DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**JOINT STATEMENT RE: MAXIMUM VACANCY RATES FOR RECREATION THERAPIST AND MEDICAL ASSISTANT POSITIONS**<br><br>Judge:   Hon. Kimberly J. Mueller |

[4252723.3]

On February 28, 2023, the Court ordered the parties to "meet and confer and file a joint statement of their respective positions on the maximum vacancy rate that should apply to recreation therapist and medical assistant classifications." 02/28/23 Order, ECF No. 7742 at 7. Pursuant to this order, the parties met and conferred on March 8, 2023 and March 13, 2023. The parties hereby submit their respective positions on the maximum vacancy rates that apply to Defendants' recreation therapist and medical assistant classifications. Additionally, Plaintiffs request clarification of one aspect of the Court's February 28 Order regarding the Court's intended scope of the forthcoming contempt proceedings laid out in that order.

## I. PLAINTIFFS' POSITION

### A. Existing Court Orders Set a Maximum Vacancy Rate of Four Percent for Recreation Therapist Positions.

The Court has signaled its intent to set the maximum vacancy rate for recreational therapists at ten percent. While Plaintiffs do not object to a ten-precent rate for the purposes of the contempt proceedings assuming the Court finds it appropriate, a preexisting court order sets the rate at or about four percent. *See* 07/26/99 Order, ECF No. 1055 at 4 (adopting Special Master recommendation that Defendants be required to fill at least 75 percent of psychiatrist positions and at least 90 percent of psychiatric social worker positions, "while keeping vacancy rates among other categories of mental health staff at present or comparable levels"); *see also* Special Master's Report on Staffing Vacancies, ECF No. 1032 at 3, 14 (May 19, 1999) (reporting four-percent vacancy rate for recreational therapists (34 of 35.5 authorized positions filled) as of April 1999).

While in 2002 Court modified its July 26, 1999 order as it related to "psychiatrists and case managers," it did not alter or withdraw in that or any other order that Plaintiffs are aware of the earlier directive requiring CDCR to maintain vacancy levels in the other clinical categories, including recreational therapists. *See* 06/13/02 Order, ECF No. 1383 at 4 (requiring Defendants to "maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent"); *see also* 03/18/22 Order, ECF No. 7504 at 4-5

(clarifying the scope of both the July 26, 1999 and June 13, 2002 orders).

This Court may well find a ten-percent maximum vacancy rate for recreational therapists should govern the forthcoming contempt proceedings. But if it does, the Court should note that threshold it is more generous than the recreational therapist fill rate required by the July 26, 1999 Order.

### B. The Court Should Adopt a Maximum Vacancy Rate of Ten Percent for Medical Assistant Positions.

Defendants' position is entirely non-responsive to this Court's order requiring the parties to inform the Court of the maximum vacancy rate that should apply to medical assistants in the forthcoming contempt proceedings. Rather than responding to the Court's directive, Defendants obfuscate the key issues.

Defendants first proposed to hire "psychiatric medical assistants" in response to a June 2014 order requiring them to "revisit and, as appropriate, revise their existing mental health staffing plan in order to resolve the ongoing problem of mental health staffing shortages and come into compliance with the requirements of this court's June 13, 2002 order (ECF No. 1383) regarding maximum mental health staff vacancy." 06/19/14 Order, ECF No. 5171 at 4. In February 2015, Defendants responded to this order by proposing to "assign each psychiatrist a psychiatric medical assistant" as one prong of a "four-prong approach" to address persistently high vacancy rates among psychiatrists. CDCR Response to Court-Ordered Staffing Review, ECF No. 5269 at 6-7 (Feb. 2, 2015). The Court ordered Defendants to implement their proposal on May 18, 2015. *See* 05/18/15 Order, ECF No. 5307 at 6.[1]

---

[1] Defendants "updated" their 2015 staffing plan in early 2017 to include "a number of new proposals" in addition to "the four original proposals" from the 2015 plan, including the medical assistant proposal. *See* Special Master's Rpt. Re: Mental Health Staffing, ECF No. 5564 at 8-9 (Feb. 6, 2017). For reasons that remain unclear to Plaintiffs, and that remain opaque in the record, Defendants at some point apparently abandoned their original plan to allocate a medical assistant to each psychiatrist. Instead, Defendants' current practice is to allocate one medical assistant position for each filled telepsychiatrist position. *See* Defs.' Dec. 2022 Monthly Staffing Vacancy Rpt., ECF No. 7717 at 5, 9

[4252723.3]

3

As originally proposed by Defendants and approved by this Court, medical assistants "remind patients of appointments, send out physician orders for labs or medication, schedule new appointments, make referrals to therapists and other physicians, meet with the patient prior to the appointment, collect relevant data, and take blood pressures and measure weights." *Id.* at 7. They also "help find treatment rooms to meet patients and schedule with correctional staff to bring a patient to the psychiatrist." *Id.* By "[r]emoving these tasks from the duty of the psychiatrist," CDCR anticipated that medical assistants would "increase productivity among its existing psychiatrist workforce, improve working conditions, increase recruitment and retention of psychiatrists, and maintain and further improve patient care." *Id.* at 7-8.

Medical assistants also play a major role in Defendant' telepsychiatry program. Under Defendants' provisionally approved telepsychiatry policy, medical assistants have primary responsibility for "telepresenting"—that is, they "present[] the patient from the originating site to the telpsychiatrist, and [are] responsible for providing clinical support and coordination." Defs.' Telepsych Policy, ECF No. 6539 at 10 (March 27, 2020). Their responsibilities in this capacity also include, but are not limited to, "reviewing the patient health record prior to the appointment and remaining with the patient during the appointment." *Id.* These tasks are critical to ensuring patients treated by remote telepsychiatrists can receive minimally adequate mental health care. Indeed, Defendants' telepsychiatry program cannot function without them. As the Special Master recently found, "the absence of medical assistants" at Mule Creek State Prison "resulted in the cancellation of all but one telepsychiatrist's appointments for an entire day." Special Master's Rpt. & Recommendation on Final Proposed Telepsych Policy, ECF No. 7682 at 79 (Dec. 15, 2022).

Defendants ignore the Special Master's findings and suggest that their refusal to fill

---

(Feb. 9, 2023) (reporting 78.81 filled telepsychiatrist positions and 79 allocated medical assistant positions—only 49 of which were filled—as of December 2022).

these court-ordered positions is harmless because "many institutions use Certified Nursing Assistants and other trained staff as telepresenters on an as needed basis." But their court-approved telepsychiatry policy expressly requires them to utilize medical assistants as telepresenters in the first instance *before* requiring it of the other job classifications – presumably because, unlike the medical assistants, those other job classifications have significant job duties beyond telepresenting. *See* ECF No. 6539 at 10. Indeed, Defendants repeatedly defend their unilateral decision to stop allocating medical assistants to on-site psychiatrists on the grounds that the only current function of the MAs they *do* allocate is to provide telepresenting services for telepsychiatrists. The fact that Defendants are willing to pull other clinical staff away from their other job responsibilities does not mean medical assistants are unnecessary. Rather, it means that Defendants are once again shortchanging other essential work to compensate for their refusal to fill the medical assistant positions that they themselves allocated for the sole purpose of facilitating their telepsychiatry program.

Given Defendants' increasing reliance on telepsychiatry and the critical role medical assistants play in facilitating telepsychiatry appointments, the Court must ensure that medical assistant positions are filled at a rate that is at least comparable to that of psychiatrists. The Court has ordered Defendants to maintain a vacancy rate for psychiatrist positions of no more than ten percent. 06/13/2002 Order, ECF No. 1383 at 4. The Court should similarly establish a maximum vacancy rate of ten percent for Defendants' medical assistant positions.

### C. Plaintiffs Request that the Court Clarify Whether PIP Positions are Included in the Forthcoming Contempt Proceedings Anticipated by the February 28 Order

In reviewing the Court's February 28 Order (ECF No. 7742), Plaintiffs noted a potential ambiguity that they request the Court resolve at the forthcoming status conference or by separate order. Specifically, it is not clear whether the Court intends to include the PIP positions listed in Defendants' monthly staffing vacancy reports in the upcoming contempt proceedings or not. While at page 2 of the February 28 Order, the

1  Court appears to count the PIP positions in the 2,395.5 mental health positions it notes
2  Defendants have allocated, as well as in its discussion of the current vacancy rates across
3  classifications, the Court does not discuss the PIP staffing plan or related orders elsewhere
4  in the order.  Plaintiffs assume that the Court does not intend to include the PIP positions
5  in the contempt proceedings at this time, but request clarification nonetheless to ensure the
6  record and Defendants' obligations are clear from the outset.

### D. Certification of Orders Reviewed

Plaintiffs' counsel certifies that he reviewed the following orders relevant to this filing:  ECF and Dkt. Nos. 1055, 1111, 1155, 1198, 1262, 1383, 1398, 5171, 5307, 5477, 5711, 7504, 7699, 7742.[2]

## II. DEFENDANTS' POSITION

The February 28 order proposes to expand, without explanation or analysis, the ten percent maximum vacancy rate applied under the June 2002 and March 2022 orders (ECF Nos. 1383 and 7504) to recreational therapists and medical assistants.  (ECF No. 7742 at 6.)  The order acknowledges that the Court has not "previously set a maximum vacancy rate for recreational therapists or medical assistants" and that it intends to extend the maximum ten percent vacancy requirement to these positions for the purpose of calculating fines imposed by the order.  (*Id.*)  The February 28 order also denies Defendants the right to respond in writing before the court issued any order concerning the imposition of sanctions and contempt, on the basis that the contempt procedures set forth in its April 19, 2017 order will provide Defendants with "ample opportunity to be heard and preclude the need for additional proceedings." (*Id.* at 3.)  Defendants present their position statement on the maximum vacancy rate for recreational therapists and medical assistants being

---

[2] Defendants cite certain additional orders in their certification, *infra*.  Plaintiffs were unable to review these additional orders because Defendants did not provide Plaintiffs with a draft of their position statement for this joint filing until 6pm on the filing deadline.  Indeed, Defendants refused to provide any information at all about their position with regard to medical assistants during the parties' meet-and-confer calls on March 8 and March 13.

1 mindful of the Court's restriction on responding to the issues raised in the February 28 order.

The February 28 order appears to be based on incorrect assumptions. Footnote 2 of the order states: "[t]he court assumes without deciding these allocations are derived from application of the staffing ratios in defendants' 2009 Staffing Plan, as modified, *see supra* note 1, to the existing population of mentally ill inmates at each level of care in CDCR's Mental Health Services." (ECF No. 7742 at 2, fn. 2.) As discussed below, the Medical Assistant classification is not part of the 2009 staffing plan and is not allocated based on the existing population of mentally ill inmates.

As explained below, Defendants do not oppose the Court's expansion of the ten percent vacancy rate to the recreational therapist classification. However, Defendants do not agree that the ten percent vacancy rate should be applied to the Medical Assistant classification.

### A.     Recreational Therapists.

The Recreational Therapist classification is part of the 2009 Staffing Plan. On Thursday, March 9, the parties met and conferred and Defendants offered to stipulate to a ten percent maximum vacancy rate for the Recreational therapist classification. Rather than accept the rate that applies to almost all mental health staff, Plaintiffs suggested the court-ordered rate is four percent.

Plaintiffs base the four percent rate on a 1999 order that adopted the following Special Master's recommendation from a May 19, 1999 report on staffing: "defendants be required to reduce . . . the vacancy rate among psychiatrists to 25 percent or less and among psych social workers to ten percent or less, **while keeping vacancy rates among other categories of mental health staff at present or comparable rates**." (ECF No. 1055 at 4 and 1032 at 2-3 and 14.) The 14 page report merely restates Defendants' current reported authorized positions and vacancies for seven classifications, focusing almost exclusively on vacancy rates that should be imposed for psychiatry and psych social worker positions. The vacancy rates reported for April 1999 included Psychologists with

20.35 vacancies (9%); Rec Therapists with 1.5 vacancies (4%); Psych Techs with 6.5 vacancies (6.6%); Nurses with 6.1 vacancies (5.8%); and Clerical with 105.25 vacancies (12.6%).

The 1999 report did not discuss the "other categories" and their reported vacancy rates or discuss the creation of five different maximum vacancy rates for the "other categories." The order adopting the report cannot logically be read to impose as maximum vacancy rates for the "other categories of mental health staff" the rates that were reported by Defendants for the month of April 1999. Plaintiffs' reading of the order would set radically different maximum vacancy rates for each category of staff without any explanation or analysis concerning why those five different vacancy rates are required for Defendants to meet their constitutional obligations to "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" *Coleman v. Wilson*, 912 F.Supp. 1282, 1306 (E.D.Cal. 1995.)

The far more logical and common sense reading of the order is that it required Defendants to maintain vacancies for the classifications discussed in the Special Master's report at or under the "ten percent" maximum rate expressly stated in the order. This reading is consistent with the Court's prior orders on the subject. Plaintiffs' request for a four percent maximum vacancy rate should be rejected.

**B.  Medical Assistants.**

Defendants urge this Court to refrain from imposing a set maximum vacancy rate for the Medical Assistant classification. Medical Assistants in the Statewide Mental Health Program are almost exclusively used for a single purpose: as telepresenters for the telepsychiatry program. They are not allocated for on-site psychiatrists, and they are just one possible classification that may be used for telepresenting; other classifications from the policy include "certified nursing assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, social worker, psychologist, psychiatrist, or physician." They are not allocated on a patient-to-clinician

ratio like positions that are part of the 2009 Staffing Plan. When a particular type of telepresenters such as a Medical Assistant is not available to provide telepresenter services, the institution wthat needs a telepsychiatry contact will often use an alternative qualified staff to provide those services, or the telepsychiatrist may be briefly reassigned to another location where other telepresenters are available. This means that a Medical Assistant vacancy does not necessarily equate to an inability to provide access to care and such vacancies do not necessarily indicate that there are insufficient telepresenters available for telepsychiatric contacts.

Similarly, a filled Medical Assistant position does not automatically signify that they are being utilized for a telepsychiatrist. A Medical Assistant allocation may be given to an institution where a telepsychiatrist is needed and assigned. Later, an on-site psychiatrist may become available, reducing the need for telepsychiatry and allowing that telepsychiatrist to be reassigned to another institution. However, if that Medical Assistant was hired into a permanent position, their state employment cannot simply be terminated. This is one of many reasons a Medical Assistant may not be assigned to a telepsychiatrist on a temporary assignment and why CDCR needs to use other classifications as telepresenters.

Defendants propose that the fill rate for psychiatrists be measured directly as it is currently measured, to ensure there are enough staff to provide care for the patients. If the goal of measuring the Medical Assistant fill rate is to ensure that telepsychiatrists are able to see patients, then any lapse would be captured by clinical care indicators such as "timely MHMD visits," "MHMD consults," and other specific duties of the telepsychiatrist.

Plaintiffs take the position that Defendants' staffing plan for Medical Assistants was ordered in 2015 when the Court approved Defendants' proposals to improve staffing and that a Medical Assistant should be allocated for every psychiatrist in the Statewide Mental Health Program. However, the 2015 proposal was never fully implemented. Over time, as Defendants expanded the telepsychiatry program, Defendants' use of Medical Assistants transitioned to telepresenting only. This is reflected in the bi-annual staffing allocations,

which show the current and unopposed use of the Medical Assistant classification for this purpose.

### 1. The 2015 Medical Assistant Proposal Evolved over the last Seven Years into the Current Medical Assistant Classification.

In 2014, the Court ordered Defendants to review their existing mental health staffing plan and to report to the court the results of the review. (ECF No. 5171 and ECF No. 5210.) Defendants filed their report on February 2, 2015. (ECF No. 5269.) CDCR developed a four-prong approach to address staffing deficiencies, including the creation of a Psychiatric Medical Assistant (PMA) classification to increase retention of staff psychiatrists by relieving psychiatrists of clerical tasks that have become part of their job duties. (ECF No. 5269 at 6-8.) These positions were proposed even before a civil servant classification had been established. (Id.) The goal of the proposal was to assign unlicensed staff to perform non-clinical tasks so that the psychiatrists could focus on patient care. *Id.* In turn, CDCR hoped this would help with psychiatrist retention. On May 18, 2015, the Court ordered Defendants to "move forward with the proposals contained in the report." (ECF No. 5307 at 6.)

Although the Psychiatric Medical Assistant proposal was approved, it was only partially implemented. The parties and the Special Master participated in workgroups from 2016 through 2018 on staffing initiatives to help address staffing deficiencies, particularly focused on increasing psychiatry fill rates. (ECF No. 6695 at 8-9.)

On January 10, 2017, Defendants submitted to the Special Master CDCR's Updated Staffing Plan that identified the Medical Assistant Plan as a "court-approved" initiative. (*See* 2017 Updated Staffing Plan, ECF No. 5564 at 39-40.) The Special Master reviewed and filed a report on the staffing update, approving the Medical Assistant proposal and recommending its immediate implementation with quarterly report to the Special Master. (ECF No. 5564 at 8.) Nine months later the Court issued its order adopting the Special Master's recommendation and adding that "Defendants shall report to the Special Master at such regular intervals as he may set on the implementation of their staffing plan

proposals related to medical assistants . . . and Defendants and the Special Master shall meet and confer not less than every 90 days for the next year, including plaintiffs as appropriate, to discuss the status of defendants' progress toward compliance with this order." (ECF No. 5771 at 29.)

Based on the mandate for compliance under the 2017 order, CDCR proposed a new set of initiatives to address compliance with the 2009 staffing plan. (ECF No. 5850 at 2-3.) The parties met in workgroups with the Special Master to achieve this until October 2018, when the Golding report was issued and the staffing proposals were rejected by the Plaintiffs. (ECF No. 6695 at 8-9.) Defendants nonetheless continued to explore ways to address staffing deficiencies, including the expansion of its telepsychiatry program. In 2020, the Court approved the parties' stipulation for the provisional telepsychiatry policy. (ECF No. 6539.) The provisional policy details the classifications that institutions may use as telepresenters: "Tele-presenters shall be assigned from position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, social worker, psychologist, psychiatrist, or physician." (ECF No. 6539 at 10.)

In 2021, as part of its plan to expand the use of telepsychiatry, CDCR issued a Budget Change Proposal for the 2020-2021 Governor's Budget.[3] The BCP describes Medical Assistants as "as a key component to telepsychiatry" and funded permanent Medical Assistant positions. (Thorn Decl., Exhibit A at A-5 and A-6.)

///

---

[3] The BCP for Expansion of Statewide Telepsychiatry Program (ca.gov) was downloaded from the Department of Finance's website at https://esd.dof.ca.gov/Documents/bcp/2021/FY2021_ORG5225_BCP3337.pdf, (last accessed on March 14, 2023) and a copy is attached as Exhibit A to the Declaration of Elise Owens Thorn in Support of Defendants' Position Statement on the Maximum Vacancy Rates for Recreational Therapists and Medical Assistants filed contemporaneously herewith (Thorn Decl.) for the Court's convenience.

2. **The Plaintiffs and the Special Master were aware of the Evolution of the Medical Assistant classification and its current allocations.**

In addition to the BCP for expansion of the telepsychiatry program, the Special Master's monitoring reports indicate full awareness that CDCR was using both Medical Assistants and other trained staff to act as telepresenters for telepsychiatrists.

The Special Master's monitoring reports indicate that he monitored CDCR's use of Medical Assistants at institutions for his 26th, 27th, 28th, and 29th rounds. (*See* Twenty-Sixth Round Report, ECF No. 5439 at 27, 29-30, 247 and 331; Twenty-Seventh Round Report, ECF No. 5779 at 44, 154, 229, 299, 347, and 450; Twenty-Eighth Round Report, ECF No. 7074 at 343, 375, 380, 396, 411, 452, 476, 500, 539, 632, 647, 672, 699, 708, 743, 752, 755, 780, 790, 799, and 808; and Twenty-Ninth Round Report, Part C, ECF No. 7715 at 96, 212, 238, 250, 274, 372, 405, 407, 422, 469, 470, 507, 579, 620, 652, 653, 654, 671, 672, and 884; and Twenty-Ninth Round Report, Part D, ECF No. 7716 at 176, 261, 283, and 320.)

Defendants have also shared with Plaintiffs the methodology used to allocate the Medical Assistant positions. The Medical Assistant allocation is based on telepsychiatry needs, not on a patient census. (*See* July 2022 Statewide Mental Health Program Position Allocation, attached as Exhibit B to the Thorn Declaration.) This allocation method distinguishes the Medical Assistant classification from the other classifications that were developed and implemented as part of the 2009 staffing plan. As the February 28 order states: "[t]he number of mental health staff required by the 2009 Staffing Plan is derived from ratios "expressed as one mental health staff person per x number of inmate patients." ECF No. 5711 at 3 (citing ECF No. 3693 at 12-33). But the Medical Assistant classification is based on telepsychiatry need, not on the number of patients. Again, Defendants have been fully transparent in their use of this methodology for allocating Medical Assistants. But the Special Master has not commented on this distinction or provided Defendants with any rationale he may have provided to the Court concerning Medical Assistant allocations.

### 3. Operational differences permitted by the use of other staff as telepresenters tips the scale against setting a set maximum vacancy rate for Medical Assistants.

Many institutions use Certified Nursing Assistants and other trained staff as telepresenters on an as needed basis. (ECF No. 6539.) This is done so that patients who are seen by telepsychiatrists can have access to care when they need it. Both Parts C and D of the Twenty-Ninth Round Report contain reporting on the use of alternative staff to assist telepsychiatrists when a Medical Assistant was not available or not on staff. (*See* Part C, ECF No. 7715 at 405 and 507 (VSP and RJD used specially trained CNAs to telepresent; and Twenty-Ninth Round Report, Part D, ECF No. 7716 at 261, 283, and 320.) Thus, simply looking at Medical Assistant vacancy rates cannot inform whether their key function—telepresenting—is adequately staffed.

In light of this history and the evolution of how CDCR uses the Medical Assistant classification, it is clear that a set vacancy rate of 10% is not appropriate for this specific classification. Because Medical Assistants were not part of the 2009 Staffing Plan and because their allocation—unlike that of other positions—is not based upon patient-to-clinician ratios, Defendants respectfully request that they be afforded additional time to develop a Medical Assistant staffing plan and allocation that comports with the focus of their current duties, including an appropriate maximum vacancy rate. Defendants would present this plan to the Special Master and Plaintiffs, and then submit it to the Court for approval.

### C. Certification of Orders Reviewed.

Defendants' counsel certifies that she reviewed the following orders relevant to this filing: ECF Nos. 614, 1055, 1111, 1155, 1198, 1262, 1383, 1398, 3693, 5171, 5210, 5307, 5477, 5711, 6539, 7504, 7699, and 7742.

| | | |
|---|---|---|
| 1 | DATED: March 14, 2023 | ROSEN BIEN GALVAN & GRUNFELD LLP |
| 2 | | |
| 3 | | By: */s/ Lisa Ells* |
| 4 | | Lisa Ells |
| 5 | | Attorneys for Plaintiffs |

DATED: March 14, 2023

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General

By: */s/ Elise Owens Thorn*
Elise Owens Thorn
Deputy Attorney General

Attorneys for Defendants