DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION IN RESPONSE TO DECEMBER 29, 2022 ORDER REGARDING DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF No. 7721)**<br><br>Judge: Hon. Kimberly J. Mueller |

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

I. ABSENT A CLARIFYING ORDER REGARDING THE PURPOSE AND SCOPE OF DATA REMEDIATION, THE PARTIES WILL REMAIN ENSNARED IN A CYCLE OF DISPUTES .............................................................. 1

II. THE ADDITIONS DEFENDANTS SEEK TO INCLUDE IN ANY FUTURE CLARIFICATION ORDER ARE IMPROPER, UNNECESSARY, AND UNWORKABLE ................................................................................................ 5

II. DEFENDANTS' CHERRYPICKED STAFF DECLARATIONS DO NOT OBVIATE THE NEED FOR CDCR LEADERSHIP TO EXPLAIN THEIR ACCOUNTABILITY EFFORTS IN OPEN COURT ............................................... 7

III. DEFENDANTS DO NOT DENY THAT CDCR FAILED (AGAIN) TO PROVIDE DR. GOLDING ADVANCE NOTICE OF STAFFING PROPOSALS, OR CONFLICTING INSTRUCTIONS REGARDING HIS PARTICIPATION IN DATA MEETINGS ............................................................. 10

CONCLUSION .................................................................................................................... 10

CERTIFICATION OF ORDERS REVIEWED .................................................................. 11

# INTRODUCTION

The Court has broad authority to issue the relief Plaintiffs seek. Defendants' Opposition only bolsters the need for clarification of this Court's prior orders.

## I. ABSENT A CLARIFYING ORDER REGARDING THE PURPOSE AND SCOPE OF DATA REMEDIATION, THE PARTIES WILL REMAIN ENSNARED IN A CYCLE OF DISPUTES

Defendants argue, for the first time, that they "do not disagree that data measures should comport with remedial requirements." ECF No. 7752 at 14. But this admission rings hollow, as they do not dispute that CDCR Employee 1 (a member of senior leadership intimately involved in data remediation) told Dr. Golding that the purpose of data remediation would require validating whether CDCR was correctly counting "the number of cars in a parking lot" if that is what CDCR designed the indicator to measure. Defendants claim that the real dispute is over "the breadth and scope of the 'remedial requirements.'" *Id.* The notion that Defendants do not understand or agree with the remedy is absurd and alarming—as the Court itself has repeatedly observed. *See* July 1, 2021 Order, ECF No. 7216 at 6; Sept. 3, 2020 Order, ECF No. 6846 at 18. "The parties' divergent understandings of the purpose of remediating CDCR's indicators have ensnared them in a cycle of data-related disputes." Special Master's Report Re: Third Level Data Disputes (hereafter "Third Level Report"), ECF No. 7755 at 32. An order clarifying and reaffirming that Defendants' data indicators must align with the Program Guide and other court-ordered requirements, as well as the Special Master's historical way of monitoring those requirements absent agreement otherwise, is necessary to resolve this dispute.

Defendants' assertion that Plaintiffs disagree which indicators are key, *see* ECF No. 7752 at 14, is unsupported. The key indicators currently undergoing remediation are the ones the Court provisionally approved, and the Special Master will submit his final list "at the conclusion of the data remediation project." *See* Jan. 4, 2023 Order, ECF No. 7695 at 2; July 1, 2021 Order, ECF No. 7216 at 14. Nothing in Plaintiffs' Motion disagrees with these orders. Defendants also argue that "many of the indicators that the Special Master or Plaintiffs may designate as 'key indicators' do not in fact measure constitutionally-

mandated requirements." ECF No. 7752 at 17. But Plaintiffs do not designate indicators as "key"—only the Court, based on the Special Master's recommendations, retains that authority. More importantly, the Court should not tolerate Defendants' attempt to relitigate this well-settled issue. In 2020, the Court firmly rejected Defendants' argument that "it is critical that those CQIT indicators that measure compliance with constitutionally-mandated functions are identified and distinguishable from those that do not carry such import," holding Defendants' "contentions misperceive the remedial function of the quality improvement process and CQIT." Dec. 17, 2020 Order, ECF No. 6996 at 5. When Defendants raised this argument again in 2021, the Court held:

> Defendants also contend "not all of the specific Program Guide, Compendium, or court-ordered requirements that may be tracked by an indicator reflect a constitutional requirement" and that "CDCR could provide constitutionally adequate mental healthcare irrespective of its performance on several indicators." ECF No. 7197 at 6. This argument is at odds with defendants' long-standing recognition that "'[t]he program guide is the remedial plan designed to get the State up to a constitutional level of care . . . .'" ECF No. 4539 at 30 n.30 (quoting RT, ECF No. 4538, at 27:5-7). If this is yet another attempt by defendants to relitigate a long-standing, foundational finding of this court, it is deeply disappointing. The court's finding has guided remediation in this action for years and been expressly confirmed by the United States Court of Appeals for the Ninth Circuit: "the Program Guide sets out the objective standards that the Constitution requires" for the delivery of adequate mental health care to members of the plaintiff class. *Coleman v. Brown*, 756 Fed. Appx. at 679; *see also* ECF No. 4539 at 30 n.30 (denying defendants' termination motion, noting "the degree to which defendants are complying with the Revised Program Guide is an appropriate way to assess whether defendants are meeting their constitutional obligations."). More narrowly, defendants' argument here either ignores or betrays a fundamental misunderstanding of the court's extended discussion in its December 17, 2020 order, referenced above. Relitigation of these issues in the guise of an objection is improper; any such objection is disregarded.

July 1, 2021 Order, ECF No. 7216 at 12-13. Defendants' attempt to revisit this issue in their Opposition (ECF No. 7752 at 17), is astonishing and betrays the same willful blindness—if not outright defiance—that required data remediation in the first place.

Defendants strive to cast doubt on the necessity of Plaintiffs' requested relief to resolve two other disputes plaguing this process: "(2) whether the underlying business rule ensures that indicators properly measure the Program Guide; and (3) whether certain proposed changes are reasonable modifications … [or] requests for entirely new

indicators." *See id.* at 14.  However, resolution of both issues requires clarification from the Court as to the purpose of this project.  First, while it is correct that disputes about individual indicators must "be resolved on an indicator-by-indicator basis in BRMR, or through the dispute resolution agreement," *id.*, those discussions must be guided by a common understanding of the purpose of data remediation.  Anything else is an exercise in futility.  Second, Defendants' narrow-minded view of data remediation emboldens them to reject proposed modifications to indicators, even when reasonable.  This further delays the process and leads to disputes.  As the Special Master recently observed:

> If passengers in a car have different destinations in mind, it is not surprising that they would come to divergent conclusions as to the most efficient route to take.  Similarly with respect to data remediation: divergent views about the core purpose of the endeavor regularly bubble to the surface.  These persistent distractions from the task at hand—completion of data remediation by the end of this year at the latest—call out for guidance from the Court.

Third Level Report, ECF No. 7755 at 3.

      Contrary to Defendants' assertions, Plaintiffs' requested relief would not allow Plaintiffs to bypass the May 2022 Dispute Resolution Process.  *See* ECF No. 7752 at 14.  It would, however, make the process more efficient by limiting Defendants' basis for rejecting proposed changes, and encouraging them to exercise "a reasonable degree of flexibility."  *See* Third Level Report, ECF No. 7755 at 33.  "Defendants' resistance to making reasonable modifications to the provisionally approved indicators has delayed data remediation at virtually every step of the process …."  *Id.*  For example, Defendants' proposed methodology for the *CCII, Captain and Warden Reviews of ASU EOP Hub Patients with LOS Over 90 Days* (RH18) indicator counted as compliant segregation length of stay reviews that took place within up to forty days of the prior review, despite that the Program Guide explicitly requires the reviews to occur at least every thirty days.  *See* Decl. of Cara E. Trapani In Supp. of Pls.' Reply, filed concurrently herewith (hereafter "Trapani Reply Decl."), ¶ 2; 2021 Program Guide, ECF No. 7333-1 at 134.  Rather than admit this mismatch and correct it, Defendants insisted on elevating this dispute to the first level of dispute resolution.  *Id.* ¶ 3.  Defendants ultimately revised the indicator to operationalize

1   the Program Guide's explicit thirty-day timeline, but much time was wasted.  *Id.*

2          Similarly, the *ASU & PSU Out of Cell Time Offered (RH12)* and *ASU & PSU

3   Shower Access (RH14)* indicators[1] initially excluded patients in the Psychiatric Services

4   Unit (PSU), despite that PSU patients are class members, the requirements clearly apply to

5   them, and the Special Master regularly monitors these units.  *Id.* ¶ 4.  This dispute was

6   elevated through the first and second levels of dispute resolution before the former

7   Secretary and the Special Master reached agreement that the PSU population should be

8   included in these indicators.  *Id.* ¶ 5.  Although the parties successfully resolved the

9   aforementioned disputes, significant time and effort would have been saved if Defendants

10  agreed that the purpose of the data remediation process is to ensure provision of accurate

11  data regarding Defendants' compliance with the remedial requirements in this case, not

12  merely to confirm that Defendants' indicators measure what they "purport" to measure.

13         To be clear, Plaintiffs understand and agree that the data remediation process is not

14  an excuse the rewrite CQIT or turn "every line of the Program Guide … into a key

15  indicator."  *See* ECF No. 7752 at 17.  At the same time, the Court's prior orders are clear

16  that "the data reports produced to support defendants' provision of constitutionally

17  adequate mental health care [must] accurately measure the remedial requirements for this

18  action."  Dec. 17, 2019 Order, ECF No. 6427 at 30.  Clarification is required, however,

19  because Defendants confuse these concepts as mutually exclusive.  They are not.  It can

20  simultaneously be true that a finite number of indicators represent "the material provisions

21  of the court-ordered remedy in this case," *see* Feb. 7, 2022 Order, ECF No. 7456 at 3, *and*

22  that Defendants' pre-existing indicators on the provisionally approved key indicator list

23  (which were based on business rules that neither the Special Master nor Plaintiffs had any

24  hand in developing, much less with the assistance of a data expert) may require reasonable

25  modifications to ensure they accurately measure Defendants' compliance with material

---

[1] The original titles on the provisionally approved key indicator list were *ASU Out of Cell Time Offered (RH12)* and *Weeks in which Shower Access in ASU was Offered as Required (RH14)*.  *See* Special Master's CQIT Key Indicators Report, ECF No. 7151 at 24.

1  remedial obligations.[2]  The fact that Defendants may have internally identified and
2  corrected some of the data errors described in the Second Golding Report, *see* ECF
3  No. 7752 at 19-22, does not obviate the need for a clarifying order.  Plaintiffs' requested
4  relief, which this Court has broad authority to issue, will provide much-needed guidance to
5  the parties as they endeavor to complete this project by the December 2023 deadline.

## II. THE ADDITIONS DEFENDANTS SEEK TO INCLUDE IN ANY FUTURE CLARIFICATION ORDER ARE IMPROPER, UNNECESSARY, AND UNWORKABLE

While eliding the clear, ripe dispute regarding the appropriate definition of "validation" within the context of this Court's data remediation orders, Defendants' Opposition inexplicably requests affirmative relief in violation of this Court's express prohibition on such end-runs around the litigation process.  Dec. 24, 2020 Order, ECF No. 7003 at 2; *see also* ECF No. 7752 at 23-26.  The Court need not order the Special Master to define data "remediation" and "certification" because the Special Master's proposed Data Remediation and Data System Certification document defining these terms is pending.[3]  *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C (hereafter "29th Round Report – Part C"), ECF No. 7715 at 46-47.  For the same reasons that the Court will wait to confirm the degree of compliance for each indicator until a later date (*see* Feb. 7, 2022 Order, ECF No. 7456 at 2-3), it is appropriate to allow the Special Master sufficient time to fully develop these definitions, especially since they are not

---

[2] Defendants assert they are "willing to consider proposed new indicators" (ECF No. 7752 at 17), but every time Plaintiffs broach this subject, Defendants refuse to engage.  While the Special Master determined that two of Plaintiffs' requested revisions should be considered as requests for new indicators (Third Level Report, ECF No. 7755 at 2 n.1), he found that four others now before the Court "do not center on requests for policy modifications, new policies, or new indicators." *Id.* at 32.

[3] Defendants conveniently omit that they rejected the Special Master's proposed definitions.  *See* 29th Round Report – Part C, ECF No. 7715 at 46-47.  After expending countless hours answering Defendants' questions and responding to their concerns in numerous all-parties data meetings from July through October 2022, it was reasonable for the Special Master to move forward and refocus the parties on the critical task at hand—completing review of and resolving disputes for all indicators on the provisionally approved key indicator list.

holding up the process. More importantly, "[t]he Special Master and his data team have spent considerable time and effort over the last two years explaining precisely and in plain language what is required of defendants to remediate CDCR's mental health data systems." 29th Round Report – Part C, ECF No. 7715 at 47. The Special Master has repeatedly described his plan to treat data remediation as he would any other monitoring obligation, with detailed, timely oral feedback provided on an interim basis followed by a formal written report at the end of the process. *See, e.g.*, Pls.' Resp. to Defs.' Updated Data Activation Schedule, ECF No. 7528 at 15-16 (describing in detail the Special Master's stated plan). This is a logical and appropriate use of the Special Master's resources so he can focus on monitoring patient care, which remains woefully inadequate.

The Court should also decline Defendants' request for the Special Master's "guidebook, business rules, [and] sample-size methodology." *See* ECF No. 7752 at 25. In the early stages of data remediation, Defendants repeatedly complained (but vaguely and without substantiation) that the Special Master's refusal to provide written comments and end-to-end feedback on their CQI Guidebook was the primary driver of delay. *See, e.g.*, Defs.' Updated Data Activation Schedule, ECF No. 7523-1 at 10. Now that it is well-established that Plaintiffs and the Special Master were right to examine the Guidebook together with the data elements into which the Guidebook instructions and audit questions feed, Defendants have dropped that dispute. This replacement complaint, overtly made in furtherance of Defendants' litigation strategy, is nothing more than "a fishing expedition" and should be rejected. *See* 29th Round Report – Part C, ECF No. 7715 at 25 n.7. The Special Master is not an adversarial party from whom Defendants are entitled to discovery, but an arm of this Court. Next, Defendants will be demanding copies of bench memoranda or draft opinions in the guise of "simply want[ing] transparency and the ability to fully understand the findings and conclusions" of the Court itself. *See* ECF No. 7752 at 25.

It is unnecessary for the Court to repeat that the data remediation project should not be resolving policy disputes. Despite Defendants' repeated complaint that data remediation has become an "overhaul of long-established and court-approved policies,"

ECF No. 7752 at 26, their Opposition fails to cite a single policy that Plaintiffs have unilaterally or improperly sought to revise. In fact, the few times Defendants have been willing to discuss a potential policy change using the agreed-upon "parallel track" (*see* Dispute Resolution Process, ECF No. 7556-2 at 2), Plaintiffs have agreed to their requested changes. *See, e.g.*, Cartwright Decl., ECF No. 7752-1 ¶ 19:15-20. In other cases, Plaintiffs discovered through BRMR that CDCR's existing work processes ignore or conflict with the Program Guide, and Defendants agreed to revise their workflows. *See, e.g.*, Trapani Reply Decl. ¶¶ 2-3. Correcting those errors does not "overhaul" the remedy in this case, rather, it helps to ensure it is carried out, to the benefit of the *Coleman* class.

Defendants' demand that the Court order Plaintiffs to defer to "CDCR's reasonable interpretation of its own policies" is outrageous. *See* ECF No. 7752 at 26. As an initial matter, Defendants' request betrays a fundamental misunderstanding that "the process must account for the fact that defendants' bedrock obligation is defined in the Program Guide and court orders, *not the wording of their existing policy*." Third Level Report, ECF No. 7755 at 9 n.8 (emphasis added). More importantly, Defendants' request evidences their staunch and continued denial of the circumstances giving rise to this process—that Defendants "evinced faulty interpretations of court-ordered remedial requirements." *Id.* at 9. As the Special Master has stated, "[t]o ignore the circumstances giving rise to the need for data remediation in the first place would sow the seeds for the next round of problems …." *Id.* at 10. Defendants' requests for affirmative orders in the guise of opposing Plaintiffs' Motion are prohibited by this Court's December 24, 2020 order, as well as misguided and unwarranted on the merits. They should be dismissed out of hand.

### II. DEFENDANTS' CHERRYPICKED STAFF DECLARATIONS DO NOT OBVIATE THE NEED FOR CDCR LEADERSHIP TO EXPLAIN THEIR ACCOUNTABILITY EFFORTS IN OPEN COURT

Defendants downplay Dr. Golding's allegations regarding CDCR's culture, and accuse Plaintiffs of "extrapolat[ing] [his] perceptions … to the entirety of the Mental Health leadership team." ECF No. 7752 at 7. Defendants' framing of these issues as based solely on "one employee's statements" is inaccurate. *Id.* The Second Golding

1  Report and Plaintiffs' Motion incorporate evidence by Defendants' own principals in the
2  form of emails, and a letter from the Special Master documenting the collective
3  observations of multiple members of his staff who witnessed the denigrating statements
4  made by Deputy Director Mehta and former Secretary Allison at CDCR's November 16,
5  2022 Mental Health Leadership Conference.  Defendants ignore (again) that the Court
6  found Dr. Golding credible, choosing instead to write off his concerns as those of a
7  disgruntled employee.  This alone warrants a clarifying order.

8  Defendants try to explain away the evidence in Plaintiffs' Motion as mere
9  "disagreements between and among medical professionals." *Id.* at 7.  But there is no world
10  in which statements made by CDCR's top official praising its Deputy Director for battling
11  the Special Master—including by gloating to a crowd of hundreds of CDCR employees,
12  "He's taking their lunch money! … And he *wins* too!" (which Defendants do not deny)—
13  are indicative of a professional, clinically-based disagreement.  Dr. Toche, to her credit,
14  takes some responsibility for the disparaging statements made at the meeting.  *See* Toche
15  Decl., ECF No. 7752-4 ¶¶ 6, 9.  CDCR's other eight declarants do not even acknowledge
16  the former Secretary and Deputy Director's disdainful comments, even though most if not
17  all were likely in attendance.  Indeed, the Deputy Director brushes off his own statements
18  at CDCR's Mental Health Leadership Conference as unintentionally offensive, though he
19  does not deny making them.  Mehta Decl., ECF No. 7752-2 ¶ 5.  As the Special Master
20  expressed, "the cavalier approach to the remedy in this case and apparent disregard for the
21  *Coleman* Court and its orders displayed during these presentations is of utmost concern."
22  ECF No. 7721-1 at 6.  Defendants' claim that "Plaintiffs misinterpret comments made at
23  one meeting" is not credible.  ECF No. 7752 at 11.  CDCR leadership's words,
24  summarized by the Special Master based on his team's direct observations and uncontested
25  by Defendants, speak for themselves.  *See* Trapani Decl., ECF No. 7721-1, Ex. A at 5-6
26  (Special Master's Dec. 8, 2022 letter to former Secretary).

27  Defendants point to CDCR's decision to disseminate the call-in information for
28  court proceedings as evidence that they understand the importance of the Court's orders.

ECF No. 7752 at 10. While this is a positive step, it does not square with their decision to chastise Dr. Golding for circulating a transcript of the Court's 2019 bench order to headquarters staff—a fact Defendants do not deny. It is also telling that Defendants failed to develop or disseminate the training they promised in the wake of the first Golding proceeding on the importance of the *Coleman* case until Plaintiffs identified the unfulfilled obligation and demanded completion. *See* Feb. 27, 2023 Order, ECF No. 7740 at 5.

Given Defendants' recent "scorched-earth litigation strategy," Jan. 6, 2023 Order, ECF No. 7699 at 3, it is heartening that Defendants believe in the parties' (and the Court's and Special Master's) "shared goal of doing what is best for patient care, including compliance with court-ordered mandates." ECF No. 7752 at 9. That said, for the same reasons it was critical for the Court to hear directly from CDCR's leadership in 2019, it is necessary now to ensure accountability. In fact, it was Defendants who asked the Court to add Dr. Toche to the witness list for the 2019 evidentiary proceedings because "Dr. Toche is in the best position to know how remedial efforts concerning any inaccurate data reporting are being implemented by CDCR." Defs.' Trial Brief, ECF No. 6304 at 2. In her instant declaration, Dr. Toche described the efforts she has made to adhere to the commitments from her 2020 declaration (ECF No. 6451-1). *See* Toche Decl., ECF No. 7752-4 ¶¶ 7-8; *see also* ECF No. 7752 at 10 (summarizing same). There is no harm to Defendants—and much to gain—by requiring Dr. Toche (and/or Secretary Macomber) to appear in court and explain precisely how these efforts have advanced the goal of "reiterat[ing] to CDCR's employees that they have an ongoing constitutional obligation to provide mental health care to patients and the importance of the Court's remedial orders, the Special Master monitoring, the Program Guide, and CDCR mental health policies to meet that obligation," and to ensure accountability. 2020 Toche Decl., ECF No. 6451-1 ¶¶ 4, 9. Given the deeply upsetting and dismissive statements from CDCR leadership recently, such action is necessary to hopefully chart a more collaborative and respectful path forward.

/ / /

/ / /

## III. DEFENDANTS DO NOT DENY THAT CDCR FAILED (AGAIN) TO PROVIDE DR. GOLDING ADVANCE NOTICE OF STAFFING PROPOSALS, OR CONFLICTING INSTRUCTIONS REGARDING HIS PARTICIPATION IN DATA MEETINGS

Defendants do not contest that CDCR failed to provide Dr. Golding—or *any* clinical headquarters or regional psychiatrist—advance notice of CDCR's September 8, 2020 staffing proposal, or the 2022 telepsychiatry policy proposal that was ultimately filed with the Court, which is eerily reminiscent of CDCR's "significant lack of good judgment and bureaucratic dysfunction" in 2019. *See* Dec. 17, 2019 Order, ECF No. 6427 at 43. Moreover, Defendants' assertion that "[h]eadquarters and regional psychiatrists are also provided with shared information on which to comment with as much advance notice as any other mental health staff member," ECF No. 7752 at 13, raises the question whether *any* mental health staff beyond the top-level administrators and CDCR lawyers receive advance warning or written materials before policies and data positions are finalized. This is indicative of a broken system, and justifies a clarifying order.

Nor do Defendants dispute that Dr. Golding received conflicting instructions regarding his participation in the Business Rule and Methodology Review (BRMR) meetings. Including psychiatrists on meeting invitations (*see* ECF No. 7752 at 12) is not equivalent to allowing them to meaningfully participate. Even after reviewing Defendants' filing, it is unclear if Dr. Golding may raise concerns about Defendants' data in BRMR meetings without fear of retaliation. An order clarifying and reaffirming that Defendants must consult clinical headquarters and regional psychiatrists (as opposed to psychiatrists serving in administrative roles not on the clinical psychiatry leadership team, such as the Deputy Director) on data indicators and policies that implicate psychiatry, including but not limited to Dr. Golding so long as he remains employed as a headquarters psychiatrist, is necessary to answer this question.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' requested relief. *See* ECF No. 7721 at 21.

**CERTIFICATION OF ORDERS REVIEWED**

Plaintiffs' counsel certifies that she reviewed the following orders relevant to this filing: ECF Nos. 7765, 7740, 7699, 7695, 7456, 7216, 7003, 6996, 6846, 6427.

DATED: March 17, 2023

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: /s/ Cara E. Trapani
Cara E. Trapani

Attorneys for Plaintiffs