Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
Hanson Bridgett LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                              Plaintiffs,<br><br>          v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                              Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF EDWARD KAFTARIAN, M.D. IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL DECLARATION OF PABLO STEWART(ECF No. 7739)** |

**DECLARATION OF EDWARD KAFTARIAN**

I, Edward Kaftarian, declare as follows:

1.      I am a psychiatrist licensed to practice medicine in the States of California, Hawaii, New York, Texas, and Utah.  I am board certified in General Psychiatry, Forensic Psychiatry, and Addiction Medicine.  I am an expert in correctional psychiatry and telepsychiatry.

**INTRODUCTION**

2.      I am familiar with the "Resource Document on Telepsychiatry for Adults in Jails and Prisons" [THE RESOURCE DOCUMENT], dated February 2023.  Due to my direct expertise in the subject matter, I was invited to be part of the writing committee for the Resource Document.  However, I ultimately asked the committee to remove my name as coauthor due to my concerns that the Resource Document had reached inaccurate conclusions.  Specifically, I was concerned that the Resource Document alleged, without citing sufficient evidence, that telepsychiatry is inferior to in-person care for acute levels of care.  I also felt that the Resource Document set forth unrealistic guidelines about site visits which were not consistent with the standard of care and the common practice of telepsychiatry nationwide.

3.      I have also reviewed the Supplemental Declaration of Dr. Pablo Stewart, dated February 24, 2023.  I am providing an expert opinion why I believe Dr. Stewart overvalues the Resource Document and draws antiquated conclusions from it.

**QUALIFICATIONS**

4.      My name is Edward Kaftarian, M.D.. I am the Founder and Executive Chairman of Orbit Health, a company that provides telepsychiatry and teletherapy services to institutions, including correctional facilities, inpatient hospitals, outpatient clinics, and crisis stabilization units.  In addition to my role as Executive Chairman of Orbit Health, I am currently a practicing psychiatrist and forensic psychiatrist.

5.      I completed my psychiatric residency training at Johns Hopkins University in 2007 and my Forensic Psychiatry fellowship with UC Davis in 2008.

19453475.1

6.      I have vast experience in correctional psychiatry and telepsychiatry.  Throughout my career, I have served in a variety of executive level roles for the California prison system, including Chief Psychiatrist, Senior Psychiatrist, Medical Director and Director of Pharmacy.

7.      I have helped build, staff, and manage correctional mental health programs and treatment centers.   For example, I helped design and develop the San Quentin State Prison Correctional Treatment Center Program and served as its Medical Director.   I also served as Chief Psychiatrist for Richard J Donovan Correctional Facility, a large prison that houses varied and complex mental health cases, including maximum security inmates and Sensitive Needs Yard (SNY) inmates.

8.      Much of my career, I have been responsible for developing and updating healthcare policies.  I have also been responsible for recruiting, hiring, training, and supervising a wide variety of correctional health staff, including psychiatrists, psychologists, nurses, psychiatric technicians, medical assistants, and administrators.  As a representative for California Correctional Healthcare Services, I have served alongside Federal Court monitors on quality improvement audits for prisons throughout California.  In each of my roles in CDCR, I was guided by data, ensuring that each program I oversaw was following Coleman mandates.

9.      For several years, I served as Statewide Chief of Telepsychiatry for the California prison system.  I first became involved in telepsychiatry around the year 2010, while serving on a special assignment in CDCR Headquarters.  It was at that time when I proposed to headquarters and Special Master representatives, a statewide expansion of the telepsychiatry program.  My proposal was accepted, and I established the first telepsychiatry satellite office outside of CDCR Headquarters, located at San Quentin State Prison.  In the following years, I lead the further expansion of telepsychiatry satellite offices.

10.      Under my leadership, the program transformed into one of the largest correctional telepsychiatry programs in the world.  I led the development of telepsychiatry programs for CDCR patients in all levels of care.   I am the author of the statewide Telepsychiatry policies and procedures.  With two regional Senior Psychiatrist Supervisors reporting to me, I oversaw the onboarding, training, and supervision of the telepsychiatrists.

11.     I also launched several telepsychiatry based programs such as the Night Shift Telepsychiatry program, telepsychiatry for Department of State Hospitals (DSH) patients residing in CDCR facilities, as well as a Medication Assisted Treatment (MAT) telepsychiatry program for patients with substance use disorders.  Throughout my tenure as Chief of Telepsychiatry, I oversaw the collection of patient care data which helped demonstrate positive outcomes for patients and programs that received telepsychiatry.  I helped solve technical, clinical, and operational challenges in order to improve the quality and reliability of the telepsychiatry services.

12.     Throughout my career, I have been an educator and leader in the field of correctional psychiatry and a pioneer in the field of correctional telepsychiatry.  I am formerly the Vice Chairman of mental health for the American Telemedicine Association (ATA).  In this role, I helped lead a discussion regarding how Telemental health should best be implemented.

13.     I served as a liaison between the ATA and the Drug Enforcement Administration (DEA), lecturing alongside the Chief of Policy of the DEA in the first ever joint lecture between the two organizations.  I worked extensively to educate providers and healthcare professionals about the impact of the Ryan Haight Online Pharmacy Consumer Protection Act and to further the discussion about prescribing controlled substances via telemedicine.

14.     I currently serve on the Telepsychiatry Committee for the American Psychiatric Association.  In this role, I have helped analyze the future direction of the field of telepsychiatry.  I have contributed to the development of telepsychiatry related materials, including the APA Telepsychiatry Toolkit, the premier online resource for the practice of telepsychiatry.

15.     I have previously held faculty positions with UCSF and UCSD.  I am currently on the Steering Committee for Psych Congress, the nation's premier conference on practical psychopharmacology and a forum that connects mental health professionals of varied backgrounds and training.  I am considered the leading expert in telepsychiatry for Psych Congress.  I have lectured extensively on the subject of psychiatry in the digital age.

16.     A true and correct copy of my Curriculum Vitae, which also includes a list of my presentations, is attached as **Exhibit A.**

3

**OPINION**

17.     It is my opinion that the Resource Document, dated February 2023, reaches conclusions about correctional telepsychiatry that are not based on adequate evidence nor are consistent with my own observations and experience in the field.

18.     The Resource Document features a fictional vignette which "highlights some of the considerations of telepsychiatry in jails and prisons…"  It describes alleged concerns and challenges surrounding a fictional telepsychiatry patient encounter.  The vignette is misleading because it implies that the challenges are fundamental problems with the use of telepsychiatry.

19.     In my discussion, below I explain how the challenges described in this vignette are caused by either a failure to properly design the telepsychiatry program or challenges that affect onsite and remote care equally.

20.     I also discuss other aspects of the Resource Document which allege limitations and disadvantages of telepsychiatry in a correctional setting.  My discussion addresses each broad category of concern alleged by the Resource Document:

**Alleged Difficulty Establishing Therapeutic Relationships**

21.     The Resource Document implies that telepsychiatrists might have difficulty establishing a therapeutic relationship with their remote patients.  The vignette in this article indicates that doctor and patient have met with each other only a few times prior to the current appointment, making it difficult for the patient to trust the doctor.

22.     It is my opinion that the example illustrated by the vignette is erroneous because the number of times a patient is seen by a provider is not a function of whether care is provided onsite or remotely.   The vignette could have chosen to feature a telepsychiatrist who had seen their patient many times.

23.     The Authors also allege, "Telepsychiatry may present additional hurdles in correctional settings where there may be dual loyalty concerns, patient mistrust of providers, lack of privacy, significant socioeconomic differences between patient and provider, lack of provider continuity, and distracting background noise complicating the therapeutic relationship."  This statement is without evidence or merit, given that loyalty concerns, mistrust, privacy issues, and

4

1    socioeconomic differences are factors that can affect onsite care as well.  Telepsychiatry does not

2    exacerbate these factors.

3        24.    It is my opinion that telepsychiatrists are less prone to "dual loyalty" than onsite

4    providers in a correctional facility.  Onsite providers are more prone to the authoritarian culture of

5    prisons and jails.  They are obliged to follow safety and security protocols onsite, such as wearing

6    masks, stab-proof vests, and alarms.  These protocols, while necessary for safety and security, are

7    not helpful in setting a tone of trust between patient and provider.

8        25.    Telepsychiatrists, on the other hand, are dressed normally and operate within a

9    comfortable environment.  They can put aside safety and security concerns and simply focus on

10   patient care.  This creates a degree of ease and comfort for the doctor, which is beneficial to the

11   therapeutic relationship.

12       26.    Furthermore, concerns about noise and privacy affect onsite care more so than

13   telepsychiatry.  Telepsychiatrists operate from offices that have little noise.  If noise on the prison

14   side is a concern, administrators can simply choose a quieter location for telepsychiatry

15   appointments.  Lack of privacy is more easily solvable via telemedicine through the use of

16   headphones.

17       27.    Lastly, socioeconomic differences between patient and provider can be bridged

18   more easily with telepsychiatry, given the expanded pool of provider applicants that can be

19   considered.  For example, if there is a shortage of Hispanic providers, telepsychiatry programs

20   can tap into remote providers from areas of the country with larger pools of Hispanic

21   psychiatrists.  Onsite care, on the other hand, is reliant on the limited provider pool that lives

22   within driving range of the facilities.  Facilities are typically in remote and rural locations which

23   are generally not preferred places to live for psychiatrists.

24       28.    The authors further write, "…telepsychiatry may especially exacerbate feelings of

25   isolation in patients who experience limited human contact through disciplinary or administrative

26   segregation practices (e.g., solitary confinement)."  It is my opinion that this statement is purely

27   speculative, as the authors offer no evidence to support their position.  One can make the opposite

28

DECL. KAFTARIAN ISO DEFS.' RESPONSE TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19453475.1

1  argument, that a telepsychiatry appointment gives enhanced access to care for inmates that are in

2  solitary confinement and thus, *reduces* feelings of isolation.

3           **Allegation that Telepsychiatrists Do Not Understand the Correctional Setting**

4           29.    The vignette in this article indicates that the fictional patient feels that the doctor

5  seems naïve about life in prison.  The Resource Document also states that *"…the actual and*

6  *metaphorical distance between the psychiatrist's world and the world their patients inhabit may*

7  *interfere with the quality of care."*  The authors assert that a telepsychiatrist who doesn't

8  understand the patient's environment might misinterpret the patient's concerns or fail to

9  adequately assess the patient's risk.

10          30.    Firstly, it is erroneous to assume that telepsychiatrists are less likely to understand

11 the patient's environment.  Many telepsychiatrists have vast experience in serving correctional

12 facilities.

13          31.    Regardless, it is my opinion that a lack of awareness of the prison environment is

14 not a sufficient reason to disqualify a provider from treating correctional patients.  In virtually

15 every correctional facility, providers with no correctional experience are hired onsite and can be

16 successful if given the proper training and support.

17          32.    Moreover, mental health providers often serve patients in unfamiliar environments.

18 For example, telepsychiatry is utilized in disasters to help patients cope with trauma.  It is a

19 fallacy to suggest that providers need to be immersed in the patient's environment or experience

20 their trauma in order to be an effective caregiver.

21          33.    Furthermore, if there is a desire for providers to understand the correctional

22 environment prior to seeing prison inmates, this can be easily accomplished with training during

23 the onboarding process.  As the telepsychiatrist gains experience working with correctional

24 patients and interacting with the onsite staff via video, they will gain greater insight into the needs

25 of their patients and find the best way to navigate the correctional system.  This is a similar

26 process an onsite psychiatrist would go through when new to the job.

27 / / /

28 / / /

DECL. KAFTARIAN ISO DEFS.' RESPONSE TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19453475.1

**Bias Against Using Telepsychiatry for Higher Levels of Care**

34.    The authors contend that *"more research is needed into higher levels of mental health care in correctional settings."*  The authors do not indicate specifically what type of research is needed, but the implication is that they have reservations about whether telepsychiatry is effective in higher levels of care.  I believe that this is a false implication.

35.    There is no need for research to tell us what is already known by psychiatrists and healthcare organizations across the nation- the standard of care is to allow telepsychiatry to serve higher levels of care.  In my company (Orbit Health), we provide services to higher levels of care including psychiatric emergency rooms, general hospital inpatient med/surg units, psychiatric hospital inpatient units, crisis stabilization units, residential treatment units for children, and higher levels of care in correctional facilities.  Without these services, our partner organizations would struggle mightily to provide adequate services to patients in higher levels of care.

**Alleged Concerns about Telepsychiatry Being Unfamiliar with the Inpatient Milieu**

36.    There is insufficient evidence to suggest that telepsychiatry is less efficacious due to a lack of familiarity with the inpatient milieu.  This is purely a theoretical concern.

37.    Regardless, any concerns about the telepsychiatrist's familiarity with the milieu and overall level of control over the therapeutic environment is easily addressable in the following ways:

- Careful onboarding, orientation, access to policies/procedures, and introductions to inpatient staff can give the telepsychiatry a strong understanding of the way the inpatient unit operates.
- Routine interdisciplinary meetings can inform all members of the treatment team about active issues in the unit and any concerns regarding the patients.

**False Notion that Telepsychiatry Should be a "Last Resort" for Higher Levels of Care**

38.    The Resource Document reads, *"It is the opinion of the authors that telepsychiatry in higher levels of care be used as a last resort or in very specific situations, for example when in-person recruitment is not successful."*  This is an opinion that is not supported by evidence.

7

1   Rather, it reveals a bias against telehealth that has historically slowed the adoption of

2   telemedicine in this country.

3          39.     As Chief of Telepsychiatry for CDCR, my goal was to serve unmet patient care

4   needs.  In the early days, offers to implement telepsychiatry were met with resistance from Chiefs

5   of Mental Health in each facility.  These individuals often had an initial bias against telehealth,

6   falsely believing that care delivered remotely was of poorer quality and effectiveness.

7          40.     However, when mental health leaders at each prison observed a sample of

8   telepsychiatry, they quickly realized how effective it was in meeting the needs of their patients.

9   Almost without exception, those same leaders had a change of heart about telepsychiatry.  They

10  quickly moved to adopt telepsychiatry on a larger scale, and as a result, backlogs of mental health

11  needs at their programs were addressed.  The faster leadership embraced telehealth, the more

12  quickly they were able to help their patients and stabilize their clinical programs.

13         41.     By the end of my tenure as Chief of Telepsychiatry, I was receiving frequent calls

14  from mental health leaders at many prisons, pleading with me to give them priority for further

15  telepsychiatry services.  Many of the requests were for telepsychiatry coverage of inpatient units,

16  as it was very difficult finding onsite staff to fill the positions.  In fact, there was such great

17  competition for telepsychiatry services that I had to prioritize those prisons with the highest need

18  and greatest backlogs.

19         **Undue Emphasis on Recruitment of Onsite Psychiatrists for Higher Levels of Care**

20         42.     I disagree with the authors' recommendation that *"Recruitment efforts (which*

21  *should include access to competitive salaries) should be ongoing, including contractual*

22  *incentives for in-person psychiatry, especially for higher acuity settings."*  Rural healthcare

23  facilities, including correctional facilities, have historically been difficult to fill with high quality

24  and reliable onsite psychiatrists.  In my experience, when correctional facilities prioritize efforts

25  to fill their positions with onsite providers, they settle on lower quality psychiatrists.

26         43.     The solution of "throwing money at the problem" is not a responsible nor effective

27  use of resources.  Many correctional facilities escalate salaries in a fruitless effort to fill their

28  onsite staff.  In many cases, facilities pay above market salaries to attract poorer quality

1    psychiatrists.  When this happens, other services receive a lesser share of the available funds and

2    resources.

3         44.    Furthermore, despite using high wages to recruit psychiatrists, facilities have

4    struggled with onsite provider turnover.  The current workforce is motivated by more than

5    money: many workers seek jobs that offer a favorable work life balance.  Working from home or

6    in a comfortable office setting is often a major factor for the current generation of workers.  Thus,

7    even if a facility is successful in hiring an onsite psychiatrist, that success is short lived as the

8    psychiatrists often resign after only serving a short time.

9         45.    In my experience, turnover seems to be much lower with telepsychiatry.

10   Psychiatrists, working from comfortable remote offices, tend to enjoy their work more and are

11   less likely to resign.  Telepsychiatrists tend to stay in their positions for years longer than onsite

12   staff, and provide valuable continuity of care for patients and programs.  Therefore, finding

13   qualified telepsychiatrists to cover inpatient units is often the most optimal, efficient, and durable

14   solution for correctional healthcare programs that seek quality and stability in their services.

15        46.    When establishing mental health services for patients, it is important to utilize

16   every tool available.  One of the most important tools is the quality of psychiatrists.  For decades,

17   one of the greatest benefits of telemedicine has been that it allows organizations to find providers

18   with specialized knowledge, regardless of location.  It is unwise to limit the pool of psychiatrists

19   to those who are close to the facility.

20                              **Arbitrary Site Visit Mandates**

21        47.    The Resource Document makes recommendations for periodic onsite visits,

22   depending on the level of care.  The authors write, *"...a site may have a telepsychiatrist come in-*

23   *person annually, at a minimum, for outpatient level of care and quarterly to semiannually for*

24   *provision of psychiatric care at more intensive levels. More frequent visitation may be necessary*

25   *if the telepsychiatrist is working in more acute contexts."*

26        48.    These recommendations are arbitrary, as there is insufficient evidence to suggest

27   that visiting an institution in the proposed intervals makes a difference to clinical outcomes.

28   Imposing such arbitrary requirements creates unnecessary obstacles to patient care.  Travel

1  requirements dampen the interest of job applicants.  If faced with unreasonable travel

2  requirements that impact their personal lives and family obligations, psychiatrists living in far

3  flung places often turn down job offers.

4       49.    The vast majority of the telepsychiatrists who have worked for me have never

5  completed a single site visit.  Nevertheless, they have been able to successfully integrate into the

6  treatment teams they serve.  There is no evidence that the quality of services has suffered due to a

7  lack of onsite visits and the receiving facilities are generally very happy with the telepsychiatrists

8  assigned to them.

9       50.    Similarly, my understanding is that the majority of existing telepsychiatry

10  companies do not require their psychiatrists to visit facilities in person.  Yet, the telepsychiatry

11  industry has grown substantially in recent years and is represented in countless hospitals and

12  clinics across the nation.  Had there been bureaucratic site visit requirements, the growth of

13  telepsychiatry would have slowed substantially and negatively impacted access to care.

14       51.    I acknowledge that site visits, while not necessary, can potentially be helpful in

15  promoting collaboration between telepsychiatrists and onsite staff.  However, there is no current

16  scientific approach nor industry standard that establishes the frequency of such visits.  Decisions

17  regarding site visits are best left to each program administrator.

18  **Telepsychiatrist Relationships with Onsite Healthcare Staff and Correctional Officers**

19       52.    I share the opinion of the authors that a lack of contact between telepsychiatry and

20  onsite staff, including correctional officers, may limit an opportunity for trust and confidence to

21  be developed.  However, I do not believe that this is an unsurmountable obstacle.   Providers need

22  not have in-person contact with healthcare staff and correctional officers in order to establish a

23  working relationship with them.

24       53.    In my experience providing telepsychiatry to correctional facilities, I have found it

25  easy to interact with healthcare and custody officers online if I make a deliberate effort to do so.  I

26  have had many conversations with correctional officers and onsite healthcare staff over

27  videoconference in order to encourage open communication and collaboration.

28

DECL. KAFTARIAN ISO DEFS.' RESPONSE TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19453475.1

54.    I have found that in nearly all cases, correctional officers and onsite healthcare staff are willing and able to share information and coordinate patient care with me.  Correctional officers have been able to coordinate the patient flow and address any problems with the clinic workflow directly with the telepsychiatrists.  Through open communication, my telepsychiatry staff and I have found it easy to establish trust and confidence with correctional officers and onsite healthcare staff.

55.    Frequent communication between the remote staff and onsite staff, for example through interdisciplinary meetings, can help address knowledge gaps, align expectations, and foster a collaborative spirit.  Program administrators can easily facilitate a culture of open communication and collaboration between the telepsychiatrists and onsite staff.  If efforts are made to integrate the telepsychiatrists, the chances of a communication breakdown are markedly reduced and the perception of telepsychiatrists as "outsiders" fades away.

**Potential Technology Challenges**

56.    The Resource Document correctly states that telepsychiatry requires a stable, secure audio and video connection that hinges upon a reliable internet network.  It also correctly states that some older correctional facilities may have outdated equipment and technology.  I agree that unstable connections and low bandwidth can lead to miscommunication between the patient and provider, which decreases the quality of the encounter and results in frustration on both sides.

57.    Furthermore, the vignette in the Resource Document illustrates a scenario where the patient and doctor have difficulty hearing each other due to a poor internet connection.  This results in the patient having to repeat himself.

58.    Nevertheless, poor internet connection or difficulties with audio/video are correctable problems.  The current state of technology allows a majority of Americans to have access to high-speed internet.  There is no reason why a correctional facility cannot establish reliable internet connections that permit high quality audio and video.  If there is an issue with the technology, it can and should be addressed without significant difficulty.

19453475.1

59.     If a telepsychiatry program is not successful because of faulty technology, this is not an indictment on the practice of telepsychiatry- rather, it is a call for technology upgrades in the correctional facility.

**Alleged Challenges with Risk Assessment**

60.     The vignette in the Resource Document indicates that the fictional doctor fails to adequately understand the nature of the patient's potential suicidal ideation. This problem has nothing to do with the modality of telepsychiatry.  If the provider is uncertain about the patient's suicide risk, they are able to ask more questions and do a more thorough risk assessment, regardless of whether the session is onsite or conducted remotely.

61.     Assuming high quality audio and video, the practice of telepsychiatry does not prevent a thorough assessment of risk.  In fact, for many years, psychiatrists have conducted 5150 evaluations via telemedicine.  Through my conversations with ATA discussion groups, I've learned of multiple examples of courts accepting these evaluations.  I have also personally completed involuntary holds remotely via telemedicine.  Telepsychiatry companies, including Orbit Health, and I personally have consulted with Emergency Department physicians and provided guidance on whether patients ought to be held against their will or released after conducting a risk assessment via telepsychiatry.

**Alleged Time Pressure on Telepsychiatrists**

62.     The vignette in the Resource Document indicates that the fictional appointment is abbreviated after the accompanying officer pressures the doctor to hurry because there is a full docket of patients waiting.

63.     This problem has nothing to do with the modality of telepsychiatry.  Custody officers are able to put pressure on onsite providers as well.  In fact, providing services remotely can serve to insulate the provider, to some degree, from experiencing pressures of the correctional environment.

64.     The vignette also indicates that the fictional doctor spends a short amount of time on chart review and documentation and must check pharmacy records through a separate portal.

1    This, too, has nothing to do with the modality of telepsychiatry.   The provider's decision to

2    spend less time on chart review is a function of how many patients he is assigned during his shift.

3         65.    The practice of telepsychiatry does not inherently reduce the amount of time the

4    doctor has to chart notes.  In fact, during some onsite visits, the computer is not accessible to the

5    psychiatrist while they are seeing the patient, depending on the setting.  Under these

6    circumstances, a psychiatrist may lose valuable charting time as they walk from the part of the

7    facility where they saw the patient to the location of their desk.

8                    **Alleged Challenges Coordinating with Onsite Staff**

9         66.    The vignette in the Resource Document describes the doctor as having difficulty

10   coordinating a follow up visit by a social worker because the previous social worker resigned and

11   the doctor does not know the name of the new social worker.

12        67.    The problem of a provider not knowing the onsite staff can happen to onsite

13   providers as well and is easily resolvable through simple communication.  If a new social worker

14   is assigned to the case, all it takes is an email or phone call to communicate this information to

15   remote providers.  This is a matter of communication that can be accomplished regardless of

16   whether the providers are remote or onsite.

17                    **Insinuation that Telepsychiatrists Lack Empathy**

18        68.    The Authors write, *"In a 2008 literature review, Khalifa and colleagues noted that*

19   *one of the commonly cited reservations about telepsychiatry is that patient interviews may be less*

20   *empathetic than direct face-to-face interviews, resulting in a detrimental impact on the*

21   *development of therapeutic rapport (Khalifa et al., 2008)."*

22        69.    However, a more careful review of Khalifa, et al., 2008 reveals the specific

23   language, *"**Critiques of telepsychiatry may argue** that videolink interviews are less empathetic*

24   *than face-to-face interviews, and have a negative effect on the rapport gained."*

25        70.    Thus, the wild allegation that telepsychiatry involves less empathy is purely

26   speculative and theoretical.  The Authors of the Resource Document incorrectly represent

27   Khalifa, et al., 2008 as having concluded that there is evidence of lower empathy with

28   telepsychiatry.  Accusing telepsychiatrists, without evidence, of having less empathy than onsite

1  psychiatrists is unfair and tantamount to smearing the many telepsychiatrists who deeply care

2  about their patients.

3  **Distance from Housing Units to Telemedicine Facilities**

4  71.    The vignette in this Article states that the fictional inmate must be escorted to the

5  telemedicine facilities which are on the other side of the prison, presumably a great distance from

6  the patient's jail cell.  The implication is that telepsychiatry offices are often a long walking

7  distance from the housing unit.

8  72.    It is my opinion that this is an erroneous concern.  The location of the

9  telepsychiatry office depends on where space is available in each correctional facility.  It is easier

10  to change the location of a telepsychiatry office than a provider's office.  A telepsychiatry office

11  only requires the videoconferencing unit and a chair.  On the other hand, the choice of where to

12  place provider offices must consider more factors and limitations, given that providers and their

13  material belongings will be located there.  Provider offices require more space than a

14  telepsychiatry endpoint that can be placed in smaller areas.

15  73.    Furthermore, a telepsychiatry endpoint can be placed within the housing unit itself,

16  provided that the space is quiet and confidential.  Regardless, healthcare program administrators

17  working with custody staff can easily find an appropriate space within the prison to place a

18  telepsychiatry endpoint.

19  **Wait Time for Telepsychiatry Appointment**

20  74.    The vignette in this article indicates that the fictional inmate/patient is forced to

21  wait for an hour until the officer can place him in the telemedicine room.  Patient wait times are a

22  function of custody programming requirements and the number of officers and providers.  Wait

23  times are not a function of whether the care is being delivered remotely or in person.

24  **Confidentiality Concerns**

25  75.    The vignette in this article indicates that the fictional inmate/patient's

26  confidentiality is compromised by the presence of a correctional officer off camera.  However, in

27  correctional healthcare, concerns about confidentiality are present regardless of whether care is

28  provided onsite or remotely.  Even when patients are seen by onsite providers, a custody officer is

14

1   usually nearby in order to address safety and security concerns.  In fact, there is a heightened need

2   for the officer to remain close to the provider in order to protect their safety.

3       76.     Telepsychiatry can be accomplished securely and confidentiality if appropriate

4   HIPAA compliant technology is utilized.  Furthermore, telepsychiatry affords unique

5   opportunities to address confidentiality concerns.  As the Resource Document states,

6   telepsychiatry patients can be given headphones so that correctional officers cannot hear what the

7   provider tells the patient.  This is not possible with onsite care.

8       77.     **It is also my opinion that the Supplemental Declaration of Dr. Pablo Stewart,**

9   **dated February 24, 2023, overvalues the significance of the Resource Document and draws**

10  **antiquated conclusions from it**.

11      78.     Dr. Stewart writes, *"In my opinion this new Resource Document is an important*

12  *source of information for decision-makers, including CDCR and this Court, in setting the right*

13  *mix between on-site and remote psychiatric services in a prison setting. As I stated in my January*

14  *17, 2023 declaration, there is a shortage of guidance in the medical literature regarding the use*

15  *of telepsychiatry at higher levels of care in correctional settings. (ECF 16 No. 7703-1 at 7.) This*

16  *new Resource Document provides the Court with guidance from 11 physician-authors listed on*

17  *the first page as contributors."*

18      79.     I disagree with Dr. Stewart's opinion that the Resource Document should be used

19  to guide CDCR and the Court in determining how services should be covered.  The resource

20  article does not represent the APA's official position on telepsychiatry.  In fact, there is a

21  disclaimer at the top of the Resource Document that reads, *"The findings, opinions, and*

22  *conclusions of this report do not necessarily represent the views of the officers, trustees, or all*

23  *members of the American Psychiatric Association. Views expressed are those of the authors."*

24  The opinions of 11 authors hardly constitutes a consensus in the psychiatric community.  It is not

25  even clear that all of the authors have subject matter expertise in correctional telepsychiatry.  In

26  fact, none of the authors disclosed their direct experience with telepsychiatry nor any potential

27  conflicts of interests.

28

DECL. KAFTARIAN ISO DEFS.' RESPONSE TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19453475.1

80.     The APA's official "Position Statement on Telemedicine in Psychiatry," dated, December 2021, sets a very different tone than the Resource Document and is firmly in support of the expansion of telepsychiatry to increase access to care.  The APA position statement reads, *"This expanded use [of Telehealth] revealed opportunities to increase access to and continuity of psychiatric care and exposed several barriers to further or sustained expansion. Telemedicine, including the use of video conferencing and audio-only care, became an essential strategy to improve health equity and increase access to high-quality psychiatric care."*  The Position Statement further reads. *"Telemedicine in psychiatry (telepsychiatry) promotes health equity by increasing access to care and is therefore a critical component of the mental health delivery system…"*

81.     Furthermore, the APA website (https://www.psychiatry.org/patients-families/telepsychiatry, last accessed 3/10/2023) reads, *"Telepsychiatry is used in a variety of different settings, including private practice, outpatient clinics, hospitals, correctional facilities, schools, nursing homes, and military treatment facilities…Telepsychiatry is helping bring more timely psychiatric care to emergency rooms…"*  The website further states that telepsychiatry is being used for *"emergency crisis intervention when it may be difficult to find a local psychiatrist to assist. Many states use telepsychiatry in corrections facilities where inmates frequently require ongoing mental health care."*

82.     I was not able to find any language on the APA website that advised against the use of telepsychiatry for higher levels of care nor did it state telepsychiatry should be used as a last resort.

83.     In his Supplemental Declaration, Dr. Stewart writes, *"Because of the Covid-19 pandemic, telehealth adoption accelerated enormously, far faster than it would have without the pandemic, and far outpacing the development of evidence that it is effective. Now that many pandemic restrictions are being eased, it is critical that clinical leadership take a close look at how far their systems have gone in becoming reliant on telehealth, and what should be the appropriate mix of on-site and telemedicine in the post-pandemic environment. It is not safe to simply adopt what we did during Covid as the new normal, without careful evaluation of the risks*

16

1  *and benefits for patient care. CDCR's proposal for full telepsychiatry in the EOP, for infrequent*

2  *on-site visits, and for fully embracing cellside telepsychiatry, represent the wrong way to move*

3  *forward with telehealth after the pandemic. The APA Resource Document correctly points to a*

4  *more careful and safer way to proceed."*

5        84.    I agree that the Covid-19 pandemic was instrumental in ushering in a new age of

6  healthcare that finally embraced telehealth as an essential tool to improve access to care for needy

7  patients.  However, unlike Dr. Stewart, I do not believe we should reverse the progress telehealth

8  has made now that we are approaching the end of the pandemic.

9        85.    According to the Diffusion of Innovation Theory by E.M. Rogers (1962), attitudes

10  toward new ideas and technologies are distributed along a bell curve.  Prior to the pandemic,

11  "Early Adopters" and the "Early Majority" had already welcomed telehealth as a valuable

12  innovation.  The pandemic represented a tipping point that convinced even those skeptical about

13  technology, i.e. "The Late Majority," that it was time to fully embrace telehealth.

14        86.    In the post-pandemic world, the value of telemedicine in all levels of care is self-

15  evident.  Savvy healthcare organizations understand that they must invest heavily in telemedicine

16  to keep pace and remain competitive.  In the year 2023, only the "Laggards," the small minority

17  of ultra-conservative and skeptical thinkers, continue to resist the advancement of telemedicine-

18  these are the people who hold back progress, to the detriment of patients.

19        87.    Contrary to Dr. Stewart, I do not believe that CDCR and the Courts should take

20  cues from the Laggards.  Progress is inevitable and efforts to resist the adoption of telemedicine

21  are futile.  The world is moving toward fully enabled telehealth services.  Handicapping CDCR

22  by limiting telepsychiatry only ensures that it remains behind the times.  For the sake of the

23  patients, it is my recommendation that CDCR and the Courts fully embrace Telepsychiatry for all

24  levels of care.

25                      **CONCLUSION**

26        88.    There is a national movement toward telepsychiatry- it has quickly become the

27  preferred way to work for psychiatrists and part of the modern standard of care.  Telemedicine,

28  including telepsychiatry, is supported, endorsed, and promoted by many organizations, including

19453475.1

1  the American Medical Association, American Psychiatric Association, American Psychological

2  Association, Centers for Medicare & Medicaid Services (CMS), and many others.

3      89.    According to the American Psychiatric Association, *"Telepsychiatry using*

4  *videoconferencing is a validated and effective practice of medicine. Telepsychiatry*

5  *videoconferencing is equivalent to in-person encounters in diagnostic accuracy, treatment*

6  *effectiveness, patient satisfaction, and is often more cost efficient than in-person*

7  *encounters…Telepsychiatry's evidence base is substantial and satisfaction is extremely high*

8  *among patients, psychiatrists and other professionals. Its effectiveness is comparable to in-person*

9  *care in terms of therapeutic engagement, quality of care, validity/reliability of assessment, and*

10  *clinical outcomes."* (APA Telepsychiatry Toolkit).

11      90.    The "Resource Document on Telepsychiatry for Adults in Jails and Prisons", dated

12  February 2023, seeks to place restrictions and limits to the use of telepsychiatry in correctional

13  environments.  In general, the Resource Document raises concerns without citing adequate

14  evidence.  The result of this attack on telepsychiatry is that it will have a cooling effect on the

15  implementation of technology and hinder access to care.

16      91.    Telepsychiatry is a valuable tool that is being used in all levels of care in countless

17  jails and prisons across the United States.  By the Resource Document's own admission, *"A*

18  *recent meta-analysis examining intervention outcomes and assessment reliability across a variety*

19  *of mental health populations and settings indicated that telepsychiatry was associated with*

20  *outcomes largely equivalent to in-person services, although it should be noted that only two of the*

21  *57 reviewed studies involved correctional settings (Batastini et al., 2021)."*

22      92.    If the concern is that the existing technology infrastructure is insufficient to

23  support high quality audio and video, the solution is to improve the existing infrastructure rather

24  than disqualify or restrict the practice of telemedicine.

25      93.    Furthermore, it would be a disservice to patients to restrict the use of

26  telepsychiatry to outpatient levels of care.  It is the responsibility of correctional healthcare

27  administrators to use every available tool to provide timely, cost-effective, and high-quality care,

28

DECL. KAFTARIAN ISO DEFS.' RESPONSE TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19453475.1

1  regardless of the level of care.  Telepsychiatry represents an opportunity to match available

2  resources with patient and program needs.

3       94.     Recruitment for psychiatrists is very competitive, especially in California.  If

4  CDCR is prevented from adopting telepsychiatry for all levels of care, it will allow competing

5  organizations to hire away some of the best and brightest psychiatrists, including those with

6  highly specialized skills.  This will leave CDCR with a smaller pool of candidates from which to

7  choose.  The subset of psychiatrists who are willing to work onsite continues to shrink with each

8  passing year as more of the world moves to telemedicine.

9       95.     It is also worth considering the impact of restricting telemedicine on those CDCR

10 patients who will eventually return to civilian life.  In the outside world, healthcare is increasingly

11 provided online.  It is in patients' best interests to be well versed in interacting with telehealth

12 providers.  Keeping inmates isolated and ignorant about telemedicine sets a false expectation in

13 their minds that all healthcare is still received in person.  Inmate/patients deserve to be prepared

14 to access telehealth because it is a common way healthcare is delivered in the real world.

15      96.     Lastly, CDCR has a unique opportunity to take a leadership role in correctional

16 telehealth.  Assuming an appropriate investment in technology and telehealth program planning,

17 CDCR can show the rest of the correctional world what can be accomplished when an

18 organization embraces technology and the future of healthcare.  CDCR can drive new ways of

19 organizing teams to integrate onsite staff with remote providers and help align correctional care

20 with the direction healthcare is headed in the modern world.

21

22      I declare under penalty of perjury under the laws of the United States of America that the

23 foregoing is true and correct.

24      Executed on this 20th day of March, 2023, at ___Los Angeles County___, California.

25

26                                              _____
                                                Edward Kaftarian, M.D.

27

28

DECL. KAFTARIAN ISO DEFS.' RESPONSE TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19453475.1

# Exhibit A



# ORBIT HEALTH
## DELIVERING HOPE THROUGH TECHNOLOGY

## EDWARD L. KAFTARIAN, M.D.

**FOUNDER & CHAIRMAN OF ORBIT HEALTH PRACTICE MANAGEMENT, INC.**

415-279-3879

26565 West Agoura Rd, St #200
Calabasas, CA, 91302

edward@orbithealth.com

www.orbithealth.com

linkedin.com/in/kaftarian

As a physician psychiatrist, I am steadfast in my belief that the health and welfare of patients is of paramount importance and must never be compromised. As a team builder and collaborator, I am selective and thoughtful about how I hire and deploy employees. As a manager, I am committed to providing the necessary tools, training, and support to members of my team so that they may thrive in their work lives.

## SKILLS

**Telepsychiatry**

**Mental Health in the Digital Age**

**Correctional Psychiatry**

**Forensic Psychiatry**

**Addiction Medicine**

**Healthcare Administration**

## BOARD CERTIFICATION

General Psychiatry, American Board of Psychiatry and Neurology
No. 60580

Forensic Psychiatry, American Board of Psychiatry and Neurology
No. 1865

Forensic Psychiatry, American Board of Psychiatry and Neurology
No. 2012245

## EDUCATION

**Forensic Psychiatry Fellowship**
University of California, Davis, Forensic Division
07/2007 - 06/2008

**Residency**
Johns Hopkins University Hospital
07/2004 - 06/2007

**Internship**
Georgetown University Hospital
07/2002 - 06/2003

**Internship**
Georgetown University Hospital
07/2002 - 06/2003

**Medical Education**
Tulane University School of Medicine
08/1998- 05/2002

**Undergraduate Education**
University of Virginia
08/1995- 05/1997

**Undergraduate Education**
University of Maryland, Honors Program, College Park
08/1993- 06/1995

## WORK EXPERIENCE

**Executive Chairman**

Orbit Health
01/2015 - Present
Serving Correctional Facilities, Crisis Units, Inpatient, Outpatient, and Community
Mental Health

**Statewide Chief of Telepsychiatry:
Co-founder,
Statewide Medication Assisted
Treatment
Program**

California Department of Corrections and Rehabilitation
04/2014 - 01/2018

- Responsible for entire statewide telepsychiatry program
- Oversight of 70 staff serving over 25 institutions from 5 hubs across the State
- Oversight of Telepsychiatry Budget and Expenditures
- Transformed the department from less than 10 psychiatrists to approximately 70 in less than four years. Achieved recruitment record for most psychiatrists hired in the history of CDCR for a single department
- Author of Statewide Telepsychiatry Policies
- Working with Federal Court monitors to audit Statewide Mental Health Program
- Doubled psychiatrist productivity

# PUBLICATIONS

Journal Article
**Lessons Learned in Prison and Jail-Based Telepsychiatry**

Author(s)
Edward Kaftarian

*March 2019*
Current Psychiatry Reports, Psychiatry in the Digital Age

Publication Type
**Best Practices in Videoconferencing-Based Telemental Health**

Author(s)
Edward Kaftarian, et al.

*Nov 2018*
Telemedicine and e-Health

Textbook
**Telepsychiatry and Health Technologies: A Guide for Mental Health Professionals**

Author(s)
Edward Kaftarian, M.D.

American Psychiatric Association Publishing

*2018*
Chapter Author, The Business of Telepsychiatry: How to Set Up a New Practice or Integrate Technology into an Existing Practice

Textbook
**First Aid for the Psychiatry Boards**

Author(s)
List of Authors

*2010*
McGraw-Hill
C-Editor

Poster
**Evaluation of a Polypharmacy Reduction Program at a Correctional Facility**

Author(s)
Kelly C. Lee, PharmD, MAS, BCPP1, FCCP, Edward Kaftarian, MD2, Lin Chen-Peng, PharmD2, Ibrahim Muradian, BS

*01/09/2013*
Presented at the UCSD Research Symposium

Poster
**Journal Article: Online Prescribing of Controlled Substances for Mental Health Issues: A View of the Current Landscape**

Author(s)
Edward Kaftarian, et all

*04/06/2019*
Journal of Technology in Behavioral Science

Journal Article
**Telmental Health in Rural Correctional Institutions**

Author(s)
Edward Kaftarian, et all

*07/05/2020*
mHealth

## Chief Psychiatrist

Richard J. Donovan Correctional Facility
*07/2012 – 04/2014*

- Brought institution into compliance on all 64 psychiatry audit measures. This is best in the State of California and has never before been accomplished in the history of CDCR
- Medical Director of Pharmacy
- Direct and indirect supervision and training of over 100 staff
- Oversight of inpatient and outpatient mental health services in a prison of over 3,000 inmates (one of the highest medical and mental health acuities in the state)
- Oversight of Mental Health Crisis Bed Unit, Referrals Program, Pre-Release Program, & Psychiatry Program
- Development of medication management quality assurance process
- Significantly reduced medication errors
- Recruited and hired 13 highly qualified psychiatrists (10 in an 8 month span)
- Founder and Chairman of multidisciplinary Polypharmacy Elimination Team & Founder of Central Operations Service (CNOPS), the primary quality management unit in the prison mental health program
- Participated in many Statewide Committees

## Senior Psychiatrist Supervisor

San Quentin State Prison
*07/2008 – 07/2012*

- Shared responsibility for psychiatric care of prison population of 5,000 inmates
- Direct and indirect supervision and training of approximately 100 staff
- Involvement in the development of State-wide medication management policies
- Primary recruiter for San Quentin Psychiatry
- Coordination with senior medical, mental health, custody, and nursing staff
- Overhauled psychiatric med management & significantly reduced medication errors
- Helped develop the Condemned Specialized Treatment Program
- Cofounder of the first San Quentin Clozapine Quality Assurance Committee
- Helped plan & develop mental health space of Central Health Services Building

## Medical Director

Correctional Treatment Center (CTC)
*05/2010 – 07/2012*

- Development and oversight of a 50 bed CTC program
- Development, implementation, and oversight of hundreds of policies & procedures
- Coordination of admissions, discharges and transfers
- Supervision and training of a large CTC multidisciplinary staff

# FACULTY APPOINTMENTS

American Psychiatric Association (2020 – Present)
Committee on State Telehealth Model Legislation

Elevate by Psych Congress 2020 Conference, Las Vegas, NV (2020)
Co-Chair

Psych Congress (2019 – Present)
Steering Committee Member

American Psychiatric Association (2018 – Present)
Committee on Telepsychiatry

American Telemedicine Association (2018 – 2020)
Vice Chair, Mental Health

Journal of Health Technology (2020 – 2021)
Editorial Board Member

UCSF Department of Psychiatry (2009 – 2012)
Assistant Clinical Professor

UCSD Skaggs School of Pharmacy (2014 – 2016)
Assistant Clinical Professor

San Diego Psychiatric Society (2013 – 2014)
Councilmember

## Clinical Director

Correctional Treatment Center (CTC)
01/2010 - 05/2010

- Founding Clinical Director of the San Quentin Correctional Treatment Center
- Establishment of a Mental Health Crisis Bed unit from the ground up

## Telepsychiatry Coordinator

San Quentin State Prison
12/2010 – 12/2011

- Founded San Quentin's first telepsychiatry program

# FORENSIC EXPERIENCE

## Founder, Forensic Division

Orbit Health Telepsychiatry
01/2018 - Present

## Psychiatric Consultant

Napa State Hospital
07/2007 - 06/2008

- Duties involved providing forensic consultation on a variety of matters to include competency to stand trial, violence risk, malingering, and clarification of diagnosis.

## Jail Psychiatric Services

Sacramento County Main Jail
07/2007 - 06/2008

- Duties involved providing psychiatric care (medication management and psychotherapy) for inmates. I also instructed a group of inmates on anger management

## Forensic Psychiatrist

Clifton T. Perkins Hospital Center
07/2006 - 09/2006

- Psychiatric treatment and competency to stand trial assessment of patients in Maryland's maximum security forensic psychiatric hospital

## Forensic Psychiatrist

Circuit Court of the City of Baltimore
03/2006 – 05/2006

- Pretrial screening exams for competency to stand trial and criminal responsibility

## Civil Commitment Hearings

Johns Hopkins Hospital
2004 – 2005

## ACHIEVEMENTS

Six Sigma Lean White Belt (2017)

Certificate in Hospital Emergency Response for Mass Casualty Events (2013)

Dep. of Homeland Security (DHS); Federal Emergency Mgmt Agency

Essentials of Firefighting Training (1994)

Emergency Medical Technician (1994)

College Park Fire Department

Certified in Basic Life Support (BLS)

Certified in Advanced Cardiac Life Support (ACLS)

## HONOR AWARDS

Certificate of Appreciation (2010)

California Department of Corrections

• Establishment of the new Correctional Treatment Center

Chairman's Letter of Appreciation for Outstanding Care (2005)

Johns Hopkins Hospital

Academic Honors Scholarship (1994)

University of Maryland

Certificate of Leadership and Teaching Excellence (1994)

University of Maryland

Case 2:90-cv-0050... Document... Filed 03/... Page 26 of 27

Telehealth Rules and Regulations: A Post-Pandemic Update

Psych Congress Annual Meeting, New Orleans, September 2022

Future of Telepsychiatry: after Omicron and beyond

Mental Health Innovation Exchange
American Psychiatric Association
Virtual Event, August 2022

Telepsychiatry: Legal & Regulatory Update

APA Annual Meeting, New Orleans, LA, May 2022

How Telepsychiatry Saved Correctional Psychiatry from COVID-19

National Commission on Correctional Healthcare
Virtual Conference, June 2021

Telehealth and Telepsychiatry for Incarcerated Individuals

Lecture given to the U.S. Department of Health and Human Services Criminal Justice and Reentry Working Group
Virtual Event, November 2020

Correctional Telepsychiatry

American Academy of Psychiatry and the Law Annual Meeting
September 2020

How Technology is Shaping the Future of Correctional Mental Health Care (10/2019)

National Commission on Correctional Health Care, Ft. Lauderdale, FL

Telepsychiatry (09/2019)

Utah Division of Substance Abuse and Mental Health, Salt Lake City, UT

Getting Involved with Telepsychiatry (03/2019)

Psych Congress Elevate Conference, Boston, MA

Five Hot Topics in Telehealth (04/2018)

American Telemedicine Association Annual Conference, Chicago, IL

Prison Telepsychiatry: 5 Biggest Hurdles to Building Our Nation's Largest Program (06/2018)

VSEE National Webinar

Addiction Treatment via Telemedicine in the Era of the Ryan Haight Act (04/2017)

Moderator: American Telemedicine Association Conference, Orlando, FL

The Power of Telepsychiatry: from Integration to Transformation (04/2017)

American Telemedicine Association Conference, Orlando, FL

Telemedicine Spotlight: Legal & Clinical Issues in Substance Use & Behavioral Health (10/2016)

American Bar Association

Prescribing Controlled Substance Via Telemedicine (05/2016)

Moderator: American Telemedicine Association Conference, Minneapolis, MN

Cultural Fit & Selection of Best Model for Telemental Health (05/2015)

American Telemedicine Association Conference, Los Angeles, CA

Telemedicine Breaks into Prison (02/2015)

Avizia Educational Webinar

Cults and Forensic Psychiatry: Unraveling Ties that Bind (10/2007)

American Academy of Psychiatry and the Law, Miami, FL

# EDWARD KAFTARIAN, MD

## Forensic Expert Services

ORBIT HEALTH PRACTICE MANAGEMENT, INC.
23679 CALABASAS RD., #1010
CALABASAS, CA 91302
415-279-3879
edward@orbithealth.com

# <u>FEE SCHEDULE</u>

| | |
|---|---|
| Records Review/Consult per hour: | $1,000.00 |
| Examination per hour: | $1,000.00 |
| Deposition Testimony per hour: | $1,000.00 |
| Trial Testimony per hour: | $1,000.00 |
| Trial Half Day: | $4,000.00 |
| Trial Full Day: | $8,000.00 |
| Travel Time per hour: | $400.00 |
| Lodging, airfare, car rental, rideshare, parking, and other costs associated with travel and/or transportation: | At cost |

NOTE: Please make checks payable to Orbit Health Practice Management, Inc.