Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
Hanson Bridgett LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                   Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                   Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF AMAR MEHTA, M.D. IN SUPPORT OF DEFENDANTS' RESPONSE TO THE SUPPLEMENTAL DECLARATION OF PABLO STEWART (ECF No. 7739)** |

# DECLARATION OF AMAR MEHTA

I, Amar Mehta, declare as follows:

1. I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR). Prior to this position, I was the Statewide Chief of Telepsychiatry. I have worked in CDCR since July 2013, during which time I have also served as a staff telepsychiatrist, site director for residency training, institutional clinical lead, and acting statewide Chief of Psychiatry. After medical school and internship, I attended residency in adult Psychiatry, and completed fellowships in both Child & Adolescent Psychiatry and Forensic Psychiatry. I am Board-certified in the 4 specialties of Adult, Child & Adolescent, and Forensic Psychiatry, as well as Addiction Medicine. I submit this declaration in support of Defendants' response to Plaintiffs' request for leave to file a supplemental declaration of Pablo Stewart, M.D., in support of their response to the Special Master's report and recommendation on a final proposed telepsychiatry policy. I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2. I have reviewed Dr. Stewart's Supplemental Declaration (ECF 7739) as well as the attachment he references in his Supplemental Declaration, entitled: "Resource Document on Telepsychiatry for Adults in Jails and Prisons," ("Resource Document") dated February 2023.

3. I would like to state broadly at the outset that delaying the adoption of proven treatment modalities for conjectural flaws causes real harm to patients. This does not protect patients, but rather it prevents them from receiving care. The Resource Document does not cite any evidence for the recommendations that Dr. Stewart endorses, and runs counter to the evidence presented by the American Psychiatric Association (APA) itself and other evidence-based recommendations. Telepsychiatry is a proven safe and effective treatment modality, and nothing presented in Dr. Stewart's Supplemental Declaration or the Resource Document shows otherwise.

4. In his Supplemental Declaration, Dr. Stewart highlights "Key Principles" in the Resource Document that he finds "particularly useful in evaluating CDCR's proposal to transition the EOP [Enhanced Outpatient] to full telepsychiatry." (Supp. Decl. Pablo Stewart, ¶ 4.) There

1  appears to be ongoing confusion or misrepresentation of CDCR's proposed telepsychiatry policy,
2  and this is not helped by Dr. Stewart's obvious lack of familiarity with CDCR's telepsychiatry
3  program. CDCR does not seek to implement a form of telepsychiatry that is countered by any
4  evidence in the Resource Document.  Dr. Stewart's inapplicable or non-specific comments are
5  based on his incomplete knowledge of CDCR's positions, as his "Key Principles" are actually not
6  relevant to the proposed changes, as explained below.

7       5.     Dr. Stewart states that the first "Key Principle" pertains to the use of telepsychiatry
8  in higher levels of care, which is defined as "'residential treatment units, inpatient psychiatry
9  units, crisis units.'"  (Supp. Decl. Pablo Stewart, ¶ 4a.)  Dr. Stewart states that the Resource
10 Document indicates that "'It is the opinion of the authors that telepsychiatry in higher levels of
11 care be used as a last resort or in very specific situations, for example when in-person recruitment
12 is not successful.'"  CDCR's proposed policy already clearly states, "CDCR will not use
13 telepsychiatry in lieu of on-site psychiatrists at the inpatient level of care for any reason other
14 than a lack of availability of on-site psychiatrists."  (CDCR's Proposed Telepsychiatry Policy,
15 ECF 7682-1 at 172 of 317, emphasis added.) Thus, CDCR meets the recommendation of the first
16 "Key Principle," as the policy continues to preclude the use of telepsychiatry for inpatient care
17 except under "in very specific situations, for example when in-person recruitment is not
18 successful." In contrast, CDCR has successfully treated patients at the the Enhanced Outpatient
19 Program (EOP) level of care via telepsychiatry for over a decade with similar outcomes to those
20 receiving mental health treatment from on-site psychiatrists.

21       6.     It is worth noting that this entire section of the Resource Document pertaining to
22 treatment at higher levels of care contains no citations, and indicates that the recommendations
23 are based on opinion and not on published evidence.  It runs counter to the APA's evidence-based
24 guidelines, the Telepsychiatry Toolkit and its Best Practices in Videoconferencing-Based
25 Telemental Health (APA, 2018), which is referenced in the Resource Document. The Resource
26 Document provides no explanation for why it would be unacceptable for a correctional setting to
27 follow the guidelines for integration into inpatient and residential care settings. It is also not clear
28 that the authors have direct experience practicing or researching telepsychiatry on which to base

2

DECL. MEHTA ISO DEFS.' RESP. TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19400825.6

1  this contrary opinion, and the document is notably lacking the customary disclosure of potential
2  conflicts of interest.

3        7.     Dr. Stewart states the second "Key Principle" from the Resource Document relates
4  to onsite visits at the correctional facility.  (Supp. Decl. Pablo Stewart, ¶ 4b.)  He believes the
5  "Resource Document correctly points out at [sic] that the psychiatrist is likely to misinterpret
6  what the patient says if the psychiatrist has no first-hand knowledge of prison life," and concludes
7  that onsite visits "may improve relationships."  CDCR's proposed policy already clearly states,
8  "[t]elepsychiatrists shall visit their assigned institution within 30 days of assignment and no less
9  than annually thereafter."  (CDCR's Proposed Telepsychiatry Policy, ECF 7682-1 at 174 of 317.)
10 Thus, CDCR meets the recommendation of the second "Key Principle", as the policy already
11 requires site visits to occur.  The Resource Document goes on to state "Separate from the periodic
12 visits noted above, when regular on-site visits are not feasible or practical, an alternative may be
13 occasional routine video staff meetings that include off-site and on-site team members."  This
14 admission would appear to invalidate the entire recommendation, acknowledging that on-site
15 visits are not essential. CDCR's telepsychiatrists participate in interdisciplinary treatment team
16 meetings at least weekly (among various other meetings), providing routine exposure to prison
17 cultural factors that impact patients.

18       8.     Dr. Stewart's concerns about a psychiatrist misinterpreting the patient are curious,
19 and have little to do with the difference between on-site psychiatry and telepsychiatry.  In the
20 community, physicians working with a population in a comparable socioeconomic demographic
21 will have very different lives from their patients, but there is no recommendation for them to visit
22 their patients' homes periodically, and more frequently if a patient is more ill. Dr. Stewart also
23 does not seem to be aware that CDCR's telepsychiatrists receive a significant amount of carefully
24 tailored training and orientation to the details of correctional work and direct mentoring from
25 other physicians that have served the patients of the institution, among other forms of positive
26 acculturation. It is also important for on-site psychiatrists to remember that they should be
27 treating these patients with the same care and consideration as any other patient that is not in a
28

correctional environment, and should not make assumptions about their patients just because they are in a prison.

9.  It is worth noting once again that these recommendations in the Resource Document contain no citations, and represent an opinion that is not based on published evidence or established guidelines. CDCR goes above and beyond any community standard by already requiring visits to the physical site, but there is no comparable clinical standard requiring this of companies that provide correctional telepsychiatry services. There is certainly no explanation or justification for the unqualified statement that "[t]he frequency of such periodic visits depends on the level of care." (ECF 7739 page 13 of 23.)

10.  Third, Dr. Stewart states that the Resource Document "correctly emphasizes that the psychiatrist should inform the patient about the use of telepsychiatry, and proceed only with consent." (Supp. Decl. Pablo Stewart, ¶ 4c.) It is not clear what point Dr. Stewart is trying to make here; his selectively truncated quote continues, "and psychiatrists should inform the patient about the use of telepsychiatry, and that conversations are not recorded and are as secure as possible from a privacy standpoint." CDCR's proposed policy already clearly states, "[a]t the beginning of the patient's first telepsychiatry contact, the telepsychiatrist shall explain the treatment modality, including a description of the role of the tele-presenter... and a plan for a response to interruption in services." It further states, "If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership ... If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate on-site psychiatric treatment." (CDCR's Proposed Telepsychiatry Policy, ECF 7682-1 at 171-172 of 317.) Thus, the CDCR policy already provides for consent, and the decision to change modalities is a clinical decision made by the treatment team, which includes the patient.

11.  Fourth, Dr. Stewart states that "[b]ased on my familiarity with the delivery of care in CDCR, it is my opinion that this statement [from the Resource Document concerning the use of cell-side telepsychiatry] would be too permissive of cell-front telepsychiatry if applied to CDCR.

4

1  The level of crowding, the noise, the lack of aural privacy between cells, and the prevalence of
2  ethnic and gang politics in CDCR, make cellside contacts almost always useless, and probably
3  always useless if the complexity of telepsychiatry is added." (Supp. Decl. Pablo Stewart, ¶ 4d.)
4  CDCR's proposed policy already clearly states, "the telepsychiatrist may request a consultation
5  from an on-site provider or conduct a cell-front telepsychiatry contact, as clinically required."
6  (*See* CDCR's Proposed Telepsychiatry Policy, ECF 7682-1 at 171-172 of 317.)  Dr. Stewart
7  presumes to make that decision for every provider and every patient in CDCR, though he appears
8  to lack familiarity with CDCR's current programs and his last visit to a CDCR institution was
9  approximately ten years ago.  (*See* Decl. Pablo Stewart, ECF 7703-1, at 3:18-19.)  Dr. Stewart
10 does not describe any personal exposure to or knowledge of CDCR's telepsychiatry program in
11 recent years[1], including monitoring or observation.  Finally, and significantly, the relevant section
12 of the Resource Document is specifically referring only to "Patients in Restrictive Housing (e.g.,
13 solitary confinement)," though Dr. Stewart does not appear to note that distinction.

14       12.     Again, the Resource Document lacks citations or even explanation for the assumed
15 "significant technical difficulties with cell-front telepsychiatry, especially the lack of adequate
16 confidentiality," and represents an opinion that is not based on published evidence or broad
17 guidelines. (Supp. Decl. Pablo Stewart, Ex. A at 9.)

18       13.     Further, this concern with respect to cell-side confidentiality has nothing to do
19 with the difference between on-site psychiatry and telepsychiatry, which is the issue at hand. Any
20 crowding, noise, "lack of aural privacy between cells, and the prevalence of ethnic and gang
21 politics in CDCR" that is present for a telepsychiatric visit to the cell-front would also be present
22 for an on-site cell-front visit. CDCR has carried out cell-front telepsychiatry visits for many years
23 under existing policy, and a demonstration including both the Special Master's subject matter

---

[1] Dr. Stewart states in his initial declaration that in August 2018, he provided a declaration relating to CDCR's telepsychiatry policy then in effect, but does not state any exposure to or familiarity with CDCR's telepsychiatry program since that time. (ECF 7703-1 at ¶ 6.)  He also states ambiguously that he has "observed over 100 telepsychiatry sessions in correctional institutions, primarily at jails and prisons in California, Arizona, and Illinois" (*Id.* at ¶ 5), though he does not specify whether any of those observations occurred within a CDCR institution, and not simply California jails. CDCR's telepsychiatry program is constantly upgrading equipment, infrastructure, trainings, and procedures as it adapts to different institutions and programs, and evolves to remain at the forefront of the field.

experts and plaintiffs demonstrated that there is in fact *more* privacy for telepsychiatric cell-side encounters than on-site cell-side encounters, as the speakers and microphone are directional and therefore leak less sound to neighboring cells.

14. Finally, Dr. Stewart opines that "[b]ecause of the Covid-19 pandemic, telehealth adoption accelerated enormously, far faster than it would have without the pandemic, and far outpacing the development of evidence that it is effective." (Suppl. Decl. Pablo Stewart, ¶ 5.) The latter part of this statement demonstrates a startling lack of familiarity with the literature on this topic. Dr. Stewart's statement contradicts the APA's own Telepsychiatry Toolkit developed by the APA's Committee on Telepsychiatry, which is "charged with focusing on educational materials related to the practice, research, and policy implications of telepsychiatry."[2] The APA Telepsychiatry Toolkit notes that "[t]elepsychiatry's evidence base is substantial and satisfaction is extremely high among patients, psychiatrists and other professionals. Its effectiveness is comparable to in-person care in terms of therapeutic engagement, quality of care, validity/reliability of assessment, and clinical outcomes."[3] Indeed, CDCR's Lessons Learned During the COVID-19 Pandemic report indicates that CDCR's experience with telehealth during the pandemic is consistent with the APA's statements in its Telepsychiatry Toolkit – including that "[t]elehealth proved to be an effective way of maintaining quality patient care while protecting both staff and patients," and "was well received with very few patient appointment refusals." (Lessons Learned Report, *see* ECF 7682-1 at 193, 194 of 317.)

15. Further, CDCR's filing on telepsychiatry from June 30, 2022 listed 56 references that supported the use of telepsychiatry, including examples of correctional settings and inpatient settings (*See* CDCR's Proposed Telepsychiatry Policy, ECF 7682-1 at 246-253 of 317.) The Resource Document does not consider many of these references before suggesting that more research is needed, and proceeding to make recommendations not supported by any research. The Resource Document instead continues to reference long outdated sources (e.g. a 2008 publication

---

[2] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry (last visited March 14, 2023).

[3] https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/evidence-base (last visited March 14, 2023)

6

DECL. MEHTA ISO DEFS.' RESP. TO SUPP. STEWART DECL. (2:90-cv-00520 KJM-DB (PC))

19400825.6

that considered only articles from 1998 – 2006) that refer to theoretical problems resolved decades ago or that never materialized and are in fact contradicted by subsequent research.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 21st day of March, 2023, at San Quentin, California.

*/s/ Amar Mehta*
Amar Mehta, M.D.