ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7318
  Fax:  (916) 324-5205
  E-mail:  Elise.Thorn@doj.ca.gov
Attorneys for Defendants

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone:  (925) 746-8460
  Fax:  (925) 746-8490
  E-mail:  PMello@hansonbridgett.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                    Plaintiffs,<br><br>        v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                    Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN RESPONSE TO DECEMBER 29, 2022 ORDER RE DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF No. 7721)** |

19376383.4

## AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D.

I, Steven Cartwright, Psy.D., declare as follows:

1.      I am currently employed as the Assistant Deputy Director of the California Department of Corrections and Rehabilitation's (CDCR) Statewide Mental Health Services Delivery System (MHSDS). I have held this position since July 17, 2020. I have been employed by CDCR since January 1, 2016. I make this amended declaration in response to the Court's March 13, 2023 order (ECF No. 7757) and in support of Defendants' Opposition to Plaintiffs Motion in Response to December 29, 2022 Order Regarding Dr. Golding's Second Whistleblower Report (ECF No. 7721) filed on March 3, 2023.  (ECF No. 7752.)  I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2.      I have reviewed Plaintiffs' motion in response to the Court's December 29, 2022 Order regarding Dr. Michael Golding's second report to the Special Master (Second Golding Report).

3.      In my capacity as Assistant Deputy Director, I oversee Defendants' data remediation efforts. I participate in all stages of validation and verification, including data analysis, planning, change management, reporting, and monitoring.  I work closely and regularly with Dr. Potter, the Special Master's data expert. Additionally, I attend meetings related to data remediation to ensure that our efforts align with the objectives of the data remediation project – documentation, validation, and verification of the mental health reporting system. By actively participating in the various stages of data remediation, I ensure that we identify the root cause of data quality issues and determine the most effective remediation approach. I work with the team to develop a comprehensive plan that outlines the scope, timelines, and resources required for data remediation. I also oversee the implementation of workflows and procedures to ensure that remediated data is accurate, complete, and produce data sufficient to measure compliance with the business requirement. Attending meetings related to data remediation allows me to stay informed and enables me to collaborate with stakeholders and communicate the progress of our data remediation efforts effectively. Through ongoing reporting and monitoring, I track the progress of data remediation efforts and identify areas for further improvement.

1

AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D. ISO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19376383.4

4.      I strongly disagree with Plaintiffs' representation that CDCR mental health leadership supports a culture of disdain towards the Court and the Special Master. I am in a position of leadership within the CDCR Mental Health Services Delivery System (MHSDS) and, put simply, this is not a reality.

5.      Plaintiffs' motion inaccurately characterizes the nature of CDCR's relationship with the Court and the Special Master. While medical professionals may have differing opinions on the best course of action for patient care, these disagreements do not indicate a disdainful relationship between CDCR and the Court. In my experience, interactions and communications between CDCR and the Court (and the Special Master Team) have always been professional, despite any disagreements that may arise.  CDCR, the Court, and the Special Master share a common goal of providing quality and appropriate mental healthcare to CDCR's patients. While there may be differing perspectives on how best to achieve this goal, I firmly believe that we all have the patients' best interests in mind. I have dedicated my career to this cause, I am committed to working collaboratively with all stakeholders to provide the best possible care to CDCR's patients.

6.      It has been made clear to me from those in leadership within CDCR Mental Health in positions above me, that compliance with court-ordered mandates is not optional. Sometimes, though, orders require interpretation to be operationalized and so we work with Plaintiffs and the Special Master team to clarify and interpret the gray area. Our interpretations are always guided by clinical judgment and CDCR policy, with the best interests of our patients in mind. It is crucial that these interpretations remain consistent to ensure stability and provide clear guidance to our clinicians on what is expected of them by the Court. While we may have disagreements with the Plaintiffs' or the Special Master's interpretations, our disputes are professional and respectful, and do not remotely rise to the level of "disdain."

7.      Plaintiffs' portrayal of CDCR's mental health leadership team as indifferent to patient care, or worse, is absolutely wrong, unfair, and demoralizing.   As a medical professional within CDCR, I take issue with these characterizations. I, along with the other healthcare providers in CDCR, have dedicated my career to caring for the mental health patients in our

custody. It is deeply hurtful to suggest that any of us are indifferent to patient care. On the contrary, patient care is at the core of everything we do, and we always have the best interests of our patients in mind. These unfounded suggestions do a disservice to the tireless efforts of our team to provide quality and appropriate care to our patients, often under challenging circumstances.

8.      I believe that the negative characterizations of CDCR's mental health leadership team trickles down to the line staff and negatively impact retention and recruitment. Working with mentally ill patients in a carceral setting is already a challenging job. But then to constantly be told that what we're doing is never enough—or that we don't have our patients' best interests at heart—makes the job that much harder. When line staff hear such criticisms, it can lead to demoralization, frustration, and burnout. As such, it is crucial that all stakeholders promote a positive and supportive work environment that values and prioritizes the care of our patients.

9.      Separately, I disagree with Plaintiffs' argument that CDCR sidelines its psychiatrists. The following psychiatrists are invited to participate in weekly meetings for pre-stakeholder internal review, pre-BRMR internal review, BRMR, and CAPC: Erick Rizzotto; Michael Golding; Toni Martello; Melanie Gonzalez; Navreet Mann; Nicole Morrison; Al Bunn; Jake Adams; and, Lisa Scott-Covello. This invitation appears on their calendar as a recurring invite. It is their choice to attend or not, and of course, all are encouraged and welcomed. Further, four of the eight voting members of CAPC are psychiatrists: Amar Mehta; Erick Rizzotto; Michael Golding; and, Toni Martello. Thus, far from Plaintiffs' assertion, CDCR psychiatrists (including at the headquarters and leadership level) are absolutely integrated into daily decision-making and are valued team members.

10.      CDCR's data remediation efforts have been thorough and include taking a close look at the source and accuracy of the data, as well as undertaking a rigorous substantive review. It is indisputable that mental health staff spend significant time and resources developing documentation for indicators discussed at BRMR meetings, and shepherd these indicators through

AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D. ISO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19376383.4

an eleven-step validation and verification process[1] to ensure that the data is accurate and appropriately reflects Program Guide requirements. CDCR Mental Health staff make every effort to provide the rationale for their Program Guide interpretations to Plaintiffs, and these interpretations are guided by *Coleman* obligations and well-reasoned clinical judgment regarding the best interests of patients.

11.     As of February 21, 2023, CDCR, the Special Master, and Plaintiffs have successfully validated 71 provisionally approved indicators.[2]  Minor edits to improve clarity, readability, and consistency notwithstanding, 42 (or about 60%) of the 71 validated indicators included significant changes to the workflows, data gathering procedures, volume of data collected, or measurement methodology.  As of today, five indicators are moving through the dispute resolution process, while the remaining indicators proceed through various stages of the remediation process.  CDCR independently identified the need for some of those changes to achieve data remediation, and accepted other changes advocated by the Special Master and Plaintiffs using the agreed-upon data remediation process.

12.     Upon reviewing Plaintiffs' Motion in response to the Court's December 29, 2022 Order, I noticed that they now seek a clarification order which "reaffirm[s] that the data measures are required to align with the remedial requirements in this case in order to resolve the parties' dispute once and for all, and expedite the data remediation process."

13.     The clarification order that Plaintiffs seek would not resolve the parties' actual disputes, which are:  (1) the appropriate scope of each provisionally approved key indicator; (2) whether the underlying business rule ensures that indicators properly measure the most salient and material provisions of the Program Guide and Compendium; and (3) whether certain proposed changes to indicators are reasonable modifications, attempts to expand the remedial scope beyond the Program Guide and Compendium, or disguised requests for entirely new indicators.

---

[1] The thirteen-step process proposed in the January 7, 2022 Data Activation Schedule was modified into an eleven-step process because Plaintiffs were integrated into the BRMR meetings.
[2] Dr. Potter has labeled 27 indicators as "remediated," but the Special Master has not made any corresponding official findings.

AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D. ISO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19376383.4

14. Instead of accepting the Special Master's provisional list of key indicators, Plaintiffs now treat the provisional key indicators as representing general categories of topics that can be indefinitely expanded to include additional new indicators. For instance, Plaintiffs requested expansion of the following indicators:

- Four indicators related to the documentation of Rules Violation Reports (RVRs) measuring whether: (1) clinicians documented Mental Health Assessments (MHAs); (2) whether Senior Hearing Officers (SHOs) mitigated RVRs as recommended; (3) whether SHOs documented their consideration of the recommendation to mitigate; and (4) whether Captains documented their reason for overturning clinicians' recommendation to document the RVR in an alternate manner. Plaintiffs requested that indicators be expanded to measure the "appropriateness" of the clinicians' MHA; the SHOs decision to mitigate; and the validity of the Captain's rationale to disagree with the clinician's recommendation. Assessing the quality of these decisions was beyond the purview of these indicators and required the development of quality standards and developing new audit tools.

- An indicator styled "Percentage of Required NDS Transfers that Occurred within 72 hours,"[3] which measures whether patients *designated* as NDS-200 are timely transferred within 72 hours of Institutional Classification Committee (ICC) determination. In data remediation, Plaintiffs requested that the indicator be modified to evaluate whether the ICC is *appropriately* identifying NDS-200 patients.

- Three indicators related to the adequacy of treatment spaces for individuals, groups, and Interdisciplinary Treatment Team (IDTTs), which already measured the number of chairs and the ventilation in treatment spaces. In data remediation, Plaintiffs requested CDCR to check whether there is actually a sufficient number

_____

[3] *See* May 6, 2021 Special Master's CQIT Report, ECF No. 7151 at 24 (listing "NDS timely expedited transfers" as a key indicator.)

19376383.4

1    of treatment spaces at a given institution to meet the needs of the mental health

2    population housed there, which is different from the purview of this indicator.

3    During Level II Dispute Resolution, the Special Master found that Plaintiffs' requested

4    modifications were requests for new indicators and should not delay data remediation.

5         15.    Another example of Plaintiffs' attempt to use data remediation to revise policy is

6    their demand that patients be treated as required attendees under the IDTT staffing indicator even

7    though patients are clearly not CDCR staff and cannot be required to attend an IDTT.  Instead of

8    following the process to request a new indicator to track patient attendance at IDTTs, Plaintiffs

9    are holding up the remediation of this critical indicator.

10        16.    CDCR acknowledges Plaintiffs' right to request new indicators and is willing to

11   consider proposed new indicators during the revised key indicator list development process,

12   which is anticipated to be included in the Special Master's June 2023 Report. However, such

13   requests should be made as new indicator requests and not be inappropriately incorporated into

14   existing indicators. This approach would only prolong discussions regarding the BRMR and the

15   data remediation process.

16        17.    Elsewhere in their motion, Plaintiffs and Dr. Golding allege that "one of

17   Defendants' segregation indicators was not measuring whether patients actually received property

18   to which they were entitled under Title 15, just whether the institution had a system for measuring

19   whether patients received their property."  (ECF No. 7721 at 8.)

20        This indicator was actually titled "Units in which Staff can Identify Non-Disciplinary

21   Segregation (NDS) Patients and *Have Tracking System* for Phone Calls and Property."  (Special

22   Master's CQIT Report, ECF No. 7151 at 24, emphasis added.)  No CDCR staff, including Dr.

23   Golding, raised concerns about measuring the existence of a property tracking system during

24   CDCR's internal review process, spanning the period between November 2021 and April 2022.

25        Later, Plaintiffs argued that the indicator should measure if and when NDS patients are

26   receiving property, and not merely confirm the existence of a tracking system as the Special

27   Master's report recommended.   During BRMR, CDCR initially opposed Plaintiffs' proposed

28   change as it appeared to be a request for a new indicator.  The indicator was ultimately moved to

6

AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D. ISO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19376383.4

1   dispute resolution and was modified to measure whether NDS patients received their property.

2   The indicator title has now been updated to "NDS Patients Provided Personal Property."   On

3   December 29, 2022, CDCRs' Change Approval Committee (CAPC), including three psychiatrists

4   (Drs. Golding, Morrison, and Bunn) unanimously approved the amended documentation

5   associated with this indicator.

6         18.     Further, Plaintiffs and Dr. Golding allege that "Defendants' interdisciplinary

7   treatment team ("IDTT") compliance indicator scored IDTTs as compliant when any psychiatrist

8   was present, despite the fact that the Program Guide requires the patient's assigned psychiatrist to

9   be present." (ECF No. 7721 at 8.)

10         Previously, the Electronic Health Records System (EHRS) could only track whether a

11   psychiatrist attended the IDTT, and could not specifically track whether the patient's *assigned*

12   psychiatrist attended.  Accordingly, during his own monitoring of a limited sample of IDTTs, the

13   Special Master would verbally inquire whether the assigned psychiatrist was in attendance.

14         Multiple CDCR staff raised concerns in the internal review process that the Special

15   Master's historical methodology did not measure if the assigned psychiatrist or primary clinician

16   were present during all IDTTs, but only for the sample of IDTTs attended by the Special Master.

17   So, in May 2021, CDCR convened a workgroup led by Dr. Bunn (who is supervised by Dr.

18   Golding) that included four psychiatrists, a psychologist and a Research Data Manager/LCSW, to

19   automate a methodology to ensure that EHRS would track whether the assigned psychiatrist was

20   in attendance at each IDTT.  Through this internal process, CDCR developed a superior auditing

21   process for staff attendance at IDTTs, yet Plaintiffs inexplicably cite this as an example of our

22   malfeasance.

23         On May 25, 2022, Dr. Bunn submitted a formal request to modify the EHRS to reflect the

24   workgroup's proposed changes.  Subsequently, a mental health team created a mock-up of this

25   change in EHRS.  This mock-up and related documentation were reviewed again internally and

26   sent to Plaintiffs and Special Master for stakeholder review.  At BRMR, Plaintiffs and the Special

27   Master expressed no objections or concerns about this improved methodology.

28

AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D. ISO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19376383.4

19.     Plaintiffs and Dr. Golding allege that "Defendants perversely interpreted the rules about initial clinical contacts to allow late contacts to count as compliant so long as the initial IDTT was also late." (ECF No. 7721 at 8.)  As in the instances discussed above, however, Defendants discovered this issue during an internal review and independently mitigated it by revising the internal policy memorandum governing clinical contact timelines.

Over the course of several internal meetings held between July 21, July 28, and August 3, 2021, several mental health staff reviewed the controlling policy for the initial contacts.  A plain language reading of the 2020 policy memorandum indicated that in some cases, an initial contact that occurs within established Program Guide timeframes, and before a late IDTT would technically comply with both the Program Guide and memorandum language.  To better understand the gap, edge cases were discussed in meetings to highlight the ambiguity of the language included in the memorandum (*e.g.*, circumstances where an initial contact on the 88th day would be considered compliant).  Recognizing this issue, I also encouraged the team to quickly initiate the internal policy change process to update the 2020 memorandum.

On May 25, 2022, a draft of this memorandum was sent to Plaintiffs and the Special Master for stakeholder feedback.  All parties discussed the memorandum on June 7, 2022; Plaintiffs and the Special Master did not voice any concerns against issuing this policy.  On June 23, 2022, that policy was replaced with a revised memorandum titled "Contact Requirements For Patients in the Mental Health Services Delivery System Before Interdisciplinary Treatment Team Meetings, And After Discontinuation Of Medications For Correctional Clinical Case Management System And Enhanced Outpatient Program Programs."  The revised language unambiguously declares late contacts non-compliant: "The psychiatrist must complete their initial evaluations within 10 working days after arrival to a Correctional Clinical Case Management System (CCCMS) program, or within 14 calendar days after arrival to an Enhanced Outpatient Program (EOP), and before the initial IDTT for all new intakes and patient transfers."  A copy was provided to Plaintiffs and Special Master on June 24, 2022 for their records.

19376383.4

20.     Plaintiffs and Dr. Golding allege that Defendants allowed "psychiatrists' brief welfare checks and medication nonadherence appointments to count as full psychiatric evaluation that reset the Program Guide timelines for clinical encounters." (ECF No. 7721 at 8.)

Mental Health staff do not dispute that welfare checks and medication nonadherence appointments do not count as full psychiatric evaluations, and this consensus predates the data remediation process.

On January 7, 2021, CDCR approved a change to the compliance methodology such that any appointment checked out as "wellness checks only" would not count as fulfilling the Program Guide requirements for Timely PC contact and Timely Psychiatrist Contact.  Although Mental Health believed the issue was resolved in 2021, on February 3, 2022, CDCR discovered that this modification was not reflected in the indicator because the change request language and the underlying policy were unclear to the coding team.  This issue was resolved on April 5, 2022, and retroactively applied so any appointment checked out as "wellness checks only" did not count as fulfilling Program Guide requirements for Timely PC contact and Timely Psychiatrist Contact, effective January 7, 2021.

Appropriate revisions to the underlying policy language have been made for clarity in the memorandum, "Appointment Resolution Guidelines and Clarification of Clinical Contacts."  On February 22 and 24, 2023 respectively, the Special Master and Plaintiffs provided feedback on this policy language, which is currently under consideration.

21.     Plaintiffs and Dr. Golding allege that Defendants were "scoring as compliant initial clinical contacts in the mental health crisis bed ('MHCB') that occur within the first 48 hours, despite that the Program Guide requires those contacts to occur within 24 hours of the patient's arrival."  (ECF No. 7721 at 8.)  But this allegation ignores that during BRMR, the Special Master and Mental Health were negotiating how to operationalize the 24 hours or one calendar day requirement for relevant key indicators.  That issue has since been resolved to the parties' satisfaction and the "MHCB Daily Provider Checks" has been validated.

The "MHCB Daily Provider Checks" indicator was reviewed by a variety of CDCR staff, including the eight psychiatrists invited to participate in data remediation.  During the internal

9

AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D. ISO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19376383.4

1    review process from August 3 to August 31, 2021, no CDCR staff raised concerns with this

2    measure starting on the first full day of MHCB care (as opposed to within the first 24 hours of

3    arrival).

4          During the September 22, 2021 BRMR meeting, Dr. Potter raised concerns that the first

5    daily contact could occur more than 24 hours after arrival and still be considered compliant.

6    CDCR adopted Dr. Potter's suggestion that the documentation specify that the indicator measure

7    the percentage of full calendar days for each patient in MHCB when contact was offered and

8    documented, as well as measure the first day as occurring within 24-hours of arrival to match

9    Program Guide expectations.

10          On April 15, 2022, Plaintiffs sent a letter to CDCR with questions and concerns regarding

11    this indicator, which included a clarifying question similar to Dr. Potter's comment.  After

12    resolving all potential barriers to validating this indicator, it was successfully validated on July

13    29, 2022.  On August 4, 2022, CDCR's Change Approval Committee, including three

14    psychiatrists (Drs. Golding, Gonzalez, and Martello) unanimously approved the amended

15    documentation—resolving this issue months before Plaintiffs filed this motion.

16         22.     Plaintiffs and Dr. Golding allege that "patients referred to Acute or ICF level of

17    care awaiting transfer/admission in outpatient housing programs" should be seen more frequently

18    as a rule and demand a key indicator that measures this frequency.  (ECF No. 7721 at 9.)

19    However, as Plaintiffs are aware, there is no Program Guide requirement that governs the

20    frequency of such contacts.  Rather, individual clinicians see referred patients as often as needed

21    based on their clinical judgment.  Key indicators should reflect carefully selected metrics that

22    concern the provision of individualized care, rather than require a narrow check-the-box approach

23    that forces a clinician or administrator to robotically hew to a flowchart—and eliminate clinical

24    judgment—that does not materially advance patient care and safety.

25          During the internal review process on June 30, 2021, some staff stated that a new policy

26    was needed to clearly define expectations for treatment services when patients are referred to

27    Acute or ICF level of care but are awaiting transfer to outpatient housing programs.  I advised

28    staff that at any point, anyone may initiate the process to create a new policy or modify an

AMENDED DECLARATION OF STEVEN CARTWRIGHT, Psy.D. ISO DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19376383.4

1   existing policy.  In July 2021, a new workgroup established to discuss a policy on this topic, even

2   though the Program Guide is silent on this issue.

3          On July 14, 2021, this issue was discussed in BRMR.  Contrary to Plaintiffs' assertions, I

4   did not advocate for contacts once every 90 days for referred patients during this meeting; indeed,

5   I do not support that position.  Instead, I inquired that if the absence of policy in the Program

6   Guide indicated that the frequency of clinical contacts for a referred patient was left up to the

7   treating clinician's clinical judgment until the transfer occurred.  I also clarified that I was not

8   advocating for reducing or lowering current treatment expectations, but that clinical judgment

9   need not be replaced by a one-size-fits-all policy in this instance.

10          I declare under penalty of perjury under the laws of the United States of America that the

11   foregoing is true and correct.

12          Executed on this 6th day of April, 2023, at Elk Grove, California.

13

14                                         */s/ Steven Cartwright*
                                         Steven Cartwright, Psy.D.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19376383.4