ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-4431
  Fax: (415) 703-5843
  E-mail: Namrata.Kotwani@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                      Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                      Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING THIRD-LEVEL DATA REMEDIATION DISPUTES** |

**INTRODUCTION**

On March 9, 2023, the Special Master filed his Report and Recommendations Regarding Third-Level Data Remediation Disputes ("Report"). (ECF No. 7755.) Defendants provided their Position Statement regarding the four outstanding disputes to the Special Master, which included certain proposed resolutions to these disputes. (*Id.* Exs. C1 and C2.) Defendants now assert objections and present additional clarifications regarding their positions on the Third-Level Data Remediation Disputes. In addition, Defendants propose additional solutions to resolve these

1

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

disputes, which may address the stakeholders'[1] concerns.

## I. MAINTAINING REASONABLE POSITIONS OR POLICY INTERPRETATIONS THAT DIFFER FROM OTHER STAKEHOLDERS' POSITIONS DOES NOT INDICATE A LACK OF UNDERSTANDING OF THE PURPOSE OF DATA REMEDIATION.

Defendants disagree with the Special Master's characterization of the gap between stakeholders' understanding of the data remediation process as "unbridgeable," and reiterate that they understand the "fundamental purpose of data remediation." (ECF no. 7755 at 2.)

As demonstrated by the tremendous progress made in remediating key provisional indicators, the parties are not faced with an "unbridgeable gap" or an irretrievably broken working relationship. As of March 31, 2023, out of a total of 139 provisional key indicators: (1) Defendants have prepared the initial documentation for 123 indicators; (2) Stakeholders have jointly reviewed and validated 83 indicators; (3) Defendants have updated the documentation for 82 indicators, which has also been approved by CDCR's Statewide Mental Health Program; (4) indicator programming has been completed for 61 indicators and 53 indicators have been verified. Minor edits to improve clarity, readability, and consistency notwithstanding, 44 (or about 53%) of the 83 validated indicators included negotiated and significant changes to the workflows, data gathering procedures, volume of data collected, or measurement methodology. None of the foregoing work could have been accomplished without Defendants' understanding of the fundamental purpose of data remediation and a functional working relationship among the parties. This progress demonstrates the parties' ability to bridge disagreements through the data-remediation process.

### A. Defendants Understand That Key Provisional Indicators Must Measure Program Guide Compliance.

Defendants believe the Special Master is mischaracterizing their understanding of data remediation. The Special Master appears to suggest that Defendants routinely resist a substantive evaluation of whether indicators properly reflect Program Guide requirements for patient care. (ECF No. 7755 at 10-15.) Defendants recognize, and the Court and the Special Master have both

---

[1] The Report collectively refers to the Special Master, Plaintiffs, and Defendants as "stakeholders." (ECF No. 7755 at 2, n. 2.)

2

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

1  emphasized, that the key indicators should be a "distil[lation]" of the "most salient elements" of
2  the Program Guide (May 6, 2021 Special Master's CQIT Report, ECF No. 7151 at 4), and should
3  "signify the material provisions of the Program Guide and Compendium." (July 1, 2021 Order,
4  ECF No. 7216 at 4 (internal citations omitted).) As the stakeholders are well aware, Defendants'
5  shepherd these indicators through an eleven-step validation and verification process to ensure that
6  the data is accurate and appropriately reflects Program Guide requirements. (*See* Defs.' Updated
7  Activation Schedules for Completion of Court Ordered Data Remediation, ECF No. 7415 at 17.)[2]
8  Accordingly, Defendants have worked in good-faith to ensure that the provisional key indicators
9  reflect and measure the most salient elements of the corresponding section in the Program Guide
10 and Compendium.

11 Defendants request that any order adopting the Report should acknowledge the foregoing
12 undisputed facts and that the discussion of Defendants' purported understanding of data
13 remediation is inaccurate and not necessary to resolve the four specific disputes that the parties
14 have referred to the Court for resolution.

### B. Presentation and Resolution of Parties' Disagreements Does Not Amount to Unnecessary "Conflict and Delay."

17 Undoubtedly, stakeholder review during the Business Rules and Methodology Review
18 (BRMR) meetings remains the most time-consuming step in data remediation. However, the
19 process of resolving good-faith disagreements about the scope and design of indicators and the
20 operationalization of relevant sections of the Program Guide is a rigorous and detail-oriented
21 activity. Accordingly, Defendants object to the Report's characterization of Defendants' right to
22 advocate for clinicians' reasonable interpretations of the Program Guide and policies as
23 "infus[ing] conflict and delay" into the data remediation process. (ECF No. 7755 at 2.)

24 Defendants believe that all stakeholders agree on the principle that a good-faith
25 presentation of their views on the scope and methodology of the indicators is an essential
26 component of the data remediation process, even if the Special Master ultimately disagrees with a

---

[2] The thirteen-step process proposed in the January 7, 2022 Data Activation Schedule was modified into an eleven-step process because Plaintiffs were integrated into the BRMR meetings.

3

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

party's position in dispute resolution. Yet the Special Master's report seems to apply a double standard. When Defendants advocate for their position, they are sowing conflict and delaying the process. (*See* ECF No. 7755 at 1-2, n. 1.) But there is no similar characterization of Plaintiffs' advocacy, even when the position they take is ultimately rejected by the Special Master. This dynamic is particularly frustrating for Defendants when of the four disputes resolved at Level II dispute resolution, three were resolved in Defendants' favor (in the one remaining instance, CDCR agreed to refer disputed issues to an internal workgroup for potential policy revisions).

The order on the Report's recommendations should recognize that the process of remediating a particular indicator may initially engender disagreement between the parties, but that a complete discussion where all stakeholders understand each other's perspective will ultimately produce more useful indicators. To this end, the Special Master should encourage *both* parties to present well-reasoned positions, and work collaboratively and creatively to resolve disputes.

Moreover, all stakeholders must recognize that requests for modifications—regardless of whether they are truly for reasonable modifications—require time and effort to evaluate, define, and operationalize. (*See* ECF No. 7755 at 14.) Even if there is agreement among stakeholders regarding the reasonableness of a modification, the Special Master and Plaintiffs must recognize that the corresponding changes to the documentation, methodology, and programming all require extensive time to complete. It is fundamentally unfair when—after numerous rounds of proposed modifications to an indicator's design— the resulting delay is solely attributed to Defendants, who are doing their best to accommodate other stakeholders' modification requests. For instance, Defendants have routinely provided stakeholders extra time to review documentation related to indicators and re-programmed indicators and revised corresponding documentation after hours of discussion to carry out modification requests made by other stakeholders. Accordingly, Defendants request that the Court recognize that requests to modify may cause deadline slippage that is not attributable to any stakeholder's lack of good-faith, but due to genuine disagreements about how each party believes indicators should measure the relevant sections of the Program Guide and Compendium, as well as the time required to modify indicators to reflect agreements

4

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

among the parties.  Likewise, Defendants are not resistive to creating new indicators.  If Defendants agree to develop new indicators or expand the scope of an indicator as requested by Plaintiffs, all stakeholders must recognize that the result will be delays in completion of the project.  The Court should acknowledge this fact.

Finally, the Report emphasizes that indicator design should be "informed by the Special Master's monitoring of . . . remedial requirements." (ECF No. 7755 at 12.)  Defendants accept that premise and again reiterate their request that Special Master share the tools and methodologies he uses.  Producing this documentation will allow the parties to expediently and efficiently align indicator design with the Special Master's current monitoring methodology, and ultimately, to advance the shared goals of enhancing patient care and case resolution.

## II. DEFENDANTS' INDICATOR DESIGN ALIGNS WITH THE PROGRAM GUIDE ON STRH/LTRH TIMEFRAMES, AND DEFENDANTS PROPOSE A DRILL-DOWN THAT ADDRESSES STAKEHOLDER CONCERNS.

### A. The Program Guide Expressly Contemplates Exceptions to the STRH/LTRH Timeframes, Contrary to the Report's Conclusion.

The central dispute is whether a key indicator titled "Transfer to STRH/LTRH within Timeframes" should be scored compliant when a Correctional Clinical Case Management System (CCCMS) patient remains in a non-mental health segregation unit for more than 30 days due to a medical hold.  (ECF No. 7755 at 17.)  Plaintiffs and the Special Master state that Short Term Restricted Housing (STRH)/ Long Term Restricted Housing (LTRH) policy requires transfer of CCCMS patients in a non-mental health segregation unit for more than 30 days, without exception.  (*Id.* at 17; 19.)  The Special Master and the Plaintiffs misstate the STRH/LTRH policy and Defendants object to the Report's recommendation that this indicator should disregard the Program Guide's explicit medical-hold exception to the timeframes.

*First*, the relevant Program Guide provision approved by the court expressly contemplates approval of not transferring a patient within 30 days if the delay is because of a medical hold:

> IPs NOT TRANSFERRED TO AN STRH WITHIN ALLOTTED TIME FRAME
> In order to avoid adversely impacting the IP's other custodial or medical needs, there may be situations where an IP will not be transferred to an STRH within 30 days. Some examples of situations include, but are not limited to, an imminent

5

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

Board of Parole Hearing date, *medical hold*, scheduled transfer to a mainline placement, scheduled court hearing, pending release to parole within 60 days of CCCMS ASU placement, and scheduled mental health evaluations for Mentally Disordered Offender or Sexually Violent Predator screenings. (emphasis added.)

ECF No. 7331-1 at 457 (emphasis added).

*Second*, the Program Guide contemplates how delayed transfers for these exceptional reasons must be documented, and how patients' interests should be protected. When the transfer-timeline exceeds 30 days, "institution classification staff shall specify the *exceptional reason* for retention (including mental health considerations) in the Classification Committee Chrono." (*Id.* (emphasis added).) In addition, "a case note shall be placed in SOMS articulating the case-by-case reason for retention under the 'STRH Retention Note Type,' and the warden or designee must "ensure a collaborative approach between Custody and Mental Health staff is employed" to ensure the wellbeing of inmate-patients whose transfers have been delayed. (*Id.*) Moreover, Custody and Mental Health Staff must discuss any ongoing behavioral issues or concerns at daily Administrative Segregation Unit morning meetings and at scheduled Interdisciplinary Treatment Teams and Institutional Classification Committees. (*Id.*)

The Report's position simply cannot be reconciled with the plain language of the Program Guide provisions discussed above, and Defendants therefore object to the Report's recommendation that this indicator should not allow for a medical-hold exception.

### B. Defendants Will Issue Guidance to Clinicians on STRH/LTRH Medical Holds, And Propose Adding An Unusual Events Flag That Identifies Medical Holds.

Although CDCR believes that its clinicians are appropriately placing medical holds, Defendants already agreed to issue a memorandum to all mental health staff in administrative segregation housing units reiterating appropriate clinical discussion between mental health and medical staff regarding medical holds and clinical standards regarding transfers delayed due to medical holds. (*See* ECF No. 7755 at 18 (stating that Plaintiffs previously rejected this proposal).) Additionally, to facilitate a compromise, Defendants offer to create an unusual events flag that will identify all medical holds that occur during STRH/LTRH transfer timelines and quantifies any delay, enabling stakeholders to effectively monitor such occurrences. This flag

6

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

1   would provide sufficient detail to locate and review the patient's chart or other relevant data if
2   needed.

3   **III.  DEFENDANTS PROPOSE ADDING AN UNUSUAL EVENTS FLAG TO THE MHCB
        DAILY PROVIDER CONTACT INDICATOR THAT ADDRESSES STAKEHOLDER
4       CONCERNS REGARDING TELEPSYCHIATRISTS TREATING MHCB PATIENTS.**

5          The provisionally approved key indicator titled "MHCB Daily Provider Contact"
6   measures whether an inmate-patient is monitored daily by the treating clinician and whether the
7   daily contact is documented   (ECF No. 7755 at 20.)  Thus, to the extent that the treating clinician
8   provides a daily contact and documents the clinical encounter daily, the Mental Health Crisis Bed
9   (MHCB) Daily Provider Contact indicator should be scored as compliant.  All stakeholders are
10  aware that the current provisional telepsychiatry policy allows for the use of telepsychiatry in the
11  MHCB "as a last resort in emergency situations when an on-site psychiatrist is not assigned to the
12  program."  (*See,* e.g. ECF No. 7755 at 21-22.)  The current provisional telepsychiatry policy,
13  however, has not yet been finalized and is pending adjudication before this Court.  (*Id.* at 22.)
14  But to avoid further delay of the remediation of this indicator related to the provision of care in
15  crisis beds until the telepsychiatry policy has been finalized, and similar to the Special Master's
16  proposal in footnote 12 of the Report, Defendants would agree to creating an unusual events flag.
17  Specifically, Defendants propose creating an unusual events flag that shows whether the
18  encounter was conducted and documented by a telepsychiatrist, so that all stakeholders may
19  determine whether the contact violated the provisional telepsychiatry policy.  (*Id.* at 23 n. 12.)

20         Defendants are committed to following their telepsychiatry policy which limits the use of
21  telepsychiatry in MHCBs.  To the extent Plaintiffs seek an indicator measuring compliance with
22  specific portions of CDCR's finalized telepsychiatry policy, Defendants invite them to use the
23  process for proposing new indicators.

24  **IV.  THE IDTT STAFFING INDICATOR ALIGNS WITH THE COMPOSITION PRESCRIBED
        BY THE PROGRAM GUIDE, AND DEFENDANTS PROPOSE ADDING A NEW INDICATOR
25      THAT WILL SHOW WHETHER A PATIENT ATTENDED THE IDTT.**

26

27         The Report recommends that the "IDTT Staffing" indicator, which measures whether all
28  required staff were in attendance in an IDTT, be changed to measure whether the patient also

7

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

attended the IDTT. However, the IDTT Staffing indicator should logically track staff attendance. As Defendants have previously noted, CDCR relies on this indicator to measure staff attendance and implement any necessary corrective action in its workforce. Defendants do not deny that patients are generally members of their own IDTT and encourage patient attendance. Nevertheless, Defendants object to the Report's recommendation to morph this indicator to measure both staff and patient attendance, especially as patients may decline to attend IDTTs as a matter of right. In addition, with respect to MHCB IDTTs, ASU IDTTs, and SHU IDTTs, patients must be included only if it is clinically and custodially appropriate to do so. (*See* ECF No. 7755 at 23-24 n. 13 (internal citations omitted).)

Although Defendants object to the Report's recommended redesign of this indicator, to address Plaintiffs' concern, as a compromise to resolve this pending dispute, Defendants propose creating a new indicator that would use a newly-developed Electronic Health Records System (EHRS) feature that tracks whether patients were offered an opportunity to attend their IDTT. Creating this indicator would allow stakeholders to track patient refusals and investigate any refusal by locating and reviewing the corresponding patient's chart, while allowing CDCR to use the original IDTT Staffing indicator for its intended purpose of tracking and managing its personnel.

V. **DEFENDANTS PROPOSE ADDING AN UNUSUAL EVENTS FLAG TO THE IDTT STAFFING INDICATOR THAT WILL SHOW WHETHER A PNP ATTENDED THE IDTT FOR PATIENTS AT EOP OR HIGHER LEVELS OF CARE.**

The provisionally approved key indicator IDTT Staffing tracks, *inter alia*, whether the patient's assigned psychiatrist attends the IDTT. (*See* ECF No. 7715 at 27.) The Report and Plaintiffs are concerned that IDTTs at EOP and higher levels of care may be being staffed by PNPs in violation of the Psychiatric Nurse Practitioner (PNP) Policy. (ECF No. 7755 at 30-31). CDCR's PNP Policy only permits PNPs to provide services at the CCCMS level of care in lieu of a psychiatrist at "institutions with a current permanent Chief Psychiatrist or Senior Psychiatrist, Supervisor who enters an agreement to supervise a PNP." (ECF No. 6978-1 at 7.) CDCR assigns PNPs to patients according to this policy. PNPs are not assigned to patients at the EOP

8

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

level of care or higher. Nor does the Report or Plaintiffs contend that PNPs are assigned to those patients. Defendants propose—as a compromise to resolve this dispute—the creation of an "unusual events" data flag which would identify when PNPs attended an IDTT for an EOP or higher level of care patient. Stakeholders will then be able to track whether the patient was treated by a PNP in violation of CDCR's PNP Policy.

## CONCLUSION

Differing opinions or clinical judgments related to the scope of an indicator are not evidence that Defendants do not understand the purpose of data remediation. Defendants understand that the key indicators should correspond to the most salient and material provisions of the Program Guide and Compendium and do not require any clarification in this regard. The tremendous progress made in remediating key provisional indicators and resolving several disputes without court intervention belies the existence of an "unbridgeable gap" between the parties.

Further, to facilitate a compromise between the parties, Defendants have proposed adding unusual event flags to the "Transfer to STRH/LTRH within Timeframes," "MHCB Daily Provider Contact," and the "IDTT Staffing" indicators to assuage stakeholders that CDCR is following its transfer timeline, telepsychiatry, and PNP policies respectively when measuring compliance through these three indicators. In addition, Defendants propose creating a new indicator to track whether patients were offered an opportunity to attend their IDTT to resolve the pending dispute related to the "IDTT Staffing" indicator. Defendants respectfully request that the Court adopt these proposed compromises to expeditiously resolve these pending third-level data remediation disputes.

9

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2

| | | |
|---|---|---|
| 1 | Dated: April 10, 2023 | Respectfully submitted, |
| 2 | | ROB BONTA |
| | | Attorney General of California |
| 3 | | DAMON MCCLAIN |
| | | Supervising Deputy Attorney General |
| 4 | | |
| 5 | | */s/ Namrata Kotwani* |
| | | Namrata Kotwani |
| 6 | | Deputy Attorney General |
| | | *Attorneys for Defendants* |
| 7 | | |
| 8 | Dated: April 10, 2023 | HANSON BRIDGETT LLP |
| 9 | | */s/ Samantha D. Wolff* |
| 10 | | PAUL MELLO |
| | | SAMANTHA D. WOLFF |
| 11 | | *Attorneys for Defendants* |

10

Defendants' Objections to Report & Recommendations Regarding Third-Level Data Remediation Disputes
(2:90-cv-00520 KJM-DB (PC))

19366274.2