UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB |
| Plaintiffs, | ORDER |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

More than five years ago, the court gave defendants one year to "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." October 10, 2017 Order, ECF No. 5711, at 30. Defendants did not come into compliance within the one year deadline and remain out of compliance. In an effort to effect compliance, the court has ordered fines to begin accumulating. *See* February 28, 2023 Order, ECF No. 7742, at 5-7. The court directed defendants to report on the accumulation of monthly fines for vacant mental health staff positions in monthly staff vacancy reports, beginning with the report due on March 31, 2023. *Id.* The court had not previously "set a maximum vacancy rate for recreation[ ] therapists or medical assistants, so it also directed the parties to "meet and confer and file a joint statement of their respective positions on the maximum vacancy rate that should apply to recreation therapist and medical assistant classifications." *Id.* at 6–7. The parties have filed their joint statement. ECF

1

No. 7761. As explained below, this order confirms the same ten percent maximum vacancy rate applies to recreation therapists and medical assistants.

**I.      RECREATION THERAPISTS**

Plaintiffs do not object to a ten percent vacancy rate for recreation therapists for purposes of the court's enforcing staffing orders. ECF No. 7761 at 2. Defendants agree the maximum vacancy rate for recreation therapists should be set at ten percent. *Id*. at 7-8.

Although plaintiffs do not object to a ten percent rate for enforcement purposes, they note their belief that the vacancy rate for recreation therapists is covered by an order the court previously issued in 1999. *See* ECF No. 7761 at 2 (citing July 26, 1999 Order, ECF No. 1055). That 1999 order required the California Department of Corrections and Rehabilitation (CDCR) to maintain vacancy rates in staffing categories other than psychiatrists and psychiatric social workers "at present or comparable levels." ECF No. 7761 at 2 (quoting July 26, 1999 Order at 4). Plaintiffs cite evidence showing the vacancy rate for recreation therapists was four percent at that time. *Id*. (citing Special Master's Report on Staffing Vacancies, ECF No. 1032, at 3, 14).

The 1999 order did not perpetually cap the vacancy for recreation therapists at four percent; rather it allowed different vacancy rates if those rates were "comparable" to the rate at the time the order issued. ECF No. 1055 at 4. The court finds a ten percent vacancy rate is "comparable" in context. Just four months before the court issued the 1999 order, the vacancy rate had been 12.5 percent. ECF No. 1032 at 3. And in a report underlying the 1999 order, the Special Master had used a ten percent vacancy rate as a guidepost for positions other than psychiatrists and psychiatric social workers. *See id*. at, *e.g.*, 3, 13-14.

For these reasons, defendants must maintain a maximum ten percent vacancy rate for recreation therapists. The court's 1999 order is clarified accordingly. For purposes of the February 28, 2023 order, then, the court will calculate the number of unfilled recreation therapist positions by multiplying the total number of allocated recreation therapist positions by 0.90, then subtracting the total number of filled positions from that result.

## II. MEDICAL ASSISTANTS

### A. Positions of the Parties

Plaintiffs contend the vacancy rate for medical assistants should also be set at 10 percent. ECF No. 7761 at 3. Defendants argue the court should not set a maximum vacancy rate for medical assistants for several reasons. *Id*. at 9. They contend the medical assistant classification is not part of the 2009 Staffing Plan and that allocation of medical assistant positions is not based on the population of mentally ill inmates. *Id*. at 7, 13. They also argue medical assistants are used almost exclusively as telepresenters for the telepsychiatry program, "are not allocated for on-site psychiatrists" and are just one of many classifications that can be used for telepresenting. *Id*. at 8. Similarly, defendants argue, because people in other classifications work as telepresenters, "a Medical Assistant vacancy does not necessarily equate to an inability to provide access to care" or "indicate that there are insufficient telepresenters available for telepsychiatry contacts." *Id*. at 9. Finally, defendants argue filled medical assistant positions do not necessarily translate to telepsychiatry assignments. *Id*.

Plaintiffs argue defendants have "obfuscate[d] the key issues" rather than "responding to the Court's directive." *Id*. at 3. Plaintiffs contend defendants' position runs afoul of a 2015 court order directing defendants to implement a specific proposal to create a psychiatric medical assistant classification to assist on-site psychiatrists. *Id*. (citing May 18, 2015 Order, ECF No. 5307, at 6). Defendants contend their 2015 proposal "was never fully implemented" and claim their use of medical assistants has "transitioned to telepresenting only." *Id*. at 9. They also contend their 2015 proposal "evolved over the last seven years into the current Medical Assistant classification." *Id*. at 10. Defendants request "additional time to develop a Medical Assistant staffing plan and allocation that comports with the focus of their current duties, including an appropriate maximum vacancy rate." *Id*. at 13.

### B. Background

In June 2014, the court instructed defendants to "revisit and, as appropriate, revise" their 2009 Staffing Plan to resolve ongoing mental health staffing shortages and comply with the maximum mental health staffing vacancy rates required by the court's June 13, 2002 order, ECF

No. 1383. June 19, 2014 Order, ECF No. 5171, at 3-4. In response, defendants proposed a new classification for psychiatric medical assistants (PMAs).

> Under this proposal, CDCR will assign each psychiatrist a psychiatric medical assistant—an unlicensed technician who will interface with custody and other members of the treatment team. Psychiatric medical assistants will remind patients of appointments, send out physician orders for labs or medication, schedule new appointments, make referrals to therapists and other physicians, meet with the patient prior to the appointment, collect relevant data, and take blood pressures and measure weights. In addition, psychiatric medical assistants will help find treatment rooms to meet patients and schedule with correctional staff to bring a patient to the psychiatrist.

ECF No. 5269 at 7. The purposes of this new classification were to ease the administrative burden on psychiatrists, improve recruitment and retention, increase the number of patients CDCR psychiatrists could see, and increase their time treating patients. *Id*. The parties fully briefed the issue. ECF Nos. 5279, 5281, 5286, 5290.

After review, the court directed defendants to "move forward" with their PMA proposal and directed the Special Master to report on the status of defendants' implementation of the proposal. May 18, 2015 Order, ECF No. 5307, at 6. The Special Master made the required report, and the court adopted it. *See* October 10, 2017 Order, ECF No. 5711, at 5 (discussing inclusion of required report in Special Master's Twenty-Sixth Round Monitoring Report and court's order thereon). The court then ordered the Special Master to "issue a stand-alone report on the status of mental health staffing and implementation of defendants' staffing plan." August 9, 2016 Order, ECF No. 5477, at 9. The Special Master reported defendants were making "sufficient progress on their proposal related to the use of medical assistants" and, finding the use of this classification "has the potential to positively impact the recruitment and retention of psychiatrists" recommended that it "be implemented without further delay." ECF No. 5564 at 10, 28. The parties filed extensive responses to this report, but neither objected to the recommendation about the PMA classification. *See* ECF No. 5711 at 6, 8-10.

In the October 10, 2017 order, the court adopted a modified version of the Special Master's recommendation regarding the PMA program. Specifically, the court ordered defendants to report to the Special Master "at such regular intervals as he may set" on the

4

implementation of the PMA program, among other proposals. *Id*. at 29. The court permitted defendants to raise "with the Special Master the issue of whether full implementation of the PMA program supports a change in staffing ratios for psychiatrists," but the court required defendants to timely raise and resolve any disputes within the one year deadline set by the order for compliance with staffing requirements.  *Id*. at 19, 30. Finally, the court required defendants to develop a telepsychiatry addendum to the Revised Program Guide. *Id*. at 30.

### C. Analysis

Defendants are required to meet their constitutional obligations to the plaintiff class, including with respect to adequate mental health staffing. *See* ECF Nos. 5307 at 5, 5711 at 12. Although the court did not expressly order defendants to "fully implement" their 2015 PMA proposal, it did order defendants to "move forward" with that proposal, ECF No. 5307 at 6, and to keep the Special Master informed of its status along with defendants' implementation of their broader staffing plan, *id*. at 6; *see also* ECF No. 5477 at 8.

It now appears defendants have effectively abandoned their original PMA proposal without informing the Special Master or the court. *See* ECF No. 7761 at 9. In defendants' own words, their plan has "evolved over the last seven years into the current medical assistant classification," and as a result, "Medical Assistants transitioned to telepresenting only." *Id*. at 9-10. Today, they say, medical assistants "are not allocated for on-site psychiatrists"; instead, "the Medical Assistant Classification is based on telepsychiatry need." *Id*. at 8, 12. Contrary to defendants' claims, they did not keep plaintiffs and the Special Master "aware of" this evolution. *Id*. at 12. Their evidence shows only that the Special Master and plaintiffs were aware by early 2020 that defendants would use medical assistants as telepresenters for the new mental health telepsychiatry policy. *See* ECF No. 7761 at 12, citing Special Master 26th through 29th Round Monitoring Report and Ex. B to Decl. of Thorn Decl., ECF No. 7760-2. The record does not support a conclusion defendants ever told plaintiffs, the Special Master, or the court they were abandoning the 2015 PMA proposal. *See* ECF No. 7761 at 3 n.1.

/////

/////

In other words, defendants again have not been fully transparent with the court and Special Master, as required. *See generally Coleman v. Newsom*, 424 F.Supp.3d 925 (E.D. Cal. 2019) (order after proceedings on first whistleblower report of misleading data submitted by CDCR Chief Psychiatrist Michael Golding). It should not have to be repeated that, as a general rule, "the importance of defendants' transparent and accurate reporting is paramount: the court and the Special Master must be able to rely fully on defendants' representations." *Id*. at 929. The importance of transparent and accurate reporting applies fully to staffing levels. And the court expressly outlined defendants' obligations if they sought to modify their staffing plan:

> Defendants simply must come to terms with the substance of the staffing plan and involve all key stakeholders in working with the proper focus to satisfy it. If, after addressing the problems [the Golding] hearings have exposed, defendants honestly believe that their staffing plan, embodied in court orders, needs to be modified, they have the option, as they always have had, of seeking a modification from the court. Any such request would need to be properly justified and honestly supported, of course. In any event, defendants must acknowledge and account for the substantial findings in this court's October 11, 2017 order, describing the heavy burden that must be met to support any increase in psychiatrists' caseloads.

*Id*. at 957. Despite this directive, defendants unilaterally and opaquely changed an important component of their 2015 plan to meet their staffing obligations. As a result, as the court moves towards enforcement of the staffing plan it has approved, it will not hesitate to impose sanctions and issue other orders as may prove necessary to bring the staffing component of the *Coleman* remedy to the most just, speedy, and efficient conclusion possible.

In the meantime, defendants' arguments are utterly unpersuasive on their own terms. As plaintiffs correctly note, "[m]edical assistants . . . play a major role in Defendants' telepsychiatry program." ECF No. 7761 at 4. The job description included as Attachment A to the Thorn Declaration shows medical assistants play a greater role in the delivery of care through telepsychiatry than telepresenting: they make and record initial observations of patients' conditions and report that to the telepsychiatrist; they observe patients before and after telepsychiatry appointments; they document clinical information in patient charts; they administer life support in emergency situations; they collaborate with the telepsychiatrist to get appropriate treatment to patients; they collaborate with nursing staff to meet the patients' clinical needs; they

assist patients with physical care; they monitor patients on suicide watch until relief arrives; and they contact local staff in the event of emergencies. ECF No. 7760-1 at 26. Indeed, medical assistants appear to be the on-site partners of telepsychiatrists in many key respects. *Id*. Finally, even if the medical assistant classification were used solely for administrative purposes—a finding not supported by the evidence—clerical mental health positions are subject to the July 26, 1999 staffing order. *See* ECF No. 1052 at 3, 14 (Special Master's report on staffing vacancies, including clerical positions among "key mental health staffing positions and vacancies"); ECF No. 1055 at 1, 4 (adopting recommendations in Special Master's report on staffing vacancies).

For these reasons, defendants must maintain a maximum ten percent vacancy rate among medical assistants allocated to the Statewide Mental Health Program. For purposes of the February 28, 2023 order, the number of unfilled medical assistant positions will be calculated by multiplying the total number of allocated medical assistant positions by 0.90, then subtracting the total number of filled positions from that result.

### III. PSYCHIATRIC INPATIENT PROGRAMS

Plaintiffs also request the court clarify whether the court's February 28, 2023 order covers the mental health positions assigned to CDCR's Psychiatric Inpatient Programs (PIPs). That request was resolved in this court's March 17, 2023 Order, which clarified the February 28, 2023 order does not apply to mental health positions assigned to the CDCR PIPs and required separate vacancy/fill rate reporting for those classifications going forward. *See generally* March 17, 2023 Order, ECF No. 7766.

/////
/////
/////
/////
/////
/////
/////

## IV. CONCLUSION

In accordance with the above, IT IS HEREBY ORDERED that:

1. Defendants shall maintain a maximum ten percent vacancy rate among recreation therapists and the July 26, 1999 order, ECF No. 1055, is deemed clarified accordingly.

2. Defendants shall maintain a maximum ten percent vacancy rate among medical assistant positions allocated to the Statewide Mental Health Program.

3. For purposes of the February 28, 2023 order, the calculation for recreation therapists and medical assistants will be made by multiplying the total number of allocated positions in each classification by 0.90, then subtracting the total number of filled positions from each result.

DATED: April 11, 2023.

CHIEF UNITED STATES DISTRICT JUDGE