UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB |
| Plaintiffs, | ORDER |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

On February 7, 2023, as part of his comprehensive twenty-ninth monitoring round, the Special Master filed two reports. The first, "Report Part C," is on findings from monitoring tours at fifteen institutions in the California Department of Corrections and Rehabilitation (CDCR) with Enhanced Outpatient Program (EOP) units.[1] ECF No. 7715. The second, "Report Part D," is on findings from monitoring tours at thirteen institutions with Correctional Clinical Case Management Services (3CMS) programs.[2] ECF No. 7716. Both reports are based on monitoring

---

[1] California Health Care Facility (CHCF); California Institution for Women (CIW); California Medical Facility (CMF); California Men's Colony (CMC); California State Prison, Corcoran (CSP/Corcoran); California State Prison, Los Angeles County (CSP/LAC); California State Prison, Sacramento (CSP/Sac); California Substance Abuse Treatment Facility (CSATF); Central California Women's Facility (CCWF); Kern Valley State Prison (KVSP); Mule Creek State Prison (MCSP); Richard J. Donovan Correctional Facility (RJD); Salinas Valley State Prison (SVSP); San Quentin State Prison (SQ); and Valley State Prison (VSP).

[2] Avenal State Prison (ASP); California Correctional Institution (CCI); California Institution for Men (CIM); California Rehabilitation Center (CRC); California State

1

1   tours between May 2021 and May 2022, ECF No. 7715 at 13-15,[3] and a review of CDCR
2   documents.  *See, e.g.*, ECF No. 7715 at 32 n.10, 68-70, 72 n.22, 97-110; ECF No. 7716 at 38-39,
3   40, 46, 48.  Several sections of Report Part C are incorporated by reference into Report Part D.
4   ECF No. 7716 at 29-30.  The Special Master makes no formal recommendations in either report;
5   nor does he request any additional court orders.  ECF No. 7715 at 173; ECF No. 7716 at 99-100.
6         The Special Master circulated a draft of Report Part C to the parties on December 8, 2022
7   and a draft of Report Part D on December 16, 2022.  ECF No. 7715 at 15.  On December 16,
8   2023, the Special Master granted defendants' request to extend the time for responses to January
9   25, 2023.  *Id*.  Both parties sent responses to the Special Master on that date, and he revised and
10  clarified the Reports, which he then filed with the court on February 7, 2023.  *Id*. at 15-30.
11        On February 17, 2023, defendants objected to both Reports.  ECF No. 7733.  With leave
12  of court, ECF No. 7745, on March 1, 2023, plaintiffs responded to defendants' objections, ECF
13  No. 7749.  Defendants' objections focus primarily on Report Part C; therefore, unless otherwise
14  noted, Report as used in this order refers to Report Part C.  Where appropriate, Report Part C and
15  Report Part D are referred to collectively as Reports.  The court adopts the Special Master's
16  Reports in full and overrules defendants' objections, as explained below.

17  **I.   LEGAL STANDARD**

18        Paragraph C of the Order of Reference specifies the legal standard this court applies in
19  response to Defendants' objections:

> [A]ny compliance report of the special master filed in accordance with paragraph
> A(5) above shall be adopted as the findings of fact and conclusions of law of the
> court unless, within ten days after being served with the filing of the report, either
> side moves to object or modify the report. . . .  The objecting party shall note each
> particular finding or recommendation to which objection is made, shall provide
> proposed alternative findings or recommendations, and may request a hearing before

---

Prison/Solano (CSP/Solano);  Correctional Training Facility (CTF);  Folsom State Prison (Folsom)/Folsom Women's Facility (FWF); High Desert State Prison (HDSP); North Kern State Prison (NKSP); Pelican Bay State Prison (PBSP); Pleasant Valley State Prison (PVSP); Sierra Conservation Center (SCC); and Wasco State Prison (WSP).

[3] Citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to the page number assigned by the ECF system and located in the upper right hand corner of the page.

the court. Pursuant to Fed. R. Civ. P. 53(e)(2), the court shall accept the special master's findings of fact unless they are clearly erroneous.

ECF No. 640, at 8. As required, the court adopts the Special Master's findings of fact unless those findings are "clearly erroneous." *Id*. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (quoted in *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)).

**II.   ANALYSIS**

The court addresses defendants' objections in turn.

**A.   Staffing Shortages**

Report Part C includes a section with findings about "the vacancy rate explosion among primary clinicians (psychologists and social workers)" and defendants' ability "to provide anything close to Program Guide-compliant mental health care" at some CDCR institutions. ECF No. 7715 at 30. In their response to the draft Reports, defendants requested a general acknowledgment "that CDCR is not an outlier [in mental health staffing shortages]—there is a nationwide and state-level shortage of mental health professionals, and the shortage acutely affects prison systems like CDCR because of additional challenges professionals face in treating patients in remote areas or under dangerous or difficult conditions." ECF No. 7715-1 at 34 (internal citation omitted). The Special Master granted that request and quoted defendants' statement in a footnote in both Reports. *See* ECF No. 7715 at 22, 30 n.9; ECF No. 7716 at 30 n.8. Defendants object here that the footnote did not go far enough. They protest that the Report "fails to acknowledge, much less address, this important and widespread concern head-on, failing to reference the labor economists' reports in Defendants' response (ECF No. 7715-1 at 33-34) or offering the Court context on how this crisis is impacting Defendants' ability to comply with Coleman staffing mandates." ECF No. 7733 at 3.

First, as the court previously has observed, "tight labor markets do not relieve defendants of their constitutional obligations." February 28, 2023 Order, ECF No. 7742 at 4 (internal citation omitted). Second, as the Special Master reiterates, defendants have fallen short of their

3

obligations for many years, not only in current labor markets, and even though they have had several options to reduce mental health staffing shortages. ECF No. 7715 at 169 (citing October 10, 2017 Order, ECF No. 5711, at 27). Finally, as the Special Master correctly observes, defendants may now need to consider "'transformational' solutions" to persistent mental health staffing shortages to meet their Eighth Amendment obligations. *Id*. at 170. Defendants have a constitutional duty to "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" *Coleman v. Wilson*, 912 F. Supp. 1282, 1306 (E.D. Cal. 1995). Nationwide labor shortages still do not relieve defendants of this duty, but rather indicate defendants must act without further delay to fill the chronic, longstanding gap between the number of available staff and the number of staff necessary to treat mentally ill inmates in California's prisons. As the Ninth Circuit has determined, "[l]ack of resources" does not relieve defendants of their duty "because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (internal citations omitted); *see also Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) ("cost or inconvenience . . . is not a defense to" meeting Eighth Amendment requirements). The court, the Special Master, and defendants themselves all have delineated a wide range of options available to defendants to meet this constitutional obligation. *See* ECF No. 5711 at, *e.g.*, 7-8, 27. Defendants have not exhausted the options available to them, including clustering of mentally ill inmates and voluntary reduction of the mentally ill prison population. *See* February 28, 2023 Order, ECF No. 7742, at 4; *see also, generally,* ECF No. 5711.

  Defendants also object to the Special Master's statement that "[t]ime spent training and supervising unlicensed clinicians further strained licensed staff members' ability to focus on delivery of care to patients.'" ECF No. 7733 at 3 (quoting ECF No. 7715 at 32). Defendants contend this training is necessary "to create a pipeline for future licensed staff." *Id.* This objection does not show the Special Master's finding is clearly erroneous. It is an explanation for defendants' staffing decisions. The objection is overruled.

B. **Data Remediation**

1. **Requests from Defendants to the Special Master**

In Section IB1 of Report Part C, incorporated by reference into Report Part D, the Special Master provides an update on ongoing data remediation efforts. ECF No. 7715 at 34-47; *see* ECF No. 7716 at 29. Defendants first object to the Special Master's denial of "Defendants' oft repeated requests for the Special Master's guidebook, business rules, sample size methodology and other necessary documents to properly replicate the monitoring process so that it aligns with Defendants' data indicators." ECF No. 7733.

This objection identifies no error; it is effectively a discovery request. Defendants may not use objections to seek discovery from the Special Master as though he were an opposing party. The Special Master is not an opposing party, but rather an arm of the court tasked with supervising and guiding both the data remediation process and the development and implementation of a final continuous quality improvement tool (CQIT).[4] The information necessary "to properly replicate the monitoring process," both for data remediation and for CQIT, is identified in the Special Master's twenty-eight monitoring reports and many other reports that preceded this one as well as this court's previous orders. The unresolved issues related to the scope and substance of data remediation are for another day. *See* ECF No. 7733 at 4-6; *see also* ECF No. 7721 at 6-12. This objection is overruled.

Defendants object similarly that the Reports "obfuscate" the Special Master's alleged refusal to "define 'data remediation' and 'certification,'" and they contend they cannot successfully complete data remediation without "clarity as to the requirements to achieve data remediation." ECF No. 7733 at 6. This objection is based on defendants' demonstrably false assertion that the Special Master has refused to define data remediation and certification. *See*, *e.g.*, ECF No. 7715 at 26; ECF No. 7715-1 at 42-45. The record rather demonstrates defendants'

---

[4] CQIT is a "comprehensive tool that, once finalized, defendants will . . . use as part of a process to 'self-monitor' the key components of the remedy in this action." September 3, 2020 Order, ECF No. 6846, at 10.

refusal to accept those definitions. *See*, *e.g.*, ECF No. 7715-1 at 47-53. The Special Master has exercised discretion at this juncture not to "attempt to force the Special Master's preferred definitions on defendants through a formal recommendation" to the court. *Id*. at 26. Any dispute over the scope and substance of data remediation is not now before the court at this time. This objection is overruled.

### 2. Characterization of Post-Certification Process

Defendants object that footnote 12 of Report Part C contains an outdated description of the post-certification process for key indicators, and they contend the Special Master ignored their request to remove the outdated post-certification process or clarify that defendants no longer intend to follow that process. ECF No. 7733 at 8. In context, the footnote accurately describes what CDCR had included in its Preliminary Activation Schedule for Completion of Court-Ordered Data Remediation. ECF No. 7715 at 39 & n.12. The Special Master also responded to the objection as raised to the draft Report Part C, by revising the final report to specify that his expert, Dr. Potter, and defendants' principal, Dr. Cartwright, are addressing development of an adequate post-certification review process in their regular discussions. *Id*. at 26, 47. The objection is overruled.

### C. Connectivity Issues with Telepsychiatry and Telehealth

Defendants object that internet connectivity issues identified by the Special Master "appear anecdotal in nature and lack specificity." ECF No. 7733 at 8. This objection identifies no clear error. As defendants acknowledge, the Report contains specific information about institution and mental health programs in which connectivity issues hampered the delivery of mental health care, *id*. at 8-9 (internal citations omitted), and the Special Master directs the reader's attention to specific institutional summaries that provide additional specificity about these issues and their impacts. ECF No. 7715 at 22. This information allows defendants to investigate further "the number of complaints and technical issues compared to the total number of telehealth encounters observed." ECF No. 7733 at at 9. Defendants can track connectivity issues through a quality improvement process; it is not the Special Master's job to do that for them. This objection is overruled.

### D. Psychiatrist Vacancy Data

Defendants object to the Special Master's finding of a "'shocking' vacancy rate of 51 percent for psychiatrists at the 15 EOP institutions visited . . . during the Twenty-Ninth Round," contending "this calculation is grossly and demonstrably inaccurate." ECF No. 7733 at 9 (quoting ECF No. 7715 at 77-78). The objection misstates the relevant finding, which reads as follows:

> The institutions continued to report extremely high staff vacancy rates for virtually all disciplines. Except for telepsychiatry, all such vacancy rates exceeded ten percent. These vacancy rates included a shocking 55 percent vacancy rate for senior psychiatrists, and a 51 percent staff psychiatry vacancy rate, which registry staff reduced to 24 percent.

ECF No. 7715 at 77-78. In addition, defendants contend falsely that the Special Master has failed to identify the source he relied on for the challenged vacancy rate and that they are "left to surmise as to the source of the miscalculation." *Id*. at 10. The Special Master cited the sources for this data and comprehensively responded to defendants' objection. *See* ECF No. 7715 at 21-22, 72 n.22. That response is adopted in full.

Defendants' failure to acknowledge the Special Master's response and their registering of this objection are grounds for the court's summarily overruling it. *See* Fed. R. Civ. P. 11; April 24, 2020 Order, ECF No. 6639, at 8 n.8; February 20, 2019 Order, ECF No. 6096, at 7; *see also* August 29, 2022 Order, ECF No. 7608, at 6 & n.3. Failures to certify future filings as required may lead to the striking of noncompliant objections.

The court also observes that the Special Master's finding is based on data from August 2022. *See* ECF No. 7715 at 21-22, 72 n.22. Defendants' objection, by contrast, is based in substantial part on data from December 2022. ECF No. 7733 at 9-10. For this reason as well, the objection demonstrates no errors in the Special Master's findings about staffing vacancy rates as of August 2022.

### E. Inpatient Referral Process

Defendants contend the Report "fails to correctly describe [the] inpatient referral process." ECF No. 7733 at 10 (citing ECF No. 7715 at 129). Specifically, defendants state that prison institutions are responsible for referring inmates to inpatient care, and that once the referrals are

1  made, the Inpatient Referral Unit (IRU) and the Health Care Placement Oversight Program
2  (HCPOP) "identify an appropriate bed and authorize movement." *Id*.  Defendants ask the court to
3  direct the Special Master to amend the Report "to reflect that transfers to inpatient care are not an
4  institutional-level issue after a referral is made."  *Id*.  In response, plaintiffs observe "the cited
5  portion of the Report does not make any factual findings describing the inpatient referral *process*.
6  It simply reports compliance with transfer timelines by institution."  ECF No. 7749 at 10
7  (emphasis in original).

8        Defendants' objection identifies no clear error.  This section of the Report focuses on
9  whether inmates who are referred to inpatient care are timely transferred to that care.  The Special
10 Master reported on the timeliness of those transfers by sending institution.  His decision to
11 present this part of the Report in this way is not clearly erroneous.  Moreover, the section of the
12 Report that immediately precedes the sections cited by defendants includes findings on the
13 timeliness of "submission of both acute and intermediate care referrals to IRU."  ECF No. 7715 at
14 128-29.  The Report includes findings that thirteen specified institutions timely completed IRU
15 referrals for both acute and intermediate inpatient care, one institution timely completed IRU
16 referrals for intermediate but not acute inpatient care, and one institution did not timely complete
17 IRU referrals for either level of inpatient care.  *Id*.  The Report also includes findings of the
18 timeliness of referrals to inpatient care from those institutions, including findings of compliance
19 and non-compliance with Program Guide timelines for transfer following referral as well as
20 findings of compliance and non-compliance with the Program Guide requirement that inpatient
21 transfers be accomplished within seventy-two hours of acceptance for admission.  *Id*. at 129-30.
22 The Report thus provides information to determine whether delays in timely transfers to inpatient
23 care are caused by delays in institutional referrals or, instead, delays in bed identification and/or
24 movement authorization, i.e., at IRU or HCPOP.

25       This objection is overruled.

26     **F.**    **Length of Stay in Mental Health Crisis Beds (MHCBs)**

27       Defendants object that the Special Master's reporting on lengths of stay in MHCBs is
28 incomplete.  ECF No. 7733 at 11.  Specifically, defendants cite the Special Master's alleged

failure to clarify that MHCB stays can exceed the ten-day period prescribed by the Program Guide if the chief psychiatrist or a designee authorizes an extended stay. *Id*.

In Report Part D, the Special Master correctly observes that defendants' objections to his draft report cite findings concerning transfers to acute inpatient care, and not to lengths of stay in MHCBs. *See* ECF No. 7716 at 26-27. Both Reports set out the statement defendants contend is incomplete: that the Program Guide provides for a clinical length of stay of up to ten days in MHCBs. ECF No. 7715 at 130; ECF No. 7716 at 75. These statements are followed by factual findings concerning the average length of MHCB stays at the various prison institutions. ECF No. 7715 at 130; ECF No. 7716 at 75-76. Neither section characterizes any institution as "noncompliant."[5] Defendants' objection here, as with some of their objections reviewed above, is aimed at providing additional context and fails to demonstrate clear error.

The objection is overruled.

### G. Class Members' Access to Jobs

Defendants object to the Special Master's findings (1) that inmates who are not part of CDCR's Mental Health Services Delivery System (MHSDS) held more job assignments than inmates who were part of MHSDS and (2) that within the MHSDS, 3CMS patients hold more job assignments than EOP patients. ECF No. 7733 at 11. Defendants contend these findings "fail to acknowledge that EOP patients are less likely to accept jobs due to mental illness and may instead choose EOP group treatment." *Id*. Defendants cite no evidence to support their assertion and in any event do not demonstrate clear error.

This objection is overruled.

### H. Terms Used to Report on Quality of Treatment

Defendants objected to the use of three categories—"adequate quality," "marginally adequate quality," and "inadequate quality"—in the Draft Report Part D to summarize the overall

---

[5] The Special Master does use the word "compliance" in connection with average lengths of stay in MHCBs at page 125 of Report Part C. There, the findings report improved lengths of stay in MHCBs. ECF No. 7715 at 125. In Report Part C, the Special Master summarizes the relevant findings, reporting that in MHCBs, "clinical lengths of stay rarely exceeded ten days." ECF No. 7716 at 78.

9

quality of care provided.  *See* ECF No. 7733 (citing ECF No. 7715-1 at 39).  The Special Master "declined to recategorize these cases in response to defendants' assertion that they were 'vague" as the categorizations speak for themselves."  ECF No. 7716 at 29.  Defendants contend this sentence is "conclusory and unsupported" and should not be adopted by the court.  ECF No. 7733 at 12.

This objection is without merit.  The words "adequate" and "inadequate" are clear on their face, and Report Part D clearly states that "marginally adequate" care means "there were concerns about the care of the patient that bordered on inadequacy (e.g., failure to provide required contacts, untimely IDTTs, poor documentation, and untimely responses to consult requests)."  ECF No. 7716 at 48.  Moreover, the Special Master has previously used the term "marginally adequate" in findings related to quality of care, *see* ECF No. 7074 at, *e.g.*, 863, without objection from defendants.  *See generally* ECF No. 7082.  It was not clear error to rely on any of these definitions.

The objection is overruled.

### III.    CONCLUSION

In accordance with the above, IT IS HEREBY ORDERED that:

1. The Special Master's Twenty-Ninth Monitoring Report—Part C, ECF No. 7715, is ADOPTED IN FULL; and

2. The Special Master's Twenty-Ninth Monitoring Report—Part D, ECF No. 7716, is ADOPTED IN FULL.

DATED:  April 12, 2023.

_____
CHIEF UNITED STATES DISTRICT JUDGE