DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO REJECT DEFENDANTS' PLAN TO PROVIDE MINIMUM TREATMENT STANDARDS FOR PSYCHIATRIC INPATIENT PROGRAMS (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFENDANTS' EIGHTH AMENDMENT VIOLATIONS** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| | Judge: Hon. Kimberly J. Mueller |

[4270899.9]

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that pursuant to the Court's order of March 17, 2023, ECF No. 7765, adopting a briefing schedule on disputes regarding minimum treatment standards in the Psychiatric Inpatient Programs (PIPs), Plaintiffs will, at the time and date set by the Court, move for relief as follows:  Plaintiffs will ask that the Court reject Defendants' plan to provide minimum treatment standards for psychiatric inpatient programs (ECF No. 7787) as inadequate to remedy the Eighth Amendment issues in this case.  The Court should order that, within thirty days, CDCR file a revised plan that provides, at a minimum, 20 hours per week of structured therapeutic treatment and 20 hours per week of unstructured out-of-cell activities for patients in the PIPs.

Plaintiffs' motion is based on this notice, the following memorandum of points and authorities, and the pleadings and records on file with the Court in this action.

[4270899.9]

1

PLS.' NOTICE OF MOTION &  MOT. TO REJECT DEFS.' PLAN TO PROVIDE MIN. TREATMENT STDS.
FOR PIPs (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFS.' 8TH AMEND. VIOLATIONS

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION.................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES....................................................... 1

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARD .................................................................................................. 4

ARGUMENT ............................................................................................................. 4

I.    DEFENDANTS' PROPOSED PLAN WOULD MAINTAIN THE STATUS
      QUO OF CONSTITUTIONALLY INADEQUATE PSYCHIATRIC
      INPATIENT TREATMENT ............................................................................... 4

      A.    The Special Master and the Court Have Repeatedly Found That
            Defendants' Inadequate Provision Of Psychiatric Inpatient Care
            Violates The Eighth Amendment. ....................................................... 4

      B.    Defendants' Plan Is Facially Insufficient to Remedy the Longstanding
            Constitutional Deficiencies Plaguing Inpatient Care. .................................. 10

            1.    Without Any Minimum Treatment Standard for Structured
                  Therapeutic Activities, Care in the PIPs Will Not Improve to a
                  Constitutional Standard. ........................................................... 10

            2.    Defendants Do Not Specify Any Changes to CDCR's Policies,
                  Procedures, and Training Programs to Ensure Delivery of Their
                  Proposed "Individualized" Minimum Treatment Standards. ............. 11

            3.    Defendants Do Not Specify the Key Performance Indicators Or
                  Audits They Would Develop to Measure Institutions'
                  Compliance With Their Proposed Minimum Treatment
                  Standards. ............................................................................. 11

II.   DEFENDANTS' PLAN IS NOT CONSISTENT WITH PAST PRACTICES
      OR STANDARDS FOR PSYCHIATRIC INPATIENT CARE............................. 12

      A.    Prior to Lift-and-Shift, The Operative Standard Of Care At
            California's Own Department of State Hospitals Was 20 Hours/Week
            Of Structured Therapeutic Activities And 20 Hours/Week Of
            Unstructured Rehabilitative Activities. .................................................. 12

            1.    From 2007 to 2013, DSH Operated Under a Consent Decree
                  with the United States that Required a Minimum of 20 hours of
                  Active Treatment and 20 Hours of Additional Activities Per
                  Week...................................................................................... 12

            2.    DSH's Quality Improvement Plan Framework Sets Minimum
                  Treatment Standards Rather Than Relying on "Clinician
                  Discretion."............................................................................. 13

[4270899.9]

PLS.' NOTICE OF MOTION & MOT. TO REJECT DEFS.' PLAN TO PROVIDE MIN. TREATMENT STDS.
FOR PIPs (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFS.' 8TH AMEND. VIOLATIONS

| | | | |
|---|---|---|---|
| | | 3. | When This Court Tried to Address the Waitlist By Speeding Up Admissions to New Units, Defendants Asserted That They Needed to Meet Minimum Treatment Standards. .............................. 14 |
| | | 4. | Defendants' Own Local Operating Procedures Assert Minimum Structured Treatment Standards. ........................................ 14 |
| | B. | The Standard Of Care For Psychiatric Inpatient Programs Is 24/7 Medical Care, With All Day Therapeutic Programming. ............................. 14 | |
| | | 1. | Acute Psychiatric Inpatient Care Should Feature Daily Psychiatry Rounds and Daily Psychologist Appointments. ............... 15 |
| | | 2. | Intermediate Psychiatric Inpatient Care Should Be Characterized By a Therapeutic Milieu, With Daylong Structured and Unstructured Programming. ....................................... 16 |
| | C. | In Comparable Correctional Systems, Inpatient Care Is Provided In Hospital Settings With At Least 20hr/Week Of Structured Therapeutic Activities .................................................................................................... 16 | |
| III. | | | THE COURT SHOULD REJECT DEFENDANTS' PROPOSED PLAN AND ORDER DEFENDANTS TO DEVELOP MINIMUM TREATMENT STANDARDS ADEQUATE TO REMEDY THE ONGOING CONSTITUTIONAL VIOLATIONS IN THE PIPS ................................. 17 |
| | A. | The Court Should Order Defendants to Provide PIP Patients With a Minimum of 20 Hours Per Week of Structured Therapeutic Programming and 20 Hours Per Week of Unstructured Out-Of-Cell Activities. .............................................................................................. 17 | |
| | B. | The Court Should Find That The Requested Order Satisfies the Need, Narrowness, and Intrusiveness Requirements of the Prison Litigation Reform Act. ...................................................................................... 19 | |

CONCLUSION ............................................................................................................... 20

CERTIFICATION OF ORDERS REVIEWED ................................................................ 20

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) ..................................................................... 4

*Brown v. Plata*,
    563 U.S. 493 (2011) ............................................................................... 1, 4

*Coleman v. Brown*,
    938 F. Supp. 2d 955 (E.D. Cal. 2013) ..................................................... 1, 4

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) ........................................... 1, 4, 13, 20

5

6

7

8

9

10

11

### STATUTES

12

18 U.S.C. § 3626.................................................................................................... 20

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

In 1995, after a full trial, the Court found that Defendants' failures to provide inpatient psychiatric hospitalization resulted in increased illness and suffering and violated the Eighth Amendment to the United States Constitution. *Coleman v. Wilson*, 912 F. Supp. 1282, 1308-09 (E.D. Cal. 1995). Lack of access to inpatient care was one of the ongoing violations that justified both the 2009 prisoner release order, and the 2013 denial of termination. *Brown v. Plata*, 563 U.S. 493, 516 (2011); *Coleman v. Brown*, 938 F. Supp. 2d 955, 981-982 (E.D. Cal. 2013).

The Court has found harms to class members caused by inadequate inpatient care, in addition to delayed access to inpatient units. In June 2013, the Court held several days of evidentiary hearings on the care and treatment of class members in inpatient mental health programs. *See* ECF Nos. 4663, 4664, 4670, 4671. The Court's subsequent order noted significant and troubling evidence regarding staffing shortages in the inpatient programs, as well as other factors going to the adequacy of inpatient care. *See* Order (July 11, 2013), ECF No. 4688 at 10-11.[1] The Court directed the Special Master to increase monitoring inpatient care, and to report findings promptly. *Id.* at 11-12.

The Special Master complied, and has found grossly inadequate treatment, where patients receive minimal individual and group treatment. *See, e.g.*, Special Master's Monitoring Report on the Mental Health Care Inpatient Programs (May 25, 2016), ECF No. 5448, at 50, 135, 177 ("Special Master's 2016 Inpatient Report"); Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation (Jan. 28, 2021), ECF No. 7039 at 21 ("Special Master's 2021 Inpatient Report") ("[C]lass members can receive more mental health care in an EOP program in the prisons than in a PIP [Psychiatric Inpatient Program],

---

[1] All pin citations to documents on the ECF system are to the ECF page numbers in the blue ECF headers, and not to internal document page numbers.

[4270899.9]

PLS.' NOTICE OF MOTION &  MOT. TO REJECT DEFS.' PLAN TO PROVIDE MIN. TREATMENT STDS.
FOR PIPs (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFS.' 8TH AMEND. VIOLATIONS

1  which holds true either pre or post-COVID-19"); *see also id.* at 49, 62-66.  Conditions

2  worsened following "Lift-and-Shift" in 2017, where CDCR voluntarily assumed

3  responsibility from the Department of State Hospitals ("DSH") for the PIPs at California

4  Health Care Facility ("CHCF"), California Medical Facility ("CMF"), and Salinas Valley

5  State Prison ("SVSP"), in addition to its preexisting PIPs at San Quentin ("SQ") and

6  California Institution for Women ("CIW").  *See, e.g.*, Special Master's Report on the

7  Current Status of Coleman Class Members' Access to Inpatient Care in the Department of

8  State Hospitals April 2, 2020), ECF No. 6565, *as amended* (April 6, 2020), ECF No. 6579

9  at 19 ("Special Master's 2020 Interim Inpatient Report") (describing the staffing vacancies

10  and lack of appropriate treatment at the Lift-and-Shift PIPs as "institutional program

11  failure").

12          To remedy these ongoing violations, Special Master recommended that the Court

13  order minimum treatment standards for the PIPs.  Special Master's 2021 Inpatient Report,

14  ECF No. 7039 at 118.  Defendants agreed to develop such plans and submit them to the

15  Special Master within 90 days, subject to their requests for clarification.  Defs.'

16  Response & Objections to the Jan. 28, 2021 Special Master's Monitoring Report on the

17  Mental Health Inpatient Care Programs for Inmates of the California Department of

18  Corrections and Rehabilitation (Feb. 8, 2021), ECF No. 7051 at 9-10.  On August 17,

19  2022, the Court accepted the representations Defendants made on November 23, 2020, to

20  the Special Master about their plans to develop treatment standards for the PIPs within 90

21  days and declined to issue an order at that time.  Order (Aug. 17, 2022), ECF No. 7605 at

22  9-10.

23          When the Special Master's 29th Round monitoring tour of inpatient programs

24  concluded in October 2021, Defendants had not yet developed a systemwide plan for

25  minimum treatment standards in the PIPs.  *See* Twenty-Ninth Monitoring Round Report –

26  Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for

27  Mental Health Patients of the California Department of Corrections and Rehabilitation

28  (May 17, 2022), ECF No. 7555 at 65 ("Special Master's 2022 Inpatient Report").  To

1    address the Special Master's findings that Defendants continued to offer patients in the

2    three Lift-and-Shift PIPs (CHCF, CMF, and SVSP) "woefully inadequate amounts of

3    structured mental health treatment," *id.*, the Special Master again recommended that the

4    Court order Defendants to develop minimum treatment standards for the provision of

5    structured therapeutic treatment and unstructured out-of-cell activities, as well as plan to

6    deliver treatment and track adherence to those standards.  *Id.* at 164-165.

7            On August 29, 2022, the Court adopted in full the findings in the Special Master's

8    29th Round Inpatient Report, over the objections of Defendants.  Order (Aug. 29, 2022),

9    ECF No. 7608 at 6.  The Court referred the issue of development of minimum treatment

10   standards for the PIPs to the Special Master and Secretary for resolution over a four-month

11   period.  *Id.* at 5-6.  When the parties failed to resolve the problem, the Court vacated its

12   August 29, 2022 order and ordered Defendants to serve on Plaintiffs and the Special

13   Master any plans for minimum treatment standards for the PIPs by January 13, 2023.

14   Order (Jan. 6, 2023), ECF No. 7697 at 3.  The Court granted the parties a forty-five day

15   period to meet and confer to resolve the issue.  *Id.*  The Court ordered the parties to file a

16   schedule for motion practice within fourteen days of the end of the meet and confer period

17   if they did not resolve the issue.  *Id.*  The Court adopted the parties' schedule.  ECF No.

18   7765.  Defendants filed their proposed standards on March 28, 2023, ECF No. 7787 at 5-7

19   ("Defendants' Plan").

20           Plaintiffs respectfully move the Court to reject Defendants' Plan and order

21   Defendants to develop minimum treatment standards for care of psychiatric inpatients

22   adequate to remedy the Eight Amendment violations in this case.  Adoption of the

23   Defendants' Plan would maintain the status quo of constitutionally inadequate treatment,

24   threatening the health and safety of the most critically ill *Coleman* patients.  The Court

25   should order Defendants to revise their treatment standards to provide at least 20 hours of

26   structured therapeutic treatment and 20 hours of unstructured out-of-cell activities per

27   week to the patients in CDCR's psychiatric inpatient units.

28

[4270899.9]

3

PLS.' NOTICE OF MOTION &  MOT. TO REJECT DEFS.' PLAN TO PROVIDE MIN. TREATMENT STDS.
FOR PIPs (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFS.' 8TH AMEND. VIOLATIONS

1

**LEGAL STANDARD**

2   Federal courts have an obligation to remedy Eighth Amendment violations in prison

3   medical and mental health care. *See Plata*, 563 U.S. at 511. "Courts may not allow

4   constitutional violations to continue simply because a remedy would involve intrusion into

5   the realm of prison administration." *Id.* In crafting remedial orders, the Prison Litigation

6   Reform Act requires the courts to make "a finding that the set of reforms being ordered—

7   the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible

8   on defendants' discretion over their policies and procedures." *Armstrong v.*

9   *Schwarzenegger*, 622 F.3d 1058, 1070-71 (9th Cir. 2010). "[W]here a court has explained

10  clearly the factual circumstances underlying an order and its understanding of the relevant

11  law as applied to the facts," it need only make an overall statement of its "determination

12  that it has found the requisite need, narrowness and lack of intrusiveness for that order."

13  *Id.* at 1071.

14

**ARGUMENT**

15  **I.    DEFENDANTS' PROPOSED PLAN WOULD MAINTAIN THE STATUS**
16  **QUO OF CONSTITUTIONALLY INADEQUATE PSYCHIATRIC**
    **INPATIENT TREATMENT**

17  Defendants' Plan fails to specify any minimum amount of structured treatment to be

18  provided to the psychiatric inpatients in their care. The Plan is facially inadequate to

19  remedy Defendants' longstanding constitutional violations. *See* ECF No. 7787 at 5-7.

20          **A.    The Special Master and the Court Have Repeatedly Found That**
                    **Defendants' Inadequate Provision Of Psychiatric Inpatient Care**
21                  **Violates The Eighth Amendment.**

22  Defendants' continuing failure to provide *Coleman* patients adequate access to

23  psychiatric inpatient care violates the Eighth Amendment. *See Coleman,* 912 F. Supp. At

24  1308-09; *Brown*, 563 U.S. at 516; *Coleman,* 938 F. Supp. 2d at 981-982. Over the past ten

25  years, the Special Master has filed six final reports on inpatient care, the findings of each

26  the Court has adopted after receiving objections from Defendants, and one interim report

27  early in the pandemic, which was not subject to Court approval. Each of these reports

28  have detailed serious deficiencies in treatment provision to inpatients.

[4270899.9]

4

1.   *Special Master's Report on the Salinas Valley Psychiatric Program,*
     *ECF No. 4830, Sept. 24, 2013, adopted by Order of Nov. 13, 2013,*
     *ECF No. 4925.*

In 2013, after extensive tours and reviews, the Special Master found that the care

delivered at what was then called the Salinas Valley Psychiatric Program (SVPP) was

"generally inadequate to address the clinical needs of its patients."  Special Master's

Report on the Salinas Valley Psychiatric Program (Sept. 24, 2013), ECF No. 4830 at 4.

Among other things, the Special Master found that patients in the SVPP were receiving

only four to six hours per week of group therapy on average, "*barely half of the minimum*

*requirement of ten hours for inmates at the lower, outpatient level of care known as the*

*EOP.*"  *Id.* at 15 (emphasis in original).

The quality of care was also so poor that "[t]he majority of it lacked clinical content

and individualization to the patients' treatment needs."  *Id.* at 4.  Many patients received no

"out-of-cell programming for significant periods of time, leading to a deficit of needed

treatment and exacerbation of patient symptomology and frustration levels."  *Id.* at 5.  The

Special Master found that the SVSP PIP did "not have the capacity or the resources to

provide basic therapeutic and rehabilitative mental health support, services, and treatment

to its inpatients in a coordinated, comprehensive, and individualized manner that is

consistent with accepted standards for forensic and other hospital settings."  *Id.* at 10.

The Court adopted these findings about the quality of inpatient care in full, after de

novo review and with the benefit of fully briefed objections by CDCR.  Order (Nov. 13,

2013), ECF No. 4925 at 11.

2.   *Special Master's Report on Adequacy of Inpatient Mental Health*
     *Care, ECF No. 5156, May 30, 2014, adopted by Order of July 25,*
     *2014, ECF No. 5188.*

In his 2014 report covering all six of the then-operating inpatient programs, the

Special Master found problems similar to those at SVPP throughout the system.  Inpatients

received inadequate levels of group therapy, in many cases less than what was provided to

EOP patients, as well as inadequate individual therapy.  Special Master's Report on

Adequacy of Inpatient Mental Health Care (May 30, 2014), ECF No. 5156 at 11, 16, 18.

[4270899.9]

1    The Special Master found that staff assumed that all inpatients were violent and not ready

2    for treatment, and thus imposed restrictions on patient movement that interfered with

3    treatment.  *Id.* at 21-22.  The Special Master's findings were supported by individual case

4    reviews in which severely ill patients received inadequate care.  *See, e.g.*, *id.* at 309-14,

5    316-17, 322-24, 326, 341-43, 345-48.  The Court adopted these findings on the quality of

6    inpatient care after reviewing the objections of Defendants.  Order (July 25, 2014), ECF

7    No. 5188 at 4.

8               3.    *Special Master's Monitoring Report on the Mental Health Care*
                      *Inpatient Programs, ECF No. 5448, May 25, 2016, adopted by Order*
9                     *of Mar. 8, 2017, ECF No. 5573.*

10         The Special Master reviewed care at the seven inpatient sites then operating; the

11   seventh site, the SQ PIP, opened after the previous report.  Special Master's 2016 Inpatient

12   Report, ECF No. 5448 at 4.  The Special Master again found that short-staffing forced the

13   inpatient programs to provide minimal levels of treatment, again with some of the

14   programs providing treatment similar to or less than what was provided in the EOP.  *Id.* at

15   50 (Atascadero State Hospital), 135 (same), 177 (SVSP).  At the CHCF inpatient unit

16   "the amount of group therapy scheduled was sparse for an inpatient program."  *Id.* at 241.

17   Staffing shortages also limited the programs' ability to provide individual therapy.  *Id.* at

18   63 (at SVSP "requests for individual sessions were frequently unheeded … it frequently

19   required a statement of suicidal intent to achieve individual contacts"), 64, 213 (at CMF

20   "[a]cute care weekly individual therapy sessions averaged 0 scheduled, 0 offered and 0

21   hours delivered"), 180 (SVSP)).  The Special Master reported unhealthy conditions of

22   confinement, such as no access to yard for many patients in the CMF program.  *Id.* at 65.

23   The Special Master's findings were again supported by individual case reviews.  *Id.* at

24   294-367.  The Court adopted the Special Master's findings in full.  Order (March 8, 2017),

25   ECF No. 5573 at 2.  The Court also adopted the Special Master's recommendations

26   regarding the need for staffing plans and a quality improvement process for the inpatient

27   programs.  *Id.* at 3.

28

4.    *Special Master's Monitoring Report on the Mental Health Inpatient Care Programs, ECF No. 5894, Aug. 30, 2018, adopted by Order of July 6, 2022, ECF No. 7581.*

The Special Master's 2018 inpatient report was his first following the "lift and shift" of operations at SVSP, CMF and CHCF PIPs from DSH to CDCR.  Special Master's Monitoring Report on the Mental Health Inpatient Care Programs (Aug. 30, 2018), ECF No. 5894 at 13.  The Special Master emphasized that this report included not only access to care, but also "adequate care to patients once admitted to an inpatient program."  *Id.* The Special Master again found inadequacies in treatment planning, as well as group and individual therapy.  *Id.* at 26-27, 50-55.  At the then newly CDCR-operated inpatient units at CHCF, SVSP, and CMF, group therapy was offered at levels "significantly lower than what was offered at the EOP level of care in CDCR prisons."  *Id.* at 39; *see also id.* at 40-42.  Individual treatment levels were also very low.  *Id.* at 43.  The Special Master found that "the amount of out of-cell structured therapeutic activities offered to acute care patients was woefully inadequate" in the CMF acute inpatient unit, and that the intermediate care unit was also not providing adequate group hours.  *Id.* at 171, 173.  The SVSP inpatient program was trying to make up for lack of treatment and out-of-cell time by offering puzzles and games at cell-front, which "was not a substitute for the provision of adequate mental health care."  *Id.* at 143-144.  Again, the Special Master's findings were supported by analysis of harms to individual patients.  *Id.* at 270-364.  The Court adopted the Special Master's findings in full.  Order (July 6, 2022), ECF No. 7581 at 2.

5.    *Special Master's Report On The Current Status Of Coleman Class Members' Access To Inpatient Care In The Department Of State Hospitals, ECF No. 6565, April 2, 2020 as amended ECF No. 6579, April 6, 2020.*

This report was prompted when DSH closed access to its hospitals at the start of the pandemic.  In addressing the consequences of that closure for patient care, the Special Master necessarily had to review the quality of care in the CDCR inpatient units that remained open for *Coleman* class members during the DSH closure, and during the subsequent delays in admissions as DSH invoked COVID-19 screening measures.  Special

7

1  Master's 2020 Interim Inpatient Report, ECF No. 6579 at 19.  The Special Master found

2  that well before the pandemic, "staffing vacancies and lack of appropriate treatment at

3  CHCF-PIP, CMF-PIP, and SVSP-PIP were known to CDCR, the Special Master, and

4  plaintiffs' counsel to have seriously limited what mental care was available in these

5  programs," and described the situation as "institutional program failure[]."  *Id.*  The

6  Special Master found that during 2019, 24% of the persons in CDCR who died by suicide

7  did so within 90 days of discharge from a crisis bed or PIP, and that "with staffing

8  shortages appropriate care cannot be provided in the PIPs."  *Id.* at 29-30.

9                   6.    *Special Master's Monitoring Report on the Mental Health Inpatient*
                          *Care Programs, ECF No. 7039, Jan. 18, 2021, adopted by Order of*
10                        *Aug. 17, 2022, ECF No. 7605.*

11        In 2021, the Special Master reported on a complete review of all CDCR and DSH

12  inpatient programs for *Coleman* class members, with a review period that ended just as the

13  COVID-19 pandemic restrictions began.  The Special Master found that "class members

14  uniformly receive less treatment than would be expected in functioning inpatient

15  programs," and in some of the programs, "class members can receive more mental health

16  care in an EOP program in the prisons than in a PIP, which holds true either pre or post-

17  COVID-19."  Special Master's 2021 Inpatient Report, ECF No. 7039 at 21; *see also, id.* at

18  49, 62-66.  Treatment planning was found to be inadequate.  *Id.* at 77-79, 117.  The

19  findings were supported by individual case reviews.  *Id.* at 332-388.  The Special Master

20  made several recommendations for Court orders, including that CDCR and DSH develop

21  plans "to provide structured therapeutic activities, unstructured out-of-cell activities,

22  treatment planning, and individual treatment, including for maximum custody patients

23  consistent with a psychiatric inpatient level of care …."  *Id.* at 118.

24        The Court received extensive objections from Defendants, and addressed them in a

25  13-page order.  Order (Aug. 17, 2022), ECF No. 7605.  The Court adopted the Special

26  Master's findings in full, but declined to issue an order on the Special Master's

27  recommendations that Defendants develop new plans to provide structured therapeutic

28  activities in the inpatient programs.  *Id.* at 9-10, 12.  The Court reasoned that no order was

necessary because the Defendants represented that they would voluntarily develop a plan within 90 days.  *Id.* at 9-10.

> 7.  *Twenty-Ninth Monitoring Round Report, Part A:  Special Master's Monitoring Report on the Psychiatric Inpatient Programs, ECF No. 7555, May 17, 2022, adopted by Order of Aug. 29, 2022, ECF No. 7608.*

The Special Master focused on the CDCR-operated programs for this report. Special Master's 2022 Inpatient Report, ECF No. 7555 at 37.  The Special Master concluded that the three "lift-and-shift" programs at SVSP, CMF, and CHCF were failing. *Id.* at 15.  The Special Master found that the inpatient programs provided "woefully inadequate inpatient mental health treatment," driven not by patient's clinical needs, "but rather by institutional staffing levels."  *Id.* at 35; *see also id.* at 160 ("Across programs, core clinical groups were rarely offered due to staffing limitations").  The Special Master examined four suicides that took place in the inpatient programs during the review period, and found that CDCR's own post-death reviews identified inadequate programming and/or inadequate clinical contacts as contributing to those deaths.  *Id.* at 49.  The Special Master found that the lack of treatment in the programs could not be explained by COVID-19 alone, and in fact predated the pandemic.  *Id.* at 67-68.  Even at the SQ and CIW PIPs, which had previously performed better than the other facilities, group treatment hours were found to have fallen well below that provided in the EOP.  *Id.* 100-101 (4 hours/week attended in CIW-intermediate, and 1 hour per week for CIW-PIP MAX custody patients; 4.18 hours/week in SQ-acute; 7 hours/week in SQ intermediate).  As in previous reports, treatment planning was inadequate.  *Id.* at 111-14.  The findings were supported by numerous case reviews.  *Id.* at 394-509.

The Special Master once again recommended that CDCR be ordered to "develop minimum standards for the provision of structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, consistent with a psychiatric inpatient level of care," and develop plans to meet these standards.  *Id.* at 164-165.  The Court adopted the Special Master's factual findings in full, after addressing

1  Defendants' objections.  Order (Aug. 29, 2022), ECF No. 7608 at 6.  Rather than ordering

2  minimum treatment standards, the Court referred the issue to the Special Master and

3  Secretary for focused discussions for four months.  When the issue was not resolved in

4  those discussions, or in the parties' subsequent meet and confer process, the Court ordered

5  the present briefing.  Order (Mar. 17, 2023), ECF No. 7765 at 2.

**B.    Defendants' Plan Is Facially Insufficient to Remedy the Longstanding Constitutional Deficiencies Plaguing Inpatient Care.**

**1.    Without Any Minimum Treatment Standard for Structured Therapeutic Activities, Care in the PIPs Will Not Improve to a Constitutional Standard.**

Defendants' Plan sets forth minimum frequencies for Interdisciplinary Treatment

Team (IDTT) meetings, psychiatry contacts, and primary clinician contacts for patients at

the acute and intermediate (ICF) levels of care.  *Id.* at 5-7.  For example, they propose that

psychiatrists see patients every 3 days for the first 30 days of a patients' stay in the PIP,

and then weekly thereafter.  *Id.* at 6-7.  Defendants further propose a minimum of 10 hours

per week of unstructured out-of-cell activities for PIP patients.  *Id.*  Defendants declined,

however, to propose a minimum treatment hours requirement for structured therapeutic

treatment in the PIPs beyond specifying frequencies of individual clinical contacts.  *See id.*

Instead, Defendants state that they plan to "offer structured treatment activities

commensurate with the individual patient's clinical needs."  *Id.* at 5-6.

Defendants' refusal to specify a minimum number of hours of structured treatment

for PIP patients will, perversely, *ensure* that CDCR's provision of inpatient care will

continue to be driven by "institutional staffing levels" and other resource constraints rather

than individual patients' clinical needs.  Special Master's 2022 Inpatient Report, ECF

No. 7555 at 35.  Indeed, the Court directed the parties to work with the Special Master to

develop minimum treatment standards precisely to address their longstanding failure to

deploy enough staff in the PIPs to provide adequate treatment.  *See* Order (Aug. 29, 2022),

ECF No. 7608 at 4.  As the Special Master has found, minimum standards for the

provision of structured therapeutic activities are necessary to enable the systemwide

[4270899.9]

10

PLS.' NOTICE OF MOTION &  MOT. TO REJECT DEFS.' PLAN TO PROVIDE MIN. TREATMENT STDS. FOR PIPs (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFS.' 8TH AMEND. VIOLATIONS

1  planning required to deliver minimally adequate treatment.  Special Master's 2022
2  Inpatient Report, ECF No. 7555 at 35-36.

3       By failing to specify any systemwide structured treatment minimum for structured
4  psychiatric treatment, Defendants' proposal relies on individual IDTTs to bring CDCR into
5  constitutional compliance, one patient at a time.  But Defendants' reliance on IDTTs to
6  ensure even a single patient obtains the amount and quality of structured programming that
7  would meet the "standard of care" is plainly unworkable.  *See* Defendants' Plan, ECF No.
8  7787 at 6.  IDTTs do not have the power to expand the group programming available to
9  meet patients' individual needs.  IDTTs cannot hire and train staff to meet a patient's needs
10 when a unit is understaffed.  IDTTs have no mechanism to ensure that there is adequate,
11 confidential, treatment space available for each of the groups they prescribe.  Defendants'
12 Plan is thus an endorsement of the status quo.

13            **2.    Defendants Do Not Specify Any Changes to CDCR's Policies,
                       Procedures, and Training Programs to Ensure Delivery of Their
14                     Proposed "Individualized" Minimum Treatment Standards.**

15      Defendants' Plan refers vaguely to new "policies and procedures" to be written
16 within 90 days of adoption, but they fail to identify even one policy or procedure that
17 would need to change.  *See* Defendants' Plan, ECF No. 7787 at 7.

18            **3.    Defendants Do Not Specify the Key Performance Indicators Or
                       Audits They Would Develop to Measure Institutions' Compliance
19                     With Their Proposed Minimum Treatment Standards.**

20      Defendants state that they will "develop audits and indicators to track and report on
21 compliance with these policies, including indicators to track timely contacts with
22 psychiatrists and primary clinicians and IDTTs."  *Id.*  Absent from Defendants' Plan is
23 even a conceptual model to measure compliance with a purely individualized treatment
24 standard.  This would require measuring first, whether the treatment prescribed by the
25 teams meet the standard of care, and second, whether the treatment prescribed is actually
26 provided.  A plan based entirely on clinical discretion provides no measurable benchmark,
27 and thus cannot bring CDCR's PIPs into durable constitutional compliance.
28

[4270899.9]

11

## II.    DEFENDANTS' PLAN IS NOT CONSISTENT WITH PAST PRACTICES OR STANDARDS FOR PSYCHIATRIC INPATIENT CARE

Defendants state that they developed their Plan "after examining community standards, including by surveying other correctional mental health systems" and after review of "California licensing requirements for inpatient mental health treatment programs." Defendants' Plan, ECF No. 7787 at 6. Contrary to Defendants' suggestions, their proposed plan is neither consistent with their own past practice, nor with community or correctional standards for psychiatric inpatient care.

### A.    Prior to Lift-and-Shift, The Operative Standard Of Care At California's Own Department of State Hospitals Was 20 Hours/Week Of Structured Therapeutic Activities And 20 Hours/Week Of Unstructured Rehabilitative Activities.

Prior to the "lift and shift," of PIP operations in 2017, the Department of State Hospitals ("DSH") (previously Department of Mental Health) used a minimum standard of 20 hours of treatment and 20 hours of additional rehabilitative activities per week to manage inpatient services.

### 1.    From 2007 to 2013, DSH Operated Under a Consent Decree with the United States that Required a Minimum of 20 hours of Active Treatment and 20 Hours of Additional Activities Per Week

After a multi-year investigation, the United States Department of Justice and the California Department of Mental Health (DMH) reached an agreement with California, embodied in a Consent Judgment in *United States v. California*, No. CV 06-2667 GPS (C.D. Cal.) (Complaint filed May 2, 2006); *id.* ECF No. 9 (Amended Consent Judgment). The Consent Judgment required a minimum of 20 hours of active treatment per week, plus another minimum of 20 hours of "adequate active psychosocial rehabilitation." *U.S. v. California,* ECF No. 9 at 13, 15-17. This additional 20 hours did not include evening and weekend recreation time. *Id.* at 16-17. The Consent Judgment standards were not incompatible with clinical discretion regarding the individual patients' needs and readiness. On the contrary, the Consent Judgment provided that treatment teams develop active treatment plans "driven by individualized needs," and provide "active psychosocial rehabilitation" "based on the individual's assessed needs" *Id.* at 12, 15-16. Despite this focus on

1   individual needs, the Justice Department and the State agreed that minimum treatment and

2   rehabilitation hours were needed.  They are still needed to ensure that patients in the PIP

3   programs do not simply linger for days in their cells due to lack of staffing.

4          **2.      DSH's Quality Improvement Plan Framework Sets Minimum
               Treatment Standards Rather Than Relying on "Clinician
5              Discretion."**

6          Since very early in this litigation, the parties and the Court have recognized the role

7   of a quality assurance system to ensure that the remedy included not only access to care,

8   but access to adequate care.  *See Coleman*, 912 F. Supp. at 1307-1309; Special Master's

9   Recommended Schedule for Implementation of Defendants' Quality Assurance Plans, p. 3,

10  filed July 20, 1998, ECF 958.  When DSH provided all of the inpatient care, except for the

11  CDCR-instituted programs at CIW and SQ, it had to develop its own quality assurance

12  plans.  Special Master's 2016 Inpatient Report, ECF No. 5448 at 81.

13         When DSH developed its quality improvement audit tools, it did not just invoke

14  clinical discretion and hope for the best.  Instead, it set minimum treatment standards:  "All

15  patients will be offered, on average, 20 hours of treatment each week.  Of the 20 hours of

16  offered treatment, at least 10 hours will be core treatment consisting of Core Groups,

17  Individual Therapy or Clinical Contacts."  Exhibit D to Special Master's 29th Round

18  Monitoring Report, Template for California Department of State Hospitals Governing

19  Body Report, July 1, 2021-December 31, 2021, as transmitted to Special Master by

20  counsel for Defendants on Feb. 22, 2022, ECF No. 7625-1 at 161.  DSH's current Quality

21  Improvement Plan report states that "Clinical & Program staff have focused on ensuring

22  patients are offered 20 hours of treatment groups per patient, per week."  Declaration of

23  Ernest Galvan in Support of  Plaintiffs' Motion to Reject Defendants' Plan to Provide

24  Minimum Treatment Standards for Psychiatric Inpatient Programs etc. ("Galvan Decl."),

25  filed herewith, Ex. A (California Department of State Hospitals Governing Body Report,

26  Department of State Hospitals – Coalinga, Coleman 2684 Report, July 1, 2022-

27  December 31, 2022) at 10-11.  These DSH quality improvement documents contain

28  specific definitions of "core group hours" and "supplemental group hours" to ensure that

1  patients receive substantive care, and not just repeated recreational groups.  *Id.* at 11-12.

2  **3. When This Court Tried to Address the Waitlist By Speeding Up Admissions to New Units, Defendants Asserted That They Needed to Meet Minimum Treatment Standards.**

3

4  When faced with a Court order to accelerate admissions to newly opened temporary

5  units at the SVSP PIP, Defendants opposed the acceleration with sworn testimony from a

6  DSH physician as well as from the head of DSH's *Coleman* program.  Both witnesses

7  testified that DSH had to meet minimum treatment standards of 35 to 40 hours per week

8  for each patient.  Psychiatrist Dr. Richard Lipon, then Medical Director of the Vacaville

9  inpatient program, testified that "[i]t is essential" that the *Coleman* inpatient programs

10  "provide between 35 and 40 hours per week of patient therapeutic programming."

11  Declaration of Richard Lipon, ECF No. 3932-2 ¶ 3.  The Executive Director of the Salinas

12  Valley program, Vic Brewer, also testified that "patient programming of between 35 and

13  40 hours per week" was essential.  Declaration of Vic Brewer, ECF No. 3913-3 ¶ 5.

14  **4. Defendants' Own Local Operating Procedures Assert Minimum Structured Treatment Standards.**

15  CDCR's own local operating procedures that prescribe minimum treatment hours

16  for the PIPs were produced as part of the Special Master's 29th Round Monitoring Tour.

17  A June 18, 2020 memorandum for the CMF PIP "establishes the minimum number of

18  required offered treatment contacts per week for PIP patients."  Galvan Decl. Ex. B

19  (Memorandum from Kristen Meyers, Psy.D. to All CMF-PIP Staff re: Minimum Offered

20  Treatment (June 18, 2020) at 1).  It sets forth a minimum of 15 hours per week of group

21  therapy and three additional individual mental health and RT contacts for ICF patients, as

22  well as a minimum of 10 hours per week of group therapy and three additional individual

23  mental health and RT contacts for acute patients.  *Id.*

24  **B. The Standard Of Care For Psychiatric Inpatient Programs Is 24/7 Medical Care, With All Day Therapeutic Programming.**

25

26  As exemplified by the minimum treatment standards that have long governed the

27  inpatient psychiatric care provided to *Coleman* patients at DSH, the standard of care for

28  psychiatric inpatient programs involves, at a minimum, 20 hours per week of structured

[4270899.9]

14

therapeutic treatment and another 20 hours of unstructured rehabilitative programming—a combined 40 hours of weekly therapeutic and rehabilitative programming. *See* Declaration of Pablo Stewart, M.D. in support of Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs etc. ("Stewart Decl.") at ¶¶ 13-15, 37, 48, 50. Defendants' Plan falls short of this standard, providing for 0 hours of structured group treatment, and at most 4 clinical contacts and 10 hours of unstructured programming per week. *See* Defendants' Plan, ECF No. 7787 at 6, n.4. For ICF patients, Defendants' Plan is even worse; they are to be offered, at most, 3 clinical contacts and 10 hours of unstructured programming (including recreation), that is, 13 weekly combined hours, or less than 2 hours per day of out-of-cell time. *See id.* at 7.

### 1. Acute Psychiatric Inpatient Care Should Feature Daily Psychiatry Rounds and Daily Psychologist Appointments.

Under Defendants' Plan, *unstable* acute patients—that is, patients with emergent psychiatric symptoms—would be guaranteed only two individual psychiatry contacts and two primary mental health contacts per *week*. *See id.* at 6. That means that under this plan, unstable, acutely ill psychiatric inpatients may not see a clinician for multiple days at a time. Further, under Defendants' Plan, the IDTT is not even required to meet for 72 hours, so multiple days may go by before a treatment plan is created and further "structured treatment" is prescribed. *See id.* Once patients are deemed "stable," psychiatry contacts reduce to only once per week for patients. *See id.*

Defendants' Plan is a dangerous departure from the standard of care for acute patients. In the community, acute inpatient psychiatric wards are characterized by daily rounding by both psychiatrists and psychologists. Stewart Decl. at ¶¶ 16, 48. Acute psychiatric patients would typically have at least two clinical contacts per *day*, in addition to daylong access to group structured and unstructured programming. This more intensive treatment model not only helps to ensure that patients are stabilized sooner (within 14 days) than is typical for CDCR (where acute stays can last months), it also is protective for patients who are at the most significant risk of self-harm and suicide. *See id.* ¶¶ 17, 44

[4270899.9]

15

PLS.' NOTICE OF MOTION & MOT. TO REJECT DEFS.' PLAN TO PROVIDE MIN. TREATMENT STDS. FOR PIPs (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFS.' 8TH AMEND. VIOLATIONS

1   (reviewing the 2022 suicide of a patient at CMF in the acute level of care).

2         Daily clinical contacts for acute psychiatric patients are not just the norm in

3   community hospitals, they are also the national standard for correctional health services.

4   *See id.* at ¶¶ 19-20 (citing National Commission on Correctional Health Care, *Standards*

5   *for Health Services in Prisons* (2018) at 115).  Defendants' Plan for acute patient clinical

6   contacts therefore falls short of both community and correctional standards of care.

7             **2.**      **Intermediate Psychiatric Inpatient Care Should Be Characterized By a Therapeutic Milieu, With Daylong Structured and**

8                     **Unstructured Programming.**

9        In the community, inpatient psychiatric care for intermediate care patients is

10  characterized by a 24/7 therapeutic milieu.  *Id.* at ¶¶ 13-15.  Patients live in unlocked

11  multi-person rooms, with access to all-day therapeutic, rehabilitative, and recreational

12  programming.  *Id.*  That means that in a hospital setting, intermediate care patients would

13  normally be outside their rooms for a minimum of 8 hours per day, 7 days a week, for a

14  total of 56 hours per week.  *Id.* at ¶ 15.  They would also typically have at least twice

15  weekly psychiatry and psychology contacts.  *Id.* at ¶ 37.  The mere 10 hours of out of cell

16  time provided in Defendants' Plan is wildly out-of-step with the community standard of

17  care.  Patients in locked correctional units need standards for out of cell time, without

18  which, incarcerated patients end up lingering alone in cells for days on end.  At best, this

19  forced isolation deprives psychiatric inpatients of the therapeutic and rehabilitative

20  programs they need to make clinical progress.  *See id.* at ¶¶ 34-44.  At worst, it may lead to

21  decompensation, self-harm, and even suicide.  *See id.* at ¶¶ 46-48.

22        **C.**    **In Comparable Correctional Systems, Inpatient Care Is Provided In Hospital Settings With At Least 20hr/Week Of Structured Therapeutic**

23                 **Activities**

24        Defendants' Plan is inconsistent with those of other correctional systems that have

25  entered into remedial agreements to address Eighth Amendment violations.  New York's

26  state hospital and correctional system entered into a private settlement agreement with

27  Disability Advocates, Inc. and other public interest groups in *Disability Advocates, Inc. v.*

28  *New York State Office of Mental Health*, No. 1:02-cv-04002 (S.D.N.Y.), ECF No. 94.  In

PLS.' NOTICE OF MOTION &  MOT. TO REJECT DEFS.' PLAN TO PROVIDE MIN. TREATMENT STDS.
FOR PIPs (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFS.' 8TH AMEND. VIOLATIONS

1  response to Defendants' survey of other state correctional systems regarding their policies

2  for treatment provision to psychiatric inpatients, New York State Department of

3  Corrections and Community Supervision stated that its inpatient psychiatric services are

4  provided by the Office of Mental Health, which provides a minimum of 20 hours per week

5  of structured treatment.  Galvan Decl. Ex. C (Email from Nick Weber to Lisa Ells re:

6  Survey and Responses (Feb. 2, 2023) at 27).  Defendants' survey did not ask respondents

7  about unstructured programming or out-of-cell time minimums.  *See id.* at 27-28.

8       The Illinois Department of Corrections also had to address Eighth Amendment

9  mental health care violations.  *See Rasho v. Baldwin*, No. 1:07-CV-1298 (C.D. Ill.), ECF

10  No. 696.  The Illinois Department of Corrections provided psychiatric inpatient care in-

11  house, but in a hospital setting, with patients in unlocked dorms with free dayroom access,

12  daily contact with psychiatrists and other mental health clinicians, and daylong

13  programming.  Stewart Decl. ¶ 21.  Short-term psychiatric seclusion was limited to rare

14  cases where a patient was not too unstable to participate in group treatment.  *Id*.  These

15  examples from other states demonstrate that psychiatric inpatient units serving correctional

16  populations can also safely and effectively provide minimum structured programming

17  standards that approximate those in community settings.

18  **III.  THE COURT SHOULD REJECT DEFENDANTS' PROPOSED PLAN AND
          ORDER DEFENDANTS TO DEVELOP MINIMUM TREATMENT**
19      **STANDARDS ADEQUATE TO REMEDY THE ONGOING
          CONSTITUTIONAL VIOLATIONS IN THE PIPS**
20

21       The Court should order Defendants to revise their treatment standards for the PIPs

22  so that they provide, at a minimum, 20 hours of structured therapeutic treatment and 20

23  hours of unstructured out-of-cell activities per week.  Such minimum treatment standards

    would establish a constitutional floor of adequate inpatient psychiatric treatment.
24

25      **A.   The Court Should Order Defendants to Provide PIP Patients With a
              Minimum of 20 Hours Per Week of Structured Therapeutic
26           Programming and 20 Hours Per Week of Unstructured Out-Of-Cell
              Activities.**

27       Defendants' PIPs uniformly lack a defining feature of psychiatric inpatient care: a

28  therapeutic milieu.  Stewart Decl. ¶¶ 33, 46.  A therapeutic milieu provides daylong

opportunities for psychiatric inpatients to engage with clinicians and participate in
psychosocial rehabilitation alongside other patients on both a scheduled and unscheduled
basis. *Id.* At CDCR, when inpatients are not at scheduled treatment activities or
unstructured out-of-cell activities, they are generally locked in their rooms. *Id.* Without
adequate scheduled activities, the default for PIP patients is isolation, which may lead to
psychiatric decompensation. *Id.* at ¶ 47. Systemwide treatment standards setting forth a
minimum of 20 hours per week of structured therapeutic programming and 20 hours of
unstructured out-of-cell time per week is therefore even more important to protect the
health and safety of PIP patients than it is for patients in traditional hospital-based
psychiatric inpatient programs like DSH that have adopted 40-hour-per-week
programming minimums. *See U.S v. California,* ECF No. 9 at 13, 15-17.

Further, patients are referred to the PIPs because they are identified as requiring a
higher level of care than that which can be provided in an outpatient setting. *See* App'x A.
Mental Health Services Delivery System Program Guide (2021 Revision), ECF No. 7333-
1 at 63, 107-108 (describing referral criteria for inpatients) ("Mental Health Program
Guide"). By definition, CDCR's psychiatric inpatient programs should provide more
intensive treatment than that which is provided to EOPs. Under the Mental Health
Program Guide, EOP patients are required to be provided a minimum of 10 hours per week
of scheduled structured therapeutic activities. *Id.* at 59. Structured therapeutic activities
may include group psychotherapy, individual therapy, and recreational and occupational
therapy, in addition to educational and work assignments. *Id.* at 59-60. Defendants' Plan,
which provides for zero minimum hours of structured treatment, less than EOP patients,
must be rejected. The Court should order Defendants to adopt 20-hour-per-week
structured programming minimum for the PIPs, which would provide a more intensive
level of care appropriate to treat the grave level of disability and acute self-harm risk
characteristic of patients referred to inpatient care.

Minimum treatment standards would obligate Defendants to build the system
capacity to provide such treatment. Such standards do not prevent IDTTs, primary

1  clinicians, or treating psychiatrists from scheduling more individual contacts and fewer

2  groups for patients not yet clinically stable enough to participate in group activities.  In

3  addition, if clinicians determine that patients are too ill to participate in the full 20 hours

4  per week of structured programming, Defendants should adopt an approach analogous to

5  that of the EOP "modified" subprogram, whereby any downward departures from the

6  minimum programming requirements are thoroughly documented, medically justified, and

7  supplemented with more frequent IDTTs.  *See id.* at 58; *see also* Stewart Decl. at ¶ 49.

8      Patients with severe mental illness are at heightened risk of harm from isolation.

9  The *Coleman* remedy has recognized these special risks and provided additional

10 protections for patients with mental illness subjected to terms in segregated housing.  In

11 spite of this recognition, Defendants' Plan would tolerate fewer hours of unstructured out-

12 of-cell time (10 hours per week) in the inpatient hospital than the 20 hours per week

13 patients in locked-down restrictive housing receive.  Mental Health Program Guide, ECF

14 No. 7333-1 at 452 (guaranteeing patients in the Correctional Clinical Case Management

15 System ("CCCMS") who are placed in short-term restrictive housing 20 hours of out-of-

16 cell activities per week).  For this reason, too, the Court should reject Defendants' Plan and

17 order Defendants to adopt treatment standards providing a minimum of 20 hours of

18 structured treatment and a minimum of 20 hours of unstructured out-of-cell activities per

19 week to PIP patients.

20      **B.    The Court Should Find That The Requested Order Satisfies the Need,**
       **Narrowness, and Intrusiveness Requirements of the Prison Litigation**
21     **Reform Act.**

22      If the Court determines that issuing a minimum treatment standards order is

23 necessary to remedy Defendants' persistent Eighth Amendment violations in their delivery

24 of inpatient care, Defendants would nevertheless retain ample discretion to design and

25 operate their PIP treatment programs as they see fit.  Defendants would retain flexibility to

26 allocate minimum structured treatment hours across treatment modalities and differentiate

27 between levels of care.  In addition, Defendants would retain expansive discretion to

28 develop plans to implement their minimum treatment standards and to track institutions'

1   adherence to those standards.  Therefore, the Court should find that Plaintiffs' requested

2   order, given all circumstances and evidence set forth, is narrowly drawn, extends no

3   further than necessary to correct the constitutional violation, and is the least intrusive

4   means necessary to correct the violation, consistent with the requirements of the Prison

5   Litigation Reform Act.  *See* 18 U.S.C. § 3626(a)(1).

6                                    **CONCLUSION**

7        For the foregoing reasons, Plaintiffs respectfully request that the Court reject

8   Defendants' proposed plan to provide minimum treatment standards for the psychiatric

9   inpatient units (ECF No. 7787).  Plaintiffs further move the Court to order Defendants to

10  develop revised minimum treatment standards to provide patients in the PIPs with 20 hours

11  of structured therapeutic treatment and 20 hours of unstructured out-of-cell activities per

12  week.

13                      **CERTIFICATION OF ORDERS REVIEWED**

14       The undersigned counsel for Plaintiffs certifies that she reviewed the following

15  relevant court orders: ECF Nos. 7765, 7697, 7608, 7605, 7581, 7456, 7392, 7133, 7108,

16  6730, 5750, 5726, 5610, 5605, 5583, 5573, 5188, 4925, 4688, 4120, 3945, 3929, 3831,

17  2134, 945, *Coleman*, 912 F. Supp. at 1308-09.

18

19  DATED:  April 17, 2023              Respectfully submitted,

20                                      ROSEN BIEN GALVAN & GRUNFELD LLP

21                                      By:  */s/ Arielle W. Tolman*

22                                           Arielle W. Tolman

23                                      Attorneys for Plaintiffs

24

25

26

27

28