DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING THIRD-LEVEL DATA REMEDIATION DISPUTES**<br><br>Judge:  Hon. Kimberly J. Mueller |

[4275678.2]

**INTRODUCTION**

On April 10, 2023, Defendants filed objections to the Special Master's March 9, 2023 Report and Recommendations Regarding Third-Level Data Remediation Disputes (ECF No. 7755 or "Third-Level Data Report").  *See* ECF No. 7805.  Plaintiffs requested, and the Court granted, leave to respond to Defendants' objections by April 24, 2023.  *See* Apr. 17, 2023 Minute Order, ECF No. 7810.  The Court required Plaintiffs to update the Court on whether any of the compromises Defendants proposed in their objections "suggest a resolution of outstanding disputes acceptable to Plaintiffs and that meets with the approval of the Special Master."  *Id.*  In light of the Court's Order, the parties agreed to meet with the Special Master team to discuss whether any of the identified disputes could be narrowed based on Defendants' proposed compromises.  *See* ECF No. 7820 at 2.  The parties stipulated, and the Court ordered, a seven-day extension for Plaintiffs to respond to Defendants' objections until May 1, 2023.  *See* Apr. 24, 2023 Minute Order, ECF No. 7821.

The parties met and conferred on April 27, 2023 and reached agreement on two of the four third-level data disputes before the Court—specifically the disputes pertaining to the IDTT Staffing indicator (patient attendance and psychiatric nurse practitioner (PNP) attendance).  Despite good faith efforts, the parties could not reach agreement on the remaining two disputes pertaining to the Transfer to STRH/LTRH Within Timeframes indicator and the MHCB Daily Provider Contacts indicator.  For all the below reasons, the Court should adopt the Special Master's recommendations as to these two indicators, as well as clarify the purpose of the data remediation process.

**I.      STANDARD OF REVIEW**

The Special Master's Third-Level Data Report includes findings regarding the data remediation process to support his recommendations regarding the outcome of four third-level data disputes now before the Court, and is therefore a compliance report within the meaning of the Order of Reference.  *Cf.* Mar. 27, 2020 Order, ECF No. 6539 at 3 ("If the parties are unable to reach an agreement after receipt of the Special Master's input, the

Special Master will file a recommendation with the Court[,] … after which the parties will have 30 days to respond consistent with the Order of Reference (ECF No. 640)."); Order of Reference at 4 (Special Master's duties are to "make interim reports to the court on the progress of the remedial plan" and to "prepare and file with the court periodic reports assessing defendants' compliance with such remedial plan as the court may order"). The Order of Reference provides that the Court shall adopt the findings of fact in the Special Master's reports "unless they are clearly erroneous." *Id*. at 8; *see also* Nov. 23, 2009 Order, ECF No. 3731 at 2 n.1 (affirming that "clearly erroneous" is the applicable standard of review for Special Master's reports). The 2019 modification of the Order of Reference provided for a 30-day deadline for reports not previously circulated to the parties while modifying "[n]o other aspect of the Order of Reference." July 29, 2019 Order, ECF No. 6230 at 2. A finding is "clearly erroneous" when "on review of the entire evidence, the reviewing court arrives at the firm conviction that the finding is mistaken." *In re U.S.A. Motel Corp*., 450 F.2d 499, 503 (9th Cir. 1971); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("To be clearly erroneous, a decision must strike the court as more than just maybe or probably wrong; it must … strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." (internal citations omitted)). The party objecting to the Special Master's findings has the burden of proving that they are clearly erroneous. *Oil, Chemical & Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B*., 547 F.2d 575, 580 (D.C. Cir. 1976).

## II.    A CLARIFYING ORDER AFFIRMING THE SPECIAL MASTER'S VIEW OF THE FUNDAMENTAL PURPOSE OF THE DATA REMEDIATION PROCESS REMAINS NECESSARY

Plaintiffs' motion in response to the second whistleblower report from Defendant California Department of Corrections and Rehabilitation's (CDCR) Chief Psychiatrist, Michael Golding, M.D. (hereafter "Second Golding Report"), requested that the Court clarify and reaffirm its prior orders holding that the purpose of data remediation is to ensure not only that the data is technically accurate, but also that it properly reflects the minimum remedial requirements governing this case. *See* ECF No. 7721 at 21. The

[4275678.2]

2

1    Special Master requested the Court's input on this dispute in the Third-Level Data Report.

2    *See* ECF No. 7755 at 33.  In light of the Special Master's request, the Court vacated the

3    hearing on Plaintiffs' motion and took under submission the issue of the purpose of data

4    remediation in order to "resolve it concurrently with the court's resolution of the Special

5    Master's [Third-Level Data Report]."  Mar. 17, 2023 Order, ECF No. 7765 at 1-2; *see also*

6    Apr. 13, 2023 Order, ECF No. 7808 at 5 ("The unresolved issues related to the scope and

7    substance of data remediation are for another day.").  Defendants contend that the Special

8    Master's "discussion of Defendants' purported understanding of data remediation is

9    inaccurate and not necessary," ECF No. 7805 at 3, and that they "do not require any

10   clarification in this regard," *id.* at 9.  For all the below reasons, the Court's input remains

11   necessary.

12        Defendants admit that the Court's prior orders hold "that the key indicators should

13   correspond to the most salient and material provisions of the Program Guide and

14   Compendium."  *Id*; *see also id.* at 3 (quoting July 1, 2021 Order, ECF No. 7216 at 4).

15   Defendants also state that they "accept th[e] premise" that their data "should be 'informed

16   by the Special Master's monitoring of … remedial requirements.'"  *Id.* at 5 (quoting ECF

17   No. 7755 at 12 (ellipsis in original)).  While these are heartening admissions, Defendants

18   have not provided actual evidence that the Special Master's findings regarding CDCR's

19   misunderstanding of the data remediation process are clearly erroneous.  Also, the Court

20   has summarily rejected Defendants' recycled demand for the Special Master's "tools and

21   methodologies."  *Compare* ECF No. 7805 at 5, *with* Apr. 13, 2023 Order, ECF No. 7808 at

22   5 ("Defendants may not use objections to seek discovery from the Special Master as

23   though he were an opposing party.").

24        Most importantly, Defendants do not now and have never disavowed their multiple

25   prior statements presenting a much narrower (and deeply problematic) view of the data

26   remediation process.  *See, e.g.*, ECF No. 7733 at 4-5 (resisting the Special Master's

27   representation in the 29th Round Report that Defendants "condede[] that the data

28   remediation process necessarily includes modifications to align the scope of a given

[4275678.2]
3

1  indicator with the Special Master's current scope of monitoring," and objecting that the

2  Report "omits the sentence that follows, which states that data remediation is 'intended to

3  assess whether CDCR's indicators measure what they purport to measure.'  Defendants

4  have consistently held this position" (internal citations omitted)); ECF No. 7523 at 3

5  (requesting that the Court "confirm that the Data Remediation process … is focused on the

6  quality and accuracy of the data and ensuring that the data elements measure what they

7  purport to measure"); ECF No. 7523-1 at 4 ("The Data Remediation Process …. [is]

8  intended to assess whether CDCR's indicators measure what they purport to measure.");

9  *id.* at 14 (same); ECF No. 7415 at 7 (arguing that the data remediation process is

10  "primarily meant to ensure that each indicator is measuring what it purports to measure").

11  Defendants make no attempt to explain their evolving position, and indeed do not even

12  acknowledge these prior statements.  They also fail to address the undisputed fact that a

13  member of senior CDCR leadership intimately involved in data remediation told

14  Dr. Golding that the data remediation process would require nothing more than validating

15  whether CDCR was correctly counting "the number of cars in a parking lot" if that is what

16  CDCR designed the indicator to measure.  *See* ECF No. 7721 at 7.  Nor have Defendants

17  ever recognized the import of the denigrating statements that Deputy Director Mehta and

18  former Secretary Allison made about the Special Master's monitoring work at CDCR's

19  November 16, 2022 Mental Health Leadership Conference.  *See Id*. at 13-14 ("He's taking

20  their lunch money! … And he *wins* too!"); *see also* ECF No. 7721-1, ¶ 2 & Ex. A.

21      Although there has been some shift in Defendants' willingness to make reasonable

22  modifications to certain indicators during the stakeholder review phase of the remediation

23  process since the Court issued its March 13, 2023 Order requiring all counsel and

24  principals to read key prior orders and reports, ECF No. 7757, a clarifying order regarding

25  the purpose of data remediation remains necessary.[1]  Without such clarification, there is

26  _____

27  [1] Plaintiffs also note that despite counsel for Defendants' affirmation that they reviewed
28  (footnote continued)

substantial risk of the parties becoming re-ensnared in the cycle of disputes plaguing the process just weeks ago. *See, e.g.*, ECF No. 7768 at 5-6 (describing recent disputes pertaining to the RH18, RH12 and RH14 indicators that Defendants elevated to the second level of dispute resolution despite the fact that the indicators' original design clearly did not align with the Program Guide). This is especially true given Defendants' history of shifting their position on this matter without warning or acknowledgment. The relief Plaintiffs requested in their pending motion—an order clarifying and reaffirming that Defendants' data indicators must align with the Program Guide and other court-ordered requirements, as well as the Special Master's historical way of monitoring those requirements absent agreement otherwise—is necessary to resolve this matter, and will provide critical guidance and structure necessary for the parties to complete this project by the Court's December 2023 deadline.[2] The Court should therefore reject Defendants' objections to the Special Master's report on this point and issue the relief Plaintiffs' requested in their pending motion post haste.

## III.    THE PARTIES HAVE REACHED AGREEMENT ON TWO OF THE FOUR THIRD-LEVEL DATA DISPUTES

Before discussing the parties' proposed agreements, it bears mentioning that Defendants' decision to present entirely new proposals in their objections was improper and inefficient. Plaintiffs are committed to narrowing disputes and preserving the resources of this Court and its Special Master, which is why Plaintiffs sought an extension

---

the Court's prior orders, they again fail to include in their objections a certification of the relevant orders reviewed in support of their filing. *See* Nov. 6, 2017 Order, ECF No. 5726 at 10.

[2] Defendants seem to request the Court's blessing to delay completion of the data remediation process past the December 2023 deadline. *See* ECF No. 7805 at 4 ("Defendants request that the Court recognize that requests to modify may cause deadline slippage."). The Special Master has not made any recommendation to extend the deadline. Defendants' objections are not an appropriate forum for seeking modification of the Court's May 29, 2022 Minute Order (ECF No. 7541) setting the December 2023 deadline. *See, e.g.*, Apr. 12, 2023 Order, ECF No. 7807 at 9-10 (explaining applicable standards under which Defendants would need to seek relief from a prior order under Federal Rule of Civil Procedure 60(b).). The Court should therefore reject Defendants' request.

to file this response in order to meet and confer with Defendants regarding the compromises proposed in their objections. *See* ECF No. 7820 at 2. But Defendants' attempt to raise new ideas at the eleventh hour inappropriately circumvents the agreed-upon dispute resolution process and renders meaningless the previous steps—including hours of meetings and time preparing written position statements, not to mention diverting the Special Master away from the many other pressing tasks in this case to hold his own meetings on these disputes with the Secretary and preparing and writing the instant Third-Level Data Report. Defendants' objections misleadingly omit the fact that they never presented the proposed compromises during the dispute resolution process. Nor do their objections even fully explain what an "usual events flag" would entail.[3] This not only violates the Court's call for transparency, *see* Jan. 7, 2020 Order, ECF No. 6441 at 2, it sows seeds of doubt that Defendants will adhere to the dispute resolution process in the future. Such an environment is not conducive to resolving disagreements, and indeed is a giant waste of everyone's time and resources. Defendants' disorganized and unpredictable approach to these third-level data disputes underscores the need for Undersecretary Toche, and/or Secretary Macomber, to appear in court and provide enhanced accountability and leadership in this process. *See* ECF No. 7721 at 21.

Notwithstanding the foregoing concerns, the parties have reached an agreement in principal regarding the two disputes pertaining to the "IDTT Staffing" indicator, as explained below. The parties intend, after consultation to the Special Master, to submit a stipulation for the Court's approval no later than May 15, 2023 resolving these disputes.

### A.    IDTT STAFFING – PATIENT ATTENDANCE

The parties agree that rather than modifying the existing IDTT Staffing indicator to measure patient attendance, Defendants will create a new indicator measuring whether patients are attending their IDTTs. *See* Decl. of Cara E. Trapani In Supp. of Pls.' Resp. to

---

[3] Defendants subsequently provided further details about the unusual event flags during the parties' April 27, 2023 meet and confer session. *See* Trapani Decl. ¶ 6.

1    Defs.' Objs. To Third-Level Data Report, filed concurrently herewith ("Trapani Decl."),

2    ¶ 3 & Ex. A (emails memorializing the parties' agreements).  The Special Master approved

3    this compromise.  *Id.* ¶ 11.  Defendants have committed to start creating the documentation

4    for this new indicator as soon as the documentation stage is complete for the other

5    provisionally approved indicators, and will work with the Plaintiffs' and Special Master to

6    complete the IDTT Patient Attendance indicator through the normal data remediation

7    processes.  *Id.* ¶ 4 & Ex. A.

8    **B.    IDTT STAFFING – PSYCHIATRY NURSE PRACTITIONER (PNP)**
      **PARTICIPATION**

9

10       The parties agree that Defendants will revise the IDTT Staffing indicator

11   methodology to count an IDTT as noncompliant if a PNP attends an IDTT for any patient

12   above the CCCMS level of care.  *See id.* ¶ 5 & Ex. A.  The Special Master approved this

13   compromise, which is identical to the recommendation he originally issued.  *See id.* ¶ 11;

14   ECF No. 7755 at 31 ("[T]he Special Master recommends the IDTT Staffing indicator be

15   modified to account for violations of the PNP policy.  In other words, an IDTT at the EOP

16   level of care or higher would be noncompliant if attended by a PNP serving as the

17   'assigned psychiatrist.'").  Defendants still intend to add an unusual events flag to the

18   IDTT Staffing indicator that will show whether a PNP attended the IDTT for patients at

19   EOP or higher levels of care, which would allow stakeholders to more easily track

20   violations of CDCR's PNP Policy.  *See* Trapani Decl. ¶ 5; ECF No. 7805 at 8-9.

21   **IV.    TRANSFER TO STRH/LTRH WITHIN TIMEFRAMES – TRANSFER**
      **CLOCK FREEZE/SUSPENDING EVENTS**

22

23       Plaintiffs appreciate and support Defendants' proposal to set up automated alerts to

24   clinicians whenever a CCCMS patient remains in a non-mental health segregation setting

25   for more than 30 days due to a medical hold.  *See* Trapani Decl. ¶ 7 & Ex. A.  Plaintiffs

26   also support Defendants' proposal to create an unusual events flag that identifies when

27   medical holds occur.  ECF No. 7805 at 6.  However, Plaintiffs maintain that transfers

28   beyond 30 days to these settings should be scored as noncompliant in the Transfer to

[4275678.2]
                                              7

1  STRH/LTRH Within Timeframes indicator.  Accordingly, the parties could not reach

2  agreement on this dispute.

3      For the first time, Defendants argue in their objections that this indicator's current

4  methodology is appropriate because the STRH policy contemplates that "there may be

5  situations where [a patient] will not be transferred to an STRH within 30 days."  *See* ECF

6  No. 7805 at 5-6 (citing 2021 Program Guide, ECF No. 7333-1 at 457 ("Some examples of

7  situations include … [a] medical hold.").  Defendants have never previously raised this

8  argument.  *See* Trapani Decl. ¶ 9; ECF No. 7755-1 at 18 (Defs.' Dec. 8, 2022 position

9  statement).  The Court should not allow Defendants to present it here in the first instance.

10  *Cf.* Order of Reference, ECF No. 640 at 8 ("The court will entertain no objection to the

11  report unless an identical objection was previously submitted to the special master.").

12      Even if Defendants had previously raised this argument during the dispute

13  resolution process, it is unpersuasive, and certainly does not establish clear error.  Nothing

14  in the STRH policy cited by Defendants says the transfer timeframe clock must "freeze"

15  for medical holds.  *See* ECF No. 7333-1 at 457.  The STRH policy also triggers a very

16  specific process involving the Warden when medical holds occur, but none of those

17  requirements are measured in any way in this or, to Plaintiffs' knowledge, any other

18  indicator.  *See id*.  Also, the STRH policy does not define medical holds, but the definition

19  of "Temporary Medical Hold" used here by Defendants is very broad, can last for up to six

20  months, and covers non-urgent medical care with no attempt to balance a patient's mental

21  health needs.  *See* ECF No. 7755-1 at 10.  In contrast to the STRH policy, nothing in the

22  LTRH policy states that there may be exceptions to the 30-day transfer timeframe.  *See*

23  ECF No. 7333-1 at 450, 453.  Defendants omit this fact.

24      The Court has determined that segregation is extremely dangerous for *Coleman*

25  class members, and the suicide rate in such units is extremely high.  Apr. 10, 2014 Order,

26  ECF No. 5131 at 45-46 ("[P]lacement of seriously mentally ill inmates in California's

27  segregated housing units can and does cause serious psychological harm, including

28  decompensation, exacerbation of mental illness, inducement of psychosis, and increased

[4275678.2]

8

1   risk of suicide.").  Allowing CCCMS patients to remain in a non-mental health segregation

2   setting for months on end with no mental health care for broadly defined medical reasons

3   should not be scored as "compliant" under this indicator.

4          Defendants remain unwilling to negotiate a more limited medical exception to the

5   STRH and LTRH transfer timeframe policies and submit them to the Court for

6   consideration, as Plaintiffs have repeatedly proposed and as the parties did with respect to

7   the inpatient and MHCB transfer timelines.  *See* Trapani Decl. ¶ 8; ECF No. 7755 at 20

8   ("To date, defendants have rejected plaintiffs' offer to negotiate mutually acceptable

9   exceptions to the STRH/LTRH transfer timeframes based on medical concerns.").

10  Defendants have not established that any of the Special Master's findings regarding this

11  dispute are clearly erroneous.  Accordingly, the Court should adopt the Special Master's

12  recommendation that "defendants modify the Transfer to STRH/LTRH Within

13  Timeframes indicator design to score transfers beyond 30 days as noncompliant."  *See id.*

14  **V.      MHCB DAILY PROVIDER CONTACTS – TELEPSYCHIATRY**

15          The parties also failed to reach agreement on this dispute.  Since Defendants filed

16  their objections, the Court adopted the provisionally approved telepsychiatry policy as

17  final.  *See* Apr. 12, 2023 Order, ECF No. 7807 at 10; *see also* Mar. 27, 2020 Order, ECF

18  No 6539 at 7 ("Telepsychiatry may not be used at the MHCB level of care except as a last

19  resort in emergency situations when an on-site psychiatrist is not assigned to the

20  program."); Oct. 10, 2017 Order, ECF No. 5711 at 21 (same).  It is now even more

21  important that the MHCB Daily Provider Contacts indicator not allow contacts that violate

22  the telepsychiatry policy to be scored as compliant.  While Plaintiffs support Defendants'

23  proposal to add an unusual events flag to this indicator, which would allow stakeholders to

24  more easily view rates of compliance with this provision of the telepsychiatry policy, *see*

25  ECF No. 7805 at 7, Plaintiffs maintain, and the Special Master agrees, that daily provider

26  contacts completed in the MHCB by telepsychiatrists in non-emergency situations should

27  be scored as noncompliant.  *See* ECF No. 7755 at 23 ("Designing this indicator to score

28  daily contacts as 'compliant' when those contacts are provided outside the bounds of the

[4275678.2]
                                              9

1  court-ordered remedy in this case would be misleading and unhelpful.").  Defendants have

2  not argued, much less provided any evidence, that the Special Master's findings regarding

3  this indicator are clearly erroneous.  The Court should adopt the Special Master's

4  recommendation that "this indicator be designed with plaintiffs['] requested reasonable

5  modification."  *Id.*

## CONCLUSION

7  For all the foregoing reasons, Plaintiffs respectfully request that the Court issue an

8  order clarifying the purpose of the data remediation process, rejecting Defendants'

9  objections to the first portion of the Special Master's report, and adopting the Special

10  Master's recommendations regarding the disputes pertaining to the Transfer to

11  STRH/LTRH Within Timeframes indicator and the MHCB Daily Provider Contacts

12  indicator.  The parties' agreements regarding the two IDTT Staffing indicator disputes will

13  be memorialized in an upcoming stipulation for the Court's review, which the parties

14  propose submitting to the Court for approval by May 15, 2023.

## CERTIFICATION

16  The undersigned counsel for Plaintiffs certifies that she reviewed the following

17  orders relevant to this filing:  ECF Nos. 640, 3731, 5131, 5711, 5726, 6230, 6441, 6539,

18  7216, 7541, 7757, 7765, 7807, 7808, 7810, 7809, 7821.

19

20  DATED:  May 1, 2023                 Respectfully submitted,

21                                      ROSEN BIEN GALVAN & GRUNFELD LLP

22

23                                      By:  */s/ Cara E. Trapani*
                                             Cara E. Trapani

24

25                                      Attorneys for Plaintiffs

26

27

28  [4275678.2]

PLS' RESPONSE TO DEFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND
RECOMMENDATIONS REGARDING THIRD-LEVEL DATA REMEDIATION DISPUTES