Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
Paul B. Mello, SBN 179755
Samantha D. Wolff, SBN 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:  925-746-8460
Facsimile:  925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al. <br><br> Defendants. | Case No. 2:90-CV-00520- KJM-DB <br><br> **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REJECT DEFENDANTS' PLAN TO RECRUIT AND RETAIN PSYCHIATRIC INPATIENT PROGRAM STAFF** <br><br> Judge:   Hon. Kimberly J. Mueller |

## INTRODUCTION

Defendants developed a multi-faceted, comprehensive, robust plan to increase and retain PIP staffing (PIP Recruitment Plan), which they presented to Plaintiff and the Special Master, met and conferred about, and ultimately filed with the court. Plaintiffs are not content with the plan and have filed a motion, as the Court's order permitted them to do, asking the Court to reject the plan and to order that Defendants file a revised plan to improve PIP vacancy rates for psychiatrists, psychologists, social workers, and recreational therapists. But Plaintiffs' motion goes beyond the Court's directive by improperly moving for an order on PIP staffing levels. (ECF

-1-

19452676.1   Defs.' Opp'n Pls.' Mot. Reject Defs.' Plan Recruit & Retain PIP Staff   Case No. 2:90-CV-00520- KJM-DB

No. 7813 at 19-20.)  There is currently no existing order that applies the 2002 staffing vacancy order to the PIPs and Plaintiffs have not moved to modify the June 2022 order, or any other orders that they rely on, to impose the ten percent vacancy rate on PIP staffing.

The Court should deny Plaintiffs' motion because Defendants' PIP Recruitment Plan presents numerous steps the state has already taken, or will soon take, to improve staffing in the PIPs, and the plan should be given an opportunity to work.  Plaintiffs' motion should also be denied because it improperly seeks an order addressing PIP staffing levels, which the Court did not permit them to address in their motion.

## ARGUMENT

### I. CDCR'S PIP RECRUITMENT PLAN PRESENTS ACTIONS THE STATE HAS TAKEN OR WILL TAKE TO RECRUIT AND RETAIN MENTAL HEALTH STAFF IN THE PIPs.

**A. CDCR has presented a multi-faceted plan for improving recruitment and retention.**

Plaintiffs roundly criticize Defendants proposed plan for recruitment and retention of PIP staff, but offer virtually no feasible or realistic alternatives to Defendants proposals, which are far reaching and comprehensively address recruitment and retention needs using the best possible resources available for those purposes.  CDCR's plan reasonably focusses on compensation and marketing related strategies.  Its compensation-related measures include PIP pay differentials, retention bonuses, and increased registry rates for clinicians working in the PIPs.  (ECF No. 7787 at 8.)  The plan's marketing-related strategies include numerous measures to attract qualified candidates through social media; radio advertising; social networking platforms; print and online advertising campaigns; partnering with large media companies; direct mail and email campaigns to mental-health clinicians; promoting CDCR job opportunities to graduating students; partnering with a national leaders in healthcare recruiting; advertising on Facebook, Google, and Instagram; partnering with professional organizations; and an expanded virtual recruitment platform.  (ECF No. 7787 at 8-9.)

The plan also includes on-site hiring events conducted by CCHCS that will allow potential PIP candidates to take civil service exams, apply for vacancies, interview, accept a conditional employment offer, get fingerprinted, and complete pre-employment requirements in a single day.

(ECF No. 7787 at 9; Muhammad Decl. ¶ 2.)  Thirteen of these events were held statewide in 2022 at thirteen different locations across the state, and the duration of each event ranged from two to four days.  (Muhammad Decl. ¶ 2.)  The primary focus of each of these events was to recruit and hire mental-health staff with a particular emphasis on hiring staff to work in the PIPs.  (*Id*.)  CCHCS was able to hire 297 new PIP staff members as a result of the events held in 2022.  (*Id*.)  Four more of these on-site hiring events have been conducted so far in 2023, and have resulted in the hiring of an additional twelve new PIP staff members.  (*Id*. ¶ 3.)  CCHCS is already planning to conduct seven additional on-site hiring events from May through October, and more events might be scheduled this year.  (*Id*.)

The Statewide Mental Health Program also supports a Psychologist Internship program at California Institution for Men, California Institution for Women, California Men's Colony, R.J. Donovan Correctional Facility, California State Prison - Sacramento, San Quentin State Prison, and Valley State Prison, and this practice would continue to be a part of the staffing plan.[1]  (*Id*.)

Contrary to Plaintiffs assertions, Defendants' PIP Recruitment Plan is not comprised solely of old initiatives.  A number of the initiatives in the plan are either brand new or relatively recent, including the following:

- CPS HR Consulting Contract— California Correctional Health Care Services (CCHCS) has recently entered into a new contract with CPS HR Consulting—a recruitment consulting firm—that will assist with recruitment of psychiatrists, psychologists, social workers, and psychiatric nurses through a geo-targeted direct-email campaign, a digital ad campaign via Google, Facebook and Instagram, and the creation of ad displays and promotion videos.  (Decl. Johnson ¶¶ 2-3.)  The focus of this endeavor will be to recruit for CDCR's psychiatric inpatient units, and the goal is to have the campaign in place later this year.  (*Id*.)

---

[1] CCHCS also engages with high schools to promote CCHCS careers and the benefits and stability of employment with CCHCS.  And although it will not address CDCR's immediate staffing needs, as a part of its long-term strategy, CDCR intends to expand outreach to this younger demographic to develop future candidate pools.  (ECF No. 7787 at 10.)

- I Heart Media Campaign—CCHCS first worked with I Heart Media in June 2022 on a general healthcare-recruitment initiative, but I Heart Media was engaged for the first time in April 2023 to create and implement a new ad campaign focused specifically on the mental-health practitioner demographic and the promotion of mental-health positions within CDCR. (*Id*. ¶ 4.) That campaign utilizes digital ads, social media ads, and podcast ads. (*Id*.)
- Geo-Targeted Mailing Campaign—In January and February this year, CCHCS initiated its own geo-targeted direct mailing campaign focused on psychiatrist recruitment. (*Id*. ¶ 5.) This new mailing campaign was expanded to clinical social workers in March, and is currently being expanded to include psychologists. (*Id*.)
- Doximity Contract—CCHCS is currently working on a new initiative to contract with Doximity, which provides an online platform for recruiting physicians that is similar to LinkdIn. (*Id*. ¶ 6.)
- HandShake Platform— In May 2022, CCHCS first entered into a contract with HandShake, which provides a large and diverse early-talent recruitment system. (*Id*. ¶ 7.) HandShake directly connects CCHCS recruiters with students and alumni across the country and provides a platform for posting ads for positions and for hosting online recruitment events. (*Id*.) In April 2023, CCHCS held its first HandShake event specifically aimed at recruiting for mental-health positions. (*Id*.) Two-hundred-fifty individuals responded to the event notice with an RSVP, and thirty-five individuals attended and participated in the event. (*Id*.)
- Brazen Technologies Contract—In April 2023, CCHCS entered into a contract with Brazen Technologies. (*Id*. ¶ 8.) This company will provide a virtual event platform and opportunities to market, meet, engage, and interview candidates virtually. (*Id*.)

Other efforts were initiated only last year. For example, the fifteen-percent PIP pay differential and retention bonuses for psychiatrists and psychologists became effective in May 2022, but could not be advertised for psychiatrist-recruitment purposes until after a Human

-4-

Resources pay letter was issued in July 2022. (Carter Decl. ¶ 2.) Similarly, the differential and retention bonuses could not be advertised for psychologists until after Human Resources issued a September 2022 pay letter. (*Id.*) Thus, the pay differential and revised retention bonuses have not yet been advertised for a full year.

Additionally, CCHCS entered into a new contract in May 2022, to increase rates for registry psychologists, social workers, and recreational/rehabilitation therapists. (Ponciano Decl. ¶ 2.) And in April 2023, CCHCS amended the contract to further raise registry rates for classifications at certain institutions, including psychologists working in the Psychiatric Inpatient Programs at Salinas Valley State Prison, California Health Care Facility, and California Medical Facility. (*Id.* ¶ 3.)

The efforts and initiatives described above are not stale, as Plaintiffs wrongly contend. Some are brand new and others have been in place for a year or less. Thus, Plaintiffs contention that Defendants are relying solely on past failed approaches to address staffing is simply false. Defendants' new recruitment initiatives should be given time to take hold. It is premature for Plaintiffs or the Court to deem CDCR's PIP Recruitment Plan inadequate and ineffective.

Although Defendants believe their plan to address PIP staffing should be allowed a chance to work, Defendants remain open to considering guidance from the Special Master and suggestions from Plaintiffs on possible ways to improve the plan to address this extremely challenging issue.

## II.  PLAINTIFFS' CRITICISMS OF THE PIP STAFFING PLAN ARE WITHOUT MERIT.

Plaintiffs complain that some parts of Defendants' plan, such as student loan forgiveness, visa support for non-citizens, and CDCR's practice of hiring staff at salaries above scheduled minimums have been in place for years and have not remedied staffing issues, but CDCR is not relying solely on those previously existing programs, which have, nonetheless, benefited healthcare staff and should therefore improve recruitment and retention. These measures should not be written off as meaningless additions to CDCR's proposed.

Plaintiffs wrongly assert that Defendants PIP Recruitment Plan does not address retention. The plan addresses retention with the PIP pay differential and retention bonuses. (ECF No. 7787

19452676.1

-5-

Defs.' Opp'n Pls.' Mot. Reject Defs.' Plan Recruit & Retain PIP Staff     Case No. 2:90-CV-00520- KJM-DB

at 8; Decl. Carter ¶ 2-3.)  If a PIP clinician opts to leave employment in the PIPs for some other area of CDCR's mental-health program, they will no longer be entitled to the PIP pay differential. And the bonus program is designed to improve retention of psychiatrists and psychologists across the board, which should invariable help CDCR fill and retain PIP staff.  Furthermore, the overall purpose of the plan is to fill vacant positions in the PIPs, which should in turn improve PIP working conditions and help with retention.

Plaintiffs' also complain that the plan does not address working conditions in the PIPs.  On this issue, the Special Master's experts noted that on-site mental health staff are less satisfied with working conditions than off-site staff.  (ECF No. 6695 at 19, 218.)  For years, CDCR has been working to try to expand telehealth, which it believes would greatly increase staff satisfaction with working conditions and help Defendants compete for mental-health practitioners in a market that is moving steadily toward telehealth, but those efforts have been met with resistance from Plaintiffs, the Special Master, and the Court.  (*See, e.g.,* Ct. Order, ECF No. 7807; *see also* ECF No. 7772-1 at 18 (Defs.' telepsychiatry expert's opinions re the inevitable trend toward telehealth).)  Thus, Plaintiffs' assertion that CDCR has been unrestrained from employing options for addressing mental-health staffing is simply wrong.

Plaintiffs brush aside Defendants' description of the challenges presented by the status of the current market for mental-health practitioners.  But as Defendants expert labor economists reported, the lack of mental-health practitioners, and in particular psychiatrists, is a nationwide crisis and directly impacts CDCR's ability to staff its mental-health program.  (ECF No. 6695 at 97-110 (Special Masters Report on Psychiatrist Employment Conditions and Compensation.)  At the time of the expert's report, CDCR already employed one of every twenty psychiatrists in California for a patient population that comprised only 0.3% of the state's population.  (*Id.* at 107.) That means CDCR's population had more than sixteen times the access to psychiatrists than California's overall population, even without all psychiatrist positions filled.  (*Id.* at 107.)  And the expert's report confirmed that California and the nation should expect the market for mental-health practitioners to continue to tighten in the coming years.  (*Id.* at 105.)  Thus, despite Plaintiffs' contentions, there is no simple solution for addressing the nation's mental-health

staffing crisis or its impact on CDCR's ability to recruit staff.

Plaintiffs further complain that the PIP Recuitment Plan does not call for more increases in pay. But, as Defendants' expert labor economist explained, both public and private organizations continue to struggle to adequately staff their mental-health programs despite increases in salaries. (*Id.* at 101.) Both the Defendants' and the Special Master's labor economist experts agree that CDCR's salaries are competitive. (*Id.* at 111-118, 191.) Moreover, Defendants experts demonstrated through regression and correlative analyses that salary increases are unlikely to work:

> "In sum, data from a reasonably long period of eight years do not provide a statistical basis to conclude that higher CDCR pay relative to statewide or nationwide averages is associated with greater fill rates for civil service psychiatrists. This conclusion holds whether we undertake a simple correlational analysis or employ regression techniques and test several sensitivities." (*Id.* at 127.)

Thus, salary increases are not the silver bullet that Plaintiffs suggest they are.

Plaintiffs assert that no part of Defendants PIP Recruitment Plan addresses recreational therapists. This is not true. The fifteen percent PIP pay differential applies to recreational therapists working in the PIPs, and CDCR also increased recreational therapist registry rates last year. (Decl. Carter ¶ 3; Decl. Ponciano ¶ 2.)

Although there is no measure in the PIP staffing plan that specifically applies only to the Lift and Shift PIPs, because fill rates at the other PIPs are usually higher, CDCR expects the PIP pay differential to be most impactful at the Lift and Shift PIPs.

### III. PLAINTIFFS HAVE NOT MOVED TO MODIFY STAFFING ORDERS.

Plaintiffs have improperly used their motion opposing Defendants' PIP Recuitment Plan to seek additional orders concerning staffing levels in the PIPs instead of filing a motion to modify existing orders that address staffing levels. Plaintiffs' motion states that "Defendants must maintain staffing of key mental health clinicians in the PIPs at vacancy rates no greater than ten percent of allocated positions." But Plaintiffs have not sought modification of any of the orders they cite as authority for their position. *See* Order (June 13, 2002), ECF No. 1383 at 4; Order (Apr. 11, 2023), ECF No. 7806 at 2, 8; Order (Aug. 17, 2022), ECF No. 7605 at 5-6.

The August 2022 Order does not hold that the June 6, 2002 order applied to PIPs. Instead, it overrules Defendants' objection to the Special Master's report because Defendants have not shown that the findings are clearly erroneous. (ECF No. 7605 at 6:11-21.) The Order reserves the question of whether the 2002 order applies to the PIP Recuitment Plan ("any determination that particular clinical staffing classifications are outside the scope of that order would likely leave a void this court would need to then fill with a further ruling" and "[w]ere a further order to become necessary, the information provided by the Special Master in his monitoring reports would be useful to the court as it considered such a question). (*Id.*) Furthermore, the Court's March 23, 2023 Order explicitly states: "The February 28, 2023 order applies to CDCR's 2009 Staffing Plan, ECF No. 3693, and the modifications thereto, see ECF No 7742 at 1 n.1. The CDCR PIP Staffing Plan was filed July 21, 2021. ECF No. 7245. Although defendants report on vacancies in the CDCR PIPs in their monthly vacancy reports, those vacancies are not within the scope of the February 28, 2023 order."

To the extent Plaintiffs want required staffing levels in the PIPs, they should meet and confer with Defendants on that issue, and then, if necessary, file a motion to modify the current staffing orders to include staffing requirements for the PIPs.

## CONCLUSION

Defendants have complied with the Court's order to submit a plan to improve PIP staffing recruitment and retention and the Court should allow that plan an opportunity to work before ruling on its efficacy. But if the Court were to rule that Defendants must augment their PIP Recuitment Plan, Defendants would make all reasonable efforts to do so, and Defendants would be open to considering guidance from the Special Master and ideas from Plaintiffs on feasible ways to improve the plan.

To the extent Plaintiffs improperly used their motion in an attempt to obtain an order regarding PIP staffing levels, the motion should be denied.

## CERTIFICATION OF ORDERS REVIEWED

The undersigned counsel for Defendants certifies that he reviewed the following relevant court orders: ECF Nos. 7808, 7806, 7766, 7765, 7742, 7697, 7608, 7605, 5711, and 1383.

| | | |
|---|---|---|
| 1 | DATED: May 5, 2023 | ROB BONTA<br>Attorney General of California |
| 2 | | MONICA N. ANDERSON<br>Senior Assistant Attorney General |
| 3 | | |
| 4 | | By: */s/ Damon McClain* |
| 5 | | DAMON MCCLAIN<br>Deputy Attorney General<br>*Attorneys for Defendants* |
| 6 | | |
| 7 | DATED:  May 5, 2023 | HANSON BRIDGETT LLP |
| 8 | | |
| 9 | | |
| 10 | | By:  */s/ Paul B. Mello*<br>PAUL B. MELLO |
| 11 | | SAMANTHA D. WOLFF<br>DAVID C. CASARRUBIAS |
| 12 | | CARSON R. NIELLO<br>*Attorneys for Defendants* |