1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone: (916) 210-7318
    Fax: (916) 324-5205
8   E-mail: Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

   HANSON BRIDGETT LLP
   PAUL B. MELLO, SBN 179755
   SAMANTHA D. WOLFF, SBN 240280
   KAYLEN KADOTANI, SBN 294114
   DAVID C. CASARRUBIAS, SBN 321994
   CARSON R. NIELLO, SBN 329970
   1676 N. CALIFORNIA BLVD., SUITE 620
   WALNUT CREEK, CALIFORNIA 94596
   TELEPHONE:   925-746-8460
   FACSIMILE:   925-746-8490
   *Attorneys for Defendants*

9

10                    IN THE UNITED STATES DISTRICT COURT

11                   FOR THE EASTERN DISTRICT OF CALIFORNIA

12                              SACRAMENTO DIVISION

13

14  RALPH COLEMAN, et al.,

                                      Plaintiffs,
15

16            v.

17  GAVIN NEWSOM, et al.

                                      Defendants.
18

19

Case No. 2:90-CV-00520- KJM-DB

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REJECT DEFENDANTS' PLAN TO PROVIDE MINIMUM TREATMENT STANDARDS FOR PSYCHIATRIC INPATIENT PROGRAMS**

Judge:   Hon. Kimberly J. Mueller

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................................... 1

Argument ........................................................................................................................ 1

    I.    CDCR's PIP Plan Conforms with Coleman Requirements and Community
        Standards. ....................................................................................................... 1

        A.    Defendants' PIP Plan Is Consistent with the Program Guide. .................... 2

        B.    The PIP Plan Is Consistent with Title 22. .................................................. 3

        C.    The PIP Plan Is Consistent with National Commission on
             Correctional Mental Health Care Standards. ............................................. 4

    II.    Plaintiffs' Proposal Would Violate The PLRA ..................................................... 6

        A.    Plaintiffs' Requested Relief Is Overbroad and Not Narrowly
             Tailored. ..................................................................................................... 7

        B.    CDCR's Narrowly Tailored PIP Plan Details Minimum Standards. ........ 11

    III.    Plaintiffs' Requested Relief Is Unsupported and Procedurally
         Inappropriate. ......................................................................................................... 12

        A.    Plaintiffs' Assertions Related to Staffing Are Misleading........................ 12

        B.    Plaintiffs' Assertions Related to Isolation and Quality of Treatment
             Are Based on a Biased Sample and Lack Reliability.................................. 12

        C.    Plaintiffs' Reliance on Outdated and Inapplicable Treatment
             Standards Is Unpersuasive. ....................................................................... 15

        D.    Plaintiffs Do Not Demonstrate That Modification of The Program
             Guide Is Appropriate Here. ....................................................................... 17

Conclusion ................................................................................................................... 18

Certification ................................................................................................................. 18

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Armstrong v. Schwarzenegger*
    622 F.3d 1058 (9th Cir. 2010) ............................................................ 6, 7

*Balla v. Idaho*
    2020 WL 2812564 (D. Idaho 2020) ...................................................... 4

*Balla v. Idaho*
    29 F.4th 1019 ...................................................................................... 4

*Rasho v. Jeffreys*
    22 F.4th 703 (7th Cir. 2022) ................................................................ 9

*Rufo v. Inmates of Suffolk County Jail*
    502 U.S. 367 (1992) ............................................................................ 17

*Turner v. Safley*
    482 U.S. 78 ......................................................................................... 7

**STATUTES**

18 U.S.C. § 3626(a)(1)(A) ......................................................................... 6, 7

Cal. Code Regs., Title 22
    § 73381(e) ........................................................................................... 4
    § 79743 ............................................................................................... 3
    § 79747(a)(1) ...................................................................................... 3
    § 79747(a)(3) ...................................................................................... 3
    § 79747(a)(4)(D) ................................................................................. 3
    § 79749(c)(1) ...................................................................................... 3

PLRA ....................................................................................... 6, 7, 9, 18

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ...................................................................... 1, 17

**COURT RULES**

Rule 60(b) ............................................................................................ 17

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

**OTHER AUTHORITIES**

4

National Commission on Correctional Health Care, *Standards for Health Services in Prisons* (2018)..................................................................................... 5, 8

5

National Commission on Correctional Health Care, *Standards for Mental Health Services in Correctional Facilities* (2015)............................................................. 5, 6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

On March 28, 2023, Defendants filed the California Department of Corrections and Rehabilitation's (CDCR) plan to establish minimum treatment standards for patients in CDCR's psychiatric inpatient programs (PIPs) (PIP Plan or Plan).  (ECF No. 7787.)  Plaintiffs ask the Court to reject the Plan "as inadequate to remedy the Eighth Amendment issues in this case" and to order CDCR to file a revised plan that provides 20 hours per week of structured therapeutic treatment and 20 hours per week of unstructured out-of-cell activities for patients in the PIPs. (ECF No. 7812.)  Plaintiffs' motion should be denied for several reasons.  First, Defendants' PIP Plan conforms with the requirements for inpatient treatment established by the Program Guide and Title 22, which do *not* prescribe a set minimum number of treatment hours.  Further, because Plaintiffs' proposed treatment minima exceed the Program Guide and Title 22 standards, as well as those in the community, their request runs afoul of the Prison Litigation Reform Act (PLRA). Finally, Plaintiffs' request is procedurally improper and should have been made in the form of a motion to modify the Program Guide, rather than as a filing made in response to Defendants' proposed plan—nor do Plaintiffs present sufficient evidence warranting modification of the Program Guide in their instant filing.

**ARGUMENT**

**I.     CDCR'S PIP PLAN CONFORMS WITH COLEMAN REQUIREMENTS AND COMMUNITY STANDARDS.**

CDCR presented a robust plan with a detailed list of the treatment that will be provided to patients admitted to the PIPs.  (ECF No. 7787 at 6-7.)  This plan was developed without consideration of any staffing limitations that may currently exist in the PIPs – notwithstanding Plaintiffs' unsupported assumptions to the contrary.  (Decl. Amar Mehta, M.D. Supp. Defs.' Opp'n (Mehta Decl.) ¶ 3.)  Indeed, Defendants developed their plan with the patients' best interests' at heart, and with the Program Guide, California licensing requirements, and national correctional and community mental health standards in mind.  (*Id.*)  The Plan reflects this.

By contrast, Plaintiffs' motion is not supported by any current statewide policies or regulations, much less established practices that address the relief they seek.  Nor is it consistent

1

1    with the Program Guide – which unmistakably does *not* prescribe a set minimum number of

2    structured treatment hours in the PIPs.  Plaintiffs do not dispute this.  Instead, Plaintiffs cite to a

3    decades-old (and long since expired) consent decree in another case with other parties, outdated

4    policies, and old filings taken out of context that generally do not apply to the PIPs.  While

5    Plaintiffs rely heavily on Dr. Stewart's testimony, his opinion is not supported by national

6    correctional or community mental health standards.  Instead, Plaintiffs' request is an attempt to

7    end run the Program Guide and tacitly seek modification without providing adequate justification.

8        **A.    Defendants' PIP Plan Is Consistent with the Program Guide.**

9          The Program Guide is the culmination of years of work between the parties and the Special

10   Master.  (ECF No. 4124 at 5, Twenty-third Round Monitoring Report.)  Since at least as early as

11   2006, Chapter 6 of the Program Guide has set forth the remedial requirements for the provision of

12   inpatient care.  The Program Guide states that treatment for patients at the acute level of care is

13   stabilization (ECF No. 7331-1 at 109), and describes the treatment for patients at the intermediate

14   level of care as based on a multidisciplinary assessment that will inform an individualized

15   treatment program developed from a wide variety of treatment modalities, including group and

16   individual psychotherapy, medication management, depression and crisis management, training in

17   daily living skills and interpersonal skills, substance abuse, management of assaultive behavior,

18   supportive counseling, modification of maladaptive behaviors, and educational and vocational

19   programs.  (ECF No. 7333-1 at 113.)

20         The Program Guide has never prescribed a set number of treatment hours that must be

21   provided to patients needing inpatient psychiatric care.  This omission reflects the lack of a single

22   straightforward standard for the treatment of patients at the acute and intermediate levels.  (Mehta

23   Decl. ¶ 3; *see also* Decl. Joseph V. Penn, M.D. Supp. Defs.' Opp'n (Penn Decl.) ¶ 10.)  While the

24   Program Guide does require that patients at the EOP level of care be "offered" ten hours of

25   scheduled structured therapeutic activities per week, it also states that patients who cannot

26   tolerate ten hours be reviewed for referral to an inpatient level of care.  (ECF No. 7333-1 at 58.)

27   In other words, the Program Guide reflects the understanding that patients at higher levels of care

28   often require an individualized approach that does not lend itself to an arbitrary standardized

minimum. (Mehta Decl. ¶ 4.) A requirement that patients at even higher levels of care receive 20 hours per week of structured therapeutic treatment and 20 hours per week of unstructured out-of-cell activities therefore undermines established principles of sound psychiatric care and significantly expands the remedy set forth in the Program Guide, as explained further below. Because Defendants' PIP Plan is consistent with Chapter 6 of the Program Guide – and Plaintiffs' proposal is not – the Court should deny Plaintiffs' motion outright.

**B.    The PIP Plan Is Consistent with Title 22.**

CDCR's PIPs are licensed Correctional Treatment Centers (CTC) under Title 22, Chapter 12. As such, they must comply with Title 22's requirements for the provision of mental health care. Among other requirements, Title 22 sets admission and discharge criteria, establishes the make-up of a multidisciplinary team and its role, delineates the contours of individual treatment plans, and describes the role(s) of each member of the treatment team. Cal. Code Regs., Tit. 22, § 79743 (admission and discharge), 79745 (multidisciplinary treatment team), & 79747 (individual treatment plan). With respect to treatment programs, Title 22 requires that patients receive "organized therapeutic social, recreational and vocational activities in accordance with the interests, abilities and needs of the inmate-patients." Cal. Code Regs., Tit. 22, § 79749(c)(1). It also requires development of an individual treatment plan for CTC patients no later than 72 hours following the patient's admission, and that the plan be reviewed no less than every seven days for acute patients and every thirty days for nonacute patients, identify treatment methods to be used, and specify the frequency for conducting each treatment method and the person(s) or discipline(s) responsible for each treatment method. Cal. Code Regs., Tit. 22, § 79747(a)(1), (a)(3), (a)(4)(D).

A reading of Title 22 demonstrates that minimum treatment standards and certain other minutiae of treatment requirements are specified elsewhere in the regulations. For instance, community inpatient hospitals operating under an intermediate care facility license[1] (Title 22, Chapter 4) "shall be responsible for encouraging participation by each patient in social and

---

[1] Community inpatient hospitals operating under an intermediate care facility license are regulated separate and apart from Correctional Treatment Centers under Title 22, Chapter 4. These regulations at Title 22, Chapter 4, are not applicable to CTCs, even at the "intermediate care facility" level of care.

1  recreational activities at least 10 hours per week unless this is documented to the contrary in the

2  patient's health record."  Cal. Code Regs., Tit. 22, § 73381(e).  That the Legislature has not seen

3  the need to overrule the judgment of the department that wrote the rules to add in statute a

4  mandatory minimum number of treatment hours for CTC patients is instructive, particularly

5  where other such minima are stated elsewhere in the regulations.

6      Defendants' PIP Plan is therefore consistent with Title 22 requirements, which mandate an

7  individualized assessment of the patient's needs.  By contrast, Plaintiffs' proposal for a strict set

8  number of treatment hours would not comport with these regulatory standards.

9      **C.    The PIP Plan Is Consistent with National Commission on Correctional
          Mental Health Care Standards.**

10

11      CDCR's PIP treatment plan, which emphasizes treatment based on individual needs, is

12  consistent with national correctional mental health standards.  The National Commission on

13  Correctional Health Care (NCCHC) is a "nationally recognized organization with the mission of

14  improving the quality of health care in prisons."  *Balla v. Idaho*, 2020 WL 2812564 at *1 (D.

15  Idaho, May 30, 2020); *see also* Decl. of Pablo Stewart, M.D. Supp. Pltfs.' Mot. (Decl. Stewart), ¶

16  19 (citing NCCHC standards).  Accreditation by the NCCHC is based upon compliance with

17  NCCHC's detailed standards applicable to jails and prisons.[2]  And "'while not determinative,

18  [accreditation] constitute[s] substantial evidence of adequate medical care.'"  *Balla v. Idaho*, 29

19  F.4th 1019, 1026 (*quoting Balla v. Idaho*, 2020 WL 2812564 at *2 (D. Idaho, May 30, 2020) and

20  finding no clear error in the district court's findings of fact).  In short, NCCHC standards bear

21  significant weight.

22      With respect to the delivery of psychiatric inpatient care within a prison hospital unit,

23  NCCHC standards mandate that "[c]linical need dictates the time required to receive the ordered

24  service; in general, waiting times should not exceed average waiting times in community

25  practice."  (*See* Decl. of Namrata Kotwani Supp. Defs.' Opp'n (Kotwani Decl.), Ex. A (National

26  Commission on Correctional Health Care, *Standards for Mental Health Services in Prisons*

27      [2] https://www.ncchc.org/accreditation/programs/mental-health-services/ (Last visited May

28  4, 2023).

4

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum
Treatment Standards for Psychiatric Inpatient Programs   (2:90-CV-00520- KJM-DB)

1  (2015), Standard MH-D-05 at 68.)[3]  Similarly, the NCCHC standard for treatment plans states,

2  "[t]he intent of this standard is that mental health patients receive care *tailored to their individual*

3  *needs*."  (*Id.* at Ex. A (Standard MH-G-03, at 107 (emphasis added)).)  These standards do not

4  mandate a minimum number of hours of structured or unstructured treatment.  (*See id.*)  Instead,

5  as with the PIP Plan and the Program Guide, treatment is determined based on clinical judgment

6  and individualized patient assessment.

7  Notably, Plaintiffs' request to set a new standard for inpatient treatment does not reference

8  NCCHC's *Standards for Mental Health Services in Correctional Facilities*.  Instead, Plaintiffs

9  and their expert rely on NCCHC standards that govern "health services" in prisons (not specific to

10  mental health treatment).  Specifically, Dr. Stewart's opinion relies on the discussion under

11  Standard P-F-03 of NCCHC's *Standards for Health Services in Prisons* (2018), which states,

12  "residential units should have continuous (24 hours a day, 7 days a week) coverage by mental

13  health staff; orientation and training for correctional officers assigned to the unit; daily (7 days a

14  week) patient evaluation by mental health staff; programming or appropriate therapies, if

15  indicated; individual treatment plans; and housing in a safe and therapeutic environment

16  conducive to symptom stabilization and maintenance of good personal hygiene."  (Kotwani Decl.,

17  Ex. B (P-F-03 at 115).)  This language is also repeated in NCCHC's standards specifically

18  applicable to mental health services in correctional facilities at MH-G-02.  (*Id.* at Ex. A (MH-G-

19  02 at 104.)  Critically, the mental health standard cautions that "[t]he intent of this standard is to

20  establish the principles and practices for mental health programs and residential units offered in

21  correctional facilities.  *It does not refer to inpatient psychiatric hospitalization, which is described*

22  *elsewhere* (see MH-D-05 Inpatient Psychiatric Care and MH-E-06 Emergency Services)."  (*Id.* at

23  Ex. A (MH-G-02 at 105).)

24  Regardless of the fact that this standard is expressly inapplicable to PIPs, Plaintiffs and Dr.

25  Stewart insist, without reference to any state regulations or other authority, that the NCCHC and

26  community standards require daily contact with a psychiatrist and a psychologist.  But even if the

27

28  _____

[3] Courtesy copies of all cited NCCHC policies are attached as exhibits to the Declaration of Namrata Kotwani, filed herewith.

5

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs   (2:90-CV-00520- KJM-DB)

1  standard cited by Plaintiffs applies to the inpatient beds in the PIPs (which it expressly does not),

2  their insistence that daily psychiatry and psychology contacts are required is a misreading of the

3  NCCHC standards.  As mentioned above, the NCCHC standards cited by Plaintiffs require "daily

4  (7 days a week) patient evaluation *by mental health staff*."  (Kotwani Decl., Ex. B (P-F-03 at

5  115.)  The NCCHC *Standards for Mental Health Services in Correctional Facilities* (2015)

6  includes a glossary that defines "mental health staff" as "qualified health care professionals who

7  have received instruction and supervision in identifying and interacting with individuals in need

8  of mental health services."  (*Id.* at Ex. A (Glossary at 157.)  The standards define "qualified

9  *health care* professionals" to include physicians, physician assistants, nurses, nurse practitioners,

10  dentists, mental health professionals, and others who by virtue of their education, credentials, and

11  experience are permitted by law to evaluate and care for patients.  (*Id.*)  And the standards define

12  "qualified *mental health* professionals" to include psychiatrists, psychologists, psychiatric social

13  workers, licensed professional counselors, psychiatric nurses, and others who by virtue of their

14  education, credentials, and experience are permitted by law to evaluate and care for the needs of

15  mental health patients.  *Id.* at 159.  Thus, even the NCCHC standard that Plaintiffs cite does not

16  support their contention that daily psychiatry and psychology contacts are necessary in an

17  inpatient setting.  Additionally, Dr. Stewart does not offer any authority or examples of

18  jurisdictions that provide this level of care.  (Mehta Decl. ¶ 10.)  In any event, contacts with

19  nursing and other qualified health care professionals occurs more than daily in CDCR PIPs.  (*Id.*)

20  **II.   PLAINTIFFS' PROPOSAL WOULD VIOLATE THE PLRA.**

21  　　　The Prison Litigation Reform Act (PLRA) requires the courts to make "a finding that the

22  set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the

23  minimal impact possible on defendants' discretion over their policies and procedures."

24  *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070-71 (9th Cir. 2010).  Here, however, Plaintiffs

25  seek reforms without providing any support for predicate factual findings required under the

26  PLRA.  Nor can they, because the relief they seek far exceeds what is "necessary to correct the

27  violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).

28  　　　The PLRA mandates that injunctive relief be "narrowly drawn, extend[] no further than

6

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum
Treatment Standards for Psychiatric Inpatient Programs   (2:90-CV-00520- KJM-DB)

1   necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary

2   to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A); *see Armstrong v.*

3   *Schwarzenegger*, 622 F.3d at 1071 (the PLRA asks whether "the same vindication of federal

4   rights could have been achieved with less involvement by the court in directing the details of

5   defendants' operations").  Here, however, Plaintiffs' proposed remedy is not appropriately

6   tailored.  Indeed, the relevant clinical evidence, literature review, licensure regulations, and

7   practice guidelines do not support Plaintiffs' conclusion that a minimum of 20 hours per week

8   each of structured therapeutic programming and unstructured out-of-cell time must be provided to

9   all PIP patients.  (*See* ECF No. 7812-2 ¶ 11.)  Because their requested relief would far exceed the

10  community standard, would require a revision to and expansion of the Program Guide, and is not

11  narrowly tailored to address the concern at issue, it runs afoul of the PLRA.

12      Additionally, although Plaintiffs insist CDCR will "retain ample discretion to design and

13  operate their PIP treatment programs as they see fit," they fail to afford the State the discretion it

14  is due by seeking to mandate the contours of "Defendants'" plan.  In other words, Plaintiffs

15  cannot set detailed parameters of a policy while also claiming to afford Defendants discretion.

16  Nor would discretion be permitted in practice; in keeping with the nearly thirty-year practice in

17  this case, Plaintiffs' proposal expressly provides for the Special Master's and Plaintiffs' input.

18  Should Plaintiffs decide that they do not approve how CDCR designs or operationalizes "its"

19  plan, they will challenge the PIP Plan.  But Plaintiffs may not insert their policy preferences here

20  without running afoul of strict limitations on their ability to do so, particularly where they have

21  not made a requisite showing that their preferred form of relief is the least intrusive form.  *See* 18

22  U.S.C. § 3626(a)(1)(A); *see also Turner v. Safley*, 482 U.S. 78, 84-85 ("[p]rison administration

23  is … a task that has been committed to the responsibility of [the legislative and executive

24  branches of government], and separation of powers concerns counsel a policy of judicial

25  restraint," particularly where a state penal system and federal courts are involved).

26      **A.    Plaintiffs' Requested Relief Is Overbroad and Not Narrowly Tailored.**

27      Contrary to Plaintiffs' minimally supported assertions, the relief they seek is not the

28  national correctional or community standard.  Instead, it is widely accepted in both the

7

1   correctional and community mental health communities that acutely ill patients requiring

2   inpatient psychiatric hospitalization are complex and diverse, needing individualized stabilization

3   that may not benefit from or even tolerate many hours of structured therapeutic programming and

4   unstructured out-of-cell time.  (Mehta Decl. ¶ 3.)  This is why a personalized assessment and

5   treatment plan for each patient is critical – and also why a one-size-fits-all approach is

6   inappropriate and unhelpful.  (*Id.*)  Mental health experts agree that care must be "tailored to

7   [mental health patients'] individual needs."  National Commission on Correctional Health Care,

8   *Standards for Health Services in Prisons* (2018), Policy MH-G-03 at 107.   Undue focus on one-

9   size-fits-all minimum number of hours diverts attention away from individualized care.  (Mehta

10   Decl. 3, Penn Decl. ¶¶ 9, 25.)  CDCR should not design a healthcare system based on what is

11   easiest to monitor, rather than the best clinical experience.  (Mehta Decl. ¶ 3.)

12          1.    *Plaintiffs' Proposal Does Not Comport with Community Standards.*

13          Plaintiffs fail to draw a correlation between a set minimum hour standard—let alone 20

14   hours of structured treatment time—to ensuring care commensurate with the community standard.

15   Indeed, there are categories of PIP patients for whom such requirements are contraindicated.

16   (Penn Decl. ¶ 8.)  For example, acutely psychotic patients who must be stabilized with

17   pharmacotherapy may not benefit from structured therapeutic programming and unstructured out-

18   of-cell time.  (*Id.*)  Patients experiencing paranoia may suffer from self-harm, may cause harm to

19   others, may not be able to benefit from Dr. Stewart's recommended mix of therapeutic and

20   unstructured hours, and may, instead, experience symptom exacerbation.  (*Id.*)

21          Community inpatient psychiatric treatment also individualizes care.  (Penn Decl. 10.)

22   There is no literature that mandates or documents the efficacy of a certain number of group or

23   individual therapy hours for inpatients, nor a certain mix of structured and unstructured hours.

24   (*Id.*)  Dr. Stewart's contention that inpatients in the community are provided a minimum of 56

25   structured and unstructured hours in psychiatric units is not a uniform, universally applicable

26   standard.  *See* ECF No. 7812-2 ¶ 15).  Rather, inpatient treatment depends on various factors,

27   including the need for stabilization, the specific condition of patients, their medical needs and life

28   circumstances, pharmacotherapy, intellectual ability, tolerance for other individuals, safety

8

1  considerations, and the patient's own choice in accepting treatment.  (Penn Decl. ¶ 10.)

2      In sum, recommended structured and unstructured treatment hours recommended by Dr.

3  Stewart are not evidence-based and appear arbitrary.  (*Id.* ¶ 13.)  And the literature offers no

4  evidence-based recommendations for minimum or total number of weekly therapy hours for acute

5  and/or sub-acute inpatients diagnosed with schizophrenia; acute depression; other mental

6  disorders; suicidality; and self-injurious behaviors, or for a certain number of weekly hours

7  spentin structured and unstructured activities.  (*Id.*)  Similarly, there are no data to support any

8  given number hours of structured and unstructured treatment, or hours spent in non-evidence

9  based enrichment activities for more symptomatically stable patients experiencing schizophrenia,

10  depressive disorders, other mental disorders, suicidality, and self-injurious behavior in

11  intermediate care facilities.  (*Id.*)  Dr. Stewart's declaration has not demonstrated that better

12  patient outcomes are linked to 20 hours of structured treatment versus 15 hours, or 20 hours of

13  unstructured out-of-cell time or 15 or 10.  (*Id.*)

14      By failing to establish how or why 20 hours of structured treatment is the panacea,

15  Plaintiffs' request violates the PLRA.  Indeed, "[t]his degree of specificity contravenes the

16  PLRA's least-intrusive-means requirement."  *Rasho v. Jeffreys*, 22 F.4th 703, 712 (7th Cir. 2022).

17  As the Seventh Circuit noted with respect to a court order requiring precise numbers and types of

18  mental health staff, "[c]ould [the department of corrections] have provided constitutionally

19  adequate care with 85 Psychiatric Providers instead of 85.5? … There is no evidence in the record

20  establishing that these specific numbers correspond to the constitutional floor, yet the PLRA

21  demands that injunctive relief 'extend no further' than necessary to remedy the constitutional

22  violation."  *Id.* at 712-713.  In this context, Plaintiffs' requested relief extends far further than

23  necessary, particularly without any evidence to support their request.

24      Because the relevant literature and guidelines do not endorse Plaintiffs' recommended mix

25  of 20 hours of structured therapy and 20 hours of unstructured activities, nor has their expert

26  provided any evidence of improved clinical outcomes connected to this specific recommendation,

27  Plaintiffs' request violates the PLRA's needs-narrowness-intrusiveness mandate.

28

1              2.     *Patients Currently Do Not Attend All Structured Treatment Offered;*

2                      *Plaintiffs Fail to Justify an Increase*

3       Patients in inpatient programs have historically elected to attend fewer hours of structured

4  than what is offered.  (Mehta Decl. ¶ 5.)  From October 2022 through March 2023, the average

5  number of statewide ICF treatment hours offered per week hovered around 10 hours (October: 10,

6  November: 9.8, December: 9.5, January 9.8, February: 11.1, March: 10.2), and yet, the average

7  number of statewide ICF treatment hours actually attended per week was significantly lower –

8  ranging from 4 hours to 4.8 hours (October: 4.1, November: 4, December: 4.2, January: 4.2,

9  February: 4.8, March: 4.6).  (Mehta Decl. ¶ 5 & Ex. A.)  This data does not include non-

10  structured out-of-cell time, which is offered in addition to the structured treatment.[4]  A similar

11  disparity exists between statewide acute treatment hours offered and attended.  (*Id.*)

12       This observation is not unique to CDCR patients.  A review of the Special Master's recent

13  report on the DSH inpatient program, which was characterized as providing adequate care (ECF

14  No. 7265 at 80), shows that patients in the inpatient programs have similarly chosen not to attend

15  treatment offered in numbers exceeding, on average, ten hours per week.  For example, the

16  Special Master reported in his twenty-ninth round report that core groups accounted for 61

17  percent of treatment offered to 229 *Coleman* patients.  Core groups offered to patients averaged

18  7.1 weekly hours with a range of 1.91 to 8.97 hours for all *Coleman* patients.  The monitor's

19  expert's independent data calculation determined that, on average, *Coleman* patients attended

20  5.38 hours of core groups and ranged from 1.77 to 6.91 hours.  (ECF No. 7625 at 95.)  The report

21  also notes that the supplemental groups were not scheduled for patients but were posted, and that

22  patients could attend any supplemental group.  (*Id.*)

23       While treatment offered and attended varied across units, it was still never reported in the

24  range of Plaintiffs' desired standards.  And the DSH governing-body reports that Plaintiffs cite to

25  support their suggested 20 hour minimum standard, actually show that *Coleman* patients are

26  offered a varied amount of weekly group treatment and supplemental activities and attend, on

27

28      [4] The PIP Plan sets a minimum of ten hours of unstructured programming offered per week.  ECF 7787 at p. 7 of 10.

10

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum
Treatment Standards for Psychiatric Inpatient Programs   (2:90-CV-00520- KJM-DB)

average, well under ten hours per week.  *See* ECF No. 7625-1 at 56 and 103; *see also* ECF 7812-

1, Ex. A at 28 (California Department of State Hospitals Governing Body Report, Department of

State Hospitals – Coalinga, Coleman 2684 Report, July 1, 2022-December 31, 2022).  Moreover,

it bears repeating that patients in higher levels of care are unlikely to tolerate a 20-hour minimum

structured treatment and 20-hour minimum unstructured activity standard, and there are

categories of PIP patients for whom such requirements are contraindicated.  (Decl. Penn, ¶ 8.)  In

sum, Plaintiffs provide no justification for a significant increase in the number of structured

treatment hours offered when patients currently are not attending all offered treatment.

### B.    CDCR's Narrowly Tailored PIP Plan Details Minimum Standards.

Plaintiffs describe the PIP Plan as offering zero hours of structured treatment and

unstructured activities.  (ECF No. 7812 at 23:21-23.)  This is a gross misinterpretation of the

Plan, which requires clinically appropriate care on an individualized basis.  (Mehta Decl. ¶ 9.)

Nowhere in the Plan does CDCR advocate providing zero hours of services to PIP patients.  (*Id*.)

Rather, as Defendants explain above, the Plan is consistent with national correctional and

community standards, as well as State licensing standards, which advocate for individualized care

and treatment.  That Plaintiffs prefer a one-size-fits-all approach that has no regard for

individualized patient needs does not render Defendants' plan inadequate.

Indeed, Plaintiffs readily acknowledge that the PIP Plan sets forth minimum standards for

Interdisciplinary Treatment Team (IDTT) meetings, psychiatry contacts, and primary clinician

contacts for patients at the acute and intermediate (ICF) levels of care.  (ECF No. 7812 at 14.)

Defendants' PIP Plan sets forth in great detail what is expected for patients at both levels of

inpatient care.  (ECF No. 7787 at 5-7.)  These treatment "minimums" are directly responsive to

the Special Master's recommendation to "develop minimum standards for the provision of

structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and

individual treatment, consistent with a psychiatric inpatient level of care."  (ECF No. 7555 at 164-

65.)  The Special Master's recommendation does not, however, require Defendants to provide a

set number of treatment hours.

As Plaintiffs are aware, the PIP Plan includes an implementation phase that requires the

11

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum
Treatment Standards for Psychiatric Inpatient Programs   (2:90-CV-00520- KJM-DB)

development of policies and procedures in line with the treatment frequencies detailed in parts II(A) and II(B) of the Plan.  (ECF No. 7787 at 7.)  The policies and procedures are anticipated to include a requirement that each PIP unit provide detailed schedules to all patients that show all daily treatment groups and out-of-cell activities offered for the week, specific to each institution.  (Mehta Decl. ¶ 11.)  The PIP Plan is based on input from clinicians and leadership at each PIP institution and includes a calendar of options that each team can choose from to offer their patients.  (*Id.* at ¶¶ 9, 11.)  Examples of the detailed schedules are attached as Exhibit B to the Mehta Declaration.  Thus, contrary to Plaintiffs' argument, the PIP plan offers a scheduling mechanism for hours of structured treatment and unstructured activities.

### III.    PLAINTIFFS' REQUESTED RELIEF IS UNSUPPORTED AND PROCEDURALLY INAPPROPRIATE.

#### A.    Plaintiffs' Assertions Related to Staffing Are Misleading.

Separate and apart from the issue of individualized treatment of PIP patients, Plaintiffs suggest that staffing is the primary driver of care, and that by setting minimum treatment hours, CDCR will be forced to "appropriately" staff the PIPs.  (*See*, *e.g.,* ECF 7812 (Pltfs.' Mot.) at 18:27-28 ("Minimum treatment standards would obligate Defendants to build the system capacity to provide such treatment").  But there simply is no connection between the purpose of mandating minimum treatment standards and achieving richer mental health staffing.  Instead, as stated above, CDCR's PIP Plan was developed based on best practices and current treatment standards without consideration of any current staffing limitations that may exist.  (Mehta Decl. ¶ 3.)  Plaintiffs' attempt to entangle the issues is therefore misleading.

#### B.    Plaintiffs' Assertions Related to Isolation and Quality of Treatment Are Based on a Biased Sample and Lack Reliability.

Plaintiffs' expert reviewed patient records and interviewed a handful of patients at the PIPs he briefly visited.  Dr. Stewart opined that CDCR offers inadequate amounts of structured mental health treatment to PIP patients.  (ECF No. 7812-2 at 18, ¶ 45.)  Dr. Stewart, however, selected a highly skewed sample consisting of some of the most treatment refractory patients to paint a dire picture of the delivery of care and purported forced isolation in CDCR's PIPs.  (Penn

12

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs   (2:90-CV-00520- KJM-DB)

1    Decl. ¶¶16-17.)  As shown below, any generalized conclusion about the PIPs that rests on Dr.

2    Stewart's unscientific methodology and deficient documentation should be rejected.  In addition,

3    Dr. Stewart's declaration does not provide any evidence of improved clinical outcomes associated

4    with his arbitrary recommendation of 20 hours of structured therapy and 20 hours of unstructured

5    activities for PIP patients.  (Penn Decl. ¶ 13.)

6            Dr. Stewart stated that he generated a "random" sample of 46 patients (five percent of all

7    PIP inpatients as of March 28, 2023) for records review.  (ECF No. 7812-2 ¶ 27.)  As Dr. Stewart

8    himself noted, this sample was not representative of the underlying population—the average

9    length-of-stay in the PIP was 208.26 days, which is far higher than the average length-of-stay of

10   134.14 days for the overall PIP population.  (Penn Decl. ¶ 16.)  Thus, Dr. Stewart was already

11   selecting records for review from a biased pool of treatment refractory patients who required a

12   much longer length-of-stay in PIPs.  (*Id.*)  From this pool, Dr. Stewart concedes that he "selected

13   for closer review the most seriously ill patients in CDCR's PIPs" and arrived at a sample of six

14   PIP patients at 3 facilities.  (*Id.* at ¶ 17.)  Dr. Stewart's declaration also analyzes two patient

15   suicides that occurred at the SVSP and CMF PIPs.  (*Id.*)

16           Notably, however, focusing on the most vulnerable patients will lead to a skewed and

17   non-representative view of healthcare-service availability and delivery in the CDCR PIP system.

18   (Penn Decl. ¶ 17.)  Consequently, Dr. Stewart's opinions are not and cannot be reflective of the

19   PIPs as a whole.  No healthcare system—correctional or otherwise—is perfect.  (*Id.*)  Adverse

20   patient outcomes occur even in the highest staffed and well-managed community state hospitals,

21   forensic unit inpatient psychiatric hospitals, and other health care systems.  (*Id.*)  Focusing only

22   on these *six* outliers at 3 PIPs, as Dr. Stewart did, leads to a flawed analysis.  (*Id.*)  This sampling

23   appears to support a foregone conclusion.  (*Id.* at ¶ 24.)

24           Further, Dr. Stewart's documentation of his interview process is inadequate.  (*Id.* at ¶ 20)

25   He does not describe any specific interview process that he employed (much less the conditions

26   of the interview) with the sampled PIP patients.  (*Id.*)  Dr. Stewart failed to, among other things,

27   identify whether he conducted a diagnostic interview, a formal mental status examination, or a

28   standard inquiry into each inpatient's mental health history.  (*Id.*)  Nor does he indicate the

1    duration of the patient interviews or and conditions of the interviews (*e.g.*, were there any

2    attorneys or others present; was a description of his role as Plaintiffs' expert in litigation

3    provided). (*Id.*) This information is needed in order to assign weight to his conclusions. (*Id.* at ¶

4    21.) It also appears Dr. Stewart did not speak to any collateral informants, such as direct treating

5    psychiatrists, psychologists, and other treatment team staff who could provide important

6    information about the selected patients. (*Id.* at ¶ 22.) This is omission is particularly concerning

7    because Dr. Stewart was unable to interview Patients A and G mentioned in his declaration and

8    concluded that Patient A's "lack of clinical improvement is directly caused by an insufficient

9    number of clinical contacts" and Patient G's "lack of a robust clinical response is likely due to an

10    insufficient number of psychiatric contacts." (*Id.* at ¶ 19.)

11           Finally, Dr. Stewart's record review and patient interviews do not establish a clear link

12    between clinical benefit and his recommended mix of therapeutic hours and out-of-cell time. (Penn

13    Decl. ¶ 22.) Dr. Stewart opined that CDCR offers inadequate amounts of structured mental health

14    treatment to PIP patients. (ECF No. 7812-2 at 18, ¶ 45.) But nothing in his declaration

15    establishes that any of those patients would in fact have attended more treatment if Plaintiffs'

16    desired standard of 20 hours of structured therapy and 20 hours of unstructured activities were

17    offered to these patients each week. (*Id.* at ¶ 23.) The selected patients discussed in Dr. Stewart's

18    declaration typically demonstrated high rates of refusal for structured treatment such as group

19    treatment. (*Id.*; *see also* ECF No. 7812-2 ¶¶ 34 (Patient A); 35 (Patient B); 38 (Patient D); 39

20    (Patient E); and 41 (Patient G).) Dr. Stewart's declaration suggests that PIP patients at the acute

21    and intermediate levels of care routinely elect not to attend treatment. In fact, Defendants' data

22    for April 2022 through March of 2023, shows that patients in the PIPs were offered structured

23    treatment per week on average between 5.18 hours (June 2022) and 9.34 hours (February 2023),

24    and similarly offered unstructured treatment per week on average between 8.82 hours (July 2022)

25    and 14.28 hours (March 2023). (Mehta Decl. ¶ 6.) Of these treatment hours offered, on average,

26    patients attended a *combined* per week average of between 7.76 hours (May and July 2022) and

27    10.44 hours (February 2023). (*Id.*)

28

In sum, the clinical benefit of Dr. Stewart's recommended 20 hours of structured therapy and 20 hours of unstructured activities is completely conjectural and has not been supported by a literature review or the interviews conducted by Dr. Stewart.  (Penn Decl. ¶ 34.)  Moreover, Dr. Stewart's patient interviews do not resolve the central question currently before the Court—whether the PIP Plan is adequate—not whether a handful of cherry-picked PIP patients adequately participated in structured and unstructured activities or had sufficient psychiatric contacts.

**C.    Plaintiffs' Reliance on Outdated and Inapplicable Treatment Standards Is Unpersuasive.**

Plaintiffs claim that comparable correctional systems provide patients in inpatient programs with at least twenty hours of structured therapeutic activities.  (ECF No. 7812 at 21.)  But the authorities referenced in the motion and by Dr. Stewart do not support this claim.  The survey results referenced in the motion (*id.* at 22, Galvan Decl. Ex. C (Email from Nick Weber to Lisa Ells re: Survey and Responses (Feb. 2, 2023)) demonstrate that treatment standards are not one-size-fits-all, and instead, are unique based on each jurisdiction's mental health program. Although Plaintiffs fail to mention it, there is a broad range of approaches to setting policy on treatment standards, as they range from no minimum required hours of treatment to a high of twenty hours required only by New York pursuant to a negotiated settlement agreement.  (*Id.* at 36-37.)  Even Illinois, where Dr. Stewart is the court's mental health monitor, has no stated minimum required hours for weekly structured treatment.  (*Id.* at 22-23.)  As is clear by the responses to CDCR's survey, whether a program imposed a minimum number of treatment hours is not the only factor in determining the scope of a program's treatment standards.

Plaintiffs also argue that treatment within DSH and at the California Medical Facility (CMF) PIP require a minimum number of structured therapy hours each week.  (*Id.* at 18-19.) But the 2020 CMF memorandum and the DSH governing-body report that Plaintiffs cite in support of this position are not part of established mental health policy or required under any *Coleman* order.  The CMF memorandum (Galvan Decl. Exhibit B), dated June 2020, was a local memorandum drafted by the CMF program to set treatment hours in the context of the pandemic

1  and is no longer in effect.  (Mehta Decl. ¶ 13.)  The CMF memorandum did not cite to any

2  treatment standard, was not approved by CDCR leadership, does not reflect state policy and it has

3  never before been suggested in the context of this case that CDCR should refer to that

4  memorandum to establish inpatient mental health policies.  (*Id.*)

5      The DSH Governing Body Reports—covering July 1, 2021, to December 31, 2021 (ECF

6  No. 7625-1 at 161) and July 1, 2022, to December 31, 2022 (ECF No. 7812-1 at 15)—also do not

7  reflect established mental health policies.  Instead, these reports are based on auditing standards

8  of specific units at DSH, and are not supported by any DSH policy.  (Mehta Decl. ¶ 14.)

9  Plaintiffs fail to point out that the reports do not set a guaranteed number of minimum hours, as

10  each patient's treatment includes an individualized assessment of whether twenty hours of group

11  per week is clinically indicated.  (ECF No 7812-1 at 15.)  The Special Master in his most recent

12  report on the DSH programs acknowledges that DSH does not have a policy that sets minimum

13  treatment standards.  (ECF No. 7625 at 40.)

14      Plaintiffs also attempt to rely upon a since-terminated 2006 consent judgment between DSH

15  and the US DOJ that required a minimum of 20 hours of active treatment per week plus 20 hours

16  of "adequate active psychosocial rehabilitation" for support.  (ECF No. 7812 at 17-18.)  This

17  amended consent judgment, however, was dissolved in 2013.  (Kotwani Decl., Ex. C (Order

18  Dissolving the Amended Consent Judgment and Dismissing the Underlying Action with

19  Prejudice).)  The terms of the consent judgment are not part of current DSH mental-health policy,

20  and it was never suggested or recommended that they be added to the Program Guide.

21      Finally, Plaintiffs reference a 2010 submission in *Coleman* as evidence that twenty hours of

22  structured therapy and twenty hours of unstructured activities should be ordered as the mental

23  health policy in the State of California.  They cite as authority statements in two declarations

24  submitted in response to a motion filed by Plaintiffs to expedite the activation of two units at the

25  Salinas Valley Psychiatric Program.  The declarations addressed the need to meet requirements

26  under Title 22, Chapter 12, regarding the timelines for completing patient assessments and

27  reviews, and developing individualized treatment plans during the activation of the units.  (ECFs

28  3932-2 ¶ 3 & 3913-3 ¶ 5.)  While the declarants each state that patients must be provided between

1    35 and 40 hours per week of therapeutic programming, treatment requirements are set by Title 22

2    and do not include a minimum number of treatment hours.  (ECF No. 3931-1.)  Chapter 12 of

3    Title 22 does not include specific "programming" requirements and there is no other place in the

4    record or in DSH or CDCR policy that mentions a requirement to provide "between 35 and 40

5    hours per week of therapeutic programming."

6        In short, none of these "authorities" upon which Plaintiffs rely for support are persuasive

7    or applicable to the *Coleman* case and the current dispute.

8    **D.    Plaintiffs Do Not Demonstrate That Modification of The Program Guide Is**

9    **Appropriate Here.**

10       This Court's March 17, 2023 order anticipated that, in response to Defendants' proposed

11   plan minimum treatment standards for PIP patients, Plaintiffs may file "a motion or motions, if

12   any, in response to the CDCR plans filed on March 28, 2023."  (ECF 7765 at 2:19-20.)  In

13   response, Plaintiffs chose to file a "Motion to Reject Defendants' Plan to Provide Minimum

14   Treatment Standards for Psychiatric Inpatient Programs (ECF No. 7787) as Inadequate to

15   Remedy Defendants' Eighth Amendment Violations."  (ECF 7812 at 1.)  Plaintiffs did not file a

16   motion to modify the Program Guide.  Yet, notwithstanding the title of their motion, the actual

17   relief Plaintiffs seek is a modification of the Program Guide.  Specifically, Plaintiffs seek to

18   augment the Program Guide and write in minimum hourly structured and unstructured treatment

19   standards that do not currently exist.  But this Court has been clear that the Program Guide

20   "established the framework for delivering constitutionally adequate mental health care, and the

21   time to materially alter its provisions has passed."  (ECF 5710 at 17-18.)  To the extent Plaintiffs

22   seek to modify its provisions, they have not satisfied their "burden of establishing that a

23   significant change in circumstances warrants revision."  *Rufo v. Inmates of Suffolk County Jail*,

24   502 U.S. 367, 383 (1992); *see also* ECF 7268 (Pltfs.' Opp'n to Defs.' Mot. to Modify 2009

25   Staffing Plan) at 9 (Plaintiffs acknowledging that "Rule 60(b) permits modification only in

26   limited circumstances" and that "[t]he moving party must 'convincingly explain' why their

27   proposed modification is suitably tailored," (citing *Flores v. Rosen*, 984 F.3d 720, 742-43 (9th

28   Cir. 2020)).  Accordingly, Plaintiffs are not entitled to the relief they are currently requesting.

17

Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum
Treatment Standards for Psychiatric Inpatient Programs   (2:90-CV-00520- KJM-DB)

**CONCLUSION**

Plaintiffs' request for an order imposing minimum-hours requirements for structured treatment and unstructured activities would be inconsistent with Program Guide and Title 22 standards, would exceed national correctional and community mental health standards – and thus, run afoul of the PLRA – and is simply not adequately supported by relevant or persuasive standards. Plaintiffs' request is also procedurally improper. For these reasons, the Court should deny Plaintiffs' motion and order Defendants to implement their proposed PIP Plan.

**CERTIFICATION**

Counsel for Defendants have reviewed the following orders that are relevant to the issues raised in this opposition: ECF Nos. 4688, 4925, 5573, 5610, 5710, 5726, 5610, 5750, 6214, 7108, 7456, 7581, 7605, 7608, 7697, 7765.


DATED: May 5, 2023

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General


By: _____/s/ Namrata Kotwani_____
NAMRATA KOTWANI
Deputy Attorney General
*Attorneys for Defendants*

DATED: May 5, 2023

HANSON BRIDGETT LLP


By: _____/s/ Samantha Wolff_____
PAUL B. MELLO
SAMANTHA D. WOLFF
Attorneys for Defendants