ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-4431
  Fax: (415) 703-5843
  E-mail: Namrata.Kotwani@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE:  925-746-8460
FACSIMILE:  925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DECLARATION OF JOSEPH PENN MD IN SUPPORT OF DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO REJECT DEFENDANTS' PLAN TO PROVIDE MINIMUM TREATMENT STANDARDS FOR PSYCHIATRIC INPATIENT PROGRAMS**<br><br>Judge:   Hon. Kimberly J. Mueller |

I, Joseph V. Penn, MD, CCHP, FAPA, declare:

1. I am the Director of Mental Health Services of the University of Texas Medical Branch (UTMB) Correctional Managed Care (CMC), a university-based correctional health care system. I have held this position since February 2008. In this capacity, I oversee the provision of psychiatric, psychological, and mental health services, including telepsychiatry services, to approximately 80% (approximately 110,000 adult inmates) of the entire Texas state jail and state adult prison population housed within the

Texas Department of Criminal Justice facilities statewide. Prior to and subsequent to the COVID-19 pandemic, Texas has maintained the largest state prison population nationally. I also manage the psychiatric services to approximately 600 youths housed statewide within secure state school residential facilities in the Texas Juvenile Justice Department. I also oversee the delivery of supplemental telepsychiatry services to jail inmates detained in the Bexar County jail, San Antonio, Texas. I previously oversaw telepsychiatry service delivery to county jails in Angleton, Galveston, and Victoria, Texas. I also had clinical and administrative oversight of on-site psychiatric services that UTMB CMC previously provided at four Federal Bureau of Prison units in Beaumont, Texas.

2. My training, qualifications, as well as my relevant correctional experience and publications are described in greater detail in my C.V. and earlier declaration submitted to the Special Master on June 30, 2022. (*See* ECF 7682-1 at 165-222 ¶¶ 1-39; 194-228.) I also provided my fee schedule in that declaration. (*Id.* at 228 (Appendix C).)

3. By way of brief review, subsequent to medical school, I pursued specialty training in general, child and adolescent, and forensic psychiatry. I achieved board certification and maintenance of certification in all three specialties. Since 1999, I have focused my clinical, administrative, and forensic work within correctional settings including adult and juvenile detention facilities, jails, and prisons, and non-correctional civil detention such as ICE (Immigration and Customs Enforcement) facilities. Additionally, I have achieved and maintained specialized certification as a Certified Correctional Health Professional-Mental Health (CCHP-MH) since 2004, approximately 18 years, by the National Commission on Correctional Health Care (NCCHC). This requires passing of a written national examination, demonstration of proficiency in national correctional health standards, annual attestation of continuing medical education credits, full medical licensure without restrictions, and annual re-certification.

4. I provided direct patient care and forensic psychiatry consultation in Rhode Island for approximately 15 years and in Connecticut for 1 year, a total of 16 years. I have continued to provide direct patient care and "on-call" after hours coverage to incarcerated adults and youths since returning to Texas in 2008. Throughout my 15 years of experience as the UTMB CMC

mental health services director, I oversee approximately 320 mental health staff including psychiatrists, psychologists, mental health managers and clinicians, case managers, psychiatric nurse practitioners, psychiatric physician assistants, and other mental health professionals and student trainees across the state. I provide both clinical and administrative support, oversight, quality assurance, supervision, and leadership. I review and co-sign at least 10 percent of charts of psychiatric nurse practitioners and physician assistants that I directly supervise. Also, I conduct peer reviews of psychiatrists and midlevel psychiatric providers.

5. As detailed in my CV, in addition to my Director of Mental Health Services role, during separate time periods due to clinical director vacancies, I previously served as the acting clinical director (lead psychiatrist) at two TCDJ inpatient units (each housing approximately 500 inpatients) and oversaw the care of several thousand inmate inpatients over the last 15 years. These patients were housed at two of three TDCJ dedicated psychiatric inpatient/behavioral health units—Wayne Scott Unit in Richmond, Texas and Skyview Unit in Rusk, Texas—where they were admitted for crisis management, diagnostic and evaluation, and other specialized treatment tracks (*e.g.*, impulse control, mood disorders, acute psychotic, partial remission, neurocognitive disorders). The crisis management inmate patients for whom I oversaw care, had been determined by an outpatient unit based Qualified Mental Health Professional ("QMHP") to be at imminent risk of significant self-injury or suicide, or their mental health needs could not be managed at their assigned outpatient unit. I now supervise the two current clinical directors (lead psychiatrists). I am routinely involved in the referral, acceptance, and admission and transfers or discharges of inmate patients across the state's three dedicated TDCJ inpatient psychiatric prison units.

6. When needed, I also consult and oversee the evaluation and management of particularly complicated patients across TDCJ outpatient units, TDCJ inpatient/behavioral health prison units, stepdown [chronic mentally ill (CMI) programs], and medical/psychiatric inpatients housed in TDCJ medical infirmary prison units or within our specialty medical surgical hospital, a maximum security prison unit, Hospital Galveston (HG), on the grounds of the UTMB academic medical center, medical school and other UTMB complex hospitals in Galveston, Texas (HG is the only one of its type in the United States). I obtained hospital privileges at a local community

hospital where we transferred nursing home level of care state prison patients to this non-correctional "free world" hospital.  This facility lacked a consulting psychiatrist; accordingly, I stepped in and oversaw the patients' psychotropic medication treatment and provided both onsite and telephonic consultation to the patient's treatment hospitalists and other medical teams when patients demonstrated agitation, confusion, or other changes in mental status.

7. In preparing this declaration, I have reviewed:

- CDCR's Plans to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs (PIPs) and to Recruit and Retain Psychiatric Inpatient Staff, which were filed with the Court on March 28, 2023.  (ECF No. 7787.)
- Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards For PIPs, filed with the Court on April 17, 2023.  (ECF No. 7812.)
- Declaration of Pablo Stewart, M.D. in Support of Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards For PIPs, filed with the Court on April 17, 2023.  (ECF No. 7812-2.)

**A. Dr. Stewart's Recommendations Are Not Supported By the Literature Or Relevant Guidelines.**

8. The relevant clinical evidence, literature review, licensure regulations, and practice guidelines do not support Dr. Stewart's conclusion that a minimum of 20 hours per week of structured therapeutic programming, and a minimum of 20 hours per week of additional unstructured out-of-cell time must be provided to all PIP patients. (ECF No. 7812-2 ¶ 11.) Indeed, there are categories of PIP patients for whom such requirements are contraindicated.  For example, acutely psychotic patients who must be stabilized with pharmacotherapy may not benefit from structured therapeutic programming and unstructured out-of-cell time.  Patients experiencing paranoia may suffer from self-harm, may cause harm to others, may not be able to benefit from Dr. Stewart's recommended mix of therapeutic and unstructured hours, and may, instead, experience symptom exacerbation.

9. The foundation of treatment in CDCR PIPs should include a risk assessment and management of safety concerns for the individual patient, other patients, staff, and that of the

milieu, psychotropic medication targeted at the underlying working diagnosis, and gradual integration into settings with other individuals as tolerated—an individualized approach for treatment rather than a one-size-fits-all approach recommended by Dr. Stewart.

10. Community inpatient psychiatric treatment also individualizes care. To my knowledge, there is no literature that mandates or documents the efficacy of a certain number of group or individual therapy hours for inpatients, nor a certain mix of structured and unstructured hours. In my experience, Dr. Stewart's contention that inpatients in the community are provided a minimum of 56 structured and unstructured hours in psychiatric units is not a uniform universally applicable standard (ECF No. 7812-2 ¶ 15); inpatient treatment depends on various factors including the need for stabilization, the specific condition of patients, their medical needs and life circumstances, pharmacotherapy, intellectual ability, tolerance for other individuals, safety considerations, and the patient's own choice in accepting treatment.

11. Dr. Stewart's blanket contention that "consistent patient refusals . . . should be treated as symptoms of either unaddressed psychiatric conditions or of structural program deficiencies" is misguided. (ECF No. 7812-2 ¶ 51.) Patients have a right to refuse treatment and although such refusals may be evidence of unaddressed psychiatric conditions, they certainly cannot be treated as incontrovertible evidence of structural program deficiencies. Patients tolerate structured and unstructured treatment differently and individualized preferences often dictate participation.

12. The National Commission on Correctional Health Care's (NCCHC) standard governing psychiatric inpatient treatments states that "inmates [must] have access to necessary inpatient psychiatric hospitalization and specialty services" and that "[c]linical need dictates the time required to receive the ordered service; in general, waiting times should not exceed average waiting times in community practice." NCCHC, *Standards for Mental Health Services in Correctional Facilities* (2015) at 68. The standard does not mandate a minimum number of hours of structured or unstructured treatment. The standard cited by Dr. Stewart in his declaration pertains not to inpatient psychiatric units but acute mental health residential units:

These residential units should have continuous (24 hours a day, 7 days a week)

coverage by mental health staff; orientation and training for correctional officers assigned to the unit; daily (7 days a week) patient evaluation by mental health staff; programming or appropriate therapies, if indicated; individual treatment plans; and housing in a safe and therapeutic environment.

NCCHC, *Standards for Health Services in Prisons* (2018) at 115.

13. In sum, there are no evidence-based recommendations for minimum or total number of weekly therapy hours for acute and/or sub-acute inpatients diagnosed with schizophrenia, depression, other mental disorders, suicidality, and self-injurious behaviors, or for a certain number of weekly hours spent in structured and unstructured activities. Similarly, there are no data to support any given number hours of structured and unstructured treatment, or hours spent in enrichment activities for more symptomatically stable patients experiencing schizophrenia, depressive disorders, other mental disorders, suicidality, and self-injurious behavior in intermediate care facilities. The goal of treatment is to stabilize the patient and remove barriers to a higher level of functioning—which is not necessarily linked to certain number of hours of structured therapeutic programming and out-of-cell time. Dr. Stewart's declaration did not link better patient outcomes to 20 hours of structured treatment versus 15 hours, or 20 hours of unstructured out-of-cell time or 15 or 10. The recommended structured and unstructured treatment hours are not evidence-based and appear arbitrary.

14. Further, Dr. Stewart's opinions on out-of-cell times are pertinent to correctional settings where patients can be safely treated in an unlocked dorm setting. CDCR PIPs have no such units; recommendations regarding hours of recreational out-of-cell time simply must correspond to custodial setting.

**B.     Dr. Stewart's Methodology is Clearly Flawed and Relies On A Biased Sample.**

15. Dr. Stewart's methodology of selecting patients for document review and interview was designed to choose the sickest patients and suffers from selection bias. To conduct a rigorous and representative analysis of the CDCR PIP inmate patients and their treatment needs, it is critically important to select a random and representative sample of all inmates who received mental health care over the period of interest.

16. Dr. Stewart stated that he surveyed a "random" sample of 46 or five percent of all PIP inpatients as of March 28, 2023, to select patients for record reviews. (ECF No. 7812-2 ¶ 27.) Dr. Stewart himself noted that patients in this "random" sample had stayed in the PIP for an average of 208.26 days—far higher than the overall PIP population whose average length-of-stay was 134.14 days. (*Id.*) Thus, Dr. Stewart was already selecting records for review from a biased pool of treatment refractory patients who required a much longer length-of-stay in PIPs.

17. From this pool, Dr. Stewart concedes that he "selected for closer review the most seriously ill patients in CDCR's PIPs." (*Id.*) Thus, Dr. Stewart selected six of the sickest patients he could find at 3 of CDCR's five PIPs for his interviews. In addition, his declaration analyzes two patient suicides that occurred at SVSP PIP and CMF PIP. (*Id.* at ¶¶ 43-44.) Focusing on the most vulnerable patients will lead to a skewed and non-representative view of healthcare-service availability and delivery in the CDCR PIP system. Consequently, Dr. Stewart's opinions are not and cannot be reflective of the PIPs as a whole. No healthcare system—correctional or otherwise—is perfect. Adverse patient outcomes occur even in the highest staffed and well-managed community state hospitals, forensic unit inpatient psychiatric hospitals, and other health care systems. Focusing only on these *six* outliers at 3 PIPs, as Dr. Stewart did, would lead to a flawed analysis.

18. The non-random sample selected by Dr. Stewart did not utilize a true scientific analysis or methodology.

19. Even without interviewing Patients A and G, Dr. Stewart concluded that Patient A's "lack of clinical improvement is directly caused by an insufficient number of clinical contacts" and Patient G's "lack of a robust clinical response is likely due to an insufficient number of psychiatric contacts." (*Id.* ¶¶ 34; 41) Dr. Stewart did not state that he attempted to speak to any member of Patient A or Patient G's treatment teams to get any insights on the perceived lack of clinical progress.

20. Dr. Stewart's documentation of his interview process is inadequate. He does not describe any specific interview process that he employed (much less the conditions of the interview) with selected PIP patients. Dr. Stewart failed to:

- Identify whether he used a diagnostic interview; a formal mental status examination; a standard inquiry into each inpatient's mental health history, medications, past/current suicidal ideation, past mental health evaluations and free world or correctional based mental health treatment and past/recent psychotropic medication treatment); the duration of the patient interviews; and the conditions of the interviews (*e.g.*, were there any attorneys or others present; was a description of his role as Plaintiffs' expert in litigation provided);

- Document if he obtained patient assent and informed consent/permission from the patient to submit to a non-clinical interview for purposes of civil litigation, which is an ethical duty.

21. It is important to gauge the duration and the quality of Dr. Stewart's interviews in order to assign weight to his conclusions. This information is glaringly absent in his declaration.

22. Dr. Stewart did not speak to any collateral informants, such as direct treating psychiatrists, psychologists, and other treatment team staff who could provide important information about the selected patients.

23. The selected patients discussed in Dr. Stewart's declaration typically demonstrated high rates of refusal for structured treatment such as group treatment. (*See* ECF No. 7812-2 ¶¶ 34 (Patient A); 35 (Patient B); 38 (Patient D); 39 (Patient E); and 41 (Patient G).) While Dr. Stewart provides his opinion concerning the treatment of these patients, nothing in his declaration establishes that any of those patients would in fact have attended more treatment if 20 hours of structured therapy and 20 hours of unstructured activities were offered to these patients each week. To the extent that Dr. Stewart is concerned about the quality of structured treatment and unstructured out-of-cell time, his recommendation of 20 hours of structured therapy and 20 hours of unstructured time does nothing to resolve that concern.

24. In conclusion, Dr. Stewart has selected a highly skewed sample of the "most seriously ill patients" to paint a dire picture of the delivery of care in CDCR's PIPs. This sampling appears to support a foregone conclusion. Even so, given the high rates of refusal of structured treatment among Dr. Stewart's sample group as described in his declaration, the clinical benefit of the recommended 20

hours of structured therapy and 20 hours of unstructured activities is completely conjectural. The literature and guidelines do not recommend this mix of 20 hours of structured therapy and 20 hours of unstructured activities, nor has Dr. Stewart provided any evidence of improved clinical outcomes connected to this specific recommendation.

25. Considering the diverse high-needs patient population in CDCR's PIPs, in my opinion, it would not be appropriate to jettison clinical judgment and individualized care in favor of a focus on minimum treatment hours.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Houston, Texas on May 5, 2023.

*/s/ Joseph V. Penn*
Joseph V. Penn, M.D., CCHP FAPA
*(original signature retained by attorney)*