# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
**Plaintiffs**

v.                                    No. CIV S-90-0520 KJM DB P

GAVIN NEWSOM, et al.,
**Defendants**

## THIRTIETH ROUND MONITORING REPORT – PART A: SPECIAL MASTER'S MONITORING REPORT ON THE PSYCHIATRIC INPATIENT PROGRAMS FOR MENTAL HEALTH PATIENTS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
May 11, 2023

## ACRONYMS AND ABBREVIATIONS

3CMS: Correctional Clinical Case Management System

ACT: Acceptance and Commitment Therapy

ADHD: Attention Deficit Hyperactivity Disorder

ADLs: Activities of Daily Living

ADU: Admissions and Discharge Unit

AGPA: Associate Governmental Program Analyst

APP: Acute Psychiatric Program

ASH: Atascadero State Hospital

ASU: Administrative Segregation Unit

C-File: Central File

C&PR: Classification and Parole Representative

CAP: Corrective Action Plan

CAT: Chart Audit Tool

CBT: Cognitive Behavioral Therapy

CC I: Correctional Counselor I

CC II: Correctional Counselor II

CC III: Correctional Counselor III

CCAT: Correctional Clinical Assessment Team

CCWF: Central California Women's Facility

CDCR: California Department of Corrections and Rehabilitation

CEO: Chief Executive Officer

CHCA: Correctional Health Care Administrator

CHCF: California Health Care Facility

CHCF-PIP: California Health Care Facility Psychiatric Inpatient Program

CIM: California Institution for Men

CIW: California Institution for Women

CIW-PIP: California Institution for Women Psychiatric Inpatient Program

CMC: California Men's Colony

CMF: California Medical Facility

CMF-PIP: California Medical Facility Psychiatric Inpatient Program

CMHPP: Custody and Mental Health Partnership Plan

CNA: Certified Nursing Assistant

CSATF: California Substance Abuse Treatment Facility

CSP/Corcoran: California State Prison/Corcoran

CSP/LAC: California State Prison/Los Angeles County

CSP/Sac: California State Prison/Sacramento

CTC: Correctional Treatment Center

DAI: Division of Adult Institutions

DAR: Daily Activity Report

DBT: Dialectical Behavior Therapy

DDP: Developmental Disability Program

DME: Durable Medical Equipment

DSH: Department of State Hospitals

ECF: Electronic Case Filing

ECT: Electroconvulsive Therapy

eHCIT: Electronic Health Care Incident Tracking

EHRS: Electronic Health Records System

EKG: Electrocardiogram

EMRRC: Emergency Medical Response Review Committee

EOP: Enhanced Outpatient Program

EVS: Environmental Services Staff

GED: General Education Development

HCITC: High Custody Intermediate Treatment Center

HCPOP: Health Care Placement Oversight Program

HPS I: Health Program Specialist I

ICC: Institutional Classification Committee

ICF: Intermediate Care Facility

IDTT: Interdisciplinary Treatment Team

IEX: Indecent Exposure

IM: Intramuscular

IMHPRC: Institutional Mental Health Pre-Release Coordinator

IPOC Interdisciplinary Plan of Care

IRU: Inpatient Referral Unit

ISUDT: Integrated Substance Use Disorder Treatment

KVSP: Kern Valley State Prison

LCSW: Licensed Social Worker

LLEDS: Law Library Electronic Delivery System

LOC: Level of Care

LOP: Local Operating Procedure

LRH: Least Restrictive Housing

LVN: Licensed Vocational Nurse

MAPIP: Medication Administration Process Improvement Program

MCSP: Mule Creek State Prison

MDO: Mentally Disordered Offender

MERD: Minimum Eligible Release Date

MHCB: Mental Health Crisis Bed

MHCT: Mental Health Compliance Team

MHPS: Mental Health Program Subcommittee

MHSDS: Mental Health Services Delivery System

MTP:  Master Treatment Plan

NCAT: Non-Clinical Activity Tracker

NKSP: North Kern State Prison

NLTG: Nursing-Led Treatment Groups

OHU: Outpatient Housing Unit

OMHD: Offender with Mental Health Disorder

OP: Operational Procedure

OSS: Office Services Supervisor

PIWP: Performance Improvement Work Plan

PBSP: Positive Behavioral Support Plan

PBST: Positive Behavioral Support Team

PC: Primary Clinician

PC 2602: Involuntary Medication Order

PIA: Prison Industries Authority

PIP: Psychiatric Inpatient Program

PPE: Personal Protective Equipment

PRC: Program Review Committee

PREA: Prison Rape Elimination Act

PRN: *pro-re-nata* (as required)

PRPA: Pre-Release Planning Assessment

PSSC: Psychology Specialist Services Committee

PSH: Patton State Hospital

PRPA: Pre-Release Parole Assessment

PSU: Psychiatric Services Unit

PTSD: Post-Traumatic Stress Disorder

QIP: Quality Improvement Plan

QMC: Quality Management Committee

QMSU: Quality Management Support Unit

QPIP: Quality and Performance Improvement Program

RJD: Richard J. Donovan Correctional Facility

RMC: Risk Management Committee

RN: Registered Nurse

ROI: Release of Information

RT: Recreation Therapist

RVR: Rules Violation Report

SBCCM: Specialized Bed Complete Care Model

SHU: Security Housing Unit

SIB: Self-Injurious Behavior

SOMS: Strategic Offender Management System

SPRFIT: Suicide Prevention and Response Focused Improvement Team

SRN: Supervising Registered Nurse

SQ: San Quentin State Prison

SQ-PIP: San Quentin State Prison Psychiatric Inpatient Program

SRASHE: Suicide Risk and Self-Harm Evaluation

STEP: System To Encourage Progress

STOP: Specialized Treatment for Optimized Programming

STRH: Short-Term Restricted Housing

SVSP-PIP: Salinas Valley State Prison Psychiatric Inpatient Program

SVSP: Salinas Valley State Prison

TCMP: Transitional Case Management Program

TTM: Therapeutic Treatment Modules

UM: Utilization Management

UMC: Utilization Management Committee

UNA: Unmet Needs Assessment

WIC: California Welfare and Institutions Code

**TABLE OF CONTENTS**

ACRONYMS AND ABBREVIATIONS ............................................................................ i

INTRODUCTION ........................................................................................................1

PART I. UPDATE ON THE STATE OF ACCESS TO MENTAL HEALTH INPATIENT CARE FOR COLEMAN CLASS MEMBERS .......................................................................10

A.    REVIEW OF RECENT DEVELOPMENTS RELATED TO CDCR'S PIPS .................12

    1.    Update on Status of CHCF-PIP ...............................................................12

    2.    Recent Developments Related to CMF-PIP ...........................................12

    3.    PIP Staffing and Treatment Standards Meet and Confer Process ...........14

B.    UPDATE ON MAXIMUM CUSTODY PIP PATIENTS ...................................17

C.    UPDATE ON POLICY DEVELOPMENT ....................................................21

    1.    Flex Bed Policy .......................................................................................21

    2.    Patient Property in the PIPs ...................................................................23

    3.    PIP Policy – Housing Review/Least Restrictive Housing ...................24

D.    UNIDENTIFIED NEEDS ASSESSMENT ...................................................25

E.    AREAS OF FOCUS: ISSUES DEFENDANTS NEED TO ADDRESS REGARDING INPATIENT CARE ................................................................................25

    1.    Staffing Vacancies ..................................................................................25

    2.    Referrals and Transfers ..........................................................................31

    3.    Least Restrictive Housing (LRH) Placements ......................................34

    4.    Access to Department of State Hospitals DSH Programs ....................34

    5.    Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group Therapy, and Individual Treatment .............................................37

PART II. THE SPECIAL MASTER'S FINDINGS AT THE PSYCHIATRIC INPATIENT PROGRAMS .............................................................................................................38

A.    STAFFING .............................................................................................38

B.    TREATMENT AND CLINICAL SERVICES ................................................43

    a)    IDTTs ......................................................................................................44

        1.    CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................44

| | 2. | CIW-PIP and SQ-PIP ................................................................45 |
| b) | Group Treatment .................................................................................45 |
| | 1. | CMF-PIP, CHCF-PIP, and SVSP-PIP ........................................45 |
| | 2. | CIW-PIP and SQ-PIP ................................................................47 |
| c) | Contact Compliance ............................................................................48 |
| | 1. | CMF-PIP, CHCF-PIP, and SVSP-PIP ........................................48 |
| | 2. | CIW-PIP and SQ-PIP ................................................................49 |
| d) | Behavioral Management ......................................................................50 |
| | 1. | CMF-PIP, CHCF-PIP, and SVSP-PIP ........................................50 |
| | 2. | CIW-PIP and SQ-PIP ................................................................51 |
| e) | Solo Programming ...............................................................................51 |
| | 1. | CMF-PIP, CHCF-PIP, and SVSP-PIP ........................................51 |
| | 2. | CIW-PIP and SQ-PIP ................................................................51 |

C.  QUALITY OF CARE IN CDCR'S PIP PROGRAMS ...................................52

| a) | Inadequate Interdisciplinary Treatment Team (IDTT) Processes .........53 |
| b) | Treatment Planning Concerns ..............................................................56 |
| c) | Delivery of Treatment Interventions and Structured Treatment Hours ...57 |
| d) | Diagnostic Concerns ...........................................................................60 |
| e) | Clinical Documentation Issues ............................................................61 |
| f) | Least Restrictive Housing and Maximum Custody Considerations .......62 |
| g) | Additional Serious Concern .................................................................64 |

D.  MEDICATION MANAGEMENT ...................................................................65

| 1. | CMF-PIP, CHCF-PIP, and SVSP-PIP ...........................................66 |
| 2. | CIW-PIP and SQ-PIP ...................................................................71 |

E.  PATIENT ACCESS TO TREATMENT ..........................................................74

| 1. | CMF-PIP, CHCF-PIP, and SVSP-PIP ...........................................75 |
| 2. | CIW-PIP and SQ-PIP ...................................................................76 |

F.  REFERRALS AND TRANSFERS ..................................................................76

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................77

2.      CIW-PIP and SQ-PIP .........................................................................78

G.      ADMISSIONS AND DISCHARGES.........................................................79

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................80

2.      CIW-PIP and SQ PIP .........................................................................80

H.      LEAST RESTRICTIVE HOUSING...........................................................81

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................81

2.      CIW-PIP and SQ-PIP .........................................................................82

I.      PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE ...........82

Patient Disciplinary Process .....................................................................82

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................83

2.      CIW-PIP and SQ-PIP .........................................................................84

Use of Force ............................................................................................85

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................87

2.      CIW-PIP and SQ-PIP .........................................................................88

J.      USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS..........89

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................89

2.      CIW-PIP and SQ-PIP .........................................................................89

K.      EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS..........89

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................90

2.      CIW-PIP and SQ-PIP .........................................................................91

L.      QUALITY MANAGEMENT AND UTILIZATION REVIEW ......................92

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................92

2.      CIW-PIP and SQ-PIP .........................................................................93

M.      PATIENT COMPLAINTS/PATIENT SATISFACTION...............................94

1.      CMF-PIP, CHCF-PIP, and SVSP-PIP ..................................................95

2.      CIW-PIP and SQ-PIP .........................................................................95

N.      CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN ......................96

1. CMF-PIP, CHCF-PIP, and SVSP-PIP ...................................................................97

2. CIW-PIP and SQ-PIP ...................................................................................99

O. COLEMAN POSTINGS...................................................................................100

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................100

2. CIW-PIP and SQ-PIP .................................................................................100

P. LAUNDRY AND SUPPLY ISSUES .........................................................................101

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................101

2. CIW-PIP and SQ-PIP .................................................................................101

Q. PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS ...........................................102

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................102

2. CIW-PIP and SQ-PIP .................................................................................104

R. LAW LIBRARY ACCESS .................................................................................104

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................105

2. CIW-PIP and SQ-PIP .................................................................................106

S. HEAT PLAN .........................................................................................106

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................106

2. CIW-PIP and SQ-PIP .................................................................................107

T. PRE-RELEASE PLANNING .............................................................................108

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................108

2. CIW-PIP and SQ-PIP .................................................................................109

U. PROGRAM ACCESS.....................................................................................110

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................110

2. CIW-PIP and SQ-PIP .................................................................................111

V. EDUCATION.............................................................................................111

1. CMF-PIP, CHCF-PIP, and SVSP-PIP .................................................................111

2. CIW-PIP and SQ-PIP .................................................................................111

CONCLUSION.................................................................................................112

APPENDIX A INSTITUTIONAL SUMMARIES ................................................................115

APPENDIX B CLINICAL CASE REVIEWS............................................................................283

APPENDIX C ACTIVITIES OF THE SPECIAL MASTER .......................................................456

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

**Plaintiffs,**

**vs.**                                    **No. 2:90-cv-0520 KJM DB**

**GAVIN NEWSOM, et al.,**

**Defendants.**

**THE COLEMAN SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT – PART A**

**INTRODUCTION**

This Report encompasses the Special Master's review of the inpatient mental health care provided at the following five California Department of Corrections and Rehabilitation (CDCR) programs: California Medical Facility Psychiatric Inpatient Program (CMF-PIP); California Health Care Facility Psychiatric Inpatient Program (CHCF-PIP); Salinas Valley State Prison Psychiatric Inpatient Program (SVSP-PIP); California Institution for Women Psychiatric Inpatient Program (CIW-PIP); and San Quentin Psychiatric Inpatient Program (SQ-PIP).[1] Consistent with the Special Master's Twenty-Ninth Round Monitoring Report – Part A, this

---

[1] The Special Master's Twenty-Ninth Round Monitoring Report – Part A also included a "targeted review of the California Men's Colony (CMC) Unit B, a Mental Health Crisis Bed (MHCB) unit that CDCR temporarily set up to provide inpatient mental health care to patients at the acute care level." ECF No. 7555 at 14. As of the time of this writing, CDCR is still providing acute care services in these beds and, according to CDCR's newly released Policy regarding the Use of Inpatient Flex Beds, plans to continue to do so for the foreseeable future. *See* Exhibit B at 11 (designating 12 beds in CMC's MHCB as "I-FLEX" beds). The Special Master will include his review of this program in his forthcoming monitoring report covering CDCR's Enhanced Outpatient Program (EOP) institutions. Finally, the Special Master notes that his suicide prevention expert's reassessment of the PIPs is ongoing and is expected to be completed in May 2023.

report is "focused on conditions at the CDCR PIPs and does not include an assessment of the DSH programs."  ECF No. 7555 at 37.[2]

In accordance with the Special Master's recommendation contained in the Twenty-Ninth Round Monitoring Report – Part A, the Special Master conducted full on-site monitoring tours of CMF-PIP, CHCF-PIP, and SVSP-PIP (collectively, the "Lift and Shift PIPs"), and paper reviews of CIW-PIP and SQ-PIP (collectively, the "CDCR-developed PIPs").  ECF No. 7555 at 160, 165; *see also* August 29, 2022 Order, ECF. 7608 at 6 (adopting Special Master's recommendation to conduct paper reviews of CIW-PIP and SQ-PIP).  The monitor and monitor's expert[3] conducted the on-site inspections of the Lift and Shift PIPs between January 9, 2023 – January 12, 2023.

As in preceding reports, the monitoring focus areas were:

A.    Staffing

B.    Treatment and Clinical Services

C.    Quality of Care Issues in Interdisciplinary Treatment Teams (IDTTs) and Treatment Planning in the Inpatient Care Programs

D.    Medication Management

E.    Patient Access to Treatment

F.    Referrals and Transfers

G.    Admissions and Discharges

H.    Least Restrictive Housing

---

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.  References to page numbers in the Report are to page numbers at the bottom of each page.

[3] While this Report includes findings from different monitoring teams, the various monitors are collectively referred to as "the monitor" for purposes of this report.  Likewise, the Special Master's staff of mental health experts are collectively referred to as "the monitor's expert."

I.      Patient Disciplinary Process and the Use of Force

J.      Use of Observation Cells/Rooms, Seclusion, and Restraints

K.      Emergency Response and the Death Review Process

L.      Quality Management and Utilization Review

M.      Patient Complaints/Patient Satisfaction

N.      Custody and Mental Health Partnership Plan

O.      *Coleman* Postings

P.      Laundry and Supply Issues

Q.      Property/Visitation/Privileges/Telephone Access

R.      Law Library Access

S.      Heat Plan

T.      Pre-Release Planning

U.      Program Access

V.      Education

Following the format of the preceding inpatient report, this Report is comprised of two major sections. Part I provides an update on the state of access to inpatient mental health care for *Coleman* class members, including brief updates on the five "previously identified core areas – staffing vacancies, referrals and transfers, least restrictive housing (LRH) placements, access to DSH facilities, and clinical services and treatment in inpatient programs – which defendants must address to sustain any progress that has been achieved related to problems with access to and the provision of adequate mental health care for incarcerated persons in CDCR custody." ECF No. 7555 at 17 (citing ECF No. 5894 at 17). Part II of this Report contains the Special Master's summaries of his findings at the five PIPs. The summaries are organized by monitoring

focus areas and include additional detailed updates on the Special Master's findings regarding

four of the five[4] "previously identified core areas."  ECF No. 7555 at 17 (citing ECF No. 5894 at

17).

The Special Master's individual summaries of his findings at each of the five CDCR PIPs

are provided in Appendices A1-A5.  His expert's clinical case reviews for these programs are

found in Appendices B1-B5.  Appendix C is a list of the Special Master's monitoring activities

since the filing of the Special Master's Twenty-Ninth Round Monitoring Report – Part D.

**Parties' Responses to Draft Report**

On March 22, 2023, the Special Master provided the *Coleman* parties with a draft version

of the Thirtieth Round Monitoring Report – Part A, covering CDCR institutions with PIPs

(hereinafter "Draft Report").  As required by the Order of Reference, the parties were given 30

days to provide any preliminary comments or objections to the Draft Report.  On April 21, 2023,

defendants sent the Special Master their responses and objections to the Draft Report.  *See* Letter

from Nicholas Weber, Esq, CDCR Office of Legal Affairs, to Special Master Lopes (April 21,

2023), attached hereto as Exhibit A.  Plaintiffs did not submit preliminary comments or

objections to the Draft Report.

The Special Master carefully reviewed the defendants' comments and objections and

revised the final version of the Report as discussed in greater detail below.

---

[4] The Special Master will provide an update on "access to DSH facilities" in his forthcoming
Thirtieth Round Monitoring Report – Part B, reporting on the Special Master's paper reviews of
DSH-Atascadero, DSH-Coalinga, and DSH-Patton.

**Defendants' Response to the Draft Report**

1. *Footnote Seven[5] Regarding CDPH-Approved Program Flexibilities*

Defendants objected to a footnote in the Draft Report which stated:

In the preceding monitoring report on CDCR's PIPs, the Special Master reported that "there was a patchwork of standards for frequency of individual treatment across the PIPs, driven by staffing inadequacies rather than the needs of PIP patients." ECF No. 7555 at 68; *see also id.* at 160 ("[S]tructured therapeutic treatment in the PIPs was commonly driven by staffing levels rather than individualized assessment of patients' clinical needs."). Moreover, the Special Master reported that the California Department of Public Health (CDPH) granted CHCF-PIP an approval of program flexibility, "which operated as a waiver of state law, allowing the program to offer less treatment than would otherwise be required" by Title 22. *Id.* at 68 n.43.

During the review period, staffing limitations continued to impact the frequency of clinical contacts in the PIPs. CDCR requested and the CDPH granted waivers from Title 22 requirements governing the frequency of psychiatry progress notes for each of the five PIPs. The Special Master notes that the waivers in effect as of the time of this writing will be effective through November 2025.

*See infra* p. 16 n. 8. Specifically, defendants objected to the suggestion that CDCR sought program flexibilities for the PIPs due to staffing limitations. CDCR reported that "staffing limitations or other staffing concerns played no part in this request." Exhibit A at 1. CDCR did not provide the reason underlying their original requests but noted that in some cases, these requests pre-dated the Lift and Shift in 2017. CDCR further noted that CDPH approved the department's requests and, in doing so, found "CDCR's alternative means" of achieving compliance with Title 22's requirements "are reasonable and will continue to allow for the provision of safe and adequate care to patients in the PIPs." *Id.* Finally, defendants requested that the final Report be revised for "accuracy" based on their preliminary objection. *Id.*

---

[5] Defendants' objected to the content of footnote seven on page 10 of the Draft Report, which is now footnote 8 on page 16 *infra*.

The Special Master disagrees that there is anything "inaccurate" about the Draft Report's discussion of the impact of staffing vacancies on the frequency of clinical contacts in the PIP or these waivers of Title 22 provisions. In addition, CDCR's statement that "staffing limitations" played "no role" in CDCR's decision to seek a waiver of state law regarding frequency of clinical contacts is difficult to square with the record in the case, which evinces longstanding challenges with mental health staffing, particularly in the PIPs. Indeed, there may have been additional reasons CDCR sought program flexibilities for the PIPs, but CDCR has not revealed what those other reasons were. Accordingly, the Special Master did not make any modifications to the footnote in question.

   2. *Defendants' Additional Requests for Modification or Clarification*

Defendants made numerous requests for modifications or clarifications to the Draft Report.

First, defendants requested that the Draft Report's discussion of the utilization of positive behavior support teams (PBSTs), including the impact of staffing vacancies on the use of PBSTs, be removed or that the final Report be clarified that PBST "is not something that is required under the Program Guide or part of the *Coleman* remedy." Exhibit A at 2. Notably, the Special Master has historically monitored the use of PBSTs within CDCR institutions and will continue to do so going forward. In addition, defendants have recognized the need to provide positive behavioral support services to *Coleman* class members for many years. *See, e.g.*, Defendants' November 24, 2010 Plan to Reduce or Eliminate Intermediate Care Facility and Acute Inpatient Waitlists in Response to the Court's March 31, 2010 and August 4, 2010 Orders, ECF No. 3962-1 at 5, 8, 11, 25. As such, it is clear defendants have "overstated the extent to which PBST was not part of the *Coleman* remedy." *Infra* p. 40; *see also infra* note 23 ("As recently as December

2021, the parties reached a stipulated agreement regarding the use of therapeutic treatment modules, which included defendants' agreement to 'take all steps necessary to ensure that treatment in the PIPs targets behaviors that result in patients being placed or continued on Max custody if mental health symptoms may have contributed to the behavior(s), and that such treatment is addressed toward the goal of helping patients get off of Max custody when appropriate. Such steps include, but are not limited to, continuing the already-established PBST program and implementing the STEP program.'") (quoting ECF No. 7392 at 3). In response to defendants' comments, the Special Master added a footnote indicating that PBST is not a Program Guide requirement, though is clinically indicated for some *Coleman* patients.

Next, defendants objected to the Draft Report's statement that "[a]ll five PIPs reported unacceptably high psychiatry vacancy rates. There were astounding vacancy rates of … 22 percent at the SQ-PIP." Exhibit A at 2. Defendants, therefore, appear to focus their objection to the report of a 22 percent vacancy rate at SQ-PIP. In support of their objection, defendants cited to their monthly psychiatry vacancy report for the month of February 2023, wherein defendants reported SQ-PIP had a vacancy rate among psychiatrists of six percent. Exhibit A at 2 (citing ECF No. 7789 at 11).

As they did in their response to the Special Master's Twenty-Ninth Round Monitoring Report Parts C and D, here, defendants objected to the Special Master's finding utilizing a vacancy rate data from a different month. *See* April 12, 2023 Order, ECF No. 7808 at 7 ("The court also observes that the Special Master's finding is based on data from August 2022. Defendants' objection, by contrast, is based in substantial part on data from December 2022. For this reason as well, the objection demonstrates no errors in the Special Master's findings about staffing vacancy rates as of August 2022.") As noted in the Report, the data defendants objected

to were taken from the "Psychiatric Inpatient Program (PIP) Staffing Data that is part of the *Coleman* monthly Report *reflective of January 2023 data* that was reported on March 15, 2023." *See infra* note 22. Accordingly, the Special Master did not modify the Report based on this objection as the objection (based on February 2023 data) "demonstrate[d] no errors in the Special Master's findings about staffing vacancy rates" in January 2023.

Defendants also objected to the contents of a graph displaying the percent of case reviews in which the monitor's expert determined the clinical care provided to be adequate, marginally adequate, or inadequate. Exhibit A at 2. Defendants noted that CMF Patient J was noted to have received "adequate care" in the case review but was reflected as inadequate in the chart. *Id.* The Draft Report contained an error as this case should have been characterized as "inadequate." Accordingly, the Special Master corrected the case review for CMF Patient J to reflect that this patient received inadequate care; no changes were made to the bar graph in question because the Draft Report's graph was accurate.

Defendants identified an inconsistency in the Draft Report's discussion of timely psychiatric assessments at SQ-PIP and requested clarification. Exhibit A at 2. Upon review, the Special Master revised the final Report by removing the statement as requested.

Defendants objected to the Draft Report's reference to the monitor's expert's case review of SQ-PIP Patient H. Exhibit A at 3. The monitor's expert noted the following in the relevant case review:

> One major concern was noted. On October 23, 2022, there were two notes by nursing staff indicating that the patient had engaged in head banging and was placed in four-point restraints. There was no documentation that a psychiatrist or psychologist was contacted, no orders present in the healthcare record for the use of restraints, and no indication when the restraint episode ended. There was also no self-harm Powerform completed in the electronic healthcare record, and the incident was not noted in any documentation by members of the IDTT. While it

8

appeared to be an isolated episode, the documentation regarding the incident was inadequate and not consistent with adequate treatment expectations.

*Infra* p. 436. Defendants stated "this patient had never been placed in restraints during his stay at SQ-PIP. It is unclear what record the report is referring to." Exhibit A at 3. The monitor's expert reviewed this case again and confirmed the accuracy of the Draft Report's representations about this patient's health record. Accordingly, the Special Master did not modify the Report based on this preliminary objection.

Defendants requested the Draft Report's reference to cell front clinical contacts being provided via a cell phone at SVSP-PIP be corrected based on the following: "CDCR believes this documentation was the result of a voice recognition/dictation system which incorrectly recorded 'cell front' as 'cell phone' as a similar error was found in other SVSP-PIP records recently." Exhibit A at 3. The Special Master made the requested clarification based on the additional information CDCR provided in their preliminary objections.

Defendants also objected to the Draft Report's discussion of the lack of milestone completion credits awarded to ICF patients at SQ-PIP. Exhibit A at 3. Specifically, defendants objected to this statement because "San Quentin PIP provides intermediate care to condemned patients who are not eligible to receive such credits." In response, the Special Master added a clarifying footnote to the Report. *See infra* note 25.

Defendants objected to the Draft Report's statement that SQ-PIP employed five registry psychiatrists. Exhibit A at 3. Defendants acknowledged an error in their document production for the SQ-PIP paper review. *Id.* Accordingly, the Special Master revised the Report to include this corrected information regarding registry psychiatrists at SQ-PIP.

Defendants requested two statements in the Draft Report regarding the number of SQ-PIP patients prescribed clozapine and the number of PC 2602 petitions for SQ-PIP patients be

removed because that information was not requested in the Special Master's Thirtieth Round document request.  Exhibit A at 3.  The Special Master concurs with defendants' suggestion, removed the statements from the Report, and will clarify the relevant sections of the PIP document request prior to the next monitoring round.

Finally, defendants requested clarification regarding the Draft Report's statement that SQ-PIP did not provide meeting minutes for either the QMC or the MHPS, noting that "Quality Management Committee minutes were uploaded for August, September, October, November, and December 2022 and January 2023 to the 'corrected and revised' SharePoint folder" on March 23, 2023, one day *after* the Special Master distributed the Draft Report to the parties on March 22, 2023.  By objecting to the Special Master's findings based on information that was not provided to the Special Master until after the Draft Report was distributed to the parties, defendants are, plainly, wasting judicial resources.  Accordingly, the Special Master did not revise the Draft Report's discussion of the lack of QMC meeting minutes because those documents were not made available to the Special Master until after the Draft Report was distributed to the parties.  However, the Special Master clarified the discussion of the MHPS meeting minutes as these documents were provided to the Special Master on January 20, 2023.

### PART I
### UPDATE ON THE STATE OF ACCESS TO MENTAL HEALTH INPATIENT CARE FOR *COLEMAN* CLASS MEMBERS

In the preceding monitoring report on CDCR's PIPs, the Special Master described the "dire conditions at CDCR's three largest PIPs – CMF-PIP, CHCF-PIP, and SVSP-PIP."  ECF No. 7555 at 14.  In addition, the Special Master reported that since declaring the Lift and Shift PIPs as "institutional program failures" in a 2020 report, ECF No. 6565 at 17, conditions at these three programs "ha[d] only deteriorated further."  ECF No. 7555 at 14.  Finally, the Special Master noted that, "consistent with the Special Master's findings in prior assessments of

defendants' mental health care programs," the CDCR-developed PIPs (CIW-PIP and SQ-PIP) "continue[d] to provide more adequate mental health care to *Coleman* patients." *Id.*

The "uneven performance" between the Lift and Shift PIPs and the CDCR-developed PIPs observed during the Twenty-Ninth Round Monitoring Report – Part A largely remained applicable during the review period. ECF No. 7555 at 50. Similar to the preceding monitoring round, CIW-PIP and SQ-PIP each confronted mental health staffing challenges during the review period, but to a lesser extent than the Lift and Shift PIPs. *See infra* p. 29-31. While mental health staffing fill rates at SVSP-PIP improved compared to the preceding review period, the other Lift and Shift PIPs (CMF-PIP and CHCF-PIP) are still dangerously understaffed and operating at limited capacity as a result. Indeed, "[t]he risk of operating these programs at current staffing" continues to be "grave and unacceptable." ECF No. 7555 at 148-49.

Likewise, while the monitor's expert noted a number of significant concerns with the adequacy of care delivered at the CDCR-developed PIPs, "[o]verall, the CDCR-developed PIPs were providing more care of adequate quality than the Lift and Shift PIPs." *Infra* p. 52.

The Special Master has filed multiple monitoring reports sounding the alarm on conditions at the Lift and Shift PIPs. It is long past time for defendants to correct these longstanding deficiencies. As previously reported, "CDCR will not be able to deliver anything close to adequate inpatient mental health care" unless and until the staffing crisis in the Lift and Shift PIPs is remedied. As noted below, due to the parties' disappointing inability to reach an agreement on either PIP staffing and PIP treatment standards, those issues will be before the Court in the coming weeks and months. *See infra* p. 14-17.

A.    **REVIEW OF RECENT DEVELOPMENTS RELATED TO CDCR'S PIPS**

1.    **Update on Status of CHCF-PIP**

In the Twenty-Ninth Round Monitoring Report – Part A, the Special Master reported that defendants closed CHCF-PIP to admissions due to the dangerously high staffing vacancies.  ECF No. 7555 at 54; *see also* Appendix A2 at 157.  CHCF-PIP leadership initially raised the prospect of closing CHCF-PIP to new admissions with the monitor's expert at the time of the July 2021 monitoring tour at CHCF-PIP.  ECF No. 7555 at 54.  After discussions with the Special Master and plaintiffs' counsel, CDCR thereafter closed CHCF-PIP to admissions for four months, reopening the program to new admissions on a limited basis as of January 28, 2022.  *Id.* at 54-55.

While CHCF-PIP remained open to new admissions during the review period, significant numbers of beds were unavailable as a direct result of ongoing mental health staffing vacancies.  As part of the CHCF-PIP's effort to reopen following the four-month closure, CHCF-PIP consolidated treatment teams "to attempt to standardize care and improve treatment."  Appendix A2 at 157; *see also* Defendants' January 2023 Census, Waitlists, and Transfer Timelines Compliance Reports for Inpatient Mental Health Care, ECF No. 7730 at 10 ("Since January 27, 2022, CDCR has been safely reopening the units in the California Health Care Facility's PIP.  The PIP is operating at 70% capacity, with 360 of 514 beds available for use.").  The consolidation of units and treatment teams "result[ed] in 91 acute care beds being taken off-line, and the closure of two of 11 intermediate care units, with 58 intermediate beds also being taken off-line."  Appendix A2 at 157.

2.    **Recent Developments Related to CMF-PIP**

At the time of the CMF-PIP monitoring tour, it was clear that the program was operating with unsustainably high mental health staffing vacancy rates.  Since the conclusion of the monitoring tour, CDCR has pursued material changes to several significant mental health

processes at CMF, driven by the critically low levels of mental health staff.  On March 2, 2023,

CDCR formally notified the Special Master and plaintiffs of the following:

> In an effort to improve job satisfaction amid the staffing issues at CMF, CDCR has
> streamlined its EHRS IDTT Master Treatment Plan documentation to remove non-
> essential fields and ensure staff are spending more time providing direct patient
> care. …CDCR will first roll out the new [Master Treatment Plan] at CMF's
> outpatient and MHCB programs effective immediately.  CDCR will monitor the
> new [Master Treatment Plan] at CMF to ensure it is working before rolling the new
> [Master Treatment Plan] out statewide.

Email from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and

Plaintiffs' Counsel (March 2, 2023), attached hereto as Exhibit C.

Defendants first brought the CMF/CMF-PIP proposals to the Special Master's clinical

experts.  During those discussions, CDCR indicated that in addition to the Master Treatment Plan

modifications, the department intended to make institution-specific changes to CMF's suicide

risk evaluation form and planned to re-prioritize certain mental health-related trainings based on

the limited staffing at the institution.  As of the time of this writing, it is unclear if the proposed

suicide risk and self-harm evaluation (SRASHE) and training modifications will impact CMF-

PIP.

The Special Master's team met with CDCR to discuss the CMF proposal on March 3,

2023.  Thereafter, plaintiffs were brought to the table to learn about the CMF proposals, ask

questions, and hear the Special Master's expert's perspective in meetings on March 6, 2023 and

March 9, 2023.  During the meet and confer process, defendants confirmed that the Master

Treatment Plan modifications would be implemented on a temporary basis and would also apply

to CMF-PIP.

In an email following the meet and confer sessions, plaintiffs' counsel confirmed their

agreement to "use of the revised [Master Treatment Plan] form on a limited basis, only at CMF,

and only for a period of 3 months." Email from Jenny Yelin, Esq., Plaintiffs' Counsel, to

Nicholas Weber, Esq, CDCR Office of Legal Affairs (March 6, 2023), attached hereto as Exhibit

D.[6] Plaintiffs' counsel consented to the use of the revised SRASHE for a period of three months.

Plaintiffs requested to meet and confer with defendants if CDCR intended to use the modified

Master Treatment Plan (MTP) and SRASHE forms beyond the agreed-upon three-month time

limit. Finally, plaintiffs requested that "CDCR report to [plaintiffs] at the end of the three-month

period whether any (and how many) staff <u>not</u> at CMF used either the modified MTP or the

modified SRASHE form in violation of policy." Exhibit E at 1. Defendants agreed to plaintiffs'

requests in emails dated March 6, 2023 and March 9, 2023. Email from Nicholas Weber, Esq.,

CDCR Office of Legal Affairs, to Jenny Yelin, Esq., Plaintiffs' Counsel (March 9, 2023),

attached here to as Exhibit F.

### 3.    PIP Staffing and Treatment Standards Meet and Confer Process

The Special Master's deep concern with the state of mental health staffing and treatment

in the PIPs has resulted in multiple recommendations in recent years. In his 2021 Monitoring

Report on the Mental Health Inpatient Care Programs, the Special Master recommended that

CDCR continue working with the Special Master "to complete staffing plans for their inpatient

programs covering all required disciplines."[7] ECF No. 7039 at 118. In his Twenty-Ninth Round

---

[6] As of the time of this writing, defendants had not provided the Special Master or plaintiffs with a proposed revision to the PIP Master Treatment Plan form. Therefore, plaintiffs (as of March 17, 2023) did not consent to use of a streamlined MTP form in the CMF-PIP. Email from Jenny Yelin, Esq., Plaintiffs' Counsel, to Nicholas Weber, Esq, CDCR Office of Legal Affairs (March 9, 2023), attached hereto as Exhibit E.

[7] In the Twenty-Ninth Round Monitoring Report-Part A, the Special Master characterized "the development and preliminary implementation of inpatient staffing plans for both DSH's inpatient programs and CDCR's PIPs" as "staffing related milestones." ECF No. 7555 at 55. The CDCR PIP Staffing Plan was filed with the Court on July 21, 2021. ECF No. 7245. The Court approved the DSH Staffing Plan in its December 19, 2022 Order adopting the Special Master's Twenty-Ninth Round Monitoring Report – Part B. ECF No. 7688 at 9-10.

Monitoring Report – Part A, the Special Master recommended "[t]hat CDCR be ordered to develop a comprehensive plan within 30 days, under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, to remedy the seriously deficient staffing levels at the Lift and Shift PIPs."  ECF No. 7555 at 164.

Likewise, regarding mental health treatment, in recent years the Special Master has twice recommended that CDCR be ordered to "develop minimum standards for the provision of structured therapeutic activities, unstructured out of cell activities, treatment planning, and individual treatment, consistent with a psychiatric inpatient level of care."  *Id.*  The Special Master also recommended that CDCR develop plans to provide treatment consistent with the minimum standards developed, as well as a "system for tracking and reporting adherence to the standards developed."  *Id.* at 164-65.

In its August 29, 2022 Order adopting the findings contained in the Special Master's Twenty-Ninth Round Monitoring Report – Part A, the Court referred "[t]he issues presented by the Special Master's first and second recommendations [PIP staffing and PIP treatment standards]…to the Special Master and [then-CDCR] Secretary [Kathleen] Allison for focused discussions."  ECF No. 7608 at 6.  In a January 5, 2023 Order, the Court vacated paragraph two of its August 29, 2022 Order and instead ordered the parties to meet and confer for 45 days and thereafter file a "joint status report outlining the results of the meet and confer required by this order and, as appropriate, either a stipulated resolution or a schedule for motion practice if one or both issues remain unresolved."  ECF No. 7697 at 3.

Following the Court's January 5, 2023 Order, defendants shared their plans to address the Special Master's recommendations regarding PIP staffing and minimum treatment standards in a January 13, 2023 letter.  Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to

Special Master Lopes and Plaintiffs' Counsel (Jan. 13, 2023), attached hereto as Exhibit G.  The

parties met and conferred on February 2, 2023, February 17, 2023, and February 24, 2023.  On

February 15, 2023, defendants distributed an updated version of their proposal for PIP treatment

frequency.  Email from Nicholas Weber, Esq., CDCR Office to Legal Affairs, to Lisa Ells, Esq.,

Plaintiffs' Counsel (Feb. 15, 2023), attached hereto as Exhibit H.  On February 24, 2023,

plaintiffs requested "all documents relating to requests for, and/or receipt of, waiver of state

licensing requirements for the five PIPs."  Email from Arielle Tolman, Esq., Plaintiffs' Counsel,

to Nicholas Weber, Esq., CDCR Office of Legal Affairs (Feb. 24, 2023), attached hereto as

Exhibit I.  Defendants responded to plaintiffs' request for information regarding waivers of state

law requirements in a February 24, 2023 letter and provided documentation regarding those

waivers currently in effect and expired waivers dating back to 2017.  Letter from Nicholas

Weber, Esq., CDCR Office of Legal Affairs, to Lisa Ells, Esq., Plaintiffs' Counsel (Feb. 24,

2023), attached hereto as Exhibit J.[8]

      On March 13, 2023, the parties filed their Joint Report in Response to the Court's

January 6, 2023 Order, wherein they reported on the result of their meet and confer regarding the

---

[8] In the preceding monitoring report on CDCR's PIPs, the Special Master reported that "there
was a patchwork of standards for frequency of individual treatment across the PIPs, driven by
staffing inadequacies rather than the needs of PIP patients."  ECF No. 7555 at 68; *see also id.* at
160 ("[S]tructured therapeutic treatment in the PIPs was commonly driven by staffing levels
rather than individualized assessment of patients' clinical needs.").  Moreover, the Special
Master reported that the California Department of Public Health (CDPH) granted CHCF-PIP an
approval of program flexibility, "which operated as a waiver of state law, allowing the program
to offer less treatment than would otherwise be required" by Title 22.  *Id.* at 68 n.43.

During the review period, staffing limitations continued to impact the frequency of clinical
contacts in the PIPs.  CDCR requested and the CDPH granted waivers from Title 22
requirements governing the frequency of psychiatry progress notes for each of the five PIPs.  *See
infra* pp. 132, 176, 217, 244 and 268.  The Special Master notes that the waivers in effect as of
the time of this writing will be effective through November 2025.

"frequency and amount of treatment in CDCR's PIPs, as well as steps taken to address staffing deficiencies those programs." ECF No. 7758 at 2. There, the parties reported that "[d]espite concerted efforts, the parties were not able to agree on CDCR's plans," and, therefore, as directed by the Court, the parties "jointly propose[d] [a] schedule…for submission of CDCR's plans to address minimum treatment standards and staffing issues for the PIPs and any related motions practice." *Id.*

In a March 17, 2023 Order, the Court adopted the parties' proposed briefing schedule.[9] ECF No. 7765 at 2.[10] In addition, the Court clarified that "vacancies in the CDCR PIPs" are not "within the scope of the February 28, 2023 order" establishing fines for mental health staff vacancies. ECF No. 7766 at 1. Further, the Court indicated it "anticipate[d] separate proceedings, as necessary, to ensure a durable staffing remedy for CDCR's PIPs." *Id.*

### B.    UPDATE ON MAXIMUM CUSTODY PIP PATIENTS

In the preceding monitoring report on CDCR's PIPs, the Special Master noted:

---

[9] The Court adopted the following briefing schedule: "a. Defendants will file, by no later than March 28, 2023, (a) CDCR's proposed minimum treatment standards for PIP patients and plan to deliver and track treatment consistent with those standards, and (b) CDCR's plan focused on recruitment and retention for PIP staff; b. Plaintiffs will have until April 17, 2023, to file a motion or motions, if any, in response to the CDCR plans filed on March 28, 2023; (c) Defendants' opposition to any motion filed by plaintiffs will be due on or before May 5, 2023; and (d) Plaintiffs' reply to defendants' opposition will be due by May 16, 2023." ECF No. 7765 at 2.

[10] Since the Special Master distributed the Draft Report, the parties have filed a number of documents in accordance with their briefing schedule. On March 28, 2013, defendants filed CDCR's Plans to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs and to Recruit and Retain Psychiatric Inpatient Staff. ECF No. 7787. On April 17, 2023, plaintiffs filed two motions related to defendants' plans. First, plaintiffs filed a Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs as Inadequate to Remedy Defendants' Eighth Amendment Violations. ECF No. 7812. On the same date, plaintiffs filed a Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff as Non-Compliant with Court's Orders. ECF No. 7813. Defendants filed their oppositions to plaintiffs' motions on May 5, 2023. *See* ECF Nos. 7827, 7828.

> Findings from the review period and at the time of the site visits could not be
> clearer: many *Coleman* patients on maximum custody status received virtually no
> structured treatment and limited out-of-cell time during the monitoring round and
> have not for years.  Remedying this deficiency is essential for these class members
> to receive treatment consistent with their rights under the Eighth Amendment.

ECF No. 7555 at 43-44; *see also id.* at 44 n.26; *id.* at 44 n.27.  In the same report, the Special

Master provided an update on the resolution of the parties' dispute regarding the use of

therapeutic treatment modules (TTMs) in the PIPs.  ECF No. 7555 at 42-43.  Below, the Special

Master provides a further update on the implementation of the parties' agreement regarding

Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants.

As part of the parties' stipulation, defendants agreed to "implement a memorandum titled

Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants to provide

direction regarding the preference for and ability to remove the designation of Max custody from

*Coleman* class members in PIPs when appropriate."  ECF No. 7392 at 2.  Defendants filed the

Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants with the

Court, ECF No. 7367, and the Court thereafter granted final approval to the parties' stipulated

agreement.  February 4, 2022 Order, ECF No. 7456 at 3-4.[11]

CDCR issued the Maximum Custody Reduction Reviews for Psychiatric Inpatient

Program Participants Memorandum to the field on March 9, 2022.  Attached hereto as Exhibit K.

The memorandum required the headquarters Mental Health Compliance Team (MHCT) to

conduct weekly "pre-reviews" of patients referred to PIPs at the Intermediate Care Facility (ICF)

level of care (LOC).  Under this directive, the MHCT is charged with identifying cases in which

---

[11] The Court approved paragraphs one through 14 of the parties' stipulation in a December 9,
2021 Order.  ECF No. 7392 at 6.  The Court approved the final paragraph of the parties'
stipulation (paragraph 15) in its February 4, 2022 Order, thereby granting final approval to the
agreement.  ECF No. 7456 at 3-4.

the referring institution's institutional classification committee (ICC) should consider suspending maximum custody or a Security Housing Unit (SHU) term to improve patient access to mental health treatment. The memorandum provided guidelines and examples of circumstances in which it may be appropriate to suspend a patient's maximum custody or SHU term and required institutions to report back to the MHCT on their decisions relative to the team's recommendations. In addition, the memorandum called for IDTTs to review patient behaviors and refer to ICC for maximum custody reviews where appropriate. The memorandum also required the MHCT to conduct bi-weekly "post-reviews" of maximum custody patients housed in PIPs and identify cases in which PIP institutions should consider suspending maximum custody or a SHU term to improve access to treatment. The memorandum further required the Division of Adult Institutions (DAI) Deputy Director, Facility Support, to conduct biweekly videoconferences with PIP institutions to follow-up on those institutions' responses to the MHCT's bi-weekly recommendations.

*Departmentwide MHCT Weekly Pre-Reviews*

The MHCT started weekly pre-reviews of patients referred to the ICF LOC in October 2022 and provided a report of the nine weekly pre-reviews conducted during the monitoring period. A total of 210 pre-reviews were conducted departmentwide; the number of patients reviewed weekly ranged from 18 to 29 and averaged 23.3 pre-reviews per week. Analysis of the data reported in the weekly spreadsheets reflected that the MHCT made zero recommendations for referring institutions to consider suspending maximum custody; the team either recommended retention on maximum custody or reported that referring institutions suspended maximum custody prior to the team's weekly pre-review. Of the 210 cases reviewed during the monitoring period, referring institutions' ICCs suspended maximum custody 36 times (17%)

19

prior to transfer to a PIP. Although the memorandum does not call for Deputy Director review of referring institutions' response to MHCT's recommendations, there were an additional 20 maximum custody suspensions after bi-weekly Deputy Director videoconferences. The 210 pre-reviews conducted during the monitoring period resulted in 56 (26.7%) maximum custody reductions.

*Departmentwide MHCT Bi-Weekly Post-Reviews and Deputy Director Follow-up Videoconferences with PIP Institutions*

The MHCT started bi-weekly post-reviews and Deputy Director videoconferences with PIP institutions in October 2022. These reviews were conducted on the 12th and 27th of October and November 2022, totaling four such reviews during the monitoring period. During the monitoring period, the MHCT conducted 524 post-reviews of maximum custody patients at five PIPs (CHCF, CMF, CIW, SQ, and SVSP), 138 on October 12th, 122 on October 27th, 126 on November 12th, and 138 on November 27th. The average number of cases reviewed bi-weekly was 131. The report of biweekly post-reviews and Deputy Director follow-up videoconferences included MHCT's recommendations to PIP institutions, each institution's ICC's actions in response to the MHCT's recommendations, and the outcomes of Deputy Director bi-weekly follow-up videoconferences with each institution.

As noted below, during the review period, "[a]cross all PIPs, patient access to group and individual treatment was negatively impacted by their maximum security status." *Infra* Part II(C)(f). While there was "relative improvement in maximum custody patients' access to mental health treatment" observed during monitoring round, "this subpopulation of *Coleman* class members continued to experience significant access to care issues in nearly all PIP institutions." *Infra* p. 44. While the "relative improvements" observed during the round are encouraging, it is clear that much work remains to remedy the serious inadequacies in maximum custody patients'

access to inpatient mental health care.  The Special Master will continue to monitor these issues, including defendants' continued implementation of their stipulated agreement regarding maximum custody reviews.

### C.    UPDATE ON POLICY DEVELOPMENT

The Special Master and parties considered several of CDCR's proposed revisions to its PIP policies since the filing of the preceding monitoring report on CDCR's PIPs.  A brief discussion and status update on several of these policies is included below.

#### 1.    Flex Bed Policy

In the Twenty-Ninth Round Monitoring Report-Part A, the Special Master reported that CDCR included a draft policy governing the use of inpatient "flex beds" as part of its broader plan to end the use of unlicensed inpatient beds, including the deactivation of the CMF L1-PIP. ECF No. 7555 at 40-41.  The Special Master also noted that "[t]he lack of a systemwide policy for the use of flex beds to provide inpatient care was of concern…, particularly in light of the expanded use of non-PIP beds to provide inpatient care" during the Twenty-Ninth monitoring round.  *Id.* at 42 n.22; *see also id.* at 41-42 (discussing CDCR's "[e]xpanded [u]tilization of [n]on-PIP [b]eds").

As previously reported, defendants initially distributed their draft Flex Bed policy on April 21, 2022.  *Id.* at 41.  On May 9, 2022, plaintiffs' counsel provided comments and questions regarding CDCR's April 21, 2022 draft Flex Bed Policy.  Letter from Marc Shinn-Krantz, Esq., Plaintiffs' Counsel, to Nicholas Weber, Esq., CDCR Office of Legal Affairs (May 9, 2022), attached hereto as Exhibit L.  On July 20, 2022, defendants responded to plaintiffs' May 9, 2022 letter and distributed a revised CMF L1-PIP deactivation plan and a revised draft of the Flex Bed policy.  Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Marc Shinn-Krantz, Esq., Plaintiffs' Counsel (July 20, 2022), attached hereto as Exhibit M.  On September 9,

2023, plaintiffs provided further written comments and objections to defendants' proposed Flex Bed policy, Letter from Marc Shinn-Krantz, Esq., Plaintiffs' Counsel, to Nicholas Weber, Esq., CDCR Office of Legal Affairs (Sept. 9, 2022), attached hereto as Exhibit N, to which defendants sent a reply letter on September 12, 2022. Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Marc Shinn-Krantz, Esq., Plaintiffs' Counsel (Sept. 12, 2022), attached hereto as Exhibit O. The Special Master provided written comments on the draft Flex Bed policy on September 13, 2022. Letter from LaTri-c-ea McClendon-Hunt, Esq., *Coleman* Monitor, to Nicholas Weber, Esq., CDCR Office of Legal Affairs (Sept. 13, 2022), attached hereto as Exhibit P. Defendants responded to the Special Master's letter on November 1, 2022, indicating the draft policy had been provided "to the unions on October 24, 2022" and that CDCR intended to implement the policy thereafter. Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to LaTri-c-ea McClendon-Hunt, Esq., *Coleman* Monitor (Nov. 1, 2022), attached hereto as Exhibit Q at 1.

On January 9, 2023, defendants notified the Special Master and plaintiffs' counsel that CDCR's policy and procedure for the Use of Inpatient Flex Beds was issued to the field on January 4, 2023. Exhibit B. The January 4, 2023 memorandum announcing the Release of Use of Inpatient Flex Beds Policy and Procedure designated the following beds as "Inpatient Flex Beds" or "I-FLEX Beds":

Effective immediately, the following beds are designated as I-FLEX Beds:

**May flex between Mental Health Crisis Bed (MHCB), Acute Psychiatric Program (APP), and Intermediate Care Facility (ICF)**

- California Health Care Facility (CHCF) MHCB – 80 beds
- CMF [High Custody Treatment Center] A/B Wing – 32 beds
- California Men's Colony MHCB – 12 beds
- San Quentin State Prison Psychiatric Inpatient Program (PIP) – 40 beds

**May flex between APP and ICF**

- All CHCF Acute – 202 beds
- All CMF Acute – 218 beds
- California Institution for Women ICF – 45 beds

Exhibit B at 11.  The memorandum required institutions to develop a Local Operating Procedure

(LOP) for the use of I-FLEX Beds within 30 days of receipt of the Memo.  *Id.* at 5.  In addition,

"all staff treating patient in I-FLEX Beds must receive the standardized training from

headquarters regarding policy and procedure related to treating patients at MHCB, APP, and ICF

level of care" within 60 days of receipt of the memorandum.  *Id.*[12]  Since the memorandum was

issued to the field, the Special Master and plaintiffs' counsel have observed several Flex Bed

Trainings, beginning in February 2023.

As the Flex Bed policy was issued to the field only days before the monitoring tours of

the Lift and Shift PIPs in January 2023, this Report does not include findings or

recommendations related to CDCR's use of inpatient flex beds.  However, as of the time of this

writing, this policy has already impacted hundreds of defendants' inpatient beds.  The Special

Master will monitor CDCR's use of inpatient flex beds under the new policy going forward.

### 2.    Patient Property in the PIPs

Defendants distributed revisions to CDCR's memorandum regarding Patient Property in

the Psychiatric Inpatient Program on September 27, 2022.  The Special Master and plaintiffs'

counsel each commented on the draft revised memorandum on October 27, 2022.  Letter from

---

[12] The Policy distributed to the field on January 4, 2023 included the following legal disclaimer:
"This policy is intended to reflect best practices in a correctional setting and should be updated
periodically to incorporate insights and lessons learned from experience, and to maintain
consistency with evolving best practices and new advancements in care recommendations.
Nothing contained herein is intended to address what is required to satisfy constitutional
obligations."  Exhibit B at 6 n.1.

LaTri-c-ea McClendon-Hunt, Esq., *Coleman* Monitor, to Nicholas Weber, Esq., CDCR Office of Legal Affairs (Oct. 27, 2022), attached hereto as Exhibit R and Email from Alex Gourse, Esq., Plaintiffs' Counsel, to Dillon Hockerson, Esq., CDCR Office of Legal Affairs (Oct. 27, 2022), attached hereto as Exhibit S.  In a November 4, 2022 letter, defendants responded to the Special Master's and plaintiffs' comments and questions, attached a further revised policy, and indicated "CDCR plans on issuing the Memo soon."  Letter from Dillon Hockerson, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and Alex Gourse, Esq., Plaintiffs' Counsel (Nov. 4, 2022), attached hereto as Exhibit T.

As of the time of this writing, defendants had not finalized the Patient Property in the PIPs memorandum.

### 3.    PIP Policy – Housing Review/Least Restrictive Housing

Revisions to CDCR's Policy and Procedure regarding Housing Review/Least Restrictive Housing were first considered in 2021 through the small workgroup process.  After discussing defendants' proposed changes in all-parties meetings in 2021, plaintiffs originally provided written comments on August 5, 2021.  Thereafter, there was no apparent movement on this policy for more than a year.

On November 8, 2022, defendants responded to plaintiffs' August 5, 2021 letter and attached a new version of the revised policy and procedure.  Plaintiffs provided comments on the November 8, 2022 version of the Policy and Procedure on November 18, 2022.  The Special Master commented on the revised Policy and Procedure on December 1, 2022.  Finally, on January 20, 2023, defendants responded to the Special Master's and plaintiffs' comments and questions and indicated CDCR would begin the process of finalizing the policy.

As of the time of this writing, the revisions to CDCR's PIP Housing Review/Least Restrictive Housing Policy and Procedure had not been finalized.

### D.    UNIDENTIFIED NEEDS ASSESSMENT

As the Special Master previously reported, the Court-ordered Unidentified Needs Assessment (UNA) launched during the Twenty-Ninth Monitoring Round.  Special Master's Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 65.  In April 2022, defendants began the process of reviewing identified UNA cases.  *Id.* at 68.

As of the time of this writing, defendants have completed all phases of the UNA clinical case review process.  According to a stipulated agreement of the parties approved by the Court on December 13, 2022, defendants indicated they would need a period of 90 days to draft their UNA Report, during which time the Special Master and plaintiffs will be provided an opportunity to comment on a draft version of the UNA Report.  ECF No. 7680 at 2-3.  Defendants are required to file the results of the UNA study by June 30, 2023.  *Id.* at 5.

The recently completed clinical review of UNA cases was a significant undertaking and the Special Master acknowledges the efforts of all those involved.  The Special Master looks forward to reviewing defendants' draft report on the results of the UNA study in the coming weeks.

### E.    AREAS OF FOCUS: ISSUES DEFENDANTS NEED TO ADDRESS REGARDING INPATIENT CARE

#### 1.    Staffing Vacancies

In the preceding monitoring report on CDCR's PIPs, the Special Master noted that the "Lift and Shift PIPs [were] in a crisis, primarily driven by deficiencies that have plagued defendants' mental health care system throughout the long history of this case, including dangerously high staffing vacancies at some programs."  ECF No. 7555 at 37.  Sadly, at the time

of the monitoring tours, staffing vacancies at two of the three Lift and Shift PIPs remained

"dangerously high" and, in some cases, had worsened since the preceding monitoring round.

With the exception of SVSP-PIP, any positive impact resulting from the steps defendants have

taken to improve staffing levels at the Lift and Shift PIPs since the preceding review period were

not apparent at the time of the monitoring tours.[13]

The charts below compare the functional vacancy rates observed during the Twenty-

Ninth and Thirtieth Monitoring Rounds in the four key mental health staff disciplines at the Lift

and Shift PIPs.[14]

---

[13] In the Twenty-Ninth Round Monitoring Report – Part A, the Special Master noted defendants' plan to increase compensation for mental health clinicians at the PIPs: "On April 21, 2022, CDCR notified the Special Master and plaintiffs of pending compensation increases for PIP clinicians.  First, 'CDCR recently noticed the unions about a 15% pay differential for civil service psychologists, social workers, psychiatrists, psychiatric technicians, and rehabilitation/recreation therapists physically working in one of CDCR's five Psychiatric Inpatient Programs.'  In addition, retention bonuses, which are currently provided to civil service psychiatrists, are planned to be extended to civil service psychologists.  The frequency of retention bonuses for both classes will increase.'  As of the time of this writing, these proposals were intended to take effect on May 1, 2022, subject to labor negotiations.  Finally, CDCR indicated that CDCR 'entered into a new contract for registry psychiatrists, psychologists, psychiatric nurse practitioners, social workers, and recreational/rehabilitation therapists,' which included increased rates for psychologists, social workers, and recreational/rehabilitation therapists."  ECF No. 7555 at 40 n.19 (citations omitted).

[14] For Twenty-Ninth Round staffing vacancy data, see ECF No. 7555 at 52 (displaying chart reporting functional vacancy rates for the Lift and Shift PIPs "at the time of the site visits.").  For Thirtieth Round staffing vacancy data, *see infra* Appendix A1 at 119-121, Appendix A2 at 166-169, and Appendix A3 at 208-209.

**Figure 1**



**Figure 2**



**Figure 3**



As demonstrated above, as of the time of the respective monitoring tours, SVSP-PIP was the only Lift and Shift PIP to show significant improvement in mental health staffing vacancies compared to the preceding monitoring period. Functional vacancies for two of four mental health staff classifications (psychiatry and recreation therapy) at SVSP-PIP were under ten percent. SVSP-PIP reported an 11 percent vacancy rate for psychology and a concerning 29 percent functional vacancy rate among social workers.

At both CHCF-PIP and CMF-PIP, mental health staffing vacancies remained unacceptably high, and in some instances, the functional vacancies observed at the time of the monitoring tours were worse than those observed in the Twenty-Ninth Monitoring Round. At CMF-PIP and CHCF-PIP, all four mental health staff classifications had functional vacancy rates in excess of ten percent. The functional vacancy rate for only one classification at CMF-PIP (psychiatry) was below 20 percent; functional vacancies among the other three classifications (psychology, social work, and recreation therapy) were near or in excess of 50 percent. At

CHCF-PIP, functional vacancies for all four classifications exceeded 30 percent, with functional vacancies in excess of 50 percent for two classifications (psychology and social work).

Consistent with the preceding monitoring round, the CDCR-developed PIPs "faced staffing challenges in certain disciplines at the time of the respective monitoring tours, [though] staffing vacancies at these programs were not at the seriously inadequate levels observed in the Lift and Shift PIPs."  ECF No. 7555 at 52.[15]

**Figure 4**



---

[15] For Twenty-Ninth Round staffing vacancy data, see ECF No. 7555 at 53 (displaying chart reporting functional vacancy rates for the CDCR-developed PIPs at the time of the site visits.). For Thirtieth Round staffing vacancy data, *see infra* Appendix A4 at 241-242 and Appendix A5 at 265-266.

**Figure 5**



At the time of the monitoring tour, all mental health classifications at CIW-PIP had vacancies in excess of ten percent.  Functional vacancies for psychiatry, social work, and recreation therapists had increased since the preceding round, while functional vacancies among psychologists decreased.  At SQ-PIP, functional vacancies among psychiatrists, psychologists, and recreation therapists were below ten percent, while social worker functional vacancies were significantly above ten percent.

The negative impact of mental health staffing vacancies on the *Coleman* class is well documented in this case and has been the subject of the Special Master's monitoring reports and the Court's orders for more than 20 years.  During the review period, staffing vacancies impacted all aspects of the provision of mental health care to *Coleman* class members.  Among the impacts observed were less frequent individual clinical contacts, utilization of nonconfidential contacts, extremely limited amount of structured treatment, and the absence of core mental health groups.  Staffing vacancies also inhibited the PIP's respective quality management programs as well as the implementation of the Statewide System to Encourage Progress (STEP) Program.  The use of

unlicensed clinicians without appropriate supervision due to vacancies in supervisory positions was also concerning.

As demonstrated above and reported on in detail in this Report, the significant mental health staffing vacancies observed during the monitoring round have pervasive, negative impacts on the *Coleman* class.  Moreover, the potential harm to members of the *Coleman* class – especially those class members whose illness requires inpatient hospitalization – who go without needed treatment due to these vacancies is unacceptable.  As the Special Master noted in the preceding monitoring report on CDCR's PIPs, "[t]he *Coleman* class cannot afford further delays in remedying the staffing crisis that exists in the Lift and Shift PIPs."  ECF No. 7555 at 37.

## 2.    **Referrals and Transfers**

In the Twenty-Ninth Round Monitoring Report – Part A, the Special Master reported "[t]here were significant decreases in acute and intermediate care referrals" compared to the Twenty-Eighth Monitoring Round.  ECF No. 7555 at 122.  In addition, the Special Master observed the marked decrease in inpatient referrals after the onset of the COVID-19 pandemic. *Id.* at 57-58 ("While defendants were faced with waitlists for inpatient care that had swelled to more than 300 by January 2021, CDCR referred significantly fewer patients to inpatient care compared to the preceding round, a trend that began at the beginning of the [COVID-19] pandemic.").  Specifically, the Special Master noted that the number of referrals to CDCR's PIPs, inclusive of both referrals to acute and intermediate care "was consistently near to or well in excess of 300" referrals per month between August 2017 – March 2020.  *Id.* at 58.  During the height of the pandemic, combined acute and intermediate care referrals ranged between 100 to 200 per month until February 2021.  *Id.* at 59.  After defendants loosened COVID-19 related restrictions on programming and movement, "inpatient referrals ranged from a low of 140 to a high of 282 per month." *Id.*

During the review period, referrals to several PIPs increased compared to the preceding monitoring round.[16]  CMF-PIP experienced the most dramatic increase in referrals compared to the preceding monitoring round, with a 94 percent increase in combined referrals to acute and intermediate care.  *Compare* ECF No. 7555 at 122 (reporting 134 acute care referrals to CMF-PIP and 79 intermediate care referrals (213 total)), *with infra* p. 143 (reporting 414 combined acute and intermediate care referrals to CMF-PIP during the review period).  Notably, there were significantly more referrals to CMF-PIP compared to CHCF-PIP during the review period.

Defendants' monthly inpatient census and waitlist filing indicate that referrals to CDCR's PIPs remain significantly below pre-COVID-19 levels, consistent with the findings from the preceding review of CDCR's PIPs.  The figure below includes referral data included in defendants' monthly filings covering June 2022 (first month of the review period) through February 2023, the most recently filed census and waitlist report.[17]

---

[16] During the Twenty-Ninth Monitoring Round, CHCF-PIP and SVSP-PIP did not provide reliable referral data.  *See* ECF No. 7555 at 122 ("CHCF-PIP and SVSP-PIP did not provide reliable referral data for patients endorsed to the programs during the review period.").  As such, comparisons to the number of referrals from preceding monitoring round are not possible for these programs.

[17] *See* ECF No. 7590 at 22 (June 2022); ECF No. 7604 at 21 (July 2022); ECF No. 7612 at 21 (August 2022); ECF No. 7628 at 21 (September 2022); ECF No. 7662 at 21 (October 2022); ECF No. 7684 at 21 (November 2022); ECF No. 7701 at 21 (December 2022); ECF No. 7730 at 21 (January 2023); ECF No. 7762 at 21 (February 2023).

**Figure 6**



On a positive note, CDCR timely transferred patients referred to the PIPs during the review period. CHCF-PIP was a notable exception, timely transferring "only seven percent of acute care patients and three percent of intermediate care patients." *Infra* p. 164.

While transfers were timely during the review period, defendants' most recently filed inpatient census and transfer reports suggest defendants are backsliding on timely transfer of ICF referrals to the PIPs. *See* ECF No. 7701 at 21 (reporting 35 ICF referrals in December 2022 out of compliance for a total of 219 days); ECF No. 7730 at 21 (reporting 43 ICF referrals in January 2023 out of compliance for a total of 570 days); ECF No. 7762 at 21 (reporting 30 ICF referrals in February 2023 out of compliance for a total of 474 days).

Notably, on February 27, 2023, the Court issued an order resetting a previously scheduled hearing[18] to August 25, 2023 "for consideration of findings of contempt and requirements of

---

[18] In its order, the Court noted that the original November 3, 2017 contempt hearing was initially vacated due to defendants' appeal of the underlying order and had not previously reset the hearing "in part due to proceedings on a whistleblower report initially presented to the court in October 2018" and, more recently, the onset of the COVID-19 pandemic. ECF No. 7741 at 2.

payments of fines that have accumulated on or after May 16, 2017." ECF No. 7741 at 2. The Court ordered the parties to meet and confer and propose a briefing schedule "for providing the court with their positions regarding contempt findings and fines as well as a proposed plan for the proceedings." *Id.*

### 3. <u>Least Restrictive Housing (LRH) Placements</u>

The Special Master previously noted that "[o]ngoing attention to patients' LRH before and after admission to inpatient care is necessary to providing appropriate care in the least restrictive setting, unless the placement is contraindicated for clinical and/or custodial reasons." Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation, ECF No. 5894 at 21. In the Twenty-Ninth Round Monitoring Report – Part A, the Special Master noted "[t]he decrease in PIP patients housed above their LRH was one of the few positive findings regarding the Lift and Shift PIPs during the monitoring round." ECF No. 7555 at 62.

As reported below, during the review period, "CMF-PIP reported a decrease in patients housed above their least restrictive housing (LRH) level," while CHCF-PIP, SVSP-PIP, and CIW-PIP all reported increases. *Infra* p. 81.

The Special Master notes that CDCR has indicated its intent to issue a revised PIP Housing Review/Least Restrictive Housing Policy. *See supra* pp. 24-25. The Special Master will monitor defendants' implementation of their new policy and will continue to report on LRH going forward.

### 4. <u>Access to Department of State Hospitals DSH Programs</u>

While the Special Master will report separately on the three DSH hospitals providing inpatient mental health care to *Coleman* class members, a brief review of defendants' recent

inpatient census and waitlist reports is warranted.  In the preceding monitoring report on

CDCR's PIPs, the Special Master noted the following:

> Access to DSH programs was a concern throughout the monitoring round. Defendants' monthly inpatient census reports indicated *historically low Coleman patient censuses at both DSH-Atascadero and DSH-Coalinga* during the round. *With more than 100 of DSH-Atascadero's 256 Coleman-designated beds routinely remaining empty during the monitoring round*, the Special Master identified the low Coleman patient counts at DSH facilities as a concern in a variety of workgroup and All-Parties meetings and urged defendants to admit eligible patients to DSH programs to alleviate stress elsewhere in defendants' inpatient mental health care system.

ECF No. 7555 at 63 (emphasis added).

Defendants recent inpatient census and waitlist reports demonstrate that the number of

"available" DSH beds has reached new heights.  As of February 27, 2023, there were only 58

*Coleman* patients at DSH-Atascadero, leaving 198 beds open.[19]  The chart below includes the

number of available beds at each DSH hospital since June 2022 and demonstrates that near or in

excess of 200 beds designated for male class members have been unoccupied by *Coleman*

patients.

---

[19] In the Twenty-Ninth Round Monitoring Report-Part B, covering the DSH hospitals, the Special Master reported the following regarding bed utilization in DSH-Atascadero's *Coleman* program: "In addition to housing 131 *Coleman* patients, Program V housed 125 non-*Coleman* patients, totaling 256 patients.  Program V beds occupied by non-Coleman class members included patients who were not guilty by reason of insanity (PC 1026) and offenders with a mental health disorder (OMHDs, PC 2962).  The 131 *Coleman* patients occupied 51 percent of Program V's beds."  ECF No. 7625 at 46.

**Available Beds at DSH Hospitals – June 2022 – February 2023[20]**

|  | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 |
|---|---|---|---|---|---|---|---|---|---|
| **Male** |  |  |  |  |  |  |  |  |  |
| DSH-Atascadero | 166 | 167 | 162 | 169 | 180 | 187 | 191 | 184 | 198 |
| DSH-Coalinga | 34 | 31 | 28 | 29 | 31 | 27 | 23 | 24 | 23 |
| *Male subtotal* | 200 | 198 | 190 | 198 | 211 | 214 | 214 | 208 | 221 |
| **Female** |  |  |  |  |  |  |  |  |  |
| DSH-Patton | 21 | 21 | 20 | 19 | 23 | 26 | 26 | 27 | 27 |

Moreover, the presence of "stress elsewhere in defendants' inpatient mental health care system" was evident during the monitoring tours at the Lift and Shift PIPs, as reported herein. The importance of the *Coleman*-designated at DSH is well documented in this case. *See, e.g.*, June 27, 2006 Order, ECF No. 1855 at 2 ("[DSH] plays a critical role in creating sustainable and effective solutions for inpatient care within the California Department of Corrections and Rehabilitation…"); Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation, ECF No. 5894 at 22 ("Providing timely access to DSH beds for all CDCR inmates who meet clinical and custodial requirements for placement at DSH-Atascadero, DSH-Coalinga, and DSH-Patton is essential to the remedial process in the *Coleman* case."). Accordingly, defendants' failure to utilize more than 200 *Coleman*-designated beds at DSH hospitals in recent months remains deeply concerning.

---

[20] *See* ECF No. 7590 at 7 (June 2022); ECF No. 7604 at 6 (July 2022); ECF No. 7612 at 6 (August 2022); ECF No. 7628 at 6 (September 2022); ECF No. 7662 at 6 (October 2022); ECF No. 7684 at 6 (November 2022); ECF No. 7701 at 6 (December 2022); ECF No. 7730 at 6 (January 2023); ECF No. 7762 at 6 (February 2023).

It appears that the underuse of *Coleman*-designated beds at DSH is in part attributable to the fact that many patients referred to inpatient care require a higher LRH than unlocked dorms, resulting in underutilization of the DSH beds.  The Special Master will provide a further update regarding *Coleman* patients' access to DSH hospitals in the forthcoming Thirtieth Round Monitoring Report – Part B.  *See supra* note 4.

> 5.    **Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group Therapy, and Individual Treatment**

This Report includes the Special Master's detailed findings regarding clinical services and treatment in inpatient programs.  In addition to the findings contained in the individual institutional summaries, the Special Master's findings regarding treatment and clinical services, including IDTTs, group treatment, individual treatment, behavioral management, and solo programming are included in Part II(B).  In addition, the monitor's expert's clinical case reviews are summarized in Part II(C).

As noted below, mental health treatment and services delivered to the Coleman class during the review period were inadequate.  Not surprisingly, the significant staffing vacancies among the mental health disciplines in PIPs were a major contributing factor to the deficiencies observed during the monitoring round.  *Infra* p. 43 ("While CDCR leadership primarily attributed the lack of sufficient mental health services during the preceding monitoring round to COVID-19 related restrictions, deficiencies identified during the current round were most often attributed to staffing vacancies.").

Likewise, the monitor's expert's clinical case reviews revealed widespread deficiencies across the five programs, though, consistent with the preceding review, "fewer concerns were demonstrated at the CDCR-developed programs."  *Infra* p. 52.  Indeed, the vast majority of patients (77 percent) "received care of inadequate quality during the reporting period."  *Infra* p.

37

52.  The monitor's expert determined that 31 percent of reviewed patients received adequate quality care, while five percent received marginally adequate care.[21]  As reported below, "the CDCR-developed PIPs were providing more care of adequate quality than the 'Lift and Shift' PIPs."  *Infra* p. 52; *see also infra* p. 53 (displaying chart which reports 59 percent of SQ-PIP cases and 52 percent of CIW-PIP cases received adequate quality care, compared to 32 percent at CHCF-PIP, 11 percent at SVSP-PIP, and no adequate quality cases at CMF-PIP).

As will be demonstrated in greater detail below, to remedy deficiencies that have been repeatedly identified, these areas of focus "continue to 'require [defendants'] full engagement and attention."

**PART II.**
**THE SPECIAL MASTER'S FINDINGS AT THE PSYCHIATRIC INPATIENT PROGRAMS**

**A.    STAFFING[22]**

Federal court oversight of CDCR will not end until there is full implementation of defendants' staffing plan.  ECF No. 5711 at 1.  Although the court-approved PIP staffing plan remains in place, during the Thirtieth Monitoring Round all five PIPs continued to report unacceptably high vacancy rates for many positions.

Overall, the three PIPs with staff psychiatry supervisory positions, namely, the CHCF-PIP, CMF-PIP, and SVSP-PIP, reported that all five of their staff psychiatry supervisor positions were vacant.  There was also an overall 64 percent staff psychiatry vacancy rate, although

---

[21] The monitor's expert notes that mental health care that was determined to be "marginally adequate quality" means "that there were concerns in the care of the patient that bordered on inadequacy (e.g., failure to provide required contacts, limited access to structured treatment, poor continuity of care.")."  *Infra* p. 52.

[22] The source for this data is the Psychiatric Inpatient Program (PIP) Staffing Data that is part of the *Coleman* Monthly Report reflective of January 2023 data that was reported on March 15, 2023.

registry staff decreased it to 26 percent.  As for psychology, the PIPs reported combined vacancy rates of 57 percent for senior psychologist supervisors, 39 percent for senior psychologist specialists, and 68 percent for staff psychologists, which contractors reduced to 46 percent.

Further, the overall social worker vacancy rate at the five PIPs was 56 percent, which registry staff reduced to 49 percent.  There was also an overall vacancy rate of 42 percent for recreation therapists, which contractors reduced to 28 percent, and a 14 percent vacancy rate for psych techs.  The consequential result of these staffing shortages were inadequacies in provided treatment and care for patients.

Regrettably, these staffing shortages had a severe negative impact on the provision of treatment provided by the PIPs.  Specifically, they resulted in CMF-PIP leadership managing the delivery of acute care by prioritizing certain treatment areas, including SRASHE completion, timely IDTTs, case review prior to discharge, and monitoring treatment hours, at the expense of other treatment areas.  Due to staffing shortages, the CMF-PIP also prioritized available staff for clinical activities such as individual contacts and IDTTs, while they resulted in RTs primarily facilitating groups, which often consisted of recreational activities, and not having PCs conduct groups in the intermediate care program.  SVSP-PIP leadership acknowledged challenges consistently offering patients a sufficient number of group treatment hours, which was in part due to inadequate staffing.

Staffing shortages also adversely impacted PIP quality management.  At the CHCF-PIP, they led to the quality management program's less than optimal performance; this resulted in the quality management support unit's limited ability to audit and drill down on deficient indicators, develop corrective action and sustainability plans, and update PIP policies.  CMF-PIP quality management activities were similarly limited secondary to staffing shortages, and especially due

to vacancies in leadership positions.  Staffing vacancies also impeded quality management at the SVSP-PIP, and were the reason why the facility did not conduct utilization management audits.

Staffing shortages also impacted the use of PBSTs.  They were the largest barrier to PBST availability at the CHCF-PIP, while insufficient staffing was the reason that the CMF-PIP had lacked a formal PBST since September 2021.[23]  Further, since August 2022, the SVSP-PIP had developed behavioral plans for only six of 19 patients who had been referred for them, which was attributed to staffing shortages.

Staffing shortages adversely impacted many other aspects of PIP treatment.  They adversely impacted medication management at the CHCF-PIP, the completion of rules violation report (RVR) mental health assessments at the SVSP-PIP, and were a barrier to STEP implementation, and the reason that pre-release groups were not offered at the CMF-PIP.   At the CMF-PIP and the SQ-PIP, staffing shortages resulted in nonconfidential patient contacts and IDTTs.

Chief Psychiatrists

At the five PIPs, there were four chief psychiatrists for a total of four positions, indicating

---

[23] In their response to the Draft Report, defendants noted that utilization of positive behavioral support teams is not required by the Program Guide "or part of the Coleman remedy."  Exhibit A at 2.  While it is true that PBST is not a specific requirement of the Program Guide, the intervention is clinically indicated for many *Coleman* class members.  Accordingly, the Special Master has and will continue to monitor the use of PBST in CDCR.  Moreover, in their objections to the Draft Report, defendants appear to have overstated the extent to which PBST was not part of the Coleman remedy.  As recently as December 2021, the parties reached a stipulated agreement regarding the use of therapeutic treatment modules, which included defendants' agreement to "take all steps necessary to ensure that treatment in the PIPs targets behaviors that result in patients being placed or continued on Max custody if mental health symptoms may have contributed to the behavior(s), and that such treatment is addressed toward the goal of helping patients get off of Max custody when appropriate.  Such steps include, but are not limited to, continuing the already-established PBST program and implementing the STEP program."  ECF No. 7392 at 3.

an overall zero percent vacancy rate.  The chief psychiatry positions at both the CMF-PIP and the CIW-PIP were filled, while the CHCF-PIP had two chief psychiatrists for one position.  The SVSP-PIP's chief psychiatrist position was vacant.  The SQ-PIP did not have a chief psychiatrist position.

### Senior Psychiatrist Supervisors

There were a total of five senior psychiatrist positions; there were two positions each at the CHCF-PIP and CMF-PIP, and one position at the SVSP-PIP.  Regrettably, all five positions were vacant, for a 100 percent vacancy rate.

### Staff Psychiatrists

Overall, at the five PIPs, 28.5 of 79.7 staff psychiatry positions were filled, reflecting a significant 64 percent vacancy rate.  The use of 29.91 registry staff decreased the number of staff psychiatry vacancies to 21.29 and reduced the overall staff psychiatry functional vacancy rate to a still noncompliant 27 percent.

All five PIPs reported unacceptably high psychiatry vacancy rates.  There were astounding vacancy rates of 91 percent at the SVSP-PIP, 65 percent at the CMF-PIP, and 61 percent at the CHCF-PIP, as well as staff psychiatry vacancy rates of 44 percent at the CIW-PIP, and 22 percent at the SQ-PIP.  However, the use of contractors at three of the institutions reduced the functional vacancy rates to 38 percent at the CHCF-PIP, 23 percent at the CMF-PIP, and one percent at the SVSP-PIP.

### Chief Psychologists

Each of the five PIPs had an authorized chief psychologist position, for a total of five positions.  All five positions at the CMF-PIP, CHCF-PIP, SVSP-PIP, CIW-PIP, and the SQ-PIP were filled.  None of the positions were filled by registry staff.

Senior Psychologist Supervisors

Of a total of 10.5 senior psychologist supervisor positions, 4.5 were filled, for an overall 57 percent vacancy rate. Notably, the 0.5 CIW-PIP position and all of the 3.75 senior psychologist supervisor positions at the CMF-PIP were vacant. Further, the SVSP-PIP and CHCF-PIP reported respective 33 and 31 percent vacancy rates for this position; at the SQ-PIP, a 0.5 senior psychologist supervisor filled the 0.4 position.

Senior Psychologist Specialists

Overall, there were a total of 4.9 senior psychologist specialist positions, of which three positions were filled, for a 39 percent vacancy rate. One of 2.5 positions at the CIW-PIP was filled, for a 60 percent vacancy rate. Two of 2.4 of these positions at the SQ-PIP were filled, for a vacancy rate of 17 percent.

Staff Psychologists

The five PIPs had a total of 82.2 staff psychologist positions, of which only 26 were filled, for an alarming 68 percent vacancy rate. Contractors covered 18.04 positions, reducing the overall functional vacancy rate to a still unacceptable 46 percent. There were vacancy rates of 77 percent at the CMF-PIP, 74 percent at the CHCF-PIP, 55 percent at the SVSP-PIP, and 44 percent at the CIW-PIP. Only the SQ-PIP reported compliance for staff psychologists with a six percent vacancy rate. However, the use of registry staff reduced the functional vacancy rates at three of the institutions to 56 percent at the CHCF-PIP, 51 percent at the CMF-PIP, and 19 percent at the SVSP-PIP.

Social Workers

There were a total of 72.1 social worker positions at the five PIPS, of which 31.5 were filled, for a 56 percent vacancy rate. Registry staff covered another 5.49 positions, reducing the

overall functional vacancy rate to 49 percent.  Regrettably, there were vacancy rates of 82 percent at the CMF-PIP, 52 percent at the CHCF-PIP, 38 percent at the SQ-PIP, 29 percent at the SVSP-PIP, and 17 percent at the CIW-PIP.  Contractors reduced the functional vacancy rates at three of the institutions to 73 percent at the CMF-PIP, 42 percent at the CHCF-PIP, and 24 percent at the SVSP-PIP.

### Psych Techs

There were a total of 324 psych tech positions, of which 279 positions were filled, for a 14 percent vacancy rate.  There were reported institutional vacancy rates of 81 percent at the CIW-PIP, 52 percent at the SVSP-PIP, ten percent at the CMF-PIP, and less than one percent at the CHCF-PIP.  Notably, registry staff filled an additional 2.31 positions, slightly reducing the overall functional vacancy rate to 13 percent, and reducing the SVSP-PIP functional vacancy rate to 46 percent.  The SQ-PIP did not have psych techs.

### Recreation Therapists

Of a total of 77.4 recreation therapist positions, 45 were filled, for a 42 percent vacancy rate.  Contractors filled another 10.63 positions, decreasing the overall recreation therapy functional vacancy rate to 28 percent.  However, there were individual vacancy rates of 60 percent at the CMF-PIP, 47 percent at the CHCF-PIP, 17 percent at the CIW-PIP, six percent at the SQ-PIP, and two percent at the SVSP-PIP.  Registry staff further reduced the functional vacancy rates to 39 percent at the CMF-PIP, and 31 percent at the CHCF-PIP.

## B.    TREATMENT AND CLINICAL SERVICES

Similar to what was reported in the Special Master's Twenty-Ninth Monitoring Round Report, the mental health treatment offered to the highest acuity *Coleman* class members within CDCR's PIPs was inadequate.  While CDCR leadership primarily attributed the lack of sufficient mental health services during the preceding monitoring round to COVID-19 related restrictions,

deficiencies identified during the current round were most often due to staffing vacancies. PIP patients in acute and intermediate care programs experienced ongoing problems with access to sufficient hours of structured therapeutic activities; clinically indicated treatment interventions, such as core clinical groups, dialectical behavior treatment (DBT), and positive behavior support plans (PBSPs); and timely required contacts, including for IDTTs, initial assessments, and routine primary clinician and psychiatry appointments. Further, collaborative and effective treatment care planning during IDTTs was often compromised by issues with attendance for required members, poor care collaboration, and deficiencies in IDTT practices. While relative improvement in maximum custody patients' access to mental health treatment was noted during the current monitoring round, this subpopulation of *Coleman* class members continued to experience significant access to care issues in nearly all PIP institutions.

a)    <u>**IDTTs**</u>

1.    <u>**CMF-PIP, CHCF-PIP, and SVSP-PIP**</u>

At CMF-PIP, the majority of observed acute care IDTTs were inadequate due to multiple deficiencies. They included a lack of consistent attendance among required disciplines, lack of collaboration, and lack of computer access and input from the correctional counselor. Shortcomings also included a failure to discuss STEP program related information, use of generic assessment questions for all patients, and failures to develop realistic and measurable treatment goals. All observed intermediate care IDTTs at CMF-PIP were inadequate, primarily due to lack of discussions regarding critical patient information and IDTTs' siloed approach to patient care.

At CHCF-PIP, observed acute care IDTTs were collaborative and adequate, while intermediate care IDTTs varied in quality. CHCF-PIP's maximum custody IDTTs appropriately

included discussion of goals and targets that addressed patients' presenting concerns and custodial factors.

Observed IDTTs at SVSP-PIP revealed widespread deficiencies affecting the quality and utility of the treatment team meetings. IDTTs in the Treatment Center and on Facility C lacked collaboration and discussions involving critical patient information for effective treatment, safety planning, and level of care determinations. Further, SVSP-PIP's Facility C IDTTs failed to review and provide recommendations regarding maximum custody related treatment planning and classification, despite maximum custody patients on Facility C having no access to treatment groups, minimal confidential individual treatment contact offerings, and extremely limited out-of-cell time.

### 2. CIW-PIP and SQ-PIP

As CIW-PIP and SQ-PIP were completed as paper reviews without on-site monitoring of services, IDTTs were not observed during this round.

### b) Group Treatment

Similar to the preceding monitoring period, the majority of PIP patients were offered insufficient structured therapeutic activity hours. Despite patients and staff reporting the need for more core clinical groups and more group hours in general, the PIPs continued to rely too heavily on recreation therapy groups in their provision of structured treatment activity. While nursing-led treatment groups (NLTG) were implemented in the PIPs, group data was either unreliable or not provided at all due to insufficient tracking practices.

### 1. CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP's acute care patients were offered an average of less than five hours of weekly group treatment. CMF-PIP was unable to provide group treatment hourly data for intermediate care patients; however, mental health staff and patients overwhelmingly reported that insufficient

group treatment hours were offered in the program. Group treatment was not offered at all in three of CMF-PIP's housing units (A-2, A-3, and the High Custody Intermediate Treatment Center (HCITC)). Due to staffing vacancies among mental health clinicians, CMF-PIP did not offer core treatment groups. Instead, groups were primarily facilitated by recreation therapists and nursing staff. While NLTGs were reportedly offered during the review period, relevant data was neither collected nor provided, including for hours offered or attended due to insufficient tracking practices. The monitor's expert observed four treatment groups and noted that only two were adequate. The two inadequate groups showed patients movies that were not relevant to the group topic, and there were no follow-up discussions.

Maximum custody patients in CMF-PIP's intermediate program were appropriately offered treatment groups upon admission or immediately after the change in designation to maximum custody. However, while CMF-PIP reported that they scheduled 16 hours of recreation therapy groups for intermediate care maximum custody patients, they did not sufficiently track or provide treatment data for hours offered, attended, or refused. Additionally, interviewed maximum custody acute care program patients reported that they were offered only one group per week.

CHCF-PIP offered acute care non-maximum custody patients an average of 7.4 hours of weekly structured treatment activities. Weekly structured treatment activity hours offered to acute care maximum custody patients were inadequate, ranging from between one and six hours during the review period. The majority of CHCF-PIP's intermediate care groups were facilitated by recreation therapists or psych techs, and primarily consisted of leisure activities. However, core groups were offered at CHCF-PIP, and the monitor's expert noted the observed core groups were adequate in terms of facilitation and content. The offered structured and unstructured out-

46

of-cell time for maximum custody patients at CHCF-PIP was inadequate during the review period, and maximum custody patients reported a lack of access to treatment groups prior to the implementation of TTMs in January 2023.  Additionally, CHCF-PIP reported that maximum custody patients housed in non-maximum custody units were offered weekly individual contacts in lieu of treatment groups due to a lack of TTMs available on those units.

SVSP-PIP leadership acknowledged that group hours currently offered to intermediate care patients were generally insufficient, and emphasized the need to fill vacant clinical positions in order to increase group hours.  While SVSP-PIP offered some core groups, including to maximum custody patients in TC1 and non-maximum custody patients on Facility C, most groups were recreational in nature and patients were only offered an average of 5.6 weekly hours of structured treatment activities overall.  SVSP-PIP's observed treatment groups were generally adequate in terms of facilitation and content; however, the clinical staff reported that SVSP-PIP's Treatment Center groups routinely started late and ended early due to custody escorting issues. This issue was observed by the monitor's expert as well.  On Facility C, SVSP-PIP maximum custody patients were not offered treatment groups at all, and non-maximum custody patients were inappropriately handcuffed during escort across an active general population yard to available treatment group rooms.  Not surprisingly, staff and patients identified the Facility C cuffing practice as a safety issue and a significant barrier to treatment group attendance.

### 2.    CIW-PIP and SQ-PIP

CIW-PIP did not separate hourly treatment data for acute and intermediate care programs. However, the provided data suggested that patients did not have sufficient access to structured therapeutic activities, only offering an average of 3.75 hours of weekly treatment.  PIP patients'

limited access to sufficient group treatment hours was both concerning and surprising considering the low census maintained throughout most of the review period.

At SQ-PIP, primary clinicians facilitated core groups, which were offered five days per week.  Supplemental groups were offered weekly, including recreation therapy groups and NLTGs.  According to SQ-PIP's treatment hour data, acute care patients were offered an average of 10.5 hours of weekly structured treatment activities, while intermediate care patients were offered an average of ten weekly hours of structured treatment activities.

As SQ-PIP and CIW-PIP were completed as paper reviews, treatment group quality at these inpatient facilities was not monitored during this round.

**c)** **Contact Compliance**

Compliance reviews for timely initial and routine mental health appointments and required IDTT attendance were conducted and varied across all PIP institutions.

**1.** **CMF-PIP, CHCF-PIP, and SVSP-PIP**

At CMF-PIP, required IDTT attendance was low in both the acute and intermediate care programs, with acute care initial IDTTs reflecting a 44 percent attendance rate, acute care routine IDTTs at 34 percent, intermediate care initial IDTTs at 63 percent, and intermediate care routine IDTTs at 55 percent.  While CMF-PIP demonstrated compliance for timely initial and routine IDTTs in the acute program, the intermediate care program was below 90 percent for initial IDTTs, reflecting 88 percent for initial IDTTs, 79 percent for routine IDTTs, 46 percent for routine psychiatry contacts, 50 percent for initial primary clinician contacts, and 63 percent for routine primary clinician contacts.

At CHCF-PIP, compliance for timely routine IDTTs, psychiatry, and primary clinician contacts was below 90 percent in both the acute and intermediate care programs.  For primary clinician contacts at CHCF-PIP, timely initial and routine primary clinician contact compliance

was below 60 percent in the acute program, and no required initial primary clinician contacts were completed timely in the intermediate program. Additionally, acute care program maximum custody patients at CHCF-PIP were not regularly offered individual contacts during November and December 2022 due to staffing coverage issues. The CHCF-PIP maintained compliance for required attendees in intermediate care IDTTs; however, required attendance in acute care program IDTTs was extremely low for the review period, with acute care initial IDTTs at six percent and acute care routine IDTTs at 24 percent.

For SVSP-PIP's intermediate care patients housed in the Treatment Center, required routine psychiatry contacts, primary clinician contacts, and initial primary clinician contacts were noncompliant. For SVSP-PIP's intermediate care patients housed on Facility C, compliance was low for routine psychiatry contacts, initial and routine primary clinician contacts, and initial and routine IDTTs.

### 2. **CIW-PIP and SQ-PIP**

CIW-PIP maintained compliance for timely initial and routine IDTTs in both the acute and intermediate care programs. CIW-PIP also maintained compliance for timely initial and routine psychiatry contacts in the acute care program; however, compliance for timely initial and routine psychiatry contacts in the intermediate care program was below 90 percent, with initial psychiatry contacts at only 65 percent. Compliance for timely primary clinician contacts suffered in both the acute and intermediate care programs at CIW-PIP, with acute care initial primary clinician contacts at 77 percent, acute care routine primary clinician contacts at 53 percent, and intermediate care initial and routine primary clinician contacts at 55 percent. The CIW-PIP was compliant for required IDTT attendance in both the acute and intermediate care programs.

SQ-PIP maintained compliance with timely initial and routine IDTTs, as well as initial and routine psychiatry contacts in both the acute and intermediate care programs. While compliance was also maintained for initial primary clinician contacts in SQ-PIP's acute program, noncompliance was identified for acute care routine primary clinician contacts (56 percent), intermediate care routine primary clinician contacts (82 percent), and intermediate care initial primary clinician contacts (54 percent). SQ-PIP's compliance for required attendees during acute care initial IDTTs (67 percent) and acute care routine IDTTs (74 percent) was concerning, as was compliance for initial intermediate care IDTTs (83 percent).

d)     **Behavioral Management**

Staffing shortages in the PIPs continued to impact the availability of PBSTs and the development and implementation of adequate PBSPs.

1.     **CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP disbanded their positive behavior support team in September of 2021 due to inadequate staffing. There were no active PBSPs for any patients, despite staff identifying this as a needed service for patients, especially patients with repeated acts of self-harm and behaviors resulting in disciplinary actions.

The CHCF-PIP had two behavioral clinicians providing consultation and behavior interventions; however, all of the PBSPs developed or maintained during the review period were inadequate for a number of reasons, including their lack of specificity and deviation from basic PBSP principles.

Similar to the preceding monitoring period, SVSP-PIP did not have a PBST or a related local operating procedure, despite healthcare record reviews and staff reports suggesting a need.

>    ### 2.     CIW-PIP and SQ-PIP

The monitor's expert found that PBSPs were underutilized at CIW-PIP.  Only two PBSPs were developed during the review period, and only one was adequate.  Additionally, CIW-PIP continued to use "crisis plans," which gravely concerned the monitor's expert, as they essentially bypassed less restrictive interventions and resulted in automatic restraints with injectable medication when patients engaged in any degree of self-injurious behavior.  The use of restraints in this manner was a departure from Mental Health Services Delivery System (MHSDS) Program Guide requirements.

SQ-PIP received ten referrals for PBSP consultations and developed four PBSPs during the review period.  The behavior specialist was also involved in consultations and interventions for high treatment refusers.

### e)     Solo Programming

### 1.     CMF-PIP, CHCF-PIP, and SVSP-PIP

Neither the CMF-PIP nor the SVSP-PIP utilized solo programming.

CHCF-PIP provided data for solo programming for the review period.  For the eight maximum custody intermediate care patients on solo programming, CHCF-PIP offered an average of 76 hours of solo programming, with a range of 12 to 172 hours per patient.  A total of six CHCF-PIP non-maximum custody patients were offered an average of 40 hours of solo programming, with a range of three to 90 hours offered to each patient.  A total of 41 non-maximum custody patients were offered an average of 132 hours of solo programming, with a range of less than one hour to 425 hours offered to each patient.

### 2.     CIW-PIP and SQ-PIP

CIW-PIP and SQ-PIP did not provide requested information regarding the use of solo programming.

C.    **QUALITY OF CARE IN CDCR'S PIP PROGRAMS**

In prior monitoring round reports regarding the delivery of care in inpatient programs, the Special Master reported variability in the care provided across the PIPs.  Specifically, in the Twenty-Ninth Round Monitoring Report, reported inadequacies in the IDTT processes, accurate diagnoses, treatment planning, least restrictive housing considerations, and documentation quality were found, primarily in the "Lift and Shift" PIP programs (CHCF-PIP, CMF-PIP, and SVSP-PIP), while fewer concerns were demonstrated at the CDCR-developed programs (CIW-PIP and SQ-PIP).  During the Thirtieth Monitoring Round, there was a similar pattern to the findings.

Patient healthcare records were reviewed in detail to determine the quality of care provided during the reporting period across the PIPs.  In addition to analyses of IDTT processes, treatment planning, treatment implementation, and documentation, an overall assessment of the adequacy of treatment was provided for each case.  Of the 120 individual cases reviewed, 37 cases (31 percent) received care of adequate quality.  Another six cases, or five percent, received care that was of marginally adequate quality, meaning that there were concerns in the care of the patient that bordered on inadequacy (e.g., failure to provide required contacts, limited access to structured treatment, poor continuity of care).  The majority of patients, 77 cases, or 64 percent, received care of inadequate quality during the reporting period.

Overall, the CDCR-developed PIPs were providing more care of adequate quality than the "Lift and Shift" PIPs.  The graph and table below provide data on quality of care across facilities.



|  | CHCF | CMF | SVSP | SQ | CIW | ALL |
|---|---|---|---|---|---|---|
| **Adequate** | 32% | 0% | 11% | 59% | 52% | **31%** |
| **Marginally Adequate** | 8% | 0% | 0% | 5% | 12% | **5%** |
| **Inadequate** | 60% | 100% | 89% | 36% | 36% | **64%** |

**a)**     <u>**Inadequate Interdisciplinary Treatment Team (IDTT) Processes**</u>

The IDTT process required a number of elements for an effective, collaborative process which supported adequate patient care, including timely meetings, having the necessary members present during discussion (including the patient), providing an updated summary and formulation of the patient's clinical presentation, reviewing treatment progress since prior IDTT meetings, addressing any significant changes in the patient's presentation since the previous IDTT meeting, and discussing the patient's progress in the STEP program.

Across all PIPs, IDTTs were generally conducted timely. Required staff members were also routinely present during the IDTT meetings across all sites except CMF-PIP where nursing

staff were frequently absent from IDTT meetings [CMF-PIP Patient A], [CMF-PIP Patient C], [CMF-PIP Patient F], [CMF-PIP Patient H], [CMF-PIP Patient I], [CMF-PIP Patient K], [CMF-PIP Patient L], and [CMF-PIP Patient S].  Patients were consistently present for their IDTT meetings, unless they refused to attend, across most sites.  The exception was the ICF level of care at CIW-PIP, where patients were absent from IDTT meetings secondary to security staff shortages [CIW-PIP Patient J], [CIW-PIP Patient K], [CIW-PIP Patient Q], [CIW-PIP Patient R], [CIW-PIP Patient T], and [CIW-PIP Patient Y].

Updated clinical summaries and case formulations were lacking at CMF-PIP (12 of the 20 cases, or 60 percent) and SVSP-PIP (16 out of the 28 cases, or 57 percent).  Similarly, cases reviewed at CMF-PIP and SVSP-PIP lacked adequate evidence of the IDTT process including discussions of the patient's response to treatment, description of current functioning, and/or review of changes in symptoms or behavior since the previous IDTT meeting.  Of major concern at CMF-PIP and SVSP-PIP was the failure of the IDTTs to note significant events that had transpired for the patient since the previous IDTT meeting.  This included events such as the patients being placed on suicide watch following acts of self-injury or receiving RVRs for violent behavior.  For example, [CMF-PIP Patient D] was placed on suicide precaution status after reporting that he swallowed batteries and was on a hunger strike.  The next IDTT meeting included no discussion of the self-injury or the placement on suicide precautions status.  Upon discharge from the acute level of care, the discharge summary inaccurately noted that the patient had been free from self-injury throughout his inpatient stay.  Similarly, [SVSP-PIP Patient D] engaged in an assault on staff and required placement on suicide watch, neither of which were discussed in IDTT documentation.  In fact, IDTT documentation stated, "no new readily identifiable additional risk factors or behavioral alerts noted at this time" during the IDTT

following the patient's placement on suicide watch. Such omissions impacted not only the adequacy of treatment being provided to patients while at the inpatient level of care but extended into subsequent treatment decisions regarding the patient's needs.

The STEP program was initiated within the PIPs to create expectations for patient conduct and support engagement in pro-social and treatment activities through the use of incentives individualized for the patient. Most PIPs were using the STEP program with patients and were reviewing patient progress and providing incentives in keeping with policy. At CMF-PIP, however, discussion of the STEP program was absent from nine of the 20 records reviewed (45 percent).

The Program Guide required that initial assessments be completed prior to a patient's initial IDTT meeting in order to ensure that developed plans addressed the patient's identified needs. Records at SVSP-PIP, CMF-PIP, and SQ-PIP had inadequate and/or incomplete initial assessments by primary clinicians and psychiatrists. For [SVSP-PIP Patient M] initial assessments by both the psychiatrist and primary clinician (PC) were not completed prior to the patient's initial IDTTs; both were completed via record review following the IDTT and did not include interviews with the patient. For [CMF-PIP Patient P] initial assessments by both the psychiatrist and PC were completed timely, but primarily consisted of outdated information that was pulled forward from previous assessments, making it difficult to determine the patient's current functioning and identified needs. [CMF-PIP Patient C], [CMF-PIP Patient I], [CMF-PIP Patient K], [CMF-PIP Patient L], and [CMF-PIP Patient Q] had PC assessments without updated information. For [CMF-PIP Patient M], [CMF-PIP Patient N], and [CMF-PIP Patient S], there was no initial PC assessment located in the record. The initial psychiatric assessment was inadequate for [CMF-PIP Patient C].

b)    **Treatment Planning Concerns**

The Twenty-Ninth Monitoring Round revealed numerous concerns with the adequacy of mental health treatment plans primarily within the "Lift and Shift" PIP programs. Those concerns included treatment goals which did not align with patients' identified symptoms and/or treatment targets, treatment goals that were not updated despite changes in patients' clinical presentations since prior IDTTs, and generic treatment plans.

These concerns continued in the Thirtieth Monitoring Round with CMF-PIP and SVSP-PIP demonstrating the most concerns in the area of treatment planning. Treatment plans reviewed at both sites included treatment goals which did not address the patient's identified problems or symptoms, and vague and/or inappropriate treatment goals. Specifically, at CMF-PIP, ten of the 20 cases reviewed (50 percent) and at SVSP-PIP 11 of the 28 cases (39 percent) included treatment goals and/or individual plans of care (IPOCs) that did not match reported symptoms or treatment targets noted. At CMF-PIP, 14 of the 20 cases reviewed (70 percent) included vague treatment goals that were not measurable and/or achievable for the patient. As an example, [SVSP-PIP Patient L]'s treatment plan included a vague plan to "assist the patient" in stabilization and reduce hallucinations with the goal of reducing the patient's level of dangerousness.

All three "Lift and Shift" PIPs demonstrated a failure to routinely update treatment plans when clinically indicated. For CHCF-PIP, this issue was identified in 40 percent of cases reviewed (ten of 25 cases), for CMF-PIP 30 percent (six of 20 cases), and for SVSP-PIP 46 percent (13 of 28 cases). As an example, [CHCF-PIP Patient L] was placed at the ICF level of care following multiple episodes of self-injurious behavior and two serious suicide attempts. While the patient's treatment goals and interventions targeted his self-injurious behavior, no updates to specific goals or interventions were made throughout his stay, despite the patient

continuing to engage in these behaviors. Adequate care required that treatment goals and interventions which were ineffective in addressing a patient's needs be updated to help the patient achieve positive outcomes.

Treatment planning concerns were not absent from the cases reviewed at CIW-PIP and SQ-PIP but occurred less frequently than in the other programs. For example, IPOCs which failed to match reported symptoms or treatment targets were found in seven of the 25 cases (28 percent) at CIW-PIP and five of the 22 cases (23 percent) at SQ-PIP. Vague treatment goals were present in 20 and nine percent of cases reviewed at CIW-PIP and SQ-PIP, respectively. There was also a failure to update the treatment plan when clinically indicated in 24 percent of cases at CIW-PIP and nine percent at SQ-PIP.

In addition to developing measurable treatment goals, treatment planning included the identification and planning of multidisciplinary interventions to support the patient's progress toward treatment goals. At CMF-PIP and SVSP-PIP, treatment plans included nonspecific treatment interventions and/or lacked the use of evidence-based therapies to address patient's needs in 40 percent (eight of 20 cases) and 64 percent (18 of 28 cases) of cases reviewed, respectively. In comparison, only two cases at each of the other PIP locations evidenced non-specific treatment interventions in treatment plans (eight to nine percent of cases reviewed at each location). At CMF-PIP, records of patients at the ICF level of care (e.g., [CMF-PIP Patient M], [CMF-PIP Patient N], [CMF-PIP Patient S]) included pre-loaded interventions within the patients' IPOCs with the sections for "frequency" and "timeframe" of planned interventions left blank.

### c)      Delivery of Treatment Interventions and Structured Treatment Hours

Quality care required the provision of adequate and coordinated treatment interventions. Treatment interventions should be in keeping with the goals of the patient's treatment plan.

When significant changes in the patient's functioning, mental health status, or symptom presentation emerged, treatment interventions often needed to be modified.

Records were reviewed to determine if the treatment being provided to patients was in keeping with the treatment frequencies outlined in the patient's treatment plan. Treatment plans for PIP patients included a section specifying the frequency of individual and group treatment. Failure of programs to provide the type and frequency of treatment hours outlined in the treatment plan was pervasive (e.g., CHCF-PIP – ten of the 25 cases reviewed, or 40 percent; SVSP-PIP – nine of the 28 cases reviewed, or 32 percent; CMF-PIP – six of the 20 cases reviewed, or 30 percent; and SQ-PIP – 12 of the 22 cases reviewed, or 55 percent). The importance of these failures cannot be understated as CDCR has proposed that individual treatment hours are to be provided in accordance with the individualized timeframes outlined in treatment plans, rather than in accordance with some set of minimum expectations. Across all PIPs, 32 percent (38 of the 120 cases) of patients were not receiving the number of weekly hours specified in their individual treatment plans. By level of care, this failure to meet specified treatment hours was found in 33 of the 90 ICF records reviewed (37 percent) and five of the 29 acute records reviewed (17 percent).

At SVSP-PIP and CMF-PIP, treatment interventions specified within the patients' treatment plans were not being provided to the patients. [SVSP-PIP Patient L]'s record evidenced no clinical interventions provided to the patient by the PC beyond supportive therapy and "check-ins" which were not targeted to address his paranoia, persecutory delusions, and disorganized thinking. Similar findings were noted for [SVSP-Patient DD], including the use of brief "check-ins" and no evidence of clinical interventions. For [CMF-PIP Patient B], [CMF-PIP Patient C], [CMF-PIP Patient H], [CMF-PIP Patient L], [CMF-PIP Patient O], [CMF-PIP Patient

P], [CMF-PIP Patient Q], and [CMF-PIP T] there was little evidence linking the interventions provided by the PC to the patients' treatment goals.  For example, [CMF-PIP Patient B] was to be provided with handouts during sessions, yet there was no documentation that these handouts were discussed or reviewed with the patient and many of the progress notes simply indicated that interventions were provided to assist "with meeting previously agreed upon goals for treatment" without specifying those goals or the interventions.

Further, at the three "Lift and Shift" PIPs, there were significant concerns regarding treatment frequency and clinical contacts failing to be responsive to the needs of the patient.  For example, [CHCF-PIP Patient W] had treatment goals developed to address depressed mood and irritability through weekly individual sessions with the PC and psychiatrist, a cognitive-behavioral therapy (CBT) group, and several psycho-educational groups.  The record revealed that groups were frequently cancelled, PC weekly contacts did not occur but instead the patient was to attend the CBT group which the patient often refused because it was held in the morning, and psychiatric contacts, while held weekly, included redundant documentation that did not evidence clear interventions.  Overall, the patient received minimal treatment and his needs were not addressed.  [SVSP-PIP Patient I] was not seen by a PC for two weeks following discharge from suicide watch initiated secondary to suicidal ideation.  When he was seen, the patient was provided with a journal to "write down details of his trauma related to the hanging attempt," which resulted in the patient being triggered due to inadequate coping skills.  The exercise was later discontinued.  For this case, neither the timing nor content of clinical sessions were appropriate for the patient's needs.  While being treated at the acute level of care, [CMF-PIP Patient E] engaged in frequent self-injurious behavior, reported auditory hallucinations and depression, and frequently requested *pro re nata* (PRN) medication.  His treatment plan included

no goals to address his mental health or behavioral needs and nearly all psychiatric and PC contacts focused on the patient's requests for non-formulary medications, rather than engaging the patient in treatment or attempting to understand his reported distress.

Across all PIPs, the groups offered to patients were not in keeping with the number of hours specified in the patients' treatment plans and/or the content of the groups was inadequate to address identified needs of the patients. These concerns were found in 44 of the 120 cases reviewed (37 percent) with the most problematic sites being CMF-PIP (ten of 20 cases, or 50 percent) and SVSP (17 of 28 cases, or 61 percent). In most cases, group treatment was limited to recreational groups which included watching movies and playing games and/or the number of hours offered to the patient was not in keeping with the number of hours specified in the patients' treatment plans. Of note, the titles of groups at the CMF-PIP were misleading. Groups labeled as being psycho-educational in nature (e.g., CBT groups, anger management) included watching documentaries or playing video games.

One final concern, noted primarily at CIW-PIP and SVSP-PIP, was the frequency of cell-front contacts being completed by PCs and psychiatrists for reasons others than patient refusal. While some instances were found across all PIPs (18 percent, 21 of 120 cases), CIW-PIP evidenced inappropriate use of cell-front contacts in seven of 25 cases (28 percent) and the SVSP-PIP evidenced cell-front contacts without a patient refusal to attend a confidential session in eight of the 28 cases reviewed (29 percent).

**d)**    **Diagnostic Concerns**

Accurate diagnoses were necessary for the provision of effective treatment and ongoing continuity of care for patients. Consistently among members of the IDTT regarding the diagnostic profile of patients was also necessary to ensure that all IDTT members were working with patients to address identified needs and achieve appropriate goals. While all PIPs evidenced

60

some concerns regarding poor diagnostic rationale or the need for diagnostic classification, the issue was not identified in the majority of cases reviewed. The site with the most diagnostic issues identified was SVSP-PIP, where eight of the 28 cases reviewed (29 percent) included concerns regarding diagnostic clarity.

For example, [SVSP-Patient J]'s record included diagnoses which varied across chart location and provider. The diagnoses which auto populated from the patient's problem list, including antisocial personality disorder, major depressive disorder, and post-traumatic stress disorder, differed from the diagnoses recorded by individual psychiatric providers who indicated diagnoses of mood disorder, attention deficit hyperactivity disorder, and borderline personality disorder. [SVSP-PIP Patient V] was being treated at the ICF level of care and was diagnosed with major depressive disorder, recurrent, unspecified; yet clinical documentation noted that the patient did not evidence signs of mental illness. There were no attempts to clarify the patient's diagnostic presentation in the record and the patient remained at the ICF level of care from August 2022 through the review conducted in February 2023. Similarly, for [SVSP-PIP Patient BB], SVSP-PIP leadership noted diagnostic discrepancies in the patient's record at the time of admission and the need to clarify his diagnosis. Discrepancies continued to be documented by the patient's providers while in the PIP and there were no indications in the record that a resolution regarding these discrepancies was being pursued.

e)    **Clinical Documentation Issues**

During previous rounds of monitoring, concerns related to notes being copied into subsequent documentation without updating were identified. Some of these concerns were noted above regarding failures on the part of PCs and psychiatrists to update information during initial clinical assessments resulting in outdated and confusing information being retained in documents. Within individual progress notes, all sites evidenced examples of PCs and

psychiatrists copying information from contact to contact with the overall rate being eight percent (ten of 120 records).

Lack of adequate record review as evidenced by failing to acknowledge or to follow-up on previously identified issues was also a concern in a number of cases, with the most problematic sites being the "Lift and Shift" PIPs. [CHCF-PIP Patient K], for example, engaged in indecent exposure and had his custody level changed from medium to maximum after receiving an RVR. There was no mention of this behavior in a subsequent IDTT meeting, the patient was not seen in response to this behavior by his PC, and there was no mention of the patient's maximum custody status or the patient's refusal to attend his ICC meeting. In the records of both [SVSP-PIP Patient D] and [SVSP-PIP Patient E] there was evidence of symptoms that had been identified and were being addressed by a psychiatrist not being included in the patient's IDTT documentation or treatment goals. [CMF-PIP Patient B] refused all groups and individual sessions with his PC and psychiatrist after receiving news that his parole hearing had been cancelled during an IDTT meeting. Despite this, PC and psychiatric contacts continued to document that the patient was attending his groups, based on the patient's self-report. Further, the patient was placed on suicide watch and neither the placement on watch nor his lack of group attendance were documented during his next IDTT meeting.

> **f)**    **Least Restrictive Housing and Maximum Custody Considerations**

Considerations and placement of patients in their LRH in inpatient settings were required. IDTTs were to develop adequate treatment plans to assist patients who were housed outside their LRH to attain stability so that they could be transferred to their LRH. Evidence of inadequate identification of patients housed outside of their LRH and inadequate treatment planning to address the symptoms and behaviors that prevented patients from moving to their LRH were found in a number of cases reviewed at CMF-PIP and SVSP-PIP (CMF-PIP Patient B, CMF-PIP

Patient C, CMF-PIP Patient T, SVSP-PIP Patient C, SVSP-PIP Patient E, SVSP-PIP Patient H, SVSP-PIP Patient O, SVSP-PIP Patient S, and SVSP-PIP Patient DD).  Of note, for ICF level of care patients [SVSP-PIP Patient P], [SVSP-PIP Patient W], and [SVSP-PIP Patient Y], record reviews indicated that the patients' LRH was being addressed appropriately by the IDTT.  CIW-PIP was adequately addressing patients' LRH (CIW-PIP Patient L, CIW-PIP Patient U, and CIW-PIP Patient V) with one exception (CIW-PIP Patient S), whose IDTT had failed to appropriately identify the patient as being housed outside of her LRH.

During the current monitoring round, 54 maximum custody patients were included in the review to determine whether their custody status was reviewed appropriately and if their access to care was impacted by their status.  An additional five patients were maximum custody status at some point during their inpatient stays.  Across all PIPs, patient access to group and individual treatment was negatively impacted by their maximum-security status.  CMF-PIP acute care patients and SVSP-PIP maximum custody patients housed in Facility C experienced significant problems with access to groups.

A number of patients were lacking IPOCs and treatment interventions designed to adequately address the behaviors and/or symptoms which required them to remain on maximum custody status (CHCF-PIP Patient B, CIW-PIP Patient B, CMF-PIP Patient E, CMF-PIP Patient K, CMF-PIP Patient M, CMF-PIP Patient N, CMF-PIP Patient P, SVSP-PIP Patient M, and SVSP-PIP Patient Q).

SQ-PIP's maximum custody patient roster indicated that all condemned patients were not eligible for maximum custody reduction, and there was no indication they were referred by IDTTs for review and consideration of maximum custody status removal based on record reviews for the condemned status patients.

Of the 59 patients who had been on maximum custody status during their inpatient stays, 19 (32 percent) received a reduction in their maximum custody status while in the PIPs.

g)    <u>**Additional Serious Concern**</u>

During the monitor's expert's reviews of care across the PIPs, there were serious concerns regarding the use of clinically indicated restraints and emergency psychotropic medications. While most of the concerns were limited to CIW-PIP, there was also one concern noted at SQ-PIP.

With regard to CIW-PIP, [CIW-PIP Patient E], [CIW-PIP Patient H], [CIW-PIP Patient I], and [CIW-PIP Patient Y] had "crisis plans" included within their records which included language similar to the following, (which was located in the record for CIW-Patient Y), "If [*the patient*] engages in any self-harm behavior, alarm will be activated and [*the patient*] to be immediately placed in restraints and given ordered [*injectable medications*] by psychiatrist and remain on [*Suicide Watch 1:1*] Should [*the patient*] verbalize a medical complaint, upon medical clearance, [*the patient*] should be placed back in restraints. Release Criteria will be given by Psychiatrist or Psychologist." These crisis plans were seriously concerning in that they ordered a patient be immediately placed in restraints and given an involuntary injection of psychotropic medication upon any instance of self-injury without attempting less restrictive or less invasive interventions first. Additionally, the language did not include that orders for restraints and the use of emergency psychotropic medications were required to be provided in the instant, prior to the use of the interventions. In other words, it appeared that these interventions, which required an order from a properly credentialed and licensed clinician, could be provided without obtaining an order at the time of the self-injury. Instead, this standing order could be relied upon and implemented by staff members who ordinarily could not order these interventions. In the case of [CIW-PIP Patient E], despite the inclusion of the crisis plan in the record, there was a

64

psychiatrist's order for the use of restraints. In addition to these cases, [CIW-PIP Patient C] was ordered to be placed in restraints without any evidence of less-intrusive interventions being attempted. Further, when restraints were used at CIW-PIP, there was an absence of documentation regarding nurse monitoring and the length of time patients were in restraints.

For [SQ-PIP Patient H], the record review noted that the patient had been placed in restraints, however, no order was located in the record.

These cases raised serious concerns about the use of emergency, highly restrictive interventions within the PIPs.

### D.    MEDICATION MANAGEMENT

The monitor's expert reviewed 50 cases–ten from each of the five PIPs–for the purpose of evaluating the adequacy of provided medication management. Of these, 28 were adequate while 22 were inadequate. However, there was substantial variation between facilities, from a high of ten adequate cases at SQ-PIP, to a low of three adequate cases at SVSP-PIP.

In general, the PIP programs evaluated patients appropriately for the use of clozapine and monitored for medication side effects. With the exception of SVSP-PIP and one case at CIW-PIP, the PIPs appropriately considered and used long-acting injectable antipsychotics.

The PIPs showed substantial variation regarding the PC 2602 process. CMF-PIP, CHCF-PIP, and SVSP-PIP all displayed delays in starting the PC 2602 process, or simply did not start the process, for patients who needed it. CIW-PIP and SQ-PIP both appropriately considered starting the PC 2602 process and implemented it where necessary.

Medication management challenges emerged in several different manners. CMF-PIP struggled with the delayed start of medications. The dosing of medications was problematic at CMF-PIP, CHCF-PIP, SVSP-PIP, and CIW-PIP. The choice of medication was inadequately

justified at CMF-PIP, CHCF-PIP, and SVSP-PIP. SVSP-PIP psychiatrists often made several medication changes at the same time.

Safety issues were especially prominent at SVSP-PIP and CIW-PIP. Patients at SVSP-PIP and CIW-PIP both hoarded medications, with an SVSP-PIP patient overdosing on them. At SVSP-PIP, prescriptions expired, resulting in the patient going without medication for several days. CIW-PIP also used what they termed "crisis plans," which involved placing patients with self-injurious behaviors into restraints and the administration of injectable medications, without trying less restrictive options first.

Documentation inadequacies abounded at all PIPs, except for SQ-PIP. The most frequent deficiencies included the carrying-over of information from prior psychiatry notes. This led to inaccurate medication lists and plans.

Staffing vacancies translated directly into inadequate patient care at SVSP-PIP and CHCF-PIP. At SVSP-PIP, many psychiatrists saw the same patient during treatment, resulting in a lack of continuity of care. SVSP-PIP also used telepsychiatry. At CHCF-PIP, patients simply were not seen by the psychiatrist for long periods of time. In contrast, higher staffing rates allowed the SQ-PIP to have better compliance in the context of continuity of care.

### 1. CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP psychiatrists prescribed clozapine for 38 patients during the reporting period.

A total of 184 patients received involuntary medications under the PC 2602 process.

CMF-PIP psychiatrists regularly used clozapine, documented consideration of the use of long-acting injectable antipsychotics, and frequently screened for side effects. Dishearteningly, only four of the ten cases reviewed by the monitor's expert were deemed adequate. Further, even

those cases where the monitor's expert determined that the overall medication management was adequate revealed sizeable deficiencies.

One concern with CMF-PIP's medication management was with the delayed starting of medications. One patient admitted for severe decompensation was only offered as needed antipsychotic medication, and not regularly scheduled medication. Relatedly, the institution also demonstrated delays in making crucial medication adjustments.

CMF-PIP also had delays in filing PC 2602 applications. A patient who needed a PC 2602 prior to admission to the CMF-PIP decompensated even further for over one month, until the psychiatrist eventually filed the petition. In another case, notes repeatedly indicated that the psychiatrist would file a PC 2602; however, no PC 2602 was ever filed.

The monitor's expert also had concerns with the choice of medications and insufficient documentation for medications. In one case, the psychiatrist started a medication requiring food for absorption despite the patient having frequent hunger strikes.

The monitor's expert was also concerned with the dosing of medications. These included both rapid dosage changes noted and higher than typical dosing.

Healthcare record review also revealed copious and varied documentation concerns, including not listing the prescribed medications; containing carry over information, impairing the ability to extract clinically relevant information from the note; stating that there were no medication changes made when the patient was titrating off clozapine, a medication requiring careful oversight and monitoring; inconsistent clinical information in notes; and assessment during IDTTs which was inconsistent with Program Guide requirements for psychiatry contacts.

At the time of the site visit, 30 CHCF-PIP patients were prescribed clozapine. During the reporting period, 130 patients received involuntary medications under the PC 2602 process.

Psychiatrists routinely prescribed clozapine and long-acting injectable antipsychotics, where appropriate, and monitored patients for possible medication side effects.

A mere five out of the ten CHCF-PIP cases reviewed by the monitor's expert were deemed adequate.

Medication concerns included the delayed initiation of medications, as well as making medication changes too slowly or too quickly.

CHCF-PIP cases also displayed unusual choices for prioritizing the treatment of various conditions, such as treating Attention Deficit Hyperactivity Disorder (ADHD) in lieu of optimizing treatment for the patient's psychotic disorder.

Reviewed CHCF-PIP cases also reflected problems related to the PC 2602 process. In one case, a patient who had received involuntary medications since 2006 had the order expire while at an outside facility. CHCF-PIP did not pursue a new PC 2602 petition. The patient promptly began refusing medications and also exhibited multiple episodes of aggression.

Staffing shortages in both clinical and custodial staff negatively impacted patient care. Patients frequently went two to three weeks without documented psychiatry sessions. Notes indicated a psychiatrist was unable to see a patient confidentially, as there was only one correctional officer on the unit.

Reviewed CHCF-PIP cases also revealed documentation issues. Psychiatry notes frequently did not adequately address the rationales for medication choices. Moreover, documentation carried forward from prior notes made many notes difficult to follow, leading to internally inconsistent documentation.

During the site visit, 21 SVSP-PIP patients were prescribed clozapine.

At the time of the site visit, 82 SVSP-PIP patients were prescribed PC 2602 involuntary medications.

Alarmingly, of all PIPs reviewed, SVSP-PIP had the lowest rate of cases deemed adequate regarding medication management.  The rate of three of ten cases was abysmally low.

It is difficult to exaggerate the degree of clinical concern that the monitor's expert experienced assessing these patients' medication management.  Many of the reviewed cases demonstrated several inadequacies.  Disappointingly, even those cases that the monitor's expert determined had adequate overall medication management revealed sizeable deficiencies.

Multiple cases reflected problems with rapidly changing medications and frequently indicated several medication changes simultaneously.  In one of them, the psychiatrist lowered two medications' doses and simultaneously initiated two other medications.  For another patient, the psychiatrist started three medications simultaneously.

The dosing of medications often proved perplexing and was inadequately justified in electronic health records system (EHRS).  In one case, a psychiatrist prescribed an exceedingly high initial dose of the antipsychotic haloperidol, despite documenting that the patient displayed no psychosis.

The monitor's expert also found serious concerns with the use of long-acting injectable medications.  In two cases, the psychiatrist ordered long-acting injectable antipsychotics without a proper trial of an oral form of the medication.  While a psychiatrist can simply stop an oral medication causing side effects, long-acting injectables remained in the body for weeks or even months depending on the medication used.

SVSP-PIP displayed multiple challenges with medication administration, including with orders expiring or nursing staff being in the wrong "encounter" of EHRS.

The discontinuity in psychiatric care was also striking. In several cases, this resulted in different plans for medication treatment.

The manner in which SVSP-PIP psychiatrists met with several patients raised significant concerns. Telepsychiatry was used cell front in multiple cases. One of these patients was on suicide watch. In another case, several psychiatry evaluations reported that the patient agreed to be seen at cell front, but no documentation noted that this patient initially refused a confidential session.

SVSP-PIP also demonstrated delays in filing or simply neglected to file involuntary medication petitions under the PC 2602 process.

In an example illustrating medical management concerns, a patient received minimal medical intervention after ingesting 14 pills.

The monitor's expert also observed multiple uses or considered uses of lithium to increase patients' white blood cell counts; many psychiatric medications can lower the white blood cell count. However, many of the involved patients were of ethnic or racial backgrounds in which a slightly lower white blood cell count was entirely normal. The monitor's expert recommended that SVSP-PIP psychiatrists carefully considered the possibility of normal variations prior to initiating treatment with lithium, as this medication had potentially grave side effects.

### 2. CIW-PIP and SQ-PIP

On November 30, 2022, three CIW-PIP patients were prescribed clozapine.

CIW-PIP reported that 16 intermediate care patients received PC 2602 involuntary medications during the review period.

The monitor's expert reviewed the healthcare records for ten patients to assess the quality of CIW-PIP's medication management. Overall, the assessment indicated adequate medication management for six of ten reviewed cases.

CIW-PIP demonstrated several positive aspects regarding medication management. When appropriate, psychiatrists timely filed PC 2602 involuntary medication petitions. The institution also frequently used long-acting injectable antipsychotics. The CIW-PIP's psychiatrists also carefully considered the use of the antipsychotic clozapine.

However, the monitor's expert found many limitations with medication management at the CIW-PIP, with many cases revealing a constellation of deficiencies. Unfortunately, even cases where the monitor's expert determined that overall medication management was adequate often revealed deficiencies.

In two intermediate care cases, the psychiatrists did not have documented sessions with patients at the frequency specified in the treatment plan. Despite one patient being assessed at high risk for suicide, the patient nonetheless went over two weeks without a documented psychiatry visit.

Unclear diagnoses listed in notes was a notable problem. Other reviewed cases did not indicate a diagnosis entered by the psychiatrist. Instead, the notes contained a section that pulled forward diagnoses and other problems from EHRS. Unfortunately, they often included multiple, and in some cases contradictory, psychiatry diagnoses.

The amount of information carried forward from prior notes also raised serious concerns. This resulted in inaccurate medications or doses listed in the note. The carrying over of prior information rendered some notes difficult to follow.

In multiple cases, the number of medications used or the dosages prescribed – or, in some cases, both – were perplexing and inadequately justified in the psychiatrists' notes. In one case, a psychiatrist started a medically-compromised patient on a robust oral dose of an antipsychotic and gave a long-acting version of the medication on the same day.

In an alarming case, a patient prescribed multiple high-dose antipsychotics and mood stabilizers, as well as buprenorphine, for an opioid use disorder, was found unresponsive in her cell, with her lips blue. The patient was in respiratory failure and required emergency treatment at an outside hospital. Notes from the hospital did not reflect the underlying etiology of the respiratory failure. The monitor's expert noted that some of the medications prescribed had the potential for cardiac side effects, as well as possible respiratory depression. The monitor's expert was in no position to opine on the etiology of the patient's respiratory failure; however, concerningly, there was scant documentation showing consideration of altering the patient's medications, even despite her recent severe medical issues.

The monitor's expert reviewed one case involving concerns around medication administration and resultant patient safety issues. During a routine check of the patient's room, custody officers found that the patient had 164 pills in her possession. The vast majority of the pills were prescribed by the medical team to treat the patient's seizure disorder. The remaining pills were prescribed by psychiatry. Having this amount of medication was not only a safety issue for this patient but potentially also for other patients as well.

Finally, the monitor's expert had grave concerns about several patients with self-injurious behaviors having what the facility termed "crisis plans." Should these patients engage in any degree of self-injurious behavior, staff were directed to bypass less restrictive interventions and instead place the patient in restraints and give them injectable medications. This deviated from

both the standard of care and Program Guide requirements.  Standard practice was for staff to employ less restrictive interventions first, only using restraints if the other interventions were unsuccessful or if the degree of self-injury was so extreme that restraints were the only reasonable option to prevent severe injury.

Many patients had orders for injectable medication written as needed for agitation.  In general practice, if a patient required injectable medications, the psychiatrist would order a one-time medication dose.

On November 30, 2022, ten SQ-PIP patients were prescribed clozapine.

SQ-PIP reported that 14 patients received PC 2602 involuntary medications during the review period.

The monitor's expert reviewed the healthcare records of ten patients to assess the quality of the SQ-PIP's medication management.  This assessment revealed adequate medication management for all ten reviewed cases.  The psychiatrists managed complex cases that indicated the rational and justified use of medications.  The psychiatrists also often clearly documented their reasons for choosing a particular medication over other possible choices.  Significantly, this justification sometimes included research articles that supported their decisions.  Further, the majority of reviewed SQ-PIP documentation was adequate.  Psychiatrists' notes painted clear clinical pictures of patients.  Also of particular importance, there was generally good continuity of care, with patients working with the same psychiatrists for most, if not all, of their stays.  The psychiatrists were also adept at prescribing and monitoring clozapine, an antipsychotic with proven efficacy in refractory patients.

Notably, the SQ-PIP obtained permission for electroconvulsive therapy (ECT) to augment a patient's response to medications.  This intervention was generally underutilized in part due to

the complexity involved in performing it within the correctional environment. In particular, CDCR has had a long history struggling to have patients receive ECT, even in cases where it was clearly indicated. As such, the facility's use of this intervention was even more admirable.

The SQ-PIP carefully considered the use of PC 2602 involuntary medications.

The facility also considered the comorbid conditions, such as mild cognitive impairment, and how they might impact treatment. Significantly, the psychiatrists also documented working closely with other disciplines including psychology, internal medicine, physical therapy, nursing, and custody.

Despite this, there were areas of concern regarding medication management at the SQ-PIP. However, these deficiencies did not rise to the level of deeming the psychiatric care inadequate. For one patient, the medication clozapine was listed as an allergy. In another case, a covering psychiatrist ordered an as needed medication that would be unlikely to have the desired effect in a reasonable timeframe. However, when the regular psychiatrist returned, this medication was discontinued.

## E.    PATIENT ACCESS TO TREATMENT

The STEP program was created to encourage treatment participation and positive patient conduct within the PIP setting. On March 15, 2022, CDCR distributed the revised statewide STEP program policy. During the monitoring period, CIW-PIP and SQ-PIP implemented the statewide policy. LOPs governed CMF-PIP, CHCF-PIP, and SVSP-PIP's versions of the STEP program. The implementation of these local plans was fraught with challenges. Common barriers included inadequate staffing, inability to obtain and secure storage space for items identified as incentives, inconsistent application of the system, and limited or frequently absent discussions of STEP progress during IDTTs.

### 1.    CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP reported that, during the review period, the institution did not implement the statewide STEP policy.  Barriers to STEP implementation included inadequate staffing, and the inability to obtain and difficulty identifying storage locations for program incentives.

CMF-PIP used a smaller version of the statewide STEP program.  However, the STEP plan was inconsistently implemented in both the acute and intermediate care programs.  In the acute program, only two of 13 observed IDTT meetings mentioned the STEP program.  In the intermediate program, approximately one-half of observed IDTTs discussed the STEP program.  Even in IDTTs in which STEP was discussed, its implementation deviated from the governing LOP.  Interviewed patients confirmed that the STEP plan was unclear, variable, and inconsistently implemented.

Staff reported that CHCF-PIP patients used a "local" STEP program several weeks prior to the site visit while awaiting headquarters' guidance of full program implementation.   This "local" STEP program was used on an "ad hoc" basis due to the unavailability of a full STEP program.  Supervisory staff anticipated implementing the revised statewide STEP program in March 2023.  Patients described the STEP program as having two STEPS: STEP 1 patients lacked group access and STEP 2 patients had such access. In almost all IDTTs, the STEP program was not discussed.

SVSP-PIP implemented revisions to their local STEP policy in May 2022.  While efforts to implement the STEP program prior to the statewide rollout were commendable, staff and patients reported numerous problems that compromised its overall effectiveness.

Mental health leadership and primary clinicians reported issues obtaining STEP incentive items and that the STEP program was implemented differently throughout the units.  Both staff

and patients reported that the STEP program had become less effective for motivating behavioral change without incentive items to purchase.

The STEP program was explained during observed Facility C IDTTs and new patients were provided with lists of incentive items.  It was, however, unclear how the program was implemented on Facility C, as the IDTTs did not discuss patients' current STEP levels or goals, expectations for advancing patients to the next STEP level, whether patients were generally progressing, or the number of points patients had accrued.

2.    <b><u>CIW-PIP and SQ-PIP</u></b>

CIW-PIP provided an updated LOP for its utilized STEP program to support patient advancement.  However, the institution provided no EHRS information for patients' STEP program participation during the review period.  As of February 22, 2023, 12 CIW-PIP patients were at STEP One, seven were at STEP Two, and nine were at STEP Three.  Patients' duration at each level was not provided.  The institution further reported granting patients telephone privileges in accordance with their STEP level.

The SQ-PIP implemented the STEP policy in June 2022 and provided an LOP dated December 2021.  The institution also provided documentation outlining STEP behavioral eligibility requirements, behavioral and treatment goals for advancement to the next STEP, prompts and incentives as well as a description of solo programming and the criteria for inclusion.  SQ-PIP attempted to address overlap between the STEP program and patients who had a formal behavioral plan.

## F.    <u>REFERRALS AND TRANSFERS</u>

There was an overall increase in acute and intermediate care referrals since the Twenty-Ninth Monitoring Round, particularly at the CMF-PIP where they experienced a 94 percent increase in referrals.  However, while referrals increased, bed occupancy decreased at CMF-PIP

76

and CHCF-PIP. The CMF-PIP experienced a 12 percent decrease in the number of beds filled from the preceding monitoring period. Even more troubling, the CHCF-PIP experienced a 52 percent decrease in occupied acute care beds and a 19 percent decrease in occupied intermediate care beds due to the deactivation of beds in both programs. These deactivations were the direct result of the aforementioned critical staffing shortages. Ultimately, the domino effect of less staff leading to the elimination of 149 crucially needed inpatient beds results in exacerbation of illness for patients waiting for placement in the highest levels of mental health care provided in CDCR.

While transfer timeframes were met in both acute and intermediate programs at CMF-PIP, SVSP-PIP, and CIW-PIP, for CHCF-PIP, only seven percent of acute care patients and three percent of intermediate care patients were admitted timely. Acute care patients were timely admitted to SQ-PIP 88 percent of the time. Discharged patients at CMF-PIP, CHCF-PIP, and SVSP-PIP experienced transfer delays after clinical discharge. CIW-PIP and SQ-PIP did not provide adequate discharge information in their paper review documentation.

## 1. CMF-PIP, CHCF-PIP, and SVSP-PIP

On January 23, 2023, 296 of 396 or 75 percent of CMF-PIP's beds were filled representing a 12 percent decrease since the preceding monitoring period. There were 414 referrals to the CMF-PIP during the review period. Thirty-four referrals were rejected; 31 for intermediate care and three for acute care. An additional 14 referrals were rescinded, of which nine were intermediate care referrals and five were referred for acute care. Rejections and rescissions were due to unavailable LRH, patient stabilization, and the need for further assessment. The total time to transfer for acute care patients averaged 7.6 days and acceptance to physical admission averaged two days. Intermediate care transfers averaged 16.7 days and acceptance to physical admission averaged 2.1 days.

On January 12, 2023, CHCF-PIP operated 514 beds.  Due to significant staffing limitations, CHCF-PIP deactivated 91 acute care beds during the review period.  As a result, of the 184 acute care beds, 78 or 42 percent were filled, representing a 52 percent decrease since the Twenty-Ninth Monitoring Round.  Similarly, CHCF-PIP deactivated 58 intermediate care level beds during that same period.  As a result, only 254 beds, or 77 percent were filled on January 12, 2023, for a 19 percent decrease since the Twenty-Ninth Monitoring Round.

There were 99 referrals to CHCF-PIP's acute care program, of which 11 or 11 percent were rejected.  CHCF-PIP accepted 30 or 33 percent within timeframe guidelines and only six patients or seven percent were admitted within ten days.  There were 159 referrals to CHCF-PIP for intermediate care.  CHCF-PIP rejected one referral.  CHCF-PIP accepted 60 or 38 percent of intermediate care referrals within timeframe guidelines; however, only five patients, or three percent were admitted within 30 days as required.

On January 10, 2023, 235 or 96 percent of SVSP-PIP's 246 beds were occupied for a ten percent increase since the preceding monitoring period.  There were 222 referrals to SVSP-PIP during the review period.  SVSP-PIP rejected two referrals, 21 referrals were rescinded, and 14 patients were placed in MHCBs.  Ninety-three percent of accepted patients were admitted within the 30-day Program Guide timeframe requirement.  Reasons for delays included positive COVID-19 test results, court proceedings, correctional clinical assessment teams (CCATs), and re-endorsements.

## 2. CIW-PIP and SQ-PIP

On January 18, 2023, 32 of 45 or 71 percent of CIW-PIP's beds were occupied, a 69 percent increase since the preceding monitoring period.  There were 35 patients referred to CIW-PIP during the review period.  Thirteen patients were referred to acute care and 17 were referred

to intermediate care.  Provided documentation revealed an additional five referrals that were accepted and rescinded; however, the level of care was not indicated for those referrals.  There were no rejections.  Transfer timeframe requirements were met for all admissions during the review period.

On January 18, 2023, 36 of 40 or 90 percent of SQ-PIP's beds were filled, a 12.5 percent increase since the preceding monitoring period.  There were 35 referrals to SQ-PIP during the review period.  Twenty-two patients were referred to acute care and 13 to intermediate care.  For acute care, four patients were endorsed to other PIPs, and one was placed in the MHCB.  Fifteen of 17 or 88 percent of acute care referrals were admitted within ten days; one admission was late due to a late acceptance decision by SQ-PIP and the other patient took nine days to transfer after his *Vitek* hearing.  For intermediate care, three referrals were rescinded, and three other patients were placed in MHCBs.  The remaining seven patients were admitted within the Program Guide timeframe guidelines.  SQ-PIP did not reject any referrals during the review period.

## G.    ADMISSIONS AND DISCHARGES

Admission increases and decreases varied across institutions throughout the review period, with CHCF-PIP experiencing the largest decrease due to bed deactivations.  Transfer timeframes for admission are discussed above.  Transfer delays after clinical discharge continued throughout the review period at CMF-PIP, CHCF-PIP, and SVSP-PIP.  CIW-PIP and SQ-PIP did not provide adequate discharge information.  Defendants' failure to timely transfer clinically discharged patients out of PIP beds effectively resulted in these beds being unavailable for other patients identified and referred to inpatient care.  It is well settled that such delays in access to necessary inpatient care "result in exacerbation of illness and patient suffering."  *Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995)

### 1.   CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP admitted 265 patients to acute care and 110 patients to intermediate care during the review period.  The average length of stay for acute care was 139.3 days.  For intermediate care, the average length of stay was 146.6 days.  Physical discharge averaged four to five days beyond clinical discharge during the review period.  However, on December 11, 2022, 16 patients were awaiting physical discharge with an average delay of 14.2 days.  Of those, eight patients were awaiting intermediate care placements at their designated LRH and eight other patients were awaiting transfer to enhanced outpatient program patients (EOPs).

CHCF-PIP admitted 88 patients to acute care and 158 patients to intermediate care during the review period.  The average length of stay for acute care patients was 97 days, and intermediate care patients averaged 394 days.  CHCF-PIP discharged 23 patients from acute care and 100 patients from intermediate care during the review period.  Of those, 33 percent had an average transfer delay of 7.6 days after clinical discharge.  Delays were attributed to the lack of beds in receiving programs.

SVSP-PIP admitted 185 intermediate care patients during the review period.  The average length of stay was 250 days.  SVSP-PIP discharged 135 patients during the review period.  Sixty percent of patients took longer than 72 hours to transfer following clinical discharge.  Delays were attributed to transportation issues, delayed ICC completion, court proceedings, medical holds, and DRB review.

### 2.   CIW-PIP and SQ PIP

CIW-PIP admitted 13 patients to acute care and 17 patients to intermediate care during the review period.  The average length of stay in acute care was 71 days.  For intermediate care,

the average length of stay was 420 days. CIW-PIP did not provide adequate documentation regarding discharges during the review period.

SQ-PIP admitted 17 patients to acute care and seven patients to intermediate care during the review period. The average length of stay was 93 days for acute care patients and 202 days for intermediate care patients. SQ-PIP did not provide adequate data regarding discharges during the review period.

## H.    LEAST RESTRICTIVE HOUSING

Compared to the prior monitoring round, the CMF-PIP reported a decrease in patients housed above their LRH level. The SVSP-PIP reported an increase while the CHCF-PIP and CIW-PIP both reported slight increases. The SQ-PIP again reported no patients housed above their LRH.

### 1.    CMF-PIP, CHCF-PIP, and SVSP-PIP

The CMF-PIP reported two intermediate care patients were housed in single cells with a locked dorm LRH determination and three intermediate care patients were housed in single cells with a multi-person cell LRH determination. Additionally, of 39 patients with an unlocked dorm LRH determination, 12 were housed in locked dorms, 11 were housed in multi-person dorms, and 16 were housed in single cells.

The monitor observed 13 CMF-PIP IDTT meetings for patients at the acute level of care; three or 23 percent discussed the patient's LRH designation but none discussed assessments for LRH changes or treatment interventions designed to support patients moving to a different type of housing.

CHCF-PIP reported 136 patients were housed above their LRH. All patients were housed in single cells though 73 patients had an unlocked dorm LRH determination, 24 patients had a locked dorm LRH determination, and 39 patients had a multi-purpose cell LRH determination.

Efforts to decrease patients' LRH included weekly patient LRH reviews, which were also reviewed during ICCs and IDTTs.

SVSP-PIP reported 94 patients housed above their LRH, of which 65 were in single-cells and 29 in multi-person cells.  The institution also reported internal improvements for LRH review.  However, challenges from the Health Care Placement Oversight Program (HCPOP) were also noted when patients were released from maximum custody and reduction to a lower LRH was recommended.

### 2.      CIW-PIP and SQ-PIP

CIW-PIP reported ten patients were housed above their LRH.  During the review period, weekly unlocked dorm audits were conducted.

SQ-PIP reported no patients were housed above their LRH.

## I.      PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

### Patient Disciplinary Process

During the review period, no institution demonstrated compliance with the timely request of mental health assessments after RVR issuance.  Only CMF-PIP reflected mental health staff timely returning mental health assessments to custody; CHCF-PIP was close to compliance at 85 percent.  No PIP demonstrated compliance with the completion of mental health assessments in a confidential setting.  Hearing officers documented consideration of the mental health assessments at CHCF-PIP, CMF-PIP, CIW-PIP, and SVSP-PIP.  However, SQ-PIP did not provide information regarding senior hearing officers' responses.

SVSP-PIP was the only institution that met 90 percent compliance for custody staff completion of the mental health assessment training; CIW-PIP was close to compliance at 87 percent.  No institutions met the training requirement for mental health staff.  Additionally, CMF-

PIP and SQ-PIP provided training data for the whole institution and not just staff assigned to the PIP.

### 1.    CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP issued 64 RVRs during the review period. A review of a sample of ten RVRs revealed that custody staff timely requested mental health assessments in 30 percent of cases. Mental health staff timely returned the completed assessment to custody 100 percent of the time. Thirty percent of mental health assessments were completed confidentially. Clinicians recommended mitigation in all cases. The senior hearing officer mitigated the penalties for all ten reviewed RVRs; however, there was no mitigation of credit loss.

Regrettably, a social worker who was not listed as having attended the required RVR training completed eight of the ten reviewed mental health assessments at the CMF-PIP.

CMF provided mental health assessment training data for the entire institution and not just for staff assigned to the CMF-PIP. The data indicated that two of four associate wardens, all five captains, 29 lieutenants, and 89 percent of sergeants attended the training. As for mental health staff, 17 senior psychologists and psychologists and four social workers attended the training.

CHCF-PIP issued 135 RVRs during the review period. A review of 20 RVRs indicated that custody staff timely referred the mental health assessment to mental health staff in 75 percent of cases. Mental health staff timely completed and returned the assessment to custody in 85 percent of cases. All patients were assigned a staff assistant. Forty percent of mental health assessments were completed confidentially. However, 20 percent of RVRs assessed penalties that negatively impacted patients' privileges but none conflicted with the assessments' recommendations concerning privilege loss.

CHCF-PIP reported that 26 percent of required custody staff and 39 percent of required mental health staff completed the RVR training.

There were 99 RVRs issued to SVSP-PIP patients during the review period. A review of 24 randomly selected RVRs revealed that custody staff timely referred 25 percent to mental health for assessment completion. Mental health clinicians completed and returned assessments timely in 29 percent of cases. Clinicians recommended alternative discipline in four cases; three of the four were reduced to counseling chronos. Twenty-nine percent of mental health assessments were conducted in confidential settings. Clinicians recommended penalty mitigation in all 24 reviewed cases; the senior hearing officer mitigated penalties in 92 percent of cases. All patients were assigned a staff assistant.

For SVSP-PIP custody staff required to receive mental health assessment training, all correctional administrators, captains, and lieutenants completed the training, as did three of four sergeants, and 91 percent of custody officers. The institution reported that only one senior psychologist completed the training; all remaining mental health staff members had not completed the training.

## 2.    CIW-PIP and SQ-PIP

During the review period, CIW-PIP issued 23 RVRs. A review of 12 randomly selected RVRs indicated that the documentation provided for seven of these RVRs was incomplete. Further, custody staff timely requested mental health assessments in only ten percent of cases. Mental health assessments were completed and returned timely in 30 percent of cases. Thirteen percent of cases reflected confidential interviews. All reviewed RVRs indicated the assignment of a staff assistant. The clinician recommended mitigation in 92 percent of cases; the hearing officer documented and mitigated penalties in each case.

Eighty-seven percent of required custody staff completed RVR training.  For mental health, the institution reported that two psychologists completed the training; no additional attendance information was provided for mental health staff.

Twelve RVRs were issued to SQ-PIP patients.  Mental health assessments were completed for all 12 patents.  Clinicians' responses to assessment question number three indicated that 67 percent of cases reported that mental illness contributed to the behavior that led to the RVR.  Clinicians' recommended penalty mitigation in 33 percent of cases.  However, the SQ-PIP did not provide information that indicated whether or not senior hearing officers actually mitigated penalties.  No cases recommended alternative discipline.  One case was reduced to a counseling chrono.  One patient was issued a SHU term.

SQ provided RVR training data for the whole institution and not just staff assigned to the SQ-PIP.  The data indicated that only one psych tech and one licensed vocational nurse (LVN) attended this training, as well as two captains, 19 lieutenants, 57 sergeants, and 44 custody officers.

### Use of Force

The PIPs reported a total of 284 use of force incidents during the review period, of which 11 were controlled and 273 were immediate[24].  There were seven controlled and 79 immediate

---

[24] CDCR defines Immediate Use of Force in its Department Operations Manual as:

> Immediate use of force is the force used to respond without delay to a situation or circumstance that constitutes an imminent threat to institution/facility security or the safety of persons. Employees may use immediate force without prior authorization from a higher official. Immediate force may be necessary to subdue an attacker, overcome resistance or effect custody. If it is necessary to use force solely to gain compliance with a lawful order, controlled force shall be used.

CDCR defines Controlled Use of Force in its Department Operations Manual as:

use of force incidents at the CHCF-PIP, no controlled and six immediate uses of force at the CIW-PIP, one controlled and 106 immediate uses of force at the CMF-PIP, one controlled and four immediate use of force episodes at the SQ-PIP, and two controlled and 78 immediate use of force incidents at the SVSP-PIP.

Review of ten controlled and 30 immediate use of force incidents all revealed compliance with applicable CDCR policy.  Notably, CMF-PIP reported forwarding one unnecessary use of force allegation to the Office of Internal Affairs; no final determination had been made at the time of the site visit about this matter.  Video recordings provided by the CHCF-PIP and SVSP-PIP further revealed compliance and consistency with written documentation pertaining to these use of force incidents.

As for use of force policy training, only the SVSP-PIP reported training data specific to the PIP; 100 percent of custody staff and 48 percent of mental health staff attended the training. The four other institutions reported institution-wide training data.  All four reported compliance for custody staff training, but noncompliance with mental health staff training.

---

A controlled use of force is the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the imminent threat to loss of life or imminent threat to institution security. All controlled use of force situations requires the authorization and the presence of a First or Second Level Manager during business hours. During non-business hours, the on-site manager shall be the Administrative Officer of the Day (AOD) who is responsible for the authorization of any controlled use of force and whose presence is required during any controlled use of force. Staff shall make every effort to identify disabilities, to include mental health issues, and note any accommodations that may need to be considered.

CDCR Operations Manual §51020.4, attached hereto as Exhibit U.

1.    **CMF-PIP, CHCF-PIP, and SVSP-PIP**

The CMF-PIP reported one controlled and 106 immediate uses of force during the review period.  One allegation of unnecessary use of force was forwarded to the Office of Internal Affairs.  No final determination regarding this alleged unnecessary use of force had been made by the time of the site visit.

The one controlled use of force as well as 11 immediate uses of force were reviewed.  All were found to be in compliance with the applicable policy.  The one controlled use of force episode stemmed from a patient refusing to exit the non-contact visiting modular.  The 11 reviewed immediate uses of force included four instances involving covered cell windows and unresponsive patients, four occurring during escorts, two incidents due to patient self-injury, and one instance of battery on a correctional officer.

Regarding use of force training, data was provided for the entire institution as opposed to solely for the CMF-PIP.  Compliance was met for custody staff while only 71 percent of mental health staff attended the training.

The CHCF-PIP reported 86 total use of force incidents, of which seven were controlled and 79 were immediate.  The 86 incidents consisted of 43 acts of patient aggression toward staff, 18 instances of patient self-harm, 11 cases of resisting a peace officer, two patient batteries, four cell extractions, two instances of disobeying a direct order, one emergency cell entry, and five episodes of fighting.  Eleven use of force incidents were reviewed; all demonstrated compliance with CDCR policy.

Video footage was also requested for five of the seven controlled use of force incidents but only provided for one.  Regrettably, compliance with controlled use of force protocols could

not be assessed from the video given the cameras' lines of site, distance from the incident, and lack of audio.

Use of force training attendance was provided for all of CHCF; 98 percent of required custody staff and 55 percent of required mental health staff attended the training.

There were two controlled and 78 immediate use of force incidents at the SVSP-PIP during the reporting period. Both controlled uses of force complied with the applicable CDCR policy based upon video footage and document review. Six immediate uses of force were also reviewed and each revealed compliance with CDCR policy. The SVSP-PIP also reported that 100 percent of custody staff and 48 percent of mental health staff completed the required use of force training.

## 2.    CIW-PIP and SQ-PIP

The CIW-PIP reported no controlled and six immediate use of force incidents. Documentation for four of the immediate use of force incidents were provided and reviewed. Three of those instances involved the same patient assaulting custody officers and the fourth involved a patient battering a nurse. Each reflected compliance with applicable policy. Use of force training data was provided for the whole institution as opposed to only the CIW-PIP; custody staff complied with training completion while only 77 percent of mental health staff completed the training.

The SQ-PIP reported one controlled and four immediate use of force incidents during the review period. The one controlled use of force was pending clarification; two of the immediate use of force incidents were closed and two were pending clarification as well. All five incidents revealed compliance with the applicable CDCR policy. Use of force training data was provided for the whole institution as opposed to the SQ-PIP exclusively; custody staff complied with

training attendance requirements while mental health staff neared compliance with 88 percent attending the training.

## J.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS

During the review period, an audit indicated concerns with the use of restraints at the CHCF-PIP, while there were unreliable tracking mechanisms for restraint usage at CIW-PIP. CDCR policies and procedures were followed for SVSP-PIP's one seclusion incident, and for SQ-PIP's one restraint episode.

### 1.    CMF-PIP, CHCF-PIP, and SVSP-PIP

During the review period, CMF-PIP did not utilize seclusion or restraint. However, patients were placed in observation rooms on suicide watch status during five of six months.

CHCF-PIP had two restraint incidents. One patient was restrained for five hours, and a nursing audit revealed one error. Another patient was restrained for four hours; no errors were documented.

SVSP-PIP did not utilize restraints during the review period. However, one patient was placed in a safety cell for less than four hours pursuant to a seclusion order.

### 2.    CIW-PIP and SQ-PIP

The CIW-PIP's tracking mechanisms for seclusion and restraint were not reliable during the review period. CIW-PIP provided multiple reports containing conflicting data. The CIW-PIP appeared to have 15 restraint incidents; nine involved one patient. CIW-PIP did not report any seclusion episodes.

SQ-PIP had one restraint incident of approximately 1.5 hours, but no seclusion episodes.

## K.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

During the review period, CHCF-PIP, CIW-PIP, CMF-PIP, and SVSP-PIP all had emergency response and review processes in place. SQ-PIP did not produce any minutes from

the institution's Emergency Medical Response Review Committee (EMRRC). Both CMF-PIP and SVSP-PIP reported one death during the review period and also reported a death review process. CHCF-PIP, CIW-PIP, and SQ-PIP did not provide examples of specific PIP death review processes or procedures.

### 1.    CMF-PIP, CHCF-PIP, and SVSP-PIP

Although CMF-PIP incorporated an EMRRC into its emergency review process, committee minutes did not indicate whether the facility appropriately responded to emergencies. CMF-PIP EMRRC minutes indicated review of daily required checks and drill documentation, identification of all emergency medical response activations, unscheduled transports outside of the facility, and case reviews. However, meeting minutes did not include information about prompt and appropriate emergency responses or information about attaining a quorum.

CMF-PIP did not track PIP-specific incidents and only provided institution-wide emergency response data. There were 302 emergency response incidents, with delays noted in five percent of cases. The nature of the delays and whether they included a PIP patient were not reported. Although corrective action plans for staff training were undertaken due to these delays, there was no reported process to assess whether training was the appropriate corrective action or if the training was effective. CMF-PIP did not provide tracking logs or audit data.

CMF-PIP reported one patient death by suicide during the review period. A review of minutes from the EMRRC, mental health subcommittee, and Patient Safety Committee revealed minimal information.

CHCF-PIP reported three Code 3 neurological incidents that required emergency medical responses during the review period. There were no staff deficiencies for these three incidents.

EMRRC minutes indicated the attainment of quorums and reported emergency medical documentation. There were no deaths at the CHCF-PIP during the review period.

SVSP-PIP's Risk Management Committee (RMC) met monthly and attained required quorums. In the absence of a chief psychiatrist, the chief psychologist chaired RMC meetings, which also lacked regular nursing representation, negatively impacting discussion of relevant issues. The RMC provided a forum that reviewed patient risk incidents, including patient abuse allegations, staff batteries and assaults, episodes of clinical restraint, certain seclusion and patient observation incidents, and self-injurious behavior. The RMC lacked a systemic incident review process to document and assess the underlying causes or factors which may have contributed to a particular incident.

SVSP-PIP reported one death during the review period. Although leadership and RMC documentation indicated no official cause of the death, suicide was not suspected and the death remained under investigation. SVSP-PIP suicide death reviews followed institutional policies.

### 2.    CIW-PIP and SQ-PIP

During the review period, CIW-PIP's EMRRC met monthly and addressed relevant PIP matters including suicide attempts, foreign body ingestions, the use of medications to reverse opiate overdose, and emergency transports. All EMRRC meetings attained a quorum. Emergency medical response drills were scheduled at least quarterly and included all watch shifts.

The CIW-PIP Patient Safety Committee met monthly and was tasked with reviewing incidents of restraint and seclusion in the PIP. There were no reported PIP patient deaths during the review period.

SQ-PIP did not submit meeting minutes for the institution's EMRRC.  There were no patient deaths at SQ-PIP during the review period.

## L.      QUALITY MANAGEMENT AND UTILIZATION REVIEW

Across all PIPs, quality management and utilization review activities were negatively impacted by staffing shortages.  PIP quality management programs were integrated into the larger facility's quality management programs, yet none of the programs were functioning at full capacity.  At CMF-PIP, CHCF-PIP, and SVSP-PIP, quality management activities were limited to a focused number of routine audits but with little to no ability to investigate the causes of deficiencies and address them adequately.  Utilization review was not occurring at CMF-PIP.  At CIW-PIP and SQ-PIP, quality management activities continued to include appropriate cause-analyses, action plans, and outcome assessments when deficiencies were noted.  Both programs were unable to fully function secondary to staffing shortages, however, with CIW-PIP suspending routine chart audits and SQ-PIP foregoing utilization management meetings.

### 1.      CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP was incorporated into the overall facility committees and subcommittees. Monthly mental health subcommittee meetings were held with quorums being achieved.  During most meetings, the inability to provide adequate care and adequate oversight were noted, however, action plans were not developed to address these issues.  The causes were documented as staffing shortages.  CMF-PIP suspended Suicide Prevention and Response Focused Improvement Team (SPRFIT) activities, the PBST, psychological testing, and out of LRH reviews.  Routine monitoring activities for the CMF-PIP were extremely limited due to vacancies in leadership positions and all processes being monitored were not meeting expectations secondary to staffing shortages.  There was no mechanism to identify emerging quality concerns.

Utilization review processes did not occur at CMF-PIP during the review period. Patient safety and utilization management committees focused on self-injury as the primary issue within the PIP, focusing on patient-specific issues rather than facility-wide trends.

CHCF-PIP's quality management program had a robust infrastructure and was sufficiently integrated within the facility's larger quality management support unit. Despite this, staffing shortages resulted in the performance of the program as less than optimal. Specifically, while routine auditing was being completed and issues were identified, the ability to understand the root causes of these deficiencies, develop corrective action, or update PIP policies, was limited. As was found in previous rounds, CHCF-PIP program directors prepared comprehensive monthly memoranda that were discussed during mental health subcommittee meetings. They identified deficient performance indicators along with root causes and corrective action plans for each deficiency. Utilization review was routinely conducted for out of LRH and over length of stay reviews.

SVSP-PIP quality management activities were part of SVSP's institutional quality management program. However, staffing vacancies impeded the PIP's quality management activities. While deficiencies and challenges in PIP programs were identified and discussed during monthly reviews, there was an overall lack of follow-through, assignment of staff responsibility, or documented problem-solving, resolution, or corrective actions. Consistent with findings from the prior review period, provided documentation reported that SVSP-PIP did not hold utilization management committee meetings and utilization management audits were not conducted during the review period due to key staffing vacancies. SVSP-PIP did not implement corrective action plans during the review period.

2.    **CIW-PIP and SQ-PIP**

CIW-PIP's quality management system was robust and was integrated into the institution's quality management structure. While quality management subcommittee activities were discussed routinely at monthly quality management committee meetings, minutes from subcommittees conducted during the review period were not provided by CIW and could not be reviewed as a result. Performance Improvement Work Plans (PIWPs) related to emergency response times and treatment within the PIP were reviewed and included action plans and tracked progress over time. Routine chart audits were on hold, however. Utilization management primarily focused on medical issues, but self-injury and suicide attempts were routinely reviewed.

The SQ-PIP's quality management process was comprehensive. The facility was proactive in discovering and subsequently investigating concerns. The monthly PIP subcommittee discussed appropriate topics and documented them in a cogent and comprehensive manner. Quality improvement plans and corrective action plans were outlined and tracked appropriately during the reporting period. Some meetings did not attain quorums, however. The Patient Safety Committee reviewed routine drills and other patient safety issues, identified concerns, and addressed them adequately. SQ-PIP's utilization management meetings were suspended during the COVID-19 pandemic and had yet to resume. The institution did not submit meeting minutes from the quality management committee and it was not possible to discern various committee's reporting structures from the information provided.

**M.**    **PATIENT COMPLAINTS/PATIENT SATISFACTION**

CIW-PIP administered patient satisfaction surveys during three months of the review period. CHCF-PIP, CMF-PIP, SVSP-PIP, and SQ-PIP did not administer patient satisfaction surveys; at CMF-PIP, this was due to staffing shortages. Patient complaints were filed at CHCF-PIP, CIW-PIP, SVSP-PIP, and SQ-PIP. However, CMF-PIP provided a list of patient complaints

for the entire institution and not only the PIP. Common patient complaints addressed treatment deficiencies and issues with staff.

### 1. CMF-PIP, CHCF-PIP, and SVSP-PIP

As a result of staff shortages, CMF-PIP did not administer patient satisfaction surveys.

Interviewed acute non-maximum custody and acute maximum custody patients nonetheless raised concerns about the lack of treatment, nonconfidential contacts, lack of access to mental health staff outside of scheduled hours, treatment teams being quick to discharge patients back to outpatient settings, and limited access to cell electrical outlets.

CHCF-PIP did not conduct patient satisfaction surveys. During the review period, CHCF-PIP patients filed 102 complaints, of which six were deemed actual staff complaints.

SVSP-PIP did not conduct patient satisfaction surveys during the review period. However, 53 patients filed complaints. Common complaints addressed treatment deficiencies, staff shortages and redirections, patients' disagreement with diagnoses or prescribed medications, and patients claiming that their mental health had worsened following transfer to the PIP.

### 2. CIW-PIP and SQ-PIP

During the review period, CIW-PIP administered patient satisfaction surveys during three months. Patients generally indicated satisfaction with treatment planning and discharge goals, treatment and medication assistance, respectful staff treatment, cultural and religious accommodations, showers, and access to privacy when appropriate. CIW-PIP patients filed 47 complaints, of which two were deemed actual staff complaints.

SQ-PIP did not conduct patient satisfaction surveys. One patient filed a complaint, but no staff were moved to another post due to this complaint.

N.    **CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN**

Overall, a positive working relationship between custody and mental health staff was reported across all PIPs, demonstrating the institutions' commitment to the continued implementation of the custody and mental health partnership plan. This was evidenced by collaborative discussions between custody and mental health staff during huddles and with regard to executive leadership joint rounding. Nonetheless, concerns remained with the Custody and Mental Health Partnership Plan's (CMHPP) implementation, which included low staff attendance at huddles and low quarterly round table and annual off-post training attendance.

LOPs for all five PIPs aligned with CDCR headquarters' custody and mental health partnership plan. The CIW-PIP's LOP was dated December 2021 while LOPs were current at the four other PIPs.

Executive leadership joint rounding was conducted once in the CMF-PIP, twice in the SVSP-PIP, and once in the SQ-PIP during the reporting period; required staff attended in each instance. Minutes from one quality management committee meeting at SVSP reflected discussion of the joint rounding; CMF Quality Management Committee (QMC) meeting minutes did not include discussion of the rounding and SQ did not provide QMC meeting minutes. Mental health subcommittee minutes at CMF, SVSP, and SQ all reflected discussion of executive leadership joint rounding. The rounding was not conducted in the CHCF-PIP or CIW-PIP during the review period.

Reviewed second and third watch huddle forms from the CHCF-PIP and SQ-PIP revealed that mental health and custody staff generally attended; mental health staff but not custody staff were generally in attendance at the CMF-PIP and CIW-PIP; and both mental health and custody staff frequently did not attend at the SVSP-PIP.

Quarterly round table training compliance could not be determined at the CHCF-PIP, CIW-PIP, SVSP-PIP, or SQ-PIP; the CMF-PIP no longer offered this training. Custody staff – but not mental health staff – at the CHCF-PIP, CIW-PIP, and CMF-PIP complied with annual partnership off-post training requirements; compliance could not be determined for the SQ-PIP or SVSP-PIP.

Staff misconduct complaints were filed at all PIPs. Three staff members at the CIW-PIP were redirected to other institutions due to the same.

### 1.     CMF-PIP, CHCF-PIP, and SVSP-PIP

The CMF-PIP's CMHPP LOP was current and aligned with statewide policy.

The institution provided one executive leadership joint rounding report from an acute care unit. The rounding was attended by required staff and indicated that staff raised safety concerns with the change from MTAs to correctional officers due to the 2017 Lift and Shift. Patients also reported a lack of programming on the unit. Executive leadership joint rounding was not discussed during QMC meetings but mental health subcommittee meeting minutes reflected discussion of the rounding.

Three observed huddles found nursing staff discussing patients in detail while other attending staff minimally contributed to the discussions. Reviewed huddle reports reflected 45 percent attendance by custody staff, 71 percent by primary clinicians, and 100 percent by nursing.

No CMF-PIP staff were reassigned because of patient complaints.

Regarding annual off-post training, data was provided for the entire institution as opposed to the CMF-PIP. Ninety-nine percent of custody staff and 85 percent of mental health

staff completed the training.  The institution reported no longer providing quarterly round table training as it lacked a mental health trainer to train staff.

The CHCF-PIP's CMHPP LOP was dated January 2022 and complied with statewide policy.

Executive leadership joint rounding was not conducted in the CHCF-PIP during the review period.

While reviewed huddle forms generally indicated attendance by required mental health and custody staff, clinical staff reported that custody staff did not attend maximum custody huddles due to union-related issues.  Two observed CMHPP huddles revealed attendance and adequate participation by required staff.

There were 100 staff misconduct complaints at the CHCF-PIP during the review period; no staff were reassigned due to the same.  One reviewed complaint revealed concerning staff behavior, wherein a staff member assaulted a patient and injured the patient's shoulder.

Quarterly round table training was offered during all months of the reporting period; however, training compliance could not be assessed from the provided documentation.  Custody staff complied with annual off-post training attendance while 76 percent of mental health staff received the training.

SVSP's CMHPP LOP, which was institution-wide, was current and aligned with statewide policy.

Executive leadership joint rounding occurred twice in the SVSP-PIP during the review period.  Minutes from only one QMC meeting and one mental health subcommittee meeting reflected discussion of the rounding.

Like in the previous monitoring round, reviewed second and third watch huddle forms revealed inadequate attendance from required mental health and custody staff; most reviewed huddle forms only listed nursing attendance.

Patients filed 117 staff misconduct complaints; five were approved, 32 were under investigation, and all others were either denied, disapproved, or rejected.

Compliance with custody or mental health staff attendance at quarterly partnership round table training and annual partnership off-post training could not be determined from the provided documentation.

### 2.     CIW-PIP and SQ-PIP

The CIW-PIP's LOP was dated December 2021 and, thus, outdated but otherwise in alignment with statewide policy.

Executive leadership joint rounding was not conducted in the CIW-PIP during the review period.  Reviewed huddle forms revealed that, while huddles timely occurred, custody staff frequently did not attend.

Patients filed 27 staff misconduct complaints alleging staff use of disrespectful language, inappropriate uses of force, molestation, threatening and retaliatory behavior, and falsifying documents, among other allegations.  Three staff members were redirected to other institutions because of patient complaints.

Compliance with staff attendance for quarterly round table training could not be determined from the provided documentation.  Regarding annual off-post training, 93 percent of custody staff and 84 percent of mental health staff attended.

The SQ-PIP's LOP was dated August 2022 and aligned with headquarters' partnership plan.

Executive leadership joint rounding occurred once in the PIP during the review period. Reviewed mental health subcommittee and executive staff meeting minutes generally revealed discussion of the CMHPP and executive leadership joint rounding. QMC meeting minutes were not provided.

Reviewed huddle documentation revealed that required staff generally attended second watch–but not third watch–huddles.

No staff misconduct complaints were filed against PIP staff during the review period.

The SQ-PIP did not report quarterly partnership round table training and did not report annual off-post training data exclusive to the PIP but, rather, for the entire institution. To that end, custody staff complied with training attendance while 88 percent of mental health staff attended the training.

**O.    *COLEMAN* POSTINGS**

All PIPs were compliant with placing *Coleman* posters in observed housing units.

**1.    CMF-PIP, CHCF-PIP, and SVSP-PIP**

*Coleman* postings were displayed in both English and Spanish in all toured housing units at CMF-PIP, CHCF-PIP, and SVSP-PIP. Further, CMF-PIP, CHCF-PIP, and SVSP-PIP institutional audits determined that *Coleman* postings were displayed in areas accessible to patients.

**2.    CIW-PIP and SQ-PIP**

CIW-PIP reported that *Coleman* posters were posted in all common areas and housing units.

*Coleman* posters displayed in English and Spanish were displayed throughout SQ-PIP, including in the IDTT and group rooms.

P.    **LAUNDRY AND SUPPLY ISSUES**

There were issues with laundry and supplies at CMF-PIP, CIW-PIP, and SVSP-PIP. CHCF-PIP and SQ-PIP did not report any issues with laundry or supplies. CMF-PIP and SVSP-PIP did not provide audits, reports, or logs of compliance for laundry or supplies.

1.    **CMF-PIP, CHCF-PIP, and SVSP-PIP**

During the review period, CMF-PIP patients reported issues with laundry services and supplies. Patients reported a continued failure to receive appropriately sized clothing. Mental health leadership acknowledged these issues and in September 2022 attempted to implement a pilot program to address them. The pilot program's goal was to provide each patient with appropriate safety issue and to ensure that there was sufficient inventory. Unfortunately, a lack of staffing continued to present challenges, further delaying the program's implementation. There were no audits, reports, or logs of compliance regarding CMF-PIP laundry and supplies during the reporting period.

CHCF-PIP did not report any laundry or supply issues. The institution maintained detailed procedures for laundry and linen cleaning and distribution with an emphasis on preventing the spread of diseases. A monthly housing unit audit attempted to ensure the maintenance of adequate supplies.

SVSP-PIP patients reported deficient laundry services and supply issues. Patients indicated receiving other patients' laundry items, not receiving clean bed sheets nor clean towels, and an overall shortage of clean clothing. The SVSP-PIP did not have any audits, reports, or logs about laundry services or supplies.

2.    **CIW-PIP and SQ-PIP**

Laundry issues at CIW-PIP improved since the preceding monitoring period but remained deficient. The CIW-PIP's LOP detailed how staff collected soiled and contaminated linens,

stored clean linens, and issued them to patients.  However, CIW-PIP laundry was cleaned off-site, resulting in delays in the return of clean laundry to the institution.  No supply issues were reported.

SQ-PIP did not report any issues with laundry and supplies.  Laundry was directly handled by PIP and correctional treatment center (CTC) staff, who worked collaboratively to monitor laundry levels in order to provide the appropriate amounts of clothing, towels, and linens to patients.

## Q.    PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Similar to the prior review period, CMF-PIP, CHCF-PIP, and SVSP-PIP all reported delays in patients' receipt of property.  Both patients and staff indicated that staffing shortages were one of the causes of the delays.

CMF's LOP included details that patients were allowed canteen items approved by the patient's IDTT.  CHCF-PIP, CIW-PIP, and SQ-PIP all reported that canteen items were dependent upon patient's privilege group or decisions by their treatment teams.

Patients reported no issues with visitation at CMF-PIP, CHCF-PIP, and CIW-PIP.  CIW-PIP and SQ-PIP allowed no-contact visitation for IDTT-approved patients.

Telephones were readily available at the CMF-PIP, although there were some access barriers.  CHCF-PIP patients reported access to a sign-up sheet to use the telephone but that the telephone cleaning fluid made the receiver function improperly.  SVSP-PIP patients reported that there was no telephone access until after 6 p.m. on business days.

### 1.    CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP patients reported significant delays in receiving personal property.  Multiple patients reported receiving their personal property after being in the unit for up to one month.  One patient reported, which custody staff confirmed, that he had not received his personal

property after being in the PIP acute care program for 51 days. One property officer reported that patients arrived at the CMF-PIP with their personal property about 50 percent of the time.

The CMF-PIP's LOP indicated that patients were allowed non-perishable canteen items as approved by their IDTT. They were also allowed to receive quarterly packages consistent with their privilege group designation.

At the time of the site visit, CDCR had implemented at CMF-PIP a new function within Strategic Offender Management System (SOMS) to document the issuance of personal property, which enabled custody staff to determine the location of patients' personal property as patients awaited receipt of it.

CMF-PIP patients did not report any issues with telephone availability.

Although an observed IDTT reported that maximum custody CMF-PIP patients were allowed to make one monthly phone call, leadership reported that patients should be permitted two monthly phone calls, unbeknown to maximum custody staff.

CHCF-PIP patients reported delayed access to property, including durable medical equipment. Some patients reported delays of several months. They also indicated significant stress related to these property issues which, in part, resulted from inadequate custody staffing. Only one officer was responsible for property management and it took an average of at least two weeks for new patients to receive their property. Patients had canteen access, which was typically based on their privileged group.

Patients did not report any concerns with visitation and had access to contact and virtual visiting unless they were assigned maximum custody status.

As for telephone usage, CHCF-PIP patients reported difficulty being heard by the other party during phone calls and attributed the problem to the cleaning supplies used to clean the telephone receiver.  A custody supervisor acknowledged this concern.

SVSP-PIP staff also reported delays in patients receiving property which resulted in some patients attending yard and walking to groups without jackets during colder months.

Nearly every interviewed SVSP-PIP Facility C patient reported problems with tablets, with several indicating they had never properly functioned.

Several Facility C patients further reported that there was no telephone access until approximately 6:00 p.m. on weekdays which negatively impacted their communications with attorneys.

## 2.    CIW-PIP and SQ-PIP

Patients at CIW-PIP had non-contact visitation unless the IDTT specifically approved contact visitation.  The institution reported granting patients telephone privileges in accordance with their STEP level.

SQ-PIP allowed patient visitation through a hybrid program that permitted in-person contact visits on Friday and Saturday, and video visitation on Sunday.  However, the institution did not provide specific data about visitation.  Provided SQ-PIP non-clinical activity tracker (NCAT) data indicated that most patients were typically offered three to four weekly telephone calls.

## R.    LAW LIBRARY ACCESS

There were no changes to the CMF-PIP law library policy since the last reporting period. CMF-PIP and CHCF-PIP patients requested documents by filling out a form and giving it to library staff.  Multiple housing units at CMF-PIP, CHCF-PIP, and SVSP-PIP contained Law Library Electronic Delivery System (LLEDS) touchscreen kiosks.  Some kiosks at these facilities

were reported to be nonoperational at the time of the visit.  CMF-PIP library staff also reported difficulties providing requested documents to patients due to issues with the request form.

Patients at CIW-PIP and SQ-PIP had law library access through the library kiosk.

### 1.   CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP patients' access to the law library was limited to the paging system in which patients filled out a form and submitted it to library staff.  Patients and staff reported that there were challenges with the paging system because of issues with patients properly completing the request form.

CMF-PIP had three library kiosks available for patients.  However, during the site visit one had been reported inoperable for the previous three weeks.

The CHCF-PIP law library was available at patients' request during certain times of the day.  Patients requested access to the law library by completing the designated form or staff contacted library staff on the patients' behalf.

Multiple housing units at CHCF-PIP also contained LLEDS touchscreen computer kiosks.  Staff provided orientation on kiosk use and were available for assistance.  During the site visit, one kiosk was not operational.  CHCF-PIP patients who were suspended from the law library for disciplinary reasons conducted legal research by using the kiosks, or through the law library paging system.  Patients approved for priority library user status were granted a minimum of four hours of weekly law library access.

SVSP-PIP patients who were offered dayroom during evening hours reported that this limited their law library access.  Patients also reported that C5's law library kiosk had not worked for several months.  Like the prior review, patients stated that they could not make copies and had to wait over one month to receive requested copies.

###### 2.     CIW-PIP and SQ-PIP

CIW-PIP patients accessed the law library both through requesting access to the law library paging delivery process and through the legal research kiosk. Nine patients utilized the law library during the review period.

SQ-PIP provided NCAT data that reported law library access appointments. During the review period, 18 patients utilized the law library.

## S.     HEAT PLAN

Each PIP institution, except for CMF-PIP, reported compliance with headquarters' heat plan directive. Each institution's housing unit staff demonstrated a working knowledge of heat plan procedures. However, all institutions reported attendance deficits for the heat-related pathologies training.

###### 1.     CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP's local operating procedures (LOP) did not conform to the requirements of headquarters' heat plan directive, specifically for reporting heat-related illnesses. All interviewed custody staff were aware of the institutional heat plan procedures, including the temperatures that initiated each stage, staff requirements at each stage, and how to access the heat risk patient list. There were 64 Stage I, seven Stage II, and two Stage III heat alerts. No heat-related incidents involving a PIP patient were reported. There was no documentation reflecting accommodations made for heat risk patients due to cancelled yard time.

At CMF, the warden and all 81 sergeants attended the heat-related pathologies training, as did three of four associate wardens, three of five captains, 28 of 29 lieutenants, and 618 of 699 correctional officers. The institution did not report CMF-PIP staff training data.

CHCF-PIP's LOP was aligned with headquarters' heat plan directives. The institution's central control hourly logged outside temperatures. As CHCF-PIP was air conditioned, the LOP

only required the logging of indoor temperatures if the air conditioning was not operating. Interviewed housing unit officers displayed a working knowledge of heat plan procedures. The institution's shared drive contained daily lists of patients who were prescribed heat-sensitive medications.

The CHCF-PIP reported 88 Stage I and no Stage II or Stage III heat alerts. One patient experienced a heat-related illness on two separate occasions. Seventy-six percent of lieutenants, 55 percent of sergeants, 52 percent of correctional officers, and 75 percent of correctional counselor Is (CC Is) attended the heat-related pathologies training. The institution did not report CHCF-PIP staff training data.

SVSP-PIP's LOP adhered to headquarters' heat plan directives. There were eight Stage I heat alerts during the review period, but no Stage II or Stage III heat alerts. No patients experienced heat-related illnesses. One custody officer and 232 mental health staff members completed the heat related pathologies training.

## 2.     CIW-PIP and SQ-PIP

CIW-PIP's heat plan LOP was generally in compliance with headquarters' heat plan directive. The institution indicated proper logging of indoor and outdoor temperatures. The list of patients who were prescribed heat sensitive medications was updated weekly.

CIW-PIP reported 76 Stage I and 17 Stage II heat alerts, but no Stage III heat alerts. No PIP patient experienced a heat-related illness. At CIW, 78 percent of custody staff and 63 percent of mental health staff attended the heat-related pathologies training. The institution did not report CIW-PIP staff training data.

SQ-PIP's LOP was compliant with the headquarters' directive. There were four Stage I, three Stage II, and three Stage III heat alerts. One patient experienced a heat-related illness and

was transported for outside medical care.  Ninety percent of mental health staff and 92 percent of custody staff completed the heat-related pathologies training.  The institution did not report SQ-PIP staff training data.

## T.  PRE-RELEASE PLANNING

CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP had limited staff for pre-release planning purposes.  SVSP-PIP did not have a designated pre-release planning coordinator and relied on the statewide pre-release coordinator for pre-release services.

CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP offered some type of pre-release planning to eligible patients.  SVSP-PIP did not have any formalized pre-release planning programs for patients.  Pre-release groups were not offered in any of the PIPs.

### 1.  CMF-PIP, CHCF-PIP, and SVSP-PIP

Although CMF allocated 1.42 positions for the pre-release coordinator for all of CMF, including the PIP, staffing shortages resulted in a 1.0 pre-release coordinator position.  One of two Transitional Case Management Program (TCMP) caseworker positions was filled; visiting caseworkers filled gaps.  Due to staffing shortages, CMF-PIP was unable to provide pre-release groups.

Forty-six PIP patients were within 90 days of release during the review period.  Of these, seven patients' California identification cards were pending, one was denied, four were held in trust, three patients refused to cooperate with the process, six patients were not eligible, and no information was available for 25 patients.  The Classification and Parole Representative (C&PR) referred eight patients to Specialized Treatment for Optimized Programming (STOP) housing; seven placements were confirmed and one patient refused STOP housing.

A full-time licensed clinical social worker served as CHCP-PIP's pre-release coordinator.  The pre-release coordinator's responsibilities also included CCATs, videoconferences with

county mental health staff, and coordination of patient transportation with custody staff. Pre-release services were reportedly offered to 55 patients during the review period, but some patients refused these services.

CHCF-PIP did not offer pre-release planning groups during the review period. The pre-release coordinator further reported that headquarters had pre-release planning processes that tracked housing for released patients and coordinated services with the TCMP.

SVSP-PIP did not have a designated pre-release planning coordinator or a formalized pre-release planning program; the institution also lacked these services during the prior review period. Mental health leadership attributed the lack of a pre-release coordinator to the low number of PIP patients who were released to the community. SVSP-PIP relied on the statewide pre-release coordinator for notifications of patient release dates and coordination of CCAT meetings.

SVSP-PIP did not offer pre-release planning groups. Rather, primary clinicians were expected to provide pre-release planning services for eligible patients. However, SVSP-PIP did not offer any pre-release planning trainings or monitor whether pre-release services were incorporated into treatment plans for qualified patients.

## 2. CIW-PIP and SQ-PIP

Pre-release activities at CIW-PIP were initiated by the pre-release coordinator. On a weekly basis, the pre-release coordinator generated a report of patients scheduled for PIP release within 60 days. Once generated, the pre-release coordinator initiated the pre-release planning assessment (PRPA) and forwarded it to the primary clinician for completion. The two then formulated a plan to provide appropriate services to patients. Subsequently, the pre-release coordinator met with patients to address their needs.

CIW-PIP reported that all 12 patients who were scheduled for release during the review period received pre-release planning services. The pre-release coordinator also initiated contact with the appropriate community services entities, including probation and parole.

SQ-PIP's mental health pre-release coordinator received a roster of patients twice monthly from headquarters that included all eligible patients. This roster was used to schedule meetings with patients to complete the PRPA. However, the institution did not provide pre-release groups during the review period.

Two SQ-PIP patients required pre-release planning during the review period, but neither patient received specific pre-release programming. Rather, they worked with their treatment teams on clinically relevant issues related to their release. One patient was clinically discharged to EOP care and the other to DSH care for treatment as an offender with a mental health disorder (OMHD). The SQ-PIP did not provide information on TCMP services.

## U.  PROGRAM ACCESS

None of the patients at any of the five PIPs held employment positions. However, patients at all five PIPs earned milestone credits.

### 1.  CMF-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP patients did not have employment opportunities but all were eligible to earn milestone credits. During the reporting period, 68 acute care patients earned a total of 135 milestone credits; 54 intermediate care patients earned 83 milestone credits.

Due to the institution's reported inability to find clinically appropriate patients to fill vacant employment positions, CHCF-PIP patients did not hold job assignments. Fifty-seven acute care and 340 intermediate care patients earned milestone credits, respectively accounting for 28 and 89 percent of these patients. CHCF-PIP was unable to report the number of patients who were eligible to earn milestone credits.

No SVSP-PIP patients had job assignments.  The institution reported that 125 of 216 or 58 percent of patients earned milestone credits, but did not report the number or percentage of patients who were eligible to earn these credits.

### 2. CIW-PIP and SQ-PIP

No CIW-PIP patient held a job assignment during the review period.  Thirty-two intermediate care patients earned milestone credits, but the institution did not report how many patients were eligible to earn them.

No SQ-PIP patients had job assignments.  The institution reported that 25 acute care patients earned milestone credits, but did not indicate patient eligibility to earn them.  No data on intermediate care patients was provided.[25]

## V. EDUCATION

During the review period, CMF-PIP, CHCF-PIP, SVSP-PIP, and CIW-PIP did not enroll patients in educational programs.  Three patients at SQ-PIP received educational services.

### 1. CMF-PIP, CHCF-PIP, and SVSP-PIP

No patients at CMF-PIP, CHCF-PIP, or SVSP-PIP were enrolled in educational opportunities.  At CHCF-PIP, the lack of education programs were due to teacher vacancies.

### 2. CIW-PIP and SQ-PIP

No CIW-PIP patients were enrolled in an educational program during the review period.  Three patients at SQ-PIP received educational services, of whom two actively participated for five or more hours weekly.

---

[25] In their response to the Draft Report, defendants noted that SQ-PIP "provides intermediate care to condemned patients who are not eligible to receive such credits."

## <u>CONCLUSION</u>

The findings reported on herein sadly confirm that "*Coleman* class members in the Lift and Shift PIPs continue to receive inadequate inpatient mental health care." Special Master's Twenty-Ninth Round Monitoring Report – Part A, ECF No. 7555 at 160. Mental health staffing vacancies limited access to and frequency of mental health treatment and adversely impacted quality of care across programs, with the most severe impacts observed in the Lift and Shift PIPs. Functional vacancies at CMF-PIP and CHCF-PIP were again found to be dangerously high and not conducive to the delivery of adequate inpatient mental health care. More concerning still, mental health vacancies at CMF-PIP and CHCF-PIP for several classifications had actually worsened since the preceding monitoring round. *See supra* p. 26. Defendants' persistent inability to adequately staff these two programs—which have been the subject of close monitoring, including program-specific workgroups, for years—is deeply troubling. Finally, despite recent improvements to mental health staffing at SVSP-PIP, the quality of care delivered to *Coleman* patients in that program was inadequate. *See, e.g.*, *supra* IIC (reporting the monitor's expert's determination that 89 percent of clinical care provided at SVSP-PIP during the review period was of inadequate quality).

The trend identified in the preceding monitoring round generally remained applicable during this review period: uneven performance across programs, with the CDCR-developed PIPs generally outperforming the Lift and Shift PIPs. This was true in terms of mental health staffing vacancies, quality of care, and amount of treatment offered to *Coleman* patients, among other metrics.

This is the sixth of the Special Master's monitoring reports on the inpatient mental health care programs for *Coleman* class members. *See* ECF Nos. 5156, 5448, 5894, 7039, and 7555. Within these reports, the Special Master has made targeted recommendations and, over time,

identified "clear and specific targets' that must be addressed in order to provide adequate
inpatient care to *Coleman* patients."  ECF No. 7555 at 164 (quoting ECF No. 7039 at 116).
Invariably, the Special Master has reported that these inpatient programs — which provide vital
mental health treatment to the most acutely mentally ill members of the *Coleman* class — are
chronically and, at times, dangerously understaffed.  Consequently, patients receive woefully
inadequate amounts of treatment for an inpatient setting.  And what treatment is provided is often
not individualized to the needs of the patient.  As has been the case for the past several rounds,
group treatment offered to *Coleman* patients is often recreational in nature, of significant value to
the patient in terms of out-of-cell time, but not a substitute for structured mental health treatment.
With some limited exceptions, monitoring round after monitoring round, the Special Master has
identified the same deficiencies with little evidence of efficacious remedial action by defendants.

The persistence of significant mental health staffing vacancies in some of the PIPs, CMF-
PIP and CHCF-PIP in particular, "raises a question about whether defendants will ever be able to
hire sufficient staff to meet their constitutional obligations to members of the plaintiff class, as
long as the size of the seriously mentally ill inmate population in California's prison system
remains at current levels or continues to grow."  October 11, 2017 Order, ECF No. 5711 at 28.
As the Special Master noted in the Twenty-Ninth Round Monitoring Report – Part C: "Given the
persistence of defendants' inability to recruit and retain sufficient mental health staff over many
years, 'transformational' solutions may need to be considered" to ensure defendants are meeting
their constitutional obligations to the *Coleman* class.[26]

---

[26] *See* December 17, 2019 Order, ECF No. 6427 at 48-49 ("[T]he court repeats its observation
from the bench, that nothing prevents the defendants coming forward with a more
transformational options. In 2014, Judge Karlton observed, 'California is not alone in
criminalizing mental illness'… If there is a transformational and pragmatic alternative to the
prison as de facto mental health hospital, as a way to address a root contributor to the

Repeating the same or similar recommendations previously made by the Special Master is unnecessary at this time, in part because the deficiencies described in this Report are consistent with the findings from prior reports and are well known to defendants. Importantly, two of the primary deficiencies identified in this and preceding reports on inpatient mental health programs for *Coleman* class members – inadequate staffing and the lack of minimum standards for structured treatment and out-of-cell time for PIP patients – will be before the Court in the coming weeks. *See supra* pp. 114-17.[27] Accordingly, the Special Master declines to make additional recommendations based on the findings contained in this Report.

Respectfully submitted,

*/s/ Matthew A. Lopes*
Matthew A. Lopes, Jr. Esq.
Special Master

May 11, 2023

---

constitutional violation in this case, this court would entertain such a proposal. Unless or until such a constructive reform is possible, the staffing remedy in this case calls for defendants' staffing plan in the context of the Program Guide to chart the way forward and be put front and center.").

[27] As noted above, enforcement of the Court's prior orders regarding timely transfer of patients to inpatient care will also be before the Court later this year. *See supra* pp. 33-34.

# **APPENDIX A**

# **INSTITUTIONAL SUMMARIES**

**APPENDIX A-1**
**CALIFORNIA MEDICAL FACILITY (CMF – PIP)**
**(January 10, 2023 – January 12, 2023)**

The CMF-PIP reported numerous deficiencies, many of which persisted from the previous reporting round.  There were staffing shortages for two of four program directors and both senior psychiatrists and 56 percent vacancy rates for psychology, 76 percent for social work, and 49 percent for recreation therapy.  Staff-to-patient ratios were only met for psychiatry.

Observed acute care IDTTS revealed attendance by required staff but variability in addressing relevant issues; observed intermediate care IDTTs were wholly inadequate.  Acute care patients attended an average of 2.47 weekly hours of structured treatment.  RTs generally facilitated groups due to staffing shortages; neither psychologists nor social workers facilitated core clinical groups.  Staff and patients universally reported that the provision of group treatment was insufficient.  Furthermore, routine psychiatry and primary clinician contacts were not timely occurring as required.

Review of CMF-PIP's medication management found that psychiatrists frequently documented the presence or absence of common medication side effects and the use of long-acting injectable antipsychotics; however, there were numerous other inadequacies.  Delays regarding the initiation of medications and filing of PC 2602 applications, concerns with the choice and dosing of medications, and various documentation issues were all reported.  Only four of ten reviewed cases revealed adequate medication management.

I.    <u>**SUMMARY OF THE FINDINGS**</u>

- CMF-PIP operated 396 beds.  During the site visit, 175 of 218 acute care beds, and 121 of 178 intermediate care beds, were filled.  Overall, 75 percent of CMF-PIP's beds were filled; during the prior site visit, 85 percent were filled.

- The institution continued to experience severe staffing shortages that had not improved since the prior site visit.  Among other vacancies, positions for two of

four program directors and both senior psychiatrists were vacant, and there were functional vacancy rates of 15 percent for psychiatry, 56 percent for psychology, 76 percent for social work, and 49 percent for recreation therapy.

- CMF-PIP failed to meet required staff-to-patient ratios in the acute and intermediate care units for psychology, social work, and recreation therapy; the ratio was only satisfied for psychiatry.

- Observed IDTTs for acute care patients were attended by required staff but were otherwise variable in addressing relevant issues.

- All observed IDTTs for intermediate care patients were inadequate.

- Acute care patients were offered a weekly average of 4.48 hours of structured treatment and attended 2.47 weekly hours.

- Due to staffing shortages, RTs primarily facilitated groups, which frequently consisted of recreational activities. No core clinical groups were facilitated by psychologists or social workers.

- Staff universally reported that the amount of group treatment provided at CMF-PIP was insufficient for patients' clinical needs.

- Interviewed patients reported dissatisfaction with both group frequency and quality, and requested more clinically focused groups.

- Routine psychiatry and primary clinician contacts were not occurring as required, and did not consistently occur in confidential settings.

- Review of the healthcare records for ten CMF-PIP patients to assess the quality of medication management indicated adequate medication management for only four of ten reviewed cases.

- Positive aspects of CMF-PIP's medication management included psychiatrists' frequent documentation of the presence or absence of common medication side effects, and the use of long-acting injectable antipsychotics.

- Regrettably, there were a multitude of inadequacies in medication management, which included the delayed starting of medications and filing of PC 2602 applications, concerns with the choice and dosing of medications, and various documentation concerns.

- Due to inadequate staffing, CMF-PIP has not had a formal positive behavioral support team since September 2021.

- The quality of observed morning huddle meetings varied across programs.

- The STEP program was inconsistently implemented in both the acute and intermediate care programs.

- On average, both acute and intermediate care patients timely transferred to the CMF-PIP.

- Quality management activities for the CMF-PIP were limited secondary to staffing shortages, and especially due to vacancies in leadership positions.

- Utilization review processes did not occur during the review period secondary to staff shortages, specifically clinical supervisors.

- Interviewed non-maximum custody patients expressed concerns with a lack of treatment, lack of access to mental health staff outside of scheduled hours, and treatment teams being quick to discharge patients back to outpatient settings.

- Mental health leadership acknowledged continued issues with laundry service and supplies.

- Interviewed patients reported significant delays in receiving personal property.

- No issues or concerns were raised regarding access to telephones, canteen or visitation during patient interviews.

- Due to staffing shortages, no pre-release groups were offered.

- CMF-PIP patients were not provided with jobs or educational classes.

## II.    **CENSUS**

On January 13, 2023, the CMF-PIP operated 396 beds.  Of 218 acute care beds, 175 were filled, as were 121 of 178 intermediate care beds, for a total of 296 PIP patients.  All of the vacant intermediate care beds were in the HCITC, as reported below.  Overall, 75 percent of CMF-PIP beds were filled; during the prior review period, 85 percent were filled.

Due to severe staffing shortages, eight acute care beds were excluded from use.  Two acute care beds were redlined.  During the site visit, leadership reported that all available acute care beds were assigned, which included several beds being held for patients in outside hospitals.

Leadership reported that these beds were held for a reasonable period awaiting the patients' return.

Further, as for the 64 beds in the HCITC, six of the 16 beds on C wing that were set aside as admission quarantine beds were occupied. An additional 16 beds on D wing were set aside as COVID-19 isolation beds or were otherwise not utilized due to staffing shortages; none of these beds were occupied. An additional eight intermediate care locked dorm beds were unavailable due to social distancing and remained off-line. Twenty-one of the remaining 24 beds were vacant due to limited endorsements for locked dorms, and two were vacant single cell beds. As such, 57 of 64 HCITC beds were unoccupied.

There were no flex beds in use at the CMF-PIP during the review period or at the time of the site visit.

## III.    STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

On January 10, 2023, the executive director, chief of mental health, and chief nursing executive positions were all filled. One of four program director positions was filled, another position was filled by staff acting out of class, and two positions were vacant. Both program assistant positions were filled; one position was filled out of class.

Chief Psychiatrist: The chief psychiatrist position was filled.

Senior Psychiatrists: Both senior psychiatrist supervisor positions were vacant.

Psychiatrists: There were 27.5 psychiatry positions, of which 8.25 positions were filled, for a staff vacancy rate of 70 percent. There were 16 registry psychiatrists, and one staff psychiatrist was on an extended leave, for a 15 percent functional vacancy rate. Should the PIP begin to flex beds, an additional five psychiatrist positions would have to be filled. Two PIP

civil service psychiatrists also provided on-call physician/psychiatrist coverage in the crisis bed on nights and weekends.

Chief Psychologist:  The chief psychologist position was vacant but was covered by staff acting out of class.

Senior Psychologists:  One of four senior psychologist supervisor positions was filled by staff acting out of class; these positions had been vacant for more than one year.  Of seven senior psychologist specialist positions, two were filled for a 71 percent vacancy rate; an additional position was filled by staff acting out of class, for a 57 percent functional vacancy rate.

Psychologists:  Four of 27.5 psychologist positions were filled, reflecting an 85 percent vacancy rate.  Eight psychology contractors reduced the functional vacancy rate to 56 percent. Two psychologists were unlicensed.  Similar to psychiatry staff, an additional five psychologist positions were allocated if the PIP began to flex beds.

Supervising Social Workers:  One of two licensed supervising social worker positions was filled.

Social Workers:  Of 27.5 clinical social worker positions, 5.5 were filled, for a vacancy rate of 80 percent; one social worker was on an extended leave and there were two registry social workers, for a 76 percent functional vacancy rate.

Recreation Therapists:  Nine of 27.5 recreation therapist positions were filled, for a 67 percent vacancy rate.  One staff member was on an extended leave and registry staff filled six positions, for a 49 percent functional vacancy rate.

Supervising Registered Nurses (SRN):  Seventeen of 25 SRN II positions were filled, for a vacancy rate of 32 percent.

Registered Nurses (RN):  Of 176 RN positions, 137 positions were filled, and one staff member was on an extended leave, reflecting a 23 percent functional vacancy rate.

Senior Psych Techs:  All five senior psych tech positions were filled.

Psych Techs:  Fifty-two of 56.6 psych tech positions were filled.  One psych tech was on an extended leave, for a ten percent functional vacancy rate.

Licensed Vocational Nurses (LVN):  For LVNs, 30.9 of 31.9 position were filled, indicating a three percent vacancy rate.

Certified Nursing Assistants (CNA):  Sixty-nine of 162.8 CNA positions were filled, for a 58 percent vacancy rate.  Two staff were on long-term leaves, resulting in a 59 percent functional vacancy rate.

Correctional Staff:  The chief deputy warden's position was filled by staff acting out of class.  All five associate warden positions were filled, but one position was filled out of class.  Five of six captain's positions were filled; two were filled out of class.  For lieutenants, 29 of 31.2 positions were filled, including one filled out of class.  For sergeants, 81 of 91.6 positions were filled, with one position filled out of class.  For correctional officers, 699 of 769.6 positions were filled, but 18 officers were on extended leaves, for a 12 percent functional vacancy rate.

## 2.    **Telepsychiatry**

The CMF-PIP did not utilize telepsychiatry.

## 3.    **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

Overall, the CMF-PIP continued to experience a severe staffing shortage that had not improved since the last site visit.  The established staffing ratios for psychiatry, psychology, social work, and recreation therapy for acute care was 1:15.  All acute care units met this ratio

for psychiatrists; however, staffing ratios for psychologists, social workers, and recreation therapists in the acute care units were not met.

The staffing ratio for intermediate care units for all four disciplines was 1:30. The psychiatrist staffing ratio was met in the intermediate care units. Again, the staffing ratios for psychologists, social workers, and recreation therapists in the intermediate care units were not met.

Notably, due to primary clinician staffing vacancies, the CMF-PIP was unable to provide both a psychologist and social worker for each PIP patient, as required. Instead, a single primary clinician—either a psychologist or a social worker-- was assigned to each patient.

## IV.   **TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

Acute Care

Leadership was asked to describe how the institution was managing the delivery of care in the acute care program given the staffing shortages. In response, leadership reported focusing on four primary areas, namely, 1) SRASHE completion at admission and discharge; 2) timely IDTTs which included required members and demonstrated quality documentation; 3) reviewing every case prior to discharge and meeting weekly to discuss upcoming releases; and 4) monitoring scheduled and unscheduled treatment hours for completion.

Senior psychologist specialists, the acting chief of mental health and the PIP executive director were responsible for monitoring these areas and providing feedback to the teams about deviations from expectations. Senior psychologist specialists reviewed the documentation for every proposed discharge, ensuring adequate documentation and discharge rationales. A weekly meeting was also held where the leadership team reviewed each case. Any concerns regarding the discharge decision were provided in writing for the IDTTs to address. Similarly, SRASHEs

and IDTTs were also monitored, and any concerns were provided by way of email for the IDTTs to address.  Leadership monitored any and all cancellations or deviations from the scheduled structured and unstructured treatment hours.  Staff were asked to clearly justify why any planned treatment was not delivered as scheduled.

<u>Intermediate Care</u>

CMF-PIP provided intermediate care on units A-2, A-3, and P-3 (maximum custody), and on the HCITC, which was also known as the "64-bed unit."  On the HCITC, A and B units were used for regular patient care.  During the site visit, C wing was used for quarantined patients and D wing was used for isolation.  Since the prior site visit, the CMF-PIP had closed the unlicensed L-1 intermediate care unit.

### 1.     **Interdisciplinary Treatment Teams (IDTTs)**

<u>Acute Care</u>

IDTTs were scheduled multiple times weekly for all acute care units.  The schedule was created to accommodate the four CC I staff assigned to the PIPs in both acute and intermediate care.  No IDTT audits were completed during the reporting period.

Thirteen IDTTs held for acute care patients were observed on units P-2, S-1, S-2, Q-1, Q-2, and Q-3.  All observed IDTTs were held in confidential space that was adequate in size; however, on units Q-2 and S-2, the dayroom area used for IDTTs connected offices and staff walked through the area during IDTT meetings.  The rooms were warmer than they needed to be and, in some cases, loud fans made hearing difficult.

Correctional officers were present during an IDTT for a patient on suicide watch on S-2 and for all patients seen in IDTT on S-1.  On S-1, the officer's presence in the room was "out of caution" and was reported not to be a routine occurrence.

During all IDTTs, all staff were observed to have computer access with the exception of the correctional counselor on S-2. This was concerning as patients had questions about issues that the correctional counselor was unable to answer due to the lack of access to the information during the meeting. In both cases, the correctional counselor stated that he would return to the unit later in the day to provide the requested information.

Required staff were present for 12 of 13 observed IDTT meetings. Eleven of 12 meetings were collaborative; however, quality custody participation was only noted in six of 13 observed IDTTs. Only two of 13 observed IDTT meetings mentioned the STEP program.

During most acute care IDTTs, the same questions were asked of each patient. These questions addressed symptoms of depression and anxiety, auditory hallucinations, sleep, appetite, and suicidal and homicidal ideation. These questions appeared to be asked regardless of the patient's diagnosis or identified symptoms. This was a concern as it was difficult to discern what was being targeted for treatment given the questionings' generic nature. Consistently in all IDTT meetings when applicable, treatment progress and/or barriers to progress were discussed, as were transitional/pre-release planning. Patient functional impairments were discussed in 11 of 12 cases and psychiatric history was discussed in 11 of 13 cases. Diagnoses were clearly stated in seven of the 13 cases, with symptoms clearly supporting those diagnoses in five cases. Agreement among team members regarding diagnoses was only explicitly referenced in three of five cases. Case conceptualization was evident in four of 13 observed IDTTs.

Nine of 13 IDTTs clearly addressed treatment goals and were assessed to be appropriate and individualized in five cases. However, in only two of nine cases were treatment goals clearly measurable, objective, and realistic. For the remaining four cases, the appropriateness of the goals could not be determined based on the information presented during the IDTTs.

Treatment interventions were clearly stated in ten of 13 cases, but appeared appropriate to patients' needs in only three cases and were directly tied to treatment goals in only two of those cases.  In the majority of cases, the only interventions discussed were psychotropic medications.  Psychotropic medications were discussed by name in seven of 13 cases.  Safety planning was discussed in seven of 12 applicable cases.  Substance use needs were mentioned in only one case.  The patient's level of care was discussed and justified in six of 13 observed cases.  Group participation was explicitly reviewed in nine of 12 applicable cases with the one remaining case having been an initial IDTT where group enrollment was not discussed.  The newly admitted patient was informed about yard and dayroom access, but not group scheduling.

Intermediate Care

The monitor's expert observed IDTTs for seven intermediate care patients.  Six of these patients were housed on A-2; the remaining patient was housed on P-3.  The monitor's expert attempted to observe additional IDTTs on other units; however, this was hampered by no IDTTs being scheduled, or due to the IDTTs occurring at times other than those listed on the schedule.  In both locations, the rooms were confidential and conducive to the purpose.  There was adequate light and space, and the room was at a comfortable temperature.

All required treatment team members, including the psychiatrist, primary clinician, CC I, nurse, and patient, were present, except for one case in which the CC I had to leave early.  The psychiatrist for one of the IDTTs arrived late, due to confusion about the start time.  RTs were also present.  All attending staff had computer access, except for the CC I on A-2, who had printed information about each patient.  The psychiatrist and the primary clinician met with all patients prior to initial IDTTs.

Nursing staff contributed useful information about medication side effects and medical issues.  The RTs contributed germane information concerning group attendance.  The psychiatrists were interactive with the patients and provided clinically useful information about medications and side effects.  The monitor's expert noted that the psychiatrist for an initial IDTT on P-3 was empathetic, took time to explain medications, and also took concrete steps to build rapport with the patient.

Despite these positives, all observed IDTTs were inadequate.  Specifically, clinical presentations and conceptualizations were frequently absent.  However, when present, they were inadequate and did not allow for a clear clinical conceptualization of the patient.  In most cases, the symptoms presented were suggestive of, but not definitive to, the stated diagnoses. Treatment plan goals were discussed in only the most rudimentary of manners; most goals discussed were neither objective nor measurable.  While all disciplines participated, the process was siloed, moving from one discipline to the next, rather than a robust, clinically-enriching interdisciplinary one.

The CMF-PIP had not implemented the statewide STEP program but had an internal LOP.  Approximately one-half of observed IDTTs discussed the STEP program.  However, discussions did not conform to that outlined in the STEP LOP.  The primary clinician reported that patients started on STEP One, then raised to STEP Two after ten days, and raised further to STEP Three after 30 days.  The LOP submitted did not mention mandatory timelines, but instead emphasized individual progress and treatment planning.  Observed IDTTs did not routinely discuss LRH.

In one case, the primary clinician stated to a patient with safety concerns that the intermediate care program was "a six-month program" and that he had already exceeded that.

This statement did not comport with the Program Guide, which does not state a limit for the duration of treatment at the intermediate level of care.

2.    **Group Therapy**

Acute Care

The CMF-PIP scheduled patients for a weekly average of 7.14 hours of structured treatment but, on average, cancelled 2.66 weekly hours of this structured treatment. Acute care patients were thus offered a weekly average of 4.48 hours of structured treatment and attended a weekly average of 2.47 hours. Significantly, the number of actual structured treatment hours offered per patient ranged from zero to 15.47 weekly hours.

Throughout the review period, only three percent of patient weeks evidenced the offering of at least ten weekly hours of structured treatment. CMF-PIP reported that each unit was scheduled for 16 weekly groups, but this did not equate to every patient being offered 16 weekly hours. It was reported, for example, that maximum custody units were scheduled for 16 hours per week but not every patient was able to attend given the limited capacity of the maximum custody group rooms.

RTs primarily offered groups during the review period. No core clinical groups were facilitated by psychologists or social workers. CMF-PIP reported offering nursing-led treatment groups (NTLGs), but they were difficult to track. The PIP's executive director reported that patient schedules and attendance in NLTG were not being consistently recorded given that patients were not "scheduled" if they refused group participation, making the number of offered hours impossible to track. NLTGs were reportedly offered primarily during afternoons and on weekends. This was made more challenging by the fact that only two of the 13 allotted scheduler positions were filled at the time of the site visit.

Groups were offered to all acute care PIP patients. The capacity of these rooms ranged from six to eight patients for maximum custody and 16 patients for non-maximum custody groups. Every group was reportedly scheduled to the room's capacity. Patients were assigned to groups via an enrollment form which was a spreadsheet that listed all patients and included which groups had vacancies. It was reported that because all current groups were recreational and not clinical, groups were open to all patients and were assigned initially by cell number. In other words, there were enough group openings to provide treatment to every patient. While on site, patients appeared to be attending groups based on their assigned housing unit, with the exception of one group for maximum custody patients, where patients came from two different units.

No audits of groups were completed during the review period. However, staff reported that the leadership team tracked group cancellations and required every staff member to immediately report group cancellations. There were a number of groups with various topics listed on the weekly schedule, however, the actual group content did not correspond to the titles of the groups listed on the weekly schedule.

The monitor's expert attempted to observe a group offered to acute care patients on S-2. The group was noted on the schedule as a stress management group and was scheduled to start at 10:30 a.m. When the monitor's expert arrived at the group, three patients were present and were actively watching a movie. The recreation therapist (RT) facilitating the group noted that the patients arrived for group an hour earlier and the movie was started at that time. The group schedule revealed that an hour earlier, a coping skills group was scheduled. In reality, it was a single group that covered neither coping skills nor stress management. The RT stated that there

was no group discussion planned for the day, and that patients were going to watch the movie and discuss its contents the following day.

A recreational group for P-2 patients was observed and patients were interviewed. The group was focused on patients communicating effectively and without getting overly emotional. There were 11 patients in the room and most appeared to be engaged, with a few remaining silent or looking disinterested. It was reported that one patient did not speak English. Fortunately, the RT was Spanish-speaking and was able to translate content for this patient. The group started on time and the space was adequate.

A recreational group for patients on P-1 was observed. On the schedule, the group was noted to be an anger management group, yet in reality the patients watched a documentary about Antarctica. Four patients attended the group and appeared engaged in the movie; however, there was no discussion during the group about the movie or anger management. The group started late due to patients' late arrival.

Observation of a process group for maximum custody patients revealed three participating patients from units P-2 and S-2. Patients reported that this was the only group they were scheduled to attend during the week and found it helpful. The discussion was psychoeducational in nature and allowed patients to work through "real-world" issues.

<u>Intermediate Care</u>

As reported during the prior site visit, CMF-PIP did not have primary clinicians conduct group treatment. This was due to the severe staffing shortages, which resulted in leadership prioritizing other clinical activities, such as individual contacts and IDTTs. RTs and nursing staff facilitated all group activities. The facility was unable to provide the total number of group hours offered, refused, and attended, as the two systems recording nursing groups and RT groups

129

were not integrated.  It was further reported that groups were not offered to three intermediate care housing units (A-2, A-3, and HCITC).

Staff universally reported that the amount of group treatment provided at CMF-PIP was insufficient for patients' clinical needs.  Senior leadership recommended that intermediate care patients should receive at least 15 to 20 hours weekly hours of group treatment.

The monitor's expert observed two RT-facilitated groups.  The rooms were large, conducive to the purpose, and were at a comfortable temperature.  One group was listed as Dialectical Behavioral Therapy on the schedule; however, it was a recreational group with some patients playing video games.  In speaking with both patients and staff, it was reported that groups frequently differed from what was listed on the schedule, with recreational activities supplanting more clinically driven ones.

The other observed group addressed anger.  Sixteen patients were assigned to the group, but only six attended.  The group did not start on time as custody staff was still in the process of releasing patients.  The group's topic and content were clinically appropriate.  The group was interactive, and the RT actively encouraged all members' participation.  Interviewed patients reported dissatisfaction with both group frequency and quality, and requested more clinically-focused groups.

The monitor's expert's attempt to observe NLTGs was hampered by confusion due to these groups being scheduled and tracked in a different system than the RT groups.  Staff reported that patients were not ducated for NTLGs in the same manner they were for other activities.  Staff reported that often the correctional officers would approach the patients just prior to group and ask if they wanted to attend.

The monitor's expert was also concerned about the lack of primary clinician-led groups. While out-of-cell time and recreational activities were admirable, and even required, they could not replace the importance of clinical groups led by primary clinicians, which were a core feature of adequate inpatient care.

**3.     <u>Individual Treatment</u>**

<u>Acute Care</u>

Fifteen acute care patients interviewed by the monitor's expert consistently reported that primary clinician contacts were often brief check-ins and did not include treatment interventions. Patients reported that most clinical contacts lasted less than ten minutes and were not consistently held in confidential settings.  Most patients further reported being seen by their assigned primary clinician with occasional contacts being held with non-assigned primary clinicians.

Primary clinicians reported having to cover a number of patients beyond those on their assigned caseloads.  This resulted in them having to conduct brief sessions with patients, and on relying on handouts and homework to reinforce treatment concepts.  Further, space issues on the housing units also often limited staff's ability to see patients confidentially, especially when covering for other clinicians.

<u>Intermediate Care</u>

Staff reported that there was inadequate space to conduct confidential 1:1 sessions, as well as limited custody escort officers, due to competing demands that included individual primary clinician and psychiatry sessions, groups, IDTTs, and medical appointments, among other matters.

The monitor's expert interviewed approximately 15 patients, both in group and individual settings, across several intermediate care units. Overwhelmingly, patients reported a lack of continuity with primary clinicians. As one example, a patient reported approximately five to six primary clinicians over his one-year treatment period at CMF-PIP. Several patients could not name their primary clinician.

Due to severe staffing shortages, primary clinicians reported frequent cross-coverage and being pulled to other units. They reported increased work stress, due to a higher caseload, as well as not being able to spend enough time with their patients.

### 4. __Solo Programming__

CMF-PIP reported that they did not offer solo programming.

### 5. __Contact Compliance__

Staffing vacancies resulted in the CMF-PIP being granted three waivers from the California Department of Public Health during the review period which permitted among other things, less frequent psychiatric contacts than would have otherwise been required under Title 22.

Acute Care

The healthcare records of 20 CMF-PIP acute care patients were reviewed to assess compliance with the timeliness of initial and routine psychiatry and primary clinician contacts, and IDTTs.

Sixteen patients required initial psychiatry contacts during the review period. All were timely. Eight or 50 percent were conducted in a confidential setting. Reasons for non-confidential initial psychiatry contacts were either not provided or were due to patient refusals.

Nineteen patients required routine psychiatry contacts.  There were 81 expected timeframes, of which 44 or 54 percent were timely.  Notably, on occasion, psychiatry and primary clinician or IDTT contacts were conducted simultaneously.  Sixty percent of routine psychiatry contacts were confidential.  Non-confidential contacts were primarily due to patient refusals, as well as COVID-19 protocols, lack of available custody staff, or a lack of available treatment space.

Sixteen patients required initial primary clinician contacts.  Twelve, or 75 percent, were timely.  Fifty-six percent were conducted confidentially.  Non-confidential contacts were primarily due to patient refusals or COVID-19 precautions and staffing shortages.

Nineteen patients required routine primary clinician contacts.  There were 72 expected timeframes, of which 48 or 67 percent were timely.  Fifty-five percent of routine PC contacts were confidential.  Non-confidential contacts were mostly due to patient refusals, COVID-19 precautions, and limited mental health or custody staff.  One patient had a combined primary clinician and psychiatry contact due to space and time limitations.

Sixteen patients required initial IDTTs.  All were timely.  Required staff attended 44 percent of initial IDTTs.

Nineteen patients required routine IDTTs.  There were 61 expected timeframes, of which 59 or 97 percent were timely.  Required staff attended 34 percent of routine IDTTs.  Patients attended 81 percent.  IDTTs held in absentia were overwhelmingly due to patient refusals.

<u>Intermediate Care</u>

The healthcare records of 20 intermediate care patients were also reviewed to assess compliance with the timeliness of initial and routine psychiatry and PC contacts, and IDTTs.

Sixteen patients required initial psychiatry contacts during the review period. Fifteen or 94 percent were timely. Sixty-nine percent were conducted in a confidential setting. One initial psychiatry contact was nonconfidential due to a patient refusal; reasons for the remaining non-confidential contacts were not provided.

Eighteen patients required routine psychiatry contacts. There were 83 expected timeframes, of which 38 or 46 percent occurred timely. Eighty percent were conducted confidentially; routine psychiatry contacts were nonconfidential due to medical restrictions, patient refusals, staffing issues, or for unspecified reasons.

Sixteen patients required initial primary clinician contacts. Eight, or 50 percent, were timely. Thirty-eight percent of initial PC contacts were confidential. Contacts were held at cell front primarily due to COVID-19 precautions, patient refusals, or for unspecified reasons.

Eighteen patients required routine primary clinician contacts. There were 83 expected timeframes, of which 52 or 63 percent were timely. Sixty-three percent of the contacts were conducted in a confidential setting. Routine primary clinician contacts were held at cell front primarily due to COVID-19 precautions, patient refusals, or for unspecified reasons.

Sixteen patients required initial IDTTs. Fourteen or 88 percent were timely. Required staff attended 63 percent of initial IDTTs. RNs did not attend 37 percent of initial IDTTs.

Eighteen patients required routine IDTTs. There were 52 expected timeframes, of which 41 or 79 percent were timely. Required staff attended 55 percent of routine IDTTs. Patients attended 81 percent. IDTTs were held in absentia overwhelmingly due to patient refusals.

6.    **Medication Management**

During the reporting period, 38 CMF-PIP patients were prescribed clozapine. However, the institution was unable to report the number of patients who were initiated on clozapine while

housed there as opposed to the number of patients prescribed clozapine prior to arrival.  CMF-PIP physicians and nursing staff were comfortable with the use of clozapine.  Further, huddle participants reviewed patients who were prescribed clozapine daily, which included reporting on medical side effects.

CMF-PIP reported that 184 patients were prescribed PC 2602 involuntary medications during the reporting period.  Two petitions, both for acute care patients, were withdrawn.  Four petitions were denied.

The monitor's expert reviewed the healthcare records of ten CMF-PIP patients to assess the quality of medication management.  This assessment revealed adequate medication management for only four of ten reviewed cases.

Nonetheless, there were positive aspects of CMF-PIP's medication management.  Among them, psychiatrists frequently documented the presence or absence of common medication side effects and the institution often considered using long-acting injectable antipsychotics.  Many healthcare systems underutilized these medications, despite demonstrated benefits, including increased medication adherence and reduced hospitalization rates.

Unfortunately, the monitor's expert observed a multitude of inadequacies in the medication management of these reviewed cases; many cases demonstrated several inadequacies.  Further, even those cases where the monitor's expert determined that the overall medication management was adequate revealed sizeable deficiencies.

One concern with CMF-PIP's medication management was with the delayed starting of medications.  One patient admitted for severe decompensation was only offered as-needed antipsychotic medication, and not regularly scheduled medication.  The institution also

demonstrated delays in making crucial medication adjustments.  In one case, the patient was delusional and agitated, yet his medications were not changed promptly.

Two cases reflected delays in filing PC 2602 applications.  In one case, a patient who needed a PC 2602 prior to admission to the CMF-PIP decompensated even further for over one month, until the psychiatrist eventually filed the petition.  In the other case, notes repeatedly indicated that the psychiatrist would file a PC 2602; however, no PC 2602 was ever filed.  This led to a cycle where the patient initially agreed to medications, only to subsequently refuse them, with the psychiatrist then changing the medication, and the cycle beginning anew.

The monitor's expert also had concerns with the choice of medications, and the lack of sufficient documentation of medications.  In one case, the psychiatrist started lurasidone, a medication that required food for absorption, for a patient with frequent hunger strikes.  In another case, a patient was prescribed a long-acting injectable antipsychotic medication, as well as an oral form of another antipsychotic.  While there can be clinical reasons to use two antipsychotics, in this instance no clinical rationale was documented.

For another patient who was under a PC 2602 involuntary medication order, the psychiatrist discontinued a long-acting injectable antipsychotic and changed to an oral one.  This patient had a history of multiple medication refusals, and had assaulted staff in the past during the administration of involuntary medications.  As such, the decision to change from a medication given once every few weeks, to a medication given daily that might require the use of force to administer, was puzzling.  In another case, the doctor reported that the patient had no medication side effects, yet the patient was offered the option of raising the dose of a medication that was used to treat side effects.

The monitor's expert was also concerned with the dosing of medications. One patient had two rapid dosage changes during the course of treatment. The psychiatrist started venlafaxine, a medication often used to treat depression and anxiety. The usual starting dose of this medication was 37.5 mg daily, or rarely, 75 mg daily. However, the psychiatrist started the patient on 150 mg daily, a dose two-to-four times higher than typical. Later in treatment, the psychiatrist reduced the dose of benztropine, a medication used to address the side effects of antipsychotics. As the patient no longer reported those side effects, this decision was quite understandable. Confusingly, the doctor lowered the dose from a total of six mg daily, to two mg daily. However, this reduction was much faster than was typically done, as patients might have uncomfortable rebound side effects from the rapid discontinuation of this medication.

In another case, due to patient agitation, an on-call psychiatrist ordered emergency medications. The psychiatrist ordered the injectable antipsychotic chlorpromazine at a dose of 200 mg, in addition to two other medications. The usual dose of injectable chlorpromazine was 25-to-50mg, with doses up to 100 mg ordered when clinically indicated. The monitor's expert understood that the psychiatrist might indeed have had clinical reasons for these dosing decisions; however, the psychiatrist did not document the rationales used to arrive at this dose decision.

Healthcare record review also revealed copious and varied documentation concerns. In one chart, the psychiatry notes did not consistently list the prescribed medications. Further, many initial psychiatry evaluations contained carry-over information, impairing the ability to extract clinically relevant information from the note. In another case, the progress notes stated that there were no medication changes, despite the fact that the psychiatrist was titrating the patient off of clozapine, a medication requiring careful oversight and monitoring. In one case,

the psychiatrist's note was internally inconsistent, stating that the patient's mood was "euthymic" (i.e., normal), while the patient was in handcuffs due to his degree of agitation.  Finally, in yet another case, the psychiatrist had multiple notes indicating the patient's assessment during IDTTs, which was inconsistent with Program Guide requirements for psychiatry contacts.

### 7. __Positive Behavioral Support Team__

During the reporting period, no patients were referred for positive behavioral support and no behavioral plans were created.  The institution had not had a formal PBST since September 2021 due to inadequate staffing levels.  However, it was reported that informal consultations to assist patients and treatment teams in managing challenging behaviors were available through early 2022.  As of July 2022, no staff were formally identified to provide consultation for behavioral management.

Given the fact that self-injury was noted as an issue during quality management meetings and CMF-PIP was cited by the CDPH for inadequate response to self-injury during the review period, CMF-PIP could benefit from a PBST.  Without a program, patients were not adequately treated for their identified symptoms resulting in unnecessary increased risk for suicide and bodily injury.  Further, the site visit revealed that patients engaging in self-injury were also demonstrating behavioral challenges that resulted in the receipt of disciplinary action and maintenance on maximum custody status, which further limited their opportunities for treatment and potentially increased the length of their incarceration.

### 8. __Maximum Custody__

Maximum custody patients were offered group treatment on O-3 as soon as they were admitted to the PIP or as soon as their designation was changed to maximum custody.  Patients did not have to wait for a housing change to attend programming.  It was further reported that

CMF-PIP was not using the STEP orientation phase and that patients were immediately enrolled in groups upon admission.  Also, although maximum custody patients were scheduled to be offered 16 weekly hours of RT groups, not every maximum custody patient was offered all 16 hours due to limitations in the size of group rooms.

The monitor reviewed eight maximum custody PIP patients' non-clinical activity tracking (NCAT) data regarding the offering of yard and showers.  The NCAT system had replaced the 114-A paper system that custody utilized to document maximum custody patients' yard time and showers.  A total of 24 weeks for eight patients of NCAT data were reviewed for November 2022 for the offering of ten hours of weekly yard and three weekly showers.  The NCAT data recorded the offering of ten weekly hours of yard for eight of 24 reviewed weeks.  For showers, nine of 24 or 38 percent of reviewed weeks documented the offering of three showers.

When maximum custody patients were seen in IDTT, patients were cuffed either behind the back or in front secured with a waist chain and a correctional officer remained in the room.

### 9.    Morning and End of Shift Meetings

Acute Care

Two observed morning huddles on units S-1 and Q-3 found all required attendees present; however, the S-1 correctional officer was briefly alone on the unit, as the second officer was responding to an emergency, so the correctional officer had to cover the door, the needs of the unit, and the morning meeting for a short time.  Individual nurses facilitated the meetings by reviewing the units' rosters and briefly discussing each patient.  Although staff interjected from time to time when issues needed discussion, there was limited discussion during the meetings.

On S-1, the meeting addressed one patient who was scheduled for IDTT later in the day but did not address three other patients who were also scheduled for IDTTs.  This was

concerning as it provided an opportunity to elicit input from the team about these patients.  Unit Q-3 discussed admissions and upcoming discharges, recent behavioral problems on the unit, and the IDTTs which were scheduled for the day.

Intermediate Care

The monitor's expert observed two morning huddles, one on unit A-2, and one on HCITC units A and B.  The huddles largely consisted of going through the list of patients on the units without any interdisciplinary discussion.  Staff reported that the huddle format was undergoing revision.

The HCITC A/B unit's huddle was marginally adequate.  The psychiatrist and the RT arrived after the huddle started.  However, the A-2 huddle was inadequate.  Neither the psychiatrist nor the internist was present.  The monitor's expert had to question nursing several times about fundamental activities, such as whom nursing would contact for any urgent issues requiring a psychiatrist, as no psychiatrist was present.  After several questions, nursing was able to explain whom they would contact.  The monitor's expert voiced concerns to the huddle team that this was a fundamental safety issue on an inpatient unit to know the doctor to contact for a patient at all times.

### 10.    Space and Facility Issues

Mental health clinicians across all disciplines reported a lack of treatment space on the intermediate care units.  Although the new 64-bed unit had several large rooms, clinicians reported challenges as there were competing demands for the use of these rooms, which were utilized for groups, IDTTs, and individual sessions.  On the old part of the intermediate care units, which had much less space, the facility reported that it was creating more 1:1 treatment space by removing clinician offices from the unit.  Additionally, the facility planned to move

medication rooms off of the unit, transitioning to a centralized pharmacy system. Interviewed P-3 nursing reported concerns about having access to medications if they were needed on an urgent basis.

The institution had severe inclement weather during the site visit. The roofs in common areas were leaking. The monitor's expert observed large trash cans to catch the dripping water along central passageways. The facility reported that given the age of the building, it was difficult to find the sources of the leaks. Staff denied that these leaks affected patient care areas.

### 11. I-Flex

At the time of the site visit, CMF-PIP had not yet implemented the I-Flex bed plan. Leadership reported that trainings were scheduled in the near future. The monitor's expert raised concerns about programming on the units if multiple levels of care were together on the same unit. This concern was amplified given cross-covering primary clinicians who might not know the patient as well as a consistent primary clinician. Institutional and regional mental health leadership reported that the plan was to group patients together by level of care, as often as possible. Interviewed clinical staff were not generally aware of the planned I-Flex changes.

## V.    PATIENT ACCESS TO TREATMENT

### System to Encourage Progress (STEP) Program

CMF-PIP reported that during the review period the institution had yet to implement the statewide STEP policy, which had been updated on March 15, 2022. Reported barriers to STEP implementation included inadequate staffing, and the inability to obtain and difficulty identifying storage locations for program incentives. Staff and patients further reported confusion as to what patients were permitted at the various STEPs; patients elaborated that they did not see the point

of working to receive unclear and inconsistent benefits, even though the STEP program identified these benefits.

CMF-PIP reported that it used a smaller version of the statewide STEP program. The facility submitted the governing LOP for review. Per the LOP, staff were to educate patients about the STEP program upon admission. The treatment team determined STEP advancement through the different levels. At each IDTT, the team was to review the current STEP level, as well as requirements to advance to the next level. Staff were to document in the master treatment plan any modifications for the STEP program.

The acute care STEP program contained two levels. All patients entered on STEP One. The goals were to "transition patients into socialization and full implementation of the patient's treatment plan." Advancement to STEP Two required attending individual contacts and the IDTT. The "IDTT shall develop patient-specific criteria for the advancement to STEP 2 and document these criteria" in the patient's master treatment plan. Some suggested criteria for consideration were maintaining hygiene and room cleanliness, respecting the rights and property of others, and following CDCR rules and regulations. To maintain STEP Two status, the patient had to attend at least 50 percent of treatment activities and have no disciplinary issues.

The intermediate care STEP program contained three levels. Given that the CMF-PIP housed patients in a variety of settings, including single-cells, multi-person cells, and locked dorms, the plan indicated that the treatment team had to adjust the incentives based on these environmental differences.

The goals for STEP One mirrored those for acute care STEP One. Criteria for advancing to STEP Two included attending at least 50 percent of treatment activities and meeting patient-specific criteria as specified in the patient's master treatment plan. The treatment team was able

to consider maintaining hygiene and room cleanliness, respecting the rights and property of others, demonstrating progress toward attaining treatment objectives, and following CDCR rules and regulations.

Criteria that the patient needed to satisfy to advance to STEP Three included attending 80 percent of treatment activities, and meeting patient-specific treatment goals documented in the master treatment plan. The team could consider the following criteria: maintaining hygiene and room cleanliness, respecting the rights and properties of others, demonstrating progress toward attaining treatment objectives, and following CDCR rules and regulations. In order to maintain STEP Three, the patient had to attend at least 80 percent of their treatment activities, have no disciplinary issues, and meet patient-specific criteria as outlined in their master treatment plan.

However, the STEP plan was inconsistently implemented, and frequently did not conform to the LOP. As one example, in IDTTs on A-2, the primary clinician reported to patients that they would remain on STEP One for ten days, then advance to STEP Two for 30 days, and afterwards, would be on STEP Three. As outlined above, this differed from the LOP, which based STEP progression on multiple factors that were largely clinical in nature. Interviewed patients confirmed that the STEP plan was unclear, variable, and inconsistently implemented.

## VI.    REFERRALS AND TRANSFERS

There were 414 referrals to CMF-PIP during the review period, of which 364 patients were admitted, 34 referrals were rejected, 14 were rescinded, and two were re-endorsed to other institutions. Of the 34 rejected referrals, three were for acute care and the remaining 31 were for intermediate care. As for the 14 rescissions, five were for acute care and nine were for intermediate care. Both re-endorsements were for intermediate level of care. The reasons

referrals were rejected or rescinded included the patient's LRH being unavailable, the patient no longer being appropriate for psychiatric hospitalization, or the patient requiring further assessment.

Acute care patients transferred in an average of 7.6 days, with a range from one to 29 days between the time of the patient's completed referral and admission. There was an average of 2.2 days between acceptance by the institution and the patient's admission, which was within the 72-hour timeframe, with a range of one to 15 days.

Overall, patients timely transferred to intermediate care at CMF-PIP, or on average within 16.7 days of the required 30 days from completion of the referral to the patient's admission. In addition, on average there were 2.1 days between acceptance and admission to intermediate care, which was within the required 72 hours.

## VII.    ADMISSIONS AND DISCHARGES

### Admissions

There were 264 patients admitted to acute care and 110 admissions to intermediate care. There were 74 internal CMF transfers, of which 40 were referred to acute care, and 34 were referred to intermediate care.

There were 45 admissions of maximum custody patients, of whom 33 were acute and 12 were intermediate care patients. The institution was unable to provide a list of patients admitted to the PIP from a SHU who were within 21 days of discharge.

Six patients with complex medical needs were referred to CMF-PIP; three were accepted, one was re-endorsed to CHCF-PIP intermediate care, and two were discharged to an outpatient housing unit (OHU).

**Discharges**

The respective average lengths of stay for acute and intermediate care patients was 139.3 and 146.6 days. During the review period, acute care patients remained in the CMF-PIP for an average of five days beyond their clinical discharge; intermediate care patients remained 4.4 days beyond their clinical discharge. As of December 11, 2022, the institution reported there were 16 PIP patients who were clinically discharged but were awaiting physical discharge. The average time they were waiting beyond their clinical discharge was 14.2 days, which was too long to be awaiting discharge, with a range of three to 52 days. Eight patients were awaiting intermediate care placements at their designated LRH and eight were awaiting transfer to an EOP program.

A number of interviewed patients reported that they were told they would be discharged directly from acute care to the EOP level of care without appropriate consideration of the need for intermediate care treatment. Discussions with site leadership revealed that every discharge was being reviewed for clinical readiness as well as treatment recommendations post-discharge. Two discharge IDTTs that were observed on S-1 appeared appropriate to the clinical needs of the patients. One patient was being discharged to a medical unit as his needs appeared to be those of neurocognitive decline with his psychiatric issues being at baseline. The patient was assessed as psychotic, but his interpersonal interactions and hygiene had improved, and his isolation had decreased in recent months. The other patient had achieved his treatment goals and was being discharged to the EOP level of care. This discharge appeared clinically appropriate.

## VIII.  LEAST RESTRICTIVE HOUSING

On December 8, 2022, the institution reported having two intermediate care patients whose LRH determination was locked dorms who were housed in single cells; and three intermediate care patients whose LRH determination was multi-person cells who were housed in

single cells.  There were also 39 patients with an LRH determination of unlocked dorm, of whom
12 were placed in locked dorms, 11 were placed in multi-person dorms, and 16 were placed in
single cells.  Vacancies within the intermediate care units were generally due to the lack of
endorsements to multi-person cells or locked dorms.

Of the 13 IDTT meetings observed for patients at the acute level of care, three or 23
percent discussed the patient's LRH designation.  None of these patients were on maximum
custody status.  The discussions were related to housing upon discharge and did not include
discussions of assessments for LRH changes or treatment interventions designed to support
patients moving to a different type of housing.

## IX.    PATIENT DISCIPLINARY PROCESS

The institution issued 64 RVRs to 49 acute care and 15 intermediate care PIP patients
during the review period.

The monitor reviewed a sample of ten RVRs.  Custody staff timely referred the mental
health assessment to mental health in three of ten or 30 percent of cases.  Mental health staff
timely returned the completed assessment to custody 100 percent of the time.  A staff assistant
was assigned for all reviewed RVRs.  The mental health assessment was confidentially
completed in three of ten cases; five patients refused the interview and two patients requested a
cell-front interview.

The senior hearing officer documented consideration of the mental health assessment for
nine of ten reviewed RVRs.  In the remaining case, the senior hearing officer quoted the response
to question number four, which asked for what penalties the senior hearing officer should
mitigate, and not the responses to questions number two and three, which provided the clinical
information about whether the patient's mental illness impacted the behavior documented in the

RVR.  The senior hearing officer mitigated the penalties for all ten reviewed RVRs, but there was no mitigation of credit loss.

The institution was unable to report solely on CMF-PIP staff training and instead provided RVR training data for CMF as a whole.  The data indicated attendance at RVR training by two of four associate wardens, and by all five captains and 29 lieutenants.  For sergeants, 72 of 81 or 89 percent attended the training.  As for mental health staff's attendance at RVR training, 17 senior psychologists and psychologists, and four social workers, attended.

Eight of the ten reviewed mental health assessments were completed by a social worker who was not listed as having attended the required RVR training.  A senior psychologist who had received this training completed the remaining two.  Notably, staff who completed mental health assessments were required to complete this training, but this was not the case at CMF-PIP.

## X.    <u>USE OF FORCE</u>

The institution reported 106 immediate use of force incidents and one controlled use of force during the review period.  The CMF-PIP further reported one allegation of unnecessary use of force, which was forwarded to the Office of Internal Affairs for appropriate action.  As of the site visit, no final determination concerning this alleged unnecessary use of force was located in the patient's record.

The monitor reviewed 11 immediate use of force incident packages and the incident package for the one controlled use of force.  The 11 reviewed immediate uses of force identified their rationales to include four for covered cell windows and unresponsive patients, four occurring during escorts, two for patient self-injury, and one for battery on a peace officer.  The one controlled use of force was a result of a patient refusing to exit the non-contact visiting modular.

147

All reviewed uses of force complied with applicable policy. The controlled use of force episode included a cool down period of four hours, a psychiatrist and RN attempting to gain the patient's compliance to exit the modular, and review of the patient's EHRS for any medical contraindications for the potential use of pepper spray.

The institution was unable to report solely on CMF-PIP staff's attendance at use of force training and instead provided training data for the entire institution. This data indicated training attendance by the warden, four correctional administrators, and five captains. Twenty-six of 29 or 90 percent of lieutenants also attended this training, as did 75 of 81 or 93 percent of sergeants, and 100 percent of the 702 correctional officers.

For mental health staff, two of three chief psychologists and psychiatrists attended the training, as did all 13 supervising psychologists, psychiatrists, and social workers. The training was also attended by 15 of 16 or 94 percent of state psychiatrists, 12 of 25 or 48 percent of registry psychiatrists, 22 of 35 or 63 percent of psychologists, 17 of 18 or 94 percent of social workers, and 171 of 245 or 70 percent of registered nurses.

## XI.    PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

Reviewed reports reflected 194 post reviews of CMF-PIP maximum custody patients during October and November 2022. During these post reviews, the MHCT recommended suspending seven patients' maximum custody status; however, the ICC overrode two such recommendations and retained those two patients on maximum custody status. Overall, the ICC suspended maximum custody status for a total of 12 patients. There were no additional maximum custody suspensions following the Deputy Director videoconferences.

The monitor observed initial ICCs for six maximum custody PIP patients' initial ICCs chaired by the warden. The six patients included five acute care patients and one intermediate

care patient.  The ICC chairperson elected to remove three patients from maximum custody status and retained three.  The chairperson had extensive discussions with the patients to ensure they understood the action being taken and what the patient needed to do in the future to be removed from maximum custody status.  The chairperson's decisions appeared reasonable based on each patient's specific case factors.

Regarding the required maximum custody reduction training, 100 percent of custody managers including the warden, four correctional administrators, and five captains completed the training.  For correctional counseling staff, a total of 33 CC I, correctional counselors IIs (CC IIs) and correctional counselors IIIs (CC IIIs) completed the training, indicating 100 percent compliance for required staff.

As for mental health staff training, the data indicated that 33 psychiatrists, 50 psychologists, and 12 social workers completed the training.  It was noted that the majority of psychiatrists and psychologists were listed as registry staff, which explained why more staff were trained than were in full-time positions.  The training requirement was for mental health staff involved in the ICC and IDTT maximum custody reduction reviews and was not required for all mental health staff.

## XII.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

There were licensed restraint rooms in all PIP units, except A-3.  In the HCITC, there were four observation and four restraint rooms.  Restraint rooms were observed on units A-3, S-1 and P-3, as well as in the 64-bed unit.  All were clean.  The observed restraint rooms were all dry cells.  Observation and restraint rooms were cleaned and sanitized after each use.

A review of documentation revealed that patients were placed in observation rooms on unit A-3 in June, August, September, October and November 2022. The patients were placed on 1:1 observation for suicide watch status.

CMF-PIP reported no use of seclusion or restraints during the reporting period. Reviewed logs were consistent with these reports. Interviewed correctional officers could not recall a patient's seclusion or restraint in more than a year.

## XIII.  **EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS**

### **Emergency Response**

The EMRRC met weekly during the review period. No information about whether a quorum was achieved was documented. Minutes included discussion items, review of daily required checks and drill documentation, a list of all emergency medical response activations and unscheduled transports outside of the facility, ongoing and new case reviews, and sign-in sheets. The minutes did not include information regarding prompt and appropriate emergency responses. No tracking logs or audit data were provided.

During 2022, there were 302 emergency response incidents, with delays noted in 16 or five percent of incidents. The nature of the delays was not reported. CMF did not track incidents specific to the PIP. Rather, these cases were institution wide. All action items which resulted from these delays included corrective action plans for staff training. However, there was no process to determine whether training was the appropriate corrective action or if the training was effective.

**Death Review Process**

CMF-PIP reported one death during the reporting period, which was a death by suicide on October 22, 2022, on one of the acute care units.  A review of minutes from the EMRRC, mental health subcommittee, and Patient Safety Committee revealed minimal information.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

Quality management activities for the CMF-PIP were limited, secondary to staffing shortages, especially vacancies in leadership positions.  The program director for hospital administration, quality management and training reported that on a monthly basis, monitoring was limited to the following areas:  1) suicide risk evaluations being completed on time, 2) average number of hours of offered treatment, 3) unresolved pending appointments, 4) physical discharges within timeframes, and 5) mental health pending appointments not resolved in over four hours.  She reported that she tracked these items through the OnDemand system using the thresholds established by headquarters.  When measures were not meeting expectation, she sent emails to individuals in leadership positions requesting corrective action plans (CAPs) on a monthly basis.  Most items not meeting thresholds were concerning month after month due to staffing vacancies.  This was the only process in place for identifying and addressing issues with delivery of care in a systematic manner.  There were no processes in place to identify any new trends or emerging issues.

Minutes for the monthly mental health subcommittee were reviewed with a focus on the PIP.  Quorums were noted to have been achieved each month.  In June, July, August, September, and October 2022, access to care was noted to be concerning, including failing to provide adequate group treatment, yet no action item was documented to address the noted issues.  In October, the minutes included the conclusion "no follow up required."

In August, September, October, and November 2022, it was noted that clinician-facilitated groups were on hold, recreational therapy group hours were reduced, IDTTs within the acute care program were occurring every 14 days instead of every seven days, SRASHE completion timelines were out of compliance, "several QM audits, reports, and CAPs are either modified or on hold," scheduling of mental health appointments were out of compliance, PBST and psychological testing services were on hold, there was no SPRFIT coordinator for the PIP, and the PIPs were not meeting licensing staff minimums. No action items were documented to address these issues. The minutes also noted that LRH monthly audits and unlocked dorm weekly audits were on hold due to staffing and supervisor shortages. It was reported that all of the suspended processes and audits noted during the reporting period continued to be suspended at the time of the site visit.

The only data consistently reported monthly in mental health subcommittee minutes related to the PIPs was timely transfer of patients into acute and intermediate care beds. There were no unresolved quality improvement plans (QIPs) during the reporting period.

Patient safety subcommittee meetings were held monthly during the review period with a quorum documented for each meeting. Minutes were reviewed with a focus on the PIP. While raw data regarding outside hospitalization and self-injury statistics for the PIP were noted, trends were facility-wide and not PIP-specific. Changes in rates were noted but no specific actions were identified to address or analyze changes over time.

Minutes of monthly utilization management (UM) subcommittee meeting minutes were provided for the review period. All minutes noted that a quorum had been met. There were no references to UM measures specific to the PIP as all measures were related to medical services throughout CMF. The PIP was referenced in regard to high-risk patients and patients who

engaged in self-injury.  There was reference to an increase in self-injury during times of limited programming secondary to COVID-19, yet no data nor analyses were provided to support this statement.  There were no measurements related to the utilization of mental health services.

CMF-PIP reported that utilization review processes did not occur during the review period secondary to staff shortages, specifically clinical supervisors.  All discharges were being reviewed by clinical supervisors for appropriateness with attention to proper completion of SRASHEs and indications that patients had achieved treatment goals; however, there was no data available to analyze these findings or to examine trends.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

No patient surveys were completed during the reporting period due to staffing shortages.  As for patient complaints, headquarters provided a list of all institutional complaints; however, PIP patients could not be extracted from the list for review.

Twelve non-maximum custody acute care patients were interviewed.  The primary concern expressed by the patients was lack of treatment, lack of access to mental health staff outside of scheduled hours, and treatment teams being quick to discharge patients back to outpatient settings.  A few patients commented that they were directly told by their IDTTs that the CMF-PIP acute care program was "psych and return," meaning that patients were not sent to intermediate care upon discharge.  Patients primarily reported seeing their primary clinicians and psychiatrists weekly and in confidential settings.  One patient noted that while his assigned psychiatrist saw him confidentially, covering psychiatrists saw him at cell front.  This report was echoed by staff who reported that leadership supported cell-front contacts when they were covering for other clinicians.

Some patients reported feeling the need to "board-up" during crises because nursing and correctional officers would not contact mental health staff otherwise. Patients reported having access to yard once daily for an hour and access to dayroom in the morning and the afternoon, however, they were not allowed to attend dayroom if they had a group scheduled for the same time. Telephone access was allowed 15 minutes per day and only when patients were attending dayroom time in the evenings. Patients noted that very few cells had electrical outlets for appliances and televisions.

Three maximum custody acute care patients were interviewed; two were housed on P-2 and one was housed on S-2. The P-2 patients reported that contacts with their primary clinician were not consistently held in confidential settings and were often brief, failing to include therapeutic interactions, but instead included rote questions about symptoms and thoughts of self-harm. The patients reported that when they asked to speak to the primary clinicians' supervisors, their requests were not replied to promptly or appropriately. They reported that contacts with psychiatry were helpful and mostly occurred in private settings, but occasionally were held in the dayroom. One P-2 patient reported being seen by the IDTT every two weeks and the other reported not being seen by the IDTT for three weeks. The patient housed on S-2 reported that contacts with his primary clinician and psychiatrist were typically held in private settings. He reported being seen by his IDTT weekly.

All patients reported being offered yard time three times a week and group once a week for two hours. They reported that the STEP program was not being used. When asked about accessing mental health staff during an emergency, all three patients reported that they often did not get adequate responses and had to "board up" in order to get attention from the mental health

154

staff.  All three patients reported that they were offered more groups and treatment in the administrative segregation unit and SHU settings than they were in the PIP.

## XVI.  CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

The institution CMHPP LOP was current and in compliance with CDCR policy.

Three huddles were observed, including two on second watch and one on third watch. All required staff attended.  The huddles were completed by nursing staff reviewing each patient on the unit, including how the patient was doing with medication, and if there were any issues noted.  There was very little, if any, discussion by other staff attending the huddle.  Several of the PIP units were utilizing the specialized bed complete care model format to conduct the huddle meetings.

A total of 214 huddle reports were reviewed for compliance with the required staff attendance.  Custody staff were in attendance 45 percent of the time and a primary clinician was present 71 percent of the time.  A nurse was present 100 percent of the time.

The institution provided one executive leadership joint rounding report, dated August 26, 2022.  The rounding occurred in P-1, an acute care unit.  The rounding was conducted by the chief deputy warden, chief executive officer, and the chief of mental health.  The report indicated staff raised safety concerns with the change from MTAs to correctional officers as a result of the 2017 Lift and Shift and patients reported a lack of programming on the unit.

The institution reported that executive leadership joint rounding was not discussed during quality management committee meetings but was a standing item for discussion on the mental health subcommittee meeting agenda.  The discussions noted in the meeting minutes included the units rounded, and a summary of issues or positive comments raised by patients and staff.

The institution reported no staff were re-assigned as a result of a patient complaint.

The facility was unable to report solely on CMF-PIP staff and instead provided training data for the entire institution.  The institution reported no longer providing quarterly round table training as it lacked a mental health trainer to train staff.  As such, no quarterly round table training information was provided.

As for annual off-post training, the warden, five correctional administrators, five captains, 81 sergeants, and 699 correctional officers attended this required training, reflecting 100 percent compliance.  Twenty-seven of 29 or 93 percent of lieutenants also attended the training.  For mental health staff, 43 psychiatrists, two chief psychologists, 11 senior psychologists, two supervising social workers, and 18 social workers attended the training, for 100 percent compliance.  For psychologists, 23 of 40 or 58 percent attended the training.

## XVII. *COLEMAN* POSTINGS

The *Coleman* notice in both English and Spanish was posted in prominent areas that were accessible to patients in all toured CMF-PIP units, including A-2, A-3, P-1, Q-1, S-1, S-2, and the HCITC.

## XVIII. LAUNDRY AND SUPPLY ISSUES

The types of laundry service provided for acute and intermediate care patients remained unchanged since the preceding site visit.  Laundry services for acute care patients continued to be provided through the closet system, a one-to-one laundry exchange.  For intermediate care patients, laundry services were provided through the bag system, where laundry was placed in a mesh bag and cleaned.  Laundry was transported to CSP/Solano for cleaning.

Interviewed patients continued to report some of the same issues with laundry and supplies that were reported during the prior site visit, including failure to receive appropriately sized clothing.  Mental health leadership acknowledged continued issues with laundry service

and supplies.  As part of their efforts to address these issues, in September 2022 CMF-PIP initiated a pilot program for safety issue inventory and accountability on acute care unit Q-3. The pilot's goal was to ensure each patient was provided with appropriate safety issue and the required inventory was on hand.  While the intention was to subsequently roll the pilot out to all acute care units, mental health leadership reported that staffing issues, specifically a shortage of environmental services (EVS) staff, had delayed implementation of the roll out.

The lack of staff continued to present challenges with keeping up with the workload, which had remained unchanged.  Mental health leadership reported that some of the workload had been shifted to nursing staff in an attempt to offset the impact of EVS staff shortages. Leadership acknowledged that while that had provided some relief and they had seen some improvements, the facility was still struggling to keep up.

According to pre-site visit documentation, there were no audits, reports, or logs of compliance generated for laundry and supplies during the reporting period.

## XIX.  PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

The institution LOP regarding PIP operations included details about patients' access to visitation, telephones, and other privileges such as canteen, quarterly packages, and yard.  The LOP indicated that PIP patients were allowed canteen items as approved by the patient's IDTT for non-perishable items.  Food items were not allowed.  PIP patients were also allowed to receive quarterly packages consistent with their privilege group designation.

Personal property items were approved by the patient's IDTT.  During patient interviews, patients reported significant delays in receiving personal property.  One patient reported, which custody staff confirmed, that he had not received his personal property after being in the PIP acute care program for 51 days.  Through patient interviews, multiple patients reported receiving

their personal property in one week to more than a month. One patient reported a delay in receiving his property for one month and he had transferred from the CMF EOP program.

The monitor interviewed one of the four CMF-PIP property officers. The officer reported that PIP patients were received at CMF-PIP with their personal property about 50 percent of the time. When a patient did not arrive with their property, the officer had to determine where the patient arrived from as well as their prior institutions, to try and locate the patient's personal property. Once the CMF-PIP property officer located the patient's property, then the institution staff where the property was located had to make arrangements for the property to be sent to CMF-PIP. The CMF-PIP property officer had no control over how quickly or how slowly the institution would send the patient's property.

At the time of the site visit, CDCR had begun to implement a new function within SOMS to document the issuance of personal property. This new function had not been implemented at all institutions but was functional at CMF-PIP. This new function was a potential significant improvement, as custody staff in the future would be able to determine where a patient's personal property was located, what items were issued and when, and what other personal property was not issued and where it was located.

During patient interviews, no issues or concerns were raised regarding access to telephones, canteen, or visiting. Patient telephones were located on each housing unit and were readily accessible to patients. The telephone on Q-3 was broken during the site visit, however the telephone on L-1, which was not being used to house patients, was used by Q-3 patients.

During an observed IDTT, it was reported that maximum custody patients were allowed to make one monthly phone call. After further discussion with leadership, it was determined that patients should be receiving two monthly phone calls as outlined in a memo dated April 8, 2020.

Maximum custody staff did not appear to be aware of the requirement that maximum custody patients were entitled to two monthly phone calls.

## XX.    LAW LIBRARY ACCESS

There were no changes to the library policy since the preceding site visit. CMF-PIP patients were allowed to request materials through the library paging system, in which the patient filled out a standardized form stating the documents and/or materials being requested. The forms, which were available in the housing units, were provided to library staff, who were responsible for filling the requests.

Interviewed patients reported issues with the paging system including the failure to receive requested documents and/or untimely receipt of requested materials. Library staff acknowledged certain challenges related to providing patients with requested documents, primarily due to issues with the request form, e.g., incorrect cites, and reported that they would speak with patients directly in order to determine exactly what they were looking for, which could sometimes cause a delay in fulfilling the patient's request.

CMF-PIP continued to have three library kiosks available to patients on housing units A-3, P-1, and the HCITC; however, during the site visit, the kiosk in P-1 had been inoperable for the previous three weeks. The facility had just received the return label for it during the week of the site visit and it had been sent out for repair. The librarian reported that the library kiosks were generally updated on a quarterly basis, which consisted of switching out the hard drive with one received from the service company.

## XXI.   **HEAT PLAN**

The institution's LOP was not current with the requirement that health care staff report all heat-related illnesses using the Electronic Health Care Incident Tracking (eHCIT) system, in addition to completing the CDCR MH 7711-2 form.

During the review period, there were 64 Stage I heat alerts, seven Stage II heat alerts, and two Stage III heat alerts.  There were no heat-related incidents involving a PIP patient.  The institution reported not having documentation reflecting accommodations provided to heat risk patients as a result of cancelled yard.

The monitor toured six PIP housing units and interviewed custody staff regarding their knowledge of heat plan operations.  All interviewed custody staff knew the institution heat plan specifics, including each stage, what the temperatures were for each stage, what was required at each stage, and how to access the heat risk patient list.

The facility was unable to report solely on CMF-PIP staff and instead provided heat plan training data for the entire institution.  The warden and all 81 sergeants attended the heat plan training, as did three of four associate wardens, three of five captains, 28 of 29 lieutenants, and 618 of 699 correctional officers.

## XXII.  **PRE-RELEASE PLANNING**

CMF, which included the PIP, allocated 1.42 licensed clinical social workers for the positions of Institutional Mental Health Pre-Release Coordinator (IMHPRC).  However, the staffing shortages at CMF allowed them to set aside just one position for the entire institution.

Due to staffing shortages, no pre-release groups were offered.

One of two TCMP caseworker positions was filled.  TCMP staff reported using visiting caseworkers to fill any gaps.  The TCMP caseworker reported no issues meeting with patients

other than the need to navigate around COVID-19 quarantines and isolation.  TCMP staff indicated they were not able to separate PIP data from the institution's data, nor were they able to provide much institutional data at the time of the site visit.

However, as for 46 PIP patients who were within 90 days of release during the review period, the following information was provided.  As for California identification cards, seven were pending, one was denied, four were held in trust, three patients refused to cooperate with the process, six patients were not eligible, and no information was available for 25 patients.  The C&PR referred eight patients to STOP housing; seven placements were confirmed, and one patient refused STOP housing.

## XXIII. <u>PROGRAM ACCESS</u>

CMF-PIP patients did not have employment opportunities.  Although requested, the monitor did not receive information on whether patients continued to be provided with general education development (GED) self-study materials, as was reported during the preceding site visit.

All PIP patients were eligible to earn milestone credits.  During the reporting period, 54 intermediate care patients earned a total of 83 milestone credits and 68 acute care patients earned a total of 135 milestone credits.

## XIV. <u>EDUCATION</u>

CMF-PIP patients were not provided with educational classes.

**APPENDIX A–2**
**CALIFORNIA HEALTH CARE FACILITY (CHCF – PIP)**
**(January 10, 2023 – January 12, 2023)**

The CHCF-PIP site visit revealed that patients were receiving inadequate treatment and care.  Deficiencies included staffing shortages, inadequate IDTT meetings, insufficient group treatment hours, substandard individualized treatment, and poor medication management.  Despite a staffing consolidation resulting in the closure of three acute care units and two intermediate care units, staffing vacancy rates remained high.  Even with the use of contractors, the CHCF-PIP still reported functional vacancy rates of 32 percent for psychiatry, 52 percent for psychology, 56 percent for social work, and 37 percent for rehabilitation/recreation therapy.  Further, many IDTTs lacked collaboration and demonstrated consistently deficient care.  PIP acute care patients were only offered an average of 7.4 hours of structured individual and group treatment.  There remained a lack of core clinical groups and the frequency of psychiatry and primary clinician contacts was often inadequate for all patients.

Review of patients' health care records revealed numerous negative medication management findings including the delayed initiation of medications, medication adjustment problems, issues related to the involuntary medication administration process, staffing shortages and documentation issues.  As such, treatment remained insufficient for both acute and intermediate care inpatient programs at CHCF-PIP.

I.    <u>SUMMARY OF THE FINDINGS</u>

- Significant staffing vacancies had previously resulted in the CHCF-PIP's leadership and regional team requesting that the Special Master support a staff consolidation in the acute and intermediate care PIP units.  This consolidation led to the closure of three of six acute care units, and two of 11 intermediate care units, resulting in 91 acute and 58 intermediate care beds being taken off-line.

- Despite this staff consolidation, the site visit indicated that many IDTTs reflected widespread deficiencies, patients received insufficient out-of-cell structured and

unstructured treatment, there remained a lack of core clinical groups, and the frequency of psychiatry and primary clinician contacts was often inadequate.

- During the site visit, only 78 or 42 percent of the CHCF-PIP's 184 acute care beds were filled. During the prior site visit in July 2021, 160 of 184 or 87 percent of acute care beds were filled.

- During the site visit, 254 or 77 percent of the CHCF-PIP's 330 intermediate care beds were filled. During the previous site visit, 312 of 330 or 95 percent of intermediate care beds were filled.

- CHCF-PIP's staffing vacancy rates had improved since the prior review period, but remained high. Functional vacancy rates included a 32 percent rate for psychiatry, 52 percent for psychology, 56 percent for social work, and 37 percent for rehabilitation/recreation therapy.

- The CHCF-PIP did not use telepsychiatry during the review period or at the time of the site visit.

- Due to the staff consolidation and the taking of so many beds off-line, the three acute care and nine intermediate care units that remained open were all able to meet the staff-to-patient ratios of 1:15 for acute care, and 1:30 for intermediate care, for psychiatry, psychology, social work, and rehabilitation/recreation therapy.

- Observed acute care IDTTs were marginally adequate; observed intermediate care IDTTs varied in quality but most lacked collaboration and demonstrated consistent and widespread deficiencies.

- The number of out-of-cell structured and unstructured treatment hours offered to acute care patients remained insufficient for an acute care program.

- The CHCF-PIP based initial intermediate care group assignments on available space and not on patients' clinical need.

- Most intermediate care structured treatment consisted of psych tech and RT-led activity and leisure groups; most patients expressed interest in more core clinical groups.

- Observed intermediate care core clinical groups were nonetheless very well conducted by psychologists and licensed clinical social workers.

- Review of the healthcare records for ten CHCF-PIP patients to assess the quality of medication management revealed adequate medication management for five of ten reviewed cases.

- Positive aspects of medication management included psychiatrists' appropriate prescription of clozapine and the use of long-acting injectable antipsychotics.

- Numerous negative medication management findings included the delayed initiation of medications, medication adjustment problems, issues related to the PC 2602 process, staffing shortages negatively impacting treatment, and documentation issues.

- The amount of structured and unstructured out-of-cell time offered to maximum custody acute care patients was insufficient.

- Interviewed maximum custody acute care patients reported delayed access to their property upon admission, poor law library access, and issues associated with idleness and isolation. Most reported a lack of access to tablets and television.

- Group treatment on the maximum custody units had only been in operation for several weeks prior to the site visit, following TTM installation.

- Many patients complained that property and packages took too long to arrive and indicated a lack of access to televisions and tablets.

- Line staff reported that acute care patients lacked dayroom access for unstructured out-of-cell time due to the perception that they were too dangerous and insufficient custody officer allocations.

- Only seven percent of acute care patients and three percent of intermediate care patients timely transferred to the CHCF-PIP.

- During the site visit, 34 acute care and 102 intermediate care patients were housed above their LRH.

- Custody officers used chemical agents during 23 percent of immediate uses of force and 29 percent of controlled uses of force.

- The CHCF-PIP's quality management program had a robust infrastructure.

- Observed CMHPP huddles revealed engaged staff, including custody, with a clinician providing a clinical and functional update for each patient on the unit.

- Union issues reportedly resulted in custody staff not attending maximum custody huddles.

- The property management unit officer reported that it took an average of at least two weeks for new patients to receive their property.

- Patients typically had access to contact and virtual visitation.

164

- The CHCF-PIP did not offer pre-release planning groups.

- Due to teacher vacancies, CHCF-PIP patients did not have access to education; no job assignments were reported for CHCF-PIP patients.

## II.    CENSUS

Due to significant staffing vacancies associated with staff burnout, which resulted in limited patient treatment, the CHCF-PIP's leadership and regional team had previously requested that the Special Master support a staff consolidation in the institution's acute and intermediate care units to attempt to standardize care and improve treatment.  This consolidation occurred after the CDCR stopped intake to the CHCF-PIP for a four-month period beginning on September 28, 2021, which permitted the facility to consolidate care teams.  It led to the closure of three of six acute care units, resulting in 91 acute care beds being taken off-line, and the closure of two of 11 intermediate care units, with 58 intermediate care beds also being taken off-line.

On January 12, 2023, the CHCF-PIP operated 514 beds, which were the same number of beds that it had at the time of the prior site visit in July 2021.  There were 184 acute care and 330 intermediate care beds.  However, only 78 or 42 percent of the 184 acute care beds were filled, as 91 acute care beds were off-line due to staffing limitations.  Of the remaining 15 unoccupied acute care beds, one was assigned to a patient who was out to court/hospital/CTC, four were reserved for accepted patients pending admission, there were six isolation room beds, and there were four unoccupied beds available for patients.  Seventeen acute care patients were on maximum custody status.  Significantly, during the prior site visit in July 2021, 160 of 184 or 87 percent of acute care beds were filled.  The CHCF-PIP thus housed 82 less acute care patients during the January 2023 site visit in comparison to the prior site visit in July 2021.

Further, 254 or 77 percent of the 330 intermediate care beds were filled, as 58 intermediate care beds were also off-line due to staffing limitations. Of the remaining 18 unoccupied beds, six beds were assigned for patients who were out to court/hospital/CTC, one was reserved for an accepted patient pending admission, six were isolation room beds, and there were five unoccupied beds available for patients. Twenty-eight intermediate care patients were on maximum custody status. During the prior site visit in July 2021, 312 of 330 or 95 percent of intermediate care beds were filled. The CHCF-PIP thus housed 58 less intermediate care patients during the January 2023 site visit as compared to the prior site visit in July 2021.

Of the 17 acute care patients on maximum custody status, 12 were housed in the acute care maximum custody unit. Five other acute care maximum custody patients were housed in two other non-maximum custody acute care units. Of the 28 intermediate care patients on maximum custody status, 24 were housed in the intermediate care maximum custody unit and four other patients were housed in two other non-maximum custody intermediate care units.

The CHCF-PIP did not flex any beds during the review period.

III.   **STAFFING**

Overall, the CHCF-PIP's staffing vacancy rates had improved since the prior reporting period. These vacancy rates nonetheless remained high.

1.   **Administrative, Clinical, and Correctional Staffing**

Program Directors:  Three of 4.5 positions for program directors were filled, for a 33 percent vacancy rate.

Program Assistants:  Both program assistant positions were filled.

Chief Psychiatrists:  Two chief psychiatrists covered one position; one of the positions was filled through the blanket.

Senior Psychiatrists:  Both senior psychiatrist positions were vacant.

Psychiatrists:  Thirteen of 29.2 psychiatry positions were filled, for a 55 percent vacancy rate.  The use of 6.77 contractors reduced the psychiatry functional vacancy rate to 32 percent.

Chief Psychologists:  Both chief psychologist positions were filled.

Senior Supervising Psychologists:  Three of four positions for senior supervising psychologists were filled, for a 25 percent vacancy rate.

Psychologists:  Nine of 29.2 psychology positions were filled, reflecting a 69 percent vacancy rate.  One psychologist was on an extended leave, but there were 6.06 psychology contractors, resulting in a psychology functional vacancy rate of 52 percent.  Three psychologists were unlicensed.

Supervising Social Workers:  All 1.9 supervising social worker positions were vacant.

Social Workers:  Twelve of 29.2 social worker positions were filled, for a 59 percent vacancy rate.  One social worker was on an extended leave, and there were 1.96 social worker contractors, for a social worker functional vacancy rate of 56 percent.  Three social workers were unlicensed.

Rehabilitation/Recreation Therapists:  Sixteen of 29.2 rehabilitation/recreation therapists were filled, reflecting a 45 percent vacancy rate.  One recreation therapist was on an extended leave, and there were 3.42 contractors, reducing the functional vacancy rate to 37 percent.

Supervising Registered Nurses (SRNs):  Fifty-seven of 72.1 supervising registered nurse positions were filled, reflecting a 21 percent SRN vacancy rate.

Registered Nurses (RNs):  Of 263.6 positions, 155.99 positions were filled, for a 41 percent vacancy rate.  Eighty-two contractors reduced the registered nurse functional vacancy rate to ten percent.

Certified Nursing Assistants (CNAs):  Including non-PIP staff, 257.7 of 515.07 CNA positions were filled, for a 50 percent vacancy rate.  Four CNAs were on extended leaves, and there were 73 registry CNAs, reducing the functional vacancy rate to 37 percent.

Senior Psych Techs:  Twenty-four senior psych techs covered 19.8 positions.  Two senior psych techs were on extended leaves.

Psych Techs:  All 210.6 psych tech positions were filled.  Four psych techs were on extended leaves, and there was one psych tech contractor, for a psych tech functional vacancy rate of one percent.

Unit Supervisors:  There were four-unit supervisors, but no established positions.

Office Services (OSS) II:  Two of 2.5 OSS II positions were filled, for a 20 percent vacancy rate.

Associated Government Program Analyst (AGPA):  Nine of 12.5 AGPA positions were filled, for a vacancy rate of 28 percent.  One AGPA was acting out of class.

Correctional Health Care Administrators (CHCA):  Four of 4.5 CHCA positions were filled, for an 11 percent vacancy rate.

Clerical positions:  Seven of 15 mental health clerical positions were filled, for a 53 percent vacancy rate.

Correctional Staff:  Positions for the warden and chief deputy warden were vacant but filled in acting capacities.  Three of six associate warden positions were filled, but one position was filled out of class.  Four of five captains' positions were filled; three were filled out of class. For lieutenants, 27 of 30.8 positions were filled, reflecting a 12 percent vacancy rate.  For sergeants, 69 of 81.6 positions were filled, but two sergeants were on extended leaves, for an 18 percent vacancy rate.

Further, eight of ten CC II positions were filled, as were 20 of 24 CC I positions.  Of 917.8 positions for correctional officers, 866 were filled, for a six percent vacancy rate. However, 36 correctional officers were on extended leaves, indicating a ten percent functional vacancy rate.

### 2.    **Telepsychiatry**

The CHCF-PIP did not use telepsychiatry during the review period or at the time of the site visit.

### 3.    **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

The staffing ratio for the four disciplines of psychiatry, psychology, social work, and rehabilitation/recreation therapy for acute care patients was 1:15.  As of January 6, 2023, the CHCF-PIP reported that all three acute care housing units that housed patients, including the maximum custody unit, met this ratio for both the units' actual census and bed capacity for all four disciplines.  Significantly, the institution was able to satisfy this 1:15 acute care staffing ratio because it had closed three acute care housing units and taken 91 beds off-line.

The CHCF-PIP had a 1:30 staffing ratio for the four disciplines for intermediate care. Given the census or bed capacity, all nine intermediate care units that housed patients, including the maximum custody unit, met the staffing ratio for all four disciplines.  Again, the institution met this 1:30 intermediate care staffing ratio because it had closed two intermediate care housing units, and taken 58 beds off-line.  Given present staffing, the institution will not be able to satisfy these staff-to-patient ratios for acute and intermediate care if the CHCF-PIP reopens the closed units and fills the off-line beds.

### 4.    Staffing Shortages and Recruitment Efforts

The CHCF-PIP reported somewhat improved staffing since the prior review period and indicated having received support from statewide leadership for staff recruitment and retention. The institution further reported that as of May 2022, a statewide effort had increased clinical staff's pay by 15 percent, and there had been retention bonuses for current providers and new hires. It was further reported that multiple job fairs had also led to the successful hiring of new staff. The institution nonetheless reported continuing difficulties hiring staff.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.    Interdisciplinary Treatment Team Meetings (IDTTs)

Acute Care

Required staff attended two observed acute care IDTTs conducted in a confidential room with adequate space. The IDTTs were marginally adequate. The IDTTs reflected collaborative discussions and patient engagement, and addressed relevant clinical issues, including patients' current diagnoses, medications, and treatment progress. However, IDTT treatment plan discussions contained minimal specificity, and barely discussed treatment interventions and goals, and group treatment. Except for correctional counselor responses to patient questions, custody input was neither obtained nor received.

Intermediate Care

Twenty observed IDTTs conducted in numerous housing units revealed adequate space and appropriate sound confidentiality. Required staff attended and had laptops to access patient information.

Observed IDTT quality varied among units. Assigned attending clinicians knew their patients and exhibited good rapport. Psychiatry participation was generally appropriate for

medication management, and included discussions of medications' side effects, and answered patients' questions.

Further, observed IDTTs on housing unit B8A were stellar. The IDTTs were patient focused; patients' presentations drove the discussions, and the primary clinician appropriately interjected when staff or the patient deviated from the topic or when there was a need for a change in direction. The patients' baseline of suicidal ideation, homicidal ideation, and depression were established at the beginning of the IDTT. The IDTTs also discussed case conceptualization in a positive and clinical manner, while treatment interventions that improved or had not improved the patients' functioning were discussed and modified where necessary. The IDTTs also discussed patients' STEP and LRH.

Nonetheless, most observed IDTTs demonstrated consistent and widespread deficiencies. They generally lacked any form of clinical case conceptualization, presentation, or review of clinical or institutional history, and did not address LRH. The IDTTs did not include discussions with the patient or between staff about level of care retention or change. They also failed to address discharge criteria, and there was minimal discussion of specific objectives or interventions outside of medication compliance. Treatment goals were frequently vague, boilerplate, and not individualized, and there was typically no discussion of the STEP program.

Further, staff lacked collaboration and often appeared robotic. IDTTs typically began with the primary clinician rotely reading a list of predetermined questions that focused on the patients' mental status and safety; however, patients' responses did not influence the line of questioning or the course of the IDTT. The primary clinician then polled each discipline for input, but there was minimal collaborative discussion. One observed IDTT revealed a floridly psychotic patient, yet each discipline continued with their presentations despite the patient's

disengagement.  It was also difficult to understand staff with the use of personal protective equipment (PPE), which negatively impacted communication.  Further, the IDTTs did not discuss as a team patients' group attendance and any barriers to attendance.

2.    **Group Therapy**

Acute Care

Although each acute care group typically included up to eight patients, during the review period COVID-19 protocols often reduced group size to five patients.  Mental health leadership also reported inadequate group treatment space.  In fact, psych tech-led groups were held in nonconfidential dining rooms.  Psych techs also reported insufficient group treatment supplies.

Each discipline conducted an initial patient assessment to determine patient group placement.  Thereafter, based upon treatment plans, a master treatment team conference selected the groups to enroll patients.  Group treatment was only offered in English; however, when available, translators were used for non-English speaking patients.

Since the previous site visit in July 2021, the number of out-of-cell structured and unstructured treatment hours offered to patients had increased.  Nonetheless, this treatment was insufficient for an acute care PIP program.

The monitor's expert analyzed reporting period data for two acute care units, reflecting 52 weeks of unstructured and structured treatment.  This data indicated the offering of weekly averages of between 5.72 and 25.07 hours of unstructured out-of-cell time per patient.  During 25 of the 52 weeks, the CHCF-PIP offered patients between ten and 15 weekly hours of unstructured treatment.  Patients were offered more than 15 weekly hours of unstructured treatment for 14 weeks, but less than ten weekly hours for 13 weeks.  Patients utilized most offered unstructured out-of-cell time.

The CHCF-PIP's objective was to offer patients a minimum of ten weekly hours of structured treatment.  During the review period, patients were offered a weekly average of structured individual and group treatment of between 5.13 and 19.22 hours; however, for 21 weeks, they were offered less than ten weekly hours, while they were offered more than ten hours for 31 weeks.  Further, patients actually received a weekly average of 7.4 hours of structured individual and group treatment.  Average cancelled structured treatment typically exceeded ten weekly hours.

Intermediate Care

Review of the unit schedules revealed very few core clinical group offerings facilitated by psychologists.  In fact, most treatment units only offered two psychologist-led weekly groups.  Rather, psych techs and RTs facilitated significantly more activity and leisure groups.  During the site visit, housing unit B3B could not offer clinical groups because no psychologist was assigned to the unit to run these groups.

Staff reported, and document review confirmed, that initial group assignments were neither based on clinical need nor the treatment plan.  Instead, patients were assigned to groups upon admission based on available space; clinical need was subsequently assessed.  Although patient reports about group assignments and quality varied, all patients expressed an interest in more core clinical groups and less activity and leisure groups.

Four observed core clinical groups, which addressed anger management, building positive relationships, stress management, and triggers, were very well conducted by psychologists or licensed clinical social workers, and addressed pertinent topics and interventions.  Three of the groups had between four and six participants; the anger management group had 11.  Clinicians typically knew their patients and the group subject matter, and

effectively redirected patients when they deviated from the topic.  The anger management group, which was co-facilitated by both of the housing unit's primary clinicians, was particularly well run and reflected highly engaged patients who received useful tools and strategies from the group curriculum.

The monitor's expert also observed RT activity/leisure groups in several units involving activities such as listening to music and playing games.  Patients participated in these activities with engaged facilitators, who were appropriately energetic in their patient interactions.  Nonetheless, patients reported that psych tech groups were often repetitive, with facilitators repeatedly using the same workbook and little variety in activities or interventions.

Intermediate care patients were allowed dayroom and yard, but clinical staff reported problems with patients selling contraband and drug paraphernalia in the dayroom.  During an observed IDTT, a patient reported obtaining the razor that he swallowed from another patient who was selling them.

Nursing Lead Therapeutic Groups (NLTG)

The CHCF-PIP provided nursing-led therapeutic groups, which allowed eligible patients to receive rehabilitative achievement credits toward a reduction in their prison sentence.  These groups had restarted in April 2021 and were conducted during third watch.  The CNE and SRN IIs reported that RNs conducted a total of 20 weekly NLTG groups on two acute care and two intermediate care units.  Group attendance averaged eight patients for the acute care groups and 12 patients for the intermediate care groups.

Patients reported not attending these groups at times because of their preferences to attend dayroom or yard, sleep, watch television or use the telephone, or because the groups were boring.  Further, since there were no scheduled times for dayroom or yard, the third watch NLTG

groups served as potential competition.  Additional barriers to the NLTG groups included continuing COVID-19 outbreaks, solo programming, 1:1 suicide watches, custody availability, and RN vacancies.

### 3.    Individual Treatment

Acute Care

As reported above, acute care patients received a weekly average of 7.4 hours of combined individual and group treatment.

Intermediate Care

Patients' reports on the timeliness, frequency, and quality of individual clinical contacts varied by housing unit.  Most patients reported receiving adequate, timely, weekly psychiatry contacts, which occurred separately from their monthly IDTTs.  They further reported that the frequency of primary clinician contacts varied widely.  For example, patients on housing unit B5A reported receiving one-hour weekly individual psychotherapy sessions with their primary clinicians, while patients on B3B indicated receiving brief check-ins with their PCs once or twice monthly.  All interviewed patients reported confidential contacts.

### 4.    Solo Programming

Acute Care

The CHCF-PIP offered a total of 239.59 hours of solo programming to six acute care non-maximum custody patients.  Each of these six patients were thus offered an average of 39.93 hours of solo programming, with a range of three to 90 hours offered per patient.

Intermediate Care

The CHCF-PIP offered a total of 5,421.91 hours of solo programming to 41 intermediate care non-maximum custody patients.  Each of these 41 patients were thus offered an average of

132.24 hours of solo programming, with a range of less than one hour to 425 hours offered per patient.

### 5.    <u>Contact Compliance</u>

Staffing vacancies resulted in the CHCF-PIP being granted three waivers from the California Department of Public Health during the review period which permitted among other things, less frequent psychiatric contacts than would have otherwise been required under Title 22.

<u>Acute Care</u>

Twenty acute care patients were reviewed to assess compliance with the timeliness of initial and routine psychiatry and PC contacts, and IDTTs.

Eighteen patients required initial psychiatry contacts during the review period.  All initial psychiatry contacts were timely.  Seventy-two percent were confidential.  Reasons for nonconfidential contacts were due to patient refusals or were not provided.

Twenty patients required routine psychiatry contacts.  There were 87 expected timeframes, of which 72 or 83 percent of routine psychiatry contacts timely occurred.  Many of the reviewed patients were on suicide watch or precaution and were therefore seen almost daily. Twenty-one percent of routine psychiatry contacts were confidential.  Reasons for nonconfidential contacts included patient refusals, contacts occurring during IDTTs, and safety reasons.

Eighteen patients required initial PC contacts.  Ten, or 56 percent, were timely.  Two patients did not have initial PC contacts.  Thirty-nine percent of initial PC contacts were confidential; the non-confidential contacts were due to patient refusals or for other unspecified reasons.

Twenty patients required routine PC contacts.  There were 71 expected timeframes, of which 42 or 59 percent timely occurred.  Forty-five percent were conducted confidentially; nonconfidential contacts were mostly due to patient refusals.

Eighteen patients required initial IDTTs.  One hundred percent were timely.  Required staff were present at one initial IDTT; psych techs did not attend 17 or 94 percent of initial IDTTs.

Twenty patients required routine IDTTs.  There were 69 expected timeframes, of which 48 or 70 percent were timely.  Patients attended 46 percent.  Reasons for IDTTs being held in absentia were mostly due to patient refusals.  Required staff attended 24 percent of routine IDTTs; psych techs were the staff member most likely to be absent.  All other staff attended at least 90 percent of routine IDTTs.

Intermediate Care

Ten intermediate care patients were reviewed to assess compliance with the timeliness of initial and routine psychiatry and PC contacts, and IDTTs.

Ten patients required initial psychiatry contacts during the review period.  Nine or 90 percent timely occurred in a confidential setting.  Patient refusal was the reason for non-confidential contacts.

Ten patients required routine psychiatry contacts.  There were 57 expected timeframes, of which 49 or 86 percent occurred timely.  Many of the reviewed patients were on suicide watch or precaution and were therefore seen almost daily.  Fifty-one percent of routine psychiatry contacts were confidential.  Patients refused 22 percent of routine psychiatry contacts and were typically seen at cell front.  Other reasons for non-confidential routine psychiatry contacts included contacts occurring during IDTTs and patient safety reasons.

None of the ten patients had an initial PC contacts.  Rather, all patients were seen during IDTTs, reflecting noncompliance.

Ten patients required routine PC contacts.  There were 44 expected timeframes, of which 30 or 68 percent occurred timely.  Forty-five percent were confidential; non-confidential contacts were mostly due to patient refusals.

Ten patients required initial IDTTs.  Nine of ten were timely.  Required staff attended all initial IDTTs.

Ten patients required routine IDTTs.  There were 36 expected timeframes, of which 32 or 89 percent were timely.  Required staff attended 100 percent of routine IDTTs.

### 6.    **Medication Management**

During the site visit, five acute care and 25 intermediate care CHCF-PIP patients were prescribed clozapine.  The institution did not report the number of patients who were prescribed clozapine during the review period.  CHCF-PIP also did not indicate the number of patients who were initiated on clozapine while housed there as opposed to the number of patients prescribed clozapine prior to arrival.

During the review period, CHCF-PIP reported that 130 patients received involuntary medications through the PC 2602 process.  There were 29 initial PC 2602 petitions, including CHCF non-PIP petitions, and 101 renewals.  The CHCF-PIP did not report the number of involuntary medication petitions that were denied or withdrawn.

The monitor's expert reviewed the healthcare records of five acute care and five intermediate care patients to assess the quality of medication management.  Overall, the assessment revealed adequate medication management for five of ten reviewed cases.

Positive aspects of CHCF-PIP's medication management included psychiatrists' appropriate, frequent prescription of clozapine, and documented monitoring of patients for side effects. The institution also often used long-acting injectable antipsychotics, which many healthcare systems underutilized, despite demonstrated benefits, which included increased medication adherence and reduced hospitalization rates.

Regrettably, the monitor's expert found numerous inadequacies in the medication management of these reviewed cases; many demonstrated several inadequacies. Further, even those cases where the monitor's expert determined that overall medication management was adequate revealed deficiencies.

One concern was the delayed initiation of medications. In one case, the psychiatrist began tapering the patient off of a long-acting injectable antipsychotic, with a plan to transition the patient to an oral one. A follow-up note 21 days later continued to state that the psychiatrist would transition the patient to the oral antipsychotic; however, the chart did not contain this prescription.

Multiple reviewed cases indicated medication adjustment problems that either proceeded too slowly or too rapidly; one reviewed case combined both. For one patient with a profound psychotic illness, the psychiatrist started a small dose of aripiprazole, an antipsychotic. While this dosage was appropriate for medication initiation, it remained unchanged for the ensuing 19 days, extending the time period that the patient had insufficiently treated psychotic symptoms. The psychiatrist then placed the patient on a long-acting injectable form of the medication, despite the patient initially taking a small dose of the oral form, and discontinued the oral medication. However, the standard recommendation was to continue the oral medication for ten-

to-14 days following administration of this injection so that the long-acting injectable could reach therapeutic blood levels.

In this same case, the psychiatrist started sertraline, a SSRI that was frequently used to treat depression.  Nausea was one of this medication's most common side effects.  Despite the patient already experiencing nausea and taking an anti-nausea medication, the psychiatrist started the patient at a higher than typical dose.  The patient experienced more nausea and had to stop the medication.  As the patient had a history of medication refusal and was under a PC 2602 involuntary medication order, such actions could increase the patient's resistance to future medications.  In another case, the psychiatrist stopped a high-dose antipsychotic without tapering the medication down or providing a rationale for this profound change.

Reviewed cases also displayed unusual choices for prioritizing the treatment of various conditions.  In one case, a patient had psychosis and a history of attentional difficulties.  Despite the patient being prescribed a small dose of an antipsychotic, the psychiatrist also prescribed atomoxetine, which is used to treat ADHD.  The monitor's expert opined that the priority should have been the stabilization of the psychotic illness prior to treatment of conditions such as ADHD.

Reviewed cases also reflected problems related to the PC 2602 process.  In one case, a patient who had received involuntary medications since 2006 had the order expire while at an outside facility.  While this was not within the CHCF-PIP's control, the institution's decision to not pursue a new PC 2602 petition was perplexing.  Thereafter, the patient promptly began refusing medications and also exhibited multiple episodes of aggression.

Another complex case revealed an outside facility that filed a non-emergent PC 2602 petition for grave disability.  The patient was admitted to CHCF-PIP on August 1, 2022; the PC

2602 hearing, which was granted, was held on August 24, 2022.  However, during the intervening time psychiatry notes frequently documented that the patient was naked and sleeping on the ground; another note stated that the floor of the patient's room was full of empty trays and was otherwise filthy.  Unfortunately, nearly one month after obtaining the PC 2602 petition, the psychiatrist reported that the patient was disheveled, with a disorganized cell that was full of trash and resultant flies.

Staffing shortages also negatively impacted patient care.  Multiple reviewed cases indicated that the CHCF-PIP struggled to effectuate psychiatry visits within mandated timeframes, even when close follow-up was clinically warranted.  Acute care and intermediate care patients frequently went two to three weeks without documented psychiatry sessions.  Further, chart notes sometimes stated that the psychiatrist was out of the office for certain time periods, during which there were no documented psychiatry contacts.  In another case, the psychiatrist documented not being able to see the patient confidentially, as there was only one correctional officer on the unit.

Reviewed cases also revealed documentation issues.  Several reviewed charts indicated that psychiatry notes did not adequately address the rationales for medication choices.  In one case, the psychiatrist prescribed three antipsychotics without clearly documented rationales.  In another, the psychiatrist made medication changes but did not document them, and documented medication changes that did not occur.  Another patient had a prescription for venlafaxine, which was frequently used to treat depression and anxiety; however, the psychiatrist's notes did not list a patient diagnosis supporting this medication.  Moreover, documentation carried forward from prior notes made many notes difficult to follow, leading to internally inconsistent documentation.

In one case, the note reflected both medication changes and continuing the patient's current regimen unchanged.

### 7.    Positive Behavioral Support Team

With the closure of the PBST unit two years ago, the CHCF-PIP reduced its behavioral team from four full-time clinicians to one full-time clinician.  However, during the past year, the behavioral team added another full-time clinician, thereby providing opportunities for these two behavioral clinicians to consult with treatment teams and evaluate and treat patients.

During the review period, this behavioral team provided services to 48 patients, of whom 11 had behavioral guideline plans.  Of the 37 remaining patients, seven were treated for IEX behavior/sexual misconduct, eight for aggressive behavior, and 22 for disruptive and/or self-injurious behavior.  The behavioral clinicians provided behavioral consultation and interventions consistent with CBT, DBT, and acceptance and commitment therapy (ACT) that were grounded in evidence-based cognitive behavioral interventions.  They also attended Program Review Committee (PRC) meetings for 16 patients, and Psychology Specialist Services Committee (PSSC) meetings for 19 patients.

Regrettably, review of the 11 behavioral guideline plans indicated inadequate PBSPs.  Overall, the plans failed to follow positive behavioral therapy principles.  Among the failures, patients were not actively involved in their behavioral plans' development, target behavior baseline measures were not established, incentives were not individualized, and behavioral plans did not clearly state the utilized strategies to achieve their goals.  The acquisition of incentives also was not explicitly explained to be contingent on increasing the frequency and/or duration of replacement behaviors.  Patients also did not sign their behavioral guideline plans, which were not timely updated, while the plans were often not individualized.

Notably, the 11 patients treated with behavioral guideline plans were appropriate for PBSPs. Specifically, these patients' diagnoses included serious mental illnesses, substance use disorders, significant intellectual disabilities, and severe personality disorders with multiple functional impairments. Additionally, targeted maladaptive behaviors were usually appropriate; however, eight of the 11 behavioral plans had too many unrelated targeted behaviors, which diminished clinicians' ability to actively focus on one specific targeted behavior.

The two behavioral team clinicians identified staffing shortages as the largest barrier to PBST treatment, which was due to the amount of time needed to correctly develop and implement PBSPs. Their reports and document reviews indicated that they provided behavioral services in the broad sense of the term to 48 patients by utilizing CBT, DBT, and ACT interventions. However, they did not provide behavioral services in the term's narrow sense by developing and implementing PBSPs, despite the need for such services.

### 8.    Maximum Custody

Acute Care

During the site visit, approximately one-third of maximum custody acute care PIP patients were actually non-maximum custody patients who had been classified as maximum custody following admission. However, although their custody classification had since been reduced, due to bed unavailability they had not been transferred to a non-maximum custody unit.

Two observed IDTTs revealed required staff's attendance; however, the attending psychiatrist was covering for patients' assigned psychiatrist. The IDTT room had adequate space, permitting confidentiality. Treatment team discussions were collaborative, and generally addressed relevant clinical information, medications, treatment progress, patients' level of care, and discharge planning, and sufficiently engaged patients. However, treatment plans were

discussed with little specificity, there was minimal discussion of group treatment, and diagnoses were not discussed.  Except for correctional counselor input in response to patient questions, custody input was neither received nor obtained.

There was improvement in both the number of out-of-cell structured and unstructured time offered to maximum custody acute care patients since the prior July 2021 site visit. Nonetheless, the offered out-of-cell time was inadequate for an acute care PIP.  Specifically, reporting period data for the acute care maximum custody unit indicated the offering of between 2.65 and 22.37 weekly hours of unstructured out-of-cell time per patient.  From June through August, the weekly offered unstructured time averaged less than seven hours per patient for 12 of 13 weeks.  However, from September through November, the offered number of hours of unstructured out-of-cell time increased to an average of approximately ten weekly hours.

Further, average weekly offered structured treatment hours per patient ranged from 1.16 to 5.81 hours, which was inadequate for an inpatient program.  Further, during 16 of 21 weeks from June through September, patients were offered less than three weekly hours.  During November 2022, patients were offered an average of approximately four weekly hours of structured treatment.  Patients utilized the majority of offered treatment hours.

Patients were supposed to receive weekly clinical contacts with both the psychiatrist and their primary clinician.  However, during November and December, due to staff coverage issues, weekly primary clinician contacts did not regularly occur.  Regrettably, the chief psychologist was unaware that these contacts had not occurred.  Further, review of ten patient charts covering the entire review period revealed that primary clinicians frequently did not meet with patients on a weekly basis.  EHRS review indicated that weekly psychiatry clinical contacts occurred.

Five acute care maximum custody patients were interviewed in a group setting while in TTMs, which had only been operational since January 1, 2023.  The patients reported that the TTMs had allowed access to group treatment, which was described as a significant improvement in services.  They further indicated that offered treatment prior to January 2023 did not include groups and that solo yard access was for approximately one daily hour.  Patients also reported delayed access to their property following admission, poor law library access, and problems associated with idleness and isolation. Most indicated a lack of access to tablets and televisions.

During the review period, the institution offered a total of 63.24 hours of solo programming to three acute care maximum custody patients, or an average of 21.08 hours per patient, with a range of three to 42 hours per patient.

Intermediate Care

The IDTT space for intermediate care maximum custody patients contained TTMs and was the same room that was used for groups.  Observed IDTTs revealed clinicians discussing goals and targets with patients, who were highly engaged.  Required staff attended the IDTTs. The IDTTs addressed custodial factors; one patient who was no longer on maximum custody status and who was awaiting transfer to a non-maximum custody unit was allowed to sit in a chair at the table instead of being placed in a TTM.

Regrettably, two observed IDTTs held in absentia revealed minimal discussions. Nonetheless, the treatment team identified the goals and IPOC items for the absent patients, but did not discuss them with patients who attended their IDTTs.

Staff reported that maximum custody patients who were housed on non-maximum custody units received weekly 1:1 confidential clinical contacts since they were not assigned

groups due to the lack of TTMs on the other treatment units.  During the site visit, the monitor's expert observed such a maximum custody patient receiving a confidential 1:1 psychiatry contact.

Group treatment on the maximum custody intermediate care unit had only been in effect for several weeks prior to the site visit, following recent TTM installation.  However, staff reported, and document review reflected, that group treatment lacked a master programming schedule, staff assignments, or a set curriculum for core clinical and leisure/activity groups.  Nonetheless, following TTM installation, the maximum custody intermediate care unit began offering core structured groups on coping skills and symptom management, and supplemental groups on life skills and leisure activities.

The CHCF-PIP also offered a total of 605.34 hours of solo programming to eight intermediate care maximum custody patients during the review period, of which patients were offered an average of 75.7 hours of solo programming, with a range of 12 to 172 hours per patient.

Staff and patients in the maximum custody unit reported that patients received initial maximum custody reduction hearings upon arrival at the CHCF-PIP, and not at the sending institution prior to transfer.

### 9.    **Patient Interviews**

Acute Care

Eleven acute care patients from housing unit B2A and six acute care patients from housing unit B2B were interviewed in group settings.  The B2A patients generally reported being offered between two to three weekly group therapies; each group lasted approximately one hour and was reported to be helpful.  They also indicated being offered nursing-led groups, but only a minority had participated in them; they also described these groups as helpful.  The B2A patients

were unclear how patients were selected to participate in the nursing-led groups.  The B2B patients reported typically being offered between four and six hours of daily group treatment, including two daily hours of nursing-led groups, which were described as useful.

B2A patients reported having to specifically request yard, which was limited to five patients at a time; based on staffing availability, yard access was available three to five times weekly for one hour at a time.  The B2B patients reported having access to considerably more yard time, which was reported to occur for between eight and ten weekly hours.  Neither patients from B2A nor B2B reported having access to unstructured dayroom time.

All but one patient from both housing units confirmed confidential, weekly meetings with their primary clinician, which lasted from 20 minutes to one hour and were reported to helpful.  EHRS review confirmed the one patient's report of not regularly meeting with their primary clinician.

All but one B2A patient reported weekly meetings with psychiatry.  EHRS review confirmed the patient's report of not meeting weekly with the psychiatrist.  Further, one of the B2A patients reported joint, and not individual, weekly meetings with both his psychiatrist and lead clinician.  Regrettably, all but one B2B patient reported not meeting with their psychiatrist on an individual basis but instead, seeing them during their weekly IDTTs, which was concerning, and was confirmed by EHRS review.

Interviewed patients from both housing units confirmed attending weekly IDTTs, but only 50 percent stated they could summarize their current treatment plan.

Many patients from both housing units complained about long delays, of up to many weeks, to receive their property following admission, and a lack of television access in their rooms due to malfunctioning outlets, and a lack of access to tablets.  Other property issues

included a lack of reasonable access to "regular" toothbrushes and delayed access to packages. Medication continuity was not reported to be a concern.

Intermediate Care

The monitor's expert interviewed approximately 20 patients on several housing units. Reports on timeliness, frequency, and quality of individual clinical contacts varied. Patients reported understanding their IDTTs' purpose and that they occurred timely. Most also reported receiving timely, weekly psychiatry contacts, which occurred separately from their monthly IDTTs. However, patients reported that the frequency of PC contacts varied widely; some reported receiving quality, weekly primary clinician contacts while others reported one to two PC "check-ins" over the past six months. All interviewed patients reported confidential psychiatry and PC contacts. Patients further reported being provided with appropriate yard time and dayroom access.

Patients further reported that there were too many leisure groups and requested more clinical groups. They also voiced concerns with certain items being removed from their property, property and packages taking months to arrive, and a lack of response from custody when asked about their property. Patients did not report any problems receiving their medications.

**10.    Line Staff Interviews**

At a meeting with the monitor's expert, line staff from various CHCF-PIP units reported that it was common for out-of-cell structured therapeutic time to conflict with yard time either due to the lack of schedules for these activities or the lack of coordination of such schedules. Staff further reported that acute care patients lacked dayroom access for unstructured out-of-cell time due to the perception that they were too dangerous, or due to insufficient custody officer

allocations.  This resulted in acute care PIP patients being locked daily in their cells for prolonged periods.  Staff also indicated the lack of, and desire for, educational activities related to being PIP treatment providers.  Mental health staff also generally reported improved working relationships with custody staff, which appeared, in part, related to implementation of the custody mental health partnership plan.

## V.    PATIENT ACCESS TO TREATMENT

### System to Encourage Progress (STEP) Program

Staff reported that CHCF-PIP patients had only begun using a "local" STEP program several weeks prior to the site visit and that the institution was awaiting headquarters' guidance on full STEP program implementation.  This "local" STEP program was used on an "ad hoc" basis due to the unavailability of a full STEP program.  Staff indicated discussing patients' appropriateness for specific groups.  Supervisory staff anticipated implementing the revised statewide STEP program in March 2023.  Patients described the STEP program as having two STEPS, with STEP 1 patients lacking group access and STEP 2 patients having such access.

## VI.    REFERRALS AND TRANSFERS

CHCF-PIP reported that the admissions and discharge unit (ADU) was understaffed after losing a 0.75 registered nurse and no longer having a senior psychologist specialist to review referrals.  During the review period, the ADU also lost a program director.

There were 99 referrals to the CHCF-PIP's acute care program, of which 11 were rejected.  Thirty of 88 or 34 percent of acute care referrals were timely accepted.  The institution did not report a range of timeframes for untimely acceptances.

There were also 159 referrals to the intermediate care program; one referral was rejected. Sixty of 158 or 38 percent of intermediate care referrals were timely accepted. A range of timeframes for untimely acceptances was not reported.

## VII.   ADMISSIONS AND DISCHARGES

### Admissions

Of the 88 acute care patients who the CHCF-PIP admitted, only six or seven percent were timely admitted within ten days of referral. The remaining 82 patients took more than ten days to transfer. The institution did not report a range of timeframes for untimely admissions.

Of the 158 intermediate care patients admitted to the CHCF-PIP, only five or three percent were timely admitted within 30 days of referral. The transfer timeframes of the remaining 153 patients all exceeded 30 days; however, the CHCF-PIP did not report a range of timeframes for untimely admissions.

During the reporting period, the CHCF-PIP admitted 35 patients with complex medical needs.

The institution was unable to report the number of patients admitted from a Psychiatric Services Unit (PSU) or SHU.

On January 6, 2023, there were four acute care and one intermediate care patients accepted by the CHCF-PIP who were pending admission. All five patients were within transfer timelines. There were also five acute care and 34 intermediate care patients who had been endorsed to the institution who were awaiting decisions on acceptance or rejection.

### Discharges

The CHCF-PIP discharged 23 acute care and 100 intermediate care patients during the review period. Lengths of stay for discharged acute care and intermediate care patients averaged

97 and 394 days, respectively.  The institution also discharged two patients who were reported as "DSH."

Seven acute care and 34 intermediate care patients, or 33 percent of all discharged patients, had physical lengths of stay exceeding their clinical stays by an average of 7.6 days. These discharge delays were reported to typically result from a lack of beds in the programs to which the patients were being discharged.

## VIII.  LEAST RESTRICTIVE HOUSING

The CHCF-PIP was unable to report the number of patients who were housed above their least restrictive housing during the review period.  However, during the site visit, 34 acute care and 102 intermediate care patients were housed above their LRH.  All CHCF-PIP patients were housed in single cells, but there were 73 patients with an LRH of unlocked dorm, 24 with an LRH of locked dorm, and 39 with an LRH of multi-purpose cell.

The institution reported making efforts to decrease patients' LRH, which included weekly reviews of patients' LRH, which was also reportedly reviewed during ICC and IDTT.

## IX.  PATIENT DISCIPLINARY PROCESS

The CHCF-PIP issued 135 RVRs to 37 acute care and 98 intermediate care patients. Eighteen of the RVRs were documented in an alternative manner.

The monitor reviewed a random sample of 20 RVRs to assess compliance with CDCR policy.  Custody staff timely referred the mental health assessment to mental health staff in 15 of 20 or 75 percent of cases; the remaining five RVRs exceeded the two-day referral timeframe by an average of six days.  Mental health staff timely completed and returned the assessment to custody in 17 of 20 or 85 percent of cases; three assessments were returned late by an average of three days.  Of the 20 reviewed mental health assessments, eight reflected patients' confidential

interviews, 11 reported patients' refusal to participate in the assessment, and one noted that the patient chose to remain in his cell during the assessment interview. All reviewed RVRs indicated the assignment of a staff assistant.

All 20 reviewed RVRs documented senior hearing officers' consideration of the clinicians' recommendations in the mental health assessment. Further, in all 20 cases, the hearing officers' specified whether penalties would be mitigated based upon those recommendations. Although four of the 20 RVRs assessed penalties that negatively impacted patients' privileges, none conflicted with the assessments' recommendations concerning the loss of privileges.

The institution reported that 95 of 369 or 26 percent of required custody staff completed the mental health assessment training. Excluding social workers, whose mental health training attendance was not reported, 11 of 28 or 39 percent of mental health clinicians completed the training.

## X.   USE OF FORCE

There were a total of 86 use of force incidents at the CHCF-PIP during the review period. There were 79 immediate uses of force involving 31 acute care and 47 intermediate care patients, and one incident that did not identify the patient's level of care. There were also seven controlled uses of force involving three acute care and four intermediate care patients. Custody officers used chemical agents for two controlled and 18 immediate uses of force.

The 86 uses of force consisted of 43 acts of patient aggression toward staff, 18 instances of patient self-harm, 11 cases of resisting a peace officer, two patient batteries, four cell extractions, two cases of disobeying a direct order, one emergency cell entry, and five fighting episodes. Fifteen patients were involved in more than one use of force; one patient was involved

in four incidents, two patients were involved in three incidents each, and 12 patients were each involved in two incidents.

The monitor reviewed 11 uses of force. All reviewed incidents reflected the custody supervisor's referral of the patient for a mental health assessment following the use of force, while all uses of force in response to patient self-harm included documentation of clinical follow-up. Moreover, all reviewed controlled uses of force documented cool down periods; in one case, the cool down period exceeded three hours. This review also revealed four uses of force involving PC 2602 involuntary medication orders, where a psychiatrist determined that a patient presented a danger to self or others and ordered the administration of medication to stabilize the patient.

Five of the 11 reviewed use of force incidents involved the use of chemical agents; two were controlled and three were immediate uses of force. In both of the controlled uses of force, nursing staff reviewed the patients' healthcare record prior to the use of force, assessed the medical risks for adverse outcomes due to the use of chemical agents, and completed required documentation. Record review further demonstrated compliance with the requirement to decontaminate patients and the cells/premises following the use of chemical agents.

The monitor requested the video recordings from five of the seven controlled use of force incidents but was only provided with one functioning incident video. The provided video contained footage from four different housing unit surveillance cameras, as opposed to footage recorded by an employee who was assigned to record the incident using the protocols specified in the use of force policy. The video's chronology coincided with the written report of the incident and reflected custody staff interacting with the patient at the cell door, the extraction team assembling next to the cell door with protective gear and equipment, and staff removing the

patient from the cell after he submitted to mechanical restraints. The video did not indicate any physical use of force. Regrettably, the surveillance camera recordings lacked audio. Further, due to the surveillance cameras' lines of site and distance from the incident, and lack of audio, the monitor could not assess compliance with the policy protocols for the controlled use of force.

The use of force training was completed by 98 percent of required custody staff and by 55 percent of required mental health staff.

## XI.    PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

Reviewed reports reflected 216 post reviews of CHCF-PIP maximum custody patients during October and November 2022. During the post reviews, the MHCT recommended suspending six patients' maximum custody status. Significantly, the ICC suspended maximum custody status for a total of 19 patients. There were no additional maximum custody suspensions following the Deputy Director videoconferences.

During the review period, the CHCF-PIP conducted 293 IDTTs for 42 maximum custody patients. However, reported data did not reflect any instances in which the IDTTs referred patients to the ICC for maximum custody reviews.

During the site visit, the monitor observed the PIP maximum custody ICC reviews of 14 patients. Nine of these patients were released from maximum custody. The monitor did not identify any concerns with the ICC's decision to retain or release patients. One patient reported hearing voices telling him to attack people and requested to be retained on maximum custody.

All required custody staff received the required training on the maximum custody reduction review process. Specifically, this training was required for all PIP correctional counselors and ICC chairpersons, as well as for mental health clinicians. All custody staff, including the chief deputy warden, associate wardens, captains, and correctional counselors

completed the training; the warden's position was vacant.  For mental health staff, the report did not include data for the chief psychiatrist or the chief psychologist.  Otherwise, one of four senior psychologists completed the training, as did seven of 14 social workers.

## XII.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

Because the CHCF-PIP housed all patients in single cells, there was no need to take a patient to a private room for observation or seclusion.  The institution used observation cells for individual patient contacts.

The CHCF-PIP restrained two patients during the reporting period.  One patient was restrained in July 2022 for five hours; a nursing audit revealed one error with this restraint episode.  Another patient was restrained in October 2022 for approximately four hours; the nursing audit did not indicate any errors.

## XIII.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### Emergency Response

Reviewed documentation for the three months when there were emergency medical responses for PIP patients indicated three Code 3s for neurological incidents that required emergency medical responses.  No staff deficiencies were noted for these three incidents.  However, there was a noted deficiency for an ambulance taking 17 minutes to arrive for one of these incidents.

The three months of reviewed EMRRC meeting minutes were adequate.  Reviewed minutes indicated the attainment of quorums, and review and approval of previous months' meeting minutes.  Reviewed emergency medical review documentation was also complete.

Significantly, the three emergency events were an improvement from the prior site visit, which identified 82 Code 3 events, and reflected 50 noted deficiencies.

**Death Review Process**

The CHCF-PIP did not report any deaths during the review period.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

The CHCF-PIP's quality management and utilization review programs were transitioning and had been adversely impacted by several factors.  Among them, COVID-19 had disrupted operations, the institution experienced staffing shortages, and the PIP's quality management and utilization review processes required coordination with CDCR's database.  The quality management support unit (QMSU) also had to coordinate processes with the PIP, which staffing shortages delayed, while DSH reviews and patient improvement programs had been discontinued and replaced with a compliance program that focused on licenses, accreditation, and PIP policies.

Overall, the quality management program's infrastructure was robust.  It included internal audits, compliance program surveys utilizing Joint Commission standards, QMSU's oversight, and PIP program directors' monthly memoranda.  Despite this comprehensive infrastructure, staffing shortages resulted in the quality management program's performance being less than optimal.

There were numerous audits during the review period.  The QMSU audited PIP performance indicators, including the timeliness of RVRs, IDTTs, mental health referrals, physical discharges, and five-day follow-ups.  Mental health leadership reported that QMSU staffing shortages limited the ability to audit and drill down on deficient indicators, develop corrective action and sustainability plans, and update PIP policies.

Several audits based on Joint Commission standards revealed numerous deficiencies, which resulted in corrective action plans.  Deficiencies included specifying treatment interventions used in treatment plans, relating treatment goals to assessment findings,

documenting patients' input into their treatment plans, and assessing staff competence.  Further, five master treatment plan audits using a comprehensive audit tool captured compliance rates for treatment objectives.  Regrettably, 75 of 105 or 71 percent of audited items reported noncompliance.

CHCF-PIP program directors prepared comprehensive monthly memoranda that were discussed during mental health subcommittee meetings.  They identified deficient performance indicators to include timely mental health referrals, RVR mental health assessments, IDTTs, and physical discharges, as well as suicide risk evaluations.  There were root causes and corrective action plans for each deficiency.

The utilization management committee (UMC) met seven times during the review period, but lacked a nursing committee member.  UMC meeting agendas included out of LRH and over length of stay reviews.  Reviewed meeting minutes indicated 37 out of LRH reviews and four over length of stay reviews.  Document reviews and staff interviews did not reveal any pressure to discharge CHCF-PIP patients.

**Risk Management**

CHCF maintained a three-level risk management review program.  The Program Review Committee (PRC), which was a multidisciplinary committee composed of nurses, mental health clinicians, and rehabilitative therapists, performed the first level of review.  Reviews were triggered by patients attempting suicide, harming themselves, being on suicide precautions for prolonged periods, or having a series of documented incidents involving self-harm, gassing, boarding up, or verbally threatening staff.  The PRC met six times and reviewed 16 patients, with treatment teams providing the PRC with a history of patients' conditions.  PRC reviews led to recommendations to the treatment team.

The PRC also typically referred complex patients to the PSSC, which performed the second level of review by assessing complex patient cases that were not benefiting from treatment. PSSC members included several PRC members, as well as mental health leadership. During the review period, the PSSC met 16 times and reviewed 21 patients. Treatment teams provided the PSSC with a mental health history, an update on the patient's condition, and an explanation of treatment interventions.

The headquarters inpatient referral unit (IRU) CCAT provided the third level of review.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

During the reporting period, CHCF-PIP patients filed 102 complaints, of which six were deemed actual staff complaints, 71 were resolved, 24 were rejected for being incomplete or illegible, and one was withdrawn. The CHCF-PIP did not conduct patient satisfaction surveys during the review period.

## XVI.    CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

The CMHPP LOP was dated January 2022 and complied with statewide policy.

Executive leadership joint rounding was not conducted in the CHCF-PIP during the review period. The chief of mental health and the warden had last conducted this rounding on March 8 and 18, 2022. However, documentation indicated that executive leadership joint rounding occurred in other housing units during five months of the review period, during which correctional officers and patients were interviewed. However, meeting minutes from the quality management committee and the mental health program subcommittee did not address this rounding.

Reviewed second and third watch huddle forms from November 2022 typically indicated attendance by required mental health and custody staff. Clinical staff separately reported that,

due to union issues, custody staff did not attend maximum custody huddles.  The monitor's expert also observed two CMHPP huddles attended by numerous mental health staff and a custody officer.  At each huddle, a clinician with computer access provided a clinical and functional update for each patient on the unit.  Mental health staff were engaged, and the custody officer appropriately participated.

There were 100 staff misconduct complaints during the review period.  Filed complaints alleged staff using disrespectful language, inappropriate uses of force, threatening and retaliatory behavior, and falsifying documents, among other allegations.  One reviewed complaint revealed concerning staff behavior.  In that instance, the patient ran toward an electric fence in a suicide attempt but ultimately stopped running and laid down on the concrete.  Nonetheless, a staff member assaulted the patient, resulting in permanent damage to the patient's shoulder.

The institution offered quarterly round table training during all months of the reporting period, but staff training attendance documentation did not indicate staff who did not attend the training.  As such, training compliance could not be determined.

The institution reported that 1,272 of 1,419 or 90 percent of required staff attended the annual off-post training.  Specifically, 97 percent of custody staff, and 76 percent of mental health staff, attended this training.

## XVII.  *COLEMAN* POSTINGS

The standard versions of the *Coleman* poster in English and Spanish were prominently displayed in enclosed bulletin boards in all visited housing units.

## XVIII. LAUNDRY AND SUPPLY ISSUES

Staff reported no issues with clothing, linen, or supplies.  The CHCF LOP for the MHCB/PIP delineated detailed procedures for laundry and linen cleaning and distribution.  The

PIP procedure required the periodic replenishment of laundry and linen in PIP housing units' utility rooms, with soiled clothing and linens being removed at least three times weekly. A one for one laundry exchange occurred when patients were offered showers. There was also a monthly housing unit audit to ensure the maintenance of adequate supplies. The LOP on the handling of soiled and contaminated linen and laundry also provided specific instructions to prevent the spread of diseases.

## XIX.    PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

PIP patients reported delayed access to property, including durable medical equipment, following admission, with some patients reporting delays of several months following arrival. They also indicated significant stress related to property issues, which in part resulted from inadequate custody staffing. The property management unit officer further reported that she alone was responsible for property management and that it took an average of at least two weeks for new patients to receive their property. Patients were allowed to possess up to six cubic feet of property, excluding health care appliances, up to one cubic foot of legal material for active cases, and had access to regular and confidential mail.

Patients did not report any concerns with visitation and had access to contact and virtual visiting unless they were assigned maximum custody status.

Canteen access was typically based upon the patient's privilege group.

Housing unit officers in all visited housing units produced telephone sign-up sheets and confirmed that sign-ups occurred on the day before the requested call. However, patients reported difficulty being heard by the other party during phone calls and attributed the problem to the cleaning of telephone handsets with liquid disinfectants. A custody supervisor acknowledged this problem. Patients had no other concerns with telephone access.

Patients expressed concerns with the size of toothbrushes.  Custody staff confirmed that the institution issued compact size toothbrushes to new arrivals but that patients could purchase regular toothbrushes from the canteen.

## XX.    LAW LIBRARY ACCESS

The law library was available at patient's request during certain times of the day. Patients could request access to the law library by completing the designated form or staff would contact library staff on the patient's behalf.  Multiple housing units also contained LLEDS touchscreen computer kiosks.  The kiosks' had written operating instructions, while staff provided orientation on kiosk use and were available for assistance.  During the site visit, kiosk testing in several housing units revealed one kiosk that was not operational.

Patients who were suspended from the law library for disciplinary reasons could still conduct legal research by using the kiosks, or through the law library paging system.  However, computer access was restricted to one hour when other patients were waiting.  Patients approved for priority library user status were granted a minimum of four hours of weekly law library access.

## XXI.    HEAT PLAN

CHCF's heat plan LOP was generally aligned with the headquarters' directive.  It required the daily logging of indoor and outdoor temperatures during the six-month heat season, further specifying that "this time frame may be earlier or later, if conditions warrant."  However, the headquarters heat plan directive did not permit such allowances.  CHCF's LOP further noted that all buildings were air conditioned.  As such, housing unit officers were not required to monitor indoor temperatures unless the air conditioning malfunctioned.  The LOP appropriately

required indoor temperature readings every three hours during the heat season if the air conditioning was not operating.

The heat plan was in effect for five of six months of the review period. Review of the institution's temperature logs for the heat season indicated the hourly logging of outside temperatures by central control. When the outside temperature reached 90 degrees, the logs reflected activation of a Stage I heat alert. There were 88 Stage I heat alerts during the review period, but no Stage II or Stage III heat alerts.

Interviewed housing unit officers displayed a working knowledge of heat plan procedures for all three stages of heat plan activation. However, some officers used a "cheat sheet" that listed the three heat plan stages and the response procedures at each stage, which was permissible. In response to the monitor's inquiry about taking indoor temperature readings in the event the air conditioning malfunctioned, housing unit officers produced a mobile thermometer that recorded the indoor temperature.

Review of a sample of Daily Activity Reports (DAR) from days when a Stage I heat plan was activated indicated the recording of the times when a Stage I heat alert was activated and deactivated. However, the DARs did not reflect the offering of accommodations for patients who were prescribed heat-sensitive medications. Notably, the institution's shared drive contained daily lists of patients who were prescribed heat-sensitive medications. During the review period, one patient experienced a heat-related illness on two occasions.

The institution reported attendance at the heat-related pathologies training during the prior 12 months by 19 of 25 or 76 percent of lieutenants, 36 of 65 or 55 percent of sergeants, 393 of 755 or 52 percent of correctional officers, and 15 of 20 or 75 percent of CC Is. The institution did not report training attendance by other custody classifications or by mental health staff.

## XXII.  **PRE-RELEASE PLANNING**

The CHCF-PIP's pre-release coordinator was a full-time licensed clinical social worker, who reported that pre-release services were offered to 55 patients during the review period, but that some patients refused them.  Other patients were OHMD offenders with mental health disorders who were discharged to DSH and were not released to the community; their discharge to DSH was discussed with the OHMD coordinator.  The pre-release coordinator's responsibilities also included CCATs, videoconferences with county mental health staff, and coordination of patient transportation with custody staff, as well as other duties that were not related to pre-release planning.

Pre-release planning groups were not offered during the review period.

The pre-release coordinator further reported that headquarters tracked housing for released patients, that patients' primary clinicians coordinated services with the TCMP, and that custody staff was responsible for providing California identification cards for released patients.

## XXIII. **PROGRAM ACCESS**

No job assignments were reported for CHCF-PIP patients. The institution reported that clinicians "could not find clinically appropriate patients to fill vacant job positions..." and, thus, custody suspended the PIP patient porter job program.

The institution was unable to report the number of acute and intermediate care patients who were eligible to earn milestone credits.  Nonetheless, 57 acute care and 340 intermediate care patients earned these credits, which respectively accounted for 28 and 89 percent of the acute care and intermediate care patients.

## XXIV. **EDUCATION**

Due to teacher vacancies, CHCF-PIP patients did not have access to education.

**APPENDIX A-3**
**SALINAS VALLEY STATE PRISON (SVSP – PIP)**
**(January 9, 2023 – January 11, 2023)**

The SVSP-PIP site visit revealed numerous, significant deficiencies in provided treatment and care.  These shortcomings included shocking staff vacancy rates for some disciplines, including vacancies for all 11.2 psychiatry positions, as well as respective vacancy rates of 55 and 38 percent for psychologist and social workers; however, the use of contractors reduced the functional vacancy rates.  Observed IDTTs were inadequate and demonstrated numerous shortcomings.  PIP patients were only offered a weekly average of 5.6 hours of group therapy and attended a weekly average of 2.4 hours.  There were also reports of circumstances where patients were prevented from attending groups, while patients also stated that groups began late and ended early, which staff confirmed.  The SVSP-PIP reported that patients received approximately 1.5 hours of individual clinical contacts.  Such provided treatment was insufficient for an intermediate care inpatient program.

Review of the patients' health care records as to medication management also revealed numerous deficiencies, including rapidly changing medications, dosing and medication administration issues, alarming discontinuity with psychiatric care, and problems with involuntary medication petitions, among other concerns.  Given these and other issues, it was undeniable that patient treatment at the SVSP-PIP was in a very poor state.

## I.     SUMMARY OF THE FINDINGS

- During the site visit, the SVSP-PIP housed 235 patients in four housing units (C5, C6, TC1, and TC2), representing 96 percent of bed capacity.  During the prior site visit in August 2021, the institution reported filling 87 percent of its beds.

- During the site visit, the SVSP-PIP housed 18 patients on maximum custody status, which represented a 55 percent decrease from the prior site visit.

- SVSP-PIP mental health leadership indicated significant staff turnover since the previous review period, reporting that approximately 75 percent of current mental health staff did not work at the institution during the prior site visit.

- The institution reported that vacancies for the chief and senior psychiatrists were a "major concern."

- Other significant SVSP-PIP staffing vacancies included vacancies for all civil service psychiatrists, and high vacancy rates for senior psychologist specialists, psychologists, and social workers. Although the use of contractors reduced some vacancies, functional vacancy rates for some of these disciplines remained high.

- The institution utilized telepsychiatry for part of the reporting period, and provided the requisite notice to the Special Master, but no non-psychiatry staff provided telehealth services.

- With the exception of the PC 1370 psychologist, all four housing units satisfied the staff-to-patient caseload ratio of 1:30 for intermediate care for psychiatry, psychology, social work, and rehabilitation therapy.

- Similar to the prior site visit, observed C5 and C6 IDTTs were grossly inadequate.

- Observed TC2 IDTTs were neither collaborative nor individualized and reflected numerous significant deficiencies.

- SVSP-PIP leadership acknowledged challenges consistently offering patients sufficient group treatment, which was insufficient for an inpatient setting. Most offered treatment groups were recreational in nature.

- C5 and C6 patients reported therapeutic benefits from core groups and only had positive comments about core group facilitators and topics.

- Since the prior site visit, the creation of four group treatment spaces located outside of the Facility C perimeter for non-maximum custody patients had resulted in a significant increase in group treatment refusals. Patients were escorted across the yard to groups in wrist restraints, which they described as a treatment barrier.

- Several staff and C5 patients reported that correctional officers prevented them from attending groups whenever group times conflicted with other unit programming.

- Observed Treatment Center core and recreational groups were adequate but needed improvement in patient-to-patient engagement; some lacked confidentiality.

- TC2 patients consistently reported that groups started late and ended early, which site visit observation confirmed. Staff confirmed that such delays were typical.

- The SVSP-PIP reported that patients received approximately 1.5 weekly hours of individual clinical contacts.

- Review of the healthcare records for ten SVSP-PIP patients to assess the quality of medication management revealed adequate medication management for only three of ten reviewed cases.

- Regrettably, the monitor's expert's review of these patients' medication management revealed very serious concerns. They included rapidly changing medications, dosing issues, concerns with the use of long-acting injectable medications, medication administration challenges, striking discontinuity in psychiatric care, and demonstrated delays or not filling out involuntary medication petitions under the PC 2602 process.

- During the review period, the SVSP-PIP lacked a behavioral plan policy and reviewed behavioral plans reflected variable content.

- Mental health treatment for maximum custody C5 and C6 patients was limited to cell-front individual contacts; these patients lacked access to treatment groups, dayroom, or yard. Maximum custody patients housed in the Treatment Center similarly reported very little out-of-cell time.

- Ninety-three percent of patient referrals to the SVSP-PIP were timely admitted.

- During the site visit, the institution housed 94 patients out of their LRH.

- SVSP-PIP quality management activities were part of SVSP's institutional quality management program. However, staffing vacancies impeded the PIP's quality management activities.

- Consistent with findings from the prior review period, the SVSP-PIP did not hold utilization management committee meetings.

- Reviewed CMHPP huddle reports revealed that, similar to the prior reporting period, there were issues with required mental health and custody staff's huddle attendance.

- Patients' reported receiving other patients' laundry items, and indicated a lack of clean bedsheets and clean towels for showering.

- There were delays in patients receiving property.

- Similar to the prior reporting period, SVSP-PIP did not have a designated pre-release planning coordinator or a formalized pre-release planning program.

- No SVSP-PIP patients were enrolled in education programs and no PIP patients had job assignments. Fifty-eight percent of PIP patients earned milestone credits.

## II.  <u>CENSUS</u>

SVSP-PIP's intermediate care facility operated 246 beds in housing units C5 and C6, and stand-alone units TC1 and TC2; 202 beds were single-celled, and 44 were multi-person cells. C5 and C6 each contained 58 single-celled beds. TC1 had 56 beds, including 32 single-celled and six multi-person cells; the multi-person cells housed four patients each. TC2 had 74 beds, including 54 single-celled and ten multi-person cells; each multi-person cell housed two patients.

On January 10, 2023, SVSP-PIP housed 235 patients, representing 96 percent of bed capacity; during the prior site visit, 87 percent of beds were occupied. Of the 202 single-celled beds, 201 or 99 percent were filled; patients on quarantine status occupied two beds. The one unoccupied single-celled bed was assigned to an accepted patient pending transfer. No beds were redlined.

Thirty-nine of 44 or 89 percent of SVSP-PIP's multi-person beds were occupied; a quarantined patient who did not have a cellmate occupied one bed. Three patients were assigned to the five remaining available unoccupied multi-person beds. Specifically, one bed was assigned to an accepted patient who was pending transfer, and two beds were assigned to rejected patients awaiting final rescission notices. Two other beds were being held for patients currently housed in single-celled beds who had refused their assigned multi-person beds. No beds were redlined.

On January 6, 2023, 18 patients were on maximum custody status. There were 14 maximum custody patients in TC1, one in C5, and three in C6.

III.    **STAFFING**

1.    **Administrative, Clinical, and Correctional Staffing**

The PIP executive director position had been eliminated since the preceding site visit.

The PIP Staffing Plan (ECF No. 7245 at 5) had created a new position of chief of mental health,

but as of the site visit this position had yet to be filled.  Institutional leadership also noted

significant staff turnover since the prior SVSP-PIP site visit in August 2021, reporting that

approximately 75 percent of current mental health staff had not worked at the institution during

the previous site visit.

Chief Psychiatrist:  The chief psychiatrist position was vacant, which was reported to be a

"major concern."

Senior Psychiatrist:  The senior psychiatrist position was vacant, which was also

indicated to be a "major concern."

Psychiatrists:  All 11.2 psychiatry positions were vacant.  The use of 10.19 registry staff

reduced the psychiatry functional vacancy rate to nine percent.

Chief Psychologist:  The chief psychologist position was filled.

Senior Supervising Psychologists:  Two senior supervising psychologists covered 1.5

positions.

Senior Psychologist Specialists:  Three of four senior psychologist specialist positions

were filled.

Psychologists:  Five of 11.2 psychology positions were filled for a 55 percent vacancy

rate.  Five contractors reduced the psychology functional vacancy rate to 11 percent.

Supervising Psychiatric Social Worker:  One supervising psychiatric social worker

covered the 0.8 position.

<u>Social Workers</u>:  Seven of 11.2 social worker positions were filled, for a 38 percent vacancy rate.  One contractor reduced the social worker functional vacancy rate to 29 percent.

<u>Rehabilitation Therapists</u>:  Eleven of 11.2 rehabilitation therapist positions were filled, for a two percent vacancy rate.

<u>Supervising Registered Nurses (SRNs)</u>:  Nineteen of 25.3 SRN positions were filled, for a 25 percent vacancy rate.

<u>Registered Nurses (RNs)</u>:  Fifty-one of 78.6 RN positions were filled, for a 35 percent vacancy rate.  The use of 10.64 contractors reduced the RN functional vacancy rate to 22 percent.

<u>Psych Techs</u>:  Thirteen of 24.8 psych tech positions were filled, for a 48 percent vacancy rate.  The use of 2.1 contractors reduced the psych tech functional vacancy rate to 39 percent.

The SVSP-PIP did not report staffing data for the positions of CNA, LVN, senior psych tech, office services supervisor II, AGPA, or for clerical positions.

## 2.    **Telepsychiatry**

SVSP-PIP utilized telepsychiatry from prior to the beginning of the review period until August 12, 2022.  Tellingly, in accordance with applicable policy, CDCR provided the Special Master with notice on May 5, 2022, that a telepsychiatrist had been assigned to the SVSP-PIP for 30 consecutive calendar days.  The telepsychiatrist had a caseload in TC2, seeing patients for individual appointments and IDTTs.  Specifically, the TC2 telepsychiatrist provided 90 individual contacts in June 2022, 71 contacts in July 2022, and 41 contacts in August 2022.  The SVSP-PIP did not provide data on the number of IDTTs that the TC2 telepsychiatrist attended.

No non-psychiatry staff provided mental health services using telehealth during the review period.

### 3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

SVSP-PIP reported that, except for the PC 1370 psychologist, the four disciplines of psychiatry, psychology, social work, and rehabilitation therapy all satisfied the 1:30 intermediate care staffing ratio in housing units C5, C6, TC1, and TC2. Psychiatry caseloads ranged from 24 to 29 patients, while primary clinician caseloads ranged from eight to 22 patients. However, the PC 1370 psychologist had an 18-patient caseload, which was noncompliant with the PIP staffing plan's 1:15 ratio for PC 1370 patients.

### 4. Staffing Document Production Issues

The monitor encountered significant challenges obtaining accurate staffing data from SVSP-PIP. Upon arrival for the site visit, SVSP-PIP leadership reported that the 72-hour staffing report was inaccurate. It took until the end of the site visit's second day for the monitor to obtain accurate, though incomplete, staffing data. Regrettably, revised staffing data did not include fill rates for all requested classifications.

## IV. TREATMENT, CLINICAL SERVICES, AND PROGRAMMING:

### 1. Interdisciplinary Treatment Team Meetings (IDTTs)

Similar to the prior site visit, observed IDTTs for C5 and C6 patients were grossly inadequate. The monitor's expert observed five IDTTs for C5 patients and four for C6 patients. All occurred in confidential offices, with required disciplines using laptops to access patient information. Observed IDTTs' overall strengths included the quality of nursing staff's contributions and generally respectful patient interactions.

A covering psychiatrist attended all observed IDTTs for C6 patients. While this psychiatrist participated in the IDTTs and asked general questions about medication side effects, it was evident that the psychiatrist had not reviewed patients' records prior to the IDTTs. The

covering psychiatrist nonetheless reviewed patient records during IDTTs whenever patients asked or complained about their medications.

Observed C5 and C6 IDTTs were noncollaborative and generally failed to fulfill their intended purpose.  Only two of nine IDTTs addressed referring institutions documented expected treatment outcomes.  They also consistently failed to address interventions and measurable treatment objectives, arrival dates, reasons for admissions, lengths of stay, and goals related to discharge and STEP program levels.  None of the C6 IDTTs provided relevant background information, which was especially concerning given that the attending psychiatrist was unfamiliar with the patients.

Further, IDTTs also did not discuss recommendations related to LRH, and maximum custody, when indicated, while level of care rationales, including rationales for retaining, discharging, and not referring patients to acute care, were not provided.  During a C6 IDTT, the primary clinician informed a patient that he would most likely be discharged to the EOP level of care; however, there was no discussion of whether the patient made sufficient progress toward his treatment goals and no rationale was provided for his discharge to the EOP level of care.  IDTTs also failed to discuss whether treatment plans needed modification in response to a lack of treatment progress, when indicated.  Significantly, mental health leadership admitted being aware of the deficiencies that were displayed by the C5 and C6 IDTTs, and attributed some of them to newly hired staff.

The monitor's expert observed six TC2 IDTTs that two different treatment teams conducted.  The IDTTs occurred in a large confidential room, with attending disciplines having access to patients' healthcare records.  The primary clinician facilitated the IDTTs, but the IDTT process was neither collaborative nor individualized.  Except for the correctional counselor, all

required team members attended, including RTs, who had been reintegrated into IDTTs since the prior review period. The correctional counselor was not at work on the day of the IDTTs and another counselor was not assigned to cover; however, an intermittently present escort officer provided useful input for some patients.

Five of six patients attended the IDTTs and were seated in a chair, facing staff in a panel-like interview arrangement. TTMs were not used. At the close of IDTTs, patients were provided with their group schedules. For the patient who did not attend, there was no discussion of treatment needs, reason for IDTT non-attendance, or a follow-up plan.

Observed IDTTs reflected that treatment team members had good therapeutic rapport with patients. The IDTTs were nonetheless inadequate in terms of treatment planning. Significantly, they lacked discussions of clinical or psychosocial history, symptoms, functional impairment, diagnosis, case conceptualization, treatment goals, interventions, progress or lack of progress, safety planning, or rationale for level of care. Instead, staff briefly engaged with each patient. The primary clinician generally posed a series of questions about current mood or symptoms, use of coping skills, program participation, and safety concerns, and gave the patient an opportunity to ask questions of other treatment team members. If patients indicated being distressed, treatment team members addressed this issue.

On a positive note, IDTTs discussed STEPs, but even this required improvement. Specifically, patients' current STEP level was not clearly identified, nor were the behaviors needed to achieve the next STEP. Although patients' point attainments were discussed, the goal the patient achieved after obtaining a certain number of points was not always clearly stated.

Only one of six observed IDTTs briefly referred to the patient's discharge planning. Further, although four of six observed IDTTs were for patients out of their LRH, only one IDTT

minimally addressed LRH by asking the patient if he was ready to transfer to his LRH.  When the patient responded that he was not ready to transfer, his resistance was not addressed and there was no further discussion of interventions to assist his underlying resistance.

> 2.    **Group Therapy**

SVSP-PIP leadership acknowledged challenges consistently offering patients a sufficient number of group treatment hours, and primarily attributed this shortcoming to inadequate staffing and regular, unexpected COVID-19 related absences.  As such, structured treatment hours were insufficient for an inpatient setting.  All SVSP-PIP patients were offered a weekly average of 5.6 hours of group treatment, and attended a weekly average of 2.4 hours.

 Similar to the prior review period, most offered groups were recreational.  Patients were offered a weekly average of 4.2 hours of recreation groups, and attended 1.5 weekly hours.  Patients were also offered a weekly average of 1.4 hours of core groups, attending a weekly average of 0.53 minutes.

Nursing-led treatment groups (NLTG) had been implemented for TC patients beginning in October 2022, but had only been introduced to Facility C patients two weeks before the site visit.  Further, during the site visit, it was learned that a communication breakdown had resulted in custody staff denying several C5 and C6 patients access to the newly implemented NLTG groups.

C5 and C6 patients reported therapeutic benefits from core groups and only had positive comments about core group facilitators and topics.  They also reported that SVSP-PIP's intermediate care program was a more therapeutic environment and offered more structured and meaningful treatment groups as compared to an EOP program.

Five patients attended an observed, adequate clinician-led core group on Facility C. The group was appropriately structured, with the facilitator presenting a new, weekly module on depression. The facilitator was prepared, asked patients to share their thoughts on the previous week's module, presented new material, and asked participants to share personal experiences and insights. Most patients remained engaged throughout the group hour.

Since the previous site visit, SVSP-PIP had created four group treatment spaces that were located outside of the Facility C perimeter as a way of addressing C5 and C6 group confidentiality concerns that prior site visits had raised. This new group treatment space offered confidentiality, sufficient space, and restroom access, but was only used for non-maximum custody patients. However, mental health staff reported a significant increase in group treatment refusals after C5 and C6 groups were relocated from housing unit dayrooms to this area beyond the Facility C perimeter.

Interviews with mental health leadership, line staff, and patients revealed several concerning practices that may have contributed to high group treatment refusals. Among them, leadership confirmed that despite their non-maximum custody status, all C5 and C6 patients were escorted across the yard to their groups in wrist restraints during general population inmates' yard time. Some patients described this escort practice as a treatment barrier and stated that they felt punished and defenseless crossing the yard in handcuffs while general population inmates roamed freely. Three interviewed C5 and C6 patients further reported not attending some groups due to fears that GP inmates on the Prison Industrial Authority (PIA) cleaning crew would steal from their cells while they attended groups or assault them in the dayroom on their way to groups.

Several staff and C5 patients stated that correctional officers prevented patients from attending group treatment when scheduled group times conflicted with other unit programming, including dayroom.  Further, mental health leadership and line staff indicated a continuing yard and group scheduling conflict that contributed to Facility C's group refusal rate.  While group and yard overlapped by approximately 15 minutes, patients reported being pulled from yard up to 25 minutes before group start time.  Moreover, four patients reported that officers told them that groups were cancelled when they had not been cancelled, while one clinician reported that officers informed clinicians that patients had refused to attend group when they had not.

Group facilitators, primary clinicians, and patients also described the "disgusting" condition of the bathrooms that were located within the group rooms as another potential group treatment barrier.  Staff further reported that the Facility C group restrooms had only been cleaned once since March 2022.  Mental health staff confirmed that these concerns had been repeatedly elevated to leadership for follow-up, but there had been no improvement.

The monitor's expert observed two core groups on TC1 and one recreational group on TC2.  All three groups were adequate but also needed improvement in patient-to-patient engagement.  TC1 groups lacked confidentiality.  Significantly, TC1 was the only SVSP-PIP unit with TTMs and could thus offer groups to maximum custody patients.

Group observation revealed that the door to both TC1 group rooms was left open, compromising confidentiality.  Despite the clinician's unexpected assignment to cover a coping skills group for a TC1 colleague, the clinician led an appropriate discussion; group participants realized that they felt better when they attended groups instead of isolating in their cells.

Three maximum custody patients attended the other observed TC1 clinical group that another covering clinician also facilitated that addressed managing depressive symptoms and

utilized cognitive behavioral therapy. This group was very well conducted and reflected good rapport and reciprocal engagement between the clinician and patients, who were attentive.

A RT-facilitated TC2 recreational group on current events was conducted confidentially. Nine patients attended. The RT reported that most patients regularly attended this group, including several patients who otherwise had been in their rooms all day due to clinical absences. The RT was very well prepared with current events' topics, projected videos onto a television screen, and flexibly accepted patients' suggestions. She exhibited a good relationship with patients, who were actively engaged in the group.

Nursing informed patients about NLTG groups during TC2 IDTTs, but provided information was brief and lacked specificity about group access.

Overall, there was a need to improve how patients were informed about scheduled treatment groups. Interviews with clinical leadership and mental health and custody staff indicated various understandings of this process, which included using ducats. However, staff and TC2 patients reported that discrepancies between actual patient group assignments and the lists officers used negatively impacted group attendance. Patients reported being aware of groups when officers came to their cell but indicated not being timely informed of group cancellations.

TC2 patients also consistently reported that groups started late and ended early, which was observed during the site visit when one group's start time was delayed 20 minutes, awaiting patient arrival. Staff reported that such delays were typical and that escort delays were the primary reason for delayed groups. A custody officer who was observing patient group arrival reported that custody was understaffed to manage various programming demands and expressed concern that programming was prioritized over safety. However, it was unclear why an officer

was needed to observe non-maximum custody patient arrival to groups and why patients could not freely walk from to their rooms to a group room.

TC2 patients reported being offered dayroom twice weekly and a daily hour of yard on weekdays and two hours on weekends.

**3.       Individual Treatment**

Overall, SVSP-PIP patients were seen for approximately 1.5 hours weekly for individual treatment.  Reported data indicated that patients received 31 weekly minutes of individual contacts with a psychiatrist, and 37 and 36 weekly minutes of individual contacts with psychologists and social workers, respectively.  RTs also individually met with patients for 19 minutes weekly.

Interviewed C5 and C6 patients reported being offered weekly or biweekly confidential out-of-cell contacts with their assigned psychiatrist and primary clinician.  Several Facility C patients reported that routine individual PC contacts generally lasted approximately 15 to 20 minutes, but elaborated that primary clinicians focused more on checking-in than offering therapeutic interventions specific to their treatment needs.

All interviewed TC1 and TC2 patients reported confidential psychiatry contacts.  TC2 patients confirmed weekly confidential primary clinician contacts and attributed cell-front contacts to clinical or custodial staffing shortages.

**4.       Solo Programming**

There were no SVSP-PIP patients on solo programming.

**5.       Contact Compliance**

Staffing vacancies resulted in the SVSP-PIP being granted three waivers from the California Department of Public Health during the review period which permitted among other

things, less frequent psychiatric contacts than would have otherwise been required under Title 22.

Facilities C5 and C6

The healthcare records of 20 C5 and C6 patients were reviewed to assess compliance with the timeliness of initial and routine psychiatry and PC contacts, and IDTTs.

Eight patients required initial psychiatry contacts during the review period.  All were conducted timely.  Seventy-five percent were confidential.  Patient refusals were the reason for nonconfidential initial psychiatry contacts.

Twenty patients required routine psychiatry contacts.  There were 88 expected timeframes, of which 70 or 80 percent were timely.  Thirty-five percent of routine psychiatry contacts were confidential.  Reasons for nonconfidential contacts included patient refusals and modified programming.

Eight patients required initial PC contacts.  Seven, or 88 percent, were timely.  Eighty-eight percent of initial PC contacts were confidential.  The nonconfidential contact was due to a patient refusal.

Twenty patients required routine PC contacts.  There were 87 expected timeframes, of which 57 or 66 percent were timely.  Sixty percent were conducted in a confidential setting; nonconfidential contacts were due to patient refusals and modified programming.

Eight patients required initial IDTTs.  Six, or 75 percent, were timely.  Required staff attended five or 63 percent of initial IDTTs.

Twenty patients required routine IDTTs.  There were 66 expected timeframes, of which 63 or 95 percent were timely.  Patients attended 60 percent.  Reasons for IDTTs being held in absentia were mostly due to patient refusals.  Required staff attended 52 or 67 percent of routine

IDTTs. Psychiatrists and custody were the required staff members who were most likely to be absent from routine IDTTs. All other staff attended 90 percent or more of routine IDTTs.

Facilities TC1 and TC2

The healthcare records of 20 TC1 and TC2 patients were reviewed to assess compliance with the timeliness of initial and routine psychiatry and PC contacts, and IDTTs.

Seven patients required initial psychiatry contacts during the review period. All were timely. Seventy-one percent were conducted confidentially. Reasons for non-confidential initial psychiatry contacts were patient refusals and modified programming.

Twenty patients required routine psychiatry contacts. There were 87 expected timeframes, of which 61 or 70 percent occurred timely. Forty-four percent were confidential. Reasons for nonconfidential routine psychiatry contacts included patient refusals, modified programming, safety concerns, and unavailable custody escorts. Telepsychiatry was used to conduct routine psychiatry contacts for three patients.

Five patients required initial primary clinician contacts. Four, or 80 percent, were timely. One patient did not have an initial PC contact. Seventy-five percent of initial primary clinician contacts were confidential. Modified programming was the reason for nonconfidential initial PC contacts.

Twenty patients required routine primary clinician contacts. There were 81 expected timeframes, of which 37 or 46 percent occurred timely. Thirty-six percent were conducted confidentiality. Nonconfidential contacts were due to patient refusals, modified programming, and COVID-19.

Seven patients required initial IDTTs. All were timely. Required staff always attended.

Twenty patients required routine IDTTs.  There were 60 expected timeframes, of which 55 or 92 percent were timely.  Patients attended 70 percent.  Reasons for IDTTs being held in absentia were mostly due to patient refusals.  Required staff attended all routine IDTTs.

### 6.    **Medication management**

During the site visit, 21 SVSP-PIP patients were prescribed clozapine.  The institution did not report the number of patients who were prescribed clozapine during the review period and also did not report the number of patients who were initiated on clozapine while housed there as opposed to the number of patients prescribed clozapine prior to arrival.

At the time of the site visit, 82 SVSP-PIP patients were prescribed PC 2602 involuntary medications.  At that time, five PC 2602 petitions were pending renewal and five others were pending initiation.  No petitions were denied or withdrawn for non-clinical reasons during the review period.  There were two controlled uses of force for two PC 2602 patients who refused their psychiatric medications.

The monitor's expert reviewed the healthcare records of ten SVSP-PIP patients to assess the quality of medication management.  Regrettably, this assessment revealed adequate medication management for only three of the ten reviewed cases.

It is difficult to exaggerate the degree of clinical concern that the monitor's expert experienced assessing these patients' medication management.  Many of the reviewed cases demonstrated several inadequacies.  Disappointingly, even those cases that the monitor's expert determined had adequate overall medication management revealed sizeable deficiencies.

Multiple cases reflected problems with rapidly changing medications, and frequently indicated several medication changes simultaneously.  In two cases, the psychiatrist made several medication changes after only meeting with the patient for an initial evaluation.  In one of them,

the psychiatrist lowered two medications' doses, and simultaneously initiated two other medications. For the other patient, the psychiatrist started three medications at the same time. The monitor's expert had profound concerns about such medication management. With the psychiatrist performing multiple medication changes at the same time, determining which medications caused resultant clinical improvement or worsening, or triggered side effects, would be elusive.

The dosing of medications often proved perplexing and was inadequately justified in EHRS. In one case, a psychiatrist prescribed an exceedingly high initial dose of the antipsychotic haloperidol, despite documenting that the patient displayed no psychosis. In another case, the psychiatrist prescribed the medication trazodone, an antidepressant often used to treat insomnia. While the typical starting dose of trazodone was 25-to-50 mg at bedtime, the doctor started a dose of 150 mg. Both cases' clinical records were silent as to the rationales for such assertive decisions. Further, although another patient's record showed that he had a low blood level of a mood stabilizer, the dosage was not adjusted. Instead, the psychiatrist added additional medications. Multiple charts also contained confusing documentation that included inconsistent diagnoses, excessive use of carry over information, and inadequate rationales for medication choices.

The monitor's expert also found serious concerns with the use of long-acting injectable medications. In one case, the psychiatrist started the patient on aripiprazole, a medication used for psychosis and mood stabilization. The psychiatrist's plan was to prescribe the patient one oral dose of this medication prior to administering the long-acting version on the following day. Despite documenting that the patient likely did not take the oral dose of the medication, the psychiatrist ordered the long-acting injectable form. In another case, the patient took only one

dose of the antipsychotic haloperidol prior to receiving a long-acting injectable.  These decisions were alarming, as it was critically important to know whether a patient experienced any serious medication side effects prior to giving the patient a long-acting injectable form of the medication.  While a psychiatrist can simply stop an oral medication causing side effects, long acting injectables remained in the body for weeks or even months depending on the medication used.

SVSP-PIP displayed multiple challenges with medication administration.  In one case, a patient missed a dose of his psychiatric medications due to the staff member administering the medication being in the wrong "encounter" in EHRS.  In another case, the antidepressant medication prescription expired, but no explanation stated whether or not this was intentional by the psychiatrist.  In yet another case, the patient did not receive the antipsychotic medication olanzapine, as the prescription expired "for a few days."  In this case, the psychiatrist noticed this expiration and resumed the medication.

The discontinuity in psychiatric care was also striking.  Many patients saw several different doctors, even within short timeframes.  In several cases, this resulted in different plans for medication treatment.  In one case, a medication was started and another one was stopped, only to have another psychiatrist do the exact opposite.  While it was expected for more than one psychiatrist to be involved in a case, due to issues such as weekend coverage, vacations, and patients' changing units, the widespread nature of this was unusual.  Many patients receiving treatment had reservations, or outright refusals, of medications.  The need for strong rapport between the psychiatrist and the patient was essential in these cases.  Given the number of different psychiatrists involved, establishing this rapport would be difficult.

The manner in which psychiatrists met with several patients raised significant concerns. One patient was seen by telepsychiatry, which included cell-front visits while the patient was on suicide watch.  The patient subsequently required transfer to acute care due to self-injury  In another case, multiple psychiatry evaluations reported that the patient agreed to be seen at cell front, but no documentation noted that this patient initially refused a confidential session.

SVSP-PIP also demonstrated delays in filing or simply neglected to file involuntary medication petitions under the PC 2602 process.  In one illustrative case, the SVSP-PIP psychiatrist who reviewed the case, prior to accepting the patient, noted that he likely met PC 2602 involuntary medication criteria while at the referring institution.  The initial psychiatric examination at SVSP-PIP noted that the patient had poor activities of daily living, and refused medications.  Thereafter, psychiatry notes from five days after the initial psychiatry assessment stated that the patient was agitated and had flooded his cell, and indicated that he might require a PC 2602.  At least three additional psychiatry notes over the ensuing five weeks reflected the need for a PC 2602 involuntary medication order.  However, SVSP-PIP did not submit the PC 2602 application until 46 days after the patient's admission.

 Yet another reviewed case revealed that the SVSP-PIP did not submit a PC 2602 petition despite the patient's initial review stating that he likely required one, the patient's repeated inconsistencies taking prescribed medications, and his ingestion of hoarded medications, resulting in the need for 1:1 observation.

This patient who ingested hoarded medications also illustrated other medical management concerns.  After the patient reportedly ingested 14 pills, a nursing note indicated contacting the psychiatrist on call.  The nursing note subsequently stated, "per MD if patient truly ingested medications to get high nonlethal amount and no reason to send patient out."

However, a central tenet with a patient medication overdose is to assume that the patient provided information of doubtful veracity, as the patient might be unable or unwilling to provide the full details surrounding the ingestion. One of the reportedly ingested medications was associated with seizures when taken at high doses.

The monitor's expert also observed multiple uses or considered uses of lithium to increase patients' white blood cell counts; many psychiatric medications can lower the white blood cell count. However, many of the involved patients were of ethnic or racial backgrounds in which a slightly lower white blood cell count was entirely normal. Determining whether the lower white blood cell count was due to a medication side effect, or simply reflected a normal variant, was of the utmost clinical importance. A simple blood test can often show whether this normal variant was present or not. The monitor's expert recommended that SVSP-PIP psychiatrists carefully considered the possibility of normal variations prior to initiating treatment with lithium, as this medication has potentially grave side effects.

### 7.    Positive Behavioral Support Team

During the review period, SVSP-PIP lacked policies that addressed behavioral plans, including referral, development, implementation, and staff training. During the staff meeting, most staff were unaware of what a behavioral plan entailed.

Since August 2022, behavioral plans had been developed for only six of 19 patients who had been referred for them, which staff attributed to staffing shortages. However, SVSP-PIP had assigned a clinician to oversee the development of behavioral plans, with the goal of expanding their use.

Reviewed behavioral plans revealed variable content. Sadly, only two of six met applicable criteria, but even these two needed improvement. Among other shortcomings, it was

unclear whether patients were involved in their plans' development, baseline data for targeted goals was not included to assess change, and goals were not clearly measurable.  Further, the remaining four purported plans were not actual behavioral plans as they lacked targeted goals and salient incentives to effect prosocial behavioral change.

### 8.   **Maximum Custody**

During the review period, maximum custody patients' lengths of stay ranged from one to 1,075 days, and averaged 129 days.

Mental health treatment for C5 and C6 maximum custody patients was limited to cell-front individual clinical contacts with psychiatrists and primary clinicians.  These patients remained confined to their cells without access to yard or dayroom, and also lacked access to treatment groups, which Facility C custody staff confirmed.  Interviewed Facility C maximum custody patients further reported rarely being offered showers, which review of available documentation confirmed.

This lack of out-of-cell time and access to treatment reinforced the importance of IDTT recommendations about maximum custody status.  Nonetheless, observed IDTTs failed to provide recommendations concerning patients' retention on maximum custody or transfer to TC1 to access programming and out-of-cell time.  Further, reviewed ICC chronos for four Facility C maximum custody patients did not reflect references to maximum custody reduction reviews or input from mental health clinicians.  Leadership attributed these shortcoming to a lack of training.

Due to the lack of out-of-cell time and programming for Facility C maximum custody patients, SVSP-PIP leadership attempted to move these patients to TC1 as quickly as possible.  However, the institution neglected to track these patients' movement from C5 and C6

to TC1 during the review period.  During the site visit, four Facility C maximum custody patients had respectively been housed there for three, 26, 46, and 48 days.  Both patients with stays exceeding 40 days had refused transfer to TC1.  The 26-day patient "had other patients that moved before him."

Significantly, TC1 maximum custody patients stated last being offered yard one month prior to the site visit and also reported not being offered dayroom due to maximum custody status.  Further, a review of 14 patients' NCATS revealed that ten were neither offered yard nor dayroom during the first two weeks of January 2023.  During this period, one patient was permitted three telephone calls, another was permitted two telephone calls, seven patients were permitted one telephone call, and five patients were not offered any telephone calls.  All patients received at least five showers during these two weeks.

## V.    PATIENT ACCESS TO TREATMENT

### System to Encourage Progress (STEP) Program

SVSP-PIP implemented revisions to their local STEP policy in May 2022.  While efforts to implement the STEP program prior to the statewide rollout were commendable, staff and patients reported numerous problems that compromised its overall effectiveness.

Mental health leadership reported issues obtaining STEP incentive items due to delayed shipments of incentive items such as shampoo, socks, and deodorant, among others.  Primary clinicians also reported the unavailability of loaner televisions for patients who advanced to the final STEP, and that the STEP program was implemented differently in the Facility C and Treatment Center units.  Specifically, there were discrepancies in the use of loaner radios as an incentive item, and in the number of points that were awarded for positive behaviors.  In fact, primary clinicians reported up to a 100 point difference in points awarded for the same

behaviors.  Treatment Center clinicians provided radios to all patients due to tablets not functioning properly; C5 and C6 clinicians used radios as an incentive, but also indicated ongoing problems with tablets.  Staff and patients reported that the STEP program had become less effective for motivating behavioral change since earned points had no extrinsic value without incentive items to purchase.

The STEP program was explained during observed C5 and C6 IDTTs, and new patients were provided with lists of incentive items.  It was nonetheless unclear how the program was implemented on Facility C, as the IDTTs did not discuss patients' current STEP levels or goals, expectations for advancing patients to the next STEP level, whether patients were generally progressing, or the number of points patients had accrued.

## VI.    REFERRALS AND TRANSFERS

There were 222 referrals to SVSP-PIP during the review period.  SVSP-PIP rejected two referrals, 21 referrals were rescinded, and 14 patients were placed in MHCBs.  Ninety-three percent of patient referrals were admitted to the SVSP-PIP within 30 days.  Reasons for delays included positive COVID-19 test results, court proceedings, CCATs, and re-endorsements.

## VII.    ADMISSIONS AND DISCHARGES

### Admissions

SVSP-PIP admitted 185 *Coleman* class members during the review period.  Sixty patients, or 32 percent, took longer than three days to admit following acceptance; admission following acceptance averaged five days.  Reasons for delay included positive COVID-19 test results, court proceedings, CCATs, and re-endorsements.

SVSP-PIP did not track the number of patients who were admitted with complex medical needs.

**Discharges**

SVSP-PIP discharged 135 *Coleman* class patients during the review period, but only provided complete data for 101 patients. For these patients, clinical stays averaged 250 days. Further, 60 percent of patients took longer than 72 hours to move following clinical discharge; delays averaged 4.61 days beyond the clinical discharge date. Most delays were due to transportation issues; other reasons typically included ICC completion, court proceedings, medical holds, and DRB review. SVSP-PIP further reported that 30 percent of patients had documented clinician-to-clinician contacts following SVSP-PIP discharge.

At the time of the site visit, SVSP-PIP did not report any patients who had been discharged but were awaiting transfer.

## VIII.  LEAST RESTRICTIVE HOUSING

SVSP-PIP did not provide historical data on LRH for the review period. On January 10, 2023, the institution housed 94 patients out of their LRH, of whom 65 patients were housed in single cells and 29 were housed in multi-person cells. SVSP-PIP staff reported that LRH review had improved internally, but that the institution continued to meet issues from HCPOP when patients were released from maximum custody, and a reduction to a lower LRH was recommended. SVSP-PIP continued to monthly review patients out of LRH on a rotating basis, while TC1 and TC2 ICCs continued to appropriately review and document patient LRH; however, C5 and C6 ICC documentation did not reveal the same reviews.

## IX.  PATIENT DISCIPLINARY PROCESS

The SVSP-PIP issued 99 RVRs during the review period. The monitor reviewed a random sample of 24 RVRs. Custody staff timely referred the mental health assessment to mental health staff in six of 24 or 25 percent of cases. Mental health staff timely completed and

returned the assessment to custody in seven of 24 or 29 percent of cases.  Four of the assessments recommended alternative discipline; three of the four were so documented and were reduced to counseling chronos.

Of the reviewed sample, seven or 29 percent of mental health assessments were completed confidentially.  Patients agreed to cell-front interviews in three cases.  Patients declined the assessment interview in the remaining cases.  All reviewed RVRs indicated the assignment of a staff assistant.

The mental health assessment recommended penalty mitigation in all 24 reviewed cases, which the senior hearing officer always documented consideration.  The senior hearing officer mitigated penalties in 22 of 24 or 92 percent of the cases.

The institution reported that only one senior psychologist completed the RVR training; all remaining mental health staff members had not completed the training.  For custody staff, all correctional administrators, captains, and lieutenants completed the training, as did three of four sergeants, and 58 of 64 or 91 percent of custody officers.

## X.    USE OF FORCE

There were two controlled and 78 immediate use of force incidents during the review period.  The monitor's video observation and document review for both controlled uses of force indicated compliance with applicable CDCR policy.  The monitor's review of six immediate use of force episodes also revealed compliance with relevant policy.  SVSP-PIP reported that 100 percent of custody staff and 48 percent of mental staff completed required use of force training.

## XI.    PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

Reviewed reports reflected 89 post reviews of SVSP-PIP maximum custody patients during October and November 2022.  During these post reviews, the MHCT recommended

suspending two patients' maximum custody status.  Significantly, the ICC suspended maximum custody status for a total of 12 patients.  There were no additional maximum custody suspensions following the Deputy Director videoconferences.

On January 6, 2023, the SVSP-PIP reported that 18 Coleman class members were on maximum custody status.  The monitor reviewed 14 of the 18 maximum custody status patients' classification chronos.  The chronos included justifications for patients' retention on maximum custody status or the rationale for removing the patient from maximum custody.  However, in C5 and C6, none of the four reviewed classification chronos indicated mental health input during the ICCs.  Due to the lack of programming or out-of-cell time for C5 and C6 maximum custody patients, SVSP-PIP reported moving these patients to TC1 as quickly as possible.  However, SVSP-PIP did not track the timeliness of movement from Facility C to TC1 during the review period.

The monitor observed the one maximum custody reduction review ICC conducted during the site visit.  The patient's mental health clinician attended and provided input, and the patient was released from maximum custody status.

As of the site visit, 34 correctional counselors, six correctional administrators, four captains, and 29 mental health staff had completed the maximum custody reduction review training.

## XII.  USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

There were no clinical restraint incidents during the review period.  There was one instance of a patient's placement in a safety cell pursuant to a seclusion order; the patient was released in less than four hours.

## XIII.   EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### Emergency Response

The RMC continued to provide a forum that reviewed patient risk incidents.  Although the RMC typically met monthly, there had been a decrease in meeting frequency since the prior review period when the RMC met two to three times per month.  Leadership attributed this reduction in the number of meetings to staff vacancies.  In the absence of a chief psychiatrist, the chief psychologist chaired RMC meetings.

Reviewed documentation revealed that all RMC meetings attained quorums.  However, the meetings lacked regular nursing representation.  The nursing coordinator was a required member but did not attend during the review period, while the nursing director was considered a guest and did not consistently attend.  Nursing absences impacted discussion of relevant issues.

Substantive topics that the RMC addressed included sentinel events, patient abuse allegations, staff battery and assaults, seclusion incidents exceeding 24 hours, episodes of clinical restraint, continuous patient observations exceeding 72 hours, self-injurious behavior (SIB) rated moderate or higher, two SIB incidents within seven days, and unusual occurrences.

Overall, there was an individualized approach documenting risk incidents, but the RMC did not have a systemic incident review process.  Each patient incident was described in varying detail and at times included provided interventions.  However, an assessment of underlying causes or factors that contributed to the incident and systemic prevention were not documented; this would be particularly useful for incidents such as fire setting, suicide watches exceeding 72 hours, SIB, and enemy concerns.

There were no outstanding QIPs from suicide autopsy reports.

**Death Review Process**

There was one death during the review period.  Leadership and RMC documentation indicated that there was no official cause of this death; however, the death was not suspected to be a suicide and staff reported that the death remained under investigation.  Staff further reported that suicide death reviews followed the SVSP institutional policy.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

SVSP-PIP's quality management activities were part of SVSP's institutional quality management program, with the quality and performance improvement plan (QPIP) being the vehicle for SVSP-PIP's quality management.  Staff reports and reviewed documentation indicated that staffing vacancies impeded the PIP's quality management activities.

QPIP meeting minutes noted attainment of a quorum for five of six months of the review period.  Agenda topics generally covered pertinent program issues, such as patient treatment attendance, LRH, and group cancellations, and included brief summaries of the current status of these issues.  Although reviewed documentation occasionally indicated suggestions to drill down to address the origins of various issues, there was an overall lack of follow-through, assignment of staff responsibility, or documented problem-solving, resolution, or corrective actions.

In June 2022, the QPIP subcommittee's improvement plan submitted four goals for 2022-2023 to SVSP's quality management committee and local governing body.  Two of these goals were continued from the previous fiscal year due to a lack of progress.  These two goals were patients having at least ten weekly hours of out-of-cell time and treatment teams' 90 percent compliance with document requirements for patients housed outside their LRH.  The two new goals were 95 percent compliance for required custody and mental health staffs' attendance at

232

second and third watch huddles and at least 90 percent compliance for required staff's IDTT attendance. Regrettably, QPIP documentation did not routinely include the status of these goals.

Consistent with findings from the prior review period, provided documentation reported that SVSP-PIP did not hold utilization management (UM) committee meetings, which was of significant concern. Relatedly, UM audits also were not conducted during the review period due to key staffing vacancies.

The SVSP-PIP did not implement corrective action plans during the review period.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

There were 53 patient complaints during the reporting period. Common complaints included insufficient treatment hours, staff shortages and staff redirections from providing treatment groups or individual sessions, treatment denial, patients claiming that their mental health had worsened when they were transferred to the PIP, and patient disagreements with diagnoses or prescribed medications. No staff were moved to another post due to a patient compliant. During the review period, no SVSP-PIP patients completed patient satisfaction surveys.

## XVI.   CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

SVSP's custody and mental health partnership plan LOP was revised in April 2022 and was aligned with statewide policy. The LOP noted SVSP-PIP's participation in CDCR's Specialized Bed Complete Care Model (SBCCM) pilot; the prior LOP lacked this required language.

Executive leadership joint rounding of the PIP occurred twice during the review period, with the institution using the required form. Reviewed warden's executive staff meeting minutes

reflected executive leadership joint rounding as a standing agenda item and the distribution of joint rounding information during the warden's meeting.

However, the SVSP-PIP provided minutes from only one quality management committee meeting. This QMC meeting reported that agenda items included executive leadership joint rounding, and provided details of the rounding.

Reviewed mental health subcommittee meeting minutes for one month also listed the CMHPP as an agenda item and included information about the joint rounding. The minutes also addressed the impact of staffing shortages on the completion of RVR mental health assessments, and delays in patient care.

Reviewed huddle reports from second and third watch revealed that similar to the prior review period, SVSP-PIP continued to have attendance issues with required mental health and custody staff's attendance at huddles. Regrettably, there were numerous instances when mental health and custody staff did not attend. In fact, most reviewed huddle reports only listed registered nurses' attendance.

Patients filed 117 grievances during the review period. The grievances included allegations of the denial of mental health treatment and medical care, excessive use of force, harassment, issues concerning RVRs, and denial of privileges such as property, packages, telephone calls, law library, and dayroom. Five grievances were approved, 32 were under investigation, and the remaining grievances were either denied, disapproved, or rejected.

The SVSP-PIP reported that 43 mental health staff members attended quarterly partnership round table training during the review period but did not indicate custody staff's training attendance, and also did not report staff who did not attend. As such, training compliance could not be determined.

234

SVSP-PIP also reported that 40 mental health and 715 custody staff attended the annual partnership off-post training.  However, the institution did not provide data on mental health and custody staff who did not attend the off-post training, making it impossible to calculate training compliance.

## XVII.  *COLEMAN* POSTINGS

The monitor observed *Coleman* posters in English and Spanish in all observed housing units.

## XVIII. LAUNDRY AND SUPPLY ISSUES

The institution reported that SVSP assumed laundry service operations for the PIP as of August 1, 2022.  There were no audits, reports, or logs pertaining to laundry services for the review period.

The LOP stated that, every Tuesday, soiled laundry was collected from the PIP units and transported for off-site laundering.  On Thursday, laundered clothing and linens were returned to the PIP and placed in designated PIP clothing areas, with staff subsequently delivering the clean clothing to the PIP units.

Patients reported several barriers to receiving clean laundry.  Among them, they reported receiving other patients' laundry items, which leadership confirmed.  Patients further reported not having clean bedsheets, that clean towels were not available for showers, and that there was often a shortage of clean clothing.

## XIX.    PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Staff reported that delays in receiving property resulted in patients attending yard and walking to groups without jackets during colder months.

Nearly every interviewed C5 and C6 patient reported problems with tablets, with several indicating they had never properly functioned.  Several Facility C patients further reported that there was no telephone access until approximately 6:00 p.m. on weekdays, which negatively impacted their communications with attorneys.

## XX.    LAW LIBRARY ACCESS

Patients who were offered dayroom during evening hours reported that this limited their access to the law library.  Further, similar to the prior review, patients stated that they could not make copies and had to wait over one month to receive requested copies.  Patients also reported that C5's law library kiosk had not been working for several months.

## XXI.    HEAT PLAN

Review of the SVSP heat plan LOP, as revised in May 2022, indicated compliance with CDCR policy.  The heat plan was in effect during five months of the review period.

There were eight Stage I heat alerts during the review period, but no Stage II or Stage III heat alerts.  No patients experienced heat-related illnesses.

The institution reported completion of the heat-related pathologies on the job training by one custody officer and 232 mental health staff members.

## XXII.    PRE-RELEASE PLANNING

Similar to the prior review period, SVSP-PIP did not have a designated pre-release planning coordinator or a formalized pre-release planning program and did not offer pre-release planning groups.  Mental health leadership attributed the lack of an assigned pre-release

coordinator to the low number of PIP patients who were released to the community.  In place of an on-site pre-release coordinator, SVSP-PIP relied on the statewide pre-release coordinator for notifications of patient release dates and coordination of CCAT meetings.

Although primary clinicians were expected to provide pre-release planning services for eligible patients, SVSP-PIP did not offer them pre-release planning trainings or monitor whether pre-release services were incorporated into treatment plans when indicated.

## XXIII.   <u>PROGRAM ACCESS</u>

No SVSP-PIP patients had job assignments or other unit responsibilities.  The institution reported that 125 of 216 or 58 percent of patients earned milestone credits.  However, the institution did not provide data on the number or percent of patients who were eligible to earn milestone credits.

## XXIV.   <u>EDUCATION</u>

No SVSP-PIP patients were enrolled in education programs during the review period.

**APPENDIX A-4**
**CALIFORNIA INSTITUTION FOR WOMEN (CIW – PIP)**
**Paper Review**
**Review period:  June 1 – November 30, 2022**

The CIW-PIP site visit revealed several positive attributes of care along with certain deficiencies.  Encouragingly, CIW-PIP met the applicable staffing ratio of 1:15 for acute care and 1:30 for intermediate care for the disciplines of psychiatry, psychology, social work, and recreation therapy.  Although there were staffing vacancies, because only 71 percent of the CIW-PIP's beds were filled, the staff-to-patient ratios were met.  Additionally, CIW-PIP conducted timely IDTTs for all acute and intermediate care patients.  Further, acute care patients received timely initial and routine psychiatry contacts, but these contacts were not timely for intermediate care patients.  Neither acute care nor intermediate care patients received initial or routine timely PC contacts.

CIW-PIP appropriately managed aspects of patients' medication in various areas:  filing PC 2602 petitions, frequent and appropriate use of long-acting injectable antipsychotics, and thoughtful use of the antipsychotic clozapine.  However, the institution fell short regarding unclear diagnoses, infrequent psychiatric sessions with patients, and listing inaccurate patient medications or doses.

I.    **SUMMARY OF THE FINDINGS**

- At the time of reporting, 32 of 45 or 71 percent of the CIW-PIP's beds were filled. During the prior site visit in September 2021, only 42 percent of the institution's beds were occupied.

- The CIW-PIP had some significant staffing vacancies.  Among them, all 2.5 senior psychiatrist supervisor positions were vacant, and there were vacancy rates of 44 percent for psychiatry, 80 percent for senior psychologist specialists, and 17 percent for psychologists, social workers, and recreation therapists.

- Because only 71 percent of the CIW-PIP's beds were filled, the institution met the applicable staffing ratios of 1:15 for acute care and 1:30 for intermediate care for

the four disciplines of psychiatry, psychology, social work, and recreation therapy.

- The CIW-PIP did not use telepsychiatry during the review period.

- Document review indicated the timely completion of initial and routine IDTTs for all acute and intermediate care patients; with one exception, required staff always attended.

- The CIW-PIP offered patients a weekly average of 3.75 hours of structured treatment, with patients attending a weekly average of 2.73 hours, which was insufficient for an inpatient program.

- For acute care patients, document review reflected the timely completion of initial and routine psychiatry contacts, but noncompliance for initial and routine primary clinician contacts.

- For intermediate care patients, document review revealed noncompliance for initial and routine psychiatry and primary clinician contacts.

- Review of the healthcare records of ten CIW-PIP patients to assess the quality of medication management indicated adequate medication management for only six of ten reviewed cases. However, even cases where the monitor's expert found that the overall medication management was adequate, revealed shortcomings.

- Positive aspects of medication management included psychiatry timely filing PC 2602 involuntary medication petitions, the frequent use of long-acting injectable antipsychotics, and careful consideration of the use of the antipsychotic clozapine.

- Numerous negative findings from medication management review included insufficient documented psychiatry sessions at the frequency specified in the treatment plan, unclear diagnoses in psychiatry notes, inaccurate or conflicting information on medication doses, and psychiatry notes' inadequate justification for used medications or prescribed doses. Regrettably, many cases demonstrated numerous deficiencies.

- The monitor's expert also had grave concerns about the use of so-called "crisis plans" for patients with self-injurious behaviors; should these patients engage in any degree of self-injurious behavior staff were directed to bypass less restrictive interventions and instead place the patients in restraints and give them injectable medications.

- Only one of two PBSPs was adequate, while the monitor's expert was also concerned that the institution underutilized these plans.

- The CIW-PIP was unable to provide EHRS information about patients' participation in the STEP program.

- The institution met transfer timeframe requirements for all acute and intermediate care patients admitted during the review period.

- The CIW-PIP did not provide documentation about patient discharges or PIP maximum custody reduction reviews.

- Custody staff timely referred the mental health assessment to mental health in only one of ten reviewed RVRs; mental health timely completed and returned the assessment in three of ten reviewed cases.

- Reviewed documentation revealed that the tracking mechanisms for the use of restraints were unreliable.

- CIW-PIP's quality management system was robust and was integrated into the institution's quality management structure.

- It was concerning that CIW's psychiatry department was asked to discontinue certain medications for all patients, many of which were used to treat insomnia.

- The Joint Commission's reaccreditation of the CIW-PIP in August 2022 was positive, but indicated some deficiencies.

- Review CMHPP huddle forms revealed that custody frequently did not attend.

- The institution reported offering pre-release planning groups to patients on a weekly basis.

- No patients were enrolled in education programs or had job assignments.

## II.   <u>CENSUS</u>

On January 18, 2023, the CIW-PIP operated 45 beds in four housing units. Four acute care and 28 intermediate care patients filled 32 of 45 or 71 percent of the beds; the remaining 13 beds were available for patients. No beds were redlined. Two patients were on maximum custody status. During the prior site visit in September 2021, 19 patients filled 42 percent of the institution's beds.

240

III.    <u>STAFFING</u>

1.    <u>**Administrative, Clinical, and Correctional Staffing**</u>

<u>Program Director</u>:  The program director position was filled.

<u>Program Assistant</u>:  The program assistant position was filled.

<u>Chief Psychiatrist</u>:  The chief psychiatrist position was filled.

<u>Senior Psychiatrist Supervisors</u>:  All 2.5 senior psychiatrist supervisor positions were vacant.

<u>Psychiatrists</u>:  Two of 3.6 psychiatry positions were filled for a 44 percent vacancy rate.

<u>Chief Psychologist</u>:  The chief psychologist position was filled.

<u>Senior Psychologists</u>:  The 0.5 senior psychologist supervisor position was vacant.  Of 2.5 senior psychologist specialist positions, 0.5 were filled for an 80 percent vacancy rate.

<u>Psychologists</u>:  Three of 3.6 psychologist positions were filled, reflecting a 17 percent vacancy rate.

<u>Social Workers</u>:  Positions for three of 3.6 social workers were filled, for a vacancy rate of 17 percent.

<u>Recreation Therapists</u>:  Three of 3.6 recreation therapist positions were filled, indicating a 17 percent vacancy rate.

<u>Unit Supervisor</u>:  The unit supervisor position was filled.

<u>Senior Psych Techs</u>:  All six senior psych tech positions were filled.

<u>Psych Techs</u>:  Twenty-six of 32 psych tech positions were filled, for a vacancy rate of 19 percent.

<u>Correctional Staff</u>:  Custody staffing data was reported for the institution as a whole.  The warden's position was vacant, but positions for the chief deputy warden, and three of four

associate wardens, were filled.  All four captains' positions, and 19 of 21 lieutenants' positions, were filled, but one captain and one lieutenant were on extended leaves.  All 62 sergeants' positions were filled; six sergeants were on long-term leaves.  All nine CC I and eight CC II positions were also filled.  There were 428 correctional officers for 398 positions, but 34 officers were on extended leaves.

### 2.    Telepsychiatry

The CIW-PIP did not use telepsychiatry during the review period.

### 3.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

The PIP staff-to-patient ratios for the four disciplines of psychiatry, psychology, social work, and recreation therapy were 1:15 for acute care and 1:30 for intermediate care.  Because the institution's census was low, the CIW-PIP met these ratios for acute and intermediate care for all four disciplines.

### 4.    Staff Recruitment Efforts

The institution did not report on its staff recruitment efforts.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.    Interdisciplinary Treatment Teams (IDTTs)

Acute Care

CIW-PIP admitted 13 acute care patients during the review period.  Document review[28] indicated compliance with completion of timely initial IDTTs within 72 hours.  Required staff was present at all but one initial IDTT, when the psychiatrist was absent.  Patients attended 46

---

[28] Because this was a paper review, there was no IDTT observation.  Relevant contact compliance data is thus being reported for IDTTs and individual contacts.

percent of initial IDTTs; the remaining 54 percent were held in absentia. Documentation was unclear as to the reasons for the lack of patient attendance.

CIW-PIP was compliant with the timely completion of routine IDTTs and for required staff's attendance. Patients attended 71 percent of routine IDTTs. Documentation was unclear regarding the reasons for the lack of patient attendance at routine IDTTs.

Intermediate Care

During the review period, CIW-PIP admitted 17 intermediate care patients. The institution timely completed initial IDTTs as required. CIW-PIP was also compliant with initial psychiatry contacts occurring prior to initial IDTTs. However, the institution achieved only 55 percent compliance for initial primary clinician contacts taking place before initial IDTTs. There was compliance for required staff's attendance at initial IDTTs. Patients attended 55 percent of initial IDTTs; the remaining were held in absentia. Documentation was unclear regarding the reasons for patients' lack of attendance at IDTTs.

All 17 patients had timely routine IDTTs, with required staff in attendance. Patients attended 65 percent of routine IDTTs. Patient refusal was the provided reason for routine IDTTs being held in absentia.

### 2. Group Therapy

CIW-PIP reporting did not differentiate between acute and intermediate care concerning the provision of group therapy. Reviewed documentation noted the scheduling of a weekly average of 5.24 hours of structured treatment, of which patients were offered an average of 3.75 weekly hours, and attended an average of 2.73 weekly hours, which was inadequate for an inpatient program. Patients refused an average of 1.02 weekly hours of structured treatment; 1.49 weekly hours were cancelled.

CIW-PIP reported assigning between five and eight patients to each group. Only English language groups were offered. There was no waitlist for group treatment during the review period.

### 3.    Individual Treatment

Staffing vacancies resulted in the CIW-PIP being granted three waivers from the California Department of Public Health during the review period which permitted among other things, less frequent psychiatric contacts than would have otherwise been required under Title 22.

Acute Care Program

CIW-PIP was compliant with the timely completion of initial psychiatry contacts for all 13 acute care patients. Thirty-eight percent were conducted confidentially, and 46 percent were conducted at cell front; documentation did not indicate confidentiality or the lack thereof for the remaining cases. Reasons for nonconfidential contacts included lack of custody escorts, quarantine, modified programming, isolation, and unknown.

All 13 acute care patients had timely required routine psychiatric contacts. However, only 11 percent were conducted confidentially; 54 percent occurred at cell front and documentation did not indicate whether contacts were confidential for the remaining 35 percent. Reasons for nonconfidential contacts included refusals, patient safety, modified programming, lack of custody escorts, and quarantine.

Only ten of 13 or 77 percent of acute care patients had timely initial primary clinician contacts. Fifty-four percent were conducted confidentially, 23 percent were conducted at cell front, and documentation did not indicate the location of the remaining 23 percent.

All 13 acute care patients required routine primary clinician contacts; 53 percent timely occurred. Fourteen percent were conducted confidentially, 29 percent were conducted at cell front, and the documentation did not indicate the location of the remaining 57 percent.

Intermediate Care Program

Eleven of 17 intermediate care patients admitted during the review period who required initial psychiatry contacts had timely contacts. Of those, 45 percent were confidential, 18 percent occurred at cell front, ten percent occurred during IDTT, and documentation did not indicate where the remaining 27 percent of initial psychiatry contacts occurred. Reasons for nonconfidential contacts included refusals, patient safety, modified programming, insufficient custody escorts, and quarantine.

All 17 intermediate care patients required routine psychiatry contacts. CIW-PIP was 88 percent compliant with the timely completion of these contacts. Ten percent occurred in a confidential setting, 53 percent occurred at cell front, and three percent occurred during IDTT. Documentation did not indicate confidentiality or lack thereof for 34 percent of routine psychiatry contacts. Reasons for nonconfidential contacts included refusals, patient safety, modified programming, insufficient custody escorts, quarantine, and unknown.

Eleven patients required initial primary clinician contacts, of which 55 percent were completed timely. Thirty-six percent of initial primary clinician contacts were confidential, and 19 percent were conducted at cell front. Documentation did not indicate confidentiality or lack thereof for 45 percent of initial primary clinician contacts.

All 17 intermediate care patients required routine primary clinician contacts. CIW-PIP timely completed only 56 percent of these contacts. Further, 50 percent were conducted

confidentially, and 42 percent occurred at cell front; documentation did not indicate the confidentiality or lack thereof for eight percent of these contacts.

### 4.  __Solo Programming__

CIW-PIP staff reported that there were no On Demand reports available to produce.

### 5.  __Medication Management__

On November 30, 2022, three CIW-PIP patients were prescribed clozapine. It was unclear whether these were clozapine initiations or continuations. CIW-PIP did not report the total number of patients who were prescribed clozapine during the review period.

CIW-PIP reported that 16 intermediate care patients received PC 2602 involuntary medications during the review period. While it was unclear, it appeared that there were five initial petitions and 11 petition renewals. CIW-PIP did not report the number of petitions that were denied or withdrawn. Further, the LOP stated that the senior psychiatrist had to approve the administration of involuntary medications on a case-by-case basis but did not specify the rationale behind this decision.

The monitor's expert reviewed the healthcare records for ten patients to assess the quality of the CIW-PIP's medication management. Overall, the assessment indicated adequate medication management for six of ten reviewed cases.

CIW-PIP demonstrated several positive aspects regarding medication management. When appropriate, psychiatrists timely filed PC 2602 involuntary medication petitions, while the institution also frequently used long-acting injectable antipsychotics. Regrettably, many healthcare systems underutilized these medications, despite demonstrated benefits that included increased medication adherence and reduced rates of repeat hospitalization. CIW-PIP's psychiatrists also carefully considered the use of the antipsychotic clozapine. While clinically

challenging to use, this medication often improved a patient's symptoms, even when other antipsychotics did not. In one case, the psychiatrist revisited this important decision with the patient on multiple occasions.

However, the monitor's expert found many limitations with medication management at the CIW-PIP, with many cases revealing a constellation of deficiencies. Unfortunately, even cases where the monitor's expert determined that overall medication management was adequate often revealed deficiencies.

In two intermediate care cases, the psychiatrists did not have documented sessions with patients at the frequency specified in the treatment plan. Although in both cases the treatment plan stated that the psychiatrist would see the patient every 72 hours, this did not occur. In one of these cases, the patient was rated at both high acute and chronic risk for suicide, and the psychiatrist filed an involuntary medication petition for danger to self. The patient nonetheless went over two weeks without a documented psychiatry visit.

Four reviewed cases demonstrated unclear diagnoses in the psychiatrists' notes, which was a critical issue as an accurate diagnosis is the cornerstone of effective treatment. Other reviewed cases did not indicate a diagnosis being entered by the psychiatrist. Instead, the notes contained a section that pulled forward diagnoses and other problems from EHRS. Unfortunately, they often included multiple, and in some cases contradictory, psychiatry diagnoses. Moreover, a patient previously having those diagnoses did not indicate that the psychiatrist was actively treating them at that time. This information also included medical diagnoses, which made it difficult to discern which diagnoses the psychiatrist was actually treating.

The amount of information carried forward from prior notes also raised serious concerns. At least three different cases listed either inaccurate medications or doses. In one case, the psychiatrist put an outdated medication list in the discharge summary. The list included valproic acid, a powerful mood stabilizer that required careful clinical and laboratory monitoring. In actuality, the psychiatrist had discontinued this medication approximately two months prior. The EOP team treating the patient following discharge from the PIP reviewed this summary, and subsequently placed this incorrect information in their note.

Additional cases contained inaccurate or conflicting information on medication doses. In one case, a note stated that the psychiatrist was increasing the dose of the mood stabilizer lithium, yet the new dose was not ordered. The carrying over of prior information rendered some notes difficult to follow.

In multiple cases, the number of medications used, or the dosages prescribed, or in some cases both, were perplexing and inadequately justified in the psychiatrists' notes. In one particularly striking case, a patient with profound grave disability was not drinking enough fluids. The medical team became concerned about her health, to the point that an immediate use of force was required to transport her to hospital. Unfortunately, the patient refused evaluation at the outside hospital, and returned to CIW-PIP. A few days later, the psychiatrist started the antipsychotic medication risperidone. The documentation clearly supported the need to control the patient's degree of profound psychosis. For reasons not adequately justified in the notes, the psychiatrist started the medication at a dose of three mg per day. This was a robust starting dose in a healthy person. The psychiatrist inadequately justified the rationale for starting this dose in a medically vulnerable patient. In addition, on the same day as starting this dose of the oral form of the medication, the psychiatrist also gave a dose of the long-acting injectable form of the

medication.  Generally, psychiatrists give a patient the oral form of a medication for a certain period of time, to see if it is tolerated and effective prior to giving the long-acting injectable version.  This medication has myriad medical side effects, including cardiovascular ones.  The risk for some of these adverse events is amplified in a patient with dehydration.  The psychiatrist documented that the patient had taken risperidone in the past; however, this did little to assuage the monitor's expert's concern about the dosing of this potent medication.

In another case, a patient was on multiple high-dose medications which were associated with cardiac side effects.  While the monitoring was within Medication Administration Process Improvement Program (MAPIP) requirements, the monitor's expert recommended more frequent monitoring of the patient's electrocardiogram (ECG), in order to detect certain cardiac side effects.

In an alarming case, a patient prescribed multiple high-dose antipsychotics and mood stabilizers, as well as buprenorphine, for an opioid use disorder, was found unresponsive in her cell, with her lips blue.  The patient was in respiratory failure and required emergency treatment at an outside hospital.  Notes from the hospital did not reflect the underlying etiology of the respiratory failure.  The monitor's expert noted that some of the medications prescribed had the potential for cardiac side effects, as well as possible respiratory depression.  The monitor's expert was in no position to opine on the etiology of the patient's respiratory failure; however, concerningly, there was scant documentation showing consideration of altering the patient's medications, even despite her recent severe medical issues.

Another documentation concern was inadequate justification for the choice of medications.  As an illustrative example, a PIP patient was noted to be doing well on the long-acting injectable form of the antipsychotic aripiprazole.  For unclear reasons, the psychiatrist

stopped this medication and started the oral antipsychotic haloperidol.  Later notes stated that this change was due to concern for how aripiprazole interacted with the patient's other medications; however, the notes did not provide any further explanation.

The monitor's expert reviewed one case involving concerns around medication administration and resultant patient safety issues.  During a routine check of the patient's room, custody officers found that the patient had 164 pills in her possession.  The vast majority of the pills were prescribed by the medical team, to treat the patient's seizure disorder.  The remaining pills were prescribed by psychiatry.  Having this amount of medication was not only a safety issue for this patient but potentially also for other patients as well.

Finally, the monitor's expert had grave concerns about several patients with self-injurious behaviors having what the facility termed "crisis plans."  Should these patients engage in any degree of self-injurious behavior, staff were directed to bypass less restrictive interventions and instead place the patient in restraints and give them injectable medications.  This deviated from both the standard of care and Program Guide requirements.  Standard practice was for staff to employ less restrictive interventions first, only using restraints if the other interventions were unsuccessful, or if the degree of self-injury was so extreme that restraints were the only reasonable option to prevent severe injury.

Many patients had orders for injectable medication written as needed for agitation.  In general practice, if a patient required injectable medications, the psychiatrist would order a one-time medication dose.

### Behavioral Management

CIW-PIP reported that IDTTs initiated the placement of two intermediate care patients on PBSPs, which, after their preparation, were subsequently presented to the IDTT for feedback.

Review of these plans indicated that only one was adequate. Although it was provided in narrative form, making it difficult for other staff to utilize, it included specific and successive interventions and was based on implemented documentation. Conversely, the other patient's plan was inadequate. Although it contained an extensive and well-documented assessment, there were noted deficiencies in the identification of specific interventions and salient reinforcers. The plan also made recommendations that were not clearly adopted by the treatment plan. Further, given the patient's functional impairment, additional focused interventions and associated reinforcers were needed.

The monitor's expert was also concerned that, despite CIW-PIP's low census during the review period, the institution underutilized PBSPs.

## V.    PATIENT ACCESS TO TREATMENT

### System to Encourage Progress (STEP) Program

CIW-PIP provided an updated local operating procedure for the System to Encourage Progress (STEP), and continued to utilize the STEP program to support patient advancement. However, the institution reported being unable to provide EHRS information for patients' STEP program participation during the review period. As of February 22, 2023, 12 CIW-PIP patients were at STEP One, seven were at STEP Two, and nine were at STEP Three. Patients' duration at each level was not provided.

## VI.    REFERRALS AND TRANSFERS

During the review period, 35 patients were referred to the CIW-PIP; 13 patients were referred to acute care, and 17 patients were referred to intermediate care. Documentation indicated that five additional patients were referred and accepted; however, their referrals were rescinded prior to physical admission and provided data did not indicate their levels of care. No

patients were rejected.  CIW-PIP met transfer timeframe requirements for all patients admitted.

Full data was not provided for the rescinded patients.

## VII.    ADMISSIONS AND DISCHARGES

### Admissions

CIW-PIP admitted 13 acute care patients and 17 intermediate care patients during the

reporting period.  Six patients had complex medical needs.  At the time of reporting, no patients

were awaiting an acceptance or rejection decision, nor had any patients been accepted to the

CIW-PIP who were awaiting placement.

During the review period, the average length of stay in acute care was 71 days, with a

range of 15 days to 183 days.  For intermediate care, the average length of stay was 420 days,

with a range of 28 days to 2,619 days.

### Discharges

CIW-PIP did not provide requested documentation for discharged patients during the

review period.

## VIII.  LEAST RESTRICTIVE HOUSING

At the time of reporting, CIW-PIP reported that ten patients were housed above their least

restrictive housing.  Data revealed that CIW-PIP conducted weekly unlocked dorm audits during

the review period.

## IX.    PATIENT DISCIPLINARY PROCESS

CIW-PIP issued 23 RVRs to one acute and 12 intermediate care patients.  Ten other

RVRs were documented in an alternative manner as counseling chronos; the institution did not

indicate these patients' level of care.

The monitor reviewed a sample of 12 RVRs to assess compliance with CDCR policy; however, seven of the 12 reviewed RVRs contained incomplete documentation, which made assessment difficult.  Nonetheless, custody staff timely referred the mental health assessment to mental health staff in only one of ten cases; late referrals ranged from one to 14 days.  Mental health staff timely completed and returned the assessment to custody in three of ten cases; the remaining assessments were all late by one day.  One of eight mental health assessments reflected confidential interviews; the remaining seven were conducted at cell front pursuant to patients' requests.  All reviewed RVRs indicated the assignment of a staff assistant.

Clinicians recommended penalty mitigation for 11 of 12 reviewed RVRs.  The senior hearing officer mitigated penalties in all 11 instances.

The institution reported that 45 of 52 or 87 percent of required custody staff completed the RVR mental health assessment training.  The institution further reported that two psychologists completed the training, but otherwise did not report mental health staff's training attendance.

## X.    <u>USE OF FORCE</u>

The CIW-PIP reported six immediate use of force incidents involving one acute and five intermediate care patients.  There were no controlled uses of force.  Review of the four immediate use of force incidents for which the institution provided documentation revealed that three involved the same patient who, in all three instances, assaulted a custody officer.  In the other case, the patient battered a nurse.  All reviewed uses of force reflected compliance with applicable policy.  In all four instances, the patient was referred for a mental health assessment.

As for use of force training, 452 of 493 or 92 percent of custody staff and 80 of 104 or 77 percent of mental health staff completed the training.

XI.     **PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS**

Reviewed reports reflected eight post reviews of CIW-PIP maximum custody patients during November 2022.  During these post reviews, the MHCT recommended suspending only one patient's maximum custody status; however, the CIW-PIP's ICC suspended two patients' maximum custody status.  There were no additional maximum custody suspensions following the Deputy Director's videoconferences.  Based on each patient's case factors, the decisions were reasonable.

Ninety-two mental health and 27 custody staff completed the maximum custody reduction review process training.  Notably, the training requirement was for mental health staff involved in the ICC and IDTT maximum custody reduction reviews and was not required for all mental health staff.  However, the institution did not provide the training information in such a way to determine whether all required staff attended the training.

XII.    **USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT**

Reviewed documentation revealed that tracking mechanisms for the use of restraints appeared unreliable, with different reports containing different numbers for their use during the review period.  It appeared that there were 15 restraint incidents involving seven patients.  Of those, nine restraint episodes involved one patient.  CIW-PIP reported no seclusion incidents.  CIW-PIP did not utilize "time out."

XIII.   **EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS**

CIW-PIP reported no PIP patient deaths during the review period.

The institutional EMRRC met monthly.  The chief physician and surgeon chaired the committee.  The chief psychiatrist represented mental health.  All meetings attained a quorum and meeting minutes were comprehensive.  The EMRRC addressed relevant matters, including

issues relevant to the PIP.  Discussed matters included suicide attempts, foreign body ingestions, the use of the medication naloxone to reverse opiate overdose, and emergency transports. Emergency medical response drills were scheduled at least quarterly and included all watch shifts.  The EMRRC revisited issues requiring follow-up from prior meetings.

The Patient Safety Committee met monthly, was chaired by the chief executive officer, and always achieved a quorum.  Mental health was represented at all meetings.  The committee was tasked with reviewing incidents of restraint and seclusion in the PIP.

### Death Review Process

The facility provided examples of the death review process from outside the PIP.  The process was thorough and comprehensive.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

The CIW-PIP had a robust quality management program.  Similar to the prior review period, CIW-PIP's quality management program was integrated into the institution's overall quality management structure.  The institutional mental health program subcommittee (MHPS) provided oversight of the CIW-PIP.  The MHPS reported to the institution's quality management committee.  While MHPS information was clearly and systematically integrated into QMC minutes, the facility did not submit actual MHPS minutes.

The institution's Medication Management Committee met monthly.  The facility submitted the presentations from the meetings, but not the minutes or attendance sheets.  It was thus not possible to determine the committee's chairperson, nor verify mental health's representation at each meeting.  The committee reviewed topics and updates from the Statewide Pharmacy and Therapeutics Committee, as well as MAPIP measures.  The committee also noted

it was reactivating a prior subcommittee surrounding the use of clozapine, started in September 2022, and was to meet quarterly.  The facility did not produce minutes from this subcommittee.

Concerningly, the Medication Management Committee noted that CIW's psychiatry department was asked to discontinue certain medications for all patients, including melatonin, diphenhydramine, topiramate, and "others."  Many of these medications were used to treat insomnia.  Documents submitted stated that staff psychiatrists had been advised to prescribe formulary alternatives.  The facility also reported that instead it would provide a specific therapy called Cognitive Behavioral Therapy for Insomnia (CBT-I), and would monitor whether these medication changes resulted in an increase in healthcare grievances.  Subsequent minutes indicated a reduced rate in the usage of non-formulary medications.

QMC minutes further indicated that it was reviewing the use of high-dose mirtazapine, an antidepressant and anti-anxiety medication.  It was not specified why they were focusing specifically on this medication.

CIW had two PIWPs during the review period.  A PIWP relevant to the PIP centered on transportation team's emergency response times.  The facility created this PIWP in response to transport delays during 2021 and 2022.  The PIWP's goal was to have the custody transportation team on the scene and responding to 95 percent of emergency transports within ten minutes by October 31, 2022.  Notably, the QMC routinely monitored this issue and QMC minutes dated November 30, 2022, revealed that all five reviewed transports occurred within the desired timeframe.  Mental health also had its own PIWPs, several of which were directly related to the PIP.  These PIWPs included monitoring IDTT timeliness and psychiatry contacts.  Chart Audit Tool (CAT) audits were on hold due to a "revamp of the CAT Audit platform."

While not a formal PIWP, CIW-PIP chartered a multidisciplinary team to review the types of orders within EHRS. The goal was to shift away from *ad hoc* orders toward the use of formalized orders. The facility had implemented this change as of this review.

The Joint Commission reaccredited the CIW-PIP in August 2022. While overall the review was positive, notable findings included shortcomings such as orders that lacked clear criteria to release a patient from seclusion or restraint. The facility submitted plans to rectify these deficiencies.

The institution's Utilization Management (UM) committee, which the chief medical executive chaired, met monthly. The chief psychiatrist represented mental health and the UM reported to the QMC. While most reviewed UM meeting minutes reflected medical issues, there was clear integration on topics of mental health relevance, such as self-injury and suicide attempts.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

CIW-PIP patients filed 47 complaints, of which two were deemed actual staff complaints, 20 were rejected, 19 had no intervention, and six were not labeled.

Patient satisfaction surveys were conducted during three months of the review period. Patients generally indicated satisfaction with treatment and medication assistance, treatment planning and discharge goals, and showers. They also reported respectful treatment from staff both generally and in responding to crises, accommodating cultural and religious beliefs, and providing privacy when appropriate.

## XVI. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

The LOP was dated December 2021; aside from being outdated, it otherwise complied with statewide policy.

Executive leadership joint rounding was not conducted in the CIW-PIP during the review period.

Reviewed second and third watch huddle forms for all months of the review period indicated the occurrence of huddles Monday through Friday, but also revealed that custody staff frequently did not attend huddles.

Twenty-seven reporting period staff misconduct complaints alleged staff using disrespectful language, inappropriate uses of force, molestation, threatening and retaliatory behavior, and falsifying documents, among other allegations. These complaints resulted in the redirection of three staff members to other institutions.

The CIW-PIP provided quarterly round table training sign-in sheets for two dates in September 2022 but did not report staff who did not attend the training and also did not provide training documentation for any other dates. Further, 527 of 573 or 92 percent of all required staff attended the annual off-post training, including 93 percent of custody staff and 84 percent of mental health staff.

## XVII. *COLEMAN* POSTINGS

Provided documentation indicated that updated *Coleman* posters were posted in all common and housing areas.

## XVIII. LAUNDRY AND SUPPLY ISSUES

The CIW-PIP's LOP detailed how to collect soiled and contaminated linens, store clean linens, and issue them to patients.

CIW-PIP laundry was transported to the California Institution for Men (CIM) for cleaning. Because CIM washers only washed 100-pound loads of laundry at a time, and the CIW-PIP did not always produce 100 pounds of laundry, CIW-PIP laundry would occasionally

be kept until 100 pounds was accumulated, resulting in delays in the return of clean laundry to the institution.

## XIX.   VISITATION/PRIVILEGES/TELEPHONE ACCESS

CIW-PIP patients had non-contact visitation unless the IDTT specifically approved contact visitation.  The institution further reported granting patients telephone privileges in accordance with their STEP level, and offering yard to PIP patients.  However, the institution did not provide NCAT data regarding offered yard hours, showers, and telephone calls.

## XX.   LAW LIBRARY ACCESS

Patients had access to the law library by requesting access to the law library paging delivery process and through the legal research kiosk.  Nine patients utilized the law library during the review period.

## XXI.   HEAT PLAN

The CIW-PIP's heat plan LOP was last updated in June 2022 and was aligned with headquarters' directive.  It specified that, due to southern California weather, the heat plan was in effect all year, resulting in the logging of indoor and outdoor temperatures throughout the year.

During the review period, the institution reported 76 Stage I and 17 Stage II heat alerts, but no Stage III heat alerts.

Reviewed lists of patients who were prescribed heat sensitive medications indicated that the lists were produced weekly; however, CDCR policy required the updating of the lists on a daily basis.  No PIP patient experienced a heat-related illness during the review period.

As for attendance at the heat-related pathologies training, the institution reported data for CIW as a whole, and did not report training attendance based on classification.  This data

indicated that 393 of 505 or 78 percent of custody staff and 451 of 716 or 63 percent of mental health staff attended the training.

## XXII. **PRE  RELEASE PLANNING**

The institution reported that it was committed to pre-release planning for PIP patients and that the 12 patients who were scheduled for release during the review period received pre-release planning services.  Pre-release activities were initiated by the pre-release coordinator, with further support from the patient's primary clinician.  On a weekly basis, the pre-release coordinator generated a report of patients scheduled for PIP release within 60 days.  Once generated, the pre-release coordinator initiated the PRPA and forwarded it to the primary clinician for completion.  Upon completion of the PRPA, the primary clinician notified the pre-release coordinator of any urgent planning needs for the patient.  Subsequently, the pre-release coordinator met with patients to address their needs.  The pre-release coordinator also initiated contact with the appropriate community services entities, including probation, parole, and any other necessary community providers.

Eight of the 12 patients were scheduled for release to parole; the remaining patients were identified for release to probation.  As for probation releases, three of the four ROIs (releases of information) were signed; a release was not found for the fourth patient.

The institution reported offering pre-release planning groups to eligible PIP patients on a weekly basis.

During the review period, the pre-release coordinator attended the monthly headquarters pre-release planning meetings and the biweekly institutional integrated substance use disorder treatment (ISUDT) pre-release meetings.  The pre-release coordinator also provided pre-release training to mental health staff.

The CIW-PIP reported that five patients received their California identification cards during their PIP stay, one patient's application was still pending as of the time of parole, three patients refused to finalize their application, two patients were ineligible, and no information was provided for one patient.

Eight of the 12 patients had TCMP services; four patients refused these services. Further, seven Medi-Cal and four SSI applications were submitted on patients' behalf; three patients refused to submit SSI applications.

C&PR referred one PIP patient to the STOP housing program; however, the placement was cancelled as the patient transferred to DSH-Patton.

During the review period, three patients were directly released to the community and nine patients transferred to Patton State Hospital.

## XXIII. PROGRAM ACCESS

No CIW-PIP patients had job assignments during the review period. Thirty-two intermediate care patients earned milestone credits, but the institution could not report how patients were eligible to earn them.

## XIV. EDUCATION

No CIW-PIP patients were enrolled in education programs during the review period.

**APPENDIX A-5**
**SAN QUENTIN (SQ-PIP)**
**Paper Review**
**Review period:  June 1 – November 30, 2022**

The SQ-PIP site visit revealed both positive findings and some deficiencies in provided staffing, treatment, and care.  Most staffing positions were filled.  Reviewed documentation indicated that IDTTs were adequate, but there were some shortcomings with required staff's IDTT attendance.  Acute and intermediate care patients attended a weekly average of six and 5.8 hours of group treatment, respectively.  For acute care patients, document review revealed the completion of timely initial and routine psychiatry contacts, and initial PC contacts, but noncompliance for routine PC contacts.  For intermediate care patients, document review reported the completion of timely initial psychiatry contacts, but noncompliance for routine psychiatry contacts, and for initial and routine PC contacts.

Review of the patients' health care records revealed adequate medication management. SQ-PIP psychiatric medication management had numerous positive aspects, including the rational and justified use of medications, and the proficient monitoring and prescribing of clozapine, review of healthcare records also indicated the in-depth consideration of the use of PC 2602 involuntary medications, and sufficient overall documentation.

I.    **SUMMARY OF THE FINDINGS**

- The SQ-PIP provided care to acute and intermediate care patients, and to patients requiring MHCB care, using a flex bed model that permitted the interchangeable use of all 40 beds for all three levels of care.

- At the time of reporting, 36 of 40 or 90 percent of the SQ-PIP's beds were filled. During the prior site visit in October 2021, 80 percent of the institution's beds were occupied.

- Most staffing positions were filled although one of two chief psychiatrist positions was vacant and there was a 38 percent social worker vacancy rate, among other vacancies.

- The SQ-PIP did not utilize telepsychiatry during the reporting period.

- The SQ-PIP met the applicable staff-to-patient ratio of 1:15 that applied to all of the unit's patients for psychiatry, psychology, and recreation therapy, but did not satisfy this ratio for social work.

- Document review indicated the timely completion of initial and routine IDTTs for all acute and intermediate care patients; only routine IDTTs for intermediate care patients reported all required staff's attendance.

- SQ-PIP acute and intermediate care patients were respectively offered a weekly average of 10.5 and 10.1 hours of out-of-cell structured therapeutic activities, and attended a weekly average of six and 5.8 hours.

- For acute care patients, document review reflected the timely completion of initial and routine psychiatry contacts, and initial primary clinician contacts, but noncompliance for routine PC contacts.

- For intermediate care patients, document review indicated the timely completion of initial psychiatry contacts, but noncompliance for routine psychiatry contacts, and for initial and routine primary clinician contacts.

- Review of the healthcare records of ten SQ-PIP patents to assess medication management revealed adequate medication management for all ten cases.

- The many positive aspects of SQ-PIP psychiatric medication management included the rational and justified use of medications, the adept prescribing and monitoring of clozapine, the careful consideration of the use of PC 2602 involuntary medications, and adequate overall documentation and documentation of working closely with other disciplines.

- Fifteen of 17 or 88 percent of acute care patients and all seven intermediate care patients timely transferred to the SQ-PIP.

- No patients were housed above their LRH during the review period or at the time of reporting.

- Review of the one controlled use of force and four immediate use of force incidents indicated compliance with applicable CDCR policy.

- Pursuant to the PIP maximum custody reduction ICC reviews, the SQ-PIP suspended three patients maximum custody status during October and November 2022.

- The SQ-PIP's quality management process was robust and comprehensive, and the facility was proactive in discovering and subsequently investigating concerns. The PIP subcommittee discussed appropriate topics and documented them in a cogent yet comprehensive manner.

- SQ-PIP Utilization Management meetings had been suspended during the COVID-19 pandemic and had yet to resume.

- The Joint Commission's reaccreditation of the SQ-PIP in August 2021 reported that the institution had addressed corrective actions.

- The institution did not report any issues with laundry or supplies.

- NCAT data indicated that most patients were typically offered three to four weekly telephone calls, and daily yard, while 18 patients utilized the law library during the review period.

- No patients had job assignments, but three patients received educational services. Twenty-five acute care patients earned milestone credits.

## II.    <u>CENSUS</u>

The SQ-PIP was a 40-bed unit that was located within a 50-bed licensed CTC.  The PIP provided care to acute and intermediate care patients, and to those requiring MHCB care, utilizing a flex bed model that permitted the interchangeable use of all 40 beds for all three levels of care.  The SQ-PIP had originally opened to serve SQ's condemned inpatient population.  The institution further reported that the SQ-PIP remained committed to its original mission but also served as a statewide resource for acute care patients from other institutions.

On January 18, 2023, the SQ-PIP housed 36 patients, reflecting 90 percent of bed capacity.  There were 17 acute and 16 intermediate care patients, two MHCB patients, and one acute care patient in a medical bed.  The facility also reported housing one complex acute care patient in a medical bed who was not counted in the census even though PIP clinicians treated this patient.

III.   **STAFFING**

1.   **Administrative, Clinical, and Correctional Staffing**

Program Director:  The position for the program director was filled out of class.

Program Assistant:  The program assistant's position was filled.

Chief Psychiatrist:  One of two chief psychiatrist positions was filled.

Psychiatrists:  Three of 3.2 psychiatry positions were filled.

Chief Psychologist:  The chief psychologist position was filled.

Senior Psychologist Supervisor:  One senior psychologist supervisor filled the 0.4 position.

Psychologists:  Three of 3.2 psychology positions were filled, for a six percent vacancy rate.  Two psychologists were acting out of class.

Social Worker Supervisor:  The 0.2 social worker supervisor position was vacant.

Social Workers:  Two of 3.2 social worker positions were filled, for a 38 percent vacancy rate.

Recreation Therapists:  Three of 3.2 recreation therapy positions were filled, indicating a six percent vacancy rate.

Supervising Registered Nurses (SRNs):  Five of 6.5 SRN positions were filled, for a 23 percent vacancy rate.

Registered Nurses (RNs):  Twelve of 14.6 RN positions were filled, for a vacancy rate of 18 percent.

Senior Psych Techs:  Both senior psych tech positions were filled.

Psych Techs:  Nineteen of 21.2 psych tech positions were filled, for a ten percent vacancy rate.

<u>Licensed Vocational Nurses (LVNs)</u>:  Six of 8.9 LVN positions were filled, for a 33 percent vacancy rate.

<u>Office Services II (OSSII)</u>:  The 0.5 OSS II position was vacant.

<u>Associated Government Program Analyst (AGPA)</u>:  Both AGPA positions were filled.

<u>Correctional Health Care Administrator (CHCA)</u>:  The one CHCA position was filled.

<u>Clerical Positions</u>:  All four mental health clerical positions were vacant.

**2.      Telepsychiatry**

The SQ-PIP did not use telepsychiatry during the reporting period.

**3.      Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

The applicable SQ-PIP staffing ratio for the disciplines of psychiatry, psychology, social work, and recreation therapy was 1:15.  This staff-to-patient ratio applied to all acute and intermediate care, and MHCB patients, since all SQ-PIP beds were flexed for interchangeable use to provide care to all three levels of care.  The caseloads of all psychiatrists, psychologists, and recreation therapists were within this ratio; however, social worker caseloads exceeded the ratio.

**IV.      TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

The SQ-PIP conducted random, monthly quality improvement audits of master treatment plans.  The audits included a review of diagnoses, symptoms, discharge plans, cultural identity, behavioral plans, referral reasons, goals and interventions, case formulation, LRH, restraint review, level of care rationale, STEP behavior goals, and treatment summaries, among other issues.  SQ-PIP also audited IDTT timeliness.

1.    **Interdisciplinary Treatment Teams (IDTTs)**

Acute Care

The monitor reviewed a random sample of healthcare records of 18 acute care patients. Fifteen patients required initial IDTTs; all were timely completed within 72 hours. Required staff attended ten or 67 percent of initial IDTTs. Staff absences were usually attributed to the lack of RNs or correctional counselors.

All 18 acute care patients required routine IDTTs. SQ-PIP was compliant for the timely completion of routine IDTTs. Required staff attended 74 percent; absences were typically attributed to the lack of RNs or correctional counselors. Patients attended 84 percent of routine IDTTs. Documentation revealed that routine IDTTs were held in absentia due to patient refusals and custody staffing issues.

Intermediate Care

The monitor reviewed a random sample of healthcare records of 14 intermediate care patients. All six patients who required initial IDTTs timely had them within 72 hours. Required staff attended 83 percent; the RN did not attend one initial IDTT. Patients attended 50 percent of initial IDTTs but reasons for nonattendance were not provided.

All 14 patients had timely routine IDTTs. Required staff attended all routine IDTTs but patients only attended 48 percent. Patient refusal was the typical reason provided for patient nonattendance.

2.    **Group Therapy**

SQ-PIP offered core groups that primary clinicians facilitated from Monday through Friday. The institution also offered supplemental groups seven days weekly, including recreation therapy and nursing-led treatment groups (NLTGs); NLTGs had been initiated since the prior site visit. Notably, documentation indicated an increase in the offering of core therapy

groups since the prior review period.  Group capacity varied from five to eight patients.  SQ-PIP only offered English language groups, but interpreters were provided when needed.  There were no group waitlists during the review period.

Acute Care

Reviewed documentation revealed that SQ-PIP scheduled a weekly average of 13.7 hours of out-of-cell structured therapeutic activities, of which patients were offered a weekly average of 10.5 hours and attended a weekly average of six hours.  Patients refused an average of 4.5 weekly hours of structured therapeutic activities and an average of 3.2 weekly hours were cancelled.

Intermediate Care

SQ-PIP scheduled an average of 12.9 weekly hours of out-of-cell structured therapeutic activities, of which 10.1 weekly hours were offered to patients.  Patients attended a weekly average of 5.8 hours and refused a weekly average of 4.3 hours of structured treatment.  An average of 2.8 weekly treatment hours were cancelled.

## 1.    **Individual Treatment**

Staffing vacancies resulted in the SQ-PIP being granted three waivers from the California Department of Public Health during the review period which permitted among other things, less frequent psychiatric contacts than would have otherwise been required under Title 22.

Acute Care

The monitor reviewed the healthcare records of 18 randomly selected acute care patients.  All 15 patients who required an initial psychiatry contact had a timely contact.  Eighty-seven percent of contacts were confidential.  Reasons for nonconfidential contacts included patient refusals and custody staffing issues.

All 18 acute care patients had timely required routine psychiatry contacts. Sixty percent were conducted in a confidential setting. Patient refusals were the cited reason for nonconfidential contacts.

All 15 required initial primary clinician contacts were conducted timely. Seventy-three percent were confidential. Patient refusal was the reason cited for nonconfidential contacts.

All 18 acute care patients required routine primary clinician contacts, but only 56 percent were timely completed. Eighty-nine percent were conducted in confidential settings. Nonconfidential contacts were the result of custody staffing issues and patient refusals.

Intermediate Care

All five patients who required initial psychiatry contacts had timely contacts. Eighty percent were conducted confidentially.

All 14 intermediate care patients required routine psychiatry contacts; only 54 percent timely occurred. Forty-four percent occurred confidentially, 33 percent occurred at cell front, and the remainder were marked nonconfidential, or there was no indication of where the contact occurred. Reasons for nonconfidential contacts were patient refusals and medical reasons.

Five of six patients had timely required initial primary clinician contacts. None of the healthcare records indicated whether the contacts occurred confidentially.

SQ-PIP timely completed 82 percent of required routine primary clinician contacts. Fifty-three percent were conducted in a confidential setting. Reasons for the lack of confidentiality were due to patient refusal or were unknown.

**2.      Solo Programming**

SQ-PIP did not identify patients on solo programming or their average length of time on solo programming status. However, the institution provided the STEP program policy, which included a description of solo programming and the criteria for inclusion.

### 3.    <u>Medication Management</u>

On November 30, 2022, ten SQ-PIP patients were prescribed clozapine.  It was unclear whether they were clozapine initiations or continuations.

SQ-PIP reported that seven acute and seven intermediate care patients received PC 2602 involuntary medications during the review period.  All were petition renewals.

The monitor's expert reviewed the healthcare records of five acute care and five maximum custody intermediate care patients to assess the quality of the SQ-PIP's medication management.  This assessment revealed adequate medication management for all ten reviewed cases.

SQ-PIP demonstrated many positive aspects regarding the psychiatric medication management of its patients.  The psychiatrists managed complex cases that indicated the rational and justified use of medications.  The psychiatrists also often clearly documented their reasons for choosing a particular medication over other possible choices.  Significantly, this justification sometimes included research articles that supported their decisions.

The psychiatrists were adept at prescribing and monitoring clozapine, an antipsychotic with proven efficacy in refractory patients.  Unfortunately, other healthcare systems frequently underutilized clozapine, due to the necessary close monitoring that was required to avoid potentially lethal side effects.  In one case, the patient reached toxic levels of clozapine and required transfer to an outside hospital for evaluation.  However, this was unpredicted, as the facility was closely monitoring levels, which included consideration of medication interactions.

In another case, the facility obtained permission for ECT to augment the patient's response to medications.  This intervention was generally underutilized, in part due to the complexity involved in performing it within the correctional environment.  In particular, CDCR

has had a long history struggling to have patients receive ECT, even in cases where it was clearly indicated. As such, the facility's use of this intervention was even more admirable.

The SQ-PIP also carefully considered the use of PC 2602 involuntary medications. Most of these cases were adequately managed. In one case, the psychiatrist lifted the PC 2602 order, only to have to file a new petition shortly thereafter. While the patient's impulsivity and inconsistency suggested that he might refuse medication if not under a PC 2602 order, a reasonable psychiatrist could also argue to have the patient receive medications voluntarily, given the ethical principle of patient autonomy.

The facility also considered the comorbid conditions, such as mild cognitive impairment, and how they might impact treatment. In one case, the SQ-PIP obtained neuropsychological testing, which proved helpful in guiding treatment.

Significantly, the psychiatrists also documented working closely with other disciplines, including psychology, internal medicine, physical therapy, nursing, and custody. In one case, the psychiatrist opined that the patient required physical activity to assist with his psychiatric condition. The psychiatrist also closely worked with internal medicine, nursing, and physical therapy to accomplish this goal and the patient had resultant improvement in his mood. In another case, the psychiatrist and the treatment team worked closely with custody staff regarding restrictions on the patient's ability to exercise and socialize with his peers upon release from the PIP. The psychiatrist stated that this intervention was critical to the patient's continued psychiatric stability.

The majority of reviewed SQ-PIP documentation was adequate. Psychiatrists' notes painted clear clinical pictures of patients. Also of particular importance, there was generally good continuity of care, with patients working with the same psychiatrists for most, if not all, of

their stays.  Exceptions to this were understandable and expected, such as coverage for weekends and time off.

The monitor's expert found some deficiencies.  However, these deficiencies did not rise to the level of deeming the psychiatric care inadequate.  For one patient who was taking clozapine, it was listed as an allergy.

In another case, a covering psychiatrist ordered an as needed medication that would be unlikely to have the desired effect in a reasonable timeframe.  However, when the regular psychiatrist returned, this medication was discontinued.  In this same case, the patient had a seizure disorder and took the medication levetiracetam.  This medication was well known to cause psychiatric side effects, such as worsened mood, irritability, aggression, psychosis, and suicidality.  While the patient may have indeed required this medication, the monitor's expert opined that the psychiatrist should have conferred with the internal medicine physician about this medication choice.

### 1. __Behavioral Management__

SQ-PIP reported that four patients had active behavioral plans that were discontinued one month prior to the review period in anticipation of the STEP program's implementation.  However, this transition was too difficult for lower-functioning patients, resulting in overall regression and the reappearance of treatment-resistant behaviors.  As such, it was determined that the patients would benefit more from behavioral plans than participation in the STEP program, and the behavioral plans were reinitiated.

During the review period, IDTTs referred ten patients to the behavioral specialist for consultation for concerning behaviors.  However, these consultations did not result in the development of behavioral plans as other interventions adequately controlled the concerning

behavior. The behavior specialist was also utilized to address group participation for high refusers.

## V.  PATIENT ACCESS TO TREATMENT

The SQ-PIP implemented the STEP policy in June 2022 and provided an LOP dated December 2021. The institution also provided documentation outlining STEP behavioral eligibility requirements, behavioral and treatment goals for advancement to the next STEP, and prompts and incentives.

## VI.  REFERRALS AND TRANSFERS

Documentation indicated 22 referrals to acute care during the review period, but four patients were admitted to other PIPs, and one patient was placed in the MHCB. Of the remaining 17 admitted patients, all but two were physically admitted within ten days. Of the two late transfers, one patient took 11 days to transfer due to a late decision. For the second late admission, the patient was not admitted until nine days after completion of his *Vitek* hearing; the reason for this delay was not provided.

Thirteen patients were referred to intermediate care at the SQ-PIP. Three of these referrals were rescinded, while three other patients were placed in MHCBs. The remaining seven patients were timely transferred and physically placed in the SQ-PIP within 30 days.

During the review period, the SQ-PIP did not reject any referrals.

## VII.  ADMISSIONS AND DISCHARGES

### Admissions

There were 17 acute care and seven intermediate care admissions during the review period. As noted above, with the exception of two acute care patients, all transfer timeframes were met.

At the time of reporting, no patients were endorsed and pending acceptance to the SQ-PIP, and no patients were accepted and waiting for admission.

During the review period, SQ-PIP reported that the average length of stay for acute care patients was 93 days, with a range of 30 to 210 days. For intermediate care, stays averaged 202 days, with a range from 43 to 800 days.

The institution admitted six patients with complex medical needs.

SQ-PIP further reported that there was no historical SOMS data to capture the number of patients admitted from a SHU.

### Discharges

SQ-PIP provided incomplete data for acute and intermediate care patient discharges during the review period. For example, the institution provided clinical discharge dates for intermediate care patients but did not provide physical discharge dates. For acute care patients, SQ-PIP provided insufficient data on the number of patients who were discharged, which affected the ability to determine whether they experienced physical transfer delays.

## VIII.  LEAST RESTRICTIVE HOUSING

SQ-PIP reported that no patients were housed above their LRH during the review period or at the time of reporting.

## IX.  PATIENT DISCIPLINARY PROCESS

The SQ-PIP issued 12 RVRs to acute care patients during the review period. Mental health assessments were completed for all 12 patents. Mental health clinicians' responses to assessment question number three indicated that eight of 12 or 67 percent of cases reported that mental illness contributed to the behavior that led to the RVR; however, clinicians' recommended penalty mitigation in only four of 12 or 33 percent of cases. Further, the SQ-PIP did not provide information that indicated whether or not senior hearing officers' actually

mitigated penalties. One case was reduced to a counseling chrono. No cases recommended alternative discipline. One patient was issued a SHU term.

RVR training information reflected data from all of SQ, and not just for staff assigned to the SQ-PIP; the institution was unable to filter the data for just the PIP. Provided data reported that only one psych tech and one LVN attended this training, as well as two captains, 19 lieutenants, 57 sergeants, and 44 custody officers.

## X.    USE OF FORCE

During the review period, there was one controlled use of force and four immediate use of force incidents. The controlled use of force was pending clarification. Two of the immediate uses of force were closed and the remaining two were pending clarification. The monitor's review of all five use of force episodes indicated compliance with applicable CDCR policy.

The facility again provided use of force training data for the entire institution. As for custody staff, the warden, one chief deputy administrator, six correctional administrators, 25 CC Is, five CC IIs, one CC III, four captains, 31 lieutenants, 77 sergeants, and 762 custody officers completed the training. For mental health staff, the program director and program assistant, chief psychiatrist, two chief psychologists, nine psychiatrists, 26 psychologists, 13 social workers, six recreation therapists, six senior psych techs, 42 psych techs, 13 supervisor RN IIs, 18 RNs, 15 LVNs, four CNAs, two health program specialists I (HPS Is), and 11 office techs attended the training.

## XI.    PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

Reviewed reports reflected 17 post reviews of SQ-PIP maximum custody patients during October and November 2022. During these post reviews, the MHCT recommended suspending only one patient's maximum custody status; however, SQ-PIP ICCs suspended three patients'

maximum custody status.  There were no additional maximum custody suspensions following the Deputy Director videoconferences.

The institution reported that the warden, one chief deputy administrator, five correctional administrators, 23 CC Is, 12 CC IIs, one CC III, and four captains completed the maximum custody reduction review process training.  For mental health staff, three psychiatrists, two senior psychologists, seven psychologists, three social workers, and three recreation therapists attended the training.

## XII.  USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

SQ-PIP reported no seclusion incidents and not using "time out" during the review period.  One patient was restrained for approximately 1.5 hours.  The patient was provided PRN medication, but did not sustain injuries during the incident, and the institution conducted a staff debrief after the restraint episode.  The observation cell was not used during the reporting period.

## XIII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

The facility did not submit meeting minutes for the institution's EMRRC.

There were no SQ-PIP patient deaths during the review period.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

The SQ-PIP's quality management process was robust and comprehensive, and the facility was proactive in discovering and subsequently investigating concerns.  There was also extensive coordination with both headquarters and regional mental health where appropriate.  Noted concerns included some meetings not attaining quorums and regular LOP review.  The institution did not submit meeting minutes from either the quality management committee or the mental health program subcommittee.  It was also not possible to discern various committee's reporting structures.

SQ-PIP reported one open QIP involving a death while a patient was at another institution. One subpart of this QIP involved mental health and reflected the patient not being seen for individual and group contacts at the frequency specified by the treatment plan.

A corrective action plan assigned by the regional mental health team included inadequate safety planning for patients discharged from the PIP. The facility implemented a plan involving training, monitoring, and supervisory review, resulting in interval improvement, with 100 percent of reviewed SRASHEs passing audit criteria. Two other SQ-PIP CAPS addressed privileges, observation level, and safety planning. One CAP required treatment teams to discuss these matters in each IDTT; the other CAP involved placing this information on the front of patient's cell doors. Supervisors audited both and noted interval improvement.

The SQ-PIP executive director chaired the PIP subcommittee, which met monthly for five of six months of the review period. The PIP subcommittee discussed appropriate topics and documented them in a cogent yet comprehensive manner. Relevant topics included performance reports with drilldowns for underperforming metrics, offered, attended, canceled, and refused treatment, seclusion and restraint, timely contacts and IDTTs, training compliance, and Joint Commission requirements. The PIP subcommittee's willingness to investigate why metrics were noncompliant was thorough. Oftentimes, they were noncompliant by how they were reported, when in fact they were clinically compliant.

However, the monitor's expert noted two deficits with the PIP subcommittee. To attain a quorum, the PIP subcommittee required both attendance by a certain number of individuals and also required specific members to be in attendance. For some months, required members or designees were not present, yet the minutes nonetheless indicated achievement of a quorum. Further, PIP subcommittee minutes required the signatures of both the PIP executive director and

the chief executive officer (CEO); however, the CEO's signature was missing for all but one month.

The Patient Safety Committee met monthly for five of six months of the review period. The Patient Safety Committee reviewed quarterly drills, which were held on each shift, and created a workgroup, which included nursing and psychiatry leadership, on telephone orders, with the goal of building upon existing statewide policy. The committee noted a resultant increase in the accuracy of telephone orders. Reviewed minutes also indicated a willingness to reevaluate the committee's efficacy, and input was solicited from committee members on improvement ideas. The chairperson emphasized the importance of obtaining feedback from staff, including explaining the process of how to file a patient safety-related concern.

The facility reported that SQ-PIP Utilization Management meetings had been suspended during the COVID-19 pandemic and had yet to resume; they were slated to restart in January 2023. During the intervening period, the team had informal conversations with leadership about certain patients' appropriateness for continued inpatient care treatment.

The Joint Commission's last reaccreditation of the SQ-PIP occurred in August 2021, when it was reported that "corrective actions were addressed." However, the SQ-PIP reported that it had to conduct annual internal monitoring in order to satisfy Joint Commission compliance.

## XV.  PATIENT COMPLAINTS/PATIENT SATISFACTION

One patient complaint was filed during the review period. No staff were moved to another post due to this complaint. There were no patient satisfaction surveys completed during the reporting period.

## XVI. <u>CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN</u>

The LOP was dated August 2022 and was aligned with headquarters' partnership plan.

Executive leadership joint rounding occurred once in the PIP during the review period. The SQ-PIP utilized the required form, which reflected relevant discussions with staff and patients about the mental health program and the physical plant.  Reviewed executive staff meeting minutes revealed that the CMHPP and executive leadership joint rounding were standing agenda items.

SQ-PIP typically provided huddle sign-in sheets instead of full huddle reports that indicated what the huddles addressed.  Reviewed second watch huddle reports indicated that all required staff were in attendance; however, third watch huddle sheets did not always reflect all required staff's attendance.

The institution did not provide QMC meeting minutes.  Reviewed mental health subcommittee meeting minutes listed CMHPP as a standing agenda item, and included pertinent information about the CMHPP, including executive leadership joint rounding and CMHPP training.

There were no staff misconduct complaints filed against PIP staff during the review period.

The institution did not report on quarterly partnership round table training.

SQ-PIP did not report annual partnership off-post training data that was exclusive to the PIP.  Rather, information was provided for the entire institution.  As for custody staff, 24 CC Is, 11 CC IIs, 29 lieutenants, 76 sergeants, and 704 custody officers completed the training.  The institution further reported that 125 custody staff members did not attend the training.  For mental health staff, one chief psychiatrist, two chief psychologists, seven psychiatrists, three

senior psychologists, 20 psychologists, eight supervisor RN IIs, 45 RNs, 30 LVNs, nine social

workers, five senior psych techs, 44 psych techs, five recreation therapists, two HPS Is, 28 office

techs, and nine AGPAs attended the training.  Otherwise, 28 mental health staff members did not

complete the training.

## XVII. *COLEMAN* POSTINGS

SQ-PIP reported that *Coleman* posters were posted in English and Spanish throughout the

PIP's housing units and were also located in IDTT and group rooms.

## XVIII.  LAUNDRY AND SUPPLY ISSUES

The institution did not report any issues with laundry and supplies.  It was further

reported that SQ-PIP patient's laundry was directly handled by PIP and CTC staff, who worked

together to monitor laundry levels to provide the appropriate amount of clothing, towels, and

linen to patients.

## XIX.  VISITATION/PRIVILEGES/TELEPHONE ACCESS

During the review period, the institution allowed patient visitation through a hybrid

program that allowed in person contact visits on Friday and Saturday, and video visitation on

Sunday.  However, the institution did not provide specific data regarding visitation.  Provided

NCAT data indicated that most patients were typically offered three to four phone calls per

week, as well as being offered daily yard, which was typically for between 45 and 75 minutes.

## XX.  LAW LIBRARY ACCESS

The institution provided NCAT data that reported appointments reflecting law library

access.  During the review period, 18 patients utilized the law library.

## XXI.  HEAT PLAN

The heat plan LOP was dated April 2022 and indicated compliance with CDCR policy. During the review period, there were four Stage I, three Stage II, and three Stage III heat alerts. One patient experienced a heat-related illness due to dehydration and was transported for outside medical care.

The institution reported completion of the heat-related pathologies on-the-job training by 90 percent of mental health staff and 92 percent of custody staff.

## XXII. PRE-RELEASE PLANNING

The institution's mental health pre-release coordinator was a clinical social worker.  The pre-release coordinator received a roster of patients twice monthly from headquarters that included all patients who were within 60 days of release.  This roster was used to schedule meetings with patients to complete the PRPA.  However, the institution did not provide pre-release groups during the review period.

Two SQ-PIP patients required pre-release planning during the review period.  However, neither patient received specific pre-release programming.  Instead, they worked with their treatment teams on clinically relevant issues related to their release.  One patient was clinically discharged to the EOP level of care.  The other patient was an OMHD and, though paroled, was transferred to DSH for treatment.

The SQ-PIP did not provide information on TCMP services.

## XXIII.  PROGRAM ACCESS

No SQ-PIP patients had job assignments during the review period.  The institution reported that 25 acute care patients earned milestone credits, but did not provide data on the number of patients who were eligible to earn milestone credits.

## XXIV.  <u>EDUCATION</u>

During the review period, three patients received educational services, of whom two actively participated in educational services for five or more hours weekly.

# APPENDIX B

# CLINICAL CASE REVIEWS

**APPENDIX B1**
**CMF – PIP**
**January 10 – 12, 2023**

**Patient A**

This 53-year-old patient had received treatment at the ICF level of care since May 25, 2021.  His healthcare record was selected for review as he had been placed in an observation room on October 9, 2022.  He was provided with diagnoses of antisocial personality disorder; major depressive disorder, recurrent, in partial remission; and opioid use disorder, severe, in sustained remission.  He was prescribed fluoxetine, atomoxetine, and aripiprazole, as well as olanzapine, mirtazapine, and hydroxyzine on an as needed basis.  He was generally medication adherent; and when he missed taking his medications for a few days during the reporting period, the issue was promptly addressed.

IDTTs occurred monthly in keeping with requirements; however, documentation was largely unchanged from month to month.  The changes were descriptions of patient status, with brief mentions of group attendance and medication adherence.  Often, the entries in IDTT documentation were the same as entries written by the PC for an individual contact documented on the same day as the IDTT.  Treatment goals were not clearly stated, and no interventions were listed beyond timeframes for contacts, which included weekly sessions with the PC and psychiatrist, as well as groups four times weekly.  Of the seven IDTT meetings held during the reporting period, three did not have a nurse present.  There was no mention of the STEP program in IDTT documentation.

Weekly contacts were documented by the PC and mostly occurred in confidential settings unless the patient refused.  It appeared that the PC counted the IDTT meeting as an individual contact.  There were a few entries for which the rationale for nonconfidential clinical contacts was not documented.  PC documentation occasionally included interventions provided to the patient that consisted primarily of handouts addressing issues that appeared appropriate to the patient's needs.  The patient was consistently seen by the same PC.  There were three occasions during the review period when the patient was not seen weekly by a psychiatrist without explanation.  The patient was mostly seen by his assigned psychiatrist, and the documentation appeared to adequately reflect discussion about medications and appropriate adjustments to medications in response to the patient's needs.

Group notes were consistently documented and indicated that multiple groups were offered to the patient weekly.  It was noted that regardless of the title of the group, group content was limited to watching movies, listening to music, or playing video games.  There was little information documented about the patient's behavior during groups in relation to his needs.
The patient was placed on suicide watch status on October 9, 2022 after expressing suicidal ideation following the death of his sister.  The patient's treatment while on suicide watch under constant observation was concerning.  Documentation indicated that PC contacts generally occurred at cell front with limited evidence of interventions to address the patient's suicidal ideation.  The psychiatrist made medication adjustments while the patient was on suicide watch, but psychiatric contacts also primarily occurred at cell front.  No IDTT was conducted while the

patient was on suicide watch, and no goals were documented to address the patient's crisis.  No SRASHE was completed at any point before, during, or after the patient's suicidal statements.  After removal from suicide watch on October 13, 2022, the patient was not seen by the IDTT until November 2, 2022, then for a routine IDTT meeting.  There was no mention of the recent suicidality or placement on suicide watch.  No updated goals were created or discussed.

**Findings**

The treatment provided to this ICF patient was inadequate.

There were no treatment goals and limited evidence of treatment interventions, even when the patient was placed on suicide watch for suicidal ideation.  There were missed psychiatric appointments, and several contacts occurred at cell front without documentation of rationale.  Structured out-of-cell treatment was inadequate in the number of hours offered and the content.  No SRASHEs were completed, despite the patient's suicidal statements and placement on suicide watch.

**Patient B**

This 46-year-old patient was provided with diagnoses of major depressive disorder, recurrent episode, with psychotic features and malingering.  The psychiatrist listed anxiety disorder in progress notes, but not on the diagnosis list.  The patient was prescribed olanzapine, hydroxyzine, lamotrigine, and mirtazapine with good medication adherence.  His healthcare record was reviewed as he was placed in an observation cell on August 31, 2022.  He was receiving treatment at the ICF level of care.

During the review period, IDTT documentation indicated that the patient was to be seen by the PC and psychiatrist weekly, with at least four groups offered weekly.  With one exception, the patient was seen weekly by the PC, usually in a confidential setting.  While there was some evidence of handouts provided to the patient during these sessions, there was no evidence of treatment interventions provided to the patient during PC contacts.  Progress notes were similar across contacts, and the plan section remained unchanged, referring to generic interventions to be provided to assist the patient "with meeting previously agreed upon goals for treatment."  One note, entered on August 25, 2022, appeared to be entered into the wrong patient's healthcare record, as the assigned PC who had been seeing the patient for months noted that she was not the assigned PC and introduced herself to the patient.  The patient was seen weekly by the psychiatrist with three exceptions.  Psychiatric contacts appeared adequate to address the patient's needs.

Multiple groups were offered weekly, and the patient generally attended those groups.  Documentation varied across groups and RTs, but there were some comprehensive entries regarding the patient's functioning and evidence that occasional groups included active engagement with patients on issues such as leisure skills and anger management.

IDTT meetings occurred monthly and included all required staff.  IDTT documentation was inadequate and included a number of blank or unchanged sections from month to month.  The

risk factors/behavioral alerts section was blank, despite indications that the patient had a history of suicide attempts and self-injurious behavior.  The clinical summary was not updated during the reporting period, nor were treatment goals, and references to readiness for discharge (which consistently noted that the patient was nearing discharge for several months).  LRH justification was also not documented.  Of note, the patient's LRH was multi-person cell, and yet he was housed in a locked dorm.  The justification provided regarding the lack of placement at the LRH stated that the patient was housed in a locked dorm because he "requires time-limited testing," and this rationale was carried over from month to month with an entry that stated "unknown if psych testing occurred."  In the unchanged clinical summary section from April 2022, a clinician documented that the patient was referred to a locked dorm by the acute care IDTT given concerns about the patient feeling overwhelmed by sharing a room with a number of individuals.  It appeared that no member of the patient's current IDTT had read this summary nor corrected the LRH rationale.  There was no mention of the STEP program in IDTT documentation.  The patient was placed in an observation cell on August 31, 2022 after refusing to return to his cell after reporting auditory hallucinations and paranoid ideation regarding his cellmates.  Assessments by the PC and psychiatrist at the time noted that the patient was believed to be attempting to influence his housing.  Of note, the patient had received news that his parole board hearing was cancelled during an August 17, 2022 IDTT, had not been attending groups for nearly a month, and had refused individual sessions with both his PC and psychiatrist after hearing this news.  No mention of these events was documented; in fact, both the PC and psychiatrist relied on the patient's self-report regarding group attendance.  There was no documentation that the RTs communicated that the patient had refused groups to the IDTT.  The patient remained on suicide watch for less than 24 hours and was seen daily by both his PC and psychiatrist; however, there was no documentation of interventions beyond the psychiatrist providing as needed medications.  The patient was not seen again in IDTT until September 20, 2022; there was no mention of the previously described events at that IDTT.

**Findings**

The treatment provided to this ICF patient was inadequate due to poor IDTT documentation, lack of interventions by the PC, missed psychiatric appointments, and evidence that healthcare record reviews were not completed, that resulted in inaccurate information about the patient's needs and treatment.  The patient was also offered less than adequate structured treatment, and that treatment was primarily recreational in nature.

**Patient C**

This 31-year-old patient was admitted to the acute level of care on August 10, 2022 from the MHCB where he was admitted for significant impairment due to mental illness.  He was provided with diagnoses of schizoaffective disorder, depressive type; alcohol use disorder, moderate; and amphetamine-type substance use disorder, moderate.  He was prescribed olanzapine, buspirone, haloperidol, venlafaxine, and lurasidone; and he was generally medication adherent.  His case was randomly selected for review.

At the time of admission, the patient was seen by a psychiatrist and a psychologist for initial assessments.  Neither assessment was comprehensive, and both included several sections that

remained blank or were not updated.  A SRASHE was completed upon admission, however, it also did not appear to have been updated.

The initial IDTT meeting occurred on August 11, 2022.  No nurse was present for the meeting, and it was unclear whether the patient attended.  Treatment frequencies were documented as weekly individual contacts with a psychologist, psychiatrist, and recreation therapist, with weekly psychological testing as well as one recreation therapy group and one pre-release planning group.  These planned interventions were unchanged throughout the reporting period.  The patient did not have documented psychological testing, was not seen for individual sessions with the RT, and was not involved in a pre-release planning group.  The absence of these interventions was never mentioned in the documentation.  IDTT documentation was generally of low quality, with little information about patient goals, progress, barriers or rationale for maintaining the patient at the current level of care.  Additionally, the patient was housed in a cell, yet his LRH was unlocked dorm.  This issue was never addressed.  There was no mention of the STEP program in IDTT documentation.

The patient was mostly seen weekly by the same PC; however, there were four weeks when sessions occurred ten days apart.  Additionally, it appeared that the patient's assigned PC was changed on October 24, 2022 with no documentation indicating that change other than notes by a different clinician appearing in the healthcare record.  PC contacts rarely included any documentation of interventions, discussions of the patient's treatment outcome expectations, or readiness for discharge.  The initial PC was focused on the patient's requests for nonformulary medications and did not appear to engage with the patient in any meaningful manner.  Psychiatric contacts were conducted weekly with the same psychiatrist and were clinically useful.  There was evidence not only of appropriate medication management but documented therapeutic interventions to support the patient's thinking and functioning.  The psychiatrist regularly documented the patient's progress toward treatment outcome expectations.
The patient was offered groups a few times per week and attended some; however, there was no mention of group participation in any clinical notes or IDTT documentation.  Groups were primarily recreation based with some psychoeducation documented.

**Findings**

The treatment provided to this acute care patient was inadequate.

Although he received clinically sound psychiatric services, treatment planning was lacking, PC interventions were largely absent, the patient was offered only a few recreational groups weekly, and initial assessments were insufficient to support good patient care.  Additionally, there was no rationale provided for maintaining the patient at the acute level of care for nearly three months.

**Patient D**

This 38-year-old transgender patient was provided with diagnoses of schizoaffective disorder, depressive type and antisocial personality disorder.  The patient was prescribed bupropion, clozapine, and escitalopram with consistent medication adherence.  The patient was also prescribed olanzapine on an as needed basis.  The patient received his psychotropic medications

by a PC 2602 order. The patient was admitted to the acute level of care in March 2022 and was discharged to the EOP on August 31, 2022. This patient was selected for review as the patient had been on the list for referral for a Positive Behavioral Support Plan (PBSP) in 2021.

At the beginning of the review period, the patient was placed on suicide precaution status after reporting swallowing batteries and being on a hunger strike. There was no SRASHE completed at that time. IDTT documentation following this incident made no mention of the self-injury or the placement on suicide precautions. In fact, IDTT documentation consistently indicated that the patient did not engage in any self-injurious behavior while at the CMF-PIP. A discharge summary by the PC also noted no self-injurious behavior during the patient's stay on the acute care unit.

IDTTs occurred with the patient every two weeks and included all required members during all but one of the meetings when the nurse was not present. Treatment outcome expectations were included, and there was reference to the patient's progress toward most of the indicators. The patient was initially scheduled for weekly individual contacts with the psychologist, psychiatrist, and RT with six hours of groups weekly. In early July 2022, the groups were reduced to two groups weekly without explanation. In actuality, the patient had refused to have a COVID-19 test and was barred from attending any groups, yard, or programming with other patients. This was not mentioned in IDTT documentation. There was no mention of the STEP program in IDTT documentation.

Weekly sessions with the psychiatrist were documented and appeared to address the patient's needs. Of note, the patient was prescribed clozapine, and while the psychiatrist monitored side effects and ordered laboratory studies, there were three messages from the pharmacist noting that the patient's laboratory results were not reported to the clozapine registry. The registry indicated that clozapine should not be dispensed until the laboratory results were filed. The first notification occurred in June 2022 and continued through August 2022. Despite these notifications, a review of the medication administration record indicated that the patient's clozapine was administered consistently. There was no documentation that the psychiatrist was aware of this issue.

PC contacts occurred weekly during most of the reporting period, but on two occasions there were lapses of nearly three weeks without contacts. PC contacts did not evidence any interventions related to the patient's treatment goals other than routine assessments of mood and suicidal ideation. As noted previously, the PC did not acknowledge the patient's self-injury while in the PIP, even in the discharge summary. Additionally, the PC noted that the patient refused all groups and programming, omitting that this was due to a refusal to be tested for COVID-19. The COVID-19 testing refusals were noted later in the discharge summary, but not adjacent to the discussion related to patient programming.

According to IDTT documentation, individual RT contacts were to occur weekly; however, they did not occur. Cell-front "rounding" contacts were documented most weeks, and there were only three occasions when the RT offered an individual session with the patient.

At the time of discharge, a SRASHE was completed that included a safety plan. Other than the omission of the self-injurious episode during the current PIP stay, the SRASHE and safety plan were adequate. Discharge summaries were adequate, with the noted self-injury omission. During the monitoring review, it was reported that all discharges were reviewed by supervisors, and there was reference to a request submitted for a discharge review. There was no documentation of the supervisory review in the healthcare record other than the fact that the patient had actually discharged.

**Findings**

The treatment provided to this acute care patient was inadequate.

The patient was not seen as required or as indicated in the IDTT documentation. PC contacts were limited in the delivery of treatment interventions; there was no recognition of an episode of self-injury in any IDTT or discharge documentation, and monitoring and reporting related to clozapine treatment was not appropriately performed.

**Patient E**

This 28-year-old patient was admitted to the acute level of care on August 8, 2022, due to lack of stabilization in the MHCB with continued depression and suicidality. He was provided with diagnoses of major depressive disorder, recurrent; antisocial personality disorder; amphetamine-type substance use disorder, severe; and opioid use disorder, moderate. He was prescribed fluoxetine, haloperidol, and chlorpromazine on an as needed basis. This patient was chosen for review as he was included on the maximum custody status list as having been considered for a custody level reduction; however, he did not receive a reduction because he "has an increasing propensity of violence based on the details of this RVR and his history of RVR's."

While a SRASHE was completed at the time of admission, the patient did not participate, and it was unclear if any updates were made to the prior assessment. The most recent information on the form was dated July 28, 2022, prior to the acute care admission. During his inpatient stay, the patient engaged in head-banging and hunger strike behavior, reported suicidal ideation and auditory hallucinations, and frequently requested as needed medications. The patient was placed on suicide precautions status on more than one occasion. Of note, on August 20, 2022, the patient was continued on limited issue that consisted of restricted clothing and property after discontinuation of suicide precautions, which was not consistent with policy. Other than SRASHEs completed upon admission and discharge, no SRASHEs were completed when the patient engaged in self-injury or expressed suicidal ideation. A safety plan was only updated at the time of discharge.

The only IPOC developed was related to the patient's maximum custody status, despite IDTT documentation indicating that his maximum custody status was unrelated to his mental health needs. There were no treatment goals related to the patient's self-injurious behavior or reported depression and auditory hallucinations. Psychiatric and PC contacts focused on the patient's requests for non-formulary medications and inconsistent report of symptoms. There did not appear to be any investment in understanding the patient's treatment needs or reasons for his

reported distress.  The IDTT appeared invested in dismissing this patient's reported needs and self-injurious behavior as "impression management" or malingering.  The rationale for discharging the patient was noted as "[p]atient lacks objective findings of a mental illness, has atypical presentation, is contradictory and lacks credibility in reporting."  There was no mention of the STEP program in IDTT documentation.

**Findings**

The treatment provided to this acute care patient was inadequate.

Continuity of care was poor, with various PCs and psychiatrists providing differing opinions and interventions for the patient without clear treatment goals identified.  Further, the patient's impulsivity and self-injurious behavior were dismissed rather than addressed.  Despite developing only one IPOC to address maximum custody status, there were no efforts documented to assist the patient with this singular goal.  Additionally, the patient was offered inadequate group therapy given his level of care requirements.

**Patient F**

This 37-year-old patient was provided with diagnoses of major depressive disorder with psychotic features, and a history of alcohol, cannabis, opioid, and amphetamine-type substance use disorders.  He was prescribed mirtazapine and olanzapine, as well as olanzapine and diphenhydramine on an as needed basis.  He was referred to the acute level of care from the MHCB due to continued symptoms of suicidality, depression, and hopelessness.  He was a maximum custody status patient, and was admitted on November 2, 2022.  His case was selected for review as he was on maximum custody status to determine if he was provided adequate structured treatment.

The initial IDTT was completed on November 3, 2022, prior to the completion of any initial assessments.  No nurse was present for the initial IDTT.  The IDTT discussed the STEP program as well as the patient's identified treatment outcome expectations, which were related to distress tolerance and mood management, with a goal of decreasing suicidal thoughts.  No specific interventions were listed for the patient, and the only treatment contacts documented included individual weekly contacts with the psychiatrist and PC.  No group therapy was recommended by the initial IDTT, nor subsequent IDTTs.  The initial IDTT documentation listed the patient's LRH as single cell; and it was documented that mental health did not contribute to the patient's maximum custody status, and there was no clinical indication for a lower LRH or reduction in maximum custody status.  Throughout his stay, the patient verbalized distress over his maximum custody status, including the inability to access his property including a television, as well as limited phone access to communicate with his family.  This became increasingly distressful for the patient as his grandmother died, and he was unable to talk with his family about the loss.  Of note, on January 17, 2023, the psychiatrist documented that limited access to the phone was "limiting his interaction with family and affecting his mental health."  The patient was seen by the ICC on two occasions, and his maximum status was consistently retained.

During his inpatient placement, the patient was seen weekly by the psychiatrist and nearly weekly by the PC, with two occasions of late weekly sessions. On December 2, 2022, the patient was seen in the dayroom for an individual session during which a correctional officer was present. The patient asked that the correctional officer not be present during his session, and the PC denied the request. The patient terminated the session and refused the next individual session, requesting to be removed from the PC's caseload due to the lack of respect and regard for privacy during the prior session. The patient's distress about the lack of privacy was discussed during group and psychiatric sessions. The content of psychiatric and PC contacts were clinically adequate and included evidence of treatment interventions provided to the patient in accordance with his needs.

During the 11 weeks of treatment reviewed, the patient was offered 13 hours of groups, and he attended all but three hours. Offered group treatment equated to 1.2 hours of groups offered weekly.

Nine IDTTs occurred during the patient's 11-week stay on the acute care unit. A nurse was present for only two of the IDTTs, and the CC I was present remotely by Microsoft Teams, with one session noting the CC I was present "via Teams email," suggesting the CC I was not actually participating by audiovisual connection. On two occasions, it was noted that the patient was unable to attend due to the lack of custody escorts. The content of IDTT documentation was largely unchanged week to week and made no mention of patient progress toward goals or interventions provided, except medications. Groups were never included as part of the planned treatment for the patient, and group participation was not mentioned until January 2, 2023, despite the patient engaging in most offered groups since November 9, 2022.

**Findings**

The treatment provided to this patient was inadequate.

He was not offered sufficient structured treatment, and his access to confidential care was compromised by his maximum custody status. IDTT documentation was inadequate, as it did not discuss patient progress, nor was group treatment included as a planned treatment intervention. Additionally, the psychiatrist indicated that the patient's maximum custody status negatively affected his mental health; yet there was no documentation of engagement by the IDTT to advocate for security level changes with custody staff.

**Patient G**

This 27-year-old patient was provided with diagnoses of impulse control disorder; borderline personality disorder; major depressive disorder, recurrent, chronic; polysubstance dependence and sleep walking disorder. He was designated as a participant developmental disability program (DDP). He was prescribed haloperidol, olanzapine, and valproic acid with diphenhydramine ordered on an as needed basis. He was generally medication adherent. His case was selected for review as he had been included on a list of patients who were referred for a positive behavior support consultation in the past; minutes from the Emergency Medical Response Review Committee on November 30, 2022 noted that a plan was being implemented for the patient.

The patient was originally admitted to the acute level of care in December 2021, but had been out to court for six months, returning on September 15, 2022. Despite the documentation in the Emergency Medical Response Review Committee minutes, there was no documentation of a formal behavioral plan in effect for the patient during his time in the CMF-PIP. A previous behavioral plan from 2018 included providing the patient with attention and positive praise when he was not engaging in self-harm or negative attention seeking behavior, and this plan appeared successful. This plan was not discussed in any documentation during the current admission. The PC did develop a brief behavioral plan with the patient which involved providing him with an additional session each week and allowed him to use a pen during the session when he did not engage in self-injury. The plan seemed effective for one week; but the following week, the PC relied on the patient's self-report and provided a pen during session when the patient had engaged in self-injury during the week. Toward the end of his stay, the IDTT restricted the patient's access to yard and groups, indicating that this would limit his access to objects that he could insert into his body or swallow. The plan appeared effective in temporarily decreasing the patient's self-harm but did not appear to result in any skill acquisition for the patient.

During his stay, the patient engaged in frequent self-injurious behavior, including the ingestion and insertion of foreign objects. This resulted in several outside hospital visits. As a result, the patient was on quarantine status often upon return due to COVID-19 restrictions, resulting in limited programming. His initial IDTT was delayed for two weeks given his frequent transfers to outside hospitals. Psychiatric and PC contacts occurred more frequently than required. IDTT meetings occurred as required, however there were no mental health goals or interventions listed to address the patient's self-injurious behaviors except for psychotropic medications and limiting the patient's access to yard and groups. Despite IDTT documentation indicating the intention to limit his access to groups, the planned treatment included in his treatment plan consistently included three groups per week and was not updated or individualized when the IDTT decided to change the treatment course. The patient was offered groups in excess of what was listed on his treatment plan, except when his programming was limited by COVID-19 quarantine, COVID-19 isolation, and limitations placed by the treatment team.

**Findings**

The care provided for this patient was inadequate.

The interventions provided to address his self-injury were minimal, reactionary and inconsistent, focusing on medications as the primary intervention. There was evidence of an attempt to engage in behavioral reinforcement with the patient; however, it was short-lived and relied on patient self-report rather than collateral, objective information regarding self-injury.

**Patient H**

This 33-year-old patient was admitted to the acute level of care on August 1, 2022 on maximum custody status. He was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed haloperidol decanoate and olanzapine with good medication adherence as the patient received his psychotropic medications by a PC 2602 order.

He was admitted due to significant weight loss due to delusional thinking regarding staff trying to kill him by poisoning and placing razors in his food. He had refused medications.

Other than delays in documenting the initial PC assessment and IDTT meeting, the patient was seen as required by the IDTT and for individual sessions with the psychiatrist and PC. Upon admission, an initial psychiatric assessment was completed and an initial SRASHE was not completed due to the patient's mental status. The patient was significantly impaired by his severe mental illness, resulting in medical complications and weight loss of nearly 90 pounds over the preceding nine months. The psychiatrist initiated an emergent PC 2602 order to provide psychotropic medication, and the medical staff considered initiating a PC 2604 to ensure that the patient was eating and drinking. It did not appear that the PC 2604 order was required; as the psychotropic medications appeared effective in reducing the patient's delusional ideation, and he resumed eating and drinking.

PC contacts included support for reality testing, and psychiatric contacts included focus on medication effects, side effects, and adherence. Ultimately, the decision was made to place the patient on a long-acting injectable antipsychotic medication with an oral medication, and this combination appeared effective. The patient was offered groups one to three hours weekly, yet the treatment plan indicated the offering of three hours of groups weekly. IDTTs occurred as required, but a nurse was not consistently present at the meeting, which was concerning as the patient had significant medical needs. Additionally, the only IPOC entered for the patient was related to his maximum custody status, yet it was documented that his mental health did not contribute to his maximum custody status. Toward the end of the reporting period, the patient was being considered for discharge to the EOP level of care which appeared appropriate.

**Findings**

The care provided to this acute care patient was inadequate.

Of concern was a delay in documenting an initial IDTT which appeared to have been conducted on August 4, 2022, but was not documented until August 8, 2022. Similarly, the patient's initial PC assessment was not documented until August 19, 2022 on the required form despite having been assessed by the PC weeks earlier. A nurse was not consistently present for IDTT meetings. It was unclear why there was an IPOC for the patient's maximum custody status, as it was determined that his mental health did not contribute to his custody status. Additionally, the patient was offered inadequate group therapy given his level of care, and the content of those groups was primarily recreation based, including movies, music, and games with an occasional psychoeducational group.

**Patient I**

This 34-year-old maximum custody patient was admitted to the acute level of care on September 26, 2022. He was provided with diagnoses of unspecified schizophrenia spectrum or other psychotic disorder; substance-induced depressive disorder with moderate or severe use disorder; and antisocial personality disorder. Conversely, progress notes by different psychiatrists noted diagnoses of schizoaffective disorder, bipolar type, and unspecified depressive disorder with psychotic features; there was no evidence of attempts to reconcile these disparate diagnoses. The

patient was prescribed aripiprazole, in both long-acting injectable and oral preparations, as well as hydroxyzine ordered on an as-needed basis, with olanzapine ordered as a back-up medication in the event of medication refusal for the PC 2602 order. This case was selected randomly for review.

The patient was admitted to acute care from the MHCB for significant impairment due to paranoid and persecutory delusional thinking, as well as command auditory hallucinations telling him to kill himself. He seriously assaulted two correctional officers who were escorting him to medication line to receive his PC 2602 medications on September 12, 2022 prior to MHCB placement.

The patient was seen timely for initial psychiatric and PC assessments, as well as an initial SRASHE. The initial PC assessment was not updated in any meaningful manner and was not completed by the patient's assigned PC. The psychiatric assessment and SRASHE were adequate. The initial IDTT was conducted without a nurse present. The PC and psychiatrist who attended the meeting were not the individuals who completed the initial assessments and had not seen the patient prior to the IDTT. The only mental health IPOC was related to the patient's maximum custody status, despite an indication that his placement on this status was unrelated to his mental health needs. The treatment plan specified that the patient would be seen weekly by his psychiatrist and PC, along with individual psychological testing and individual pre-release planning contacts weekly, two recreational therapy groups, and one pre-release planning group weekly. The patient's earliest possible release date was November 2025. These treatment frequencies were never updated; further, psychological testing was never attempted, there were no individual or group contacts with a pre-release planner, and the patient was not offered groups weekly. Subsequent IDTT meetings rarely included nursing staff, and despite documentation that a CC I was present, individual notes with the PC included the patient asking for information from the CC I week after week. There was no evidence that the patient posed these questions during an IDTT, which should have occurred if the CC I was present at the meetings. There was no mention of the STEP program in IDTT documentation.

While psychiatric contacts were documented most weeks, several contacts appeared to coincide with IDTT meetings and it was unclear if there were separate meetings, or if the patient was simply seen in IDTT, and these were documented as individual contacts. The patient was not seen for an individual psychiatric session between November 8 and November 30, 2022, yet the psychiatrist documented a mental status examination on November 18, 2022, after documenting that the patient was "unavailable" for the session. The patient was seen by two psychiatrists during the review period; each documented different diagnoses and appeared to have differing ideas regarding the patient's medication needs and understanding of his PC 2602 medications. One psychiatrist documented that the injectable medication was the only court-ordered medication, while another psychiatrist documented that oral medications were included in the order.

The PC conducted weekly confidential sessions with the patient which did not include evidence of interventions beyond listening and support. Of concern, the PC documented in progress notes and IDTT documentation that the patient attended all groups offered, when the patient did not attend groups except on one occasion.

Fortunately, the patient appeared to stabilize with medication treatment and was appropriately determined ready for discharge to the EOP level of care.

**Findings**

The care provided for this acute care patient was inadequate.

The patient was not offered treatment as indicated in his treatment plan, and he was not seen as required by a psychiatrist. IDTT documentation was sparse and did not include adequate treatment goals, interventions, or provide adequate updates on the patient's engagement in the treatment modalities listed in the plan. Additionally, the patient was offered inadequate group therapy given his level of care, and the content of those groups was primarily recreation based, including movies, music, and games with an occasional psychoeducational group.

**Patient J**

This 57-year-old patient was provided with a diagnosis of antisocial personality disorder, and he was prescribed aripiprazole, escitalopram, and diphenhydramine. He had an active PC 2602 order; yet on December 8, 2022, the psychiatrist documented that he would not renew nor enforce the order as the patient's prior psychotic symptoms had been due to substance use. This patient was selected for review as he had been interviewed while on-site and appeared stable, yet he was receiving treatment at the acute level of care where he had been hospitalized for nearly six months.

The patient was initially admitted to the acute level of care in March 2022 following a suicide attempt by overdose that occurred in full view of a psychologist, and ongoing reports of depression, anxiety, auditory hallucinations, and suicidal ideation in the MHCB. The patient fell and broke his hip playing basketball while at the acute level of care in May 2022, and he was housed in a CTC until July 15, 2022, when he returned to the CMF-PIP at the acute level of care. Upon his return, timely initial assessments with the psychiatrist and PC were completed. There was no evidence that a SRASHE was completed upon the patient's return, or at any point since. IDTTs were completed as required yet evidenced only minimal updates with no change in IPOCs or discussion of patient progress toward treatment outcome expectations, despite significant changes in case formulation and treatment approaches during the course of treatment. This was unfortunate as the clinical work by the psychiatrist with support from the PC was clinically thoughtful, well-documented, and ultimately addressed the patient's needs, which were associated with his antisocial personality disorder rather than the patient's self-reported symptoms of depression and psychosis. The IDTT successfully navigated the patient's attempts to change clinical decisions with a hunger strike. There was good continuity of care, including responses by the on-call psychiatrist, facilitated by the clarity of documentation, rationale, and case formulation provided by the psychiatrist.

The treatment plan included weekly contacts with the psychiatrist and PC as well as four hours of groups weekly. On average, the patient was consistently offered groups in keeping with the treatment plan. The patient was clinically ready for discharge to the EOP level of care; however

a pending safety investigation delayed the discharge. There was no mention of the STEP program in IDTT documentation.

**Findings**

The overall care provided to this patient was inadequate.

While the treatment provided to this patient was clinically sound and appeared to adequately address his treatment needs, IDTT documentation was poor, rarely updated, and did not include actual patient goals or progress in treatment. Additionally, the patient was offered inadequate group therapy, and the content of those groups did not address the patient's needs but were primarily recreation based, including movies, music, and games with an occasional psychoeducational group.

**Patient K**

This 36-year-old patient was randomly selected for healthcare record review to assess the quality of acute care provided at the CMF-PIP. The patient was on maximum custody status.

The patient's most recent CDCR incarceration began on February 1, 2013. The patient had been treated at the Correctional Clinical Case Management System (3CMS), EOP, and MHCB levels of care. He had over 40 MHCB placements, and multiple treatments at the inpatient levels of care, with the last placement at the acute level of care at CMF-PIP in 2018.

The patient had an extensive history of aggression and violence. A warden's order, dated August 7, 2018, indicated that the patient was required to wear a protection mask every time he left his cell due to multiple incidents of biting staff, resulting in serious injury. The patient reportedly set his cell on fire in 2021. He required a four-person escort with transport.

He was admitted to the California State Prison at Sacramento (CSP/Sac) MHCB on November 17, 2021, due to suicidal ideation, depression, and decompensation. The MHCB team referred the patient to the acute level of care on November 23, 2021. His stay in the MHCB included the gassing of staff, as well as threats to kill staff and their families. He arrived at the CMF-PIP acute care unit on January 28, 2022.

The most recent SRASHE, dated December 30, 2022, assessed high chronic and moderate acute suicide risk. The patient had a history of prior suicide attempts and self-harm.

He was provided diagnoses of bipolar I disorder, with psychotic features, and antisocial personality disorder.

The patient had a history of receiving involuntary medications by a PC 2602 order since at least 2016 due to danger-to-self and others.

He was prescribed haloperidol, an antipsychotic medication ordered in a long-acting injectable and oral form; topiramate and valproic acid, both mood stabilizing medications; benztropine, for antipsychotic side effects; and melatonin, for sleep.

The initial PC and the psychiatric evaluations occurred timely prior to the initial IDTT. The initial PC evaluation contained carry-over information from prior notes and evaluations and did not provide a clear clinical presentation of the patient.

The necessary participants were present for the IDTT, except for nursing, who was not present for some treatment teams; the patient was generally present. The treatment team did not update the clinical summary and case formulation, carrying over past documentation from prior MHCB treatment. Mental health treatment goals were absent from the first several treatment plans. The treatment targets included reducing thoughts of harming others below a certain numeric threshold, as well as the absence of explosive behavior for one week. The patient was on maximum custody status with a long history of dangerousness-to-others. Despite this, there was no maximum custody treatment plan for the duration of treatment at the CMF-PIP.

Routine contacts with the psychiatrist and PC occurred timely. The psychiatrist adjusted the patient's dose of long-acting injectable haloperidol, with a plan to taper and discontinue the oral haloperidol.

The patient had multiple episodes of aggression during his treatment at the acute level of care. In one such incident on April 9, 2022, the on-call psychiatrist gave an unusually high-dose injection of chlorpromazine 200 mg, along with standard doses of diphenhydramine and lorazepam. Despite the unusually large dose of chlorpromazine given, documentation reflected no harm to the patient.

The PC worked with the patient regarding anger management. The treatment team implemented a behavioral plan in May 2022, and referred the patient to the PBST. Documentation indicated that the patient responded positively to the provision of additional structure and staff contact during each shift.

The patient was clinically discharged from the acute level of care on June 2, 2022, with physical discharge on June 15, 2022; he was discharged to the EOP level of care at the CSP/Sac PSU. The patient was subsequently admitted to the MHCB on July 3, 2022, with discharge on July 19, 2022. At the time of review, the patient was treated at the EOP level of care and housed at the CSP/Sac PSU.

**Findings**

The care provided to this CMF acute care patient was inadequate.

Information from previous documents was copied and repeated, making it difficult to determine the relevance of documentation, and the documentation was repeatedly pulled forward for lengthy timeframes and across levels of care. The primary clinician initial assessment lacked

clear documentation regarding the patient's current treatment needs, and IPOCs were not sufficiently updated to address changes in treatment needs during routine IDTTs.

The patient made very limited progress for the first two months of treatment; however, there were no specific treatment interventions documented to address that barrier. For the duration of treatment at the CMF-PIP, no maximum custody treatment plan was developed and implemented as required. Despite a long history of aggression and maladaptive actions to have his needs met, the patient did not have a behavioral plan until May 2022. Once implemented, it appeared to be clinically beneficial.

Overall, medication management appeared appropriate. The psychiatrist adjusted the dosage of the antipsychotic injection, with supplementation of the oral medication until the injectable form reached therapeutic effect. Medication side effects were adequately addressed. The rationale for the use of the medication was sufficiently documented. One concern regarding medication management was the emergency medication the on-call psychiatrist ordered on April 9, 2022. The patient received a dose of injectable chlorpromazine, far exceeding typical dosing. The typical dosing is 25 or 50 mg injection. The patient received 200 mg, along with diphenhydramine and lorazepam. While the clinical situation may have merited a higher than standard dose, the documentation did not support the rationale provided for this departure from standard practice. Documentation did not reflect any adverse outcome for the patient.

Transfer timelines occurred longer than mandated by policy, including transfer from the MHCB to acute care, as well as delay in physical discharge from the acute level of care. COVID-19 related transfer difficulties may have contributed to these delays.

**Patient L**

This 33-year-old patient was randomly selected for healthcare record review to assess the quality of acute care provided at the CMF-PIP. The patient was on maximum custody status.

His most recent CDCR incarceration began on December 10, 2021, when he was included in the MHSDS at the 3CMS level of care. The patient was housed at the WSP MHCB from March 26, 2022, until transfer to the CMF-PIP acute care unit on April 26, 2022. The treatment team referred the patient to acute care due to concerns of grave disability and threatening behavior. The MHCB treatment team reported that the patient screamed in his cell, kicked the door, threatened to hurt others, and possibly spat on others. The patient had no prior treatment at the EOP level of care and had one prior MHCB admission in 2013 during a prior incarceration. He had no history of treatment at the intermediate or acute levels of care.

The most recent SRASHE, on June 21, 2022, assessed low chronic and high acute suicide risk. The patient had a history of multiple suicide attempts, including by hanging in 2008, 2013, and 2019. He also had a history of self-harm; but the details, severity, and most recent injury were unclear.

He was provided with a diagnosis of schizoaffective disorder, bipolar type. While at WSP, the treatment team obtained a PC 2602 involuntary medication order. The patient was prescribed olanzapine, divalproex, and fluphenazine.

The initial PC evaluation occurred timely, and the PC indicated that the patient appeared to have a drug induced psychosis. The summary and case formulation was documented as "per previous documentation." The initial psychiatric evaluation also occurred timely. The PC and the psychiatric evaluations occurred prior to the initial IDTT.

The initial treatment plan on April 27, 2022, displayed copious information from prior treatment plans. A representative from nursing was not present at the IDTT as required. Some treatment goals were vague and ill-defined, such as displaying "behavior appropriate for a lower level of care." Other goals were not focused on the patient's current presentation. As an example, despite denying suicidal ideation, one treatment goal was to "reduce suicidal ideation-rated as a 6 or below." The PC notes contained limited details and did not align with the treatment plan goals.

Routine psychiatric and PC contacts generally occurred timely.

The psychiatric note on April 29, 2022, stated that the patient was seen at cell front because "this writer was busy and training all week and did not have time to see everyone in person." The note on May 3, 2022, noted that the patient exhibited delusional thinking and agitation. Despite this, the psychiatrist did not make medication changes. The patient changed units on May 10, 2022. On May 13, 2022, the new psychiatrist continued the same medications. On May 19, 2022, the psychiatrist-initiated treatment with fluphenazine. On May 25, 2022, the patient was too agitated for IDTT, and the psychiatrist increased the fluphenazine dose.

The patient paroled from the acute level of care on June 2, 2022, transferring to the custody of a county sheriff. The psychiatric discharge summary indicated that an evaluation for an involuntary hold was recommended upon release from CDCR.

The patient soon returned to CDCR, arriving at North Kern State Prison (NKSP) on June 17, 2022, and was placed at the EOP level of care. The patient transferred to Mule Creek State Prison (MCSP), where he remained at the time of review.

**Findings**

The care provided to this CMF-PIP acute care patient was inadequate.

Documentation was repeatedly pulled forward from past documentation for lengthy timeframes. Treatment plan clinical summaries and case formulations lacked sufficient documentation of current symptoms, functional impairments, relevant treatment history, and treatment response. Instead, documentation focused on historical information. IPOCs were not clearly in alignment with treatment needs identified during initial assessments or updated to address changes in the patient's treatment needs during routine IDTTs. As one example, the patient had a treatment goal of reduction of suicidal ideation, despite the notes documenting that he did not have suicidal

ideation. Another example included no goals for aggression and impulsivity, despite the current presence of these severely impairing symptoms. Routine IDTT documentation did not provide an adequate summary of the patient's functioning and treatment between IDTTs. PC notes did not clearly link to established treatment plan goals.

Regarding medication management, the rationale for not making more prompt medication changes despite the patient's degree of impairment merited explanation.

Despite the patient's planned parole, discharge planning was not clearly incorporated into the treatment plan. A clinician met with the patient for pre-release planning on May 4, 2022; however, the patient was severely psychiatrically ill at that time and could not adequately participate. A psychiatric note stated that the patient was going to parole soon and may require an evaluation for involuntary commitment at the time of discharge. Despite this, there was inadequate documentation of coordination of care with release to the sheriff's department.

**Patient M**

This 30-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CMF-PIP. The patient's custody status was maximum custody at the time of admission but was subsequently lowered to Close B.

His CDCR incarceration began in November 2012. He was included in the MHSDS in 2015, and at the EOP level of care in 2019, after two prior MHCB placements. While at the EOP level of care at CSP/Sac, the patient decompensated due to worsening anxiety and depression. The patient arrived at the CMF-PIP for treatment at the intermediate level of care on November 10, 2022. He had no prior history of treatment at the intermediate or acute levels of care.

The most recent SRASHE, dated November 10, 2022, assessed high chronic and moderate acute suicide risk. The patient had a reported history of suicide attempts and self-harm.

The patient was provided with diagnoses of major depressive disorder, post-traumatic stress disorder (PTSD), alcohol use disorder, and opioid use disorder.

The patient had no history of receiving involuntary medications by a PC 2602 order.

The psychiatrist made multiple medication changes. The patient was prescribed fluoxetine, an antidepressant and antianxiety medication; aripiprazole, an antipsychotic medication also used to augment the action of antidepressants; oxcarbazepine and lithium, for mood stabilization; prazosin, used to treat the nightmares associated with PTSD; and diphenhydramine, for anxiety and sleep. The patient also received treatment with acamprosate and buprenorphine for medication-assisted treatment for alcohol use disorder and opioid use disorder, respectively.

The psychiatric initial evaluation occurred timely prior to the initial IDTT. There was no initial evaluation by the PC documented in the healthcare record. The initial IDTT also occurred timely. The patient attended his IDTTs. Routine contacts with the psychiatrist and PC occurred

timely. Some psychiatric notes did not include a list of medications prescribed. The PC notes contained several good elements, such as specific therapeutic techniques utilized with the patient.

Treatment targets included participation in unit programming daily; however, the sections of the plan for documentation of treatment goals included blank spaces regarding the frequency and timeframes for those goals, and these areas remained incomplete for the duration of the patient's treatment. The other goal was for discharge to a lower level of care. Despite the patient's maximum custody status for the initial portion of his treatment, no maximum custody IPOC was documented.

The patient remained at the CMF-PIP at the intermediate level of care at the time of review.

**Findings**

The care provided to this CMF-PIP intermediate care patient was inadequate.

There was no documented initial PC evaluation. The goals in the treatment plan were carried forward repeatedly. The goals were incomplete and contained blank spaces. Despite maximum custody status, there was not documentation that this was addressed in treatment, and no corresponding IPOC was present. While the actual medication treatment appeared adequate, the psychiatric documentation was confusing, with several notes not including the patient's current medications.

**Patient N**

This 40-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CMF-PIP. The patient was on maximum custody status.

The most recent CDCR incarceration began on May 11, 2022. The patient was initially not included in the MHSDS, but was soon placed in the EOP on May 30, 2022, then to the MHCB level of care on June 6, 2022. The reasons for MHCB admission included suicidality and psychotic symptoms due to medication nonadherence. The treatment team made a referral to the intermediate level of care on July 5, 2022, and the patient was admitted to the CMF-PIP intermediate care unit on August 1, 2022.

The most recent SRASHE, dated August 1, 2022, assessed moderate chronic and low acute suicide risk. The patient had a history of self-harm. There was no reported history of suicide attempts.

The patient was provided with diagnoses of schizoaffective disorder, bipolar disorder, and substance use disorder.

The patient had no history of receiving involuntary medications by a PC 2602 order. The psychiatrist made multiple changes to the patient's medications. He was prescribed quetiapine, lurasidone, olanzapine, aripiprazole, and chlorpromazine, all antipsychotic medications; divalproex and lithium, for mood stabilization; citalopram, an antidepressant medication; and

trazodone, an antidepressant medication used for sleep. Relevant medical conditions included a head injury and seizure disorder, treated with levetiracetam.

An initial PC evaluation was not located in the healthcare record. The initial psychiatric evaluation occurred timely. The initial IDTT also occurred timely, with all required members in attendance, including the patient. The IDTT recommended four hours of clinical groups weekly. The treatment targets included reducing the frequency of hallucinations rated below a specific number and displaying behavior appropriate for a lower level of care. Despite being on maximum custody status, no corresponding IPOC was developed. The psychiatric note stated that the patient was on "max status with limited programming opportunities." Routine contacts with the psychiatrist and PC occurred timely.

On multiple occasions, the patient initially agreed to take medication, only to subsequently refuse. Medication changes occurred frequently. On August 19, 2022, the psychiatrist documented the intention to file a PC 2602 petition for danger-to-others and grave disability. Subsequent notes stated that the psychiatrist would file a PC 2602 if medication nonadherence continued; however, no PC 2602 petition was submitted.

The group treatment provided was primarily recreation and not clinically based.

The pre-release planner met with the patient in a nonconfidential, cell-front meeting on January 12, 2023. During the session, the patient twice required prompting to identify the correct county of his parole, even after being informed of this by the clinician. A CCAT meeting also occurred involving the treatment team regarding discharge planning. The PC noted on February 9, 2023, "(i)t appears unlikely [the patient] will be able to manage to find and maintain housing, employment, or financial support independently. It is also unlikely [the patient] will consistently attend psychiatric appointments or continue to take his psych meds without some type of support. This increases chances that [the patient] will be unsuccessful in maintaining his sobriety and steady housing without intervention."

The patient paroled on February 13, 2023, with the documented plan of transfer to the county psychiatric hospital for determination of possible involuntary mental health commitment for grave disability.

**Findings**

The care provided to this CMF-PIP intermediate care patient was inadequate.

No initial PC evaluation was documented. Treatment plan clinical summaries and case formulations lacked sufficient documentation of current symptoms and functional impairments. Instead, documentation focused on historical information. Routine IDTT documentation did not provide an adequate summary of the patient's functioning and treatment between IDTTs. IPOCs were not clearly in alignment with treatment needs identified during initial assessments or updated to reflect the evolving clinical status of the patient. Treatment goals were templated and incomplete. Despite the patient's documented history of substance use, this issue was not

incorporated into the treatment plan. Although the patient was on maximum custody status, there was no maximum custody IPOC in the treatment plan as indicated and required.

The medication management for this patient was inadequate. The patient frequently agreed, then subsequently refused medications. Medication changes occurred frequently, including immediately prior to parole. Despite multiple notes stating that the psychiatrist would consider filing a petition for involuntary medication, and some notes indicating that such a petition would be filed, the psychiatrist did not pursue a PC 2602 order.

Despite planned discharge and documentation that the patient was highly unlikely to provide basic services for himself, the documentation did not reflect clearly incorporated discharge planning into the patient's treatment plan. The CMF-PIP staff did attempt to meet with the patient, and the IDTT conducted a CCAT about his upcoming parole. Given the severity of the patient's impairment and the risk of discontinuity of services upon release, more intensive planning was required. Despite the knowledge of his release, there was no evidence of clear communication with the receiving facility.

**Patient O**

This 40-year-old transgender patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CMF-PIP. Her custody status was Medium A upon admission; however, her custody level was increased to maximum custody status during her treatment course at the CMF-PIP.

The patient arrived at CDCR on August 27, 2012, when she was included in the MHSDS at the 3CMS level of care. After multiple MHCB stays, the patient was placed at the EOP level of care on October 6, 2020. The patient had no prior history of treatment at the intermediate or acute levels of care. She was admitted to the SVSP MHCB on January 15, 2022. On January 18, 2022, the treatment team referred the patient to the intermediate level of care due to paranoia, delusional thinking, prolonged hunger strikes, impaired cognition and memory functioning, and impaired insight. The patient was admitted to the CMF-PIP intermediate care unit on February 25, 2022.

The most recent SRASHE, dated September 29, 2022, assessed moderate chronic and low acute suicide risk. The patient had a history of suicide attempts, most recently on July 4, 2022; however, the documentation was inconsistent with some documentation indicating that this incident was not a suicide attempt. There was also a history of self-harm.

The patient was provided diagnoses of bipolar I disorder, most recent episode manic, with psychotic features; delusional disorder, somatic type; gender dysphoria; and unspecified anxiety disorder. Other documentation included diagnoses of factious disorder and borderline personality disorder.

She was prescribed risperidone, aripiprazole, lurasidone, and olanzapine (oral and injection) on an as needed basis, all antipsychotic medications; and lithium, for mood stabilization.

The patient had a history of receiving psychotropic medications by a PC 2602 order due to grave disability and danger-to-self. The current PC 2602 order would expire on November 30, 2023.

The initial psychiatric evaluation occurred timely prior to the initial IDTT. Despite impaired cognition and memory as reasons for referral, there was no documentation of standard memory tests included in the initial psychiatric evaluation. The initial PC evaluation did not occur timely, as it occurred on March 4, 2022, after the initial IDTT. The patient did not attend her initial IDTT, reportedly due to custody staffing shortages.

The number of planned clinical group hours varied frequently between IDTTs, without clear justification for these changes. Treatment goals were broadly appropriate for psychosis; however, they were vague, and most were not measurable. An example noted that the patient would be taught to review the paranoid or delusional thinking, rather than just accepting it. Large amounts of information were frequently carried forward, making the delineation of current and historical information difficult. Psychiatric notes frequently stated that the patient was seen with the psychologist to minimize splitting and paranoia. Notes focused largely on medications, without clearly explaining the psychological interventions used in sessions, and how these linked to treatment plan goals.

On May 10, 2022, the patient was placed on maximum custody status, due to reportedly assaulting a peer. The mental health assessment stated that the mental illness "definitely contributed to her behaviors leading to the RVR, but at this time cannot be noted to be the sole causal nexus as there are questions regarding either criminogenic thinking and one cannot ignore her personality traits." The treatment team initiated a maximum custody IPOC at that time. On June 27, 2022, the patient received an RVR for assault on a peace officer. The clinician performing the RVR mental health assessment recommended alternative adjudication, as the behavior occurred during the administration of PC 2602 medication.

Routine contacts with the psychiatrist and PC generally occurred timely; however, given the number of concurrent sessions between the psychiatrist and psychologist, this was difficult to determine. PC contacts occurred more consistently after the patient was moved to the high custody unit. The patient had intermittent hunger strikes, sometimes driven by disagreements with the psychiatrist regarding medication decisions.

The patient clinically discharged from the CMF-PIP on September 22, 2022, with physical discharge on September 27, 2022. The patient discharged to CSP/Sac at the EOP level of care, where she remained at the time of review.

**Findings**

The care provided to this CMF-PIP intermediate care patient was inadequate.

The transfer to intermediate care exceeded mandated timeframes.

The diagnoses included in the healthcare record varied, with no documented attempts at diagnostic clarification. The connections between treatment plan goals and the treatment

documented in the notes were nebulous. Without clear rationales stated for the number of group hours planned per the treatment plan, the variability between the hours recommended appeared capricious, and not clinically driven. The patient usually did not receive the number of hours of treatment stated in her treatment plans.

While coinciding PC and psychiatric sessions could be clinically useful in certain limited instances, the majority of sessions in this circumstance occurred concurrently, and the rationale for this practice was not documented and was of questionable clinical benefit.

Medication management was inadequate. The decision to switch the patient from a long-acting injectable to an oral medication was insufficiently justified. The patient had a history of frequent medication refusals, with resultant need for administration of injectable back-up medication. She was also assaultive while staff administered the required medications. If the psychiatrist indeed determined that the patient required an oral daily medication, the choice of lurasidone was questionable. This medication required administration with food for proper absorption, and this patient had a well-documented recent history of hunger strikes.

**Patient P**

This 35-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CMF-PIP. The patient was on maximum custody status.

The most recent CDCR incarceration began in July 2021. He received treatment at the EOP level of care at WSP, and he subsequently transferred to the California State Prison at Los Angeles Count (CSP/LAC). On January 12, 2022, the patient required placement in the CMC MHCB due to worsening psychotic symptoms and suicidal ideation. The CMC treatment team increased the level of care to intermediate on January 28, 2022, and he transferred to the intermediate level of care at the CMF-PIP on March 17, 2022.

The patient had a history of treatment at the EOP, MHCB, intermediate, and acute levels of care during prior incarcerations.

The most recent SRASHE, dated November 6, 2022, assessed moderate chronic and low acute suicide risk. The patient had a reported history of two prior suicide attempts in 2008 by overdose, and in 2013 by drinking a toxic cleaning substance. Documentation regarding these suicide attempts was inconsistent regarding dates and whether there was an intent to die.

The patient was provided diagnoses of schizoaffective disorder and antisocial personality disorder.

The patient had a history of receiving psychotropic medications by a PC 2602 order for grave disability and danger-to-others from 2015 to 2017, and again since February 25, 2022, with the date of expiration on May 3, 2023.

The patient was prescribed risperidone and paliperidone long-acting injectable, both antipsychotic medications; mirtazapine, an antidepressant/antianxiety medication; and

benztropine, a medication used to treat side effects of antipsychotics. He was also prescribed an olanzapine injection, an antipsychotic medication, for refusal of oral medications. The initial plan was to switch to paliperidone pills, and if effective and tolerated, to transition to a long-acting version of paliperidone, upon approval of the involuntary medication order. There were substantial delays in the PC 2602 hearing for reasons beyond the institution's control. The PC 2602 was not granted until May 3, 2022.

The initial evaluations by the psychiatrist and the PC occurred timely prior to the initial IDTT. The initial evaluations were difficult to follow, as it was unclear what information was current or historic and forwarded from prior evaluations and notes. Much of the information was of limited utility. As an example, the evaluations contained what appeared to be messages in the electronic healthcare record from psych techs informing the psychiatrist that they had given the patient a dose of medication. The patient struggled to participate fully in the interview, due to his psychotic symptoms. The patient reported that he wanted to harm people of a certain race believing that he "had a war with them one week ago and they messed up his brain." The PC evaluation did not include an updated clinical summary. The PC note listed "schizophreniform psychosis, depressive Type," which was not an actual psychiatric diagnosis.

Routine PC and psychiatric contacts generally occurred timely. The PC notes generally did not show clear linkage to treatment team goals.

The patient did not attend his initial IDTT on March 18, 2022. While the treatment plan documented the patient's maximum custody status, there was no corresponding treatment plan goal. The initial IDTT stated under "Inmate-Patient Needs" that the patient needed "mental health groups" but also stated that there were no planned groups for the patient.

The patient attend his ten-day IDTT on March 30, 2022. The psychiatrist participated by Microsoft Teams, or telephone, as documentation was inconsistent. The treatment plan included significant carry over material from prior documentation. The goal setting with patient section contained the same information as in the initial clinical update/summary. The plan indicated that the patient would be seen by the psychiatrist and PC weekly and attend four clinical groups weekly.

Treatment goals included reducing verbal aggression, learning functional communication skills, complying with instructions, and using replacement behaviors to aggression when provoked. An IPOC for treatment nonadherence was started on April 10, 2022. On April 11, 2022, the treatment team lowered the patient's recommended clinical groups to two hours per week, without clear justification.

The psychiatrist noted on April 7, 2022, that the patient rarely left his cell for treatment. On April 10, 2022, nursing contacted the on-call psychiatrist, as the patient refused oral medication, and there was not an order for backup injectable form of medication in the event of medication refusal.

On July 5, 2022, the patient reported suicidal ideation with a plan to swallow soap. The psychiatrist placed the patient on safety precautions with every 11-minute nursing checks, and

the patient was provided limited issue with a safety blanket and smock. The treatment team did not document an updated SRASHE. The next SRASHE occurred on September 9, 2022, in preparation for an upcoming video court appearance.

The patient was involved in two immediate uses of force on April 10 and April 13, 2022. The first occurred due to refusal to relinquish the handcuffs and resulted in staff assault; the patient suffered a head laceration. The second use of force also involved a staff assault.

The patient was on maximum custody status at the time of arrival at the CMF-PIP. At the March 22, 2022 ICC, he reportedly refused to appear, and he was retained on maximum custody status. The treatment team started a maximum custody IPOC on March 30, 2022.

On April 19, 2022, the patient attended his ICC. Despite initially asking for an explanation of the maximum custody status, the clinician deemed the patient stable enough to continue with the ICC. The ICC retained him on maximum custody status until June 21, 2022. The patient received an RVR on August 24, 2022, for reported battery on a prisoner. He was returned to maximum custody status, but the treatment team did not start a maximum custody IPOC. On September 2, 2022, the RVR mental health assessment found no nexus between the patient's mental illness and his behavior; and the clinician opined that the behavior appeared related to volitional choice, personality traits, and potentially his personality disorder.

The patient was discharged from the intermediate level of care on October 19, 2022, transferring to the California State Prison at Corcoran (CSP/Corcoran) on November 4, 2022 at the EOP level of care. At the time of review, the patient remained at CSP/Corcoran.

**Findings**

The care provided to this CMF-PIP intermediate care patient was inadequate.

The patient did not transfer to the CMF-PIP timely, as the MHCB IDTT increased his level of care to intermediate on January 27, 2022, but he did not transfer until March 17, 2022.

Clinicians repeatedly pulled forward documentation, both in clinical notes and in treatment plans. This rendered determining the relevance of clinical information, as well as determining what was historical and what was current clinical information profoundly challenging. The PC note frequently referenced "schizophreniform psychosis, depressed type," a nonexistent diagnosis. Due to frequent carry over of information, this mistaken diagnosis continued to frequently appear in subsequent notes. Treatment plan clinical summaries and case formulations lacked sufficient documentation of current symptoms, functional impairments, relevant treatment history and treatment response; instead, documentation focused on historical information. The importance of logical and easy to follow notes and evaluations cannot be overstated, particularly in the case of this severely ill patient. There were multiple instances requiring the interventions of the on-call psychiatrist, and the ability to rapidly extract salient clinical information was of the utmost importance in such instances.

While several of the stated treatment plan goals appeared appropriate, there was insufficient documentation how the clinicians actively incorporated these goals into treatment.

Of significant concern was the IDTT response to the patient's report of suicidal ideation with a plan. Given the patient's prior suicide attempt by ingestion of a cleaning product, his suicidal ideation with a plan to ingest soap merited more assertive interventions. Documentation lacked a rationale for not placing the patient on one-to-one suicide monitoring.

Multiple concerns arose regarding the treatment surrounding the patient's maximum custody status. There were delays in starting the appropriate IPOC. While the patient's RVR mental health assessment did find a nexus between the patient's mental health with one RVR, the assessing clinician did not find such a connection for the later RVR. Healthcare documentation during the period when the later RVR occurred indicated that the patient had an ongoing, severe psychiatric illness. When maximum custody status was resumed, a new maximum custody IPOC was not started.

The medication management appeared appropriate. The delay in obtaining the PC 2602 hearing was unfortunate, as administration of a long-acting antipsychotic medication may have obviated the need for future uses of force; however, this delay was beyond the institution's control.

## Patient Q

This 46-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CMF-PIP. His custody status was Medium A.

The most recent CDCR incarceration began in 2017, when he was included in the MHSDS at the 3CMS level of care. The patient was treated at the 3CMS, EOP, and MHCB levels of care. The patient was admitted to the MHCB from the 3CMS level of care on March 10, 2022. He was subsequently referred to the acute level of care on March 29, 2022 at the CHCF-PIP. The patient was treated at the acute level of care until June 10, 2022, when he transferred to CHCF-PIP intermediate care unit. The patient subsequently transferred to SVSP-PIP intermediate level of care, where he was treated from July 22 to November 14, 2022, when he transferred to the CMF-PIP at the intermediate level of care.

The patient had a history of two MHCB stays during prior incarcerations. Additionally, he had a brief stay at a CMF inpatient unit (unclear level of care, then under the Department of Mental Health) in 2005.

The most recent SRASHE, dated November 16, 2022, assessed moderate chronic and low acute suicide risk. Documentation was inconsistent regarding the number of suicide attempts; all were reportedly by overdose. There was no reported history of self-injurious behavior.

The patient was provided diagnoses of schizoaffective disorder, depressed type; amphetamine use disorder; inhalant use disorder; and traumatic brain injury.

The patient was prescribed olanzapine and aripiprazole, both antipsychotic medications, and mirtazapine, an antidepressant and antianxiety medication. Olanzapine was ordered in injectable form as a back-up for refusal of the oral medication. Relevant medical medications included divalproex and levetiracetam, both for seizure disorder.

The patient had received his psychotropic medications by a PC 2602 order since March 15, 2022, due to grave disability and danger-to-others.

The initial evaluations by the PC and the psychiatrist both occurred timely prior to the IDTT. The initial evaluation by the psychiatrist was comprehensive and provided a clear clinical conceptualization of the patient; however, the PC evaluation was hampered by significant bringing forward of prior information. An example of this was the current clinical summary and case formulation, which listed the patient's prior placement, and not his current location at the CMF-PIP.

Routine psychiatric contacts generally occurred timely. Of note were certain psychiatric notes that were identified as "confidential assessments during IDTT." Routine psychiatric and PC notes also include such vague statements such as "continue to monitor" and the use of "supportive therapy."

Medication management appeared reasonable and consistent with the standard of care. The psychiatrist worked cooperatively with the patient with appropriate medication adjustments that were responsive to clinical concerns, such as medication side effects. The dosage of olanzapine was optimized, and polypharmacy was reduced by eliminating aripiprazole. The psychiatrist lowered the mirtazapine dose to address excessive daytime sedation.

Treatment plans were inadequate, vague, and contained multiple examples of carryover information. Importantly, PC progress notes did not reflect concrete steps employed to attain treatment plan goals. Despite a diagnosis of schizoaffective disorder, a disorder characterized by both symptoms of psychosis and mood instability, the treatment goals focused on hallucinations, a symptom of psychosis; however, there were no clear mood treatment goals.

At the time of review, the patient remained at the intermediate level of care at CMF-PIP.

**Findings**

The care provided to this CMF-PIP intermediate care patient was inadequate.

In some cases, documentation was repeatedly pulled forward for lengthy timeframes and across levels of care. IPOCs were not clearly aligned with the patient's diagnosis. The PC notes did not clearly link to established treatment plan goals and did not demonstrate interventions to achieve stated treatment plan goals. The notes lacked documentation of evidenced-based interventions for the patient's diagnoses. Treatment plan goals were largely vague, without clear metrics.

Of note, the medication management for this patient was adequate. The psychiatrist worked cooperatively with the patient, and adequately addressed medication side effects. The rationale

for the use of the medication was sufficiently documented. The psychiatrist minimized the number of medications from the same therapeutic class. Yet, it must be noted that assessments of the patient during IDTT were not a substitute for individual psychiatric contacts, as mandated by the Program Guide.

**Patient R**

This 31-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at CMF-PIP. His custody status was Medium A.

This CDCR incarceration began in January 2012. The patient received treatment at the 3CMS, EOP, MHCB, intermediate, and acute care levels of care. The patient had eight prior MHCB stays, two hospitalizations at the acute level of care, and four prior hospitalizations at the intermediate level of care. Additionally, the patient had a history of mental health treatment in the community since age eight. Documentation noted prior diagnoses of schizoaffective disorder and antisocial personality disorder.

The patient received mental health services at the EOP level of care at CSP/Sac prior to admission to the intermediate level of care at the CMF-PIP on March 5, 2021; he was admitted to the CMF-PIP due to deterioration at the EOP level of care, increased agitation, medication nonadherence, increased paranoia, and behavioral concerns. The patient reported psychotic symptoms, including delusional thinking, command auditory hallucinations, and visual hallucinations.

The most recent SRASHE, dated December 14, 2022, assessed high chronic and low acute suicide risk. The patient had a history of suicide attempts and self-harm. The last suicide attempt occurred during hospitalization at the CMF-PIP on July 13, 2021. During that incident, the patient repeatedly hit his head, and documentation included contradictory information regarding the patient's intent to die. Since 2009, the patient had several suicide attempts, which included medication overdose, choking with a piece of material, and hitting himself in the face.

The patient was provided diagnoses of schizoaffective disorder, methamphetamine dependence, and antisocial personality disorder. The psychiatrist made medication changes during the patient's hospitalization. He was prescribed aripiprazole, thiothixene, haloperidol, and chlorpromazine, all antipsychotic medications; divalproex, for mood stabilization; clonidine, possibly prescribed for impulsivity; hydroxyzine, for antianxiety effects; as well as amantadine and benztropine, used to treat antipsychotic medication side effects.

Since at least 2014, the patient received psychotropic medications by a PC 2602 order due to grave disability and danger-to-others. The current PC 2602 order was due to grave disability, expiring on May 3, 2023.

The initial evaluation by the psychiatrist occurred timely on March 5, 2021, prior to the initial IDTT. The initial plan was to continue current medications. The initial PC evaluation was not timely, and it occurred after the initial IDTT.

The initial and subsequent IDTTs occurred timely; in the few instances when IDTTs were late, they were typically overdue by ten days or less.

Both psychiatric and PC notes displayed frequent carrying over of prior information. Psychiatric notes were internally inconsistent. For one example, on July 8, 2022, the psychiatrist indicated that the patient requested more amantadine; however, the psychiatrist declined to inform the patient that his dosage was at the maximum level. The psychiatrist offered more benztropine instead. Both medications are frequently used to address side effects of antipsychotic medications. Later in the note, the psychiatrist stated that the patient had no medication side effects, despite prescribing two medications to address medication side effects. In another note on September 22, 2022, the psychiatrist noted that the patient was in handcuffs due to agitation; however, the assessment stated that the patient presented as "euthymic." This error appeared to be due to carrying over prior documentation. The PC notes often had similar, if not identical, portions which contained scant information.

With rare exception, the patient attended his IDTTs. The treatment targets included reducing irritability and hallucinations. Treatment goals were frequently unchanged. For example, the patient had a goal of reducing irritability to a rating of two or less for a large portion of his treatment stay. The treatment team did not adequately document progress towards this goal.

The patient clinically discharged from the CMF-PIP on December 8, 2022, with physical discharge on December 12, 2022. The patient returned to CSP/Sac at the EOP level of care, where he remained at the time of review.

**Findings**

The care provided to this CMF-PIP intermediate care patient was inadequate.

Treatment plan clinical summaries and case formulations lacked sufficient documentation of current symptoms, functional impairments, relevant treatment history and treatment response. Instead, documentation focused on historical information. IPOCs were not clearly updated to address changes in the patient's treatment needs during routine IDTTs. Some treatment plans lacked any mental health goals. In some cases, documentation was repeatedly pulled forward for lengthy timeframes. Treatment planning was not individualized. Psychiatric documentation was inconsistent. Some notes documented that the patient was agitated and required placement in handcuffs, yet later in the same note stated that the patient's mood was euthymic.

While the patient attended most IDTTs, there was insufficient documentation of the patient's meaningful input into the treatment planning process. Despite the patient's documented history of substance use, this area of concern was not incorporated into the treatment plan. The PC notes did not clearly link to established treatment plan goals.

The medication management for this patient was inadequate. The rationale for the use of several medications was insufficiently documented. Notes frequently carried over prior information, rendering the note difficult to follow. Psychiatric notes reflected that the patient had no

medication side effects, yet the psychiatrist discussed with the patient the option of increasing the dose of a medication to address medication side effects.

**Patient S**

This 29-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CMF-PIP. His custody status was Close B.

His CDCR incarceration began on February 19, 2021. He was included in the MHSDS at the 3CMS level of care on March 11, 2021, and his level of care was increased to EOP on April 29, 2021. On December 16, 2021, the MCSP treatment team referred the patient to the intermediate level of care due to aggression and hostility toward others and response to auditory hallucinations. The patient had not showered, was naked in his cell, and he talked to himself at night. His room was dirty with trash and water on the floor. The patient refused almost all mental health treatment. Surprisingly, the documentation from MCSP stated that the patient did not meet criteria for a PC 2602 order. On February 17, 2022, the patient arrived at the CMF-PIP for treatment at the intermediate level of care.

The patient had no history of treatment in the MHCB, or at the intermediate or acute levels of care.

The most recent SRASHE, dated July 8, 2022, assessed low chronic and acute suicide risk. The patient had one prior suicide attempt in 2015 or 2016, apparently by jumping from a car window.

The patient was provided with a diagnosis of schizophrenia. He was prescribed olanzapine, risperidone, and paliperidone, all antipsychotic medications. The patient had no prior history of receiving psychotropic medications by a PC 2602 order; however, the patient was placed on a PC 2602 order for grave disability and danger-to-others while at the CMF-PIP.

No initial PC evaluation was documented; there were brief notes stating that the patient refused to leave his cell for the session. The initial evaluation by the psychiatrist occurred timely. The patient stated that he did not want to take medication. The psychiatrist ordered as needed olanzapine for agitation. The psychiatrist documented that the need for a PC 2602 order would continue to be evaluated. On March 11, 2022, the psychiatrist ordered regularly scheduled doses of olanzapine, which the patient largely refused. A PC 2602 petition was submitted on March 24, 2022, and approved on April 19, 2022. After obtaining the involuntary medication order, the psychiatrist ordered a long-acting injectable antipsychotic medication.

The initial IDTT occurred timely; however, there was no documentation that nursing was in attendance. The PC documented treatment goals on February 25, 2022; however, they were template goals with unfilled blank spaces in the frequency and timeframe sections. Treatment goals included participation in unit programming and "a continued improvement of functioning across treatment team intervals." Subsequent treatment plans repeated the same mental health goals, with the same blank areas present.

The patient was clinically discharged on July 1, 2022, and physically discharged on July 7, 2022. He returned to MCSP for continued treatment at the EOP level of care.

**Findings**

The care provided to this CMF-PIP intermediate care patient was inadequate.

There were significant clinical concerns regarding the care provided to this patient.

The transfer of the patient from the MCSP EOP to the CMF-PIP intermediate level of care exceeded mandated timeframes. Given the magnitude of the patient's clinical impairment, it was unclear why the referring facility did not pursue a PC 2602 prior to or while awaiting the patient's placement at the intermediate level of care. While the prior decision not to pursue a PC 2602 at MCSP was not the fault of the CMF-PIP IDTT, the PIP IDTT decision to delay pursuing an involuntary medication order for over one month after admission was particularly concerning.

No initial PC assessment was documented. Treatment plan clinical summaries and case formulations lacked sufficient documentation of current symptoms and treatment response. Routine IDTT documentation did not provide an adequate summary of the patient's functioning and treatment between IDTTs. Treatment plans consistently included vague goals, most of which were neither measurable nor time limited. A treatment goal, seemingly from a template, contained blank spaces repeatedly from initiation until the patient discharged. The patient made virtually no clinical progress toward these goals. Despite this, the same goals were simply repeated from one IDTT to the next. Lack of progress toward goals should have prompted the team to reevaluate the appropriateness of the goals, to discover barriers preventing attainment, and consideration of a change in the goals.

With rare exception, the IDTTs included the required participants; however, importantly, the patient was not included, as the patient did not attend any of his IDTTs during his 134-day stay at the CMF-PIP. The patient remained on STEP 1 for the duration of his stay. Of concern, the IDTT contemplated discharging the patient for non-participation in treatment, despite the patient's clear evidence of psychotic impairment both prior to and during treatment at the intermediate level of care.

The medication management for this patient was inadequate. Given the severity of the patient's mental health impairment, it was unclear why the psychiatrist prescribed only an as-needed medication, instead of a regularly scheduled one. When a regularly scheduled antipsychotic medication was prescribed, there was no order for a back-up injection for patient refusal, which often occurred until a PC 2602 order was in place. The rationale for the use of two antipsychotic medications and oral olanzapine was not provided and appeared clinically questionable. While there could be clinical reasons for the use of two antipsychotic medications, the psychiatric notes should have provided clear rationale for this treatment decision.

This patient should receive close clinical monitoring for any evidence of decompensation while at the EOP level of care at MCSP.

**Patient T**

This 38-year-old transgender patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CMF-PIP. Her custody status was Medium A.

Her CDCR incarceration began on April 25, 2002. The patient was included in the MHSDS on May 15, 2002, but she was not included in the program from September 2003 to August 2005. Since August 2005, she had a complex placement history, including treatment at the 3CMS, EOP, MHCB, intermediate, and acute levels of care. Her most recent inpatient treatment occurred at the CHCF-PIP acute care from July 8 to October 9, 2020, followed by CHCF-PIP intermediate care hospitalization until March 29, 2022. The patient discharged to CSP/Sac at the EOP level of care. The patient was again referred to the intermediate level of care due to "deficient in self-care due to lack of insight, motivation and possibly enough energy to address her self-care need." She began treatment at the CMF-PIP intermediate level of care on August 1, 2022.

The most recent SRASHE, dated August 2, 2022, assessed high chronic and low acute suicide risk. The patient had a history of suicide attempts, with the most recent on June 9, 2020. There was also a reported history of self-harm.

The patient was provided diagnoses of schizoaffective disorder, gender dysphoria, and antisocial personality disorder. The patient had a history of receiving psychotropic medications by a PC 2602 order from 2012 to 2013, then again from 2017 to 2021. The CMF-PIP IDTT obtained a new PC 2602 order due to grave disability in effect until July 26, 2023. The psychiatrist prescribed clozapine, haloperidol, olanzapine, and quetiapine, all antipsychotic medications; sertraline, venlafaxine, and bupropion, all antidepressant medications; hydroxyzine, an antianxiety medication; and benztropine, used to treat the side effects of antipsychotics.

The initial IDTT on August 2, 2022 occurred timely prior to the initial IDTT. The initial PC evaluation was not timely and occurred on August 8, 2022. Treatment recommendations included weekly contacts with the psychiatrist and PC and four hours weekly of clinical groups.

The routine IDTTs generally occurred timely. The patient attended her IDTTs, except for one refusal. The September 30, 2022 treatment plan contained contradictory information whether the patient was present at the IDTT.

The treatment targets included reduction of hallucinations and "display behavior appropriate for a lower level of care;" despite the patient's lack of self-care, one of the main reasons for admission, no mental health IPOC addressing this important concern was developed. On January 18, 2023, nursing initiated a self-care deficit IPOC. Clinical summaries were more consistent with a mental status examination than a robust clinical summary. The case formulation was pulled forward repeatedly from July 12, 2020. This continued for the duration of the patient's hospitalization during the review period.

The treatment team recommended single-cell status due to the patient's history of aggression and lack of interpersonal skills. Notes for the mental health housing review section of the treatment plan were simply carried forward from prior treatment, as it stated, "(w)hen she moves to PIP, it can be re-evaluated whether IP is fit to move to having a cellie."

The patient reported that she made poor progress toward her goals. Despite this, mental health treatment goals were not substantively updated. The January 30, 2023 IDTT note stated that the patient might be over-endorsing symptoms to remain at the intermediate level of care longer. The patient reported that she was not taking her medications, but nursing reported that she was medication adherent. Her grooming was described as marginal.

Routine contacts with the psychiatrist and PC occurred timely. PC notes contained scant documentation of how the interventions linked to stated treatment plan goals.

The psychiatrist made multiple medication changes. Despite the psychiatrist actively lowering the doses of clozapine, psychiatric notes repeatedly stated that there were no medication changes with the visit. Of concern was the speed with which the treating psychiatrist made several medication adjustments.

At the time of review, the patient remained at the CMF-PIP, at the intermediate level of care.

**Findings**

The care provided to this CMF PIP intermediate care patient was inadequate.

While the treatment team recommended four hours of clinical groups weekly, the patient largely did not receive this amount of therapy. Furthermore, some of the groups that were identified as clinical groups were actually "coping and leisure" or recreation-based groups.

The medication management for this patient was inadequate. Two examples were of particular concern. At the initial psychiatric assessment, sertraline was discontinued, and venlafaxine started. The starting dose of venlafaxine was two-to-four times higher than the standard recommended dosage. The patient was also prescribed a robust dose of benztropine. As she was not reporting the side effects which prompted the initiation of this medication, the psychiatrist understandably began to taper the medication. Of concern was the speed with which this tapering occurred. The psychiatrist lowered the dose to one-third of the original dose. This risked the possibility of uncomfortable side effects. While the psychiatrist may have had clinical reasons for these changes, there was inadequate rationale provided.

The patient remained on single-cell status for the duration of her stay during the review period. The rationale for not addressing this issue in the current treatment plan was inadequate, and information appeared to have been pulled forward from prior treatment plans when the patient received services at the EOP level of care. There was inadequate documentation indicating that the patient's single-cell status was periodically reviewed by the IDTT.

**APPENDIX B2**
**CHCF – PIP**
**January 10 – 12, 2023**

**Patient A**

On November 22, 2022, this 44-year-old patient was referred from the CTC at CSP/Sac to the DSH acute care program due to psychotic behaviors.  He was admitted to the CHCF-PIP on November 30, 2022, when he received his initial psychiatric assessment.  The patient was provided with a diagnosis of schizoaffective disorder, depressed type, and was prescribed appropriate psychotropic medications.  The patient received a timely history and physical examination and an initial master treatment plan by the IDTT.

A December 7, 2022, licensed clinical social worker's (LCSW) progress note included the following:

Current: Adjustment disorder with depressed mood, antisocial personality disorder, bipolar I disorder, current or most recent episode manic, moderate delusional disorder, depression, paranoid personality disorder, unspecified schizophrenia spectrum and other psychotic disorder, intermittent explosive disorder.

Historical: Adjustment disorders, with mixed disturbance of emotions and conduct, adjustment disorder with depressed mood, bipolar 1 unspecified.

During the month of December 2022, the patient was seen at least twice weekly by the psychiatrist, usually in a confidential setting.

There were multiple therapeutic intervention/group progress notes, generally documented several times a week, which usually indicated participation in some form of group therapy.  Apparently therapeutic modules were in use at that time based on progress note documentation, which was not consistent with information provided during the opening meeting with CHCF-PIP leadership staff.

Only one progress note by a primary mental health clinician was located during December 2022.

**Findings**

This patient did not receive adequate treatment due to the lack of regular individual contacts with a non-psychiatric mental health clinician, very limited out-of-cell time, and limited structured therapeutic activities.  The previously summarized LCSW progress note was very concerning due to the multiple diagnoses described.

This patient did not receive individual counseling by a non-psychiatric clinician due to staff coverage issues.  He did receive clinical contacts in a confidential manner by psychiatry at least on a weekly basis.  It was generally difficult to determine whether the therapeutic

316

intervention/group progress notes documented individual treatment or group treatment.  IDTTs occurred timely.

**Patient B**

This 44-year-old male patient was initially admitted to the CHCF-PIP acute care program on November 18, 2022, when he was seen for his initial psychiatric assessment that occurred timely.  He was provided with a diagnosis of schizoaffective disorder, bipolar type.

Clinical contacts by the psychiatrist and IDTTs generally occurred weekly.  Although there was documentation of contacts with a psychologist, documentation of those clinical contacts did not occur weekly during November and December 2022.

There were multiple therapeutic intervention/group progress notes, generally documented several times weekly, which indicated participation in some form of group therapy held in a non-confidential setting due to the patient's maximum custody status during November and December 2022.

**Findings**

This patient did not receive adequate treatment due to the lack of regular individual contacts with a non-psychiatric mental health clinician, very limited out-of-cell time, and limited out-of-cell structured therapeutic activities.

**Patient C**

This 48-year-old patient was admitted to the maximum security PIP on January 5, 2023, after engaging in self-injurious behaviors with a history of multiple similar incidents.  He was seen timely for the initial psychiatric and mental health clinician assessments and the initial IDTT.  The initial IDTT note included the following:

Patient attended his 72 hrs. IDTT.  Patient requested to rehouse early.  Didn't want to engage with treatment team, was hostile in his response and repeatedly voiced unsafe and self-harm ideations.  Will be educating to I/P Cell side about PT structured group and the max program expectations.

The patient was provided with diagnoses of major depressive disorder, recurrent, antisocial personality disorder, and borderline personality disorder.  In addition, he had several medical conditions including chronic pain, seizure disorder, urine incontinence, hypothyroidism, and a skin ulcer on his hip.

The patient was interviewed during the site visit in a group setting on January 11, 2023.  He was focused on verbalizing his lack of need for psychiatric hospitalization, his desire to return to a medical setting, and his complaints about a failed back surgery.  He was admitted to the CHCF-PIP due to suicidal behaviors.

317

**Findings**

The care provided to this patient appeared to be adequate.

Despite the attempts made by the clinical staff, the patient was uncooperative with the treatment program. He was offered appropriate clinical inventions; however, he rejected those treatments. He was receiving mental health services at the appropriate level of care in the acute care program.

**Patient E**

This 26-year-old patient was admitted to the CHCF-PIP acute care program on November 16, 2022, for self-abusive thoughts. He received timely initial assessments by the psychiatrist and mental health primary clinician as well as a timely initial IDTT. Progress notes indicated that he had significant adherence issues regarding prescribed psychotropic medications. He was provided with a diagnosis of schizoaffective disorder, bipolar type.

This patient was generally either seen and/or offered weekly clinical contacts by a psychologist and psychiatrist. He experienced clinical decompensation during December 2022, which appeared related to medication non-adherence. He was offered, and appeared to participate, in a limited number of weekly group therapies.

The patient was briefly interviewed in a group setting during the site visit, but he had significant difficulty providing reliable information due to his disorganized clinical state.

**Findings**

This patient did not receive adequate mental health care.

He clearly required inpatient level of care due to his psychotic symptoms; however, he exhibited psychotic decompensation related to both his medication non-adherence and the very limited treatment offered to him on the maximum security unit.

**Patient F**

The 26-year-old man was transferred to the CHCF-PIP acute care unit for assessment and treatment on November 15, 2022. He reported depressed mood with anxiety and suicidal ideation. The patient reported that he engaged in a strangulation attempt a few days prior to admission while in an MHCB related to the death of his mother in June 2022.

The patient received timely initial mental health evaluations and an initial IDTT. During November and December 2022, he received weekly clinical contacts from the psychiatrist and the PC. Participation in some form of modified group therapy increased during December 2022; however, he exhibited self-injurious behavior on December 22, 2022.

The patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, major depressive disorder, recurrent, unspecified, and opioid use disorder.  In addition, he had several medical conditions including diabetes mellitus, type II, hypothyroidism, morbid obesity, and hyperprolactinemia.

During November and December 2022, this patient was seen at least weekly by his psychiatrist and the primary clinician.

The patient was briefly interviewed in a group setting during the site visit on January 11, 2023.  He confirmed being seen on a regular basis by his clinicians in a confidential setting.  However, he provided very little information about the treatment program.

**Findings**

This patient was not provided with adequate care.

Although he was seen on a regular basis by his mental health clinicians and received timely IDTTs, limited out-of-cell unstructured time and limited out-of-cell structured therapeutic activities resulted in inadequate care provided by the CHCF-PIP acute care program.

**Patient G**

This 35-year-old patient's initial 72-hour CHCF-PIP intermediate care IDTT included the following:

> Reviewed reason for referral.  Patient unable to recall reason for referral.  He endorsed AH that occur on a daily basis.  Patient appeared to have minimal insight into his mental health.  Patient appeared hyper focused on receiving a bible, speaking to the chaplain and receiving writing paper for in his cell.  Patient unable to id new mh goals.  Patient inquired about discharged back to EOP or lower LOC.

Patient G is 35 year old, Hispanic male, admitted to CHCF-PIP Acute Max on 09/21/22.  Patient was referred from Kern Valley State Prison (KVSP).  Patient's referred symptoms include: responding to internal stimuli; disorganized thought process; assaultive bx; verbal and physical outbursts; thought blocking.

On September 29, 2022, the ICC removed the patient's maximum custody status.  On October 11, 2022, he was transferred to the CHCF-PIP acute care program.  He had previously been placed on a PC 2602 order.  The patient was provided with diagnoses of amphetamine (or other stimulant) induced psychotic disorder, with moderate or severe use disorder, cannabis use disorder, moderate, dependence in remission, and opioid use disorder.

His prescribed medications included Haldol and Depakote.

On November 1, 2022, the patient refused to attend his IDTT, which was held in absentia. The patient was placed on maximum custody status the previous day as he had assaulted the medication nurse by storing and throwing bodily fluids during medication administration.

Prior to November 1, 2022, the patient was seen on a regular basis by his psychiatrist but not consistently by the primary clinician. Medication non-adherence was noted. On November 10, 2022, the ICC retained his maximum custody status.

Throughout November and December 2022, the patient was seen on a regular basis by a psychiatrist but only periodically by the primary clinician. IDTTs were conducted timely.

Very few progress notes were present during December 2022 to document whether the patient was offered and/or participated in out-of-cell therapeutic activity.

**Findings**

This patient did not receive adequate mental health treatment.

He was not seen consistently by the PC for individual therapy. Further, documentation did not indicate that he was provided adequate out-of-cell unstructured time and out-of-cell structured therapeutic activities.

**Patient J**

This 44-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. The patient was recommended for ICF referral by the UNA process. Prior to ICF placement, the patient received mental health services at the EOP level of care at CSP/LAC. He was housed at an administrative segregation unit (ASU) EOP Hub prior to ICF referral on June 29, 2022. He was admitted to the PIP-ICF maximum custody unit on July 14, 2022, due to danger to others after he reportedly threw a shirt at an officer in an attempt to be placed in ASU due to safety concerns. His custody level was reduced from maximum to medium at his ICC on July 21, 2022.

The patient had a history of at least two suicide attempts when he was approximately 29 years of age by jumping from a second tier and by cutting with intent to die; these attempts reportedly occurred in response to command auditory hallucinations. The most recent SRASHE on July 22, 2022, that was conducted at the time of ICF admission assessed high chronic and low acute suicide risk.

The patient was provided with a diagnosis of schizoaffective disorder, and was prescribed Invega injection, BuSpar, and Vistaril to address suicidality and psychosis with reported medication adherence.

The patient received timely IDTTs throughout the review period. Each IDTT was attended by the required staff, and the treatment plans appeared individualized and specific to the patient's clinical presentation. Review of treatment plans indicated that the goals and interventions

provided were clinically appropriate, measurable, and updated appropriately over time. The patient was assigned and participated in clinical groups and individual weekly clinical contacts with his PC and psychiatrist. Discharge and level of care change criteria were clearly identified in the treatment plans with incorporation of patient input regarding goal setting and treatment planning.

PC contacts generally occurred timely and were in alignment with the treatment plan. Individual PC contacts usually occurred every seven to 14 days; additionally, the patient was seen by the primary clinician during core clinical groups, which noted good patient participation. PC progress notes of those contacts reflected the goals and interventions identified in the treatment plans and were updated appropriately. Psychiatry contacts generally occurred timely and occurred at least once every seven days, with two exceptions, when the patient was not seen by a psychiatrist between September 26 and October 19, 2022, and again between November 14 and November 29, 2022, when the unit psychiatrist was on leave. Review of psychiatry progress notes indicated that the patient responded well to treatment and medications. Review of psychiatric and PC progress notes documented that the patient was consistently offered a confidential setting for individual clinical contacts, but he often declined, preferring to be seen at cell front.

**Findings**

The care and treatment provided to this CHCF-PIP patient was adequate.

The patient appeared involved in treatment, and the treatment plan was individualized with appropriate interventions, objectives, and goals. PC and psychiatric contacts generally occurred timely. The patient was medication adherent and actively participated in both individual therapy and core clinical group therapy. Clinical documentation indicated that the patient responded well to the mental health treatment provided during the review period.

**Patient K**

This 27-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at CHCF-PIP. The patient was recommended for ICF referral by the UNA process, and was admitted to ICF on August 3, 2022, from the MCSP EOP due to significant impairment due to mental illness. Documentation indicated that the patient refused more than 50 percent of offered treatment with a pattern of refusing to leave his cell for extended periods of time and poor activities of daily living (ADLs). A SRASHE completed upon ICF admission on August 4, 2022, assessed moderate chronic and low acute suicide risk. The patient's self-reported history of suicide attempts, and self-harm, was inconsistent over time and therefore unreliable; however, there was record of two serious attempts in 2017 and 2020. Neither of these attempts resulted in injury or included intent to die. This patient was placed on suicide watch on October 29, 2022, after reporting suicidal ideation in response to anxiety about his upcoming PC 2602 hearing and discharge to the EOP level of care. Suicide watch was discontinued on October 31, 2022.

The patient was provided with diagnoses of schizoaffective disorder, bipolar type, and antisocial personality disorder. He was prescribed Zyprexa and Lexapro to address psychosis and mood instability, and documentation indicated medication adherence during the review period.

This patient received timely monthly IDTTs. IDTTs included the necessary participants with the patient in attendance. Discharge and level of care change criteria were identified at each IDTT. The treatment plan goals and interventions were individualized; however, although initially clinically appropriate, the plans lacked updates over time to reflect the patient's lack of progress and response to the interventions provided in the initial treatment plan. For example, the patient's custody status was changed from medium to maximum on November 9, 2022, after the patient exposed himself to a psych tech during a group and received a RVR for indecent exposure. At the next IDTT on November 22, 2022, there was no mention of the incident with no adjustment or modification to the patient's programming or treatment plan to provide additional support or interventions to address this behavior. The patient was assigned several core clinical and leisure groups; however, he demonstrated inconsistent participation and engagement, and often did not attend psych tech and core clinical groups. Thus, the treatment plans were inadequate due to the lack of updates to reflect the patient's current status and functioning; particularly the lack of modifications in response to the patient's placement on suicide watch, engaging in indecent exposure, and receiving an RVR.

Psychiatric contacts occurred timely at least once every seven days. The patient was generally medication adherent, and medications were adjusted in response to patient need and request. PC contacts during the review period occurred sporadically and were untimely, despite the treatment plans indicating that the patient would receive PC contact at least once weekly. During the review period, this patient received PC contacts approximately every two to three weeks. It was also concerning that when this patient was removed from suicide watch status on October 31, 2022, he did not meet with his PC until November 3, 2022, and that contact occurred at cell front as the patient refused to leave his cell. When the patient engaged in indecent exposure less than one week later on November 9, 2022, and was placed on maximum custody status, he was not seen by the PC until November 17, 2022, more than one week later. The patient also refused to attend his ICC on that same day, and he was retained on maximum custody status; this was not mentioned or discussed in the PC progress notes or at the next IDTT on November 22, 2022.

**Findings**

The care and treatment provided to this CHCF-PIP patient was inadequate.

Although IDTTs occurred timely with necessary staff in attendance, the lack of treatment plan updates and modifications over time was concerning considering the lack of patient response to treatment. This patient demonstrated several significant behaviors which warranted clinical intervention and response, which was not provided. Placement on maximum custody status impacted the patient's ability to attend and participate in programming; however, there was no documentation in the healthcare record addressing this change. The frequency of PC contacts was inconsistent and inadequate and did not align with the frequency prescribed in the treatment plans.

**Patient L**

This 25-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. He had an extensive history of mental health treatment, and his history was notable for depressive episodes, cutting and self-harming behaviors, suicide attempts, and multiple MHCB placements and inpatient care admissions, including at the SVSP-PIP, CMF-PIP, and Atascadero State Hospital (ASH). The patient received treatment at the EOP level of care since April 23, 2019. He was referred to the ICF level of care on May 9, 2022, and was initially admitted to the SVSP-PIP on May 17, 2022. After a suicide attempt by hanging on June 4, 2022, he was transferred to CHCF-PIP due to the lack of suicide resistance cells at SVSP-PIP. He was admitted to the CHCF-PIP on June 13, 2022.

The patient received a total of six SRASHEs during the review period, and was placed on suicide watch several times. His chronic suicide risk was consistently assessed as high with several episodes of self-injurious behavior by cutting and two serious suicide attempts while in CDCR. Acute suicide risk was also consistently assessed as high. However, the SRASHE completed on November 9, 2022, provided an acute suicide risk of low; this despite the patient's placement on suicide watch at the time.

The patient was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, and antisocial personality disorder. He was prescribed Remeron, Zyprexa, and Celexa with medication adherence.

IDTTs generally occurred timely, with the exception of the period between August 3 and September 27, 2022. Most IDTTs documented the presence of necessary staff; however, the IDTTs of August 3, September 27, and October 25, 2022, did not identify the names of the CC I, RN, or RT in attendance and instead referred to their titles. Treatment plan goals, objectives and interventions were very limited across treatment plans; the IDTT on July 6, 2022, lacked IPOCs and interventions altogether. The only significant update to the patient's initial treatment plan of June 28, 2022, was an IPOC for self-harm by cutting, which was subsequently updated to an IPOC for danger-to-self on August 3, 2022. Interventions and goals for this patient remained essentially unchanged throughout the review period, despite multiple episodes of self-injurious behaviors and suicide attempts. Further, the safety concern's section of each treatment plan indicated that the patient denied thoughts of self-harm or suicide; this was inconsistent and contradictory to other documentation in the healthcare record.

Psychiatric contacts occurred timely on a weekly basis. Review of psychiatric progress notes indicated that the patient was generally medication adherent with no reported medication side effects. PC contacts occurred inconsistently and did not adhere to the treatment plan, which indicated that the patient would receive weekly PC contacts. There were several periods during the review period when the patient was not seen by the PC for one month or longer, despite repeated episodes of self-harm, suicidal ideation, and placement on suicide watch. Specifically, this patient was not seen by the PC between August 2 and September 1, 2022, or between September 27 and November 4, 2022, despite placement on suicide watch during this period.

Further, PC progress notes included inadequate, contradictory, and inconsistent documentation and reporting regarding whether IPOC goals were met.

**Findings**

The care and treatment provided to this CHCF-PIP patient was inadequate.

The patient consistently demonstrated high risk, self-injurious behaviors, and consistently and repeatedly expressed suicidal ideation and intent to die by heroin overdose upon discharge from the PIP. Treatment planning was inadequate, as the treatment plan IPOCs did not adequately address the patient's level of risk and did not provide sufficient interventions and strategies to reduce the risk and to improve the patient's safety. PC contacts were inadequate regarding frequency and document quality. The SRASHE of November 9, 2022, was inadequate and appeared to grossly underestimate the patient's acute suicide risk.

**Patient M**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. The patient entered CDCR for his most recent incarceration on September 8, 2021, at the NKSP Reception Center, and was placed at the EOP level of care. He subsequently transferred to CSP/LAC and reportedly had several MHCB referrals and admissions for self-injurious behaviors and suicidal ideation. The patient was placed in ASU on May 14, 2022, for battery on a peace officer; while in ASU, he received RVRs for fighting in his cell on May 20, 2022, and destruction of state property on June 3, 2022. While in ASU, the patient's level of care was reduced from EOP to 3CMS, despite his significant mental health history including six MHCB referrals with three admissions during the current incarceration. He was admitted to the SVSP MHCB on June 22, 2022, after he was found with a noose secured to a vent in his short-term restricted housing (STRH) cell with a plan to hang himself. He was reportedly too disorganized to participate in an assessment at that time, admitting to methamphetamine use two days prior, and requiring pharmacological intervention to address his disorganization and agitation. He was unable to participate in the initial MHCB IDTT on June 24, 2022, due to those symptoms, and he was referred to the ICF level of care on July 1, 2022 after he continued to demonstrate severe psychosis and disorganization. He was admitted to the CHCF-PIP on July 20, 2022, as a maximum custody patient. His custody level was reduced at his ICC on July 28, 2022.

He was provided with the following diagnoses upon admission to the CHCF-PIP: schizoaffective disorder, bipolar type, substance use disorder, other psychoactive substance use, and antisocial personality disorder. The patient was prescribed lithium and fluphenazine. His diagnoses were subsequently updated to include schizophrenia, and lithium was discontinued.

An admission SRASHE assessed high chronic and moderate acute suicide risk. These suicide risk determinations remained unchanged throughout the review period, including a SRASHE on November 23, 2022, conducted in preparation for discharge to the EOP level of care.

The patient received timely monthly IDTTs throughout the review period. Each IDTT was attended by the patient, psychiatrist, PC and CC I, although the name of the specific CC I in attendance was never documented. The August 24, 2022, IDTT treatment plan was not located in the healthcare record. One IPOC was included in the treatment plan for self-harm; the treatment plan also indicated that the patient would receive cognitive behavior therapy (CBT) from the PC, medication management, and RT groups. The treatment outcome expectations were appropriate for his clinical presentation; however, it was concerning that the treatment team was actively preparing the patient for discharge despite the patient not having fully met those targets and not consistently participating in programming. Review of treatment plan clinical summaries indicated that the patient's engagement with programming and medication adherence varied.

Psychiatric contacts generally occurred timely throughout the review period, occurring approximately every seven days. There were limited occasions when psychiatric contacts were delayed by five to seven days, but these delays appeared to be related to custody-related issues or the patient's refusal to meet with the psychiatrist. Review of psychiatric progress notes indicated that the patient responded well to medication when taken as prescribed; however, he had periods of medication nonadherence which resulted in increased psychotic symptoms. PC contacts occurred less frequently; the initial PC contact occurred on August 24, 2022, over one month after ICF admission. Subsequent PC contacts occurred inconsistently, and contact frequency generally occurred once every 14 to 30 days. Most contacts occurred in a non-confidential setting. Documentation indicated that the patient only attended one core clinical group during the review period and consistently refused to participate in clinical groups. Review of PC progress notes revealed that clinical intervention provided by the PC consisted of encouraging group attendance, and there was no documentation that CBT or therapeutic interventions were provided.

**Findings**

The care and treatment provided to this CHCF-PIP patient was inadequate.

The patient was admitted due to concerns about danger-to-self and self-harm secondary to psychosis; however, treatment interventions and objectives were never updated to reflect the patient's current status. Review of treatment plans and progress notes indicated that the clinical therapeutic interventions prescribed in the treatment plans were not provided. PC contacts were inconsistent, sporadic, and far outside the treatment plan prescription. Clinical interventions for this patient were limited to encouraging group attendance and medication adherence.

**Patient N**

This 43-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. The patient entered CDCR at the 3CMS level of care on September 27, 2021. He was placed in the MHCB on July 8, 2022, due to mental decompensation and inability to attend to his ADLs. The patient had no history of EOP placement, MHCB referrals, or other inpatient referrals prior to this MHCB referral and admission. He was subsequently referred to the ICF level of care on July 28, 2022, for further

stabilization and treatment, and was admitted to the CHCF-PIP at the ICF level of care on August 3, 2022.  He was provided diagnoses of schizophrenia and polysubstance use disorder, and was prescribed Zyprexa and Cymbalta.

An admission SRASHE on August 4, 2022, assessed moderate chronic and acute suicide risk. This patient received one additional SRASHE during the review period on October 11, 2022, after he reported that auditory and visual hallucinations were "level 10" with command auditory hallucinations telling him to kill himself.  This SRASHE assessed high chronic and low acute risk after the patient reported that he did not plan to harm himself despite the voices.

The patient received timely monthly IDTTs throughout the review period.  All IDTTs included the necessary participants with the patient in attendance.  Review of clinical summaries and IPOCs indicated that the treatment plan was individualized and appropriate for the patient's clinical presentation.  The treatment plan provided specific clinical interventions to address psychotic symptoms.  Goals and objectives were measurable and updated appropriately at each IDTT.  The treatment plans also identified discharge criteria and change in level of care criteria, and monitored progress toward discharge.

PC contacts were timely and generally occurred weekly.  The patient was consistently offered confidential contacts, but was also seen at cell front when he refused to leave his cell for the appointment.  Review of PC progress notes indicated that the interventions and treatment provided by the PC aligned with the treatment plans and were clinically appropriate.  Psychiatric contacts were also timely, and the patient was seen from one to three times weekly throughout the review period.  Review of psychiatric progress notes indicated collaboration between the patient and psychiatrist to determine the appropriate medication regimen.  Documentation indicated that the patient's group attendance and participation was inconsistent.

**Findings**

The care and treatment provided to this CHCF-PIP patient was adequate.

The patient received timely IDTTs which included the necessary participants.  Goals, objectives, and interventions were appropriate to the patient's clinical presentation and were updated appropriately over time as the patient responded to treatment.  Discharge and level of care change criteria were clearly documented and tracked as part of the IDTT process.  The frequency of clinical contacts provided by the PC and psychiatrist were appropriate, and clinical progress notes indicated that the interventions provided by the PC aligned with the treatment plans.

**Patient O**

This 29-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP.  The patient entered CDCR at NKSP during May 2022 to serve his first term.  He was admitted to the CMF MHCB on June 23, 2022, after making statements expressing suicidal ideation and endorsing severe command auditory hallucinations telling him to harm himself.  At his MHCB IDTT on July 10, 2022, the patient reported intrusive command auditory hallucinations and was observed with toilet paper in his ears, but he denied

suicidal ideation, plan, or intent.  He was referred for ICF placement at that time.  He was admitted to the CHCF-PIP at the ICF level of care on July 20, 2022.  Upon admission to the CHCF-PIP, the patient was provided a diagnosis of schizoaffective disorder, bipolar type and was prescribed Remeron, Lamictal, and Zyprexa.

An admission SRASHE on July 21, 2022, assessed the patient with high chronic and acute suicide risk.  The patient reported a history of five previous suicide attempts and a history of suicidal ideation with intent to die.  He did not receive another SRASHE during the review period.

IDTTs occurred timely and included the necessary participants throughout the review period.  The patient attended four of six IDTTs.  At each IDTT, the patient reported intrusive command auditory hallucinations, and he rated his anxiety and depression symptoms as ten of ten on a one-to-ten scale where ten was the most severe.  His clinical presentation reportedly varied; at times, the patient presented with euthymic mood and goal-oriented behaviors, and at other times he was disorganized, irritable, and incoherent.  The treatment plan IPOCs were limited, focusing solely on managing the patient's depressed mood and lacking a plan of care to address the patient's chronic psychotic symptoms.  The patient reportedly programmed well despite his symptoms and attended groups.  The IPOCs, goals, and discharge criteria remained unchanged throughout the review period.

Healthcare documentation indicated that the frequency of psychiatric and PC clinical contacts was severely inadequate and not in accordance with treatment plans.  Review of the treatment plans indicated that the patient was to be seen for psychiatric contact every seven days and weekly by a psychologist, social worker, and recreation therapist.  Healthcare documentation indicated that the patient was not seen for an individual psychiatric contact other than the initial psychiatric assessment on July 20, 2022, and initial IDTT, until August 18, 2022.  Subsequent psychiatric contacts throughout the review period were untimely with greater than seven day intervals between contacts, despite several medication changes and the patient consistently reporting sleep disturbances, high levels of anxiety and depression, and ongoing command auditory hallucinations.  Individual psychiatry contacts occurred on August 18 and 23, September 15, October 7, and November 4 and 14, 2022, after the patient refused to attend the IDTT.

The frequency of PC contacts and the quality of those contacts were woefully inadequate, and significantly less than what was indicated in the treatment plans.  The patient received only one meaningful, confidential individual PC contact during the review period.  The record documented sporadic cell-front attempts at clinical contact by the PC at a frequency of once every two to four weeks.  In all but the one confidential contact on September 14, 2022, the PC attempted to see the patient between 8:30 and 10:00 am, when the patient was asleep, and did not document any attempts to see him at a later time when he might be awake and more willing to engage.  This patient's group attendance and participation was generally limited to recreation therapy and leisure groups, with very limited core clinical group participation and attendance.

**Findings**

The care provided to this CHCF-PIP patient was inadequate.

Treatment plans lacked interventions and an individual plan of care which would appropriately address the patient's clinical presentation and risk factors. The treatment plan contained one IPOC focusing on depressed mood and did not address the patient's chronic and severe psychotic symptoms, including intrusive command auditory hallucinations telling him to harm himself. This was particularly concerning given the patient's history of suicidal ideation and suicide attempts. The frequency and quality of PC and psychiatric contacts were severely inadequate given this patient's chronic symptoms, medication changes, and risk factors.

**Patient P**

This 37-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. This was the patient's second CDCR incarceration, and upon arrival, he was placed at the 3CMS level of care. The patient's first MHCB admission occurred in December 2015, and he was subsequently discharged to the EOP level of care on December 30, 2015. There were nine MHCB admissions documented since 2015, one acute referral that was rescinded prior to patient transport, and one ICF hospitalization between July 27 and October 26, 2021. The patient was admitted to the CHCF-PIP for his current ICF placement on July 28, 2022, after referral from the CMC ASU EOP due to severe depression and daily passive suicidal ideation not responsive to treatment in the EOP. Upon admission to the PIP, he was provided diagnoses of major depressive disorder, recurrent episode, unspecified, opioid use disorder, severe, cannabis use disorder, severe, in sustained remission, alcohol use disorder, severe, in sustained remission, and amphetamine-type substance use disorder, mild, in sustained remission. He was prescribed Risperdal, Prozac, BuSpar, and Remeron.

An admission SRASHE on August 4, 2022, assessed the patient with high chronic and moderate acute suicide risk. The patient reported a history of self-harm and suicide attempts that included an overdose of pills in 2018 and 2021 and swallowing a razor in 2018. He also consistently reported high levels of depression, anxiety, and auditory hallucinations that were negative and persecutory in nature. Identified protective factors included willingness to participate in treatment and medication adherence.

IDTTs during the review period included the necessary participants, and the patient attended all of his IDTTs. At each IDTT, the patient reported ongoing and increasing depression, anxiety, suicidal ideation, and auditory hallucinations. IDTTs were, however, not timely, as there was no documentation indicating that an IDTT occurred in October and November 2022. IDTTs were documented on July 29 (admission), August 4, and September 1 and 26, 2022. At the September 26, 2022, IDTT, the patient reported a significant increase in stressors and symptom severity. The next IDTT did not occur until December 20, 2022, almost three months later and outside the scope of the review period. IPOCs contained in the treatment plan were clinically appropriate and focused on reducing suicidal ideation, reducing self-harm, and improving coping skills and distress tolerance. Interventions were identified as medication management, group interventions,

and CBT sessions with the PC. Group assignments were appropriate and focused on topics related to coping skills, social skills, stress management, and relaxation skills.

Psychiatric contacts generally occurred timely throughout the review period, with isolated instances when the patient was not seen for 12 to 14 days between appointments. Review of psychiatric progress notes documented medication adherence, and the patient advocated for himself when discussing medications with the psychiatrist. Individual PC contact frequency was severely inadequate and not consistent with the frequency designated in the treatment plan. The patient was only seen by the PC on six occasions for clinical contacts between July 28 and November 30, 2022; these included three individual sessions, one cell-front check-in, and two PC-led groups. PC progress notes documented utilization of CBT coping skills and strategies during confidential individual therapy sessions. More frequent and regular sessions with the PC likely would have been highly beneficial for this patient, as he appeared engaged and responsive in those sessions.

**Findings**

The care and mental health treatment provided to this CHCF-PIP patient was inadequate.

The timeliness of clinical contacts, specifically IDTTs and PC contacts, was severely inadequate and insufficient for this patient's clinical presentation and symptoms. The patient was not seen by the IDTT between September 26 and December 20, 2022, even after reporting a significant increase in stressors and symptoms at the September 26, 2022, IDTT. The frequency of PC contacts was severely deficient, as the patient was only seen by his PC on six occasions between admission in July 2022 and the end of the review period on November 30, 2022. Further, he received only three PC contacts in October 2022 (two group contacts and one individual contact), even after he reported an increase in stressors and symptoms at his IDTT on September 26, 2022.

**Patient Q**

This 53-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. The patient was admitted to the CHCF-PIP from CSP/LAC's EOP program on July 29, 2022, after referral by the UNA process. The referral rationale was "stabilization of his symptoms related to his mental health diagnosis," specifically, referral for assessment of mental capacity for medical decision-making and consideration of a non-urgent PC 2602 order. The patient had received treatment in the MHCB for 21 days; however, he had not stabilized. The treatment team identified that the patient's symptoms, specifically, paranoia and delusional thinking, impaired his ability to program as he refused psychiatric appointments and medications, refused to leave his cell for meals, did not attend groups, was not showering, appeared to respond to auditory hallucinations despite denying their presence, and demonstrated poverty of speech. The patient also had poor insight regarding his mental illness and did not recognize the need for treatment or support. Upon admission to the PIP, he was provided with diagnoses of antisocial personality disorder and "unspecified anxiety versus schizophrenia." The diagnoses were later updated to bipolar I disorder, manic with psychotic features. He was not prescribed psychotropic medications upon admission, and the

patient stated that he did not wish to take psychotropic medications. A PC 2602 order was granted on September 22, 2022, and the patient was prescribed and administered Invega, which appeared to have a positive effect on his symptoms and functioning. An admission SRASHE assessed low chronic and acute suicide risk.

IDTTs during the review period occurred timely. All IDTTs included the necessary participants, including the patient, who attended all but one of his IDTTs. IPOCs and treatment were individualized and appropriate to clinical needs, placing the primary focus on addressing the delusional thinking and improved ADLs. Progress toward goals was updated appropriately at each IDTT. Discharge and level of care change criteria were clearly stated and appropriate for the patient's clinical presentation. However, at each IDTT, the patient continued to demonstrate poor insight regarding his mental illness. He was able to make some progress and achieved several treatment goals during the review period, including attending individual and group meetings regularly with improvement in his ADLs; however, the patient remained with poor insight. The November 22, 2022, IDTT noted that the patient remained unable to engage in meaningful discussion about mental health goals and was unwilling to learn any skills to challenge paranoid ideation. He continued to deny having any paranoid thoughts that would negatively impact his ability to function at the EOP level of care.

Psychiatric contacts occurred timely throughout the review period, generally occurring at least once every seven days with isolated occasions when eight to ten days lapsed between psychiatric contacts. Review of psychiatric progress notes indicated that the majority of psychiatric contacts occurred at cell front, despite the psychiatrist offering and encouraging the patient to participate in confidential individual sessions. The psychiatric care provided was appropriate. The patient was placed on a PC 2602 order on September 22, 2022, and he responded well to medication treatment. His participation in groups and individual PC contacts improved significantly, as did his mood stability and ability to engage with treatment providers. His insight, however, remained poor, and he continued to deny the presence of any mental illness or symptoms.

PC contacts also occurred timely throughout the review period, and the patient was seen by a PC several times weekly during most weeks of the review period. The patient was seen for confidential individual sessions, cell-front check-ins, and clinical group therapy contacts by the PC. PC progress notes reflected alignment with the interventions and objectives included in the treatment plan and efforts by clinicians to encourage the patient to increase engagement and participation in programming.

**Findings**

The care and treatment provided to this CHCF-PIP patient was adequate and appropriate for his clinical presentation and needs.

The patient received appropriate and timely IDTTs, and psychiatric and PC contacts. The treatment plan goals, interventions, discharge, level of care change criteria, and plan of care were individualized and specific to this patient. Progress toward goals and barriers to successful treatment were identified and updated at each IDTT. PC progress notes were consistent with the treatment plans and reflected appropriate interventions. The patient began taking antipsychotic

medication that was clinically indicated and provided by the PC 2602 order that had a positive effect in improving his symptoms. Patient participation and engagement in programming increased, and he appeared to make positive progress towards treatment goals over the course of the review period, despite ongoing denial of symptoms and paranoia regarding treatment.

**Patient R**

This 49-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. The patient was admitted to the PIP acute unit on January 11, 2022, due to danger-to-self after a self-harm incident when he lacerated his scrotum, requiring sutures. The patient later described this incident as a suicide attempt, stating that he cut his scrotum hoping to bleed to death prior to discovery. The patient had a significant mental health history, including at least 16 inpatient admissions (primarily due to cutting), over 15 suicide attempts, and many episodes of self-injurious behaviors. He remained at the acute level of care until he was referred to the ICF in July 2022, when his treatment team reported that "(d)ue to the Pt's long history of impulsivity, dysregulation, and risk for decompensation in an environment where he does not feel safe, the team agreed that the Pt would benefit from additional treatment at ICF level of care in order for him to continue to work on skill building to better manage emotional regulation and distress tolerance."

The patient was provided with diagnoses of bipolar I disorder and borderline personality disorder. He received his psychotropic medications by a PC 2602 order due to danger-to-self. He was prescribed several psychotropic medications, including Invega, Haldol, Depakote, propranolol, and lithium.

An initial PC assessment SRASHE on July 14, 2022, assessed the patient with high chronic and moderate acute suicide risk. The patient reported an extensive history of suicide attempts and self-injurious behaviors, and he previously was observed exhibiting manic, psychotic, and depressive symptoms. He also reported a significant history of trauma and substance abuse as well as auditory hallucinations that exacerbated his depressive symptoms. Another SRASHE was completed on November 28, 2022, after the patient engaged in a series of self-injurious behaviors during the Thanksgiving weekend, including endorsing suicidal ideation with a plan. He also cut himself while on suicide watch, and later that same day, swallowed his hearing aid battery. His chronic risk was assessed as high, and his acute risk remained moderate as the patient reported that he was not trying to kill himself; rather, he was frustrated with the treatment team and custody staff and was attention seeking.

The patient was seen monthly for IDTTs throughout the review period; all IDTTs included the necessary participants including the patient. The patient's primary mental health treatment focused on danger-to-self and reducing suicidal ideation and self-harming behaviors. The treatment plan interventions included medication management, group therapy, and CBT with the PC to focus on acceptance and tolerance of emotional pain. The patient's goals and interventions were updated appropriately at each IDTT to reflect the patient's functioning and mental status at that time, and the patient remained actively engaged in his treatment planning throughout the review period. According to the IDTT clinical summary on November 8, 2022, the patient responded well to treatment and had achieved several treatment goals. The summary also stated,

"the Pt has been programming as expected, has been consuming his meals, has been attending to ADLs, has been keeping cell clean and organized, and has not displayed symptoms or behavior indicating acute distress." The patient also attended over 90 percent of assigned groups, and prescribed medications effectively treated his mood symptoms and psychosis. The patient was also medication adherent for the past 30 days.

During the review period, this patient was placed at both the acute and intermediate levels of care. In both settings, he received timely routine and urgent/emergent PC and psychiatric contacts consistent with Program Guide requirements and treatment planning. PC and psychiatric progress notes documented individual clinical contacts from each discipline at least weekly, and in many cases the patient was seen by each discipline several times weekly based on clinical need and acuity. PC progress notes were consistent with the treatment plans and appropriately tracked the patient's progress toward goals and the effectiveness of interventions and treatment. Review of psychiatric progress notes indicated that the patient was adherent with prescribed medications and was able to advocate for medication changes or adjustments when appropriate. Documentation indicated that the treatment team was responsive and attentive to the patient's clinical presentation and needs as reflected by the increased frequency of clinical contacts when the patient's stressors increased, or his mental status declined.

**Findings**

The care and treatment provided to this CHCF-PIP patient was adequate.

The patient received timely IDTTs with the necessary participants in attendance throughout the review period. The treatment plan goals, interventions, discharge, level of care change criteria, and plan of care were individualized. Progress toward patient goals and barriers to successful treatment were identified and updated at each IDTT. Psychiatric progress notes indicated that the patient responded well to medication management, and he advocated for medication adjustments or changes appropriately. PC progress notes were consistent with the treatment plans and reflected that the PC implemented appropriate clinical interventions and support for this patient.

**Patient S**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CHCF-PIP. This patient's clinical history was significant for a long history of mood and thought disorder, auditory hallucinations, and paranoia. The patient had received treatment at the EOP level of care before he was admitted to the MHCB on June 13, 2022, due to danger-to-self and others after he was observed "tearing up a sheet, putting it around his neck, and then tied to a post, and started to lean back." He also reportedly threatened staff, refused to comply with orders, and stated that he had "no reason for living." The patient remained in the MHCB and was referred for ICF level of care on June 23, 2022, due to ongoing suicidal ideation and behavior as well as danger-to-others; he arrived at ICF on July 22, 2022. He was provided with a diagnosis of bipolar I disorder, manic with psychotic features. The patient was prescribed Wellbutrin and Haldol.

An ICF admission SRASHE on July 26, 2022 assessed high chronic and moderate acute suicide risk. The moderate acute risk was based upon a recent hanging attempt that was described as impulsive and "driven by rage." This patient reportedly demonstrated a propensity for losing self-control and engaging in self-harm and harm towards others when angry and upset.

IDTTs occurred timely throughout the review period. All IDTTs included the necessary participants, with the patient present at all but one IDTT. Review of treatment plan clinical summaries indicated that the patient consistently endorsed problems with anger, impulsivity, hostility, irritability, and difficulty with coping skills. He also reportedly was treatment non-adherent throughout much of the review period, often refusing medications and groups. At his initial ICF IDTT on July 25, 2022, the patient was provided IPOCs for danger-to-self and danger-to-others, and the patient agreed to that plan and focus. Treatment plan interventions and goals were appropriate for the patient's presentation and progress; however, the treatment team consistently reported difficulty with the patient's participation in treatment.

The patient was generally nonadherent with treatment throughout the review period. He often refused to leave his cell to meet with the PC or psychiatrist, and often refused to attend assigned groups. Psychiatric contacts generally occurred timely, occurring at least once every seven days aside from several isolated instances when ten to 14 days lapsed between contacts. The majority of psychiatric contacts occurred at cell front as the patient consistently refused to leave his cell. Psychiatric notes reflected consistent effort and encouragement by the psychiatrist for the patient to attend confidential sessions and to take his medications as prescribed.

PC contacts occurred inconsistently. The amount of time between PC individual contacts, either at cell front or in a confidential setting, ranged from three days to several weeks. There was no documentation of PC contact progress during September 2022 in the healthcare record. Several PC progress notes indicated that the PC was scheduled to follow-up with the patient on the following day or week, but this follow-up never occurred or was never documented in the healthcare record. Despite consistent patient refusals to leave his cell for PC contacts, there was no evidence that the PC obtained documented refusals for scheduled sessions or that the PC regularly checked in with the patient at cell front. This patient was only seen for nine individual PC contacts that included cell-front check-ins, between his admission on July 25, 2022, and the end of the review period on November 30, 2022.

**Findings**

The care and treatment provided to this CHCF-PIP patient was inadequate.

The patient reportedly demonstrated resistance regarding participation in treatment throughout his hospitalization at the CHCF-PIP ICF. Although psychiatric contacts generally occurred timely, the frequency of PC contacts (and attempted contacts) was grossly inadequate considering this patient's clinical needs. While this patient was reportedly resistant to participating in treatment and often refused to leave his cell for programming or clinical contacts, documentation of consistent attempts to engage the patient, even at cell front, were insufficient. Throughout the review period, PC and psychiatric progress notes and IDTT summaries described the patient as frequently angry, explosive, reactive, and impulsive. It did not appear that the

patient's goals and interventions were appropriately updated or modified to reflect his treatment nonadherence and the need for treatment engagement.

**Patient T**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 33-year-old patient was serving a life sentence with the possibility of parole; his minimum eligible release date (MERD) was March 2038. He was provided with diagnoses of opioid use disorder and major depressive disorder, recurrent, with severe psychotic symptoms (paranoia and auditory hallucinations). He had a history of traumatic brain injury, and had lost an eye at a young age due to violence. Despite his violent history and traumatic brain injury, there was no evidence that the patient was ever evaluated for the presence of a neurocognitive disorder. The treatment plan case formulation focused on his traumatic and unstable developmental history, his mother's psychotic symptoms, his father's absence, and his older brother's incarceration as an adolescent. He reportedly initially experienced auditory hallucinations at age 13 and subsequently began using illicit substances. As an adolescent, neither his psychotic symptoms nor substance use disorders were appropriately treated. As an adult, he served multiple prison terms where he received mental health services. His current term began on January 9, 2020.

The patient was admitted to the PIP level of care on August 24, 2021, after an attempted escape and a serious suicide attempt in July 2021. He was placed on suicide precautions for several weeks in August and September 2022. The rationale for placement on suicide precautions was his history of suicide attempts and self-harming behaviors, and current unstable mental status. He also received two RVRs during the review period. In July 2022, he received an RVR for battery on a peace officer and in October 2022, he received an RVR for indecent exposure (IEX) behavior. Since he refused to participate in the RVR mental health evaluations, the evaluator's conclusions were based on healthcare record reviews, central file (C-File) reviews, and staff interviews. Both RVR evaluations concluded that mental illness may have contributed to the alleged offenses, but did not directly cause the behavior. The evaluations noted that if found guilty, mental illness should be considered when selecting a penalty, because isolation would likely increase his mental health symptoms.

The treatment team met at least monthly during the review period. The necessary participants were present at the IDTTs, and the patient's current mental status was noted. Treatment outcome expectations did not change over time, despite the patient's treatment refusal. Treatment goals, which included identifying reasons to live, reframing negative thoughts, and learning DBT and CBT skills, appeared disconnected from his clinical presentation. Providers and staff described the patient as nonverbal and/or selectively mute, with disheveled appearance and a dirty and malodorous room. Staff observed the patient displaying immobility by remaining in the same position without moving for periods of time lasting up to several minutes, and he was described with signs and symptoms suggestive of catatonia.

The primary clinician met with the patient weekly, and he was seen by the treating psychiatrist at least every seven days. He refused to meet with clinicians in a confidential setting, usually

meeting with them at cell front where he responded to questions by gesturing with his head and hands. The patient refused to take prescribed antidepressant and antipsychotic medications. Treatment sessions, evaluations, and mental status examinations were limited by the patient's refusal to participate. No progress was made in achieving treatment outcome expectations during the review period. Additionally, there was no documentation of discussions involving consideration of pursuing a PC 2602 order, based on his history of severe suicide attempts and self-injuries, and his current lack of progress.

**Findings**

The mental health services provided to this patient were marginally adequate.

Contacts with the primary clinician and psychiatrist occurred timely. Additionally, although the patient had a history of severe suicide attempts and self-injury, he had not recently presented with those behaviors, nor did he exhibit deterioration in his mental status. Areas of need improvement included the need for diagnostic clarification, and consideration of a PC 2602 order.

**Patient U**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 38-year-old patient was serving a four-year prison term for battery with serious injury, and his earliest parole release date was May 2024. He was provided with diagnoses of schizophrenia and substance use disorders. He was prescribed antipsychotic and antidepressant medications.

The patient had an unstable developmental history characterized by drug and alcohol abuse starting at age 13. He graduated from high school, briefly attended college, enlisted in the Navy in 2004, and was dishonorably discharged in 2005 due to drug use. Additionally, his father was killed in a motor vehicle accident in 2004. He reported having "mental breakdowns" starting at age 22 due to drug and alcohol abuse. He also reported a history of several psychiatric hospitalizations, and he received supplemental security income benefits.

He was admitted to the CHCF-PIP from the MCSP ASU on July 5, 2022, due to significant functional impairment related to mental illness. He had been receiving mental health services at the 3CMS level of care until March 15, 2022, when he placed at the EOP level of care. On June 22, 2022, his treatment team referred him to ICF due to functional impairments, psychotic symptoms that had not improved with treatment, impulsive and assaultive behavior, inappropriate interactions with peers and staff, and multiple RVRs.

The initial PC and psychiatric assessments and IDTT occurred timely on July 6, 2022; however, they were limited as the patient was uncooperative and refused to participate. The treatment team met eight times during the review period. The patient refused to participate during the first four IDTTs. He attended and participated in the last four IDTTs, stating that he wanted to work on his crack cocaine addiction and discuss his feelings of depression. These disclosures were

not, however, utilized by staff to develop a therapeutic alliance and to motivate the patient to participate in treatment.

Most treatment team members did not meet with the patient as prescribed by the treatment plan. The patient was generally seen by the treating psychiatrist weekly. The rehabilitative therapist and a social worker only occasionally met with the patient, and documentation indicated that the PC rarely met with the patient. Individual primary clinician contacts were wellness checks at cell front rather than confidential treatment sessions directed by the treatment plan. Additionally, no documentation was located in the healthcare record regarding pre-release planning that was prescribed by the treatment plan.

The patient had difficulty adjusting to the inpatient unit during his first two months at the CHCF-PIP, resulting in psychotic decompensation, an assault on staff, and utilization of an emergency PC 2602 order. The psychiatrist stabilized the patient with medication treatment. The treatment outcome expectations and interventions were aspirational and never changed during the review period, despite the patient's changing mental status and clinical presentation.

**Findings**

Overall, the mental health services provided to this patient by the treatment team were inadequate, except for the psychiatrist who was able to stabilize the patient during mental status decompensation. Other treatment team members only occasionally met with the patient. Treatment planning was poor, as treatment goals, interventions and outcomes were not provided or were unchanged despite changes in the patient's clinical presentation.

**Patient V**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 51-year-old patient was serving a 36-year-to-life prison term with the possibility of parole. He had been incarcerated in CDCR since June 1992. His developmental history was traumatic with parental substance abuse, criminal behavior, and significant psychiatric treatments. Additionally, the patient had an extensive juvenile criminal record.

The patient was initially placed into the MHSDS in 2011. During the past 11 years, he was admitted to DSH in 2016 and 2018. He also had several MHCB referrals, and he received treatment at the APP, ICF and EOP levels of care. He was admitted to CHCF-PIP acute care on August 5, 2021, after transfer from the CSP/Sac MHCB where he was admitted for suicidal ideation with a plan to hang himself with a sheet. After receiving treatment in the acute care unit for approximately one year, he was referred to intermediate care in March 2022; however, the referral was rescinded after supervisory review due to a lack of functional impairment for the patient. In June 2022, he was referred to ICF again due to persistent symptoms of depression and suicidal ideation. He was endorsed to the CMF-PIP locked dorm but rejected based on the receiving team determination that the patient did not need further inpatient care. After a CCAT during which the rejection was upheld, the patient was re-endorsed to and accepted by the CHCF

ICF, where he continued to request more intensive CBT and DBT inpatient programming at CMF or DSH.

During the review period, the patient was provided with multiple diagnoses including adjustment disorder with mixed anxiety and depressed mood; major depressive disorder, recurrent and severe; generalized anxiety disorder; bipolar II disorder; antisocial personality disorder; and borderline personality disorder. Additionally, he had a history of substance use disorders which included cannabis, cocaine, and alcohol. The CHCF treatment team focused on his history of depression, anxiety, and suicidal ideation; however, the patient rarely injured himself. SRASHEs consistently assessed high chronic and low to moderate acute suicide risk. Additionally, his risk for danger-to-others was chronically assessed as moderate to high, and acute danger was assessed as moderate. The patient had a history of treatment with psychotropic medication that included medications for mood stabilization, depression, and anxiety.

During the review period, COVID-19 resulted in frequent treatment interruption for this patient. Additionally, modified programming and building closures resulted in several changes in treatment teams and subsequent changes in case conceptualization. At times treatment teams focused on the patient's potential exaggeration of symptoms to influence housing placement for safety concerns, and at other times treatment focused solely on his significant depressive symptoms. The treatment teams never clarified his mental health needs or changed treatment outcome expectations (i.e., develop coping skills to adaptively manage depression and suicidal ideation; identify triggers leading to depression and suicidal ideation; achieve a rating of six or lower on a suicide ideation scale from one to ten with ten being the highest; and achieve a rating of seven or lower on a depression scale from one to ten) despite changes in their case conceptualization. Additionally, the treatment plan prescribed CBT and DBT interventions; however, their utilization was minimal.

**Findings**

The mental health services provided to this patient were marginally adequate due to changing treatment teams and providers' conceptualizations of the patient's mental health needs. The patient's diagnoses, case conceptualization, and treatment interventions required clarification to facilitate continuity of care.

**Patient W**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 35-year-old patient had an earliest parole release date of July 6, 2024. He had a long history of receiving mental health services in the community and in CDCR. His referral from EOP to ICF was generated by the UNA process due to significant impairment due to mental illness. He was transferred from the MCSP EOP to the CHCF-PIP intermediate care unit on August 15, 2022.

The patient had a history of psychotic symptoms which began in his early twenties. He also had a history of involuntary hospitalizations, several MHCB admissions, and numerous RVRs for battery on prisoners and on a peace officer. He was provided with a diagnosis of schizoaffective disorder, depressive type, and antisocial personality disorder. Additionally, he had a history of substance use disorders beginning at age 16. He denied having a mental illness and attributed his mental health symptoms to his history of drug abuse, and he refused psychotropic medications resulting in worsening symptoms and MHCB admissions. His condition deteriorated, as well as his insight regarding his mental illness, his ADLs, and his interactions with peers. He assaulted two staff members in the past year, and he was placed on a PC 2602 order due to danger-to-others and grave disability. His symptoms included command auditory hallucinations and paranoid and grandiose delusional thinking resulting in violent, disruptive behavior.

On the day of CHCF-PIP arrival, the patient received an initial health screen, a nursing administered assessment, and an initial psychiatric assessment. There was no documentation in the healthcare record that the primary clinician completed an initial assessment. The treatment team met within 72 hours of arrival, and they subsequently met monthly. The patient attended his IDTTs and denied mental illness; however, he expressed an interest in having less violent behavior, as he expected to parole within approximately one year, in 2024.

The treatment plan included two IPOCs for depressed mood and irritability, as well as recommendations for inclusion in several psychoeducational groups, a weekly CBT group, and weekly individual sessions with the treating psychiatrist and primary clinician. Despite the prescribed treatment, the actual treatment received was minimal. The patient intermittently attended his psychoeducational groups (i.e., social skills communication, leisure activity, stress management, life skills, coping, current events, daily living skills), that were often canceled. He rarely attended CBT groups, which met in the morning when he was asleep. Psychiatric progress notes were redundant with minor changes between sessions, and the primary clinician appeared to only meet with the patient during the CBT group, which he usually declined to attend.

**Findings**

The mental health services provided to this patient were inadequate.

Although the patient suffered from a serious mental illness with minimal insight, he was aware of both his upcoming earliest parole release date and the fact that he needed help developing skills to avoid recidivism. He received minimal treatment, especially from his primary clinician, who did not appear actively involved in the patient's treatment.

**Patient X**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 48-year-old patient was serving a 45-year prison sentence with an earliest parole release date of December 2038. He reported a traumatic developmental history, characterized by neglect

and abuse involving his parents' alcohol abuse, and a neighbor dousing him with gasoline and setting him on fire. He also reported behavioral problems throughout childhood.

He was placed in the MCSP ASU for violence and transferred to the MCSP MHCB on July 1, 2022, due to danger-to-self. On July 13, 2022, he was transferred to the CHCF-PIP acute care on maximum custody status. He was provided with a diagnosis of major depressive disorder, recurrent and moderate; PTSD; and unspecified personality disorder. Additionally, he had a history of opioid use disorder, attention deficit disorder, and renal cancer. Suicide risk factors included a long prison sentence, depression, a reported history of suicidal ideation and self-injurious behavior, a family history of suicide, and chronic pain related to his cancer. He was adherent with physical and mental health medications.

After arrival to the CHCF-PIP acute unit, the patient generally received timely evaluations. Within 24 hours of arrival, he was seen for initial PC and psychiatric assessments and a SRASHE. He was described as cooperative and motivated for treatment; however, at times he refused to participate. The evaluations were generally comprehensive, and the results were used to develop the treatment plan. Occasionally, when he refused to cooperate, the evaluations were based on healthcare record reviews and staff interviews. During his first week at the CHCF-PIP, the patient was seen for daily psychiatry contacts, and he met with his acute care interdisciplinary treatment team on July 18 and 26, 2022 and on August 9, 2022. As the patient was engaged in treatment, showed progress toward treatment goals, and was motivated for additional programming, he was referred to the CHCF-PIP intermediate care. Headquarters IRU approved the referral, and the treatment team held a discharge IDTT on August 18, 2022. Discharge summaries written by the psychiatrist, primary clinician, and rehabilitative therapist were timely and clinically adequate.

Overall, ICF treatment services were timely and adequate. Initial assessments were completed on September 1, 2022. Subsequent IDTTs occurred monthly, starting with an initial IDTT on August 31, 2022. The quality of treatment outcome expectations and objectives was variable. Several goals were specific and measurable (i.e., decrease angry outbursts at staff and participate in at least 75 percent of treatment offered), and other goals were vague and subjective (i.e., learn DBT skills to reduce stress and suicidal ideation). Psychiatric and primary clinician contacts generally occurred weekly. The treatment team worked collaboratively, referencing other's progress notes. Additionally, the patient attended and actively participated in his IDTTs and was intermittently engaged with psychoeducational groups. The primary clinician emphasized the importance of developing therapeutic rapport with the patient, and actively worked with him in confidential settings to practice DBT skills.

**Findings**

The mental health services provided to this patient were adequate.

**Patient Y**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 33-year-old patient's childhood was characterized by behavioral problems related to attention deficit hyperactivity disorder and victimization due to bullying. His criminal history started during childhood and resulted in juvenile hall placement at age 12.

His CDCR mental health history included 3CMS level of care services for approximately ten years, followed by transfer to the EOP level of care. After an UNA team recommendation for a higher level of care, he was referred from the MCSP EOP to the ICF level of care for significant impairment due to mental illness on August 4, 2022. The referral from the EOP noted poor program participation, a refusal to engage in treatment, and a significant pattern of hostile and aggressive behavior toward mental health staff. The patient had not shown improvement while receiving services at the EOP level of care.

On August 15, 2022, the patient was transferred to the CHCF ICF where he received an initial psychiatric assessment. The 72-hour IDTT occurred on August 17, 2022, and the initial PC assessment and SRASHE were completed after the initial IDTT on August 18, 2022. The patient was uncooperative and refused to participate in the evaluations and the IDTT. He was provided with diagnoses of antisocial personality disorder; attention deficit hyperactivity disorder; amphetamine use disorder; and psychotic symptoms (i.e., disorganization and paranoia resulting in hospitalization) related to substance abuse and/or a borderline personality disorder. The initial PC assessment noted that the diagnoses were unclear as the patient had been uncooperative. Upon arrival at CHCF ICF, he had been provided with a diagnosis of unspecified psychotic disorder, which was in question.

The patient had no history of self-injurious behavior, suicidal ideation, or MHCB admissions. He attended to his ADLs and left his cell for showers. He consistently refused to work with mental health providers who conducted monthly IDTT meetings in absentia. He remained irritable and agitated yelling at mental health providers, banging on his door, and threatening to kill a psych tech if she returned to his cell door and asked him to participate in a psychoeducational group. Mental health providers rarely attempted individual contact, despite the treatment plan prescribing weekly individual psychiatrist, primary clinician, and rehabilitative therapist contacts.

The amount of mental health treatment provided at the CHCF ICF appeared like that provided at the EOP level of care. After three months of ICF treatment, the primary clinician noted there were no significant changes in the patient's presentation since ICF admission. Despite the treatment team's acknowledgement of his lack of improvement, they did not discuss the need to clarify his diagnosis, develop strategies to engage him in treatment, or consider pursuing a PC 2602 order.

**Findings**

The mental health services provided to this patient were inadequate.

**Patient Z**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 38-year-old patient had a traumatic developmental history, characterized by parental neglect, multiple foster homes, and sexual abuse. He had a history of serving multiple prison terms. His current CDCR term started in August 2016. He was serving a life sentence with the possibility of parole for sex offenses. He also had a long history of receiving mental health services in CDCR, starting at the 3CMS level of care in November 2009. Additionally, he had a history of receiving mental health services at the EOP, inpatient, and MHCB levels of care.

During the review period, the patient was provided with diagnoses of major depressive disorder, recurrent and mild, and pedophilic disorder. He also had a history of amphetamine and alcohol use disorders, as well as psychotic symptoms. He reported a history of one suicide attempt and ongoing chronic passive suicidal ideation. There were no verified self-harm incidents.

The patient transferred from the MCSP ASU where he had been referred to the ICF level of care due to concerns that he had decompensated after discontinuing his medication. He was placed in the ASU pending an investigation of a Prison Rape Elimination Act (PREA) allegation, identifying him as the sexual perpetrator. He was transferred to the CHCF-PIP on August 11, 2022, cleared of the PREA allegation, and released from maximum custody status.

Initial psychiatric and nursing evaluations were completed on the day of his arrival to the CHCF-PIP. An initial SRASHE assessed high chronic and low acute suicide risk. The initial IDTT occurred on August 15, 2022, and the ten-day IDTT occurred on August 24, 2022. The patient actively participated in monthly IDTTs and weekly confidential individual contacts with the psychiatrist and primary clinician. He also participated in available programming. He was prescribed antidepressant and antipsychotic medications. The primary clinician provided supportive counseling and worked with the patient in improving problem-solving skills and developing CBT and DBT coping skills. Weekly progress note documentation was minimal; however, it revealed positive therapeutic relationships with both the psychiatrist and primary clinician.

**Findings**

The mental health services provided to this patient were adequate.

The psychiatrist and primary clinician established therapeutic rapport with the patient and were able to improve his clinical symptomatology and programming; however, documentation was cryptic, minimal and difficult to follow, jeopardizing continuity of care.

**Patient AA**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 56-year-old patient was received by CDCR on July 13, 2018, from a county jail. He was convicted of rape and multiple violent offenses, and his earliest parole release date was July 24, 2029.

The patient's developmental history was unstable. When he was age nine his father died, and his mother began to abuse alcohol, resulting in her death when the patient was age 17. He reported using alcohol and cannabis at age 16 and smoking cocaine at age 23, which coincided with his first conviction for possession of a controlled substance. In CDCR, mental health clinicians noted that the patient was difficult to assess due to poverty of speech, possible preoccupation with internal stimuli, paranoia, possible perceptual disturbances, and lack of insight regarding his mental illness. A review of his CDCR history revealed multiple MHCB, APP, and ICF admissions for grave disability. Nursing staff reported that he had been victimized by his cellmate resulting in head injury; he also experienced possible head injuries during adolescence. Additionally, he had a history of presenting with disheveled and malodorous appearance with a disorganized cell. He was prescribed antipsychotic medication by a PC 2602 order for grave disability.

The patient was transferred from CSP/Sac to the CHCF ICF for grave disability on August 15, 2022. He received an initial psychiatric assessment and a nursing admissions assessment on the day of arrival. There was no documentation of the completion of an initial PC assessment. The patient refused to attend or participate in his initial IDTT on August 17, 2022 and his ten-day IDTT on August 25, 2022. There was no documentation that the first 30-day IDTT was completed; the subsequent IDTT occurred approximately two months after the ten-day IDTT on October 19, 2022. The IDTT subsequently met on November 16, 2022. The same psychiatrist and rehabilitative therapist attended the four IDTTs; however, the primary clinician changed for each IDTT. Additionally, the patient was not seen for an initial PC contact until October 19, 2022, approximately eight weeks after he arrived at the CHCF-PIP. One week later on October 26, 2022, the primary clinician changed again; subsequently, weekly individual contacts with that PC were documented until the end of the review period.

The same psychiatrist met with the patient weekly, and the same rehabilitative therapist met with him every two to three weeks starting in October 2022. Despite the psychiatrist and rehabilitative therapist's efforts for confidential individual sessions, the patient usually refused confidential or cell-front contacts, stating that he did not need mental health services.

Treatment goals were specific, measurable and achievable; however, the patient refused to meet with his providers and did not make any progress toward achieving those goals. Additionally, the treatment team never discussed the root cause underlying his denial of mental illness and they never explored strategies to engage the patient in treatment.

**Findings**

The mental health services provided to this patient during the review period were inadequate for the reasons previously stated.

**Patient BB**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 28-year-old patient was serving a six-year prison term with an earliest parole release date of August 25, 2023. He was convicted of assault with any means likely to produce grave bodily injury that resulted in a second strike. His developmental history was unstable and traumatic. By third grade, he was described as a behavioral problem in school, assaulting other children and damaging property.

On August 10, 2022, the patient attempted suicide by hanging. Upon discovery, the ligature was cut, and he briefly regained consciousness before transport to a community hospital by paramedics. Later that day, he was returned to CMC and admitted to the MHCB. Custody found a note in his cell, stating that he was killing himself because he felt set up by correctional officers due to a July 7, 2022 RVR for battery on an inmate causing serious injury. He repeatedly denied the battery allegation.

He was subsequently referred to the ICF level of care due to the severity of his suicide attempt, continued distrust and frustration with custody, and his maladaptive coping strategies.

On August 29, 2022, after a 19-day stay in the CMC MHCB, the patient transferred to the CHCF-PIP ICF. He received an initial psychiatric assessment and a nursing admissions assessment on the day of arrival. On August 30, 2022, a SRASHE, initial clinician assessment, and initial rehabilitative therapy assessment were completed. Assessments occurred timely and were generally comprehensive, identifying a history of depression and impulsivity. The patient was provided with diagnoses of attention deficit hyperactivity disorder, impulsive type; bipolar I disorder; PTSD; and antisocial personality disorder. The primary clinician also documented provisional traumatic brain injury and seizures related to the August 10, 2022 suicide attempt.

The 72-hour IDTT met on September 1, 2022. Three subsequent IDTTs occurred during the review period. The treatment outcome expectations were specific, measurable and achievable, focusing on reducing self-harm, adhering with medication therapy, and developing/implementing distress tolerance skills. The primary clinician also focused on skills related to reentering the community after prison release. The patient was motivated for treatment and met with his primary clinician and treating psychiatrist weekly in a confidential setting. He had a therapeutic relationship with both providers and appeared to be working well with them.

On November 30, 2022, an RN notified the psychiatrist that the patient was on a hunger strike, demanding his property. He covered his cell door window and refused to respond to the psychiatrist; consequently, an alarm was triggered, and he was given an emergency medication injection. He was also placed on suicide watch in a cell that was barren of items that might be used for self-harm. His demands included issues involving property, food, and an RVR. On December 2, 2022, he was removed from suicide watch with decreased monitoring and the provision of full issue. On December 5, 2022, the psychiatrist and primary clinician discussed and decided to discontinue every 11-minute monitoring and to return to every 12-minute

standard safety observation.  Mental health, medical, and custody collaboratively worked together.

**Findings**

The mental health care provided to this patient was adequate.

Assessments were related to the treatment plan, which contained goals that were collaboratively developed with the patient.  The treating psychiatrist and primary clinician worked together and provided weekly confidential individual contacts.

**Patient CC**

This patient was randomly selected to evaluate the mental health care provided at the CHCF-PIP ICF.

This 41-year-old patient entered the criminal justice system at age 12.  Except for a brief time when he was released from incarceration at age 25, he had been incarcerated since he was age 16.  During adolescence, he was convicted of grand theft auto, theft of personal property, robbery, and carjacking.  He began serving his current CDCR term in 2007 at age 26 for attempted murder and assault with a deadly weapon (firearm).  His earliest parole release date was February 2041.

The patient began receiving mental health services at the 3CMS level of care when he was incarcerated in 2008.  Since 2014, his placements in highly restrictive inpatient treatment facilities increased, along with minor self-injurious behavior and RVRs for IEX, sexual misconduct, and overfamiliarity.  He was admitted to the CHCF-PIP on August 31, 2021, and discharged to the CSP/Sac EOP on November 28, 2022.

During the review period, the patient was provided with diagnoses of major depressive disorder with psychotic features; exhibitionist disorder; antisocial personality disorder; and borderline personality disorder.  He also had a history of additional diagnoses including schizoaffective disorder, schizophrenia spectrum disorder, alcohol use disorder, and cannabis use disorder.  He was prescribed Abilify, lithium, Cymbalta, and Zyprexa.  The psychiatrist and primary clinician saw the patient at least weekly for individual confidential treatment sessions.

Psychopharmacological treatment was augmented by cognitive and dialectical behavioral therapies (i.e., correcting distorted beliefs related to depressed mood and disruptive behavior), psychoeducational groups (i.e., develop adaptive coping skills to increase emotional regulation and to decrease impulsive behavior), and a positive behavioral support plan focusing on anger, impulsivity, and IEX behaviors.

During the review period, the treating psychiatrist and primary clinician changed; however, treatment interventions remained consistent with treatment planning.  The treatment outcome expectations were specific and measurable.  Evaluations, treatment plans, and progress notes were comprehensive and facilitated continuity of care.

Despite adequate treatment, the patient did not benefit from the interventions provided during the review period.  A healthcare record review by the treatment team revealed positive correlational relationships between his RVRs and inpatient placement.  Specifically, it appeared that the patient used suicidal ideation and mild self-harm to be placed on suicide watch, where he could impact his level of care housing placement and access female staff for IEX opportunities.  The treatment team also discovered that his RVRs for threatening staff increased during inpatient placements.  These findings suggested that inpatient placement was contraindicated.  Consequently, his discharge IDTT occurred on November 23, 2022, and the patient was transferred to CSP/Sac on November 28, 2022.

**Findings**

The mental health services provided to this patient were adequate.

**APPENDIX B3**
**SVSP – PIP**
**January 9 – 11, 2023**

**Patient A**

This 53-year-old DD2 patient was admitted to the SVSP-PIP on June 6, 2022 from the EOP following a pattern of poor distress tolerance which resulted in multiple incidents of self-injurious behavior and/or suicidal ideation.  Since admission, he was housed in the TC2 housing unit.  He was provided a diagnosis of schizoaffective disorder, bipolar type.  He was prescribed Abilify, Zyprexa, Benadryl, BuSpar and lithium.  His healthcare record was selected for review after his IDTT was observed during the monitoring visit.

Initial psychiatric and social worker assessments provided a useful summary of recent functioning, decompensation and reason for referral; although most of the documentation was copied from other sources.  Social worker documentation indicated that the assessment was primarily based on healthcare record review due to the lack of custodial availability for escort.  Of note, the social worker assessment did not clearly indicate the origin of the copied documentation.

The patient had a long history of mental health treatment for mood instability, psychosis, self-injurious behavior and suicide attempts by various methods including foreign body ingestion, cutting, overdose and a hanging attempt from which he had to be cut down.  He had a family history of mental illness and suicide.

The initial IDTT was completed in absentia due to the lack of custody escorts and was based on initial assessment documentation.  Established IPOCs targeted self-harm, medication nonadherence and coping skills.  Mental health IPOCs, goals and interventions established during the initial IDTT on June 8, 2022 remained unchanged through IDTT documentation on January 11, 2022.  Similarly, reviewed clinical IDTT documentation also remained unchanged from the initial IDTT and lacked a summary of treatment progress, barriers to progress and discharge readiness.  Incidents of self-injury were not included in the clinical summary nor were adjustments made to treatment goals and interventions, including group participation or assignment.

A behavior plan was developed, but a review of the plan indicated that the plan focused on treatment interventions for staff.  It was unclear how this information would be communicated to staff, and the plan was not easily located in the healthcare record or referenced in IDTT or provider documentation.

Between December 5, 2021 and January 12, 2022, the patient was offered between five and nine hours of group which were not consistently offered daily.  Of the five groups he was offered between January 10 and January 12, 2022, he refused three; and there was no documentation regarding refusal rationale.

Between September 2022 and January 2023, the patient had three different primary clinicians.  Contacts did not regularly occur weekly, and there was a gap in appointments between October

20 and November 7, 2022, but improvement was noted after a new clinician assignment in late November 2022. Overall, contacts were indicative of an assessment of the patient's current functioning and were supportive in nature, but these contacts lacked targeted interventions for chronic mood dysregulation and low frustration tolerance which resulted in several incidents of self-injurious behavior.

Psychiatric contacts occurred with same provider. Documentation provided a brief summary of the patient's functioning and mental status. Documentation regarding psychiatric medication adherence, side effects and effectiveness was not located in the reviewed documentation.

The rationale provided for discontinuation of suicide precautions was minimal. An IDTT on January 11, 2023 was observed during the monitoring visit when the patient was placed on suicide observation. Clinical documentation regarding placement and discontinuation of suicide watch was minimal. In addition, documentation from December 5, 2021 was limited to "IP has continued to do well on SP [suicide precaution] and denies any stressors or thoughts of self-harm at this time. He was returned to baseline. SP discontinued." Suicide precautions were initiated after the patient cut himself the day prior. A SRASHE was not completed despite clinical indication, as was the case for other incidents of self-harm or suicidal ideation. Of note, for the four SRASHEs that were completed, all were completed by a social worker rather than a psychiatrist or psychologist as required.

**Findings**

The care provided to this patient was inadequate.

The patient was offered insufficient group programming and individual therapy that were inadequate for an inpatient level of care. Treatment planning was inadequate and not individualized or updated appropriately. This patient required targeted behavioral interventions to address chronic mood instability to effect behavior change. DBT or a behavior plan, collaboratively developed with the patient including meaningful incentives and measurable goals based on a functional behavioral analysis was needed. Documentation regarding suicide precaution/watch and risk assessments was also insufficient. Lastly, documentation copied from previous sources was an area of concern.

**Patient B**

This 40-year-old maximum custody patient who was housed in the TC1 unit was admitted to the SVSP-PIP on September 15, 2021 from the acute level of care following stabilization of psychotic symptoms. He was referred for continued inpatient treatment for residual symptoms. The patient had an extensive history of chronic mental illness including psychosis, delusional thinking, depression, impulsivity as well as negative symptoms. Diagnoses varied but included schizoaffective disorder, schizophrenia and unspecified bipolar disorder. He was prescribed Zyprexa, Invega and Lamictal by a PC 2602 order. His healthcare record was randomly selected from the census roster to assess the adequacy of care provided.

The patient was treated overnight at an outside hospital for medical needs in early December 2022. For unclear reasons, upon return he was treated as a new admission and thus, all initial assessments were completed again. The initial psychiatric assessment included a brief summary

of outside hospital treatment and updated orders. The initial social worker assessment was copied from an outdated initial assessment on September 17, 2021. Documentation included useful historical information regarding the patient's functioning and symptomatology at the time of referral to the acute level of care in March 2020 following a suicide attempt and psychosis, but it lacked a useful summary of the course of acute care treatment and functioning in the ICF prior to transfer for outside medical treatment.

During the review period, IDTT documentation was not appropriately updated to reflect changes in symptoms, progress in treatment or lack thereof. IPOCs addressed self-harm, delusional thinking and maximum custody status. A previous IPOC for depression was not resumed following the ICF re-admission, and the reasons for the change were not documented. Goals were measurable; however, there was no baseline assessment documented to assess treatment progress. Due to insufficient assessments, it was unclear that goals were in alignment with the patient's treatment needs. No interventions were documented between June and November 2022, except for the danger to self IPOC.

There was a discrepancy in the documentation regarding the patient's LRH. The January 5, 2023 IDTT documentation indicated that the LRH was a single cell, while progress notes on January 6, 2023 indicated that the LRH was unlocked dorms. Regardless, the IDTT recommended single cell LRH due to functional deficits and maximum custody status which was targeted as an IPOC.

Reviewed documentation indicated that despite the patient's ongoing poor insight and limited engagement with treatment providers; contacts occurred regularly, and attempts were made to engage the patient in treatment. Most clinician contacts occurred at cell front due to various reasons including time constraints, refusal and modified programming. Documentation provided clinically useful information about the patient's ongoing psychosis, hyperreligiosity and hypersexuality; however, except for psychotropic medication, utilization of treatment interventions was not documented. Psychiatric contacts appropriately discussed psychotropic medications, including an upcoming PC 2602 renewal and medication adjustments in response to increased symptoms.

Between December 5, 2021 and January 12, 2022, the patient was offered between two and six hours of groups which were not consistently offered daily. Of note, for the four weeks that he was offered three or less hours of group therapy, only one week included a holiday or shortened week. Of the six groups offered between January 10 and January 12, 2022, the patient attended all offered groups.

**Findings**

The care provided to this maximum custody patient was inadequate.

The patient was offered insufficient group programming and nonconfidential individual primary clinician contacts that were inadequate for an inpatient level of care. The patient was confined to his cell for most of the time with no documentation of the provision of in-cell programming to offset resulting isolation. Initial assessments were copied, outdated and not individualized. Treatment planning needed improvement, and the utilization of treatment interventions to assist with treatment goal achievement was lacking.

**Patient C**

This 43-year-old patient was admitted to the SVSP-PIP on November 10, 2022. At the time of the review, he was housed in the TC1 unit on maximum custody status. He was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorders, antisocial personality disorder, delusional disorder and substance disorder. The patient had a history of psychosis, poor insight and medication refusal. Specific symptoms included bizarre, inappropriate, and at times aggressive statements, disorganized thought processes, delusional thinking and paranoia that impacted his functioning and resulted in significant isolation. He was not prescribed psychotropic medication. His healthcare record was randomly selected from the PIP roster to assess the adequacy of care provided.

Initial provider assessments included relevant current treatment needs and treatment history; although some content was copied from previous documentation but not clearly indicated as such.

Treatment planning required improvement. IPOCs addressing mental health needs were not developed until the IDTT on December 2, 2022, and remained unchanged through IDTT documentation on January 12, 2023. The only IPOC targeted maximum custody status, and the established goals, while measurable, were not individualized for his current treatment needs. For example, a goal to attend all out of cell programming was unrealistic given the patient's total lack of programming prior to admission. Interventions were not documented. Further, IPOCs did not address treatment outcome expectations which included medication adherence, which was the primary treatment intervention to address psychotic symptoms. This patient's mental status remained largely unchanged during the inpatient stay.

Of concern, the inpatient referral referenced consideration of a non-emergent PC 2602 order. Despite documentation from two SVSP-PIP supervisory staff on November 9, 2022 that psychotropic medication "appears exceptionally necessary given the reason for referral. It appears likely that PC 2602 criteria may be met"; consideration of this documentation or the pursuit of a PC 2602 order was not addressed in the initial psychiatric assessment on November 10, 2022. Shortly thereafter, the psychiatrist documented on a few occasions that he might benefit from an emergency PC 2602 order; however, there was no documentation that this was further pursued. The psychiatrist also indicated that a PC 2602 petition would be pursued on January 19, 2023 but no further clarification or details were provided.

The patient's LRH was unlocked dorm, but he was recommended for and placed in a single cell pending stabilization and improved functioning by the IDTT which was appropriate. However, IPOCs did not target symptoms and behaviors to facilitate transfer to the LRH.

Throughout the course of hospitalization, most provider contacts occurred at cell front due to patient refusals; although, there was documentation that one primary clinician cell front contact occurred due to a scheduling issue. Further, documentation indicated that the patient continued to isolate, including an indication that he was refused showers on December 29, 2022.

This patient was rarely offered group therapy. Between December 2, 2022 and January 6, 2023, the last documentation of offered group at the time of review, he was offered a total of five hours of group therapy.

**Findings**

The care provided to this patient was inadequate.

The patient was offered insufficient group programming and nonconfidential provider contacts that were inadequate for an inpatient level of care. The lack of follow-up regarding a PC 2602 order for this patient whose mental status remained decompensated and unchanged with lack of insight that continued to interfere with his willingness to take psychiatric medication, was a significant concern. Treatment planning was not individualized for his current treatment needs. The lack of identification of copied prior clinical documentation was an area of concern.

**Patient D**

This 32-year-old transgender, maximum custody patient housed in the TC1 unit was admitted to the SVSP-PIP on October 10, 2022 following stabilization of suicidal ideation with a plan to hang herself in the acute level of care. This patient had an extensive history of self-injurious behavior by multiple methods including cutting, overdose and foreign body insertion. Diagnoses, which varied by provider and documentation location, included borderline and antisocial personality disorders, depression, anxiety, mood disorder, psychosis, PTSD and gender dysphoria. She was prescribed Zyprexa, Lexapro and Benadryl. Her healthcare record was randomly selected from the census roster to assess the adequacy of care provided for maximum custody patients.

The initial social work assessment was not individualized to the patient's current treatment needs. Most of the documentation was copied from previous providers with frequently unknown original authors and dates which impacted the ability to assess the documentation's relevance. The lack of individualization impacted treatment planning, as the same historical information was repeatedly copied in IDTT documentation through December 29, 2022 with minimal update to the patient's current symptoms, functioning, treatment progress, response or significant incidents including a staff assault. Suicide watches were not added to treatment planning. Conflicting IDTT documentation on December 1, 2022 following a suicide watch placement stated that no new readily identifiable additional risk factors or behavioral alerts were noted at that time; this was an area of concern.

Treatment planning was not individualized nor was there alignment or rationale for non-alignment with treatment outcome expectations. Treatment outcome expectations targeted the development of coping skills to address self-injurious behavior which was appropriate given the reason for referral. However, established IPOCs excluded these treatment needs and instead focused on maximum custody status and anxiety. In addition, sleep disturbance and nightmares disclosed to the psychiatrist were not targeted, indicating a lack of provider collaboration and communication. IPOCs developed on October 13, 2022 were continued in the treatment plan on December 29, 2022. IPOCs were measurable; however, it was unclear how IPOCs would be achieved without the provision of treatment interventions.

Overall, the patient's hospital course was unremarkable, and she presented as generally stable until late-November 2022 when she had the first of three incidents of suicide precaution/watch until her last incident on December 16, 2022. SRASHEs were not consistently completed as clinically indicated. A SRASHE that was completed on December 12, 2022, included undated but copied nursing information, that did not indicate that it was copied, resulting in difficulty determining the date of the self-injurious behavior and suggesting that the behavior occurred on the day of discharge from the suicide watch. The patient was discharged from two of the suicide precaution incidents without a face-to-face psychiatric contact but through communication to the nurse. It was unclear what clinical information the decision to discontinue suicide monitoring was based upon.

Psychiatric contacts indicated that medication adjustments were made to address symptoms, and laboratory studies were reviewed. Primary clinician contacts did not occur regularly, and treatment interventions were rarely utilized and generally were not indicative of a meaningful therapeutic contact, despite the patient's ability to engage in therapy.

During the first two weeks of January 2023, the patient was offered three and seven hours of groups respectively.

**Findings**

The care provided to this patient was inadequate.

The patient was offered insufficient group programming and meaningful individual therapy that was inadequate for an inpatient level of care. This patient was kept safe and monitored appropriately, but the overall treatment was not individualized to her treatment needs, in part attributed to copied previous provider documentation throughout her stay. Treatment needs, both those that resulted in inpatient referrals and ongoing needs, were not actively targeted during the SVSP-PIP admission, including treatment planning and clinician contacts. This patient required therapy to address long-standing affective instability which was not provided.

SRASHEs were not completed as clinically indicated or completed by the required staff, and suicide monitoring was terminated after a psychiatric order without an accompanying psychiatric face-to-face assessment. Overall, suicide monitoring documentation did not provide a useful narrative of the precipitating factors for distress or improved stability necessary for treatment planning, risk assessment and continuity of care. Other than adjustments to psychiatric medications, clinical interventions to assist the patient with managing suicidal ideation or in-cell programming were lacking.

**Patient E**

This 68-year-old patient was admitted to the SVSP-PIP on November 22, 2021 for stabilization of psychotic symptoms and grave disability. He was housed in TC2 housing unit. Diagnoses varied in the healthcare record and included schizophrenia, anxiety and major depression. He was prescribed Vistaril, Remeron, Zoloft and trazodone at the time of review. His healthcare record was selected to assess the adequacy of care provided following observation of his IDTT during the monitoring visit.

Treatment planning needed improvement in individualization and documentation of clinical information for continuity of care. Despite a prompt to provide a summary of current treatment needs; documentation instead summarized historical information with most of the content unchanged, even when it was appropriate to do so, making it difficult to assess documentation relevance.

IPOCs, established shortly after admission on December 1, 2021 were continued without modification through July 11, 2022; the IPOCs targeted auditory hallucinations with a goal to reduce hallucinations with ultimate remission. It was unclear if remission was a realistic goal for this patient with schizophrenia, or how the goals would be achieved without documented interventions. In August 2022, for reasons that were not clearly documented; an IPOC for depressed mood was added, and the IPOC for auditory hallucinations was discontinued. This IPOC was not resumed despite documentation of intermittent auditory hallucinations. In general, goals were measurable; however, the clinical rationale for interventions was not documented. Psychiatric documentation of the presence of anxiety was not targeted as an IPOC.

This patient's LRH was locked dorms, but the IDTT recommended an LRH of single cell. Documentation in treatment plans and routine psychiatric and primary clinician contacts did not address the underlying reason, goals or interventions to assist the patient in achieving transfer to his LRH.

Reviewed documentation indicated gaps in provider contacts and primary clinician changes with no documentation of transition planning. Documentation was variable, but overall not useful for continuity of care given minimal documentation, rare use of treatment interventions by the clinician and discrepancies between psychiatric contacts regarding the patient's clinical presentation. This brought into question the authenticity of the assessment. For example, overall primary clinician documentation described the patient with a clean appearance; whereas psychiatric documentation described him as unkempt, which was consistent with his presentation during the observed IDTT, on the CDCR photograph of the patient, and in historical and referral information. In addition, a discrepancy regarding the patient's clinical presentation was noted in documentation on December 6, 2022; the primary clinician documented that the patient "seems distracted", and also documented "no distracted behavior." Provider documentation indicated that the patient often made multiple religious references and expressed fear for his soul; these statements, which could have been symptoms of his mental illness, were not further assessed, nor were clinical interventions utilized. There was also documentation that suggested the presence of paranoia, but the patient was not assessed regarding this issue nor was there documentation that the beliefs were reality based; this was concerning due to the patient's history of paranoia.

**Findings**

The care provided to this patient was inadequate.

Clinical documentation, including treatment planning, was not sufficiently individualized for the patient's treatment needs or useful for continuity of care. Other than psychiatric medication, clinical treatment interventions were not documented, and further assessment of mental status was indicated.

**Patient F**

This 27-year-old maximum custody patient was admitted to the TC 1 unit at SVSP-PIP on June 20, 2022. He was provided with a diagnosis of schizophrenia, and he was prescribed various medications by a PC 2602 order. He had a history of inpatient treatment, psychosis, catatonia and significant impairment due to mental illness. The patient began refusing his medications shortly after admission with rapid decompensation. His healthcare record was reviewed to assess the adequacy of care provided with a focus on the documentation of use of force that occurred on July 10, 2022 following refusal of psychotropic medication.

Due to improved symptomatology and medical needs, the patient's psychotropic medications were adjusted with clear rationale documented on June 24 and June 26, 2022. However, on June 27, 2022, the patient refused Abilify, an antipsychotic medication, despite two attempts from nursing staff. The psychiatrist was contacted, and it was documented that the patient was allotted 24 hours to take the medication. Nursing documentation on June 29, 2022 indicated that the patient took the medication.

On June 28, 2022, psychiatric documentation indicated that the patient refused Ativan, that was used to treat catatonia, with a request to "address this as soon as possible"; but no follow-up or response was documented. Later that same day, the patient refused Zyprexa, an antipsychotic medication; in response the psychiatrist documented the plan to hold the PC 2602 ordered medications. There was no further psychiatric documentation until July 2, 2022, when the patient was seen by a different psychiatric provider. For reasons that were unclear, an order for Zyprexa, evident in nursing documentation on June 29, 2022, was not included in psychiatric documentation on July 2, 2022 or subsequent clinical documentation; and there was no psychiatric documentation regarding a change in medications.

Between July 3 and July 8, 2022, the patient continued to show signs of acute decompensation. On July 3, 2022, a custody alarm was activated after he lay in the shower and did not respond to custody staff. On July 5, 2022, his cell was unkempt and smelled of urine. He was unresponsive to treatment providers who attempted to engage him at cell front. The psychiatrist activated the alarm due to concerns for catatonia or emergent decompensation that warranted cell extraction for emergency assessment. The patient was combative, and emergency medications were ordered and given. On July 7, 2022, the patient's clothes were described as soaked in urine. The following day, he was transported by ambulance to an outside medical hospital due to altered mental status and catatonia. He returned later the same day with a diagnosis of catatonia, and the psychiatrist ordered Ativan to treat the catatonia.

There were no provider assessments until July 10, 2022, when the controlled use of force occurred due to medication refusal. Psychiatric documentation indicated multiple attempts to engage the patient and to encourage medication adherence. The risk of use of force was carefully considered. Medications were subsequently adjusted to address his psychosis.

There was no documentation regarding discussion of the patient's decompensation in the multidisciplinary twice daily huddle or communication to leadership until July 7, 2022.

A special IDTT occurred on July 11, 2022, and the patient was transferred to the acute level of care due to psychotic decompensation.

**Findings**

The care provided to this patient was inadequate.

The patient was not evaluated by providers as was clinically indicated; this contributed to multiple missed opportunities for intervention as the patient's mental status continued to deteriorate. Reviewed clinical documentation did not provide a useful narrative regarding this patient's psychiatric care, and the MAR was inaccessible.

The patient was ultimately and appropriately referred for stabilization at the acute level of care.

**Patient G**

This 38-year-old maximum custody patient was admitted to the SVSP-PIP on October 12, 2022; he was housed in the TC1 unit. He was provided with diagnoses of antisocial personality disorder and unspecified depressive disorder. His healthcare record was randomly selected from the census roster to assess the adequacy of care provided.

Most of the documentation in provider initial assessments was copied and lacked individualization. Much of the documentation included an assessment that the patient was inappropriate for ICF level of care and recommended acute level of care. Psychopathy, self-injurious behavior, grandiosity and possible psychosis were the provided reasons for referral. Documentation in the initial and subsequent IDTTs continued to be copied from previous sources and lacked an updated summary of the patient's current symptoms, functioning and treatment progress. In contrast to the reasons for referral; IPOCs targeted danger to self, with no change since implementation on October 13, 2022; maximum custody status, with no change since implementation on November 30, 2022; and irritability, established on December 29, 2022. Goals were measurable, but interventions were not consistently documented.

Routine provider documentation varied by clinician. Prior to a housing change, psychiatric contacts often occurred at cell front. In general, documentation of psychiatric content was brief. Overall, primary clinician contacts did not occur weekly, and varied in usefulness of content, ranging from useful to inadequate for continuity of care and lacked clinical interventions to address treatment goals.

Offered group treatment varied. During the first week of January 2023, the patient was offered two hours of group therapy of which he attended one hour, followed by seven hours the following week of which he attended three hours.

**Findings**

The care provided to this patient was inadequate.

The patient was offered insufficient group programming and individual therapy that were inadequate for an inpatient level of care. Initial assessments were not sufficiently individualized

and hampered individualized treatment planning.  Provider documentation was variable; and other than medication management, clinical interventions were not utilized.

**Patient H**

This 43-year-old patient was admitted to the SVSP-PIP on March 5, 2019.  Clinical documentation indicated a diagnosis of schizophrenia which was absent in the official place of record.  He was prescribed clozapine to target psychosis and psychogenic polydipsia.  The patient had a long history of inpatient treatment including ten years at Patton State Hospital.  His healthcare record was randomly selected from the census roster to assess the adequacy of care provided.  He was housed in TC2 unit at the time of review.

Reviewed IDTT documentation was insufficient.  There was no summary of current symptoms, functioning or response to treatment despite a prompt to provide this information.  Instead, a brief summary that was minimally updated was continuously copied for almost three years.  IPOCs for hallucinations and grave disability were similarly outdated and had not been updated since March 27, 2019 and August 18, 2021, respectively.  Lastly, the rationale for inpatient treatment was not useful and was limited to the following: listing treatment outcome expectations from June to October 2022, "polydipsia" on October 26, 2022, and "continues to require higher level of care" on December 14, 2022.  The patient's LRH was multi-person cell; however, he was recommended for a single cell due to his polydipsia, which was not targeted as an IPOC.

Since October 2022, reviewed primary clinician contacts occurred biweekly despite a plan for weekly contacts.  Most primary clinician contacts occurred at cell front due to refusals.  The patient attended psychiatric contacts, and there was an improvement in mental status after clozapine adjustment.  Consideration of adding memantine to the medication regimen was repeatedly documented with no documented addition of this medication.  Overall, there was minimal documentation regarding assessment, treatment strategies and the status of polydipsia.

During the first two weeks of January 2023, the patient was offered six and seven hours of group therapy, of which he attended two hours during the first week.

**Findings**

The care provided to this patient was inadequate.

The patient was offered insufficient group programming and minimal PC out of cell contacts which limited clinical assessment and therapeutic rapport.  This care was inadequate for an inpatient level of care.  The patient would have benefitted from a collaboratively developed behavior plan to target his isolation and polydipsia.  Copied documentation for a prolonged period impeded clinical utility of treatment planning documentation which was outdated and not individualized or useful for continuity of care.

**Patient I**

This 60-year-old patient was admitted to the SVSP-PIP on March 5, 2021. Diagnosis varied and was unclear. He was prescribed Zoloft, Wellbutrin and Vistaril. His healthcare record was randomly selected from the roster to assess the adequacy of care provided for TC2 PIP patients.

The IDTT documentation was not clinically useful. Most of the documentation was copied from well over a year since the patient's initial IDTT at the SVSP-PIP, and thus was outdated. There was no documentation that summarized current symptoms, functioning or treatment response between IDTTs, despite a prompt to do so. IPOCs, developed shortly after admission for anxiety and depression, also remained unchanged. Despite admission following a serious suicide attempt by hanging, in which the patient had to be cut down in November 2020; suicide watch for suicidal ideation with plan and ongoing passive suicidal ideation with self-harm was not addressed. Additionally, trauma symptoms, hopelessness and insomnia discussed with providers were not targeted in treatment.

A SRASHE had not been completed since December 2021, despite suicide watch placement after disclosing suicidal ideation with a plan to hang himself in September 2022. The December 2021 SRASHE assessed moderate chronic and low acute suicide risk; the assessment of moderate appeared to underestimate the chronic risk.

Overall, provider contacts occurred in confidential settings; symptoms and functioning were regularly monitored, and concerns were addressed. Primary clinician contacts were supportive and assisted the patient in processing issues.

Of concern was a two-week gap between primary clinician contacts after the patient was removed from suicide monitoring. At the subsequent contact on October 10, 2022, the patient was provided a journal to document the details of his trauma related to the hanging attempt; the documentation was unclear, but it appeared that this referenced the 2020 suicide attempt. Absent sufficient development and utilization of coping skills, the patient was triggered by the exercise, which was appropriately discontinued, albeit after a few sessions. Treatment then utilized narrative treatment which focused on his past.

Improved collaboration was needed between providers regarding diagnostic clarification and suicidal ideation. Primary clinician documentation consistently indicated the presence of passive suicidal ideation while corresponding psychiatric documentation often indicated the absence of suicidal ideation. Regarding diagnostic differences, diagnoses that auto-populated in psychiatric documentation (generalized anxiety disorder and major depression with psychotic features) were not updated to reflect psychiatric assessments in routine documentation which included anxiety, bipolar disorder, PTSD and mood disorder. It was unclear if the primary clinician was aware of the psychiatric diagnostic changes, as there was no mention of those in the clinician routine progress notes or IDTT documentation.

During the first two weeks of January 2023, the patient was offered four hours of group therapy, of which he attended two hours the first week and one hour the second week.

**Findings**

The care provided to this chronically suicidal patient was inadequate.

Treatment planning was insufficient and not useful for continuity of care. His primary treatment needs were not appropriately targeted by treatment planning or during individual treatment with the primary clinician. Offered group therapy was minimal. While the utilization of clinical interventions was a positive finding, and though likely not deliberately meant to be harmful; the techniques utilized by the unlicensed clinician were harmful to this patient who required skills to manage his current symptoms before delving into past, particularly trauma-related memories. Provider collaboration and diagnostic clarification was also indicated.

**Patient J**

This 42-year-old patient was admitted to the SVSP-PIP on November 17, 2022 from the MHCB for severe depression and passive suicidal ideation not responsive to treatment. At the time of the review, this patient was prescribed seven different psychotropic medications including Wellbutrin, BuSpar, clonidine, clozapine, Ativan, Zyprexa and Trileptal. His healthcare record was randomly selected from the census roster to assess the adequacy of care provided. He was admitted to the C5 unit; but at the time of review, he was housed in the TC2 housing unit.

The initial psychiatric assessment provided useful clinical documentation, including the clinical rationale for diagnostic impressions and medication adjustments. The initial assessment by the psychologist provided a brief summary of the patient's current treatment needs and historical information. Copied documentation was not clearly indicated as such and excluded original source information.

IDTT documentation was not clinically useful. Documentation was frequently copied from unknown previous sources and lacked a current summary of the patient's symptoms, functioning and treatment response. Mental health IPOCs addressing nonadherence and anxiety were not established until November 30, 2022. Treatment interventions for goal achievement were needed. Of significant concern was the lack of IPOCs to address necessary treatment needs including depression and suicidal ideation.

Despite a plan for weekly clinician contacts, there was no routine primary clinician contact documented until December 8, 2022, and then not again until December 22, 2022; the note contained conflicting information regarding the patient's mental status and confidentiality. During the subsequent clinician contact, this documentation remained unchanged. Psychiatric contacts occurred regularly; patient engagement and the level of clinical detail varied by provider; but overall, the rationale for multiple medication changes were documented.

The patient did not attend any of the eight hours of group treatment offered during the first week of January 2023; he was offered seven hours during the second week. It was unclear how the patient would attend an offered group on Facility C when he had been assigned housing in TC2 since early December 2022.

Diagnoses varied by provider and healthcare record location. A psychiatrist provided diagnoses that included antisocial personality disorder, major depressive disorder and PTSD in the place of

record; however, psychiatric providers also documented additional diagnoses of mood disorder, ADHD and borderline personality disorder in progress notes. Collaboration with the primary clinician or IDTT was not documented, nor was the healthcare record updated.

The IDTT housing recommendation was commensurate with the patient's LRH of multi-person cell, but it was subsequently changed to single cell during an IDTT on November 22, 2022 due to increased anxiety, hypothesized as due to heroin withdrawal. IPOCs to address barriers to transfer to LRH, specifically anxiety and substance use, were not established. During subsequent IDTTs, documentation regarding the IDTT housing recommendation was unclear.

SRASHEs consistently assessed high chronic risk and moderate acute suicide risk. The patient was transferred to an outside emergency department after a reported overdose of Tylenol on November 26, 2022, which was attributed to heroin withdrawal and mood instability. Diagnostic testing was negative for Tylenol but positive for methamphetamine. He was placed on suicide watch and downgraded to suicide precaution which was appropriately discontinued on November 28, 2022. While he was monitored for safety, clinical interventions to address the overdose precipitants were not utilized.

**Findings**

The care provided to this patient was inadequate.

The patient was offered insufficient group programming and individual therapy that were inadequate for an inpatient level of care. When offered, the patient's treatment needs were not appropriately met. Other than medication management, needed clinical interventions were not utilized. The quality of primary clinician and IDTT documentation was insufficient for treatment planning, treatment implementation and continuity of care. Diagnostic clarification and provider collaboration was also needed. Offered group treatment in a housing unit where the patient was not housed was an area of concern, and this error incorrectly elevated his actual offered group treatment.

**Patient K**

This patient was selected for review to assess the care provided to maximum custody patients at the SVSP-PIP. The patient was placed on maximum custody status after reportedly assaulting a correctional officer two months after his arrival at the SVSP-PIP.

The patient was referred to the intermediate level of care after an UNA referral due to grave disability. He was provided with a diagnosis of bipolar disorder, unspecified. He received his psychotropic medications by a PC 2602 order initially granted on May 11, 2022 for grave disability. He was prescribed Lamictal, Zyprexa and Invega.

A treatment plan completed in the CMC MHCB prior to transfer for intermediate treatment indicated that the patient should be single celled based on clinical factors due to the presence of delusional thinking that result in violence/disruption, and because the patient was unable to negotiate the complexities of a less restrictive housing environment due to his functional capacity. The treatment team added that the patient required single cell housing at least upon admission to ICF as he had been housed in the ASU prior to MHCB placement, and he made

358

aggressive and threatening statements while housed in the MHCB. His LRH was multi-person cell. The patient had a history of bizarre behavior, poor ADLs, threatening staff, grandiose delusional thinking and nonsensical statements. Documentation in the healthcare record indicated that the patient was housed in the MHCB from May 14 to June 15, 2022, prior to transferring to the SVSP-PIP.

Based upon review of the medication administration record, the patient was initially medication adherent early in his SVSP-PIP admission, with reported stabilization after the implementation of the PC 2602 order. However, in August 2022, the staff noted that the patient had not complied with mouth checks during medication administration and had been observed cheeking his medications; he subsequently decompensated. He was described as reluctant to take his prescribed medication and had no insight into his mental status. He remained erratically adherent with his psychotropic medication. The patient refused to attend his September 7, 2022 IDTT when he appeared with continued decompensation as demonstrated by social withdrawal, continued failure to adhere with medication administration procedures, and hypersexuality including inappropriate comments and increased aggression toward staff that included assault of an officer and speaking to staff aggressively.

The patient was seen timely by the IDTT, and early treatment plans addressed his single cell status and included general clinical interventions aimed at the behavior underlying his single cell status. However, the treatment plan required greater use of observable, objective treatment goals with specific interventions for each. Early treatment plans in June, July and August 2022 utilized cut and paste or nearly identical rationale for maintaining the patient on single cell status, specifically that the patient was delusional, guarded and on a PC 2602 order for grave disability. Specific examples were provided beginning in September 2022, after another PC was responsible for treatment plan completion. As the patient continued to decompensate despite the PC 2602 order, he became more aggressive and was described as aggressive verbally toward staff with sexual overtones.

The discharge criteria were initially equally problematic, e.g., improvement only necessary for 14 days, although these criteria were revised by later treatment teams and providers to require more sustained improvement before discharge. While the patient was reported as stable without incident, with participation in treatment and medication adherence in July 2022; he remained at STEP 1. By August 10, 2022, the patient advanced to STEP 2; however, he remained on single cell status for clinical reasons. While he had earlier reported to his treatment team that he would be fine with multi-person cell housing; he told his August 2022 treatment team that he did not want to house with others and reported that he became easily stressed when he thought that his safety was at risk. The patient was incarcerated for multiple sexual offense charges. As the patient continued to decompensate, he was returned to STEP 1 and remained on single cell status. A maximum custody IPOC was initiated on October 6, 2022.

This patient had limited access to treatment likely due to his maximum custody status and based on healthcare record documentation. The patient initially was not on maximum custody status and reportedly participated and regularly attended treatment groups; however, in August 2022, as the patient decompensated, he began to increasingly refuse individual and group contacts. December 2022 and January 2023 documentation indicated that the patient rarely participated in treatment and was listed as a "no show." The use of the term "no show" rather than canceled or

refused seemed odd given the patient's maximum custody status and the requirement for custody escort to treatment. Despite the patient's ongoing lack of treatment adherence, an individualized behavior plan was not implemented. The group treatment offered to the patient was provided by recreation therapists, and there was a lack of clinical groups targeted to the patient's functional level.

**Findings**

The care provided to this patient was inadequate.

He was referred for intermediate care as a result of an UNA referral. Although the patient was seen consistently by staff in the SVSP-PIP, he was not properly monitored. Despite a PC 2602 order in place, the patient was allowed to remain inconsistently adherent with his psychotropic medications to which the IDTT attributed an increase in aggressive and sexually behavior with further decompensation.

The patient decompensated as demonstrated by decreased treatment engagement and participation, reduction from STEP 2 to STEP 1, social withdrawal and isolation, and increased bizarre behaviors, including pacing and yelling in cell with talking to himself. The treatment plan did not include clinical interventions that were consistent with his clinical acuity and modified with continued decompensation. As a result, the patient remained on single cell status and was ultimately placed on maximum custody status, further limiting his access to treatment. This patient appeared appropriate for an individualized behavior plan and would benefit from development of such plan.

**Patient L**

This 30-year-old patient was admitted to the SVSP-PIP on August 5, 2022, with an earliest possible release date of May 2023. His case was reviewed to assess the care provided to maximum custody patients.

The patient entered CDCR in April 2022; documentation indicated that the patient had been unsuccessful in programming in settings other than those that were highly structured, including reception center, segregation or psychiatric hospital settings. He was referred to the SVSP-PIP due to danger to others and significant impairment due to serious mental illness. He was provided diagnoses of schizophrenia and mood disorder; and he had a history of aggression and anxiety. He was prescribed BuSpar, Clozaril, Depakote ER, and Vistaril on an as-needed basis. Medication changes occurred during the course of the patient's hospitalization in an effort to maintain medication adherence and to achieve psychiatric stability.

Intake assessments indicated that the patient experienced auditory hallucinations, including command hallucinations to kill himself, believing that one voice was Jesus. The psychiatric intake assessment identified rapid tranquilization as the only treatment intervention to any emergency needs, such as self-injury by the patient. The social work intake assessment noted that the patient would be encouraged to seek assistance from the IDTT when in distress. The intake assessments contained much of the same information because of the use of cut and paste or pulled forward information in which information from prior contacts could be electronically entered in the current documentation.

It was noted that the patient struggled to program due to persistent and overwhelming fear for his safety, clinically perceived due to his persecutory delusional thinking. Even though the patient functioned better in structured mental health settings, records indicated that he continued to exhibit paranoia and disorganized thinking.

The patient had received two RVRs on May 18, 2022; the RVR mental health assessment indicated that mental health was not found to be a factor in the RVR behavior. Referring MHCB staff disagreed with those findings and documented the patient's decompensation that included increased disorganized thinking, hyperverbal speech and worsened impulsivity.

Intake assessments noted that the patient began receiving mental health treatment in the county jail and had been prescribed Clozaril there which had reportedly been beneficial. The patient was found incompetent to stand trial and transferred to Napa State Hospital. Although the Clozaril was discontinued in CDCR prior to the patient's arrival at the SVSP-PIP due to nonadherence, the medication was restarted while at the SVSP-PIP due to previous effectiveness.

IDTTs occurred timely. At the initial treatment team on August 8, 2022, the patient was noted to be Medium A status and not on maximum custody status. The IDTT, however, recommended single cell status despite his LRH of unlocked dorm for clinical reasons, as the patient had command hallucinations that severely impacted functioning and could result in disruptive or violent behavior. In addition, the team noted that the patient was unable to negotiate the complexities of a less restrictive setting. Specifically, the team noted the recommendation was for safety reasons due to the prior RVRs and to allow for further psychiatric stabilization. The next IDTT on August 15, 2022 additionally noted that the patient had documented violent incidents within one year of referral. While the patient was initially not on maximum custody status, he was later apparently placed on maximum custody status; however, the reason for this change was unclear.

Treatment plans did include a vague plan to "assist the patient" in stabilization and to reduce hallucinations and aggressive behaviors to move the patient to his LRH. The treatment plans merely included three treatment goals for hallucinations and did not include objective behavioral outcomes beyond a reduction in level of care. Only one treatment goal included an evidence-based intervention, and the treatment plan was not modified over time as the patient failed to improve. In fact, treatment adherence was documented as a problem for the patient, but no substantive clinical changes were made to the treatment plan to increase the patient's participation and stabilization.

The patient further decompensated as noted by his increasing refusal of clinical contacts, group treatment and even medical contacts. The patient was repeatedly seen at cell front due to refusal to attend appointments. The patient remained at STEP 1 at the time of the monitoring visit. He reported to his clinician that he used his tablet most of the night and slept in the mornings, missing psychiatric and PC contacts. The treatment team on January 18, 2023 did not document consideration of limiting the patient's access to the tablet at night in an effort to facilitate good sleep hygiene and engagement with treatment, nor did they consider timing his appointments to maximize the probability of patient's participation. The patient's refusal of individual contacts increased at the end of December 2022 and the beginning of January 2023, and group treatment

participation remained erratic, with a slight increase in group treatment attendance during that time.

**Findings**

The care provided to this patient was inadequate.

This patient had a history of serious mental illness, inpatient treatment, and poor adjustment in general population due to the severity of his mental illness. Clinical staff documented that the patient's paranoia, persecutory delusional and disorganized thinking were significant and directly impacted his functional level. Despite this, treatment plans were not developed consistent with the many impairments of this patient. Instead, only hallucinations were targeted, and evidence-based clinical interventions were not utilized.

In addition, as the patient failed to stabilize, the psychiatrist responded with medication changes, but other changes to the treatment plan did not occur. The patient appeared to decompensate during his hospitalization, as his treatment participation and refusals of healthcare contacts increased. When clinical contacts did occur in a confidential setting, the psychiatrist addressed medication effectiveness with modification as needed, but the PCs did not document implementation of clinical interventions beyond supportive therapy and brief check-ins.

This patient would benefit from an incentive program with salient reinforcers and/or an individualized behavior plan to increase treatment engagement.

**Patient M**

This 33-year-old patient entered CDCR on April 11, 2019. He was admitted to the SVSP-PIP from CSP/LAC on November 3, 2022. His case was selected for review to assess the treatment provided to this maximum custody patient.

The patient received RVRs for threats of violence prior to the SVSP-PIP admission, and another RVR for assault on a peace officer shortly after admission to the SVSP-PIP. He was provided diagnoses of schizophrenia and delusional disorder, with psychotic symptoms and anxiety.

The patient refused psychotropic medication and was not prescribed medications at the time of admission. The record documented disagreement regarding whether the patient met criteria for a non-emergent PC 2602 order and how those criteria impacted his placement in inpatient care. Specifically, there was documentation that the SVSP-PIP IDTT questioned whether the patient met criteria for inpatient admission if he did not meet criteria for a PC 2602 order. SVSP-PIP appeared to confuse the two sets of criteria, as a patient might require and meet criteria for inpatient treatment without meeting PC 2602 criteria. The patient was referred because he was unable to function at the EOP level of care due to persecutory delusional thinking, danger to others, and lack of insight regarding his mental illness. The patient was also clinically recommended for single cell status because of recent aggressive behavior.

This patient did not receive initial intake assessments timely, and he was not seen consistently by the same psychiatrist. Documents entered as initial assessments were actually healthcare record reviews, as they were completed without having seen the patient. Clinical assessments with the

patient did occur after the IDTT.  The patient was also not seen by the IDTT timely; although subsequent IDTTs did occur timely.  The RT completed their intake assessment the day prior to IDTT; however, the initial social work intake occurred after IDTT.

The patient was placed on maximum custody status shortly after admission to the SVSP-PIP based at least in part on an RVR for assault on a peace officer by means not likely to cause great bodily injury.  That mental health disciplinary assessment did find that the patient's mental illness likely contributed toward the behavior.

Progress notes indicated that the patient was extremely mentally ill with no insight regarding his mental illness.  He exhibited grandiose and persecutory delusional thinking as well as auditory hallucinations that he was convinced were real.  The patient was seen by psychiatry after the November 9, 2022 IDTT when a determination was made that the patient did not meet criteria for a PC 2602 order at that time.

The initial treatment plan noted treatment goals targeting treatment nonadherence and ineffective coping.  A mental health IPOC for maximum custody was not initially completed as indicated in the treatment plan maximum custody tab in the electronic healthcare record.  Subsequent treatment plans did include the maximum custody IPOC, as well as IPOCs for noncompliance, delusions and ineffective coping.  Treatment goals were a mixture of appropriate behaviorally based goals and vague goals such as "verbalization of fears, anxieties, feelings".  Despite this, the treatment plans included important clinical information, including treatment targets, treatment goals, and interventions allowing for sufficient appropriate goals to guide treatment. When interventions were specified, they were thoughtful and appropriate.

The patient was also recommended for single cell status due to the presence of delusional thinking that resulted in violent/disruptive behavior and documented violent incidents within one year.  While there were many treatment goals established, this goal was only addressed indirectly.  Documentation indicated that the patient's delusions included belief that he was a victim of human trafficking by the facility and that others were also being forced or manipulated. The patient's delusional thinking was believed to contribute to his lack of participation, as the patient became agitated when challenged and had limited interactions with peers.

The patient was frequently seen at cell front by psychiatry.  When the reason for these nonconfidential contacts was documented; those reasons included safety risk due to violence, or due to modified custody program.  Despite not agreeing to take psychotropic medications, the need for those medications was indicated in documentation by psychiatry; however, efforts to facilitate medication adherence were problematic.  On December 20, 2022, a different psychiatrist indicated that a PC 2602 order would be sought, but later documentation by the same psychiatrist did not include reference to a PC 2602 order.

**Findings**

The care provided to this patient was inadequate.

There was clearly confusion and conflicting opinion regarding the pursuit of a PC 2602 order. Of note, the patient had been admitted to the MHCB and then the SVSP-PIP for danger to others. He repeatedly engaged in aggressive behavior and threatened physical aggression toward staff.

The patient had multiple persecutory delusions which the staff agreed contributed directly to his aggressive behavior. This patient appeared to meet criteria for a PC 2602 order, and involuntary treatment with psychotropic medication was clearly indicated. This patient would benefit from supervisory consultation with the IDTT regarding pursuit of a PC 2602 order and needed interim psychiatric interventions.

The treatment plan did include appropriate treatment targets and interventions, but the patient's severe symptomatology, including acute psychosis interfered with the ability to implement those interventions.

**Patient N**

This 42-year-old patient was admitted to the SVSP-PIP on June 3, 2022. His case was selected as he was maintained above his LRH on single cell status.

Intake documents noted that the patient had been re-referred to intermediate treatment because his suicidality had diminished and he was considered low acute risk; this implied that an earlier referral may have been upgraded to acute inpatient referral, but the patient still required inpatient treatment, thus the referral for intermediate care.

The patient was provided diagnoses of major depressive disorder and unspecified anxiety disorder. He lit his cell on fire on three occasions, and he swallowed foreign objects on at least two occasions resulting in transfer to an outside hospital. This was reportedly following the patient's refusal to accept a cellmate and subsequently losing his property. The patient stated that he would continue to engage in risky behavior with a plan to end his life. He had been noted to rarely leave his cell, resulting in problems with his ADLs due to lack of showering. At the time of admission, he was provided a diagnosis of bipolar disorder, unspecified. He was prescribed Lexapro and Trileptal.

The patient was initially recommended for single cell placement on a clinical basis due to a documented pattern of agitated, disruptive, and difficult to re-direct behavior. The IDTT documented rationale for single cell status included that the patient threatened to set fires in his cell and that he threatened to hang himself. According to SVSP tracking, the patient's LRH was unlocked dorm. The initial treatment plan on June 6, 2022 did not address LRH, only initiating a treatment target for impulsive behavior without any specific details. It was also noted in the ten-day treatment plan, but no significant clinical interventions were documented.

IDTTs occurred timely; although there was initially discontinuity in PCs. At the first 30-day treatment plan on June 29, 2022, the plan noted that the patient had a family history of schizophrenia, major depression, and the suicide of an uncle. The patient had a history of isolation and poor treatment engagement, due to his fears and anxiety with limited coping. This treatment plan identified the need for the patient to attend appointments; however, an IPOC for noncompliance was not established, nor was detail provided of any specific clinical interventions to assist in treatment adherence. No IPOC for single cell or for anxiety were established either; this was concerning as these were the implied reasons for many of the patient's maladaptive behaviors and single cell status. The treatment plan was not updated from the one completed by the prior provider.

The treatment team in July 2022 also did not update or modify the treatment plan to adequately address the patient's housing status, his lack of advance from STEP 1, his poor treatment participation, and impaired mental status. The team continued to document the vague treatment intervention to encourage the patient to use coping strategies to decrease poor functioning. The treatment plan was simply maintained unchanged from the prior month without recognition that encouragement was not an adequate clinical intervention. Finally, the October 2022 IDTT created a behavioral symptom IPOC. The interventions were directed toward the patient (e.g., use activities, aromatherapy, baby doll or bathing process) and dependent on other staff (i.e., custody to allow the patient to shower) rather than evidence-based clinical interventions. A description of what would be considered psychoeducation was included, but no documentation of an enhanced incentive program or individualized behavior plan was developed. The patient apparently, at the direction of the IDTT utilized aromatherapy by burning incense in his cell that activated the unit alarm, and the provided psychoeducation was directed at burning incense and papers in his cell. Nursing initiated a risk for injury IPOC that included education and "environmental safety implemented." The treatment plan remained effectively unchanged through December 2022, while the patient continued to demonstrate poor treatment participation, refusing to even attend his IDTTs.

A review of progress notes indicated that the patient generally refused treatment contact; however, he did attend confidential sessions with the psychiatrist on September 15, 2022 and the PC on September 21, 2022. The patient admitted during the session to paranoia, difficulty in crowds and loud noises, being easily stressed and triggered with flashbacks. He did express willingness to increase his Lexapro dosage. While the PC discussed the need for treatment, no actual treatment interventions were identified, and contacts were referenced as check ins. The patient did not appear scheduled for many treatment groups based on group progress notes, and no detail regarding treatment groups was present in the treatment plan.

The patient received several RVRs at the SVSP-PIP including for delaying a peace officer and destruction of state property for breaking a window. Mental health was not found to be a factor for the RVRs.

Documentation suggested a lack of communication and coordination within the treatment team regarding the most appropriate diagnosis for the patient and treatment planning.

**Findings**

The care provided to this patient was inadequate.

The treatment plan never adequately addressed the patient's single cell status and more restrictive housing than his LRH. In addition, the treatment plan did not adequately address his functional deficits including treatment nonadherence. Individual contacts with his PC were documented as check ins and typically occurred at cell front as did his psychiatric contacts.

Based on several disciplinary mental health assessments, the IDTT did not properly address disturbing behaviors such as lighting items on fire in his cell. This was particularly highlighted in his treatment plan that referenced aromatherapy and suggested that the patient not burn as

much incense to activate the unit alarm. The patient repeatedly activated the alarm by burning papers, when patients were not allowed to possess flame starting materials.

This patient would benefit from an individualized behavior plan to increase treatment participation. Additionally, a comprehensive diagnostic assessment was indicated to clarify whether the patient was anxious due to psychotic symptoms, suggested at the time of referral, or personality disorder, or other factors. The treatment team should revise and update the treatment plan to include evidence-based treatment interventions and appropriate treatment targets.

**Patient O**

This 37-year-old patient was admitted to the SVSP-PIP on October 20, 2022; and he was clinically discharged on January 18, 2023 due to ongoing refusal to participate in treatment and lack of observed functional deficits necessitating the intermediate level of care. This case was selected for review as the patient had an LRH of unlocked dorm but was housed out of his LRH in a single cell.

The patient was referred for inpatient care as a result of the UNA. He was discharged from intermediate treatment in March 2022 but at the time of UNA screening; the patient was noted by custody staff with issues of poor hygiene, persistent body odor, refusal to leave his cell for long periods of time, bizarre or confused behavior, and social withdrawal. The patient also had multiple cell moves over a 90-day period for unknown reasons; at least one cellmate had complained of the patient's hygiene.

The patient had received treatment at the intermediate level of care for just over three years. He was previously hospitalized at Coalinga State Hospital where he participated in group therapy.

On June 16, 2022, a PC 2602 order was granted due to grave disability; the patient also had a prior order in 2020 due to grave disability.

The patient was clinically assessed to require single cell placement due to an inability to negotiate the complexities of a less restrictive housing setting due to functional capacity; specific examples to justify single cell status were not provided as required in the housing review portion of the initial treatment plan on October 20, 2022. The subsequent IDTT on October 24, 2022 did not update the treatment plan to meet requirements of the form. In addition, the treatment plan did not indicate the author or evidence-based interventions. The treatment plan also did not directly address the patient's treatment nonadherence.

The treatment plan was not updated for housing review or treatment even when a different PC completed the treatment plan on December 14, 2022. In that treatment plan it was noted that the patient had stated that he met his treatment goals and wanted discharge. The treatment team also documented that the patient reported having no motivation to attend group treatment; however, he requested treatment with Wellbutrin and BuSpar, suggesting that treatment with these medications might provide him the motivation for treatment participation. From the time of the initial IDTT, the staff appeared to question whether the patient was feigning symptoms, particularly to acquire specific medications. The clinical summary noted psychological testing to determine the presence of malingering, but it was not identified in the treatment plan.

There was no documentation that the indicated psychological testing had occurred, and testing was not noted in the discharge notes even by the supervising psychologist/PIP supervisor.  There was no indication of a diagnostic evaluation to rule out malingering, nor did discharge documentation address the patient's history of grave disability, medication treatment by PC 2602 order, prior lengthy stay in intermediate treatment, poor treatment engagement, and relatively brief hospitalization at the SVSP-PIP without any real documentation of improvement beyond medication adherence and attendance at occasional individual contacts.

The psychiatric discharge documentation indicated that the patient was not on a PC 2602 order, but it was unclear if that was incorrect or if the PC 2602 that had been initially granted had later been allowed to lapse.  Progress notes suggested that, while medication management was provided to improve the patient's functioning, there was little actual therapeutic intervention beyond monitoring and supportive therapy.

**Findings**

The care provided to this patient was inadequate.

He was placed on single cell status and was not housed at his LRH for unknown clinical reasons, though presumably due to hygiene issues.  The SVSP-PIP treatment team did a poor job of providing a rationale for the ongoing single cell status and lack of targeted treatment for the behaviors underlying the need for single cell status.  The patient was discharged for not participating in treatment which was one of the reasons for inpatient referral.  Treatment plans were not updated and did not specifically address the patient's treatment nonadherence and poor functioning.

SVSP-PIP staff implied that the patient was malingering and indicated that psychological testing would occur; however, such testing did not occur and was not addressed in any discharge documentation.  No diagnostic clarification was provided; despite, the lack of achievement of treatment goals and the IDTT suggestion that the patient was exaggerating symptoms in an effort to access medication.  This patient would benefit from a comprehensive diagnostic evaluation to address the question of malingering and another review of level of care appropriateness.

**Patient P**

This patient was admitted to the SVSP-PIP on March 20, 2020.  His case was reviewed to assess the care provided to this patient who on single cell status and housed above his LRH of multi-person cell.

Upon the patient's arrival at the SVSP-PIP, the treatment team recommended against multi-person cell housing due in part to the patient's lack of insight.  That rationale continued the following year, though the recommendation was added that the patient had a history of aggression (without dates), and water restrictions.  In April 2022, the recommendation continued due to polydipsia, water restrictions and the patient's refusal of regular weight measurements and laboratory testing.

The patient had a diagnosis of schizoaffective disorder, unspecified that was later updated to schizophrenia and psychogenic polydipsia.  The patient was described as paranoid, and clinicians

believed the paranoia impacted his ability to cell with others. The patient had received his psychotropic medications by a PC 2602 order since December 2020 due to grave disability. He was prescribed Haldol injection, lithium, olanzapine and hydroxyzine. Psychiatry managed the patient's medication regime based on the patient's functioning and observed symptoms.

Treatment plans reviewed for the monitoring period specifically addressed the reasons for the patient's placement on single cell status, the patient's motivation to possibly house in a multi-person cell, and included specific evidence-based interventions to address the underlying reasons for single cell placement. It was noted that the patient did not always require water restriction due to his polydipsia, so a move was possible if the treatment team could help the patient to manage his paranoia, aggression, and ADLs. Treatment plans did mix treatment goals and interventions, but the treatment plan form itself contributed to that to some degree. The patient was not fully adherent with treatment, as he only attended groups occasionally. This was addressed in his treatment plan.

**Findings**

The care provided to this patient was adequate.

This was an extremely ill patient whose functional ability and impairments impacted not only his ability to house with others, but his ability to program safely. Because of the patient's continued poor participation in groups, he would benefit from an assessment of the appropriateness of each group, since his motivation to attend group might be negatively impacted by his long length of stay; as he might be bored by some of the provided groups. If attendance was not impacted by group offering, the patient would benefit from an individualized behavior plan.

**Patient Q**

This 53-year-old patient was clinically recommended for single cell status because of aggressive and disruptive behavior, disrespect to peers, and reportedly staying up at night yelling. He also had a recent history of violence toward staff. His case was reviewed to assess the care provided.

The patient was provided diagnoses of schizophrenia and unspecified personality disorder. A non-emergent PC 2602 order was requested by the prior facility, CMC, and granted on October 12, 2022, due to danger to others. The patient was prescribed olanzapine and Trileptal.

Three treatment plans were completed in September 2022; two on September 20, 2022 and one on September 21, 2022 that all appeared identical. The patient was not seen by the IDTT again until November 10, 2022.

The PC changed almost monthly based on IDTT documentation. However, beginning at the November 2022 IDTT, the patient's single cell status was directly addressed in the treatment plan, and his nonadherence with treatment groups was specifically addressed in the context of the STEP system. The patient would receive 100 points by attending one treatment group weekly as documented in the healthcare record. Unfortunately, the housing portion of each treatment plan was not updated to provide specific examples of behavior from each review period to justify the clinical recommendation.

The patient was also placed on maximum custody status after arriving at the SVSP-PIP on September 22, 2022. This was not addressed in the treatment plan until November 10, 2022. The November treatment plan did include appropriate clinical interventions. Some of those were removed from the December treatment plan. By his January 4, 2023 IDTT, the patient had been removed from maximum custody status but remained on single cell status.

It should be noted that psychiatric notes indicated failure to review earlier records, as they repeatedly documented that there was "no qualifying data available" regarding a PC 2602 order. Psychiatry should have been aware of the pending non-emergent order, but as late as two days before it was issued, documentation indicated that the psychiatrist was unaware of the order. On October 12, 2022, the patient was told by the psychiatrist on the tier that his PC 2602 order had been entered by the Court; the lack of provision of confidentiality was reportedly due to the lack of custody escort officers. The psychiatrist had a discussion with the patient at cell front regarding medications and informed the patient of the medication that would be initiated by the following evening. The patient was only sporadically seen confidentially by the psychiatrist, as he often refused mental health contacts and medical assessments. In response to the patient's functional impairment, psychiatry responded by modifying prescribed psychotropic medications.

Documentation indicated that few treatment groups were offered to the patient until late November 22, 2022, that were recreation therapy groups. The patient attended two groups at the end of November 2022, but soon refused to attend again. The treatment plan was not modified to address the patient's ongoing poor treatment adherence. In fact, the December and January 2022 treatment plans did not include the incentive for treatment group attendance.

**Findings**

The care provided to this patient was inadequate.

Clinically significant information, for example a pending PC 2602 order and maximum custody placement, was not clearly reviewed and documented in progress notes or addressed in treatment plans. While there was one adequate treatment plan in November 2022, prior and subsequent plans did not include important treatment goals and sufficient specific clinical interventions. In addition, the treatment team did not include specific examples to support the clinical rationale for single cell status for each review period. Instead, the IDTT simply continued the same information from the initial treatment plan. While one item cited by the team for continued single cell status was recent violence, that violence was directed at staff and did not appear to solely justify single cell placement.

**Patient R**

This 42-year-old patient was selected for review of the care provided at the intermediate level of care at the SVSP-PIP. The patient was admitted to the SVSP-PIP on December 18, 2021, and he remained at SVSP-PIP until December 23, 2022, when he was transferred to CSP/Sac ASU at the EOP level of care. While at the SVSP-PIP, the patient was provided diagnoses of major depressive disorder and borderline personality disorder, with a history of opioid use disorder. He was prescribed Prozac, olanzapine, and Benadryl on an as-needed basis for anxiety. He was also prescribed Suboxone, and he was involved in the ISUDT.

According to treatment plan clinical summaries, the patient was unable to adequately function at an outpatient level of care and required long-term stabilization. In July 2022, he continued to report depressed mood, feelings of stress, and suicidal ideation with plan by hanging. The patient reported excessive sleeping due to depression and command auditory hallucinations to kill himself. The treatment team or at least the supervisor who completed the treatment plan on July 7, 2022, expressed skepticism of the patient's self-report based on documentation in the treatment plan.

IPOCs for self-injury and behavioral symptoms were activated and maintained. At the August 4, 2022 IDTT, ineffective coping was added to the treatment plan. The treatment plans identified treatment goals that were dependent on the patient's actions, or inactions such as no self-harm for one week, with no evidence-based clinical intervention specified. Treatment plans remained unchanged until December 15, 2022, when the treatment team began to focus on pre-release planning pending parole in March 2023. Just two weeks after that IDTT, another was held when the IDTT documented that the patient had adequately met his treatment goals and appeared stable with low acute risk of self-harm.

Nursing progress notes at the time of discharge noted that the patient reported that he was happy about discharge and would do well anywhere so long as he had Suboxone.

He did receive several RVRs close to his discharge, on October 24, 2022 for delaying a peace officer and on December 3, 2022 for fighting. Accomplished treatment goals included the patient remaining clean and sober for at least two months prior to discharge, no self-harm/suicide attempts for more than two months prior to discharge, identified triggers to self-harm, and demonstrated utilization of multiple coping and protective factors.

The PCs and psychiatrist met weekly with the patient. He began to refuse confidential individual contacts in November and December 2022, and he was seen more frequently at cell-front with no reported complaints according to documentation. The patient was clearly anticipated his parole and appeared hopeful and excited. Treatment included identifying triggers for substance use, and the patient was provided with a relapse prevention plan workbook to discuss with his treatment team members.

**Findings**

The care provided to this patient was adequate.

Although discharge planning was not mentioned in the IDTT on December 15, 2022; it was unusual that the subsequent IDTT two weeks later indicated that treatment goals were met, and discharge was planned. Despite this, it did not appear that the patient's discharge was contraindicated based upon available documentation.

**Patient S**

This 30-year-old patient was admitted to the SVSP-PIP on November 10, 2022. His case was selected for review as he had resisted inpatient treatment but lost his *Vitek* hearing.

The patient was provided diagnoses of major depressive disorder, recurrent episode, unspecified; schizoaffective disorder, bipolar type; antisocial personality disorder and borderline personality disorder.  The patient experienced significant psychotic symptoms that had increasingly interfered with his ability to function at the EOP level of care.  He reported auditory hallucinations and experienced paranoid delusional thinking that his food was poisoned.  He was prescribed Abilify, clonidine, risperidone and Zoloft with erratic medication adherence.  No PC 2602 order was in place.

Upon arrival to the SVSP-PIP, the patient reported to the psychiatrist that he did not feel safe in the facility, because he had a bad prior experience and requested transfer to a different facility.  He was classified as maximum custody status with an LRH of multi-person cell.

The initial treatment plan on November 10, 2022 established treatment goals based on the referral, but the activated IPOCs were developed by nursing/medical and not mental health.  The patient was not seen again until December 8, 2022, when he was no longer on maximum custody status.  The additional treatment goal of improved treatment adherence was identified and included appropriate interventions.  When seen again by the IDTT on January 5, 2023, the treatment goals and interventions remained unchanged.

The patient repeatedly expressed to staff that he wanted transfer and told them that he would not program at the SVSP-PIP.  He preferred ASH or another intermediate facility.  He was transferred from Facility C to TC housing.  While the November and December 2022 treatment plans noted multi-person cell recommendation consistent with the IRU, a progress note on November 30, 2022 indicated that the patient's LRH was actually unlocked dorm, but he was housed out of his LRH due to medication nonadherence, limited insight into his symptoms and impaired functioning.  The interventions to address these concerns were appropriate; however, it was unclear how this patient's behavior prohibited transfer to an unlocked dorm setting.  There was not clear clinical rationale that justified multi-person cell LRH rather than unlocked dorm designation.  It was also possible that multi-person cell was initially recommended by the IRU when the patient was on maximum custody status.

The patient continued to refuse treatment groups and confidential contacts including the completion of mental health RVR assessments for refusing assigned housing and delaying a peace officer.  The assessing clinician consulted with the assigned PC who did not believe that the patient's mental health contributed to the RVR behavior.  The mental health assessment ultimately found that the patient's mental illness did not contribute to the behavior.

**Findings**

The care provided to this patient was inadequate.

While the December 2022 treatment plan added the treatment goal of increased treatment adherence, the patient was housed outside his LRH for questionable clinical reasons.  The patient was clear that he did not want remain at SVSP-PIP due to a prior bad experience, and that he would not program there.  Considering the patient's extreme paranoia which kept him from eating prison provided food for fear it was poisoned, his housing should have been more closely evaluated by the IDTT, and the patient either referred to his LRH or better documentation

provided of the clinical rationale for non-transfer. The patient continued to refuse treatment and was erratically medication adherent; however, the treatment plan was not modified after nonadherence was included. It was also unclear if sufficient consideration of a non-emergent PC 2602 order had occurred.

This patient would benefit from a supervisory consultation regarding qualification for a PC 2602 order and re-consideration of transfer to the LRH.

**Patient T**

This 38-year-old intermediate care patient transferred to the SVSP-PIP on October 3, 2022. His case was reviewed as he had been endorsed to multi-person cell housing but was clinically recommended for single cell.

The patient was seen timely by the IDTT until January 2023. He received timely initial assessments by social work, psychiatry, and recreation therapy. He was provided diagnoses of PTSD, depression, anxiety and antisocial personality disorder. He was prescribed Wellbutrin, Benadryl, Remeron, prazosin and valproic acid.

The patient was clinically recommended for single cell housing because of a "significant history of aggression in less restrictive housing" and was determined to be unable to negotiate the complexities of less restrictive housing. The clinical rationale provided was the reason included for inpatient referral. Clear examples were not provided; however, the identified indicators noted that the patient was severely paranoid, perseverative and unable to focus or engage in reality testing. While the initial treatment plan on October 5, 2022 and the ten-day treatment plan on October 12, 2022 did not focus on paranoia, they did include an IPOC for anxiety though without evidence-based clinical interventions. The patient reportedly stated that he planned to work collaboratively with the SVSP-PIP staff.

On November 16, 2022, the IDTT recommended multi-person cell housing; although the indicators and rationale did not change. The IDTT did add an IPOC for danger to self as a result of the patient's continued symptoms and functional impairment. However, this also did not include specific evidence-based interventions. The treatment plan remained unchanged when the patient was seen at the December 14, 2022 IDTT.

Review of progress notes indicated that the patient was initially offered minimal group treatment; and during psychiatric contacts, he reported worsening symptoms including difficulty sleeping and nightmares.

The patient was not seen regularly by a PC; he was seen by a predoctoral intern. Beyond active medication management, the patient did not receive treatment consistent with his level of care and functional impairment. The patient was erratically adherent with group treatment when offered and with psychotropic medication. Nonadherence was not addressed in the treatment plan.

**Findings**

The care provided to this patient was inadequate.

The patient did receive active medication management but was not offered adequate individual and group therapy. The patient was not seen consistently by his PC, and he received most contacts from a predoctoral intern. Treatment plans did not sufficiently justify the patient's housing, and it was unclear why the IDTT changed the LRH from single cell to multi-person cell housing. One possible reason was that a different PC completed the treatment plan document. The IPOCs generated did not adequately address the patient's functional impairments and did not include any clinical interventions.

**Patient V**

This 49-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP. The patient transferred to the SVSPIP from the CSP/LAC ASU EOP hub on or around August 9, 2022. The patient was initially placed in an ASU EOP hub in April 2022. Primary concerns noted by the referring institution included significant impairments in functioning as a result of mental illness including withdrawn, isolative and violent behaviors; difficulties responding to staff direction; poor attention to self-care; medication refusals; advanced aging; and significant medical issues, including increased risk for stroke. The most recent SRASHE, dated December 27, 2022, assessed moderate chronic and low acute suicide risk. The SRASHE noted a history of self-harm by laceration in November 2017, adding that the patient had no intention of dying and that the method was non-lethal. The SRASHE further indicated that, while there were other reported self-harm incidents, the patient denied a history of self-injurious behaviors with the intent to die.

Upon admission, the patient was provided a diagnosis of major depressive disorder, recurrent, unspecified. He arrived at the SVSP-PIP without prescribed psychotropic medication, and neither the referring institution's psychiatrist nor the SVSP-PIP psychiatrist determined that the patient met criteria for an involuntary medication order.

The primary clinician did not complete the initial assessment until one day after the initial IDTT on August 11, 2022. The assigned psychiatrist completed their initial assessment on the date of the initial IDTT, and indicated that there were significant discrepancies between the patient's current presentation and the description of the patient in the inpatient referral. The psychiatrist documented that the patient was "bathed," "fairly clean," "and not disheveled." The psychiatrist further noted the patient did not meet the criteria for involuntary medication at that time.

The IDTT clinical summaries focused almost solely on the patient's criminal history instead of providing a brief synopsis of current symptoms, functioning and recent treatment history. The summary referenced 24 RVRs issued since 2016, including battery on a peace officer, threatening to kill a public official, IEX and assault on a non-prisoner.

PIP treatment plans developed between August 10, 2022 and December 2022 failed to include planned interventions specific to the patient's treatment goals and discharge objectives, including for medication adherence and treatment participation. Treatment plans did not address the patient's behaviors resulting in placement on maximum custody status. The treatment plan noted clinical contact frequencies including psychiatric contacts every seven days (per current licensing flex), social worker contacts weekly, and ten hours of weekly treatment groups. Additionally, the IDTT noted that the referring institution included in their treatment outcome

expectations a goal of the patient attending 50 percent of offered out of cell treatment over the next 30-days; however, the patient did not have access to treatment groups due to his maximum custody status and housing on Facility C. Further, there were no services offered in lieu of treatment groups, and PC contacts were not offered weekly as indicated in the treatment plan. When PC contacts did occur, treatment interventions were rarely implemented.

In early October 2022, the patient moved to the TC1 housing unit. Treatment plans were subsequently modified and identified the patient's maximum custody status; however, interventions were not included.

During ICC on October 25, 2022, the patient was removed from maximum custody status.

The psychiatrist did not recommend medication treatment during the patient's SVSP-PIP hospitalization. PC and psychiatric progress notes suggested that the patient did not meet the intermediate level of care criteria throughout the course of his admission, as they routinely noted an absence of psychiatric symptoms and observed a generally stable presentation over time. The patient also routinely questioned the reason for his SVSP-PIP admission and denied symptoms of a mental illness.

IDTT clinical summaries contained the same copied and pasted information throughout the current hospitalization. IDTTs failed to summarize the current course of treatment, to provide status updates, or to indicate whether the patient was progressing toward a less restrictive level of care. Despite concerns regarding the patient's appropriateness for intermediate care placement since August 2022, IDTTs failed to document discussions regarding discharge readiness, and level of care rationales were not patient specific.

By November 2022, the patient became increasingly frustrated regarding his retention at the SVSP-PIP. He demanded to review his mental health records and asked to speak with mental health leadership; leadership met with the patient and recommended diagnostic clarification. During November 2022, treatment providers began documenting that the patient did not have a serious mental illness. On December 1, 2022, the PC described the patient as generally high functioning, adding that throughout the current admission, they had not "observed, read, nor heard reports of any actions/behaviors which would suggest that ICF is an appropriate or beneficial placement for him." This PC further stated that the patient did not have a mental health diagnosis documented. Still, the IDTT did not convene in December 2022 to discuss potential discharge to a less restrictive level of care.

The patient's level of care was eventually discussed in an IDTT around January 19, 2023, when they noted a plan to coordinate a CCAT with the referring institution. The IDTT continued to document that the patient did not have a serious mental illness. As of February 10, 2023, the patient remained in the SVSP-PIP, and no CCAT notes were located in the healthcare record. The clinical documentation remained poor throughout the patient's hospitalization.

**Findings**

The care and clinical decisions regarding this patient were inadequate.

The patient arrived at the SVSP-PIP for intermediate care on maximum custody status and was placed in a facility where maximum custody patients did not have access to sufficient mental health treatment, programming or out of cell time. The patient remained on maximum custody status on Facility C from August 10 to September 16, 2022. SVSP-PIP provided treatment data for the month of September 2022, indicating only 1.3 hours of mental health treatment was offered over a 16-day period to the patient. Facility C treatment plans were not tailored to the limitations of the environment or the patient's specific needs, including his maximum custody status. The PC initial assessment was not completed timely. PC and recreation therapy contacts were not increased in lieu of treatment groups while he was housed on Facility C. Further, PC contacts were not offered weekly as documented in the IDTT treatment plan.

Clinical documentation and treatment plans were deficient, including after the patient moved to the TC1 unit. Clinical notes indicated that the treatment providers did not appropriately discuss level of care and discharge. A review of documentation throughout the current admission suggested that the patient may have been unnecessarily retained in intermediate care with significantly less access to out of cell time and programming than he would have received in an ASU EOP hub or mainline EOP program.

**Patient W**

This patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP. The patient transferred to the SVSP-PIP from CSP/Sac on or around September 20, 2022. Primary concerns noted by the referring institution included delusional thinking, bizarre behavior, and racial and other verbally aggressive comments toward peers and staff. The referring institution recommended intermediate care to address treatment and medication non-adherence, anxiety, depression, psychotic symptoms and aggressive behavior.

Upon admission, the SVSP-PIP staff noted the patient's LRH was unlocked dorm, that HCPOP had endorsed the patient to a more restrictive LRH based on a lack of vacant beds, and that HCPOP recommended that the IDTT re-evaluate and resubmit a referral for placement "in accordance with DSH/PIP housing review policy."

The patient was provided a diagnosis of schizoaffective disorder, and he was prescribed olanzapine, Trileptal and BuSpar. While the IDTT did not document sufficient case formulations or pursue neuropsychological testing and diagnostic clarification; one PC progress note, dated October 11, 2022, suggested that the patient's symptoms and behaviors might result from both mental illness and traumatic brain injury.

The most recent SRASHE, dated September 21, 2022, assessed moderate chronic and acute suicide risk. The SRASHE also referenced a history of suicide attempts and self-injurious behavior incidents, and the evaluating clinician noted that the patient appeared to minimize the severity of previous suicide attempts. Although there were four suicide attempt entries in the healthcare record, a date was included for only one of those entries.

The PC initial assessment noted that the patient had been interviewed in a nonconfidential setting, in the C6 dining hall, when he presented with tangential and mildly disorganized thinking and minimization of his symptoms; however, he ultimately admitted to experiencing

auditory hallucinations. While the primary clinician's initial assessment occurred on the same date as the initial IDTT on September 21, 2022; the time stamps for the two documents suggested that the PC did not complete their assessment prior to reviewing the case in IDTT. An initial psychiatrist assessment was not located in the healthcare record.

The IDTT recommended treatment contact frequencies included weekly psychiatric and social worker contacts and ten hours of weekly treatment groups. The initial treatment plan targeted hallucinations but did not include corresponding interventions. The treatment plan did, however, include goals and interventions aimed at preparing the patient for transfer to his LRH of unlocked dorm.

The patient received four RVRs during the current hospitalization. RVRs were issued for willfully resisting a peace officer in the performance of duty on September 16, 2022, battery on a peace officer on November 3, 2022, and refusing to accept assigned housing on November 22 and December 27, 2022. Three of the four corresponding RVR mental health assessments determined that there was a nexus between the patient's mental illness and the RVR behaviors. The most recent RVR for refusing to accept assigned housing on December 27, 2022, however, did not note a nexus. The clinician who determined that the December 27, 2022 RVR was not influenced by the patient's mental illness noted in their assessment that the psychiatrist was unavailable for interview and that the primary clinician did suggest that the patient's symptoms and functioning likely contributed to the RVR behavior of refusing assigned housing. This evaluating clinician did not indicate their reasons for disagreeing with the assigned clinician's opinion or offer a sufficient rationale for their opinion in general. All the RVR mental health assessments included in their recommendations to the hearing officer, "access to all treatment modalities, under the circumstances, including possible programming in therapeutic treatment modules." Three of the four RVR mental health assessments also indicated there was no evidence to suggest that potential penalties would adversely impact the patient's mental illness symptoms, including the RVR that may have resulted in a SHU term.

While psychiatric contacts generally occurred timely, PC contacts did not occur weekly as indicated in treatment plans, including while the patient was on maximum custody status without access to treatment groups on Facility C. Further, when PC contacts did occur, they were generally limited to brief check-ins. On October 11, 2022, the PC wrote that the session was prematurely terminated as the patient became increasingly agitated during the session, reportedly believing that he was seeing the clinician's brother. The PC subsequently recommended against bringing the patient out of cell for contacts due to his agitated behavior. Despite the patient's worsening presentation, there were significant gaps between subsequent PC encounters. For example, there were no routine PC contacts offered between October 11 and October 25, 2022, and from November 3 to December 7, 2022.

In November 2022, the IDTT began recommending single cell placement due to the patient's alleged attempt to assault a custody officer and reported violent, antagonizing, and disruptive behaviors on the unit. Treatment plans were not modified to address the behaviors resulting in the RVRs and maximum custody placement until November 14, 2022. Still, the IDTT did not include interventions or address documented symptoms of depression and anxiety. Throughout the current PIP hospitalization, IDTT clinical summaries contained the same copied and pasted information pulled forward from the referring institution. The IDTT repeatedly failed to include

updates regarding symptoms, functioning and response to treatment. Level of care rationales were also deficient.

On December 12, 2022, the PC met with the patient in the C6 dining room. During this contact the patient reportedly stated, "I know I'm staying. I'm here for jury duty. They told me I'll be coming off maximum tomorrow!" The PC further documented that, while there were no plans to remove the patient from maximum custody status at that time, he would benefit from transferring to a unit where he could program.

On January 4, 2023, the IDTT convened and noted they had seen the patient at cell-front due to refusal. The IDTT again recommended transfer to the TC1 unit where the patient would have access to out of cell treatment and programming. A subsequent psychiatric contact on January 30, 2023 was prematurely terminated after the patient became agitated with yelling and screaming.

On February 1, 2023, the patient was removed from maximum custody status. While progress notes in February 2023 indicated that the patient had been medication adherent, he refused all or nearly all offered out of cell contacts.

The IDTT documentation did not improve over time, and there was no indication that modifications to the current treatment plan, diagnosis, or level of care considerations were discussed.

**Findings**

The care provided to this patient was inadequate.

Treatment plans were insufficient, not implemented as planned, and not modified when clinically indicated. The PC initial assessment was not completed timely, and subsequent PC contacts for treatment purposes were not offered in accordance with IDTT recommendations or as clinically indicated when the patient exhibited worsening symptoms.

Sufficient treatment access was further limited when the patient was placed on maximum custody status and remained housed in Facility C. The psychiatrist never completed an initial assessment, and both providers prematurely terminated sessions without documented attempts to deescalate the patient or plans to follow up within appropriate timeframes to reassess the patient's mental status and safety.

Additionally, the IDTT documentation was extremely deficient, as there were no updates regarding current symptoms, functioning, response to treatment, potential barriers to treatment, progress toward discharge and level of care rationales. Clinical documentation suggested that there were unresolved diagnostic uncertainties, and that a diagnostic clarification evaluation should have been pursued.

This patient likely would have benefitted from a positive behavior support plan, re-evaluation of his current medication regimen, and increased collaboration among treatment team members to address his lack of progress and general resistance to engage with mental health staff as a result of delusional thinking.

377

Lastly, a review of the RVR mental health assessment recommendations provided to the hearing officer for consideration suggested that training was indicated for clinicians conducting the RVR mental health assessments, as all the assessments urged the hearing officers to allow the patient ongoing access to treatment. This recommendation was totally inappropriate, as denial of access to treatment was not an option for RVR adjudication.

**Patient Y**

This 28-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP. The patient transferred to the SVSP-PIP from the NKSP reception center on or around October 3, 2022. He entered CDCR for the current prison term in July 2022. Primary concerns noted by the referring institution included passive suicidal ideation, self-harm, depression, anxiety and psychosis. The referring institution also indicated that the patient recently swallowed a spoon while in the county jail, which resulted in bowel perforation, sepsis and surgical intervention. His history was significant for two psychiatric hospitalizations in the community for wrist cutting, six MHCB admissions for danger to self, and acute and intermediate care admissions in 2017 and 2018. His most recent MHCB admission occurred in August 2022.

The patient was referred for intermediate care from the EOP level of care. Upon admission, he was provided a diagnosis of unspecific schizophrenia spectrum and other psychotic disorder. He was prescribed lithium, Haldol, Risperdal and Cogentin. His LRH was single cell.

The PC completed their initial assessment one day prior to the initial IDTT. No initial psychiatric assessments were located in the healthcare record. The initial IDTT occurred on October 5, 2022; however, the initial treatment plan on that date did not include any assessment information. The clinical summary section contained only outdated information pulled forward from the referring institution. Additionally, the initial IDTT occurred at cell-front for reasons that were not documented; the team did note that the patient had not refused to attend the IDTT on this date.

The initial treatment plan included IPOCs for hallucinations and impulsive behaviors. Interventions included medication management, distress tolerance skills and cognitive behavior treatment to address cognitive distortions and self-harm. The treatment plan also indicated that the STEP incentive program was explained to the patient and that he was informed of his goals related to self-harm.

Regarding his LRH, the IDTT indicated that the patient was unable to negotiate the complexities of a less restrictive housing environment due to functional capacity, adding that he might be appropriate for a multi-person dorm setting after his symptoms stabilized. The IDTT further indicated that the patient would receive psychiatric contacts every seven days, social worker contacts weekly, and ten hours of weekly treatment groups.

On October 12, 2022, the patient was placed on suicide watch after reporting command auditory hallucinations to harm or kill himself. He was released from suicide watch on October 14, 2022; however, a SRASHE was not completed on that date. Instead, the PC stated that the patient had agreed not to self-harm and had verbally contracted for safety. The PC subsequently completed a

SRASHE on November 2, 2022, indicating that they were updating the form in response to his suicide watch placement three weeks prior.  The patient's acute and chronic suicide risks were assessed as moderate on this date.

A review of PC progress notes suggested interventions were not offered during clinical encounters, which often occurred at cell-front through January 2023.  Psychiatric progress notes suggested that contacts occurred timely, that medications were adjusted when indicated, and that the patient appeared to respond well to his medication regimen by January 2023.

The patient was placed on maximum custody status while housed in Facility C during November 2022.  He remained in Facility C with the maximum custody designation for a period of 16 days; during this time, he did not have access to treatment groups.

During November 2022, the patient received two RVRs for battery on a prisoner.  Although the two RVR incidents occurred only six days apart, on November 6 and November 12, 2022; the RVR mental health assessments differed in terms of identifying a nexus between the patient's mental illness and RVR behaviors.  The RVR mental health assessment for the November 6 incident determined there was a nexus, noting that the patient had been experiencing command auditory hallucinations that resulted in placement on suicide watch the night before the RVR occurred.  The RVR mental health assessment completed for the November 12 incident, however, found no nexus, stating that there was no indication that the patient experienced significant decompensation in his mental illness symptoms before, during or after the alleged incident.  Recommendations for the hearing officer in both RVRs were generally sufficient but with one exception noted.  The recommendation included allowing the patient access to groups, dayroom, yard, phone calls, and visits; this was of concern as the restriction of group therapy, necessary for inpatient treatment, should not have been identified and considered as a possible area of restriction.

The patient transferred from Facility C to the TC1 unit on November 29, 2022, and he was ultimately removed from maximum custody status on or around December 11, 2022.

Intermediate care treatment plans remained unchanged throughout the current hospitalization.  IDTTs failed to modify the treatment plans to address behaviors resulting in RVRs and placement on maximum custody status.  Further, there were no IPOCs addressing suicidal thoughts or self-harm, despite the patient's self-harm history and placement on suicide watch on at least two occasions during the current admission.  IDTTs did not document level of care rationales or patient specific discharge objectives.  IDTT documentation also did not include updates on current symptoms, functioning, progress or obstacles to treatment progress and how those would be addressed.

In early January 2023, the psychiatrist noted Cogentin and Haldol were discontinued.  Prescribed medications at that time included Lexapro, to address symptoms of depression and anxiety; Zyprexa for mood and psychotic symptoms; Naltrexone to address impulsivity and "non-suicidal self-harming behaviors," and lithium for mood stabilization.  Subsequently, psychiatric progress notes suggested that the patient was exhibiting improvement in his symptoms and treatment engagement.

**Findings**

Although recent improvements were noted; the overall care provided to this patient was inadequate.

The psychiatrist failed to complete an initial assessment. Treatment plans did not sufficiently address the patient's presenting problems, and they were not modified to address behaviors resulting in RVRs and possible increased suicide risk.

It was very concerning that the patient was removed from suicide watch based on a contract for safety rather than an actual suicide risk evaluation; contracts for safety are not an effective suicide prevention intervention.

The patient lacked group treatment access while housed in Facility C on maximum custody status; however, there was no increase in PC contact frequencies or other services in lieu of treatment groups. PCs also very rarely documented interventions during clinical contacts, and most PC encounters were limited to brief check-ins.

**Patient Z**

This 43-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP. The patient transferred to the SVSP-PIP from the California Substance Abuse Treatment Facility (CSATF) EOP on or around August 16, 2022. Primary concerns noted by the referring institution included delusional thinking, auditory hallucinations, significant impairments in functioning and danger to others as a result of a mental illness. The referring institution further explained that the patient's delusion involved having a cyborg chip or microchip implanted in his head, and that he had previously threatened harm to others and to himself if they did not intervene to remove the microchip. The patient had at least two documented suicide attempts by hanging, with the most recent attempt occurring in 2012. Records indicated the patient had an LRH of single cell.

The patient was provided diagnoses of schizoaffective disorder, major depressive disorder, antisocial personality disorder and opioid use disorder. He was prescribed Remeron upon arrival to the SVSP-PIP. His psychotropic medications were adjusted throughout the hospitalization, and he was ultimately discharged with prescriptions for lamotrigine, mirtazapine and topiramate.

The initial IDTT occurred on August 17, 2022. The initial PC assessment was completed one day after the initial IDTT on August 18, 2022. There were no initial assessments completed by the psychiatrist during the current admission.

The patient received one RVR during this hospitalization. The RVR mental health assessment indicated that an RVR was issued on September 19, 2022 for possession of contraband. The evaluating clinician noted that the patient had refused the interview; however, the clinician determined based on collateral information that mental illness did not contribute to the RVR behavior. The recommendation for the hearing officer indicated that prolonged isolation should be avoided, as it might result in mood instability.

Treatment plans targeted anxiety and delusional thinking. While the treatment goals included ratings, there were no baseline ratings for comparison. There were also no interventions listed for the current treatment targets. Planned contact frequencies indicated that the patient would be provided psychiatric contacts every seven days, psychologist contacts weekly, recreation therapy contacts daily and eight hours of weekly group treatment. Routine psychiatric contacts appeared to occur timely; however, weekly contacts with a psychologist did not occur as planned and fewer than eight hours of group therapy were offered weekly.

Other than at the time of discharge, IDTT clinical summaries failed to include relevant information about symptoms, functioning, and/or response to treatment. Instead, the IDTT clinical summaries contained extensive historical documentation that had been repeatedly pulled forward by various clinicians prior to the current PIP admission. In fact, most sections of the PIP treatment plans contained outdated information that had been pulled forward from other institutions. For example, every SVSP-PIP treatment plan stated the patient was currently housed in an STRH overflow unit for possession of a deadly weapon; this was incorrect and reflective of a treatment plan from another institution. There were also sections of the treatment plan that were not completed correctly. For example, in a section prompting clinicians to ask whether patients experienced thoughts of harming themselves, the clinician quoted the patient as stating that he was not hurting himself; thoughts of self-harm were not addressed.

The November 2022 IDTT clinical summary included a new statement indicating the patient had a STEP goal of attending two groups per week and would remain medication adherent; however, this statement belonged elsewhere in the document, and it was subsequently pulled forward in the next three IDTT clinical summaries along with the extensive historical information from other institutions. Information regarding current symptoms, functioning, and response to treatment remained absent. There was also no reference to any of the IDTTs discussions, including level of care.

Clinical documentation suggested that the patient continued to present with delusional thinking and symptoms of anxiety and depression through January 2023. Despite the PC noting that the patient attended treatment groups; a review of group notes in December 2022 and January 2023 revealed that he only attended one treatment group during that period, not showing for all other groups offered. Treatment nonadherence did not appear to be addressed during individual contacts, and the IDTT did not document whether discussions addressed group treatment adherence, inquired about the reason for his absence, or considered a change in incentives. The patient also refused to attend most of IDTTs, including the IDTT in December 2022 and the discharge IDTT in January 2023.

There were also numerous individual contacts with the PC and psychiatrist that were completed at cell-front between November 2022 and January 2023. In December 2022, PC progress notes described the patient's mood as depressed and indicated that he continued to discuss the electrodes in his brain; at times indicating that the delusions resulted in feeling "stressed and claustrophobic." Psychiatric progress notes from late November 2022 through early January 2023 also described the patient as experiencing ongoing psychotic symptoms, including auditory hallucinations and the same fixed delusion. These notes also stated that the patient routinely reported sleep disturbance and increased depression, including rating his depression at a seven of ten on January 3, 2023. Despite the presence of these symptoms, documentation indicated that

the patient remained medication adherent, had not voiced thoughts of self-harm, and was observed occasionally socializing in the dayroom.

On December 29, 2022, the IDTT convened, but the patient refused to attend. No reason for his frequent IDTT refusals were documented. The IDTT level of care rationale section included a statement that the patient continued to present with impairments in mental health, although no explanation was offered. There was also no mention of the lack of group treatment attendance. The IDTT again failed to document status updates, including whether the patient was progressing toward his treatment outcome expectations or being considered for discharge. However, less than two weeks later, on January 9, 2023; the IDTT convened again without the patient in attendance, indicating that he would be discharged to the EOP level of care. For the first time during the SVSP-PIP hospitalization, the IDTT provided a clinical summary and indicated that the patient had met all his treatment outcome expectations. There were no discharge recommendations for the receiving institution provided.

The discharge SRASHE assessed high chronic and low acute suicide risk. The evaluating clinician inaccurately documented a complete absence of acute risk factors during the preceding three-month period, including recent symptoms of depression and psychosis.

The patient transferred to CSP/Sac on or around January 11, 2023.

**Findings**

The overall care provided for this patient was inadequate.

An initial psychiatric assessment was not completed. The frequency of offered PC contacts was inconsistent with the treatment plan. The PC did not address the patient's group treatment nonadherence, and some notes suggested they were not aware of the patient's refusals.

The SRASHE contained inaccurate and misleading information. Treatment plans remained deficient, did not include interventions, and were not updated to address new presenting concerns such as treatment nonadherence. The IDTT convened on eight occasions during the hospitalization, and consistently failed to document necessary information regarding the patient's symptoms, functioning, response to treatment, or potential barriers to treatment progress.

Further, nearly all the IDTT documentation contained outdated information repeatedly pulled forward from prior institutions, including the patient's current housing. Level of care rationales were never provided until the date of discharge. As such, it was unclear what occurred during the IDTTs or whether there was provider agreement regarding treatment planning, diagnosis and level of care.

**Patient AA**

This 36-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP. The patient transferred to the SVSP-PIP from CMC on or around October 11, 2022. He paroled from the ICF level of care during a prior term and returned to CDCR for the current term in September 2022. Primary concerns noted by the referring

institution included significant impairments due to mental illness, delusional thinking, lack of treatment participation, and poor medication adherence.

The patient was provided with a diagnosis of schizoaffective disorder, bipolar type. The patient had an active PC 2602 order for grave disability, and medications were adjusted throughout the current hospitalization. Most recently, the patient was prescribed Invega Sustenna. The most recent SRASHE, dated October 12, 2022, assessed low chronic and moderate acute suicide risk. The patient did not have a documented history of suicide attempts or self-injurious behavior. The SRASHE stated that the patient had a history of reporting suicidal ideation for secondary gain.

The IDTT noted that the patient had not completed reception center processing and was unclassified at the time of admission. His initial LRH was locked dorm, but this was changed to unlocked dorm on or around December 5, 2022. On January 10, 2023, the patient received an RVR for battery on a prisoner. The corresponding RVR mental health assessment determined that there was a nexus between the patient's mental illness and behavior; and the clinician provided an adequate justification for recommending the patient retain his yard privileges.

The SVSP-PIP initial treatment plan targeted grave disability, medication nonadherence, and delusional thinking. Documentation also referenced the referring institution's expectations regarding group treatment and medication adherence. The corresponding goals were relevant and stated in measurable terms. Interventions were also appropriate. The IDTT indicated that the patient would be offered psychiatric contacts every seven days, social worker and recreation therapy contacts weekly and ten hours of weekly clinical groups.

The initial PC assessment and initial IDTT occurred on October 12, 2022. No initial psychiatric assessments were located in the healthcare record. While psychiatric contacts often occurred more frequently than minimum requirements, PC contacts did not occur as indicated in the treatment plans. For example, the PC did not follow up with the patient from October 27, 2022 to November 17, 2022. Although groups were offered, the patient very rarely attended. The patient also expressed fear of participating in yard time.

On December 5, 2022, the IDTT convened with the patient in attendance. The IDTT described the patient as agitated, adding that the patient wanted to leave and threatened to sue each IDTT member. The team stated that they would discuss discharge plans with the patient on that date. The level of care rationale section on this date indicated that the patient was not yet ready to discharge as he had not met his treatment outcome expectations. The IDTT also recommended single cell placement due to his potential for violent and disruptive behavior in a dorm setting.

The IDTT documentation did not include information regarding current symptoms, functioning, progress toward treatment objectives, and/or barriers to treatment progress. Status updates in treatment plans were generally limited to stating that the patient was not ready for discharge, as he had not met his treatment objectives. The IDTT also did not modify treatment plans in response to the patient's lack of progress or in response to the RVR in January 2023.

**Findings**

The overall care provided to this patient was inadequate.

While initial treatment plans were generally appropriate and included measurable goals, such as percentage of groups attended, IDTT documentation consistently failed to indicate whether the patient was progressing toward his treatment objectives or whether there were obstacles to treatment progress that should have been addressed.  A review of progress notes suggested the patient was not demonstrating improvement toward most of his treatment objectives; however, treatment plans were not modified in response to the lack of progress or to address the patient's RVR behaviors.

The psychiatrist met with the patient frequently and adjusted the patient's medications on several occasions in response to complaints; however, the psychiatrist did not complete the required initial assessment.  PC contact frequencies were insufficient for the current level of care and did not adhere to the treatment plan documented recommendation for weekly PC contacts, which was especially concerning given the patient lack of participation in treatment groups.

**Patient BB**

This 61-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP.  The patient was identified for referral by the UNA process, and he subsequently transferred to the SVSP-PIP from CSP/Sac for intermediate care on or around September 16, 2022.  Primary concerns noted by the referring institution included suicidal thoughts, psychosis, depression, persecutory delusions, medication nonadherence, hygiene concerns and recent MHCB admission.  The patient had one documented suicide attempt in 1974 and one self-harm incident in 1999.

During the referral screening process, the SVSP-PIP leadership noted diagnostic discrepancies among the referring institution's providers, stating that clarification might be warranted.  The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder and antisocial personality disorder.  Diagnostic discrepancies were also noted in clinical documentation during the current SVSP-PIP stay.  At the time of review, the patient was prescribed Latuda and Abilify. The patient's LRH was single cell.

The initial PC assessment and IDTT occurred on September 19, 2022.  An initial psychiatric assessment was not located in the healthcare record.

The treatment plans targeted depressed mood, hallucinations, and group treatment attendance. Interventions were absent, and treatment goals relied on subjective ratings without documenting baseline measures to demonstrate progress.  IDTT level of care rationales were often limited to a vague statement indicating the patient "will discharge when he has met his treatment outcome expectations, when he has benefitted to the extent possible, or when circumstances otherwise determine it to be an appropriate time."  Although one covering provider wrote a brief update on the patient's current status in the most recent IDTT documentation dated February 9, 2023; the other eight IDTT clinical summaries authored by the assigned clinician only contained extensive historical data pulled forward from several prior institutions.  Those eight IDTTs failed to include any meaningful updates about the patient, including whether the patient was progressing toward treatment/discharge objectives or whether treatment plans required modification to address barriers to progress.  There was also no reference to any of the IDTT discussions in these

documents, and the section for documenting goal setting with the patient was limited to a statement from the patient indicating, "I want to go to groups."

The patient reported suicidal thoughts on at least three occasions during the SVSP-PIP hospitalization; once in November and twice in December 2022. On December 5, 2022, the PC completed a SRASHE and safety plan in response to the patient's suicidal statements. The December 5, 2022 SRASHE assessed high chronic and moderate acute suicide risk.

The following day, on December 6, 2022, the patient reported feeling lonely, agitated, depressed, paranoid, and afraid that officers were planning to have other incarcerated people assault him. On this date, the patient made statements suggesting that he might not be alive much longer and that he would not disclose plans to take his own life as he knew staff would attempt to intervene. The PC intervened by placing the patient on suicide precautions until December 7, 2022. During an IDTT on December 12, 2022, the patient made a statement suggesting he was thinking about hanging himself. The IDTT noted on this date that the patient denied intent but would not contract for safety. He was provided a copy of his safety plan and allowed to return to his cell with no further follow up or interventions on this date. The IDTT also did not modify the treatment plan on this date.

On January 16, 2023, the patient received an RVR for battery causing serious injury. The corresponding RVR mental health assessment determined that there was a nexus between the patient's mental illness and RVR behavior. Recommendations for the hearing officer were appropriate and patient specific. For example, the clinician recommended retaining yard privileges, noting that the patient's engagement in yard was a primary coping skill for managing his mental health symptoms. The clinician also stated that long term isolation might exacerbate or result in worsening of the patient's severe symptoms.

Although the patient was designated maximum custody status after receiving this RVR, the IDTT did not modify the treatment plan to address the RVR behavior or limitations on treatment access due to his maximum custody status. For example, planned contact frequencies still indicated the patient would be offered ten hours of weekly treatment groups during this time.

Progress notes in late January 2023 suggested that the patient continued to struggle with medication adherence. His group and individual treatment attendance appeared sporadic, based on a review of multiple progress notes during this period. Psychiatric and PC contacts often occurred at cell-front due to refusals. There were no modifications to the treatment plan, despite evidence of worsening symptoms, functional impairments, and behavioral concerns during the preceding two-month period. IDTTs also did not document the patient's reasons for treatment refusals to identify and address barriers to attendance, and they did not document the percentage of treatment contacts attended.

**Findings**

While the RVR mental health assessment was documented appropriately, the overall care provided to this intermediate care patient was inadequate.

An initial psychiatric assessment was not completed during admission. IDTTs failed to develop sufficient treatment plans with measurable goals and interventions. The treatment plans were not

revised in response to the RVR, evidence of increased suicide risk, worsening symptoms, and increased treatment refusals. PC contact frequencies and group hours were not offered as documented in treatment plans or as clinically indicated. IDTT documentation did not offer meaningful information, including updates on the patient's current symptoms, functioning and response to treatment. There was no indication that the IDTT discussed diagnostic discrepancies, barriers to treatment progress, or level of care justifications. The level of care rationale appeared to be a copied and pasted paragraph that could generically apply to any patient.

The IDTT failed to intervene appropriately when the patient reported thoughts of hanging himself on December 12, 2022. Additionally, the utilization of a contract for safety as an intervention was clinically inappropriate, ineffective as a suicide prevention tool, and potentially dangerous.

**Patient CC**

This 30-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP. The patient transferred to the SVSP-PIP from the Richard J. Donovan Correctional Facility (RJD) on or around May 27, 2022, after being identified for referral through the UNA process. Primary concerns noted by the referring institution included significant impairments in functioning due to mental illness, poor attention to ADLs, lack of participation in group treatment and poor hygiene.

The patient was provided a diagnosis of schizophrenia, and he had a history of severe decompensation during periods of medication nonadherence. He had an active PC 2602 order that had recently been renewed during the current hospitalization. He was prescribed Haldol, Zyprexa and Prozac. The patient's LRH was single cell.

The initial IDTT and PC assessment were completed on June 1, 2022. An initial psychiatric assessment was not located in the healthcare record. On June 20, 2022, the IDTT convened for a third time to review this case; however, a treatment plan had not been developed to date. The IDTT did, however, acknowledge the referring institution's treatment outcome expectations and indicated that the psychiatrist, PC and recreation therapist would follow up weekly, and that ten hours of weekly treatment groups would be offered.

Throughout June 2022, the patient refused to leave his cell and only minimally engaged with mental health staff at cell front. He refused to participate in his initial PC assessment and the initial IDTT. On July 18, 2022, the patient attended his IDTT and informed the team that he had engaged in self-harm by repeatedly hitting himself and a wall the night before. Following further inquiry from the IDTT, the patient explained that he felt lost and wanted to leave prison. The PC appropriately met with the patient individually on this date, completed a SRASHE and safety plan, and asked the patient to post the safety plan on his wall as a reminder; the patient agreed. The July 2022 treatment included a STEP goal to motivate the patient's group treatment attendance through incentives. Although self-harm was not integrated in the treatment plan, the PC continued to assess and address suicide risk concerns during individual contacts.

Treatment plans and STEP goals were modified over time to address different presenting problems. By November 2022, the patient's new STEP goal focused on yard attendance, noting

100 points would be awarded for attending yard three times per week. Further, IDTT documentation included updates on progress toward treatment objectives and included total points accrued for each STEP goal. By December 2022, the patient had earned 700 points for group attendance.

By February 2023, the IDTT noted significant improvements during the five-month intermediate care stay. The IDTT appropriately summarized the patient's progress toward expected treatment outcomes, including medication adherence, lack of observed and reported psychotic symptoms, reduction in acute suicide risk factors, adequate hygiene and attention to ADLs, and participation in yard, groups and exercise. The IDTT discharged the patient to EOP level of care on February 6, 2023. The PC documented on February 7, 2023 that the patient reported feeling happy about his discharge to EOP and hopefully anticipated securing a job.

The most recent SRASHE, dated February 2, 2023, rated high chronic and low acute suicide risk. The SRASHE indicated that the patient had not engaged in self-harm for five months or reported thoughts of suicide since August 2022. This SRASHE also noted multiple protective factors believed to mitigate the patient's suicide risk.

**Findings**

The care provided to this patient appeared adequate.

While there were initial delays in individualized treatment planning, no initial psychiatric evaluation was completed, and PC and group contact frequencies did not occur as stated in treatment plans; treatment quality improved after the first month. Treatment interventions were patient specific and effective. The PC 2602 order was appropriately renewed. The patient appeared to respond well to the use of STEP incentives for achieving treatment goals. SRASHEs and safety plans were completed and reviewed when indicated. Individual providers and IDTTs routinely documented treatment progress updates and modified treatment plans to address new concerns throughout the admission. Clinical documentation throughout the course of hospitalization, and at the time of discharge, supported the level of care decision upon discharge.

**Patient DD**

This 20-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at the SVSP-PIP. The patient transferred to the SVSP-PIP from RJD on or around November 10, 2022. The patient was provided with a diagnosis of adjustment disorder, anxious type at the referring institution, and included a diagnostic consideration of schizoid personality disorder. The referral reasons included chronic symptoms of anxiety and depression, history of cutting, recurrent thoughts of suicide, recent MHCB admission for danger to self, significant safety concerns resulting in frequent ASU placements, and overall challenges adjusting to the prison setting. At the time of the pre-admission screening, the SVSP-PIP leadership suggested that there was a need for diagnostic clarification, as the referring institution's diagnoses did not appear to capture the full clinical picture for this patient.

The initial PC assessment was completed on November 15, 2022, and the initial IDTT occurred the following day on November 16, 2022. An initial psychiatric assessment was not located in the healthcare record. None of the SVSP-PIP IDTT documentation referenced discussions

regarding diagnosis, case formulation, functional impairments, clinically indicated interventions or discharge objectives.  The IDTT also never developed a treatment plan for this patient over the course of three months, including to address LRH. The IDTT notes indicated that the patient's LRH was multi-person cell; however, the documented rationale for single cell placement remained unchanged through February 2023, stating only that "[patient] is new and adjusting."

None of the PC progress notes suggested the development of a treatment plan or offered treatment interventions during clinical contacts.  A review of PC progress notes between December 2022 and February 2023 suggested that PC contacts were generally used for brief check-ins.  The PC did, however, copy and paste in each progress note the referring institution's poorly developed four treatment outcome expectations, noting "met" or "partially met" next to each one.  Despite the PC noting that two of the referring institution's expectations related to psychotropic medication had been met or partially met in January and February 2023; the psychiatrist had documented medication refusal since late December 2022, and ultimately all psychiatric medications were discontinued due to refusals on January 11, 2023.  Additionally, the PC documented during February 2023 that the patient declined a psychiatric referral, despite the patient presenting with withdrawn, paranoid behavior and mood lability.

Progress notes suggested that the PC often failed to intervene when indicated to appropriately challenge the patient's poor decision-making.  For example, the PC did not intervene when the patient declined all medications, when the patient declined a referral to be seen by the psychiatrist despite evidence of worsening symptoms, and when the patient was assigned to a Spanish speaking group in response to his request to attend this group to learn Spanish.

The most recent SRASHE, dated November 15, 2022, assessed moderate chronic and acute suicide risk.  The SRASHE noted a history of "self-mutilation," observable arm scars, and ongoing passive suicidal ideation without intent or plans for self-harm.  The patient denied a history of suicide attempts.  Despite the PIP referral noting concerns regarding chronic suicidal ideation and a history of cutting, the PC failed to implement interventions to address these concerns after the date of admission.

At the time of review in February 2023, the patient remained at the SVSP-PIP.  The documentation remained insufficient, including the most recent IDTT level of care rationale which stated only that the patient "is still having some mood problems."  This statement was not accompanied by any explanation of observed or reported symptoms or a plan to address the concern.

**Findings**

The care and clinical documentation for this patient were inadequate.

The psychiatrist did not complete an initial psychiatric assessment.  Clinical summaries contained only historical information about the patient instead of offering updates on symptoms, functioning and response to treatment.  The IDTT never developed a treatment plan, including to address concerns noted in the referral, the patient's LRH, or new presenting problems documented during the course of PIP hospitalization.  As such, it was unclear whether providers

understood the patient's treatment needs, the most appropriate interventions to address those needs, or how progress toward a less restrictive level of care would be determined.

Further, the PC failed to offer interventions during clinical contacts, including when the patient exhibited worsening symptoms and poor judgment. The PC progress notes also suggested that they may have been unaware that the psychiatrist had discontinued psychotropic medications in early January 2023.

Overall, there appeared to be a lack of collaboration between the treating psychiatrist and PC based on discrepancies in the documentation, unresolved diagnostic uncertainties, and failures to develop discharge objectives and integrated treatment planning over a three-month period.

## APPENDIX B4
## CIW-PIP
## Paper Review

**Patient A**

This 28-year-old acute care patient was admitted to the CIW-PIP on January 18, 2023.  She was provided with a diagnosis of schizophrenia, and was prescribed Prolixin, Cogentin, Vistaril, Zyprexa, and Depakote.  Her healthcare record was randomly selected from the CIW-PIP roster to assess the adequacy of care provided.

Within hours of admission to the reception center from the county jail on January 11, 2023, the patient was admitted to the MHCB for psychotic symptoms including response to internal stimuli with bizarre and disorganized thinking and behavior.  Her mental status improved with psychiatric medication treatment and adherence within one week of her CIW-PIP admission.

Treatment planning (72 hour and seven-day IDTTs) included a summary of the patient's functioning since the previous treatment plan.  Her sole IPOC targeted grave disability with appropriate goals, including goals for programming and medication adherence; however, interventions were not documented.  A plan to transition the patient from acute to intermediate care was documented.

Initial assessments were thorough and appropriately individualized.  Similarly, confidential, routine primary clinician contacts occurred regularly, and the documentation included useful clinical summaries of the patient's symptoms and functioning.  Psychiatric documentation content varied by provider but overall was useful, although the rationale for cell-front contacts was not clearly documented.

Since her admission, she was offered five hours or less of group treatment.

**Findings**

This acutely psychotic patient's care was adequate, but needed improvement.

The patient stabilized with medication treatment and adherence, and she was appropriately monitored by providers who also recognized the need for further care and treatment at the intermediate level of care.  There was also a need for increased group treatment, improvement in the documentation of the rationale for cell-front psychiatric contacts, and IPOC treatment interventions.

**Patient B**

This 45-year-old patient was treated at the acute level of care at the CIW-PIP between November 16, 2022 and January 30, 2023, when she was discharged to the EOP level of care.  She was provided with a diagnosis of schizoaffective disorder, bipolar type.  She was prescribed Haldol,

Zyprexa, Cogentin, Cymbalta, and Vistaril. Her healthcare record was randomly selected from the CIW-PIP roster to assess the adequacy of care provided.

For the first month of her acute care hospitalization, she was on maximum custody status, which was discontinued on December 22, 2022; subsequently, she was able to fully program, which included groups, yard, and dayroom.

The patient had a history of four suicide attempts; the most recent attempt occurred while she was housed in the PSU four days prior to her PIP admission when she tied an unattached sheet around her neck. She was hospitalized in the CIW-PIP from July 28 to September 7, 2022; the patient expressed her concern that the hospitalization was too brief.

The initial psychiatric assessment lacked sufficient information for a comprehensive assessment. Medications were adjusted, but clear rationale for those changes was not documented. The content of the documentation of routine psychiatric contacts varied by provider, but overall documentation was minimal and did not convey meaningful clinical contact with the patient. There were multiple cell-front contacts with no clear rationale for the lack of confidential contacts.

Primary clinician contacts generally occurred twice weekly, and the documentation of those contacts provided a useful summary of the patient's symptoms and functioning. While treatment planning appropriately targeted hallucinations, danger-to-self and maximum custody status when appropriate, clinician documentation did not clearly align with treatment goals. Specifically, other than "reviewed coping skills," treatment interventions, including those to target the precipitants to her suicide attempt, were not documented.

The patient was assessed with high chronic and moderate acute suicide risk. Documentation was thorough, clear, individualized, and clinically appropriate. An appropriate safety plan was also developed.

Offered group treatment varied. During the first two weeks of January 2023, she was offered four hours weekly, and the last week she was offered eight hours. During the third week there was no documentation regarding offered group treatment. Overall, groups were recreation based.

**Findings**

This care provided to this CIW-PIP patient was marginally adequate.

Clinician treatment implementation, minimal group treatment, and psychiatric documentation needed improvement. Overall, the patient stabilized in the CIW-PIP, indicating readiness to return to a lower level of care. Medication adjustments were made; however, targeted treatment to address underlying factors that contributed to her suicide attempt and to effect long-term change was needed.

**Patient C**

This transgender 39-year-old patient was admitted to the CIW-PIP from the MHCB after a serious suicide attempt by hanging in which he was initially unresponsive upon discovery. He was admitted to the CIW-PIP at the acute level of care, which was changed to intermediate care within the first month. Provided diagnoses, which varied by provider and healthcare record location, included antisocial personality disorder, gender dysphoria, depressive disorder, and substance-related disorders. He was prescribed Zoloft daily and Vistaril on an as needed basis. His healthcare record was randomly selected from the CIW-PIP roster to assess the adequacy of care provided.

The patient's suicide attempt was precipitated by a drug debt at his sending institution. Through mid-January 2023, he maintained that he would kill himself if returned to the sending institution. However, his ability to manage the inevitable future return improved with targeted treatment while he was on suicide watch and was sustained through working with his treatment team. Documentation indicated a plan to coordinate care with the sending institution prior to discharge. The initial psychiatric assessment and routine psychiatric documentation generally included appropriate and useful clinical information including the rationale for medication adjustments. Confidentiality was not consistently documented, and there were some cell-front contacts due to lack of custody escorts or provider preference.

Primary clinician contacts occurred weekly. In accordance with the sole IPOC for self-harm, documentation addressed symptoms and functioning with a focus on the patient's plan to kill himself following discharge but did not clearly target contributing symptoms of anxiety, depression, or hopelessness. Utilization of targeted clinical treatment interventions, including self-directed workbooks, was more evident during placement on suicide watch.

Shortly after CIW-PIP discharge discussions were initiated on January 5, 2023, the patient was appropriately placed on suicide watch due to increased hopelessness and suicidal ideation. The next day, he was placed in clinical restraints and provided an intramuscular (IM) medication injection; this despite a lack of documentation that least restrictive interventions were utilized, and that the patient's self-harm was of a severity to merit the use of an IM medication injection and clinical restraint.

The patient remained on suicide precaution for more than two weeks, which he experienced as punitive. The rationale for continued suicide watch/precaution was not located in most of the clinical documentation. The rationale for the termination of suicide precaution and rationale for property provision was not located in clinical documentation. At times, documentation did not clearly indicate that the patient was on suicide watch/precaution.

Reviewed documentation indicated that he was offered between four and six hours of group weekly.

**Findings**

The care provided to this patient improved over time; however, it was inadequate.

Areas of needed improvement included treatment planning and implementation by the clinician, insufficient group treatment, and psychiatric use of cell-front contacts without clear rationale for the lack of provision of confidential contacts.

Of significant concern was the use of chemical and physical restraint and prolonged suicide watch absent clear clinical justification and sufficient attempts to utilize least restrictive interventions, as well as specific criteria for termination of suicide monitoring.

**Patient D**

This acute care 32-year-old patient was admitted to the CIW-PIP on January 23, 2023. She was provided with diagnoses of bipolar disorder, borderline personality disorder, antisocial personality disorder, and cannabis and opioid abuse. She was prescribed Prolixin, Haldol, Benadryl, propranolol, and Vistaril. She received her psychotropic medications by a PC 2602 order. Her healthcare record was selected from the CIW-PIP roster to assess the adequacy of care provided for maximum custody patients.

This patient was admitted to the CIW-PIP after a period of decline in functioning that resulted in multiple MHCB admissions from the PSU. Symptoms included agitation, erratic and hostile behavior, and threats to self and others. IPOCs targeted impulsive behavior, maximum custody status, and substance use. At the time of admission, she was assessed with high chronic and moderate acute suicide risk.

Clinician initial assessments were thorough and provided pertinent clinical documentation. In contrast, the psychiatric initial assessment lacked sufficient detail necessary for a comprehensive initial evaluation. Of note, the psychiatric assessment indicated that that patient wore a spit mask, but no rationale for this use was located in the healthcare record, and subsequent use was not documented.

Most routine provider contacts typically occurred in confidential settings, and appropriate reasons were documented for non-confidential contacts. Documentation was clinically useful, and clinical interventions were utilized.

The patient was offered five groups between February 1 and February 10, 2023; however, it was unclear whether group topics were fully aligned with the patient's treatment needs.

**Findings**

The care provided to this maximum custody patient was marginally adequate.

As for the provision of treatment, the minimal out-of-cell time due to insufficient group programming was an area of concern. Overall, while documentation was clinically useful for continuity of care, there were several areas needing improvement, including the need for alignment of diagnoses and a rationale to support them, improvement in the initial psychiatric

assessment, a rationale for utilization of a spit mask during the psychiatric assessment, and an IPOC for self-harm was needed.

**Patient E**

This 62-year-old intermediate care patient had been hospitalized at the CIW-PIP since at least 2015.  Following her commitment to CDCR, she was assessed as a mentally disordered offender (MDO) and at her request remained at the CIW-PIP under Welfare and Institutions Code (WIC) 7301.  She was provided with a diagnosis of schizoaffective disorder, and was prescribed multiple psychotropic medications by a PC 2602 order.  Her healthcare record was selected from the CIW-PIP roster to assess the adequacy of care provided for maximum custody CIW-PIP patients.

The patient had a long history of mental illness and poorly controlled symptoms including response to auditory hallucinations, poor impulse control, delusional thinking, and head banging.  During the review period, her chronic symptoms and functioning varied.  Reviewed treatment plans indicated an individualized, updated summary of her functioning and IPOCs for self-harm.  The patient had regular contacts with her primary clinician, psychiatrist, and the recreation therapist.  Medications were adjusted by the psychiatrist, and clinical interventions were utilized by the clinician.  With few exceptions, documentation was clinically appropriate and provided a useful summary of the patient's symptoms and functioning.

A Positive Behavioral Support Plan (PBSP) was referenced throughout documentation but was not located in the healthcare record.  Documentation focused on the distribution of points for abstaining from maladaptive behaviors.  However, without a review of the functional analysis (frequency and maintaining factors for problematic behaviors), the clinical utility of the PBSP could not be determined.

Reviewed documentation indicated that there were two incidents of head banging that resulted in the utilization of four-point restraints on November 30, 2022 and January 9, 2023 according to a standing crisis plan which was not located in the healthcare record.  Nursing documentation reported that a doctor's order was obtained for the restraint use and IM medication for both incidents.  However, there was insufficient documentation that least restrictive interventions were utilized, and that the patient's self-harm increased to the extent of requiring IM medication administration and clinical restraint.  Specific documentation was also not located for the time the patient spent in restraints, nursing observations, and discharge criteria for restraint discontinuation.  Following both incidents, the patient was placed on suicide watch for five and at least three days, respectively; then monitoring was downgraded to suicide precaution for one day and four days, respectively.  Continuation of the suicide watch/precaution contrasted with the patient's clinical presentation.  In addition to the lack of documented rationale for continued suicide watch, rationale for property allowance was also not located in clinical documentation.  Of note, following the second incident of head banging, there was documentation of a "temporary helmet" utilized for three months, but no further documentation was located.

The patient was placed on maximum custody status after "splashing" coffee on staff on January 9, 2023, which was described in the risk assessment as "pushing/spilling her coffee in the food

port box and it getting on the staff." Maximum custody status was discontinued on February 2, 2023. Of concern, the treatment team recommended that maximum custody status be continued due to the patient's agitation during a January 25, 2023 IDTT.

Group treatment offering was insufficient. For the month of January 2023, the patient was offered five hours of group therapy. Documentation of group treatment prior to that was not located since June 2022, when she was offered one group for the entire month.

**Findings**

The care provided to this complex patient was inadequate.

Of concern was the management of this patient's self-harm. Specifically, the utilization of chemical and physical restraint and continued suicide watch absent clear clinical justification and sufficient attempts to utilize least restrictive interventions was inappropriate. Further, the standing plan to utilize clinical restraints and lack of an accompanying doctor's note and order were areas of significant concern. Any utilization of clinical restraints should be an individualized and current assessment.

Source documents that drove clinical decisions, such as the crisis plan and PBSP, should be readily accessible in the healthcare record for all staff to review.

The provision of group therapy was woefully inadequate for this patient. Further, the utilization of a helmet for a period of three months lacked sufficient clinical rationale, and the treatment team's recommendation to continue maximum custody status were additional areas of concern.

**Patient F**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient care at the CIW-PIP. This patient entered the CDCR for her first term on May 4, 2022, to serve a three-year sentence for assault with force likely to produce grave bodily harm.

Upon arrival to CDCR, she was described as highly agitated and volatile, and she reported auditory hallucinations. She was subsequently placed at the EOP level of care. The patient had several MHCB admissions and two RVRs for assault. Her most recent MHCB admission occurred from July 16 to July 27, 2022, and she was discharged to the CIW-PIP acute care on July 27, 2022. At the time of admission, she exhibited significant agitation with volatility, auditory hallucinations, and recent assaultive behavior resulting in an RVR, as well as passive suicidal ideation. She indicated that she wanted to discontinue her psychotropic medications as she believed that they worsened her mental health symptoms.

The CIW-PIP admission SRASHE assessed the patient with high chronic and low acute suicide risk; she was assessed with high chronic risk due to her history of four suicide attempts, as well a history of trauma, violence, and mental illness. She arrived at the CIW-PIP on maximum custody status; however, she was removed on August 4, 2022.

She was provided with a diagnosis of schizoaffective disorder, bipolar type. Upon admission, she was prescribed Prolixin, Zyprexa, Depakote, and Cogentin; she was reportedly adherent with her medications upon arrival and indicated her intention to continue medication adherence.

IDTTs occurred timely throughout the review period; IDTTs occurred weekly while she was provided acute care that were decreased to monthly after change to the ICF level of care on August 18, 2022. The IDTTs included the necessary participants including the patient. Treatment plans were individualized and appropriate for the patient's clinical presentation and symptoms. Goals and objectives were clear, measurable and were updated appropriately over time. This patient advanced through the STEP program, and the IDTT updated the patient's STEP status appropriately, including referral to appropriate mental health groups and programming. Discharge criteria, level of care change criteria, and salient clinical updates were clearly identified and updated appropriately over time, and the IDTT appeared to consider the patient's input and her response to treatment.

Individual PC and psychiatric contacts occurred timely and in alignment with the patient's treatment plans and contact guidelines. While at the acute level of care, individual PC contacts occurred at least several times weekly, and psychiatric contacts occurred daily during the work week. Clinical contacts continued to be appropriately scheduled and completed when this patient's level of care was reduced to ICF. While at the ICF level of care, individual PC contacts occurred at least weekly, and psychiatric contacts occurred at least every 72-hours. Most clinical contacts occurred at cell front due to the patient's refusal to leave her cell for confidential sessions despite clinician encouragement. PC progress notes reflected alignment with the treatment plans IPOCs, and the patient's status and progress toward goals were updated appropriately at each PC contact. Psychiatric progress notes documented medication adherence with good medication response and improvement in mental stability over time.

**Findings**

The care and treatment provided to this CIW-PIP patient was adequate.

IDTTs and clinical contacts occurred, and the necessary participants were present at all IDTTs. Treatment goals and objectives were individualized and measurable over time with consistency and alignment with the treatment plans. The patient progressed through the STEP process, indicating clinical improvement, and was appropriately referred to clinical, recreation, and psych tech groups. Psychiatric contacts occurred consistently with appropriate medication management. Level of care and discharge criteria were clearly identified in the treatment plans, and progress was monitored appropriately.

**Patient G**

This 33-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient care provided at the CIW-PIP. She entered the CDCR on March 29, to serve a term of 50 years to life. She was placed in alternative housing on the day of CDCR arrival due to grave disability, danger-to-others, and danger-to-self.

This CIW-PIP admission was her fourth PIP admission since incarceration. The patient was previously hospitalized in the CIW-PIP from June 1, 2017 to February 5, 2019, March 21, 2019 to July 30, 2019, and September 12, 2019 to January 17, 2020. Her most recent CIW-PIP admission occurred on April 9, 2021 for treatment at the ICF level of care due to danger-to-others and significant impairment due to mental illness after placement in the MHCB on March 24, 2021. Prior to MHCB placement, the patient was housed in the ASU at the EOP level of care where she routinely refused to engage in treatment and psychiatric care.

This patient remained at the ICF level of care at CIW-PIP since admission on April 9, 2021. She was provided with a diagnosis of schizoaffective disorder, bipolar type. She received her psychotropic medications by a PC 2602 order; those medications included Zyprexa, Haldol, Risperdal, Depakote, Benadryl, and Clozaril.

Two SRASHEs were completed during the review period, on August 12, 2022 and November 4, 2022. The August 12, 2022 routine 90-day evaluation SRASHE assessed high chronic and moderate acute suicide risk. The high chronic risk determination was based on her history of five previous suicide attempts, history of self-harm, long sentence, first prison term, and history of trauma and substance abuse. The subsequent SRASHE on November 4, 2022, provided the same risk level determinations when it was noted that the patient had difficulty with medication adherence that appeared to affect her mood and treatment participation.

IDTTs occurred timely throughout the review period and included the necessary participants, with the patient attending two of the seven IDTTs. The treatment team consistently indicated that the patient demonstrated poor insight with treatment resistant auditory hallucinations and periods of treatment nonadherence.

Treatment plan IPOCs were appropriate to the patient's clinical presentation and updated appropriately to reflect clinical functioning and mental status. For example, the patient's IPOC initially focused on reducing the patient's danger-to-others; after demonstrating no aggression towards others for the prescribed period of time, the IPOC was updated to focus on reducing the impact of auditory hallucinations on functioning. The treatment plan clinical summaries documented appropriate updates at each IDTT, and the treatment team appeared to thoughtfully consider the patient's clinical and functional status in treatment planning. The treatment team utilized the STEP program appropriately to guide the patient's programming referrals and to encourage participation in treatment.

Psychiatric contacts for this patient occurred timely and generally occurred at least every seven days throughout the review period. There were limited instances when the patient was not seen for eight days between psychiatric appointments, but this was not a frequent occurrence. The patient's medication adherence varied. Her mood symptoms appeared to respond best to Clozaril; however, her auditory hallucinations persisted despite medication treatment. The patient demonstrated increasing stability and engagement with treatment between June 1, 2022 and September 1, 2022; however, she then refused to take Clozaril after September 1, 2022 against psychiatric advice, due to side effects and ineffectiveness in reducing auditory hallucinations. The patient's mental status and functioning declined for the remainder of the

review period, as she increasingly refused to participate in groups or to leave her cell for PC or psychiatrist individual contacts.

PC contacts also generally occurred timely. She was seen at least weekly for PC contacts during the review period with limited exceptions. PC progress notes reflected that the interventions provided aligned with the treatment plans and were clinically appropriate for the patient's symptoms and presentation. The patient's group attendance and participation were inconsistent, ranging from 96 percent participation in August 2022 to zero percent participation by November 2022.

**Findings**

The care and treatment provided to this CIW-PIP patient was adequate.

IDTTs occurred timely with the necessary participants in attendance, and treatment plans were updated appropriately. The patient was also provided appropriate clinical and therapeutic interventions to address her psychiatric symptoms and difficulties. Discharge and level of care change criteria was clearly documented and appropriate. The frequency and quality of individual clinical contacts with the PC and psychiatrist were appropriate and aligned with the interventions and goals identified in the treatment plans. Review of treatment plans and progress notes indicated that the treatment team made appropriate efforts to collaboratively work with the patient on treatment planning and goals, and frequently encouraged her toward medication adherence and to leave her cell to participate in programming.

**Patient H**

This 39-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CIW-PIP. The patient had multiple CIW-PIP admissions and received MHSDS services at the 3CMS, EOP, and MHCB levels of care since entering the CDCR in October 2015. The patient was discharged from the CIW-PIP on May 17, 2022 to the PSU, but was soon referred back to the MHCB approximately two weeks later on June 3, 2022 after cutting her arm and swallowing the razor blade she used. The patient had a significant history of high-risk self-harm behaviors, poor impulse control, mood lability, and poor coping skills. This patient also had a history of suicidal ideation and of using self-injurious behaviors as a means to prevent discharge from the PIP to the EOP level of care.

The patient was most recently admitted to the CIW-PIP at the acute level of care on June 23, 2022 from the CIW MHCB for ongoing self-harm and inability to achieve stability in the MHCB. She was placed on suicide watch upon admission. She was on maximum custody status. Targeted behaviors in treatment included reducing ongoing self-injurious behavior and suicidal ideation, reducing substance abuse, and reducing aggressive behaviors toward staff and other patients that resulted in her maximum custody status.

The patient was provided with diagnoses of schizoaffective disorder, antisocial personality disorder, borderline personality disorder, PTSD and methamphetamine abuse. She was

prescribed Prolixin, Zyprexa, Cymbalta, lithium, and clonidine; Lexapro, Vistaril and Benadryl were later added.

An admission SRASHE on June 23, 2022 assessed the patient with high acute and chronic suicide risk; this was based on her significant history of self-harm, impulsivity, recklessness, and very recent self-injurious behaviors in the weeks and months prior to admission. The patient received a total of 20 SRASHEs during the review period, with chronic and acute suicide risk levels consistently assessed as high.

The patient was treated at the acute and intermediate levels of care during the review period. She was initially placed at the acute level of care upon admission on June 23, 2022, and was later reduced to the ICF level of care at the August 4, 2022 IDTT. IDTTs occurred timely at both levels of care with the necessary participants in attendance. The patient attended most IDTTs and appeared engaged with the treatment team and in treatment planning.

The treatment team primarily focused on improving coping skills and reducing the patient's self-injurious behaviors. Treatment plan clinical summaries and IPOCs documented appropriate interventions which were individualized and measurable. She was provided a PBSP that included appropriate incentives for behavior changes. The crisis plan was highly problematic in that it required the patient to immediately be placed in restraints and given an injection of psychotropic medication upon any instance of self-injurious behavior without initially attempting less restrictive or invasive interventions. The patient was placed in restraints in response to self-injurious behavior several times during the review period. The patient's level of care was appropriately reduced from acute to intermediate level of care at the August 4, 2022 IDTT after she had not engaged in self-injurious behaviors for a period of 30-days as per the treatment plan.

The patient maintained relative stability through September 2022; however, she decompensated and frequently engaged in self-injurious behavior throughout October 2022, requiring four special IDTTs. She remained at the ICF level of care throughout the remainder of the reporting period, and she continued to engage in impulsive suicidal and self-injurious behaviors as the treatment team attempted discharge. The significant majority of the patient's self-injurious and suicidal behaviors were not actual attempts to die, but rather were impulsive acts done without consideration of potential lethality.

Psychiatric contacts generally occurred timely throughout the review period. She was seen at least several times weekly while at the acute level of care and at least twice weekly while at the intermediate level of care, with isolated instances when the patient was not seen for psychiatric contact for ten to fourteen days. Review of psychiatric progress notes indicated that the patient was generally medication adherent with good insight regarding the beneficial effects of adherence.

PC contacts also occurred timely throughout the review period. Documentation indicated that the PC and patient frequently discussed and worked on objectives and goals identified in the treatment plans, and the patient's engagement was generally consistent. The patient was on maximum custody and/or solo programming status throughout the review period, and she was not assigned to groups.

**Findings**

The care and treatment provided to this CIW-PIP patient was inadequate.

The treatment team's discharge planning and preparation were premature given the patient's presentation. Additionally, less restrictive measures were not attempted regarding restraint usage. Of concern was the order to provide an intramuscular medication injection in response to any instance of self-injurious behavior.

This patient demonstrated a long and significant history of impulsive and reckless self-injurious behaviors, particularly when discussing or pending discharge from the PIP or MHCB back to the EOP level of care. Self-injurious behaviors increased in frequency as discussions regarding discharge progressed, and she was frequently placed on suicide watch and/or severe property and programming restrictions during October and November 2022. In response, the treatment team appropriately increased the frequency of clinical contacts to focus on coping skills and preparing the patient for eventual discharge; yet the treatment team continued to aggressively pursue discharge, although the patient had not met the significant treatment plan goal of abstaining from self-injurious behavior for a period of at least three months or demonstrated sufficient stability to adequately function at the EOP level of care.

Also of significant concern was that the crisis plan included in the treatment plan necessitated that the patient be immediately placed in restraints and injected with psychotropic medication for any instance of self-injurious behavior without initially attempting less restrictive or invasive measures.

**Patient I**

This 22-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CIW-PIP. This most recent admission was the patient's second CIW-PIP hospitalization since entering CDCR in January 2021. The first PIP admission occurred between July 26, 2021 and September 28, 2021; documentation indicated that the patient was focused on discharge and that the hospitalization was uneventful.

The patient was admitted to the CIW MHCB during November 2021 due to danger-to-self after ingesting 22 Keppra pills; subsequently, she was admitted to the CIW-PIP for the most recent hospitalization on November 9, 2021. Upon admission, the patient was noted with frequent agitation, history of aggressive behavior, multiple RVRs, and recent MHCB referrals due to suicidal ideation, self-injurious behavior, and suicide attempts.

The patient was provided with diagnoses of bipolar I disorder, PTSD, borderline personality disorder, and amphetamine-type substance use disorder, severe. She was prescribed asenapine, Depakote, Zyprexa, and Cogentin.

Three SRASHEs were completed during the review period, occurring on June 29, September 19, and October 3, 2022; both acute and chronic suicide risk were consistently assessed as high. The

September 19, 2022 SRASHE was completed after the patient reportedly swallowed a small rock, and the October 3, 2022 SRASHE was completed in response to the patient swallowing a toothbrush.

IDTTs occurred timely during the review period with the necessary participants in attendance, including the patient.  Ten special IDTTs occurred in response to clinical need or special events.  Treatment plan documentation noted the patient's active participation in treatment planning.  Treatment plans were individualized and clinically appropriate, with measurable objectives and goals.  Treatment plan IPOCs focused on substance use, anger, aggression, danger-to-self, and improving social skills.  The patient was appropriately offered clinical core groups and recreation groups with good attendance and participation.  A PBSP providing more clinical support and structure was initiated at a special IDTT on July 12, 2022 to address the patient's verbal aggression toward staff and other patients and appropriately included providing the patient with more groups and self-help materials. The crisis plan provided at the October 3, 2022 IDTT was highly problematic in that it ordered the patient be immediately placed in restraints and injected with psychotropic medication upon any instance of self-injurious behavior, without initially attempting less invasive or restrictive methods.  The crisis plan was activated several times during the review period, typically in response to headbanging behaviors.

Psychiatric contacts occurred timely throughout the review period, occurring at least every seven days.  The patient was generally medication adherent, and she collaborated with the psychiatrist about medication-related issues and response to treatment.

The patient was seen frequently for PC contacts throughout the review period, generally meeting in a confidential session or for cell-front check-ins at least two to three times weekly.  Documentation indicated that the patient was frequently engaged in treatment and appeared motivated toward change and clinical improvement.  The PC also appeared to closely follow the PBSP and appropriately tracked the patient's response and progress.

**Findings**

The care and treatment provided to this CIW-PIP patient was generally adequate, except for the crisis plan.

The crisis plan was concerning, as it ordered the patient to be placed in restraints and provided a medication injection immediately upon any self-injurious behavior or self-harm events without consideration of less restrictive or invasive interventions.

Other aspects of this patient's treatment were adequate and appropriate.  The patient received timely IDTTs that included the necessary participants, and the IDTT worked with the patient collaboratively with consideration of the patient's clinical presentation and treatment needs.  The patient received timely psychiatric and PC contacts, and the PC provided appropriate interventions in alignment with the treatment plan and incorporated patient feedback and response.

**Patient J**

This 38-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at CIW-PIP. The patient had a long history of incarceration and mental health treatment beginning at age 14. More recently, she was housed at CIW on September 9, 2022 prior to admission to the CIW MHCB due to danger-to-self and danger-to-others after reported suicidal ideation and command auditory hallucinations to harm clinical staff. The patient also had confusion and delirium that was monitored by the patient's mainline EOP treatment team and medical staff. She remained in the MHCB until discharge to the CIW-PIP at the ICF level of care on September 23, 2022 for further stabilization.

The patient was provided diagnoses of schizoaffective disorder, bipolar type; PTSD; antisocial personality disorder; borderline personality disorder; opioid use disorder, severe and alcohol use disorder. She was prescribed clozapine, Zyprexa, Haldol, and lithium.

An admission SRASHE assessed high chronic suicide risk based on a history of two previous suicide attempts and a long history of self-injurious behavior, and high acute suicide risk due to recent suicidal ideation, command auditory hallucinations to harm self and others, depressed mood, anxiety, and isolation/disconnection from family. No subsequent SRASHE was required during the review period.

IDTTs occurred timely, and no special IDTTs occurred during the review period. The necessary participants were in attendance, and the patient attended all but one IDTT that she missed due to custody shortage and lack of escort availability. Review of the treatment plan IPOCs and objectives revealed appropriate interventions that were measurable, objective, and individualized. Specifically, IPOCs targeted self-harm by cutting behaviors and hallucinations. The treatment plan documented the provision of ten group hours weekly, one PC contact weekly, and one psychiatric contact every seven days. Discharge and level of care reduction criteria stated in the September 26, 2022 initial treatment plan were generalized but adequate, requiring the patient to show stability for 30 days with medication adherence, with no harm to herself or others. IDTT notes documented the patient's active involvement in treatment planning and engagement with the treatment team.

PC contacts occurred timely, occurring at least weekly, and were almost always conducted in a confidential setting. PC progress notes revealed that the session's focus was consistent with the IPOCs and goals identified in the treatment plans. The interventions were applied appropriately by the clinician and specifically addressed the patient's symptoms and problem behaviors. The patient was also assigned two core clinical groups with good attendance and participation. Psychiatric contacts occurred timely throughout the review period and occurred at least every seven days. The patient was medication adherent, and she worked collaboratively with the psychiatrist to determine the most effective medication regimen. Medications were adjusted appropriately based on the patient's response and medication side effects. During the review period, the patient appeared to stabilize, and she responded well to medication management.

**Findings**

The care and treatment provided to this CIW-PIP patient was adequate.

The patient received timely IDTTs and clinical contacts throughout the review period, including individual and group contacts. The treatment plan was individualized and appropriate for the patient's needs and clinical presentation. Discharge and level of care reduction criteria were identified and were consistent with the treatment plan and the interventions provided by the clinicians. The treatment team worked collaboratively with the patient, and the treatment plan was updated appropriately as the patient's needs changed and her mental status improved.

**Patient K**

(Chart reviewed from admission on 11/8/22 - 2/15/23)

This 41-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at the CIW-PIP. This patient entered CDCR for her most recent term on October 4, 2022 at the Central California Women's Facility (CCWF) for a four-year term for assault with a deadly weapon. The patient had prior CDCR incarcerations from 2012 to 2015, 2018 to 2020, and in 2021. She had a long history of mental health treatment in the community as well as multiple MHCB placements during previous CDCR terms, and she paroled to Patton State Hospital (PSH) in 2020. She primarily received treatment at the 3CMS level of care.

The patient arrived at CDCR with a prescription for Zyprexa, but this prescription was discontinued for unclear reasons by a CDCR psychiatrist on October 10, 2022. The patient decompensated quickly and was referred to the MHCB on October 23, 2022 due to danger-to-others as she presented with agitated, threatening, and aggressive behavior, and she broke a window. She was subsequently referred to the CIW-PIP for ICF level of care on November 8, 2022.

The patient was provided with a diagnosis of bipolar I disorder, manic with psychotic features. She was prescribed Zyprexa upon admission, but she was not medication adherent. The psychiatrist initiated a nonemergent PC 2602 order upon the patient's admission to the CIW-PIP. She was also prescribed Depakene and Klonopin during this hospitalization.

An admission SRASHE on November 8, 2022 assessed low acute and chronic suicide risk. A routine 90-day ICF SRASHE was completed on February 8, 2023 that assessed moderate chronic and low acute suicide risk. The patient denied any suicidal ideation at that time, and she had not demonstrated recent evidence of suicidal intent or self-injurious behavior. The patient's symptoms appeared to stabilize, and she was programming well at the ICF level of care. IDTTs occurred timely and included the necessary participants. Four special IDTTs, including a discharge IDTT on February 14, 2023, were conducted. The patient attended all but two of her IDTTs, refusing to attend her ten-day IDTT on November 16, 2022 and not attending her December 15, 2022 IDTT because there was no officer available for escort. Review of treatment plans and IDTTs indicated the provision of appropriate goals and interventions for the patient's

clinical presentation, with IPOCs that targeted danger-to-others, ineffective coping, and maximum custody status.

The patient was placed on maximum custody status on November 17, 2022, after she presented with extreme agitation, verbally threatening to physically assault custody staff. She demonstrated extreme manic behaviors, and she had verbally threatened clinical, nursing, and custody staff. An emergency PC 2602 order was initiated, and the patient remained on maximum custody status; she was ordered to wear a spit hood and leg restraints when brought out of cell.

Another special IDTT occurred the following day on November 18, 2022, after the patient was placed on one-to-one behavioral observations the night prior after repeatedly demonstrating extreme and severe bizarre and aggressive behavior. The treatment team met with the patient for another special IDTT on November 21, 2022, after the patient had decompensated over the prior weekend and required two intramuscular injections for stabilization. At the next routine IDTT on December 15, 2022, the patient was described as improved; the behavioral one-to-one observation was removed, and aggression had reportedly decreased. The patient had also begun to participate in maximum custody groups, but she continued to demonstrate mood lability. The treatment team recommended that she remain on maximum custody status and be provided full regular maximum custody programming.

At the January 12, 2023 IDTT, the treatment team noted that over the previous 30 days, the patient had not had any episodes of self-harm or harm to others, had been removed from maximum custody status and solo programming, was programming well with other patients, and had been medication adherent. As a result of this progress, the treatment team began to prepare for discharge, with a plan to discharge the patient to CCWF to complete reception center processing if she remained stable for another 30 days. The patient demonstrated stability over those 30 days, demonstrating 100 percent group attendance and positive interactions with custody, clinical, and nursing staff. The patient reportedly acknowledged and accepted her need for treatment with psychotropic medications and was prepared to discharge to CCWF at the EOP level of care. The patient discharged from the CIW-PIP at her final ICF IDTT on February 14, 2023.

Psychiatric contacts occurred timely throughout her admission, occurring at least every seven days as per licensing flex guidelines. Although the patient was initially not medication adherent, the psychiatrist appropriately petitioned for a nonemergent PC 2602 order upon admission and subsequently petitioned for an emergency PC 2602 order when the patient decompensated and continued to refuse medications. Review of psychiatric progress notes indicated that the psychiatrist consistently encouraged the patient to adhere to medication orders and worked with the patient to address medication side effects after the patient began to take her medication voluntarily.

PC contacts occurred approximately every seven to ten days, with more frequent contacts when the patient was in periods of acute decompensation. Review of PC progress notes indicated that the PC and patient targeted the goals identified in the treatment plan, and the patient's participation and engagement with the PC improved as the patient's medication effectiveness increased.

**Findings**

The care and treatment provided to this CIW-PIP patient was adequate and appropriate.

The patient received timely and individualized IDTTs, and the treatment plans provided appropriate goals and interventions for the patient's symptoms and clinical presentation. PC and psychiatric contacts occurred timely, and the interventions provided were appropriate, including initiating petitions for nonemergent and emergent PC 2602 orders and engaging the patient appropriately to encourage medication adherence. The patient improved consistently over the course of her hospitalization, and she was appropriately discharged after demonstrating stability as specified in the treatment plans.

**Patient L**

This 58-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at CIW-PIP. Prior to admission to the CIW-PIP at the ICF level of care on November 9, 2022 for grave disability, she received mental health services at the EOP level of care at CCWF. The patient was reportedly referred to the ICF level of care after she displayed psychotic symptoms, including delusional and disorganized thinking, poor reality awareness, and hallucinations for several months prior to referral. Her symptoms reportedly did not respond fully to MHCB treatment, and she was referred to the PIP pending subsequent referral to Patton State Hospital for LRH placement. Her LRH was later changed by the IDTT to reflect the DSH recommendation that the patient was not appropriate for unlocked dorms due to her severe mental decompensation; they recommended that the patient have a period of stability at the CIW-PIP before considering unlocked dorm placement as she would likely decompensate significantly in the unlocked dorm and continue with disruptive behavior.

The patient was provided with a diagnosis of schizoaffective disorder, depressive type. She was prescribed Risperdal, Haldol, Cymbalta, Buspar, Cogentin and Vistaril.

An admission SRASHE on November 9, 2022 and a routine SRASHE on February 14, 2023 both assessed the patient with moderate chronic and low acute suicide risk.

IDTTs occurred timely with the necessary participants in attendance, including the patient who actively participated in her IDTTs and treatment planning. The goals and interventions provided were appropriate to the patient's clinical presentation and needs and included IPOCs targeting the patient's delusional thinking, ineffective coping skills, medication adherence, and substance abuse difficulties with the goal of achieving sufficient stability for placement at the LRH at PSH. The patient's goals and IPOCs were updated appropriately as the patient responded to treatment and requested additional support in certain areas. The patient advanced through the STEP program appropriately, beginning at Step 1 and progressing to Step 3 by the January 9, 2023 IDTT. Goals and discharge criteria were clearly identified, and progress toward discharge was identified at each IDTT. At the February 6, 2023 IDTT, the treatment team reported that the patient had stabilized on medication, and if she continued to program successfully for 30 days, she would be referred to PSH.

Psychiatric contacts occurred timely and occurred at least every seven days, with more frequent contacts upon admission and during medication adjustments. Review of psychiatric progress notes indicated that the patient was engaged in her treatment with the psychiatrist and was medication adherent throughout her hospitalization.

PC contacts generally occurred timely and occurred at least every seven to nine days throughout the patient's admission. Review of PC progress notes indicated alignment with the IDTT IPOCs and goals, and the interventions provided were appropriate for the patient's clinical needs. Most clinical contacts occurred in confidential settings, with nonconfidential contacts occurring due to officer shortages or other unit difficulties. The patient was referred to and participated actively in both core clinical groups, recreation therapy, and leisure groups.

**Findings**

The care and treatment provided to this CIW-PIP patient was adequate.

The patient received timely IDTTs that included the necessary participants. IDTT documentation indicated that the meetings were collaborative with the development of specific goals and interventions that were appropriate to the patient's clinical needs and presentation. Goals and interventions were updated appropriately over time to reflect improvements in the patient's clinical stability and needs. Psychiatric and PC contacts occurred timely, and interventions aligned with treatment plans. Discharge and level of care change criteria were discussed and updated at each IDTT, and it appeared from the February 6, 2023 IDTT that the patient had responded well to treatment and was preparing to discharge at the next IDTT if stability was maintained.

**Patient M**

This 38-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at CIW-PIP. Prior to her placement at the CIW-PIP, this patient was receiving treatment at the CCWF EOP.

Documentation indicated that the patient seriously assaulted her PC in the dayroom of the EOP housing unit at CCWF in May 2022 in response to command auditory hallucinations telling her to harm someone, and she was placed in EOP ASU pending adjudication of the RVR. The RVR was adjudicated in October 2022, and the patient was endorsed to the CIW PSU to serve her SHU term. She arrived at the CIW PSU on October 13, 2022, but she was quickly admitted to the MHCB on October 19, 2022 after she was observed actively responding to auditory hallucinations with yelling, as well as command auditory hallucinations to harm others. The patient was released from maximum custody status at her ICC on October 20, 2022.

The patient was retained in the MHCB, as she was prescribed Clozaril upon admission; the treatment team recommended that the patient be retained in an inpatient setting to appropriately titrate Clozaril to clinically effective levels and to determine the effectiveness of the medications in decreasing the command auditory hallucinations. The treatment team noted significant

concerns regarding the patient's serious history of staff assault and endorsement of command auditory hallucinations telling her to physically strike others, as well as her delusional thinking and dysregulated emotions. For this reason, the patient was admitted to the CIW-PIP at the ICF level of care on November 8, 2022 due to danger-to-others and grave disability, with primary treatment goals of reducing command auditory hallucinations and disorganized thinking and to decrease risk of violence towards others.

The patient was provided with a diagnoses of schizophrenia. She was prescribed Clozaril, Haldol, Zyprexa, Depakote, Vistaril and propranolol.

An admission SRASHE on November 10, 2022 assessed high chronic and low to moderate acute suicide risk. Several significant protective factors were noted, including family support, desire to see her children, and her upcoming release date in the spring or summer 2023. A routine 90-day SRASHE was completed on February 1, 2023 that assessed high chronic and low acute suicide risk.

The patient was reportedly medication adherent, although she continued to display psychotic symptoms and to endorse anxiety related to her upcoming release date. Despite this, the IDTT indicated that the patient demonstrated the ability to maintain safety with no self-harm, and she was future-oriented, active, and motivated in her treatment.

IDTTs occurred timely with the necessary participants in attendance. The patient attended three of five IDTTs since her admission on November 9, 2022. She was absent for her initial ICF IDTT because she was at an outside hospital due to chest pain, and she was absent for the December 13, 2022 IDTT due COVID-19 isolation. The treatment plan IPOCs were individualized and identified appropriate clinical interventions and goals for the patient's clinical needs and presentation. The treatment plan contained IPOCs focused on reducing the patient's hallucinations, danger-to-others, ineffective coping, and medication adherence. The planned frequency of mental health contacts was appropriate, and the patient was referred for groups appropriately. Review of IDTTs indicated that the patient demonstrated increasing stability and overall positive response to treatment during her hospitalization, and IPOCs were updated appropriately.

At the February 7, 2023 IDTT, the patient reportedly participated well in her treatment by attending groups and individual sessions; she had not engaged in harm to others or herself, and she had good medication adherence and group participation with improved social interactions. She, however, continued to report command auditory hallucinations, and she was observed responding to internal stimuli on multiple occasions with yelling, cursing, crying, and slapping herself. At that IDTT, the treatment team discussed the patient's upcoming release date of March 16, 2023, and that she would likely require hospitalization at Patton State Hospital for further treatment and stabilization. The patient reportedly expressed disappointment that she was not going to Ohio to be with her family, but she understood the need for further inpatient treatment.

Psychiatric contacts occurred timely throughout the review period. Psychiatric contacts did not always occur in confidential settings, and progress notes indicated that some of the nonconfidential contacts were due to "psychiatrist preference." Psychiatric contacts occurred

three times weekly for the first two months of the patient's hospitalization, then contacts were appropriately reduced to every seven days by the treatment team when her response to medication improved, and her presentation stabilized. Review of psychiatric progress notes indicated the patient worked collaboratively with the psychiatrist; medications were reviewed with the patient, and patient input was considered in medication management.

PC contacts generally occurred timely, and the patient was usually seen for individual weekly sessions. Most PC contacts occurred in a confidential setting, except for periods of COVID-19 isolation status that included daily cell-front check-ins. Review of PC progress notes indicated that the PC and patient focused their sessions on the goals and objectives identified in the treatment plans, and progress was tracked appropriately over time. The clinical interventions provided to the patient, such as teaching anger management techniques, maintaining a voices journal, and using earplugs to help quiet the voices, were individualized and appropriate for this patient's clinical needs.

**Findings**

The care and mental health treatment provided to this CIW-PIP patient was adequate.
The patient received timely and appropriate clinical contacts with members of her treatment team. IDTTs occurred timely, were collaborative, and addressed the patient's clinical needs appropriately. Discharge criteria and goals were appropriate, clearly stated, and individualized; and as the patient approached her parole date and had not yet achieved adequate clinical stability, she was appropriately referred for ongoing inpatient treatment at PSH. Clinical contacts with the PC and psychiatrist occurred timely, and the interventions provided were appropriate and individualized,. The patient was medication adherent, and the medication regimen appeared effective in reducing the patient's acute symptoms and complimented the coping tools and techniques developed with the PC.

**Patient N**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at CIW-PIP. The patient entered CDCR on August 3, 2022 at CCWF, and she was placed at the EOP level of care on August 3, 2022. She was referred to the MHCB for grave disability and indecent exposure on September 21, 2022. The healthcare record referenced an inpatient consult note that stated that the patient exhibited odd behavior such as taking food from the trash, had poor ADLs and hygiene, was malodorous, and was observed wandering lost in the yard. She had also refused psychotropic medications since her arrival to CDCR. She was admitted to the CIW-PIP at the ICF level of care on October 5, 2022.

The patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder; bipolar disorder, unspecified; cannabis use disorder, severe and amphetamine use disorder, severe. The patient received her psychotropic medications by a PC 2602 order for grave disability and danger-to-self. She was prescribed Zyprexa, Depakote, and Prolixin. Two SRASHEs were completed during this hospitalization, appropriately administered at intake and discharge; both assessed low chronic and acute suicide risk.

IDTTs occurred timely, and no special IDTTs were required. The necessary participants were present at the IDTTs. Although the patient refused to attend her initial and ten-day IDTTs, her clinical presentation improved in response to medications, and she attended and participated in her remaining IDTTs on November 7 and December 5, 2022. Review of treatment plans indicated that the treatment team developed IPOCs focused on encouraging the patient to engage in treatment, to improve insight regarding her mental illness, to improve her functioning, ADLs and coping skills, and to prepare for discharge and parole on January 3, 2023. Review of IDTT notes indicated that the patient responded well to medication treatment, but her insight remained very poor, and she did not connect her improvement to medication adherence. She also attended groups but was not an active participant. The patient advanced through the STEP program appropriately as she responded to treatment, and she was placed at STEP 3 at her final IDTT on December 5, 2022. The treatment team noted, however, that the patient had not met her treatment goals prior to parole. The treatment plan noted that the patient requested referral to a community program post-parole.

Psychiatric contacts occurred timely, initially occurring every two to three days and then every seven days as the patient responded to medications and her symptoms stabilized. Review of psychiatric progress notes indicated that the patient had very little to no insight regarding her mental illness and did not acknowledge the potential or actual benefits of medication treatment. She was generally medication adherent with the assistance of the PC 2602 order; however, a PC note on December 29, 2022, only a few days prior to patient's parole, indicated that the patient had been cheeking her medications, and she continued to demonstrate poor insight. The psychiatrist appropriately changed her medications as the patient approached discharge, titrating her off Depakote and Zyprexa and initiating treatment with Prolixin for eventual placement on a long-acting injection, as the patient was not likely to be medication adherent with oral medications after parole.

PC contacts generally occurred timely, with limited exceptions when eight to eleven days lapsed between contacts despite the treatment plan prescribing weekly PC contacts. Review of PC progress notes indicated that the PC provided appropriate engagement and support for this patient, and the focus of PC sessions aligned with the treatment plan's goals and interventions. Throughout her hospitalization, the patient remained with extremely poor insight, and she constantly persevered on discharge and return to CCWF. The patient paroled on January 3, 2023, prior to achievement of her treatment goals; however, the treatment team appeared to make appropriate efforts to prepare the patient for discharge and parole.

**Findings**

The care and treatment provided to this CIW-PIP patient was adequate.

Although her hospitalization at the CIW-PIP was brief, the treatment team provided timely and appropriate clinical interventions to support recovery and made efforts to prepare her for discharge and parole. IDTTs were collaborative, and the treatment plans, goals, and interventions were individualized to the patient's needs. Discharge planning was appropriately modified as the patient's disposition changed, and her parole date approached. Although she continued to demonstrate poor insight and medication nonadherence immediately prior to

discharge, the treatment team provided an adequate discharge plan that included changing the patient's medication from oral to injectable form to encourage adherence and to assist with connecting the patient to an outpatient community program.

**Patient O**

This 31-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at CIW-PIP. The patient was discharged from the CIW MHCB to the CIW-PIP acute care on maximum custody status on November 29, 2022 for further inpatient treatment and stabilization. The patient had a long history of mental illness and multiple suicide attempts, MHCB admissions, and one prior CIW-PIP admission. Most recently, an inpatient consult note dated November 23, 2022 indicated that the patient was referred to the MHCB due to two suicide attempts within a 24-hour period, involving strangulation, erratic behaviors, impulsive actions, and recklessness. Both suicide attempts just prior to the MHCB admission involved strangulation, requiring treatment at an outside hospital. The first attempt occurred on November 21, 2022, when the patient attempted to hang herself with a piece of fabric while in the holding module while awaiting transport to the CIW MHCB. The second attempt occurred on November 22, 2022, when the patient was found unresponsive in the van entering the sally port at CIW, and officers found her with the seatbelt wrapped around her neck. The MHCB treatment team agreed that the patient required stabilization and treatment at the ICF level of care in a single cell.

The patient was provided with diagnoses of borderline personality disorder; bipolar II disorder; cannabis dependence; major depressive disorder, recurrent episode, severe, and PTSD. She was placed on an emergent PC 2602 order on November 23, 2022, and she was prescribed Risperdal, Prolixin, Effexor, Buspar, Zyprexa, Keppra, Lexapro, Prazosin, and propranolol.

An admission SRASHE on December 2, 2022 assessed high chronic and acute suicide risk. The high chronic risk assessment was due to the patient's long history of suicide attempts and self-harm, history of childhood trauma and abuse, history of substance abuse, history of psychiatric illness, and current single-cell placement. The high acute risk assessment was due to two recent suicide attempts, recent anxiety, depression, hopelessness, and agitation. Several protective factors were also identified, including family support, children at home, and positive coping skills.

IDTTs occurred timely, and the patient did not require any special IDTTs. At the 72-hour IDTT on December 2, 2022, the patient reportedly told the treatment team that she was happy the suicide attempt was unsuccessful; at that time, her mental status was described as normal. At the patient's ten-day IDTT on December 8, 2022, the treatment team reported that the patient appeared with improved symptoms with treatment and medication adherence. She was appropriately placed at the ICF level of care at that IDTT, and subsequent IDTTs occurred monthly on December 28, 2022, January 27, 2023, and February 22, 2023.

The patient was removed from maximum custody status at the ICC on December 22, 2022. Review of subsequent IDTTs and treatment plans indicated that the IPOCs and related goals and interventions were appropriate for this patient's clinical needs and presentation. IPOCs targeted

self-harm behaviors, poor coping skills, medication adherence, substance abuse, and discharge planning. The patient was referred to core clinical groups that were appropriate for her clinical needs; she was seen consistently for individual PC contacts, and she had responded well to treatment since admission.  The patient advanced appropriately through the STEP program and was placed at STEP 3 with no restrictions at the most recent IDTT on February 22, 2023.  At that same IDTT, the treatment team noted that the patient had demonstrated ongoing stability and positive response to treatment, and the team would consider discharge to the EOP level of care at the next 30-day IDTT if stability continued.

PC and psychiatric contacts occurred timely throughout the review period.  The patient was seen by a psychiatrist at least every two to three days at initial admission and while at the acute level of care; contacts were reduced to every seven days as per guidelines and licensing flex once the patient's level of care was changed to ICF and her stability improved.  Review of psychiatric progress notes indicated that the patient was medication adherent, was responding well to medications, and actively participated in the treatment process.  PC contacts generally occurred weekly, with one isolated instance when nine days lapsed between contacts.  Review of PC progress notes indicated that the interventions provided by the PC aligned with treatment plan IPOCs, and progress was tracked appropriately.

**Findings**

The care and treatment provided to this CIW-PIP patient was adequate.

This patient was seen timely for IDTTs, psychiatric, PC, and recreation therapy contacts.  Clinical interventions and goals provided were individualized, appropriate, and measurable.  Discharge and level of care criteria were clearly identified, and treatment was targeted toward meeting these criteria.  The patient appeared to respond well to treatment, was an active participant in treatment, and the treatment team planned to consider discharge to the EOP level of care at the next 30-day IDTT in March 2023.

**Patient P**

This 61-year-old patient was randomly selected for healthcare record review to assess the quality of acute and intermediate care provided at the CIW-PIP.  The patient's custody status was Medium A.

During prior incarcerations, the patient had a history of treatment at the EOP level of care.  The patient's most recent period of incarceration began in September 2022.  The patient initially received mental health services at the 3CMS level of care.  On October 10. 2022, the patient received two RVRs for battery on a prisoner and property destruction, and she was subsequently admitted to the MHCB level of care.  The MHCB referred the patient to the acute level of care due to paranoia, agitation, and aggression.  The patient was admitted to the CIW-PIP on October 20, 2022.

The most recent SRASHE, dated January 20, 2023, assessed low acute and chronic suicide risk.

Psychiatric diagnoses included schizophrenia and substance use disorder. Prescribed medications included olanzapine, an antipsychotic medication; divalproex, a mood stabilizing medication, and as needed hydroxyzine for anxiety. The MHCB team initiated an emergent involuntary medication petition under the PC 2602 process due to danger-to-others.

The initial evaluation by the PC and psychiatrist occurred timely prior to the initial IDTT. The psychiatric evaluation contained sufficient clinical information to formulate a clear clinical picture of the patient. The psychiatrist did not enter the patient's diagnosis in the note. Instead, there was a section in the note that pulled diagnoses and problems from a list. This issue occurred as well when this psychiatrist saw the patient on future visits.

Routine contacts with the psychiatrist and PC overall occurred timely. The psychiatrist appropriately adjusted the patient's doses of olanzapine and divalproex. The PC saw the patient regularly. Some PC notes stated, "IP seen today," but did not indicate whether the visits occurred in a confidential setting.

The patient attended most IDTTs. When she did not attend, the reason listed was patient refusal. The IDTTs treatment targets included reducing hallucinations and feelings of distress, as well as adherence with prescribed medications. Treatment plan documentation included a statement that if the patient did not follow the rules in the PIP, she could lose privileges or be reduced in the STEP program without a special IDTT being held. No treatment goals regarding aggression were documented; despite, the patient's history of aggressive behavior. The patient was offered but initially refused to attend groups; however, no goal regarding increasing group attendance was documented.

The patient was discharged from the acute level of care to the intermediate level of care on or around October 28, 2022. Given her history of aggression pre-dating the CIW-PIP admission, the patient remained on single-cell status.

The patient made gradual clinical improvement. The psychiatric discharge summary noted the patient's substantial improvement by the time of discharge.

On January 19, 2023, the patient discharged to CCWF at the EOP level of care, where she remained at the time of review.

**Findings**

The care provided to this CIW-PIP patient treated at the acute and intermediate levels of care was adequate.

Notes clearly documented that the patient made substantial improvements while treated at the CIW-PIP. The psychiatrist documented the rationale for medication treatment. Additionally, the psychiatrist appropriately monitored for and addressed medication side effects.

Deficiencies included the initial psychiatric evaluation and some psychiatric notes not directly listing the patient's diagnosis. The diagnoses were pulled forward from a master diagnosis list.

This rendered determining which diagnoses the psychiatrist was actively treating exceedingly difficult. IPOCs were not clearly in alignment with treatment needs identified during initial assessments. Of note, despite the patient having recent aggression towards people and property, which led the treatment team to determine that she needed to remain on single-cell status, there were no treatment goals specific to aggression or violence. IPOCs were insufficiently updated to address changes in patient's treatment needs during routine IDTTs.

**Patient Q**

This 34-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at CIW-PIP. The patient was initially on maximum custody status but was subsequently lowered to Medium A.

During prior incarcerations, the patient was treated at the 3CMS level of care. The most recent CDCR incarceration began in March 2020. The patient had two prior episodes of treatment at the MHCB level of care, in March 2021 and April 2021. After that most recent discharge, the patient was treated at the EOP level of care until admission to the intermediate level of care on January 24, 2022. The patient was admitted to the intermediate level of care due to auditory hallucinations telling her to hurt others. The patient had no prior treatment at either the intermediate or the acute levels of care.

The most recent SRASHE, dated December 23, 2022, assessed high chronic and moderate acute suicide risk. She had four prior suicide attempts, by laceration and asphyxiation.

She was provided with a diagnosis of schizophrenia.

The patient was prescribed aripiprazole, fluphenazine, olanzapine, paliperidone, and thiothixene all antipsychotic medications and buspirone, an antianxiety medication. Relevant medications prescribed by the primary care doctor included levetiracetam for seizure disorder. The patient received her psychotropic medications by the PC 2602 process due to danger-to-others.

The initial evaluations by the PC and the psychiatrist occurred timely prior to the initial IDTT. The PC evaluation contained useful clinical information; however, this information was diluted and diminished in utility by the amount of information carried over from the patient's prior treatment at other levels of care. The initial psychiatric evaluation was appropriate and contained sufficient information to support the diagnosis. The medication management was complex, yet justified, due to the refractory nature of the patient's psychotic symptoms.

The patient was unable to attend her initial treatment team meeting due to lack of custody officers for escort. As was noted with other CIW-PIP patients reviewed, the IDTT stated that the patient could lose privileges without holding a special IDTT.

Routine contacts with the psychiatrist and PC occurred timely. Multiple individual sessions with the psychiatrist and PC were conducted at cell front. The patient was unable to attend some treatment team meetings; both occurrences were reportedly due to the lack of custody escort officers.

413

The psychiatrist made multiple medication adjustments, and clearly documented the rationale for those changes. The psychiatrist repeatedly discussed a trial of treatment with the antipsychotic medication clozapine with the patient; however, the patient repeatedly declined.

The patient had multiple safety issues during her treatment at the CIW-PIP. On June 21, 2022, she tied a sheet around her neck. On June 30, 2022, she cut herself with a razor. On February 16, 2023, the correctional officers found 164 pills in her room; most of these were the medication used to treat her seizure disorder, and the remaining were antipsychotic and antianxiety medications. The patient denied that she was planning to overdose utilizing the hoarded medications.

At the time of review, the patient remained at the CIW-PIP at the intermediate level of care.

**Findings**

The care provided to this CIW-PIP patient treated at the intermediate level of care was inadequate.

The PCs notes were often vague, and did not clearly link back to stated treatment team goals. Additionally, the notes from the PC did not demonstrate interventions to achieve stated treatment plan goals. Despite limited progress toward some goals, the treatment team did not meaningfully update or revise those goals and interventions.

The medication management for this patient appeared adequate. The psychiatrist clearly documented the rationale for appropriate medication changes.

The lack of sufficient custody officers significantly impaired the patient's treatment. The patient was unable to attend multiple IDTTs, including her initial and a special IDTT called due to the patient harming herself on the unit. Furthermore, multiple session with the psychiatrist and the PC occurred at cell front.

Most concerning, the patient was able to hoard a supply of 164 pills in her room. While the monitor's expert understood that patients sometimes hid medications and pretended to take them (so-called "cheeking"), this did not explain why staff did not discover this issue sooner. This posed a serious risk to the patient. Additionally, this posed a risk to other patients on the unit, as the patient could have given these pills to another patient on the unit. Moreover, the patient had a high degree of impulsivity and behavioral dysregulation, and if the patient were altered by taking medications in a manner not prescribed, this could pose risk for the safety of patients and staff on the unit.

**Patient R**

This 34-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CIW-PIP. The patient was originally on maximum custody status but was reduced to Medium A during her treatment at the intermediate level of care.

The patient's incarceration began on or about July 7, 2022. She was included in the 3CMS level of care soon after incarceration; then she subsequently required transfer to the MHCB level of care from August 31 to September 8, 2022. The patient discharged from the MHCB to the ASU at the EOP level of care. She subsequently transferred to the PSU on November 3, 2022. On November 21, 2022, she once again required admission to the MHCB. Her treatment team increased her level of care to intermediate, and she was admitted to the CIW-PIP on November 30, 2022.

The most recent SRASHE, dated February 27, 2023, assessed moderate chronic and low acute suicide risk. The patient had one prior suicide attempt by hanging in 2015.

She was provided with diagnoses of schizophrenia, alcohol use disorder, and methamphetamine use disorder.

The patient had no history of receiving involuntary medications under the PC 2602 process; however, the MHCB treatment team submitted a petition for a PC 2602 order prior to the patient transferring to the intermediate level of care.

The PC met with the patient prior to the initial IDTT; however, the full evaluation was not completed until one week after the initial IDTT, and nine days after the patient was admitted to the CIW-PIP. The initial evaluation by the psychiatrist occurred timely and was comprehensive; however, due to an issue concerning the way the electronic healthcare record displayed diagnoses, the exact patient diagnosis was unclear.

The initial IDTT occurred timely; however, it did not occur in a nonconfidential setting and occurred at cell front due to a lack of custody escort officers. Portions of the treatment plan were carried forward from when patient was at the MHCB level of care. Unfortunately, this included important sections such as the case formulation. While some goals were reasonable, such as reducing thoughts of harming others, others appeared to be from a template. Examples of this included goals of identifying ways to improve decision-making and positive coping skills; both were not completed appropriately. Other goals appeared generic. An example of this included the patient maintaining sobriety between treatment team intervals, despite the patient being in a PIP setting.

Routine contacts with the psychiatrist and PC generally occurred timely.

The psychiatrist appropriately adjusted medications and dosages. Positive aspects included close monitoring for side effects with medication adjustments to address these symptoms. Additionally, the psychiatrist worked collaboratively with the patient. One example of this was when the patient declined one mood stabilizing medication but was willing to take another; the psychiatrist subsequently changed to the option that the patient was willing to take, which was an equally logical medication choice. The notes contained information which appeared to have been carried forward. Thus, the plan for one note listed a prior medication that the psychiatrist had already changed. Additional difficulties arose regarding the dosing of lithium. On December 19, 2022, the psychiatrist stated that they would increase the lithium dosage due to a

low blood level; however, this did not occur. Subsequent notes indicated continuation of the lower lithium dosage, despite noting the subtherapeutic lithium blood level.

The PC notes frequently brought forward historic information that was not clinically relevant to the current presentation. An example of this was repeating the previous plan to "build rapport," despite the patient's treatment at the intermediate level of care for a protracted period. Similar issues were noted regarding "beginning" to work on anger and distress tolerance.

This carry-over issue also appeared in treatment team notes. The goals were carried forward and not meaningfully updated. Of note were the blank spaces on the templated treatment goals that remained for months. While it was admirable that the team incorporated substance abuse into the treatment plan, goals appeared to be generic and not specific for the patient. One example was "patient will demonstrate a (sic) improvement in maintenance of sobriety across treatment team intervals." The treatment plan case formulation was simply the case formulation from a prior level of care with a statement that it had been reviewed.

The patient remained hospitalized at the CIW-PIP at the intermediate level of care at the time of this review.

**Findings**

The care provided to this CIW-PIP patient treated at the intermediate level of care was inadequate.

Treatment plan clinical summaries and case formulations lacked sufficient documentation of current symptoms, functional impairments, relevant treatment history, and treatment response. Instead, documentation focused on historical information, which reflected outdated information from the patient's prior treatment at other levels of care. Many treatment goals were generic and templated, with blanks spaces rather than goals. With rare exception, the notes from the PC did not clearly link to established treatment plan goals, or consistently demonstrate interventions to achieve these stated goals. The notes documented an overall lack of evidenced-based interventions.

Regarding psychiatric care, medication management was adequate, yet with limitations. These limitations included not making medication changes stated in the plan section of the note, and notes containing an outdated list of medications.

Both PC notes, and to a lesser extent psychiatric notes, had information carried over from prior notes. This led to patient safety issues, such as a covering psychiatrist having the wrong medications listed in their plan.

Finally, inadequate custody staffing compromised the confidentiality of some individual sessions and treatment team meetings.

**Patient S**

This 33-year-old patient was randomly selected for healthcare record review to assess the quality of acute and intermediate care provided at the CIW-PIP. The patient was Medium A custody level.

The patient's CDCR incarceration began in 2013. She had a history of treatment at the 3CMS, EOP, intermediate, and acute levels of care. The patient also had brief periods when she was not included in the MHSDS.

The patient's most recent MHCB placement occurred from August 18 to August 29, 2022; subsequently, she was admitted to the CIW-PIP at the acute level of care. On August 31, 2022, the patient transitioned to the intermediate level of care.

The patient also received treatment at the acute level of care at CIW-PIP briefly in June 2020. She then transferred to the intermediate level of care at Patton State Hospital. She was also treated at the intermediate level of care from February to June 2022.

The most recent SRASHE, dated January 13, 2023, assessed high chronic and acute suicide risk. The patient had multiple instances of suicide attempts and self-injurious behavior. The last documented suicide attempt occurred in May 2020 by overdose. The last self-injurious behavior occurred on January 12, 2023, by banging her head.

While at the CIW-PIP, the patient had multiple episodes of self-injurious behavior, including swallowing a portion of a toothbrush (September 8, 2022), cutting her wrist (January 3, 2023 and January 6, 2023), punching a wall (January 6, 2023), and banging her head (January 12, 2023). This last episode of headbanging resulted in the use of restraints.

The patient's course of treatment at the intermediate level of care was complicated by medical issues. From September 12 to October 3, 2022, she was hospitalized in the CTC for COVID-19 treatment. During that time, the CIW-PIP treatment team continued to follow the patient.

The patient was provided with diagnoses of schizoaffective disorder, depressed type, borderline personality disorder, and amphetamine-type substance use disorder.

She was prescribed haloperidol, olanzapine, risperidone, fluphenazine, all antipsychotic medications; lithium for mood stabilization; sertraline, an antidepressant and antianxiety medication; and diphenhydramine and benztropine, used to treat side effects from antipsychotic medications.

The patient had no prior history of receiving involuntary medications by the PC 2602 process. The treatment team filed for a non-emergent PC 2602 order on February 9, 2023, due to danger-to-self.

The initial PC and psychiatric evaluations occurred timely prior to the initial IDTT.

Routine contacts with the psychiatrist and PC largely occurred timely during the initial portion of the patient's stay. Unfortunately, later, the psychiatric contacts did not occur timely. As an example, despite the treatment plan stating that the patient would see the psychiatrist every 72 hours, there was a two-week period from February 14 to February 28, 2023, without documented psychiatric contact.

The psychiatrist made multiple medication adjustments. On October 10, 2022, the psychiatrist had to lower the medication doses due to electrocardiogram (EKG) changes that were possibly medication related.

The PC documentation included multiple carry over information which led to inaccurate crucial clinical information, such as the patient's last episode of self-injury. Despite a well-documented history of emotional dysregulation due to family issues, the PC performed a non-confidential, cell-front session to discuss difficult family news involving the death of a family member.

The patient attended her IDTTs. As was noted in the treatment of other CIW-PIP patients, the IDTT stated that the patient could have privileges revoked and lose a STEP without holding a special IDTT.

The IDTT documentation also suffered from unclear carry over of prior information. As much of this information was from treatment at other levels of care or treatment from prior hospitalizations, the documentation was unclear. As one example, the case formulation stated an incorrect reason for admission, and this appeared to be the reason for a prior hospitalization.

Treatment plan goals involved increased coping skills and reduced frequency of swallowing foreign bodies. Of note, the team clearly documented which groups the patient should receive, which appeared appropriate based on the patient's presentation. IDTT documentation also contained incorrect information. The IDTT documentation stated that the patient was not housed at her LRH, when in fact, the patient was housed at her LRH.

At the time of review, the patient remained hospitalized at the CIW-PIP receiving mental health services at the intermediate level of care.

**Findings**

The care provided to this CIW-PIP patient treated at the acute and intermediate levels of care was inadequate.

Given the patient's degree of poor frustration tolerance and self-injury including multiple incidents while in the CIW-PIP, the patient clearly needed a behavior plan, such as one crafted by a PBST. Without adequate psychological and behavioral interventions, the patient continued to have ongoing dysregulation. This resulted in the psychiatrist, problematically but understandably, trying to address these behaviors with medications. While it was unclear what the underlying etiology was, the patient was prescribed multiple medications with potential cardiac side effects. The psychiatrist had to discontinue one of these medications after the patient presented with cardiac concerns.

There was a two-week lapse in documented psychiatric contact. This occurred despite the treatment plan stating that the psychiatrist would see the patient every 72 hours, the patient having multiple episodes of self-injury while in the CIW-PIP, and the patient being assessed with high acute suicide risk by the last SRASHE.

**Patient T**

This 50-year-old patient was randomly selected for healthcare record review to assess the quality of acute and intermediate care provided at the CIW-PIP.

The patient's incarceration began in or around 1992. Since that time, the patient received treatment at the 3CMS, EOP, MHCB, intermediate, and acute levels of care.

The patient had multiple MHCB stays. In March 2021, the MHCB stay led to treatment at the CIW-PIP. The patient transitioned to the acute level care followed by the intermediate level of care, where she received treatment from March 29, 2021 through October 11, 2022. She was discharged to the EOP level of care.

On November 30, 2022, the patient required admission to the MHCB due to the ingestion of several foreign bodies requiring surgical removal. After treatment in the MHCB, the patient transferred to the acute level of care, where she received treatment from December 7, 2022 to December 27, 2022. She transferred to the intermediate level of care, where she remained at the time of review. Of note, the patient required treatment at an outside hospital from February 6 to February 15, 2023. She subsequently required placement in the CTC for medical reasons from February 15 to February 22, 2023. The PIP team continued to follow the patient during that time.

The most recent SRASHE, dated December 7, 2022, assessed high chronic and acute suicide risk. The patient had a history of multiple suicide attempts, generally by pills or overdose. Additionally, she had a history of foreign body ingestion.

The patient was provided with diagnoses of schizoaffective disorder, antisocial personality disorder, eating disorder, and substance use disorder.

The patient received psychotropic medications by a PC 2602 order since at least 2017 for danger-to-self.

She was prescribed fluphenazine, olanzapine, risperidone, all antipsychotics medications; lithium for mood stabilization; venlafaxine and escitalopram, antidepressant and antianxiety medications; trazodone, an antidepressant medication often used to treat insomnia; benztropine for side effects of antipsychotics, and diphenhydramine as needed for anxiety. Relevant medical medications included buprenorphine for treatment of opioid use disorder.

The initial evaluation by the psychiatrist occurred timely prior to the initial IDTT. The initial PC evaluation was completed one week after admission. The psychiatrist made multiple

adjustments to the patient's medication regimen.  Routine contacts with the psychiatrist and PC overall occurred timely.

The initial IDTT occurred timely; the patient was not present due to a lack of correctional officers for escort.  The case formulation was carried forward from prior treatment plans and stated that the patient would remain in the EOP with a goal "to continue her success in EOP" level of care, despite her current PIP inpatient treatment placement.

The treatment plans were internally inconsistent.  For example, the IDTT on December 15, 2022, stated that the patient was not cleared to attend groups; however, in planned treatment, it stated that she would attend three groups per week.

Treatment goals included reducing foreign body ingestion to less than two times per month.  Many of the other goals appeared generic and not patient specific, such as working on coping skills.  Many clinical summaries from the treatment team were more consistent with a mental status examination, rather than a robust summary of the patient since the time of the last IDTT.

On February 6, 2023, the patient was found unresponsive with blue lips.  Her oxygen level was dangerously low.  The patient was sent emergently to an outside hospital, where she remained until February 16, 2023.  The diagnosis was respiratory failure and pneumonia.  The exact etiology was unclear.  The patient was then admitted to the CTC for ongoing medical care, with the PIP team continuing to treat her there.

At the time of this review, the patient remained hospitalized at the CIW-PIP at the intermediate level of care.

**Findings**

The care provided to this CIW-PIP patient treated at the acute and intermediate levels of care was inadequate.

The most recent SRASHE assessed high acute and chronic suicide risk.  Additionally, the patient received involuntary medications by a PC 2602 order for danger-to-self.  For these reasons, it was unclear why the treatment team did not perform a repeat SRASHE prior to changing the patient from the acute to the intermediate level of care.

The psychiatrist treated the patient with multiple medications from the same medication class at the same time.  Examples of this included the use of three antipsychotic medications, and two closely related antidepressant medications, all simultaneously.  The monitor's expert acknowledged the challenging nature of this case; and yet, the monitor's expert was concerned about the use of multiple medications with cardiovascular and respiratory side effects, especially given the patient's recent treatment for respiratory failure.

While the treatment team referred to a foreign body ingestion protocol, the absence of a comprehensive behavioral plan, such as those created by a PBST, was concerning.  This patient required major surgery to address her ingestion of foreign bodies.  The records suggested that the

patient might have benefited from a comprehensive, behaviorally based program such as DBT. Many of the patient's challenges appeared to have been more appropriate for behavioral, rather than medication, treatments.

**Patient U**

This 33-year-old transgender patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at the CIW-PIP. The patient was Medium A custody level.

His incarceration began in 2012. Since that time, the patient had a complex placement history. The patient was placed at the 3CMS level of care soon after arrival to CDCR. Since that time, he received treatment at the 3CMS, EOP, MHCB, intermediate, and acute levels of care.

The patient was treated at the acute level of care in 2016, followed by treatment at the intermediate level of care. The patient had a history of suicide attempts and self-injurious behavior, primarily by laceration.

He had received treatment at the intermediate level of care since June 16, 2022. The reason for admission was repeated MHCB stays within a short period of time.

The most recent SRASHE, dated January 25, 2023, assessed high chronic and moderate acute suicide risk.

The patient was provided with diagnoses of schizoaffective disorder, bipolar type, and substance use disorders.

He had no history of receiving involuntary medications by the PC 2602 process.

The patient was prescribed fluphenazine, haloperidol, olanzapine, and quetiapine, all antipsychotic medications; lithium and oxcarbazepine, mood stabilizing medications; mirtazapine, an antidepressant and antianxiety medication; buspirone, an antianxiety medication; propranolol and benztropine, for medication side effects; and hydroxyzine on an as needed basis for anxiety.

The initial evaluations, initial IDTT, and routine contacts with the psychiatrist and PC occurred timely. The IDTT's treatment targets were not updated with the evolving clinical picture of the patient. As an example, despite the patient no longer reporting suicidal ideation, the goal of reducing suicidal thoughts below a certain number remained. The treatment goals centered around coping skills, and this section contained blank spaces, as was seen in other reviewed cases.

The psychiatrist made multiple medication adjustments to address the patient's psychosis and mood instability. The psychiatrist regularly revisited the option of the patient taking clozapine; however, the patient declined.

The PC worked with the patient regarding depression, psychosis, and suicidal thoughts.

The patient transferred from the CIW-PIP intermediate level of care to the intermediate level of care at Patton State Hospital on January 26, 2023. At the time of review, the patient remained hospitalized at the intermediate level of care.

**Findings**

The care provided to this CIW-PIP patient treated at the intermediate level of care was adequate.

While the overall care provided was adequate, documentation issues were pervasive. Treatment plan goals were not updated as the patient's clinical status evolved. Blank spaces in the treatment plan from a template remained for months.

The psychiatrist provided complex medication management. While the psychiatrist performed monitoring as required, the expert opined that more assertive monitoring of the EKG would have been preferred, as the patient was prescribed several medications with potential cardiac effects.

The expert noted that the treatment team regularly revisited the patient's LRH, including submitting multiple reviews for transition to a less restrictive housing environment, specifically Patton State Hospital.

**Patient V**

This 42-year-old transgender patient was randomly selected for healthcare record review to assess the quality of acute and intermediate care provided at the CIW-PIP.

The patient's CDCR incarceration began in 2013. Since that time, the patient had a complex placement history, including treatment at the 3CMS, EOP, MHCB, and intermediate levels of care. He had no prior treatment at the acute level of care.

While treated at the 3CMS level of care, the patient subsequently required admission to the MHCB on September 20, 2022, due to self-injurious behavior. The patient received treatment at the acute level of care from September 30, 2022 to October 12, 2022, with transfer to the intermediate level of care on October 12, 2022.

The most recent SRASHE, dated December 28, 2022, assessed high chronic and low acute suicide risk. The patient had a history of suicide attempts and self-harm. The most recent self-injury occurred on September 19, 2022, which resulted in MHCB placement.

The patient was provided with diagnoses of schizoaffective disorder, bipolar type, alcohol use disorder, and opioid use disorder.

The patient had a history of receiving involuntary medications by a PC 2602 order since at least 2014 due to danger-to-self.

He was prescribed aripiprazole, haloperidol, olanzapine, all antipsychotic medications; lithium for mood stabilization; escitalopram, an antidepressant and antianxiety medication; hydroxyzine, an antianxiety medication; and prazosin on an as needed basis, a medication often used to treat nightmares associated with prior traumas.

The initial psychiatric evaluation occurred timely. Curiously, the psychiatrist reported that the patient "finds medications helpful," then discontinued aripiprazole, a long-acting injectable medication, and started oral haloperidol. Subsequent notes stated that aripiprazole was discontinued due to medication interactions; however, the psychiatrist did not provide further details.

The initial evaluations by the psychiatrist and PC, as well as follow-up visits, generally occurred timely.

IDTT documentation contained useful clinical information; however, the utility of this was diminished by the amount of prior information carried forward from prior plans. While goals were overall appropriate, they changed little during the patient's course of treatment. The IDTT clearly documented that patient was housed out of LRH due to clinical necessity.

On October 12, 2022, psychiatric notes documented the patient's strong cravings for opiates; however, this was not addressed in the assessment and plan. Throughout the healthcare record, documentation suffered due to the carrying forward of prior information. As an example, the psychiatrist documented the wrong dose of lithium, which appeared to be due to carrying over information from prior notes.

At the time of review, the patient remained hospitalized at the CIW-PIP at the intermediate level of care.

**Findings**

The care provided to this CIW-PIP patient treated at the intermediate level of care was adequate.

As was observed in many other patients' healthcare reviews, there were significant documentation deficits. Examples included carrying forward of prior documentation, including treatment goals for the patient, as well as outdated medication management plans. While substantial, these did not rise to the level of demonstrating inadequate clinical care of the patient. The psychiatrist's medication management was clinically adequate; however, the documentation should have reflected stronger rationales for medication changes.

**Patient W**

This 30-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at CIW-PIP. The patient was on maximum custody status at the time of admission but was lowered to Medium A.

The patient's CDCR incarceration began in 2019, when she rapidly required treatment at the MHCB level of care.  Since that time, the patient received treatment at the EOP and MHCB levels of care.  The patient required multiple MHCB stays, with the most recent from June 3 to June 7, 2022.  The patient discharged to the EOP level of care; however, she was referred to the intermediate level of care on July 5, 2022.  The reasons for admission included poor ability to program, and thoughts of harming others.

The most recent SRASHE, dated February 3, 2023, assessed high chronic and moderate acute suicide risk.  The patient had a history of suicide attempts and self-harm, generally by laceration.

She was provided with diagnoses of schizophrenia, schizoaffective disorder, and opioid use disorder.

The patient had no prior history of receiving medications by a PC 2602 order; however, the CIW-PIP treatment team filed a PC 2602 petition due to danger-to-others, as the patient reportedly threatened to kill the psychiatrist.  The PC 2602 order was granted on August 11, 2022.

The patient was prescribed risperidone, fluphenazine, and olanzapine, all antipsychotics medications; lithium, for mood stabilization; venlafaxine, an antidepressant and antianxiety medication; buspirone, an antianxiety medication; and benztropine to treat side effects from antipsychotic medications.

The initial psychiatric evaluation occurred timely.  The initial IDTT was inadequate, as prior outdated information was carried forward in the current document.  For example, the initial IDTT stated that the patient "will remain in EOP LOC at this time," despite being at the intermediate level of care.  Some IDTT treatment goals were unrealistic.  For example, one goal was to have the patient's hallucinations in remission for three months; while a lofty goal, this was unrealistic given the severity of the patient's psychotic illness.

While the treatment plan continued to state that the psychiatrist would see the patient every 72 hours, this did not occur in the later portion of the patient's hospitalization.

The patient attended some IDTTs and refused others.

PC progress notes documented treatment goals; however, they did not clearly outline the skills or steps used to work towards those goals.

At the time of review, the patient remained hospitalized at CIW-PIP at the intermediate level of care.

**Findings**

The care provided to this CIW-PIP patient treated at the intermediate level of care was inadequate.

Treatment plans contained outdated information from the patient's prior treatment at lower levels of care. While notes reflected goals, there were scant specific details on how these goals were to be achieved. While the treatment plan stated the patient would be seen by the psychiatrist every 72 hours, this did not occur during later portions of the hospital stay. The complex psychiatric medication management was logical, and the rationales for medication choices were generally clinically sound.

**Patient X**

This 30-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care provided at CIW-PIP.

The patient's CDCR incarceration began in August 2022. Soon after arrival, the patient was included in the MHSDS at the 3CMS level of care. Since that time, the patient received treatment at the EOP and MHCB levels of care. The patient was treated at the MHCB level of care from September 19 to September 27, 2022, and was subsequently discharged to the EOP level of care. She required readmission to the MHCB from October 12, 2022 to November 1, 2022, due to medication refusal. The MHCB treatment team referred the patient to the intermediate level of care due to threatening others, yelling, appearing to respond to hallucinations, and having two MHCB admissions in a short period of time.

The most recent SRASHE, dated February 23, 2023, assessed moderate chronic and low acute suicide risk. The patient had a history of suicide attempts and self-harm. The last documented suicide attempt occurred in 2000 when she walked into traffic.

The patient was provided with diagnoses of schizoaffective disorder and substance use disorder. The patient had no history of receiving involuntary medications by a PC 2602 order. The patient was intermittently medication adherent, until November 2, 2022, when she refused recommended medications. The CIW-PIP treatment team filed a non-emergent PC 2602 petition due to danger-to-others and grave disability, and it was granted on December 8, 2022.

The patient was prescribed risperidone and olanzapine, both antipsychotics medications; propranolol used to treat side effects from antipsychotics; valproic acid, a mood stabilizing medication; and hydroxyzine on an as needed basis for anxiety.

The initial PC and psychiatric evaluations occurred timely. The patient refused her initial IDTT.

Clinical contacts frequently occurred at cell front, reportedly due to patient refusal or the unpredictable nature of the patient. The patient's room was described as littered and filthy, with food on the walls and window. The patient had poor fluid intake. On December 9, 2022, the medical provider opined that the patient was at risk of severe dehydration and stated that the patient required an immediate use of force in order to have her evaluated at an outside hospital. Unfortunately, the patient refused evaluation at the outside hospital, and was returned to the CIW-PIP.

On December 13, 2022, the psychiatrist ordered the antipsychotic medication risperidone at a dose of three milligrams per day, a robust starting dose for a healthy person. The psychiatrist additionally prescribed the long-acting injectable version of risperidone, to be given on the same day.

Psychiatry documentation contained significant documentation issues, especially due to excessive carry over of prior information. As one example, a note from January 31, 2023 stated that the patient was taking valproic acid, a medication discontinued on November 30, 2022. The treatment team at the time of the CIW-PIP discharge reviewed this incorrect information and incorporated it into their documentation.

The treatment goals were poorly incorporated into progress notes. The goals were continued unchanged; despite the patient being severely ill with resultant limited ability to participate in treatment during the initial portion of her hospital stay.

Routine visits with the PC and psychiatrist generally occurred timely.

On February 21, 2023, the patient discharged from the intermediate level of care to the EOP level of care at CCWF, where she remained at the time of review.

**Findings**

The care provided to this CIW-PIP patient treated at the intermediate level of care was inadequate.

Of significant concern was the psychiatrist's initiation of the antipsychotic medication risperidone. For reasons not adequately justified in the notes, the psychiatrist started the medication at a dose of three milligrams per day, and then ordered a long-acting version of the medication for administration on the same day. This would be an assertive and questionable treatment strategy in a physically healthy individual. The psychiatrist inadequately justified the rationale for starting this dose in a medically vulnerable patient. The psychiatrist documented that the patient had taken risperidone in the past; however, this rationale was insufficient as the patient's medical status had changed since the last time the patient took this medication.

Documentation issues were numerous, including carrying over inaccurate medication lists. PC notes insufficiently documented how treatment goals guided treatment. The treatment team insufficiently adjusted the patient's treatment goals, despite the patient's severe illness preventing her from making meaningful progress toward the stated goals.

**Patient Y**

This 33-year-old patient was randomly selected for healthcare record review to assess the quality of acute and intermediate care provided at the CIW-PIP. The patient was on maximum custody status.

The patient's most recent CDCR incarceration began in 2014. Since that time, she had a complex placement history, including treatment at the 3CMS, EOP, MHCB, intermediate, and acute levels of care. Her most recent treatment at the acute level of care occurred from August 12 to August 24, 2020. From there, the patient transitioned to the intermediate level of care, where she remained until March 10, 2021. Prior to the current PIP hospitalization, the patient's last MHCB stay occurred from June 15 to June 21, 2022.

The patient was treated at the MHCB level of care prior to the CIW-PIP acute care transfer on November 10, 2022. The reason for the MHCB admission included hitting a peer in the face, then refusing to go to the ASU. During the cool down period for a possible controlled use of force, the patient wrapped a sheet around her neck.

The most recent SRASHE, dated January 20, 2023, assessed moderate chronic and low acute suicide risk. The patient had a history of suicide attempts and self-harm.

The provided psychiatric diagnoses were difficult to determine in the psychiatric progress notes. According to the problem list, the patient was provided with diagnoses of alcohol use disorder, antisocial personality disorder, borderline personality disorder, cannabis use disorder, ecstasy use disorder, gender dysphoria, opioid use disorder, and PTSD.

The patient received involuntary medications by a PC 2602 order since at least 2018 due to danger-to-self, danger-to-others, and grave disability. The most recent PC 2602 order was due to danger-to-self and to others.

The patient was prescribed fluphenazine, an antipsychotic medication; sertraline, an antidepressant and antianxiety medication; and benztropine, diphenhydramine, and propranolol used to treat side effects from antipsychotics.

The initial psychiatric evaluation occurred timely prior to the initial IDTT. The initial IDTT contained information carried over from prior treatment team documents, including crucial information such as the date of the patient's last MHCB admission.

Upon admission to the CIW-PIP, the treatment team placed the patient on a crisis plan. The plan documented the following: "If [the patient] engages in any self-harm behavior, alarm will be activated and [the patient] to be immediately placed in restraints and given ordered [injectable medications] by psychiatrist and remain on [Suicide Watch 1:1] Should [the patient] verbalize a medical complaint, upon medical clearance, [the patient] should be placed back in restraints. Release Criteria will be given by Psychiatrist or Psychologist."

The patient generally attended her IDTTs. The ten-day IDTT was held in absentia due to custody officers dealing with an urgent issue with another patient. The plan stated that the IDTT formulated changes to the treatment plan that would later be discussed with the patient.

The treatment plan targets included reducing suicidal ideation and self-harm. Portions of the treatment plans, such as progress in treatment, were difficult to decipher, due to extensive carry-over of information.

Routine contacts with the psychiatrist and PC generally occurred timely. Although the psychiatrist documented that the patient was prescribed sertraline for anxiety, no corresponding IPOCs for anxiety were located in the healthcare record.

The psychiatric discharge summary noted that the patient made substantial progress. The patient reportedly attributed this to the incentive store where she could shop upon earning points.

The patient was discharged from the intermediate level of care on January 18, 2023 to the CCWF ASU at the EOP level of care. At the time of review, the patient remained at the EOP level of care.

**Findings**

The care provided to this CIW-PIP patient treated at the acute and intermediate levels of care was inadequate.

Of significant concern was the patient's placement on a crisis plan; this plan was also noted in other CIW-PIP patients' healthcare records. This plan involved the use of restraints and injectable medications, without initially attempting less restrictive measures. Concerningly, the order continued by stating that if a patient had a medical issue, the patient was to be seen by the medical provider, and, if cleared, placed back in restraints. It was striking to note that the team would not reassess the patient after such an evaluation to determine whether restraints were still required. There was no indication that the patient required the implementation of this crisis plan, and the use of such a plan was inconsistent with standard practice in the community as well as Program Guide requirements governing the use of restraints.

Regarding medication management, the psychiatrist prescribed as needed injectable medications, which appeared to be part of the crisis plan, and this practice was questionable at best. The monitor's expert strongly recommends that CDCR carefully review the use of these crisis plans that direct the utilization of restraints and injectable medications in this manner.

The patient was also placed on a foreign body ingestion plan. Although it was understandable that some patients required a behavioral plan and temporary restrictions to reduce the potential for harm from foreign body ingestions, two broad restrictions in this plan were concerning. The plan contained a generic statement that the patient was to have no durable medical equipment (DME) in her room. Although the removal of DMEs was not noted for this particular patient, such a general statement about the denial of medically indicated equipment was alarming. Second, the plan stated that the patient was to have "no phone or kiosk at this time." Such significant denial of rights, if clinically indicated, should be reviewed daily, which was consistent with community standards.

The psychiatric discharge summary documented that the patient attributed her improved behavior largely due to access to the incentive store. As was noted for many of the CIW-PIP patients reviewed, this patient would have likely benefitted from a comprehensive behavioral plan, such as one created by the PBST.

**APPENDIX B5**
**SQ – PIP**
**Paper Review**

**Patient A**

This 53-year-old condemned patient on maximum custody status was provided diagnoses of bipolar disorder; major depressive disorder, recurrent episode with psychotic features; PTSD; borderline personality disorder; antisocial personality disorder and substance abuse, mostly alcohol abuse. He was prescribed paliperidone, prazosin, trazodone, propranolol, and diphenhydramine as well as olanzapine and trazodone on an as-needed basis. He was consistently medication adherent. His case was selected as he had been considered for positive behavioral support, but it was noted that the IDTT found the STEP incentives to be sufficient to support the patient's behavioral needs.

The patient was admitted to the intermediate inpatient level of care from the MHCB following an interrupted suicide attempt, ongoing self-injury and overall psychiatric instability. The patient was seen for initial assessments as required, including completion of a SRASHE. All assessments were comprehensive. A safety plan was completed with the patient as was clinically indicated. The content of the plan was adequate.

The initial IDTT included all required participants as well as a CC II, psych tech and a social worker. The treatment plan contents were comprehensive and updated, including measurable, objective and reasonable goals that were individualized and supported the patient's treatment toward achieving the treatment outcome expectations. The case formulation was comprehensive and supported an understanding of the patient and his needs. Subsequent IDTT meetings adequately documented the patient's progress toward treatment goals, included a description of the interventions provided, and included review of the patient's STEP progress and incentives earned. IDTT documentation also included review of the patient's participation in groups and attendance at yard activities. All members of the IDTT were present for meetings except one, in which a nurse was not present. The treatment frequencies outlined in the plan included weekly meetings with the PC, psychiatrist, social worker and recreation therapist along with seven hours of group. Except for weekly individual meetings with the social worker and the recreation therapist, the patient was consistently offered what was planned, resulting in 7.5 to 11.8 hours of structured treatment weekly.

PC and psychiatric contacts were well-documented, including the provision of appropriate interventions outlined in the treatment plan, the patient's response, treatment progress, and adequate plans for ongoing treatment. The four progress notes by the social worker were adequate. The decision to discharge the patient was supported by adequate rationale and was well documented in discharge summaries by the PC, psychiatrist, social worker and recreation therapist.

**Findings**

The treatment provided to this patient was adequate, despite individual sessions with the social worker and recreation therapist not being completed as indicated in the treatment plan, and nursing absence at one IDTT meeting.

**Patient B**

This 49-year-old patient was provided diagnoses of unspecified bipolar and related disorder; amphetamine (or other stimulant)-induced psychotic disorder, with moderate or severe use disorder; borderline personality disorder; PTSD and polysubstance dependence. IDTT and some psychiatric documentation noted additional diagnoses of major depressive disorder and antisocial personality disorder. The patient was prescribed aripiprazole, bupropion, topiramate and trazodone with medication adherence. He was a condemned individual on maximum custody status. His case was selected randomly for review.

The patient was admitted to the ICF level of care from the MHCB due to suicidal thoughts and ongoing depression. During the review period, the patient was consistently seen in IDTT meetings monthly, and all required members were present. Additionally, several meetings also included a social worker, recreation therapist and psych tech. The patient consistently attended his IDTT meetings. Goals were appropriate to the patient's needs and were individualized. IDTT documentation included a review of patient progress toward treatment goals, response to treatment interventions, attendance at structured and unstructured programming, and information regarding the patient's STEP program which was individualized. Of concern was the fact that the planned treatment section indicated that psychiatric contacts would occur every 72 hours, PC contacts were to occur every 48 hours, and individual social worker and recreation therapist contacts were to occur weekly. The patient was also to be offered ten hours of group therapy weekly. Psychiatric, PC, recreation therapist and social work individual contacts did not occur as indicated in the treatment plan. The patient was offered nearly ten hours of groups weekly. Groups offered by recreation therapists, a social worker, psych techs and a dietician appeared relevant to the needs of the patient. Over the reporting period the patient was offered between 11 and 19 hours of structured treatment weekly and attended most treatment offered.

In addition to not being seen as planned in the treatment plan, the patient was not seen weekly on a consistent basis by a psychiatrist or his PC. Throughout the reporting period, the patient was seen by his assigned psychiatrist as well as three other psychiatrists. Of note, one of the non-assigned psychiatrists saw the patient frequently, often within one day of the patient having been seen by his assigned psychiatrist. The rationale for these contacts was not documented. There were three occasions when the PC did not see the patient within one week of the prior appointment, including twice where the patient was not seen for two weeks or more. The patient was seen by the social worker during these time periods, however.

Clinically, psychiatric, PC and social worker individual sessions, as well as groups, were adequate and addressed the patient's needs.

**Findings**

The treatment provided to this patient was inadequate, as required timeframes for individual contacts were not met nor were the timeframes indicated in the treatment plan. Otherwise, the treatment was clinically sound and appropriate to the patient's needs.

**Patient C**

This condemned 69-year-old patient had a difficult diagnostic profile to discern. The healthcare record noted a diagnosis of major depressive disorder, recurrent; however, progress notes and IDTT documentation noted diagnoses of unspecified bipolar disorder, antisocial personality disorder, unspecified psychosis, major depressive disorder with psychosis and opioid use disorder. The patient was prescribed bupropion, haloperidol, lithium, olanzapine and gabapentin. He was on maximum custody status. His case was selected as it was mentioned that behaviors warranting consideration for positive behavioral support were managed through medication modifications rather than a behavior plan.

The patient was placed at the ICF level of care on September 22, 2022, due to significant decompensation secondary to severe mental illness marked by delusions; this included self-injurious and destructive behavior in response to his delusions, agitation, poor hygiene and tangential thinking. The patient was seen timely for the initial psychiatric assessment and initial IDTT, and all necessary members were present including a recreation therapist, psych tech and social worker. No IPOCs were established at the initial IDTT; however, the treatment outcome expectations were noted as well as plans for treatment frequency. Planned treatment included weekly sessions with a psychologist, social worker and recreation therapist, sessions with a psychiatrist every 72 hours and seven hours of group per week. In subsequent IDTTs that occurred at least monthly, it was noted that the patient's group participation was expected to include three groups weekly; however, the planned treatment frequencies were not updated in the identified section of the IDTT that designated planned treatment. Additionally, other than an initial recreation therapist assessment, no other recreation therapy individual sessions were documented during the review period. Psychiatric, PC and social worker contacts occurred as indicated in the treatment plan.

The STEP program was mentioned in IDTT documentation after the patient was housed on the unit for over one month; however, the psychologist had outlined STEP expectations in an updated clinical summary on October 7, 2022. The patient's goal for the STEP program was to attend at least three groups weekly and to attend yard weekly. Despite this, the patient was not offered groups until October 17, 2022. He was consistently offered three to five groups weekly; however, he was never offered the seven groups per week indicated in the treatment plan. Groups included both recreation and clinical groups. Yard participation was not documented in the IDTT documentation.

Individual psychiatric notes were clear and evidenced interventions and medication adjustments necessary to support the patient's stability and to manage his symptoms. Psychology and social work progress notes occasionally evidenced the use of treatment interventions to assist the patient in achieving his goals but were primarily focused on providing documentation of his current status. The IDTT was responsive to the patient's request to return to the EOP to engage

in more activities to distract from his symptoms. A discharge IDTT occurred within ten days of the patient's request. The patient had achieved the identified goals and outcomes but had not sustained them for the timeframes indicated. Given the patient's irritability and desire to return to the EOP, the discharge decision was clinically appropriate. All disciplines completed adequate discharge summaries.

**Findings**

This patient's treatment at the ICF level of care was adequate, despite IDTT documentation not updated to reflect the patient's treatment frequencies. In other words, the patient was provided with the care he needed to stabilize and to return to a lower level of care; however, what he received was not consistent with his treatment plan, and he did not fully sustain the goals outlined for him prior to discharge. The patient's behavior appeared to have been effectively treated with medication management without a behavior support plan.

**Patient D**

This 41-year-old patient was provided diagnoses of major depressive disorder, recurrent episode, moderate; PTSD; attention-deficit/hyperactivity disorder, predominantly hyperactive/impulsive presentation; amphetamine dependence; borderline personality disorder and manic-depressive psychosis. He was prescribed prazosin, naltrexone, olanzapine and guanfacine as well as gabapentin, bupropion, diphenhydramine and olanzapine on an as-needed basis. This condemned patient was on maximum custody status. His case was selected for review as it was noted that this ICF patient with a history of self-injury was determined not in need of a positive behavior support plan as other interventions had proved effective in reducing his self-injurious behavior.

This patient was admitted to the ICF from the acute level of care on September 12, 2022. While a SRASHE was completed on the day of admission, no initial psychiatric or PC assessments were completed prior to the initial 72-hour IDTT; and no PC initial assessment was completed prior to the IDTT completed on September 21, 2022. The initial IDTT documentation was largely unchanged from the IDTT documentation present in the healthcare record during his acute level of care. Planned treatment included contact with a psychiatrist every 72-hours, weekly PC, social worker and recreation therapist individual contacts and nine hours of group weekly, for a total of 16 hours of structured treatment weekly. While the patient was offered between ten and 19 hours of structured treatment, the patient was not seen every 72 hours by a psychiatrist and recreation therapist; and weekly recreation therapy contacts occurred at cell front and consisted of exchange of supplies. The patient was seen weekly by a psychiatrist consistent with requirements for ICF level of care. Subsequent IDTT documentation was adequate and included patient progress toward treatment goals and reference to the STEP program. Planned treatment frequency was not updated in any subsequent IDTT documentation, however.

Psychiatric contacts were adequate and addressed not only medication needs, but emotional regulation, coping, trauma and overall skill-building. Contacts with the PC were limited in the discussion of therapeutic interventions, as were social worker notes. The groups offered to the patient included both recreation and clinical groups, and documentation was adequate. Overall,

the services the patient received appeared to support him in remaining free from self-injurious behavior.

**Findings**

The treatment provided for this patient was adequate, but it was not in keeping with the frequencies outlined in IDTT documentation but were in keeping with requirements.

**Patient E**

This 62-year-old patient was treated at the ICF level of care during the reporting period.   He was provided diagnoses of schizophrenia and antisocial personality disorder.  He was prescribed clozapine and cariprazine, and he received his medications by PC 2602 and PC 2604 orders, with resulting medication adherence.  His case was selected for review as he was on maximum custody status and had been considered for a reduction in this status; however, it was denied based on the circumstances of a recent offense.

A review of the healthcare record revealed that the patient had not received a recent RVR; the most recent was documented in 2016 for possession of a controlled substance, resulting in counseling only.  The patient was removed from condemned status and was resentenced to a sentence of life without parole, requiring him to remain on maximum custody status.  One challenge in this case was the months-long wait for clarification regarding the patient's custody status, as he had been clinically ready for discharge to a lower level of care but could not be endorsed due to his custody and medical status.  Further inquiry with DAI staff revealed that the wait had to do with the lack of appropriate bed availability, rather than clarification regarding custody status.  This information differed from that present in the healthcare record which noted that his undefined custody status had impacted his transfer, and the information documented in institutional tracking logs which indicated a recent offense as the rationale for not considering maximum custody status reduction.

Clinically, the patient was seen as required by the psychiatrist, PC and a social worker weekly.  Additionally, a recreation therapist conducted weekly cell-front check-ins to offer recreation supplies to the patient.  The patient was also offered six and nine hours of groups weekly, including recreation and clinical groups.  Despite meeting requirements, the offered structured treatment was not consistent with the planned frequency of treatment outlined in the treatment plan.  It was documented that the patient would be offered 18 hours of treatment weekly, including weekly individual contacts with all clinicians, daily individual contacts with the recreation therapist and eight hours of groups offered weekly.   This planned treatment was not updated in any IDTT documentation during the review period.

IDTT documentation was otherwise comprehensive, providing treatment goals that were individualized to the patient's needs, updating the goals regularly and tracking patient progress.  IDTT documentation included evidence that the SQ-PIP was moving away from the use of positive behavior support plans and using individualized targets in the established STEP program.  For this patient specifically, the rationale for the transition was that the patient's positive behavior support plan had been successful in increasing the patient's participation in programming and improving the frequency of showering with immediate incentives and

reinforcements, while the STEP program would provide delayed reinforcements, assisting the patient in generalizing behavioral changes. This was a reasonable course of treatment for the patient. Patient participation in structured and unstructured activities as well as showering were monitored and tracked routinely in IDTT documentation. STEP levels and incentives were tracked and documented during IDTTs.

**Findings**

The treatment provided to this ICF patient was adequate and individualized. He was provided with the care necessary to stabilize his psychiatric condition despite documentation being inconsistent regarding planned treatment frequency. While the care was adequate, this case raised concerns regarding timely patient transfer, which appeared to be directly impacted by his custody status and the lack of beds. There was also inaccurate and conflicting tracking and documentation regarding the patient's custody status.

**Patient F**

This 56-year-old patient was provided diagnoses of persistent depressive disorder; major depressive disorder, single episode, severe; borderline personality disorder; PTSD and antisocial personality disorder. He was prescribed aripiprazole and fluoxetine as well as mirtazapine on an as-needed, and he was medication adherent. The patient was randomly selected to review the care provided to this condemned ICF patient who was on maximum custody status.

The patient was admitted to the ICF level of care on June 3, 2022 due to suicidal ideation and isolation. He was awaiting transfer to another yard, and the MHCB IDTT believed that he would be better maintained at the ICF level of care during this waiting period given his level of distress. The patient was seen timely for the initial psychiatric assessment and IDTT, yet the psychiatrist who completing the initial assessment was not the psychiatrist present at the initial IDTT meeting. The initial IDTT included an IPOC for discharge planning which was not consistent with treatment outcome expectations related to decreasing negative thoughts, isolation and suicidal ideation. Treatment frequency included psychiatric contacts every 72 hours, weekly individual sessions with a psychologist and social worker, as well as ten hours of groups weekly for a total of 15 hours of offered treatment weekly.

The patient was seen for initial social worker and recreation therapist assessments two days following the initial IDTT; however, he was not seen again by any clinician or provider for six days until the 10-day IDTT on June 14, 2022. All required members were present at this IDTT, yet the only clinician who had met with the patient previously was the psychiatrist. During this IDTT, there were updates to the treatment goals and interventions, with the frequency of psychiatric contacts reduced to weekly, resulting in 14 hours of expected treatment offered each week. These planned interventions were not updated in subsequent IDTT documentation. During the ICF stay, the patient was offered between seven and 10 hours of treatment weekly; he was never offered the planned 14 hours. While one of the treatment goals was to reduce isolation; the patient refused all offered groups during June and July 2022, yet not until August 14, 2022 did the IDTT implement the STEP program to assist in incentivizing group attendance.

The patient was seen by the assigned psychologist weekly; however, the initial PC assessment was not completed until June 28, 2022, over three weeks following admission. There was documentation of interventions provided during PC contacts, but no documentation of interventions provided by the social worker was present. Many of the social worker notes were similar in content from week to week and included inaccurate information that the patient routinely attended groups.

The patient was discharged from the SQ-PIP, on September 21, 2022, despite not having achieved his identified treatment goals. A discharge SRASHE included an updated safety plan which appeared appropriate to the situation, given the patient was not discharged to the yard he preferred. The patient was admitted to the ICF level of care in part awaiting transfer to the identified yard.

**Findings**

This care provided to this ICF patient was inadequate.

He was not offered the treatment outlined in the treatment plan, the initial PC assessment was conducted weeks late, and the patient had not achieved his treatment goals prior to discharge.

**Patient G**

This 70-year-old condemned patient was treated at the ICF level of care. He was provided diagnoses of unspecified bipolar and related disorder; generalized anxiety disorder; amphetamine (or other stimulant)-induced depressive disorder with moderate or severe use disorder; and amphetamine (or other stimulant)-induced psychotic disorder with moderate or severe use disorder. He was prescribed hydroxyzine, olanzapine and valproic acid, with medication adherence. This maximum custody patient's case was randomly selected for review to assess the care provided.

The patient was admitted to the ICF level of care following relapse of substance use resulting in medical complications and suicidal ideation. The referral for the ICF level of care was to assist in managing depressive symptoms and suicidal ideation while restarting medications to assist with the maintenance of sobriety. The initial assessments were completed timely and contained adequate clinical information. An initial SRASHE was completed and included an updated safety plan which was adequate.

IDTT meetings occurred monthly, including required members and often a social worker, CCII, recreation therapist and psych tech were in attendance. The patient usually attended the IDTT meetings. Treatment goals and IPOCs were appropriate to the patient's needs, and treatment progress was reviewed regularly. The STEP program was initiated in August 2022, and incentives for group and yard participation were provided and were individualized. Much of the treatment focused on the patient's mood and substance use cravings. Medications were appropriately adjusted to address changes in symptoms. IDTT documentation indicated that the patient would be seen by a psychiatrist every 72 hours, however, the patient was typically seen weekly. Weekly PC and social worker contacts were planned; while the PC offered weekly sessions, social worker contacts were not offered weekly. In late October 2022, the patient became angry with his PC and refused future contacts; subsequently, the social worker offered

weekly contacts. Both the PC and social worker documented the therapeutic interventions offered. IDTT documentation indicated that the patient would be offered 10 hours of groups weekly; review of offered treatment indicated that the patient was offered between 11 and 17 hours of structured treatment weekly during the review period.

**Findings**

Overall, the care provided to this ICF patient was adequate. The frequency of his treatment contacts was in keeping with his needs and requirements. However, the planned treatment frequencies outlined within his treatment plan were not updated to reflect what was being provided.

**Patient H**

This 49-year-old condemned patient was provided diagnoses of schizoaffective disorder, depressed type and polysubstance dependence. He was prescribed clozapine, venlafaxine and mirtazapine with paliperidone ordered on an as-needed basis. He was adherent with his medication regimen. This patient was on maximum custody status. His case was randomly selected for review of the care provided at the ICF level of care.

The patient was admitted to ICF on October 20, 2022, following an increase in paranoia, psychosis and depressive symptoms with increased isolation and medication refusal. The plan for hospitalization was to address those symptoms, to improve his hygiene and group attendance, and to initiate treatment with clozapine. The patient was seen for initial assessments timely, and the content of those assessments was adequate. IDTT meetings occurred as required and included the required staff and the patient; a psych tech, recreation therapist and social worker were present at IDTT meetings as well. The IDTT documentation reviewed patient progress along with planned treatment interventions that were largely evident in clinical documentation.

The IDTT was inconsistent regarding planned treatment, as a narrative section of the plan noted planned weekly contacts with the psychiatrist, PC and social worker; yet the planned treatment section of the IDTT documentation noted that psychiatric contacts would occur every 72 hours and the recreation therapist was also to see the patient weekly for individual contacts. The psychiatrist saw the patient weekly, and the recreation therapist offered the patient recreation supplies at his cell door but did not offer individual contacts. IDTT documentation included documentation of the STEP program with individualized goals and incentives noted.

Weekly contacts with the PC, social worder and psychiatrist were documented and were clinically adequate. PC and social worker contacts included interventions and often used rating scales to assess patient progress.

One major concern was noted. On October 23, 2022, there were two notes by nursing staff indicating that the patient had engaged in head banging and was placed in four-point restraints. There was no documentation that a psychiatrist or psychologist was contacted, no orders present in the healthcare record for the use of restraints, and no indication when the restraint episode ended. There was also no self-harm Powerform completed in the electronic healthcare record, and the incident was not noted in any documentation by members of the IDTT. While it

appeared to be an isolated episode, the documentation regarding the incident was inadequate and not consistent with adequate treatment expectations.

**Findings**

While the patient's treatment at the ICF level of care was clinically appropriate, the overall care provided to this patient was inadequate due to poor documentation and failure to follow-up appropriately after the use of restraints with the patient who had engaged in self-injury.

**Patient I**

This 51-year-old patient was provided diagnoses of major depressive disorder, PTSD and severe substance use disorder.  He was prescribed fluoxetine and hydroxyzine.

He was admitted to the ICF level of care from the EOP on September 22, 2022 due to increased depression, traumatic response, substance use, hopelessness and isolation as well as inability to use adaptive coping skills.  Initial PC and psychiatric assessments, as well as an admission SRASHE, were completed on the day of admission and were adequate.  The initial IDTT occurred the day following admission; however, the psychologist who completed the initial assessment and SRASHE was not the PC present at the IDTT.  There was also no nurse present at the initial IDTT, and the patient refused to attend.  There were no mental health IPOCs initiated, and the goals noted were the treatment outcome expectations provided by the EOP IDTT prior to SQ-PIP admission.  Planned treatment was documented as psychiatric contacts every 72 hours and weekly individual contacts with the PC, social worker and recreation therapist.  The patient was to be offered seven groups weekly for a total of 12 hours of structured treatment weekly.

While the patient was seen every 72 hours by a psychiatrist, the patient was not seen for an individual session with a PC prior to the IDTT on September 29, 2022.  The psychiatrist present for this IDTT had not seen the patient previously, the PC was not the patient's assigned clinician, and no nurse was present at the IDTT.  A social worker and recreation therapist were in attendance.  Much of the IDTT documentation remained unchanged, and it was noted that "tentative" STEP goals were created for attending IDTT and groups.  The first IDTT in which the patient's assigned PC and psychiatrist were in attendance occurred on October 26, 2022.  No nurse was present, but a PT, recreation therapist and social worker were in attendance.  Goals were updated along with the interventions planned for addressing the patient's identified needs.  The specifics regarding the patient's individualized STEP program were not adequately documented until the IDTT on November 28, 2022.  Planned treatment in IDTT documentation remained unchanged other than an increase in groups to 10 hours weekly for a total of 15 hours of structured treatment weekly.  The patient was consistently offered between 14 and 21 hours of structured treatment per week; however, individual contacts with the PC, social worker and recreation therapist did not consistently occur.  During the 10 weeks of treatment reviewed, the patient had seven contacts with a social worker and PC and no individual sessions (beyond cell-front supply exchanges) with a recreation therapist.  The patient was seen every 72 hours by a psychiatrist through mid-October 2022, when sessions were decreased to weekly contacts.

Clinically, PC, psychiatric and social worker contacts appeared to address the patient's needs and demonstrated evidence of the interventions outlined in the treatment plan. The social worker focused on substance use issues, while the PC and psychiatrist worked with the patient on symptoms of anxiety and trauma reactions.

**Findings**

The treatment of this patient within the ICF level of care was inadequate. He was not seen as required by his PC, not seen by a social worker and RT in keeping with his treatment plan, IPOCs were delayed in being initiated, required staff were not consistently present during IDTT meetings, and there was a delay in initiating the STEP program. While the patient's needs were addressed when he was seen for individual treatment by members of the IDTT, the frequency of contacts were less than what the patient required for adequate care.

**Patient J**

This 55-year-old condemned patient was provided diagnoses of schizophrenia and delusional disorder. He was prescribed olanzapine with mediation adherence; he received his psychotropic medications by a PC 2602 order. This patient was randomly selected to assess the treatment provided at the ICF level of care.

The patient was initially admitted to ICF in April 2021. He was at maximum custody status. The patient denied psychotic symptoms but appeared internally preoccupied and was observed talking to himself. He also demonstrated negative symptoms of schizophrenia including avolition and inertia. The focus of treatment was to engage the patient in activities outside of his cell and to support improved hygiene practices.

Monthly IDTT meetings occurred throughout the review period with required members present. Despite the patient's lack of participation in groups and yard for months and an IPOC for treatment non-adherence as well as discussion amongst the IDTT of a positive behavior support plan; the STEP program was not initiated until August 2022. The use of STEP incentives was successful in motivating the patient to increase his group and IDTT attendance for two consecutive months. IDTT documentation noted patient progress toward goals as well as the interventions provided by the staff to support the patient's engagement in treatment. Planned treatment included weekly meetings with the psychiatrist, PC, social worker and recreation therapist as well as seven group offerings weekly.

During the review period, the patient was not offered PC contacts during nine of the 27 weeks, social worker contacts during seven of the 27 weeks, and psychiatrist contacts during 10 of the 27 weeks of treatment. There were two weeks when the patient was not offered individual sessions with the PC or the social worker, and the patient was only seen at cell-front by the psychiatrist during those weeks as he declined to be seen out of cell. Most psychiatric contacts with the patient's assigned psychiatrist occurred at cell-front, and the patient was seen by six different psychiatrists during the review period. Of serious concern was the fact that the patient was seen every two weeks by a psychiatrist from August 19, 2022 to September 30, 2022, and he was not seen by a psychiatrist between October 7, 2022 and November 10, 2022 other than during an October 21, 2022 IDTT. Additionally, despite the focus on providing the patient with

opportunities for groups, the patient was never offered the seven hours of groups noted in the treatment plan. The patient was actually only offered between 0.75 and six hours of structured therapeutic activities weekly during the review period.

**Findings**

Treatment of this patient at the ICF level of care was inadequate. The patient, who was suffering from negative symptoms of schizophrenia which resulted in isolation and disengagement, was often not seen by his PC, social worker, or psychiatrist as required and was not offered group treatment as outlined in his treatment plan. There was an unexplained delay in implementing the STEP program, which proved successful in motivating the patient once implemented appropriately.

**Patient K**

Patient K was randomly selected from a list of SQ-PIP patients to review the care provided.

This 27-year-old patient had a traumatic developmental history characterized by domestic violence, mental illness and drug abuse. He was incarcerated in August 2019 at age 24. He was serving his first prison term, sentenced to three life sentences without the possibility of parole for numerous charges to include sexual and physical assault of a minor. He was maximum custody status due to staff assaults at SVSP.

During his three-and-a-half-year incarceration, he received treatment at the MHCB, intermediate and acute levels of care, for all except two months. His inpatient placements were due to danger to himself and others due to command auditory hallucinations and paranoid delusional thinking. He was provided diagnoses of schizoaffective disorder, bipolar type; amphetamine use disorder and cannabis use disorder. He was previously diagnosed with unspecified schizophrenia and other psychotic disorders. He received his psychotropic medications by a PC 2602 order due to danger to himself and others.

In January 2022, he transferred from the CMF acute care unit to SVSP with the goal of transition to an EOP. On August 19, 2022, he transferred to the SQ-PIP for acute care, and he was placed on suicide watch due to command auditory hallucinations telling him to harm himself; paranoid delusions resulting in anxiety and isolating behavior; self-injurious behavior, including head banging; bizarre behavior, including hoarding with smearing and consumption of feces and urine; and functional impairments resulting in poor ADLs. On August 22, 2022, the primary clinician administered a SRASHE, performed an initial primary clinician evaluation, and facilitated an initial IDTT in absentia. On August 23, 2022, suicide watch was downgraded to suicide precautions; and on the following day, the IDTT unanimously agreed to discontinue suicide precautions.

Initial treatment plan goals included reduction of self-injurious behavior, increased medication adherence and increased out of cell time. Goals were changed as progress was attained. The patient exhibited improvement, from refusal to talk with his providers and cell-front contacts to participation in confidential out of cell individual contacts and group programming. He also progressed from refusing to participate in IDTTs to contributing to treatment goals, with

attendance and participation in IDTTs.  The required IDTT members were in attendance, meeting with the patient weekly.  Sessions were meaningful and aligned with the treatment plan.

There was continuity of care with the primary clinician during the review period; however, continuity of care with the treating psychiatrist and recreation therapist was inconsistent.  Provider documentation revealed treatment progress and adequate treatment interventions.

**Findings**

The care provided to this patient was adequate.

Initial goals were achieved, new goals were established, and discharge criteria were discussed during the IDTTs.

**Patient L**

This 50-year-old patient's case was reviewed to assess the care provided at the SQ-PIP.  He was serving his third CDCR prison term for robbery with a firearm.  His earliest parole release date was May 11, 2024.

The patient's developmental history was traumatic.  He reportedly grew up in the streets in Mexico and began abusing cocaine by age 12.  He joined the Mexican army at age 16.  Two years later, he began abusing heroin and fled to the United States, where he completed high school, married, and had four children.

He received mental health services at the Los Angeles County Jail after attempting suicide in 2016.  In CDCR, he received mental health services at the 3CMS and EOP levels of care, until an MHCB admission on September 5, 2022; he was admitted to the MHCB due to a self-harm incident related to persecutory delusions and command auditory hallucinations.  As the patient did not stabilize at the MHCB level of care; subsequently, he was referred to the SQ-PIP for acute care on September 20, 2022.

A nursing admission assessment was completed on the day of the SQ-PIP arrival.  The psychiatrist attempted to complete the initial psychiatric assessment on September 21, 2022, but the assessment was not completed as the patient was uncooperative.  The initial IDTT occurred on September 22, 2022; however, the PC and psychiatric initial assessments did not occur timely and were not completed prior to the initial IDTT.  IDTTs occurred weekly, and the PC and psychiatric contacts occurred every seven to ten days.  Initial PC and RT assessments were completed on September 28, 2022.

Initial treatment outcome expectations were clearly stated; they included increased treatment participation to at least four sessions per week, decreased suicidal ideation from every seven days to once weekly, development of three new coping skills to manage depression and auditory hallucinations, and discussion of the utilization of one new skill during confidential individual sessions.  These treatment outcome expectations were amended over time to include decreased thoughts of self-harm, identification and challenging of two negative thoughts, decreasing depressive symptoms, and increased medication adherence.  Progress notes indicated that individual treatment sessions were not consistent with these outcome expectations.

In October 2022, the patient swallowed two sharpened paper clips in response to delusional thinking and anxiety. A SRASHE assessed no suicidal intent, but high chronic and acute suicide risk. During a follow-up IDTT, the patient agreed to practice breathing and visualization exercises to mitigate anxiety symptoms. The primary clinician also provided handouts on breathing exercises and mindfulness meditation. Despite his willingness to practice these coping skills, documentation did not reveal any clinical follow-up for the recommended breathing exercises and mindfulness meditation.

**Findings**

The care provided to this SQ-PIP patient was marginally adequate.

Providers were responsive to the patient; however, initial assessments were not timely, completed after the initial IDTT. Providers did not address treatment outcome expectations during individual sessions. Additionally, targeted treatment goals and progress made toward achieving those goals were unclear.

**Patient M**

This 46-year-old condemned patient's healthcare record was reviewed to assess the quality of intermediate care provided to maximum custody patients at the SQ-PIP. This patient had multiple intermediate care hospitalizations during his incarceration, the most recent occurred in June 2020. On or around September 8, 2021, the patient transferred from the SQ EOP to the SQ-PIP due to minimal participation in available mental health programming, significant impairment resulting from mental illness and gradual deterioration in ADLs during the preceding six-month period.

Upon admission, the patient was provided a diagnosis of schizophrenia, undifferentiated type, and the IDTT noted that the patient's negative symptoms of schizophrenia appeared most prominent. He was prescribed clozapine, haloperidol decanoate injection and bupropion. He received his psychotropic medications by a PC 2602 order that was in place since 2014.

The initial psychiatric assessment occurred timely on September 8, 2021. The psychologist and social worker initial assessments did not occur timely and occurred after the initial IDTT. The PC noted during their initial assessment that the patient was unable to recall his treatment history, medication indications and prior psychiatric diagnoses.

A SRASHE, dated October 14, 2021, assessed high chronic and low acute suicide risk. This SRASHE referenced three prior suicide attempts, the most recent reportedly involved starvation with a 60 pound weight loss in 2003.

Treatment plans targeted psychotic symptoms and grave disability concerns, treatment participation, hygiene and out of cell programming. Goals were measurable and specific, for example, showering twice weekly and using soap for six consecutive weeks. Interventions were appropriately tailored to the treatment targets and involved prompting from all disciplines for out of cell activities participation. The STEP incentive program was appropriately used to motivate

treatment participation.  Treatment plans were also modified in response to the patient's lack of progress in certain areas, including development of a positive behavior support plan and offering more immediate rewards for positive behaviors.

Clinical summaries provided meaningful updates, including for current symptoms, functioning, cell conditions, hygiene and response to treatment.  IDTTs also documented objective evidence of progress since the preceding IDTT review period.  Level of care rationales were appropriate and referenced progress toward treatment objectives and expectations for discharge consideration.

The most recent IDTT clinical summary in January 2023 suggested that the patient continued to demonstrate progress in some areas despite ongoing negative symptoms of schizophrenia.  He attended an average of two hours of weekly treatment groups and two hours of weekly individual treatment contacts.  The IDTT also noted tracking of the patient's exercise and that he was walking five days weekly.

Regarding the patient's maximum custody status, it appeared that he was maintained on maximum custody status and was not considered for removal due to his condemned status.  The IDTT indicated in the maximum custody section of the treatment plan that the patient did not exhibit symptoms that could lead to an adverse change in custody status.

**Findings**

While the initial PC assessment was not completed timely, the overall care provided to this patient was adequate.

The IDTT developed a useful case formulation and provided meaningful status updates in clinical summaries over time.  Treatment plans included patient specific and measurable goals, and the plans were appropriately modified to target barriers to progress throughout the course of hospitalization.  Reviewed treatment plans and level of care decisions suggested that there was appropriate collaboration among the various IDTT disciplines.  Individual progress notes from the psychiatrist and psychologist also provided detailed information regarding the patient's current mental status and treatment response.

**Patient N**

This 40-year-old condemned patient's healthcare record was reviewed to assess the quality of intermediate care provided to maximum custody patients at the SQ-PIP.  The patient was referred from the SQ EOP due to significant impairment due to a mental illness, worsening depressive symptoms, limited program participation and poor self-care.

The SQ-PIP admitted the patient for intermediate care on or around August 20, 2021.  He was provided diagnoses of schizoaffective disorder, bipolar type; antisocial personality disorder and borderline personality disorder.  Prescribed psychotropic medications included antipsychotic and mood stabilizing medications, Haldol and olanzapine.  The patient had an active PC 2602 order for grave disability, danger to others and self.  The healthcare record also referenced multiple

medical procedures in the preceding year, including brain imaging in April 2022, spinal surgery in July 2022, a colonoscopy in December 2022, and a pending appointment for a lumbar puncture to rule out neurological concerns.

The psychiatrist and primary clinician completed their initial assessments timely on August 23, 2021, prior to the initial IDTT. The most recent SRASHE, dated October 19, 2021, assessed high chronic and low acute suicide risk. The SRASHE referenced five reported suicide attempts, the most recent occurred in 2014.

Treatment plans included patient specific targets with short and long term goals. The IDTT routinely noted that the patient would be offered ten hours of weekly treatment groups, as well as weekly contacts with the psychiatrist, psychologist, social worker and recreation therapist. The clinical summaries offered useful updates on current symptoms, functioning and response to treatment. The IDTT also included updated information regarding the patient's medical concerns, including pending appointments and outcomes. Treatment plans were developed collaboratively and indicated which of the IDTT disciplines were responsible for addressing the patient's various treatment concerns.

The most recent IDTT documentation, dated January 31, 2023, suggested that the patient continued to demonstrate progress toward treatment goals. IDTT notes suggested that the patient's psychotic and mood symptoms were generally well managed with antipsychotic medication, and that he had not required involuntary medication administration during the current hospitalization. The patient recently began utilizing creative writing "for healthy self-expression." NCAT data was included in the IDTT summaries to demonstrate progress with participation in certain program activities.

The IDTT noted preparation for discharge to the EOP level of care during the January 31, 2023 review. The psychiatrist also indicated that the PC 2602 order would not be renewed in February 2023 due to the patient's medication adherence throughout the current hospitalization.

Regarding the patient's maximum custody status, it appeared that he was maintained on maximum custody status and was not considered for removal due to his condemned status. The IDTT indicated in the maximum custody section of the treatment plan that the patient did not exhibit symptoms that could lead to an adverse change in custody status.

**Findings**

The overall care provided to this SVSP-PIP patient in the intermediate care program was adequate.

The care was appropriately collaborative, and records routinely referenced consultation between mental health and medical providers. The IDTT developed a useful case formulation and developed individualized treatment plans with measurable goals and effective interventions. The STEP incentive program appeared to be utilized appropriately and in accordance with policy. Treatment plans were also reviewed and modified when clinically indicated. Individual progress

notes and IDTT documentation included relevant information to track progress and to support treatment planning and level of care decisions.

**Patient O**

This 57-year-old transgender condemned patient's healthcare record was reviewed to assess the quality of intermediate care provided to maximum custody patients at the SQ-PIP. The patient was sentenced to death in 1988 at age 22. The SQ MHCB referred the patient for intermediate care due to depression, isolation in cell, a recent suicide attempt and ongoing concerns regarding danger to self. She received gender affirming surgery in early October 2022 and had been experiencing distress and safety concerns while housed with males at SQ.

The patient was admitted to the SQ-PIP on or around December 21, 2022. She was provided diagnoses of major depressive disorder and gender dysphoria. She was prescribed Lexapro for depression and melatonin for sleep. The most recent SRASHE, dated December 21, 2022, assessed high chronic and moderate acute suicide risk. This SRASHE referenced one suicide attempt by overdose in December 2020.

An initial psychiatric assessment was not located in the healthcare record. Initial assessments completed by the psychologist and social worker were not completed timely, occurring several days after the initial IDTT.

Individual progress notes suggested contacts with the PC and psychiatrist generally occurred at least every seven days. Providers documented meaningful interventions and updates on the patient's mental status and response to treatment. A psychiatric progress note, dated February 21, 2023, noted that the patient's court case against CDCR for retaining her in a men's institution had been transferred to another judge. The psychiatrist indicated that the patient tried to remain hopeful and to cope by reading books. Group progress notes suggested three to four treatment groups were offered weekly; however, the patient refused to attend.

The IDTT convened on three occasions between December 22, 2022 and January 27, 2023. Treatment plans targeted suicidal thoughts, symptoms of depression, medication adherence, treatment participation and out of cell programming. Treatment goals were measurable, and interventions were appropriate. Expected dates for meeting treatment objectives were appropriately included in the level of care rationales. A STEP goal was developed to motivate the patient's out of cell programming. The IDTT clinical summaries provided meaningful updates on symptoms, functioning, response to treatment, and progress toward STEP and other treatment goals.

The IDTT retained the patient at the intermediate level of care during the most recent IDTT on February 23, 2023. The IDTT noted that, while the patient continued to refuse treatment groups and yard, she exercised in her cell and recently engaged with the recreation therapist, accepting in-cell materials. The IDTT suggested that the patient would not be considered for discharge until discharge objectives were met, most likely around March 24, 2023.

The patient was maintained on maximum custody status and was not considered for removal due to her condemned status. The IDTT indicated in the maximum custody section of the treatment plan that the patient did not exhibit symptoms that could lead to an adverse change in custody status.

**Findings**

While initial assessments were not completed timely, the overall care provided to this patient was adequate.

Providers often followed up more frequently than indicated in treatment planning. Treatment plans addressed the patient's presenting psychiatric concerns with individualized interventions and measurable goals; expected dates for achieving discharge objectives were also included. IDTT clinical summaries and individual progress notes provided meaningful updates on current symptoms, functioning and response to treatment. Level of care decisions were also appropriately justified.

**Patient P**

This 54-year-old condemned patient's healthcare record was reviewed to assess the quality of intermediate care provided to maximum custody patients at the SQ-PIP. The patient was admitted to the SQ-PIP from the SQ MHCB on October 11, 2022. The referring treatment team noted increased risk for suicide attempts, mood and psychotic symptoms that were triggered by a recent relapse and ongoing substance use while housed in East Block. The patient was provided diagnoses of major depressive disorder, stimulant use disorder and antisocial personality disorder. He was prescribed Prozac, an antidepressant medication, and Suboxone.

The social worker and psychologist did not complete their initial assessments timely, occurring several days after the initial IDTT. The psychiatric initial assessment was not located in the healthcare record. The most recent SRASHE completed on October 12, 2022 assessed high chronic and moderate acute suicide. The SRASHE referenced three suicide attempts in 2018, 2019 and 2022, all involved a lethal method with intent to die.

The IDTT planned contact frequencies included weekly contacts with the psychiatrist, psychologist and social worker, as well as seven hours of weekly treatment groups. The IDTT anticipated and expected a length of stay of several weeks to a few months for adequate medication treatment. Treatment plans targeted suicidal ideation and substance use, noting more than one measurable goal for each. Planned interventions were appropriate and evidenced-based when indicated. STEP goals were also incorporated in treatment plans to address the patient's medication nonadherence and lack of IDTT participation.

Reviewed individual progress notes from the psychiatrist and primary clinicians suggested that treatment access was limited between December 2022 and February 2023. The patient began reporting frustration with repeated treatment group cancellations due to staffing shortages in December 2022. The PC met with the patient at cell-front in January and February 2023; despite noting that the patient requested out of cell contacts, the PC did not provide rationale for the lack

of provision of a confidential out of cell encounter.  On February 4, 2023, the patient met with the psychiatrist and reported, "They cut our groups by 50%," adding that he believed this occurred due to complaints from non-death row patients.  Clinicians did not refute the patient's claims about limited treatment group offerings in progress notes, and this reviewer did note fewer group notes during this period.  During the most recent psychiatric contact in February 2023, the patient reported that he was frustrated, did not trust anyone, did not believe his medications were effective, and requested discharge from the SQ-PIP.

The most recent IDTT documentation, dated February 9, 2023, indicated that the patient continued to report passive suicidal ideation, low frustration tolerance, lack of motivation in his relapse prevention planning and minimal use of coping skills.  The IDTT did not document whether the patient had progressed in the STEP program, or whether modifications to the current treatment plan were indicated.  While the IDTT did not discuss discharge on that date, documentation suggested that they were preparing the patient for transfer to a less restrictive level of care soon.

**Findings**

The care provided to this patient was inadequate.

Group and individual treatment contacts were not offered in accordance with IDTT treatment plans.  The patient did not demonstrate noteworthy progress during the four-month hospitalization, and he continued to report elevated depression ratings, passive suicidal thoughts, urges to use illicit substances and poor distress tolerance.  Despite the lack of progress, treatment plans were not modified, and individual contact frequencies and other activities were not offered in lieu of treatment groups between December 2022 and February 2023.  PCs also completed cell-front contacts without documenting a rationale for the lack of provision of confidential clinical sessions.

**Patient Q**

This 38-year-old condemned patient's healthcare record was reviewed to assess the quality of intermediate care provided to maximum custody patients at the SQ-PIP.  Records indicated that the patient's index crime occurred in 2007, and he was sentenced to death in 2015.  The patient had previously received his psychotropic medications by a PC 2602 order for grave disability that expired in May 2019.  During prior inpatient hospitalizations, the patient exhibited bizarre behaviors with disorganized, grandiose and delusional thinking.  The patient had one reported suicide attempt in 2012 by hanging while in the county jail.

The SQ EOP referred the patient for intermediate care due to depression, possible command auditory hallucinations involving self-harm content, low treatment participation and suicidal thoughts with some planning and a desire to die.  The patient was admitted to the SQ-PIP on or around May 25, 2022.  He was provided a diagnosis of schizoaffective disorder, bipolar type. The IDTT documented in May 2022 that diagnostic clarification was needed, including a determination whether the patient actually experienced genuine command auditory hallucinations or obsessive and intrusive thoughts.  The SQ-PIP psychiatrist prescribed

antipsychotic and mood stabilizing medications, which were adjusted throughout the current admission, including as recently as February 2023.

The initial IDTT, psychiatric and primary clinician assessments occurred timely. The IDTT planned treatment frequencies included weekly contacts with the psychologist, social worker, and recreation therapist with psychiatric contacts every 72 hours. The IDTT also planned to offer ten hours of weekly treatment groups.

In September 2022, the IDTT revised the treatment plan and STEP goals. The clinical summary for that month referenced additional psychotic symptoms, including persecutory delusions, thought broadcasting, ideas of reference and command auditory hallucinations to hurt himself and others. The modified STEP goals were appropriate and included incentives for out of cell time and maintaining a fitness routine. The IDTT provided the patient with a step-counter to track his fitness goals. The IDTT also indicated that the patient was referred for psychological testing due to ongoing diagnostic uncertainties.

Clinical documentation in February 2023 suggested that the patient had demonstrated progress in several areas. The IDTT noted advancement to level 3 of the STEP program, completion of college courses and increased yard and group participation; the patient partially met his goals for suicidal thoughts and psychotic symptoms. Accrued points were included in the clinical summary as well as other objective signs of progress. The IDTT also documented an expected timeframe for meeting discharge objectives, within 30 to 60 days.

Despite records suggesting the need for diagnostic clarification upon admission and the IDTT documenting a referral for psychological testing in September 2022; the IDTT continued to document that the patient was awaiting testing for a differential diagnosis to the date of this review in February 2023. The IDTT did not document a reason for the delay or indicate whether they planned to follow up regarding the initial referral.

**Findings**

The care provided to this maximum custody intermediate care patient was adequate.

The documentation offered clear justifications for treatment and level of care decisions. Treatment plans were collaborative and appropriately modified based on the patient's response to interventions and changes in presentation during admission. Treatment goals and progress were documented in objective or measurable terms, and detailed status updates were provided in each IDTT clinical summary. It was also clear that the patient was included in treatment planning and the tracking of progress. STEP goals were also appropriate, and the implementation of the STEP program appeared consistent with policy language.

Of concern was the delay in resolution of the need for diagnostic clarification. A referral for psychological testing was submitted five months prior in September 2022, and had not been completed at the time of review. Diagnostic clarification is an important requirement for treatment, resolution of this issue was necessary to appropriately direct treatment efforts regarding the appropriate diagnoses.

**Patient R**

This 48-year-old patient's healthcare record was reviewed to assess the quality of acute care provided to maximum custody patients at the SQ-PIP. The patient was referred from the CMF MHCB due to psychotic symptoms, aggressive behavior, medication nonadherence and grave disability concerns. He was admitted to the SQ-PIP on or around September 5, 2022. He was provided with diagnoses of schizophrenia, unspecified schizophrenia and other psychotic disorder, and antisocial personality disorder. The patient also had a history of traumatic brain injury and neurocognitive disorder. He was prescribed olanzapine for psychosis, hydroxyzine for anxiety and melatonin for sleep. In October 2022, a PC 2602 order was granted due to grave disability and danger to others.

The initial IDTT occurred timely. The PC initial assessment was not timely, completed two days after the initial IDTT. The initial psychiatrist assessment was not located in the healthcare record. Upon admission, the PC noted that the patient was responding to internal stimuli and exhibiting grandiose delusional thinking, paranoia and hypervigilance.

Treatment plans targeted medication adherence, grave disability, delusions and anxiety. Throughout the current hospitalization, the patient was retained on maximum custody status, and the IDTT recommended a single cell due to active psychosis, including paranoia, aggression, and mental health symptoms that they deemed appeared to increase his danger to others. Despite this, treatment plans did not include interventions to address aggressive or violent behaviors. Instead, interventions listed in the IPOCs section of the treatment plan were limited to a generic statement that the PC would foster a therapeutic alliance through empathy.

On November 16, 2022, the patient received an RVR for delaying a peace officer. The corresponding RVR mental health assessment determined that there was a nexus between the patient's mental illness and RVR behavior, suggesting that his delusional belief regarding food tampering likely contributed to the alleged incident. In December 2022, the patient refused most individual contacts, but reportedly attended some treatment groups. However, during one attended PC contact in December 2022; the patient reported that many groups had been cancelled recently and that patients had not received incentives. The patient continued to present with grandiose delusional and disorganized thinking and "intense eye contact" during December 2022, but providers routinely described him as calm during his interactions with others.

During January and February 2023, the IDTT continued to note that the patient was retained on maximum custody status for recent assaultive behavior; however, the corresponding rationale only referenced RVRs received in May and June 2022. Some recent progress notes referenced premature removal from a treatment group by a custody escort due to aggression toward another patient and assault on an officer; however, no dates for these incidents were provided. During January and February 2023, the patient also continued to refuse most individual treatment contacts, and individual providers routinely documented that he was either sleeping under a blanket or lying down on his bed when they attempted to interview him at cell front. Treatment plans and progress notes, however, continued not to reference interventions targeting aggressive and violent behaviors or individual treatment nonadherence.

The IDTT convened again on February 7, 2022, and a plan was documented to discharge the patient to an ASU EOP hub on February 15, 2023. At that time, the IDTT noted that the patient had increased his group treatment attendance during the preceding two-week period, but he continued to refuse most individual treatment sessions and in-cell materials. Regarding the referring institution's treatment outcome expectations, the SQ-PIP treatment team opined that the expectations for developing insight into mental illness and the need for medication were unrealistic. The IDTT further indicated that; although the MAR suggested medication adherence, the patient recently admitted during a PC contact to diverting his psychotropic medications. The patient also reported having no intention of taking psychotropic medication after his PC 2602 order expired. The level of care rationale section on this date did not provide a sufficient justification for discharging the patient to an ASU EOP hub instead of to an intermediate care program.

The patient discharged from the SQ-PIP and transferred to CSP/Sac on or around February 17, 2023.

**Findings**

Although the psychiatrist appropriately pursued an involuntary medication order; the overall care provided to this acute care patient was inadequate.

While the IDTT indicated that the patient required maximum custody status and single cell placement due concerns regarding danger to others with aggressive and violent behaviors motivated by symptoms of a serious mental illness; treatment plans did not include interventions to address these concerns. Treatment plans also did not address the patient's ongoing nonadherence with individual contacts. Although the IDTT decision to discharge the patient from the acute level of care was appropriate, the team did not provide a sufficient justification for discharging the patient to an ASU EOP hub rather than to an intermediate care program. This was concerning as the patient demonstrated minimal progress in several areas and had very recently admitted to diverting his psychotropic medications.

**Patient S**

This 52-year-old patient's healthcare record was reviewed to evaluate the quality of acute care provided to patients at the SQ-PIP. The patient was referred from the SQ MHCB due to ongoing risk of self-harm. The MHCB IDTT referenced a recent self-harm cutting incident, ongoing thoughts of suicide, depressive symptoms, limited engagement with mental health staff and refusal of out-of-cell activities. The most recent SRASHE occurred prior to the MHCB admission on October 6, 2022, with assessment of moderate acute and chronic suicide risk.

The SQ-PIP admitted the patient in the acute program on October 5, 2022. He was initially provided a diagnosis of major depressive disorder, recurrent episode; however, diagnoses referenced in more recent psychiatric progress notes included unspecified depressive disorder and severe adjustment disorder with mixed anxiety and depressed mood. The patient was prescribed Effexor with overall medication adherence throughout the SQ-PIP hospitalization.

The initial IDTT occurred timely. The initial PC assessment was not timely and occurred several days after the initial IDTT. An initial psychiatric assessment was not located in the healthcare record. The planned contact frequencies indicated that the patient would be offered psychiatric contacts every 72 hours, weekly individual contacts with a psychologist and a social worker, and ten hours of weekly treatment groups. Individual progress notes suggested that routine psychiatric and PC contacts generally occurred timely, and relevant therapeutic interventions were documented during individual PC encounters. It appeared that all or nearly all treatment groups were facilitated by nursing staff or recreation therapists.

Treatment plans targeted the patient's guilt, worthlessness, depressed mood, distress tolerance, group treatment participation and suicidal thoughts. The STEP incentive program was also used to increase group treatment participation. Throughout the current hospitalization, the IDTT documented that the patient remained on Close B status and had not required mechanical restraints since his review on October 21, 2022.

Treatment plan clinical summaries provided useful information about the course of hospitalization. The patient had not received an RVR or engaged in self-harm during the current stay. He remained medication adherent, regularly attended individual treatment contacts, continued to respond positively to the STEP incentive program by increasing his group treatment attendance, and reported motivation to actively participate in mental health treatment once discharged to an intermediate care program.

Throughout the current acute care hospitalization, the patient routinely reported moderate levels of anxiety and depression, chronic passive thoughts of suicide, and conditional plans to attempt suicide if placed on a Level 4 yard; although, he denied specific safety concerns. The patient also reported ongoing distress related to a pending RVR hearing for an alleged incident of overfamiliarity in July 2022 and the impact that the RVR might have at a future board of prison hearing review.

The IDTT repeatedly documented plans to discharge the patient to intermediate care since early January 2023, adding that the patient was also anticipating treatment at an intermediate care facility. The IDTT convened most recently on February 24, 2023, and noted that the patient would likely be discharged to intermediate care on March 1, 2023.

**Findings**

The care provided to this acute care patient was adequate.

Although the initial assessments did not occur timely, the initial IDTT occurred timely. Treatment plans included appropriate targets and interventions, and goals were measurable. The IDTT documented evidence of progress toward discharge over the course of four months, including the patient's ongoing medication adherence, lack of self-harm incidents, increased participation in individual and group treatment, and motivation to receive additional treatment in intermediate care. While this patient appeared appropriate and willing to discharge to intermediate care in January 2023, he seemingly had good rapport with his current treatment

team and continued to benefit from the individual counseling and group treatment offered while in the program.

**Patient T**

This 39-year-old patient's healthcare record was reviewed to assess the quality of acute care provided to maximum custody patients at the SQ-PIP. The patient was referred from the CSP/LAC MHCB due to danger to self and others. While at CSP/LAC, the patient exhibited psychotic symptoms, refused treatment and medication, and received three RVRs within a two-month period, one for battery on a peace officer. Prior to the SQ-PIP admission, the patient also engaged in seven self-harm incidents during October and November 2022, including cutting, biting his arms, and severe head banging resulting in evaluations at an outside hospital. The most recent SRASHE, dated December 1, 2022, assessed moderate chronic and acute suicide risk.

The patient was admitted to the SQ-PIP acute program on or around November 30, 2022. He was provided with diagnoses of schizophrenia and schizotypal personality disorder. He was prescribed Zyprexa, perphenazine, lithium, mirtazapine and Benadryl; documentation indicated that the patient was medication nonadherent throughout the SQ-PIP hospitalization.

Two RVR mental health assessments were completed during this hospitalization, both for RVRs issued at CSP/LAC. The assessments determined that there was a nexus between the patient's psychiatric symptoms and RVR behaviors, and the evaluating clinicians documented for the hearing officer that prolonged isolation was not recommended, as it would likely lead to worsening symptoms. The clinicians also recommended retention of phone privileges.

An initial psychiatric assessment was not located in the healthcare record. The initial PC assessment was completed timely on December 1, 2022. The initial IDTT occurred timely on December 1, 2022. IDTT treatment plans targeted medication and treatment nonadherence, self-harm and psychotic symptoms. The IDTT also indicated that the STEP incentive program would be used to motivate treatment attendance.

A review of clinical notes between December 1, 2022 and the date of review on February 15, 2023, suggested that the patient had not demonstrated noteworthy progress during the current acute care hospitalization. Providers continued to reference ongoing concerns regarding danger to self and others and grave disability. IDTTs noted the severity of the patient's psychotic symptoms and acknowledged that they were an ongoing barrier to treatment engagement, medication adherence, attention to ADLs and participation in out of cell activities, including showers and yard. Nearly all individual treatment contacts were completed at cell front due to the patient's fear of leaving his cell. Healthcare records also referenced the patient's ongoing fear of food tampering, missed meals, crying in the cell, screaming at auditory hallucinations and threatening violence toward staff.

On or around February 1, 2023, the IDTT submitted a chrono recommending "cuff only" status for the patient. The IDTT also documented that SHU restriction and duration on maximum

451

custody restriction had been reviewed in ICC and that a CC2 consultation had not confirmed the patient's removal from cuff status.

Despite IDTTs and individual providers repeatedly documenting plans to pursue or to consider a PC 2602 petition since December 1, 2022; the PC 2602 petition was not filed until on or after February 7, 2023.

During mid-February 2023, the IDTT continued to rate the patient's psychotic symptoms as very severe. Individual mental health providers also documented that the patient continued not to maintain his ADLS, not to participate in out of cell activities, refusing individual treatment contacts or to leave his cell due to fear of attack. Further, despite the patient's lack of positive response to the STEP incentive program, the IDTT continued to document that a positive behavior support plan was not yet considered through February 15, 2023.

The most recent IDTT documentation indicated that a non-emergent PC 2602 hearing was scheduled for February 28, 2023.

**Findings**

The care provided to this acute care patient on maximum custody status was inadequate.

Throughout the current acute care hospitalization; mental health, nursing and custody staff documented sufficient evidence indicating that the patient had grave disability and presented danger to himself and to others as a result of a severe mental illness. Clinical notes since December 2022 suggested that his very severe psychotic symptoms also resulted in objective signs of suffering (e.g., shouting at auditory hallucinations and crying), fearfulness of leaving his cell, failure to attend to ADLs, threats of violence toward staff, worry that his food had been contaminated, and recommendation for ongoing cuffing and maximum custody status. While mental health staff repeatedly documented consideration of obtaining an involuntary medication order since December 1, 2022, they did not document a sufficient rationale for not pursuing the order sooner, prior to February 7, 2023. Lastly, the IDTT continued to document that the patient exhibited poor attention to ADLs without developing IPOCs to address this concern or to refer the patient to the positive behavior support team for evaluation and development of a positive behavior support plan.

**Patient U**

This 56-year-old patient's healthcare record was reviewed to assess the quality of acute care provided to maximum custody patients at the SQ-PIP.

The patient was referred from the CSP/Sac MHCB due to poor medication adherence, suicidal and homicidal thoughts, self-induced vomiting, possible razor blade ingestion and delusions involving food tampering and custody staff murdering his children. The patient also received a serious RVR for battery with a deadly weapon while at CSP/Sac on October 14, 2022.

The patient was admitted to the SQ-PIP on October 24, 2022. He was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, PTSD, bulimia, opioid use disorder and antisocial personality disorder. The primary clinician also documented traits of borderline personality disorder. New concerns noted during this hospitalization included body image issues and reports of vomiting with weight loss. He was prescribed quetiapine, prazosin, melatonin, benztropine and hydroxyzine.

The primary clinician completed the initial assessment timely on October 26, 2022, prior to the initial IDTT. The psychiatric initial assessment was not located in the healthcare record. Treatment plans indicated that the patient would be offered psychiatric contacts every 72 hours, weekly psychologist and social worker contacts and ten hours of weekly treatment groups. A review of PC progress notes suggested meaningful and evidence-based interventions were implemented during individual encounters. The PC also documented the patient's response to treatment interventions during these contacts. Psychiatric contacts occurred timely, and the provider adjusted the patient's medications throughout the current admission. The patient was generally offered four to seven weekly treatment groups that were 45 to 75 minutes in duration.

Treatment plans targeted depression, anger, threats toward others, psychotic symptoms, medication adherence and suicidal thoughts. STEP program incentives were used to increase group and yard attendance. The patient responded well to the STEP incentive program, and he advanced to level 3 by January 2023. Clinical summaries were updated at the time of each IDTT to indicate progress toward discharge objectives, obstacles to progress and ongoing treatment needs prior to discharge.

The patient was accused of stabbing another incarcerated individual prior to the SQ-PIP admission in October 2022. During this hospitalization, the patient received three RVRs. In November and December 2022, he reportedly made homicidal threats toward others. On January 16, 2023, he reportedly removed his handcuffs and refused to return the handcuffs and key. The patient was subsequently escorted using triangular mechanical restraints.

A review of PC progress notes suggested that the PC addressed the RVR behaviors with adequate interventions during individual encounters. Additionally, IDTTs appropriately completed the maximum custody section of the treatment plans by providing an opinion regarding whether the patient's mental health symptoms might result in an adverse change in custody status. The IDTT also documented plans for addressing the behaviors and symptoms warranting ongoing maximum custody and cuffing status.

The healthcare record suggested that the patient demonstrated some progress during the acute care hospitalization; however, the IDTT continued to document concerns regarding intermittent violent outbursts and what was described as a pattern of regression every two weeks. As such, the IDTT determined that the patient was not ready for an outpatient setting and submitted a referral for intermediate care on January 25, 2023. The discharge documentation provided individualized recommendations for care continuity.

**Findings**

The care provided to this acute care patient on maximum custody status was adequate.

Treatment plans targeted the reasons for referral and were modified based on the patient's response and new presenting problems during hospitalization. STEP goals were appropriate and appeared to be effective in increasing the patient's participation in treatment and other out of cell activities. Although the patient remained on maximum custody status, the IDTT appropriately reviewed and recommended specific interventions to address his maximum custody and cuffing status. Treatment plans and PC interventions also addressed the behaviors resulting in RVRs. Additionally, progress notes and IDTT documentation suggested that level of care decisions were appropriate.

**Patient V**

This 40-year-old condemned patient's healthcare record was reviewed to assess the quality of acute care provided to maximum custody patients at the SQ-PIP. The patient was referred from the SQ MHCB. The referring IDTT concerns included resistance to treatment, psychotic symptoms, bizarre and disorganized thinking, paranoid delusions and risk of danger to self and others. The SQ MHCB admission SRASHE assessed high acute and chronic suicide risk.

The patient was admitted to the SQ-PIP on December 20, 2022. He was provided diagnoses of bipolar I disorder, most recent episode depressed with psychotic features; stimulant use disorder; opioid use disorder and PTSD. He was prescribed Zyprexa.

The initial primary clinician assessment was not completed timely with completion after the initial IDTT. The most recent initial psychiatric assessment was completed more than one year prior on October 14, 2021. Treatment plans indicated that psychiatric contacts would occur every 72 hours, and the psychologist and social worker would follow up weekly. Treatment plans also indicated that the patient would be offered ten hours of weekly treatment groups.

Two RVR mental health assessments were completed during the current acute care hospitalization. He received RVRs for indecent exposure without prior convictions and battery on a peace officer. The two evaluating clinicians determined that there was a nexus between the patient's mental illness and RVR behaviors. Recommendations for the hearing officer included retention of phone privileges for ongoing family contact.

Treatment plans targeted the patient's mood and psychotic symptoms, treatment and medication nonadherence and danger to self and others. The STEP incentive program was used to increase attendance in IDTT, treatment groups and individual mental health appointments.

Within three days of admission, the patient was placed on suicide watch. He remained on suicide watch from December 23, 2022 to January 3, 2023. During that period, he also refused individual contacts and psychotropic medication. On January 4, 2023, the patient reported feeling motivated to consistently program, and he requested programming and treatment groups; however, groups were not offered until a few days prior to his discharge on January 14, 2023.

IDTTs provided useful updates on current symptoms, functioning and treatment response. In January 2023, the IDTT noted that the patient had remained sober and had exhibited a gradual improvement in symptoms due to the long-acting antipsychotic medication prescribed during this hospitalization. The IDTT also noted that the patient no longer presented with acute risk for suicide, cooperated in programming, voluntarily accepted medication and agreed to further treatment in the intermediate care setting.

The patient discharged to the intermediate level of care on or around January 18, 2022. The discharge documentation included individualized treatment recommendations for care continuity. A review of the initial intermediate care progress notes suggested that the patient continued to engage in treatment and to demonstrate further improvements in symptoms and functioning.

**Findings**

Overall, the care provided to this condemned patient during the four-week acute care hospitalization was adequate.

While there were unexplained delays in offering treatment groups after the patient was released from suicide watch, individual contacts were offered in accordance with treatment planning, and therapeutic interventions were implemented during those encounters. The patient demonstrated significant improvement in a short period of time, and he appeared with continued progress after discharge to the intermediate care program at the SQ-PIP.

Additionally, the RVR mental health assessments appropriately recognized the impact of the patient's mental illness on his behaviors, and the evaluating clinicians provided at least one relevant recommendation for the hearing officer to consider.

As this condemned patient was on maximum custody status, review of his custody level was not indicated.

# APPENDIX C

# ACTIVITIES OF THE SPECIAL MASTER

**ACTIVITIES OF THE SPECIAL MASTER <u>SINCE</u> THE SUBMISSION OF THE TWENTY-NINTH MONITORING ROUND REPORT – PART D: SPECIAL MASTER'S MONITORING REPORT ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATIONS INSTITUTIONS WITH CORRECTIONAL CLINICAL CASE MANAGEMENT PROGRAMS COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS, FILED FEBRUARY 7, 2023, ECF NO. 7716**

**DATA REMEDIATION ACTIVITIES**

- Business Rules and Methodology Review Workgroup – 25 meetings

- Quality Assurance Certification Workgroup – Meets Weekly

- Indicators Status (based on data provided by CDCR at the May 10, 2023 BRMR Meeting):
  - <u>Initial Documentation Preparation</u>: 143 Indicators Started; 130 Indicators Completed
  - <u>Documentation Reviewed with Stakeholders (Validation)</u>: 129 Indicators Started; 99 Indicators Completed
  - <u>Documentation Updated and Approved By MH</u>: 99 Indicators Started; 98 Indicators Completed.
  - <u>Indicator Programming</u>: 90 Indicators Started; 80 Indicators Completed
  - <u>Indicator Testing (Verification)</u>: 78 Indicators Started; 64 Indicators Completed.
  - <u>Remediated</u>: 42 Indicators

**COURT COORDINATION MEETINGS – Two meetings**

**SMALL WORKGROUP MEETINGS**

- DSH Small Workgroup – Nine meetings, CDCR discontinued this meeting April 4, 2023.

**UNA MEETINGS**

- Case Presentations – 35 meetings

- Dispute Resolutions – Seven meetings

- Patient Interview – One interview

**SPECIAL MASTER REPORTS**

- Special Master's Report and Recommendations Regarding Third-Level Data Remediation Disputes Pursuant to the Data Remediation Dispute Resolution Process, ECF No. 7755