DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

       Plaintiffs,

   v.

GAVIN NEWSOM, et al.,

       Defendants.

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO REJECT DEFENDANTS' PLAN TO PROVIDE MINIMUM TREATMENT STANDARDS FOR PSYCHIATRIC INPATIENT PROGRAMS (ECF NO. 7787) AS INADEQUATE TO REMEDY DEFENDANTS' EIGHTH AMENDMENT VIOLATIONS**

Judge:   Hon. Kimberly J. Mueller

[4290989.5]

**INTRODUCTION**

1. I am providing this declaration in support of Plaintiffs' Reply in Support of Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for the Psychiatric Inpatient Programs (ECF No. 7787) As Inadequate to Remedy Defendants' Eighth Amendment Violations.

2. This declaration supplements the declaration I provided on April 17, 2023 in support of Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for the Psychiatric Inpatient Programs (ECF No. 7787) As Inadequate to Remedy Defendants' Eighth Amendment Violations, filed at ECF No. 7812-2 (Stewart Decl.). In preparing this declaration, I reviewed the following documents:

- Defendants' Memorandum in Opposition to Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs, filed at ECF No. 7828 (Defs.' Opp'n);

- Declaration of Joseph Penn, M.D., in Support of Defendants' Memorandum in Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs, filed at ECF No. 7828-1 (Penn Decl.);

- Declaration of Namrata Kotwani in Support of Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs, filed at ECF No. 7828-2 (Kotwani Decl.); and

- Declaration of Amar Mehta, M.D., in Support of Defendants' Opposition to Plaintiffs' Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs, filed at ECF No. 7828-3 (Mehta Decl.).

3. Below, in response to the above filings, I detail my view of how to interpret the utility of existing national correctional healthcare standards in the development of minimum treatment standards for CDCR's PIPs, my methodological approach to selecting patients for records review, and my patient interview protocol.

## NATIONAL CORRECTIONAL HEALTHCARE STANDARDS

4.      As an initial matter, I must state that I do not put much weight on the utility of national correctional healthcare standards for guiding remedial approaches in correctional systems which have a documented history of constitutional inadequacy, as in California.  I cited Standard P-F-03 of the National Commission on Correctional Health Care's *Standards for Health Services in Prisons* (2018) in my report to give an example of a very low bar for treatment, which CDCR chose to aim below.  To be clear: my view on the frequency of clinical contacts required for the adequate treatment of acutely ill psychiatric inpatients (daily rounds by both psychiatrists and psychologists) is not based on this or any other national correctional standard.  Rather, it is based on my decades of experience treating thousands of psychiatric inpatients in both community and correctional settings, and in my experience as a monitor.  Furthermore, contrary to Defendants' assertions, Defs.' Opp'n, ECF No. 7828 at 10, I did offer an example of a jurisdiction where I observed this frequency of psychiatry contacts in a correctional setting: Illinois. Stewart Decl., ECF No. 7812-2 at ¶ 21.

5.      I agree with Defendants that Standard P-F-03 refers to on-site acute "residential units," rather than "inpatient psychiatric hospitalization."  *See* Defs.' Opp'n, ECF No. 7828 at 9; Exhibit B, Kotwani Decl., ECF No. 7828-2 at 22.  However, I draw the opposite conclusion as they do from that fact.  If anything, clinical contacts should be *more* intensive in an acute inpatient hospital setting than in residential units, because inpatient psychiatric hospitalization is a higher level of care than residential units.  Defend-ants' suggestion otherwise—that, in their view, prescribing inpatients more structured treatment than patients at lower levels of care "undermines established principles of sound psychiatric care"—is frankly alarming.  Defs.' Opp'n, ECF No. 7828 at 7.

6.      Further, even if one takes as broad a view of the term "mental health staff" as Defendants do, *see id.* at 10, I would not agree that all members of a clinical team are competent to conduct "evaluations" of acutely ill patients.  Daily evaluation of acutely ill psychiatric patients should be done by psychiatrists or psychologists.  In any case,

1  Defendants' proposed minimum treatment standards for acute patients do not provide for

2  daily clinical evaluations by any member of the mental health care team.

3        7.      Furthermore, I agree with Defendants that other correctional healthcare

4  standards on inpatient psychiatric care, for example, MH-D-05 "Inpatient Psychiatric

5  Care" of the National Commission on Correctional Health Care's *Standards for Mental*

6  *Health Services in Correctional Facilities* (2015)*, see* Exhibit A, Kotwani Decl., ECF No.

7  7828-2 at 14, are instructive—but again, for opposite reasons.  This standard, as others like

8  it, is nearly contentless in terms of describing appropriate levels of clinical contacts or

9  treatment hours because it is built around the assumption that jails and prisons transfer

10  patients requiring psychiatric hospital-level care to outside hospitals.  For example, the

11  bulk of the discussion in this standard refers to the importance of correctional facilities

12  obtaining a written agreement with outside community hospitals, and ensuring that

13  "appropriate continuity of care" is provided with "off-site providers."  *Id.*  These standards

14  are consistent with what I stated in my initial declaration: in my experience, many

15  correctional systems utilize outside psychiatric hospitals for patients requiring that level of

16  care; they do not attempt to provide psychiatric inpatient services "in-house," as CDCR

17  has elected to do.  If the system chooses to use in-house psychiatric care, then it should

18  meet the same standard as outside hospitals.

19  **PATIENT SELECTION FOR RECORDS REVIEW**

20        8.      I utilized a two-part methodology to select patients for in-depth records

21  review.  First, I used random selection to create a sample of patients to collect more

22  information about.  Specifically, of the 950 patients in the total PIP census on March 28,

23  2023, I randomly selected a group of 46 patients, representing approximately 5% of the

24  overall CDCR PIP.  This 5% random sample of patients was remarkably representative of

25  the overall PIP population on several key variables including institution and level of care

26  (acute v. ICF).  *See* **Exhibit A**.  However, as I noted in my initial declaration, the random

27  sample was not representative on one characteristic: patients' length of stay.  The average

28  length of stay in my random sample was 208.3 days whereas the average length of stay in

1  the total population was 134.1 days.  This length-of-stay differential was largely driven by

2  two length-of-stay outliers: two patients, **Patient X** and **Patient Y**, who were randomly

3  selected and who had lengths of stay over 1,000 days in the PIPs.  When these patients are

4  removed from the length-of-stay analysis, the average length of stay of my sample reduced

5  to 150.3 days, much closer to the overall population.  I reviewed one of these patients'

6  records, but I did not discuss either of these two patients with unusually long inpatient

7  stays in my April 17, 2023 declaration.

8      9.    In the experimental sciences, random selection is the "gold standard" method

9  of assignment of patients into treatment or control groups because it ensures that patients

10  are not being selected on the basis of a confounding observed or unobserved variable.  The

11  fact that random selection may result in a sample not being representative on every

12  *observed* variable does not make the sample "biased," as Defendants suggest.  Defs.'

13  Opp'n, ECF No. 7828 at 17.  There is no method to ensure that any sample is perfectly

14  representative of the total population, because even if one selected the sample to be

15  representative according to a slew of measured variables, there could always be confound-

16  ing, unmeasured variables that distinguish the sample from the total population.  Random

17  selection is the selection tool of choice for many scientific purposes because it avoids any

18  risk that patients are sorted into a treatment or control group in a way that differs in

19  systematic—observed or unobserved—way that correlates with the dependent variables of

20  interest.  Here, it was simply utilized to draw as representative of a sample as possible.

21      10.   From my 5% sample, I selected approximately half (n=24) to review in more

22  depth.  Specifically, consistent with my practice in other cases, I chose to focus my

23  examination on the most seriously ill patients in this group.  *See Jensen v. Shinn*, 609 F.

24  Supp. 3d 789, 855-856 (D. Ariz. 2022).  In my view, the adequacy of a healthcare system

25  can best be assessed from the standpoint of those in most of need of care.  I selected the

26  most ill patients of the group on the basis of their prescribed psychotropic medications,

27  self-harm history, and forced treatment orders.  Given the severity of illness in this group,

28  it was my assumption that these patients would likely receive more frequent clinical

contacts and more focused structured treatment attention than the average PIP patient.  In this way, given my outcome of interest—whether the amount of treatment provided to these patients was adequate—this group was intended to provide a conservative estimate of any treatment provision inadequacies.

## INTERVIEW PROTOCOL

11.     I interviewed two patients at each of the three PIPs I visited in April 2023. All patients were drawn from the initial randomly selected pool, not on the basis of prior correspondence with Plaintiffs' counsel or any other rationale.  I only interviewed patients whose records I had already reviewed prior to my site visits.  Specifically, I reviewed their appointment attendance history, their most recent treatment plan, and their most recent psychiatry note prior to the interview.  This gave me a good sense of their clinicians' view of their psychiatric issues, their diagnoses, and course of treatment, including current medications.  Given that I already had documentation from each patients' treating psychiatrist and treatment team, in my view, there was no need to speak in-person with any clinicians about these specific patients during my site visits.

12.     The purpose of the interviews was to understand the patients' experience of treatment in the PIPs.  An attorney for Plaintiffs, Arielle Tolman, accompanied me for each interview.  We introduced ourselves and explained the purpose of the interview, *i.e.*, that she was class counsel, that I was a psychiatrist, an expert working for Plaintiffs, and that the purpose of the interview was to learn about the care the patient was receiving in the PIPs.  We explained that the interview was completely voluntary.  We also explained that although I am a psychiatrist, I was not the *patient's* psychiatrist.  Each of the interviews lasted approximately 15-20 minutes.  We asked each patient a standard set of questions (e.g., where were you housed before you came to this PIP, why were you admitted, how frequently do you see your psychiatrist, how frequently do you go to groups, how often are you out of your cell each day?).  In addition, where appropriate, we asked some targeted follow-ups based on patients' responses.  For example, if patients said they did not like going to groups, we asked why that was.

13.    These interviews were not comprehensive psychiatric evaluations by any means.  However, despite their informality, and their brevity, I was able to glean quite a bit of information about the symptomatology of these patients.  Indeed, in several cases, patients disclosed current psychotic symptoms that were not noted in their records.  In those cases where it was apparent to me that they were experiencing serious untreated symptoms, that is, when my clinical observations conflicted with the patients' records, I encouraged patients to talk to their clinicians about what they were experiencing.  In addition, these interviews helped me understand with more clarity some of the grave systemic deficiencies in CDCR's PIPs.  As one acute patient at San Quentin explained to me, rather than be treated as if he was in a hospital, in the PIP, he just moved from his cell, to a treatment module, to a cage in the yard, to a dayroom alone, or, as he put it, "from cage, to cage, to cage."

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1       I declare under penalty of perjury under the laws of the United States of America

2 that the foregoing is true and correct to the best of my knowledge, and that this declaration

3 is executed at Honolulu, Hawaii this 16th day of May, 2023.

4

5

6                                            Pablo Stewart, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## Aulx  PIP Patient Sample and Total PIP Patient Population (March 28, 2023)

**Institution Distribution (5% Sample)**

| Institution | Number of Patients | Percentage |
|---|---|---|
| CHCF | 13 | 0.282609 |
| CIW | 2 | 0.043478 |
| CMF | 16 | 0.347826 |
| SQ | 4 | 0.086957 |
| SVSP | 11 | 0.23913 |
| Total | 46 | |



**Institution Distribution (Total PIP)**

| Institution | Number of Patients | Percentage |
|---|---|---|
| CHCF | 340 | 0.357895 |
| CIW | 39 | 0.041053 |
| CMF | 308 | 0.324211 |
| SQ | 36 | 0.037895 |
| SVSP | 227 | 0.238947 |
| Total | 950 | |



**LOC Distribution (5% Sample)**

| Program | Count of Program | Percentage |
|---------|------------------|------------|
| ACU(M) | 15 | 0.326087 |
| ICF(M) | 24 | 0.521739 |
| PIP (all) | 7 | 0.152174 |
| Total | 46 | |



**LOC Distribution (Total PIP)**

| Program | Count of Program | Percentage |
|---------|------------------|------------|
| ACU(M) | 281 | 0.295789 |
| ICF(M) | 578 | 0.608421 |
| PIP (all) | 91 | 0.09579 |
| Total | 950 | |

