1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RALPH COLEMAN, et al.,                        No. 2:90-cv-0520 KJM DB P

12                       Plaintiffs,                ORDER

13          v.

14    GAVIN NEWSOM, et al.,

15                       Defendants.

16

17          Since 2020, defendants have been working under the Special Master's supervision and

18    with plaintiffs' participation to remediate data about mental health care to the plaintiff class.  *See*,

19    *e.g.*, September 3, 2020 Order, ECF No. 6846, at 24 n.12[1]; *see also* August 25, 2021 Order, ECF

20    No. 7283, at 3-4.  The main purpose of this remedial work is to ensure defendants' reports are

21    transparent and accurate.  *See Coleman v. Newsom*, 424 F. Supp. 3d 925, 929 (E.D. Cal. 2019)

22    (*Golding I*).  This remedial work became necessary after the court learned defendants had

23    knowingly presented misleading data to the court and Special Master.  *See generally id*.

24          Two related matters are now pending.  First, plaintiffs move for clarification that the

25    purpose of data remediation is to ensure defendants' "data is technically accurate, [and] that it

---

[1] In this order citations to page numbers in documents filed in the Court's Electronic Case
Filing (ECF) System are to the page number assigned by the ECF System and located in the upper
right-hand corner of the page.

1    also properly reflects the minimum remedial requirements that govern this case." ECF No. 7721

2    at 6.[2]  Defendants oppose the motion, ECF No. 7752, and plaintiffs have filed a reply, ECF

3    No. 7768.  Second, the Special Master has filed a Report and Recommendations regarding certain

4    data remediation disputes (hereafter Report), including what the Special Master describes as "the

5    essential dispute among the stakeholders" over the purpose of data remediation.  ECF No. 7755

6    at 6.  Defendants filed objections to the Report, ECF No. 7805, and, with leave of court, ECF

7    Nos. 7810, 7821, plaintiffs have responded, ECF No. 7825.

8            Due to concerns with the parties' previous filings, the court required all counsel and

9    principals who have filed briefs or evidence in connection with these two pending matters to file

10   affidavits attesting they have read specific prior court orders and reports from the Special Master.

11   March 13, 2023 Order, ECF No. 7757 (specifically identifying orders and reports).  Two counsel

12   for plaintiffs and seven counsel for defendants have filed the required affidavits.  *See* ECF Nos.

13   7779, 7780 (plaintiffs' counsel); ECF Nos. 7776-7778, 7781-7784 (defendants' counsel).  Eight

14   defense principals have filed the required affidavits, ECF Nos. 7794-7801, and as authorized by

15   the March 13, 2023 order, one defense principal has amended his declaration in opposition to

16   plaintiffs' motion.  ECF No. 7802.

17          As explained below, the court now resolves the disputes above.[3]

18   **I.    FUNDAMENTAL PURPOSE OF DATA REMEDIATION**

19          **A.    Respective Positions of the Special Master and the Parties**

20          As plaintiffs and the Special Master see it, the parties disagree about the purpose of data

21   remediation.  Plaintiffs describe the dispute as follows:

---

[2] Plaintiffs' motion raises two issues in addition to the data remediation issue.  *See* ECF No. 7721 at 2.  In addition, defendants have moved to redact a whistleblower report.  ECF No. 7720.  The court submitted both motions on the papers and will address these issues in a separate order.  March 17, 2023 Order, ECF No. 7765.

[3] In their response to defendants' objections, plaintiffs represent the parties have reached agreement on two of the four specific third-level disputes discussed in the Special Master's Report.  ECF No. 7825 at 2, 7.  On May 16, 2023, the parties submitted a stipulation and proposed order memorializing their agreement and the Special Master's approval thereof.  ECF No. 7837.  The court approved the stipulation by separate order.  May 19, 2023 Order, ECF No. 7844.

1      Defendants' mental health leadership appear to believe the process is limited to
2      verifying that the data measures what CDCR designed it to measure.  Plaintiffs
3      maintain that the data remediation process is meant to ensure not only that the data
4      is technically accurate, but that it also properly reflects the minimum remedial
5      requirements that govern this case.

6  ECF No. 7721 at 6 (citation omitted).  The Special Master describes the dispute similarly as over

7  whether data remediation is to ensure that "defendants' operationalization of key CQIT indicators

8  accurately measure what defendants purport them to measure" or, instead, that "defendants'

9  operationalization of the provisionally approved indicators accurately measure what they should

10  measure in concordance with the Program Guide or other court-ordered remedial requirements, as

11  informed by the Special Master's long-standing monitoring practices."  ECF No. 7755 at 6.

12  CQIT, short for "continuous quality improvement tool," is the comprehensive tool defendants

13  will ultimately use when they assume the monitoring responsibilities the Special Master has borne

14  to date.  *See generally*, July 1, 2021 Order, ECF No. 7216; *see also* January 4, 2023 Order, ECF

15  No. 7695, at 2.   "The 'key indicators' in CQIT 'signify the material provisions of the Program

16  Guide and the Compendium that must be durably implemented' in order to satisfy the Eighth

17  Amendment."  ECF No. 7216 at 4 (citing  ECF No. 6846 at 28; December 16, 2020 Order, ECF

18  No. 6996, at 8).   The Program Guide, in turn, is "defendants' plan, approved by the court, to

19  remedy identified violations in the delivery of mental health care to the plaintiff class."  ECF

20  No. 6846 at 4.  And the Compendium is the Compendium of Custody-Related Policies and

21  Orders.  *Id*. at 6.

22       Defendants "do not disagree that data measures should comport with remedial

23  requirements" but they believe the parties disagree about "the breadth and scope of the 'remedial

24  requirements.'"  ECF No. 7752 at 14.  Defendants identify three disagreements:

25      (1) which indicators are key, i.e., a core metric that provides useful information on
26      remedial requirements;

27      (2) whether the underlying business rule ensures that indicators properly measure
28      the Program Guide; and

29      (3) whether certain proposed changes are reasonable modifications, attempts to
30      expand the remedial scope beyond the key provisions of the Program Guide
31      compliance, or disguised requests for entirely new indicators.

1   *Id.* (line breaks added for clarity).  Defendants also contend plaintiffs are trying to obtain a

2   premature definition of a final list of "key indicators" for CQIT, and they reiterate their "concerns

3   that many of the indicators that the Special Master or plaintiffs may designate as 'key indicators'

4   do not in fact measure constitutionally-mandated requirements." *Id.* at 17.

5        Defendants also assert the Special Master's description of "Defendants' purported

6   understanding of data remediation is inaccurate."  ECF No. 7805 at 3.  Defendants state they

7        recognize, and the Court and the Special Master have both emphasized, that the key
8        indicators should be a "distil[lation]" of the "most salient elements" of the Program
9        Guide and should "signify the material provisions of the Program Guide and
10       Compendium." . . . . Accordingly, Defendants have worked in good-faith to ensure
11       that the provisional key indicators reflect and measure the most salient elements of
12       the corresponding section in the Program Guide and Compendium.

13   ECF No. 7805 at 2-3 (citations omitted).  Defendants contend they have attempted in good faith

14   to present their clinicians' "reasonable interpretations of the Program Guide and policies," and

15   they deny that they are attempting to sow conflict or delay the data remediation process.  *Id.*

16   at 3-4.  Defendants also contend "all stakeholders must recognize that requests for modification—

17   regardless of whether they are truly for reasonable modifications—require time and effort to

18   evaluate, define, and operationalize," and they contend it is unfair to blame resulting delay on

19   them.  *Id.* at 4.  Finally, defendants accept "that indicator design should be 'informed by the

20   Special Master's monitoring of . . . remedial requirements.'"  *Id.* at 5.  They "reiterate their

21   request that the Special Master share the tools and methodologies he uses."  *Id.*

22       **B.    Analysis**

23       Since his appointment in December 1995, the Special Master has been aiding in the

24   development of remedial plans, monitoring defendants' compliance with those plans, and filing

25   monitoring reports.  *See generally* December 11, 1995 Order, ECF No. 640.  To date, the Special

26   Master has completed twenty-nine rounds of monitoring and filed corresponding reports, in

27   addition to many other reports.[4]

---

[4] The current Special Master served as Deputy Special Master from February 15, 1996, *see* February 15, 1996 Order, ECF No. 664, until his appointment as Special Master in 2007, *see* October 9, 2007 Order, ECF No. 2453.

1    In 2012, the court ordered defendants to work under the Special Master's guidance to

2 "develop an improved quality improvement process by which they can address issues with the

3 quality of care that is delivered." ECF No. 4232 at 5. Without this process, defendants could

4 neither "achieve and maintain compliance" with constitutional requirements nor "transition . . .

5 into self-monitoring and . . . *eventual removal of federal court oversight.*" *Id*. at 4-5 (quoting

6 ECF No. 4205 at 65) (emphasis in original). CQIT, a work in progress since 2012, is a core

7 component of the process. *See* August 9, 2016 Order, ECF No. 5477 at 3-4; *see also* ECF

8 No. 6846 at 10, ECF No. 6996 at 6-8. Full implementation of the improved quality assurance

9 process, including CQIT, is at the heart of

10          defendants' assumption of responsibility for self-monitoring the adequacy of mental
11          health care delivered to the plaintiff class. This function is as essential to the
12          constitutional remedy as are individual components measured by CQIT. . . . While
13          key CQIT indicators must be identified as an aid to measurement of compliance
14          with remedial plans in this action, namely the Program Guide and the Compendium,
15          that identification is but a component of full implementation of CQIT and the quality
16          improvement process," both of which are "required as part of the constitutional
17          remedy in this action to the same extent as all other court-ordered remedies.

18 ECF No. 6996, at 7-8. Simply put, CQIT is central to CDCR's assumption of monitoring

19 responsibilities. *See*, *e.g.*, ECF No. 6846 at 10.

20    CQIT must be completed so it can be used to "report all degrees of compliance with

21 monitored [remedial] requirements, from zero percent to 100 percent." July 12, 2018 Order, ECF

22 No. 5852, at 3.[5] The court's direction to finalize the list of indicators is "neither an opportunity to

23 reinvent the wheel, . . . nor it is an invitation to depart from the law of the case." ECF No. 7216

24 at 8 (quoting ECF No. 6846 at 25). Rather, it requires straightforward completion of "'a

25 necessary task' on the road to finalizing the remedy." ECF No. 7216 at 8 (quoting ECF No. 6846

26 at 26).

27    Two years ago, the court provisionally approved a preliminary list of CQIT key indicators

28 and directed the Special Master to "test and monitor the functionality and efficacy of the

---

[5] The Special Master has advised the court there are a small group of key indicators that are not susceptible to measurement by percentage. In his final report, the Special Master will identify those indicators and either stakeholder agreement or, alternatively, his proposal for how these indicators should be used in measuring compliance.

5

1   indicators on the provisionally approved list during his Twenty-Ninth Monitoring Round" and

2   thereafter report his findings to the court.  ECF No. 7216 at 14.

3        Data systems now play a critical role in monitoring delivery of mental health care to the

4   plaintiff class and the required custody remedies.  For that reason, finalization of the list of CQIT

5   key indicators "'is progressing jointly' with the ongoing data remediation process" and will be

6   presented to the court for final approval once data remediation is complete.  ECF No. 7695, at 2.

7   Resolution of disputes that arise during the data remediation process is controlled by a dispute

8   resolution process agreed to by the Special Master and the CDCR Secretary and approved by the

9   court.  *See* ECF Nos. 7556-2, May 20, 2022 Minute Order, ECF No. 7557.

10       **1.**    **Discussion**

11              a)     <u>What Must CQIT Key Indicators Measure?</u>

12       CQIT key indicators must be operationalized to properly measure the core requirements of

13  the Program Guide and the Compendium.  *See*, *e.g.*, ECF Nos 7216 at 4, 6996 at 8, 6846 at 28.

14  Accepting defendants' briefing at face value, there is no dispute over this core principle.

15  However, the briefing also reveals some fundamental misunderstandings that, unless resolved,

16  will obstruct data remediation and operationalization of CQIT.

17              (b)     <u>What CQIT Key Indicators Must Go Through the Data</u>
18                       <u>Remediation Process?</u>

19       The data remediation process requires validation and verification of all indicators on the

20  preliminary list provisionally approved by the court unless the court has ordered an indicator

21  removed from the list.  *See* ECF No. 7216 at 14.  The focus of the data remediation process is not

22  on any subset of indicators that any party believes are "key."  The focus is on the entire

23  preliminary list of key indicators provisionally approved by the court except to the extent that list

24  is modified in accordance with criteria the court has set.  *See generally id*.

25       During the period of provisional approval the court has granted, the Special Master will

26  test the "functionality and efficacy" of each indicator and "continue discussions with the parties

27  as necessary to ensure the final list of proposed indicators will serve its intended purpose."  *Id*.

28  /////

1    at 1-2.  Thus the provisional approval process allows for necessary modification of the

2    preliminary list of key indicators to eliminate, modify or add indicators.  *Id*.[6]

3          If the Special Master and all parties agree an indicator should be eliminated from the list

4    because it does not measure a core remedial requirement, then that indicator does not need to be

5    validated or verified; likewise if the court approves removal of an indicator as a result of the

6    dispute resolution process, that indicator does not need to be validated or verified.  All other key

7    indicators must be validated and verified.

8                    (c)    What is a Request for "Reasonable Modification" of a CQIT Key
9                            Indicator as Compared to a Request for a New Indicator?
10

11         CQIT's purposes are to accurately measure remedial requirements and transition

12   monitoring from the Special Master to defendants.  Each key indicator must substantively track

13   the areas the Special Master has monitored so the court can assess defendants' compliance with

14   the Eighth Amendment.  The business rules for each key indicator must be written so that the

15   court can rely on defendants' data in assessing their compliance.  Thus, each key indicator must

16   be designed and operationalized to accurately capture the corresponding information gathered and

17   reported on by the Special Master as part of his monitoring responsibilities.

18         Defendants acknowledge the design of CQIT's key indicators "should be 'informed by the

19   Special Master's monitoring of . . . remedial requirements.'"  ECF No. 7805 at 5.  Indeed,

20   defendants recognize that the data indicators must "properly replicate the monitoring process."

21   April 13, 2023 Order, ECF No. 7808, at 5 (quoting ECF No. 7733 at 3).  Defendants' repeat

22   request for the Special Master to "share the tools and methodologies he uses" in monitoring is

23   misguided.  The court has already rejected that request and incorporates the reasoning for that

24   rejection herein by reference.  ECF No. 7808 at 5.  The goal of data remediation as it applies to

25   the CQIT key indicators is to capture the substance of the Special Master's monitoring in the

26   requirements measured by the indicator.  The substance of the Special Master's monitoring is

---

[6] Unless approved by the court during the data remediation process, all adjustments to the
list of key indicators will be subject to court approval when the court reviews the final list of
CQIT indicators.

well known to defendants through the Special Master's monitoring reports, *see id*.  Defendants have actively participated in this monitoring either directly or through institutional agents or both; through document production, participation in monitoring tours by the Special Master and his team; and through the Special Master's draft and final monitoring reports and court orders on those reports.  Defense counsel and principals have all attested to reading seven of those reports in connection with their briefing on this matter.

The substance of the Special Master's monitoring is also well-known to plaintiffs; they have been afforded regular opportunities to attend monitoring tours and have also received and commented on draft and final monitoring reports.  Two of their counsel have attested to reading the required reports.

Finally, the Special Master brings over twenty-seven years of experience in the remedial phase of this action, including development and monitoring of the remedial plans and reporting to the court.  His experience informs his review of the preliminary list of CQIT indicators, his role in finalizing that list, his supervision of the data remediation process, and his role in the dispute resolution process that is part of the data remediation work, *see* ECF No. 7556-2.

All of the Special Master's monitoring reports have been reviewed and adopted in whole or in part by the court.  Therefore "straightforward completion" of the necessary tasks of finalizing the list of CQIT key indicators and ensuring the data captured by those indicators replicates the corresponding information captured by the Special Master in his monitoring reports should be virtually conflict free.  If an indicator requires modification to thoroughly capture information monitored by the Special Master on the topic covered by the indicator, each party has all relevant information: the Special Master's monitoring reports and all relevant court orders. Remedial planning has been substantially complete for at least four years.  *See* ECF No. 6214 at 4.  Therefore, new indicators should generally be limited to indicators required by court-approved updates to the remedial plans and necessary for CQIT to serve its intended purpose.  *See* ECF No. 6996 at 9-10.  The Special Master is well-situated to resolve any disputes regarding whether an indicator must be modified to capture what he has monitored or, instead, whether the requested modification actually requires creation of a new indicator.  His resolution of these

1  disputes will be grounded in established facts of record concerning the scope of his monitoring

2  and his knowledge of the requirements of all court orders in this action; consistent with the order

3  of reference, any disputes over these decisions will be reversed by the court only if the decisions

4  are clearly erroneous.  *See* ECF No. 640 at 8.

5                  (d)      <u>What Levels of Compliance Must the Key Indicators Measure?</u>

6        As discussed above, each key indicator must be operationalized so the court will

7  ultimately be able to rely on the defendants' data to assess whether and when they have come into

8  compliance with the Eighth Amendment.  To achieve this goal, the focus must be on tracking

9  compliance with each indicator from zero percent to 100 percent or, as appropriate, in a manner

10  susceptible to adequate measurement by that indicator.  *See* note 4 *supra*.  The court will resolve

11  ultimate questions of constitutional compliance.  *See*, *e.g.*, ECF No. 7216 at 4.

12              **2.**     **Conclusion**

13        The court expects that, prospectively, good faith application of the above by all

14  stakeholders will be sufficient to resolve any remaining dispute over the fundamental principles

15  guiding data remediation.  The court will direct the Special Master to report to the court

16  informally within one month whether that expectation has been met and if not, why not.

17  **II.**     **SPECIFIC DISPUTES**

18        The Special Master's Report also includes recommendations on four disputes that were

19  unresolved at the second level of the dispute resolution process.  ECF No. 7755 at 15.  The parties

20  have resolved two of those disputes.  *See* note 3 *supra*.  The court resolves the remaining two

21  disputes below.

22       **A.**     **Transfer to STRH/LTRH Within Timeframes—Transfer Clock**
23             **Freeze/Suspending Events**

24        In 2015, defendants created Correctional Clinical Case Management System—Short Term

25  Restricted Housing (CCCMS—STRH) units and Correctional Clinical Case Management

26  System—Long Term Restricted Housing (CCCMS—LTRH) units to provide alternatives to

27  placement of CCCMS inmate-patients in administrative segregation units (ASUs) and/or

28  segregated housing units (SHUs).  ECF No. 7333-1 at 450.  The first dispute arises from the

9

1    requirement that such inmate-patients be transferred to an alternative unit within thirty days after

2    an institutional classification committee (ICC) retains such inmate-patient for ASU or SHU

3    placement.  Specifically, the indicator as written reports transfers as compliant with the thirty-day

4    requirement for inmate-patients whose transfer is suspended because of a medical hold.  *See* ECF

5    No. 7755 at 17.  The Special Master recommends defendants modify this "indicator design to

6    score transfers beyond 30 days as noncompliant, unless or until the parties negotiate and the court

7    adopts an exception to this Court-approved policy."  *Id*. at 20.

8           In their objections, defendants contend the court has approved a Program Guide provision

9    that "expressly contemplates approval of not transferring a patient within 30 days if the delay is

10   because of a medical hold."  ECF No. 7805 at 5-6 (quoting ECF No. 7333-1 at 457).  Defendants

11   also contend the relevant Program Guide provision "contemplates how delayed transfers for these

12   exceptional reasons must be documented, and how patients' interests should be protected."  *Id*.

13   at 6.  In response, plaintiffs contend the court cannot entertain this argument because defendants

14   did not raise it during the dispute resolution process.  ECF No. 7825 at 9.  Plaintiffs also contend

15   the language of the policy does not establish the Special Master's recommendation is clear error.

16   *Id*.

17          The Order of Reference is clear:  the court does not consider any objection to a report or

18   recommendation by the Special Master "unless an identical objection was previously submitted to

19   the [S]pecial [M]aster . . . ."  ECF No. 640 at 8.  Defendants did not raise with the Special Master

20   the contentions they now make concerning the cited Program Guide provision.  That said, it

21   appears this Program Guide provision may have relevance to resolution of this dispute.  The court

22   notes it previously has approved exceptions to inpatient and MHCB transfer timeline

23   requirements, *see* December 15, 2017 Order, ECF No. 5750, and those exceptions may provide a

24   prototype for use in the context of transfers to LTRH and STRH units.  For this reason, this issue

25   will be referred back to the Special Master for further consideration.  The parties are reminded of

26   their obligation to timely present the Special Master with all relevant information and their

27   respective positions during the dispute resolution process.  The parties are also encouraged to

28   work together under the supervision of the Special Master to resolve this issue.

1        **B.      MHCB Daily Provider Contact (Telepsychiatry)**

2              The indicator at issue in this dispute measures compliance with the Program Guide

3    requirement that inmate-patients in MHCBs "'be assessed and monitored daily by the treating

4    clinician, either a psychiatrist or psychologist'"; that those daily contacts be documented within

5    twenty-four hours; and that "patients housed in MHCBs must be seen 'at least twice weekly' by

6    the 'assigned psychiatrist' to address psychiatric medication issues."  ECF No. 7755 at 20

7    (quoting ECF No. 7333-1 at 84-85).  The parties dispute the extent to which telepsychiatry

8    contacts "should count toward compliance" within these requirements.  *Id.*  Under the court-

9    approved telepsychiatry policy, telepsychiatrists may serve only in MHCB units "except as a last

10   resort in emergency situations when an on-site psychiatrist is not assigned to the program" and for

11   not more than fourteen days without notice to the Special Master and plaintiffs' counsel with a

12   plan for resolution of the issue or demonstration that it has been resolved.  ECF No. 6539 at 7-8.

13   Plaintiffs contend only psychiatric contacts that are compliant with this policy should count,

14   while defendants contend all telepsychiatry contacts should count.  ECF No. 7755 at 21.

15             The Special Master finds plaintiffs' request is a reasonable request for modification to this

16   indicator, and he is not persuaded by defendants' contention that plaintiffs must seek a new

17   indicator that measures implementation of the telepsychiatry policy.  *Id.* at 21-22.  He

18   recommends this indicator be designed with the reasonable modification requested by plaintiffs.

19   *Id.* at 23.  He also

20             notes that this indicator can be designed to provide both parties with the information
21             they seek: A drill-down could be built into the indicator to demonstrate the provider
22             type for the MHCB daily contacts so that stakeholders can view (1) all clinical
23             contacts provided (including those telepsychiatry contacts provided in violation of
24             the telepsychiatry policy) and (2) all clinical contacts provided in conformance with
25             the Program Guide and related remedial requirements (including the telepsychiatry
26             policy).

27   *Id.* at 23 n.12.

28             In their objections, defendants propose creating "an unusual events flag that shows

29   whether the encounter was conducted and documented by a telepsychiatrist, so that all

30   stakeholders may determine whether the contact violated the provisional telepsychiatry policy."

1  ECF No. 7805 at 7.  In response, plaintiffs support the proposal to add the unusual events flag,
2  but they contend that "daily provider contacts completed in the MHCB by telepsychiatrists in
3  non-emergency situations should be scored as noncompliant."  ECF No. 7825 at 11.
4       As discussed above, the main purpose of data remediation is to ensure the transparency
5  and accuracy of defendants' mental health data reporting.  *See Golding I,* 424 F. Supp. 3d at 929.
6  Viewed through this lens, the Special Master's finding that plaintiffs have requested a reasonable
7  modification of an existing indicator is supported by the record.  A psychiatric contact that
8  violates one remedial requirement—here existing telepsychiatry policy—cannot satisfy another
9  remedial requirement—here clinical contacts in MHCBs.  This indicator must accurately report
10  when MHCB daily provider contacts are made by providers operating within the parameters of
11  court-ordered policy and when MHCB daily provider contacts are made by providers operating
12  outside those parameters.  The Special Master's recommendation that this indicator be designed
13  with the reasonable modification requested by plaintiffs will be adopted in full.

## III.  CONCLUSION

For all of the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Plaintiffs' motion for clarification of court orders regarding the purpose of data remediation is GRANTED to the extent of the clarification provided by this order;

2.  The Special Master's March 9, 2023 Report and Recommendations regarding Third Level Data Remediation Disputes is ADOPTED to the extent consistent with this order;

3.  The dispute over the indicator for transfer to STRH/LTRH within timeframes is REFERRED BACK to the Special Master for further consideration in accordance with this order; and

4.  The Special Master's recommendation that the indicator for MHCB daily provider contacts be designed with plaintiffs' requested reasonable modification is ADOPTED in full.

IT IS SO ORDERED.

DATED:  May 23, 2023.

CHIEF UNITED STATES DISTRICT JUDGE

12