# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
    **Plaintiffs**

      v.

GAVIN NEWSOM, et al.,
    **Defendants**

No. 2:90-CV-0520 KJM DB

_____

## SPECIAL MASTER'S REPORT IN RESPONSE TO THE COURT'S JANUARY 3, 2023 ORDER (ECF NO. 7695) ON THE STATUS OF *COLEMAN* DATA REMEDIATION

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
June 30, 2023

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 3CMS/ CCCMS | Correctional Clinical Case Management System |
| ASU | Administrative Segregation Units |
| BRMR | Business Rule and Methodology Review |
| CAPC | Clinical Advisory and Prioritization Committee |
| CCI | California Correctional Institution |
| CCHCS | California Correctional Health Care Services |
| CCWF | Central California Women's Facility (located in Chowchilla) |
| CDCR | California Department of Corrections & Rehabilitation |
| CMHPP | Custody and Mental Health Partnership Plan |
| CQI | Continuous Quality Improvement |
| CQIT | Continuous Quality Improvement Tool |
| CIM | California Institution for Men |
| CMC | California Men's Colony |
| CMHPP | Custody and Mental Health Partnership Plan |
| CSATF | California Substance Abuse Treatment Facility |
| CSP/LAC | California State Prison, Los Angeles County |
| CSP/Sac | California State Prison, Sacramento |
| DSH | Department of State Hospitals |
| ECF | Electronic Case Filing |
| EOP | Enhanced Outpatient Program |
| HQ | Headquarters |
| Hub | Ad Seq Unit for EOP Patients |

i

| | |
|---|---|
| IDTT | Interdisciplinary Treatment Team |
| LTRH | Long-Term Restricted Housing |
| MH | Mental Health |
| MHI | Mental Health Identifier |
| MHSDS | Mental Health Services Delivery System |
| OLA | Office of Legal Affairs |
| PC | Primary Clinician |
| PIP | Psychiatric Inpatient Program |
| PNPs | Psychiatric Nurse Practitioners |
| QAC | Quality Assurance Certification |
| R&R | Receiving & Release |
| STRH | Short Term Restricted Housing |
| SVSP | Salinas Valley State Prison |
| UOF | Use of Force |

## <u>TABLE OF CONTENTS</u>

ACRONYMS AND ABBREVIATIONS ........................................................................ i

INTRODUCTION ................................................................................................... 1

I.    Background ................................................................................................ 8

      A.    Quality Assurance is Deeply Rooted in *Coleman* Remedy ..................... 8

      B.    Transition from Quality Assurance to Quality Improvement ............... 11

      C.    Development and Testing of Defendants' Continuous Quality
            Improvement Tool ............................................................................ 12

      D.    The Golding Report and the Need to Remediate CDCR's Mental Health
            Data Systems .................................................................................... 13

            1)    Appointment of Special Master's Data Expert ......................... 16

            2)    Initial Data Remediation Efforts ............................................. 17

      E.    Identification and Provisional Approval of CQIT Key Indicators ....... 18

            1)    December 2020 Order Regarding Key Indicators ..................... 19

            2)    Provisional Approval of the Key Indicators ............................. 21

II.   Current Status of Data Remediation Generally .......................................... 22

      A.    Overview of Data Remediation Process .............................................. 22

      B.    Overview of Data Remediation-Related Meetings ............................... 26

III.  Current Status of Data Remediation As Related to Finalization of the List of
      CQIT Indicators ....................................................................................... 28

      A.    Provisionally-Approved Key Indicator Remediation Status (as of June 16,
            2023) ................................................................................................ 29

      B.    Decommissioned Indicators ............................................................... 31

      C.    "Placeholder" Indicators ................................................................... 35

      D.    Dispute Resolution Process Results .................................................... 37

      E.    Summary of Progress Toward Identifying Final List of CQIT Key
            Indicators ......................................................................................... 41

IV.     Next Steps as the Stakeholders Progress Toward Completion of Data Remediation....... 42

CONCLUSION AND RECOMMENDATION.............................................................................. 44

APPENDIX A ACTIVITIES OF THE SPECIAL MASTER ....................................................... 46

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.,
    **Plaintiffs**

    **vs.**                           **No. 2:90-CV-0520 KJM DB**

GAVIN NEWSOM, et al.,
    **Defendants**

---

**SPECIAL MASTER'S REPORT IN RESPONSE TO THE COURT'S JANUARY 3, 2023
ORDER (ECF NO. 7695) ON THE STATUS OF *COLEMAN* DATA REMEDIATION**

**INTRODUCTION**

The Special Master[1] submits this report in response to the Court's January 3, 2023 Order.

ECF No. 7695 at 2.[2]  The report includes a review of relevant case history followed by brief

status updates on data remediation generally and as it pertains to the finalization of the list of

Continuous Quality Improvement Tool (CQIT) key indicators.  *Id.*

The data remediation stakeholders[3] are three years into the data remediation process and

just six months shy of the December 31, 2023 deadline for completion of data remediation. *See*

ECF No. 7541.  As the Court recently summarized:

> Since 2020, defendants have been working under the Special Master's supervision
> and with plaintiffs' participation to remediate data about mental health care to the

---

[1] The Special Master has also attached an updated list of his monitoring activities since the filing
of the Thirtieth Round Monitoring Report – Part A (ECF No. 7833).  *See* Appendix A.

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF)
system are to page numbers assigned by the ECF system.  References to page numbers in this
report are to the page numbers at the bottom of each page.

[3] For purposes of this Report, "data remediation stakeholders" or "stakeholders" refer to
defendants, plaintiffs, and the Special Master's team, all of whom are working under the
supervision of the Special Master for the purposes of remediating defendants' mental health data
systems.

> plaintiff class. The main purpose of this remedial work is to ensure defendants'
> reports are transparent and accurate. This remedial work became necessary after
> the court learned defendants had knowingly presented misleading data to the court
> and Special Master.

May 23, 2023 Order, ECF No. 7847 at 1.

This report discusses projections which signal significant data remediation work yet to be

completed and potential roadblocks to efficient completion of the data remediation project;

nonetheless material progress has been made and the Special Master is cautiously optimistic

about the status of this behemoth-like undertaking so pivotal to the process of transitioning away

from federal court oversight of CDCR's Mental Health Services Delivery System (MHSDS).

When this endeavor started, none of the stakeholders, including the Special Master, could

have anticipated the amount of time and effort required to remediate CDCR's mental health data

systems to accurately, transparently, and reliably report on defendants' compliance with their

remedial plan.[4] Data remediation has proven to be one of the most complex and challenging

projects the mastership has undertaken in the long history of this case. This work has entailed

detailed review of the business rules and processes operationalizing each of the indicators in the

list provisionally approved by the Court. ECF No. 7216 at 14. To date, this has required

preparation for and participation in more than one hundred all-parties meetings regarding data

remediation. In addition, the Special Master's data expert has participated in hundreds of other

---

[4] *See, e.g.*, May 23, 2023 Order, ECF No. 7847 at 7 ("CQIT's purposes are to accurately measure
remedial requirements and transition monitoring from the Special Master to defendants. Each
key indicator must substantively track the areas the Special Master has monitored so the court
can assess defendants' compliance with the Eighth Amendment. The business rules for each key
indicator must be written so that the court can rely on defendants' data in assessing their
compliance. Thus, each key indicator must be designed and operationalized to accurately
capture the corresponding information gathered and reported on by the Special Master as part of
his monitoring responsibilities.").

meetings with individual or smaller groups of CDCR representatives in furtherance of the data remediation project.

Over time, as the stakeholders grappled with the size and scope of this project, they have developed strategies to promote efficient completion of data remediation. For instance, over the past several months, the stakeholders have implemented several measures to accelerate the pace of their reviews of the key indicators in the Business Rule and Methodology Review (BRMR) meetings, which are attended by the Special Master's data team, multiple managerial, clinical, and legal representatives of CDCR as well as plaintiffs' counsel. As discussed in greater detail below, the BRMR meeting is the primary vehicle for the stakeholder review, or validation, step of the five-step remediation process that the stakeholders have operationalized in furtherance of the data remediation project. *See infra* p. 23.

Moreover, the stakeholders now appear to have reached an understanding, recently affirmed by the Court, as to the purpose of the data remediation process. *See* May 23, 2023 Order, ECF No. 7847 at 6 ("CQIT key indicators must be operationalized to properly measure the core requirements of the Program Guide and the Compendium. Accepting defendants' briefing at face value, there is no dispute over this core principle."). As the Court stated: "The business rules for each indicator must be written so that the court can rely on defendants' data in assessing their compliance. Thus, each key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities." *Id.* at 7. This clarification should serve to eliminate time-wasting debate concerning this question and speed successful completion of data remediation.

Notably, of the original list of 148 provisionally approved key indicators, the stakeholders have agreed to remove 14 indicators because they are not necessary to measure a core remedial requirement or, although they do measure a core remedial requirement, they are duplicative of another provisionally approved indicator that sufficiently addresses the same requirement. *See infra* pp. 31-35; *see also* May 23, 2023 Order, ECF No. 7847 at 7 ("If the Special Master and all parties agree an indicator should be eliminated from the list because it does not measure a core remedial requirement, then that indicator does not need to be validated or verified…"). The stakeholders' collaboration on this initiative eliminated the need to remediate these 14 "decommissioned" indicators, nearly all of the 16 indicators defendants originally proposed for decommissioning.

As depicted in the figures below, as of June 16, 2023, 128 of 139 key indicators[5] have been discussed in the BRMR (validation) process, with 104 completing this stage of the process. Sixty-seven have completed the verification process, with 42 indicators marked as fully remediated by the Special Master's data expert. [6]

---

[5] The total number of key indicators here (139) accounts for 14 provisionally approved key indicators that have been decommissioned by agreement of the stakeholders and the addition of five key indicators identified and agreed to by the stakeholders through the BRMR process. (148 provisionally approved key indicators *minus* 14 decommissioned key indicators *plus* five new indicators = 139). This figure does not account for the addition of 14 indicators developed by the Special Master's team to flesh out the additional or placeholder indicators contained on the provisionally approved list, as the stakeholders were still considering these items at the time of this writing.

[6] Each step of the data remediation process is described in greater detail within this report. *Infra* pp. 22-26.

| Provisionally Approved Key Indicator Status as of June 16, 2023 | Started | Completed |
|---|---|---|
| Initial Documentation Preparation | 136 | 128 |
| Documentation Reviewed with Stakeholders (Validation) | 128 | 104 |
| Documentation Update and Approved by MH | 104 | 99 |
| Indicator Programming | 93 | 84 |
| Indicator Testing (Verification) | 79 | 67 |
| Total Key Indicators Remediated | NA | 42 |



Notwithstanding these constructive developments, this is no time for complacency. As of June 16, 2023, both the validation and verification steps of the remediation process were behind schedule compared to previously established completion targets for these steps, though not to an insurmountable degree. Specifically, BRMR review of the original provisionally approved list (not including any added new indicators) had been projected to be completed by the end of July 2023. However, the most recent data projects a completion of the BRMR review by the end of September 2023, indicating this step of the process is running approximately eight weeks behind original projections. Later steps in the remediation process also show they are behind schedule.

However, the Special Master remains cautiously optimistic that the data remediation project will be completed by the end of 2023. This guarded optimism is based on the fact that there are only 35 key indicators remaining for BRMR review.  Of those, at least 19 are tied to one overarching disagreement, *see infra* p. 6, and share many of the same design elements. As such, the Special Master expects the stakeholders will be able to complete the BRMR review step in an expeditious manner.  In addition, CDCR has represented that the department has sufficient staff to address the later data remediation steps and that CDCR will "ensur[e] additional staff, as may be necessary" are assigned to the project "to complete data remediation before December 2023." ECF No. 7556 at 3.

Moreover, there are a number of indicators that require resolution of one or more global issues in order for them to be fully remediated.  Two core global issues impacting the largest number of indicators are:

(1)     How to accurately and transparently summarize defendants' adherence to their remedial plan via summary statistics and the case data underlying the service requirements measured by each indicator; [7] and

(2)     Design and implementation of adequate population sampling strategies for many of the audit-based indicators.[8]

In addition, on June 14, 2023 the Special Master provided the parties with the details concerning the additional indicators ("placeholders") included in the original provisionally approved list of key indicators, but not developed in detail at the time the original list was filed

---

[7] The Level 2 review team, consisting of the Special Master and CDCR Secretary (and whoever else either deems necessary), *see* ECF No. 7556-2 at 3, discussed the dispute regarding summary statistics during a June 20, 2023 meeting.  The Special Master and CDCR Secretary agreed to convene a second Level 2 meeting in early July 2023.

[8] During the June 27, 2023 BRMR meeting, the stakeholders discussed adequate sampling methodologies and agreed that there were ten indicators impacted by the sampling issue.

6

with and provisionally approved by the court. *See* Letter from Special Master Lopes to Ms. Elise Thorn, Esq., Office of the Attorney General and Ms. Lisa Ells, Esq., Plaintiffs' Counsel (June 14, 2023), attached hereto as Exhibit A; *see also infra* pp. 35-37. This will require that the stakeholders develop and remediate 14 new indicators.[9]

Also adding to the workload, the remediation process has revealed the need for some new indicators beyond the 14 associated with the placeholder indicators, all of which require consideration by the stakeholders and, thereafter, remediation.[10] While the stakeholders have considered some new items, *see supra* note 10, discussion of other potential new indicators is ongoing as the stakeholders complete the validation process for the provisionally approved key indicators. However, it is the Special Master's expectation that all stakeholders will work to remediate these indicators using the well-established framework developed jointly over the last three years. The complete list will be presented to the court for approval. May 23, 2023 Order, ECF No. 7847 at 7 n.6.

Ultimately, successful and timely completion of data remediation will require focused action and cooperation among the stakeholders at each day-to-day step of the process including prompt follow-up on issues unamenable to immediate resolution, a minimization of unproductive

---

[9] In his June 14, 2023 letter, the Special Master requested that the parties provide written comments on the list of placeholder indicators by June 28, 2023. The parties timely provided their written comments, which are attached hereto as Exhibits B and C, respectively. *See* Letter from Ms. Cara Trapani, Esq., Plaintiffs' Counsel, to Special Master Lopes (June 28, 2023), attached hereto as Exhibit B; *see also* Letter from Ms. Melissa Bentz, Esq., to Special Master Lopes (June 28, 2023), attached hereto as Exhibit C.

[10] As of June 16, 2023, CDCR's Reports A and B reflected five "new indicators" in the net total of 139 key indicators outside of the placeholder indicators identified in the Special Master's June 14, 2023 letter. These new indicators are: QC13 (IDTT Patient Attendance), *see* ECF No. 7837 at 2; NM1 (Timely Response to Critical Med non-adherence notification); NM2 (Timely response to Non-critical Med non-adherence notification; NM3 (Timely Response to Non-Critical Non Adherence Notification Seen Within 30 days; and G1 (Timely Compliance).

disputes, and the rapid resolution of disagreements where they cannot be avoided.  Concurrent

work must also continue to ensure that once remediated the indicators operate in system certified

by the Court's data expert as sufficiently transparent and sustainable so that the achievements of

the remediation process are durable.  *Id.*

## I.    <u>Background</u>

The role of quality assurance/management in *Coleman* has been discussed in numerous

Court Orders and reports of the Special Master and will be briefly reviewed below to provide

proper context to this Report.

### A.    <u>Quality Assurance is Deeply Rooted in *Coleman* Remedy</u>

While the ongoing data remediation process resulted from the Court's finding that

defendants presented misleading mental health data and statistics to the Court and Special

Master, *see, e.g.*, May 23, 2023 Order, ECF No. 7847 at 1, quality assurance is deeply rooted in

the *Coleman* remedy.  Specifically, the development and implementation of a quality assurance

system was the subject of one of the Magistrate Judge's recommendations in 1994 and has

remained a core remedial requirement since.[11]  *See* Special Master's Report on the Continuous

---

[11] The Magistrate Judge's findings regarding quality assurance and peer review were as follows:

> It was undisputed that the most efficacious method for assessing the competence
> of medical staff is through a quality assurance/peer review program.  The CDC
> has no effective quality assurance or peer review program either department-wide
> or at individual institutions within the class.  The few efforts at quality assurance
> and peer review in the system are 'rudimentary.'

> Defendants' own expert, Dr. Dvoskin, opined that 'a large system such as the
> California Department of Corrections could probably not provide adequate mental
> health care without some sort of management information system and some form
> of quality assurance.'  At this point, defendants have no effective method for
> insuring the competence of their mental health staff, and, hence, for insuring that
> mentally ill inmates in the department have access to competent care.  In this

Quality Improvement Tool Key Indicators, ECF No. 7151 at 2 [hereinafter 2021 Key Indicators

Report] ("From the very beginning, the abiding focus of the *Coleman* case has been defendants'

obligation to provide incarcerated persons with serious mental illness access to adequate mental

health care and treatment. To that end, the development and implementation of an effective CQI

system has been a foundational building block of the remedy."). In its 1995 decision, the Court

adopted the Magistrate Judge's 1994 recommendation regarding quality assurance[12] and

overruled defendants' objection thereto.[13] *Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D.

Cal., Sept. 13, 1995) (describing defendants' objection "to the suggestion that a remedial order

require the development of a quality assurance system"). The Court further noted that

defendants' expert at the time testified "that in his opinion 'a large system such as the California

Department of Corrections could probably not provide adequate mental health care without some

---

regard, they are violating the class members' Eighth Amendment right of access
to adequate mental health care.

Magistrate Judge's Report and Recommendation, ECF No. 547 at 41-42 (internal citations
omitted).

[12] The Magistrate Judge's recommendation regarding quality assurance was as follows:

Within ninety (90) days of the order of the district court, defendants shall develop
and implement a system for quality assurance and peer review of mental health
care services. Said system shall be developed in consultation with an expert to be
designated by the court after consultation with the special master, with defendants
to pay the cost of the expert.

ECF No. 547 at 80-81.

[13] For context, the Court summarized the full extent of defendants' quality assurance-related
objections as follows: "Defendants object to the finding that they have no effective method for
ensuring either the competence of their staff or that inmates have access to competent care. They
also object to the magistrate judge's finding that this violates the plaintiff class members' Eighth
Amendment right of access to adequate mental health care. Finally, they object to the suggestion
that a remedial order require the development of a quality assurance system." *Coleman*, 912 F.
Supp. 1282, 1308.

sort of management of information and some form of quality assurance." *Id.* In light of the inadequate mental health care provided to *Coleman* class members, CDCR's lack of "any form of quality assurance that reaches all institutions," and defendants' concession that they could not "provide adequate mental health care without some form of quality assurance," the Court determined that "[r]requiring development of a quality assurance program [wa]s an appropriate remedy for constitutional deficiencies in the delivery of prison health care." *Id.*

Since the Court's 1995 decision, development of CDCR's quality management system has progressed in fits and starts. *See* 2021 Key Indicators Report, ECF No. 7151 at 2 ("Regrettably, as described in detail below, defendants' progress stagnated at nearly every stage of development."); *see also id.* at 13 (noting the "constructive and generally collaborative work [of developing CQIT] was interrupted by derailing events such as defendants' termination motion and the filing of the Golding Report and was slowed by the unpredictable pace of defendants' production of draft reports for review and comment"). As the Special Master noted in his 2021 Key Indicators Report,

> Although the sufficiency of treatment was always the over-riding objective, for many years defendants did not reliably have even rudimentary quality assurance systems in place. As a result, it was premature for them to attempt to develop programs aimed at systematically improving the quality of care they provided. Defendants first had to ensure that clinical functions were routinely occurring as required and that they had a quality assurance structure in place across institutions to track this. Only then would defendants be in a position to focus seriously on the quality of the treatment they provided….
>
> In his monitoring and in his approach to promoting defendants' progress towards remediation, the Special Master was guided by a simple fact – a clinical encounter had to occur in the first place for it to occur in a clinically appropriate manner. Similarly, regularly occurring quality assurance meetings in local prisons attended by the necessary personnel was a condition precedent for the development of a more robust quality management system to improve the quality of care. This was the struggle over the first 17 years of monitoring.

2021 Key Indicators Report, ECF No. 7151 at 2-3.

B.    Transition from Quality Assurance to Quality Improvement

In his Twenty-Fourth Round Monitoring Report, the Special Master noted that "it has become apparent over the past several monitoring periods that CDCR institutions have generally succeeded with establishing and maintaining the foundations of the quality management framework that was conceived early in the remedial process."  ECF No. 4205 at 72.  The Special Master noted that "[a]n important goal of the remedial phase of this case is, after all, for CDCR itself to assume the mantle of ultimate responsibility for diagnosing of its own problems, i.e. conduct its own 'qualitative analysis,' and create an quality improvement process that it can use to achieve and maintain compliance, and move on to eventual removal from federal court oversight."  *Id.* at 74.  Further, the Special Master observed the need "for the quality management function within CDCR institutions to begin moving in the direction of being monitored by" CDCR, with a goal of developing "a quality management process that can detect and address issues in mental health care from a quality improvement perspective, in contrast to merely a quality assurance perspective, which is what it has been."  *Id.*[14]

The Special Master viewed this transition from quality assurance to quality improvement "as a next step in the evolution of a sustainable quality management process that CDCR can eventually use to assess its own levels of functionality, detect problems early, and resolve them efficiently, i.e. as the backbone of its own future self-monitoring process."  *Id.* at 75.

---

[14] *See also* ECF No. 4205 at 74-75 ("While quality assurance is an important component of a quality improvement process, it generally focuses on the presence or absence of various elements – for example, what percentage of Form X's were completed, or how many inmates received a mental health screening within 24 hours of admission, etc.  That is to say, it tends to quantify deficiencies in performance.  Quality improvement, on the other hand, focuses on identifying not only problem areas but also on improving current health care to make it more effective and efficient.  The quality improvement process might well benefit from being coordinated at the CDCR HQ level for a variety of reasons, including systems-planning purposes and general systems-management and systems-supervision issues.").

Accordingly, the Special Master recommended that the Court "enter an order requiring defendants to review and assess their existing quality assurance process, and to develop an improved quality improvement process by which it can detect and address issues with the quality of the care that is delivered…." *Id.*

In an August 30, 2012 Order, the Court adopted the Special Master's recommendations to "to review and assess their existing quality assurance process, and to develop an improved quality improvement process" and "emphasize[d] in particular its complete concurrence" with the Special Master's findings related to CDCR's quality management system. ECF No. 4232 at 4-6.[15]

C.    Development and Testing of Defendants' Continuous Quality Improvement Tool

Following the Court's August 30, 2012 Order, the defendants, under the guidance and supervision of the Special Master and with input from plaintiffs, undertook the task of developing an "improved quality improvement process." This process included the "creation of a self-auditing tool with which CDCR can identify issues and improve its performance levels in the delivery of mental health care." ECF No. 4730 at 5. This "self-auditing tool" is now known as the CQIT. *Id.*

---

[15] In the Twenty-Sixth Round Monitoring Report, the Special Master described the impact of this order:

> This order had profound implications for the direction of Coleman federal court oversight, signaling that the focus was shifting towards the long-term goal of the quality management effort—eventual transition away from court-supervised external monitoring to assumption by defendants of the responsibility for self-monitoring. It set the stage for development of a more matured and self-sustaining quality management process than what had been in place.

ECF No. 5439 at 107.

By January 2013, significant progress had been made identifying key indicators and developing a prototype of the audit tool. *Id.* at 7. However, defendants' January 7, 2013 motion to terminate Court oversight of CDCR's MHSDS "seriously disrupted" efforts to complete and deploy CQIT. *Id.* at 6-7; *see also* 2021 Key Indicators Report, ECF No. 7151 at 7-8 (describing defendants' motion to terminate as a "major derailing event in the development of the CQIT").

Following the Court's denial of defendants' termination motion, the Special Master and plaintiffs began participating in the CQIT process again and it was soon "clear to everyone involved that the process must accelerate rapidly, that the initial form of the tool should be completed, and that a pilot of the fledgling tool should be organized and implemented forthwith in order to accomplish its purpose…." ECF No. 4730 at 8. Accordingly, in May 2013, the Special Master and parties agreed to conduct an eight-institution pilot of CQIT. *Id.*; *see also id.* (noting that the eight institutions included in the CQIT pilot would be CIM, CSP/LAC, CMC, CSP/Sac, SVSP, CCWF, CSATF, CCI). As extensively reported on in prior reports, additional CQIT pilots were conducted in 2014 and 2016. *E.g.*, ECF No. 7151 at 10-12.

After conducting these pilots and reviewing the draft reports derived therefrom, it was clear that the CQI process had "potential strength" but also "a number of core improvements that needed to be made." *Id.* at 12. By June 2018, "CDCR provided a draft outline for a systemwide report to the Special Master and plaintiffs" and the parties were preparing for the next phase of this critical remedial project. *Id.*

D.     The Golding Report and the Need to Remediate CDCR's Mental Health Data Systems

Just four months later, on October 4, 2018, the *Plata* Receiver provided the Special Master with CDCR's then-Chief Psychiatrist Dr. Michael Golding's whistleblower report ("Golding Report"). *Id.* As the Special Master noted in a prior report: "As so much of the CQI

process is dependent on transparently produced accurate data, the process once again ground to a halt pending data remediation….." *Id.*  Thereafter, the Golding Report "set off a chain of events that led to the appointment of a neutral expert and an evidentiary hearing to determine whether the defendants intentionally provided misleading information to the Court and the Special Master."[16]  Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 43 (citing ECF No. 6064 at 2).

---

[16] The Court identified the seven issues where misleading information may have been submitted to the Court and Special Master as follows:

    a.    Lengthening the intervals between psychiatric appointments beyond court-mandated timelines for inmate-patients at the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) levels of care who are transferred to new institutions by resetting the clock for such appointments from the time of transfer rather than from the last completed appointment, rescheduling such appointments at the maximum time allowed in the Program Guide, and reporting compliance with Program Guide requirements using the reset timelines. *See* Golding Report, ECF No. 5988-1 at 1, 14-23.

    b.    Lengthening the interval between psychiatrist appointments for EOP inmate-patients and reporting compliance based on the extended intervals. *See id.* at 2, 23-26.

    c.    Combining CCCMS and EOP appointment compliance numbers into one reporting category. *See id.* at 26-27.

    d.    Inflating compliance numbers by counting every encounter between a psychiatrist and an inmate-patient as an appointment for purposes of measuring Program Guide timeline compliance, without regard to whether the encounter was a psychiatry appointment or, e.g., a wellness check or a cell-front attempt to communicate with an inmate patient. *See id.* at 5-6, 54-57.

    e.    The manner of reporting of scheduled appointments and missed appointments. *See id.* at 7-8, 35-47, 62-63.

    f.    Failing to report that psychiatric supervisors were also performing some or all the functions of staff psychiatrists. *See id.* at 5, 56-57.

At the conclusion of the Golding Report-related proceedings, the Court summarized its findings regarding defendants' presentation of misleading mental health data to the Court and Special Master as follows:

> All of the foregoing compels the conclusion that two of the issues discussed above, the change in the EOP timeline business rule and the failure to properly quantify and identify the extent to which supervising psychiatrists perform the duties of line staff psychiatrists, involved the knowing presentation of misleading information to the court. With respect to the Appointments Seen As Scheduled indicator, the court finds no knowing presentation of misleading information but, instead, a public-facing error in the descriptor that should have been caught sooner and that caused misunderstanding of the nature of the information presented.
>
> Taken together with defendants' admissions prior to hearing, defendants have knowingly presented misleading information to the court in numerous areas critical to the remedy in this case and measuring compliance with that remedy.

December 17, 2019, ECF No. 6427 at 40-41.[17]

As noted, the revelations of CDCR's then-Chief Psychiatrist Dr. Michael Golding's Whistleblower Report ("the Golding Report") called the accuracy and reliability of CDCR's reporting on mental health statistics into serious question. At minimum, the Golding Report and resulting proceedings made it abundantly clear that the Court, Special Master, and plaintiffs' counsel needed a granular understanding of the design and operation of defendants' mental

---

    g.    The way in which medication non-compliance is measured. *See id*. at 8, 58-62.

December 17, 2019 Order, ECF No. 6427 at 7-8.

[17] The Court offered the following analysis of the apparent reason defendants knowingly presented misleading information to the Court and Special Master: "In the final analysis, inexplicably, it is apparent defendants lost complete sight of the reasons remediation is required here. Defendants adopted a laser focus in an effort to obtain termination of court supervision, which lead to a stark 'ends justify the means' approach. Their litigation tactics have wholly missed the significance of the constitutional rights of the thousands of mentally ill persons defendants have in their custody." ECF No. 6427 at 44.

health statistical measures in order for CDCR to eventually transition to self-monitoring its remedial compliance.

1)    Appointment of Special Master's Data Expert

In response to this newly discovered need to review in depth defendants' data and processes which underlay it, the Special Master requested that the court approve his retention of a data expert. In its December 23, 2019 Order, the Court noted it had "authorized the Special Master to hire his own data expert or otherwise make arrangements to ensure he has the necessary data expertise at his disposal." ECF No. 6435 at 2. Further, the Court made clear defendants "must forthwith" give the Special Master "access to all of the business rules defendants are currently using to process mental health data and generate informational reports related to delivery of constitutionally adequate mental health care to members of the plaintiff class." *Id.* The Court also required defendants to "arrange for the Special Master to be included in all discussions that concern the use of CCHCS Quality Management Section to manage CDCR Mental Health data" and "take all steps necessary to both include the Special Master in all such discussions and respond to any steps the Special Master may require of them in the process of their compliance." *Id.* at 3. Finally, the Court ordered that "the Special Master and the plaintiffs must forthwith have access to all mental health care data that affects the care and treatment of members of the plaintiff class." *Id.*

On April 13, 2020, the Special Master requested approval to appoint Dr. Daniel F. Potter, Ph.D., CAIA, to his staff as data expert. ECF No. 6604 at 1; *see also* ECF No. 6461 at 3 ("[T]he Special Master is currently seeking to hire an expert in data quality management who would be responsible for advising him on all mental health data-related issues and also working with both CDCR and the Plata Receiver's Quality Management departments on the same."). The Court

16

approved the Special Master's request and appointed Dr. Potter as *Coleman* data expert in an April 28, 2020 Order.  ECF No. 6646 at 1-2.

2)    <u>Initial Data Remediation Efforts</u>

After providing an initial report on data issues on June 8, 2020, ECF No. 6705, the Special Master provided additional updates on his data expert's work in his Twenty-Eighth Round Monitoring Report.  *See* ECF No. 7074 at 51-55.  For instance, the Special Master reported that "[b]eginning on October 21, 2020, the Special Master's data team, Mental Health Program leadership, quality management staff and subject matter experts convened two-hour weekly Business Rules and Methodology Review meetings, which were tasked with reviewing information that would be required for data validation."  *Id.* at 53.  The Special Master explained that "[t]he focus of the [BRMR] meetings was directed to ensuring that mental health program indicators, business rules, and data elements were measuring Program Guide requirements and departmental policies as accurately as possible."  *Id.* at 53-54.

The Special Master appended his data expert's first data report to the Twenty-Eighth Round Monitoring Report.  *See id.* at 217-42.  There, the Special Master's data expert observed the following about CDCR's CQIT indicators:

> In CDCR, indicators designed to measure Program Guide compliance rely on a series of business rules to describe and implement their operation. To be considered accurate, *the business rules must be designed with fidelity to the dictates of the Program Guide* and rely on data that is appropriate to achieve its intended purpose. The actual operation of the indicator must then match its intended operation.
>
> In order to determine whether an indicator is accurate requires both careful review of its design to determine if it will indeed correctly measure its business requirement, and comparison of its intended operation with its actual operation. *In other words, the system must not only give a technically precise correct answer to a query, but it must also ask the right question and have access to information appropriate to answer that question.*

17

The watchwords for an acceptable data system are accuracy, transparency, and sustainability. Unfortunately, defendants' mental health data systems are not currently sufficient on any of these fronts. Remediation is required so that trust in defendants' data can be established. This can only be accomplished through meticulous assessment of what the system currently does, what it needs to do in order to be sufficient to the task at hand, and what it needs to maintain sufficiency over time.

*Id.* at 218-19 (emphasis added).  Further, the Special Master's data expert reported the following:

The current [quality assurance] data system, including a lack of documentation, testing framework support, and change management processes, is insufficient for the task at hand.  Work must also continue on validating the indicators and their individual business rules which are used in the ASU EOP Hub certification and CQIT processes and software testing must occur to verify that the indicator's actual operations are correct.  At present, these processes are not sufficiently transparent.  CDCR could address these issues more quickly and more effectively if they had additional personnel devoted to these tasks.

The time has come to move the system to the next level and for the parties, working under the guidance of the Special Master to devise a plan for CDCR to develop a data system to address the deficiencies described in this report.  CDCR would then have a data system capable of producing data in which the parties, the Special Master and the Court could have confidence accurately reflected defendants' compliance for the indicators reported and which had the controls in place to maintain the integrity of the data over time.  That system would also be sufficiently transparent which would help restore trust in the data defendants produce and rely upon.

*Id.* at 241.

       E.     <u>Identification and Provisional Approval of CQIT Key Indicators</u>

Shortly after approving the appointment of Dr. Potter as data expert, on September 2, 2020, the Court issued an order confirming "the framework developed over the past twenty-five years for the requirements defendants must satisfy to achieve compliance with the Constitution and against which their progress toward constitutional compliance is being measured."  ECF No. 6846 at 2.[18]  The Court reiterated that it had "already determined that defendants must report

---

[18] Relatedly, "the court emphasized this order merely reviews what the court has previously decided, providing a compilation and synthesis in order to avoid the need for revisiting the

compliance with each indicator from zero to 100 percent" and that "the court ultimately will use the CQIT reports as part of an overall determination of compliance with constitutional standards and durability of the remedy." *Id.* at 24. The Court stated that the CQIT key indicators "are likely equivalent to the materials provisions of the Program Guide and the Compendium that may not be modified without court approval." *Id.* at 24 n.11. Finally, the Court characterized the key indicators "as the functional equivalent of 'benchmarks' that…signify the material provisions of the Program Guide and the Compendium that must be durably implemented at a degree of compliance the court will confirm in a subsequent order." *Id.* at 28.[19]

### 1)    December 2020 Order Regarding Key Indicators

In a December 16, 2020 Order, the Court discussed the parties briefing on the process of finalizing a list of CQIT indicators. The Court noted defendants' desire to ensure "that those CQIT 'indicators that measure compliance with constitutionally-mandated functions are identified and distinguishable from those that do not carry such import, but instead are used to enhance or improve performance.'" ECF No. 6996 at 5 (quoting ECF No. 6936 at 9). In responding to this contention, the Court reiterated a key guiding principal for the data remediation stakeholders – that identifying CQIT's key indicators and determining the degree of compliance required to satisfy defendants remedial obligations are separate and distinct processes:

---

contours of the established and comprehensive remedy in this case." September 2, 2020 Order, ECF No. 6846 at 29.

[19] In its February 4, 2022 Order approving the 2021 Program Guide Update, the Court discontinued the parties "obligation to file further annual updates to the Program Guide and the Compendium" as "[t]he court anticipate[d] that final approval of a list of CQIT indicators will replace the need for annual updates to the Program Guide and the Compendium." ECF No. 7456 at 4.

These contentions misperceive the remedial function of the quality improvement process and CQIT. For the reasons explained above, it is settled in this action that full implementation of the quality improvement process, including CQIT, is essential to a durable remedy in this action. For that reason, implementation of all components of CQIT is essential to the proper function of this key remedial requirement; the court's questions did not invite parsing of that tool in any way that would impede this function. *Identification of "key" indicators and confirmation of the degree of compliance required for each indicator serves separate remedial functions by facilitating assessment of the degree to which full implementation of the remedial plans in this action remains to be accomplished. Once full implementation is accomplished using these measures, what will remain is a demonstration that these fully implemented remedies are durable.*

ECF No. 6996 at 5 (emphasis added).[20] The Court noted it "anticipate[d] confirming that the updated list of key indicators in CQIT that pertain to Program Guide requirements is properly considered a comprehensive list of the material provisions of the Program Guide, that, taken as a whole and met at the requisite degree of compliance, signals constitutionally adequate compliance with the Program Guide." *Id.* at 8. Accordingly, the Court ordered defendants to, under the supervision of the Special Master, update the CQIT key indicators "to reflect any

---

[20] The Court addressed a similar argument later in the same order:

Defendants also suggest that "once compliance with a key indicator is durably achieved, that requirement should be terminated from this case, as envisioned by this Court's July 12, 2018 order." This contention is, at best, premature. As the September 3, 2020 order observes, the complex remedy for the persistent Eighth Amendment violation identified in this action must be both fully implemented and durably sustained. Defendants' ultimate constitutional obligation is to provide the tens of thousands of seriously mentally ill inmates in their custody with "access to adequate mental health care," as well as to remedy the identified custody-related violations of plaintiffs' constitutional rights. Meeting that obligation will require durable implementation of all material aspects of court-ordered relief as well as, ultimately, demonstrating the ability to assume full responsibility for self-monitoring. The question of whether these remedial objectives can be achieved in full without full court supervision continuing until they are met is not before the court at this time.

ECF No. 6996 at 8.

changes required by the 2018 Update to the Program Guide and the Compendium of Custody Related Remedial Measures." *Id.* at 11.

2)    Provisional Approval of the Key Indicators

Following the Court's December 16, 2020 Order, the Special Master and the parties engaged in a process to update the list of CQIT key indicators. *See* 2021 Key Indicators Report, ECF No. 7151 at 15-21. The parties were unable to agree on a final list of "key" indicators and, as a result, the Court referred the matter to the Special Master. ECF No. 7112. In an Order following a status conference held on March 25, 2021, the Court directed the Special Master to "file a report on CQIT key indicators on or before April 29, 2021." ECF No. 7112.[21]

In his 2021 Key Indicators Report, the Special Master recommended the Court provisionally approve 149 "preliminary CQIT key indicators." ECF No. 7151 at 21; *see also id.* at 21-26 (list of Special Master' recommended "preliminary CQIT key indicators"). In its June 30, 2021 Order, the Court adopted the 2021 Key Indicators Report, struck one preliminary CQIT key indicator as duplicative, and provisionally approved the remaining 148 of the Special Master's recommended key indicators. ECF No. 7216 at 14. The Court further ordered the Special Master to "test and monitor the functionality and efficacy" of the provisionally approved key indicators during the Twenty-Ninth Monitoring Round. *Id.*

During the course of the Twenty-Ninth Monitoring Round, it became clear that the Special Master's ability to "test and monitor the functionality and efficacy" of the provisionally approved key indicators was "inextricably linked," ECF No. 7693 at 5, to the ongoing data remediation process. As the Special Master noted:

---

[21] The Court later granted the Special Master an extension to May 6, 2021 to file his report on CQIT key indicators. ECF No. 7143.

> However,… a final list of proposed key indicators cannot be provided at this time
> as the list is progressing jointly with the remediation process and the efficacy and
> functionality of the indicators is intertwined with data remediation.  A complete
> list will only emerge at the conclusion of the data remediation project.

Special Master's Request for an Extension of Time to Report to the Court on the Functionality

and Efficacy of the Provisionally Approved List of Indicators, ECF No. 7693 at 2.  As such, the

Special Master requested an extension of time "for submission of the report [on a final

recommended list of CQIT key indicators] until the data remediation project is complete."  *Id.* at

5.

On January 3, 2023, the Court granted the Special Master's request for an extension of

time and directed the Special Master to "file a brief report on the status of data remediation

generally and as it pertains to finalization of the list of CQIT indicators in particular" on or

before June 30, 2023.  ECF No. 7695 at 2.

## II.    **Current Status of Data Remediation Generally**

### A.    Overview of Data Remediation Process

The validation and verification process that the stakeholders have operationalized over

the last three years consists of five basic steps, which are reflected in the former CDCR

Secretary's May 19, 2022 declaration in response to the Court's April 29, 2022 Order.  By way

of background, in its April 29, 2022 Order, the Court identified the need to identify "tools…to be

adopted to monitor deadlines for complete remediation of each CQIT indicator as part of

completion of the entire project globally" and invited defendants to respond via declaration. ECF

No. 7541.  In their response to the Court's April 29, 2022 Order, defendants attached a plan to

"streamline data remediation," which included a "proposed Activation Schedule Template for

both individual indicators ('Report A') and the data remediation project globally ('Report B'),"

each of which were jointly developed by the Special Master's team and defendants.  ECF No.

7556 at 3.

Significantly, the five-step validation and verification process outlined below has been

fully operationalized as of the time of this writing.  As reflected in the "Report A" template,

remediation of each individual key indicator involves five basic steps, as follows, and as

described further below:



Step 1: DOCUMENTATION

CDCR Mental Health creates preliminary documentation for the indicator and its

business rules.  This documentation includes a list of business requirements that the indicator

intends to measure and then describes how the software (or an audit) will operate to achieve this.

Step 2: VALIDATION

Stakeholders then validate the indicator's documentation (in the context of business

requirements and workflows it is intended to measure) to ensure its design will create transparent

and accurate data. When issues are discovered, stakeholders work by consensus to correct the

deficiency or use the agreed dispute resolution process.  Stakeholder validation takes place

through written comments provided by the Special Master's team and plaintiffs along with

detailed discussion during BRMR meetings.

Step 3: APPROVALS

The agreed-upon documentation approved by all stakeholders including the Special

Master's data expert then enters CDCR's current change management process for approval by

CDCR Mental Health.

Step 4: PROGRAMMING

The indicator is programmed according to the validated documentation by CDCR

programmers under the supervision of MH.

Step 5: VERIFICATION

Software tests are created to confirm that the indicator is working as designed on an

ongoing basis. These tests are created by a separate team of CDCR programmers working with

CDCR subject matter experts in order to verify that the CDCR's data products (including row-

level "case data" and summary statistics) are correctly generated per their previously validated

designs.

Remediation of Individual Indicators

Finally, when indicators and their business rules complete the five-step validation and

verification process, and there are no outstanding stakeholder disputes, the Special Master's data

expert marks them as remediated and communicates the same to the date remediation

stakeholders.[22]

Data System Certification

In order for the data remediation process to be completed, the individual remediated

indicators must operate in a system that is transparent and has adequate version control to enable

---

[22] While there was significant discussion among the stakeholders about the definitions of certain
data-remediation related terms earlier in the data remediation process, *see* Twenty-Ninth Round
Monitoring Report – Part C, ECF No. 7715 at 45-47, no remaining concerns have been presented
to the Special Master.

users to easily track and compare current documentation to prior versions. This will provide for the durability of the gains made during the remediation endeavor. The Special Master's data expert has committed to reviewing and certifying that such processes are in place so that the significant achievements of the data remediation process are durable and that the Court can rely on the accuracy of defendants' mental health-related data after the remediation process has completed.

The certification of the data system and the processes which underlay it must happen concurrently with the remediation of the individual key indicators.  In his initial report appended to the Twenty-Eighth Round Monitoring Report, the Special Master's data expert reported that defendants' quality assurance "system documentation [wa]s not designed to maintain certification."  ECF No. 7074 at 236.  Specifically, the Special Master's data expert noted the following:

- It is difficult to know how critical QA system details have changed over time.
- There is no way to review the QA system or QA data system specifications as of a certain date.
- There is no way to review all documentation changes that have occurred to the QA system or QA data system over a specific period of time.
- The On-Demand reporting system is designed to handle business rule changes as follows: when a business rule is changed, the current rule is supposed to be retired (by setting its effective end date).  However, there does not seem to be a process to track significant changes to the inputs.

*Id.*

Since the time of that report, defendants have worked with the Special Master's data expert to remedy these initially identified deficiencies.  For instance, defendants have archived daily verification test results and made these results available to stakeholders.  Also, most documentation is now stored under version control.  This allows stakeholders to compare the version of the documentation that was validated with subsequent versions of the documentation.

To facilitate CDCR's preparedness for certification, the Special Master's data expert and CDCR Mental Health have agreed to do a joint review of CDCR's progress in developing a sustainable process during the second and third quarters of 2023. The purpose of this review is to allow time for CDCR to attempt to correct any deficiencies before the remediation deadline.

B.     Overview of Data Remediation-Related Meetings

As previously reported, the data remediation process includes numerous meetings per week, some of which include the Special Master's data team and defendants and others that also include plaintiffs' counsel.  These meetings have included regularly scheduled Business Rule and Methodology Review (BRMR), Quality Assurance Certification (QAC) workgroup, Clinical Advisory and Prioritization Committee (CAPC) meetings and both regularly scheduled and ad-hoc meetings between the Special Master's data expert and various CDCR staff members assigned to the data remediation project.

Both the frequency and content of the various data remediation-related meetings have evolved with the overall data remediation project over time.  In the Twenty-Eighth Round Monitoring Report, the Special Master reported on the initial purpose of one of the key data remediation-related meetings, the now twice-weekly BRMR meeting: "CDCR Mental Health and Dr. Potter initiated a series of Business Rule and Methodology Review meetings to develop the detailed and specific information that specifies both the current intended operation (i.e. how the system is supposed to be currently working), and when needed, required future intended operation (i.e. how they system needs to work to be in concordance with the Program Guide)…." ECF No. 7074 at 233.  The BRMR process[23]  in place as of the time of this writing serves as the

---

[23] Initially, all data remediation stakeholders participated in regularly scheduled Data Meetings, while the Special Master's data team and defendants attended the BRMR, Quality Assurance Certification (QAC) workgroup, and Clinical Advisory and Prioritization Committee (CAPC)

main forum for all stakeholders (including plaintiffs' counsel) to review, discuss, and validate

business rules and other documentation related to the key indicators.

    A.    <u>Update on Strategies Implemented to Promote Efficient Completion of Data</u>
        <u>Remediation</u>

    In his Twenty-Ninth Round Monitoring Report – Part C, the Special Master reported on a

number of "strategies" the data remediation stakeholders were pursuing to promote "the efficient

completion of data remediation by December 2023." ECF No. 7715 at 38. These strategies

included "combin[ing] the regularly scheduled all-parties data meeting with an additional BRMR

meeting, resulting in three BRMR meetings occurring every two weeks, which is expected to

accelerate the completion of stakeholder review of the indicators." *Id.* At the time, the Special

Master reminded the parties that "his team is ready, willing, and able to add as many additional

meetings as necessary to timely meet Court-required deadlines." *Id.*

    Since the filing of the Twenty-Ninth Round Monitoring Report – Part C, the parties again

agreed to add an additional BRMR meeting to the weekly calendar, resulting in two BRMR

meetings per week (an increase from three BRMR meetings every two weeks). More recently,

the stakeholders agreed to lengthen one of the weekly BRMR meetings to further accelerate the

stakeholder review process. Relatedly, in response to CDCR's plan to include counsel, the

Special Master recently disbanded the weekly QAC meetings.[24] The subject matter that was

---

meetings. Beginning in November 2022, the agenda for the all-parties Data Meetings was rolled
into the BRMR meeting.

[24] During the May 16, 2023 QAC meeting, CDCR informed the Special Master's team that
CDCR's Office of Legal Affairs (OLA) would be participating in QAC meetings going forward.
The Special Master's team brought this to the attention of the stakeholders during the BRMR
meeting of the same date and raised their concern that the inclusion of legal counsel would
detract from the original purpose of the QAC meeting, which was to allow a free-flowing
exchange of ideas between the Special Master's data team and CDCR's Mental Health
leadership regarding data remediation related issues. Rather than include counsel for the parties

historically discussed at the QAC meeting will be discussed at the longer of the two weekly BRMR meetings on an as needed basis going forward.

In addition, the parties have worked to reduce the number of so-called "bring backs" and also resolve BRMR-related issues via email in between meetings as much as possible to avoid using time during BRMR to resolve previously identified issues and potential barriers to remediation. Finally, in consideration of the additional time added to the weekly BRMR meetings, the stakeholders recently agreed that defendants would accelerate distribution of BRMR meeting agendas to facilitate necessary stakeholder preparation for the meetings.

III.    **Current Status of Data Remediation As Related to Finalization of the List of CQIT Indicators**

As noted, in his 2021 Report on CQIT key indicators, the Special Master initially recommended 149 key indicators based in large part on the list of indicators defendants had submitted to the Special Master in advance of the 2021 Report. *See* ECF No. 7151 at 17. In its Order adopting the 2021 Key Indicators Report, the Court provisionally approved all but one of the Special Master's recommended key indicators, leaving 148 provisionally approved key indicators to be remediated. June 30, 2021 Order, ECF No. 7216 at 14 (striking indicator 8 on the list of key indicators for Access to Care contained in the 2021 Key Indicators Report as duplicative). Below is an update on the remediation status of the provisionally-approved key indicators. Also included below are updates on the key indicators the parties have agreed to decommission, the development of the so-called "placeholder" indicators, and the data remediation dispute resolution process.

---

in the QAC meeting, the stakeholders instead agreed, as indicated, to include subjects that would have historically been discussed in QAC in the extended 3.5 hour BRMR meeting. On June 21, 2023, defense counsel sent an email requesting revisions to the BRMR schedule. Deputy Special Master Walsh responded on June 23, 2023 indicating that the Special Master's data team was unable to agree to the requested changes to the agreed upon schedule.

A.    <u>Provisionally-Approved Key Indicator Remediation Status (as of June 16, 2023)</u>

In consultation with the Special Master's data expert, defendants regularly report on the status of each of the steps of the data remediation process during BRMR meetings.[25]  At the June 21, 2023 BRMR meeting, defendants provided the following remediation status updates for the provisionally approved key indicators, as of June 16, 2023:

- Documentation preparation had started for 136 and completed for 128 key indicators.

- Stakeholder review during BRMR had started for 128 completed for 104 key indicators.

- Mental Health had started the process of updating and approving documentation in CAPC for 104 key indicators and completed updated documentation for 99 key indicators.

- Defendants started indicator programming for 93 key indicators and completed programming for 84 key indicators.

- Defendants started indicator testing for 79 key indicators and completed testing for 67 key indicators.

- Finally, 42 Key Performance Indicators (KPIs) had been successfully remediated.

| Provisionally Approved Key Indicator Status as of June 16, 2023 | Started | Completed |
|---|---|---|
| **Initial Documentation Preparation** | 136 | 128 |
| **Documentation Reviewed with Stakeholders (Validation)** | 128 | 104 |
| **Documentation Update and Approved by MH** | 104 | 99 |
| **Indicator Programming** | 93 | 84 |
| **Indicator Testing (Verification)** | 79 | 67 |
| **Total Key Indicators Remediated** | NA | 42 |

---

[25] The information reported out to the stakeholders during BRMR includes information from the templates attached to defendants' May 19, 2022 declaration, known as "Report A" and "Report B."   ECF No. 7556-1 at 2-3; *see also* ECF No. 7556 at 2 (discussing Report A and Report B).



In addition to reporting on the status of each of the five data remediation steps, the Special Master's data expert and CDCR also regularly report on the whether the steps of the remediation process are being completed at the rate necessary to complete the data remediation project by December 31, 2023. While the validation (stakeholder review) process has begun for the vast majority of the initially identified provisionally approved key indicators (128 of 139, *see supra* note 5 and p. 29), only 104 have completed the stakeholder review process. Based on the Report B analysis as of June 16, 2023, the validation step of the remediation process for the 139 provisionally approved key indicators is projected to complete in September 2023, rather than the previously projected July 2023. Later steps in the remediation process are also currently behind schedule compared to previously established target completion dates. While the most recent Report B analysis demonstrates that CDCR Mental Health efficiently updates and

approves validated indicator documentation after stakeholder review,[26] the indicator

programming and testing steps have lagged in recent weeks, falling behind the required

completion rate for the most recent two-week period.  Based on the June 16, 2023 projection of a

September 2023 completion of stakeholder review, it is essential that CDCR accelerate the rate

of completion of the programming and testing steps of the process as the stakeholders

simultaneously continue to work to optimize BRMR output.

    While these projections are informative and will help direct the stakeholders' focus over

the next several months, the Special Master's remains cautiously optimistic that the data

remediation project will be completed by the end of 2023. As noted, only 35 indicators remain

for BRMR review, with at least 19 tied to the dispute regarding summary statistics. *See supra* p.

6. With respect to the later stages of the process, his optimism is based on the former CDCR

Secretary's representation that the department has sufficient staff to address the downstream data

remediation steps and that CDCR will "ensure additional staff, as may be necessary" are

assigned to the project "to complete data remediation before December 2023." ECF No. 7556 at

3.

    B.    <u>Decommissioned Indicators</u>

    As alluded to, over the last eight months, the stakeholders have considered

decommissioning (i.e. removing from the list of provisionally approved key indicators) several

---

[26] For instance, the most recent Report B analysis (as of June 16, 2023) demonstrates that 104 key indicators have completed the validation/stakeholder review step of the remediation process. Of these, CDCR has updated and approved documentation for 99 validated indicators.

key indicators. As a result of these efforts and consistent with the Court's authorization,[27] the stakeholders have agreed to decommission 14 provisionally approved key indicators.

On October 31, 2022, defendants sent a letter to the Special Master and plaintiffs' counsel discussing, among other data remediation-related items, defendants' proposal to decommission ten provisionally-approved key indicators and identifying an additional six "duplicate" indicators. Between October 2022 and May 2023, the parties exchanged a total of six letters regarding defendants' proposal to decommission these indicators.[28]

As of the date of plaintiffs' May 23, 2023 correspondence, the parties have agreed to decommission 14 of the 16 provisionally approved key indicators identified in defendants' October 31, 2022 letter. Specifically, the parties have agreed to decommission the following indicators:

| Indicator Number (as identified in SM's 2021 Report on CQIT key indicators | Description | Date of agreement to decommission |
|---|---|---|
| Restricted Housing # 5 (ECF No. 7151 at 24) | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 | May 23, 2023 (*see* Exhibit I at 2-3). |

---

[27] *See* May 23, 2023 Order, ECF No. 7847 at 7 ("If the Special Master and all parties agree an indicator should be eliminated from the list because it does not measure a core remedial requirement, then that indicator does not need to be validated or verified."); *see also* April 22, 2022 Transcript of Proceedings, ECF No. 7540 at 37:5-7 ("THE COURT: …Just so it's clear, I've made – I've told the Special Master that if the Special Master and the parties agree that an indicator can come off of this list, I don't need to approve that.").

[28] *See* Letter from Mr. Nicholas Weber, Esq., CDCR OLA, to Special Master Lopes and Ms. Lisa Ells, Esq., Plaintiffs' Counsel (October 31, 2022), attached hereto as Exhibit D; Letter from Ms. Cara Trapani, Esq., Plaintiffs' Counsel, to Mr. Nicholas Weber, Esq. (November 18, 2023), attached hereto as Exhibit E; Letter from Mr. Nicholas Weber, Esq., to Ms. Cara Trapani, Esq. (December 23, 2022), attached hereto as Exhibit F; Letter from Ms. Cara Trapani, Esq., to Mr. Nicholas Weber, Esq. (February 22, 2023), attached hereto as Exhibit G; Letter from Mr. Nicholas Weber, Esq., to Ms. Cara Trapani, Esq. (April 28, 2023), attached hereto as Exhibit H; Letter from Ms. Cara Trapani, Esq., to Mr. Nicholas Weber, Esq. (May 23, 2023), attached hereto as Exhibit I.

| Indicator Number (as identified in SM's 2021 Report on CQIT key indicators | Description | Date of agreement to decommission |
|---|---|---|
| | Working Days | |
| Suicide Prevention # 10 (ECF No. 7151 at 22. | Percentage of Observed R&R [Receiving and Release] and Reception Center Screens in Confidential Setting and Correct Documentation Used | November 18, 2022 (*see* Exhibit E at 3). |
| Restricted Housing # 36 (ECF No. 7151 at 25) | Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required | May 23, 2023 (*see* Exhibit I at 2.). |
| Restricted Housing # 20 (ECF No. 7151 at 25) | ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria | November 18, 2022 (*see* Exhibit E at 5).[29] |
| Restricted Housing # 23 (ECF No. 7151 at 25) | Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors | February 22, 2023 (*see* Exhibit G at 4). |
| Restricted Housing # 8 (ECF No. 7151 at 24) | ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | May 23, 2023 (*see* Exhibit I at 2). |
| Utilization and Resource Management # 2 (ECF No. 7151 at 25) | Percentage of mental health OHU stays 48 hours or less | February 22, 2023 (*see* Exhibit G at 5). |
| Staffing/Personnel Training, and Staff Resources # 12 (ECF No. 7151 at 26) | Staff that report having computers for all out of cell clinical appointments. | As of June 15, 2023, plaintiffs' counsel verbally confirmed their agreement to decommission this indicator. |
| Restricted Housing # 4 (ECF No. 7151 at 24) | ASU Pre-Screens | February 22, 2023 (*see* Exhibit G at 6). |
| Restricted Housing # 6 (ECF No. 7151 at 24) | Percentage of ASU Screenings that Occurred within 72 Hours of Placement of Arrival | February 22, 2023 (*see* Exhibit G at 6). |
| Access to Care # 12 (ECF No. 7151 at 22) | Percentage of IDTTs Observed in which a Health Record and C-File were Available | February 22, 2023 (*see* Exhibit G at 6). |
| Restricted Housing # 38 (ECF | Percentage of MH-7s | February 22, 2023 (*see* |

---

[29] In their November 18, 2022 and subsequent correspondence, plaintiffs' reserved the right to revisit the content of this key indicator in the context of the CMHPP placeholder indicator. Exhibit E at 5.

| Indicator Number (as identified in SM's 2021 Report on CQIT key indicators | Description | Date of agreement to decommission |
|---|---|---|
| No. 7151 at 25) | required completed prior to ASU placement | Exhibit G at 6). |
| Staffing/Personnel Training, and Staff Resources # 13 (ECF No. 7151 at 22) | Percentage of healthcare staff with current suicide prevention training | February 22, 2023 (*see* Exhibit G at 6). |
| Specialized Custody # 11 (ECF No. 7151 at 23) | Additional Use of Force (Specificity to be determined) – On __, defendants indicated the following: "CDCR will prep the following: UOF involving MH inmates").[30] | February 22, 2023 (*see* Exhibit G at 6). |

There are two key indicators included on defendants' original list of proposed decommissioned indicators that all parties have not agreed to decommission: "Inpatient Transfer Deadlines for PIPs and DSH," and "Emergency Response Procedures for Self-Injurious Behaviors and Suicide Attempts."

First, regarding the key indicator entitled "Inpatient Transfer Deadlines for PIPs and DSH," the parties have narrowed the scope of their dispute but have not agreed to decommission the indicator. This dispute regarding measurement of Program Guide requirements for timely transfer to inpatient programs was referred to the dispute resolution process in June 2023. The Level 1 dispute resolution review team discussed the dispute during meetings on June 15, 2023 and June 22, 2023 but was unable resolve the dispute.

Regarding the second indicator defendants originally proposed for decommissioning – Emergency Response Procedures for Self-Injurious Behaviors and Suicide Attempts – the plaintiffs agreed to "meet and confer with the Special Master team to learn what they audit under

---

[30] As noted below, the Special Master identified additional Use of Force indicators through the process of providing further specificity to the "placeholder" indicators initially identified in his 2021 Report on Key Indicators. *See* Exhibit A at 6.

34

this category to determine whether CDCR already conducts such auditing or whether further indicator development is necessary." Exhibit I at 2.

       C.    "Placeholder" Indicators

Included in the list of 148 provisionally approved key indicators were five general categories of monitoring topics the Special Master identified as meeting the standard for "key indicators" but did not yet have specific indicators in defendants' CQIT. In some cases, the "placeholder" remedial requirements (e.g. Custody and Mental Health Partnership Plan (CMHPP)) came into existence after the initial phases of the development of CQIT, so the creation of new indicators was necessary to ensure appropriate measurement of the remedial requirements of the case. Similarly, the initial development of CQIT pre-dated the Lift-and-Shift, whereby control over three PIPs was transferred from DSH to CDCR. As a result, CQIT's coverage of remedial requirements in the PIPs was limited and required further specification.

Since the filing of the 2021 Key Indicators Report, the data remediation stakeholders have referred to these five general monitoring areas as the "placeholder indicators." The placeholder indicators covered the following monitoring areas:

    (1)    Additional Use of Force, ECF No. 7151 at 23;

    (2)    Sustainability Process, *id.* at 26;

    (3)    ASU EOP Hub Certification, *id.*

    (4)    PIP, *id.*

    (5)    Custody and Mental Health Partnership Collaboration, *id.*

After the Court's adoption of the 2021 Key Indicators Report, the Special Master created an internal workgroup of experts and monitors and tasked them with defining the placeholder

indicators with the specificity required to begin the remediation process (i.e. documentation, stakeholder review, etc.) for each measurement.

In considering the appropriate measurements for each placeholder indicator, the internal workgroup was mindful of the long history of the development of the provisionally approved key indicator list. *See supra* pp. 18-22; *see also* ECF No. 7151 at 15-21. Accordingly, where possible, the workgroup sought to utilize existing provisionally approved key indicators by, for instance, modifying the subprogram/MHI being measured, as opposed to creating genuinely new indicators for these placeholders.

As communicated to the parties in a June 14, 2023 letter, the Special Master's internal workgroup identified 14 new indicators across the five placeholder categories. Exhibit A at 6. In addition, the workgroup identified 41 existing key indicators that should be extended to cover remedial requirements related to the PIPs and use of force. *Id.* at 6-10.

The stakeholders discussed the placeholder indicators during BRMR meetings held on June 21, 2023, and June 27, 2023. On June 28, 2023, the parties each provided written comments regarding the placeholder indicators identified in the Special Master's June 14, 2023 letter. *See* Exhibits B and C. In their letter, plaintiffs requested additional indicators in the Additional Use of Force, ASU EOP Hub, and PIP placeholder categories. Exhibit B at 1. Defendants objected to three of the 14 new placeholder indicators and agreed to remediate the majority of the extended indicators identified in the Special Master's June 14, 2023 letter, Exhibit C at 1, 5, though they suggest that the addition of these measurements would "make[] it impossible to complete data remediation this calendar year." Exhibit C at 1.

The Special Master and his data team are evaluating the parties' respective responses and are preparing to move forward with the remediating these indicators in concordance with the

Court's direction.  *See, e.g.*, May 23, 2023 Order, ECF No. 7847 at 7 ("The business rule for

each key indicator must be written so that the court can rely on defendants' data in assessing

their compliance.  Thus, each key indicator must be designed and operationalized to accurately

capture the corresponding information gathered and reported on by the Special Master as part of

his monitoring responsibilities.").

      D.    <u>Dispute Resolution Process Results</u>

      As reported in the Special Master's Twenty-Ninth Round Monitoring Report – Part C, a

year ago the stakeholders agreed to a dispute resolution process to resolve data remediation-

related disputes.  ECF No. 7715 at 42.  The Special Master described the dispute resolution

process as follows:

> [The agreed-upon data remediation dispute resolution process] envisioned a three-step process for resolving disputes over the scope of CDCR's CQIT indicators. Disputes regarding methodological issues were to be "addressed in the BRMR/QAC process and only move through dispute resolution as a last resort." Where the Special Master and parties agreed on an indicator "but also agree[d] that the policy measured by the indicator' required modification 'to align with the indicator," CDCR would pursue the policy modification in a manner so as not to "delay the data remediation process."  Further, "[a]ny request by the parties for a new indicator (not including reasonable modifications to an existing one) shall be sent to the Special Master for his consideration…."

> Disputes regarding indicators left unresolved after two weeks of BRMR/QAC consideration are referred to the "First Level Review Team" consisting of "[CDCR's] Mental Health Program Deputy Director, Undersecretary of Health Care Services, the Special Master and/or Special Master's designated experts, defendants' counsel, plaintiffs' counsel, and the minimal number of subject matter experts necessary."  First Level Reviews left unresolved after two weeks of consideration…were referred to the "Second Level Review Team," consisting of the CDCR Secretary, Special Master, and "whomever else either deems necessary."  Step three of the process consist[s] of the Special Master making a recommendation to the Court to resolve those dispute left unresolved after two weeks of "Second Level review."

ECF No. 7715 at 42-43 (quoting ECF No. 7556-2 at 2).

The data remediation dispute resolution process has generally served the process well to address and resolve disputes; however, as described below, in some instances disagreements should have been addressed more efficiently at either BRMR or level 1 of the process.  First, of the 139 provisionally approved key indicators going through the remediation process – each of which consists of multiple data elements – a relatively small number of disagreements have required the Special Master to submit a Third Level recommendation to date.  Since the data remediation dispute resolution process commenced, the parties have brought 36 disputes to some level of the process.  Of 36 disputes, only four have required a Third Level recommendation from the Special Master.  *See* ECF No. 7755.  Three of the four disputes subject to the Special Master's March 9, 2023 Third Level Recommendation were resolved by court order;[31] one is pending the Special Master's further recommendation after the Court referred the dispute back to the Special Master.  ECF No. 7847 at 12.

As of June 28, 2023, 22 disputes had been resolved at either Level 1 or Level 2 of the dispute resolution process; four disputes are pending stakeholder review after being referred back to BRMR; three disputes are pending further consideration of adequate sampling strategies; two disputes are pending consideration at Level 1; and one dispute is pending consideration at Level 2.  As noted in the Special Master's May 9, 2023 Report, several disputes that were elevated to Level 2 were resolved in defendants' favor.  *See* ECF No. 7755 at 1 n.1.

---

[31] Specifically, the Court adopted the Special Master's recommendation that the "indicator for MHCB daily provider contacts are designed with plaintiffs' requested reasonable modification" in a May 23, 2023 Order.  ECF No. 7847 at 12 ("This indicator must accurately report when MHCB daily provider contacts are made by providers operating within the parameters of court-ordered policy and when MHCB daily provider contacts are made by providers operating outside those parameters.").  The parties stipulated to resolutions of the disputes regarding measurement of patient attendance at IDTTs and psychiatric nurse practitioner participation in IDTTs, ECF No. 7837 at 2-3, which the Court approved on May 17, 2023.  Stipulation and Order, ECF No. 7844 at 2-4.

**DISPUTE RESOLUTION SUMMARY TABLE**
**(as of June 28, 2023)**

| Number of Disputes (BROUGHT TO ANY LEVEL) | 36 |
|---|---|
| RESOLVED AT LEVEL 1 or 2 | 22 |
| RESOLVED BY COURT ORDER AFTER SM LEVEL 3 RECOMMENDATION | 3 |
| PENDING SM REC. (STRH/LTRH) | 1 |
| PENDING AFTER REFERRED BACK TO BRMR | 4 |
| PENDING - SAMPLING | 3 |
| PENDING AT LEVEL 1 | 2 |
| PENDING AT LEVEL 2 | 1 |

Moreover, since CDCR Secretary Jeff Macomber assumed the position of Secretary, defendants have demonstrated willingness to modify what once appeared to be hardline positions on some disputes.  For instance, in March 2023, after consistently resisting measuring milestone credits awarded to PIP patients, defendants changed their position shortly before a scheduled Level 2 dispute resolution meeting, resolving the dispute and allowing the indicator in question to move forward.  *See* Email from Mr. Nicholas Weber, Esq, CDCR OLA, to Deputy Special Master Kerry Walsh and Ms. Arielle Tolman, Esq, Plaintiffs' Counsel (March 27, 2023), attached here to as Exhibit J.  Similarly, after resisting measuring patient attendance at IDTTs for months, including through both Levels 1 and 2 of the dispute resolution process, defendants changed their position and agreed to create a new indicator measuring this Program Guide requirement.  ECF No. 7844 at 2.  Likewise, defendants changed their position on whether psychiatric nurse practitioners (PNPs) could satisfy the Program Guide requirement that psychiatrists participate in IDTT meetings outside the 3CMS level of care.  *Id.* at 3.  Finally, on

39

June 29, 2023, defendants offered to resolve a dispute regarding measurement of the Program

Guide's requirement that patients transfer to inpatient settings within 72 hours of bed

assignment, *see* ECF No. 7333-1 at 19, 111, 117, by creating a new indicator, including a

summary statistic.  Email from Mr. Nicholas Weber, Esq., CDC OLA, to Ms. Cara Trapani, Esq.,

Plaintiffs' Counsel, and Deputy Special Master Kerry Walsh (June 29, 2023), attached hereto as

Exhibit K.  Like the other disputes discussed above, defendants previously refused to agree to

measure the 72-hour timeframe, arguing that "CDCR does not view this as a constitutional issue

or key indicator."  *See, e.g.*, Email from Mr. Nicholas Weber, Esq., to Ms. Cara Trapani, Esq.

(June 2, 2023), attached hereto as Exhibit L.

While encouraging, defendants' changes of heart on these issues is reflective of their

contradictory approaches to the remediation process.  As they did with the disputes resolved by

stipulation, for instance, defendants sometimes engage in constructive problem solving

seemingly aimed at bringing remediation to timely and successful completion.  At other times,

however, the tone and content of defendants' communications is unnecessarily combative, which

impedes the stakeholders' collective ability to accomplish the "straightforward completion of 'a

necessary task' on the road to finalizing the remedy," as the Court has directed.  May 23, 2023

Order, ECF No. 7847 at 5.[32]  For example, in a recent communication regarding a pending

---

[32] Because of the breadth and depth of the record in this case, the Court recently observed the
following about the task of finalizing the list of CQIT key indicators:

> All of the Special Master's monitoring reports have been reviewed and adopted in
> whole or in part by the court.  Therefore 'straightforward completion' of the
> necessary tasks of finalizing the list of CQIT key indicators and ensuring the data
> captured by those indicators replicates the corresponding information captured by
> the Special Master in his monitoring reports *should be virtually conflict free*.  If
> an indicator requires modification to thoroughly capture information monitored
> by the Special Master on the topic covered by the indicator, each party has all
> relevant information: the Special Master's monitoring reports and all relevant

dispute, defense counsel bemoaned what they described as the Special Master's attempt to move the remedial goal posts by forcing a particular methodology upon defendants. Such rhetoric serves only to slow the data remediation process and is reminiscent of what the Court recently described as defendants' "distracting and costly scorched earth litigation strategy" that has for so long impeded progress toward a durable remedy in this case. January 6, 2023 Order, ECF No. 7699 at 3.

The Special Master urges defendants to reconcile these disparate approaches to the daunting project in favor of the constructive one recently taken by the Secretary. It is only through a commitment to constructive problem-solving by all stakeholders and maintenance of a laser focus on the work ahead that defendants' mental health data can be successfully remediated by the end of 2023 and the cascading set of problems set into motion by defendants' submission of misleading data be put behind us. This, in turn, will facilitate the meaningful resumption of CQIT paving the way to eventual removal of federal court oversight.

    E.    <u>Summary of Progress Toward Identifying Final List of CQIT Key Indicators</u>

As noted, the Court provisionally approved 148 key indicators, inclusive of five placeholder categories, in its June 30, 2021 Order. ECF No. 7216 at 14. The stakeholders have since agreed to remove 14 provisionally approved key indicators from the final list. In addition, as of June 16, 2023, five new indicators have been added to the remediation process, leaving a total of 139 key indicators.

The five placeholder indicators have been replaced by 14 specific indicators to measure remedial requirements related to defendants' sustainable process, use of force, the Court-ordered

---

court orders. Remedial planning has been substantially complete for at least four years.

May 23, 2023 Order, ECF No. 7847 at 8 (emphasis added).

CMHPP as well as those related to CDCR's psychiatric inpatient programs (PIPs). Accounting for the adjustments noted above, the stakeholders have identified at least 153 key indicators requiring remediation as of June 16, 2023. These figures do not include other potential new indicators identified by the stakeholders that are not yet included on the list of 139 key indicators currently undergoing remediation, which will be briefly addressed in the following section.

## IV.    Next Steps as the Stakeholders Progress Toward Completion of Data Remediation

The Special Master has previously described the task of remediating CDCR's mental health data systems as "arduous," Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 37, and indeed, the stakeholders experience over the last three years has borne this out. Moreover, as the record makes clear, the road to data remediation has, at times, been bumpy. *See id.* at 14 (describing the data remediation process as proceeding in "fits and starts"); *see also* Special Master's Report and Recommendations Regarding Third-Level Data Remediation Disputes, ECF No. 7755 at 32 ("The parties' divergent understandings of the purpose of remediating CDCR's indicators have ensnared them in a cycle of data-related disputes. Without resolution of this fundamental dispute about the purpose of data remediation in the context of this case, the Special Master is deeply concerned that the process will continue to be bogged down, jeopardizing the completion of data remediation by the end of this calendar year.").

Despite these challenges, the stakeholders have made significant progress in recent months. As reported above, as of June 16, 2023, defendants have completed initial documentation for nearly all of the provisionally approved (not including the placeholder indicators). *See supra* p. 29 (noting defendants have completed initial documentation

preparation for 128 of the 139 indicators undergoing remediation.).[33] The validation (stakeholder review) process has started for the vast majority of these indicators and the stakeholders are approaching completing this step of the remediation process for the initially identified provisionally approved key indicators.  While the efficiencies built into the BRMR process have shown promise in recent weeks, the validation step of the remediation process must accelerate further.  Likewise, CDCR must also increase the completion rate for the programming and testing steps of the process and be prepared to efficiently program those indicators that have yet to complete stakeholder review.

A significant amount of work remains over the next six months and there are a number of potential hurdles facing the stakeholders.  For instance, the placeholder indicators need to be developed and remediated through the established validation and verification process outlined above.  This includes the new placeholder indicators as well as the extension of existing indicators to measure remedial requirements across the five placeholder indicator categories.  *See supra* pp. 35-37; *see also* Exhibit A at 6-11.

Relatedly, soon after submission of this report, the stakeholders need to identify and, as necessary, develop and remediate any other new indicators or extensions of existing indicators to new settings identified through remediation process.  It is natural for this process to occur after the validation process has been completed for the initially identified provisionally approved key indicators because the stakeholder review process, in some cases, revealed gaps in CDCR's existing indicators.  In some cases, these gaps have required modifications to existing indicators or new indicators to be created.  The stakeholders need to work together forthwith to identify

---

[33] Here, the 143 provisionally approved indicators does not include the five placeholder indicators.  As noted above, the Court provisionally approved 148 key CQIT indicators, inclusive of five placeholder indicators that had been defined as of the date of the Court's order adopting the 2021 Key Indicators Report.

and remediate any new indicators so the Court can be presented with a complete proposed list of key indicators by the end of this year.

As reported above, a global dispute regarding summary statistics and an outstanding issue regarding adequate sample sizes need to be resolved. Together, these disputes are holding up full remediation of approximately two dozen indicators. Because one or both of these disputes could be presented to the Court at a later date, it is premature to discuss the merits of either dispute. What is clear, however, is that both issues must be resolved promptly so the remediation process for these indicators can proceed.

In addition, the stakeholders need to remain committed to rapidly resolving questions and disputes about key indicator documentation at the lowest level possible (preferably at the BRMR level) and in the most efficient manner possible (including via email when possible to preserve valuable BRMR time). The stakeholders have demonstrated their willingness and ability to follow this practice in recent months and continuation of this practice is essential moving forward.

Finally, as noted, to facilitate CDCR's preparedness for data system certification, the Special Master's data expert and CDCR Mental Health have agreed to do a joint review of CDCR's progress in developing a sustainable process during the second and third quarters of 2023. The purpose of this review is to allow time for CDCR to attempt to correct any deficiencies before the remediation deadline.

## CONCLUSION AND RECOMMENDATION

The Special Master submits this report with great appreciation for the stakeholders' efforts to remediate defendants' mental health data systems. The work ahead of the stakeholders will require continued focus and flexibility in order to achieve their common purpose of completing this critically important remediation project on or before December 31, 2023 as

ordered by the Court.  Based on the developments discussed above, the Special Master is cautiously optimistic that the stakeholders will complete their work on schedule.

In light of the foregoing, the Special Master recommends that the Court adopt this data remediation status report and direct the Special Master to file a further brief status update on data remediation no later than October 15, 2023.

Respectfully submitted,

/s/ *Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr., Esq.
Special Master

June 30, 2023

45

**APPENDIX A**
**ACTIVITIES OF THE SPECIAL MASTER**

**ACTIVITIES OF THE SPECIAL MASTER SINCE THE FILING OF THE
THIRTIETH ROUND MONITORING REPORT - PART A: SPECIAL MASTER'S
MONITORING REPORT ON THE PSYCHIATRIC INPATIENT PROGRAMS FOR
MENTAL HEALTH PATIENTS OF THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION (ECF NO. 7833, MAY 11, 2023)**

**DATA REMEDIATION ACTIVITIES**

- Business Rules and Methodology Review Workgroup – 14 meetings
- Level 1 Data Dispute Meetings – Six meetings
- Level 2 Data Dispute Meetings – One meeting

**COURT COORDINATION MEETINGS – June 20, 2023**

**SPECIAL MASTER REPORTS ISSUED IN 2023**

- Twenty-Ninth Monitoring Round Report – Part D: Special Master's Monitoring Report on the California Department of Corrections and Rehabilitation's Institutions with Enhanced Outpatient Programs Compliance with Provisionally Approved Plans, Policies, and Protocols, Filed February 7, 2023, ECF No. 7715
- Twenty-Ninth Monitoring Round Report – Part D: Special Master's Monitoring Report on the California Department of Corrections and Rehabilitation's Institutions with Correctional Clinical Case Management Programs Compliance with Provisionally Approved Plans, Policies, and Protocols, Filed February 7, 2023, ECF No. 7716
- Special Master's Report and Recommendations Regarding Third-Level Data Remediation Disputes Pursuant to the Data Remediation Dispute Resolution Process, March 9, 2023, ECF No. 7755
- Thirtieth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation, Filed May 11, 2023, ECF No. 7833