# EXHIBIT A

**PANNONE LOPES**
**DEVEREAUX & O'GARA** LLC
*c o u n s e l o r s   a t   l a w*

June 14, 2023

**Elise Thorn, Esq.**
Deputy Attorney General
1300 I Street, Rm. 1040-16
Sacramento, CA 95814

Via Email:  Elise.Thorn@doj.ca.gov

**Lisa Ells, Esq.**
Rosen, Bien Galvan & Grunfeld, L.L.P.
50 Fremont Street, 19th Floor
San Francisco, CA 94105

Via Email:  lells@rbgg.com

Re:    <u>Identification of "Placeholder" Indicators</u>

Dear Attorneys Thorn and Ells:

      The Special Master's recommended list of key CQIT indicators, provisionally approved by the Court on June 30, 2021, *see* Order, ECF No. 7216 at 14, included five indicators identifying key areas of focus which would have to be updated with specific indicators used to measure remedial requirements in those areas.  This letter identifies the indicators that the Special Master intends to recommend to the Court for inclusion in the final list of CQIT key indicators under each of those additional indicators ("placeholders").  Therefore, the remediation process on these specific indicators should commence forthwith so that they are remediated before the court-ordered deadline of December 31,2023.  *See, e.g.*, April 29, 2022 Order, ECF No. 7541.

      The "placeholder" indicators cover the following five monitoring areas:

(1)     Additional Use of Force (Specificity to be determined), ECF No. 7151 at 23;
(2)     Sustainability Process, *id.* at 26;
(3)     ASU EOP Hub Certification, *id.*
(4)     PIP (To be developed), *id.*
(5)     Custody and Mental Health Partnership Collaboration, *id.*

**<u>Background</u>**

      Working together for three years on the painstaking process of remediating defendants' mental health data systems, the data remediation stakeholders[1] have accomplished a great deal. From time to time, the data remediation process has been contentious and, as the Special Master observed in a recent report, disagreements between the parties about the "foundational purpose

---

[1] For purposes of this letter, "stakeholders" refers to defendants, plaintiffs, and the Special Master's team, who together work under the supervision of the Special Master on the data remediation project.

Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 2

of the overall data remediation endeavor [have] infuse[d] conflict and delay into each step of the process."  Special Master's Report and Recommendations Regarding Third-Level Data Remediation Disputes, ECF No. 7755 at 2; *see also* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 45 ("[I]t is past time to sharpen our collective focus and finish this project.  The Special Master has directed his team to proceed with steadfast focus on the remedial requirements of this case; he expects and hopes the parties will do the same.").

More recently, however, the Court noted that based on the parties' respective filings, "there is no dispute over [the] core principle" that "CQIT key indicators must be operationalized to properly measure the core requirements of the Program Guide and the Compendium."  May 23, 2023 Order, ECF No. 7847 at 6.  In addition, the stakeholders have implemented several strategies to accelerate consideration of key indicators and promote timely completion of the project.  For instance, defendants agreed to increase the frequency of BRMR meetings to twice weekly and the stakeholders recently agreed to add an additional hour and a half to one of the weekly BRMR meetings.  Other examples of efforts toward achieving efficiencies include an agreement among the stakeholders to move forward with the remediation of all possible components of an indicator even when they have yet to resolve differences as to one aspect of its remediation;[2] agreements to remove certain indicators from the list of provisionally approved indicators because they, for instance, were duplicative of other indicators covering the same ground; and agreements to, where possible, resolve remaining issues via email exchange rather than during valuable joint meeting time.  Additionally, the Special Master's team provided CDCR with a list of 27 indicators to prioritize as they appeared to present opportunities for efficient movement through the validation process.

These adjustments to the process have allowed us to complete the stakeholder review process for more indicators per week than would have been possible with less frequent BRMR meetings or a less efficient process.  As of June 2, 2023, the stakeholder review/BRMR process has been started for 126 key indicators and completed for 99 indicators.[3]  These are positive

_____

[2] For example, the parties have agreed to remediate data elements of various key indicators where there are disputes as to the appropriate method for calculating summary statistics or what constitutes an adequate sample size.

[3] During the June 7, 2023 BRMR meeting, CDCR reported the following statistics regarding the status of the data remediation process (data as of June 2, 2023):

- Documentation preparation – 136 started/127 completed

- Reviewed by stakeholders (BRMR) – 126 started/99 completed

- Updated/approved by MH (CAPC) 99 started/96 completed

- Indicator programming – 90 started/80 completed



Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 3

developments and all stakeholders deserve recognition for the hard work that has gotten us this far. If we maintain our collective focus and continue down this more constructive path, we will be well-positioned to complete the data remediation process on time.

Notwithstanding these constructive developments, this is no time for complacency as much work remains to be completed; and a word of caution is in order: In the past several weeks there appears to have been a diminution in our ability to resolve thorny issues which will likely result in an increased need to utilize the dispute resolution process.

In addition, while the number of indicators pending completion of the validation process is relatively small, many require resolution of one or more global issues including how to compute summary statistics[4] and determination of adequate sample sizes. Of course, the placeholder indicators discussed in this letter must also be remediated at the same time that work continues at the various stages of remediation for those indicators not yet fully remediated.

After a brief review of the background regarding the "placeholder" indicators and the Special Master's team's process for identifying these indicators, this letter includes the specific placeholder indicators the Special Master intends to recommend to the Court for inclusion in the final list of CQIT key indicators under each of the placeholder indicator category.

**Special Master's 2021 Report on CQIT Key Indicators**

In his 2021 CQIT Key Indicators Report, the Special Master noted that "[t]he framework for identifying the CQIT key indicators included several exchanges of proposed CQIT key indicators by the parties and discussion of each proposal and counter proposal in granular detail during the meetings." ECF No. 7151 at 15. After an exhaustive meet and confer process, the parties were unable to reach agreement on a list of CQIT key indicators. *Id.* at 18. After defendants filed their proposed list of CQIT key indicators, *see* ECF No. 7089-1, the Court referred "[f]inalization of [the] list of key CQIT indicators…to the Special Master" and directed the Special Master to file a report on key indicators. March 29, 2021 Order, ECF No. 7112.

---

- Indicator Testing – 77 started/61 completed

- KPIs successfully remediated: 42

[4] The issue of how to accurately and transparently summarize CDCR's adherence with remedial requirements in this case via summary statistics is currently in the dispute resolution process. The stakeholders participated in Level 1 dispute resolution meetings on May 11, 2023, May 25, 2023, and May 26, 2023 but were unable to resolve the dispute. A Level 2 dispute resolution meeting is scheduled for June 20, 2023.



Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 4

In his 2021 CQIT Key Indicators Report, the Special Master described his team's approach to evaluating the parties' competing lists of key indicators:

In developing his recommended list, the Special Master concluded that if an indicator was sufficiently salient to be included in the original CQIT pursuant to the exhaustive process he and his staff undertook with the defendants to develop the CQIT with input from the plaintiffs, then it was presumptively a "key" indicator. In addition, if an indicator measured a requirement that cannot be changed without leave of the Court, the Special Master also considered it presumptively material, and therefore a CQIT "key" indicator."

ECF No. 7151 at 21.[5]

Based substantially on defendants' submission of their list of CQIT indictors, the Special Master recommended a list of 149 "preliminary CQIT key indicators" and requested a court order directing him to "test and monitor the functionality and efficacy of these preliminary CQIT key indicators during the Twenty-Ninth Monitoring Round. *Id.*

In an Order dated June 30, 2021, the Court adopted the Special Master's Report, with the exception of one indicator under the Access to Care heading, which the Court struck at defendants request as duplicative. ECF No. 7216 at 14. The Court provisionally approved the modified list of 148 key indicators and directed the Special Master to "test and monitor" the indicators during the Twenty-Ninth Monitoring Round.[6]

---

[5] *See also id.* at 19-20:

Faced with this and in the context of [the] parties inability to reach compromise, the Special Master and his team examined the entire list of indicators proffered by defendants to determine which were required by the Program Guide or Court order or were otherwise material to the provision of adequate mental health care and determined that it was reasonable to consider those as "key."

The Special Master was mindful that when defendants had developed the original list of CQIT indicators, under his guidance and supervision, with substantial input from plaintiffs…they had conducted a thorough review of the entire Program Guide and its myriad requirements, came to an agreement on which of those constituted its material provisions, and collaboratively developed the indicators using that standard….

[6] On December 30, 2022, the Special Master requested an extension of time to report on the efficacy and functionality of the provisionally approved key indicators. ECF No. 7693. The Special Master explained:"[A] final list of proposed key indicators cannot be provided at this time as the list is progressing jointly with the remediation process and the efficacy and

Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 5

**<u>Identification of Placeholder Indicators</u>**

Included in the list of 148 provisionally approved key indicators were five general categories of monitoring topics the Special Master identified as meeting the standard for "key indicators" but did not yet have specific indicators in defendants' CQIT. In some cases, the "placeholder" remedial requirements (e.g. CMHPP, sustainable process) came into existence after the initial phases of the development of CQIT, so it is reasonable to ensure appropriate measurement of these remedial requirements with additional indicators.

Since the filing of the Special Master's 2021 CQIT Key Indicators Report, the data remediation stakeholders have referred to these five general monitoring areas as the "placeholder indicators." As indicated above, the placeholder indicators include the following:

(1)    Additional Use of Force (Specificity to be determined), ECF No. 7151 at 23;
(2)    Sustainability Process, *id.* at 26;
(3)    ASU EOP Hub Certification, *id.*
(4)    PIP (To be developed), *id.*
(5)    Custody and Mental Health Partnership Collaboration, *id.*

After the Court's adoption of the Special Master's 2021 CQIT Key Indicators Report, the Special Master created an internal workgroup of experts and monitors and tasked them with defining the placeholder indicators with the specificity required to begin the remediation process for each measurement.

In considering the appropriate measurements for each placeholder indicator, the internal workgroup was mindful of the long history of the development of the provisionally approved key indicator list. *See supra* pp. 3-4. Accordingly, where possible, the workgroup sought to utilize existing provisionally approved key indicators that measure requirements in one setting (e.g. EOP) and apply those indicators to another setting, such as the PIPs, rather than create new indicators.

Below are the specific indicators the Special Master intends to recommend to the Court for inclusion in the final list of CQIT key indicators to operationalize the provisionally approved placeholder indicators.

---

functionality of the indicators is intertwined with data remediation. A complete list will only emerge at the conclusion of the data remediation project." *Id.* at 2. On January 3, 2023, the Court granted the Special Master's request for an extension of time and directed the Special Master to "file a brief report on the status of data remediation generally and as it pertains to finalization of the list of CQIT indicators in particular" on or before June 30, 2023. ECF No. 7695 at 2.

pldolaw.com

Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 6


Placeholder Indicators[7]

      The Special Master's approach to the placeholder indicator identification process resulted in only 14 new indicators, a modest number considering the potential breadth of the five placeholder indicator categories and the court-ordered requirements they are intended to measure. In addition, the Special Master will recommend to the Court the extension of several existing key indicators to measure remedial requirements in the PIP programs.

      The placeholder indicators are listed below separated by category and identified as either a "new indicator" or an "extended indicator." Regarding extended indicators, title and measurement modifications necessary to extend the indicator to the new setting (PIP) are noted in underlined text.

    *1.*    *Additional Use of Force*

        *a.*    *New Indicators*

            •    (1) What is the total number of Institutional Executive Review Committee (IERC) UOF reviews that required corrective action?

            •    (2) Total number of mental health and custody staff required to attend UOF training and total number that attended.

        *b.*    *Extended Indicators*

            •    SC10: UOF involving MH inmates[8]

---

[7] For purposes of this letter, "new indicators" refers to those indicators related solely to the five placeholder indicators. This letter does not discuss or account for other new indicators that the stakeholders have either discussed or agreed to through the data remediation process or any the Special Master may ultimately recommend when he submits his final recommended list to the court. *See, e.g.*, Stipulation and Order Regarding Third-Level Data Disputes, ECF No. 7844 at 2 (parties' agreement to "create a new indicator measuring whether patients are attending their IDTTs."). Moreover, existing indicator names included in this letter in some cases do not match the indicator names included in the Special Master's 2021 Report on CQIT Key Indicators as some indicator names have been updated through the remediation process.

[8] In a letter dated October 31, 2022, defendants proposed to decommission the placeholder "Additional Use of Force (Specificity to be determined)" and indicated that "CDCR will prep the following [indicator]: UOF involving MH inmates." This existing indicator should be designed to include a



Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 7

    2.     *Sustainability Process (ECF No. 4069)*

        a.    *New Indicators*

- (3) Are sustainability visits and reports occurring in accordance with the sustainable process order?

        b.    *Extended Indicators*

- None

    3.     *ASU EOP Hub Certification*

        a.    *New Indicators / Extended Indicators*

- Upon review, the Special Master offers no additional ASU EOP Hub *Certification* key indicators.

    4.     *PIP*

        a.    *New Indicators*

- (4) *Number* of Behavior Management Plans developed and number of those implemented.

- (5) *LRH* policy adhered to in implementation

- (6) *Number* of SIRS/Sentinel Events

- (7) Timely review of max custody patients and in compliance with CDCR policy.

- (8) Custody Staff with CPR Training

---

qualitative review of a certain percentage of controlled and immediate UOF incidents for compliance with CDCR UOF policy.  In the review of controlled use of force incidents, that the indicator should also track whether a mental health assessment was included in the process.  Tracking whether specific policy requirements were met can be accomplished with a drilldown.

Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 8

     *b.*    *Extended Indicators*

- PIP Staffing, to include extension of the following existing key indicators to the PIPs:

  - SPSTR1: Chief Psychiatrist;
  - SPSTR2: Chief Psychologist, Correctional Facility;
  - SPSTR3: Senior Psychologist, Correctional Facility (Supervisor);
  - SPSTR4: Senior Psychiatrist (Supervisor), Correctional and Rehabilitative Services (Safety);
  - SPSTR5: Supervising Psychiatric Social Worker I, Correctional Facility
  - SPSTR6: Senior Psychiatrist (Specialist), Correctional and Rehabilitative Services (Safety)
  - SPSTR7: Senior Psychologist, Correctional Facility (Specialist)
  - SPSTR8: Staff Psychiatrist, Correctional and Rehabilitative Services (Safety)
  - SPSTR9: Recreation Therapist, Correctional Facility
  - SPSTR10: Psychologist-Clinical, Correctional Facility
  - SPSTR11: Clinical Social Worker (Health/Correctional Facility – Safety)
  - SPSTR14: Allocated and Filled Positions

- SP4: Suicide-resistant PIP patient rooms (Title modification from existing MHCB indicator underlined)

- SP14: PIP Records with Rationale for Limited Issues of Clothing and Bedding (Title modification from existing MHCB indicator underlined)

- SP15: PIP Property and Privileges (Title modification from existing MHCB indicator underlined)

- SP23: SREs that Met All Audit Criteria

- SP24: Discharges from MHCB w/ Clinician Review of D/C Summary (SRASHE)[9]

---

[9] Regarding SP 23 and SP 24, these indicators should be modified to measure timeliness and quality of SREs required under defendants' PIP Suicide Prevention Policy.

Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 9

- QC3: Treatment Plans with Satisfactory Documentation

- QC12: IDTTs with Observed Interactive Process

- SC1: Percentage of RVR MH Assessments Where the Patient was Informed of the Limits of Confidentiality

- SC2: RVRs Recommended for Mitigation with Custody Documentation

- SC3: RVRs Where the Captain Disagreed with PC's Rec. to Doc. In Alt. Manner & Doc. Rationale for Disagreement on 128B

- SC4: Percentage of Days Where Heat Plan was Activated and Alternative Out of Cell Activities were Offered to Heat Alert Patients

- SC5: Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM

- SC7: Thermometer Checks Completed and Accurate

- SC8: Timely MH RVR Assessments

- SC9: RVRs Recommended for Mitigation That Were Mitigated

- FEC1: Adequate Group Treatment Space

- FEC2: Adequate IDTT Space

- FEC3: Adequate Individual Treatment Space

- AC5: Treatment Offered (Measurement modification: average treatment hours received, per patient, per week).

- SP6: SRE Mentor Program and Training (Title modification underlined)

- SP9: Percentage of Timely Nursing Rounds in PIPs for Patients on Suicide Watch and Precaution recorded in EHRS clearly marked, on time, and documented on correct form



Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 10

- SP10: Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used

- SP11: Housing Unit/Patient Living Areas with Emergency Response Equipment and Inventoried Daily

- SP18: Nursing Staff Current with CPR training

- SP19: Percentage of Health Care Staff with Annual Suicide Prevention Training

- SP20: Percentage of Custody Staff with Annual Suicide Prevention Training

- PS3.1: Seclusion

- PS3.5: Restraint

5.   *Custody and Mental Health Partnership Collaboration (ECF Nos. 6095, 6314)*

   a.   *New Indicators*

- (9) Was the CMHPP huddle report used to document required attendees during each program's required huddle during second and third shift?

- (10) Did all custody, mental health and nursing staff attend the mandatory one hour off post CMHPP training annually/within the past 12 months?

- (11) Did all required staff (mental health program supervisors, social worker psychologists, psychiatrist and recreations therapists and mental health housing unit officers, escort officer, treatment area officers, and mental health unit sergeants,) by required housing unit (EOP mainline, ASU-EOP Hub, PSU, MHCB, PIP, LTRH, and STRH) and required watches (second and third watch) attend the quarterly round table training, facilitated by the required staff (mental health supervisor and correctional sergeant)?

- (12) Was monthly joint executive rounding attended by required staff (at least one custody and healthcare leadership staff member) and conducted as required for programs (twice annually for EOP,



Elise Thorn, Esq.
Lisa Ells, Esq.
June 14, 2023
Page 11

                ASU-EOP Hub, PSU, MHCB, PIP, STRH, LTRH and annually for
                3CMS)?

- (13) Did 3CMS CMHPP activities (supervisor weekly meeting, monthly IAC meeting, monthly joint supervisory program tours) occur as required with required staff?

- (14) In the preceding month, were all newly placed patients into EOP level of care scheduled for four required Intro to EOP groups led by required facilitators (sergeant, mental health clinician and patient-peer)?

    *b.*    *Extended Indicators*

- None

        The Special Master's team looks forward to discussing the placeholder indicators with the parties in greater detail and continuing to work toward timely completion of data remediation.  To that end, please provide written comments on the placeholder indicators identified in this letter no later than June 28, 2023.

        Thank you for your consideration.

Sincerely,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr., Esq.
Special Master

CC:   **Via Email to the following:**
      Nicholas Weber, Esq.
      Melissa Bentz, Esq.
      Dr. Diana Toche
      Dr. Amar Mehta
      Dr. Steven Cartwright
      Michael Bien, Esq.
      Cara Trapani, Esq.
      Jenny Yellin, Esq.
      Arielle Tolman, Esq.
      Steven Fama, Esq.

# EXHIBIT B



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email:  CTrapani@rbgg.com

June 28, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A. Lopes, Jr., Esq.
*Coleman* Special Master
mlopes@pldolaw.com

>    Re:    *Coleman v. Newsom:* Comments on Proposed "Placeholder" Indicators
>              <u>Our File No. 0489-3</u>

Dear Special Master Lopes:

This provides Plaintiffs' initial feedback on your June 14, 2023 letter identifying the indicators you intend to recommend to the Court for inclusion in the final list of CQIT key indicators under the five "placeholder" categories included in the provisionally approved key indicator list (ECF No. 7151).  These comments are preliminary and not intended to preclude further discussion and refinement amongst the stakeholders at future BRMR meetings.  Our comments are organized below by category: (1) Additional Use of Force; (2) ASU EOP Hub Certification; and (3) PIP.[1]

## I.    Additional Use of Force

In footnote 8 on page 6 of your letter, you recommend expanding SC10 UOF Involving MH Inmates to include a qualitative review of controlled and immediate use of force incidents.  We agree that compliance with use of force policies should be measured. But SC10 is a quantitative measure of the total number of use of force incidents, and embedding a qualitative audit into this indicator would obscure the data.  Instead, CDCR should create a new audit and KPI to measure whether use of force incidents comply with CDCR UOF policy.  The *Coleman* use-of-force remedies at issue are those approved by the *Coleman* court on Aug 11, 2014, at ECF No. 5196 (approving plan at ECF No. 5190), as modified on October 15, 2015, ECF No. 5371, and included in the Compendium of Custody-Related Remedies at ECF No. 7332-2 at 3.

---

[1] We are finalizing a separate letter regarding Plaintiffs' requests for new non-placeholder indicators that we will send shortly.

Matthew A. Lopes, Jr., Esq.
June 28, 2023
Page 2


## II.    ASU EOP Hub Certification

Our understanding of the purpose of this placeholder category is to ensure that the data CDCR relies on in the current ASU EOP Hub self-certification process is subject to the data remediation process. *See, e.g.* Special Master's Data Expert Report, ECF No. 7074 at 241 ("Work must also continue on validating the indicators and their individual business rules which are used in the ASU EOP Hub certification … process[.]"). CDCR's current ASU EOP Hub certification process deems certain indicators "core" (i.e., those that must score at least 90% for the Hub to pass certification), and others as not core, but still necessary for consideration in the certification decision.

Based on information provided by CDCR, one of the "core" ASU EOP Hub indicators used in the current process is not included on the provisionally approved key indicator list. This item (IDTTs with Measurable Treatment Goals) should be added. CDCR explained that the current "core" indicators are:

1. **Timely MH Referrals** (same as AC1 Timely MH Referrals)
2. **EOP Treatment Hours** (same as (AC5 Treatment Offered)
3. **IDTT Quality** (a roll up of two indicators: IDTTs with Measurable Treatment Goals and IDTTs Meeting All Audit Criteria) – this includes QC12 IDTTs with Observed Interactive Process, but there is not a current provisionally approved key indicator regarding IDTTs with Measurable Treatment Goals.
4. **Out of Cell Time offered** (same as RH12 ASU Out of Cell Time Offered)
5. **ICC Review** (same as RH7 ICCs with Mental Health Clinicians Present and Relevant Information Provided and RH21 Initial ICCs Reviewed that were Held within 10 Calendar Days of Arrival to Segregation Placement)

CDCR is working to provide us the current list of non-core indicators, including whether any of those items are missing from the provisionally approved key indicator list. We will update the Special Master data team when we receive that information.

Accordingly, Plaintiffs request that you add "IDTTs with Measurable Treatment Goals" and any other non-core indicators that are not already on the provisional key indicator list to the ASU EOP Hub Certification placeholder category. We also respectfully request that you recommend a new indicator in this category that would provide historical information of the percentage of Hubs that passed certification each month, with information on which Hubs passed certification with "explanation" or failed certification and the reasons therefore available in the drilldown.

These comments notwithstanding, Plaintiffs continue to have significant concerns about the efficacy and appropriateness of the current ASU EOP Hub and PSU

Matthew A. Lopes, Jr., Esq.
June 28, 2023
Page 3

certification process, as we have noted repeatedly in letters and pleadings following the 2109 evidentiary proceedings.  *See, e.g.*, Pls.' Prop. Remedies Following Evidentiary Hr'g, ECF No. 6374 at 15-16.  We preserve our right to revisit and renegotiate appropriate changes to that process at a later date, and/or to further litigate the issues.

III.    **PIP**

The Court's May 24, 2023 Order required:

Each key indicator must substantively track the areas the Special Master has monitored so the court can assess defendants' compliance with the Eighth Amendment.  The business rules for each key indicator must be written so that the court can rely on defendants' data in assessing their compliance.  Thus, each key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities.

ECF No. 7847 at 7.  In light of these mandates, please consider adding/extending the following remedial requirements that were not included in the PIP placeholder category in your June 14, 2023 letter, but which are frequently included in your monitoring reports.  For each of these indicators, we are not aware of any reason that the measured requirement would not be applicable to the PIPs, or any reason that the requirement should be considered "key" for non-PIP programs and patients but not for PIPs:

a.    New Indicators

- PIP STEP Policy (March 15, 2022) implemented and adhered to. Your team monitored rollout of this policy in the 30th Round PIP Monitoring Report (*see, e.g.*, ECF No. 7833 at 153-55).

- Do staffing ratios comport with the Court-approved PIP staffing plan?  *See* Defs.' Submission of CDCR's PIP Staffing Plan, ECF No. 7245 at 4-5 (requiring 1:30 staff-to-patient ratio in ICF and 1:15 staff-to-patient ratio in Acute for Clinical Psychologist, Licensed Clinical Social Worker, Staff Psychiatrist, and Recreational Therapist positions).  Your team regularly monitors this.  *See, e.g.*, 30th Round PIP Report, ECF No. 7833 at 133-134.

- Out-of-cell time for PIP patients.  How many weekly hours of unstructured out-of-cell time (with yard, dayroom, showers, law library drilldowns) do PIP patients receive, per NCAT data?  Your

Matthew A. Lopes, Jr., Esq.
June 28, 2023
Page 4

team reports on the weekly hours of out-of-cell time, and reviews NCAT data for this purpose. *See, e.g.*, 30th Round PIP Report, ECF No. 7833 at 151, 184, 238, 292.

b.     Extended Indicators

- PS2 Percentage of MHCB Clinical Restraint Occurrences Meeting All of the Audit Criteria. *See, e.g.*, 30th Round PIP Report, ECF No. 7833 at 63, 76-77, 84-85, 101.

- RH35 Controlled Use of force MH assessments meeting documentation requirements. *See, e.g.*, *id.* at 98.

- SC10 Use of Force Involving MH Inmates (SC10 currently shows MHSDS vs. non-MHSDS uses of force, but does not disaggregate by level of care, which is something your team monitors, *see, e.g.*, *id.* at 97-98).

- SP13 Orders Reviewed with Properly Documented Observation Orders. *See, e.g.*, Fifth Re-Audit of Suicide Prevention Practices, ECF No. 7636-1 at 60-61.

- AC17 Appointments Cancelled Due to Custody. *See, e.g.*, 30th Round PIP Report, ECF No. 7833 at 71, 139, 185, 227.

- QC11 Psychiatry Continuity of Care. *See, e.g.*, *id.* at 78, 82, 85, 216, 234, 302, 452.

- QC10 Primary Clinician Continuity of Care. *See, e.g.*, *id.* at 144, 302.

- QC1 IDTT Staffing (including the new IDTT Patient Attendance indicator that CDCR agreed to create). *See, e.g.*, *id.* at 65-66, 108, 351.

- SC6 Percentage of 128Bs Indicating the Use of Mechanical Restraints in the MHCB. *See, e.g.*, *id.* at 226. The policy cited in the Business Rule for this indicator applies equally to the PIP and the MHCB, but SC6 currently only measures whether non-MAX *MHCB* patients identified as requiring mechanical restraints had a 128B completed. The rule population should be expanded to measure the full scope of the policy.

[4315623.6]

Matthew A. Lopes, Jr., Esq.
June 28, 2023
Page 5

- SP2 Timeliness of Suicide Risk Evaluation Documentation (previous title: "Emergent/Urgent MH Referrals that Result in SRASHEs"). Currently there is an exception in this indicator that excludes Acute/ICF patients, but the Program Guide requirement cited in the Business Rule (section 12-10-7) applies to all MHSDS patients.[2] Your team monitors timeliness of SRASHEs in the PIPs. *See, e.g.*, 30th Round PIP Report, ECF No. 7833 at 164; Fifth Re-Audit of Suicide Prevention Practices, ECF No. 7636-1 at 59-60.

In addition, AC2 Timely PC Contacts, AC3 Timely MHMD Contacts, and AC4 Timely IDTTs will need to be extended to the PIPs once the Court determines the minimum treatment standards that will apply. Under either party's proposal, there will be requirements for IDTT timelines and frequency of clinical contacts. We ask that you recommend that CDCR start developing the documentation for these indicators now, so that completion of these items can be expedited whenever the Court issues a final order.

Finally, we understand that all the medication management indicators that have gone through the data remediation process (e.g., MM1-14 and NM1-3) apply to patients in the PIPs. If that is not correct, those indicators should be extended to the PIPs.

Thank you for considering these comments. We welcome the opportunity to answer any questions you may have, and/or discuss these issues at a future data meeting.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By: Cara E. Trapani

CET:kc
cc: *Coleman* Co-counsel          Nick Weber          Nina Raddatz
    *Coleman* Special Master Team  Elise Thorn         Brent Reden
    Carrie Stafford               Namrata Kotwani     Kris Kent
    Melissa Bentz                 Damon McClain
    Dillon Hockerson              Samantha Wolff
    Sundeep Thind                 Paul Mello

---

[2] Footnote 9 on page 8 of your letter recommends that SP23 and SP24 be modified to measure timeliness of SREs, but that is measured in SP2, which was not included on your list. It appears that may have been an oversight, so we have added it here.

# EXHIBIT C

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                                     GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 28, 2023


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1201 Atwood Avenue
Johnston, RI 02919

*VIA EMAIL ONLY*


Special Master Lopes:

I write in response to your June 14, 2023, letter regarding the identification of "placeholder" indicators. The California Department of Corrections and Rehabilitation (CDCR) appreciates the opportunity to comment on the Special Master's recommendations regarding new and existing indicators. Discussed below are points of agreement and disagreement.

    I.    New Indicators

CDCR agrees to create a number of new indicators, as discussed in detail below. However, although the June 14, 2023 letter represents there are only 14 new indicators recommended, many of the new indicators seek to measure multiple items. Thus, more than 14 new indicators are actually recommended.[1] CDCR's assessment of the increased number of new indicators, coupled with the expanded indicators, makes it impossible to complete data remediation this calendar year. However, of all the recommended new indicators, CDCR only objects to the creation of three.

        A.  New Indicators CDCR Agrees to Create[2]

CDCR agrees to create the following new indicators[3]:

- Additional Use of Force: Total number of mental health and custody staff required to attend UOF training and total number that attended.
- Psychiatric Inpatient Program (PIP): Number of SIRS/Sentinel Events

---

[1] At least one "extended" indicator will require the development of an entirely new indicator as well.  See Section II(C), *infra.*
[2] CDCR's agreement to create new indicators or extend existing indicators does not signify agreement that each indicator has an appropriate compliance threshold. Defendants will address the issue of compliance thresholds when the parties and Special Master discuss that topic.
[3] CDCR's agreement to create these indicators is based on the understanding that each item is only one indicator. CDCR reserves the right to object to expansions of the above items.

- PIP: Custody Staff with CPR Training
- Custody and Mental Health Partnership Plan (CMHPP): Was the CMHPP huddle report used to document required attendees during each program's required huddle during second and third shift?
- CMHPP: Did all custody, mental health, and nursing staff attend the mandatory one hour off-post CMHPP training annually?

CDCR will begin building any new indicators once the indicators on the provisionally approved key indicator list have completed verification.[4] Please let us know if the Special Master believes these new indicators should be prioritized in a different manner.

> i. CDCR Agrees to Measure the Following Six Topics, but It Will Require CDCR to Build More than Six Indicators

A handful of the new indicators recommended by the Special Master are posed as a single question (or indicator), yet seek to measure multiple requirements. Because each recommended new indicator seeks to measure multiple requirements, CDCR will need to create multiple indicators per question. CDCR agrees to create these new indicators; however, creation of multiple indicators per question will take more time than envisioned in the June 14, 2023 letter. Even if the Special Master treats each topic as a singular indicator, it is crucial to note that the workload involved will be equivalent of creating multiple indicators given the need for different rules and documentation for each part of the question. The stakeholders should be transparent about the work required to create the recommended new indicators as it is paramount to provide a realistic understanding of the time needed to complete data remediation.

> 1. Sustainability Process: Are sustainability visits and reports occurring in accordance with the sustainable process order?

Yesterday, the parties and the Special Master's team discussed the recommendation to create a new Sustainability Process (SusPro) indicator. Based on that conversation, CDCR understands that the Special Master's team is interested in measuring the following requirements: 1. Whether the SusPro visits occurred at the required frequency in accordance with Defendant's 2012 Sustainable Process plan; 2. Whether the appropriate participants attended the SusPro tours; and 3. Whether the SusPro reports were issued as required. Please let us know if we have misinterpreted the Special Master's recommendation.

Based on the above understanding, CDCR agrees to create the SusPro indicators above. However, it must be noted that the Special Master's team is recommending that CDCR audit three separate requirements, which will require CDCR to build at least three indicators.

---

[4] Data remediation is comprised of numerous steps: 1. Preparation of documents; 2. Pre-Stakeholder review; 3. Stakeholder review; 4. Pre-BRMR meeting; 5. BRMR with all stakeholders including Plaintiffs' counsel and the Special Master's team; 6. Approval by the Change Advisory Prioritization Committee (CAPC); 7. Programming; 8. Release to statewide users; 9. Verification by CDCR; and 10. Remediation by the Special Master's data expert. All stakeholders agree to an indicator in BRMR before it can move forward in the process. Disputes in BRMR that any stakeholder believes must be resolved to remediate the indicator are resolved through the agreed upon dispute resolution process. *See* ECF No. 7556-2. The indicator will not move forward to subsequent steps until the dispute is resolved either through agreement of the stakeholders or Court order.

> 2.  PIP: LRH policy adhered to in implementation

Yesterday, the parties and the Special Master's team discussed the Special Master's recommendation to create an indicator that measures the Least Restrictive Housing (LRH) policy. Based on that conversation, CDCR understands that the Special Master's team is focused on how PIP IDTTs are addressing each patients who are housed outside of their LRH and is interested in measuring the following requirements: 1. Timely review of LRH housing during the IDTT; 2. Whether clinical barriers to patient's LRH placement are documented in the Master Treatment Plan; 3, Correctional Counselor review of LRH during IDTT with an appropriate response; and 4, The number of PIP patients housed outside of their LRH. Please let us know if we have misinterpreted the Special Master's recommendation.

Based on the above understanding, CDCR agrees to create the LRH indicators. However, it must be noted that the Special Master's team is seeking four separate pieces of information, which may require CDCR to build at least four indicators.

> 3.  CMHPP: Did all required staff, by required housing unit and required watches, attend the quarterly round table training, facilitated by the required staff?

The above question asks whether two separate requirements were met: 1. Did all required staff attended the quarterly round table training?; and 2. Was the quarterly round table training facilitated by the required staff? This effectively translates into the construction of two new indicators, each involving its own set of rules and documentation.

> 4.  CMHPP: Was monthly joint executive rounding attended by required staff and conducted as required for programs?

The above question asks whether two separate requirements were met: 1. Did the required staff attend the monthly joint executive round?; and 2. Was monthly joint executive rounding conducted as required? This effectively translates into the construction of two new indicators, each involving its own set of rules and documentation.

> 5.  CMHPP: Did 3CMS CMHPP activities (supervisor weekly meeting, monthly IAC meeting, monthly joint supervisory program tours) occur as required with required staff?

The above question asks whether three separate activities were completed. It also asks whether the required staff participated in the activities. To appropriately capture this information, CDCR will need to create at least three separate indicators – one indicator to correspond with each activity, each involving its own set of rules and documentation.

      6.   CMHPP: In the preceding month, were all newly placed patients into EOP level of care scheduled for four required intro to EOP groups led by required facilitators?

The above question asks about two separate requirements: 1. Were patients newly placed into EOP scheduled for the four Introduction to EOP groups?; and 2. Were the Introduction to EOP groups led by the required facilitators? This effectively translates into the construction of two new indicators, each involving its own set of rules and documentation.

      B.   New Indicators CDCR Does Not Agree to Create

CDCR objects to the creation of the following indicators.

      i.   Additional Use of Force: What is the total number of Institutional Executive Review Committee (IERC) UOF reviews that required corrective action?

The Special Master's team does not currently ask for information regarding use of force reviews that required corrective action in their monitoring document request. The Special Master does not report on use of force reviews that required corrective action. While use of force is part of the *Coleman* remedy, employee discipline is not. CDCR objects to creating a new indicator that does not measure a Program Guide, Compendium, or Court ordered requirement and is not currently monitored by the Special Master.

      ii.   PIP: Number of Behavior Management Plans Developed and Number of Those Implemented

Behavior management plans and the positive behavioral support team (PBST) are not *Coleman* requirements. The Special Master acknowledged this in his 30th round report. *See* ECF No. 7833 at fn. 23. "CQIT key indicators must be operationalized to properly measure the core requirements of the Program Guide and Compendium." ECF No. 7847 at 6. CDCR objects to the creation of a new indicator measuring PBST or behavior management plans as neither are Program Guide or Compendium requirements.

      iii.   PIP: Timely Review of Max Custody Patients and In Compliance with CDCR Policy[5]

On November 4, 2021, the parties filed a stipulation regarding the use of Therapeutic Treatment Modules (TTMs) in the PIPs. ECF No. 7366. Paragraph 15 of the stipulation states "The parties agree that Defendants' plan shall not be included in the MHSDS Program Guide or

---

[5] Yesterday, the parties and the Special Master's team discussed the Special Master's recommendation to create this new indicator. Based on that conversation, CDCR understands that the Special Master's team is interested in creating indicators regarding the following topics: 1. Pre-transfer ICC review for Max custody patients referred to the ICF level of care; 2. PIP ICC review of Max custody patients within 10 calendar days of arrival; 3. MHCT bi-weekly review of Max custody patients; 4. The number and percent of PIP patients retained on Max custody; and 5. The number and percent of PIP patients removed from Max custody.

Compendium." *Id.* at 5. On November 8, 2021, the Court issued an order to show cause why the
Court should not decline to approve Section III of the stipulation, which includes Paragraph 15.
ECF No. 7368. In response, the parties filed a joint statement explaining that Section III,
including Paragraph 15, was critical to reaching an agreement on this issue and Defendants
would withdraw their agreement from all parts of the stipulation if any language in Section III
was struck. ECF No. 7380 at 5.[6]

On December 9, 2021, the Court approved paragraphs 1 through 14 of the TTM stipulation and
conditionally approved Paragraph 15. ECF No. 7392 at 6. The Court granted final approval of
Paragraph 15 on February 7, 2022, and referred the question of whether the provisions of the
TTM are, or should be, reflected in the list of CQIT key indicators to the Special Master. ECF
No. 7456 at 3-4.

CDCR objects to the inclusion of provisions of the TTM stipulation as key indicators. "CQIT
key indicators must be operationalized to properly measure the core requirements of the Program
Guide and Compendium." ECF No. 7847 at 6. The parties specifically agreed in Paragraph 15,
which was approved by the Court, that Defendants' plan outlined in the TTM stipulation shall
not be included in the MHSDS Program Guide or Compendium. ECF No. 7381. To now include
provisions from the TTM stipulation as CQIT key indicators directly contradicts the parties'
Court-approved agreement, which Defendants made clear was critical to reaching an agreement
on this issue.

Requiring indicators to measure provisions of the TTM stipulation also disregards Paragraphs 9
and 11 of the stipulation which outline what data and documents Defendants will produce to
Plaintiffs and the Special Master. Per the agreement, Defendants will provide the agreed-upon
data and documentation for two years following the initial implementation report, which was
provided in September 2022. *Id.*  Paragraph 11 states that the parties will meet and confer about
the frequency and scope of the data and document production at the end of the two-year period.
*Id.* Creating indicators auditing provisions of the TTM stipulation automatically extends
Defendants' obligation to provide data and documentation beyond the agreed-upon period.

The parties worked together to carefully craft an agreement regarding the use of TTMs in the
PIPs. The resulting agreement was then approved by the Court. CDCR objects to the creation of
any new indicators that would circumvent the parties' agreements in the TTM stipulation.

    II.    Extended Indicators

CDCR agrees to extend most of the existing indicators recommended in the Special Master's
June 14, 2023 letter. CDCR will agree to extend several other indicators pending clarifications
and will agree to partially extend two other indicators. Notably, at least nineteen indicators
recommended for extension to the PIPs do not require extension at all because they already apply
to the PIP population. Finally, CDCR objects to the extension of one indicator, as discussed
below.

---

[6] In addition to the joint statement, the parties filed a revised stipulation with minor clarifications to Section II. ECF
No. 7381.

A.  Existing Indicators CDCR Agrees to Extend, Extend Pending Clarification, or Partially Extend[7]

The Special Master's June 14, 2023 letter provides insight into how the existing indicators were considered while determining the recommended measurements for each placeholder indicator. The letter notes that "the workgroup sought to utilize existing provisionally approved key indicators that measure requirements in one setting (e.g., EOP) and apply those indicators to another setting, such as the PIPs, rather than create new indicators." Based on this statement, as well as discussions in yesterday's Business Rules and Methodology Review (BRMR) meeting, CDCR understands that the existing indicators will be extended to include the PIP in the rule population or audit area, or in some cases to include PIP-specific policy requirements. However, the intent is not to create (or re-create) indicators that have already been approved by the stakeholders. CDCR does not agree to re-review parts of existing indicators that have already been reviewed and agreed upon in BRMR, unless revisions are made as a result of the expanded rule population/audit area or PIP-specific policy requirements.

i.  Existing Indicators CDCR Agrees to Extend

CDCR agrees to extend the following existing indicators to the PIP:

- SP4: Suicide-Resistant PIP Patient Rooms (MHCB indicator released to statewide users on June 5, 2023; Pending remediation)
- SP14: PIP Records with Rationale for Limited Issue of Clothing and Bedding (MHCB indicator remediated on September 22, 2022, but the Special Master's team requested additional changes after remediation; Revised indicator released to statewide users on June 19, 2023)
- QC3: Treatment Plans with Satisfactory Documentation (Approved by CAPC on February 16, 2023; Pending remediation)
- QC12: IDTTs with Observed Interactive Process (Remediated on August 19, 2022)
- SC1: Percentage of RVR MH Assessment Where the Patient was Informed of the Limits of Confidentiality (Remediated December 2, 2022)
- SC2: RVRs Recommended for Mitigation with Custody Documentation (Remediated March 22, 2023)
- SC3: RVRs Where the Captain Disagreed with PC's Rec. to Doc. In Alt. Manner & Doc. Rationale for Disagreement on 128B (Remediated January 23, 2023)
- SC4: Percentage of Days Where Heat Plan was Activated and Alternative Out of Cell Activities were Offered to Heat Alert Patients (Approved by CAPC on December 1, 2022; Pending remediation)

[7] The existing indicator names included in this letter mirror those used in the Special Master's June 14, 2023 letter for ease of reference. However, as explained in footnote 7 of that letter, some indicator names have been updated through the data remediation process. Attachment A to this letter includes a chart providing the updated name for each indicator on the provisionally approved key indicator list as of June 26, 2023. The chart also shows which indicators were split into multiple indicators as a result of the data remediation process and provides the indicator identification number.

- SC5: Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM
- SC7: Thermometer Checks Completed and Accurate (Remediated on July 29, 2022)
- SC9: RVRs Recommended for Mitigation that were Mitigated (Released to statewide users on August 12, 2022; Pending remediation)
- FEC1: Adequate Group Treatment Space (Released to statewide users on July 12, 2022; Pending remediation)
- FEC2: Adequate IDTT Space (Released to statewide users on August 5, 2022; Pending remediation)
- FEC3: Adequate Individual Treatment Space (Released to statewide users on July 12, 2022; Pending remediation)
- AC5: Treatment Offered (Currently in BRMR)[8]
- SP11: Housing Unit/Patient Living Areas with Emergency Response Equipment and Inventoried Daily (Remediated July 29, 2022)

To increase efficiency, CDCR recommends completing review of the indicators that require a simple expansion of the rule population or audit location via email, instead of re-reviewing the items in BRMR, as no substantive changes other than inclusion of the PIP will be required. Please let us know if the Special Master and Plaintiffs' counsel agree to a truncated review process for such items.

    ii.   Existing Indicators CDCR Agrees to Extend Pending Clarification

CDCR agrees to extend three other existing indicators to include the PIP, per the Special Master's recommendation (SP15: PIP Property and Privileges; PS3.1: Seclusion; and PS3.5: Restraint), but requires clarification as to the scope of the recommendation. During the data remediation process, the Special Master's team and the parties agreed to split all three indicators into eleven different indicators. It is unclear from the letter whether the Special Master recommends extending all of the split indicators or only some indicators to the PIPs.

    1.   SP15: PIP Property and Privileges

During data remediation, the MHCB Property and Privileges indicator on the provisionally approved key indicator list was split into five separate indicators: 1. SP15.1: MHCB Out of Cell

---

[8] CDCR's understanding, from discussions with the Special Master's team during BRMR yesterday, is that the recommendation is to simply extend the treatment offered indicator created for the required outpatient programs to the PIP. In other words, any decisions or agreements made regarding reasonable modifications to the existing indicator or the methodology used to calculate the summary statistic would also be applied to the PIP treatment offered indicator. CDCR agrees with this proposal. However, there are several outstanding issues regarding AC5. First, AC5 is impacted by the timely compliance methodology dispute that is currently in Level 2 of dispute resolution. CDCR maintains its position on that dispute. Second, the Special Master's team has recently requested indicators regarding treatment attended, scheduled, canceled, and refused. The Special Master's team views their request as a reasonable modification to AC5. CDCR has agreed to consider this position and will provide a response shortly. Third, the stakeholders are still discussing AC5 in BRMR, so there is the possibility that other disputes will arise. Finally, the PIP minimum treatment requirements are currently before the Court. CDCR cannot build the PIP treatment offered indicator without resolution of the issues before the Court.

Activities – Yard; 2. SP15.2: MHCB Out of Cell Activities – Phone Calls; 3. SP15.3: MHCB Out of Cell Activities – Visits; 4. SP15.4 MHCB Out of Cell Activities – Showers; and 5. SP15.5 MHCB Out of Cell Activities – Dayroom. All of the indicators were approved by CAPC on April 20, 2023. CDCR agrees to extend SP15 to the PIPs as appropriate per policy. However, it is unclear whether the Special Master is recommending that all or just some of the indicators be extended. Please clarify which of the five property and privileges indicators are recommended for extension.

### 2.    PS3.1: Seclusion

During data remediation, the seclusion indicator on the provisionally approved key indicator list was split into three separate indicators: 1. PS3.1: Seclusion Incidents; 2. PS3.2: Seclusion Incidents per Patient; and 3. PS3.3: Seclusion Duration Greater than 8 Hours. CDCR agrees to extend PS3.1: Seclusion Incidents to the PIPs. Given the specificity of the numbering used in the Special Master's letter, it is CDCR's understanding that only PS3.1 is recommended for extension. Please clarify whether the Special Master will recommend any of the other seclusion indicators for extension.

### 3.    PS3.5: Restraint

The provisionally approved key indicator list included only one restraint indicator: Percentage of Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria. This indicator was remediated on March 13, 2023. During data remediation, CDCR agreed to create three other restraint indicators: 1. PS3.5: Restraint Incidents; PS3.6: Restraint Incidents per Patient; 2. PS3.7; and 3. Restraint Duration Greater than 4 Hours. CDCR agrees to extend PS3.5: Restraint Incidents to the PIPs. Given the specificity of the numbering used in the Special Master's letter, it is CDCR's understanding that only PS3.5 is recommended for extension. Please clarify whether the Special Master will recommend any of the other restraint indicators for extension.

### iii.   Existing Indicators CDCR Agrees to Extend in Part

The Special Master recommends extending SP23: SREs that Met All Audit Criteria and SP24: Discharges from MHCB w/ Clinician Review of D/C Summary (SRASHE) to include the PIPs. CDCR agrees to that extension. However, at footnote 9 of the June 14, 2023 letter, the Special Master also recommends that "these indicators should be modified to measure timeliness and quality of SREs required under defendants' PIP Suicide Prevention Policy." This recommendation comes despite the fact that the parties and the Special Master's team have already agreed upon the scope of SP23 and SP24. Moreover, both indicators were remediated by the Special Master's data expert in December 2022.[9]

Both SP23 and SP24 are qualitative indicators that do not assess whether SREs were timely. The scope of these indicators was discussed at length in BRMR and were ultimately agreed upon despite not assessing the timeliness of SREs. Plaintiffs' counsel and the Special Master's team had an opportunity to raise either indicator through the dispute resolution process (*see* ECF No. 7556-2) if they believed a reasonable modification of the indicator was necessary, yet that

---

[9] SP23 was remediated on December 9, 2022 and SP24 was remediated on December 16, 2023.

process was not utilized. To the extent the Special Master is now seeking an indicator regarding the timeliness of SRE that would require the creation of a new indicator. CDCR does not agree to modify the existing SP23 and SP24 indicators to assess timeliness.

### B.  Indicators that Do Not Require Any Adjustment

The Special Master recommends an extension of the below nineteen existing indicators to the PIPs. However, all nineteen indicators already include PIP requirements. No further changes to these indicators are necessary.

### i.  SPSTR1-11 and SPSTR14: PIP Staffing Indicators

The parties and the Special Master's team have agreed to use the Court ordered staffing reports to provide the information for the staffing indicators on the provisionally approved key indicator list. The Psychiatry Vacancy report[10] and the monthly Mental Health Vacancy reports for the other classifications were reviewed and approved in BRMR. The Psychiatry Vacancy report was remediated in December 2022 and the other monthly Mental Health Vacancy reports are currently in verification. All of the reports already include information regarding staffing in the PIPs for the positions listed on the provisionally approved key indicator list. *See* ECF No. 7849. Because the staffing indicators already include PIP staff and have been agreed to by the Special Master's team and the parties in BRMR, no further extension of these indicators is necessary.

The one caveat to these staffing indicators is SPSTR6, Senior Psychiatrist Specialists. During a January 2023 QAC meeting and a February 2023 BRMR meeting, the stakeholders agreed to decommission this indicator because the position is a headquarters position and not assigned to any institution. Please confirm your understanding of this and remove SPSTR6 from the list of recommended extensions.

### ii.  SC8: Timely MH RVR Assessments

The Timely MH RVR Assessments indicator is currently on hold due to the dispute regarding the timely compliance methodology. However, the business rule and data element related to this indicator were reviewed and approved in BRMR and have been approved by CAPC. The agreed-upon business rule includes all mental health RVR evaluation orders in the rule population, meaning this indicator will capture all mental health assessments ordered regardless of the patient's program. Because this indicator already includes mental health assessments for PIP patients, no further extension is necessary.

---

[10] The Psychiatry Vacancy report was remediated prior to the Court's March 17, 2023 order requiring Defendants to separate the allocated and filled positions under the 2009 Staffing Plan and its modifications separately from the positions allocated and filled under the PIP Staffing Plan. ECF No. 7766. However, the remediated Psychiatry Vacancy report included information regarding allocated and filled PIP psychiatry positions for the required classifications. CDCR will update the reports for the psychiatry staffing positions to those required in the Court's March 17, 2023 order as part of the annual update process.

iii.     SP6: SRE Mentor Program and Training

SP6 measures Mental Health clinical staff in all Mental Health programs who have completed Suicide Risk Evaluation Mentoring. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of mental health clinical staff at the institution. This is inclusive of PIP staff.

| Numerator | Denominator |
|---|---|
| **SRE Mentoring (N1):** The number entered for each institution from the denominator in the field: "# of MH Clinical Staff Trained", entered on the Suicide Risk Evaluation (SRE) Mentoring Program from the Court Ordered Training Site. | **SRE Mentoring (D1)**: The number entered for each institution in the "Total # of MH Clinical Staff" field on Suicide Risk Evaluation (SRE) Mentoring Program from Court Ordered Training Site during the review period. |
| **Biennial Training (N2):** The number entered for each institution from the denominator in the field: "# of "MH Clinical Staff Trained", entered on the Suicide Prevention and SRASHE Core Competency Building from the Court Ordered Training Site. | **Biennial Training (D2):** The number entered for each institution in the "Total # of MH Clinical Staff" field on the Suicide Prevention and SRASHE Core Competency Building from the Court Ordered Training Site. during the review period. |

SP6 was completed in BRMR on June 14, 2023 and approved by CAPC on June 22, 2023. It is currently in the programming step. Because SP6 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

iv.     SP9: Percentage of Timely Nursing Rounds in PIPs for Patients on Suicide Watch and Precaution Recorded in Electronic Healthcare Records System (EHRS) Clearly Marked, On Time, and Documented on Correct Form

The Mental Health Observations Reporting Tool is the report agreed upon to measure the timely completion of mental health observation rounds, including Suicide Watch and Suicide Precaution rounds in the EHRS. The report already includes all mental health observation rounds, including those conducted in the PIP. This report has been discussed numerous times in BRMR. There are a few outstanding questions regarding the report, but those issues should be resolved shortly so this item can move forward to verification and remediation. Therefore, no further extension of this indicator is necessary.

> v.    SP10: Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correction Documentation Used

SP10 was revised during the data remediation process to focus on Receiving and Release (R&R) screenings for patients. The new title agreed upon for SP10 is Observed Initial Health Screenings in a Confidential Setting. The source for the SP10 KPI is a CQIT on-site audit. The April 27, 2023 CQIT Guidebook provides instructions for the R&R on-site audit. A screenshot is provided below.

### Receiving and Release (R&R) Screening – Hayes Item 1

a) General Instructions:
- Observe R&R process to see if they are conducted confidentially.
- Check to see if all of the questions are being asked.
- Respond for each R&R Screen observed (e.g., if five are observed, complete the audit five times).
- If multiple nursing staff assigned to the R&R during the on-site assessment, audit each nurse
- Sample size: Five inmates per nurse assigned to perform screens during the observation of the R&R screening process. If there are less than five inmate screens per nurse, observe all.
- CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
  - Start Date
  - Sub Area

The instructions require the auditor to observe the R&R process for confidentiality for inmates offered screenings at the time of the audit regardless of the patient's level of care. Therefore, PIP patients are already included in this audit if they are in R&R at the time of the audit. The indicator and the CQIT Guidebook instructions were reviewed in BRMR; the indicator was released to statewide users on April 3, 2023. Because SP10 already includes PIP patients and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

> vi.    SP18: Nursing Staff Current with CPR Training

SP18 measures nursing staff current with CPR training. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of nursing staff employed at the institution at the time of the on-site audit. This is inclusive of PIP staff.

| Numerator | Denominator |
|---|---|
| The response to following question from the audits in the denominator:<br>• Of those nursing staff, how many completed CPR training within the last 730 days? | The response to the following question in CQIT Audit: Cardiopulmonary Resuscitation (CPR) Training during the on-site audit:<br>• How many nursing staff were employed at the time of the on-site audit? |

This indicator was reviewed in BRMR and released to statewide users on June 5, 2023. It is currently pending remediation. Because SP18 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

vii.    SP19: Percentage of Health Care Staff with Annual Suicide Prevention Training

SP19 measures the percentage of health care staff with annual suicide prevention training. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of health care staff (nursing, mental health, and medical) employed at the institution at during the last calendar year. This is inclusive of PIP staff.

| Numerator | Denominator |
|---|---|
| The sum of the numbers entered in response to the questions below from the CQIT: Annual IST Suicide Prevention Training Compliance - Hayes Item 16. **Nursing:** • Of those, how many nursing staff were trained in suicide prevention in the last calendar year? **Mental Health:** • Of those, how many mental health staff were trained in suicide prevention in the last calendar year? **Medical:** • Of those, how many medical staff were trained in suicide prevention in the last calendar year? | The sum of the numbers entered in response to the following questions below from the CQIT: Annual IST Suicide Prevention Training Compliance - Hayes Item 16. **Nursing:** • How many currently employed nursing staff (excluding staff currently on long-term leave) were employed during the last calendar year? **Mental Health:** • How many currently employed mental health staff (excluding staff currently on long-term leave) were employed during the last calendar year? **Medical:** • How many currently employed medical staff (excluding staff currently on long-term leave) were employed during the last calendar year? |

This indicator was reviewed in BRMR and released to statewide users on May 1, 2023. It is currently pending remediation. Because SP19 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

viii.    SP20: Percentage of Custody Staff with Annual Suicide Training

SP20 measures custody staff current with annual suicide training. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of custody staff employed at the institution during the last calendar year. This is inclusive of PIP staff.

| Numerator | Denominator |
|---|---|
| The number entered in the following question in CQIT: Custody Training from the denominator:<br>• Of those, how many custody staff were trained in suicide prevention in the last calendar year? | The number entered in the following question in CQIT: Custody Training<br>• How many custody staff were employed (less long term leave) in the last calendar year? |

This indicator was reviewed in BRMR and is currently in verification. It is pending release to statewide users and remediation. Because SP20 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

C.  CDCR Does Not Agree to "Extend" SC10: UOF Involving MH Inmates

The Special Master's team and Plaintiffs' counsel reviewed SC10 in BRMR and agreed to the below numerator and denominator:

| Numerator | Denominator |
|---|---|
| The sum of the numbers entered in response to Questions #2 and #4 on CQIT audit: Use of Force from the denominator:<br>• What is the total number of controlled use of force incidents involving MH patients?<br>• What is the total number of immediate use of force incidents involving MH patients? | The sum of the numbers entered in response to Questions #1 and #3 on CQIT audit: Use of Force:<br>• What is the total number of controlled use of force incidents?<br>• What is the total number of immediate use of force incidents? |

The parties and the Special Master's team agreed that SC10 would reflect the percent of use of force incidents that involved mental health patients. SC10 was remediated by the Special Master's data expert on November 18, 2022.

Now, despite remediation of SC10 and agreement between the parties as to the scope of the indicator, the Special Master seeks to "extend" SC10 to "include a qualitative review of a certain percentage of controlled and immediate UOF incidents for compliance with CDCR UOF policy." This is not merely an extension of SC10. The Special Master recommends not one, but several new indicators.

The Special Master also recommends that SC10 "should also track whether a mental health assessment was included in the process." *Id*. RH35: Controlled Use of Force MH Assessments Meeting Documentation Requirements was reviewed by the Special Master's team and Plaintiffs' counsel in BRMR and the stakeholders agreed to the qualitative review of the mental health assessments completed for controlled use of force incidents. RH35 was remediated by the Special Master's data expert on December 23, 2022. To the extent the Special Master's recommended extension of tracking mental health assessments is not measured in RH35, it is a request for a new indicator.

The scope of SC10 and RH35 were discussed at length in BRMR, yet were ultimately agreed to and remediated. Plaintiffs' counsel and the Special Master's team had an opportunity to raise the indicator through the dispute resolution process (*see* ECF No. 7556-2) if they believed a reasonable modification of the indicator was necessary, yet that process was not utilized for either indicator.

CDCR generally objects to any indicator, new or extended, that requires CQIT auditors to conduct a qualitative review of use of force incidents. CDCR already has internal processes for reviewing use of force incidents at both the institution and Headquarters levels. Requiring duplicative audits not only burdens resources, but may also cause potential inconsistencies due to reasonable varied views of the same incident by different review teams.

III.    Timing of Remediation for New/Extended Indicators

The June 14, 2023 letter states that remediation of the indicators recommended by the Special Master should commence forthwith so they are remediated before December 31, 2023. Such a deadline is impossible to meet and is not in line with CDCR's September 2021 activation schedule.

The Special Master is recommending at least 14 new indicators and the extension of 41 existing indicators.[11] It has been nearly two years since the Court provisionally approved the Special Master's list of CQIT key indicators. As of June 2, 2023, only 42 indicators of the initial 139 indicators have been successfully remediated. Expecting the stakeholders to remediate an additional 55 new or expanded indicators, on top of the 97 initial indicators not yet remediated, in just six months, despite taking nearly two years to remediate only 42 indicators, is unrealistic.

---

[11] As discussed above, many of the new indicators recommended are in fact recommendations for multiple new indicators. Thus, the total number of new recommended indicators is well above 14. However, CDCR has identified some indicators that are recommended for extension to the PIP that already include PIP staff or requirements. Therefore, the total number of indicators recommended for extension may be less than 41.

On September 29, 2021, Defendants filed CDCR's preliminary activation schedule for completion of data remediation. ECF No. 7334. As required by the Court's August 26, 2021 order, CDCR included "all contingencies of which they are aware that preclude at this time development of final activation schedules for completion of data remediation." ECF No. 7283 at 6-7.

CDCR's preliminary data activation schedule specifically identified two contingencies related to new or unknown indicators that would have a major effect on the data remediation timeline. First, CDCR noted that expanding or reducing the number and scope of key indicators would affect the timeline. ECF No. 7334 at 11. "If the number of indicators changes or the scope of the current indicators are revised, the timeline will be significantly impacted." *Id*. As seen in Attachment A, the number of indicators has changed through the data remediation process. The scope of many indicators has also changed. CDCR has been able to absorb these changes by working with stakeholders to make the process more efficient. However, adding over 50 new indicators, even though some of those indicators are expansions of current indicators, significantly changes the total number and scope of indicators to be remediated, thus extending the overall timeline.

Second, CDCR identified the Special Master's placeholder indicators – those not yet built or clearly defined – as a contingency with a high impact on the timeline to complete data remediation. *Id*. at 12. CDCR created the initial timeline with six placeholder indicators included on the provisionally approved key indicator list.[12] The estimated time attributed to remediation of any of these placeholder indicators was the same as any other single indicator. Now, instead of six indicators, the Special Master is recommending over 50 additional indicators or extensions for review and remediation.

The December 2023 timeline was based on the indicators and subcomponents known to CDCR at the time of the September 2021 data activation schedule. Since that time, the scope and number of indicators has changed unpredictably and the workload associated with each indicator has become clearer than it did in 2021. CDCR could not possibly have known in September 2021 that six placeholder indicators might be expanded to include 45 additional indicators. Nor could it have accurately projected an end date for remediation of those placeholders. As detailed above, CDCR has agreed to create many of the recommended new indicators and expand the recommended existing indicators. But all of that will take time that was not accounted for in the original December 2023 deadline.

CDCR is committed to completing data remediation as expeditiously as possible, but the timeline for completion must be realistic given the significantly increased scope of work. CDCR recommends finishing the current batch of known indicators and then developing a new activation schedule to account for the list of new or expanded indicators.

---

[12] The Special Master's June 14, 2023 letter did not include the placeholder titled "Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here). Given there are no new or expanded indicators for this placeholder, please remove the indicator from the provisionally approved key indicator list. Similarly, the Special Master has not recommended any new or extended indicators for "ASU EOP Hub Certification." Please remove this item from the provisionally approved key indicator list as well.

IV.     Conclusion

CDCR agrees to create many of the new indicators and extend many of the existing indicators recommended by the Special Master in the June 14, 2023 letter. The few objections provided are based on prior agreements or recommendations to measure non-*Coleman* requirements. To the extent Plaintiffs' counsel recommends additional new or extended indicators, CDCR requests the opportunity to respond.

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney III
Office of Legal Affairs
California Department of Corrections and Rehabilitation

# Attachment A

| Indicator Number | Provisionally Approved Indicator Names | Current Indicator Name |
|---|---|---|
| AC1 | Timely MH Referrals | Timely MH Referrals |
| AC2 | Timely PC Contacts | Timely PC Contact |
| AC3 | Timely Psychiatry Contacts | Timley Psychiatry Contacts |
| AC4 | Timely IDTTs | Timely IDTT |
| AC5 | Treatment Offered | Treatment Offered |
| AC6 | Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes | Transfer to STRH/LTRH within Timeframes |
| AC7 | Timely Transfers to CCCMS/EOP | Timely Transfers to EOP |
| AC8 | Timely Admissions to Inpatient Care | CDCR Inpatient Program Referrals: Compliance with Program Guide Timeframes fro Acute and Intermediate Admissions within 10 and 30 days |
| AC9 | Inpatient Transfer Deadlines for PIPs and DSH | Timelines of IDTT Acute/ICF Referrals and IRU Review |
| AC10 | Effective Communication Achieved | Effective Communication Achieved |
| AC11 | IDTTs in a Confidential Setting | IDTTs in a Confidential Setting |
| AC13 | Group Treatment in a Confidential Setting | Group Treatment in a Confidential Setting |
| AC14 | MHSDS Patients Transferred out of Desert Institutions | MHSDS Patients Transferred Out of Desert Institutions |
| AC15 | Observed RC Screens Conducted in a Confidential Setting | Percentage of Observed Reception Center MH Screens in a Confidential Setting |
| AC16.1 | MH Screens (Split Indicators) | ASU Pre-Screen |
| AC16.2 | N/A | ASU GP Screens |
| AC16.3 | N/A | RC MH Screens |
| AC17 | Appointments Cancelled Due to Custody | Appointments Cancelled Due to Custody |
| AC18 | Appointments Seen as Scheduled | Scheduled Appointments Completed or Refused |
| AC19 | Housing Units where 128 MH-5s are Accessible and Available to Housing Unit Staff | Housing Units Where 128-MH-5s Are Available and Accessible to Housing Unit Staff |
| AC20 | Custody MH Referrals | Custody MH Referrals |
| AC21 | MHSDS inmates in ASU transferred within policy requirements | MHSDS inmates in ASU transferred within policy requirements |
| SP1 | Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs.  MHCB, Alternative Housing, DSH, and PIPs | Timely Clinical Discharge Follow-ups |
| SP2 | Emergent/urgent MH referrals that result in SRASHEs | Emergent/urgent MH referrals that result in SRE |
| SP3 | Safety planning to reduce suicide risk | MHCB/PIP Discharge Safety Plans |
| SP3.4 | N/A | Quality of Safety Planning to Reduce Suicide Risk |

| SP4 | Suicide-resistant MHCBs | Suicide Resistant Cells |
|---|---|---|
| SP5 | APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days | Documentation of Acute/ICF Discharges with Clinician to Clinician Contact within 5 days |
| SP6 | SRE Mentor Program | Percentage of Required MH Clinical Staff with Completed SRE Mentoring |
| SP7 | Patients referred to MHCB on Continuous Direct Visual Observation | Patients Referred to MHCB on Continuous Direct Visual Observation |
| SP8 | Patients in Alt Housing on continuous observation and provided suicide-resistant bed | Patients in Alternative Housing with a Bed |
| SP9 | Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | Mental Health Observations Reporting Tool |
| SP10 | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | Observed Initial Health Screenings in a Confidential Setting |
| SP11 | Housing Unit/Inmate Living Areas with emergency response equipment and Inventoried Daily | Housing Unit/Inmate Living Areas with Emergency Response Equipment and Daily Inventories |
| SP12 | Custody Follow Ups for MHCB Discharges/7497 Forms | Custody Follow Ups 7497 Forms |
| SP13 | Orders Reviewed with Properly Documented Observation Orders | Observation Orders Reviewed That Are Properly Documented |
| SP14 | MHCB Records with Rationale for Limited Issues of Clothing and Bedding | MHCB Records with Rationale for Partial Issue |
| SP15.1 | MHCB property and privileges (Split Indicator) | MHCB Out of Cell Activities - Yard |
| SP15.2 | N/A | MHCB Out of Cell Activities - Phone Calls |
| SP15.3 | N/A | MHCB Out of Cell Activities - Visits |
| SP15.4 | N/A | MHCB Out of Cell Activities - Showers |
| SP15.5 | N/A | MHCB Out of Cell Activities - Dayroom |
| SP16 | ASU Intake Inmates Appropriately Housed | ASU Intake Inmates Appropriately Housed |
| SP17.1 | Percentage of ASU Welfare Checks audited that were not completed on time and staggered | Segregated Housing Unit Security/Welfare Check Discrepancies with an Explanatory Memo |
| SP17.4 | N/A | Audited Security Welfare Checks in Segregated Housing that Included the Required Visual Observation |
| SP18 | Percentage of nursing staff current with CPR training | Nursing Staff Current with CPR Training |
| SP19 | Percentage of Health Care Staff with Suicide Prevention Training | Healthcare Staff Current with Suicide Prevention Training |

| | | |
|---|---|---|
| **SP20** | Percentage of Custody Officers with Suicide Prevention Training | Custody Staff with Suicide Prevention Training |
| **SP21** | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | N/A |
| **SP22** | MHCB Daily Provide Checks | MHCB Daily Provider Contacts |
| **SP23** | SREs that Met All Audit Criteria | Quality of Selected SRASHE Documentation |
| **SP24** | Discharges from MHCB with Clinician Review of D/C Summary (SRASHE) | Discharges from MHCB with clinician review of d/c summary |
| **SP25** | Satisfactory SPR FIT Meeting | Institution SPRFIT Meetings Observed that Satisfy All Audit Criteria |
| **SP25.4** | N/A | Institution SPRFIT Meeting Minutes Reviewed that Satisfy All Audit Criteria |
| **QC1** | IDTT Staffing | IDTT Required Staffing |
| **QC2** | Cases with Documentation of Appropriateness of LOC Discussed for Patients Identified by 7388B as Potentially Requiring Higher LOC | Cases w/doc. of appropriateness of LOC discussed for pts identified by 7388B as potentially requiring HLOC |
| **QC3** | Treatment Plans with Satisfactory Documentation | Treatment Plans with Satisfactory Documentation |
| **QC4** | Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers | Treatment Plans with reason for refusal and intervention documented for high refusers |
| **QC5** | Treatment Plans with Documented and Implemented Pre-Release Plans | Treatment Plans with Documented and Implemented Pre-Release Plans |
| **QC6** | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT |
| **QC7** | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT |
| **QC9** | EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation | EOP IDTTs Addressing Accommodations and Clinical Appropriateness for Work and Education |
| **QC10** | Primary Clinician Continuity of Care | Mental Health Primary Clinician Continuity of Care |
| **QC11** | Psychiatrist Continuity of Care | Mental Health Psychiatrist Continuity of Care |
| **QC12** | IDTTs Meeting All Audit Criteria | IDTTs with Observed Interactive Process |
| **QC13** | IDTT Patient Attendance | IDTT Patient Attendance |
| **SC1** | Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality | Percentage of RVR MH Assessments where the Patient was Informed of the Limits of Confidentiality |
| **SC2** | RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation | RVRs Recommended for Mitigation with Custody Documentation |

| | | |
|---|---|---|
| **SC3** | RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B | RVR MHAs where Captain Disagreed with Mitigation and Documented Rationale |
| **SC4** | Percentage of Days Where Heat Plan was Activated, and Alternative Out of Cell Activities were Offered to Heat Alter Patients | Days Alternative Out-of-Cell Activities were Offered to Patients on Heat Alert Medications when Indicated |
| **SC5** | Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM | MHCB Patients Placed in TTM According to Policy |
| **SC6** | Percentage of 128Bs Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients | The Use and Documentation of Mechanical Restraints Among Non-MAX Custody Patients in MHCB Units |
| **SC7** | Thermometer Checks Completed and Accurate | Thermometer Checks Completed and Accurate |
| **SC8** | Timely MH RVR Assessments | Timely Submission of MH RVR MH Assessment Results |
| **SC8.7** | N/A | Timely RVR MH Assessment Request |
| **SC9** | RVRs Recommended for Mitigation That Were Mitigated | RVRs Recommended for Mitigation That Were Mitigated |
| **SC10** | Use of Force involving MH Inmates | Use of Force involving MH Inmates |
| **MM20** | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | Medication Administration: Chronic Care Medications Historical Administration (Psychiatrist Prescribed Meds) |
| **MM22** | Medication Admin: Outpatient Provider New Medication Orders (Psychiatrist) | Medication Administration: Outpatient Provider New Medication Orders (Psychiatrist Prescribed Medications) |
| **MM3** | Diagnostic Monitoring-Antipsychotics | Diagnostic Monitoring-Antipsychotics |
| **MM4** | Diagnostic Monitoring-Clozapine | Diagnostic Monitoring-Clozapine |
| **MM11.1** | Diagnostic Monitoring-Mood Stabilizers | Diagnostic Monitoring – Carbamazepine |
| **MM11.2** | N/A | Diagnostic Monitoring – Lamotrigine |
| **MM11.3** | N/A | Diagnostic Monitoring – Lithium |
| **MM11.4** | N/A | Diagnostic Monitoring – Oxcarbazepine |
| **MM11.5** | N/A | Diagnostic Monitoring – Valproic Acid |
| **MM14** | Diagnostic Monitoring-Antidepressants | Diagnostic Monitoring-Antidepressants |
| **MM10** | Diagnostic Monitoring-QT Prolongation EKG 12 Months | Diagnostic Monitoring - QT Prolongation EKG 12 Months |
| **MM5** | Continuity of Meds Upon Inter-Institutional Transfer at R&R | Medication Management: All Medications Administered Timely - Inter-System Arrival |
| **MM6** | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | Medication Management: All Medications Administered Timely - Intra-System Non-Restricted/Non-Inpatient Housing Arrival |

| MM7 | Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers | Medication Management: All Medications Administered Timely - Arrival at MH Inpatient - MHCB/PIP/Alt. Housing |
|---|---|---|
| MM8 | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Medication Management: All Medications Administered Timely - Intra-System - Restricted Housing - ASU/PSU/SHU Arrival |
| MM9 | Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH | Medication Management: All Medications Administered Timely - Arrival at Medical HLOC - Medical - CTC/Hospital |
| MM12 | Medication Compliance with PC 2602, Involuntary Meds: Court Order | Involuntary Medication Court Orders |
| MM13 | Medication Compliance with PC 2602, Involuntary Meds: Med Order | Controlled Use of Force Incidents Required to Administer PC2602 Medication |
| MM15 | Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here) | N/A |
| RH1 | Placement of ASU EOPs in Appropriate Housing Within Timeframes | Placement of ASU EOPs in Appropriate Housing Within Timeframes |
| RH2 | NDS timely expedited transfers | Required NDS Transfers that Occurred within 72 Hours |
| RH3 | Psych Tech Rounds Completed According to PG Requirements | PT Rounds Completed in Segregated Housing Units |
| RH5 | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | Note: Proposed to decommission |
| RH7 | ICCs with Mental Health Clinicians present, and relevant information provided | ICCs with Mental Health Clinicians Present and Relevant Information Provided |
| RH9 | (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices | Cells Reviewed where Inmates are Allowed Approved Entertainment Devices |
| RH10 | Percentage of Unclothed Body Searches Conducted in a Private Area | Percentage of Staff Who Report Unclothed Body Searches Conducted in a Private Area |
| RH11 | ASU Screens that are Conducted in Confidential Settings | Observed ASU GP Screens Conducted in Confidential Settings |
| RH12 | ASU Out of Cell Time Offered | ASU & PSU Out of Cell Time Offered |
| RH13 | Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy | STRH/LTRH Custody Out of Cell Time Offered |
| RH14 | Weeks in which Shower Access in ASU was Offered as Required | ASU & PSU Showers |

| RH15 | Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property | Percentage of Custody Staff who Can Identify all NDS Patients |
|---|---|---|
| RH15.4 | N/A | Weeks where NDS Patients are Offered Required Phone Calls |
| RH15.7 | N/A | NDS Patients Provided Personal Property |
| RH16 | Warden Review of Cases Over 90 Days | Note: Combined with RH18 |
| RH17 | ASU LOS for MHSDS v. Non-MHSDS Patients | Segregation LOS |
| RH18 | EOP Hub CCII and Captain Review for LOS Over 90 Days | CCII, Captain and Warden Reviews of ASU EOP Hub Patients with LOS Over 90 Days |
| RH19 | Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed on Time | Percentage of Patients with LOS Over 150 Days for whom Long-Term Segregated Case Conferences Were Completed on Time |
| RH21 | Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival | Initial ICCs Reviewed that were Held within 10 Calendar Days of Arrival to Segregation Placement |
| RH22 | Number of EOP and CCCMS Patients in ASU | Census (CQIT) |
| RH24 | High Refusers Due to Custody Reasons with Documented Plan of Action | High Refusers Due to Custody Reasons with Documented Plan of Action |
| RH25 | High Refusers in which 128B was Completed | High refusers for whom a 128B was completed |
| RH26 | Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Calendar Days | High Refusing EOP Patients in Segregation for Whom a Meeting Between MH and Custody was Conducted |
| RH27 | Inmates Who Received ASU MH Guide | ASU Inmates Who Received an ASU MH Guide |
| RH28 | Percentage of Psych Tech Round Documentation That Meets All Audit Criteria | Psychiatric Technician Rounds Documentation Audited that Meets All Audit Criteria |
| RH29 | Psych Tech Rounds Where EC and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as Indicated | Observation of PT Rounds Where Effective Communication, Interaction, and Referrals Met All Audit Criteria |
| RH30 | Percentage of IDTTs Observed in which a Health Record and C-File were Available | IDTTs Observed in Which Pt Electronic Health Records and SOMS are Available |
| RH31 | Percentage of Peace Officers Observed to Carry their CPR Mouth Shield | Percentage of Peace Officers Observed to Carry Their CPR Mouth Shield |
| RH32 | Percentage of Eligible MHSDS Patients Receiving Milestone Credits | MHSDS Earned Milestone Credit |
| RH33 | RVR MH Assessments Where All Documentation Requirements Were Met | RVR Assessments where documentation Requirements were Met |

| RH34 | RVR MH Assessments Conducted in Private Setting | RVR MH Assessments Conducted in a Private Setting |
|---|---|---|
| RH35 | Use of Force MH Assessments Meeting Documentation Requirements | Controlled Use of force MH assessments meeting documentation requirements |
| RH37 | Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs | RVRs Issued |
| RH37.2 | N/A | RVRs Issued to Non-MHDS Participants |
| RH37.3 | N/A | RVRs Issued to Patients at the CCCMS Level of Care |
| RH37.4 | N/A | RVRs Issued to Patients at the EOP Level of Care |
| RH37.5 | N/A | RVRs Issued to Patients at the MHCB Level of Care |
| RH37.6 | N/A | RVRs Issued to Patients at the Acute Level of Care |
| RH37.7 | N/A | RVRs Issued to Patients at the ICF Level of Care |
| PS1 | Number of Episodes of Heat Related Illness Occurring in MHSDS | Heat Related Illness Incidents for MHSDS Patients Prescribed Heat Alert Medications |
| PS2 | Percentage of Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria | Clinical Restraint Occurrences Meeting All of the Audit Criteria |
| PS3 | Seclusion, Frequency, and Duration | Seclusion Incidents |
| PS3.2 | N/A | Seclusion Incidents per Patient |
| PS3.3 | N/A | Seclusion Duration Incidents greater than 8 Hours |
| PS3.5 | N/A | Restraint Incidents |
| PS3.6 | N/A | Restraint Incidents per Patient |
| PS3.7 | N/A | Restraint Duration Incidents greater than 4 Hours |
| URM1 | MHCB Clinical Stays within Timeframes | MHCB Clinical Stays within Timeframes |
| URM3.1 | Timely admission to MHCB | Timely admission to MHCB |
| FEC1 | Adequate Group Treatment Space | Adequate Group Treatment Spaces |
| FEC2 | Adequate IDTT Space | Adequate IDTT Spaces |
| FEC3 | Adequate Individual Treatment Space | Adequate Individual Treatment Spaces |
| SPTSR1 | Chief Psychiatrist | Allocated and Filled Psychiatrist Positions |
| SPTSR2 | Chief Psychologist, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| SPTSR3 | Senior Psychologist, Correctional Facility (Supervisor) | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |

| | | |
|---|---|---|
| **SPTSR4** | Senior Psychiatrist (Supervisor), Correctional and Rehabilitative Services (Safety) | Allocated and Filled Psychiatrist Positions |
| **SPTSR5** | Supervising Psychiatric Social Worker I, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR7** | Senior Psychologist, Correctional Facility (Specialist) | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR8** | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | Allocated and Filled Psychiatrist Positions |
| **SPTSR9** | Recreation Therapist, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR10** | Psychologist-Clinical, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR11** | Clinical Social Worker (Health/Correctional Facility) – Safety | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR14** | Allocated and filled positions | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **AddKPI1** | Sustainability Process | N/A |
| **AddKPI2** | ASU EOP Hub Certification | N/A |
| **AddKPI3** | PIP (To be developed) | N/A |
| **AddKPI4** | Custody and Mental Health Partnership Collaboration | N/A |
| **NM1** | Timely response to Critical Med non-adherence notification | Timely response to Critical Med non-adherence notification |
| **NM2** | Timely response to Non-critical Med non-adherence notification | Timely Response to Non-Critical Med Non-Adherence Notification Reviewed Within 7 Days |
| **NM3** | Timely Response to Non-Critical Non Adherence Notification Seen Within 30 Days | Timely Response to Non-Critical Med Non-Adherence Notification Seen within 30 Days |

# EXHIBIT D

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 31, 2022

Special Master Lopes                          Lisa Ells
Pannone Lopes Devereaux and O'Gara LLC        Rosen Bien Galvan and Grunfeld LLP
Northwoods Office Park, Suite 215N            101 Mission Street, Sixth Floor
1301 Atwood Avenue                            San Francisco, A 94105
Johnston, RI 02919

VIA EMAIL

Special Master Lopes and Lisa,

This letter provides an update on the progress of the Data Remediation process and a list of
indicators that should be decommissioned or that are duplicates of others already on the court's
Provisional List of Key Indicators. (See ECF No. 7151 at 21.)  Also included is a "cross walk"
list of indicators from the Provisional List of Key Indicators with updated names.

1.  Data Remediation Progress Report.

On May 19, 2022, Secretary Kathleen Allison filed a declaration that included templates for data
activation schedules.  (ECF Nos. 7556 at 2 and 7556-1 at 2-3.)  Since then, CDCR has
maintained those activation schedules (Reports A and B) and updated them quarterly.  Attached
to this letter are Reports A and B as of September 30, 2022.

As indicated in Report B, only twenty-five indicators have passed verification as of September
30, 2022, a step that should have been reached by May 13, 2022 – or approximately twenty
weeks sooner.[1]  Nineteen indicators had been remediated[2] as of September 30, 2022.

| | | INDICATOR TESTING (VERIFICATION) | | | TOTAL # INDICATORS REMEDIATED |
|---|---|---|---|---|---|
| | | Start | | Completed | |
| Cutoff date | Year + Quarter | 5. Planned | 5. Actual | 5. Planned | 5. Actual | |
| 6/24/2022 | 2022 Q2 | 43 | 18 | 34 | 6 | **4** |
| 9/30/2022 | 2022 Q3 | 63 | 37 | 54 | 25 | **19** |

---

[1] Since September 30, two more indicators have completed the verification process, bringing the total completed to
twenty-seven, a mark that should have been met by May 20, 2022 – or twenty-three weeks ago.
[2] Defendants understand that an indicator is remediated when Dr. Potter finds that the indicator is validated and
verified and where there are no longer any unresolved disputes.  Defendants are unclear whether the Special Master
has also found these nineteen indicators to be remediated.

Special Master Lopes
Lisa Ells
Page 2

As noted in my October 24, 2022 email, Report B projects that 1.47 indicators must be completed each week in BRMR on average to meet the December 2023 completion date. However, given the magnitude of the delay, in order to meet that completion date, it is estimated that 1.9 indicators must be completed each week in BRMR – a thirty percent increase in productivity. Subsequent programming and verification steps will have to accelerate to three indicators per week as well.

To meet the December 2023 deadline, the parties and the Special Master must work collaboratively to identify ways to increase the rate indicators are reviewed during the BRMR process, more strictly adhere to the May 19, 2022 Dispute Resolution process, and more expeditiously resolve disputes that reach dispute resolution.

    2.   Indicators to Decommission and Those That Are Duplicative

Below is a list of indicators that CDCR recommends be decommissioned as well as a list of indicators that are duplicative of other indicators. CDCR discussed these items with the Special Master team during past QAC meetings and requests that both the Special Master and Plaintiffs agree to remove them from the Provisional List of Key Indicators.

    A.  Decommission List

| | | |
|---|---|---|
| Decommission | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | This indicator measures whether the ASU post screen refusal results in a consult. Timeliness of post-refusal referrals is now measured in the timely MH referral indicator. |
| Decommission | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | As noted in Section 3, below, CDCR is decommissioning this indicator and splitting much of it into two indicators. A piece of the old indicator – whether the correct documentation is used - is recommended for decommissioning as it pre-dates EHRS implementation. |
| Decommission | Inpatient Transfer Deadlines for PIPs and DSH | The more relevant indicator is timely admission to inpatient care. |
| Decommission | Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required | CDCR cannot monitor case work completed at DSH. This is not a CDCR function. |

Special Master Lopes
Lisa Ells
Page 3

| Decommission | ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria | These should be decommissioned and replaced with a new CMHPP huddle indicator.[3] |
|---|---|---|
| Decommission | Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors | DAI now monitors Guard One rounds via the Guard One report that measures if rounds were completed timely. |
| Decommission | ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | This measures an outdated process now that Guard One rounds extend beyond the first twenty-one days in ASU. |
| Decommission | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | This title appeared on the provisional list but does not correspond with any known CQI indicator. |
| Decommission | Percentage of mental health OHU stays 48 hours or less | MH OHUs no longer exist. |
| Decommission | Staff that report having computers for all out of cell clinical appointments. | All staff have assigned computers now that EHRS is active. |

B. Duplicates

| Duplicate | ASU Pre-Screens | ASU Pre-Screens is under MH Screens (MH Screens: ASU Pre Screens, ASU GP Screens, RC Screens) |
|---|---|---|
| Duplicate | Percentage of ASU Screenings that Occurred Within 72 Hours of Placement of Arrival | This is the ASU GP Screen which is under MH Screens (MH Screens: ASU Pre Screens, ASU GP Screens, RC Screens) |
| Duplicate | Percentage of IDTTs Observed in which a Health Record and C-File were Available | Duplicate with "Percentage of all IDTTs observed in which a health record and C-file are available" under "Access to Care". |
| Duplicate | Percentage of MH-7s required completed prior to ASU placement | MH7 is the ASU Pre Screens which is under MH Screens (MH Screens: ASU Pre Screens, ASU GP Screens, RC Screens) |
| Duplicate | Percentage of healthcare staff current with | Duplicate with "Percentage of Health Care Staff with Suicide Prevention |

---

[3] ECF No. 7151 at 26 recommends CDCR develop indicators to measure the Custody and Mental Health Partnership Plan.

Special Master Lopes
Lisa Ells
Page 4

| | suicide prevention training | Training" under "Suicide Prevention" item #19 |
|---|---|---|
| Duplicate | Additional Use of Force (Specificity to be determined) | CDCR will prep the following: UOF involving MH inmates. |

3. Cross-Walk

Below is a list of indicators from the Provisional List of Key Indicators that CDCR has either split into new indicators or has updated the indicator name. CDCR requests that these titles be updated on any revision to the Provisionally Approved Key Indicator list that the Special Master may recommend.

| Category | Indicator | Updated Name and/or Split Indicators |
|---|---|---|
| Access to Care | Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes | Placement in STRH or LTRH |
| Access to Care | Observed RC Screens Conducted in a Confidential Setting | Percentage of Observed Reception Center MH Screens in a Confidential Setting |
| Access to Care | MH Screens | 1. ASU Pre-Screens 2. ASU GP Screens 3. RC Screens |
| Suicide Prevention | Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs. MHCB, Alternative Housing, DSH, and PIPs | Timely Clinical follow up |
| Suicide Prevention | Emergent/urgent MH referrals that result in SRASHEs | Timely Suicide Risk Evaluation |
| Suicide Prevention | Patients in Alt Housing on continuous observation and provided suicide-resistant bed | 1. Patients referred to MHCB on Continuous Direct Visual Observation 2. Percentage of Patients in Alternative Housing with a Bed |

Special Master Lopes
Lisa Ells
Page 5

| | | |
|---|---|---|
| Suicide Prevention | Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | MH Observation Tool |
| Suicide Prevention | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | 1. Percentage of Observed Reception Center MH Screens in Confidential Setting<br>2. Percentage of Observed R&R Screens in Confidential Setting<br>3. Percentage of Observed R&R Screens *with Correct Documentation Used* (Recommend decommission) |
| Suicide Prevention | Housing Unit/Inmate Living Areas with emergency response equipment and Inventoried Daily | Housing Unit/Inmate Living Areas with Emergency Response Equipment and Daily Inventories |
| Suicide Prevention | Orders Reviewed with Properly Documented Observation Orders | Percentage of Observation Orders Reviewed That Are Properly Documented |
| Suicide Prevention | MHCB Records with Rationale for Limited Issues of Clothing and Bedding | MHCB Records with Rationale for Limited Issue |
| Suicide Prevention | Percentage of Custody Officers with Suicide Prevention Training | Percentage of Custody Staff with Suicide Prevention Training |
| Quality of Care | EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation | EOP IDTTs Discussion of Clinical Appropriateness for Work, Education, and Accommodation Addressed |
| Specialized Custody | Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality | Percentage of RVR MH Assessments Where the Patient Was Informed of the Limits of Confidentiality |
| Specialized Custody | RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation | RVRs Recommended for Mitigation with Custody Documentation |

Special Master Lopes
Lisa Ells
Page 6

| Restricted Housing | ICCs with Mental Health Clinicians present, and relevant information provided | ICCs with Mental Health Clinicians Present and Relevant Information Provided |
|---|---|---|
| Restricted Housing | (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices | Percentage of Cells in Segregated Housing/Condemned Units Reviewed where Inmates were Provided Entertain. Apps |
| Restricted Housing | Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy | STRH/LTRH Custody out of cell time offered |
| Restricted Housing | Weeks in which Shower Access in ASU was Offered as Required | ASU Showers |
| Restricted Housing | Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property | 1. Percentage of Custody Staff who Can Identify all NDS Patients 2. Percentage of Housing Units with a Tracking System for Phone Calls and Property for NDS Patients |
| Access to Care | Percentage of all IDTTs observed in which a health record and C-file are available | IDTTs Observed in which Pt Electronic Health Records and SOMS are Available |
| Access to Care | Housing Units where 128 MH-5s are Accessible and Available to Housing Unit Staff | Housing Units Where 128-MH-5s Are Available And Accessible to Housing Unit Staff |
| Suicide Prevention | APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days | Number of Acute/ICF Discharges with Clinician to Clinician Contact within 5 Days |
| Suicide Prevention | SREs that Met All Audit Criteria | Quality of Selected SRASHE Documentation |
| Suicide Prevention | Discharges from MHCB with Clinician Review of D/C Summary (SRASHE) | Discharges from MHCB with Clinician Review of D/C Summary |
| Quality of Care | IDTTs Meeting All Audit Criteria | IDTTs with Observed Interactive Process |
| Specialized Custody | RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B | RVRs Where the Captain Disagreed w/PC's Rec. To Doc. In Alt. Manner& Doc. Rationale for Disagreement on 128B |

Special Master Lopes
Lisa Ells
Page 7

| Restricted Housing | NDS timely expedited transfers | Percentage of Required NDS Transfers that Occurred Within 72 Hours |
|---|---|---|
| Restricted Housing | Percentage of Unclothed Body Searches Conducted in a Private Area | Percentage of Staff Who Report Unclothed Body Searches Conducted in a Private Area |
| Restricted Housing | Number of EOP and CCCMS Patients in ASU | Number of EOP and CCCMS Patients in ASU |
| Restricted Housing | Inmates Who Received ASU MH Guide | Percentage of ASU Inmate Who Received an ASU MH Guide |
| Restricted Housing | RVR MH Assessments Where All Documentation Requirements Were Met | RVR Assessments where Documentation Requirements were Met |
| Restricted Housing | Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs | Number of RVRs |
| Patient Safety | Percentage of Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria | Percentage of Clinical Restraint Occurrences Meetings All of the Audit Criteria |

Sincerely,

Nick Weber

*/s/ Nick Weber*

Attorney
CDCR
Office of Legal Affairs

ACTIVATION SCHEDULE
INDICATOR STATUS – REPORT A (2022 Q3)
as of 9/30/2022

INDICATOR STATUS – REPORT A provides information on each indicator's progress through the data remediation process.

| # | Item# | Provisional Key Indicator | INITIAL DOCUMENTATION PREPARATION Begin Date Prep Start | INITIAL DOCUMENTATION PREPARATION Completion Date Internal Methods Completed (max) | DOCUMENTATION REVIEWED WITH STAKEHOLDERS Begin Date SME/Ror review Start or the BRMR Start (min BRMR start date) | DOCUMENTATION REVIEWED WITH STAKEHOLDERS Completion Date BRMR Completion date or SME/Ror review date (max review date) | DOCUMENTATION UPDATED AND APPROVED BY SME Begin Date CAfC start date (min) | DOCUMENTATION UPDATED AND APPROVED BY SME Completion Date CAfC completion (max) | INDICATOR PROGRAMMING Begin Date Programming Start (min) | INDICATOR PROGRAMMING Completion Date Prod Release (max) | INDICATOR TESTING (VERIFICATION) Begin Date Verification Start (min) | INDICATOR TESTING (VERIFICATION) Completion Date Verification Completed (max) | REMEDIATED (Y/N) | STATUS | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | A11 | Timely MH Referrals | 10/15/2020 | 7/20/2022 | 7/22/2022 | | | | | | | | | Pre-BRMR | prep, pending memo |
| 2 | A12 | Timely HC Contacts | 1/5/2021 | | | | | | | | | | | Delay | prep, pending memo |
| 3 | A13 | Timely Psychiatry Contacts | 1/26/2021 | | | | | | | | | | | Delay | prep, pending memo |
| 4 | A14 | Timely SRTs | 1/5/2021 | | | | | | | | | | | Queue | Ready for SR review (in queue) |
| 5 | A15 | Treatment Refused | 1/5/2021 | 8/31/2022 | 9/10/2021 | 10/26/2021 | 11/18/2021 | 11/18/2021 | 11/24/2021 | | | | | In Queue | prep, pending memo |
| 6 | A16 | Placement of A&D Onto UCCMH re 5TP/6TH within Timeframes | 3/23/2021 | 2/18/2022 | 2/25/2022 | | 9/9/2021 | 9/17/2021 | | | | | | Dispute | 2nd level; Policy interpretation (9/24/2022) |
| 7 | A17 | Timely Transfers to CCCMS/DSH | 3/25/2021 | 8/31/2022 | | | | | | | | | | Queue | Ready for SR review (in queue) |
| 8 | A18 | Timely Admissions to Inpatient Care | 5/19/2022 | | | | | | | | | | | Queue | Clarification needed |
| 9 | A1B | Inpatient Transfer Deadlines for PIPs and DSH | 5/19/2022 | | | | | | | | | | | Discontinuation | Discontinuation - as of 8/22/2022 (DAC) |
| 10 | A21 | Effective Communication Achieved | 8/18/2021 | 9/14/2021 | 9/15/2021 | 11/20/2021 | 1/6/2022 | 1/6/2022 | 1/6/2022 | 1/6/2022 | 1/4/2022 | 5/23/2022 | Y | Remediated | Successfully Remediated 7/25/22 |
| 11 | A211 | IDTTs in a Confidential Setting | 8/18/2021 | 9/14/2021 | 9/15/2021 | 11/20/2021 | 12/22/2021 | 12/22/2021 | 2/28/2022 | 3/9/2022 | 3/7/2022 | 7/5/2022 | Y | Remediated | Successfully Remediated 7/25/22 |
| 12 | A22 | Percentage of IDTTs observed in which a health record and C-file are available | 9/21/2021 | 10/27/2021 | 11/9/2021 | 12/1/2021 | 1/27/2022 | 1/27/2022 | 5/13/2022 | 7/8/2022 | 6/7/2022 | 7/13/2022 | Y | Remediated | Successfully Remediated 7/29/22 |
| 13 | A23 | Group Treatment in a Confidential Setting | 9/20/2021 | 9/14/2021 | 9/14/2021 | 10/26/2021 | 11/18/2021 | 11/18/2021 | 11/22/2021 | 11/22/2021 | 11/22/2021 | | | In Progress | Verification in progress |
| 14 | A24 | MHCDS Patients Transferred out of Desert Institutions | 9/21/2021 | 7/8/2022 | 7/8/2022 | | | | | | | | | In Progress | BRMR |
| 15 | A2CS | Observed HC Screens Conducted in a Confidential Setting | 8/18/2021 | 9/2/2021 | 9/2/2021 | 10/12/2021 | 11/4/2021 | 11/4/2021 | 7/11/2022 | 7/28/2022 | 7/31/2022 | 7/28/2022 | Y | Remediated | Successfully Remediated 8/3/22; Status provided on 9/27/2022 |
| 16 | A16 | MH Screens | 10/12/2020 | 9/21/2021 | 10/13/2020 | 12/29/2021 | 6/24/2021 | 1/20/2022 | 9/27/2021 | 2/4/2022 | 9/15/2021 | 6/20/2022 | Y | Remediated | 3 KPIs successfully remediated 2/14/2022, 4/11/2022 and 9/9/2022 |
| 17 | A2CT | Appointments Cancelled Due to Custody | 9/1/2021 | 10/5/2021 | 5/18/2022 | 7/27/2022 | 8/4/2022 | 8/4/2022 | 8/4/2022 | | | | | In Progress | Verification in progress |
| 18 | A218 | Appointments Seen as Scheduled | 9/1/2021 | | | | | | | | | | | In Progress | Pre-SR review |
| 19 | A25D | Housing Units where 328 MH-5s are Accessible and Available to Housing Unit Staff | 9/14/2021 | 11/16/2021 | 12/8/2021 | 3/31/2021 | 9/9/2021 | 6/21/2022 | 7/11/2022 | 7/14/2022 | 7/11/2022 | 8/1/2022 | | Dispute | Dispute interpretation (7/22/2022) regarding methodology |
| 20 | A25D | Custody MH Rounds | 10/14/2021 | 1/7/2022 | 3/4/2022 | 4/20/2022 | 4/20/2022 | 4/28/2022 | 5/13/2022 | 7/14/2022 | 7/5/2022 | 8/9/2022 | Y | Remediated | Successfully Remediated 8/12/22 |
| 21 | A21 | MHODS Inmates in ASU transferred within policy requirements | | | | | | | | | | | | Delay | Prep. Delay - Clarification needed |
| 22 | SP1 | Timely Completion of 5/8 Day follow Ups from MHCB, alternative housing and DSH/PIPs, MHCB, Alternative Housing, DSH, and PIPs | 3/31/2021 | 2/5/2021 | 2/5/2021 | 1/25/2022 | 3/24/2022 | 3/24/2022 | 4/25/2022 | | 4/29/2022 | | | Delay | Delay - Complete Programming/Verification |
| 23 | SP2 | Emergent/urgent Mhr referrals that result in SRASHEs | 4/8/2021 | 8/4/2022 | 8/9/2022 | | | | | | | | | Queue | On BRMR Agenda |
| 24 | SP3 | Safety planning to reduce suicide risk | | | | | | | | | | | | Queue | Delay - Crosswalk |
| 25 | SP4 | Suicide-resistant MHCBs | | | | | | | | | | | | Delay | Delay - Crosswalk |
| 26 | SP5 | APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days | 7/15/2021 | 9/21/2021 | 9/22/2021 | 2/10/2022 | 4/28/2022 | 4/28/2022 | | | | | | Pending CQIT data | Pending CQIT application and pending CAT live data |
| 27 | SP6 | SRE Review Proposed | 10/26/2021 | 4/6/2022 | | 11/13/2021 | | | | | | | | Pending CQIT data | Pre-SR Review |
| 28 | SP7 | Patients in MHCB on Continuous Direct Visual Observation | 9/18/2021 | 12/14/2021 | 12/14/2021 | 7/1/2022 | 6/9/2022 | 9/22/2022 | | | | | | Pending CQIT data | Pending CQIT data |
| 29 | SP8 | Patients in ASU Housing on continuous observation and provided suicide-resistant bed | 9/18/2021 | 3/9/2022 | 4/15/2022 | 6/8/2022 | 9/22/2022 | 9/22/2022 | 8/24/2022 | | | | | Pending CQIT data | Pending CQIT data |
| 30 | SP9 | Percentage of Inmate Nursing Discharged to which patients on suicide watch and suicide precaution received on EHRS Clearly Marked, On Time, and Documented on Correct Form | 6/2/2022 | 6/24/2022 | 6/24/2022 | | | | | | | | | In Progress | BRMR |
| 31 | SP10 | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | 8/18/2021 | 3/30/2022 | 4/29/2022 | 8/30/2022 | 8/22/2022 | 8/22/2022 | | | | | | Pending CQIT data | Completed CQIT pending CQIT data "Correct Documentation" part decommissioned as of 6/27/2022 (DAC) |
| 32 | SP11 | Housing Unit Inmate Living Areas with emergency response equipment and Inventoried Daily | 8/18/2021 | 11/9/2021 | 11/17/2021 | 4/1/2022 | 6/9/2022 | 6/9/2022 | 7/5/2022 | 7/14/2022 | 7/5/2022 | 7/20/2022 | Y | Remediated | Successfully remediated 7/29/2022; Status provided on 10/7/2022 |
| 33 | SP12 | Custody Follow-Ups for MHCB Discharges (Pro Forms) | 8/18/2021 | 12/14/2021 | 12/14/2021 | 3/18/2022 | 7/7/2022 | 7/8/2022 | | | | | | In Progress | BRMR - Interpretation/CQIT |
| 34 | SP13 | Orders Renewed with Properly Documented Observation Orders | 8/18/2021 | 12/14/2021 | 12/15/2021 | 3/18/2022 | 7/7/2022 | 7/8/2022 | | | | | | Dispute | Successfully Remediated 9/22/2022; Status provided on 10/7/2022 |
| 35 | SP14 | MHCB Records with Rationale for Limited Hours of Clothing and Bedding | 8/18/2021 | 12/14/2021 | 12/15/2021 | 12/15/2021 | 3/10/2022 | 3/10/2022 | 5/13/2022 | 7/8/2022 | 6/29/2022 | 9/8/2022 | Y | Remediated | Pending crosswalk discussion and suicide prevention audit reboot |
| 36 | SP15 | MHCB property and privileges | 8/18/2021 | 10/9/2021 | 10/7/2021 | 12/8/2021 | 3/10/2022 | 3/10/2022 | | | | | | Delay | BRMR |
| 37 | SP16 | ASU Intake Inmates Appropriately Housed | 8/18/2021 | 9/21/2021 | 9/30/2022 | 3/18/2021 | 3/10/2022 | 3/10/2022 | 5/13/2022 | 7/8/2022 | 6/29/2022 | 7/25/2022 | Y | Remediated | Successfully remediated 7/29/2022 |
| 38 | SP17 | Percentage of ASU Welfare Checks audited that were not completed on time and not staggered | 5/27/2022 | 9/21/2022 | 9/30/2022 | | | | | | | | | In Progress | Pre-SR Review |
| 39 | SP18 | Percentage of nursing staff current with SRE training | 8/18/2021 | 9/7/2021 | 9/22/2021 | 12/8/2021 | | | | | | | | In Progress | Pending Dispute on SP23 |
| 40 | SP19 | Percentage of Mental Health Staff with Suicide Prevention Training | | | | | | | | | | | | Dispute | Dispute - Policy interpretation (12/13/2021) |
| 41 | SP20 | Percentage of Custody Officers with Suicide Prevention Training | | | | | | | | | | | | Dispute | |
| 42 | SP21 | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | | | | | | | | | | | | Discontinuation | Discontinuation as of 5/19/2022 |
| 43 | SP22 | MHCB Daily Provider Checks | 3/23/2021 | 8/31/2021 | 4/15/2022 | 9/22/2021 | 8/4/2022 | 8/4/2022 | 8/29/2022 | | | 9/13/2022 | | In Progress | Programming/Verification |
| 44 | SP23 | SREs that Met All Audit Criteria | 7/15/2021 | 8/19/2021 | 8/19/2021 | 10/12/2021 | 11/4/2021 | 11/4/2021 | | | | | | Pending CQIT data | Pending CQIT data; pending CAT live data |
| 45 | SP24 | Discharges from MHCB with Clinican Review of QIC Summary (SRASHE) | 7/15/2021 | 9/14/2021 | 9/29/2021 | 2/10/2022 | 4/28/2022 | 4/28/2022 | | | | | | Pending CQIT data | Pending CQIT application and pending CAT live data |
| 46 | SP25 | Satisfactory QIM FIT Meeting | 3/4/2021 | 6/29/2022 | 7/1/2022 | | | | | | | | | In Progress | Dispute - Policy Interpretation (12/13/2021) |
| 47 | QE1 | IDTT Staffing | | | | | | | | | | | | In Progress | BRMR |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48 | 2 | QC2 | Cases with Documentation of Appropriateness of LOC Discussed for Patients Identified by 7388B as Potentially Requiring Higher LOC | 9/21/2021 | 12/7/2021 | 12/8/2021 | 2/1/2022 | 7/28/2022 | 7/28/2022 | 7/29/2022 | 8/9/2022 | 7/29/2022 | 8/17/2022 | Y | Remediated | Successfully remediated 8/19/2022 |
| 49 | 3 | QC3 | Treatment Plans with Satisfactory Documentation | 9/1/2022 | | | | | | | | | | | In Progress | Draft Review Start |
| 50 | 4 | QC4 | Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers | 7/15/2021 | 8/31/2021 | 9/2/2021 | 2/3/2022 | 7/28/2022 | 7/28/2022 | | | | | | Pending CQIT/CAT data | Pending CQIT/CAT data |
| 51 | 5 | QC5 | Treatment Plans with Documented and Implemented Pre-Release Plans | | | | | | | | | | | | Rebuild | Pending Audit revision |
| 52 | 6 | QC6 | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT | 1/5/2021 | 11/23/2021 | 12/1/2021 | 1/5/2022 | 2/16/2022 | 2/17/2022 | 5/13/2022 | 7/12/2022 | 6/29/2022 | 7/28/2022 | Y | Remediated | Successfully remediated 8/5/2022. Status provided on 10/7/2022 |
| 53 | 7 | QC7 | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT | 11/1/2021 | 11/23/2021 | 12/1/2021 | 1/5/2022 | 2/16/2022 | 2/17/2022 | 5/13/2022 | 7/12/2022 | 6/29/2022 | 7/20/2022 | Y | Remediated | Successfully remediated 8/29/2022 |
| 54 | 9 | QC9 | EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation | 9/21/2021 | 10/26/2021 | 10/27/2021 | 12/22/2021 | 2/3/2022 | 2/3/2022 | 5/13/2022 | 7/12/2022 | 6/29/2022 | | | Pending CQIT data | Verification |
| 55 | 10 | QC10 | Primary Clinician Continuity of Care | 9/13/2021 | 6/15/2022 | 6/17/2022 | | | | | | | | | Queue | On Pre-BRMR Agenda |
| 56 | 11 | QC11 | Psychiatrist Continuity of Care | 9/13/2021 | 6/15/2022 | 6/17/2022 | | | | | | | | | Queue | On Pre-BRMR Agenda |
| 57 | 12 | QC12 | IDTTs Meeting All Audit Criteria | 9/21/2021 | 10/26/2021 | 10/27/2021 | 1/11/2022 | 1/27/2022 | 1/27/2022 | 5/13/2022 | 8/2/2022 | 7/1/2022 | 8/9/2022 | Y | Remediated | Successfully remediated 8/19/2022 |
| 58 | 1 | SC1 | Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality | 7/15/2021 | 9/21/2021 | 9/22/2021 | 11/2/2021 | 11/18/2021 | 11/18/2021 | 10/7/2022 | | | | | Pending CQIT/CAT data | Pending CAT moving to CQIT application and pending CAT live data |
| 59 | 2 | SC2 | RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation | 9/10/2021 | 10/5/2021 | 10/7/2021 | 12/22/2021 | 2/3/2022 | 2/3/2022 | 5/13/2022 | 8/1/2022 | 6/29/2022 | | | In Progress | Verification |
| 60 | 3 | SC3 | RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B | 10/6/2021 | 12/7/2021 | 12/8/2021 | 3/11/2022 | 6/9/2022 | 6/21/2022 | 7/11/2022 | 7/28/2022 | 7/11/2022 | | | Dispute | Dispute - Methodlogy/Sampling |
| 61 | 4 | SC4 | Percentage of Days Where Heat Plan was Activated, and Alternative Out of Cell Activities were Offered to Heat Alter Patients | 7/11/2022 | 8/11/2022 | 8/12/2022 | | | | | | | | | Queue | On BRMR Agenda |
| 62 | 5 | SC5 | Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM | 9/21/2021 | 11/9/2021 | 11/10/2021 | 4/15/2022 | 7/21/2022 | 7/21/2022 | 8/16/2022 | 8/25/2022 | | | | Pending CQIT data | #REF! |
| 63 | 6 | SC6 | Percentage of 128Bs Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients | 7/11/2022 | 7/27/2022 | 7/29/2022 | | | | | | | | | In Progress | Pending CQIT data |
| 64 | 7 | SC7 | Thermometer Checks Completed and Accurate | 9/10/2021 | 10/5/2021 | 10/14/2021 | 12/14/2021 | 1/6/2022 | 1/6/2022 | 5/13/2022 | 7/8/2022 | 6/28/2022 | 7/13/2022 | Y | Remediated | Successfully remediated 7/29/2022 |
| 65 | 8 | SC8 | Timely MH RVR Assessments | 9/13/2021 | | | | | | | | | | | Delay | Prep; pending memo |
| 66 | 9 | SC9 | RVRs Recommended for Mitigation That Were Mitigated | 10/6/2021 | 12/7/2021 | 12/8/2021 | 4/1/2022 | 6/23/2022 | 6/23/2022 | 7/11/2022 | 8/1/2022 | 7/11/2022 | 8/8/2022 | | Dispute | Dispute identified 4/1/2022 |
| 67 | 10 | SC10 | Use of Force involving MH Inmates | 10/6/2021 | 11/16/2021 | 12/2/2021 | 2/22/2022 | 5/12/2022 | 5/18/2022 | 8/16/2022 | 9/2/2022 | 8/29/2022 | | | In Progress | Verification |
| 68 | 11 | SC11 | Additional Use of Force (Specificity to be determined) | 10/14/2021 | 11/16/2021 | 12/2/2021 | 2/22/2022 | 5/12/2022 | 5/18/2022 | 8/16/2022 | 9/2/2022 | 9/29/2022 | | | Duplicate | Duplicate (1/1/2022) |
| 69 | 20 | MM20 | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | 3/23/2022 | 9/14/2022 | 9/23/2022 | | | | | | | | | In Progress | PreBRMR |
| 70 | 22 | MM22 | Medication Admin: Outpatient Provider New Medication Orders (Psychiatrist) | 3/23/2022 | 9/14/2022 | 9/23/2022 | | | | | | | | | In Progress | PreBRMR |
| 71 | 3 | MM3 | Diagnostic Monitoring-Antipsychotics | 12/15/2021 | 1/5/2022 | 2/11/2022 | | | | | | | | | Workgroup | Pending workgroup |
| 72 | 4 | MM4 | Diagnostic Monitoring-Clozapine | 3/16/2022 | 3/18/2022 | 3/18/2022 | | | | | | | | | Workgroup | Pending workgroup |
| 73 | 11 | MM11 | Diagnostic Monitoring-Mood Stabilizers | 3/16/2022 | 3/18/2022 | 3/18/2022 | | | | | | | | | Workgroup | Pending workgroup |
| 74 | 14 | MM14 | Diagnostic Monitoring-Antidepressants | 3/16/2022 | 3/18/2022 | 3/18/2022 | | | | | | | | | Workgroup | Pending workgroup |
| 75 | 10 | MM10 | Diagnostic Monitoring-QT Prolongation EKG 12 Months | 3/16/2022 | 3/18/2022 | 3/18/2022 | | | | | | | | | Workgroup | Pending workgroup |
| 76 | 5 | MM5 | Continuity of Meds Upon Inter-Institutional Transfer at R&R | 3/23/2022 | 4/27/2022 | 3/18/2022 | | | | | | | | | In Progress | BRMR |
| 77 | 6 | MM6 | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | 3/23/2022 | 4/27/2022 | 5/20/2022 | | | | | | | | | In Progress | BRMR |
| 78 | 7 | MM7 | Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers | 3/23/2022 | 4/27/2022 | 5/20/2022 | | | | | | | | | In Progress | BRMR |
| 79 | 8 | MM8 | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | 3/23/2022 | 4/27/2022 | 5/20/2022 | | | | | | | | | In Progress | BRMR |
| 80 | 9 | MM9 | Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH | 3/23/2022 | 4/27/2022 | 5/20/2022 | | | | | | | | | In Progress | BRMR |
| 81 | 12 | MM12 | Medication Compliance with PC 2602, Involuntary Meds: Court Order | 3/23/2022 | 4/27/2022 | 5/6/2022 | | | | | | | | | Rebuild | Delay - Rebuild |
| 82 | 13 | MM13 | Medication Compliance with PC 2602, Involuntary Meds: Med Order | 3/23/2022 | 4/27/2022 | 5/6/2022 | | | | | | | | | Rebuild | Delay - Rebuild |
| 83 | 15 | MM15 | Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here) | | | | | | | | | | | | Crosswalk | Delay - Crosswalk |
| 84 | 1 | RH1 | Placement of ASU EOPs in Appropriate Housing Within Timeframes | 3/23/2021 | 4/13/2022 | 5/13/2022 | | | | | | | | | In Progress | PreBRMR |
| 85 | 2 | RH2 | NDS timely expedited transfers | 2/24/2022 | 3/9/2022 | 4/8/2022 | 5/25/2022 | 5/25/2022 | 6/2/2022 | 8/15/2022 | 8/19/2022 | 8/16/2022 | | | In Progress | Verification |
| 86 | 3 | RH3 | Psych Tech Rounds Completed According to PG Requirements | | | | | | | | | | | | Rebuild | Delay - Audit rebuild (nursing) |
| 87 | 4 | RH4 | ASU Pre-Screens | 10/1/2020 | 10/13/2020 | 10/13/2020 | 5/6/2021 | 6/24/2021 | 6/30/2021 | 9/2/2021 | 9/14/2021 | 9/15/2021 | 2/14/2022 | Y | Duplicate | Duplicate |
| 88 | 5 | RH5 | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | 4/1/2022 | 5/18/2022 | | | | | | | | | | Decommission | Decommission as of 7/11/2022 (QAC) |
| 89 | 6 | RH6 | Percentage of ASU Screenings that Occurred Within 72 Hours of Placement of Arrival | 4/15/2021 | 8/31/2021 | 9/1/2021 | 10/26/2021 | 11/18/2021 | 11/18/2021 | 12/17/2021 | 1/27/2022 | 2/7/2022 | 3/30/2022 | Y | Duplicate | Duplicate |
| 90 | 7 | RH7 | ICCs with Mental Health Clinicians present, and relevant information provided | 9/10/2021 | 12/7/2021 | 10/27/2021 | 12/14/2021 | 1/6/2022 | 1/6/2022 | 5/13/2022 | 7/8/2022 | 6/27/2022 | 8/9/2022 | | Dispute | Dispute identified 12/14/2021 - regarding sampling and methodology. |
| 91 | 8 | RH8 | ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | 9/10/2021 | 12/1/2021 | | | | | | | | | | Decommission | Decommission as of 4/4/2022 (QAC) |
| 92 | 9 | RH9 | (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices | 10/12/2021 | 1/26/2022 | 3/11/2022 | 7/28/2022 | 7/28/2022 | 8/4/2022 | | | | | | Pending CQIT data | Pending CQIT data |
| 93 | 10 | RH10 | Percentage of Unclothed Body Searches Conducted in a Private Area | 10/12/2021 | 1/19/2022 | 2/25/2022 | 3/30/2022 | 3/30/2022 | 4/7/2022 | 5/13/2022 | 7/14/2022 | 7/22/2022 | 8/23/2022 | | Dispute | Verification Completed but there is a dispute regarding methodology. |
| 94 | 11 | RH11 | ASU Screens that are Conducted in Confidential Settings | 11/22/2021 | 8/17/2022 | 8/19/2022 | 9/14/2022 | 9/14/2022 | 9/22/2022 | | | | | | Pending CQIT data | Pending CQIT data |
| 95 | 12 | RH12 | ASU Out of Cell Time Offered | 9/10/2021 | 2/23/2022 | 3/25/2022 | | 4/27/2022 | 5/5/2022 | 9/12/2022 | 9/19/2022 | 9/16/2022 | | | Dispute | Dispute identified 4/20/2022 - regarding measurement indicators. Latest: Verification Start. |
| 96 | 13 | RH13 | Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy | 11/22/2021 | 2/23/2022 | 4/1/2022 | 5/11/2022 | 5/11/2022 | 5/19/2022 | | | | | | Pending CQIT data | Pending CQIT data |
| 97 | 14 | RH14 | Weeks in which Shower Access in ASU was Offered as Required | 9/27/2021 | 3/16/2022 | 4/22/2022 | | | | | | | | | Dispute | Dispute |
| 98 | 15 | RH15 | Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property | 11/22/2021 | 5/18/2022 | 4/8/2022 | 9/14/2022 | 6/29/2022 | 9/22/2022 | 8/15/2022 | 8/19/2022 | 8/16/2022 | | | Dispute | Earliest: BRMR Start/Latest: Verification Start. KPI split into 2 KPIs. One has a dispute. One was CAPC approved pending CQIT data. |
| 99 | 16 | RH16 | Warden Review of Cases Over 90 Days | 10/12/2021 | 9/7/2022 | 9/9/2022 | | | | | | | | | Queue | On BRMR Agenda |
| 100 | 17 | RH17 | ASU LOS for MHSDS v. Non-MHSDS Patients | | | | | | | | | | | | Delay | Prep Delay - Clarification needed |
| 101 | 18 | RH18 | EOP Hub CCII and Captain Review for LOS Over 90 Days | 10/12/2021 | 9/7/2022 | 9/9/2022 | | | | | | | | | Queue | On BRMR Agenda |
| 102 | 19 | RH19 | Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed on Time | 10/12/2021 | | | | | | | | | | | In Progress | Prep |
| 103 | 1/20/1900 | RH20 | ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria | 11/22/2021 | 2/2/2022 | 2/18/2022 | | | | | | | | | Decommission | Decommission - as of 6/6/2022 |
| 104 | 1/21/1900 | RH21 | Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival | 10/14/2021 | 1/7/2022 | 6/3/2022 | 9/14/2022 | 9/14/2022 | 9/22/2022 | | | | | | Pending CQIT data | Pending CQIT data |
| 105 | 1/22/1900 | RH22 | Number of EOP and CCCMS Patients in ASU | 4/20/2022 | 5/11/2022 | | | | | | | | | | Delay | Prep Delay - Clarification needed |
| 106 | 1/23/1900 | RH23 | Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors | | | | | | | | | | | | Decommission | Decommission - as of 6/6/2022 |
| 107 | 24 | RH24 | High Refusers Due to Custody Reasons with Documented Plan of Action | 9/10/2021 | 10/12/2021 | 10/13/2021 | 3/4/2022 | 5/26/2022 | 5/26/2022 | | | | | | Pending CQIT data | Pending CQIT data |
| 108 | 25 | RH25 | High Refusers in which 128B was Completed | 9/10/2021 | 10/12/2021 | 10/13/2021 | 3/4/2022 | 5/26/2022 | 5/26/2022 | | | | | | Pending CQIT data | Pending CQIT data |

| # | | Code | Description | Status | Y | Notes |
|---|---|---|---|---|---|---|
| 100 | 26 | RH26 | Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Calendar Days | In Progress | | Pending CQAC discussion Pre-BIMR |
| 110 | 27 | RH27 | Inmates Who Received ASU MH Rounds | In Progress | | Verification |
| 111 | 28 | RH28 | Percentage of Flash Fresh Rounds Documentations That Meets All Audit Criteria | Rebuild | | Delay - Audit rebuild (rscoring) |
| 112 | 29 | RH29 | Psych Tech Rounds Where: EC and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as indicated | Rebuild | | Delay - Audit rebuild (rscoring) |
| 113 | 30 | RH30 | Percentage of EOPs Observed in which a Health Record and Crite were Available | Duplicate | Y | Duplicate |
| 114 | 31 | RH31 | Percentage of Peace Officers Observed to Carry the CPR Mouth Shield | Remediated | Y | Successfully remediated 8/5/2022 |
| 115 | 32 | RH32 | Percentage of Eligible MHSDS Patients Receiving Milestone Credits | In Progress | | Prep |
| 116 | 33 | RH33 | RVR MH Assessments Where All Documentation Requirements Were Met | Pending CQIT data | | Pending CAT moving to CQIT application and pending CAT live data |
| 117 | 34 | RH34 | RVR MH Assessments Conducted in Private Setting | Pending CQIT data | | Verification |
| 118 | 35 | RH35 | Use of Force MH Assessments Meeting Documentation Requirements | In Progress | | Pending CAT moving to CQIT application and pending CAT live data |
| 119 | 36 | RH36 | Patients Discharged from DDH with Classification Caseworx Completed Prior to Transfer When Required | Decommission | | Decommission as of 6/16/2022 |
| 120 | 37 | RH37 | Compare Percent of Inmate Overall that Received PVRs with Percentage of MH Inmates that Received PVRs | Pending CQIT data | | CQAC approved. Pending CQIT data |
| 121 | 38 | RH38 | Percentage of MH-1s required completed prior to ASU placement | Duplicate | Y | Duplicate; see ASU Pre-Screen (1/1/2022) |
| 122 | 1 | PS1 | Number of Suicides of Heat Related Illnesses Occurring in MHSDS | In Progress | | Pending CQIT data |
| 123 | 2 | PS2 | Percentage of Clinical Restraint Occurrences Meetings (sic) All of the Audit Criteria | Pending CQIT data | | Pending CQIT data |
| 124 | 3 | PS3 | Seclusion, Frequency, and Duration | In Progress | | Prep |
| 125 | | UXM1 | MHCB Clinical Stays within Timeframes | In Progress | | Programming and Verification |
| 126 | 1/21/900 | UXM2 | Percentage of mental health DHU stays 48 hours or less | Decommission | | Decommission as of 1/1/2022 |
| 127 | 3 | UXM3 | Timely admission to MHCB | In Progress | | SMOH review |
| 128 | 1 | FIC1 | Adequate Group Treatment Space | Dispute | | Verification completed and passed but Plaintiff has a dispute |
| 129 | 1 | FIC2 | Adequate IOTT Space | Dispute | | Verification completed and passed but Plaintiff has a dispute |
| 130 | 3 | FIC3 | Adequate Individual Treatment Space | Dispute | | Verification completed and passed but Plaintiff has a dispute |
| 131 | 1 | SPTSR1 | Chief Psychiatrist | Queue | | BIMR Agenda |
| 132 | 2 | SPTSR2 | Chief Psychologist, Correctional Facility | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 133 | 3 | SPTSR3 | Senior Psychologist, Correctional Facility (Supervisor) | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 134 | 4 | SPTSR4 | Senior Psychiatrist (Supervisor), Correctional and Rehabilitation Services (Safety) | Queue | | BIMR Agenda |
| 135 | 5 | SPTSR5 | Supervising Psychiatric Social Worker I, Correctional Facility | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 136 | 6 | SPTSR6 | Senior Psychiatrist (Specialist), Correctional and Rehabilitation Services (Safety) | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 137 | 7 | SPTSR7 | Senior Psychologist, Correctional Facility (Specialist) | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 138 | 8 | SPTSR8 | Staff Psychiatrist, Correctional and Rehabilitation Services (Safety) | Queue | | BIMR Agenda |
| 139 | 9 | SPTSR9 | Recreation Therapist, Correctional Facility | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 140 | 10 | SPTSR10 | Psychologist-Clinical, Correctional Facility | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 141 | 11 | SPTSR11 | Clinical Social Worker (Health/Correctional Facility) – Safety | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 142 | 1/12/900 | SPTSR12 | Staff that report having computers for all out of cell clinical appointments | Decommission | | Decommission as of 1/1/2022 |
| 143 | 1/13/900 | SPTSR13 | Percentage of Healthcare Staff Current with suicide prevention training (duplicate from SP) | Duplicate | | Duplicate |
| 144 | 14 | SPTSR14 | Allocated and filled positions | In Progress | | Going back to Prep, pending BIMR discussion on the psychiatrist position related KPI |
| 145 | 14 | A&HPS | Sustainability Process | In Progress | | placeholder |
| 146 | 1 | A&HPS | ASU EOP Hub Certification | Crosswalk | | placeholder |
| 147 | 2 | A&HPS6 | PIP (To be developed) | Crosswalk | | placeholder |
| 148 | 4 | A&HPS | Custody and Mental Health Partnership Collaboration | Crosswalk | | |

## Report B
## 2022 Q3
## as of 9/30/2022

| Cut off date | Year + Quarter | INITIAL DOCUMENTATION PREPARATION | | | | DOCUMENTATION REVIEWED WITH STAKEHOLDERS (VALIDATION) | | | | DOCUMENTATION UPDATED AND APPROVED BY MH | | | | INDICATOR PROGRAMING | | | | INDICATOR TESTING (VERIFICATION) | | | | TOTAL # INDICATORS REMEDIATED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Start | | Completed | | Start | | Completed | | Start | | Completed | | Start | | Completed | | Start | | Completed | | |
| | | 1. Planned | 1. Actual | 1. Planned | 1. Actual | 2. Planned | 2. Actual | 2. Planned | 2. Actual | 3. Planned | 3. Actual | 3. Planned | 3. Actual | 4. Planned | 4. Actual | 4. Planned | 4. Actual | 5. Planned | 5. Acutal | 5. Planned | 5. Actual | |
| 9/24/2021 | 2021 Q3 | 6 | 67 | 0 | 18 | 0 | 15 | 0 | 4 | 0 | 3 | 0 | 3 | 0 | 3 | 0 | 3 | 0 | 3 | 0 | 0 | 0 |
| 12/31/2021 | 2021 Q4 | 26 | 93 | 18 | 44 | 18 | 42 | 10 | 21 | 10 | 12 | 9 | 12 | 9 | 5 | 6 | 4 | 6 | 3 | 0 | 0 | 0 |
| 3/25/2022 | 2022 Q1 | 44 | 99 | 35 | 58 | 35 | 48 | 28 | 40 | 28 | 24 | 26 | 26 | 26 | 8 | 24 | 7 | 24 | 7 | 15 | 3 | 2 |
| 6/24/2022 | 2022 Q2 | 63 | 112 | 54 | 72 | 54 | 69 | 47 | 49 | 47 | 42 | 46 | 41 | 46 | 29 | 43 | 14 | 43 | 18 | 34 | 6 | 4 |
| 9/30/2022 | 2022 Q3 | 84 | 112 | 75 | 94 | 75 | 88 | 68 | 58 | 68 | 57 | 66 | 55 | 66 | 39 | 63 | 35 | 63 | 37 | 54 | 25 | 19 |

# EXHIBIT E

**R B**
**G G**    **ROSEN BIEN**
**GALVAN & GRUNFELD** LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

November 18, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

Nicholas Weber
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov

Re:     *Coleman v. Newsom*: Plaintiffs' Response to CDCR Update on Data
         Remediation Process
         <u>Our File No. 0489-03</u>

Dear Nick:

        We write in response to your October 31, 2022 letter to the Special Master and
Plaintiff's counsel.

**1.      Data Remediation Progress Report**

        Your letter states that as of September 30, 2022, we were approximately twenty
three weeks behind schedule. Your letter also states that we must complete 1.9 indicators
in BRMR each week to meet the December 2023 completion date.

        We agree that the parties and the Special Master team must work collaboratively
to identify ways to increase the rate that indicators are reviewed during the validation step
of data remediation. Indeed, we have been working towards that goal by (1) adding
additional BRMR meetings;[1] (2) allowing numerous indicators to proceed through the
coding step notwithstanding outstanding disputes; (3) resolving disputes wherever
possible via email to save time in meetings; (4) employing creative solutions (e.g., policy
revision) to resolve disputes in Level 1. The Special Master and the Secretary also
recently provided feedback on disputes that were pending in Level 2, which will aid in
moving those items along. Finally, we understand that Dr. Cartwright and Dr. Potter

---

[1] Plaintiffs and the Special Master team proposed adding an additional weekly BRMR
meeting, but Defendants requested to lower the frequency to once every other week. We
presume this is due to Defendants' staffing limitations.

Nicholas Weber
November 18, 2022
Page 2

have begun meeting more frequently to ensure there is mutual agreement regarding Report B's methodology and the areas where the parties should prioritize their acceleration efforts.

Nonetheless, your letter does not acknowledge that the third Quarter of 2022 was the first time since starting this process that the proposed timelines were not adhered to in the validation step (*see* column titled "Documentation Reviewed with Stakeholders (Validation)" in Report B). This omission is critical, because Report B shows that the BRMR and dispute resolution steps are not the only sources of delay. Accordingly, Defendants must commit to enhancing their collaboration with the Special Master team and allocating sufficient resources to ensure that all steps in the process are sped up (these steps are: "documentation updated and approved by MH," "indicator programming," and "indicator testing (verification)," *see* Report B).

Your letter also does not acknowledge that there are currently eleven[2] disputes regarding sample size that are pending before the Quality Assurance Certification (QAC) Workgroup. Many of these issues have been pending for months, and it is not clear what has caused the delay. Other items not pending QAC have similarly been on hold for many months due to delays in Defendants' internal processes. For example, despite submitting comments on the five diagnostic monitoring measures in February 2022 and discussing them in four BRMR meetings in March 2022, Defendants took those indicators back for internal discussions and reworking that lasted seven full months, before bringing them back to BRMR just recently in late October. We understand that Defendants caused much of this delay by not providing a revised MAPIP proposal to the Special Master team for review. Other items on the BRMR agenda have been on hold for months due to pending internal discussions, such as the MH Observation Reporting Tool indicator. Neither Report B nor your letter acknowledges these types of delays. It is important to address the cause of these issues as well as focusing on BRMR productivity.

Another area on which Defendants should focus is to proactively address documentation deficiencies, such as typographical errors and other consistency issues that cause undue confusion and waste time during stakeholder review and BRMR meetings. For example, the MM20 Medication Administration Chronic Care Medications Historical Administration (psychiatrist prescribed medication) and MM22 Medication Administration Outpatient Provider New Medication Orders (PSYT Prescribed Meds) indicators had numerous problems in the documentation that made them nearly incoherent. Upon revisiting the documentation in BRMR in our November 1 meeting, it became apparent that Defendants shared our concerns and may end up

---

[2] This number comes from the updated dispute log that Kerry Walsh circulated to the parties on November 14, 2022.

[4185707.4]

Nicholas Weber
November 18, 2022
Page 3

proposing to decommission these two indicators altogether.  As we and the Special Master team have requested numerous times, CDCR must obtain review from a technical writer for all documentation to the fullest possible extent.  It would save time and improve accuracy to conduct such reviews both during the initial documentation preparation step, as well as after all changes have been made post-BRMR.

We all have a common goal of meeting the Court's December 2023 deadline.  We appreciate Defendants' collaboration in the BRMR and Level 1 dispute resolution meetings.  We believe that by continuing to foster a focused, practical, and collaborative environment in these meetings, we will maximize efficiency and limit disputes.  We look forward to continuing to work together in this process.

2.    **Indicators to Decommission and Those That Are Duplicative**

Below are Plaintiffs' responses to Defendants' recommendations to decommission certain indicators and remove duplicative indicators from the Provisional List of Key Indicators.

A.    **Decommission List**

| Defendants' Decommission List (copied from pages 2-3 of your letter) | | | Plaintiffs' Responses |
|---|---|---|---|
| Decommission | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | This indicator measures whether the ASU post screen refusal results in a consult. Timeliness of post-refusal referrals is now measured in the timely MH referral indicator. | *This indicator has not gone through Stakeholder review, and Defendants have not provided the business rule(s) or methodology. Please provide this indicator's documentation so that we can opine on whether decommissioning is appropriate.* |
| Decommission | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | As noted in Section 3, below, CDCR is decommissioning this indicator and splitting much of it into two indicators. A piece of the old indicator – whether the correct documentation is used – is recommended for decommissioning as it | *Agree.* |

Nicholas Weber
November 18, 2022
Page 4

| | | pre-dates EHRS implementation. | |
|---|---|---|---|
| Decommission | Inpatient Transfer Deadlines for PIPs and DSH | The more relevant indicator is timely admission to inpatient care. | *When Defendants previously sought to eliminate this indicator, the Court denied the request.  See July 1, 2021 Order, ECF No. 7216 at 5-6 ("[D]efendants use conditional language, i.e., 'seem to measure' or 'if . . . then,' in describing the alleged duplication. None of the [indicators] is characterized by identical language.  Given this, the court cannot find these items are in fact duplicative.").  The Court ordered the Special Master to review these indicators over the course of the current monitoring round to determine if they truly are duplicates.  See id. at 6.*<br><br>*Accordingly, we request that CDCR provide documentation for both of these indicators so that we can opine on whether* decommissioning the *Inpatient Transfer Deadlines for PIPs and DSH indicator is appropriate.  It is impossible to discern the difference between the two indicators from the titles alone.* |
| Decommission | Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required | CDCR cannot monitor case work completed at DSH. This is not a CDCR function. | *Please provide the documentation for the indicator that CDCR wants to decommission.  Even if CDCR is not responsible for the casework completed by DSH, it could certainly measure whether patients who are returned to CDCR custody have the required casework.  Also, does DSH audit this in its CQIT process?* |

Nicholas Weber
November 18, 2022
Page 5

| Decommission | ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria | These should be decommissioned and replaced with a new CMHPP huddle indicator | *We agree, subject to agreement on the appropriate scope of the new CMHPP indicator(s).  As the Court has ordered, the Special Master must finalize all placeholders from the Provisional List of Key Indicators (ECF No. 7151) by the end of the Twenty-Ninth Monitoring Round.  See July 1, 2021 Order, ECF No. 7216 at 8. One of these placeholders is "Custody and Mental Health Partnership Collaboration," and presumably would incorporate a measurement of the morning meetings that are part of the CMHPP process.  See id. at 7, n. 4.* |
|---|---|---|---|
| Decommission | Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors | DAI now monitors Guard One rounds via the Guard One report that measures if rounds were completed timely | *The* Security Welfare Monitoring System *indicator that we have reviewed in BRMR only looks at timeliness of Guard One checks in segregation units (using automated SOMS data), while the* Custody Follow Ups 7497 Forms *indicator (also reviewed in BRMR) excludes segregation settings from its rule population because Guard One, rather than paper forms, are used in those settings.  Accordingly, it is not clear whether custodial 5-day follow ups in segregation are currently being measured anywhere.  Is that Defendants' understanding?  We are concerned that decommissioning this indicator may result in information about 5-day custody follow ups in segregation not being measured.* |

Nicholas Weber
November 18, 2022
Page 6

| Decommission | ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | This measures an outdated process now that Guard One rounds extend beyond the first twenty-one days in ASU. | *For the reasons noted above, please provide the documentation so we can opine on whether the* Security Welfare Monitoring System *indicator that has gone through BRMR sufficiently covers this. In particular, it is not clear that the 72 hour requirement is being measured elsewhere.* |
|---|---|---|---|
| Decommission | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | This title appeared on the provisional list but does correspond with any known CQI indicator | *We do not agree that the lack of pre-existing indicators is a basis for decommissioning. The Court has previously overruled Defendants' objections to placeholder items on the Provisional List of Key Indicators on similar grounds.* See *July 1, 2021 Order, ECF No. 7216 at 8 ("Defendants have not demonstrated how the eight proposed items they identify on the Special Master's list exceed the scope of indicators that must be included on the final list. Their objection is overruled for this reason.").* |
| Decommission | Percentage of mental health OHU stays 48 hours or less | MH OHUs no longer exist | *As noted above, please provide documentation for this indicator so we can appropriately assess CDCR's decommission request.* |
| Decommission | Staff that report having computers for all out of cell clinical appointments. | All staff have assigned computers now that EHRS is active | *Although the rationale for decommissioning this indicator seems reasonable, we need to better understand how computer issues are documented/monitored during the Special Master's monitoring rounds before we can agree.* |

[4185707.4]

Nicholas Weber
November 18, 2022
Page 7

### B.    Duplicates

We are unclear what exactly CDCR is suggesting in the chart on pages 3-4 of your letter, including what each column represents.  It appears that CDCR has discussed this in QAC and is using shorthand to describe the status, but further explanation is required for us to provide an opinion.  Please walk us through each proposal at an upcoming meeting so we can provide a response.

Moreover, the Court already denied Defendants' request to eliminate some of these indicators in the July 1, 2021 Order.  *See* ECF No. 7216 at 5-6.  Specifically, Defendants already requested that the *Percentage of MH-7s required completed prior to ASU placement* indicator be eliminated.  The Court denied the request, finding "defendants use conditional language, i.e., 'seem to measure' or 'if . . . then,' in describing the alleged duplication.  None of the [indicators] is characterized by identical language.  Given this, the court cannot find these items are in fact duplicative." *Id.* at 6.

Defendants also requested that the *Percentage of Health Care Staff with Suicide Prevention Training* indicator be eliminated, but the Court held: "The … indicators on the list appear under two separate topics on the proposed indicator list.  Given their inclusion under two separate topics, the court cannot determine from this record whether they are duplicative or, instead, intended to capture different information related to the specific topic under which they are listed." *Id.*  The Court ordered that "[o]ver the course of the upcoming monitoring round, the Special Master shall review [the] indicators to which defendants object as duplicative, and shall recommend adoption of a final list of key indicators that eliminates all duplications." *Id.*

As to the indicator titled "Additional Use of Force (Specificity to be determined)" listed in the chart on page 4 of your letter, this is one of the placeholder items from the Provisional List of Key Indicators.  The Court overruled Defendants' objection to this specific placeholder item in July 2021 and "direct[ed] the Special Master to finalize these indicators, without delaying the monitoring process, by the end of the Twenty-Ninth Monitoring Round." *Id.* at 7 n.4 & 8.

### 3.    Cross-Walk

Below are questions regarding the cross-walk of indicators on pages 4-7 of your letter that purports to show the indicators from the Provisional List of Key Indicators that CDCR has split into new indicators or for which CDCR has updated the title:

First, why do some of the updated names that CDCR has proposed start with "Percentage of" while others do not?  Has CDCR worked with a technical writer to ensure all indicators that require this wording in the title actually have it?

[4185707.4]

Nicholas Weber
November 18, 2022
Page 8

Second, the updated name for the indicator titled *EOP IDTTs Discussion of Clinical Appropriateness for Work, Education and Accommodation Addressed* (page 5 of your letter) is awkwardly worded. Please consider revising, for example, "EOP IDTTs Addressing Accommodations and Clinical Appropriateness for Work and Education."

Third, on page 6 of your letter, the description of the NDS indicators is incorrect. The indicators for tracking property and phone calls are now two separate indicators: (1) *Percentage of Weeks Where NDS patients offered required phone calls*; and (2) *Percentage of Units that Have Tracking System for Issuance of Property for NDS Patients*.

Fourth, the updated title for the RVR indicator at the bottom of page 6 of your letter is awkwardly worded. Please consider revising, for example, "RVR MHAs Where Captain Disagreed With Mitigation and Documented Rationale."

Fifth, the indicator titled *Percentage of ASU Inmate Who Received an ASU MH Guide* on page 7 is missing an "s" on "Inmate." We believe CDCR has already corrected this issue in the documentation on Sharepoint per our feedback, but please verify.

Sixth, the wording for RVR mental health assessments (MHAs) is not consistent throughout CDCR's proposed updated indicator titles; some titles use "MHAs," some use "MH Assessment," and others use "RVR Assessments." CDCR should select one form and apply it consistently. Given that the commonly-used acronym "MHA" is the shortest of these options, it may make most sense to use this form.

Finally, the proposed updated title of *Number of RVRs* could be clarified to better match the original title on the Provisional List of Key Indicators (which was *Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs*"). For example, CDCR could use: "RVRs Issued to MH and non-MH Inmates."

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

[4185707.4]

Nicholas Weber
November 18, 2022
Page 9

We look forward to discussing these matters at an upcoming meeting.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:   Cara E. Trapani

CET:cg

cc:   *Coleman* Co-counsel             Namrata Kotwani
      *Coleman* Special Master Team    Damon McClain
      Carrie Stafford                  Samantha Wolff
      Melissa Bentz                    Paul Mello
      Dillon Hockerson                 Nina Raddatz
      Sundeep Thind                    Brent Reden
      Elise Thorn                      Kris Kent

[4185707.4]

# EXHIBIT F

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



December 23, 2022

Cara Trapani
Rosen Bien Galvan and Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105

Cara,

I write in response to sections II and III of your November 18, 2022 letter regarding indicators that should be decommissions, are duplicative, or have been renamed (crosswalk).

    I.      Indicators to Decommission and those that are Duplicative

        A.  Decommission List

At the outset, Plaintiffs request documentation for several indicators before they can opine whether they should be decommissioned.  CDCR has not prepared documentation for irrelevant or duplicative indicators.  CDCR seeks to avoid unnecessarily preparing documentation and presenting them through stakeholder review by reaching an agreement to decommission these indicators.

Below, CDCR provides responses for several indicator in order to help explain better why the indicators should be decommissioned.

           i.      Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within Five Working Days

Plaintiffs request documentation for "Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within Five Working Days" before opining on whether decommissioning it is appropriate.  (Plaintiffs' letter at 3.)  There is no documentation for this indicator as it measures a workflow that is no longer in operation.   It originally ensured that CDCR did not unduly delay a mental health referral following a positive ASU GP screen.  Today, with the use of EHRS, those processes have been replaced and are measured by the ASU Pre-Screen (RH4) indicator and the Mental Health Referral (AC1) indicator.  When a patient refuses the mental health screen prior to their placement in ASU, it results in a Routine referral to MH.  Nursing places that referral in EHRS, and an order goes to mental health to be scheduled.

          ii.      Inpatient Transfer Deadlines for PIPs and DSH

Plaintiffs request documentation for "Inpatient Transfer Deadlines for PIPs and DSH) before opining on whether decommissioning it is appropriate.  (Plaintiffs' letter at 4.)  The Inpatient

Transfer Deadlines for PIP and DSH (AC9) indicator measures the same thing as the timely admission to inpatient care indicator (AC8). CDCR has not prepped documentation for AC9. CDCR measures timely admission to inpatient care using its monthly filed inpatient compliance report which will be brought to BRMR in 2023.

iii.     Patients Discharged from DSH with Classification Casework Completed Prior to Transfer when Required.

Plaintiffs request documentation for "Patients Discharged from DSH with Classification Casework Completed Prior to Transfer when Required" before opining on whether decommissioning it is appropriate. (Plaintiffs' letter at 4.) Plaintiffs also suggest that CDCR could measure DSH's compliance with required casework. No documentation exists for this indicator. Even if CDCR had the ability to measure whether DSH completed the case work, CDCR has no enforcement mechanism and there cannot be a compliance threshold assigned to such an indicator. Nor is CDCR in the best position to audit DSH as CDCR is not familiar with or in charge of DSH's casework requirements or processes. Thus, no documentation can be designed for this indicator as it is not a CDCR function. Questions regarding DSH's CQI tool should be referred to DSH.

iv.     Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors

Plaintiffs ask whether "5-day custody follow ups in segregation [are] being measured" anywhere. (Plaintiffs' letter at 5.) CDCR is unsure what Plaintiffs mean by "5-day custody follow ups" because there is no five day follow up for custody; rather, five day follow ups are conducted by clinicians for patients recently discharged from crisis beds, etc.. Custodial welfare checks are generally conducted for the first twenty-four hours. For custodial welfare checks conducted in a segregation unit, CDCR relies on Guard One to replace the 7497 process. Custodial welfare checks outside of segregation use the 7497 process and are measured through SP12, Custody Follow Ups for MHCB Discharges/7497 Forms. Clinical five-day follow ups are measured through another indicator (SP1), Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs, which is unrelated to this custody indicator which CDCR wishes to decommission.

v.     ASU Inmates on 21-Day Intake Status with Markers Posted for Initial 72 Hours

Plaintiffs request documentation for "ASU Inmates on 21-Day Intake Status with Markers Posted for Initial 72 Hours" before opining on whether decommissioning it is appropriate. (Plaintiffs' letter at 6.) They state that it is not clear that the 72 hour requirement for markers being posted is being measured elsewhere. There is no documentation for this indicator. Additionally, markers are no longer posted for the first 72-hours. DAI utilizes SOMS to determine how long a patient is in ASU and "INTAKE" is stenciled on ASU intake cells.

Page 3

      vi.      Emergency Response Procedures for Self-Injurious Behaviors and Suicide Attempts

Plaintiffs state that they do not agree to decommission this indicator because, apparently, the indicator does not exist. (Plaintiffs' letter at 6.) However, Defendants will not guess what "emergency response procedures for self-injurious behaviors and suicide attempts" the court believes should be measured. Absent specificity regarding the court ordered policy or regulation, CDCR cannot develop an indicator to measure this vague and open ended item. If Plaintiffs have a proposal for a new indicator, they should raise it to the Special Master for his consideration on the final key indicator list.

      vii.     Percentage of Mental Health OHU Stays 48 Hours or Less

Plaintiffs request documentation for "Percentage of Mental Health OHU Stays 48 Hours or Less" before opining on whether decommissioning it is appropriate. (Plaintiffs' letter at 6.) But Plaintiffs are aware that Mental Health OHUs no longer exist as does the old policy which allowed MHOHU stays in excess of 24 hours for patients referred to a crisis bed. CDCR eliminated the MHOHU rule in early 2015 and now only allow patients to wait up to twenty-four hours for crisis bed placement in alternative housing. As the programs no longer exist, there can be no policy, no business rule, and no documentation. CDCR will measure timely admission to crisis beds, however, with URM3 which will be presented to stakeholders early next year.

    B. Duplicates

The duplicates chart in my October 31 letter shows which indicators should be decommissioned because they are duplicative of other indicators already going through the data remediation process, which are noted in the third column. There are no particularized proposal to discuss at a meeting. Rather, CDCR requests that the Special Master's remove all duplicates from his anticipated revised list of key indicators. Because each indicator on the list is duplicative of others, the indicators should be removed from the final list of key indicators and CDCR should not be compelled to prepare, review, program, and verify these duplicative indicators.

CDCR remains hopeful that Plaintiffs will not oppose this request. CDCR disagrees with Plaintiffs' reliance on the court's July 1, 2021 order denying CDCR's initial request to remove duplicate indicators. That same court order acknowledged that "Defendants have identified a potential issue[] for the Special Master to carefully consider" and required him, during his monitoring round, to review duplicative indicators and recommend a final list "that eliminates all duplications." (ECF No. 7216 at 6.) CDCR has met with the Special Master's team to discuss these duplicative indicators and memorialized them in my October 31, 2022 letter. Plaintiffs' current opposition to removing duplicates may contribute to unnecessary delays in this project.

First, Plaintiffs oppose removing the Percentage of MH-7s Required Completed Prior to ASU Placement indicator. But an MH-7 is an ASU Pre-Screen – which itself is an indicator that has since been fully remediated. (RH4, <u>KPI - ASU Pre-Screen (sharepoint.com)</u>.) It is not beneficial to develop a duplicative indicator to the ASU Pre-Screen indicator simply because it appears on the 2021 provisional key indicator list.

Page 4

Second, Plaintiffs oppose removing Percentage of Health Care Staff with Suicide Prevention Training which can be found twice on the key indicator list in both the suicide prevention and the staff/personnel training sections.[1]  Regardless of where (or how many times) the indicator is listed, nothing changes the fact that there is only one policy on suicide prevention training and only one indicator is necessary to measure compliance.  If Plaintiffs believe that the indicators are not duplicative of each other, they should explain how the indicators are different and disclose the other indicator's business rules, policy basis, sample size, audit technique, and other methodology for comparison.

Third, Plaintiffs oppose removing a "placeholder" titled Additional use of Force (Specificity to be Determined).  But this item has also been resolved.  CDCR has developed an indicator measuring use of force involving mental health inmates.  The indicator went through BRMR on December 15, 2021 and includes a drill down allowing the user to look at both immediate and controlled use of force, including by level of care.  The indicator was released on September 2, 2022.  (SC10, Use of Force Involving MH Inmates (sharepoint.com).)  The "placeholder" indicator is no longer necessary.  Suggestions for any new indicators at this point should be made to the Special Master for consideration in the final key indicator list.

II.    Cross-Walk

Plaintiffs' seven questions regarding the cross-walk are addressed below.

First, Plaintiffs ask why some updated names of indicators start with "percentage of" while others do not.  CDCR agrees that standardizing the titles of indicators is necessary, but would prefer to do that once BRMR is complete as all indicators will need to be reviewed.  For instance, some indicators measure a "percentage" while others measures a "count."

Second, Plaintiffs recommend rewording "EOP IDTTs Discussion of Clinical Appropriateness for Work, Education and Accommodation Addressed" to "EOP IDTTs Addressing Accommodations and Clinical Appropriateness for Work and Education."  CDCR accepts this change.

Third, Plaintiffs state that the description of the NDS indicator is incorrect and that it has been split into (1) Percentage of Weeks Where NDS patients offered required phone calls; and (2) Percentage of Units that Have Tracking System for Issuance of Property for NDS Patients.[2]  This is correct and will be reflected on the final indicator titles once both are approved by CACP.

Fourth, Plaintiffs suggest rewording the RVR indicator (RVRs Where the Captain Disagreed w/PC's Rec. To Doc. In Alt. Manner & Doc. Rationale for Disagreement on 128B) to "RVR MHAs where Captain Disagreed with Mitigation and Documented Rationale."  CDCR accepts this title change.

---

[1] This indicator went through stakeholder review on November 23, 2022 and will go to BRMR soon.
[2] The first indicator was approved by CAPC in September 2022 and the second is pending approval.

Page 5

Fifth, Plaintiffs recommend adding "s" to the word "inmate" in "Percentage of ASU *Inmate* Who Received an ASU MH Guide" to ensure it is plural.  CDCR will make this change.

Sixth, Plaintiffs note that the wording for RVR mental health assessments (MHAs) is not consistent throughout CDCR's proposal.  Plaintiffs recommend CDCR agree to use "MHA" as the common terminology.  CDCR will adopt MHA as the common terminology.

Seventh, Plaintiffs recommend modifying the "Number of RVRs" indicator to better align with the title on the key indicator list (comparing the number of RVRs received by MHSDS patients versus the number to non-MHSDS inmates) and recommend the title be revised to "RVRs Issued to MH and non-MH Inmates."  CDCR accepts this recommendation.


CDCR appreciates Plaintiffs' comments on these lists.  CDCR is available to meet and confer, if necessary, but requests that any meet and confer be conducted outside of scheduled BRMR meetings.


Sincerely,

Nick Weber

*/s/ Nick Weber*

Attorney
CDCR
Office of Legal Affairs

# EXHIBIT G



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

February 22, 2023

VIA ELECTRONIC MAIL ONLY

Nicholas Weber
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov

  Re: *Coleman v. Newsom*: Plaintiffs' Response to Defendants' December 23,
    2022 Letter Regarding Indicators that Should Be Decommissioned, Are
    Duplicative, or Have Been Renamed
    Our File No. 0489-03

Dear Nick:

  On October 31, 2022, you wrote to the Special Master and Plaintiffs' counsel
proposing a list of indicators that should be decommissioned or declared duplicative of
others already on the Court's Provisional List of Key Indicators (ECF No. 7151 at 21), as
well as a "cross walk" list of indicators from the Provisional List of Key Indicators with
updated names. Plaintiffs responded on November 18, 2022, and Defendants replied on
December 23, 2022. This letter responds to Defendants' December 23, 2022 letter.

**I. Indicators to Decommission and those that are Duplicative**

  As a general matter, we are loathe to agree to decommission or declare duplicative
indicators from the Court's Provisional List of Key Indicators based solely on their titles.
We have witnessed on multiple occasions Defendants' edits to indicator titles in BRMR
because the titles did not reflect what was actually being measured. It is our
understanding from Defendants' representations in BRMR that all of the items they have
agreed should be on the key indicator list are actual existing indicators or reports. *See,
e.g.*, ECF No. 7151 at 17 (explaining how the Special Master's "draft key indicators were
based on the indicators that had been used during the CQIT test period …, which had
been developed by defendants under his guidance, with input from plaintiffs"). As such,
we request that Defendants show or provide us access to the existing indicators or reports
at issue so we can make a fully informed decision before we agree to decommission or
declare the requested indicators duplicative. With that said, we offer the following
comments in order to advance the conversation.

[4230962.6]

Nicholas Weber
February 22, 2023
Page 2

     **A.**       **Decommission List**

          i.       Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within Five Working Days.

Your December 23, 2022 letter states on page 1 that this indicator measures whether "a patient who refuses the mental health screen prior to their placement in ASU" receives "a Routine referral to MH." But your October 31, 2022 letter stated that this indicator measures "whether the ASU *post* screen refusal results in a consult." Defs.' Oct. 31, 2022 Ltr. at 2 (emphasis added). Which is it?[1] You also state in your December 23 letter that the workflow this indicator purportedly measures focuses on delays in mental health referrals "following a *positive* ASU GP screen" (page 1, emphasis added), but then you go on to discuss the workflow regarding refusals. Please clarify.

Assuming this indicator is meant to measure *refusals* during the *pre*-placement screening conducted for all incarcerated people entering segregation (as opposed to the *post*-placement screening that occurs only for MHSDS patients), we have several additional questions. You write that the requirement for patients to be seen by a mental health clinician within five working days (i.e., a routine referral) if they refuse the mental health pre-placement screen prior to placement in ASU is now measured by the ASU Pre-Screen (RH4) indicator and Mental Health Referral (AC1) indicator (titled "Timely MH Referrals" on Sharepoint). Defs.' Dec. 23, 2022 Ltr. at 1. But the Business Rule documentation for the ASU Pre-Screen (RH4) does not mention anything about refusals or how they are measured in that indicator. And the Timely MH Referrals (AC1) indicator only measures whether a mental health referral results in a timely contact, not whether a referral was correctly placed for patients who *refuse* the ASU pre-screening.

In sum, it does not seem correct that the ASU Pre-Screen (RH4) and Timely MH Referrals (AC1) indicators appropriately replace the requirement that appears to be measured by the title of this indicator. If you believe we are incorrect, please provide the specific Business Rule documentation that substantiates your position. Otherwise, we request that CDCR either keep this indicator, or agree to add documentation to the ASU Pre-Screen (RH4) indicator and/or the Timely MH Referrals (AC1) indicator so that one

---

[1] *Compare* 2021 Program Guide, ECF No. 7333-1 at 127-28 ("**Pre-placement mental health screening**: All inmates are screened by medical personnel for possible suicide risk, safety concerns, and mental health problems before placement in ASU. … If an inmate screens positive on the CDCR 128-MH7, *ASU Pre-Placement Chrono*, they are referred for a mental health evaluation on an Emergent, Urgent, or Routine basis, depending on their answers to the screening questions.") (emphasis added), *with id.* at 461 ("**Post-placement screening** shall be administered to all non-Mental Health System Delivery Services patients within 72 hour of the placement in ASU. … Refusals of the screening result in Mental Health Referrals on an Urgent [24-hour] basis.") (emphasis added).

Nicholas Weber
February 22, 2023
Page 3

or both measure whether nurses appropriately enter a Routine mental health referral for incarcerated people who refuse the ASU pre-screen.

        ii.      Inpatient Transfer Deadlines for PIPs and DSH

If the Inpatient Transfer Deadlines for PIPs and DSH (AC9) indicator is identical to the Timely Admissions to Inpatient Care indicator (AC8), *see* Defs.' Dec. 23, 2022 Ltr. at 2, what was your basis for initially asserting that "[t]he more relevant indicator is timely admission to inpatient care"?  *See* Defs.' Oct. 31, 2022 Ltr. at 2.  What do you mean by "relevant" in this context?  If they are truly identical, why did you decide not to list this on the duplicative indicators list?  Given that the Court specifically overruled Defendants' request to eliminate this indicator, subject to the Special Master's review to determine if the two indicators are in fact duplicative, ECF No. 7216 at 5-6, we cannot simply agree to decommission this indicator without a full explanation of what it measures and how it compares to AC8.

Please provide us with information on whether AC9 measures additional Program Guide or court-ordered requirements related to inpatient transfers, such as: (1) the requirement for patients to transfer within 72-hours of bed assignment; (2) the requirement that IDTTs submit referral paperwork to IRU within 5 business days of referral to ICF, or 2 business days for Acute; (3) the requirement that IRU facilitate the referral process as soon as possible, and not to exceed 1 business day for Acute referrals, or 3 business days for ICF referrals; and (4) the requirement to complete the referral, transfer, and admission process for Acute and ICF patients within 5 calendar days after an exception to the transfer timelines is resolved (e.g., due to a medical hold, the patient refusing to transfer, or being out to court).

We infer from the title of AC9—which refers to "transfer deadlines" as opposed to AC8's reference just to "timely admissions"—that AC9's scope may be broader.  Given the significant concerns about the documentation and purported scope of AC8, which has not yet been fully discussed in BRMR, and the importance of the inpatient transfer timelines to a durable remedy, Plaintiffs' position is that AC9 is not appropriate for decommissioning absent a closer review, which likely includes preparation of stakeholder documentation and discussion in BRMR.

        iii.     Patients Discharged from DSH with Classification Casework
                         Completed Prior to Transfer When Required

You argue that "[e]ven if CDCR had the ability to measure whether DSH completed the case work, CDCR has no enforcement mechanism and there cannot be a compliance threshold assigned to such an indicator."  Defs.' Dec. 23, 2022 Ltr. at 2.  As you know, several indicators do not lend themselves to a compliance threshold, such as

Nicholas Weber
February 22, 2023
Page 4

the Use of Force Involving MH Inmates indicator.  Despite our disagreement, in order to move the process forward we will agree to decommission this indicator upon Defendants' confirmation that this indicator is limited to DSH and does not pertain to the PIPs in any way.

> iv.    Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors

We agree to decommission this indicator.

> v.    ASU Inmates on 21-Day Intake Status with Markers Posted for Initial 72 Hours

If this indicator is decommissioned, is there another indicator to measure the requirement that "any inmate that cannot be double-celled upon initial placement in ASU must be housed in an ASU intake cell for the first 72 hours of ASU placement"?  *See* 2021 Program Guide, ECF No. 7333-1 at 569.  From reviewing the titles of indicators on the provisional list, it seems that either the SP4 Suicide Resistant Cells indicator, or SP16 ASU Intake Inmates Appropriately Housed indicator, may measure this requirement. Please provide documentation sufficient to confirm, as well as access to view the applicable indicator or report that measures the above requirement to the extent it exists. Once we receive confirmation that either SP4, SP16, or another indicator measures the above-quoted Program Guide requirement, we will agree to decommission the ASU Inmates on 21-Day Intake Status with Markers Posted for Initial 72 Hours indicator.

> vi.    Emergency Response Procedures for Self-Injurious behaviors and suicide attempts

We are perplexed by your assertion that you do not know what this indicator is supposed to measure, given that Defendants listed "Emergency Response Procedures for Self-Injurious behaviors and suicide attempts" as an indicator you believed was "key" even before the Special Master proposed his list that the Court provisionally approved. *See* ECF No. 7089-1 at 3.

Regardless, as stated in our November 18, 2022 letter (page 6), we do not agree that the lack of pre-existing indicators is a basis for decommissioning.  You argue that "Defendants will not guess what 'emergency response procedures for self-injurious behaviors and suicide attempts' the court believes should be measured."  Defs.' Dec. 23, 2022 Ltr. at 3.  That is not an appropriate justification for decommissioning this

Nicholas Weber
February 22, 2023
Page 5

indicator.[2]  The Court overruled Defendants' similar objections to placeholder items on the Provisional List of Key Indicators, as these must be developed in consultation with the Special Master based on his monitoring round.  *See* July 1, 2021 Order, ECF No. 7216 at 8.

Does Defendants' CQIT Guidebook or Suicide Prevention Guidebook address how auditors should monitor emergency response procedures for self-injurious behaviors and suicide attempts?  If so, please provide a citation(s).  If not, will Defendants add such language to the Guidebook(s) in exchange for Plaintiffs agreeing to decommission this indicator?  For example, we understand that the Special Master monitors emergency response procedures by auditing the adequacy of certain emergency response forms that staff complete after an incident occurs.  A similar audit could be added to Defendants' CQIT or Suicide Prevention Guidebook.

vii.    Percentage of mental health OHU stays 48 hours or less

We agree to decommission this indicator.

viii.    ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria

You stated in your October 31, 2022 letter that "[t]hese should be decommissioned and replaced with a new CMHPP huddle indicator."  We agreed in our November 18 response, subject to reaching agreement on the appropriate scope of the CMHPP indicators, which the Court provisionally approved as a placeholder category of indicators.  *See* ECF No. 7216 at 7, n. 4.  Because the CMHPP indicators have yet to be finalized, we reserve our right to withdraw this agreement if the documentation for the final CMHPP indicators does not incorporate an appropriate measurement of the morning meetings that are part of the CMHPP process.

**B.    Duplicates**

Based on the explanations in your December 23, 2022 letter and your representation on page 3 that "CDCR has met with the Special Master's team to discuss these duplicative indicators and memorialized them in [your] October 31, 2022 letter," we do not oppose Defendants' request to decommission the indicators listed in column two of the chart shown in Section 2.B. on pages 3-4 of your October 31, 2022 letter (reproduced below for ease of reference).

---

[2] Indeed, there are numerous emergency response requirements that this indicator could measure.  *See, e.g.*, 2021 Program Guide, ECF No. 7333-1 at 174, 189-90, 277; *see also* Compendium of Custody-Related Remedial Measures, ECF No. 7333-2 at 5.

Nicholas Weber
February 22, 2023
Page 6

B. Duplicates

| | | |
|---|---|---|
| Duplicate | ASU Pre-Screens | ASU Pre-Screens is under MH Screens (MH Screens: ASU Pre Screens, ASU GP Screens, RC Screens) |
| Duplicate | Percentage of ASU Screenings that Occurred Within 72 Hours of Placement of Arrival | This is the ASU GP Screen which is under MH Screens (MH Screens: ASU Pre Screens, ASU GP Screens, RC Screens) |
| Duplicate | Percentage of IDTTs Observed in which a Health Record and C-File were Available | Duplicate with "Percentage of all IDTTs observed in which a health record and C-file are available" under "Access to Care". |
| Duplicate | Percentage of MH-7s required completed prior to ASU placement | MH7 is the ASU Pre Screens which is under MH Screens (MH Screens: ASU Pre Screens, ASU GP Screens, RC Screens) |
| Duplicate | Percentage of healthcare staff current with suicide prevention training | Duplicate with "Percentage of Health Care Staff with Suicide Prevention Training" under "Suicide Prevention" item #19 |
| Duplicate | Additional Use of Force (Specificity to be determined) | CDCR will prep the following: UOF involving MH inmates. |

## II.     Cross-Walk

Thank you for answering our questions and accepting our recommendations.  We agree that waiting to standardize the indicator titles once all the indicators have completed the BRMR process makes sense.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:  Cara E. Trapani

CET:cg
cc:   *Coleman* Co-counsel          Namrata Kotwani
      *Coleman* Special Master Team   Damon McClain
      Carrie Stafford               Samantha Wolff
      Melissa Bentz                 Paul Mello
      Dillon Hockerson              Nina Raddatz
      Sundeep Thind                 Brent Reden
      Elise Thorn                   Kris Kent

[4230962.6]

# EXHIBIT H

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



April 28, 2023

Cara Trapani
Rosen Bien Galvan and Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105

Cara,

I write in response to your February 22, 2023 letter regarding indicators Defendants propose to decommission.

    I.      Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within Five Working Days (RH5)

Plaintiffs ask for clarification on the workflow as well as whether CDCR monitors when nurses appropriately enter a routine mental health referral for inmates who refuse the ASU pre-screen and if not, whether AC1 or RH4 will be modified to do so.  Monitoring the referral is unnecessary because the request for a referral is made automatically whenever the nursing screening reports that the patient refused.  There is no separate process for nursing to enter or request a mental health referral other than the same screening process which is already monitored by RH4 – ASU Prescreens.

ASU pre-screen refusals are entered onto the EHRS PowerForm by nursing and the mental health consult is automatically generated at that point.  When the screening occurs, nursing selects the level of participation, including whether the patient refused. If the patient refused the prescreen, a consult will be requested by completion of the prescreen form.



Page 2

Original order entered and electronically signed by SYSTEM SYSTEM on 04/13/23 at 09:23 PDT.
Mental Health Department
**MHPC Consult Emergent**

| Details | Additional Info | History | Comments | Validation | Results | Ingredients | Pharmacy |

**Details**

| | |
|---|---|
| Requested Start Date and Time | 04/13/23 00:01 PDT |
| Patient Consult Reason | Results of ASU PrePlacement Assessment |
| Special Instructions | Date/Time Received is either from Section IV of the 128 MH-5 or when MH first learned of the consult |
| Must be seen within | Stat |
| Scheduling Instructions | Schedule Stat |
| 7362/MH5 Identifier | None |
| Date Written | 04/13/23 |
| Requested End Date/Time | 04/14/23 23:59 PDT |

**Comment**
Placed by Discern based on ASU PrePlacement Form results.

Nursing also follows up with a phone call to mental health to let them know that a referral has been placed. The mental health consult is captured in AC1 – timely mental health referrals – based on the type of referral generated (urgent, emergent, routine).

## II. Inpatient Transfer Deadlines for PIPs and DSH (AC9)

Plaintiffs request that Defendants not decommission AC9 but instead confirm whether it measures several other inpatient transfer timelines[1]. (See also Plaintiff's February 27, 2023 email regarding AC8, Timely Admission to Inpatient Care, and the same timeframes.) Defendants are committed to measuring the ten and thirty day timeline associated with inpatient transfers. Defendants further agree to measure the two and five day IDTT timeline, the one and three day IRU timeline, and five day exception timelines. CDCR will circulate new documentation pertaining to inpatient transfer indicators in the near future.

CDCR's documentation may include these timelines in one indicator (i.e. AC8 or AC9) or spread across several indicators depending on how they are designed.[2]

---

[1] (1) [T]he requirement for patients to transfer within 72-hours of bed assignment; (2) the requirement that IDTTs submit referral paperwork to IRU within 5 business days of referral to ICF, or 2 business days for Acute; (3) the requirement that IRU facilitate the referral process as soon as possible, and not to exceed 1 business day for Acute referrals, or 3 business days for ICF referrals; and (4) the requirement to complete the referral, transfer, and admission process for Acute and ICF patients within 5 calendar days after an exception to the transfer timelines is resolved (e.g., due to a medical hold, the patient refusing to transfer, or being out to court).

[2] Note, Defendants are already authorized by court order to decommission AC8 and could also choose to move the inpatient indicator timelines into AC9. (See ECF No. 7216 at 14.)

Page 3

III.    Patients Discharged from DSH with Classification Casework Completed to Transfer
When Required (RH36)

Plaintiffs state that they "will agree to decommission this indicator upon Defendants'
confirmation that this indicator is limited to DSH and does not pertain to the PIPs in any way."
This audit measures whether classification casework was completed prior to transfer *from* DSH.
It audits whether appropriate paperwork has been completed for the patient to be rehoused in
CDCR facilities.

IV.    ASU Inmates on 21-Day Intake Status with Markers Posted for Initial 72 Hours

Plaintiffs ask whether "there another indicator to measure the requirement that "any inmate
that cannot be double-celled upon initial placement in ASU must be housed in an ASU
intake cell for the first 72 hours of ASU placement."  SP16, ASU Intake Inmates
Appropriately Housed, includes this requirement. The numerator and denominator cover
the intake cell and double cell requirements:

| Numerator | Denominator |
| --- | --- |
| The sum of responses to the following question from audits in the denominator:<br><br>• How many inmates housed in ASU for the first 72 hours are either double celled with an appropriate cell partner or are celled alone in a retrofitted intake cell? | The sum of responses to the following question from <u>CQIT Audit: Intake Procedures</u> audits completed during the on-site review period:<br><br>• How many inmates are on intake status within the first 72hours of placement? |

Additionally, SP16 cites to the double cell policy in the KPI and BR:

**Policy**

**REVISED ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL PROCEDURE (10/30/2015)**

The purpose of this memorandum is to provide direction regarding the inmate housing
procedure for Administrative Segregation Unit (ASU) intake cells. This procedure was originally
detailed in a September 29, 2010 memorandum, titled "Administrative Segregation Unit Intake Cell
Procedure," and is being revised to further enhance this existing policy.

The double-celling of inmates continues to be a critical protective factor against  potential suicides
inside the Department's ASUs. However, all ASU inmates cannot be double-celled upon initial
placement into the unit. In order to address this issue, the Department previously retrofitted a
number of ASU intake cells throughout the state.  These ASU intake cells were designed to reduce
the opportunity for inmates to commit suicide; therefore, it Is imperative institutional staff
appropriately manage the use of these ASU intake cells. ==Any inmate that cannot be double-celled
upon initial placement in ASU must be housed in an ASU intake cell for the first 72 hours of ASU
placement;== this includes both single-cell restricted inmates and double-cell approved inmates for
whom an appropriate cell partner is unavailable upon initial ASU placement. After 72 hours,
inmates may be housed in alternate ASU housing consistent with their case factors.

Page 4

     V.     Emergency Response Procedures for Self-Injurious Behaviors and Suicide Attempts (SP21)

CDCR's position is unchanged since our December 23, 2022 letter.  No indicator criteria exists for SP21.  CDCR is willing to meet and confer with the Special Master to team to learn what, if anything, they audit under this category to determine whether CDCR's auditing already includes such auditing or whether further indicator development is necessary.

     VI.     ASU, STRH, LTRH Morning Meetings meeting all Audit Criteria

CDCR agrees to revisit this indicator when developing CMHPP indicators. CDCR understands from the Special Master's December 30, 2022 report that the process for developing placeholder indicators is ongoing.  (See ECF No. 7693 at 2, "Informed by his 29th Round monitoring, the Special Master is also in the process of fleshing out the details of four "placeholder" indicators included in the provisionally approved list.")

Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation

# EXHIBIT I



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email:  CTrapani@rbgg.com

May 23, 2023

VIA ELECTRONIC MAIL ONLY

Nicholas Weber
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov

Re:    *Coleman v. Newsom*: Plaintiffs' Response to Defendants' April 28, 2023
         Letter Regarding Indicators that Defendants Propose Should Be
         Decommissioned
         Our File No. 0489-03

Dear Nick:

On October 31, 2022, Defendants provided a list of indicators that they believed
should be decommissioned or declared duplicative of others already on the Court's
Provisional List of Key Indicators (ECF No. 7151 at 21), and a "cross walk" list of
indicators from the Provisional List of Key Indicators with updated names.  Plaintiffs
responded on November 18, 2022, and Defendants replied on December 23, 2022.  We
responded to your December 23 letter on February 22, 2023.  Our response resolved all
issues except for six indicators that Defendants proposed should be decommissioned.
Defendants responded to our February 22 letter on April 28, 2023.  This letter responds to
your April 28 letter.

## I.    Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within Five Working Days (RH5)

Your April 28, 2023 letter did not explain what this indicator was intended to
measure, nor did Defendants show or provide us access to the existing indicators or
reports at issue so we can make a fully informed decision before we agree to
decommission.  As we have previously stated, we are loathe to agree to decommission
indicators from the Court's Provisional List of Key Indicators based solely on their titles.

Despite this, in order to move this process forward, Plaintiffs agree to
decommission this indicator so long as CDCR adds to the documentation for the ASU
Prescreens (RH4) indicator that the reason there are no business rules about pre-screen

[4286791.3]

Nicholas Weber
May 23, 2023
Page 2

refusals or how they are measured is because the request for a referral is made automatically whenever the nursing screening reports that the patient refused and there is no separate process for nursing to enter or request a mental health referral. *See* Defs.' Apr. 28 Ltr. at 1.

Please also confirm our understanding that neither this indicator, nor any other indicator, measures the Program Guide requirement that "[p]ost-placement screening shall be administered to all non-Mental Health System Delivery Services patients within 72 hour of the placement in ASU. … Refusals of the screening result in Mental Health Referrals on an Urgent [24-hour] basis." ECF No. 7333-1 at 461.

## II.      Inpatient Transfer Deadlines for PIPs and DSH (AC9)

Defendants did not state whether they will measure the requirement for patients to transfer within 72-hours of bed assignment in the revised AC8/AC9 documentation. *See* Defs.' Apr. 28 Ltr. at 2. The Special Master consistently monitors this and it must be measured. This is the only remaining issue given Defendants' other agreements. Plaintiffs are prepared to discuss this in Level 1 if necessary. *Id.*

## III.    Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required (RH36)

Given your representation that this indicator is limited to DSH and does not pertain to the PIPs in any way, we agree to decommission it.

## IV.     ASU Inmates on 21-Day Intake Status with Markers Posted for Initial 72 Hours

Given your representation that the ASU Intake Inmates Appropriately Housed (SP16) indicator measures the requirement that "any inmate that cannot be double-celled upon initial placement in ASU must be housed in an ASU intake cell for the first 72 hours of ASU placement," ECF No. 7333-1 at 569, we agree to decommission this.

There is a typo in the screenshot of the denominator for SP16 included on page 3 of your letter—a space is missing between <72> and <hours>.

## V.      Emergency Response Procedures for Self-Injurious behaviors and suicide attempts (SP21)

Plaintiffs are also willing to meet and confer with the Special Master team to learn what they audit under this category to determine whether CDCR already conducts such auditing or whether further indicator development is necessary. *See* Defs.' Apr. 28 Ltr. at 4; *see also* ECF No. 7089-1 at 3 (listing this as "key" for Defendants).

[4286791.3]

Nicholas Weber
May 23, 2023
Page 3

As stated in our February 22, 2023 letter, there are numerous emergency response requirements that this indicator could measure. *See, e.g.*, 2021 Program Guide, ECF No. 7333-1 at 174, 189-90, 277; *see also* Compendium of Custody-Related Remedial Measures, ECF No. 7333-2 at 5. We understand that the Special Master monitors emergency response procedures by auditing the adequacy of certain emergency response forms that staff complete after an incident occurs. Defendants could conduct a similar audit.

## VI.    ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria

As stated in our November 18, 2022 and February 22, 2023 letters, we agree to revisit this indicator when developing the CMHPP indicators.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:  Cara E. Trapani

CET:cg

cc:  *Coleman* Co-counsel          Namrata Kotwani
     *Coleman* Special Master Team  Damon McClain
     Carrie Stafford               Samantha Wolff
     Melissa Bentz                 Paul Mello
     Dillon Hockerson              Nina Raddatz
     Sundeep Thind                 Brent Reden
     Elise Thorn                   Kris Kent

# EXHIBIT J

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Monday, March 27, 2023 3:51 PM
**To:** Arielle Tolman <ATolman@rbgg.com>; Walsh Kerry F. <kwalsh@pldolaw.com>
**Cc:** Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Henry A. Dlugacz <hdlugacz@blhny.com>; Dan Potter <dpotter@alumni.brown.edu>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Metzner, Jeffrey <jeffrey.metzner@cuanschutz.edu>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>
**Subject:** RE: Coleman - Pls' Summary of MCC Indicator 2nd Level Dispute [IMAN-DMS.FID12440]

Kerry and Ari,

CDCR is willing to modify the milestone indicator, RH32, to include the PIP populations as Plaintiffs and the Special Master team have requested.  Our agreement to modify the indicator to measure milestone awarded to PIP patients should not be construed as a waiver of any part of the March 2, 2015 *Hecker* Settlement Agreement.

Please let me know if this resolves the dispute.  If so, CDCR will update the documentation and move the indicator forward.

Thanks.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
(916) 217-1949
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


**From:** Arielle Tolman <ATolman@rbgg.com>
**Sent:** Thursday, March 23, 2023 5:32 PM
**To:** Kerry F. Walsh <kwalsh@pldolaw.com>
**Cc:** Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Henry D. Dlugacz <hdlugacz@blhny.com>; Dan Potter

<dpotter@alumni.brown.edu>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Jeffrey Metzner
<jeffrey.metzner@cuanschutz.edu>
**Subject:** Coleman - Pls' Summary of MCC Indicator 2nd Level Dispute [IMAN-DMS.FID12440]

<div style="border: 1px solid #c00; background-color: #f5dd7e; padding: 4px;">
<span style="color:#c00;">**CAUTION:**</span> This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.
</div>

Dear Kerry,

Please find attached Plaintiffs' summary statement for the *RH32 Percentage of Eligible MHSDS Patients Receiving Milestone Credits Report* indicator that will be elevated for Second Level Review.

Thank you,
Ari


Ari Tolman
Associate Attorney
(she/her/hers)



101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
atolman@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at atolman@rbgg.com.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT K

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Thursday, June 29, 2023 12:48 PM
**To:** Cara Trapani (CTrapani@rbgg.com) <CTrapani@rbgg.com>; Kerry.Walsh <kwalsh@pldolaw.com>; Dan Potter <dpotter@alumni.brown.edu>; Henry A. Dlugacz <hdlugacz@blhny.com>; Lisa Ells (LElls@rbgg.com) <LElls@rbgg.com>; Jeffrey Metzner <JEFFREY.METZNER@CUANSCHUTZ.EDU>
**Cc:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Subject:** Coleman - Data Remediation Dispute re 72-Hour Inpatient Transfer Timeline

All,

I write regarding the dispute over the development of an indicator to measure the 72-hour transfer timeline for patients accepted to an inpatient bed.  In an effort to avoid further disputes, CDCR agrees to develop a standalone indicator, with summary statistic, to measure the 72-hour transfer timeframe requirement.  The details of this indicator can be further discussed during the stakeholder review process.  CDCR also reserves the right to develop reasonable exceptions to the 72-hour timeline through that same process.

CDCR maintains its disagreement that this indicator is subject to a compliance standard and that it is any different than the "information" indicators developed during BRMR.  However, CDCR will agree to table that discussion until such time as its appropriate to discuss compliance thresholds for the key indicators.

Please let me know if this resolves the issue and whether it can move forward to indicator development and stakeholder review.

Thanks.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
(916) 217-1949
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# EXHIBIT L

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Friday, June 2, 2023 7:53 PM
**To:** Cara Trapani <CTrapani@rbgg.com>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Dan Potter <dpotter@alumni.brown.edu>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Millham, Sofia A. <smillham@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Arielle Tolman <ATolman@rbgg.com>
**Cc:** Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Subject:** RE: Coleman: BRMR item AC8 Timely Admission to Inpatient Care [IMAN-DMS.FID12440]

Cara,

CDCR is committed to developing an indicator to measure the five day exception timeline.  Because exceptions are rare and are integral to monthly court requirements and the potential imposition of fines, CDCR manually reviews late transfers at the end of each month to determine exceptions.  CDCR reports on these exceptions monthly and has done so since 2017.  If Dr. Potter is willing to verify and remediate these manual exceptions reports, then CDCR is prepared to move forward.  However, if automation of this event and development of an entirely new report is required to meet remediation standards, then the parties should discuss the technical barriers and how best to develop this report.

Regarding the 72-hour timeline, CDCR does not view this as a constitutional issue or key indicator.  At best, an indicator measuring this timeline is informational.  The 72 hour timeline is a utilization management policy to help encourage institutions to meet the overarching goal of admitting patients into acute or intermediate care within 10 or 30 days of referral, respectively.  In fact, meeting the ten or 30 day timeline is not necessarily dependent on meeting the 72-hour timeline.  Conceivably, CDCR could never meet the 72 hour timeline while also being perfectly compliant with the 10 or 30 day timeline.  CDCR has agreed to measure compliance with each step of the referral process using AC8 and AC9 – from IDTT, to IRU, and finally to admission.  The 72 hour timeline is not part of that flow and is just one of several interim timelines CDCR uses to meet the 10 and 30 day requirements.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
(916) 217-1949
1515 S Street, Suite 314S
Sacramento, CA  95811-7247

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications

Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Cara Trapani <CTrapani@rbgg.com>
**Sent:** Friday, June 2, 2023 3:54 PM
**To:** Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Dan Potter <dpotter@alumni.brown.edu>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Sofia Millham <smillham@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Arielle Tolman <ATolman@rbgg.com>
**Cc:** Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Subject:** RE: Coleman: BRMR item AC8 Timely Admission to Inpatient Care [IMAN-DMS.FID12440]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Sundeep,

Your response that Bring Back #2 below is an improvement idea to be addressed after the end of data remediation is inconsistent with Nick's April 28 letter, which stated that CDCR agreed to measure the below requirements in (AC9) *Inpatient Transfer Deadlines for PIPs and DSH*. We are not able to extend the Court's December 2023 deadline to complete data remediation.

1. the requirement that IDTTs submit referral paperwork to IRU within 5 business days of referral to ICF, or 2 business days for Acute;
2. the requirement that IRU facilitate the referral process as soon as possible, and not to exceed 1 business day for Acute referrals, or 3 business days for ICF referrals; and
3. the requirement to complete the referral, transfer, and admission process for Acute and ICF patients within 5 calendar days after an exception to the transfer timelines is resolved (e.g., due to a medical hold, the patient refusing to transfer, or being out to court).

There is an outstanding dispute about whether AC8 or AC9 will measure the requirement for patients to transfer within 72-hours of bed assignment. What is CDCR's position on this?

I also cannot tell from the documentation (Link: AC8 MHR Timely admission to Inpatient Care.docx (sharepoint.com)) which of Plaintiffs' redlines (if any) CDCR is accepting. We are open to discussing the numerous open comments and redlines per our usual practice in BRMR given that it has been some time since the stakeholders last reviewed this item. I see it is on the agenda for Tuesday. If you prefer to continue corresponding about this via email, please clarify which of the redlines CDCR is accepting, and which are rejected.

Thank you,

Cara Trapani



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

**(Pronouns – she/her/hers)**

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at ctrapani@rbgg.com.

---

**From:** Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Sent:** Friday, June 2, 2023 11:39 AM
**To:** Cara Trapani <CTrapani@rbgg.com>; Dan Potter <dpotter@alumni.brown.edu>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Sofia Millham <smillham@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Arielle Tolman <ATolman@rbgg.com>
**Cc:** Steven Cartwright <Steven.Cartwright@cdcr.ca.gov>; Worrell, Wendy <Wendy.Worrell@cdcr.ca.gov>; Kirby, Melissa@CDCR <Melissa.Kirby@cdcr.ca.gov>; Garland, Latoya@CDCR <latoya.garland@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>
**Subject:** Coleman: BRMR item AC8 Timely Admission to Inpatient Care

[EXTERNAL MESSAGE NOTICE]

All,

AC8 Timely Admission to Inpatient Care had been reviewed in BRMR, there were Bring Back items needed to be addressed.  Below you will see the responses to the pending bring backs. Attached are workflows pertaining to AC8. The document will be cleaned up and sent to CAPC next week if there are no additional outstanding concerns.  CDCR requests you respond back to this either **by the end of the day today or no later than noon on Monday, June 5, 2023** to let us know if the below responses are acceptable, so this item can be moved forward. This item is also on the agenda for discussion at next week's BRMR meetings in case there are any additional concerns you would like to discuss.

| Bring Backs | Response |
|---|---|
| The two and five day timelines (for acute, and ICF, respectively) for Interdisciplinary Treatment Teams ("IDTTs") to submit referral paperwork to the Inpatient Referral Unit ("IRU");<br><br>The one and three day timelines (for acute, and ICF, respectively) for IRU to facilitate the referral process. | Agree to add a new report with summary statistic.<br><br>This is all on AC9 which will be released for SM/SH review next week on June 5th |
| The five day timelines for Defendants to complete admission following resolution of a transfer timeline exception | Add to improvement idea, with a commitment of creating a new report within 12-month after Data Remediation Process completed (currently scheduled to complete on 12/31/2023) |

| | This is due to a current technical difficulty. Exception is currently not a data point. CRU had submitted an IT request requesting this data point to be added to RIPA. Currently, there is no way to track this automatically. It is currently tracked manually by IRU. |
|---|---|
| Add Workflows | Attached are the two workflows that will be added.  These items went through CAPC this past week.<br><br>The links are not currently on the document but will be added once they are uploaded to the EHRS website. |

Link:  AC8 MHR Timely admission to Inpatient Care.docx (sharepoint.com)


Thank you,

*Sundeep Thind*

Attorney
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.