# Exhibit B

California Department of Corrections and Rehabilitation's (CDCR)
Unmet Needs Assessment (UNA) Report

I.     Background

On September 13, 2021, the court ordered CDCR to "undertake an assessment of whether there
is unmet need for inpatient care, including acute care, intermediate care, and mental health crisis
bed care." (ECF No. 7305 at pages 15-16.) The study was ordered to be "broad in scope and
focused in methodology to ensure that it results in a clear and comprehensive assessment of
whether there is any unmet need for access to necessary inpatient care, whether unmet need is
the result of an insufficient number of beds in one or more inpatient programs or whether it is the
result of an absence of necessary treatment programs." (Id. at page 14.)

Shortly after the issuance of the order, CDCR, Department of State Hospitals (DSH), the Special
Master team, and the Plaintiffs met and conferred regarding the methodology for the study.
Together, the stakeholders developed the most expansive review methodology in the history of
CDCR unmet needs assessments. In total, 32,545 patients were screened for inclusion in the
study, 4,717 were flagged for study, and 462 patients were recommended for referral either by
the UNA team or by the patient's treatment team while the UNA occurred at their institution.[1]
Of those 462 patients, 120 were not referred following discussions between the UNA team and
the patients' treatment teams, resulting in 342[2] total acute and intermediate care referrals during
the UNA period.

Unlike past unmet needs assessments, the 2022/23 UNA looked separately at whether there were
patients within CDCR that did not need inpatient care but had personality disorders that may
benefit from a special treatment program for patients that is not available within the existing
Mental Health Services Delivery System. During the 2022/23 UNA, CDCR identified 470
patients in this category and has determined further study of this diverse population is necessary
to adequately address their treatment needs.

Although the study was expected to be completed by December 31, 2022, given the larger
number of patients screened and flagged as compared to prior studies, additional time to
complete the study and produce this report was needed. The parties began discussing an
extension of time in August 2022 and reached agreement in December 2022. (ECF No. 7680.)
The deadline for completion was extended to June 30, 2023. (Id. at 4-5.) As part of that
stipulated agreement, CDCR agreed to provide Plaintiffs and the Special Master with a copy of
the draft report prior to June 30, 2023, and to provide Plaintiffs and the Special Master with
thirty days to provide comments. (Id. at 3.) CDCR provided the Draft UNA Report to Plaintiffs
and the Special Master on May 16, 2023.

CDCR representatives met with members of the Special Master team on May 18 and 25, 2023 to
discuss the draft report and later communicated by email on further questions. Plaintiffs sent an

---

[1] In contrast, the 2009 Mental Health Assessment Referral Project (MHARP), the last system-wide unmet needs
assessment, flagged just 1,800 patients while recommending 987 patients for referral.
[2] One of the 342 patients was recommended for acute care but in reviewing the data for the UNA, CDCR discovered
that the IDTT referred the patient to the crisis bed instead.

1

initial email with questions about the draft report on May 23, 2023. (See Enclosure A, email from Tom Nolan, Esq. to CDCR.) CDCR provided responses to Plaintiffs' email on June 6 and 7, 2023. (See Enclosure B, emails from Melissa Bentz, Esq. to Plaintiffs' counsel.) After incorporating changes based on the Special Master and Plaintiffs' May 2023 communications, CDCR provided the Plaintiffs and Special Master with a revised Draft UNA Report on June 8, 2023 in clean and track-changes formats. Both the Special Master and Plaintiffs provided written comments on the Draft UNA Report on June 15, 2023. (See Enclosures C and D, June 15, 2023 letter from Special Master Matthew A. Lopes, Jr., Esq., and June 15, 2023 letter from Michael S. Nunez, Esq.) CDCR incorporated many suggestions from those letters into the final UNA Report. CDCR's responses are discussed in more detail below.

II.    Special Master's Response to the Draft Report

CDCR received comments from the Special Master on June 15, 2023. The Special Master's letter included general comments, questions regarding whether there is an unmet need for inpatient care, questions regarding whether there is an unmet need for personality disorders, questions regarding mental health crisis beds, and additional miscellaneous comments.

A.    General Comments

First, the Special Master states that the Draft UNA Report did not focus more on the court's September 10, 2021 requirement to examine whether there is "any unmet need for access to necessary inpatient care, whether unmet need is the result of an insufficient number of beds in one or more inpatient programs or whether it is the result of an absence of necessary treatment programs." (Special Master letter at pages 4-5, quoting the September 10, 2021 Order, ECF No. 7305 at 14.) Additionally, the Special Master recommended additional discussion of the "current or projected future need for inpatient beds by custody level." (Id. at 5-6.)

In response, CDCR updated its 2022/23 UNA Report at pages 51-58 to bring greater focus to the question of whether CDCR has sufficient inpatient beds and whether those beds are sufficient for each level of care and Least Restrictive Housing type[3]. Regarding the question of whether there is "an absence of necessary treatment programs," CDCR's UNA Report includes robust discussions on the personality disorder study and whether CDCR found an absence of necessary treatment for that population. (See generally UNA Report at pages 41-44.)

Second, the Special Master states that the 2022/23 UNA Report does not "answer the critical question of why referral rates to inpatient care have not returned to pre- COVID-19 levels even though restrictions on patient movement and programming have been largely removed" and recommends analysis of this trend. (Special Master letter at page 6.) This recommendation is not consistent with any order requiring the 2022/23 UNA. The 2022/23 UNA was not designed to analyze *why* referral rates have not returned to pre-COVID levels (or any levels). Rather, the study sought only to determine whether there were patients within CDCR that were in need of inpatient care. As noted above, CDCR screened over 30,000 patients for inclusion in the study

---

[3] The Special Master recommended a discussion based on "custody level" but since 2015 inpatient beds have been classified by a patients' Least Restrictive Housing designation, not custody level.

and reviewed over 4,700 patients for possible higher level of care referral to determine whether there was any unmet need. The rate of inpatient referral should be based on the needs of the patient population, not on historical data.

Third, the Special Master recommends additional discussions of "lessons learned" from the 2022/23 UNA about staffing levels within CDCR institutions during the UNA and how "lessons learned" may benefit refinement of CDCR's Sustainable Process. (Id.) The 2022/23 UNA Report discusses staffing impacts on the UNA report. (UNA Report at page 60.) The 2022/23 UNA was conducted independent of any institutional staffing shortages.



The reviews were conducted by a team of regional and headquarters clinicians assigned full time to the project. Over the course of a year, those teams reviewed 4,717 patients and provided, essentially, a second opinion on whether those patients needed a higher level of care. Despite that oversight, inpatient referral rates during the 2022/23 UNA period were generally lower than prior years, both during and before COVID. (See UNA Report at pages 37-40.)

## B.     Is There an Unmet Need for Inpatient Care?

The Special Master raised several data-related criticisms with the Draft UNA Report. CDCR met with the Special Master's experts after providing the Draft UNA Report on May 16, 2023 to rectify as many discrepancies as possible and to ensure that the data presentation were in line with the UNA methodology as much as possible. Although CDCR believed it had addressed the Special Master's concerns during these informal discussions, his letter raises additional concerns. Those concerns are discussed below.

### 1.   Prior Year Comparisons

The Special Master suggests that there is "limited utility" in CDCR's comparison of the 2022/23 UNA data to past referral data (i.e., in 2019 and 2021) because the UNA data does not include "all referrals made to inpatient care during [the UNA] time period." (Special Master letter at page 6.) CDCR has modified its report at pages 35-36. 342 referrals were generated as part of the UNA methodology – either by the UNA team or while the UNA was occurring (Phase I and Phase II) at each institution. The tables and graphs at pages 36-38 of the UNA Report illustrates how comparisons between the 2022/23 UNA and prior years' referral data were made.

/

/

3

### 2.   Resolution of Data Discrepancies

The Special Master notes data discrepancies between their tracking and CDCR's tracking of UNA referrals.  (Special Master letter at page 7.)  CDCR employed the agreed upon tracking tool during the UNA.  It is not clear what tool was used by the Special Master team to maintain their logs.  Nonetheless, CDCR worked with the Special Master team to identify discrepancies between the two data sets.  CDCR fully recognizes the importance of accurate data to inform its analysis and is committed to ensuring the unmet needs of patients are duly addressed.

Data reconciliation was a joint goal of CDCR and the Special Master team and it was necessary to engage in frequent, repeated verification steps to ensure data accuracy both internally with the UNA review teams and externally with the Special Master team.  Following conversations with the Special Master team, CDCR identified an additional twenty-seven interphase referrals not accounted for in the Draft UNA Report, increasing the total to eighty-five interphase referrals.  (UNA Report at pages 30.)  CDCR updated the report to reflect these numbers and believes the changes address the Special Master's concerns.

The Special Master also noted varying numbers recorded for acute referrals between CDCR and the Special Master team.  (Special Master letter at page 7.)  CDCR is surprised by this reported divergence and believed that CDCR had reached an accord on these numbers with the Special Master team on June 1, 2023.  (See June 1, 2023 email from Dr. Sharen Barboza to Dr. Steven Cartwright, Enclosures E.)  CDCR understood, from Dr. Barboza's email, that CDCR and the Special Master team were "as close as possible to agreement on the numbers" and that she did "not believe the discrepancies are significant enough to warrant holding up the analyses."  (Id.)

CDCR is also surprised at the assertion that these data discrepancies "inhibits [the Special Master's] ability to evaluate whether there are unmet needs specific to either the acute or intermediate care programs" given the steps taken to align data with the Special Master team.  In its analysis, CDCR identified nearly 100 additional referrals *more* than those identified by the Special Master team (249 compared to 342 identified by CDCR).  CDCR's dedication to ongoing verification reflects its commitment to ensuring the final UNA data and analysis is as accurate as possible before relying on it.

### 3.   Non-UNA Referrals

The Special Master notes a "significant" number of referrals made outside the UNA process during Phase II and seven days following were discovered during the redrafting of the UNA Report.  (Special Master letter at page 7.)  In the Draft UNA Report, CDCR "examined referral rates during Phase II of the UNA process and one week after, comparing them to methodologically equivalent periods in 2019 and 2021."  CDCR initially took this approach to eliminate factors such as the observer effect, concurrent Sustainable Process activities during the UNA period, and any unanticipated Phase II referrals that did not strictly align with the 2022/23 UNA methodology.  The initial analysis tallied 611 referrals from 604 unique patients.

Shortly after sharing the draft report, CDCR met with the Special Master's experts regarding the accuracy of the count.  CDCR was urged to align its count with the agreed upon UNA methodology and re-run the analysis – which it did.  The mutually agreed upon UNA methodology tallies all recommended referrals made by the UNA review teams, those ultimately referred by treatment teams, and the "interphase" referrals that occurred care "after Phase I, but

before Phase II." (See UNA Report at Appendix A, page 3.) This resulted in a far lower number than CDCR's initial analysis of 342 higher level of care referrals during the 2022/23 UNA.

The Special Master's letter expresses concern about the non-UNA referrals that took during Phase II and asks how they came to be referred to a higher level of care while the UNA was ongoing. (Special Master letter at page 7.) CDCR identified 338 such referrals.

Some were never screened into the UNA project; some were screened but did not register any flags; some were screened but not recommended for referral by the UNA review teams; some were only identified in the personality disorder cohort; and some were not referred by their IDTT following an UNA team recommendation but were later referred anyway. Data for each category is in the table below.

| Higher Level of Care Referrals Not Counted in Official UNA Referral Count | Count |
|---|---|
| Patients not screened or reviewed based on 2022/2023 UNA methodology, but referred during Phase II + 7 days | 92 |
| Patient screened with 0 flags during Phase I, but referred during Phase II + 7 days | 90 |
| Patients not recommended for referral during Phase II, but referred during Phase II + 7 days | 94 |
| Patients identified as PD Category 1-3, but referred during Phase II + 7 days | 55 |
| Patients not referred since their IDTT did not agree with the referral at CRD, but referred during Phase II + 7 days | 7 |
| **TOTAL** | **338** |

### 4. Methodology and Data Clarifications

The Special Master recommends changes to page 22 (Mental Health Screenings) to reflect the agreed upon methodology and changes to page 24 to ensure consistency with total numbers of patients reviewed by the UNA team. (Special Master letter at pages 7 and 8.) CDCR has revised the report accordingly.

### 5. Description of IDTT's Role in Operationalization Documents

The Special Master recommends changes to page 27 regarding language on IDTT roles after receiving higher level of care recommendations from the UNA team. (Id. at page 8.) No changes were made to the report. This section only describes the operationalization of the UNA study – not its outcomes. The section discusses the *expectation* that IDTTs would conduct their reviews within six business days of receiving an UNA reviewer's recommendation. Delayed

IDTTs did occur, however, and those delays are discussed elsewhere within the 2022/23 UNA Report. (UNA Report at page 33, "Delayed Referrals.")

The Special Master also questioned whether these delays were indicative of bed unavailability. (Special Master letter at page 8.) IDTTs and their level of care change recommendations work independently of bed availability. Delayed referrals from IDTTs were attributed to several reasons as discussed at page 33 of the UNA Report, but none were due to inpatient bed availability.

### 6. Clinical Resolution Discussion Cases

The Special Master noted concerns with language at page 30 of the UNA Report regarding UNA review team recommendations that did not result in a referral following the Clinical Resolution Discussion process. (Id., referencing "UNA Review Team Recommendations" heading.) That language has been struck and replaced. The subsequent table at page 30 tallies all UNA recommended referrals as well as those ultimately not referred to a higher level of care.

Next, the Special Master recommends additional analysis on the 120 cases recommended for referral but not ultimately referred, including whether any of those 120 cases were subsequently referred to inpatient care by local clinicians. (Id. at page 9.) CDCR has added information on those 120 cases to the 2022/23 UNA Report at page 31. The UNA Report also includes an ad hoc analysis examining how these 120 recommendations would have impacted the unmet need analysis had they been ultimately been referred to inpatient care. (See UNA Report at pages 37-38.) Of those 120 cases, only eighteen (seven acute, eleven intermediate) patients were referred to inpatient care within a ninety day period following the Clinical Resolution Discussion. CDCR chose a ninety day window for two reasons. First, referrals made beyond ninety days after the Clinical Resolution Discussions are most likely influenced by symptoms and patient factors not apparent during the patient's UNA review. Second, the most recent Clinical Dispute Resolutions took place about ninety days ago – March 22, 2023. A ninety-day period standardizes the review period for all 120 cases. CDCR does not believe these eighteen subsequent referrals are indicative of an unmet need as symptoms of mental illness wax and wane over time and a need may not have been present during the UNA.

The Special Master also recommended a comparison of the "rescission and rejection rates" in 2019 and 2021 for comparison with the 120 UNA recommendations that were not referred. (Special Master's letter ate page 9.) Comparing rescission and rejection rates in this particular context would neither be appropriate nor particularly meaningful. Rescission rates track instances where a patient's treatment team retracts its initial independent decision to refer a patient to a higher level of care. In contrast, the 120 cases rejected by the UNA Clinical Resolution Discussion were not situations where the treatment team had initially agreed to a referral. These 120 cases were instances of where the UNA review team had recommended referral, but the treatment team disagreed, prompting a Clinical Resolution Discussion. In many of these disputes, the UNA review team ultimately agreed with the treatment team's perspective. Thus a comparison of when a treatment team changed its mind (historical rescission data) versus instances where the treatment team maintained its decision (2022/23 UNA Clinical Resolution Discussions) is not appropriate.

Additionally, rejection data pertains to decisions made by the inpatient program after receiving a referral from the treatment team. In the case of the 120 non-referred patients, the treatment team

did not concur with the UNA review team's initial recommendation. As a result, none of these 120 cases progressed to a stage where the referral could be rejected by the inpatient program. Juxtaposing these data with past years' rejection rates will not yield a valid comparison.

7.  Sequestered Cases

The Special Master recommends that CDCR's UNA Report analyze 103 "sequestered" population of patients whose significant medical needs outweighed their need, if any, for higher levels of inpatient care. (Id.) CDCR did not sequester 103 patients from the study. Those 103 patients were assessed in December 2022 and January 2023. Twenty-six additional cases were not reviewed, however, following discussion with the Special Master and Plaintiffs in late 2022. All twenty-six received screening flags for nonparticipation in mental health treatment because they were in inpatient medical hospital beds. Four of those twenty-six were in memory care units. (See UNA Report at pages 33-34.)

8.  Language Revisions to Page 35 of the UNA Report

The Special Master recommends several revisions to page 35 of the UNA report, including that CDCR revise page 36 to note that the court was concerned with "whether there are enough inpatient beds and whether there are program-specific (i.e., custody level and/or MH level of care) deficiencies in bed supply;" regarding comparison to specific time periods of twenty-eight UNA institutions; and statements regarding the timeframes of UNA reviews as compared to those of Sustainable Process review period. (Special Master letter at page 9.) CDCR has revised page 35 accordingly.

9.  Seasonal Trends Graph

The Special Master recommends revising a seasonal trends graph at page 39 of the UNA Report. (Id. at page 10.) The graph has been updated to include data from 2016 to present. The data is discussed at page 40 of the UNA Report.

C.  Is There an Unmet Need for Patients with Personality Disorder?

With respect to the UNA's screen for patients with untreated personality disorders, the Special Master raised two concerns: 1) whether CDCR should immediately develop a program to provide treatment to these patients in lieu of further study, and 2) whether the 2022/23 UNA Report's reliance on the International Classification of Diseases as a diagnosis source is appropriate. Those concerns are discussed below.

1.  Designing a New Program For Category 3 Personality Disorders

In addition to looking at potential unmet need for higher levels of inpatient care, the 2022/23 UNA looked at whether there were patients within CDCR's Mental Health Services Delivery System (MHSDS) in need of additional care for their personality disorder. CDCR developed a separate screening and assessment tool aimed at locating patients with personality disorders and categorized those in need of care into three categories: 1) patients responding adequately to treatment within the existing MHSDS; 2) patients not responding adequately to treatment but additional MHSDS treatment is available; and 3) patients not responding adequately and may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at Department of State Hospitals.

7

With respect to these last category of patients, "Category 3," the Special Master disagreed with the UNA Report's finding that the 2022/23 UNA "'did not conclusively answer' the question of whether there was an unmet need for patients with personality disorders." (Id. at page 10.) CDCR identified 470 Category 3 patients during the UNA period. The Special Master recommends "establishing a pilot program for patients with borderline personality disorder as there is no need for further study as to evidence-based treatment for patients with this diagnosis." (Id.)

While the UNA results show that some patients may benefit from a specific program not currently available within the existing MHSDS framework, this finding should not imply an immediate risk of further harm while these patients receive treatment for other aspects of their mental health. A blanket approach to treatment is not feasible considering the complexity of personality disorders, and CDCR urges the Plaintiffs and the Special Master to avoid oversimplifying a clinical process that requires a high degree of expertise and nuanced understanding.

Designing a new treatment program necessitates thoughtful consideration of many factors, including the logistics of implementation and the specialized training requirements for CDCR clinicians. In addition, due consideration must be given to finding, soliciting, and hiring subject matter experts to staff these new units, as well as attaining significant buy-in from local custody staff.

### 2. Sources for Personality Disorder Diagnoses

Additionally, the Special Master states that his monitors do not recall CDCR using Dissocial Personality Disorder or Emotionally Unstable Personality Disorder diagnoses in the past. (Special Master letter at page 10.) These are International Classification of Diseases (ICD-10) diagnoses. CDCR's Electronic Health Record Systems incorporates diagnoses from multiple sources including the DSM-5, the DSM-5-TR, the ICD-10, the Intelligent Medical Objects, and Systematized Nomenclature of Medicine. All CDCR clinicians have access to one or more of these diagnostic references which broadens the scope of CDCR's diagnostic accuracy.

While it is true the May 16, 2023 Draft UNA Report exclusively used DSM-5 and DSM-5-TR diagnoses, the June 8 draft expanded this to increase accuracy and transparency in the report and to reflect the full range of diagnostic codes used in clinical practice within CDCR. No policy, order, UNA methodology or operationalization document limits CDCR from considering ICD-10 diagnoses. In fact, there are some patients with an active personality disorder diagnosed using the ICD-10 without a corresponding DSM-5 code. To exclude these patients or inaccurately report their diagnoses under a similar DSM code would be imprecise and potentially misleading.

Dissocial Personality Disorder and Emotionally Unstable Personality Disorder diagnoses may not be frequently utilized, but exist within the ICD-10 diagnostic list and may be used by some CDCR clinicians. CDCR's intention was to provide a comprehensive report, reflecting all active personality disorder diagnoses, regardless of the diagnostic reference used. Highlighting the dual use of DSM-5 and ICD-10 diagnoses maximizes the transparency of the report, as it captures the diverse and comprehensive nature of diagnostic processes within CDCR. It is not a departure from established practice but a reflection of the diagnostic reality within CDCR's system.

### D. Whether Defendants Have a Sufficient Number of Crisis Beds

The Special Master raised questions about CDCR's analysis of crisis bed population projections at pages 48-49 of the UNA Report. (Special Master letter at page 10.) The table and corresponding language at pages 48-49 have been updated in response.

### E. Miscellaneous Comments

CDCR revised page 7 of the UNA Report in response to the Special Master's comments regarding grammar at page 10 of his letter.

### III.    Plaintiffs' Response to the Draft Report

CDCR received written comments from Plaintiffs' counsel on June 15, 2023. Those comments involved criticism of CDCR's comparison of the UNA to its Sustainable Process, the UNA Report's description of prior unmet needs studies, pandemic related issues, staffing issues, least restrictive housing issues, questions regarding personality disorder findings, rejected referrals, and improvements to the Sustainable Process. CDCR's responses are discussed below.

### A. The Draft Report's Comparison of UNA and the Sustainable Process

Plaintiffs first take issue with CDCR's comparison of the UNA results to the Sustainable Process claiming that the Court "did not call for any such comparison or analysis." They state that the parties agreed to compare the UNA referrals to the number of total referrals identified without an UNA. (Plaintiffs' letter at page 1.) But they fail to acknowledge that CDCR's baseline referral process – that is, the process that generates referrals outside of an unmet needs assessment – is reliant on Sustainable Process and has been since its inception in 2012. Any comparison between the 2022/23 UNA and CDCR's referral process prior to the UNA must include an assessment of its Sustainable Process.

Indeed, it was the Special Master's own findings from 2016 that the Sustainable Process "turned out to be unsustainable" that in part prompted the 2022/23 UNA. (See ECF No. 5448 at 24, adopted March 8, 2017, ECF No. 5573.) If the Sustainable Process truly was unsustainable in 2016, then a comparison to more recent years' referral data (i.e., 2019 and 2021) and the 2022/23 UNA are necessary to understanding whether that remains the case and, if so, what must be done to ensure the Sustainable Process remains well functioning. Thankfully, the 2022/23 UNA illustrates that the Sustainable Process has been identifying patients for higher level of care placement at rate comparable to or better than the expansive 2022/23 UNA.

Plaintiffs later claim that CDCR's conclusion that the UNA did not identify more individuals than the Sustainable Process in 2019 and 2021 is "both methodologically flawed and unsubstantiated." (Id. at page 2.) Plaintiffs point to no flaw in CDCR's comparison. CDCR's UNA Report includes comparison of *all* referrals identified by the 2022/23 UNA and compares them to relative timeframes in 2019 and 2021.

Plaintiffs' attack on CDCR's comparison is both baffling and disappointing. Comparing the 2022/23 UNA's results to the Sustainable Process is essential. Plaintiffs appear to forget the very purpose of the Sustainable Process and its lengthy history. Sustainable Process is CDCR's

continuous assessment tool used to determine whether an unmet need exists and to ensure prompt referral and admission to inpatient beds.  It was developed after the 2009 Mental Health Assessment Referral Process (MHARP) and for good reason.  MHARP, like the 2022/23 UNA, was an exhaustive and time-consuming undertaking and was not a sustainable model to determine whether there was unmet need within CDCR.  By creating and maintaining a well-functioning Sustainable Process, CDCR has a model to identify patients who are in need of the highest level of mental health care.

A well-functioning Sustainable Process system is necessary to ensure prompt identification and access to care.  CDCR's takeaway from the 2022/23 UNA is that the Sustainable Process is identifying patients at the same or better rate than the 2022/23 UNA – the same UNA that screened over 30,000 patients and reviewed, one by one, 4,700 patients for potential referrals to inpatient care over the course of a year.  CDCR would think that Plaintiffs would welcome this as positive news, but unfortunately that does not appear to be the case.

Next, Plaintiffs claim that the comparison between Sustainable Process and the 2022/23 UNA is flawed because the 2022/23 UNA assessed personality disorders.  (Plaintiffs' letter at page 2.)  This complaint is confusing.  Sustainable Process is an *inpatient* referral tool – not a personality disorder referral tool – and CDCR made no such claim otherwise either in the agreed upon development of the 2022/23 UNA methodology and operationalization or in its 2022/23 UNA Report.  Plaintiffs' attempt to obfuscate the nature of Sustainable Process is not well taken.  Plaintiffs claim, without basis, that "some, if not most, of the 470 Category 3 [personality disorder] patient…would have been identified as needing inpatient treatment and referred to" inpatient care during prior studies.  (Id.)  This grossly misstates the agreed upon methodology.  Category 3 patients are those that do *not* meet any inpatient referral criteria in this UNA or in any past unmet needs assessment.  (See UNA Report at Appendix A, UNA Methodology and Operationalization.)  Patients with personality disorders and a need for inpatient care are not counted within Category 3 because they would have been referred for inpatient care instead.

Finally, Plaintiffs claim that the UNA Report excludes a quarter of UNA-generated referrals because the data was "limit[ed]…to 2022 only."  (Id. at pages 2-3.)  This is incorrect.  As clarified in the UNA Report, CDCR is reporting on all 342 UNA-generated referrals per the agreed upon methodology. This includes all UNA referrals made between April 2022 and the end of the study in spring 2023.  Explanatory language has been added to the UNA Report at page 35.

## B.  The Draft Report's Analysis of Prior Unmet Needs Studies

Plaintiffs raise concerns about the UNA Report's description of past unmet needs studies, particularly the 2009 MHARP.  (Plaintiffs' letter at page 4.)  The concentric circle graph at page 8 of the 2022/23 UNA Report compares referral data for patients in the Enhanced Outpatient Program (EOP) during both the 2009 MHARP and the 2005 Unmet Needs Assessment.  (Compare UNA Report at pages 7 and 8.)  Because the graphs only focus on EOP generated referrals to inpatient care, the graph includes only the 654 EOP referrals during the 2009 MHARP, not the 987 total recommended referrals from all levels of care.

Further, Plaintiffs claim that forty-eight recommended referrals in 2009 were rescinded and thus should not be removed from the total referral numbers.  CDCR has added those forty-eight cases back into the concentric circle graph and its corresponding analysis.

C.  Comparisons Between the 2022/23 UNA and Prior Years' Referrals

Plaintiffs request that the UNA Report assess the impact of the pandemic and staffing issues on whether there is an unmet need for inpatient care.  They also request additional data on inpatient demand based on level of care and type of bed and whether transfer delays had any impact on the UNA.

1.  The Impact of the Pandemic

Plaintiffs discuss at length their views of the COVID-19 pandemic and how it impacted CDCR's inpatient referral rates over the past several years.  (Plaintiffs' letter at pages 6-7.)  It is undisputed that referral rates changed during and after the onset of the pandemic.  (See generally UNA Report at page 14, 38.)  Although their particular objection is difficult to discern, they appear to recommend that the UNA Report "explore the reasons that lower referral rates have persisted even after most pandemic transfer restrictions have been lifted."  (Plaintiffs' letter at page 6.)  This recommendation is not consistent with any order setting out the requirements for the 2022/23 UNA.  The current UNA was not designed to analyze *why* referral rates have not returned to pre-COVID levels (or any levels). The study was undertaken with no preconceived notion of what the "right" referral rates should be.  Rather, the study sought only to determine whether there were patients within CDCR that were in need of inpatient care.

2.  Staffing Impacts on the UNA

Plaintiffs next opine that the "likely reason for low referral rates" is staffing shortages that impact CDCR's ability to identify and refer patients in need of inpatient care.  (Plaintiffs' letter at page 7.)  Neither the September 2021 UNA order, the negotiated methodology or its operationalization documents contemplated studying the impact of institutional staffing shortages on referral rates during the pendency of the 2022/23 UNA.  As noted above, the UNA was conducted independent of any institutional staffing shortages.  The UNA was conducted by a team of regional and headquarters clinicians assigned full time to the UNA project.  Over the course of a year, those teams reviewed 4,717 patients and provided, essentially, a second opinion on whether those patients needed a higher level of care.  Despite that oversight, inpatient referral rates during the UNA period were generally lower than prior years, both during and before COVID.  (See UNA Report at pages 37-39.)  Staffing deficiencies are addressed in the UNA Report at page 60.

Plaintiffs noted that UNA reviewers relied on patient records during their UNA reviews.  As noted in the report, when insufficient information was available, UNA review teams would recommend a referral to inpatient care even when evidence of active symptoms may have been lacking.  UNA reviewers also had the option of setting up video conference calls with patients or clinicians at any institution under review.

/

3.   Analysis by Custody Level, Program Type, and Least Restrictive Housing

Plaintiffs, like the Special Master, raise concern that the draft report did not adequately address inpatient bed need by various custody level, program type or least restrictive housing. (Plaintiffs' letter at pages 8-12.)  As noted above, CDCR revised the UNA Report beginning at page 51 to provide detail on whether any inpatient bed need exists at any particular level of care or least restrictive housing designation.  CDCR does not divide its inpatient beds by "custody level" (i.e. levels I-IV and max custody); rather its beds have been categorized by their least restrictive housing (LRH) designation since 2015.  Each LRH and its relative occupancy rates over time is analyzed in the UNA Report.

Plaintiffs complain that unlocked dorm beds are not being utilized at the same rate as more restrictive beds such as single cell or multi-person cells.  (Plaintiffs' letter at pages 9-11.)  The UNA was not designed to look at the LRH process nor to analyze why patients are sent to certain LRH beds over others.  Plaintiffs had the opportunity to ask for such an assessment during the design phase of the UNA process, but did not.  Defendants have been clear that assessing whether there is an unmet need for inpatient care is not the same as assessing whether the LRH process is working.

Finally, Plaintiffs suggest that transfer timeframe delays are evidence that CDCR lacks enough inpatient beds.  (Id. at page 11.)  In the same instance, Plaintiffs acknowledge that CDCR has nearly 150 inpatient beds offline due to staffing.  (Id.)  The nexus between this concern and the UNA Report is not clear from Plaintiffs' letter.

D.  Personality Disorder Findings

Plaintiffs disagree with CDCR's assertion that further study of the Category 3 personality disorder population is warranted.  (Id. at pages 12-15.)  Plaintiffs believe that treatment tools are readily available to CDCR and that no delay should occur in implementing them.  (Id.)  These assertions lack basis and are incorrect.

The UNA Report shows that some patients may benefit from a specific program not currently available within the current MHSDS.  All of these patients, however, are already receiving treatment for their other mental health diagnoses and no immediate risk of harm exists for them. Plaintiffs believe that CDCR studied a cohort of personality disorder patients in 2020 and were in the process of developing a program for them.  (Id. at page 13.)  This small project is not comparable to the 2022/23 UNA.

The patients identified in 2020 were identified based on an entirely different criteria, and even at that time, CDCR recognized the need for varied treatment approaches such as Dialectical Behavioral Treatment (DBT) for some and a clozapine unit for others with chronic self-harm. The Category 3 personality disorder patients are not a homogeneous population and a one-size-fits-all approach is clinically inappropriate for their varied treatment needs.  Plaintiffs should avoid oversimplifying a clinical process that requires a high degree of expertise and nuanced understanding.

12

As noted in Section II(C)(1), *supra*, designing a new treatment program necessitates thoughtful consideration of many factors, including the logistics of implementation and the specialized training requirements for clinicians. In addition, due consideration must be given to finding, soliciting, and hiring subject matter experts to staff these new programs, as well as attaining significant buy-in from institutional custody staff.

Next, Plaintiffs ask why the number of personality disorder diagnoses changed between the May 16 and June 8, 2023 draft of the UNA Report. (Plaintiffs' letter at page 13, footnote 4.) Data validation was still ongoing at the time of the May 16 draft. The changes in the number of diagnoses is attributed to the inclusion of ICD-10 diagnoses. Some patients have either an ICD-10 diagnosis or a DSM-5 diagnoses, while others have both. This increased the number of diagnoses attributed to the Category 3 patients.

Finally, Plaintiffs ask why CDCR revised its report to include ICD-10 diagnoses and not just DSM-5 or DSM-5-TR and claim that using ICD-10 diagnoses makes the draft report less transparent. (Id. at page 15, footnote 5.) These concerns are identical to those raised in the Special Master's June 15, 2023 letter and are addressed in Section II(C)(2), *supra*.

### E.    IDTT Rejections of UNA Recommendations

Plaintiffs request that CDCR revise its UNA Report to include data and an assessment on the number of recommended referrals "ultimately not accepted by the IDTT." (Plaintiffs' letter at page 15.) One hundred twenty recommended referrals were ultimately not referred to inpatient care following the agreed upon Clinical Resolution Discussion meetings, of which Plaintiffs and the Special Master were attendees. CDCR's 2022/23 UNA Report includes discussion of these 120 cases and an assessment of these cases in the context of the UNA project. (UNA Report at pages 30-31.)

CDCR did not capture systematic data on the "role of clinical staffing shortages in these rejections." But staffing resources were involved regardless of whether the treatment team agreed with the UNA review teams' recommendations. Whether they held the treatment team meeting to refer a patient to inpatient care or participated in a Clinical Resolution Discussion, local staff had to take time to consider the referred patient's case and attend and participate in a multidiscipline discussion of the patient's treatment needs.

Plaintiffs other concerns largely mirror those raised by the Special Master in his June 15, 2023 letter and are addressed in Section II(B)(6), *supra*.

### F.    Improving Sustainable Process by Incorporating UNA Screening Criteria

Finally, Plaintiffs recommend that the UNA Report address "whether there would be a benefit to incorporating any of the UNA screening criteria into the Sustainable Process." (Plaintiffs' letter at page 16.) CDCR remains committed to ensuring its Sustainable Process is up to date. However, the expanded UNA methodology did not reveal any significant advantages over how the Sustainable Process currently screens and identifies patients today. Given this, and the results of the 2022/23 UNA, CDCR believes the Sustainable Process is a well-functioning tool to identify and refer patients to higher levels of inpatient care and no changes are needed at this time.

# ENCLOSURE A

**Weber, Nicholas@CDCR**

| | |
|---|---|
| **From:** | Thomas Nolan <TNolan@rbgg.com> |
| **Sent:** | Tuesday, May 23, 2023 4:38 PM |
| **To:** | Weber, Nicholas@CDCR; CDCR OLA Coleman CAT Mailbox; Bentz, Melissa@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Ceballos, Laura@CDCR; Golding, Michael@CDCR; Elise Thorn |
| **Subject:** | Coleman  -- Plaintiffs' Request for Documents and Data Underlying Draft UNA Report Analysis [IMAN-DMS.FID12440] |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

My 23, 2023

Dear Nick –

Thank you for providing us with copies of the Draft UNA Study Report ("the Draft Report").  We are working to analyze the Draft Report, but we would like to be able to review the underlying results data in more detail in order to provide more specific feedback about the study.  Specifically, we request the following data, and answers to the following questions about the data presented in the Draft Report:

1.  We understand from speaking with the Special Master team that the Draft Report did not include about 114 referrals to a higher level of care that were made between the start of Phase I of UNA and the beginning of phase 2.  With those referrals included, the total number of cases identified through UNA would be 370 instead of 256 as noted in the report (p.28.)  For each of the 370 patients referred to a higher level of care as a result of the UNA study, we would like to have the data showing the following information for each case referred to a higher level of care:

    a.  Name
    b.  CDCR number
    c.  Location of UNA Review (i.e. Prison at time of UNA Review and Referral)
    d.  Custody Level
    e.  LRH
    f.  Positive Flags from Phase I
    g.  Referral Date
    h.  Actual transfer Date
    i.  Whether the transfer was during Phase I or Phase II and whether there was a UNA review (although we can determine the latter as well).
    j.  The HLOC Program referred to, including facility and type of program (e.g. "High Custody ICF, CHCF" or "ICF, ASH" or "Acute, CHCF") .
    k.  Most recent IDTT date prior to any IDTT convened to consider and process UNA review team's higher level of care recommendation
    l.  If possible, the current mental health diagnosis, including any personality disorder diagnoses.

It appears that much or all of this data is available in the SharePoint data collection, but we do not have access to that data.

2. The second chart on page 2 of the Draft Report includes Acute and ICF referrals by year for 2018-2022. We would like to know more information about referrals over time.
   a. How many total referrals were made in the first quarter of 2023? How many were UNA referrals?
   b. We would like to know the total number of referrals for a few more years in the past, and request the data on total referrals for 2015, 2016 and 2017, as well as the referral rate per 1000 patients for those years
   c. We would like to know how you calculated the rate per 1000 patients for those years (2015-2022). What number did you employ for the total number of patients each year, and how was that number determined or calculated?

3. For the 461 Personality Disorder Category 3 Cases captured in the chart on page 30 of the Draft Report, we would like to see the raw data on those cases, including the following (much of this is presumably also in the SharePoint site data):
   a. Name
   b. CDCR number
   c. Location of UNA Review (i.e. Prison at time of UNA Review and Referral)
   d. Custody Level
   e. LRH
   f. Positive Flags from Phase I
   g. The Personality Disorder Diagnosis (and who made the diagnosis, i.e. UNA review team or IDTT)
   h. IDTT diagnoses for other mental health and other personality disorder diagnoses
   i. For the chart on page 41 of the report, breaking down diagnoses by different personality disorders, we would like to see a list of all of the people with multiple personality disorder. Put another way, we would like to be able to review the raw data for the 461 cases to see the combination of personality disorder diagnoses for each individual on the list.

4. For the Chart that is on page 2 and 35 of the report showing acute/ICF referrals by program of origin for Suspro2019, Suspro2021 and UNA, what are the thin red bars representing that are atop each graphic element? If these are confidence intervals or margins of error, please explain how they were calculated and provide the actual calculation and methodological technique used. Also, what was the reason for excluding people referred from MHCB units from this table?

5. We did not understand how the ASH vacancies chart on page 49 was calculated. The chart says there were more than 500 vacancies for several of the UNA quarters, but ASH only has 256 beds. Please explain the calculation. If it is a monthly calculation, please break it down by month.

Thanks and regards,

Tom Nolan


Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105

tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.

# ENCLOSURE B

**Weber, Nicholas@CDCR**

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **Sent:** | Tuesday, June 6, 2023 3:49 PM |
| **To:** | Thomas Nolan; Weber, Nicholas@CDCR; CDCR OLA Coleman CAT Mailbox; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Elise Thorn |
| **Subject:** | RE: Coleman  -- Plaintiffs' Request for Documents and Data Underlying Draft UNA Report Analysis [IMAN-DMS.FID12440] |
| **Attachments:** | 2022 UNA Data - APP.ICF.PDcat3.xlsx |

Tom,

Please see responses to your questions and requests below. Per the request of the Special Master's team, CDCR anticipates providing a revised Draft Report by June 8th that includes the revisions noted below, as well as others requested by the Special Master's team. The deadline for comments will still be June 15, 2023.

Please let me know if you have any questions.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Thomas Nolan <TNolan@rbgg.com>
**Sent:** Tuesday, May 23, 2023 4:38 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>
**Subject:** Coleman -- Plaintiffs' Request for Documents and Data Underlying Draft UNA Report Analysis [IMAN-DMS.FID12440]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

My 23, 2023

Dear Nick –

Thank you for providing us with copies of the Draft UNA Study Report ("the Draft Report"). We are working to analyze the Draft Report, but we would like to be able to review the underlying results data in more detail in order to provide more specific feedback about the study. Specifically, we request the following data, and answers to the following questions about the data presented in the Draft Report:

1. We understand from speaking with the Special Master team that the Draft Report did not include about 114 referrals to a higher level of care that were made between the start of Phase I of UNA and the beginning of phase 2. With those referrals included, the total number of cases identified through UNA would be 370 instead of 256 as noted in the report (p.28.) For each of the 370 patients referred to a higher level of care as a result of the UNA study, we would like to have the data showing the following information for each case referred to a higher level of care:

   a. Name
   b. CDCR number
   c. Location of UNA Review (i.e. Prison at time of UNA Review and Referral)
   d. Custody Level
   e. LRH
   f. Positive Flags from Phase I
   g. Referral Date
   h. Actual transfer Date
   i. Whether the transfer was during Phase I or Phase II and whether there was a UNA review (although we can determine the latter as well).
   j. The HLOC Program referred to, including facility and type of program (e.g. "High Custody ICF, CHCF" or "ICF, ASH" or "Acute, CHCF") .
   k. Most recent IDTT date prior to any IDTT convened to consider and process UNA review team's higher level of care recommendation
   l. If possible, the current mental health diagnosis, including any personality disorder diagnoses.

   It appears that much or all of this data is available in the SharePoint data collection, but we do not have access to that data.

   Your statement that the Draft Report did not contain 114 referrals to a higher level of care is incorrect. However, the Special Master's team did notice some inconsistencies between CDCR's final numbers and theirs. When the issue was raised, CDCR's Mental Health team worked closely with the Special Master's team to reconcile the patient numbers for ICF, APP, and Category 3 patients during the 2022 UNA. During these discussions, CDCR adopted an inclusive approach, such that patients that were in the referral process or were about the be referred between Phases I and II were included. The updated numbers have been agreed to and verified by Drs. Metzner and Barboza and CDCR is in the process of updating the UNA Report with these agreed upon numbers.

   Plaintiffs requested several data points for each patient. Not all of this information was readily available. I have attached much of the information you requested above for the ICF/APP referrals and those patients included in Category 3. We have also included the active diagnoses in EHRS for the Category 3 patients on a separate tab.

2. The second chart on page 2 of the Draft Report includes Acute and ICF referrals by year for 2018-2022. We would like to know more information about referrals over time.
   a. How many total referrals were made in the first quarter of 2023? How many were UNA referrals?
      CDCR does not believe data from a single quarter is comparable to data from a whole year for comparison purposes. Thus, we have opted to exclude that information from the Draft Report. Members of the Special Master's team agreed with that approach.
   b. We would like to know the total number of referrals for a few more years in the past, and request the data on total referrals for 2015, 2016 and 2017, as well as the referral rate per 1000 patients for those

years. The Special Master's team has requested we add the total number of referrals for 2016 and 2017. There were a total of 2,756 APP/ICF referrals in 2016 (rate of 74.6) and 3,600 in 2017 (rate of 93.7). CDCR is in the process of updating the graph to include information for those two years.

    c.  We would like to know how you calculated the rate per 1000 patients for those years (2015-2022). What number did you employ for the total number of patients each year, and how was that number determined or calculated? In the Draft Report, CDCR calculated the rate per 1000 patients based on the total CDCR population. However, the Special Master's team has requested that the rate be recalculated based on the mental health population. The population is as of January 1 of each respective year. CDCR is in the process of updating the graph with this revised rate methodology.

3. For the 461 Personality Disorder Category 3 Cases captured in the chart on page 30 of the Draft Report, we would like to see the raw data on those cases, including the following (much of this is presumably also in the SharePoint site data):

    a.  Name
    b.  CDCR number
    c.  Location of UNA Review (i.e. Prison at time of UNA Review and Referral)
    d.  Custody Level
    e.  LRH
    f.  Positive Flags from Phase I
    g.  The Personality Disorder Diagnosis (and who made the diagnosis, i.e. UNA review team or IDTT)
    h.  IDTT diagnoses for other mental health and other personality disorder diagnoses
    i.  For the chart on page 41 of the report, breaking down diagnoses by different personality disorders, we would like to see a list of all of the people with multiple personality disorder. Put another way, we would like to be able to review the raw data for the 461 cases to see the combination of personality disorder diagnoses for each individual on the list.

See response to item 1 above.

4. For the Chart that is on page 2 and 35 of the report showing acute/ICF referrals by program of origin for Suspro2019, Suspro2021 and UNA, what are the thin red bars representing that are atop each graphic element? If these are confidence intervals or margins of error, please explain how they were calculated and provide the actual calculation and methodological technique used. Also, what was the reason for excluding people referred from MHCB units from this table?

The thin red bars represent confidence intervals. CDCR is updating the Draft Report to include the methodology for these confidence intervals.

Plaintiffs ask why CDCR excluded people referred from MHCB units in the chart on page 2 and 35 of the report. CDCR did not exclude patients referred from the MHCB. As explained on page 35, "CDCR … included patients in an MHCB at the time of referral in their previous level of care (e.g., an MHCB patient that came from EOP is considered an EOP patient for this analysis)." Since most patients referred to APP or ICF come from the MHCB, any results comparing MHI referrals in 2019, 2021, and UNA would be skewed toward MHCB referrals. To avoid this, our methodology includes all MHCB patients referred to APP or ICF but categorized under their most recent outpatient MHI (e.g., CCCMS, EOP). This approach offers more insights into where APP and ICF referrals stem from. For example, it is very unusual for a CCCMS patient to be referred directly to APP or ICF. They almost always go to the MHCB first. Our methodology allows us to easily see the volume of current or recent CCCMS patients that are identified and referred to APP or ICF.

5. We did not understand how the ASH vacancies chart on page 49 was calculated. The chart says there were more than 500 vacancies for several of the UNA quarters, but ASH only has 256 beds. Please explain the calculation. If it is a monthly calculation, please break it down by month.

The calculation is explained on pages 5 and 49 of the Draft Report: "The data is based on monthly averages (average census + pending). The number of vacancies for each month was determined by subtracting the monthly

averages from the total bed capacity (256 beds)." However, the Special Master's team has requested we adjust this methodology to reflect the occupancy percentages for each month (January 2012-April 2023). Under the requested occupancy percentage methodology, some months will be above 100% because the occupancy rate is a combination of total census plus patients endorsed and pending transfer, which can sometimes exceed the total capacity if there is a waitlist. Additionally, they requested we add all DSH beds on a single graph (ASH, CSH, and PSH) instead of just the ASH beds, as well as a separate graph for all CDCR beds (APP/ICF) using the same methodology. We are in the process of updating the graph with the Special Master's specifications and evaluating the rationale to include these requests in the final draft of the 2022 UNA.

Thanks and regards,

Tom Nolan

Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105

tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.

# ENCLOSURE C

**PANNONE LORES**
**DEVEREAUX & O'GARA LLC**
*c o u n s e l o r s   a t   l a w*

June 15, 2023

*VIA EMAIL*

| | | |
|---|---|---|
| **Elise Thorn, Esq.** | **Nicholas Weber, Esq.** | **Melissa C. Bentz, Esq.** |
| Deputy Attorney General | CDCR | Class Action Team |
| 1300 I Street, Rm. 1040-16 | 1515 S Street, Suite 314S | Office of Legal Affairs |
| Sacramento, CA 95814 | Sacramento, CA 95811-7243 | CDCR |
| | | |
| Elise.Thorn@doj.ca.gov | Nicholas.Weber@cdcr.ca.gov | melissa.bentz@cdcr.ca.gov |

> RE:    Special Master's Comments Regarding Defendants'
>           Draft Report on the UNA Study

Dear Attorneys Thorn, Weber and Bentz:

This letter contains the Special Master's team's comments to the Draft Unmet Needs Assessment (UNA) Report defendants distributed on June 8, 2023 (hereinafter "Draft Report"). As the Draft Report indicates, the UNA study was a significant undertaking. The Special Master greatly appreciates the hard work of the CDCR team members who participated in the UNA study and thanks them for their contributions.

On May 16, 2023, defendants distributed a draft Unmet Needs Assessment (UNA) Report (hereinafter "May 16th Draft"). The Special Master's team reviewed the May 16th Draft and immediately identified discrepancies[1] between the data reported therein and the Special Master's internal tracking of UNA referrals. For instance, across institutions, referral data included in the May 16th Draft conflicted with the Special Master's team's records, which was concerning because the Special Master's team had reconciled internal numbers with CDCR's records continually throughout the UNA process. In addition, the Special Master's team discovered that nearly 100 UNA referrals had been omitted from the May 16th Draft.

On May 18, 2023, and again on May 25, 2023, two of the Special Master's experts, Drs. Jeffrey Metzner and Sharen Barboza, met with CDCR to discuss the discrepancies identified by the Special Master's team. During these meetings, Drs. Metzner and Barboza worked with CDCR to reconcile the UNA referral data to the greatest extent possible.

---

[1] As will be discussed in greater detail later in the letter, some significant discrepancies between the Draft Report's data and the Special Master's team's internal numbers remain.

Northwoods Office Park
1301 Atwood Avenue, Suite 215 N   Johnston, RI   02919
tel 401 824 5100    fax 401 824 5123

pldolaw.com

Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 2

In addition, during the May 18, 2023 meeting, CDCR agreed that the May 16th Draft did not follow the UNA methodology because the report did not include referrals to inpatient care that occurred between the start of UNA Phase 1 and Phase 2. *See* Draft Report, Appendix A ("UNA Methodology") at 3.[2]  According to the UNA methodology, these referrals should have counted as UNA referrals.[3]  Instead, the analysis in the May 16th Draft included referrals to acute and intermediate care that were independent of the UNA referral process and occurred between the beginning of Phase 2 through one week following completion of Phase 2.  The Special Master's team requested that CDCR revise the referral numbers to include all UNA referrals contemplated in the agreed-upon methodology instead of referrals made independent of the UNA process during Phase 2 through one week following completion of Phase 2.

In an effort to accommodate defendants, the Special Master's team agreed to provide comments on a revised draft UNA report within the original 30-day comment period (i.e. by June 15, 2023) if CDCR distributed a revised draft which remedied the data and methodological discrepancies identified by the Special Master's team by June 8, 2023.  Defendants agreed and distributed their revised draft UNA Report on June 8, 2023.

After a brief review of relevant background information, this letter contains the Special Master's team's comments to the Draft Report.

I.    Background

As noted in its September 10, 2021 Order, the Court began signaling the potential need for an additional UNA study in 2019 in relation to questions over the sufficiency of defendants' supply of crisis beds.  ECF No. 7305 at 2-3.  In 2019, defendants reduced the scope of their plan to build 100 new licensed MHCB beds (50 at CIM and 50 at RJD) by eliminating the 50 new beds at RJD.  *See* September 9, 2019 Order, ECF No. 6275 at 1-2 (directing the parties to be prepared to address "whether the [MHCB] project as currently approved in its reduced scope is sufficient to permit defendants to take all unlicensed MHCBs offline and replace them with licensed MHCBs as required by the Program Guide.").

---

[2] As discussed below, the Special Master's records reflect 97 referrals between the start of Phase 1 and Phase 2, while the Draft Report identifies only 58 such referrals.  *See* Draft Report at 30; *see also infra* p. 7.

[3] The UNA methodology states: "Additionally, after Phase I, but before Phase II, institutions may choose to refer selected patients to a HLOC, based on clinical need.  Such patients, who were referred after the master list was established yet prior to the start of Phase II, will be tracked via the database as 'between Phase I and II referrals.'  Such referrals will be counted a [sic] HLOC referral and will be tracked via the existing automated reporting process."  UNA Methodology at 3.

Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 3

In its October 7, 2019 Order, the Court noted that recent developments "suggest[ed] a likely need for a study similar to those conducted several times during the remedial phase to determine whether there is an unmet need for MHCB care and inpatient care in CDCR's inmate population." ECF No. 6312 at 5-6. The Court set a briefing schedule for consideration of "whether an unmet bed need study should be conducted" and included the issue on the agenda for the fourth quarterly status conference of 2019. *Id.* at 6.

In its March 17, 2020 Order, the Court indicated it had "reached the tentative conclusion that at least one additional unmet bed needs study will be required in order for defendants to demonstrate (a) that they have a sufficient number of licensed inpatient mental health beds, including mental health crisis beds; and (b) that all class members in need of inpatient mental health care are in fact being timely identified, referred, and transferred to such care." ECF No. 6509 at 3. As noted in the Twenty-Ninth Round Monitoring Report – Part C, the COVID-19 pandemic began to dramatically impact all aspects of programming in CDCR facilities shortly after the Court's March 17, 2020 Order and further consideration of the unmet needs assessment was delayed significantly. *See* ECF No. 7715 at 66 (citing September 10, 2021 Order, ECF No. 7305 at 4).

On September 10, 2021, the Court issued an Order requiring defendants to conduct the UNA study, noting the following:

> As the history of remediation in this area described in preceding sections of this order makes clear, defendants need both accurate mental health population projections and a fully sustainable process for continuous identification, referral, and placement of class members at the appropriate level of mental health care in order to accurately determine and plan for the number of inpatient beds, including MHCBs, required to meet the needs of the plaintiff class. Defendants' suggestion that population projections plus actual bed usage is necessarily an accurate measure of bed needs misses the mark and ignores substantial history in this case. Actual inpatient bed usage is only an accurate measure of bed need if it is otherwise clear that bed usage is the result of a robust and thorough process of identification and referral of class members in need of inpatient care.

ECF No. 7305 at 13. The Court rejected defendants' proposal that they be allowed to "fix" CDCR's sustainable process for identifying and referring patients in need of inpatient mental health care in lieu of conducting an unmet needs assessment:

> Given all of the foregoing, defendants' contention that they should be permitted to fix the sustainable process without conducting an unmet bed needs study must be rejected. The history of this litigation shows that the absence of a robust sustainable process for identification and referral of inmates to inpatient care has inevitably led to large numbers of inmates in need of inpatient care remaining unidentified and



Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 4

unreferred to such care. Fixing the process puts the cart before the horse: once the sustainable process began to break down it became incumbent on defendants to take all steps available to them to find any class members in need of inpatient care who might have slipped through the cracks.

*Id.* at 14. The Court thereafter ordered defendants to, under the Special Master's supervision, "undertake an unmet bed needs study to assess whether there are class members in need of inpatient or crisis bed care who have not been identified or referred for necessary care." *Id.* at 14-15.

On February 25, 2022, the Court issued an Order setting a December 31, 2022 deadline for defendants to file their report on the UNA study. ECF 7477. On December 2, 2022, the parties filed a stipulation and proposed order requesting an extension of the December 31, 2022 deadline to file the report on the UNA study to June 30, 2023. ECF No. 7676 at 4. The Court granted the requested extension in a December 15, 2022 Order. ECF No. 7680 at 4-5.

II.      General Comments

Throughout the Draft Report, defendants evinced a desire to demonstrate that their existing sustainable process (referred to as "SusPro" throughout the Draft Report) is superior to UNA at identifying patients in need of inpatient care. While CDCR's desire to defend its sustainable process is understandable in light of the Court's findings,[4] this approach misses the

---

[4] For instance, the Court adopted the findings contained in the Special Master's May 2016 Report on Mental Health Inpatient Care Programs for Inmates of the CDCR, which included the Special Master's determination progress made in timely identifying and referring patients to inpatient care had stalled:

Under the sustainable process in 2012, *Coleman* class patients who needed care were identified, referred and transferred to an appropriate setting to receive the needed care; reducing wait lists and improving timeliness of transfers to inpatient care. Yet, after the 2011 project and the earlier ones, the gains in access to inpatient care turned out to have been short-lived. Over time, in each instance, the number of *Coleman* class members in DSH beds diminished, referrals and transfers slowed, and waitlists grew – just as they did by July 2015. The process known as the sustainable process for identification, referral and transfer of CDCR inmates to inpatient care…unfortunately turned out to be unsustainable.

ECF No. 5448 at 24. The Court adopted the Special Master's findings without objection from the parties. March 8, 2017 Order, ECF No. 5573 at 2.



Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 5

mark and appears to have distracted defendants from attending to some of the Court's specific directives regarding the UNA study.

> Defendants must, under the supervision of the Special Master, undertake an unmet bed needs study to assess whether there are class members in need of inpatient or crisis bed care who have not been identified or referred to necessary care. This unmet needs study must be sufficiently broad in scope and focused in methodology to ensure that it results in a clear and comprehensive assessment of whether there is *any unmet need for access to necessary inpatient care, whether unmet need is the result of an insufficient number of beds in one or more inpatient programs or whether it is the result of an absence of necessary treatment programs*. The Special Master has informed the court that there is a subset of class members with severe personality disorders associated with significant function impairments who have special treatment needs not yet available in an inpatient setting. The Special Master will be directed to ensure that the scope of the unmet bed needs study conducted in accordance with this order is sufficient to identify with specificity the size of that need and what is required to ensure that it is met, as well as to adequately identify whether there is any ongoing unmet need for inpatient care.

September 10, 2021 Order, ECF No. 7305 at 14-15 (emphasis added). Rather than calling for an assessment of whether defendants' sustainable process was superior to UNA, the Court directed defendants to conduct a "comprehensive assessment of whether there is any unmet need for access to necessary inpatient care, whether unmet need is the result of an insufficient number of beds in one or more inpatient programs or whether it is the result of an absence of necessary treatment programs." While the Draft Report addresses the adequacy of the number of MHCBs, it is virtually silent on the question of whether defendants have enough inpatient beds to meet the identified inpatient mental health needs of the incarcerated population. The Draft Report should be revised to respond to the Court's directive regarding the sufficiency of the number of inpatient beds.

Moreover, the Draft Report contains no discussion of the current or projected future need for inpatient beds by custody level. This analysis is critically important to determining whether there is an unmet need and whether that unmet need extends to all of CDCR's inpatient beds, or only a subset (such as high-custody intermediate care beds). It is possible that defendants have a sufficient supply of low-custody inpatient beds – like the *Coleman*-designated intermediate care beds at DSH-Atascadero, nearly 200 of which were available as of April 24, 2023[5] — but an insufficient supply of high-custody beds. By aggregating inpatient beds of all custody levels together and declaring that there is no global unmet need for inpatient mental health services, the Draft Report fails to answer the critical question of whether defendants have a sufficient supply

---

[5] *See* Defendants' Census, Waitlists, and Transfer Timelines Compliance Reports for Inpatient Mental Health Care, ECF No. 7836 at 6.

Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 6

of the right types of inpatient beds (e.g., both from a custody level perspective and from a level of care perspective (e.g., APP, ICF)) to meet the needs of the incarcerated population.  Such analysis is required in order for the final report to be fully responsive to the Court's September 10, 2021 Order.  ECF No. 7305 at 15 ("This unmet needs study must be sufficiently broad in scope and focused in methodology to ensure that it results in a clear and comprehensive assessment of whether there is *any unmet need* for access to necessary inpatient care, whether unmet need is the result of an insufficient number of beds *in one or more inpatient programs* or whether it is the result of an absence of necessary treatment programs.") (emphasis added).

In addition, the Draft Report includes a review of defendants' 2021 Lessons Learned from COVID-19 Report.  ECF No. 7196.  However, the Draft Report unfortunately does not answer the critical question of why referral rates to inpatient care have not returned to pre-COVID-19 levels even though restrictions on patient movement and programming have been largely removed.  Defendants should analyze this question and include this analysis in the final Report.

Finally, while the Lessons Learned from COVID-19 discussion was reasonable given the timeframe considered in the UNA study, the Draft Report contained extremely limited discussion of the lessons learned from the UNA study.  Specifically, throughout the UNA process, UNA review teams, including CDCR clinicians, consistently expressed concern about the woeful mental health staffing levels in the institutions and the resultant lack of follow-up care and required IDTTs.  Defendants allude to the fact that the sustainable process requires continual "evaluat[ion] and refine[ment]."  Draft Report at 40.  Clearly, any future efforts to improve the sustainable process would benefit from an assessment of the lessons learned, including those related to inadequate staffing levels, from this exhaustive study.

III.    Is There an Unmet Need for Inpatient Care?

As currently constituted, the data contained in the Draft Report do not support defendants' conclusion that there is no unmet need for inpatient mental health care.  Draft Report at 35 ("Is There an Unmet Need with Inpatient Referrals:  No.  The 2022 UNA was designed to screen and review a larger population compared to the SusPro method.  The results of the UNA support the conclusion that SusPro is effectively identifying and referring patients in need of HLOC.").  The Draft Report based its conclusion that there is no unmet need for inpatient care on comparisons of inpatient referral rates from 2019, 2021, and 2022.  *See* Draft Report at 35 ("To accurately assess the effectiveness of the 2022 UNA in identifying unmet needs, it is crucial to compare the number of UNA referrals generated to the number of referrals generated by SusPro.").  However, the comparisons contained in the Draft Report are of limited utility in their current form because the 2022 UNA referral numbers do not include *all* referrals to inpatient care made during that time period whereas the 2019 and 2021 SusPro figures include all referrals.



Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 7

Significantly, despite efforts to reconcile defendants' UNA data with the Special Master's team's internal numbers, *see supra* p. 1, discrepancies remain. First, while defendants correctly updated the Draft Report to include "interphase referrals" as UNA referrals *see* Draft Report at 30, the number of interphase referrals included in the Draft Report (58) is still significantly less than the Special Master's team's records (97). In addition, the Draft Report indicates there were 74 UNA referrals to acute care; however, the Special Master's team's records indicate only 39 UNA referrals to acute care. This significant divergence in data further inhibits our ability to evaluate whether there are unmet needs specific to either the acute or intermediate care programs. Finally, CDCR conducted a patient-by-patient analysis of discrepancies between the Special Master's data and CDCR data and shared that analysis during the call on May 25, 2023. Unfortunately, CDCR had reorganized the data and the analysis appeared to misunderstand how the Special Master's team tracked patient outcomes so while the effort to reconcile was thorough, it did not appear to address all discrepancies noted by the Special Master's team.

Additionally, as defendants discovered during the process of re-writing the May 16th Draft, there were significant numbers of referrals made outside of the UNA process during Phase 2 and the seven days following the close of Phase 2 at the respective institutions. In an email dated June 13, 2023, Dr. Steven Cartwright reported the following: "The data shows there were 297 more patients referred during the 'Phase II + 7 days' period compared to the number of patients referred using the 'UNA methodology,' including all referrals made after Phase I and before Phase II." Email from Dr. Steven Cartwright, Psy.D., CDCR Assistant Deputy Director, Statewide Mental Health Program, to Dr. Jeffrey Metzner, M.D., *Coleman* expert (June 13, 2023), attached hereto as Exhibit A. This indicates that 297 patients who were not referred during the UNA process were referred to inpatient care during Phase 2 of the UNA process as well as during the 7 days following completion of Phase 2 but independent of the UNA process at the respective institutions. Dr. Cartwright correctly acknowledged that this finding was "surprising." This "surprising" finding should be analyzed further in the final report, with specific attention to the following questions: How many of these 297 patients referred during this time period had been initially recommended for referral by the UNA review team but not referred by the IDTT? How many of these patients referred were on the Phase I list but not referred by the UNA review team? What are the likely reasons for such a large number of referrals occurring independent of the UNA review process in the context of the Phase I screening criteria casting such a wide net of potential referrals? In other words, why were so many patients referred not identified during the UNA process as needing an inpatient referral?

On page 22, under the heading "Mental Health Screenings," the Draft Report states that "Primary clinicians completed the screening tools for any CCCMS, EOP, and MHCB patients on their caseload…." The Draft Report should be revised to accurately reflect the agreed-upon UNA methodology, under which this screening was the responsibility of the treatment team, not solely the primary clinician. Notably, later on the same page (under the heading "Integration of objective data with subjective screening tools"), the Draft Report appropriately refers to "mental health treatment teams" when discussing the mental health screening.


pldlaw.com

Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 8

On page 24, in the table entitled "Flagged for Unmet Needs Assessment Review," the numbers in the "Total" column add up to 4,717; however, the Draft Report indicates a total of 4,726 for this column. Please review and correct these data.

On page 27, under the heading "Treatment Team Review and Dispute Resolution," the Draft Report states the following:

> IDTTs were required to review HLOC referral recommendations within six business days of receiving the recommendation. If the IDTT agreed with the recommendation, a referral was made in accordance with established policies and procedures. If the IDTT disagreed with the HLOC recommendation, a referral was made to the UNA Clinical Dispute/Consultation Team.

Draft Report at 27. As written, the Draft Report leaves the reader with the impression that referrals were timely made in 100 percent of cases where treatment teams and the UNA review team were in agreement regarding the need for a higher level of care. Were there cases where the IDTT agreed with the UNA review team but still did not refer the patient to inpatient care in a timely manner as per the agreed upon UNA methodology? If so, this should be noted and analyzed in the final report as delays in transfer may be indicative of the unavailability of appropriate beds, either in terms of MH level of care or custody level.

On page 30, under the heading "UNA Review Team Recommendations," the Draft Report states, "[a]ll patients that were initially recommended by the UNA Review Team are reflected in the following table along with the *count of referral recommendations the UNA Review Team rescinded* (i.e., recommendation for non-referral to HLOC) after meeting with the IDTT and discussing the case in CRD." This statement assumes that in all cases where a patient was not referred to inpatient care after CRD, the UNA Review Team "rescinded" the referral recommendation. Characterizing these cases as "UNA Review Team" rescissions is neither an accurate nor a fair representation of the process. As the Draft Report makes clear, treatment teams were left with the discretion to ultimately decide whether to make a referral to inpatient care after consultation with the CRD. *See, e.g.*, Draft Report at 27 ("If at least half of the UNA Review Team members agreed with the recommendation for a HLOC referral, *a referral was made to the IDTT for a final decision*."). As defendants know, there were plenty of cases where the treatment team made the decision not to refer a patient to inpatient care despite all others involved recommending a referral. These cases should be quantified and analyzed, as required by the agreed-upon UNA methodology.[6]

---

[6] To be clear, this is not a request but a requirement of the UNA Methodology: "All recommendations for HLOC to the IDTT that are ultimately not accepted by the IDTT will be tracked and totaled. The final report will include an assessment of such rejections in the context of the purpose of the UNA project. For example, how were these recommendations factored into the final recommendations of any unmet bed needs?" Draft Report, Appendix A (UNA Methodology) at 4.

Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 9

The Draft Report should be revised to provide additional context to the number of UNA review team recommendations for referral that were rejected or otherwise not pursued by the treatment teams.  The final report should note that of the 376 initial UNA review team recommendations for referral to HLOC, 156, or 41 percent, were disputed by the treatment teams.  Of the 156 disputed referrals, 120, or 77 percent, were not referred to inpatient care by the IDTT.  Overall, the 120 initial UNA recommendations for referral that did not result in referral represented 32 percent of all UNA review team recommendations for referral.  The final report should also note whether and to what extent any patients whose UNA referrals were rejected by the respective treatment teams were subsequently referred to inpatient care.  Moreover, the final Report should include rescission and rejection rates for the comparison years to allow further analysis of the 41 percent of disputed referrals and 32 percent of initial UNA review team recommendations that were not referred.

On pages 33-34, the Draft Report discusses "sequestered" patients.  The final report should analyze the findings for this subgroup of 103 patients to enable determination of any unmet needs for patients whose significant medical needs require specialized housing.

On page 35,[7] the Draft Report discusses the "four areas of concern raised before the 2022 UNA."  As alluded to above, these focus areas are not in complete alignment with the Court's September 10, 2021 Order.  Specifically, this paragraph ignores the question of whether there are enough inpatient beds and whether there are program-specific (i.e., custody level and/or MH level of care) deficiencies in bed supply.  Defendants should revise the Draft Report to accurately refer to and align with the Court's directives.

Later on page 35, the Draft Report continues to describe the analysis of data as, "CDCR compared referral rates during specific time periods in 28 UNA institutions. CDCR examined referral rates during Phase II of the UNA process and one week after, comparing them to methodologically equivalent periods in 2019 and 2021."  It is our understanding that this was no longer the case in the updated Draft Report.  Please correct this statement to accurately reflect how analyses were completed.

Also on page 35, the Draft Report states: "During SusPro, patients were considered for HLOC over different periods of time depending on their category: 365 days for CCCMS, 90 days for EOP, and 30 days for EOPMod.  However, in the UNA process, all patients in these categories were reviewed together in a shorter time frame."  This is not accurate.  The UNA methodology incorporated the timeframes from the sustainable process review and, in addition, reviewed higher level of care indicators from a more proximate period of time for all levels of care.  The final Report should be revised to accurately reflect the UNA study's methodology.

_____

[7] A similar discussion appears in the Executive Summary on page 1 of the Draft Report.



Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 10

On page 39, the Draft Report includes a graph displaying seasonal trends in referrals to inpatient care from January 2020 – March 2023. This graph should be revised to include years prior to the onset of the COVID-19 pandemic as movement restrictions significantly impacted inpatient referrals and transfers for virtually the entire time period included in the Draft Report's graph.

IV.    Is There an Unmet Need for Patients with Personality Disorder?

Significantly, our team disagrees with the Draft Report's statement (page 41) that "[t]he 2022 UNA did not conclusively answer" the question of whether there was an unmet need for patients with a personality disorder. While it would be reasonable to conclude that there is an unmet need and additional study needs to be undertaken to understand the nature of that need, it is unreasonable to suggest that the UNA study's results are inconclusive as to the existence of the need. The Draft Report's findings, which identified 470 Category 3 patients, meaning "[t]he patient may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at DSH," clearly demonstrate a significant unmet need for this population. Draft Report at 26. In addition, the population has and will continue to put pressure on defendants' already limited staffing and resources. Leaving these patients in housing units (inpatient or outpatient) without needed treatment risks further harm to these patients, as well as staff and other patients. While we understand the desire to further investigate the unmet need for this population, our team recommends establishing a pilot program for patients with borderline personality disorder as there is no need for further study as to evidence-based treatment for patients with this diagnosis.

On pages 4 and 42, the Draft Report refers to Dissocial Personality Disorder and Emotionally Unstable Personality Disorder. In their years of reviewing CDCR patient records, the Special Master's experts do not recall seeing CDCR clinicians use these International Classification of Diseases (ICD) diagnoses. Moreover, the May 16th Draft Report did not include these diagnoses. Revising the Draft Report to include diagnoses that are not used in practice by CDCR clinicians is confusing and unhelpful.

V.    Whether Defendants Have a Sufficient Number of Crisis Beds

Regarding the tables on pages 47-48 displaying MHCB population projections, it is unclear what the row "Actual Bed Need" represents? Is this based on MHCB daily occupancy? Does it account for referrals or alternative housing stays? For the years impacted by COVID-19, do these figures account for the use of TMHUs?



Elise Thorn, Esq.
Nicholas Weber, Esq.
Melissa Bentz, Esq.
June 15, 2023
Page 11

     VI.    <u>Miscellaneous Comments</u>

On page 7, in the first sentence (beginning "On October 5, 2004…"), there appears to be a missing word.

     <u>Conclusion</u>

Thank you for your consideration of these comments. We look forward to reviewing the final report on the 2022 UNA study.

Sincerely,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr., Esq.
Special Master

CC:   **Via Email to the following:**

| | | |
|---|---|---|
| Elise Thorn, Esq. | Namrata Kotwani, Esq. | Samantha Wolff, Esq. |
| Tom Nolan, Esq. | Damon McClain, Esq. | Dillon Hockerson, Esq. |
| Steven Fama, Esq. | Paul B. Mello, Esq. | Sundeep Thind, Esq. |

4877-1232-6506 v.1



# EXHIBIT A

**From:** Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>
**Sent:** Tuesday, June 13, 2023 10:40 AM
**To:** Metzner, Jeffrey <JEFFREY.METZNER@CUANSCHUTZ.EDU>
**Cc:** Sharen Barboza (sharen@sharenbarboza.com) <sharen@sharenbarboza.com>
**Subject:** UNA Analysis: Patient Referral Counts

[External Email - Use Caution]

Good morning,

I received the all the patient referral counts from Dr. Leidner late yesterday. The figures, albeit surprising, are consistent with our findings:

1. Phase II + 7 Days (1st analysis): **610** referrals
2. Official UNA Referrals (updated analysis): **314** referrals

The data shows there were 297 more patients referred during the 'Phase II + 7 days' period compared to the number of patients referred using the 'UNA methodology', including all referrals made after Phase I and before Phase II.

If you have any further inquiries or need clarification on this matter, please let me know.

Thank you,


Steven Cartwright

# ENCLOSURE D



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

June 15, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Nick Weber                            Dr. Amar Mehta
Melissa Bentz                         Deputy Director, Mental Health Services
CDCR Office of Legal Affairs          Dr. Steven Cartwright
P.O. Box 942883                       Assistant Deputy Director
Sacramento, CA 94283-0001             CDCR Mental Health
Nicholas.Weber@cdcr.ca.gov            Amar.Mehta@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov             Steven.Cartwright@cdcr.ca.gov

       Re:     *Coleman v. Newsom*
                Plaintiffs' Comments on Defendants' Draft UNA Report
                <u>Our File No. 0489-03</u>

Dear All:

       Thank you for providing us with the Draft 2023 Unmet Needs Assessment Report on May 16, 2023 ("May 2023 Draft Report") and the updated draft Unmet Needs Assessment Report on June 8, 2023 ("Draft Report" or "June 2023 Draft Report").  We write to provide our comments and objections to the Draft Report.

**I.**      **The Draft Report's Comparison of UNA and the Sustainable Process Is Flawed, Rendering Its Ultimate Conclusions Questionable**

       When the UNA was designed, the parties discussed the need to compare the number of individuals identified at each institution during UNA, and compare that number to the total number of people identified without UNA during a similar period of time in other years.  No mention was made of comparing the results to Sustainable Process results in particular quarters, and indeed the Court's directive did not call for any such comparison or analysis.  *See* September 10, 2021 Order, ECF No. 7305 at 14-15.

[4298425.12]

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 2

Yet, this seems to be what the charts on pages 2 and 37 of the study are doing,[1] and a key argument in the Draft Report is that UNA did not identify more individuals in need of inpatient care than the 2019 and 2021 Sustainable Process reviews identified.  This argument is both methodologically flawed and unsubstantiated.

Defendants' comparison highlights a fundamentally flawed assumption that is built into all of CDCR's comparisons of the 2022 UNA to other periods of time as well as to the prior unmet need studies.  Specifically, the 2022 UNA is the first and only time clinicians have been asked explicitly to consider and identify patients who fall into Personality Disorder Category 3, i.e., personality disordered patients who need a different program than anything offered within the MHSDS, including the inpatient programs.  Some, if not most, of the 470 Category 3 patients identified during the 2022 UNA would have been identified as needing inpatient treatment and referred during the prior studies and presumably through the sustainable process as well due to their inability to function appropriately in lower levels of care, even if Defendants' inpatient programs do not have programs to properly treat them.  Yet the Draft Report does not mention this important caveat or attempt to analyze how that affects the data comparisons, including those supporting CDCR's conclusions both that there is no unmet need and that the Sustainable Process functions well.   This is a critical limitation that must be addressed.

Moreover, the Draft Report is not comparing referrals generated from the sustainable process to referrals generated from UNA; rather, it is comparing total referrals to acute and ICF combined in the years with sustainable process, to total referrals in 2022, which captures a portion of the UNA process but excludes the significant number of UNA reviews and referrals in 2023.  In response to our request for information regarding UNA referrals during the first quarter of 2023, Defendants declined to provide this information because "CDCR does not believe data from a single quarter is comparable to data from a whole year for comparison purposes."  Email from Melissa Bentz (June 6, 2023).  But of course, the UNA reviews did not start until April 2022 (see Draft Report at 1) – meaning that by limiting the data to 2022 only, CDCR is not examining a full year's worth of data as claimed, and is indeed excluding almost 25% of the relevant time period in which the UNA reviews occurred.  Further, even referrals flowing from the UNA reviews conducted in 2022 would not all be captured in the 2022 data, as the inpatient referrals themselves were generated by later-occurring IDTTs and indeed were sometimes subject to further delays due to the dispute processes as well as other issues including staffing shortages.  *See* Draft Report at 32.  It is also notable that

---

[1] Page citations to the Draft Report are based on pagination printed on the document in the June 2023 Draft Report.

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 3

CDCR's most persistent reported inpatient transfer delays have been in 2023, per their monthly filings with the Court.  It is not acceptable to simply exclude 2023 UNA referrals from the analysis and still maintain the study's data and results have been fairly and fully analyzed.

With respect to time periods, the Draft Report also makes unequal comparisons between UNA and the Sustainable Process on an institution-by-institution level as well. Some of the charts in the Draft Report, for example the chart on page 2, compare sustainable process time periods that are much longer than the time periods used in UNA (and the 2023 portions of UNA are omitted from these comparisons).  As the chart on page 36 of the report shows, for EOP patients, the time period involving the sustainable process is the entire quarter (presumably due to the fact that IDTTs are required to be held once a quarter for EOP patients), and for CCCMS patients the time period is the entire year (similarly, presumably due to the fact that IDTTs are required to be held once a year for CCCMS patients).  But the time frame for a number of UNA institution reviews was less than a month, and the UNA review periods for most individual institutions were one to two months.  *Id.*  Referral rates over a longer Sustainable Process period are certain to be higher than over the much shorter UNA periods.

Furthermore, CDCR's stated methodology for calculating the UNA referrals used as a point of comparison do not make sense.  CDCR states that it examined referral rates "during Phase II of the UNA process and one week after."  Draft Report at 35.  The agreed upon UNA methodology, however, includes referrals generated after the Phase I "master list was established yet prior to the start of Phase II."   *See* Appx. A at 3. Defendants' stated methodology improperly excludes those referrals.  Additionally, using a one-week cut off after Phase II would exclude some referrals given the timeframes permitted to complete the referral process.  As discussed on page 27 of the Draft Report, the Phase II UNA team was permitted five business days to provide a referral recommendation for each patient.  After that, IDTTs were permitted six business days to review recommendation and decide on next steps.  If the IDTTs agreed to refer, they were to follow normal processes for making the referral – which, per CDCR policy, allow for an additional five business days to prepare and submit ICF referral paperwork to IRU, and two business days for acute referrals.  (If the CRD process was invoked, the referral timeframes would be extended even further out, although as noted below Plaintiffs' understanding is that almost every case submitted to CRD resulting in the IDTT rejecting the referral recommendation.)  Given these time frames, there is no question that using a seven-day cut off after the end of each institution's Phase II would arbitrarily exclude UNA-generated referrals.  Not only should the timeframe for UNA referrals employed in CDCR's methodology be expanded to account for these anticipated additional steps in the referral process, CDCR should report on how often the above timeframes were actually

[4298425.12]

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 4

met to ensure that most if not all UNA-generated referrals are actually captured in their analysis.

To the extent the UNA report should contain comparisons to the Sustainable Process at all or opine on that process's efficacy at all, given the Court's order mandating the study contains no such requirements, it must at least make a valid, apples-to-apples comparison. The Report should compare the number of cases identified by the full 2022-2023 UNA process, using a methodology adjusted to account for the issues identified above, with the number of cases identified specifically by the Sustainable Process over equivalent periods of time.

In short, it does not appear that Defendants' analysis of the UNA data supports its conclusion that no unmet need was identified, or that their Sustainable Process works despite prior admissions and Special Master findings to the contrary. *See, e.g.*, Special Master Inpatient Report, May 2016, ECF No. 5448 at 24. Defendants did not include all UNA referrals in their analysis, failed to address the Category 3 patients in their unmet need analysis, and drew comparisons of little value to other data periods.

## II.     The Draft Report's Analysis of Prior Unmet Needs Studies Is Unclear

The Draft Report's analysis of prior unmet needs studies is unclear and potentially problematic. Rather than taking the unmet bed need numbers accepted by the Special Master and the Court at the end of those studies, Defendants appear to be retroactively applying a new methodology that seems to reduce the number of referrals those studies generated. For instance, Defendants' report at page 8 states that the 2009 Mental Health Assessment and Referral Project (MHARP) generated 654 referrals when in fact Defendants' MHARP report stated that 987 patients were referred from the study either by the institutions or because of an MHARP referral team recommendation. *See* ECF No. 3825-2 at ECF page 7 (March 12, 2010 MHARP Report submitted to the Special Master, reporting "As a result of the MHARP, 987 cases were either recommended for referral by the MHARP assessment teams or directly referred by the institutions."). This methodology is similar to that employed in the current UNA, whereby patients who are referred after being flagged for inclusion in the study, but before they are reviewed by the UNA clinical team, are counted. *See* Appx. A at 3. Plaintiffs cannot discern the basis for CDCR's claim that the MHARP referral number is 654 rather than the MHARP report's conclusion of 939 patients, and it appears faulty. Particularly given Defendants then further reduce the 654 referrals they claim MHARP generated to account for an unstated

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 5

average referral rate for 2008,[2] it is critical that Defendants fully explain and justify their use of 654 as the MHARP referral rate.

At least part of the issue is Defendants' attempt to reduce the 987 MHARP referrals by 48 to account for later rescissions is improper. Particularly given the waitlist for inpatient care was many months long and hundreds of patients deep at the time of the MHARP, the fact that some patients may have improved or needed a different level of care while waiting to transfer to an inpatient bed does not mean those 48 patients were improperly referred in the first place. Notably, the referrals were not rejected, meaning they were clinically sound when made, and Defendants' MHARP report does not disclaim the validity of the 48 referrals even if they were rescinded at some later date.[3] Even assuming Defendants correctly subtracted the 48 rescissions in their Draft Report, Plaintiffs still cannot discern the basis for claiming the MHARP generated 654 referrals. Please explain both the genesis of that number and why it is appropriate to use it instead of the number of referrals Defendants' MHARP report actually used: 987.

**III.    The Draft Report's High Level Comparisons Between UNA Year Referrals and the Sustainable Process ("Suspro") Year Referrals Are Not Particularly Helpful In Determining Whether There is An Unmet Need or Whether Sustainable Process is Working.**

The Draft Report opens with the conclusion that "The 2022 UNA did not identify an unmet need for inpatient care." Draft Report at 2. However, this conclusion appears to be primarily based on a side-by-side analysis of UNA results for 2022, and the annual results for Sustainable Process years 2021 and 2019, as well as on a comparison of the total annual number of inpatient referrals as well as referral rates per 1,000 patients for the years 2016-2022.

The Court's reason for ordering UNA study was not to find out whether the Sustainable Process works or not, although we agree that that issue has some relevance to the Court's questions. Rather, the Court asked the parties to determine (a) whether Defendants "have a sufficient number of licensed inpatient mental health beds, including

---

[2] Please provide and explain the 2008 average referral rate information CDCR has utilized in its methodology, including both stating what the number used was and explaining how that number was generated and from what data.

[3] Plaintiffs request confirmation that Defendants are not subtracting any rescissions from the referral numbers reported for the current UNA. To the extent that they are, Plaintiffs object and request that Defendants explicitly report that information in their final report.

[4298425.12]

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 6

mental health crisis beds" and (b) whether "all class members in need of inpatient mental health care are in fact being timely identified, referred and transferred to such care." *See* 9/13/21 Order, ECF 7305, at 3:22-4:4 (quoting March 17, 2020 Order, ECF 6509).

The Court's tentative initial conclusion that an UNA study was needed was set forth in the March 17, 2020 Order, at the beginning of the pandemic. *See* March 17, 2020 Order, ECF 6509, at 3:5-18. Since that time, the pandemic has thrown a wrench, or perhaps several different wrenches, into the provision of mental health care in CDCR, and made the study results difficult to interpret. The current severe staffing crisis, and its impact on care throughout CDCR, has also introduced a number of potentially confounding factors that must be addressed in the report on the UNA study. Recent delays in transfers to inpatient care, and transfers outside Program Guide timelines for higher custody institutions, also suggest a shortage at certain custody levels or program types.

CDCR should address each of the following potentially confounding factors, or important but unexplored factors, in the report:

## A.    The Impact of the Pandemic

The influence of the pandemic on referral rates from CDCR mental health programs to inpatient programs is clear. In 2019, according to the data in the Draft Report, there were 4,803 referrals to these programs. Draft Report at 3. In 2020, during the pandemic, the number of referrals dropped by 1,986, or 41.4 percent to 2,817. *Id.* This drop was likely due to restrictive rules on transfers in place during the pandemic, and not due to a drop in actual need. In 2021, the rates dropped even more, to 2,307, which is a drop of 2,496, or 52 percent from the pre-pandemic rate in 2019. *Id.* Since then, referral rates have not returned to pre-pandemic levels. *Id.* Instead, the 2022 rate per 1,000 patients is approximately ten percent lower than the already low 2021 rate, even with the first part of the UNA referrals included in those referral rates. *Id.*

The Draft Report does discuss the pandemic at page 12 in the context of Defendants' "Lessons Learned" report filed with the Court at ECF No. 7196. The findings of that report are presented as fact, despite the fact that Plaintiffs strongly contest many aspects of Defendants' methodologies and findings (ECF No. 7241) and the Court never adopted it. The final UNA report must be revised to acknowledge these facts.

Further, the discussion of the Lessons Learned report merely points to observed declines in certain mental health acuity markers during the first phase of the pandemic. Many of the explanations for the decline in acuity point to the notion that people rally

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 7

together and show more resilience in times of collective struggle. The Draft Report says decreased mental health visits for urgent concerns observed in CDCR is partially explained by reduced suicides, reduced overdoses, fewer RVRs, fewer incidents of self-injury, and fewer treatment refusals. Draft Report at 14. However, these are all evidence of the general decline in mental health treatment needs during the pandemic. None of those factors explains the persistence of the low rates of referral to inpatient programs in 2022 and again this year, when the suicide rate in the CDCR, for example, has returned to and indeed exceeded its pre-pandemic high level.

It is difficult to understand why CDCR inpatient referrals have remained so low, and the low rates are troubling. The Report should explore the reasons that lower referral rates have persisted even after most pandemic transfer restrictions have been lifted.

**B.      Severe Staffing Shortages of Both Custody and Mental Health Staff May Have Limited The Ability of Staff to Identify and Refer All Cases of Need**

Another likely reason for low referral rates is that even with the UNA study in 2022, severe staffing shortages in CDCR may be limiting the ability of the remaining clinical staff (and the remaining custody staff) to identify everyone in need of inpatient care, and to make appropriate referrals. During the UNA process, it was clear from the UNA review discussions that there were many instances where the individual prisons being reviewed were not doing regular IDTTs and only providing very infrequent and limited (including non-confidential) clinical contacts with class members.

This means that both UNA and the 2021 Sustainable Process may have missed people in need of higher levels of care because of the widespread and severe staffing shortages currently impacting care throughout CDCR. The inpatient referral process in general, including both the UNA process and the sustainable process, relies on staff contact to know when a patient is not doing well. Clinicians have a particularly strong need to know patients well enough if they are expected to identify people using the more subjective criteria for inpatient care, including the UNA Criterion 1 ("unable to adequately function" in an EOP Program), Criterion 2 ("serious to major impairment of functioning in most life areas") and Criterion 3 (chronic psychiatric symptoms that are "not responding sufficiently" as measured by lack of treatment progress or "less than clear benefit" from treatment activities). *See* **Appendix D** to Draft UNA Report (criteria for Phase I UNA identification). If there are few or no treatment activities, staff will not be in positions to gauge progress in response to such treatment.

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 8

Staffing shortages and frequent turnover in staffing of all types would make it difficult for staff to employ these subjective criteria effectively in UNA, and indeed, recognizing this problem, the UNA methodology told staff members who did not know their patients well that they should not complete the relevant screening forms for new patients or patients not well known to them. This decision may have limited the ability of both UNA and the 2021 Sustainable Process to identify all need in the mental health population.

Additionally, Phase II reviewers relied almost exclusively on medical records and other documentation in deciding whether to refer patients. But at multiple institutions, documentation was noted to be poor or incomplete, and many patients flagged for inclusion in UNA had not had required recent IDTTs or other clinical contacts that would have provided the most complete, up-to-date picture of their diagnoses and functioning. For instance, EOP patients at RJD were repeatedly noted to have not received required in person IDTTs for many months, sometimes six months or longer, due to staffing shortages. Yet very few class members were interviewed in Phase II, despite the lack of recent required confidential clinical contacts. While the Draft Report acknowledges the impacts of staffing shortages briefly on the last page, the analysis is extremely cursory and indeed insinuates that reviewers erred on the side of referring patients when current information on their functioning was limited. *See* Draft Report at 53. Defendants provide no substantiation for this claim, and make no effort to evaluate the extent to which staffing shortages leading to limited care affected the process given Phase II reviewers' heavy reliance on documentation. Plaintiffs request that Defendants expand on this analysis to include, for example, discussions of where reviewers repeatedly identified problems caused by staffing shortages that affected their reviews, as well as how often reviewers conducted interviews of flagged patients to gather current information (both at the institutions where problematic staffing shortages were identified and in general).

The UNA Report should analyze the possible impact of staffing shortages on identification of cases potentially needing inpatient care, both in UNA and in the 2021 Sustainable Process Year.

C.     **The Report's Failure to Analyze Inpatient Program Need By Custody Level, Program Type (APP vs. ICF) and LRH Type**

The Draft Report gives almost no response at all to the Court's query as to whether Defendants have sufficient numbers of inpatient beds, at the correct levels of care and custody levels, to meet the true patient need. In particular, the Draft Report also must, but does not, address whether any unmet need for inpatient care varies by the

[4298425.12]

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 9

custody level of the particular inpatient programs and by the type of inpatient program. This was a requirement of the Court's order, and must be addressed. *See* ECF No. 7305 at 15 ("This unmet needs study must be sufficiently broad in scope and focused in methodology to ensure that it results in a clear and comprehensive assessment of whether there is any unmet need for access to necessary inpatient care, whether unmet need is the result of an insufficient number of beds in one or more inpatient programs.").

> 1. **Variation in Occupancy Rates By Custody Level and Type of Program**

Recent data makes clear that there is more space in lower custody intermediate inpatient (ICF) programs like ASH, CSH, PSH and the locked dorms at CMF than at higher custody ICF programs or acute programs. The most recent management information report in the monthly document production, dated March 27, 2023, shows that only 100 out of 370 low custody ICF beds for men are occupied, **an occupancy rate of only 27 percent**. By way of contrast, the MIS report indicates that 564 out of 691 higher custody ICF beds for men are occupied, **an occupancy rate of 82 percent**. (These numbers, of course, do not account for the roughly 150 high custody ICF beds that remain offline.) The occupancy rate for acute programs is 67.5 percent, also much higher than the rate for low custody programs. Moreover, Defendants' recent waitlist and census reports for its inpatient programs continue to show persistent delayed transfers and late pending referrals for their high custody ICF and acute programs. *See* May 15, 2023 Defendants' Census, Waitlist and Transfer Timelines Compliance Report, ECF No. 7836, at 21. Given these issues, it would make sense to analyze UNA results separately for high and low custody ICF, and also to separate out the APP results.

> 2. **Concerns About Low Custody Program Vacancies and low DSH Bed Occupancy**

It is also troubling that the low custody program rates are so low. These rates may be impacted by clinician recognition of the difficulty of getting patients admitted to DSH beds rather than by a reduction in need. The Draft Report includes a chart showing steadily decreasing occupancy rates of DSH beds over the last three years, with particularly large vacancies during the pendency of the UNA study itself. *See* Draft Report at 6. In the past, low referral rates into the ASH program has been a sign of growing unmet need. Defendants argue in the Draft Report that in fact the growth in vacancies during UNA reflects a lack of need for these beds. *See* Draft Report at 5-6. However, if that is the case, there should be some other data confirming this. For example, has there been a drop in low custody EOP patients? There are now more Level

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 10

II EOP programs that ever, which one would think would generate more referrals of Level II, ASH-eligible patients to ICF programming, not fewer referrals.

Data suggests that a surprising number of Level II class members are housed in the high custody inpatient programs. For example, the most recent monthly report filed by Defendants on inpatient referrals, filed on May 15, 2023, reports the following census of level I and II patients in high custody Acute and ICF programs:

| Program | Level I Patients | Level II Patients | Level I + II Total |
|---|---|---|---|
| CHCF High Custody ICF | 5 | 45 | 50 |
| CMF High Custody ICF | 3 | 15 | 18 |
| SVSP High Custody ICF (single and multi-person) | 2 | 44 | 46 |
| **TOTAL Low Custody out of Level in High Custody ICF** | 10 | 104 | 114 |

*See* May 15, 2023 Defendants' Census, Waitlist and Transfer Timelines Compliance Report, ECF No. 7836, at Exhibit E, ECF pages 17-18. The fact that there are 114 level I and II patients in restrictive Level IV inpatient programs is very troubling, and may suggest that lower custody ICF beds at ASH, CSH and CMF are being underutilized. The UNA report should address this issue.

### 3.    LRH Concerns

Concerns about underutilization of low-custody inpatient beds are inherently linked to Defendants' persistently poor implementation of the LRH process. As the Special Master has routinely reported, Defendants often fail to take required steps to ensure that patients in inpatient care are housed in their least restrictive housing. In his 2023 Inpatient Report, the Special Master reported that "[e]vidence of inadequate identification of patients housed outside of their LRH and inadequate treatment planning to address the symptoms and behaviors that prevented patients from moving to their LRH were found in a number of cases reviewed at CMF-PIP and SVSP-PIP[.]" ECF No. 7833 at 74. The Special Master reported that none of the IDTTs that he observed during his thirtieth round tour at CMF-PIP took steps to facilitate patients out of their LRH to move to less restrictive housing, and CMF-PIP suspended LRH reviews due to high staffing

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 11

vacancies. *Id.* at 93, 104. At SVSP, the Special Master reported "challenges from the Health Care Placement Oversight Program (HCPOP) […] when patients were released from maximum custody and reduction to a lower LRH was recommended." *Id.* at 94.

Defendants' May 15, 2023 Census, Waitlist, and Transfer Timelines Compliance Report shows that there were 104 patients as of April 24, 2023 who were not in their LRH at Stockton ICF, 25 patients not in their LRH at CMF ICF, and 73 patients not in their LRH at SVSP ICF. *See* ECF No. 7836. Thus, a total of 202 patients in these high custody programs are not in their LRH. This is a very large number of patients out of their LRH. This, combined with the large number of patients who are Level I and II but are housed in high custody CDCR ICF is very troubling. The Special Master's reporting makes clear that the high number of patients out of their LRH is due in part to high staffing vacancies, but another source for the low DSH bed utilization appears to be that CDCR is still improperly keeping low custody patients in its high custody programs by failing to properly implement its LRH policy. The Report should analyze this issue and whether there is currently sufficient high custody ICF space, and/or underutilization of lower custody ICF beds.

### 4. Concerns That Delays in Transfers to High Custody ICF and Acute Programs Suggest Shortages of Beds In Those Programs

The delays beyond timelines reported to the Court in recent months in referring and transferring patients to high custody ICF and acute programs is also troubling and suggests that CDCR may not have enough of those beds. The UNA Report should address the data on these delays, including the extent to which CDCR would have sufficient beds to transfer all patients timely if they reactivated the 150-plus offline ICF beds at CHCF and CMF PIPs.

For example, the most recent May 15, 2023 filing on transfers to inpatient care out of compliance with timelines shows that in April there were 74 referrals out of compliance with Program Guide timelines and 553 total patient days out of compliance. *See* May 15, 2023 Defendants' Census, Waitlist and Transfer Timelines Compliance Report, ECF 7836, at 21. Similarly, 19 patients waited past timelines to transfer to acute programs for 36 days of non-compliance. *Id.*

The high-custody ICF delays are particularly troubling. The January – March 2023 inpatient reports illustrated similar delays in transfers to higher custody inpatient programs (April is again included for comparison in the chart below):

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 12

| Month | Referrals Out of Compliance | Total Patient Days Out of Compliance |
|---|---|---|
| January 2023 | 44 | 573 |
| February 2023 | 30 | 474 |
| March 2023 | 66 | 723 |
| April 2023 | 74 | 553 |

The vast majority of the non-compliant ICF transfers completed during these months were to male high custody ICF programs. *See, e.g.*, Defendants' May 2023 Inpatient Report, ECF 7836, at 24-27 (reporting almost all untimely ICF transfers completed in April 2023 were to high custody beds); April 2023 Report, ECF 7811, at 24-27 (same for March 2023).  The same is true of the month to month reporting on pending delayed transfers that have yet to be completed.   *See* Defendants' May 2023 Inpatient Report, ECF 7836, at 13 (reporting April 2023 data showing 9 pending referrals over 30 days to high custody ICF, 1 pending overdue referral to locked dorm ICF at CMF); April 2023 Report, ECF 7811, at 13 (March 2023 data showing 27 pending referrals over 30 day timeline to high custody ICF programs, one pending overdue referral to acute program).

If these delays beyond mandated time frames are not due to inadequate numbers of available high custody ICF and acute beds, what is the cause of these delays?  Would Defendants have sufficient inpatient beds to timely transfer all patients needing inpatient care if all existing PIP beds were reactivated, including the offline beds at CHCF and CMF PIPs? The UNA Report should address this issue.

## IV.    Defendants' Personality Disorder Findings and Proposed Next Steps Are Unsupported

Defendants' claim that further analysis is required to determine whether there is an unmet need for patients with personality disorders is belied by the study's results. CDCR's own clinicians identified 470 patients struggling with severe personality disorders that have not responded adequately to offered treatment, have already been offered all clinically appropriate treatment available in the MHSDS, and "may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or DSH." *See* Draft Study, Appendix G, UNA Case Review Template at 4 (explanation of criteria for Personality Disorder Category 3).

[4298425.12]

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 13

While CDCR quibbles about the step in the UNA process at which those patients' needs were identified, the point remains that, according to the negotiated methodology that was specifically designed to assess this potential need, almost 500 patients were identified. There is no question that the UNA identified unmet need in this area, even if Defendants are correct that further study is needed to determine how best to address that need.

Furthermore, Plaintiffs disagree with Defendants' plan, set forth in the Draft Report at pages 41-43, to delay any new personality disorder treatment program for the 470 patients identified using the carefully negotiated UNA methodology. Defendants claim that delay is necessary in order to study the issue of personality disorder treatment more thoroughly to better understand the results with respect to those identified in UNA as needing treatment targeting their personality disorders. *Id.* at 41. We do not agree. In 2020, Defendants' clinicians, with assistance from the Special Master's experts, spent considerable time studying the subset of class members with persistent personality disorders and how best to treat their behaviors. CDCR established a workgroup dedicated to this issue and developed an internal training led by Dr. Golding. This initiative was discussed repeatedly in task force meetings between the parties and the Special Master, including in multiple meetings in Summer 2020. Yet Defendants ultimately refused to proceed with the project, or even to show the training developed by CDCR's clinicians to the Special Master's experts. The issues presented by the group of patients now formally identified in UNA PD Category 3 are well known to Defendants and indeed have already been the subject of focused study and research. There is no good justification to spend another year contemplating whether or not to treat them, much less developing further methodologies to confirm their existence and well-established needs. That was the express purpose of the Court's order initiating the 2022 UNA and the parties' agreed-upon methodology achieved that purpose.

Even if Defendants need time to evaluate the literature and treatment options for certain categories of personality disorder diagnoses, Defendants admit that treatment is known to be available for significant numbers of the patients identified in Category 3.[4] For instance, among the Category 3 patients identified by Defendants' clinicians, there

---

[4] We observed that the total number of personality disorder diagnoses changed from 648 in Defendants' May 2023 version of the Draft Report to 526 in Defendants' June 8, 2023 version of the Draft Report and that the number of persons diagnosed with each specific type of personality disorder changed between the May and June version of the Draft Report. Why did the total number of personality disorder diagnoses and the number of persons diagnosed with each type of personality disorder change in the Revised Draft Report?

[4298425.12]

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 14

are 166 active diagnoses of Emotionally Unstable Personality Disorder or Borderline
Personality Disorder, which Defendants state are the same. Draft Report at 42.
Defendants acknowledge that psychotherapy is the primary treatment for these diagnoses.
Draft Report at 42. Defendants' statement is supported by available literature, such as a
2017 article "What Works in the Treatment of Borderline Personality Disorder," in which
Lois Choi-Kain and her colleagues note that BPD was "once thought to be an untreatable
condition" but that in recent years "five major treatments" for BPD "have been
established as evidence based treatments (EBTs)…" Lois Choi-Kain, Ellen Finch, et al.,
*What Works in the Treatment of Borderline Personality Disorder?*, Curr Behav Neurosci
Report 2017; 4(1): 21-30. Those treatments include "DBT, mentalization-based
treatment (MBT), schema-focused therapy (SFT), transference-focused psychotherapy
(TFP), and systems training for emotional predictability and problem solving (STEPPS)."
*Id.* CDCR has more than enough information to design and begin implementing a
treatment program for this significant identified population of patients given these known
treatment protocols.

Defendants further claim that "[t]reatment for ASPD is challenging" and that
"[t]here are no specific medications or evidence-based treatment available to treat
ASPD." Draft Report at 42. But the patients identified in PD Category 3 with ASPD, or
Dissocial Personality Disorder,[5] are not in the MHSDS primarily because of their ASPD
– such a diagnosis alone would not qualify someone for treatment. By virtue of being in
prison, many or most incarcerated persons could potentially be diagnosed as having
ASPD, yet only about a third of the prison population is in the MHSDS. (Some have
criticized ASPD as a diagnosis for being overbroad.) People with ASPD are in the
MHSDS in general because they are self-injurious or behaviorally disturbed, or because
they have additional diagnoses such as depression. These types of behaviors and
symptoms are already treated routinely, and likely need more focused and targeted
treatment – hence their identification in the study. Those patients already take up a large
amount of staff time and treatment resources, which would be freed up if a treatment
program could successfully treat or reduce the dysfunctional behaviors of even a subset
of these patients. CDCR should establish a pilot program focused on treating these
difficult patients to evaluate the efficacy of potential treatment modalities rather than
spending a year refining a study that very clearly has identified a pressing need. If

---

[5] Why did Defendants revise the Draft Report to use personality disorder diagnoses based
on the ICD instead of the DSM V? It is our understanding that the ICD is primarily used
internationally and not in the United States. In the final version of the Report,
Defendants should utilize diagnoses based on the DSM V to maximize the transparency
of the Report.

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 15

Defendants are permitted to take a year to further study this issue, it should at a minimum be developed and conducted with oversight from the Special Master's experts and participation from Plaintiffs.

## V.    Additional Information and Analysis is Needed Regarding IDTT Rejections of UNA Recommendations

The parties' agreed-upon methodology required the tracking and analysis of recommendations for HLOC that IDTTs ultimately rejected. *See* Appx. A at 4 ("11. All recommendations for a HLOC to the IDTT that are ultimately not accepted by the IDTT will be tracked and totaled. The final report will include an assessment of such rejections in the context of the purpose of the UNA project. For example, how were these recommendations factored into the final recommendations of any unmet bed needs?"). The Draft Report does not sufficiently address this requirement.

The table on page 30 of the Draft Report includes a column with the number of "patients not referred after CRD."  Draft Report at 30.  But it does not identify the number of patients subjected to the CRD process in the first place.  Please identify this information.   Our understanding is that almost every patient for whom the CRD was invoked was ultimately not referred.  Additionally, please expand this table to provide information on how many of the 120 patients not referred after CRD were not referred because the UNA team rescinded the referral versus how many were not referred because the patient's treatment team refused to make the referral, overruling the UNA team's recommendation.

In addition to providing this additional information that is necessary to understand the role of the IDTTs in this UNA, Defendants must "include an assessment of such rejections in the context of the purpose of the UNA project," including discussing how the UNA recommendations were factored into the overall unmet bed need analysis. Appx. A at 4.  In doing so, Defendants should address whether IDTT decisions not to refer in light of UNA team recommendations to the contrary reflect similar issues to those identified in prior unmet needs studies, such as those discussed in the Draft Report with respect to the 2005 study.  *See* Draft Report at 7 (noting final report found "[s]ome staff showed signs of institutionalization, with higher tolerance for pathology and decompensation").  Similarly, Defendants should address the role that clinical staffing shortages at the institutional levels played in the rejections, particularly with respect to the numerous UNA team reports that required IDTTs had not been held for flagged patients at certain institutions such as RJD, which gives rise to the question as to whether the IDTTs were actually best positioned to patients' current clinical status.

[4298425.12]

CDCR Office of Legal Affairs
CDCR Mental Health
June 15, 2023
Page 16

## VI.    Defendants Should Consider Whether SusPro Could be Improved By Incorporating UNA Screening Criteria or Other Lessons Learned

Finally, the Report should address whether there would be a benefit to incorporating any of the UNA screening criteria into the Sustainable Process. Some of the additional UNA screening factors may make UNA a better process for identifying missed cases of inpatient need, even if the overall number of referrals identified through UNA was similar to the number of referrals identified through the Sustainable Process, which may or may not be true. If that is the case, determining which additional UNA criteria might be useful to add to the sustainable process would be valuable.

### Conclusion

The Draft Report's analysis of the UNA study falls short in many ways. We urge Defendants to address these deficiencies by revising the Report to address the concerns identified above.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael S. Nunez*

By:    Michael S. Nunez
Senior Counsel

MSN:cg
cc:    *Coleman* Special Master Team
Co-Counsel

[4298425.12]

# ENCLOSURE E

| From: | Sharen Barboza <sharen@sharenbarboza.com> |
|---|---|
| Sent: | Thursday, June 1, 2023 6:17 AM |
| To: | Cartwright, Steven@CDCR |
| Cc: | Thomas, Trent@CDCR; Jeffrey Metzner |
| Subject: | RE: UNA - Data Reconciliation |

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning,

Thanks again for sending the updated numbers. Based on my review, I believe we are as close as possible to agreement on the numbers. There continue to be discrepancies but this is likely due to the fact that the Special Master's team did not track the ultimate status (type and outcome) of the interphase referrals. I do not believe the discrepancies are significant enough to warrant holding up the analyses. Additionally, it appears that the Special Master's team tracked "facility" in a different manner than CDCR making it difficult to ascertain where the differences lie, other than going case by case, which does not appear to be worth the time given the minor discrepancy.

We support moving forward with the data as CDCR has it to date.

Thank you again for your hard work and quick turnaround.
Sharen

**From:** Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>
**Sent:** Wednesday, May 31, 2023 3:23 PM
**To:** Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Sharen Barboza <sharen@sharenbarboza.com>
**Cc:** Thomas, Trent@CDCR <Trent.Thomas@cdcr.ca.gov>
**Subject:** RE: UNA - Data Reconciliation

Good afternoon Jeff and Sharen,

Thank you for your involvement in our data reconciliation meeting last week. Your input is truly valued and is instrumental in ensuring the accuracy of our UNA analysis, which is of utmost importance to us.

Please find attached our revised numbers for APP and ICF referrals, as well as the figures for Category 3. You'll note that these updated figures have increased when compared with our draft report, and also surpass the totals sent to us by the Special Master's team on May 18, 2023. The reason behind the higher numbers is quite straightforward: we've adopted an inclusive approach to our counts. For instance, if a patient was included in the Special Master's Category 3 list but was missing from ours, we've added them to our updated tally. Moreover, we've accounted for the interphase referrals in our updated figures. These are the patients who were in the referral process, or were about to be referred, between Phase I and II. Although they were not included in the initial ICF or APP numbers because the type of referral had not been confirmed, they are now included in our revised count.

Here are the overall counts derived from the attached document:

| APP/ICF | Count | | PD Cat 3 | Count |
|---|---|---|---|---|

| APP | 74 | PD Category 3 | 470 |
|---|---|---|---|
| ICF | 240 | | |
| **Grand Total** | **314** | | |

If we can find common ground on these numbers, it would be beneficial for the next steps. I can then discuss this data with Dr. Leidner and his methodology. I appreciate your continued collaboration on this matter, and I look forward to your thoughts.

Thank you,

Steven Cartwright


-----Original Appointment-----
**From:** Cartwright, Steven@CDCR
**Sent:** Wednesday, May 24, 2023 2:54 PM
**To:** Cartwright, Steven@CDCR; Jeffrey Metzner; Sharen Barboza (sharen@sharenbarboza.com); Thomas, Trent@CDCR
**Subject:** UNA - Data Reconciliation
**When:** Thursday, May 25, 2023 1:30 PM-2:30 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

---