# Exhibit C

# 2022/23 UNA REPORT



# STATEWIDE MENTAL HEALTH PROGRAM

California Department of Corrections and Rehabilitation                    Division of Health Care Services

# 2022/2023 Unmet Needs Assessment

Analysis of the Inpatient Referral Processes, Inpatient Bed Demand, and Patients Diagnosed with Personality Disorders in the California Department of Corrections and Rehabilitation.

Table of Contents

Executive Summary ........................................................................................................................ 1

    There Is No Unmet Need for Inpatient Referrals Within CDCR ................................................ 2

    Whether There Is an Unmet Need for Patients with Personality Disorder Requires Further Study .... 3

    There Are a Sufficient Number of Mental Health Crisis Beds .................................................. 5

    The Sustainable Process Is Effective ........................................................................................ 5

Previous Unmet Needs Assessments .......................................................................................... 7

    2005 Unmet Needs Assessments ............................................................................................. 7

    2009 Mental Health Assessment and Referral Project ........................................................... 8

    2012 Sustainable Self-Monitoring Process ............................................................................. 9

    2014 San Quentin Condemned Unmet Need Analysis .......................................................... 10

New Unmet Need Concerns ....................................................................................................... 11

    2016 Concern: The Sustainable Process is Unsustainable ................................................... 11

    2019 Concern: Insufficient Mental Health Crisis Beds ......................................................... 12

    2020 Concern: Patients with Personality Disorders ............................................................. 12

    2020 Concern: Insufficient Inpatient Referrals .................................................................... 13

2021 Report: Lessons Learned During the COVID-19 Pandemic ............................................... 14

2022 Unmet Needs Analysis Methodology ................................................................................ 15

    Timeline of Meetings ............................................................................................................ 15

    Methodology Development .................................................................................................... 15

2022 Unmet Needs Assessment: Phase I .................................................................................. 19

    Operationalization ................................................................................................................ 19

        Screening criteria – Objective ........................................................................................ 19

        Screening criteria – Subjective ....................................................................................... 20

    Screening Results .................................................................................................................. 23

        Flagged for Unmet Needs Assessment Review .............................................................. 24

2022 Unmet Needs Assessment: Phase II ................................................................................. 25

    Operationalization ................................................................................................................ 25

        Higher Level of Care Review .......................................................................................... 26

        Personality Disorder Review .......................................................................................... 26

        Clinical Case Discussions ................................................................................................ 26

        Treatment Team Review and Dispute Resolution .......................................................... 27

    Dual Authentication Methodology for Unmet Needs Assessment Data ................................ 28

Inpatient Recommendations and Referrals Results ................................................................ 30

Unmet Needs Assessment Review Team: Personality Disorder Results ............................... 32

Special Circumstances ............................................................................................................. 33

**2022 Unmet Needs Assessment: Findings** .................................................................................. 35

Is There an Unmet Need with Inpatient Referrals? ................................................................. 35

Analysis .................................................................................................................................... 35

Recommendation ..................................................................................................................... 40

Is There an Unmet Need for Patients with Personality Disorder? ........................................... 41

Recommendation ..................................................................................................................... 43

Are There Insufficient Mental Health Crisis Beds? ................................................................. 45

Average Mental Health Crisis Bed Referrals, Alternative Housing, Temporary Mental Health Unit, and Occupancy .................................................................................................................. 45

Population Projections ............................................................................................................. 47

Recommendation ..................................................................................................................... 50

Is the Sustainable Process Unsustainable? ........................................................................... 51

CDCR Inpatient Beds .............................................................................................................. 51

*CIW-PIP APP/ICF Beds* .......................................................................................................... 54

*SQ-PIP APP/ICF Beds* ........................................................................................................... 55

*CDCR ICF Locked Dorms* ...................................................................................................... 55

*CDCR ICF Multi-Person Cell and Single Cell Beds* .............................................................. 56

ICF Single Cell since 2018 ...................................................................................................... 57

ICF Multi-Person Cell since 2018 ............................................................................................ 57

Recommendations ................................................................................................................... 58

**2022 Unmet Needs Assessment: Limitations** ............................................................................. 59

**2022 Unmet Needs Assessment: Contributors** .......................................................................... 61

**APPENDICES** ............................................................................................................................... 63

## Selected Abbreviations Used in This Report

| | |
|---|---|
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASPD | Antisocial Personality Disorder |
| ASU | Administrative Segregation Unit |
| BPD | Borderline Personality Disorder |
| CCCMS | Correctional Clinical Case Management System |
| CCHCS | California Correctional Health Care Services |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | California Healthcare Facility |
| CI | Confidence Interval |
| CIM | California Institution for Men |
| CIT | Crisis Intervention Team |
| CIW | California Institution for Women |
| COR | California State Prison, Corcoran |
| CRC | California Rehabilitation Center |
| CRD | Clinical Resolution Discussion |
| CTC | Correctional Treatment Center |
| DAI | Division of Adult Institutions |
| DMH | Department of Mental Health |
| DSH | Department of State Hospitals |
| EHRS | Electronic Healthcare Record System |
| EOP | Enhanced Outpatient Program |
| EUPD | Emotionally Unstable Personality Disorder |
| HCPOP | Health Care Placement Oversight Program |
| HLOC | Higher Level of Care |
| HQ | Headquarters |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| IRU | Inpatient Referral Unit |
| LAC | California State Prison, Los Angeles |
| LOC | Level of Care |
| LRH | Least Restrictive Housing |
| LTRH | Long-Term Restrictive Housing |
| MCSP | Mule Creek State Prison |
| MH | Mental Health |
| MHARP | Mental Health Assessment and Referral Project |
| MHCB | Mental Health Crisis Bed |
| MHI | Mental Health Identifier |
| MHPC | Mental Health Primary Clinician |
| MHSDS | Mental Health Services Delivery System |

| MOU | Memorandum of Understanding |
| MTP | Master Treatment Plan |
| OHU | Outpatient Housing Unit |
| PIP | Psychiatric Inpatient Program |
| PT | Psychiatric Technician |
| RC | Reception Center |
| RJD | Richard J. Donovan Correctional Facility |
| RVR | Rules Violation Reports |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SMHP | Statewide Mental Health Program |
| SOMS | Strategic Offender Management System |
| SQ | San Quentin State Prison |
| SQL | Structured Query Language |
| SRASHE | Suicide Risk and Self-Harm Evaluation |
| STRH | Short-Term Restricted Housing |
| SusPro | Sustainable Self-Monitoring Process |
| TMHU | Temporary Mental Health Unit |
| UNA | Unmet Needs Assessment |
| VPP | Vacaville Psychiatric Program |

# Executive Summary

The California Department of Corrections and Rehabilitation (CDCR) is committed to providing high-quality mental health care services to its incarcerated population. Over the past twenty-one months, in response to court orders, CDCR has conducted the 2022/2023 Unmet Need Assessment (hereinafter referred to as the "UNA" or "2022/2023 UNA")[1] to identify potential gaps in the delivery of these critical services. This report presents the findings and recommendations of the UNA and provides actionable strategies to improve the Statewide Mental Health Program (SMHP). It also documents the significant time and effort devoted to the UNA over an almost two-year process. During a time of historic upheavals, CDCR assigned a team of at least 70 dedicated employees to screen more than 32,500 patients and complete over 4,700 detailed UNA patient reviews. The UNA required a significant investment of collective resources, and it is likely impossible to fully account for all the time and effort CDCR, Department of State Hospitals (DSH), Plaintiffs, the Special Master, and others contributed.

The scope of the 2022/2023 UNA analysis was guided by specific concerns raised by the Special Master and Plaintiffs between 2016 and 2020. In 2016, the Special Master highlighted the challenges of providing timely access to appropriate higher levels of care for mentally ill patients. He concluded that despite efforts to improve access, the sustainable process for identification, referral, and transfer of CDCR patients to inpatient care at DSH was no longer sustainable as evidenced by the number of vacant beds at Atascadero State Hospital (ASH). (ECF No. 5448 at 24.) In 2019, based on population projections and Mental Health Crisis Bed (MHCB) construction plans, the court signaled the intent to conduct an unmet bed need study to determine whether there are enough inpatient hospital beds and MHCBs. In 2020, in the midst of the COVID pandemic, Plaintiffs also raised concerns about the low number of mental health referrals to inpatient care, potentially signaling an unmet need within CDCR's mental health population.

On September 13, 2021, the court issued an order stating, "defendants shall, as soon as practicable... undertake an assessment of whether there is unmet need for inpatient care, including acute care, intermediate care, and mental health crisis bed care." (ECF No. 7305 at 15-16.)[2] CDCR, in consultation with DSH, Plaintiffs and the Special Master, designed and completed the 2022/2023 UNA reviews between April 2022 and March 2023. The UNA addressed the issues of whether there were unmet needs for inpatient care, unmet needs for patients with personality disorders, whether there were sufficient crisis beds, and whether the Sustainable Process (SusPro) was unsustainable. Significantly, and as expanded upon further in the report below, CDCR makes several key findings:

1. There is no unmet need for inpatient referrals within CDCR.
2. Whether there is an unmet need for patients with personality disorder requires further study.
3. There are a sufficient number of mental health crisis beds.

---

[1] This report refers to past Unmet Need Assessments, but distinguishes these by including the year or commonly used terms (e.g., "MHARP", "2005 UNA")

[2] On February 25, 2022, the court issued a minute order extending the planning phase to allow time to finalize the remaining details. At that time, the court noted, "On or before December 31, 2022, Defendant's shall file with the court a written report on the results of the unmet bed needs assessment." Due to the extensive scope of the study, the December 31, 2022, deadline was extended to June 30, 2023.

4.  The Sustainable Process is effective.

### There Is No Unmet Need for Inpatient Referrals Within CDCR

The 2022/2023 UNA did not identify an unmet need for inpatient referrals. The findings discussed in this report showed no such unmet need as the number of referrals during the UNA were not substantially or consistently higher than referral numbers in previous years using CDCR's baseline referral process (i.e., SusPro). Since its inception, SusPro was designed and used to systematically identify and refer patients in need of a Higher Level of Care (HLOC). It accomplishes this by enforcing statewide training standards and by applying a rigorous review process that includes continuous institutional, regional, and HQ oversight. The 2022/2023 UNA was modeled after the 2009 MHARP study and designed to screen almost every mental health patient not currently housed in an APP or ICF program – over 32,500 patients. The results of the 2022/2023 UNA support the conclusion that SusPro is effectively identifying and referring patients in need of HLOC. This conclusion is reinforced by two separate avenues of investigation.

First, a side-by-side analysis of the 2022/2023 UNA referrals to comparable timeframes in which SusPro was used (2019 and 2021)[3] shows significantly higher SusPro referral rates for CCCMS and EOP patients, and comparable referral rates for EOPMod patients. This analysis took into consideration differences in the mental health population and methodological variances between the 2022/2023 UNA and SusPro. It also factored in comparisons from pre-COVID (2019), pre-UNA (2021), and UNA (April 2022 – March 2023) periods.



---

[3] The methodology for this analysis is discussed in more detail later in this report.



Source: Referrals to Inpatient Programs Application, OnDemand Census Report (January 1 mental health statewide census)

Second, the annual referral rate per thousand patients over a span of seven years, from 2016 through 2022, was analyzed. If there was an unmet need, then the referral rate during the 2022/2023 UNA could be expected to be significantly, or at least noticeably, higher. However, the annual referral rates for each year from 2016 to 2021 consistently proved to be higher than the 2022 referral rate. The results of this analysis show that there was not a significant increase in referrals in 2022, even though the institutions with the highest concentration of Mental Health Services Delivery System (MHSDS) patients participated in the UNA from April – December 2022.

The chart, "Yearly APP/ICF Referrals & Referral Rate Statewide Mental Health Population", was constructed using referral data sourced from the Referrals to Inpatient Programs Application (RIPA) on a yearly basis, complemented by the yearly statewide mental health census data as of January 1st. This combined dataset - the number of APP/ICF referrals statewide per year and the annual statewide mental health patient census on January 1st - enabled the computation of the referral rate per 1,000 patients.[4]

<u>Recommendation</u>: Maintain current practice. SusPro has proven effective in identifying patients needing inpatient care and referring them accordingly. It remains crucial to persistently assess and fine-tune the process. This could involve investigating whether review frequency should be increased, whether referral criteria should be modified, or whether additional evidence-based screening tools should be introduced to enhance the detection of patients requiring inpatient care.

## Whether There Is an Unmet Need for Patients with Personality Disorder Requires Further Study

The UNA Review Teams identified 470 patients who do not qualify for inpatient hospitalization but, who *may* benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or to CDCR patients at DSH (i.e., PD Category 3). However, key methodological limitations, diagnostic anomalies, and unexpected Phase II inclusion results in the UNA

---

[4] The rate is based on CDCR total mental health population as of January 1 for each year listed. Rate = (referrals/census) * 1000. Using the OnDemand Census Report, the total mental health population for each year was: 2016 = 36,919; 2017 = 38,405; 2018 = 38,701; 2019 = 36,961; 2020 = 35,982; 2021 = 29,576; 2022 = 32,596

created significant challenges in assessing the needs of the identified population or drawing inferences about the population at large.

When considering recommendations for patients with personality disorders in the PD Category 3, UNA reviewers were asked to respond in an open-ended narrative fashion as to why the patient met criteria for inclusion in that category. Since there was no required standardized justification or rationale for these patients, the inconsistent response patterns make comparative analysis near impossible. To understand the population identified in the 2022/2023 UNA, a separate analysis of the identified patients using standardized methodology is required.

Of the 470 patients identified in the 2022/2023 UNA as meeting the above criteria, 379 (81%) had an active personality disorder diagnosis in EHRS, and 91 patients (19%) had no active personality disorder diagnosis at the time of UNA review. Of the PD Category 3 patients who had an active personality disorder diagnosis in the Electronic Health Records System (EHRS), Dissocial Personality Disorder was the most predominant diagnosis with Emotionally Unstable Personality Disorder as the second most represented diagnosis.

Although not initially flagged during Phase I, a considerable number of patients, 349 or 74%, were subsequently identified by the UNA Review teams as falling into PD Category 3. Similarly, among 91 patients without an active personality disorder diagnosis at the time of review, 75 (82%) were identified as PD Category 3 by the UNA reviewers, despite not having been flagged during Phase I. The distinctions between these subgroups and those screened in Phase I by clinicians and designated as PD Category 3 by the UNA Review teams remained unclear. There was no Clinical Resolution Discussion (CRD) process for the PD recommendations, meaning the Interdisciplinary Treatment Team (IDTT) did not have an opportunity to refute or confirm the recommendations for these specific subgroups, as was the case with HLOC recommendations.

Among the patients identified as PD Category 3 who had a current or historical personality disorder diagnosis in the EHRS, there was a notable divergence in diagnoses. The wide range of symptoms and maladaptive behaviors demonstrated by these patients suggested a high degree of variation in treatment needs, making a uniform treatment approach inappropriate. Accordingly, further research is needed to determine if there was an unmet need for a therapeutic intervention aimed at addressing and treating patients diagnosed with personality disorders.

Recommendation: CDCR should implement the 12-month plan outlined in this report, aiming to validate the findings from the 2022/2023 UNA and evaluate the treatment needs of the 470 patients with personality disorders identified during the 2022/2023 UNA. The plan includes conducting a literature review, designing a mixed-methods study, developing data collection instruments, collecting and analyzing data, interpreting findings, and determining any additional treatment services that might benefit to this population. This recommendation is guided by a thoughtful and rigorous evaluation of patient needs, not by legal categorizations. It doesn't automatically equate a diagnosis of personality disorder with inclusion in the *Coleman* class, nor does it suggest that a *Coleman* remedy is necessarily inclusive of a treatment program for these disorders. As mental health practitioners dedicating our career to improving the lives of our patients, our focus remains on understanding and addressing their individual treatment needs.

### There Are a Sufficient Number of Mental Health Crisis Beds

CDCR has a sufficient number of MHCBs to provide care to patients in need of crisis care. No unmet need was identified for this population. CDCR receives MHCB bed need projections on a semi-annual basis from its consultant, to guide future facility planning. The methodologies used in these studies has evolved since 2011 and involve population projections by level of care and gender. Recent forecasts for both male and female MHCB needs have consistently been below the current capacity, indicating that the number of beds is sufficient to meet patient needs.

Despite the surplus in capacity, additional *licensed* beds may be necessary in the Southern Region. The California Institution for Men (CIM) 50-bed Project will replace 34 unlicensed beds at CIM and 19 unlicensed beds at the California Institution for Women (CIW) with licensed beds, for an overall net loss of three beds. However, those beds are planned to be usable for either male or female patients depending on statewide need, providing more flexibility to the Southern Region. Onsite construction preparation for the project commenced in April 2023. Overall, the existing capacity is projected to be adequate to provide access to crisis bed level of care.

Recommendations: CDCR should maintain existing MHCB bed capacity and continue to regularly monitor demand to ensure optimal resource allocation and address regional disparities. CDCR should continue to assess bed projections and actual usage to ensure adequate numbers of crisis beds in the future.

### The Sustainable Process Is Effective

CDCR's baseline referral process, also known as the Sustainable Process, has demonstrated its effectiveness in identifying CDCR patients in need of inpatient hospitalization. Its performance, as evidenced by the comparison with the 2022/2023 UNA, attests to its success in detecting unmet needs. Importantly, the SusPro was not conceived with the objective of filling specific inpatient beds such as those at DSH, but rather to promptly identify and refer patients requiring inpatient care. As such, the 2022/2023 UNA found no correlation between the number of empty beds at DSH and the level of unmet need.

Specifically, historical data from the past five years indicates that an uptick in the number of available DSH beds does not automatically equate to an increased level of unmet need. During the 2022/2023 UNA, the occupancy rate of DSH beds saw a decline, with the bed occupancy dropping roughly 10% by the UNA's end compared to the beginning. Even amidst the fluctuating occupancy rates of DSH beds between 2018 and 2019, the number of inpatient referrals produced by SusPro displayed a consistent annual growth. The bar graph below illustrates the percentage of occupied DSH beds (ASH, CSH,[5] and PSH[6]) from January 2012 – April 2023,[7] further supporting the finding of a weak correlation between

---

[5] Coalinga State Hospital

[6] Patton State Hospital

[7] Some months will be above 100% because the occupancy rate is a combination of total census plus patients endorsed and pending transfer, which can sometimes exceed the total capacity if there is a waitlist.

available DSH beds and unmet need.



Recommendations: Uphold current practices. CDCR remains dedicated to routinely reviewing and updating the Sustainable Process as needed, ensuring it continues to be a potent tool for pinpointing and referring patients who need HLOC. Additionally, CDCR will continue to monitor and assess the need to adjust the Sustainable Process to preserve its effectiveness.

# Previous Unmet Needs Assessments

## 2005 Unmet Needs Assessments

On October 5, 2004, the *Coleman* Court ordered CDCR to conduct an UNA. Between August 2004 and March 2005, 24 institutions with an MHCB, Enhanced Outpatient Program (EOP), or Reception Center (RC) were included in the study. Patients meeting at least one of the designated 14 screening criteria, and not already in the process of being referred to the then-named Department of Mental Health (DMH), were reviewed. Cases were generally discussed by two-member teams (one *Coleman* expert and one CDCR clinician), with the opportunity to discuss cases with other teams to help clarify issues and maintain inter-rater reliability.

While 796 patients flagged positive for at least one item on the 14-item screener, 326 of them were already in the process of being referred to DMH. Of the remaining 470 patients, 326 were recommended for referral to a HLOC. During their onsite visits, the review teams conducted chart reviews, patient interviews, and met with clinical staff, resulting in 512 referrals in total.[8] The EOP population over the course of the study was 3,571.



The unmet need for the 2005 assessment was 11.2% of the EOP population, after factoring in the 2004 referral rates. Although 512 patients were referred to a HLOC during the 2005 UNA, CDCR applied an adjustment to account for expected referrals during the review period to identify the true "unmet need." Adjusting the final UNA results to account for the typical monthly ICF (39) and APP (60) referrals, the final report for the 2005 UNA estimated the "unmet need" was 400 patients (385 ICF and 15 APP).

The final report raised several concerns, including inadequate preparation by some institutions for the UNA, with a one-time occurrence mentality towards reviewing criteria and HLOC consideration. Some staff showed signs of institutionalization, with higher

The graph demonstrates the proportions of flagged, referred, and total unmet needs within the 2005 EOP population. Each concentric circle represents the total population, with the inner circle for unmet needs, the middle circle for referred, and the outer circle for total flagged. The blue segments in each circle represent the proportion of the respective category within the EOP population. Flagged and referred are the total counts from the 2005 UNA, while the unmet need is calculated by subtracting the average referrals in 2004 from the total referrals during the 2005 UNA.

tolerance for pathology and decompensation. Referral tracking varied greatly, with inaccurate logs in some institutions, necessitating a universal tracking system. Additionally, despite training, some confusion about the referral process remained, with staff unaware that referrals were possible from EOP.

---

[8] The final report included the "UNA Factor," which statistically accounted for the proportion of likely referrals had the UNA not occurred.

## 2009 Mental Health Assessment and Referral Project

Four years later, on March 31, 2009, the *Coleman* Court ordered CDCR and DMH to conduct another unmet needs assessment. Between April and December 2009, patients in all 28 non-desert institutions were reviewed. Patients meeting at least one of 13 screening criteria were reviewed by the MHARP review team. Compared to the 2005 UNA, the 2009 MHARP assessment expanded the number of institutions reviewed and patients considered by adjusting the screening criteria to cast an even wider net.

As a part of the 2009 MHARP, 1,800 patients flagged positive for at least one item on the 13-item screener, 337 of which were referred to a HLOC by the institutions before the MHARP review team arrived at a recommendation. Of the remaining 1,463 patients, the MHARP reviewers recommended 650 for HLOC referral. At the conclusion of the study, a total of 939 patients were referred, either by the institutions or because of an MHARP referral team recommendation. The total EOP population over the course of the study was not provided in the final MHARP report. However, historical data shows the average EOP population in 2009 was 5,069.[9]



The 2009 MHARP Report did not include an "UNA Factor" as CDCR did during the 2005 UNA. Nevertheless, some of the referrals identified by institutions during the MHARP would have been identified and referred as a part of the ongoing and regular practice of the mental health program at the institution. While not analyzed in the 2009 UNA report, it follows that those referrals would not be representative of an unmet need. After adjusting the final MHARP results to account for the 2008 rate of ICF and APP referrals for the EOP population, the estimated unmet need was 477. Accordingly, the unmet need for EOP patients in the 2009 assessment was 9.4%. [10] Given the average 2009 Correctional Clinical Case Management System (CCCMS) population was 30,060 and there were 285 CCCMS referrals for HLOC during MHARP, based on the 166 CCCMS referrals to HLOC in 2008 the unmet need for CCCMS patients was 0.4% during the 2009 assessment.[11]

The graph demonstrates the proportions of flagged, referred, and total unmet needs within the 2009 MHARP population. Each concentric circle represents the total population, with the inner circle for unmet needs, the middle circle for referred, and the outer circle for total flagged. The blue segments in each circle represent the proportion of the respective category within the EOP population. Flagged and referred are the total counts from the 2009 UNA, while the unmet need is calculated by subtracting the average referrals in 2008 from the total referrals during the 2009 MHARP.

On November 4, 2009, CDCR implemented a new ICF Pilot Program that was designed to sustain the process of reviewing patients for possible DMH ICF recommendations and referrals, and to increase

---

[9] Taking the sum of the number of nights each EOP patient spent at CDCR during the 2009 calendar year and dividing it by the maximum interval of that period.

[10] Methodology and limitations to determine the 2009 EOP population and unmet need are discussed in Limitations section of this report.

[11] [Unmet Need (MHARP Referrals – 2008 Referrals) / Population during MHARP]

referrals of patients whose custody factors would have previously prevented their referral to an ICF bed in a Least Restrictive Housing (LRH) unit. CDCR's HCPOP reviewed the waitlist for DSH's Salinas Valley Psychiatric Program utilizing the new ICF Pilot Program custody criteria, which resulted in 27 additional patients admitted to ASH and 14 accepted to DSH's Vacaville Psychiatric Program dorms (VPP). The MHARP and the ICF Pilot Program were incremental steps toward establishing a sustainable identification and referral process for patients needing a HLOC.

## 2012 Sustainable Self-Monitoring Process

In 2012, under the guidance of the Special Master, CDCR developed and implemented the SusPro as part of a court-ordered agreement. SusPro expanded upon MHARP and was designed to be a continuous ongoing process to ensure that patients were identified and referred to higher levels of care in a timely manner. Since 2012, SusPro has been conducted continuously by CDCR as its primary HLOC referral process and was designed with two primary objectives. The first was to ensure that patients were at the appropriate level of care (LOC), receiving the mental health treatment they needed, and were evaluated, referred, and transferred timely to higher levels of care when clinically indicated. The second was to develop a sustainable, internally monitored, quality improvement process that identified opportunities for enhancement (e.g., targeted need for additional training, supervision, and oversight). Each institution, all four regional teams, and headquarters (HQ) had a collective commitment to ensuring patients were timely referred to a HLOC when indicated, through this self-monitoring process.

SusPro consists of site visits, data review, HLOC consideration documentation, monthly audits, APP and ICF referral and non-referral monitoring, documentation consistency audits, and review of patient records. In short, SusPro serves as a comprehensive safety net to ensure that patients in need are identified and referred to higher levels of care when clinically indicated.

The regional teams work closely with the institutions and their higher-LOC teams, including the inpatient coordinators, to conduct quarterly site visits and monitor all processes included in the SusPro review. Institutions use the HLOC Document audit tool, previously known as CDCR Form 7388-MH-B, as part of the SusPro to assess the LOC needed by patients with mental health concerns. To complete the form, clinicians must answer seven yes/no questions and enter an explanation as necessary. The seven questions[12] include three subjective questions and four objective questions, summarized below.

---

[12] Listed under the Methodology section of this report.

| Subjective Questions |
| --- |
| 1. Unable to function at the current LOC. |
| 2. Patient requires highly structured inpatient treatment. |
| 3. Unresponsive psychiatric symptoms in the last six months. |

| Objective Questions |
| --- |
| 4. MHCB for at least ten days. |
| 5. Three or more MHCB Referrals in the last 180 days. |
| 6. Three or more Rule Violation Reports in the last 90 days. |
| 7. Participating in less than 50% of Treatment. |

While comprehensive, SusPro was not designed to include the LRH review process, which was developed as part of a Memorandum of Understanding (MOU) [13] between CDCR and the DSH in 2015-2016. CDCR staff not involved in SusPro determine the least restrictive custodial environment for patients referred to APP and ICF.

## 2014 San Quentin Condemned Unmet Need Analysis

On December 10, 2013, the *Coleman* Court ordered CDCR to assess the unmet need for inpatient care in the condemned population at San Quentin State Prison (SQ). In late December 2013, CDCR began activation on SQ's 40-bed Psychiatric Inpatient Program (PIP) to provide ICF and APP levels of mental health care to the condemned population.

From March 20, 2014 - May 7, 2014, all 720 condemned individuals at SQ were screened using a 12-item screening tool. During this review, 127 patients flagged positive for at least one of the 12 items. CDCR's clinical specialists, in the presence of the Special Master's experts and Plaintiffs' counsel, decided which cases should proceed to a full clinical evaluation. There was little disagreement on which cases should proceed to full evaluation. Of the 98 clinically evaluated cases, 17 were recommended for referral to inpatient care. Following IDTT reviews, 14 referrals were initiated for admission to inpatient care. The unmet need for the 2014 assessment was 2% of the SQ condemned population.

Unlike the previous unmet needs assessments, which included many patient referrals that would have been identified and referred as a part of the ongoing practice of the mental health program, condemned patients were typically not referred to APP and ICF programs. In anticipation of the new 40-bed PIP at SQ, CDCR had already identified 23 patients for referral before the 2014 UNA started. The 14 additional patients identified for referral during the 2014 UNA, represented the unmet need identified.

---

[13] An inter-agency agreement under which CDCR and DSH carry out referral, transfer, and treatment of CDCR patients in designated DSH inpatient programs.

# New Unmet Need Concerns

## 2016 Concern: The Sustainable Process is Unsustainable

On May 25, 2016, the Special Master filed his report on "MENTAL HEALTH INPATIENT CARE PROGRAMS FOR INMATES OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION." (ECF No. 5448.) The report provides an analysis of the challenges faced during the reporting period in providing timely access to appropriate higher levels of care. During this reporting period, DSH and CDCR were in the process of approving and implementing the 2015 MOU. Additionally, there were approximately 100 beds designated for mentally ill patients at DSH-ASH that remained unfilled. The LRH process was also in its preliminary stages, which made it difficult to refer patients to the ASH beds. Further complicating matters, DSH and CDCR were preparing for the "Lift-and-Shift" process, where the management of three DSH sites was transferred to CDCR.

The Special Master wrote that *Coleman* remediation aims to achieve seven fundamental goals, one of which is providing timely access to appropriate higher levels of care for mentally ill patients. (*Id*. at 22.) He reported that he has been working to improve access to inpatient care through various projects, including the Unidentified Needs Assessment of 2005, the MHARP of 2009-2010, and the Assessment and Referral Project of 2011, also known as SusPro. (*Id*. at 23.) He lamented that while the 2011 project and the earlier ones showed positive results, "the gains in access to inpatient care turned out to have been short-lived." (*Id.* at 24.) Foreshadowing his July 2015 findings regarding ASH bed usage described later in the report, the Special Master determined that the "sustainable process for identification, referral and transfer of CDCR inmates to inpatient care at DSH unfortunately turned out to be unsustainable." (*Id.* at 24.)



*The red bars signify time periods during which court orders were issued to address the lack of patients being admitted to ASH. The blue bars indicate initial declines in bed availability at ASH after the issuance of court orders, followed by gradual increases over time resulting in the issuance of further court orders.*

The report underscores the significance of access to inpatient care at DSH-ASH and the series of *Coleman* court orders, spanning 17 years, directed at solving this problem. A bar graph showing the Average Beds Available at ASH is included to visualize the "roller coaster of non-compliance with utilization of DSH-ASH beds … and the all too predictable cycle of court intervention." (*Id*. at 39.) The Special Master concludes that "Each time the waitlist inches up, it means that another seriously mentally ill person is not receiving the care he needs. If defendants cannot be expected to adhere to their own sustainable

remedies without repeated court intervention, then failure to provide access to inpatient care will remain the barrier between defendants and termination of court oversight of this matter." (*Id.* at 40.) The report, however, did not identify which part of the agreed upon sustainable process had fallen short in his estimation.


## 2019 Concern: Insufficient Mental Health Crisis Beds

The court has long recognized that bed planning is a crucial task in ensuring an adequate mental health system. In subsequent documents and the September 13, 2019, status conference, the focus was largely on the plans for constructing additional MHCBs. This was also stated in the Court's September 13, 2021, order that summarized "the question of whether to require a further unmet bed needs study arose initially in the context of assessing... construction," with regards to projections for bed needs. (ECF No. 7305 at 12.) On September 3, 2020, the court wrote, "the court... anticipates issuing an order shortly requiring defendants to conduct an unmet bed need study... as an essential component of determining whether defendants have a sufficient number of inpatient hospital beds and MHCBs." (ECF No. 6846 at 27.)

The insufficiency of MHCBs and inpatient beds within CDCR to meet patient needs was a distinct concern, separate from the Special Masters' assessment that SusPro no longer addressed the fluctuating ASH bed use. However, once the COVID-19 pandemic was officially declared, efforts to minimize transmission and offer treatment services within California Department of Public Health guidelines drew the lion's share of attention from all stakeholders. The primary goal at that time was to minimize and mitigate any harm to patients within CDCRs custody.


## 2020 Concern: Patients with Personality Disorders

On May 11, 2020, a clinical work group (later named the DSH – Small Workgroup) was spun off from the larger weekly COVID-19 Task Force meetings that met exclusively to discuss the safe referral and transfer of patients from CDCR to DSH. In this work group, there were multiple occasions where a thorough review was undertaken of all referred patients to determine if any more patients could meet custodial and clinical requirements for the LRH level of unlocked dorms (which is required for transfer to DSH) while balancing COVID related transfer requirements. Clinical Subject Matter Experts from the Special Master's team attended and participated in all these Small Workgroup weekly meetings, and routinely offered their input on the clinical appropriateness of referrals.

Patients with personality disorders may be referred to DSH but ultimately are not admitted to DSH for various reasons. In some cases, treating personality disorders in a traditional inpatient setting can create an environment that is harmful or counterproductive for the patient. This can happen because the structure and rules of an inpatient facility can conflict with the patient's personality, leading to increased distress and possibly worsening of their symptoms. In these situations, CDCR agreed to offer individualized treatment to these patients within the current MHSDS levels of care instead of transferring the patient to an inpatient setting. In each case, CDCR understood that the Special Master's team agreed that the patient should not go to DSH and that CDCR should offer individualized treatment

within the appropriate LOC.[14] At the same time, they expressed concerns that there may be an unmet need for patients with personality disorders.

## 2020 Concern: Insufficient Inpatient Referrals

Later in 2020, concerns shifted focus to the changes in referral rates, and a presumptive association between decreased referrals—especially as they related to unoccupied *Coleman*-designated beds at DSH facilities—and an unmet need within CDCR's Mental Health (MH) population. This shift began in September 2020 when *Coleman* Plaintiffs began raising concerns at the weekly COVID-19 Task Force meetings over the low number of mental health referrals to inpatient levels of care.

During the September 8, 2020, COVID-19 Task Force meeting, Plaintiffs raised their initial concerns over low mental health referrals to inpatient levels of care and requested an additional reminder to refer patients be sent out to all institutions. CDCR agreed and sent out a statewide email reminder on September 30, 2020. To help underscore that this expectation was ongoing and periodically reinforced, CDCR cited recent policies that memorialized mental health referral expectations and noted instances where the Deputy Director of the SMHP had met with each institution to review expectations and agreed to include similar expectations in future policies.

On September 29, 2020, Plaintiffs reported concerns about a decline in inpatient referrals after indicating they had discovered evidence of clinicians being hesitant to refer patients due to COVID-19. When pressed for details, Plaintiffs could only identify two patients who purportedly supported the claim. Plaintiffs declined to offer any details or additional examples to support their concerns and insisted that an "Unmet Needs Assessment" was the only path forward to determine if patients are being referred to a HLOC appropriately.

Historically, unmet needs assessments can take several years to implement, analyze, and enact programmatic changes. CDCR recognized that waiting for the results of another study may not align with its mandate to provide ethical, professional, and effective mental health care services. As a result, in late 2020 and early 2021, CDCR took immediate action to analyze current procedures, identify opportunities for improvement, and consider how emerging research could enhance the SMHP. The results, along with other valuable insights, were documented in CDCR's 2021 Lessons Learned During the COVID-19 Pandemic report (Lessons Learned report).

---

[14] Some of these patients were maintained in EOP, others were sent to the PIP.

## 2021 Report: Lessons Learned During the COVID-19 Pandemic

CDCR's Lessons Learned report was filed on June 14, 2021. (ECF No. 7196.) In the Lessons Learned report, CDCR examined potential factors that could have contributed to declines in inpatient referrals. Factors examined by CDCR included the possibility of reduced compliance with the SusPro procedures, decreased compliance with policies and procedures related to the LOC decisions, population changes between 2019 and 2020, and estimated changes in behavioral outcomes due to the COVID-19 pandemic. CDCR found that mental health visits during the COVID-19 pandemic decreased (from April 1, 2020, through February 28, 2021) and made the following conclusions concerning the decreases:

- **Not Unique to CDCR**. Several studies[15,16,17] observed a similar decrease in mental health visits during the COVID-19 pandemic, though none identified reliable causes for the decline. Prior research on the traditional stages of psychological responses to disasters, especially as they relate to suicide rates, helped explain some patterns by findings of increased resilience within certain populations.
- **Not Due to Significant Population Changes**. After controlling for population decrease, there was a decline in inpatient referrals (i.e., outpatient LOC to any inpatient LOC, from MHCB to APP/ICF, or from APP to ICF) of 37% [-38, -36].[18]
- **Not Due to Deviations from Policies, Standards, or Due Diligence in Referral Procedures.** This was confirmed through a regional review and assessment of SusPro results. IDTT consistently followed these guidelines as frequently as before the COVID-19 pandemic, with 95% of reviews agreeing with the teams' decisions regarding the LOC.
- **At Least Partially Explained by Several Behavioral Changes**
  - Reduced incidents of Suicide                                         -35% [-61, -8]
  - Reduced incidents of Overdose Hospitalizations                        -33% [-38, -28]
  - Reduced incidents of Serious Rules Violation Reports (RVR)            -32% [-34, -30]
  - Reduced incidents of Treatment Refusal                                -31% [-32, -31]
  - Reduced incidents of Patient Self-Reported Depression                 -31% [-34, -28]
  - Reduced incidents of Emergent Mental Health Referrals                 -29% [-30, -28]
  - Reduced incidents of Severe Self-Injury                               -22% [-35, -9]
  - Reduced incidents of Self-Harm with Intent to Die                     -20% [-38, -13]

The information presented in the Lessons Learned report included an analysis of the unprecedented changes to the SMHP during the first year of COVID-19, and the surprising changes and potential challenges it presented to patients.

---

[15] Hoyer, C., Ebert, A., Szabo, K., Platten, M., Meyer-Lindenberg, A., & Kranaster, L. (2020). Decreased utilization of mental health emergency service during the COVID-19 pandemic. European Archives of Psychiatry and Clinical Neuroscience, 1–3. https://doi.org/10.1007/s00406-020-01151-w

[16] Kolar, D. (2020). Psychiatric emergency services and non-acute psychiatric services utilization during COVID-19 pandemic. European Archives of Psychiatry and Clinical Neuroscience, 1–2. https://doi.org/10.1007/s00406-020-01182-3

[17] Goldenberg, M. N., & Parwani, V. (2020). Psychiatric emergency department volume during Covid-19 pandemic. The American Journal of Emergency Medicine. https://doi.org/10.1016/j.ajem.2020.05.088

[18] Confidence Intervals (CI): A 95% confidence level indicates that, if you took 100 random samples from the population, the CIs for approximately 95 of the samples would contain the mean response. CDCRs analysis uses a two-sided CI to estimate both likely upper and lower values for the mean response.

# 2022 Unmet Needs Analysis Methodology

To conduct the 2022/2023 UNA, CDCR faced the challenge of reallocating resources, which involved pulling people away from clinical work and reviews. As a result, certain aspects of SusPro[19] and other related programs had to be temporarily suspended. Despite these adjustments, CDCR ensured that a team of at least 70 employees was available, working over 24,000 hours on the 2022/2023 UNA at an estimated cost of $2.2 to $2.8 million.[20] This team was devoted to screen more than 32,500 patients and complete over 4,700 detailed UNA patient reviews. It is important to note that this estimated cost does not include any UNA-related work performed by the dedicated clinicians treating patients onsite, DSH, Plaintiffs, the Special Master's team, or any attorneys representing the State of California.

## Timeline of Meetings

On November 22, 2021, the Special Master scheduled the first in a series of ten near-weekly meetings, to take place through February 7, 2022, to discuss the development of the UNA. The meetings brought together members from CDCR's mental health, nursing, custody, and legal teams, DSH, the Special Master's team, and representatives from *Coleman* Plaintiffs' counsel. CDCR dedicated significant resources to prepare for these meetings, including educating external stakeholders on the basic processes and implementation of the SusPro; discussing the effects of COVID-19 on the format and procedures associated with the study; interpreting the MHARP study and extrapolating the undocumented details of its methodology; and updating stakeholders on progress. Of special note was the court's requirement to screen for "a subset of class members with severe personality disorders associated with significant function impairments who have special treatment needs not yet available in an inpatient setting." (*Id*. at 15.)

Efforts at every stage of the UNA development focused on casting the widest net possible to capture any patient that may require an inpatient LOC. Detailed methodologies and timelines for both Phase I (the screening phase) and Phase II (the evaluation phase) were developed with all stakeholders.

## Methodology Development

This report includes the final versions of the methodology and operationalization documents.[A] These documents were developed after a thorough review and revision process with input from all stakeholders; however, some notable disagreements were still present during the review process, including disagreements on the research, design, scope, and other key components of the methodology. The disagreements, outlined below, may have an impact on the validity and reliability of the UNA findings and are highlighted in the report so that future researchers and stakeholders are aware of any potential limitations or areas of uncertainty in the methodology and can take these into consideration when interpreting the findings.

1. <u>Secondary Reviewer v. Team Review</u>: CDCR proposed a plan that entailed a single Primary Reviewer to examine cases and provide recommendations, followed by a representative sample being evaluated by a Secondary Reviewer to ensure consistency in clinical judgments. The plan

---

[19] During the 2022/2023 UNA, Regional reviews and onsite visits typically preformed during SusPro were suspended. However, IDTT referrals to HLOC, onsite reviews of non-referral decisions, and HQ monitoring and assessment of SusPro activities were not suspended at any point.

[20] CDCR employees estimated the total hours spent on these activities after completing all work related to Phase I and II. If they were uncertain, they were asked to provide a conservative estimate, as no time during the UNA was dedicated to precise timekeeping. The primary focus remained on identifying and referring patients in need of higher levels of care.

also included a consult team for any difficult cases or questions, comprised of expert staff from various patient care areas. However, this plan was rejected by the Special Master in favor of the team-based approach, where, instead of having one reviewer review each case, a team of three would review cases individually and then present all their cases to the team on a later date for a referral decision.

2. <u>Patients with a Personality Disorder</u>: CDCR wrestled internally with the best approach to include personality disorder patients in the study. CDCR pointed out that clinicians were being asked to determine if these patients needed a treatment program that was not yet defined. The Special Master's experts noted that there was "limited experience nationally on this," and the intent was not to identify patients with a specific diagnosis or requiring only a specific treatment modality. The criterion was ultimately defined as outlined in the final methodology – "The inmate-patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors."

3. <u>Onsite Requirements</u>: CDCR proposed remote options for certain stages of the process, based on the realities of the ongoing COVID-19 pandemic, as well as broadly accepted practices in telemedicine. Ultimately it was agreed that dates for onsite activities would be scheduled but could be cancelled if deemed unnecessary. At the start of UNA, there was an expectation that all patient interviews would require the entire UNA team and monitors to visit the institution together. Over the course of the UNA, this was revised to require the interviewer to be onsite, and other members could participate remotely via videoconference. This resulted in only one onsite interview, with the balance conducted via videoconference with an onsite telepresenter, typically a primary clinician. Upon using, and becoming more familiar with, the videoconference format, no concerns were voiced by Special Master's team or Plaintiffs concerning the interview process and neither asked that onsite activities resume.

4. <u>Supervision of Custody Officers and Nursing Staff</u>: Initially, the Special Master's team wanted CDCR to have HQ staff present when custody and nursing staff identified patients of concern in Phase I. Ultimately, custody conducted onsite supervision of the custody screening by Regional Lieutenants, while onsite supervisors for nursing and mental health oversaw the mental health and nursing screenings.

The parties also negotiated a dispute resolution process for when IDTTs disagreed with the UNA team's HLOC recommendations. The process required that more senior CDCR and DSH staff members become involved in resolving these issues. It was agreed that the patient's current treatment team would not be forced to sign treatment orders they disagreed with, and in the alternative, the UNA Review Team could sign such orders.

Finally, there was a need for clarity on a number of terms and criteria used to assess patients. An extensive list of terms and criteria had been compiled, but there was disagreement on the definition and meaning of some of these terms. To address this, CDCR created an official data spreadsheet to capture all of the criteria used to assess the patients. The spreadsheet had over 90 columns for each patient, reflecting the comprehensive nature of the assessment process. Through these efforts, the disagreements were eventually resolved.

The final version of the 2022/2023 UNA criteria was not identical to the MHARP criteria. The 2009 MHARP criteria could not be readily converted for use in the 2022/2023 UNA. MHARP was conducted before the Lift-and-Shift and treated all MH inpatient beds as a separate entity controlled by DSH. Additionally, it was conducted before the introduction of electronic medical records, which greatly changed the way reviews are conducted and data queries can be carried out. Advances in CDCR's ability to conduct data queries was immediately apparent early in the 2022/2023 UNA process when it was discovered CDCR was capturing thousands more patients in its screening tool than occurred during the 2009 MHARP.

A comparative summary of those criteria is included here, where the 2009 MHARP, the basis for SusPro and 2022/2023 UNA, is in the central column for comparison:

| <u>2012 SusPro/ 7388-B/ HLOC</u> | <u>2009 MHARP</u> ← → | <u>2022/2023 UNA</u> |
|---|---|---|
| 1. As a result of the major mental disorder, the inmate-patient is unable to adequately function ~~within the structure of the CDCR Enhanced Outpatient Program (EOP)~~ at the current Level of Care. | 1. As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care. | 1. As a result of a major mental disorder, the ~~inmate-~~patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care. |
| 2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; ~~stabilization or elimination of~~ ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms. | 2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms. | 2. The ~~inmate-~~patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms. |
| N/A | 3. The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and a structured treatment environment. | N/A |
| 3. The inmate-patient demonstrates chronic psychiatric symptoms (disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning. | 4. The inmate-patient demonstrates chronic psychiatric symptoms (disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning. | 3. The ~~inmate-~~patient demonstrates chronic psychiatric symptoms ~~(disturbed emotions, perceptions, thought processes, and/or impaired cognitions)~~ that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning. |
| 7. On average and in the last 3 months, has the inmate-patient participated | 5. Inmate-patient has **less than 50% overall cooperation / participation** | 4. In the last 90 days, the ~~inmate-~~patient has **participated in** less than |

| | | |
|---|---|---|
| in less than the minimum number of structured treatment hours per week? Minimums per week are: <br>• 5 hours for EOP inmate-patients <br>• 2.5 hours for RC EOP inmate-patients <br>• 50% of scheduled hours for inmate-patients on modified treatment plans <br><br>*(not in 7388-B, but part of SusPro)* | **with programming** and/or the treatment plan <u>during the last 3 months.</u> (i.e., mental health issues substantially affect ability to actively participate in treatment, the inmate-patient is noncompliant with medication, etc.). | **50%** ~~overall~~ **of all** ~~cooperation/participation with~~ **programming offered.** ~~and/or the treatment plan during the last 3 months. (i.e., mental health issues substantially affect ability to actively participate in treatment, the inmate-patient is noncompliant with medication, etc.).~~ |
| 6. The inmate-patient has ~~incurred~~ had ~~three~~ 3 or more ~~Rules Violation Reports~~ CDCR 115-MH evaluations completed during the last 3 months. | 6. The inmate-patient has incurred three (3) or more Rules Violation Reports during the last 3 months. | 5. The inmate-patient has incurred three (3) or more Rules Violation Reports during the last 3 months that required a mental health assessment. |
| N/A | 7. The inmate-patient needs a comprehensive assessment for diagnostic clarification (only available at ASH, PSH, and VPP). | N/A |
| N/A | 8. The inmate-patient needs initiation of a trial of Clozapine. | N/A |
| 5. The inmate-patient has had ~~three~~ 3+ ~~or more admissions to a~~ MHCB referrals initiated during the last 6 months. <br>(Includes all MHCB placement request regardless of where the inmate-patient was housed when the request was initiated, e.g., OHU, alternative housing or overflow beds.) | 9. The inmate-patient had three (3) or more admissions to a MHCB during the last six (6) months. | 6. The inmate-patient had three (3) or more ~~admissions~~ referrals to a MHCB during the last six (6) months, or two (2) rescissions from ICF or APP in 12 months. |
| 4. The inmate-patient ~~has been~~ is currently in a MHCB and has been in a MHCB for at least 10 ~~or more~~ days ~~for clinical issues, i.e. the inmate-patient is not yet stabilized~~. | 10. The inmate-patient has been in a MHCB for ten (10) or more days for clinical issues, i.e., the inmate-patient is not yet stabilized. | 7. The inmate-patient has been in a MHCB ~~for ten (10) or more days for clinical issues, i.e. the inmate-patient is not yet stabilized.~~ clinical stay exceeding 10 days. |
| N/A | 11. Has had two (2) or more admissions and/or referrals during the last twelve (12) months to a DMH facility. | N/A |
| N/A | 12. Has ever been referred to DMH but rejected. | N/A |
| N/A | 13. Has been accepted to DMH within the past year but ultimately not transferred. | N/A |
| N/A | N/A | A. The inmate-patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors. |

# 2022 Unmet Needs Assessment: Phase I

## Operationalization

In compliance with the Phase I Operationalization Guidelines, the UNA was implemented in two stages. The first phase generated a comprehensive list of patients by applying the agreed-upon screening criteria to existing mental health datasets and CDCR staff contributions. The final Phase I list was created by integrating data from the EHRS and the Strategic Offender Management System (SOMS) gathered electronically using the mental health data warehouse and standardized subjective screening tools created for the UNA. The "objective" dataset screening results and the "subjective" CDCR staff screening results were then consolidated into a single master list.

- **Criteria 1** – As a result of a major mental disorder, the patient is unable to adequately function within the structure of the CDCR EOP LOC.
- **Criteria 2** – The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or stabilization of refractory psychiatric symptoms.
- **Criteria 3** – The patient demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.
- **Criteria 4** – In the last 90 days, the patient has participated in less than 50% of all programming offered.
- **Criteria 5** – The inmate-patient has incurred three (3) or more RVRs during the last 3 months that required a mental health assessment.
- **Criteria 6** – The inmate-patient had three (3) or more referrals to a MHCB during the last six (6) months, or two (2) rescissions from ICF or APP in 12 months.
- **Criteria 7** – The inmate-patient has been in a MHCB clinical stay exceeding 10 days.*
  (*Patients in MHCB with a referral to HLOC will be counted, but excluded from review)
- **Criteria A** – The inmate-patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.

## Screening criteria – Objective

Criteria 1, 4, 5, 6, and 7 were systematically retrieved from the CDCR Data Warehouse. To ensure that all patients were screened with the most recent information, the same criteria were applied to all patients on the second Monday of Phase I.[B]

Criteria 1 identified all patients who were flagged by the following criteria listed on the MH Master Treatment Plan (MTP), HLOC section, but who were not referred:

a. HLOC form Number 1- As a result of a major mental disorder, the patient is unable to adequately function at the current LOC.

b. HLOC form Number 2- The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of

functioning in most life areas; ritualistic or repetitive self-injurious/suicidal behavior, or refractory psychiatric symptoms.

c. HLOC form Number 3- The patient demonstrates chronic psychiatric symptoms (e.g., disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least six (6) months of treatment to a degree that facilitates adequate levels of functioning.

d. HLOC form Number 4- The patient is currently in a MHCB and has been in the MHCB for at least 10 days.

e. HLOC form Number 5- The patient has had three (3) or more MHCB referrals initiated during the last six (6) months (includes all MHCB placement request regardless of where the patient was housed when the request was initiated, e.g., OHU, alternative housing or overflow beds).

f. HLOC form Number 6- The patient has had three (3) or more CDCR 115-MH evaluations (i.e., Mental Health Assessment following a RVR) completed during the last three (3) months.

g. HLOC form Number 7- [For EOP and MHCB Patients ONLY]: On average and in the last three (3) months, has the patient participated in less than the minimum number of structured treatment hours per week (minimums per week are 5 hours for EOP patients, 2.5 hours for RC EOP patients, and 50% of scheduled hours for patients on modified treatment plans)?

Criteria 1 uses data documented in the patients' most recent MTP as of the data pull date. For some patients, particularly those in the Mainline CCCMS, their most recent treatment plan could be several weeks or months old. To address that potential gap, data related to criteria 4, 5, 6 and 7 was gathered on all patients who meet the criteria at the time of the data pull, addressing cases where circumstances have changed since the patient's last IDTT:

> Criteria 4 - In the last 90 days, the patient has participated in less than 50% of all programming offered.

> Criteria 5 - The patient has incurred three (3) or more Rules Violation Reports during the last three (3) months that required a mental health assessment.

> Criteria 6 - The patient had three (3) or more referrals to a MHCB during the last six (6) months, or two (2) or more rescissions from ICF or APP in twelve (12) months.

> Criteria 7 - The patient has been in a MHCB clinical stay exceeding ten (10) days.

With the exception of Criteria 4, the agreed-upon criteria applied to all CCCMS, EOP (including EOPMod) and MHCB patients at midnight on the date of the second Monday of Phase 1. After the first UNA review of patients housed at RJD, the Special Master team agreed to exclude CCCMS patients from Criteria 4 on May 13, 2022. As a result, Criteria 4 only applies to EOP (including EOPMod) and MHCB patients.[c]


## Screening criteria – Subjective

Phase I subjective screening tools were standardized and developed in written and electronic formats for deployment in the institution for mental health clinical, custody, and nursing staff to complete as

described below[A]. Like the objective data list, patients meeting any screening criteria were included in the final Phase I list.

*Data management tools*

A SharePoint site was developed to serve as a centralized platform for authorized users. It provided access to PowerApps and a Power BI Dashboard, which were designed to enhance the user experience, improve collaboration, and eliminate data entry errors. Phase I PowerApps consisted of the Regional Team Review Flag PowerApp, Treatment Teams Screening Tool PowerApp, Criterion A Screening Tool PowerApp, and the Custody/Nursing Screening Tool PowerApp. Paper versions of these screening tools were also created for institutions where electronic entry was not feasible, and all paper tools eventually entered into the database through the same PowerApps.[D]

The Treatment Teams Screening Tool PowerApp was designed as the electronic screening tool for treatment teams to identify patients who meet predetermined criteria for inclusion in Phase II of the UNA. The Criterion A Screening Tool was designed to identify patients with personality disorders associated with disruptive behavioral disturbances, such as self-harming behaviors. The Nursing/Custody Screening Tool PowerApp was designed for nursing and custody staff to identify patients who may be unable to function at their current LOC. Finally, the Regional Team Review Flag PowerApp was designed to identify patients flagged by the Regional Team as needing intervention, based on the results of a prior quarter's SusPro review.

*Orientation and Training*

Once the UNA tools were ready for deployment, orientation trainings[E] were scheduled for executive leadership, nursing supervisors, custody leadership, and mental health supervisors. The trainings were designed to provide tailored information on the purpose of the UNA, the screening process, and the development of the Master Phase I list. The Special Master's team reviewed the orientation and training materials, and were encouraged to offer feedback.

Executive Leadership Orientation: The executive leadership orientation was aimed at introducing the UNA study to executive leaders and establishing it as a statewide priority. A high-level overview of each phase of the study was provided, along with information on institutional responsibilities, study schedule, and timelines.

Mental Health Treatment Teams Screening Orientation: The mental health treatment teams screening orientation was provided for mental health supervisors to coordinate Phase I screenings. The orientation included an overview of the UNA process, instructions for deploying the screening tools, a review of screening criteria, and a demonstration of the screening tools and SharePoint.

Nursing Orientation: The nursing orientation was conducted by the Regional Nurse Consultant Program Review . Nursing supervisors were introduced to the UNA project and Phase I data collection procedures, and the UNA Custody Nursing Review screening tool was demonstrated through a hands-on exercise using a fictional patient.

Custody Orientation: Division of Adult Institutions (DAI) HQ staff held meetings with institutional leadership to provide background information on the UNA and to explain the roles and expectations specific to housing unit staff.

*Scheduling, Coordination, and Deployment of Screening Tools*

Phase I screening activities were scheduled to take place within one to three weeks prior to the Phase II reviews. Nursing, custody, and mental health teams conducted the screenings as follows:

Mental Health Screenings: Mental health supervisors coordinated the screening process during each institution's scheduled Phase I screening period. Mental health treatment teams completed the screening tools for any CCCMS, EOP, and MHCB patients on their caseload who met the criteria on the Treatment Team Screening Tool and were not currently referred to HLOC.

Nursing Screenings: Local Supervising Registered Nurse (SRN) II/III, Unit Supervisors, and Senior Psychiatric Technicians (PT) coordinated the screening activities with housing unit nursing staff. They provided instruction and supervision on how to complete the screening process, which was conducted by PTs on 2nd and 3rd watch for patients in EOP/MHCB/Short-Term Restrictive Housing (STRH)/Long-Term Restrictive Housing (LTRH)/Psychiatric Services Unit /Administrative Segregation Unit (ASU) EOP Hub. Screenings were typically focused on staff working during a single 24-hour period, although at some institutions, the screenings occurred over a two-to-three-day period. Each shift was only screened once, and each shift completed a screening.

Custody Screening: Regional lieutenants coordinated the screening activities onsite with housing officers. They provided instruction and supervision on how to complete the screening process and coordinated with each institution on the most effective and efficient means of distributing the screening tool. Screens were completed by regularly assigned officers or those most familiar with the activity patterns of the housing unit. A Regional lieutenant was onsite during the screening process for both instructional and supervisory purposes. For housing units where 2nd and 3rd watch huddles occur, the huddles provided an additional option for completing the screening tool.

*Integration of objective data with subjective screening tools*

After the subjective data from the nursing, custody, and mental health treatment teams was completed, the "objective" screening data was integrated into a Master Phase I list of patients to be included in Phase II. Duplicate patient names were removed, and each criterion met by the included patients was retained for use by reviewers in Phase II. Patients were randomly assigned to each UNA Review Team member, and the Master list was validated and finalized for distribution to UNA Review Teams and all other stakeholders. After several institution cohorts were completed, it was recognized that some patients who were transferred during the study would reappear on Master lists of subsequent institutions. Patients with a previous UNA review were excluded from review at subsequent institutions.

## Screening Results

All patients with an MHI of CCCMS, EOP, EOPMod, and MHCB were screened. When a patient met at least one criterion, either objective or subject criteria, the patient was flagged for further review in Phase II.

| Inst. | CCCMS | EOP | EOPMod | MHCB | Undetermined MHI | Total Screened |
|---|---|---|---|---|---|---|
| ASP | 1,357 | 3 | 0 | 0 | 0 | 1,360 |
| CCI | 866 | 3 | 0 | 0 | 0 | 869 |
| CCWF | 1,283 | 98 | 0 | 2 | 29 | 1,412 |
| CHCF | 671 | 326 | 28 | 13 | 0 | 1,038 |
| CIM | 1,093 | 6 | 0 | 25 | 0 | 1,124 |
| CIW | 475 | 55 | 0 | 10 | 0 | 540 |
| CMC | 753 | 601 | 8 | 33 | 0 | 1,395 |
| CMF | 408 | 453 | 51 | 37 | 0 | 949 |
| COR | 1,162 | 230 | 17 | 21 | 0 | 1,430 |
| CRC | 1,283 | 2 | 0 | 0 | 0 | 1,285 |
| CTF | 928 | 2 | 0 | 0 | 0 | 930 |
| FSP | 390 | 0 | 0 | 0 | 0 | 390 |
| HDSP | 386 | 2 | 0 | 0 | 0 | 388 |
| KVSP | 802 | 135 | 1 | 6 | 482 | 1,426 |
| LAC | 738 | 582 | 51 | 11 | 0 | 1,382 |
| MCSP | 1,481 | 795 | 14 | 7 | 0 | 2,297 |
| NKSP | 1,060 | 82 | 0 | 6 | 0 | 1,148 |
| PBSP | 364 | 2 | 0 | 1 | 0 | 367 |
| PVSP | 476 | 4 | 0 | 0 | 0 | 480 |
| RJD | 1,299 | 877 | 20 | 16 | 0 | 2,212 |
| SAC | 334 | 711 | 8 | 12 | 0 | 1,065 |
| SATF | 1,934 | 574 | 27 | 10 | 0 | 2,545 |
| SCC | 168 | 1 | 0 | 0 | 7 | 176 |
| SOL | 709 | 0 | 0 | 9 | 0 | 718 |
| SQ | 1,041 | 210 | 27 | 2 | 0 | 1,280 |
| SVSP | 1,103 | 289 | 5 | 9 | 0 | 1,406 |
| VSP | 993 | 320 | 7 | 0 | 0 | 1,320 |
| WSP | 1,363 | 100 | 1 | 5 | 144 | 1,613 |
| Total | 24,920 | 6,463 | 265 | 235 | 662 | 32,545 |

Flagged for Unmet Needs Assessment Review

| Inst. | CCCMS | EOP | EOPMod | MHCB | Total |
|-------|-------|-----|--------|------|-------|
| ASP | 13 | 3 | 0 | 0 | 16 |
| CCI | 2 | 0 | 0 | 0 | 2 |
| CCWF | 38 | 68 | 0 | 1 | 107 |
| CHCF | 5 | 160 | 18 | 5 | 188 |
| CIM | 10 | 4 | 0 | 16 | 30 |
| CIW | 9 | 40 | 0 | 4 | 53 |
| CMC | 12 | 151 | 6 | 27 | 196 |
| CMF | 3 | 203 | 25 | 24 | 255 |
| COR | 140 | 149 | 3 | 16 | 308 |
| CRC | 9 | 2 | 0 | 0 | 11 |
| CTF | 9 | 1 | 0 | 0 | 10 |
| FSP | 16 | 0 | 0 | 0 | 16 |
| HDSP | 12 | 0 | 0 | 0 | 12 |
| KVSP | 16 | 80 | 0 | 3 | 99 |
| LAC | 54 | 398 | 39 | 10 | 501 |
| MCSP | 48 | 531 | 11 | 5 | 595 |
| NKSP | 17 | 36 | 0 | 5 | 58 |
| PBSP | 17 | 1 | 0 | 1 | 19 |
| PVSP | 20 | 4 | 0 | 0 | 24 |
| RJD | 37 | 491 | 14 | 15 | 557 |
| SAC | 29 | 574 | 7 | 9 | 619 |
| SATF | 69 | 348 | 11 | 9 | 437 |
| SCC | 2 | 1 | 0 | 0 | 3 |
| SOL | 5 | 0 | 0 | 4 | 9 |
| SQ | 43 | 88 | 23 | 2 | 156 |
| SVSP | 91 | 179 | 1 | 7 | 278 |
| VSP | 11 | 116 | 4 | 0 | 131 |
| WSP | 2 | 24 | 0 | 1 | 27 |
| Total | 739 | 3,652 | 162 | 164 | 4,717 |

## 2022 Unmet Needs Assessment: Phase II

### Operationalization

During the last week of Phase I, patient lists were generated for the four teams of Phase II clinical reviewers. These teams, known as UNA Review Teams, consisted of a regional senior psychologist specialist, a CDCR psychiatrist, and a DSH psychologist or psychiatrist. Notably, institutional staff from the facility under review were not included in the review teams. *Coleman* experts participated in review discussions as non-voting participants. Any concerns raised by the Special Master's team were communicated to and resolved by CDCR's Regional Mental Health Administrators.

Each clinician in the UNA Review Teams was assigned patients from the Phase I list for review, until all patients identified in the Phase I process (unless a HLOC referral had already been initiated) were reviewed. Generally, clinical reviews along with written case summaries took place for three days of the week, with the remaining two days dedicated to team presentations, clinical dispute/consultation meetings, and other team interactions. Across all teams, approximately 72-84 cases were reviewed per day, resulting in a total of 144-168 cases per week.

For each institution reviewed, a designated site visit day was scheduled as a placeholder, with cases slated for further review scheduled on this day to ensure adequate notice for team members and stakeholders. Additional days were added to the schedule as needed.

UNA Review Team clinicians received training on EHRS as necessary and were provided with case review training as well as a suggested template[f] to follow for comprehensive case reviews. This template ensured that all necessary information was included in the review. During the review process, clinicians assessed the clinical needs of Phase I patients by examining the following documentation:

- Patient Placement history in OnDemand (may be obtained in the EHRS)
- Two most recent MH MTPs, if two were present, including the HLOC Tab in the EHRS
- MH Psychiatry Notes in the EHRS
- MH Primary Clinician (MHPC) Notes in the EHRS
- Most recent Suicide Risk and Self Harm Evaluation (SRASHE) in the EHRS
- Any MH RVR MH Assessments from the last three months in the EHRS
- Any Discharge Summary from Inpatient (PIP and MHCB) stays from the last six months
- For MHCB stays, Psychiatrist Discharge Summary in the EHRS
- For PIP stays, APP ICF SW Discharge Summary or APP ICF Discharge Summary in the EHRS

Additional sources of information included as needed:

- Medication Administration Record Summary in the EHRS
- Psych Tech Rounds in the EHRS (i.e., Weekly Summaries or Weekly Notes with the "Progress Note-Psych Tech" note type)
- MH Crisis Intervention Team (CIT) or corresponding MHPC Consult Emergent Progress Note in the EHRS
- Patient Record in SOMS

- After identifying in a patient's placement history that a patient spent less than 24 hours in MHCB, review the corresponding SRASHE or MHPC Progress Note in the EHRS for documentation on MHCB referral rescission.
- Inquiry to the treatment team
- Patient interview

During the evaluation process, each patient underwent an assessment in two distinct categories: personality disorder, and consideration of referral to ICF or APP LOC.

## Higher Level of Care Review

Program Guide criteria for ICF and APP levels of care were used to make referral recommendations. While not required by policy or the 2022/2023 UNA Methodology, cases where immediate patient care issues were identified, the Chief of Mental Health at the institution was notified on an emergent basis. This ensured that the patient received an evaluation and appropriate clinical action was taken.

## Personality Disorder Review

For patients flagged for personality disorders in Phase I, a clinician from the UNA Review Team utilized the following criteria to determine if interventions were necessary to address treatment needs. Reviewing clinicians evaluated the following questions:

1. Is the patient appropriate for APP/ICF/MHCB?
   a. Yes — Refer to inpatient.
   b. No.
2. If the answer to the above (#1) is no: Has the patient responded adequately to offered treatment?
   a. Yes — Category 1. The patient has clinically responded adequately to treatment within the existing MHSDS. No additional interventions indicated.
   b. No.
3. If the answer to the above (#2) is no: Has the patient already been offered all clinically appropriate treatment available within the MHSDS?
   a. No — Category 2. Additional interventions indicated.
   b. Yes — Category 3 (The patient may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at DSH.)

## Clinical Case Discussions

Following completion of the reviews, the reviewing clinician created a written summary that included the rationale for their determination. This summary was used to present the case to a review team, as previously described, and was later included in the final case documentation entered into the UNA data entry SharePoint site. The overall patient summary included the following information:

- Why the patient was flagged/included in the Phase I list
- A brief summary of each record reviewed.

- Recommendation and rationale (inclusive of both a data and clinical nexus to why the patient was flagged)

Reviewing clinicians presented their clinical summaries and recommendations to their assigned team via a Teams meeting. The UNA Review Team then reviewed the information worked toward reaching a consensus on whether to recommend a HLOC referral or other interventions for patients with personality disorders. In some cases, patient interviews and/or treatment team interviews were necessary before making a final determination.

Following case presentation and discussion, each UNA Review Team member stated their agreement with the reviewer's assessment. If any team member disagreed, the case was discussed further until agreement was reached. If at least half of the UNA Review Team members agreed with the recommendation for a HLOC referral, a referral was made to the IDTT for a final decision. The IDTT received a written summary of the relevant clinical information and team opinions within five business days of the recommendation, including any non-binding recommendations from the *Coleman* expert(s).

For patients with a primary personality disorder, a detailed summary and rationale for determination was documented in the UNA Team Review Outcome section of the UNA Data Collection SharePoint site if a HLOC recommendation was not made but their treatment needs met PD Category 2 or 3. The summary included specific patient needs to be addressed by interventions and was provided to the institution's clinical point of contact within 10 working days.

## Treatment Team Review and Dispute Resolution

IDTTs were required to review HLOC referral recommendations within six business days of receiving the recommendation. If the IDTT agreed with the recommendation, a referral was made in accordance with established policies and procedures. If the IDTT disagreed with the HLOC recommendation, a referral was made to the UNA Clinical Dispute/Consultation Team. A designated clinician from the IDTT entered the outcome of the review in the UNA Data Collection SharePoint site, which was used, in part, for the analysis in this report.

The UNA Clinical Dispute/Consultation Team was available as a resource for clinical consultation during Phase II reviews. However, its primary role was to determine whether a referral to HLOC was necessary for any cases in which the UNA Review Team could not reach a consensus. The UNA Clinical Dispute/Consultation Team included:

1. Treatment team and supervisor from the institution
2. Referring team (UNA Review Team)
3. IRU (Inpatient Referral Unit) clinician
4. CDCR PIP & DSH supervisors
5. Ad hoc components as needed:
   a. Primary medical physician
   b. Nursing representative
   c. HCPOP representative
   d. Classification Services Unit (CSU) representative
   e. Regional team representative (if someone separate from the referral team is required)
   f. others as needed
   g. *Coleman* expert

      h.   Members of *Coleman* Plaintiffs' counsel
      i.   Representative from CDCR Office of Legal Affairs

If the UNA Clinical Dispute/Consultation Team recommended a referral and the IDTT concurred after the consultation, a referral was initiated by the IDTT and completed in accordance with the referral policies and procedures outlined by the CDCR for ICF and APP. The outcomes of the UNA Clinical Dispute/Consultation Team were entered into the UNA Data Collection SharePoint site.


## Dual Authentication Methodology for Unmet Needs Assessment Data

Data authentication for UNA Data involves three phases of review: screening patient data, identifying flagged patient data, and processing patient referral data. Data is collected from the UNA records of all screened patients, including those who have potentially been evaluated more than once. After collecting the data, it is reviewed by two independent users who sort it by the total number of records or flagged patients. This data subset includes all instances where a patient received a flag based on one of the 85 criteria in items 1-9 (or PD). As a result, some duplicate records may be present. Each independent user evaluated these records using the following measurement system:

**Measurement System:**

- *Screened Patients*: This category includes all patients who were evaluated for any UNA criteria.

- *Flagged Patients*: This category removes patients without flags and those flagged more than once. Duplicate records are either combined or removed from the UNA records based on the following criteria:

  - *Removal (a)*: If a patient has two identical flagged records, keep the first record at the institution where the patient was initially flagged and remove the subsequent record.

  - *Removal (b)*: If a patient has two or more flagged records with different screenings and more than one review, assume the highest outcome recommendation and/or merge information where possible.

  - *Merge*: If a patient has two or more flagged records that indicate a continuation of screening (e.g., the patient was moved to another location and re-evaluated), merge the records' data and keep the original census location.

After applying the measurement criteria, the two independent reviewers created a draft list of records and compared their lists to ensure that the appropriate records were retained before being added to the UNA records. Once the draft lists were authenticated, each record's data was entered into the UNA records for finalization. To finalize the records, all entries were organized into their corresponding columns and matched against the raw data record (Structured Query Language (SQL) Observation Data) to address any errors or omissions.

Throughout the process and again at the conclusion of the 2022/2023 UNA, CDCR worked closely with the Special Master's team to reconcile the final list of UNA patients referred to ICF and APP, as well as the list of patients identified as PD Category 3. CDCR adopted an inclusive approach to resolving

discrepancies between the Special Master's list and CDCRs. The Special Master's team supported this approach and encouraged CDCR to use the final list of patients in the 2022/2023 UNA analysis.

## Inpatient Recommendations and Referrals Results

<u>UNA Review Team Recommendations</u>: All patients that were initially recommended by the UNA Review Team are reflected in the following table along with the count of patients not referred after meeting with the IDTT and discussing the case in CRD. The total referrals after CRD are also presented in the table below.

| Inst. | Interphase Referrals[21] | Initial UNA Review Team Recommendations for HLOC Count | Count of Patients Not Referred After CRD | Total Referred to HLOC |
|---|---|---|---|---|
| ASP | 0 | 0 | 0 | 0 |
| CCI | 0 | 0 | 0 | 0 |
| CCWF | 0 | 9 | 4 | 5 |
| CHCF | 1 | 7 | 4 | 4 |
| CIM | 1 | 1 | 0 | 2 |
| CIW | 2 | 8 | 2 | 8 |
| CMC | 1 | 8 | 3 | 6 |
| CMF | 4 | 19 | 5 | 18 |
| COR | 6 | 30 | 11 | 25 |
| CRC | 0 | 0 | 0 | 0 |
| CTF | 0 | 1 | 0 | 1 |
| FSP | 0 | 0 | 0 | 0 |
| HDSP | 0 | 0 | 0 | 0 |
| KVSP | 0 | 10 | 2 | 8 |
| LAC | 5 | 51 | 27 | 29 |
| MCSP | 10 | 74 | 16 | 68 |
| NKSP | 2 | 3 | 1 | 4 |
| PBSP | 1 | 0 | 0 | 1 |
| PVSP | 0 | 2 | 0 | 2 |
| RJD | 12 | 31 | 9 | 34 |
| SAC | 16 | 44 | 9 | 51 |
| SATF | 10 | 30 | 12 | 28 |
| SCC | 0 | 0 | 0 | 0 |
| SOL | 1 | 3[22] | 1 | 3 |
| SQ | 3 | 11 | 3 | 11 |
| SVSP | 9 | 19 | 3 | 25 |
| VSP | 0 | 15 | 8 | 7 |
| WSP | 1 | 1 | 0 | 2 |
| Total | 85 | 377 | 120 | 342 |

---

[21] Patients who were in the referral process, or were about to be referred, between Phase I and II of the UNA. These referrals were counted towards the overall 2022/2023 UNA referral numbers.

[22] One of the UNA Review Team recommendations at SOL was to APP, but upon reviewing the UNA Review Team recommendation the IDTT referred the patient to the MHCB.

Out of the initial 377 referrals to the HLOC recommended by the UNA Review Team, the IDTTs did not immediately agree with 166 (44%) of the recommendations. Upon further review at the CRD, 120 out of these 166 referrals, approximately 72%, were not referred to inpatient care by the IDTT. This was due to a variety of reasons - including instances where the UNA Review Team concurred with the decision not to refer or situations where, despite widespread recommendation for referral, the IDTT ultimately decided against referring their patient to HLOC. Overall, the 120 non-referral cases originally recommended for HLOC constituted 31.8% of all UNA Review Team's recommendations for HLOC. CDCR tracked the 120 non-referral cases and found that within 90 days of the CRD meeting, ten of these patients, approximately 8.3%, were subsequently referred to HLOC (three to APP and seven to ICF).

<u>Patient Referrals to HLOC</u>: The following table encompasses all patients who were referred to HLOC by the IDTT during the UNA review process. This includes patients who were referred to HLOC subsequent to the CRD process.

| Inst. | MHCB | APP | ICF | Total |
|---|---|---|---|---|
| ASP | 0 | 0 | 0 | 0 |
| CCI | 0 | 0 | 0 | 0 |
| CCWF | 0 | 0 | 5 | 5 |
| CHCF | 0 | 0 | 4 | 4 |
| CIM | 0 | 1 | 1 | 2 |
| CIW | 0 | 1 | 7 | 8 |
| CMC | 0 | 1 | 5 | 6 |
| CMF | 0 | 5 | 13 | 18 |
| COR | 0 | 6 | 19 | 25 |
| CRC | 0 | 0 | 0 | 0 |
| CTF | 0 | 0 | 1 | 1 |
| FSP | 0 | 0 | 0 | 0 |
| HDSP | 0 | 0 | 0 | 0 |
| KVSP | 0 | 0 | 8 | 8 |
| LAC | 1[23] | 3 | 26 | 30 |
| MCSP | 0 | 9 | 59 | 68 |
| NKSP | 0 | 3 | 1 | 4 |
| PBSP | 0 | 1 | 0 | 1 |
| PVSP | 0 | 0 | 2 | 2 |
| RJD | 0 | 14 | 20 | 34 |
| SAC | 0 | 14 | 37 | 51 |
| SATF | 0 | 2 | 26 | 28 |
| SCC | 0 | 0 | 0 | 0 |
| SOL | 1 | 1 | 1 | 3 |
| SQ | 0 | 1 | 10 | 11 |

[23] One of the UNA Review Team recommendations at LAC was to PD Category 2, but upon reviewing the UNA Review Team recommendation the IDTT referred the patient to the MHCB.

| | | | | |
|---|---|---|---|---|
| **SVSP** | 0 | 9 | 16 | 25 |
| **VSP** | 0 | 2 | 5 | 7 |
| **WSP** | 0 | 1 | 1 | 2 |
| **Total** | **2** | **74** | **267** | **343** |

## Unmet Needs Assessment Review Team: Personality Disorder Results

| Inst. | Category 1 | Category 2 | Category 3 | Total |
|---|---|---|---|---|
| **ASP** | 1 | 1 | 0 | 2 |
| **CCI** | 0 | 3 | 0 | 3 |
| **CCWF** | 0 | 3 | 13 | 16 |
| **CHCF** | 2 | 3 | 18 | 23 |
| **CIM** | 0 | 1 | 2 | 3 |
| **CIW** | 3 | 0 | 14 | 17 |
| **CMC** | 2 | 2 | 12 | 16 |
| **CMF** | 3 | 2 | 10 | 15 |
| **COR** | 6 | 2 | 21 | 29 |
| **CRC** | 1 | 0 | 0 | 1 |
| **CTF** | 0 | 0 | 0 | 0 |
| **FSP** | 0 | 0 | 0 | 0 |
| **HDSP** | 0 | 1 | 4 | 5 |
| **KVSP** | 0 | 4 | 17 | 21 |
| **LAC** | 13 | 10 | 70 | 93 |
| **MCSP** | 5 | 10 | 56 | 71 |
| **NKSP** | 0 | 1 | 2 | 3 |
| **PBSP** | 0 | 0 | 1 | 1 |
| **PVSP** | 0 | 1 | 1 | 2 |
| **RJD** | 10 | 7 | 66 | 83 |
| **SAC** | 10 | 5 | 102 | 117 |
| **SATF** | 2 | 0 | 13 | 15 |
| **SCC** | 0 | 0 | 0 | 0 |
| **SOL** | 0 | 0 | 1 | 1 |
| **SQ** | 2 | 0 | 7 | 9 |
| **SVSP** | 3 | 11 | 36 | 50 |
| **VSP** | 1 | 1 | 3 | 5 |
| **WSP** | 0 | 1 | 1 | 2 |
| **Totals** | **64** | **69** | **470** | **603** |

**Delayed Referrals**

Some referrals for higher-level care were delayed for more than two weeks during the UNA referral process. The IRU received 29 such delayed referrals, categorized into four groups based on the reasons for the delay. One referral was not moved forward due to the patient's extended absence for a court appearance, four referrals were delayed due to reasons such as delayed Vitek hearings or PC being unaware of the decision to refer, eleven referrals were delayed due to staffing shortages, and thirteen referrals were delayed due to backlog in scheduling the CRD.

## Special Circumstances

During the UNA, CDCR found a small number of cases that were not initially contemplated in the study design. These patients were either difficult to review or in a medical setting that made a referral to a HLOC inappropriate.

**Patients Unavailable for UNA Review**

Some patients identified in Phase I were unavailable for review because they were in court or in medical care for an indefinite period, or they had been released from custody or passed away. CDCR determined it was not practical or possible to review these cases. Adjustments were made to data collection tools to create new categories for these cases and excluded them from analysis.

| Inst. | Parole/Discharge | Unable to Assess OTC/OTM | Sequestered |
|---|---|---|---|
| CCWF | 3 | 1 | 0 |
| CHCF | 7 | 0 | 26 |
| CMC | 6 | 2 | 0 |
| CMF | 7 | 0 | 0 |
| COR | 7 | 2 | 0 |
| KVSP | 1 | 0 | 0 |
| LAC | 7 | 3 | 0 |
| MCSP | 10 | 5 | 0 |
| NKSP | 2 | 0 | 0 |
| RJD | 3 | 1 | 0 |
| SAC | 8 | 2 | 0 |
| SATF | 28 | 2 | 0 |
| SQ | 3 | 0 | 0 |
| SVSP | 7 | 3 | 0 |
| VSP | 1 | 0 | 0 |
| **Total** | **100** | **21** | **26** |

**Sequestered**

As the Phase I list of patients from California Healthcare Facility (CHCF) was pulled, it became apparent that the list included patients admitted into the Correctional Treatment Center (CTC) and Outpatient Housing Unit (OHU), primarily under medical care, who may not be appropriate for the UNA review.

These patients were often screened in because of lack of participation in programming, which was largely attributed to their ambulation and daily care needs. In consultation with *Coleman* monitors, it was determined that recommendations for HLOC would likely be more disruptive than helpful to the patients and not address the core mission of meeting an unmet bed need, as these patients were already receiving a high level of medical care. It was recommended that identified cases should be sequestered in the study and excluded from UNA review. Further stakeholder review established criteria for impacted cases and which cases should be included for sequestration. The purpose of sequestering cases was to allow for later review should stakeholders determine that the review of these cases was material to the study. There were 129 cases (patients receiving medical care in the CTC or OHU) originally sequestered from the master list. Of the 129 cases originally identified from the master list, 26 remained sequestered/excluded from Phase II review and 103 were reviewed during Phase II. Of the 129 cases:

- 69 OHU patients were re-added and reviewed in December 2022.
- 34 CTC patients were re-added and reviewed in January 2023.
- 26 CTC patients were not reviewed.
  - *These patients received one flag for lack of participation, four were receiving treatment in a memory care unit.*


**Vitek Hearings**

Upon being notified that their IDTT has referred them to an APP or ICF, some patients refused to transfer and requested a due process or Vitek hearing. During the 2022/2023 UNA, nine patients prevailed in their due process hearings and consequently did not transfer to an APP or ICF treatment program. These cases were distributed across various locations, with three at the CMF, one at Los Angeles County (LAC), four at Mule Creek State Prison (MCSP), and one at Sacramento (SAC). Despite these patients not transferring, the data gathered during Phases I and II were incorporated into the 2022/2023 UNA analysis.

# 2022 Unmet Needs Assessment: Findings

The 2022/2023 UNA findings focus on four areas of concern raised before the 2022/2023 UNA: first, whether there is an unmet need for inpatient referrals (including identifying and referring patients in need of various inpatient programs); second, whether there is an unmet need for personality disorder patients; third, whether there are sufficient numbers of MHCBs; and fourth, whether the SusPro is effective, which includes evaluating whether there are sufficient number of inpatient beds need within various inpatient programs.

## Is There an Unmet Need with Inpatient Referrals?

No. The 2022/2023 UNA was designed to screen and review a larger population compared to the SusPro method. The results of the 2022/2023 UNA support the conclusion that SusPro is effectively identifying and referring patients in need of HLOC.

To accurately assess the effectiveness of the 2022/2023 UNA in identifying unmet needs, it is crucial to compare the number of UNA referrals generated to the number of referrals generated by CDCR's baseline referral process. This comparison provided valuable insights into the progress made in addressing unmet needs and help identify areas for further improvement. By analyzing the referral data, CDCR evaluated the extent to which the 2022/2023 UNA identified an unmet need with inpatient referrals.

During the initial phase of the UNA, nearly all MHSDS patients within a given institution were reviewed. This process, as outlined in the methodology, incorporated both objective and subjective data, and solicited inputs from a diverse team including clinical, custody, and nursing staff. Additionally, patients who were flagged by the Regional Team as needing intervention - based on the preceding quarter's SusPro review - were included in the subsequent phase of the UNA review (Phase II).

CDCR's baseline referral process, on the other hand, considers patients (at a minimum) for HLOC considerations according to their level of care: CCCMS patients are considered annually, EOP patients quarterly, and EOPMod patients monthly. This varied scheduling implies that a simple side-by-side comparison would not capture the nuanced differences between the 2022/2023 UNA and CDCR's regular referral process, SusPro.

## Analysis

1. *2022/2023 UNA APP and ICF Referrals*

To assess the extent of any unmet need the 2022/2023 UNA process detected in referrals to APP/ICF programs, CDCR conducted a systematic comparison of referral rates across 28 institutions participating in the UNA during specified periods. This analysis includes all of the 341 APP or ICF referrals from April 2022 to March 2023, which were classified as 2022/2023 UNA referrals. These were then contrasted against referrals from equivalent periods in 2019 and 2021. Changes in the size of mental health population across these three timeframes was also accounted for in the analysis.

Not all ICF and APP referrals made across the state between April 2022 and March 2023 fall under the UNA referral classification. Only those referrals adhering to the exacting standards and procedures of

the UNA methodology, as outlined in the agreed-upon operationalization documents, are deemed UNA referrals. As the timing of UNA implementation varied across institutions, referrals made outside a particular institution's UNA participation window were generated via the existing SusPro method.

The analysis compared the 341 UNA referrals against those from corresponding periods in 2019 and 2021. This approach carefully accounts for the distinct timeframes and methodological prerequisites of the UNA process, and ensures a balanced comparison with equivalent timeframes in 2019 and 2021. For example, at RJD, virtually all CCCMS patients were screened during RJD's seven-week UNA review period. However, CDCR's baseline referral process would (at a minimum) review virtually all the CCCMS patients at RJD over the course of 12 months. The analysis factored in these timeframes for CCCMS in 2019 and in 2021, as well as quarterly and monthly timeframes for EOP and EOPMod respectively. The institutions and date ranges of each observation period is listed below.[24]

| | 2019 | | | | | | 2021 | | | | | | 2022/2023 UNA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inst. | CCCMS | | EOP | | EOPMod | | CCCMS | | EOP | | EOPMod | | CCCMS, EOP, EOPMod | |
| RJD | 01 Jan | 31 Dec | 04 Apr | 03 Jul | 04 Apr | 04 May | 01 Jan | 31 Dec | 04 Apr | 03 Jul | 04 Apr | 04 May | 04 Apr '22 | 10 Jun '22 |
| LAC | 01 Jan | 31 Dec | 16 May | 14 Aug | 16 May | 15 Jun | 01 Jan | 31 Dec | 16 May | 14 Aug | 16 May | 15 Jun | 16 May '22 | 08 Jul '22 |
| MCSP | 01 Jan | 31 Dec | 20 Jun | 18 Sep | 20 Jun | 20 Jul | 01 Jan | 31 Dec | 20 Jun | 18 Sep | 20 Jun | 20 Jul | 20 Jun '22 | 05 Aug '22 |
| SAC | 01 Jan | 31 Dec | 18 Jul | 16 Oct | 18 Jul | 17 Aug | 01 Jan | 31 Dec | 18 Jul | 16 Oct | 18 Jul | 17 Aug | 18 Jul '22 | 16 Sep '22 |
| CMC | 01 Jan | 31 Dec | 18 Jul | 16 Oct | 18 Jul | 17 Aug | 01 Jan | 31 Dec | 18 Jul | 16 Oct | 18 Jul | 17 Aug | 18 Jul '22 | 16 Sep '22 |
| COR | 01 Jan | 31 Dec | 29 Aug | 27 Nov | 29 Aug | 28 Sep | 01 Jan | 31 Dec | 29 Aug | 27 Nov | 29 Aug | 28 Sep | 29 Aug '22 | 28 Oct '22 |
| SATF | 01 Jan | 31 Dec | 29 Aug | 27 Nov | 29 Aug | 28 Sep | 01 Jan | 31 Dec | 29 Aug | 27 Nov | 29 Aug | 28 Sep | 29 Aug '22 | 28 Oct '22 |
| SVSP | 01 Jan | 31 Dec | 03 Oct | 01 Jan | 03 Oct | 02 Nov | 01 Jan | 31 Dec | 03 Oct | 01 Jan | 03 Oct | 02 Nov | 03 Oct '22 | 09 Dec '22 |
| CHCF | 01 Jan | 31 Dec | 03 Oct | 01 Jan | 03 Oct | 02 Nov | 01 Jan | 31 Dec | 03 Oct | 01 Jan | 03 Oct | 02 Nov | 03 Oct '22 | 09 Dec '22 |
| VSP | 01 Jan | 31 Dec | 28 Nov | 26 Feb '20 | 28 Nov | 28 Dec | 01 Jan | 31 Dec | 28 Nov '21 | 26 Feb '22 | 28 Nov | 28 Dec | 28 Nov '22 | 23 Dec '22 |
| KVSP | 01 Jan | 31 Dec | 28 Nov | 26 Feb '20 | 28 Nov | 28 Dec | 01 Jan | 31 Dec | 28 Nov '21 | 26 Feb '22 | 28 Nov | 28 Dec | 28 Nov '22 | 23 Dec '22 |
| CMF | 01 Jan | 31 Dec | 03 Jan | 03 Apr | 03 Jan | 02 Feb | 01 Jan | 31 Dec | 03 Jan | 03 Apr | 03 Jan | 02 Feb | 03 Jan '23 | 10 Feb '23 |
| SQ | 01 Jan | 31 Dec | 03 Jan | 03 Apr | 03 Jan | 02 Feb | 01 Jan | 31 Dec | 03 Jan | 03 Apr | 03 Jan | 02 Feb | 03 Jan '23 | 10 Feb '23 |
| NKSP | 01 Jan | 31 Dec | 03 Jan | 03 Apr | 03 Jan | 02 Feb | 01 Jan | 31 Dec | 03 Jan | 03 Apr | 03 Jan | 02 Feb | 03 Jan '23 | 10 Feb '23 |
| CCWF | 01 Jan | 31 Dec | 30 Jan | 30 Apr | 30 Jan | 01 Mar | 01 Jan | 31 Dec | 30 Jan | 30 Apr | 30 Jan | 01 Mar | 30 Jan '23 | 24 Feb '23 |
| CRC | 01 Jan | 31 Dec | 30 Jan | 30 Apr | | | 01 Jan | 31 Dec | 30 Jan | 30 Apr | | | 30 Jan '23 | 24 Feb '23 |
| CIW | 01 Jan | 31 Dec | 30 Jan | 30 Apr | 30 Jan | 01 Mar | 01 Jan | 31 Dec | 30 Jan | 30 Apr | 30 Jan | 01 Mar | 30 Jan '23 | 24 Feb '23 |
| CIM | 01 Jan | 31 Dec | 30 Jan | 30 Apr | 30 Jan | 01 Mar | 01 Jan | 31 Dec | 30 Jan | 30 Apr | | | 30 Jan '23 | 24 Feb '23 |
| HDSP | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| PBSP | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| SOL | 01 Jan | 31 Dec | 13 Feb | 14 May | 13 Feb | 15 Mar | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| FSP | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| SCC | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| CTF | 01 Jan | 31 Dec | 13 Feb | 14 May | 13 Feb | 15 Mar | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| PVSP | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| CCI | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| ASP | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 01 Jan | 31 Dec | 13 Feb | 14 May | | | 13 Feb '23 | 10 Mar '23 |
| WSP | 01 Jan | 31 Dec | 13 Feb | 14 May | 13 Feb | 15 Mar | 01 Jan | 31 Dec | 13 Feb | 14 May | 13 Feb | 15 Mar | 13 Feb '23 | 10 Mar '23 |

CDCR calculated the referral rates by adding all APP/ICF referrals during each period and dividing the result by the average daily population of CCCMS, EOP, or EOPMod patients. CDCR excluded referrals of patients who were already in an APP or ICF program and included patients in an MHCB at the time of referral, but for the purposes of this analysis, categorized them in their previous outpatient level of care (e.g., an MHCB patient that came from EOP is considered an EOP patient for this analysis). This methodology provides a more comprehensive understanding of the sources of APP and ICF referrals. For instance, it is rare for a patient from CCCMS to be referred directly to either APP or ICF; they usually transition through MHCB first. By classifying MHCB patients referred to APP or ICF according to their prior outpatient level of care, CDCR gained a clearer picture of the quantity of current or recent CCCMS

___

[24] Some institutions did not have any EOPMod patients during the 2019 and 2021 timeframes. Accordingly, the date ranges for 2019 and 2021 timeframes are blank.

patients who are identified and subsequently referred to APP or ICF. The analysis revealed the following referral rates per 1,000 patients for each period and patient category:

1. <u>CCCMS</u>: referral rates were highest in 2019 (SusPro), followed by 2021 (SusPro), and lowest during the UNA period. These differences were statistically significant.

2. <u>EOP</u>: referral rates were highest in 2019 (SusPro), followed by 2021 (SusPro), and lowest during the UNA period. These differences were also statistically significant.

3. <u>EOPMod</u>: referral rates did not significantly differ across any period. However, referral rates were significantly lower than EOP patients in 2019 (SusPro) and 2021 (SusPro), but not during the UNA period. Further case-level analyses could be performed to better understand the causes of this finding.

These analyses were conducted on June 22, 2023, using R version 4.2.2, and the red error bars indicate 95% confidence intervals (CI). Exact confidence intervals for each rate were calculated using the pois.exact function of the epitools library (0.5-10.1). Differences between rates within each MHI were tested using the rateratio function from epitools.  For CCCMS and EOP, referral rates differed significantly between all three periods (p<.05, two-tailed) while no significant difference between periods was found for EOPMod.



In an ad-hoc analysis completed on June 27, 2023, CDCR included the 120 non-referrals that were initial recommended by the UNA Review Teams, but ultimately not referred to a HLOC at the conclusion of the CRD meetings. Including this group in the overall analysis increased the rate of the UNA referrals from

CCCMS (1.8), EOP (61.1), and EOPMod (104.9). For CCCMS, all three referral rates differed significantly from each other, for EOP, 2019 rates differed significantly from 2021 and UNA rates, and for EOPMod, 2021 rates differed significantly from UNA rates. These findings remain consistent with the overall conclusion of this report that there was no unmet need found for inpatient referrals. The number of referrals during the UNA were not substantially or consistently higher than referral numbers in previous years using CDCR's baseline referral process (i.e., SusPro).

## 2. Annual Referral Rates



The annual referral rate per thousand patients over a span of seven years, from 2016 through 2022, was analyzed. If there was an unmet need, then the referral rate during the 2022/2023 UNA could be expected to be significantly, or at least noticeably higher. However, the annual referral rates for each year from 2016 to 2021 consistently proved to be higher than the 2022 referral rate. This indicates that there was not a significant increase in referrals in 2022, even though institutions with the highest concentration of MHSDS patients[25] participated in the UNA from April – December 2022.

The chart, "Yearly APP/ICF Referrals & Referral Rate Statewide Mental Health Population", was constructed using referral data sourced from RIPA on a yearly basis, complemented by the yearly statewide mental health census data as of January 1st. This combined dataset - the number of APP/ICF referrals statewide per year and the annual statewide mental health patient census on January 1st - enabled the computation of the referral rate per 1,000 patients. Rate = (referrals/census) * 1000. Using the OnDemand Census Report, the total mental health population for each year was reported to be: 2016 = 36,919; 2017 = 38,405; 2018 = 38,701; 2019 = 36,961; 2020 = 35,982; 2021 = 29,576; 2022 = 32,596)

The same data visualized monthly and with distinct Pre-COVID, COVID, and UNA timeframes is illustrated below. The 2022/2023 UNA high and low points are within the COVID range as well as the 2016 and most of the 2017 range, but noticeably lower than all the 2018 and 2019 data points.

---

[25] RJD, LAC, MCSP, SAC, CMC, COR, SATF, SVSP, CHCF, VSP, and KVSP.



Analyzing the seasonal trends in the APP/ICF referral rate per 1,000 patients from January 2016 to March 2023 provides valuable insights into the patterns and fluctuations of this variable over time. Exploring these seasonal trends and consider if there were any changes in historical patterns during various conditions (i.e., COVID and UNA). Considering the impact of these conditions on the interpretation of the analysis, stakeholders can gain a deeper understanding of how external factors may have influenced the referral rate.



|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 5.7 | 5.8 | 6.4 | 7.3 | 7.4 | 6.6 | 6.3 | 7.2 | 5.6 | 5.9 | 4.8 | 5.8 |
| 2017 | 5.7 | 5.0 | 5.5 | 5.1 | 6.0 | 5.9 | 8.3 | 11.0 | 10.5 | 11.4 | 9.8 | 9.6 |
| 2018 | 11.8 | 10.2 | 10.6 | 9.0 | 8.5 | 9.5 | 8.1 | 10.5 | 7.2 | 9.7 | 9.7 | 7.6 |
| 2019 | 8.8 | 8.1 | 9.4 | 10.0 | 12.2 | 11.3 | 13.6 | 13.2 | 12.4 | 11.9 | 9.3 | 9.8 |
| 2020 | 10.8 | 9.9 | 10.6 | 7.7 | 6.4 | 6.4 | 5.9 | 4.5 | 4.1 | 4.0 | 3.9 | 4.1 |
| 2021 | 5.0 | 5.0 | 5.9 | 6.1 | 7.3 | 8.0 | 9.4 | 7.2 | 6.6 | 6.6 | 5.3 | 6.2 |
| 2022 | 4.1 | 4.8 | 4.2 | 5.5 | 5.3 | 6.5 | 9.2 | 8.3 | 7.9 | 5.8 | 6.6 | 5.3 |
| 2023 | 6.5 | 6.4 | 6.7 |  |  |  |  |  |  |  |  |  |

Source: Referrals to Inpatient Programs Application, OnDemand Census Report (based on yearly January 1st mental health statewide census)

The analysis of the data reveals distinctive seasonal patterns in the APP/ICF referral rate over the examined period. From January 2020 to November 2020, the referral rate experiences a steady decline, suggesting a decrease in referrals made per 1,000 patients. This decline is followed by a slight increase in December 2020. From January 2021 to July 2021, there is a significant upward trend, indicating a surge in referrals during the early months of the year. However, the data shows a gradual decrease until February 2022.

Comparing the seasonal trends of the referral rate during COVID (March 2020 – March 2022) and UNA (April 2023 – March 2023) conditions reveals interesting insights. The COVID data shows more variability over time compared to the UNA data, which aligns with the expectation presented in the Lessons Learned report that a pandemic would introduce greater fluctuations in healthcare utilization and referral rates. Additionally, the peak referral rate during the COVID period reached higher levels than during the UNA period, indicative of the unique challenges and demands posed by the pandemic.

## Recommendation

The methodologies employed in both the Sustainable Process (SusPro) and the 2022/2023 Unmet Needs Assessment (UNA) demonstrated comparable effectiveness in identifying and referring patients for inpatient care. It affirms the current effectiveness of CDCRs established referral process, however, steps should be taken to continually evaluate and refine SusPro. Such steps include exploring opportunities to optimize the review frequency, adjusting the criteria for referrals, and implementing additional evidence-based screening tools to improve the identification of patients who require inpatient care.

Continued monitoring and evaluation of both SusPro and the overall mental health care delivery system within CDCR is paramount. These practices facilitate timely identification of improvement areas, evaluate the efficacy of introduced interventions, and ensure comprehensive coverage of patients' mental health needs. Regularly reviewing and updating the CDCR referral process will help maintain and possibly refine CDCRs ability to identify patients in need of a HLOC.

## Is There an Unmet Need for Patients with Personality Disorder?

The 2022/2023 UNA did not conclusively answer this question. The UNA Review Teams identified 470 patients who do not qualify for inpatient hospitalization and *may* benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or to CDCR patients at DSH (i.e., PD Category 3). However, key methodological limitations, diagnostic anomalies, and unexpected Phase II inclusion results stemming from the 2022/2023 UNA created significant challenges in assessing the needs of the identified population or drawing inferences about the population at large.

Methodological Limitations: When considering recommendations for patients with personality disorders in the PD Category 3, a significant issue was encountered. UNA reviewers were instructed to provide open-ended narrative justifications as to why each patient fulfilled the criteria for inclusion in this category. However, the lack of a uniformly mandated format for these justifications led to a variety of response patterns, which posed a substantial challenge for comparative analysis.

To fully comprehend the PD Category 3 population identified in the 2022/2023 UNA, it became clear that CDCR needed to perform additional analysis of the identified patients - this time employing a standardized methodology. The absence of such a method in the initial analysis made it difficult for CDCR to draw consistent and reliable conclusions about the treatment needs and unique characteristics of this patient group. Therefore, the additional analysis using a standardized approach was deemed essential in order to gain a more accurate understanding of this population and to help guide future treatment recommendations and interventions.

Unexpected Phase II PD CAT 3 Recommendations: During the 2022/2023 UNA, Review Teams identified 349 patients (74% of the total) as PD Category 3, despite these individuals not being flagged during Phase I. Similarly, among 91 patients without an active personality disorder diagnosis at the time of review, 75 (82%) were identified as PD Category 3 by the UNA reviewers, despite not having been flagged during Phase I.  The distinctiveness of these subgroups, as compared to those screened into Phase I by institutional clinicians and endorsed as PD Category 3 by the UNA Review Teams, remained unclear. Due to the lack of a CRD process for PD recommendations, the IDTT was not given the opportunity to counter or confirm the recommendations for these subgroups, as was standard procedure for HLOC recommendations. A significant divergence was observed among the patients identified as PD Category 3, who had a current or historical personality disorder diagnosis in the EHRS. The wide spectrum of symptoms and maladaptive behaviors presented by these patients highlighted a great variation in treatment needs and diagnoses, underscoring the inadvisability of a one-size-fits-all treatment approach. The 2022/2023 UNA findings indicated the necessity for a more comprehensive analysis of this diverse patient population.

<u>Diagnostic Characteristics</u>:
Of the 470 patients identified in the UNA as meeting the above criteria, 379 (81%) had an active personality disorder diagnosis in the EHRS. When CDCR examined the PD Category 3 patients who had an active personality disorder diagnosis in EHRS, it was found that Dissocial Personality Disorder was the most prevalent diagnosis. Dissocial Personality Disorder is essentially another term often used interchangeably with Antisocial Personality Disorder (ASPD), particularly in the ICD-10 classification system. Like ASPD, it is



To provide a comprehensive overview, CDCR compiled a graph that accounted for the total count of personality diagnoses. It's important to note that the total patient count was exceeded by the number of personality disorder diagnoses as some patients were diagnoses with more than one personality disorder. The insights from this breakdown were instrumental in understanding the complexity and diversity of the personality disorders within the patient population identified in the 2022/2023 UNA.

characterized by a disregard for social obligations, and callous unconcern for the feelings of others. This behavior is often criminal. Treatment for ASPD is challenging, as individuals with this disorder may be uncooperative in therapy or unwilling to change their behavior. There are no specific medications or evidence-based treatments available to treat ASPD.

The second most prevalent diagnosis was Emotionally Unstable Personality Disorder (EUPD), similar to Borderline Personality Disorder (BPD), is a mental health disorder that impacts the way you think and feel about yourself and others, causing problems functioning in everyday life. It includes self-image issues, difficulty managing emotions and behavior, and a pattern of unstable relationships.

Individuals with EUPD/BPD may experience intense episodes of anger, depression, and anxiety that can last from a few hours to days. People with this disorder also tend to view things in extremes, such as all good or all bad. Their opinions of other people can also change quickly. An individual who is seen as a friend one day may be considered an enemy or traitor the next. These shifting feelings can lead to intense and unstable relationships. Treatment for Emotionally Unstable Personality Disorder is primarily through psychotherapy.

It is important to underline that a diagnosis of a personality disorder does not automatically equate to an immediate need for a specialized treatment program. The landscape of mental health care is complex, and there are illnesses, including some categories of personality disorders, for which there are no widely accepted or specifically tailored treatments. It is imperative to understand that patients with these diagnoses can and do receive effective treatment within the existing MHSDS framework for other aspects of their mental health.

Moreover, it is important to remember that while the UNA identified a number of patients with personality disorders, these patients form anything but a homogeneous group. Their individual diagnoses span a spectrum, and their needs are varied. Equally, the treatments that might benefit them are varied and require nuanced implementation. As such, the decision to establish a new treatment program should not be made hastily based purely on the prevalence of a diagnosis. Each patient's individual needs must be thoroughly evaluated, and the most appropriate course of action determined on a case-by-case basis.

CDCR's proposed 12-month follow-up plan is specifically designed to delve deeper into the unique needs of these patients. It is a comprehensive approach that considers the broad spectrum of personality disorders and the complexity of their management. CDCR anticipates that this careful and systematic approach will yield insights necessary to design and implement more effective treatment services and strategies for this patient population. Our objective is not just to react to the current findings, but to enhance our understanding and approach towards treating personality disorders.

### Recommendation

CDCR recommends designing, implementing, and evaluating a follow-up study to validate and better understand the treatment services needs of patients with personality disorders. A comprehensive 12-month follow-up plan involves conducting a literature review, designing a mixed-methods study, developing data collection instruments, collecting and analyzing data, interpreting findings, and determining which treatment services would be most beneficial to this population.

1. Conduct a Thorough Literature Review: During the first phase of the plan, CDCR will review evidence-based practices for treating personality disorders in correctional settings. This review will inform the design of the study and provide a foundation for data-informed treatment services.

2. Design a Mixed-Methods Study: In the second phase, CDCR will design a study that combines quantitative and qualitative data collection methods to capture the complex needs of the "PD Category 3" population. This approach will allow CDCR to compare their objective markers, such as rates of RVRs, referrals and admissions, treatment participation, and incidents of self-harm, to those of the comparison group.

3. Define Study Sample and Develop Data Collection Instruments: During the third and fourth months of the plan, CDCR will define the study's sample and create or adapt questionnaires, interview guides, and focus group protocols that address the study objectives. As needed, CDCR will also submit the study protocol for ethical approval.

4. Collect and Analyze Data: Over the course of months five to eight, CDCR will recruit participants, administer the data collection instruments, and analyze the results. The analysis will focus on identifying patterns and trends that can inform the development of treatment services.

5. Interpret Findings and Design Treatment Services: Upon completion of the data analysis, CDCR will interpret the findings and consider their implications for the design and implementation of additional treatment services for "PD Category 3" patients.

6.  <u>Disseminate Study Findings</u>: During the ninth and tenth months, CDCR will disseminate study findings to relevant stakeholders to build support for the development and implementation of the additional treatment services.

7.  <u>Develop and Implement the Special Treatment Needs Program</u>: In the last two months of the plan, CDCR will develop policies and procedures for treatment services based on our study findings, input from stakeholders, and best practices identified in the literature review. CDCR will monitor the effectiveness of these services and adjust as needed to ensure they meet the needs of the "PD Category 3" population.

## Are There Insufficient Mental Health Crisis Beds?

CDCR has a sufficient number of MHCBs to provide care to patients in need of crisis care. No unmet need was identified for this population. The 2022/2023 UNA methodology documented five specific questions to identify potential unmet MHCB needs within the patient population:

1. *Total number of referrals (including a monthly average) to an MHCB,*
2. *Average daily and monthly number of patients on a waitlist for transfer to a MHCB,*
3. *Average daily census of alternative housing beds used for patients who would have otherwise been assessed in a MHCB,*
4. *Average daily census of TMHU admissions if TMHUs were in use,*
5. *Average daily occupancy of MHCBs systemwide.*

## Average Mental Health Crisis Bed Referrals, Alternative Housing, Temporary Mental Health Unit, and Occupancy

The table below presents a breakdown of the total number of MHCB referrals, daily averages for MHCB referrals, alternative housing census, MHCB census, and TMHU census, from January 1, 2018, to December 31, 2022, covering 24 months prior to the COVID-19 pandemic (before January 1, 2020).

An MHCB referral is identified by a Mental Health Identifier (MHI) change to MHCB in the EHRS MH Place In order. Alternative housing refers to patients with an MHCB MHI who are not in an MH inpatient housing unit (i.e., not in the APP/ICF or MHCB program). Census data includes patients in alternative housing or MHCB for part of a calendar day.

A TMHU is defined by the COVID Mental Health Treatment Guidance memo and designated as a TMHU cell bed by DAI, beginning April 24, 2020. TMHU cell beds were deactivated on April 3, 2021, therefore the data only includes TMHU census between April 24, 2020, and April 3, 2021. TMHU designation is based on the cell bed rather than patient attributes. A patient is included in the TMHU census when placed in a TMHU-designated bed per SOMS. Census data covers patients in any TMHU-designated cell bed for part of a calendar day. The TMHU beds were not exclusively reserved for MHCB use, as they were designed and used for MHCB, APP, and ICF. The daily average TMHU census data in the table below includes all TMHU use.

| Year | Month | Number of MHCB referrals | Daily Average - MHCB Referrals | Daily Average - Alt. Housing Census | Daily Average - MHCB Census | Daily Average – TMHU Census |
|------|-------|--------------------------|--------------------------------|-------------------------------------|-----------------------------|-----------------------------|
| 2018 | 1 | 1345 | 43 | 97 | 382 | n/a |
| 2018 | 2 | 1234 | 44 | 91 | 336 | n/a |
| 2018 | 3 | 1361 | 43 | 90 | 321 | n/a |
| 2018 | 4 | 1286 | 42 | 82 | 310 | n/a |
| 2018 | 5 | 1397 | 44 | 91 | 280 | n/a |
| 2018 | 6 | 1444 | 47 | 90 | 316 | n/a |
| 2018 | 7 | 1415 | 45 | 91 | 315 | n/a |
| 2018 | 8 | 1466 | 47 | 86 | 336 | n/a |
| 2018 | 9 | 1380 | 45 | 87 | 303 | n/a |
| 2018 | 10 | 1253 | 40 | 78 | 283 | n/a |
| 2018 | 11 | 1227 | 40 | 72 | 307 | n/a |
| 2018 | 12 | 1134 | 36 | 65 | 271 | n/a |
| 2019 | 1 | 943 | 30 | 48 | 245 | n/a |
| 2019 | 2 | 944 | 33 | 53 | 272 | n/a |
| 2019 | 3 | 1053 | 33 | 54 | 269 | n/a |
| 2019 | 4 | 1136 | 37 | 60 | 300 | n/a |
| 2019 | 5 | 1105 | 35 | 55 | 296 | n/a |
| 2019 | 6 | 1148 | 38 | 57 | 325 | n/a |
| 2019 | 7 | 1193 | 38 | 58 | 347 | n/a |
| 2019 | 8 | 1264 | 40 | 62 | 365 | n/a |
| 2019 | 9 | 1065 | 35 | 57 | 377 | n/a |
| 2019 | 10 | 1051 | 33 | 50 | 327 | n/a |
| 2019 | 11 | 1000 | 33 | 54 | 303 | n/a |
| 2019 | 12 | 1071 | 34 | 56 | 303 | n/a |
| 2020 | 1 | 1065 | 34 | 56 | 320 | n/a |
| 2020 | 2 | 1051 | 36 | 60 | 343 | n/a |
| 2020 | 3 | 1028 | 32 | 58 | 335 | n/a |
| 2020 | 4 | 751 | 25 | 56 | 261 | 24 |
| 2020 | 5 | 771 | 24 | 62 | 243 | 64 |
| 2020 | 6 | 775 | 25 | 70 | 279 | 100 |
| 2020 | 7 | 673 | 21 | 62 | 262 | 120 |
| 2020 | 8 | 602 | 19 | 50 | 252 | 136 |
| 2020 | 9 | 612 | 20 | 46 | 230 | 155 |
| 2020 | 10 | 640 | 20 | 49 | 241 | 170 |
| 2020 | 11 | 586 | 19 | 50 | 240 | 177 |
| 2020 | 12 | 580 | 18 | 48 | 269 | 199 |
| 2021 | 1 | 595 | 19 | 54 | 279 | 196 |
| 2021 | 2 | 602 | 21 | 41 | 257 | 175 |
| 2021 | 3 | 632 | 20 | 32 | 231 | 125 |
| 2021 | 4 | 677 | 22 | 36 | 223 | 96 |

| 2021 | 5  | 684  | 21 | 33 | 220 | n/a |
|------|----|------|----|----|-----|-----|
| 2021 | 6  | 720  | 23 | 36 | 246 | n/a |
| 2021 | 7  | 712  | 22 | 34 | 256 | n/a |
| 2021 | 8  | 733  | 23 | 40 | 255 | n/a |
| 2021 | 9  | 738  | 24 | 39 | 273 | n/a |
| 2021 | 10 | 755  | 24 | 42 | 263 | n/a |
| 2021 | 11 | 780  | 25 | 44 | 259 | n/a |
| 2021 | 12 | 813  | 26 | 44 | 270 | n/a |
| 2022 | 1  | 716  | 23 | 42 | 273 | n/a |
| 2022 | 2  | 730  | 25 | 46 | 226 | n/a |
| 2022 | 3  | 957  | 30 | 54 | 233 | n/a |
| 2022 | 4  | 1026 | 33 | 61 | 262 | n/a |
| 2022 | 5  | 992  | 31 | 55 | 273 | n/a |
| 2022 | 6  | 1023 | 33 | 56 | 290 | n/a |
| 2022 | 7  | 1062 | 34 | 60 | 278 | n/a |
| 2022 | 8  | 1159 | 37 | 62 | 279 | n/a |
| 2022 | 9  | 1123 | 37 | 65 | 250 | n/a |
| 2022 | 10 | 1097 | 35 | 57 | 239 | n/a |
| 2022 | 11 | 1055 | 35 | 59 | 240 | n/a |
| 2022 | 12 | 1104 | 35 | 58 | 234 | n/a |

## Population Projections

CDCR receives MHCB need studies twice annually. The purpose of these studies is to guide future facility planning efforts. The forecasts are provided by level of care and gender, using population projections. The methodologies used in these forecasts have evolved since their inception in the Fall of 2011 and are partly based on the efforts of HCPOP staff in collecting additional data related to classification levels and analyses of pending lists.

Forecasted population levels for CDCR's MHCB population since 2018 are presented in the tables below, separated by gender. The percentage difference between the forecasted numbers and the bed needs is also presented for reference. Based on the methodology presented in the biannual studies, the bed need is calculated by adding the average census and average pending list (Awaiting Placement) from the weekly Mental Health Services Delivery System MIS report to calculate a bed need (at 90% occupancy for inpatient and 95% for outpatient programs). Then for the Male MHCB (as well as EOP-GP, and EOP-ASU programs and the Female EOP-ASU) program the number of patients awaiting placement is used to determine if they are already being accounted for in another type of mental health bed. If so, an adjustment factor is calculated so that the overall mental health need is not overstated. The trued bed need takes this adjustment into account.  The bed need includes alternative housing stays and flex bed use such as the Temporary Mental Health Unit (TMHUs).

In recent years, the projected numbers for 2021 and 2022 were within +/- 10% of the male MHCB need. Since 2019, all projections and needs have been below the current male MHCB capacity (377), including projections up to 2027.

| MHCB & Forecast (Male) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|
| Bed Capacity | 428 | 407 | 423 | 397 | 377 | 377 | | | | |
| **Bed Need** | **397** | **296** | **329** | **282** | **282** | | | | | |
| Spring 2018 Forecast | 447 (+11%) | 434 (+32%) | 426 (+23%) | 419 (+33%) | 412 (+32%) | | | | | |
| Fall 2018 Forecast | | 388 (+24%) | 384 (+14%) | 380 (+26%) | 377 (+25%) | 372 | | | | |
| Spring 2019 Forecast | | 306 (+3%) | 301 (-9%) | 297 (+5%) | 294 (+4%) | 290 | | | | |
| Fall 2019 Forecast | | | 259.6 (-27%) | 254.6 (-11%) | 257.2 (-10%) | 251.2 | 248 | | | |
| Spring 2020 Forecast | | | 343 (+4%) | 340 (+17%) | 334 (+16%) | 328 | 323 | | | |
| Fall 2020 Forecast | | | | 285 (+1%) | 265 (-6%) | 290 | 296 | 284 | | |
| Spring 2021 Forecast | | | | 273 (-3%) | 262 (-8%) | 276 | 282 | 275 | | |
| Fall 2021 Forecast | | | | | 304 (+7%) | 328 | 327 | 283 | 276 | |
| Spring 2022 Forecast | | | | | 279 (-1%) | 288 | 285 | 260 | 256 | |
| Fall 2022 Forecast | | | | | | 271 | 263 | 252 | 244 | 239 |



For female MHCB needs, the projected numbers for 2021 and 2022 were within +/- 40% of the bed need. Since 2018, all projections and bed needs have been below the current female MHCB capacity (41), including projections up to 2027.

| MHCB & Forecast (Female) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|
| Bed Capacity | 22 | 41 | 41 | 41 | 41 | 41 | | | | |
| **Bed Need** | **30** | **28** | **25** | **11** | **14** | | | | | |
| Spring 2018 Forecast | 30 (0%) | 32 (+13%) | 33 (+24%) | 32 (+66%) | 31 (+55%) | | | | | |
| Fall 2018 Forecast | | 32 (+13%) | 31 (+19%) | 30 (+63%) | 29 (+52%) | 29 | | | | |
| Spring 2019 Forecast | | 27 (-4%) | 28 (+11%) | 27 (+59%) | 27 (+48%) | 26 | | | | |
| Fall 2019 Forecast | | | 26 (+4%) | 25 (+56%) | 24 (+42%) | 24 | 24 | | | |
| Spring 2020 Forecast | | | 30 (+17%) | 29 (+62%) | 28 (+50%) | 28 | 27 | | | |
| Fall 2020 Forecast | | | | 17 (+35%) | 19 (+26%) | 23 | 22 | 22 | | |
| Spring 2021 Forecast | | | | 11 (0%) | 10 (-40%) | 12 | 13 | 13 | | |
| Fall 2021 Forecast | | | | | 13 (-8%) | 15 | 13 | 13 | 13 | |
| Spring 2022 Forecast | | | | | 16 (+13%) | 15 | 15 | 17 | 17 | |
| Fall 2022 Forecast | | | | | | 14 | 14 | 14 | 14 | 14 |



The analysis of the capacity and usage of MHCBs in CDCR suggested that the number of beds was sufficient to meet the needs of both male and female patients. According to the data, the capacity of

MHCBs for male patients was higher than the forecasted needs. In 2021, the bed usage of MHCBs for males was 282, with a forecasted need of the same number for 2022. The capacity, however, was listed at 377 beds, which indicated a surplus of MHCBs. The Fall 2022 projections forecasted a continuing decrease in bed needs for male patients over the following years, with the forecast averaging 5% lower than the Spring 2022 study. CDCR has 377 MHCBs for male patients within 19 of the 32 male institutions. The Fall 2022 Study forecasted a bed need of 282 for the fiscal year (FY) 2022. The existing capacity was more than adequate to cater to the needs of male patients.

Similarly, for female patients, the capacity of MHCBs exceeded the projected needs. In 2021, the average usage for females was 11 beds, with a forecasted need of 14 for 2022. The capacity for female MHCBs was 41 beds, which was also sufficient to accommodate the patients. The Fall 2022 Study forecasted a bed need of 14 for FY 2022, a decrease of 3 beds compared to the Spring report. The bed needs for the forecasted years were lower in each forecast year, further demonstrating the adequacy of the current capacity.

Although the capacity versus need suggests that existing capacity was more than adequate, there are other factors that have indicated additional beds were necessary. The Southern Region was at risk of needing more licensed beds. Of the 60 beds, 26 were licensed beds, and 34 were unlicensed beds. The CIM 50-bed Project will replace the 34 unlicensed beds at CIM and 19 unlicensed beds at CIW with licensed beds, for an overall net loss of 3 beds. However, those beds are planned to be used for either male or female patients depending on statewide need, providing more flexibility to the Southern Region. Overall, the existing capacity was projected to adequately meet the projected patient needs.

## Recommendation

Given the above evidence, CDCR should maintain the existing MHCB bed capacity. Based on projected MHCB needs, the MHCB capacity was sufficient to meet the needs of patients with mental health care needs. However, to ensure the continued adequacy of MHCB bed capacity, it is important to regularly monitor the demand for these beds and adjust capacity as needed.

To achieve this, the following recommendations are offered:

1. Continue with conducting MHCB population projections to guide future facility planning efforts. These studies should be updated at least twice annually to account for changes in population projections and mental health care needs.

2. Maintain close collaboration with the HCPOP staff to collect additional data related to classification levels and analyses of pending lists. This will enable CDCR to make more accurate projections and better assess the need for MHCB beds.

3. Maintain a system to regularly review MHCB usage and capacity across all institutions, ensuring that resources are optimally allocated and that any disparities between regions are promptly addressed.

## Is the Sustainable Process Unsustainable?

The Sustainable Process has demonstrated its effectiveness in identifying CDCR patients in need of inpatient hospitalization. Its performance, as evidenced by the comparison with the 2022/2023 UNA, showed its success in detecting unmet needs. Importantly, the SusPro was not conceived with the objective of filling specific inpatient beds such as those at DSH, but rather to promptly identify and refer patients requiring inpatient care. As such, the 2022/2023 UNA found no correlation between the number of empty beds at DSH and the level of unmet needs.

Specifically, historical data from the past five years indicates that an uptick in the number of available DSH beds does not automatically equate to an increased level of unmet need. During the 2022/2023 UNA, the occupancy rate of DSH beds saw a decline, with the bed occupancy dropping roughly 10% by the UNA's end compared to the beginning. Even amidst the fluctuating occupancy rates of DSH beds between 2018 and 2019, the number of inpatient referrals produced by SusPro displayed a consistent annual growth. The bar graph below illustrates the percentage of occupied DSH beds (ASH, CSH, and PSH) from January 2012 – April 2023, further supporting the finding of a weak correlation between available DSH.



Some months will be above 100% because the occupancy rate is a combination of total census plus patients endorsed and pending transfer, which can sometimes exceed the total capacity if there is a waitlist.

### CDCR Inpatient Beds

Similarly, the occupancy rates for CDCR APP and ICF beds are illustrated below. The monthly changes in occupancy during the 2022/2023 UNA match seasonal patterns from previous years and are noticeable lower than most months since 2012.



CDCR also reviewed historical demand for various inpatient beds used within multiple inpatient programs to ensure there are enough inpatient beds, and address concerns related to whether there are program-specific (i.e., custody level and/or MH level of care) deficiencies in bed supply.

*APP Beds*[26]

Over the past 5 year, a clear majority of months are well below 100% occupancy rate (a combination of total census plus patients endorsed and pending transfer) for APP beds. However, it is also true that there are a few months in late 2019 and early 2020 that exceed 100%. During the 2022/2023 UNA, the occupancy rate of APP beds was relatively stable (initially showed a slight decline, followed by a slight increase), and mirrored low-level occupancy rates not seen since 2018.[27]

---

[26] These numbers do not include CIW-PIP or SQ-PIP beds that are designated APP/ICF flex beds. A separate graph will show occupancy rates at CIW and SQ.

[27] The APP occupancy rate includes CMC beds, starting in June 2021



*ICF Beds*[28]

Similarly, the ICF bed occupancy rate over the past 5 years has largely remained well below 100%. However, the data shows that from approximately September 2019 – May 2020, the ICF occupancy rate was consistently above 100%. During the 2022/2023 UNA, the occupancy rate of ICF beds rose and fell, mirroring typical seasonal fluctuations observed in prior years.

---

[28] These numbers do not include CIW-PIP or SQ-PIP beds that are designated APP/ICF flex beds. A separate graph will show occupancy rates at CIW and SQ.



*CIW-PIP APP/ICF Beds*

Since 2020, the occupancy rate has remained under 100%. However, beginning in 2021, a noticeable pattern of increasing occupancy was observed. During the 2022/2023 UNA the occupancy continued to rise.



*SQ-PIP APP/ICF Beds*

Since 2019, the occupancy rate has consistently remained under 100%. However, beginning in 2021, a noticeable increase followed by a stable occupancy rate between 80% -90% was observed. During the 2022/2023 UNA the occupancy rate remained relatively consistent.



*CDCR ICF Locked Dorms*

Since 2020, the occupancy rate for ICF Locked Dorms has remained below 100%, often below 80%. During the UNA, the occupancy rate rose, but remained below 60%.



*CDCR ICF Multi-Person Cell and Single Cell Beds*

Historical data for the occupancy rates of multi-person and single cells within CDCR ICF started being categorized separately in 2018. To provide a comprehensive perspective, this report includes an initial graph that combines the occupancy data from both cell types starting from 2013. This combined data visualization reveals a consistent trend of occupancy rates under 100% since 2020. However, an increase is apparent during the UNA timeframe, where rates climb to a peak in the mid-90% range.

To delve into more recent and specific trends, this report provides two additional graphs. These charts display the distinct occupancy rates for multi-person and single cells from 2018 to the present. Upon closer inspection, it became clear that the increase in combined occupancy rates, particularly during the UNA period, is largely driven by a significant rise in the occupancy of ICF Multi-Person Cells. Indeed, between October 2022 and March 2023, the occupancy rate for ICF Multi-Person Cells almost reached 120%.



## ICF Single Cell since 2018



## ICF Multi-Person Cell since 2018



CDCR ICF Multi-Person Cell Occupancies by Month - 2018-2023

Recommendations: Uphold current practices. CDCR remains dedicated to routinely reviewing and updating the SusPro as needed, ensuring it continues to be a useful tool for pinpointing and referring patients who need HLOC. CDCR will continue to monitor and assess the need to adjust the SusPro to preserve its effectiveness. Based on the observable increase in bed occupancy at CIW, CDCR should continue to build the CIM 50-Bed project. Additionally, CDCR should commit to ensuring IDTTs are regularly reviewing patients not housed within their current LRH for potential step down, including patients in Multi-Person Cells that may be able to go to a Lock Dorm or Unlocked Dorm.

# 2022 Unmet Needs Assessment: Limitations

CDCR is confident that the agreed-upon methodologies presented in this report resulted in a comprehensive and evidence-based study that is reliable and answers the questions posed by the Court's September 13, 2021, order. However, as with most studies, the 2022/2023 UNA data and findings have some limitations. Recognizing and discussing these limitations is essential for providing a transparent and comprehensive account of the challenges and uncertainties associated with the analysis. By addressing these limitations, CDCR aims to enhance the understanding of the scope and applicability of the findings, ensuring that readers can interpret the results within the appropriate context. Furthermore, acknowledging these limitations offers opportunities for future research to refine methodologies, improve data quality, and address potential gaps in knowledge.

*Global Limitations*

1. Data quality: The data used for the UNA report may contain inaccuracies due to data entry errors by end-users, which can impact the reliability of the analysis.
2. Methodological clarity: The methodologies used in previous reports, such as the 2005 UNA and 2009 MHARP, lack clarity and detail, making it difficult to fully assess unmet needs data or compare findings across different time points.
3. Incomplete information: The report may not have comprehensive information on all relevant programs or populations, such as the MHCB and RC programs, leading to potential gaps in the analysis.
4. Lack of use of validated measures: The study did not utilize validated assessment measures for symptomology and outcomes when flagging patients for inclusion or during the review phase of UNA. This data was unavailable for utilization, and it was impractical to collect it for all screened patients. Additionally, even when naturally collected by providers, CDCR systems do not capture this data in a way that allows for population-wide analysis purposes. This lack of validated measures may limit a comprehensive understanding of the patients' conditions and outcomes.

*Specific Limitations*

1. Ambiguity in the 2005 UNA report: The 2005 report does not clearly differentiate between different programs, such as MHCB, EOP, and RC, creating uncertainty about the scope and applicability of the findings.
2. Lack of information on the 2009 EOP population and unmet need: The 2009 MHARP report does not provide enough information to distinguish the LOC for the 939 MHARP referrals making it difficult to conduct a comprehensive analysis of unmet needs.
3. Decimal rounding issues: The data may contain automatic decimal rounding issues due to limitations in the Structured Query Language algorithm, which could affect the accuracy of calculated averages.
4. Exclusion of TMHU-designated cell beds: The TMHU census data does not include eight TMHU-designated cell beds (out of 835), as they do not exist in SOMS, leading to an underestimation of patients housed in those cells.
5. Specific Data entry errors: The data may include various end-user input errors, such as MHCB admits without MHCB MHI, MHI unchanged for an extended period without MHCB admission, and multiple MHI changes during an MHCB stay. These errors can affect the accuracy of the population and unmet needs estimations.

6. <u>Referral recommendations impacted by staffing deficiencies</u>: Referral recommendations may have been influenced by staffing deficiencies, according to discussions among UNA reviewers. In some cases, patients were not being seen in a timely manner due to staffing shortages, which led to challenges for the UNA Review Teams to make a recommendation. This was particularly difficult when patients had a significant number of flags. In some cases, the review teams made recommendations for referral to inpatient care despite lacking current active symptoms meeting admission criteria.

## 2022 Unmet Needs Assessment: Contributors

Dr. Andrea Ames
Senior Psychologist Specialist

Dr. Juan Carlos Arguello
Associate Medical Director, DSH

Dr. Navdeep Baath
Staff Psychiatrist

Laurie Ball
Associate Director

Dr. Deserie Barragan
Consulting Psychologist, DSH

Dr. Carrie Brecker
Senior Psychologist Specialist

Dr. Dominique Bressi
Senior Psychologist Specialist

Dr. Albert Bunn
Senior Psychiatrist Specialist

Ashley Cabigon
Staff Services Manager I

Dr. Robert Canning
Senior Psychologist Specialist

Steven Carroll
Health Program Specialist I

Dr. Steven Cartwright
Assistant Deputy Director

Dr. Laura Ceballos
Mental Health Administrator

Dr. Caitlin Chinn
Senior Psychologist Specialist

Dr. Chris Cornell
Mental Health Administrator

Dr. Diana Couto da Silva
Senior Psychologist Specialist

Dr. Shalila Douglas
Senior Psychologist Specialist

Dr. Rosie Dunn
Consulting Psychologist, DSH

Dr. David Fennell
Senior Psychiatrist Supervisor,
DSH

Dr. Roger Flanigan
Senior Psychiatrist Supervisor

Arianna Genetin
Health Program Specialist I

Dr. Jack Gills
Senior Psychiatrist Specialist

Dr. Michael Golding
Chief Psychiatrist

Dr. Melanie Gonzalez
Senior Psychologist Specialist

Dr. Brian Gotterer
Senior Psychologist Specialist

Dr. Mandip Grewal
Senior Psychologist Specialist

Dr. Melissa Griffith
Senior Psychologist Specialist

Dr. Catherine Harris
Psychologist, DSH

Stacy Hart
Associate Health Program
Advisor

Dr. Michael Hewitt
Mental Health Administrator

Dr. Gretchen Huntington
Chief Psychologist

Sybil James
Nurse Consultant Program
Review, DSH

Anjetta Johnson
Associate Governmental
Program Analyst

Jennifer Johnson
Staff Services Manager II

Dr. Radhika Katyal-Castillo
Consulting Psychologist, DSH

Dr. Dina Khoury
Senior Psychologist Specialist

Dr. Peter Kim
Senior Psychiatrist Supervisor

Dr. Raymond Kim
Senior Psychologist Specialist,
DSH

Dr. Alex Kushnier
Senior Psychiatrist Supervisor

Dr. David Leidner
Senior Psychologist Specialist

Pak Yan Leung
Research Data Manager

Natasha Lim
Research Data Specialist II

Dr. John Lindgren
Senior Psychiatrist

Dr. Peter Madsen
Senior Psychologist Specialist

Dr. Navreet Mann
Senior Psychiatrist Specialist

Dr. Amar Mehta
Deputy Director

Dr. Fereshte Mirzad
Senior Psychologist Specialist

Ben Molin
Research Data Specialist II

Dr. Emily Moresco
Senior Psychologist Specialist

Dr. Nicole Morrison
Senior Psychiatrist Supervisor

Dr. Elijah Morrow
Psychologist, DSH

Dr. Stephanie Neumann
Mental Health Administrator

Dr. Shana Nguyen
Senior Psychiatrist Supervisor

Dr. Ann Nicholas
Senior Psychologist Specialist

Dr. Allen Nodine
Senior Psychologist Specialist

Dr. Julie Oldroyd
Senior Psychiatrist Specialist

Dr. K. Brent Olsen
Chief of Mental Health

Dr. Cheryl Paizis
Senior Psychiatrist Specialist

Megan Parker
Associate Governmental
Program Analyst

Gloria Perez
Associate Health Program
Advisor

Donald Piring
Research Data Analyst II

Candace Raney
Staff Services Manager II

Dr. Lisa Richards
Senior Psychologist Specialist,
DSH

Dr. Erick Rizzotto
Assistant Deputy Director

Dr. Maher Saleeb
Senior Psychiatrist Supervisor

Dr. Brittany Sawyer
Senior Psychologist Specialist

Dr. R. Andrew Schultz-Ross
Senior Psychiatrist Specialist

Dr. Lisa Scott-Covello
Senior Psychiatrist Specialist

Dr. Ruby Shandilya
Senior Psychiatrist Supervisor

Dr. Sarah Sherman
Staff Psychiatrist

Dr. Candy Soares
Senior Psychologist Specialist

Daniel Stebbins
Associate Health Program
Advisor

Dr. Devin Stroman
Senior Psychiatrist Supervisor

Dr. Nicole Suprovici
Staff Psychiatrist

Jeffrey Tackett
Associate Health Program
Advisor

Dr. Tara Tanaka
Senior Psychologist Specialist

Dr. Gregory Tarasoff
Senior Psychiatrist

Trent Thomas
Health Program Specialist II

Dr. Aikaterini Tsapanidou
Staff Psychologist, DSH

Dr. Lawrence Tucker
Senior Psychiatrist Specialist

Dr. Kelsey Tumiel
Senior Psychologist Specialist,
DSH

Dr. Celeste Wiser
Staff Psychiatrist

Dr. Wendy Worrell
Mental Health Administrator

Dr. Marissa Worth
Senior Psychologist Specialist,
DSH

Dr. Brian Zollweg
Senior Psychologist Supervisor,
DSH

# APPENDICES

A.  UNA Methodology and Operationalization

B.  UNA Timeline

C.  UNA Objective Data Methodology

D.  SharePoint Data Collection PowerApps

E.  UNA Orientation Training Materials

F.  UNA Case Review Template

# Appendix A – UNA Methodology and Operationalization

**Unmet Bed Needs Assessment (UNA) Methodology**

**Phase I**

Each institution, under the direction of a Regional psychologist or psychiatrist in consultation with the *Coleman* experts, will compile a master list of patients that meet one or more of 8 specific criteria that warranted consideration for a potential referral to a higher level of care (HLOC- specifically APP, ICF or MHCB setting) or a special treatment needs program for patients with a personality disorder (i.e., a specialized treatment program) that is not available within the existing MHSDS or at DSH (*See* Appendix 1—2022 UNA Criteria). This list will be compiled 2-3 weeks prior to the scheduled start of Phase II at the institution.

Criterion 1 of Appendix 1 (2022 UNA Criteria) states the following:

> As a result of a major mental disorder, the patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

Criterion A of Appendix 1 (2022 UNA Criteria) states the following:

> The inmate-patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.

Appendix 2 (Operationalization of 2022 UNA criteria 1 & A) operationalizes both of these criteria.

Phase I includes obtaining input from custody and nursing staff re: patients who may be considered for referral to a HLOC or a specialized treatment program. Appendix 3 provides guidelines for obtaining such information.

*Regional Lieutenants* will receive guidance in serving as liaisons with housing officers. They will provide instruction and supervision to the housing officers on how to complete the screening process as operationalized in Appendix 3. Regional Lieutenants will coordinate with each institution as to the most effective/efficient means of distributing the screening tool on each watch. Screens will be completed by custody staff representation from each housing unit. Having all housing unit staff complete the screen is not required. Regularly assigned officers or those most familiar with activity patterns of the housing unit should complete the screen. Custody staff from each shift for all housing units with mental health patients will participate. (CCCMS/EOP/MHCB/STRH/LTRH/PSU/ASU EOP hub). The daily huddle process will serve as one source for obtaining such information. A Regional Lieutenant will be onsite during the information gathering process for both instructional and supervisory purposes.

Local Supervising Registered Nurse (SRN) II/III, Unit Supervisors, and Senior Psychiatric Technicians will receive guidance in serving as liaisons with housing nursing staff. They will provide instruction and supervision to the housing nursing staff on how to complete screening process as per Appendix 3. Local SRN II/III, Unit Supervisors and Senior Psychiatric Technicians

1

will coordinate, at each institution, the most effective/efficient means of distributing the screening tool on each watch. Screens will be completed by Psychiatric Technicians (PT) on 2nd and 3rd watch for patients in EOP/MHCB/STRH/LTRH/PSU/ASU EOP Hub.

During Phase I, CDCR will develop a database to track information throughout the UNA process, which shall be in Excel format so that data can be sorted. This database will include fields for tracking the following:

1.  the institutions where cases were initially identified as potential referrals for a HLOC  or recommended for a specialized treatment program (both done during Phase I) and the reason(s) the patient was identified (i.e., which Phase I criteria were met),
2.  the names, CDCR numbers and custody designation of the patients identified,
3.  the date that each case was reviewed by the UNA Review Team during Phase II,
4.  whether or not the patient was recommended for referral to a HLOC or recommended for a specialized treatment program by the UNA Review Team during Phase I, Phase  II or the inter-phase period,
5.  if a recommendation for referral to a HLOC or recommendation for a specialized treatment program, is made, specify whether the recommendation was to APP, ICF MHCB, or a specialized treatment program for a personality disordered patient; for ICF referral recommendations, indicate if the patient was on Max custody status at the time of the recommendation,
6.  if a HLOC recommendation is made after a tie vote by the UNA Review Team, specify that such a recommendation was made as a result of a tie vote and include the IDTT's decision regarding referral,
7.  if the UNA Review Team's recommendation for a specialized treatment program for a personality disordered patient is made after tie vote, a recommendation will be made for such a specialized treatment program with a notation that it was the result of a tie vote,
8.  if a HLOC recommendation is not made, the reason(s) for not making a recommendation will be documented and there must be sufficient detail in the drop-down rationale to allow all parties to clearly understand the clinical rationale for not recommending a HLOC referral,
9.  the date if the patient paroled or who left the facility for other reasons (e.g., out to court) prior to being reviewed by the UNA Review Team, IDTT if referred, or prior to transfer to a HLOC if referred,
10. the date the UNA Review Team sent their HLOC recommendations to the IDTT for processing,
11. the date of the IDTT review,
12. the decision of the IDTT (refer or not to refer to HLOC).


13. Date referral made by IDTT (in EHRS),
14. Date IRU referral complete,
15. if the IDTT did not make the referral, the reason for a non-referral,

16. the date and the result of the UNA Clinical Dispute/Consultation Team review if the IDTT did not make a referral,
17. if the patient is on a waitlist (a temporary designation – provide the date that patient was placed on the waitlist,
18. if referred to DSH, the date DSH admitted the patient,
19. if referred to DSH and applicable, the date that DSH rejected the referral and the reason for the rejection,
20. if referred to a PIP, the date and location of the facility that the PIP admitted the patient,
21. if applicable, dates and outcomes of Vitek hearings.

Patients currently referred or awaiting transfer to a HLOC prior to Phase I will not be included in the database.

Additionally, after Phase I, but before Phase II, institutions may choose to refer selected patients to a HLOC, based on clinical need. Such patients, who were referred after the master list was established yet prior to the start of Phase II, will be tracked via the database as "between Phase I and II referrals." Such referrals will be counted a HLOC referral and will be tracked via the existing automated reporting process.

## Phase II

During Phase II, designated UNA Review Teams will assess all of the patients identified as the result of the Phase I process (unless a HLOC referral has already been initiated). Each UNA Review Team will consist of a CDCR psychologist, a CDCR psychiatrist, and one or two clinicians from DSH. DSH will determine whether the UNA Review Teams will have one or two clinicians and the number of clinicians on each team may vary within these parameters. If a team has two DSH clinicians, one will be a psychiatrist and the other clinician will be a psychologist. If an UNA Review Team has just one DSH clinician, the clinician will be either a psychiatrist or a psychologist. In order to facilitate meeting the court ordered December 31, 2022 timetable, the number of UNA Review Teams at a specific institution will be dependent on the number of patients identified at the institution during Phase I. The UNA Review Team(s) will not include institutional staff from the specific institution being reviewed. *Coleman* experts will also observe and participate as appropriate in the UNA Review Team review process.

The review process will consist of the following steps:

1. At least one member of the UNA Review Team will review the EHRS of patients identified in Phase I, with a focus on the identified Phase I positive criteria, to determine whether a HLOC referral is recommended or a specialized treatment program is recommended.
2. The reviewer(s) will verbally present his/her findings and recommendation to the team.
3. The UNA Review Team will initially approve, disapprove, or request additional information prior to reaching a majority consensus as to whether or not to make a recommendation for a HLOC referral or a specialized treatment program is recommended. This team review process may occur virtually. If further information is

3

required from the primary clinician, such information may be obtained virtually. However, if an interview with the patient is required to make such a determination, the interview by the UNA Review Team will occur onsite.

4. If a majority consensus cannot be achieved (i.e., following a tie vote and further discussion) regarding a HLOC recommendation, a referral will be made to the IDTT for a final decision with a written summary of the relevant clinical information and team opinions, which will include a non-binding recommendation from the *Coleman* expert(s) observing the team process.

5. If a HLOC recommendation is made, a written case summary will be prepared by the reviewing clinician and sent to the patient's IDTT within five business days of the recommendation.

6. If a recommendation to a HLOC is not made for a patient with a primary personality disorder and the treatment needs of that patient cannot be met within existing  MHSDS or DSH programs, a recommendation for treatment within a specialized treatment program will be provided by the reviewing clinician to HQs within 10 working days to include specific patient needs to be addressed by specialized treatment. Recommendations to a specialized treatment program will not be reviewed by an IDTT but will be assessed and addressed in the final report submitted to the court.

7. If a majority consensus cannot be achieved (i.e., following a tie vote and further discussion) regarding an UNA Review Team's recommendation for a specialized treatment program for a personality disordered patient, a recommendation will be made for such a specialized treatment program with a notation that it was made after a tie vote.

8. The IDTT will review all recommendations for referral to a HLOC within six business days of receipt of the HLOC recommendation. (The day of referral will be regarded as "day 0," and the next business day morning is day 1, of 6.) Unless the IDTT disagrees with the recommendation, a referral will proceed pursuant to current referral and admission policies and procedures.

9. If the IDTT disagrees with the HLOC recommendation, a referral to the UNA Clinical Dispute/Consultation Team will occur. The UNA Clinical Dispute/Consultation Team will make a referral recommendation within five business days.

10. If the UNA Clinical Dispute/Consultation Team recommends referral, a referral packet will be developed and sent to the IRU in a timely manner.

11. All recommendations for a HLOC to the IDTT that are ultimately not accepted by the IDTT will be tracked and totaled. The final report will include an assessment of such rejections in the context of the purpose of the UNA project. For example, how were these recommendations factored into the final recommendations of any unmet bed needs?

**Mental Health Crisis Bed (MHCB) Needs Assessment Methodology**

In addition to the Phase 2 process, which may identify some patients in need of a MHCB, CDCR will provide and analyze data covering at least 24 months prior to COVID-19 (i.e., before

January 1, 2020) and at least 24 months immediately prior to the initial onset of Phase I of the UNA assessment. This data will include, but is not limited to the following:

1. total number of referrals (including a monthly average) to an MHCB,
2. average daily and monthly number of patients on a waitlist for transfer to a MHCB,
3. average daily census of alternative housing beds used for patients who would have otherwise been assessed in a MHCB,
4. average daily census of TMHU admissions if TMHUs were in use,
5. average daily occupancy of MHCBs systemwide.

CDCRs' written analysis should include both data and relevant information from their annual bed needs study by John Misener (Stephens Consulting) since 2018. CDCR's final report will incorporate these data sources and MHCB referrals occurring as result of the UNA process and include any other relevant data in assessing the system's need for MHCBs. The accuracy of the Misener studies in projecting MHCB bed needs and the projected MHCB needs contained in the most recent study should also be included in the final report.

**Unexpected Issue(s) resolution**

Any issues in implementing the methodology or unexpected issues arising in the UNA process will be brought to the attention of the *Coleman* experts with a proposed remedy to be approved by the *Coleman* experts.

## Appendix 1 - 2022 UNA Criteria

1) As a result of a major mental disorder, the patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

2) The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or stabilization of refractory psychiatric symptoms.

3) The patient demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.

4) In the last 90 days, the patient has participated in less than 50% of all programming offered.

5) The patient has incurred three (3) or more Rules Violation Reports during the last 3 months that required a mental health assessment.

6) The patient had three (3) or more referrals to a MHCB during the last six (6) months, or two (2) rescissions from ICF or APP in 12 months.

7) The patient has been in a MHCB clinical stay exceeding 10 days.*
    a. *Patients in MHCB with a referral to HLOC will be counted, but excluded from review.*

+

1) The patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.

# Appendix 2 - UNA Phase I – Operationalization of Subjective Criteria

**1) As a result of a major mental disorder, the patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.**

Guidelines to operationalize subjective portion of UNA:  Target observers are staff who have greatest access to patient behavior on the tier. To assist custody and nursing staff in the identification of patients who may be, *unable to adequately function,* in an EOP, staff will use the following screening guidelines. Positive screens will be placed in the Phase I cohort of patients. Treatment Teams will also be asked to identify patients who meet any of these criteria in their caseload and are not currently referred to HLOC.

**GUIDELINES FOR INCLUSION**

a.  Not eating/refusing food trays pattern, or not attending dining hall hours.
b.  Pattern of repeatedly refusing showers.
c.  Poor hygiene/grooming on a constant basis or intermittent poor hygiene/grooming.
d.  Persistent body odor.
e.  Refusing to leave cell for long periods of time (yards, visits, health care appts, showers).
f.  Disruptive (yells/screams for no apparent reason).
g.  Frequent talking to oneself.
h.  Pattern of crying in cell.
i.  Bizarre or confused behavior.
j.  A pattern of hostile, aggressive, or threatening behavior or statements.
k.  Talking about suicide, death, dying, or hurting oneself.
l.  Concerning change in behavior/presentation.
m.  Withdrawn.
n.  Pattern of staying up all night.
o.  Chronic problem with cell Cleanliness.
p.  Complains about other patients.
q.  Complains of being victimized.
r.  Not coping well with recent bad news.
s.  Poor medication compliance.
t.  Frequent Pacing.

**2) The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a [a]major mental disorder, [b]serious to major impairment of functioning in most life areas, [c]stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, [d]or stabilization of refractory psychiatric symptoms.**

Guidelines to operationalize this subjective criteria of UNA: Treatment Teams will be asked to identify any patients from their caseload who meet any of this criteria and are not currently referred to HLOC.

Updated 3/16/2022

**3) The patient demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.**

Guidelines to operationalize this subjective criteria of UNA: Treatment Teams will be asked to identify any patients from their caseload who meet any of criteria below and are not currently referred to HLOC.

### GUIDELINES FOR INCLUSION

a. Patients who have shown a lack of treatment progress despite attendance in treatment
   - Treatment progress is not clinically significant
   - Less than clear benefit from attending group activities (i.e. responding to internal stimuli for the entire group)
b. Patient needs more individualized treatment to meet treatment goals.
c. Patients who are chronically medication non-compliant, but do not meet criteria for PC2602 or have had medication changes with no significant improvement.

**4) The patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.** (Additional separate 2022 UNA Criteria A)

Guidelines to operationalize this additional criteria of the UNA: Treatment Teams will be asked to identify any patients in their caseload with a personality disorder, who meet any of the criteria below and are not currently referred to HLOC:

### GUIDELINES FOR INCLUSION

a. Frequently utilizes CIT.
b. Self-harm behaviors resulting in multiple MHCB admissions or significant and frequent disruptions in their housing units.
c. Functional Impairment - Disrupt the program of others
d. Functional Impairment – Has not benefitted from program because of acting out behaviors or refusal to engage with treatment options.
e. Functional Impairment - Frequent peer conflict
f. Patients with a personality disorder who display the above behaviors as a primary attempt to manage safety concerns.

## UNA Operationalization – Phase I

**Criteria for Identifying Patients for Consideration of *Potential* Referral to Acute or Intermediate Care Facilities**

- A master list will be compiled in a standardized way under the direction of a Regional psychologist or psychiatrist in consultation with the Coleman experts.
- CCCMS, EOP, and MHCB patients at the institutions with EOP or MHCB will be reviewed for overall criteria that warrant consideration of potential referral to Acute or Intermediate Care Facilities.
  - o Headquarters (HQ)/Regional Team will pull a list of patients 2-3 weeks prior to each institution's scheduled UNA assessment.
- Patients currently referred or awaiting transfer to an Acute or Intermediate Care Facility will not be considered.
  - o All referrals are reviewed by Inpatient Referral Unit. Data will be collected for referrals from one month prior to the UNA review and through the completion of the study to compare to prior month's data averages.
- Treatment Team participation/completion of the review shall be documented. (Screening Tool then into UNA Spreadsheet/SharePoint Site)
- Custody/Nursing staff participation/completion of review shall be documented. (Screening Tool then into UNA Spreadsheet/SharePoint Site)

**Criteria for Identifying Patients for Consideration of Referral to Acute or Intermediate Care Facilities:**

**Available data will be used to identify patients using criteria below:**

1. All patients who were flagged by the higher level of care (HLOC) form criteria below, but were not referred will be pulled by HQ/Regional Team and included in the Phase I Cohort:

   a. **HLOC form Number 1**- As a result of a major mental disorder, the patient is unable to adequately function at the current level of care.
   b. **HLOC form Number 2**- The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas; ritualistic or repetitive self-injurious/suicidal behavior, or refractory psychiatric symptoms.
   c. **HLOC form Number 3**- The patient demonstrates chronic psychiatric symptoms (e.g., disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least six (6) months of treatment to a degree that facilitates adequate levels of functioning.
   d. **HLOC form Number 4**- The patient is currently in a MHCB and has been in the MHCB for at least 10 days.
   e. **HLOC form Number 5**- The patient has had three (3) or more MHCB referrals initiated during the last six (6) months (includes all MHCB placement request regardless of where the patient was housed when the request was initiated, e.g., OHU, alternative housing or overflow beds).
   f. **HLOC form Number 6**- The patient has had three (3) or more CDCR 115-MH evaluations completed during the last three (3) months.

    **g. HLOC form Number 7** - [*For EOP and MHCB Patients ONLY*]: On average and in the last three (3) months, has the patient participated in less than the minimum number of structured treatment hours per week (minimums per week are 5 hours for EOP patients, 2.5 hours for RC EOP patients, and 50% of scheduled hours for patients on modified treatment plans)?

**2.** Patients identified as needing intervention as a result of a Sustainable Process review by the Regional Team, which were flagged on the prior quarter's finalized audit spreadsheet, will be included in the Phase I Cohort.

**3. Objective 2022 UNA Criteria**

The negotiated objective criteria below (a, b, part of c, and d) are included in the HLOC form (number 1 above). However, the criteria below will result in an additional data pull by HQ/Regional Team to ensure all patients who meet the criteria at the time of the pull are included in the Phase I Cohort, in case circumstances have changed since a patient's last IDTT.

    **a. In the last 90 days, the patient has participated in less than 50% of all programming offered.** (2022 UNA Criteria 4)

    HQ/Regional Team pull report to see if any additional patients meet criteria.

    **b. The patient has incurred three (3) or more Rules Violation Reports during the last three (3) months that required a mental health assessment.** (2022 UNA Criteria 5)

    HQ/Regional Team pull report to see if any additional patients meet criteria.

    **c. The patient had three (3) or more referrals to a MHCB during the last six (6) months, or two (2) or more rescissions from ICF or APP in twelve (12) months.** (2022 UNA Criteria 6)

    HQ/Regional Team pull report to see if any additional patients meet criteria.

    **d. The patient has been in a MHCB clinical stay exceeding ten (10) days.** (2022 UNA Criteria 7)

    HQ/Regional Team pull report to see if any additional patients meet criteria.

**Institution Treatment Teams will identify additional patients from criteria below:**

**Subjective 2022 UNA Criteria -** (See Appendix 2 – Operationalization of 2022 UNA Subjective Criteria and Appendix 4 – Treatment Team Screening Tool)

**Methodology:**

The Regional Teams will have an introductory, virtual or in-person meeting with the Treatment Teams regarding this request. Up to 3 weeks prior to Phase I, each Treatment Team will provide a list of CCCMS, EOP, and MHCBs patients in their caseload who meet any of the criteria on the Treatment Team Screening Tool (Appendix 4) and are not currently referred to HLOC. This screening tool will be provided 2-3 weeks prior to the institution's scheduled UNA Phase II start date and will include an introductory statement as context to the review process. Screening will happen concurrently to compiling data for items 1-3, above. Results shall be notated on the template and provided back to

MH HQ/Regional Team no later than 1 week prior to each institution's Phase II start date. HQ will transfer the results into the UNA Spreadsheet/SharePoint site.

4. **As a result of a major mental disorder, the patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.** (2022 UNA Criteria 1)

5. **The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or stabilization of refractory psychiatric symptoms.** (2022 UNA Criteria 2)

6. **The patient demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.** (2022 UNA Criteria 3)

**Institution Custody and Nursing Staff will identify patients from criteria below:**

**Expanded Review Criteria:** Patient may be unable to *adequately function* within current LOC. (See Appendix 3 – Custody/Nursing Screening Tool)

**Methodology:**

7. Custody Officers:
*Regional Lieutenants* will receive guidance in serving as liaisons with housing officers. They will provide instruction and supervision to the housing officers on how to complete the screening process as operationalized in Appendix 3. Regional Lieutenants will coordinate with each institution as to the most effective/efficient means of distributing the screening tool on each watch.  Screens will be completed by custody staff representation from each housing unit. Having all housing unit staff complete the screen *is not* required.  Regularly assigned officers or those most familiar with activity patterns of the housing unit should complete the screen. Custody staff from each shift for all housing units with mental health patients will participate. (EOP/MHCB/STRH/LTRH/PSU/ASU EOP Hub). The daily huddle process will serve as one source for obtaining such information. A Regional Lieutenant will be onsite during the information gathering process for both instructional and supervisory purposes.

- DAI HQ will schedule a MS Teams call with institutional leadership to provide background information regarding the UNA, in addition to providing roles and expectations specific to Housing Unit staff
- The Custody Screening tool will be provided to housing unit staff via Institutional Leadership 2-3 weeks prior to the institution's Phase II start date. Institutional Leadership will ensure housing unit staff understand their role and what is expected to be completed (i.e Screening Tool).
- Regional Lieutenants will be onsite to assist Housing Unit staff in gathering the information contained in the survey. This will ensure the housing units are gathering the appropriate information the UNA team will need for Phase II.
- For housing unit staff where 2nd and 3rd watch huddles occur, this will be an additional option for completing the provided survey.
- Housing Unit staff will complete the screening tool with the assistance of Regional Lieutenants. The institution will then route to MH HQ/Regional Team no later than 1 week prior to the institution's Phase II start date.

- HQ will transfer the results into the UNA Spreadsheet/SharePoint site.

8. Nursing Staff:

   *Local Supervising Registered Nurse (SRN) II/III, Unit Supervisors, and Senior Psychiatric Technicians* will receive guidance in serving as liaisons with housing nursing staff. They will provide instruction and supervisions to the housing nursing staff on how to complete screening process as per Appendix 3. *Local SRN II/III, Unit Supervisors and Senior Psychiatric Technicians* will coordinate, at each institution, the most effective/efficient means of distributing the screening tool on each watch. Screens will be completed by Psychiatric Technicians (PT) on 2nd and 3rd watch for patients in EOP/MHCB/STRH/LTRH/PSU/ASU EOP Hub.

   The Screening Tool will be provided 2- 3 weeks prior to the institution's scheduled UNA Phase II start date. Nursing results shall be notated on the template and provided back to MH HQ/Regional Team no later than 1 week prior to each institution's Phase II start date. HQ will transfer the results into the UNA Spreadsheet/SharePoint site.

## Criteria for Identifying Patients with Personality Disorders for Consideration of Further Review to Another Level of Care:

CCCMS, EOP, and MHCB patients at the institutions with EOP or MHCB will be reviewed for overall criteria.

A. **The patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.**

   (Additional separate 2022 UNA Criteria A – See Appendix 4 - Treatment Team Screening Tool)

   **Methodology:** The Treatment Teams will be asked to identify any patients on their caseloads with a personality disorder, who meet any of the criteria and are not currently referred to HLOC. Teams will complete the screening process as operationalized in Appendix 4. This screening tool will be provided 2-3 weeks prior to the institution's scheduled UNA Phase II start date and will include an introductory statement as context to the review process. Screening will happen concurrently to compiling data for items 1-3, above. Results shall be notated on the template and provided back to MH HQ/Regional Team no later than 1 week prior to each institution's Phase II start date. HQ will transfer the results into the UNA Spreadsheet/SharePoint site.

**Patients who meet any criteria will go into the Phase I Cohort and will be reviewed during Phase II.**

**Screening Results – Treatment Team, Custody, and Nursing – SharePoint Methodology**

- Designated support staff from the Regional/HQ Teams will enter the results data from the screening sheets provided by Treatment Teams, Custody, and Nursing, into the UNA Spreadsheet/SharePoint site.
- Reports will be pulled into Excel identifying the Phase I Cohort for review in Phase II.

## Appendix 3 - UNA Custody and Nursing Review - Screen List

As part of a Statewide Unmet Needs Assessment (UNA), Custody Officers and Nursing staff are being asked to identify patients in their housing unit/on their watch who may be unable to *adequately function* in their current level of care. This screening tool is provided 2-3 weeks prior to your institution's scheduled UNA Phase II start date and results shall be notated on the template and provided back to MH Headquarters (HQ)/Regional Team no later than 1 week prior to your Phase II start date. Time to complete screens for all housing units should not exceed 1 day. Your response will help identify patients who might need more intensive treatment than is currently being provided. Thank you for your participation in this important effort.

**Criteria:** Patient may be unable to *adequately function* within current level of care.

**Guideline for evaluating criteria:** As a guideline to evaluating whether a patient may be unable to *adequately function*, please use the following template to identify patients from your housing unit/on your watch who exhibit any of the following criteria, and which criteria specifically:

   a.  Not eating/refusing food trays pattern, or not attending dining hall hours.
   b.  Pattern of repeatedly refusing showers.
   c.  Poor hygiene/grooming on a constant basis or intermittent poor hygiene/grooming.
   d.  Persistent body odor.
   e.  Refusing to leave cell for long periods of time (yards, visits, health care appts, showers).
   f.  Disruptive (yells/screams for no apparent reason).
   g.  Frequent talking to oneself.
   h.  Pattern of crying in cell.
   i.  Bizarre or confused behavior.
   j.  A pattern of hostile, aggressive, or threatening behavior or statements.
   k.  Talking about suicide, death, dying, or hurting oneself.
   l.  Concerning change in behavior/presentation.
   m.  Withdrawn.
   n.  Pattern of staying up all night.
   o.  Chronic problem with cell cleanliness.
   p.  Complains about other patients.
   q.  Complains of being victimized.
   r.  Not coping well with recent bad news.
   s.  Poor medication compliance.
   t.  Frequent Pacing.

Institution: _____ Custody/ Nursing (Circle One) Screener: _____ Date: _____

**Criteria a. through i. - Indicate criteria with a Y (Yes) or N (No) and continue to next page for additional criteria**

| Last Name | CDCR # | a. Not eating/ refusing food trays or dining hall pattern | b. Refuse Showers pattern | c. Poor Hygiene/ grooming | d. Persistent Body Odor | e. Refuse to leave cell for long periods of time | f. Disruptive (yells/ screams for no apparent reason) | g. Frequent talking to oneself | h. Pattern of crying in cell | i. Bizarre/ confused behavior |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Institution: _____ Custody/ Nursing (Circle One) Screener: _____ Date: _____

**Criteria j. through t. - Indicate criteria with a Y (Yes) or N (No) for same patients.**

| Last Name | CDCR # | j. Pattern of hostile, aggressive, or threatening behavior | k. Talk about Suicide, death, dying or hurting oneself | l. Concerning change in behavior/ presentation | m. Withdrawn | n. Pattern of staying up all night | o. Chronic problem with cell cleanliness | p. Complains about other patients | q. Complains about being victimized | r. Not coping well with recent bad news | s. Poor med compliance | t. Frequent pacing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

## Appendix 4 - UNA Treatment Teams - Screen List

As part of a Statewide Unmet Needs Assessment (UNA), Treatment Teams are being asked to identify patients on their caseloads who may benefit from additional consideration for higher level of care. During this expanded review, patients previously considered poor or inappropriate candidates for referral to HLOC may be included. Positive screens are not a referral to HLOC. Positive screens are patients who may benefit from a detailed review of functioning. This screening tool is provided 2-3 weeks prior to your institution's scheduled UNA Phase II start date and results shall be notated on the template and provided back to MH Headquarters (HQ)/Regional Team no later than 1 week prior to your Phase II start date.

**2022 UNA Criterion 1:** As a result of a major mental disorder, the patient is unable to *adequately function* within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

**Guideline for evaluating criteria:** Please identify patients from your caseload who exhibit any of the following criteria and are not currently referred to HLOC, and which criteria specifically:

a. Not eating/refusing food trays pattern, or not attending dining hall hours.
b. Pattern of repeatedly refusing showers.
c. Poor hygiene/grooming on a constant basis or intermittent poor hygiene/grooming.
d. Persistent body odor.
e. Refusing to leave cell for long periods of time (yards, visits, health care appts, showers).
f. Disruptive (yells/screams for no apparent reason).
g. Frequent talking to oneself.
h. Pattern of crying in cell.
i. Bizarre or confused behavior.
j. A pattern of hostile, aggressive, or threatening behavior or statements.
k. Talking about suicide, death, dying, or hurting oneself.
l. Concerning change in behavior/presentation.
m. Withdrawn.
n. Pattern of staying up all night.
o. Chronic problem with cell cleanliness.
p. Complains about other patients.
q. Complains of being victimized.
r. Not coping well with recent bad news.
s. Poor medication compliance.
t. Frequent Pacing.

Institution: _____   Screener: _____   Date: _____

**2022 UNA Criterion 1 continued:** As a result of a major mental disorder, the patient is unable to *adequately function* within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

**Criteria a. through i. - Indicate criteria with a Y (Yes) or N (No) and continue to next page for j. through t.**

| Last Name | CDCR # | a. Not eating/ refusing food trays or dining hall pattern | b. Refuse Showers pattern | c. Poor Hygiene/ grooming | d. Persistent Body Odor | e. Refuse to leave cell for long periods of time | f. Disruptive (yells/ screams for no apparent reason) | g. Frequent talking to oneself | h. Pattern of crying in cell | i. Bizarre/ confused behavior |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Institution: _____ Screener: _____ Date: _____

**2022 UNA Criterion 1 continued:** As a result of a major mental disorder, the patient is unable to *adequately function* within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

**j. through t. - Indicate criteria with a Y (Yes) or N (No) for same patients.**

| Last Name | CDCR # | j. Pattern of hostile, aggressive, or threatening behavior | k. Talk about Suicide, death, dying or hurting oneself | l. Concerning change in behavior/ presentation | m. Withdrawn | n. Pattern of staying up all night | o. Chronic problem with cell cleanliness | p. Complains about other patients | q. Complains about being victimized | r. Not coping well with recent bad news | s. Poor med compliance | t. Frequent pacing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**2022 UNA Criterion 2:** The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a [a]major mental disorder, [b]serious to major impairment of functioning in most life areas, [c]stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or [d]stabilization of refractory psychiatric symptoms.

**Guideline for evaluating:** Please identify patients on your caseload who meet any of the criteria listed above and are not currently referred to HLOC, and which criteria specifically.

| Last Name | CDCR# | a. Major mental disorder | b. Serious to major impairment of functioning in most life areas | c. Stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior | d. Stabilization of refractory psychiatric symptoms |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2022 UNA Criterion 3:** The patient demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.

**Guideline for evaluating criteria:** Please identify patients on your caseload who, for the past 6 months have not responded sufficiently to treatment to a degree that facilitates adequate levels of functioning, and are not currently referred to HLOC.  Examples of patients who meet this criteria may include:

    **a.** Patients who have shown a lack of treatment progress despite attendance in treatment.
- Treatment progress is not clinically significant.
- Less than clear benefit from attending group activities (i.e. responding to internal stimuli for the entire group)

    **b.** Patients who needs more individualized treatment to meet treatment goals.

    **c.** Patients who are chronically medication non-compliant, but do not meet criteria for PC2602 or have had medication changes with no significant improvement.


Institution: _____    Screener: _____    Date: _____

**Indicate criteria with a Y (Yes) or N (No)**

| Last Name | CDCR# | a. Patient has shown a lack of treatment progress despite attendance in treatment | b. Patient needs more individualized treatment | c. Patient who is chronically medication non-compliant, but do not meet criteria for PC2602 or have had medication changes w/ no significant improvement |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**2022 UNA Criterion A – Personality Disordered Patients:** The patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.

**Guideline for evaluating criteria:** Please identify patients on your caseload who, due to predominant personality disorder characteristics and have been diagnosed with a personality disorder meet any of the following criteria, and are not currently referred to HLOC:

a. Frequently utilizes CIT.
b. Instrumental self-harm behavior resulting in multiple MHCB admissions or significant and frequent disruptions in their housing units.
c. Functional Impairment - Disrupt the program of others.
d. Functional Impairment – Has not benefitted from program because of acting out behaviors or refusal to engage with treatment options.
e. Functional Impairment - Frequent peer conflict.
f. Patients with a personality disorder who display the above behaviors as a primary attempt to manage safety concerns.


Institution: _____  Screener: _____  Date: _____

**Indicate criteria with a Y (Yes) or N (No)**

| Last Name | CDCR# | a. Frequent use of CIT | b. Self-harm behaviors resulting in multiple MHCB admissions/ significant and frequent disruptions in their housing units | c. Functional Impairment – Disrupt the program of others. | d. Functional Impairment – Has not benefited from program because of acting out behaviors or refusal to engage w/ tx options | e. Functional Impairment – Frequent peer conflict | f. Display behaviors as primary attempt to manage safety concerns. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Institution: _____    Screener: _____    Date: _____

**2022 UNA Criterion A continued:** The patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors. **Indicate criteria with a Y (Yes) or N (No)**

| Last Name | CDCR# | a. Frequent use of CIT | b. Self-harm behaviors resulting in multiple MHCB admissions/ significant and frequent disruptions in their housing units | c. Functional Impairment – Disrupt the program of others. | d. Functional Impairment – Has not benefited from program because of acting out behaviors or refusal to engage w/ tx options | e. Functional Impairment – Frequent peer conflict | f. Display behaviors as primary attempt to manage safety concerns. |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

Phase I patient lists will be created for the scheduled reviews in close proximity to the actual reviews. In order to facilitate meeting the court ordered December 31, 2022 timetable, the number of UNA Review Teams at a specific institution will be dependent on the number of patients identified at the institution during Phase I. The UNA Review Team(s) will not include institutional staff from the specific institution being reviewed. *Coleman* experts will also observe and participate as appropriate in the UNA Review Team presentations as a non-voting participant.

During Phase II, designated UNA Review Teams will assess all of the patients identified as the result of the Phase I process *(unless a HLOC referral has already been initiated)*. Each UNA Review Team will consist of at least a CDCR psychologist, a CDCR psychiatrist, and a clinician from DSH. UNA case reviews will occur remotely.

**TEAM COMPOSITION**

<u>**The UNA Review Teams will include:**</u>

1. At least one CDCR Psychologist, as long as the psychologist is not from the institution under Phase II review.
2. At least one CDCR Psychiatrist, as long as the psychiatrist is not from the institution under Phase II review.
3. At least one DSH Psychologist or DSH Psychiatrist

An UNA Clinical Dispute/Consultation team will be an available resource during Phase II reviews and also will review any cases for which the UNA Review Team recommends referral to a HLOC and the IDTT disagrees, to provide a determination on whether referral to HLOC is necessary.

<u>**UNA Clinical Dispute/Consultation Team shall include:**</u>

1. Treatment team & Supervisor from institution
2. Referring team (UNA Review Team)
3. IRU clinician
4. CDCR PIP & DSH supervisors
5. Ad hoc components as needed:
   a. Primary medical physician
   b. Nursing representative
   c. HCPOP representative
   d. CSU representative
   e. Regional team representative (if someone separate from the referral team is required)
   f. others as needed

**GENERAL GUIDANCE TO UNA REVIEW TEAM MEMBERS**

Reviewing clinicians will be expected to review at least the following documentation as they consider the clinical needs of Phase I patients. As needed, read-only EHRS training will be provided to DSH clinicians.

Documentation review options include, but are not limited to:

- Placement history in OnDemand *(may be obtained in the EHRS)*
- Two most recent MH Master Treatment Plans (MTP), including the Higher Level of Care (HLOC) Tab in the EHRS
- MH Psychiatry Notes (MHMD) in the EHRS
- MH Primary Clinician Notes (MHPC) in the EHRS
- Most recent Suicide Risk and Self Harm Evaluation (SRASHE) in the EHRS
- Any MH Rules Violation Report (RVR) MH Assessments from the last three months in the EHRS
- Any Discharge Summary from Inpatient (PIP and MHCB) stays from the last six months
    - For MHCB stays, MHMD Discharge Summary in the EHRS
    - For PIP stays, ACUTE ICF SW Discharge Summary or ACUTE ICF Discharge Summary in the EHRS

Additional sources of information may include:

- MAR Summary in the EHRS
- Psych Tech Rounds in the EHRS
- MH Crisis Intervention Team (CIT) or corresponding MHPC Consult Emergent Progress Note in the EHRS
- Inmate Record in SOMS
- After identifying in a patient's placement history that a patient spent less than 24 hours in MHCB, review the corresponding Suicide Risk and Self Harm Evaluation (SRASHE) or MHPC Progress Note in the EHRS for documentation on MHCB referral rescission.

**PERSONALITY DISORDER REVIEW**

For the personality disordered patients identified in Phase I, an UNA Review Team clinician will review the case and apply the criteria below in order to make a determination whether interventions may be necessary to meet treatment needs. Reviewing clinician will assess the following questions:

1. **Is the patient appropriate for Acute/ICF/MHCB?**
    a. **Yes —** Refer to inpatient.
    b. **No.**

**If the answer to the above (#1) is no:**

2. **Has the patient responded adequately to offered treatment?**
    a. **Yes — *Category 1.*** The patient has clinically responded adequately to treatment within the existing MHSDS. No additional interventions indicated.
    b. **No.**

**If the answer to the above (#2) is no:**

3. **Has the patient already been offered all clinically appropriate treatment available within the MHSDS?**
    a. **No — *Category 2.*** Additional interventions indicated, specify:
    b. **Yes — *Category 3*** (The patient may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at DSH.)

**THE UNA REVIEW PROCESS WILL CONSIST OF THE FOLLOWING STEPS:**

1. UNA Review Teams consisting of at least a CDCR psychologist, a CDCR psychiatrist, and a clinician from DSH will conduct the Phase II reviews at each institution in accordance with the UNA project timeline. The UNA project timeline is an estimate and actual review timeframes may vary depending on the number of UNA Review Teams reviewing cases. The timeline and UNA Review Teams can be adjusted to accommodate accelerations or delays.

2. The Phase I master patient list for each institution being reviewed will be divided amongst the reviewers, each UNA reviewer will conduct an EHRS chart review of their assigned patient list and use the existing PIP referral criteria policy in making their referral decisions.

3. Should the reviewer need additional information, the reviewer can reach out to someone on the multidisciplinary Clinical Dispute/Consultation Team. Designated clinical consultation time will also be scheduled each week to be used as needed for more complex case consultations.

4. The goal of the review will be to determine whether a HLOC referral is recommended, into what category a personality disordered patient falls, and whether other interventions may be necessary to meet that patient's treatment needs.

5. Once the review is complete, the reviewing clinician will write a summary with the rationale for their determination if a HLOC recommendation is made. The summary will include:
   - Why the patient was flagged/included in the Phase I list
   - A brief and relevant summary of each record reviewed
   - Recommendation and Rationale *(inclusive of both a data and clinical nexus to why the patient was flagged)*

**FOLLOWING THE REVIEW PROCESS:**

1. The reviewer(s) will present his/her findings and recommendation to the team.

2. The UNA Review Team will initially approve, disapprove, or request additional information prior to reaching a majority consensus as to whether or not to make a recommendation for a HLOC referral or if other interventions may be necessary to meet a personality disordered patient's treatment needs.

3. This team review process will occur virtually. If further information is required from the primary clinician, such information may be obtained virtually. However, if an interview with the patient is required to make such a determination, the interview by members of the UNA Review Team will occur onsite.

**PATIENTS REVIEWED FOR HLOC**

4. If, following further discussion, at least half of the UNA Review Team voting members ultimately support a HLOC recommendation, a referral will be made to the IDTT for a final decision. The IDTT will be provided with a written summary of the relevant clinical information and team opinions. The summary may also include a non-binding recommendation from the *Coleman* expert(s) observing the evaluation process.

5. If a HLOC recommendation is made by the UNA Review Team, a written case summary will be prepared by the reviewing clinician and sent to the patient's IDTT within five business days of the recommendation.

6. The IDTT will review all recommendations for referral to a HLOC within six business days of receipt of the HLOC recommendation. (The day of referral will be regarded as "day zero," and the next business day morning is day one, of six.) If the IDTT agrees with the recommendation, a referral will proceed pursuant to current referral and admission policies and procedures.

7. If the IDTT disagrees with the HLOC recommendation, a referral to the UNA Clinical Dispute/Consultation Team will occur. The UNA Clinical Dispute/Consultation Team will meet and discuss the case and make a recommendation within five business days.

8. If the UNA Clinical Dispute/Consultation Team recommends referral, the results will be provided to the IDTT and a referral will be sent to the IRU in a timely manner.

9. All recommendations for a HLOC to the IDTT that are ultimately not accepted by the IDTT will be tracked and totaled.

**PERSONALITY DISORDERED PATIENTS REVIEWED**

10. For patients with a primary personality disorder, if a recommendation to a HLOC is not made and the treatment needs of that patient are determined to meet category 2, a detailed summary and rationale for the determination will be provided by the reviewing clinician to HQ within 10 working days to include specific patient needs to be addressed by interventions. These patients will be reviewed by an IDTT and will be addressed in the final report submitted to the court.

11. For patients with a primary personality disorder, if a recommendation to a HLOC is not made and the treatment needs of that patient are determined to meet category 3, a detailed summary and rationale for the determination will be provided by the reviewing clinician to HQ within 10 working days to include specific patient needs to be addressed by interventions (for example, a comprehensive DBT residential program)

12. If, following further discussion, only half of the UNA Review Team voting members ultimately support an assessment of a personality disordered patient, a recommendation will be made with a notation that it was made after a tie vote.

**UNA PHASE II TIMELINE WORKFLOW**

The UNA Review Team will be afforded protected time to complete their reviews and will have the UNA review as their primary assignment while participating in this review. The following weekly schedule example demonstrates the expected elements of the review process. The UNA review team can modify this schedule to best coordinate the review process with due notice to Regional MHAs and stakeholders.

In a typical week, three days are designated as EHRS review days. UNA reviewers will spend these days reviewing EHRS for their assigned cases and writing case summaries in preparation for team presentations. Assuming a 6 hour day to account for breaks and consultations, each UNA reviewer should be able to complete a 3 full case review and summaries per day (assuming 1 hour review and 1 hour for written summary/notes of determination rationale). This will yield approximately 36 cases/ per day and 108 cases/week for presentation.

Two Days of the week will be dedicated to team presentations (Approximately 48 cases per day/96 cases per week), clinical dispute/consultation meetings and other team interactions. All members of the team should ensure their availability on designated team presentation days.

For each institution reviewed, a designated site visit day should be scheduled as a placeholder. Cases designated for further site review can be scheduled on this predesignated day to ensure adequate travel time notice for team members and stakeholders. Additional days can be added as needed.

| 3 Days | 2 Days | Designated Placeholders |
|---|---|---|
| Individuals Review EHRS and complete written summaries | Case presentations to UNA Review team | Case Consultations |
| | | Clinical Dispute Resolution Conferences |
| | | Site Visits |
| | | Data entry into Spreadsheet |

The UNA spreadsheet will be updated as each case is reviewed during Phase II. The expectation is that all information gathered during the week, will be entered into the spreadsheet no later than the end of the following week. A designated time during each week will be schedule to ensure that the spreadsheet is complete and valid.

**Unexpected Issue(s) resolution**

Any issues in implementing the methodology or unexpected issues arising in the UNA process will be brought to the attention of the *Coleman* experts with a proposed remedy to be approved by the *Coleman* experts.

**UNA Interviews**

For a variety of reasons, in-person interviews during phase 2 of the UNA process have not occurred. In order to encourage interviews of phase 2 selected inmates, when clinically indicated, the phase 2 process has been modified on a pilot basis to allow for inmate interviews via tele-mental health process. The following protocol for these interviews will be as follows:

1. Standard equipment and setting for telepsychiatry interviews will be used (e.g., office setting for sound privacy with a trained telepresenter (or member of the clinical team) in the office). The meeting will be conducted over the Webex platform. Cell front interviews will not occur.

2. The clinicians with access to the interview will be limited to the following persons:
   a. the UNA review team (whether all CDCR review team members or some variation will be at the discretion of the UNA team),
   b. Institutional patient treatment team member(s) as requested by the UNA review team
   c. the Coleman expert, or designee, regularly assigned to the team,
   d. Jeffrey Metzner, M.D., or designee (at his discretion)
   e. Michael Hewitt, Psy.D. or designee (at his discretion).

3. A plaintiff representative and a CDCR attorney may observe the UNA team's discussion that will immediately follow the interview with the inmate. This discussion meeting will be scheduled as a separate Teams meeting.

4. All of the above potential participants will receive at least 24 hours advanced notice of the scheduled interview. The involved attorney will need to be on call for the discussion phase of the process.

# Appendix B – UNA Timeline

## 4 Team Model UNA Institution Schedule
### *** DRAFT- SUBJECT TO CHANGE***

| Region | Inst. | Projected Case Count | Phase I Start | Phase II Start | Phase II End | Total Work Weeks |
|--------|-------|---------------------|---------------|----------------|--------------|------------------|
| 4 | RJD | 602 | 04/04/2022 | 04/25/2022 | 06/10/2022 | 7 |
| 3 | LAC | 507 | 05/16/2022 | 06/13/2022 | 07/08/2022 | 4 |
| 1 | MCSP | 600 | 06/20/2022 | 07/11/2022 | 08/05/2022* | 4 |
| 1 | SAC | 619 | 07/18/2022 | 08/08/2022 | 09/16/2022* | 6 |
| 2 | CMC | 196 | | | | |
| 3 | COR | 336 | 08/29/2022 | 09/19/2022 | 10/28/2022 | 5 |
| 3 | SATF | 448 | | | | |
| | **Break for Suicide Prevention Summit – October 17 – 21 (Summit dates October 18 – 20)** | | | | | |
| 2 | SVSP | 278 | 10/03/2022 | 10/31/2022 | 12/09/2022 | 4 |
| 2 | CHCF | 211 | | | | |
| | **Break for SMHP Leadership Conference – November 14 – 18 (Conference dates November 16-17)** | | | | | |
| | **Break for Thanksgiving Week - November 21 – 25, 2022** | | | | | |
| 2 | VSP | 275 | 11/28/2022 | 12/12/2022 | 12/23/2022 | 2 |
| 3 | KVSP | | | | | |
| | **Winter Holiday Break – December 26 - 30** | | | | | |
| 1 | CMF | 132 | 01/03/2023 | 01/17/2023 | 02/10/2023 | 4 |
| 1 | SQ | 81 | | | | |
| 3 | NKSP | 98 | | | | |
| 2 | CCWF | 59 | 01/30/2023 | 02/13/2023 | 02/24/2023 | 2 |
| 4 | CRC | 32 | | | | |
| 4 | CIW | 64 | | | | |
| 4 | CIM | 57 | | | | |
| 1 | HDSP | 22 | 02/13/2023 | 02/27/2023 | 03/10/23 | 2 |
| 1 | PBSP | 12 | | | | |
| 1 | SOL | 15 | | | | |
| 1 | FSP | 24 | | | | |
| 2 | SCC | 2 | | | | |
| 2 | CTF | 8 | | | | |
| 2 | PVSP | 37 | | | | |
| 3 | CCI | 14 | | | | |
| 3 | ASP | 30 | | | | |
| 3 | WSP | 69 | | | | |
| Remaining Clinical Dispute Resolution Meetings | | 03/10/2023 – 03/22/2023 | | | | |

| Finalization of all data entry and dual authentication | 03/23/2023 – 04/17/2023 |
| --- | --- |
| *Modified to reflect existing 4.5 teams*<br>*This schedule will be reviewed in November with analysis of projected vs. actual case counts* | |

Revised 05/15/23

# Appendix C – UNA Objective Data Methodology

MAY 31, 2022

# UNA Objective Data Methodology
VERSION 1.2

STATEWIDE MENTAL HEALTH PROGRAM
Division of Health Care Services, CDCR

# UNA Objective Data Methodology
Version 1.1



## About this Report

This report is intended to provide a list of patients, and patient details, in order to track information through the Unmet Bed Needs Assessment (UNA) process.

## General Terminology

- **UNA** – Unmet Bed Needs Assessment
- **HLOC** – Higher Level of Care
- **SOMSPID** – The unique identifier for each patient.
- **MHI** – Mental Health Indicator
- **EHRS** – Electronic Health Record System
- **NLTG** – Nursing Lead Therapeutic Group, scheduled in SOMS.

## General Parameter

- Exclude patients with GP, GP(M), Acute and ICF MHI at midnight on the date of UNA report is run.
- Voided orders and In Error forms are considered deleted therefore are not included in the results.

## General Limitation

- This report may include any data entry errors by end-user input errors
- Paper forms will not be included in the results.

# UNA Objective Data Methodology

Version 1.1



## General Demographics

| Column Name | Source | Definition |
|---|---|---|
| Report Date | Datawarehouse | Date, at midnight, the data was collected for this report |
| somspid | SOMS | Unique patient identifier |
| CDCR Num | SOMS | Patient's CDCR number |
| lastname | SOMS | Patient's last name |
| firstname | SOMS | Patient's first name |
| middlename | SOMS | Patient's middle name |
| Institution | SOMS | Institution of the patient at the time of the UNA report |
| Program | SOMS | Program of the patient at the time of the UNA report |
| SubProgram | EHRS: MH Housing Arrival Order | Subprogram of the patient at the time of the UNA report |
| MHI | EHRS: MH Place In order or MH Discharge patient order | MHI of the patient at the time of the UNA report |
| Insert Date | Datawarehouse | Date and time the data was compiled |
| Assignment | System generated | A system generated random number, from 1 to 12. |

# UNA Objective Data Methodology
Version 1.1



## Criteria 1

All patients who were flagged by the higher level of care (HLOC) form criteria below, but were not referred will be pulled by HQ/Regional Team and included in the Phase I Cohort:

a. HLOC form Number 1- As a result of a major mental disorder, the patient is unable to adequately function at the current level of care.
b. HLOC form Number 2- The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas; ritualistic or repetitive self-injurious/suicidal behavior, or refractory psychiatric symptoms.
c. HLOC form Number 3- The patient demonstrates chronic psychiatric symptoms (e.g., disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least six (6) months of treatment to a degree that facilitates adequate levels of functioning.
d. HLOC form Number 4- The patient is currently in a MHCB and has been in the MHCB for at least 10 days.
e. HLOC form Number 5- The patient has had three (3) or more MHCB referrals initiated during the last six (6) months (includes all MHCB placement request regardless of where the patient was housed when the request was initiated, e.g., OHU, alternative housing or overflow beds).
f. HLOC form Number 6- The patient has had three (3) or more CDCR 115-MH evaluations completed during the last three (3) months.
g. HLOC form Number 7- [For EOP and MHCB Patients ONLY]: On average and in the last three (3) months, has the patient participated in less than the minimum number of structured treatment hours per week (minimums per week are 5 hours for EOP patients, 2.5 hours for RC EOP patients, and 50% of scheduled hours for patients on modified treatment plans)?

## Parameter:

- The most recent Master Treatment Plan as of midnight of the date identified on the Report Date column.
- Only signed Master Treatment Plan are included. In progress/saved but not signed Master Treatment Plan are not included.

# UNA Objective Data Methodology
Version 1.1



| Column Name | Source | Definition |
| --- | --- | --- |
| PerformedOnDate | EHRS: Master Treatment Plan | Date and time documented as "performed on" date |
| 1a | EHRS: Master Treatment Plan, Higher LOC consideration | 1 = "Yes" on HLOC Question 1 <br> 0 = "No" on HLOC Question 1 |
| 1b | EHRS: Master Treatment Plan, Higher LOC consideration | 1 = "Yes" on HLOC Question 2 <br> 0 = "No" on HLOC Question 2 |
| 1c | EHRS: Master Treatment Plan, Higher LOC consideration | 1 = "Yes" on HLOC Question 3 <br> 0 = "No" on HLOC Question 3 |
| 1d | EHRS: Master Treatment Plan, Higher LOC consideration | 1 = "Yes" on HLOC Question 4 <br> 0 = "No" on HLOC Question 4 |
| 1e | EHRS: Master Treatment Plan, Higher LOC consideration | 1 = "Yes" on HLOC Question 5 <br> 0 = "No" on HLOC Question 5 |
| 1f | EHRS: Master Treatment Plan, Higher LOC consideration | 1 = "Yes" on HLOC Question 6 <br> 0 = "No" on HLOC Question 6 |
| 1g | EHRS: Master Treatment Plan, Higher LOC consideration | 1 = "Yes" on HLOC Question 7 <br> 0 = "No" or no answer entered on HLOC Question 7 |

# UNA Objective Data Methodology
Version 1.1



## Criteria 3

The negotiated objective criteria below (a, b, part of c, and d) are included in the HLOC form (number 1 above). However, the criteria below will result in an additional data pull by HQ/Regional Team to ensure all patients who meet the criteria at the time of the pull are included in the Phase I Cohort, in case circumstances have changed since a patient's last IDTT.

a. In the last 90 days, the patient has participated in less than 50% of all programming offered. (2022 UNA Criteria 4)
b. The patient has incurred three (3) or more Rules Violation Reports during the last three (3) months that required a mental health assessment. (2022 UNA Criteria 5)
c. The patient had three (3) or more referrals to a MHCB during the last six (6) months, or two (2) or more rescissions from ICF or APP in twelve (12) months. (2022 UNA Criteria 6)
d. The patient has been in a MHCB clinical stay exceeding ten (10) days. (2022 UNA Criteria 7)

## Parameter:

a. In the last 90 days, the patient has participated in less than 50% of all programming offered.
  - Date range: 90 days prior to the date identified on "Report Date"
  - Patients with CCCMS MHI at the time of the "Report Date" are excluded
  - For Cerner/EHRS appointments:
    - Only appointments mapped as Mental Health appointments are included
    - Appointments with a duration more than 4 hours, in minutes, are excluded
    - Only structured treatments are included
    - Calculation of the percentage
      - Numerator: sum of duration (in minutes) of all attended appointments
      - Denominator: sum of duration (in minutes) of all attended and refused appointments
  - For SOMS job assignment:
    - ISUDT are excluded
    - NLTG are excluded from SOMS job assignment. Please see below on how NLTG hours are captured.
    - Only structured treatments are included
    - Up to a maximum of 4 hours (measured in minutes) per week are included
      - Week: Monday 0000 to Sunday 2359
      - Examples of "up to maximum of 4 hours per week":
        a. Attended 8 hours of job assignment. Refused 0 hours.
          i. Numerator: 240 minutes
          ii. Denominator: 240 minutes
        b. Attended 0 hours of job assignment. Refused 8 hours.
          i. Numerator: 0 minutes
          ii. Denominator: 240 minutes
        c. Attended 4 hours of job assignment. Refused 4 hours.
          i. Numerator: 240 minutes

# UNA Objective Data Methodology
Version 1.1

    ii. Denominator: 240 minutes
   d. Attended 2 hours of job assignment. Refused 2 hours.
    i. Numberator: 120 minutes
    ii. Denominator: 240 minutes
   e. Attended 2 hours of job assignment. Refused 0 hours.
    i. Numberator: 120 minutes
    ii. Denominator: 120 minutes
   f. Attended 0 hours of job assignment. Refused 2 hours.
    i. Numberator: 0 minutes
    ii. Denominator: 120 minutes

- ▪ Calculation of the percentage
  - Numerator: sum of duration (in minutes), up to maximum of 4 hours per week, of all attended appointments
  - Denominator: sum of duration (in minutes), up to maximum of 4 hours per week, of all attended and refused appointments
- For NLTG appointments
  - ▪ NTLG appointments are NLTG groups completed in SOMS
  - ▪ Appointments with a duration more than 4 hours, in minutes, are excluded
  - ▪ Calculation of the percentage
    - Numerator: sum of duration (in minutes) of all attended NLTG appointments
    - Denominator: sum of duration (in minutes) of all attended and refused NLTG appointments

b. The patient has incurred three (3) or more Rules Violation Reports during the last three (3) months that required a mental health assessment.
- Date range: 3 months prior to the date identified on "Report Date"
  - ▪ Examples of date range

| Report run on | Date range | Calendar days |
|---|---|---|
| 4/7/2022 | 1/7/2022 - 4/7/2022 | 90 days |
| 5/7/2022 | 2/7/2022 - 5/7/2022 | 89 days |
| 7/7/2022 | 4/7/2022 - 7/7/2022 | 91 days |

- ▪ Only system generated orders are included
- ▪ System generated MH RVR evaluation orders are placed when SOMS users request for a MH RVR assessment.
- Non-system generated orders are excluded to avoid duplicate.
- Limitation: When an RVR is a re-issue re-hear, and an MHA is requested, the system will generate an RVR evaluation order. Per policy, only one MHA is to be completed for each RVR. If the RVR MHA request is a duplicate, staff are trained to void them. Although void orders are not included, there may be a gap between the date the order

# UNA Objective Data Methodology
Version 1.1

was created and staff voiding the order, resulting in counting the re-issue re-hear orders as a separate request.

c. The patient had three (3) or more referrals to a MHCB during the last six (6) months, or two (2) or more rescissions from ICF or APP in twelve (12) months.

- MHCB referrals:
  - Definition of MHCB referral: patient's MHI changed to MHCB
  - Date range: 6 months prior to the date identified on "Report Date". Examples of date range:

| Report run on | Date range | Calendar days |
|---|---|---|
| 4/7/2022 | 10/7/2021 - 4/7/2022 | 182 days |
| 5/7/2022 | 11/7/2021 - 5/7/2022 | 181 days |
| 7/7/2022 | 1/7/2022 - 7/7/2022 | 181 days |

- ICF or Acute rescissions:
  - Definition of ICF or Acute rescissions: patient's MHI changed from Acute or ICF to non-Acute or non-ICF MHI while the patient is housed in outpatient housing
  - Date range: 12 months prior to the date identified on "Report Date". Examples of date range:

| Report run on | Date range | Calendar days |
|---|---|---|
| 4/7/2022 | 4/7/2021 - 4/7/2022 | 365 days |
| 5/7/2022 | 5/7/2021 - 5/7/2022 | 365 days |
| 7/7/2022 | 7/7/2021 - 7/7/2022 | 365 days |

d. The patient has been in a MHCB clinical stay exceeding ten (10) days.

- Patient who are current physically housed in MHCB program with MHI of MHCB
- Patient who MHI of MHCB exceeds 10 days, including pre-MHCB admission

# UNA Objective Data Methodology
Version 1.1



| Column Name | Source | Definition |
|---|---|---|
| #3a | EHRS: Appointments | 1 = less than 50%<br>0 = more than or equal to 50% |
| #3b | EHRS: MH RVR Evaluation order | 1 = three (3) or more RVRs required a mental health assessment<br>0 = less than 3 RVRs required a mental health assessment |
| #3c | EHRS:<br>MH Place in orders | 1 = three or more MHCB referrals during the last six months, or two or more Acute or ICF rescissions in twelve months<br>0 = less than three MHCB referrals during the last six months, or less than two Acute or ICF rescissions in twelve months |
| | EHRS: Housing Arrival order | |
| #3d | EHRS:<br>MH Place in orders/MH Discharge Patient orders | 1 = MHCB clinical stay exceeding ten days<br>0 = MHCB clinical stay less than ten days |

# Appendix D – SharePoint Data Collection PowerApps

 UNA Data Collection Site

Home

Recycle bin

Edit

+ New ⌄    ⚙ Page details    📊 Analytics



**Phase I: Screening Tools**

 Regional Team Review Flag     Treatment Teams Screening Tool    Criterion A Screening Tool     Custody/Nursing Screening Tool

**Phase II: Review Tools**

 UNA Team Review Outcome

 UNA IDTT Referral Tool

**Reports**

 PBI report

 UNA Data Collection Site

Home

Recycle bin

Edit

+ New ∨    ⚙ Page details    ▦ Analytics



**Phase I: Screening Tools**

 Regional Team Review Flag    Treatment Teams Screening Tool     Criterion A Screening Tool     Custody/Nursing Screening Tool

**Phase II: Review Tools**

 UNA Team Review Outcome

 UNA IDTT Referral Tool

**Reports**

 PBI report

## Phase I: Screening Tools

### Regional Team Review Flag



### Treatment Teams Screening Tool



## Criterion A Screening Tool



## Custody/Nursing Screening Tool



 UNA Data Collection Site



+ New ⌄    ⚙ Page details    📊 Analytics



**Phase I: Screening Tools**

 Regional Team Review Flag     Treatment Teams Screening Tool     Criterion A Screening Tool     Custody/Nursing Screening Tool

**Phase II: Review Tools**

 UNA Team Review Outcome

 UNA IDTT Referral Tool

**Reports**

 PBI report

Phase II: Screening Tools

UNA Team Review Outcome



IDTT Referral Tool



Reports



# Appendix E – UNA Orientation Training Materials



# UNMET NEEDS ASSESSMENT (UNA)

Executive Leadership Presentation

# UNA OVERVIEW

Court Ordered Statewide study to determine whether there is an unmet need for higher levels of mental health care among MHSDS Patients in CDCR.
- Modeled off of MHARP study (2009)
- You will notice many similarities to Sustainable Process

The court order also directs a review of Personality Disordered Offenders with "significant function impairments who have special treatment needs not yet available in an inpatient setting."

The study will be conducted in two phases
- Institution Staff (Mental Health, Custody, and Nursing) will participate in Phase I for Data Collection

Final report will be submitted to the court with findings

# UNA OVERVIEW - PHASE I DATA COLLECTION

**Mental Health**
- Objective measures (collected from EHRS/On Demand)
- Subjective measures
  - Mental Health Staff (CCCMS/EOP/MHCB)
    - Clinicians review their entire caseload
    - Coordinated by Mental Health Program Supervisors

# UNA OVERVIEW - PHASE I DATA COLLECTION

**Custody**

- Custody in EOP, MHCB and Restricted Housing (ASU CCCMS/EOP, STRH, LTRH, ASU EOP HUB, PSU)
  - 1st, 2nd and 3rd Watch
  - Coordinated by Regional Lieutenants

# UNA OVERVIEW - PHASE I DATA COLLECTION

**Nursing**

- Nursing (EOP, MHCB, ASU CCCMS, STRH, LTRH, ASU EOP HUB, PSU)
  - 2nd and 3rd watch
  - Coordinated by Institutional Nursing Supervisors

**Data from all sources are combined into a Master Review List for UNA Review Team in Phase II**

# UNA OVERVIEW - PHASE II CLINICAL REVIEW (REGIONAL AND DSH)

**UNA Review Team (4 teams of 3 reviewers)**

- Regional Senior Psychologist Specialist
- Regional Senior Psychiatrist Specialist
- DSH Psychologist/Psychiatrist

- Each review team will review Phase I identified cases and determine:
- Does patient meet criteria for referral to APP/ICF/MHCB?
- Does the patients have a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.
  - Has the patient responded adequately to offered treatment?
  - Has the patient already been offered all clinically appropriate treatment available within the MHSDS?
  - Would the patient benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at DSH?

# UNA OVERVIEW - PHASE II CLINICAL REVIEW (REGIONAL AND DSH)

- Based on the review, the Treatment Teams may receive recommendations for treatment planning, or consideration for referral to HLOC.

  - If the Treatment Team is not in agreement with the recommendations, there will be an opportunity to have a clinical discussion with the UNA review team.

  - This process is meant to be collegial and Treatment Teams will not be directed to change a LOC if they are not in agreement.

- Coleman experts will observe and participate, as appropriate, with this process.

# UNA Statewide Project Timeline

*working calendar updated 1/23/2023

- **Based on 4 Teams of 3 Reviewers on Each Team (except MCSP & SAC/CMC which had more review teams)**

- **Tentative End Date for Phase II – March 10, 2023**

- **Dispute Resolutions will Continue through March 24, 2023**

- **Report Writing – March 2023**

- **CDCR's Final Report will be Filed June, 2023**

## 4 Team Model UNA Institution Schedule
***DRAFT- SUBJECT TO CHANGE***

| Region | Inst. | Projected Case Count | Phase I Start | Phase II Start | Phase II End | Total Work Weeks |
|---|---|---|---|---|---|---|
| 4 | RJD | 602 | 04/04/2022 | 04/25/2022 | 06/10/2022 | 7 |
| 3 | LAC | 507 | 05/16/2022 | 06/13/2022 | 07/08/2022 | 4 |
| 1 | MCSP | 600 | 06/20/2022 | 07/11/2022 | 08/05/2022* | 4 |
| 1 | SAC | 619 | 07/18/2022 | 08/08/2022 | 09/16/2022* | 6 |
| 2 | CMC | 196 | | | | |
| 3 | COR | 336 | 08/29/2022 | 09/19/2022 | 10/28/2022 | 5 |
| 3 | SATF | 448 | | | | |
| Break for Suicide Prevention Summit – October 17 – 21 (Summit dates October 18 – 20) | | | | | | |
| 2 | SVSP | 278 | 10/03/2022 | 10/31/2022 | 12/09/2022 | 4 |
| 2 | CHCF | 211 | | | | |
| Break for SMHP Leadership Conference – November 14 – 18 (Conference dates November 16-17) | | | | | | |
| Break for Thanksgiving Week - November 21 – 25, 2022 | | | | | | |
| 2 | VSP | 275 | 11/28/2022 | 12/12/2022 | 12/23/2022 | 2 |
| 3 | KVSP | | | | | |
| Winter Holiday Break – December 26 - 30 | | | | | | |
| 1 | CMF | 132 | 01/03/2023 | 01/17/2023 | 02/10/2023 | 4 |
| 1 | SQ | 81 | | | | |
| 3 | NKSP | 98 | | | | |
| 2 | CCWF | 59 | 01/30/2023 | 02/13/2023 | TBD (02/24/23) | 2 |
| 4 | CRC | 32 | | | | |
| 4 | CIW | 64 | | | | |
| 4 | CIM | 57 | | | | |
| 1 | HDSP | 22 | TBD (02/13/23) | TBD (02/27/23) | TBD (03/10/23) | 2 |
| 1 | PBSP | 12 | | | | |
| 1 | SOL | 15 | | | | |
| 1 | FSP | 24 | | | | |
| 2 | SCC | 2 | | | | |
| 2 | CTF | 8 | | | | |
| 2 | PVSP | 37 | | | | |
| 3 | CCI | 14 | | | | |
| 3 | ASP | 30 | | | | |
| 3 | WSP | 69 | | | | |

# INSTITUTIONS PHASE I ACTIVITIES

- Executive Leadership UNA Orientation

- Nursing Orientation and Screening Tool Instruction

- Mental Health Supervisors UNA Orientation and Screening Tool Instruction

- Phase I Data Collection Activities

# FSP, HDSP, PBSP, SOL, CTF, PVSP, SCC, CCI, ASP, WSP UNA PHASE I TIMELINE

| Activity | Purpose | Location | Date/Time |
|---|---|---|---|
| **Institutional Leadership Orientation** | Provide high level review of the project and scheduled activities to executive leadership at FSP, HDSP, PBSP, SOL, CTF, PVSP, SCC, CCI, ASP, WSP. | Teams | **2/1/23** 11:00-12:00 HRS |
| **Mental Health Supervisor Orientation and Instruction** | Orient mental health supervisors to screening tool and coordinate the entry of the data into SharePoint. | Teams | **2/2/23** 10:00-11:00 HRS |
| **Nursing Supervisor Orientation and Screening Instruction** | Orient Nursing supervisors to screening tool. Coordinate SharePoint entry with Nursing. | Teams | **Week of 2/6/23 (led by each Region)** |
| **Mental Health Phase I Data Collection** | Institution Mental Health Supervisors will coordinate the completion of the UNA mental health screening tool and entry into SharePoint. | Institution Supervisors onsite | **2/13/23 to 2/19/23** |
| **Nursing Phase I Data Collection** | Institutional Nursing Supervisors will coordinate the completion of the UNA mental health screening tool. | Institution Supervisors onsite | **2/13/23 to 2/19/23** |
| **Custody Phase I Data Collection** | Region I, Region II, and Region III lieutenants will distribute UNA Custody/Nursing screening tool to all 3 watches in EOP, MHCB and Restricted housing units with MHSDS patients. | Onsite | **2/13/23 to 2/19/23 (all Regions will check institutions' census on 2/13/23 and will be collecting data during that week; tentative data collection date for Region II and III is 2/15/23)** |
| **UNA Phase I Data Entry** | Enter paper screening form data from Custody into SharePoint; Objective Data pull; Create Master Phase II list. | Remote | **2/20/23 to 2/25/23** |

# WHAT CAN THE INSTITUTION EXPECT DURING PHASE II?

## UNA Review Team Onsite Patient Interviews

- UNA review team may schedule a day to conduct onsite interviews with patients

## UNA Review Team Remote Patient and/or Staff Interviews

- UNA review team may schedule a day to conduct remote interviews with patients and/or staff

## UNA Review Team IDTT Recommendations

- UNA Review Team recommendations will occur throughout Phase II
- IDTT to review recommendation within **6 business days** of receiving the recommendation
- IDTT disagreement with recommendation taken to Clinical Dispute/Consultation process
  - Meeting within **5 business days** of notice of disagreement
- IDTT maintains the role of final treatment determination during entire process

# UNA Study Phase I Nursing Orientation and Training (Region1, Region 2, and Region 3)

UNA Study

February 7, 2023

# What is UNA?

**Unmet Needs Assessment** –

It is a Court ordered statewide study to determine whether there is an unmet need for higher levels of mental health care among MHSDS Patients in CDCR

Primary concern is the use of inpatient beds (MHCB, APP, ICF)

Examples of unmet needs:
- Pts not benefitting from treatment at their current level of care and require a referral to an Inpatient setting – such as APP (Acute Psychiatric Program) or ICF (Intermediate Care Facility) Level of care
- Significant decompensation from previous functioning that may warrant more intensive care than can be provided in an outpatient setting

# What is UNA?

- The study will be conducted in two phases
  - Phase I Data Collection (February 13, 2023)
    - Data collected from EHRS/ON Demand and Institutional Staff
    - Master list created for Phase II Clinical Review
  - Phase II Clinical Review
    - Regional, HQ, DSH clinicians will work in teams to evaluate cases
    - Summary Treatment information will be provided to IDTTs when appropriate

- Institutional Nursing and Custody staff will be participating primarily in Phase I Data Collection
- Final report will be submitted to the court with findings

## UNA Study Workflow
## Phase I- Data Collection
## *Nursing Onsite*

- Screening will be completed by 2nd and 3rd watch Nursing staff who provide direct patient care to the target population
  - Ideally, by the staff who are regularly assigned to a specific housing unit (PTs, LVNs [medication nurses], RNs)
- Screening will be completed by Psychiatric Technicians (PT) **on a single 2nd and 3rd watch shift** for patients in EOP, STRH, LTRH, MHCB, and Ad Seg areas.
- Data will be inputted and submitted on the UNA Data Collection SharePoint site using "Nursing/Custody Screening Tool."

## UNA Study Workflow
## Phase I- Data Collection
## *Nursing Onsite*

- Screens to be conducted by nurse on duty at time of survey who is most familiar with the patients.

- Nursing staff completing the surveys will consider their patients and enter surveys into the UNA SharePoint site based upon their knowledge of their patients.
  - Record reviews are not required but can be utilized if needed to verify information.
  - Patient interviews are not necessary

## UNA Study Workflow
## Phase I- Data Collection
## *Nursing Onsite*

- IMPORTANT:
- Paper forms may be used to collect data, but staff must transfer data into the SharePoint site.
- Remind staff to submit ALL the completed forms to the designated point of contact (US, SPT, or SRN II) after data transfer.
- All questions should be grouped by your Institutional Lead:
- Region I HDSP Lead- SRN II Thomas, PBSP Lead- SRN II Abad, SOL Lead- SRN II Henry, FSP Lead- SRN II Montemayor
- Region II CTF-Lead SRN II Grinde, PVSP- Lead SRN II Vega,  SCC Lead- SRN II Carlson,
- Region 3-WSP SPT Rosa Flores and Jason Morrow SRN II, CCI Nancy Segovia Rutledge SRN II and Darlene Rojas SPT, ASP CNE Kimberly Adkins

- Do not shred the forms, as Region I, II & III NCPRs will collect them from the institution.

# UNA SharePoint Entry

- Surveys are entered at the UNA data collection SharePoint site into the custody/nursing screening tool.

Link:

UNA Data Collection Site - Home (sharepoint.com)

# UNA SharePoint Entry



# UNA SharePoint Entry

- After selecting "custody/nursing screening tool"
- Select "create new entry"
- Complete all fields and enter one survey for each patient you identify as meeting screening criteria (see next slides for criteria).



# UNA Custody and Nursing Screening Tool





# UNA Custody and Nursing Screening Tool



# UNA Custody and Nursing Screen List

## Appendix 3 - UNA Custody and Nursing Review - Screen List

As part of a Statewide Unmet Needs Assessment (UNA), Custody Officers and Nursing staff are being asked to identify patients in their housing unit/on their watch who may be unable to *adequately function* in their current level of care. This screening tool is provided 2-3 weeks prior to your institution's scheduled UNA Phase II start date and results shall be noted on the template and provided back to MH Headquarters (HQ)/Regional Team no later than 1 week prior to your Phase II start date. Time to complete screens for all housing units should not exceed 1 day. Your response will help identify patients who might need more intensive treatment than is currently being provided. Thank you for your participation in this important effort.

**Criteria:** Patient may be unable to *adequately function* within current level of care.

**Guideline for evaluating criteria:** As a guideline to evaluating whether a patient may be unable to *adequately function*, please use the following template to identify patients from your housing unit/on your watch who exhibit any of the following criteria, and which criteria specifically:

a. Not eating/refusing food trays pattern, or not attending dining hall hours.
b. Pattern of repeatedly refusing showers.
c. Poor hygiene/grooming on a constant basis or intermittent poor hygiene/grooming.
d. Persistent body odor.
e. Refusing to leave cell for long periods of time (yards, visits, health care appts, showers).
f. Disruptive (yells/screams for no apparent reason).
g. Frequent talking to oneself.
h. Pattern of crying in cell.
i. Bizarre or confused behavior.
j. A pattern of hostile, aggressive, or threatening behavior or statements.
k. Talking about suicide, death, dying, or hurting oneself.
l. Concerning change in behavior/presentation.
m. Withdrawn.
n. Pattern of staying up all night.
o. Chronic problem with cell cleanliness.
p. Complains about other patients.
q. Complains of being victimized.
r. Not coping well with recent bad news.
s. Poor medication compliance.
t. Frequent Pacing.

1 | P a g e

# UNA Custody and Nursing Review Screen -
Example Scenario

Inmate Jackson is a 25 year old male inmate who has been at State Prison for two years. He has been a part of the Enhanced Outpatient mental health program for 9 months, originally referred to EOP due to appearing depressed and requiring reminders for tasks such as attending appointments and taking medication. Custody officers state that Inmate Jackson is a model inmate, who is friendly and follows the rules. They did note that in the past, he would come out of cell daily and go to yard for exercise, talking to officers and other inmates, but recently has elected to stay in his cell more often, forgoing yard time and staying alone in cell for extended periods. He works as a porter five days per week and does a decent job of keeping the unit clean.

He attends mealtimes religiously and typically purchases items from canteen when available. A psychiatric technician stated that Inmate Jackson's cellmate expressed that he believes Jackson might be giving away some of his canteen items to another inmate who asks for his food. The cellmate also explained he has to remind Inmate Jackson to tidy his side of the cell, take showers and wash his clothes. Officers indicate he is seen going to shower daily, but that he often presents with body odor and requires reminders to wash clothes or exchange laundry.

He recently has begun refusing medication, explaining "I don't think it does anything." A recreational therapist on the unit notes that Jackson has begun to upset other inmates in group with outbursts of yelling and negativity, causing other inmates to choose not to attend groups if inmate Jackson is there. His mental health clinician notes that he has recently appeared more depressed, missing some appointments, not being as communicative and appears to be having difficulty adjusting to life in prison. She says Jackson talks about how he can't imagine how he can spend his life in prison. She said that Jackson says he would never kill himself, but sometimes "wishes he could do something like that." The clinician explained that Jackson has no history of self-harm or suicide attempts and assures her he would never kill or harm himself.

# UNA Custody and Nursing Review Screen

Does Mr. Jackson meet the criteria for inclusion in this study?



# UNA Data Collection Tool Entry Example



# UNA Data Collection Site hyperlink

- UNA Data Collection Site - Home (sharepoint.com) (double-click to open hyperlink on PDF)

- Submit an access request through the site 1-2 weeks prior.
- Institutional UNA Leads please assure everyone has tested their access prior to data collection week.
- *If data collection is being done through the paper data collection tool due to unforeseen technical issues, the preference is for the data to be submitted electronically when power is restored.
  - please submit all completed UNA assessment tools and the binders to your institutional UNA Lead
  - Institutional Lead will arrange to give them to the respective Regional NCPRs

# UNA Custody and Nursing Review Screen





# UNMET NEEDS ASSESSMENT (UNA)

## Treatment Teams Screening



# UNA OVERVIEW

- Court Ordered Statewide study to determine whether there is an unmet need for higher levels of mental health care among MHSDS Patients in CDCR.
  - Modeled off of MHARP study (2009)
  - You will notice many similarities to Sustainable process

- The court order also directs a review of Personality Disordered Offenders with "significant function impairments who have special treatment needs not yet available in an inpatient setting."

- The study will be conducted in two phases
  - Institution Staff will primarily participate in Phase I for Data Collection

- Final report will be submitted to the court with findings



# UNA OVERVIEW - SCHEDULE FOR: FSP, HDSP, PBSP, SOL, CTF, PVSP, SCC, CCI, ASP, WSP

**4 Team Model UNA Institution Schedule**
**\*\*\* DRAFT- SUBJECT TO CHANGE\*\*\***

| Region | Inst. | Projected Case Count | Phase I Start | Phase II Start | Phase II End | Total Work Weeks |
|---|---|---|---|---|---|---|
| 4 | RJD | 602 | 04/04/2022 | 04/25/2022 | 06/10/2022 | 7 |
| 3 | LAC | 507 | 05/16/2022 | 06/13/2022 | 07/08/2022 | 4 |
| 1 | MCSP | 600 | 06/20/2022 | 07/11/2022 | 08/05/2022* | 4 |
| 1 | SAC | 619 | 07/18/2022 | 08/08/2022 | 09/16/2022* | 6 |
| 2 | CMC | 196 | | | | |
| 3 | COR | 336 | 08/29/2022 | 09/19/2022 | 10/28/2022 | 5 |
| 3 | SATF | 448 | | | | |
| Break for Suicide Prevention Summit – October 17 – 21 (Summit dates October 18 – 20) | | | | | | |
| 2 | SVSP | 278 | 10/03/2022 | 10/31/2022 | 12/09/2022 | 4 |
| 2 | CHCF | 211 | | | | |
| Break for SMHP Leadership Conference – November 14 – 18 (Conference dates November 16-17) | | | | | | |
| Break for Thanksgiving Week - November 21 – 25, 2022 | | | | | | |
| 2 | VSP | 275 | 11/28/2022 | 12/12/2022 | 12/23/2022 | 2 |
| 3 | KVSP | | | | | |
| Winter Holiday Break – December 26 - 30 | | | | | | |
| 1 | CMF | 132 | 01/03/2023 | 01/17/2023 | 02/10/2023 | 4 |
| 1 | SQ | 81 | | | | |
| 3 | NKSP | 98 | | | | |
| 2 | CCWF | 59 | 01/30/2023 | 02/13/2023 | TBD (02/24/23) | 2 |
| 4 | CRC | 32 | | | | |
| 4 | CIW | 64 | | | | |
| 4 | CIM | 57 | | | | |
| 1 | HDSP | 22 | TBD (02/13/23) | TBD (02/28/23) | TBD (03/10/23) | 2 |
| 1 | PBSP | 12 | | | | |
| 1 | SOL | 15 | | | | |
| 1 | FSP | 24 | | | | |
| 2 | SCC | 2 | | | | |
| 2 | CTF | 8 | | | | |
| 2 | PVSP | 37 | | | | |
| 3 | CCI | 14 | | | | |
| 3 | ASP | 30 | | | | |
| 3 | WSP | 69 | | | | |

Revised 01/23/23



# UNA OVERVIEW – PHASE I

- Phase I –Data Collection
  - Objective measures (collected from EHRS/On Demand)
  - Subjective measures
    - Mental Health Staff (CCCMS/EOP/MHCB)
      - Clinicians review their entire caseload
    - Custody in EOP, MHCB and Restricted Housing (ASU CCCMS/EOP, STRH, LTRH, ASU EOP HUB, PSU)
      - 1st, 2nd and 3rd Watch
    - Nursing (EOP, MHCB, ASU CCCMS, STRH, LTRH, ASU EOP HUB, PSU)
      - 2nd and 3rd watch
  - Data combined into Master Review List for UNA review teams in Phase II



# PHASE I CLINICAL IDENTIFICATION INSTRUCTIONS

- The senior psychologist and psychiatrist for every program will send the SharePoint link to their clinical teams and request they complete the tool for any patients they identify within one week of notice.

- Primary clinicians (PCs) and psychiatrists who have a caseload in all MHSDS levels of care (CCCMS, EOP, MHCB) will be asked to consider patients and complete the screening tool.

- Program supervisors will be responsible for providing guidance to staff on how to complete the screener
  - Screenings must be entered no later than one week after their distribution
  - The screening tool is comprised of four criterion
  - You will notice Criterion 1 – 3 are the subjective criteria in the HLOC tab of the Master Treatment Plan.
  - Patients previously considered poor or inappropriate candidates for referral to HLOC may be included on the screening tool





# 2022 UNA CRITERION 1

As a result of a major mental disorder, the patient is unable to *adequately function* within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care.

**Guideline for evaluating 2022 UNA Criterion 1:** Please identify patients from your caseload who exhibit any of the following criteria and are not currently referred to HLOC:

a. Not eating/refusing food trays pattern, or not attending dining hall hours.
b. Pattern of repeatedly refusing showers.
c. Poor hygiene/grooming on a constant basis or intermittent poor hygiene/grooming.
d. Persistent body odor.
e. Refusing to leave cell for long periods of time (yards, visits, health care appointments, showers).
f. Disruptive (yells/screams for no apparent reason).
g. Frequent talking to oneself.
h. Pattern of crying in cell.
i. Bizarre or confused behavior.
j. A pattern of hostile, aggressive, or threatening behavior or statements.
k. Talking about suicide, death, dying, or hurting oneself.
l. Concerning change in behavior/presentation.
m. Withdrawn.
n. Pattern of staying up all night.
o. Chronic problem with cell cleanliness.
p. Complains about other patients.
q. Complains of being victimized.
r. Not coping well with recent bad news.
s. Poor medication compliance.
t. Frequent Pacing.



**Guideline for evaluating 2022 UNA Criterion 1 - Continued**

- Identify patients on your caseload who are unable to adequately function within the structure of the EOP LOC
    - For MHCB and CCCMS - is there any patient on your caseload who is not functioning adequately at the current LOC and would not likely be able to function in EOP?
    - When looking at the criteria provided, consider this in the context of functional impairment.
    - Look at a pattern of behavior rather than a snap shot, unless there's a sudden shift/change that is of concern based on what you know about the patient.
    - Patients can meet one or more criteria.





**2022 UNA CRITERION 2**

The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or stabilization of refractory psychiatric symptoms.

**Guideline for evaluating 2022 UNA Criterion 2:** Please identify patients on your caseload who require highly structured  inpatient psychiatric care with 24-hour nursing, due to the criteria listed below, and are not currently referred to HLOC:

      a. Major mental disorder.
      b. Serious to major impairment of functioning in most life areas.
      c. Stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior.
      d. Stabilization of refractory psychiatric symptoms.

- For patients in MHCB, this criterion is for those who require ICF or APP LOC





# 2022 UNA CRITERION 3

The patient demonstrates chronic psychiatric symptoms that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning.

**Guideline for evaluating 2022 UNA Criterion 3:** Please identify patients on your caseload who, for the past 6 months, have not responded sufficiently to treatment to a degree that facilitates adequate levels of functioning, and are not currently referred to a HLOC.

a. Patients who have shown a lack of treatment progress despite attendance in treatment.
- Treatment progress is not clinically significant
- Less than clear benefit from attending group activities (i.e. responding to internal stimuli for the entire group)

b. Patients who need more individualized treatment to meet treatment goals.

c. Patients who are chronically medication non-compliant, but do not meet criteria for PC2602 or have had medication changes with no significant improvement.

- Consider impact of chronic psychiatric symptoms on patient's ability to respond to treatment.



# 2022 UNA CRITERION A

## PERSONALITY DISORDERED PATIENTS



The patient has a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.

**Guideline for evaluating 2022 UNA Criterion A – Personality Disordered Patients:** Please identify patients on your caseload who, due to predominant personality disorder characteristics and have been diagnosed with a personality disorder, meet any of the following criteria, and are not currently referred to HLOC:

a.  Frequently utilizes CIT.

b.  Instrumental self-harm behavior(s) resulting in multiple MHCB admissions or significant and frequent disruptions in their housing units.

c.  Functional Impairment - Disrupt the program of others.

d.  Functional Impairment – Has not benefitted from the program because of acting out behaviors or refusal to engage with treatment options.

e.  Functional Impairment - Frequent peer conflict.

f.  Patients with a personality disorder who display the above behaviors as a primary attempt to manage safety concerns.



# ENTRY OF PATIENTS WHO ARE IDENTIFIED

▪ Once patients are identified as meeting any of the criteria, clinical staff enter each patient identified into the "Treatment Teams Screening Tool" section of the UNA SharePoint site.

Treatment Teams - Screen List - Power Apps

- Enter the correct criterion for the patient into the site.

- If no patients are identified, clinical staff will notify their supervisor, who will provide a summary to the chief of mental health or chief psychologist.

- The chief of mental health or chief psychologist will provide a summary to the regional mental health administrator to confirm completion of the entries and notice of when no referrals were made (the purpose of this is to confirm that the review was complete).



# UNA OVERVIEW - PHASE I, SCHEDULE FOR: FSP, HDSP, PBSP, SOL, CTF, PVSP, SCC, CCI, ASP, WSP

| Activity | Purpose | Location | Date/Time |
|---|---|---|---|
| Institutional Leadership Orientation | Provide high level review of the project and scheduled activities to executive leadership at FSP, HDSP, PBSP, SOL, CTF, PVSP, SCC, CCI, ASP, WSP. | Teams | 2/1/23 11:00-12:00 HRS |
| Mental Health Supervisor Orientation and Instruction | Orient mental health supervisors to screening tool and coordinate the entry of the data into SharePoint. | Teams | 2/2/23 10:00-11:00 HRS |
| Nursing Supervisor Orientation and Screening Instruction | Orient Nursing supervisors to screening tool. Coordinate SharePoint entry with Nursing. | Teams | Week of 2/6/23 (led by each Region) |
| Mental Health Phase I Data Collection | Institution Mental Health Supervisors will coordinate the completion of the UNA mental health screening tool and entry into SharePoint. | Institution Supervisors onsite | 2/13/23 to 2/19/23 |
| Nursing Phase I Data Collection | Institutional Nursing Supervisors will coordinate the completion of the UNA mental health screening tool. | Institution Supervisors onsite | 2/13/23 to 2/19/23 |
| Custody Phase I Data Collection | Region I, Region II, and Region III lieutenants will distribute UNA Custody/Nursing screening tool to all 3 watches in EOP, MHCB and Restricted housing units with MHSDS patients. | Onsite | 2/13/23 to 2/19/23 (all Regions will check institutions' census on 2/13/23 and will be collecting data during that week; tentative data collection date for Region II and III is 2/15/23) |
| UNA Phase I Data Entry | Enter paper screening form data from Custody into SharePoint; Objective Data pull; Create Master Phase II list. | Remote | 2/20/23 to 2/25/23 |



# UNA OVERVIEW - PHASE II

Phase II – Clinical Review (Regional and DSH Clinicians)

- UNA Review Team (4 teams of 3 clinicians)
  - Regional Senior Psychologist Specialists
  - Regional Senior Psychiatrist Specialists
  - DSH Psychologists/Psychiatrists.
- Review team will review case and determine:
  - Does patient meet criteria for referral to APP/ICF/MHCB?
  - Patients with a personality disorder associated with significant disruptive behavioral disturbances, which may include self-harming behaviors.
    - Has the patient responded adequately to offered treatment?
    - Has the patient already been offered all clinically appropriate treatment available within the MHSDS?
    - Would the patient benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at DSH?

# UNA OVERVIEW – PHASE II CONTINUED

- Based on the UNA team review, the treatment teams may receive recommendations for treatment planning, or consideration for referral to HLOC.
  - If the Treatment Team is not in agreement with the recommendations, there will be an opportunity to have a clinical discussion.
  - This process is meant to be collegial and treatment teams will not be directed to change a LOC if they are not in agreement.

- Coleman experts will observe and participate, as appropriate, with the Phase II process.



# NEXT STEPS – PHASE II, IDTT

- If the majority of the UNA review team recommends a HLOC, a case summary will be prepared and sent to the IDTT within 5 business days of the recommendation.
  - ✓ The IDTT may also receive recommendations from the UNA review team related to interventions to address in treatment.

- The IDTT will review the recommendation for referral to HLOC within 6 business days of receipt of the recommendation.

- If the IDTT agrees with the recommendation, a referral will proceed pursuant to current referral and admission policies and procedures.

- If the IDTT disagrees with the HLOC recommendation, a referral to the UNA Clinical Dispute/Consultation Team will occur, via the regional team member who requested the IDTT



# NEXT STEPS - PHASE II, SHAREPOINT ENTRY

▪ A designated clinician from IDTT will enter the referral decision into the <u>UNA Phase 2 IDTT Referral Tool</u> within the UNA SharePoint site (link will be included in the recommendation email).

▪ The designated IDTT member completes the "Patient" and "IDTT & Referral" tabs of the SharePoint site (UNA IDTT Referral Tool).

  ✓ First, search for the patient's CDCR number. If there is no entry, then "create new."

  ✓ Enter brief summary of IDTT review and considerations related to higher level of care recommendation into "Patient" tab.

  ✓ Complete date and all drop downs in "IDTT & Referral" tab.

  ✓ **Do not create multiple entries. There should be one entry for each patient.**



# FREQUENTLY ASKED QUESTIONS

- Q: What if it's a covering/new clinician or psychiatrist and they don't know the patients?
  - A: Only clinicians who have knowledge of the patient should complete the screening tool. There is not a requirement to review the patients' charts.

- Q: Can psychiatrist and PC fill it out together?
  - A: Psychiatrist and PC can fill out together. Once all of the data has been collected, all responses are all consolidated (if more than one clinician completes the tool on a single patient, all responses will be group together).



# UNA 2022 Study – Phase II

## ORIENTATION & CASE PRESENTATION GUIDE

**CMF/SQ/NKSP REFRESHER TRAINING**

# UNA Phase II Workflow

1. **Master Patient List-** The Phase I master patient list is divided and randomly assigned to reviewers within each team.

2. **EHRS Chart Reviews-** Each UNA reviewer will write a summary with the rationale for their determination as to whether or not to make a recommendation for a HLOC referral; or if other interventions may be necessary to meet a personality disordered patient's treatment needs.

3. **Case Presentations-** Each UNA reviewer will virtually present a summary of findings and recommendation to their respective team.

   ▶ The UNA review team will initially approve, disapprove, or request additional information prior to reaching a majority consensus

4. **Final Findings-** will be entered into SharePoint Tool and referral recommendations communicated to the Institutional IDTT

# Weekly Schedule – CMF/SQ/NKSP

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
| **Team 1**<br>Case Presentations | **All Teams**<br>Individual Case Reviews | **All Teams**<br>Case Presentations | **Team 3**<br>Case Presentations | **Team 2 & 4 & 5**<br>Case Presentations |
| **Team 2, 3 & 4**<br>Individual Case Reviews | | | **Team 1, 2 & 4**<br>Individual Case Reviews | **Team 1 & 3**<br>Individual Case Reviews |

| Other Important Dates |
|---|
| Monday, January 16 – Holiday – No UNA<br>Dispute Resolution/ Consultation Team – Wednesdays 1:00 – 4:00 pm<br>Institution Travel Day Placeholder- (Virtual Interviews have also been approved) |

# Daily Tasks- Individual Case Review Days

▶ Individual Case Reviews

- o Minimum of 12-14 per week
  - ▪ Tasks:
    - ❑ Summary recommendation
    - ❑ Case presentation preparation

▶ End of Day Report and Scheduling

- o Report completed case reviews each day to AHPA

- o At least 24 hours before the next scheduled presentation day, submit any changes to the agenda to the AHPA

# Daily Tasks- Case Presentation Days

▶ Case Presentations

- o Agenda will be preset based on your assigned cases
- o Target is a minimum of 18 - 21 cases per day
- o Team should arrive at a decision by the end of the presentation

▶ If additional information is needed, the case should be elevated for further data collection/consultation (i.e., consult with PC virtually, on-site patient interview, refer to the Clinical Dispute/Consultation Team).

▶ End of Day Reporting

- o At the end of the day, the assigned reviewer reports the UNA review team outcome to the AHPA
- o The assigned reviewer completes the UNA Review Team Outcome tool preferably by the end of the day, but no later than Friday of the week of the presentation

# Case Review Management and Data Entry Tools

▶ UNA Dashboard - Power BI (powerbigov.us)



▶ UNA Data Collection SharePoint Site



# Goals of Review and Written Summary

1. Determine whether or not to make a recommendation for a HLOC referral

2. For personality disordered patients not recommended for a refer to HLOC, determine whether or not the patient's treatment needs are being met

3. A written summary of your determination to include:

   ❑ Why the patient was flagged/included in the Phase I list
   ❑ A brief and relevant summary of each record reviewed
   ❑ Recommendation and Rationale (*inclusive of both a data and clinical nexus to why the patient was flagged*)

# Written Summary/Case Presentation

- ▶ Demographics/Screening Criteria Met
- ▶ Presenting Problem
- ▶ Risk Factors
- ▶ Functional Impairment
- ▶ Treatment course and progress
- ▶ Recommendation/Rationale

# PIP Referral Criteria - ICF

**Criteria for ICF**: Experiencing active symptoms consistent with mental disorder(s) as defined in the DSM and meets one or more of the following criteria:

- Requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a serious mental disorder, serious to major impairment of functioning, stabilization or elimination of chronic repetitive self-injurious/suicidal behavior.
- Unable to function in his or her current setting and requires long term stabilization.
-  would benefit from a comprehensive treatment program with an emphasis on skill development
- Documented pattern of escalation of threats or behavioral patterns suggestive of risk that have not stabilized within an outpatient setting.
- Behavior is considerably influenced by psychotic symptoms; or serious impairment in communication or judgment; or inability to function in almost all areas.
- Documented pattern of repeated admissions to the MHCB for suicidal ideation or self-injurious behavior.
- Requires a neurological/neuropsychological consultation.
- Requires an inpatient diagnostic evaluation.
- A clozapine trial might be useful and the trial cannot be completed in the patient's designated housing.

# PIP Referral Criteria - Acute

**Criteria for APP**:  Acute exacerbation or active symptoms consistent with mental disorder(s) as defined in the DSM and the patient meets one or more of the following criteria:

- Unable to stabilize in MHCB within 10 days and/or is unable to provide for basic needs or use available supportive treatment resources
- Assessed as a severe suicide risk.
- Documented pattern of repeated admissions to the MHCB for suicidal ideation.
- Engages in recent and severe self-injurious behavior.
- A high risk of harming others, as evidenced by:
  - ✓ Recent serious assaultive behavior.
  - ✓ Expressed intention to harm others that is intensified by psychotic symptoms with a plan and/or means to carry out.

# Recommendation – HLOC Rationale

▶ Suggestion for the best course of action for the treatment team

  o Based upon the patient's functional impairment and mental health needs, what is the most appropriate setting (inpatient or outpatient) to address treatment needs?

  o Is a higher level of care needed, why or why not?

▶ Set of reasons or logical basis for the recommendation of referring to HLOC/non-referral to HLOC

# Recommendation – Rationale: Personality Disorder

▶ For the personality disordered patients identified in Phase I, apply the criteria below in order to make a determination whether interventions may be necessary to meet treatment needs:

1. Is the patient appropriate for Acute/ICF/MHCB?
   a. Yes – Refer to inpatient.
   b. No.

2. If no to question #1, has the patient responded adequately to offered treatment?
   a. Yes – Category 1. The patient has clinically responded adequately to treatment within the existing MHSDS. No additional interventions indicated.
   b. No.

3. If no to questions #2, has the patient already been offered all clinically appropriate treatment available within the MHSDS?
   a. No – Category 2.  Additional interventions indicated, specify.
   b. Yes – Category 3. The patient may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at DSH.

# Phase II: Following the Review-
## *HLOC Review*

▶ If UNA review team members ultimately support a HLOC recommendation, a referral will be made to the IDTT:

❑ The IDTT will be provided with the reviewing clinician's written summary of the relevant clinical information and team opinions within five business days of the recommendation.

❑ The summary may also include a non-binding recommendation from the Coleman expert(s) observing the evaluation process.

# Phase II: Following the Review-
## *Personality Disorder Review*

▶ If a recommendation to a HLOC is ___not___ made ___and___ the patient's treatment needs are determined to meet category 2 or 3:

  ❖ *Category 2* - additional interventions indicated, specify

    ❑ A detailed summary and rationale for the determination will be provided by the reviewing clinician to IDTT/HQ within 10 working days to include specific patient needs.

  ❖ *Category 3* – may benefit from a special treatment needs program not available within MHSDS or at DSH

    ❑ A detailed summary and rationale for the determination will be provided by the reviewing clinician to HQ within 10 working days to include specific patient needs.

# Phase II: Following the Review
## *IDTT Outcomes*

❑ The IDTT will review all recommendations for referral to a HLOC within six business days of receipt of the HLOC recommendation. (*The day of referral will be regarded as "day zero," and the next business day is day one of six*.)

　❖ If the IDTT agrees with the recommendation, a referral will proceed pursuant to current referral and admission policies and procedures.

　❖ If the IDTT disagrees with the HLOC recommendation, a referral to the UNA Clinical Dispute/Consultation Team will occur.

　　○ The UNA Clinical Dispute/Consultation Team will meet and discuss the case and make a recommendation within five business days.

　　　▪ If the UNA Clinical Dispute/Consultation Team recommends referral, the results will be provided to the IDTT.

❑ All recommendations for a HLOC to the IDTT that are ultimately not accepted by the IDTT will be tracked and totaled.

# Appendix F – UNA Case Review Template

**UNA 2022 Study – Phase II: Patient Reviews**

Written Summary/Case Presentation Guide – Handout Version

*This is a guide highlighting key elements to address in the written summary/case presentation. This guide is not intended to be all-inclusive or presented in a particular order.  Any other information deemed clinically appropriate may be included.*

| Categories | Examples |
|---|---|
| **Introduction:** (identifying data) | <ul><li>Name</li><li>Age</li><li>Gender</li><li>Race</li><li>DDP Designation</li><li>Current LOC and Length of Stay</li><li>Current MH Program Area (i.e, ASU EOP, ML EOP)</li><li>Brief Overview of MHI History</li><li>**List of patient flags/criteria met in Phase I**</li></ul> |
| **Presenting Problem:** (including patient's perception and observed presentation) | <ul><li>Primary diagnosis/"focus-of-treatment" diagnosis</li><li>Secondary diagnosis/rule-outs/personality traits</li><li>Relevant areas of distress</li><li>Patient's reported current/recent symptoms and behaviors</li><li>Recent/current symptoms and behaviors observed by treatment team or collateral sources</li><li>*Mental Status Exam (MSE):* at intake or during the course of treatment – any variations</li><li>*Current Clinical Concerns:* diagnostic clarification needed, violation of boundaries, etc.</li></ul> |
| **Risk Factors:** | <ul><li>Severe impairment due to mental illness</li><li>SI/Self-harm behaviors</li><li>HI/Violence towards others</li><li>Victimization</li></ul> |

| | |
|---|---|
| **Functional Impairment:** (Assess the extent to which a mental illness impairs or limits a patient's psychological functioning capacity and daily activity) | *What's the nexus between their level of functional impairment and identified "flags" (i.e., CITs, MH staff referrals/staff observations, number of MHCB referrals/admits, treatment compliance, number of RVRs, recent disciplinary issues, relevant safety concerns)?*<br><br>➤ *Areas of assessment:*<br><br>• *ADL's* – ability to self-care: eating, personal hygiene, maintaining living environment, etc.<br>• *Social Functioning/Communication* – ability to interact with and be around others, tolerate large group settings, follow directives, navigate prison environment, level of distress tolerance, conflict resolution skills, ability to regulate both emotions and behaviors, etc.<br>• *Concentration/Comprehension* – ability to learn and retain new information to complete a task, understand and follow instructions<br>• *Housing Unit/Yard/Chow Performance* – ability to follow unit/program routines within the correctional environment, capability to function in institutional activities, etc.<br>• *Programming (i.e., Work, School)* – likelihood of deterioration or decompensation in a work-like setting (i.e., panic attacks, episodes of psychosis, and exacerbation of existing mental health symptoms<br><br>➤ *What is the frequency of impairment (i.e., daily, weekly, monthly, stressful event)?*<br>➤ *What is the severity of impact on day-to-day functioning?* |
| **Treatment:** (Are there specific interventions addressing the symptoms and behaviors impacting their functioning?) | • Medications prescribed and compliance<br>• Brief Summary of Active Treatment Plan/Treatment Objectives/Targets for Treatment<br>• Chosen modality/interventions – rationale for a particular treatment approach/"fit" between approach and patient's issues<br>• Long-term and short-term goals (i.e., goals included in the IPOCs)<br><br>*Monitoring of Treatment Outcomes*<br><br>• *Treatment Response:* level of engagement, treatment resistance, therapeutic relationship, major themes emerged |

| | |
|---|---|
| | ▪ Progress towards treatment goals and other signs of improvement<br>▪ Barriers to established treatment goals (i.e., substance use/abuse, illness, change of MHPC)<br>▪ *Prognosis:* probable outcome of treatment for current disorder/problems |
| **Recommendation:** (refer or not refer to HLOC) | What is the suggestion for the best course of action for the treatment team?<br><br>➢ Based upon the patient's functional impairment and mental health needs, what is the most appropriate setting (inpatient or outpatient) to address treatment needs?<br><br>    • Is a higher level of care needed, why or why not? |
| **Recommendation:** (for personality disordered patients) | Apply the criteria below in order to make a determination whether interventions may be necessary to meet treatment needs:<br><br>1. Is the patient appropriate for Acute/ICF/MHCB?<br>   a. Yes – Refer to inpatient.<br>   b. No.<br>2. If no to question #1, has the patient responded adequately to offered treatment?<br>   a. Yes – Category 1. The patient has clinically responded adequately to treatment within the existing MHSDS. No additional interventions indicated.<br>   b. No.<br>3. If no to questions #2, has the patient already been offered all clinically appropriate treatment available within the MHSDS?<br>   a. No – Category 2. Additional interventions indicated, specify.<br>   b. Yes – Category 3. The patient may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or at DSH. |
| **Rationale:** | ▪ Set of reasons or logical basis for recommendation of referring to HLOC/non-referral to HLOC |

Written Summary/Case Presentation Guide – Report Format

**Identifying Information:**

Name:
Age:
Gender:
Race:
DDP Designation:
Current LOC and Length of Stay:
Current MH Program Area (i.e, ASU EOP, ML EOP):

**Brief Overview of Mental Health History (hospitalizations, suicide attempts, prior diagnoses):**

**List of Patient Flags/Criteria Met in Phase I:**

**Presenting Problem (including patient's perception and observed presentation):**

*Primary diagnosis/"focus-of-treatment" diagnosis:*

*Secondary diagnosis/rule-outs/personality traits:*

*Patient's reported current/recent symptoms and behaviors:*

*Recent/current symptoms and behaviors observed by treatment team or collateral sources:*

*Relevant Mental Status Exam (MSE) factors from last or recent MSE:*

*Current Clinical Concerns (diagnostic clarification needed, violation of boundaries, etc):*

**Risk Factors:**
*Severe impairment due to mental illness:*

*SI/Self-harm behaviors:*

*HI/Violence towards others:*

*Victimization concerns:*

**Functional Impairment (assess the extent to which a mental illness impairs or limits a patient's psychological functioning capacity and daily activity):**

➢ *Areas of assessment:*
  ▪ *ADL's – ability to self-care: eating, personal hygiene, maintaining living environment, etc.*

- ▪ *Social Functioning/Communication* – *ability to interact with and be around others, tolerate large group settings, follow directives, navigate prison environment, level of distress tolerance, conflict resolution skills, ability to regulate both emotions and behaviors, etc.*

- ▪ *Concentration/Comprehension* – *ability to learn and retain new information to complete a task, understand and follow instructions*

- ▪ *Housing Unit/Yard/Chow Performance* – *ability to follow unit/program routines within the correctional environment, capability to function in institutional activities, etc.*

- ▪ *Programming (i.e., Work, School)* – *likelihood of deterioration or decompensation in a work-like setting (i.e., panic attacks, episodes of psychosis, and exacerbation of existing mental health symptoms*

➢ *What is the frequency of impairment (i.e., daily, weekly, monthly, stressful event)?*

➢ *What is the severity of impact on day-to-day functioning?*

---

**Treatment (are there specific interventions addressing the symptoms and behaviors impacting their functioning?):**

Medications Prescribed and Compliance:

Treatment Plan/Treatment Objectives/Targets for Treatment:

*Monitoring of Treatment Outcomes (level of engagement, treatment resistance, barriers to meeting treatment goals):*

*Prognosis: probable outcome of treatment for current disorder/problems:*

**Recommendation:** (refer or not refer to HLOC; for personality disorder patients what category does patient meet):

**Rationale for recommendation:**