ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE:  925-746-8460
FACSIMILE:  925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520- KJM-DB |
| Plaintiffs, | **JOINT STATEMENT RE: DEFENDANTS' CONSULTANTS' TOURS** |
| v. | |
| GAVIN NEWSOM, et al. | Judge:  Hon. Kimberly J. Mueller |
| Defendants. | |

19773623.1

JOINT STATEMENT RE: DEFENDANTS' CONSULTANTS' TOURS

## I. PLAINTIFFS' POSITION

In the midst of a dangerous, systemwide mental health staffing crisis so bad the State is facing millions of dollars in contempt fines, Defendants, without leave of Court, have "noticed" and initiated unprecedented, disruptive, and burdensome expert discovery: tours by their "retained experts" of every prison with MHSDS patients to "conduct a broader, systemwide study of the [MHSDS]" and evaluate whether Defendants will "take action to terminate or modify all or parts of this case … pending the experts' determination and recommendation(s)." Bien Decl., Ex. A. The experts intend to tour up to two prisons simultaneously each week, with 2-4 experts at each location, for 5-7 days a week and with events occurring around the clock, from July 2023 through the Spring of 2024. Plaintiffs seek an Order to postpone the tours until at least October 1, 2024, and to set reasonable limits on the scope, protocols, and schedule for any such tours in the future, including: prohibiting any contact with patients or observations of patient treatment outside the presence of Plaintiffs' counsel; prohibiting observation of one-on-one treatment; and requiring patient and staff consent to interviews, treatment and/or hearing observations.

### A. Defendants' Expert Tours Constitute Impermissible Discovery

Defendants have made clear that the results of their experts' study may be used in litigation. *See* Bien Decl., Ex. A. The Court, pursuant to its authority to regulate when, whether, and the extent to which discovery occurs, repeatedly has stated that discovery is closed, absent the Court's express authorization. Fed. R. Civ. P. 26(b)(1)-(2); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 958 n.6 (9th Cir. 2017); *In re Arizona*, 528 F.3d 652, 655 (9th Cir. 2008); *see* Aug. 4, 2021 Status Conf. Tr., ECF No. 7267 at 7; Aug. 14, 2019 Order, ECF No. 6242 at 3; Sept. 20, 2018 Order, ECF No. 5928 at 12.

Nonetheless, Defendants have not sought Court permission to conduct the tours nor moved to reopen discovery as required by rules of this Court. *See* Civ. L.R. 251. They should not be permitted to proceed without Court authorization and clear parameters for the scope and schedule of the tours. Specifically, Defendants' experts should not be allowed to interview patients, observe mental health treatment, or have any other contact with class members, because of the disruption these events cause to the delivery of patient care—currently a rarity in many prisons—

as well as the burden on institutional staff, the Special Master, and Plaintiffs' counsel, who cannot and will not agree to any communication with their clients outside of their presence.  Defendants have not identified what information their experts seek to obtain through patient interviews and observation of patient treatment, nor explained why they cannot obtain it through other, less-burdensome means, such as by reviewing data and reports and anonymized patient records, interviewing staff, and touring facilities without patient contact or observation.  Fed. R. Civ. P. 26(b)(2)(c)(i).  They have also not identified why their own CQIT process—which Defendants spent years developing and which the Court has identified as the appropriate way for Defendants to end court oversight—is not sufficient for "self-evaluation."  *See* ECF No. 6846 at 10, 24.

### B. The Court Must Set Limits on The Scope and Schedule of the Tours.

Plaintiffs' counsel did not learn until the Friday before the first tours began that Defendants' experts intended to observe patients' mental health treatment, including 1:1 clinical contacts, and only received a few weeks' notice that the experts would be splitting up and intended to conduct patient interviews.  Bien Decl. ¶¶ 10-11, Exs. B, D.  All of these were departures from the tours conducted by the same experts in Fall 2021, and were not disclosed in Defendants' April 2023 letter noticing their intent to resume tours.  *Id.* ¶ 6.  Indeed, Defendants provided less than a months' notice of their intent to spend 58 days touring only 5 of the 28 MHSDS prisons in July and August alone – and just days before tours commenced announced their intent to keep that pace up at least through the end of the year, while refusing to provide any further scheduling information beyond their plan to tour every prison with a MHSDS program by Spring 2024.  *Id.* ¶ 4 & Ex. C.  This pace and scope too was a dramatic departure from the experts' Fall 2021 tours, during which they spent a total of only 13 days touring 15 prisons.  *Id.* ¶ 6.  As a result, Plaintiffs' counsel has had to scramble to arrange coverage for the tours, including by roping in attorneys who do not normally work on the case, and attempt to negotiate some temporary limits in order to uphold their ethical duties to their clients and ensure Plaintiffs' counsel's ability to defend against any motion in which the expert evidence is used.  *See* Order, Apr. 5, 2013, ECF No. 4539, at 22; Bien Decl. ¶ 8; Cal. Rule Prof. Conduct 4.2.  Defendants have also continuously changed the tour schedules or failed to provide adequate notice about the timing of the tours, and have generally not

provided an advance daily schedule of the planned treatment observations, and which experts would be observing what.  *See* Bien Decl. ¶ 20; Spector Decl. ¶ 3; Nolan Decl. ¶¶ 6-9; Tolman Decl. ¶¶ 6-7, 9, Trapani Decl. ¶¶ 4-6; Yelin Decl. ¶¶ 3, 6, 8; Xu Decl. ¶¶ 5-6; Jackson-Gleich Decl. ¶¶ 5-11.  These burdensome practices have undoubtedly strained and will continue to strain the Special Master's resources as well during a time in which he is reporting extreme deficiencies in care.  And Defendants are simply wrong to claim the current tours are run-of-the mill for this case because the Special Master attended the Fall 2021 tours – in fact, this Court ordered him not to.  *See* Aug. 4, 2021 Status Conf. Tr., ECF No. 7267 at 25-26; *see also* Bien Decl. ¶ 6.

Plaintiffs' counsel do not consent to any contact with their clients outside of their presence.  And given the interference with treatment caused by having so-called "silent" outsiders observe, *see, e.g.*, Tolman Decl. ¶¶ 16-17; Xu Decl. ¶¶ 11, 15, 18; Jackson-Gleich Decl. ¶¶ 15, 18, Plaintiffs' counsel strongly object to any observation of mental health treatment, especially in light of the very limited treatment many patients currently receive.  *See, e.g.,* ECF No. 7715 at 78; ECF No. 7716 at 48; ECF No. 7833 at 42-43, 51-52.  If the experts are permitted to observe any treatment events, they should be limited to treatment that is not one-on-one, and they should be prohibited from observing outside the presence of Plaintiffs' counsel.  Defendants' intention to have several experts on each tour, separately observing treatment and/or speaking with patients, with two simultaneous tours per week, often scheduled for seven days in a row, makes it difficult for Plaintiffs' counsel to staff the tours at all, and impossible to ensure sufficient coverage to accompany each expert.  This is especially true given the other important work Plaintiffs' counsel must do contemporaneously to protect their clients' rights, including preparing for the upcoming contempt trials and continuing work on the data remediation process given the impending December 31, 2023 deadline.  *See* Feb. 28, 2023 Order, ECF No. 7741; Mar. 27, 2023 Order, ECF No. 7786; June 12, 2023 Order, ECF No. 7856; *see also* Apr. 22, 2022 Order, ECF No. 7541.

If the tours are allowed to proceed, the Court should set limits on them, including: (1) pausing all tours until at least October 1, 2024, and/or after the conclusion of the contempt trials; (2) prohibiting Defendants from scheduling two tours simultaneously; (3) requiring that the start and end time of each day of the tour be provided to Plaintiffs' counsel and the Special Master

Team at least 7 days before the start of the tour; (4) prohibiting Defendants' experts from observing any patient treatment or staff interaction with patients outside the presence of Plaintiffs' counsel; and (5) requiring Defendants to negotiate with Plaintiffs' counsel the time, place, and manner of any portions of their expert tours that involve contact with *Coleman* class members. These limits are necessary for Plaintiffs' counsel to be able to oppose adequately any future motions to alter or terminate the Court's remedial orders and protect their clients' rights, and will also ensure that the factual record regarding what the experts observed is clear.

### C. The Court Should Prohibit Observation of One-on-One Treatment

In addition to any other limits imposed by the Court or negotiated with Defendants, the Court should prohibit Defendants' experts from observing in person one-on-one mental health treatment. One-on-one treatment provides a private, confidential environment that fosters open and honest communication between the patient and mental health clinician. The Special Master's monitors and experts do not observe one-on-one treatment during their monitoring tours.

Given the severe staffing shortages at many prisons, patients currently receive far less than the Program Guide-mandated level of individual treatment. *See e.g.*, ECF No. 7715 at 78. Allowing Defendants' experts to observe confidential individual treatment will harm patients and interfere with clinicians' ability to provide care. Even patients who have consented to observation of their *group* treatment sessions have reported that being observed changed the content of the session. Xu Decl. ¶ 15. And Defendants' experts have been observed interrupting and participating in treatment events, including 1:1s when Defendants allowed their experts to observe over Plaintiffs' counsel's objections. *See, e.g.*, Tolman Decl. ¶ 16. Even if patients consent, the Defendants' experts' presence may lead patients in 1:1 sessions to withhold information, discuss different issues, answer clinicians' questions differently, or end the session early. The Court should not allow Defendants to introduce another potential barrier to this essential treatment in service of their overarching litigation strategy.

That Plaintiffs did not object to Dr. Penn's limited observation of telepsychiatry appointments is immaterial to the current dispute. Dr. Penn's observations were time limited, conducted during active litigation of a dispute overseen by the Court, and were to evaluate a new

1  *mode* of delivering psychiatric care.  Xu Decl. ¶¶ 26-28.  They were also less intrusive to the
2  treatment process because he was not in a confidential live setting meant only for a patient and the
3  clinician.  *Id.* ¶¶ 26, 28.  Here, Defendants have not identified what information they seek from
4  observing one-on-one appointments and why they cannot obtain it through other means.

5          **D.**       **The Court Should Require Informed Consent**

6          The Court should require Defendants to obtain informed consent from *Coleman* class
7  members before Defendants' experts may interview them or observe their mental health contacts.[1]
8  Ensuring that Defendants' experts interview and observe only patients who are capable of
9  consenting and who do consent is critical to protect their rights.  Patients have the right to refuse to
10 participate in interviews that might later be used against their interests in the litigation, including
11 to reduce the amount and type of care provided to them, and patients may be uncomfortable
12 participating in group treatment, IDTTs, mental health screenings, or ICCs while Defendants'
13 experts observe them.  The consent process must fully and clearly notify patients that the experts'
14 evaluation may be used in litigation, and provide patients with notice of their right to opt out.
15 Defendants agreed to the temporary use of an oral consent to be read to patients prior to expert
16 observations starting the week of July 17, and many patients did refuse, showing that an informed
17 consent process works and is necessary.  Bien Decl. ¶¶ 15-16; Tolman Decl. ¶¶ 16, 21; Jackson-
18 Gleich Decl. ¶ 14; Trapani Decl. ¶ 7; Spector Decl. ¶ 5; Yelin Decl. ¶ 7; Xu Decl. ¶¶ 13, 17, 20.
19 The Court should require Defendants to negotiate the form of consent with Plaintiffs, and it must
20 at a minimum explain that the purpose of the study is to evaluate the Program, and that the study
21 may be used to modify or terminate the Court's orders.  Finally, all clinical staff whose treatment
22 events are to be observed must also be told in advance about the purpose of the expert study and
23 their right to refuse the observation, in order to protect the exercise of their clinical judgment
24 about whether an observation might negatively impact their patient's treatment or whether their
25 patients are incapable of giving consent.  *See* Yelin Decl. ¶ 7; Xu Decl. ¶ 21.

26
27

---

28 [1] Defendants have raised the question of whether informed consent should become a standard practice on future tours.  The Court need not resolve this question at this time.

## II. DEFENDANTS' POSITION

Contrary to the long history in this case of how tours have been conducted, Plaintiffs seek to stop altogether or delay Defendants' tours and impose restrictions on how the tours are conducted. In 2020, Defendants informed this Court, Plaintiffs, and the Special Master (OSM) of VRJS/Falcon's retention and the details of the project. ECF 6853 at 33:5-7 & 6855-1 at ¶ 1. In 2021, tours were conducted with Plaintiffs' counsel and the OSM present. In April 2023, Plaintiffs' counsel and the OSM were notified that VRJS/Falcon would "conduct a broader, systemwide study of the Mental Health Services Delivery System," (MHSDS) which "*will likely include on-site visits in the future – currently estimated to begin in July 2023.*" Decl. McClain ¶ 2. (emphasis added). Without objection, Plaintiffs' counsel said they would attend. *Id.*

VRJS/Falcon endeavored to conduct their tours in a similar fashion as those conducted by the OSM and previously by Plaintiffs' counsel's expert(s), including by observing group and individual treatment sessions, touring areas where mental healthcare is delivered, and speaking with clinical staff where appropriate. *Id* at ¶ 9. They also planned to interview patients at each institution which is a critical component of their review and is standard practice in similar evaluations of other systems. Decl. Falcon ¶¶ 7, 9.

After meeting and conferring on several issues pertaining to the VRJS/Falcon tours, Plaintiffs' counsel agreed that class member interviews could proceed with certain limitations, refused to agree to silent observations of 1:1 treatment, and agreed to silent observation of group treatment and other non-confidential meetings and encounters so long as a written script was read to obtain the patients' verbal informed consent. Decl. McClain ¶ 8. None of these limitations have ever been imposed during other prison tours in this case, even those previously conducted by Defendants' experts. *Id* at ¶ 9. Plaintiffs are now retracting the parties' prior agreements and seek to impose limitations that have not previously been imposed in this case for *any* tour and threaten to derail VRJS/Falcon's work—without any citation to any authority.

### A. VRJS/Falcon's tours do not require Court permission and do not constitute impermissible discovery.

Plaintiffs contend that Defendants need court permission before their consultants can tour

prisons as part of their evaluation of CDCR's MHSDS. But there is no order in this case requiring Defendants to pre-clear a self-evaluation of their own system. Defendants have a responsibility to "self-monitor, and as necessary, self-correct inadequacies in the delivery of mental health care." ECF 6846 at 10. The "self" in self-monitoring would be defeated if VRJS/Falcon cannot tour and observe the provision of mental health care.

Further, Plaintiffs agreed to attend and observe the tours *without objection*. Despite having notice of the VRJS/Falcon tours since April 2023, Plaintiffs never moved the Court for an order enjoining the tours from going forward on any ground—including that Defendants needed Court permission to conduct a self-assessment of their own MHSDS, or that the tours constituted impermissible discovery. Thus, these objections were forfeited the moment Plaintiffs agreed to attend the tours and began imposing their conditions on how the tours should be conducted.

Additionally, this Court has never ruled that self-monitoring tours (particularly where Plaintiffs' counsel are present) constitute impermissible discovery. *Cf.* ECF 5774 at 3:2-7 (ruling that that self-monitoring tours *without* Plaintiffs' counsel present may open the door to *future* discovery). Defendants are not aware of any rule or decision enjoining their ability to engage expert consultants to self-monitor their own MHSDS. Indeed, the OSM has not suggested the tours were improper because Court approval had not been obtained.

Finally, it should go without saying that fact development (even in litigation) does not necessarily constitute discovery as defined in the FRCP. *See, e.g., Doe v. Eli Lilly & Co., Inc.*, 99 F.R.D. 126, 128 (D.D.C. 1983) ("while the [FRCP] have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the *ex parte* interview of a witness who is willing to speak"). Defendants are head and shoulders above the interviews contemplated in *Eli Lilly* because they are not *ex parte*. Any patient interviews will only be conducted in Plaintiffs' counsel's presence and with the patient's consent. Thus, the Court should reject the suggestion that Defendants are conducting impermissible discovery.

**B.  The timing, schedule, and scope of the tours.**

Plaintiffs were given advance notice of the prison tours, provided tour schedules

available to date, agreed to send representatives (but are not obligated to do so), and informed of the scope, purpose, and length of the tours. Decl. McClain ¶¶ 2, 3, 5. Significant coordination and planning is required to create VRJS/Falcon's tour schedules, and Defendants are working hard to provide Plaintiffs and the OSM at least four weeks' advance notice of the tour schedule (sometimes even longer) consistent with the common practice in this case. *Id* at ¶ 11. And while Plaintiffs complain Defendants have generally not provided an advance daily schedule and start/stop times, this has never been the practice in this case, including by the OSM team. *Id.* Any attempt by Plaintiffs to postpone or terminate the tours moving forward would have a detrimental impact on VRJS/Falcon's ability to complete the project; the dozens of experts who are working on this project have set aside other obligations to make time for this project, and cannot be expected to simply delay this work indefinitely or even for a few months. Decl. Falcon ¶ 5.

Neither the OSM nor Defendants have expressed any timing or bandwidth concerns related to the upcoming contempt proceedings, or the impending data remediation deadline. That Plaintiffs may be inconvenienced by the confluence of these events does not justify enjoining the tours, particularly given that Plaintiffs' Quarterly Statement for Q1 2023 included time billed by 45 billers across two firms. ECF 7858 at 4-5. Although tours are inconvenient, they are a necessary part of this case, and to the extent there is any prejudice on preparing for the upcoming proceedings, it is borne equally by both sides with no added burden on the Court.

**C.     What may VRJS/Falcon observe during the tours, and under what circumstances.**

Observing patient care is an important component of evaluating CDCR's MHSDS—as Plaintiffs have recognized—and consistent with prior tours in this case. In 2018, Plaintiffs filed a motion regarding future prison tours and requested an order mandating that all onsite expert tours be conducted in the presence of counsel for all parties. ECF 5764 at 9-14. Although the Court denied their request, Plaintiffs admitted the following: "*it is unclear how the experts could be expected to [conduct an analysis] without ever observing the care provided.*" ECF 5764-1 at 12:24-13:4 (emphasis added). Thus, Plaintiffs recognize the value of observing patient care.

Now, five years later, Plaintiffs seek to block VRJS/Falcon from silently observing 1:1

treatment and insist on new restrictions for other encounters, despite Defendants' expert's prior observation of 1:1s and Defendants' offer to allow Plaintiffs' counsel and an OSM expert to sit in the room during the 1:1 treatment (without defense counsel present), and agreement that the treating clinician obtain patient consent for the observation. Decl. McClain ¶¶ 8, 12.

Plaintiffs' objections would eliminate an important element of CDCR's self-evaluation of its MHSDS, and their proposed limitations on treatment observation are arbitrary, clinically unnecessary, and inconsistent with standard practices in other jurisdictions. Decl. Falcon ¶ 7. While some information can be captured through discussion with clinicians and chart reviews—which they have done—this alone is insufficient. *Id.* VRJS/Falcon needs to review the systems in place and the quality of the process—in other words, the quality of the *delivery* of care. *Id.*

Moreover, both Dr. Penn (Defendants' expert) and members of the OSM team observed 1:1 telepsychiatry treatment recently as part of an evaluation of CDCR's telepsychiatry policy. Decl. McClain ¶ 12. Plaintiffs took no issue then, and were even present during Defendants' expert's observation. *Id.* It is uncertain why this practice is suddenly objectionable now, but to use Plaintiffs' own words, it is unclear how the experts could be expected to opine on CDCR's MHSDS "without observing the care provided." ECF 5764-1 at 13:2-4.

**D.     What disclosures must be provided and what form of consent should be required to interview and observe mental health treatment.**

The OSM's expert tours regularly include observations of the following types of encounters, to which Plaintiffs' counsel have never objected nor required informed consent: IDTTs; Mental Health Treatment Groups; R&R Nurse Screens; Crisis Intervention Team contacts; Urgent and Emergent Referral Assessments; Pre-ASU Screening; Alternative Housing Assessments; ICCs; Huddles; and, Psych Tech Rounds. Decl. McClain ¶ 9. Notwithstanding this prior practice, Plaintiffs' counsel are now requiring VRJS/Falcon to obtain verbal informed consent before observing these encounters. Defendants are perplexed by Plaintiffs' new requirement since Defendants are not aware that such demands have been made in prior prison tours in this case, including the staffing tours previously conducted by VRJS/Falcon (which included observation of IDTTs). *Id.* Thus, neither disclosures nor informed consent should be

required during the ongoing tours unless the Court orders them for all tours going forward (including OSM tours, and tours conducted by experts and consultants for both sides). Otherwise, stakeholders would be held to inconsistent and unfair obligations thereby violating "basic notions of equity and reciprocity." *See* ECF 5764-1 at 14:9-12 (Plaintiffs arguing to the Court that the parties should be held to the same standards in how prison tours are conducted).

Nonetheless, Defendants agreed to certain limitations to permit VRJS/Falcon to silently observe certain forms of group treatment and conduct patient interviews. Regarding interviews, the parties agreed: (1) Plaintiffs' counsel may meet with their clients privately before the interviews; (2) Plaintiffs' counsel would be present at patient interviews while Defendants' counsel would not; and, (3) interviews would be recorded, with recordings being preserved and provided within two business days. Decl. McClain ¶ 7. Regarding group treatment and other observations, the parties agreed that VRJS/Falcon could silently observe group treatment, IDTTs, huddles, R&R screens, pre-ASU screening, ICCs, and psych tech rounds where verbal consent is obtained. *Id* at ¶ 8. The parties negotiated[2] an informed consent script to permit observations, though a script has never before been used in this case and this particular script has proven to be intimidating and confusing to patients and clinicians. Decl. Falcon ¶ 10; Decl. McClain ¶ 10. If a script is required, it should be simplified as set forth in the Declaration of Dr. Falcon. *Id.* at ¶ 10.

## CONCLUSION

The Court should reject Plaintiffs' improper request to enjoin Defendants from engaging in a self-review of their MHSDS. Defendants' evaluation of their system is consistent with past practice in this case and the practice of prison monitors across the nation. Nor should this evaluation be delayed, where Plaintiffs' counsel are amply staffed and a delay would detrimentally impact the consultants' work. Should the Court issue any order enjoining any aspect of these tours, Defendants request that the Court stay such order pending further review.

---

[2] Plaintiffs agreed to an informed consent script but their approval was subject to change.

# DEFENDANTS' CERTIFICATION OF ORDERS REVIEWED

Defense counsel certify they have reviewed the following orders: ECF Nos. 5774, 5783, 5786, 6846, and 7880.

DATED: July 25, 2023

ROB BONTA
Attorney General of California

By:    */s/ Damon McClain*
DAMON MCCLAIN
Supervising Deputy Attorney General
*Attorneys for Defendants*

DATED: July 25, 2023

HANSON BRIDGETT LLP

By:    */s/ Samantha Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
Attorneys for Defendants

# PLAINTIFFS' CERTIFICATION OF ORDERS REVIEWED

Plaintiffs' counsel certifies that he reviewed the following orders relevant to this filing: ECF Nos. 7856, 7786, 7741, 7541, 6846, 6242, 5928, 4539.

DATED: July 25, 2023

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:    */s/ Michael Nunez*
Michael Nunez

Attorneys for Plaintiffs