Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:   925-746-8460
Facsimile:   925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.<br><br>    Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DECLARATION OF ELIZABETH FALCON, PSY.D., IN SUPPORT OF DEFENDANTS' PORTION OF JOINT STATEMENT REGARDING TOUR DISPUTE**<br><br>Judge:   Hon. Kimberly J. Mueller |

I, Elizabeth Falcon, Psy.D., declare as follows:

1. I am a Clinical, Correctional and Forensic Psychologist, and a Certified Correctional Healthcare Professional specializing in Mental Health (CCHP-MH), with over 20 years of experience. I am a nationally recognized expert in behavioral health program strategy and innovation in jails and prisons across the country. I have worked with over 200 facilities across 27 states to develop, implement, restructure, monitor, and manage jail and prison mental health programs. I lead field experts in the implementation of evidence-based models and best practices in jails and prisons nationwide. I hold expertise in: mental health program development for jails and prisons, suicide prevention, evidence-based programming for justice involved people with serious mental-illness, specialized programming for segregated incarcerated persons, restoration of competency, inpatient and outpatient programs, community reintegration, policy development, and specialized assistance to facilities and systems in class action litigation. Specifically, I have worked with large consent decree facilities, and those undergoing settlement agreements: the Sacramento County Jail (CA), the Baltimore City Pretrial Complex (MD), Bernalillo County Metropolitan Detention Facility in Albuquerque (NM), and Maricopa County Detention Facilities in Phoenix (AZ). I have evaluated or currently am evaluating mental health, psychiatric, and security programs and systems, in several Department of Corrections, some of which are undergoing litigation, including: the Massachusetts Department of Correction (MADOC), the Louisiana Department of Corrections (LADOC), the Washington Department of Corrections (WADOC), and the Arizona Department of Corrections Reentry and Rehabilitation (ADCRR) beginning August 24, 2023. I am also currently the lead Court Monitor for the Alabama Department of Corrections in *Braggs v. Hamm,* Federal District Court for the Middle District of Alabama, Case No. 2:2014cv00601. I have trained and taught hundreds of healthcare and security staff in various correctional mental health and crisis intervention topics and have served as a keynote or plenary speaker for many industry audiences on such topics as: suicide prevention, managing high-risk populations, segregation and restrictive housing. I am a member of the American Correctional Association, and the International Corrections and Prisons Association,

and have been a speaker with the National Commission on Correctional Healthcare. I work closely with many more corrections organizations, as well as the Department of Justice, National Institute of Corrections as a high-level Technical Resource Provider.  In 2017, I formed a company, Falcon Correctional and Community Services, Inc. (Falcon Inc.) and brought together the most distinguished and credentialed experts and leaders in correctional behavioral health, healthcare and correctional practice and administration. With hundreds of years of collective experience and hand-picked from across the nation, these experts are former and current operators, high-level clinicians, providers, administrators, and industry leaders, each steeped in evidence-based practices. The collective knowledge and know-how of these experts form an unrivaled data and skill-set warehouse, designed to assist jurisdictions in addressing their unique problems and challenges in their systems. My comprehensive skills, credentials, training, and expertise are a unique combination, not readily available in many correctional healthcare executives.  As both a senior clinician and senior executive, I have honed my skills and understanding of the correctional healthcare environment to create a modern, data-driven and best-practice based approach to my company's work and work products (Attached as Exhibit A is a true and correct copy of my curriculum vitae).

2. In October 2020, my company, Falcon, Inc., was engaged along with Voorhis Robertson Justice Services (VRJS) by the State of California to perform a staffing analysis and study. The focus of this study was on the provision of mental health services and treatment for CDCR patients, specifically evaluating CDCR's mental health staffing levels and patient-to-provider staffing ratios.  VRJS/Falcon formed a multi-disciplinary team of mental health, medical, security operations experts and industry leaders from across the country to independently assess and objectively address the following inquiries:

- Does CDCR's mental health program meet or exceed industry or nationwide standards?  Does CDCR's delivery of care meet or exceed industry or nationwide standards?
- Considering the changed circumstances in the delivery of mental health care in

prisons since 2009, does the 2009 Staffing Plan need updating? If it does, what does updating look like for the mental health staff in each facility?

- How does CDCR's program and delivery of care compare to the group of Departments of Correction used in the development of 2009 staffing ratios?
- What does VRJS/Falcon see as alternate ideas/plans for mental health staffing positions or a combination of positions which are needed to meet the requirements of the Program Guide?

3.  To answer these questions, the VRJS/Falcon team utilized a multi-method approach that involved document reviews, data collection and analysis, literature reviews, standardized interviews of CDCR personnel, standardized patient chart reviews, standardized facility tours, a study of selected states navigating similar litigation, evaluation of CDCR's Mental Health Services Delivery System (MHSDS) Program Guide (2020 and 2021) Revisions and 2009 Staffing Plan, evaluation of nationwide standards (i.e., National Commission on Correctional Healthcare, American Correctional Association, etc.), and analysis and formulation of data. The study ran for a period of 18 months (from October 2020 to March 2022).

4.  On August 26, 2022, VRJS/Falcon issued a memorandum sharing the results of our study. VRJS/Falcon found that CDCR's Program Guide exceeds nationwide standards and that staffing levels required by the Program Guide exceed national consensus standards and exceed the levels needed for providing clinically adequate care for patients in a correctional setting. VRJS/Falcon also found, however, that an additional study was warranted to determine how services are implemented and delivered on-site. VRJS/Falcon recommended that "CDCR undertake a broader, systemwide study of mental health care delivery to more fully understand how services are delivered, the quality of care delivered, and how Program Guide requirements are conducted on site. We also recommend assessing how this delivery of care compares to nationwide standards, community standards, and other similar State Departments of Correction." (Aug. 26, 2022 Memorandum at p. 3.) A true and correct copy of this memorandum is attached as **Exhibit B**.

5.      Consistent with our August 2022 recommendation, CDCR retained VRJS/Falcon to conduct a broader, systemwide study of CDCR's Mental Health Services Delivery System.  In order to conduct this evaluation, VRJS/Falcon hired a diverse array of experts (approximately 30) with hundreds of years of collective correctional experience and range in areas of expertise from behavioral health, psychiatry, security, operations, nursing, programming, staffing, and data analytics.  These experts are nationally recognized leaders in the industry, many are published and renowned industry presenters with a strong commitment and passion for justice involved individuals, especially those living with serious mental-illness.  They are currently or have previously served as Directors or Chiefs of Mental Health and Psychiatry services for departments of correction; clinicians within state or federal prisons or county jails; and security and operational experts, such as former Directors, Commissioners or Deputy Directors.  All experts are busy and are in extremely high demand, especially those with part-time and full-time jobs.  All cleared their schedules months ago for the appointed dates given to us to accommodate this important work, which will benefit *all* stakeholders.  The coordination and orchestration of this team and methodology has been a massive logistical undertaking.  In short, any substantial delays or indefinite timelines to continue the tours will significantly impact VRJS/Falcon's ability to complete our evaluation, and VRJS/Falcon may potentially lose our expert pool as they may or may not be available following the delay.  The process through which we are now engaging with our analysis is at a critical juncture where the integration of "practice" data is important to our momentum going forward. Undoubtedly, delays of several weeks or more will have detrimental effects on this study, resulting in diminished availability of experts and compromising the integration and completeness of the data collection.

6.      This study requires our team to complete the following:

- Review of data;
- Survey of national and state standards;
- Data validation;
- Interviews of CDCR employees;

- Chart reviews; and
- Facility studies, including patient interviews and treatment observation.
- Comparing and contrasting our findings to best practice approaches as indicated by research and the lived experience of our experts in the correctional environment.

VRJS/Falcon team of experts have diligently immersed themselves in extensive research, meticulously reviewing vast amounts of data, including an extensive analysis of over 1200 charts. After devoting approximately eight months to the development of a scientifically validated tool methodology, we have successfully established an impartial and independent framework for studying CDCR's MHSDS and its facilities. With this groundwork in place, our team of experts is poised to engage firsthand, observations of service implementation. This will enable them to fully refine and solidify their expert impressions.

7. Part of this study necessarily includes patient interviews at each institution, which is a critical component of this review and is standard practice in similar evaluations I have conducted of other systems. Another important component of a comprehensive quality study within CDCR's MHSDS is observing 1:1 patient assessments and treatment. Direct observation of the care delivery process holds immense importance as it serves as a potential confirmatory mechanism to assess whether the intended work aligns with the actual practice implemented (work imagined vs work done). This approach not only sheds light on any existing barriers but also helps uncover potential opportunities for improvement. However, it should be noted that chart reviews and provider interviews alone cannot provide a comprehensive understanding of the systems and the quality of care being delivered. To fully comprehend the quality of care, it is essential to assess the systems in place and the actual process, and the quality of the *delivery* itself. The objective is not limited to capturing the content of treatment discussions, as this information is readily available in the patient's chart.

8. To make this clearer, the following are sample questions from our Facility Studies tool that we attempt to answer regarding 1:1 treatment processes:

- Is there a system in place for psychiatric 1:1 routine follow-up visits?

- Is there a method of scheduling routine follow-up visits to ensure contacts are done per required timeframes?
- Was there adequate and available treatment or office space to conduct the 1:1 session?
- Was the space private and confidential?
- Was the evaluation done by a psychiatrist?
- Did the psychiatrist review patient information in CERNER/SOMS before the evaluation?
- Did the psychiatrist determine if any language or other communication barriers exist? If yes, how was it addressed?
- Did the psychiatrist introduce themselves?
- Did the psychiatrist explain the reason for the evaluation?
- Did the psychiatrist ask permission to complete the evaluation?
- Did the psychiatrist attempt to educate the patient on the benefits of his/her participation?
- Did the psychiatrist attempt to develop a good rapport with the patient?
- Was there an appropriate psychiatrist contact evaluation form (examine form as applicable)?
- Did the psychiatrist ask the questions that would elicit a response (i.e., open-ended, nonjudgmental, expressing empathy)?
- Did the psychiatrist ask all the questions on the form?
- Were the questions asked in a reasonable pace?
- When/if applicable, did the psychiatrist ask follow-up or clarifying questions?
- If applicable, did the psychiatrist appear to observe remarkable nonverbal behaviors of the patient?
- If urgent or emergency intervention/referral was needed, did the psychiatrist ensure the patient's safety while awaiting consult?

- Did the psychiatrist educate the patient on his/her mental health findings and treatment plan?
- Did the psychiatrist educate the patient on access to care and next steps?
- Other observations?

While the answers to the first three questions above can be obtained by interviewing or speaking with the treating clinician, the remaining questions can only be answered through observation of the treatment-session process.

9. The VRJS/Falcon team and I believe that patient interviews and 1:1 assessment and treatment observations are essential pieces of our study. Ultimately, our goal is to provide a comprehensive response to all questions that is inclusive of both research and practice data. Having access to only group-treatment sessions and no access to observe the essential clinicians and providers, would render the evaluation incomplete and would preclude VRJS/Falcon's expert consultants from formulating a fully informed opinion on CDCR's delivery of mental healthcare. Furthermore, the number of 1:1 sessions and interviews required to be observed to satisfy our methodology has been carefully selected based on methodological requirements to represent all facilities and all levels of care in the MHSDS. It is critical that we adhere to our protocol to ensure the most valid and reliable data are obtained.

10. As I stated earlier, I personally and those who work for my company have been employed by scores of other jurisdictions – jails and state prisons alike – across the country to conduct neutral evaluations of their delivery of mental health services. My experts have practiced as clinical supervisors, regional administrators, facility and statewide leadership, quality assurance specialists, surveyors and expert witnesses in many arenas—and I and my experts have never heard of, nor personally experienced, the types of limitations that Plaintiffs' counsel are seeking to impose here – including exclusion from silently observing 1:1 treatment, demanding written informed consent, and requiring a written script for verbal informed consent, among other things. In fact, I obtained feedback from our highest-level experts assigned to this project called the Formulation Team. In addition to serving as senior clinicians and administrators, Chiefs of

Mental Health or Psychiatry, representing well over a dozen department-of-corrections, these experts have served in evaluative roles, conducting surveys for The Joint Commission on Accreditation of Healthcare Organizations, ACA, NCCHC and providing technical assistance to prison systems which all relied upon observation of care delivery processes. It is our consensus that:

a) It is common for outside clinicians to observe 1:1 treatment, including for training or evaluative purposes. The American Medical Association Code of Medical ethics, section 3.1.2 *Patient Privacy and Outside Observers to the Clinical Encounter* confirms this process and states its conditions.[1] The consideration of clinician experience, as well as the patient experience in health care delivery, is in line with the core tenets of the widely accepted Quadruple Aim of healthcare.[2] Observation of treatment processes allows for these components to be considered and added to a full formulation of system performance.

b) It is a common and accepted practice to observe 1:1 treatment to develop formulations for accreditation, licensure, or certification within healthcare. Within correctional health care, the National Commission on Correctional Healthcare (NCCHC) and the American Correctional Association (ACA) incorporate observation of 1:1 services into assessments for accreditation. Outside of jail and prison settings, the Commission on Accreditation of Rehabilitation Facilities (CARF) and the Joint Commission (TJC) utilize on-site surveys as part of the quality assurance and accreditation process to include observation of organizational practices and observations of those providing care.[3]

c) When outside clinicians silently observe the 1:1 or any treatment process, it is also common practice for the treating clinician to obtain *verbal* consent from the patient for

---

[1] AMA Principles of Medical Ethics- I, IV, VIII, available at https://code-medical-ethics.ama-assn.org/sites/default/files/2022-08/3.1.2.pdf, last accessed on July 23, 2023.
[2] Sikka R, Morath JM, Leape L. BMJ Qual Saf 2015; 24:608-610, available at https://qaulitysafety.bmj.com/content/24/10/608, last accessed on July 23, 2023.
[3] Available at https://www.carf.org/Accreditation/AccreditationProcess/ and https://www.jointcommission.org/who-we-are/facts-about-the-joint-commission/joint-commission-faqs, both last accessed on July 25, 2023.

1  the observation without the use of a written script or need for written consent. As
2  mentioned before, it is not our experience that a written consent or a script is required.
3  It is our consensus and experience that when obtaining consents, it is verbal. The
4  communication is basic, simple and concise as to not intimidate, exacerbate symptoms
5  or destabilize the patient. For example, it can contain: 1) who the observers are and
6  purpose 2) explains the patient is able to terminate the observation at any time 3)
7  obtaining acknowledgement of patients understanding and approval. This type of
8  consent is standard in system-wide analyses, compliance reviews or audits, as well as
9  training for new clinical staff. VRJS/ Falcon's approach to treatment observations is
10 very similar to previous experts who have observed CDCR's treatment services, who
11 from our understanding were only required to obtain a simple verbal consent.

d) In this case, we understand the need to utilize a script to ensure consistency with each treating clinician obtaining consent. However, the current script – which I understand was drafted initially by Plaintiffs' counsel and revised by Defendants' counsel (but without clinician input) – is, in our opinion, intimidating, confusing and perhaps even leading the inmate-patient to decline. As suggested before, it's important to keep communication simple and basic as to not confuse, exacerbate or even destabilize the patient. For the patient and for the integrity of the study, the script must remain neutral. I believe the following language would comply with these important mandates: "These experts have been engaged by CDCR to evaluate CDCR's mental health services. They would like to silently observe your appointment today. You can decide whether to allow them to observe or not, and you can change your mind at any point. Do you have any questions? Would you like to give permission for the experts to observe your appointment?"

11. As an important side note, VRJS/Falcon has established a Business Associate Agreement with CDCR to maintain the protection of Patient Health Information (PHI) and HIPAA compliance, as is a common Falcon, Inc. practice when we evaluate mental health and healthcare

services for other jail or prison systems.

12. In conclusion, the primary objective of this study is to gain a comprehensive understanding of the mental health systems and the day-to-day delivery of services within the CDCR. This involves a wide-ranging assessment that extends beyond the simple review of policies, procedures, chart reviews, dashboards and reports. Direct observations of services, assessments and interventions are integral components of this process. To ensure credibility of our findings, we have relied on evidence-based research, community, and correctional standards of practice, as well as the extensive expertise of professionals in various correctional fields. This collective knowledge has enabled us to establish robust procedures for data collection, analysis and drawing informed inferences. The conclusions derived from this study will offer an unbiased and objective assessment of the functioning of CDCR's MHSDS at both the systemic and facility levels, allowing for meaningful comparisons to external correctional and community standards. It will also provide valuable feedback on the initial study questions being posed with the intention of ultimately benefiting inmate-patients and staff who work within this complex correctional healthcare system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Peoria, Illinois on July 25, 2023.

*/s/ Elizabeth Falcon*
Elizabeth Falcon, PsyD, CCHP-MH, MBA