1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California  94710-1916
4   Telephone:   (510) 280-2621

5   CLAUDIA CENTER – 158255
    DISABILITY RIGHTS EDUCATION
6   AND DEFENSE FUND, INC.
    Ed Roberts Campus
7   3075 Adeline Street, Suite 210
    Berkeley, California  94703-2578
8   Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13            EASTERN DISTRICT OF CALIFORNIA

15  RALPH COLEMAN, et al.,                    Case No. 2:90-CV-00520-KJM-DB

16                 Plaintiffs,                **DECLARATION OF MICHAEL W.
                                              BIEN IN SUPPORT OF PLAINTIFFS'
17          v.                                POSITION FOR JOINT STATEMENT
                                              RE DEFENDANTS' EXPERT TOURS**
18  GAVIN NEWSOM, et al.,
                                              Judge:   Hon. Kimberly J. Mueller
19                 Defendants.

[4328612.3]

I, Michael W. Bien, declare:

1.     I am a partner in the law firm, Rosen Bien Galvan & Grunfeld LLP, a member of the Bar for this Court and counsel of record for the Plaintiff class in this litigation.  I have personal knowledge of the facts stated herein and if called as a witness I would and could competently so testify.  I make this declaration in support of Plaintiffs' Position Statement in the parties' Joint Statement Re: Defendants' Expert Tours.

**Defendants' Notice of Expert Tours**

2.     On April 21, 2023, Defense counsel Paul Mello notified Special Master Lopes and Plaintiffs' counsel that their previously retained litigation experts, Falcon/VRJS, had been working on an expanded project, since August 2022, "to evaluate the quality and adequacy of CDCR's mental health care and programming," and their work will "likely include onsite visits in the future—currently estimated to begin in July 2023."  Defendants promised to "work closely and collaboratively with members of the Special Master's team and Plaintiffs' counsel (and their expert, if any) to coordinate your attendance at these tours if you wish to be present."  Defendants' counsel made clear that while they may use the evidence and opinions of these experts in support of a motion "to terminate or modify all or parts of this case," they are not yet providing the six months' notice required by this Court's February 21, 2018 Order.  A true and correct copy of Mr. Mello's letter is attached hereto as **Exhibit A**.

3.     Attached to Mr. Mello's letter is an August 26, 2022 "Confidential" Memorandum from Defendants' retained litigation experts, Jim Robertson and Elizabeth Falcon, to Rob Bonta, Attorney General of the State of California, concerning their work to date and proposed additional study.  Defendants' experts, based on their 18 month study (October 2020-March 2022), concluded that "CDCR' Program Guide exceeds nationwide standards," that the 2009 staffing Plan ratios "continue to be adequate to support the Program Guide," that "the staffing levels required by the Program Guide exceed national consensus standards and exceed the levels needed for providing clinically adequate care for patients in a correctional setting," and "exceeds staffing standards in other comparison

states."  VRJS/Falcon "recommends considering a realignment of the Program Guide to align with national standards more closely, which will allow for more efficient and effective allocations of staffing."  Ex. A.

4.     Defense counsel did not provide any further information about the VRJS/ Falcon tours in the April 21 letter:  when and where they would take place, the length of the tours, the number of experts on each tour, or protocols and intended scope of the tours. Having heard nothing further from Defendants, in mid-June 2023, both Plaintiffs' counsel and the Special Master's team reached out to defense counsel to ask if and when the tours would take place.  Defendants began to provide some information about the tours on June 13, 2023 in an e-mail from Samantha Wolff of Hanson Bridgett.  The information was limited to the names of prisons and the dates of the tours to take place throughout July and August 2023, which revealed that Defendants' experts intended to spend 58 days touring 5 prisons in those two months alone.  A true and correct copy of the e-mail exchange with Samantha Wolff regarding the tours, which includes her June 13 email, is attached hereto as **Exhibit B**.  In response to the Deputy Special Master's request for more information and a schedule regarding Defendants' experts' tour plans beyond August, Melissa Bentz, counsel for CDCR, stated in an e-mail on July 6 that the experts would tour all prisons with a mental health program through Spring 2024 and that "the volume of tours per month, at least through the end of the year, will be similar to what is currently scheduled for July and August."  Ms. Bentz further informed the Deputy Special Master and Plaintiffs' counsel that no schedule for tours beyond August was available and committed only to send information for September tour dates by the end of July.  A true and correct copy of the e-mail exchange between Deputy Special Master Walsh and Ms. Bentz, which includes her July 6, 2023 email, is attached hereto as **Exhibit C**. Plaintiffs' counsel has not received any further information regarding tour dates for September or later as of today.  The information provided in Defendants' counsel's June 13 and July 6 emails was inadequate for Plaintiffs' counsel to make an informed decision about how to staff the tours, as Defendants did not share information about what

their experts were going to observe and who they intended to interview, or how many or which experts were attending each tour.  Defendants' refusal to provide future tour schedules to the Special Master and Plaintiffs' counsel more than a month in advance, even while signaling their intent to tour roughly thirty days per month for the foreseeable future, further complicates the matter significantly.

5.      Since then, Defendants have repeatedly changed the scope of their experts' planned activities and observations as well as the schedules for the tours.  Defendants have repeatedly insisted that they have a "right" to do whatever they want, whenever they want, with their experts on the tours.  According to Defendants, they are generously allowing Plaintiffs' counsel and the Special Master team representatives to observe what they are doing.  We have raised objections based on scheduling, privacy, interference with mental health treatment and confidentiality, informed consent, and contact and communication with a represented party over the objection of counsel.

**Meet and Confer Efforts Regarding Disputes**

6.      Plaintiffs' counsel requested additional information about the tours, and learned, in a telephone conference on June 15, 2023–less than a month before the tours were set to begin—that Defendants would have 3-4 experts at each prison, observing all three watches, that the tours could go 7 days a week (and up to 13 days per prison), and that the experts would sometimes tour separately and not in a single group.  This was a surprise to Plaintiffs' counsel, given the same group of experts spent no more than one day (and in many cases a half day) at each of the 15 prisons they toured in Fall 2021, toured as a unit and did not split up, did not tour multiple prisons simultaneously, and did not tour on weekends or outside of regular business hours.  No one from the Special Master team attended any of the Fall 2021 tours, contrary to Defendants' claim.

7.      Defendants did not negotiate with Plaintiffs' counsel prior to scheduling the tours about the fact that they were touring prisons with their litigation experts, the number of tours, the dates of the tours, or the scope or protocols for the tours.  Given that Defendants had given notice of the tours, and that they stated that they would use the tours

1   as the foundation for their experts' opinions in support of a motion to modify the Program

2   Guides, staffing orders, or terminate the case, Plaintiffs' counsel faced a difficult decision

3   as to how to staff the tours in order to protect the interests of the Plaintiff class.  In my

4   experience in *Coleman* and many other cases, observing and accompanying the tour of an

5   opposing expert is critical to the ability to cross-examine the expert, and respond to the

6   expert's opinion with opposing experts.  By being present, Plaintiffs' counsel can learn

7   what each defense expert did and for how long, who they spoke to and what was said, what

8   units they visited, what documents and information were provided, and more.  Plaintiffs'

9   counsel can also take note of what the defense expert chose not to observe, who they

10  ignored, and what information they chose to avoid.  Reviewing a testifying experts' notes

11  and emails and taking their deposition cannot replace the information learned by observing

12  the expert on the tour.

13         8.      Due to Defendants' unilateral decision to tour two prisons simultaneously,

14  and to allow the defense experts to separate and tour individually, we would need to send 3

15  or 4 attorneys to each prison each day—6 to 8 attorneys per day, up to seven days a week,

16  for up to 24 hours a day, in order to completely protect the interests of the Plaintiff class by

17  observing each defense expert and every aspect of every tour.  Given the demands of other

18  work in the *Coleman* case, as well as all of our other work for other clients, that level of

19  coverage was simply beyond the ability of Plaintiffs' counsel to staff.  We even had

20  difficulty securing sufficient attorney coverage to have one attorney present for each of

21  Defendants' prison tours (making it impossible to observe each of Defendants' experts

22  when they split up).  Only by pulling in RBGG and PLO attorneys who do not regularly

23  work on the *Coleman* case were we able to provide the bare minimum coverage of one

24  attorney per prison.  Given the late notice and inflexible schedule, it was also not possible

25  to even consider retaining our own experts to accompany the defense experts on their

26  tours.

27         9.      Over the next few weeks, and continuing to today, we have attempted to

28  negotiate various aspects of the tours.  While we made some progress on some issues,

1   fundamental disagreements about the timing, scope and protocols for the tours remain.

2       10.     It was not until June 20, 2023 that Defendants informed us that the experts

3   intended to interview our clients and record their interviews, and asked for our permission

4   to do so.  Ex. B.  We objected to the interviews, and then negotiated with Defendants by e-

5   mail and in a meeting on July 7, 2023, in an effort to reach a compromise, about the

6   circumstances under which we would allow our clients to be interviewed.  A true and

7   correct copy of a subsequent e-mail exchange with Samantha Wolff and then with Damon

8   McClain regarding the tours is attached hereto as **Exhibit D**.  We did not reach full

9   agreement on the terms of patient interviews, and ultimately informed Defendants that we

10  would need to revisit the issues related to patient interviews once we learned more about

11  the tours.  Ex. D. We negotiated in good faith concerning that request but given

12  Defendants' refusal to record their interviews with CDCR staff, to limit other contacts with

13  the Plaintiff class outside the presence of Plaintiffs' counsel, or to cooperate in scheduling

14  the number and dates of tours, we will not permit these interviews to go forward.

15      11.     We also did not learn until July 7, 2023, only three days before the tours

16  were scheduled to start, that the experts intended to observe patient treatment, including

17  "MH Screening and Intake, MH follow-up contacts (1:1s), IDTTs, and groups."  Ex. D.

18  We objected particularly to the proposed observation of 1:1s and screening and intake

19  appointments.  *Id.*

20      12.     On July 10, 2023, the first day of the CHCF tour, at which I was present, as

21  was Melissa Bentz from the CDCR Office of Legal Affairs, I informed Defendants that we

22  continued to object to observation of one-on-one treatment events.  I reiterated this

23  objection in an email later that day, and also stated that we would only allow observations

24  of IDTTs and group treatment if the patients consented.  Ex. D.

25      13.     Damon McClain, from the Office of the Attorney General, and I exchanged

26  several e-mail messages over the following days.  Ex. D.  On July 11, 2023, Mr. McClain

27  informed me that Defendants disagreed with our objection to their experts observing 1:1

28  treatment, and that while Defendants agreed to obtain patient consent for and allow

Plaintiffs' counsel to be present for observations of "IDTTs, intake and screening, and group treatment," they "intend to go forward with their planned observations of these activities for these tours" whether or not Plaintiffs' counsel could staff them to cover all such observations. *Id.* Because my office and our co-counsel from the PLO simply do not have the resources to send multiple attorneys to each tour, I acquiesced to Defendants' demand that their experts be able to observe IDTTs and group treatment outside of our presence pending additional negotiations. We continue to object to that practice.

14.     On July 12, 2023, I requested to pause the tours in August and September to allow the parties to prepare for the contempt proceedings scheduled for September 29, 2023. Ex. D. Defendants refused in an email from Damon McClain on July 14, claiming that "[a] tremendous amount of planning and effort has gone into preparations for these tours." *Id.* Mr. McClain also informed me in his July 14 email that "[a]s for our experts' observation of one-on-one treatment and encounters, they intend to proceed with that next week," regardless of our objections. *Id.*

15.     The following day, I sent Mr. McClain an email setting forth six areas of dispute and requesting Defendants' consent to ask the Court to resolve a motion regarding the disputes on shortened time. Ex. D. I also provided a proposed disclosure statement that would be provided to patients and to clinical staff before a patient enters a room to be observed, with both the clinician and patient informed that they can refuse the observation. Mr. McClain responded on July 16, confirming that the parties remained in dispute about nearly all of the issues in my July 15 email, but agreeing that Defendants would look into whether their experts could provide advanced notice of when patient interviews would occur and whether it would be feasible to avoid scheduling them at the same time as 1:1 observations of treatment. He also stated that Defendants would not agree to written consent by patients, but would agree to a verbal consent process. He also rejected plaintiffs' disclosure statement and revised it to delete that the observations were for the purpose of litigation and stated that Defendants intended the statement to be read by the clinician to the patient prior to the observers entering the treatment or IDTT room. *Id.*

16.     On Monday, July 17, the second round of tours, at Salinas Valley State Prison and San Quentin State Prison, commenced.  I learned during the first days of those tours that Defendants' experts proceeded with observing 1:1 treatment over our objections. I wrote to Mr. McClain on July 17, informing him that we remained in dispute about all material aspects of the tours, including whether they should proceed at all, given the evolving set of issues that were developing each day the tours continued.  Ex. D.  I requested that the parties bring the issues to the Court's attention for resolution as soon as possible, including the primary dispute about whether the tours could proceed at all, or on Defendants' noticed schedule.  Mr. McClain responded that day, agreeing that the parties should seek resolution of the disputes by the Court and agreeing to pause further observations of 1:1 treatment pending presentation of the issues to the Court.  *Id.*  On July 18, 2023, I informed Mr. McClain that we would agree that the experts could observe IDTTs, group treatment, R&R screening, and huddles, and that Defendants could use their version of the verbal consent disclosure statement, but as to both, only temporarily until the Court could resolve the disputes.  *Id.*  After that, Mr. McClain and I agreed that we would present our disputes to the Court.  *Id.*; *see also* ECF No. 7878.

17.     During the second week of tours, Defendants also added a request to observe *Coleman* patients' ICC and UCC hearings, where decisions about housing, custody level, transfers, programs and credit earning and privileges are made.  We insisted that they provide the same consent notification to patients as they were using for IDTT and group observations.  Defendants refused, but agreed that patients would be told that there are observers in the beginning of the hearing and confirmed that they consent to the observation.  A true and correct copy of my June 20, 2023 e-mail exchange with Mr. McClain regarding observation of ICCs and UCCs is attached hereto as **Exhibit E** (Exhibit E omits the earlier part of the email chain, which is the same set of email in Exhibit D).

**Falcon Tour of CHCF**

18.     On Monday, July 10 and Tuesday, July 11, 2023, I attended, on behalf of the

1   plaintiff class, Defendants' experts' tour of California Health Care Facility ("CHCF").

2   Two members of the Special Master Team, Sharen Barboza and Brett Johnson, were

3   present, along with Melissa Bentz from CDCR's Office of Legal Affairs, and three Falcon

4   experts, David Stephens (Psychologist), Brandy McDonald (Nursing), and Shirley Moore-

5   Smeal (Custody).  The tour began with a meeting with the Warden, her senior staff, senior

6   mental health staff.  Dr. Stephens, the lead Falcon expert, made clear that they would need

7   access to the prison 24/7 and the Warden said she would make sure they received whatever

8   access and support they needed.  There was confusion about who the Falcon experts were

9   and what they were doing.  We were frequently referred to in the meeting and during the

10  tour as a "Coleman" tour, which everyone understood to mean a *Coleman* Special Master

11  tour.  The fact that two members of the Coleman Special Master Team, who had just been

12  at the prison a few weeks earlier for their own tour, were present, along with Plaintiffs'

13  counsel, added to the confusion.  A patient in a wheel chair approached us on the yard,

14  asked if "are you Coleman," and then began speaking about the new tablets before anyone

15  could answer.

16      19.      The tour was led by senior clinical and custody staff.  Dr. Savoy, who

17  usually supervises the EOP program, said that she was the only supervisor on site that day

18  for all of the clinical programs.

19      20.      We had been told that the tour would likely last all day.  We finished the

20  touring activities for the first morning at 11:48 a.m.  We were brought to conference rooms

21  for lunch that had signs on their doors that said "Reserved for Coleman."  We were told to

22  eat lunch and that we would then be told the plan for the afternoon.  After approximately

23  an hour, Ms. Bentz came into our conference room and told us that we were done for the

24  day and that we should report back the next morning.

25      21.      The same group was present on Tuesday, July 11.  The Falcon experts split

26  up so I was unable to accompany all of them.  Brandy McDonald, a Falcon expert,

27  observed group treatment in the MHCB outside of my presence.  I do not know if she

28  obtained consent from the patients, how she introduced herself or what the patients or the

1    clinician stated in response.  I stayed with Dr. Stephens and Ms. Moore-Smeal, who

2    observed four IDTTs in the MHCB.  The information provided to patients and staff and the

3    resulting "consent" was, in my opinion, inadequate.  The observers (the two Falcon

4    experts, Melissa Bentz, Brett Johnson and myself) were already seated in the IDTT room

5    when the patient was escorted into the room.  The introduction of Falcon said that the

6    purpose was to "observe the CDCR clinical and procedural process" and made no mention

7    of the use of the observation to further litigation adverse to the plaintiff class.  The patients

8    were not properly informed of their right to exclude the observers so that they could have a

9    confidential communication with their mental health providers about how they were

10   feeling, their treatment plan, medications, side effects or housing issues.  The coercive

11   pressure on both the clinicians and the patients to allow the observation to go forward was

12   obvious, given that an objection would require all of these "important visitors" to get out

13   of their seats and leave the room.  In addition, given the patients' high degree of

14   dysfunction and acuity of illness--one was waiting for transfer to a PIP level of care,

15   another was actively psychotic, a third was identified with a developmental disability in

16   addition to SMI—it was unlikely that any of them could give a truly informed consent to

17   an observation with no benefit to the patient and downsides of loss of confidentiality.

18           22.      In the afternoon, we observed EOP groups.  The three Falcon experts each

19   observed different groups, precluding me from being present on each occasion they

20   observed mental health treatment and communicated with patients and clinical staff.  I

21   observed a card making group led by a recreational therapist with Ms. Moore-Smeal of

22   Falcon and Ms. Bentz.  As with the IDTTs, we were seated in the room before all of the

23   patients entered and, in my opinion, the disclosure was inadequate and the consent not

24   fully informed and voluntary.  The RT ended the group early and stated that the patients

25   had been "unusually quiet—they were usually very talkative" as a result, she thought, of

26   the observers present in the room.

27   / / /

28   / / /

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 25th day of July, 2023.

/s/ Michael W. Bien
Michael W. Bien

# Exhibit A

**PAUL B. MELLO**
PARTNER
LABOR & EMPLOYMENT
DIRECT DIAL (925) 746-8480
DIRECT FAX (925) 746-8492
E-MAIL pmello@hansonbridgett.com



April 21, 2023

VIA E-MAIL

| | |
|---|---|
| Matthew Lopes | Michael Bien |
| *Coleman* Special Master | Ernest Galvan |
| Pannone Lopes Devereaux & O'Gara LLC | Lisa Ells |
| Northwoods Office Park | Rosen Bien Galvan & Grunfeld LLP |
| 1301 Atwood Ave., Ste. 215 N. | 101 Mission Street, Sixth Flr. |
| Johnston, RI 02919 | San Francisco, CA 94105 |

Re:    Status update re: Defendants' staffing experts
       *Coleman v. Newsom*, E.D. Cal., Case No. 90-cv-00520 KJM

Dear Special Master Lopes and Class Counsel:

On September 14, 2020, Defendants filed their response to the Court's July 30, 2020 Order, and informed the *Coleman* Court and Plaintiffs' counsel that "Defendants retained an expert group to provide consultation, and if needed, expert testimony, regarding the novel issues presented by the Court's order." ECF 6853 (Defendants' Response to the Court's July 30, 2020 Order) at 29:1-3; see also ECF 6885-1 (Declaration of James R. Robertson). Specifically, Voorhis/Robertson Justice Services, LLC (VRJS) and Falcon, Incorporated (Falcon) were retained to conduct a comprehensive study on the 2009 Staffing Plan, the relationship between the 2009 Staffing Plan to general requirements of the Program Guide, and whether changes in circumstances since development of the 2009 Staffing Plan warrant modifications to the 2009 Staffing Plan or alternatives to come into compliance with the 2009 Staffing Plan. ECF 6885-1 at ¶ 1. This letter is to provide an update to the Special Master and Plaintiffs' counsel on the status of this work and to advise you of the next steps.

In late August 2022, the State's retained experts at VRJS/Falcon prepared a memorandum memorializing their general methodology and initial set of observations and recommendations. The experts did not intend for this memorandum to be a final report or an exhaustive recording of data collected, data analyzed, research strategies, methodologies or formulations, nor did the memorandum include formal expert opinions. Instead, the memorandum recommended that "a broader, more comprehensive study is warranted and recommended for evaluating the quality and adequacy of CDCR's mental health care and programming being provided within its facilities." (*See* Attachment at 1.) A true and correct copy of this August memorandum is enclosed as an attachment.

**Hanson Bridgett LLP**
425 Market Street, 26th Floor, San Francisco, CA 94105   hansonbridgett.com

19528262.5

Special Master Lopes
Class Counsel
April 21, 2023
Page 2

Consistent with that recommendation, Defendants engaged VRJS/Falcon to conduct a broader, systemwide study of the Mental Health Services Delivery System. The experts at VRJS/Falcon have been conducting their evaluation of the system since that time, and it will likely include on-site visits in the future – currently estimated to begin in July 2023. Defendants will work closely and collaboratively with members of the Special Master's team and Plaintiffs' counsel (and their expert, if any) to coordinate your attendance at these tours if you wish to be present.

Please note that while Defendants have retained experts to evaluate the MHSDS, Defendants have not made any decision to move for termination and are therefore not providing notice pursuant to this Court's February 21, 2018 Order. ECF 5794. Defendants may, in the future, take action to terminate or modify all or parts of this case – or none at all – pending the experts' determination and recommendation(s), at which time Defendants will provide six months' notice as required by this Court's February 21, 2018 Order.

Very truly yours,

Paul B. Mello
Partner

Attachment

cc (via e-mail, with Attachment):
     Kerry Walsh
     Donald Specter
     Steven Fama
     Coleman Special Master
     Team Coleman Team – RBG
     Only Co-Counsel

# ATTACHMENT

# VRJS FALCON™

## MEMORANDUM

## CONFIDENTIAL

**To:**      Rob Bonta, Attorney General
            State of California Department of Justice

**From:**    Jim Robertson, Principal, VRJS
            Elizabeth M. Falcon, PsyD, CCHP-MH, Principal, Falcon, Inc.

**Date:**    August 26, 2022

**Subject:** Consultant Contract in the Matter of: *Coleman, Ralph, et al. v. Gavin Newsom, et al.*
            Agreement Number: 21-031U

---

VRJS and Falcon, Inc. were engaged by the State of California Attorney General's Office to perform a staffing analysis and study. The focus of the staffing analysis and study was on the provision of mental health services and treatment for inmates confined to the California Department of Corrections and Rehabilitation's (CDCR) custody in 33 state-run facilities across the State of California. At the heart of VRJS and Falcon, Inc.'s inquiry were the staffing levels and patient-to-provider staffing ratios adopted and ordered by the federal court.[1]

This document is intended to memorialize our general methodology and our initial set of observations and recommendations, recognizing that the scope of our study has been limited to an evaluation of CDCR's Mental Health Services Delivery System (MHSDS) Mental Health staffing. This memo is <u>not</u> a final report, nor an exhaustive recording of the data collected, data analyzed, research strategies, methodologies, or formulations. This memo does not include formal expert opinions. Rather, a broader, more comprehensive study is warranted and recommended for evaluating the quality and adequacy of CDCR's mental health care and programming being provided within its facilities. The full results of this staffing study may be more appropriately integrated into a formal expert report following completion of a comprehensive system-wide analysis.

In October of 2020, VRJS/Falcon formed a multi-disciplinary team of consultants and corrections experts to independently assess and report objectively on answers to questions posed by CDCR. The team consisted of mental health, medical, and security operations experts from across the country, many of whom are recognized as industry leaders and all of whom have worked extensively in correctional settings. Led by Jim Robertson and Dr. Elizabeth Falcon, this team sought to address the following inquiries:

---

[1] See, the 2021 Annual Update to the Mental Health Services Delivery System (MHSDS) Program Guide and 2021 Update of the Compendium of Custody Related Remedial Measures, referred to as "the Program Guide".  See also the 2009 Staffing Allocation Model, referred to as the "2009 Staffing Plan."

VRJS FALCON™

## MEMORANDUM

1. Does CDCR's mental health program meet or exceed industry or nationwide standards? Does CDCR's delivery of care meet or exceed industry or nationwide standards?
2. Considering the changed circumstances in the delivery of mental health care in prisons since 2009, does the 2009 Staffing Plan need updating? If it does, what does that updating look like for the mental health staff in each facility?
3. How does CDCR's program and delivery of care compare to the group of Departments of Correction used in the development of 2009 staffing ratios?
4. What does VRJS/Falcon see as alternate ideas/plans for mental health staffing positions or a combination of positions which are needed to meet the requirements of the Program Guide?

To answer the study questions above, the VRJS/ Falcon team engaged in a multi-method approach that involved:

- Document Reviews
- Data Collection and Analysis
- Literature Reviews
- Standardized Interviews of CDCR Personnel
- Standardized Patient Chart Reviews
- Standardized Facility Tours
- Standardized Virtual Facility Studies
- Study of Selected States Navigating Similar Litigation
- Evaluation of CDCR MHSDS Program Guide (2020 and 2021 Revisions) and 2009 Staffing Plan
- Evaluation of Nationwide Standards (i.e., National Commission on Correctional Healthcare (NCCHC))
- Analysis and Formulation of Data

This study ran for a period of 18 months (October 2020 to March 2022). The methodologies used in VRJS/Falcon's Staffing Analysis were designed to inform understanding of the questions listed above. These extensive fact-finding activities were followed by integration and synthesis of information, with quantitative and qualitative data extracted from all data sources and all system levels. These data sets then formed the basis for VRJS/Falcon's preliminary observations and recommendations.

### VRJS/Falcon Observations and Recommendations

Notably, results from this study found that CDCR's Program Guide exceeds nationwide standards. However, additional study is warranted to determine how services are implemented and delivered on-site.

It is VRJS/Falcon's observation that as of this study period, the 2009 Staffing Plan ratios continue to be adequate to support the Program Guide, with the model allowing for core staff and core allocations to adequately sustain and service the Program Guide requirements. Accordingly, no

# VRJS FALCON™

## MEMORANDUM

augmentation to the 2009 staffing plan ratios is necessary to support the Program Guide requirements at this time.

VRJS/Falcon found that staffing levels required by the Program Guide exceed national consensus standards and exceed the levels needed for providing clinically adequate care for patients in a correctional setting. In many instances, it was also found that CDCR's staffing plan exceeds staffing standards in other comparison states studied. Of course, CDCR should continue to address recruitment and retention concerns.

VRJS/Falcon observed staffing allocation inefficiencies warranting continued examination. VRJS/ Falcon recommends a facility-by-facility review, conducted by leadership and staff to:

- Strengthen lines of communication, from top-down and bottom-up, with Headquarters making clear in all facilities, the objectives and purpose in making staffing policy adjustments.
- Routinely examine staffing allocations at the site-level, develop a better understanding of how allocations are made, and identify and eliminate inefficiencies.
- Improve systemwide standardization. Identify and establish leadership personnel specifically responsible for staffing levels at each facility to improve accountability.

VRJS/ Falcon recommends considering a realignment of the Program Guide to align with nationwide standards more closely, which will allow for more efficient and effective allocations of staffing and improved outcomes for treatment and programming.

Some efficiencies could quickly be achieved by considering the following alternatives and best practice models:

- Expand the scope and role of Psychiatric Nurse Practitioners (PNPs).
- Expand the number and scope of masters-prepared Qualified Mental Health Professionals, such as Licensed Clinical Social Workers (LCSWs) and Licensed Professional Clinical Counselors (LPCCs) in clinical positions; explore the options available for assigning individuals in these job classes to specialist positions.
- Consider the conversion of a portion of Psychologist positions to masters-prepared Qualified Mental Health Professionals for clinical work.
- Re-examine the functions and necessity of Psychologist Specialists.
- Expand the use of telepsychiatry and incorporate services beyond psychiatry. This would include improving access to psychological and other clinical services for incarcerated persons via remote solutions.

As a next step, VRJS/Falcon strongly recommends CDCR undertake a broader, systemwide study of mental healthcare delivery to more fully understand how services are delivered, the quality of care delivered, and how Program Guide requirements are conducted on site. We also recommend assessing how this delivery of care compares to nationwide standards, community standards, and other similar State Departments of Correction.

# Exhibit B

| From: | Samantha Wolff |
|---|---|
| To: | Michael W. Bien; Kerry F. Walsh; Matt Lopes; Coleman Special Master; Ernest Galvan; Lisa Ells; Donald Specter; Steve Fama; Coleman Team - RBG Only; Margot Mendelson; Sara Norman |
| Cc: | Paul B. Mello; David C. Casarrubias; v_Damon.McClain@doj.ca.gov; Elise Thorn; v_Namrata.Kotwani@doj.ca.gov; Kaylen Kadotani; Carson R. Niello; Laurel E. O"Connor; Melissa Bentz; Nick Weber; Thind, Sundeep@CDCR; v_dillon.hockerson@cdcr.ca.gov |
| Subject: | RE: Coleman - Defense expert tours |
| Date: | Friday, June 30, 2023 3:51:52 PM |

[EXTERNAL MESSAGE NOTICE]

Michael,

Thanks for your response to my email below. We look forward to receiving the information regarding who from your office will be attending the tours at your earliest convenience. We have already received that information from the Special Master's team and need your info to finalize our own staffing of the tours.

Regarding the issue of patient interviews, we understand your position to be that you would consent to such interviews provided that: (1) you better understand who will be conducting the interviews and for what purposes; (2) class counsel is present during the interviews; (3) class counsel is able to meet privately with the patient before the interview; and (4) any such agreement is mutual with respect to potential future tours by Plaintiffs' experts and possible interviews of CDCR staff. With that understanding, we respond to your points below.

First, we understand that the current plan is for all patient interviews at facilities will be conducted by one of the following Falcon Inc. experts: Dr. Elizabeth Falcon, Dr. Robin Timme, Dr. Joel Andrade, Dr. David Stephens, and Dr. Steven Helfand. Each of these experts is a doctorate-level psychologist with over 20-30 years' experience in corrections. Only one expert will interview each patient. The purpose of these interviews is to assist the Falcon team in evaluating CDCR's MHSDS. Part of their evaluation will involve an assessment of patient quality of care, and include patient interviews. The patients' honest feedback regarding their experiences receiving care at various levels would help the experts make that assessment and could provide valuable insights into patient perspectives.

Second, Defendants agree and understand that class counsel will be present during these interviews.

Third, we understand the concern that the patients need to be aware of the issues you raise (confidentiality, use of the interviews, etc.) and so we would propose that class counsel raise those issues at the very beginning of the interview *with the experts present*. Of course, we have no concerns if class counsel wishes to speak with their client in private after the interview concludes.

Fourth, Defendants agree that any agreement with respect to the State's experts' interviews of class members would be mutual, and that the same conditions would apply to any potential future tour(s) conducted by Plaintiffs' expert(s) and interviews they may wish to conduct with CDCR staff (e.g., defense counsel would first want to know who will interview their clients and the scope of the interviews; defense counsel will need to be present for any such interviews; etc.).

Finally, the State's experts are requesting to record these interviews to preserve the integrity of all patients' responses.  An audio recording preserves the patient's response and message in their own words, which could arguably be lost by relying on notetaking.  Similarly, bias could potentially result from notetaking by summarizing the patient's response through the lens of the interviewer.  The patients' recorded interviews would of course be made available to class counsel as well.

Please let us know if these terms are agreeable, or if you have any further questions.

Sincerely,
Sam

---

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Thursday, June 22, 2023 12:12 PM
**To:** Samantha Wolff <SWolff@hansonbridgett.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Matt Lopes <mlopes@pldolaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; David C. Casarrubias <DCasarrubias@hansonbridgett.com>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; v_Elise.Thorn@doj.ca.gov <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Kaylen Kadotani <KKadotani@hansonbridgett.com>; Carson R. Niello <CNiello@hansonbridgett.com>; Laurel E. O'Connor <LOConnor@hansonbridgett.com>; v_Melissa.Bentz@cdcr.ca.gov <Melissa.Bentz@cdcr.ca.gov>; v_Nicholas.Weber@cdcr.ca.gov <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; v_dillon.hockerson@cdcr.ca.gov <dillon.hockerson@cdcr.ca.gov>
**Subject:** [EXTERNAL] RE: Coleman - Defense expert tours

**EXTERNAL:** Use caution when opening attachments, links or responding to this e-mail.

---

Samantha

We are still working on assigning attorneys to particular tours.  We hope to have the information for July by early next week.

Plaintiffs' counsel does not consent to any interviews by defense experts, defense counsel or their agents of our clients.

It is possible that we would cooperate in defendants' efforts to obtain interviews if we are provided sufficient information to understand who will be doing the interviews and for what purpose.  Right now, we don't know anything about defendants' current flock of experts and the purpose of their work and how they intend to use interviews as part of their study.

At minimum, we may permit interviews with incarcerated persons by defense experts when:  1) we are present for the interview and 2) we have had an opportunity to meet privately with the person to be interviewed in advance to explain to the client who the person is that wants to conduct the interview, the purpose of the interview and how the information provided can be used by defendants and whether or not it will be "confidential."

Any agreement on defendants' experts' tours would have to be mutual:  that is, defendants will agree that plaintiffs' experts can undertake tours of the prisons and interview CDCR employees as part of their work (with defense counsel present).

Thanks.


Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission St.  Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
(415) 439-9821 (cell)
mbien@rbgg.com
www.rbgg.com

---

**From:** Samantha Wolff <SWolff@hansonbridgett.com>
**Sent:** Thursday, June 22, 2023 8:41 AM
**To:** Kerry F. Walsh <kwalsh@pldlaw.com>; Matt Lopes <mlopes@pldlaw.com>; Coleman Special Master <colemanspecialmaster@pldlaw.com>; Michael W. Bien <MBien@rbgg.com>; Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; David C. Casarrubias <DCasarrubias@hansonbridgett.com>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Kaylen Kadotani <KKadotani@hansonbridgett.com>; Carson R. Niello <CNiello@hansonbridgett.com>; Laurel E. O'Connor <LOConnor@hansonbridgett.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; v_dillon.hockerson@cdcr.ca.gov <dillon.hockerson@cdcr.ca.gov>
**Subject:** RE: Coleman - Defense expert tours

[EXTERNAL MESSAGE NOTICE]

Good morning,

For planning purposes, we were hoping to get a list of those who will be attending each tour for both the Plaintiffs and OSM team.  Also for planning purposes, please advise whether Plaintiffs will permit Defendants' experts to interview class members.

Thanks,
Sam

---

**From:** Samantha Wolff
**Sent:** Tuesday, June 20, 2023 3:47 PM
**To:** Kerry F. Walsh <kwalsh@pldolaw.com>; Matt Lopes <mlopes@pldolaw.com>; colemanspecialmaster@pldolaw.com; MBien@rbgg.com; 'Ernest Galvan' <EGalvan@rbgg.com>; Lisa Ells <lells@rbgg.com>; Don Specter <dspecter@prisonlaw.com>; Steven Fama <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; David C. Casarrubias <DCasarrubias@hansonbridgett.com>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; v_Elise.Thorn@doj.ca.gov <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Kaylen Kadotani <KKadotani@hansonbridgett.com>; Carson R. Niello <CNiello@hansonbridgett.com>; Laurel E. O'Connor <LOConnor@hansonbridgett.com>; v_Melissa.Bentz@cdcr.ca.gov <Melissa.Bentz@cdcr.ca.gov>; v_Nicholas.Weber@cdcr.ca.gov <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; v_dillon.hockerson@cdcr.ca.gov <dillon.hockerson@cdcr.ca.gov>
**Subject:** RE: Coleman - Defense expert tours

All,

As promised, we're following up to let you know that the start time for the first day of all tours listed below will be 9am.  Start times on the other tour days will be determined once on site.  Additionally, Defendants' experts would like to interview patients at each institution.  Please advise whether Plaintiffs' counsel would object to these interviews (recognizing that if the interviews are permitted to proceed, that Plaintiffs' counsel may choose to be present during the interviews).

Thanks,
Sam

---

**From:** Samantha Wolff
**Sent:** Tuesday, June 13, 2023 2:19 PM
**To:** Kerry F. Walsh <kwalsh@pldolaw.com>; Matt Lopes <mlopes@pldolaw.com>; colemanspecialmaster@pldolaw.com; MBien@rbgg.com; 'Ernest Galvan' <EGalvan@rbgg.com>; Lisa Ells <lells@rbgg.com>; Don Specter <dspecter@prisonlaw.com>; Steven Fama <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; David C. Casarrubias <DCasarrubias@hansonbridgett.com>; v_Damon.McClain@doj.ca.gov

<Damon.McClain@doj.ca.gov>; v_Elise.Thorn@doj.ca.gov <Elise.Thorn@doj.ca.gov>;
v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Kaylen Kadotani
<KKadotani@hansonbridgett.com>; Carson R. Niello <CNiello@hansonbridgett.com>; Laurel E.
O'Connor <LOConnor@hansonbridgett.com>; v_Melissa.Bentz@cdcr.ca.gov
<Melissa.Bentz@cdcr.ca.gov>; v_Nicholas.Weber@cdcr.ca.gov <Nicholas.Weber@cdcr.ca.gov>;
Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; v_dillon.hockerson@cdcr.ca.gov
<dillon.hockerson@cdcr.ca.gov>
**Subject:** Coleman - Defense expert tours

Good afternoon,

We write to provide the dates for Defendants' experts' tours.  A few things to note – first, there will
be additional tours after August, but we are still working on those dates and we wanted to provide
you the schedule for the next couple of months as soon as we could.  Second, the dates below have
been confirmed with the institutions, though it is possible they may change if the need should arise.
We will, of course, provide as much advance notice as possible in the event of a schedule change.
Finally, we will follow up with start times for the first day of each tour as soon as we have that detail
nailed down.

**JULY**

SAC: July 10th-14th

CHCF: July 10th-16th

SVSP: July 17th-21st

SQ: July 17th-23rd

CMF: July 24th-28th

**AUGUST**

SAC: August 2nd-6th

CMF: August 5th-11th

CHCF: August 7th-11th

SQ: August 14th-18th

SVSP: August 19th-25th

Sincerely,
Sam

---

**Samantha Wolff**
**Partner**
Hanson Bridgett LLP
(415) 995-5020 Direct

(415) 995-3547 Fax
swolff@hansonbridgett.com

This communication, including any attachments, is confidential and may be protected by privilege. If you are not the intended recipient, any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email, and permanently delete all copies, electronic or other, you may have.

The foregoing applies even if this notice is embedded in a message that is forwarded or attached.

# Exhibit C

| From: | Melissa Bentz |
|---|---|
| To: | Kerry F. Walsh; Nick Weber; Elise Thorn; Damon McClain; Namrata Kotwani; Samantha Wolff |
| Cc: | Kerry F. Walsh; Patricia M. Williams; Michael Ryan; Latricea McClendon-Hunt; Michael W. Bien; Lisa Ells; Steve Fama |
| Subject: | RE: CQIT and Staffing Tours |
| Date: | Thursday, July 6, 2023 6:44:10 AM |

---

**[EXTERNAL MESSAGE NOTICE]**

Kerry,

Thank you for your email. As we have stated several times, there are no CQIT tours currently scheduled. Several weeks ago, Dr. Cartwright asked the Regional Mental Health Administrators to put forth a proposed schedule for consideration. However, CDCR has not decided to move forward with any CQIT tours at this time. We will, of course, inform the Special Master's team and Plaintiffs' counsel should Mental Health decide to conduct CQIT tours in the future.

As for the Falcon tours, we are still working on a schedule for future tours. The experts intend to visit all institutions with a mental health program. We expect the volume of tours per month, at least through the end of the year, will be similar to what is currently scheduled for July and August. The expert tours are expected to continue through Spring 2024. We anticipate providing a schedule for September by the end of this month.

Please let me know if you have any further questions.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Sent:** Wednesday, July 5, 2023 1:39 PM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Elise Thorn <elise.thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Samantha Wolff <SWolff@hansonbridgett.com>
**Cc:** Kerry.Walsh <kwalsh@pldolaw.com>; Patricia.Williams <harconwil@gmail.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>; McClendon-Hunt, LaTri-ea <lmcclendonhunt@pldolaw.com>; mbien@rbgg.com; LElls@rbgg.com; Steve Fama <sfama@prisonlaw.com>
**Subject:** CQIT and Staffing Tours

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Counselors – I wanted to put in writing some issues that we have discussed and/or communicated with the parties, either separately or together, regarding the Falcon staffing tours and information that was conveyed to us about potential CQIT tours.  We do not have a schedule for the Falcon staffing tours beyond the end of August and would appreciate it if you could let us know where else you will be conducting those tours and if you will be visiting all institutions with mental health programs.

Regarding the CQIT tours, we have been assured by OLA on more than one occasion (5/25/2023, 6/8/2023 and 6/25/2023) that there are no CQIT tours taking place and none have been scheduled at this time.  The reason why we continue to ask, is that members of our team have been provided with different information.  On May 24, 2023, members of our team attended the CQIT training during which it was stated that practice CQI tours would begin sometime in July 2023.  In addition, during central office monitoring meetings conducted on June 5, 2023, our team members were informed that CQI tours were possibly starting at CCWF.  A review of the court transcript from August 4, 2021 contains testimony from Dr. Mehta that CQI tours would be paired with minor sustainable process audits starting perhaps in the Spring of 2022 and as such would not require a separate trip or visit.  Those are the sources of our confusion that I wanted to make known to the parties.

We would like to confirm that no CQI visits have been scheduled and would also ask for the future locations and dates for the Falcon staffing tours as soon as possible.  Given the ongoing 30th round monitoring visits, suicide prevention site visits and the upcoming Falcon staffing tours, if CQI tours were to be scheduled, the Special Master would have to give consideration to adding additional staff to his team to provide sufficient resources to cover any expanded touring schedules.  Thank you and we look forward to a response.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 •  F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

# Exhibit D

| | |
|---|---|
| **From:** | Michael W. Bien |
| **To:** | Damon McClain |
| **Cc:** | Samantha Wolff; Lisa Ells; Jenny Yelin; Paul B. Mello; Elise Thorn; Coleman Team - RBG Only; Steve Fama; Margot Mendelson; Donald Specter; Sara Norman; Coleman Special Master; Coleman Special Master Team; Melissa Bentz; Nick Weber; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR; Penny Godbold; Hannah Chartoff; Marissa Hatton |
| **Subject:** | Re: Coleman - Follow up re patient interviews: Falcon Tours |
| **Date:** | Tuesday, July 18, 2023 7:26:54 AM |
| **Attachments:** | Statement for Informed Patient Consent- MH Treatment 7.17.23.pdf |

Damon

Thank you for your agreement to present our disputes about the Falcon tours to the Court on an expedited basis. We also appreciate that defendants have agreed to halt observations of one on one mental health encounters pending the Court's resolution of the disputes. To clarify, a one on one is an otherwise confidential interaction between a patient and a clinician. It includes cell-front or in another non-confidential space if that is the place the interaction is occurring.

For purposes only of the pending tours, I am confirming that Falcon may proceed with observations of IDTT's, group treatment, R&R screening, and huddles. We still have a dispute about the content of the consent form and the manner of obtaining consent but will permit the use of the form you sent to the field yesterday pending resolution by the Court.

We request again that the tours be halted pending the Court's decision.

Thank you.

MIchael




Sent from my iPad


> On Jul 17, 2023, at 6:57 PM, Damon McClain <Damon.McClain@doj.ca.gov> wrote:


> [EXTERNAL MESSAGE NOTICE]
> Mike,
>
> It seems we are talking past each other, and you haven't responded to our prior questions and points. That said, I must again correct your misstatements. Neither defense counsel nor the experts are conversing with patients outside the presence of Plaintiffs' counsel. We have reiterated this point multiple times now. We also did not agree for the

experts to forego observations of one-on-one treatment; in the email I sent on Friday, we clearly stated that those observations would proceed and that Plaintiffs' counsel was welcome to attend.  Additionally, it is incorrect that VRJS/Falcon was retained by my office and Hanson Bridgett.  They were retained by CDCR to conduct an evaluation of the MHSDS.  CDCR conducting an evaluation of its own MHSDS does not constitute discovery.  The focus of the experts' work is the delivery of mental-health services and all of the processes that entails under the Program Guide.

We are not aware of any Court order that requires CDCR to obtain advance approval from the Court to evaluate its own system or to have consultants conduct tours. And Defendants' and Plaintiffs' experts have recently toured prisons without obtaining prior Court approval. Furthermore, you have been on notice about these tours since April, and this is the first time you have suggested that Defendants need a Court order to conduct this evaluation.

While on the tours, we have endeavored to conduct the tours in a similar manner to those conducted previously in this case by the Special Master team and Plaintiffs' experts.  We have done everything possible to address the issues you have raised with respect to the current tours by providing advance notice, inviting Plaintiffs' counsel and the Special Master to attend, and by agreeing that under no circumstances would the experts engage in conversations with patients without the presence of Plaintiffs' counsel.  But now, you continue to add requirements and change positions as to what lengths CDCR's consultants must go to in order to conduct their evaluation.  It appears your goal here is to obstruct, which is unfortunate.

As things currently stand, we understand the parties have a disagreement as to whether CDCR's consultants may silently observe one-on-one treatment.  We have accordingly asked that they pause those observations while we resolve this dispute.  As for their observations of group treatment, IDTTs, R&R screening, and huddles, it is our understanding based on our prior emails with you and Ernie, that our consultants were permitted to observe those activities.  It is also our understanding that our consultants may conduct interviews with Plaintiffs' counsel present, as agreed upon previously.  If anything has changed or if you are now rescinding these prior agreements, please let us know immediately.

Notwithstanding our prior agreements, we agree that these matters should be brought to the Court in an expedited fashion.  We propose that

the parties seek permission to file a joint statement of the disputes and request a telephonic status conference.  Please let us know if you agree.

Lastly, I attach a consent script, which we offer to address your concerns regarding consent so the tours can move forward.

-Damon

---

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Monday, July 17, 2023 12:05 PM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>
**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Penny Godbold <PGodbold@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Marissa Hatton <mhatton@prisonlaw.com>
**Subject:** RE: Coleman - Follow up re patient interviews: Falcon Tours

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Damon

I just learned from my associates attending the Falcon tours at SVSP and SQ today that Falcon is proceeding today with observations of confidential one on one mental health treatment at both prisons.  Falcon and defense counsel are proceeding despite plaintiffs' counsel's instruction not to communicate with our clients or observe confidential one on one mental health treatment.   This is further proof that we have no agreements in place about these tours and that we should bring our dispute to Court as soon as possible.  I had understood that defendants and Falcon would respect our demand not to observe one on one mental health treatment until our disputes were resolved.

You have previously informed plaintiffs and the Special Master that Falcon are expert consultants retained by Hanson Bridgett and/or the Attorney General's Office for purposes of the Coleman litigation.  Touring the prisons, where the Coleman class lives, works, and receives mental health treatment, is part of discovery in the Coleman

litigation.  Reviewing my clients' medical records, interviewing my clients, observing their otherwise confidential mental health treatment sessions, and speaking with their clinicians about them, will be the foundation for Falcon or some other expert to express their opinion about issues in the Coleman litigation and/or support a motion for termination.

The rules of discovery, the Rules of Professional Conduct, and the rules governing research on incarcerated persons do apply to the State of California and its lawyers.  The Court has the power to govern the timing, extent and type of discovery in the litigation and to protect the privacy and dignity and access to mental health treatment of members of the plaintiff class.  Defendants chose to schedule the tours without seeking permission from the Court.

We have been negotiating important issues about these tours in a piecemeal fashion; there is no agreement about anything at this moment given the material disputes that remain, as well as the evolving nature of the tours and other facts on the ground.  For example, we are in dispute about the fundamental issues of the timing, number and scope of the tours, access to one on one treatment, patient interviews, consent and more.  We have also asked, and you have refused, to pause the tours entirely in August and September due to the important contempt proceedings.

There are major fundamental disagreements about the Falcon tours that must be resolved as soon as possible.  Given that defendants and Falcon are now violating even the agreements we reached, we request that the tours be stopped now.   We intend to bring these issues to the Court as soon as possible.

You failed to respond to our request to have the motion heard on shortened time.  Should we assume that you have refused?

Michael

---

**From:** Damon McClain <Damon.McClain@doj.ca.gov>
**Sent:** Sunday, July 16, 2023 10:00 PM
**To:** Michael W. Bien <MBien@rbgg.com>
**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Special Master Team

<[ColemanSpecialMasterTeam@rbgg.com](mailto:ColemanSpecialMasterTeam@rbgg.com)>; Melissa Bentz
<[Melissa.Bentz@cdcr.ca.gov](mailto:Melissa.Bentz@cdcr.ca.gov)>; Nick Weber <[Nicholas.Weber@cdcr.ca.gov](mailto:Nicholas.Weber@cdcr.ca.gov)>; Thind,
Sundeep@CDCR <[Sundeep.Thind@cdcr.ca.gov](mailto:Sundeep.Thind@cdcr.ca.gov)>; Hockerson, Dillon@CDCR
<[Dillon.Hockerson@cdcr.ca.gov](mailto:Dillon.Hockerson@cdcr.ca.gov)>; Penny Godbold <[PGodbold@rbgg.com](mailto:PGodbold@rbgg.com)>; Hannah
Chartoff <[HChartoff@rbgg.com](mailto:HChartoff@rbgg.com)>; Marissa Hatton <[mhatton@prisonlaw.com](mailto:mhatton@prisonlaw.com)>
**Subject:** RE: Coleman - Follow up re patient interviews: Falcon Tours

[EXTERNAL MESSAGE NOTICE]

Mike,

We are writing to correct a number of misstatements in your email below and to try to
reach agreement where we can.  As an initial matter though, we are concerned that
Plaintiffs continue to obstruct Defendants' evaluation of the MHSDS, including by
attempting to block treatment observation, misleading patients as to the purpose of
these tours, and imposing unrealistic, unnecessary, and inappropriate restrictions on
these tours.  Tours and observations happen in this case all the time – and that's likely
why staff and patients mistakenly think these are "Coleman tours."  Plaintiffs know the
purpose of these tours.  In our April letter, we explained that "Defendants engaged
VRJS/Falcon to conduct a broader, systemwide study of the Mental Health Delivery
System" in light of VRJS/Falcon's recommendation that "a broader, more
comprehensive study is warranted and recommended for evaluating the quality and
adequacy of CDCR's mental health care and programming being provided within its
facilities."  Despite this, Plaintiffs continue to feign ignorance of the purpose, even
going so far as to suggest – in front of patients and clinicians – that the purpose is to
reduce staffing.  It is not.  You know that it is untrue.  And these comments are
inappropriate.

Regarding your first concern that the prison tours have wasted Plaintiffs' counsel's
time, certain disruptions are inevitable as you know from other tours in this case.  But
we agree to work with VRJS/Falcon to try and streamline the tours as much as
possible.  It's just been one week since the tours started and they are still getting their
bearings.  We appreciate and expect your patience in this regard.  VRJS/Falcon is also
trying to be flexible with schedules depending on the institution's schedule and need,
similar to how the Special Master's tours are conducted.

Regarding your numbered points below, we had thought the parties reached
agreement on #2 (observations of group treatment).  Are Plaintiffs reneging that
compromise?

Regarding #3, as we have said before, we will provide you with as much information
and as much advance notice as possible.  We do not believe the tours should pause for
the contempt proceedings, as I indicated in my prior email to you.

Regarding #4, it is not unusual for experts to split up during tours – indeed, the Special
Master's teams routinely do this for the sake of efficiency.  We also provided advance

notice of this fact.  And Melissa advised Kerry Walsh on July 6th (in an email that copied Plaintiffs' counsel) that we anticipate a similar volume of touring through the end of this year and Spring of 2024.

Regarding #5, Defendants will work with our consultants to determine whether it is feasible to provide advance notice as to the days patient interviews will occur, and can also look into the feasibility of limiting simultaneous observations of 1:1 treatment (while another consultant conducts a patient interview elsewhere in the prison) *if* we can reach an agreement that the interviews may go forward.  Please advise.

Regarding #6, VRJS/Falcon has access to patients' medical records.  They are Defendants' consultants, are engaged in an evaluation of the system – including the quality of care being delivered, and have executed a BAA permitting them to access these records.

With respect to your point about confusion at the prisons regarding the tours, we agree to work with you and do what we can to minimize confusion.  We will ask to change gate passes and signage so that they indicate "Falcon Tours" instead of "Coleman."  We are unclear what "inconsistent information" has been provided to the prisons and patients – if you could be more specific, we can better address that concern.

Your statements that you have "witnessed the disruption of mental health treatment" and "derailment of group programming" are pure speculation.  There were some patients who said there were things they did not want to talk about, but they did not indicate it was due to the presence of observers.  It could have been for any number of reasons and is not for any of us to speculate.  Also, your statements relaying the rec therapist's comments are not entirely accurate either.  During art group, the rec therapist did say the patients were unusually quiet, but she also said the group was unusually small and thought it *may* have had to do with the observers, but also stated that she was trying something new in her art group that she had not done before.  She also mentioned that the patients recently received tablets and that Monday was the first day they were not allowed to bring their tablets to the treatment building, and that may have had something to do with the absences.

We are unclear of your concern with VRJS/Falcon touring PIPs, MHCBs, and EOPs (it appears to be an incomplete sentence?), but it bears noting that tours of these areas are commonplace in this case.

With respect to your request that the parties agree to a written statement to be provided and explained to the patients before they are escorted or walk into a room with observers present, Defendants suggest instead that an agreed-upon written statement be read by the clinician to the patient once the patient is in the room, and that VRJS/Falcon not enter the room until consent has been obtained.  We agree that the treating clinician could separately object to the observation if, for instance, they

have specific concerns with respect to the patient's current condition.  We are puzzled, however, by your statement that it is inappropriate to request consent to observe treatment after a patient has walked into a room with the observers present, since this is how Special Master tours and observations have always been conducted.

We also want to correct your statement that Defendants intend "to continue to have your retained consultants communicate with patients, our clients, over our objections and outside of our presence."  This is absolutely false – we have never stated an intent in that regard.  To be clear, CDCR counsel and VRJS/Falcon are not communicating with patients outside of your presence, nor have we said we will do so, nor will we ever do so.  This statement is also contrary to your prior email, where you state that you "expect that counsel has instructed their experts that they are not to engage in conversation with patients outside the presence of plaintiffs' counsel.  We continue to object to any such communication but are permitting defendants' experts to observe group therapy and IDTTs, even if we are not present."  It also bears reiterating that Defendants' counsel will not observe 1:1 treatment.

Your citations to the Rules of Professional Conduct and the Penal Code are inapplicable and unavailing.  We are not communicating with your clients outside of your presence, nor are our consultants.  Nor is this discovery, or biomedical or behavioral research.

In terms of the proposed statement to be read to each patient before Falcon observations or interviews, we believe the statement should be read to the patient by the treating clinician.  We intend to provide the following statement beginning this week to clinicians to read prior to obtaining patient consent:

> CDCR has hired *a team of expert* consultants from a *group* ~~private company~~ called *VRJS/*Falcon~~/Voorhis~~ to study the mental health system at this and other prisons.  The purpose of the study is *to evaluate the quality and adequacy of CDCR's mental health care and programming being provided within its facilities.* ~~to find out whether mental health staffing can be reduced at this prison.  The study may be used in court in an attempt to reduce the amount of mental health care CDCR is required to provide to you.~~
>
> The consultants have asked to [interview you about your mental health care] or [observe your mental health treatment session.]  If you prefer not to be interviewed or hav*e*~~ing~~ people observe and take notes during your mental health treatment session, please say so now or at any time during the interview or observation.   If you decide to allow the consultants to interview you or observe your treatment, you are giving permission to *the team of expert consultants* ~~CDCR~~ to use whatever information they learn from you or from listening and watching your mental health treatment *when, and if, they prepare a report following their evaluation of the system and, if they provide any testimony to any Court regarding the mental health system* ~~in their testimony or report~~.  CDCR and the consultants have agreed that your name and CDCR

*number would not be disclosed publicly; nor will information you give be*
*provided to CDCR clinicians or custody staff at the prison.  You are free to allow*
*this or not.  You will not be rewarded in any way for agreeing to be interviewed*
*or allowing your treatment to be observed.  Nor will you be punished or harmed*
*in any way if you decide to keep your mental health treatment private.*

*This is not a tour or study by the Coleman Special Master or Plaintiffs' counsel.*
*If you see people from the Special Master Team or Plaintiffs' counsel, they are*
*here to observe the work of the consultants only.*

While we are amenable to reading the above statement to obtain a patient's verbal
consent, we will not agree to develop a form for written consent.  Written consent has
never been a requirement in this case, nor are we aware of your office requiring
written consent in any other cases in which you act as class counsel.  In fact, neither
verbal nor written consent is required of patients during the Special Master Team's
tours and observations.  Nor did Plaintiffs' counsel require written consent during Dr.
Penn's observation of 1:1 telepsychiatry contacts.  This requirement has no basis in this
case and would constitute an impermissible obstruction to the consultants' fair
evaluation of the MHSDS.

-Damon

---

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Saturday, July 15, 2023 1:35 PM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>
**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny
Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Elise Thorn
<Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-
RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson
<mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara
Norman <snorman@prisonlaw.com>; Coleman Special Master
<colemanspecialmaster@pldolaw.com>; Coleman Special Master Team
<ColemanSpecialMasterTeam@rbgg.com>; Melissa Bentz
<Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind,
Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Hockerson, Dillon@CDCR
<Dillon.Hockerson@cdcr.ca.gov>; Penny Godbold <PGodbold@rbgg.com>; Hannah
Chartoff <HChartoff@rbgg.com>; Marissa Hatton <mhatton@prisonlaw.com>
**Subject:** RE: Coleman - Follow up re patient interviews: Falcon Tours

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Damon

Given the experience of the first week of tours at two prisons, there are a series of major disputes that should be resolved.

The tours have been disorganized and unplanned, costing plaintiffs' counsel to waste time that would be otherwise available for other work or personal time.   During the tour at CHCF, defendants first informed plaintiffs' counsel (and the Special Master team) that Falcon would not be touring on Sunday late Friday afternoon.   No schedule has been provided to plaintiffs' counsel other than the start time for the next day.

Defendants have repeatedly added to their demands for access to otherwise confidential mental health patient encounters.  Unless we can reach agreement on these issues, we should bring them to the Court's attention as soon as possible—we request your agreement that any motion be heard on shortened time:

1. Whether Falcon experts can observe one on one treatment sessions at all, and if so, what type and form of consent must be obtained, and can these observations take place outside the presence of plaintiffs' counsel;
2. Whether Falcon experts can observe IDTTs, group therapy and screening, and if so, what type and form of consent must be obtained, and can these observations take place outside the presence of plaintiffs' counsel;
3. The schedule for the tours:  when they will occur, number of days each, what days will involve patient interviews and/or observations, whether they should be paused to allow the parties to prepare for the contempt proceedings.
4. Defendants are now disclosing that they intend to tour multiple prisons, simultaneously, each week through the Spring of 2024.   Defendants notice says tours can be 7 days a week and cover all three shifts.  In addition, defendants three experts on each tour can go to three different locations simultaneously. This is burdensome and oppressive to the plaintiff class, to plaintiffs' counsel and to the delivery of mental health treatment to the plaintiff class.
5. Falcon patient interviews:  we have negotiated a plan for these interviews that will involve the full attention of plaintiffs' counsel on the tour.   We need advance notice of which day these interviews will take place and request a limit on other Falcon patient observations at the same time.
6. Whether and under what circumstances Falcon experts can read or copy a patient's medical records.  (To my knowledge, defendants have not requested access to individual medical records in connection with the Falcon study.)

We are continuing to observe confusion at the prisons concerning whether the Falcon tours are actually Coleman Special Master tours.  For example, gate passes and signs say "Coleman."  Inconsistent information is being provided by Falcon experts and CDCR counsel to custody staff, clinical staff and patients at the prisons, and many of them have expressed confusion.  We have also witnessed the disruption of mental health treatment, such as patients refusing to discuss sensitive issues in the presence of the observers, as well as the derailment of group programming.   For example, a clinician running an EOP group at CHCF that I attended on Tuesday reported that the usually

talkative group had become very shy and withdrawn due to the presence of observers.

Falcon has been touring PIPs, MHCBs and EOPs—programs for patients that CDCR clinicians have determined have the highest level of dysfunction and need for mental health treatment and care.   Patient's "consent" to a violation of their privacy and disruption to their mental health encounters

We request that the parties agree to a written statement that will be provided to and explained to patients *before* they are escorted or walk in to a room with observers present.  The coercion to consent when an incarcerated person walks in to a room where the observers are already present and seated is inappropriate.   The treating clinicians need to be informed that they too can object to the observation by Falcon if they believe their ability to communicate confidentially with the patient about sensitive and personal information is unduly hampered.

You have stated your intention to continue to have your retained consultants communicate with patients, our clients, over our objections and outside of our presence.   Among other Court orders and laws that preclude such communications is Rule 4.2 of the California Rules of Professional Conduct.  The California Penal Code [section 3501, et seq] also governs studies involving incarcerated persons and requires written consent.  The Court has the power to regulate the amount and timing of discovery in this case.  The Court has indicated that discovery may not proceed without permission.  You have not asked for or received approval from the Court:

*We are again instructing you that we do not consent to CDCR counsel and/or their experts communicating with patients outside of the presence of plaintiffs' counsel.  To be clear, we also object, and the Rule precludes, Falcon asking for the patient's "consent" directly or indirectly (through CDCR staff), over plaintiffs' counsel objection and outside of counsel's presence.*

Here is a proposed statement that we request be provided in writing to and explained to each patient and clinician *before* Falcon observations or interviews, where a patient has a diagnosed cognitive disability, comprehension and agreement should also be confirmed by a non-Falcon clinician and/or plaintiffs' counsel prior to the start of observation:

*CDCR has hired consultants from a private company called Falcon/Voorhis to study the mental health system at this and other prisons.  The purpose of the study is to find out whether mental health staffing can be reduced at this prison.  The study may be used in court in an attempt to reduce the amount of mental health care CDCR is required to provide to you.*

*The consultants have asked to [interview you about your mental health care] or [observe your mental health treatment session.]  If you prefer not to be interviewed or having people observe and take notes during your mental health treatment session,*

*please say so now or at any time during the interview or observation.   If you decide to allow the consultants to interview you or observe your treatment, you are giving permission to CDCR to use whatever information they learn from you or from listening and watching your mental health treatment in their testimony or report.   CDCR and the consultants have agreed that your name and CDCR number would not be disclosed publicly; nor will information you give be provided to CDCR clinicians or custody staff at the prison.   You are free to allow this or not.   You will not be rewarded in any way for agreeing to be interviewed or allowing your treatment to be observed.   Nor will you be punished or harmed in any way if you decide to keep your mental health treatment private.*

*This is not a tour or study by the Coleman Special Master or Plaintiffs' counsel.    If you see people from the Special Master Team or Plaintiffs' counsel, they are here to observe the work of the consultants only.*

An appropriate form for written consent should be developed.

Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission St.  Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
(415) 439-9821 (cell)
mbien@rbgg.com
www.rbgg.com

---

**From:** Damon McClain <Damon.McClain@doj.ca.gov>
**Sent:** Friday, July 14, 2023 10:24 AM
**To:** Michael W. Bien <MBien@rbgg.com>
**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Penny Godbold <PGodbold@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Marissa Hatton <mhatton@prisonlaw.com>

**Subject:** RE: Coleman - Follow up re patient interviews: Falcon Tours

[EXTERNAL MESSAGE NOTICE]

Mike,

Defendants will not agree to stop the tours at the end of July. Defendants have the right to assess their own mental-health system. It seems clear at this point that Plaintiffs seek to obstruct Defendants from doing this. A tremendous amount of planning and effort has gone into their preparations for these tours. It is not practical or feasible for Defendants to ask their consultants, who are working under contract, to simply cease all work and stand by for an indefinite period before resuming their tours. The consultants are busy professionals who have foregone other work projects and set aside this time to complete their work for CDCR. It is a perpetual fact that *Coleman* is a busy case. If Defendants cannot be permitted to evaluate their system when there are multiple filings, hearings, and reporting going on, they will never be allowed to conduct their own assessment of the MHSDS. And Defendants are well aware of the fact that prison tours are inconvenient and burdensome endeavors for the prisons and the attorneys. Defendants have endured countless prison tours for decades in this and other cases. But as I am sure Plaintiffs and the Special Master agree, tours are a necessary component of evaluating the MHSDS despite their burdensome nature.

In 2018, Plaintiffs expressed outrage that Defendants' staffing consultants conducted tours without inviting Plaintiffs to attend, and even asked the Court to order that Defendants' staffing consultants re-conduct their tours so that Plaintiffs could participate. In consideration of the concerns Plaintiffs raised in their 2018 motion (ECF No. 5764), Defendants provided notice of the tours in April, invited Plaintiffs to attend, and spent well over a month providing schedules, providing notice of attendees, and making arrangements for Plaintiffs' counsel and the Special Master's team to attend the tours. But after receiving the notice, you never asked that the tours be postponed due to concerns about the timing or burdensomeness in April or at any other time before Wednesday evening, three days after the tours started. We have reviewed your past motions concerning expert tours and the *Coleman* and *Three-Judge-Court's* orders concerning expert tours, and the current tours comport with those orders and your preferences as stated in Plaintiffs' prior filings.

As for our experts' observation of one-on-one treatment and encounters, they intend to proceed with that next week. A single expert will attend each observed one-on-one treatment session or encounter and will solely observe and not otherwise interact with the patient. Of course, Plaintiffs' counsel are welcome to attend if they choose to. And as we previously stated, defense counsel do not intend to sit in on any one-on-one encounters the experts observe. This should address your concern about the number of observers.

Defendants are not aware of any Court order or law that precludes observations of one-on-one encounters when the patient consents. Indeed, such observations have

previously occurred without objection and are consistent with the work of Mr. Hayes, Dr. Metzner, and Dr. Penn on this case.

As we explained, observations of one-on-one treatment and encounters are an important component of the experts' evaluation of the MHSDS and the quality of care provided. Defendants have confirmed with their experts that these types of observations are routine in other jurisdictions when evaluating the provision of mental healthcare.

To be clear, the expert's observations of one-on-one encounters would be subject to patient consent and patients could revoke their consent at any time. Furthermore, if any treating clinician were to indicate that observation of one-on-one treatment for a particular patient is contraindicated for any reason, or if a patient's mental health status precluded obtaining actual consent, the experts would forego observing that treatment session. We believe the approach outlined above addresses your concerns.

-Damon

---

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Wednesday, July 12, 2023 5:09 PM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>
**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Penny Godbold <PGodbold@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Marissa Hatton <mhatton@prisonlaw.com>
**Subject:** Re: Coleman - Follow up re patient interviews: Falcon Tours

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Damon

The burden of these tours on plaintiffs, the institutions, plaintiffs' counsel and the Special Master Team is extraordinary, especially given all of the other obligations in Coleman. Defendants, for example, have requested that we respond rapidly to important new proposals (telehealth and RHU). We are all getting ready for two contempt trials set for September, including expert and other discovery. We also have many other Coleman projects, such as the ongoing data verification process that must be

completed in the next few months.  Given that the Falcon experts have
been working since 2020 and have yet to provide any opinions to the
Court, and that defendants have also not indicated for what purpose in
the litigation Falcon is engaged, we request that the tours be paused at
the end of July to permit the parties to prepare for the contempt
proceedings and work on other more pressing Coleman projects.

We can then evaluate how the Falcon tours can proceed on a schedule
and in a manner that is fair to both the experts, the plaintiff class and
plaintiffs' counsel.   If we cannot agree, we will seek appropriate relief
from the Court.  At that time, we can raise any and all remaining disputes
about the Falcon tours, their schedule, access to patients and treatment,
etc.

Michael Bien

Sent from my iPad

On Jul 12, 2023, at 7:48 AM, Damon McClain
<Damon.McClain@doj.ca.gov> wrote:

[EXTERNAL MESSAGE NOTICE]

Mike,

It appears we may not be able to reach an agreement on one-on-one
treatment.  Defendants have a right to evaluate their provision of mental-
health treatment, whether it is to improve the mental-health system, or
for litigation, or for both reasons.  The observation of one-on-one
treatment by a single expert consultant would not be disruptive or
harmful and is a necessary component of the consultants' planned
evaluation of the system.  If Plaintiffs are concerned about large groups
observing one-on-one treatment, they could either not participate in
these observations or send a single representative to observe, as they did
during the expert observations of telepsychiatry one-on-one encounters
earlier this year.  Defendants intend to seek Court intervention on this
matter if no agreement is reached.  Please let us know if Plaintiffs'
position changes on this issue as we prepare to do that.

It is not surprising that some confusion persists about the tours given that
a Special Master team and attorneys from your office are a part of the
tour group.  Defendants and their consultants will continue to make best
efforts to avoid this confusion by clearly communicating the nature of the

tours to patients and staff when necessary.  If Plaintiffs' counsel are ever concerned that the nature of the tours was not adequately described or that patients or staff are confused, please let us know in real time so that Defendants counsel or the consultants can correct any misunderstandings immediately.

Based on the observations of our attorneys and consultants, we believe that patients have genuinely consented to the consultant observations and have not expressed concerns.  In fact, at SAC, an attorney from your office confirmed directly with the patients that they consented to the observations.  But if Plaintiffs' counsel observe something to the contrary during the tours, it would be helpful if they would speak up immediately so that the matter can be addressed instead of raising the concern after the observation has concluded.   For our part, we will reiterate to the consultants that they should not to proceed with observations unless they are reasonably certain that the patients have consented.

We very much appreciate your flexibility on the consultants splitting up to observe IDTTs and group treatment because doing so is necessary to complete the tours in a reasonably efficient manner.  And we fully understand the struggle to staff the tours with attorneys because it is a significant challenge for Defendants too.  We agree that if any single patient in a group-treatment session does not consent to the observation, then the consultants will not observe that group.  And you are correct that the consultants have been instructed that they are not to engage in conversations with patients outside the presence of Plaintiffs' counsel.

-Damon

---

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Tuesday, July 11, 2023 6:23 PM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>
**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Subject:** Re: Coleman - Follow up re patient interviews: Falcon Tours

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Damon

We remain opposed to observations of one on ones.  Today at CHCF, where defendants' understaffing of MH clinical positions is at crisis levels, an EOP patient reported that he had only seen his primary twice since January 1!  It is unacceptable to interfere with the tiny amount of one on one treatment going on for the benefit of a litigation expert study.

Defendants and their experts at CHCF did a better job of identifying themselves as not being a Coleman Special Master tour but some confusion persists.  Patients are not truly "consenting" to interviews or observations.  The pressure to allow the observers/experts in to an otherwise confidential and private clinical health care encounter is great.  We are already in the room and the patient is asked "are you uncomfortable" or "are you OK with everyone staying to observe".  Several staff introduced the group as "Coleman" to the patients.  A rec therapist running a group we observed today said that the patients were unusually quiet and "shy" today—she thought due to our presence.  It should not be a surprise that having observers present can change the nature of a clinical interaction.

Be that as it may, we are doing are best to facilitate defendants' tours.  We will not, at present, object to defendants' experts splitting up to observe IDTTs and groups simultaneously, resulting in the inability of plaintiffs' counsel to be present at each encounter by defendants' experts with represented parties.   Your suggestion that we simply send along two more attorneys for each tour is simply beyond the ability of plaintiffs' counsel to staff.

We expect that counsel has instructed their experts that they are not to engage in conversation with patients outside the presence of plaintiffs' counsel.  We continue to object to any such communication but are permitting defendants' experts to observe group therapy and IDTTs, even if we are not present.  (Of course, if the patient in the IDTT objects, the experts should leave.  And if one or more of the patients in a group object, the experts should leave.).

We are still waiting to learn more details about the scope and schedule for the Falcon prison tours.   We have been able to work out must of our disputes and I expect that we can continue to work cooperatively so that the tours can go forward in a manner that is fair to the plaintiff class.

Thanks.

Michael


Sent from my iPad


On Jul 11, 2023, at 9:41 AM, Damon McClain
<Damon.McClain@doj.ca.gov> wrote:


| [EXTERNAL MESSAGE NOTICE] |
Mike,

We understand your position that Defendants' consulting
experts cannot observe one-on-one treatment, even with
the patient's consent.  We are not aware of any Court order
or law that would prevent Defendants' consultants from
observing such treatment so long as the patient consents.
We are also not aware of any clinical basis to preclude the
proposed observations.  In fact, Plaintiffs' expert Pablo
Stewart, Defendants' expert Joseph Penn, and an attorney
from your office recently observed one-on-one patient
treatment—with patient consent—at CMF and SQ to
evaluate treatment via telepsychiatry.  And it is routine
practice for supervisors to occasionally observe clinical staff
providing patient treatment for the purpose of evaluating
staff performance.

We understand that one of your concerns is that the
presence of "outsiders" during the treatment will harm
patients.  To be clear, Defendants' consultants only intend to
have a single licensed mental-health professional present
during such encounters, and that expert would be there for
the sole purpose of observing the encounter to evaluate it.

We also understand your concern that patients might not be
comfortable having a treatment session observed.  But this
concern is adequately addressed by providing each patient
the option of either consenting or not consenting to the
observation.  No one-on-one treatment would be observed
without the patient's consent.

In light of Plaintiffs' stated position on this issue, and because this is an important component of the consultants' evaluation of CDCR's mental-health system, Defendants will evaluate their options if you do not reconsider your position.

Regarding the planned observations of IDTTs, intake and screening, and group treatment, the experts intend to obtain patient consent and Defendants do not object to a Plaintiffs' attorney being present for those observations.  But because you're only now raising this concern, Defendants' experts intend to go forward with their planned observations of these activities for these tours.  Please make all efforts to have sufficient staff present so that the tours can go forward as planned.

Regarding your other concerns, Defendants do not intend for anyone to believe that these tours are being conducted by the Special Master, and we will continue to make efforts to avoid any confusion about that during the tours.  For the purpose of interviewing patients, they will be told that the interviews are being conducted by expert consultants hired by CDCR for the purpose of evaluating the mental-health system.  It is only logical that the evaluation may include recommendations for improving the provision of care.  So we don't view the experts' representation to that effect as inaccurate.

Defendants have been upfront about the purpose of the tours and the work our consultants need to do to assess the system and patient care. The restrictions Plaintiffs seek to impose on this work are unreasonable and unfairly restrict Defendants' ability to have its own assessment of their system and patient care.  Similar observations and assessments have been made during the course of this case without the restrictions you now seek to impose and have not resulted in any harm to the patients.

-Damon

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Monday, July 10, 2023 3:46 PM
**To:** Samantha Wolff <SWolff@hansonbridgett.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>

**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>
**Subject:** Re: Coleman - Follow up re patient interviews: Falcon Tours

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Melissa and I spoke today during the CHCF tour.  Plaintiffs maintain our objection to defendants' experts observing one on one mental health treatment (psychiatry, psychology, social work).   Having outsiders present in a one on one mental health encounter, by definition, materially changes the nature of the encounter and the opportunity for sharing confidential, embarrassing or personal information that may be highly relevant to the patient's treatment.  CDCR is currently unable to deliver timely one on ones in many programs and some patients are only scheduled to see a clinician one on one every few months.  The danger of harm to the class members far outweighs the usefulness of the additional information to be gained by direct observation.  For example, Falcon can still observe where one on ones take place, how long they last, whether or not they are confidential,  and read the clinical note.

While some of the same issues can arise in intake and screening, we are willing to allow those to go forward with patient consent and plaintiffs' counsel present.  We also will permit the observation of IDTT's and group treatment with plaintiffs' counsel present and patient consent.

There was a lot of confusion today at CHCF about who the Falcon experts are and what they are doing.  Custodial and clinical staff, especially when also observing members of the Special Master Team on the tours, assume this is a Coleman Special Master Tour.  Spaces were "reserved for Coleman."

Melissa has tried hard to correct CDCR employees and explain that this is not a Coleman Special Master tour, but clearly whatever effort was made in advance of the tours to communicate about them was ineffective.   It is not appropriate for anyone—CDCR staff or patients— to believe that the Falcon tour, litigation experts hired by litigation counsel, are working for the Coleman Special Master.

Nor is it appropriate for Falcon experts to represent that they touring to study the system in order to improve mental health care, when their work is actually intended to support a motion to modify the Program Guide to make it less costly and more "efficient" (reduce clinical staffing) and/or to terminate the Coleman case completely and end judicial supervision of the system.   While defendants are certainly entitled to hire experts to support their litigation goals, they are not entitled to benefit from the good will and access that the Special Master Team—-neutrals working for the Court and not for either party—have gained over decades of work. Falcon's plan to randomly select patients for interviews will again raise this issue of confusion with the Special Master Team, which from time to time uses the same method.  What will CDCR staff be told about the process and what will the patients be told?

Michael Bien

Sent from my iPad

On Jul 7, 2023, at 3:53 PM, Ernest Galvan <[EGalvan@rbgg.com](mailto:EGalvan@rbgg.com)> wrote:

This is to sum up agreements and remaining disputes regarding the patient interviews as of the end of business on Friday, 7/7/23:

Points of Agreement:

1. Plaintiffs' counsel may meet with their clients privately before the interviews.
2. Plaintiffs' counsel will be present at patient interviews.
3. The entirety of the interview will be recorded and those present will identify

themselves on the recording.

4. Recordings may be provided to client counsel but will not be provided to CDCR employees at the facilities.  The recordings will be maintained by the State's experts.

5. Recordings to be provided to Plaintiffs' counsel within 2 business days of recording.

6. No patient-level information (even anonymized information) will be provided to clinicians or custody staff at the institution.  Information provided by patients during the interviews will be anonymized before use in any litigation to protect the identify and confidentiality of the patient and the information.  The expert may, however, inform mental health staff at the institution if they have a concern about an individual's immediate safety (e.g., suicide risk).

7. Defendants have provided a sample set of questions the experts will be using for the patient interviews.

   1. Did your treatment plan provide you with a good understanding of the interventions that would be provided?

   2. Did you feel that you contributed to your treatment plan and that your input was valued?

   3. Do you believe your progress is reviewed regularly and that you receive feedback on that progress from the IDTT?

   4. Do you feel you receive enough contact with your PC?

   5. Do you feel you receive enough contact with your Psychiatric Provider?

8. Defendants have provided information on the method being used to select patients to be interviewed.  (Details provided below for information—

Plaintiffs reserve the issue of whether this many interviews is practicable.)

1. VRJS/Falcon will request an up-to-date MHSDS roster 1-2 days prior to each facility visit.
2. To prevent selection bias, a subset of 10 inmate-patients for each LOC subgroup will be created, using a simple random sample selection process Excel.
3. Note that 10 names will be selected in acknowledgement that participation in the interview is fully voluntary and not all inmates will wish to participate.

9. Defendants agree to request that their experts preserve information in the event they are ultimately designated as testifying experts.

Points of Disagreement.

1. Observation of treatment. Defendants seek a full range of treatment, including intake, screening, MH follow-up contacts (1:1s), IDTTs, and groups. Plaintiffs object to expert groups attending intake, screening, and 1:1 contacts.

Additional Information Re Structure of Tours (Not a point of agreement or disagreement):

1. In terms of the number of interviews, it will vary somewhat across facilities but it is equal to 3 completed interviews per LOC represented in each facility. So for example, if a facility contains CCCMS, EOP, MHCB, and STRH, they will complete 12 interviews. The experts also would like to interview 10 patients (total statewide) for each of the following groups:

1. High frequency transfers in/out of higher LOC since 1/1/2019
2. High MH acuity (w/ PC2602 in place)
3. High frequency of placements in Restricted Housing since 1/1/2019

2. When possible, the experts would like to work with facilities to accomplish at least a portion of these interviews virtually to preserve time and resources.

3. In general, they will first observe and evaluate the systems in place at each facility, reserving the interviews for the latter part of their facility visits.  For larger facilities with longer study timeframes that require them to return a second time, patient interviews will be conducted during the second visit (e.g., SAC and CHCF - they're returning in August).  But for smaller facilities where they are only visiting for 1 week (1 visit), the interviews will be conducted towards the latter part of the week.

Ernest Galvan
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 296-2293 (direct)
(415) 694-3606 (mobile)
(415) 433-7104 (fax)
egalvan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbgg.com

**From:** Ernest Galvan <EGalvan@rbgg.com>
**Sent:** Friday, July 7, 2023 1:22 PM
**To:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>;

v_Damon.McClain@doj.ca.gov
<Damon.McClain@doj.ca.gov>; Elise Thorn
<Elise.Thorn@doj.ca.gov>
**Subject:** RE: Coleman - Follow up re patient
interviews [IMAN-DMS.FID12440]

Sam:

Thanks for the additional information.  Skipping
to your two questions at the end:

1. We do not agree to expert interviews
   without plaintiffs' counsel there.  We
   intend to be present for the interviews.
2. Yes, we agree to receiving the recordings
   within 2 business days.

The number of interviews per site, 10, does
raise the question of whether that will leave
time to observe anything else.  As with the
other elements, we should revisit this after the
first tours.

On experts being present for 1:1 treatment,
that raises serious concerns about interfering
with treatment.  The same questions arise with
screening and intake, where it is vital that the
patient feel safe to disclose information about
thoughts of self-harm.  Neither of those
contexts should be interfered with this way.  I
suggest further discussion of this problem
during the Stockton tour on Monday when
Mike Bien will be present.

Ernest Galvan
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 296-2293 (direct)
(415) 694-3606 (mobile)
(415) 433-7104 (fax)
egalvan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message
may be privileged, confidential and protected from

disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbgg.com

---

**From:** Samantha Wolff <SWolff@hansonbridgett.com>
**Sent:** Friday, July 7, 2023 12:36 PM
**To:** Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>
**Subject:** RE: Coleman - Follow up re patient interviews [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

Ernie,

Below are the answers to your outstanding questions, and a couple questions for you at the bottom.

Sample Questions
  1. Did your treatment plan provide you with a good understanding of the interventions that would be provided?
  2. Did you feel that you contributed to your treatment plan and that your input was valued?
  3. Do you believe your progress is reviewed regularly and that you receive feedback on that progress from the IDTT?
  4. Do you feel you receive enough contact with your PC?
  5. Do you feel you receive enough contact with your Psychiatric Provider?

Selection Methodology
  1. VRJS/Falcon will request an up-to-date MHSDS roster 1-2 days prior to each facility visit.

2. To prevent selection bias, a subset of 10 inmate-patients for each LOC subgroup will be created, using a simple random sample selection process Excel.
3. Note that 10 names will be selected in acknowledgement that participation in the interview is fully voluntary and not all inmates will wish to participate.

In terms of the number of interviews, it will vary somewhat across facilities but it is equal to 3 completed interviews per LOC represented in each facility.  So for example, if a facility contains CCCMS, EOP, MHCB, and STRH, they will complete 12 interviews.  The experts also would like to interview 10 patients (total statewide) for each of the following groups:

4. High frequency transfers in/out of higher LOC since 1/1/2019
5. High MH acuity (w/  PC2602 in place)
6. High frequency of placements in Restricted Housing since 1/1/2019

When possible, the experts would like to work with facilities to accomplish at least a portion of these interviews virtually to preserve time and resources.

The experts also intend to observe the full range of MH services, including MH Screening and Intake, MH follow-up contacts (1:1s), IDTTs, and groups.

In general, they will first observe and evaluate the systems in place at each facility, reserving the interviews for the latter part of their facility visits.  For larger facilities with longer study timeframes that require them to return a second time, patient interviews will be conducted during the second visit (e.g., SAC and CHCF - they're returning in August).  But for smaller facilities where they are only visiting for 1 week (1 visit), the interviews will be conducted towards the latter part of the week.

Lastly, have you decided whether you are okay

with our experts interviewing the patients one-on-one (without counsel and OSM present in the room, and after you've had a chance to meet with your client privately)?  And are you okay with us sending the recordings 2 business days after the completion of each facility tour?

Thanks,
Sam

---

**From:** Ernest Galvan <EGalvan@rbgg.com>
**Sent:** Friday, July 7, 2023 8:09 AM
**To:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; v_Elise.Thorn@doj.ca.gov <Elise.Thorn@doj.ca.gov>
**Subject:** [EXTERNAL] RE: Coleman - Follow up re patient interviews [IMAN-DMS.FID12440]

**EXTERNAL:** Use caution when opening attachments, links or responding to this e-mail.

---

Dear Sam—

Thanks for the summary.  All of this is contingent on how it goes during the first tours, as there are so many moving parts we do not know about yet.  The size of the schedule and the number of experts splitting up and going different directions raise significant issues regarding the burden of these tours.

When you look at the sample methodology, can you also find out how many client interviews they intend to do per facility?

Ernest Galvan

ROSEN BIEN GALVAN & GRUNFELD LLP

101 Mission Street, 6th Floor

San Francisco, CA 94105

(415) 433-6830 (telephone)

(415) 296-2293 (direct)

(415) 694-3606 (mobile)

(415) 433-7104 (fax)

egalvan@rbgg.com

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbgg.com

---

**From:** Samantha Wolff
<SWolff@hansonbridgett.com>

**Sent:** Thursday, July 6, 2023 10:28 PM

**To:** Ernest Galvan <EGalvan@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>

**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>

**Subject:** Coleman - Follow up re patient interviews

[EXTERNAL MESSAGE NOTICE]

Dear Ernie, Lisa, and Jenny,

Thanks again for our call this afternoon.  I wanted to confirm where I believe we have agreement and note the few remaining issues that have not yet been resolved:

Areas of Agreement
1. Plaintiffs' counsel may meet with their clients privately before the interviews.
2. The entirety of the interview will be recorded and those present will identify themselves on the recording.
3. Recordings may be provided to client

counsel but will not be provided to CDCR employees at the facilities. The recordings will be maintained by the State's experts, not Hanson Bridgett or the AG's office.

4. No patient-level information (even anonymized information) will be provided to clinicians or custody staff at the institution. Information provided by patients during the interviews will be anonymized before use in any litigation to protect the identify and confidentiality of the patient and the information. The expert may, however, inform mental health staff at the institution if they have a concern about an individual's immediate safety (e.g., suicide risk).

5. Defendants will provide a sample set of questions the experts will be using for the patient interviews.

6. Defendants will provide information on the method being used to select patients to be interviewed.

7. Defendants agree to request that their experts preserve information in the event they are ultimately designated as testifying experts.

Remaining Issues

1. Whether Plaintiffs will agree that the expert may conduct a one-on-one interview of the patient without counsel and the Special Master present (following a confidential meeting between Plaintiffs' counsel and the patient/client to ensure informed consent).

2. On the issue of recordings, thank you for your email. Can we agree to provide you with the recordings within 2 business days following completion of the facility tour? That way, all recordings for a single institution are kept together and provided as the tour concludes.

Additionally, as we stated during the call, we cannot agree to your points 7 (our experts recording interviews with our clients) and 8 (immediate production of all discovery).  You were going to get back to us on this as well.

We look forward to hearing from you on these issues by 2pm tomorrow (earlier, if possible, would be great).  We will also provide the following information to you tomorrow:

1. Confirmation whether the experts intend to observe treatment and, if so, which types of treatment
2. Provide sample set of questions (if we reach agreement on the remaining issues)
3. Provide selection methodology (if we reach agreement on the remaining issues)

Thanks,
Sam

---

**Samantha Wolff**
**Partner**
Hanson Bridgett LLP
(415) 995-5020 Direct
(415) 995-3547 Fax
swolff@hansonbridgett.com



 

---

This communication, including any attachments, is confidential and may be protected by privilege. If you are not the intended recipient, any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email, and permanently delete all copies, electronic or other, you may have.

The foregoing applies even if this notice is embedded in a message that is forwarded or attached.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit E



**From:** "Michael W. Bien" <MBien@rbgg.com>
**Date:** July 20, 2023 at 8:31:45 AM PDT
**To:** Damon McClain <Damon.McClain@doj.ca.gov>
**Cc:** Cara Trapani <CTrapani@rbgg.com>, Ernest Galvan <EGalvan@rbgg.com>, Elise Thorn <Elise.Thorn@doj.ca.gov>, "Carson R. Niello" <CNiello@hansonbridgett.com>, Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>, "Laurel E. O'Connor" <LOConnor@hansonbridgett.com>, "Paul B. Mello" <Pmello@hansonbridgett.com>, Samantha Wolff <SWolff@hansonbridgett.com>
**Subject: Re: ICC and UCC Observations**

 As with many other parts of these tours, the request to observe these otherwise private events where critical decisions about patients' lives are made were not discussed with plaintiffs' counsel in advance.  We agree that patients should have the right to refuse the observation by Falcon.  Therefore the "consent" process defendants are using is inadequate to be meaningful.

Michael


Sent from my iPhone


On Jul 20, 2023, at 7:48 AM, Damon McClain <Damon.McClain@doj.ca.gov> wrote:


[EXTERNAL MESSAGE NOTICE]

Hi Mike and Cara,

Because ICCs and UCCs are not confidential and are not treatment, we don't think there is any requirement to obtain consent or to read the entire consent form before each meeting. However, we advised our attorneys that at the start of the ICC or UCC meetings, the subject participant should be advised that there are observers present and it should be confirmed that the individual consents to the observation.


-Damon


**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Wednesday, July 19, 2023 11:56 AM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>
**Cc:** Cara Trapani <CTrapani@rbgg.com>; Ernest Galvan <EGalvan@rbgg.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Carson R. Niello <CNiello@hansonbridgett.com>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Laurel E. O'Connor

<LOConnor@hansonbridgett.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>
**Subject:** Re: Bien Email Chain

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Issue was consent.  Still have right to refuse observations.

Michael

Sent from my iPhone

> On Jul 19, 2023, at 11:52 AM, Damon McClain <Damon.McClain@doj.ca.gov> wrote:

[EXTERNAL MESSAGE NOTICE]

Hi Cara,

I've received messages from the tours that you are objecting to observations of ICCs.  It's our understanding—based on the below email chain—that Plaintiffs object to observations of certain one-on-one treatment encounters.  No objections are raised below re observing ICCs, which are not confidential and do not constitute treatment.  Defendants' experts should be free to observe ICCs and they intend to do so.  But we can discuss further if necessary.

-Damon

---

**From:** Damon McClain <Damon.McClain@doj.ca.gov>
**Sent:** Tuesday, July 18, 2023 9:14 AM
**To:** Michael W. Bien <MBien@rbgg.com>
**Cc:** Samantha Wolff <SWolff@hansonbridgett.com>; Lisa Ells <LElls@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Paul B. Mello <Pmello@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Sara Norman <snorman@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Penny Godbold <PGodbold@rbgg.com>; Hannah Chartoff <HChartoff@rbgg.com>; Marissa Hatton <mhatton@prisonlaw.com>
**Subject:** RE: Coleman - Follow up re patient interviews: Falcon Tours

Mike,

Thank you for those agreements.  Do you also agree with our proposal to request leave to file a joint statement of the disputes and request a telephonic