DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF JENNY S. YELIN IN SUPPORT OF PLAINTIFFS' POSITION IN JOINT STATEMENT REGARDING DEFENDANTS' EXPERT TOURS**<br><br>Judge: Hon. Kimberly J. Mueller |

[4327993.1]

DECLARATION OF JENNY S. YELIN

I, Jenny S. Yelin, declare:

1. I am an attorney duly admitted to practice before this Court. I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration based in support of Plaintiffs' Position in the Joint Statement Regarding Defendants' Expert Tours.

2. After receiving an e-mail on June 13, 2023 notifying us of the dates of the July and August Falcon tours, on June 15, I participated in a telephone call with Ernest Galvan from my office, as well as Elise Thorn from the Attorney General's Office and Samantha Wolff of Hanson Bridgett, both representing Defendants, to discuss (among other things) Defendants' planned expert tours. During that call, Ms. Wolff informed us that defense counsel still did not know many details about the tours. She informed us that Defendants expected there to be 3-4 experts on each tour, that the experts would be splitting up into groups while at the prisons, and that the experts wanted to observe all 3 watches at each prison. We asked Ms. Wolff whether the experts would indeed be touring on weekends, as their initial schedule stated, and she confirmed that they would use the weekend dates provided in the schedule.

3. On July 20, 2023, I attended the morning session of the Falcon tour of San Quentin State Prison ("SQSP"). The day before, my colleague Cara Trapani had been the representative for Plaintiffs' counsel. She learned during the day on July 19 that the tour schedule for July 20 would go from 8:00 a.m. to 1:00 p.m., there would be a break from 1:00 p.m. to 5:30 p.m., and the tour would reconvene from 5:30 p.m. to 8:30 p.m. At approximately 8:20 p.m. on July 19, Ms. Trapani contacted me to let me know that she had heard from defense counsel that the schedule had changed. I was now to report at 7:30 a.m. and the first part of the tour was expected to end at 1:30 p.m.

4. I arrived at SQSP by 7:30 a.m. on July 20, 2023. I waited with Defendants' counsel Laurel O'Connor, of Hanson Bridgett, and Namrata Kotwani, of the Attorney

[4327993.1]

1

1  General's Office, until the experts, Dr. Elizabeth Falcon (psychologist), Robert "Bob"
2  Ochs (custody), and Dr. Joe Baskin (psychiatry), arrived a few minutes before 7:40 a.m.
3  Deputy Special Master Kerry Walsh and Dr. Jeffrey Metzner met us inside the prison.

4      5.    I first accompanied Dr. Falcon, Dr. Metzner, and Ms. O'Connor to observe
5  EOP IDTTs in the H Unit. When we arrived, a Supervising Clinician was reading the
6  consent disclosure statement Defendants had agreed to provide to a group of patients who
7  were waiting outside the IDTT room. She asked if any of them objected to the group
8  observing the IDTTs. None of the patients spoke up, so we entered the room and observed
9  the IDTTs. During one patient's IDTT, the clinical team noted that the patient had arrived
10 for his IDTT but had left before he was called in, and stated that this patient had severe
11 psychosis, so I was concerned that he may have left when he realized his IDTT would be
12 observed. I was also concerned that one patient did not speak English, and the Correctional
13 Counselor on his team was translating the IDTT meeting for him; I wondered how he
14 could have consented to the observation based on hearing the disclosure statement read in
15 English along with the other patients waiting outside.

16     6.    After observing these IDTTs, we also observed a very brief ICC hearing for
17 an EOP patient. No one read the full consent disclosure to the patient. We were all
18 already in the room when he arrived, and he was just asked if he was ok with the group
19 observing him. He said yes. We returned to the conference room where the expert group
20 had been set up during the week at approximately 9:30 a.m., and I learned that there was
21 nothing on the schedule until 11:30 a.m.

22     7.    At 11:30 a.m., the group went to observe scheduled CCCMS IDTTs. There
23 were seven patients on the schedule. Before the first IDTT, the Supervising Psychologist
24 Supervisor came to tell us that the patient's psychiatrist had not consented to his IDTT
25 being observed. Our group went into an adjacent conference room to wait for the next
26 IDTT. Several minutes later, the Supervising Psychologist Supervisor came back into the
27 room with the Chief of Mental Health and someone who I believe was an Acting
28 Psychiatrist Supervisor. They informed our group that of the seven patients on the

schedule, two patients had refused to allow us to observe after hearing the consent disclosure statement, and the psychiatrist on the team for the other five had refused to allow those patients' IDTT meetings to be observed. I later learned that this psychiatrist had 1:1 consultations with patients on Monday, July 17, 2023, and one of the Falcon experts had observed those treatment interactions before Defendants had agreed to pause their observations of 1:1 treatment later that day.

8. After the failed observations of the CCCMS IDTTs, we were told that we could take a lunch break and to come back at 1:00 p.m. because the experts planned to interview a CIT clinician and supervisor. I returned to the conference room after lunch at 12:45 p.m. Ms. O'Connor, Ms. Kotwani, and Dr. Falcon informed me that they had decided to skip the interview of the CIT clinician and supervisor, and that we were done and could leave, but that the group would meet again at 5:30 p.m. for the evening observations. I communicated the meeting time to my colleague Ms. Trapani, who planned to cover the evening session for Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 25th day of July, 2023.

_____
Jenny S. Yelin