DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF AMY XU IN SUPPORT OF JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS**<br><br>Judge: Hon. Kimberly J. Mueller |

[4327828.2]

DECLARATION OF AMY XU IN SUPPORT OF JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS

I, Amy Xu, declare:

1. I am an attorney duly admitted to practice before this Court. I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration based in support of Joint Statement Re Defendants' Expert Tours.

2. I represented Plaintiffs during Defendants' Falcon expert tour at Salinas Valley State Prison (SVSP) from Monday, July 17, 2023 through Friday, July 21, 2023.

3. At SVSP, Defendants sent two expert consultants from Falcon: Dr. Kimberly Weaks and Ewa Podlacha. They were supposed to be joined by Mr. Robert Ochs starting on Thursday, July 20, 2023, but I was informed during the week that Mr. Ochs would not attend this tour. Defendants had two attorney representatives: Elise Thorn of the California Attorney General's Office and Carson Niello of Hanson Bridgett. The Special Master had two members of his team present through the entire week: Kristina Hector and Dr. Sharen Barboza. I was the only representative for Plaintiffs.

4. My declaration is based on the contemporaneous notes I took on paper and on my laptop during the tours.

## Lack of Schedule and Disorganization

5. Defendants provided Plaintiffs with a 9:00 A.M. start time for the first day of the SVSP tour, but at that time, did not provide any other information about the anticipated start and end time for the other days of the tour. When the experts arrived at SVSP on July 17, there was no predetermined plan about how the experts would tour and observe treatment.

6. Once onsite, Defendants' experts did not share a schedule of activities with me, the Special Master's representatives, or the institution. Instead, each day Defendants' experts would review schedules provided by SVSP or discuss available programming with SVSP staff, and devise an approximate schedule for the day. At times, this would mean that we would arrive to observe treatment and find that it had been cancelled or was not

running. Additionally, Defendants' experts informed us of the next day's start time, which ranged from 6:30 A.M. to 8:00 A.M., usually at or around the conclusion of each day. We were not told when the tour would conclude each day. At one point during the tour, I was told that the experts might tour at night during third watch, but those plans were later cancelled.

### Confusion Over Tour Purpose

7. Repeatedly throughout the week, SVSP staff members thought that we were touring as part of the *Coleman* Special Master's team and referred to our group as a *Coleman* tour. For example, on July 18 in the morning, a custody officer in Z-9, which is the short-term restricted housing (STRH) unit referred to our group as a "*Coleman* tour" until he was corrected.

8. SVSP staff members were confused about the tour purpose and who was involved in the tour. For example, when introducing the Falcon experts and other observers to patients on July 17, a nurse said that the consultants were there to "improve the [mental health] program."

9. I observed Defendants' experts making vague statements to CDCR staff that obfuscated the purpose of their tours. Throughout the week, Dr. Weaks introduced herself to SVSP staff and incarcerated people by saying that she was there to "observe the process." Defendants' team of experts did not explain, nor did Defendants' attorneys explain, that the experts were retained for litigation purposes to support a possible motion to modify the Court's orders in this case, or to terminate it entirely.

### Patient Treatment Interruption

10. On July 17, 2023 during the opening meeting, Dr. Matthew Borba, Chief of Mental Health at SVSP, informed the Falcon experts and other tour attendees that SVSP is "really struggling with staffing." Dr. Borba further elaborated that certain yards do not have any clinicians assigned. Nevertheless, numerous SVSP staff members were taken away from their regular responsibilities and escorted our group around the institution throughout the week, including Dr. Muriel Yanez (Chief Psychologist for SVSP),

Dr. Lindsey Hailston (Chief Psychologist for SVSP PIP), and Benjamin Cornelsen (Supervising Social Worker for SVSP PIP).

11. On July 17, around approximately 9:45 A.M., I attended an EOP group with Dr. Weaks, Carson Niello, and Kristina Hector. When told that he may have observers, the Recreational Therapist leading the group stated that the group "would not discuss anything personal." I took that to mean that the Recreational Therapist anticipated that the content of the group would change due to the number of observers.

12. On July 17 in the afternoon, I attended an EOP group with Dr. Weaks and others in A-yard. After the Recreational Therapist read the consent script, a patient indicated that he no longer wanted to participate in the group. I stopped the patient from leaving the group and told him that the observers would leave instead. I do not know if that would have occurred if I would not have been in attendance during that part of the tour.

13. On July 18, I accompanied Ewa Podlacha, Falcon expert, as she attempted to observe mental health intake interviews in Receiving and Release (R&R). The nurse read the patient the consent script, and the patient declined to be observed.

14. On July 18 at around 3:45 P.M., I observed Dr. Weaks as she planned to observe Ms. Peterson, a supervising social worker, conduct cell-front mental health rounds in A-facility. Ms. Peterson explained that she conducted these rounds weekly because A-facility currently only has one clinician for approximately 150 EOP patients, and this is a way to identify people with serious mental health issues who are otherwise unable to see their clinician for routine contacts due to staffing shortages. I objected to Dr. Weaks observing these rounds because her presence, along with the presence of additional observers, would disrupt the efficacy of cell-front mental health rounding, which was already a poor substitute to the routine and confidential contacts that EOP patients are entitled to. Based on my objection, defense counsel instructed Dr. Weaks to observe the cell-front mental health rounding from a distance, out of sight, and out of earshot to maximize confidentiality for the patient. I do not know if that would have occurred if I

would not have been in attendance during that part of the tour.

15. On July 19 at around 9:40 A.M., I observed a PIP treatment group in TC-1 which took place while two patients were in therapeutic treatment modules (TTMs) due to their maximum custody status.  The clinician leading the group read the consent script and obtained consent from the patients before our group entered, which consisted of Dr. Weaks, Carson Niello, Sharen Barboza, and me.  During the group, one patient referenced how the treatment was different and the other patient was quieter than usual because of the observers in the room, even though both patients had consented to having observers.

16. On July 19 in the afternoon, Dr. Hailston, the chief psychologist for SVSP PIP, stated that she was going to be a part of a discharge IDTT and ICC meeting the following day.  She said that the Falcon experts and other observers should probably not attend the ICC, which would also be attended by custody staff, as that number of people in one room would likely have a negative impact on the patient.  Despite this warning, Dr. Weaks decided to observe both the IDTT and ICC meeting on the morning of July 20, bringing along with her defense counsel, the Special Master's expert, and me.

17. On July 20 at around 9:15 A.M., I accompanied Dr. Weaks to TC-1, a PIP unit, as she attempted to observe an initial IDTT.  We were informed by the clinician that the patient did not consent to being observed.

18. On July 20 at around 12:45 P.M., I accompanied Dr. Weaks as she observed a PIP treatment group in C-yard for patients with life sentences in prison.  One patient left the group while the clinician read the consent script, stating that he was tired and did not want to attend.  Later, the clinician informed us that the patient who left was not comfortable having observers, but opted to leave because he did not want to "ruin it for everyone else."

19. On July 20 at around 2:45 P.M., I accompanied Dr. Weaks, defense counsel, and the Special Master's expert to observe a PIP group led by a Recreational Therapist in TC-1.  At least one patient left the group early and did not return.  It was unclear whether

that was solely because of the presence of observers or some other reason.

20. On July 21, I observed Dr. Weaks attempt to observe seven IDTTs in the MHCB and/or the CTC. Two patients did not consent to having observers in their IDTTs. Dr. Weaks observed at least two IDTTs that were held while the patients were *in abstentia*, and therefore could not give consent.

21. Additionally, on July 21 at around 1:00 P.M., I observed Dr. Weaks attempt to observe the IDTT for a patient in the CTC whom the treatment team described as experiencing cognitive impairment. Members of the patient's treatment team stated they had conducted several Montreal Cognitive Assessments (MoCA) which led them to conclude that the patient had severe dementia. Nevertheless, Dr. Weaks still wanted to observe the patient's annual CCCMS IDTT, which the treatment team intended to hold bedside in the CTC. I strongly objected and stated that the patient could not provide informed consent to being observed. The treatment team ultimately agreed with me that the patient could not provide informed consent, and Dr. Weaks did not observe this IDTT.

**Lack of Informed Consent**

22. Starting on July 17, defense counsel had a consent script that they distributed to all clinicians, which was read to patients before the Falcon experts observed group treatment, IDTTs, one-on-one treatment with primary clinicians and psychiatrists, and mental health screening in Receiving and Release (R&R). On Monday and Tuesday, I observed that the consent script was read while the Falcon expert and the other observers were already in the room where treatment was going to be provided. From Wednesday through Friday, I observed that the consent script was read before the Falcon expert and the other observers entered the treatment room. To my knowledge, the consent script did not include instructions that clinicians are allowed to refuse observations if they believe observations are clinically contraindicated or if they do not believe that their patients have capacity to provide informed consent.

23. On July 17, I observed an EOP group led by a Recreational Therapist with Falcon expert Dr. Weaks, defense counsel Carson Niello, and Special Master

representative Kristina Hector. The Recreational Therapist read the consent script to the group while our group was already in the room. I introduced myself as Plaintiffs' counsel and asked the patients if they consented to observation, which they did. However, to refuse observation, a patient would have required a group of four observers to leave the room.

24. Throughout the tour, patients would sometimes arrive to groups late after the consent script was already read to the group. This meant that the late patient would not get to hear the consent script and was not able to object to the observers. I observed this occur on July 17 during an EOP group in A-yard that started at approximately 9:45 A.M., and on July 17 during a nursing-led therapeutic group in A-yard that started at approximately 11:00 A.M.

25. Despite my objections, defense counsel refused to read the consent script to a patient when the Falcon experts and other observers attended an institutional classification committee (ICC) meeting on July 18 in Z-9. I introduced myself to the patient in English and explained that the patient did not have to consent to observers in the ICC. However, it was unclear whether the patient, a Spanish-speaker who was aided by Spanish-speaking custody officers, fully understood the explanation, what he was consenting to, the identity of the observers, and the purpose of their observations.

### Telepsychiatry Observations

26. I accompanied Dr. Joseph Penn, Elise Thorn, and Damon McClain as Dr. Penn observed telepsychiatry appointments from the telepsychiatry hub at San Quentin State Prison on December 2, 2022. We were also joined by Dr. Devin Stroman and Dr. Amar Mehta. During that day, Dr. Penn observed only three telepsychiatry appointments from the perspective of the telepsychiatrist for the purpose of evaluating that mode of treatment and the provisional telepsychiatry policy. Previously, my former colleague Brenda Muñoz, who is no longer with our firm, accompanied Dr. Penn as he observed telepsychiatry at California Medical Facility (CMF) on December 1, 2022.

27. Defendants' current request to observe one-on-one treatment throughout all CDCR institutions—especially at a time when institutions have a severe shortage of mental

health staff and patients are not being provided required routine treatment—is not equivalent to Defendants' expert Dr. Joseph Penn's limited observation of individual telepsychiatry appointments.

28. Defendants' telepsychiatry observations were much more limited in scope and only occurred over the course of two days at two institutions, leading to less disruption to treatment provided to the *Coleman* class. Additionally, the purpose of the telepsychiatry observations were to evaluate a new mode of delivering psychiatric services and would likely benefit the *Coleman* class by increasing the number of available psychiatrists. Here, there is no apparent benefit to permitting Defendants' experts to observe one-on-one treatment. Further, we permitted Defendants to observe telepsychiatry because relevant questions, such as the quality of the connectivity, could not be easily determined in a different way.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 25th day of July, 2023.

Amy Xu