DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>  Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF GINGER JACKSON-GLEICH IN SUPPORT OF JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS**<br><br>Judge: Hon. Kimberly J. Mueller |

[4327847.1]

DECLARATION OF GINGER JACKSON-GLEICH IN SUPPORT OF JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS

I, Ginger Jackson-Gleich, declare:

1. I am an attorney duly admitted to practice before this Court. I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration based in support of Joint Statement Re Defendants' Expert Tours.

2. I represented Plaintiffs during Defendants' Falcon expert tour at California State Prison-Sacramento ("SAC") on Wednesday, July 12, 2023; Thursday, July 13, 2023; and Friday, July 14, 2023.

3. At SAC, Defendants sent four expert consultants from Falcon: Dr. Joel Andrade, Dr. Scott Eliason, Mr. Scott Semple, and Dr. Corey Brawner. On the days that I was present, Defendants sent two attorneys, Elise Thorn and Nick Weber, although both were not always present. On Friday, July 14, 2023, Defendants also brought an extern (Melina, last name unknown) on the tour. On July 12, the Special Master had two members of his team present: Deputy Special Master Kerry Walsh and Dr. Jeffrey Metzner. On July 13 and 14, Mr. Walsh and Tim Rougeaux attended on behalf of the Special Master. I was the only representative for Plaintiffs.

4. My declaration is based on the contemporaneous electronic notes I took on my laptop and/or cell phone during the tour.

**General Disorganization and Lack of Schedule**

5. Around 3:00 p.m. on July 11, I was informed by my colleague, Arielle Tolman, that the expert consultants had just decided that the tour on July 12 would begin at 8:00 a.m. She also informed me that Defendants' experts hoped to observe an evening or night shift on July 12 and were planning to stay as late as 8:00 p.m. that evening, with a break in the middle of the day.

6. When the experts arrived at SAC on July 12, there was no predetermined plan about how the experts would tour and observe treatment. After they observed IDTTs for the morning and then a meeting of supervising clinicians, they broke for the morning at

[4327847.1]                                         1
DECLARATION OF GINGER JACKSON-GLEICH IN SUPPORT OF JOINT STATEMENT RE
DEFENDANTS' EXPERT TOURS

1  1:00 p.m., and we were directed to return at 3:00 p.m.  I returned at 3:00 p.m. on July 12,
2  the tour attendees entered the facility and went to the conference room.  The experts
3  conferred privately, and at approximately 3:45 p.m., they asked to speak with Mr. Weber
4  and Ms. Thorn.  Shortly thereafter, the experts decided that the tour was done for the day.
5  They did not observe anything that afternoon, and the group left at 4:17 p.m.

6      7.    We were instructed to report at 6:00 a.m. the following day. The experts
7  noted that they would split into an early shift and a late shift the following day, with
8  Mr. Eliason and Mr. Brawner coming at 6:00 a.m., and the other two experts arriving at
9  10:00 a.m. or later.  The experts mentioned that there might be a break in the middle of the
10 day, but also that there might not be a break.

11     8.    On July 13, I arrived at SAC at 5:45 a.m. and entered the facility at 6:00 a.m.
12 After observing pill call, IDTTs in EOP B and EOP A, and programming in the PSU (with
13 gaps in between some observation periods), we stopped for a break at 2:15 p.m.  Earlier,
14 around 12:30 p.m., two of the experts left for the day.  I stayed to continue observing the
15 two experts who remained at SAC.  At around 2:45 p.m., the remaining experts decided
16 they were done for the day.  Contrary to the plan announced the previous day, they decided
17 not to stay to observe the arrival of the bus that was scheduled for that afternoon.  The
18 experts decided that we would return at 8:00 a.m. the following day.

19     9.    On July 14, we all arrived at 8:00 a.m. and entered the facility.  The experts
20 engaged in an extended discussion of potential observations options.  Around 8:45 a.m.,
21 Dr. Andrade and Mr. Walsh left to observe group programming in EOP B, and by
22 9:00 a.m., Mr. Semple and Dr. Brawner were on their way to observe IDTTs in CTC I; I
23 accompanied Mr. Semple and Dr. Brawner.  Because I was the only representative for
24 Plaintiffs' counsel, no one was able to observe Dr. Andrade's observations of group
25 programming in EOP B for Plaintiffs' counsel.

26     10.   After the IDTTs in CTC I, we went to observe IDTTs in CTC II around
27 10:00 a.m.  By 10:30 a.m., we returned to the conference room.  Around 11:00 a.m., I
28 accompanied Mr. Semple and Dr. Brawner back to CTC I to observe intake procedures.  It

[4327847.1]
2
DECLARATION OF GINGER JACKSON-GLEICH IN SUPPORT OF JOINT STATEMENT RE
DEFENDANTS' EXPERT TOURS

did not appear that any intakes were taking place, although the experts did speak with Dr. Sanchez about intake procedures in general terms. By 11:30 a.m., our group had again returned to the conference room.

11. At 1:16 p.m., the experts left the conference room to watch group programming in EOP B, and I accompanied them. Two leisure groups were meeting, and Mr. Brawner said the experts would observe them for 10 minutes, adding that he did not need notes on leisure groups. We were all back in the conference room by 2:09 p.m., and shortly thereafter, the experts informed everyone that they were done for the day.

### Lack of Informed Consent

12. During the observation of IDTTs for patients in Ad Seg, no one informed the patients about the presence of outside observers until after their IDTTs began and introductions were made. As far as I saw, at no point on July 12 were patients informed of the presence of outside observers prior to being escorted to their appointments by custody.

13. On July 14, I accompanied Mr. Semple and Dr. Brawner to observe IDTTs in CTC I. That morning, I requested that patients be asked for their consent to the observation of their treatment *prior to* being escorted to the treatment room. Of the four patients that were scheduled for IDTTs, two agreed to observation and two refused to attend their IDTTs altogether. For the two patients who did attend their IDTTs, the introductions given by the experts were very vague. Neither Dr. Brawner nor Mr. Semple mentioned that they had been hired by CDCR; instead, each one merely introduced himself as "an observer."

14. Later that morning, I accompanied Mr. Semple and Dr. Brawner during their observations of IDTTs in CTC II. I again asked to solicit consent for treatment observations from patients before they were escorted to the treatment room. Mr. Weber, Mr. Brawner, and I spoke with all five patients slated to have IDTTs before their IDTTs started; three of them agreed observation, while two declined.

### Interruption and Disruption of Patient Treatment

15. On July 12, I was present when the defense experts observed IDTTs in Ad.

[4327847.1]

3

DECLARATION OF GINGER JACKSON-GLEICH IN SUPPORT OF JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS

Seg. A5. During one of the IDTTs, a patient was asked about recent drug use. He looked around at all the people in the room and then declined to answer the question. His clinician encouraged him to bring up the issue in his 1:1 appointment instead.

16. Later that day, during the mental health supervising clinician meeting, Dr. Franceschi noted that staff are pretty overwhelmed by the volume of tours at SAC and the level of attention the tours entail. She mentioned the Hayes, Coleman, Huddleston, and SPRFIT tours along with the defense expert tour. She asked the supervisors to reassure their teams that they do good work and that, when people are touring, clinical teams just need to do the work they always do. She said that tours are an extra strain and that audits should not be making people really distressed.

17. On July 13, I was present when Dr. Eliason observed programming in the PSU. At 11:07 a.m., we entered a group in which only three patients were present. Dr. Eliason asked for their consent to observe the group, and two of the three patients immediately requested to leave. It was unclear whether that was solely because of the presence of observers or some other reason, but the group was then canceled.

18. On July 14, I was present when two defense experts were observing IDTTs in CTC I. One patient was asked about the stress his was feeling around gang debriefing, and he responded that he did not want to talk about debriefing in front of the group. Dr. Sanchez responded that his mental health providers "know what going on with that and will talk about it later."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 25th day of July, 2023.

_Ginger Jackson-Gleich_