| | |
|---|---|
| DONALD SPECTER – 083925<br>STEVEN FAMA – 099641<br>MARGOT MENDELSON – 268583<br>PRISON LAW OFFICE<br>1917 Fifth Street<br>Berkeley, California  94710-1916<br>Telephone:   (510) 280-2621<br><br>CLAUDIA CENTER – 158255<br>DISABILITY RIGHTS EDUCATION<br>AND DEFENSE FUND, INC.<br>Ed Roberts Campus<br>3075 Adeline Street, Suite 210<br>Berkeley, California  94703-2578<br>Telephone:   (510) 644-2555 | MICHAEL W. BIEN – 096891<br>ERNEST GALVAN – 196065<br>LISA ELLS – 243657<br>JENNY S. YELIN – 273601<br>THOMAS NOLAN – 169692<br>MICHAEL S. NUNEZ – 280535<br>AMY XU – 330707<br>CARA E. TRAPANI – 313411<br>MARC J. SHINN-KRANTZ – 312968<br>ALEXANDER GOURSE – 321631<br>GINGER JACKSON-GLEICH – 324454<br>ADRIENNE PON HARROLD – 326640<br>ARIELLE W. TOLMAN – 342635<br>ROSEN BIEN<br>GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California  94105-1738<br>Telephone:   (415) 433-6830 |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>             Plaintiffs,<br><br>      v.<br><br>GAVIN NEWSOM, et al.,<br><br>             Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF ARIELLE W. TOLMAN IN SUPPORT OF PLAINTIFFS POSITION IN JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS**<br><br>Judge:  Hon. Kimberly J. Mueller |

[4328789.2]

DECLARATION OF ARIELLE W. TOLMAN ISO PLS.' POSITION IN JOINT STATEMENT RE DEFS.' EXPERT TOURS

I, Arielle W. Tolman, declare:

1. I am an attorney duly admitted to practice before this Court. I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of Plaintiffs' position statement in the parties' Joint Statement Regarding Defendants' Expert Tours.

2. I represented Plaintiffs during Defendants' Falcon expert tour at California State Prison-Sacramento ("SAC") on Monday, July 10, 2023 and Tuesday, July 11, 2023. I also represented Plaintiffs during Defendants' VRJS/Falcon expert tour at San Quentin State Prison ("SQ") on Monday, July 17, 2023 and Tuesday, July 18, 2023.

3. At SAC, Defendants sent four expert consultants from Falcon: Dr. Joel Andrade, Dr. Scott Eliason, Mr. Scott Semple, and Dr. Corey Brawner. On July 10, 2023, Defendants' sent three attorneys, Elise Thorn, Nick Weber, and Dillon Hockerson. On July 11, Defendants' had two attorneys present, Elise Thorn and Nick Weber. The Special Master had two members of his team present for both July 10 and July 11, Deputy Special Master Kerry Walsh and Dr. Jeffrey Metzner. I was the only representative for Plaintiffs.

4. At SQ, Defendants sent three expert consultants from VRJS/Falcon: Dr. Elizabeth Falcon, Dr. Joseph Baskin, and Mr. Robert Ochs. Defendants also had two attorneys present: Namrata Kotwani and Laurel O'Connor (Hanson Bridgett). The Special Master had two members of his team present, Deputy Special Master Kerry Walsh and Dr. Jeffrey Metzner. I was the only representative for Plaintiffs.

5. My declaration is based on the contemporaneous electronic notes I took of the tours on my laptop and on my cell phone's notes application.

### Lack of Schedule and Disorganization

6. In advance of the tours, Defendants provided Plaintiffs with a start time (9:00am) for the first day of tours, but did not provide any other information about the anticipated start and end time for the other days of the tour. We were provided notice that the experts may tour all three watches; therefore, we needed to be available for up to 24

[4328789.2]

hours each day.

7. At SAC, on Monday, July 10, once onsite, Defendants' experts did not share a schedule of activities with Plaintiffs, the Special Master, or the institution. At 9:30am, the Warden assembled a staff of over 20 mental health and custody supervisors to welcome the experts. Referring to the tour, the Warden stated, "I'm not sure how this is going to go. Do you have any questions? Anything that you'd like to go over?" The experts requested a walking tour to see all levels of care, as well as R&R. When the walking tour concluded at approximately 12:30pm, the experts requested the institution's program schedules and transfer lists; they had not reviewed them in advance. They set a start time the next morning for 7:45am, and stated that they intended for their experts to go to three separate locations. Dr. Eliason stated that they want to do a "random smattering" of observations, to avoid selection bias. They said they would take the rest of the afternoon to plan their schedule for the next days of the tour. The next day, however, upon arrival, neither Defendants nor their experts provided me with a written schedule of the activities each of their experts would be observing that day or for any of the following days.

8. On Monday, July 10, I renewed Plaintiffs' objection to the expert's observation of 1:1 treatment and of group treatment or IDTTs without my presence. Defendants' counsel noted Plaintiffs objection but proceeded to plan to observe these treatment activities for the following days over our objection.

9. At SQ, on Monday, July 17, 2023, once onsite, Defendants' experts similarly did not have a planned schedule of activities or observations for the day or week that they had shared with Plaintiffs, the Special Master, or the institution. Dr. Burton, the Chief Psychiatrist at San Quentin, opened the tour asking Defendants' experts how he could structure the seven planned days of the tour so that they were "as productive" as possible. Dr. Falcon said that she had an "agenda" of the different areas that they wanted to see, and that they had a "detailed" and "scripted" "document that we have to fill out." However, the experts requested program schedules from the institution that day; they had not reviewed program schedules in advance. At the conclusion of the first day of the tour, at

approximately 4:00pm, Dr. Falcon said that we would start the tour the next day at 9:00am again.  Later that evening, at approximately 8:15pm, I was informed by Defendants' counsel Namrata Kotwani that we would in fact be meeting at 7:30am the next morning instead.  A true and correct copy of that email is attached as **Exhibit A**.  The next day, neither Defendants nor their experts provided me with a written schedule of the activities each of their experts would be observing that day or for any of the following days.

10. On Monday, July 17, at the beginning of the day, I renewed Plaintiffs' objection to the expert's observation of 1:1 treatment.  Defendants' counsel noted Plaintiffs' objection but proceeded to plan to observe these treatment activities for that day.  Mental health leadership had received a consent script for these observations earlier that morning and were instructed by Defendants to distribute the script to all clinicians.  Later that day, at approximately 1:15pm when Defendants' elected to halt 1:1 observations, and Dr. Burton expressed some concern that they would need to let all the clinicians know the new operating procedures again, Defendants' counsel, Laurel O'Connor, said the change was "not because of CDCR," when in fact, the decision to proceed initially with 1:1 treatment observations over Plaintiffs written and oral objections was Defendants' choice, as was their decision later in the day to halt the observations in light of those previously stated objections.

**Confusion Over Tour Purpose**

11. At SAC, at the opening meeting on July 10, the Falcon expert stated to the large group of CDCR staff that their purpose was to "help study the system" and that their organization "helps elevate systems."  Their team of experts did not explain, nor did Defendants' attorneys explain, that the experts were retained for litigation purposes to support a possible motion to modify the Court's orders in this case, or to terminate it entirely.

12. At SQ, I observed Defendants' experts make statements to CDCR staff about the purpose of their tours.  On Monday, July 17, Dr. Falcon told mental health leadership (including Dr. Burton and Dr. Chen), that "our purpose is to study the mental health

services and that's it. We're here to learn from you." She did not explain, nor did Defendants' attorneys explain, that the experts were retained for litigation purposes to support a possible motion to modify the Court's orders in this case, or to terminate it entirely.

13. On July 17, I observed our escort, SQ Chief Psychiatrist, Dr. Burton, introduce our group repeatedly to staff as primarily a "*Coleman*" group: in the second floor of the health care unit waiting room as "*Coleman* team, plaintiffs' team, Falcon team;" at the H unit dorm, as "*Coleman*, CDCR, Falcon;" and at the EOP H-Unit Dorm, as "*Coleman* here today, CDCR Legal, Falcon."

## Patient Treatment Interruption

14. At SAC, I observed both mental health leadership and clinicians repeatedly explain to experts that due to staffing vacancies, that they were limiting care for EOP patients to monthly 1:1 PC contacts, in violation of Program Guide requirements. Nevertheless, I observed clinical staff spend significant time escorting the Falcon experts around the facility, answering basic questions about program operations, and participating in unscheduled group interviews. Two senior mental health clinicians, Dr. K. Franceschi (Chief of Mental Health), and Dr. S. Chamber (Chief Psychologist), along with senior custody officers, Captain A. Konrad (HCA Captain), and Lt. B. Schroeder, were the primary escorts for July 10 and July 11. On July 10, Dr. Franceschi and Dr. Chamber spent approximately three hours (9:30am to 12:30pm) escorting the experts on an unplanned walking tour of the entire prison's treatment facilities. I also observed Dr. Franceschi and Dr. Chamber on both July 10 and July 11 help the Falcon experts plan their changing schedule of observations. On July 11, I observed Falcon expert Dr. Eliason engage several EOP IDTT clinicians in an impromptu group interview (which included two psychiatrists and two primary clinicians) that lasted approximately an hour and a half.

15. At SQ, I observed mental health leadership, Dr. Burton, inform the experts that the psychiatry caseloads were presently too high to provide quality psychiatric care to patients. Nevertheless, I observed clinical staff spend significant time escorting the Falcon

experts around the facility, answering basic questions about program operations, and participating in unscheduled group interviews. Two senior mental health clinicians, Dr. Burton and Dr. Chen, were our primary escorts for July 17 and July 18. In addition, other mental health clinicians were tasked with escorting the group between treatment activities, and assisting the VRJS/Falcon experts with planning their observation schedules. These clinicians included supervising psychologist Dr. Schmidt and an EOP treatment scheduler. I observed Dr. Falcon and Dr. Baskin engage several EOP clinicians, including one psychiatrist and several clinicians, in an impromptu group interview in the afternoon of July 17. I also observed Dr. Burton assist the VRJS/Falcon experts continue planning their changing schedule of observations in the afternoon of July 18.

16. On July 17, I observed Defendants' expert, Dr. Baskin, attempt to observe six 1:1 appointments with CDCR psychiatrist, Dr. Deal. After the first patient's appointment concluded, I observed Dr. Deal mention to Dr. Baskin that he wanted to complete documentation of the encounter, but Dr. Baskin asked him numerous questions, including about a San Quentin newspaper in Dr. Deal's office. The second patient did not consent to Dr. Baskin's observation. When he left his appointment, approximately four minutes after he declined observations, the patient made a thumbs down gesture in the hallway and appeared to be upset. The third patient who was in the waiting room refused the appointment entirely. The fourth patient consented to Dr. Baskin's observations. I observed Dr. Baskin speak directly with the patient once inside Dr. Deal's office. I heard the patient ask Dr. Baskin a direct question, and Dr. Baskin responded to the patient that he was "not registered to practice in California." Approximately nine minutes later, I observed the patient talking directly to Dr. Baskin again about the alarm that was going off on the unit. Later, approximately fifteen minutes later, when the appointment concluded, I observed Dr. Baskin say to the patient in the hallway, "thank you for consenting today," and the patient say that he is "still suffering brain fog." The fifth patient did not consent to Dr. Baskin's observations of his 1:1 treatment. The sixth patient consented to observations.

17. On July 18, I observed Defendants' expert, Dr. Falcon, observe IDTTs in the SQ PIP. The IDTT discussed the treatment of one gravely disabled acute patient in absentia who struggled to engage in any treatment outside of his cell, including participating in his IDTT meetings. A social worker member of the IDTT made a statement that in the past, the IDTT had successfully completed IDTTs for this patient inside his cell, bedside. He said that to attempt to do that today with the observers would be "too much" because in the past he had soiled himself, and they wanted to maintain his "integrity."

**Lack of Informed Consent**

18. On the second day of the SAC tour, on Tuesday, July 11, Defendants proceeded with observing patient group treatment and IDTTs without a written consent procedure, without a consent script or form, and without the requirement that Plaintiffs' counsel would be present. I attended one EOP RT gardening group with Falcon expert Dr. Eliason, Defendants' counsel, Elise Thorn, and Dr. Metzner. Our group of observers were already present in the treatment room as patients slowly started to enter. Dr. Eliason introduced himself as a psychiatrist "hired by defendants as part of the *Coleman* case." I did not observe any explanation provided to the patients about the purpose of the VRJS/Falcon study. I introduced myself as Plaintiffs' counsel, and asked the patients if they each consented to observation, which they did. To refuse observation, at that point, however, would have required a group of four observers to leave the room.

19. At SQ, on Monday, July 17, Dr. Burton stated that he had received a consent script that morning from Defendants' counsel and asked Defendants if it should be distributed to all clinicians. A true and correct copy of this consent form is attached as **Exhibit B**. This consent script does not include instructions that clinicians are allowed to refuse observations if they believe observations are clinically contraindicated or if they do not believe that their patients have capacity to provide informed consent.

20. Despite distribution of the script, I observed that it was read inconsistently to patients. Later that day, at approximately 2:30pm, Defendants' experts elected to observe a PIP group in the healthcare building. I did not observe Dr. Burton or the group clinician

[4328789.2]

6

DECLARATION OF ARIELLE W. TOLMAN ISO PLS.' POSITION IN JOINT STATEMENT RE DEFS.' EXPERT TOURS

1  read the group the consent script.  Instead, while Dr. Falcon, Mr. Ochs (a nonclinician
2  security expert), and Dr. Metzner stood in the doorway to the group treatment room where
3  patients sat in TTMs, I observed Dr. Burton introduce everyone as "psychologists and
4  experts who are all part of the *Coleman* case."  I did not observe either Defendants'
5  experts, Dr. Falcon or Mr. Ochs, or Defendants' counsel, Laurel O'Connor, correct this
6  misstatement.

7        21.    At SQ, on Tuesday, July 18, Dr. Burton stated that he had received a new
8  consent script that morning from Defendants' counsel, Melissa Bentz, and asked
9  Defendants if it should be distributed to all clinicians.  A true and correct copy of this
10 consent form is attached here as **Exhibit C**.  This revised consent script further limits the
11 information that patients are provided about the purpose of the VRJS/Falcon expert tours.
12 This consent script does not include instructions that clinicians are allowed to refuse
13 observations if they believe observations are clinically contraindicated or if they do not
14 believe that their patients have capacity to provide informed consent.  On July 18, I
15 observed one EOP RT group refuse observations by Dr. Falcon after being read this script.
16 / / /
17 / / /
18 / / /
19 / / /
20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

1  I declare under penalty of perjury under the laws of the United States of America
2 that the foregoing is true and correct, and that this declaration is executed at San Francisco,
3 California this 25th day of July, 2023.

_____
Arielle W. Tolman

# Exhibit A

| | |
|---|---|
| **From:** | Namrata Kotwani |
| **To:** | Jeffrey Metzner; Arielle Tolman; Kerry F. Walsh |
| **Cc:** | Damon McClain; loconnor@hansonbridgett.com |
| **Subject:** | Falcon Tour Start Time Tomorrow: SQSP 7/18 |
| **Date:** | Monday, July 17, 2023 8:15:37 PM |

[EXTERNAL MESSAGE NOTICE]

Good evening Kerry, Dr. Metzner, and Ari,

Defendants' experts will be observing IDTTs at 8 am tomorrow.  We will meet at 7:30 am at the same spot, just outside the gate as we met Ari today.  Dr. Metzner and Kerry, you can proceed as you did this morning or meet us at the gate, as per your convenience. Kindly confirm receipt.

Thank you,
Namrata

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit B

## Statement for Informed Patient Consent
## Observation of Mental Health Treatment Session

CDCR has hired a team of expert consultants from a group called VRJS/Falcon to study the mental health system at this and other prisons. The purpose of the study is to evaluate the quality and adequacy of CDCR's mental health care and programming being provided within its facilities.

The consultants have asked to observe your mental health treatment session. If you prefer not to be interviewed or have people observe and take notes during your mental health treatment session, please say so now or at any time during the interview or observation. If you decide to allow the consultants to interview you or observe your treatment, you are giving permission to the team of expert consultants to use whatever information they learn from you or from listening and watching your mental health treatment when, and if, they prepare a report following their evaluation of the system and, if they provide any testimony to any Court regarding the mental health system. CDCR and the consultants have agreed that your name and CDCR number would not be disclosed publicly; nor will information you give be provided to CDCR clinicians or custody staff at the prison. You are free to allow this or not. You will not be rewarded in any way for agreeing to be interviewed or allowing your treatment to be observed. Nor will you be punished or harmed in any way if you decide to keep your mental health treatment private.

This is not a tour or study by the Coleman Special Master or Plaintiffs' counsel. If you see people from the Special Master Team or Plaintiffs' counsel, they are here to observe the work of the consultants only.

# Exhibit C

## Statement for Informed Patient Consent
## Observation of Mental Health Treatment Session

CDCR has hired a team of expert consultants from a group called VRJS/Falcon to study how mental health services are provided at this and other prisons.

The consultants have asked to observe your mental health treatment session. If you prefer not to have people observe and take notes during your mental health treatment session, please say so now or at any time during the observation. If you decide to allow the consultants to observe your treatment, you are giving permission to the team of expert consultants to use whatever information they learn from you or from listening and watching your mental health treatment in their study and, if they provide any testimony to any Court regarding the mental health system. CDCR and the consultants have agreed that your name and CDCR number would not be disclosed publicly; nor will information you give be provided to CDCR clinicians or custody staff at the prison. You are free to allow this or not. You will not be rewarded in any way for allowing your treatment to be observed. Nor will you be punished or harmed in any way if you decide to keep your mental health treatment private.

This is not a tour or study by the Coleman Special Master or Plaintiffs' counsel. If you see people from the Special Master Team or Plaintiffs' counsel, they are here to observe the work of the consultants only.