DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>GAVIN NEWSOM, et al.,<br><br>            Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' 2022-2023 UNMET NEEDS ASSESSMENT REPORT**<br><br>Judge:   Hon. Kimberly J. Mueller |

[4330192.10]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.     THE UNA RESULTS ARE UNRELIABLE AND ALMOST CERTAINLY UNDERCOUNT NEED ........................................................................ 3

    A.    Widespread Staffing Shortages Undermine the Reliability of the UNA Study Results ............................................................... 4

    B.    The Large Number of Referrals Outside of UNA Undermines the UNA Study Results .................................................................. 7

    C.    The Substantial and Ongoing Drop In Inpatient Referrals Since the Pandemic is Unexplained and Undermines the Reliability of the UNA Study Results. .......................................................... 11

II.    THE FINDINGS IN THE REPORT REGARDING LACK OF UNMET NEED FOR LOW-CUSTODY DSH BEDS AND HIGH-CUSTODY PIP BEDS IGNORE CONFOUNDING FACTORS ........................................ 13

    A.    Defendants Ignore the Role of the Broken LRH Process in Assessing the Need for Low-Custody DSH Beds ............................ 13

    B.    Defendants' Claim of Sufficient High-Custody and Acute PIP Beds Is Predicated On A Fiction .................................................. 17

III.    THIS COURT SHOULD ADOPT THE FINDINGS SHOWING A CLEAR NEED FOR A TREATMENT PROGRAM FOR CLASS MEMBERS WITH PERSONALITY DISORDERS AND ORDER THE SPECIAL MASTER TO MAKE RECOMMENDATIONS REGARDING APPROPRIATE NEXT STEPS ................................................................................................ 18

IV.    DEFENDANTS' EFFORTS TO REHABILITATE THEIR SUSTAINABLE PROCESS THROUGH THE UNA REPORT SHOULD BE REJECTED ............ 22

CONCLUSION ................................................................................................. 23

CERTIFICATION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## OTHER AUTHORITIES

Irene Epshteyn, Hossam Mahmoud, *Enhancing Mental Health Treatment for Borderline Personality Disorder in Corrections,* Journal of Correctional Health Care, 2021; 27(4) ................................................................. 19, 21

Kelly E. Moore, *et. al*, *The Relation of Borderline Personality Disorder to Aggression, Victimization and Institutional Misconduct Among Prisoners, Comprehensive Psychiatry*, 84 (July 2018) ................................................ 21

Lois Choi-Kain, Ellen Finch, et al., *What Works in the Treatment of Borderline Personality Disorder*, Curr Behav Neurosci Report 2017; 4(1) ............................ 19

Mayo Clinic, Information Page on Borderline Personality Disorder .................................. 20

Reiter Keramet, et al.,  *Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States*, 2017-2018. Am J Pub. Health. 2020 ................................................................................................................. 12

**INTRODUCTION**

On September 13, 2021, the Court ordered Defendants to complete "an unmet bed needs study to assess whether there are class members in need of inpatient or crisis bed care who have not been identified or referred to necessary care." ECF No. 7305 at 14-15.[1] The Court also noted that "[t]he Special Master has informed the court that there is a subset of class members with severe personality disorders associated with significant function[al] impairments who have special treatment needs not yet available in an inpatient setting." *Id*. at 15:5-8. To understand this group of individuals with personality disorders, its size, and its needs better, the Court directed the Special Master "to ensure that the scope of the unmet bed needs study conducted in accordance with this order is sufficient to identify with specificity the size of that need [for treatment for personality disorders] and what is required to ensure that it is met." *Id*. at 15:8-10.

On June 30, 2023, Defendants submitted their Final UNA Study in response to the Court's Order.[2] *See* ECF No. 7865, Defendants' Notice of Filing Unmet Needs Assessment Report, and ECF No. 7865-1 (Exhibit A, Cover Letter), 7865-2 (Exhibit B, Response to Plaintiffs' and Special Masters' Comments on Draft Report), 7865-3 (Exhibit C, 2022/2023 Unmet Needs Assessment). Defendants' 2022/2023 Unmet Needs Assessment (the "Final UNA Report" or "the Report") includes four sweeping conclusions, namely (1) that "there is no unmet need for inpatient referrals within CDCR," (2) that "whether there is an unmet need for patients with personality disorder requires further study," (3) that "there are a sufficient number of mental health crisis beds," and (4) that "the Sustainable Process is effective." *See* ECF No. 7865-3 at 8-9.

But the utility and reliability of Defendants' study is substantially limited by data

---

[1] All citations to filed pleadings in these objections are to the ECF pagination, not to the internal pagination of the cited document, where different.

[2] The Court initially set a deadline for the report of December 31, 2022. ECF 7477. On December 2, 2022, the parties requested an extension of the deadline to June 30, 2023. ECF No. 7676 at 3-4. The Court granted the requested extension on December 15, 2022. ECF No. 7680 at 4-5.

irregularities, confounding factors, and methodological limitations that go largely
unaddressed, including the impact of severe clinical staffing shortages, the unexplained
discovery that essentially equal numbers of inpatient referrals occurred outside of the UNA
process concurrent with the study, and the ongoing low rates of inpatient referrals since the
beginning of the pandemic that remain unexplored.  These factors call the study's findings
into serious question and limit the usefulness of the study in prospectively estimating
future needs.

Similarly, Defendants' conclusions that the level of unmet need does not correlate
with high vacancy rates at DSH and that CDCR has sufficient numbers of acute and high-
custody PIP beds are unsubstantiated.  On the first point, Defendants' findings ignore the
fact that CDCR's LRH process largely controls the flow of patient referrals to DSH, but, as
the Special Master has long reported, that process is non-functional.  And Defendants'
reporting of excess PIP bed capacity fails to account for the fact that over 200 high-
custody ICF and acute beds at CHCF and CMF PIPs have long been unavailable to treat
patients due to Defendants' persistent, unaddressed staffing shortages.  Without those beds,
Defendants' lack the capacity to timely transfer and treat patients needing inpatient care, as
confirmed by their ongoing non-compliance with Program Guide transfer timelines.

Plaintiffs further object to Defendants' unsupported conclusion that it is still
uncertain whether unmet need exists for patients with personality disorders, given the
UNA Report's identification of 470 patients with personality disorders who CDCR
clinicians determined cannot be treated within the existing MHSDS and may benefit from
a different treatment program.  Furthermore, the Court should order the Special Master to
address Defendants' proposal to spend an additional year studying this identified group of
patients with personality disorders to determine whether and how to provide treatment,
particularly as to the large subset diagnosed with Borderline Personality Disorder (BPD)
for whom all parties agree well-established and effective treatment protocols exist.

Finally, this Court should disregard the Final Report's finding that "the sustainable
process is effective."  The Court did not ask Defendants to evaluate the effectiveness of the

sustainable process, nor was the study designed or implemented to address this question. And Defendants' retroactive attempt to rehabilitate the sustainable process through this Report suffers from questionable methodological and analytical choices, rendering it of questionable value.  Defendants' assertions regarding the sustainable process should be saved for a time when that process is actually at issue.

**ARGUMENT**

## I.   THE UNA RESULTS ARE UNRELIABLE AND ALMOST CERTAINLY UNDERCOUNT NEED

Unfortunately, despite the best efforts of the parties to design a high quality unmet needs assessment, some factors external to the study itself, along with some data irregularities, the large number of referrals outside of UNA, and other unexplained and unexpected results, all undermine the reliability of the study in answering the Court's questions.  Indeed, as Defendants themselves acknowledge, every iteration of the UNA report presented different resulting referral numbers, despite a clear methodology and multiple efforts to reconcile the data with the Special Master team along the way.  *See* ECF No. 7865-2 at 5 (acknowledging final report includes twenty-seven additional referrals not identified in prior draft report, and failing to reconcile or explain other discrepancies identified by the Special Master); *see also* ECF No. 7865-2 at 25-26, 31 (Special Master comments noting UNA referral discrepancies plagued each iteration of the draft report that could not be reconciled with the Special Master's monitoring and tracking).[3]  The unstable, constantly shifting referral numbers, which remain out of sync with the Special Master's tracking even in their final reported form, are never fully explained and fundamentally undermine the reliability of the entire Report.

The reliability of the Report is further undermined by Defendants' failures to

---

[3] Like the reported UNA referral numbers, Defendants' reporting of the "non-UNA" referrals generated contemporaneously to the UNA has repeatedly shifted.  *Compare* ECF No. 7865-2 at 6 (final report noting 338 "non-UNA referrals"), *with* ECF No. 7865-2 at 31 (Special Master comments on prior reporting of 297 such referrals).  This additional unexplained change further undermines the reliability of Defendants' Report.

properly account for the effects of widespread staffing shortages, their identification of essentially equal numbers referrals purportedly generated outside of the UNA process at the same time as that process was occurring, and the dramatic and sustained drop in referrals since the beginning of the pandemic.

**A.      Widespread Staffing Shortages Undermine the Reliability of the UNA Study Results**

Primary among the factors that urge caution in generalizing from the current UNA study going forward is the current severe staffing shortage among CDCR clinical and custody staff, which has resulted in widespread triaging of patient care and in frequent turnover in case managers and other primary treating staff for each patient. *See* 2/7/23 Twenty-Ninth Round Monitoring Report – Part C: Special Master's Monitoring Report on the California Department of Corrections and Rehabilitation's Institutions with Enhanced Outpatient Programs Compliance with Provisionally Approved Plans, Policies and Protocols ("29th Round EOP Report"), ECF No. 7715 at 30 (noting the "vacancy rate explosion" among primary clinicians and explaining that "[w]ith the vacancy rates observed at some institutions, it was virtually impossible to provide anything close to Program Guide-compliant mental health care"), 33 (finding that "[b]y pivoting to triaging patients, CDCR is tacitly acknowledging that many institutions' mental health staffing vacancies make it impossible to provide Program Guide-compliant mental health care to the entire MHSDS population"), 34 (determining that "[t]he impact [of the staffing shortage] on those mental health staff members who remained employed in CDCR institutions was evident during the monitoring tours: many carried excessively high patient caseloads and reported experiencing burnout," and warning that "the staffing crisis within CDCR is untenable and requires immediate attention and intervention.").

In addition to directly causing Defendants' inability to comply with core Program Guide requirements and the resulting patient harm, the staffing crisis has undermined the ability of CDCR to identify and refer all cases of need for inpatient care both in the context of the UNA study, and in CDCR's routine reviews of patients for higher levels of care in

IDTTs.  As the Special Master noted, "throughout the UNA process, UNA review teams, including CDCR clinicians, consistently expressed concern about the woeful mental health staffing levels in the institutions and the resultant lack of follow-up care and required IDTTs."  ECF No. 7865-2 at 30 (Special Master comments on draft report.)  Defendants themselves acknowledged the link between staffing and inpatient referrals in the Final UNA Report, noting that "[r]eferral recommendations may have been influenced by staffing deficiencies, according to discussions among UNA reviewers" and explaining that "patients were not being seen in a timely manner due to staffing shortages, which led to challenges for the UNA Review Teams to make a recommendation."  ECF No. 7865-3 at 67.  Defendants assert, without substantiation, that the UNA teams sometimes made up for this by making "recommendations for referral to inpatient care despite lacking current active symptom meeting admission criteria."  *Ibid*.  However, Plaintiffs' limited observation of the UNA reviews confirm that such referrals were not necessarily routine.  Moreover, such referrals would not make up for the people not screened into the UNA review in the first place during Phase I of the UNA review, because staffing shortages prevented their proper identification.

The reason these staffing vacancies impeded the UNA study is that the key criteria for inpatient care rest on subjective clinical standards that require intimate knowledge of a given patient, the patient's level of functioning, and/or the patient's progress in treatment.  The first three of the seven UNA criteria for Phase I inclusion are subjective criteria that are key to catching those who are "quietly psychotic" and would be missed by the more objective indicators for higher levels of care like MHCB stays or frequent disciplinary infractions.  For example, the first UNA criteria is that "as a result of a major mental disorder, the patient is unable to adequately function within the structure of the CDCR Enhanced Outpatient Program (EOP) Level of Care."  ECF No. 7865-3 at 77, 78.  To employ this criteria, a given clinician needs to have an understanding of the patient's baseline level of functioning, and their current functioning.  If a patient is not being seen or closely monitored by clinical staff, this criteria cannot be properly employed.  Similarly,

1   the second UNA criteria requires a patient to have "serious to major impairment of

2   functioning in most life areas," which requires close monitoring and intimate knowledge of

3   the patient's level of functioning. *Id*. at 77, 78-79. Likewise, the third UNA criteria

4   subjectively asks if "[t]he patient demonstrates chronic psychiatric symptoms that have not

5   responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate

6   levels of functioning." *Id*. at 77, 79. Without close personal knowledge of the patient's

7   functioning and progress in treatment over a six-month period, a clinician cannot be

8   expected to correctly screen for this factor. This is why clinicians with new patients or

9   who otherwise did not know their patients well were told in training materials for the UNA

10   study not to bother to screen their patients for these criteria. *See* ECF No. 7865-3 at 170

11   (UNA training materials with the following question and answer about treatment team

12   screening for Phase I identification: "What if it's a covering/new clinician or psychiatrist

13   and they don't know the patients? A: *Only clinicians who have knowledge of the patient*

14   *should complete the screening tool. There is not a requirement to review the patients'*

15   *charts*.") (emphasis supplied)).

16         Moreover, in Phase II of the UNA Study, the primary method of evaluating patients

17   was records review, but at many institutions documentation was noted to be poor or

18   incomplete, and many patients flagged for review had not had required IDTTs or other

19   clinical contacts that would have provided the most complete, up-to-date picture of their

20   diagnoses and functioning. *See* Plaintiffs' June 15, 2023 Letter, attached to Report as

21   Enclosure D, at ECF No. 7865-2 at 46 (noting observation of these issues); *see also* ECF

22   No. 7865-2 at 30 (Special Master commenting on observed effects of staffing crisis).

23   Defendants do not contest, for instance, that EOP patients at RJD were repeatedly noted to

24   have not received required in person IDTTs for many months, sometimes six months or

25   longer, due to staffing shortages, and very few class members were interviewed in

26   Phase II, despite the lack of recent required confidential clinical contacts. *Compare* ECF

27   No. 7865-2 at 46 (raising concerns regarding staffing impacts), *with* ECF No. 7865-2 at 12

28   (agreeing that the UNA teams sometimes lacked sufficient information due to poor staffing

and "had the option" to interview patients).  Yet Defendants make no effort to seriously evaluate the impact of the staffing crisis on the UNA process and ensuing Report beyond acknowledging that staffing problems delayed UNA referrals and that the lack of timely contacts "led to challenges for the UNA Review Teams to make a recommendation." *Id* at 67.[4]

The staffing crisis infected the UNA process and undermined the reliability of its results.  Adequate and consistent clinical staffing is key to a fully functional system of inpatient referrals, and also to a comprehensive, accurate study of unmet needs for inpatient care.[5]

**B.    The Large Number of Referrals Outside of UNA Undermines the UNA Study  Results**

During Phase II of the UNA reviews, the key period when UNA review teams reviewed cases for each prison and made recommendations for referral, 338 patients were referred by local institutions to an inpatient program, *but not through the UNA review process*.  *See* ECF No. 7865-2 at 6.  That is almost exactly the same number of indi-viduals—342—that were identified by the UNA process itself.  ECF No. 7865-3 at 37.  It is hard to fathom how a well-executed study for unmet need could possibly be reconciled with this outcome.

In response to Special Master concerns about this anomalous outcome and request

---

[4] This also partly explains some of the subsequent referrals outside of the UNA process during UNA Phase II by IDTTs of flagged cases reviewed but not referred by the UNA teams.  *See* Argument I.B. *infra.*

[5] Defendants added some additional screening layers to the 2022-2023 UNA study, including a review by custody and nursing staff, to try to address this limitation.  However, in the end, the referral patterns documented in connection with the study suggest that these measures were insufficient to address the lack of intimate knowledge of individual patients required to properly refer patients to higher levels of care.  Moreover, there were widespread severe shortages of custody staff during this time period, so custody staff faced similar barriers to short clinical staff—lack of personal knowledge of mental health patients, and some institutions have also been experiencing nursing shortages. *See* ECF No. 7715, 29th Round EOP Report at 134 (noting impact of staffing deficiencies on custody and mental health partnership activities.), 254 (noting shortages of nursing staff at CMC), 349 (noting re-direction of nurses at San Quentin due to staffing shortages).

for additional information and analysis, Defendants produced, without further discussion, the following chart breaking down these 338 referrals outside of UNA:

| Higher Level of Care Referrals Not Counted in Official UNA Referral Count | Count |
|---|---|
| Patients not screened or reviewed based on 2022/2023 UNA methodology, but referred during Phase II + 7 days | 92 |
| Patient screened with 0 flags during Phase I, but referred during Phase II + 7 days | 90 |
| Patients not recommended for referral during Phase II, but referred during Phase II + 7 days | 94 |
| Patients identified as PD Category 1-3, but referred during Phase II + 7 days | 55 |
| Patients not referred since their IDTT did not agree with the referral at CRD, but referred during Phase II + 7 days | 7 |
| **TOTAL** | **338** |

*See* ECF No. 786-2 at 6.

These 338 referrals outside of UNA are a serious problem for several reasons.  First, the large number of referrals during the study period, but outside of the study process, shows that the UNA study basically missed as many cases of inpatient need as it caught. More than a quarter of those—the 92 in the first category—never even made it in to the study itself, strongly suggesting the gatekeeping criteria for the study were too stringent or improperly applied.  Further, the fact that there were 90 referrals to inpatient programs in this short period of time of patients who failed to screen positive for further review in Phase I of the study, which was designed to be an extremely broad screening tool, suggests both a gap in the study design and a poorly executed screening in Phase I, likely exacerbated by the staffing issues identified above.  *See*  ECF No. 7865-2 at  6.  There were also 94 individuals screened into Phase II (meaning they were flagged in Phase I) but not recommended for referral by the UNA reviewers during Phase II.  *Id*.  These cases suggests that the UNA study reviews themselves may not have been well executed, or that

1   they were undermined by low staffing levels, or that some other problem was in play.

2   Similarly, the 55 referrals of personality disordered patients identified in Phase I but

3   referred to higher levels of care during Phase II outside of UNA suggests these cases

4   identified as having personality disorders were not properly or fully evaluated for possible

5   need for inpatient treatment by the UNA teams. *See id.* The large number of non-UNA

6   referrals has not been adequately explained by Defendants, and calls into serious question

7   the results.

8         Second, the large number of referrals outside of UNA indicates that clinical staff

9   very likely defensively made referrals outside of the UNA process so that they did not look

10  like poor clinicians for failing to identify and refer such cases themselves. Defendants

11  obliquely acknowledge that this was a significant problem identified during the 2005 UNA

12  study. *See* ECF No. 7865-3 at 14 (noting 2005 UNA report found "[s]ome staff showed

13  signs of institutionalization, with higher tolerance for pathology and decompensation").

14        While Plaintiffs identified this issue and asked that Defendants analyze it further,

15  Defendants did not do so. Nonetheless, the data from the 2022/2023 UNA study appears

16  to demonstrate the same flaw identified by the 2005 study. Based on the essentially equal

17  number of contemporaneous non-UNA referrals in the same short timeframe, it seems

18  likely that institution staff made inpatient referrals outside of the UNA process so they

19  were not seen as having failed to refer appropriate patients on their caseloads.[6] The most

20  tangible evidence of this effect is the fact that seven patients' IDTTs fought to block the

21  Phase II reviewers' referral recommendation, prevailed through the dispute resolution

22  process, and then within days referred the patient to inpatient programs anyways. See ECF

23  7865-2 at 6.

24        Additional evidence that institutionalization may have depressed UNA referrals is

25  demonstrated by the extremely high percentage (44%) of cases where institution IDTTs

26

27  [6] This is a well-known problem in research, often referred to as the Hawthorne Effect or
    the Observer Effect, which takes place when people change their behavior when they know

28  they are being observed.

disputed the Phase II team's referral recommendation, of which 72% were ultimately not referred. *See* ECF No. 7865-3 at 38.  (Notably, the Special Master's data on this issue departed, once again, from Defendants' reported count.  *See* ECF No. 7865-2 at 33.) Approximately one in ten of those patients was then referred for inpatient care by their IDTTs within three months, despite the IDTT's resistance to the UNA referral recommen-dation.  ECF No .7865-3 at 38.  While Plaintiffs and the Special Master both asked for additional analysis on this point, including whether it demonstrated institutionalization that should be accounted for in assessing unmet need and/or how it compared to rescission and rejection rates in prior years, Defendants declined to provide it beyond reporting later-generated referrals.  *Compare* ECF No. 7865-2 at 33 (Special Master comments), and *id.* at 53 (Plaintiffs' comments), *with* ECF No. 7865-2 at 7.

Indeed, in their response to the comments on the draft report, Defendants discussed the observer effect in connection with this very group of referrals.  *See* ECF No. 7865-2 at 5 (noting Defendants initially counted 604 referrals, based on a count of all referrals including non-UNA team referrals during Phase II in order "to eliminate factors such as the observer effect, concurrent Sustainable Process activities during the UNA period, and any unanticipated Phase II referrals that did not strictly align with the 2022/23 UNA methodology.").  Rather than carefully analyzing how these highly suspect numbers of concurrent non-UNA referrals could possibly be reconciled with their conclusion that the UNA process was robust, or including them as additional UNA referrals suppressed by the observer effect, Defendants blithely attribute the results to the success of the Sustainable Process.  This claim is unsubstantiated, at a minimum because Defendants halted their sustainable process activities during the UNA study.  *See* ECF No. 7865-3 at 22; *see also infra* Section IV (objecting to proposed findings regarding the efficacy of Defendants' Sustainable Process).  The large number of referrals outside of UNA call into serious question the results of the UNA.

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' 2022-2023 UNMET NEEDS ASSESSMENT REPORT

**C.      The Substantial and Ongoing Drop In Inpatient Referrals Since the Pandemic is Unexplained and Undermines the Reliability of the UNA Study Results.**

A third troubling factor that limits the usefulness of the UNA report's finding is the large and sustained drop in inpatient referrals since the beginning of the pandemic, which Defendants acknowledge but fail to explain.  Even with most of the UNA reviews occurring in 2022, the rate of referrals per MHSDS patient in 2022 fell below the 2000 and 2021 referral rates, and the rate for all three years was far below the rate in 2019.  This is shown in Defendants' chart on page 45 of the Final UNA Report, which shows that the annual rate of referrals has declined significantly, both in absolute numbers and in the rate per 1,000 patients in the MHSDS during those years.  ECF No. 7865-3 at 45.  The key information in the chart is reproduced below for clarity:

| Year | Total Number of Referrals to APP/ICF | Referrals Per 1000 Patients |
|---|---|---|
| 2016 | 2756 | 74.6 |
| 2017 | 3600 | 93.7 |
| 2018 | 4352 | 112.5 |
| 2019 | 4803 | 129.9 |
| 2020 | 2817 | 78.3 |
| 2021 | 2307 | 78.0 |
| 2022 | 2290 | 70.3 |

This chart shows steadily increasing referrals to ICF and UNA from 2016 through the start of the pandemic in early 2020, suggesting that efforts to ensure inpatient beds were appropriately being used were working during that time period.  However, since the pandemic year of 2020, rates of referral to inpatient care have crashed to almost one-half the 2019 rate of referrals of 129.9 per 1,000 patients.  *See* ECF No. 7865-3 at 45. Defendants argue in the Report that "[i]f there was an unmet need, then the referral rate during the 2022/2023 UNA could be expected to be significantly, or at least noticeably

1   higher." *Ibid*.  The problem is that Defendants do not have an explanation as to why the

2   2022 rate remains so much lower than the 2019 rate.  The 2022 rate is even lower than the

3   pandemic years—or indeed any reported rate for the seven years for which data is

4   provided—and appears to be falling further.  This large drop in referrals is unexpected and

5   anomalous.  One would have expected that after a year of intense isolation due to the

6   pandemic, MHSDS patients would have an increased need for inpatient care,[7] but in fact,

7   the referrals to inpatient programs have nearly halved during the pandemic and this

8   reduction in referrals has continued for two years after the worst of the pandemic

9   lockdowns ended.[8]

10      The explanation could well be that poor staffing in CDCR institutions is impacting

11  identification and referral, or it could be that staffing shortages in the PIP programs have

12  impacted quality of care to such a degree that EOP clinicians are not bothering to send

13  their patients there, or there could be another explanation.  It could be that there are

14  temporary factors impacting referrals that also impacted the UNA reviews.  Whatever the

15  explanation, and defendants provide none that pass muster, this unexamined, extremely

16  anomalous trend undermines the reliability of the UNA results.

17      The Court should acknowledge that these three factors call into question the

18  reliability of the UNA study's conclusions.  To the extent that the Court accepts the study's

19  finding that there is no unmet need, it should do so with the caveat that these three factors

20  cast doubt on the reliability of the findings and the durability of its conclusions regarding

---

[7] It is well established that the kinds of isolation and lack of stimulation experienced in the pandemic, which are similar to the kinds of isolation in segregation units, typically leads to psychological decompensation, and psychological crises.  *See*, Reiter Keramet, et al., *Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States*, 2017-2018. Am J Pub. Health. 2020, at 1 ("Many studies document psychological harms of segregation, including associations between solitary confinement and self-harm, anxiety, depression, paranoia, and aggression, among other symptoms.").

[8] The Report does discuss the pandemic (ECF 7865-3 at 21) in the context of Defendants' "Lessons Learned" report (filed with the Court at ECF No. 7196).  The findings of that Lessons Learned report are presented as fact in the Final UNA Report, despite the fact that Plaintiffs strongly contest many aspects of Defendants' methodologies and findings (ECF No. 7241) and the Court never adopted it.  Even if these explanation validly described the pandemic patterns, they fail to explain the persistent low rates of referral in 2021 and 2022.

1  ongoing need.

2  **II.   THE FINDINGS IN THE REPORT REGARDING LACK OF UNMET NEED
       FOR LOW-CUSTODY DSH BEDS AND HIGH-CUSTODY PIP BEDS
3     IGNORE CONFOUNDING FACTORS**

4        Additionally, Defendants' conclusions regarding utilization of the low-custody

5  DSH beds and the high-custody PIP beds are undermined by major confounding factors

6  that CDCR fails to address.

7        **A.   Defendants Ignore the Role of the Broken LRH Process in Assessing the
            Need for Low-Custody DSH Beds**
8

9        Plaintiffs object to the Report's conclusions regarding lower custody inpatient beds

10 operated by the Department of State Hospitals (DSH) at Atascadero State Hospital and

11 other State Hospitals.  *See* ECF No. 7865-3 at 12-13.  Defendants' Report asserts that in

12 the context of ongoing low utilization rates of low custody inpatient beds, the low referrals

13 to DSH beds during the UNA review period show that there is at best "a weak correlation

14 between [higher numbers of] available DSH beds and unmet need."  *Id*.  Plaintiffs disagree

15 with and object to this conclusion, and ask that the Court specifically reject this finding in

16 the Report as well as the other findings regarding DSH/ASH beds.

17       There is no question that DSH beds are not being fully utilized at this time and have

18 not been fully utilized for years.  Defendants' most recent monthly filing with inpatient

19 bed census data, dated July 14, 2023, shows that at the end of June 2023, only 59 out of

20 259 contracted ICF beds at Atascadero State Hospital ("ASH") were filled, a shocking low

21 occupancy rate of only 23 percent.  *See* ECF No. 7874 at 19.  Similarly, the same report

22 shows that for low-custody ICF beds for men, only 126 out of 370 such beds overall are

23 occupied, a rate of only 34 percent.  *Id*.

24       Similarly, in the Final UNA Report, Defendants' include the following chart

25 showing low custody DSH ICF occupancy rates over the last decade.  ECF No. 7865-3 at

26 58.  The chart shows the dramatic decline in utilization of DSH beds in the last two years

27 and provides some context regarding utilization rates over the last decade or so:

28





DSH Occupancies by Month - 2012-2023

As the chart shows, since 2012, DSH inpatient bed utilization has varied.  At times, particularly when there is pressure from the Court and the Special Master to fill the chronically underutilized DSH beds at ASH and other DSH facilities, the usage increased to 80 percent and even 100 percent of occupancy.  For example, the relatively high rates of DSH bed utilization in 2012, 2016 and 2017 reflected court intervention and/or Special Master scrutiny of the low rate of lower custody beds around those times.  *See* ECF No. 5448 at 33-40 (2016 Special Master's Inpatient Report discussing successful court interventions in 2011-12, and 2015-16 to increase utilization of DSH beds and particularly ASH beds).  Notably, at the end of 2019, just before the pandemic, occupancy for DSH beds was also at close to 100 percent for around five months.  ECF No. 7865-3 at 58. However, for the roughly ten year period in the chart above as a whole, the average utilization of DSH beds would appear to be only around 70-75 percent, if the last two years are excluded.  The chart also shows two brief periods, in 2015 and 2018-19, where the occupancy rates slipped to just below 60 percent.  However, since the end of the key pandemic restrictions in early 2021, the rate of occupancy has dropped dramatically—and in an unprecedented manner—to well below 40 percent and has remained there.  *Id*.

Defendants do not have a clear explanation for this drop, and as explained above

1   they assert that the low rate during the UNA reviews shows there is no unmet need for the

2   DSH beds.  But this conclusion completely ignores an obvious confounding factor that

3   undermines the basis of their finding:  the broken LRH process.  Indeed, other data

4   suggests a different explanation than that proffered by Defendants—that people who

5   should be going to low-custody ICF beds in DSH facilities are being needlessly sent to and

6   kept in higher-custody CDCR facilities that are badly understaffed and failing to provide

7   minimally adequate care, including SVSP, CMF and CHCF.  The Report includes the

8   following chart showing occupancy rates for "multi-person cells," about two-thirds of

9   which are four-man dormitories in the PIP program at Salinas Valley State Prison and one-

10  third of which are a wing of double-cells in the CMF PIP.  *See id*. at 65.



22      The graph shows that the demand for the "Multi Person Cells" skyrocketed to 120

23  percent of capacity during UNA—higher than any period since the start of Defendants'

24  reporting in January 2018.  Defendants do not provide a thorough explanation for this

25  unprecedented surge in demand, but it strongly suggests that patients from the UNA

26  process who previously would have gone to lower-custody DSH and CDCR ICF programs

27  are instead being sent to (or needlessly kept in) the four-person dorms at SVSP and the

28  double-celled wing at CMF.  Indeed, Defendants acknowledge in the Final UNA Report

that this data shows a problem with LRH reviews, noting that "CDCR should commit to ensuring IDTTs are regularly reviewing patients not housed within their current LRH for potential step down, including patients in Multi-Person Cells that may be able to go to a Lock[ed] Dorm or Unlocked Dorm." *Id.*

Recent data confirms significant problems with the LRH process and suggests it is completely broken. For example, Defendants' most recent monthly report on inpatient referrals, dated July 14, 2023, shows that there were 97 patients who were not in their LRH at the Stockton high custody ICF, 13 patients not in their LRH in two program categories at CMF ICF, and 103 patients in two categories not in their LRH at the SVSP ICF. *See* ECF No. 7874 at 18-19. Thus, a total of 213 patients in these high custody programs are not in their LRH—almost half of all the 502 people in these high custody ICF programs.

The large number of patients who are Level I and II but are housed in high custody CDCR ICF programs also underscores the clear current problem with the LRH referral system. The most recent monthly report filed by Defendants on inpatient referrals reports the following census of level I and II patients in high custody ICF programs:

| Program | Level I Patients | Level II Patients | Level I + II Total |
|---|---|---|---|
| CHCF High Custody ICF | 8 | 44 | 52 |
| CMF High Custody ICF | 2 | 6 | 8 |
| SVSP High Custody ICF (single and multi-person) | 4 | 41 | 45 |
| TOTAL Low Custody out of Level in High Custody ICF | 14 | 91 | 105 |

*See id.* at 18-19. The fact that there are 105 level I and II patients in restrictive Level IV inpatient programs is very troubling, and shows that the process for ensuring patients move to the lowest custody inpatient treatment setting is failing, leaving lower custody ICF beds at ASH, CSH and CMF severely underutilized.

The Special Master also documented this LRH problem in his 2023 Psychiatric Inpatient Program Report, where he wrote that "[e]vidence of inadequate identification of

1   patients housed outside of their LRH and inadequate treatment planning to address the

2   symptoms and behaviors that prevented patients from moving to their LRH were found in

3   a number of cases reviewed at CMF-PIP and SVSP-PIP[.]"  ECF No. 7833 at 74; *see also*

4   June 9, 2023 Order, ECF No. 7854 (adopting Special Master's PIP Report).  The Special

5   Master also reported that none of the IDTTs that he observed during his thirtieth round

6   tour at CMF-PIP took steps to facilitate patients out of their LRH to move to less

7   restrictive housing, and that CMF-PIP suspended LRH reviews due to high staffing

8   vacancies.  ECF No. 7833 at 93, 104.  At SVSP, the Special Master reported "challenges

9   from the Health Care Placement Oversight Program (HCPOP) […] when patients were

10  released from maximum custody and reduction to a lower LRH was recommended."  *Id.* at

11  94.  The Special Master found that "CHCF-PIP, SVSP-PIP and CIW-PIP all reported

12  increases" in patients housed above their LRH during the review period .  *Id*. at 46.  The

13  PIP Report also found that treatment planning efforts in IDTTs, which presumably

14  included the LRH process, were "compromised by issues with attendance for required

15  members, poor care collaboration, and deficiencies in IDTT practices."  *Id*. at 56.

16          Given these problems, the Court should reject the Report's conclusions about unmet

17  need and the DSH vacancy rate.  The LRH process controls access to DSH beds.  That

18  process is broken in all meaningful ways.  Until it is fixed or replaced, it impossible to

19  discern whether there is a correlation between unmet need and the utilization rate of the

20  DSH beds.

21          **B.      Defendants' Claim of Sufficient High-Custody and Acute PIP Beds Is
                      Predicated On A Fiction**

22

23          Additionally, Defendants' reporting on the occupancy levels of their APP and high-

24  custody ICF PIP units appears to show consistent capacity in those units since 2020.  ECF

25  No 7865-3 at 59-60, 63-64.  But Defendants' reporting is based on a fiction, as it fails to

26  account for the fact that roughly 200 high-custody and acute beds at CMF PIP and CHCF

27  PIPs have been offline for years due to Defendants' chronic inability to hire and retain

28  sufficient clinical staff to run those units.  *See, e.g.*, ECF No. 7836 at 10-11 (reporting 203

offline beds at CMF and CHCF PIPs).  Without those beds, Defendants very clearly lack

sufficient capacity to provide class members timely access to inpatient psychiatric

hospitalization, as reflected in Defendants' sustained inability to comply with Program

Guide transfer timelines.  *See* Feb. 28, 2023 Order, ECF No. 7741.  By counting inpatient

beds that physically exist, but have not been available to treat patients for years,

Defendants present a false picture of capacity where in reality none—indeed, less than

none—exists.

### III.   THIS COURT SHOULD ADOPT THE FINDINGS SHOWING A CLEAR NEED FOR A TREATMENT PROGRAM FOR CLASS MEMBERS WITH PERSONALITY DISORDERS AND ORDER THE SPECIAL MASTER TO MAKE RECOMMENDATIONS REGARDING APPROPRIATE NEXT STEPS

Defendants claim that further analysis is required to determine both whether there is

an unmet need for patients with personality disorders and to decide what treatment is

appropriate.  ECF No. 7865-3 at 8, 48.  The assertion that there is no clear unmet need is

irreconcilable with the study's results: CDCR's own clinicians conclusively identified 470

patients who struggle with severe personality disorders that have not responded adequately

to offered treatment, who have already been offered all clinically appropriate treatment

available in the MHSDS, and who "may benefit from a special treatment needs program

for patients with a personality disorder that is not available within the existing MHSDS or

DSH."  *Id*. at 95 (UNA Operationalization for Phase II explanation of criteria for

Personality Disorder Category 3); *id*. at 39 (identification of 470 Category 3 patients).

There is simply no basis for Defendants' claim that there is a question as to whether any

unmet for this group of patients exists:  They were identified by Defendants using

methodology they designed themselves for the express purpose of determining whether

this category of unmet need exists.  *See* ECF No. 7305 at 15:9-10 (ordering that study with

respect to personality disorder needs must be "sufficient to identify with specificity the

size of that need and what is required to ensure that it is met").  The conclusive answer

from Defendants' study is that it does, and the unmet need is large.

Defendants also assert that a year-long study is needed to determine whether and

how to treat this identified unmet need among class members.  *See* ECF No. 7865-2 at 9, 13; ECF No. 7865-3 at 50-51.  Yet they do not contest that they already spent significant time in 2020 studying, with the input of the Special Master's experts, how best to treat class members with personality disorders and identified appropriate treatment protocols "including Dialectical Behavioral Treatment (DBT) for some [those with BPD] and a Clozapine unit for others with chronic self-harm."  ECF No. 7865-2 at 13.  Defendants do not explain why they failed to implement such programs after their review of these issues in 2020, much less why another year of study is necessary—particularly given the fact that their plan does not even account for the time *after* the year-long study period that Defendants claim must be spent "finding, soliciting, and hiring subject matter experts to staff these new programs, as well as attaining significant buy-in from institutional custody staff."  *Id.* at 14.

Moreover, Defendants cannot explain why any further study at all is needed to create a program to treat the 152 identified patients who are diagnosed with BPD and/or EUPD.[9]  As Defendants themselves admit, psychotherapy is the well-accepted treatment for these diagnoses.  ECF No. 7865-3 at 49; *see also* Lois Choi-Kain, Ellen Finch, et al., *What Works in the Treatment of Borderline Personality Disorder*, Curr Behav Neurosci Report 2017; 4(1): 21-30 (noting that BPD was "once thought to be an untreatable condition" but that in recent years established evidenced-based treatment protocols have been identified); *see also* Mayo Clinic, Information Page on Borderline Personality Disorder, *available at* https://www.mayoclinic.org/diseases-conditions/borderline-

---

[9] While Defendants identified 152 Category 3 Personality Disorder patients with diagnoses of BPD (or EUPD, as Defendants admit the two are essentially synonymous, *see* ECF 7865-3 at 49), there is good reason to believe this is a small fraction of the class members who could benefit from an evidence-based BPD-treatment program.  *See* Irene Epshteyn, Hossam Mahmoud, *Enhancing Mental Health Treatment for Borderline Personality Disorder in Corrections,* Journal of Correctional Health Care, 2021; 27(4): at 220 (finding that "[a]mong the personality disorders, borderline personality disorder (BPD) is particularly prevalent in correctional settings" and noting that "[e]stimates [of prevalence in correctional settings] range from  25 % to 50%, likely exceeding its prevalence in all other institutional settings, including inpatient psychiatric units (20%), outpatient psychiatric settings, and the general population (1%-2%)." ).

1   personality-disorder/diagnosis-treatment/drc-20370242 (affirming that psychotherapy

2   along with good psychiatric management "have been found to be effective" for BPD).

3          Defendants assert that designing a program to treat all of the patients identified in

4   Category 3 of UNA is complicated because the patients' "diagnoses span a spectrum,"[10]

5   potentially necessitating different treatment.  ECF No. 7865-3 at 50.  While this may be

6   true when considering the 470 patients identified in Category 3 as a whole, Defendants do

7   not contest the Special Master's point that treatment for patients with BPD can and should

8   be developed on a pilot basis now "as there is no need for further study as to evidence-

9   based treatment for patients with this diagnosis."  ECF No. 7865-2 at 34 (Special Master's

10  comments).  Defendants assert that the personality disordered patients can wait years

11  longer to receive well-established treatment because there is no "immediate risk of further

12  harm while these patients receive treatment for other aspects of their mental health."  *Id*. at

13  9.  As a threshold matter, if these patients were functioning well or amenable to treatment

14  within the existing MHSDS programs, they would not meet the criteria for Category 3 in

15  the first place.  *See* ECF No. 7865-3 at 95 (Personality Disorder Category 3 criteria) and 97

16  (reporting requirement for Category 3 patients that UNA reviewers provide "a detailed

17  summary and rationale for the determination … to HQ within 10 working days to include

18  specific patient needs to be addressed by interventions (for example, a comprehensive

19  DBT residential program).").  Moreover, the reality is that these patients pose a serious

20  risk to themselves and to others on a daily basis, as the Special Master notes.  *See* ECF No.

21

22  [10] Defendants' decision to modify earlier drafts of the report to further stratify the
    personality disorder diagnoses for the Category 3 patients by including the ICD-10
23  classification system appears designed to advance their argument that the group of patients
    at issue are heterogenous, as illustrated in their semi-legible chart at page 49 of the Report.
24  Not only do Defendants admit that the two most common ICD-10 diagnoses identified
    (Dissocial Personality Disorder and Emotionally Unstable Personality Disorder) are
25  essentially the same as the two most common DSM diagnoses identified (Antisocial
    Personality Disorder and Borderline Personality Disorder, respectively), *see* 7865-3 at 49,
26  the Special Master has never seen CDCR clinicians actually use the ICD-10 classification
    system in his many years of monitoring, *see* ECF No. 7865-2 at 34.  Nor do Defendants
27  claim those codes are actually in use within CDCR.  *See id*. at 9 (asserting merely that
    CDCR clinicians "have access to one or more … diagnostic references" including ICD-10
28  and "may" use it).

7865-2 at 34 (noting that denying known treatment to this group "risks further harm to these patients, as well as staff and other patients."); *see also* Kelly E. Moore, *et. al*, *The Relation of Borderline Personality Disorder to Aggression, Victimization and Institutional Misconduct Among Prisoners, Comprehensive Psychiatry*, 84 (July 2018): 15-21, *available at* https://www.sciencedirect.com/science/article/abs/pii/S0010440X18300579 (finding prisoners with BPD were more likely than those without BPD to perpetrate and be victimized by psychological aggression).

Patients diagnosed with BPD often are seriously self-harming, consume extensive resources, and frequently incur disciplinary infractions that extend their time in prison. Continuing to deny them well-known, evidence-based treatment that can alleviate their symptoms is deliberate indifference.  As the Special Master noted, this patient population places tremendous pressure on Defendants' "already limited staffing and resources."  ECF No. 7865-2 at 34; *see also* Irene Epshteyn, Hossam Mahmoud, *Enhancing Mental Health Treatment for Borderline Personality Disorder in Corrections,* Journal of Correctional Health Care, 2021; 27(4): at 220-224 (noting that treatment for correctional patients with BPD is particularly cost effective because "such patients often present in a state of crisis and seek help repeatedly and simultaneously from multiple sources").  CDCR has more than enough information to design and begin implementing a treatment program for this significant identified population of patients, who are suffering because Defendants have spent years delaying implementing well-accepted, known treatment protocols.

Accordingly, this Court should reject Defendants' conclusion that the UNA did not clearly answer whether an unmet need exists for patients with personality disorders, and order the Special Master to opine and make appropriate formal recommendations regarding their claim that an additional year of evaluation is necessary both to ascertain whether unmet need in this area exists and to determine whether and how patients with personality disorders, particularly those with borderline personality disorder diagnoses, can be treated.

If this Court declines to request formal input and potential recommendations from

the Special Master in lieu of Defendants' proposal to further evaluate treatment for patients with personality disorders, it must, at a minimum, direct the Special Master to oversee the development and implementation of Defendants' proposed study, with input as appropriate from Plaintiffs' counsel.  Particularly given Defendants' repeated claims that this population is heterogenous and difficult to treat, coupled with their claims that the agreed-upon UNA methodology was flawed and requires a "standardized methodology" (ECF No. 7865-3 at 48), Defendants would presumably welcome the Special Master's assistance and expertise in what is essentially a refinement and extension of the UNA study.

## IV.   DEFENDANTS' EFFORTS TO REHABILITATE THEIR SUSTAINABLE PROCESS THROUGH THE UNA REPORT SHOULD BE REJECTED

The Court should reject Defendants' attempts to use the UNA process to rehabilitate their Sustainable Process.  These comparisons are beyond the scope of the Court's order dictating the requirements of the UNA study, and were therefore not considered or addressed in the design of the study's methodology or its execution.  In fact, the Court specifically sought to separate consideration of unmet need and evaluation of Defendants' sustainable process.  *See* Sept. 10,2021 Order, ECF No. 7305 at 14-15.  Moreover, Defendants' attempts to assert that the sustainable process better identifies unmet need are questionable at best.  First, Defendants do not include in their comparisons the 338 purportedly "non-UNA" referrals generated contemporaneously with the UNA, even though it is not clear these referrals would have occurred had the UNA process not been taking place.  *See supra* Section I.B.  Second, Defendants do not acknowledge the role of the current staffing crisis, which undermined the UNA process and its results and likely plays a role in the ongoing depressed referral rate.  The extreme nature of the systemwide clinical staffing vacancy rate among primary care clinicians (as opposed to psychiatrists) is a relatively recent development, and confounds comparisons to pandemic and pre-pandemic years.

Further, Defendants' comparisons are methodologically flawed because they do not use the appropriate time periods for purposes of comparison overall.  Some of the charts in

the Final Report compare sustainable process time periods that are much longer than the time periods used in UNA.  *See, e.g.*, ECF No. 7865-3 at 43.  As the chart on page 43 shows, for EOP patients, the time period involving the sustainable process is a three month period (presumably due to the fact that IDTTs are required to be held once a quarter for EOP patients), and for CCCMS patients the time period is the entire year (similarly, presumably due to the fact that IDTTs are required to be held once a year for CCCMS patients).  *Id*.  But the time frame for a number of UNA institution reviews was less than a month, and the UNA review periods for most individual institutions were one to two months.  *Id*.  Referral rates over a longer Sustainable Process period are certain to be higher than over the much shorter UNA periods, so these comparisons are methodologically flawed.

The Court should disregard Defendants' ad hoc comparisons of the UNA results to the sustainable process.  The Court's order mandating the study contains no requirements for such a comparison, and as such the UNA study was never designed nor implemented to address it.  And Defendants' reported comparisons attempting to rehabilitate the sustainable process are methodologically suspect.  To the extent the Court at some point in the future considers a further unmet needs evaluation, Defendants' claims about the effectiveness of the sustainable process will be relevant and squarely at issue.  But they are not part of this Court-ordered UNA study, and the portions of Defendants' Report asserting the purported efficacy of that process should be rejected and disregarded.

## CONCLUSION

Based on the foregoing, Plaintiffs request that the Court reject, or at a minimum acknowledge the limitations of, the UNA study's findings of no unmet need for ICF and acute inpatient care, given the unanswered questions about the methodology and data results, the large number of referrals outside of the study, the likely impact of the current staffing crisis on inpatient referrals and on the UNA study itself, and the unexplained persistence of seriously depressed referral rates post-pandemic.  At the very least, the Court should find that these limitations cabin the predictive power of the study with

1  respect to future inpatient bed need.

2        Further, the Court should reject the Final UNA Report's sweeping conclusion that

3  there is a lack unmet need for low custody DSH beds given Defendants' persistent inability

4  to design and implement a functioning process for ensuring patients are treated in their

5  least restrictive inpatient housing setting.  Similarly, Defendants' finding of excess acute

6  and high-custody ICF capacity is predicated on the fiction that all existing PIP beds are

7  available to treat patients.  This has not been true for years, as hundreds of CDCR inpatient

8  beds remain offline due to CDCR's unabating staffing crisis.  CDCR does not actually

9  operate sufficient numbers of high-custody acute and ICF beds to timely treat the

10  identified inpatient need.  Their assertion of sufficient capacity must be rejected.

11        Moreover, this Court must conclude, based on the objective outcome of the study,

12  that an unmet need for patients with personality disorders exists, despite Defendants'

13  protestations.  And it should order the Special Master to opine and make recommendations

14  regarding Defendants' claim that this patient population will suffer no harm while awaiting

15  at least another additional year of study and evaluation before Defendants will agree to

16  consider treating them.  At least for the large subset of the group diagnosed with borderline

17  personality disorder, treatment protocols are indisputably well-defined and beneficial.

18        Finally, this Court should ignore Defendants' attempt to use the UNA to establish

19  the effectiveness of the Sustainable Process.  Such a comparison is beyond the scope of the

20  study and as such was not accounted for in its development or planning; regardless,

21  Defendants' post-hoc analysis is methodologically flawed.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[4330192.10]

1

**CERTIFICATION**

2        The undersigned counsel for Plaintiffs certifies that he reviewed the following

3   relevant court orders:  ECF Nos.  7305, 7477, 7676, 7680, 7854.

4

5   DATED:  August 1, 2023            Respectfully submitted,

6                                     ROSEN BIEN GALVAN & GRUNFELD LLP

7                                     By:  */s/ Thomas Nolan*

8                                          Thomas Nolan

9                                     Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[4330192.10]

25