UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | ORDER |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

This matter is before the court on plaintiffs' motion to reject defendants' plan to recruit and retain mental health staff in the psychiatric inpatient programs (PIPs) operated by the California Department of Corrections and Rehabilitation (CDCR). ECF No. 7813. Defendants oppose the motion, ECF No. 7827, and plaintiffs have filed a reply, ECF No. 7839. In addition, in response to the court's invitation, ECF No. 7817, the United States Department of Justice has filed its views on plaintiffs' motion. ECF No. 7846. As authorized by court order, ECF No. 7854, the parties have filed supplemental briefing. ECF Nos. 7864 (defendants), 7868 (plaintiffs).

**I.        BACKGROUND**

In 1995, the court found defendants in violation of their Eighth Amendment obligation to provide the plaintiff class with access to adequate mental health care. *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995). In part relevant here, the court found defendants' prisons

"significantly and chronically understaffed in the area of mental health care services." *Id*. at 1308.

The remedial plan for delivery of adequate mental health care to class members, the Program Guide, is structured into four levels of mental health care: Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient Program (EOP); Mental Health Crisis Bed (MHCB); and Intermediate Care Facility (ICF) and Acute Inpatient Program (APP). Together, the ICF and APP provide for the delivery of inpatient care. While "CDCR 'is responsible for providing acute and intermediate inpatient care, in a timely manner, to those CDCR inmates clinically determined to be in need of such care,'" September 5, 2013 Order, ECF No. 4784, at 4[1] (quoting July 11, 2013 Order, ECF No. 4688, at 5 (in turn quoting Revised Program Guide at 12-6-1)), for almost two decades of the remedial phase of this action, CDCR delegated provision of August 2009. June 18, 2009 Order, ECF No. 3613, at 2. In accordance with the required plan, ECF No. 3693 filed September 30, 2009, defendants use ratios of clinical staff to inmate-patients for care at the CCCMS, EOP, and MHCB levels of care to determine staffing at each level of the CDCR mental health services delivery system (MHSDS). *See generally*, ECF No. 3693; *see also* October 10, 2017 Order, ECF No. 5711, at 17-18.

In July 2014, significant and chronic understaffing still plagued defendants' mental health services. The court ordered both the CDCR and the DSH defendants, under the guidance of the Special Master, to

> review and re-evaluate existing clinical staffing levels in the six inpatient programs and their effect on the delivery of treatment to CDCR patients in those programs, and to the extent indicated, develop a plan to adjust clinical staffing levels where necessary to ensure that adequate and sufficient treatment can be delivered to class members at those programs.

July 25, 2014 Order, ECF No. 5188, at 4-5. At that time, defendants staffed inpatient facilities using staff-to-patient ratios. *See* ECF No. 5156 at, *e.g.*, 7-8; *see also* ECF No. 5448 at 44-45.

/////

---

[1] Citations to page numbers in documents filed in this action are to the page number assigned by the Court's Electronic Case Filing (ECF) System and located in the upper right-hand corner of the page.

Between August 2015 and February 2016, the Special Master worked with CDCR and DSH "to develop a new Memorandum of Understanding (MOU)" between the two agencies. ECF No. 5894 at 14. The new MOU was written to transfer responsibility of DSH inpatient programs in California's prisons to CDCR, specifically the programs at California Health Care Facility (CHCF), California Medical Facility (CMF), and Salinas Valley State Prison (SVSP). *Id*. This so-called "Lift and Shift" project was developed to finally work through long waitlists of class members for admission to DSH inpatient programs. *Id*.

The Lift and Shift project "did not survive the winnowing process" of the 2016-2017 budget cycle. *Id*. It was resubmitted in the Governor's 2017/2018 budget and approved that year. *Id*. The 2017/2018 budget "allocated funds to CDCR's budget for . . . the transfer of 1,156 inpatient mental health treatment beds" at the three DSH inpatient programs at CDCR prisons "to the responsibility of CDCR effective July 1, 2017." ECF No. 5779 at 24. The Special Master worked with CDCR and DSH defendants from February to June 2017 to accomplish the transfer by July 1, 2017. *Id*. CDCR now operates a total of five PIPs: the three Lift and Shift PIPs as well as PIPs at CIW and San Quentin State Prison (SQ). ECF No. 7833 at 13.[2] DSH continues to operate three programs that provide inpatient care to *Coleman* class members, at Atascadero State Hospital (ASH), Coalinga State Hospital (CSH), and Patton State Hospital (Patton). *See*, *e.g.*, ECF No. 7859 at 7.

Simultaneously, in March 2017, the court ordered the DSH defendants to "continue to work on their staffing plan for their inpatient programs that treat *Coleman* class members . . . in coordination with CDCR's development of its own mental health staffing plan. . . ." March 8, 2017 Order, ECF No. 5573, at 3.

In October 2017, more than twenty years had passed since the court found defendants in violation of their Eighth Amendment obligation to provide the plaintiff class with access to adequate mental health care, and yet staffing shortfalls persisted. The court ordered the CDCR

---

[2] CDCR also provides acute inpatient care at twelve Inpatient Flex Beds at California Men's Colony (CMC). ECF No. 7833 at 13 n.1. These beds are used for APP or MHCB levels of care, as needed. *See* ECF No. 7921 at 10-11, *amended by* ECF No. 7922 at 4-5.

defendants to, within one year, "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." ECF No. 5711, at 30. The court also required "complete implementation of the DSH defendants' staffing plan within one year. . .." *Id*. In February 2021, citing the March and October 2017 orders, the court recognized defendants were "under long-standing orders to develop staffing plans for mental health inpatient programs provided to class members" and set new deadlines for DSH and CDCR, respectively, to file the required plans. February 18, 2021 Order, ECF No. 7064, at 2. On March 11, 2021, defendants filed DSH's Staffing Plan. ECF No. 7078-1. The court provisionally approved DSH's Staffing Plan on March 26, 2021, subject to one year of monitoring by the Special Master. March 26, 2021 Order, ECF No. 7108, at 1. The DSH Staffing Plan is based on ratios of clinical staff to the maximum census of *Coleman* patients at each DSH Program. *See* ECF No. 7078-1 at 2.

In July 2021, defendants filed CDCR's PIP Staffing Plan. ECF No. 7245. Defendants explained the origins of the CDCR plan:

> When CDCR opened the PIPs at San Quentin State Prison (SQ) and at the California Institution for Women (CIW), CDCR established a ratio of one psychiatrist per 15 beds for the Acute Psychiatric Program (APP) level of care and a ratio of one psychiatrist per 35 beds for the Intermediate Care Facility (ICF) level of care. Following the transition of the remaining PIPs from the Department of State Hospitals (DSH), CDCR maintained the positions previously allocated by DSH. The DSH staff-to-patient ratio for psychiatrists, psychologists, clinical social workers, and rehabilitation therapists was established in 2012 at one per 35 beds for ICF units. The ratios for the APP level of care for the above classifications were one per 15 beds.

*Id*. at 4. The PIP Staffing Plan is based on ratios of clinical positions to the number of beds in each program. *Id*. at 4-5.

On May 17, 2022, the Special Master filed a monitoring report on inpatient mental health care at the six PIPs operated by CDCR. ECF No. 7555 (hereafter Report). In relevant part, the Special Master recommended that the court order defendants to, within thirty days, develop "a comprehensive plan . . . to remedy the seriously deficient staffing levels" in CDCR's PIPs. August 29, 2022 Order, ECF No. 7608, at 2 (quoting ECF No. 7555 at 164).

4

On August 29, 2022, the court adopted the findings in the Report in full. *Id*. at 6. The court did not adopt the recommendations regarding development of a comprehensive remedial plan for staffing the PIPs. Instead, the court referred "the issue of durable achievement of mental health staffing levels" in the PIPs for focused discussions between the Special Master and then CDCR Secretary Kathleen Allison over six months. *Id*. at 4. The court signaled it would accept a declaration from Secretary Allison setting out an agreed-upon resolution if achieved and filed within six months. *Id*.

In the meantime, on December 20, 2022, the court gave final approval to the DSH Staffing Plan. December 20, 2022 Order, ECF No. 7688.

Secretary Allison retired at the end of 2022, and the Special Master reported to the court that "productive discussions . . . had stalled" prior to her retirement. January 6, 2023 Order, ECF No. 7967 at 3. On January 6, 2023, the court vacated that part of the August 29, 2022 order that had referred the PIP staffing issue to Secretary Allison and the Special Master and directed defendants to serve on plaintiffs and the Special Master any plans they had developed to address the issue. *Id*. at 3. The court directed the parties to meet and confer for a period of forty-five days in an effort to resolve the issue and, thereafter, to file a joint status report together with "as appropriate, either a stipulated resolution or a schedule for motion practice if" the issue remained unresolved. *Id*. The parties were unable to resolve the issue and as required filed a joint schedule for defendants to file their plan and plaintiffs to file a motion, if any. ECF No. 7758.

On March 28, 2023, defendants timely filed the plan. ECF No. 7787. On April 17, 2023, plaintiffs timely filed their current motion to reject that plan. On May 11, 2023, as part of his thirtieth round of monitoring, the Special Master filed a further monitoring report on inpatient mental health care in the CDCR PIPs. ECF No. 7833. The findings in that report, which the court adopted in full and without objection, June 9, 2023 Order, ECF No. 7854, show significant ongoing understaffing in the CDCR PIPs despite the court's finding in 1995—nearly thirty years in the past—that defendants' prisons were significantly and chronically understaffed in the area of mental health care services. *Id*. at, *e.g.*, 50-55.

## II. POSITIONS OF THE PARTIES

Plaintiffs contend that defendants' plan to recruit and retain mental health staff in the PIPs is inadequate in several respects. They argue it includes "no meaningful new initiatives" to remedy staffing vacancies and instead relies on ineffective plans that have failed in the past. ECF No. 7813 at 12–14. They argue the plan does not address working conditions, staff retention, or recreational therapists and addresses mental health staffing generally rather than in the PIPs. *Id.* at 14–17. Plaintiffs seek an order requiring defendants to file a revised plan within thirty days and reduce the PIP clinical staffing vacancy rate to 10 percent within one year. *Id*. at 16-17.

In response, defendants describe their proposal as "far reaching" and comprehensive. ECF No. 7827 at 2. They claim their plan includes several new initiatives that "should be given time to take hold." *Id.* at 5. They argue their plan will improve retention by increasing pay, *see id.* at 5–6, but at the same time, they argue pay increases will not work, *see id.* at 7. They also emphasize their plan to hold more hiring events like those that resulted in many new hires in 2022. *Id*. at 3. They blame plaintiffs, the Special Master, and the court for poor working conditions in the PIPs, arguing working conditions would be better if they had been permitted to rely more on telehealth. *Id.* at 6. They excuse their delays by citing a national shortage in mental health professionals. *Id.* at 7. Defendants also contend plaintiffs have not sought leave of court to file motions for additional relief beyond the request for a new staffing plan, and they contend the court has not yet held that a 10 percent vacancy rate applies to PIP staffing levels. *Id*. at 7. They request the court order the parties to meet and confer on these issues and file further motions, if necessary. *Id*. at 8.

Plaintiffs contend in reply that no evidence shows defendants' proposal will remedy ongoing staffing deficiencies. ECF No. 7839 at 3. They argue defendants offer no evidence to show that better pay is an ineffective measure, relying in part on the opinions of defendants' expert economist, *id.* at 4–5, 8, and they point out the inconsistency between defendants' argument that pay is ineffective and defendants' proposal to retain staff by increasing pay, *id.* at 6–7. Plaintiffs describe defendants' claims about hiring events as "extremely misleading" because the new hires were not psychiatrists, psychologists, social workers, or recreational

therapists. *Id.* at 6. They argue tight labor markets are no excuse for constitutional violations, *id.* at 6–7, and they argue defendants must accept responsibility for poor working conditions, as they have not addressed those poor working conditions and have not proposed the use of tele-mental-health beyond telepsychiatry, *id.* at 8–9.[3] Finally, they contend defendants have not offered any reason to carve the PIPs out from the 2002 order setting a 10 percent maximum vacancy rate, *id.* at 3–4, and they argue the 10 percent maximum vacancy rate does apply to clinicians in the PIPs, *id.* at 11–12. They ask the court to clarify that the 10 percent vacancy rate applies to all CDCR clinicians. *Id.*

The United States Department of Justice takes the position that while it is currently "challenging to hire sufficient staff to fill positions in correctional facilities at all levels," defendants cannot avoid their constitutional obligation to provide adequate mental health care by "arguing that they have made efforts to provide adequate staffing." ECF No. 7846 at 4. The Department of Justice also reports that the recruitment and retention initiatives outlined in defendants' plan "are consistent with strategies the United States has negotiated to address the issue of understaffing in its CRIPA cases." *Id*. Finally, the Department of Justice cites cases in which it has sought specific relief, such as the relief the plaintiffs now seek, when it has "encountered extended non-compliance." *Id.* at 5.

### III. LEGAL STANDARD

The court has a responsibility to remedy the ongoing Eighth Amendment violations addressed in plaintiffs' motion. *See Brown v. Plata*, 563 U.S. 493, 511 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978)). While the court owes deference to prison administrators, it cannot "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administrators." *Id*. The Prison Litigation Reform Act of 1995 (PLRA) requires the court to ensure that prospective relief in cases involving prison conditions is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right,

---

[3] The Special Master recently informed the court that defendants have presented both him and plaintiffs with a new proposed policy for use of tele-mental-health, and the court has directed the parties to meet and confer with a joint status report due to the court by early September. *See* ECF No. 7901.

and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). This requirement is satisfied when the court makes the requisite "need-narrowness-intrusiveness findings" in an order that explains "clearly the factual circumstances underlying an order and its understanding of the relevant law as applied to the facts." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070-71 (9th Cir. 2010).

## IV.   ANALYSIS

The court's resolution of plaintiffs' motion is controlled primarily by the court's August 9, 2022 and October 10, 2017 orders. In addition, the court clarifies its August 17, 2022 order and requires an additional meet and confer between the parties.

As noted above, in the August 29, 2022 order, instead of ordering the development of a further remedial plan for PIP staffing, the court referred the matter to the Special Master and the previous CDCR Secretary for discussions aimed at durably achieving adequate mental health staffing levels in the PIPs. ECF No. 7608 at 2. At the time, remedial planning had been completed for more than three years, and the focus had shifted to setting and meeting clear deadlines for durable implementation of the entire remedy in this action. *Id*. The court observed that "'defendants have a wide range of options available to meet their constitutional obligations to hire sufficient' mental health staff." *Id*. (quoting ECF No. 5711 at 27). They "may use a combination of these options and others in a focused effort to finally remedy ongoing staffing shortages" but they "cannot . . . continue to fail to meet their obligation to hire" sufficient numbers of mental health clinicians. ECF. No. 5711 at 27.

Plaintiffs' request for an order requiring defendants to revise their plan is inconsistent with this and other prior orders. Defendants' options for full remediation of constitutional violations in mental health staffing levels are well-known and have been for years. *See generally* ECF No. 5711. Now is not the time for revised plans or new plans. Now is the time for action. Already too much time has passed without compliance. In March and October 2017, the court signaled that staffing plans covering inpatient programs should be completed and, at least as to DSH, fully implemented within one year. *See* ECF No. 5573 at 3; *see also* ECF No. 5711 at 30 (amending paragraph 2 of March 8, 2017 order, ECF No. 5573). Approximately one year ago, in

8

1  its August 29, 2022 order, the court directed the parties to concentrate on "durable achievement of
2  adequate mental health staffing levels in the PIPs."  ECF No. 7608 at 4.
3       Even as plaintiffs' request for revised planning is inconsistent with prior orders,
4  defendants' contention that plaintiffs required further leave of court to request an order setting a
5  specific deadline for compliance with PIP staffing levels, *see* ECF No. 7827 at 2, 7-8 is meritless.
6       Despite years of planning and repeated court orders, mental health staff vacancy rates
7  remain unacceptably high.  In their motion, plaintiffs focus on the three so-called Lift and Shift
8  PIPS, at California Medical Facility (CMF), California Health Care Facility (CHCF), and Salinas
9  Valley State Prison (SVSP).  They include a comparison of vacancy rates at these three PIPs
10 reported by the Special Master in his 29th Monitoring Round and by defendants in their monthly
11 report on staffing vacancies as of February 2023, as follows:

|  | CMF PIP | | CHCF PIP | | SVSP PIP | |
|---|---|---|---|---|---|---|
|  | 29th Round | Feb. 2023 | 29th Round | Feb. 2023 | 29th Round | Feb. 2023 |
| Psychiatry | 37% | 34% | 30% | 34% | 29% | 24% |
| Psychology | 49% | 49% | 55% | 44% | 20% | 30% |
| Social Workers | 68% | 69% | 60% | 46% | 46% | 26% |
| Recreational Therapists | 37% | 40% | 38% | 31% | 29% | 2% |

12 ECF No. 7813 at 8 (citing Special Master's 2022 Inpatient Report at 52; Feb. 2023 Staffing
13 Report at 11-14).  The only improvement in certain staffing vacancies between February 2023
14 and May 2023, the time of defendants' latest report, occurred among psychiatrists and
15 psychologists at the CHCF PIP as shown here:

|  | CMF PIP | | CHCF PIP | | SVSP PIP | |
|---|---|---|---|---|---|---|
|  | Feb. 2023 | May 2023 | Feb. 2023 | May 2023 | Feb. 2023 | May 2023 |
| Psychiatry | 34% | 34% | 34% | 21% | 24% | 30% |
| Psychology | 49% | 58% | 44% | 30% | 30% | 23% |
| Social Workers | 69% | 70% | 46% | 46% | 26% | 25% |
| Recreational Therapists | 40% | 43% | 31% | 30% | 2% | 2% |

16
17 ECF No. 7866 at 11-14.
18      Defendants do not dispute that vacancy rates in the PIPs are unacceptably high.  *See*
19 *generally* ECF No. 7827.  Nor do they provide a timetable for full implementation of a durable
20 staffing remedy for the PIPs.  *See generally id.*; *cf. generally* ECF No. 7608.  Given the

undisputed numbers, the court will set a firm deadline for full implementation of this aspect of the required remedy.

The parties' briefs also reveal a disagreement about what vacancy rate the court should use in measuring whether defendants have met their Eighth Amendment obligations. As discussed below, this disagreement raises a narrow and precise question, which the court will answer following the additional meet and confer required by this order.

The parties are in general agreement that full implementation of a durable staffing remedy will be assessed by measuring the fill rate of staff required by defendants' PIP Staffing Plan over time and requiring consistency in that fill rate. The parties dispute what that fill rate should be. As noted, plaintiffs contend the 10 percent staff vacancy rate required by the court's June 13, 2002 order, ECF No. 1383, applies to staffing in the CDCR PIPs. ECF No. 7813 at 6. Defendants contend the court has reserved the question. ECF No. 7827 at 2, 8. Defendants rely on the court's August 17, 2022 order, ECF No. 7605. In relevant part, that order provides:

> [D]efendants object to the Special Master's finding that the CDCR and DSH defendants are failing to maintain a ten percent vacancy rate among psychiatrists, psychologists and clinical social workers. ECF No. 7051 at 5 (citing Inpatient Program Report at 15, 16, and 40). Defendants contend the Special Master "wrongly assumes" that the 10 percent maximum staffing vacancy rate required by the court's June 13, 2002 order, ECF No. 1383, applies to the CDCR PIPs; defendants argue it does not. ECF No. 7051 at 5. Plaintiffs contend defendants have waived this argument by failing to raise it in objections to the Special Master's 2018 monitoring report on inpatient care, ECF No. 5894. ECF No. 7067 at 6-7. Plaintiffs also observe that defendants have provided no reason why a ten percent vacancy rate cap should not apply to the inpatient programs. *Id*. at 7-8.
>
> In the Report, the Special Master explains he has used the 10 percent vacancy cap established in the June 13, 2002 order as a reporting standard in monitoring the CDCR PIPs since CDCR assumed responsibility for those inpatient programs and that defendants have not until now objected to that approach. ECF No. 7039 at 15. The Special Master also states his view that the question of whether the vacancy rate the court established in its June 13, 2002 order applies to DSH "is a legal issue outside of the Special Master's authority to determine." *Id*. at 16.
>
> Defendants' objection is misplaced; it also fails to show that the challenged findings are clearly erroneous. As the court has explained in another context, "the degree to which defendants have implemented" the remedial requirements in this action "is extremely relevant and useful to assessment of whether they are meeting their constitutional obligations." February 28, 2013 Order, ECF No. 4361, at 9.

        Moreover, as this court suggested during the May 14, 2021 hearing on plaintiffs' motion to clarify aspects of the application of the June 13, 2002 order, any determination that particular clinical staffing classifications are outside the scope of that order would likely leave a void this court would need to then fill with a further ruling. *See* Reporter's Transcript of Proceedings (5/14/21 RT), ECF No. 7180, at, *e.g.*, 32. Were a further order [to] become necessary, the information provided by the Special Master in his monitoring reports would be useful to the court as it considered such a question.

        Defendants' second objection is overruled.

ECF No. 7605 at 5-6.

        Contrary to defendants' assertion, the court expressed no view whether PIP clinical staffing classifications are within the scope of the June 13, 2002 order. Instead, it observed that if any classifications were found to be outside the scope of the June 13, 2002 order, the court likely would have to determine the appropriate vacancy rate for such classifications. Here, the dispute is not about whether particular staffing classifications are outside the scope of the June 13, 2002 order.[4] Instead, the dispute is about whether the 10 percent vacancy rate applies to inpatient programs for class members that were operated by DSH, then the State Department of Mental Health (DMH), at the time of the 2002 order. For the reasons explained below, the court requires additional input from the parties and the Special Master in order to make that determination.

        The June 13, 2002 order is based on a February 26, 2002 report on staffing vacancies from the Special Master, ECF No. 1351. That report states it covers "clinical vacancies in the California Department of Corrections' (CDC) [now known as CDCR] mental health services delivery system (MHSDS)." *Id*. at 1. A careful review of the report shows it expressly excluded clinical positions funded for the inpatient program at SVPP set to be opened by the DMH, now known as DSH, in 2002 from the total number of clinical positions that "had been added to the department's allocation of MHSDS staff." *Id.* at 3. As noted above, CDCR delegated operation of most inpatient programs to DSH until 2017.

/////

---

[4] Plaintiffs acknowledge that the recreation therapist classification was not "expressly covered" by the 2002 order and, therefore, that there is an ambiguity with respect to this classification. ECF No. 7839 at 11 n.1.

The 2009 Staffing Plan, which applies to CDCR's MHCB, EOP, and CCCMS programs, is based on ratios of clinical staff to inmate-patients. The June 13, 2002 order applies to that plan. *See, e.g.*, ECF No. 6711; *see also* April 11, 2023 Order, ECF No. 7806, at 2.

The court-approved 2021 DSH Staffing Plan is based on ratios of staff to the maximum number of designated *Coleman* beds at each DSH Hospital: 256 beds at ASH, 50 beds at CSH, and 30 beds at Patton. ECF No. 7078-1 at 2. A review of the plan shows it assumes that a 10 percent vacancy rate applies, and that DSH has been largely successful in meeting that target. *Id*. at 2. The plan also includes the observation that "due to the relatively small number of *Coleman* class beds at DSH, a single vacant position in any of the *Coleman* units would cause DSH to fall below 90% of required staffing per the 1:35 ratio." *Id*. at 3.

The 2021 PIP Staffing Plan is based on ratios of clinical staff to beds; currently CDCR has an inpatient bed capacity of 1259 beds. ECF No. 7921 at 13.[5] Defendants project bed need for the PIPs using average daily census figures and based on a 90 percent occupancy rate. *See, e.g.*, ECF No. 7753 at 15-18. Thus, the 2021 PIP Staffing Plan ratios are based on a number that is by design higher than the number of patients served by the PIPs, assuming they are filled to no more than 90 percent of capacity. This difference, as well as the fact that, as explained above, the report on which the June 13, 2002 order was based did not expressly cover inpatient programs for class members, does leave open the limited question of whether, and if so what, maximum vacancy rate should be confirmed for the PIPs. That question will be referred to the parties for an additional focused meet and confer.

The record is clear that defendants are not providing adequate inpatient care with the current high vacancy rate across all PIP staffing classifications. During the meet and confer

---

[5] Defendants' PIP Staffing Plan includes the following in a footnote: "Defendants do not believe that CDCR's PIP Staffing Plan is constitutionally required, nor that the plan would satisfy the Prison Litigation Reform Act's requirements that prospective relief be narrowly drawn, extend no further than necessary to correct the alleged violation of a federal right, and be the least intrusive means necessary to correct the alleged violation." ECF No. 7245 at 4 n.1. Defendants were ordered to produce this plan over six years ago in the context of this litigation as a necessary component to remedy longstanding Eighth Amendment violations. Defendants provide no substantive evidence that their PIP Staffing Plan, once fully implemented, will exceed what is necessary to provide constitutionally adequate mental health care.

required by this order, the parties shall focus on whether the court should confirm a maximum vacancy rate for the PIPs that is different from the ten percent rate established by the June 2002 order and used by DSH. If so, the parties shall discuss what that rate should be to enable defendants to meet their constitutional obligations to the plaintiff class. The court will require the parties to file a joint statement in fourteen days, after which it will issue an order establishing the maximum vacancy rate for clinical staffing in the CDCR PIPs together with a firm deadline for coming into compliance with the 2021 PIP Staffing Plan and that vacancy rate; as explained below, the court anticipates that deadline will be six months from the date of the further order.

Plaintiffs propose a compliance deadline of one year from the date of any order resolving their motion, consistent with the court's approach to enforcement of the 2009 Staffing Plan. *See* ECF No. 7813 at 19. Defendants do not respond to the proposal of one year; they assert only that this aspect of plaintiffs' motion is improper, and they propose no timeline for full and durable implementation of the PIP staffing remedy. They also contend that their recruitment and retention plan should be given time to work. ECF No. 7827 at 5. Here as well, defendants' position is utterly meritless.

There are six defendants in this action: the Governor of California, the Directors of the California Department of Finance and the Department of State Hospitals, the CDCR Secretary, the CDCR Undersecretary for Mental Health, and the CDCR Deputy Director for Mental Health. The Governor and the CDCR defendants, at least, each have a role to play in solving the apparently intractable understaffing problem in the CDCR PIPs, and each has had ample time. In the six years since CDCR assumed responsibility for the PIPs, none of these defendants has succeeded in meeting their responsibility to ensure there is sufficient clinical staff in the CDCR PIPs to meet the needs of the number of inmate-patients hospitalized in those units. In the past three months, defendants have made inroads in hiring in two of four classifications at one of the three Lift and Shift and PIPs; otherwise, efforts appear to have stagnated. Again, defendants may need to rely on a wide range of options to meet their constitutional obligations, but they cannot fail to meet them. *See* ECF No. 5711 at 27; *see also generally* Feb. 28, 2023 Order, ECF No. 7742; *see also* ECF No. 7846 at 4.

In sum, the record does not support a finding that defendants should be given an additional year to come into full compliance with the 2021 PIP Staffing Plan. Understaffing has plagued these programs for many years. Defendants have not, in almost six years, been able to meet the one-year deadline the court set in 2017 for them to come into compliance with the 2009 Staffing Plan, which covers all levels of the CDCR Mental Health Services Delivery System (MHSDS) except the ICF and APP inpatient programs. ECF No. 5711 at 30. In view of defendants' repeated assertions about the impact of nationwide labor shortages on their ability to hire sufficient mental health staff, *see*, *e.g.*, ECF Nos. 6695 at 122 (defendants' labor economists' 2018 report stating that "California and the U.S. more broadly are experiencing a psychiatrist shortage that is projected to worsen"), 7827 at 6, there is no evidence that one more year will turn the tide.

Under all the circumstances, a deadline of six months for defendants to come into full compliance with the 2021 PIP Staffing Plan, subject to a vacancy rate to be determined by subsequent court order, is required to bring proper focus to solving the problem of clinical understaffing that plagues the CDCR PIPs. *Cf.* Reporter's Transcript of Proceedings (RT 2/10/23), ECF No. 7726, at 11-13 (discussion of mental health population reduction as one way to meet staffing ratios, as well as possible court appointment of receiver). This case is simply too old, and the CDCR PIPs are the source of necessary mental health care to the inmate-patients in CDCR's Mental Health Services Delivery System who need that care most urgently.

Given the foregoing and good cause appearing, the court will require the parties to meet and confer under the supervision of the Special Master in an effort to agree on an appropriate maximum vacancy rate for clinical staff in the CDCR PIPs and to file within fourteen days a joint statement of the results of the meet and confer. Thereafter the court will issue a further order setting out the requirements for full compliance with the 2021 PIP Staffing Plan, including a deadline for full compliance.

V.   **CONCLUSION**

For the reasons above, plaintiffs' April 17, 2023 motion is DENIED as to the request to reject defendants' plan for recruitment and retention of staff in the CDCR PIPs and GRANTED

14

1  as to the request to set a deadline for full implementation of defendants' 2021 PIP Staffing Plan.
2  By subsequent order the court will set a six-month deadline for full implementation of the 2021
3  PIP Staffing Plan. Within fourteen days the parties shall meet and confer under the supervision of
4  the Special Master and file the joint statement required by this order.
5       **IT IS SO ORDERED**.
6  DATED: August 23, 2023.
7                                              CHIEF UNITED STATES DISTRICT JUDGE