ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-4431
 Fax: (415) 703-5843
 E-mail: Namrata.Kotwani@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                              Plaintiffs,<br><br>   v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                              Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**RESPONSE TO PLAINTIFFS' OBJECTIONS TO DEFENDANTS' 2022-2023 UNMET NEEDS ASSESSMENT REPORT** |

**TABLE OF CONTENTS**

**Page**

Introduction ........................................................................................................................... 1

Argument .............................................................................................................................. 2

    I.    Plaintiffs' Objections Mischaracterize the UNA's Methodology and Ultimately, Fail to Establish *Any* Missed Referrals ................................... 2

        A.    Alleged "Tracking Divergence" Does Not Impugn the UNA's Reliability ............................................................................................ 3

        B.    Staffing Issues Did Not Compromise the Integrity or Conclusions of the UNA ................................................................................................ 5

        C.    Clinically Justifiable Routine Referrals Were Properly Made in Addition to UNA Referrals, as Anticipated in the Study Design and Consistent with Prior UNAs ......................................................... 6

        D.    The UNA Was Not Designed to Analyze Referral Rates Since the Pandemic ................................................................................... 11

    II.    Plaintiffs' Objections Ignore the Purpose of the UNA ........................................... 12

        A.    Least Restrictive Housing Issues Are Not Within the Scope of the UNA ................................................................................................ 12

        B.    Plaintiffs Erroneously Conflate Staffing and Bed Capacity ....................... 13

    III.    The Court Should Follow Defendants' Plan to Address the Patients Identified with Personality Disorders ......................................................... 14

    IV.    The Sustainable Process Is a Natural Data Comparison for the UNA ................... 16

Conclusion ......................................................................................................................... 17

Certification ....................................................................................................................... 18

# INTRODUCTION

Prior to conducting the 2022/23 Unmet Needs Assessment (UNA), the parties met for several months to reach agreement as to the study's methodology and implementation. The Special Master provided the final methodology to Defendants per Court Order (*see* ECF No. 7477), and Defendants adhered to it despite their objections to the methodology. This UNA is the most comprehensive in the history of evaluating unmet inpatient need at CDCR—screening 32,545 patients[1] and flagging 4,717 patients for possible referral to higher levels of care during Phase I. (ECF No. 7865-2, at 2.)[2] The UNA was orchestrated by a specialized team of regional and headquarters clinicians assigned full time to the project. (*Id.* at 4.) During Phase II, review teams comprising of DSH and CDCR clinicians reviewed those 4,717 patients over 11 months at each institution and provided a "second opinion" on whether they needed a higher level of care (HLOC). (*Id.*; ECF No. 7865-3, at 101-02.) These UNA teams reviewed cases on a full-time basis, completing 72-84 cases daily, or about 144-168 cases weekly. (ECF No. 7865-3, at 3; 97.) Ultimately, 342 acute and intermediate referrals were made. (ECF No. 7865-2, at 2.)[3]

Defendants filed their 2022/23 Unmet Needs Assessment report (UNA Report) on June 30, 2023. (ECF No. 7865-3.) In addition, Defendants filed a 2022/23 Unmet Needs Assessment cover report (UNA Cover Report, ECF No. 7865-2), which explains the background of the UNA Report and responds to written comments received from the Special Master and Plaintiffs' counsel in response to CDCR's draft UNA Report.

On August 1, 2023, Plaintiffs filed a series of objections to the final UNA Report, restating many of their previous written objections and raising new ones. (ECF No. 7900.) Now, after the UNA Report's results failed to align with Plaintiffs' expectations, they attack the development and implementation of the UNA as though they were not intimately involved in its development.

---

[1] For reference, the MHSDS population on January 1, 2022 was 32, 596. (ECF No. 7865-3, at 45).

[2] Citations are to page numbers assigned by the Court's Electronic Case Filing system and are located in the upper right hand corner of the page.

[3] 462 patients were recommended for referral either by the UNA review team or by the patient's treatment team while the Phase II UNA occurred at their institution. (ECF No. 7865-2, at 2). Of those 462 patients, 120 were not referred following discussions between the UNA team and the patients' treatment teams. (*Id.*)

These objections ignore the purpose and scope of the UNA (as articulated in the Court's September 13, 2021 order) and attack the methodology developed by the Special Master following months-long meetings involving all stakeholders. (*See* ECF No. 7865-3, at 22 (ten development meetings occurred between November 22, 2021 – February 7, 2022).)

Although Plaintiffs present several speculative theories attacking the study's methodology, their objections fail to show a single instance of unmet need. This obvious kitchen-sink attack should be rejected, and the Court should deny Plaintiffs' request to discard the UNA's findings or otherwise limit its predictive power with respect to future inpatient bed needs. (*See* ECF No. 7900 at 23-24.)[4] Plaintiffs' objections to the UNA Report are conjectural—lacking any statistical, scientific, or clinical support—and should not be allowed to undermine the months-long efforts of dedicated clinical professionals conducting a scientifically sound analysis. Notably, Plaintiffs participated fully in the development of the Phase I screening methodology and Phase II clinical reviews, and did not point to any methodological flaws at that time. This belated posturing is attributable only to Plaintiffs' aversion to the study's results, not to any genuine methodological critiques that could have easily been raised previously.

## ARGUMENT

### I. PLAINTIFFS' OBJECTIONS MISCHARACTERIZE THE UNA'S METHODOLOGY AND ULTIMATELY, FAIL TO ESTABLISH *ANY* MISSED REFERRALS

Plaintiffs criticize the UNA and the UNA Report as unreliable based on factors external to the study—such as staffing deficiencies at CDCR; the study's validated data diverging from data produced by an unverifiable tracking instrument based on an unknown methodology; and the purported impact of the pandemic on referrals. As shown below, these objections are immaterial to the UNA's framework and otherwise scientifically meritless. Plaintiffs' objections do not constitute valid reasons to discount the UNA's results. Ultimately, Plaintiffs are unable to demonstrate how any of the factors they complained about resulted in missed instances of unmet need. And, as shown below, there are redundancies built into the methodology; *i.e.* patients were flagged for review through various pipelines (including application of five broad screening

---

[4] In any event, new relief may not be requested by way of filing objections.

criteria to mental health datasets, as well as by gathering nursing, custody, and clinical input) to ensure that patients requiring referrals were not missed. (*See* ECF No. 7865-3, at 26-29.) This multiplicity of data sources ensured comprehensiveness—even if a single data source were to miss a few instances. In short, every stage of UNA development focused on casting the widest net possible to capture any patient who may require inpatient care.

### A. Alleged "Tracking Divergence" Does Not Impugn the UNA's Reliability

Plaintiffs complain that Defendants' and the Special Master's tracking of UNA cases is not aligned, and therefore Defendants' data is somehow flawed. (ECF No. 7900 at 6.) As explained in the UNA Report, Defendants tracked the UNA data using the mutually agreed-upon standardized tools for data collection—accurately recording up to 162 data points for more than 30,000 patients over an extended period. Defendants were informed that the data does not perfectly match the tracking done internally by the Special Master; in fact, CDCR identified nearly 100 more referrals than those identified by the Special Master team (249 referrals compared to 342 identified by CDCR). (*See* ECF No. 7865-2, at 5.) That should put to rest Plaintiffs' notion that Defendants "undercounted" any referrals. (*See* ECF No. 7900, at 6.)

Defendants cannot speak to or verify what type of tracking instrument, if any, was employed by the Special Master's team. The Special Master did not identify his tracking system so it was not possible for CDCR to reconcile its numbers with those of the Special Master. Nevertheless, as explained in the UNA Cover Report, the Special Master's team and Defendants engaged in repeated verification steps to ensure accuracy and updated the number of interphase referrals (*i.e.*, those referrals occurring between Phase I and Phase II of the UNA) after discussions with the Special Master team. (*See* ECF No. 7865-2, at 5; 31 (noting that Defendants undertook a "thorough" "patient-by-patient analysis" of the differences between the Special Master's data and the UNA count).) Eventually, CDCR understood from correspondence with the Special Master's expert that its count and the Special Master Team's count were "as close as possible to agreement on the numbers" and that analyses should not be held up. (*See id.*) For their part, Plaintiffs do not attempt to identify a different count of UNA referrals.

Plaintiffs ignore the explanations in the UNA Cover Report that articulate why CDCR revised numbers provided in the Draft Report and use Defendants' tenacity in their data reconciliation efforts against them—stating their foregone conclusion that the "unstable, constantly shifting referral numbers" undermine the reliability of the report. (ECF No. 7900, at 6.) This is disingenuous. The numbers were not arbitrarily shifting, but rather revised in response to various discussions with the Special Master's team about the inclusion and exclusion of various categories of referrals. (*See* ECF No. 7865-2, at 31.) For instance, in the draft report, CDCR analyzed a larger number of referrals, including referrals made outside of the UNA process that occurred until a week after Phase II ended.[5] This initial tally amounted to 611 referrals. (*See* ECF No. 7865-2, at 6.) However, at the Special Master's recommendation, CDCR narrowed the scope of its analysis to 342 referrals[6] that could strictly count as UNA referrals to align with the UNA methodology—the same methodology the Plaintiffs bargained for and agreed to at the start of the UNA process. (*See* ECF No. 7865-2, at 4; 26.). Under either analysis, however, it is clear that there is no unmet need for inpatient referrals, and CDCR's initial and more expansive analysis demonstrates this point even more conclusively.

In addition, following conversations with the Special Master team, CDCR identified an additional twenty-seven interphase referrals (referrals made at institutions between Phase I and Phase II) not accounted for in the Draft UNA Report, increasing the total to eighty-five interphase referrals. (ECF No. 7865-2, at 5.) Defendants were diligent in accounting for any revisions to the final tally of referrals, and Plaintiffs willful blindness to their explanations does not render the count or the UNA's conclusions unreliable.

---

[5] At first, CDCR analyzed this larger set of referrals to make sure that no referrals that could possibly be attributed to the UNA would be missed. (*See* ECF No. 7865-2, at 4.) For instance, it is known that being observed can change behavior. Accordingly, CDCR counted any referrals that occurred right after the UNA ended as UNA referrals. (*see id.*) Even if these "extra" referrals occurred as a matter of routine, the UNA team believed that it was preferable to be over-inclusive rather than to undercount any referrals.

[6] These referrals include referrals recommended by the UNA review team that were ultimately made by the treatment teams, as well as any institutional referrals that occurred after Phase I ended but before Phase II commenced. (*See* ECF No. 7865-2, at 4; ECF No. 7865-3, at 30; 74.)

### B. Staffing Issues Did Not Compromise the Integrity or Conclusions of the UNA.

Plaintiffs criticize the UNA as unreliable due to staffing shortages within CDCR. (ECF No. 7900 at 7-8.) As the UNA Cover Report addresses head-on, the evidence does not support or even suggest that staffing issues render the UNA or the UNA Report unreliable. (*Id.* ("[n]either the September 2021 UNA order, the negotiated methodology or its operationalization documents contemplated studying the impact of institutional staffing shortages on referral rates during the pendency of the 2022/23 UNA" and "the UNA was conducted independent of any institutional staffing shortages.")). Plaintiffs suggest that staffing impacted whether a patient might have screened into the UNA review process. (ECF No. 7900 at 8-9.) This baseless and speculative objection, however, ignores the fact that this UNA reviewed more patients than any other prior unmet needs study. For example, the 2009 MHARP study reviewed 1,800 patients versus the 2022/23 UNA's Phase II review of 4,717. (*See* ECF No. 7865-3, at 15; 24.)

Phase I involved a robust data review that screened over 32,500 patients for objective evidence of unmet need, accounting for nearly *every* MHSDS patient not housed in an acute or inpatient program. (*See* ECF No. 7865-3, at 9; 26). Additionally, during Phase I, besides conducting record reviews, CDCR worked with staff at each institution to identify additional patients to review. The UNA methodology, which Plaintiffs agreed to, required custody officers "most familiar with" patients to provide opinions on patients to potentially include in the UNA. (ECF No. 7865-3, at 82.) Likewise, clinical staff were directed to review patients "in their caseload who meet *any* of the criteria" for inclusion. (*Id.* at 81 (emphasis added).) There is simply no evidence to show that the Phase I pipeline was under-inclusive.

Plaintiffs also argue that Phase II records review was impeded because documentation was poor. (ECF No. 7900 at 9.) The mere fact that the UNA Report discusses documentation issues in some patient records does not show that Phase II reviews are unreliable. (ECF No. 7865-3, at 67.) Indeed, in many instances, when the UNA review team found insufficient information on a case, they recommended referrals to the treatment team out of an abundance of caution. (ECF No. 7865-2, at 12.) Review teams could also conduct patient interviews and send inquiries to

5

treatment teams, as necessary. (ECF No. 7865-3, at 33.) Such measures show that the UNA was designed to bring to light any cases of unmet need, and review teams were conscientiously encouraging treatment teams to consider the need for HLOC referrals.

Plaintiffs' position here is inconsistent with both the Special Master and Plaintiffs' laudatory comments during the UNA concerning its breadth and inclusiveness. The Special Master and Plaintiffs were present for the Phase II clinical review discussions and clinical resolution discussions (CRDs, which are also referred to as dispute resolution process by Plaintiffs). (*See* ECF No. 7900, at 8; 12; ECF No. 7865-3, at 32.) These reviews occurred over eleven months without any objection from Plaintiffs. None of these complaints were raised during the design and implementation of the UNA, despite Plaintiffs' significant involvement in and approval of the study's design. Rather, Plaintiffs waited until after the results were reported to raise their purported concerns. And regardless, their belated objections regarding the purported impact of staffing or poor documentation are scientifically unfounded because the data were derived from numerous other sources assuring a robust, inclusive, and exhaustive sample for Phase II review. There is simply no evidence that supports Plaintiffs' innuendos that the UNA was somehow subverted to suppress appropriate HLOC referrals.

**C. Clinically Justifiable Routine Referrals Were Properly Made in Addition to UNA Referrals, as Anticipated in the Study Design and Consistent With Prior UNAs.**

Plaintiffs criticize the UNA and its results because routine inpatient referrals occurred during the UNA assessment period, and not all were counted as "UNA referrals." (ECF No. 7900 at 10-13.) Plaintiffs argue that somehow this demonstrates that the UNA is unreliable. But this is how the study was designed. Institutions continued to refer patients while the UNA was ongoing, not unlike past unmet needs assessments. For example, during MHARP and the 2005 UNA, both "UNA referrals" and non-UNA referrals were taking place simultaneously. (*See* ECF No. 3825-1, at 10-11.)[7] And the way those routine referrals are counted in the UNA is governed by the UNA

---

[7] As a point of comparison, the 2009 MHARP review teams identified 365 referrals at 24 institutions, while patients' treatment teams identified 628 referrals. (ECF No. 3825-1, at 10-11.) The 2022/23 UNA identified 342 referrals, while treatment teams identified 338 referrals. (ECF No. 7865-3, at 33; ECF No. 7865-2, at 6.)

methodology. For this most recent UNA, the Special Master instructed CDCR to focus only on the UNA referrals. (*See* ECF No. 7865-2, at 26.) Thus, the final UNA Report focuses only on those referrals required to be analyzed by the methodology. Notably, Plaintiffs point to no deviation from the methodology when making this objection.

Plaintiffs attempt to cast doubt on the UNA results because 338 patients were referred by local institutions to an inpatient program during Phase II of the UNA. (ECF No. 7900, at 10.) This objection misapprehends both the study design and the dynamic nature of the patient population being studied. Plaintiffs mistakenly assume that the symptoms of the underlying patient population remained static after 4,717 patients were screened into the study during Phase I for further evaluation.

Indeed, as explained in the UNA Cover Report, among the 338 non-UNA referrals:

(1) 92 patients were not identified based on Phase I screening criteria but referred during Phase II or one week thereafter;

(2) 90 patients were screened in Phase I and did exhibit any flags then, but were referred to HLOC during Phase II or one week thereafter;

(3) 94 patients identified in Phase I and not recommended for referral in Phase II, but referred to HLOC in the one week thereafter;

(4) 55 patients identified as PD Category 1-3 in Phase I but referred to HLOC during Phase II or one week thereafter;

(5) 7 Patients not referred since their IDTT did not agree with the referral but referred during Phase II or one week thereafter.

(*See* ECF No. 7865-2, at 6.) All but 92 of these "outside referrals" were screened for further evaluation during Phase I of the UNA. The 92 patients who were never flagged during Phase I are a miniscule portion of MHSDS population (and less than 2% of the 4,717 patients screened during Phase I and 0.28% of the 32,545 patients initially reviewed), and could have developed symptoms requiring inpatient care after Phase I screening ended. There is simply no evidence to support the assumption that these 92 patients were excluded because the "gatekeeping criteria" were "too stringent" or "improperly applied." (ECF No. 7900, at 11.)

1         Next, Plaintiffs attempt to cast doubt on the reliability of Phase II UNA review teams using
2   a wildly unrepresentative statistic. For example, they argue that 94 patients reviewed during
3   Phase II, but later referred to inpatient care by local treatment teams, indicate the UNA was
4   somehow flawed. But 94 out of 4,717 is less than two percent of the cases reviewed by UNA
5   teams. This statistic is hardly indicative of a flawed or unreliable process. Plaintiffs also assert
6   that these 94 cases, accounting for less than two percent of the reviewed population, suggest that
7   the UNA study reviews may not have been well-executed. (ECF No. 7900, at 12.) But such a
8   small percentage of the total-reviewed patients does not support Plaintiffs' conclusion, and the
9   Special Master's Experts and Plaintiffs attended these reviews and commented on individual
10  reviews throughout the process. (ECF No. 7865-3, at 32; 34-35.) Plaintiffs' objection is also
11  speculative. For example, it is equally plausible that these 94 patients developed new symptoms
12  after Phase II UNA reviews at their institution. But again, Plaintiffs do not present any medical
13  history for any of these patients, they simply cast aspersions.
14        In addition, Plaintiffs argue that fifty-five "referrals of personality disordered patients
15  identified in Phase I but referred to higher levels of care during Phase II outside of [the] UNA
16  suggests these cases identified as having personality disorders were not properly or fully
17  evaluated for possible need for inpatient treatment by the UNA teams." (ECF No. 7900 at 12.)
18  Describing these fifty-five cases as a "large number" that have not been "adequately explained,
19  despite accounting for a mere 1.2 percent of the cases reviewed during Phase II, is hyperbolic.
20  (*Id.*) Importantly, Plaintiffs' objection ignores the very UNA methodology that they were
21  involved in shaping. According to the Special Masters' methodology, patients categorized under
22  Category 3 for personality disorders must have exhausted all available treatment options such as
23  possible referrals to higher levels of care, before being considered part of a group of patients that
24  may benefit from a special treatment program unavailable in the MHSDS or at DSH. (ECF No.
25  7865-3, at 33; 95.) Indeed, the methodology, which Plaintiffs agreed to, that requires UNA review
26  teams to inform a personality-disordered patient's treatment team of their findings may have
27  prompted the treatment team to consider whether the patient could benefit from a HLOC referral.
28  In sum, the process worked as envisioned. It is, of course, also possible that at least some

8

percentage of these fifty-five patients who were subsequently referred to higher levels of care may have developed new symptoms after Phase I, which could be addressed by inpatient care. Plaintiffs' objections reflect a biased reading of data without supporting clinical evidence.

Plaintiffs also speculate that the non-UNA referrals indicate flaws in the UNA and the conclusions. Specifically, they claim that clinical staff "very likely defensively made referrals outside of the UNA process . . . so they did not look like poor clinicians for failing to identify and refer such cases themselves." (ECF No. 7900 at 12.) Notably, the UNA methodology explicitly accounts for referrals made by treatment teams between Phase I screening and Phase II clinical reviews by the UNA teams, categorizing them as UNA referrals. This design feature ensures that any preemptive or "defensive" referrals made by treatment teams of patients identified in Phase I would be attributed to the UNA process, negating the Plaintiffs' claim of a defensive referral strategy. (*See* ECF No. 7865-2, at 5.) Plaintiffs conveniently ignored the robust study-design, and instead, maligned the professionalism and clinical judgment of CDCR providers without any basis.

After accusing CDCR treatment teams of adopting a "defensive referral" strategy and inflating referrals, Plaintiffs next make the opposite argument—CDCR clinicians suppressed referrals because they showed signs of "institutionalization," *i.e.* evinced a "higher tolerance for pathology and decompensation." (ECF No. 7900 at 12.) By way of support, they state that the 2005 UNA conducted 18 years ago identified institutionalization as a possible flaw. (*Id.*) In support of their "institutionalization" argument, Plaintiffs clutch at straws. They state that treatment teams for seven out of the 4,717 cases reviewed—only 0.1%—disagreed with the UNA team's recommendation to send the patient to a higher level of care and then, after prevailing during dispute resolution, ultimately sent the patient to a higher level of care anyway. Plaintiffs do not account for the very plausible scenario that this small cohort of patients could have developed symptoms after dispute resolution.

Moreover, Plaintiffs' reliance on the proportion of treatment team disagreements with UNA referrals as evidence of "institutionalization" is statistically untenable. (ECF No. 7900 at 12-13.) They state that 72% of the cases (120 out of 166 referrals) where treatment teams disputed the

9

UNA initial referral recommendation were ultimately not referred. (*Id.*) Plaintiffs are aware, based on their attendance, that Clinical Review Discussions rarely ended in a stalemate. Instead, these discussions usually led to a consensus between the UNA review team and the treatment team on whether or not to make a referral. (*See* ECF No. 7865-3, at 30.) Plaintiffs employ disingenuous phrasing to inflate the significance of treatment team disagreements with UNA referrals by stating, "[a]pproximately one in ten of those patients was then referred for inpatient care by their IDTTs within three months, despite the IDTT's resistance to the UNA referral recommendation." (ECF No. 7900 at 13.) In fact, CDCR's meticulous tracking of the 120 non-referral cases revealed that only *ten* patients—amounting to approximately 8.3%—were referred to higher levels of care within 90 days. (ECF No. 7865-3 at 38.) This figure hardly supports Plaintiffs' insinuation that IDTT resistance to UNA referrals led to a significant number of subsequent inpatient referrals. Accordingly, the Court should reject Plaintiffs' fanciful characterizations of CDCR clinicians as employing a "defensive" referral strategy or evincing signs of "institutionalization."

Plaintiffs also complain that Defendants "blithely attribute" non-UNA referrals to the "success of the Sustainable Process," without providing further analysis. (ECF No. 7900 at 13.) But CDCR removed this analysis at the Special Master's request and the results in the initial draft did not differ from the overall conclusions of the final report—that there is no unmet need for inpatient referrals. Finally, Plaintiffs again misstate the facts when they claim that Defendants halted the Sustainable Process activities during the UNA. (*Id.*) Instead, Defendants reported that ". . . *certain aspects* of SusPro and other related programs had to be temporarily suspended." (ECF No. 7865-3 at 22, emphasis added.) In fact, only regional reviews and onsite visits typically performed during Sustainable Process were suspended. IDTT referrals to higher levels of care, onsite reviews of non-referral decisions, and headquarters monitoring and assessment of Sustainable Process activities were not suspended at any point. (*Id.*)

### D. The UNA Was Not Designed to Analyze Referral Rates Since the Pandemic.

Plaintiffs next allege that the UNA is flawed and unreliable because it does not explain the "sustained drop in inpatient referrals since the beginning of the pandemic." (ECF No. 7900 at 14.) As discussed in Defendants' UNA Cover Report (ECF No. 7865-2, at 12), and as should be well known to Plaintiffs, the UNA was not designed to find ways to increase referral rates to those seen pre-pandemic. Nor were Defendants ordered to conduct such an analysis. The current UNA was not designed to analyze *why* referral rates have not returned to pre-COVID levels (or any particular level). The study was undertaken with no preconceived notion of what the "right" referral rates should be. Rather, the study sought only to determine whether there were patients within CDCR who were in need of inpatient care. (ECF No. 7865-2 at 12.) As explained in the UNA Cover Report, the impact of the pandemic was not part of the Special Master's UNA methodology, and was not requested by any stakeholder until the UNA had concluded.

Plaintiffs provide a chart of referral rates indicating that rates were higher before the pandemic. They conclude that current referral rates are, therefore, unreasonably low despite the overwhelming evidence presented in the UNA that needed referrals are being made appropriately. (ECF No. 7900, at 12.) According to their chart, the 2022 referral rate was 70.3 per 1,000 patients; the 2021 referral rate was 78.0 per 1,000 patients; and the 2020 referral rate was 78.3 per 1,000 patients. While the 2019 and 2018 rates were higher (129.9 and 112.5 per 1,000 patients respectively), the rate in 2016 was on par with pandemic-era rates at 74.6 per 1,000 patients. (*Id.* at 14, where Plaintiffs claim that "efforts to ensure inpatient beds were appropriately being used were working during that time period.") It is unclear what conclusion Plaintiffs are trying to draw from these data or whether it is even the post-pandemic period that is anomalous based on Plaintiffs own data table. After all, 2018 and 2019 could be the outlier years with anomalously high levels of referrals.[8] Yet, without basis, Plaintiffs contend that the mere reduction in referral

---

[8] High numbers of acute and intermediate care referrals do not inherently mean the beds were appropriately being used. It is disingenuous to state that Defendants are accurate only when the HLOC referral rate is high, but undercounting when the referral rate is low.

rates must "undermin[e] the reliability of the UNA results." (*Id.* at 15.) Plaintiffs' unsupported objections must be rejected. Several theories may account for the drop in referral rate from 2018 and 2019—introduction of tablets allowing for various coping outlets; reduced patient stress attributable to reduction in the incarcerated population; or increased continuity of care or reduced exacerbation of symptoms of severe mental illness attributable to movement restrictions during the pandemic. The UNA, however, was not designed to test these hypotheses.

## II. PLAINTIFFS' OBJECTIONS IGNORE THE PURPOSE OF THE UNA

### A. Least Restrictive Housing Issues Are Not Within the Scope of the UNA.

Plaintiffs criticize the UNA because it did not address issues related to the negotiated Least Restrictive Housing (LRH) policy and procedure that have been in place since 2015. (ECF No. 7900 16-20.) Specifically, Plaintiffs ask the Court to reject the statement in the UNA that historical data demonstrates there is a weak correlation between available beds at DSH and an unmet need for inpatient treatment. (*Id.* at 16.) But Plaintiffs' request ignores the undisputed fact that the UNA was not designed to address or assess the LRH policy. As stated in the UNA Cover Report, the UNA was not designed to evaluate the LRH process nor to analyze why patients are sent to certain LRH beds over others. Rather, the UNA is concerned with whether there is an unmet need for inpatient care, which is a separate inquiry from whether patients are being placed in more restrictive settings than necessary. Moreover, per policy, LRH reviews occur for patients when they are referred to inpatient care. By design, the UNA only reviewed patients in the outpatient and MHCB levels of care, not patients who were placed in a CDCR PIP or DSH. Plaintiffs had the opportunity to ask for a different assessment during the design phase of the UNA process but did not do so. (ECF No. 6865-2 at 13.)

Even so, Plaintiffs' own objections do not show that patients are somehow improperly diverted from low-custody intermediate DSH beds to higher-custody CDCR facilities resulting in artificially depressed occupancy rates at DSH, or that the mere existence of Level I and Level II patients in high-custody intermediate care programs is problematic *per se*. (ECF No. 7900, at 17-19.) As Plaintiffs know, clinical housing recommendations are based on more factors than just a patient's custodial LRH. CDCR's commitment to ensuring IDTTs regularly review patients not

12

housed within their current LRH for potential step-down does not amount to an admission that patients are erroneously being placed at higher-custody facilities or that there is a "problem with LRH reviews." (*See* ECF No. 7685-3, at 65; ECF No. 7900, at 19.)

Finally, Plaintiffs suggest that the number of patients who are housed in beds that are higher than a patient's LRH indicates the LRH system is "completely broken." (ECF No. 7900 at 19:5-26.) Plaintiffs present no evidence that treating patients in custody settings above their LRH designations is actually wrong or that *no* appropriate exceptions apply. The fact that patients are treated in a custody level above their LRH is not a violation of any policy and is not indicative of a lack of access to care or an unmet need.

On May 11, 2020, a clinical work group (later named the DSH – Small Workgroup) was spun off from the larger weekly COVID-19 Task Force meetings to exclusively discuss the safe referral and transfer of patients from CDCR to DSH. (ECF No. 7865-3, at 19.) In this work group, there were multiple occasions where a thorough review was undertaken of all referred patients to determine if any more patients could meet custodial and clinical requirements for the LRH level of unlocked dorms. (*Id.*) Clinical Subject Matter Experts from the Special Master's team attended and participated in all these Small Workgroup weekly meetings, and routinely offered their input on the clinical appropriateness of referrals. (*Id.*) The results of the UNA square with the clinical experience of the Small Workgroup, at least until it was discontinued in April 2023, corroborating evidence that should not be discounted.

Although Plaintiffs spend a significant portion of their objections criticizing the LRH policy and process, they do not use these criticisms to dispute the conclusions of the UNA Report that there is not an unmet need for identifying and referring patients in need of a higher level of care. (ECF No. 7900, at 17-20.) Ultimately, Plaintiffs' dissatisfaction with the LRH policy is irrelevant to the conclusions of the UNA Report.

### B. Plaintiffs Erroneously Conflate Staffing and Bed Capacity.

Plaintiffs are critical of statements in the UNA that demonstrate, conclusively, that there is sufficient inpatient bed capacity in the MHSDS system. (ECF No. 7900 at 20:21 - 21:7.) Plaintiffs claim that Defendants' statements concerning sufficient bed capacity is a fiction. (*Id.*) But

13

Plaintiffs' position conflates the issues of staffing vacancies and bed capacity. The UNA was not designed to assess staffing levels in treatment programs; the number of beds and referrals to these beds is a different question entirely from inpatient staffing. Defendants do not claim that all inpatient beds are in use at all times. In fact, Defendants' monthly reports identify the beds that are not being used. (ECF No. 7836 at 10-11.) The UNA Report establishes that there are adequate numbers of inpatient beds for MHSDS patients and that patients are being properly referred to these beds; this Report is not a forum to litigate staffing related issues.

### III. THE COURT SHOULD FOLLOW DEFENDANTS' PLAN TO ADDRESS THE PATIENTS IDENTIFIED WITH PERSONALITY DISORDERS

There is no dispute that the UNA identified 470 patients who do not qualify for inpatient hospitalization and may benefit from a special treatment needs program for patients with a personality disorder that is not available within the existing MHSDS or to CDCR patients at DSH. (ECF No. 7865-3 at 48.)[9] This is exactly what the Court ordered Defendants to assess as part of the UNA. (ECF No. 7305 at 15.) Contrary to Plaintiffs' assertions, Defendants have never claimed an absence of need. Instead, the UNA Report describes the nature of the population at issue and how best to proceed to fully assess the treatment needs of the patients identified. (ECF Nos. 7865-3 at 10 and 7865-2 at 8-9.) As a next step, Defendants have provided the Court with a detailed 12-month timeline to evaluate the treatment needs of the 470 patients with personality disorders, as well as to develop and create policies for a Special Treatment Needs Program with milestones for each phase of this yearlong period. (ECF No. 7865-3, at 50-51). Defendants have explained the details of the plan and why they should be permitted to proceed with the plan. (*Id.* at 11; 48-51.)

Plaintiffs erroneously argue that further study is unnecessary because the group of patients were identified using Defendants' "methodology they designed themselves" and that the Special Master should be tasked with recommending any appropriate next steps. (ECF No. 7900, at 21.)

---

[9] The UNA methodology also refers to this population (*i.e.*, patients with personality disorders who do not require a HLOC but may benefit from a special treatment needs program) as "Category 3" patients. (*See* ECF No. 7865-3, at 33.)

1  Plaintiffs know that the methodology was not of Defendants' design. Instead, it was designed by
2  the Special Master, and Defendants were ordered to follow it. (*See* ECF No. 7477.)
3        Plaintiffs also oversimplify a clinical process that requires a high degree of expertise and
4  nuanced understanding. (ECF No. 7865-2, at 9.) As explained in the UNA Cover Report, these
5  470 patients are not a homogeneous population; rather, they require a clinically appropriate
6  tailored approach for their varied treatment needs. There are currently no national standards on
7  treatment for this population and the treatment options relevant to incarcerated settings require
8  further study, as Defendants detailed in the UNA Report. (ECF Nos. 7865-3 at 50-51.)
9        Plaintiffs also state that no further study is needed to create a program to treat the subset of
10  152 identified patients who are diagnosed with Borderline Personality Disorder (BPD) or
11  Emotionally Unstable Personality Disorder (EUPD) and cite to various community treatment
12  approaches to BPD in support of their position. (ECF No. 7900, at 22.) Plaintiffs advocate for the
13  use of Dialectical Behavioral Therapy (DBT) and/or clozapine as a clinically indicated treatment
14  for those patients diagnosed with Borderline Personality Disorder (BPD) or who engage in self-
15  harm behavior respectively. (ECF No. 7900, at 12.) This is an oversimplification of clinically
16  complex conditions. For instance, according to the current Diagnostic and Statistical Manual of
17  Mental Disorders (DSM), there are 256 combinations of symptoms that could lead to a diagnosis
18  of BPD. Treatment of an individual patient requires a thorough analysis to ensure the patients are
19  receiving a clinically indicated treatment for their specific combination of symptoms. In addition,
20  the UNA identified patients with a primary personality disorder which met the "Category 3"
21  classification (*i.e.*, patients with personality disorders who do not require a HLOC but may
22  benefit from a special treatment needs program). (*See* ECF No. 7865-3, at 33.) However, at least
23  some patients may also have a combination of personality disorders that may not respond well to
24  Plaintiffs' suggested treatment interventions. Accordingly, a targeted evaluation of this
25  population, as articulated by Defendants, is clinically indicated.
26        Moreover, Plaintiffs do not factor in any of the concerns related to creating a forensic
27  Dialectic Behavioral Therapy Pilot Program that would be required to treat BPD patients. The
28  diagnoses of these 152 patients would have to be systematically re-evaluated to ensure that no

1  patients with other personality disorders have been included among these 152 patients, such as
2  dissocial or narcissistic personality disorder. Further, designing a new forensic treatment program
3  requires consideration of several factors, including the logistics of implementation, varying
4  security levels of the patient population, and the specialized training requirements for clinicians.
5  (ECF No. 7865-2, at 9.)  Subject matter experts need to be hired to staff these new programs, and
6  institutional custody staff's buy-in, training, and collaboration needs to be solicited. (*Id.*)

Further, Plaintiffs' description of the identified population and the unmet need as "large" is statistically misleading. (ECF No. 7900 at 21.) These 470 patients represent roughly less than two percent of the MHSDS population. (*See supra* n. 1). And contrary to the timeline proposed by Defendants, Plaintiffs incorrectly suggest that patients with personality disorders will wait years to receive treatment. (ECF No. 7900 at 23.) These patients will continue to be observed and treated in the MHSDS during the one year where appropriate treatment programs and policies will be developed. (*See* ECF No. 7865-3, at 49.) Plaintiffs also exaggerate the state of the patients in Category 3 as posing "a serious risk to themselves and to others on a daily basis." (*Id.*) That position is hyperbolic considering that these patients were *not* identified as needing a referral to a higher level of care.

In sum, nothing in Plaintiffs' Objections provide a scientific basis for disregarding Defendants' proposed plan to fully assess the needs of this treatment population and create appropriate special needs programming as necessary; the Court should defer to Defendants in this regard rather than imposing Plaintiffs' ad-hoc suggestions on this population with complex treatment needs.

## IV.  THE SUSTAINABLE PROCESS IS A NATURAL DATA COMPARISON FOR THE UNA

Plaintiffs' suggestion that Defendants are trying to "rehabilitate" the Sustainable Process through the UNA is nonsensical. Mere references in the UNA Report to pre-UNA data on inpatient referrals do not suggest an attempt to rehabilitate prior processes. As Defendants succinctly reported, concern about the Sustainable Process is one of the bases for the Court's ordering of the UNA. (ECF No. 7865-2 at 10-11.) An assessment of pre-UNA referral rates and

the referral rates found under the UNA necessarily requires an evaluation of the Sustainable Process, which is a natural point of comparison. (*Id.*)

Plaintiffs also suggest that the comparison between the Sustainable Process reviews and the UNA reviews are "methodologically flawed" because the UNA review period is much shorter than the annual CCCMS review period and the quarterly EOP review period. (ECF No. 7900 at 26.) Although the review periods are different, the comparison is not flawed. The UNA reviewed almost all MHSDS patients at each institution during a truncated review period (weeks) while the Sustainable Process reviews the same population over a period of months (quarterly for EOP and annually for CCCMS programs). All referrals identified in the UNA were compared to relative timeframes in 2019 and 2021. (ECF No. 7865-2, at 10.) Thus, while the duration of the review may be different, the review populations are identical, and the purpose of identifying HLOC referrals is identical. In any event, including this comparison in the UNA Report is no reason to reject the conclusions of the UNA.

## CONCLUSION

Plaintiffs sliced and diced the referral data in an attempt to drum up methodological deficiencies but failed to do so. As explained above, the UNA Report and Cover Report already addressed their imagined flaws. The UNA study collected patient data from a multiplicity of sources, generating the largest pool of individuals ever evaluated for unmet needs in Phase I. These individuals were thoroughly assessed for possible HLOC in Phase II. Plaintiffs were intimately involved in both study development and implementation all along. The clinical experience of the past two years also bears out the UNA's conclusion that MHSDS bed capacity is adequate.

On the one hand is a statistically-valid study supported by a reliable analysis (*see* ECF No. 7865-3, at 44) that was performed by scores of trained clinicians overseen by experts from the Special Master's team; on the other hand, there are baseless assertions which do not establish a single instance of unmet need. Plaintiffs' wildly contradictory allegations that CDCR clinicians somehow inflated referrals by adopting a "defensive" referral strategy, or suppressed referrals by

exhibiting signs of "institutionalization" are without any evidentiary support. A cursory review of the study design easily refutes these bald pronouncements.

The Court should reject these implausible objections in light of a robust study that shows adequate bed capacity in the system and accept Defendants' careful, well-designed timeline to evaluate and develop a special treatment needs program for the 470 personality disorder patients identified by the UNA. The plan is supported by DSH and CDCR clinicians who understand the difficulties presented in the treatment of complex populations in carceral settings. Misdirecting precious clinical resources to increasing bed capacity without justification diverts the parties' focus from tasks that have a far greater impact on patient health.

## CERTIFICATION

The undersigned counsel for Defendants certifies that she reviewed the following relevant court orders: ECF Nos. 7305, 7477, 7680, 7854, 7871, and 7905.

Dated: September 5, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General

*/s/ Namrata Kotwani*
Namrata Kotwani
Deputy Attorney General
*Attorneys for Defendants*

HANSON BRIDGETT LLP

Dated: September 5, 2023

*/s/ Paul Mello*
PAUL MELLO
SAMANTHA D. WOLFF
*Attorneys for Defendants*