ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7318
Fax: (916) 324-5205
E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S RESPONSE TO THE MAY 24, 2023 ORDER** |

**INTRODUCTION**

Like in his March 9, 2023 report, the Special Master's August 8, 2023 report on remediation of the indicator for transfer timeframes to Short-Term and Long-Term Restrictive Housing recommends (1) removing the medical hold exception in the existing indicator's documentation, and (2) deeming all untimely transfers a per se violation of the 30-day transfer business requirement.[1]  (ECF No. 7907.)  Defendants object to these two recommendations because they conflict with CDCR's policy and the Program Guide, each of which permits doctors

---

[1] Defendants do not object to the third recommendation in the August 8 Report, that the indicator should include drill-down information including any explanation for delayed transfers, including medical holds.

1

1  to place temporary medical holds on patients to delay their transfers for valid medical reasons. If

2  these two recommendations were adopted, they would inflate CDCR's non-compliance rate and

3  adversely affect data remediation by unfairly recording late transfers caused by medical holds as

4  untimely.  Thus, this Court should reject those two recommendations because, despite the Special

5  Master's efforts to avoid a conflict, they plainly conflict with CDCR policy and the Program

6  Guide.

7  **I.      TRANSFER DELAYS ATTRIBUTED TO MEDICAL HOLDS ARE EXPRESSLY**
       **CONTEMPLATED BY THE PROGRAM GUIDE**
8

9          The court should reject the Special Master's August 8 recommendation to remove the

10  medical hold exception because the recommendation contravenes CDCR policy of permitting a

11  doctor, based on his or her professional judgement, to place a medical hold on a patient, and thus

12  delay any housing transfer, based on medical necessity.  Section 1.2.14 of CDCR's Health Care

13  Departmental Operations Policy states: CDCR "shall utilize a Medical Classification System (MCS) to

14  serve as the system for considering medical factors in making patient placement decisions. The MCS shall

15  be used to match patients' medical needs with the capabilities of facilities and programs."  The purpose of

16  the policy is "[t]o provide guidance to clinical and custody staff in considering medical factors in making

17  patient placement decisions.  (See HCDOM 1.2.14, Medical Classification System, and Appendix 1,

18  Medical Classification Factors, https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-

19  ch01-art2.14.pdf, last accessed 9/7/2023, defining medical holds and enumerating requirements

20  for placement.)[2] The policy provides for a "temporary medical hold" when a patient requires

21  medically necessary health care services, and it is medically prudent to provide these services at the

22  institution where the patient is currently housed.

23          Moreover, the Program Guide expressly contemplates not transferring a patient within 30

24  days because of a medical hold:

25          IPs NOT TRANSFERRED TO AN STRH WITHIN ALLOTTED TIME FRAME
       In order to avoid adversely impacting the IP's other custodial or medical needs,
26       there may be situations where an IP will not be transferred to an STRH within 30

27          [2] A copy of the policy downloaded from https://cchcs.ca.gov/wp-
       content/uploads/sites/60/HC/HCDOM-ch01-art2.14.pdf, last accessed 9/7/2023, is attached as
28       Exhibit A.

1    days. Some examples of situations include, but are not limited to, an imminent
     Board of Parole Hearing date, *medical hold*, scheduled transfer to a mainline
2    placement, scheduled court hearing, pending release to parole within 60 days of
     CCCMS ASU placement, and scheduled mental health evaluations for Mentally
3    Disordered Offender or Sexually Violent Predator screenings.

4    ECF No. 7331-1 at 457 (emphasis added).  In sum, a transfer that occurs outside of 30 days is still

5    compliant with the Program Guide if the delay is caused by a medical hold.

6          The Special Master's position to remove medical holds from the indicator's business rule

7    cannot be reconciled with the plain language of the Program Guide provisions.  (ECF No. 7805

8    at 6.)  Nor can his narrow reading of the Defendants' policies be reconciled with CDCR's medical

9    hold requirements as outlined in the Health Care Department Operations Manual.  (See Exhibit A,

10   HCDOM 1.2.14, Medical Classification System, and Appendix 1, Medical Classification Factors,

11   https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-ch01-art2.14.pdf, last accessed

12   9/7/2023.)  The August 8 report expressly states that under the Program Guide "medical holds

13   may delay transfers of some male patients to STRH units and establishes a process for

14   institutional monitoring of medical holds."  (ECF No. 7907 at 8.)

15         The court recently confirmed that the main purpose of data remediation is to ensure

16   transparency and accuracy of Defendants' mental health data reporting.  (ECF No. 7847 at 12.)

17   The Court has also acknowledged that there are instances when indicators must be designed to

18   report compliance with multiple remedial policies.  (*Id*.)  This is one of those occasions.

19   Defendants' indicator measures compliance with the transfer timeframe policies as they are

20   modified by appropriate timeframe exceptions – namely medical hold policies and, more

21   specifically, the March 3, 2016 STRH policy.  Here, Defendants propose a reasonable

22   modification so that the indicator accurately reports transfers compliant with current policies.

23   The Special Master's first and second recommendations clearly conflict with CDCR policy and

24   the Program Guide, and should be rejected.

25   **II.    THE REASONS CITED IN THE AUGUST 8 REPORT FOR REMOVAL OF THE MEDICAL
             HOLD EXCEPTION ARE MISGUIDED AND CLEARLY ERRONEOUS**
26

27         The Special Master provides several reasons why the court should ignore CDCR policy

28   and require the indicator to be programmed without accounting for patients on medical holds.

Defendants' Objections to the Special Master's Response to the May 24 Order  (2:90-cv-00520 KJM-DB (PC))

1  (ECF No. 7907 at 8 – 13.)  None have merit.

2        First, the Special Master notes that the March 3, 2016 policy lacks a "definition of medical

3  hold or [a] cit[ation] to a definition of medical hold elsewhere in CDCR regulation or policy."

4  (Id. at 8.)  This reasoning is flawed.  The term "medical hold" is well known and defined within

5  CDCR policy.  (*See Id.*, at 9, 10, fn. 4., discussing CDCR's timeframe exception for inpatient

6  transfers.) The HCDOM defines medical hold at Chapter 1, Article 2, section 14, Medical

7  Classification System Appendix 1.  Temporary medical holds are used when a "patient requires

8  medically necessary health care services, and it is medically prudent to provide these services at

9  the institution where the patient is currently housed."  (Exhibit A, HCDOM 1.2.14, Medical

10  Classification System, Appendix 1, Medical Classification Factors, https://cchcs.ca.gov/wp-

11  content/uploads/sites/60/HC/HCDOM-ch01-art2.14.pdf, last accessed 9/7/2023.)  There is no

12  confusion between the parties or the Special Master about the definition of a medical hold.

13        Second, the Special Master notes that there is currently nothing specified as to how a

14  medical hold would be operationalized with respect to scoring compliance with the remedial

15  transfer requirement.  (ECF No. 7907 at 8.)  But that is hardly unique amongst CDCR policies.

16  Few, if any, policies outline how compliance would be scored within a yet-to-be-developed data

17  indicator.  The entire purpose of data remediation is to take CDCR policies and determine ways to

18  measure them and to score compliance.  This is not a reason to reject the policy or Defendants'

19  indicator design outright.

20        Third, the Special Master notes that the 2016 policy is not comparable to prior exceptions

21  policy, citing to the inpatient transfer exception policy from 2017.  (*Id*. at 8-9.) This is an apples

22  to oranges comparison.  The inpatient transfer policy was created following an order to come into

23  full compliance with the inpatient transfer timeframes and to develop any exceptions to those

24  timeframes in a meet and confer process.  (ECF No. 5610 at 6.)   The court signaled that it would

25  be assessing contempt fines for every late transfer that lacked an exception.  (*Id.* at 8.)

26  Defendants met and conferred to develop exceptions for a discrete population of patients needing

27  the highest levels of care.  That is not the case here where CDCR is simply developing data

28

19900160.1

1    indicators to accurately measure its existing policies.  And these are not patients in need of

2    inpatient care; they are patients at the lowest level of care being considered for transfer to another

3    restricted housing setting.

4        In concluding that the 2016 policy is insufficient to create an exception, the Special

5    Master misreads Defendants' prior statements concerning the 2016 Memorandum.  Defendants

6    reference the Memorandum as evidence of the fact that when the Memorandum was developed

7    and implemented in 2016, medical holds were contemplated as a legitimate reason for not

8    meeting the 30-day transfer timeline in the interest of the patient's medical needs.  (ECF No.

9    7805 at 6.)  The policies in place support the inclusion of the exception as part of the indicator.

10        Fourth, the Special Master notes that the 2016 policy does not "specify that the transfer

11    timeline *suspends* due to a medical hold."  (Id. at 9, emphasis original.)  While it is true the policy

12    does say "suspends", the intent is clear – timeframes will yield to a medical hold.  (ECF No.

13    7333-1 at 457.)  The timeframes either suspend or end entirely.  CDCR developed its indicator to

14    suspend (i.e. to pause) the clock for patients on medical holds.  The harsher alternative of ending

15    the timeframe and resetting the clock upon resolution of the medical issue is not being proposed.

16    CDCR's suspension rule is a middle ground approach that seeks to avoid overly long transfer

17    delays and has been programmed into its indicator.  CDCR's interpretation is reasonable, if not

18    obvious—a hold necessarily suspends a transfer and its attendant timeline.  That the policy does

19    not define "medical hold" in greater detail does not justify getting rid of the medical hold

20    exception entirely.

21        Fifth, the Special Master notes that because there is an "absence of comparable language

22    regarding temporary 'suspension' of the STRH transfer timeframe…the Special Maser has not

23    historically in his monitoring and reporting and does not now interpret the Memorandum as

24    creating a court-approved exception."  (*Id.* at 10.)  Defendants are not aware of a specific instance

25    where the Special Master has informed the parties that he has chosen not to monitor part of the

26    Program Guide due to policy language ambiguity.  The Special Master does not state why he does

27    not interpret the policy to require suspension (as opposed to termination) of the timeframe.  In any

28    event, his apparent refusal to monitor CDCR policy is not an adequate reason to remove it from

1   CDCR's data business rules.

2        Relatedly, the Special Master notes that his past monitoring "has not excluded transfers

3 delayed due to medical holds from his assessment of whether defendants have satisfied their

4 remedial obligation to transfer patients to STRH and LTHR within 30 days." (*Id.* at 11.) But

5 Defendants have not proposed excluding late transfers due to medical holds from their reporting.

6 Defendants have only proposed suspending the timeline during the pendency of the medical hold.

7 If the transfer is still late after the clock restarts and the timeline expires, then the transfer would

8 be reported as noncompliant.

9        Sixth, the Special Master notes that "defendants did not object to the Special Master's

10 findings regarding STRH and LTRH transfer timeframes nor did they argue that transfers delayed

11 due to medical hold should be excepted from the 30-day transfer timeframe." (*Id.*) This criticism

12 is curious considering that the Special Master had not at the time of the 29th Round provided

13 Defendants with his monitoring tool or methodology for calculating compliance with STHR or

14 LTRH transfers. A plain reading of the 29th Round Report sheds no light on whether late

15 transfers due to medical hold are counted as compliant or noncompliant transfers. Although the

16 August 8 Report provides a lengthy string of citations ostensibly about "not excluding transfers

17 delayed to medical holds," the words "medical" and "hold" appear nowhere within it. (*Id*. at fn.

18 6.)

19        Seventh, the Special Master notes, correctly, that the 2016 policy on its face applies only

20 to male and STRH transfers, and not to female or LTRH transfers. (*Id*. at 12.) The Special

21 Master reasons that medical holds cannot apply to female patients or patients transferring into an

22 LTRH. The Special Master also makes a strawman argument -- while also making an illogical

23 and unnecessary swipe at "defendant's litigation strategy," that applying the policy would lead to

24 "nonsensical result[s]" by treating male and female patients differently, as well as STRH and

25 LTRH patients. (*Id*.) Defendants have never taken the position that male and female patients

26 should be treated differently with respect to how medical holds impact transfer timeframes.

27 CDCR medical hold policy is clear: "when a patient requires medically necessary health care

28 services, and it is prudent to provide these services at the institution where the patient is currently

Defendants' Objections to the Special Master's Response to the May 24 Order  (2:90-cv-00520 KJM-DB (PC))

1    housed" a medical hold will issue.  (HCDOM 1.2.14 Appendix 1.)  All patients, regardless of

2    gender or type of transfer, are subject to CDCR's medical hold policy and indicators measuring

3    compliance with transfer timeframes must take those into account in order to provide accurate

4    and meaningful information.  Anything less would be incomplete, misleading, and clearly

5    erroneous.

6         Finally, the Special Master's recommendation puts staff in the untenable position of being

7    required either to violate the medical hold policy—potentially putting patients' health at risk—or

8    to cause a late transfer that will be held against Defendants in this proceeding.  It would be an

9    absurd and counterproductive result if staff were given low transfer-compliance scores because

10   they appropriately chose to prioritize patients' health and safety by complying with the medical

11   hold policy.

12                                    **CONCLUSION**

13        The Court should reject the August 8 Report's recommendation to remove medical hold

14   data from the Transfer to STRH and LTRH within Timeframes indicator.  The August 8 Report

15   does not provide a sufficient rationale for removing this data rule from an indicator that measures

16   a transfer timeline.  And the Court should reject the second recommendation as well, because

17   without a rule excepting late transfers due to legitimate and necessary medical holds, the indicator

18   will not provide an accurate picture of the timeliness of all transfers to STRH and LTRH units.

19   Instead, Defendants agree that the third recommendation—that the indicator include drill-down

20   information including any explanation for delayed transfers, including medical holds—is the

21   appropriate way to resolve the current dispute.  (ECF No. 7907 at 15.)

22

23

24

25

26

27

28

Defendants' Objections to the Special Master's Response to the May 24 Order  (2:90-cv-00520 KJM-DB (PC))

19900160.1

1    Dated: September 7, 2023                    Respectfully submitted,

2                                               ROB BONTA
                                               Attorney General of California
3                                               DAMON MCCLAIN
                                               Supervising Deputy Attorney General
4

5                                               **/s/ Elise Owens Thorn**
                                               Elise Owens Thorn
6                                               Deputy Attorney General
                                               *Attorneys for Defendants*
7

8    Dated:  September 7, 2023                  HANSON BRIDGETT LLP

9                                               **/s/ Paul Mello**
                                               PAUL MELLO
10                                              SAMANTHA D. WOLFF
                                               *Attorneys for Defendants*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Objections to the Special Master's Response to the May 24 Order  (2:90-cv-00520 KJM-DB (PC))

19900160.1

# Exhibit A

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

## 1.2.14      Medical Classification System

**(a) Policy**

California Correctional Health Care Services (CCHCS) and California Department of Corrections and Rehabilitation (CDCR) shall utilize a Medical Classification System (MCS) to serve as the system for considering medical factors in making patient placement decisions.  The MCS shall be used to match patients' medical needs with the capabilities of facilities and programs.  The MCS is intended to:

(1) Ensure all patients are assigned Medical Classification Factors that allow matching of medical needs to institutions/facilities to support efficient bed management.

(2) Eliminate redundant and unnecessary forms, screenings, and evaluations.

(3) Reduce or prevent inefficiencies caused by disparity between patient medical needs and facility capabilities and resources.

(4) Provide department-wide capacity to profile the medical needs of the patient population.

**(b) Purpose**

To provide guidance to clinical and custody staff in considering medical factors in making patient placement decisions.

**(c) Responsibility**

(1) The Chief Executive Officer, or designee, is responsible for the implementation, monitoring, and evaluation of this policy and its corresponding procedures.

(2) The Health Care Placement Oversight Program (HCPOP) at headquarters is responsible for various population management functions.  HCPOP is responsible for maintaining a unit procedure, as well as for maintaining and issuing medical classification matrices and Decision Support Material.

**(d) Procedure**

**(1) Medical Classification Chrono General Process**

(A) Medical Classification Chrono (MCC)

1. Physical Description: The MCC is generated via the electronic MCC database.  It is viewable in the Strategic Offender Management System (SOMS).

2. Distribution: A copy of the MCC shall be printed for the patient's records; the transmission must ensure confidentiality.

3. Decision Support Material: Decision Support Material shall be updated as necessary under the authority of the Chief Medical Executive (CME) and the Chief Nurse Executive.  Issues, questions, and suggestions regarding the materials shall be routed to the HCPOP.  CCHCS and CDCR shall issue Decision Support Material that includes reference material regarding:

   a. Criteria for medical risk determination
   b. Criteria for nursing acuity determination
   c. Pregnancy Program
   d. Transplant Program
   e. Hemodialysis Program
   f. Therapeutic Diet Policy
   g. CDCR 7410, Comprehensive Accommodation Chrono
   h. CDCR 1845, Disability Placement Program Verification

(B) Completing the MCC in the Reception Center (RC)

1. An MCC is completed at the time of the RC physical examination.  If the Medical Classification Factors (Refer to Appendix 1, The Medical Classification Factors) change during the RC stay, a new MCC must be issued.

2. There may be situations where further clinical data are needed in order to make a clear determination of the appropriate Medical Classification Factors.  In this case, the MCC is completed based on medical judgment.  For example, the patient has cirrhosis, but the degree of stability and severity has not been assessed because laboratory studies are pending.

(C) Relationship to CDCR 1845 and CDCR 7410

1. The CDCR 1845 provides details regarding disabilities that impact placement and assistive devices such as wheelchairs, walkers, and hearing aids.

2. The CDCR 7410 provides details regarding other patient needs such as lower bunks and bottom tiers. Many of these needs do not impact placement.

3. Specified Medical Classification Factors, if present, require a matching CDCR 1845 or CDCR 7410 in order to provide supporting details. These factors are marked with a superscript "1."

(D) Issuing an MCC

1. The MCC is normally completed by a Primary Care Provider (PCP) (Physician, Nurse Practitioner, or Physician Assistant). Chief Physicians & Surgeons (CP&S) and CMEs may also complete the MCC.

2. The PCP may need to seek input from nursing staff in order to accurately determine the Nursing Care Acuity (Refer to Appendix 1). Nursing staff is responsible for reporting changes in patient status to the PCP that result in a change in Medical Classification Factors.

3. In the case of an outside hospital admission or discharge, the CP&S or designee is responsible for completing the new MCC.

4. Overrides may only be requested through HCPOP. This is normally initiated by the institution Classification and Parole Representative (C&PR) or RC Correctional Counselor III (CC-III). Only a Regional Deputy Medical Executive (RDME) or designee may issue an Override MCC. (Refer to Section (d)(3)(F)3.)

(E) Triggers for Change in Classification

1. A new MCC is issued whenever the patient's medical condition changes in a way that changes Medical Classification Factors (Level of Care, Classification Factors, Intensity of Services, Specialized Services, and/or Institutional-Environmental). Whenever a patient's need for a medical level of care changes, either to higher or lower level, a new MCC shall be issued. Examples include admission to or discharge from a Correctional Treatment Center (CTC), placement into or return from an outside hospital stay, or a new requirement for medium-intensity nursing.

2. The MCC must be completed promptly on admission and again on discharge from an outside hospital stay in order to show the placement into a new level of care. This placement into a new level of care may require a telephone order from the on-call provider.

(F) Temporary and Permanent Chronos

1. Permanent Chronos: A Permanent Chrono indicates that the Medical Classification Factors are not expected to change in the next six months. Automatic or periodic reclassification is not needed if the MCC is a Permanent Chrono.

2. Temporary Chronos: A Temporary Chrono indicates that the Medical Classification Factors are expected to change within six months or that an automatic requirement for Medical Reclassification is needed within six months.

   a. Defined Expiration Date: An MCC with a defined expiration date will cease to be valid on that date. On the defined expiration date, the patient will no longer have a valid MCC, which will require issuance of a new MCC. A temporary MCC is used, for example, when a patient is pregnant and qualifies for the pregnancy program. The expiration date would be set by the estimated date of confinement or estimated delivery date.

   b. Undefined Expiration Date: An MCC with an undefined expiration date is used, for example, when a patient is admitted to an acute care hospital for an acute disease whose course is not certain. The "temporary" designation indicates that the need is expected to be time-limited; however, the duration of the need is unpredictable. The MCC must be reviewed and re-issued within six months.

**(2) Medical Classification Matrices**

(A) Medical Classification Planning Matrix

1. The Medical Classification Planning Matrix (MCPM) shows the Specialized Medical Bed (SMB) and medical program capacities and census at each CDCR institution. The MCPM allows CDCR to review and plan for an efficient match of Institution Attributes to the demand across the various custody levels and programs. Where custody program is important (e.g., Security Housing Unit, Special Needs Yard, Minimum Support Facility [MSF]), the MCPM includes information for that program.

2. The MCPM is maintained by HCPOP.

(B) Medical Classification Matrix

The Medical Classification Matrix (MCM) is a tool that supports the task of matching a patient's Medical Classification Factors with the available facility's medical capabilities.

(C) Maintaining and Issuing the Matrix

The MCM is maintained by HCPOP. As the availability of beds, programs, and other capacities change, HCPOP staff updates the MCM. The MCM is available via SOMS.

**(3) Placement Authority**

(A) Routine Placements

1. Routine placements for patients classified with Outpatient level of care are done using the CDCR endorsement process. The MCM and the MCC provide inputs to the endorsement process.

2. Specialized Outpatient (SOP) endorsements to California Health Care Facility, Stockton (CHCF) shall be made by HCPOP. SOPs who are not endorsed to CHCF shall be endorsed to an intermediate institution. All SOP transfer endorsements require transfer referral from a classification committee prior to endorsement. When necessary, HCPOP is authorized to endorse SOP patients to a basic institution to accommodate required case factors, such as Enhanced Outpatient Program, when there are no available intermediate institutions commensurate with the patient's case factors.

3. All SMB endorsements shall be made by HCPOP. At HCPOP's request, patients with an SMB level of care shall be taken to committee prior to endorsement.

(B) Medical Classification Factor Priorities

1. Decision support for using the MCM includes a tool that shows which Medical Classification Factors represent absolute requirements and which represent preferences (Refer to Appendix 2, Medical Classification Factor Priorities). For example, "Requires Electrical Access" is an absolute factor: a patient on life-support equipment that requires electricity must be in housing with electricity available. "Proximity to Tertiary Consultations" is a preference factor: a patient who needs a retinal specialist is best managed where the specialist is nearby, but the patient can be managed at any institution as long as transportation to a very distant specialist can be accomplished.

2. The Medical Classification Factors listed as preferences on Appendix 2 can be overridden by a Classification Staff Representative (CSR) or a CC-III with endorsement authority as part of matching overall patient medical needs with facility capabilities in a particular institution. If a CSR approves a placement using a Medical Classification Factor listed as a preference on Appendix 2, the CSR approval noted on the CDC 128-G, Chrono Classification (Regular), must include the reason for using the flexibility provided by the preference.

3. The Medical Classification Factors marked as absolute can only be overridden by a new MCC marked as "Override" and completed by the responsible RDME (Refer to Section (d)(3)(F)3) at the request of the institution CME.

(C) Medical Placement Based on Level of Care Medical Classification Factors

1. Placement of a patient into and from the level of care factors (Refer to Appendix 1) is done by medical staff without classification action as part of the patient care routine. Placement based on level of care factors does not require endorsement action. CDCR will be notified of a change in level of care via the MCC.

2. If the institution does not have the needed level of care but has a higher level of care, the patient is normally placed into the higher level of care. Mismatches in actual level of care compared with needed level of care shall be referred to HCPOP for population management.

3. Returns from a higher level of care outside CDCR institutions and facilities that require a level of care not available at the institution shall be noticed to HCPOP for potential medical endorsement.

(D) Medical Endorsement

1. All patients requiring placement into an SMB as indicated by their medical level of care on the MCC shall be reviewed and endorsed by HCPOP. The patient may be placed immediately into an appropriate health care setting by institution medical staff. HCPOP shall consider permanent endorsement into an appropriate institution SMB within 45 days of the date the MCC is completed.

2. Patient transfers to SMBs do not require classification committee action, as the placement decision is made to provide necessary health care treatment or access; however, at HCPOP's request, patients with an SMB level of care shall be taken to committee prior to endorsement.

(E) Decision Support Material

HCPOP shall issue and maintain Decision Support Material that includes:

1. Detailed guidance regarding this policy
2. Medical Classification Factor Priorities (Refer to Appendix 2)
3. Sample chrono

(F) Processes for Resolving Ambiguity or Difference of Opinion

1. Concerns from CSR

   Concerns from the CSR shall be resolved by a case conference between the Classification Services Unit, the Population Management Unit, the Class Action Management Unit, and HCPOP. If the issue cannot be resolved, the RDME shall be consulted.

2. Resolution of Inappropriate Placement

   a. Concerns from nursing staff, custody staff, or providers that a placement is medically inappropriate must be forwarded to the institutional CME. If the CME determines that a medical placement was inappropriate based on the Medical Classification System policy or patient safety considerations, the CME must notify the RDME. The CME must provide appropriate clinical detail.

   b. The RDME shall take appropriate action, in cooperation with HCPOP if necessary, to resolve the issue. HCPOP shall be notified of the issue and resolution for tracking and quality improvement purposes.

3. Override Process

   a. The institution C&PR or RC CC-III shall request guidance from HCPOP and the Classification Services Unit by a case conference if it appears that a placement that meets all classification and medical requirements is not possible. The RDME shall be consulted if the issue cannot be resolved during the case conference. If the RDME determines that an override of one or more Medical Classification Factors is appropriate, the RDME shall issue an MCC with an override.

   b. If the RDME cannot resolve the issue, it shall be referred to the Departmental Review Board. All overrides shall be noticed to HCPOP for action and tracking.

(G) Required Training

Orientation to the Medical Classification System shall be included in the orientation of new classification staff, PCPs, nursing staff, and health records staff.

(H) Quality Improvement

1. The institution CME is accountable for the accuracy of MCCs issued by that institution. The institutional Local Operating Procedure must include processes for monitoring the consistency, reliability, accuracy, and variability of the MCCs. The results of monitoring are provided to the institution Quality Management Committee (QMC), which forwards them to the statewide QMC.

2. The institution Classification Committee Chairperson is accountable for the accuracy of placement recommendations by the Classification Committee. The accountability process is the same as used for custody placements.

(I) Local Operating Procedure

1. Each Chief Executive Officer is responsible for ensuring that the institution has an approved and current Local Operating Procedure that includes, at a minimum:

   a. Description of Institution Attributes including the Institution Medical Grouping for the institution (Refer to Appendix 3, Institutional Medical Groupings).

   b. Contact information for the C&PR, RC CC-III (if applicable), RDME, the HCPOP contact, and Institution Medical Executive.

   c. MCCs including a description of:

      i. Who completes the MCC and when.

      ii. Who is responsible to complete an MCC when a patient changes level of care within a facility (sending provider or receiving provider).

      iii.  When the MCC is completed in the RC and whether laboratory results are required before it can be completed.

      iv.  Detailed process for obtaining a new MCC when a temporary has expired.

      v.  Interaction between nursing and providers to accurately determine Nursing Care Acuity.

      vi.  Changes in patient condition that prompt nursing to notify the provider for completion of an updated MCC.

d.  Distribution

How the patient copy is handled and how confidentiality is ensured.

e.  Decision Support Material

      i.  How Decision Support Material will be distributed, where it will be available, and how obsolete versions will be removed.

      ii.  Local additions to Decision Support Material (if any) and process for approval, distribution, and revision.

      iii.  Process for recommending changes to Decision Support Material.

f.  Quality Improvement

      i.  Periodic sampling for accuracy and completeness.

      ii.  Statement that required detail is entered into the "Comments" section.

      iii.  Statement that confidential information is entered into the "Confidential Comments" and not the "Comments" section.

      iv.  Patient movements based on incorrect MCCs that required a re-endorsement of the patient.

      v.  Patients with more than three changes to their MCC in seven days; results of CME review.

g.  Local Training Plan

Description of who provides local training, staff who receive training, and frequency of training.

h.  Approval Process

      i.  Description of the Local Operating Procedure approval process including any local sign-off.

      ii.  Statement that final approval is obtained from the Regional Health Care Executive, acting in concert with the Regional Leadership Team.

(J)  Unit Procedures

  1.  Classification Services Unit

The Classification Services Unit is responsible for maintaining a unit procedure that includes, at a minimum, a description of the following:

    a.  Training plan for the Classification Services Unit, C&PRs, RC CC-IIIs, and CSRs.

    b.  Process for elevating suggestions regarding revision to the Medical Classification System.

    c.  Process and responsibilities for the case conference between the Classification Services Unit and HCPOP.

  2.  Health Care Placement Oversight Program

HCPOP is responsible for maintaining a unit procedure that includes, at a minimum, a description of the following:

    a.  Detailed processes for maintaining the MCPM.

    b.  Detailed processes for maintaining the MCM.

    c.  Process for elevating suggestions regarding revision to the Medical Classification System.

    d.  Detailed process for endorsing a patient to an appropriate institution SMB.

    e.  Detailed process for approval, distribution, and revision of Decision Support Material.

    f.  Process and responsibilities for the case conference between the Classification Services Unit and HCPOP.

    g.  Detailed process for resolution of inappropriate placements in concert with the RDME, including tracking of cause, resolution, and impact on the patient and the system and interface with the QMC.

    h.  Process for HCPOP to receive notification of overrides from the RDME, including tracking and reporting and interface with the QMC.

    i.  Training plan.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

**Appendices**
- Appendix 1: The Medical Classification Factors
- Appendix 2: Medical Classifications Factor Priorities
- Appendix 3: Institutional Medical Groupings

**References**
- *Plata v. Newsom*, Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at Pleasant Valley and Avenal State Prisons, June 24, 2013
- California Code of Regulations, Title 15, Division 3, Chapter 1, Subchapter 4, Article 10, Section 3379, Inmate Transfers
- California Code of Regulations, Title 22, Division 3, Subdivision 1, Chapter 8, Article 1, Sections 58018, Hospice Services
- California Code of Regulations, Title 22, Division 5, Chapter 3, Article 1, Section 72103, Skilled Nursing Facility
- California Code of Regulations, Title 22, Division 5, Chapter 12, Article 1, Section 79516, Correctional Treatment Center
- California Code of Regulations, Title 22, Division 5, Chapter 12, Article 1, Section 79555, Outpatient Housing Unit
- California Department of Corrections and Rehabilitation, Department Operations Manual, Chapter 6, Article 12, Sections 62080.1-62080.6
- Health Care Department Operations Manual, Chapter 3, Article 1, Section 3.1.9, Health Care Transfer
- Health Care Department Operations Manual, Chapter 3, Article 6, Section 3.6.2, Comprehensive Accommodation
- National Fire Protection Association 1582, Standard on Comprehensive Occupational Medical Program for Fire Departments

**Revision History**
Effective: 11/2009
Revised: 09/2017

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

# Appendix 1

## The Medical Classification Factors

**(a) Level of Care Based on Patient Need**

   **(1)** This Factor rates the medical setting the patient currently needs; the patient may not actually be housed in that setting.  For example, a patient may be currently housed in a Correctional Treatment Center but need only Outpatient Housing Unit level of care.  By collecting this Factor, users of the Medical Classification System can take appropriate actions for bed management.

   **(2) Outpatient (OP):**  No need for a medical setting that provides the patient with daily nursing care.

   **(3) Specialized Outpatient (SOP)**:  A high medical risk outpatient with the potential for clinical deterioration, decompensation, morbidity, or mortality who has long-term care needs.  This patient population needs frequent supportive care management, care coordination, nursing education, nursing interventions, and may need specialized nursing care.  Endorsements shall be made by the Health Care Placement Oversight Program (HCPOP).  All SOP transfer endorsements require a classification committee referral to HCPOP.

   **(4) Outpatient Housing Unit (OHU):**  A housing unit of a city, county, or city and county law enforcement facility established to retain patients who require special housing for security or protection.  Typically, these are patients whose health condition would not normally warrant admission to a licensed heath care facility and for whom housing in the general population may place them at personal or security risk.  Outpatient housing unit residents may receive outpatient health services and assistance with the activities of daily living.  Outpatient housing unit beds are not licensed correctional treatment center beds.

   **(5) Correctional Treatment Center (CTC):**  A health facility with a specified number of beds within a state prison, county jail, or California Division of Juvenile Justice facility designated to provide health care to that portion of the patient population who do not require general acute care level of services but are in need of professionally supervised health care beyond that normally provided in the community on an outpatient basis.

   **(6) Acute Rehabilitation:**  An acute rehabilitation hospital provides intensive physical, occupational, and speech therapy and supportive nursing services to patients recovering from strokes, amputations, severe burns, etc.  This is a community placement.

   **(7) Hospice:**  Services that are designed to provide palliative care, alleviate the physical, emotional, social, and spiritual discomforts of an individual who is experiencing the last phases of life due to the existence of a terminal disease, and to provide supportive care to the primary care giver and the family.  Care may be provided by a skilled or unskilled person under a plan of care developed by a physician or a multidisciplinary team under medical direction.

   **(8) Skilled Nursing Facility:**  A health facility or a distinct part of a hospital which provides continuous skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis.  It provides 24-hour inpatient care and, at a minimum, includes physician, skilled nursing, dietary, and pharmaceutical services as well as an activity program.

**(b) Classification Factors**

   These Medical Classification Factors guide the operation of procedures in the Medical Classification System rather than specify any placement eligibility.

   **(1) Temporary Medical Hold:** A Temporary Medical Hold is used when a patient requires medically necessary health care services, and it is medically prudent to provide these services at the institution where the patient is currently housed.  The Medical Classification Chrono (MCC) will be "Temporary."  Examples of patients who should be reviewed for potential medical holds include, but are not limited to the following:

   **(A)** Medical:

   1. Patients scheduled for major surgery or recovering from major surgery and requiring close post-operative review by the surgical team.
   2. Patients having chemotherapy or radiation therapy treatment.
   3. Patients undergoing a diagnostic workup.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

4. Patients being fitted for a major prosthetic, requiring temporary prostheses adjustments and frequent visits.
5. Patients awaiting major Durable Medical Equipment.
6. Patients scheduled for a specialist visit, which cannot easily be duplicated elsewhere (e.g., surgical subspecialties such as retinal surgery, or specialized oncology surgery).
7. All urgent Requests for Services or specialty appointments.
8. Hemophiliac, Hepatitis C virus, post-transplant, or human immunodeficiency virus/acquired immunodeficiency syndrome patients requiring close management of medication access and continuity.
9. Patients in the middle of a speech therapy, occupational therapy, or physical therapy regimen which would be adversely impacted by transfer.

**(B)** Dental:
1. Patients for whom an immediate denture was recently inserted.
2. Patients at a Program Facility awaiting completion of endodontic treatment.
3. Patients awaiting or in the middle of care for jaw fractures.
4. Untreated Dental Priority Classification 1A conditions.

**(C)** Mental Health:
1. Patients receiving Clozapine.
2. Patients awaiting Court or other hearings.

**(D)** Obstetrics and Gynecology:
1. Patients with high risk pregnancies, in late second trimester or third trimester.

**(E)** Patients in the middle of a diagnostic workup for cancer or other high risk conditions.

**(F)** Public Health:
1. Patients in quarantine or isolation for a variety of conditions including, but not limited to: TB, influenza-like illness, gastroenteritis, sexually transmitted diseases under treatment, source cases until clearance obtained, and contact cases until clearance obtained.

**(2) Temporary Medical Isolation:** Temporary Medical Isolation means the patient may not be endorsed to another institution unless prompted by a Medical Reason for Endorsement. Patients requiring temporary medical isolation shall also have a temporary medical hold entered on the MCC. Medical Isolation may be confinement to quarters or isolation in a medical setting. For example, a patient with Methicillin-Resistant Staphylococcal infection may be placed on Medical Isolation. If that patient should develop a need for dialysis, the patient could be moved for medical reason to an institution with a dialysis program. The type of isolation must be listed in the Comments section. If the patient requires negative pressure respiratory isolation, the Respiratory Isolation Specialized Service factor must be checked as well. Medical Isolation is always temporary. Closure of institutions or housing units for public health issues does not require an MCC.

**(3) Long-Term Stay**: This applies only to Levels of Care other than OP. This factor means that the patient is expected to continue to need at least the indicated Level of Care for the rest of his/her life.

**(4) Override:** Override means that the MCC has been reviewed by a Regional Health Care Executive and permission has been granted to depart from the usual placement requirements for one or more Medical Classification Factors. The patient's actual Medical Classification Factors are still completed according to usual procedure and the specific directions regarding permitted departures are listed in the Comments section.

**(c) Intensity of Services**
The Intensity of Services Medical Classification Factors are a set of scales that indicate the patient's need for medical services and the institution's ability to provide those services.

**(1) Proximity to Consultation** indicates the frequency and intensity of the patient's need for specialty medical services. These services are typically provided in the community by contracted providers. The availability and distance to the services varies by institution. A match between patient need and institution capability reduces risk and cost.

**(A) No Particular Need** means there is no anticipated need for consultations at the present time.

**(B) Basic Consultations** are consultative services typically available in a medium-sized community such as general surgery, orthopedics, obstetrics, radiology, ophthalmology, and internal medicine.
1. *Infrequent* - There is an anticipated need for fewer than four Basic Consultations per year.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

    2. *Frequent* - There is an anticipated need for more than four Basic Consultations per year.

**(C) Tertiary Consultation** are consultative services typically available in the university or large medical center setting such as oncology, endocrinology, neurology, neurosurgery, radiation therapy, interventional cardiology, nephrology, and cardio-thoracic surgery.

**(D) Community Placement** indicates the patient requires placement into a community hospital or other medical setting on a permanent basis. The patient should be assigned to an institution that can most efficiently provide the necessary custody services to that outside level of care.

**(2) Functional Capacity**

Functional Capacity is a scale for the patient's ability to be assigned to particular jobs. That ability affects placement into certain settings.

**(A) Vigorous Activity:** Qualified for all assignments including food-handling and firefighting. Able to dig ditches, chop wood, haul water, and wear a respirator. Good mobility, endurance, and bilateral grip strength.

    1. For California Correctional Health Care Services/California Department of Corrections and Rehabilitation (CDCR) purposes, Chronic Active Hepatitis is defined as patients who are antibody positive, viral load negative, and whose FIB is less than 1.45.

    2. Patients must meet the National Fire Protection Association's (NFPA) standards in order to work as firefighters at fire camps. Patients who do not meet the NFPA standards for firefighters may still be able to work at fire camps in non-firefighter positions (e.g., cooks, clerks, clerical support, porters, mechanics, and those who support other functions). Refer to Appendix 3, Institutional Medical Groupings, "Fire Camps Special Skills" section.

    3. Below are the 2013 NFPA standards which disqualify patients from fire camps. (Note: See NFPA Annex A, Explanatory Material for all asterisked items within this section):

        a. **Head and Neck**

            1) Defect of skull preventing helmet use or leaving underlying brain unprotected from trauma.

            2) Any skull or facial deformity that would not allow for a successful fit test for respirators used by that department.

            3) Any head condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

            4) Any neck condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

        b. **Eyes and Vision**

            1) *Far visual acuity less than 20/40 binocular, corrected with contact lenses or spectacles, or far visual acuity less than 20/100 binocular for wearers of hard contacts or spectacles, uncorrected.

            2) *Color perception - monochromatic vision resulting in inability to use imaging devices such as thermal imaging cameras.

            3) *Monocular vision.

            4) Any eye condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

        c. **Ears and Hearing**

            1) Chronic vertigo or impaired balance as demonstrated by the inability to tandem gait walk.

            2) On audiometric testing, average hearing loss in the unaided better ear greater than 40 decibels (dB) at 500 Hz, 1000 Hz, 2000 Hz, and 3000 Hz when the audiometric device is calibrated to ANSI Z24.5, *Audiometric Device Testing*.

            3) Any ear condition (or hearing impairment) that results in the candidate not being able to safely perform one or more of the essential job tasks.

            4) *Hearing aid or cochlear implant.

        d. **Dental**

            1) Any dental condition that results in inability to safely perform one or more of the essential job tasks.

        e. **Nose, Oropharynx, Trachea, Esophagus, and Larynx**

            1) *Tracheostomy.

Case 2:90-cv-00520-KJM-SCR   Document 7989   Filed 09/04/23   Page 19 of 29

    2) *Aphonia.
    3) Any nasal, oropharyngeal, tracheal, esophageal, or laryngeal condition that results in inability to safely perform one or more of the essential job tasks including fit testing for respirators such as N-95 for medical response, P-100 for particulates and certain vapors, and SCBA for fire and hazmat operations.

  f. **Lungs and Chest Wall**
    1) Active hemoptysis.
    2) Current empyema.
    3) Pulmonary hypertension.
    4) Active tuberculosis.
    5) *A forced vital capacity (FVC) or forced expiratory volume in 1 second (FEV1) less than 70 percent predicted even independent of disease.
    6) *Obstructive lung diseases (e.g., emphysema, chronic bronchitis, asthma) with an absolute FEV1/FVC less than 0.70 and with either the FEV1 below normal or both the FEV1 and the FVC below normal (less than 0.80).
    7) *Hypoxemia - oxygen saturation less than 90 percent at rest or exercise desaturation by four percent or to less than 90 percent (exercise testing indicated when resting oxygen is less than 94 percent but greater than 90 percent).
    8) *Asthma - reactive airways disease requiring bronchodilator or corticosteroid therapy for two or more consecutive months in the previous two years, unless the candidate can meet the requirement in 6.8.1.1.
    9) Any pulmonary condition that results in the candidate not being able to safely perform one or more of the essential job tasks.
    10) Lung transplant.

  g. **Aerobic Capacity**
    1) An aerobic capacity less than 12 metabolic equivalents (METs) (1 MET = 42 mL O2/kg/min).

  h. **Heart and Vascular System**
    1) *Coronary artery disease, including history of myocardial infarction, angina pectoris, coronary artery bypass surgery, coronary angioplasty, and similar procedures.
    2) *Cardiomyopathy or congestive heart failure, including signs or symptoms of compromised left or right ventricular function or rhythm including dyspnea, S3 gallop, peripheral edema, enlarged ventricle, abnormal ejection fraction, and/or inability to increase cardiac output with exercise.
    3) *Acute pericarditis, endocarditis, or myocarditis.
    4) *Syncope, recurrent.
    5) *A medical condition requiring an automatic implantable cardiac defibrillator or history of ventricular tachycardia or ventricular fibrillation due to ischemic or valvular heart disease, or cardiomyopathy.
    6) Third-degree atrioventricular block.
    7) *Cardiac pacemaker.
    8) Hypertrophic cardiomyopathy including idiopathic hypertrophic subaortic stenosis.
    9) Any cardiac condition that results in the candidate not being able to safely perform one or more of the essential job tasks.
    10) Heart transplant.
    11) Hypertension.
    12) *Uncontrolled or poorly controlled hypertension.
    13) *Hypertension with evidence of end organ damage.
    14) *Thoracic or abdominal aortic aneurysm.
    15) Carotid artery stenosis or obstruction resulting in greater than or equal to 50 percent reduction in blood flow.
    16) *Peripheral vascular disease resulting in symptomatic claudication.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

17) Any other vascular condition that results in the inability to safely perform one or more of the essential job tasks.

i. **Abdominal Organs and Gastrointestinal System**
 1) Presence of uncorrected inguinal/femoral hernia regardless of symptoms.
 2) Any gastrointestinal condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

j. **Metabolic Syndrome**
 1) Metabolic syndrome with aerobic capacity less than 12 METs.

k. **Reproductive System**
 1) Any genital condition that results in inability to safely perform one or more of the essential job tasks.

l. **Urinary System**
 1) Renal failure or insufficiency requiring continuous ambulatory peritoneal dialysis or hemodialysis.
 2) Any urinary condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

m. **Spine and Axial Skeleton**
 1) Scoliosis of thoracic or lumbar spine with angle greater than or equal to 40 degrees.
 2) History of spinal surgery with rods that are still in place.
 3) Any spinal or skeletal condition producing sensory or motor deficit(s) or pain due to radiculopathy or nerve root compression.
 4) Any spinal or skeletal condition causing pain that frequently or recurrently requires narcotic analgesic medication.
 5) Cervical vertebral fractures with multiple vertebral body compression greater than 25 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (partial, moderate, severe), abnormal exam, ligament instability, symptomatic, and/or less than six months post injury or less than one year since surgery.
 6) Thoracic vertebral fractures with vertebral body compression greater than 50 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (severe-with or without surgery), abnormal exam, ligament instability, symptomatic, and/or less than six months post injury or less than one year since surgery.
 7) Lumbosacral vertebral fractures with vertebral body compression greater than 50 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (partial, moderate, severe), fragmentation, abnormal exam, ligament instability, symptomatic, and/or less than six months post injury or less than one year since surgery.
 8) Any spinal or skeletal condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

n. **Extremities**
 1) Joint replacement, unless all the following conditions are met:
    a) Normal range of motion without history of dislocations post-replacement.
    b) Repetitive and prolonged pulling, bending, rotations, kneeling, crawling, and climbing without pain or impairment.
    c) No limiting pain.
    d) Evaluation by an orthopedic specialist who concurs that the candidate can complete all essential job tasks listed in Chapter 5.
 2) Amputation or congenital absence of upper-extremity limb (hand or higher).
 3) Amputation of either thumb proximal to the mid-proximal phalanx.
 4) Amputation or congenital absence of lower-extremity limb (foot or above) unless the candidate meets all of the following conditions:
    a) Stable, unilateral below-the-knee amputation with at least the proximal third of the tibia present for a strong and stable attachment point with the prosthesis.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

    b) Fitted with a prosthesis that will tolerate the conditions present in structural firefighting when worn in conjunction with standard firefighting personal protective equipment.

    c) At least six months of prosthetic use in a variety of activities with no functional difficulties.

    d) Amputee limb healed with no significant inflammation, persistent pain, necrosis, or indications of instability at the amputee limb attachment point.

    e) No significant psychosocial issues pertaining to the loss of limb or use of prosthesis.

    f) Evaluated by a prosthetist or orthopedic specialist with expertise in the fitting and function of prosthetic limbs who concurs that the candidate can complete all essential job tasks listed in Chapter 5, including wearing personal protective ensembles and self-contained breathing apparatus while climbing ladders, operating from heights, and walking or crawling in the dark along narrow and uneven surfaces that may be wet or icy.

    g) Has passed the department's applicant physical ability test as a condition of appointment without accommodations or modification of the protocol.

  5) Chronic non-healing or recent bone grafts.

  6) History of more than one dislocation of shoulder without surgical repair or with history of recurrent shoulder disorders within the last five years with pain or loss of motion, and with or without radiographic deviations from normal.

  7) Any extremity condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

o. **Neurological Disorders**

  1) Ataxias of heredo-degenerative type.

  2) Cerebral arteriosclerosis as evidenced by a history of transient ischemic attack, reversible ischemic neurological deficit, or ischemic stroke.

  3) Hemiparalysis or paralysis of a limb.

  4) *Multiple sclerosis with activity or evidence of progression within previous three years.

  5) *Myasthenia gravis with activity or evidence of progression within previous three years.

  6) Progressive muscular dystrophy or atrophy.

  7) Uncorrected cerebral aneurysm.

  8) All single unprovoked seizures and epileptic conditions including simple partial, complex partial, generalized, and psychomotor seizure disorders other than as allowed in 6.17.1.1.

  9) Dementia (Alzheimer's and other neurodegenerative diseases) with symptomatic loss of function or cognitive impairment (e.g., less than or equal to 28 on Mini-Mental Status Exam).

  10) Parkinson's disease and other movement disorders resulting in uncontrolled movements, bradykinesia, or cognitive impairment (e.g., less than or equal to 28 on Mini-Mental Status Exam).

  11) Any neurological condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

p. **Skin**

  1) Metastatic or locally extensive basal or squamous cell carcinoma or melanoma.

  2) Any dermatologic condition that would not allow for a successful fit test for any respirator required by the fire department.

  3) Any dermatologic condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

q. **Blood and Blood-Forming Organs**

  1) Hemorrhagic states requiring replacement therapy.

  2) Sickle cell disease (homozygous).

  3) Clotting disorders.

  4) Any hematological condition that results in inability to safely perform one or more of the essential job tasks.

r. **Endocrine and Metabolic Disorders**

  1) *Type 1 diabetes mellitus, unless a candidate meets all of the following criteria:

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

   a)  Is maintained by a physician knowledgeable in current management of diabetes mellitus on a basal/bolus (can include subcutaneous insulin infusion pump) regimen using insulin analogs.

   b)  Has demonstrated over a period of at least six months the motivation and understanding required to closely monitor and control capillary blood glucose levels through nutritional therapy and insulin administration.  Assessment of this shall take into consideration the erratic meal schedules, sleep disruption, and high aerobic and anaerobic workloads intrinsic to firefighting.

   c)  Has a dilated retinal exam by a qualified ophthalmologist or optometrist that shows no higher grade of diabetic retinopathy than microaneurysms, as indicated on the International Clinical Diabetic Retinopathy Disease Severity Scale.

   d)  Has normal renal function based on a calculated creatinine clearance greater than 60 mL/min and absence of proteinuria.  (Creatinine clearance can be calculated by use of the Cockroft-Gault or similar formula.  Proteinuria is defined as 24-hour urine excretion of greater than or equal to 300 mg protein or greater than or equal to 300 mg of albumin per gram of creatinine in a random sample.)

   e)  Has no autonomic or peripheral neuropathy.  (Peripheral neuropathy is determined by diminished ability to feel the vibration of a 128 cps tuning fork or the light touch of a 10-gram monofilament on the dorsum of the great toe proximal to the nail.  Autonomic neuropathy might be determined by evidence of gastroparesis, postural hypotension, or abnormal tests of heart rate variability.)

   f)  Has normal cardiac function without evidence of myocardial ischemia on cardiac stress testing (to at least 12 MET) by electrocardiogram (ECG) and cardiac imaging.

   g)  Has a signed statement and medical records from an endocrinologist or a physician with demonstrated knowledge in the current management of diabetes mellitus as well as knowledge of the essential job tasks and hazards of firefighting as described in 5.1.1, allowing the fire department physician to determine whether the candidate meets the following criteria:

      i.  Is being successfully maintained on a regimen consistent with 6.20.1(1)(a) and 6.20.1(1)(b).

      ii.  Has had hemoglobin A1C measured at least four times a year (intervals of two to three months) over the last 12 months prior to evaluation if the diagnosis of diabetes has been present over one year.  A hemoglobin A1C reading of eight percent or greater shall trigger a medical evaluation to determine if a condition exists in addition to diabetes that is responsible for the hemoglobin A1C not accurately reflecting average glucose levels. This shall include evidence of a set schedule for blood glucose monitoring and a thorough review of data from such monitoring.

      iii.  Does not have an increased risk of hypoglycemia due to alcohol use or other predisposing factors.

      iv.  *Has had no episodes of severe hypoglycemia (defined as requiring assistance of another) in the preceding one year, with no more than two episodes of severe hypoglycemia in the preceding three years.

      v.  Is certified not to have a medical contraindication to firefighting training and operations.

2)  Insulin-requiring Type 2 diabetes mellitus, unless a candidate meets all of the following criteria:

   a)  Is maintained by a physician knowledgeable in current management of diabetes mellitus.

   b)  Has demonstrated over a period of at least three months the motivation and understanding required to closely monitor and control capillary blood glucose levels through nutritional therapy and insulin administration.  Assessment of this shall take into consideration the erratic meal schedules, sleep disruption, and high aerobic and anaerobic workloads intrinsic to firefighting.

    c) Has a dilated retinal exam by a qualified ophthalmologist or optometrist that shows no higher grade of diabetic retinopathy than microaneurysms, as indicated on the International Clinical Diabetic Retinopathy Disease Severity Scale.

    d) Has normal renal function based on a calculated creatinine clearance greater than 60 mL/min and absence of proteinuria. (Creatinine clearance can be calculated by use of the Cockroft-Gault or similar formula. Proteinuria is defined as 24-hour urine excretion of greater than or equal to 300 mg protein or greater than or equal to 300 mg of albumin per gram of creatinine in a random sample.)

    e) Has no autonomic or peripheral neuropathy. (Peripheral neuropathy is determined by diminished ability to feel the vibration of a 128 cps tuning fork or the light touch of a 10-gram monofilament on the dorsum of the great toe proximal to the nail. Autonomic neuropathy can be determined by evidence of gastroparesis, postural hypotension, or abnormal tests of heart rate variability.)

    f) Has normal cardiac function without evidence of myocardial ischemia on cardiac stress testing (to at least 12 METS) by ECG and cardiac imaging.

    g) Has a signed statement and medical records from an endocrinologist or a physician with demonstrated knowledge in the current management of diabetes mellitus as well as knowledge of the essential job tasks and hazards of firefighting as described in 5.1.1, allowing the fire department physician to determine whether the candidate meets the following criteria:

        i. Is maintained on a stable insulin regimen and has demonstrated over a period of at least three months the motivation and understanding required to closely monitor and control capillary blood glucose levels despite varied activity schedules through nutritional therapy and insulin administration.

        ii. Has had hemoglobin A1C measured at least four times a year (intervals of two to three months) over the last 12 months prior to evaluation if the diagnosis of diabetes has been present over one year. A hemoglobin A1C reading of eight percent or greater shall trigger a medical evaluation to determine if a condition exists in addition to diabetes that is responsible for the hemoglobin A1C not accurately reflecting average glucose levels. This shall include evidence of a set schedule for blood glucose monitoring and a thorough review of data from such monitoring.

        iii. Does not have an increased risk of hypoglycemia due to alcohol use or other predisposing factors.

        iv. *Has had no episodes of severe hypoglycemia (defined as requiring assistance of another) in the preceding one year, with no more than two episodes of severe hypoglycemia in the preceding three years

        v. Is certified not to have a medical contraindication to firefighting training and operations.

  3) Any endocrine or metabolic condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

s. **Systemic Diseases and Miscellaneous Conditions**

  1) Any systemic condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

t. **Tumors and Malignant Diseases**

  1) Malignant disease that is newly diagnosed, untreated, or currently being treated, or under active surveillance due to the increased risk for reoccurrence.

  2) Any tumor or similar condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

u. **Psychiatric Conditions**

  1) Any psychiatric condition that results in the candidate not being able to safely perform one or more of the essential job tasks.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

v. **Chemicals, Drugs, and Medications**
   1) Those that require chronic or frequent treatment with any of the following medications or classes of medications:
      a) Narcotics, including methadone.
      b) Sedative-hypnotics.
      c) Full-dose or low-dose anticoagulation medications or any drugs that prolong prothrombin time, partial thromboplastin time, or international normalized ratio.
      d) Beta-adrenergic blocking agents at doses that prevent a normal cardiac rate response to exercise, high-dose diuretics, or central acting antihypertensive agents (e.g., clonidine).
      e) *Respiratory medications: inhaled bronchodilators, inhaled corticosteroids, systemic corticosteroids, theophylline, and leukotriene receptor antagonists (e.g., Montelukast).
      f) High-dose corticosteroids for chronic disease.
      g) Anabolic steroids.
      h) Any chemical, drug, or medication that results in the candidate not being able to safely perform one or more of the essential job tasks.
   2) Tobacco use shall be a Category A medical condition (where allowed by law).
   3) Evidence of illegal drug use detected through testing, conducted in accordance with Substance Abuse and Mental Health Service Administration, shall be a Category A medical condition.
   4) Evidence of clinical intoxication or a measured blood alcohol level that exceeds the legal definition of intoxication according to the authority having jurisdiction at the time of medical evaluation shall be a Category A medical condition.
   **(B) Full Duty:** Qualified for all institutional assignments (including food-handling) without restrictions.
   **(C) Limited Duty:** Restrictions on duty assignment, which are listed in the Comments section. For example, no assignment to work where standing for longer than two hours is required. Qualified for food-handling unless specifically noted.
   **(D) Totally Disabled:** Incapable of any duty assignment.
(3) **Medical Risk**
   Medical Risk provides a scale of the risk of adverse outcome caused by the patient's medical conditions.
   **(A) Low Risk:** Routine medical conditions, focused on preventative care. Chronic care of common conditions in good control throughout the last year.
   **(B) Medium Risk:** Chronic care of well or moderately-controlled common conditions. Requires time-sensitive laboratory studies.
   **(C) High Risk:** Chronic care of complicated, unstable, or poorly-controlled common conditions (e.g., asthma with history of intubation for exacerbations, uncompensated end-stage liver disease, hypertension with end-organ damage, diabetes with amputation). Chronic care of complex, unusual, or high risk conditions (e.g., cancer under treatment or metastatic, coronary artery disease with prior infarction). Implanted defibrillator or pacemaker. High risk medications (e.g., chemotherapy, immune suppressants, Factor 8 or 7, anticoagulants other than aspirin). Transportation over a several day period would pose a health risk, such as hypercoagulable state. Case management is required.
(4) **Nursing Care Acuity**
   Nursing Care Acuity is a scale for the extent, frequency, and complexity of nursing interventions and activities needed.
   **(A) Basic, Uncomplicated Nursing (Population Risk Stratification Level I: Primary Prevention):** Care of largely well population; prevention and wellness; stable, uncomplicated chronic disease; episodic care of acute injury and illness; routine nursing care in primary care clinic; annual or semi-annual patient service plans; Keep on Person Medications available seven days per week or Nurse administered (NA) medications no more frequent than twice daily.
   **(B) Low-Intensity Nursing (Population Risk Stratification Level II: Secondary Prevention):** Care of chronic stable disease; functional limitations compensated by adaptive equipment; patients able to participate in Activities of Daily Living; maintenance of status; prevention of exacerbation; symptom control and management of pain; uncomplicated wound care (time-limited); uncomplicated chemo/radiation therapy;

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

quarterly patient service plans; Unit pill line: Direct Observed Therapy, Nurse Administered Medications, Intramuscular or subcutaneous injections, and Keep on Person Medications.

**(C) Medium-Intensity Nursing (Population Risk Stratification Level III: Tertiary):** Care of complex, stable or at-risk patients; uncomplicated post-surgical care; dementia, quadriplegia, hemiplegia who are able to participate in self-care; uncomplicated wound care; high risk for skin breakdown; Outpatient Housing Unit (OHU) placement; monthly or every two month patient service plans. Case management/care coordination is required.

**(D) High-Intensity or Specialized Nursing (Population Risk Stratification Level IV: Catastrophic/Complex):** Direct, total and/or specialized nursing care of complex, complicated, unstable, or high risk patients; daily nursing plan update; significant dementia, paraplegia, hemiplegia or quadriplegia who are unstable and unable to participate in self-care; complex medication protocols. Care management/care coordination is required. Inpatient level of care.

**(d) Minimum Support Facility Criteria**
To be medically eligible for Minimum Support Facility (MSF) Placement, patients must have a MCC Risk Category designation of Low Risk or meet the Medium Risk criteria for MSF eligibility (see Clinical Risk Definitions on the Lifeline Quality Management Portal). Additionally, patients must also meet all custodial criteria required for MSF placement (i.e., Time in Custody, no S or R Suffix, etc.).

**(e) Specialized Services**
Specialized Services are special programs or patient needs that are provided by certain specified institutions.

**(1) Pregnancy Program:** Medical program for pregnant and post-partum patients.

**(2) Transplant Center:** Medical program at institutions with agreements with a local transplant center. Currently these patients are managed as part of the continuum of care; this factor then flags these patients for purposes of population management and census.

**(3) Hemodialysis:** Medical program for patients requiring hemodialysis. The program may provide dialysis within the institution or by transportation outside the institution.

**(4) Dementia:** Medical program for patients with dementia. Currently these patients are managed as part of the continuum of care; this factor then flags these patients for purposes of population management and census.

**(5) Therapeutic Diet:** Specified therapeutic diets are available to outpatients and in medical settings. Authorized therapeutic diets include:
(A) Gluten-free diet
(B) Hepatic diet
(C) Renal diet
(D) Pre-renal diet

**(6) Respiratory Isolation:** Low-pressure respiratory isolation room is required. These rooms are included in CTCs and used primarily in the care of patients with active tuberculosis.

**(7) Speech/Occupational Therapy:** Speech and occupational therapy services. These are most commonly provided for patients being rehabilitated from strokes who are being cared for in a medical setting.

**(8) Physical Therapy:** Physical therapy services, which can be provided both in medical settings and as outpatients.

**(9) Durable Medical Equipment:** Provisioning and repair of durable medical equipment including wheelchairs, prostheses, portable oxygen concentrators, and continuous positive airway pressure devices which are available both in medical settings and as outpatients.

**(10) Transgender:** Medical program for transgender patients.

**(f) INSTITUTIONAL-ENVIRONMENTAL**
These Classification Factors are related to institutional capabilities or characteristics that are due to the physical location and architectural design.

**(1) Restricted-Altitude:** The patient has a condition that is placed at risk by high altitude (above 3,500 feet) including patients who require supplemental oxygen and patients with sickle-cell disease (sickle-cell trait does not require restriction).

**(2) Restricted-Cocci Areas**
(A) Institutions in Restricted-Cocci Area 1 include: Avenal State Prison, California City Correctional Center, California Correctional Institution, California Men's Colony, California State Prison, Corcoran, California

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

Substance Abuse Treatment Facility and State Prison at Corcoran, Kern Valley State Prison, North Kern State Prison, Pleasant Valley State Prison, Wasco State Prison, and any Community Correctional Facility/Modified Community Correctional Facility that has these institutions as their hub.

1. Patients who are designated as Restricted-Cocci Area 1 are precluded from endorsement to the institutions listed above.
2. Patients with Clinical Category 1 or 2, pregnancy, a history of lymphoma, status post solid organ transplant, chronic immunosuppressive therapy, moderate to severe Chronic Obstructive Pulmonary Disease (on intermittent or continuous $O_2$,) or cancer patients on chemotherapy and/or radiation therapy are restricted from placement in Cocci Area 1, unless they have a history of cocci disease.

(B) Institutions in Restricted-Cocci Area 2: Avenal State Prison, Pleasant Valley State Prison, and any Community Correctional Facility/Modified Community Correctional Facility that has these institutions as their hub.

1. Patients who are designated as Restricted-Cocci Area 2 are precluded from endorsement to the institutions listed above.
2. High Medical Risk patients and those who test negative with the cocci skin test, have not been offered the cocci skin test, or have an incomplete skin test (e.g., consented to testing but the test has not yet been completed) are absolutely restricted from Cocci Area 2, unless they have a history of cocci disease; these patients cannot waive the restriction.
3. Patients with diabetes or who are Filipino or African American are restricted from Cocci Area 2, unless they have a history of cocci disease or test positive with a cocci skin test; these patients may waive the restriction.

**(3) Restricted-No Stairs:** Patients who require an environment without stairs for their activities of daily living. This may be due to mobility impairment or to other functional impairments such as heart failure.

**(4) Requires Electrical Access:** Patients with electrically-operated supportive equipment such as portable oxygen concentrators or continuous positive airway pressure devices that require an electrical outlet within six feet of the head of the bed.

**(5) Requires Adaptive Equipment:** Patients who require adaptive equipment in their living area such as grab bars in the toilet or shower or trapeze bars over the bed.

**(6) Requires Medical Transport:** The patient cannot safely be transported using custody staff and a state car, state bus, or state transport van. For example, a quadriplegic with autonomic instability.

**(7) See 1845 and 7410:** The patient has medical needs that are specified on a CDCR 1845, Disability Placement Program Verification, and/or a CDCR 7410, Comprehensive Accommodation Chrono.

**(g) COMMENTS**

**(1)** Specified Medical Classification Factors, if present, require supporting details to be written into the "Comments" section of the MCC. These factors are marked with a superscript "*".

**(2)** Comments that contain protected health information should be entered into the "Confidential Comments" section.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

**Appendix 2**

**Medical Classifications Factor Priorities**

| *Medical Classification Factor* | *Absolute (A) or Preference (P)* | *Comment* |
|---|---|---|
| Level of Care | P | Preference ONLY in that a higher level of care may be used. For example, an Outpatient Housing Unit or Hospice patient may be housed in a Correctional Treatment Center. |
| | A | Specialized Outpatient transfers require classification committee referral and endorsement to California Health Care Facility, Stockton or an intermediate institution. |
| | A | OP-Outpatient. |
| Proximity to Consult | P | Can always be obtained at high extra cost if needed. |
| Functional Capacity | A | Important particularly with regard to Camp placement and Armstrong. |
| Medical Risk | A | For Fire Camp, Community Correctional Facilities, Modified Community Correctional Facilities, Minimum Support Facilities, Out-of-State. |
| | P | If alternative is Basic Institution. |
| Nursing Care Acuity | P | In California Department of Corrections and Rehabilitation (CDCR) institutions, Medium Intensity Nursing can be provided at extra cost. |
| | A | In all other cases. |
| Clinical Category 1 | A | In anything but CDCR institutions. |
| | P | Can be done in a Clinical Category 2 institution at extra cost. |
| Clinical Category 2 | A | |
| Pregnancy Program | A | |
| Transplant Center | P | Can always be obtained at extra cost if needed. |
| Hemodialysis | P | Can always be obtained at high extra cost if needed. |
| Dementia | P | No special program yet exists; tracked for reporting purposes only. |
| Therapeutic Diet | A | |
| Respiratory Isolation | A | |
| Speech/Occupational Therapy | P | Can always be obtained at extra cost if needed. |
| Physical Therapy | P | Can always be obtained at extra cost if needed. |
| Durable Med Equipment | A | |
| Transgender | A | |
| Restricted – Altitude | A | |
| Restricted – Cocci Area 1 | A | |
| Restricted – Cocci Area 2 | A | |
| Restricted – No Stairs | A | |
| Requires Electrical Access | A | |
| Requires Adaptive Equipment | A | |
| Requires Medical Transport | A | |

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

**Appendix 3**

**Institutional Medical Groupings**

| *Description of Institutional Setting* | *Medical Classification System Criteria* | |
|---|---|---|
| **Minimum Support Facilities**: These settings require that patients be located in a facility attached to but separate from an institution. Nursing and primary care provider care is available, but patients must be taken into the secure perimeter in order to access urgent care. | Functional Capacity: | Limited Duty (Or Better) |
| | Level Of Care: | Outpatient (OP) |
| | Proximity To Consultation: | Frequent Basic Consultation (Or Less) |
| | Medical Risk: | Medium Risk (Or Less) |
| | Nursing Care Acuity: | Basic, Uncomplicated Nursing or Low Intensity Nursing (Or Less) |
| **Community Correctional Facilities**: These settings require that the patient be able to be located in a small to medium sized contracted facility that may be many miles from a hub institution. These facilities provide limited nursing and primary care provider access. Patients must be taken to local emergency rooms or transported to the hub for urgent care. | Functional Capacity: | Limited Duty (Or Better) |
| | Level Of Care: | OP |
| | Proximity To Consultation: | Infrequent Basic Consultation (Or Less) |
| | Medical Risk: | Low Risk |
| | Nursing Care Acuity: | Basic, Uncomplicated Nursing |
| **Fire Camps Firefighters**: These settings require that the patients be able to be located in remote areas, capable of vigorous physical activity if in firefighter assignments, and require no daily nursing care. | Functional Capacity: | Vigorous Activity |
| | Level Of Care: | OP |
| | Proximity To Consultation: | No Particular Need Or Infrequent Basic Consultation |
| | Medical Risk: | Medium Risk (Or Less) |
| | Nursing Care Acuity: | Basic, Uncomplicated Nursing |
| **Fire Camps Special Skills:**  Non-firefighters assigned to fire camps such as cooks, clerks, clerical support, porters, mechanics, and those who support other functions.  These patients shall not be assigned to firefighting duties. | Functional Capacity: | Vigorous Activity or Full Duty |
| | Level of Care: | OP |
| | Proximity to Consultation: | No Particular Need Or Infrequent Basic Consultation |
| | Medical Risk: | Medium Risk (Or Less) |
| | Nursing Care Acuity: | Basic, Uncomplicated Nursing |
| **Out-of-State Facilities**: These settings require that patients must be able to be located in a medium-sized contracted facility in another state.  These facilities provide nursing and primary care provider services on a continuous basis and can provide urgent care onsite. Short and long term placements into Outpatient Housing Unit (OHU) *or* Correctional Treatment Center (CTC) are available onsite.  Patients must be able to be transported to and from California using routine custody transportation. | Functional Capacity: | Limited Duty (Or Better) |
| | Level of Care: | OP |
| | Proximity To Consultation: | Frequent Basic Consultation (Or Less) |
| | Medical Risk: | Medium Risk (Or Less) |
| | Nursing Care Acuity: | Low Intensity Nursing (Or Less) |
| **Basic Institutions**: These facilities provide nursing and primary care provider services on a continuous basis and can provide urgent care onsite.   Short and long term placements into OHU *or* CTC are available onsite.   Basic consultations (general surgery, orthopedics, | Level Of Care: | OP, OHU, or CTC |
| | Proximity To Consultation: | Frequent Basic Consultation (Or Less) |
| | Medical Risk: | Medium Risk (Or Less) |

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

| | | |
|---|---|---|
| obstetrics, radiology, ophthalmology, internal medicine) are available. | Nursing Care Acuity: | Medium Intensity Nursing (Or Less). *Example: Calipatria State Prison* |
| ***Description of Institutional Setting*** | ***Medical Classification System Criteria*** | |
| **Intermediate Institutions**: These facilities provide nursing and primary care provider services on a continuous basis and can provide urgent care onsite. Short and long term placements into OHU *and* CTC are available onsite. Basic Consultations (general surgery, orthopedics, obstetrics, radiology, ophthalmology, internal medicine) and Tertiary Care Consultations (oncology, endocrinology, neurology, neurosurgery, interventional cardiology, nephrology, cardio-thoracic surgery) are close and readily available. Specialized Services, such as HIV Clinical Category 1, pregnancy services, therapeutic diets, and hemodialysis may be provided. | Level Of Care: | OP, OHU, or CTC |
| | Proximity To Consultation: | Tertiary Consultation (Or Less) |
| | Medical Risk: | High Risk (Or Less) |
| | Nursing Care Acuity: | High Intensity or Specialized Nursing (Or Less). *Example: Mule Creek State Prison* |
| **Center Institutions**: These facilities are restricted to patients with significant medical needs. They provide nursing and primary care provider services on a continuous basis and can provide urgent care onsite. Short and long term placements into OHU *and* CTC are available onsite. Basic Consultations (general surgery, orthopedics, obstetrics, radiology, ophthalmology, internal medicine) and Tertiary Care Consultations (oncology, endocrinology, neurology, neurosurgery, interventional cardiology, nephrology, cardio-thoracic surgery) are close and available. Specialized Services, including HIV Clinical Category 1, pregnancy services, therapeutic diets, speech therapy, occupational therapy, dementia support program, transplant center, respiratory isolation, complex durable medical equipment, and hemodialysis are all provided. | Proximity To Consultation: | Tertiary Consultation (Or Less) |
| | Level of Care: | Specialized Outpatient |
| | Medical Risk: | High Risk (Or Less) |
| | Nursing Care Acuity: | High Intensity or Specialized Nursing (Or Less). *Example: California Medical Facility.* |