IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA (SACRAMENTO)

|  |  |  |
|---|---|---|
| RALPH COLEMAN, *et al.*, | ) | Case No. 2:90-CV-00520-KJM-DB |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| GAVIN NEWSOM, *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) | Thursday, August 10, 2023 |
| _____ | ) | 10:01 A.M. |

TRANSCRIPT OF PRE-HEARING STATUS CONFERENCE
**BEFORE THE HONORABLE KIMBERLY J. MUELLER**
**UNITED STATES CHIEF DISTRICT COURT JUDGE**

Electronic Court Recorder:      Rachel Alvarez
                                United States District Court
                                Robert T. Matsui United States
                                Courthouse
                                501 I Street
                                Sacramento, California 95814

Transcription Service By:       Dipti Patel, CET-997
                                Liberty Transcripts
                                7306 Danwood Drive
                                Austin, Texas 78759
                                (847) 848-4907
                                www.libertytranscripts.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:

For the Plaintiffs:                  Rosen Bien Galvan & Grunfeld LLP
                                     BY:  MICHAEL BIEN, ESQ.
                                          JENNY SNAY YELIN, ESQ.
                                          LISA ADRIENNE ELLS, ESQ.
                                     101 Mission Street, Sixth Floor
                                     San Francisco, California 94105


For the Defendants:                  Department of Justice
                                     Office of the Attorney General
                                     BY:  DAMON GRANT McCLAIN, ESQ.
                                     455 Golden Gate Avenue
                                     Suite 11000
                                     San Francisco, California 94102

                                     Department of Justice
                                     Office of the Attorney General
                                     BY:  ELISE OWENS THORN, ESQ.
                                     1300 I Street, Suite 125
                                     Sacramento, California 94244

                                     Hanson Bridgett LLP
                                     BY:  DAVID CASARRUBIAS, ESQ.
                                     425 Market Street, 26th Floor
                                     San Francisco, California 94105

3

1    **Sacramento, California, Thursday - August 10, 2023, 10:01 a.m.**

2              **P R O C E E D I N G S**

3                   ---oOo---

4        (Call to order of the Court.)

5            THE CLERK:  Calling Civil Case 90-520, Coleman, *et*

6    *al.*, versus Newsom, *et al.*  This is on for a pre-hearing

7    status conference.

8            THE COURT:  All right.  Appearances, please, for the

9    plaintiffs.

10            MR. BIEN:  Good morning, Your Honor.

11            Michael Bien, Lisa Ells, and Jenny Yelin for

12    plaintiffs.

13            THE COURT:  Good morning to all of you.

14            And for the defendants?

15            MR. McCLAIN:  Good morning, Your Honor.

16            Damon McClain for defendants, and I have with me

17    Elise Thorn from the Attorney General's Office and David

18    Casarrubias from the Hanson Bridgett firm.

19            THE COURT:  All right.  Good morning to each of you.

20            This is on for a pre-hearing status regarding the

21    matter set for September 29th.  Originally, the matter was set

22    and it still is set in the Court's mind to cover two critical

23    matters.  I acknowledge the late-breaking stipulation filed

24    last night at 7:01 p.m.  I did see it last evening, and I have

25    reviewed it.  I do want to talk about it.

4

1          But the two matters we're covering this morning with

2     you, and I should also make clear the Court's staff on this

3     matter is listening in and the Special Master is listening in

4     with members of his team.

5          So the two matters in this long-running civil rights

6     case brought by and on behalf of mentally-ill population

7     incarcerated in California State Prisons are the timelines for

8     transferring inmates to higher levels of care as needed, and

9     the parties had indicated they thought that issue should go

10    first in the enforcement proceedings set and then secondly,

11    staffing of mental health care professional positions at

12    levels sufficient to provide the required care.

13          And the Court for some time now has been signaling

14    it's ready to focus on this.  While the COVID-19 pandemic had

15    occasioned some delay, the case has dragged on as defendants

16    have not been able to demonstrate compliance with the court-

17    ordered remedy to satisfy the Eighth Amendment's prohibition

18    against cruel and unusual punishment in the Prison's provision

19    of mental health care.

20          I want to talk first about staffing given your

21    stipulation because staffing is still on for September 29th in

22    full for the evidentiary hearing that the parties have begun

23    to prepare for.  So let's talk about that first and then come

24    back to the transfer timelines issue in light of your

25    stipulation.  And I'll share my initial thoughts on that

5

1    stipulation with you when we get there.

2         So for context regarding staffing, it was in October

3    2017 that the Court ordered defendants to fully comply with

4    their own 2009 staffing plan as modified within one year.

5    There's a percentage requirement for vacancy rates that's in

6    effect.  The Court had planned to hold in-person proceedings

7    following the issuance of that order, but a number of things

8    have gotten in the way and that's why we're just focusing now

9    before any more time goes by.

10        There were proceedings on the October 2018

11   whistleblower report, precipitated in large part by events

12   leading up to them leaving deadlines, the need to seriously

13   consider the whistleblower's reports of inaccurate reporting

14   took significant time.  As the parties know, the Court had

15   hearings.  It ultimately issued an order data remediation is

16   still in effect.

17        The Court did continue matters until the COVID

18   pandemic began to subside.  It's not completely subsided, of

19   course, and there appears to be some flare-up in certain

20   quarters.  But following the resumption of proceedings after

21   the pandemic, I set March 31st as the date on which fines

22   would start to accrue if defendants did not meet the

23   court-ordered staffing levels.  That client schedule, as the

24   parties know, is based on the average of the maximum salary

25   for each class of mental health professional in the state's

6

1    salary schedules.

2         Just for reference, the fines are not being imposed

3    yet.  The enforcement proceedings are a way for the Court to

4    make a final decision.  But by the Court's calculation based

5    on the information defendants have provided to the Court

6    regarding staffing as of today, more than $34 million in fines

7    have accrued.  So that's a measure of the failure to meet the

8    required staffing levels.

9         The enforcement proceedings will create the record

10   on which the Court will base its decision later this year

11   regarding whether and, if required, how to enforce its

12   staffing order in particular and including whether to direct

13   the payment of the accrued fines.  The parties have

14   telegraphed to the Court their positions.  I understand the

15   defendants' position.  A contempt finding would have to come

16   first.  We're not getting to the merits of those arguments

17   today.

18        So that's context on staffing.  And we'll get to

19   housekeeping matters.  On the transfer timelines, it was in

20   April 2017 that the Court ordered defendants to come into full

21   compliance with program guide timelines for transfers.  And

22   these transfers are of mentally ill inmate patients to acute

23   and intermediate care facility inpatient programs to ensure

24   they are receiving constitutionally adequate care.

25        I set a compliance deadline of May 15th, 2017 and,

7

1    in that component of the case, directed that fines in the

2    amount of $1,000 per inmate patient per day would begin

3    accumulating May 16th, 2017.

4          There, as well, I set the matter for hearing in

5    2017, November, for consideration of findings of contempt and

6    payment of accrued fines.  But I signaled I would have vacated

7    the hearing and not imposed fines if no fines had accrued by

8    then, of course.  By September of 2017, the accrued fines as a

9    measure of non-compliance had reached $572,000.  I continued

10   indefinitely the November 3rd hearing in light of defendants'

11   appeal.  The appeal was dismissed in November 2018, mandate

12   issued in December 2018.

13         I didn't reset those proceedings due in part to the

14   whistleblower report claiming material misrepresentation of

15   critical information.  And by the time I got through with

16   that, we had run into the COVID pandemic.

17         I have required ongoing reporting here, as well.  I

18   note the information in the stipulation the last several

19   months and what appears to be a downward trend.  And certainly

20   since 2017, there have been periods of time when no fines

21   accumulated, significant periods.  I acknowledge that.  But

22   there have also been spikes.  There's a spike 2021 to 2022,

23   and I don't think that can be pegged to the COVID-19 pandemic.

24   there were exceptions the parties agreed to in light of the

25   pandemic.

8

1          At this point in time, if we take the entire period

2     of time covered by the Court's accrued fine order, the amount

3     is over $4 million, $4,240,156.  So here are my thoughts on

4     transfer timelines because I think there are unanswered

5     questions.  It's one thing if the current data, you know,

6     maybe it's a hat trick three times in a row, but it's got to

7     be a hat trick times infinity.

8          And I recognize the parties are saying they see a

9     positive trend and would like to give it six more months to

10    see if the defense can demonstrate sustainability in terms of

11    transfer timelines.  Even if I were to continue the contempt

12    proceedings, I would want to have other proceedings to keep

13    the focus on transfer timelines so the Court can closely

14    monitor what's going on and gather more information.

15         So my tentative is, well, yes, I can kick out

16    contempt proceedings but I'm not willing to completely vacate

17    any hearing on transfer timelines.  For one, I think it's

18    interconnected with staffing issues.  And it also, I believe,

19    is interconnected with bed need, and that issue is coming to

20    the Court very soon now.  I believe the matter will be teed up

21    for the Court's consideration by the beginning of September.

22         So my plan subject to hearing from you this morning

23    on the transfer timelines is this, on September 29th, we would

24    now begin with staffing and, again, we'll cover the

25    housekeeping.  The staffing is critical, remains critical.

9

1    It's not just a labor economics problem in the Court's mind.

2    There may be a labor economics component, but that's not the

3    sum of it.  I would listen carefully to the evidence

4    developed.

5            Then following the presentation of evidence on

6    staffing, we would then move to a special hearing on transfer

7    timelines.  I would ask the parties to file a joint report

8    helping me understand fully what's behind your request for a

9    continuance and why you believe there is the possibility

10    defendants can demonstrate ongoing compliance.

11            I'd like to see in that report on Page 1 for, you

12    know, executive summary for your generalist judge a bar graph

13    going back to the date I first ordered full compliance because

14    that can demonstrate trends in an easy way that we can all

15    digest.  But explain to me in detail what's going on and why

16    there is hope for ongoing compliance or virtual compliance.

17    The most recent report still shows $7,000 in fines accrued, so

18    it's not down to zero yet.

19            In terms of the monthly reports you're providing me,

20    I think those also need to include more meaningful detail,

21    this is for the defendants, explaining if a transfer can't be

22    met timely, why exactly.  Is it staffing?  Is it bed space?

23    Is it something else?  And if the numbers are so low, that

24    should not be an excessive burden.

25            So joint report, additional detail and any monthly

1    report between now and September 29th, and then the September

2    29th proceeding -- you can propose to me how why hold that

3    proceeding on timelines and what else you'd like to cover.

4    I'm assuming you're saying you don't want to present evidence,

5    but I want to also get to the bottom of the unmet bed needs

6    issue at that hearing because I think it's connected.

7            In terms of providing me with more information prior

8    to that proceeding restyled, whatever other information will

9    help me understand specific data points, for example, the

10   Atascadero numbers are very low.  Is that reflecting a policy,

11   a practice, that is part of the parties' position that these

12   numbers are on a permanent downward trend to allow ongoing

13   compliance?

14           So that's my tentative, while continuing contempt

15   proceedings for six months, have a focused hearing on transfer

16   timelines and anything else related to it.  So thoughts on

17   that, Mr. Bien?  Or whoever is speaking for the plaintiffs.

18           MR. BIEN:  No, I do think that -- we do think there

19   are issues, and it's reflected in the stipulation, that do

20   need to be addressed including why more low custody patients

21   who need ICF care are not going to Atascadero and Coalinga

22   where there are empty beds.

23           We think that -- those 100 or so or more empty beds

24   every day would alleviate tremendous pressure and, plus, it's

25   a denial of appropriate mental health care to leave someone in

1    a high-security bed when they can be functioning in a

2    low-security place.  Really, they're in a segregation kind of

3    environment, in-patient interrogation kind of environment

4    rather than in a low-custody environment.

5            And, again, we think that the LRH process is not

6    working and needs to be rethought.  And, again, these are

7    patients who are approved by custody for transfer but, as we

8    understand, clinically they're not approved.  And we think

9    that's clinically unsupportable and that DSH takes people like

10   this every day from state courts or incompetent to stand

11   trial, they take it from CCR, for MDOs, and SVPs.  Same human

12   beings, and they have the means to handle this population.

13           So, you know, we think that that is rather than

14   constructing more beds, we need to use the existing resources

15   that are there in the state hospitals and, again, this has

16   been an ongoing saga of litigation.  So we think that would be

17   -- that plus opening the inpatient high-security beds that

18   have been closed due to staffing, those are the two major

19   issues that we think led to the non-compliance.  And that's

20   why while opening these beds did alleviate the shortage now,

21   and I think that's why we think the defendants would remain in

22   compliance for the next six months, ultimately, we need to get

23   more people into DSH.

24           THE COURT:  All right.  I understand that position.

25   And I did note that language about what you had covered during

1    the six-month period, but that's not inconsistent.  If I

2    continue contempt and otherwise approve with this additive,

3    nothing I've proposed is inconsistent with that, correct?

4            MR. BIEN:  That's correct, Your Honor.

5            We think the (indiscernible) study revealed another

6    issue that needs to be addressed, which is there are several

7    hundred patients who are not going to DSH because of

8    behavioral issues, other issues.  By the way, this is the same

9    several hundred that was found earlier in this case and in the

10   Gates case.  This problem has been ongoing and known.  It's

11   not a surprise.

12           And we think -- you know, I think there's an

13   argument that DSH can take care of them but someone has to

14   take care of them.  The State has to take care of them, have

15   to find a place to take care of them.  And I think that would

16   also help address this problem because I think when people

17   receive appropriate care, they might need less in-patient care

18   over time.

19           THE COURT:  All right.  And the Special Master has

20   alerted me to that issue.  So anything else from the

21   plaintiffs?

22           MR. BIEN:  (No audible response).

23           THE COURT:  All right.  Mr. McClain, are you taking

24   the lead on this?  Any reason not to proceed as the Court has

25   proposed approving the stipulation but with that additional

1    activity?

2        MR. McCLAIN:  Thank you, Your Honor.

3        I think I understand the Court's proposal.  I don't

4    see an issue in doing those things.  So defendants are fine

5    with the Court's proposal.

6        THE COURT:  All right.  Anything to say about the

7    low census at Atascadero State Hospital, DSH Department of

8    State Hospitals?

9        MR. McCLAIN:  Well, I understand that you're

10   interested in better understanding why that is.  I know that

11   for patients who are referred to the state hospitals, you

12   know, there's an analysis that takes place and the result of

13   that is either, yes, they can transfer or, no, they can't.

14       So I think defendants have that information as to

15   why it was decided that some patients shouldn't go.

16       THE COURT:  All right.  I'll look forward to

17   receiving more information on that front.

18       On the COVID exceptions, can you -- I even had a

19   chance to go back and comb the record, but I did temporarily

20   modify program guide and transfer requirements.  Have I lifted

21   those?  Do I need to now?  What's the status?

22       I have Docket Number 6639 and 6660 as ones I might

23   check, but do you here today know off the top of your heads

24   what I should do there, if anything, or should I direct you to

25   file a special joint status report on that question?

1          MS. ELLS:  Your Honor, is the question whether you

2    have already --

3          THE COURT:  Lifted.

4          MS. ELLS:  -- lifted the --

5          THE COURT:  Yes.

6          MS. ELLS:  -- prior orders?  I believe that you

7    have.

8          THE COURT:  Okay.

9          MS. ELLS:  However, I would like an opportunity to

10   check.  Defendants can clarify, but my understanding is that

11   they have revised their policies and they're back to the

12   normal pre-COVID transfer and referral policies.  So --

13         THE COURT:  And I have blessed that.  Is that your

14   understanding, Mr. McClain?

15         MR. McCLAIN:  I would say that the transfers are

16   much more back to normal.  But --

17         THE COURT:  But in terms of the policy exceptions,

18   have I lifted everything that was in place before COVID,

19   recognizing we're living with COVID, we will be probably for

20   the rest of our lives.  But in terms of the temporary

21   exceptions while people scramble to figure out what to do,

22   have those all been lifted?

23         MR. McCLAIN:  Your Honor, we're not sure.  We would

24   have to look.

25         THE COURT:  Okay.  Meet and confer, let me know in a

1  joint statement in 14 days if there's more to clean up there.

2         All right.  I'll issue an order laying out exactly

3  what I'm expecting on transfer timelines to follow evidentiary

4  hearing on staffing with all proceedings beginning on

5  September 29th.

6         In terms of September 29th, particularly is relevant

7  to the critical staffing vacancies, I want to clarify that I

8  have established procedures and parameters for the hearing,

9  including in the order I issued November 2017, the plaintiffs'

10  referenced it, I'll clarify that in a moment, but also in

11  March, June, and July of this year.  So the critical

12  information is in Docket Numbers 5726, 7786, 7856, 7861, and

13  7872.  I'll put that in writing.  And if there are any

14  questions about what that means, you can let me know.

15         I've already provided the expert depositions on

16  staffing, shall be completed by September 14th.  I haven't

17  heard any disputes related to that.  All other discovery

18  related is to be completed by August 29th.  Again, I've heard

19  no dispute that any court needs to resolve about those issues.

20         Am I right about that?

21         MS. ELLS:  Your Honor?

22         THE COURT:  Ms. Ells?

23         MS. ELLS:  There is an issue regarding discovery at

24  this point.  We have served discovery and asked for expedited

25  responses consistent with this Court's order that we need to

1    resolve discovery by August 29th, which we interpret to mean

2    including motions to compel.

3           Defendants have refused to expedite the discovery

4    responses and have stated that they intend to take 30 days to

5    respond.  We had requested 15 days, which would have required

6    responses on Monday but defendants have not agreed.  We have

7    identified this Court's prior orders expediting discovery

8    responses in the three-judge core proceedings; the termination

9    proceedings, which were 21 and 14 days' respectively, and the

10   DSH proceedings, which were 7 days.

11          I want to emphasize that the information that we've

12   requested in discovery is necessary for our expert to consider

13   and review.  So to the extent defendants are not intending to

14   provide the information we're requesting, we need to know that

15   and bring it to the Court immediately so we can properly

16   prepare our expert and his opinion.

17          In particular, we're requesting information on how

18   much total compensation savings the state is benefitting from

19   by failing to staff all -- you know, hire and staff all of the

20   clinical positions that remain open.  And that information,

21   again, is critical to our expert and to our ability to depose

22   their expert.

23          So we would like clarification from the Court on the

24   appropriate amount of time defendants have to respond.  We

25   think it should be 15 days.

1        THE COURT:  All right.  Are you referencing a

2   particular prior order or general course of conduct in

3   previous matters?

4        MS. ELLS:  I can provide you with the ECF numbers of

5   the termination and three judge court and DSH orders, but I

6   don't have them on hand right now.

7        THE COURT:  All right.  So who's responding to this

8   for the defendants?

9        MR. McCLAIN:  I will, Your Honor.

10       THE COURT:  Uh-huh.

11       MR. McCLAIN:  So defendants simply want to have the

12  time that they're allowed under the Federal Rules to respond

13  to the written discovery.

14       THE COURT:  And so when do you plan to provide the

15  responses on your current calendar?

16       MR. McCLAIN:  Responses would be due August 28th.

17       THE COURT:  And are you unable to provide responses

18  prior to that, is that your position, or you're just standing

19  on the Federal Rules?

20       MR. McCLAIN:  I'm standing on the Federal Rules,

21  Your Honor.  I mean I can say we have been very busy.

22       THE COURT:  All right.  Well, Ms. Ells, provide by

23  the end of the day the prior orders you're relying on for --

24       MS. ELLS:  I believe Ms. Yelin --

25       THE COURT:  -- your position that there's a --

1          MS. ELLS:  -- may.

2          THE COURT:  -- shorted response period?  Ms. Yelin

3    has that?

4          MS. ELLS:  Ms. Yelin I think has those and she's --

5          THE COURT:  All right.

6          MS. YELIN:  Sure.  So in the Coleman docket, it's

7    ECF 4306, that's the order from termination; and 6600 is from

8    the DSH trial; and then Plata ECF 1294 is the 2008 three-judge

9    court trial order.

10         MS. ELLS:  And I guess I would just like to

11   emphasize that these are exigent circumstances.  I understand

12   defendants are busy, but it prejudices our ability to prepare

13   our expert and present evidence in this trial.  And those are

14   similar circumstances to what we're presented during

15   termination where there's expedited time frames.  If we don't

16   even receive a response as to whether there will be objections

17   until the 29th, there is no way that we can meaningfully meet

18   and confer and resolve that issue before the close of

19   discovery the next day.

20         THE COURT:  I think I heard the 28th, but still.

21         MS. ELLS:  Right.  I think the close of discovery is

22   the 29th, though.

23         THE COURT:  Right.  It is.  When did you propound

24   the discovery requests?

25         MS. ELLS:  It was -- I believe it was July 28th.  I

1    can check the date on that.

2              THE COURT:  And your position is those prior orders

3    just don't apply here because the Court's never made it

4    expressed?  Is that what you're saying, Mr. McClain?

5              MR. McCLAIN:  Yes, Your Honor.  I mean those prior

6    orders concerned those particular proceedings that were

7    happening at the time.

8              THE COURT:  All right.

9              MR. McCLAIN:  I would just note that plaintiffs

10   could have propounded discovery earlier than they did.  And at

11   least for one of their requests, it is rather complicated.  I

12   think we're still trying to understand exactly what it is that

13   they want, and it may be complicated and time-consuming to

14   produce a response.

15             MS. ELLS:  I would just like to note that we've

16   offered to meet and confer about clarifying and narrowing our

17   requests but have received no -- that's the first I've heard

18   that there is any complication or confusion about what we're

19   requesting and the scope.

20             THE COURT:  All right.  Well, you're directed to

21   meet and confer about this issue to at least narrow any

22   dispute if you really can't work it out.  It would appear to

23   the Court that you could propose to the Court a modest

24   extension of the discovery cutoff, still giving plaintiffs

25   sufficient time to complete expert depositions by September

1    14th and resolving the matter fairly without the Court needing

2    to issue an order with which both sides might be unhappy.

3            So meet and confer and provide a summary joint

4    status report by the close of business tomorrow, which means

5    5:00 p.m. August 11th.

6            All right.  Anything else on discovery?

7            MS. ELLS:  Not for plaintiffs, Your Honor.

8            THE COURT:  Mr. McClain?

9            MR. McCLAIN:  No, Your Honor.

10           THE COURT:  All right.  In terms of the method of

11   presenting witnesses for the evidentiary hearing on staffing

12   now, I believe the parties have agreed direct testimony by

13   declaration with cross and redirect in person.  The parties

14   have not agreed?

15           MS. ELLS:  No, Your Honor.

16           THE COURT:  I thought there was a carveout with the

17   possibility of something else, the only exception being Dr.

18   Stewart.

19           MS. ELLS:  Your Honor, most of our witnesses are

20   clients of defendants, so we cannot provide declarations or

21   prepare them.  So that's simply not possible.  We did not

22   agree to that.  Our --

23           THE COURT:  So you're saying direct.

24           MS. ELLS:  Yeah.

25           THE COURT:  Calling adverse witnesses --

1          MS. ELLS:  Correct.

2          THE COURT:  -- on direct.

3          MS. ELLS:  Correct.  So we have proposed a set

4     amount of time for each party to use as they wish.  For

5     staffing, we've estimated that five hours of court time per

6     side --

7          THE COURT:  Okay.

8          MS. ELLS:  -- would be appropriate.  And we continue

9     to think that that is, you know a procedure that has worked

10    well in this case in the past.

11         THE COURT:  Are there any witnesses who could be by

12    declaration for the plaintiffs?

13         MS. ELLS:  In our view, we do think that

14    declarations by experts would be appropriate and could make

15    sense.

16         THE COURT:  All right.  So with the carveout for

17    adverse witnesses, that's what's agreed, Mr. McClain?

18         MR. McCLAIN:  Defendants would agree that, yeah, the

19    adverse witnesses that plaintiffs call that could do their

20    either direct or cross-examination, however you want to

21    characterize that, live and on the record.

22         MS. ELLS:  Your Honor, we continue to believe that

23    all direct testimony should be live except for the experts

24    including defendants' witnesses.  We think that is the best

25    way to proceed and it has worked well in the past in this

1    case.

2              It prejudices plaintiffs to not be able to, you

3    know, prepare declarations as we would like, and it benefits

4    defendants' ability to do so.  And it also provides them

5    additional -- essentially additional testimony time that we

6    will not be receiving.

7              THE COURT:  All right.  So no exception then?

8              All right.

9              MS. ELLS:  Experts only would be our proposal.

10             THE COURT:  I don't think I've seen an exact

11   schedule of who and when, right?  So I haven't seen the names

12   of the witnesses?

13             MS. ELLS:  That's correct.

14             THE COURT:  Right.  All right.

15             All right.  Well, live testimony is preferable, and

16   I'm fine with that as the default unless the parties stipulate

17   and agree in advance to a witness, an expert for example being

18   presented on direct by declaration but otherwise the default

19   will be in person.  Understood?

20             MR. McCLAIN:  Yes, understood, Your Honor.

21             May I speak a little more to that?

22             THE COURT:  You may.

23             MR. McCLAIN:  So one of the reasons that defendants

24   thought that it was a good idea to provide declarations for

25   direct testimony is that we believe it would really help to

1    streamline and save time during the actual proceedings.

2            THE COURT:  I understood that, and I'm well familiar

3    with the method.  But, frankly, if there's any case where

4    we're going to err on the side of making the time to create

5    the right record, this is the case.

6            MR. McCLAIN:  Sure, and fair enough, Your Honor.

7            But, you know, putting in the testimony via

8    declaration, I mean not only is there no prejudice to

9    plaintiffs with defendants doing that --

10            THE COURT:  Well, plaintiffs disagree with you.

11            MR. McCLAIN:  But it gives them -- you know, I think

12    we proposed that we would produce declarations by September

13    19th.  It gives them a ten-day window to prepare for a cross-

14    examination of that testimony.

15            THE COURT:  If you can work out stipulations with

16    the plaintiffs, I'll accept that.

17            MR. McCLAIN:  Okay.

18            THE COURT:  I'm hearing they would rather go the

19    other route.  I'll refine -- I'll address this issue in an

20    order confirming procedures leading up to September 29th.

21            In terms of Dr. Stewart, I understand he is not

22    available for in-person testimony on September 29th.  Is that

23    correct?

24            MS. ELLS:  Your Honor, Dr. Stewart was only going to

25    testify in the in-patient transfer timeline issue.

1          THE COURT:  Uh-huh.  All right.

2          MS. ELLS:  So I think that --

3          THE COURT:  All right.

4          MS. ELLS:  -- is obsolete.

5          THE COURT:  Got it.  Thank you for clarifying that.

6          In terms of opening and closing, my understanding is

7     the parties do agree on the papers.  Opening on the papers,

8     closing on the papers, right?

9          MR. McCLAIN:  Yes, Your Honor.

10          MS. ELLS:  I thought the original order provided for

11     a ten-minute opening statement per side.

12          THE COURT:  I think it did.  I thought -- and I'm

13     happy to accept ten-minute opening statements.

14          MS. ELLS:  Yes, in addition to the opening briefs

15     that the parties had proposed and the Court ordered --

16          THE COURT:  Okay.

17          MS. ELLS:  -- which we had agreed -- the parties

18     have agreed those would be due on the 19th of September.

19          THE COURT:  Correct.  By noon on the 19th.

20          MS. ELLS:  And the Court has set the closing

21     briefing in lieu of closing argument.

22          THE COURT:  So each party will have the option of up

23     to ten-minute statement, opening statement to focus the

24     Court's mind in addition to filing the opening brief.  Did you

25     agree on page limits for the briefs, the Court's standard 20

1    pages max?

2              MR. McCLAIN:  That's suitable for defendants.

3              MS. ELLS:  Certainly.  And we'll meet and confer as

4    to whether we can make it shorter than that for the opening

5    brief, at least.

6              THE COURT:  All right.  Yeah, no more than 20 pages.

7              At one point in a joint report filed in March, I

8    believe the parties had indicated -- well, that was transfer

9    timelines.  So at this point, just confirm for me how much

10   time you think you need now for staffing before we move to the

11   separate proceeding on transfer timelines.

12             MS. ELLS:  Your Honor, we had proposed five hours

13   per side, which is roughly two court days.

14             THE COURT:  Two days, defendants say four.

15             MR. McCLAIN:  Let's see.

16             THE COURT:  What I would ask you to do is to meet

17   and confer and provide the Court with the detailed schedule.

18   I'm not going to hold you to the minute.  I'm not inclined to

19   put a clock on you, but I do find that when everyone focuses

20   on exactly who's being called when, often the time shrinks.

21   But, again, I'm not going to -- I mean I am going to have a

22   civil trial trailing this matter, but I'm not going to cut

23   this matter short.

24             So we will take the time needed to develop the

25   record.  So if it's really four days, then it will be four

26

1     days.

2              MR. McCLAIN:  I appreciate that.

3              THE COURT:  But then we will adjourn to at least a

4     half day on the transfer timelines issue.

5              MR. McCLAIN:  I appreciate that, Your Honor.

6              And defendants will be happy to meet and confer with

7     plaintiffs about it.  I'll just note that our time estimation

8     was based on our proposal to submit testimony via declaration,

9     which would have meant less time was needed during the

10    proceeding.  So we'll need to go back and look at that again

11    before meeting and conferring with plaintiffs.

12             THE COURT:  All right.

13             MS. ELLS:  Your Honor, we'll meet and confer about

14    all these issues --

15             THE COURT:  All right.

16             MS. ELLS:  -- and come up with a joint proposal.

17             THE COURT:  And that can be due on the Friday,

18    September 8th; noon, Friday, September 8th.

19             MS. ELLS:  Thank you, Your Honor.

20             THE COURT:  So detailed schedule.  Take account of

21    the orders I mentioned, and I'll identify again in an order

22    following this hearing.  Also, I'm going to clarify --

23    actually, I don't believe -- I think the current plan on

24    transfer timelines moots the need for me to clarify whether or

25    not the Court's statement in the November 6th, 2017 order

1    applies to the evidentiary hearing we now plan.

2              Agreed, Ms. Ells?

3              MS. ELLS:  Yes, Your Honor.

4              THE COURT:  All right.  Agreed, Mr. McClain?

5              MR. McCLAIN:  Yes, Your Honor.

6              THE COURT:  All right.  You already can tell I think

7    that order is in effect to the extent it would have any

8    applicability to (indiscernible).

9              One question, again, I'm not putting pressure on you

10   to streamline, but if there is any possibility of agreement,

11   factual stipulations.  You know, the defendants say they have

12   been in compliance with staffing requirements for certain

13   periods, so plaintiffs agree, well, let me know.  That takes

14   some creative time off the table.

15             The only other housekeeping issue, I would just --

16   you should check with the courtroom deputy closer to the

17   hearing date to see what the Court is able to provide in terms

18   of court reporters.  And if we are not in a position to

19   provide a live court reporter, then the parties need to figure

20   that out on their own.

21             That's the Court's list of housekeeping matters.

22   Anything else we haven't covered for September 29th before we

23   talk briefly about the defendants' expert tours?

24             Mr. Bien?

25             MR. BIEN:  No, Your Honor.

1          THE COURT:  Mr. McClain?

2          MR. McCLAIN:  No, Your Honor.

3          THE COURT:  All right.  On the expert tours, I did

4    suspend them.  I haven't heard anything to suggest that

5    there's discovery related to September 29th.  And so my plan

6    is to order that they remain paused pending completion of the

7    enforcement proceedings and the special hearing on transfer

8    timelines.

9          Anything to say about that, Mr. Bien?

10          MR. BIEN:  We would agree with that.  And it's

11    certainly quite burdensome to staff, but we also think there

12    should be some -- perhaps if defendants want to continue with

13    the tours, they be required to take a motion or something so

14    that we can better understand what the tours are, what their

15    purpose is and set the ground rules so we don't have this kind

16    of dispute in the future.

17          THE COURT:  All right.  The defendants could bring

18    such a motion.  I think all attention should be on the

19    September 29th proceedings at this point.

20          Anything else to say, Mr. McClain?

21          MR. McCLAIN:  Well, Your Honor, an order pausing the

22    tours for a substantial period like that would be very

23    prejudicial to defendants and their experts.  As Dr. Falcon

24    stated in her declaration, any substantial pause or delay in

25    this project risks defendants losing this team of experts that

1    VRJS/Falcon worked very hard to put together.

2            It was this specific team of experts that defendants

3    wanted to work on this project.  But these are busy

4    professionals who carved out a certain amount of time to work

5    on this, and they can't just wait around.

6            THE COURT:  The Court is not ruling on a motion

7    explaining that until -- I have not heard that the tours are

8    generating any discovery relevant to September 29th.  And this

9    case is too old with too long a period of noncompliance in

10   critical areas for there to be this major distraction leading

11   up to September 29th based on what the Court sees.

12           So minds need to be focused on September 29th and

13   what will be a continued contempt hearing with transfer

14   timelines.  So if you come forward with a motion that explains

15   how the proper focus can be kept on where the Court has

16   identified the need for compliance, or if you can work out

17   some agreement with the plaintiffs, then I'll reconsider.  But

18   at this point in time, unless or until I order otherwise, the

19   tours remain suspended.

20           MR. McCLAIN:  Could I ask a clarification, Your

21   Honor?

22           THE COURT:  You can ask.

23           MR. McCLAIN:  Thank you.

24           So you're saying paused until after the September

25   29th proceeding?

1          THE COURT:  That in the Court's mind is key.  If

2     there's not a motion by which the Court has granted the

3     resumption of the tours or if the parties have not reached

4     agreement on the parameters of the tours, then we'll revisit

5     that at the end of the proceedings beginning on September

6     29th.

7          So I'll ask for an update on the defendants' plans

8     and whether or not there's any agreement after we conclude our

9     discussion about transfer timelines.  Because it appears the

10    dispute may continue if you simply resume once those

11    proceedings are done.

12          MR. McCLAIN:  Okay, Your Honor.

13          THE COURT:  All right.  Anything else we need to

14    discuss today, Mr. Bien?

15          MR. BIEN:  No, Your Honor.

16          THE COURT:  Mr. McClain?

17          MR. McCLAIN:  No, Your Honor.

18          THE COURT:  All right.  I'll issue an order, and

19    then I'll see you beginning on September 29th.

20          MR. McCLAIN:  Your Honor, will the order on the

21    tours, will that be a written order?

22          THE COURT:  Yes.

23          MR. McCLAIN:  And --

24          THE COURT:  It will be brief.  Well, my primary

25    question today was does this at all relate to enforcement

1    proceedings starting on September 29th.  It's they don't.

2              MR. McCLAIN:  Okay.

3              THE COURT:  So --

4              MR. McCLAIN:  And I think --

5              THE COURT:  -- it will be very brief.

6              MR. McCLAIN:  And I think I know the answer to this

7    question, but would the Court stay that order so that

8    defendants could seek review?

9              THE COURT:  No, I would not, but you can seek

10   review.  You know well how to do that.

11             All right.  We're in recess.

12        (Proceedings adjourned at 10:46 a.m.)

13                          ---o0o---

14

15              **C E R T I F I C A T E**

16        I, DIPTI PATEL, court-approved transcriber, certify that

17   the foregoing is a correct transcript from the official

18   electronic sound recording of the proceedings in the above-

19   entitled matter.

20

21             *Dipti Patel*

22   _____

23   DIPTI PATEL, CET-997

24   LIBERTY TRANSCRIPTS                 Date: August 11, 2023

25