Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:   925-746-8460
Facsimile:    925-746-8490
Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520- KJM-DB |
|---|---|
| Plaintiffs, | **DEFENDANTS' OPENING TRIAL BRIEF** |
| v. | Date:      September 29, 2023 |
| GAVIN NEWSOM, et al. | Time:      10:00 a.m. |
| | Location: Courtroom 3, 15th Floor |
| Defendants. | Judge:    Hon. Kimberly J. Mueller |

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................1

I.      STATEMENT OF FACTS .............................................................................4

II.     ADMISSIONS/STIPULATIONS .................................................................7

III.    SUMMARY OF POINTS OF LAW .............................................................7

     A.     Applicable Legal Standards for Civil Contempt Proceedings. ...................7

     B.     The Court's notice to Defendants of possible sanctions made clear that the sanctions were civil *coercive* in nature, thereby requiring an adequate opportunity to purge. ...............................................................................9

     C.     The burden of proof is on Plaintiffs, as the real parties in interest, to show by clear and convincing evidence that Defendants violated a specific and definite order of the Court. ...............................................................9

     D.     Defendants will assert various defenses that preclude a finding of contempt..........10

           1.     Defendants are in compliance with various provisions of the 2009 Staffing Plan. ...................................................................................11

           2.     Defendants have been in substantial compliance with certain requirements of the 2009 Staffing Plan.........................................12

           3.     Compliance the 2009 Staffing Plan—even at 90% fill rates—is impossible in the current labor market, but Defendants have taken all reasonable steps to alleviate staffing vacancies. ....................13

           4.     The Court cannot impose civil coercive contempt sanctions predating an adjudication of contempt and must afford Defendants an opportunity to purge. .............................................................16

     E.     The November 6, 2017 Order Is Inapplicable to These Proceedings.......................16

IV.    CONCLUSION .............................................................................................17

V.     CERTIFICATION OF ORDERS REVIEWED ...............................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*CBS Broadcasting Inc. v. FilmOn.com, Inc.,*
   814 F.3rd 91, 102 (2nd Cir. 2016) .......................................................................................... 16

*F.T.C. v. Affordable Media,*
   179 F.3d 1228 (9th Cir. 1999) ....................................................................................... 9, 10, 11

*Gen. Signal Corp. v. Donallco, Inc.,*
   787 F.2d 1376 (9th Cir. 1986) ............................................................................................... 10

*Int'l Union, United Mine Workers of America v. Bagwell,*
   512 U.S. 821 (1994) ................................................................................................... 8, 9, 16

*Jeff D. v. Otter,*
   643 F.3d 278 (9th Cir. 2011) ................................................................................................. 12

*Kelly v. Wengler,*
   822 F.3d 1085 (9th Cir. 2016) ............................................................................................... 10

*Labor/Community Strategy Center, et al. v. Los Angeles Metropolitan Transp.*
   *Authority,*
   564 F.3d 1115 (9th Cir. 2009) ......................................................................................... 10, 11

*Maggio v. Zeitz,*
   333 U.S. 56 (1948) ................................................................................................................ 10

*Milliken v. Bradley,*
   433 U.S. 267 (1977) ................................................................................................................ 8

*N.L.R.B. v. Trans Ocean Export Packing, Inc.,*
   473 F.2d 612 (9th Cir. 1973) ......................................................................................... 10, 11

*Sekaquaptewa v. MacDonald,*
   544 F.2d 396 (9th Cir. 1976), cert. denied, 430 U.S. 931 (1977) ....................................... 8, 10

*Shillitani v. U.S.,*
   384 U.S. 364 (1966) ................................................................................................................ 7

*Shuffler v. Heritage Bank,*
   720 F.2d 1141 (9th Cir. 1983) ............................................................................................ 7, 8

*Singh v. Holder,*
   649 F.3d 1161 (9th Cir. 2011) ............................................................................................... 10

*Sophanthavong v. Palmateer,*
   378 F.3d 859 (9th Cir. 2004)................................................................................. 10

*Spallone v. U.S.,*
   493 U.S. 265 (1990) ............................................................................................. 8

*Stone v. City and County of San Francisco,*
   968 F.2d 850 (9th Cir. 1992)................................................................................. 10

*U.S. v. Ayres,*
   166 F.3d 991 (9th Cir. 1999)............................................................................ 10, 11

*U.S. v. City of Yonkers,*
   856 F.2d 444 (2nd Cir. 1988)................................................................................ 8

*U.S. v. Drollinger,*
   80 F.3d 389 (9th Cir. 1996).................................................................................. 11

*U.S. v. Rylander,*
   460 U.S. 752 (1983) ............................................................................................. 10

*Whitcomb v. Chavis,*
   403 U.S. 124 (1971) ............................................................................................. 8

**Other Authorities**

"Agreement to Resolve the Department of Justice's Investigation of Hampton
   Roads Regional Jail," ¶ 145(a), Available at
   https://www.justice.gov/opa/pr/justice-department-reaches-proposed-consent-
   decree-resolve-hampton-roads-regional-jail ........................................................ 11

# INTRODUCTION

At issue in these proceedings is whether the State has failed to comply with this court's 90% staffing mandate across five mental health classifications – psychiatrists, psychologists, clinical social workers, medical assistants, and recreation therapists – and if so, whether compliance is impossible or whether the State has taken all reasonable measures to address staffing shortages. The evidence will show that the State has met the court-imposed 90% fill rate for various classifications at various points in time – and in many instances, for sustained periods of time and well above the 90% threshold. The evidence will also show that for those classifications that have fallen short, compliance is impossible under the current context and the State has taken every reasonable effort to improve those fill rates through a plethora of measures designed to improve recruitment and retention.

But maintaining a 90% fill rate is no easy task, particularly when viewed in context: there is a well-documented nationwide staffing shortage among mental health professionals. Indeed, recruitment and retention are complex issues, not easily resolved by any one solution. The evidence will show that salary and other financial incentives are an important component, but not the panacea to vacancy rates. In fact, CDCR salaries among some of the classifications at issue already *exceed* those offered by community providers—further demonstrating that money is not the only factor at play. Recruitment and retention are driven by a number of other factors, including retirement, benefits, commute, and quality of life, among others.

Nonetheless, Defendants will show that the State has taken and is taking significant steps to further improve monetary incentives and working conditions. Just this month,  the State committed to raise salaries for each of the classifications that are the subject of these proceedings. These collective bargaining agreements were overwhelmingly approved by the member clinicians, ratified by the Legislature, and signed by the Governor. In addition, the State is currently working to quickly implement telepsychology and telesocial work (collectively, including telepsychiatry which CDCR already uses, telemental health) across CDCR's Mental Health Services Delivery System. CDCR anticipates that expansion of its telemental health program will directly improve mental health staffing vacancy rates and make CDCR more competitive with community

DEFENDANTS' TRIAL BRIEF

1  employers (while, most importantly, improving access to care in a manner that comports with

2  community standards and best practices). Indeed, the telepsychiatry program is popular among

3  clinicians and there is a waitlist of qualified candidates who want these coveted positions.

4           These developments add to the State's significant and ongoing efforts to improve

5  recruitment and retention among CDCR's mental health clinicians at a time of national scarcity.

6  Defendants will show that they regularly organize mental-health-targeted hiring events, held at

7  locations central to the communities near the hiring institutions. These events help expand

8  awareness of career pathways within the institutions, increase the candidate pipeline, and facilitate

9  convenient and immediate hiring. These events also streamline the hiring process and allow

10  candidates to take a civil service exam onsite, apply for vacancies, interview, accept a conditional

11  employment offer, get fingerprinted, and complete pre-employment requirements in a single day.

12  Thirteen of these events were held in 2022, and nine have been held so far in 2023. As a result of

13  these events, 22 providers (psychologists, clinical social workers, and recreation therapists) have

14  started work at CDCR with an additional 8 with a future start date. CDCR also engages in

15  recruitment and marketing outreach to niche associations and professional associations for each

16  classification, and partners with educational entities to promote correctional health care career

17  opportunities to alumni and graduating students. CDCR has also expanded its recruitment and

18  retention bonuses to include psychologist and clinical social worker classifications (in addition to

19  psychiatrist classifications) providing care onsite. CDCR is also able to offer salaries above the

20  applicable minimum salary rate for candidates with extraordinary qualifications, provides

21  relocation reimbursement assistance, and promotes student loan forgiveness programs. In short,

22  improving recruitment and retention is a continuing and ongoing effort and the evidence will show

23  that CDCR is constantly evaluating and adjusting its efforts in this area and has done so for years

24  when other classifications were more difficult to fill.

25           The evidence will also show that, when these efforts fall short and line-staff positions

26  become vacant because of resignations, retirements, or extended leave, CDCR makes every effort

27  to fill those positions using registry providers to ensure patients are receiving adequate care and as

28  a bridge to hiring civil service staff. CDCR has entered into a registry network contract with

Management Solutions that provides a network of different registry vendors to provide mental healthcare and medical registry services. Depending on the position to be filled, Management Solutions has 30 or 45 days to submit a provider. CDCR monitors this process closely to ensure positions are timely filled. But sometimes even CDCR's contract registry provider cannot fill positions due to a lack of providers that is worse in some regions in California than in others, and because many other employers are offering telework opportunities which many registry providers are choosing over onsite work.

These and many other measures that Defendants have taken over the years and continue to implement have been successful, but staffing is a dynamic issue and factors influencing recruitment and retention do not remain static. For instance, whereas the combined psychiatrist fill rate remained below the 90% threshold for years (from at least 2013 through 2020), it has stayed above 82% since January 2021, and has mostly hovered around the 90% threshold during that time. Conversely, psychology positions were consistently filled above 84%, and usually above or around 90% for eight years, from 2013 until June 2021. The fill rates among psychology positions, however, have fallen since then, demonstrating the challenges inherent in attaining 90% fill rates across all classifications at all times. Nonetheless, Defendants continue to adapt to this ever-changing dynamic by taking every reasonable measure to address issues as they arise.

In short, Defendants will present evidence at the staffing contempt hearing demonstrating the complex nature of mental health staffing, their compliance or substantial compliance with this Court's 90% fill rate, and their extensive and reasonable efforts to address myriad and universal staffing challenges and improve staffing fill rates. Considering these ongoing efforts and forthcoming measures, it would be a gross abuse of this Court's discretion to hold the State in contempt and impose in excess of $40 million in fines when Defendants are in substantial compliance with staffing requirements and have taken all reasonable efforts to improve staffing. Nor is contempt appropriate where, as here, less intrusive measures exist and are currently in the process of being implemented.

/ / /

/ / /

# I.   STATEMENT OF FACTS

This proceeding concerns staffing vacancy rates among CDCR psychiatrists, psychologists, clinical social workers, recreation therapists, and medical assistants. In the 2009 Staffing Plan setting forth the ratios for CDCR's mental health clinicians, Defendants cautioned that they:

> [D]o not concede that the proposed staffing and services are constitutionally required, nor do they believe that this Plan would satisfy the Prison Litigation Reform Act's requirements that prospective relief be narrowly drawn, extend no further than necessary to correct the alleged violation of the federal right, and be the least intrusive means necessary to correct the alleged violation.  Further, by creating this Plan, *the Defendants make no representations that ... CDCR will be able to recruit and retain staff to meet the Plan's goals.  Recruitment and retention are significant issues for the entire healthcare industry, and CDCR is not immune from that reality*.

(ECF No. 3693, emphasis added.) Notwithstanding Defendants' stated concerns relating to the recruitment and retention of the substantial number of mental health providers required by the ratios in the 2009 Staffing Plan, over time Defendants have been ordered to fill these allocated positions at a rate of not less than 90%.

Over the years, CDCR has undertaken extraordinary and extensive efforts to recruit and retain mental health providers to work in its institutions and treat the *Coleman* class. The evidence will show that included among these efforts are:

- Increased salaries;
- Promotion of student loan forgiveness programs;
- Pay differentials;
- Recruitment and retention bonuses;
- Salaries above minimum salary rate to qualified candidates;
- Relocation assistance;
- On-site dual appointment opportunities;
- Creating more opportunities for advancement for psychiatrists;
- Visa support for both non-citizen and non-permanent resident status;
- Recruitment and marketing outreach to niche professional associations for each classification;
- Partnership with educational entities to promote correctional health care opportunities to alumni and graduating students;
- Targeted conference attendance where current mental health staff speak directly with prospective candidates;
- Geo-targeting through direct mail and email campaigns;
- Nearly two dozen multi-day fully comprehensive hiring events targeting mental health providers in communities close to CDCR institutions since 2022;
- Contracted with a national leader in clinical recruitment; and
- Contract with online employment platforms targeting clinicians.

Additionally, the evidence will show that when CDCR is unable to fill vacancies with civil servants, it hires registry providers to fill vacant roles. Indeed, in fiscal years 2021-2022 and 2022-2023, CDCR spent nearly $65 million and $80 million, respectively, solely on mental health registry staff.

Most recently, CDCR entered into new labor contracts with the unions representing each of the five classifications at issue.[1] The evidence will show that these agreements include a variety of financial incentives which should further increase recruitment and retention of those providers. Negotiated financial incentives include general salary increases, pay differentials, additional caseload compensation, increased maximum salary ranges, special salary adjustments, and bonus payments for qualified employees.

As a result of its extraordinary efforts, CDCR has met and often exceeded the Court's staffing requirements. For instance, the evidence will show that psychologist positions remained filled above 90% from March 2017 through March 2019 (when the rate dropped to just 89% for several months before crossing the 90% threshold again from July 2019 through October 2019). Similarly, the fill rate among clinical social worker classifications exceeded 90% from April 2014 through August 2021 and even rose as high as 107%, save for two months in 2017 when it dipped to 89%. Indeed, the clinical social worker fill rate even exceeded 100% from July 2018 through October 2019. Many times, when fill rates did not reach the 90% threshold, they hovered just below 90%. For instance, recreation therapist positions have been staffed at no less than 82% from August 2016 through December 2022 and were even staffed above 100% from October 2019 through June 2021. And psychiatry positions were staffed at or above 84% since September 2020 apart from a brief dip to 82% in early 2023. Since the Court's February 28, 2023 order, CDCR has been compliant with the Court's 90% fill rate requirement in the following classifications over the following periods: staff psychiatry positions (March through June 2023), recreation therapist positions (March through June 2023), and supervisor clinical social workers (June 2023). The

---

[1] The contracts with UAPD (representing psychiatrists), AFSCME (representing psychologists, recreation therapists, and clinical social workers), and SEIU (representing medical assistants) were ratified by their members and the legislature and signed by the Governor on September 13, 2023.

point is, fill rates fluctuate over time, reflecting changes in the workforce dynamic, larger macro-economic forces, and updates to allocations, which are driven by changes in the MHSDS patient census. Indeed, CDCR is not immune to national labor staffing shortages that reduce the pool of qualified provider candidates and increase competition with community healthcare employers.

The evidence will also show that there is currently a national mental health provider shortage linked to an increased demand for mental health services since the onset of the COVID-19 pandemic, related burnout, and an aging workforce. Despite the tremendous effort and resources dedicated to filling vacant positions, this shortage limits CDCR's ability to consistently meet the Court's 90% fill rate threshold in all classifications.

The evidence will also show that offering telework is one additional way to meet contemporary demands of potential provider candidates, expand the pool of candidates, and compete with community employers. Since at least 2013, CDCR has used telepsychiatry to mitigate the shortage of in-person psychiatrists.  The evidence will show the program has been a success. Staff psychiatry is the one classification where Defendants have more recently enjoyed sustained actual and substantial compliance with the 2009 order.  In fact, there are so many applicants for telepsychiatry roles offered by CDCR that it has had to turn away or waitlist qualified candidates. Yet, Defendants' attempt to expand the use of telepsychiatry was recently rejected by the Court at Plaintiffs' urging. And Defendants' proposed use of telepsychology and telesocial work has likewise met some resistance from Plaintiffs. In sum, the evidence will show CDCR is currently constrained and unable to fully take advantage of the most powerful tools at its disposal for remedying vacant mental health staffing positions. Moreover, the evidence will show that the CDCR's use of telemental health is entirely consistent with scientific literature, field expertise, and even the explicit wishes of *Coleman* class members who would benefit from expanded access to telemental health care.

Defendants anticipate that Plaintiffs' expert will claim that there is no economic labor shortage among psychiatrists or psychologists in California and that CDCR's staffing vacancy challenges for in-person mental health providers can be solved very simply by increasing wages. In his report, Plaintiffs' expert estimates the increase in wages needed to do so is in the range of

57% to 286% for at least one classification. However, during his deposition, Plaintiffs' expert refused to opine whether it would be reasonable for CDCR to do so. Further, he does not have an opinion as to how large a wage increase is needed to sufficiently increase staffing for any of the five categories of mental health professionals at issue, and in his opinion the only way to find out is trial and error—namely, offer the highest salary possible and see what happens. But as set out above, raising compensation is already among the many efforts to recruit and retain mental health providers that CDCR has employed.

In addition to the past efforts described above, CDCR is in the process of implementing newly bargained for financial incentives as well as rolling out telepsychology and telesocial work—all important and reasonable measures to address mental health staffing vacancies. Based on her extensive work and analysis, Defendants' expert has found that there is no guarantee that CDCR will be able to significantly enhance the number of mental health providers it employs simply through salary adjustment or other monetary compensation. In her opinion, contrary to the opinion of Plaintiffs' expert, there is a shortage of mental health providers nationally and in California. In light of prevailing labor market conditions and compensation levels, in sum, CDCR will show it has taken reasonable measures to meet mandated staffing levels and maximum vacancy rates among the classifications of mental health providers at issue.

## II.     ADMISSIONS/STIPULATIONS

The parties are in the process of meeting and conferring to present a set of stipulated and uncontested facts. Defendants anticipate filing this set of stipulated facts with the Court on or before September 25, 2023.

## III.     SUMMARY OF POINTS OF LAW

### A.     Applicable Legal Standards for Civil Contempt Proceedings.

Courts have the "inherent power to enforce compliance with their lawful orders through civil contempt" where a person "willfully disobeys a specific and definite order requiring him to do or to refrain from doing an act." *Shillitani v. U.S.*, 384 U.S. 364, 371 (1966); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir. 1983). Civil contempt proceedings are generally designed to compensate or coerce a party to act when that party has failed to take "'all the

1    reasonable steps within [its] power to insure compliance with the [court's] order.'" *Shuffler*, 720

2    F.2d at 1146-1147, *quoting Sekaquaptewa v. MacDonald*, 544 F.3d 396, 406 (9th Cir. 1976); *see*

3    *also Bagwell*, 512 U.S. at 827-829. Here, Defendants only address civil coercive contempt as the

4    Court has not provided any notice that the proceedings relate to civil *compensatory* contempt, and

5    has also expressly stated that the proceedings are not criminal in nature.[2] *See* ECF No. 7872 at

6    2:22-24; *see also*, *e.g.*, ECF Nos. 5711 ("the court recently issued an enforcement order intended

7    to bring defendants into full and permanent compliance"), 7742 (referencing imposition of

8    "monetary sanctions to compel compliance with the court's orders on staffing").

9         However, a court's remedial powers "are not unlimited." *Whitcomb v. Chavis*, 403 U.S.

10   124, 161 (1971). As the Supreme Court has recognized, "'in selecting contempt sanctions, a court

11   is obliged to use the least possible power adequate to the end proposed.'" *Spallone v. U.S.*, 493

12   U.S. 265, 276 (1990), quoting *U.S. v. City of Yonkers*, 856 F.2d 444, 454 (2nd Cir. 1988) (internal

13   quotations omitted). Indeed, "'the federal courts in devising a remedy must take into account the

14   interests of state and local authorities in managing their own affairs, consistent with the

15   Constitution.'" *Spallone*, 493 U.S. at 276, quoting *Milliken v. Bradley*, 433 U.S. 267, 280-81

16   (1977).

17        In issuing a finding of civil coercive contempt, courts must give the contemnor the

18   opportunity to purge its contempt—*i.e.*, the opportunity for the contemnor to avoid the fines by

19   coming into compliance with the court's order. *Bagwell*, 512 U.S. at 829. Indeed, the opportunity

20   to purge is essential, and has been described as a choice the contemnor has the liberty to make:

21   "[T]he contemnor is able to purge the contempt and obtain his release by committing an

22   affirmative act, and thus carries the keys of his prison in his own pocket." *Id.* at 828 (internal

23   quotations omitted). Accordingly, a Court cannot impose monetary civil coercive sanctions of any

24   amount without first making the requisite contempt finding. *See id.* at 833-34 (holding that summary

25

26   [2] Notwithstanding, because these proceedings involve alleged out-of-court disobedience to a
     complex injunction requiring elaborate and reliable fact finding, Defendants do not waive their
27   right to criminal procedural protections including that any contempt be tried to a jury and proved
     beyond a reasonable doubt. *See Int'l Union, United Mine Workers of America v. Bagwell*, 512
28   U.S. 821, 833-34 (1994).

1  adjudications of indirect contempt (*i.e.* those that take place outside of court) are improper, especially

2  those involving "out-of-court disobedience to complex injunctions").

**B.      The Court's notice to Defendants of possible sanctions made clear that the sanctions were civil *coercive* in nature, thereby requiring an adequate opportunity to purge.**

5       In the Court's April 19, 2017 Order, after laying out the relevant legal standards for

6  contempt—including authority stating that where a fine is not compensatory, it is civil only if the

7  contemnor is afforded the opportunity to purge—the Court provided Defendants with the

8  following notice:

> In light of the foregoing principles, the court now notifies defendants that the provisions of this order requiring them to come into full and permanent compliance . . . will be enforceable by civil contempt proceedings, imposition of monetary sanctions to *coerce* compliance.

12  ECF No. 5610 at 9:26-10:2, emphasis added. While the April 2017 order related to the issue of

13  transfer timelines, the Court referenced this order in its October 10, 2017 order regarding staffing.

14  *See* ECF No. 5711 at 27:25-27. The Court has also subsequently referenced the imposition of

15  "monetary sanctions to *compel* compliance with the court's orders on staffing, among other

16  topics." ECF No. 7742 at 3:1-3, emphasis added. Accordingly, the nature of the sanctions

17  contemplated in the Court's contempt proceedings regarding staffing can only be understood to be

18  civil coercive. *See also* ECF No. 7916 at 2:1-6 (referencing orders that established procedures and

19  parameters for staffing contempt proceeding and citing as one of those orders ECF No. 5726); *see*

20  *also* ECF No. 5726 at 2:15-16 (citing ECF No. 5610 and stating: "By its terms, the [Court's

21  contempt] order is 'enforceable by civil contempt proceedings and, if necessary, imposition of

22  monetary sanctions to *coerce* compliance.'" Emphasis added.).

**C.      The burden of proof is on Plaintiffs, as the real parties in interest, to show by clear and convincing evidence that Defendants violated a specific and definite order of the Court.**

25       "The standard for finding a party in civil contempt is well settled: The moving party has

26  the burden of showing by clear and convincing evidence that the contemnors violated a specific

27  and definite order of the court." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).

28  Clear and convincing evidence requires "more than proof by a preponderance of the evidence and

1    less than proof beyond a reasonable doubt." *Singh v. Holder*, 649 F.3d 1161, 1168 (9th Cir. 2011).

2    Evidence may only be considered "clear and convincing" if it demonstrates that the factual

3    contentions are "highly probable." *Sophanthavong v. Palmateer*, 378 F.3d 859, 866 (9th Cir.

4    2004). If the Court finds by clear and convincing evidence that the contemnors violated a specific

5    and definite order, the burden then shifts to the contemnors to demonstrate why they were unable

6    to comply. *F.T.C.*, 179 F.3d 1239.

7             If the burden is properly shifted to the contemnors, the contemnors may assert a present

8    inability to comply with the court's order. *See Maggio v. Zeitz*, 333 U.S. 56, 75-76 (1948). "Where

9    compliance is impossible, neither the moving party nor the court has any reason to proceed with

10   the civil contempt action." *U.S. v. Rylander*, 460 U.S. 752, 757 (1983). The burden is on the

11   defendant to show "categorically and in detail" why he is unable to comply, or what defenses may

12   excuse some level of noncompliance. *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d

13   612, 616 (9th Cir. 1973); *U.S. v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999). Similarly, a party in

14   violation of a court order may avoid civil contempt sanctions by "showing it took *all* reasonable

15   steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016), emphasis

16   in original; *see also Stone v. City and County of San Francisco*, 968 F.2d 850, 856-857 (9th Cir.

17   1992) ("This Circuit's rule with regard to contempt has long been whether the defendants have

18   performed 'all reasonable steps within their power to insure compliance' with the court's orders"),

19   citing *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976), cert. denied, 430 U.S. 931

20   (1977).

21         **D.**    **Defendants will assert various defenses that preclude a finding of contempt.**

22            Substantial compliance with a court order is a defense to an action for civil contempt. *Gen.*

23   *Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). "If a violating party has taken

24   'all reasonable steps' to comply with the court order, technical or inadvertent violations of the

25   order will not support a finding of civil contempt." *Id.* An analysis of substantial compliance

26   requires more than "simply count[ing] the number of technical deviations from the decree."

27   *Labor/Community Strategy Center, et al. v. Los Angeles Metropolitan Transp. Authority*, 564 F.3d

28   1115, 1122 (9th Cir. 2009). Instead, it requires a "holistic view of all the available information,"

1  including whether compliance was "substantial, notwithstanding some minimal level of

2  noncompliance." *Id.* In short, and as the United States' Department of Justice has agreed in a

3  recent consent decree it authored, "substantial compliance" equates to "material compliance with

4  the components of the relevant provision." ("Agreement to Resolve the Department of Justice's

5  Investigation of Hampton Roads Regional Jail," ¶ 145(a) at p. 25.)[3]

6       A party's inability to comply with a judicial order also constitutes a defense to a charge of

7  civil contempt. *F.T.C.*, 179 F.3d at 1239; *U.S. v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999). To

8  assert an "impossibility" defense, a party must show "'categorically and in detail'" why it is

9  unable to comply with the Court's order. *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d

10  612, 616 (9th Cir. 1973); *F.T.C.*, 179 F.3d at 1241. A court should "'weigh all the evidence

11  properly before it determines whether or not there is actually a present ability to obey.'" *Ayres*,

12  166 F.3d at 994, quoting *U.S. v. Drollinger*, 80 F.3d 389 (9th Cir. 1996).

13       **1.    Defendants are in compliance with various provisions of the 2009
14  Staffing Plan.**

15       Defendants will produce evidence showing they are in compliance with certain

16  requirements of the 2009 Staffing Plan (at the requisite 90% level), notwithstanding previous

17  periodic noncompliance. Ensuring a 90% fill rate across all classifications is a challenging,

18  constantly evolving endeavor and each of the five classifications has had historical periods of

19  compliance.

20       With respect to historical compliance with psychiatry positions, Defendants will present

21  evidence demonstrating that psychiatry positions in the aggregate historically achieved a 90% fill

22  rate for much of 2021, and the fill rate has since hovered closely to 90% since that time.

23  Psychology positions maintained a 90% fill rate or exceeded that rate for many years during the

24  period of 2014 through 2021. Combined social worker positions maintained a 90% fill rate or

25  above for over seven consecutive years—from April 2014 through January 2022. Medical

26

27  [3] Available at https://www.justice.gov/opa/pr/justice-department-reaches-proposed-consent-
28  decree-resolve-hampton-roads-regional-jail, last accessed Sept. 17, 2023

1    assistant positions were filled at 90% or above from March 2021 through June 2021. And

2    recreation therapists have maintained a 90% or above fill rate for much of the period from 2015

3    through December 2022. This historical data shows how compliance varies over time, and

4    demonstrates the constantly shifting challenges associated with maintaining the high levels of staff

5    demanded by this Court's orders.

6         More recently, and most relevantly, since the Court's February 28, 2023 order, CDCR has

7    been compliant with the Court's 90% fill rate requirement in the following classifications over the

8    following periods: staff psychiatry positions (March through June 2023), recreation therapist

9    positions (March through June 2023), and supervisor clinical social workers (June 2023). There

10   can be no finding of contempt with respect to the staffing of these positions during these

11   referenced time periods.

         **2.    Defendants have been in substantial compliance with certain**
         **requirements of the 2009 Staffing Plan.**

12

13

14        Defendants will produce evidence showing they have been in substantial compliance with

15   certain requirements of the 2009 Staffing Plan (at the requisite 90% level), notwithstanding

16   previous periodic noncompliance. "The status of compliance in light of the governing standards

17   require overall attention to whether the larger purposes of the decrees have been served." *Jeff D. v.*

18   *Otter*, 643 F.3d 278, 288 (9th Cir. 2011). Defendants need only be in substantial compliance with

19   this Court's order requiring 90% compliance; meaning, something less than the 90% threshold.

20   Here, Defendants will present evidence demonstrating they have substantially complied with the

21   Court's order setting the 90% staffing threshold across all five classifications at various points in

22   time.

23        Specifically, Defendants will demonstrate that, since the Court issued its enforcement

24   order on February 28, 2023, Defendants have been in substantial compliance with the 90% fill rate

25   for the follow classifications (excluding those listed above as in full compliance) during the

26   following time periods:

27   / / /

28   / / /

| Classification | Period of Substantial Compliance |
|---|---|
| Line Staff Psychiatry Positions | February 2023 |
| Senior Psychology Positions (Supervisor) | February 2023, March 2023, April 2023, May 2023, June 2023 |
| Senior Psychology Positions (Specialist) | February 2023, March 2023, April 2023, May 2023, June 2023 |
| Recreation Therapists | February 2023 |
| Chief Psychiatry | February 2023, March 2023, April 2023 |
| Chief Psychologist | February 2023, March 2023, April 2023 |
| Supervisor Clinical Social Worker | February 2023, March 2023, April 2023, May 2023 |
| Clinical Social Worker Positions | February 2023, March 2023, April 2023, May 2023, June 2023 |
| Medical Assistant Positions | February 2023, March 2023, April 2023, May 2023, June 2023 |

In addition, Defendants will show they have been in substantial compliance with the 90%

fill rate threshold at various other times before the Court's February 28, 2023 Order,

demonstrating again that staffing fill rates are a constantly moving target. For instance, Defendants

will present evidence demonstrating substantial (or actual) compliance with the 90% fill rate

threshold for combined psychology positions from 2013 until approximately 2021, when the rate

started to fall. Similarly, Defendants will show that they have substantially complied with the 90%

fill rate requirement among combined clinical social worker positions consistently from

approximately 2013 until mid-2022, when the rate began to drop. For these classifications that

have historically experienced extended periods of substantial or actual compliance followed by a

recent downturn in fill rates, Defendants will show they are taking every reasonable step to

improve recruitment and retention among those classifications, including through implementation

of a statewide telepsychology and telesocial work program.

> **3.      Compliance the 2009 Staffing Plan—even at 90% fill rates—is impossible in the current labor market, but Defendants have taken all reasonable steps to alleviate staffing vacancies.**

Defendants will produce evidence showing that there is a well-documented collective

nationwide shortage of mental health professionals, as well as a shortage of psychiatrists in

1   particular that is projected to worsen. In fact, there were no psychiatrists in more than half of U.S.

2   counties according to a 2018 American Association of Medical Colleges article. There are

3   documented difficulties in the hiring and retention of mental health providers among California

4   public sector employers and Kaiser Permanente, as well as additional evidence that indicates that

5   such difficulties are not limited to CDCR. The COVID-19 pandemic has also likely caused pre-

6   existing recruitment and retention problems to worsen among licensed professions that provide

7   mental health care and has exacerbated correctional staffing shortages, including among mental

8   health care providers working in correctional settings.

9        At the same time, Defendants' expert will testify that demand for mental health services

10   continues to grow. One in five adults in the United States suffers from some form of mental illness

11   and the COVID-19 pandemic led to a documented increase in anxiety and depression among U.S.

12   adults. Demand for mental health care continues to grow as recognition of mental health needs

13   increases. Less than half of those with a mental illness in the U.S. received mental health services

14   in 2020, and 77% of counties across the nation have severe shortages of mental health providers.

15   And the American Psychological Association's 2022 COVID-19 Practitioner Impact Survey found

16   that 60% of psychologists were reporting no openings for new patients, 38% had a waitlist, and

17   among those with a waitlist more than 40% had waiting lists of 10 or more patients. Among those

18   with no waitlist, nearly 60% indicated this was due to either not having the capacity to manage

19   one or too many people requesting services.

20        Additionally, while CDCR's expanded use of telepsychiatry during the COVID-19

21   pandemic coincided with a reduction among psychiatrist vacancy rate at CDCR, Court-imposed

22   restrictions on the use of telepsychiatry further limit Defendants' ability to expand this successful

23   program to other patient levels of care and recruit and retain providers who prefer telework.

24        Notwithstanding that it is factually impossible to comply with the Court's 90% staffing

25   threshold order in light of the current nationwide shortage of mental health professionals and

26   limits on the use of telepsychiatry, Defendants will show that they have taken all reasonable

27   efforts to attain compliance. Defendants will show their tireless efforts to improve staffing through

28   the use of both financial and non-monetary incentives, including general salary increases, loan

1  forgiveness, pay differentials, additional caseload compensation, increased maximum salary

2  ranges, special salary adjustments, recruitment and retention bonuses, relocation assistance, and

3  visa support for both non-citizen and non-permanent resident status, among others. Defendants

4  will show that CDCR offers substantial premiums in base pay relative to average pay among other

5  employers of mental health professionals in California and nationwide. In fact, conservative

6  estimates of CDCR average base pay for psychiatrists, psychologists, clinical social workers, and

7  recreation therapists have universally exceeded statewide and nationwide averages between 2018

8  and 2022. The maximum pay available to CDCR medical assistants has similarly exceeded

9  California and U.S. benchmarks throughout this period, and the minimum pay has been generally

10 consistent with the national benchmark.

11          Plaintiffs' expert is expected to opine that, notwithstanding the above data, CDCR should

12 increase wages in the range of 57% to 286%. But, as set forth above, Plaintiffs' expert refused to

13 opine whether it would be reasonable for CDCR to implement these proposed wage increases, or

14 how large a wage increase he believes is needed to sufficiently increase staffing for any of the five

15 categories of mental health professionals at issue. Instead, Plaintiffs' expert believes that the only

16 way to find out what size wage increase is needed is through trial and error. But this is consistent

17 with Defendants' well-documented historical and ongoing efforts to continually improve monetary

18 compensation to attract scarce candidates.

19          Defendants have also worked to implement non-monetary incentives to further increase

20 recruitment and retention among mental health professionals. For instance, CDCR has

21 implemented its telepsychiatry program with great success and often must turn away or waitlist

22 qualified candidates. CDCR is also currently working to implement telepsychology and telesocial

23 work in an effort to address vacancies among those classifications and expand access to care, and

24 anticipates those positions will be similarly attractive among candidates. Finally, CDCR has also

25 alleviated staffing vacancies through the use of registry, and has spent nearly $150 million total

26 over the last two years on mental health registry staff, though even CDCR's contracted registry

27 provider is sometimes unable to fill temporarily vacant line staff positions.

28          In sum, Defendants will show that it is impossible to fill all mental health classifications to

15

1    at least 90% in light of current conditions, but that they have left no stone unturned in their efforts

2    to address recruitment and retention challenges.

        **4.**        **The Court cannot impose civil coercive contempt sanctions predating**
3                            **an adjudication of contempt and must afford Defendants an**
4                            **opportunity to purge.**

5            In issuing a finding of civil contempt, courts must give the opportunity to purge, *i.e.*, the

6    opportunity for the contemnor to avoid the fines by coming into compliance with the court's order.

7    *Bagwell*, 512 U.S. at 829.  Indeed, the opportunity to purge is essential, and has been described as

8    a choice the contemnor has the liberty to make: "[T]he contemnor is able to purge the contempt

9    and obtain his release by committing an affirmative act, and thus carries the keys of his prison in

10   his own pocket."  *Id.* at 828 (internal quotations omitted). Fines that pre-date a future finding of

11   contempt cannot be imposed, and Defendants must be afforded an opportunity to purge following

12   any finding of civil contempt with respect to the 2009 Staffing Plan. *CBS Broadcasting Inc. v.*

13   *FilmOn.com, Inc.*, 814 F.3rd 91, 102 (2nd Cir. 2016). Here, to the extent this Court finds

14   Defendants in contempt with its order requiring staffing among the five mental health

15   classifications at no less than 90%, this Court must afford Defendants an opportunity to come into

16   compliance with its contempt order and purge the fines. Or put another way, the Court cannot in

17   this civil contempt proceeding, immediately impose the accumulated fines CDCR has reported

18   since February 2023.

19           **E.**        **The November 6, 2017 Order Is Inapplicable to These Proceedings**

20           In its August 11, 2023 order, the Court directed the parties to "include in their opening

21   briefs a succinct statement of the extent to which, if at all, the court's November 6, 2017 order

22   applies" given the change in the scope of the September 29, 2023 contempt proceedings. (ECF

23   No. 7916.) The Court's November 6, 2017 order analyzes whether Defendants' appeal of an April

24   19, 2017 order divested the Court of jurisdiction to further consider issues pertaining to

25   compliance with transfer timelines under the Program Guide and focuses exclusively on the issue

26   of waitlists and transfer timelines. While Defendants agree with the Court's statements in the

27   November 6, 2017 order—that a court order is "'enforceable by civil contempt proceedings and, if

28   necessary, imposition of monetary sanctions to coerce compliance,'" and that "it may be useful to

assess the sustainability of defendants' most recent compliance efforts as part of any contempt proceeding"—because the November 6, 2017 order is unrelated to the issue of staffing, it is Defendants' position that the order is inapplicable to the current staffing contempt proceedings.

## IV.    CONCLUSION

Defendants believe the evidence will conclusively establish that they have either actually or substantially complied with the Court's 90% staffing threshold for each of the classifications. Defendants will also show that compliance is impossible in light of a national scarcity of mental health professionals and restrictions on its use of telehealth. But where Defendants have fallen short, they will show they are taking all reasonable measures to improve recruitment and retention. Accordingly, the Court should not hold Defendants in contempt of the Court's staffing orders. However, even if the Court finds Defendants in contempt and issues civil coercive fines totally tens of millions of dollars, it must first provide Defendants with an adequate opportunity to purge their contempt to avoid or mitigate such sanctions.

## V.    CERTIFICATION OF ORDERS REVIEWED

Defendants' counsel certifies that they reviewed the following orders relevant to this filing: 5583, 5610, 5711, 5726, 6312, 7741, 7742, 7786, 7742, 7766, 7786, 7806, 7856, 7861, 7872, 7879, 7916.

DATED: September 19, 2023

ROB BONTA
Attorney General of California

By:_____/s/ Elise Owens Thorn_____
DAMON MCCLAIN
Supervising Deputy Attorney General
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

DATED:  September 19, 2023

HANSON BRIDGETT LLP

By:_____/s/ Samantha Wolff_____
LAWRENCE M. CIRELLI
PAUL B. MELLO
SAMANTHA D. WOLFF
Attorneys for Defendants