DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
MARISSA HATTON – 348678
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' OPENING BRIEF FOR HEARING ON STAFFING**<br><br>Judge: Hon. Kimberly J. Mueller<br>Date: Sept. 29, 2023, 10:00 am<br>Location: Courtroom 3. |

[4357389.6]

PLAINTIFFS' OPENING BRIEF FOR HEARING ON STAFFING

## I.     INTRODUCTION[1]

In 1995, this Court found, after a lengthy bench trial, that the California Department of Corrections and Rehabilitation (CDCR) "is significantly and chronically understaffed in the area of mental health care services." *Coleman v. Wilson*, 912 F. Supp. 1282, 1307-08 (E.D. Cal. 1995). The "overwhelming weight of the evidence," the Court explained, showed that Defendants' mental health staff "were stretched dangerously thin" as a result of vacancy rates approaching 20 percent of budgeted positions. *Id.* at 1307. This understaffing, in turn, "result[ed] in…fewer patients being treated and/or patients receiv[ing] reduced care" and caused Defendants to inadequately implement their plan to prevent suicides among incarcerated people, *id.* at 1307, 1315. Defendants ' deliberate indifference to the harms of this understaffing crisis constituted a violation of the Eighth Amendment and the Court appointed a Special Master to oversee Defendants' development and implementation of a remedial plan. *Id.* at 1324.

Nearly thirty years later, some things have changed in CDCR but much remains the same. Between 1999 and 2002, Defendants made significant progress filling vacant "case manager" positions with psychologists and by resorting to the use of "registry" staff (that is, temporary, contracted staff as opposed to permanent civil-service employees). *See* ECF No. 1351 at 4-5. In June 2002, in an attempt to prevent backsliding on mental health staffing amidst the state's looming fiscal crisis, the Court ordered Defendants to "maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services." ECF No. 1383 at 4 ("June 2002 Order"). This June 2002 Order, as clarified, continues to govern Defendants' implementation of their operative Staffing Plan, which Defendants developed in response to a June 2009 Order and which defines the need for various classes of mental health staff in terms of ratios of staff to patients. *See* ECF No. 7504; ECF No 3693 ("2009 Staffing Plan"). But it has not

---

[1] The Parties are the process of meeting and conferring for the purpose of agreeing to a list of stipulated facts, which they anticipate filing with the Court on or before September 22, 2023.

[4357389.6]

1

PLAINTIFFS' OPENING BRIEF FOR HEARING ON STAFFING

prevented the backsliding the Court foresaw in 2002, and for many years Defendants have "demonstrated no sense of the required urgency for a meaningful implementation" of their Staffing Plan. ECF No. 5564 at 5-6 (quoting ECF No. 5439 at 31).

In October 2017, the Court gave Defendants one year to "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." ECF No. 5711 at 30 ("October 2017 Order"). It has now been almost six years since the Court issued the October 2017 Order and almost five years since the deadline for Defendants' compliance expired. During that time, the precise character of Defendants' understaffing crisis has shifted. Most of the vacancies are now among psychologist and social worker positions, rather than psychiatrist positions. But the impact on care is the same. Defendants' "[c]hronic understaffing continues to hamper the delivery of constitutionally adequate [mental health] care and is a central part of the ongoing constitutional violation in this action." *Coleman v. Brown*, 938 F. Supp. 2d 955, 988 (E.D. Cal. 2013). Defendants' longstanding and ongoing non-compliance with their staffing obligations justifies a contempt finding and imposition of the accumulated fines. *See* ECF No. 7742 at 5-6.

## II. DEFENDANTS SHOULD BE HELD IN CONTEMPT

"Civil contempt … consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 945 (9th Cir. 2014) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993)). When, as here, there is clear and convincing evidence that the court's specific and definite orders have been violated, "the burden then shifts to the contemnors to demonstrate … [that] they took every reasonable step to comply." *Stone v. City and County of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992); *see also Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016). Defendants cannot meet this burden, as they cannot show that they have taken all reasonable steps to comply with the orders at issue in these proceedings.

### A. The Relevant Orders Are Specific and Definite

The staffing orders are specific and definite. On June 13, 2002, the Court ordered Defendants to "maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services." ECF No. 1383 at 4. The Court subsequently clarified the term "psychiatrists" in the 2002 Order and explained that it includes chief psychiatrist and senior psychiatrist supervisor positions as well as staff psychiatrist positions. *See* ECF No. 7504. On October 10, 2017, the Court ordered Defendants to "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order," and to do so within one year. ECF No. 5711 at 30. Finally, on April 11, 2023, the Court clarified an earlier order and explained that that order requires Defendants to maintain a maximum vacancy rate of ten percent for recreation therapist positions. ECF No. 7806 at 2.[2] The Court also directed Defendants to "maintain a maximum ten percent vacancy rate among medical assistant positions allocated to the Statewide Mental Health Program." ECF No. 7806 at 8.

None of these orders leave any doubt as to what is required of Defendants. *See CBS Broadcasting, Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) ("An injunction is sufficiently clear and unambiguous [to be enforced through civil contempt] if it leaves 'no doubt in the minds of those to whom it was addressed … precisely what acts are forbidden.'" (quoting *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989)).

### B. There Is No Genuine Dispute About Defendants' Lack of Compliance.

Defendants have been and currently are non-compliant with these orders, even though their deadlines for compliance have long since passed. During the three months leading up to the February 28, 2023 Order initiating these contempt proceedings, *see* ECF No. 7742,

---

[2] Defendants agree that this clarification represents a "logical and common sense reading of the order." ECF No. 7761 at 8.

Defendants' own monthly staffing data, summarized in the table below, shows fill rates well under 90% for nearly all relevant positions. *See* ECF No. 7744 at 5-9; ECF No. 7788 at 5-9; ECF No. 7789 at 5-9.

| Category | Dec. 2022 | Jan. 2023 | Feb. 2023 |
|---|---|---|---|
| **Chief Psychiatrist** | 67% | 71% | 70% |
| **Senior Psychiatrist** | 63% | 46% | 63% |
| **Staff Psychiatrist (including PNPs)** | 89% | 86% | 89% |
| **Chief Psychologist** | 72% | 74% | 70% |
| **Senior Supervising Psychologist** | 86% | 81% | 85% |
| **Senior Specialist Psychologist** | 83% | 73% | 82% |
| **Clinical Psychologist** | 64% | 61% | 61% |
| **Social Work Supervisor** | 93% | 69% | 78% |
| **Social Worker** | 73% | 68% | 71% |
| **Recreational Therapist** | 91% | 87% | 89% |
| **Medical Assistant** | 71% | 73% | 72% |

Since the Court issued its February 28, 2023 Order, Defendants were substantially compliant with the ratios in their 2009 Staffing Plan for staff psychiatrist positions and with the ratios for recreation therapist positions in all months except July 2023. *See* ECF No. 7824 at 5, 8; ECF No. 7849 at 5, 8; ECF No. 7866 at 5, 8; ECF No. 7898 at 5, 8; ECF No. 7933 at 5, 8. As shown in the table below, however, fill rates have declined in recent months for staff psychologists and clinical social workers, who provide most of the care.

| Category | March 2023 | April 2023 | May 2023 | June 2023 | July 2023 |
|---|---|---|---|---|---|
| **Chief Psychiatrist** | 70% | 70% | 67% | 63% | 57% |
| **Senior Psychiatrist** | 63% | 63% | 58% | 58% | 53% |
| **Staff Psychiatrist (including PNPs)** | 95% | 95% | 99% | 99% | 95% |
| **Chief Psychologist** | 70% | 70% | 68% | 68% | 72% |
| **Senior Supervising Psychologist** | 85% | 85% | 88% | 87% | 84% |
| **Senior Specialist Psychologist** | 81% | 79% | 84% | 82% | 80% |
| **Clinical Psychologist** | 61% | 60% | 59% | 58% | 56% |
| **Social Work Supervisor** | 74% | 74% | 78% | 94% | 93% |
| **Social Worker** | 72% | 73% | 75% | 75% | 72% |
| **Recreational Therapist** | 91% | 91% | 92% | 91% | 88% |
| **Medical Assistant** | 71% | 76% | 77% | 78% | 68% |

Defendants state that they "will produce evidence showing they have been in substantial compliance with certain requirements of the 2009 Staffing Plan, notwithstanding previous periodic noncompliance." ECF No. 7877 at 5. The Court ordered Defendants to "identify with specificity those requirements of the 2009 Staffing Plan they contend they are in compliance with and those requirements of the 2009 Staffing Plan they contend they have been in substantial compliance with." ECF No. 7879. In response, Defendants presented two tables, one listing months since February 2023 of "full compliance with the 90% fill rate" and one listing months since February 2023, of "substantial compliance with the 90% fill rate." ECF No. 7904 at 3-4. Defendants offered to provide similar tables dating back to 2015 during the evidentiary hearing. *Id.* at n. 2.

Contrary to what the tables claim, Defendants have not identified any months in which

they were fully compliant with *any* portions of the 2009 Staffing Plan. The table of "full compliance" with the "90% fill rate" is an attempt to move the goalpost. Ninety percent is not full compliance with the staffing plan. Defendants developed the 2009 Staffing Plan "to remedy previous staffing levels described as deficient by the United States Supreme Court," and Defendants themselves identified the requirements in the Plan as "'appropriate' and necessary to meet constitutional standards." ECF No. 5711 at 16. The 10-percent vacancy orders are not freestanding injunctions subject to the doctrine of substantial compliance, but rather *definitions of what constitutes substantial compliance* with the staffing ratios that Defendants developed and have been ordered to fully implement. *See* ECF No. 5711 at 30. Where Defendants have filled at least 90 percent of the positions required to comply with a given staffing ratio in their Plan, but not all the positions required to comply with that ratio, they are in substantial compliance. Where Defendants have filled fewer than 90 percent of those positions, they are not in substantial compliance.

Substantial compliance is a defense to civil contempt where the violating party has taken all reasonable steps to comply, but has still committed technical or inadvertent violations of the order. *Vertex Distribg., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 892 (9th Cir. 1982); *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). The Court's decision to set the vacancy threshold at 10 percent gives Defendants a large margin to account for staff turnover and other inevitable vicissitudes of a large workforce. Holding them to this vacancy rate ensures that they are accountable for substantial compliance, and not for episodic or inadvertent violations.

The Court should limit its tolerance of vacancy rates higher than 10 percent to months just after staffing allocations are increased, causing the staff allocation target to rise before Defendants have time to fill the new positions. Allowing any other increases of the vacancy rate undermines compliance with the order. If, for example, 85 percent rather than 90 percent were the new "substantial compliance" level, then it would not be long until the Defendants moved the full compliance goalpost down to 85 percent, meaning that 80 percent would be the new substantial compliance, and so on down the scale.

Defendants also suggest that they are in substantial compliance because their current non-compliance with regard to psychologist and social worker positions purportedly represents a departure from their typical practice between 2015 and 2021. ECF No. 7904 at 4 & n.2. But Defendants offer no explanation for why they selected 2015 as the relevant start-date for their analysis—or, for that matter, why they believe their purported compliance with regard to psychologist and social worker positions at "various" points before 2021 is relevant to the question of whether they are *currently* in substantial compliance. If anything, Defendants' previous (partial) success in filling these positions makes it clear that *compliance is possible* and that Defendants have failed to take all reasonable steps to comply. *Cf. Scott v. Clarke*, 355 F. Supp. 3d 472, 496 (W.D. Va. 2019) (treating defendant-corrections officials' progress toward compliance with minimum nursing staff requirements as evidence that compliance was not impossible).

Whatever Defendants' reasoning, it is indisputable that their non-compliance is longstanding—including but not only with regard to mental health clinicians. The evidence presented at trial will show that, in the nearly five years since the Court's October 2018 deadline for compliance passed, the statewide vacancy rate for clinical psychologists exceeded 10 percent *every single month* except for a brief two-month window in July and August 2019. Psychiatrist vacancy rates, meanwhile, have fluctuated multiple times since October 2018 between brief lows of approximately eight percent and extended periods when they exceeded 20 percent. There is simply no genuine dispute that Defendants are non-compliant with the Court's staffing orders and have been for many years.

### C. Compliance is Not Impossible

Impossibility is a defense to contempt, and Defendants have indicated that they intend to present evidence that purportedly shows that "compliance with all aspects of the 2009 Staffing Plan is impossible in the current labor market for mental health professionals." ECF No. 7877 at 5. But a contemnor asserting impossibility bears the burden of showing "'categorically and in detail' why he is unable to comply." *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973). "[T]hat burden is

1 difficult to meet," *Fotin v. Commissioner of Mass. Dep't of Public Welfare*, 692 F.2d 790, 796 (1st Cir. 1982), "particularly in cases such as this where the defendants have a long history of delay and the plaintiffs' needs are urgent," *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986). Defendants' Rule 26(a)(2)(B) disclosure of their expert witness, Dr. Erica Greulich, falls well short of this threshold.

For one thing, Dr. Greulich's expert report conflates *economic* labor shortages with *needs-based* shortages—the latter of which is not an economic concept, but rather a policy concept. Needs-based shortages refer to the difficulty that free-market consumers (or here, patients) face in obtaining services. By contrast, economic labor shortages refer to the difficulty that *employers* face in obtaining employees to provide services. As Plaintiffs' expert health economist Dr. Timothy Brown will testify, Defendants' mental health staffing efforts are affected by needs-based shortages, but *not* economic labor shortages, and therefore can be overcome by offering sufficient economic incentives—namely, higher pay. These economic incentives must be large enough to compensate for the comparatively undesirable working conditions in Defendants' prisons, as well as the more limited geographic-based amenities and lost opportunities resulting from the locations of those prisons. Notably, Dr. Greulich testified at deposition that she did not conduct an analysis to determine whether larger economic incentives than those offered in the past would be effective; instead, her data analysis was limited to the effectiveness of incentives that Defendants have *already tried*.

Plaintiffs' expert will further testify that employers must rely on educated trial and error to determine the level of compensation that is needed to incentivize employment of mental health clinicians, particularly in undesirable jobs or undesirable locations. Evidence at trial will show that Defendants have not engaged in such a process of educated trial and error, especially with regard to psychologists and social workers. Instead, the evidence will show that Defendants have negotiated pay increases that do little to compensate clinicians for the undesirable working conditions they must endure. Plaintiffs' expert will testify that, in regions with needs-based labor shortages, like many of those at

issue in this case, small economic incentives have small effects and large economic incentives have large effects. As Defendants have provided only small economic incentives, there is no evidentiary support for Defendants' position that even large incentives will have little or no effect on vacancy rates. This is fatal to their impossibility defense.

### D.  Defendants Must Show They Took *All* Reasonable Steps To Comply.

It is Defendants' burden to show that they "took every reasonable step to comply." *Stone*, 968 F.2d at 856 n.9; *see also Kelly*, 822 F.3d at 1096 ("A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took *all* reasonable steps to comply with the order." (emphasis in original)). If Defendants do not meet their burden, the Court must issue findings of contempt.

Defendants have not yet disclosed all the steps they have taken to comply or why those measures purportedly constitute "every reasonable step." But Defendants have provided only small economic incentives for most of the positions at issue in these proceedings. These incentives are not competitive with those being offered by other mental health employers in critical metropolitan areas such as the San Francisco-Oakland and Sacramento metropolitan areas—both in absolute terms and in light of the unfavorable working conditions for clinicians working in CDCR. CDCR has not offered regional cost-of-living adjustments to the salaries of civil service mental health staff. CDCR cut mental health staff salaries in 2020 and did not provide COVID-related bonuses to mental health staff. CDCR excluded mental health staff working in outpatient programs from the 15% salary increase they provided in 2022 to mental health staff working in inpatient programs. CDCR excluded social workers from certain retention bonus programs offered to other mental health staff. CDCR has not engaged in the kind of educated trial-and-error process that other employers routinely use to identify the size of the incentives needed to fill undesirable roles.

CDCR also has made little or no effort to streamline their sclerotic processes for hiring staff. Nor have they undertaken significant measures to improve the undesirable

working conditions that mental health clinicians report. These conditions include, but are not limited to, safety risks; a lack of support staff such as court-ordered psychiatric medical assistants; rodent-infested work spaces; inadequate or non-functioning air-conditioning systems; and limitations on the ability of mental health staff to communicate with family and friends during the workday as a result of rules prohibiting mental health staff from bringing cellular phones and other electronic devices to work. Defendants' failures to take all reasonable steps to reform their hiring process and improve working conditions have contributed to their failure to recruit and retain adequate numbers of mental health clinicians.

Defendants may argue that, despite their failure to take all reasonable steps earlier, certain recently announced initiatives demonstrate that they are now making reasonable efforts. But these efforts are both too little and too late. The recruitment measures described in Defendants' proposed PIP staffing plan, for example—to the extent they apply to outpatient programs at all—were only initiated recently, even though the vacancy crisis among psychologists and social workers became evident at least two years ago, in 2021. So too with Defendants' recent agreements with the unions representing CDCR mental health staff, which provide far more generous terms to psychiatrists than to psychologists and social workers, despite vacancy rates for psychologists and social workers being far higher than for psychiatrists. These agreements were only ratified and approved by the Governor in September 2023, and thus they still would not absolve Defendants' previous failures to take all reasonable steps to comply with their staffing obligations—even if they were sufficient on their own terms (which they are not). *See, e.g., NLRB v. Ironworkers Local 433,* 169 F.3d 1217, 1221 (9th Cir. 1999), *Salazar ex rel. Salazar v District of Columbia*, 602 F.3d 431, 438 (D.C. Cir. 2010); *CBS Broadcasting, Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 101-02 (2d Cir. 2016). Defendants should be held in contempt because they neglected their staffing obligations for years and still have not taken all reasonable steps to comply.

## III. EVIDENTIARY ISSUES

### A. Extent To Which The Court's Order of November 6, 2017 Applies To These Proceedings.

On August 11, 2023, the Court ordered the parties to include in their opening briefs a succinct statement of their respective positions on whether and how the Court's Order of November 6, 2017, *see* ECF No. 5726 at 9, relating to the presentation evidence about individualized patient care in the inpatient transfer contempt proceedings, applies in these proceedings.  ECF No. 7916 at 2.   Plaintiffs' maintain that, although the November 6, 2017 Order is not directly controlling here because it specifically addressed the admissibility of evidence only in the inpatient-transfer contempt proceedings, similar considerations support the exclusion on relevance grounds of any evidence introduced for the purpose of attacking the underlying staffing requirements at issue in these proceedings. Nevertheless, some evidence relating to Defendants' compliance with Program Guide requirements still may be relevant to measure "the character and magnitude of the harm threatened by continued contumacy" so as to determine the appropriate sanction.  *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947).[3]

The Court's November 6, 2017 Order was designed to preemptively prevent Defendants from raising an improper collateral attack on their own remedial plan as a defense to contempt.  See ECF No. 5726 at 8-9.  The Court's decision in this regard was and remains correct.  *See, e.g.*, *NLRB v. Ironworkers Local 433*, 169 F.3d 1217, 1222 (9th Cir. 1999) (declining to consider a contemnor-defendant's claim that the injunction it was charged with violating was no longer "justified" and should therefore be "set aside"); *see also Hook v. Arizona Dep't of Corrections*, 107 F.3d 1397, 1404 (9th Cir. 1997) (mere filing of a Rule 60(b) motion did not relieve civil contemnor-defendant of obligation to comply with injunction, because Rule 60(c)(2) expressly states that "[t]he motion does not

---

[3] In determining the appropriate sanction, the Court must also consider "the probable effectiveness of any suggested sanction in bringing about the result desired" and "the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United Mine Workers*, 330 U.S. at 304.

affect the finality of a judgment or suspend its operation"); *GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*, 445 U.S. 375, 386 (1980) ("[P]ersons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.").

While the November 6, 2017 Order itself was directed at the narrow question of whether Defendants would be permitted to introduce evidence about individual patients' care in the inpatient transfer contempt proceedings, *see* ECF No. 5726 at 8-9, the same principles apply here. Defendants did not appeal the Court's October 10, 2017 Order that requires them to fully comply with their 2009 Staffing Plan and the Court's 10-percent vacancy orders. *See* ECF No. 5711. Nor have they asked the Court to modify those orders, under the framework of Rule 60(b) or otherwise—despite having had ample opportunity to do so in the nearly *six years* since the October 10, 2017 Order issued. *Id.* As a result, any evidence whose purpose is to show that the requirements of Defendants' 2009 Staffing Plan, as modified, are no longer needed should be excluded as legally irrelevant.

At the same time, *some* evidence relating to the consequences of Defendants' non-compliance with their staffing obligations *may* be admissible for the narrow purpose of establishing "the character and magnitude of the harm threatened by continued contumacy" and the resulting need for sanctions. *United Mine Workers*, 330 U.S. at 304. The evidence will show that Defendants' failure to comply with their staffing obligations is having severe consequences on their ability to comply with the Program Guide—including but not limited to a complete suspension of core clinical groups, routine IDTTs, and routine 1:1 clinical contacts in some EOP and CCCMS programs.

/ / /
/ / /
/ / /
/ / /
/ / /

## IV. CONCLUSION

Because Defendants have neither complied nor taken all reasonable steps to comply with the Court's specific and definite orders, the Court should issue findings of contempt and impose appropriate sanctions.

## CERTIFICATION

The undersigned counsel for Plaintiffs certifies that he reviewed the following relevant orders to prepare this filing: ECF Nos. 1055, 1383, 5711, 5726, 7504, 7742, 7806, 7916; *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Coleman v. Brown*, 938 F. Supp. 2d 955 (E.D. Cal. 2013).

DATED: September 19, 2023    Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Alexander Gourse*
    Alexander Gourse

Attorneys for Plaintiffs

[4357389.6]

13

PLAINTIFFS' OPENING BRIEF FOR HEARING ON STAFFING