**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.,
    **Plaintiffs**

    **vs.**                          **No. 2:90-CV-0520 KJM DB**

GAVIN NEWSOM, et al.,
    **Defendants**

<u>**SPECIAL MASTER'S REPORT AND RECOMMEDNATION REGARDING THIRD-LEVEL DATA REMEDIATION DISPUTE REGARDING TIMELY COMPLIANCE METHODOLOGY**</u>

<u>**EXECUTIVE SUMMARY**</u>

The impact of the court's finding that defendants knowingly presented misleading data to the Special Master and to the Court itself continues to have far-reaching effects through the present. As the Special Master has previously reported, data remediation requires a granular review of each business rule undergirding the data defendants provide to the court and the Special Master with respect to each of the originally identified 148 key indicators[1] provisionally approved by the court. *See* Special Master's June 30, 2023 Report on the Status of Data Remediation, ECF No. 7863 at 7 ("Data remediation has proven to be one of the most complex

---

[1] As of the time of this writing, the stakeholders are collaboratively working to develop an updated list of provisionally approved key indicators that reflects stakeholder consensus regarding indicators that have been re-named, re-numbered, split into multiple indicators/sub-indicators, decommissioned, etc. This collaborative work is substantially complete, and the Special Master anticipates providing a further update in his October 15, 2023 data remediation status report. The Special Master's data expert advises that, as of the time of this writing, there are now a total of 153 provisionally approved key indicators, not including the five "placeholder indicators" discussed in the Special Master's June 30, 2023 status report on data remediation. *See* ECF No. 7863 at 40-42.

and challenging projects the mastership has undertaken in the long history of this case. This work has entailed detailed review of the business rules and processes operationalizing each of the indicators in the list provisionally approved by the Court."); *see also* June 30, 2021 Order, ECF No. 7216 at 14 (provisionally approving 148 key indicators). This word-by-word review of CDCR's mental health data systems' documentation, necessitated by defendants' conduct, had not previously been undertaken during the long history of the remedial stage of this case. Nor would it have been possible given the state of that documentation. *See, e.g.*, Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 241 (discussing the lack of documentation of CDCR's mental health data systems).

While the process of data remediation is fundamentally to equip defendants to accurately and transparently report data to replicate the substance of Special Master's monitoring, *see* May 23, 2023 Order, ECF No. 7847 at 7, on occasion this review, guided by the expertise of the Special Master's data expert, leads to the discovery of a more refined and comprehensive way of measuring and reporting what the Special Master has done historically. This dispute involves such an instance. *See infra* p. 29-31 (discussing the respective methodological "shifts" proposed by the Special Master and defendants).

The Program Guide defines the minimal mental health treatment services that defendants are constitutionally required to provide to each individual in the *Coleman* class. *See, e.g.*, *Coleman v. Brown*, 756 Fed. Appx. 677, 679 (9th Cir. 2018) (noting it is "established that the Program Guide sets out the objective standards that the Constitution requires in this context…"). Historically, the Special Master has utilized multiple methods to assess and report on the degree to which defendants have met these standards. In addition to utilizing global data concerning large groups of the more than 33,000 individual people with serious mental illness comprising

the class, the Special Master's monitoring has also emphasized, for instance, individual and group interviews of incarcerated people concerning their mental health treatment, clinical expert review of patient medical records, and observation of treatment team meetings on the individual patient level.

During the data remediation process, the Special Master became aware in a more focused way that defendants' presentation of mental health data tended to lump together the number of times they completed a certain task in a timely manner rather than informing him on how many individual members of the *Coleman* class timely received the particular treatment service required by the Program Guide and its expression of minimally adequate mental health treatment. At various times, defendants' proposed approach has been referred to as "events-wise", "opportunity-based," and "last due date" methodologies. [2] *See infra* note 2 (discussing TCM dispute terminology). The Special Master's data expert informed the Special Master of a way to better align his historic focus on the individual people in the *Coleman* class with his need to report global performance statistics: the patient-wise methodology.

Thus, for example, rather than reporting on how many times a given facility performed psychiatric contacts within the minimum timeframes required by the Program Guide (opportunity-based), the Special Master could receive data (and report to the Court) on the

---

[2] Through the course of this dispute, defendants' preferred methodology has at times been referred to as the "events-wise," "opportunity-based," and "last due date" (LDD) methodology. The Special Master's data expert has determined that defendants' methodology is most accurately described as LDD. However, the Special Master notes that defendants' use the term "opportunity-based" to describe their preferred methodology, while plaintiffs' use LDD to refer to defendants' methodology. For purposes of this report, defendants' methodology will be referred to as the "opportunity-based/LDD" methodology.

number (and percentage) of EOP *patients* who received the contacts they required in a timely manner (patient-wise) during the reporting period.  *See infra* pp. 13-14.

Importantly, the Special Master and his team were judicious in their request that defendants provide topline statistics using this patient-wise methodology, limiting their request to only 26 (or 17 percent) of the 153 provisionally approved key indicators, *see supra* note 1 (discussing revised number of provisionally approved key indicators), which focused on fundamental aspects of minimally adequate treatment.  This request and defendants' related concerns have been discussed throughout the course of the data remediation process, with the Special Master attempting to address defendants' stated concerns at each turn.

For instance, defendants expressed the view that their proposed method of computing and reporting statistics for these 26 indicators was best suited to their day-to-day management of their program.  *See* Exhibit A at 5.  Rather than make a request that might appear to intrude on defendants' managerial prerogatives, the Special Master offered a compromise whereby they would remediate these indicators and provide data using whatever methodology they find useful, *as well as* the suggested patient-wise methodology, affording both defendants and the Special Master the data each thought best suited to their respective scope of responsibility.

Further, the Special Master recognized that when multiple events cluster in a single patient (i.e., one patient is required to have multiple psychiatric sessions during a given period of time) it can be highly informative to view adherence to a requirement through more than one lens.[3]  When faced with defendants' misperception that the patient-wise methodology required "perfection" (i.e., that they not miss a deadline even once during a reporting period even by a day

---

[3] This is not a new concept in the world of healthcare data analysis: is the right unit of analysis the number of people who had a heart attack or the number of heart attacks?

in order to be considered to have met the requirement), *see infra* p. 25, the Special Master's data expert provided examples and a demonstration of how the patient-wise approach required no such thing: it can be applied flexibly to adjust to any threshold the court may ultimately set as the benchmark for constitutional minima.

CDCR also raised a concern that patient-wise statistics would hide how well their most needy patients are being treated. *See infra* pp. 25-28.  In response, the Special Master's data expert reiterated that this concern could be mitigated by calculation of a "degree of impact" statistic which enables measuring and reporting on not just rates of non-compliance but the extent of non-compliance.  In other words, this approach acknowledges the difference between a psychiatrist seeing a patient one day past the required timeframe and, say, 30 days late.  Use of "degree of impact" statistics also addresses CDCR's suggestion that the use of patient-wise statistics would provide a perverse incentive for mental health staff to deprioritize care for patients once they have missed a minimum requirement.[4]

Lastly, the Special Master's data expert demonstrated to CDCR a technical approach to remediating data for these measures using both methods that was not overly time-consuming or resource intensive and that would have little to no impact on the data remediation timeline. Indeed, in their position statement, defendants acknowledged that CDCR "can build multiple summary statistics and, in some cases, it may be appropriate to look at the same data in different ways" and, further stated "[t]here is no workload issue in developing these summary statistics."

---

[4] Related to concerns about incentives to deprioritize care, one highly concerning aspect of CDCR's opportunity-wise/"last due date" (or "LDD") approach is that after a timeframe is missed (for example, an EOP patient was *not* "seen at least every 30 days"), the methodology assumes the appropriate deadline to make up the missed requirement would be the end of the *next timeframe* (i.e., seen within 60 days), whereas the Special Master's team has consistently taken the position that missed deadlines must be made up as soon as possible.

*See* Exhibit A at 1 n. 2; *see also infra* pp. 34-35.  Despite this acknowledgment, defendants rejected the Special Master's compromise proposal.

In summary, this dispute (referred to as the "Timely Compliance Methodology" or "TCM" dispute) centers on defendants' unwillingness to add a patient-wise summary statistic for a small number (only 17 percent) of provisionally-approved key indicators.  Because the Special Master has determined the patient-wise methodology is best suited to transparently and accurately report the number and percentage of *patients* who received Program Guide-compliant mental health care for these indicators, he requires patient-centered summary statistics for his monitoring going forward and, consistent with his compromise proposal offered earlier in the dispute resolution process, is recommending that:

- Defendants provide data and summary statistics in accordance with the patient-wise approach – inclusive of flexible scoring – for 26 of the provisionally approved key indicators *in addition* to CDCR's preferred methodology (not instead of it); and

- The patient-wise data be placed in context by use of a degree of impact statistic showing extent of non-compliance.

The Special Master has also demonstrated that the patient-wise approach does not require perfection but instead is flexible and amenable to any compliance threshold the court ultimately determines is appropriate for any given measure.

## **INTRODUCTION**

This is the Special Master's second[5] Report and Recommendation concerning data

---

[5] The Special Master filed his first Report and Recommendations Regarding Third-Level Data Remediation Disputes on March 9, 2023.  ECF No. 7755 (hereinafter "Special Master's March 9, 2023 Report").  On August 8, 2023, in response to the Court's directive, *see* ECF No. 7847 at 12, the Special Master also filed a subsequent recommendation regarding one of the disputes (related

remediation related disputes that have reached "Level 3" of the data remediation dispute resolution process filed with the Court. *See* Declaration of Kathleen Allison in Response to April 19, 2022 Order, ECF No. 7556-2 at 2-3 (describing the three levels of the data remediation dispute resolution process). This Report includes the information the Special Master believes the Court requires to make focused determinations regarding the Timely Compliance Methodology (TCM) dispute that the data remediation stakeholders[6] were unable to resolve through the dispute resolution process.

As the Special Master previously reported, the data remediation dispute resolution process includes three levels of review with the goal of resolving and/or narrowing disputes among the stakeholders at the lowest level possible. *See* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 42-43; *see also* Special Master's March 9, 2023 Report, ECF No. 7755 at 3-5. As of September 14, 2023, 45 disputes have gone through at least the first level of the dispute resolution process, but only five have required a Third Level recommendation from the Special Master to resolve. *But see infra* note 28.

Importantly, the TCM dispute impacts 26, or 17 percent of the provisionally approved key indicators.[7] As will be demonstrated below, the instant dispute is not the first time the Court

---

to transfers to Short-Term Restricted Housing (STRH) and Long-Term Restricted Housing (LTRH)) discussed in the Special Master's March 9, 2023 Report). *See generally* Special Master's Response to the Court's May 24, 2023 Order (ECF No. 7847), ECF No. 7907.

[6] The term "stakeholders" refers to defendants, plaintiffs, and the Special Master's team, all of whom are working under the supervision of the Special Master to remediate defendants' mental health data systems.

[7] As reflected in the parties' position statements, the TCM dispute originally involved 19 provisionally approved key indicators. Since that time, two of the original 19 indicators (AC2 and SC8) have been split into two indicators, resulting in a total of 21 TCM indicators. As described further below, *see infra* note 16, five indicators related to medication management were also included on the list of TCM indicators once CDCR made the documentation available

has had to consider conflicting interpretations of what constitutes "timely" performance of a remedial obligation in this case. In fact, the incidents of defendants' provision of misleading data regarding remedial compliance identified by the Court during the Golding Report-related proceedings involved reports of defendants' "timely" satisfaction of critical remedial requirements. *See infra* note 18. Because the TCM dispute involves such critically important remedial requirements, it is all the more important that this dispute be resolved in a manner that ensures accurate and transparent data and summary statistics regarding these measurements of defendants' timely delivery of minimally adequate mental health care to members of the plaintiff class.

Given that these indicators measure a diverse array of business requirements and each contain several subcomponents, the Special Master's recommendation for resolving this dispute ensures patient-wise data will be available to the Court and stakeholders, but does not include granular instructions to defendants on operationalizing the recommendation for each affected

---

for stakeholder review, resulting in a total of 26 TCM indicators. The 26 indicators are as follows: AC1: Timely MH Referrals; AC2.1: Timely PC Contacts; AC2.4: Daily PC Interactions – ASU EOP Hub High Refusers; AC3: Timely Psychiatry Contacts; AC4: Timely IDTTs; AC5: Treatment Offered; MM11.3: Diagnostic Monitoring Lithium (created from MM11); MM10: Diagnostic Monitoring-QT Prolongation EKG 12 Months; MM11.1: Diagnostic Monitoring Carbamazepine (created from MM 11); MM11.2: Diagnostic Monitoring Lamotrigine (created from MM 11); MM11.4: Diagnostic Monitoring Oxcarbazepine (created from MM 11); MM11.5: Diagnostic Monitoring Valproic (created from MM11); MM14: Diagnostic Monitoring-Antidepressants; MM3: Diagnostic Monitoring-Antipsychotics; MM4: Diagnostic Monitoring-Clozapine; MM5: Continuity of Meds Upon Inter-Institutional Transfer at R&R; MM6: Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding: ASU/SHU/PSU); MM7: Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers; MM8: Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU; MM9.1: Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH; NM1: Timely response to Critical Med non-adherence notification; NM2: Timely response to Non-critical Med non-adherence notification; SC8: Timely Submission of MH RVR Assessment Results; SC8.7: Timely RVR MH Assessment Request; SP9: Mental Health Observation Tool; and URM3: Timely admission to MHCB.

indicator.  To do so would circumvent a critical stop of the data remediation process, stakeholder review.  *See* Special Master's June 30, 2023 Data Remediation Status Report, ECF No. 7863 at 28 (describing stakeholder review process).  The Special Master trusts the parties will work together cooperatively to operationalize the recommendations contained herein should the Court adopt them.

## I.    Remedial Requirements

The TCM dispute impacts 26 provisionally approved key indicators, each of which measures whether the business requirement in question (*e.g.*, routine PC contact at least every 90 days for a 3CMS patient), was delivered to individual patients within timeframes mandated by defendants' remedial plan, the Program Guide and Compendium of Custody Related Remedial Requirements, and related court orders for a given reporting period.

These 26 indicators involve a variety of clinically critical important Program Guide requirements, including:

- Timeliness of initial and routine primary clinician evaluations, psychiatric evaluations, and Interdisciplinary Treatment Team (IDTT) meetings across MHSDS levels of care;[8]

---

[8] *See, e.g.*, 2021 Program Guide Update, ECF No. 7333-1 at 41 (3CMS: initial PC evaluation within "ten working days of referral/arrival"); *id.* at 44, 48 (3CMS: routine psychiatric and PC evaluations at least every 90 days); *id.* at 57 (EOP: initial evaluations "within 14 calendar days from arrival at the EOP"); *id.* at 59 (EOP IDTTs "at least every 90 days"); *id.* (EOP: "Weekly clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week."); *id.* (EOP: psychiatry evaluations to occur "monthly"); *id.* at 83 (Mental Health Crisis Bed (MHCB): initial IDTT "within 72 hours of an inmate-patient's admission and at least weekly thereafter"); *id.* at 84 (MHCB: "An inmate-patient's condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist."); *id.* at 85 ("The assigned psychiatrist shall evaluate each MHCB inmate-patient individually at least twice weekly to address psychiatric medication issues.").

- Timely response to emergent, urgent, and routine mental health referrals;[9]

- Satisfaction of the requirement to offer a minimum of ten hours per week of structured treatment to EOP patients;[10]

- Timely completion of suicide watch and suicide precaution checks;[11]

- Timely admission to MHCB units within 24 hours of referral;[12]

- Timely completion of Rules Violation Report (RVR) mental health assessments;[13] and

- Timely completion of diagnostic monitoring related to various psychotropic medications.[14]

---

[9] *See* 2021 Program Guide Update, ECF No. 7333-1 at 8 ("Referrals to mental health may be made on an Emergent, Urgent, or Routine Basis. An inmate deemed to require an Emergent (immediate) referral shall be maintained under continuous staff observation until evaluated by a licensed mental health clinician. An Urgent referral is to be seen within 24 hours. A Routine referral should be seen within five working days.").

[10] *See* 2021 Program Guide Update, ECF No. 7333-1 at 58 ("Each inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT.").

[11] *See* 2021 Program Guide Update, ECF No. 7333-1 at 182-85 (describing requirements for suicide watch and suicide precaution checks and related documentation).

[12] *See* 2021 Program Guide Update, ECF No. 7333-1 at 74-75 (requiring transfer to MHCB within 24 hours).

[13] *See* ECF No. 7333-1 at 292 ("Once the Rules Violation Report: Mental Health Assessment (CDCR 115-MH-A) is received from custody, mental health staff will: 1. Complete the CDCR 115-MH-A in its entirety, including any required consultations. 2. Return the completed CDCR 115-MH-A to custody within eight (8) calendar days."); *see also* ECF No. 7333-2 at 2 (identifying California Code of Regulations Title 15, Section 3317, Mental Health Assessment for Disciplinary Proceedings as a "Negotiated or Court-Ordered Remedial Measure Related to Custodial Issues Not Included in the 2021 Program Guide Revision").

[14] *See, e.g.*, 2021 Program Guide Update, ECF No. 7333-1 at 45 (referencing "Health Care Department Operations Manual, Medication Management and Pharmacy regarding procedures for administration of medication, medication refusals, Directly Observed Therapy (DOT), medication adherence, and other aspects of medication administration.").

The Special Master has historically sought to assess defendants' compliance with their remedial plan in a patient-centric manner.[15]  Patient interviews, individual clinical case reviews, and observation of individual patient's IDTTs during on-site monitoring tours are but a few examples of the Special Master's practice of putting the patient at the center of his monitoring.

## II.    Indicators[16] Measuring Remedial Requirements

The 26 provisionally approved key indicators subject to the TCM dispute are:

1.   AC1: Timely MH Referrals
2.   AC2.1: Timely PC Contacts
3.   AC2.4: Daily PC Interactions – ASU EOP Hub High Refusers

---

[15] The Special Master's patient-centered approach to monitoring is consistent with the structure of the Program Guide, which delineates those *minimally-required* mental health services defendants' must provide to each *patient*.  *See, e.g.*, 2021 Program Guide Revision, ECF No. 7333-1 at 44 ("Each *CCCMS inmate-patient* on psychiatric medication shall be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues."); *id*. at 46 ("*Inmate-patients* shall be transferred to MHCB for crisis episodes requiring 24-hour nursing care. The transfer to a MHCB shall be accomplished within 24 hours of referral."); *id*. at 48 ("Face-to-face *individual contacts between the PC and the CCCMS inmate-patients* in a GP setting shall occur as often as clinical needs dictate but *at least* once every 90 days."); *id*. at 58 ("Each *EOP inmate-patient will have an individualized treatment plan* that provides for treatment consistent with the inmate-patient's clinical needs. The treatment plan shall be documented on a CDCR 7388, *Mental Health Treatment Plan. Each inmate-patient* shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT."); *id*. at 59 ("*Individual Treatment Planning* involves a meeting of the IDTT *and the inmate-patient* at least every 90 days for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in accordance with the inmate-patient's needs and progress."); *id*. ("Weekly clinical contact with PC either *individually* or in group psychotherapy; individual clinical contact at least every other week."); *id*. ("A psychiatrist shall evaluate *each EOP inmate-patient* at least monthly to address psychiatric medication issues."); *id*. at 75 ("The *inmate-patient shall* be transferred within 24 hours of referral."); *id*. at 84 ("An *inmate-patient's* condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist."); *id*. at 85 ("The assigned psychiatrist shall evaluate *each MHCB inmate-patient* individually at least twice weekly to address psychiatric medication issues.") (emphasis added).

[16] As of the time of this writing, CDCR had not made the documentation for MM5, MM6, MM7, MM8, MM9.1 available to the stakeholders.  Therefore, these five items were not included in the original list of 19 TCM indicators.  However, the Special Master's team has been clear that all medication management measurements must include patient-wise summary statistics and added these five medication management measurements to the original list of TCM indicators.

4.  AC3: Timely Psychiatry Contacts
5.  AC4: Timely IDTTs
6.  AC5: Treatment Offered
7.  MM11.3: Diagnostic Monitoring Lithium (created from MM11)
8.  MM10: Diagnostic Monitoring-QT Prolongation EKG 12 Months
9.  MM11.1: Diagnostic Monitoring Carbamazepine (created from MM 11)
10. MM11.2: Diagnostic Monitoring Lamotrigine (created from MM 11)
11. MM11.4: Diagnostic Monitoring Oxcarbazepine (created from MM 11)
12. MM11.5: Diagnostic Monitoring Valproic (created from MM11)
13. MM14: Diagnostic Monitoring-Antidepressants
14. MM3: Diagnostic Monitoring-Antipsychotics
15. MM4: Diagnostic Monitoring-Clozapine
16. MM5: Continuity of Meds Upon Inter-Institutional Transfer at R&R
17. MM6: Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding: ASU/SHU/PSU)
18. MM7: Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers
19. MM8: Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU
20. MM9.1: Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH
21. NM1: Timely response to Critical Med non-adherence notification
22. NM2: Timely response to Non-critical Med non-adherence notification
23. SC8: Timely Submission of MH RVR Assessment Results
24. SC8.7: Timely RVR MH Assessment Request
25. SP9: Mental Health Observation Tool
26. URM3: Timely admission to MHCB


III.   **Brief Statement of Dispute**

The Special Master, based on the advice of his data expert and clinical experts, and defendants each have a methodology they view as best suited to produce the top line statistic for accurate and transparent presentation of data regarding defendants' remedial compliance for this limited number of indicators.  The TCM dispute relates to defendants' refusal to adjust their mental health data systems to calculate and report summary statistics using the patient-wise methodology *in addition* to those derived from defendants' preferred LDD methodology for the small number (26, or 17 percent) of provisionally approved indicators listed above.

12

A.  "Patient Wise" and "Opportunity-Based/LDD" Methodologies

As will be demonstrated in greater detail below, the primary difference between the patient-wise and opportunity-based/LDD methodologies relates to their respective ability to summarize the number of individual class members who received the minimum treatment required by the Program Guide.[17]  Rather than "attempt to force" defendants to use the methodology that he finds most appropriate for the task at hand, *see* Exhibit A at 1, the Special Master proposed a compromise whereby the 26 TCM indicators would be remediated to enable summary statistics to be calculated using *both* methodologies.  Importantly, the Special Master's proposed compromise preserves the Court's ability to make future determinations about compliance thresholds with a comprehensive, patient-centered view of defendants' remedial compliance.  Plaintiffs supported this compromise proposal and defendants rejected it.

1.  *Patient-Wise Methodology*

Generally, when calculating a summary statistic using the patient-wise methodology, the numerator is the number of patients who *timely* received a particular service requirement, and the denominator is the number of patients who were *required* to timely receive the service requirement.  For example, across a subpopulation of ten patients requiring routine PC contacts in a mainline 3CMS program, the patient-wise denominator would be ten.  The patient-wise numerator would be the number of patients who timely received their required routine PC contacts during the review period.  Assuming, for purposes of this illustration, all ten patients

---

[17] Both the opportunity-based/LDD and patient-wise methods rely on business rules that generate a table of fulfillments that have been scored as compliant or non-compliant.  The key difference between the methods is how this row-level data is summarized.  Patient-wise summary statistics report the percentage of patients whose requirements (of particular type) were compliantly fulfilled during the reporting period.  Opportunity-based/LDD summary statistics report the percentage of requirement deadlines that were met during the review period but, importantly, *does not aggregate its results per patient*.

13

required two routine PC contacts during the review period, if only seven patients received two *timely* routine PC contacts, the numerator would be seven, and the resulting summary statistic would be 70 percent (seven patients who timely received routine PC contacts over the review period divided by ten patients who were required to receive timely routine PC contacts during the review period).  As is clear from this example, the patient-wise methodology reveals the number (and percent) of *patients* who received minimally adequate care (in this case, routine PC contacts in a mainline 3CMS program within the timeframes mandated by the Program Guide).

2.  *Opportunity-Based/LDD Methodology*

Using the same hypothetical subpopulation of ten patients, defendants' preferred opportunity-based/LDD methodology would calculate a summary statistic using a numerator of the number of routine PC contacts that were timely delivered and a denominator of the number of routine PC contact *deadlines* that occurred during the review period.  Assuming seven patients received two timely PC contacts, and the remaining three each received one timely PC contact, the numerator would be 17 timely PC contacts and the denominator would be 20 routine PC contact deadlines that occurred during the review period, resulting in a summary statistic of 85 percent.  This methodology reveals the number of minimal service deadlines (due dates) that were met (timely delivered) over a review period, but it does not indicate how many *patients* received the services they required (i.e. minimally adequate care).

IV.  **Dispute Resolution Meetings Held Regarding This Dispute**

While the Special Master and parties have been discussing the TCM problem since the outset of the data remediation process, the TCM dispute was discussed in Level 1 dispute resolution meetings on May 11, 2023, May 25, 2023, and May 26, 2023.  During the May 25, 2023 Level 1 Dispute Resolution meeting, the Special Master's data expert provided a

demonstration of the patient-wise methodology, including approaches to using flexible scoring and degree of impact statistics.  The stakeholders were unable to resolve the dispute at Level 1 and, consequently, a Level 2 dispute resolution meeting was convened between the Special Master and CDCR Secretary on June 20, 2023.  While the Special Master had initially anticipated conferring with the CDCR Secretary during a follow-up Level 2 dispute resolution meeting, on July 3, 2023, Secretary Macomber notified the Special Master that the Department had not changed its position and that second Level 2 meeting was not required.

## V.    <u>Summary of Plaintiffs' Position</u>

Plaintiffs' position statement of the TCM dispute is attached in full as Exhibit B.  Salient excerpts from plaintiffs' position statement are included below.

> CDCR should remediate the TCM indicators to allow for generation of compliance statistics based on both the Special Master's preferred methodology, known as "Patient-Wise" or "PW," and CDCR's preferred methodology, known as "Last Due Date" or "LDD." Remediating the TCM indicators using only Defendants' methodology would foreclose the Court (and all stakeholders) from knowing precisely what percentage of patients received the mental health service they are minimally required to receive pursuant the remedial requirement being measured. This is the core question in this case: Both the Constitution and Program Guide focus on individual patients' experiences. *See, e.g.*, *Coleman v. Wilson*, 912 F. Supp. 1282, 1296 (E.D. Cal. 1995) ("[T]he Eighth Amendment requires the state to provide *inmates* with access to adequate mental health care." (emphasis added)); *see generally* 2021 Program Guide, ECF No. 7333-1 (mentioning the word "patient" more than 2,000 times and setting forth countless patient-centered requirements, such as that "[e]ach inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT"). The PW statistic's ability to show when individual patients are receiving substandard care is necessary to accurately and transparently determine the state of Defendants' compliance. *Cf.* Rptr. Tr. of Proceedings, Oct. 23, 2019, ECF No. 6380 at 40:16-20 (directing that "[t]he data must be pulled together, gathered and collected in a form that allows the defendants ultimately, when they truly can, accurately to demonstrate to the Court that the Constitution is finally satisfied"). Moreover, the Special Master's monitoring has always focused on individual patients' experiences, which means adopting the recommendation to remediate the data in a way that allows for PW measurement is required under the May 24, 2023 Order. *See* ECF No. 7847 at 7 ("Each key indicator must substantively track the areas the Special Master has monitored so the court can assess defendants'

compliance with the Eighth Amendment. … [E]ach key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities."). It is also necessary to adopt the recommendation under the Order of Reference, which allows the Special Master to access available data in any form he requires to conduct his monitoring – and there is no dispute that the data necessary for PW measurement is available. The decision about what statistic(s) the Court will consider when determining compliance is for a different day.

The parties agreed, and the Court approved, the Special Master to hire a data expert precisely because of the need for neutral expertise in this area. *See* Jan. 7, 2020 Order, ECF No. 6441 at 4; *see also* Apr. 29, 2020 Order, ECF No. 6646 at 1 (granting Special Master's request to appoint Daniel F. Potter, Ph.D., CAIA, as his data expert). Dr. Potter has made it abundantly clear, in his professional opinion, that remediating the TCM indicators in a way that allows for both methodologies, rather than just LDD, is possible, consistent with industry standards, requires minimal additional work, and would provide the Special Master with the information he requests. Plaintiffs support this recommendation.

## VI.    <u>Summary of Defendants' Position</u>

Defendants' position statement on the TCM dispute is attached in full as Exhibit A.

Salient excerpts from defendants' position statement are included below.

This dispute is an attempt to force the California Department of Corrections and Rehabilitation (CDCR) to build at least 19 indicators using a methodology that CDCR fundamentally disagrees with and that will be used to report on CDCR's compliance. CDCR has repeatedly raised concerns regarding the Special Master's team's proposed "patient-wise" methodology, including its complexity, its potential to create patient safety issues, and the inappropriateness of using it in quality improvement metrics. CDCR has also raised concerns that the "patient-wise" methodology is considerably different from how compliance has been reported in prior Special Master monitoring reports. In response to these concerns, the Special Master's team has told CDCR it can use a different methodology internally, while the Special Master will use the "patient-wise" methodology to gauge and report on CDCR's compliance with various key indicators. But this does not resolve CDCR's concerns. Therefore, CDCR maintains its objections to the methodology proposed by the Special Master's team.

Defendants' position statement focuses on the following arguments, which are further addressed in Section VII of this report:

- CDCR's Proposed Methodology is Straightforward and Not in Dispute.

16

- The Methodologies Proposed by the Special Master's Team are Overly Complicated and Not Easy to Understand.

- The Methodologies Proposed by the Special Master's Team Create[] Patient Safety Issues.

- The Methodologies Proposed by the Special Master's Team Are Not Appropriate Quality Improvement Metrics.

- The Methodologies Proposed by the Special Master's Team are Not Consistent with Methodologies Used in Other Correctional Systems or Other Larger Health Care Systems to Monitor Timely Access to Care.

- The Methodologies Proposed by the Special Master's Team is a Significant Shift from Current and Prior Monitoring Practices.

- Requiring CDCR to Build Indicators Using the Methodologies Proposed by the Special Master's Team May Increase the Number of Future Disputes.

**VII.    <u>Special Master's Analysis and Recommendations</u>**

A.  <u>"Timeliness" and the Origins of the Data Remediation Process</u>

Notably, the history of the Golding Report and related proceedings is relevant to the TCM dispute and underscores the necessity of remediating these indicators to ensure transparent, accurate reporting of defendants' *timely* satisfaction of various remedial obligations.  Indeed, at the heart of Dr. Michael Golding's Whistleblower Report which gave rise to the data remediation process were concerns with the accuracy of defendants' mental health data systems' reporting of "timeliness" of certain Program Guide requirements.  *See, e.g.*, ECF No. 7755 at 8 ("During the course of the Golding Report-related proceedings, the Court found that the design of certain of defendants' then-existing indicators inaccurately measured compliance with the mandates of the Program Guide and defendants' acknowledged that 'misleading information was provided to the court.").  Ultimately, the Court found that "defendants ha[d] knowingly presented misleading information to the court in numerous areas critical to the remedy in this case and measuring compliance with that remedy."  ECF No. 6427 at 41.

17

Among the issues the Court referred to the Neutral Investigator were issues that directly impacted the data underlying some of the provisionally-approved key indicators subject to the TCM dispute.[18]  For instance, the key indicator measuring compliance with Program Guide timeframes for psychiatry contacts is part of the TCM dispute.  *See supra* Part II.  In its Order following the Golding Report-related proceedings, the Court found defendants' efforts to redefine "monthly" as 45 days rather than 30 days for measuring compliance with the Program Guide's requirement that EOP patients be seen by psychiatrists at least "monthly," ECF No. 7755 at 8, to be "inconsistent with implementation of the relevant Program Guide requirements as established through more than a decade of practice."  December 17, 2019 Order, ECF No. 6427 at 29; *see also* August 14, 2019 Order, ECF No. 6242 at 5 (noting the decision to change monthly from 30 days to 45 days resulted in a "'significant alteration' to the Program Guide") (quoting ECF No. 6185 at 9).

In addition to defendants' efforts to redefine "monthly," other issues the Court referred to the Neutral Investigator implicated how various other remedial requirements were "scored" and summarized via summary statistics, including: "[c]ombining CCCMS and EOP appointment compliance numbers into one reporting category;" "[i]nflating compliance numbers by counting every encounter between a psychiatrist and an inmate-patient as an appointment for purposes of measuring Program Guide timeline compliance, without regard to whether the encounter was a psychiatry appointment or, e.g., a wellness check or a cell-front attempt to communicate with an

---

[18] Of the seven issues submitted to the Neutral Investigator, *see* December 17, 2019 Order, ECF No. 6427 at 8-9, the Court held evidentiary hearings to determine if "misleading data ha[d] been presented to the court and/or the Special Master" as to the following five issues:  (1) Redefining "Monthly" to Lengthen the Intervals between EOP Appointments; (2) Counting All Encounters as Evaluations; (3) Reporting of Scheduled and Missed Appointments; (4) Psychiatric Supervisors Acting as Line Staff; and (5) Medication Noncompliance.  ECF No. 6187 at 2.

inmate patient;" "[t]he manner of reporting of scheduled appointments and missed

appointments," "[f]ailing to report that psychiatric supervisors were also performing some or all

the functions of staff psychiatrists;" and "[t]he way in which medication non-compliance is

measured." December 17, 2019 Order, ECF No. 6427 at 7-8.

B.  Defendants Are Under Court Order to Report Program Guide Compliance from "Zero to 100 Percent"

The Special Master's approach to the TCM dispute has been and continues to be

grounded in the Court's direction that defendants' transparently and accurately report satisfaction

of remedial requirements from zero to 100 percent. In an Order issued before the Golding

Report emerged, the Court highlighted the Special Master's practice of "provid[ing] information

to the court on the full range of defendants' compliance with their obligations, including and up

to 100 percent compliance." July 12, 2018 Order, ECF No. 5852 at 2. The Court specifically

directed defendants to "follow the standard practice, set by the Special Master and approved by

the court, and shall report all degrees of compliance with monitoring of Program Guide

requirements, from zero to 100 percent." *Id.*[19]

---

[19] Relatedly, in its May 24, 2023 Order, the Court made clear that "the focus must be on tracking compliance with each indicator from zero percent to 100 percent or, as appropriate, in a manner susceptible to adequate measurement by that indicator." ECF No. 7847 at 9. Further, the Court noted the following: "The Special Master has advised the court there are a small group of key indicators that are not susceptible to measurement by percentage. In his final report, the Special Master will identify those indicators and either stakeholder agreement or, alternatively, his proposal for how these indicators should be used in measuring compliance." *Id.* at 5 n. 5. Thus, but for this "small group of indicators that are not susceptible to measurement by percentage," the provisionally approved key indicators must include validated and verified summary statistics in the form of percentage compliance. Specifically, the Special Master does not consider the 26 indicators subject to this dispute as part of this "small group" of indicators referenced in the Court's May 24, 2023 Order.

As is evident from the existence of this dispute, there are multiple ways to calculate and summarize defendants' remedial performance from zero to 100 percent.  The Special Master, based on his data expert's advice, is convinced the patient-wise methodology is most appropriate for transparently and accurately summarizing, for a given reporting period, whether *Coleman* patients receive minimally adequate care for the remedial requirements measured by this subset of indicators.

C.  <u>Special Master's Response to Defendants' Position Statement</u>

While defendants' position statement offers a spirited critique of the patient-wise methodology, the first sentence of their position statement suggests their primary concern is with the compliance thresholds that the Court will ultimately use to determine questions of constitutional compliance.  *See* Exhibit A at 1 ("This dispute is an attempt to force the California Department of Corrections and Rehabilitation (CDCR) to build at least 19 indicators using a methodology that CDCR fundamentally disagrees with *and that will be used to report on CDCR's compliance*.") (emphasis added).  As the Special Master and his data team have repeatedly reminded the parties, determinations of constitutional compliance generally and indicator-related compliance thresholds in particular are in the purview of the Court and need not serve as a distraction from the important work ahead.  *See, e.g.*, July 1, 2021 Order, ECF No. 7216 at 4 ("The degree of compliance for each indicator remains for the court to determine by subsequent order….").

The Special Master's data expert has also advised, as the parties are aware, that it is standard practice in quality assurance systems to utilize summary statistics derived from multiple methodologies to accurately measure if quality assurance standards have been met and inform quality improvement efforts.

Proceeding with the Special Master's recommendation will result in the production of validated and verified summary statistics regarding remedial compliance using both methodologies. This, in turn, will equip the Court with the information it needs to thoughtfully consider questions regarding compliance thresholds as it guides this longstanding case to an end.

Given the complexity of the data remediation process overall, its importance to defendants' transition to self-monitoring, and the premature nature of the legal questions that appear to preoccupy defendants, remediating these indicators to enable production of summary statistics derived from both methodologies is the most prudent and efficient path forward.

The Special Master provides brief responses to defendants' major points of contention below.

1. *"CDCR's Proposed Methodology is Straightforward and Not in Dispute"*

Defendants first argue that they should be allowed to remediate these indicators using *only* their preferred methodology because the opportunity-based/LDD methodology is "straightforward" and "[t]he Special Master's team and Plaintiffs' counsel have not raised significant issues with" it. Exhibit A at 2. In addition, defendants contend the Special Master's data expert "has acknowledged that the 'opportunity-based' methodology can provide important information and may be incredibly useful for quality improvement." *Id.*

Here, defendants mischaracterize the Special Master's position. As noted, because of its focus on whether *patients* received the minimal requirements of the Program Guide, the Special Master finds the patient-wise methodology to be best suited to summarize defendants' satisfaction of the Program Guide requirements measured by the TCM indicators. Therefore, to say that CDCR's preferred methodology is "not in dispute" is a mischaracterization.

The opportunity-based/LDD methodology preferred by defendants focuses on the number of times a mental health service was delivered within deadlines.  Significantly, defendants' methodology is presently unable to aggregate patient-level data over a review period, making it difficult to discern whether multiple requirements have been met (either through time, or in combination).  *See supra* note 17.  In contrast, the patient-wise approach allows one to easily understand when multiple requirements were met on a per-patient basis for a given reporting period.

However, the Special Master recognizes that defendants' methodology provides useful information and does not seek to prevent defendants' from using data derived from this methodology.  However, the Special Master requires validated and verified *patient-wise* summary statistics for purposes of his monitoring going forward.  He further believes that now, when the provisionally approved key indicators are undergoing remediation, is the most sensible time to effectuate the minimal changes to the design and operationalization of the indicators to permit patient-wise statistics to be calculated (in addition to opportunity-based/LDD statistics, not in place of them).[20]

2.   *"The Methodologies Proposed by the Special Master's Team are Overly Complicated and Not Easy to Understand"*

Defendants argue that "CDCR's proposed 'opportunity-based' methodology is straightforward and user-friendly," and, "[c]onversely, the methodologies proposed by the Special Master's team are overly complicated and difficult to understand, even for those who

---

[20] In their position statement, defendants state: "[T]he Special Master's team already has access to the raw data underlying each of the 19 indicators in question and can calculate compliance for those indicators at any time using any of several methodologies."  Exhibit A at 1 n. 2.  This argument is unavailing, ignores the purpose of the data remediation process altogether, and would likely require another, separate stakeholder validation and verification process.

have been steeped in the data remediation process."  Exhibit A at 2.  Defendants contrast the

patient-wise and opportunity-based/LDD methodologies using the analogy of a student being

graded in school:

> [U]nder CDCR's proposed methodology, a student who is assigned ten tasks to complete over the course of a semester would be scored on whether he completes each assignment.  Thus, if the student completes nine of the ten assignments, he would receive a 90 percent on his report card at the end of the semester.

*Id.*  Defendants, however, object to the patient-wise methodology because the "student would

*only pass the course if he completed all (or a set subset) of the assignments.*"  *Id.* 2-3 (emphasis

added).  Further, defendants complain that, using the patient-wise methodology, "if the student

only completes nine of the ten assignments, he could fail the course."  *Id.* at 3 (emphasis added).

The Special Master disagrees that the patient-wise methodology is "overly complicated

and difficult to understand."  From the perspective of determining how many *patients* received

the Program Guide's minimally required amount of mental health care, the patient-wise

methodology is actually more intuitive than the opportunity-based/LDD methodology.

Moreover, as defendants acknowledge in their position statement, *see* Exhibit A at 3, the Special

Master's data expert demonstrated how the patient-wise methodology provides the ability to

utilize flexible scoring to allow limited amounts of variation from the minimum standard laid out

in the Program Guide to be scored as compliant.  Using this approach permits the scoring of the

indicator to be adjusted to accommodate whatever compliance threshold the Court ultimately

sets.  In addition, the patient-wise methodology pairs well with "degree-of-impact" statistics

which would help users understand the nature and extent of deviations from the minimum

standard.  Neither flexible scoring nor degree of impact statistics renders the patient-wise

methodology "overly complicated" or "difficult to understand."  To the contrary, these features

are consistent with the Special Master's historic practice of monitoring to a 90 percent standard

for most Program Guide requirements and his efforts to specify the extent of noncompliance where it is found.[21]

The school analogy offered by defendants is useful, though oversimplified. For example, defendants' hypothetical suggests that the patient-wise methodology is unique in that it requires a student to "complete[] all (or a set subset) of the assignments" in order to pass the course. Exhibit A at 2-3. This ignores the fact that the student being graded using defendants' preferred methodology would *also* have to satisfy some minimum threshold (e.g. number of correct answers) to get a passing grade on the test or, over time, to pass the course.[22]

Using the school analogy, defendants' opportunity-based/LDD methodology would result in a summary statistic calculated by dividing the number of correct answers to a test across a

---

[21] *See, e.g.*, 29th Round Monitoring Report – Part C, ECF No. 7715 at 363 ("The monitor reviewed 20 RVRs issued to MHSDS patients. Custody staff timely requested mental health assessments for ten, or 50 percent, of RVRs. *The late referrals ranged from one to 13 days late.*"); *id.* at 400 ("The monitor reviewed a randomly selected sample of 29 RVRs. Of those, custody staff timely referred the RVR to mental health staff for completion of a mental health assessment in 13, or 45 percent of the cases. *The late referrals ranged from one to 13 days overdue.*"); Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 484 ("Custody staff timely referred RVRs for a mental health assessment in 21 or 75 percent of the 28 reviewed cases. *The range of overdue days in which custody staff referred the RVR for mental health assessment for four to ten days.*"); *id.* at 534 ("ASP made 16 referrals to MHCBs during the review period. Of those, nine of 56 percent were rescinded. Five referrals or 31 percent took longer than 24 hours to transfer or rescind *with a range of four to 14 days.*"); *id.* at 559 ("Review of the sample of inmates in Facility D EOP indicated that excluding one inmate who was not seen at all by a psychiatrist during the review period, *there was a range of two to 104 days between psychiatric contacts.*"); *id.* at 588 ("Of the 21 inmates transferred to MHCBs, 17 or 81 percent transferred timely. The *four transfers beyond 24 hours averaged 39.2 hours, and there was one outlier who waited 13.7 days to transfer.*") (emphasis added).

[22] Of course, using either methodology, defendants would need to meet "all (or a set subset)" of the remedial requirement being measured to be scored compliant. With limited exception, see, e.g., ECF No. 6973 at 7-8 (discussing suicide prevention compliance thresholds), the Special Master has monitored to a 90 percent compliance threshold. In other words, defendants are able to demonstrate compliance by satisfying a "set subset" of at least 90 percent. Defendants' vociferous objections notwithstanding, there is nothing new about the Special Master's seeking to measure "whether each patient was offered all or some subset of those services…required over a period of time." Exhibit A at 3.

population by the total number of questions.  The patient-wise methodology, in contrast, would report the number of students who passed the test (or, over time, passed the course).  In addition, the degree of impact statistic would allow the user to differentiate between, for example, students who missed a passing score by one percentage point and a student who failed to answer any question correctly.

Whatever methodology is (or methodologies are) used to assess defendants' compliance with their remedial obligations from "zero to 100 percent," the Court will need to establish compliance thresholds.  The patient-wise methodology offers the most accurate, transparent view of the number of *patients* who are receiving minimally adequate mental health care.

> 3.  *"The Methodologies Proposed by the Special Master's Team Creates Patient Safety Issues"*

CDCR states "[t]he 'patient-wise' methodology creates concerns for CDCR and the safety of its patients."  Exhibit A at 4.  More specifically, CDCR describes their objections to the patient-wise methodology as follows:

> CDCR is concerned that PWA or PWF will obscure compliance rates with high-needs patients.  *By focusing on patients who achieve perfect scores*, progress and the needs of patients who require more intensive care are overlooked, particularly when there is a significant disparity between the proportions of low-need and high-need patients.  Within CDCR's mental health program, it is common for a small portion of patients to have a high need for services.  For example, if 90 percent of EOP patients are low-need patients who easily achieve a perfect score, the PWA and PWF methodologies indicate that 90 percent of patients received all required services.  However, this figure could obscure that the remaining 10 percent of high-need patients might not receive adequate care.

> Similarly, indicators using the PWA or PWF methodology can obscure progress in achieving compliance for high-need patients.  For example, consider a scenario where services provided to a high-need EOP patient improve from 60 percent to 85 percent compliance while a low-need EOP patient maintains 100 percent compliance.  The PWA or PWF measure would remain unchanged because the high-need patients will be shown as having received zero care.

*Id.*

Defendants' concerns regarding patient safety are unfounded.  Moreover, the Special Master reiterates that he is not recommending that CDCR exclusively use the patient-wise methodology for these 26 indicators, but that they augment their systems to permit patient-wise statistics to be calculated *in addition* to CDCR's opportunity-based/LDD methodology.

Defendants' position statement incorrectly assumes that the Special Master's methodology would *"focus[] on patients who achieve* perfect scores."  *Id.*  As noted in defendants' position statement, the Special Master's data expert has identified two variations of the patient-wise methodology:  the patient-wise "all-or-none" (or "PWA) variation, and the patient-wise "flexible" (or "PWF") variation.  The "all-or-none" variation of the patient-wise methodology would require a patient to receive *all* required services in a review period in order to be scored as compliant.  In contrast, the flexible scoring variation would permit cases featuring some deviation from the minimum standard to be scored as compliant.  The flexible scoring approach is most similar to the Special Master's historic monitoring approach and is most appropriate for the task at hand, in part because it can adjust to whatever compliance thresholds the Court ultimately establishes for these 26 indicators.  Defendants' concern that the patient-wise methodology inappropriately focuses on "perfect scores" is unfounded in light of the Special Master's recommendation to use the flexible variation of the patient-wise methodology.

Further, defendants' offer a hypothetical related to "high-need" and "low-need" patients which perplexingly assumes that "low-need" EOP patients can "easily achieve a perfect score."

*Id.*[23]  Defendants argue that the patient-wise methodology "overlook[s]" the "progress and the needs of patients who require more intensive care."  *Id.*  These statements and the assumptions underlying them demonstrate defendants' mischaracterization of the features of the patient-wise methodology.  The patient-wise methodology – inclusive of flexible scoring to permit minor deviations from the Program Guide-required standard to be scored as "minimally adequate" and degree-of-impact statistics to specify the extent of any observed noncompliance – in no way *only* "focus[es] on patients who achieve perfect scores." [24]

In addition, defendants incorrectly state that the "high need" patient in their hypothetical would "be shown as having received zero care" under the patient-wise methodology.[25]  This is false.  Using flexible scoring and degree of impact statistics, rather than seeing a patient as having received "zero care," one would be able to determine the extent and nature of the noncompliance and take appropriate corrective action.  In the example provided, the degree of impact statistic would show the extent of the observed noncompliance (60 percent v. 85 percent). The totality of defendants' position statement evinces an understanding of the Special Master's preferred methodology; thus, defendants should cease advancing such mischaracterizations.

---

[23] The Program Guide establishes *minimum* standards.  CDCR is required to provide *at least* those mental health services required by the Program Guide to MHSDS patients based on their level of care regardless of whether the patients are considered "high need" or "low need."  Of course, when clinically indicated CDCR should provide more than the minimum frequency of contacts for those patients who require that level of service.

[24] Defendants' suggestion that utilization of either of the methodologies in question would reflexively result in "progress and the needs of patients who require more intensive care" being "overlooked" presents significant though separate concerns about the manner in which defendants manage their MHSDS.  *See infra* p. 28.

[25] In the example defendants provide, assuming a 90 percent compliance threshold, the reason the patient-wise compliance score did not improve when a "high-need EOP patient improve[d] from 60 percent to 85 percent compliance" is because the number of patients who received minimally adequate care (the numerator) did not change.

The unintended consequences related to the patient-wise methodology that CDCR's position statement warns against are at least as concerning when viewed through the opportunity-based/LDD lens. *See* Exhibit A at 5 ("This unintentional influence could encourage staff to lean towards low-need patients to achieve compliance when they are genuinely striving to manage time and resources optimally. An unintended decrease in focus on high-need patients could inadvertently compromise optimal patient care outcomes."). For example, difficult to engage "high needs" patients could easily go overlooked if clinicians were to focus on completing "easy" remedial requirements for "low need" patients who readily engage in treatment, potentially creating an inflated view of how many patients received minimally adequate care.

However, the Special Master's experience in the field suggests the team of mental health professionals that staff CDCR's institutions are more focused on meeting the needs of their patients (often in chronically and dangerously understaffed environments) than they are turning indicators from "red" to "green." To the extent that impression is wrong, defendants have a significant management problem that they must address forthwith.

4. *"The Methodologies Proposed by the Special Master's Team Are Not Appropriate Quality Improvement Metrics"*

As the Special Master and his data expert have repeatedly told the parties, unless and until ordered otherwise by the Court, CDCR can use whichever methodology it pleases for internal quality management purposes. By focusing their ire on the "all-or-nothing" version of the patient-wise methodology—which neither the Special Master nor his data expert have recommended be used in isolation—defendants persist in their misrepresentation of the Special Master's position. After these many years of remedial effort, there should be little confusion as to the following: CDCR is required to provide minimally adequate mental health care, as delineated in defendants' remedial plan (the Program Guide), to the patients who comprise the

plaintiff class.  The requirements of the Program Guide are the *minimum* standards against which CDCR will be evaluated; use of either of the timely compliance methodologies will not change this basic truth.

5. *"The Methodologies Proposed by the Special Master's Team are Not Consistent with Methodologies Used in Other Correctional Systems or Other Larger Health Care Systems to Monitor Timely Access to Care"*

While arguing definitively that the patient-wise methodology is inconsistent with "methodologies used in other correctional systems or other larger health care systems to monitor timely access to care," defendants concede that "[b]usiness rules for large health care systems and correctional systems are not widely available."  Exhibit A at 6.  More than likely, the business rules for a comparable state department of corrections found to have knowingly presented misleading information to a federal court in aid of their efforts to demonstrate durable remedial compliance are even less "widely available."  Thus, defendants' arguments here are unavailing.

6. *"The Methodologies Proposed by the Special Master's Team is a Significant Shift from Current and Prior Monitoring Practices"*

Defendants characterize the Special Master's proposed compromise – to produce validated and verified summary statistics using both the opportunity-based/LDD and patient-wise methodologies – as a "shift from how the Special Master has previously monitored" and an effort to "move the goal posts again and implement a new methodology."  Exhibit A at 7.  To the contrary, seeking to determine how many patients received minimally adequate care and, for those patients who received less than minimally adequate care, determining the nature and extent of the shortfall, is entirely consistent with the Special Master's historic monitoring practices.  *See supra* note 15 and accompanying text.  Moreover, as described earlier, the granular review of indicator documentation necessitated by the data remediation process has revealed the possibility

of refined and improved ways of measuring and summarizing the *substance* of the Special

Master monitoring. *See* May 23, 2023 Order, ECF No. 7847 at 7. Use of the patient-wise

methodology will not change the substance of the Special Master's monitoring but instead will

provide the Court with a patient-centered view of defendants' remedial compliance for this small

number of key indicators especially salient to the mental health treatment of members of the

*Coleman* class of inmates with serious mental illness.

Critically, defendants' position statement obfuscates the fact that the opportunity-

based/LDD approach *also* represents a methodological shift from the way CDCR has recently

preferred to measure and report compliance statistics. For instance, The Neutral Investigator's

Report discussed CDCR's then-preferred methodology, the "patient-weeks compliant" approach:

> This methodology—sometimes referred to as "patient-weeks"—measures the
> amount of time that a patient is current on their required appointments. CDCR
> performs a weekly check every Sunday that looks back at the week prior to
> determine whether the patient was up to date on their routine contact for that week.
> For instance, if an EOP patient was seen on April 1, 2019…and again on May 1,
> CDCR would report four weeks of compliance because the patient was never
> overdue on his required psychiatry contacts by the time the Sunday check occurred,
> thus resulting in a compliance rate of 100%.

ECF No. 6147 at 21-22.[26] Notably, the Neutral Investigator described the "patient-weeks"

methodology as "integral to a host of performance indicators that CDCR Mental Health uses to

---

[26] Of relevance to the TCM dispute, the Neutral Investigator also discussed CDCR's view
of the importance of having some measurement of "how late an appointment was," ECF
No. 6147 at 22, which is akin to the Special Master's recommendation to utilize degree-
of-impact statistics. *Id.* ("According to CDCR, [the patient-weeks] methodology is the
best way to have a single number that includes both whether an appointment was late and
how late the appointment was…According to CDCR, [an alternative to the patient-
weeks] methodology is inferior because it does not tell the viewer how late an
appointment is; it only tells the viewer whether the appointment was late."). Likewise, at
the time of the Neutral Investigator's Report, CDCR expressed concerns about the
"insensitivity" of methodologies other than the patient-weeks approach, a potential
problem that, here, the patient-wise methodology mitigates through the use of flexible
scoring. *Id.* at 23 ("Additionally, CDCR asserts that [the alternative to patient-weeks]

report Program Guide compliance." *Id.* at 21.  Further, "[s]ome witnesses and documents

suggested that CDCR Mental Health Leadership errs on the side of over-reporting compliance"

by using the patient-weeks method. *Id.*

While the Special Master concurs with defendants shift away from the highly problematic

"patient-weeks" method, defendants' currently preferred methodology nonetheless represents a

significant alteration to the way in which they previously presented data and calculated summary

statistics.

In addition, the anticipated transition from the Special Master's monitoring to CDCR's

self-monitoring will necessarily include some adjustments in practices and methodology.[27]

Some of these adjustments have already been effectuated during the BRMR process and

generally the stakeholders have demonstrated their ability to consider these issues in a

thoughtful, productive manner.

      7.   *"Requiring CDCR to Build Indicators Using the Methodologies Proposed by the Special Master's Team May Increase the Number of Future Disputes"*

Finally, defendants' contend if "the Special Master disregard(s) CDCR's view of the

dispute and instead characterize[s] this as a simple request to build the indicator using multiple

methodologies, it must be noted that this may in fact increase the number of future disputes in

---

methodology fails to account for multiple appointments occurring within a short period of time, thereby increasing compliance ('clumping'), or the fact that an appointment that is only slightly late would result in 0% compliance ('insensitivity').").

[27] One significant shift that will need to occur involves the timely PC and timely MHMD indicators.  Since the Golding Report proceedings, the Special Master has reported on timely PC contacts, timely psychiatry contacts, and timely IDTTs based on his monitoring team's manual review of a small random sample of patient charts.  This practice of reviewing samples of patient charts to evaluate timely compliance was necessitated by defendants' knowing presentation of misleading data regarding timely psychiatry contacts, as revealed by the Golding Report.  The Special Master does not think this practice should be replicated in CDCR's CQIT process because the computer systems can produce system-wide statistics on these measures.

BRMR." Exhibit A at 8. The Special Master has in no way "disregarded" defendants concerns with this dispute. In addition to being consistent with standard practice in quality assurance systems, the Special Master's recommendation to build these 26 indicators with both methodologies respects defendants' position and, as noted, will permit the Court to make informed decisions in the future about compliance thresholds.

Defendants' suggestion that the Special Master's recommendation "may in fact increase the number of future disputes" is particularly concerning because, in recent weeks, defendants have increasingly tended to reject the Special Master's teams' recommendations to bridge the divide between the parties. Relatedly, defendants have also signaled an unwillingness to exhaust discussions at the second level of review or further consider issues at the first level.

While the Special Master has previously commented on the utility of the dispute resolution process, *see* ECF No. 7863 at 43, the Special Master's recent experience indicates the process is no longer efficiently resolving disputes at the lower levels. Instead, new third level disputes have proliferated in recent weeks, [28] each of which will require a report and recommendation from the Special Master, which the Court then has to consider, encumbering significant judicial resources and jeopardizing timely completion of remediation for the indicators in dispute.

As the deadline for completion of data remediation looms closer, it may be time for the Court to consider a more efficient process for resolving any remaining data remediation disputes.

---

[28] For instance, there have been five disputes (including the TCM dispute) that have required third-level recommendations from the Special Master through the life of the dispute resolution process. After the most recent Level 2 dispute resolution meeting between Secretary Macomber and the Special Master, there are now four additional disputes that will require third-level recommendations and Court consideration of the same (with additional disputes in the pipeline).

## VIII.    **Special Master's Conclusion and Recommendations**

Necessarily, the patient is and always has been at the center of this case and its remedy.

*See, e.g.*, ECF No. 7111 at 61:22-25 ("The Court has in the past made a point of reminding all of

us of what this case is really about, and it is appropriate to invoke the *real persons* who really are

at the heart of this case.") (emphasis added).  Indeed, it is the *patient's* Eighth Amendment rights

that are at stake.  In order to remedy the Eighth Amendment violations identified in the Court's

1995 decision, defendants developed a remedial plan that prescribes *minimum requirements* for

mental health services to be provided to the patients who comprise the *Coleman* class.  And, to

the greatest extent practicable, the Special Master for years has monitored defendants' remedial

compliance in a patient-centered manner – with those "seriously mentally ill individuals housed

behind bars in [California] who have the absolute, undeniable right to constitutionally adequate

treatment and care" at the forefront.  December 17, 2019 Order, ECF No. 6427 at 45.

Just as "legal cases are not just words on a piece of paper and a series of jousting

matches," *id.* at 44, remedial compliance is about more than turning indicators from red to green.

It is about *Coleman* patients finally receiving those mental health services to which they are

constitutionally entitled.  When an indicator turns from red to green, it must mean that patients

are receiving that minimum level of service which the Program Guide prescribes.  And it is the

Special Master's position that his data expert's recommended methodology – the patient-wise

methodology – ensures the Court has clear data and summary statistics about whether *patients*

are receiving Program Guide required services.

This dispute involves the stakeholders' disagreement about the best method to satisfy the

Court's directive to report summary statistics regarding Program Guide compliance "from zero

to 100 percent" through the provisionally approved key indicators.  Based on his experience over

more than two decades monitoring defendants' MHSDS and the advice of his court-appointed

data expert, the Special Master finds the patient-wise methodology superior in its ability to

accurately and transparently summarize the number of *patients* who received minimally adequate

mental health care, for a given reporting period for these 26 indicators.  These patient-wise

summary statistics – fully remediated so that there is no question about their accuracy – will be

essential to the Court's consideration, in the future, of appropriate compliance thresholds for the

indicators.  The Special Master acknowledges defendants' methodology provides useful

information, but defendants do not (and cannot) argue that their methodology provides patient-

centered data and summary statistics.  It does not.

  The Special Master's recognition of the concerns defendants have consistently expressed

regarding the patient-wise methodology led him to propose a compromise solution that was not

unduly burdensome and, significantly, respected defendants' management prerogatives.

Unfortunately, defendants' rejected this compromise.  If defendants continue to reject

compromise proposals and, as a result, the stakeholders' are unable to resolve disputes at the

lowest levels of the process, the Special Master will need to produce – and the Court will need to

consider –  additional Third Level Reports.  *See supra* note 28 (discussing pending Level 2

disputes).  In light of the fast-approaching deadline for completion of data remediation, the

Special Master is increasingly concerned that the established dispute resolution process,

inclusive of the significant strain on judicial resources it currently encumbers, is no longer the

most efficient vehicle to resolve data remediation disputes.

  Considering the factors discussed in this Report, along with defendants'

acknowledgement that: (1) CDCR is able to build indicators capable of generating validated and

verified summary statistics derived from multiple methodologies; (2) it is appropriate to "look at

34

the same data in different ways;" and (3) there is "no technical or workload barrier to developing these summary statistics," the Special Master recommends the 26 TCM indicators be designed to allow for the calculation of both patient-wise and opportunity-based / LDD summary statistics. The Special Master has also demonstrated that the patient-wise methodology does not require perfection, but instead is flexible and amenable to any compliance threshold the Court determines appropriate for the given indicator.

Specifically, the Special Master recommends that:

- Defendants provide data and summary statistics in accordance with the patient-wise approach –inclusive of flexible scoring – for 26 of the provisionally approved key indicators *in addition* to CDCR's preferred methodology (not instead of it); and

- The patient-wise data be placed in context by use of a degree of impact statistic showing extent of non-compliance.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr. Esq.
Special Master

September 21, 2023