# EXHIBIT A

Defendants' Level 2 Dispute Statement:
Timely Compliance Methodology

This dispute is an attempt to force the California Department of Corrections and Rehabilitation (CDCR) to build at least 19 indicators using a methodology that CDCR fundamentally disagrees with and that will be used to report on CDCR's compliance.[1,2] CDCR has repeatedly raised concerns regarding the Special Master's team's proposed "patient-wise" methodology, including its complexity, its potential to create patient safety issues, and the inappropriateness of using it in quality improvement metrics. CDCR has also raised concerns that the "patient-wise" methodology is considerably different from how compliance has been reported in prior Special Master monitoring reports. In response to these concerns, the Special Master's team has told CDCR it can use a different methodology internally, while the Special Master will use the "patient-wise" methodology to gauge and report on CDCR's compliance with various key indicators. But this does not resolve CDCR's concerns. Therefore, CDCR maintains its objections to the methodology proposed by the Special Master's team.[3]

   I.   CDCR's Proposed Methodology is Straightforward and Not in Dispute.

CDCR's proposed timely compliance methodology, termed "opportunity-based" methodology, measures requirements in a common sense manner similar to how requirements are measured in every-day life. For example, where a student is assigned ten tasks to complete over the course of a semester, the student is scored on whether he completes each assignment. If the student completes nine of the ten assignments, he would receive a 90 percent on his report card at the end of the semester. At its most basic level, this is the approach CDCR recommends. For each indicator affected by the timely compliance methodology, CDCR's "opportunity-based" methodology measures the percentage of service requirements (e.g., psychiatry contacts, primary clinician contacts, interdisciplinary treatment team meetings) completed on time out of the total services required. This aligns with how the Special Master has historically monitored CDCR's services.

---

[1] At this time, CDCR knows of 19 indicators affected by this dispute; however, the Special Master's team has acknowledged that he may choose to apply their methodology to other indicators that have yet to go through the Business Rules and Methodology Review (BRMR) meeting.

[2] Plaintiffs' counsel or the Special Master's team may characterize this dispute as request to provide data in a certain format. However, the Special Master's team already has access to the raw data underlying each of the 19 indicators in question and can calculate compliance for those indicators at any time using any of several methodologies. This is also not a dispute about whether CDCR is able to build a methodology that includes multiple high-level summary statistics. CDCR has acknowledged that it can build multiple summary statistics and, in some cases, it may be appropriate to look at the same data in different ways. There is no workload issue in developing these summary statistics.

[3] CDCR reserves the right to make new objections to any future writings from the Special Master regarding this issue. To date, CDCR has not received the Special Master's position on this issue in writing. The Special Master's team has only provided an example of how their methodologies might work on a single indicator, but they have not provided enough information to fully understand the methodologies and how they would be applied to the 19 indicators in question. *See* Section II *supra*. The Court recently noted that under the Order of Reference, "the court does not consider any objections to a report or recommendation by the Special Master 'unless an identical objection was previously submitted….'" ECF No. 7847 at 10 (citing ECF No. 640 at 8). However, the cited section of the Order of Reference applies to compliance reports filed under paragraph A(5). ECF No. 640 at 8. Under paragraph A(5), the Special Master provides a draft report and each party has 30 days to provide informal objections. *Id*. at 4-5. That is not the case here. No written description, much less a draft report, has been provided here. CDCR maintains its right to supplement these objections should a written report be issued in the future or if Plaintiffs' position statement raises new issues.

The application of CDCR's "opportunity-based" methodology to timely contact indicators is straightforward. For example, the Program Guide requires weekly primary clinician (PC) contacts for patients in Enhanced Outpatient Programs (EOP). Using CDCR's "opportunity-based" methodology, if a patient was required to be offered four PC contacts in a month, but was only offered three contacts timely, the timely PC contacts offered to that individual patient would be 75 percent compliant. Similarly, if a patient was required to be offered four PC contacts in a month, but was only offered two contacts timely, that individual patient would be 50 percent compliant.

At a higher level, CDCR's methodology would look at a particular service requirement to see if the service requirement was delivered on time to multiple patients over a specific period. So if the two patients above were the total population of a housing unit, CDCR's methodology would put the number of timely contacts (a total of five) over the total number of required contacts (a total of eight) to determine that PC contacts were offered timely 62.5 percent of the time.

The Special Master's team and Plaintiffs' counsel have not raised significant issues with CDCR's methodology. In fact, the Special Master's data expert, Dr. Potter, has acknowledged that the "opportunity-based" methodology can provide important information and may be incredibly useful for quality improvement. Despite this, CDCR has been precluded from moving 19 indicators through BRMR using its proposed methodology. This pause is not based on qualms with CDCR's proposed methodology, but on the concern that CDCR will not also build the 19 indicators in question using the methodology proposed by the Special Master's team.

Given the short time left to complete remediation of the provisionally approved key indicators, CDCR requests to move the disputed indicators through BRMR using CDCR's proposed methodology while the parties and the Special Master work to resolve the dispute over the methodology proposed by the Special Master's team.

> II. The Methodologies Proposed by the Special Master's Team are Overly Complicated and Not Easy to Understand.

In the May 24, 2023 order, the Court made clear that "the main purpose of data remediation is to ensure the transparency and accuracy of defendants' mental health data report." ECF No. 7847 at 12. Transparency requires that data be readily understood by its users. One of CDCR's goals in choosing an appropriate methodology was to pick the methodology that accurately reflected what was occurring at the institutions, while also presenting the data in a way that was easy for the Court, external stakeholders, and staff to understand. As explained above, CDCR's proposed "opportunity-based" methodology is straightforward and user-friendly. Conversely, the methodologies proposed by the Special Master's team are overly complicated and difficult to understand, even for those who have been steeped in the data remediation process.

Based on conversations with the Special Master's team, CDCR understands that the proposed "patient-wise" methodologies measure whether a patient received all or a subset of the required services over a period of time. Going back to the above example, under CDCR's proposed methodology, a student who is assigned ten tasks to complete over the course of a semester would be scored on whether he completes each assignment. Thus, if the student completes nine of the ten assignments, he would receive a 90 percent on his report card at the end of the semester. However, under the "patient-wise" methodology proposed by the Special Master's team that student would only pass the course if he completed all (or a

set subset) of the assignments. Therefore, if the student only completes nine of the ten assignments, he could fail the course.

During the first Level 1 dispute resolution discussion, held on May 11, 2023, Dr. Potter revealed for the first time that the methodology proposed by the Special Master's team was actually comprised of two "patient-wise" methodologies: Patient-Wise All-or-None (PWA) and Patient-Wise Flexible (PWF). To help everyone understand the methodologies, the Special Master's data expert applied the proposed methodologies to the indicator measuring Timely PC Contacts for EOP patients. The Program Guide requires CDCR to offer weekly PC contacts for patients in EOP. The proposed "patient-wise" methodologies will measure whether each patient was offered all or some subset of those services (in this case, weekly PC contacts) required over a period of time (in this case, one month). In this example, the EOP patient should have been offered four PC contacts in one month.

The PWA methodology, as CDCR understands it, will measure whether each patient was offered all of the care required during the time period. If one of the four contacts in the above example was late, that patient would be counted as zero percent compliant for that time period. If a second patient was offered all four of his contacts in that month, CDCR and PWA would score 100 percent for that patient. But at a higher level, the Special Master's team would add the compliant patients in the numerator and divide that by the total number of patients who should have received services to determine compliance. Thus, for the two patients, one compliant (4/4) and one not (3/4), the compliance score would be 50 percent even though only one of the eight contacts was out of compliance.

The PWF methodology, as CDCR understands it, measures whether each patient was offered some subset of care, such as 90 percent, required in a given time period. If one of the four contacts in the above example was late, that patient would be counted as zero percent compliant because the patient only received 75 percent of the required care during the time period. The higher-level statistic would mirror the PWA methodology above.[4]

Dr. Potter has also stated that a "degree of impact" statistic is required as part of both methodologies. The "degree of impact" statistic would show the degree of lateness for each late service. This may be factored into overall compliance by allowing some late contacts to count as compliant so long as each individual contact is not too late and there are not too many late contacts. The specifics of this requirement are vague and confusing and will not serve stakeholders unfamiliar with minute details of data science well when attempting to discern levels of compliance.

During the Level 1 dispute discussions on May 11 and 25, 2023, CDCR had several questions regarding the methodologies proposed by the Special Master's team, including what time period would be used to run the data, what percent of care would be required under PWF to achieve compliance for each patient, and what the threshold for the "degree of impact" statistics would be under either PWA or PWF. The Special Master's team declined to provide the requested information because they believe these matters

---

[4] CDCR has not received a written explanation of the methodologies proposed by the Special Master's team. The understanding presented here is based on conversations with the Special Master's team and the example presented in the Level 1 dispute discussions. CDCR requests the opportunity to submit supplemental information if it has misunderstood the methodology or if new information is presented during the Level 2 discussion.

relate to compliance, which is ultimately up to the Court.[5] This misinterprets the type of compliance thresholds the court will decide. While the Court will set compliance rate requirements, time periods for compliance are a different determination. Indeed, the parties, along with the Special Master's team, have discussed and agreed on time periods for compliance and internal thresholds for other indicators – such as how often a patient must be seen by the same provider to achieve continuity of care. It is unclear why the Special Master's team is now taking the position that such issues can no longer be discussed in data remediation. The information is necessary to fully understand the Special Master team's proposed methodologies and is necessary if CDCR will be required to build indicators using said methodology.

      III.      The Methodologies Proposed by the Special Master's Team Creates Patient Safety Issues.

The "patient-wise" methodology creates concerns for CDCR and the safety of its patients. CDCR recognizes that there are pros and cons to every measurement methodology. Still, the cons for PWA and PWF[6] are particularly prevalent when applied to measuring adherence to the timely provision of discrete events in an extensive behavioral healthcare delivery system.

CDCR is concerned that PWA or PWF will obscure compliance rates with high-need patients. By focusing on patients who achieve perfect scores, progress and the needs of patients who require more intensive care are overlooked, particularly when there is a significant disparity between the proportions of low-need and high-need patients. Within CDCR's mental health program, it is common for a small portion of patients to have a high need for services. For example, if 90 percent of EOP patients are low-need patients who easily achieve a perfect score, the PWA and PWF methodologies indicate that 90 percent of patients received all required services. However, this figure could obscure that the remaining 10 percent of high-need patients might not receive adequate care.

Similarly, indicators using the PWA or PWF methodology can obscure progress in achieving compliance for high-need patients. For example, consider a scenario where services provided to a high-need EOP patient improve from 60 percent to 85 percent compliance while a low-need EOP patient maintains 100 percent compliance. The PWA or PWF measure would remain unchanged because the high-need patients will be shown as having received zero care.

---

[5] In the May 24, 2023 order, the Court reiterated that it "will resolve the ultimate questions of constitutional compliance." ECF No. 7847 at 9 (citing ECF No. 7216 at 4 "The degree of compliance for each indicator remains for the court to determine by subsequent order…"); *see also* ECF No. 6996 at 9 "With the court's approval, the Special Master has for years used a 90 percent compliance rate as the target for monitoring most of the key measures in those plans. Generally, the court is inclined to confirm this compliance rate. It will, however, direct the Special Master to file findings and recommendations recommending different compliance rates, if any, for one or more of the key indicators on the completed list…." While the Court is the ultimate arbiter of the threshold for compliance, the Special Master will be tasked with providing a recommendation. It is unclear why the Special Master's team has refused to provide their recommendation regarding how PWA and PWF will be applied so that CDCR can fully understand the methodology.

[6] As discussed above, CDCR is unclear exactly what thresholds the Special Master's team recommends for the PWF methodology. Our arguments are based on the assumption that under PWF, the Special Master's team would look to see whether a patient received 90 percent of required services over the time period. This was the example presented during the Level 1 discussions. PWF suffers from the same shortcomings as PWA if a patient must receive 90 percent of the required services over a period of time during which there are only a few requirements in order to achieve compliance. This will result in one late requirement causing the patient to fall below the 90 percent threshold.

The PWA or PWF methodology could also inadvertently overlook the varied demands of different patient service requirements after a lapse in service. A single delayed service, regardless of the extent of the delay, might inadvertently obscure a patient's overall service quality in these methodologies. Take the example of a patient in a Mental Health Crisis Bed who misses one daily contact during their ten-day stay, yet receives all others. The PWA methodology would find this patient as non-compliant, not fully capturing the totality of the patient's care experience.

Another unintended implication of the PWA and PWF methodologies could be an unintentional skew in service provision towards low-need patients. This may unintentionally lead to an overemphasis on patients who are likely to achieve perfect scores, potentially detracting attention from those with more substantial needs. For instance, an institution may appear highly compliant using the PWA or PWF methodology by centering on a segment of low-need patients, rather than balancing care for those patients who require more comprehensive services during the same period. This unintentional influence could encourage staff to lean towards low-need patients to achieve compliance when they are genuinely striving to manage time and resources optimally. An unintended decrease in focus on high-need patients could inadvertently compromise optimal patient care outcomes.

> IV.     The Methodologies Proposed by the Special Master's Team Are Not Appropriate Quality Improvement Metrics.

CDCR staff use its data on a daily basis to identify patient needs and identify gaps in service delivery. It is vital that the summary statistic presented to CDCR staff allows institutional managers and headquarters executives to quickly decipher problem areas. Using PWA or PWF to calculate the primary summary statistic may result in shockingly low compliance scores, when in fact, patients are receiving near-perfect care. All patients may be offered timely PC contacts 90 percent of the time. Yet PWA would score that program as providing zero care. Or, for example, the Special Master's team recommends that the summary statistic for inpatient transfers look at several steps of the process to determine compliance, not just whether the patient transferred to Acute Psychiatric Program (APP) within 10 days or Intermediate Care Facility (ICF) within 30 days. If this occurs, a patient could be counted as non-compliant despite arriving in the appropriate APP or ICF bed within timelines. From a process improvement perspective, PWA and PWF are essentially useless in improving the mental health delivery system.

CDCR needs a methodology that can more readily identify areas for improvement and allocate resources efficiently without having to invest considerable effort in deciphering the nuances of the data. Delivery of care problems are fixed at the process, not patient, level. If process problems require CDCR managers and executives to conduct a deep dive into the underlying data to determine the reasons for the low compliance scores, as with PWA or PWF, the indicator is a poor tool for administrators and risks further breakdowns in the process. CDCR's (and other healthcare systems') methodology focuses on the system and processes to enhance patient care. This streamlined approach would ultimately benefit the entire program, allowing the focus to be on delivering the best possible care to all patients, regardless of their specific needs.

The Special Master's team has dismissed this concern by stating that CDCR can use whatever methodology it prefers for internal quality management. The suggestion that two different measurement and reporting methodologies be used creates significant problems. Having parallel quality management systems is dangerous for patient care, creating staff confusion and paralysis. When the service providers don't know which measure they are being held to, their decision-making process becomes clouded and

vulnerable to mistakes. CDCR's measurement tools are de facto ways to communicate to the field about policy and priorities – the contents of the Business Rules and the outcomes of key indicator measures help shape the field's patient care focus and resource allocation decisions. Once staff in the field understand that the Special Master is measuring compliance using the PWA or PWF methodology, they will adapt their decisions to comply with that methodology, even if CDCR Mental Health Leadership does not agree with the methodology or the direction in which it moves patient care decisions. The focus must be on the system that makes the most sense to measure adherence to the Program Guide while efficiently and transparently allowing staff and other stakeholders at all levels to identify patients in need of care now and identify patterns of missed care so that they can be quickly and sustainably rectified.

> V. The Methodologies Proposed by the Special Master's Team are Not Consistent with Methodologies Used in Other Correctional Systems or Other Larger Health Care Systems to Monitor Timely Access to Care.

CDCR has asked the Special Master's team for any examples or literature to support the use of PWA or PWF in correctional mental health systems or even large community healthcare systems. In response, the Special Master's team has only provided one resource from the National Quality Forum looking at "Optimal Diabetes Care." Upon review, the National Quality Forum noted that the all-or-none approach was considered the "gold standard, reflecting best patient outcomes" for diabetes care. ECF No. 7523-1 at 12. However, none of the mental health care indicators on the National Quality Forum website used the all-or-none methodology. *Id*.

CDCR has conducted its own research into various systems to discern whether they use a "patient-wise" approach to measure timely compliance or an approach more similar to CDCR's "opportunity-based" methodology. Business rules for large health care systems and correctional systems are not widely available, however, the business rules used by the California Correctional Health Care System (CCHCS) to measure compliance with medical requirements in *Plata v. Newsom* are publicly available.[7] CCHCS has a very reputable quality management system and is an appropriate comparator to CDCR's Mental Health system as they are measuring compliance within the same setting. Further, several CCHCS indicators measure whether medical care was provided timely, including "PCP Urgent Referrals 1 Day," several "Transfers Seen Timely" indicators, and "High Priority Specialty 14 Days." These indicators are incredibly similar to many of those mental health indicators affected by the timely compliance methodology dispute, including "Timely PC Contacts," "Timely Psychiatry Contacts," "Timely MH Referrals," "Timely MH RVR Assessments," "Timely Response to Critical Med Non-Adherence Notification," "Timely Response to Non-Critical Med Non-Adherence Notification," and "Timely Admission to MHCB." CCHCS's methodology for timely contact indicators and timely transfer indicators is very similar to CDCR's proposed methodology. For example, to determine compliance for PCP Urgent referrals, CCHCS looks to all Medical Urgent/Emergent Follow Up orders with a compliance date within the reporting month and then counts all of the orders in the denominator that were completed in one calendar day by a PCP as compliant. The CCHCS methodology does not look to see if a patient required multiple Medical Urgent/Emergent Follows Ups during the month and whether that one patient received all (or some subset) of the required contacts timely, as the Special Master's proposed methodology would. It is also important to note that ten of the items currently tied up in this dispute are

---

[7] The CCHCS Performance Measures are publicly available at https://cchcs.ca.gov/dashboard-glossary/

indicators that were created by CCHCS. None of those indicators employs the Special Master's proposed methodology.[8]

Despite extensive research, CDCR has not found a single correctional or large healthcare system that employs the all-or-none methodology proposed by the Special Master's team for assessing timely care provision.

> VI. The Methodologies Proposed by the Special Master's Team is a Significant Shift from Current and Prior Monitoring Practices.

During BRMR and Level 1 dispute calls, the Special Master's team conceded that the PWA and PWF methodologies are a shift from how the Special Master has previously monitored. While the Special Master's team does look at individual patients while on-site, compliance with timely contacts has not been calculated by seeing if each patient received all or a certain subset of care over the reporting period. Similarly, compliance with transfer timelines was not based on whether all steps in the transfer process were completed on time. The methodology for calculating compliance in the monitoring reports is actually more akin to the methodology proposed by CDCR.[9]

"The goal of data remediation as it applies to the CQIT key indicators is to capture the substance of the Special Master's monitoring in the requirements measured by the indicators." ECF No. 7847 at 7. Yet now that CDCR has put forth a methodology that is substantially similar to how the Special Master has monitored for years, if not decades, the Special Master's team seeks to move the goal posts again and implement a new methodology. Such a change to how compliance is measured should not be taken lightly and over CDCR's continuing objections.

---

[8] Building a quality improvement system using PWA and PWF further silos CDCR's mental health program for CCHCS which results in a less integrated healthcare system and jeopardizes patient care.

[9] *See* Twenty-Ninth Round Monitoring Report- Part C, ECF No. 7715 at 190 ("Eleven of 14 patients had initial primary clinician evaluations before the IDTT and were compliant. Eleven of 19 required weekly required PC contacts occurred every seven days."); *Id*. ("Twelve of 14 patients had initial IDTTs within 14 calendar days of arrival. All seven routine IDTTs occurred within 90 days."); *Id*. at 192 ("CMF conducted all 59 required twice-weekly psychiatry contacts…"); *Id.* ("Forty-four of 136 required daily primary clinician contacts in the MHCB occurred."); *Id*. at 196 ("Six of ten patients who required an initial psychiatric contact had one before the IDTT and within 14 calendar days of arrival. Twenty of 29 psychiatry contacts timely occurred within 30 days."); *Id*. ("Seven of ten patients had an initial primary clinician contact within 14 days of arrival. Thirteen of 50 routine PC contacts were timely."); *Id*. at 197 ("Six of 10 initial IDTTs were timely."); *Id*. at 198 ("Twelve of 14 required quarterly PC contacts timely occurred."); *Id.* at 340 ("Eight, or 80 percent, of initial psychiatric evaluations occurred within 24 hours of admission."); *Id*. at 525 ("Twenty of 67 or 30 percent of required routine psychiatry contacts timely occurred within 30 days."); *see also* Thirtieth Round Monitoring Report- Part A, ECF No. 7833 at 95 ("A review of a sample of ten RVRs revealed that custody staff timely requested mental health assessments in 30 percent of cases. Mental health staff timely returned the completed assessment to custody 100 percent of the time."); *Id*. ("A review of 20 RVRs indicated that custody staff timely referred the mental health assessment to mental health staff in 75 percent of cases. Mental health staff timely completed and returned the assessment to custody in 85 percent of cases."); *Id*. at 145 ("Nineteen patients required routine psychiatric contacts. There were 81 expected timeframes, of which 44 or 54 percent were timely."); *Id.* ("Nineteen patients required routine primary clinician contacts. There were 72 expected timeframes, of which 48 or 67 percent were timely."); *Id*. at 203 ("The monitor reviewed a random sample of 20 RVRs to assess compliance with CDCR's policy. Custody staff timely referred the mental health assessment to mental health staff in 15 of 20 or 75 percent of the cases…").

VII. Requiring CDCR to Build Indicators Using the Methodologies Proposed by the Special Master's Team May Increase the Number of Future Disputes.

Plaintiffs' counsel and the Special Master's team have tried to characterize this dispute as a simple request for CDCR to build the 19 indicators currently paused due to this dispute (and perhaps others in the future) using various methodologies. Should the Special Master disregard CDCR's view of the dispute and instead characterize this as a simple request to build the indicator using multiple methodologies, it must be noted that this may in fact increase the number of future disputes in BRMR.

If CDCR is required to build the 19 indicators in question using the methodology proposed by the Special Master's team, CDCR would need details regarding the design of the methodologies, as discussed above. Then each indicator would have to go through the data remediation process, including BRMR. It is likely that there may be disputes on how the methodologies proposed by the Special Master's team are applied to some or all of the 19 indicators. Importantly, building the data ledger that the Special Master's data expert has requested is only the first step in remediating the indicators. The stakeholders must then agree on the respective numerator and denominators for each indicator which, given the differences between PWA and PWF, may cause further disputes.

# EXHIBIT B



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email:  CTrapani@rbgg.com

June 14, 2023

VIA ELECTRONIC MAIL ONLY
Kerry Walsh
Deputy Special Master
kwalsh@pldolaw.com

  Re: *Coleman v. Newsom*: Plaintiffs' Statement Regarding Timely Compliance Methodology (TCM) Dispute
    Our File No. 0489-03

Dear Kerry:

  Stakeholders could not reach agreement on the timely compliance methodology ("TCM") dispute in Level 1 meetings on May 11 and 25, 2023, and in a follow-up meeting on May 26.  Plaintiffs' position statement is attached for consideration by the Special Master and the Secretary in Level 2 of the dispute resolution process.

            Sincerely,

            ROSEN BIEN
            GALVAN & GRUNFELD LLP

            */s/ Cara E. Trapani*

          By: Cara E. Trapani

CET
cc: Dr. Potter
   Henry Dlugacz
   Dr. Metzner
   Matt Lopes
   Melissa Bentz
   Nick Weber
   Sundeep Thind

[4302302.5]

Kerry Walsh
June 14, 2023
Page 2

## Timely Compliance Methodology ("TCM") Dispute

**Issue:** For a small subset of indicators on the provisionally-approved key indicator list, and possibly others to be determined (collectively, "TCM indicators"), should CDCR remediate the data to allow stakeholders to calculate multiple TCM statistics?

**Affected indicators:**[1]

1. AC1: Timely MH Referrals
2. AC2: Timely PC Contacts
3. AC3: Timely Psychiatry Contacts
4. AC4: Timely IDTTs
5. AC5: Treatment Offered
6. MM 11.3: Diagnostic Monitoring Lithium (created from MM11)
7. MM10: Diagnostic Monitoring-QT Prolongation EKG 12 Months
8. MM11.1: Diagnostic Monitoring Carbamazepine (created from MM 11)
9. MM11.2: Diagnostic Monitoring Lamotrigine (created from MM 11)
10. MM11.4: Diagnostic Monitoring Oxcarbazepine (created from MM 11)
11. MM11.5: Diagnostic Monitoring Valproic (created from MM11)
12. MM14: Diagnostic Monitoring-Antidepressants
13. MM3: Diagnostic Monitoring-Antipsychotics
14. MM4: Diagnostic Monitoring-Clozapine
15. New1: Timely response to Critical Med non-adherence notification
16. New2: Timely response to Non-critical Med non-adherence notification
17. SC8: Timely MH RVR Assessments
18. SP9: Mental Health Observation Tool
19. URM3: Timely admission to MHCB

**Plaintiffs' Position:** Yes. CDCR should remediate the TCM indicators to allow for generation of compliance statistics based on both the Special Master's preferred methodology, known as "Patient-Wise" or "PW," and CDCR's preferred methodology, known as "Last Due Date" or "LDD." Remediating the TCM indicators using only Defendants' methodology would foreclose the Court (and all stakeholders) from knowing precisely what percentage of patients received the mental health service they are minimally required to receive pursuant the remedial requirement being measured. This is the core question in this case: Both the Constitution and Program Guide focus on individual patients' experiences. *See, e.g.*, *Coleman v. Wilson*, 912 F. Supp. 1282, 1296 (E.D. Cal. 1995) ("[T]he Eighth Amendment requires the state to provide *inmates* with

---

[1] Defendants provided this list of 19 TCM indicators to Plaintiffs on June 1, 2023. It is not clear to us whether the list has changed since then.

[4302302.5]

Kerry Walsh
June 14, 2023
Page 3

access to adequate mental health care." (emphasis added)); *see generally* 2021 Program Guide, ECF No. 7333-1 (mentioning the word "patient" more than 2,000 times and setting forth countless patient-centered requirements, such as that "[e]ach inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT").  The PW statistic's ability to show when individual patients are receiving substandard care is necessary to accurately and transparently determine the state of Defendants' compliance.  *Cf.* Rptr. Tr. of Proceedings, Oct. 23, 2019, ECF No. 6380 at 40:16-20 (directing that "[t]he data must be pulled together, gathered and collected in a form that allows the defendants ultimately, when they truly can, accurately to demonstrate to the Court that the Constitution is finally satisfied").  Moreover, the Special Master's monitoring has always focused on individual patients' experiences, which means adopting the recommendation to remediate the data in a way that allows for PW measurement is required under the May 24, 2023 Order.  *See* ECF No. 7847 at 7 ("Each key indicator must substantively track the areas the Special Master has monitored so the court can assess defendants' compliance with the Eighth Amendment. … [E]ach key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities.").  It is also necessary to adopt the recommendation under the Order of Reference, which allows the Special Master to access available data in any form he requires to conduct his monitoring – and there is no dispute that the data necessary for PW measurement is available.  The decision about what statistic(s) the Court will consider when determining compliance is for a different day.

The parties agreed, and the Court approved, the Special Master to hire a data expert precisely because of the need for neutral expertise in this area.  *See* Jan. 7, 2020 Order, ECF No. 6441 at 4; *see also* Apr. 29, 2020 Order, ECF No. 6646 at 1 (granting Special Master's request to appoint Daniel F. Potter, Ph.D., CAIA, as his data expert).  Dr. Potter has made it abundantly clear, in his professional opinion, that remediating the TCM indicators in a way that allows for both methodologies, rather than just LDD, is possible, consistent with industry standards, requires minimal additional work, and would provide the Special Master with the information he requests.  Plaintiffs support this recommendation.

While Defendants' LDD statistic may provide helpful information for CDCR to manage its employees, it obscures what happens at the patient level, especially over long periods of time, because it focuses exclusively on the total number of deadlines missed or met.  PW, on the other hand, focuses on the sequence of care through time for each patient, and can show precisely what percentage of patients received the mental health service at issue.  Moreover, the PW methodology allows for all-or-none ("PWA"), or flexible

[4302302.5]

Kerry Walsh
June 14, 2023
Page 4

("PWF") statistics.[2]  The flexible PWF methodology is the Special Master team's preferred statistic because it allows for variation, but constrains the variation.  Also known as an "error budget," this feature of PWF leaves room for compliance when, for example, services are slightly late some of the time, but not routinely or by long periods.  The Court would ultimately decide what, if any, budget constraint is appropriate when deciding compliance thresholds.  But if Defendants are permitted to design the TCM indicators to only allow for their preferred methodology, this type of refinement and flexibility inherent in the PWF methodology cannot be employed in the first instance.

The history of data remediation is central to this dispute.  CDCR is obligated pursuant to federal court orders to provide minimally adequate mental health care to remediate ongoing constitution violations, and has been found to have knowingly presented false and misleading compliance data to the Court, the Special Master, and Plaintiffs.  These circumstances are not present in other systems, which makes any attempted comparisons futile.  Even if comparisons were helpful, CDCR has not identified a single correctional system that uses their preferred methodology.  Meanwhile, Dr. Potter has explained that the industry standard is for systems not to restrict themselves to a single statistic.  Instead, data is commonly used to present multiple statistics.  For example, in hospital settings, insurance providers and administrators may wish to know the total number of doses administered hospital-wide (LDD or requirement based).  But doctors may prefer to know what percentage of their patients received all their required doses (PW).  Remediating the data in a manner that allows for this type of adaptability is all that Dr. Potter suggests.

Contrary to Defendants assertions, there is no basis to assume that use of a PW statistic would disincentivize clinicians from treating patients who are high need and require more services, or whose appointments were already missed.  The notion that clinicians may not focus their limited time and resources on the most ill patients indicates the need for more staff and/or a population reduction, not a different statistic that could risk masking the quality of care for individual patients on the ground.  Nor would PW disincentivize clinicians from providing late treatment if the late contact will not "turn them green."  Clinicians' reactions to compliance scores is a matter of institutional culture and training, and will be a factor to contend with under either methodology.  If clinicians truly are picking and choosing which patients to see with the intent of maximizing compliance

---

[2] The Special Master's data team has stated they do not anticipate using PWA (which may be more challenging to meet over long periods of time, but in the short term is useful to show the current compliance).  Any focus on the "all or none" possibility of this methodology is therefore misguided.

[4302302.5]

metrics, as Defendants seem to suggest, that would be indicative of far deeper problems with CDCR's MHSDS than can be addressed through choices among multiple statistical methods. Regardless, Plaintiffs and the Special Master's data team agree that CDCR can use the LDD methodology for local administration if that is the best tool for their internal purposes. The Special Master's data team's request is simply that the system not be built in a way that would preclude all other statistical methods. Indeed, headquarters staff would surely benefit from seeing both sets of statistics, even if only the LDD data is provided to the institutions should CDCR determine that methodology is more intuitive or appropriate for staff who provide direct patient care.

It is undisputed that the data needed for both methodologies is already being preserved. Dr. Potter, the only data scientist involved in these discussions, has stated that it is feasible and straightforward to remediate the data both ways, and far more efficient to do so simultaneously rather than coding the data for LDD first and having to build the functionality for PW later.

The Court approved Dr. Potter's appointment as a data expert to provide expertise in precisely this area of data science. The Special Master and the Secretary should adopt his recommendation to remediate the TCM indicators using both LDD and PW.

[4302302.5]