DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>GAVIN NEWSOM, et al.,<br><br>          Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF ALEXANDER GOURSE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE***<br><br>Judge:   Hon. Kimberly J. Mueller |

[4365415.1]

1    I, Alexander Gourse, declare:

2    1.    I am an attorney duly admitted to practice before this Court.  I am an

3    associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4    Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a

5    witness, I could competently so testify.  I make this declaration in support of Plaintiffs'

6    Opposition to Defendants' Motion in Limine.

7    2.    Attached hereto as **Exhibit A** is an excerpt of a true and correct copy of the

8    transcript of the August 29, 2023 deposition of Dr. Alexandra David.

9    3.    Attached hereto as **Exhibit B** is an excerpt of a true and correct copy of the

10    transcript of the August 25, 2023 deposition of Dr. Shelly Minor.

11    4.    Attached hereto as **Exhibit C** is an excerpt of a true and correct copy of the

12    transcript of the August 28, 2023 deposition of Dr. Paul Burton.

13    5.    Attached hereto as **Exhibit D** is an excerpt of a true and correct copy of the

14    transcript of the August 18, 2023 deposition of Dr. Kelley Franceschi.

15    6.    Attached hereto as **Exhibit E** is a true and correct copy of an email I

16    received from counsel for Defendants on September 21, 2023.

17    7.    I declare under penalty of perjury under the laws of the United States of

18    America that the foregoing is true and correct, and that this declaration is executed at San

19    Francisco, California this 22nd day of September, 2023.

20

21                                        */s/ Alexander Gourse*
                                         Alexander Gourse
22

23

24

25

26

27

28

# Exhibit A

**Alexandra David, M.D.**

1           UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, et al.,              )
                                        )
5                   Plaintiffs,         )
                                        ) Case No.:
6          v.                           ) 2:90-CV-
                                        ) 00520-KJM-DB
7    GAVIN NEWSOM, et al.,              )
                                        )
8                   Defendants.         )
     _____)

9

10

11            REMOTE DEPOSITION OF

12            ALEXANDRA DAVID, M.D.

13                 California

14          Tuesday, August 29, 2023

15

16

17

18

19    REPORTED BY:  ANNABELL ANDERSON
                    Certified Shorthand Reporter
20                  License No. 14143

21

22    Job No: 10126076

23

24

25

**Alexandra David, M.D.**

```
 1                   INDEX OF APPEARANCES

 2

 3    FOR THE PLAINTIFFS:

 4         ROSEN BIEN GALVAN & GRUNFELD LLP
           BY:  ALEXANDER GOURSE, Attorney at Law
 5         101 Mission Street, Sixth Floor
           San Francisco, California  94105
 6         (415) 433-6830
           agourse@rbgg.com
 7         (Appeared via Videoconference)

 8

 9    FOR THE DEFENDANTS AND DEPONENT:

10         HANSON BRIDGETT LLP
           BY:  DAVID C. CASARRUBIAS, Attorney at Law
11         425 Market Street, 26th Floor
           San Francisco, California  94105
12         (415) 995-5893
           dcasarrubias@hansonbridgett.com
13         (Appeared via Videoconference)

14

15    ALSO PRESENT:

16         Chris Landrum (Appeared via Videoconference)

17         Adrienne Harrold (Appeared via Videoconference)

18         Nicholas Weber (Appeared via Videoconference)

19

20

21

22

23

24

25
```

```
 1                            INDEX

 2                                                    PAGE

 3    EXAMINATION BY MR. GOURSE                           4

 4                         --oOo--

 5

 6                        EXHIBITS

 7
           (No exhibits marked on the record.)
 8

 9                         --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Alexandra David, M.D.

1    Q.      Great.

2            All right.  So for the record, can you please

3    state your full name including the spelling?

4    A.      Alexandra, A-l-e-x-a-n-d-r-a, last name is

5    David, D-a-v-i-d.

6    Q.      And what is your current employer, Dr. David?

7    A.      CDCR.

8    Q.      And for the record, that is the California

9    Department of Corrections and Rehabilitation, correct?

10   A.      Yes, it is.  I'll try not to speak in acronyms.

11   Q.      No.  It's fine.  I just want to make sure we get

12   it on the record.  Thank you.

13           And what is your current title and/or position?

14   A.      Chief of mental health.

15   Q.      And is that at a particular institution?

16   A.      CMF, California Medical Facility.

17   Q.      How many years have you been employed with CDCR?

18   A.      It will be nine years on September 1st.

19   Q.      How long have you been chief of mental health at

20   CMF?

21   A.      Well, I've been in the new CEA-CMH position

22   since 7/14, but I've been chief of mental health for a

23   little over two years.

24   Q.      That's July 14th of this year?

25   A.      Yes.

Alexandra David, M.D.

1  Q.      And you used the acronym CEA, can you explain

2  what that is?

3  A.      Yeah.  So they changed the CMHs in PIP

4  institutions to be career executive assignment over the

5  entire mental health department.  Prior to July 14th, I

6  was the chief of mental health over just outpatient and

7  crisis bed services, and I've done that for a little over

8  two years now.

9  Q.      Okay.

10  A.      Maybe close to three.  Somewhere in there.

11  Q.      What position were you in before you were chief

12  of mental health?

13  A.      I was a chief psychologist for the L-1 PIP and

14  specialty services.

15  Q.      And that is at CMF, correct?

16  A.      Yes.  I've only worked at CMF.

17  Q.      What position were you in before that?

18  A.      Senior psychologist supervisor of the mental

19  health crisis bed and CIT.

20  Q.      And what years were you in that position?

21  A.      Oh, goodness.  Okay.  Let me think.  This is

22  going to be an approximation because I'm really bad with

23  dates without them sitting in front of my face.  I think

24  '18 to '20, 2018 to 2020, thereabouts.

25  Q.      And were you a clinical psychologist at CMF

Alexandra David, M.D.

1  before that?

2   A.      I was a senior psychologist specialist prior to

3  that and a clinical psychologist prior to that.

4   Q.      Great.

5          What professional licenses do you hold?

6   A.      I am a licensed clinical psychologist in the

7  state of California.

8   Q.      And when did you receive that license?

9   A.      I received that in September of 2016, I think.

10  I graduated in 2015.  Yeah.  September 2016.

11   Q.      You have any non-current or expired professional

12  licenses?

13   A.      No.  No.

14   Q.      What degrees do you hold?

15   A.      I have a bachelor of arts in sociology, a

16  bachelor's in social work, a master's of science in

17  criminal justice, a master of arts in clinical

18  psychology, and a doctorate in clinical psychology.

19   Q.      And when did you receive your doctorate?

20   A.      I received my doctorate in August of 2015.

21   Q.      Where did you work immediately before you

22  started with CDCR?

23   A.      I was in graduate school, so I held various

24  practica and internship placements.  My APA internship

25  was at the DSH program within CMF, and that's when I

**Alexandra David, M.D.**

1  started at CMF.

2  Q.      Got it.

3         Have you ever worked in a position providing

4  mental health services in the private sector?

5  A.      Yes, I have when I was a social worker.  So I

6  was -- prior to graduate school, I was the executive

7  director of transitional age youth services for Abode

8  Health and Human Services in Fairfield, California.

9  Q.      Got it.

10        How long did you work as a social worker?

11  A.      Well, I was never licensed because in Canada and

12  Massachusetts it's very different, and when I moved out

13  to California, it was for administrative positions, but I

14  was -- graduated with my social work degree in Canada in

15  2001, and then I worked in that field until I returned to

16  graduate school in '09, 2009.

17  Q.      Are you a member of any labor union currently?

18  A.      CCSO, but I don't think that counts as a labor

19  union.  It's a supervisors organization.

20  Q.      What does that acronym stand for?

21  A.      California Correctional Supervisors

22  Organization.

23  Q.      Does that organization have a contract or a

24  memorandum of understanding with -- with CDCR?

25  A.      I don't believe so, no.

Alexandra David, M.D.

1  **Q.     So you stated that you are the -- that you have**

2  **been the CEA at CMF since July 14th, correct?**

3  A.     Correct.

4  **Q.     And that you were the chief of mental health**

5  **before that, correct?**

6  A.     Correct.

7        I'm still the chief of mental health.  It's just

8  now in a CEA designation.  It's confusing.

9  **Q.     Okay.  Can -- can you explain what your**

10  **responsibilities are as the chief of mental health?**

11  A.     Yes.  So I oversee all operational procedures

12  for our mental health programs.  I liaise with the CEO

13  and the warden.  I interface with custody, nursing, and

14  medical leadership to ensure that our programs are

15  running smoothly and that issues are being addressed.

16        I do my best to come up with creative

17  problem-solving for the use of our current resources,

18  interface with other institutions, try to ensure that

19  we're -- we're striving to meet program guide

20  requirements throughout all of our programs, and really

21  just try to work with the staff that I have to get the

22  services that we need out to our patients.

23  **Q.     And what additional responsibilities as -- do**

24  **you have as CEA?**

25  A.     So the CEA added the PIP.  It added 500 beds to

 1   my job.

 2    Q.      Understood.

 3            So you had previously --

 4               (Simultaneous colloquy.)

 5   BY MR. GOURSE:

 6    Q.      -- been charged with overseeing the outpatient

 7   programs at CMF plus the MHCB, you said?

 8    A.      Yes.  Yes.

 9               (Simultaneous colloquy.)

10            THE WITNESS:  We were -- the DSH PIP lifted and

11   shifted, but the leadership didn't lift and shift until

12   July 14th when they eradicated the executive director

13   position and it went under me.

14   BY MR. GOURSE:

15    Q.      They eradicated the executive --

16    A.      Well, they -- it went away.  It got dissolved.

17   It disappeared.  However you want to put it.  Eradicated

18   might be too strong.

19    Q.      Got it.

20            Are you familiar with the phrase working out of

21   class?

22    A.      Yes, I am.

23    Q.      What does it mean?

24    A.      If you're working in and out of class, you are

25   in a certain job title, but you're in a limited term

1  assignment to a promotional opportunity.  It can't be

2  more than one step above your current title.

3  **Q.     And are you currently working out of class or**

4  **have you worked out of class while --**

5           (Simultaneous colloquy.)

6           MR. CASARRUBIAS:  Sorry.  Objection.  Compound.

7  BY MR. GOURSE:

8  **Q.     Are you currently working out of class?**

9  A.     No.

10 **Q.     Have you worked out of class while in any of the**

11 **positions at CDCR that you mentioned?**

12 A.     No.

13 **Q.     Who do you report to?**

14 A.     The CEO, Traci Patterson.

15 **Q.     And who reports to you?**

16 A.     Everyone in the mental health services

17 department.

18 **Q.     Are there people who directly report to you**

19 **within --**

20          (Simultaneous colloquy.)

21 BY MR. GOURSE:

22 **Q.     -- the organization hierarchy?**

23 A.     Currently it's a lot because we have a lack of

24 supervisors.  Do you want me to go through everyone?

25 **Q.     You don't have to go through every single**

1  **person.  You can just summarize if it's literally --**

2              (Simultaneous colloquy.)

3              (Reporter admonition.)

4              MR. GOURSE:  I was just explaining my --

5  BY MR. GOURSE:

6  **Q.      So the question was who -- who reports to you,**

7  **and I believe Dr. David asked whether I wanted to know**

8  **every single person or position who is charged with**

9  **reporting to her and I said that it was fine to provide a**

10 **summary.**

11              **You know, if it's everybody -- if it's every**

12 **supervisor in the mental health program, then -- then**

13 **that would be sufficient as an answer.  I just would like**

14 **to hear it.**

15 A.      So currently the chief psychologist for

16 outpatient, Draw Campbell.  The chief psychologist out of

17 class for inpatient, Nicole Touge.  All of specialty

18 services reports under me, so that's my inpatient

19 referral coordinators, my suicide prevention specialist,

20 the evaluations team, DDP, which is developmental

21 disabilities program, the prerelease coordinator, crisis

22 intervention team.

23              I am missing a few.  And then -- because of the

24 lack of supervisors in the PIP, I'm directly overseeing

25 everyone that works for the intermediate care program,

Alexandra David, M.D.

Coleman vs.
Newsom

1    ICF level of care.

2    **Q.      Thank you.**

3    A.      And I might be missing a few.  Just...

4    **Q.      Understood.**

5            **Are you -- is one of your job responsibilities**

6    **to adjust schedules or assignments when clinicians call**

7    **out sick or on vacation?**

8            MR. CASARRUBIAS:  Objection.  Lacks foundation.

9    BY MR. GOURSE:

10   **Q.      Dr. David, you can answer the question.**

11   A.      Oh, okay.  Thank you.

12           Yes.  If someone calls out sick, myself or a

13   member of my team will adjust their schedules or adjust

14   coverage assignments.

15   **Q.      What about when mental health staff leave --**

16   **leaves CMF?**

17           MR. CASARRUBIAS:  Objection.  Lacks foundation.

18           THE WITNESS:  Yes.  Then I am moving people

19   around to fill the holes.

20   BY MR. GOURSE:

21   **Q.      And can you explain just a little bit of how you**

22   **identify what tasks should be assigned to which staff**

23   **members when -- when there are vacancies?**

24           MR. CASARRUBIAS:  Objection.  Lacks foundation.

25   And calls for a narrative.

**Page 15**

**Alexandra David, M.D.**

1   BY MR. GOURSE:

2   **Q.      You can answer.**

3   A.      Okay.  So it's a little like playing Tetris.  So

4   it's a collaborative process.  I work in tandem with both

5   my chief psychologist and my chief psychiatrist, and we

6   do our best to triage needs, so we look at our acute care

7   beds, so trying to cover our licensed units in crisis bed

8   in acute, sort of, as our first priority, the sickest

9   patients.

10          Then we're looking at ICF, ASU, EOP, and then

11   EOP main line, and CCC, and that's sort of the

12   unfortunate titration of our triage plan.  We try to get

13   our sickest patients to care first and then roll it out.

14   **Q.      Are you involved with hiring mental health staff**

15   **at CMF?**

16   A.      Yes.

17   **Q.      What are your responsibilities with regard to**

18   **hiring mental health staff?**

19   A.      I get the cert list, the request for interview.

20   I assign the panels, set the dates, and then if I am on

21   the panel, take place in the -- the discussion hiring,

22   et cetera, and then getting everything back up to HR for

23   processing.

24          Once it's been processed, regardless of whether

25   or not I'm on the panel, I am following that hiring

1   through to the end.  We have weekly conference calls with

2   CHU and our regional HR department and contracts to keep

3   track of -- of where these -- where these are at and

4   ensure that we're onboarding appropriately.

5        **Q.      You mentioned something called CHU.  Can you**

6   **explain what that is?**

7    A.      Centralized hiring unit.  They were -- now it's

8   the regional hiring unit that will be attending those

9   calls moving forward, but they were responsible for the

10  hiring of all psychologists and social workers for the

11  institutions.  That has now been moved to RHU, the

12  regional hiring unit.

13       **Q.      When did that change happen?**

14   A.      I was just informed about it on a call this

15  week, so I am assuming recently, but I don't know.

16       **Q.      Do you select the candidates who will be**

17  **interviewed for positions at CMF?**

18   A.      No.  We receive a list based off their -- their

19  scoring and where they fall.

20       **Q.      And who do you receive that list from?**

21   A.      Our regional HR.

22       **Q.      Okay.  And --**

23   A.      I think.

24               (Simultaneous colloquy.)

25  ///

Alexandra David, M.D.

1    BY MR. GOURSE:

2    Q.     Different from the centralized hiring unit or

3    the regional hiring unit?

4    A.     Yes.  So when the centralized hiring unit was

5    doing our hiring, they would reach directly out to us.

6    I've noticed in the transitional period, CHU has been

7    sending cert lists to the FLA, the field liaison, to come

8    down to us while we're waiting for regional hiring to

9    sort of step into the process.  So it's all been a little

10   loosey-goosey.

11   Q.     How far along in the process -- in the hiring

12   process are candidates by the time you interview them or

13   anyone else at CMF interviews them?

14        MR. CASARRUBIAS:  Objection.  That lacks

15   foundation, and calls for speculation.

16        THE WITNESS:  So the position --

17             (Simultaneous colloquy.)

18   BY MR. GOURSE:

19   Q.     Go ahead.

20   A.     In the position control reports that we get, I

21   see the date that position closed and the date that the

22   cert list was generated, which is the list of candidates

23   that get sent to the institution.  That's generally a

24   three-week period between closure of the posting and when

25   the cert list gets sent out.

Alexandra David, M.D.

 1          CMF is in a tricky position.  We have not had an

 2    on-site field liaison analyst to do our hiring for well

 3    over a year now, so it's been parsed out to multiple

 4    different FLAs and multiple different institutions, and

 5    it's changed, like, every two to three months, so a lot

 6    of things have gotten lost.  A lot of cert list went

 7    stale because no one ever knew about them.

 8          But the people we have now seem to be really on

 9    the ball, so it seems like it's still -- it's still

10    looking like two weeks from the time they get the cert

11    list till we get the request for interview.  And then

12    once we get the request for interview, they need at least

13    a week to set everything up, so we're looking at, like,

14    another two weeks from them.

15          So post closes, three weeks for cert list, about

16    two weeks to get to us, and then another two weeks for

17    interview and that's if everything is quick.  And those

18    are estimates to best of my knowledge.

19    **Q.      Thank you.**

20            **You mentioned that in certain instances cert**

21    **lists for a position had gone stale; is that --**

22    A.      Yes.  Meaning that there's been so much time

23    that's passed from when the posting closed to when we

24    actually get the cert list and can schedule the

25    interviews that all of the candidates decline.

Alexandra David, M.D.

1  Q.    Do you remember the last time that happened?

2  A.    Couple months ago, I think, for a specialist.

3  Q.    For a senior psychologist specialist?

4  A.    Yes.

5  Q.    Do you remember about how many times that's

6  happened in the last year?

7  A.    It's happened multiple times because I've been

8  on multiple calls where I've asked where the cert lists

9  are and they tell me they'll get back to me and then I

10  never hear back.

11  Q.    And these are calls with?

12  A.    HR.

13  Q.    HR.  Thank you.

14       What about prior to the past year?  Has this

15  been an issue that was happening two years ago as well?

16       MR. CASARRUBIAS:  Objection.  Lacks foundation.

17  BY MR. GOURSE:

18  Q.    You can answer.

19  A.    It's happened since Amanda Gwinn quit, and I

20  think that was about a year and a half ago, but I can't

21  remember.  Once we lost our on-site FLA, they haven't

22  filled that position.  We haven't had anyone on-site from

23  hiring to process any of our things, and it's bounced

24  around from person to person, like, every three months.

25  It's been a bit of a disaster.

Alexandra David, M.D.

1          And so since Amanda Gwinn quit, and I think that

2   was about a year and a half ago, but it could be more

3   than that.  It's also difficult to track because I don't

4   interview a whole lot of people anymore.

5   Q.     Is that because they don't provide you with very

6   many candidates anymore?

7   A.     I don't think we get many candidates applying

8   anymore.

9   Q.     Understood.

10         Have you raised any of these concerns about cert

11  lists going stale with anyone from CDCR leadership?

12  A.     Yes.

13  Q.     Who?

14  A.     Traci Patterson, Dr. Albert Bunn, Dr. Laura

15  Ceballos.  I think I've talked about it with Dr. Mehta

16  and Dr. Cartwright.  I mean, everyone knows hiring is

17  a -- is a massive problem.  That's why we have a weekly

18  call with them.

19  Q.     What was their response when you -- well, strike

20  that.

21         Let's start with Dr. Mehta.  What -- what was

22  Dr. Mehta's response when you told him about this

23  problem?

24         MR. CASARRUBIAS:  Objection.  Calls for hearsay.

25  ///

Alexandra David, M.D.

```
 1   BY MR. GOURSE:
 2     Q.      You can answer.
 3     A.      Can't remember.  I remember we were talking
 4   about it.  It was in a larger group setting and we were
 5   just having a conversation during one of our chiefs
 6   meetings, and a lot of institutions are having issues
 7   with the HR process.  And he's -- he's working on it.
 8   He's trying to figure out what's going on.
 9           I -- in case taking action -- it's difficult
10   because HR is, like, it's own bucket, right.  They're not
11   under CDCR or CCHCS.  They're their own shop, and it
12   seems like they very much do their own thing.
13     Q.      Do you remember approximately when you raised
14   concerns about this problem with Dr. Mehta?
15     A.      Goodness.  We've had conversations about
16   difficulty of -- and again, I didn't raise it.  Like, it
17   wasn't in a one-on-one conversation.  It was in a larger
18   group thing.  Executive leadership meeting that happened
19   last year September, we all talked about the difficulties
20   with hiring.
21           And he brought HR in to talk to us about --
22   about their process, and we were all able to ask a lot
23   questions.  And then our last regional chiefs meeting it
24   came up, which I think was, like, four months ago now, at
25   Folsom.
```

Alexandra David, M.D.

Coleman vs.
Newsom

1    Q.      Have you gotten any other responses to your

2    concerns about this problem from -- from anyone in CDCR

3    leadership?

4    A.      Yeah.

5             MR. CASARRUBIAS:  Objection.  Vague as to "this

6    problem," and it also calls for hearsay.

7    BY MR. GOURSE:

8    Q.      I'll -- I'll rephrase.

9             Have you gotten any other responses to your

10   concerns about cert lists going stale for mental health

11   positions at CMF?

12   A.      Well, both Dr. Sebios and Dr. Bunn have started

13   attending our Wednesday critical staffing meeting that

14   was established --

15             (Reporter clarification.)

16             THE WITNESS:  So the meeting was established by

17   Rainbow Brockenborough's office, and so as I was talking

18   to them about the issues and we were all keeping logs and

19   elevating, they started attending that meeting, I think,

20   over six months ago so that they can hear the responses

21   to the issues straight from HR.

22             And then my understanding is they're doing

23   things on their end to -- to assist.  So when I elevate

24   things, they -- they seem to be addressed.

25   ///

Alexandra David, M.D.

1    BY MR. GOURSE:

2     Q.       So since those weekly meetings have started when

3    you raise a concern about not receiving applicants or a

4    cert list, they have then provided cert lists or a list

5    of applicants or -- why don't I back up.  Strike that.

6             Can you explain what has changed since these

7    meetings began?

8             MR. CASARRUBIAS:  Objection.  Assumes facts.

9    BY MR. GOURSE:

10    Q.       You can answer.

11    A.       Well, we've had the same FLA assigned to us for

12    longer than we ever have had in the past.  I don't know

13    if that's a fallout from the call.  I mean, I don't -- I

14    don't know, right.

15             Once I report it up to my chain of command up at

16    headquarters, they say that they're looking into it, and

17    I -- I trust that to be so.

18    Q.       You interview every candidate for a psychologist

19    position at CMF?

20    A.       I don't, no.  I sit on more panels now than I

21    used to because of our lack of supervisory staffing, but

22    I also cannot tell you the last time I had a psychologist

23    interview panel for a line staff.  It's been a real long

24    time.

25    Q.       Can you explain what those interview panels are?

1    A.    Yeah.  So it's generally for a line staff.  It

2    can be a supervisor or a chief sitting on the panel.

3    There is generally three of us.  It needs to be gender

4    diverse, and there are set of questions that we ask of

5    each candidate, and then there are scoring criteria for

6    each question.

7         We rank the candidates as being competitive,

8    very competitive, or highly competitive or

9    noncompetitive, and then based on those rankings, we

10   check preferences and go through HR to make a tentative

11   offer while they go through credentialing and all of that

12   good stuff.

13   **Q.    Does the panel make the final decision about**

14   **whether to make an offer to a candidate?**

15   A.    Yes.

16   **Q.    What is HR's role once the panel has decided to**

17   **make an offer?**

18        MR. CASARRUBIAS:  Objection.  Lacks foundation.

19   And calls for speculation.

20   BY MR. GOURSE:

21   **Q.    You can answer.**

22   A.    So I don't -- I don't work with HR, but what

23   I've seen them do is they'll reach out to the candidate,

24   they'll offer the candidate the tentative offer, they'll

25   then let us know whether the candidate has accepted or

Alexandra David, M.D.

1    rejected the tentative offer.

2           If the candidate accepts the tentative offer,

3    then they enter credentialing and paperwork and

4    fingerprinting.  Once all of that has been complete, as

5    long as there are no issues with background checks,

6    fingerprinting, or their ability to become credentialed,

7    they'll contact me, work with me on a preferred start

8    date, and schedule.

9           And then they reach back out to the candidate

10   with the information, and then they send us the hiring

11   packet and the gate clearance so everything is ready to

12   go their first day.

13   **Q.      How long does that whole process usually take**

14   **from the time of the offer to the time when someone is**

15   **ready to start work?**

16          MR. CASARRUBIAS:  Objection.  Lacks foundation.

17   BY MR. GOURSE:

18   **Q.      You can answer.**

19   A.      We've seen it taking approximately three to four

20   months on average.

21   **Q.      Do you know --**

22   A.      Sometimes less.

23          I've been told it's because credentialing is

24   very backed up and moving much slower than usual.

25   **Q.      And can you just explain what that means?  What**

1    -- what does the credentialing process involve?

2    A.      I don't know.

3    Q.      Who told you that the credentialing process is

4    very backed up?

5    A.      Centralized hiring unit and various other HR

6    representatives when I reached out to find out why it's

7    taking so long to onboard a candidate.

8    Q.      Have any candidates declined an offer because

9    this process was taking so long?

10          MR. CASARRUBIAS:  Objection.  Lacks foundation.

11    And calls for speculation.

12    BY MR. GOURSE:

13    Q.      You can answer.

14    A.      We've had candidates decline during the process.

15    I don't know if it was because of the length of time the

16    process was taking.

17    Q.      Do you know approximately how many candidates

18    declined while this process was pending?

19    A.      Off the top of my head, no.  I'd have to go back

20    through my records.  A handful.

21    Q.      And what positions were those candidates?

22    A.      I've lost line staff, so social worker,

23    psychologists.  I've just had a supervisor refuse -- or a

24    specialist just refuse a supervisor position that was

25    about three months on the table.  Let me think.  Yeah.

Alexandra David, M.D.

 1  Mostly we've seen it with -- with line staff, not so much

 2  with specialists and supervisors.

 3          But again, I'd have to go back through my notes

 4  because it's been a while because we also haven't really

 5  interviewed people for a while.

 6  **Q.      Thank you.**

 7  **        And just to clarify something you said earlier,**

 8  **when you said that there was a handful, you think, of**

 9  **candidates who's -- who have refused or declined an offer**

10  **while this -- while this credentialing process was**

11  **pending, is that within the last year or the last two**

12  **years?**

13          MR. CASARRUBIAS:  Objection.  Compound.

14  BY MR. GOURSE:

15  **Q.      You can answer.**

16  A.      Probably the last two years.  The last year we

17  haven't really -- it's been -- it's been pretty bleak.

18  **Q.      What do you mean by that?**

19  A.      We just haven't had anyone in the pipeline to

20  interview.

21  **Q.      All right.  Sorry.  There is a fire truck going**

22  **by my --**

23          MR. CASARRUBIAS:  We can't hear you.

24          MR. GOURSE:  Still on mute.

25  ///

Alexandra David, M.D.

Coleman vs.
Newsom

1    BY MR. GOURSE:

2    **Q.    Are you familiar with the current vacancy rates**

3    **for outpatient mental health positions at CMF?**

4         MR. CASARRUBIAS:  Objection.  Lacks foundation.

5    BY MR. GOURSE:

6    **Q.    You can answer.**

7    A.    Yes.

8    **Q.    Do you know what the current vacancy rate is for**

9    **psychologists on the outpatient side at CMF?**

10   A.    I just completed my report that I submit to

11   headquarters last week.  I don't have it in front of me,

12   but I believe our functional fill rate is about

13   33 percent for psychologists.  So again, that's

14   functional.

15        I do my numbers taking out anyone who's on

16   long-term leave from those numbers, so about a 77 percent

17   vacancy rate.

18   **Q.    Such --**

19             (Simultaneous colloquy.)

20   BY MR. GOURSE:

21   **Q.    So just to clarify, the functional fill rate, as**

22   **you used the term, means the -- the vacancy rate**

23   **including people who are out on long-term leave?**

24   A.    Yeah.  So I do my fill rates.  It's state

25   employees plus contractors minus anyone who's out on

Alexandra David, M.D.

```
 1                     REPORTER'S CERTIFICATE

 2             I certify that the foregoing proceedings in the

 3     within-entitled cause were reported at the time and place

 4     therein named; that said proceedings were reported by me,

 5     a duly Certified Shorthand Reporter of the State of

 6     California, and all audible words for appearances via

 7     videoconference, and all objections made at the time of

 8     the examination were recorded stenographically by me to

 9     the best of my ability and thereafter transcribed into

10     typewriting.

11             I further certify that I am not of counsel or

12     attorney for either or any of the parties to said cause

13     of action, nor in any way interested in the outcome of

14     the cause named in said cause of action.

15             IN WITNESS WHEREOF, I have hereunto set my hand

16     this 5th day of September, 2023.

17

18              _____

19              ANNABELL ANDERSON, CSR No. 14143
                Certified Shorthand Reporter
20

21

22

23

24

25
```

1    DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Coleman vs. Newsom

3    Date of Deposition: 08/29/2023

4    Job No.: 10126076

5

6        I, ALEXANDRA DAVID, M.D., hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9        Executed this _____ day of

10   _____, 2023, at _____.

11

12

13        _____

14        ALEXANDRA DAVID, M.D.

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,    proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

Alexandra David, M.D.

1    DEPOSITION ERRATA SHEET

2    Case Name: Coleman vs. Newsom
     Name of Witness: Alexandra David, M.D.
3    Date of Deposition: 08/29/2023
     Job No.: 10126076
4    Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
5                   3. To correct transcription errors.

6    Page  4   Line  8   Reason  3

7    From      M.D            to   PSY.D (my licunsse needs to
                                    change throughout)
8    Page  14  Line  16  Reason  3

9    From      Draw           to   Jarrod

10   Page  14  Line  17  Reason  3

11   From      Touge          to   Tucci

12   Page  23  Line  12  Reason  3

13   From      Sebios         to   Ceballos (throughout doc)

14   Page  25  Line  10  Reason  3

15   From      preferencus    to   referencus

16   Page  52  Line  4   Reason  3

17   From      questing       to   Testing

18   Page  52  Line  12  Reason  3

19   From      U              to   youth

20   Page  65  Line  19  Reason  3

21   From      HIPPA          to   HCPOP

22   Page  67  Line  1   Reason  3

23   From      Our tour       to   R tower

24   Page  68  Line  10  Reason  3

25   From      really         to   rarely

Alexandra David, M.D.

1    DEPOSITION ERRATA SHEET

2    Page _68_ Line _17_ Reason _3_

3    From _our_          to _R_

4    Page _68_ Line _18_ Reason _3_

5    From _mx_           to _annex_

6    Page _69_ Line _21_ Reason _1_

7    From _"to patients"_  to _"to PIP patients"_

8    Page _74_ Line _14_ Reason _3_

9    From _our glouts_   to _case loads_

10   Page _75_ Line _7_ Reason _3_

11   From _sends us_     to _census_

12   Page _87_ Line _7_ Reason _3_

13   From _criminag_     to _criminogenic_

14   Page _88_ Line _5_ Reason _3_

15   From _IBTT_         to _IDTT_

16   Page _93_ Line _2_ Reason _3_

17   From _enclosed_     to _noseol_

18   Page _97_ Line _6_ Reason _3_

19   From _DTP_          to _DDP_

20   Page _____ Line _____ Reason _____

21   From _____     to _____

22   __✓__   Subject to the above changes, I certify that the
              transcript is true and correct
23   _____ No changes have been made. I certify that the
              transcript is true and correct.

24         _____ PsyD

25         ALEXANDRA DAVID, ~~M.D.~~ PsyD

# Exhibit B

Case 2:90-cv-00520-KJM-SCR    Document 7959-1    Filed 09/22/23    Page 35 of 105

Volume 1                                                                      Coleman vs.
Shelly Minor, Ph.D.                                                              Newsom

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3

4  RALPH COLEMAN, et al.,

5          Plaintiffs,

6      vs.                        No. 2:90-cv-00520-KJM-DB

7  GAVIN NEWSOM, et al.,

8          Defendants.
   _____
9

10

11

12

13

14

15         REMOTE VIDEOCONFERENCE DEPOSITION OF

16              SHELLY MINOR, PH.D.

17            Friday, August 25, 2023

18          10:00 a.m. - 12:58 p.m.

19                Volume 1

20

21

22

23

24       JODI L. BOSETTI, CSR No. 11316, RPR

25            JOB NO. 10126077

```
 1                    APPEARANCES OF COUNSEL

 2

 3   For Plaintiffs:

 4           ROSEN, BIEN, GALVAN & GRUNFELD, LLP
             BY:  ALEXANDER GOURSE
 5           BY:  JENNY S. YELIN
             BY:  ADRIENNE HARROLD
 6           Attorneys at Law
             101 Mission Street, Sixth Floor
 7           San Francisco, California 94105
             (415) 433-6830
 8           agourse@rbgg.com
             jyelin@rbgg.com
 9           aharrold@rbgg.com

10

11   For Defendants:

12           STATE OF CALIFORNIA
             OFFICE OF THE ATTORNEY GENERAL
13           BY:  NAMRATA KOTWANI
             Attorney at Law
14           1300 I Street, Suite 1200
             Sacramento, California 95814
15           (916) 445-9555
             namrata.kotwani@doj.ca.gov
16

17

18

19

20

21

22

23

24

25
```



```
 1                          INDEX

 2


 3   WITNESS                              EXAMINATION

 4   SHELLY MINOR, PH.D.
     Volume 1
 5


 6


 7             BY MR. GOURSE                        4

 8


 9


10                        EXHIBITS

11   DEPOSITION                              PAGE

12   Exhibit 1    June 2023 Mental Health Staffing    30
                  Vacancy Report
13
     Exhibit 2    Defendants' Monthly Mental Health   32
14                Staffing Vacancy Report

15


16


17


18


19


20


21


22


23


24


25
```

1  and truthfully?

2       A    No.

3       Q    Great.

4            Please let me know if you need to take a

5  break or, actually, when you want to take a break.  We

6  will definitely take breaks.  And I'm happy to

7  accommodate you if you want to take a break at a

8  particular time.  The only thing I would add to that

9  is that if there's a question pending when you take a

10  break, that you finish -- or that you answer the

11  question before you take a break.

12       A    Thank you.

13       Q    Great.

14            All right.  So, for the record, can you

15  please state your full name and can you spell it out,

16  please.

17       A    Shelly Minor, S-H-E-L-L-Y, M-I-N-O-R.

18       Q    Thank you.

19            And who is your current employer?

20       A    Department of Corrections and Rehabilitation.

21       Q    Thank you.

22            For purposes of this deposition, is everyone

23  okay if we just refer to the Department of Corrections

24  and Rehabilitation as CDCR?  Will everyone understand

25  that acronym?

```
 1       A    Yes.

 2       Q    Thank you.

 3            What is your current title and your current

 4  position?

 5       A    My current title is the chief psychologist

 6  for the intermediate PIP program.

 7       Q    And how long have you been in that position?

 8       A    Two and a half years.

 9       Q    Okay.  What was the position you held

10  immediately before the chief psychologist in the

11  intermediate care program?

12       A    I was the chief of mental health, in that

13  position as a designation, up until the end of last

14  year.

15       Q    What professional licenses do you hold?

16       A    I'm a licensed clinical psychologist.

17       Q    And when did you receive that license?

18       A    2004.

19       Q    Sorry, was that 2004?  I didn't catch all of

20  that.

21       A    2004.

22            (Interruption by the court reporter.)

23  BY MR. GOURSE:

24       Q    Do you have any noncurrent or expired

25  licenses?
```

1     A     No.

2     **Q     And what degrees do you hold?**

3     A     I have a Master's and a Bachelor's in

4    psychology, a Master's in clinical psychology and a

5    Ph.D in clinical psychology.

6     **Q     Thank you.**

7           **And when did you obtain your Ph.D?**

8     A     That was 2004.

9     **Q     2004.**

10          **Where did you work immediately before you**

11    **started working for CDCR?**

12    A     I was a predoctoral student and I worked for

13   CYA, which is the Department of Juvenile Justice prior

14   to that, and I owned my own business at the same time.

15    **Q     What kind of business was that?**

16    A     My dissertation was on the effects of

17   exercise on depression and anxiety in women.  And it

18   was a training center to run that dissertation and to

19   service individuals in health and wellness and

20   exercise.

21    **Q     Interesting.**

22          **Do you still own that business or are you**

23    **still affiliated with that business in any way?**

24    A     No.  I have a private practice.

25    **Q     You have a private practice, okay.  And what**

1  kind of work do you do in your private practice?

2      A    I work with patients in the community.

3      Q    **What other positions have you held since you**

4  **started working at CDCR?**

5      A    I've been a line staff, working directly with

6  the patients for 14 years in total.  I have been a

7  supervisor, activated the mental health crisis center

8  at CHCF, as well as a specialist activating CIT.  I

9  also worked as the executive director in the PIP prior

10  to rolling over to the chief psychologist and chief of

11  mental health position.

12      Q    **Thank you.**

13          **Can you clarify what years you were in a line**

14  **staff position?**

15      A    I was in a line staff position, including the

16  predoctoral internship, 2003, and became a supervisor

17  approximately 2014.  I went back to a line staff

18  position at PIP for two and a half more years in 2016,

19  and then came back to the department as a specialist

20  for PIP.

21      Q    **And how long have you been at CHCF?**

22      A    Since its first patient came, 2013.

23      Q    **2013?**

24      A    Yes.

25      Q    **And where were you before that, which**

1  institutions?

2      A   I was at CMF, in their crisis bed, and Mule

3  Creek.  And that was it, with the exception of the DJJ

4  experience at Chad and OH Close and DeWitt.  I have

5  been at those two institutions, CDCR adult division --

6  or excuse me, three institutions.

7          (Interruption by the court reporter.)

8      THE WITNESS:  DeWitt, and that's the Department

9  of Juvenile Justice; and then Chaderjian, which you

10  can just do Chad for short, DJJ; and OH Close, DJJ.

11  BY MR. GOURSE:

12      Q   Are you a member of any labor union?

13      A   Yes, but I can't tell you the name.  It's a

14  supervisorial labor union.

15      Q   Okay.  How long have you been affiliated with

16  them?

17      A   Since I became a supervisor.

18      Q   Okay.  So you stated that your current role

19  is as a chief psychologist in the PIP program, right?

20      A   Yes.

21      Q   Can you describe that role, explain what your

22  primary responsibilities are?

23      A   My primary responsibilities is twofold.

24  Obviously we do not have a chief of mental health and

25  we don't have an assigned chief psychologist for the

1  outpatient, other than an acting.  So I assist the CEO

2  with covering and making sure the institution has its

3  needs met; as well as in the PIP, the intermediate

4  program has needs and oversight, and so I do cover

5  that area as well.

6      **Q   And do you have any oversight**

7  **responsibilities with regards to outpatient programs**

8  **at CHCF?**

9      A   Yes.

10     **Q   Can you explain what those roles are?**

11     A   I, as I mentioned prior to April -- prior to

12 April, when we got our acting chief psychologist, I

13 oversaw the supervisors, the clinical care, assisting

14 with issues that arise, just like any other chief.

15 That's my role.

16     **Q   Are you familiar with the phrase "working out**

17 **of class"?**

18     A   Yes.

19     **Q   Can you explain what it means?**

20     A   It means that you are taking on a position,

21 but you are -- your actual position number is in

22 another category, and you're working, functionally

23 working the position of the position you're out of

24 class in and fulfilling those duties.

25     **Q   Are you working out of class currently?**

 1      A    No.

 2      Q    I didn't hear the response but saw your --

 3      THE REPORTER:  We can't hear you.

 4      THE WITNESS:  No, no.

 5  BY MR. GOURSE:

 6      Q    Thank you.

 7           Have you worked out of class previously?

 8      A    Yes.

 9      Q    When and in what positions?

10      A    In 2000 I worked as the executive director of

11  the PIP for approximately a year and a half until the

12  final end of the lift in shift, which that position

13  turned into a chief psychologist position.

14      Q    Just to clarify, you said that was in the

15  year 2000?

16      A    Yes.

17      Q    Okay.  Was that before you obtained your

18  professional license to work at CDCR?

19      A    Excuse me, I apologize, correction.  2020.

20      Q    Thank you.

21           Who do you report to as the chief

22  psychologist for the PIP?

23      A    Currently, without the chief of mental health

24  at CHCF, I report directly to the CEO.

25      Q    And who reports to you?

1        A    I have supervisors in the PIP.  I have

2   various support staff that do report to me.  I have

3   program directors that report to me.

4        **Q    And are there supervisors and program**

5   **directors and staff who report to you from all mental**

6   **health classifications or is it just certain mental**

7   **health classifications?**

8        A    The supervisors that report to me are

9   clinical supervisors.  So a supervising psychiatric

10  social worker, a senior psychologist.

11       **Q    What about psychiatrists?**

12       A    No, they do not report to me.

13       **Q    Okay.  Are you involved in hiring mental**

14  **health staff at CHCF, on the outpatient side, I should**

15  **clarify?**

16       A    Yes.

17       **Q    Yes, you are involved in the hiring process**

18  **on the outpatient side?**

19       A    Yes.

20       **Q    What are your responsibilities with regard to**

21  **hiring mental staff for the outpatient programs?**

22       A    Arranging and attending interviews, arranging

23  onboarding.

24       **Q    Do you identify candidates for interviews or**

25  **are candidates provided to you?**

```
 1      A    Candidates are provided.

 2      Q    And who provides them to you?

 3      A    HR.

 4      Q    Can you just describe a little bit how that

 5  process works?  Do they send all candidates to you?

 6  Do they select candidates and then send only certain

 7  of them to you?

 8      MS. KOTWANI:  Objection.  That's compound.  Can

 9  you --

10  BY MR. GOURSE:

11      Q    All right.  I will rephrase.

12           Does HR send all applicants to you?

13      MS. KOTWANI:  Objection.  Leading.

14  BY MR. GOURSE:

15      Q    Does HR screen the pool of applicants before

16  they send candidates to you?

17      A    Yes, there is a process in which candidates

18  apply and they complete -- I don't want to call it a

19  test, but I don't know exactly the terminology for it,

20  but it is to meet all of the qualifications, and then

21  they are on a list.  And once the list is closed, we

22  are given and notified and we arrange for interviews

23  with HR.

24      Q    So would it be fair to say that the

25  candidates are far along in the hiring process before
```

 1 | their names are provided to you?  Do you understand

 2 | the question?

 3 |     A    No, I'm not -- if you could clarify that one

 4 | more time.

 5 |     Q    Sure.  Would it be fair to say that the

 6 | candidates have gone through several steps of the

 7 | hiring process before their names are provided to you?

 8 |     MS. KOTWANI:  Lacks foundation.

 9 | BY MR. GOURSE:

10 |     Q    You can answer if you understand the

11 | question.

12 |     A    Yes.

13 |     Q    Thank you.

14 |         Do you make offers to candidates?

15 |     A    No.

16 |     Q    Who does?

17 |     A    HR.

18 |     Q    Do you have a role in selecting which

19 | candidates to make offers to?

20 |     A    Yes.

21 |     Q    Could you describe that role?

22 |     A    The candidate will come in.  Since COVID

23 | we've been doing a lot on the Zoom or the Teams.  We

24 | interview them with standard questions.  We rate their

25 | responses following the interview.  And we -- there's

Case 2:90-cv-00520-KJM-SCR    Document 7959-1    Filed 09/22/23    Page 48 of 105

Volume 1                                                          Coleman vs.
    Shelly Minor, Ph.D.                                              Newsom

1  a criteria of the level the candidate is at, and then

2  we send our selections to HR with all the

3  documentation.

4      **Q    Does HR or any other group within CDCR have**

5  **the final say over who gets an offer?**

6      MS. KOTWANI:  Lacks foundation.

7  BY MR. GOURSE:

8      **Q    You can answer if you understand the**

9  **question.**

10     A    Could you repeat it again.  I apologize.

11     **Q    Who has the final say over which candidates**

12  **receive offers?**

13     A    It's twofold.  We have the say of who we

14  selected.  There's a credentialing process and things

15  of that nature that may not allow for an offer, but

16  that is outside of our realm in that process.

17     **Q    Have you ever recommended that a candidate be**

18  **hired and then the candidate was not provided with an**

19  **offer?**

20     A    Yes.

21     **Q    Do you recall what the circumstances were?**

22     A    There was an issue with that first test that

23  I mentioned.  The candidate hadn't taken the test or

24  there was issues with the test.  I'm not exactly sure

25  of the details, but that candidate couldn't be

1  offered.

2      Q    Any other instances where that occurred?

3      A    No.

4      Q    Do you speak with indicates after they've

5  received an offer of employment with CDCR?

6      MS. KOTWANI:  Vague.

7  BY MR. GOURSE:

8      Q    Let me rephrase.  Do you take any actions to

9  try to persuade them to accept the offer?

10     A    We aren't given telephone numbers of staff

11  members.  All of that is with HR.  So we aren't able

12  to contact staff members.

13     Q    Do you know whether anyone from HR follows up

14  with candidates who have received an offer?

15     A    That's outside.  I'm not aware of how that

16  process works outside of what I've discussed.

17     Q    In terms of your responsibilities and role in

18  overseeing the outpatient programs, do you adjust

19  schedules or assignments when clinicians call out sick

20  or are on vacations?

21     A    I do not specifically because we don't have a

22  supervisor out in E yard currently.  I have over the

23  last month done that.  But, in general, our seniors do

24  that.

25     Q    What about when people leave?

Case 2:90-cv-00520-KJM-SCR    Document 7959-1    Filed 09/22/23    Page 50 of 105

Volume 1                                                                    Coleman vs.
Shelly Minor, Ph.D.                                                          Newsom

```
 1                      REPORTER'S CERTIFICATION

 2

 3        I, JODI L. BOSETTI, a Certified Shorthand

 4   Reporter of the State of California, do hereby

 5   certify:

 6        That the foregoing proceedings were taken before

 7   me at the time and place herein set forth; that any

 8   witnesses in the foregoing proceedings, prior to

 9   testifying, were duly sworn; that a record of the

10   proceedings was made by me using machine shorthand and

11   later transcribed into typewriting under my direction;

12   that the foregoing is a true record of the testimony

13   and proceedings taken at that time.

14        I further certify that I am not of counsel or

15   attorney for either or any of the parties to said

16   proceedings, nor in any way interested in the outcome

17   of the cause named in said caption.

18        IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20   DATED:  September 1, 2023

21

22              _Jodi L. Bosetti_ (signature)

23   _____

24   JODI L. BOSETTI, CSR No. 11316, RPR

25
```

1        DECLARATION UNDER PENALTY OF PERJURY

2   Case Name: Coleman vs. Newsom

3   Date of Deposition: 08/25/2023

4   Job No.: 10126077

5

6             I, SHELLY MINOR, PH.D., hereby certify

7   under penalty of perjury under the laws of the State of

8   California         that the foregoing is true and correct.

9             Executed this 12th  day of

10  September       , 2023, at Stockton             .

11

12

13                          /s/Shelly Minor

14                          SHELLY MINOR, PH.D.

15

16  NOTARIZATION (If Required)

17  State of _____

18  County of _____

19  Subscribed and sworn to (or affirmed) before me on

20  this _____ day of _____, 20__,

21  by_____,    proved to me on the

22  basis of satisfactory evidence to be the person

23  who appeared before me.

24  Signature: _____ (Seal)

25

1   DEPOSITION ERRATA SHEET

2   Case Name: Coleman vs. Newsom
    Name of Witness: Shelly Minor, Ph.D.
3   Date of Deposition: 08/25/2023
    Job No.: 10126077
4   Reason Codes:   1. To clarify the record.
                    2. To conform to the facts.
5                   3. To correct transcription errors.

6   Page __28__ Line __22__ Reason __3__

7   From __triple CMS__ to __CCCMS__

8   Page __28__ Line __24__ Reason __3__

9   From __triple C__ to __CCCMS__

10  Page __29__ Line __4__ Reason __3__

11  From __triple CMS__ to __CCCMS__

12  Page __57__ Line __25__ Reason __3__

13  From __triple CMS__ to __CCCMS__

14  Page __58__ Line __9__ Reason __3__

15  From __triple CMS__ to __CCCMS__

16  Page __59__ Line __25__ Reason __2__

17  From __outpatient__ to __inpatient__

18  Page __67__ Line __11__ Reason __3__

19  From __HOM__ to __HAM__

20  Page __77__ Line __23__ Reason __3__

21  From __SSRIs__ to __SRASHEs__

22  Page __78__ Line __20__ Reason __3__

23  From __SSRIs__ to __SRASHEs__

24  Page __83__ Line __10__ Reason __3__

25  From __triple__ to __trickle__

1   DEPOSITION ERRATA SHEET

2   Page _____ Line _____ Reason _____

3   From _____ to _____

4   Page _____ Line _____ Reason _____

5   From _____ to _____

6   Page _____ Line _____ Reason _____

7   From _____ to _____

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  SM
    _____   Subject to the above changes, I certify that the
             transcript is true and correct

23  SM
    _____   No changes have been made. I certify that the
             transcript  is true and correct.

24           /s/ Shelly Minor
             _____

25                    SHELLY MINOR, PH.D.

# Exhibit C

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3

    RALPH COLEMAN, et al.,
4
                Plaintiffs,
5                                    CASE NO.
      vs.                            2:90-CV-00520-KJM-
6                                    DB
    GAVIN NEWSOM, et al.,
7
                Defendants.
8    _____

9

10

11

12

13

14         REMOTE DEPOSITION OF PAUL BURTON, M.D.

15              Monday, August 28, 2023

16

17

18

19

20

21

22

23  Reported by:
    Layli Phillips
24  RPR, CRR, CSR No. 14402

25  Job No. 10126078

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA

3

     RALPH COLEMAN, et al.,

4
              Plaintiffs,

5                              CASE NO.
       vs.                     2:90-CV-00520-KJM-
6                              DB
     GAVIN NEWSOM, et al.,

7
              Defendants.

8    _____

9

10

11

12

13

14        Remote Deposition of PAUL BURTON, M.D., taken

15   on behalf of Plaintiffs, beginning at 10:19 a.m. and

16   ending at 1:40 p.m., on Monday, August 28, 2023,

17   appearing remotely via Zoom before Layli Phillips, RPR,

18   CRR, Certified Shorthand Reporter No. 14402.

19

20

21

22

23

24

25

```
 1  REMOTE APPEARANCES:

 2

    For the Plaintiffs:
 3      ROSEN, BIEN, GALVAN & GRUNFELD LLP
        BY:  ADRIENNE HARROLD, ESQ.
 4           JENNY S. YELIN, ESQ.
        101 Mission Street, Sixth Floor
 5      San Francisco, California 94105
        (415) 433-6830
 6      aharrold@rbgg.com
        jyelin@rbgg.com
 7

 8  For the Defendants:
        HANSON BRIDGETT LLP
 9      BY:  DAVID C. CASARRUBIAS, ESQ.
        425 Market Street, 26th Floor
10      San Francisco, California 94105
        (415) 995-5893
11      dcasarrubias@hansonbridgett.com

12

13  ALSO PRESENT: VINCENT TAISAGUE, Aptus monitor
                  NICHOLAS O. WEBBER, ESQ., CDCR Office of
14                  Legal Affairs

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3  WITNESS                              EXAMINATION

 4  PAUL BURTON, M.D.

 5       By Ms. Harrold                          6

 6

 7

 8

 9                 E X H I B I T S

10  Plaintiffs'                           PAGE

11   Exhibit 1     Defendants' Monthly Mental      26

12                 Health Staffing Vacancy Reports

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Paul Burton, M.D.**

```
 1        Q. Great.  Thank you.

 2            And what is your position?

 3        A. My current position is chief psychiatrist at

 4  San Quentin.

 5        Q. Are you the chief psychiatrist for both the

 6  outpatient and inpatient PIP side of the institution?

 7        A. I was for many years.  Beginning in 2022, they

 8  created a second chief psychiatrist position.  I believe

 9  technically, I am the chief psychiatrist on the PIP pay

10  line, although at San Quentin we do things a little

11  differently, and both chiefs are involved in inpatient

12  and outpatient psychiatric services.

13            MS. HARROLD:  Okay.  And, Ms. Phillips, PIP is

14  an acronym, P-I-P.

15  BY MS. HARROLD:

16        Q. Can you explain a bit more about -- so to make

17  sure I understand, you do have some -- you don't

18  currently have a role in the outpatient side?

19        A. I'm involved in outpatient psychiatric services

20  on a daily basis.

21        Q. You are.

22            And is there a second chief psychiatrist right

23  now?

24        A. There is.  We have someone in an acting chief

25  psychiatrist position.
```

**Paul Burton, M.D.**

1          Q. And who is that?

2          A. Her name is Gundeep Sekhon, M.D.

3          Q. Great.

4             Would you mind --

5          A. She is a --

6          Q. Sorry.  Go ahead.

7          A. She is a staff psychiatrist at San Quentin who

8     is currently in an acting out-of-class chief position.

9          Q. Okay.  You used the term out of class.  What

10    does that mean?

11         A. That means someone has been appointed into the

12    supervisory promotional position on a temporary basis

13    while the official interviewing process is ongoing, so

14    it's meant to be a temporary assignment pending the

15    permanent fill.

16         Q. And how often does that happen that someone

17    might work out of class in a mental health position in

18    San Quentin?

19             MR. CASARRUBIAS:  Objection.  Lacks foundation.

20    BY MS. HARROLD:

21         Q. You can answer the question if you understand

22    it.

23         A. There are a variety of different mental health

24    positions.  Was there one in particular you were

25    interested in?

**Paul Burton, M.D.**

1        Q. Perhaps in psychiatry?

2        A. It's quite rare that we've had to do an

3   out-of-class position for a psychiatric classification.

4        **Q. And going back to your background, how many**

5   **years have you been with CDCR?**

6        A. I have worked at San Quentin for the last

7   14 years, the last 12 of which I've been in a variety of

8   different civil service classifications.

9        **Q. And how long have you been chief psychiatrist?**

10       A. Since December 2014, so just under nine years.

11       **Q. And you described you've held other positions**

12  **in CDCR.  Can you please describe them and the years of**

13  **each to the best that you remember?**

14       A. Most definitely.  In 2001, I rotated at

15  San Quentin as a medical student for the summer.

16            In 2009, for one year, I was a UCSF forensic

17  psychiatry fellow rotating at San Quentin two days a

18  week for one year.

19            In -- from 2010 to 2011, I was a registry locum

20  tenens psychiatrist providing clinical services at

21  San Quentin State Prison.

22            Beginning in 2011, I began my civil service

23  employment with CDCR as a staff psychiatrist providing

24  treatment services via telepsychiatry, inpatient

25  psychiatry, and the condemned or death row psychiatric

1  program that was available at that time.

2          I remained in that staff psychiatrist

3  classification until 2013, at which time I was promoted

4  to senior psychiatrist supervisor.

5          I remained in that position for 14 months until

6  the conclusion of 2014, December 2014, when I was

7  promoted to chief psychiatrist, and I remained in a

8  chief psychiatrist classification since that time.

9      **Q. Thank you.**

10         **You use the term registry.  What does that**

11 **mean?**

12      A. Registry is like locum tenens, temporary help.

13 These are psychiatrists who are not employed by the

14 department but who are employed by a third-party and

15 provide psychiatric services, not as employees but as

16 temporary help while civil service classifications are

17 in the process of being filled.

18      **Q. And what professional licenses do you hold, and**

19 **when were they granted?**

20      A. I am currently licensed to practice medicine in

21 the State of California continuously since 2008.

22         I am board certified in psychiatry since 2010

23 and board certified in forensic psychiatry since 2011.

24         I also have federal DEA registration since

25 approximately 2008 or 2009.

1  and calls for speculation.

2  BY MS. HARROLD:

3       **Q. You can answer.**

4       A. I don't know.

5       **Q. Great.**

6       **I will ask a couple of questions to better**

7  **understand your role.  What does it mean to be chief**

8  **psychiatrist?**

9       A. Essentially to be a chief psychiatrist means to

10  run a psychiatric program in which one supervises a team

11  of physicians who provide direct patient care to the

12  patients we are entrusted with, but also who helps

13  ensure that policy, procedure, and practice are

14  conducive to the application and implementation of the

15  care that is recommended by the physicians that that

16  individual supervises.

17       **Q. You mentioned that there's another chief**

18  **psychiatrist in an acting position.  Can you describe**

19  **more the division of responsibilities between you and**

20  **that individual?**

21       A. Yeah.  It's somewhat fluid.  For many years, we

22  had one chief psychiatrist at San Quentin and one senior

23  psychiatrist who reported to the chief.

24       Beginning in January 2022, a year and a half

25  ago, the senior position was upgraded to a chief

Paul Burton, M.D.

 1  psychiatrist position, and since that time, there have

 2  been three individuals in the other chief position:  One

 3  permanent and two temporary.  And I found that working

 4  collaboratively with that individual and providing

 5  support for all functions within the prison, inpatient

 6  and outpatient, tends to be a superior form of

 7  structuring administration than siloing services into

 8  one side or the other.

 9          So it's an evolving process.  It depends on the

10  individuals involved but, so far, we are three for three

11  with developing a collaborative and team-oriented

12  approach to all psychiatric services that are provided

13  at San Quentin.

14      **Q. I appreciate you explaining, if I'm**

15  **understanding it correctly, that it's a bit fluid and**

16  **it's not truly siloed.**

17          **Are -- do you and this other individual have**

18  **different primary responsibilities?**

19      A. Yes.  If one wanted to view it through the lens

20  of specialization, knowing that we are able to also

21  engage in other activities, my specialization would be

22  over inpatient services, and I'm the medical director of

23  our 50-bed inpatient unit, and the other individual's

24  specialization would be to focus more on outpatient

25  services, although in reality, we're constantly

1   collaborating and communicating and troubleshooting in

2   person on a regular hour-by-hour basis.

3       **Q. Were you involved in the decision to create two**

4   **chief roles in 2022?**

5          MR. CASARRUBIAS:  Objection.  Lacks foundation.

6   BY MS. HARROLD:

7       **Q. You can answer the question.**

8       A. It was certainly not my decision, no.

9       **Q. Were you in any -- were you in any**

10  **conversations about why the decision was made?**

11         MR. CASARRUBIAS:  Objection.  Asked and

12  answered.

13      A. Not in 2022.  I believe I was given a heads-up

14  several months prior, but it was more of a notification

15  than a conversation that this would be happening at some

16  point in the future.

17      **Q. And who gave you that heads up?**

18      A. Dr. Mehta.

19      **Q. And who -- can you please describe who he is?**

20      A. Dr. Mehta is the deputy director of statewide

21  mental health in CDCR.

22      **Q. And in the heads-up conversation, did he**

23  **explain any reason for creating the second role?**

24         MR. CASARRUBIAS:  Objection.  Calls for

25  hearsay.

1  BY MS. HARROLD:

2       **Q. You can answer the question if you understand**

3  **it.**

4       A. To the best of my recollection, I believe they

5  wanted to come up with a uniform statewide system that

6  applied to the three large PIPs that were involved in

7  the 2017 lift and shift and to come up with a similar

8  administrative structure for those three facilities and

9  the two smaller PIPs that existed prior to lift and

10  shift.

11       **Q. Thank you.**

12       **Who do you report to?**

13       A. I currently report to the San Quentin chief

14  executive officer.  Her name is Rhonda Litt.

15       **Q. And who reports to you?**

16       A. Currently, I have staff psychiatrists who all

17  work on site at San Quentin who report to me, and I have

18  one newly created limited-term SSA position, support

19  staff person, who reports to me.

20       **Q. What is -- did you say the acronym was SSA?**

21       A. Correct, staff services analyst, I believe.

22       **Q. And what is that role?**

23       A. The primary function of the SSA at San Quentin

24  is to serve as the medication court administrator, so

25  essentially that is like the clerk of the court for

Paul Burton, M.D.

1  Penal Code 2602 court hearings, Penal Code 2604 court

2  hearings, and ECT court hearings.  She also has other

3  duties, but that is the majority of her responsibility.

4      **Q. And you said it's newly created.  When was it**

5  **created?**

6      A. It was created on paper in 2022.  It was just

7  filled in reality earlier this year in 2023, and it was

8  created at the level of San Quentin.

9      **Q. And is that a permanent role?**

10     A. It is a limited-term position, so from a human

11  resources perspective, it's not permanently funded, but

12  our current CEO has been creative with creating

13  positions out of existing support staff vacancies to

14  assist in some of the challenges San Quentin has had

15  with the recruitment and retention of support staff.

16     **Q. And who would you say reports to the acting**

17  **chief psychiatrist role for over outpatient services?**

18     A. Other staff psychiatrists.

19     **Q. Does anyone else report to you other than this**

20  **SSA and psychiatrists?**

21     A. No.

22     **Q. In your role, do you ever work with**

23  **psychologists?**

24     A. On a daily basis, yes.

25     **Q. And clinical social workers?**

1        A. Yes, regularly.

2        **Q. What about recreational therapists?**

3        A. Yes, regularly.

4        **Q. Are you involved in the hiring of psychiatrists**

5    **at San Quentin?**

6        A. Yes, I am.

7        **Q. And what are your responsibilities as to**

8    **hiring?**

9        A. As the chief psychiatrist for staff

10   psychiatrist interviews, I am on the interview panel

11   often with the other chief or senior psychiatrist.  We

12   ultimately make decisions whether or not to pursue

13   employment with candidates who are interested in working

14   at San Quentin following the interview, review of

15   collateral materials, checking of references, et cetera.

16        Upon our recommendation, the panel would submit

17   the packet to the CEO who is also the hiring authority

18   for health care at San Quentin, and a formal offer would

19   be extended, and once they begin their employment, we

20   are responsible for most of the onboarding as well as

21   the administrative and clinical supervision necessary to

22   thrive within a correctional environment.

23        **Q. You mentioned you're on an interview panel with**

24   **the other chief and a senior psychiatrist; is that**

25   **right?**

1    A. Up until 2022, it was a senior psychiatrist

2    with the classification upgrade, that senior position

3    becoming a chief in 2022.  That's when it was two chief

4    psychiatrists.

5    **Q. I see.**

6    **Is anyone else on the panel?**

7    A. From time to time, we've had our psychology

8    colleagues sit in, but typically it is -- it involves

9    the two psychiatrists in leadership positions that sit

10   on the interview panel for staff psychiatry applicants.

11   **Q. And were you involved in the hiring of the SSA?**

12   A. I was, yes.  I was one of several panel

13   members.

14   **Q. And are you involved in the hiring of any other**

15   **nonpsychiatry mental health staff at San Quentin?**

16   A. Yes, but not on a consistent basis.

17   **Q. Can you describe that a bit more?**

18   A. So over my near ten years of experience in a

19   supervisory classification at San Quentin, in addition

20   to the psychiatry interviews that were just described, I

21   have occasionally sat in on nursing supervisor interview

22   panels, various quality management position interview

23   panels.  I've sat in occasionally on support staff

24   interview panels once or twice a year, but nothing on a

25   consistent basis.

1          Q. Have you ever sat in or been involved in in any

2    way the hiring of psychologists at San Quentin?

3          A. There was one occasion approximately five to

4    six years ago in which I was a panel member for several

5    vacant senior psychologist supervisor positions at the

6    time, so, yes, I do have that experience, but it is not

7    a -- not a regular event.

8          Q. Great.

9             What about clinical social workers?

10         A. I don't recall at this time being on a clinical

11   social worker panel in the past.

12         Q. And lastly, recreational therapists?

13         A. Not that I can recall.

14         Q. Do you know who does the hiring for, say,

15   psychologists at San Quentin?

16         A. Yes.  In addition to the hiring authority CEO

17   ultimately being responsible for that process, typically

18   the decision lies with the chief of mental health at

19   San Quentin.

20         Q. And do you have meetings with the chief of

21   mental health?

22         A. Yes, I do, on a regular basis.

23         Q. And in any of those meetings, do they -- does

24   this person talk about staffing?

25         A. Yes.

Paul Burton, M.D.

1       Q. Does this person talk about efforts to fill

2   vacancies in any of these meetings?

3       A. On occasion, yes.

4       Q. Great.

5          And in your role, do you see data about

6   vacancies at San Quentin in mental health positions?

7       A. I -- I do.  I tend to focus on the psychiatrist

8   data since that's my primary responsibility.

9       Q. And what data do you regularly come into

10  contact with?

11      A. There's a variety of different sources.  Every

12  once in a while, a few times a year, there may be a

13  statewide data sheet that is sent out that talks about

14  vacancies at all of the different facilities including

15  San Quentin.  So I've glanced at that from time to time.

16         Typically San Quentin doesn't have too many

17  psychiatrist vacancies, but it is helpful to get a sense

18  of what other facilities are going through.

19         On a every two- to four-week basis, we have a

20  meeting with human resources as well as the central

21  hiring unit to discuss current vacancies specifically at

22  San Quentin.  And in that process, all health care

23  classifications, including those under primary care,

24  nursing, psychology, social work, psychiatry, are

25  reviewed to get a status update on not only recruitment

1  efforts but updates on where the individual is at in the

2  hiring process.

3      **Q. I hope to ask a couple questions to better**

4  **understand those meetings.  You mentioned HR.  Is that**

5  **HR at San Quentin?**

6      A. Yes, HR at San Quentin, regional HR, and, on

7  occasion, headquarters HR.

8      **Q. And you mentioned central hiring.  Is that also**

9  **at a headquarters level, or what level is it at?**

10      A. Central hiring is centralized.  It's at a

11  headquarters level.

12      **Q. And who else attends these meetings?**

13      A. Typically, all of the various chiefs over

14  health care divisions at San Quentin State Prison attend

15  the meeting alongside the San Quentin health care CEO

16  and a variety of HR representatives.

17      **Q. So is this meeting you're describing focused**

18  **just on San Quentin, or does it have other institutional**

19  **leadership from different institutions?**

20      A. It is focused exclusively on San Quentin.

21      **Q. And do you happen to know whether other**

22  **institutions have similar meetings?**

23          MR. CASARRUBIAS:  Objection.  Lacks foundation,

24  and calls for speculation.

25      A. I don't know.

1      Q. How long have these meetings been happening?

2      A. In its current form, the meetings have been

3   happening for approximately two years.

4      Q. And does the chief of mental health join these

5   meetings, the chief of mental health at San Quentin?

6      A. Yes.

7      Q. And what is that person's name?

8      A. Rachel Chen.

9      Q. Great.

10         So I have some questions to better understand

11   the status of vacancies in mental health positions at

12   San Quentin.  I'll likely pull up an exhibit so we can

13   look at some numbers, but just to start with some

14   questions, focusing on psychiatry positions, so chief

15   psychiatrist, to make sure I understand, you say there's

16   currently yourself, a chief psychiatrist, and one acting

17   psychiatrist, correct?

18      A. That is correct, yes.

19      Q. And you don't have other duties outside of your

20   role as chief psychiatrist?  I can clarify the question.

21         MR. CASARRUBIAS:  Objection.  Vague.  Yeah.

22   BY MS. HARROLD:

23      Q. You're not in any acting position yourself?

24      A. I am not, no.

25      Q. Okay.  Great.

Paul Burton, M.D.

```
 1              I, the undersigned, a Certified Shorthand

 2   Reporter of the State of California, do hereby certify:

 3              That the foregoing proceedings were taken

 4   before me at the time and place herein set forth; that

 5   any witnesses in the foregoing proceedings, prior to

 6   testifying, were duly sworn; that a record of the

 7   proceedings was made by me using machine shorthand,

 8   which was thereafter transcribed by me; that the

 9   foregoing is a true record of the testimony given.

10              Further, that if the foregoing pertains to

11   the original transcript of a deposition in a federal

12   case, before completion of the proceedings, review of

13   the transcript [ X ] was [ ] was not requested.

14              I further certify I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney or party to this action.

17              IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20

21   Dated:  August 28, 2023

22

23

24   _____
     Layli Phillips
25   RPR, CRR, CSR No. 14402
```

Case 2:90-cv-00520-KJM-SCR   Document 7959-1   Filed 09/22/23   Page 75 of 105   Coleman vs. Newsom

Paul Burton, M.D.

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2    Case Name: Coleman vs. Newsom

 3    Date of Deposition: 08/28/2023

 4    Job No.: 10126078

 5

 6              I, PAUL BURTON, M.D., hereby certify

 7    under penalty of perjury under the laws of the State of

 8    California          that the foregoing is true and correct.

 9              Executed this  6th    day of

10    September         , 2023, at  San Quentin, CA        .

11

12

13

14              PAUL BURTON, M.D.

15

16    NOTARIZATION (If Required)

17    State of _____

18    County of _____

19    Subscribed and sworn to (or affirmed) before me on

20    this _____ day of _____, 20__,

21    by_____,      proved to me on the

22    basis of satisfactory evidence to be the person

23    who appeared before me.

24    Signature: _____ (Seal)

25
```

Paul Burton, M.D.

```
 1  │  DEPOSITION ERRATA SHEET
 2  │  Case Name: Coleman vs. Newsom
    │  Name of Witness: Paul Burton, M.D.
 3  │  Date of Deposition: 08/28/2023
    │  Job No.: 10126078
 4  │  Reason Codes:  1. To clarify the record.
    │                 2. To conform to the facts.
 5  │                 3. To correct transcription errors.
 6  │  Page  39   Line  21   Reason  3
 7  │  From  CCCMS at EOP        to  CCCMS to EOP
 8  │  Page  44   Line  23   Reason  1
 9  │  From  physicians, but that   to  strike "but": physicians, that
10  │  Page  47   Line  21   Reason  1
11  │  From  physician          to  position
12  │  Page  51   Line  21   Reason  1
13  │  From  EKG, tests.        to  EKG test.
14  │  Page  95   Line  11   Reason  1
15  │  From  not like going forward,  to  not like, going forward
16  │  Page  99   Line  20   Reason  3
17  │  From  offices            to  Office of
18  │  Page  _____ Line _____ Reason _____
19  │  From  _____  to  _____
20  │  Page  _____ Line _____ Reason _____
21  │  From  _____  to  _____
22  │  Page  _____ Line _____ Reason _____
23  │  From  _____  to  _____
24  │  Page  _____ Line _____ Reason _____
25  │  From  _____  to  _____
```

Paul Burton, M.D.

```
1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   PB     Subject to the above changes, I certify that the
            transcript is true and correct
23          No changes have been made. I certify that the
            transcript is true and correct.

24          _____

25                PAUL BURTON, M.D.
```

# Exhibit D

1          UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, et al.,

5          Plaintiffs,

6       vs.              CASE NO. 2:90-CV-00520-KJM-DB

7    GAVIN NEWSOM, et al.,

8          Defendants.

9    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

10

11

12             DEPOSITION OF

13          KELLEY FRANCESCHI, Psy.D

14

15

16             August 18, 2023

17              8:58 a.m.

18

19

20             Folsom, California

21

22

23

24       JENNIFER SCHUMACHER, CSR No. 9763

25            Job No. 10125861

```
 1                    APPEARANCES OF COUNSEL

 2


 3   For the Plaintiffs RALPH COLEMAN, et al.
     (Videoconference):
 4
          ROSEN, BIEN, GALVAN & GRUNFELD LLP
 5        BY:  JENNY S. YELIN, Esq.
               ALEXANDER GOURSE, Esq.
 6        101 Mission Street, Sixth Floor
          San Francisco, California 94105
 7        (415) 433-6830
          Jyelin@rbgg.com
 8


 9   For the Defendant GAVIN NEWSOM, et al.
     (Videoconference):
10
          STATE OF CALIFORNIA
11        OFFICE OF THE ATTORNEY GENERAL
          BY:  ELISE OWENS THORN, Esq.
12        1300 I Street, Suite 1200
          P.O. Box 944255
13        Sacramento, California 95814
          Elise.thorn@doj.ca.gov
14


15   Also Present (Videoconference):

16        Melissa Bentz, Esq., CDCR Office of Legal Affairs
          Chris Landrum, Aptus Monitor
17
                         --oOo--
18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATIONS

 2    WITNESS: KELLEY FRANCESCHI, Psy.D

 3    EXAMINATION                                    PAGE

 4    By Ms. Yelin                                     5

 5

 6

 7                       ---o0o---

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Kelley Franceschi, Psy.D**

Coleman vs.
Newsom

```
 1                    INDEX OF EXHIBITS

 2   Number              Description          Page

 3   Exhibit 1     Defendants' Monthly Mental    24

 4                 Health Staffing Vacancy

 5                 Reports, Filed 7/31/23

 6   Exhibit 2     Defendants' Monthly Mental    39

 7                 Health Staffing Vacancy

 8                 Reports, Filed 3/30/23

 9

10

11                    ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

www.aptusCR.com

Kelley Franceschi, Psy.D

Coleman vs.
Newsom

```
 1   effect as if you were testifying in court.  Do you
 2   understand that?
 3        A.  Yes.
 4        Q.  Is there any reason that you are not able to
 5   give your best testimony today due to sleep,
 6   medications, any other substances?
 7        A.  No.
 8        Q.  Okay.  We will definitely be taking breaks.
 9   You should feel free to let us know if you need a break
10   at any point, or your attorneys, of course, will suggest
11   a break, and generally we will try and take breaks about
12   once an hour.  Just let us know if you need additional
13   breaks.  Okay?
14        A.  Yes.
15        Q.  So if there's a question pending, you'll have
16   to answer that question before we go on the break.  Do
17   you understand that part?
18        A.  Yes.
19        Q.  Great.  Okay.  So let's start.  What is your
20   current employer?
21        A.  My current employer is the California
22   Department of Corrections & Rehabilitation.
23        Q.  And what is your position?
24        A.  My position is chief psychologist.  I hold a
25   title of chief of mental health.
```

1    Q.  Great.  Thanks for clarifying that.  And how

2    many years have you worked with the Department of

3    Corrections?

4    A.  I've worked with the Department of Corrections

5    since 2005.  I don't know the math right now to know how

6    many years that is.

7    Q.  Almost 20 years, I guess.

8    A.  Okay.  Yeah, 18 years.

9    Q.  And for the purposes of the deposition today is

10   it okay with everyone if I refer to the California

11   Department of Corrections & Rehabilitation as CDCR?  We

12   all know what that means.  Okay.  Great.

13       How long have you been in the chief of mental

14   health position or have held that title?

15   A.  I've held the chief of mental health title

16   since April of 2021.  Yeah.

17   Q.  What was your title prior to April of 2021?

18   A.  Since 2013 I was the chief psychologist at the

19   CSP-SAC.

20   Q.  Do you hold any professional licenses?

21   A.  I hold a license, I'm a licensed psychologist

22   in the state of California.

23   Q.  Okay.  And when was that license granted,

24   approximately?

25   A.  Oh, it was right before Gigi was born.  2007.

1    Q.   And what degrees do you hold?

2    A.   I hold a BA from the University of California

3  at Santa Cruz, and then the Doctor of Psychologist, the

4  Psy.D, P-s-y, dot D, from the California School of

5  Professional Psychology.

6    Q.   When did you obtain that Psy.D degree?

7    A.   I obtained the Psy.D degree in 2004.

8    Q.   So you have been working at CDCR almost your

9  entire career, correct?

10    A.   That is correct.

11    Q.   Okay.  What were you doing in that one-year

12  period between obtaining your Psy.D and starting at

13  CDCR?

14    A.   I moved up to Northern California and was

15  looking for post-doc work after I graduated.  I did a

16  little bit of psych apprenticeship through Santa Rosa --

17  through a private practice in Santa Rosa.  I also did

18  six months at Santa Rosa Junior College in their

19  counseling center.

20    Q.   And what was the position that you held at CDCR

21  when you joined in 2005?

22    A.   As a staff psychologist.

23    Q.   Are you currently a member of any labor union?

24    A.   I am not.

25    Q.   Okay.  Can you describe your current role and

1  your primary responsibilities?

2      A.  In my current role at CDCR I work to deliver

3  care to the mental health population at CSP-SAC.  I am

4  the person who would implement policies and procedures

5  and make determinations of how best to implement the

6  various policies that come from headquarters.  I also

7  assist with clinical supervision for any clinical

8  disputes and/or clinical evaluations that come up that

9  are difficult so I can lend clinical expertise as well.

10 I meet regularly with the CEO to coordinate care on how

11 to deliver patient care to the patient population at

12 CSP-SAC.

13     **Q.  Who do you report to, Dr. Franceschi?**

14     A.  I report to the CEO.  Her name is Kerry

15 Oglesby.

16     **Q.  And who reports to you?**

17     A.  Directly?

18     **Q.  Directly reports to you, yes.**

19     A.  Dr. Chamber, the chief psychologist, reports to

20 me.  Most of our specialists, senior psychologist

21 specialists report to me, and I have some senior

22 psychologist supervisors that report to me.

23     **Q.  So the chief psychiatrist does not report to**

24 **you?**

25     A.  Correct.

Kelley Franceschi, Psy.D

1    Q.  And what about the social work supervisors?

2    A.  She reports to me.

3    Q.  Okay.

4    A.  Yeah.

5    Q.  What is your role in terms of -- sorry.  Strike

6    that.

7        Are you responsible for managing the schedules

8    of line psychologists and/or clinical social workers at

9    CSP-SAC?

10   A.  Yes.

11   Q.  Okay.  Can you describe your role when it comes

12   to scheduling?

13   A.  My role in terms of scheduling would be to

14   ensure that we run the due date report, which gives us

15   timelines for compliance, and we make sure that the

16   clinicians get to weigh in on a schedule, then we hand

17   it to the OTs for scheduling, and then we speak with

18   custody about treatment hours and parameters and the

19   ability for them to get patients to appointments.

20   Q.  Okay.  And I'm realizing that my question was

21   not very clear.  So I think what you're describing is

22   scheduling clinical treatment with patients, correct?

23   A.  Yes.

24   Q.  Okay.  Do you also have any responsibilities

25   related to scheduling the work schedules of the line

1    **psychologists and clinical social workers?**

2        A.   You know --

3            MS. THORN:  Objection.  Just vague and

4    ambiguous.  Are you talking just about individual staff

5    members' day-to-day schedules as to when they report to

6    the institution?

7            MS. YELIN:  Yes.

8            MS. THORN:  Okay.

9            MS. YELIN:  Thank you for the clarification.

10           MS. THORN:  Thank you.  Do you understand what

11   she's asking for?

12           THE WITNESS:  I do.  Yes, I do that.

13   BY MS. YELIN:

14       **Q.   Okay.  Do you have any responsibility related**

15   **to figuring out coverage when certain psychologists or**

16   **social workers are out of work due to vacation, short-**

17   **or long-term leave, sick, et cetera?**

18       A.   Yes.

19       **Q.   Okay.  How do you perform those duties?  Can**

20   **you describe them?**

21       A.   It depends on the classification of the

22   position.  For example -- do I go on?  Like, for

23   example, rec therapists have a bid where we try to take

24   it for the whole year, and we look at the institutional

25   needs, what institution can have any one rec therapist

1  be off at any one time, and we negotiate that time off

2  with them for the whole year, and they can submit

3  throughout the year.  But we take that and we -- so

4  that's how the RTs do it.

5          The psychologists, the social worker, PC, would

6  go to their supervisor and the supervisor would have,

7  depending on the size of the program and the number of

8  people that are in that program, look at their

9  calendars, and then we would review those calendars as

10 it was brought up in our program check-ins to see if we

11 have enough staff that are afforded to cover care.  And

12 then give the time off as needed.

13     **Q.  Okay.  Thanks.  Sorry for cutting you off.**

14 **What about in circumstances where a psychologist, for**

15 **example, calls in sick or hasn't planned their absence**

16 **ahead of time?**

17          MS. THORN:  Is there a question with that?

18 BY MS. YELIN:

19     **Q.  How do you figure out coverage during those**

20 **circumstances?**

21          MS. THORN:  Thank you.

22          THE WITNESS:  The coverage would go to the

23 program supervisor to figure out.  If we cannot find

24 appropriate resources to cover that position for the

25 day, we would activate other help, be it the supervisor

1  could then coordinate care, or we can activate our

2  specialists to help cover the absence.  We could look to

3  another program that might have resources in during that

4  day.  The last resort being to cancel a ducat, to cancel

5  the appointment would be the last report.

6      **Q.  And for the court reporter's benefit, I believe**

7  **ducat is spelled d-u-c-a-t; is that correct?**

8      A.  That is correct.

9      **Q.  And can you describe the steps that you take**

10 **when -- in figuring out coverage and/or assignment**

11 **changes when you learn that a psychologist or social**

12 **worker is leaving the institution, leaving their**

13 **position?**

14     A.  Leaving?

15     **Q.  Leaving.**

16     A.  Like leaving --

17     **Q.  Leaving their position.**

18     A.  Like resigning?

19     **Q.  Sure.  Resigning their position.**

20     A.  Okay.  So weekly we look through at the

21 staffing and the staffing model and the staffing

22 allocations, and at CSP-SAC we have a robust system

23 where we are looking at every staff, every program.  We

24 are looking at allocations.  We're looking at ratios.

25 And so depending on which program the staff is leaving

1    from, we will either have to redistribute that caseload

2    or pull from another area in order to make that program

3    whole, if it's a program that at this point we consider

4    vital and having a lot of importance, right?  So we have

5    to pull -- we either pull resources or disburse the

6    caseload amongst the team that's left.

7        Q.  It sounds like you're directly involved in that

8    process; is that correct?

9        A.  Yes.

10       Q.  Okay.  And who else is involved in that process

11   with you?

12       A.  Chamber, Sunita Chamber, my chief psychologist,

13   Robert Lucas, my HPS II, would be the people who are in

14   that weekly meeting.  If the program -- I can pull in

15   seniors and I routinely do to show them both my line of

16   thinking and also make clear and transparent what is

17   happening with the program at any various time.

18       Q.  Okay.  Great.  And do you mind spelling out, or

19   sorry, saying what the acronym that you mentioned --

20       A.  Yeah, for sure.  I'm so sorry to talk over you.

21   Health program specialist.  I do not know.

22       Q.  Okay.  Health program something that starts

23   with an S?

24       A.  II.

25       Q.  II.  Got it.  Thank you.  Are you involved in

1  hiring mental health staff for CSP-SAC?

2      A.  Yes.

3      Q.  Okay.  And what is your role as to hiring?

4  What are your responsibilities?

5      A.  I typically chair the panels to hire.

6      Q.  What does that mean?

7      A.  I typically am the lead person to start the

8  interview, to do the introductions, introduce them to

9  SAC, I show them who is the panel, and I tell them we

10  have a structured interview that is consistent across

11  all interviewees today, and then I orient them to SAC

12  with a little introduction, and then we take turns

13  asking questions and then I do the ending process where

14  I ask them, have they had any adverse action or kind of

15  the personnel questions in that, and then I'm the person

16  to end the interview.

17      Q.  By the time a candidate has gotten to this

18  panel interview, have they done any other interviews

19  with anyone at CDCR?

20      A.  I don't know.

21      Q.  And who else is generally on the panel with

22  you?

23      A.  It will be anybody from a senior psychologist

24  supervisor or higher.  I guess I would like to retract

25  that.  It depends on what position I'm hiring for.

1     Q.  Sure.

2     A.  The HR process identifies people that can be in

3  that panel, and so I choose from the available people

4  that are allowed to be on that panel, and we try to pick

5  two other people, plus me, for hiring.

6     **Q.  Do you select the candidates that are brought**

7  **in for a panel interview with you and the other two**

8  **people you just mentioned?**

9     A.  I do not.

10     **Q.  Who selects those candidates, to your**

11  **knowledge?**

12     A.  It comes from me from -- well, it has been

13  changed numerous times in the last even year.  But like

14  it started with the -- it started with my own local

15  staff, then it went to the central hiring unit, and now

16  it's, I think, at the regional hiring unit.  But I'm not

17  quite sure.  Maybe I don't know is the best answer for

18  that.

19     **Q.  Sure.  So by the time somebody is coming to you**

20  **for a panel interview you -- strike that.**

21        **You have no role in selecting who you**

22  **interview, correct?**

23     A.  Correct.

24     **Q.  They are candidates that are provided to you**

25  **and you're informed by someone that you will be**

**Kelley Franceschi, Psy.D**

1    interviewing this candidate?

2        A.  Correct.

3        **Q.  Who usually conveys that information to you?**

4        A.  The last time that I had a candidate it was the

5    central hiring unit.

6        **Q.  Okay.  Do you interview every candidate for a**

7    **line psychologist position at SAC?**

8        A.  Yes, any candidate that's brought to me, yes.

9        **Q.  Okay.  But nobody would ever be hired as a line**

10   **psychologist at SAC without having an interview with you**

11   **first, correct?**

12       A.  Or with the panel.

13       **Q.  Or with the panel.  So sometimes --**

14       A.  Let's say I'm off, I appoint another chair and

15   they would go through the process.  I do not want to

16   delay or in any way say I'm not -- we're not available

17   immediately when somebody is available to hire.

18       **Q.  Understood.  That makes sense.  Is the same**

19   **true for line clinical social workers, that you or the**

20   **panel would interview every single candidate who might**

21   **be hired into that position at SAC?**

22       A.  Yes.  Oh, I need to strike that.  Recently, and

23   I was not involved with this, but there was a hiring

24   fair and a social worker came through the door wanting

25   to work at SAC, and they hired her for me.  But I have

1    not yet -- I don't even know the name of that person or

2    what is involved with what happened.  But I do know that

3    the hiring is in progress.

4        **Q.  Do you know when that person will start**

5    **working?**

6        A.  I do not, no.  But I don't want to misinform

7    that I am on every -- because this just happened, so it

8    was a deviation from what's typically happened in the

9    past.

10       **Q.  Sure.  Has that ever happened before during**

11   **your tenure as the chief of mental health?**

12       A.  It has never happened, no.

13       **Q.  Do you also interview, generally you or the**

14   **panel, interview all candidates for a psychologist**

15   **supervisor position?**

16       A.  Yes.

17       **Q.  And a senior psychologist position?**

18       A.  A specialist?

19       **Q.  A specialist, yeah.**

20       A.  Yes.

21       **Q.  Okay.  Does the panel determine whether to give**

22   **an offer of employment to a candidate that they**

23   **interview at SAC?**

24       A.  Yes.

25       **Q.  So you have the final say as the panel?**

Kelley Franceschi, Psy.D

1    A.  Yes.

2    Q.  Can you describe what your process is after an

3    offer of employment has been provided to a candidate for

4    a, let's say, line psychologist position at SAC when

5    that person is determining whether to join?

6    A.  What my process is or what I know of the

7    department's process?

8    Q.  That was not a clear question.  I apologize.

9    Why don't you first talk about what your process is.

10    A.  My process is to say please hire this person,

11    and then the person will come.

12    Q.  Who do you communicate that please hire this

13    person to?

14    A.  To my personnel department.

15    Q.  What is your personnel department?

16    A.  What is it?

17    Q.  Yeah.

18    A.  There's two people that work for CSP-SAC that

19    does the hiring paperwork and anything that it takes to

20    bring a person through that process.

21    Q.  So the hiring paperwork is completed entirely

22    through the institution?

23    A.  I don't know.

24    Q.  At the institution level.  Okay.  Do you ever

25    speak to candidates after they have been provided an

1   offer of employment?

2           MS. THORN:  Objection.  Vague.  At any time

3   after they are provided an offer?

4           MS. YELIN:  Yes.

5           THE WITNESS:  I have in the past, yes, talked

6   to candidates.  But it is not standard practice.  They

7   would have to email for something --

8           MS. THORN:  Sorry.  Objection.  So are you

9   asking her the period of time between when they are

10  interviewed and when they are hired?  Is that the period

11  of time you're referencing?

12          MS. YELIN:  I'll clarify the question.

13          MS. THORN:  Thank you.

14  BY MS. YELIN:

15      **Q.  Have you ever had a conversation with a**

16  **candidate in the time period between when they were**

17  **provided an offer of employment to come work at SAC and**

18  **the time when they make a decision about whether they**

19  **will be accepting that offer or not?**

20      A.  Yes, I have.

21      **Q.  Okay.  Can you describe the circumstances when**

22  **you have had conversations with candidates like that?**

23      A.  So some -- a couple times, or I can't count how

24  many, they will get stuck in the process in like they

25  need to show up for a LiveScan, or they need to submit

1   this paperwork, or they need to do the -- I don't know,

2   all sorts of different activities to hire on.  Sometimes

3   the personnel will include me in the email, and I will

4   write words of encouragement to the candidate in order

5   to continue to facilitate their interest in coming to

6   work for CSP-SAC.  Nothing has ever changed.  None of

7   the hiring process has ever changed by my reaching out

8   to -- I haven't ever tried to interfere with or to align

9   with them.  I'm just trying to encourage them, this is a

10  good time, we're all having a good time, please come and

11  help, let me know if there's anything I can do.  So that

12  kind of email.

13       **Q.  Great.  So those communications are generally**

14  **in writing it sounds like?**

15       A.  Yes.  I do not have any -- I've never spoken to

16  a person on the phone after the interview process.

17       **Q.  On average how long does it take between when**

18  **someone is provided an offer and is able to start --**

19  **finish the hiring process?**

20       A.  I don't have the numbers specifically in front

21  of me.

22       **Q.  How often has a delay like the one you were**

23  **just -- the type that you were just describing occurred**

24  **in completing the hiring process?**

25       A.  It almost always happened.  I mean, my

Kelley Franceschi, Psy.D

1  communication with them doesn't happen, but there's

2  always almost a delay.

3      Q.  What are some of the causes of those delays

4  from what you understand?

5      A.  They don't show up for the LiveScan, or they

6  can't -- credentialing, they will go into credentialing,

7  then that can take forever.  And then -- well,

8  credentialing is a big one.  The paperwork, the hiring

9  packet gets stuck up in headquarters for a signature,

10 right.  Those are -- when I ask HR, my personnel, those

11 are the kind of answers that I get back.  That's how I

12 know that information.

13     Q.  Great.  Thank you for clarifying that.  And you

14 mentioned the credentialing process.  Can you explain

15 what that is?

16     A.  I don't have a good understanding.  It's a

17 broad term of credentialing.  I have been credentialed

18 and I submit a bunch of stuff, and then I don't know

19 what happens after that.

20     Q.  Is the credentialing process conducted by CDCR?

21     A.  I do not know.

22     Q.  I'm going to attempt to put a document into the

23 chat.  Let's see if I can figure out how to do it.  I

24 know you guys are all looking at one screen together.

25 Are you able to open this document or we can screen

```
 1                    REPORTER'S CERTIFICATION

 2

 3        I, JENNIFER SCHUMACHER, a Certified Shorthand

 4   Reporter in and for the State of California, do hereby

 5   certify:

 6

 7        That the foregoing witness was by me duly sworn;

 8   that the deposition was then taken before me at the time

 9   and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and

11   later transcribed into typewriting under my direction;

12   that the foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15        IN WITNESS WHEREOF, I have subscribed my name this

16   August 23, 2023.

17

18

19        _____

20        JENNIFER SCHUMACHER, CSR No. 9763

21

22

23

24

25
```

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2    Case Name: Coleman vs. Newsom

 3    Date of Deposition: 08/18/2023

 4    Job No.: 10125861

 5

 6              I, KELLEY FRANCESCHI, PSY.D, hereby certify

 7    under penalty of perjury under the laws of the State of

 8    California_____ that the foregoing is true and correct.

 9              Executed this 28____ day of

10    August_____, 2023, at 1530_____.

11

12                          ┌─ DocuSigned by:
                            │  K Franceschi              8/28/2023
13                          └─ 1D3EB8FE04334AE..._____

14                                  KELLEY FRANCESCHI, PSY.D

15

16    NOTARIZATION (If Required)

17    State of _____

18    County of _____

19    Subscribed and sworn to (or affirmed) before me on

20    this _____ day of _____, 20__,

21    by_____,    proved to me on the

22    basis of satisfactory evidence to be the person

23    who appeared before me.

24    Signature: _____ (Seal)

25
```

**Kelley Franceschi, Psy.D**

```
1   DEPOSITION ERRATA SHEET

2   Case Name: Coleman vs. Newsom
    Name of Witness: Kelley Franceschi, Psy.D
3   Date of Deposition: 08/18/2023
    Job No.: 10125861
4   Reason Codes:  1. To clarify the record.
                   2. To conform to the facts.
5                  3. To correct transcription errors.

6   Page   8     Line   18     Reason   3

7   From   2013                to   2017

8   Page   51    Line   6      Reason   3

9   From   choosing to come    to   choosing not to come

10  Page _____  Line _____  Reason _____

11  From _____  to _____

12  Page _____  Line _____  Reason _____

13  From _____  to _____

14  Page _____  Line _____  Reason _____

15  From _____  to _____

16  Page _____  Line _____  Reason _____

17  From _____  to _____

18  Page _____  Line _____  Reason _____

19  From _____  to _____

20  Page _____  Line _____  Reason _____

21  From _____  to _____

22  Page _____  Line _____  Reason _____

23  From _____  to _____

24  Page _____  Line _____  Reason _____

25  From _____  to _____
```

**Page 115**

```
1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____  Subject to the above changes, I certify that the
              transcript is true and correct
23   _____  No changes have been made. I certify that the
              transcript  is true and correct.

24            _____
                   KELLEY FRANCESCHI, PSY.D
25
```

KF

Docusigned by
K Franceschi
1D3EB8FE04334AE...

# Exhibit E

| | |
|---|---|
| **From:** | Samantha Wolff |
| **To:** | Lisa Ells; Ernest Galvan; Jenny Yelin; Adrienne Harrold; Marissa Hatton; Alex Gourse; Michael W. Bien |
| **Cc:** | Paul B. Mello; v_Damon.McClain@doj.ca.gov; Elise Thorn; v_Namrata.Kotwani@doj.ca.gov; Laurel E. O"Connor; Lawrence M. Cirelli; David C. Casarrubias; Kaylen Kadotani; Carson R. Niello |
| **Subject:** | Coleman - Dr. Burton testimony |
| **Date:** | Thursday, September 21, 2023 5:13:33 PM |

**[EXTERNAL MESSAGE NOTICE]**

Counsel,

You had previously indicated that you no longer wished to call Dr. Burton as a witness but would still seek to introduce portions of his deposition transcript as evidence. We informed you at that time that we would not stipulate to the admissibility of his deposition. In your Motion In Limine No. 1, you state that you "also hope to avoid the need to call Dr. Burton as a witness so as to streamline a contempt hearing that is already expected to last six court days." In Defendants' motion in limine, we argued (among other things) that Dr. Burton should be required to testify live. We have now reconsidered our position and will agree that Dr. Burton does not need to testify live – either on direct or cross.

We will still maintain our arguments in our motion in limine that any statements by Dr. Burton that Plaintiffs wish to introduce into evidence must meet the requirements of FRE 801. Our position remains unchanged with respect to the other witnesses. We will also inform the court that we no longer seek to compel his live testimony.

Let us know if you have any questions.

Sincerely,
Sam


**Samantha Wolff**
**Partner**
SWolff@hansonbridgett.com
Direct: (415) 995-5020

**Hanson Bridgett LLP**
1676 N. California Blvd., Suite 620
Walnut Creek, CA, 94596
Website | LinkedIn
Costa Mesa • Los Angeles • Sacramento • San Francisco • San Rafael • Walnut Creek

This communication, including any attachments, is confidential and may be protected by privilege. If you are not the intended recipient, any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email, and permanently delete all copies, electronic or other, you may have. The foregoing applies even if this notice is embedded in a message that is forwarded or attached.