1   ROB A. BONTA, State Bar No. 202668
    Attorney General of California
2   DAMON MCCLAIN, State Bar No. 209508
    Supervising Deputy Attorney General
3   ELISE OWENS THORN, State Bar No. 145931
    NAMRATA KOTWANI, State Bar No. 308741
4   Deputy Attorneys General
     1300 I Street, Suite 125
5     P.O. Box 944255
     Sacramento, CA 94244-2550
6     Telephone:  (916) 210-7318
     Fax:  (916) 324-5205
7     E-mail:  Elise.Thorn@doj.ca.gov
    *Attorneys for Defendants*

    PAUL B. MELLO, State Bar No. 179755
    SAMANTHA D. WOLFF, State Bar No. 240280
    KAYLEN KADOTANI, SBN 294114
    DAVID C. CASARRUBIAS, SBN 321994
    CARSON R. NIELLO, SBN 329970
    LAUREL E. O'CONNOR, SBN 305478
    HANSON BRIDGETT LLP
     1676 N. California Boulevard, Suite 620
     Walnut Creek, CA 94596
     Telephone:  (925) 746-8460
     Fax:  (925) 746-8490
     E-mail:  PMello@hansonbridgett.com
    *Attorneys for Defendants*

8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                    SACRAMENTO DIVISION

12

| | |
|---|---|
| 13 **RALPH COLEMAN, et al.,** | Case No. 2:90-cv-00520 KJM-DB (PC) |
| 14                              Plaintiffs, | **PARTIES' JOINT REPORT IN RESPONSE TO AUGUST 11, 2023 ORDER ON INPATIENT TRANSFER TIMELINES (ECF NO. 7916)** |
| 15   v. | |
| 16 **GAVIN NEWSOM, et al.,** | Judge:  The Hon. Kimberly J. Mueller |
| 17                              Defendants. | |

19

20                      **INTRODUCTION**

21        On August 11, 2023, the Court ordered the parties to file a joint report containing the

22   following with respect to the inpatient transfer timeline issue: (1) a bar graph showing the

23   monthly levels of compliance/non-compliance from May 16, 2017 through September 15, 2023;

24   and (2) the parties' statements of their respective positions on the specific steps required for

25   sustained compliance with the transfer timelines, as well as which steps have been accomplished

26   by the time of the filing and which remain to be accomplished.  (ECF No. 7916 at 3.)  The Court

27   also converted the previously scheduled enforcement proceedings on transfer timelines to a

28

hearing covering essential updates on Defendants' progress towards sustained compliance, to take place after the staffing vacancies contempt hearing set to begin September 29, 2023.  (*Id.* at 3.)

Presented below are the required bar graph prepared by Defendants and the parties' respective positions on the steps required for sustained compliance with the Program Guide's inpatient transfer timelines.

## I.   BAR GRAPH

Defendants on September 18 provided Plaintiffs with the bar graph depicting the timeline for all referrals that were admitted to an inpatient bed from May 16, 2017 through September 15, 2023.  The bar graph, attached as Exhibit A, was prepared based on CDCR's referral and admission data for patients admitted to inpatient programs during the reporting period.

## II.   DEFENDANTS' POSITION ON THE STEPS REQUIRED FOR SUSTAINED COMPLIANCE

Defendants have worked for over a decade to improve the inpatient referral process so that referrals are reviewed expeditiously and patients are transferred and admitted, when appropriate, to an inpatient bed.  These efforts have been well-documented through the development of the inpatient referral and admission policies and through Defendants' monthly reports that document compliance, non-compliance, and issues concerning transfers such as the COVID-19 pandemic.

The current processes for the referral and admission of patients to inpatient mental health programs are set forth in the policies that were developed, negotiated, and adopted as part of the 2015 CDCR-DSH Memorandum of Understanding and as part of the policies that were implemented in 2017 when CDCR assumed responsibility from DSH for the Psychiatric Impatient Programs (PIP) in the institutions.  CDCR and DSH continue to follow those policies in the referral, admission, and discharge of patients.  Under those policies, Defendants achieved long-standing compliance with the Program Guide transfer timeframes to admit Acute Psychiatric Program (APP) patients within ten days of the referral and to admit Intermediate Facility Program (ICF) patients within 30 days of the referral.

When the inpatient referral process was interrupted by the pandemic, the referral process remained essentially the same, however, acceptances and admissions were affected due to restrictions on transfers and movement.  (ECF Nos. 6616-1, 6679 at 49 (Appendix A), and 7196

at 12-13.)  CDCR implemented the Movement Matrix to provide clear communication about the ability to move patients into and out of PIP and DSH programs. The Movement Matrixes were routinely updated based on CDC guidelines to prevent exposure of COVID-19.  *See* Covid 19 Movement Matrix updated March 28, 2023 (ca.gov), last visited September 25, 2023. Additionally, emergency transfer guidelines were also developed to allow for patients to transfer expeditiously to a PIP if their symptoms worsened while awaiting placement.  CDCR's Inpatient Referral Unit (IRU) reviewed all emergency transfer requests and communicated approvals to CDCR's Healthcare Placement Oversight Program (HCPOP) for priority placement in the PIPs. (ECF No. 6679 at 49.)

The information provided below on the steps required for sustained compliance with the transfer timelines is based on the current policies and procedures as well as the lessons learned over the past six years on what worked to ensure that patients who have appropriate referrals are transferred and admitted to inpatient programs within the Program Guide transfer timeframes.

**A.     CDCR's Steps to Maintain Sustained Compliance.**

CDCR identifies four steps that it has taken and continues to take to maintain sustained compliance with the Program Guide requirements for transfers to inpatient care.  Two steps follow the successful processes and policies that have been in place since 2017 and that have resulted in long-term and sustained compliance with the transfer timeframes.  A third step involves CDCR's collaboration with DSH to improve the inpatient referral process and the review of patients who meet the custodial and clinical criteria for treatment at DSH.  Finally, CDCR also describes its efforts to address staffing pressures as a fourth step that has not yet been fully achieved and that will require long-term efforts to resolve.

**1.     CDCR's Sustained Compliance under the Current Inpatient Referrals Policies and Processes.**

Since 2017, CDCR's HCPOP and its IRU have worked internally and with their counterparts at DSH to achieve sustained compliance with Program Guide transfer timelines. HCPOP is staffed by an experienced team that includes a Correctional Administrator, a Captain, and Correctional Counselor, who review each patient's custody factors to determine his least

restrictive housing designation (LRH) and endorsement location.  IRU is staffed by a dedicated

team including the IRU Chief Psychologist, seven Senior Psychologist Specialists, and one Senior

Psychiatrist, Specialist who conduct a clinical review of each patient referred to an inpatient bed

and make a clinical housing recommendation based on the patient's presenting problems.

HCPOP and IRU follow processes under the current inpatient referral policies and maintain

oversight of admission timeliness to inpatient care.

The collaboration and communication between IRU and HCPOP throughout the referral

process ensures that any known obstacles to a patient's timely referral and admission to an

inpatient program are addressed and remedied.  IRU communicates daily with HCPOP to review

statewide bed availability at the APP and ICF levels of care and any pending referrals to those

programs.  IRU also communicates daily with the PIPs to ensure that the review of referrals is

completed promptly, that requests from DSH for additional information on referrals are

addressed, and that any rejections from DSH are resolved to ensure the prompt placement of

patients in the appropriate beds.

Additionally, IRU is in daily contact with referring institutions to ensure that referrals move

through the various phases of the referral process timely, including confirmation of transportation

arrangements and admissions.  CDCR's monthly reporting indicates the timelines for all referrals,

including the number of days between the date of a referral and the date of the patient's admission

and any explanation for patients who were admitted to an inpatient program outside of the

Program Guide's 10-day transfer timeline for referrals to the APP level of care and outside of the

Program Guide's 30-day transfer timeline for referrals to the ICF level of care.

Based on the past and current sustained periods of compliance, CDCR has a high level of

confidence that the current inpatient referral process will continue to result in sustained

compliance with the Program Guide transfer timeline requirements.

### 2. CDCR's Flex Bed Policy Helps Ensure that Inpatient Programs are Able to Use Mental Health Beds for the Patients Referred to Inpatient Care.

CDCR implemented a Flex Bed Policy on March 4, 2023.  The policy allows CDCR to use

inpatient beds as Flex Beds at Specific Institutions.  A Flex Bed can be used to provide any level

of inpatient care, Mental Health Crisis Beds (MHCB), APP, and ICF, in response to changes in statewide bed demand.  The Flex Bed Policy allows IRU and HCPOP to monitor any change in the number of referrals for a particular level of care in real-time and to identify whether a bed flex may be needed to provide additional beds at the needed level of care.  This policy makes it possible to change a patient's level of care without the need to move the patient to a new bed. The following shows the locations and levels of care that can flex in response to statewide need:

> **Programs that may flex between MHCB, APP, and ICF**:  California Health Care Facility (CHCF) MHCB – 98 beds; CMF A/B Wing – 32 beds; California Men's Colony (CMC) MHCB – 10 beds; and San Quentin State Prison (SQSP) PIP – 40 beds.

> **Programs that may flex between APP and ICF**: all APP beds at CHCF – 214 beds; all APP beds at CMF– 218 beds; and all of the ICF beds at California Institution for Women (CIW) – 45 beds.

CDCR is confident that the Flex Bed Policy will help it maintain sustainable compliance with the inpatient transfer timeline requirements.  This confidence level is based on the past ability the policy has shown to enable CDCR to adapt to a fluctuating pattern of inpatient bed demand. In 2012, CDCR opened a PIP at CIW.  The CIW PIP has always had the flexibility to use beds based on the patient needs for APP or ICF.  In 2014 CDCR opened a PIP at SQSP that has always been able to flex between APP, ICF, and MHCB, depending on patient needs. As an example, CDCR successfully flexed beds at SQSP and at CMC in July 2023 from APP to MHCB to meet statewide need.  Those included ten APP beds at CMC on July 25, 2023, and six APP beds at SQSP on July 27, 2023.

IRU and HCPOP continue to monitor statewide referral trends and activate flex beds in the identified locations to meet referral need.  Because the Flex Bed Policy is relatively new, CDCR will continue to gather data on the benefits realized from implementation of the policy.

### 3.    Continued Access to DSH Programs.

As stated above, CDCR and DSH process inpatient referrals and admissions in part under an MOU and related policies.  The original 2015 MOU and its related policies were the result of months-long meetings and negotiations with the Special Master and Plaintiffs.  Transfer timelines

1    to DSH programs have been almost universally met since 2017 with the exception of pandemic-

2    related delays.  Despite the lack of changes in the MOU since 2017[1], there has been a decrease in

3    admissions to DSH Programs.  This decrease in admissions to DSH programs is commensurate

4    with the overall decrease in inpatient referrals beginning in 2020, as demonstrated in the data

5    presented in the Unmet Needs Assessment report and as reported by Defendants' on a monthly

6    basis.  (ECF No. 7865-3 at 46-47.)

7        In response to the need to adjust the inpatient referral process when the pandemic paused

8    patient movement, a small workgroup consisting of the Special Master's experts, DSH, and

9    CDCR, in 2020 began reviewing inpatient referrals.  Notably, during the period when the small

10   workgroup process was in place (between May of 2020 and March of 2023), the admission rate

11   for patients referred to an unlocked dorm LRH decreased.  Defendants' monthly inpatient reports

12   also show a decrease in the total number of monthly referrals to inpatient care for the same time

13   period.  The average total pre-pandemic referrals, from May 2017 through April 2020 was 358.7.

14   The average total post-pandemic referrals, from May 2020 through March 2023 was 190.1.

15   From May 2017 through April 2020 the range in referrals was between 201 and 483, with nine

16   months out of 36 at well over 400 referrals.  But after April 2020, monthly referrals never reached

17   the 300 mark.  Although a cause for this decrease has not been established, it was demonstrated

18   by the UNA that there is no current unmet need for DSH beds.

19       Despite sustained compliance with transfer timelines and no demonstrated unmet need for

20   DSH beds, Defendants are piloting some process changes to further *Coleman* patients' access to

21   DSH programs.  To this end, CDCR and DSH recently developed a two-step plan anticipated to

22   increase the number of patients accepted into DSH.  First, Defendants will ensure that all patient

23   referrals with custodial unlocked dorm eligibility, regardless of clinical factors, are reviewed by

24   DSH for possible admission.  Second, CDCR and DSH are instituting a joint review of unlocked

25   dorm–eligible patients housed in a CDCR PIP to determine whether they may now be eligible for

26

27

28   _____

     [1] The 2015 MOU was revised and updated in 2017 but its processes are largely unchanged
     since its inception in 2015.

Joint Report Re: Inpatient Transfer Timelines in Response to 8/11/23 Order  (2:90-cv-00520 KJM-DB (PC))

1  DSH admission.  Although both CDCR and DSH have conducted similar reviews in the past,

2  CDCR and DSH will conduct a joint review of a sample of that population every 30–45 days.

3     **4.**  **Staffing Initiatives and Efforts to Improve Recruitment and Retention.**

4     The fourth and final step to ensuring compliance with transfer timelines includes CDCR's

5  ongoing efforts to address staffing deficiencies.  Staffing directly impacts operating capacity.  For

6  instance, due to staffing challenges in the CHCF PIP, it is operating at 81% capacity with 415 of

7  514 beds available.  Similarly, CMF is operating at 88% capacity, with 347 of 396 beds available.

8  As staffing levels improve, additional beds within those programs will be made available for

9  patient placement.

10     Staffing deficiencies have also affected the regular audits of patients housed outside their

11  LRH.  Each patient's Interdisciplinary Treatment Team (IDTT) routinely reviews or audits the

12  patient's LRH to confirm whether the current level is appropriate.  When clinical staffing levels

13  are low, direct patient care is necessarily prioritized over local utilization review, including LRH

14  auditing. Once staffing improves, those regular audits can resume.  Independent of local staffing

15  levels, the IRU continues to conduct monthly reviews of patients housed out of LRH and provides

16  feedback and consultation to the PIP treatment teams for patients who appear clinically

17  appropriate to transition to a less-restrictive ICF setting.  Additionally, in April through July

18  2023, IRU, in conjunction with the PIP treatment teams, completed a comprehensive review of all

19  patients housed out of their LRH to identify barriers to, and readiness for, transfer to a less

20  restrictive setting.  DSH and CDCR are also discussing a proposal to jointly review all patients

21  housed out of their LRH to identify additional patients appropriate for transfer to DSH.  Finally,

22  CDCR has recently allocated Nursing positions for statewide PIP Utilization Management for

23  additional assistance with the development and implementation of utilization reviews at every

24  PIP.

25    **B.**  **DSH's Steps to Maintain Sustained Compliance.**

26     The specific steps DSH has taken or proposes to take to maintain sustained compliance with

27  the transfer timelines include its adherence to the current inpatient referral, admission, and

28

1  housing policies, as amended during the pandemic, as well as a series of detailed patient-level

2  reviews that resulted in a proposal to further refine the review process.

3       **1.    DSH follows the current inpatient referral process to maintain its
          compliance with the requirements for patients referred to inpatient
4          care.**

5       DSH follows the current inpatient referral policies and processes to maintain compliance

6  with the Program Guide's inpatient referral transfer timeframes.  These steps have been in place

7  for more than eight years and have resulted in significant periods of 100% compliance with

8  Program Guide requirements.  DSH has high confidence that following the current policies and

9  processes will continue to ensure timely transfers of *Coleman* patients to DSH given the level of

10  compliance achieved from September 2017 through 2020, and the current level of compliance

11  achieved on the tail of the COVID-19 pandemic.  A potential barrier to sustained compliance is

12  the potential for a resurgence in COVID-19 cases that could lead to *Coleman* patients being

13  quarantined before scheduled transfer to DSH, or some other unknown issue such as another

14  pandemic, earthquake, or fire.

15       DSH adheres to the following four steps to maintain compliance:

16       • First, the DSH Patient Management Unit (PMU) receives an endorsement (a request

17         for placement) for a *Coleman* patient from HCPOP (this starts the *Coleman* court–

18         ordered timeline).  This process was modified during the pandemic to allow preview

19         of patients before endorsement.  During that period, CDCR's IRU provided the

20         name and CDCR number of the patient and later the patient was endorsed (if

21         accepted).

22       • Second, PMU clinical and PMU nursing conduct simultaneous psychological and

23         nursing reviews for the referred patient.  The DSH PMU clinical review utilizes the

24         CDCR electronic health record (EHRS) to conduct thorough written reviews of

25         every *Coleman* patient referred, going back at least six months and reviewing

26         previous DSH hospital and PIP stays.  PMU clinical reviews whether a patient

27         meets criteria for admission to an unlocked dorm housing setting in accordance with

28         the MOU Policy Directive 3601.  DSH PMU nursing reviews the SharePoint packet

for completeness and highlights any specific medical concerns or upcoming medical appointments or procedures.  If any documentation or information is missing from the referral, DSH PMU contacts CDCR IRU to acquire the information so that the referral can move forward.

- Third, DSH PMU forwards the *Coleman* patient's identifying information (usually the endorsement), SharePoint packet (if PMU nursing has stated the packet is complete), and clinical reviews to the DSH Admission and Discharge Unit (ADU) and medical director, or designee.  DSH PMU clinical communicates with the state hospital medical director, or designee, on every referral to ensure each patient meets an APP or ICF level of care, is clinically indicated for an unlocked dorm setting, and to clarify the patient's treatment needs.  The DSH Clinical Operations nursing forwards the SharePoint packet to the Chief of Medicine, or designee, and discusses any pertinent medical or nursing concerns for every referral.

- Fourth, based on all of the information gathered to date on the referral, the receiving DSH facility can either agree to recommend the patient for admission or recommend against admission due to clinical or medical concerns.  If the referral is not recommended for admission, DSH PMU clinical communicates this to CDCR IRU and provides a written rationale.  If CDCR IRU disagrees with the decision, CDCR can request a case conference as outlined in Section V of the MOU.  If a case conference does not provide a resolution, then CDCR has the option to request a Coordinated Clinical Assessment Team (CCAT) to discuss the referral.  DSH will then write a rejection letter and post it on SharePoint.  If after the CCAT there is no resolution, then CDCR may submit a written appeal to DSH and CDCR executive leadership for discussion by executive leadership.  If the rejection stands after discussion, then the referral will be removed from DSH's waitlist.  If the *Coleman* referral is recommended for admission, DSH uploads a decision form for acceptance and issues an Acceptance Transfer Chrono (ATC) as indicated in Policy Directive 3601.  The patient will be admitted after the ATC is posted.

### 2. Detailed Patient Reviews Resulted in a Proposal for Expanded LRH Assessments.

The COVID-19 pandemic presented a unique opportunity to assess whether there might be some benefit to altering the parties' approach to inpatient referrals under the decades-old Program Guide requirements. One such change to the process entailed having DSH conduct additional patient reviews as a result of the small workgroups. In March and April 2021, CDCR requested that DSH conduct pre-reviews of patients who were either in a CDCR PIP or on a waitlist for admission to the PIP to determine if the patients were suitable for placement in an unlocked dorm setting. DSH agreed to conduct the reviews. Most of the patients reviewed had an LRH for unlocked dorms, but were clinically recommended for more restrictive housing. As part of this review, 73 patients were evaluated and 39 (53%) were recommended for admission to DSH. All reviews were shared and discussed with CDCR and the Special Master's experts in the small workgroup.

In May 2021, CDCR requested DSH conduct further pre-reviews for patients with a locked dorm LRH, but who could potentially be stepped-down to a new LRH for unlocked dorms. Forty *Coleman* patients were reviewed and 14 (35%) were recommended for admission to DSH. Again, all reviews were shared and discussed with CDCR and the Special Master's experts in the small workgroup.

In October 2021, CDCR requested DSH conduct further pre-reviews for patients on the inpatient referral waitlist who had an LRH of unlocked dorm, but who were clinically recommended for a more restrictive housing setting. For this review, eight *Coleman* patients were evaluated by DSH and four (50%) were recommended for admission to DSH. As with the other reviews, all reviews here were shared and discussed with CDCR and the Special Master's experts in the small workgroup.

In February and March 2023, CDCR requested DSH conduct pre-reviews for patients on the inpatient referral waitlist with an LRH of unlocked dorms, but who were clinically recommended for a more restrictive housing setting. For this review, 35 *Coleman* patients were

Joint Report Re: Inpatient Transfer Timelines in Response to 8/11/23 Order  (2:90-cv-00520 KJM-DB (PC))

1    evaluated by DSH and nine (26%) were recommended for admission to DSH.  All reviews were

2    shared and discussed with CDCR and the Special Master's experts OSM in the small workgroup.

3         Overall, DSH and CDCR pre-reviewed 156 *Coleman* patients and, of those, 66 (42%) were

4    recommended for admission.  Due to the results of the pre-reviews, Defendants recently

5    developed a plan that DSH review all new referrals with an LRH of unlocked dorms regardless of

6    clinical housing recommendation.  In addition, DSH proposed reviewing with CDCR's IRU every

7    30–45 days, a large percentage of referred patients who were housed out of their LRH for

8    unlocked dorms.  Although this is a new method of assessing referrals and, it may take time to

9    implement and determine its full effect, DSH is confident that these focused patient reviews will

10   continue to aid in the sustained compliance with the Program Guides inpatient referral transfer

11   timelines.

12        **C.    Defendants' Certification of Orders Reviewed.**

13         Counsel for Defendants certify that they have read the following orders that are relevant to

14   the issues raised in the foregoing statement: ECF Nos. 5367, 5519, 5583, 5610, 5720, 5726, 6622,

15   7741, 7855, 7872, 7916, and 7950.

16   **III.    PLAINTIFFS' POSITION ON THE STEPS REQUIRED FOR SUSTAINED COMPLIANCE**

17        Defendants have been unable to consistently ensure timely access to inpatient mental health

18   care—"the highest and most urgent levels of mental health care"—for *Coleman* class members.

19   ECF No. 5583 at 4.[2]  They must now implement a durable solution.  It is encouraging that

20   Defendants, faced with contempt fines, now report compliance with the Program Guide's

21   inpatient transfer timeframes in the last two monthly census, waitlists, and transfer timelines

22   compliance reports.  *See* ECF No. 7947 at 22; ECF No. 7921 at 22.  Defendants, however, have

23   had periods of compliance before, only to have long waitlists for inpatient care reemerge.  They

24   must immediately take steps to ensure ongoing and sustained compliance.

25        A durable remedy is not out of reach.  In fact, it is entirely possible that Defendants could

26   remain complaint if they implement three specific measures:  Most critically, Defendants must

27   use the hundreds of empty state hospital beds that are designated for *Coleman* class members, but

28        [2] Plaintiffs cite to the ECF pagination at the top of documents, when available.

Joint Report Re: Inpatient Transfer Timelines in Response to 8/11/23 Order  (2:90-cv-00520 KJM-DB (PC))

1    sit unused.  Defendants' current Least Restrictive Housing ("LRH") policy is the biggest barrier

2    to placing patients in these low-custody state hospital beds and should be withdrawn entirely or at

3    least substantially revised.  Second, over a hundred—and, in recent months, upwards of two

4    hundred—Psychiatric Inpatient Program ("PIP") beds are offline, almost entirely due to staffing

5    shortages.  Staffing the PIPs adequately would allow Defendants to reopen the offline PIP beds,

6    which would then help alleviate the waitlists.  Finally, Defendants must implement a long-

7    overdue program for patients with personality disorders, so that they can treat those patients

8    appropriately while reserving the Acute Psychiatric Program ("APP") and Intermediate Care

9    Facilities ("ICF") beds for patients who need traditional inpatient psychiatric hospital care.

10        If Defendants fully commit to these steps and move immediately to implement them,

11   ongoing and sustained compliance is possible.  If they do not, enforcement  will be necessary.

12        **A.    Defendants Cannot Achieve Sustained Compliance with Inpatient Transfer**
             **Timelines Without Reforming Their LRH Process, Staffing the PIPs**
13           **Adequately, and Implementing a Personality Disorder Program.**

14           **1.    Defendants Must Treat More Class Members at DSH by**
                 **Withdrawing or Substantially Revising Defendants' Least Restrictive**
15               **Housing Policy**

16        There is no sustainable solution to the transfer timeline issue without making full use of the

17   state psychiatric hospitals reserved for treatment of *Coleman* class members, particularly at

18   Atascadero State Hospital.  To accomplish that, Defendants must withdraw or substantially

19   reform their existing Least Restrictive Housing ("LRH") policy, which in its current form permits

20   clinicians to deny patients in urgent need of inpatient care access to available beds in psychiatric

21   hospitals run by the California Department of State Hospitals ("DSH").

22        DSH hospitals have 336 beds designated for *Coleman* class members.  *See* ECF No. 7947 at

23   6.  As has repeatedly been the pattern in this case, however, the number of those beds unoccupied

24   by *Coleman* patients has recently "reached new heights."  ECF No. 7833 at 47.  The Special

25   Master found that between June 2022 and February 2023, of the 306 DSH psychiatric hospital

26   beds specifically designated for male *Coleman* class members, near or in excess of 200 beds

27   consistently sit empty.  *Id.* at 47-49.  Most of these unoccupied beds are at Atascadero State

28

1   Hospital.  *Id.* at 48.  The low utilization of DSH beds designated for *Coleman* class members is,

2   as the Special Master explained, "deeply concerning."  *Id.*

3          Defendants' own Unmet Needs Assessment ("UNA") Report confirms that there has been a

4   dramatic, unprecedented decline in DSH occupancy rates in the last two years.  *See* ECF No.

5   7865-3 at 58; *see also* ECF No. 7900 at 16-17.  And Defendants' most recent inpatient census,

6   waitlist, and transfer timeline report further confirms that Defendants have not made meaningful

7   progress in filling these beds, even following many months of accruing fines for late transfers:

8   As of August 28, 2023, there were 200 ICF low custody beds immediately available for male

9   class members (195 at Atascadero State Hospital and 5 at Coalinga State Hospital) out of 306

10  designated beds, and 26 available for female class members out of 30 designated beds (at Patton

11  State Hospital).  ECF No. 7947 at 6.

12         Defendants have failed to fill the dedicated beds in DSH hospitals for *Coleman* patients,

13  even while patients are waiting past Program Guide transfer timelines, largely due to serious

14  flaws in Defendants' Policy 12.11.2111, Housing Review/Least Restrictive Housing (effective

15  June 30, 2017), known as the LRH policy, and its implementation.  *See* Declaration of Adrienne

16  Harrold in Support of Plaintiffs' Statement in Joint Report on Inpatient Transfer Timelines

17  ("Harrold Decl."), filed herewith, ¶ 2 & Ex. 1 (copy of LRH policy); *see also* ECF No. 7833 at 49

18  (Special Master identifying the failed LRH process as a reason for the unoccupied *Coleman*-

19  designated DSH beds).

20         Defendants' LRH policy provides that "[p]atients shall receive treatment in the least

21  restrictive setting based on their Least Restrictive Housing (LRH) designation."  Harrold Decl.

22  ¶ 2, Ex. 1 at 1.  Defendants presented evidence to the Court, around the time when the policy

23  became effective in 2017, suggesting "that proper use of the LRH process will indeed aid

24  defendants in making complete and efficient use of their full complement of inpatient mental

25  health beds and in complying with Program Guide timelines."  ECF No. 5583 at 16.  Even

26  accepting the baseline assumption that there are some class members DSH hospitals cannot treat

27  for custodial reasons, which Plaintiffs do not, Defendants' policy includes a loophole so large it

28

1  swallows the rule: Clinicians may determine that "specific clinical factors" prevent a patient from

2  being safely treated in a setting consistent with their custodial LRH.  Harrold Decl. ¶ 2, Ex. 1 at 1.

3      It is axiomatic that in CDCR's non-PIP programs, correctional staff determine the

4  appropriate security level of the housing for incarcerated people based on careful application of

5  various custodial factors.  CDCR's LRH policy accounts for this by having custody staff

6  determine, in the first instance, the least restrictive housing setting appropriate for each patient

7  referred to inpatient care, including DSH's unlocked dorms.  But the policy then upends this

8  calculus by permitting CDCR clinicians to override these custody determinations and keep their

9  patients in a more restrictive setting—a power not afforded to clinicians anywhere else in the

10  MHSDS.  *See id.*  Despite a custodial determination to the contrary, CDCR clinicians are

11  empowered to unilaterally decide that a patient's mental illness is incompatible with dormitory

12  living, thereby forcing the person to be treated in a high custody, locked single-cell PIP setting.

13  As a result, many CDCR patients purportedly require higher LRH than DSH's low-custody

14  unlocked dorms and are deemed ineligible to transfer to a DSH hospital.  *See* ECF No. 7833 at

15  47, 49 (Special Master describing this).

16      In other words, Defendants continue to refuse to treat many class members in DSH

17  hospitals—even when faced with long waitlists and non-compliant transfers—because of a

18  purported mismatch between the security levels of the DSH inpatient bed supply and the *Coleman*

19  patients who require inpatient mental health services.  This practice not only is inconsistent with

20  principles of good mental health care, but also violates patients' rights to be treated in the least

21  restrictive setting possible, as required by the Program Guide and the Americans with Disabilities

22  Act.  *See* Program Guide, ECF No. 7333-1 at 4 ("The goal is to provide constitutionally

23  appropriate levels of mental health treatment to the incarcerated serious[ly] mentally ill inmate *in*

24  *the least restrictive environment*." (emphasis added)); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S.

25  581, 597 (1999); 42 U.S.C. § 12132; 28 C.F.R. § 35.130; 28 C.F.R. § 35.152(b)(2) ("Public

26  entities shall ensure that inmates or detainees with disabilities are housed in the most integrated

27  setting appropriate to the needs of the individuals."); *see also* Order for Final Approval of

28

1    Settlement Agreement & Exs., ECF No. 5284 at 3 (incorporating into, and applying ADA and

2    Rehabilitation Act claims to, *Coleman*).

3          Defendants' use of the LRH policy is distressing because large numbers of low-custody

4    class members remain stuck in high-custody ICF programs, despite the high number of vacancies

5    in lower custody ICF programs at DSH hospitals and indeed in the PIPs themselves.  In March

6    2023, even as Defendants reported $723,000 in fines for delayed transfers and an additional 28

7    patients currently waiting past Program Guide timelines (ECF No. 7811 at 13, 21), at least 121

8    Level I and Level II male class members—who are routinely housed in low-security outpatient

9    dorms in CDCR and will return to those settings after their inpatient hospitalization—were locked

10   up on CDCR's high custody ICF units.  *See id.* at 18-19.   Moreover, 239 patients (out of a total

11   census of 564 patients) in the high custody ICF programs are housed above their LRH level—

12   over 40% of all high custody PIP patients.  *See id.*  The fact that Defendants ignored transfer

13   timelines and left patients in need of hospitalization to suffer on a waitlist because CDCR's LRH

14   policy ostensibly prevented utilization of the hundreds of open low custody DSH beds (and lower

15   custody PIP beds) is unconscionable.

16         The LRH policy, by its terms, is disconnected from how inpatient hospitalizations work and

17   is an unnecessary barrier to necessary inpatient care.  Specifically, the LRH policy's criteria used

18   to justify housing someone in a more restrictive setting for clinical reasons are extremely broad

19   and unwarranted.  In fact, the LRH policy's list of "clinical" criteria that can be used to justify

20   restricting class members to high custody PIPs—e.g., "[c]ommand hallucinations," "[p]resence of

21   delusions," "[d]ocumented pattern of agitation, disruptive, and difficult to predict behavior"—is

22   vague and reads like a list of the types of patients who by definition need inpatient treatment in a

23   psychiatric hospital.  *See* Harrold Decl., Ex. 1, Attachment B; *see, e.g.*, Program Guide, ECF No.

24   7333-1 at 113-14 (ICF admission criteria including: "The inmate-patient's Global Assessment of

25   Functioning indicates behavior that is considerably influenced by psychotic symptoms; OR

26   serious impairment in communication or judgment; OR inability to function in almost all areas.").

27   After all, DSH facilities are able to safely and effectively provide inpatient mental health

28   treatment to the most seriously mentally ill *Coleman* class members, including those who are

1    acutely psychotic and exhibit aggressive, possibly violent behavior.  *See, e.g.*, ECF No. 4055

2    ¶¶ 136-49 (Plaintiffs' expert Dr. Pablo Stewart opining that state hospitals can safely treat

3    patients with these characteristics).  State licensing rules generally require public mental health

4    facilities to accept and treat any patient who needs inpatient care.  *See* ECF No. 4055 ¶¶ 139.

5    They do not have the luxury of turning anyone away.  *See id.*  DSH hospitals and their staff, like

6    any psychiatric hospital, are designed and staffed with trained professionals who are equipped to

7    stabilize a person, even if aggressive treatment is required to get symptoms under control, and

8    then move them into an open therapeutic milieu.  *See* ECF No. 4055 ¶¶ 136-37, 142.  Indeed, the

9    lower custody environment in DSH hospitals, as compared to CDCR PIPs, generally offers more

10   effective inpatient care because it permits the kinds of socialization and psycho-social treatment

11   interventions that are often required to calm, stabilize, and heal seriously ill patients.  *See, e.g.*,

12   ECF No. 7625 at 78; ECF No. 6948-1 ¶¶ 16-17.

13       The same DSH facilities treat patients deemed Sexually Violent Predators or Offenders

14   with a Mental Health Disorder ("OMHDs," formerly referred to as Mentally Disordered

15   Offenders ("MDOs")); who have been found incompetent to stand trial or not guilty by reason of

16   insanity; who are under conservatorships because they represent a danger to themselves or others

17   due to mental illness; or who are civilly committed because a court determined that they are a

18   substantial danger of physical harm to themselves or others.  *See* DSH, Department of State

19   Hospitals – Atascadero, *Patient Population*, https://www.dsh.ca.gov/Atascadero/index.html

20   (accessed September 26, 2023); DSH, Department of State Hospitals – Coalinga, *Patient*

21   *Population*, https://www.dsh.ca.gov/coalinga/ (accessed September 26, 2023); DSH, Department

22   of State Hospitals – Patton, *Patient Population*, https://www.dsh.ca.gov/Patton/index.html

23   (accessed September 26, 2023).  There is no reason why these hospitals cannot similarly treat

24   *Coleman* patients from CDCR.

25       In fact, some of these same DSH patients are former or future class members.  For example,

26   *Coleman* patients who reach the end of their prison term and are deemed dangerous to others as a

27   result of a severe mental health disorder can be paroled directly from CDCR to DSH for

28   mandatory inpatient psychiatric treatment as OMHDs.  *See, e.g.*, Cal. Pen. Code §§ 2960-2981.

This includes class members being held in high custody ICF PIP settings who are then immediately admitted to Atascadero State Hospital as OMHDs at the end of their terms—that is, they became eligible for treatment in a DSH hospital, from which they had previously been excluded, simply because their legal status changed (they paroled). *See, e.g.*, ECF No. 5552 at 51:20-60:17 (testimony by Director of DSH Pam Ahlin in 2017 evidentiary hearing re timely access to inpatient mental heath care, discussing example class members where this happened).

Further, since 2021, Atascadero State Hospital and Patton State Hospital even have special units for patients who are at the highest risk of committing violence, called the Enhanced Treatment Program ("ETP"). *See* DSH, Enhanced Treatment Program, ,https://www.dsh.ca.gov/Treatment/Enhanced_Treatment_Program.html (accessed September 26, 2023). ETP patients receive targeted individualized treatment with enhanced staffing and security, with the intention that their symptoms stabilize and they are returned to the standard DSH environment. *See id.* DSH, however, refuses to treat *Coleman* class members in the ETP or to staff the *Coleman* units at the enhanced levels employed in the ETPs, which are designed to allow for safe and effective management of violent and unstable patients. *See* DSH, Budget Change Proposal – Cover Sheet, Mission-Based Review – Treatment Team and Primary Care, Request 4440-049-BCP-2020-GB (FY 2021-22) at 18-19, https://esd.dof.ca.gov/Documents/bcp/2021/FY2021_ORG4440_BCP3596.pdf (accessed September 26, 2023) (providing only "moderate" treatment team staffing ratios for *Coleman* patients, compared to "high" treatment team staffing ratios for ETP). In other words, DSH has the know-how and enhanced staffing to deal with extremely violent and unstable patients if needed, but chooses to staff *Coleman*-designated beds at levels contingent on accepting only relatively easy, stable class members.

Even accepting arguendo that Defendants' overly restrictive LRH policy is justified in the first instance, Defendants' implementation has been extremely flawed since its inception. The LRH policy, for example, requires regular IDTT reviews of CDCR's clinical determinations that a patient's condition makes them inappropriate for unlocked dorms like those in DSH. Harrold Decl., Ex. 1 at 1-2. In practice, however, the Special Master has found, monitoring round after

1    monitoring round, that IDTTs rarely discuss patients' eligibility for less restrictive placements at

2    all. *See, e.g.*, ECF No. 7833 at 93, 183; ECF No. 7555 at 115-16; ECF No. 7039 at 43; ECF No.

3    6579 at 20. And treatment teams have long failed to routinely offer treatment planning sufficient

4    to address "the symptoms and behaviors that prevented patients from moving to their LRH."

5    ECF No. 7833 at 74 (lack of treatment planning around LRH movement at CMF-PIP and SVSP-

6    PIP in 30th Round); *see, e.g.*, ECF No. 7555 at 114-16 (identifying "major deficiencies" in

7    treatment planning around LRH progress at the Lift and Shift PIPs).

8        The LRH policy causes problems with timely inpatient transfers not only to DSH hospitals,

9    but also to the PIPs. When patients are held in more restrictive settings than their LRH, they hold

10   beds that could be used to treat other patients in need of inpatient care. The Special Master's

11   Thirtieth Round Inpatient Report concluded that CMF-PIP was rejecting significant numbers of

12   patients referred to the PIP due to unavailable least restrictive housing options. ECF No. 7833 at

13   89. And CHCF-PIP, SVSP-PIP, and CIW-PIP all reported an increase in the number of patients

14   housed above their least restrictive housing level. *Id.* at 46, 93.

15       In short, eliminating or substantially revising the LRH policy is critical to improve and

16   maintain Defendants' ability to timely transfer class members needing inpatient psychiatric

17   hospitalization. When the parties agreed to continue the contempt hearing on inpatient transfer

18   timelines for six months, part of the agreement was "that during this six month period, they will

19   meet and confer regarding Defendants' Least Restrictive Housing Policy and practices, including

20   any proposed modifications from Plaintiffs." ECF No. 7908 at 2. Plaintiffs maintain that a

21   wholesale revision of the policy is required. Any new policy should eliminate entirely or severely

22   restrict a clinician's or IDTT's ability to override a patient's LRH designation. Plaintiffs have

23   shared this view with Defendants and remain willing to meet and confer with Defendants

24   regarding the policy.

25       It is not impossible for Defendants to revise its LRH policy. But it will take a willingness

26   on Defendants' part to completely overhaul the LRH process with the express goal of moving

27   patients into DSH and other lower-custody beds to reduce demand on the higher custody beds.

28   Defendants should also dedicate resources for a concerted effort to prioritize identifying and

referring to DSH anyone needing inpatient level of care.  Thus far, Defendants have not

demonstrated this level of commitment.

### 2. Defendants Must Improve Inpatient Staffing Levels and Reopen PIP Beds that are Currently Offline

Defendants' mental health staffing crisis directly impacts their ability to meet inpatient

transfers timeframes.  Staffing shortages undermine Defendants' ability to identify and refer all

patients who need inpatient care, as Defendants' recent UNA Report seems to acknowledge.  *See*

ECF No. 7865-3 at 67; *see also* ECF No. 7900 at 7-8.  Moreover, since September 2021, huge

swaths of PIP beds, reaching in excess of 200 beds, were closed and remain offline largely due to

poor staffing levels.  *See, e.g.*, ECF No. 7836 at 10-11; ECF No. 7811 at 10-11.  It is unsurprising

that the uptick in delayed transfers occurred as massive numbers of PIP beds are offline.  And

Defendants' recent compliance with transfer timeframes is likely attributable to the reopening of

approximately 40 PIP beds in May and June 2023—under the pressure of impending contempt

proceedings—and the dedication of additional staffing resources.  *See* ECF Nos. 7859 at 11, 7874

at 10.  For Defendants to reach durable compliance with the inpatients transfer timelines, they

must staff the PIPs appropriately such that all beds can be open.

Defendants closed the California Health Care Facility's ("CHCF") PIP to all new

admissions from September 2021 to January 2022 due to "the staffing crisis and resultant poor

quality of care."  ECF No. 7555 at 54; *see* ECF No. 7590 at 11-12.  Defendants have since only

made modest progress in bringing these beds back online.  Despite some limited reopenings in

recent months, 99 CHCF-PIP beds remain offline (19% of all CHCF-PIP beds) as of August 31,

2023.  *See* ECF No. 7947 at 10.  And Defendants have not made any progress towards reopening

beds in California Medical Facility's (CMF) PIP, which continues to operate with 12% of beds

offline.  *See id*.  While some CMF-PIP beds are offline to serve as COVID isolation and

quarantine space, 17 beds are specifically "offline due to staffing."  *Id.* at 10-11.

Further, on September 14, 2023, Defendants filed a report on rescissions and rejections of

inpatient referrals for May 15, 2017 through July 31, 2023 (the time period since the date the

Court ordered full compliance with the transfer timeframes), correcting a gap in their compliance

1   reporting that Plaintiffs and the Special Master only learned about during the data remediation

2   process.  *See* ECF No. 7944.  The report shows that 76 referrals were rescinded, rejected, or the

3   patient paroled beyond the Program Guide transfer timelines, with no exception to justify the

4   delay.  *Id*. at 6.  For 53 of these non-excused late referrals (or 70%), Defendants report the reason

5   for their non-compliance was "no bed availability."  *See id.* at 8, 40-44.

6       Given Defendants' significant periods of sustained compliance in the years before staffing

7   levels plummeted, necessitating widespread PIP bed closures, the link between those closures and

8   Defendants' dramatic recent backsliding is obvious.  Indeed, although Defendants excused all

9   non-compliance with the transfer timelines from May 2020 to May 2022 by blaming COVID, it is

10  highly likely that the hundreds of offline beds compounded the delays.  *See, e.g.*, *id.* at 10-40

11  (applying the COVID exception to every single non-excused late referrals from May 2020 to May

12  2022).  This is most obviously demonstrated by the fact that Defendants' admitted non-

13  compliance jumped to previously unseen heights the moment when, under pressure from

14  Plaintiffs, Defendants ceased asserting a blanket COVID exception for every delayed transfer in

15  mid-2022, when the PIP beds remained closed due to inadequate clinical staffing.  *See* Exhibit A

16  (Defendants' bar graph).

17      The Special Master's Thirtieth Round monitoring report on inpatient mental health care in

18  the PIPs, which the Court adopted in full (ECF No. 7854), further confirmed the chronic

19  understaffing of mental health positions in the PIPs.  *See* ECF No. 7833 at 50-55 ("all five PIPs

20  continued to report unacceptably high vacancy rates for many positions").  As the Court

21  observed, "[t]he record is clear that defendants are not providing adequate inpatient care with the

22  current high vacancy rate across all PIP staffing classifications."  ECF No. 7923 at 12.

23  Dedicating the staffing resources to reopening closed PIP beds and keeping all currently operating

24  PIP beds open is critical to ensure that Defendants can durably comply with the Program Guide

25  transfer timelines.  It is not impossible for them to take the steps necessary to increase PIP

26  staffing, as "defendants have a wide range of options available to meet their constitutional

27  obligations to hire sufficient mental health staff."  ECF No. 7923 at 8 (quoting ECF No. 7608 at

28  2).  Yet Defendants' current plan for increasing staffing levels in the PIPs has no realistic chance

1   of closing the staffing gaps necessary to reopen (and keep open) the numerous closed PIP beds

2   anytime soon.  *See generally* ECF No. 7813; ECF No. 7839.

3        Plaintiffs are hopeful that this Court's August 23, 2023 order (ECF No. 7923) signaling it

4   will set a maximum vacancy rate for the PIPs and initiate enforcement proceedings will force

5   Defendants to seriously address this dire problem, which is a root cause of the constitutionally

6   deficient care in the PIPs in addition to driving bed closures that then cause delayed transfers.

7   But Defendants' refusal to accept that any minimum clinical staffing threshold is necessary to

8   ensure adequate care in the PIPs is not a positive sign.  *See* ECF No. 7937 at 2.  Given the clear

9   link between poor staffing and both deficient care and bed closures, this Court should require the

10  PIPs to meet the 10% maximum vacancy rate requirement consistent with other CDCR mental

11  health programs and DSH programs.  *See id.* at 2-3.  Without a court-ordered maximum vacancy

12  rate threshold tied to their 2021 PIP Staffing Plan, Defendants will have no incentive to reopen

13  the PIP beds closed for lack of staffing.  Indeed, their incentives will be to concentrate all

14  available staff in the currently operating units in an effort to improve care there—leaving over a

15  hundred offline PIP beds that are likely to remain closed indefinitely.

16       Defendants' ongoing attempts to evade responsibility for the low staffing levels in the PIP

17  remain a serious obstacle to reaching constitutional compliance.  They must improve staffing in

18  the PIPs so that they can reopen and keep open all currently offline PIP beds.  Without those

19  beds, Defendants cannot durably comply with the Program Guide's transfer timelines.  The Court

20  therefore should proceed to set a 10% maximum clinical vacancy rate for the PIPs based on

21  Defendants' 2021 Staffing Plan, and then initiate the six month period for compliance.

22            **3.    Defendants Should Implement a Personality Disorder Program**

23       Defendants have refused to implement in the near term any program for patients with

24  personality disorders.  But such a program would help alleviate pressure on Defendants' program,

25  including its inpatient programs, and contribute to sustained compliance with transfer timelines.

26       Defendants' recent UNA Report finds that CDCR clinicians have identified 470 patients

27  with personality disorders who have not responded adequately to the treatment CDCR currently

28

1   provides or who may benefit from special treatment for personality disorders that CDCR does not

2   currently provide.  ECF No. 7865-3 at 39, 95.

3        The population of patients with personality disorders, as the Special Master commented,

4   "has and will continue to put pressure on defendants' already limited staffing and resources."

5   ECF No. 7865-2 at 3.  Patients with borderline personality disorder consume considerable

6   resources as they often present in a state of crisis, seek help repeatedly, and engage in self-harm.

7   *See* ECF No. 7900 at 24.

8        Defendants have been dragging their feet on this issue for years, despite repeatedly

9   acknowledging the need for such programs.  To provide a few illustrative examples: Defendants

10  in 2017 announced a policy to implement a pilot for Dialectical Behavioral Treatment ("DBT"), a

11  treatment protocol that is appropriate for patients with borderline personality disorders, for EOP

12  patients at CMF, with plans to eventually expand the program to other institutions.  *See* Program

13  Guide, ECF No. 7333-1 at 354-64 (Policy 17-0721).  But Plaintiffs' understanding is that

14  Defendants have effectively discontinued this DBT program without notice to or permission from

15  the Court.  Defendants again identified, in a 2020 study, appropriate treatment protocols for

16  patients with personality disorders, including DBT for those with borderline personality disorders

17  and a Clozapine unit for others with chronic self-harm.  *See* ECF No. 7865-2 at 13.  But

18  Defendants have failed to explain why they did not implement these identified programs.  *See*

19  ECF No. 7900 at 21-22.  Further, Defendants have repeatedly failed to support the Positive

20  Behavioral Support Team ("PBST") program, in which treatment teams can provide enhanced

21  care to complicated patients, including those with personality disorders, when their existing

22  treatment methods are not working.  In 2021, despite committing to continue PBST programs

23  (ECF No. 7392 at 3), Defendants closed the PBST at the CHCF-PIP, which included treatment of

24  patients with "severe personality disorders," and reduced its behavioral team in half (from four

25  clinicians to one clinician, adding a second clinician by 2023) (ECF No. 7833 at 194-95).  The

26  remaining behavioral team clinicians identified staffing shortages as the largest barrier to

27  providing PBST treatment to patients.  *Id.* at 195.  And in 2022, the CMC MHCB "Acute Care"

28  clinical staff reported that they "believed that the majority of the unit's patients had significant

1   personality disorders," and expressed that they did not have enough staffing to develop and

2   implement appropriate behavioral plans.  ECF No. 7555 at 106.

3       As Plaintiffs explained in their objections to Defendants' 2023 UNA Report, Defendants

4   cannot justify why they have failed to implement necessary programs to properly treat patients

5   with personality disorders, including those with borderline personality disorders.  *See* ECF No.

6   7900 at 21-22.  And Defendants' claim in their UNA Report that a year of further study is needed

7   to assess whether and how to treat this unmet need for patients with personality disorders does not

8   make sense.  *See id.*  Plaintiffs agree with the Special Master that treatment at least for patients

9   with borderline personality disordered can and should be developed as a pilot immediately.  *See*

10  *id.* at 23.

11      Implementing a personality disorder program is a necessary step Defendants should take to

12  achieve long-term durability of keeping the inpatient waitlist low.  If the 470 class members with

13  personality disorders identified by Defendants receive treatment better targeted for their

14  diagnosis, they will consume fewer resources and need less time in an inpatient setting,

15  unclogging the system and keeping inpatient beds open for class members who need them.

16      **B.    Defendants Must Also Improve Transparency by Providing Additional
            Data and Information on Inpatient Referrals.**

17

18      Transparency is key to monitoring whether Defendants are fully complying with the

19  Program Guide's inpatient transfer timeframes.  However, Defendants' monthly census, waitlist,

20  and transfer timelines compliance reports for inpatient mental health care do not currently provide

21  a complete picture.  The Court recently modified the monthly reporting requirement going

22  forward to include that Defendants shall provide a statement of the reason(s) for why any patient

23  waited past Program Guide timelines, if not subject to an exception.  ECF No. 7916 at 3.  This

24  information will be valuable and useful.  Still, more transparency is needed.

25      Most significantly, Defendants' reporting of the number of referrals out of compliance does

26  not count any referrals resulting in rescind, rejection, or parole/discharge—that is, situations

27  where the referral was essentially canceled before an admission could occur.  *See, e.g.*, ECF No.

28

1  7947 at 22.  The report does not reflect how many of these cancelled referrals occurred after the

2  referral had remained pending past the Program Guide timeframes.

3         Defendants' bar graph, Exhibit A of this joint report, suffers from the same flaws.  The

4  graph looks to admitted referrals only—that is, whether an admitted referral was within the

5  timeframe or an exception applied.  Defendants' data does not look at referrals that were canceled

6  before an admission could occur (i.e., due to rescission, rejection, or parole/discharge).  Thus,

7  Defendants' bar graph and the table that follows does not reflect *all* referrals that exceeded the

8  Program Guide timeframes.

9         As Defendants recently confirmed, many referrals resulting in rescind, rejection, or

10  parole/discharge do go past the timeframes.  *See* ECF No. 7944 at 6, 8-44.  Specifically, Plaintiffs

11  and the Special Master have both questioned Defendants' misleading presentation of the transfer

12  timeline data, taking the position that Defendants' monthly reports should include data on the

13  recissions, rejections, and paroles/discharges that canceled an inpatient referral after the Program

14  Guide timeframes expired.  *See id.* at 1-2.  Defendants oppose including this information in their

15  monthly reports but agreed to file a one-off standalone report that provides a list of all referrals to

16  inpatient care since May 2017 that were rejected, rescinded, or paroled after the Program Guide

17  timeframes, which they filed on September 14, 2023.  *Id.* at 3.

18         That report shows that 76 of these referrals were cancelled outside of the Program Guide

19  transfer timelines, without any claimed exception, often due to lacking bed availability.  *Id.* at 6;

20  *see id.* at 8, 40-44.  Examples include an EOP class member at Mule Creek State Prison who was

21  referred to ICF treatment but, two weeks after Program Guide transfer timelines expired, paroled

22  directly to the community without the intensive inpatient care his CDCR clinicians determined he

23  needed because Defendants did not have sufficient inpatient beds.  *Id.* at 41.  Another class

24  member referred for ICF care by his mental health crisis bed clinicians at SATF waited 50 days—

25  almost three weeks past transfer timelines—because CDCR did not have enough inpatient beds,

26  only to have his referral ultimately rejected by headquarters staff.  *Id.*  Even as recently as June

27  2023, when Defendants claimed only two referrals were out of compliance (ECF No. 7874 at 22),

28  there were two additional referrals to APP that were rescinded after the Program Guide timeframe

1    had passed and no exception applied (ECF No. 7944 at 43).  Counting such referrals as compliant

2    with the Program Guide timeframes, as Defendants' monthly reports seem to do, is fundamentally

3    misleading.

4        Defendants must include in their monthly reports going forward this detailed information of

5    all referrals to inpatient care that were rejected or rescinded, or where the class member paroled

6    or was discharged, after the Program Guide transfer timelines expired.  Clarifying Defendants'

7    data will not itself ensure timely transfers to inpatient care, but an accurate assessment of the

8    situation is necessary to measure whether compliance is ongoing.

9        Defendants' bar graph also only displays the number of *referral*s, not the *total days* out of

10   compliance.  *See* Exhibit A.  Only looking at referrals masks the extent to which Defendants

11   exceed the timeframes by extremely long delays, which is why this Court requires reporting by

12   both referral and number of days delayed.  *See* ECF No. 5610 at 14.

13       The bar graph also attempts to smooth over the periods of compliance and noncompliance,

14   to calculate an average of being mostly in compliance from 2017 to present.  That misses the

15   point.  Even setting aside the roughly two-year period in which Defendants claimed a blanket

16   COVID exception for each and every delayed referral due to the extreme exigencies of the

17   pandemic, *see, e.g.*, ECF No. 7944 at 10-40, Defendants' adherence to the Program Guide's

18   transfer timelines has cycled in and out of compliance over the years.  "[C]ourt orders going back

19   to 1998 reflect the myriad of efforts to address ongoing problems with access to inpatient care,"

20   and any gains were "'short-lived.'"  ECF No. 5583 at 4-5 (quoting Special Master report, ECF

21   No. 5448 at 24).  As the Court observed in 2017, it was "particularly telling" that—at least for the

22   period from 2009 to 2016—there was a pattern of increases in unoccupied beds at Atascadero

23   State Hospital over the years, followed by declines only after court intervention aimed at reducing

24   inpatient waitlists; after a few years, the number of unoccupied beds would creep back up and

25   then decline again only after another court intervention.  ECF No. 5583 at 6.  The swings in the

26   inpatient waitlist over time are exactly why the Court has made clear that "this cycle must be

27   broken."  ECF No. 5610 at 7.

28

There are other unknowns in Defendants' data that require explanation. As Plaintiffs explained in detail in their objections to Defendants' UNA Report, there has been a large and sustained drop in inpatient referrals since the beginning of the pandemic that Defendants have failed to analyze or explain. *See* ECF No. 7900 at 14-16. This is in sharp contrast to the steady increase in referrals to ICF care from 2016 through early 2020, which may well have been driven by efforts to ensure inpatient beds were being appropriately utilized. *See id.* at 14. But there was a decline in referrals during the pandemic that has not yet picked back up. *See id.* Defendants do not explain why the 2022 rate remains so low, lower than even the peak pandemic years 2020-2021 and far, far less than the pre-pandemic years. *See id.* at 14-15. This unexplained, unprecedented decline raises concerns about the reliability of Defendants' UNA findings, including raising questions as to whether the entrenched staffing crisis makes it difficult to identify and refer patients who need inpatient care, or the extent to which outpatient clinicians are not bothering to send patients to poorly-staffed PIPs. *See id.* at 15. Whatever the cause, Defendants should analyze the reason(s) for this anomalous trend and provide the Court a detailed explanation, as the durability of their transfer timeline compliance could well be at risk if the referrals return to the routine heights of their pre-pandemic averages.

## C.   Conclusion

Defendants must fully commit to addressing the problems outlined above in order to finally reach durable compliance with the Program Guide's inpatient transfer timeframes. If they do not, Plaintiffs lack confidence that the years-long cycle of periods of compliance followed by backsliding will not repeat itself.

## D.   Plaintiffs' Certification of Orders Reviewed

The undersigned counsel for Plaintiffs certifies that she reviewed the following relevant orders to prepare this filing: ECF Nos. 5519, 5583, 5610, 5726, 7741, 7786, 7854, 7872, 7916, 7923, 7950; *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Coleman v. Brown*, 938 F. Supp. 2d 955 (E.D. Cal. 2013).

1    Dated:  September 26, 2023                         ROB A. BONTA
                                                        ATTORNEY GENERAL OF CALIFORNIA
2                                                       DAMON MCCLAIN
                                                        SUPERVISING DEPUTY ATTORNEY GENERAL
3
                                                        /s/ Elise Owens Thorn
4                                                       ELISE OWENS THORN
                                                        DEPUTY ATTORNEY GENERAL
5                                                       Attorneys for Defendants

6    Dated:  September 26, 2023                         HANSON BRIDGETT LLP

7                                                       /s/ Samantha D. Wolff
                                                        PAUL MELLO
8                                                       SAMANTHA D. WOLFF
                                                        Attorneys for Defendants
9

10   Dated:  September 26, 2023                         ROSEN BIEN GALVAN & GRUNFELD LLP

11                                                      /s/ Adrienne Pon Harrold
                                                        ADRIENNE PON HARROLD
12                                                      Attorneys for Plaintiffs

13

14   CF1997CS0003
     Parties' Joint Report on Inpatient Transfer Timelines.docx

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



Monthly Program Guide Compliance with APP and ICF Transfer Timelines
May 16, 2017 through September 15, 2023 | 97% Compliance (17,884 / 18,444)

| Reporting Month | Within PG Timeframes or Exception Applied | Outside PG Timeframes (including partial exceptions) | Grand Total |
|---|---|---|---|
| 2017-05 | 94 | 5 | 99 |
| 2017-06 | 163 | 51 | 214 |
| 2017-07 | 192 | 34 | 226 |
| 2017-08 | 353 | 58 | 411 |
| 2017-09 | 366 | 8 | 374 |
| 2017-10 | 454 | | 454 |
| 2017-11 | 351 | | 351 |
| 2017-12 | 336 | | 336 |
| 2018-01 | 388 | | 388 |
| 2018-02 | 385 | | 385 |
| 2018-03 | 409 | | 409 |
| 2018-04 | 321 | | 321 |
| 2018-05 | 310 | | 310 |
| 2018-06 | 321 | | 321 |
| 2018-07 | 314 | | 314 |
| 2018-08 | 354 | | 354 |
| 2018-09 | 291 | | 291 |
| 2018-10 | 342 | | 342 |
| 2018-11 | 356 | | 356 |
| 2018-12 | 305 | 1 | 306 |
| 2019-01 | 291 | | 291 |
| 2019-02 | 280 | | 280 |
| 2019-03 | 327 | | 327 |
| 2019-04 | 339 | | 339 |
| 2019-05 | 413 | | 413 |
| 2019-06 | 339 | | 339 |
| 2019-07 | 448 | | 448 |
| 2019-08 | 460 | | 460 |
| 2019-09 | 403 | | 403 |
| 2019-10 | 414 | 1 | 415 |
| 2019-11 | 318 | | 318 |
| 2019-12 | 332 | | 332 |
| 2020-01 | 313 | | 313 |
| 2020-02 | 338 | 1 | 339 |
| 2020-03 | 321 | | 321 |
| 2020-04 | 154 | | 154 |
| 2020-05 | 134 | | 134 |
| 2020-06 | 163 | 1 | 164 |
| 2020-07 | 76 | | 76 |
| 2020-08 | 92 | | 92 |
| 2020-09 | 84 | | 84 |
| 2020-10 | 121 | | 121 |
| 2020-11 | 80 | | 80 |
| 2020-12 | 46 | | 46 |
| 2021-01 | 70 | | 70 |
| 2021-02 | 151 | | 151 |
| 2021-03 | 215 | | 215 |
| 2021-04 | 204 | | 204 |
| 2021-05 | 164 | | 164 |
| 2021-06 | 214 | | 214 |
| 2021-07 | 215 | | 215 |
| 2021-08 | 160 | | 160 |
| 2021-09 | 179 | | 179 |
| 2021-10 | 164 | 1 | 165 |
| 2021-11 | 142 | | 142 |
| 2021-12 | 115 | | 115 |
| 2022-01 | 107 | 1 | 108 |

| Reporting Month | Within PG Timeframes or Exception Applied | Outside PG Timeframes (including partial exceptions) | Grand Total |
|---|---|---|---|
| 2022-02 | 135 | | 135 |
| 2022-03 | 144 | | 144 |
| 2022-04 | 136 | | 136 |
| 2022-05 | 143 | 1 | 144 |
| 2022-06 | 124 | 47 | 171 |
| 2022-07 | 140 | 28 | 168 |
| 2022-08 | 231 | 1 | 232 |
| 2022-09 | 186 | 5 | 191 |
| 2022-10 | 159 | 4 | 163 |
| 2022-11 | 151 | 17 | 168 |
| 2022-12 | 115 | 37 | 152 |
| 2023-01 | 110 | 44 | 154 |
| 2023-02 | 129 | 30 | 159 |
| 2023-03 | 151 | 66 | 217 |
| 2023-04 | 112 | 74 | 186 |
| 2023-05 | 194 | 42 | 236 |
| 2023-06 | 217 | 2 | 219 |
| 2023-07 | 190 | | 190 |
| 2023-08 | 227 | | 227 |
| 2023-09 | 99 | | 99 |
| **Grand Total** | **17884** | **560** | **18444** |

97%