ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF BRIAN ZOLLWEG, Psy.D. IN SUPPORT OF DEFENDANTS' POSITION STATEMENT IN THE PARTIES' JOINT REPORT IN RESPONSE TO AUGUST 11, 2023 ORDER ON INPATIENT TRANSFER TIMELINES (ECF NO. 7916)** |

# DECLARATION OF BRIAN ZOLLWEG , Psy.D.

I, Brian Zollweg, Psy.D., declare as follows:

1.    I am currently employed as the Assistant Chief Psychologist of the Department of State Hospitals (DSH).  I have held this position since February 2022.  I have been employed by DSH since December 2020.  Prior to my employment with DSH I was employed by the California Department of Corrections and Rehabilitation (CDCR) as a Senior Psychologist Specialist within the Inpatient Referral Unit (IRU).  I worked for CDCR in the Statewide Mental Health Program for approximately four-and-a-half years.  I make this declaration in response to the Court's August 11, 2023 order (ECF No. 7916), and in support of Defendants' position statement in the Parties' Joint Report in Response to August 11 Order on Inpatient Transfer Timelines filed on September 26, 2023.   I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

**Inpatient Referrals Under Current Policies**

2.    In my position as the Assistant Chief Psychologist, I oversee DSH's Patient Management Unit (PMU), responsible for all steps of the inpatient referral process from CDCR from the point of initial referral through admission.  DSH's PMU is staffed by Consulting Psychologists, Nurse Practitioners, Staff Services Managers, Health Program Specialists, and Associate Government Program Analysts.  In respect to Coleman referrals, PMU Consulting Psychologists and Nurse Practitioners clinically review each referral to determine if the patient's medical and nursing needs can be managed at the state hospital. The PMU team review Coleman referrals as they are received, which can be daily (on occasion more than one referral is received in one day) or multiple times a week.  In addition, the Consulting Psychologists attend case conferences, discuss current referrals and current patients already admitted to the state hospital with leadership, clarify current policies to leadership or staff when indicated, and review patients who are currently out of their Least Restrictive Housing (LRH). Health Program Specialists and Associate Government Program Analysts input identifiable information into a database that is shared with the state hospitals to track each referral up until admission and communicate with the state hospital and CDCR regarding, but not limited to, status of the referral, missing items from

19376383.4

1   the referral packet, and requests from the state hospital regarding additional information.   Since

2   2017, PMU has worked with CDCR's Inpatient Referral Unit (IRU) and Healthcare Population

3   Oversight Program (HCPOP) to maintain sustained compliance with Program Guide transfer

4   timelines.

5          3.     The DSH PMU follows the current inpatient referral policies and processes to

6   maintain compliance with the Program Guide's inpatient referral transfer timeframes.   The

7   current policy was developed and implemented as part of the 2017 Memorandum of

8   Understanding (MOU) between CDCR and DSH.   Copies of the current MOU and Policy

9   Directive setting forth the joint policy on referrals from CDCR are attached hereto as Exhibits A

10   and B respectively.   The steps set forth in the policy have been in place for more than eight years

11   and have resulted in significant periods of 100% compliance with Program Guide requirements.

12          4.     DSH has high confidence that following the current policies and processes will

13   ensure timely transfers of *Coleman* patients to DSH given the level of compliance maintained

14   from September 2017 through 2020, and the current level of compliance achieved on the tail of

15   the COVID-19 pandemic.   A potential barrier to sustained compliance is the potential for a

16   resurgence in COVID-19 cases that could lead to Coleman patients being quarantined before

17   scheduled transfer to DSH, or some other unknown issue such as another pandemic, or natural

18   disaster.

19          5.     DSH adheres to the following four steps to maintain compliance with inpatient

20   referral requirements under the current policies:

21          a.     First, PMU receives an endorsement (a request for placement) for a

22   *Coleman* patient from HCPOP (this starts the Coleman court ordered timeline).   This process was

23   temporarily modified during the pandemic to allow preview of patients before endorsement.

24   Under this modified process, CDCR's IRU provided the name and CDCR number of the patient,

25   after which the patient would be endorsed to DSH only if accepted.

26          b.     Second, PMU clinical and PMU nursing conduct simultaneous

27   psychological and nursing reviews for the referred patient.   The PMU clinical review utilizes the

28   CDCR electronic health record (EHRS) to conduct thorough written reviews of every *Coleman*

2

19376383.4

1  patient referred, going back at least six months and reviewing previous DSH hospital and PIP

2  stays.  PMU clinical assesses whether a patient meets criteria for admission to an unlocked dorm

3  housing setting in accordance with Policy Directive 3601.  PMU nursing reviews the SharePoint

4  packet received from CDCR for completeness and highlights any specific medical concerns or

5  upcoming medical appointments or procedures.  If any documentation or information is missing

6  from the referral, PMU contacts CDCR IRU to acquire the information so that the referral can

7  move forward.

8          c.      Third, PMU forwards the *Coleman* patient's identifying information

9  (usually the endorsement), SharePoint packet (if PMU nursing has stated the packet is complete),

10  and clinical reviews to the DSH Admission and Discharge Unit (ADU) and medical director, or

11  designee.  PMU clinical will communicate with the state hospital medical director, or designee,

12  on every referral.  The DSH Clinical Operations nursing forwards the SharePoint packet to the

13  Chief of Medicine, or designee, and discusses any pertinent medical or nursing concerns for every

14  referral.

15          d.      Fourth, based on all of the information gathered to date on the referral, the

16  receiving DSH facility can either agree to recommend the patient for admission or recommend

17  against admission due to clinical or medical concerns.  If the referral is not recommended for

18  admission, DSH PMU clinical communicates this to CDCR IRU and provides a written rationale.

19  If CDCR IRU disagrees with the decision, CDCR can request a case conference as outlined in

20  Section V of the MOU.  If a case conference does not provide a resolution, then CDCR has the

21  option to request a Coordinated Clinical Assessment Team (CCAT) to discuss the referral.  DSH

22  will then write a rejection letter and post it on SharePoint.  If after the CCAT there is no

23  resolution, then CDCR may submit a written appeal to DSH and CDCR executive leadership for

24  discussion by executive leadership.  If the rejection stands after discussion, then the referral will

25  be removed from DSH's waitlist.  If the *Coleman* referral is recommended for admission, DSH

26  uploads a decision form for acceptance and issues an Acceptance Transfer Chrono (ATC) as

27  indicated in Policy Directive 3601.  The patient will be admitted after the ATC is posted.

28  //

19376383.4

**Detailed Patient Reviews for Expanded Least Restrictive Housing Assessments.**

6.      During the COVID-19 pandemic the referral process was modified to allow for a more detailed patient review process additional patient reviews as a result of the small in what has been termed "the small workgroups" attended by DSH, CDCR, and the Special Master's experts.

7.      As part of the small workgroup process, in March and April 2021, CDCR requested that DSH conduct pre-reviews of patients who were either in a CDCR PIP or on a waitlist for admission to the PIP to determine if the patients were suitable for placement in an unlocked dorm setting.  DSH agreed to conduct the reviews.  Most of the patients re-reviewed had an LRH for unlocked dorms, but were clinically recommended for more restrictive housing. As part of this review, 73 patients were evaluated and 39 (53%) were recommended for admission to DSH.  All reviews were shared and discussed with CDCR and the Special Master's experts in the small workgroup.

8.      In May 2021, CDCR requested DSH conduct further pre-reviews for patients with a locked dorm LRH, but who could potentially be stepped down to a new LRH for unlocked dorms.  Forty *Coleman* patients were reviewed and 14 (35%) were recommended for admission to DSH.  Again, all reviews were shared and discussed with CDCR and the Special Master's experts in the small workgroup.

9.      In October 2021, CDCR requested DSH conduct further pre-reviews for patients on the inpatient referral waitlist who had an LRH for unlocked dorm, but who were clinically recommended for a more restrictive housing setting.  For this review, 8 Coleman patients were evaluated by DSH and 4 (50%) were recommended for admission to DSH.  As with the other reviews, all reviews here were shared and discussed with CDCR and the Special Master's experts in the small workgroup.

10.      In February and March 2023, CDCR requested DSH conduct pre-reviews for patients on the inpatient referral waitlist with an LRH for unlocked dorms, but who were clinically recommended for a more restrictive housing setting.  For this review, 35 Coleman patients were evaluated by DSH and 9 (26%) were recommended for admission to DSH.  All

1    reviews were shared and discussed with CDCR and the Special Master's experts in the small

2    workgroup.

3           11.    Overall, DSH and CDCR pre-reviewed 156 *Coleman* patients and of those, 66

4    (42%) were recommended for admission.  Due to the results of the pre-reviews, Defendants

5    recently developed a plan that DSH review all new referrals with an LRH for unlocked dorms

6    regardless of clinical housing recommendation.  In addition, DSH proposed reviewing with

7    CDCR's IRU every 30-45 days a large percentage of referred patients who were housed out of

8    their LRH for unlocked dorms.  DSH is confident that these focused patient reviews will likely

9    continue to result in increased referrals of patients to DSH's ICF programs for treatment.

10          I declare under penalty of perjury under the laws of the United States of America that the

11    foregoing is true and correct.

12          Executed on this 26th day of September, 2023, at Sacramento, California.

13

14                            */s/ Brian Zollweg*
                        Brian Zollweg, Ph.D.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19376383.4

# Exhibit A

# MEMORANDUM OF UNDERSTANDING BETWEEN CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND DEPARTMENT OF STATE HOSPITALS FOR MANAGEMENT AND OVERSIGHT OF INTERMEDIATE CARE AND ACUTE INPATIENT PROGRAMS

## I.   INTENT

This Memorandum of Understanding (MOU) establishes the legal framework by which the California Department of Corrections and Rehabilitation (CDCR) and the California Department of State Hospitals (DSH) function cooperatively to provide treatment to CDCR patients requiring inpatient mental health care.  These services shall include clinically appropriate care decisions that conform to all legal requirements and optimize use of available resources to perform mental health evaluation and treatment. DSH operates Intermediate and Acute programs for the treatment of CDCR patients under Penal Code section 2684, subdivision (a) and/or Chapter 6 of the Mental Health Services Delivery System (MHSDS) Program Guide (2009 Edition).

All parties intend to operationalize this MOU through the following policies:

- Joint Policy and Procedure re: Referral, Admissions, and Movement (Attached)
- DSH Rules Violation Reporting Policy – CDCR Patients in DSH Inpatient Programs (Attached)
- Joint Policy re: Suicide Review Process (Attached)
- Joint Policy re: Medical Cases (Attached)
- Joint Policy re: DSH Referral and Penal Code Section 2602 Management (Attached)
- DSH Utilization Management Policy (Attached)
- DSH Treatment Planning and Delivery of Care Policy (Attached)
- Joint Policy re: Non-Formulary Psychotropic Medication (Attached)
- Joint Policy re: Discharge (Attached)
- Joint Policy re: DSH Facility Pre-Release Planning (Attached)
- Joint Policy re: Penal Code 1370 Commitments (Attached)

## II.   DEFINITIONS

**Acceptance:**  DSH agrees to admit a patient for placement at a DSH hospital.

**Acute:**  Inpatient programs providing intensive, short-term mental health treatment for CDCR patients who have a serious mental disorder or an exacerbation of a chronic serious mental illness requiring treatment not available within the intermediate level of care.  See also MHSDS Program Guide at 12-6-2.

**CDCR Inpatient Referral Unit (IRU):** The CDCR Headquarters Mental Health unit responsible for review and oversight of all CDCR referrals to DSH.

**Coordinated Clinical Assessment Team (CCAT):** A CDCR/DSH team created to ensure a centralized approach to the review and decision-making process for all difficult, perplexing, or disputed CDCR referrals to DSH. The CCAT is comprised of CDCR senior mental health clinicians, CDCR Health Care Placement Oversight Program (HCPOP) representatives, CDCR Classification Services Unit representatives, a Classification & Parole Representative, the referring clinician and his or her supervisor, DSH PMU representatives, DSH executive clinical leadership, and any additional CDCR or DSH staff, as needed. See also MHSDS Program Guide at 12-6-18.

**DSH hospitals:** State hospitals housing CDCR patients under Penal Code section 2684, subdivision (a), currently DSH-Atascadero, DSH-Coalinga, and DSH-Patton. Each DSH hospital is assigned a hub CDCR institution. The hub institutions are, respectively, California Men's Colony, Pleasant Valley State Prison, and California Rehabilitation Center.

**DSH Patient Management Unit (PMU):** The DSH headquarters mental health unit responsible for management and oversight of all CDCR referrals to DSH.

**Incomplete Referral:** A referral received by DSH that does not include all information as outlined in Section IV of this MOU.

**Intermediate:** Inpatient programs within DSH hospitals and PIPs providing longer term intermediate and sub-acute mental health treatment for CDCR patients who have a serious mental disorder. See also MHSDS Program Guide (2009 Edition) at 12-6-6.

**Least Restrictive Housing (LRH):** The lowest custody setting in which a patient may be housed within a Psychiatric Inpatient Program or DSH Hospital, as determined by CDCR HCPOP.

**MHSDS Program:** The CDCR-DSH system of providing mental health screening, diagnostic evaluation and treatment to CDCR patients, primarily set forth in the MHSDS Program Guide (2009 Edition) and subsequent policies established in accordance with *Coleman v. Brown*.

**Near Miss:** An event or situation that could have resulted in an adverse/sentinel event but did not, either by chance or through timely intervention.

**Patient Movement:** The prompt placement of patients into the least restrictive inpatient program consistent with HCPOP's custodial case factor review and DSH acceptance.

**Referral:** The process by which CDCR requests admission of a patient to DSH by providing all information outlined in Section IV of this MOU.

**Rejection:** When the referral of a patient for placement at a DSH hospital is declined by DSH.

**Sentinel Event:** An event or series of events that cause the death or serious disability of a patient, personnel, or visitor. In accordance with California Correctional Health Care Services' (CCHCS) sentinel event policy, a sentinel event also includes unusual occurrences and near-misses.

**Serious Disability:** A physical or mental impairment that substantially limits one or more of the major life activities of an individual, or the loss of bodily function, if the impairment lasts more than seven days or is still present at the time of discharge, or unintentional loss of a body part.

**Unusual Occurrences:** Events that constitute an unusual occurrence include, but are not limited to, poisonings, fires, explosions, death of a patient, employee or visitor due to unnatural causes, sexual acts involving patients, physical assaults on patients, employees, or visitors, all suspected criminal acts involving patients, employees, or visitors, all suspected incidents of physical or sexual abuse to a patient, unexplained or illicit disappearance or loss of a patient's remains, or any disruption of service in the licensed facility.

## III.  GENERAL PROVISIONS

The Secretary of CDCR maintains custodial authority over CDCR patients following their referral and admission to a DSH hospital.  Except as otherwise set forth in this document, DSH is responsible for day-to-day mental health treatment of patients once accepted and admitted by DSH.

- A. In accordance with the MHSDS Program Guide (2009 Edition), the parties agree the policy of both agencies is to expeditiously refer, admit and move patients to the most appropriate level of care in the least restrictive environment that is consistent with their custodial and clinical needs.  The parties agree to work collaboratively to ensure that referrals, admissions, movement within the programs to appropriate levels of care or housing, and return of patients to CDCR are done timely in accordance with the Joint Policy and Procedure re: Referral, Admissions, and Movement (Attachment 1).  The parties agree to ensure that their efforts will effectively utilize staff and available resources.
- B. DSH hospitals that are currently Joint Commission accredited shall maintain accreditation.
- C. A standardized bed utilization report shall be provided by DSH to CDCR HCPOP each business day and it shall include, at a minimum, patient name, CDCR number, and length of stay.

D. CDCR shall provide all patient transportation to and from DSH facilities and between DSH hospitals. Parties agree that transfers will occur as expeditiously as possible, but not to exceed timelines set forth in the MHSDS Program Guide (2009 Edition). The patient movement for both admission and discharge shall occur within 72 hours of CDCR's receipt of the Admissions Transfer Chrono (ATC) or discharge documentation.

E. The parties agree that CDCR shall provide access to mental health records upon referral to DSH. DSH shall provide patient records including a discharge summary to CDCR within 24 hours of physical discharge of a patient back to CDCR. Clinical information is made available via secure electronic file transfer systems and the Electronic Health Record.

F. DSH inpatient records for all patients shall be in compliance with Title 22 and Joint Commission, where accredited. DSH staff shall be responsible for maintaining and completing all DSH inpatient mental health records.

G. If a CDCR patient is found unresponsive while housed at a DSH hospital, staff shall follow the emergency policy and procedures in place at the DSH hospital.

H. DSH hospitals shall advise the hub prison warden and on duty watch commander of unusual or significant events or actions as described in section 51030.3, CDCR Department Operations Manual (DOM), by the end of the watch or shift. In addition to DSH procedures that shall be followed, notifications of a patient's death while admitted to a DSH facility shall be immediately sent to the hub prison warden and the prison's chief medical executive, or designees. CDCR shall complete all required notifications in the event of a death. DSH will provide access to its facilities, records, policies, and staff when necessary to perform law enforcement and health care reviews into the circumstances of a patient's death. In addition, if a patient commits suicide or attempts suicide and medical treatment is required, a notification of the known circumstances will also be sent to the CDCR Suicide Response Coordinator. Reviews of suicides occurring within DSH shall be conducted in accordance with the Joint Policy re: Suicide Review Process (Attachment 3).

## IV. REFERRALS

All referrals to DSH are completed consistent with the MHSDS Program Guide (2009 Edition) timelines. When a referral is made from a Security Housing Unit (SHU) or from SHU via a Mental Health Crisis Bed (MHCB), the CDCR referring clinician shall document this referral is from a SHU or from a SHU via a MHCB on the referral form.

Referral information provided to DSH shall include:

A. Authority for the patient's transfer - the patient's consent to the transfer to DSH, documentation that the transfer has been determined appropriate and necessary following a due process hearing, or confirmation that the transfer meets emergency certification criteria;

B. Clinical reason or justification for referral;

C. Most recent CDCR Suicide Risk Evaluation;

D. Current treatment plan;

E. Medical clearance for transportation;

F. Documentation of medical needs, as applicable; (See Joint Policy re: Medical Cases, Attachment 4).

G. Pharmacy Profile or Medication Administration Record (MAR);

H. Penal Code Section 2602 (PC 2602) Court Order (when relevant) or supporting documentation; (See Joint Policy re: DSH Referral and Penal Code Section 2602 Management, Attachment 5);

I. Tuberculosis (TB) status, which may include a health care evaluation and clearance if TB test results are unavailable; and

J. Clozaril supporting documentation, if a Clozaril trial is requested.

All referrals shall be accepted or rejected within MHSDS Program Guide (2009 Edition) timelines. Rescission of referrals is solely the decision of the referring Interdisciplinary Treatment Team (IDTT).

If an incomplete referral is received by DSH, DSH agrees to notify the IRU immediately, and IRU will provide all required items within one working day.

## V. ACCEPTANCE OR REJECTION OF REFERRALS

All referrals to DSH are reviewed by DSH according to the MHSDS Program Guide (2009 Edition) timelines and criteria. The parties agree that patients who have been identified through IDTT for inpatient need are presumed to have such need and will be referred to DSH for inpatient treatment. The referral review completed by DSH is to ensure that clinical criteria for admission are met, and to identify any housing considerations based upon clinical evaluation.

Rejections that occur due to non-clinical reasons shall be raised to the headquarters executive staff of the parties for resolution.

In the event that a patient has substantial co-existing medical needs that they cannot be adequately cared for at the DSH facility to which they were referred, the parties agree to work together to identify a suitable placement to ensure the provision of necessary mental health treatment in accordance with the Joint Policy re: Medical Cases (Attachment 4).

Involuntary administration of psychiatric medications on CDCR patients shall be processed in accordance with PC 2602, associated regulations, and the Joint Policy re: DSH Referral and Penal Code Section 2602 Management (See Attachment 5). A pending hearing or expiration of an order under PC 2602 will not be a basis for denying or delaying the referral, acceptance, or discharge of a patient.

If DSH anticipates rejecting a referral, the DSH PMU shall notify the CDCR IRU, and a case discussion between DSH designated clinical staff and CDCR headquarters clinical staff shall occur. If resolution is not achieved and a rejection occurs, a CCAT will be held.

If a resolution is not achieved in CCAT, CDCR may elect to appeal the rejection decision via a written appeal, at which time executive leadership will discuss the appeal.  CDCR agrees to provide DSH with rejection appeals within two business days of the official rejection notice.  The appeal process shall consist of a discussion between designated DSH and CDCR HQ clinical leadership or designees.

## VI.  PATIENT MOVEMENT

CDCR HCPOP shall manage the patient movement for all patients to and from DSH hospitals, and between DSH hospitals, in accordance with the Joint Policy and Procedure re: Referral, Admissions, and Movement (Attachment 1).

## VII.  ADMISSIONS

The parties shall follow criteria for admission to DSH in accordance with the MHSDS Program Guide (2009 Edition) and the Joint Policy and Procedure re: Referral, Admissions, and Movement (Attachment 1).   Admissions to DSH facilities shall be available between 8 a.m. and 4 p.m., Monday through Friday during all regular state business days.  Admissions may be made outside of these hours by mutual agreement and advance coordination.

## VIII. UTILIZATION REVIEW AND MANAGEMENT

The parties shall cooperatively manage length of inpatient stays within DSH in accordance with the Joint Policy re: Utilization Management (Attachment 6).

## IX. TREATMENT PLANNING

DSH shall ensure that appropriate treatment planning for all patients under their care occurs in accordance with the DSH Treatment Planning and Delivery of Care Policy (Attachment 7) and Joint Policy re: Non-Formulary Psychotropic Medication (Attachment 8).

## X. MEDICATIONS

Non-formulary decisions by both agencies shall occur in accordance with the Joint Policy re: Non-Formulary Psychotropic Medication.  (Attachment 8).

## XI. DISCHARGE

It is the policy of the parties to expeditiously return patients to outpatient settings as soon as their need for inpatient care has subsided.

Discharge of patients from DSH inpatient programs to CDCR shall be cooperatively managed by the parties in accordance with the discharge criteria and procedure set forth in the MHSDS Program Guide (2009 Edition) at Chapter 6 (12-6-5 to 12-6-6 and 12-6-12 to 12-6-15) and the Joint Policy re: Discharge (Attachment 9).

## XII. INSTITUTIONAL RELEASE

If a patient is to be paroled or otherwise released before they are suitable for discharge from DSH, the parties agree to follow the Joint Policy re: Pre-Release Planning (Attachment 10).

## XIII. PATIENT RIGHTS

All CDCR patients retain the rights afforded to them pursuant to Title 15 unless specifically accepted in the MHSDS Program. Rights shall be afforded to patients in accordance with Title 22 and Joint Commission, where accredited.

## XIV. OUT TO COURT

The local CDCR Litigation Coordinator, HCPOP, and DSH shall be advised when an order is received for a patient in DSH to appear in court.

## XV. TRAINING

CDCR and DSH shall distribute copies of this MOU, all associated policies, procedures, attachments, and the MHSDS Program Guide (2009 Edition) to all CDCR institutions, Parole Regions, and relevant DSH facilities; CDCR and DSH shall conduct system-wide training for all executive staff at DSH state hospitals, all clinical, program, and administrative staff, including but not limited to, social workers, psychologists, psychiatrists, supervising clinicians, and discipline chiefs, including CDCR staff involved in the transfer of patients to, or treatment of patients at, DSH on the nature, extent and availability of care, admission criteria, discharge criteria, and procedure for admitting to and discharging from DSH programs. Training shall occur upon hiring and annually, and reviewed thereafter upon approval by the parties of any modification to this MOU, and/or any associated policy, procedure, or attachment thereto, or to the MHSDS Program Guide (2009 Edition).

## XVI. COMPLIANCE

CDCR and DSH shall regularly monitor compliance with this MOU. Any unresolved disputes or failure to comply with the terms of the MOU shall be reported for action to the DSH Director and the CDCR, Division of Health Care Services, Deputy Director.

## XVII.  TERMINATION

This MOU shall remain in effect until the parties agree to modify or terminate the agreement. Amendments to this MOU shall be made only by the written agreement of the parties. This MOU shall automatically renew every 3 years after the date of signature provided that the parties review the document and communicate in writing their agreement to continue with the MOU prior to the date of renewal.

Dated: _/ / . 8 . / 7_                Dated: _11/6/17_

PAMELA AHLIN
Director
Department of State Hospitals

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services
California Department of Corrections and
Rehabilitation

Dated: _11/9/17_

KATHLEEN ALLISON
Director
Division of Adult Institutions
California Department of Corrections and
Rehabilitation

# Exhibit B

# POLICY DIRECTIVE

| NUMBER | 3601 |
|---|---|
| TITLE | **JOINT POLICY AND PROCEDURE RE:  Referral, Admission and Movement** |
| EFFECTIVE DATE | July 1, 2017 |
| SUPERSEDES | AL2015-17 |

**References/ Authority**

- By Order of the Director, Department of State Hospitals
- Mental Health Services Delivery System Program Guide – 2009 Edition
- Memorandum Of Understanding Between California Department Of Corrections and Rehabilitation And Department Of State Hospitals For Management And Oversight Of Intermediate Care And Acute Inpatient Programs

**Policy**

The California Department of Corrections and Rehabilitation (CDCR) and Department of State Hospitals (DSH) shall identify, accept, and place patients into the least restrictive DSH inpatient program consistent with custodial and clinical factors.  DSH and CDCR shall collaboratively manage all DSH inpatient program patient movement.

Patients requiring 24-hour inpatient care for treatment of mental health disorders, or transfer from a CDCR Psychiatric Inpatient Program (PIP) to a less restrictive housing environment shall be referred and admitted to Intermediate Care Facilities (ICF) or Acute inpatient level of care (LOC) in accordance with the following timelines:

ICF:

Referral shall be submitted to CDCR Headquarters within five (5) business days of the Interdisciplinary Treatment Team (IDTT).

If accepted by DSH, admission shall be completed as soon as possible and shall not exceed 30 calendar days from DSH receipt of the referral.

Acute:

Referral shall be submitted to CDCR headquarters within two (2) business days of the IDTT.

If accepted by DSH, admission shall occur as soon as possible and shall not exceed 10 calendar days from DSH receipt of the referral.

No patient shall be accepted or admitted for care without an order by a clinician who is credentialed and privileged to do so.

**Responsibility**

Responsibility for policy review and implementation:

# POLICY DIRECTIVE

DSH Director or designee.

CDCR Deputy Director, Statewide Mental Health Program or designee.

Responsibility for compliance with the policy:

The Executive Directors or designees of the DSH state hospitals treating CDCR patients.

Responsibility for compliance with policy by Patient Management Unit staff at DSH-Sacramento:

DSH Deputy Director of Hospital Strategic Planning, or designee.

**Purpose**

To ensure patients requiring 24-hour inpatient care for mental health disorders, or transfer from a CDCR PIP to a less restrictive housing environment, are referred, accepted, and admitted for treatment within required timeframes, without discrimination on the basis of sex, gender identity, race, color, religion, ancestry, national origin, sexual orientation, disability, medical condition, marital status, or registered domestic partner status.

**Definitions**

**Acceptance:** DSH agrees to admit a patient for treatment at a DSH hospital.

**Acute:** Inpatient programs providing intensive, short-term mental health treatment for CDCR patients who have a serious mental disorder or an exacerbation of a chronic serious mental illness requiring treatment not available within the intermediate level of care. See also MHSDS Program Guide at 12-6-2.

**Admission and Discharge Unit (ADU):** A multidisciplinary team at each DSH facility that is responsible for processing and coordinating referrals, admissions, bed management, discharges, and transfers in and out of the facility. The ADU is, at a minimum, comprised of a registered nurse or a psychiatrist, an analyst, and a manager or administrator, and may include and other staff, as necessary.

**California Correctional Health Care Services (CCHCS):** Established to oversee and provide a constitutionally appropriate level of health care in all adult prisons operated by the CDCR throughout California.

**CDCR Inpatient Coordinator:** The designated CDCR institution clinical staff member responsible for facilitating DSH referrals and all DSH related activities with prison staff, other CDCR institutions, CDCR Headquarters, and DSH facilities.

**CDCR Inpatient Referral Unit (IRU):** The CDCR Headquarters Mental Health unit responsible for review and oversight of all CDCR referrals to DSH.

**Custodial Factors:** Custodial factors include, but are not limited to, disciplinary/segregated housing history, sentence length, security and custody levels, history of violence and escape, staff and inmate separation alerts, and

# POLICY DIRECTIVE

security threat group status.

**Classification Staff Representative (CSR):** A CDCR employee designated to represent the CDCR Director in the classification process during the review, approval, or deferral of actions by institution classification committees, including but not limited to, inmate transfers, inmate special housing program placements/retention, and custody designations.

**Clinical Factors:** Clinical factors include, but are not limited to: medical conditions and mental health levels of care, developmental and/or physical disabilities impacting placement.

**DSH Patient Management Unit (PMU):** The DSH Headquarters mental health unit responsible for management and oversight of all CDCR referrals to DSH.

**Health Care Placement Oversight Program (HCPOP):** The CCHCS unit responsible for bed management of health care beds and for determining each patient's Least Restrictive Housing.

**Intermediate:** Inpatient programs within DSH hospitals and PIPs providing longer term intermediate and sub-acute mental health treatment for CDCR patients who have a serious mental disorder. See also MHSDS Program Guide (2009 Edition) at 12-6-6.

**Least Restrictive Housing (LRH):** The lowest custody setting in which a patient may be housed within a Psychiatric Inpatient Program or DSH Hospital, as determined by CDCR HCPOP.

**Penal Code Section 2602 (PC 2602) Order:** A court order for involuntary medication of an inmate in the custody of, or housed in, a state prison issued pursuant to the statute. (See Joint DSH Referral and Penal Code Section 2602 Management Policy.)

**Primary Clinician (PC):** A psychologist, clinical social worker, or psychiatrist who performs the necessary case management functions for all patients in their caseloads. This includes assessment, treatment planning and treatment, clinical monitoring, and clinical case reviews.

**Psychiatric Inpatient Program (PIP):** An Acute or Intermediate level of care program operated by CDCR.

**Referral:** The process by which CDCR requests admission of a patient to DSH by providing all information outlined in Section IV of the Memorandum of Understanding (MOU) between CDCR and DSH.

**Rejection:** When the referral of a patient for placement at a DSH state hospital is declined by DSH.

**Transfer Endorsement (Endorsement):** CSR authorization to transfer/move an inmate/patient from his/her current institution and/or program/level of care to another institution and/or program/level of care.

# POLICY DIRECTIVE

| Procedure | **CDCR Interdisciplinary Treatment Team (IDTT)** |
|---|---|

The CDCR IDTT determines whether a patient meets the criteria for a referral to a DSH Intermediate or Acute program.

**Primary Clinician (PC)**

1. When the mental health PC identifies a patient who may require ICF or Acute level of care, the mental health representative shall initiate discussion of the patient in the morning huddle (and/or rounds or other meeting), to determine whether medical conditions may impact the referral decision and or placement (Inmate Medical Services Policies and Procedure (IMSP&P), Chapter 12, Volume 11, Correctional Treatment Center; Psychiatric Inpatient Program; Medical Care). If a patient has complex medical needs that require inpatient medical service and precludes immediate admission to available ICF or Acute inpatient programs, a medical hold shall be ordered and the patient shall be referred to ICF or Acute level of care. If clinically appropriate from a medical and mental health perspective, the referring institution shall coordinate with HCPOP to facilitate admission of the patient to the CTC at CHCF or CMF for medical and psychiatric treatment until they can safely be transferred to the ICF or Acute inpatient program, according to IMSP&P (Health Care Transfer Procedure Chapter 4.3.2). If the patient cannot be admitted to the CTC at CHCF, the CTC at CMF shall be considered.

2. If a patient is identified during the IDTT as requiring ICF or Acute level of care, presentation at the morning huddle is not required prior to referral.

3. The IDTT shall discuss consideration for referral at the patient's next scheduled IDTT, or sooner if clinically indicated, and make a determination. If the IDTT determines that the referral is warranted, the PC completes the Inpatient Consult and ICF or Acute Place In Order on the same day as the IDTT.

4. During the IDTT, the PC shall discuss the reason for referral to inpatient care, and inform the patient of the benefits of inpatient treatment and inherent risks should the patient not be admitted for inpatient treatment.

5. The PC shall address any distress expressed by the patient related to the referral, upcoming transfer, and suspension of Sensitive Needs Yard (SNY) status, as applicable, in a therapeutic manner.

6. The PC shall ask the patient to sign a Transfer to ICF/Acute Due Process Chrono. The institution inpatient coordinator is notified of the referral via electronic messaging. The PC provides the inpatient coordinator with the Transfer to ICF/Acute Due Process Chrono.

# POLICY DIRECTIVE

7. The referring clinician shall ensure that all required documentation for referral to ICF or Acute is completed and available for the inpatient coordinator for review within three (3) business days from IDTT for ICF and within the same day as the IDTT for Acute.

The following documentation is required:

   a. The patient's consent to transfer to DSH from an MHCB or an outpatient program, or documentation that transfer has been determined appropriate and necessary following a due process hearing, or confirmation that the transfer meets emergency certification criteria (consent to transfer to DSH is not required for patients transferring from a CDCR PIP);

   b. Clinical reason or justification for referral;

   c. Most recent Suicide Risk and Self Harm Evaluation;

   d. Current treatment plan;

   e. Medical evaluation for transportation;

   f. Documentation of medical needs, as applicable; (See also Joint Medical Needs Policy)

   g. Pharmacy Profile or Medication Administration Record (MAR);

   h. PC 2602 Court Order (when relevant) or supporting documentation;

   i. Tuberculosis (TB) status, which may include a health care evaluation and clearance if TB test results are unavailable; and

   j. Clozaril supporting documentation, if a Clozaril trial is requested.

**CDCR Correctional Counselor**

The referring institution Correctional Counselor shall inform patients through IDTT that while in a DSH psychiatric program or state hospital, SNY or general population designations are temporarily put in abeyance. The Correctional Counselor shall document this advisement in a Strategic Offender Management System (SOMS) case note.

**CDCR Inpatient Coordinator**

1. The CDCR Inpatient Coordinator shall ensure all required clinical documentation received from the PC is transmitted to the IRU within five (5) business days from the date of IDTT for an ICF referral and within two (2) business days from the date of IDTT for an Acute referral.

2. The CDCR Inpatient Coordinator shall schedule a due process hearing (Vitek) if the patient refuses to sign the consent form. A due process hearing (Vitek) shall be conducted within 10 business days from the

# POLICY DIRECTIVE

date of IDTT for ICF and within five (5) business days from the date of IDTT for Acute.

3. Documentation of the due process hearing (Vitek) shall be transmitted to the IRU and HCPOP within 10 business days from the IDTT for ICF and within five (5) business days from the IDTT for Acute.

**IRU**

1. Within three (3) business days for all ICF referrals and within one (1) business day of receipt for all Acute referrals, the IRU shall review each referral for completeness and clinical need and notifies the CDCR Inpatient Coordinator and referring clinician whether the referral is complete or incomplete.

2. If the referral is incomplete or lacks justification, the referring DSH Coordinator and clinician shall provide all required information within 24 hours for ICF referrals and within four hours of notification by IRU for Acute referrals.

3. Upon completion of the referral and its review, and not to exceed three (3) business days for ICF and one (1) business day for Acute, the IRU shall notify the ADU, PMU, and HCPOP that all clinical documentation is complete and ready for review.

## DSH Clinical Review

### Criteria

<u>Criteria for ICF Admission</u>: A patient may be appropriate for admission to ICF care when identified by a qualified mental health clinician as experiencing active symptoms consistent with one or more of the mental disorders as defined in the current edition of the DSM and, as a result, meets one or more of the following criteria:

1. The patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a serious mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of chronic ritualistic or repetitive self-injurious/suicidal behavior;

2. The patient is unable to function in his or her current setting and requires long term stabilization;

3. Patient would benefit from a comprehensive treatment program with an emphasis on skill development (i.e. coping skills, daily living, and medication compliance);

4. The patient has a documented pattern of escalation of threats or behavioral patterns suggestive of risk, that have not stabilized within an outpatient setting;

# POLICY DIRECTIVE

5. The behavior is considerably influenced by psychotic symptoms; or serious impairment in communication or judgment; or inability to function in almost all areas;

6. The patient has a documented pattern of repeated admissions to the MHCB for suicidal ideation or self-injurious behavior;

7. The patient requires a neurological/neuropsychological consultation.

8. The patient requires an inpatient diagnostic evaluation;

9. The patient's psychiatric medication history indicates that a clozapine trial might be useful and the trial cannot be completed within CDCR.

<u>Criteria for Acute Admission</u>: A patient may be appropriate for admission to Acute care when he/she has been identified by a qualified mental health clinician as experiencing acute exacerbation or active symptoms consistent with one or more of the mental disorders as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) and, as a result, meets one or more of the following criteria:

1. Patient has been unable to stabilize in the MHCB LOC within 10 calendar days and/or is unable to provide for his basic needs or use the supportive treatment resources available to him;

2. Patient has been assessed as a severe suicide risk;

3. The patient has a documented pattern of repeated admissions to the MHCB for suicidal ideation;

4. The patient engages in recent and severe self-injurious behavior;

5. Patient is a high risk of harming others, as evidenced by:

   a. Recent serious assaultive behavior;

   b. Expressed intention to harm others that is intensified by psychotic symptoms, with a plan and/or means to carry out.

Patients admitted to Acute shall be anticipated to be stabilized sufficiently for discharge from the Acute LOC within 30 to 45 days.

Patients may also be admitted for Acute care when determined to be a danger to self in the absence of a diagnosed mental disorder.

**Admission Procedure**

Within three (3) business days of receipt of the CDCR DSH referral documentation from IRU for ICF and one (1) business day for Acute, DSH ADU/PMU shall review and provide the following to HCPOP via electronic means:

1. Level of care decision.

2. Any housing considerations based upon clinical evaluation. Housing

# POLICY DIRECTIVE

considerations are made in accordance with criteria in Attachment A (Joint Referral Admission DSH Clinical Placement Criteria).

3. DSH PMU and CDCR HCPOP will be responsible for the determination and coordination of the appropriate DSH inpatient program where the patient will be treated upon transfer from CDCR. If it is anticipated that the referral will be rejected by DSH staff, the procedure documented in the MOU, Section V, Acceptance or Rejection of Referrals, will be followed.

## HCPOP Custodial Review

HCPOP shall complete custodial reviews of each DSH referral to determine the LRH based on CDCR custodial factors within three (3) business days of receipt of the DSH LOC decision for ICF, and one (1) business day for Acute. In making Endorsement decisions, the clinical factors provided by DSH will be considered. DSH shall be provided an Endorsement location upon bed availability based on LRH and clinical factors received from DSH ADU/PMU. Note: All patients referred to a DSH state hospital must have an LRH of Unlocked Dorm.

## DSH Acceptance Transfer Chrono (ATC)

1. Within one business day of receipt of Endorsement location, DSH PMU shall submit the ATC to CDCR DSH Referral Unit (DRU).

2. If the ATC is not submitted or notification of disagreement is not received within one (1) business day, HCPOP shall proceed with Endorsement. In the case of disagreement regarding the Endorsement location, DSH PMU will contact HCPOP immediately for dispute resolution. If resolution cannot be achieved with HCPOP and DSH PMU within one (1) business day, the case shall be escalated to the Director of DSH and Deputy Director of CDCR Statewide Mental Health Program, or their designees, for resolution within one (1) business day.

## Endorsement and Transfer

1. The Classification & Parole Representative of the referring institution, IRU, and HCPOP shall be immediately notified of the ATC via electronic means. HCPOP shall endorse via SOMS upon receipt of the ATC.

2. CDCR shall transport the patient within 72 hours of HCPOP Endorsement.

## Referral Tracking

All referrals to DSH are tracked by CDCR and DSH. Accepted referrals with no bed available are placed on an accepted referrals list, which is provided electronically by DSH to CDCR HCPOP via the standardized Bed Utilization Management Meeting report each business day.

# POLICY DIRECTIVE

## Patient Movement Within DSH

### CDCR Housing Reviews while in an ICF or Acute Program

If the patient requires transfer to a CDCR PIP and a classification committee determines the patient is ineligible for retention in his or her LRH, the patient shall be referred to the DSH PMU for transfer coordination with HCPOP. HCPOP shall review and endorse each case requiring transfer in accordance with the program's custodial case factors as indicated within this document.

### Mental Health LOC Changes while in an ICF or Acute Program

1. In cases where a patient's mental health LOC changes from ICF to Acute or Acute to ICF, the facility's ADU shall notify the PMU. PMU shall coordinate with HCPOP for custodial review, Endorsement, and transfer as appropriate.

2. HCPOP will treat these LOC changes in the same manner as an initial referral to an ICF or Acute program.

**Signature**

PAMELA AHLIN
Director
Department of State Hospitals

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services
California Department of Corrections
and Rehabilitation