1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2

3    Ralph Coleman, et al.,
            Plaintiffs,
4                                       Sacramento, California
     vs.                                No. 2:90-cv-00520
5                                       Fri., Sep. 29, 2023
     Gavin Newsom, et al.,              10:09 a.m.
6           Defendants.
     _____/
7

8                         TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
9                             ---oOo---

     APPEARANCES:
10

11     For the Plaintiffs:            Rosen, Bien, Galvan and
                                      Grunfeld, LLP
12                                    101 Mission Street
                                      Sixth Floor
13                                    San Francisco, CA  94105
                                      By:  Ernest Galvan
14                                    Michael Bien
                                      Jenny Snay Yelin
15                                    Lisa Adrienne Ells
                                      Alexander Ross Gourse
16                                    Adrienne Pon Harrold
                                      Attorneys at Law

17

18     For the Defendants:           Hanson Bridgett, LLP
                                      1676 N. California Blvd.
19                                    Suite 620
                                      Walnut Creek, CA  94596
20                                    By: Paul B. Mello
                                      Laurel O'Conner,
21                                    Attorneys at Law
     (Appearances continued on following page)

22     Official Court Reporter:      Kimberly M. Bennett,
                                      CSR, RPR, RMR, CRR
23                                    501 I Street
                                      Sacramento, CA 95814
24

       Proceedings recorded by mechanical stenography, transcript
25     produced by computer-aided transcription

```
 1                          APPEARANCES CONTINUED

 2      For the Plaintiffs:            Prison Law Office
                                       1917 Fifth Street
 3                                     Berkeley, CA  94710
                                       By: Marissa Hatton
 4                                     Attorney at Law

 5
        For the Defendants:           Hanson Bridgett, LLP
 6                                     425 Market Street, 26th Floor
                                       San Francisco, CA  94105
 7                                     By: Samantha Derin Wolff
                                       Lawrence Michael Cirelli
 8                                     Attorneys at Law

 9      For the Defendants:           Office of the Attorney
                                       General
10                                     1300 I Street, Suite 125
                                       Sacramento, CA  94244
11                                     By: Elise Owens Thorn
                                       Deputy Attorney General
12

13      For the Defendants:           Office of the Attorney
                                       General
14                                     455 Golden Gate Ave.
                                       Suite 11000
15                                     San Francisco, CA  94102
                                       By: Damon Grant McClain
16                                     Namrata Kotwani
                                       Deputies Attorney General
17

18

19

20

21

22

23

24

25
```

1                              INDEX

2

     WITNESS:                                          PAGE:

3

     ERICA GREULICH

4    DIRECT EXAMINATION BY MR. CIRELLI................... 31
     CROSS-EXAMINATION BY MS. HATTON..................... 154

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Call to order of the court, 10:09 a.m.)

2            THE CLERK:  Calling civil case 90-520, Coleman, et

3    al. versus Newsom, et al.

4       This is on for an enforcement hearing.

5            THE COURT:  All right.  Appearances, please, for

6    Plaintiffs.

7            MR. GALVAN:  Good morning, Your Honor.  Ernest Galvan

8    from Rosen, Bien, Galvan, & Grunfeld for the Plaintiff Class.

9       With me from my firm are Michael Bien, Lisa Ells, Jenny

10   Yelin, Alex Gourse, and Adrienne Harrold.  And from the Prison

11   Law Office, Marissa Hatton.

12           THE COURT:  Good morning to you all.

13      And for the Defense.

14           MR. MELLO:  Good morning, Your Honor.  Paul Mello for

15   Defendants from Hanson Bridgett, along with Samantha Wolff,

16   Larry Cirelli, Laurel O'Connor.  And from the AG's office,

17   Damon McClain, Namrata Kotwani, and Elise Thorn.  Good morning.

18           THE COURT:  Good morning to you all.

19      All right.  This is on for enforcement proceedings.  I just

20   want to frame these, but first a bit of housekeeping, and then

21   we'll turn to additional housekeeping.

22      Ms. Schultz, the courtroom deputy, has informed the Court

23   that there are certain members of the media who asked if they

24   could record the proceedings for the purposes of note taking.

25   And so the Court's tentative response was, as I've done, I

1   believe, at least once before, that if devices are in airplane

2   mode, the recording is solely for the purposes of note taking,

3   there is no replaying apart from the person who is recording

4   for their own purposes -- reporting purposes, no replaying of

5   the recording, no broadcasting, and the recording is destroyed

6   as soon as the journalistic product is created, that I would

7   approve that, subject to telling the parties first and allowing

8   them to express any position they may have.

9        Mr. Galvan, any comment about that?

10           MR. GALVAN:  No concerns or objections, Your Honor.

11           THE COURT:  Mr. Mello?

12           MR. MELLO:  No, Your Honor.

13           THE COURT:  All right.  Then for -- I don't recognize

14   you.  If there is any member of the media who has made that

15   request, those are the conditions of any recording.  They must

16   be observed scrupulously.  Any violation would be a violation

17   of a court order.

18       Before we turn to additional housekeeping, we're beginning

19   with the question of the staffing remedy in this long-running

20   case.  Just to frame this, the parties know this, the Court, of

21   course, has been aware of it, but for focusing purposes, I just

22   want to very briefly review the relevant chronology here,

23   because staffing has long impeded full compliance with the

24   Coleman remedy.

25       It was actually first in 1999 that the Court -- a prior

1    judge of this court, but the Court ordered a reduction in

2    staffing vacancies, more complete staffing.

3        The Court made an additional order in 2000 -- August

4    of 2000.

5        In April of 2001, the Court specifically ordered the

6    reduction of staffing vacancies.

7        In June of 2002, the Court established maximum vacancy

8    rates.  Specifically, June 13, 2002, set a 10 percent maximum

9    vacancy rate.

10       The Court, in a June 2009 order, directed the Defendants to

11   continue to take all steps necessary to resolve all outstanding

12   staffing issues, staffing allocation issues, and directed

13   Defendants to prepare their own staffing plan.

14       In September of 2009, the Defendants filed their staffing

15   plan.  And it is that plan that has been part of the remedy in

16   this case.

17       In 2017, the Court specifically ordered, after long periods

18   of noncompliance with the full plan, occasional periods of

19   compliance with portions.  In 2017, October 10, 2017,

20   specifically, the Court ordered that within one year of that

21   date, the Defendants should take all steps necessary to come

22   into complete compliance with the staffing ratios in their 2009

23   Staffing Plan and the maximum 10 percent vacancy rate required

24   by the Court's June 13, 2002, order.

25       The Court had intended to proceed with enforcement

1    proceedings earlier than now, but COVID intervened.  We are now

2    over the emergency created by the pandemic and are living with

3    COVID, and so the Court has now convened this proceeding today.

4    It did so only after, earlier this year, ordering the

5    Defendants to provide reports for the Court to assess what

6    proposed penalties would look like if there were not full

7    compliance.  The Court, in February, established a three-year

8    period -- a three-month period for reporting in order to

9    determine whether or not this kind of proceeding was really

10   needed.  After three months, the Court determined, in fact,

11   that it was time to finally convene these proceedings.

12       That's a summary of the chronology that has brought us here

13   today.  So before we begin with the parties' presentation of

14   evidence, just a few questions.  One is substantive.

15       And just so I'm clear, given the parties' stipulation

16   regarding the numbers relevant to compliance and the order of

17   evidence here, my understanding is that Defendants concede that

18   the record establishes they are not in compliance.  The

19   question is are there defenses that excuse full compliance.

20       Do I have that right, Mr. Mello?

21           MR. MELLO:  So there is quite a bit to unpack there.

22   Defendants are in compliance or substantially compliant with

23   aspects of the 2009 Staffing Plan --

24           THE COURT:  Let's just talk about -- don't introduce

25   substantial compliance.  Just talk about compliance.

1            MR. MELLO:  I don't think they're divorced from one

2    another.

3            THE COURT:  I understand that's your position.

4            MR. MELLO:  Okay.

5            THE COURT:  I read your brief.  I understand that

6    position.

7            MR. MELLO:  Okay.  So, again, I think that the record

8    demonstrates that they are in compliance with certain

9    classifications during -- relating to the 2009 Staffing Plan

10   and that they are not in compliance with other classifications

11   and that it varied over time, and it even varies since February

12   of this year.

13           THE COURT:  All right.  Anything to say about that,

14   Mr. Galvan, that response?

15           MR. GALVAN:  That -- that response, I think, does

16   concede that as to certain categories of professionals for

17   certain time periods the Defendants are out of compliance.

18           THE COURT:  In terms of the order of evidence, the

19   Defendants are not suggesting the Plaintiffs need to meet some

20   initial burden before the burden shifts to the Defense,

21   correct?

22           MR. MELLO:  With respect to those classifications

23   that Defendants were not in compliance -- and, again, I won't

24   repeat substantial compliance -- I believe that that is

25   correct; we have to prove our defenses.  And compliance is

1   vastly different than contempt.  But yes, Your Honor, I believe

2   that it is our burden to prove up our defenses.

3          THE COURT:  All right.  At one point in a Defense

4   brief, the Defendant suggests -- I'm paraphrasing here -- but

5   that the Court has closed the door on telepsychiatry or

6   expansion of telepsychiatry or telemental health.  That is

7   patently not true.  I won't say more at this point.

8          MR. MELLO:  May I respond, Your Honor?

9          THE COURT:  Well, the Court has approved a

10  telepsychiatry policy.  I realize the Defense introduced what

11  they're referring to as a telemental health policy.  The Court

12  has not been asked to consider that, and the Court has not been

13  asked to make any further decisions regarding telepsychiatry,

14  correct?

15         MR. MELLO:  The Court imposed limitations on

16  Defense -- Defendants' requested expansion of telepsychiatry.

17  The Court issued an order that did not go as broadly

18  as limiting Defendants' use of telepsychiatry.

19         THE COURT:  I did not slam the door on anything

20  further, correct?

21         MR. MELLO:  With respect to telepsychiatry, other

22  than those limitations that are in the current policy, that is

23  not the policy that Defendants requested; that is correct.

24  And, of course, that issue is also on appeal, Your Honor.

25         THE COURT:  Correct.  But, just so it's clear, this

1   Court has not slammed the door on telepsychiatry, on

2   telehealth.

3               MR. MELLO:  I -- I don't need to repeat myself.  I

4   agree, Your Honor.

5               THE COURT:  All right.  I had asked for expert

6   reports so that I had paper copies of those reports.  I have

7   received a Redweld, a folder, that does contain the Plaintiffs'

8   expert report for Dr. Brown, I believe.

9       Is that correct, Mr. Galvan, I have --

10              MR. GALVAN:  Yes, Your Honor.

11              THE COURT:  All right.  I don't believe I received

12  the Defense' expert's report.  That is there?

13              MR. MELLO:  I can provide that if you would like,

14  Your Honor.

15              THE COURT:  If you can hand that up to Ms. Schultz,

16  please.  There are three copies there?

17              MR. MELLO:  Yes.

18              THE COURT:  All right.  I was pointed to some

19  deposition testimony, but that's not the same as an expert

20  report, so I haven't considered any deposition testimony.

21      All right.  Thank you for those.

22      The parties have seen the Court's determination on a

23  technical advisor.  I sustained the Defendants' objection to

24  the initial advisor the Court had contemplated in terms of

25  efficiency.  The Court continues to seek a technical advisor.

1    I will keep the parties apprised.  I believe it may well be

2    that I identify someone that would be available to the Court

3    based on the record that is created.  The parties will be kept

4    apprised and be aware of all communications.  The Court had no

5    communications with Dr. Steward, just so that is clear.

6        In terms of motions in limine, there is one Defense motion

7    I have not resolved.  It appears to the Court that that motion

8    is simply reminding the Court of its ongoing obligation to be

9    alert to objections during expert testimony in case the Defense

10   believes the Defense' expert -- the Plaintiffs' expert is going

11   outside the bounds of what that expert has opined.

12       Do I have that right?

13           MR. MELLO:  Yeah.  I think it's a pretty standard

14   motion in limine filed in court with respect to limiting

15   experts' testimony to opinions that were provided.  But I think

16   that's correct, Your Honor.

17           THE COURT:  So I'm not acting on that motion.  I'll

18   remain alert to objections.

19       In terms of Plaintiffs' motion in limine filed last evening

20   regarding the Defense' expert's demonstrative, the Court has

21   not seen the demonstrative.

22       What's the Defense' response to that motion in limine?

23           MR. MELLO:  I'm going to pass to Mr. Cirelli, Your

24   Honor.

25           THE COURT:  All right.

1              MR. CIRELLI:  Your Honor, I have copies of the

2      demonstrative printed out, if Your Honor would like them.

3              THE COURT:  I'm not going to look at them subject to

4      my resolution of the motion.

5          So what's your response to the substance of the Plaintiffs'

6      motion?

7              MR. CIRELLI:  My response, Your Honor, is there is no

8      attempt -- the Plaintiffs' motion is based on their argument

9      that we, in essence, were holding this back and sandbagging

10     them, which is not the case.  The report was finalized

11     yesterday afternoon by Dr. Greulich and by Dr. Dutra, who are

12     the two economists who prepared the report.

13             THE COURT:  The primary report?

14             MR. CIRELLI:  Yes, they prepared the primary report,

15     and they prepared the demonstrative.

16             THE COURT:  Did the Plaintiffs only receive a final

17     expert's report yesterday, Mr. --

18             MR. CIRELLI:  No.  No.  I'm sorry, Your Honor.  I

19     misspoke.

20             THE COURT:  All right.

21             MR. CIRELLI:  The report -- Dr. Greulich and

22     Dr. Dutra prepared the demonstrative, which is based on the

23     report that the two of them prepared.  The report itself was

24     produced on August 31st as required.

25             THE COURT:  And has been subject to deposition?

1            MR. CIRELLI:  Exactly, Your Honor.

2            THE COURT:  Well, is any part of the demonstrative --

3    does it simply reproduce portions of what is in the report?

4            MR. CIRELLI:  Yes, Your Honor.  It -- the attempt

5    with the demonstrative is to assist in --

6            THE COURT:  I understand demonstratives.

7    Demonstratives aren't evidence.  I understand.  But it sounds

8    as if it's quite substantial.  So what portion of the

9    demonstrative is simply lifting information from the expert's

10   report previously disclosed and displaying it in a way to

11   provide a visual, to the extent the Court needs a visual?

12           MR. CIRELLI:  The vast majority of it is pulled from

13   the report itself.  So there are --

14           THE COURT:  So it's verbatim excerpts of text or any

15   graphics?

16           MR. CIRELLI:  There are -- there is text that is not

17   verbatim from the report.  It's an effort to simplify what is a

18   136-page report and distill it down to the essential components

19   of that report.

20       The figures and charts that are in the demonstrative all

21   come from the report itself with one exception.  There is a bar

22   graph that is on page 31 of the -- of the demonstrative that is

23   based on data that is in the reported Table 2, and it's taking

24   that data and putting it into a bar form.

25       With the exception of that one bar graph, all other charts

1   and graphs in the demonstrative come from the report.

2       The other --

3               THE COURT:  Verbatim?  Verbatim?

4               MR. CIRELLI:  The charts are verbatim, yes.

5               THE COURT:  And with cites so the Court can confirm

6   that independently if need be?

7               MR. CIRELLI:  Yes, I believe so, Your Honor.  I

8   didn't prepare the demonstrative, but, yes, I believe that

9   Dr. Greulich and Dr. Dutra, when they were able to, put cites

10  specifying which pages certain information is coming from from

11  the report.

12              THE COURT:  So let me ask, Mr. Galvan, recognizing

13  you got this at 4:30 last evening on the eve of a substantial

14  proceeding, do you have any response to what you've just heard?

15  Are you able to confirm that characterization of the

16  demonstrative?

17              MR. GALVAN:  Your Honor, we did not stop our other

18  work last night to try to confirm every single page.  The bar

19  graph on page 31 certainly jumped out to us as new material.

20  The pullout quotes from the academic literature, I do not

21  believe were in the report.

22      I think counsel's calling it a report at first is rather

23  significant, because it's -- it's unlike a regular

24  demonstrative; it's like a new report.  Apparently, someone was

25  not satisfied with the length or presentation of the old report

1    and wants to put in a new report, and it's way past the time

2    for that.  And 4:30 at night the day before trial is -- in the

3    afternoon, day before trial, does not give us any time to

4    digest that report.

5        So at a minimum, that bar graph on page 31 should not be

6    used.  And I'm not in a position to identify right now what

7    else is new there.

8            MR. CIRELLI:  Your Honor, if I may.  I had not

9    finished what is new that's in the demonstrative that was not

10   in the report.

11       Mr. Galvan is correct.  There are -- in the demonstrative,

12   there are quotes from certain of the source material that

13   Dr. Greulich and Dr. Dutra relied upon for their opinion with

14   respect to whether there is a labor shortage or not.  And so

15   all of the articles and source material that are cited in the

16   demonstrative are from the report, they are in the report as

17   well, but not all of the quotes are produced in the report that

18   are on the demonstrative.

19       There are also some slides, primarily at the end, that

20   address Dr. Greulich's criticisms of Dr. Brown's testimony at

21   deposition and of his report and responding to some of

22   Dr. Brown's criticisms of Dr. Greulich, which are not in the

23   August 31st report, because, obviously, none of that was known

24   at the time until the reports -- after the reports were

25   produced and the depositions were taken.

1                    MR. GALVAN:  If I may, Your Honor?

2                    THE COURT:  Well --

3                    MR. GALVAN:  May I?

4                    THE COURT:  Yes.  On the last point?

5                    MR. GALVAN:  Yes, on the last point.

6                    THE COURT:  All right.

7                    MR. GALVAN:  That is a new report.  That's a new

8      report attacking Dr. Brown that we've never seen before.

9      They've had Dr. Brown's report since August 31st.  If they

10     wanted to do a rebuttal report, they could have asked this

11     Court for leave or simply done it.  To do a rebuttal report

12     now, 4:30 the day before Dr. Greulich's testimony, when we have

13     no opportunity to test her methods in the rebuttal report, is

14     completely unfair.

15                    THE COURT:  Why is that not a rebuttal report, that

16     portion of the demonstrative?

17                    MR. CIRELLI:  It is not a rebuttal report.  It is

18     just bullet points of some of the issues that Dr. Greulich has

19     with Dr. Brown's opinions.  And she was asked during her

20     deposition, at the end of the deposition, by Plaintiffs'

21     counsel whether she has any criticisms at that time of

22     Dr. Brown's work and was examined on that issue.  And there is

23     about six or seven pages, I think, of testimony where

24     Dr. Greulich spells out what, based on the information she had

25     at that point -- and her deposition was taken the day before

1   Dr. Brown's, so his deposition had not yet been taken -- but

2   based on the information that she had at that point, she did

3   answer questions with respect to any criticisms or differences

4   of opinion that she had with Dr. Brown.

5            THE COURT:  All right.  On the demonstrative, without

6   prejudging any objections made during the witness' testimony,

7   but I am granting the Plaintiffs' motion.  It's not consistent

8   with principles of fair play to provide such a demonstrative,

9   based on the characterizations provided here by the record, at

10  4:30 the day before the hearing.

11     I do have the expert's report now.  I can easily flip to a

12  page and look at graphics and text, and so I'll be prepared to

13  do that, and I will be prepared to rule upon objections as we

14  proceed.

15     Are there any other motions in limine to resolve,

16  Mr. Galvan?

17            MR. GALVAN:  We have a request, Your Honor.  It's not

18  a motion in limine.  It's just a request that we -- that the

19  Court exclude witnesses until they've testified under Federal

20  Rule of Evidence 615.

21            THE COURT:  Is that a joint request, Mr. Mello?

22            MR. MELLO:  Does that -- does that request also

23  include named Defendants?

24            THE COURT:  Mr. Galvan?

25            MR. GALVAN:  I think it -- in fairness to -- because

1    their primary witness, Dr. Mehta, may be a named Defendant.

2              THE COURT:  Is there any Defense representative that

3    Plaintiffs would agree to remaining in the courtroom?

4              MR. GALVAN:  The ones who are not testifying, Your

5    Honor.

6              THE COURT:  All right.  So I'll grant that motion.

7              MR. MELLO:  Okay.

8              THE COURT:  Testifying witnesses should be excluded

9    until they have completed testimony and are excused -- finally

10   excused.

11       All right.  Any other motions in limine, Mr. Galvan?

12             MR. GALVAN:  No, Your Honor.

13             THE COURT:  Mr. Mello?

14             MR. MELLO:  No.

15             THE COURT:  Just to confirm the schedule, the Court

16   plans to go until 5:00 p.m. on the days that we have set for

17   hearing.  That includes today, Tuesday through Friday of next

18   week.  Next week we will begin at 9:00 a.m. each day.  If

19   needed, we'll continue on October 10th and 11th.  On the 10th

20   and 11th, I may need some specified break times.  I'll share

21   with the parties as we get closer.  Otherwise, we'll take

22   normal breaks, which means about every hour and a half, we'll

23   take a break.  And we'll take some kind of lunch break; it may

24   not be a full hour.  I'll check with you, when we take our

25   lunch breaks, to see if you need more than, say, 45 minutes.

1          Is there anything else before we begin, Mr. Galvan?

2                MR. GALVAN:  No, Your Honor.

3                THE COURT:  Mr. Mello?

4                MR. MELLO:  No, Your Honor.

5                THE COURT:  All right.  Then the Defense may call its

6     first witness.

7                MR. MELLO:  Your Honor, are there opening statements?

8                THE COURT:  That's right.  I gave you ten minutes in

9     addition to the briefs.

10               MR. MELLO:  Right.

11               THE COURT:  All right.  You may have your ten

12    minutes.

13               MR. MELLO:  Would you like us at the lectern for

14    opening statement?

15               THE COURT:  Whatever is most comfortable for you.

16               MR. MELLO:  I'm happy here, if that's okay with Your

17    Honor.

18               THE COURT:  Does that work for you, Mr. Galvan, to

19    make your statement from the table?

20               MR. GALVAN:  Yes, Your Honor.

21               THE COURT:  All right.  All right, Mr. Mello.

22                    OPENING STATEMENT BY MR. MELLO

23               MR. MELLO:  Good morning.  We are here today to

24    determine whether failure to comply with the Court's 90 percent

25    fill rate requirement is the stuff of civil contempt.

1    In 2017, the Court ordered CDCR to fully implement the 2009

2    Staffing Plan and to attain a vacancy rate for psychiatrists

3    and case managers of no more than 10 percent.

4    The California prison system, in 2009, was in a much

5    different place.  In September 2009, the incarcerated

6    population was over 148,000, and adult institutions were at

7    186.8 percent of institutional design capacity.  15 years

8    later, the landscape looks much different.  The adult

9    institution population is now down to less than 92,000, and the

10   institutional design capacity was at 118.9 percent on

11   September 15, 2023.

12   Unlike 2009, the state now annually funds and allocates

13   positions, and CDCR has and continues to raise salaries, hire

14   registry, increase registry rates, and implement creative

15   programs like telehealth to recruit and retain mental health

16   staff.  There is no dispute that these efforts have resulted in

17   actual and substantial compliance with the Court's 90 percent

18   fill rate requirement for some of the classifications covered

19   by the staffing plan over time.  But it is also important to

20   acknowledge the headwind CDCR is facing as it attempts to

21   comply with the Court's 90 percent fill rate requirement.

22   There is a nationwide shortage of mental health staff.  We

23   are also emerging from a global pandemic that shifted workers'

24   expectations and priorities, challenging the methods previously

25   relied upon to attract and retain psychiatrists, psychologists,

1    social workers, recreational therapists, and medical

2    assistants.  This is all to say that labor market conditions

3    are not static.  They are not the same as they were in 2009,

4    before the outset of the pandemic, or what they were just a

5    year or two ago.

6        In simple terms, the state's challenges meeting the Court's

7    90 percent fill rate requirement have changed over time.  The

8    evidence will show that for Defendant -- for years, Defendant

9    struggled to meet the 90 percent fill rate requirement for

10   psychiatrists but had sustained success filling most of the

11   other classifications at issue.  Recently, that has changed,

12   and CDCR has substantially complied, met, or exceeded the 90

13   percent fill rate for psychiatrists and rec therapists but

14   struggles to fill the psychologist, social worker, and medical

15   assistant classifications to the 90 percent fill rate

16   requirement.

17       Despite these changes and prevailing labor market

18   conditions, the evidence will show that CDCR has taken all

19   reasonable measures to meet mandated fill rates among the five

20   classifications of mental health providers at issue.  To be

21   clear, Defendants are not suggesting that impossibility is a

22   defense to their Eighth Amendment obligations to the patient

23   class, but, importantly, it is a defense to civil contempt.

24   And -- it is a defense to civil contempt.  And the

25   impossibility of the labor market conditions Defendants face is

1    a defense to any civil contempt finding here.

2        Despite labor market rate realities, Defendants have not

3    stood still.  They have engaged in all reasonable efforts to

4    meet the 90 percent fill rate requirement for the

5    classification at issue.  Defendants do not have to take all

6    steps; they do not have to take unreasonable steps or

7    impossible steps.  Defendants must take all reasonable steps

8    within the system's rules and laws in which they operate.

9        Plaintiffs' labor economist is expected to offer testimony

10   that Defendants could possibly staff psychiatrists,

11   psychologists, and social workers to 90 percent fill rate if

12   they just implemented wage increases in the neighborhood of 57

13   percent to 285 percent.  On its face, these increases are not

14   reasonable.

15       The evidence will show that recruitment and retention are

16   complex issues, not easily resolved by one solution.

17   Defendants do not dispute that salary and financial incentives

18   are an important component, or that it is almost universally

19   true that people would prefer to make more as opposed to less

20   money, or that caring health care leaders want to pay their

21   dedicated staff more.

22       But money is not the only factor at play, and recruitment

23   and retention are driven by a number of other factors,

24   including retirement, benefits, commute, quality of life,

25   opportunity to telework, and job security, among other things.

 1    If money were truly the only consideration, then one would

 2    expect all CDCR's positions would be easily filled with

 3    registry providers who can earn more than civil service

 4    employees.

 5        Nonetheless, just a month ago -- just this month, the state

 6    committed to raise the salaries for each of the classifications

 7    that are the subject of this proceeding via new collective

 8    bargaining agreements.  These collective bargaining agreements

 9    were negotiated by union leadership -- union leadership

10    selected by their members -- were overwhelmingly approved by

11    union members, ratified by the legislature, and signed into law

12    by the governor.

13        This is actually consistent with what we believe

14    Plaintiffs' expert, Dr. Brown, will testify to, the suggestion

15    that fill rates of 90 percent or higher are best achieved

16    through some process of trial and error.  This is exactly what

17    Defendants have done and are doing.  They have increased

18    registry rates, provided recruitment and retention bonuses, and

19    have recently negotiated compensation and benefit packages

20    increases for each of the classifications at issue, pursuant to

21    those collective bargaining agreements recently.  And they

22    continue to evaluate each of these things to say what is

23    working and what needs to be improved.

24        In addition, and despite some resistance, Defendants have

25    and continue to work to quickly implement telepsychology and

1   telesocial work in a further effort to recruit staff who would

2   otherwise not consider working on-site in institutions and in

3   keeping with changing community standards and provider

4   expectations.  This new telemental health program capitalizes

5   on the lessons learned and the successes of CDCR's

6   telepsychiatry program.  These developments add to the state's

7   significant and ongoing efforts to improve recruitment and

8   retention among the classifications at issue at a time of

9   national scarcity of these positions.

10      And when those efforts fall short and line staff positions

11  become vacant because of increased allocations, resignations,

12  retirements, terminations, or extended leave, CDCR uses every

13  effort to fill those positions using registry staff to ensure

14  patients are receiving access to care and as a bridge to hiring

15  civil servant staff.

16      The evidence will show that in the last two years -- fiscal

17  years, CDCR has spent nearly 65 million and 80 million

18  respectively solely on registry -- mental health care registry

19  staff.  Of course, registry staff providers are not immune from

20  the reality of the labor market and cannot always fill

21  requested registry positions.  But that impossibility of the

22  labor market does not transform Defendants' multilayer

23  reasonable efforts into contemptible conduct.

24      In closing, the evidence will show that CDCR does not staff

25  in a vacuum.  They are not immune from market pressures.  It

1    will show that CDCR has had sustained periods of satisfying or

2    being substantially compliant with the 90 percent fill rate

3    requirement in some of the classifications but that labor

4    markets ebb and flow.

5        The evidence will show that CDCR offers compensation

6    packages that appear to exceed state and national averages;

7    that they are engaged -- engaging in targeted, and have engaged

8    in targeted, recruitment activities; that they have and are

9    working to streamline hiring practices; and that they have

10   embraced modern health care solutions of telepsychiatry and are

11   expanding telemental health.

12       As I said at the beginning, this is not the stuff of a

13   finding of civil coercive contempt, and the Defendants are

14   confident the Court will weigh the evidence, show fidelity to

15   the law, and decide in their favor.

16       Thank you, Your Honor.

17            THE COURT:  All right.  That concludes the Defense'

18   opening.

19       Just -- just to address one thing, saying "90 percent fill

20   rate" repeatedly does not amend the court order.  It's a 100

21   percent fill rate with an allowable vacancy rate.

22       Mr. Galvan.

23            OPENING STATEMENT BY MR. GLAVAN

24            MR. GALVAN:  Thank you, Your Honor.

25       The elements of contempt are a specific and definite order

 1   and a violation, and those are established here, so the burden

 2   now has shifted to CDCR to prove a defense.  So I'd like to go

 3   over the defenses.

 4       Defense number one:  They say that for some positions, they

 5   have been in compliance for some months and some -- at some

 6   professions.  That just goes to the size of the sanction, and

 7   the formula for calculating the sanction already gives them

 8   full credit for when they've met the 10 percent vacancy limit

 9   for a category.  That number is already baked in.

10       There seems to be a defense one and a half now, which is

11   that the system is not as crowded as it was in 2009, that the

12   population is down.  Similarly, the staffing requirement is

13   constantly adjusted.  It's adjusted twice a year, in January

14   and July, to take into account a drop in population or a rise

15   in population.  And so the crowding element is not a defense

16   either.

17       Defense two is it is substantial requirement -- substantial

18   compliance, that there is some -- some vacancy rate above 10

19   percent that is substantially compliant.  That seems to just be

20   a legal question, and it shouldn't take any trial time.

21       Defense three is that compliance is impossible in the

22   current labor market.  There will be two experts testifying,

23   our expert labor economist, Dr. Brown, and theirs,

24   Dr. Greulich.  They disagree on many things, but they agree

25   that filling vacancies is not impossible.  They took different

1    approaches to studying the question, but neither came up with a

2    conclusion that it's impossible.

3         Dr. Greulich's approach is retrospective; she measured the

4    pay premiums that CDCR has applied in the past and has

5    concluded that the fill rate was not responsive statistically

6    to those premiums.  That just proves that what they've tried so

7    far hasn't worked, and that's why we're here.

8         The Plaintiffs' expert, Dr. Brown, addressed the question

9    that's before us, whether it's possible to attract clinicians

10   by doing something different.  The answer to that is yes, but

11   it's only going to work if Defendants stop doing business as

12   usual.  Fixing the problem is not impossible.

13        On the medical side of the system, there used to be vacancy

14   rates just like what we're seeing here in the mental health

15   side, but CDCR and the Plata Receiver have brought the staffing

16   levels up and kept them there, and that's true after COVID.

17   The most recent -- the evidence will include the most recent

18   medical site staffing levels, which are compliant, with few

19   exceptions, after COVID.  So it's not impossible for CDCR to

20   comply.

21        Defense number four is they've taken all reasonable steps.

22   They have not.  They've just done business as usual.  Business

23   as usual means not taking a harder look at compensation.  It

24   means using small salary hikes that don't keep up even with

25   inflation over the last three years, which has been quite high.

1   It means a recruitment process that's full of bureaucratic

2   delays that they're doing nothing to change, and that makes

3   them lose candidates to other employers.  It means not

4   addressing bad working conditions that cause clinicians to

5   leave.  And business as usual means not listening to the

6   frontline managers on what they need to fill the jobs.

7        The frontline managers know that they're not getting enough

8   applicants, and they're not getting offers accepted that they

9   make.  They know they're losing these applicants for a number

10  of reasons.  First and foremost, they know that, although CDCR

11  salaries have risen, private sector salaries have risen more.

12  They know that they're losing candidates to Kaiser because CDCR

13  is not competitive.  They know that the pension benefits that

14  used to attract people to state service and made up for a

15  difference in salary don't attract them anymore because of

16  pension reform.  They know that CDCR made a mistake when they

17  gave a 15 percent raise to the inpatient clinicians without

18  also giving it to the outpatient clinicians.  They've told

19  headquarters about these problems, and headquarters hasn't done

20  enough to address them.  They haven't taken all reasonable

21  measures.

22       Let me address the size of the sanctions.  For the period

23  from February through July, they're about 42.1 million, and a

24  report was filed yesterday that would make them higher.

25  They're accumulating at about $7 million per month, and that's

1    based on double the state salary savings for each unfilled

2    position below 90 percent compliance.  There are no fines for

3    the unfilled positions up to the 10 percent vacancy level.

4        These fines are properly set to motivate Defendants to fill

5    the positions.  They're in line with the undisputed amounts

6    that the state has saved by not filling them.  There is no

7    dollar value that could compensate the Coleman Class for the

8    harms of an understaffed medical system.  The $42.1 million

9    divided by 33,000 class members would be about $1,300 per class

10   member.  That's a modest sum, and it's a good indicator that

11   the salary method that the Court has chosen is reasonable and

12   conservative.  And the size of the proposed fines is

13   commensurate with the harm caused by the violations.

14       The mental health system that's operating in many

15   California prisons today is not the one described in the

16   Program Guide.  In the Program Guide system, patients in the

17   enhanced outpatient program are supposed to see their primary

18   clinicians once a week.  They're supposed to be offered group

19   treatment.  The system as it works now in some prisons, EOP

20   patients see their primary clinicians once a month, or they see

21   them only in large clinician groups rather than one-on-one

22   appointments.  And the core clinical group treatment is just

23   disappearing from the system.  It's being replaced by

24   recreational groups, which means basically sitting around

25   watching a video.

1          In the lower level of care, the CCCMS, the primary

2     clinicians are supposed to have caseloads of fewer than a

3     hundred patients, but today, the CCCMS caseloads run as high as

4     300 to 500 patients per clinician in some prisons.  The mental

5     health chiefs that we deposed talked about triaging care.  They

6     have to choose what services they can deliver based on the

7     limited staff they have.  They have to decide which Program

8     Guide requirements to violate, because they don't have enough

9     staff to do them all.

10         The staffing crisis increases the harm that it causes by

11    feeding on itself.  Clinicians don't want to work in an

12    understaffed system.  They worry that their patients will get

13    sicker despite their best efforts to fill the gaps.  They feel

14    burdened by impossibly high caseloads and unsupported by

15    leadership, so they quit, and that just makes it worse.

16    Staffing has to be brought into compliance, or it will keep

17    spiraling downward.

18         We ask that the Court impose the fines for the period from

19    February through July 2023 and that, after imposing them,

20    further briefing be ordered on how the funds can be used to

21    benefit the Coleman class.

22         Thank you, Your Honor.

23              THE COURT:  All right.  That concludes the

24    Plaintiffs' opening.

25         And now the Defense may begin with its presentation of

1    evidence.

2              MR. CIRELLI:  Good morning, Your Honor.  At this

3    time, we will call Dr. Erica Greulich.

4              THE COURT:  All right.

5              MR. CIRELLI:  Would you like me to question from the

6    podium?

7              THE COURT:  I think that makes sense for the court

8    reporter's purpose, certainly.

9         The witness may come forward.

10             THE CLERK:  Dr. Greulich, please step into the

11   witness stand and remain standing.

12        Please raise your right hand.

13        (The Witness, Erica Greulich, is sworn.)

14             THE WITNESS:  I do.

15             THE CLERK:  Thank you.  You may be seated.

16        Will you please say and spell your first and last name for

17   the record.

18             THE WITNESS:  Erica, E-R-I-C-A, Greulich,

19   G-R-E-U-L-I-C-H.

20             THE COURT:  You may proceed.

21                         DIRECT EXAMINATION

22   BY MR. CIRELLI:

23   Q.  Good morning, Dr. Greulich.

24   A.  Good morning.

25   Q.  By whom are you currently employed?

1    A.   My employer is Secretariat Economists.

2    Q.   And what is the nature of Secretariat Economists' business?

3    A.   Secretariat Economists is a consulting firm.  It is an

4    entity that's owned by a larger consulting firm called

5    Secretariat.  Secretariat Economists specifically focuses on

6    economic consulting, frequently in the context of litigation,

7    some advisory work as well.

8    Q.   And what is your profession?

9    A.   I am an economist.

10   Q.   And in the area of economics, are there different fields of

11   economics?

12   A.   Yes.

13   Q.   What are those fields?

14   A.   There is --

15   Q.   Unless they're too numerous to name.

16   A.   I -- there are multiple fields.  I don't know if they're

17   too numerous to name, but, you know, some of them would include

18   labor economics -- which is my field of study -- or was my

19   field of study, is my field of employment -- public finance;

20   industrial organization; health economics; transportation

21   economics; urban economics; macroeconomics; econometrics, which

22   is the study of statistics as applied to economic issues;

23   international economics; finance.  Those are the ones that

24   occur to me off the top of my head.

25   Q.   And which field do you specialize in?

 1   A.   I specialize in labor economics.

 2   Q.   And can you describe, just briefly, what labor economics

 3   is?

 4   A.   Labor economics is the study of -- of labor force,

 5   employment outcomes, and the incentives that cause people to

 6   supply more or less labor.

 7   Q.   Do you know if Dr. Brown, the Plaintiffs' expert, has a

 8   field of specialization in the world of economics?

 9   A.   My understanding is that Dr. Brown is a health economist.

10   Q.   Which field of economics is most relevant to the work that

11   is being done here in this case?

12   A.   For the question at hand, labor economics.

13   Q.   I'd like to talk just a little bit about your background,

14   beginning with your education post high school.

15        Can you describe for the Court your education.

16   A.   Sure.  I have a bachelor's degree in mathematics from

17   Princeton University and a PhD in economics from the University

18   of California at Berkeley.

19   Q.   And can you describe your work experience as an economist.

20   A.   Sure.  So for the past 18 years, I have been employed as a

21   consultant, first with the firm Economists Incorporated, which

22   was subsequently bought by Secretariat and became Secretariat

23   Economists.

24        My expertise involves what I would generally call

25   microeconomics, frequently involves the use of data work.  Many

1    of the cases or matters I have worked on are in the field of

2    labor and employment.  I have also done some work on antitrust

3    matters and more general cases such as breach of contract

4    matters.

5    Q.  Could you take a look at -- are the binders of exhibits up

6    by you, Doctor?

7    A.  Yes, I believe so.

8    Q.  There we go.  Could you take a look at Defendants'

9    Exhibit 5.

10       Do you recognize that document?  I'll give you a moment to

11   take a look.

12   A.  Yes.  This appears to be the report that Dr. Dutra and I

13   submitted on August 31st.

14   Q.  If you could turn to the back, to Appendix 4, I believe

15   that's where we'll find your CV, as well as the CV of

16   Dr. Dutra.  I believe yours -- if you look at the bottom

17   right-hand corner of the document, you'll see that there are

18   page numbers there.  I believe your CV begins at page 126.

19   A.  That is correct.

20   Q.  Does this CV true and accurate -- contain true and accurate

21   information as of today, other than your work on the Coleman

22   matter that we're here for today?

23   A.  Correct.  It is -- it does not include the report that we

24   submitted on August 31st or the deposition that I sat for in

25   this case, but other than that, it is current.

1    Q.   And complete and accurate as of today?

2    A.   Yes.

3    Q.   And I don't want to go through all the other categories in

4    your CV, but your CV does address your accreditations and

5    memberships, correct?

6    A.   Yes.

7    Q.   As well as honors, awards, fellowships?

8    A.   Yes.

9    Q.   Your publications?

10   A.   Yes.

11   Q.   Some reference to teaching you have done?

12   A.   I believe so.  Let me just find it.

13   Q.   I believe it's in the very first introductory paragraph.

14   A.   Correct.  It's the -- the third paragraph down, under

15   Professional Experience, yes.

16   Q.   And what is your teaching experience, just since we're

17   there?

18   A.   So in graduate school, I was a teaching assistant in the

19   courses of game theory and intermediate microeconomics for

20   undergraduates.

21   Q.   Your CV also sets out matters in which you have been

22   retained as either an expert in litigation or consultant in

23   litigation or consultant generally; is that correct, Doctor?

24   A.   Yes.

25   Q.   How would you describe the nature of the work that you have

1    performed here, in relation to this matter, that resulted in

2    your August 31, 2023, report?

3    A.  I was asked to apply analytical methods to measure

4    employment outcomes.

5    Q.  And is this the first time you've ever done that?

6    A.  No.

7    Q.  Can you ballpark on how many occasions you have applied

8    analytical methods to measure employment outcomes?

9    A.  For -- among the cases listed on my CV, I think a rough

10   estimate would be --

11   Q.  Many times?

12   A.  -- 20 to 30?  Yes.  Many times, yes.

13   Q.  And you have acted, from your CV, as an expert before?

14   A.  I have.

15   Q.  On how many occasions?

16   A.  I've submitted written testimony, reports or declarations,

17   in six matters.  And I have testified orally in one other case

18   and now in this case.

19   Q.  Have you ever testified in trial before today?

20   A.  No.  This is my first.

21   Q.  But you did do some work in the Coleman case previously,

22   correct, Doctor?

23   A.  Correct.

24   Q.  What have you done in relation to this case?

25   A.  So five years ago, a coauthor -- Dr. Fowdur -- and I

1    submitted a report regarding the labor market conditions and

2    employment outcomes for psychiatrists.

3        Dr. Fowdur and I also submitted a rebuttal report to -- to

4    a -- I believe it was a draft report submitted by Dr. Steward

5    in 2019.

6    Q.  So I'd like to turn now to your work specifically in this

7    matter as it relates to the opinions you're going to express

8    today and that you expressed in your report of August 31, 2023.

9    Okay, Doctor?

10   A.  Okay.

11   Q.  What were you asked to do in relation to this matter?

12   A.  I was asked to assess -- well, in light of labor market

13   conditions and -- and recent and current compensation levels,

14   whether the measures that CDCR has taken to enhance its -- its

15   employment and to meet Court-mandated fill rates and vacancy

16   levels, whether those have been reasonable for the five

17   classifications of mental health employees that are at issue.

18   Q.  And I see Her Honor looking at your report.  Is that

19   assignment spelled out specifically in your report?  Is it

20   included in paragraph 2 of the introduction?

21   A.  It -- yes.  It is the first sentence of paragraph 2.

22   Q.  And for the record, which Bates page number are you

23   referring to?

24   A.  It is page 7 of Defendants' Exhibit 5.

25   Q.  Thank you, Doctor.

1      So in an effort to respond to that inquiry, what did you

2    do?

3    A.   We did -- my coauthor -- Dr. Dutra -- and I took numerous

4    steps.  We did a comprehensive review of literature, which

5    included academic publications, trade press, press articles,

6    policy studies, government reports, projections, to assess

7    whether, and the extent to which, there is a labor market

8    shortage for the classifications at issue.

9    Q.   And just so the record is clear, what are the

10   classifications at issue?

11   A.   Psychiatrists, psychologists, clinical social workers,

12   recreation therapists, and medical assistants.

13   Q.   Thank you, Doctor.

14      What else did you do?

15   A.   We obtained data and information from CDCR relevant to

16   their efforts and their compensation and their staffing levels.

17   And we analyzed that data.

18      We obtained information and data from publicly-available

19   sources, such as the Bureau of Labor Statistics, the Federal

20   Bureau of Prisons, and the US Census Bureau.  And we analyzed

21   that data.

22      We conducted a statistical analysis, regression analysis,

23   using the data that we obtained from CDCR and from the

24   publicly-available data sources.

25      We reviewed certain court filings and opinions in this

1    litigation.

2       We reviewed Dr. Brown's report.  And I attended Dr. Brown's

3    deposition virtually.

4    Q.  Both of those events occurred after your report was issued

5    of August 31, 2023, correct, Doctor?

6    A.  Well, the review of Dr. Brown's report was after our report

7    was submitted, yes.  I believe they were both submitted on the

8    same date.  And his deposition was subsequent to that.

9    Q.  Anything else?

10   A.  Not that I can think of right now.

11   Q.  And, Doctor, if you go back to Exhibit 5, your report,

12   Appendix 3, which begins on Bates page 107, does that list all

13   of the materials that you relied upon that you just described

14   in categories?

15   A.  Yes.

16   Q.  And I think you said you also did a statistical analysis?

17   A.  Yes.

18   Q.  And that's called a regression analysis?

19   A.  Yes.

20   Q.  And we'll talk a little bit about what a regression

21   analysis is in a moment.

22       You've mentioned Dr. Dutra a few times.  Who is Dr. Dutra,

23   and what was her involvement in this matter?

24   A.  Dr. Dutra is a colleague of mine at Secretariat Economists.

25   She is a fellow economist.  Her background -- she has greater

1   experience on the health economics side.  And we partnered

2   to -- to do the analysis and write the report.

3   Q.  Was there any particular part of the analysis and the

4   report that one of you was responsible for versus the other, or

5   did you work together?

6   A.  No.  Everything was shared.  All of the responsibility was

7   shared.  You know, there might have been very specific little

8   pieces -- one piece of analysis that one of us took the lead on

9   as opposed to the other.  But, you know, we worked together to

10  discuss the analyses that would be done, to get those analyses

11  done, to write up the findings from our analyses, and to

12  produce the report.

13  Q.  And I think we mentioned earlier that Dr. Dutra's CV is

14  also included in Appendix 4 to Exhibit 5 that's in front of

15  you, correct?

16  A.  Yes.  It starts at page 121.

17  Q.  To your knowledge, does that accurately reflect Dr. Dutra's

18  background?

19  A.  To my under -- to my knowledge, yes.

20  Q.  Were you assisted by -- you and Dr. Dutra, by anyone else

21  in relation to the analysis you performed here and, ultimately,

22  the report that you issued?

23  A.  Yes.  There were four research -- actually, they don't call

24  them research associates anymore; they're just associates.

25  Four associates at Secretariat Economists assisted us in the --

1    in doing the analyses for the report.

2    Q.  In doing computations and doing the statistical analyses;

3    is that what you're referring to?

4    A.  Right.  So the -- our associates are, you know, essentially

5    the people who do the actual number crunching.  We just --

6    Dr. Dutra and I would provide them with direction; they would

7    go -- they would, you know, do the calculations, run the

8    computations.  They -- the -- the process for doing data work

9    at Secretariat Economists is such that every, you know, piece

10   of computations or number crunching, every piece of data

11   analysis gets done by two people independently, and then they

12   reconcile their results, their findings, against each other to

13   ensure that the -- the numbers are calculated correctly and --

14   and that the task was understood correctly.

15        Following that, Dr. Dutra and I would review their work,

16   again for accuracy and completeness and appropriateness, before

17   it would, essentially, go into our report.

18   Q.  So it sounds like from what you just described, in essence,

19   the number crunching, using your term, is, in essence, triple

20   checked; two people do it independently, check each other, and

21   then you and Dr. Dutra would look at it as well; is that

22   correct?

23   A.  In a sense.  It's kind of different levels of checking.

24   The associates will check the actual calculations against each

25   other, and then Dr. Dutra and I may go in and check some of the

1    calculations.  We won't do it as comprehensively as the

2    associates would.

3        And then we are also checking to -- to ensure that the

4    calculations that were done are appropriate, that they were the

5    right calculations to do, that they understood the question or

6    the project correctly.

7    Q.  And just so we have a complete record, what is, just in

8    general terms, the background of those four associates?  For

9    example, are they PhDs?

10   A.  No, they are folks that have a graduate -- I'm sorry -- an

11   undergraduate degree, a bachelor's degree.  They generally come

12   to us right out of college, so they might be in the first two,

13   three years of working after college.  They typically have a

14   bachelor's degree where they majored in either economics or

15   math or statistics, computer science, data science.  So a

16   very -- a technical oriented background.

17   Q.  Ballpark, Doctor, how many hours has your team spent

18   working on this matter?

19   A.  As of two days ago, we had spent more than 1100 hours.

20   Q.  How much of that time did you personally spend --

21   A.  I --

22   Q.  -- approximately?

23   A.  I've spent in excess of 300.  It's about 320 hours.

24   Q.  What about Dr. Dutra, how much time did she spend?

25   A.  She has spent in excess of 260 hours.

1    Q.  And then the remaining time to get to the 1100, which is

2    somewhere around 500 or 600 if I'm doing the math in my head

3    correctly, those hours would have been spent by the four

4    associates you just described?

5    A.  Yes.  That's correct.

6    Q.  What is your hourly rate for your work, Doctor?

7    A.  $675.

8    Q.  What is Dr. Dutra's?

9    A.  $675.

10   Q.  What are the rates that are charged for the four associates

11   that you mentioned?

12   A.  Three of the four have a billing rate of $385.  And the

13   fourth is a senior associate; she has a billing rate of 425.

14   Q.  Now, as a result of all that work, did you reach any

15   opinions in this matter?

16          MS. HATTON:  Objection, Your Honor.  The witness

17   hasn't been qualified as an expert.

18          MR. CIRELLI:  I believe --

19          THE COURT:  Are you asking for qualification?  Is

20   there some stipulation in the record you think results in the

21   need to ask?

22          MR. CIRELLI:  I remember in the old days, Your Honor,

23   that we -- we did that and requested that the witness be

24   approved as an expert, and I just went forward because that

25   practice has no longer been applied, at least in the trials

1    I've had recently.

2        But I will certainly tender Dr. Greulich as an expert in

3    labor economics.  And I think that her CV, that is part of the

4    record, and her testimony and the fact that she has already

5    worked on this matter and there's been no objection up until

6    now with respect to her credentials, that she is qualified to

7    testify as a labor economist.

8              THE COURT:  All right.  So that formal tendering is

9    made.  It can matter in case the opposing party wishes to

10   conduct voir dire.  The Court makes a final decision.

11       Do you wish to conduct voir dire?

12             MS. HATTON:  Not at this time, Your Honor, under the

13   understanding that she's being offered as an expert in labor

14   economics.

15             THE COURT:  All right.  So, agreed to that scope?

16             MS. HATTON:  Yes, Your Honor.

17             THE COURT:  All right.  And that scope is accepted?

18             MR. CIRELLI:  Yes, Your Honor.

19             THE COURT:  All right.  The request is granted.

20       You may provide your opinions, ma'am.

21             THE WITNESS:  Thank you, Your Honor.

22   Q.  MR. CIRELLI:  So as a result of all of the work you did in

23   this matter and all the analyses you did and the literature

24   review and everything that you've described, have you reached

25   any opinions in this matter?

1    A.   I have, yes.

2    Q.   And are your opinions reflected in your report, which is

3    Exhibit 5?

4    A.   They are.  Yes.

5    Q.   And is the basis for those opinions reflected in Exhibit 5?

6    A.   It -- they are, yes.

7    Q.   So what is your overriding or overarching opinion in this

8    matter?

9    A.   So the overarching opinion is that in light of labor market

10   conditions and prevailing current and -- current and recent

11   compensation levels, that CDCR has taken reasonable measures to

12   enhance employment and to meet its Court-mandated employment

13   levels and vacancy rates among the five classifications of

14   mental health employees that are at issue.

15   Q.   During the course of your work, did you discover any

16   information or data that informs or supports that opinion?

17   A.   Yes.

18   Q.   What did you discover in that regard?

19   A.   So -- well, as I mentioned earlier, one of the steps we did

20   was to conduct a rather voluminous literature review.  And

21   the -- the literature and the studies and the projections and

22   the government reports that are out there indicate that there

23   is a shortage of mental health professionals in the United

24   States and, also specifically, in California.

25   Q.   And we'll get into the specifics of what your literature

1    review revealed in that regard in a moment.

2       Were there any other pieces of information or data that you

3    discovered that informs or supports your overall opinion with

4    respect to the reasonableness of CDCR's conduct?

5    A.  Yes.  The -- the fact that -- and, you know, I can -- we

6    can show this through some of the figures in the report -- that

7    CDCR has had some degree of success in achieving lower vacancy

8    rates among the five classifications at issue between 2018 and

9    2022.

10   Q.  Any other data or information that you discovered that

11   informs or supports your opinion?

12   A.  Yes.  The fact that CDCR's increased use of telepsychiatry

13   has coincided with a reduction in the psychiatrist vacancy

14   rates at CDCR.

15   Q.  Any other data or information that informs or supports your

16   opinion with respect to the reasonableness of CDCR's conduct?

17   A.  Yes.  We -- we looked at the relative access to certain

18   classifications of mental health providers at CDCR and among

19   the general population in the state of California and observed

20   that CDCR has -- CDCR inmates have much greater access to

21   mental health professionals than does the general population in

22   California.

23           MS. HATTON:  Your Honor, I would object to the -- on

24   scope grounds for that.  And move to strike that answer.

25           THE COURT:  Response to that objection?

1              THE WITNESS:  Um --

2              THE COURT:  I'm asking Mr. Cirelli.  I'm sorry.

3              MR. CIRELLI:  That is within the scope of the type of

4    work and analyses and data that an economist, in particular a

5    labor economist such as Dr. Greulich, relies upon in analyzing

6    situations and forming opinions such as those that are before

7    you today, Your Honor.

8              THE COURT:  I'm going to let the answer stand, but

9    I'll give it due weight, given the Doctor's credentials.  I may

10   end up giving it no weight, but I'll let it stand.

11             MR. CIRELLI:  Certainly, Your Honor.

12   Q.  BY MR. CIRELLI:  Are there -- is there any other

13   information or data that you discovered in your work, in your

14   analysis, that informs or supports your opinion with respect to

15   the reasonableness of CDCR's conduct?

16   A.  Yes.  So the vacancies among the mental health

17   classifications at issue have persisted at CDCR despite the

18   fact that CDCR has paid salaries -- again, between 2018 and

19   2022 -- for those five classifications that have consistently

20   exceeded the average salaries paid to such providers in the

21   state of California and nationwide.

22   Q.  And doing that type of analysis, is that something that

23   you, as a labor economist, do as part and parcel to your work?

24   A.  Absolutely.  I mean, compensation is one of the chief

25   motivating factors of employment and employment outcomes.

1    Q.  Any other information or data that you discovered during

2    the course of your analysis and work that informs or supports

3    your opinion with respect to CDCR's conduct in staffing and

4    hiring of these mental health professionals we've been talking

5    about?

6    A.  Yes.  We did obtain information and data on certain other

7    financial incentives that were -- for which either CDCR's

8    mental health providers were eligible, or which they were

9    offered, and do not observe these financial benefits and

10   incentives having a meaningful effect on employment outcomes.

11   Q.  And is there any other work you did or information or data

12   that you discovered or obtained in the course of your work that

13   informs and supports your opinion?

14   A.  Well, we did do statistical analysis using the data -- some

15   of the data that we obtained from publicly-available sources,

16   as well as some of the data that we obtained from CDCR.  And

17   that statistical analysis failed to yield evidence that CDCR's

18   compensation differences relative to benchmarks, be it

19   California or nationwide, that those compensation differences

20   had impacted its filled positions or its net hires through

21   civil service over the past five years.

22       Given the current and recent labor market conditions,

23   namely that there are shortages for some or all of such

24   providers, we haven't found evidence to suggest that this would

25   be any different in the future.

1    Q.  And is that statistical analysis the regression analysis

2    you alluded to earlier?

3    A.  Yes.  That's correct.

4    Q.  And we'll talk about what that is and what its specific

5    findings were in a little bit.

6         Have we now covered all of the information and data that

7    you discovered in the course of your work that supports or

8    informs your opinion with respect to the reasonableness of

9    CDCR's conduct in hiring and retention of mental health

10   professionals?

11   A.  Yes.

12   Q.  So turning to the first one of those data points that you

13   referenced, the shortage of mental health professionals

14   nationwide and within California, just to reorient us, what was

15   your conclusion with respect to whether there's a labor

16   shortage of mental health professionals?

17   A.  We concluded that there is a shortage of mental health

18   professionals both nationwide and within California.

19   Q.  And what is the basis for that conclusion?

20   A.  So that conclusion draws on the -- the literature that we

21   reviewed.  And again, you know, this includes academic studies,

22   press articles, trade press, government reports, projections.

23   There may be others just -- I'm just blanking on right now.

24   Q.  And is there a place in your report where there is a

25   discussion and there is reference to the research that you did

1    and the articles that you found with relation to -- and first,

2    we're talking about a shortage in the US as a whole; is that

3    correct, Doctor?

4    A.  Yes.  So with respect to nationwide shortages, there is

5    actually a couple of sections in the report that reference

6    nationwide shortages.  They are discussed in Section 4-A, which

7    starts on -- starts on the page that is the Bates stamp that

8    ends 11.  And that section goes through the page that is marked

9    as page 26.

10        Then we also touch on nationwide shortages in a section

11   where we describe the impact of the COVID-19 pandemic on the

12   provision and demand for mental health care and resulting

13   shortages.  And that starts on the page that is denoted as page

14   36, and that section ends on page 41.

15   Q.  Is that it, Doctor, just so that we have reference to the

16   report for Her Honor?

17   A.  That is it.

18   Q.  And in general terms, what did you find specifically among

19   the literature that led you to conclude that there is, in fact,

20   a labor shortage with respect to certain categories of mental

21   health professionals in the United States as a whole?

22   A.  Well, again, we reviewed numerous studies, you know, and --

23   and those are documented in our report.  We've referenced

24   certain ones that discuss the evidence that there is a

25   shortage.  In some cases, it's psychiatrists; in some cases,

1    it's psychologists and social workers; in other cases, it's

2    therapists and counselors; and in some cases, it's -- it's

3    mental health providers in the aggregate.  And, again, that's

4    all cited -- discussed and cited in our report.

5         I will say that the materials that we reference and cite in

6    our report are not exhaustive.  There are many more out there.

7    But, you know, we thought that this was sufficient to make the

8    point that it's -- it's well-accepted that there are shortages

9    nationwide.

10   Q.  And those materials are referenced in the body of your

11   report in the pages you described; they're also listed in

12   Appendix 3; is that correct?

13   A.  They are listed in Appendix 3.  And that is where you can

14   find the full citation for -- actually, I think the full

15   citation will be in the footnotes in the body of the report as

16   well.  But there is a complete listing of all our materials

17   that we relied upon.

18        And for purposes of literature review, many of those

19   sources will be in either the academic papers section of

20   Appendix 3 or the -- some will be in the -- some will be in the

21   data from external sources, and then the articles and online

22   sources, I believe, is the other section where you'll find the

23   bulk of that information.

24   Q.  And embedded in the report --

25   A.  I'm sorry.  Also the reports section in Appendix 3 as well.

1   Q.  And embedded in the report are links to, if not all,

2   virtually all of this source information; is that correct,

3   Doctor?

4   A.  That is correct.  We tried to include links both in the

5   footnotes and in the -- and in Appendix 3, to the extent

6   possible.

7   Q.  And I know there is a wealth of information supporting the

8   fact that there is, in fact, a labor shortage with respect to

9   these health professionals that you cited.  Is there any

10  particular article or treatise or study that is of particular

11  importance to your analysis?

12  A.  You know, I -- I wouldn't say that there is one, because

13  different -- different articles, you know, might focus -- some

14  might focus on mental health care providers taken as a whole,

15  others might focus on psychologists, others might focus on

16  psychiatrists.

17      You know, there are examples -- you know, for example, we

18  cite to a survey that the American Psychological Association

19  conducted in 2022 that documents increasing workloads and

20  inability of psychologists nationwide to meet patient demand.

21  So that's an example of one that's specific to psychologists.

22      There is -- another study that we reference is one by

23  Butryn, et al., and they discuss unmet need for non-prescribing

24  mental health care practitioners.  So that includes

25  psychologists, social workers, therapists, advanced

1    practitioners, and counselors.

2        There are sources that discuss the shortage of

3    psychiatrists.  One such example -- one such example is the

4    Weiner 2018 article that we reference in our report.

5            THE COURT:  How do you spell that name?

6            THE WITNESS:  Yes.  Weiner -- there is actually two

7    different Weiners referenced in the report.  This one is

8    W-E-I-N-E-R.

9        There is -- you know, another example is the National

10   Alliance on Mental Illness, N-A-M-I, has a 2020 report.  They

11   again discuss shortage -- shortages of psychologists,

12   counselors, and social workers nationwide.

13       Those are some examples.

14   Q.  BY MR. CIRELLI:  So based on your literature review, you

15   found there to be a shortage with respect to all five of the

16   categories at issue in this matter?

17           MS. HATTON:  Objection.  Leading.

18           THE COURT:  Sustained.

19   Q.  BY MR. CIRELLI:  What did you find, in sum, Doctor?

20   A.  We found evidence of shortages both, you know, for mental

21   health providers in the aggregate, as well as for specific

22   classifications of mental health providers.

23       Specific to the ones at issue in this -- currently in this

24   litigation, I believe the only one we didn't see any reference

25   to was medical assistants.

1    Q.   Thank you, Doctor.

2         In your literature review with respect to the labor

3    shortage in the United States, apart from the types of articles

4    you just described, did you find any other data of significance

5    to you in assessing whether or not there is, in fact, a labor

6    shortage?

7    A.   We -- we did consider certain other pieces of information

8    that we consider -- that we deem are consistent with a shortage

9    of providers nationwide.

10        One such piece of information is the large -- specifically

11   for psychiatrists, the large number that are in private

12   practice.  So the estimates we've seen are that 40 to 45

13   percent of psychiatrists nationwide are in private practice.

14   And, you know, so, essentially, if they're in private practice,

15   they're not among the pool of psychiatrists that would be

16   available to be employed by an institutional employer, be it

17   CDCR or government or a hospital.

18   Q.   And you just made reference to a statistic.  Is there a

19   particular article or document that you're referring to that's

20   in your report as well?

21   A.   So there are two.  One is an article by Gardner, et al., in

22   2020.  The other is an article by an individual, the last name

23   is Harrar, H-A-R-R-A-R, and that is in -- was written in 2019.

24   Q.   In the course of your literature review and assessment, did

25   you find any data or information in other respects, other than

1  just the general shortage that you've already discussed and the

2  number of psychiatrists going into private practice, that

3  informed or supported your conclusions?

4  A.  Yes.  So a third type of evidence supporting -- supporting

5  that there are shortages is that for certain classifications

6  relevant to this litigation, there are a large number of

7  practitioners that are older and are expected or have already

8  started or are expected to retire in the immediate future.  And

9  the incoming pipeline of recent graduates for these types of

10  practitioners is insufficient to replace the number that have

11  either started retiring or are expected to retire in the near

12  future.

13  Q.  Can you give an example of one of the articles that's

14  reflected in your report that -- from which you obtained that

15  information?

16  A.  So this is one of the ones that I referred to already, but

17  it is the Weiner article -- Weiner, W-E-I-N-E-R -- from 2018.

18  Q.  Anything else that you found in your literature review with

19  respect to whether there is a labor shortage of certain types

20  of mental health providers in the United States?

21  A.  Those were the main points and several examples that --

22  several, not exhaustive -- several examples that support the

23  nationwide shortage.  That is it.

24  Q.  And I've heard the phrase being used by Dr. Brown, economic

25  shortage versus needs-based shortage.  The shortages you're

1    referring to are what?

2    A.  The -- both.  So I -- I don't entirely agree with

3    Dr. Brown's characterization of a needs-based shortage versus

4    an economic shortage.  I think that, you know, one leads to the

5    other or, you know, that they are -- they are closely entwined.

6         To the extent that -- so a -- Dr. Brown specifically

7    defines a needs-based shortage as coming from a -- a

8    governmentally designated geographic area which is a -- called

9    an HPSA, a health provider shortage area.  And, you know, I --

10   I agree with him that health provider shortage areas are

11   governmentally designated areas, where the government has, you

12   know, determined that more need for mental health services

13   exists than is currently being provided.

14        However, you know, need and demand, more generally, are not

15   governmentally designated.  And when individuals have need for

16   greater provision of care and they are able to pay for greater

17   provision of care, that is what drives employers -- people who

18   would -- employers who would employ mental health providers,

19   that is what drives them to hire more providers.  And if needs

20   persist in an area, that is a sign that employers are unable to

21   hire sufficient number of providers to satisfy consumers need.

22   Q.  And when you say that there is a labor shortage in the

23   United States of mental health providers here, just so the

24   record is clear, what type of shortage are you referring to?

25   A.  I'm referring to an economic shortage.

1   Q.  An economic shortage in the light of what you just defined?

2   A.  Yes.  And -- and certain pieces of evidence, even if they

3   only discuss need, they're still indicative of an economic

4   shortage.

5   Q.  Have we now covered the basis for your finding that there

6   is a labor shortage of mental health providers in the United

7   States as a whole?

8   A.  Yes.

9   Q.  Did you also look at whether there is a labor shortage with

10  respect to mental health providers in California specifically?

11  A.  I did.

12  Q.  What did you do in that regard?

13  A.  So again, Dr. Dutra and I looked at literature and -- and

14  studies to assess whether there is, and has been in recent

15  years, and is projected to be, a shortage of mental health

16  providers in California.

17  Q.  Where is that information found in your report, Doctor?

18  A.  There is a section on shortages in California.  So most of

19  that information will be in Section 4-B of our report, which

20  starts on the page that has the Bates number ending in 27, and

21  it goes through page 36.

22      There may also be an occasional tidbit here or there,

23  perhaps in the COVID section, again, that I referenced earlier.

24  You know, I can't recall off the top of my head, but we might

25  have some additional studies that either were specific to

1   California or called out California in other sections.

2   Q.  And what did you find with respect to California in your

3   literature review?

4   A.  So similarly to our findings nationwide, we found that

5   there are shortages of mental health -- mental health providers

6   in California.  We saw specific reference to psychiatrists,

7   psychologists, clinical social workers, as well as behavioral

8   health providers considered more broadly.

9   Q.  And as with the US shortage, are there any particular

10  pieces of literature that -- that, in particular, informed you

11  in that respect?

12  A.  Yes.  So the two I think are most relevant are two studies.

13  One is by Coffman, et al., from 2018, and that discusses

14  current and projected shortages for psychiatrists,

15  psychologists, and clinical social workers.  There is a second

16  study, by Coffman and Fix, and this one is really recent, this

17  was published in 2023.

18  Q.  And what does it find?

19  A.  They found shortages of behavioral health providers in

20  California.

21      They also -- one of the things they also looked at was the

22  age distribution of the provider workforce.  And they found

23  that -- particularly for psychiatrists and psychologists, that,

24  again, there is a large number of older practitioners who are

25  expected -- who either have started retiring or are expected to

1    retire in the near future.

2    Q.  And what impact did that have on whether there is a labor

3    shortage or not?

4    A.  Well, not just whether there is a labor shortage, but if

5    there is a labor shortage, it's likely to make it worse.

6    Q.  And what is the conclusion from -- in those articles with

7    respect to that issue?

8    A.  So, again, the -- the Coffman and Fix article largely just

9    documents that psychiatrists and psychologists are likely to

10   retire.

11       I believe Coffman, et al., does more to make the connection

12   that with impending retirements, we are likely to see shortages

13   get worse.

14   Q.  And how does that information that you found in that

15   literature inform or support your opinion with respect to there

16   being a labor shortage with respect to certain mental health

17   providers in California?

18   A.  Again, I mean, I think it -- I think it indicates that

19   there is a shortage in California.  You know, the -- the

20   Coffman and Fix article specifically also talks about hiring

21   difficulties at county behavioral health agencies in

22   California.  They have had almost -- you know, a large

23   percentage -- I believe 70 percent -- have had hiring

24   difficulties for behavioral health providers.

25   Q.  And is that an indicia of whether there is a shortage or

1   not?

2   A.   That does indicate that -- that there is a shortage, yes.

3   Q.   Have we now covered your literature review and your

4   findings with respect to whether there is a labor shortage in

5   California for certain mental health providers?

6   A.   Yes.

7   Q.   In the course of your literature review, did you find any

8   other data or information that -- that supports your ultimate

9   or overarching opinion with respect to the reasonableness of

10  CDCR's actions in hiring and staffing of mental health

11  providers?

12  A.   We did.  Another -- another type of literature that we

13  looked at was literature or studies that -- that projected

14  supply and demand for mental health providers and -- or certain

15  types of mental health providers and projected that there

16  either are or -- that there are shortages, that there will

17  continue to be shortages into the future.

18  Q.   And where do we find, in your report, those articles and

19  that data?

20  A.   That -- so that starts on page 17 of Exhibit 5 and

21  continues through -- sorry -- continues through page 22.

22  Q.   Just so the record is clear, when you say "page," are you

23  referring to the page number on the face of the report itself

24  or are you referring to the page number that is marked in the

25  bottom right-hand corner, the Bates page number?

1    A.   I am referring to the Bates numbers in the bottom

2    right-hand corner.

3    Q.   Okay.  Perfect.

4              THE COURT:  While we're at it, when you say

5    Exhibit 5 --

6              MR. CIRELLI:  Defendants' Exhibit 5, Your Honor.

7              THE COURT:  The total Exhibit 5?

8              MR. CIRELLI:  Yes.

9              THE COURT:  No Exhibit 5 was in the report, because

10   I'm not seeing exhibits identified in the report itself.

11             MR. CIRELLI:  I'm talking about -- when I refer to

12   Exhibit 5, I'm referring to the entire report.

13             THE COURT:  Got it.

14             MR. CIRELLI:  Sorry if that wasn't clear, Your Honor.

15             THE COURT:  I'm finding the pages otherwise, so

16   understood.

17   Q.   BY MR. CIRELLI:  Are there other places in the report that

18   identify the literature that you found with respect to those

19   projected shortages that you just described?

20   A.   Yes.  We also discussed this at pages 30 through 33.

21   Q.   What other information or data did you find in the course

22   of your literature review that informs your opinion?

23   A.   We found evidence of increased shortages and increased

24   difficulty on the part of consumers to obtain mental health

25   care since COVID-19, since the pandemic hit.

1    Q.   And what did you find in that regard?

2    A.   So that literature indicates that COVID exacerbated

3    existing shortages of mental health provision and essentially

4    expanded recruitment and retention problems that had previously

5    existed to -- to other -- to additional behavioral health

6    professions.

7    Q.   And let me just back up for one moment.

8        With respect to projected shortages that you just

9    described, are there any particular articles that are cited in

10   the pages that you have just listed where that is discussed in

11   your report that are of particular significance to you in your

12   analysis?

13   A.   Sure.  So I would -- I would highlight, again, the Coffman,

14   et al., article from 2018.  There is a Satiani, et al., article

15   also from 2018.  We discuss health resources and services

16   administration -- or HRSA -- data and projections.  And there

17   was also one from Wiener -- this time it's spelled W-I-E-N-E-R,

18   Wiener -- from September 22nd that discusses shortages as well.

19              THE COURT:  Time for one or two more questions now.

20   We'll take a slightly early lunch break, given how long we've

21   been going.

22              MR. CIRELLI:  We can break at any point you'd like,

23   Your Honor.  I'm about to talk about another type of data and

24   information that she found in her literature review, so it

25   would be a good time to stop now, if you'd like, or we can

1    continue.

2                THE COURT:  Let's go ahead and break now.  Let's come

3    back in an hour, so that gives you time for lunch.

4        The cafeteria, as I understand it, is open today.  I know

5    the cafeteria operator was asking what was happening next week,

6    so the parties will be on their own to figure out lunch, given

7    the lunch breaks we'll take.  But I believe the cafeteria in

8    the building is open today because things are not yet shut

9    down.

10       So an hour, come back here at 12:50, and then we'll go

11   until 5:00, with breaks as needed.

12               MR. CIRELLI:  Thank you, Your Honor.

13               THE COURT:  Thank you very much.

14       (Recess taken, 11:49 a.m. - 12:54 p.m.)

15               THE COURT:  All right.  You may be seated.

16       And, Mr. Cirelli, you may continue.

17               MR. CIRELLI:  Thank you, Your Honor.

18   Q.  BY MR. CIRELLI:  Dr. Greulich, when we took our lunch

19   break, we were starting to talk about another area in which you

20   did a literature review, and I believe you identified it as

21   evidence of increased shortages and difficulty obtaining care

22   since the onset of COVID.  I think that's what we were talking

23   about.

24   A.  Yes.  That's correct.

25   Q.  And where is this information found in your report?

1   A.  Let me find the pages.  There is a few pages interspersed

2   throughout the report.  There is some information on pages 12

3   and 13.

4   Q.  And, again, you're referring to the Bates page numbers that

5   are at the bottom right-hand corner, just so the record is

6   clear?

7   A.  Yes, I am.  There is a reference to COVID reducing access

8   to care on page 25.

9       And then there is a section on the impact of COVID that

10  begins at page 36 and continues through page -- sorry --

11  continues through page -- specifically for shortages, through

12  page 39.

13  Q.  And the literature that you found on that subject that you

14  relied upon for your opinions is found in your report at those

15  pages?

16  A.  It is, yes.

17  Q.  Is there any particular piece of literature that was of

18  particular interest to you in connection with the impact of

19  COVID on shortages of mental health providers?

20  A.  There are several.  Some examples of the articles and

21  studies we reference that document that COVID has exacerbated

22  shortages in the provision of mental health care include the

23  National Alliance on Mental Illness 2020 paper; an his Markit

24  Study -- Markit is M-A-R-K-I-T-- Study from 2021; and a

25  Harrell, et al., article from 2023.

1      Certain other articles document that COVID is associated

2   with preexisting recruitment and retention problems becoming --

3   spreading to other professions -- to other behavioral health

4   professions.  Those would include a Barna, B-A-R-N-A, 2022

5   paper and a Henry 2022 paper.  And these are among the

6   references that are cited in our report.

7   Q.  In your literature review, did you find other information

8   and data, other than what we've already discussed, that informs

9   or supports your opinion with respect to the reasonableness of

10  CDCR's conduct in hiring and staffing mental health providers?

11  A.  We did come across information with regard to correctional

12  systems throughout the country documenting that -- essentially,

13  that CDCR is not the only system that's being sued for its

14  provision of mental health care.  There are multiple states

15  where litigation is happening.

16  Q.  And where is that information referenced in your report?

17  A.  That -- some of that is also on pages 38 and 39 and page 25

18  and 26.

19  Q.  And are there particular pieces of literature that are of

20  particular interest or importance to you with respect to this

21  issue?

22  A.  Again, there are -- there are several -- two that document

23  some of the mental health provider shortages that are occurring

24  in other correctional systems.  Two examples would be a Koran

25  2023 article -- Koran is K-O-R-A-N -- and -- and Ervin,

 1    E-R-V-I-N, 2023 article.

 2    Q.  And have you now told us how those articles inform or

 3    support your opinion?

 4    A.  Yes.  I mean, again, it's just, you know, essentially CDCR

 5    is not alone throughout the country with -- with the hiring

 6    difficulties it has had for mental health providers.

 7    Q.  In your literature review, did you find any other

 8    information or data -- categories of data that inform or

 9    support your overarching opinion with respect to the

10    reasonableness of CDCR's conduct?

11    A.  Yes.  We also came across evidence of hiring difficulties

12    on the part of employers, which, again, is consistent with a

13    shortage among providers of mental health care.

14    Q.  What did you find in that regard?

15    A.  So, actually, specific to California, there are several

16    articles that document hiring difficulties among public

17    employers throughout California.  One of those is the Coffman

18    and Fix 2023 article, which I've already mentioned.  Another

19    one is another Wiener -- another Wiener article, this time from

20    August 2022, and it's Wiener spelled W-I-E-N-E-R.

21        Separate from those, there has also been -- it's been

22    somewhat well documented in the press the hiring difficulties

23    that Kaiser Permanente has had in hiring and retaining mental

24    health providers throughout its system in California.  And some

25    of the -- some of the sources we cite specific to Kaiser

1   Permanente and its difficulties, which have been going on for,

2   I believe, at least ten years, are the Gold 2017 article, a

3   Kaiser Foundation Health Plan Survey from 2017, and, again, the

4   Wiener August 2022 article, and that's W-I-E-N-E-R.

5   Q.  And where would the discussion of the hiring difficulties

6   by these public employers and Kaiser be found in the report?

7   A.  That -- that will be on pages -- Bates-numbered pages 33

8   through 36.

9   Q.  Have we now covered how that literature informs or supports

10  your opinion?

11  A.  Yes.

12  Q.  Anything else that you found during the course of your work

13  that -- in the literature that also helps inform and address

14  your opinion?

15  A.  Yes.  So one more piece is that we found evidence of

16  reduced access to mental health care -- reduced access for

17  consumers.  And, again, this is evidence that's consistent with

18  labor market shortages for the provision of mental health care.

19      One such type of evidence are long waitlists.  So two

20  examples are the 2022 American Psychological Association

21  survey, which I believe I previously mentioned.  And that

22  describes how psychologists' waitlists have increased in recent

23  years.  Also, some psychologists don't even maintain a waitlist

24  because -- essentially because they have too much on their

25  plates already.

 1      Another -- another similar source, it's abbreviated NCMW.

 2   I'm trying to remember; I believe it's the National Council on

 3   Mental Wellness.  And that's a study from 2023 where they

 4   provide evidence of long waitlists for mental health providers.

 5      A second type of evidence -- evidence of reduced access

 6   that's consistent with shortages for the provision of mental

 7   health care are long wait times and difficulty -- consumers'

 8   difficulty in getting mental health care appointments.

 9      So two examples that we discuss in our report.  One is the

10   Harrar article from 2019.  Harrar is H-A-R-R-A-R.  And that one

11   is actually specific to California, to the Los Angeles area.

12   And a Nenn, N-E-N-N, 2023 article, and that one is with respect

13   to counselors.

14   Q.  And how is this information an indicia of a labor shortage?

15   A.  Well, again, if -- if consumers are having difficulty

16   obtaining care, you know, there is a reason for that; that's

17   because there is not enough providers able to provide care.

18      And when consumers are putting themselves on waitlists when

19   they're trying to get appointments, this is evidence that they

20   have -- they're willing to pay.  They have the ability or

21   they're willing to pay for the provision of care.  You know,

22   this is not some artificial construct aimed to -- you know,

23   aimed to document unmet need.  And the fact that they can't

24   receive the care that they're seeking and willing to pay for is

25   consistent with there being a shortage of providers to provide

1   such care.

2   Q.  And where, just so we have it in the record, would Her

3   Honor find the discussion with respect to the impact of long

4   waitlists, wait times, and difficulty getting appointments in

5   the report?

6   A.  So this is at pages 24, 25, and 26 of our report.

7   Q.  Was there anything else that you found in your literature

8   review that supports or informs your opinion with respect to

9   the reasonableness of CDCR's conduct in hiring and retaining

10  mental health professionals?

11  A.  Not among the literature that we reviewed prior to

12  submitting our report.  That would be it.

13  Q.  So is it accurate to say that your review of this

14  literature led you to the conclusion that there is a shortage

15  of mental health professionals both in the United States as a

16  whole and in California?

17  A.  Yes.

18  Q.  And I think you alluded a little bit to Dr. Brown's opinion

19  with respect to whether there is a shortage or not when we

20  discussed the definition of an economic shortage versus a

21  needs-based shortage.

22      Do you have any other differences of opinion with Dr. Brown

23  with respect to his opinion -- his overall opinion that there

24  is no shortage of psychiatrists?

25      Maybe you can define what his opinion is and who it relates

1    to.

2    A.   Sure.   So Dr. Brown looked at two types of providers; he

3    looked at psychiatrists and psychologists.   He concluded that

4    the -- that the relevant market to consider was California --

5    or certain geographic areas in California, and that across

6    California, there is a surplus of psychiatrists, and there --

7    and that the labor market for psychologists is in equilibrium,

8    meaning that, essentially, demand and supply match.

9    Q.   And so did he look at all at social workers, recreational

10   therapists, or medical assistants?

11   A.   No, he did not.

12   Q.   I'm sorry.   I interrupted, Doctor.

13   A.   I was just going to say that we did not -- my coauthor and

14   I do not agree with that conclusion.

15   Q.   And what is it about that conclusion and his basis for that

16   conclusion that you disagree with?

17   A.   Well, again, you know, based on the voluminous evidence and

18   literature and studies that we've reviewed, we -- you know, we

19   do not agree that -- either that the labor market for

20   psychologists is in equilibrium or that there is a surplus of

21   psychiatrists in California.

22   Q.   So turning to -- I think we have -- have we covered your

23   observation with respect to the shortage of mental health

24   providers in California and the US?

25   A.   Yes.

1  Q.  And so I think, then -- the next area that you examined was

2  what?

3  A.  So we also looked at the extent to which CDCR has been

4  able -- we looked at CDCR's employment fill rates and vacancy

5  rates for the five classifications at issue.

6  Q.  And what was the source of that information with respect to

7  vacancy rates?

8  A.  We relied on information regarding filled positions and

9  vacant positions and authorized positions that we obtained from

10 CDCR.

11 Q.  And did you prepare some demonstratives that show your

12 analysis that are actually in your report?

13 A.  Yes.  I can refer you to a series of figures that are in

14 our report that show the results of our analysis regarding

15 vacancy rates and filled positions.

16        MR. CIRELLI:  I would ask, Your Honor, that with

17 respect to these figures that are coming right off the report,

18 that we be able to publish it on the screen so others can see

19 what she's talking about to put it in context.

20        THE COURT:  All right.  Any objection if it's

21 preceded by an identification of the page of the report --

22        MS. HATTON:  No, Your Honor.

23        THE COURT:  -- that is being displayed?

24    All right.  Permission granted.

25        MR. CIRELLI:  Thank you, Your Honor.

1    Q.  BY MR. CIRELLI:  So go ahead, Doctor, where would we find

2    these demonstratives?

3    A.  So I will start by talking about psychiatrists.  And the

4    first two figures I would like to explain are Figures 5 and 6

5    in the report.  They are at pages 42 and 43.

6    Q.  Okay.  Thank you.

7        Do you see those figures?

8    A.  Yes.

9    Q.  And Ms. Pooni has put them side-to-side.

10       Do these two figures relate to each other?

11   A.  They do.

12   Q.  Can you describe for the Court what these depict?

13   A.  Sure.  So starting with the figure on the left, Figure 5,

14   this shows the vacancy rate among psychiatrist positions at

15   CDCR from January of 2018 through December of 2022.  I know

16   that the -- the January and December months don't show up on

17   the horizontal axis down the bottom, but those are the starting

18   and end points of our data.

19       So this shows, over time, for the last complete five years

20   -- or five calendar years, the vacancy rate for psychiatrists

21   at CDCR.  We see that it starts a little bit above 20 percent,

22   might be about 22, 23 percent in the early 2018 period.  It

23   jumps around a little bit -- a little bit below 20 percent, a

24   little bit above 20 percent -- before rising to approximately

25   25 percent as of, we'll call that, spring of 2020.

1       So starting around April or May of 2020, the psychiatrist

2   vacancy rate had a pretty sharp decline, nearly to zero

3   around -- looks like approximately August of 2021.  And since

4   August of 2021, it's increased a bit.  It's generally remained

5   below 10 percent.  And I believe at the end of our data period,

6   as of December 2022, it was -- it was right at 10 percent.

7       The figure on the right, Figure 6, shows the components

8   that go into the calculation of that vacancy rate.

9       So, again, we're looking over time, starting in January

10   of 2018 going through December of 2022.  We're looking at the

11   number of authorized positions, filled positions, and vacant

12   positions for psychiatrists at CDCR.

13       So as you can see, the vertical axis -- these are measured

14   in number of positions.  The red line up at the top is the

15   number of authorized psychiatrist positions.  The -- those are

16   the positions that CDCR is attempting to fill.  The green line,

17   just below the red line, that one is the total filled positions

18   among psychiatrists.  And the number of total -- or the total

19   number of filled positions is comprised of on-site civil

20   service filled positions, registry filled positions, and

21   telehealth filled positions.  Those three components are the

22   three blueish-grayish lines.  If you were to add those three

23   lines up, they would sum to the green line.

24   Q.  The other three lines at the bottom that are not yellow?

25   A.  Yes.

1  Q.  It's hard for me to tell which one is green and which is

2  gray.

3  A.  They're also a little bit thinner than the other lines.

4  That might be hard to read on the chart.

5      The yellow line is the number of vacant positions over

6  time.  So that one is -- it's essentially the number of

7  authorized position minus the total number of filled positions,

8  so it is the -- the green -- I'm sorry -- the red line minus

9  the green line equals the yellow line.

10  Q.  And the space between the red line at the very top and the

11  green line, which we see there is some places where there is no

12  space, what does that signify?

13  A.  So, again, that's -- that's the number of vacant positions.

14  And the number of vacant positions divided by the number of

15  authorized positions equals the vacancy rate, which is what we

16  are looking at in Figure 5 over to the left.

17      So we do see, again, that, you know, the number -- both

18  number and the percent of vacant positions, you know, kind of

19  reached its lowest point in mid -- mid-2021.

20  Q.  And for a period of time, it's been in the neighborhood of

21  10 percent consistently?

22  A.  Consistently at or below since approximately -- just

23  eyeballing it, I'm going to say approximately November of --

24  November or December of 2020.

25  Q.  So these two figures address psychiatrist vacancy rate.

1      Did you do the same type of analysis for the other four

2  disciplines?

3  A.  Yes.

4  Q.  Do you have a figure or figures with respect to

5  psychologists?

6  A.  Yes.  So psychologists are Figures 11 and 12.  They are on

7  page 47 of our report.

8  Q.  And I think you've explained how the figure on the right

9  here, Figure 12, relates to what's on the left, Figure 11.  So

10 we'll focus on Figure 11.

11     What is that depicting?

12 A.  So, again, Figure 11 is a vacancy rate, this time for

13 psychologists, from January -- it shows how the rate changes

14 from January of 2018 through December of 2022.

15     We see that CDCR had a decent measure of success, early on

16 in this period, maintaining a vacancy rate below 10 percent,

17 but the trend has been generally increasing.  And I believe,

18 other than a brief dip down in, looks like, either

19 December 2020 or January of 2021, that the vacancy rate for

20 psychologists has been above 10 percent since late 2019.

21     The largest increase in the psychologist vacancy rate

22 had -- again, started late 2020, which is, you know, not

23 something we've, you know, sought to figure out exactly why

24 that rate has been increasing since then, but it is certainly

25 consistent with the existence of the COVID pandemic, which

1  started several months before then.

2  Q.  And is that consistent with the literature that you found

3  and you described earlier with respect to the impact of COVID

4  on labor shortages?

5  A.  Very much so, for several reasons.

6      The literature has documented that COVID exacerbated

7  shortages of the provision of mental health care.  The

8  literature has documented that COVID has increased burnout

9  among various types of providers of mental health care.  And

10  burnout is something that could lead to somebody leaving the

11  labor force.

12     The literature has documented an increase in demand for

13  behavior -- for -- for mental health care services since COVID.

14     And the literature has also documented the increased use

15  and acceptance of telehealth since COVID began and, also, that

16  many providers have expressed a preference for telehealth,

17  either solely or hybrid, where they provide some services

18  through telehealth and some services in an office.

19     So, you know, to the extent that provider -- providers who

20  are unable to offer a telehealth option, that could impact

21  their employment of mental health providers as well.

22  Q.  Anything else that these figures tell us from your

23  analysis?

24  A.  That's all I can think of right now.

25  Q.  We've now covered psychiatrists, psychologists.  Did you

1   also look at the other categories of mental health providers?

2   A.   Yes, we did.

3   Q.   And what would be the next category you looked at?

4   A.   So if we want to look at clinical social workers, those are

5   depicted in Figures 7 and 8, which are on page 44 of our

6   report.

7   Q.   I'm waiting for them to load.  You can go ahead and start

8   describing.  What are these telling us?

9   A.   Sure.  Again, I think the -- the story here is somewhat the

10   same as the story for psychologists.  CDCR had began this

11   period, 2018 to 2022, started out the period with very low

12   vacancy rates among their clinical social worker positions, and

13   CDCR was able to maintain very low vacancy rates through --

14   well, it looks like they maintained rates below 10 percent

15   through about late 2021.

16       However, the vacancy rates among clinical social worker

17   positions began increasing -- it's either late 2020 -- the very

18   end of 2020 or the very beginning of 2021, and they have been

19   increasing, with the possible exception of the last month or

20   two of our -- of our data period.

21       So, again, the timing of the increase in the vacancy rate

22   for clinical social workers is very similar to when the vacancy

23   rate for psychologists began increasing at a larger rate than

24   previously.

25   Q.   And is that in the era of COVID?

1    A.   That is in the era of COVID.  It starts several months into

2    the -- what I would call the pandemic period.

3    Q.   And in reading Figure 7, am I reading this correct, that at

4    times, going back to 2018 and forward, the vacancy rate was

5    below zero?

6    A.   That's correct.  We see that for -- for clinical social

7    worker positions.  I think we might also -- I'd have to look.

8    I think we also see it for recreation therapists.  But it has

9    happened that CDCR has filled more clinical social worker

10   positions than it needed to at various points in time.

11   Q.   Unless you had other observations of this chart, we'll move

12   to recreational therapists.

13   A.   Sure.  Those are Figures 9 and 10 to our report.  Those are

14   on pages 45 and 46.

15   Q.   And I think we see on Figure 9 what you were just

16   describing.

17        So what -- what does this tell us, Figures 9 and 10?

18   A.   So, again, I'm going to focus on Figure 9, the vacancy

19   rate.

20        CDCR's vacancy rate among recreational therapist positions

21   started out slightly above 10 percent in early 2018, but they

22   were able to reduce that vacancy rate below 10 percent and, at

23   times, even below zero percent, meaning that they employed more

24   recreational therapists than they needed to, according to the

25   number of authorized positions.  And the vacancy rate for

1   recreation therapists has -- has generally remained below 10

2   percent for most of the five-year period -- the last five

3   calendar years, 2018 through 2022.

4   Q.  And, again, we see that 10 percent on the -- the far

5   left-hand side of -- of what's up on the screen, Figure 9,

6   where we see the percentages going from zero up to ten and the

7   line being relatively consistently below that 10 percent line.

8   Is that what you're referring to?

9   A.  That's correct.  The vertical axis on the left is what

10  shows the scale, the -- the percent -- percentage of authorized

11  positions that were vacant.

12  Q.  And there is one more category.  Did you also look at this

13  for medical assistants?

14      And are we done with the observations you have with respect

15  to those figures before I move us on?

16  A.  Yes.  That's, I think, all I need to say about recreation

17  therapists.

18  Q.  So, lastly, medical assistants.  What did you find there?

19  A.  So medical assistants are documented in Figures 13 and 14

20  of our report.  Those are on pages 48 and 49.

21  Q.  What are we looking at here, Doctor?  What does this tell

22  us?

23  A.  So the charts for medical assistants are a little bit more

24  confusing, simply because the time frame differs between these

25  two charts.

1        So starting with Figure 14, which is the chart on the

2    right, this one has the same time frame as the other vacancy

3    and filled position charts we've been looking at.  It starts in

4    January of 2018; it goes through December of 2022.

5        We have data on the number of filled positions starting in

6    January of 2018 for medical assistants, but we didn't have

7    information on the number of authorized positions, which is the

8    red line.  We didn't have that information or it wasn't

9    available until either June or July of 2020.  So that's why we

10   only see the red line and the yellow line.

11       The yellow line is the number of vacant positions, which is

12   based, in part, on the number of authorized positions, so we

13   were unable to observe that information until, again, either

14   June or July of 2020.

15       So we're only able to calculate a vacancy rate for medical

16   assistants starting in mid-2020.  So that is what the Figure 13

17   on the left is showing.  It shows the vacancy rate for medical

18   assistants from mid-2020 through the end of 2022.

19       I find it kind of hard to draw any conclusions from this

20   one.  The vacancy rate is all over the place.  It starts out

21   quite high, pops up to almost 60 percent, but then it dropped

22   pretty precipitously in late 2020 and early 2021, such that the

23   vacancy rate was near zero for a couple of months in spring of

24   2021; then it jumped back up; it came back down; it came back

25   up.  It looks like it's approximately 30 percent as of the end

1   of our data period at the end of 2022.

2       So, you know, again, here we have an example where CDCR was

3   able to maintain a vacancy rate below 10 percent for a few

4   months during the data period, but it was not there at the end

5   of 2022.

6   Q.  Have we now covered the data and information that you found

7   leading you to the comment that you made earlier, the

8   observation that CDCR has achieved lower vacancy rates among

9   certain classifications between 2018 and 2022?  Have we covered

10  that?

11  A.  That's correct.  You know, I think I would summarize by

12  saying that CDCR appears to have had success in lowering the

13  vacancy rate among psychiatrists, it's had reasonable success

14  in maintaining a vacancy rate below 10 percent for recreation

15  therapists, and it's -- at some point during the -- during the

16  data period, it has had a rate below 10 percent for the other

17  three classifications, but they were not below 10 percent in

18  the -- at the end of the data period.

19  Q.  With respect to the next observation that you indicated

20  informed or supported your overriding -- overarching opinion

21  with respect to the reasonableness of CDCR's conduct in hiring

22  and retaining mental health professionals, what did you next

23  observe relative to that opinion?

24  A.  So -- and this kind of dovetails with the vacancy rates we

25  just looked at.  In fact, I'm going to ask Ms. Pooni to bring

1   Figures 5 and 6 back up again.  But that CDCR's expanded use of

2   telepsychiatry throughout the 2018 to 2022 period coincided

3   with a reduction -- with the reduction -- large reduction in

4   the vacancy rate among CDCR psychiatrist positions.

5   Q.   And I think she's pulling up Figures 5 and 6 now.

6        What is it about Figures 5 and 6 that tell us that?

7   A.   So starting with Figure 6, on the right, there is a -- a

8   gray line it is -- which is the telepsychiatrist -- the number

9   of telepsychiatrist filled positions.  It's the line that's

10  the -- as of 2018.  It's the lowest line on the chart.

11       And then -- yes.  She's highlighting it there.  It's the

12  lowest line on the chart through about -- well, it's more or

13  less flat.  More or less -- looks like it's about 50 --

14  approximately 50 telepsychiatrist filled positions at CDCR

15  until March or April of 2020.

16       And then the number of telepsychiatrist filled positions at

17  CDCR increases from -- again, it looks like March of 2020; it

18  increases through about September of 2021, and at that point,

19  it's approximately 100 positions that are filled via

20  telepsychiatry.  And it remains at approximately 100 filled

21  positions through the end of 2022.

22       So, again, this increase from about 50 to about 100

23  telepsychiatrist filled positions, that occurs from March

24  of 2020 through September of 2021.

25       If we go and look at the chart, Figure 5 on the left,

1   March of 2020 through September of 2021 is more or less within

2   a month or two when we observe this rather precipitous drop in

3   the vacancy rate among psychiatrists at CDCR, from about 25

4   percent down to almost zero percent.

5   Q.  Have you now covered the information that informed you with

6   respect to the expanded use of telepsychiatry coinciding with

7   the reduction in psychiatry vacancy rates?

8   A.  Yes.

9   Q.  Your next observation that informed your overarching

10  opinion with respect to the reasonableness of CDCR's actions in

11  hiring and retaining mental health professionals was an

12  analysis you did with respect to the number of mental health

13  providers available to people in the prisons operated by CDCR

14  and the population as a whole; is that correct?

15  A.  Yes.  That's correct.

16  Q.  Is that the type of analysis that is common and that you do

17  as a labor economist?

18  A.  Yes.  This is looking at employment of -- of mental health

19  providers, employment at CDCR, and employment in the state of

20  California, looking at employment per a given -- for a given

21  population of individuals.  Employment is -- is squarely, you

22  know, what labor economists study.

23  Q.  And do you have a table or a figure in your report that

24  shows the data that you used to reach this observation or

25  conclusion?

```
 1                    MS. HATTON:  Objection.  Scope.

 2                    THE COURT:  You can answer yes or no first.

 3                    THE WITNESS:  Yes, I do.

 4   Q.  BY MR. CIRELLI:  Where would --

 5                    THE COURT:  So what scope issue exactly?

 6                    MS. HATTON:  So --

 7                    THE COURT:  We're going beyond labor economics?

 8                    MS. HATTON:  Yes.  We're talking about patient

 9   provider access, which is a health policy concept; it's not a

10   labor concept.

11                    THE COURT:  All right.  Point me to the page that you

12   would testify about, Doctor.

13                    THE WITNESS:  I will.  It is Table 2.  Let me locate

14   Table 2 --

15                    MR. CIRELLI:  I believe it's on page 51, if that

16   helps.

17                    THE WITNESS:  You beat me to it.  Yes.  Page 51.

18                    MR. CIRELLI:  And the economic --

19                    THE COURT:  Wait a minute.  I'm determining the

20   objection.

21                    MR. CIRELLI:  Sorry, Your Honor.

22                    THE COURT:  I'll sustain the objection to this

23   extent.  You can try to lay a foundation to help me understand

24   how this falls within the expertise of a labor economist.

25                    MR. CIRELLI:  Sure.
```

1    Q.  BY MR. CIRELLI:  Specifically, Doctor, this analysis you

2    did, does this inform your prior opinion with respect to

3    whether there is a -- a shortage or not, looking at supply and

4    demand?

5    A.  Well, this -- this squarely looks at supply, and supply is

6    a component of -- of a labor market shortage, yes.

7    Q.  And did you also, in your work, consider the demand by the

8    general population for psychiatrists in comparison to the

9    demand in the prison population for psychiatrists and other

10   mental health care providers?

11   A.  We did.

12   Q.  And so is this analysis of supply and demand in connection

13   with this particular labor market something that falls within

14   the type of work that you ordinarily do as a labor -- and other

15   labor economists do as labor economists?

16   A.  Absolutely, yes.

17           THE COURT:  All right.  I'm going to allow the line

18   of questioning, subject to cross, of course.

19       All right.  You may proceed.

20           MR. CIRELLI:  Thank you, Your Honor.

21   Q.  BY MR. CIRELLI:  So looking at Table 2, which is on page 51

22   -- Bates page 51 of Exhibit 5, what -- first, what is it

23   showing us, and where did you obtain the data?

24   A.  Sure.  So the data that we are looking at here is

25   information on the number of providers, and the number of

1   providers for a given population at CDCR compared to the number

2   of providers for a given population within California at large.

3       We look specifically at three provider types:

4   Psychiatrists, psychologists, and social workers.  You'll see

5   that in the column toward the left.  The second column is

6   labeled provider type.  These are the three types of providers

7   for which the information was available.

8   Q.  Is that why you didn't look at the other two categories,

9   recreational therapists and medical assistants --

10  A.  That's --

11  Q.  -- there was no data?

12  A.  That's correct.

13  Q.  Okay.  Go ahead, Doctor.

14  A.  Also, you'll see the five years that we look at are, again,

15  the same five years that we looked at for our analysis of

16  vacancies and filled positions at CDCR; that is 2018 through

17  2022, the five most recent calendar years.

18      The data that we used to compile and do the calculations in

19  this table, the information on the number of providers at CDCR

20  and the CDCR inmate population, came from CDCR.  It is

21  documented in sources 1 and 2 listed on the table.

22      Information on the number of providers in California came

23  from one of the research studies that we -- that I've mentioned

24  earlier, which is a study by Coffman and Fix that was completed

25  in February 2023.  They had information on the number of

1   providers in California.

2   Q.  Do you see that reference source down below as number 3?

3   Is that correct?

4   A.  That's correct.  That is source number 3.  And they had

5   information for these three provider types -- psychiatrists,

6   psychologists, and social workers -- on the number of providers

7   in California.

8       We obtained estimates of the California population and

9   California adult population from census bureau data files -- US

10  Bureau of the Census data files.  Those are listed as sources 4

11  through 8 of this table.

12      So what we -- we do in this table -- so we take the CDCR

13  numbers, and if we go out -- if you look out at column -- it's

14  the column labeled E, under population per provider, CDCR, we

15  assess -- it's essentially the -- the opposite, the inverse of

16  the number of providers per population.  So we're looking at

17  the -- how many individuals -- or how many inmates at CDCR per

18  provider.

19      So just to look at the first row of the table, as an

20  example, at CDCR, in 2018, the inmate population was 127,652.

21  Q.  And we're looking at Column B?

22  A.  That is from Column B.

23  Q.  Okay.

24  A.  And then in Column A, we see that there were 283

25  psychiatrists employed at CDCR in 2018.  And the ratio -- the

1   population -- inmate population per provider at CDCR was 450.4.

2   That is the number in Column E.

3   Q.   And that is taking the 127,652 in B, the inmate population,

4   and dividing it by the number of providers at CDCR, 283, in

5   Column A?

6   A.   That's correct.

7   Q.   And it's that same analysis you did all the way throughout

8   2018 through 2022 for the three categories of providers,

9   psychiatrists, psychologists, and social workers?

10  A.   That is correct.  Those are the different rows of the

11  table.

12  Q.   And that --

13  A.   So I would just say that this number, the 450.4, is a

14  measure of the access or the availability of psychiatrists to

15  the CDCR inmate population.

16  Q.   Okay.

17  A.   Column F, which is labeled CA Adult, that calculates the

18  population per provider among the adult population in

19  California.

20       So, again, focusing on the first row of the table, it is

21  psychiatrists in 2018.  If you look at Column C, there were

22  6,013 psychiatrists in California.  And there was -- the adult

23  population of California was 30,567,090 people.  Dividing --

24  you take California's adult population, dividing it by the

25  number of psychiatrists in California in 2018, yields an access

1   number of 5,083.78 people per psychiatrist in California in

2   2018.

3        The last step that we do in this table is we compare these

4   two numbers.  So at CDCR, there were 450.4 psychiatrists per

5   inmate [sic].  Among the general adult population in

6   California, there were 5,083.78 psychiatrists per person -- I'm

7   sorry -- people per psychiatrist.

8   Q.  Say that again, Doctor, so we make sure we've got this

9   right.

10  A.  In 2018, among the general adult population in California,

11  there were 5,083.78 people per psychiatrist.

12       And dividing the -- those two relative access numbers --

13  the 5,083.78, dividing that by 450.4 yields the number that

14  shows up in Column G, which is the relative access to

15  psychiatrists among CDCR inmates relative to the access among

16  the adult population throughout California in 2018.

17  Q.  So for every 400 -- just so I understand this, with respect

18  to CDCR, for every 450.4 inmates, there is a psychiatrist

19  available, and in the general population, there is a

20  psychiatrist available, but that person has to service

21  potentially 5,083.78 people; is that what we're looking at?

22  A.  That --

23            MS. HATTON:  Objection.  Leading.

24            THE COURT:  Sustained.  That answer is stricken.

25  Q.  BY MR. CIRELLI:  So can you explain, Doctor, just so that

1   we put it in context, what those two numbers mean and how you

2   get to the final access number at the very last column, which

3   is G?

4   A.  Sure.

5        So, again, focusing on psychiatrists in 2018, looking at

6   Column E we see that there is one psychiatrist for every 450.4

7   inmates at CDCR.  That same year, 2018, in the -- in the

8   general population -- the adult population throughout

9   California, there was one psychiatrist for every 5 --

10   essentially, 5,084 adults.

11       So taking the ratio of these two numbers indicates that

12   CDCR inmates had 11 times -- more than 11 times the access to

13   psychiatrists than did the adult population of California in

14   2018.

15   Q.  And so with respect to psychologists and social workers,

16   and then for each of the years 2018 through 2022, it would be

17   taking the same data and doing the same calculations to get to

18   what -- the access for inmates at CDCR relative to the general

19   population, the comparison number in Column G, it would be the

20   same --

21   A.  Yes --

22   Q.  -- process?

23   A.  -- it's the same calculation in each year and for each type

24   of provider.

25   Q.  So if we look at psychiatrists for 2021, what does this

1  tell us?

2  A.  So psychiatrists in 2021, there were 352 psychiatrists

3  employed at CDCR, an inmate population of 99,790.  Within

4  California, more broadly, there were 5,964 psychiatrists

5  employed throughout California in 2021 for an adult population

6  of 30,465,205.

7  Q.  And what I'm focusing on, Doctor, is doing the math.  What

8  is the relative access for psychiatrists to CDCR inmates versus

9  the general California population based on your calculations?

10  A.  Sure.  So in 2021, for psychiatrists, inmates at CDCR had

11  approximately 18 times the access to psychiatrists as did the

12  general adult population of California.

13  Q.  And so we can just do that and look at the last column, the

14  Column G, to see the access ratio for all three of these for

15  each of these years.  You'll see it there, right?

16  A.  Correct.

17  Q.  And this is the supply side of the supply of psychiatrists,

18  social workers, and psychologists, correct?

19          MS. HATTON:  Objection.  Leading.

20          THE COURT:  I'm going to allow that.  I think it's

21  just clarifying a point.

22      You can answer that.

23          THE WITNESS:  That is correct.

24  Q.  BY MR. CIRELLI:  Did you also look at the demand side and

25  how the demand for mental health in the general population

1    compares to the inmates in CDCR?

2    A.   Yes.

3    Q.   And what did you find there?

4         And is that documented, what you just -- what you're about

5    to testify to, in your report?  And if so, can you point us to

6    where?

7    A.   It is.  This is discussed in paragraph 100 of the report,

8    which is on pages 51 and 52.

9    Q.   And what did you find with respect to the relative demand?

10   A.   So CDCR inmates do have relatively greater demand for

11   mental health care than does the general -- than do estimates

12   of the demand for mental health care among the general

13   population in California.

14        So in recent years, CDCR's mental health census has

15   included approximately one third of the inmates at CDCR, so

16   that is approximately 33 percent of CDCR's inmates.

17        Recent estimates of the demand for mental health care in

18   California are that between 14 percent and 17 percent of adults

19   in California need mental health care.

20        So comparing those two percentages -- so 33, 34 percent at

21   CDCR, if we compare it to -- if we assume that 17 percent of

22   adults in California need mental health care, that suggests

23   approximately double the -- the need for mental health care --

24   or the demand for mental health care at CDCR relative to the

25   general population.  Or if we do the calculation with 14

1   percent, divide 33, 34 percent at CDCR by 14 percent of the

2   general population needing mental health care, that suggests

3   that the need for mental health care at CDCR is 2 and a half

4   times that among the general population in California.

5       So we're looking at 2 to 2 and a half times the demand at

6   CDCR relative to the general population.

7   Q.  So now taking into account demand versus supply, what does

8   that tell you with respect to the number of mental health

9   providers employed by CDCR versus those in California and its

10  impact on access.

11  A.  Right.  So going back to Table 2 and looking at the numbers

12  in 2022 -- the CDCR access relative to California in 2022, it's

13  a little bit more than 18 times the access at CDCR relative to

14  California for psychiatrists.  The relative access at CDCR is

15  almost 14 percent as much -- I'm sorry -- 14 times as much at

16  CDCR relative to the general population in California for

17  psychologists.  And the relative access at CDCR is nearly 4

18  times as much relative to the general population of California

19  for social workers.

20      If we scale those numbers to account for the fact that

21  inmates at CDCR have greater need -- greater demand for mental

22  health care, dividing that 18 times the access to psychiatrists

23  by 2 to 2 and a half times the -- the demand for psychiatrists

24  would be -- would suggest that even accounting for demand, that

25  inmates at CDCR still have 7 to 9 times the access relative to

1    the general population for psychiatrists.

2        Doing a similar calculation for psychologists suggests

3    that, accounting for demand, inmates at CDCR have 5 to 7 times

4    the access to psychologists as does the general population of

5    California.

6        And that accounting for demand, inmates at CDCR have 1 and

7    a half to 2 times the access relative to the general population

8    of California for clinical social workers.

9    Q.  And you're looking at 2022?

10   A.  Yes.

11   Q.  And you can do the same analysis for the prior four years

12   as well?

13   A.  Yes.

14   Q.  Would you find, if you did the math for the prior four

15   years -- have you done that math to determine whether or not,

16   taking demand into account, the access would still be greater

17   at CDCR versus the general population?

18   A.  I haven't -- I have not done it.  You know, we do observe

19   that the relative access numbers just on the supply side, the

20   ones that don't account for demand, they don't change a ton.  I

21   believe the relative access to psychiatrists at CDCR is higher

22   at the end of this five-year period than it was back in 2018.

23       The relative access -- not accounting for demand, the

24   relative access for psychologists and social workers doesn't

25   really change much over the period.  So accounting for demand,

1    the numbers would not change very much.

2    Q.  Have we now covered this observation with respect to CDCR

3    employing a disproportionate number of mental health providers

4    in California?

5    A.  Yes.

6    Q.  What was your next observation that informed your opinion

7    with respect to whether or not CDCR acted reasonably, or has

8    acted reasonably, with respect to the hiring and staffing of

9    mental health providers?

10   A.  So earlier, we looked at vacancies among the five mental

11   health classifications at issue.  These vacancies have

12   persisted despite CDCR paying substantially more in base

13   compensation to its mental health providers in these five

14   classifications relative to other employers in California and

15   the US.

16   Q.  And what was it that you looked at and analyzed to come to

17   that conclusion?

18       And just so the record is clear, when you say that we

19   looked at vacancies before, that's when we looked at the

20   figures from the report that start with Figure 5 and go beyond

21   that?

22   A.  Yes.  Yes.

23   Q.  So turning to this observation, can you describe for us

24   what you found here and how you found it, what the basis is for

25   your ultimate conclusions.

1   A.   Sure.   So we obtained from CDCR data on -- on its

2   compensation to the five mental health classifications at issue

3   for the same time period, 2018 through 2022.   We calculated an

4   average salary for each classification over that time period.

5        We also obtained data from the US Bureau of Labor

6   Statistics regarding the average salaries paid to the same five

7   classifications -- psychiatrists, psychologists, social

8   workers, recreation therapists, and medical assistants -- over

9   the same -- over the same time period from 2018 through 2022.

10   Q.   And did you create -- well, go ahead.   Have you covered --

11   A.   I was going to say and then we compared the two.

12   Q.   And did you create figures that we find in your report that

13   show these comparisons?

14   A.   Yes.

15   Q.   Starting with psychiatrists, where would we find the figure

16   that compares CDCR average salaries to these benchmarks that

17   you just described?

18   A.   So for psychiatrists, we have charted this information,

19   this data, in Figure 15, which is on page 56.

20   Q.   What are we looking at here, Doctor?

21   A.   So in Figure 15, the red line -- solid red line shows the

22   average salary paid to CDCR psychiatrists from -- from January

23   of 2018 through December of 2022.   This is actually a

24   conservative estimate of the average salary paid to CDCR

25   psychiatrists for a couple of different reasons.

1    Q.  What are those?

2    A.  One is that we are just showing the average salary for CDCR

3    staff psychiatrists.  This average excludes chief psychiatrists

4    and senior psychiatrists.  They earn more than staff

5    psychiatrists, so if they were included in this chart, the

6    average salary for CDCR psychiatrists would be even higher than

7    what we are showing.

8        A second reason that the CDCR average is conservative is

9    that we -- we have information on the pay band in which CDCR

10   staff psychiatrists -- the pay bands that are available to them

11   and how much they can earn -- the minimum that they can earn

12   within each pay band and the maximum that they can earn.  So we

13   don't know what each -- each individual actually earns; we only

14   know the maximum they could earn, the minimum they could earn,

15   and how many of them earn the maximum, how many of them earn

16   the minimum, and how many earn something that's in between the

17   maximum and the minimum.

18       So for purposes of calculating an average pay, we assume --

19   so we know how many are in the maximum; we assume those people

20   earn what they earn.  We know how many are in the minimum; we

21   assume those people earn what they earn.  For the folks that

22   are in the middle, we just know where -- where -- they fall in

23   between the minimum and the maximum in terms of their actual

24   earnings in any given period, so we assume that they earn the

25   minimum.  It's a conservative assumption.  It leads us to --

1    you know, essentially, for those folks, we're assuming they

2    earn less than they actually earn.  We don't know how much less

3    than they actually earn.

4    Q.  So what does that do to the red line?

5    A.  So, again, if we -- you know, if we made a different

6    assumption about what these people earned or if we knew what

7    they actually earned, it would be more than we assume that they

8    earn.  So the -- the red line, the CDCR average salary, would

9    be greater.

10   Q.  Resulting in a greater delta between CDCR's salary being

11   higher than the benchmarks that you're about to describe for

12   us; is that fair?

13   A.  Sure.  So let me -- let me first, you know, describe the

14   benchmarks that we use.

15        One is the average salary paid to psychiatrists -- to

16   employed psychiatrists throughout California; that is the

17   yellow dotted line you see charted on this figure.  The other

18   benchmark we consider is the average salary paid to employed

19   psychiatrists nationwide; that is the green dotted line that is

20   charted on this figure.

21        And so CDCR has, on average, paid its staff

22   psychiatrists -- has, on average, consistently paid its staff

23   psychiatrists more than the average paid to employed

24   psychiatrists either in California or throughout the United

25   States.

1          So, again, to get back to the previous point, if we -- if

2     we didn't assume that any CDCR staff psychiatrists that earn

3     something in between the minimum and the maximum -- if we -- if

4     we didn't assume that they earn the minimum, which is what we

5     do assume -- but if we didn't assume that, then that red line

6     would be even higher, and the gap between what CDCR pays and

7     the average that's paid either in California or nationwide,

8     that gap would be larger.

9     Q.  So, in essence, what it's telling you that consistently

10    CDCR pays more is the fact that the red line is above both the

11    green and the yellow line consistently throughout this chart;

12    is that correct?

13    A.  That is correct.

14    Q.  And I don't think you told us what the source is for the

15    California information, for the US information.  Is that

16    reflected at the bottom of this figure?

17    A.  That is the Bureau of Labor Statistics source, that -- the

18    Bureau of Labor Statistics.  Specifically, it is a Bureau of

19    Labor Statistics survey called the Occupational Employment and

20    Wage Survey.  And that data is publicly available on the Bureau

21    of Labor -- US Bureau of Labor Statistics' website.  And that

22    is data that we obtained to -- to do this analysis.

23    Q.  And so you did this analysis for the other four mental

24    health provider disciplines that are at issue as well?

25    A.  Yes, we did.

1  Q.  Let's take a look at psychologists.  Where would we find

2  that, Doctor?

3  A.  So psychologists are in Figure 16, which is on page 58 of

4  our report.

5  Q.  Did you use the same sources for the information here, with

6  respect to salaries, as what you just described for

7  psychiatrists?

8  A.  Yes.  We used the same sources for all five

9  classifications.

10  Q.  And with respect to the pay, the red line, CDCR, is that

11  also a conservative estimate?

12  A.  It is, for the same two reasons I discussed relating to

13  psychiatrists.

14      Number one, that we exclude chief and senior psychologists

15  from the calculation.  So if they were included, the average

16  salary paid to CDCR psychologists would be even higher than

17  what we show here.

18      And also, again, similarly to psychiatrists, for

19  psychologists, we assume that anybody who is not earning the

20  maximum pay available to them in their pay band earns the

21  minimum pay, so to the extent that there are individuals who

22  earn somewhere in between the minimum and the maximum, we are

23  assuming that they earn less than what they actually earn, and

24  if -- and so that causes the -- the average salary that we

25  chart here to be lower than the true average salary.

1  Q.  So, in sum, what does this figure tell us?

2  A.  So, again, similar to psychiatrists, CDCR psychologists

3  have earned -- consistently earned more than psychologists have

4  earned on average, statewide or nationwide, throughout this

5  period from 2018 through 2022.

6  Q.  Did you also look at clinical social workers?

7  A.  Yes.

8  Q.  Where would we find a similar chart for clinical social

9  workers?

10  A.  That is Figure 17 on page 60.

11  Q.  And, again, how did you arrive at the information for this

12  chart?

13  A.  We relied on the same data sources from CDCR and the Bureau

14  of Labor Statistics, performed similar calculations.

15      And, again, for clinical social workers at CDCR, we

16  excluded the supervising psychiatric social workers who earn

17  more than the clinical social workers.  So if they were

18  included, the average salary at CDCR would be higher than what

19  is shown here.

20      And, again, we also assumed that anybody who did not earn

21  the maximum within their pay band at CDCR earned the minimum,

22  and so that causes the average salary at CDCR that we chart

23  here to be lower than the actual average.

24  Q.  So even with that conservative calculation with respect to

25  the salary for clinical social workers at CDCR, the red line,

1  what does -- ultimately, even with that conservative estimate,

2  what does this graph tell us?

3  A.   So similar to psychiatrists and psychologists, clinical

4  social workers at CDCR have, on average, earned -- consistently

5  earned more than their -- than the average that was paid to

6  social workers in California or nationwide.

7  Q.   When you say consistently, you mean throughout an entire --

8  the five-year period that's reflected here?

9  A.   Yes.

10  Q.   Recreational therapists, did you look at their salaries and

11  comparison benchmarks as well?

12  A.   Yes.   They are in Figure 18, which is on page 61.

13  Q.   And what did your analysis there show?

14  A.   So, again -- so recreation therapists, there are no higher

15  level recreation therapists, so there is only one job category

16  for it.   This just reflects the salaries -- or the average

17  salary for recreation therapists.

18      Again, we do still assume that anybody not earning the

19  maximum available to them earns the minimum.

20      And consistently from 2018 through 2022, CDCR recreation

21  therapists, on average, earned more than the average recreation

22  therapist in California or nationwide.

23  Q.   And then the last category is medical assistants.   Did you

24  also look at their salaries compared to the benchmarks?

25  A.   We did.   That is in Figure 19, which is on page 63.

1   Q.  This has some more lines, so what is this telling us?

2   A.  Right.  So as I discussed earlier, for purposes of

3   computing the average salary at CDCR, we assumed that anybody

4   not earning the maximum was earning the minimum.

5       During the time period that we studied, which was 2018

6   through 2022, there were no medical assistants at CDCR who

7   earned the maximum pay available to them.  So our calculation,

8   because it assumes that anybody not earning the maximum earns

9   the minimum, the red line that's shown here is the minimum CDCR

10  salary available to medical assistants over this period.

11      So a couple of points.

12      One is that we have been informed that there have been

13  medical assistants hitting the maximum pay available to them

14  more recently, in recent months in 2023, so we know that it is

15  happening, but it was not during this period.

16      A second point is that, at least as of recent months --

17  sorry -- I think at the end of 2022, more than 75 percent of

18  the medical assistants were earning more than the minimum

19  salary that was available to them, but they weren't yet earning

20  the maximum salary available to them.  I believe it's 23

21  percent were earning the minimum.  So we know that most of the

22  medical assistants earn somewhere in between the minimum and

23  the maximum, but we just don't know where they are in between.

24      So for medical assistants, we show the minimum salary at

25  CDCR that is available to them and the maximum salary at CDCR

1    that would be available to them if they earned the max.  The

2    minimum is the dark red line; the maximum is the lighter red

3    line, pinkish line.  So we know that -- we know that 23 -- I

4    think it's 23 percent of medical assistants are earning the

5    amount that's shown in the dark red line, and the rest,

6    approximately three quarters, are earning somewhere in between

7    the red line and the pink line, but we just don't know where.

8    We don't know where they are.

9        So the minimum amount earned by CDCR medical assistants in

10   the two most recent years, it's been above the national average

11   but below the average paid to medical assistants in California.

12   In the earlier portion of the time period, it was lower than

13   the national average -- slightly lower as well.

14       The maximum amount paid to medical assistants at CDCR,

15   again, the light red line, has consistently been greater than

16   both the California average and the national average.  And,

17   again, we just don't know where three quarters -- what three

18   quarters of the medical assistants are earning, where they fall

19   in between those two dark red and light red lines.

20   Q.  So in addition to looking at this benchmark data from the

21   Bureau of Labor Statistics, did you look at any other sources

22   or do any other analyses with respect to this salary issue that

23   we've been discussing?

24   A.  We did.  There are two other things I would discuss.

25       One is that we did a similar analysis to the five figures

1  that we looked at for the state of California and nationwide;

2  we did a similar analysis within metropolitan areas in

3  California where we had the data available to do that

4  comparison, so this would be within specific metropolitan areas

5  such as Fresno or Los Angeles, San Francisco.  If there were

6  data available both from CDCR and the Bureau of Labor

7  Statistics, we compared the average CDCR salary specific to

8  employees in that metropolitan area to the average salary that

9  we obtained from the Bureau of Prisons of Labor Statistics

10  specific to employees -- employees of all employers in that

11  metropolitan area.

12       Those -- there is a series of charts which we do that.

13  That is in Appendix 1 to our report.

14  Q.  We won't go through all of those charts, but what did you

15  find when you looked at this data on a regional basis?  Just at

16  a high level, if you can.

17  A.  So, yeah, again, the same general conclusion.  I think the

18  regional analysis corroborates the statewide and nationwide

19  findings, that for the five classifications at issue -- you

20  know, again, certainly for psychiatrists, psychologists,

21  clinical social workers, and recreation therapists CDCR average

22  salaries are generally at or above, sometimes considerably

23  above, the average paid to similar employees in most

24  metropolitan areas.

25       Medical assistants, again, you know, we're looking at --

1  since we don't have a true calculation of the average, we're

2  looking at the minimum and the maximum pay that was available

3  to medical assistants and how that compared to the average pay

4  for medical assistants.

5      And again, you know, in most metropolitan areas, in most

6  years, the maximum is certainly above the average in the

7  metropolitan area, and the minimum sometimes below, sometimes

8  about the same, sometimes -- sometimes above.  So that one is a

9  bit more of a wash.

10 Q.  So in addition to looking at the national and the state

11 averages based on the Bureau of Labor Statistics information,

12 did you look at any other source to compare the salaries at

13 CDCR with other institutions?

14 A.  We did look at one other data source, which was we obtained

15 data from the Federal Bureau of Prisons on the compensation

16 they pay to their psychiatrists, psychologists, and clinical

17 social workers at their California locations.

18 Q.  And where in the report is that data and that analysis

19 found?

20 A.  That is on pages 65 and 66 of the report.

21 Q.  And in sum, Doctor, in comparing the salaries at CDCR to

22 the salaries at the Federal Bureau of Prisons provided by the

23 Federal Bureaus of Prisons what did you find?

24 A.  So we found that CDCR's average pay for psychiatrists was

25 consistently always above the pay available to psychiatrists

1   employed at the Federal Bureau of Prisons throughout

2   California.  It was with, I believe, you know, one totally

3   minor exception; it was -- the CDCR psychologist pay was higher

4   than all of the Federal Bureau of Prisons psychologist

5   salaries.

6        And CDCR clinical social worker pay is also generally --

7   generally above that available to clinical social workers

8   employed by the Bureau of Prisons in California.

9   Q.  Did you reach a conclusion as to how much higher the salary

10  paid by CDCR was in comparison to the Federal Bureau of Prisons

11  for those three categories of mental health providers?

12  A.  Sure.  So it's a range, because, again -- so for the

13  Federal Bureau of Prisons information, we know the minimum and

14  the maximum that they are able to earn in different areas in

15  California.

16       For psychiatrists, the average CDCR compensation for

17  psychiatrists is anywhere from 79 percent to 250 percent higher

18  than the compensation available to Bureau of Prisons

19  psychiatrists in California.

20       For psychologists, CDCR's average base pay was generally --

21  it was as much as or up to 97 percent higher than the

22  psychologist pay available to Bureau of Prisons psychologists

23  in California.

24       The one exception, I think -- I think, if you are a Bureau

25  of Prisons psychologist earning the maximum available to you in

1    the San Francisco metropolitan area -- I think it was in 2020

2    -- then that was the -- that was the one exception to that.

3    And they earned 1 to 2 percent more if they earned the maximum

4    available to them at the Bureau of Prisons.

5         For clinical social workers, again, at CDCR, the average

6    compensation for clinical social workers was generally as much

7    as or up to 55 percent higher than the base pay available to

8    Bureau of Prisons clinical social workers.

9         There were years -- certain years for which clinical social

10   workers earning the maximum -- Bureau of Prisons clinical

11   social workers earning the maximum pay available to them would

12   have earned more than the average clinical social worker at

13   CDCR.  That was limited to the -- the metropolitan -- the four

14   largest metropolitan areas in California:  San Francisco, San

15   Diego, Los Angeles, and Sacramento.

16   Q.  And, again, looking at the comparison generally, without

17   focusing on that one area, what did you find?

18   A.  That CDCR, on average, earns more than both the -- than the

19   pay available to the Bureau of Prisons employees.

20   Q.  With respect to clinical social workers as well, that's

21   what we were just focusing on, right?

22   A.  Yes, that's correct.

23              THE COURT:  We should take a break.  So 20-minute

24   break.

25              MR. CIRELLI:  Can I ask one question to close this

```
 1   loop?

 2           THE COURT:  All right.

 3   Q.  BY MR. CIRELLI:  Have we now covered the analysis you did

 4   with respect to salaries paid at CDCR in comparison to

 5   benchmarks?

 6   A.  Yes.

 7   Q.  Thank you, Doctor.

 8           THE COURT:  All right.  20-minute break.  We'll start

 9   at 2:40.

10       (Recess taken, 2:21 p.m. - 2:43 p.m.)

11           THE COURT:  You may be seated.  The Court is going to

12   stand, just to give itself a break.  If anyone else needs to

13   stand for purposes of ergonomics --

14           MR. CIRELLI:  I can't do it, because I was trained to

15   stand whenever I'm in court, but I'd love to sit right now

16   because my lower back is killing me, Your Honor.

17           THE COURT:  Well, if that's a formal ergonomic

18   request, it's granted.

19           MR. CIRELLI:  I can't do it, even if you allowed me

20   to.

21           THE COURT:  Okay.  So are you on track with no more

22   than four hours with this witness?

23           MR. CIRELLI:  I hope so.

24           THE COURT:  All right.

25           MR. CIRELLI:  How far am I right now, Your Honor?
```

 1                   THE COURT:  Let's see, you went from 10:50 to 11:50,

 2     12:55 to about 2:20, so you're about two and a half hours in.

 3                   MR. CIRELLI:  Okay.  Thank you, Your Honor.

 4                   THE COURT:  My thought is that the Plaintiff should

 5     be able to start today before we adjourn at 5:00.

 6                   MR. CIRELLI:  That is certainly my hope.

 7                   THE COURT:  All right.

 8                   MR. CIRELLI:  And my goal now.

 9                   THE COURT:  All right.  I'll let you know when you

10     have 15 minutes left of four hours.  How about that?

11                   MR. CIRELLI:  Okay.  I didn't realize that we had

12     time limits, Your Honor.

13                   THE COURT:  I'm just looking at your estimates.  And

14     if we're going to get done in the time anticipated, I assume

15     you made a reasonable estimate of the time needed.

16                   MR. CIRELLI:  As best I could as a lawyer.

17                   THE COURT:  All right.  You may proceed.

18                   MR. CIRELLI:  Thank you, Your Honor.

19     Q.  BY MR. CIRELLI:  So, Doctor, we were just talking about

20     your observations with respect to CDCR salaries in comparison

21     to benchmarks.

22          Are there other observations that you made that inform or

23     support your overriding opinion with respect to the

24     reasonableness of CDCR's conduct in the staffing of mental

25     health providers at the prisons?

1    A.   Yes.

2    Q.   And what is that?

3    A.   So certain financial benefits and incentives that CDCR has

4    offered to its mental health providers have not meaningfully

5    impacted their employment of mental health care professionals.

6    Q.   Are there particular benefits that you looked at?

7    A.   There are three that I would discuss, yes.

8    Q.   And what are those?

9    A.   The first one is dual appointment opportunities, that my

10   understanding is CDCR has made those available to

11   psychiatrists, psychologists, and clinical social workers in

12   its employment.

13   Q.   Before we talk about what you observed with respect to the

14   dual appointment opportunities, is this discussed in your

15   report?

16   A.   It is.

17   Q.   Where would we find it?

18   A.   It is discussed at pages -- Bates-numbered pages 69 and 70.

19   Q.   And, Doctor, based on your review and analysis with respect

20   to dual appointment opportunities, what did you find?

21   A.   So my understanding is that CDCR offers these opportunities

22   to the three classifications I just mentioned, where employees

23   have the opportunity to work up to an additional ten hours per

24   week at a secondary appointment that is in addition to their

25   primary appointment.  So they thus have the opportunity to earn

1    up to 25 percent additional base compensation -- 25 percent

2    supplemental to their base compensation.  Which, despite this

3    opportunity being available to many CDCR employees, we do

4    not -- we have not seen that many individuals taking this offer

5    up.

6        So information that we obtained from CDCR indicates that,

7    to date, there have been 32 psychiatrists, 25 psychologists,

8    and 12 social workers that have practiced in the dual

9    appointment program.  And that's not necessarily at a given

10   point in time either.  I'm not a hundred percent clear on the

11   timing, but that might be over a span of time.  So at any given

12   point in time, it might be fewer than that number of providers

13   that's actually participating in the program.

14   Q.  So what does this tell you with respect to your opinions?

15   A.  So the majority -- large majority of CDCR's psychiatrists,

16   psychologists, and clinical social workers are not

17   participating in the program.  They are not taking advantage of

18   this opportunity to earn 25 percent or more -- I'm sorry, up to

19   25 percent additional pay in addition to their base

20   compensation.  So this is not consistent with individuals

21   simply wanting to earn more money.

22   Q.  What else did you look at, Doctor?

23   A.  We looked at fringe benefits that are -- that CDCR offers

24   to its employees -- to the five mental health classifications

25   at issue.

1    There is a CDCR interrogatory response that provides

2    estimates of how much -- the value that CDCR places on its

3    retirement, health insurance, and, I believe, its other

4    post-employment benefits.

5    Q.  Where is this -- before you continue, where is this

6    discussed in your report?  Did you tell me that already?

7    A.  I did not.  This is at page 71 of our report.

8    Q.  Thank you, Doctor.  Go ahead.

9    A.  So CDCR has an estimate of the value of these benefits

10   related -- related to the salary that the mental health

11   classifications earn.  And CDCR estimates that the value of

12   these benefits is anywhere from 34 percent of the mental health

13   provider's salary to 50 -- essentially 59 percent of the mental

14   health provider's salary.  And the percentage tends to be lower

15   for those employees who earn a higher salary, and the

16   percentage tends to be higher for those employees who earn a

17   lower salary.

18      But this range of estimates, 34 to 59 percent, it's more,

19   and potentially considerably more, than an estimate of the

20   average -- the average value of similar benefits provided to

21   employees nationwide.

22      So we obtained information again from the Bureau of Labor

23   Statistics, this time from its publication on employer costs

24   for employee compensation, and that data suggests that

25   nationwide, employer costs for insurance, retirement, and

1    legally-required benefits among health care and social

2    assistance workers were 27 percent of wages and salaries as of

3    March of this year.

4        So 27 percent is less generous than the estimates that CDCR

5    has for the value of similar benefits that it provides to its

6    mental health employees.

7        So thinking back to the -- the chart that compares CDCR's

8    salary to average salaries in California and average salaries

9    nationwide, we saw that CDCR pays base compensation

10   consistently above base compensation the average employee in

11   California and nationwide earns for the -- for the

12   classifications at issue.  And this -- these fringe benefits

13   would -- would simply make the gap even larger if we were to

14   think about including fringe benefits in that comparison.

15   Q.  Is that because the fringe benefits provided by CDCR,

16   they're higher than the benchmarks as well?

17   A.  As a percentage of compensation, they are greater than the

18   national benchmark.

19   Q.  Have we covered your observations with respect to fringe

20   benefits and the impact of those on your opinion?

21   A.  Yes.

22   Q.  Anything else that you looked at?

23   A.  One other thing we looked at was we obtained data from CDCR

24   on its registry pay and the differentials and increases in

25   registry pay that have existed throughout, again, the same time

1    period that we've been looking at, 2018 through 2022.

2         So we obtained the --

3    Q.   Can I stop you for a minute, Doctor?

4    A.   Yes.

5    Q.   Just tell us, what is registry pay?

6    A.   Sorry.  So registry pay would be the hourly pay that CDCR

7    pays to its contracted registry -- I'll call them registry

8    employees.  I'm not sure if that's precisely the right term,

9    but it's -- it's a term that labor economists will use even

10   though these are contracted -- contracted employees.

11        But the registry pay is an hourly rate that CDCR pays to

12   the different class -- there are different rates for the

13   different classifications of mental health providers.  And that

14   can be -- one can calculate an annualized equivalent or just

15   look at the hourly rate itself.

16   Q.   And where is the discussion of the impact of registry rate

17   differentials and increases on your opinions in your report?

18   A.   That is at pages 66 through 68.

19   Q.   And what did you find that impacts your overriding opinion

20   in this matter?

21   A.   So we -- we observed that CDCR has paid -- has increased

22   its registry pay over time, and it has offered differential pay

23   at different CDCR facilities, but despite the differentials and

24   the increases, we don't observe an increase in registry

25   employment or registry filled positions at CDCR over the 2018

1    through 2022 period.

2              THE COURT:  I think this starts on page 84, doesn't

3    it?

4              THE WITNESS:  There -- there is -- there is

5    actually -- so there are two sections that discuss registry

6    pay.  The -- at pages 66 through 68, we --

7              THE COURT:  Okay.  I see.

8              THE WITNESS:  -- we talk about the effect on filled

9    positions.  And pages -- starting at page 84, we are making the

10   point that individuals, should they choose to work for CDCR

11   through registry rather than civil service, that they could

12   earn considerably more.

13             THE COURT:  I see both sections now.

14   Q.  BY MR. CIRELLI:  Thank you, Doctor.

15       So we just talked about dual appointment opportunities,

16   fringe benefits, and registry pay differentials and increases

17   and how those potentially impact or do not impact staffing

18   levels.  I don't want to go into others, but does your report

19   also address other benefits, such as helping with visas and

20   student loans and other benefits that are potentially

21   available?

22   A.  It does.  There are a number of these.  I can give you some

23   page numbers if you give me a --

24   Q.  That's exactly what I was going to ask you.

25   A.  Give me a minute here.

1        So we discussed certain other incentives that are available

2   to CDCR employees -- to the mental health employees at issue,

3   starting at Bates-numbered page 66 and continuing -- both the

4   incentives and hiring initiatives, that continues through page

5   74.

6   Q.   Thank you.

7        So did you do anything else or observe anything else that

8   informed or supports your opinion with respect to the

9   reasonableness, and specifically your opinion that CDCR has

10  been reasonable, with respect to its staffing efforts?

11  A.   So we -- we did conduct a statistical analysis, yes.

12  Q.   And this is the regression analysis you alluded to before?

13  A.   Yes.

14  Q.   And so what is a regression analysis?

15  A.   So regression analysis is a statistical tool that is

16  frequently used by economists, and it measures relationships

17  between variables.  And variable -- a variable can be anything

18  that can be measured, can be quantified.

19       Regression analysis plays an important role in allowing

20  economists to test a hypothesis or a theory about whether there

21  is a relationship or not between two variables.

22       So, for example, you know, a -- one can test whether two

23  factors are related.  And, if they are related, is the

24  relationship positive, when one factor increases, does the

25  other one increase, too.  Or is the relationship negative, when

1   one factor increases, the other one decreases.

2       So regression analysis allows you to assess relationships

3   in this manner.

4       Regression analysis is set up or constructed with a

5   dependent variable and a set of independent variables.  The

6   dependent variable is a variable of interest; it is something

7   you're trying to determine its relationships with the

8   independent variables.  The independent variables are what the

9   economist thinks might have a relationship with the dependent

10  variable.

11  Q.  So to put things in context, what was the dependent

12  variable that you were looking at in your regression analysis

13  that you performed in connection with this matter?

14  A.  Right.  So we looked at two different -- we separately

15  looked at two different dependent variables.  One was the

16  number of filled positions, specifically civil service filled

17  positions at CDCR, for each of the five classifications at

18  issue.

19      Another set of regressions, we looked at CDCR's net hires

20  for psychiatrists, psychologists, and clinical social workers.

21  Net hires are simply the number of appointments in a time

22  period to that particular classification minus the number of

23  separations or people who left that -- that classification in

24  that time period.

25  Q.  Okay.  So having identified those dependent variables you

1    looked at -- I interrupted you.  Go ahead and continue to

2    explain what the analysis does.

3    A.   Okay.  So -- so, essentially, here, we are testing whether

4    higher levels of compensation that CDCR has offered relative to

5    statewide or nationwide averages -- are CDCR's higher levels of

6    compensation associated with either greater fill rates or

7    greater net hires among the five classifications at issue.

8        And so, again, the filled positions or the net hires are

9    the dependent variables in our regression analyses.  Those are

10   the ones we're seeking to look at relationships between CDCR

11   pay and those measures of employment.

12       We include other independent variables as well as CDCR pay

13   in our regression analyses.  We include benchmark pay, whether

14   that be statewide average pay, California average pay, or US

15   average pay.  And that is so that we can assess the effect of

16   higher compensation at CDCR relative to a given level of

17   compensation statewide or nationwide.

18       We also include, as an independent variable, the number of

19   authorized positions for each specific classification at CDCR.

20   And the number of authorized positions is essentially a measure

21   of demand.  It's -- it's the number of positions that CDCR is

22   trying to fill for that particular classification.

23       We include a time trend which will capture and control for

24   any -- anything that is -- is changing smoothly, increasing

25   over time or decreasing over time.

1  Q.  When you say a time trend, what does that mean?

2  A.  A time trend is a variable that, you know, takes -- in

3  economist speak, it takes the value of one in the first period;

4  it takes the value of two in the second period.  So it's a

5  variable that trends.  And it will -- it will capture and

6  control for any -- like I said, any smoothly changing, smoothly

7  increasing or decreasing, anything that's changing in that way

8  over time, so that the relationship that we estimate between

9  CDCR pay and either filled positions or net hires is

10 independent of anything that changes smoothly over time.

11 Q.  Any other things you included?

12 A.  One other variable that we include in our regression

13 analyses is what we call an indicator, or a dummy variable, for

14 the COVID-19 pandemic.

15     And an indicator variable takes on the value of one when

16 something -- in this case, the pandemic -- was in existence,

17 and it takes on the value of zero when it was not in existence.

18 So the -- the indicator variable will capture the effect of

19 anything that is specifically related to COVID.

20 Q.  Anything else that was included in the regression?

21 A.  No.  I think that's it.

22 Q.  And is there a statistical software program that is used by

23 economists once you put the input in to run this type of

24 analysis?

25 A.  There are many statistical software programs that are used

1   by economists.  We happen to use one that's called R.  You

2   know, there are -- there are others, there is Stata, there is

3   SAS, there's SPSS.  It -- you know, all statistical software

4   packages will tend to offer the same -- you can run the same

5   analysis in any of these.

6   Q.  And does this -- once you run the software program, you get

7   results that indicate whether there is a relationship between

8   the variables that you're looking at?

9   A.  So statistical -- regression results that come from a

10  statistical analysis will -- will indicate -- they will

11  estimate a relationship between the dependent variables and

12  each of your independent variables.  But because everything is

13  measured with error, because things vary over time, it won't

14  just provide a single estimate, what we call a point estimate;

15  it will provide a range of estimates that you can be a certain

16  percent confident that the -- the true relationship is

17  somewhere within that range.  So we call that a confidence

18  interval.

19      And a frequently -- a frequently used confidence interval

20  among economists is a 95 percent confidence interval.  And a 95

21  percent confidence interval is the range of values such that

22  you can be sure the true relationship -- or you can -- you

23  can't be sure, but you can be 95 percent confident that the

24  true relationship between two variables is somewhere in that

25  range.  We don't know exactly where, but it's somewhere in

1   there.

2   Q.  So maybe it will help to take a look at what the results

3   were of the analyses you did here.

4       Are those results found in your report?

5   A.  They are.  So we have three figures, and then a more

6   complete reporting of regression analysis results is in

7   Appendix 2.

8   Q.  And where does Appendix 2 start?

9   A.  Appendix 2 starts on Bates number page 96, and it continues

10  through page 106.

11  Q.  And do you have figures that show -- illustrate the

12  results?

13  A.  We do.  The first one is figure 20.

14  Q.  Where would we find that in the report?

15  A.  It is on page 78.

16  Q.  And I believe it's up on the screen now.

17      What are we looking at here, Doctor?  What is this telling

18  us?

19  A.  So let me start by describing the axes.  This doesn't show

20  every single relationship that we're estimating in the

21  regression, but it shows the relationships that we estimate

22  between filled positions and salary measures.

23      So you can see there is -- on the vertical axis, there are

24  six sets of -- of lines, essentially.  The first five are

25  specific to each of the five classifications at issue, and the

1   lines that are to the right in the figure represent estimates

2   from two different regressions for -- specific to each of those

3   five classifications.

4       The sixth line, where it just says CDCR salary, that is an

5   additional two -- two more regressions where we looked to

6   estimate a -- a relationship between CDCR pay and filled

7   positions for all five -- a single relationship for all five

8   classifications.

9       The horizontal axis where we have numbers negative 10 to

10  positive 15, those are estimates of the -- or numbers that

11  reflect estimates of the relationship between CDCR pay and

12  filled positions.

13      So, for example, a -- a five -- the number 5 would indicate

14  that we estimate a -- that a 1 percent increase in CDCR pay,

15  controlling for everything else that we control for in the

16  regression, is associated with a 5 percent increase in filled

17  positions at CDCR.

18      Now, the dots and the lines that we --

19  Q.  Can I stop you, Doctor, for just one second?

20  A.  Yes.

21  Q.  If what we're looking at is a dot that is on the negative

22  side, what does that mean?

23  A.  So if it's a negative number, that suggests that over the

24  time period we studied, a -- a 1 percent increase in CDCR pay

25  was associated with a decrease in filled positions at CDCR in

1    that time period.

2    Q.   Okay.   Sorry I interrupted you.   Go ahead.

3    A.   Right.   So the -- the horizontal lines that are in blue for

4    each of the six -- essentially, the six lines that we show on

5    this chart show what we call point estimates and coefficient --

6    excuse me -- confidence intervals for the regressions that we

7    ran.

8        So, for example, let's look at psychiatrists, which is

9    the -- the second set of lines up from the bottom.   So these

10   are -- the two lines for psychiatrists are the estimated

11   relationship between CDCR pay and filled positions for

12   psychiatrists.   The top line is when -- is the estimate when we

13   control for average psychiatrist -- average psychiatrist

14   salaries in California.   The bottom one is when we control for

15   average salaries in the US.

16   Q.   The average salaries you're talking about is what we looked

17   at before when we looked at the benchmarks?

18   A.   That's correct.   It's the same -- we relied on the same

19   data that we charted in figures where we looked at CDCR and

20   benchmark average salaries.

21       The dot is essentially what we call a point estimate.   The

22   line is the 95 percent confidence interval.

23       So, for example, for the top line that we see for

24   psychiatrists, the line goes from approximately negative 1 to

25   5.   And what -- what this tells us is that we can be 95 percent

1   confident that the true relationship between psychiatrist pay

2   and psychiatrist filled positions at CDCR during the time

3   period we analyzed was such that a 1 percent increase in pay

4   would be associated with anywhere from a 1 percent decrease in

5   psychiatrist filled positions to a 5 percent increase in

6   psychiatrist filled positions.

7       So the black line -- the black vertical line in this figure

8   is a line that indicates zero.  So when any of our confidence

9   intervals cross that zero line, those are estimates for which

10  we cannot conclude, to a 95 percent degree of confidence, that

11  the estimated relationship is any different from zero, because

12  all of the values on that horizontal line are -- we can't

13  conclude that they are statistically different.

14      So from the -- from the four -- there are four regressions

15  that we report on this chart.  The first two regressions

16  are the two lines that we see in each of the top five panels,

17  the ones that are specific to each of the five classifications

18  at issue, and the third and fourth regression results that we

19  report are the two -- the two lines in the bottom panel where

20  it just says CDCR salary.

21      And with the exception of medical assistants and, it looks

22  like, also the exception of psychologists for -- for the

23  regression where we control for California average salaries,

24  which is the top of the two lines for psychologists, it appears

25  that we cannot conclude -- we can't conclude that the

1   relationship between pay and filled positions is -- is

2   different from zero.

3       For medical assistants, there appears to be -- for these

4   regressions, there appears to be a positive relationship

5   between filled position and pay.  And for psychologists, the

6   opposite actually appears to be true over this time period.

7   Q.  Because that line is on the negative side of --

8   A.  It is --

9   Q.  -- zero?

10  A.  It is fully to the left of zero, yes.

11  Q.  And just so that I understand it, the 95 percent confidence

12  interval, that is represented by the -- all these horizontal

13  lines, correct?

14  A.  That is correct.

15  Q.  And so is that telling us, at a 95 percent confidence

16  interval, that 95 times out of a hundred the result is going to

17  be somewhere on that line?

18  A.  Yes.  You can think of it that way.  Yes.

19  Q.  So, in sum, if we're there yet, what does this statistical

20  analysis tell you that informs your opinion with respect to the

21  conduct of CDCR in relation to staffing?

22  A.  So the statistical -- the regression analyses that are --

23  that are shown here, the four regression analyses, in general,

24  do not find a statistically significant relationship between

25  CDCR pay and filled positions for the five classifications at

1    issue.  The three caveats being the medical assistant and the

2    psychologist ones that we just discussed.

3    Q.  Anything else that you observed from the results of this

4    particular regression analysis that we are looking at in Figure

5    20?

6    A.  No.

7    Q.  Did you run another set of regression analyses?

8    A.  We did.  We ran several others.  And, again, they're --

9    they're fully reported in Appendix 2.  But we did prepare

10   figures for a couple of other sets of regression analyses.

11   Q.  Why did you pick these to prepare figures for?

12   A.  The -- the two sets that we did not prepare figures for

13   relied on -- they looked at relationships between filled

14   positions, or net hires, and lagged pay, with the -- the

15   thought process being that it might take a period or two for

16   filled positions or net hires to respond to changes in pay.

17        The -- our findings from those regressions were

18   qualitatively the same as the findings from the ones that we

19   produced figures for.

20   Q.  Okay.  So going back to the ones that you did produce

21   figures for, what is the next figure that informs us with

22   respect to what you found in doing the regression analysis?

23   A.  So the next one is Figure 21, which is on page 80.

24   Q.  And what are we looking at here, Doctor?

25   A.  So here, we, again, have four regressions that are reported

1  on this chart.  I know it gets a little bit confusing because

2  we haven't separated out exactly where the different

3  regressions are shown.  But this set of four regressions,

4  rather than including CDCR average salaries and the benchmark

5  average salaries, be they California or US -- rather than

6  including them as separate independent variables in our

7  regression, here we looked at a single measure, which was the

8  premium of CDCR's salary over the benchmark salary.

9      Again, the benchmark can be either California or the US;

10  we've done it both ways.

11      So this set of regressions looks at the relationship

12  between CDCR's salary premium relative to benchmarks -- the

13  relationship between that and filled positions for the five

14  classifications at issue.

15  Q.  And what does this -- the results from these regressions

16  tell you that informs your opinion with respect to the

17  reasonableness of CDCR's efforts with regard to staffing

18  levels?

19  A.  Right.  So the big picture takeaway, again, is that

20  we've -- we show the 95 percent confidence intervals; those are

21  the horizontal lines that are charted in this figure.  They

22  almost all cross the vertical line at zero, the one exception

23  being the relationship between CDCR salary premiums over

24  California salaries for psychiatrists.  That is the fifth line

25  down.  With that one exception, all of the confidence intervals

1   include zero.  All of these horizontal lines cross the line at

2   zero.  And thus we can't conclude that there is a statistical

3   relationship between CDCR's compensation -- I'm sorry -- CDCR's

4   salary premium and filled positions for the five

5   classifications at issue.

6   Q.  And the one where the horizontal line does not cross, that

7   indicates a negative?

8   A.  It does.  So, again, it just suggests that in the periods

9   when CDCR had a larger salary premium relative to California

10  average salaries for psychiatrists, that in those periods,

11  those were the periods when CDCR filled fewer psychiatrist

12  positions.

13  Q.  So when the lines cross zero, that means there is no

14  statistically significant relationship between the salary and

15  filled positions; is that correct?

16  A.  That is correct.

17  Q.  Did we cover what this regression analysis tells us -- or

18  analyses, since there is more than one?

19  A.  Yes.

20  Q.  And I think you said you have a figure for one more?

21  A.  Yes.  We included one figure for our -- for regression

22  analyses relating CDCR salaries and salary premiums to measure

23  of net hires as opposed to filled positions.  And that is

24  Figure 23 in our report.

25  Q.  What is Figure 23 -- first, tell us where we can find that.

1   Sorry.

2   A.   Figure 23 is on page 83.

3   Q.   And what does Figure 23 tell us?

4       And, by the way, I'm noticing that the numbers on the

5   bottom in the horizontal are different.  They're not minus one,

6   minus five --

7   A.   That's correct.

8   Q.   What is that?

9   A.   So for -- for net hires -- so net hires, again, are

10  appointments minus separations.  That can be either a positive

11  number or a negative number for any given period, because if

12  you have more appointments than you do separations for a

13  particular classification, then it's a positive number, but if

14  you have more separations than you do appointments, it will be

15  a negative number.

16  Q.   So what you're saying is if you hire five people and three

17  leave, your net is an increase of two --

18  A.   Yes.

19  Q.   -- people.

20  A.   Yes.  But if you hire three and five leave, it's a net of

21  negative two.

22      But because this -- this -- so unlike filled positions --

23  filled positions have to be a positive number because it will

24  always be either zero or some positive number.  But because net

25  hires can be negative, we can't use the same measure to

 1   estimate the relationship between net hires and pay, and that's

 2   because for the filled position regressions, we used a

 3   logarithmic measure, and you can't -- you can't do that if you

 4   can have a negative number for your -- for your dependent

 5   variable.

 6        So what the horizontal scale on this figure tells us is for

 7   a 1 percent increase in -- in CDCR compensation -- or a 1

 8   percent increase in CDCR salary premium, what's the -- the

 9   number of net hires -- the estimated number of net hires that

10   that is associated with.

11        So, again, we have four regressions that are reported here.

12   We have data -- the same -- same data on -- on CDCR salary and

13   either California or US average salary that we used in the

14   previous regressions and that we also saw in the previous

15   charts where we compared CDCR and California and US pay.

16        We only have information on net hires for psychiatrists,

17   psychologists, and social workers, so there is slightly less

18   data available to run these regressions, and that's why we just

19   have estimates that are a single estimate across the -- the

20   three classifications at issue for these four regressions.  The

21   reason we don't break the classifications out separately is due

22   to data limitations.

23        The takeaway from this figure is that, again, we have the

24   lines that show that 95 percent confidence interval of the

25   relationship between either the CDCR salary premium over

1   California salary or over US salary or -- the relationship

2   between -- between those measures and net hires for the three

3   classifications at issue.

4        And the bottom two lines are the relationship between CDCR

5   salary for the three classifications at issue and net hires for

6   those classifications where we control for either California

7   salary or US average salary separately.

8        In all four cases, the 95 percent confidence interval

9   crosses the zero line -- the vertical line at zero, so we do

10  not find evidence of a statistically significant relationship

11  between these measures of CDCR's pay or its pay premiums and

12  net hires for the three classifications for which we're able to

13  do this analysis.

14  Q.  So does that cover, at least for purposes of illustrating

15  these three regressions, what you found in your statistical

16  analysis?

17  A.  Yes.  I would just say that it's three sets of regressions.

18  Q.  Fair enough.  Some have four in them?

19  A.  12 regressions in total are shown on these three charts.

20  Q.  Now, you told us earlier that you were present at

21  Dr. Brown, the economist hired by the Plaintiffs -- you were

22  present at his deposition, as well as seeing some analyses that

23  he did with respect to your regression analysis; is that

24  correct?

25  A.  That is correct.

1    Q.   And did Dr. Brown have criticisms of your work with respect

2    to the regression analysis?

3    A.   He did.

4    Q.   You agree with those criticisms?

5    A.   I do not.

6    Q.   Why not?  What are they, and why is it that you do not

7    agree with what he has raised?

8    A.   So I believe that our regression models are reasonable and

9    supportable, given the data available.

10       Dr. Brown had two -- I would place them into two buckets --

11   two different types of criticisms of our regression analyses.

12       The first set of criticisms are data related.  So one

13   criticism was that our time period was too short.

14       So we looked at 2018 through 2022.  And I guess I should

15   just start off by saying, you know, I -- we -- we used the data

16   that are available.  We did the best we could with the data

17   that are available.  And in terms of the time period, the data

18   that were available to run the regression were 2018 through

19   2022.  It is five years of data.  It is the five most recent

20   calendar years of data, which I believe are the most relevant

21   years for assessing the relationship between CDCR's pay and --

22   and any -- any relationship that it has with their filled

23   positions or their net hires.

24       A second criticism that Dr. Brown had related to our data

25   was that it was, essentially, too aggregated.

1          So we included -- our observations were on a semiannual

2     basis, and his criticism was that if it were -- if everything

3     was measured on a more granular basis over time, that we would

4     be more likely to find statistically significant effects or

5     statistically significant relationships.

6          There are pros and cons, both, to aggregating the data and

7     to making it more disaggregated.  I -- you know, on the one

8     hand, some level of aggregation is unavoidable.  We are looking

9     at -- to assess relationships of pay and filled positions, and

10    pay and net hires, and each of those things -- filled positions

11    and net hires -- has to be measured over a period of time.

12         So then the -- you know, the question of -- of whether, you

13    know, something is too aggregated or should it be less

14    aggregated, again, there is pros and cons to both.

15         If we were to do what seems to be Dr. Brown's opinion that

16    we should run things on a more disaggregated basis, that could

17    be problematic given the data that we're using, because some of

18    the data that we rely on, specifically the BLS salary data,

19    which is the average salaries for California, the average

20    salaries for the US, that data is only available on an annual

21    basis.

22         And then other data that we rely on, namely CDCR's numbers

23    of authorized positions for each of the classifications at

24    issue, that data is generally available or generally changes on

25    a semiannual basis.

1       And when -- when one has data that is only measured, let's

2    say, annually or semiannually and you're looking to run a

3    regression, let's say, that's weekly or monthly, you have to

4    make assumptions about how the annual or semiannual data

5    changes from week to month or whether it doesn't change or

6    whether it changes in some smooth fashion.  But any assumption

7    that you would make essentially is going to -- it's going to

8    assume that the -- it's going to force -- force your data to be

9    smoother than it actually is.  And the further you kind of

10   break down your time periods, the greater that assumption has

11   to be.

12      And for that assumption, you have to make a statistical

13   correction.  The statistical correction would -- would increase

14   the confidence intervals that one would measure at the more

15   finely grained time intervals.

16      So, yes, the confidence intervals would be -- would likely

17   become smaller if we went from semiannual, let's say, to

18   monthly, but then we'd have to make that correction for -- the

19   statistical correction for assuming how data behaves or forcing

20   the data to behave in a way that it does not actually behave,

21   that can cause -- that will cause the confidence intervals to

22   increase again.  And in the end, you know, it's entirely likely

23   that the statistical findings would be the same with respect to

24   conclusions about statistical significance.

25   Q.  So, in sum, what he's suggesting wouldn't make a difference

1    at the end of the day?

2    A.   I'm sorry, what he's suggesting would or --

3    Q.   Would not.

4    A.   There -- we don't know, but it's -- it's entirely likely

5    that it would be.  It might not even make a difference when you

6    go from -- let's say we do it semiannually, let's say you go to

7    monthly or weekly, it might not even make a difference there.

8    But then making that statistical correction for how you force

9    the data to behave in a way that it doesn't -- wouldn't

10   actually behave if you had actual data at that level, that

11   would make it much more likely that the conclusion would be the

12   same.

13   Q.   And that conclusion being the same, what conclusion are you

14   talking about, that there is no statistical --

15   A.   That we don't find statistical evidence of a relationship,

16   correct.

17   Q.   Any other criticisms that Dr. Brown leveled at your work

18   that you don't agree with?

19   A.   There were more.  There were two more that I kind of think

20   of in terms of the data.

21       One is that he said we should have -- rather than using

22   nominal salaries over time, so salaries measured at the actual

23   point in time, we should have accounted for inflation and

24   converted those to what, as economists, we call real wages or

25   real salaries that are as of a benchmark year.

1    Q.   And in your view, did you need to account for inflation?

2    A.   No.  Because our analyses were not looking at how salaries

3    change over time.  That is what Dr. Brown did, so I think it's

4    entirely appropriate that he made a correction for inflation in

5    his analyses.  But our analyses were looking at how CDCR

6    salaries relate to benchmark salaries and filled positions or

7    net hires at a given point in time.  So any inflation

8    adjustment that would be, you know, made to CDCR's salaries

9    would also have to be made to the benchmark salaries, and the

10   relationship would be the same.

11   Q.   Any other critiques by Dr. Brown that --

12   A.   There was --

13   Q.   -- he leveled and you don't agree with?

14   A.   There was one more data-related criticism.  And that was

15   that we -- I believe his word was "imputed" the average

16   salaries for CDCR.

17        And -- and here again is another example of we did the best

18   we could with the data that were available.  We didn't have the

19   exact salary for every single mental health employee.  We had

20   information on the maximum and minimum salaries available to

21   them and the numbers that were earning the minimum and the

22   maximum over time.  So we did calculate an average based on the

23   information that we had.

24        There is -- you know, one -- one response to that is that

25   there is always going to be measurement error.  And even if

1   you, you know, have what you think are complete data, there is

2   going to be measurement error with any calculation of an

3   average.

4       Also, you know, the structure of measurement error matters

5   for how it affects your estimates and whether it makes -- would

6   make you more or less likely to find a statistically

7   significant effect for -- for any of the variables or the

8   variable that you're considering or some other variable in the

9   regression.  And we do not know the structure of the

10  measurement error here, so we cannot assess that.

11      And we don't know -- I mean if measurement error is small,

12  then any -- any affect -- that would affect the -- the

13  statistical significance of the findings would also be small.

14  Q.  Let me ask it this way:  Did you find any evidence to

15  support that relying on the different data and adjusting

16  methodological approaches in the ways that Dr. Brown opines

17  would change your findings and conclusions in any way?

18  A.  No.  Although I haven't even gone through all his

19  criticisms yet.

20  Q.  Okay.  I thought we were there.  Sorry, Doctor.

21  A.  So those are the criticisms that I think of in terms of the

22  data.  He also had four criticisms that relate to our model and

23  how we specified the model.

24      One was that since -- we ran what's called a pooled

25  regression.  We included data for all the classifications in

1    the same regression model, and we estimated effects of -- we

2    estimated relationships between measures of pay and measures of

3    either filled positions, net hires, for the five

4    classifications.

5        We did run models where we allowed the relationship between

6    pay and filled positions to vary by -- by the five -- across

7    the five classifications.

8        So, you know, we did -- even though we're running a pooled

9    regression, we're estimating a separate effect for the five

10   classifications at issue.

11       Dr. Brown also was of the opinion that time period fixed

12   effects rather than a -- a time trend would have been

13   preferable.

14   Q.  What is your response to that?

15   A.  Given the data that were available, that if we had included

16   time period fixed effects rather than a time trend, that would

17   imply including additional explanatory or independent variables

18   in our model that would reduce our ability to find

19   statistically significant results.

20   Q.  So the opposite is true; it wouldn't enhance your ability

21   to find statistically significant results?

22   A.  Correct.  Correct.

23       Dr. Brown also opined that we should have considered

24   regional variation or regional differences for the effects that

25   were -- the relationships that we are looking at in our

1   regressions.  Unfortunately, I agree that that would be a good

2   thing to do, but given the data limitations, we are unable to

3   run regressions specific to metropolitan areas within

4   California.

5       However, in our Appendix 1, we did compare CDCR's salary to

6   the average salaries that were prevalent in the metropolitan

7   areas.

8   Q.  To refresh our memory, what did that comparison conclude?

9   A.  That, generally, CDCR consistently pays at or above the

10  benchmark salary in the different metropolitan areas for which

11  the comparison can be made.

12  Q.  Any more?

13  A.  One more.  Which is that Dr. Brown, I believe, criticized

14  us for excluding the PIP facilities from our analysis.  And my

15  understanding is that those facilities are not currently at

16  issue.

17  Q.  And that's why you didn't look at them?

18  A.  Right.  Correct.

19  Q.  So, in sum, do you believe that your regression models are

20  reasonable and supportable, given the data that was available?

21  A.  Yes.

22  Q.  So those were -- do you -- are you aware of any other

23  criticisms that Dr. Brown has with your work, based on your

24  attending his deposition and the review of his report?

25  A.  Not at this time.

1   Q.  Did you find any shortcomings with respect to the work

2   performed by Dr. Brown in this matter?

3   A.  We did.

4   Q.  What did you find in that regard?

5   A.  So with regard -- so Dr. Brown had two different pieces of

6   analysis that I believe are most relevant to the -- the case at

7   hand.

8       The first was his analysis of labor shortages among

9   psychiatrists and psychologists in California.

10      Related to -- actually, so, briefly, what Dr. Brown did was

11  he looked at average wages for psychiatrists -- separately for

12  psychiatrists and psychologists in California and in

13  metropolitan areas in California, looked at them from, I

14  believe it was, 2015 through 2020, and he defined a shortage as

15  being a statistically significant area -- statistical

16  differences between the wages paid to each classification in

17  2017 versus 2020.  And if wages were increasing, that indicates

18  a shortage; if wages were decreasing, that indicates a surplus;

19  and if wages are neither one nor the other, that suggests that

20  the market is in equilibrium.

21  Q.  Do you agree with that analysis?

22  A.  No.  I don't agree with his conclusions from that analysis.

23  Q.  Fair enough.  Why not?

24  A.  So kind of a threshold issue, before we even get to what he

25  did, is that Dr. Brown ignores the literature and the published

1  studies and the analyses -- published analyses regarding

2  shortages -- labor shortages, not just of psychiatrists and

3  psychologists, but mental health providers more broadly

4  throughout California and more broadly throughout the United

5  States.

6  Q.  To your knowledge, did he research or review any literature

7  with respect to whether there is a shortage?

8  A.  I don't recall seeing any discussion of that in his report

9  nor at deposition.

10     A second comment is that Dr. Brown's analysis of

11  psychiatrist and psychologist labor shortages ended as of 2020,

12  so he excludes the last two and a half years.  Which, you know,

13  the effects of COVID and the pandemic are, you know, much more

14  likely to be observed in those years, so he excludes a very

15  relevant recent time period from his analysis.

16     A third comment is that Dr. Brown limits his analysis of

17  the labor shortages to California and metropolitan areas within

18  California, and he failed to consider a potentially broader

19  geographic market for the labor market for -- for these types

20  of providers or for the providers of mental health care.

21  Q.  When you say broader geographic market, what broader market

22  are you referring to?

23  A.  You know, it could be the US.  It could be any -- any

24  market for which either, you know, people in -- outside of

25  California might consider coming -- moving to California to

1  take up employment here.  Conversely, it could be -- a

2  geographic market would include areas outside of California

3  that people currently living and working in California would

4  consider moving to for employment.

5  Q.  And why should he have considered that broader geographic

6  market?

7  A.  Again, you know, I -- it happens that people move to

8  different states for employment reasons.  And, you know, it --

9  it -- and I'm somewhat agnostic as to what the market should

10  be.  It could be the entire United States.  You know, we've

11  seen literature discussing, you know, physicians, which would

12  include psychiatrists, moving across state lines.

13      It might just be -- you know, it might not be the entire

14  United States, but it might include Reno, Nevada, or Las Vegas

15  or, you know, states that border California.

16  Q.  Bottom line is he didn't attempt to include any other

17  geographic markets other than California?

18  A.  As far as I'm aware, he did not assess any others, no.

19  Q.  What other problems do you see with Dr. Brown's analysis

20  and assumptions and ultimate results?

21  A.  Well, on a -- on his analysis of labor shortages, as I

22  mentioned, it's limited to psychiatrists and psychologists.  It

23  excludes any analysis for clinical social workers, recreation

24  therapists, or medical assistants.

25  Q.  All of which are at issue in this case, right?

1    A.   Correct.

2    Q.   What else?

3    A.   Still on the labor shortages, Dr. Brown's definition of a

4    labor shortage, which is -- or how he defines -- determines

5    whether there is a labor shortage or a labor surplus or

6    equilibrium, is to look at the last three years -- actually, in

7    his case, it's not even the last three years, it's 2017 versus

8    2020, how the wages changed in that time period.  And that's

9    how he -- how he concludes whether or not a shortage exists --

10    a shortage exists.

11         As far as I can tell, this is a completely unsupported

12    definition.  I've -- you know, I have not seen a three-year --

13    a three-period definition for a labor shortage being any sort

14    of standard by which to measure it.  I believe at deposition,

15    Dr. Brown couldn't point to any literature or other studies

16    that uses similar definition to determine whether or not a

17    labor shortage exists.

18         And even in one of his previous publications, he has done a

19    similar analysis, but he didn't use this three-period

20    definition to assess whether or not a labor shortage exists.

21    Q.   Which publication are you referring to?

22    A.   It's the one that is Plaintiffs' Exhibit 103 and page 98 in

23    that exhibit.

24    Q.   Do you want to pull that up and explain to us what it is he

25    did that's inconsistent, or not consistent, with what he's

1  doing?

2  A.  I'd be happy to, yes.

3  Q.  If you can pull that up, Ms. Pooni.

4  A.  So if we could scroll --

5  Q.  Page 95?

6  A.  98.

7  Q.  98.  Sorry.

8  A.  So this is 94.

9  Q.  Again, apart from that three-year period, he's not even

10 considering the most recent two years, correct?

11 A.  That's correct.  He's looking at 2017 versus 2020.

12 Q.  Would it help you to see a hard copy of that exhibit,

13 Doctor?  It looks like you're straining to try to read it on

14 the screen.

15 A.  It will probably take me -- that's actually nicer.

16     So here in the paragraph that we're looking at, that says

17 in the -- this is one example.  I believe there might be

18 another example in the article.  But if we look at the

19 paragraph that starts, "In the labor market for DAs."  So here,

20 Dr. Brown is stating that inflation-adjusted mean wages rose

21 from 1997 to 2001, also an indication of a labor shortage

22 during this time.

23     And this is discussing the chart that is to the left.  The

24 purple line is the line that he's referring to.  These are --

25 actually, no, I'm sorry, it's not that chart.  Can we --

 1    actually, if I could have a hard copy, that would be helpful.

 2              MR. CIRELLI:  Your Honor, may I approach the witness?

 3              THE COURT:  You may.  Given this interlude, it's --

 4    you've got about 20 minutes until we'll take our break, and

 5    that would complete four hours, but you had estimated to

 6    include your redirect.

 7              MR. CIRELLI:  Yes, Your Honor.

 8              THE COURT:  So --

 9              MR. CIRELLI:  I'm going to do my best.

10              THE COURT:  All right.

11              MR. CIRELLI:  Here you go, Doctor.

12              THE WITNESS:  Thank you.

13        So, to be honest, I mean, I'm not even sure I need to

14    discuss the figure that this paragraph refers to.  You know,

15    but here, Dr. Brown is discussing for DAs, which is dental

16    assistants, inflation adjusted mean wages rising from 1997 to

17    2001, indication of a labor shortage during this time.  That

18    happens to be a four-year period, not a three-year period.

19        Similarly, he's talking about the, in the next sentence,

20    inflation adjusted mean wages peaked in 2001 and decreased from

21    2001 to 2005, indicating that the market for DAs was in surplus

22    during this period.  So, again, not a three -- not a three-year

23    period.

24    Q.  BY MR. CIRELLI:  What other concerns or criticisms do you

25    have with Dr. Brown's work?

1   A.  So I don't believe that his conclusions regarding shortages

2   or the lack of shortages for psychiatrists and psychologists

3   follow from his own analyses.

4       Dr. Brown -- actually, can we look at one of the figures in

5   his report?  Is that --

6   Q.  Yes, we can do that.

7   A.  Okay.

8   Q.  So his report, I believe, is Plaintiffs' Exhibit 25.  Test

9   my memory.  It is.  Would you like a hard copy of it?

10  A.  Please.

11          MR. CIRELLI:  May I approach, Your Honor?

12          THE COURT:  You may.

13          THE WITNESS:  So I will try to be quick.  If we could

14  look at --

15  Q.  BY MR. CIRELLI:  This also has Bates pages at the bottom.

16  A.  Yes.  Going by the Bates numbers, if we could go to page

17  10.

18      Dr. Brown, in this figure, Figure 1, is charting

19  psychiatrist mean hourly earnings in California from 2015

20  through 2020.  And his definition of a shortage is based on the

21  years from 2017 through 2020.

22      He concludes that because the mean earnings for

23  psychiatrists are decreasing over this period, that there is a

24  surplus of psychiatrists.  However, Dr. Brown has also included

25  95 percent confidence intervals for his estimates of the mean

1    hourly earnings in each year.  Those are the vertical black

2    lines that look like a very narrow I at each year.  And his

3    confidence intervals for his estimate in 2017, the bottom of

4    that confidence interval is lower than the top of the

5    confidence interval in 2020.

6    Q.  So what does that tell us?

7    A.  So this -- this suggests that they -- they may not be

8    statistically different.  And if they're not statistically

9    different, then -- then he -- he can't conclude that this --

10   that there is a surplus of psychiatrists.  By his -- by his

11   definition, that would suggest that the market is in

12   equilibrium.

13   Q.  So his own data as shown on this figure doesn't support his

14   ultimate conclusion; is that a fair statement?

15   A.  And that's using his definition of a shortage, which,

16   again, is not one that I've seen used elsewhere.

17   Q.  Any other comments with respect to Dr. Brown's report and

18   analysis and conclusions?

19   A.  Regarding the labor shortages, it's not necessarily the

20   case that decreasing real wages need be consistent with a labor

21   surplus.

22   Q.  Why is that?

23   A.  There are other situations in which one might observe

24   decreasing real wages over time.  One example would be a -- a

25   global decrease in purchasing power.  So there are things that

 1    can affect entire economies such that -- that everybody's real

 2    wages go down over time.  You know, recent examples have been

 3    COVID or the war in the Ukraine that can affect the wages

 4    for -- for an entire country.

 5        A second example would be changes in the distribution of

 6    the -- of the labor force at issue or the labor pool at issue.

 7    And I think this is relevant for the case at hand.  So if --

 8    it's a well-accepted fact in labor economics, that, in general,

 9    people's incomes increase with age and experience and up to a

10    certain point, you know, early sixties, something like that.

11    Then wages flatten out and maybe come down a little bit as

12    people retire.

13        But if your labor force is changing in a way such that all

14    the older, more experienced, well-paid people -- well-paid

15    employees are leaving the labor force -- so perhaps they're

16    retiring because COVID hit and they were near retirement

17    anyway, and, you know, they just say, I've had it, I'm leaving,

18    even if your -- and so there may be a shortage.  The older,

19    more well-paid folks are leaving.  The folks replacing them

20    are -- are younger; they're newer; they may actually --

21    employers may be offering them more money because there is a

22    surplus -- I'm sorry -- because there is a shortage, so they're

23    offering these younger folks more money than they would have

24    otherwise, than they had been historically.  That is consistent

25    with a surplus, but the overall average mean salary for

1    everybody would still be going down because you're losing all

2    the older, more well-paid people, and even though you're paying

3    more to new people coming in, that still lowers the average.

4    Q.   Anything else, Doctor?

5    A.   That is it on the labor shortages.  I had a few quick

6    comments on -- on Dr. Brown's analysis of wage increases.

7    Q.   Please go ahead.

8    A.   So, again, Dr. Brown provides estimates of 57.1 percent to

9    285.7 percent wage increases that may be needed to meet -- meet

10   vacancy goals at CDCR.

11       Those 57.1 to 285.7 percent increases are based on

12   unsupported assumptions and either dated or inapplicable

13   literature regarding the supply responsiveness of individuals

14   to wage changes.

15       Another comment is that Dr. Brown assumes a constant wage

16   elasticity, meaning that if your -- if -- if your income is

17   currently just below -- say it's just below the poverty line;

18   you get a 5 percent increase in your income, you might be

19   willing to work a lot more or to work more hours to get that --

20   to get those additional wages, because that 5 percent makes a

21   very big difference to you.  Conversely, if you're earning

22   $5 million, that same 5 percent increase might be a large

23   dollar value, but it might not convince you to work more hours.

24   So the wage elasticity, the responsiveness to a given

25   percentage change in wages, can vary depending on how much

1   you're already earning.

2   Q.  When you use the term "wage elasticity," what does that

3   mean?

4   A.  That is what Dr. Brown refers to as supply responsiveness

5   to wages.  It is the percent change in -- the percent change in

6   labor supply -- that could be hours worked; that could be

7   people working -- relative to the percent change in labor

8   supply for a -- a 1 percent change in wages, or 1 percent

9   increase in wages.

10  Q.  And how does this, assuming a constant wage elasticity,

11  impact his analysis and the conclusions from his analysis?

12  A.  So, again, it just -- it -- it calls into question, you

13  know, the numbers that he gives.  And it -- you know, we --

14  it's not an assumption that economists -- labor economists

15  typically make, that there is constant wage elasticity.

16      We don't know exactly what the wage elasticity is for

17  different points of the distribution, but especially given the

18  fact that CDCR already pays considerably more than the average

19  wages for psychiatrists and psychologists, which is what --

20  actually, specifically psychologists for this one is what

21  Dr. Brown is analyzing.  His analysis looks at market average

22  wages, and that's not what CDCR is paying.  So they might be

23  faced with a different wage elasticity should they attempt to

24  increase compensation.

25  Q.  So is another one of your criticisms that he ignores CDCR's

1    actual compensation?

2    A.   Yes.  I guess I already stated that one, yes.

3    Q.   And going back for just a moment, you talked about how with

4    respect to his estimates of the 57.1 percent to the 285.7

5    percent estimated wage increase that you would need in order to

6    increase supply, you said he's using dated estimates of supply

7    responsiveness.  Is there a place in his report where you can

8    see what he's using and see that it's dated?  Is there a table?

9    A.   Yes.  It is Table 2 of his report.

10   Q.   What page is that on?

11   A.   That is on --

12   Q.   We're still looking at Exhibit 25, correct?

13   A.   Correct.  Page 38 of Exhibit 25.

14   Q.   In looking at this table --

15        And, Ms. Pooni, can you, by chance, pull that up.

16   A.   I'm sorry.  It's Table 2 on -- there it is.  Okay.

17   Q.   There you go.

18   A.   So for his estimates of what Dr. Brown calls supply

19   responsiveness, which we also call wage elasticity, Dr. Brown

20   relies on three studies.  And if you look at the data dates

21   column, for two of these three studies, it relies on data that

22   is from the 20th century.  That's -- that's -- in economics

23   terms, that's old.

24        I would also add that the Schroeder study that Dr. Brown

25   relies on -- actually, so all three of these -- Dr. Brown

1   characterized all three of these studies as having supply

2   responsiveness estimates for physicians.  He acknowledged that

3   there is nothing specific for psychiatrists and that he doesn't

4   have any estimates for mental health practitioners other than

5   psychiatrists, which, again, he's relying on these estimates

6   for physicians for his numbers for psychiatrists.

7        One of the three studies, the Schroeder study, is not

8   specific to physicians at all.  It looks at all males between

9   the age of 25 and 55 -- actually, I guess I should say is

10  limited to males between the ages of 25 and 55, and it includes

11  all -- all occupations, not limited to physicians.

12       So I would think that study is not particularly relevant.

13  Q.  Not informative?

14  A.  Not informative.

15  Q.  Any other issues you have or criticisms of Dr. Brown's work

16  with respect to the real wage issue?

17  A.  No, other -- well -- other than, again, his analysis is

18  limited to psychiatrists and psychologists, and his estimates

19  of supply responsiveness are limited to psychiatrists, which

20  he's using physician-based estimates as a -- as a measure for

21  psychiatrists.

22  Q.  Have we now covered all of the issues that you have with

23  Dr. Brown's analyses and report?

24  A.  Yes.

25  Q.  And so have we now, Doctor, covered all of your main

1  opinions and the support and the bases for those opinions?

2  A.  Yes.

3  Q.  And, in sum, again, what is your opinion with respect to

4  whether or not CDCR was reasonable in its efforts?

5  A.  So again, in light of the prevailing labor market

6  conditions and compensation levels, CDCR has taken reasonable

7  measures to meet its mandated staffing levels and vacancy rates

8  for the five classifications of mental health employees that

9  are currently at issue.

10  Q.  And that's based on all the information and data we

11  discussed over the last almost four hours I think?

12  A.  Yes.

13        MR. CIRELLI:  Thank you, Doctor.

14     I have no further questions at this time, Your Honor.

15        THE COURT:  All right.  Let's go ahead and take our

16  break now.  It's 4:10.  Come back at 4:30.  The Plaintiffs will

17  have half an hour before we adjourn.

18     (Recess taken, 4:09 p.m. - 4:30 p.m.)

19        THE COURT:  You may be seated.  And cross.

20                    CROSS-EXAMINATION

21  BY MS. HATTON:

22  Q.  Good afternoon, Dr. Greulich.  It's good to see you again.

23  A.  Good afternoon.

24  Q.  I just really want to quickly start with the team that you

25  put together to write your August 31, 2023, report.  That was

1   you, Dr. Dutra, and four associates, correct?

2   A.  Correct.

3   Q.  Okay.  And that team, together, billed the state $457,815

4   for the creation of your August 31st report, right?

5   A.  I don't know what the total was as of the time the report

6   was submitted.

7   Q.  You wrote in your report that it was $457,815, right?

8   A.  Then -- let me check, but then that's what it was, yes.

9   Q.  I want to talk about the relative access to mental health

10  that you talk about in your report.

11      And just to start off, I want to get an idea of the scope

12  of your expertise here.  You have no expertise in evaluating

13  the quality of mental health care in prisons, correct?

14  A.  No.

15  Q.  You don't have expertise in the quality of mental health

16  care anywhere, even outside of prisons, correct?

17  A.  No.

18  Q.  You're not offering an opinion about the adequacy of mental

19  health care in CDCR prisons, right?

20  A.  No.

21  Q.  You have no experience studying the prevalence of mental

22  illness in various populations, right?

23  A.  Other than through what I've read in the literature with

24  respect to this case.

25  Q.  I understand you've done a literature review, but you've

1    not done your own study of the prevalence of mental health care

2    providers in the community, right?

3    A.   Correct.

4    Q.   You've not done your own study on the prevalence of mental

5    health care providers in CDCR prisons, right?

6    A.   Say that one more time.

7    Q.   You did not do your own study on the prevalence of mental

8    health care providers in CDCR prisons, right?

9    A.   The prevalence of mental health providers.  We do look at

10   employment of mental health providers in CDCR institutions.

11   Q.   Well, let me ask you this:  You didn't study the working

12   hours of mental health clinicians in CDCR prisons, right?

13   A.   We do not look at hours, no.

14   Q.   So if you have a whole number of providers in the prisons,

15   you don't know how much they're working or how available they

16   are to people in the prison, right?

17   A.   Correct.

18   Q.   You don't know how many minutes a week incarcerated

19   individuals have with their providers?

20   A.   No.

21   Q.   The data you relied on, for instance, of mental health

22   issues in the community doesn't say anything about the acuity

23   of those mental health issues, right?

24   A.   It did, although I don't believe we included anything in

25   our report.

1    Q.  Okay.  So you can't tell me whether or not the mental

2    health conditions in the community that you talk about are

3    relatively acute or not?

4    A.  No.  We have simply a measure of -- an estimate of the

5    percentage of the population that has mental health needs.

6    Similarly, we have an estimate of the percentage of CDCR's

7    population -- inmate population that has mental health needs.

8    Q.  So it's possible that the people in the community with

9    mental health needs have anxiety, and the people in prison with

10   mental health needs are experiencing hallucinations, and it's

11   all the same in your report in terms of how that data is

12   presented?

13   A.  I mean, yes, we're not assessing actual conditions --

14   Q.  Okay --

15       (Crosstalk.)

16            THE COURT REPORTER:  Excuse me.

17            THE WITNESS:  There are different individuals,

18   different levels of care at CDCR.  You know, so, for example,

19   there is the CCCMS; there is the EOP.  You know, we've seen

20   estimates of the, you know, number of individuals at those

21   different levels of care, but that is -- that is not

22   incorporated into the relative access calculation.

23   Q.  BY MS. HATTON:  Okay.  So you have just the total number of

24   people with mental health needs and the total number of

25   providers but no information about the severity of the mental

1   health needs in prison, right?

2   A.  For the purposes of that table, correct.

3   Q.  Okay.  Similarly, you have a whole number of people with

4   mental health needs in prisons and a whole number of providers

5   of mental health care in prisons, but you don't know how many

6   of each of those groups is in a given prison, correct?

7   A.  Correct.

8   Q.  So if I asked you about the access to mental health care at

9   CSP Sacramento, you don't have an opinion on that, right?

10  A.  I have an opinion on systemwide but not at specific

11  locations.

12  Q.  Okay.  So you can't tell me for any given prison whether or

13  not incarcerated individuals have any amount of relative higher

14  access to mental health care than elsewhere, right?

15  A.  I mean, we do have information elsewhere on the number of

16  providers at specific -- specific locations.  It is -- it is

17  not a part of the relative access table that we created.

18  Q.  Okay.  And I'm talking about the relative access table here

19  for these questions.

20  A.  Okay.

21  Q.  You didn't do your own study of the working hours of mental

22  health clinicians in CDCR prisons, right?

23  A.  No.

24  Q.  You didn't study the availability of mental health care

25  providers in CDCR prisons, right?

1    A.   The availability?  Can you explain what you mean by that,

2    please.

3    Q.   Well, you're the one that has the opinion on access, so

4    what does availability mean to you?

5    A.   For access, we're just looking at the number of providers.

6    Q.   Okay.  So not quality of care?

7    A.   No.

8    Q.   Not whether or not people who are incarcerated can actually

9    physically access those providers?

10   A.   I have no information on that.

11   Q.   Okay.  And you have no idea whether a higher proportion of

12   providers in CDCR prisons means adequate mental health care in

13   CDCR prisons, right?

14   A.   I have no opinions on the adequacy of mental health care.

15   Q.   Okay.

16   A.   That's outside my purview as an economist.

17   Q.   Okay.  I would like to show you what has been premarked as

18   Plaintiffs' Exhibit 102.  This is a 181-page document of

19   e-mails between you and Dr. Dutra.  I promise we're not going

20   to look at all 181 pages.  I'm actually only interested in the

21   very last page.  So if I could get Mr. Gonzalez to pull that

22   one up.

23            MR. GALVAN:  May I approach, Your Honor?

24            THE COURT:  You may.  This is page 181 of Exhibit --

25            MS. HATTON:  It's a 181-page document, but I'm

1    looking at the last page.

2              THE COURT:  That's what I'm saying; it's page 181?

3              MS. HATTON:  I believe so, yeah.  Bates stamped 3899.

4              THE COURT:  Correct.  All right.

5        You have that, ma'am?

6    Q.  BY MS. HATTON:  Dr. Greulich, do you recognize this?

7    A.  It is an e-mail from Dr. Dutra to me.

8    Q.  Okay.  And that's dated August 5, 2023, right?

9    A.  Yes.

10   Q.  And you submitted your opening report on August 31, 2023?

11   A.  Yes.

12   Q.  Okay.  I'm going to read this e-mail from Dr. Dutra, your

13   coauthor, to you:

14       Hi, Erica.  One thought on the table of access to mental

15   health treatment to inmates versus general population that has

16   been occurring to me for a while.  I know you and Lona --

17       I'm just going to stop there.

18       That's Dr. Fowdur, right?

19   A.  Yes.

20   Q.  I know you and Lona did something similar --

21             THE COURT REPORTER:  I'm sorry.  You've got to slow

22   down.

23             MS. HATTON:  Sorry.

24   Q.  BY MS. HATTON:  I know you and Lona did something similar

25   last time and they loved it that inmates are having a lot more

1   access to MH treatment --

2       Which I believe is probably mental health treatment,

3   correct?

4   A.  Correct.

5   Q.  Okay.  And the "they" in that sentence is the attorneys for

6   CDCR, correct?

7   A.  I don't know who Dr. Dutra was referring to.

8   Q.  And you don't know who loved it that you included a lot

9   more access to mental health treatment in your report with

10  Dr. Fowdur?

11  A.  I don't know who she's referring to by the "they."

12  Q.  Do you have any reason to believe it's someone else other

13  than the Defendants?

14  A.  It could be the client.  You said the lawyers; it could be

15  the client.  I don't know.

16  Q.  Okay.

17  A.  Yeah.

18  Q.  It's either CDCR or their lawyers, right?

19  A.  That -- yeah, I think that's a reasonable conclusion from

20  the context.

21  Q.  Okay.  I'll continue where I left off in the e-mail:

22      But you don't think that an easy comeback to this is that

23  they are also more likely to need mental health treatment?

24      Then there is a link to the Mental Health Problems of

25  Prison government website.  And she writes:

1      About 50 percent of inmates have some sort of mental health

2  problem versus 11 percent for the general population I believe

3  is the -- excuse me -- is the statistics.  So five-fold.  Are

4  they getting more than five-fold the amount of access?  Thanks,

5  Jess.

6      Did I read that accurately?

7  A.  Yes, I believe so.

8  Q.  Okay.  So even though you didn't study the availability of

9  mental health care in CDCR prisons or how many minutes a week

10  individuals have with their providers in prisons or the working

11  hours of mental health clinicians in CDCR prisons, at some

12  point after you received this e-mail, you still included a

13  table, relative access to mental health care in CDCR prisons,

14  right?

15  A.  Yes.

16  Q.  Okay.

17      MS. HATTON:  Your Honor, the next things I might move

18  on to, I'm not certain I can get done in 20 minutes.

19      THE COURT:  Let's start.

20      MS. HATTON:  Okay.

21      THE COURT:  We're going to use all the time we have.

22      MS. HATTON:  Okay.

23  Q.  BY MS. HATTON:  I want to talk about your opinions on labor

24  shortages.

25      In your report -- I'm sorry.  I don't have the exact page.

1    I know that it's Section B.  It's about psychologists.  You

2    include in your report that the Bureau of Labor Statistics

3    projects there will be 11,300 new psychologist jobs created

4    between 2021 and 2031, correct?

5    A.  Let me find that paragraph.  Can you -- I'm sorry.  Can you

6    repeat to me the numbers again that you were referring to?

7    Q.  Sure.  And this is in Section B about psychologists.  Do

8    you have that in front of you?

9    A.  I have a section on psychologists.  I'm not sure it's the

10   one you're referring to.

11   Q.  I have written here page 9, but I'm not sure if that refers

12   to the Bates stamp or the pagination that was originally on the

13   report.

14   A.  Okay.  I'm sorry.  What was the number you were referring

15   to again?

16   Q.  The Bureau of Labor Statistics projects there will be

17   11,300 new psychologist jobs created between 2021 and 2031,

18   right?

19   A.  Yes.  Nationwide.  That's paragraph 29.

20   Q.  And that represents 6 percent growth for psychologists,

21   right?

22   A.  Nationwide, yes, based on the numbers the BLS was using.

23   Q.  Okay.  To determine whether a shortage of psychologists

24   exists, you need to know the starting number of psychologists,

25   right?

1   A.   Yes.

2   Q.   And the demand for psychologists, right?

3   A.   Yes.

4   Q.   And you do not know the demand for psychologists in

5   California, right?

6   A.   It's generally not known.  I mean, there is -- it's

7   generally not known the exact number of people who demand

8   psychologist treatment.  It's something that we infer from

9   other indicia.

10   Q.   So you don't know what the demand is for psychologists in

11   California?

12   A.   I have evidence of -- that there is demand, and we have

13   evidence that there is insufficient demand, but I do not have

14   an actual number of people that demand psychologist services in

15   California.

16   Q.   Okay.  And you didn't attempt to conduct your own study

17   assessing whether there is a shortage of psychologists in

18   California, right?

19   A.   No.  We relied on the literature and analyses and

20   government reports and projections of others for that.

21   Q.   Right.  So beyond giving a literature review to the Court,

22   you are not offering your own analysis of whether or not there

23   is a shortage of psychologists in California, correct?

24   A.   Correct.

25   Q.   And without knowing the demand for psychologists in

1  California, you couldn't assess whether there was a shortage of

2  psychologists, right?

3  A.  Well, Dr. Brown claims to have done that.

4  Q.  I'm asking about you.  Do you want me to restate the

5  question?

6  A.  Please.

7  Q.  Okay.  Without knowing the demand for psychologists in

8  California, you cannot assess whether there is a shortage in

9  California, right?

10 A.  If I were doing my own analysis, I would want to know

11 demand and supply.  You know, but again, there are other

12 indicia that indicate that there is a shortage.  There is other

13 literature that's being written.  Other people have done such

14 studies to assess whether or not there is a shortage.

15 Q.  But you didn't do your own study?

16 A.  No.

17 Q.  Okay.  You would agree that in the current labor market,

18 it's possible for some employers to hire psychologists, right?

19 A.  Sure.  I think that's generally true regardless of whether

20 there is a shortage or surplus or equilibrium; some people will

21 be able to hire.

22 Q.  And the factors determining which people are able to hire

23 are going to be compensation, benefits, location, work

24 environment, schedule flexibility, ability to work from home

25 and telehealth opportunities, according to you, right?

1    A.  There may be more than that.  That's probably the list that

2    I offered at my deposition.  So, yes, those are all factors I

3    believe are relevant to employers' ability to hire people.

4    Q.  Compensation being chief among them, right?

5    A.  Perhaps.  I mean, probably yes.  Not in every single case,

6    I would think, but compensation is an important factor.

7    Q.  So it's -- you would agree that the employers who are going

8    to be able to hire psychologists in this labor market are the

9    ones that are the most competitive in those factors that I just

10   listed, right?

11   A.  It's some combination of those factors.  And that -- the

12   particular combination will vary from individual to individual.

13   But yes.

14   Q.  You didn't study how competitive CDCR's benefits for

15   psychologists are, did you?

16   A.  Well, again, we did look at fringe benefits -- CDCR's

17   estimates of fringe benefits, which include retirement and

18   health insurance, which are the two -- generally the two

19   largest dollar value benefits that employers generally offer.

20   And we saw that CDCR is more generous as a percentage of base

21   compensation than the average employer nationwide.

22   Q.  You didn't study how competitive CDCR's working conditions

23   for psychologists are, right?

24   A.  Other than that, you know -- my understanding is that CDCR

25   currently does not have a telehealth or a work-from-home option

1   for psychologists, and certain other employers do.  Other than

2   that, no.

3   Q.  Okay.  So you don't know if psychologists working in CDCR

4   have windows in their offices, right?

5   A.  I do not.

6   Q.  You don't know what their caseloads are, right?

7   A.  No, I don't think I've seen anything on that.

8   Q.  You don't know the diagnoses of the patients that they're

9   working with, right?

10  A.  Correct.

11  Q.  This might be obvious, but since you agree that it's

12  possible for some employers to hire psychologists in the

13  current labor market, it's not your opinion that it's

14  impossible to hire a psychologist in the current labor market,

15  right?

16  A.  Correct.

17  Q.  Okay.

18          MS. HATTON:  Do I have time to put up one more?

19          THE COURT:  You have 12 more minutes.

20          MS. HATTON:  Okay.

21  Q.  BY MS. HATTON:  I'm wanting to pull up Figure 11 from

22  Dr. Greulich's report itself.  If we're going to be using

23  Defendants' Exhibit 6, I believe it's page 47.

24          THE COURT:  Defendants' Exhibit 5 --

25          MS. HATTON:  5.

1          THE COURT:  That's the graph, Psychologist Vacancy

2     Rate?

3          MS. HATTON:  Correct.

4          THE COURT:  It is 5.047.

5     Q.  BY MS. HATTON:  Okay.  We pulled up this graph and

6     discussed it earlier, correct?

7     A.  Yes.

8     Q.  Okay.  And you noted that psychologist vacancy rates went

9     up starting around October of 2020, correct?

10    A.  Looks like at that point, they were still decreasing a

11    little bit.  A couple months later, probably either December

12    of 2020 or January of 2021, they kind of hit the bottom spike,

13    and then they started increasing again.

14    Q.  Okay.  So psychologist vacancy rates started increasing in

15    late 2020 or early 2021, correct?

16    A.  Yes.

17    Q.  The Bureau of Labor Statistics Consumer Price Index

18    indicates that inflation between 2020 and now is 18 percent.

19    Would you agree with that?

20    A.  I have no information one way or the other on that.

21    Q.  Do you have any information that would suggest that's

22    incorrect?

23    A.  No.  Nor do I have any information to suggest it's correct.

24    But if that's what you're asking me to assume, I will assume

25    that.

1   Q.  Okay.  I'll represent to you that that's what the CP --

2   CPI-U is.

3   A.  I'm sorry.  That was from 2021 to --

4   Q.  2020 to 2023.

5   A.  Okay.

6   Q.  And for California, inflation was 17 percent.

7       What I'm curious to know is you said that this -- this

8   period of increased vacancy coincides with COVID, generally,

9   right?

10  A.  Yes.

11  Q.  It also coincides with CDCR failing to provide an 18 or 17

12  percent salary increase, right?

13  A.  I'd have to go back and look in my report, see if we had

14  a -- an estimate of what the salary increase was over that

15  period.

16  Q.  Did you ever see any data that would suggest to you that

17  salaries have increased in CDCR by 17 or 18 percent since 2020?

18  A.  Let me look.

19  Q.  Okay.

20  A.  Yes.  A couple of things.

21      We do state in our report that salaries increased -- for

22  psychologists, increased 11 percent from 2018 through 2022 at

23  CDCR.  It looks like the bulk of that increase was starting in

24  late 2020.  And also, the -- the CPI numbers you quoted me, you

25  said, go through 2023.  I don't know how much CDCR's salaries

1  for psychiatrists have increased from -- since the end of 2022.

2  Q.  The 11 percent increase you're talking about is salary

3  range, correct?

4  A.  It is the calculated average salary, again, which excludes

5  certain categories of psychologists -- certain higher

6  compensated categories of psychologists at CDCR.

7  Q.  So it's the average.  And you don't know how many CDCR

8  employees actually received any amount of raise between 2020

9  and now, right?

10 A.  No.  I mean, I -- we had information from CDCR that said

11 that -- well, again, first of all, we know that the -- the

12 minimum and maximum for the pay bands that I discussed earlier,

13 that those increase over time.  So presumably -- I mean, we

14 could -- I can check the underlying data, but presumably, the

15 minimum and maximum pay that was available to psychologists at

16 CDCR increased in these years.

17     We also know that CDCR employees are eligible for annual

18 raises.  I believe we have information that -- from the client

19 that most employees generally get those -- it's not automatic,

20 but most employees generally get those annual merit pay

21 increases.

22 Q.  CDCR does not offer annual cost of living adjustments

23 automatically, right?

24 A.  I don't know.  I haven't seen any information, and I did

25 not ask.

1  Q.  And eligibility for an annual increase is not the same as

2  actually receiving an annual increase, right?

3  A.  No.  I mean, I don't know if that was the -- the wording I

4  used.  You know, my understanding from the client was that most

5  employees receive the annual merit increases until they hit the

6  maximum, at which point they're not eligible for additional

7  merit increases.

8  Q.  In looking at this graph, you didn't do any analysis to

9  determine whether or not that spike in vacancy rate is

10  attributable to COVID versus failure to keep up with inflation,

11  right?

12  A.  You're talking about since late 2020?

13  Q.  Correct.

14  A.  True.  We did not look into -- do an evaluation comparing

15  the possible reasons for the spike.

16  Q.  You didn't do any analysis to exclude the possibility that

17  failure to keep up with inflation is the reason for the spike

18  on this graph, right?

19  A.  Well, again, you know, I don't know the extent to which

20  CDCR failed to keep up with compensation since I don't know

21  their 2023 compensation levels.

22      And, again, I'd have to, you know, do the calculation

23  specific to the time period that you are -- I'd want to do the

24  calculation specific to the time period you are discussing,

25  which is 2020 through 2023.

1    Q.  But you didn't do the calculation, right?

2    A.  No.

3    Q.  Okay.  So you didn't do any analysis that could exclude

4    this graph -- that could exclude CDCR's failure to keep up with

5    inflation as the cause for the spike in this graph, right?

6    A.  If, in fact -- correct, if, in fact, CDCR did fail to keep

7    up with inflation.

8    Q.  Did you do any analysis to say determinatively that the

9    spike in this graph is due to COVID, or is that just an

10   assumption?

11   A.  It's not an assumption.  It's an observation that this is

12   consistent with the time period when COVID was in effect and

13   when one might expect to see employment outcomes changing due

14   to COVID.

15   Q.  Okay.  So you just observed that two things happened at

16   similar points in time, and you're drawing some conclusion that

17   they're related; is that right?

18   A.  No.  It's just an observation.  We're not -- you know,

19   we're not -- we are observing that they are coincident.

20   Q.  And there are ways to determine whether or not something is

21   correlative or cause -- cause -- causal, right?

22   A.  There are.  Or at least ways one can try to do so, given

23   sufficient and appropriate data.

24   Q.  Okay.  And you didn't try to do that here in determining

25   whether or not this graph is either correlative or has a causal

1  relationship to COVID, right?

2  A.  Well, again, you know, I believe we can say that there is a

3  correlation between the increased vacancy rate and COVID

4  because of the fact that they occurred at the same time or over

5  the same time period.

6      We have not done a causal analysis to assess whether or not

7  COVID is a causal factor.  I'd need to think more about whether

8  there is even data available to do such an analysis.

9  Q.  So you don't know if there is data available to help you

10  determine the relationship between COVID and the vacancy rate

11  between 2020 and 2023, right?

12  A.  Well, again, we can observe a correlation.  So that, one

13  can observe.  We have not assessed whether or not it's possible

14  to do a causal analysis.

15  Q.  Okay.  And as you sit here today, you don't even know the

16  data that you would use to do the causal analysis, right?

17  A.  I haven't thought about it.

18  Q.  CDCR did not share with you any information about the

19  approximately 42 percent increase in salary that it offered to

20  psychologists and social workers in 2006, right?

21  A.  No.  Nor did I ask for information back from 2006.

22  Q.  So your study does not take into account the influx of

23  psychologists and social workers joining CDCR around 2007 and

24  2008 after that increase in compensation?

25  A.  No.  We did not look at that time period.

1    Q.   Okay.  And you're not offering the opinion that it's

2    impossible for CDCR to hire psychologists, right?

3              MR. CIRELLI:  It's been asked and answered, Your

4    Honor.

5              THE COURT:  Overruled.

6              MR. CIRELLI:  Couple times, I believe.

7              THE COURT:  Overruled.

8         You may answer.

9              THE WITNESS:  Can you repeat the question, please.

10   Q.  BY MS. HATTON:  You are not offering the opinion that it's

11   impossible for CDCR to hire psychologists, correct?

12   A.   No, I'm not offering that opinion.

13             THE COURT:  All right.  That brings us to 5:00 p.m.

14   so we'll adjourn for the evening.  We will begin again on

15   Tuesday morning, October 3rd, at 9:00 a.m.  So if you can be

16   back there at 9:00 on Tuesday.

17        All right.  Any housekeeping in the meantime, Mr. Galvan?

18             MR. GALVAN:  No, Your Honor.

19             THE COURT:  Mr. Mello?

20             MR. MELLO:  No, Your Honor.

21             THE COURT:  All right.  We'll see you Tuesday.

22             THE CLERK:  Court is in recess.

23                  (Proceedings adjourned, 5:00 p.m.)

24                       ---oOo---

25

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4                              /s/ Kimberly M. Bennett
                               KIMBERLY M. BENNETT
5                              CSR No. 8953, RPR, CRR, RMR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25