IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA


Ralph Coleman, et al.,
        Plaintiffs,                 Sacramento, California
                                    No. 2:90-cv-00520
vs.                                 Tue., Oct. 03, 2023
                                    9:08 a.m.
Gavin Newsom, et al.,
        Defendants.
_____/

                        TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
                        ---oOo---

APPEARANCES:

  For the Plaintiffs:          Rosen, Bien, Galvan and
                               Grunfeld, LLP
                               101 Mission Street
                               Sixth Floor
                               San Francisco, CA  94105
                               By:  Lisa Adrienne Ells
                               Jenny Snay Yelin
                               Alexander Ross Gourse
                               Adrienne Pon Harrold
                               Attorneys at Law


  For the Defendants:          Hanson Bridgett, LLP
                               1676 N. California Blvd.
                               Suite 620
                               Walnut Creek, CA  94596
                               By: Paul B. Mello
                               Laurel O'Conner,
                               Attorneys at Law
(Appearances continued on following page)


  Official Court Reporter:     Kimberly M. Bennett,
                               CSR, RPR, RMR, CRR
                               501 I Street
                               Sacramento, CA 95814


  Proceedings recorded by mechanical stenography, transcript
  produced by computer-aided transcription

```
1                        APPEARANCES CONTINUED
2
     For the Plaintiffs:           Prison Law Office
3                                  1917 Fifth Street
                                   Berkeley, CA  94710
4                                  By: Marissa Hatton
                                   Attorney at Law
5

6    For the Defendants:           Hanson Bridgett, LLP
                                   425 Market Street, 26th Floor
7                                  San Francisco, CA  94105
                                   By: Samantha Derin Wolff
8                                  Lawrence Michael Cirelli
                                   Attorneys at Law
9

10   For the Defendants:           Office of the Attorney
                                   General
11                                 1300 I Street, Suite 125
                                   Sacramento, CA  94244
12                                 By: Elise Owens Thorn
                                   Deputy Attorney General
13

14   For the Defendants:           Office of the Attorney
                                   General
15                                 455 Golden Gate Ave.
                                   Suite 11000
16                                 San Francisco, CA  94102
                                   By: Damon Grant McClain
17                                 Namrata Kotwani
                                   Deputies Attorney General
18

19

20

21

22

23

24

25
```

1                                    INDEX

2

   WITNESSES:                                              PAGE:

3

   ERICA GREULICH

4  CROSS-EXAMINATION CONTINUED BY MS. HATTON...........5
   REDIRECT EXAMINATION BY MR. CIRELLI.................27

5

   JASINDA MUHAMMAD

6  DIRECT EXAMINATION BY MR. MELLO....................31
   CROSS-EXAMINATION BY MS. YELIN.....................94

7  REDIRECT EXAMINATION BY MR. MELLO.................134
   RECROSS EXAMINATION BY MS. YELIN..................137

8

   ANGELA PONCIANO

9  DIRECT EXAMINATION BY MR. MCCLAIN.................140
   CROSS-EXAMINATION BY MS. YELIN....................174

10 REDIRECT EXAMINATION BY MR. MCCLAIN...............194

11 TONI MARTELLO
   DIRECT EXAMINATION BY MS. WOLFF...................197

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to order of the court, 9:08 a.m.)

 2              THE CLERK:  Calling civil case 90-520, Coleman, et

 3    al. versus Newsom, et al.

 4        This is on for enforcement, and today is day two.

 5              THE COURT:  All right.  Good morning.

 6        Counsel are present.  I understand Ms. Ells is now serving

 7    as lead counsel for Plaintiffs.

 8              MS. ELLS:  Correct, Your Honor.

 9              THE COURT:  So that change is noted.

10        Any other changes with respect to counsel that need to be

11    noted, Ms. Ells?

12              MS. ELLS:  No.  Except that Mr. Bien is not --

13    Mr. Bien and Mr. Galvan are not here this week.

14              THE COURT:  The Court had understood Mr. Bien was not

15    able to be present.

16        Mr. Mello?

17              MR. MELLO:  No changes, Your Honor.

18              THE COURT:  All right.  So let's proceed.  Continue

19    with the cross-examination.

20              MS. HATTON:  Your Honor, may I bring my phone up to

21    keep track of my time?

22              THE COURT:  You may, as long as it's on airplane mode

23    and silenced.

24        And, Doctor, you continue to testify under oath this

25    morning.
```

1           THE WITNESS:  Thank you, Your Honor.

2       (The Witness, Erica Greulich, previously sworn.)

3           THE COURT:  All right.  You may proceed.

4                   CROSS-EXAMINATION CONTINUED

5   BY MS. HATTON:

6   Q.  Good morning, Dr. Greulich.

7   A.  Good morning, Ms. Hatton.

8   Q.  I'm going to pick up where we left off on Friday, talking

9   about shortages.

10      You did not perform your own study to determine whether

11  there was a shortage of social workers in the labor market,

12  right?

13  A.  We did not perform a study, no.

14  Q.  If you did, you would need to know the demand in California

15  for social workers, correct?

16  A.  Unless -- unless we were to rely on other indicia of

17  whether there is a shortage or not.

18  Q.  You do not know the demand in California for social

19  workers, correct?

20  A.  No.  I don't -- I don't know that that's something that's

21  measured.

22  Q.  You agree that social workers are getting hired by

23  employers in California today, right?

24  A.  Yes, including at CDCR.

25  Q.  Right.  In fact, you found that CDCR achieved less than a

1    10 percent vacancy rate for social workers up until

2    February 2022, correct?

3    A.  Let me check.  That sounds -- that sounds about right.

4    Q.  And you would agree that CDCR can potentially achieve that

5    vacancy rate again for social workers, right?

6    A.  Hold on a sec.  I mean, in theory, yes, anything is

7    possible.  Given the current labor market conditions, you know,

8    it's -- it's more difficult.  But if the labor market

9    conditions were to change, I think it would be a more

10    feasible -- feasible concept.

11    Q.  Let's talk about recreational therapists.

12        You did not do your own research, as with social workers,

13    as to whether there is a shortage of recreational therapists in

14    California, right?

15    A.  Correct.  We did not do our own analysis.

16    Q.  And you do not know the demand in California for

17    recreational therapists, right?

18    A.  Correct.  I actually don't know if anybody does.

19    Q.  It's not your opinion that recreational therapists are not

20    being hired in California right now, right?

21    A.  Not at all.  I think they're one of the classifications

22    that CDCR has had greater success in hiring.

23    Q.  Okay.  So you believe that CDCR can hire more recreational

24    therapists, right?

25    A.  More, I mean -- "more" is a broad term.  I mean, they've

1    had some success.  I'm sure they can continue to hire

2    recreational therapists.  You know, hiring one recreational

3    therapist is very different from hiring a thousand recreational

4    therapists, so it's -- it's relative.

5    Q.  Sure.  Did you see the vacancy report that the defendants

6    filed on Friday?

7    A.  I don't believe I have.

8    Q.  We'll come back to that.  I want to talk about medical

9    assistants.

10       You did not do your own independent analysis of whether

11   there is a shortage of medical assistants in California, right?

12   A.  We did not.

13   Q.  And you do not know the demand in California for medical

14   assistants, right?

15   A.  No.  Again, I -- yeah, I have not seen anything that

16   anybody has produced on demand for medical assistants in

17   California.

18   Q.  It's not your opinion that medical assistants are not being

19   hired anywhere in California right now, right?

20   A.  Correct.  Including at CDCR.

21   Q.  It's not your opinion that it's impossible for CDCR to hire

22   more medical assistants in this labor market, right?

23   A.  Again, correct.  You know, "more" being a relative term.

24   It's a very different concept to, you know, hire one versus

25   hire one hundred.

1    Q.   I understand from your report that almost one quarter --

2    23.1 percent to be exact -- of medical assistants at CDCR make

3    the minimum available salary within their salary range.

4        You would agree, right?

5    A.   I believe that was correct as of December 2022, yes.

6    Q.   And so for those medical assistants, they are not making

7    premiums above the state average, right?

8    A.   I think that's correct.

9    Q.   And you would agree that you're not aware of anything that

10   prevents CDCR from offering more than the minimum base salary

11   to its medical assistants, right?

12   A.   I don't know if CDCR has any, you know, budgetary

13   restrictions.  I -- you know, that would be one thing that

14   might prevent them from offering more than they are.  But,

15   obviously, they are offering more than the minimum to others.

16   Q.   So you said you don't know CDCR's budgetary constraints, so

17   I'll rephrase the question.

18       You're not aware of anything that precludes CDCR from

19   offering more than the minimum base salary to medical

20   assistants, right?

21   A.   Correct.

22   Q.   You agree that if CDCR wanted to hire and retain more

23   medical assistants, it could try paying more than the minimum

24   available salary, right?

25   A.   That's one of many things it could do, yes.

1  Q.  Okay.  I want to talk about something that you said last

2  Friday about the data that you used in your regression

3  analysis.  You said, we did the best with the data that we had.

4      I just want to confirm, you do not have individualized data

5  for CDCR employees' salary, right?

6  A.  Correct, we do not.

7  Q.  CDCR certainly has information on the salaries that it

8  pays.  Did you ask for it?

9  A.  We did.

10  Q.  Did you receive it?

11  A.  We did not.

12  Q.  Okay.

13  A.  I don't know if that's because it wasn't available or, you

14  know, if it just takes too much time for them to compile data

15  specific to that request we made.

16  Q.  And you're speculating right now, right?

17  A.  Yes.

18  Q.  I want to talk about your regression analysis.  And I think

19  this is, really, you know, the big point of your report, that

20  you find no statistically significant relationship between

21  salaries and vacancies.

22      You only analyzed the average salaries that CDCR has

23  offered either currently, in the past -- or in the past, right?

24  A.  Are you asking -- I mean, yes.  We haven't analyzed future

25  salaries because we do not know what they will be.

1  Q.  So you did not attempt to study whether there would be a

2  statistically significant relationship if CDCR were to offer

3  higher salaries?

4  A.  We can't do that because we don't have any information on

5  the number of filled positions or net hires if CDCR offered

6  different salaries.

7  Q.  The way you would find that information on fill rates would

8  be to study if there is a statistically significant

9  relationship between hypothetically higher salaries and fill

10 rates, right?

11 A.  Well, we'd need to know what the fill rates are with these

12 hypothetically higher salaries.  And without actual data, you'd

13 have to make up data in order to do that.

14 Q.  I thought you were saying fill rates are a result of

15 salaries, right?

16 A.  No.  I mean, fill rates are what they are.  They're fill

17 rates.

18 Q.  So your -- your opinion that there is no statistically

19 significant relationship between salaries and vacancies goes

20 along with an opinion that salaries can't tell you anything

21 about vacancy rates?

22 A.  That's what we're looking to assess, is whether there is a

23 relationship between salaries and fill rates or salaries and

24 net hires.

25 Q.  It seems a little backwards to see how many people would be

1  hired before you analyze how much you would have to pay them to

2  hire them.

3      So this is my question:  You did not attempt to study

4  whether there would be a relationship -- a statistically

5  significant relationship between salary and vacancy if CDCR

6  were to offer higher salaries?

7  A.  No, because you'd need to make up data in order to do that.

8  Q.  So your regression analysis can't tell us anything about

9  what would happen to vacancy rates if CDCR offered higher

10 salaries?

11 A.  I mean, regression results are generalizable to some

12 extent.  They're not -- they're not strictly limited to the

13 exact values of salaries in the data and relationship with --

14 with fill positions or net hires.  I mean, that's why you

15 have -- when you estimate a coefficient, when you estimate an

16 estimate in a regression, it's offering a relationship, it's

17 measuring a relationship.  And that relationship is certainly

18 generalizable.

19      You know, you can generalize with more certainty two values

20 that are closer to those that you've actually relied on to

21 estimate that relationship --

22 Q.  I don't want to cut you off, but can I ask you about this,

23 the estimation of the relationship?

24 A.  Sure.

25          MR. CIRELLI:  Your Honor, I'd ask that the witness be

1    allowed to answer the questions fully.

2            THE COURT:  She's under cross.

3    Q.  BY MS. HATTON:  And I'm --

4            THE COURT:  You should answer the question and then

5    wait for the next question, generally.  And the attorney,

6    within reason, is free to control the witness, to the extent

7    she can.

8            MS. HATTON:  And I appreciate that you want to

9    explain, Dr. Greulich.  That's your counsel's job to help you

10   explain.  I'm asking yes or no questions.  And just out of

11   respect for the Court's and my time -- I only have 60 minutes.

12   Q.  BY MS. HATTON:  So this is the question:  Your regression

13   analysis cannot tell us what the effect -- what the vacancy

14   rates would be if CDCR were to offer higher salaries?

15   A.  Again, I think it is informative for salaries that are not

16   strictly in the data, including some higher salaries.  The

17   estimates are -- would apply with greater uncertainty the

18   further away you get from the data we actually use.

19   Q.  Your regression analysis can't tell us, for instance, what

20   effect you would expect to see on CDCR's ability to hire and

21   retain if CDCR offered salaries of 25 percent higher, right?

22   A.  Again, I think it can still be informative.  I mean, you

23   know -- whether, you know, the exact same estimates would

24   apply, we'd need to do more analysis and more robustness checks

25   to see, you know, how, kind of, generalizable they are, how far

1    out that extends.

2    Q.  I'm going to -- I -- I understand you need to do robustness

3    checks.  I understand there is a lot going into it.  I just

4    want to know, yes or no, can your regression analysis tell us

5    what would happen to vacancy rates if CDCR were to increase its

6    salaries?

7    A.  Yes.

8    Q.  Okay.

9    A.  Yes.

10   Q.  Thank you.

11       You did not assess whether higher salaries would have an

12   impact on vacancies, though, right?

13   A.  Again, if you're asking if we plugged in hypothetical

14   values of higher salaries, the answer is no.

15   Q.  So CDCR didn't provide you with any data saying, here is

16   what we could potentially offer, and then you assessed it,

17   right?

18   A.  No, because they don't have information on filled positions

19   that would relate to those hypothetical higher salaries.

20   Q.  If they were trying to fill positions, they could try to

21   pay more, right?

22   A.  It is one of many options in their arsenal, yes.

23   Q.  Okay.  So you would agree that increasing compensation is a

24   way to enhance hiring, right?

25   A.  Yes.

1    Q.  And you would agree that increased compensation can

2    increase retention, right?

3    A.  Yes.

4    Q.  But you did not consider the impact the increased salaries

5    would have on hiring and retention for CDCR, right?

6    A.  We're not looking at -- at CDCR's salaries relative --

7    Q.  I'm sorry.  I'm sorry.  I really -- this is a yes or no

8    question.  Did you consider it; that's the question.  I'll ask

9    it again.

10        Did you consider -- or you did not consider the impacts

11   that increased salaries would have on hiring and retention,

12   right?

13   A.  We did not consider the impacts of hypothetical salaries.

14   Q.  You agree that there are salary premiums that CDCR could

15   offer to get more people to take jobs, right?

16   A.  Correct.  And I believe they've already implemented salary

17   premiums.

18   Q.  And your analysis shows that they didn't work, right?

19   A.  Correct.

20   Q.  Okay.  So you agree that there are salary premiums that

21   CDCR can offer to get more people to stay in their jobs, but

22   you are not offering an opinion, and you don't have an opinion,

23   about what that wage increase would need to be to fill the

24   vacancies, right?

25   A.  Correct.

1    Q.  You agree that monetary attributes of a job, like location

2    and working conditions, matter, too, in terms of hiring and

3    retention, right?

4    A.  You mean nonmonetary, right?

5    Q.  I'm sorry.  Yes.

6    A.  Yes, they do matter.

7    Q.  But you do not have an opinion on how CDCR's working

8    conditions could be improved to fill vacancies, right?

9    A.  No, with the exception, like I mentioned on Friday, that

10   we've observed telehealth being associated with a decrease in

11   the vacancy rate for psychiatrists, so telehealth appears to be

12   one potential such avenue.

13   Q.  But you're not familiar with the on-the-ground working

14   conditions in CDCR, right?  And you're not offering an opinion

15   how that could be improved to increase hiring and retention?

16   A.  I mean, if you're again talking about things like office

17   space or natural light, no.

18   Q.  Okay.  You haven't done an exit analysis with people who

19   are leaving CDCR or declining jobs to determine why, right?

20   A.  I have not.

21   Q.  And you're not here telling the Court as to what premiums

22   CDCR would need to offer to fill its positions, right?

23   A.  Correct.

24   Q.  So CDCR paid you half a million dollars, almost, to

25   determine if it can fill its vacancies, and you didn't

1   calculate how much money it would need to offer to fill its

2   vacancies?

3   A.  We did a lot more than -- than just looking at CDCR's base

4   compensation.

5   Q.  My question is whether or not you calculated how much money

6   CDCR would need to offer to fill its vacancies.

7   A.  I did not calculate how much money.  I do not know how much

8   money --

9   Q.  Okay.

10  A.  -- CDCR would need to fill its vacancies.  And I do not

11  know -- it could be different for every person, and we don't

12  know, again, the other aspects of the job -- nonmonetary

13  compensation that would get people to -- to accept jobs and to

14  remain with CDCR.

15  Q.  You didn't attempt to study what the nonmonetary

16  compensation would need to be to get people to take jobs in

17  CDCR, right?

18  A.  No.

19  Q.  Okay.

20  A.  A lot of these things are not even quantified.

21  Q.  Your regression analysis is -- well, let me be precise with

22  my words.

23      Your opinions about how responsive potential employees will

24  be to premiums offered by CDCR are limited to relatively small

25  premiums, right?

1    A.   Say that one more time, please.

2    Q.   Your opinions -- I'm informing this by the fact that you

3    only studied salaries at CDCR either offered in the past or

4    currently offered, but nothing above that.

5         This is the question:  Your opinions about how responsive

6    potential employees will be to premiums offered by CDCR are

7    limited to relatively small premiums, right?

8    A.   I don't know that that's true, because I think CDCR has had

9    some pretty large premiums relative to benchmark employers.

10   And, also, those premiums have varied over time.

11   Q.   Your regression analysis is limited to the effect that

12   relatively small increases in premiums have, right?

13   A.   No.  I mean, again, we have some large differences in

14   premiums.  You know, for example, if you look at --

15   Q.   That's all right.  That's all right.  The only thing that's

16   important is what you're saying to me is no.

17        So your testimony today, under oath, is that your -- when I

18   ask if your regression analysis is limited to relatively small

19   increases in premiums, you're telling me no, correct?

20   A.   We're not looking at increases in premiums per se.  We're

21   looking at premiums.  And we observed --

22   Q.   I'm sorry.

23   A.   -- some large premiums.

24   Q.   I think we're having miscommunication.

25        I'm talking about the premiums that CDCR offered in the

1  past.  I'm characterizing them as relatively small.

2      And the question is this, and I'm just confirming what

3  you've already said a minute ago, that your regression analysis

4  and the way it measures responsiveness of employees to

5  increased premiums is limited to relatively small increases in

6  premiums.  Your answer -- your yes or no answer today is no,

7  right?

8  A.  No.  And I would not characterize it as increases in

9  premiums either.

10 Q.  Okay.  Do you recall having your deposition taken a few

11 weeks ago?

12 A.  I do.

13 Q.  And you gave that testimony under oath, correct?

14 A.  I did.

15 Q.  And you were represented by both an attorney from Hanson

16 Bridgett and an attorney from the AG's office there, right?

17 A.  Yes.

18 Q.  Okay.  I would like to pull up your deposition.

19     Mr. Gonzalez, I don't recall the number for that.  And the

20 page number, please, is going to be 100.

21         THE COURT:  You're asking to display that on the

22 screen?

23         MS. HATTON:  Yes.

24         THE COURT:  All right.  Are there certain lines?

25         MS. HATTON:  Yes.  Is everyone ready?  I'm looking at

1   the bottom of page 22 -- I'm sorry -- 100, line 22.  And I'm

2   going to go over to 101.

3       Question --

4           MR. CIRELLI:  I'm sorry, what line at 101?

5           MS. HATTON:  100 -- starting 100, line 22, and going

6   over to 101 at 5.

7           MR. CIRELLI:  Thank you.

8           MS. HATTON:  Question:  Okay.  So it sounds like your

9   opinions about the responsiveness of CDCR potential employees

10  or employees to make increased premiums are limited to small --

11  relatively small increases in premiums; is that right?

12      Answer:  Specific to our regression analysis, I mean, yes.

13  You know, it's my expectation that, you know, the response is

14  going to change as the premiums increase and increase and

15  increase beyond what we had considered in the analysis.

16  Q.  BY MS. HATTON:  So your regression analysis is limited to

17  relatively small increases in premiums, yes?

18  A.  I think the context of this discussion was in the

19  generalizability of the regression estimates.

20      So, you know, I can't see the question again right now, but

21  I think the question that preceded it, and even the response

22  here, is we're looking at increases relative to the data that

23  we observed that we used for our regression and how

24  generalizable it was.

25  Q.  And the data you used for regression was only past salary

1    data for CDCR?

2    A.  Correct.

3    Q.  Okay.  And those were relatively small increases in

4    premiums, and your answer here is:  Specific to our regression

5    analysis, I mean, yes.

6    A.  And I believe the question was in the context of the

7    generalizability of our estimates, and my response was that

8    the -- it's generalizable within small -- you know, you can be

9    almost certain that a small increase relative to the historical

10   premiums, those results are generalizable.

11       But a larger increase on top of what's been historically

12   observed, it would be generalizable but with greater

13   uncertainty.

14   Q.  So your regression analysis only tells us, reliably, what

15   employee response is to small increases in premiums like CDCR

16   has done in the past, right?

17   A.  No.  Again, I -- I disagree that CDCR has only -- only had

18   small premiums in the past.

19   Q.  Can your -- well, your regression analysis cannot tell us

20   what would happen to vacancy rates if CDCR were to increase its

21   premiums higher than what it has done in the past, right?

22   A.  Well, again, I think it's very informative for increases

23   that are slightly higher than what's been done in the past, and

24   it may still be informative for larger increases on top of

25   that, but at what point, you know, it starts becoming more

1    uncertain, I don't have an opinion about that.

2    Q.   Increased rates of premiums could result in a different

3    type of responsiveness than previously seen in workers in terms

4    of their willingness to work for CDCR, right?

5    A.   It's possible.  I do not know.

6    Q.   You agree that there are certain magnitudes of salary

7    increases or salary premiums that might decrease vacancies,

8    right?

9    A.   Sure.

10   Q.   In fact, it's your expectation that the response of

11   potential employees would change as CDCR's premiums increase?

12   A.   They may up to a point.  I mean, at some point, people get

13   a tradeoff where they just don't care about more money.

14   Q.   And, therefore, your opinions would potentially change if

15   CDCR's premiums were to increase higher than what they've

16   offered in the past?

17   A.   Potentially, but it's not certain.

18   Q.   And you've already come here today to tell us what they

19   tried in the past didn't work, right?  That's why we're all

20   here?

21   A.   And that's somewhat generalizable to other premiums that

22   they may offer as well.

23   Q.   I want to pull up a table from your report.  We can use

24   Defendants' Exhibit 7.  I believe this is on page 51.  It

25   should be familiar to everyone.  It was the subject of some

1    conversation last week.

2              MR. CIRELLI:  I believe her report is Exhibit 5.

3              MS. HATTON:  Apologies.  5.  I think you had to

4    correct me on that once already.

5    Q.  BY MS. HATTON:  Okay.  This is Table 2; it's titled -- my

6    eyesight is getting bad -- CDCR Inmates' Access to Mental

7    Health Providers Relative to California Adult Population.

8         Do you recognize this?

9    A.  I do.

10   Q.  Okay.  We're going to talk about this in just a second, but

11   first, I want to talk about the actual number of employees that

12   CDCR needs to hire to comply with court orders.  And I won't

13   even talk about full compliance with court orders, but only 90

14   percent.

15        Do you know how many social workers CDCR needs to hire to

16   achieve a 10 percent vacancy rate statewide?

17   A.  I believe as of -- I think it's as of December '22, it was

18   in excess of 100.

19   Q.  I asked earlier if you were familiar with the defendants'

20   most recent vacancy report which was filed on Friday.  It's --

21   I don't need to put it up.  I'll represent to you that,

22   according to CDCR, it needs just over 63 licensed clinical

23   social workers to be compliant with this Court's orders.

24        So according to your Table 2, as of December 2022 -- and

25   that's the most recent data that you have, I believe -- there

1    were 25,720 social workers in California, correct?

2    A.   Yes.

3    Q.   It's your opinion that out of those roughly 26,000 social

4    workers, CDCR cannot hire 63 of them?

5    A.   I mean, I -- I don't know that I have an opinion on, you

6    know, what CDCR can and can't hire.

7    Q.   Is it your opinion that CDCR has done everything in its

8    power to hire 63 social workers out of that pool of 26,000?

9    A.   I don't even know everything that CDCR has done.

10   Q.   Don't know everything that CDCR has done in what capacity?

11   A.   In order to try to hire more social workers.

12   Q.   Do you know what CDCR has done in order to try to hire more

13   psychologists?

14   A.   I mean, I know some things that they have done.  I know the

15   pay increases, the --

16   Q.   I'm sorry, but my question was:  Do you know everything?

17   A.   Do I know everything?  I do not know everything.

18   Q.   Do you know everything that they've done to hire medical

19   assistants?

20   A.   I do not.

21   Q.   Do you know everything that they've done to hire

22   recreational therapists?

23   A.   I do not.

24   Q.   According to CDCR, as of this Friday, it needs just over 18

25   medical assistants to achieve a 90 percent fill rate.  Would

1   you agree there are enough medical assistants in California for

2   CDCR to hire 18 of them?

3   A.   I think we can be pretty confident that there are at least

4   18 additional medical assistants in California that are not

5   employed by CDCR.

6   Q.   And you do not know everything that CDCR has done to try to

7   hire more medical assistants, correct?

8   A.   Correct.

9   Q.   So you cannot tell me if CDCR has done everything

10  reasonable it can to hire more medical assistants, right?

11  A.   I mean, I can -- I have an opinion of, you know, the steps

12  that it has taken, and I can opine that they are reasonable,

13  and I do.  But --

14  Q.   The question is not whether the steps are reasonable, it's

15  whether they've taken all reasonable steps.  And you're not

16  able to tell me that, right?

17  A.   I mean, I do not know every step that they've taken.

18  Q.   Okay.

19  A.   So yes.

20  Q.   According to CDCR, as of Friday, it needs just over 281

21  psychologists to achieve 90 percent fill rate.

22       According to your Table 2, as of December 2022, there were

23  17,251 psychologists in California.  It's not your opinion that

24  out of those 17,251 psychologists, CDCR cannot hire 281 of

25  them, correct?

1    A.   I do not know whether they can or can't.

2    Q.   And you don't know everything that they've done to try to

3    hire more psychologists, right?

4    A.   I do not know everything -- every single thing that they

5    have done.

6    Q.   Okay.  So you can't say if they've taken all reasonable

7    steps to hire more psychologists, right?

8    A.   I can say that they've taken reasonable steps.  I do not

9    know if they have taken every single possible reasonable step.

10   Q.   I am actually almost finished here.

11        I'm going to let Mr. Gonzalez know that in a second, I'd

12   like him to pull up what's been premarked as Plaintiffs' 101?

13        But I just want to ask you, Dr. Greulich, when you were

14   writing this report, you wanted to include all relevant

15   information that would present a fair and accurate

16   representation to the Court, right?

17   A.   Yes.

18   Q.   Even if it didn't support the defendants' position?

19   A.   Yes.

20   Q.   Okay.  And, Mr. Gonzalez, could you pull up Plaintiffs'

21   101, please.

22        Do you recognize this, Dr. Greulich?

23   A.   I do.

24   Q.   It's an e-mail from your coauthor, Dr. Dutra, to you,

25   correct?

1    A.  Yes.

2    Q.  Okay.  Mr. Gonzalez, could you zoom in a little bit.  I

3    still want to be able to see the graph, but I'd like

4    Dr. Greulich to read the text of this e-mail.  Okay.

5        Dr. Greulich, could you please read what Dr. Dutra wrote to

6    you.

7    A.  Sure.

8        Hi, Erica.  I worked with the workforce projection data

9    today, and I was honestly a bit surprised.  This is something

10   we should discuss on how to address on the report.  I included

11   more professions on the plot below than we will need, but it

12   was to get a more full picture.  A positive gap indicates more

13   demand for the professional than supply.  It is clear that for

14   the foreseeable future, there will be a lack of psychiatrists,

15   and this gap is projected to increase.  However, for most other

16   mental health related professionals, this is not the case, so

17   we cannot use the same long run arguments in the report.

18   Q.  Thank you.  And this graph was not included in your report,

19   correct?

20   A.  Correct.

21            MS. HATTON:  No further questions, Your Honor.

22            THE COURT:  All right.  Any redirect?

23            MR. CIRELLI:  Yes, briefly, Your Honor.

24            THE COURT:  All right.

25            MR. CIRELLI:  Ms. Pooni, if you could put --

1              MS. POONI:  Just need to switch it.

2              MR. CIRELLI:  Okay.  Sorry.

3                        REDIRECT EXAMINATION

4    BY MR. CIRELLI:

5    Q.  Could you bring up Plaintiff's Exhibit 101 that was just up

6    on the screen?

7         Dr. Greulich, why is it that you did not include that graph

8    in your report?

9    A.  So this graph is the HRSA, the Health Resources Services

10   Administration, projections of the -- essentially, the

11   projections of shortages for various types of behavioral and

12   mental health care providers over time.

13        With the exception of psychiatrists, the HRSA, for purposes

14   of these projections, assumes that demand for each type of

15   practitioner equals the supply of that type of practitioner in

16   their baseline year, which here is 2022.  So that's why we see

17   a whole bunch of lines clustered over at the zero percent --

18   the horizontal line at zero percent as of 2022.  That's because

19   they -- the HRSA knows how many providers exist nationwide, and

20   they just assume that demand for those -- for each of those

21   types of providers equals supply.

22        However, they acknowledge in their documentation that that

23   assumption ignores the evidence of a large amount of unmet

24   demand for behavioral and mental health practitioners

25   nationwide and that, as a result, their estimates of demand for

1  those types of practitioners should be viewed as a lower bound

2  for the actual demand that exists.  And when you translate that

3  into shortages, that's equivalent to an assumption that the

4  shortages that they project are an upper bound of any excess

5  supply and that any shortage may actually be -- I'm sorry --

6  any surplus may actually be a shortage in a given year.

7      And certainly assuming, you know, that assumption in the

8  baseline year, that -- if they're stating their assumption

9  should be viewed as a lower bound of the demand, that would

10  suggest that as of 2020, the demand for these types of

11  practitioners would exceed the supply.

12      So we, you know, found that because of that assumption --

13  which they expressly acknowledge that this was inconsistent

14  with the voluminous literature and studies and policy papers

15  and projections that others have -- have published, so that is

16  why we did not include this in our report.

17  Q.  Thank you, Doctor.

18      Now, Ms. Hatton asked you some questions about your

19  regression analysis, just at the end of Friday as well as this

20  morning.

21      Doctor, based on your review of Dr. Brown's work and being

22  present at and reading his deposition, did Dr. Brown do a

23  regression to determine if increased salaries have an impact on

24  fill rates?

25  A.  He did not.

1    Q.  Did Dr. Brown analyze how much money CDCR would need to pay

2    in order to meet its -- in order to fill and meet and fulfill

3    its vacancies?

4    A.  I'm sorry.  Say that one more time.

5    Q.  Yeah, that wasn't very good.

6        Did Dr. Brown analyze how much money CDCR would need to pay

7    to fill its vacancies?

8    A.  No.  I mean, he -- he didn't do a regression analysis.

9        And he had a calculator, essentially, where he put in --

10   plugged in certain assumptions and said it would be in, you

11   know, a certain range that, you know, might be what's needed,

12   but that's not how he would actually go about doing -- how he

13   would go about doing it to, you know -- how he thinks CDCR

14   should go about doing it to try to increase their fill rates.

15   Q.  But did he opine on a dollar figure, a number that CDCR

16   would need to pay to fill its vacancies?  I think that's what

17   Ms. Hatton was asking you.

18   A.  He had a range of percentages -- percentage increases in

19   pay.  He did not have a dollar value, I believe.  And, again,

20   his -- his range of percentages was hypothetical.  It was based

21   on -- it was based on assumptions; it was not based on CDCR's

22   actual salaries.

23   Q.  Did Dr. Brown analyze nonmonetary compensation that would

24   be needed to be provided in order to fill -- for CDCR to fill

25   its vacancies?

1    A.  He did not.

2    Q.  I think you said this -- did Dr. Brown run any type of

3    regression analysis?

4    A.  No, he did not.

5    Q.  And based on the information -- the questions that were

6    asked and the materials that were provided to you during

7    Ms. Hatton's examination, is there anything that you heard that

8    in any way changes your opinions in this matter?

9    A.  No.

10            MR. CIRELLI:  Thank you.  I have no further

11   questions, Your Honor.

12            THE COURT:  All right.  Any recross?

13            MS. HATTON:  No, Your Honor.

14            THE COURT:  All right.  Is this witness excused,

15   then, Mr. Cirelli?

16            MR. CIRELLI:  Yes, Your Honor.

17            THE COURT:  Excused?

18            MS. HATTON:  Yes.

19            THE COURT:  So when I say "excused," I mean stepping

20   down, no longer subject to recall, so, for example, could

21   remain in the audience.  So are the parties agreeing, excused

22   in that sense?

23            MR. CIRELLI:  Unless there is something that comes up

24   in Dr. Brown's testimony where we would need to recall her.

25   That is a possibility.  I don't anticipate it, Your Honor, but

1    phrased in that fashion, yes, there is that possibility.

2            THE COURT:  All right.  Then subject to recall, you

3    may step down.

4            THE WITNESS:  Thank you, Your Honor.

5            THE COURT:  All right.  Next witness.

6            MR. MELLO:  Your Honor, we're going to be calling

7    Ms. Jasinda Muhammad.  She's in the hallway.

8            THE COURT:  All right.

9            THE CLERK:  Ms. Muhammad, please come forward.  Step

10   into the witness stand and remain standing.

11       Please raise your right hand.

12       (The Witness, Jasinda Muhammad, is sworn.)

13            THE WITNESS:  I do.

14            THE CLERK:  Thank you.  You may be seated.

15       Please say and spell your first and last name for the

16   record.

17            THE WITNESS:  Jasinda Muhammad, J-A-S-I-N-D-A

18   M-U-H-A-M-M-A-D.

19            THE COURT:  All right.  You may proceed.

20            MR. MELLO:  Thank you, Your Honor.

21                          DIRECT EXAMINATION

22   BY MR. MELLO:

23   Q.  Good morning, Ms. Muhammad.

24       Where do you work?

25   A.  California Correctional Health Care Services.

1    Q.    And CDCR is an acronym place.  What is the acronym for

2    California Correctional Health Care Services?

3    A.    CCHCS.

4    Q.    Okay.  You understand if I use that acronym today?

5    A.    Yes.

6    Q.    And what is CCHCS?

7    A.    It is the health care side of CDCR.

8    Q.    And how long have you worked for CCHCS?

9    A.    28 years.

10   Q.    Okay.  And what is your current position?

11   A.    Deputy Director, human resources.

12   Q.    And how long have you been in that position, Ms. Muhammad?

13   A.    Since January 31, 2018.

14   Q.    Okay.  Prior to becoming Deputy Director, what was your

15   position?

16   A.    Assistant Deputy Director, HR.

17   Q.    Who do you report to in your current position as Deputy

18   Director?

19   A.    Lara Saich, Director of Health Care Policy and

20   Administration.

21   Q.    And she works for CCHCS?

22   A.    Yes.

23   Q.    Who does she report to?

24   A.    She has a dual reporting relationship to Undersecretary of

25   Health Care Services Dr. Diana Toche and Mr. Clark Kelso.

1    Q.   And Dr. Toche works for CDCR?

2    A.   Yes.

3    Q.   And what are your job duties in your current position as

4    Deputy Director at CCHCS?

5    A.   I have overall responsibility and accountability for

6    statewide human resources functions.  Those include

7    classification and pay, compliance and oversight, recruitment

8    and hiring, disability management, to name a few.

9    Q.   Okay.  Can you explain what classification and pay means?

10   A.   Classification and pay is a headquarters unit within HR

11   that's responsible for headquarters and regional hiring, as

12   well as statewide human resources policies and procedures.

13   Q.   How about the compliance and oversight unit, what is that?

14   A.   The compliance and oversight unit is a headquarters unit

15   that reviews employees' pay and employment history records,

16   makes determinations on those reviews, and works with local HR

17   offices to resolve any issues.

18   Q.   I'm going to come back and ask you some questions about the

19   hiring process generally, but do you have any oversight

20   relating to the hiring of or retention of registry staff?

21   A.   No.

22   Q.   Who does?

23   A.   Angela Ponciano.

24   Q.   And what is Ms. Ponciano's position?

25   A.   She is the Deputy Director of Business Services.

```
 1   Q.  And does she work for CCHCS?

 2   A.  Yes.

 3   Q.  Who does she report to?

 4   A.  Lara Saich.

 5   Q.  So you have the same boss?

 6   A.  Yes.

 7   Q.  Do you and your staff meet regularly with Ms. Ponciano and

 8   her team?

 9   A.  Yes.

10   Q.  How often?

11   A.  Biweekly.

12   Q.  Why?

13   A.  We coordinate with her staff responsible for registry

14   coverage hiring to look at our HR fill rates, our candidate

15   pipeline, and what coverage we need from a registry perspective

16   for physicians, psychiatrists, psychologists, and clinical

17   social workers.

18   Q.  And would those needs -- would those needs change based

19   upon hiring, retention, resignations, terminations, and those

20   types of things?

21   A.  Yes.

22   Q.  Okay.  And those are some of the subjects that you and your

23   team discuss with Ms. Ponciano's team --

24   A.  Yes.

25   Q.  -- biweekly?
```

1      And can you generally describe -- let me back up.

2      You understand we're here talking about five specific

3 classifications, correct?

4 A.  Yes.

5 Q.  And do you know what those classifications are?

6 A.  Yes.

7 Q.  Which ones?

8 A.  Psychiatrists, psychologists, clinical social worker,

9 recreation therapist, and medical assistant.

10 Q.  And do you understand that we're not -- we're talking

11 about -- not talking about the PIPs, correct?

12 A.  Yes.

13 Q.  Okay.  Can you describe, generally, at a very high level,

14 the hiring process that would be applicable to the five

15 classifications that you just mentioned, Ms. Muhammad?

16 A.  Yes.  The general hiring process starts with HR advertising

17 the job vacancy.  Candidates for employment with the State of

18 California are required to take a civil service examination,

19 which for these classes would generally be education, training,

20 and experience.

21      From there, the candidate will apply for a job vacancy at

22 an institution or location they're interested in.  HR will

23 review those applications, determine that they meet the minimum

24 qualifications.  And this is at our headquarters and regional

25 offices.

1    They will send those eligible candidates to our local

2    hiring analyst, who will work with the local hiring managers to

3    schedule interviews.

4    The candidate will participate in those interviews.  If

5    they are the successful candidate, they will receive a

6    tentative job offer and move into the preemployment process,

7    which will include required documents.  If they're a clinical

8    class, they're required to do -- go through credentialing and

9    privileging, a TB -- tuberculosis -- skin test, reference

10   checks, file reviews, background, which would be the

11   fingerprint process.

12   Q.  Has that process that you have described generally, that

13   hiring process, has it changed recently?

14   A.  Yes.

15   Q.  How?

16   A.  In 2021, we centralized some of the hiring for

17   psychologists, psychiatrists, and clinical social worker.

18   We established, in 2022, an end-to-end hiring model

19   concept.  And then in 2023, most recently, we created a

20   region -- wide hiring unit that currently is responsible for

21   psychologists and clinical social worker hiring.

22   Q.  Okay.  So let's break that down.

23   Let's talk, first, about what prompted you to make the

24   first change, the coming up with the one-day hiring events.

25   A.  I needed to look at some other methods to reduce the time

1  to hire, and try to help facilitate candidates getting into the

2  pipeline.  In thinking about how we may be able to do that, I

3  thought that we could break down the hiring silos into a

4  one-day end-to-end process.

5  Q.  And in -- when did those one-day end-to-end processes or

6  events start?

7  A.  They started in January of 2022.

8  Q.  Okay.  And can you describe what that one-day end-to-end

9  process looks like?

10  A.  Yes.  So we scheduled these offsite events.  The targeted

11  classifications was mental health.  But we would advertise

12  these events through a number of different platforms, and a

13  candidate can come on-site to this event and do all of the

14  recruitment process in one day.

15      So come in, get assistance in taking the civil service

16  exam.  They would move into an interview process.  From the

17  interview process, again, if they're the successful candidate,

18  they could get a tentative job offer on the spot and then move

19  into preemployment, including that background, fingerprint

20  process.

21  Q.  I've heard the term Live Scan.  What is that, Ms. Muhammad?

22  A.  Live Scan is the fingerprint process, so the background

23  process, for our department.  It does a criminal records

24  history check on candidates with the Department of Justice for

25  California and the FBI.

1    Q.   And is that Live Scan process part of the one-day hiring

2    events?

3    A.   Yes.

4    Q.   Okay.  And why did you include that event at the one-day

5    hiring events?

6    A.   I wanted to make it convenient for the candidates, so a

7    one-stop shop kind of concept.  So they would -- they would

8    come in and get all of their things done, and they wouldn't

9    have to have another appointment to come back and get that

10   fingerprint process.  So once they complete that, they really

11   completed all of the preemployment requirements.

12   Q.   You indicated that these one-day hiring events started in

13   2022, correct?

14   A.   Yes.

15   Q.   And how many of these one-day hiring events occurred in

16   2022?

17   A.   13 total.

18   Q.   And, again, we're focused on the five classifications at

19   issue here.  What, if anything, were the results in 2022 of

20   those one-day hiring events?

21   A.   In 2022, for psychologists, psychiatrists -- excuse me,

22   psychologists, clinical social worker, and recreation

23   therapists, we job-offered 47 individuals; 22 of those

24   individuals started; and then there are 8 pending.

25   Q.   Have those one-day hiring events occurred -- continued to

1  occur in 2023?

2  A.  Yes.

3  Q.  How many have occurred to date?

4  A.  Ten to date.

5  Q.  And what have been the results, if any, of those ten hiring

6  events to date?

7  A.  Through the end of August, we job-offered 31 individuals;

8  14 of those individuals started; and there are approximately 10

9  pending for psychologists, clinical social workers, and

10  recreation therapists.

11  Q.  Backing up, are any additional one-day events planned for

12  2023?

13  A.  Yes.

14  Q.  How many more?

15  A.  About three.

16  Q.  Okay.  And, again, we're focusing on the hiring of the five

17  classifications at issue with respect to these one-day hiring

18  events, but those one-day hiring events, are they limited only

19  to the five classifications at issue in this proceeding?

20  A.  No, they are not.

21  Q.  What have been the results, on a more global basis, of

22  those hiring events?

23  A.  Overall, for 2022 and 2023, we job-offered approximately

24  1500 individuals; approximately over 1300 accepted those job

25  offers; 980 have started to date; and through the end of

1    August, we had about 180 individuals pending in the process.

2    Q.  And what classifications, generally, do those folks fall

3    into, those -- those individuals and the numbers that you just

4    described for the Court?

5    A.  Generally nursing classifications.  So registered nurse,

6    licensed vocational nurse; there may be some CNAs, in addition

7    to the mental health classes that we discussed.

8    Q.  What's a CNA?

9    A.  Certified nursing assistant.

10   Q.  In addition to these one-day hiring events that you talked

11   about, you talked about other things to try to speed up the

12   hiring process, correct?

13   A.  Yes.

14   Q.  And what have you done in that regard in your role as

15   Deputy Director of Human Resources at CCHCS?

16   A.  I had my staff do a statewide Lean Six Sigma Green Belt

17   project.

18   Q.  That sounds like consultant speak.  What is Lean Six Sigma?

19   A.  Lean Six Sigma is a globally-recognized tool and system to

20   do project improvement projects -- process improvement

21   projects.

22   Q.  And what was this Green Belt project that you mentioned?

23   A.  I had my staff conduct a review of the time to hire and, in

24   each of those components of the hiring process, how long was it

25   taking -- where could we achieve some streamlining and

1    standardization and other factors that would help reduce the

2    time to hire.

3    Q.  And what did you learn?

4    A.  We learned that we had a lot of redundancies in our

5    process, some unnecessary approval processes.  We learned that

6    we needed to standardize the process across the state with our

7    HR staff.  And we needed to put some additional -- or put some

8    refinement on the time in which the tasks were to be completed.

9    Q.  Okay.  And what were those time frames that you learned?

10   A.  We learned that we could potentially reduce the time to

11   hire to about 55 business days for nonclinical staff and about

12   65 business days for clinical staff.

13   Q.  And that's through the ordinary process that you discussed

14   earlier, not the one-day hiring events, correct?

15   A.  Correct.

16   Q.  With respect to the one-day hiring events, how would that

17   relate to the 55 days that you just discussed under the Green

18   Belt project?

19   A.  The one-day hiring event really takes all of those time

20   frames and business days and consolidates it into one day.

21   Q.  So have you rolled out this new process -- Green Belt

22   process anywhere?

23   A.  Yes.

24   Q.  Where?

25   A.  At Wasco State Prison and our information technology

1  groups.

2  Q.  Okay.  So what do you mean by your information technology

3  groups?

4  A.  Information technology is the IT unit; it has headquarters,

5  regional offices, and institution staff.  So that group has

6  become one of the pilots.

7  Q.  I think you used the term RHU earlier in your testimony.

8  What is RHU?

9  A.  Regionalized Hiring Unit.

10  Q.  Have you made any changes with respect to the RHU recently?

11  A.  Yes.

12  Q.  What?

13  A.  In June 2023, we established the Regional Hiring Unit and

14  transitioned the hiring of psychologists and clinical social

15  workers from Centralized Hiring to the Regionalized Hiring

16  Unit.

17  Q.  And why did you do that?

18  A.  I felt like we needed to put some additional focus on those

19  classifications, redirected some resources to bolster that unit

20  in focusing on those hires.

21  Q.  And what type of work does that RHU do now under this new

22  focused effort?

23  A.  They do that centralized hiring currently for the

24  psychologists and the clinical social workers, and they're also

25  responsible for assisting in the hiring events.

1    Q.  In addition to the Green Belt project, the one-day hiring

2    events, and this change with respect to the RHU, what other

3    types of activities does CCHCS and your department use to

4    increase recruitment and retention of the classifications at

5    issue here?

6    A.  We have a number of platforms that we procured through our

7    social media presence, marketing through radio advertisements.

8    We support information regarding educational -- excuse me --

9    we conduct -- do educational outreach with colleges and

10   universities in order to engage candidates as they are coming

11   out of school.

12   Q.  Earlier this -- I'm going to show you Plaintiffs' new

13   Exhibit 12.

14        Ms. Pooni, can you pull it up?

15        In the binder behind you, also, Ms. Muhammad, if it's

16   easier with your eyes, is a binder that has Plaintiffs'

17   exhibits.

18            MR. MELLO:  Or, Your Honor, if I may, I have a hard

19   copy for her to hand her.

20            THE COURT:  That's fine.  You can approach.

21            MR. MELLO:  Thank you.

22            THE COURT:  Plaintiffs' Exhibit 12.

23            MR. MELLO:  Yes.  I'm sorry.  I mean -- it's not 12.

24   What number does that say?

25            THE WITNESS:  This says 12.

 1              MS. YELIN:  There is a revised Plaintiffs'

 2    Exhibit 12.

 3              MR. MELLO:  I want to make sure I have the right one.

 4    Do you have the revised one, Ms. Pooni?

 5              THE COURT:  It's in the Court's Dropbox?

 6              MR. MELLO:  I'm going to hand you -- I'm sorry, Your

 7    Honor.  I'm just milling around the courtroom.  I apologize.

 8              THE COURT:  So we're clear, this is the revised

 9    Exhibit 12?

10              MR. MELLO:  This is the revised.  It's not the

11    declaration.  Do you have access to it?

12              MS. POONI:  I don't.  I'm getting it right now.

13              MR. MELLO:  Okay.

14              THE COURT:  Can Plaintiffs assist?

15              MS. YELIN:  We can display it, if that would be

16    helpful.

17              THE COURT:  Is there a certain page?

18              MR. MELLO:  We're going to start at the beginning of

19    the first page, which is actually page 2.

20              THE COURT:  There is some kind of e-mail

21    correspondence, so we're skipping past that?

22              MR. MELLO:  Yeah.  Skipping to -- I'm sorry.

23              MS. ELLS:  Would you like us to display it?

24              MR. MELLO:  Yes.  Thank you.

25    Q.  BY MR. MELLO:  So, Ms. Muhammad, showing you what has been

1    marked as Plaintiffs' Exhibit 12, going to page 2, so not the

2    cover e-mail, what is this document?

3    A.   This is the California Correctional Health Care Services

4    Mental Health Recruitment and Retention Strategies, Coleman

5    Responses, February 2023.

6    Q.   And did your team put this document together?

7    A.   Yes.

8    Q.   Okay.  And did you review this document before it was

9    provided?

10   A.   Yes.

11   Q.   Okay.  And on page 1, it talks about marketing.  Do you see

12   that?

13   A.   Yes.

14   Q.   Can you describe some of the new marketing efforts that you

15   and your department in CCHCS have engaged in to increase

16   staffing in these five classifications?

17   A.   Yes.  Social media and digital radio advertisement, a

18   campaign designed to lift the veil on correctional health care.

19   They also were conducting some marketing pushes, which is

20   really a release of marketing materials centered around mental

21   health employees and career opportunities in correctional

22   health care services.

23   Q.   How about any advertising efforts?  And, again, focusing

24   your attention on page 2.

25   A.   We continue to have a presence at national, regional, and

1    local events, implemented some social media and promotional

2    media events.

3    Q.  Anything else with respect to media and advertising?

4    A.  I think that covers it.

5    Q.  Okay.  Does your office engage in any direct contact

6    mailings or e-mails with potential candidates?

7    A.  Yes.

8    Q.  How so?

9    A.  Our Workers Development Unit will request mailing lists of

10   the licensed providers in those classifications through the

11   state boards.  Depending on the list, it may either be a direct

12   home mailer or an e-mail mailer.

13   Q.  Do you work with educational institutions or associations?

14   A.  My staff does, yes.

15   Q.  Okay.  What type of work and outreach do you do -- does

16   CCHCS do in that regard with respect to the five

17   classifications at issue?

18   A.  They will engage with current student body, as well as

19   graduating students at colleges and universities.  They will

20   attend on-site events at those educational entities, as well as

21   do some focused interaction with what we would call a niche

22   organization.  So that may be the Association of African

23   American Students or Pan-Asian or LGBTQ+, so engaging with

24   those associations.

25   Q.  It mentions here enhanced recruitment at the bottom of page

1    2 of this document.  Can you explain what that is?  Enhanced

2    recruitment.  I'm sorry.  It's at the bottom of the page.

3        Let me ask it this way:  What is Merritt Hawkins?

4    A.  Merritt Hawkins is a national recruiter for clinical

5    providers.

6    Q.  And did CDCR enter into an agreement with Merritt Hawkins

7    at any time with respect to any other classifications at issue?

8    A.  Yes.

9    Q.  When?

10   A.  In 2019, we entered into a contract for physicians and

11   psychiatrists.

12   Q.  Okay.  And was that agreement amended in any way to add any

13   classifications?

14   A.  Yes.

15   Q.  When?

16   A.  In 2022.

17   Q.  And why?

18   A.  We added psychologists and clinical social worker, as we

19   needed to put some attention on those positions and the

20   vacancies.

21   Q.  And is -- Merritt Hawkins is a significant recruiter of

22   medical staff around the country, correct?

23   A.  Correct.

24   Q.  Okay.  And you testified that you worked with them to fill

25   the positions -- several of the positions at issue in this

1    case.  What, if anything, resulted from those efforts with this

2    national recruiting organization?

3    A.  We were able to hire some clinicians in those

4    classifications, but it didn't yield the results that we had

5    hoped for.

6    Q.  Why do you think that is?

7    A.  I think that Merritt Hawkins had the same challenges that

8    we did in terms of staffing and staffing shortages, and a

9    number of the referrals did not want to seek employment with a

10    correctional facility or correctional entity.

11    Q.  Did location play any role in the success or failures of

12    Merritt Hawkins, in your experience -- work locations?

13    A.  For some in our least -- you know, less desirable

14    locations; the remote institutions proved a challenge.

15    Q.  If you can go to the next page, page 3, at the top, it

16    talks about professional partnerships.

17        What is that?

18    A.  The -- excuse me.  The professional partnerships is where

19    the Workers Development Unit engaged with the Psych Times to

20    have a dedicated page on their homepage promoting mental health

21    program opportunities for the psychiatric inpatient,

22    outpatient, and telehealth settings.

23    Q.  Next it refers to virtual recruitment.  What is that,

24    Ms. Muhammad?

25    A.  The virtual recruitment platform, we secured a number of

1    platforms that would allow us access to professional

2    organizations, educational recruiting events for the mental

3    health classifications statewide.

4    Q.  And, lastly, it talks about candidate engagement.  What is

5    this, Ms. Muhammad?  What did you guys do?

6    A.  In the Centralized Hiring Unit, the white glove approach

7    was focused on connecting with those candidates and getting

8    them into the candidate pipeline, between discussing with our

9    HR recruiters and then connecting them with a clinical

10   provider, kind of peer-to-peer discussion, in that setting, as

11   well as our candidate pages, we talk -- we speak to the various

12   benefits, the career path, compensation with those providers

13   through the recruiters.

14   Q.  Thank you.  At the bottom of the page, you talk about

15   hiring events.  Are these the hiring events that you testified

16   about earlier?

17   A.  Yes.

18   Q.  Okay.  And do -- these one-day hiring events that occurred

19   in 2022 and 2023, are there plans to do them in 2024?

20   A.  Yes.

21   Q.  Do you have an estimate as to how many hiring events you

22   intend to do in 2024?

23   A.  We estimate three of the larger events.  We will be adding

24   some additional sites, either at our regional HR offices or at

25   a local institution.

1  Q.  So 2022, we were still in the -- I feel like we're still --

2  we were still in the midst of the pandemic.  How did you select

3  the locations for the 2022 events?

4  A.  In 2022, we looked at locations that were kind of central

5  or geographically close to the institutions that we were hiring

6  for, but we held them off site to not have that foot traffic at

7  the institution when we were in the midst of COVID and COVID

8  protocols.

9  Q.  How about in 2023, how have you selected the locations for

10  those events, if different?

11  A.  Not different.  Really the same, with the exception of if

12  we learned that a location didn't draw a high volume of

13  candidates, they may have switched out a location.  But

14  primarily, the majority of them will be the same.

15  Q.  Terrific.  And how about in 2024; you mentioned some

16  potential changes.  How, if at all, is it going to be different

17  in 2024, Ms. Muhammad?

18  A.  In 2024, it will -- right now, they're in the development

19  of that 2024 schedule.  So keeping in mind the same concept --

20  location, availability, geographic areas to our -- central to

21  our institutions.

22  Q.  Thank you.  If we can go to the next page.  At the top, it

23  talks about federal student loan forgiveness and human

24  resources services agency.

25      Can you tell me what this is and what your team did with

1    respect to this subject.

2    A.   The Workforce Development Unit promotes the federal student

3    loan forgiveness program.  And so as part of that process, the

4    agency that manages that program through the Department of

5    Health and Human Services has a scoring system.  And so what

6    the staff have listed is, by institution, what the score was in

7    the health professional shortage area.

8    Q.   And on the next page you talk about visa hiring

9    initiatives.  Can you describe for the Court what visa hiring

10   initiatives CCHCS has done with respect to these

11   classifications?

12   A.   We offer visa support to candidates.  And once the

13   candidate is an employee, we have a contract with an

14   immigration law office, so we help, both if they would like to

15   be a citizen of the United States or work in the United States

16   for the nonpermanent residence status.  So we provide both

17   support from a legal perspective, completion of their required

18   documents, and we also pay for their filing fees.

19   Q.   And would that apply to all the classifications at issue or

20   just some of them?

21   A.   All.

22   Q.   On the next page, you refer to hiring above minimums.

23   We'll come back to that later.

24       At the bottom of the page, it talks about college student

25   outreach.  Can you speak to that in CCHCS's efforts with

1    respect to that subject.

2    A.   Yes.   The Handshake platform is an electronic platform that

3    allows us to engage with college students and alumni.   It also

4    has the ability for us to engage in information sessions with

5    those colleges and universities, where, again, we're promoting

6    CCHCS and the career opportunities.

7    Q.   On the next page of the document, what is this,

8    Ms. Muhammad, generally?

9    A.   This depicts the Workforce Development Unit's mental health

10   recruitment specific activities.   This particular document is

11   from November 2022 to February of 2023.

12       So it lists our print and digital advertisements and when

13   those were posted for the classifications listed; psychiatrist,

14   psychologist, and clinical social worker.   It also speaks to

15   our social media campaigns, as well as targeted events where we

16   attended Corporate Gray virtual military job fair, another

17   RecruitMilitary national virtual career fair, the Northern

18   California Psychiatric Society annual career fair, and the

19   Nevada Psychiatric Association Psychopharmacology.

20   Q.   What's the next page of this document describe?

21   A.   The next page describes the job postings during that period

22   and in which media we advertised in for those various

23   classifications.   So this one breaks down by month, and which

24   networks or organizations or platforms we posted on.

25   Q.   And what's the American Psychiatric Association platform?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    A.  They have a webpage and also marketing materials.  So if

2    they have a conference, we will advertise in that conference

3    material, as well as online platform and any other -- any other

4    medium they may have.

5    Q.  And you also market and post on LinkedIn?

6    A.  Yes.

7    Q.  And what is the National Health Care Career Network?

8    A.  That is a similar network that targeted -- that has a

9    target audience of clinical professionals.

10   Q.  Below, it talks about something called PracticeLink.  What

11   is PracticeLink?

12   A.  PracticeLink is another platform that allows us connection

13   to clinical providers through electronic media.

14   Q.  Does that include all five of the classifications at issue?

15   A.  This one primarily focuses on the clinical classes.  So it

16   would be clinical social worker, psychologist, and

17   psychiatrist.

18   Q.  And what is YourMembership career network?  Did I just

19   repeat myself?

20   A.  No.  I don't think you did.

21   Q.  Okay.

22   A.  YourMembership career network is another media avenue to

23   promote careers on that network.

24   Q.  Below is something called Handshake, and I think you may

25   have alluded to this before, but what is Handshake?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1   A.  Handshake is what I was referring to earlier.  It's one of

2   the electronic platforms to engage college students and alumni.

3   Q.  So, again, this document was created several months back.

4   Are there other platforms that you at CCHCS human resources and

5   your staff use to market and recruit and retain the five

6   classifications at issue that you haven't already testified

7   about?

8       And I'll slow down.  I apologize, Madam Court Reporter.

9   A.  I think the only other one that comes to mind is we entered

10  into an agreement with Doximity, and that is a -- it's LinkedIn

11  but for physicians and psychiatrists.

12  Q.  Thank you.

13      On the next page, it mentions Social Work Today.  What is

14  that?

15  A.  Social Work Today is an association -- it's an association

16  page that has not only a digital presence, but also, they have,

17  like, an association newsletter and other avenues for us to

18  market our careers.

19  Q.  And then, again, on this page, it talks about several

20  national associations, the Association of Black Social Workers,

21  the National Association of Social Workers, and you -- you and

22  your team market to those groups as well?

23  A.  Yes.

24  Q.  Okay.  And how do you market to those groups?

25  A.  The Workforce Development Unit will send information.  We

1  have a series of campaign flyers and other media.  So depending

2  on whether it's a digital platform marketing, if it's an

3  association newsletter, if it's a part of recruitment event,

4  pamphlet, brochure, flyer, we will send corresponding

5  information that will talk about our benefits and our career

6  opportunities.

7  Q.  At the bottom of that page, it talks about ZipRecruiter.

8  What is ZipRecruiter?

9  A.  ZipRecruiter is another electronic platform that provides

10  the ability for us to post job postings to that site.  And so

11  based on those postings, we posted for psychiatrists,

12  psychologists, clinical social worker, and recreation

13  therapist.

14  Q.  And when did that begin?

15  A.  February of 2023.

16  Q.  Does that continue to today?

17  A.  Yes.

18  Q.  And those marketing efforts and direct mailings and

19  conferences, etc., that you've testified about, does that

20  continue to today?

21  A.  Yes.

22  Q.  What's the next -- on the next page is a flyer.  What is

23  this?

24  A.  This is one of our flyers that Workforce Development

25  produces.  This one in particular is for psychiatrists.

1  Q.  And other than knowing it was created prior to February

2  of 2023, when this document was created, do you know if this

3  flyer is still in existence?

4  A.  It is still in existence.

5  Q.  Do you know if it's changed in any way?

6  A.  It will be changing.

7  Q.  Why?

8  A.  There was recent changes to the state compensation.  So

9  they will need to go in and refresh the salary -- annual

10  salaries on this document.

11  Q.  Okay.  Do you know -- strike that.

12      Let's move to the next page, which appears to be a somewhat

13  similar document.

14      What is this document?

15  A.  This is the recruitment and marketing flyer for clinical

16  social workers.

17  Q.  And will this document need to be changed or updated?

18  A.  Yes.

19  Q.  And is that because there are new bargaining agreements?

20  A.  Yes.

21  Q.  And going to the next page, it's a piece from Psychiatric

22  Times.  What is this?

23  A.  This is the Psychiatric Times newsletter.

24  Q.  Let's go to the next page.  What is this?

25  A.  This is an article based on an interview that the

1    Psychiatric Times conducted with Dr. Amar Mehta.

2    Q.  And do you use this article as a means in recruitment of

3    new staff to work at CDCR in the five classifications at issue?

4    A.  Yes.

5    Q.  How do you do that?

6    A.  The Workforce Development Unit will use this as part of

7    their marketing material, as part of their lifting the veil of

8    working in a correctional institution or with correctional

9    health care.

10    Q.  The next page.  Again, I don't have the Bates numbers, so I

11    apologize.  You can continue one more, I believe.

12       What is this page?

13    A.  This page depicts our 2023 statewide hiring events.  This

14    was the schedule of events from the beginning of the year.

15    Q.  Okay.  And you will have a similar schedule for 2024,

16    correct?

17    A.  That's correct.

18    Q.  Turning to the next page, can you just tell us and describe

19    for the record what this document is?

20    A.  This is the Public Service Loan Forgiveness program.  It's

21    an overview page that our staff and Workforce Development

22    provides candidates so they can learn more about the program.

23    It provides the links; it provides when individuals will -- can

24    apply and where they can go for more details.

25    Q.  I'm going to take you to -- it's, like, the third or fourth

1    page from the end or maybe the fifth page from the end.  It's

2    entitled Mental Health Clinicians Additional Incentives for

3    CCHCS and CDCR.  Do you see that?

4    A.   Yes.

5    Q.   What is this document?

6    A.   This document is part of the recruitment materials that

7    focuses on two of the available pay differentials for mental

8    health clinicians.

9    Q.   What's the first differential -- strike that.

10       This is, again, a document that was created before February

11   of 2023, correct?

12   A.   Correct.

13   Q.   Okay.  So at that time, before 2023, what was the

14   appreciation bonus?

15   A.   That was the recruitment and retention pay differential.

16   Q.   Okay.  And who was that for?

17   A.   Chief psychiatrist, senior psychiatrist supervisor, senior

18   psychiatrist specialist, staff psychiatrist, chief physician,

19   chief psychologist, senior psychologist supervisor, senior

20   psychologist specialist, and clinical psychologist.

21   Q.   And can you describe for me what that $35,000 appreciation

22   bonus -- how it worked?

23   A.   It worked at the time that they -- that eligible

24   classifications and employees would receive $5,000 payments

25   over the course of a prescribed number of months in the pay

1    differential.

2    Q.   And we'll come to the new bargaining agreements, the new

3    MOUs.  Will this change under the new MOUs?

4    A.   Yes.

5    Q.   Okay.  And we'll talk about that later.

6        The next one is a 15 percent stipend of base salary.  What

7    is that?

8    A.   That was the psychiatric -- that is the Psychiatric

9    Inpatient Unit pay differential that provides for 15 percent of

10    base salary to those eligible classifications at our inpatient

11    units located at the five institutions.

12    Q.   Okay.  And so we're not here to talk about a -- the PIPs

13    necessarily, but what are differentials?

14    A.   Pay differentials are another form of compensation within

15    state service.  So depending on the pay differential, it will

16    have a compensatory amount and then a criteria for which you

17    are eligible.  And then it will also determine the frequency in

18    which its paid.

19    Q.   This 15 percent pay differential was aimed at the PIPs.  Do

20    you know why?

21    A.   At the time, we needed to increase staffing in the PIPs,

22    and so this pay differential was developed to incentivize

23    staffing in the PIPs.

24    Q.   So it was aimed at the PIPs -- to increase hiring into the

25    PIPs?

1    A.  Yes.

2    Q.  And will this change under the new bargaining agreements in

3    any way?

4    A.  No.

5    Q.  Okay.  So people who work in the PIPs will still receive a

6    15 percent stipend?

7    A.  Yes.

8    Q.  The next page -- what is the next page, Ms. Muhammad?

9    A.  This page is another marketing document specific to the

10   psychologist classifications.

11            THE COURT:  We're at the point where we should take a

12   break.  Is now an acceptable point?

13            MR. MELLO:  I have, like, three more questions, and

14   then it would be a great time.

15            THE COURT:  All right.

16            MR. MELLO:  Will this -- may I start again?

17            THE COURT:  Yes.

18            MR. MELLO:  Okay.

19   Q.  BY MR. MELLO:  Will this change -- this flyer change in any

20   way?

21   A.  Yes.

22   Q.  And that's as a result of the new collectively bargained

23   agreements?

24   A.  Yes.

25   Q.  Okay.  What's the next document, aimed at recreation

1    therapists?

2    A.  This also is one of our marketing materials for recreation

3    therapist.

4    Q.  And will this need to change as a result of the new

5    marketing -- the new collective bargaining agreements or not?

6    A.  Yes.

7    Q.  Okay.  And, lastly, the last page, the Centralized Hiring

8    Unit, what is this?

9    A.  Centralized Hiring Unit previously was responsible for

10   hiring physicians, psychiatrists, psychologists, and clinical

11   social worker.  We've since split that unit.

12            MR. MELLO:  Now is a good time, Your Honor.  Thank

13   you.

14            THE COURT:  All right.  So midmorning break, 15

15   minutes, 10:50.

16            MR. MELLO:  Thank you.

17       (Recess taken, 10:36 a.m. - 10:50 a.m.)

18            THE COURT:  You may be seated.  We'll go now until

19   12:00, take a break then for an hour, and then pick up again at

20   1:00.

21       You may proceed.

22            MR. MELLO:  Thank you, Your Honor.

23   Q.  BY MR. MELLO:  Ms. Muhammad, in your role as head of Human

24   Resources, do you generally understand the labor negotiation

25   process?

 1    A.  Yes.

 2    Q.  Can you please give us a general description of that

 3    process in California.

 4    A.  Generally speaking, California Department of human

 5    resources, Cal HR, is the state employer and negotiates on

 6    behalf of the governor's office with the employee labor

 7    organizations.  They enter into bargaining negotiations on

 8    terms and conditions.  Once they reach an agreement, that

 9    becomes a tentative agreement.  That agreement is then sent to

10    the employee labor organization members to ratify via vote.

11        Once that is ratified, it moves to the legislature for

12    approval and then ultimately to the governor's office for

13    review and approval.

14    Q.  And when you say terms and conditions, does that include

15    compensation?

16    A.  Yes.

17    Q.  And did that recently happen for any of the classifications

18    at issue in this proceeding?

19    A.  Yes.

20    Q.  What is Bargaining Unit 20?

21    A.  That is the bargaining unit that the medical assistants are

22    in; it's a part of SEIU.

23    Q.  How about Bargaining Unit 19?

24    A.  Bargaining Unit 19 represents the recreation therapists,

25    psychologists, and clinical social workers.

1    Q.  And how about Bargaining Unit 16?

2    A.  Bargaining Unit 16 is the psychiatrists under UAPD.

3    Q.  And were each of those bargaining unit agreements ratified

4    by their union members?

5    A.  Yes.

6    Q.  And they were approved by the legislature?

7    A.  Yes.

8    Q.  And the governor signed them into law?

9    A.  Yes.

10    Q.  I'd like to pull up what's been marked as Defendants'

11    Exhibit 6.  And it's -- the parties have stipulated to its

12    admissibility.

13        But Defendants' Exhibit 6, can you tell me what this is,

14    Ms. Muhammad?

15    A.  This is the Cal HR summary of the collective bargaining

16    agreement for Bargaining Unit 16, UAPD.

17    Q.  And so that is for the psychiatrists?

18    A.  Yes.

19    Q.  Directing your attention to Exhibit 6, what are GSI?

20    A.  A GSI is a general salary increase.  It's similar to a cost

21    of living adjustment.

22    Q.  And are these applicable to the psychiatrists at issue in

23    this proceeding?

24    A.  Yes.

25    Q.  And what do they provide?

1    A.  They provide, effective July 1st of 2023, a 3 percent

2    general salary increase and then for 2024, effective July 1,

3    2024, a 2 and a half percent GSI.

4    Q.  On page 2, it mentions recruitment and retention salary

5    differential.  What does the MOU for psychiatrists provide in

6    that regard?

7    A.  It provides a 15 percent differential for direct patient

8    care on grounds.

9    Q.  And does that mean for just individuals who work in the

10   PIPs, or is it for all psychiatrists who work for CDCR?

11   A.  This one would be for all.  Excuse me.

12   Q.  It would not apply -- strike that.

13       Okay.  So it applies to psychiatrists who work for CDCR.

14       On the same page, it says pay differentials, additional

15   workload pay.  Do you see that?

16   A.  Yes.

17   Q.  What is that?

18   A.  That's a new provision, and it's still under development.

19   Q.  And what does it provide?  What does it say?

20   A.  It says:  Effective the first day of the pay period six

21   months following ratification by both parties through June 30th

22   of 2026, psychiatrists at California Department of Corrections

23   and Rehabilitation, California Correctional Health Care

24   Services, and Department of State Hospitals are eligible for

25   additional compensation at 135 percent of their base hourly

1    rate for working additional caseload.

2    Q.   And you indicated that's still in development?

3    A.   Yes.

4    Q.   Okay.  Please take a look at page 4 regarding the 324

5    amendment.  What is this, Ms. Muhammad?

6    A.   This pay differential 324, is the recruitment and retention

7    bonus payment, and this amendment revises the payments under

8    that pay differential.

9    Q.   And what does it provide?

10   A.   It provides that -- it eliminates the previous structure

11   and moves into a graduated percentage structure following the

12   completion of 12 consecutive qualifying pay periods.  So after

13   completion of each of these various pay period categories, it

14   increases 1 percent of base through 7 percent of base after

15   completion of 84 consecutive pay periods.

16   Q.   So this is aim -- is this aimed at recruitment and

17   retention?

18   A.   Yes.

19   Q.   Okay.  And what does it provide, at the bottom there, about

20   a $10,000 payment?  What does that mean?

21   A.   The bottom reflects eligible employees who have more than

22   84 consecutive qualifying pay periods and eligible

23   classification and who have not received any payment under pay

24   differential 324 shall be entitled to a single, onetime payment

25   of $10,000.

1    Q.  Okay.  Thank you.

2        I want to pull up what the parties have stipulated to the

3    admissibility of -- Defendants' Exhibit 7.

4        And what is this, Ms. Muhammad?

5    A.  This is the Cal HR summary collective bargaining agreement

6    for Bargaining Unit 19.

7    Q.  And which classes does this cover again?

8    A.  Psychologist, clinical social worker, and recreation

9    therapist.

10   Q.  Does this provide for GSIs?

11   A.  Yes.

12   Q.  And what are those GSIs?

13   A.  Effective July 1st of 2023, a 3 percent GSI.  The following

14   year, on July 1, 2024, a 2 and a half percent GSI.

15   Q.  And that's for all three of the classifications at issue?

16   A.  Yes.

17   Q.  Okay.  On the same page, what are special salary

18   adjustments?

19   A.  Special salary adjustments are another form of compensation

20   that's negotiated in addition to the GSI.

21   Q.  Okay.  And what does the agreement provide with respect to

22   special salary adjustments?

23   A.  In the first bullet, effective July 1, 2023, or August 2,

24   2023, Bargaining Unit 19 employees identified in various

25   classifications of Section 7.18 shall receive a special salary

1    adjustment ranging from 2 and a half percent to 9.63 percent.

2    This particular bullet is for -- also includes recreation

3    therapists.

4    Q.  What about the second bullet, what does that relate to?

5    A.  The second bullet relates to clinical social worker

6    classifications.  So effective July 1st of 2023, the maximum

7    salary range for Bargaining Unit 19 employees and clinical

8    social worker classes shall be increased in the range of 2.65

9    percent to 3 percent.

10   Q.  And is this in addition to the GSIs --

11   A.  Yes.

12   Q.  -- from above?

13   A.  Yes.

14   Q.  Okay.  And how about the last bullet, what's that relate

15   to?

16   A.  The last bullet, relating to psychology, effective July 1,

17   2023, the maximum of the salary range for Bargaining Unit 19

18   employees in psychology classes shall be increased by 10

19   percent.

20   Q.  And that's, again, in addition to the GSIs above?

21   A.  Yes.

22   Q.  Okay.  On the same page, does it -- on page 2, does it

23   provide for additional workload pay?

24   A.  Yes.  For psychologists, effective the first pay period

25   following ratification by both parties, salaried psychologists

1    at California Department of Corrections and Rehabilitation,

2    California Correctional Health Care Services, are eligible for

3    straight time compensation for working additional caseload.

4    Q.  And on the same page, it mentions clinical supervisor

5    differentials.  What are those?

6    A.  Clinical supervision differential is for providers who are

7    providing the supervised hours for unlicensed individuals.

8    Q.  And what does it provide?

9    A.  It provides the individual -- effective the first pay

10   period following ratification by both parties, the differential

11   for providing clinical supervision to unlicensed individuals

12   increases from $100 to $500.

13   Q.  And on the same page, there is a reference to retention

14   bonuses.  Do you see that?

15   A.  Yes.

16   Q.  What does that provide?

17   A.  This provides, effective the first pay -- the first pay

18   period following ratification by both parties, psychologists

19   and clinical social workers newly hired into classifications

20   will be eligible for bonus payments annually through 84 months.

21   Employees currently performing the duties eligible for the

22   bonus employed over 84 months and not receiving the bonus under

23   the previous differential are eligible for a onetime payment of

24   $10,000.

25   Q.  I'm going to show you what -- now we'll move to Exhibit 8.

1   Defendants' Exhibit 8.

2       And what is Defendants' Exhibit 8, Ms. Muhammad?

3   A.  This is the Cal HR summary of the collective bargaining

4   agreement for SEIU.

5   Q.  And MAs are part of this collective bargaining agreement?

6   A.  Yes.

7   Q.  Okay.  And turn your attention to page 1, compensation.

8   Does the new MOU provide a GSI for MAs?

9   A.  Yes.

10  Q.  What does it provide?

11  A.  Effective July 1, 2023, all SEIU employees shall receive 3

12  percent GSI.  Effective July 1, 2024, all SEIU employees shall

13  receive a 3 percent GSI.  And then effective July 1st, 2025,

14  all SEIU employees shall receive a 3 percent GSI.

15  Q.  And this would include MAs who are part of this bargaining

16  unit, correct?

17  A.  Yes.

18  Q.  Okay.  On page 2, there is something called a wage equity

19  adjustment?

20  A.  Yes.

21  Q.  Can you tell us what a wage equity adjustment is?

22  A.  A wage equity adjustment is for compensation adjustment for

23  low paying classifications.

24  Q.  And what does this wage equity adjustment provide for the

25  classification at issue?

1   A.   This provides a 4 percent special salary adjustment

2   effective July 1, 2023.

3   Q.   And that's in addition to the other items that you've

4   discussed earlier with respect to MAs?

5   A.   Yes.

6   Q.   Okay.  In your experience as an HR professional, is salary

7   a critical component for recruiting and retention?

8   A.   It is one of the critical components.

9   Q.   Are there other critical components, based upon your

10  experience?

11  A.   Yes.

12  Q.   What are they?

13  A.   Job stability, paid leave benefits, health, dental, and

14  vision benefits, and retirement plans.

15  Q.   And in California, do job classifications have pay ranges?

16  A.   Yes.

17  Q.   And what are they, generally?

18  A.   It depends on the classification.  Generally, our

19  classifications will either be specific to our department or to

20  a location.

21  Q.   And do they provide for minimum and maximum salary ranges?

22  A.   Yes.

23  Q.   And does CDCR have salary ranges for -- I don't know why

24  I'm moving my hands -- have salary ranges for the five

25  classifications at issue?

1    A.   Yes.

2    Q.   Okay.  And I'd like to pull up what has been marked as

3    Defendants' Exhibit 15, another document the parties have

4    stipulated to its admissibility.

5            THE COURT:  Can you remind me, is the procedure --

6    has the Court blessed a procedure whereby if authenticity and

7    admissibility is stipulated to, upon reference, the exhibits

8    automatically come in?

9            MR. MELLO:  I don't think so.  I think Ms. Ells was

10   going to take up that issue.

11           MS. ELLS:  Your Honor, we were going to raise this

12   during housekeeping.  We'll talk about it today.

13           THE COURT:  All right.  Very good.

14           MR. MELLO:   Thank you.

15   Q.  BY MR. MELLO:  Ms. Muhammad, what is Exhibit -- Defendants'

16   Exhibit 15?

17   A.   It is the CCHCS employees at min and max salary ranges

18   summary for July 2023.

19   Q.   And who created this document?

20   A.   My staff.

21   Q.   And did you verify the information on this document?

22   A.   I spot-checked the information.

23   Q.   And what does Exhibit 15 show with respect to chief

24   psychiatrist in terms of the percentage -- backing up.

25           Individuals can be paid at minimum, maximum, or somewhere

1  in between in terms of salary range, correct?

2  A.  Yes.

3  Q.  Okay.  And what does Defendants' Exhibit 15 show with

4  respect to chief psychiatrist in terms of what percentage of

5  the classification are paid at the maximum salary?

6  A.  For chief psychiatrist, 88.2 percent of the employees are

7  at the maximum of salary.

8  Q.  Same question for chief psychologist, what percentage of

9  those persons are paid at the max salary?

10  A.  70.7 percent.

11  Q.  And, again, just for clarity, this report was run at the

12  end of July, correct?

13  A.  Correct.

14  Q.  This chart.  Okay.  Thank you.

15      So as of that time, it was approximately 70 percent for

16  that classification.

17      Same question for clinical social workers, what percentage

18  are paid at the max salary?

19  A.  For clinical social worker?

20  Q.  Yes.

21  A.  70.4 percent -- excuse me -- 58.5.

22  Q.  Clinical -- I skipped one.  Thank you.

23      How about for clinical psychologist?

24  A.  Clinical psychologist is 70.4 percent.

25  Q.  Are paid at the max?

1    A.  Are paid at the max.

2    Q.  Okay.  How about for medical assistants?

3    A.  For medical assistants, zero percent are paid at the max.

4    Q.  Do you know why it is zero?

5    A.  It could be a number of reasons.

6    Q.  What might those reasons be?

7    A.  Depending on when we started hiring these employees, when

8    they were appointed, how long they've been in the department in

9    that classification.

10   Q.  Okay.  For clinical social workers, the percentage paid at

11   58.5 percent was lower.  Do you know why it's lower than some

12   of the other classifications?

13   A.  I don't know why it would be lower.  I mean, it's the same

14   as when we're speaking to the medical assistant.  It could be a

15   variety of reasons, including when individuals were appointed.

16   Q.  Okay.  What about for recreation therapists, what does it

17   show with respect to max salary?

18   A.  Recreation therapist is 72.3 percent are at max.

19   Q.  Okay.  And how about senior psychiatrist supervisors?

20   A.  A hundred percent of senior psychiatrist supervisors are at

21   the maximum.

22   Q.  And how about senior psychologist specialists?

23   A.  82 percent.

24   Q.  How about senior psychologist supervisors?

25   A.  76.2 percent.

1    Q.  How about staff psychiatrists?

2    A.  90.9 percent.

3    Q.  And how about supervising psychiatric social worker Is?

4    A.  84 percent.

5    Q.  And what does this analysis show with respect to the

6    overall percentage of individuals in these classifications who

7    are paid at the max?

8    A.  There are a number of individuals at the maximum

9    compensation range overall in all these classes.  70.5 percent

10   of employees are at the maximum.

11   Q.  How are -- new employees to state service, how is their

12   initial salary set?

13   A.  A personnel specialist will do -- conduct a salary

14   determination.  Typically, they're going to be placed at the

15   minimum of the salary range unless we are providing a hiring

16   above minimum.

17   Q.  Again, the case of the acronyms, is a hiring above minimum

18   known as a HAM?

19   A.  Yes.

20   Q.  And how does one determine whether somebody will be hired

21   above the minimum or receive a HAM?

22   A.  Some of the factors in determining a HAM are recruitment

23   challenges or extraordinary skills for new employees.

24   Q.  Are any of the classifications at issue in this proceeding

25   eligible for HAMs?

1    A.   Yes.

2    Q.   Which ones?

3    A.   Psychiatrists, psychologists, clinical social worker,

4    primarily.

5    Q.   Okay.  And based upon your experience trying to fill these

6    positions, what are some of the barriers or obstacles that

7    you've seen?

8    A.   Some of the obstacles we've seen -- or I've seen relate to

9    staffing shortages, employee burnout, candidates that do not

10   want to work in a correctional facility or provide care to our

11   incarcerated population.

12   Q.   Based upon your experience trying to recruit and retain

13   these positions, did the pandemic have any effect upon the

14   hiring and retention of these classifications?

15   A.   Yes.

16   Q.   How so?

17   A.   It -- we observed that through the pandemic, there was an

18   increase in employee -- employee burnout and fatigue.  It

19   changed the landscape of how candidates approached employment.

20   Q.   How so?

21   A.   Candidates really changed in terms of the ability or the

22   desire to work on-site.  In addition to, when you couple that

23   with some of our geographic locations of our institutions, they

24   just had a different -- a different desire for employment and

25   terms.

1    Q.  And have candidates' expectations changed, based upon your

2    experience, with respect to the option to telework?

3    A.  Yes.

4    Q.  How so?

5    A.  Especially coming after the pandemic or during the

6    pandemic, a lot more -- a significant amount of candidates

7    prefer telework as an option.

8    Q.  What are the goals -- so CDCR employees, civil servant

9    staff members, correct?

10   A.  Yes.

11   Q.  They also use registry staff to fill positions; is that

12   correct?

13   A.  Yes.

14   Q.  What is CDCR's goal for staffing the allocated mental

15   health positions?

16   A.  Our goal is to achieve a hundred percent fill rate,

17   although we're required to achieve 90 percent.

18   Q.  And do you have different goals -- is the goal to fill it

19   with civil servant staff?

20   A.  Yes.

21   Q.  And do you understand that CDCR is looking to expand its

22   telemental health program?

23   A.  Yes.

24   Q.  How, if at all, would offering telework, based upon your

25   experience, impact the ability to fill staffing vacancies?

1    A.   I think it will help.

2    Q.   Why?

3    A.   Based on our success both in our telemedicine program and

4    our telepsychiatry program.

5    Q.   And what do you mean by telemedicine program?

6    A.   We have a unit in the CCHCS medical services program that

7    physician and surgeon employees provide primary care treatment

8    services through a telehealth office.

9    Q.   Okay.  And telepsychiatry, that is specific to this matter?

10   A.   Yes.

11   Q.   And, historically, has CDCR relied on registry to fill any

12   telepsychiatry positions?

13   A.   No.

14   Q.   Again, we are here today because CDCR has failed to meet

15   the 90 percent fill rate for various classifications.  Have you

16   and your staff gone back in time to see Defendants' fill rates

17   over time?

18   A.   Yes.

19   Q.   I want to pull up what has been previously marked as

20   Defendants' Exhibit 12.  And let's focus on the footnotes to

21   start.

22       Ms. Muhammad, first of all, what is this document?

23   A.   This is the CCHCS Coleman Request Filled Vacancy Report.

24   This first page is the combined psychiatry charts for

25   January 2013 through December 2022.

1   Q.   Okay.  Can you -- and it has various footnotes.  Can you

2   explain what the footnotes mean?

3   A.   Yes.  The footnotes -- the first footnote refers to that

4   the 2013 to 2017 total filled includes civil service and

5   registry.  For 2018 to 2022, the total filled includes civil

6   service, registry, and telehealth.

7       Number two, these reports include staffing data for the

8   psychiatric inpatient units.

9       Number three includes chief psychiatrist, senior

10  psychiatrist supervisor, and staff psychiatrist.

11      Four through seven reference the data sources used to

12  compile this report.

13  Q.   Back to the chart, the first -- the top line, what does

14  this demonstrate, Ms. Muhammad, and who does it relate to?

15  A.   This relates to the psychiatry classes.  It demonstrates

16  the authority -- changes in authority and the total fill rate

17  over time.

18  Q.   And what was that fill rate over time for 2013 to 2014?

19  A.   It ranged anywhere from the mid-70 percent, so 75 percent,

20  up to 83 percent fill rate.

21  Q.   The next item on the chart, does this still relate to

22  psychiatrists?

23  A.   Yes.

24  Q.   And is this for the period 2015 to 2016?

25  A.   Yes.

1  Q.  What does it demonstrate?

2  A.  It demonstrates a fill rate that at some points was in the

3  high 60s up through 8 -- mid-80 percent.

4  Q.  How about the next item of the chart, again, still

5  psychiatrists?

6  A.  Yes.

7  Q.  And this is for 2017 to 2018?

8  A.  Yes.

9  Q.  And what does it demonstrate?

10 A.  It shows that the fill rate fluctuated between 70 percent

11 up to around 82 percent -- or at one point, it was 84 percent

12 over that time frame.

13 Q.  Let's flip to the next page.  And focus on the top item.

14     This is still for psychiatrists, correct?

15 A.  Correct.

16 Q.  And this is for 2019 through 2020.  What does it

17 demonstrate?

18 A.  It shows that we -- that fill rates fluctuated between the

19 upper 70 -- mid- to upper 70 percent up through the high 80s,

20 around 88 percent.

21 Q.  Let's go to the next item.

22     This is '21/'22, still for psychiatrists, correct?

23 A.  Yes.

24 Q.  And what does this demonstrate with respect to the fill

25 rate during that period of time?

1    A.  This demonstrates that we were in the high 80s.  And at

2    some points over these months, we achieved 90 percent or

3    greater.

4    Q.  And, again, these charts include the PIPs, the ones that

5    we've talked about in this Exhibit 12, correct?

6    A.  Correct.

7    Q.  So they actually would decrease the fill rates because of

8    the fill rates in the PIPs, correct?

9    A.  Yes.

10    Q.  Okay.  Let's move to the next page.  And if we could blow

11    this up.

12        What classification is this relating to?

13    A.  Psychology.

14    Q.  Okay.  And what does it show with respect to psychology

15    fill rates in 2013 to 2014?

16    A.  It shows that we were at mid- to high 80s, achieving 90 to

17    92 percent.

18    Q.  Let's go to the next item, 2015 to 2016.  Still for

19    psychologists.

20        What does this demonstrate, Ms. Muhammad?

21    A.  This demonstrates that we achieved between mid- 80s --

22    around 85 percent -- up to 90 percent or higher in this

23    classification.

24    Q.  Let's continue.  What does it demonstrate in 2017 to 2018?

25    A.  2017 to 2018, we were at the high 80s, around 87 percent,

1    and in a number of these months, we were at or above -- or

2    above 90 percent fill rate.

3    Q.  Let's go to the next item.  And this is still for

4    psychologists, 2019 to 2020.

5        What does this demonstrate, Ms. Muhammad?

6    A.  This demonstrates that the fill rate averaged -- or was at

7    the mid- to high 80s, up to 90 percent or above.

8    Q.  And that's for '19/'20.  Let's look at the next item,

9    '21/'22.

10       What does this demonstrate?

11   A.  This demonstrates that we were at anywhere between the high

12   60s, 70s, 80s, and 90 percent or above.

13   Q.  So in the second half of the year in 2021, the numbers

14   changed?

15   A.  Yes.

16   Q.  Okay.  Do you know why?

17   A.  I don't know why specifically.  It could be a variety of

18   reasons.

19   Q.  What reasons might it be?

20           MS. YELIN:  Objection.  Calls for speculation.

21           THE COURT:  Sustained.

22   Q.  BY MR. MELLO:  Have you investigated any of the reasons why

23   the rate dropped in the second half of '21?

24   A.  My staff looked into some of the reasons that the rates

25   dropped based on employee feedback.

1    Q.  What did you learn?

2    A.  We learned that there were a number of separations,

3    retirements, during that time.

4    Q.  Let's go to the next page.

5         This relates to clinical social workers, correct?

6    A.  Yes.

7    Q.  And what does it show for 2013 to 2014, based upon -- with

8    respect to fill rates?

9    A.  The fill rates were anywhere between 68 percent up through

10   90 percent or above.

11   Q.  The next item, 2013 -- 2015/'16, what does that

12   demonstrate?

13   A.  This demonstrates that we were consistently above 90

14   percent fill rate.

15   Q.  Okay.  How about the next one, 2017 to 2018, what does it

16   demonstrate?

17   A.  This demonstrates that we were above -- we were at the --

18   around 89 percent and then above 90 percent for a number of

19   months.

20   Q.  On a couple of the months, it indicates that the fill rate

21   was above a hundred percent.  What does -- how does that

22   happen; if you know?

23   A.  It could happen if we hired over the authority.  So we may

24   have had additional staff.

25   Q.  Any other reasons?

1    A.   It could be that we hired temporarily behind somebody who

2    was on a leave and they returned to work.

3    Q.   Let's go to the next item or the next time period.  And

4    this remains for clinical social workers, correct?

5    A.   Yes.

6    Q.   And this is for 2019 to 2020.  What does it demonstrate?

7    A.   It demonstrates that we were either in the high 90s or

8    above 100 percent.

9    Q.   The last one on this document, which, again, goes to the

10   end of 2022, what does this demonstrate with respect to

11   clinical social workers?

12   A.   This shows that we were either around 69 percent, high 70s,

13   80s, 90 percent or above for a number of months.

14   Q.   And does it also show a drop in fill rates in the second

15   half of 2021?

16   A.   Yes.

17   Q.   Let's go to the next item.

18        What is this document?

19   A.   This is the CCHCS Coleman Request Filled Vacancy Report for

20   medical assistants, charts for January 2013 to December 2022.

21   Q.   Okay.  So in January -- in the 2013 to 2014, what does this

22   show?

23   A.   We did not have any position authority or filled employees

24   in these positions.

25   Q.   Let's go to the next period, 2015 to 2016.

1          Is that still the case?

2    A.   Yes.

3    Q.   Let's go to the next.

4          What does this show for 2017 to 2018 with respect to MAs

5    and fill rates?

6    A.   That we started to fill positions in October of 2017.

7    Q.   And what does it show in terms of fill rates?

8    A.   At zero percent.

9    Q.   How about the next time period, what does this show with

10   respect to 2019 to 2020 in MAs?

11   A.   It shows that beginning in July of 2020, we were at 45

12   percent fill rate through December of '20, where we were at 74

13   percent.

14   Q.   And with respect to allocations, if an allocation changes,

15   does it affect -- does it potentially affect fill rates?

16   A.   Yes.

17   Q.   Okay.  And if an allocation goes up -- I'll strike that.

18        Let's move to the next item on this one.  2021 to 2022,

19   with respect to MAs, what does this demonstrate?

20   A.   It demonstrates that we were at a fill rate of mid-60s up

21   through 90 percent at various points.

22   Q.   Okay.  Is this the last page of this exhibit?  Okay.

23        Let's move on to -- what is this?

24   A.   This is the CCHCS Coleman Request Filled Vacancy Report

25   recreation therapist charts for January 2013 through

1    December 2022.

2    Q.  So let's look at the first item for the period 2013 to

3    2014.

4        What does that show with respect to fill rates for

5    recreational therapists?

6    A.  This shows that recreational therapists were filled at

7    between 58 percent, mid-70s and higher up through 82 percent

8    over that time frame.

9    Q.  How about for the next period, 2015 to '16, what does it

10   show?

11   A.  2015 to '16, the fill rate varied between the low 70

12   percent, mid- to high 86 percent, and then 90 percent or above.

13   Q.  How about for the next period, 2017 to 2018, what does it

14   demonstrate with respect to fill rates for rec therapists?

15   A.  2017, we were at the high 80s and 90 percent or above.

16   Q.  Continuing forward, for the time period of '19/'20 for

17   recreation therapists, what does it demonstrate?

18   A.  We were at 91 percent or higher, up to 100 percent, or over

19   100 percent during that time frame.

20   Q.  Last one.  What does this demonstrate for '21/'22?

21   A.  This demonstrates that over 2021/'22 we were either mid- to

22   high 80s or at 90 percent or above.

23   Q.  Ms. Muhammad, did you also have your staff prepare similar

24   charts for the first half of this year?

25   A.  Yes.

1    Q.   Okay.  So let's pull up Defendants' Exhibit 13, I believe.

2         And, first of all, what is Defendants' Exhibit 13,

3    Ms. Muhammad?

4    A.   It is the CCHCS Coleman Request Filled Vacancy Report

5    combined psychiatry charts for January 2023 to July 2023.

6    Q.   Okay.  And what do the footnotes -- what is significant

7    about the footnotes, Ms. Muhammad?

8    A.   The footnotes.  This information does not include the

9    psychiatric inpatient units.  It does cover filled -- total

10   filled includes civil service registry and telehealth.  It

11   includes the chief psychiatrist, senior psychiatrist,

12   supervisor, and staff psychiatrist.  And then the data sources

13   for footnotes 4 through 7.

14   Q.   Okay.  And what does it demonstrate for this period,

15   January through July of this year, with respect to the fill

16   rate for psychiatrists?

17   A.   It demonstrates that over that time, we were at 85 -- 85

18   percent, 89 percent, or 90 percent and above during that time

19   frame.

20   Q.   And this includes all psychiatrist classifications or

21   positions, correct?

22   A.   Correct.

23   Q.   So it includes the supervisors, etc.?

24   A.   Yes.

25   Q.   Okay.  Let's go to the next page.

 1       What is -- what is this page about?

 2   A.   The psychologists -- psychology classifications.

 3   Q.   And this is for the same time period?

 4   A.   Yes.

 5   Q.   Okay.  And what does this document demonstrate with respect

 6   to fill rates of psychologists?

 7   A.   We've consistently been in the 60 percent range, low to

 8   high 60 percent.

 9   Q.   And on the next page, what is the next page?

10   A.   It's the same chart for clinical social workers.

11   Q.   And what does it demonstrate for this time period?

12   A.   That we were consistently filled between 71 and 76 percent.

13   Q.   And the next page, what does this refer to?

14   A.   This is the same chart for medical assistants.

15   Q.   And what does it show?

16   A.   It shows that we were in the 70 percent range; up through

17   July 2023, we were in the 68 percent filled.

18   Q.   And let's go to the last page, I believe.

19       What is this?

20   A.   This is the same chart for recreation therapists.

21   Q.   And what does it demonstrate?

22   A.   It demonstrates that we were at between 88 and 92 percent

23   over this year.

24   Q.   Ms. Muhammad, you've testified about some of the steps

25   you've taken to speed up the hiring process, including these

1    hiring events.  What, if any, additional steps could you take,

2    consistent with state rules and regulations, that you believe

3    you have not taken to date, if any?

4    A.  I think that I would just continue to assess the filled

5    vacant rates, consider any strategies or approaches that we

6    haven't taken, and then make -- make changes that are within my

7    purview to do so.

8    Q.  You indicated that new compensation was negotiated by union

9    leadership and the state, earlier in your testimony.  Do you

10   remember that testimony?

11   A.  Yes.

12   Q.  Do you have any belief or understanding as to what, if any,

13   impacts those salary increases may have on filling or retaining

14   staff in the classifications at issue?

15              MS. YELIN:  Objection.  Calls for speculation.

16              THE COURT:  Well, just answer yes or no.

17              THE WITNESS:  Yes.

18              THE COURT:  Next question.

19   Q.  BY MR. MELLO:  Do you think those compensation changes will

20   have any impact on recruiting and retaining staff?

21              MS. YELIN:  Objection.  Calls for speculation.

22              THE COURT:  Sustained, based on that record.

23       If there is more foundation you can lay, you can try to do

24   that.

25   Q.  BY MR. MELLO:  Ms. Muhammad, have you observed salary

1   increases in the past in your role at CDCR?

2   A.  Yes.

3   Q.  And, for example, you testified that there was a 15 percent

4   pay differential for PIP staffing?

5   A.  Yes.

6   Q.  Okay.  Do you know, based upon your experience -- with that

7   pay differential for PIP staffing, can you tell whether that

8   differential improved recruitment and retention in the PIPs?

9   A.  It does some.

10  Q.  How so?

11  A.  We were able to attract additional providers into the PIPs.

12  Q.  Do you know if that was based upon the PIP differential or

13  something else?

14  A.  I believe it was based on the PIP differential.

15  Q.  And based upon that experience and similar experience with

16  compensation changes, are you optimistic these compensation

17  changes in the newly negotiated collective bargaining

18  agreements will help?

19  A.  I am.

20  Q.  Ms. Muhammad, did CDCR -- strike that.

21      During COVID, were state employees compensation packages

22  impacted?

23  A.  Yes.

24  Q.  What happened, during COVID, to state employees?

25  A.  In 2020, the state implemented a Personal Leave Program or

1    a furlough program.

2    Q.  And what was that furlough program?

3    A.  The furlough program for most bargaining units -- and

4    excluded supervisors and managers -- reduced salaries by the

5    equivalent of two days' worth of pay and provided two days'

6    worth of leave on the leave books.

7    Q.  Okay.  And was that leave on the leave book paid leave?

8    A.  Yes.

9    Q.  And it had to be taken at some point in the future?

10    A.  Yes.

11    Q.  And was that PLP program just directed at CDCR mental

12    health staff?

13    A.  No.

14    Q.  It applied to virtually all state employees?

15    A.  Yes.

16    Q.  And was that PLP program supposed to last two years?

17    A.  Yes.

18    Q.  And did it end earlier than two years?

19    A.  Yes.

20             MS. YELIN:  Objection.  Leading.

21             THE COURT:  Sustained.

22             MR. MELLO:  I'll withdraw.

23    Q.  BY MR. MELLO:  When did that PLP program end?

24    A.  July of 2021.

25    Q.  Do you know why it ended one year early?

1    A.   It's my understanding that the state's fiscal outlook had

2    improved.

3    Q.   Did CDCR -- we talked about this earlier -- provide a pay

4    differential to any employees who were working in the PIPs?

5    A.   Yes.

6    Q.   And was the -- what was the purpose of that pay

7    differential?

8    A.   It was to attract and retain providers in the PIP program.

9    Q.   Was -- was it in any way related to those who work in

10   outpatient programs?

11   A.   No.

12   Q.   Why not?

13   A.   At the time, we were focused on increasing staffing in the

14   PIP.

15   Q.   Okay.  In the past, were some retention bonuses not

16   available to social workers?

17   A.   Yes.

18   Q.   When?

19   A.   The recruitment and retention bonus would have been through

20   this year.  It was recently negotiated.

21   Q.   Okay.  And so are retention -- recruitment and retention

22   bonuses now available to clinical social workers pursuant to

23   the new agreements?

24   A.   Yes.

25   Q.   And you testified about that earlier, correct?

1    A.    Yes.

2    Q.    Okay.  Do you believe that CDCR can improve its staffing

3    fill rates without increasing the salaries beyond those in the

4    newly negotiated contracts between the labor unions and the

5    state?

6              MS. YELIN:  Objection.  Calls for speculation.

7              THE COURT:  Sustained.

8    Q.  BY MR. MELLO:  Ms. Muhammad, do you believe that -- strike

9    that.

10        We talked about the pay differentials, and you believe they

11   might have helped with respect to the PIP.  Do you believe that

12   psychologists and clinical social workers should be paid the

13   same?

14   A.    No.

15   Q.    Why not?

16   A.    They are two different classifications with two different

17   educational requirements.

18   Q.    And what's the difference between the Centralized Hiring

19   Unit and the Regional Hiring Unit?

20   A.    The Centralized Hiring Unit is a unit in headquarters that

21   currently is recruiting for psychiatrists and physicians.

22        The Regionalized Hiring Unit is located in our regional

23   field offices, and it's currently hiring for psychologists and

24   clinical social worker.

25   Q.    So you testified earlier about the one-day hiring events,

1    correct?

2    A.  Yes.

3    Q.  And you indicated, I believe, that a person could leave

4    that one-day hiring event with a conditional job offer,

5    correct?

6    A.  Yes.

7    Q.  How long after receipt of that conditional job offer will

8    an employee receive notification about a final position?

9    A.  At the hiring event, they're receiving it the same day.

10   Q.  And that's different, correct?

11   A.  Yes.

12   Q.  And that speeds up the process to do it, correct?

13   A.  Yes.

14   Q.  And you've had much more success with other classifications

15   than the five classifications at issue during those hiring

16   events?

17              MS. YELIN:  Objection.  Leading.

18   Q.  BY MR. MELLO:  Have you had more success -- what have been

19   the relative successes in making job offers between those

20   classifications and other classifications as a result of these

21   one-day hiring events?

22   A.  We have provided a higher number of job offers to

23   individuals that come through the hiring event.

24   Q.  And, again, those are going to continue into 2024, correct?

25   A.  Yes.

1          MR. MELLO:  Nothing further right now, Your Honor.

2    Thank you.

3          THE COURT:  All right.  Cross.

4                    CROSS-EXAMINATION

5    BY MS. YELIN:

6    Q.  Good morning, Ms. Muhammad.

7    A.  Good morning.

8    Q.  My name is Jenny Yelin.  I represent the Plaintiffs.

9        So you said earlier that you're the Deputy Director of

10   Human Resources for CCHCS, right?

11   A.  Yes.

12   Q.  And you've been in that position since the beginning of

13   2018?

14   A.  Yes.

15   Q.  And for the five years before that, you were the Associate

16   Director of Human Resources; is that right?

17   A.  Yes.  I held another position during that time, but yes.

18   Q.  Was that the Assistant Deputy Director position?

19   A.  It was the Assistant Deputy Director, as well as an

20   Associate Director.

21   Q.  And you've worked in HR at CDCR since 2007, right?

22   A.  Yes.

23   Q.  Okay.  So the 28 years that you've been employed with CDCR,

24   part of that time was prior to getting involved in human

25   resources?

1    A.  I'm sorry?

2    Q.  You said earlier that you worked for CDCR for 28 years,

3    right?

4    A.  Yes.

5    Q.  Okay.  But you've been involved in HR since 2007?

6    A.  Yes.

7    Q.  So a couple minutes ago, you testified about the new MOU

8    with the UAPD, which stands for Union of American Physicians

9    and Dentists, right?

10   A.  Yes.

11   Q.  Okay.  And that's Bargaining Unit 16?

12   A.  Yes.

13   Q.  So that new MOU was effective July 1, 2023; is that

14   correct?

15   A.  Yes.

16   Q.  And it has a three-year term, right?

17   A.  I believe so.

18   Q.  Okay.  And the MOU that immediately preceded this 2023 MOU

19   with the same UAPD Bargaining Unit 16, did that also have a

20   three-year term?

21   A.  I don't -- I don't know for sure without seeing it.

22   Q.  I'll represent to you that it had a start date of July 2020

23   and end date of July 2023.

24   A.  Yes.

25   Q.  Does that sound correct to you?

1    A.   Yes.

2    Q.   Okay.  And under that 2020 MOU, the prior MOU, the state

3    provided for a 2.5 percent general salary increase for UAPD

4    members, which would be effective July 2022, correct?

5    A.   That sounds right.

6    Q.   Okay.  But the state also maintained the discretion to

7    defer that GSI to July 2023 if there was a budget --

8    insufficient budget?

9    A.   Yes.

10   Q.   And the 2023 MOU that you just talked about provides that

11   psychiatrists can earn 135 percent of base salary for working

12   an additional caseload, correct?

13   A.   Yes.

14   Q.   And they also can receive 15 percent of their base salary

15   as a differential for working on-site at least 50 percent of

16   the time?

17   A.   Yes.

18   Q.   And you also talked about the recent MOU with BU 19 which

19   represents psychologists, rec therapists, and social workers,

20   correct?

21   A.   Yes.

22   Q.   And that's also effective July 1, 2023?

23   A.   Yes.

24   Q.   And all BU 19 members are getting a 3 percent GSI under

25   this contract, right?

1   A.  Yes.

2   Q.  Okay.  And then 2.5 percent in the second year?

3   A.  Yes.

4   Q.  And they're also -- this MOU also provides for increases in

5   the max salary ranges for the clinical social workers and

6   psychologists, right?

7   A.  Yes.

8   Q.  You talked about that earlier.

9       So psychologists are receiving a 10 percent increase

10  effective July 1, 2023, in those max salary ranges, right?

11  A.  Yes.

12  Q.  And clinical social worker classes are getting an increase

13  of 2.65 to 3 percent in the max salary range numbers?

14  A.  Yes.

15  Q.  Right.  Okay.

16      And there is no increase in the max salary range for rec

17  therapists, correct?

18  A.  No.

19  Q.  And under this contract, psychologists are going to receive

20  their straight time rate, or regular hourly rate, for taking on

21  additional caseload responsibilities, correct?

22  A.  Yes.

23  Q.  But, as you said earlier, psychiatrists are getting 135

24  percent of their regular rate for doing additional caseload

25  work, correct?

1  A.  Yes.

2  Q.  And clinical social workers are not getting any additional

3  compensation, even their regular rate, for taking on additional

4  caseload work?

5  A.  No.

6  Q.  And recreation therapists are not either?

7  A.  No.

8  Q.  The BU 19 contract also does not have a pay differential

9  for psychologists who are working on-site at least 50 percent

10  of the time, correct?

11  A.  Correct.

12  Q.  And it does not have a pay differential for clinical social

13  workers working on-site at least 50 percent of the time?

14  A.  Correct.

15  Q.  Psychiatrists, though, as you said earlier, are getting a

16  15 percent pay differential for working on-site 50 percent of

17  the time, right?

18  A.  Yes.

19  Q.  So the MOU prior to this one with BU 19 was effective

20  July 2020 and went until July 2023; does that sound right to

21  you?

22  A.  Yes.

23  Q.  Okay.  And under that 2020 MOU, clinicians -- or all

24  employees covered by BU 19 received a 2.5 percent general

25  salary increase each year, right?

1   A.  Yes.

2   Q.  Okay.  You also talked about the recent contract with BU

3   20, which represents medical assistants at CDCR, right?

4   A.  Yes.

5   Q.  And they also reached a new MOU with the state effective

6   July 1, 2023?

7   A.  Yes.

8   Q.  You discussed with Mr. Mello that some employees

9   represented by BU 20 are receiving what was called a wage

10  equity adjustment of 4 percent; is that right?

11  A.  Yes.

12  Q.  Okay.  And are medical assistants receiving that 4 percent

13  wage equity adjustment?

14  A.  Yes.

15  Q.  Okay.  And then some other categories of employees in BU 20

16  are receiving a special salary adjustment of 5 percent, right?

17  A.  Yes.

18  Q.  Okay.  But not medical assistants?

19  A.  Correct.

20  Q.  Okay.  And the last MOU with BU 20, before the 2023 one,

21  was effective July 2020?

22  A.  Sounds right, yes.

23  Q.  And that provided for annual general salary increases of

24  between 2 and 2.5 percent?

25  A.  Yes.

1    Q.  Okay.  And MAs received that as well?

2    A.  Yes.

3    Q.  You talked earlier about the PIP pay differential.  The PIP

4    pay differential was implemented in May 2022, correct?

5    A.  Sounds right, yes.

6    Q.  Okay.  And the prior MOUs for Bargaining Units 16, 19, and

7    20, as we just discussed, each had terms of 2020 to 2023,

8    correct?

9    A.  Yes.

10   Q.  So that PIP pay differential was implemented in the middle

11   of the existing term of those MOUs?

12   A.  Yes.

13   Q.  And it increased pay for mental health staff working in the

14   PIPs by 15 percent over their salary that they would otherwise

15   be paid?

16   A.  Yes.

17   Q.  It was not implemented for mental health staff that are

18   working in non-PIP programs, right?

19   A.  Yes.  Correct.

20   Q.  The pay differential, once implemented, caused some

21   clinicians who had been working in non-PIP programs in CDCR to

22   move to PIP programs, right?

23          MR. MELLO:  Objection.  Lacks foundation.

24          THE COURT:  Sustained.  Subject to laying a

25   foundation, if you can.

1  Q.  BY MS. YELIN:  Do you track the departures or transfers of

2  employees of CCHCS?

3  A.  My staff does, yes.

4  Q.  Are you aware of any transfers of mental health staff who

5  had been working in non-PIP programs to PIP programs after the

6  implementation of the 15 percent pay differential?

7  A.  Yes.

8  Q.  At least four psychiatrists left the outpatient program at

9  CMF to move over to the PIP at CMF, right?

10        MR. MELLO:  Lacks foundation.

11        THE COURT:  You can answer if you're able.

12        THE WITNESS:  It's possible.  I don't have that

13  information in front of me.

14  Q.  BY MS. YELIN:  At least two psychologists transferred from

15  the Correctional Training Facility, CTF, to the PIP at Salinas

16  Valley State Prison after the implementation of the

17  differential, right?

18        MR. MELLO:  Lacks foundation.  Calls for speculation.

19        THE COURT:  Again, you can answer if you're able.

20        THE WITNESS:  It's possible.  I don't have that

21  information.

22  Q.  BY MS. YELIN:  And one psychiatrist transferred from CTF to

23  the SVSP PIP as well?

24        MR. MELLO:  Lacks foundation.  Calls for speculation.

25        THE COURT:  Same direction.

1          THE WITNESS:  It is possible, yes.

2    Q.  BY MS. YELIN:  Do you know that your lawyers represented to

3    Plaintiffs, in early 2023, that these transfers I just asked

4    you about occurred?

5          MR. MELLO:  Lacks foundation.

6          THE COURT:  Just answer yes or no.

7          THE WITNESS:  No.

8    Q.  BY MS. YELIN:  In 2007, this Court ordered that clinicians

9    serving Coleman patients at Department of State Hospital

10   facilities have to be paid in parity with CDCR clinicians, and

11   this was done due to a concern that clinicians would jump from

12   one agency to the other if the pay differed significantly,

13   right?

14   A.  Yes.

15   Q.  When CDCR created the PIP pay differential, it needed to

16   wait for Cal HR to issue what's called a pay letter, I think,

17   before the differential could be implemented; is that correct?

18   A.  Yes.

19   Q.  And it took several months for those pay letters to issue,

20   right?

21   A.  Yes.

22   Q.  So even when a pay increase is approved, it can't be

23   implemented until a pay letter is issued by Cal HR, right?

24   A.  Correct.

25   Q.  And that can take months, as it did for the PIP pay

1  differential?

2  A.  Correct.

3  Q.  So earlier, you were talking about the recruitment and

4  retention bonuses.  Is it okay if we just refer to them as

5  retention bonuses?

6  A.  Yes.

7  Q.  Okay.  Great.

8      And one of the pages of the marketing materials that were

9  included in Plaintiffs' Exhibit 12 talked about a $35,000

10  appreciation bonus.  Was that referring to what we are talking

11  about as a recruitment and retention bonus?

12  A.  Yes.

13  Q.  And it says $35,000, but not every employee received

14  $35,000?

15  A.  Correct.

16  Q.  Before May 2022, these retention bonuses were only offered

17  to psychiatrists, right?

18  A.  Yes.

19  Q.  And then they were expanded to psychologists in May 2022?

20  A.  Yes.

21  Q.  And that was the only additional mental health

22  classification that received the retention bonuses at that

23  time, correct?

24  A.  Yes.

25  Q.  So they weren't offered to clinical social workers in 2022?

1    A.  Correct.

2    Q.  Nor to recreation therapists, right?

3    A.  Correct.

4    Q.  And that expansion of the retention bonuses to

5    psychologists in 2022 was done through a pay letter as well,

6    right?

7    A.  Yes.

8    Q.  And that was in the middle of the term of the BU 19 MOU

9    that was in place at the time, right?

10   A.  Yes.

11   Q.  But CDCR did not include social workers in that pay letter,

12   even though they're also represented by BU 19?

13   A.  Correct.

14   Q.  And the new -- the new agreement with BU 19 provides for

15   new employees to get retention bonus payments annually through

16   84 pay periods, right?

17   A.  Yes.

18   Q.  That's calculated as a percentage of their base salary?

19   A.  Yes.

20   Q.  And existing employees who have worked for CDCR but for

21   less than 84 pay periods are eligible for some of these bonuses

22   but not all of them, right?

23   A.  Yes.

24   Q.  So they're prorated?

25   A.  I wouldn't say prorated.  It would depend on the terms and

1    where those employees go.

2    Q.  There is also a onetime retention bonus for currently

3    employed psychologists and clinical social workers of $10,000

4    if they've been employed longer than 84 pay periods but they

5    didn't previously receive a retention bonus, right?

6    A.  Yes.

7    Q.  So a psychologist who otherwise meets those criteria but

8    received one of the bonuses in 2022 cannot receive another

9    bonus in 2023?

10   A.  I would believe so.  We need the actual pay diff in order

11   to make that determination.

12   Q.  As far as you know, is that true for psychiatrists who

13   previously received a retention bonus as well?

14   A.  As far as I know, yes.

15   Q.  And the new Bargaining Unit 19 contract provides for these

16   retention bonuses for several categories of the represented

17   employees, right?

18   A.  Yes.

19   Q.  But not rec therapists?

20   A.  Without -- I -- I can't recall at this moment.

21   Q.  There is no recruitment or retention bonus provided for

22   medical assistants in the recent Bargaining Unit 20 tentative

23   agreement, correct?

24   A.  Correct.

25   Q.  You discussed the hiring above minimum process earlier, and

1    you mentioned that there is some criteria for employees to be

2    eligible for a hiring above minimum.  And I think the two main

3    criteria are documented history of recruitment difficulties for

4    the position and the candidate has extraordinary

5    qualifications; is that right?

6    A.  Yes.

7    Q.  You said earlier that psychologists, social workers, and

8    psychiatrists are eligible for the hiring above minimum,

9    possibly, right?

10    A.  Yes.

11    Q.  But not recreation therapists?

12    A.  They're eligible; we just may not need to utilize the HAM

13    process.

14    Q.  Is that true for medical assistants as well?

15    A.  Correct.

16    Q.  When a candidate is given a contingent offer for a mental

17    health position, it's always initially presented at the

18    starting minimum salary in the range, correct?

19    A.  Yes.

20          MS. YELIN:  Your Honor, this may be a good stopping

21    point for lunch.

22          THE COURT:  All right.  We'll do that three minutes

23    early.  So an hour for lunch.  Be back here, ready to go right

24    at 1:00.  You can be back in your seat then.

25          THE WITNESS:  Thank you.

1          MS. YELIN:  Thanks.

2          THE COURT:  All right.  Thank you.

3      (Recess taken, 11:57 a.m. - 1:01 p.m.)

4          THE COURT:  You may be seated.

5      And we'll continue with the cross of Ms. Muhammad,

6  Ms. Yelin.

7  Q.  BY MS. YELIN:  Hi, Ms. Muhammad.

8  A.  Hello.

9  Q.  So right before lunch, we were talking about the hiring

10  above minimum, or HAM, process?

11  A.  Yes.

12  Q.  The acronym just makes me laugh, but I'll use it.

13      And I think that you said that when a candidate is given a

14  contingent offer, it's always initially at the starting salary

15  within the salary range, right?

16  A.  Yes.

17  Q.  The minimum salary?

18  A.  Yes.

19  Q.  And that's true regardless of the person's relevant

20  experience in the field, right?

21  A.  Yes.

22  Q.  And so then if the candidate is not satisfied with that

23  starting minimum salary, the onus is on the candidate to ask

24  about the possibility of a hiring above minimum?

25          MR. MELLO:  Objection.  Lacks foundation.

 1              THE COURT:  Sustained.  Subject to laying foundation.

 2  Q.  BY MS. YELIN:  You said earlier that the marketing

 3  materials that CCHCS provides to candidates mentioned the

 4  possibility of a hiring above minimum, although it doesn't use

 5  that terminology, right?

 6  A.  Yes.

 7  Q.  So once a candidate receives their initial contingent

 8  offer, they have the option to ask about whether it's possible

 9  to receive a hiring above minimum premium?

10              MR. MELLO:  Lacks foundation and calls for

11  speculation.

12              THE COURT:  Overruled.

13      You can answer if you're able.

14              THE WITNESS:  Would you mind repeating the question?

15  Q.  BY MS. YELIN:  After a candidate receives a contingent

16  offer at the starting minimum salary, they have the option to

17  ask about a HAM, correct?

18              MR. MELLO:  Same objection, just for the record, Your

19  Honor.

20              THE COURT:  All right.  That can be a standing

21  objection to this line of questioning.

22      But you may answer to the extent you're able.

23              THE WITNESS:  Yes.

24  Q.  BY MS. YELIN:  And after a candidate asks about it, CCHCS

25  HR considers whether the candidate meets the criteria for a

```
 1   HAM, right?

 2   A.  Yes.

 3   Q.  And after they make that determination, they need to

 4   prepare and submit some HAM documentation?

 5   A.  No.

 6   Q.  Okay.  So they don't -- CCHCS HR does not need to seek

 7   approval for the HAM from Cal HR, for example?

 8   A.  Correct.

 9   Q.  What about from any other state departments?

10   A.  No.

11   Q.  But there is documentation that must be filled out?

12   A.  Correct.

13   Q.  And who fills that out?

14   A.  CCHCS HR.

15   Q.  And at that point, after its approved, the candidate can be

16   offered something above the minimum salary, right?

17   A.  Yes.

18   Q.  And when a candidate is approved for a HAM, they're offered

19   a salary that's somewhere within the pay scale for that

20   classification, correct?

21   A.  Yes.

22   Q.  So anything above the minimum in the salary range counts as

23   a HAM?

24   A.  Yes.

25   Q.  But HAM cannot get you a salary that's above the state's
```

 1  salary schedule bands?

 2  A.  Correct.

 3  Q.  No matter the person's experience?

 4  A.  Correct.

 5  Q.  And the hiring above minimum salary has to be requested and

 6  approved before the candidate accepts employment, correct?

 7  A.  No.  I'm sorry.  It's prior to start.  So --

 8  Q.  Prior --

 9  A.  -- after acceptance of the job.

10  Q.  So it can happen after acceptance of the position but

11  before the start date?

12  A.  Correct.

13  Q.  But a current employee who is unhappy with their salary is

14  not eligible for a HAM?

15  A.  Correct.

16  Q.  And CDCR has not sought any exceptions from the state rules

17  to allow HAM increases for current employees, right?

18  A.  Correct.

19  Q.  Has CDCR classified all of the clinical positions that are

20  at issue here -- the five classifications -- as having a

21  documented history of recruitment difficulties?

22  A.  Primarily three of the five.

23  Q.  And which are those three?

24  A.  Psychologists, psychiatrists, and clinical social worker.

25  Q.  You keep records of the salaries that are paid to all

1    mental health staff working for CDCR, right?

2    A.   Yes.

3    Q.   That's -- those are records maintained by CCHCS HR?

4    A.   Yes.

5    Q.   Earlier today, you and Mr. Mello were looking at an

6    exhibit, Defendants' 15, which showed a chart of minimum and

7    maximum salary ranges and what percentage of employees in each

8    classification are paid within -- at the maximum salary range,

9    for example.  Do you remember that?

10   A.   Yes.

11   Q.   And that table shows how many people are currently paid at

12   a particular level within the salary range for a particular

13   position, right?

14   A.   Yes.

15   Q.   Thank you.

16        So Defendants' Exhibit 15 is now displayed.  Do you see

17   that?

18   A.   Yes.

19   Q.   But Defendants' Exhibit 15 does not show how many people

20   were hired originally at a particular salary level, right?

21   A.   Correct.

22   Q.   So some of the people that are shown as being paid at the

23   max were not hired at the max?

24   A.   It's possible.

25   Q.   Some of the people got to that max salary, over time,

1    working in their position, correct?

2    A.  Correct.

3    Q.  You would need a different table to show how many people

4    were hired into the max salary level in a given time period,

5    correct?

6    A.  Yes.

7    Q.  And the number of people who are currently paid at the max

8    of the salary range does not prevent CDCR from hiring a new

9    incoming clinician who qualifies at the max of the range,

10   right?

11   A.  Yes.

12   Q.  Before lunch, we were talking about the one-day hiring

13   events, and I think that you testified that they were initiated

14   for mental health positions in 2022; is that correct?

15   A.  That's correct.

16   Q.  And there were, if I did my math correctly, a total of 23

17   one-day hiring events in 2022 and 2023, correct?

18   A.  Yes.

19   Q.  So that was 13 in '22 and 10 in 2023?

20   A.  Yes.

21   Q.  And from those events, you've hired 36 mental health

22   providers who have started work already?

23   A.  Approximately.

24   Q.  Okay.  That, again -- my math may have been faulty, but I

25   think that you said 22 who were hired in 2022 have already

1    started plus 14 who have started who were hired in 2023 --

2    A.   Yes.

3    Q.   -- right?  Okay.

4         Not all of those clinicians will work in the non-PIP

5    programs, though, right?

6    A.   Those are specifically for the non-PIP programs.

7    Q.   Those are numbers specifically for the non-PIP?

8    A.   Correct.

9    Q.   So there have been additional clinicians who were hired for

10   the PIP programs?

11   A.   Yes.

12   Q.   After a clinician is given an offer at a one-day hiring

13   event, they still have to go through the credentialing process

14   as well, right?

15   A.   Yes.

16   Q.   And there was also another process that you mentioned that

17   they still have to complete.  Can you remind us what that's

18   called?

19   A.   I believe you're referring to preemployment or the

20   fingerprint process.

21   Q.   No.  But I'll come back to that.

22        The credentialing process sometimes takes months, right?

23   A.   It may.

24   Q.   And you said earlier that you've worked in HR at CDCR since

25   2007, right?

1    A.   Yes.

2    Q.   So you know that these one-day hiring events are not new

3    for CCHCS HR, correct?

4    A.   They're new in the manner in which we're conducting them.

5    Q.   But the receiver has been using one-day hiring events for

6    approximately 15 years, right?

7    A.   No.

8    Q.   Okay.  The receiver informed this Court in 2007 that he was

9    creating a pilot for one-day hiring events to fill medical

10   positions.  Were you aware of that?

11            MR. MELLO:  Lacks foundation.

12            THE COURT:  Just answer yes or no.

13            THE WITNESS:  No.

14   Q.   BY MS. YELIN:  Okay.  You discussed the Merritt Hawkins

15   contract that had been in place previously for mental health

16   staffing, right?

17   A.   Yes.

18   Q.   And that contract was recently terminated?

19   A.   Yes.

20   Q.   At the end of August 2023?

21   A.   It expired.

22   Q.   It expired.

23        So the contract is no longer in place?

24   A.   Correct.

25   Q.   And CCHCS has not entered into a new contract with Merritt

1    Hawkins?

2    A.   No.

3    Q.   The document that you were going through with Mr. Mello

4    earlier also mentioned loan forgiveness programs.  Is that

5    another one of the initiatives that CCHCS has undertaken to

6    increase mental health staffing?

7    A.   Yes.

8    Q.   But none of the loan forgiveness programs that are

9    mentioned in that document are CDCR specific programs, are

10   they?

11   A.   Correct.

12   Q.   They're all federal programs?

13   A.   Correct.

14   Q.   So the National Health Service Corps -- abbreviated as NHSC

15   -- Federal Loan Repayment Program is a federal program, right?

16   A.   Yes.

17   Q.   As is the loan forgiveness program through the US

18   Department of Health and Human Services?

19   A.   Yes.

20   Q.   And CDCR has been participating in federal loan repayment

21   programs since at least 2015, right?

22   A.   Yes.

23   Q.   The loan forgiveness program through the US Department of

24   Health and Human Services is limited due to federal funding,

25   correct?

1    A.   Yes.

2    Q.   And only clinicians in certain institutions in CDCR qualify

3    for the majority of the grants through that program, right?

4    A.   Yes.

5    Q.   Because they have to be located in a certain area?

6    A.   Yes.

7    Q.   Okay.  So an area has to qualify as an underserved area; is

8    that correct?

9    A.   Yes.

10   Q.   And only 16 CDCR institutions qualify, right?

11   A.   I would have to refer back to the document.

12   Q.   Okay.  We can show it to you.

13        Can you please put up Plaintiffs' Exhibit 12.  And go to

14   page 5.

15        On page 5, Ms. Muhammad, do you see the list of

16   institutions that are -- that are in the table --

17   A.   Yes.

18   Q.   -- here?

19        Are these the institutions that qualify for that federal

20   loan forgiveness program?

21   A.   Yes.

22   Q.   So clinicians who are working at another one of the

23   institutions in CDCR would not qualify for the program, right?

24   A.   Correct.

25   Q.   And, for example, Sac, which is located here in the -- CSP

1    Sac, which is located here in the Sacramento area, does not

2    qualify, right?

3    A.  Correct.

4    Q.  And the other program that was mentioned is the National

5    Health Service Corps federal repayment program.  That also has

6    limited federal funding, right?

7    A.  Yes.

8    Q.  And only certain types of mental health providers qualify?

9    A.  Yes.

10    Q.  That's psychiatrists, clinical social workers, and

11    psychologists?

12    A.  To my recollection.

13    Q.  Okay.  So not rec therapists?

14    A.  Correct.

15    Q.  And not medical assistants?

16    A.  Correct.

17    Q.  And you only qualify for that program if you already have

18    your license, right?

19    A.  I don't recall.

20    Q.  Okay.  The visa sponsorship program you discussed has also

21    been around for approximately 15 years, correct?

22    A.  Yes.

23    Q.  How many mental health staff has CCHCS sponsored for a work

24    visa in the last year?

25    A.  I don't have that information available.

1    Q.  CDCR doesn't recruit internationally for its vacant mental

2    health positions, does it?

3    A.  No.

4    Q.  Before the COVID pandemic, CDCR did consider recruiting

5    foreign trained clinicians, right?

6    A.  Yes.

7    Q.  But you never implemented a targeted program like that?

8    A.  No.

9    Q.  Are you aware of a Budget Change Proposal that was

10   submitted earlier this year for telemental health?

11   A.  Yes.

12   Q.  And that was submitted May 12, 2023, correct?

13   A.  Without looking at the document, I don't know the date.

14   Q.  Okay.  Mr. Gonzalez, can you please pull up Defendants'

15   Exhibit 1.

16       Is this the Budget Change Proposal that was submitted

17   related to telemental health this year?

18   A.  Yes.

19   Q.  Okay.  And do you see at the bottom of page 1, there is a

20   date of submission, and it looks like it was submitted to the

21   legislature on May 12, 2023, and also signed by various

22   officials on that date, right?

23   A.  Yes.

24   Q.  Okay.  Does that help refresh your recollection --

25   A.  Yes.

1    Q.  -- about the date?

2        And so this BCP was for budget year 2023 /'24, correct?

3    A.  Correct.

4    Q.  Mr. Gonzalez, can you please go to page 7.

5        So towards the bottom of page 7, do you see the paragraph

6    that starts:  In order for -- to complete -- to compete, excuse

7    me, for candidates?

8    A.  Yes.

9    Q.  Second-to-last paragraph.

10       Is this paragraph describing the one-day hiring events that

11   you were talking about earlier?

12   A.  Yes.

13   Q.  And then in the following paragraph, the last paragraph on

14   that page, it says:  Based on the increasing workload, HR is

15   requesting permanent funding positions to maintain and support

16   mental health program recruitment and hiring initiatives,

17   including the new TMH -- which I believe stands for telemental

18   health -- program, while addressing current staffing

19   deficiencies and ensuring the SMHP workload demands are met

20   efficiently, accurately, and timely.

21       Do you see that?

22   A.  Yes.

23   Q.  Okay.  So you asked for four more positions for CCHCS HR to

24   focus on mental health hiring and recruitment initiatives

25   through this BCP, right?

1    A.  Yes.

2    Q.  CDCR did not seek additional HR staff allocation in budget

3    year 2022 to 2023, right?

4    A.  Correct.

5    Q.  Or in budget year 2021 to 2022?

6    A.  Correct.

7    Q.  And I believe you said earlier that CCHCS implemented the

8    Centralized Hiring Unit in 2021?

9    A.  One of the changes to that unit.

10   Q.  One of the changes to that unit.  Okay.

11       And was part of the reason for turning over mental health

12   staffing to the Centralized Hiring Unit at that time to take

13   away some of the discretion from institutions during hiring?

14           MR. MELLO:  Lacks foundation.

15   Q.  BY MS. YELIN:  What were some of the reasons that CCHCS

16   turned over hiring of mental health positions to the

17   Centralized Hiring Unit in 2021?

18   A.  It was to standardize the process and the recruitment to a

19   single function.

20   Q.  And how many staff are assigned to the CHU currently?

21   A.  I don't recall offhand, but it's approximately six analysts

22   and then a managerial complement that has other functions.

23   Q.  Did that number stay -- did that number change between 2021

24   and the present?

25   A.  In the Centralized Hiring Unit, it's the same.

1  Q.  Did the implementation of the Centralized Hiring Unit

2  increase the capacity of CCHCS to hire?

3  A.  Yes.

4  Q.  Did it increase the speed of hiring for mental health

5  positions?

6  A.  In some ways.

7  Q.  What are the ways that it did increase the speed?

8  A.  By having the unit standardized and a centralized process,

9  it maintained the responsibility of the hiring throughout the

10  process and the connection with the candidate.

11  Q.  And then in 2023, you implemented the Regional Hiring

12  Units, correct?

13  A.  Yes.

14  Q.  And those are only for psychologists and clinical social

15  workers?

16  A.  Yes.

17  Q.  How many RHUs, or Regional Hiring Units, are there in the

18  state?

19  A.  There is one unit.

20  Q.  So the Centralized Hiring Unit still exists, but now there

21  is also a Regional Hiring Unit?

22  A.  Correct.

23  Q.  The Centralized Hiring Unit or the Regional Hiring Unit

24  reviews the applications for the vacant mental health

25  positions, correct?

1    A.   Yes.

2    Q.   And identifies the candidates to be interviewed?

3    A.   They identify the applicants that will move forward.

4    Q.   The institution mental health leadership don't have access

5    to the pool of applicants to select who they would like to

6    interview, correct?

7    A.   That's not correct.

8    Q.   Okay.  Do you want to explain?

9    A.   The list of candidates is provided to the local hiring

10   manager, and the HR field liaisons work with those hiring

11   managers to schedule applicants.

12   Q.   Who initially reviews the applications that are submitted

13   to CCHCS HR for mental health positions?

14   A.   The hiring analyst in either the Centralized Hiring Unit or

15   the Regional Hiring Unit.

16   Q.   And I don't remember if I asked you this already.  How many

17   people are working in the Regional Hiring Unit?

18   A.   We have redirected approximately six analysts to that unit.

19   Q.   Where were they -- from where were they redirected?

20   A.   We had some positions in headquarters and the regional

21   human resources office that were redirected for the unit.

22   Q.   So these six positions are in addition to the six to eight

23   that work in the Centralized Hiring Unit?

24   A.   Yes.

25   Q.   But the Centralized Hiring Unit also hires medical staff,

1    correct?

2    A.  Yes.

3    Q.  Putting aside the one-day hiring events, in a normal

4    application process, what is the average time it takes, after

5    an application is submitted, before an interview is scheduled?

6              MR. MELLO:  Lacks foundation.  Calls for speculation.

7              THE COURT:  Overruled.

8        You can answer if you're able.

9              THE WITNESS:  It varies.

10   Q.  BY MS. YELIN:  Do you have data -- do you track that in

11   some way?

12   A.  We do track the time to hire.

13   Q.  Including these interim steps, like time to interview being

14   scheduled?

15   A.  Yes.

16   Q.  You just don't have it off the top of your head right now?

17   A.  Correct.

18   Q.  Understood.

19       You'd be able to review applications more quickly if there

20   were more staff in the HR unit, right?

21   A.  Correct.

22   Q.  And after the interview by the institution interview panel,

23   the institution tells HR that they would like to hire the

24   person if they decide to make them an offer, correct?

25   A.  Yes.

1    Q.   And then HR provides the offer?

2    A.   Yes.

3    Q.   And after the offer is accepted, the clinician cannot start

4    until there are other steps completed, right?

5    A.   Yes.

6    Q.   What are those steps?

7    A.   The Live Scan fingerprint process, the credentialing and

8    privileging process, and then there is preemployment documents,

9    they will also need a tuberculosis skin test.

10   Q.   Okay.  And then I think in your direct examination, you

11   also mentioned something called a file review.

12   A.   Yes.  A reference check and a file review.

13   Q.   Okay.  So the file review is part of the reference check

14   process?

15   A.   Correct.

16   Q.   Okay.  And it has often taken three months or even more for

17   that post-offer process to play out, correct?

18              MR. MELLO:  Lacks foundation.

19              THE CLERK:  Overruled.

20              THE WITNESS:  Sometimes.

21   Q.  BY MS. YELIN:  And during that time, sometimes clinicians

22   have accepted another position by the time those processes have

23   fully played out?

24              MR. MELLO:  Same objection.

25              THE COURT:  There can be a standing objection here.

1          But you may answer to the extent you're able.

2               THE WITNESS:  Thank you.

3          Sometimes, yes.

4     Q.  BY MS. YELIN:  A unit called the Credentialing and

5     Privileging Support Unit does the credentialing and privileging

6     process; is that right?

7     A.  Yes.

8     Q.  And they're within CCHCS HR?

9     A.  No.

10    Q.  No.  They're within CCHCS?

11    A.  Yes.

12    Q.  How -- do you know how many people work in that unit and do

13    credentialing for mental health positions specifically?

14    A.  I do not.

15    Q.  You mentioned this Lean Six Sigma Green Belt analysis that

16    was recently completed.

17    A.  Yes.

18    Q.  When -- when did that happen?

19    A.  Initially, it was done in 2016.  Most recently, it was

20    resumed in 2022.

21    Q.  Why was there a break in the process between 2016 and 2022?

22    A.  There were a number of initiatives that we were working on

23    in addition to that one, so it was incorporated throughout a

24    number of projects.

25    Q.  And through that process, you learned that it was taking,

1   on average, 65 days to hire clinical staff?

2   A.   No.   It was, on average -- that's what we've determined we

3   can reduce it to at this initial point.

4   Q.   Okay.   And is that -- so you determined that you could

5   reduce the time to hire to 65 days for clinical staff?

6   A.   Yes.

7   Q.   And is that business days or calendar days?

8   A.   Business days.

9   Q.   65 business days?

10   A.   Yes.

11   Q.   And so far, this new streamlined process that resulted from

12   the Green Belt analysis has only been ruled out at one prison,

13   correct?

14   A.   Correct.

15   Q.   Ms. Muhammad, you signed discovery responses that said that

16   194 psychologists left CDCR between January 1, 2022, and

17   August 2023.   Do you remember that?

18   A.   I recall.

19   Q.   Okay.   Does that number still sound accurate to you for

20   that time period?

21   A.   Based on my recollection, yes.

22   Q.   Do you know how many of those 194 psychologists were

23   working in non-PIP programs?

24   A.   I do not.

25   Q.   The discovery responses also said that 112 social workers

1  left CDCR employment between January 1, 2022, and August 2023,

2  right?

3  A.  Based on my recollection.

4  Q.  Does that number still sound correct to you?

5  A.  Yes.

6  Q.  So you have no reason to think it's not accurate?

7  A.  No.

8  Q.  And do you know how many of those 112 were working in

9  non-PIP programs?

10  A.  No.

11  Q.  CDCR hires unlicensed psychologists into allocated mental

12  health positions sometimes, correct?

13  A.  Yes.

14  Q.  And allows them to work under the supervision of a licensed

15  psychologist?

16  A.  Yes.

17  Q.  And it does the same with unlicensed social workers, right?

18  A.  Yes.

19  Q.  It's not uncommon for clinicians to stay in CDCR employment

20  until they've completed their licensing hours and then leave,

21  correct?

22  A.  Yes.

23  Q.  Do you track how many clinicians leave after completing

24  their licensing hours?

25  A.  I don't recall at this moment.

1   Q.  You don't recall if you do track it or what -- what the

2   numbers are?

3   A.  I believe my Workforce Development Unit tracks it.  I don't

4   recall what the numbers are.

5   Q.  But that information is available somehow?

6   A.  Potentially.

7   Q.  CDCR doesn't -- does not have a targeted initiative focused

8   on retaining clinicians after they receive their licensing

9   hours, does it?

10  A.  No.

11  Q.  Have you surveyed clinicians who leave after obtaining

12  their licensing hours to find out why they have decided to

13  leave?

14  A.  I don't know.

15  Q.  Going back for a moment to the Lean Six Sigma process, when

16  you undertook the analysis and decided to make changes to

17  streamline the hiring process, can you tell us how many days --

18  business days it was taking, on average, for clinicians to be

19  hired that caused you to think you should streamline it?

20  A.  On average, it was taking 108 -- approximately 108 days.

21  Q.  Business days?

22  A.  Yes.

23  Q.  And that was for clinical staff?

24  A.  Yes.

25  Q.  Do you or your staff conduct exit interviews with employees

1    who leave?

2    A.   My staff does.

3    Q.   What are the reasons clinicians say that they are leaving

4    CDCR employment when they decide to leave?

5    A.   I don't have the report available.  So based on my

6    recollection, beyond retirement and those types of separations,

7    some leave for personal reasons, family; some leave because

8    they no longer want to work in a correctional facility.

9    Q.   Any other reasons that you can remember?

10    A.   Those are the ones that come to mind.

11    Q.   The receiver does not currently have direct authority over

12    hiring for mental health positions, right?

13    A.   Correct.

14    Q.   But he does have direct authority for hiring medical

15    positions?

16    A.   Correct.

17    Q.   Including nursing positions, correct?

18    A.   Yes.

19    Q.   And that includes nursing -- nursing staff who work in

20    mental health programs in the prisons?

21    A.   Yes.

22    Q.   Defendants contemplated turning over mental health hiring

23    to the receiver as early as 2007, correct?

24         MR. MELLO:  Lacks foundation.

25    Q.  BY MS. YELIN:  Do you know whether Defendants contemplated

1    turning over mental health hiring to the receiver in 2007?

2    A.  I do not.

3    Q.  Have you ever heard any discussions about whether mental

4    health hiring should be turned over to the receiver?

5              MR. MELLO:  Lacks foundation.

6              THE COURT:  Just answer yes or no.

7              THE WITNESS:  No.

8    Q.  BY MS. YELIN:  You're aware that in 2006, the -- this Court

9    ordered Defendants to implement higher salaries due to

10   widespread staffing clinical shortages and ordered that

11   provisions of California law be waived, correct?

12             MR. MELLO:  Lacks foundation.

13             THE COURT:  Just answer yes or no.

14             THE WITNESS:  Generally aware.

15   Q.  BY MS. YELIN:  Okay.  I'll just represent to you that in an

16   order on December 15, 2006, this Court ordered Defendants to

17   implement a new pay schedule for mental health staff that was

18   recommended by the Special Master and which waived a number of

19   provisions of state law related to setting salaries and

20   collective bargaining.  Do you have any reason to believe that

21   that is not accurate?

22   A.  No.

23   Q.  CDCR has not sought waivers of state law at any time in the

24   period since October 2017 to the present, correct?

25   A.  No.

```
 1   Q.  Has it been discussed?

 2             MR. MELLO:  To the extent it calls for

 3   attorney-client or deliberative process privilege, we would

 4   object.

 5   Q.  BY MS. YELIN:  Other than in any discussions with CDCR

 6   attorneys, including outside counsel, have you heard any

 7   discussions about seeking waivers of state law related to

 8   mental health staffing?

 9   A.  No.

10   Q.  So you said that you have some recollection of this 2006

11   order.  Salaries for mental health staff increased

12   significantly after that order, right?

13             MR. MELLO:  Lacks foundation.  Calls for speculation.

14             THE COURT:  Answer if you know.

15             THE WITNESS:  I don't know.

16   Q.  BY MS. YELIN:  But as you testified earlier, you were aware

17   of the subsequent order from this Court that DSH clinicians,

18   which at that time were called DMH clinicians, had to be paid

19   in parity with CDCR clinicians because there was a concern that

20   everybody was going to defect to CDCR due to the increase in

21   salaries at CDCR?

22             MR. MELLO:  Lacks foundation.  Calls for speculation.

23             THE COURT:  You may answer if you're able.

24             THE WITNESS:  I don't want to speculate.

25   Q.  BY MS. YELIN:  But you remember that order?
```

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    A.   Vaguely.

2    Q.   And the receiver has also sought waivers of state law in

3    the past where he thought it was necessary to address staffing

4    shortages in medical positions, correct?

5             MR. MELLO:   Relevance.   Lacks foundation.

6             MS. YELIN:   It's relevant because it is one of the

7    possible options Defendants could have pursued.

8             THE COURT:   Overruled on relevance grounds.

9        And you may answer if you're able.

10             THE WITNESS:   Yes.

11   Q.   BY MS. YELIN:   And the Court in Plata granted those waivers

12   in 2006 and 2008, right?

13   A.   I don't recall the dates specifically.

14   Q.   That's fine.   The waivers, though, allowed the receiver

15   flexibility to set salaries, right?

16   A.   To my recollection, not independently.

17   Q.   And they allowed the receiver to modify pay without

18   negotiating directly with the labor unions, correct?

19             MR. MELLO:   That may lack foundation.

20             THE COURT:   Answer if you know.

21             THE WITNESS:   I don't know.

22             THE COURT:   And always feel free to say, I don't

23   know.

24             THE WITNESS:   Thank you.   I don't know.

25   Q.   BY MS. YELIN:   Since October 2017, CDCR has not sought any

1  similar waiver of state law related to mental health staffing,

2  correct?

3  A.  I don't know.

4  Q.  I believe you said earlier that it has not.

5  A.  Not to my knowledge.

6  Q.  At the end of your direct examination, Mr. Mello asked you

7  whether there were any additional steps that CCHCS could take,

8  and you said that you cannot -- I believe you said that you --

9  you can't think of additional steps that you could take that

10 are within your purview and consistent with state law; is that

11 correct?

12 A.  That's correct.

13 Q.  Something like that.

14     But, again, you haven't sought any waivers of any state

15 laws that are impeding your ability to implement other methods

16 or strategies?

17         MR. MELLO:  Lacks foundation.  Calls for a legal

18 conclusion.

19         THE COURT:  Overruled.

20     You may answer to the extent you're able.

21         THE WITNESS:  I would have to defer to legal counsel

22 on the waiver of law.

23 Q.  BY MS. YELIN:  So you said at the end of that direct

24 examination that your plan is to continue with the same

25 initiatives that you've already implemented and to consider new

1    initiatives, correct?

2    A.   Yes.

3    Q.   But other than the initiatives you mentioned today, there

4    are no other initiatives that you are planning currently,

5    correct?

6    A.   Not currently.

7             MS. YELIN:   One moment.

8        (Pause in proceedings.)

9             MS. YELIN:   No further questions.   Thank you,

10   Ms. Muhammad.

11            THE COURT:   All right.   Any redirect?

12            MR. MELLO:   Yes, Your Honor.   Thank you.

13                     REDIRECT EXAMINATION

14   BY MR. MELLO:

15   Q.   Good afternoon again, Ms. Muhammad.

16   A.   Good afternoon.

17   Q.   During cross-examination by Ms. Yelin, you were asked about

18   various differences between the compensation packages

19   negotiated between the unions.

20       Can you tell me why there are differences between the

21   recruitment and retention bonuses or differentials or GSIs, or

22   SSAs that are provided to some of the classifications versus

23   other classifications at issue?

24            MS. YELIN:   Objection.   Compound.

25            THE COURT:   Sustained.

1          Can you break that down?

2               MR. MELLO:  Sure.

3    Q.  BY MR. MELLO:  Ms. Muhammad, during cross-examination,

4    Ms. Yelin asked you about various differences between the

5    compensation packages that were offered to the classifications

6    at issue.  Do you remember that?

7    A.  Yes.

8    Q.  Do you know why those compensation packages are different

9    for the classifications at issue?

10   A.  They would be different based on the negotiations that

11   occurred with Cal HR and the employee labor organizations at

12   that time.

13   Q.  So they would be the result of the tentative agreements

14   that were approved by the members and the legislature and the

15   governor?

16   A.  Yes.

17   Q.  Ms. Yelin also spoke to you about the pay differential

18   letters with respect to the PIPs.  Do you remember that?

19   A.  Yes.

20   Q.  And there was testimony regarding delays in issuance of pay

21   differential letters; do you remember that?

22   A.  Yes.

23   Q.  What happens when a pay differential or pay letter is

24   delayed?  What happens to the employees once it is finally

25   issued?

1    A.  The employee will receive retroactive pay and compensation

2    back to the effective date of the pay letter.

3    Q.  Okay.  During cross-examination, Ms. Yelin also asked you

4    about that time period after a contingent offer is issued and

5    the employee starts work.  Do you remember that?

6    A.  Yes.

7    Q.  Are any of those steps or processes impacted by the

8    potential employee scheduling events or anything of that

9    nature?

10    A.  Yes.

11    Q.  Which ones?

12    A.  The completion of their preemployment documents, completion

13    of a fingerprint appointment, completion of their credentialing

14    and privileging packet to be reviewed.

15    Q.  And specifically to credentialing, what, if anything, could

16    the potential employee do that might clog up or slow down that

17    process?

18    A.  They may provide incomplete documents; they may provide an

19    incomplete application.

20    Q.  Anything else?

21    A.  They may be nonresponsive to follow-up from the

22    Credentialing and Privileging Unit or any of the hiring units.

23    Q.  Thank you.  On cross, Ms. Yelin asked if CDCR HR had asked

24    for additional HR positions in the past budget years, and you

25    said no, correct?

```
 1    A.  Correct.
 2    Q.  But CDCR HR is not the proper entity to request those
 3    positions, correct?
 4        Let me ask it -- would CCHCS be involved in requesting
 5    additional positions for CCHCS HR?
 6    A.  Yes.
 7    Q.  Okay.  And so CDCR wouldn't make such a request; is that
 8    correct?
 9    A.  Correct.
10            MR. MELLO:  I have nothing further, Your Honor.
11            THE COURT:  All right.  Any recross?
12            MS. YELIN:  Just very briefly.
13                         RECROSS EXAMINATION
14    BY MS. YELIN:
15    Q.  So at the -- at the end of your redirect examination, you
16    were talking about the BCP requesting additional HR staff.  And
17    I just want to make sure that the record is clear that CDCR --
18    CCHCS, which is a component of CDCR, did request additional HR
19    staff in the BCP that was submitted earlier this year, correct?
20    A.  Yes.
21    Q.  So it would be the correct entity to make that request?
22    A.  Yes.
23            MS. YELIN:  Thank you.  Nothing further.
24            THE COURT:  Mr. Mello?
25            MR. MELLO:  No, Your Honor.  Thank you.
```

```
 1                  THE COURT:  All right.  Is Ms. Muhammad excused at
 2     this time?
 3                  MR. MELLO:  She's excused.
 4                  THE COURT:  For all purposes?
 5                  MR. MELLO:  For all purposes for us.
 6                  THE COURT:  Agreed, excused for all purposes,
 7     Ms. Yelin?
 8                  MS. YELIN:  Yes.
 9                  THE COURT:  All right.  You may step down, ma'am.
10     You're excused.
11          All right.  Next witness.
12                  MR. MCCLAIN:  Good afternoon, Your Honor.  Damon
13     McClain for Defendants.
14          Defendants will next call Angela Ponciano, who is out in
15     the hallway.  I think we're getting her.
16                  THE COURT:  All right.
17                  MS. ELLS:  Your Honor, while the witness is coming --
18                  THE COURT:  Can you use the microphone, please?
19                  MS. ELLS:  I'm sorry.  It was away from me.
20          While the witness is coming, should we discuss the
21     housekeeping issue around the exhibit list?
22                  THE COURT:  If we can cover it in a minute or two.
23                  MS. ELLS:  I believe that we can.
24                  THE COURT:  All right.
25                  MS. ELLS:  The parties submitted a joint list of
```

1    exhibits and indicated which of those exhibits were stipulated

2    to both as to admissibility and as to authentication.

3                THE COURT:  Correct.

4                MS. ELLS:  We filed it yesterday and provided it to

5    Ms. Schultz.  The parties would like to jointly request that

6    all of the documents for which both are stipulated be admitted

7    into the record.

8                THE COURT:  You join in that request, whoever is

9    speaking for the defense?  Mr. McClain?

10               MR. MCCLAIN:  Yes, Your Honor.

11               THE COURT:  All right.  So that request is granted.

12   So -- and this is the amended joint stipulated exhibit list

13   dated October 2nd.

14               MS. ELLS:  That's correct.

15               THE COURT:  All right.  So if both authenticity and

16   admissibility are stipulated, those exhibits are admitted.

17               MS. ELLS:  That's -- well, that's our request.

18               THE COURT:  Yes.  They are admitted.

19               MS. ELLS:  Thank you.

20               THE COURT:  So I'm letting Ms. Schultz know that.

21        Is that sufficient direction for you, Ms. Schultz, to note

22   for your purposes?

23               THE CLERK:  Yes, Your Honor.

24               THE COURT:  All right.  And the parties can always

25   check with Ms. Schultz if they want to make certain they agree

1  with her record of the list.

2          MR. MCCLAIN:  Okay.

3          THE COURT:  All right.  You may swear the witness.

4          THE CLERK:  Please stand up.  Raise your right hand.

5      (The Witness, Angela Ponciano, is sworn.)

6          THE WITNESS:  I do.

7          THE CLERK:  Thank you.  You may be seated.

8      Will you please say and spell your first and last name for

9  the record.

10          THE WITNESS:  Angela Ponciano, A-N-G-E-L-A

11  P-O-N-C-I-A-N-O.

12          THE COURT:  You may proceed.

13                       DIRECT EXAMINATION

14  BY MR. MCCLAIN:

15  Q.  Good afternoon, Ms. Ponciano.

16      Can you please tell us what is your current job?

17  A.  I'm currently the Deputy Director of Business Services for

18  the California Correctional Health Care Services, CCHCS.

19  Q.  Okay.  And can you tell us, what is CCHCS?

20  A.  California Correctional Health Care Services, who provides

21  health care services to California's incarcerated population.

22  Q.  And who do you report to?

23  A.  I report to Lara Saich, the Director of Health Care Policy

24  and Administration.

25  Q.  And who does Ms. Saich report to?

1    A.   She reports to Diana Toche and Clark Kelso.  It's a dual

2    reporting relationship because of the receivership in Plata.

3    Q.   And who is Diana Toche?

4    A.   Diana Toche is the Undersecretary of Health Care for

5    California Department of Corrections and Rehabilitation.

6    Q.   And who is Clark Kelso?

7    A.   Clark is the court-appointed receiver from Plata.

8    Q.   How long have you worked for CCHCS?

9    A.   I've been in my current position since November of 2020.

10   And prior to that, I was the Associate Director for CDCR's

11   statewide mental health program from about 2014 to November

12   of 2020.

13   Q.   And what did you do as associate director from 2014 to

14   2020?

15   A.   I was responsible for all of the mental health programs,

16   staffing allocations, and adjustments that occurred twice a

17   year.  I also was responsible for all of the staffing plans and

18   proposals.  I oversaw bed planning, bed activations, other

19   programmatic and operational activations.  I was part of the

20   original planning for the crisis bed unit at CIM.  And I also

21   worked very closely with the Special Master team on monitoring

22   tours and various policy development.

23   Q.   And what are your duties in your current role as Deputy

24   Director of Business Services?

25   A.   I currently oversee four programs in Business Services.

1    First is business operations, which we're responsible for all

2    of the headquarters, Elk Grove building, and regional office

3    building operations, mail services, reprographics, business

4    continuity.

5        The second program I oversee is acquisition management, who

6    is responsible for non -- all non-IT procurements of goods and

7    services for CCHCS.

8        The third program is my health care invoicing section, who

9    is responsible for the development and submittal of all claims

10   for all health care providers, physicians, and all of the

11   health care contracts.

12       And the last program is the direct care contract section,

13   who is responsible for all of the direct medical, mental

14   health, and dental health care contracts, which includes the

15   specialty network with Health Net for all of the specialty

16   medical services, as well as the registry network contracts.

17   Q.  Okay.  Can you please describe, generally, for us the role

18   of registry contracts in staffing CDCR's mental health program?

19   A.  The registry contract is there to provide temporary service

20   -- staffing services behind vacant positions in the mental

21   health program as a result of resignations, retirements, and

22   staff out on long-term leave.

23   Q.  And are positions permanently filled with registry staff?

24   A.  No.  They are temporary in nature.  And institutions can

25   request a specified amount of time, again, if they have staff

1    out on long-term leave.  And providers that are submitted by

2    Management Solutions also can specify a period of time that

3    they wish to work in that assignment.

4    Q.  Are there any differences in the duties between a registry

5    provider and a civil service provider?

6    A.  No.

7    Q.  Does CCHCS have a preference of filling positions with

8    either registry staff or civil service providers?

9    A.  Yes.  The preference is to fill positions with civil

10   service providers as those are permanent in nature and provide

11   for a more stable, steady workforce in the institutions.

12   Q.  Does registry generally cost more or less than civil

13   service providers?

14   A.  The cost of the registry contract does cost more than civil

15   service providers.  We pay the actual contractor as well as the

16   provider, which is part of the reason for the cost is higher.

17   Q.  Setting aside CDCR's mental health registry for a moment,

18   in general, do registry health care providers cost more than

19   permanent employees?

20   A.  Yes.  The work of a registry provider is temporary in

21   nature, and so typically they are paid at a higher rate.  Their

22   tenure in an assignment can end at any given notice.  There is

23   no guaranteed minimum term of an assignment, so they don't have

24   any stability.  And they often travel to work at the

25   assignments in which they choose to work in.

1    Q.   Okay.  You mentioned that you oversee registry network

2    contracts.  What is a registry network contract?

3    A.   A registry network contract is a contract with one

4    contractor, who then provides a supply of vendors that can

5    submit and provide the health care resources needed.

6         It also simplifies the process for the institutions in

7    which they can go into one electronic system to submit an order

8    with one contractor rather than having to submit numerous

9    orders with numerous vendors.

10   Q.   How many registry network contracts do you oversee?

11   A.   Two.

12   Q.   And what are those two contracts?

13   A.   The dental and mental health registry network contract and

14   the medical registry network contract.

15   Q.   Okay.  Is it okay with you if I refer to the dental and

16   mental health registry network contract as the mental health

17   registry contract?

18   A.   Yes.

19   Q.   Okay.  And is it okay with you if I refer to the medical

20   registry network contract as the medical registry contract?

21   A.   Yes.

22   Q.   Okay.  Who are those two contracts with?

23   A.   They are both with -- Management Solutions is the name of

24   the contractor.

25   Q.   Okay.  And what is Management Solutions?

1  A.  Management Solutions is a company that provides temporary

2  health care staffing resources to various health care

3  organizations.  And they've been in the business for over ten

4  years and are experienced at providing temporary staffing.

5  Q.  Okay.  What is the term of the current mental health

6  registry contract with Management Solutions?

7  A.  The term -- the contract was awarded in May of 2022, which

8  is when the term started.  And the contract is set to expire in

9  April of 2025, but we have three optional years to extend.

10  Q.  And what is the term of the current medical registry

11  contract with Management Solutions?

12  A.  The medical registry contract went into effect in 2014.  It

13  was set to expire in 2020, but the receiver has extended that

14  contract each year.

15  Q.  Okay.  And do you understand that the proceeding here today

16  concerns five different classifications?

17  A.  Yes.

18  Q.  And what are those?

19  A.  Psychiatrists, psychologists, clinical social workers,

20  recreational therapists, and medical assistants.

21  Q.  And do you understand that the proceeding here today

22  concerns the provision of health care in the outpatient setting

23  and not in the psychiatric inpatient units?

24  A.  Yes.

25  Q.  Okay.  So with respect to the five classifications that are

1  at issue, which of those fall under which of those two

2  different registry contracts?

3  A.  Psychiatrists, psychologists, licensed clinical social

4  workers, and recreational therapists are part of the mental

5  health registry network contract, and medical assistants are

6  part of the medical registry network contract.

7  Q.  Okay.  You mentioned before that you oversee the mental

8  health registry contract.  What does that entail?

9  A.  That entails -- I have a team that is responsible for the

10  contract.  We oversee the development of the bidding process as

11  new contracts need to come into play.  We oversee the actual

12  bidding process, the award of the actual contract.  And we

13  monitor their contract requirements and the performance by the

14  contractor thereafter.

15  Q.  And with respect to the medical registry contract, are your

16  duties the same or different?

17  A.  They're the same.

18  Q.  Under the -- these registry contracts, what are the

19  institutions' general obligations?

20  A.  The institutions are responsible to submit the orders for

21  the registry need behind vacancies.  They are also responsible

22  to review and accept candidates that are submitted by the

23  contractor.  And once a provider is submitted, they're

24  responsible for ensuring the on-site gate clearance and Live

25  Scan processes run smoothly.

1          Once a provider starts, they're responsible for the

2     onboarding, as well as the ongoing timely submittal and review

3     of the provider's time sheets.

4     Q.  And do you monitor those activities to make sure that

5     they're happening?

6     A.  Yes.  My team does monitor those activities so they can

7     intervene if we see delays.

8     Q.  And what are Management Solutions' general obligations

9     under these registry contracts?

10    A.  Management Solutions is responsible to submit providers as

11    the orders come in from the institutions.

12    Q.  And do you monitor Management Solutions' efforts to fulfill

13    its obligations?

14    A.  Yes, we do.

15    Q.  Do you have periodic meetings with Management Solutions?

16    A.  Yes.  My team -- my registry network team meets with

17    Management Solutions on a biweekly basis, and I regularly

18    attend those meetings.  And the majority of the institutions

19    have a monthly meeting with my team and Management Solutions to

20    discuss local registry issues as well.

21    Q.  What types of things are discussed at these periodic

22    meetings with management solutions?

23    A.  We will regularly look at aging order data.  We look at

24    specific institution needs and/or issues with provider

25    submittals, any delays in processes that are on the

1    contractor's side as well as the institution's side.  It is

2    really to ensure we are communicating and collaborating to get

3    providers onboard as soon as possible.

4    Q.  Okay.  You just mentioned something called aging order

5    data.  What is that?

6    A.  That is the period of time from when an order is submitted

7    and it has -- a provider has yet to be submitted by Management

8    Solutions, so that order remains unfilled.  And so we track the

9    number of days that those orders are unfilled.

10   Q.  Do you work with CCHCS's human resources department?

11   A.  Yes.  My team and I work regularly with human resources to

12   ensure that we are tracking upcoming resignations, as well as

13   retirements and staff out on leave so that we can ensure we

14   have the appropriate number of orders to match the vacancies.

15   Q.  And who from CCHCS human resources do you work with?

16   A.  I mostly work with Deputy Director Jasinda Muhammad, as

17   well as her assistant deputy directors and the chief of the

18   Centralized Hiring Unit.

19   Q.  Okay.  Can you please give us a high level overview of the

20   process for filling mental health vacancies using the registry

21   contracts.

22   A.  So typically, an institution will submit an order for a

23   need behind a vacancy.  And Management Solutions would then

24   provide -- submit a provider to fill that order.  The

25   institutions review and accept the candidate.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1       And then the other processes follow to get that candidate

2   on board.  That includes the credentialing, gate clearance,

3   Live Scan process, and those processes all mirror the same as

4   when hiring a civil service mental health provider.

5   Q.  Okay.  And how do the institutions submit an order for

6   registry services?

7   A.  It is done through an electronic system called StafferLink,

8   which is Management Solutions' electronic system for submitting

9   orders.

10  Q.  And how are you and your team involved in this process of

11  filling vacant positions with registry?

12  A.  My registry network team manages the process.  They oversee

13  and ensure -- monitor the progression of all of the steps

14  required to get a provider on board.

15  Q.  What happens if there are issues in that process or

16  problems?

17  A.  If things can't get resolved at the local level, the issues

18  will get raised to my senior managers.  If it still can't get

19  resolved, I will regularly work with the institution's CEO.  If

20  needed, I go to the regional health care executives.  And for

21  issues on the contractor side, I regularly work with the

22  president of Management Solutions.

23  Q.  Okay.  From the point in time when Management Solutions

24  submits a potential registry provider to the point in time when

25  that provider actually starts working at the prison, what does

1    that time frame look like?

2    A.  Currently it is taking less than 60 days for all five of

3    the classifications that we're discussing today.

4    Q.  And are -- do institutions ever submit orders to Management

5    Solutions for registry providers before the positions are

6    actually vacant?

7    A.  Yes.  We confirm with human resources of a retirement date,

8    as well as if somebody has requested to go out on leave and/or

9    a resignation, because we do know that it could take up to 60

10   days from the time of submittal to a start date.  We do allow

11   the orders to be submitted so that Management Solutions can

12   begin its recruitment to fill that upcoming vacancy.

13   Q.  And during that period of time, which I think you said is

14   less than 60 days, what types of things are happening during

15   that period before the registry provider actually starts

16   working at the prison?

17   A.  Again, it's all of the same steps and processes of civil

18   service in regards to the credentialing.  The provider has to

19   submit all of the documentation required for credentialing, as

20   well as the documentation for the local gate clearance process,

21   Live Scan, and those steps as well.

22   Q.  Under the contracts with Management Solutions, what is a

23   registry rate?

24   A.  A registry rate is the amount that we pay to the contractor

25   for supplying a provider.  And that rate is inclusive of an

1    overhead that Management Solutions keeps, as well as the rate

2    to the provider.

3    Q.   Okay.  So Management Solutions takes a part of that rate?

4    A.   Correct, yes.

5    Q.   Are there any restrictions on how much of the rate that

6    Management Solutions can take?

7    A.   Yes.  In the mental health registry contract, there is an

8    overhead restriction, and for each classification, an overhead

9    rate is determined.

10   Q.   If it wants to, can Management Solutions -- can it pay more

11   than the minimum rate to the registry provider?

12   A.   Yes.  So currently, the overhead is restricted, so it would

13   leave a minimum rate that a provider would actually get.

14   Management Solutions does, at its discretion, have the ability

15   to take less of an overhead, which would then increase the

16   minimum rate that the provider receives.

17   Q.   And does that ever happen?

18   A.   Yes.  I am aware of instances in which Management Solutions

19   indicated they have done that.

20   Q.   Does the -- do the contracts with Management Solutions have

21   any terms that ensure that competitive rates are being offered

22   to the providers?

23   A.   Yes.  In the actual scope of work of the contract, it does

24   state that Management Solutions is required to offer a

25   comparable rate to the marketplace for registry.

1    Q.  Are the rates offered under the contracts with Management

2    Solutions ever above community registry rates?

3    A.  Yes.  There are many factors that are taken into account as

4    rates are determined for the mental health contract.  That

5    takes into account the geographic location, the population --

6    the patient population in which they'll be serving, the work

7    environment in which they will be providing services in an

8    institution.  Those are all factors taken into account when

9    determining the rate, as well as the fact that the majority of

10   these providers are traveling to provide these services and the

11   fact that it's temporary in nature.

12   Q.  And taking into consideration all of those factors that you

13   just mentioned, is the result that registry rates are sometimes

14   above community registry rates?

15   A.  Yes.

16          MS. YELIN:  Objection.  Leading.

17          THE COURT:  Sustained.  So that exchange is stricken.

18      You can rephrase.

19          MR. MCCLAIN:  Okay.

20   Q.  BY MR. MCCLAIN:  Do you know if the registry rates offered

21   under the Management Solutions contracts are ever above

22   community rates?

23   A.  Yes.  Management Solutions does offer higher rates when you

24   take all of the factors into consideration.

25   Q.  Are you familiar with the concept of registry tiers --

1  that's T-I-E-R-S -- as it relates to the contracts with

2  Management Solutions?

3  A.  Yes.

4  Q.  Under the Management Solutions registry contracts, how are

5  registry tiers used?

6  A.  Tiers are used for each of the classifications.  A specific

7  rate is identified in each tier, and each institution is

8  assigned a tier for each classification.

9  Q.  And is there only one tier for each classification?

10 A.  No.  In psychiatry, we have eight tiers; in psychology, we

11 have five tiers; licensed clinical social worker and

12 recreational therapist have three tiers; and medical assistants

13 have ten tiers.

14 Q.  And are there any advantages to this tiered approach to

15 these registry contracts?

16 A.  Yes.  It allows us the flexibility to move institutions

17 into different tiers as we see changes in the community

18 registry rates or other programmatic factors which would result

19 in a higher rate.

20 Q.  And how would you go about modifying a rate under the

21 contract?

22 A.  The contract would be amended in order to change an

23 institution from one tier to another.

24 Q.  Okay.  Under the current mental health registry contract,

25 for each institution, how is it decided in which tier each

1    classification would be placed?

2    A.   That was determined at contract award between my direct

3    care contracts team, as well as the mental health program

4    leadership and Management Solutions.

5         And they looked at a number of factors.  They looked at

6    what tiers the institutions were in at the prior contract; they

7    looked at a point in time of the aging order data; they looked

8    at vacancies and how long the vacancies had been at

9    institutions; and with those factors, they then placed the

10   institutions in the various tiers.

11   Q.   And are -- the tier assignments under the contracts, are

12   they permanent throughout the duration of the contract?

13   A.   No.  Again, we can amend the contract to move various

14   institutions by classification into various tiers.

15   Q.   And what are some reasons that an amendment like that might

16   be made?

17   A.   Could be a change in the community rates and what our team

18   sees or Management Solutions reports.  Again, the contract

19   requires that they offer a comparable, competitive rate to the

20   marketplace, and so they are regularly doing that research.

21   And my team conducts an analysis twice a year to also look at

22   the competitiveness of our rates to the community.

23   Q.   Who has the authority to change the classification tier at

24   an institution under the contract?

25   A.   I am the authority to sign all of the contracts and

1    amendments.  I work closely with Deputy Director Dr. Mehta in

2    regards to the mental health program need to change any tiers

3    for any institutions or classifications.  And then we also work

4    with the fiscal office.

5    Q.  Has Management Solutions been able to fill all of the

6    orders for registry providers that the institutions have

7    submitted to it?

8    A.  No.

9    Q.  Does Management Solutions have an incentive to let you know

10   if the registry rates permitted under the contract are

11   preventing it from being able to offer providers to fill

12   positions?

13   A.  Yes.  For a few reasons.  One, they are a for-profit

14   company, and the more positions they fill, the more money they

15   make.

16       And, two, the contract which they signed includes in the

17   scope of work that they are to provide competitive rates with

18   the community marketplace.

19   Q.  Under the current Management Solutions mental health

20   registry contract, has Management Solutions ever advised you

21   that the rates offered are not competitive?

22   A.  No.

23   Q.  Has Management Solutions, under the current mental health

24   registry contract, ever advised you that the rates offered are

25   a barrier to it being able to offer providers to fill

1   positions?

2   A.  No.

3         MS. YELIN:  Objection.  Calls for hearsay.

4         THE COURT:  Your response to that?

5         MR. MCCLAIN:  Well, we're talking about reasonable

6   steps, and so I think that Management Solutions, a company that

7   has a lot of experience in filling positions with registry --

8         THE COURT:  Is it non-hearsay?

9         MR. MCCLAIN:  It's non-hearsay.  It's also -- it's

10  also not -- it's not an out-of-court statement because her

11  response was that Management Solutions has never said this to

12  her.

13        THE COURT:  Well, the objection stands.  If need be,

14  I'll resolve the matter in issuing a final order in this

15  matter.

16     You may proceed.

17  Q.  BY MR. MCCLAIN:  Okay.  Ms. Ponciano, with respect to the

18  current mental health and medical registry contracts, in your

19  view, have all reasonable steps been taken to offer competitive

20  registry rates?

21        MS. YELIN:  Objection.  Calls for a legal conclusion.

22        THE COURT:  I'm sustaining that to the extent the

23  question seeks a legal conclusion.

24     But you may answer as a lay witness, not an attorney, to

25  the extent you're able.

1           THE WITNESS:  Yes.

2    Q.  BY MR. MCCLAIN:  Okay.  Ms. Ponciano, switching gears a

3    little bit.  You mentioned previously that the term of the

4    current Management Solutions mental health registry contract

5    began in May 2022, right?

6    A.  Correct.

7    Q.  Was there a different mental health registry contract in

8    place before that date?

9    A.  Yes.  The prior contract was awarded in May of 2017 and

10   expired in April of 2022.

11   Q.  And when did the current mental health registry contract go

12   through the bidding process?

13   A.  The bidding process began in 2021.

14   Q.  Ms. Ponciano, have you prepared a summary that compares the

15   registry rates, for the five positions that we're talking about

16   today, from the 2017 contract with the registry rates offered

17   under the 2022 registry contract?

18   A.  Yes.

19   Q.  Okay.  I'm going to show you what's been previously marked

20   as Defendants' Exhibit 20.

21       And the parties have stipulated to this exhibit being

22   admitted.

23           THE COURT:  All right.

24   Q.  BY MR. MCCLAIN:  What is this document, Ms. Ponciano?

25   A.  This is a document that I asked my team to create that

1  provides the tiers in comparison from the prior 2017 contract,

2  and those were the tiers at the end of the contract compared to

3  the tiers in the -- in the current contract.

4  Q.  Okay.  And is this a true and accurate summary of the rates

5  from the two contracts?

6  A.  Yes.

7  Q.  What did you -- the -- there are several charts on this

8  document.  What does the -- the first column of these charts

9  show?

10 A.  It shows the classification.

11 Q.  And I see some -- in the rows under the classification,

12 what do those rows show?

13 A.  It shows the tiers as well.

14 Q.  Okay.  And what does the second column in these charts

15 show?

16 A.  It shows the rate at the end of the 2017 registry

17 contract --

18 Q.  And --

19 A.  -- for each of the tiers.  Sorry.

20 Q.  And for the -- the charts that have a third column, what

21 does that column show?

22 A.  That shows the rates -- I'm sorry -- the tiers in the

23 current contract.

24 Q.  Okay.  Let's look at the chart for psychiatrists.

25     Did the psychiatrists' rates change for the various tiers

1   from the 2017 contract to the 2022 contract?

2   A.  No.

3   Q.  And why not?

4   A.  In April of 2020, there was an amendment to the prior

5   contract that added additional tiers with higher rates for

6   psychiatry.  And at the time of the rate analysis for the new

7   contract, when that occurred, it was determined that the rates

8   that were added in April of 2020 were still competitive and at

9   or above the community registry rates, so they stayed the same.

10  Q.  Okay.  Let's look at the rates for psychologists.

11      How did the rates change for the various tiers from 2017 to

12  2022?

13  A.  They were increased.

14  Q.  And can you tell us, for each of the tiers, what the

15  increase was?

16  A.  Tier 1 went from $90 to $140.  Tier 2 went from 100 to 153.

17  Tier 3 went from 120 to 168.  Tier 4 went from 140 to 193.  And

18  Tier 5 went from 155 to 200.

19  Q.  Okay.  Let's look at the chart for social workers.

20      How did the rates change from the 2017 contract to the 2022

21  contract for social workers?

22  A.  Those rates also increased.

23  Q.  And, again, could you take us through the different tiers.

24  A.  Tier 1 went from 64 to 103.  Tier 2 went from 73 to 113.

25  And Tier 3 went from 86 to 128.

1    Q.   Okay.  And let's look at the chart for recreational

2    therapists.  How did those rates change between the two

3    contracts?

4    A.   They increased as well.  Tier 1 went from 57 to 92.  Tier 2

5    went from 67 to 100.  And Tier 3 went from 79 to 115.

6    Q.   Okay.  And why were the rates increased for psychologists,

7    social workers, and recreational therapists?

8    A.   When the rate analysis was conducted, prior to the new

9    contract, there had been a rate increase identified as things

10   had shifted through the pandemic.  There was an increased

11   demand for psychologists and social workers, and the rates had

12   increased accordingly.  And there were also changes in the

13   working conditions in which telemental health was being offered

14   to providers as well.

15   Q.   And I just want to make sure I understand.  When you said

16   that -- you said that something had risen, were you talking

17   about the community registry rates?

18   A.   Yes.  All of the factors identified impacted the community

19   rates, which were increased.

20   Q.   Okay.  Now let's look at the last chart on this exhibit,

21   which is for medical assistants.

22       And for this one, there is only one column that shows

23   rates.  Why is that?

24   A.   There is only one contract.  The contract has not -- again,

25   we don't have a new contract yet.  So it's just the one

1   contract, and we've amended it over time to add tiers.

2   Q.  And have registry rates for medical assistants gone up over

3   time?

4   A.  Yes.  We originally, in 2014, had the institutions at Tier

5   1, which was at $22 an hour.  And currently, the majority of

6   the institutions are between 33 and $42 an hour.

7   Q.  And why have the medical assistant rates been increased?

8   A.  Also to stay competitive and comparable with the community

9   registry rates for the nursing classifications.

10  Q.  Okay.  Turning back to the current mental health registry

11  contract, have there been any changes to that contract since it

12  began in May of 2022?

13  A.  Yes.  In October of 2022, there was an amendment to fix a

14  typographical error that was in the original contract for the

15  psychiatry rate at Mule Creek.  And then the contract was

16  amended in April of 2023 to move institutions into -- a few

17  institutions into a higher tier for psychiatrists,

18  psychologists, and licensed clinical social worker.

19  Q.  Okay.  Do you recall how many institutions were moved to

20  higher -- a higher psychiatry tier?

21  A.  Four institutions.

22  Q.  Okay.  And how many institutions were moved to a higher

23  psychology tier?

24  A.  14.

25  Q.  And how many institutions were moved to a higher social

1    worker tier?

2    A.   7.

3    Q.   And those higher tiers that they were moved to equate to a

4    higher rate?

5    A.   Correct.  Yes.

6    Q.   And why were those raises and rates made at those

7    institutions in April of 2023?

8    A.   In February of 2023, Deputy Director Dr. Mehta had reached

9    out to me to discuss some programmatical operational things

10   occurring in the mental health program and wanted to discuss

11   raising rates at some of the institutions.

12       There was an effort to reopen the crisis bed unit at CCWF.

13   There was an increased need at reception centers.  There were

14   some institutions that had increases in their EOP population or

15   were going to be opening an EOP program, and so we discussed

16   some of those programmatic things that were occurring that

17   required some additional resources and amended the contract

18   accordingly.

19           THE COURT:  We should take a break.  Is now a good

20   time?

21           MR. MCCLAIN:  It is a good time.

22           THE COURT:  Let's take a 15-minute break.  Come back

23   at 2:45.

24       (Recess taken, 2:29 p.m. - 2:49 p.m.)

25           THE COURT:  You may be seated.

1          And you may continue.

2               MR. MCCLAIN:  Thank you.

3   Q.  BY MR. MCCLAIN:  Okay, Ms. Ponciano, we're going to switch

4   subjects.  I would like to ask you some questions about

5   registry funding.

6          How is mental health registry funded?

7   A.  There are two sources of funding.  The primary source is

8   salary savings, and the secondary source is a -- an amount

9   that's specified as a mental health registry budget line item

10  in the governor's budget.

11  Q.  And what are salary savings?

12  A.  Salary savings -- each position receives a budget

13  allocation for all mental health positions in the budget, and

14  for positions that are vacant, the money not used to pay the

15  civil service salary is considered salary savings.

16  Q.  And when was a line item first included in the State's

17  budget for mental health registry providers?

18  A.  The first budget line item I'm aware of was from fiscal

19  year 2018/'19, and there has been a budget and line item since

20  that time.

21  Q.  How much funding did those line items provide for mental

22  health registry?

23  A.  Fiscal year 2018/'19 and '19/'20 was 18.1 million, and

24  fiscal years 2021 -- '21/'22, '22/'23 was 13.3 million.

25  Q.  And are those line items in the budgets for mental health

1  registry -- are those -- that funding only for the five

2  classifications that we're talking about here today, or is it

3  for other classifications -- other mental health

4  classifications?

5  A.  I believe it's for mental health registry.  The line item

6  does not specify classification.

7  Q.  And what is the -- what is the line item budget amount for

8  the current fiscal year for mental health registry?

9  A.  The 13.3 million.

10  Q.  And is that -- that line item of 13.3 million, is that

11  enough to cover all registry costs?

12  A.  No.  It's not even close.  The majority of the registry

13  expenses comes from salary savings.

14  Q.  And why is the current line item amount for mental health

15  registry only 13.3 million if it's clear that that won't be

16  enough to cover all registry costs?

17  A.  Because the primary source of registry funding is salary

18  savings.

19  Q.  Okay.  Ms. Ponciano, for the period from fiscal year 2018

20  to 2019 through fiscal year 2022/'23, do you know how much was

21  spent on mental health registry for the five classifications?

22  A.  Yes.  I asked my health care invoicing team to put together

23  a summary of the expenses for registry for the five

24  classifications for the five fiscal years.

25  Q.  And what was their source of data?

1   A.   The data source is all of the invoices from the registry

2   contractor.

3   Q.   And have you prepared a document that summarizes those

4   registry expenditures?

5   A.   Yes.

6   Q.   Ms. Ponciano, I'm going to show you what has been marked as

7   Defendants' Exhibit 22.

8        What is Defendants' Exhibit 22?

9   A.   This is a summary prepared by my team that provides the

10  mental health registry expenditures for psychiatry, psychology,

11  social worker, recreational therapy, and medical assistant for

12  the five fiscal years, fiscal year 2018/'19 all the way through

13  fiscal year '22/'23.

14  Q.   And is this a true and accurate summary of the registry

15  expenditures?

16  A.   Yes.

17  Q.   On Exhibit 22, let's look at the row titled Registry

18  Expenditures and then, in parentheses, not including PIP

19  registry.

20       What does that row represent?

21  A.   That row represents the expenditures for the five

22  classifications, excluding those classifications that were

23  working in the psychiatric inpatient programs.

24  Q.   And can you please tell us, for each of those five fiscal

25  years, how much was spent on registry for the five

1    classifications, excluding the psychiatric inpatient program.

2    A.   In fiscal year 2018/'19, the expenditures were 58,333,817.

3    For fiscal year '19/'20, 60,021,326.  Fiscal year 2021,

4    69,658,398.  Fiscal year '21/'22, 64,446,239.  And fiscal year

5    '22/'23, 78,801,068.

6    Q.   And can you tell us what the total amount of registry for

7    mental health -- excuse me -- for mental health providers,

8    excluding the psychiatric inpatient units, can you tell us what

9    the total was for that five years?

10   A.   For these five classifications, it was 331,260,848.

11   Q.   Okay.  And what does the row entitled PIP registry

12   expenditures show?

13   A.   That shows the registry expenditures for these five

14   classifications in the psychiatric inpatient programs.

15   Q.   And for the five years that we're discussing, what was the

16   total amount spent on mental health staff for psychiatric

17   inpatient units?

18   A.   112,044,501.

19   Q.   And for the five-year period we're talking about, what was

20   the total combined, so both the psychiatric inpatient unit and

21   the outpatient care, what was the total mental health registry

22   cost?

23   A.   For the five classifications, it was 443,305,349.

24   Q.   Okay.  And does that figure include all expenditures for

25   mental health registry --

1    A.   No.

2    Q.   -- during the five-year period?

3    A.   I'm sorry.

4         No, it does not.  It includes for these five

5    classifications.  There are other mental health registry

6    nursing classifications that are not included in this.

7    Q.   And I think you mentioned that for the current fiscal year,

8    there is, again, a line item for 13.3 million for registry; is

9    that right?

10   A.   Yes.

11   Q.   And for the current fiscal year, where will the additional

12   registry funding come from?

13   A.   Salary savings.

14   Q.   Okay.  Switching gears, Ms. Ponciano, do you keep track of

15   registry hires under the current mental health registry

16   contract?

17   A.   Yes.  I have monitored the performance of the new contract,

18   and I have requested my team provide me a biweekly report that

19   identifies the number of registry providers brought on board.

20   Q.   And what is your -- why does your team prepare that report?

21   A.   I wanted to be able to measure the -- the performance and

22   the results of the new contract, specifically with the new

23   rates for psychologists, licensed clinical social workers, and

24   recreational therapists.

25   Q.   Okay.  Ms. Ponciano, I'm going to show you what has been

1    marked as Defendants' Exhibit 21.

2        What is Defendants' Exhibit 21?

3    A.  This is the biweekly report sent to me by my registry team.

4    Q.  And does this report usually come to you as an e-mail?

5    A.  Yes.

6    Q.  And is Exhibit 21 a true and correct copy of the biweekly

7    report from just last month, mid-September?

8    A.  Yes.

9    Q.  Okay.  Ms. Ponciano, this report has some charts, and I'd

10   like to skip down to the -- the first chart.  And that chart is

11   entitled Providers Started.

12       What does this chart show?

13   A.  This chart identifies the institution; it also identifies

14   four classifications -- licensed clinical social worker,

15   psychologist, psychiatrist, recreational therapist -- and the

16   total number of registry providers that have started since the

17   new contract went into effect.

18   Q.  Skipping to the bottom row of this first chart.

19       What does that bottom row show?

20   A.  It provides the total of providers started by

21   classification, as well as a grand total of all providers.

22   Q.  Okay.  Could you please tell us, for each of the four

23   providers represented here, how many hires there have been as

24   of mid-September under the current mental health registry

25   contract?

1  A.  Yes.  For licensed clinical social workers, we've had 56

2  providers start.  Psychologists, we've had 76.  Psychiatrists,

3  we've had 75.  Recreational therapists, we've had 50.  For a

4  total of 257 registry providers.

5  Q.  Okay.  Thank you.

6     Skipping down to the next chart entitled Providers in

7  Process.  What does this chart show?

8  A.  This chart, again, provides the institutions, the four

9  classifications, and a grand total.  And what it provides is

10 the number of providers that are in one step of the process of

11 starting.  So Management Solutions has identified a provider,

12 and they are in one of the various steps in process of pending

13 a start date.

14 Q.  Okay.  But they haven't actually started yet?

15 A.  No.

16 Q.  And what are the total number of registry -- potential

17 hires that are still in process -- or were still in process as

18 of mid-September?

19 A.  46.

20 Q.  And skipping down to the next chart, which is entitled

21 Providers Ended.  What does this chart show?

22 A.  This chart identifies the number of providers who -- in the

23 four classifications by institution, that have ended their

24 assignment.  So they either ended it on their own, the term of

25 the assignment which they committed to had ended, or the

 1    institution ended their assignment.

 2        So there is various reasons why a provider's assignment

 3    could be ended, but this shows how many of those assignments

 4    ended during this same period of time.

 5    Q.  Okay.  And what is the total number of assignments that

 6    have ended?

 7    A.  57.

 8    Q.  All right.  Let's now skip down to the -- the last -- I'll

 9    call it a graph on your biweekly report.  The graph is entitled

10    Provider Starts Over Time.  What does this show?

11    A.  This is a graph that provides a cumulative look at the

12    number of providers that have started in the four

13    classifications since July 2022.

14    Q.  And you said that this -- this graph shows the cumulative

15    number, right?

16    A.  Correct, yes.

17    Q.  And what do you mean by that?

18    A.  Meaning when you look at any of the given dates identified

19    on the graph, the number associated with that is the total

20    number that have started.

21    Q.  Okay.  So let's look at the last date at the bottom of this

22    graph, which is September 18, 2023.  And let's look at

23    psychologists, which are represented with an orange color.

24        What does this show for psychologists as of September 18,

25    2023?

1    A.  76 providers had started as of that date.

2    Q.  And that means, as of that date, since the beginning of the

3    contract?

4    A.  Yes.  Since the first date on the chart is -- that date --

5    started July 25, 2022, yes.

6    Q.  How did the hiring rates under the current mental health

7    registry contract compare to the hiring rates under the

8    previous mental health registry contract?

9    A.  I specifically looked at the hiring rates for psychologists

10   and licensed clinical social worker.  Doing that comparison and

11   in looking at the last year of the prior contract compared to

12   the first year of the new contract, the rate of hire was

13   significantly increased.

14   Q.  Under the new contract?

15   A.  Under the new contract, yes.

16   Q.  And what do you attribute to that increase in hiring?

17   A.  For a few reasons.

18       One, the new contract now has the rates that are comparable

19   and competitive in the marketplace for registry for

20   psychologists and licensed clinical social workers.

21       And, two, the demand is higher.  So the rate of hire is

22   also reflective to the increased number of orders for those

23   classifications.

24   Q.  With respect to CDCR's efforts to fill vacant mental health

25   positions, how important is registry?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    A.  Registry is very crucial in providing temporary relief

2    staff while human resources is recruiting to fill the positions

3    -- the vacancies with permanent civil service staff.

4    Q.  And in your view, has CDCR taken all reasonable steps to

5    fill vacant positions with registry providers?

6              MS. YELIN:  Objection.  Calls for a legal conclusion.

7              THE COURT:  Same ruling as previously.

8    No legal conclusion will be accepted here, but you may

9    respond as you're able as a lay witness.

10              THE WITNESS:  Yes.

11    Q.  BY MR. MCCLAIN:  Ms. Ponciano, why are all registry

12    providers not simply paid at the highest tier under the

13    contract?

14    A.  There is a few reasons.

15         One, in my role, I am responsible to be a good steward of

16    taxpayer dollars.  And it has not been proven that having every

17    institution, or certain institutions, at the highest tiers

18    necessarily fills all vacancies.

19         Also, the nature of this provider is temporary in nature.

20    So each position, again, does not come with a guaranteed amount

21    of time.  And over half of these providers travel from out of

22    state to come work in the institutions; it is not where they

23    live.

24         So there is a number of reasons that, you know, paying the

25    highest tier doesn't necessarily bring all providers.  There

1    are numerous factors for this specific type of provider.

2       There is also changes in the working conditions since the

3    pandemic, in which many organizations offer a telemental health

4    positions, and providers are able to do the work from their

5    homes.

6    Q.  And, Ms. Ponciano, based on your experience in your current

7    role and your work with these registry contracts, what have you

8    learned about the current market for mental health care

9    registry providers?

10   A.  I've learned that the demand has increased and that there

11   are numerous organizations all vying for the same candidates,

12   that the rates that we offer are typically above the community

13   marketplace for the registry providers, taking into account all

14   of the factors of working in a prison environment and the

15   geographical locations.

16   Q.  With respect to the current mental health registry

17   contract, is there any limit in the contract on the number of

18   orders for registry services that the institutions can submit

19   to Management Solutions?

20   A.  No.  In fact, we monitor and regularly ensure that the

21   number of orders matches the number of vacancies.

22   Q.  Does the geographical location of institutions affect the

23   ability to fill positions with registry?

24   A.  Yes.  Again, this type of provider, a traveling mental

25   health provider, we have over half of them travel from out of

1  state, and so it's easier to recruit in some of the more

2  populated areas with major airports.

3  Q.  Okay.  And you just mentioned that over half of the mental

4  health registry providers that you've been talking about travel

5  from outside of California and come to California to work in

6  CDCR's prisons?

7  A.  Yes.

8  Q.  And what is -- what, if anything, does that tell you about

9  the rates that are offered under the current mental health

10  registry contract?

11  A.  That our rates are, in fact, competitive and comparable and

12  are drawing in the traveling mental health provider candidates

13  that are specific to this type of temporary relief position.

14  And Management Solutions continues to provide a consistent and

15  steady number of submissions, as shown in the report.

16          MR. MCCLAIN:  Okay.  Thank you, Ms. Ponciano.  That's

17  all I have for you right now.

18          THE WITNESS:  Thank you.

19          THE COURT:  All right.  Cross.

20                      CROSS-EXAMINATION

21  BY MS. YELIN:

22  Q.  Good afternoon.

23  A.  Good afternoon.

24  Q.  Can you confirm how to pronounce your last name, please.

25  A.  Ponciano.

1    Q.  Ponciano.  Okay.

2        And, Ms. Ponciano, you said that you're the Deputy Director

3    of Business Services for CCHCS, correct?

4    A.  Yes.

5    Q.  And you've been in that position since November 2020?

6    A.  Yes.

7    Q.  And your prior position was from 2014 to 2020, correct?

8    A.  Yes.

9    Q.  When you were under direct examination, you and defense

10   counsel were using the term Management Solutions mental health

11   registry contract to talk about the dental and mental health

12   registry network contract, correct?

13   A.  Yes.

14   Q.  Can we use the same terminology here?

15   A.  Yes.

16   Q.  Okay.  So the current contract with Management Solutions

17   for mental health staffing was entered in 2022, correct?

18   A.  Yes.

19   Q.  And the one prior was entered in 2017?

20   A.  Yes.

21   Q.  And the original term of that 2017 contract was through

22   April 30, 2020, correct?

23   A.  Yes.  With an option to extend the two additional years.

24   Q.  Right.  So CCHCS had the option to either negotiate a new

25   contract in 2020 or take those optional extension years for two

1    years?

2    A.  Correct.

3    Q.  And CCHCS decided to extend the contract for both of the

4    optional extension years, correct?

5    A.  Yes.

6    Q.  So it did not negotiate any new contract with Management

7    Solutions in 2020?

8    A.  There was -- no, there was no new contract.

9    Q.  And you didn't seek any bids from any other contractors in

10    2020, correct?

11    A.  I -- again, I started in November of 2020.  And in

12    November/December of 2020, we did not, and I am not aware of

13    any solicitation prior to that.

14    Q.  Okay.  And I should be clear that when I say "you," I mean

15    CDCR and CCHCS.

16        But CCHCS did not seek bids from any other registry

17    contractors in 2020, correct?

18    A.  Correct.

19    Q.  Earlier, you were talking about the tier system for

20    registry rates.

21    A.  Yes.

22    Q.  So the way that that works is that there are different

23    tiers of rates for each classification under the registry

24    contract, correct?

25    A.  Yes.

1    Q.   So, for example, in the original three-year term of the

2    2017 contract with Management Solutions, there was a Tier 1

3    rate for psychologists of $75 per hour for the provider plus a

4    $15 overhead charge.  Does that sound right to you?

5    A.   It sounds about right.  I'd need to look at the actual

6    exhibit, but, yes, it sounds about right.

7    Q.   And there was a Tier 3 rate for psychologists of $105 per

8    hour plus a $15 per hour overhead amount under that 2017

9    contract.  Does that sound right to you?

10   A.   Sounds about right.

11   Q.   During that original three-year contract term, from 2017 to

12   2020, the rates that were provided to -- that were paid to

13   providers for each position within each tier remained the same,

14   correct?

15   A.   The minimum amount, when you take into account the

16   overhead, would have remained the same.  I can't speak to what

17   a provider was actually paid; I can only speak to what the

18   minimum allows in the contract.

19   Q.   Right.  But the minimum allowed under the contract remained

20   the same within each tier?

21   A.   Yes.

22   Q.   And during the two-year contract extension period, from

23   2020 to 2022, some of the tier rates remained the same from the

24   original three-year term, correct?

25   A.   Correct.

1   Q.   Earlier, you talked about registry providers as temporary

2   employees, right?

3   A.   Yes.  A registry, it's a temporary network, yes.

4   Q.   But some registry providers come and work at CDCR

5   institutions for years?

6   A.   There are some, yes.

7   Q.   You talked about the period of time that you expect

8   Management Solutions to take to fill a position under the

9   contract, and I believe you said that the expectation or -- and

10  you can correct me -- or the reality is that it should take

11  about 60 days for them to fill a position after an order has

12  been placed?

13  A.   No.  I didn't -- that -- that question was not about

14  filling an order.  That question was related to from the time a

15  provider is submitted to their actual start.

16  Q.   Start date.  Understood.

17  A.   Yes.

18  Q.   Thank you for that correction.

19  A.   Yes.

20  Q.   So that period of time between the order being fulfilled

21  and the provider starting is 60 days?

22  A.   No.  The contract indicates 30 days from the time of an

23  order to submittal, and 45 days for hard-to-recruit

24  institutions or classifications.

25  Q.   Are those periods of time calendar days or business days?

1    A.  We track them as calendar days.

2    Q.  Is that what the contract says?

3    A.  I'd have to look at the contract to see.

4    Q.  How many of the CDCR institutions are hard-to-recruit ones

5    that would qualify for that 45-day period?

6    A.  I don't have that in front of me, but I believe it is --

7    I'm going to say it's around 12 to 15 institutions.  And,

8    again, it could be by classification, not just institution.  So

9    I don't have that breakdown in front of me.

10   Q.  Understood.

11       Okay.  So a moment ago, you said that during the two-year

12   contract extension period from 2020 to 2022, some of the tier

13   rates for certain classifications remained the same from the

14   original 2017 contract, right?

15   A.  Yes.  The only tiers that had rates added in the prior

16   contract was psychiatry.

17   Q.  And what year was that?

18   A.  In 2020.

19   Q.  And within the tiers, the rates remained the same for many

20   classifications and many tiers under the -- during that

21   two-year contract extension period?

22   A.  That is -- yes, for that contract, all of the tiers

23   remained the same.  Whether or not an institution moved from

24   tier to tier, that -- that occurred, but there were no

25   additional tiers added, outside of psychiatry, in April

1    of 2020.

2    Q.  So the Tier 1 rate for psychologists, as we just

3    established, was $75 in the original three-year contract term

4    that started in 2017, and then it remained $75 per hour for the

5    provider in the second extension period of 2021 to 2022,

6    correct?

7    A.  Correct.

8    Q.  And similarly, the Tier 1 rate for clinical social workers

9    was $46 for the provider in the original three-year contract

10   term, correct?

11   A.  I believe so.  I would need to see the contract to refresh

12   my memory.

13   Q.  I'll represent to you that that was the rate under the

14   original three-year contract term.  And as far as you know, the

15   Tier 1 rate remained $46 for a clinical social worker provider

16   in the second extension year of 2021 to 2022, correct?

17   A.  Yes.

18   Q.  And in the extension periods of the contract, some

19   classifications at some institutions moved from one tier to

20   another, right?

21   A.  Yes.

22   Q.  But not all?

23   A.  I'd have to review every amendment, but typically not all

24   institutions, correct.

25   Q.  So the rates that providers in certain classifications

1  could receive at certain prisons remained the same for five

2  years?

3  A.  I would -- I would have to go back and check.

4  Q.  Do you have any reason to believe that that's not the case?

5  A.  For institutions that had 100 percent fill rate, then it

6  would make sense to not change their tier.  So we have

7  institutions that are easier to recruit and are more successful

8  at hiring those classifications, and so, correct, there would

9  not need to be -- there wouldn't be a need to change their

10  tier.

11  Q.  But there were also institutions that did not have a 100

12  percent fill rate for those particular classifications, and the

13  tier rates still remained the same during that five-year

14  period, correct?

15  A.  I don't have the -- all of the amendments in front of me of

16  where they didn't change.

17  Q.  Mr. Gonzalez, can you please share Defendants' Exhibit 20.

18      So, Ms. Ponciano, this is the chart that you were examining

19  earlier, correct?

20  A.  Correct.

21  Q.  And you had a role in preparing this?

22  A.  Correct.

23  Q.  Those rates that are shown in Defendants' Exhibit 20

24  include the overhead cost to the registry provider in the rate,

25  correct?

1    A.  To the contractor, yes.

2    Q.  To the contractor, yes.

3        So, in other words, the rates shown here include both the

4    amount of money that's going directly to the provider, as well

5    as the overhead that's going to the contractor?

6    A.  Correct.

7    Q.  And you testified earlier that the current Management

8    Solutions mental health registry contract was entered into in

9    2022, correct?

10   A.  Yes.

11   Q.  And it included, as shown in this chart, new rates for many

12   of the mental health classifications, correct?

13   A.  Correct.

14   Q.  Including increases for psychologists?

15   A.  Correct.

16   Q.  And social workers?

17   A.  Yes.

18   Q.  And rec therapists?

19   A.  Yes.

20   Q.  And you set those rates based on an assessment of what's

21   necessary to entice providers to take on an assignment like

22   this, correct?

23   A.  In comparing to the community registry rates and taking

24   into account the working conditions, the patient population,

25   and geographical areas, yes.

1    Q.  And your analysis that you described earlier indicated that

2    higher rates were necessary for these particular positions we

3    just mentioned because of changing conditions during the

4    pandemic, right?

5    A.  Correct.

6    Q.  Including concerns about coming to work in person and other

7    things like that?

8    A.  Correct.

9    Q.  But CCHCS did not increase the rates before 2022?

10   A.  We did not add additional tiers.  We could have, and most

11   likely, raised the rates within the tiers at some institutions,

12   but no additional tiers were added, no.

13   Q.  You did not add any additional tiers, and you also did not

14   change the rates provided within each tier?

15        Perhaps I haven't phrased that question properly.

16        So, for example, the Tier 1 rate for psychologists remained

17   the Tier 1 rate for psychologists, and it was a question only

18   of whether psychologists at certain institutions would graduate

19   to a higher tier?

20   A.  Right.

21   Q.  But the Tier 1 rate and the Tier 2 rate and the Tier 3 rate

22   all remained the same?

23   A.  As did with psychiatry.  What we did is we added tiers.  So

24   rates in the tiers were not changed; we added tiers.

25   Q.  And to be clear, I am talking about in the period prior to

1    the 2022 --

2    A.   Correct.

3    Q.   -- contract.

4    A.   Correct.  Yes.

5    Q.   And you mentioned earlier that the rates for psychiatrists

6    -- the tier rates for psychiatrists did not change between the

7    2017 contract and the 2022 contract, correct?

8    A.   Correct, because they had been changed within the 2017

9    contract.

10   Q.   Right.  The rates for psychologists at all tiers increased,

11   correct?

12   A.   Correct.

13   Q.   So, for example, Tier 1, there was an increase from $75 per

14   hour for the provider at the end of the 2017 contract to $102

15   per hour for the provider, not including the overhead, under

16   the 2022 contract?

17   A.   Correct.

18   Q.   And you also added, as you said, two higher tiers for

19   psychologists, so there is now five tiers of rates for

20   psychologists versus three in the 2017 contract, right?

21   A.   Correct.

22   Q.   And the Tier 5 rate for psychologists to the provider, not

23   including the overhead, is $162 per hour, correct?

24   A.   Correct.

25   Q.   And the rates for social workers increased between the two

1    contracts, too?

2    A.    Yes.

3    Q.    So the Tier 1 rate for social workers in the 2017 contract

4    was $46 going to the provider, not including the overhead, and

5    an increase to $65 to the provider under the 2022 contract,

6    correct?

7    A.    Correct.

8    Q.    There were also significant increases in the rates for

9    recreation therapists between the two contracts, correct?

10    A.    Yes.

11    Q.    And, again, you set these rates based on your meeting --

12    CCHCS's -- together with Management Solutions' assessment of

13    what is necessary to entice providers to take on this

14    assignment, correct?

15    A.    Correct.

16    Q.    Then you also testified to increases in the registry rates

17    for certain classifications at certain institutions in

18    April 2023, correct?

19    A.    Yes.

20    Q.    That was done through an amendment to the 2022 contract?

21    A.    Yes.

22    Q.    That was because you determined that higher rates were

23    necessary to attract candidates at that point in time?

24    A.    Yes.    In consultation with Dr. Mehta, yes.

25    Q.    The rate changes in April 2023 were within the ranges

186 of 240

1    provided by the 2022 contract, correct?

2    A.  The tiers, yes.

3    Q.  And so some classifications at certain institutions moved

4    from one tier to another under the contract?

5    A.  Correct.

6    Q.  Currently, there are no non-PIP programs at which

7    psychologists are receiving the highest available Tier 5 rate

8    of $162 per hour for the provider, correct?

9    A.  Correct.

10    Q.  Those rates are only offered to psychologists in the three

11    lift-and-shift PIPs?

12    A.  I haven't heard that term in a while.  Yes.

13    Q.  Which are Salinas Valley, CMF, and CHCF, correct?

14    A.  Correct.

15    Q.  The psychiatric inpatient programs at those three

16    facilities?

17    A.  Correct.

18    Q.  And the 2023 amendment increased rates for licensed

19    clinical social workers at some institutions, correct?

20    A.  Correct.

21    Q.  It was at seven institutions --

22    A.  Yes.

23    Q.  -- is that correct?

24        But other than those seven institutions, the clinical

25    social workers remained in the tiered rates that they were

1    receiving under the original 2022 contract, correct?

2    A.  Correct.

3    Q.  So, for example, licensed clinical social workers at Sac

4    are still currently receiving the lowest available registry

5    rate under the contract, which is a Tier 1 rate of $65 per hour

6    for the provider, correct?

7    A.  I would have to look at all the tier assignments, but I

8    will take your word for it.

9    Q.  Do you have any reason to believe that that is not

10   accurate?

11   A.  No.

12   Q.  Okay.  And the same is true for clinical social workers at

13   Mule Creek State Prison, correct?  They're also paid the Tier 1

14   rate of $65 per hour?

15   A.  Again, I will take your word for it.

16   Q.  Do you have any reason to believe that that is not

17   accurate?

18   A.  No.

19   Q.  Mr. Gonzalez, can you please put up Defendants' Exhibit 21.

20       Ms. Ponciano, this is an exhibit that you were looking at

21   earlier with Mr. McClain, correct?

22   A.  Correct.

23   Q.  And, Mr. Gonzalez, if we can go down to the final page of

24   this.  And zoom in on the chart that says Provider Starts Over

25   Time.

1         So this chart shows, as you said earlier, the cumulative

2    number of providers who have started during this period shown

3    on the chart, which is from July 25, 2022, to September 18,

4    2023, correct?

5    A.  Correct.

6    Q.  And this chart, in particular, does not show the number of

7    providers who have left during this period?

8    A.  No.

9    Q.  And this chart also includes providers working in PIPs,

10   correct?

11   A.  Correct.

12   Q.  Thank you.

13        You also talked about the medical registry contract, which,

14   again, for our purposes, can we refer to it in that way?

15   A.  Yes.

16   Q.  You understand what that means.

17        And that contract covers medical assistants, correct?

18   A.  Correct.

19   Q.  You're using very little registry for medical assistants

20   currently, correct?

21   A.  Yes.

22   Q.  The most registry usage for MAs is at CMF, which had

23   slightly less, I think, than four positions filled with

24   registry in August 2023.  Does that sound right to you?

25   A.  I have no reason to believe otherwise.

1   Q.  Most institutions where MAs are allocated for mental health

2   are not using any registry currently, correct?

3   A.  Correct.

4   Q.  And the medical registry contract was just recently amended

5   on September 15, 2023, correct?

6   A.  Yes.

7   Q.  And the rates for MAs at many institutions were increased?

8   A.  Correct.

9   Q.  So as you said earlier, most MAs at most institutions would

10  be paid 40 to $45 per hour under the new contract?

11  A.  Around there, yes.

12  Q.  The last amendment --

13  A.  Under the amendment.  I'm sorry.

14  Q.  Under the amendment.  Thank you for that correction.

15      And the prior amendment, before this September 1st, was

16  done in January 2023, correct?

17  A.  Correct.

18  Q.  And that amendment did not increase the MA registry rates?

19  A.  Correct.

20  Q.  Even though the rates for other medical classifications

21  increased under that amendment for the first half of 2023?

22  A.  Yes.  That is -- yes.  It is a large contract, and the team

23  is on a schedule of when they review classifications.

24  Q.  So MAs were not reviewed for potential rate increases under

25  that amendment?

1    A.   In the January amendment, I'd have to confirm, but I don't

2    believe so.  We typically look at the nurses every six months.

3    Q.   And MAs are considered nurses?

4    A.   Yes.  It's in the nursing classification.

5    Q.   So for the first half of 2023, before the September

6    amendment, the registry rates at most institutions for medical

7    assistants were somewhere between $23 and $35 per hour,

8    correct?

9    A.   Correct.

10    Q.   And those were also the rates in place in 2022?

11    A.   Correct.

12    Q.   So, as an example, in June 2023, the registry rate for

13    medical assistants at Mule Creek was $35 per hour, correct?

14    A.   I have no reason to think otherwise.

15    Q.   Mr. Gonzalez, can you please load Plaintiffs' Exhibit 49.

16    Can you go down to the next page, please.

17         Ms. Ponciano, do you recognize this document?

18    A.   I do.

19    Q.   What is this document?

20    A.   This is part of the monthly data submittal in my prior role

21    in mental health.  It was my team that prepared this report

22    from the State Controller's Office data.

23    Q.   And these reports are provided every month to --

24    A.   Correct.

25    Q.   -- to the Special Master and Plaintiffs, right?

```
 1   A.  Correct.
 2              MS. YELIN:  Your Honor, we'd like to introduce
 3   Plaintiffs' Exhibit 49 into evidence.
 4              THE COURT:  This is disputed, Mr. McClain?
 5              MR. MCCLAIN:  It's disputed.  Objection, Your Honor.
 6              THE COURT:  What's the objection?
 7              MR. MCCLAIN:  First of all, it's cumulative, because
 8   we already have staffing reports that are stipulated to.
 9      Secondly, we think that it is -- it's a confusing document,
10   because if you look at the footnotes, it excludes -- I'm trying
11   to read the footnote here.
12              THE COURT:  This is identified as a demonstrative on
13   the list, right, Ms. Yelin?
14              MS. YELIN:  I don't believe so.  We're intending to
15   submit Plaintiffs' Exhibits 49 through --
16              THE COURT:  I'm sorry.  I was looking at 48.  49.
17   That's right.  So this same issue applies to 49 through --
18              MS. YELIN:  98.
19              MR. MCCLAIN:  Yes.
20              THE COURT:  Got it.
21              MS. YELIN:  Your Honor, these are reports that are
22   provided in the monthly data package --
23              THE COURT:  I heard that.
24              MR. MCCLAIN:  So, Your Honor, if I may?
25              THE COURT:  Prepared by the Defense?
```

1          MS. YELIN:  Yes.  To the Special Master and

2    Plaintiffs.  So obviously it is concerning for us to hear

3    Defendants' objection that they do not -- that they believe

4    these documents are confusing or misleading.

5          MR. MCCLAIN:  So --

6          THE COURT:  So they haven't been altered, they're in

7    the form provided by the Defense, Mr. McClain?

8          MR. MCCLAIN:  They have not been altered.

9          THE COURT:  Well, I'm going to let them in, but

10   subject to full examination of the witness or any other witness

11   to help the Court understand the content.

12         MR. MCCLAIN:  Could I finish making my objection?

13   I'm sorry.  I was trying to read the footnotes.

14         THE COURT:  All right.

15         MR. MCCLAIN:  If you look at footnote 11, it explains

16   that new and certain existing -- let's see.  I'm sorry.  It's

17   footnote 10.  The SCO data is approximately 45 days in arrears

18   and does not include employees hired through various registry

19   services or positions paid from the temporary help blanket and

20   unallocated positions.

21       So for that reason, we think that the document is

22   confusing, in that its probative value is outweighed by the

23   danger of confusing the issues, and is misleading.

24         MS. YELIN:  Your Honor, may I respond to that?

25         THE COURT:  You may.

1          MS. YELIN:  So Defendants' Exhibit 12 are the charts

2    that they examined with Ms. Muhammad, which we stipulated to

3    being admissible.  They're charts showing filled percentages

4    from January 2013 to December 2022.  Those say -- I believe

5    they're demonstratives, but they say that they are relying on

6    the SCO data, which is the same data that is used to generate

7    Plaintiffs' Exhibits 48 -- sorry -- 49 through 98.

8          THE COURT:  Ms. Muhammad did testify to SCO data,

9    agreed?

10          MR. MCCLAIN:  Agreed, Your Honor.  But -- so the

11    underlying data is -- it's true that it's the same data, but

12    this is a different report, created differently, using a

13    different methodology.

14          THE COURT:  Well, I'm not disregarding what you're

15    saying, but I'm going to let the exhibits in.  If the same

16    objections apply to all, they're made of record.  They're in,

17    but they can be subject to examination and then explanation in

18    closing briefing so that I understand what you're saying.

19      I'm not going to just leap to conclusions based on raw

20    numbers here.  And I'll take account of the footnotes in

21    evaluating what is before me.

22      All right.  So any other objections to any other exhibit in

23    that series, Mr. McClain?

24          MR. MCCLAIN:  It's the same objections for that

25    series of documents.

1          THE COURT:  All right.  So those objections are all

2     noted, but Plaintiffs' 49 through -- did you say 98?

3          MS. YELIN:  98, yes.

4          THE COURT:  -- 98 are admitted.

5          MS. YELIN:  Okay.  Ms. Ponciano, I have no further

6     questions for you at this time.  Thank you.

7          THE COURT:  All right.  Mr. McClain, anything on

8     redirect?

9          MR. MCCLAIN:  Just briefly.

10                      REDIRECT EXAMINATION

11    BY MR. MCCLAIN:

12    Q.  Okay.  So, Ms. Ponciano, Ms. Yelin was asking you about

13    changes in tiers during the period of the 2017 mental health

14    registry contract.  Do you recall that?

15    A.  Yes.

16    Q.  For clarity, although most of the -- the tiers during the

17    life of that contract did not change, with the exception of the

18    April 30, 2020, changes that you testified about, most of the

19    tiers themselves did not change; is that right?

20    A.  Correct.

21    Q.  Okay.  But rates paid to -- to various classifications at

22    various prisons did change during the -- the life of that

23    contract; is that true?

24    A.  Yes.  There were a number of amendments that changed

25    institutions to different tiers for various classifications.

1    Q.  Okay.  And this might be a stretch, but do you recall how

2    many different amendments were made to the 2017, contract?

3    A.  I do not.

4    Q.  Okay.  Would it help refresh your recollection to take a

5    look at that contract?

6    A.  Yes.

7    Q.  Okay.  So there are some exhibits, I believe, behind you.

8    If you want to, you can look at Defendants' Exhibit 17.  And

9    when you get to Exhibit 17, if you could tell us what that --

10   what that document is.

11   A.  Exhibit 17 is the Management Solutions contract for the

12   dental/mental health registry network from May 1, 2017 to

13   April 30, 2020.

14   Q.  Okay.

15   A.  And does this include all amendments in this exhibit?

16   Q.  It should contain the amendments, yes.

17   A.  Okay.

18          THE COURT:  Do you want the witness to review the

19   whole thing right now?

20          MR. MCCLAIN:  I just -- I'm asking her to -- to see

21   if she can assess how many amendments there were to the

22   contract.

23          THE COURT:  All right.

24          THE WITNESS:  It appears as though there were 14

25   amendments.

1    Q.   BY MR. MCCLAIN:  Okay.  And those amendments, did they increase

2    the rates of pay for registry providers?

3    A.   Yes, it did.  It moved them into higher tiers, yes.

4            MR. MCCLAIN:  Okay.  No further questions.

5            THE COURT:  All right.  Anything further, Ms. Yelin?

6            MS. YELIN:  No, Your Honor.

7            THE COURT:  All right.  Is Ms. Ponciano excused as a

8    witness, Mr. McClain?

9            MR. MCCLAIN:  Yes, she is.

10            THE COURT:  Ms. Yelin?

11            MS. YELIN:  Yes.

12            THE COURT:  All right.  You may step down.  You're

13    excused.

14       All right.  Next witness.

15            MS. WOLFF:  Your Honor, Defendants call Dr. Toni

16    Martello.  We are going to run outside and grab her.

17            THE COURT:  All right.

18            THE CLERK:  Dr. Martello, please come forward.  Step

19    into the witness stand and remain standing.

20       Please raise your right hand.

21       (The Witness, Toni Martello, is sworn.)

22            THE WITNESS:  I do.

23            THE CLERK:  Thank you.  You may be seated.

24       Will you please say and spell your first and last name for

25    the record.

```
 1                 THE WITNESS:  My name is Toni Martello.  T-O-N-I

 2    M-A-R-T-E-L-L-O.

 3                 THE COURT:  You may proceed.

 4                        DIRECT EXAMINATION

 5    BY MS. WOLFF:

 6    Q.  Good afternoon, Dr. Martello.

 7    A.  Good afternoon.

 8    Q.  What is your current job?

 9    A.  I am the Assistant Deputy Director of telemental health for

10    California Department of Corrections and Rehabilitation.

11                 THE COURT:  Can you speak up or pull the microphone

12    closer?

13                 THE WITNESS:  Yes.

14    Q.  BY MS. WOLFF:  How long have you worked for CDCR?

15    A.  Almost six years.

16    Q.  So about what time did you start?

17    A.  October 2017.

18    Q.  And what was your first role as CDCR that you were hired

19    for?

20    A.  Staff telepsychiatrist.

21    Q.  And how long did you work in that role for?

22    A.  For almost two years.

23    Q.  And then what was your next role after staff

24    telepsychiatrist?

25    A.  I was the Acting Chief Psychiatrist at Salinas Valley PIP,
```

1    the psychiatric inpatient program.

2    Q.   It's an acronym, P-I-P.

3         How long were you in that role for?

4    A.   For four months.

5    Q.   Why such a short period of time?

6    A.   Just because it was an acting role to fill in for

7    short-term.

8    Q.   And where did you go after that?

9    A.   I became a Senior Supervising Psychiatrist for

10   telepsychiatry.

11   Q.   And was that a statewide position, meaning you weren't

12   assigned to a specific institution?

13   A.   Yes, it was with the statewide telepsychiatry program.

14   Q.   And what did you do in that role?

15   A.   I supervised approximately 15 staff telepsychiatrists, and

16   I helped to facilitate their assignments, so working with the

17   institutions to distribute equipment, do whatever needed to be

18   done to get their caseloads assigned, working to overcome any

19   obstacles to the implementation of telepsychiatry, and just

20   assisting the program as necessary.

21   Q.   And what was your next role after that?

22   A.   I became the Chief Psychiatrist over the statewide

23   telepsychiatry program.

24   Q.   And when did you start that job?

25   A.   In July 2020.

1    Q.   What were your duties as statewide chief of -- sorry,

2    statewide Chief Psychiatrist of telepsychiatry?

3    A.   In that role, I was ultimately responsible administratively

4    and clinically for the program.  So I helped to hire, recruit,

5    and supervise senior psychiatrists, along with my co-chief.

6    And I was the second line -- second line supervisor to the line

7    staff telepsychiatrists, of which we had about 90 by the end.

8         And I also worked with institutions on higher level issues

9    regarding telepsychiatry and assessing the need and

10   implementation.

11        I worked with telehealth IT regarding our technological

12   needs.

13        And I also represented telepsychiatry in headquarters in

14   committees and projects.  I helped to work on multiple projects

15   at headquarters and various reports as well.

16   Q.   And did you assist in any way with relevant policies?

17   A.   Yes.  I also helped to create and implement and revise

18   relevant policies as needed.

19   Q.   How long were you Chief Psychiatrist of telepsychiatry?

20   A.   Almost three years.

21   Q.   And did you serve in any other roles in that time?

22   A.   Yes.  I was -- for a few months, I was the Acting Assistant

23   Deputy Director of Psychiatric Services.

24   Q.   And then what was your next position within CDCR after

25   Chief Psychiatrist of telepsychiatry?

1    A.  Then I got into my current role as Assistant Deputy

2    Director.

3    Q.  And when was that?

4    A.  Starting in June of this year.

5    Q.  Was that a promotion?

6    A.  Yes.

7    Q.  Why do you believe you were selected for this position?

8    A.  I think my experience with telepsychiatry, and, in

9    particular, leadership of telepsychiatry, helped me to better

10   understand the needs of our program and how telepsychiatry is

11   run and how to implement telehealth in our system.

12   Q.  Did anyone precede you in this role?

13   A.  No, this was a newly established role.

14   Q.  And what is your understanding of why this position was

15   established?

16   A.  My understanding is that it was established to help expand

17   telemental health services to include other classifications,

18   including psychology and social work, and also to help to

19   oversee the telepsychiatry program.

20   Q.  And have you always worked with telepsychiatry throughout

21   your employment at CDCR, with the exception of the acting

22   positions we discussed?

23   A.  Yes.  With those exceptions, yes.

24   Q.  Where did you work before coming to CDCR?

25   A.  I worked for Traditions Behavioral Health, which was a

1    contracting company, but my actual job was at Highland

2    Hospital, where I was an outpatient liaison psychiatrist in

3    their primary care clinics.  I eventually also became a

4    psychiatrist in their intensive outpatient program and partial

5    hospitalization program.  And I was the medical director of

6    their substance use program.

7    Q.   And did you work in any other roles in the community?

8    A.   Yes.  I also did some moonlighting at John George

9    Psychiatric Pavilion in San Leandro.

10   Q.   Do you have a currently updated CV?

11   A.   I do, yes.

12   Q.   I'd like to show you what's been marked as Defendants'

13   Exhibit 3.  Thank you.

14        Is this your current CV?

15   A.   Yes, it is.

16   Q.   And does it accurately set forth your employment history

17   that we just discussed?

18   A.   Yes, it does.

19   Q.   Does it also describe your education and training?

20   A.   Yes, it does.

21   Q.   Okay.  Let's talk about your education.

22        Where did you obtain your undergraduate degree?

23   A.   Wesleyan University.

24   Q.   What degree did you earn?

25   A.   Bachelor of Arts.

1    Q.  What year did you graduate?

2    A.  2008.

3    Q.  And what did you do after graduation?

4    A.  I went to medical school.

5    Q.  Where did you attend medical school?

6    A.  Mount Sinai School of Medicine.

7    Q.  What year did you graduate medical school?

8    A.  2012.

9    Q.  What training did you do after medical school?

10   A.  I did a psychiatry residency.

11   Q.  And what board certifications do you have?

12   A.  I'm board certified in psychiatry.

13   Q.  Okay.  Thank you.

14       Can you please describe your duties as Assistant Deputy

15   Director of the Telemental Health Services.

16   A.  Sure.  Right now, I'm mostly helping to implement those

17   additional classifications as I mentioned, so telepsychology

18   and telesocial work, which right now involves trying to do a

19   lot of hiring, as well as coordinating to get those programs

20   set up.  And I also continue to help to oversee telepsychiatry.

21   Q.  And what form of telemental health treatment is currently

22   available to CDCR patients?

23   A.  Currently, telepsychiatry.

24   Q.  What levels of care within CDCR's mental health services

25   delivery system are seen by CDCR telepsychiatrists currently?

1    A.  Currently, primarily CCCMS and EOP are seen by

2    telepsychiatry, as well as some urgent care overnight.

3    Q.  Do telepsychiatrists perform any other functions besides

4    seeing CCCMS and EOP patients?

5        I'm sorry.  Just so the court reporter knows, it's three Cs

6    MS for CCCMS.

7                MS. ELLS:  Objection, Your Honor.  Relevance.

8                MS. WOLFF:  I think the telepsychiatry program is

9    relevant to our defense, which relates to reasonable efforts

10   and explaining --

11               THE COURT:  I'll allow a brief response, subject to

12   motion to strike.

13               THE WITNESS:  Yes.  Our telepsychiatrists also, like

14   I mentioned, provide urgent care overnight through a nightshift

15   program.

16       We also have a couple telepsychiatrists who serve as PC

17   2602 specialists --

18               THE COURT REPORTER:  I'm sorry.  You need to slow

19   down.

20               THE WITNESS:  Sorry.

21       PC 2602, that's our involuntary medication order.  They

22   help to evaluate patients, prepare reports, testify at their

23   hearings, and help with other psychiatrists in cases related to

24   involuntary medication.

25       We also have the psych -- Psychopharmacology Resource

1  Network psychiatrists who are essentially consultants who can

2  help with complicated cases or complex psychopharmacology needs

3  with other psychiatrists in our system.

4  Q.  BY MS. WOLFF:  You mentioned that EOP patients are seen by

5  telepsychiatrists.  Has that historically been the case in the

6  context of CDCR's telepsychiatry program?

7          MS. ELLS:  Objection, Your Honor.  Relevance.

8          MS. WOLFF:  Your Honor, this all goes to explaining

9  how the telepsychiatry program works and how -- furthermore,

10  the expansion to telesocial work and telepsychology, and it's

11  premised on the telepsychiatry program.

12          THE COURT:  I'm going to allow you to make the

13  record.  I will -- I'm not, at this point, ruling on the

14  relevance objection.

15          MS. WOLFF:  I understand.

16          THE COURT:  So that can be argued more fully in the

17  closing briefing.

18          MS. WOLFF:  Understood.

19          MS. ELLS:  Your Honor, may I make a standing

20  objection to this line of questioning, then?

21          THE COURT:  You may.

22          MS. ELLS:  Thank you.

23          THE COURT:  Yes.

24  Q.  BY MS. WOLFF:  Do you want me to ask that again?

25  A.  Yes, please.

1    Q.  You mentioned that EOP patients are seen by

2    telepsychiatrists.  Has that historically been the case in the

3    context of CDCR's telepsychiatry program?

4    A.  Yes.  For most of the existence of telepsychiatry in our

5    system, there were no restrictions on the levels of care that

6    telepsychiatry could see.  And so we --

7              THE COURT REPORTER:  I'm sorry.  You've got to slow

8    down.

9              THE WITNESS:  I'm sorry.  I will try to speak slower.

10       Yes, there were no restrictions on the levels of care that

11   telepsychiatry can serve, and so we did see CCCMS and EOP

12   patients, for more than a decade since the inception of

13   telepsychiatry, without restriction.

14   Q.  BY MS. WOLFF:  And when you say a decade, which decade are

15   we talking about?

16   A.  Approximately 2011 to -- 2010 to 2020.

17   Q.  Are there restrictions now on the use of telepsychiatry for

18   EOP patients?

19   A.  Yes, there are.

20   Q.  And what are those restrictions?

21   A.  The provisional policy that we had placed restrictions on

22   EOP, where we needed to have one PY -- or full-time equivalent

23   of psych -- on-site psychiatrist per program per yard for each

24   EOP program.

25       If we were not able to meet that requirement and were using

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    telepsychiatry in those settings, then we needed to provide

2    notice to the stakeholders and ultimately a plan to remedy that

3    if we continued to use telepsychiatry.

4        It also added additional requirements for more frequent

5    site visits for telepsychiatrists serving those levels of care.

6    Q.  You mentioned provisional policy.  Do you know why that

7    policy was considered provisional?

8              MS. ELLS:  Objection.  Calls for a legal conclusion.

9              THE COURT:  Just answer yes or no.

10             THE WITNESS:  Yes.

11   Q.  BY MS. WOLFF:  And what is your understanding of why it was

12   considered provisional?

13             THE COURT:  The objection stands.

14       But you can answer to the extent you're able.  But I'm not

15   going to construe it as having any legal value.

16             THE WITNESS:  My understanding is that it was

17   implemented for a provisional period of 18 months, with the

18   understanding that it would be revisited to have any edits or

19   changes as needed after that provisional period.

20   Q.  BY MS. WOLFF:  Do you know when that provisional policy

21   first went into effect?

22   A.  In 2020.

23   Q.  And do you recall the time period the provisional policy

24   was to remain in effect?

25   A.  For 18 months.

1   Q.  And you mentioned some restrictions on the EOP level of

2   care.  How do those restrictions impact the program currently?

3   A.  Currently, they're mostly administrative, because if

4   patients need to be seen, we do our best to get them seen.  But

5   it's placed an administrative burden on our program to track

6   the assignments of psychiatrists, make sure that we're meeting

7   that requirement on-site, and to provide notice and plan when

8   we're not.

9        It also requires moving staff around, which can impact

10  continuity of care.

11       And it also impacts our -- the site visits can impact our

12  assignments, so it does make those assignments less desirable

13  for people who, for many reasons, may not be able to travel or

14  have difficulty traveling.

15       And it also -- in doing the site visits, because it's

16  considered work time when they're traveling -- can impact

17  clinical time on either end of each site visit.

18            MS. ELLS:  Your Honor, I'm once again going to say

19  relevance objection.  I do not understand why restrictions on

20  this policy are at issue in this contempt proceeding.  There is

21  an appeal about this issue.  It is addressed in other orders

22  and motions.  It is not at issue in this contempt motion.

23            MS. WOLFF:  Your Honor, if I may respond?

24            THE COURT:  Is that fair, rather than taking lots of

25  time?

1          MS. WOLFF:  I'm sorry.  Is what fair?

2          THE COURT:  Is that objection not fair?

3          MS. WOLFF:  No, it's not, Your Honor.  Because part

4   of our defense to this contempt proceeding requires us to show

5   that Defendants are taking, and have taken, all reasonable

6   efforts, and part of that requires an explanation of the

7   telepsychiatry program, which includes the limitations of the

8   current policy and how that impacts staffing.

9          THE COURT:  And do you have a position regarding the

10  effect of the pending appeal on the extent of this Court's

11  ability to consider this record?

12          MS. WOLFF:  I don't believe that the pending appeal

13  impacts this Court's ability to consider this testimony in the

14  context of this proceeding, because it's a discussion of the

15  policy that is currently in effect and how that impacts

16  staffing currently.

17          THE COURT:  Are Plaintiffs in any way saying they

18  weren't prepared to address this issue?

19          MS. ELLS:  Could you repeat that, Your Honor?

20          THE COURT:  Ms. Martello has been on the witness

21  list.  Ms. Martello is on the witness list.  Are Plaintiffs in

22  any way saying they are not prepared to address the issue?

23          MS. ELLS:  We are prepared to address the issue.  We

24  think it's beyond the -- very clearly beyond the scope of the

25  contempt proceeding, however.

1          THE COURT:  I understand that objection.  I -- given

2    the nature of this proceeding -- that there is no jury present;

3    this is a bench proceeding -- I'm -- I'm going to allow you to

4    develop the record.

5      I'm taking note of when Ms. Martello started testifying.

6    I'll let you know when I consider you to be out of time based

7    on your estimate.  And I -- I will entertain a motion to

8    strike, if that's what the Plaintiffs seek.  And I'll make a

9    reasoned decision --

10          MS. WOLFF:  Understood.

11          THE COURT:  -- upon submission of the entire matter

12    to me.

13          MS. WOLFF:  Understood.

14          THE COURT:  All right.

15          MS. WOLFF:  Thank you, Your Honor.

16    Q.  BY MS. WOLFF:  I'm sorry if I repeated this.  I can't

17    remember exactly where I was.

18      But how -- how do those restrictions impact the program?

19    A.  So they are primarily administrative, because we do get

20    patients seen by telepsychiatry if there is a need in EOP, but

21    it does place an administrative burden on our program to track

22    the assignments.  We developed an app in order to do so.

23      It requires a lot of coordination with the institutions in

24    order to make sure that we are meeting those requirements or,

25    if not, to move staff around to work with them to come up with

 1    a plan.  And it can impact continuity of care by moving people

 2    around.

 3         And, again, with site visits, the increased frequency for

 4    people assigned to EOP can make those assignments less

 5    desirable or place a burden on people to be away from their

 6    families, etc.

 7    Q.  Do you agree with the restrictions on EOP telepsychiatry

 8    that are currently in the policy?

 9    A.  I do not.

10    Q.  Why is that?

11    A.  In my experience, I don't know of any evidence to support

12    those restrictions.  I think we can effectively treat patients

13    at the EOP level of care.

14             THE COURT:  This is a lay witness.

15             MS. WOLFF:  Yes.

16             MS. ELLS:  Yes.  Objection, Your Honor.  We object --

17             THE COURT:  That's sustained, actually.

18             MS. ELLS:  Yes.

19             THE COURT:  The last two answers are stricken.

20             MS. WOLFF:  She -- Your Honor, she's an expert in

21    telepsychiatry in the sense that she's served in this role

22    and --

23             THE COURT:  She's identified as an expert?

24             MS. WOLFF:  No, she's not identified as an expert.

25    But she can offer her opinion as to the impact of

1    telepsychiatry and the use of telepsychiatry.  She's been --

2    she testified that she has worked in the capacity as a

3    telepsychiatrist for at least six years, I believe, and has

4    overseen the program for some time as well.

5              THE COURT:  Yeah.  The --

6              MS. ELLS:  Your Honor.

7              THE COURT:  The objection is still sustained.

8              MS. WOLFF:  Okay.

9              THE COURT:  I did just review the resumé.  I couldn't

10   load it in the electronic format, but I have now reviewed it,

11   just so you know.

12      Okay.  Next question.

13             MS. WOLFF:  Okay.

14   Q.  BY MS. WOLFF:  Have you reviewed medical literature on the

15   use of telepsychiatry in the correctional setting and in the

16   community generally?

17   A.  Yes, I have.

18   Q.  And why did you conduct a review of medical literature?

19   A.  We do gather articles on an ongoing basis and look at

20   emerging research to make sure that we're in keeping with

21   community standards.  But we also did a more in-depth analysis

22   of literature related to the negotiation of our telepsychiatry

23   policy last year.

24             MS. WOLFF:  Your Honor, I'd like to show her an

25   exhibit that Plaintiffs have stipulated as to the authenticity

1  but not the admissibility.  But I just wanted to make that

2  clear before I ask Ms. Pooni to put it on the screens.

3              THE COURT:  All right.  Which exhibit is it?

4              MS. WOLFF:  It's Defendants' Exhibit 4.

5              THE COURT:  All right.  Any objection to showing that

6  to the witness?

7              MS. ELLS:  No, but we definitely object to the

8  exhibit being admitted.

9              THE COURT:  All right.

10  Q.  BY MS. WOLFF:  Do you recognize this?

11  A.  Yes.

12  Q.  And what is it?

13  A.  This is the summary that my team and I prepared of the

14  articles that we reviewed.

15  Q.  And did you assist in the preparation of the document?

16  A.  Yes, I did.

17  Q.  How did you assist?

18  A.  I assisted in reviewing the articles and helping to

19  construct the form of the summary and the overall content of

20  the summaries.

21  Q.  And can you please just describe, generally, what

22  information is contained in this document?

23  A.  It's really summarizing the articles that we found that

24  were related to use of telepsychiatry and, when possible, in a

25  correctional setting but also just generally in the community.

1    Q.   And what were you trying to evaluate?

2    A.   Whether our program and our services are in keeping with

3    medical literature and the standards in the community.

4    Q.   Do you recall about when you and your team prepared this

5    summary?

6    A.   In the spring of 2022.

7    Q.   And does this document accurately summarize your findings?

8    A.   Yes, it does.

9            MS. ELLS:  Your Honor, may I raise the objection to

10   this document?

11           THE COURT:  I haven't heard a motion to admit.

12           MS. WOLFF:  I haven't made one yet.

13           THE COURT:  Yeah.  So, wait --

14           MS. ELLS:  Thank you.

15           THE COURT:  Wait until there is that motion.

16           MS. WOLFF:  I will soon.

17   Q.  BY MS. WOLFF:  Did you reach a conclusion after you

18   completed the review --

19           MS. ELLS:  Objection, Your Honor.

20           MS. WOLFF:  I haven't finished my question.  If I

21   could finish my question?

22           THE COURT:  You're asking for a conclusion?

23           MS. WOLFF:  I'm asking for her -- yes, I'm asking

24   what her team found.

25           THE COURT:  So what's the complete question, just so

1    the record is clear.

2         MS. WOLFF:  I'm asking what her team and -- what

3    Dr. Martello and her team determined, after completing the

4    review, as to whether the literature supported their position

5    on the use of telepsychiatry.

6         THE COURT:  All right.  And the objection?

7         MS. ELLS:  Rule 701.  She's not qualified as an

8    expert; this is not within her specific expertise; she's not

9    disclosed; there is no report.  This report is hearsay, and

10   it's not relevant.

11        THE COURT:  That objection --

12        MS. ELLS:  The propriety of the scope of the

13   telepsychiatry program and the restrictions are not at issue in

14   this hearing.

15        MS. WOLFF:  Your Honor, if I may briefly respond?

16        THE COURT:  You may.

17        MS. WOLFF:  First of all, as to the hearsay

18   objection, I'm not offering -- we're not offering this document

19   for the truth of what it asserts; we're offering it for the

20   effect on the -- on Dr. Martello and her team in compiling the

21   policy as it relates to relevance.  Dr. Martello has testified

22   that the restrictions on telepsychiatry impact staffing and

23   assignments, and that goes to Defendants' reasonable efforts.

24        THE COURT:  The objection is sustained.  So Exhibit 4

25   -- Defendants' 4 is not admitted.

1    Q.   BY MS. WOLFF:  Going back to -- you can take that down.

2    Thank you.

3        Going back to CDCR's current telepsychiatry policy, do

4    patients at higher levels of care, above EOP, receive services

5    via telepsychiatry?

6    A.   At times, yes.

7    Q.   When would that be?

8    A.   When there is not adequate staffing on-site.

9    Q.   In any given month, approximately how many telepsychiatry

10   encounters occur across all levels of care?

11   A.   Over the past 12 months, on average we have had almost

12   17,500 telepsychiatry encounters per month.

13   Q.   And how many institutions is that across?

14   A.   31.

15   Q.   Are there any institutions, then, that do not provide

16   telepsychiatry?

17   A.   Yes, there are two.

18   Q.   And which two are those?

19   A.   That's San Quentin and Avenal State Prison.

20   Q.   Do you know why those institutions opted out of

21   telepsychiatry?

22   A.   It's my understanding mostly related to nightshift

23   telepsychiatry, which is intended to be a statewide service,

24   that they are able to staff more readily on-site and,

25   therefore, are satisfied with their current program and not --

1    not in need of the nightshift program at this time.

2    Q.  Can you please describe generally how telepsychiatrists at

3    CDCR work with their patients?

4    A.  Yes.  They work with them very similarly to on-site

5    psychiatrists.  So they review the chart.  They do a

6    psychiatric evaluation with the patient, just over video

7    instead of in person.  They review the labs, the notes from

8    other providers.  They can order medications and relevant lab

9    work, schedule follow-up, and they also work with other members

10    of the team to get collateral or to coordinate care.

11    Q.  And what does a typical telepsychiatry encounter entail?

12    A.  At the beginning, the telepresenter helps to escort the

13    patient into the room and make sure there is a good connection

14    with the telepsychiatrist.  And then the telepsychiatrist

15    introduces themself, talks about the process, and then performs

16    a psychiatric evaluation, if it's the first time.  If they

17    already know each other, then, you know, they just identify

18    each other and get into the evaluation.

19    Q.  And what is a telepresenter?

20    A.  A telepresenter is an on-site staff member who helps to

21    facilitate the encounter from the institution side.

22    Q.  And what do the telepresenters do?

23    A.  Generally, they help to make sure the patient gets into the

24    room, they make sure that the audio and visual connection is

25    working appropriately, and then they help to facilitate any

1   needs of the telepsychiatrist.  So they can provide paper, such

2   as if a medication consent needs to be signed, they can provide

3   handouts.  They can also help to alert local staff if there is

4   an emergency, either psychiatric, or medical, or otherwise.

5   And they can also help to evaluate the patient physically, if

6   needed, with some guidance.

7   Q.  What staffing classification fills the role of a

8   telepresenter?

9   A.  Typically medical assistants or MAs.

10  Q.  Could any other classification fill that role?

11  A.  Yes.  Per our policy, almost any clinical classification

12  can fill that role, but it's typically an MA or a CNA, which is

13  a certified nursing assistant.

14  Q.  What happens if the patient isn't comfortable with the

15  telepresenter in the room?

16  A.  If they're not comfortable, we have the ability to ask them

17  to step out, such as if we feel the patient is being guarded or

18  not -- not feeling comfortable disclosing something in front of

19  someone else, or even if they outright say that they don't feel

20  comfortable with the person there.

21  Q.  And when you provided patient care as a telepsychiatrist,

22  did you ever ask a telepresenter to step out?

23  A.  I did at times.  Not often, but it did happen sometimes.

24  Q.  How do telepsychiatrists interact with the on-site

25  treatment team?

 1    A.  We're generally very available -- telepsychiatrists.  We're

 2    always in front of our computers, so easy to find by e-mail or

 3    chat or phone.

 4       We can reach out, when necessary, to chat with someone.

 5    Sometimes they would pop into my room, honestly, and I would

 6    see them on video.  But we can call or e-mail just to

 7    coordinate care or -- and we also participate as part of the

 8    IDTT, which is Interdisciplinary Treatment Team, when the team

 9    formally meets to discuss patient care.

10    Q.  How does a telepsychiatrist follow up with a patient who

11    fails to show for an appointment?

12    A.  If a patient doesn't show up to their appointment and it

13    wasn't a documented refusal, like they came into the room to

14    refuse, then we have the ability to go cell side with the

15    assistance of the telepresenter and usually a tablet or a

16    laptop.  And there we can check on the patient, see if they're

17    in any acute crisis, and also try to engage them to come out to

18    a confidential setting either then, if possible, or if we were

19    able to reschedule the appointment.  We can also check on the

20    status of their cell and just generally do a quick

21    nonconfidential but still important wellness check.

22            THE COURT:  We're at the point where we should take a

23    break.  So 15-minute break.  Come back at 4:30, and we'll go

24    for another half hour today.

25        (Recess taken, 4:15 p.m. - 4:30 p.m.)

1           THE COURT:  All right.  You may be seated.

2      And you may continue.

3           MS. WOLFF:  Thank you, Your Honor.

4  Q.  BY MS. WOLFF:  Dr. Martello, before we took a break, I had

5  asked you how does a telepsychiatrist follow up with a patient

6  who fails to show for an appointment.

7      I apologize.  Do you mind re-answering that, because it

8  relates to my next question.

9  A.  Sure.  With the assistance of the telepresenter, they have

10  the ability to go to cell side, using a tablet or a laptop,

11  typically, to check on the patient.  It's not confidential, but

12  it helps us to make sure that they're not in acute crisis and

13  to see if we can engage them to come out to a confidential

14  setting for a more full evaluation either right then or at a

15  rescheduled appointment.  And it also helps to build rapport,

16  honestly, to check with them and show that you care.  And, yep,

17  I think that's it.

18  Q.  How does that compare to what an on-site provider might do

19  under similar circumstance?

20  A.  It's very similar.  Pretty much the same, except that if

21  they are doing it in response to a documented refusal, then

22  they're allowed to count it to Program Guide requirements, and

23  we are not.

24  Q.  They're allowed to count what towards Program Guide

25  requirements?

1    A.  The encounter.

2    Q.  Substantively, though, is there a difference in the on-site

3    and telepsychiatrist encounters when cell side?

4    A.  No.  Not in my opinion.  They are both not confidential.

5    It's both just to do a check-in, essentially.  And, in fact,

6    using the telepsychiatry equipment, we've demonstrated that it

7    can be more confidential, in fact, because you can hold -- we

8    have little pickup speakers that you can hold up to the port in

9    the door so that the patient is more able to easily hear from

10    the speaker, and also, the mic can pick up what they're saying

11    through the door, and it tends to be a little bit more

12    confidential than having to shout like you do when you're there

13    in person.

14    Q.  And separate and apart from a patient who fails to show for

15    an appointment, how do you address a patient who doesn't wish

16    to be seen by a telepsychiatrist?

17    A.  Our policy has -- outlines the process, which is

18    essentially that the IDTT, or the Interdisciplinary Treatment

19    Team, discusses the appropriateness of telepsychiatry for that

20    patient.

21    Q.  And what would make a patient not appropriate for

22    telepsychiatry?

23    A.  It's rare, but typically something like a

24    technology-focused delusion, where they're paranoid

25    specifically of that medium.  Or if they have some sort of

1    disability, like cognitive or sensory, that would impair their

2    ability to engage via telepsychiatry.

3    Q.  Generally, can patients choose whether or not they are seen

4    by a telepsychiatrist or on-site provider?

5    A.  Not generally, no.  But in the same way that they're not

6    able to choose between on-site providers.

7    Q.  And why is that?

8    A.  It's just how our system is.  You know, like, our patients

9    don't have the same level of choice that they would have in the

10   community where they get to find their own provider.

11   Q.  Are there any concerns about doctor shopping or --

12   A.  Yes.  That's also part of it.  If patients have specific

13   preferences or are trying to find a particular doctor to get a

14   particular medication of abuse, for instance, that can be part

15   of it as well.

16   Q.  You mentioned earlier that as part of its telemental health

17   program, that CDCR is working to implement telepsychology.

18        Can you please tell us about the current status of the

19   implementation of that program?

20   A.  Sure.  It's still very early in implementation, but right

21   now, we are trying to hire leadership and are doing, like I

22   mentioned, some coordination to prepare for the implementation

23   of telepsychology, such as ordering equipment.

24   Q.  And so what have you done so far to implement

25   telepsychology?

1    A.  We have posted for both the Chief Psychologist and the

2    Senior Psychologist positions.  We've done a couple rounds of

3    interviews for the Chief Psychologist position and extended an

4    offer that was, unfortunately, not accepted.

5        We've also implemented the policy, and we've ordered

6    equipment, which has arrived, and -- or what not -- what has

7    not arrived will be there shortly.

8    Q.  How will the telepsychology program be structured in terms

9    of supervision?

10   A.  It's structured very similar to telepsychiatry, so with a

11   Chief Psychologist over the Senior Psychologists who directly

12   supervise the line staff.

13   Q.  Is it ratio based?

14   A.  Yes.  The leadership positions are ratio based.  So as the

15   line staff -- the number of line staff grows, so will the

16   leadership positions and ratio.

17   Q.  And what will be the role of the Chief Telepsychologist?

18   A.  The Chief Telepsychologist, again, is ultimately

19   responsible for overseeing the program both administratively

20   and clinically.  So they will help to recruit and hire and

21   supervise the Senior Psychologists, and they'll be the

22   second-level supervisor to the line staff psychologists.

23   They'll help with, kind of, higher level issues, coordinating

24   with institutions to implement the program, working with

25   telehealth IT about technology needs, working on policy and

1    quality management or quality improvement projects.

2    Q.  What is the role of the Senior Telepsychologist?

3    A.  The Senior Telepsychologist is similar to Senior

4    Telepsychiatrist.  And they will help to recruit, hire, and

5    supervise the line staff psychologists.  They will work with

6    the institutions on implementing their assignments, signing out

7    equipment.  They'll do all the administrative responsibilities

8    of a supervisor in our system and also just generally assist

9    with the operations of telepsychology.

10   Q.  And generally, when do you expect to fill those leadership

11   positions we've just discussed?

12   A.  As soon as possible.

13   Q.  What has the interest been like for those leadership

14   position?

15   A.  There has been a lot of interest.  We had 44 applicants for

16   the Chief Psychologist position, and we have 13 applicants for

17   the senior positions.

18   Q.  Why is the plan to wait to onboard the line staff before --

19   I'm sorry -- until you finish interviewing and hiring the chief

20   and the senior positions?

21   A.  Because we want the chief to be able to choose their

22   leadership team when rolling out such a big program, but also,

23   we generally need someone to do the hiring and onboarding of

24   those line staff.

25   Q.  Is the plan to fill all of the leadership positions before

1    onboarding line staff?

2    A.   No.  Again, because it will be ratio based, we will

3    ultimately have more leadership.  But we do need an initial

4    complement of leadership to help stand up the program.

5    Q.   And when do you anticipate starting to hire telepsychology

6    line staff?

7    A.   Again, as soon as possible, but, realistically, probably

8    early 2024 at this rate.

9    Q.   And then when do you think the telepsychology program will

10   be up and running?

11   A.   It will be up and running in its initial form as soon as we

12   get line staff that we can help to assign to the institutions,

13   but, realistically, reaching its full potential will probably

14   take a couple years.

15   Q.   Why is that?

16   A.   It takes a lot of time to hire and train and deploy line

17   staff, especially at the numbers we're looking at.

18   Q.   And what do you envision is the program's full potential in

19   terms of total positions for telepsychologists?

20   A.   It's a little hard to say definitively, because it really

21   depends on the needs of the institutions and organization.  But

22   right now, we are looking between 60 and 70 line staff.

23   Q.   Why does it depend on the needs of the institution?

24   A.   Because these -- the telepsychologists are filling

25   vacancies at the institutions, so it really depends on the

1  number of vacancies and the need, and particularly at the lower

2  levels of care.

3  Q.  Are you adding any additional allocated staff psychiatrist

4  positions for telepsychology, or is it just to fill the vacant

5  on-site positions?

6  A.  We're not adding any new positions; we're just helping to

7  fill those existing vacancies.

8  Q.  And once the telemental health program is up and running

9  and the full complement of telemental health line staff has

10  been hired, how do you believe it will impact staff psychology

11  fill rates?

12          MS. ELLS:  Objection.  Calls for speculation.

13          THE COURT:  Sustained.

14  Q.  BY MS. WOLFF:  Do you believe that the telemental health

15  program will impact staff psychology fill rates?

16          MS. ELLS:  Objection.  Calls for speculation.

17          THE COURT:  Sustained.

18  Q.  BY MS. WOLFF:  Do you believe that telepsychology will

19  ultimately -- let me ask it this way.  Let me start over.

20      Has the telepsychiatry program impacted staff fill rates

21  for on-site psychiatrists?

22  A.  Yes, it has.  It has helped us to fill to over 90 percent

23  in psychiatry statewide.

24  Q.  And do you believe that telepsychology will have the same

25  result?

1          MS. ELLS:  Objection.  Calls for speculation.

2          THE COURT:  Sustained.

3   Q.  BY MS. WOLFF:  Do you believe that -- based on the interest

4   you've seen in the number of applicants for the leadership

5   positions, that you will likewise see a significant interest in

6   the line staff positions?

7          MS. ELLS:  Objection.  Calls for speculation.

8          THE COURT:  Sustained.

9   Q.  BY MS. WOLFF:  Is CDCR also working to implement a

10  telesocial work program?

11  A.  Yes, we are.

12  Q.  What is the current status of that program?

13  A.  Similarly, it's in its early stages, but we have hired our

14  first supervising Psychiatric Social Worker I, and we will be

15  starting to hire line staff soon.

16  Q.  How many Supervising Psychiatric Social Worker I positions

17  are currently contemplated?

18  A.  At this time, two to start with, but it's also ratio based

19  and will grow with the line staff.

20  Q.  And are you anticipating hiring any Supervising Psychiatric

21  Social Worker II positions?

22  A.  Yes.  As soon as possible.

23  Q.  How many of those?

24  A.  One at this time.

25  Q.  And, again, will that number grow as the program grows?

```
 1   A.  Yes, potentially.
 2   Q.  Is that position -- the Supervising Psychiatric Social
 3   Worker II, is that roughly equivalent to a chief?
 4   A.  Yes.  There is no chief social worker position in our
 5   system, but that's the closest thing to it.
 6   Q.  What will their job duties eventually entail?
 7   A.  It will be similar to the Chief Telepsychologist and Chief
 8   Telepsychiatrist, where they are ultimately responsible for
 9   overseeing the program, implementing policy, supervising, and
10   hiring the Supervising Psychiatric Social Worker I, which is as
11   close as we have to a senior social worker in our system, and
12   generally helping with higher level implementation of the
13   program.
14   Q.  And -- I'm sorry -- that was the job duties for the
15   Supervising Psychiatric Social Worker II position, correct?
16   A.  Yes.
17   Q.  And what are the job duties for the Supervising Psychiatric
18   Social Worker I position?
19   A.  That is similar to a Senior Telepsychiatrist or Senior
20   Telepsychologist.  They will be helping to recruit, hire, and
21   supervise the line staff social workers -- or line staff
22   telesocial workers, helping to implement their assignments,
23   distribute equipment, address any issues that come up in the
24   provision of telesocial work, and help with operations of the
25   program in general.
```

1   Q.  What happens after those telesocial work leadership

2   positions are filled?

3   A.  Then we will begin hiring line staff for the program.

4   Q.  And approximately how long before the first telesocial

5   worker line staff are hired and onboarded?

6   A.  Again, as soon as possible, but probably in November of

7   this year.

8   Q.  What do you envision is the program's full potential in

9   terms of total positions for telesocial workers?

10   A.  Again, it really depends on the number of need -- of

11   vacancies at the institutions, but at this time, it's planned

12   for between 30 and 40.

13   Q.  And, again, why does it depend on the number of on-site

14   staff clinical social worker vacancies?

15   A.  Because we're helping to fill existing vacancies or

16   allocations at the institutions.  We're not adding any new

17   positions.

18   Q.  Have you been successful in filling vacant on-site

19   positions for psychiatry?

20   A.  Yes, we have.

21   Q.  Can you walk me through the process after a

22   telepsychiatrist is hired; what happens next for them?

23   A.  Sure.  They begin their work in the hub, which is one of

24   our offices based, typically, in a regional office for CDCR.

25   And there they get familiar with the equipment; they do their

1    initial training, such as on our electronic medical record.

2    They also typically shadow other telepsychiatrists to get a

3    sense of the work and how our system works.

4        And then they begin their assignment -- being assigned to

5    an institution, receiving a caseload, and starting to work with

6    their team and see their patients.

7        Once -- once they're comfortable with that and the

8    supervising -- or the Senior Psychiatrist is comfortable and

9    the on-site leadership also is comfortable, then they

10   transition -- if they would like to, they can transition to

11   working from home.

12   Q.   And you mentioned CDCR hubs.  Can you explain what a hub

13   is?

14   A.   Yes.  We have regional offices, or offices outside of

15   institutions, essentially, in metropolitan areas where we have

16   dedicated telehealth offices where our -- our telepsychiatrists

17   can start their work, sometimes continue their work.

18   Q.   You mentioned that they're away from the institutions.  Do

19   you find that the location of the hubs impacts your ability to

20   recruit candidates?

21   A.   Yes.  It's by design that we are recruiting from these

22   metropolitan areas.  We know that most doctors and clinicians

23   are based in metropolitan areas as opposed to rural areas, and

24   so we're trying to draw from a bigger pool of candidates.

25   Q.   Will the onboarding process for telepsychologists and

1  telesocial workers be the same as it is for telepsychiatrists?

2  A.  Yes.  It will be very similar.  At first, there won't be

3  other telepsychologists or telesocial workers to shadow, but as

4  soon as there are, we will aim to do that as well.

5  Q.  In addition to staffing, what other components of the

6  telemental health program are currently underway?

7  A.  We have implemented the telemental health policy.  And, as

8  I mentioned, we've been working with telehealth IT to order

9  more equipment to facilitate telemental health, and most of

10  that has arrived.

11  Q.  Let's talk about staffing.  Approximately how many

12  telepsychiatrists are currently working for CDCR?

13  A.  There is currently over 90 telepsychiatrists working for

14  the CDCR.

15  Q.  And are those 90 telepsychiatrists civil servants or

16  registry providers?

17  A.  They're all civil servants.

18  Q.  How difficult is to fill telepsychiatrist positions that

19  are posted?

20  A.  It's not difficult.  Typically, we have -- we pretty much

21  always have more interest in the position than openings

22  available.  And we also have an informal list of people who are

23  interested when new positions do post or do become available.

24  Q.  Is it accurate to say that the hiring for these positions

25  is competitive?

1    A.   Yes.  Certainly.

2    Q.   Has that generally been the case since you've overseen the

3    telepsychiatry program, so since about 2020?

4    A.   Yes.  In my time in telepsychiatry leadership, that's been

5    the case.

6    Q.   And do you anticipate a lot of interest in the

7    telepsychology positions as well?

8              MS. ELLS:  Objection.  Calls for speculation.

9              THE COURT:  Sustained.

10   Q.   BY MS. WOLFF:  Have you seen a significant amount of

11   interest in the Chief Telepsychology position?

12   A.   Yes, we have.

13   Q.   And have you seen a lot of interest in the Supervising

14   Telepsychology positions?

15   A.   Yes.

16   Q.   Same question.  Have you seen a lot of interest in the

17   Supervising Psychiatric Social Worker I position?

18   A.   Yes.  We had 24 applicants for that position.

19   Q.   And have you seen a lot of interest in the Supervising

20   Psychiatric Social Worker II position?

21   A.   We have not yet been able to post that position, but I have

22   heard of people who are interested.

23   Q.   Why do you believe telemental health roles are so

24   desirable?

25             MS. ELLS:  Objection.  Calls for speculation.

```
 1                    THE COURT:  Sustained.

 2                    MS. WOLFF:  If I may respond to that, Your Honor?

 3                    THE COURT:  You can create your record.

 4                    MS. WOLFF:  Okay.  She's -- she's overseeing the

 5      telepsychology program for years.  She worked in the community.

 6      She understands and talks to candidates.  She's -- she's very

 7      knowledgeable about this topic and why people are seeking out

 8      those roles.

 9                    THE COURT:  Sustained.

10      Q.  BY MS. WOLFF:  Do you speak with candidates who apply for

11      telepsychiatry positions?

12      A.  Yes, I do.

13      Q.  And what is your understanding of why they are applying?

14      A.  Typically, they're specifically interested in

15      telepsychiatry -- or providing services via telepsychiatry.  A

16      lot of times, that's because of the work-life balance or their

17      personal factors.  Some would like to be closer to home if they

18      have young families.  Some just don't live near an institution.

19      Like I mentioned, we draw from metropolitan areas

20      intentionally, which are -- most of our institutions are rural,

21      so they may not live close to or be willing to relocate to an

22      institution.

23      Q.  Do you participate in meetings where mental health staffing

24      is discussed?

25      A.  Yes, I do.
```

1    Q.  Do you discuss both telemental health staffing as well as

2    on-site staffing?

3    A.  Yes.

4    Q.  For on-site, do you discuss both civil service and

5    registry?

6    A.  Yes, at two different meetings.

7    Q.  Do you know, from those meetings, how the pool of

8    candidates that CDCR receives for telepsychiatry positions

9    compares to the on-site civil service and registry staff

10   psychiatrist positions?

11   A.  From what I have seen, there is typically more interest in

12   the telepsychiatry positions.

13   Q.  And do you know --

14           THE COURT:  When you get a question like that, you

15   should first answer yes or no.

16           THE WITNESS:  Thank you.

17           THE COURT:  Could you go back, in fact, and clarify

18   your basis for that answer?

19       You said from what you have seen?

20           THE WITNESS:  From what I have seen in the meetings

21   where we discuss -- there is one meeting where we discuss the

22   applicants and the interested candidates who have come through

23   the Central Hiring Unit for available psychiatrist positions

24   for civil service.  Typically, we have seen more interest and

25   more applicants to the telepsychiatry positions than the

1    on-site staff psychiatrist positions.

2        And, similarly, we don't currently have registry

3    telepsychiatry positions available, but when we did, we had

4    many applicants.  And, again, there are typically more

5    applicants to those positions than to some of the on-site staff

6    psychiatrist positions, and there continue to be some

7    availabilities of those on-site staff psychiatrist positions.

8            THE COURT:  All right.  Plaintiff can explore that,

9    if it wishes.

10   Q.  BY MS. WOLFF:  How are telepsychiatrists currently

11   compensated as compared to their on-site staff psychiatry

12   peers?

13   A.  Currently, their compensation is very similar, although

14   they're not eligible for certain -- like, for the PIP

15   differential, for instance, which is a 15 percent differential

16   only for on-site staff.  And they're also not eligible for some

17   of the retention bonuses.

18   Q.  Are you aware that the unions representing psychiatrists,

19   psychologists, and social workers recently negotiated new

20   contracts with the State?

21   A.  Yes.

22   Q.  Do you know if the newly approved union contracts will

23   impact how telepsychiatry providers are compensated as compared

24   to their on-site peers?

25   A.  Yes.  The -- the new contract for BU 16, which is the

1    bargaining unit that represents psychiatrists, includes a

2    stipulation for an on-site differential -- pay differential of

3    15 percent that on-site psychiatrists will get but

4    telepsychiatrists will not be eligible for.

5    Q.  And do you know if the newly-approved union contracts will

6    impact how telepsychologists and telesocial workers will be

7    compensated as compared to their on-site peers?

8            MS. ELLS:  Objection.  Lack of foundation.  Calls for

9    speculation.

10           MS. WOLFF:  She just answered how --

11           THE COURT:  Just answer yes or no.

12           THE WITNESS:  Yes.

13           THE COURT:  All right.  You can explore how she knows

14    before you get a substantive answer.

15    Q.  BY MS. WOLFF:  How do you know that?

16    A.  I've seen the contracts and the summaries of the contracts

17    that have been discussed from labor representatives within our

18    organization.

19    Q.  And how are they -- how will they be compensated as

20    compared to their on-site peers?  This is -- I'm sorry.  This

21    is for telepsychologists and telesocial workers.

22    A.  Currently, they will be compensated similarly.  They --

23    there is not a similar pay differential for on-site in their

24    contract.  But there may be differences in classifications

25    which would affect not their pay tier but their retirement,

1    potentially, deductions.

2    Q.   How is the expansion of telemental health services within

3    CDCR funded?

4    A.   We submitted a BCP which helps to fund the infrastructure

5    for the telemental health program, which includes the

6    leadership positions, the support staff positions, and the

7    telepresenter positions for the newly implemented

8    telepsychology and telesocial work programs.

9    Q.   And how many leadership and support positions were funded

10   pursuant to that BCP?

11   A.   There were 85 positions funded for the first year, 2023 to

12   2024, and in 2024 to 2025, there will be 59 additional

13   positions funded.

14   Q.   And, again, does that include any line staff positions for

15   telemental health?

16   A.   No.   Those positions are drawn from existing allocated

17   vacancies at the institutions, which are allocated per the 2009

18   Staffing Plan.

19   Q.   Did you help write that BCP?

20   A.   Yes, I did.

21   Q.   Did others help, too?

22   A.   Yes.   I did not write it alone.

23   Q.   Ms. Pooni, can you please pull up Defendants' Exhibit 1.

24        Is this the BCP we were just discussing?

25   A.   Yes.

1    Q.  And is -- do you recall, is that BCP 7061?

2    A.  Yes, I believe it is.  Yes.

3    Q.  Thank you.  Okay.  We can put it down.

4        When did CDCR issue the telemental health policy?

5    A.  It was issued on September 19th and then reissued with

6    corrections on September 21st of this year.

7    Q.  I'm sorry?

8    A.  Of this year.

9    Q.  Why was it reissued?

10   A.  Simply put, we had version control issues and so had to

11   make a correction.

12           THE COURT:  You had what kind of control issues?

13           THE WITNESS:  Version control.  We had multiple

14   versions --

15           THE COURT:  Oh, version control.

16           THE WITNESS:  -- circulating.

17           THE COURT:  All right.

18           THE WITNESS:  Didn't fully incorporate all the edits.

19   Q.  BY MS. WOLFF:  Are you familiar with the substance of

20   CDCR's telemental health policy?

21   A.  Yes, I am.

22   Q.  And why is that?

23   A.  Because I helped to write it.

24   Q.  What was the process for creating this policy?

25   A.  In creating this policy, we drew from our experience.

1   There were multiple people involved, but many of us had

2   experience providing telepsychiatry as both staff

3   telepsychiatrists and in leadership positions overseeing the

4   telepsychiatry program, so we drew on that experience in

5   forming this policy.

6       We also incorporated lessons learned from the rapid

7   expansion of telemental health during COVID, which was brought

8   in beyond the telepsychiatry program, and from other just

9   experiences in administrating telepsychiatry over the years.

10      We also evaluated literature, looking at articles to make

11  sure that our practices and our positions were supported by the

12  medical literature on telepsychiatry and telemental health in

13  general.

14      And we submitted the policy to the Plaintiffs and had to

15  meet and confer in the past -- or in August, I guess, to

16  discuss the policy.

17  Q.  Did you submit it to any other stakeholders?

18  A.  Oh, and the Office of the Special Master, yes.

19  Q.  What are the goals of the telemental health policy?

20  A.  First and foremost is to help patients get seen by

21  expanding our pool of clinicians and being able to help to

22  relieve some of the burden from on-site clinicians who are

23  currently carrying a lot of the burden, honestly, with the

24  current staffing situation.

25  Q.  Based on your current -- I'm sorry.  Based on your

1  experience in your current role in working in CDCR's

2  telepsychiatry program for six years, how do you think CDCR's

3  mental health staffing would be impacted, if at all, if it

4  didn't offer telemental health?

5          MS. ELLS:  Objection.  Calls for speculation.

6          THE COURT:  Sustained.

7  Q.  BY MS. WOLFF:  Do you believe CDCR benefits by expanding

8  its telemental health program?

9          MS. ELLS:  Objection.  Calls for speculation.

10          THE COURT:  Sustained.

11          MS. WOLFF:  It doesn't call for speculation, Your

12  Honor.  It's her opinion about whether or not CDCR benefits by

13  the expansion of this program.

14          THE COURT:  Sustained.  General benefit is not the

15  issue here.

16          MS. WOLFF:  General benefit of the program?  I think

17  it is because we're talking about staffing.

18          THE COURT:  I understand that's your position, but

19  I -- the objection is sustained.

20  Q.  BY MS. WOLFF:  When on-site staff leaves CDCR, are you

21  involved in any discussions relating to explanation as to why

22  those staff are leaving?

23  A.  I have been told by multiple leaders from institutions that

24  many of the staff are leaving to go to positions that involve

25  telework, as it's become more of a standard in the community

1    and people are seeking it out.

2    Q.  Do you believe that CDCR is able to expand the pool of

3    mental health staff candidates by -- through telemental health?

4    A.  Yes, I do.  As I mentioned, we are intentionally drawing

5    from major metropolitan areas where we know that there are more

6    candidates.  And we're trying to draw a new candidate pool, not

7    just from the existing people we have in our system.  We're

8    trying to add to our system.

9        I also know that, like I mentioned, it's become more of a

10   standard in the community, and people are seeking that out.

11   I've seen articles discussing that a majority of clinicians at

12   this time basically expect to have some component of telework,

13   and so in doing this, I think it helps to keep us competitive

14   with the community and add to our candidate pool.

15              THE COURT:  All right.  It's 5:00 o'clock, so we will

16   adjourn for the day and continue again at 9:00 a.m. tomorrow

17   morning.  So be back there at 9:00 a.m. tomorrow morning.

18              THE CLERK:  Court is in recess.

19                   (Proceedings adjourned, 5:00 p.m.)

20                        ---oOo---

21   I certify that the foregoing is a correct transcript from the

22   record of proceedings in the above-entitled matter.

23

24                        /s/ Kimberly M. Bennett
                          KIMBERLY M. BENNETT
25                        CSR No. 8953, RPR, CRR, RMR