IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

Ralph Coleman, et al.,
     Plaintiffs,          Sacramento, California
                        No. 2:90-cv-00520
vs.                     Wed., Oct. 04, 2023
                        9:11 a.m.
Gavin Newsom, et al.,
     Defendants.
_____/

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
---oOo---

APPEARANCES:

For the Plaintiffs:        Rosen, Bien, Galvan and
                        Grunfeld, LLP
                        101 Mission Street
                        Sixth Floor
                        San Francisco, CA  94105
                        By:  Lisa Adrienne Ells
                        Jenny Snay Yelin
                        Alexander Ross Gourse
                        Adrienne Pon Harrold
                        Attorneys at Law


For the Defendants:        Hanson Bridgett, LLP
                        1676 N. California Blvd.,
                        Suite 620
                        Walnut Creek, CA  94596
                        By: Paul B. Mello
                        Laurel O'Conner,
                        Attorneys at Law

(Appearances continued on following page)


Official Court Reporter:     Kimberly M. Bennett,
                        CSR, RPR, RMR, CRR
                        501 I Street
                        Sacramento, CA 95814


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription

```
 1                          APPEARANCES CONTINUED

 2      For the Plaintiffs:              Prison Law Office
                                         1917 Fifth Street
 3                                       Berkeley, CA  94710
                                         By: Marissa Hatton
 4                                       Attorney at Law

 5

        For the Defendants:             Hanson Bridgett, LLP
 6                                       425 Market Street, 26th Floor
                                         San Francisco, CA  94105
 7                                       By: Samantha Derin Wolff
                                         Lawrence Michael Cirelli
 8                                       Attorneys at Law

 9      For the Defendants:             Office of the Attorney
                                         General
10                                       1300 I Street, Suite 125
                                         Sacramento, CA  94244
11                                       By: Elise Owens Thorn
                                         Deputy Attorney General

12

13      For the Defendants:             Office of the Attorney
                                         General
14                                       455 Golden Gate Ave.
                                         Suite 11000
15                                       San Francisco, CA  94102
                                         By: Damon Grant McClain
16                                       Namrata Kotwani
                                         Deputies Attorney General

17

18

19

20

21

22

23

24

25
```

1                               INDEX

2

   <u>WITNESSES:</u>                                              <u>PAGE:</u>

3

     TONI MARTELLO
4    DIRECT EXAMINATION CONTINUED BY MS. WOLFF.......... 9
     CROSS-EXAMINATION BY MS. ELLS...................... 15
5    REDIRECT EXAMINATION BY MS. WOLFF.................. 37

6    AMAR MEHTA
     DIRECT EXAMINATION BY MR. MELLO.................... 39
7    CROSS-EXAMINATION BY MS. ELLS..................... 106
     REDIRECT EXAMINATION BY MR. MELLO................. 144

8

     TIMOTHY BROWN
9    DIRECT EXAMINATION BY MS. HATTON.................. 148
     CROSS-EXAMINATION BY MR. CIRELLI................. 188
10   REDIRECT EXAMINATION BY MS. HATTON............... 227
     RECROSS EXAMINATION BY MR. CIRELLI.............. 235

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to order of the court, 9:11 a.m.)

 2              THE CLERK:  Calling civil case 90-520, Coleman, et

 3    al. versus Newsom, et al.

 4         This is on for enforcement hearing, day three.

 5              THE COURT:  All right.  Good morning.  All counsel

 6    are present.  Apologies for the late start.  It's on the Court.

 7         Two things, housekeeping.  There is this emergency system

 8    test at 11:20, I believe, our time.  I don't know how long it's

 9    going to go on.  Our IT department advises that if cellphones

10    are completely off, they do not believe they will sound.  So

11    the order is for all cellphones, starting at 11:15, to be off

12    entirely.  I mean, they should be not recording; they shouldn't

13    be set to sound, but even if they're set to silent, they'll

14    vibrate, as we understand it.  So starting at 11:15, all

15    cellphones off.  We believe iPads, if connected to a phone,

16    will not trigger.  Erring on the side of caution, I will

17    probably turn mine completely off.  And we'll see if we can

18    have a security officer at the back door to monitor anyone

19    coming in so that we don't have to take a break.  But if we do,

20    we will at that time.

21         Here is the other housekeeping I wanted to cover.  I'm

22    just -- I just want to make certain folks understand how I'm

23    sizing up the framing of this, given some of what's going on

24    here.

25         There is an Eighth Amendment remedy in place.  That is the
```

1   remedy that sets the framework for these proceedings.  The

2   Court -- with respect to the issue of telepsychiatry and

3   telemental health, I did my best to clarify that issue with

4   Mr. Mello, at least in a very basic way, on the first day of

5   hearing, given a stray line in the trial brief that suggests

6   that Defendants have taken the position the Court has shut down

7   any further expansion.  The Court has, in fact, blessed pretty

8   significant use of telepsychiatry in this case.  I have

9   signaled that the way to modify the remedy is to bring a

10  Rule 60 motion.  There is no Rule 60 motion pending before the

11  Court.  So the parameters of the remedy are set for the

12  purposes of this hearing.

13      In terms of the Plaintiffs' objections to testimony related

14  to telepsychiatry or telemental health, the Defendants' trial

15  brief signaled that Defendants would go there.  There was no

16  motion in limine to clarify the scope to exclude any portion of

17  testimony regarding telepsychiatry or telemental health, so

18  that's why I'm allowing much of the testimony in, subject to a

19  motion to strike if the Plaintiffs really believe that some of

20  this is outside the scope of the existent remedy.

21      Relatedly, the Court has received the parties' joint status

22  report regarding telemental health, and I read that before the

23  hearing, and I read it again yesterday evening.  And that

24  provides the Court a report.  It doesn't ask for any action.

25  It identifies some concerns the Plaintiffs register regarding

 1    telemental health but also indicates the Plaintiffs' belief the

 2    program should move forward.

 3        So I see that.  It doesn't modify the remedy that's in

 4    effect now.  So maybe this is just an issue for very careful

 5    briefing in closing argument, but that's how the Court is

 6    sizing this up.

 7        If anyone thinks I've got that wrong, for the purposes of

 8    considering objections going forward, please let me know now.

 9        Ms. Ells?

10            MS. ELLS:  We agree with you, Your Honor.  And we

11    will carefully consider if we need to bring a motion to strike

12    as to any of the testimony we heard, now that we've heard the

13    full extent of it -- well, after we have heard the full extent

14    of it.

15            THE COURT:  Well, there is Dr. Martello, and there is

16    Dr. Mehta.

17            MS. ELLS:  Correct.  But we agree with your analysis

18    at the top level.

19            THE COURT:  All right.  The Court -- this Court has a

20    long fuse, if you haven't noticed.  So, I mean, I give people a

21    lot of rope.  But it doesn't mean I won't consider a motion to

22    strike.

23        Anything else to say?

24            MR. MELLO:  I mean, I can speak to the issue of

25    relevance, but it sounds like Your Honor set forth a framework,

```
 1   and if Plaintiffs choose to file a motion to strike, we can

 2   speak to the issue of relevance; we can speak to the issues of

 3   how they've raised these issues in their trial brief, in their

 4   opening statement, and the impacts of telepsychiatry and

 5   telemental health on staffing, which is at the core of this

 6   issue.

 7       But I don't really have anything more to say about that or

 8   about our line in our opening brief, Your Honor.  And we

 9   appreciate the latitude.

10           THE COURT:  All right.  All right.  Anything else

11   before we bring Dr. Martello back?

12           MS. ELLS:  Yes, Your Honor.  The parties jointly have

13   one bit of housekeeping.

14           THE COURT:  All right.

15           MS. ELLS:  At one point, Your Honor indicated that

16   you intended to hold a hearing on the inpatient transfer

17   timeline issue immediately following the close of evidence.

18       Given this proceeding has been longer than originally

19   anticipated, we would like to jointly request that Your Honor

20   not hold it immediately afterwards but give us a little bit of

21   time before we hold that hearing so that we can turn our

22   attention to preparing for that matter.

23           THE COURT:  What's a little bit of time?

24           MS. ELLS:  I -- so the other thing is, on both sides,

25   lead counsel and, you know, primary counsel have conflicts next
```

1    week between jury duty and business travel and other case

2    conflicts.  So, ideally, no earlier than the end of next week

3    or sometime the following week or any time thereafter,

4    essentially.

5           THE COURT:  All right.  I'm willing to entertain

6    that, particularly because a trial I had set appears to have

7    gone away.  I won't know for certain until, I believe, the end

8    of the day on the 13th.  But I'm willing to entertain that.  I

9    would suggest you meet and confer, confer with Ms. Schultz,

10   identify a time that works for the Court and counsel that need

11   to be present for that proceeding.

12           MS. ELLS:  Thank you, Your Honor.

13           MR. MELLO:  Your Honor, just if I may, one question

14   about that proceeding.  How does the Court envision that

15   proceeding?  What it -- what will it look like?  Will it be

16   counsel?  Are you wanting to hear from any of the principals in

17   a status-conference-type setting?  I want to make sure, for

18   purposes of scheduling when we meet and confer, that we have a

19   better sense of what you envision that proceeding looking like.

20           THE COURT:  I'll have to go back and look at what

21   I've told you previously.  I understood the parties didn't

22   believe they needed any presentation of evidence.

23      Do I have that right, Ms. Ells?

24           MS. ELLS:  Yes, at this point.

25           MR. MELLO:  I'm sorry.  Yes, Your Honor.

1          THE COURT:  I try not to mess with the burdens.  So

2    if you're saying you don't want to put on evidence, then -- I

3    had understood it would be styled as legal argument.

4          MR. MELLO:  Perfect.  Thank you, Your Honor.

5          MS. ELLS:  Thank you.

6          THE COURT:  All right.  All right.  Anything else,

7    Mr. Mello?

8          MR. MELLO:  No, Your Honor.  Thank you.

9          THE COURT:  All right.  Let's bring Dr. Martello

10   back, then.

11     (The Witness, Toni Martello, previously sworn.)

12          THE COURT:  All right.  Dr. Martello, you continue to

13   testify subject to the oath you took yesterday.  Understood?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.  You may proceed.

16          MS. WOLFF:  Thank you, Your Honor.

17                 DIRECT EXAMINATION CONTINUED

18   BY MS. WOLFF:

19   Q.  Good morning, Dr. Martello.

20   A.  Good morning.

21   Q.  What is the goal of the telemental health program in terms

22   of staffing?

23   A.  In terms of staffing, it's really to improve our staffing,

24   to draw from a new pool of candidates to add to our staffing,

25   and, in doing so, to help treat our patients, improve access to

1    care, and to keep us competitive with the community where

2    telemental health has become a standard.  It really helps us to

3    be able to compete in the market and draw qualified clinicians

4    and psychiatrists to our program.

5    Q.  And, specifically, in terms of staffing as it relates to

6    on-site vacancies, what is the goal?

7    A.  It's to help fill those vacancies that are on-site.  As I

8    mentioned yesterday, we're not adding new positions; we're

9    helping to fill those positions that already exist and are

10   vacant.

11       And also, in doing so, our hope is that in adding more

12   clinicians to the pool, that we can help to stabilize on-site

13   staffing as well, because it's very hard to retain people when

14   your caseloads are too high and you're overburdened.  So we're

15   hoping to help relieve that burden and help improve recruitment

16   and retention on-site as well.

17   Q.  Have you been able to improve fill rates among staff

18   psychiatrist positions using telepsychiatry?

19   A.  I do believe so.  Since we have expanded the telepsychiatry

20   program, our overall staffing rates have improved, and we're

21   above 90 percent in staffing statewide for psychiatrists.

22   Q.  I'm going to ask Ms. Pooni to please bring up Defendants'

23   Exhibit 26.  Thank you.

24       Ms. Martello, have you seen this document before?

25   A.  Yes, I have.

1    Q.   How did you previously come to see this document?

2    A.   I was shown this by Dr. Mehta, who I believe received it

3    from the institutional leadership at SATF.

4    Q.   Who authored the letter?

5    A.   It was written by the chairman of the Facility G IAC, which

6    is the Inmate Advisory Council at SATF.

7    Q.   Can you describe what an Inmate Advisory Council is, just

8    briefly?

9    A.   Yes.  I believe it's a council of inmates who have been

10   elected to represent other inmates in raising issues to

11   leadership.

12   Q.   And who is the letter addressed to?

13   A.   It's addressed to the CEO of SATF.

14   Q.   I'm sorry.  SATF stands for?

15   A.   It's the Substance Abuse Treatment Facility.  It's one of

16   our prisons.

17   Q.   Where is that located?

18   A.   It's in Corcoran, which is in the central valley.  It's a

19   rural area.

20   Q.   The first line of the letter says, quote, I offer this on

21   behalf of the Facility G IAC and population to respectfully

22   request your consideration of implementing the telehealth

23   services for the CCCMS care within our facility.

24        Do you see that?

25   A.   Yes.

1    Q.  At the time the letter was authored on August 21, 2023,

2    were telepsychiatry services available to the patient

3    population at SATF at the CCCMS level of care?

4    A.  Yes, they were.

5    Q.  Were telepsychology and telesocial work available then?

6    A.  No, they were not.

7    Q.  The letter states, in the second paragraph, that, quote --

8    sorry -- quote, telehealth has emerged as an innovative

9    solution to address the health care challenges we are facing,

10   end quote.

11        And, quote, by offering virtual CCCMS consultations,

12   inmates would have access they need before it becomes a more

13   serious psychological problem, end quote.

14        Do you see that?

15   A.  Yes, I do.

16   Q.  Do you agree with the IAC's statement that offering

17   telemental health to the CCCMS population would give inmates

18   access to care they need before it becomes a more serious

19   psychological problem?

20   A.  I do.  That is certainly our goal, is to improve their

21   access to care and help to keep them in the lower levels of

22   care whenever possible.

23   Q.  Why do you believe that?

24   A.  I believe that because that's been our experience with

25   telepsychiatry, that we've been able to effectively treat

1    patients at the CCCMS level of care.  And I believe that we

2    would be able to do so with telepsychology and telesocial work

3    as well.

4    Q.  The letter also states that, quote, screen therapy is

5    better than no therapy, end quote.

6        Do you agree with that statement?

7    A.  I do, yes.

8    Q.  And why is that?

9    A.  Because I think we can, like I said, effectively provide

10   care via video.  And, again, any care is better than no care.

11   But I, on top of that, think that we can provide effective care

12   through telemental.

13   Q.  And the letter states in the third paragraph that the

14   population has grown accustomed to telehealth for PCP

15   appointments, surgical consultation, psychiatry, and even for

16   court proceedings and parole hearings.  And it says, quote, it

17   is only sensical [sic] to move forward to significantly improve

18   the quality of CCCMS health care, end quote.

19       Do you see that?

20   A.  Yes, I do.

21   Q.  Will telemental health be offered to CCCMS patients at SATF

22   when the program is up and running?

23   A.  Yes, that is our goal.

24   Q.  And approximately when do you believe patients at SATF will

25   first be seen using this modality?

1    A.  Our social workers are anticipated to hire this fall, so my

2    best estimate would be in December of this year, we would be

3    able to start seeing patients, and SATF would be a priority for

4    sure, given their staffing situation.

5    Q.  And what about for telepsychology?

6    A.  For telepsychology, as I mentioned yesterday, our timeline

7    is a little bit further out.  So, realistically, my best

8    estimate is in February of next year, we would likely start

9    seeing patients.

10   Q.  And that's for SATF?

11   A.  Yes, that would be for SATF.

12   Q.  Then, more generally, when do you expect patients

13   throughout CDCR to begin to be seen via telepsychology?

14   A.  Similarly, and we would start in likely early February of

15   -- early next year.  It would not immediately be available to

16   all institutions, but that is our goal as we grow, to improve

17   access at multiple institutions.

18   Q.  And then same question for telesocial work.  When do you

19   expect patients throughout CDCR to begin to be seen via that

20   modality?

21   A.  Similarly, they would start being seen, best estimate, in

22   December of this year.  And, again, it would roll out slowly as

23   we hire, but beginning in December and then rolling out as

24   quickly as we can to other institutions as we build our staff.

25         MS. WOLFF:  Thank you, Dr. Martello.  I have no

 1    further questions.

 2            THE COURT:  All right.  Cross-examination.

 3                        CROSS-EXAMINATION

 4    BY MS. ELLS:

 5    Q.  Good morning, Doctor.

 6    A.  Good morning.

 7    Q.  Your current role is the Assistant Deputy Director of

 8    Telemental Health, right?

 9    A.  Yes.

10    Q.  And you've been in that position about four months?

11    A.  Yes.

12    Q.  Since June 2023?

13    A.  Yes.

14    Q.  And you're the first person to hold this position, right?

15    A.  Yes.  It's a newly created position.

16    Q.  It didn't exist before that?

17    A.  No.

18    Q.  In fact, telemental health, as a concept, did not exist

19    prior to June 2023, right?

20    A.  To include telepsychology and telesocial work, it was not

21    existing, but we had telepsychiatry.

22    Q.  Thank you for clarifying.  Yes.

23        You testified on direct about the long-standing use of

24    telepsychiatry in CDCR, since 2010, I believe you said; is that

25    right?

1    A.   Yes, approximately since then.

2    Q.   And you also testified about the great efficacy of CDCR's

3    telepsychiatry program, in your opinion, correct?

4    A.   Yes.

5    Q.   It's been in place for many years, and you've testified

6    that it's effective at reducing psychiatry vacancy fill rates

7    in your estimation, right?

8    A.   Yes.

9    Q.   I'd like Mr. Gonzalez to bring up Defendants' Exhibit 1.

10   This is the BCP that you testified yesterday that you helped

11   write for telemental health.

12        Now, this BCP is dated May -- thank you -- May 2023, right?

13   A.   Um-hum.

14   Q.   And it's for fiscal year 2023 through 2024?

15   A.   Um-hum.

16            THE COURT:   When you -- please say yes or no.

17            THE WITNESS:   I'm sorry.   Yes.

18   Q.   BY MS. ELLS:   CDCR did not submit any BCP for

19   telepsychology or telesocial work for any fiscal year prior to

20   2023/'24, correct?

21   A.   No.   Yes.   Correct.

22   Q.   And you did not -- the department did not propose a policy

23   for the use of telemental health -- and by that, I mean

24   telesocial work and telepsychology specifically and not

25   telepsychiatry.   You did not propose a policy for the use of

1    telemental health in CDCR until this summer, after the BCP was

2    submitted in May, correct?

3    A.  Correct.

4    Q.  Now, this BCP, as you've testified, calls for redirecting a

5    hundred line staff psychologists and social workers.  And that

6    includes 66 to 77 psychologists, correct?

7    A.  Correct.

8    Q.  And 31 -- 30 to 41 social workers, right?

9    A.  Correct.

10   Q.  None of those 66 to 77 line staff telepsychologist

11   positions are filled today, right?

12   A.  Yes.  Correct.

13   Q.  And you don't know for sure when they will be filled?

14           MS. WOLFF:  Objection.  Misstates her testimony.

15           THE COURT:  Overruled.

16       You may answer if you're able.

17           THE WITNESS:  I don't know exactly when they will be

18   filled, but I estimate that we will be able to hire soon and

19   hopefully quickly, given our experience with telepsychiatry.

20   Q.  BY MS. ELLS:  But that's your best estimate?

21   A.  My best estimate.

22   Q.  You don't know?

23   A.  I don't know for sure, no.

24   Q.  None of the 30 to 41 line level telesocial worker positions

25   the BCP calls for are filled today either, right?

1   A.  No.

2   Q.  And, similarly, you don't know for sure when those will be

3   filled?

4   A.  Not for sure.

5   Q.  Even the first one?

6   A.  No.

7   Q.  The BCP also calls for hiring a number of supervisors for

8   the telemental health program.  On page 4 of the BCP, displayed

9   here, it indicates that the plan is for six Senior Psychologist

10  Supervisors, correct?

11  A.  Correct.

12  Q.  Two Chief Psychologists, correct?

13  A.  Correct.

14  Q.  One Supervising Psychiatric Social Worker II, correct?

15  A.  Correct.

16  Q.  Three Supervising Psychiatric Social Worker Is.

17      Of those positions, and please correct me if I'm wrong, I

18  believe you testified that you have hired one Supervising

19  Psychiatric Social Worker I so far; is that right?

20  A.  That is right.

21  Q.  Okay.  All of the other supervisory positions for the

22  telemental health program are vacant?

23  A.  Yes.  We're not intending to fill all of them immediately,

24  as I mentioned yesterday.  We're trying to fill some of them up

25  front, and it will grow as the line staff grows.  But, correct,

1    the other ones are not yet filled.

2    Q.  As you sit here today, you don't know when they will be

3    filled, correct?

4    A.  Not exactly, no.

5    Q.  You said you had made an offer to a Chief Telepsychologist

6    candidate, correct?

7    A.  Correct.

8    Q.  And they turned it down?

9    A.  Yes.

10    Q.  Did the candidate tell you why?

11    A.  It relates to the safety -- or lack of safety

12    classification, which is, without getting into the weeds, a

13    classification that affects retirement calculations and

14    deductions.

15    Q.  And am I correct that that means that people working

16    remotely have less of a retirement benefit than people that

17    work on-site; is that right?

18    A.  Yes.

19    Q.  Okay.  So they turned it down because they would be getting

20    paid less than if they were working on-site?

21    A.  Correct.

22    Q.  You're waiting to hire any line level telepsychologists,

23    the ones who actually treat the patients, until you have hired

24    supervisory telepsychologists, right?

25    A.  Yes.

 1   Q.  Similarly, you're waiting to hire line level telesocial

 2   workers until you've hired supervisory telesocial workers,

 3   right?

 4   A.  Yes.

 5   Q.  So by your estimate -- I believe you testified yesterday --

 6   the telemental health program won't be staffed up and fully

 7   operative until, you said, a couple of years from now?

 8   A.  That would be fully staffed.

 9   Q.  Fully staffed.

10   A.  Estimate.  But we will begin seeing patients well before

11   then.

12   Q.  So the program anticipated by this BCP, which calls for up

13   to 77 psychologists and, I believe, 41 treating social workers,

14   you don't expect that to be up and running in full until a

15   couple of years from now?

16   A.  Not full, but it will be operative and seeing patients well

17   before then.  Hopefully within the next few months.

18   Q.  I'm sorry.  I'm just trying to clarify.

19       But the full scope of the program anticipated by this BCP,

20   you don't expect that to be up and running completely for a

21   couple of years?

22   A.  Correct.

23   Q.  Okay.  Mr. Gonzalez, could you please turn to Defendants'

24   Exhibit 13, page 2.

25       Even if you fill all of the 77 psychologist positions that

1    the department anticipates, CDCR would still not be at a 90

2    percent fill rate for their current allocations, correct?

3              MS. WOLFF:  Objection.  Lacks foundation.

4              THE COURT:  Overruled.

5         You can answer if you're able.

6              MS. ELLS:  I'd be happy to lay the foundation.

7              THE COURT:  All right.

8    Q.  BY MS. ELLS:  This exhibit shows that in July 2023, you had

9    an allocation of 1,009.80 psychologists, correct?

10        Do you see that on the far right?

11   A.  I do see that, yes.

12   Q.  90 percent of 1,009.80 would be just over 900, correct?

13   A.  Correct.

14   Q.  The same month, you had just shy of 629 psychologists

15   working for you, according to this chart, correct?

16   A.  Um-hum.  Yes.  Correct.

17   Q.  And 77 on top of the existing 629 would get you to just

18   over 700 psychologists, correct?

19   A.  Correct.

20   Q.  And that's still well short of the roughly 900 you would

21   need to be compliant with the 90 percent fill rate, correct?

22   A.  It is, but the 77 is an approximation.

23        As I was explaining yesterday, the telepositions are really

24   drawn from vacancies, and so it's fungible.  The number -- the

25   exact number of positions we would need really depends on the

1   number of vacancies on-site, the levels of care at which those

2   vacancies exist.  And our hope is also that as we are able to

3   add staff and relieve the burden, hopefully on-site recruitment

4   and retention will stabilize and improve as well.

5   Q.  Okay.  So let me try and unpack that a little bit.

6       Am I understanding you to testify that this program may

7   ultimately be larger than 77 telepsychologists?

8   A.  It's possible.  It really depends on the staffing situation

9   as we go forward and, like I said, the levels of care those

10  vacancies are at, etc.

11  Q.  But this BCP only anticipates 77, including as to the

12  equipment that is planned and the administrative staff and the

13  support staff and the supervisory staff, correct?

14  A.  Yes.

15  Q.  Okay.  So that's all that's funded or anticipated by the

16  BCP that's been approved by the legislature?

17  A.  The vacancies for line staff, again, already exist, but in

18  terms of the other positions, correct.

19  Q.  Correct.

20  A.  Although we have -- the leadership positions are ratio

21  based, so my understanding is that they would get funded if the

22  program were to grow.

23  Q.  But up to the amount anticipated by the BCP, which I think

24  you previously testified is six Senior Psychologist

25  Supervisors, two Chief Psychologists, one Supervising

1   Psychiatric Social Worker II, and three Supervising Psychiatric

2   Social Worker Is, right?

3   A.   That was what was originally funded.  I would have to

4   double-check whether it would be -- we would be able to do more

5   than that, beyond the BCP, without getting another BCP.

6   Q.   But as you sit here today, you don't know if you have

7   authority to do that or funding?

8   A.   I'm not confident, no.

9   Q.   Mr. Gonzalez, could you turn to page 3 of this exhibit,

10   please.

11       So this is the same chart.  This page refers to social

12   workers.

13       In July 2023, you had an allocation of 397 social workers.

14   Do you see that on the right --

15   A.   I do.

16   Q.   -- of this exhibit?

17       90 percent of 397 would be about 357, right?

18   A.   Something like that, yes.

19   Q.   Roughly.

20   A.   Roughly.

21   Q.   Math is not either of our expertise.

22       In the same month, you had about 291 social workers working

23   for you, right?

24   A.   Yes.

25   Q.   So if you filled all of the 41 telemental health social

1   work positions that are anticipated by this BCP and you added

2   it to the 291 social workers you have, you'd be at 332, right?

3   A.  Correct.

4   Q.  And that's still short of the 357 social workers you would

5   need to be at 90 percent compliant fill rate, correct?

6   A.  Yes.

7   Q.  I think you testified yesterday that telepresenters play an

8   important role in the telepsychiatry program today, correct?

9   A.  They do, yes.

10  Q.  And a lot of those are medical assistants, correct?

11  A.  Yes.

12  Q.  And, in fact, the medical assistants right now are

13  specifically allocated in order to be telepresenters for the

14  telepsychiatry program, correct?

15  A.  Yes.

16  Q.  The telemental health BCP also calls for hiring new support

17  staff for the new telemental health program, right?

18  A.  Yes.

19  Q.  The BCP calls these people crucial to the success of the

20  telemental health program.

21      Do you agree with that?

22  A.  I do.

23  Q.  This BCP, in fact, calls for adding 100 medical assistants

24  to serve as telepresenters for the planned 100, approximately,

25  new telemental health providers, right?

 1   A.  Yes.

 2   Q.  And this information is on page 4 of the exhibit

 3   highlighted here.

 4       Mr. Gonzalez, could you turn to page 5 of this exhibit,

 5   please.

 6       Okay.  So the resource request in this BCP is for 50

 7   medical assistants in this budget year and 50 more next budget

 8   year; is that correct?

 9   A.  Correct.

10   Q.  You're currently well short of the 90 percent fill rate for

11   medical assistants with the existing allocations, correct?

12           MS. WOLFF:  Objection.  Lacks foundation.

13           MS. ELLS:  Mr. Gonzalez, could you pull up

14   Plaintiffs' Exhibit 35.

15           THE COURT:  So you're going to lay a foundation?

16           MS. ELLS:  Yes, Your Honor.  Thank you.  I will lay a

17   foundation.

18       And please turn to page 9.

19   Q.  BY MS. ELLS:  Dr. Martello, this is the most recent filing

20   with the Court, displaying the department's fill rate for the

21   five classifications at issue in this trial.

22       Do you recognize this?

23   A.  I do.

24   Q.  Okay.  And this is the page that reports on allocated and

25   filled medical assistant positions in August of 2023.

1    A.   Yes.

2    Q.   And it shows, at the bottom, that there are 86 currently

3    allocated medical assistants, correct?

4    A.   Yes.

5    Q.   And it shows that you're currently about 27 short of the 90

6    percent fill rate, correct?  That's 86 allocated, minus 59

7    filled, roughly 27, correct?

8    A.   That is of medical assistants.  My understanding is that

9    this report does not account for other classifications filling

10   these positions, such as if there is a SAR, like a CNA or any

11   other clinical classification.

12   Q.   Right.  I understand.  But of the medical assistants --

13   A.   Of medical assistants --

14   Q.   -- that are specifically allocated for the telepresenter

15   role in your telepsychiatry program, you're already well short

16   of the 90 percent fill rate, correct?

17   A.   Of medical assistants.

18   Q.   Of medical assistants.

19   A.   That does not necessarily mean these positions are not

20   operative, or there is not someone functioning in that

21   capacity.

22   Q.   But they're not medical assistants?

23   A.   Correct.

24   Q.   And, once again, the medical assistant role is specifically

25   to be a telepresenter in your telepsychiatry program, correct?

1   A.   Yes.  But as I said, it could be filled by other

2   classifications.

3   Q.   I understand.  Thank you.

4   A.   Yes.

5            THE COURT:  Can you just follow up on that and

6   clarify which -- who else might fill the job if a medical

7   assistant is not available?

8            THE WITNESS:  Yes.  There -- our policy allows for a

9   number of clinical classifications to fill the telepresenter

10  role.  Commonly, it's a certified nursing assistant or CNA.  My

11  understanding is that a lot of institutions, for one reason or

12  another, have an easier time filling the CNA position, and so

13  they are able to do a SAR.  And I apologize, I don't, off the

14  top of my head, remember what a SAR stands for, but it's our

15  process of converting one position into another.  They're able

16  to use the MA position to fill a CNA in that role.  And so

17  that's what I'm trying to say is that --

18           THE COURT:  So if not MA, it's CNA --

19           THE WITNESS:  CNA.

20           THE COURT:  -- actually on the ground.

21           THE WITNESS:  Yes.

22           THE COURT:  Not just policy.

23           THE WITNESS:  Yes.  Either a CNA -- at times, it's

24  other classifications, too.  I know we have some recreation

25  therapists who sometimes fill in.  Our policy also allows for

1  up to a physician or psychologist, social worker, to function

2  in the role.  And if it's an MHPC -- or primary clinician --

3  that is helping telepresent, it can count as a joint session

4  for both the clinician and the psychiatrist.

5  Q.  BY MS. ELLS:  Is the telepresenter role included in the job

6  duties of any of those classifications?

7  A.  I'm not sure I know what you mean.

8  Q.  I'm sorry?

9  A.  I'm not sure I know -- I understand your question.

10  Q.  So each job classification has a job duty statement,

11  correct?

12  A.  Yes.

13  Q.  Are you aware of whether any of those positions that you

14  just mentioned that are functioning as telepresenters have

15  included telepresenter duty in their job statements?

16  A.  I --

17       MS. WOLFF:  Objection.

18       THE WITNESS:  Sorry.  Go ahead.

19       MS. WOLFF:  Objection.  Lacks foundation.  Calls for

20  speculation.

21       THE COURT:  Overruled.

22     You can answer yes or no.

23       THE WITNESS:  I'm not sure.

24  Q.  BY MS. ELLS:  So moving back toward the BCP, the BCP

25  specifically anticipates that medical assistants will perform

1  the telepresenter role for the new telemental health program,

2  right?

3  A.  It's complicated.  It would be similar to telepsychiatry.

4  For a number of reasons, after a lot of conversations, medical

5  assistants are the position that made the most sense to include

6  here, but functionally, we -- I would anticipate that there

7  would possibly be CNAs or other people working in that position

8  as well.

9  Q.  Mr. Gonzalez, could you go back to page 4, please.  Is this

10  page 4?  I believe this is page 5.  Thank you.

11      In the second full paragraph, the first three lines, it

12  says:  Telepresenters, medical assistants, MAs, play an

13  important role in providing technical and on-site support for

14  the telepsychology and telesocial work services.  MAs will be

15  calculated at a one-to-one ratio for psychologists and social

16  workers providing teleservices and will be managed by

17  Supervising Nurse RN -- Supervising Registered Nurse IIs, which

18  are calculated at a one-to-twelve ratio.  These MAs will help

19  facilitate TMH -- which I understand to be telemental health,

20  correct?

21  A.  Correct.

22  Q.  -- services at the institution.  And then it goes on to

23  list their anticipated job duties.

24      All of those are telepresenter duties, correct?

25  A.  Yes.

1   Q.   So they are being specifically allocated in order to be

2   telepresenters for a one-to-one matching ratio for the

3   psychologists and social workers that you're adding to this

4   department?

5   A.   Yes.

6   Q.   Okay.  There is no funding for the hundred new MAs to be

7   allocated and hired in this BCP, right?

8   A.   I believe there is in the BCP.

9   Q.   You will only start advertising and recruiting for these MA

10  positions after the new telemental health providers are already

11  hired, correct?

12  A.   No.  Actually, we're going to start advertising probably

13  very soon so that we can hire them in anticipation of them

14  starting.

15  Q.   So this is page 9 of the BCP.  This says that upon approval

16  of the Budget Act -- 2023 Budget Act, CDCR will advertise and

17  recruit for the 35 positions that exclude the MAs.  The

18  remaining 50 MAs will be established, advertised, and recruited

19  upon the hiring of the clinicians.

20       Are you saying that's not accurate?

21  A.   It gets complicated with hiring and authority.  I know that

22  there are ways that we can internally fund things at times, so

23  that might -- may be how we're hiring or planning to start to

24  hire the MAs in anticipation.  I would honestly have to ask

25  other people about the technicalities of that.

1   Q.  You haven't currently advertised this position, correct?

2   A.  Not yet.

3   Q.  And from what I understand you to say -- and please tell me

4   if you just don't know the answer -- you believe that the MA

5   positions, if they're hired before what's anticipated in this

6   BCP, would be from the blanket or from CDCR's internal budget?

7   Do you have any information on that?

8           MS. WOLFF:  Objection.  Compound.

9           THE COURT:  Sustained.

10      Can you break it down?

11  Q.  BY MS. ELLS:  Do you have any information on where the

12  funding that you're referring to for hiring these medical

13  assistants would come from?

14  A.  I do not, no.

15  Q.  But this BCP says that 50 MAs will be established,

16  advertised, and recruited upon the hiring of the clinicians.

17  And then the next year, starting in July 2024, the additional

18  50 MAs will be established, advertised, and recruited for upon

19  the hiring of more clinicians, correct?

20  A.  That is what it says, yes.

21  Q.  When CDCR expanded its telepsychiatry program, some on-site

22  psychiatrists left to join the telepsychiatry program, correct?

23  A.  A few, yes.

24  Q.  You testified yesterday that psychiatrists who agree to

25  work on-site under the new MOU for Bargaining Unit 16 will

1    receive a 15 percent pay differential if they agree to work

2    on-site more than 50 percent of the time, correct?

3    A.   That is my understanding, yes.

4    Q.   So telepsychiatrists would not be eligible for that?

5    A.   They would not.

6    Q.   And that's to encourage psychiatrists to work on-site,

7    correct?

8    A.   Yes, I believe so.

9    Q.   But there is no similar pay differential for on-site

10   psychologists in the Bargaining Unit 19 MOU, correct?

11   A.   That is my understanding, correct.

12   Q.   And there is no similar pay differential for on-site social

13   workers in the bargaining unit MOU -- Bargaining Unit 19 MOU

14   either, correct?

15   A.   That is my understanding.

16   Q.   So telepsychologists will be paid the same as on-site

17   psychologists, correct?

18              MS. WOLFF:  Objection.  Asked and answered.

19              THE COURT:  Overruled.

20              THE WITNESS:  Currently, they will receive the same

21   pay.  Again, they will not be eligible for certain

22   differentials, such as the PIP differential, or certain

23   retention bonuses, is my understanding.  And, again, without

24   getting too far into the weeds, there is a possibility they

25   will have the classification that impacts their deductions and

1  retirement, which would affect their pay.  But that has not

2  been decided definitively.

3  Q.  BY MS. ELLS:  Okay.  So that does not exist right now,

4  correct?

5  A.  Correct.

6  Q.  And it may not exist?

7  A.  It may not.

8  Q.  Okay.  So telesocial workers also will not receive -- I'm

9  sorry.  On-site social workers will receive the same amount of

10  money to work absent these -- the same salary as telesocial

11  workers, correct?

12  A.  Currently, yes.

13  Q.  You testified yesterday that you had heard from multiple

14  institutional leaders that their on-site clinicians are leaving

15  because they want to telework, correct?

16  A.  Correct.

17  Q.  Given that, it would not surprise you if some of the

18  on-site psychologists working for CDCR today chose to move over

19  to the new telemental health program, right?

20        MS. WOLFF:  Objection.  Calls for speculation.

21        THE COURT:  Given the prior testimony, overruled.

22        THE WITNESS:  I would not be surprised if some of

23  them applied for telemental health, yes.

24  Q.  BY MS. ELLS:  You don't have a policy prohibiting existing

25  CDCR on-site clinicians from taking positions in your new

1    telemental health program, right?

2    A.   They have a right to apply for other jobs.  So no, we

3    cannot make that prohibition.

4    Q.   But I asked about hiring.  You don't have a policy

5    prohibiting you from hiring existing on-site psychologists or

6    social workers into the new telemental health program, right?

7    A.   My understanding is that we would not be able to make such

8    a prohibition on hiring them because they have a right to apply

9    to other jobs within the state.

10   Q.   So the answer is no; is that correct?

11   A.   That is correct.

12   Q.   You testified yesterday that you had received 44

13   applications for the Chief Telepsychologist position, right?

14   A.   Yes.

15   Q.   You also received 14 applications for the open Senior

16   Telepsychologist positions, right?

17   A.   I believe it was 13.

18   Q.   Thank you.  Were any of those applications from existing

19   CDCR psychologists?

20   A.   Some of them were.  I don't know all the details of all of

21   the applicants, but based on the interviewees, yes.

22   Q.   And you also testified yesterday that you had received

23   numerous applications for the Supervising Social Worker II

24   position in the telemental health department, correct?

25   A.   Supervising Social Worker I.  The II has not yet been

1    advertised.

2    Q.   Okay.  Thank you.  That was why I was going to ask you how

3    many applications you had received.  Okay.

4        How many applications did you receive for the Supervising

5    Social Worker I position?

6    A.   24, I believe.

7    Q.   Were any of those applications from existing CDCR social

8    workers?

9    A.   At least some of them, based on the interviewees.  I don't

10   know the details of all of the applicants -- the candidates.

11   Q.   And you've hired one into that position, correct?

12   A.   Yes.

13   Q.   Was that person from within CDCR?

14   A.   Yes, she was.

15   Q.   Was she -- I'm sorry.  Just to clarify, is she an existing

16   social worker in CDCR?

17   A.   She was a Supervising Social Worker at an institution, yes.

18   Q.   Thank you.  Restrictions on -- I'm sorry.

19       You testified yesterday that there are restrictions on

20   CDCR's use of telepsychiatry due to its existing telepsychiatry

21   policy, correct?

22   A.   Yes.

23   Q.   Mr. Gonzalez, could you pull up Plaintiffs' 35 again.

24   Thank you.  Could you go to page 5.  Okay.  Thank you.

25       CDCR's reported fill rate for line psychiatrists is 97

1   percent as of this data filed last Friday, correct?

2   A.  I believe so, yes.

3   Q.  That's well above the 90 percent threshold, right?

4   A.  Yes.

5   Q.  So the restrictions on telepsychiatry that you were

6   describing have not prevented compliance with the Court

7   staffing orders, right?

8           MS. WOLFF:  Objection, Your Honor.  I was not

9   permitted to discuss the limitations, and so I don't believe

10  that the witness is permitted to respond.

11          THE COURT:  Sustained.  Sustained.

12  Q.  BY MS. ELLS:  Mr. Gonzalez, could you pull up

13  Plaintiffs' -- I'm sorry.  Defendants' 26, please.

14      So on direct testimony, you were discussing this letter

15  that you received in -- sort of through different mechanisms

16  from class members at SATF, right?

17  A.  Yes.

18  Q.  And you received this letter sometime after August 21,

19  2023, right?

20  A.  Yes.

21  Q.  So at the end of the first paragraph, this letter says:  We

22  are currently without any CCCMS clinicians working in our

23  facility.

24      Right?

25  A.  It does say that, yes.

1    Q.  And it says that many of our constituents have not had a

2    meaningful direct patient care session since December of 2020.

3        Correct?

4    A.  It does say that, yes.

5    Q.  So do you understand this letter to be saying that they

6    would rather receive some mental health care from a remote

7    provider rather than no health care -- mental health care?

8               MS. WOLFF:  Objection.  Calls for speculation.

9               THE COURT:  Overruled.  You may answer.

10              THE WITNESS:  I understand it to be that they're

11   asking for telehealth.  I don't necessarily think that that

12   means it's worse than -- worse than on-site, but they are

13   asking for care.  And I -- that is the goal of our program, is

14   to provide that care.

15   Q.  BY MS. ELLS:  But the letter does say that care through a

16   screen is better than no care, correct?

17   A.  That's true, yes.

18              MS. ELLS:  Thank you.  I don't have any further

19   questions.

20              THE COURT:  Any redirect?

21              MS. WOLFF:  Just very briefly, Your Honor.

22                       REDIRECT EXAMINATION

23   BY MS. WOLFF:

24   Q.  Dr. Martello, would you prefer on-site social workers or

25   on-site staff psychologists apply to work as CDCR telemental

1   health providers or that they leave the state service to work

2   in a telemental health capacity in the community?

3   A.  I would prefer that we can keep them in our system.  And

4   that is something I do anticipate, that we know that people are

5   leaving for other organizations.  Again, our whole -- our whole

6   goal with this program is to add to the pool of candidates and

7   clinicians.  But I do think that it would be better for us to

8   retain, you know, qualified and experienced clinicians in our

9   program than to lose them altogether.

10           MS. WOLFF:  Thank you.  I have no further questions.

11           THE COURT:  All right.  Anything, Ms. Ells?

12           MS. ELLS:  No, Your Honor.  Thank you.

13           THE COURT:  All right.  Is Dr. Martello excused as a

14  witness?

15           MS. WOLFF:  Yes, Your Honor.

16           MS. ELLS:  Yes, Your Honor.

17           THE COURT:  All right.  You're excused.  You may step

18  down.

19      All right.  Next witness.

20           MR. MELLO:  We'll be calling Dr. Mehta.

21           THE COURT:  All right.

22           MR. MELLO:  He's being retrieved.

23           THE CLERK:  Dr. Mehta, please come forward.  Step

24  into the witness stand and remain standing.

25      Please raise your right hand.

```
 1              (The Witness, Amar Mehta, is sworn.)

 2                   THE WITNESS:  I do.

 3                   THE CLERK:  Thank you.  You may be seated.

 4         Will you please say and spell your first and last name for

 5    the record.

 6                   THE WITNESS:  Yes.  My name is Amar Mehta.  First

 7    name A-M-A-R.  Last name M-E-H-T-A.

 8                   THE COURT:  All right.  You may proceed.

 9                   MR. MELLO:  Thank you, Your Honor.

10                        DIRECT EXAMINATION

11    BY MR. MELLO:

12    Q.  Good morning, Dr. Mehta.

13         What is your job?

14    A.  I'm Deputy Director of Statewide Mental Health at the

15    California Department of Corrections and Rehabilitation.

16    Q.  And when did you start working for CDCR?

17    A.  I started with CDCR about ten years ago.  Ten years and a

18    couple months.

19    Q.  And how long have you been in your current position, Deputy

20    Director?

21    A.  Over -- just over three years.

22    Q.  And what positions did you hold from 2013, when you joined

23    the department, until you became the Deputy Director?

24    A.  I started out as line staff, just seeing patients through

25    telepsychiatry at High Desert State Prison.  I was the
```

1   Residency Training Director for California Pacific Medical

2   College.  We had a rotation where they would come work with me

3   one day a week for about five or six years.  I was Clinical

4   Lead at High Desert as well.  And then one year before I took

5   this position, I became Statewide Chief of Telepsychiatry.

6   Q.  I want to pull up Defendants' Exhibit 2.

7       Dr. Mehta, what is this document?

8   A.  This is my CV.

9   Q.  And is it accurate and up to date?

10  A.  It is, yes.

11  Q.  Okay.  I want to walk through your educational background

12  briefly.

13      Where did you attend college?

14  A.  I went to University of California, San Diego.

15  Q.  And what did you study?

16  A.  I have a Bachelor's of Science in biological

17  neuropsychology with a minor in chemistry.

18  Q.  And what did you do after college in terms of next steps in

19  your education?

20  A.  I attended New York Medical College for my medical degree.

21  Q.  And where is that?

22  A.  It's in Valhalla, New York, just north of the Bronx.

23  Q.  And did you graduate and get an MD?

24  A.  I did, yes.

25  Q.  Okay.  And did you have any post-medical school training?

1    A.    Yes.   I did my internship in medicine and neurology at the

2    Montefiore Medical Center, also in the Bronx, New York.

3    Q.    You mentioned an internship and a residency.   What's the

4    difference?

5    A.    The internship is the first half a year to a year after

6    medical training where everybody, regardless of what specialty

7    you're going into, has to be able to perform medical care for

8    internal medicine.   And for psychiatry, we often do an extra

9    couple years of neurology -- sorry -- couple of months of

10   neurology.

11   Q.    And following completion of your residency, did you do

12   anything else in terms of your education?

13   A.    I did.   I went from residency straight into fellowship,

14   which is additional specialization training, starting with

15   child and adolescent psychiatry.

16   Q.    And where did you do that?

17   A.    Also at Montefiore Medical Center in the Bronx.

18   Q.    And following your fellowship in child and adult

19   psychiatry, did you complete any other training?

20   A.    I did.   All of my kids that I worked with had legal issues

21   with either them or their parents, and I didn't know how to

22   help that aspect, so I went in for further training in forensic

23   psychiatry, another fellowship there.

24   Q.    What's the difference between child and adolescent

25   psychiatry and forensic psychiatry?

1    A.  Child and adolescent really focuses on developmental stages

2    and milestones, which is actually super helpful in the prison

3    setting as well.  A lot of our people had deprivations during

4    their childhood.  And then forensic psychiatry is really the

5    interface of psychiatry and the law.

6    Q.  Did you do any work or any training in any correctional

7    settings prior to joining CDCR?

8    A.  Yes.  When I was doing my fellowship, I was employed by the

9    New York State Office of Mental Health, and I was working at

10   Sing Sing Correctional Center in New York, and I was also on

11   loan to Rikers Island jail.

12   Q.  Are you board certified?

13   A.  Yes, I am.

14   Q.  What is board certification?

15   A.  Board certification is not required to practice medicine.

16   After you get your license, you can become board certified to

17   basically demonstrate an additional level of proficiency in

18   your field.

19   Q.  Okay.  And what specialties are you board certified in?

20   A.  I got my Adult Psychiatry Board Certification, which is

21   the, kind of, basic one.  I did Child and Adolescent Psychiatry

22   Board Certification and then Forensic Psychiatry Board

23   Certification.  And then most recently, I did the Addiction

24   Medicine Board Certification.

25   Q.  And in the most general sense, what are the differences

1    between those board certifications?

2    A.  Addiction medicine is actually not through the Psychiatry

3    and Neurology Board.  It is a medical specialty.  And the --

4    they all have very long exams and a lot of, kind of, different

5    information that they're testing.

6    Q.  Dr. Mehta, how often -- how regular is it for a physician

7    to have more than one board certification?

8    A.  My understanding is it's about 20 percent of people that

9    have more than one.

10   Q.  Okay.  Do you know anybody else who has four board

11   certifications?

12   A.  I don't, no.

13   Q.  And, again, your most recent board certification was when?

14   A.  2022, board certified in addiction medicine.

15   Q.  Okay.  Back to your current role.  What are your primary

16   duties as the Deputy Director?

17   A.  We -- really, I see my job as -- I -- the reason we exist

18   at headquarters is to assist the institutions, so to help 33

19   institutions, treating 33,000 patients every day, to be able to

20   do their job, to have strong clinical policies and procedures,

21   and just help them overcome all the hurdles that they have to

22   face.

23   Q.  And do you have headquarters staff or regional staff that

24   help you with this oversight -- these oversight functions?

25   A.  Yeah.  Yeah.  We have robust teams that have to do a lot

1    of, you know, data remediation and things like the UNA and

2    other things in addition to all the regular policy and

3    procedure and updates that we do.  So I have about -- it's

4    almost a hundred or around -- maybe a little over a hundred

5    clinical staff and then administrative and support staff.

6    Q.  So just so the record is clear, those hundred --

7    approximately 100 clinical staff, what classifications are

8    those workers in?

9    A.  Those are primarily psychologists, psychiatrists, and

10   social workers.

11   Q.  And do any of those -- and that's -- there is approximately

12   100 of those individuals at the headquarters and regional

13   level?

14   A.  Yes.

15   Q.  Okay.  And do any of those hundred individuals count

16   towards the fill rates at issue in this proceeding?

17   A.  No.  They're additional support.

18   Q.  And what are the primary duties and responsibilities of

19   that headquarters and regional staff?

20   A.  So we do -- whenever there is a suicide, we have a suicide

21   prevention team that kinds of swoops in, collects all the data

22   at the institution, puts it all together, writes the report,

23   and then does the annual report that is required by

24   legislature.  And in this case, they do all of the training for

25   the whole state, essentially, for the statewide items.  They

1   do -- they write the trainings both in LMS, our learning

2   management system, but also the PowerPoints and all that kind

3   of stuff.

4       They do all of the big projects that we are asked to

5   perform.  Data remediation, of course, has been just a gigantic

6   one over the last few years.  The UNA over the last couple of

7   years.  We have regional teams that assist all the different

8   institutions with audits and compliance mechanisms.  We have an

9   inpatient referral unit that helps with all transfers to

10  inpatients -- to and from inpatient beds statewide.  They work

11  with the Health Care Population Management Unit or HCPOP.

12      We have to interface with many, many different

13  classifications and fields, so we have liaisons with nursing,

14  medical, custody, CCHCS, quality management unit, and

15  dentistry, and everybody else.

16      We have our EHRS team that just does the upgrades and

17  changes to our electronic medical records system.

18      We have a variety of other teams.  I'm sure I'm not --

19  Q.  Understood.  I'd like to pull up stipulated -- the

20  stipulated facts.  Can we go specifically to stipulated fact

21  17.

22      Dr. Mehta, the parties stipulated to certain facts in this

23  case.  Can you tell me how many psychiatrists were employed by

24  your department at the end of July of this year?

25  A.  Yes.  So these -- these are a month or two behind now, but

1   we had about 320 allocated positions, and 283 of them were

2   filled.

3   Q.   And are the fill rates, based upon your understanding, for

4   line staff psychiatrists higher than that 89 percent overall

5   fill rate?

6   A.   Yeah.  For psychiatry specifically, some of our vacancies

7   are in the chief roles, which is not true for the other

8   classifications.  And so the line staff fill rate is higher

9   than the chief fill rate.

10  Q.   Same question for psychologists.  What was the status as of

11  the end of July?

12  A.   We had over a thousand positions, which is normal for us,

13  and about 628, 629 of those positions were filled.

14  Q.   And for clinical social workers?

15  A.   Around 400 positions and 290 of which were filled.

16  Q.   And recreational therapists?

17  A.   Rec therapists, we had about 281 positions, they're kind of

18  distributed differently.  About 250 of them or so were filled.

19  Q.   Okay.  And for medical assistants?

20  A.   Yeah, medical assistants are tricky.  We have 86

21  allocations, and 58 of them are filled, but we don't use them

22  in a way that we need them filled all the time.  We use other

23  classifications sometimes for the same duties.

24  Q.   Okay.  So let's stop there and start there.

25       What do you mean by you use other classifications to fill

1    some of those positions or some of those duties?

2    A.   Yeah.  The telepsychiatry policy has a fairly long list of

3    classifications that can assist with telepresenting; medical

4    assistants are at the top.  But at some of our institutions, we

5    will use CNAs or certified nursing assistants.  In rare cases,

6    we will use actual licensed vocational nurses or LVNs.  We try

7    not to use licensed nurses for those jobs, but sometimes that's

8    necessary.

9       We can use basically any other clinician in mental health,

10   so the four categories we talked about:  Recreational

11   therapists, medical -- clinical social workers, psychologists,

12   psychiatrists.  We can also use medical physicians from the

13   medical side if needed.  And when I was seeing patients, we

14   would often use the actual clinician of that particular patient

15   to have a joint session, which was definitely helpful at times.

16   Q.  I may have asked this before, and if I did, I apologize.

17   Do those fill rates -- that information about the

18   classifications, does that include any of the regional and

19   headquarters staff?

20   A.  No.  You're right.  The hundred-plus positions we have are

21   not included in those.

22   Q.  And does it include any information with respect to the

23   PIPs?

24   A.  No.  Right.  That's -- we file those separately.  We do it

25   combined but also separately.  This is just for the non-PIP

1  institutions.

2  Q.  We're going to turn to stipulated fact 18.  I'm going to

3  ask you just about sort of the magnitude of the population that

4  you and your team are treating.

5     As of July 31 -- first of all, what does -- what is CCCMS?

6  A.  Yeah.  We really like our acronyms.  CCCMS is Clinical

7  Correctional Case Management System.  And it's roughly

8  equivalent to an outpatient level of care that -- that you or I

9  may go to, to see your doctor on the outside in a clinic, and

10  just checking in.

11  Q.  And how many CCCMS patients did you have in the system as

12  of July 31 of this year?

13  A.  We usually live around 25,000, and that's where we were in

14  July as well.

15  Q.  Do you know what the approximate share of your population

16  is -- mental health population that you treat that are CCCMS

17  patients?

18  A.  Yeah.  The vast majority.  About 75 percent of our

19  population are that lowest level of care, which is consistent,

20  you know, with mental health populations outside of prison.

21  Q.  What is EOP?

22  A.  EOP is enhanced outpatient.  It's kind of a next step up.

23  We give them a little bit more programming and different living

24  situation.  But EOP is enhanced outpatient.

25  Q.  Approximately how many individuals -- or how many

1   individuals were in that at the end of July of 2023?

2   A.  About 7,000.  We usually live between 6 and 7,000.

3   Q.  And what percentage of that -- of your overall population

4   is EOP, generally?

5   A.  It's about 20 percent, give or take.  So between the 75

6   percent in CCC and the other outpatients in EOP, that counts

7   for 95 percent of our patient population.

8   Q.  What is MHCB?

9   A.  The Mental Health Crisis Bed.  It's our version,

10  essentially, of an emergency department.

11  Q.  And as of July 31, 2023, how many patients were in that?

12  A.  About 265.  And we -- we move them fairly quickly.  We do

13  our best to move them quickly, and so that number involves,

14  like, a lot of turnover.  But 265.

15  Q.  And are -- APP and ICF, what are those?

16  A.  Yeah.  We mentioned PIP earlier; that's psychiatric

17  inpatient, and that's divided into two groups.  The ICF, or

18  Intermediate Care Facility, is the slightly lower severity.

19  And then APP is Acute Psychiatric Program, and those are the

20  higher severity patients.

21  Q.  And how many were APP at the end of July of 2023?

22  A.  About 325 -- 327 were APP.

23  Q.  And how many were ICF?

24  A.  About 771.  So total of about a thousand patients, give or

25  take, on the inpatient side.

1   Q.  I want to pull up Defendants' Exhibit 16 and turn to page

2   7.

3       Dr. Mehta, how does CDCR identify -- how does your staff

4   identify patients who may want or need help?

5   A.  So there are three main pathways, as it says.  The

6   reception centers do a fairly robust -- a very robust screening

7   that, in partnership with nursing, we have a lot of different

8   staff that touch the patient and help -- help them find the

9   right way.  So they do screening on every single patient as

10  they come in from the county jails.  We -- obviously, if

11  they've ever been in our system before, we have some

12  information about whether they've needed mental health before.

13  But we screen for suicidality, ability to kind of manage their

14  own hygiene, and other things that they need to take care of

15  themselves, prior mental health hospitalizations, and then,

16  also, of course, if they've been seeing mental health in jail

17  and may or may not be on medications.

18  Q.  Okay.  So that's at reception.  What other ways might they

19  come into your system?

20  A.  Yeah.  So then for their remainder of the entire stay, the

21  patient, at any time, can put in a slip -- it's called a 7362

22  form, and it's -- basically, it's a request to be seen for

23  mental health.  We respond to those -- for any slip that any

24  patient places, we will respond to that and meet with that

25  patient.

1          In addition to the patient themselves, really, any staff --

2    so I work at San Quentin every day.  We have more volunteer

3    staff than we have paid staff, and any of them included, pretty

4    much anybody that interacts with the patient could put a --

5    another slip in.  That one is called the MH5.  And that slip

6    could basically say anything.  I've seen ones that say,

7    basically, like, this guy is a little weird, do you want to

8    talk to him?  And it can go from that all the way down to, you

9    know, this person -- this patient's mother just passed away,

10   and their celly is worried about them.  So any of those slips,

11   we respond to the same way; we see the patient.

12   Q.  Other than those, sort of, three pathways into your system,

13   are there any others?

14   A.  Sometimes patients come with, kind of, court-mandated

15   mental health situations, where they may be an OMHD offender

16   with a mental health disorder, which requires certain types of

17   evaluations regardless of whether they screen in or have any

18   slips.

19          Maybe one or two other things like that, but that's really

20   the vast majority.

21   Q.  That's the primary --

22   A.  Yeah.

23   Q.  -- vehicle?

24   A.  Um-hum.

25   Q.  Can you flip to the next page of that.

1      So you've talked about the initial screening.  Can you

2  describe sort of how the -- what happens next?

3  A.  So yeah.  So as they get in from the jail, they get medical

4  screening; they get mental health screening, dental screening,

5  all of those specialties and more, kind of check the patient

6  out, see what kinds of things they will be needing.  And that

7  is taken into account for their placement when they are

8  transferred to an institution.  That institution has to have

9  that level of care or that particular type of care available

10  for patients.

11      So the initial health screening is within 24 hours, and

12  then mental health has about seven days to complete their

13  additional screening.  And then if it triggers positive, we

14  have an additional 18 days or so to make sure that they get a

15  full clinical assessment so that they can -- so that that can

16  be taken into account when the patient is placed.

17  Q.  Can we move to the stipulated facts again and pull up

18  stipulated fact 23, Ms. Pooni.

19      Dr. Mehta, the Program Guide mandates that patients within

20  CDCR's mental health services delivery system be seen with

21  certain frequencies.  I'm going to pull up Exhibit -- or

22  stipulated fact 23, and if you can describe those frequencies

23  for the Court.

24  A.  Yeah.  I'll simplify a little bit.

25      But typically CCCMS, that basic outpatient level of care,

1  has to be seen by their primary clinician, which is usually a

2  psychologist or a social worker, although it can be a

3  psychiatrist as well -- they have to be seen at least once

4  every 90 days.

5      And then the psychiatrist, if they're on medication, has to

6  see them at least once every 90 days after some -- if they're

7  not on medication, they still get a certain amount of visits

8  and screening and that sort of thing with the psychiatrist.

9  That's the minimum.  I think a lot of our patients are seen

10  more frequently and scheduled more frequently.

11      They also get an Interdisciplinary Treatment Team, IDTT, at

12  least once a year.  Although, again, they get -- we get the

13  IDTTs for a lot of different reasons, including changing level

14  of care, changing location, changing programs sometimes.  And

15  the patient can just request one if they wanted to talk about

16  their -- their permissions and things.

17  Q.  Okay.  Anything else about these timelines for EOP, or

18  anything else that you would like to discuss?

19  A.  Yeah.  So CCCMS, being the lowest level of care, has the

20  lowest frequency, at least every 90 days.

21      For EOP, in general, they have to be seen by their primary

22  clinician every week and by their psychiatrist at least once a

23  month.  And, again, if you're titrating your medications or

24  something, you're going to see them more frequently of course.

25      They also get routine IDTTs at least every 90 days.  In

1  different settings, they get them more frequently, but that

2  Interdisciplinary Treatment Team that brings together all the

3  different types of staff that assist the patient, that happens

4  at least once every three months.

5      And then kind of steps up from there to Mental Health

6  Crisis Bed, our emergency department.  That one, they're seen

7  daily by their routine primary clinician and at least two times

8  a week -- I would say usually more than that; it's often every

9  72 hours -- by their psychiatrist.  And they have an IDTT once

10  every week in that setting.  And that is a licensed bed --

11  licensed by the California Department of Public Health, so we

12  follow Title 22 requirements for that.

13  Q.  Again, in the most general sense, what is a CCCMS patient?

14  A.  They are like relatively stable outpatients.  They're

15  expected to be able to live and work in the general population.

16  They may have jobs or school or other programs.  And so

17  they're -- they're getting their mental health care, but

18  they're also, really, in all other aspects, just able to do

19  anything else that the population can do.

20  Q.  And how often are CCCMS treatment plans reviewed?

21  A.  It's at least once a year.  But when they transfer, it has

22  to be within ten days of arrival at the new institutions; they

23  have to get a full, kind of, over -- over -- overhaul of the

24  treatment plan.  And then various other things will trigger

25  that.  If they need certain types of chronos, like they need to

1    be in a single cell or something, the treatment team will meet

2    to discuss that sort of thing.

3    Q.  And what levels of security are CCCMS patients?

4    A.  So CCC can be any level -- 1, 2, 3, 4, or max.  And they

5    would be treated in a setting with mostly other GP.

6    Q.  And in a general sense, what type of treatment do CCCMS

7    patients receive?

8    A.  In general or in the -- in the administrative segregation

9    area?

10   Q.  In general.

11   A.  In general.

12       So they -- there is a wide variety of things that we offer.

13   The primary therapy itself may be cognitive behavioral therapy

14   or CBT.  That's kind of more of a manualized, you know,

15   rigorous more evidence-based treatment.  But depends, really,

16   on the -- on the problem they're having.

17       If they have PTSD, for example, they may be in an exposure

18   therapy or cognitive processing therapy or CPT.

19       If they have, you know, anxiety, then they'll be working on

20   ways to manage their anxiety through behavioral changes.

21       Depression, similar; they might have different things.

22   They could have what we call the more dynamic therapies --

23   psychodynamic therapies, which are more kind of process

24   oriented; you know, how do you feel about things, how do you

25   live your life, that sort of thing.

1      Then, as I mentioned, a lot of them missed some of their

2   development milestones, so there may be some kind of basic

3   skill building, psychoeducation, that kind of stuff going on as

4   well.

5   Q.  Dr. Mehta, stipulated fact 23 provides for these

6   frequencies of interactions and treatments.  Can you evaluate

7   the impact on an individual patient, on a general basis, if

8   they miss such a treatment or event occurring?

9   A.  If -- if a patient misses an appointment, it would really

10  depend on the patient, and I think that's the same for all of

11  us that would be outpatient.  Some people just need their

12  prescription refilled and really don't -- you know, are just

13  left alone other than that.  And some people would need more

14  attention.

15  Q.  Okay.  Can you evaluate the harm of a patient for missing a

16  treatment frequency as described in the Program Guide?

17  A.  Not in a blanket sense.  I think it would have to be

18  individually assessed case by case.

19  Q.  How would you do that?

20  A.  You'd look into the chart, maybe talk to the treatment

21  team, and get a sense of what that patient is struggling with,

22  how long they have been struggling with it -- it could be an

23  acute problem versus a chronic problem -- whether they're on

24  medications, which medications they're on -- some medications

25  require more monitoring than others -- and just how they've

1    been doing lately, kind of where they're at in their treatment.

2    Q.  Your goal is to meet those frequencies as a department,

3    correct?

4    A.  Yes, definitely, to provide the best care we can.

5    Q.  Okay.  What do you mean by the best care?

6    A.  You know, we -- we -- we aren't going to kind of slavishly

7    adhere.  If the patient needs to be seen more frequently,

8    they're seen more frequently.  Right.  And we want to make sure

9    that we're receptive and flexible to the patients' needs.

10   Q.  But it is -- is it your belief that you can't evaluate

11   whether a particular patient is harmed without evaluating that

12   individual patient?

13   A.  Yes.  I couldn't make a blanket statement about that.

14   Q.  Dr. Mehta, let's turn next to the highest level of

15   outpatient care, EOP.

16        What types of patients are in the EOP level?

17   A.  So EOP has two main categories of patients.  One category

18   is the patients that maybe need a few months to a year, maybe,

19   to learn some of the skills that they may never have learned,

20   get some of the medications stabilized at the right doses and

21   the right types of medications.

22        Once their treatment has reached a plateau and they're kind

23   of in therapy and they're doing what they got to do but are

24   otherwise able to live and work in their environment, then they

25   may be dropped back down to CCCMS.  And that's because we're --

1    we're obligated by law and by -- by ethics to treat them at the

2    least restrictive setting possible.  So CCCMS gives them the

3    least restrictive setting.

4        EOP patients also get -- sorry.

5        The second category of EOP patients are the ones that are

6    really not -- their particular mental illness or what they're

7    dealing with is not expected to change or improve

8    significantly.  Some patients are just that's where they're

9    going to live for the rest of their life, that level of

10   function.  And in those cases, those patients may stay in EOP

11   for much longer periods.

12   Q.  I should have asked this with CCCMS.  What are the goals of

13   the CCCMS program in terms of patients?

14   A.  Really to just help people kind of get by with -- with the

15   same -- to assist them in being able to behave and exist in the

16   same way as anybody else, mental health or not.  So just giving

17   them as much or as little support as they need.

18   Q.  Okay.  And you described two distinctly different

19   categories of individuals in the EOP program.  But, generally,

20   what's the goal of the EOP program with respect to your

21   patients?

22   A.  For that first category, if we can get people set up and

23   stabilized and doing well and happy with where they're at, then

24   the goal of the treatment is to get them there, and then they

25   may step down to CCCMS.

```
 1        For the other patients, it's just to provide them an
 2   environment where they can thrive as much as possible, that
 3   they can get access to all the things that -- that they need to
 4   help them and give them, you know, hopefully, as many
 5   activities and things as possible to keep them engaged.
 6   Q.   What level of security are EOP patients?
 7   A.   EOP can also be all levels.  So 1 through 4 or max status.
 8   Q.   How are they housed?
 9   A.   EOPs -- CCCMS, as I mentioned, they live with GP
10   population, so they could be cellmates or in the same tier as
11   people who are not involved in mental health in any way.
12        Our EOP or enhanced outpatients, they live in units only
13   with other EOPs.  So their -- their peer group in that setting
14   would be only other EOP patients.  They do program with people
15   who are not in EOP, but they live with people who are in EOP.
16   Q.   And how is the program different between CCCMS and EOP,
17   generally?
18   A.   So I was talking about some of the things that happen with
19   therapy, the different diagnoses and the different treatments
20   for CCCMS.  They're -- of course, also, the whole other half of
21   that is the psychopharmacology or medication that assists with
22   mental health.  So all of that is true for EOP, and then they
23   also get a specific number of hours of structured therapy
24   outside of their -- outside of their cell, structured treatment
25   outside of their cell.
```

1    So that is composed of groups that we -- that come from a

2    variety of settings.  Most recently, we've had nursing-led

3    therapeutic groups; we've had substance use disorder groups.

4    But prior to that, the -- both of those are within the last few

5    years, really.  And so the -- the majority of the group mental

6    health treatment were run by the mental health department in

7    the past.  That includes -- a certain number of hours of school

8    or work can be included in that, but only up to four hours.

9    The rest of it really has to be that structured treatment

10    outside of their cells.

11   Q.  And who creates the treatment plans for EOP patients?

12   A.  So we have the Interdisciplinary Treatment Team in EOP, and

13   they meet more frequently, so there is more modifications to

14   the plan, I would say.  But they would set that treatment plan.

15   Q.  And how often do they meet?

16   A.  They meet once every three months at least.  Again,

17   maybe -- maybe more frequently.  And then also to meet those

18   timelines, we'll often schedule them a week or two early just

19   in case we miss one; we can get back to them in time.

20   Q.  Okay.  And what types of contacts do EOP patients have with

21   mental health clinicians or providers?

22   A.  So they'll have that primary clinician, usually a

23   psychologist or a social worker, that meets with them at least

24   every week.  The groups that I was talking about, EOP is where

25   we start assigning recreation therapists -- recreational

1  therapists to assist with running those groups for them.  They

2  have the psychiatry contacts.  Medications or not, they still

3  have some psychiatry contacts that they -- that they get.

4     And then there is kind of a variety of other things that

5  happen.  The substance use disorder, for example, as I

6  mentioned, they'll meet with a medication-assisted treatment

7  provider, so a medical provider that provides their chemical

8  assistance, essentially.  And then they'll have a certain

9  amount of -- they call it CBI, cognitive behavioral

10  intervention, where they have groups that are run, often by

11  social workers or drug counselors, that help with skill

12  building and that sort of thing.

13     Kind of a variety of other groups as well.  Some of the

14  inmate-run groups that are run out of the housing units, there

15  is a lot of those that are super positive for our patients.

16  There are lifers' groups and parenting groups and things like

17  that.  So there is kind of a wide variety of different

18  directions that might come from.

19  Q.  Okay.  And I'm going to channel the court reporter.  If you

20  can slow down just a little.

21  A.  Yes.  Sorry.  Will do.

22  Q.  What happens when an EOP patient isn't getting better?

23  A.  So two possibilities there.

24     First possibility is that they are part of that second

25  group I was talking about where they're not expected to improve

1    significantly, but they're also not getting particularly worse.

2    They are -- they're stable; they are where they are going to

3    live for most of their life.  So in that case, we keep them in

4    EOP; we keep them with as many activities as we can, and we

5    keep monitoring them.

6        So the other, sort of, answer to that question would be the

7    patients that are getting worse.  And that could be because of

8    external stressors.  It could be because of the progression of

9    their disease or mental illness, and sometimes medications need

10   to be adjusted and, you know, could be less effective over time

11   for certain things.  So those patients, we do our best to

12   stabilize them within the EOP program, but if they need more

13   attention, more care, they will generally be elevated up to the

14   PIP level of care -- psychiatric inpatient level of care.  That

15   may or may not go through the Mental Health Crisis Bed or MHCB.

16   Q.  So a patient could -- and I know we're not here to talk

17   about the PIPs, but just generally, a patient could go directly

18   from EOP to a PIP bed?

19   A.  Yes.  Definitely.  And I'd say quite a few of them do.

20   Q.  And where are those PIP beds?

21   A.  We have five established PIPs.  And CMC has some flex beds,

22   PIP beds.  So they're kind of spread out across the state.  I

23   can talk more about that if you want.

24   Q.  Again, we're not here to talk about the PIPs, but just to

25   close the loop, are PIP beds or that level of care, inpatient

1   beds, also available at DSH?

2   A.  Yes.  Thank you.  We have three facilities at DSH, two for

3   our male patients and one for our female patients, that have

4   dedicated beds towards our Coleman patients.  And so if they

5   are at a certain level of illness but also a low level of

6   violence or reactivity in a way, then they can be housed at DSH

7   beds.

8   Q.  Okay.  So earlier, you talked about mental health crisis

9   beds, and you mentioned that they're sort of akin to emergency

10  room beds, but can you tell me about those beds?

11  A.  Yeah.  So we have a set number of them statewide.  They're

12  distributed amongst the institutions in a way that is supposed

13  to make nobody have to travel too far to get to one, because

14  these patients are often in crisis -- or, I mean, always, by

15  definition, they are in crisis.  And so we have a 24-hour

16  timeline to get them into a mental health crisis bed.  And once

17  they are there, there is a lot of stabilization that goes on.

18      Typically, historically, they stay there for up to about

19  ten days.  And then at that point, if they still need

20  additional stabilization or additional acute care, then they'll

21  be transferred to one of our PIP beds, either ICF --

22  intermediate -- or APP -- acute.

23  Q.  And how does a person get into a mental health crisis bed?

24  A.  So it's identified by the clinician, but it could come

25  through any pathway.

1    Again, the staff -- the staff that works with the patient

2    every day that are on the units or nursing staff that pass out

3    medications, they will often pick up on changes and worsening

4    symptoms in our patients, and so they can refer the patient or

5    they can speak to the mental health provider and say, hey, this

6    guy really needs a check-in.

7    Once the mental health clinician checks with the patient

8    and speaks to them, they make a determination whether the

9    patient is -- is not safe and needs to be in an environment

10   where they're watched 24 hours a day and are kept safe in that

11   way.

12   Q.  So that's a nice segue.  What kind of clinical contacts do

13   inmate CB patients receive?

14   A.  They meet with their primary clinician at least daily.

15   It's often, you know, multiple times a day as you're passing by

16   the cell, that sort of thing.

17   They meet with their -- with their psychiatrist usually

18   every 72 hours.

19   And they have a lot of contacts with nursing providers and

20   others that just touch the patient multiple times over the day,

21   doing med pass or getting meals to them and that sort of thing.

22   In many cases, the patient may be on a one-to-one watch, so

23   that means that there will be a sitter sitting outside the cell

24   with eyes on the patient at all times.

25   Q.  So do they have IDTTs when you're in a mental health crisis

1    bed?

2    A.   They do.  An IDTT has to happen at least once every seven

3    days.  And if a decision is made on the patient, it will happen

4    sooner, and that patient then will sort of follow that course

5    of action.  But it's at least once every week.

6    Q.   Okay.  And what do those IDTT meetings every seven days or

7    so entail?

8    A.   They -- they have a variety of staff; so the custodial

9    staff, the mental health clinician -- sorry -- primary

10   clinician and psychiatrist; nursing is involved as well.  All

11   of those people who have different perspectives on the patient

12   get together and decide what is the most appropriate treatment

13   for that patient.

14       The team may determine that the patient needs, you know,

15   their property or needs, you know, contact with their family if

16   they've had a recent loss or something like that.  Or they need

17   changes in medication that will take longer than a week or two,

18   so then in those cases, they would get transferred to a higher

19   level of care.

20       But the whole treatment team comes together to really

21   determine what is going to be most helpful for that patient.

22   Q.   For these most acute patients, who is generally the primary

23   clinician?

24   A.   Generally it's the psychologist or social worker.  And

25   that's kind of been that way since the -- the negotiated 2009

1    Staffing Plan.

2    Q.   Okay.  And you mentioned nursing.  Can you describe some of

3    the nursing functions for folks who are in the MHB -- MHCBs?

4    A.   Yeah.  We have what we call psych techs or psychiatric

5    technicians.  It's a type of nurse that has additional training

6    and special expertise dealing with mental illness, and so they

7    can relate to the patient; they can talk to the patient; they

8    can provide psychoeducation and answer the patient's questions

9    about their medication side effects and things like that.  So

10   there is a lot of contact that goes on through there.

11       We have LVNs -- licensed vocational nurses -- and RNs --

12   registered nurses -- all providing different levels of care to

13   the patient.  That includes things like med pass; depending on

14   the medications they're on, they may need their vital signs

15   checked more frequently, so their blood pressure and things

16   like that.  All of that is performed by nursing, including, you

17   know, EKGs, where we're looking at the effects of the

18   medication on the patient's heart.  All of that type of

19   monitoring would occur through the nursing staff.

20   Q.   Do rec therapists work in -- with patients in mental health

21   crisis beds?

22   A.   They can.  Mental health crisis beds don't typically have

23   groups, because the patients are so acute and they're so unsafe

24   from -- from themselves that we usually don't have large groups

25   in that.  But they're also not in that setting for more than

1    about ten days in the vast majority of cases, so we'll send

2    them to another level of care where they can get more of that.

3    Q.  What's the role of the psychiatrist for patients in mental

4    health crisis beds?

5    A.  So crisis bed is often, you know, the worst that patient

6    has ever felt.  And they -- they really can -- they can benefit

7    from psychoeducation and skill building and things like that.

8    But in that moment, when they're there and everything is

9    crashing down, a lot of times, medication can help with that as

10   well.  So long or short-term medication.

11        And even if they don't get medication, there is kind of a

12   variety of different things that could be triggering that

13   patient at the time, and it's important for the psychiatrist

14   with the medical background to look in to see whether this may

15   be a withdrawal syndrome from some type of substance.  Or it

16   may be a medical syndrome that is kind of occult that is

17   expressing itself a certain way.  The patient may have a --

18   there is a type of tumor that you can get in your adrenal gland

19   where it makes you incredibly anxious all the time, so that

20   could look like anxiety, but the medical provider would be able

21   to determine whether there was something else that needed

22   investigation there.

23   Q.  What's the goal of care in a mental health crisis bed?

24   A.  It's really acute stabilization.  As I mentioned, those

25   patients are not doing well.  They are really struggling.  And

1    our goal is to get them to the point where they feel safe and

2    they feel steady and they feel ready to engage in that skill

3    building, which is going to, in the long-term, help not -- help

4    them not get to that place again in their lives, where they

5    can -- they can prevent that from happening again.

6    Q.  So what happens if a patient isn't getting better who is

7    housed or being treated in a mental health crisis bed?

8    A.  Yeah.  If they're there for, you know, ten days or more and

9    they're just not really able to get better, or if they need

10   particular types of medication, such as clozapine, which is

11   a -- it's a very, kind of, regimented approach to that

12   medication, then they will often be transferred to one of those

13   psychiatric inpatient beds or PIP beds.  And if they are not

14   able to be stabilized in the crisis beds, they are more than

15   likely going to be going to that acute psychiatric program or

16   APP bed.

17             MR. MELLO:  Your Honor, I don't have a watch.  I'm so

18   afraid my phone is going to go off --

19             THE COURT:  It's 10:43.  We're close to needing a

20   15-minute break, so we can take it now.

21             MR. MELLO:  That would be great.

22             THE COURT:  15-minute break.  That will get us back

23   here right before 11:00, and then the test, I understand, is

24   11:20 our time, so I thought I'd give a five-minute warning.

25             MR. MELLO:  Terrific.

 1            THE COURT:  And our IT department thinks that iPads

 2    could be triggered if they're linked to an iPhone, so I will

 3    definitely be turning my iPad off as well.

 4        All right.  So let's take a 15-minute break.  Be back here

 5    in 15 minutes.

 6        (Recess taken, 10:44 a.m. - 11:01 a.m.)

 7            THE COURT:  You may be seated.  I'm going to stand

 8    for a bit.

 9        And you may continue, Mr. Mello.  I'll give a five-minute

10    warning prior to 11:20.

11            MR. MELLO:  Thank you, Your Honor.  Ready, Your

12    Honor?

13            THE COURT:  Yes.

14            MR. MELLO:  Thank you.

15    Q.  BY MR. MELLO:  Can you please pull up Defendants'

16    Exhibit 17 -- pardon me -- 27, page 8, Ms. Pooni.

17        Dr. Mehta, just briefly, what types of treatments -- and

18    more importantly, you discussed some of the types of

19    treatments, so I'm not trying to be cumulative -- but what

20    types of treatments that you haven't discussed, if any, does

21    CDCR offer to its patients in the program?

22    A.  So I talked about a lot of them.  There is also kind of a

23    supportive therapy, putting that under the bullet of social

24    context, helping them just incorporate all the stuff that

25    they've learned.

1        Psychopharmacology, I didn't talk about as much, but it's a

2   big one, of course.  It's a mainstay of treatment, and a lot of

3   our patients are on a wide variety of medications and get

4   trials on medications that they otherwise wouldn't get in any

5   other setting, so we're proud of that.

6        The Interdisciplinary Treatment Teams also do interface

7   with the teachers in school, the foremen or the bosses for job

8   assignments.  So bringing all of that information into the

9   Interdisciplinary Treatment Team is really a positive aspect of

10  being able to see 360 degrees around the patient kind of thing.

11       I mentioned some of the groups.  There are manualized

12  groups like CBT, as I mentioned, or process groups or what we

13  call the psychodynamic groups.  So we have veterans' groups

14  that help process the trauma that that particular population

15  goes through.  And we do a variety of other things to try to

16  capture almost every patient in some kind of cohort where they

17  can feel that they can share their experiences.

18       Recreation therapy is actually a really important one as

19  well.  As I mentioned, some of our patients are very ill and

20  maybe not expected to improve; the prognosis for their

21  particular illness is not positive.  So in those cases, it's

22  still really important to give those people a sense of

23  accomplishment, a sense of community, and keeping them engaged.

24       So recreation therapy runs a wide gamut, but it can include

25  the kinds of art therapy or music therapy or different things

1    that can provide that -- that sort of glove for the patient to

2    fit into.

3    Q.  Can you flip to the next page, page 9, please.  And you're

4    probably going to have to blow it up, or I'm going to have

5    to --

6        Dr. Mehta, first of all, these two slides are from a

7    presentation you made to the California District Attorneys

8    Association; is that correct?

9    A.  Yes.  I think this is that one.  It may be the one that I

10   gave to the CROB, California Rehabilitation Oversight Board.  I

11   apologize, I can't tell which one --

12           THE COURT:  That's identified on the exhibit list,

13   CROB.

14           THE WITNESS:  Okay.

15           THE COURT:  You may clarify what that stands for --

16   oh, California Rehabilitation Oversight Board.  Got it.

17           MR. MELLO:  Would you share the first page of this

18   document to see what it is.

19           THE COURT:  I don't think it says it.

20           THE WITNESS:  I didn't put it on there.  The one with

21   the comic on the front was for CDAA.  So this one is --

22           MR. MELLO:  This is for --

23           THE WITNESS:  -- California -- I'm sorry.

24           MR. MELLO:  I'm sorry.

25   Q.  BY MR. MELLO:  What is CROB?

1   A.  The California Rehabilitation Oversight Board, which is a

2   panel of people that provide a lot of really important feedback

3   to our system and oversight over our system.

4       They invited me to come and speak about -- specifically

5   about these types of treatment and transfers.

6   Q.  And was that a public hearing?

7   A.  It was.  And my slides are published online at their

8   website as well, with all of the -- all of the information

9   there is public.

10  Q.  Okay.  So, again, we're doing an eye test.  Next can we go

11  back to page 9 of this document.

12      And can you explain what DRP is?

13  A.  Yeah.  The Division of Rehabilitative Programs is a

14  separate group in our system.  They are part of the custody

15  side or the DAI, Department of Adult Institutions.  I did warn

16  about the acronyms.

17      So they do a lot of the school, which is the first few

18  columns there, academics.  Any patient who does not have their

19  high school diploma is required by law to participate in that,

20  to work towards their GED, for example.

21      Then they do career technical education.  That's -- it's

22  sort of like apprenticeships and that kind of thing.  So they

23  do a lot of -- you see from auto body to welding, essentially,

24  skills that will hopefully serve the patient, when they leave

25  our facilities, to be able to have some marketable skills.

1        They do -- two more columns over -- cognitive behavioral

2    intervention.  That is part of the substance use disorder

3    treatment.  So medical, of course, does the actual medication

4    prescribing, and in this case, DRP does run the groups that are

5    a crucial part of that.

6        And then there is an other programs category at the end.

7    But you can see that some things are available everywhere;

8    everybody gets a law library, everybody gets school, that sort

9    of thing.  And then we do as much as we can for -- for the

10   other -- the other categories here.

11       So there is a few that are available everywhere, again,

12   like computer training, but then there is a bunch of them, it

13   just depends if they have an auto body shop and an auto body

14   expert that can help teach that course.

15   Q.  In addition -- you can pull that down.

16       Are there any resident-led groups or volunteer groups that

17   you haven't told us about?

18   A.  Yeah.  So there is a whole category of volunteer-led

19   groups.  I mentioned that we have very high number of

20   volunteers at San Quentin, since it's in the Bay Area.  They do

21   yoga, meditation.  There is gardening groups.  They will often

22   paint murals on the sides of some of the buildings to try to

23   make the environment more -- more livable and welcoming.  So

24   that's the -- the volunteer side.

25       And then just within the group of patients or the -- the

1  people living in the housing unit, they will often run their

2  own groups in parallel.  And it may be a support-type group,

3  people who are lifers or something like that.  Or it may be,

4  really, a more skills-based group, where the clinicians or the

5  recreational therapists will provide them with the material

6  that they need to lead a group in a similar way as a trained

7  professional would.

8  Q.  Thank you, Dr. Mehta.

9     Can we pull up Defendants' Exhibit 16, please, the first

10  page to start.  Pardon me.  It's the allocation document -- the

11  July allocation.  Pardon me.  It's 14, Ms. Pooni.

12     Dr. Mehta, what is this document?

13  A.  So this is our monthly filing on program position

14  allocations and fill rates.

15  Q.  Is this --

16  A.  Sorry -- state -- no, sorry.  This is -- we do the monthly

17  in addition to this, which is the filing for the biannual

18  staffing adjustment, where we true up the number of allocations

19  to number of patients at different institutions.

20  Q.  Okay.  Can you describe that process generally for the

21  Court -- the allocation process.  You mentioned biannually.

22  A.  Yeah.  For sure.  So there is a giant spreadsheet.  One of

23  my administrative staff put that together, and she's fantastic.

24  You basically plug in the number of patients at each level of

25  care at each institution, and the spreadsheet applies the 2009

1    Staffing Plan ratios with the minor modifications that have

2    occurred since then -- I think 2015 and 2021.  It applies those

3    ratios and creates a certain number of allocated clinicians

4    that would be needed to treat that population.

5        We do a couple small things.  We usually round up, and we

6    usually make sure that there is other things that are covered.

7    But it's -- it's a process that gives you sort of concrete

8    numbers that aren't really discretion based; they're based on

9    the negotiated ratios.

10       So we do this twice a year, January and July.  And we

11   distribute this to the institutions.  They then will need to

12   hire to that level moving forward.

13   Q.  Okay.  So in this document, on -- the bottom of page 1

14   provides some clarifications, those three bullet points.  What

15   clarifications are provided in this allocation memo from July?

16   A.  So we have, generally, two Chief Psychologist positions

17   allocated to each institution.  There isn't really the

18   appropriate work for those -- both of those people to be

19   full-time.  So at certain institutions, typically our more

20   complex institutions, we will allow them to fill both

21   positions.  But in the other case, we -- we have that one Chief

22   Psychologist.  I believe -- and I'm definitely not an expert on

23   the 2009 Staffing Plan, but I believe that there were positions

24   foreseen in that plan that now correlate more closely to our

25   CEO, for example.  So they don't need that second position

1    because the duties are covered in other ways.  So that's the

2    first bullet.

3        The second bullet is for the Correctional Health Services

4    Administrator level II.  We call that a CHSAII.  Again,

5    acronyms.

6        The CHSAII is -- it's a position that their duties -- based

7    on their duty statement and the statewide classification of

8    what that position does -- is not particularly married to the

9    needs of the mental health program at the institution.  So for

10   several institutions, we use an HPM -- Health Program Manager

11   -- Level II, and we use the CHSAII position and the CHSAII

12   funding to fill that Health Program Manager, which is more the

13   duties we expect, which is to run the clinic and that sort of

14   thing, take care of those things.

15       So some places don't need a CHSAII at all; they have

16   different levels of support, and some places get an HPM II.

17   Q.  What are Clinical Psychologists Intern positions?

18   A.  Yeah.  So the third bullet here has to do with one of the

19   differences in licensing between our different classifications.

20       So for psychiatrists, for example, you have to be licensed

21   to practice before you see anybody outside of your training

22   program.  For psychologists, you finish your training, and then

23   you need a certain number of clinical hours to become licensed.

24   And that clinical work has to be done in a regular setting,

25   where you would be, you know, getting the same experience as if

1   you were licensed already.

2       So we do support a large population of Clinical

3   Psychologists Interns.  And interns mean they're working

4   towards those clinical hours.  When I was talking about my

5   internship in medicine, it's the same term, but they mean

6   completely different things.

7       So this bullet says that those positions shall be limited

8   term, so they're not permanent, because they have a certain

9   number of years that they need to -- that they are allowed to

10  work before they have to pass their exam in order to continue

11  working.  And so those are limited term positions.

12      And then the 918 blanket is funding speak for -- for large

13  organizations.  It just tells them where that money comes from,

14  essentially.

15      And then it starts talking about the fiscal year

16  operational authority, which is what the institutions are

17  really more concerned with.

18  Q.  Are these --

19          THE COURT:  It's 11:15, so this is the five-minute

20  warning.  For anybody who has a device that may be triggered by

21  the alert, you should turn it off.

22      I did see a security officer come in.  Maybe he's

23  already -- (audio interruption).  I'm going to ask Ms. Schultz

24  to take this out, because I'm trying to turn it off, and that's

25  what's triggering this.  This is an example of what can happen.

1  I guess I have Siri without knowing it.  So thank you.

2     Sir -- the security officer is going to see if anyone comes

3  in, just to inform them that any electronic device needs to be

4  off, and we'll see if this works.

5          COURT SECURITY OFFICER:  Does it apply to watches?

6          THE COURT:  Anything that could be triggered by the

7  security alert we're all supposed to experience at 11:20.  This

8  is a test of how far the systems permeate.  We're assuming they

9  don't -- they don't reach the electronic devices we otherwise

10  have set up.  And if alarms go off, we'll just take a pause.

11  Hopefully we won't need a full recess.

12     You may proceed now.

13          MR. MELLO:  I have to admit, my anxiety is up with

14  the alarm, so I am trying to ground myself.

15  Q.  BY MR. MELLO:  Dr. Mehta, we were talking about Clinical

16  Psychologist Interns and the earning of hours.

17     There's been some testimony or questioning in this

18  proceeding about persons who are completing their hours towards

19  licensure.

20     And my question for you is, first, are the Clinical

21  Psychologist Interns included in the fill rates in this

22  proceeding?

23  A.  I don't believe they are.  We do our best to keep them

24  separate.  They do require supervision, so our on-site

25  clinicians that are included in the fill rate will be

1    supervising those people as well, but it kind of balances out

2    with the work that they contribute.

3    Q.  Do -- these persons who are completing their hours, do they

4    provide patient care?

5    A.  They do, yes.

6    Q.  And who provides the supervision of the clinical

7    psychologist interns?

8    A.  So those would be typically our licensed psychologists at

9    the institution, sometimes the supervising psychologists,

10   either senior or chief.  We're actually in the process of

11   transferring a lot of that responsibility to our headquarters

12   and regional teams just to take that burden off a little bit

13   and allow them to manage their interns.

14   Q.  How -- I mean, before this change that you're describing is

15   going to occur -- first of all, when will that change occur?

16   A.  We've been working on it.  I think we're hiring for those

17   positions now, as we speak.  And it's been something that we've

18   talked about a few times with -- with different parties, but

19   it's something we're -- we're proud of, looking forward to.

20   Q.  So those clinical interns, to your knowledge, are not part

21   of the numbers of allocated positions and do not go towards

22   your fill rates with respect to this classification, correct?

23   A.  I don't believe so.  I will say that 918 blanket means that

24   their funding doesn't come from the way that all the rest of

25   our funding comes from, yeah.

1    Q.  And you testified that currently, that oversight

2    supervision of unlicensed providers is occurring at the

3    institution level --

4    A.  Yes.

5    Q.  -- by psychologists?

6    A.  Yes.  Absolutely.

7    Q.  Okay.  How are psychologists, under the current scheme,

8    identified as people who will supervise unlicensed or people

9    working towards their licensure?

10   A.  So they have to be -- they have to have completed their

11   licensure themselves.  And that's the -- we follow the

12   regulations of the Board of Psychology -- California Board of

13   Psychology -- that sets those guidelines -- how many hours of

14   supervision are required per week and what sort of supervision

15   happens there.

16        They are allowed to be telesupervised, and so that's why

17   we're working on that aspect.

18   Q.  And under the current scheme where it's handled at the

19   institution level, are psychologists -- do they volunteer or

20   are they voluntold that they're going to supervise unlicensed

21   staff?

22   A.  There is an additional stipend that they receive.  It has

23   historically been $100.  The new contract with the union

24   increases that to $500, I believe.  And so typically, they are

25   volunteers, and typically, they are -- or oftentimes, I will

1    say, they are already supervisors, so a senior or a chief

2    supervisor.  But certainly, our licensed line staff can do that

3    supervision as well.

4    Q.  And again, back to Exhibit 14, this document demonstrates

5    how allocations may have changed for the classifications at

6    issue in this proceeding as a result of that true-up; is that

7    correct?

8    A.  Yes.  Exactly.

9    Q.  Dr. Mehta, let's talk about those staffing ratios.

10        Ms. Pooni, if you could pull up stipulated fact number 6.

11   I believe it's a chart.  Thank you.

12        Is it on your screen, Dr. Mehta?

13   A.  It is, yes.

14   Q.  Okay.  Can you tell me what those staffing ratios -- what

15   this provides with respect to the staffing ratios?

16   A.  Yeah.  So I have no expertise or direct knowledge of the

17   2009 plan and how it was sort of designed, but they eventually

18   ended up with numbers of patients-to-staff ratios for the

19   different levels of care that were a rough guide of how many

20   doctors were -- sorry -- how many clinicians were appropriate

21   for those -- for that number of patients.

22   Q.  It's all right.  I'll wing it.

23   A.  You've got one on this side.

24   Q.  Dr. Mehta, we're going to pull up now stipulated fact

25   number 8.  And you alluded to it earlier in your testimony.  It

1  provides, on January 6, 2021, the Court-approved modifications

2  to the 2009 Staffing Plan.

3      Can you describe what those modifications are and how they

4  affected the ratio -- ratios; if you know?

5  A.  Yes.  So in 2020, the modifications were to change the

6  number of patients per clinician, depending on whether or not

7  they were on medications.  There was a direct ratio of CCCMS,

8  or that outpatient level of care, to psychiatrists, but the

9  number of visits you get whether you're on medication or not

10  are very different.  So this was to correct that difference,

11  essentially, that when patients are not on medications, they

12  are seen much less frequently by the psychiatrist.  So this

13  accommodated that reality.

14  Q.  Okay.  Have there been any other changes to the 2009

15  Staffing Plan, other than those that you've already discussed?

16  A.  A few minor ones.

17      This was negotiated and approved that there was .5 position

18  at each institution that was to -- .5 of a psychiatrist to

19  assist with crisis management.  We moved all of those into the

20  same pool, and we now use that as our nightshift telemedicine

21  allocation or authority.  And so it serves the same purpose.

22  It -- it gives the institutions resources to deal with

23  emergencies, especially overnight and on weekends.  But the --

24  overnight, I should say.  And those positions were moved over,

25  and I believe five positions were taken out of that pool to

1    serve other purposes.

2        Those are the -- those are the only changes that have

3    occurred in my time.  I believe there were minor changes in

4    2015 that I'm not directly familiar with.

5    Q.  And, again, you've been in your current position since

6    when?

7    A.  Three years.  So 2020, around July.

8    Q.  You can pull it down.  Thank you.

9        Dr. Mehta, has the State's challenges, meaning the 90

10   percent fill rate -- have they changed over time?

11   A.  Yes, very much so.  So -- yes.

12   Q.  How so?

13   A.  I will say, for most of my time here, our -- and most of

14   the time I was line staff, so I didn't -- I say "our," but I

15   didn't have anything to do with those decisions -- the focus

16   was on psychiatrists.  We were trying to make sure that we

17   could attract enough psychiatrists to our system, and that's

18   really where our shortages were.  We had good fill rates --

19   healthy fill rates with psychologists and social workers for

20   many years.

21       And then during COVID, there was quite a shift.  We were

22   able to keep our psychiatry fill rate up and actually improve

23   it, and we got to 90 percent there for many of the months, but

24   at the same time, a large number -- I want to say roughly,

25   like, a third or so -- of our psychologists and social workers

 1  moved.

 2      And there is a lot of societal context to that, called the

 3  Great Resignation, and what people were looking for in their

 4  work/life balance.  But that hit us -- as with many other

 5  institutions, hit pretty hard.

 6  Q.  Dr. Mehta, we looked at the stipulated facts 6 and 8, and

 7  it provided ratios, and those ratios are used for the

 8  allocations that you mentioned earlier when talking about the

 9  biannual allocations.

10      My question for you is, are caseloads and staffing ratios

11  the same thing?

12  A.  No.  I don't think so at all.  I think that the clinician

13  may have a greater or lesser caseload.  I would expect most

14  clinicians don't have a caseload of exactly that number, fully

15  staffed or not.  Like, I just -- that -- that's not usually how

16  it works.

17      Caseload is dependent on a variety of factors, including a

18  Level 4 CCCMS patient is not the same workload as a Level 1

19  CCCMS patient, for example.  And so the ratios are sort of, I

20  think, guides, rules of thumb; this is how many doctors you

21  should need on average.  But that would not -- we don't use

22  that as a caseload, assigning that number of patients only to a

23  patient [sic].

24  Q.  Is that the same for the -- I know you mentioned doctors,

25  and, of course -- but is that also true for the other clinical

1   categories, psychologists and social workers?

2   A.   Yes.  Absolutely.  I meant -- I meant to say clinicians.

3   Q.   And rec therapists?

4   A.   Rec therapists as well, yes.

5   Q.   And, Dr. Mehta, as a general matter, how do you --

6   practitioners prioritize the patients in their caseload?

7   A.   It's day to day, as well as, kind of, month to month, and

8   that sort of thing.  So in each day, you typically -- you maybe

9   have one patient in crisis, and you have your line of patients

10  that are regularly scheduled, so you would have to prioritize

11  your time.  And there may be a patient in crisis with a consult

12  order that has to be seen within 4 hours, so you would see that

13  patient first and bump the rest of your patients a little bit

14  later if needed.  So there is a level of individual triage that

15  goes on, I think, day to day.

16       And then, also, larger scale, you know, how many patients

17  are in your patient caseload, how many patients in different

18  settings are you seeing.  Sometimes we follow our patients to

19  administrative segregation settings.  We don't hand them off,

20  but we actually continue to see that patient.  And sometimes --

21  so you would have patients in different places that you would

22  need to make sure that you have access to those patients at the

23  right time.  So it's kind of a constant juggling act, I think,

24  which is -- is -- works pretty well day to day.

25  Q.   Terrific.

1        You used the word triaging.  Is triaging a term that's

2   limited to the provision of mental health services at CDCR?

3   A.  No.  Definitely not.

4        So triage, generally we think of it in an emergency

5   department setting, where triage is you treat the sickest

6   patients first rather than, kind of, first-come first-serve.

7   And so you may come to the ED with a relatively minor injury

8   and wait for a very long time because your injury is not as

9   severe, your need is not as acute as others.

10  Q.  And you described the mental health crisis bed versus

11  CCCMS.  What -- what, if anything, would be the role of

12  triaging for clinicians with respect to patients and MHCB

13  versus CCCMS?

14  A.  Yeah.  Usually the MHCB clinicians will only be doing MHCB,

15  but there is a fair amount of flexibility there as well.

16       People are sick; people call out; doctors have lives that

17  they need to attend to outside.  So we may have patients --

18  sorry -- may have providers that are covering patients in

19  multiple settings, like I mentioned.  And you typically want to

20  make sure that the -- the patients with the greatest need are

21  seen first.  And the adjustments that they need that may

22  take -- you know, we need pharmacy to change their medication

23  dose, so we want to do that early in the morning so they get

24  the right med by the evening.  So you're kind of gauging that

25  as you go.

1   Q.   How about do clinicians who see CCCMS patients also see EOP

2   patients?

3   A.   Sometimes, yeah.

4   Q.   Okay.  And is it true that patients within CCCMS have

5   different levels of mental illness even within that

6   classification or group?

7   A.   Absolutely.  It's a broad spectrum within each level of

8   care, as we call them.

9   Q.   Same with respect to EOP?

10  A.   Yes.  Exactly.  And even -- really, even in crisis bed, we

11  may have a patient that has a severe mental illness versus

12  severe social triggers that are going on in their lives, and

13  you treat those patients very differently.

14  Q.   So you could triage within even EOP, correct?

15  A.   Yes.  Absolutely.  Within your caseload for the day, yeah.

16  Q.   Dr. Mehta, we've heard testimony about telepsychiatry and

17  telemental health.  Generally, what are your goals for the

18  telemental health program that you are rolling out?

19  A.   So, you know, I think numbers one, two, and three are

20  access to care.  We want the patients to have greater access to

21  highly trained and skilled clinicians a greater percentage of

22  the time.  We want them to always have that, sort of, need

23  fulfilled.

24       Second, though, from a different sort of perspective is we

25  do want to improve recruitment and retention.  So we've

1    recruited a lot of telepsychiatrists in our system.  And I know

2    -- three years ago, I knew every single psychiatrist in our

3    system personally.  And we've recruited a lot of people from

4    settings where they would likely never have worked in a

5    correctional setting, you know, unless this was their -- this

6    was the availability.  We're able to kind of break into a new

7    population that way.  So recruitment and retention.  These

8    doctors are -- appreciate the flexibility that this provides

9    them in their lives.

10        And then the last thing I would say is that we really want

11   to make life easier for the institutional clinicians.  We want

12   to make their jobs easier.  We want to take some burden away

13   from them.  And all of the teleproviders that we -- that we get

14   to the institution take work off the institution.  So that's

15   a -- it's a big part of it.  And hopefully that makes life

16   better for them and more people willing work at the

17   institution.

18   Q.  Those goals that you have for broader telemental health,

19   are they the same goals for telepsychiatry?

20   A.  For telepsychology and telesocial work?

21   Q.  I asked it more broadly.

22   A.  Sorry.

23   Q.  Are the goals the same for both --

24   A.  Yes.

25   Q.  -- all three classifications?

 1   A.   Yes.  My apologies.  I think I heard that backwards.

 2        But, yeah, our goals are the same.  We really -- I'm very

 3   proud of our telepsychiatry program.  I think it's one of the

 4   best programs I've ever seen, public or private.  And we hope

 5   to be able to replicate that in telepsychology and telesocial

 6   work.

 7   Q.   Okay.  And have you met those goals -- those three goals,

 8   which I believe is actually one, two, three, or --

 9   A.   Right.

10   Q.   Access to care --

11   A.   Four, five.

12   Q.   -- recruitment and retention.  But have those goals been

13   met, in your estimation, with respect to telepsychiatry?

14   A.   I think so.  We have 80-some clinicians, 87 or so

15   telepsychiatrists, all civil service, and that's fully a third

16   of our -- of our total psychiatry workforce.

17        And, as we said, 90, 95 percent of our patients are

18   outpatient, so that's -- I think that's been a good -- a

19   positive development.

20   Q.   Okay.  Dr. Mehta, you testified earlier that the challenges

21   have shifted recently with respect to which classifications

22   you're having more difficulty attracting and recruiting and

23   retaining.

24        And that started -- when, approximately, did those

25   challenges with psychology and social worker start?

1    A.   Certainly in the -- within my years, I would say in the

2    middle of COVID.  So 2020, 2021 is when things started looking

3    more bleak from that perspective.

4    Q.   And you mentioned that there were societal pressures.  What

5    have you learned about some of the causes of that shift

6    generally?

7    A.   Yeah.  I've spoken to a lot of psychologists and a lot of

8    social workers in our system, out of our system, and on the way

9    in or out of our system.

10       It's -- I think -- I think everyone can acknowledge that

11   COVID was -- was a really difficult time.  It was hard on all

12   sorts of medical professionals.  By no means is mental health

13   special in that regard.  Nurses, especially, I would say, were

14   hit hard.  It was really difficult to change the way you do

15   everything but still accomplish the same goals.  I think a lot

16   of people realized that the -- for sort of small differences in

17   pay or things like that, it was not worth it for them to work

18   in a setting where they -- they didn't feel like they had the

19   work/life balance.

20       So I think a lot of our -- the ones that I've spoken to

21   have said that they left to find opportunities to do telemental

22   health or work in other settings where they're -- they're able

23   to have a different personal life.

24   Q.   Dr. Mehta, we've heard testimony or there's been questions

25   about persons leaving on-site positions for telepositions.

1       Have you heard of that happening?

2    A.  Yeah.  Our -- our prior Chief of Telepsychiatry before me

3    -- or a couple before me -- opened a private company called

4    Orbit that does telepsychiatry, and several of our

5    psychiatrists actually left to join that company.

6    Q.  And how about within the system, have you heard of people

7    transitioning from on-site facility positions to telepsychiatry

8    positions?

9    A.  You know, it hasn't been very common.  Telepsychiatry grew

10   steadily over years before COVID, so most of the people we

11   attracted were people who were seeing the advertisements from

12   outside of our system.  Most of the people working at the

13   institutions lived near those institutions and continued

14   working there.

15       We had a few that came over, but I think we looked at the

16   numbers at one point; it really wasn't that many.  Definitely

17   single digits.

18   Q.  Is that a concern that you're going to draw from on-site

19   positions for these telemental health or telepsychiatry

20   positions?

21   A.  I'd say, yes, it's definitely a concern, and that has

22   helped drive the way that we're shaping our recruitment and how

23   we're approaching the -- the new programs here.

24       So I think we can do it.  I think we can get there without

25   taking too much from our institutions.  But that's absolutely

1    something we're working very hard on.

2    Q.  Have you had any of these people transition from on-site

3    facility positions to telepsychiatry positions who have told

4    you they would have left the system but for this option?

5              MS. ELLS:  Objection.  Foundation.  Hearsay.

6              THE COURT:  Sustained.

7    Q.  BY MR. MELLO:  Dr. Mehta, have you spoken to any of the

8    individuals who have transitioned from on-site positions to

9    telepsychiatry positions?

10   A.  Yes.

11   Q.  Okay.  And have any individuals informed you that they

12   would have left the system but for the option to be a

13   telepsychiatrist?

14             MS. ELLS:  Objection.  Hearsay.

15             THE COURT:  Sustained.

16             MS. ELLS:  Lack of foundation.

17             THE COURT:  Sustained.

18   Q.  BY MR. MELLO:  Dr. Mehta, as a result of your experience

19   with telepsychiatry, you are rolling out a larger telemental

20   health program, correct?

21   A.  Yes.

22   Q.  And that telemental health program was subject to a BCP,

23   correct?

24   A.  Yes.  Budget Change Proposal.

25   Q.  I believe it's Defendants' -- it's Defendants' 1.  Thank

 1   you, Ms. Pooni.

 2       Dr. Mehta, have you seen this document before?

 3   A.  Yes.

 4   Q.  Did you have any role in its preparation?

 5   A.  Yes.  Absolutely.

 6   Q.  And it is dated May of this year.  Do you see that?

 7   A.  Um-hum.

 8            THE COURT:  Yes or no, please.

 9            THE WITNESS:  Sorry.  Yes, it is dated in May.

10   Q.  BY MR. MELLO:  And, Dr. Mehta, on -- generally, what --

11   what resources did this BCP provide to you with respect to the

12   rollout of the telemental health program?

13   A.  So we intentionally created our program to have their own

14   supervisory staff.  That is, again, so that we're not drawing

15   resources away from the institution.  We don't have to train

16   all of them in the hardware, like the DX80 monitors or the

17   software that we use through Webex and things like that; we

18   have dedicated supervisors who just do that work for the

19   institutions.

20       So this BCP, Budget Change Proposal, was largely to provide

21   us with the authority for those supervisors, as well as the

22   support staff that goes with it.  Every telemental health --

23   every clinician in our system has to have certain trainings --

24   annual trainings and then one-off trainings, things like that.

25   So we need support staff to track that, manage what -- what

1   people got what trainings or need what trainings and just to

2   set up our system in general.  There are a thousand duties that

3   I could get into if you'd like, but this is to establish those

4   positions, the support and the supervisors.

5   Q.  And you don't dispute that prior to May of 2023, you -- you

6   -- or the department, CDCR, had not requested a BCP for the

7   expansion of a telemental health program?

8   A.  Correct.  It takes about a year to see a BCP from earth to

9   fruition, so we started, but, yeah, we were in that cycle.

10  Q.  Okay.  And, Dr. Mehta, at the bottom of page 4 --

11      (Alarm sounding.)

12          THE COURT:  That's a belated notice.  I thought we

13  had survived.  Can you leave the room, please, if you can't

14  turn that off immediately.

15          MR. GOURSE:  It's off.  I apologize, Your Honor.

16          THE COURT:  We're at 11:42.  Nothing went off at the

17  time we expected it.  I was going to observe I do have some

18  control over my courtroom, with that one exception so far.

19      You may continue.  We'll go for another about 12 minutes.

20          MR. MELLO:  Thank you, Your Honor.

21  Q.  BY MR. MELLO:  If we can go to the bottom, the last

22  paragraph on page 4.

23      Do you see this paragraph, Dr. Mehta?

24  A.  Yes, I can see it.

25  Q.  Okay.  There has been testimony about the numbers of

 1   positions identified in this paragraph and whether even filling

 2   all of those positions would get the Defendants to a 90 percent

 3   fill rate on these two classifications.

 4       My question for you is what does this BCP -- what was the

 5   goal of this particular paragraph in the BCP when you helped

 6   draft it?

 7   A.  Yeah.  So this was really just to kind of give a general

 8   overview of what we were doing.  We need no money to do this,

 9   so we did not request any funds to redirect these positions.

10   It was simply meant to be explanatory.

11       These 100 positions are already allocated based on the

12   ratios we discussed.  We can count them as telemental health or

13   regular, typical, whatever you want to call it.  We can count

14   them as either one, and we can do that with any number of those

15   positions that we would like.  It's -- it's really -- it's just

16   for accounting purposes.  We already have the allocations.

17       So in this case, we were anticipating how quickly we might

18   grow, but it's really a mid estimate -- midlevel estimate.  We

19   could be faster; we could be slower.

20   Q.  Okay.  And are you limited in any way over time -- let me

21   just back up.

22       It's undisputed that as of today, you have zero

23   telepsychologists, correct?

24   A.  Correct.

25   Q.  And as of today, you have zero telelicensed clinical social

1  workers, correct?

2  A.  We have one supervisor, but that's it, yeah.

3  Q.  And -- and it will take time to fill those positions?

4  A.  Yes.  We -- we learned a lot of really important lessons

5  for telepsychiatry, and so we're doing our best to do this in a

6  measured sustainable way and taking advantage of all those

7  benefits.

8  Q.  So I understand that you -- the plan is to fill at least

9  some of the supervisor positions first.  Why wait to hire line

10  staff?

11  A.  Yeah.  So the -- the hiring and orientation process itself

12  is very time consuming, so definitely just in terms of having

13  the bodies to be on the hiring panels and make those decisions,

14  we need those supervisors.

15      But as I mentioned earlier as well, we actually -- we do

16  our full orientation for our people.  We teach them how to use

17  the electronic medical records system; we give them a mentor,

18  often that works at the same -- almost always that works at the

19  same institution at which they will be assigned.  We do a lot

20  of training so that when this provider goes to the institution,

21  they are ready to see patients that day.  They go straight in

22  and get into it.  That has been a huge benefit that we've been

23  able to provide, because the orientation process and everything

24  does require -- is very time consuming.  There is a lot of

25  trainings and things that people have to sign off on.

1        So having that also, we need to make sure that the

2    orientation we have for telepsychologists and telesocial

3    workers are specific to those classifications.  Right now, we

4    have the psychiatry one, of course.  And then we need people to

5    actually supervise those people and monitor their progress and

6    answer questions at the beginning.

7    Q.  Okay.  And, Dr. Mehta, have you -- I think you testified

8    earlier there has been one hire --

9    A.  Yes.

10   Q.  -- in the supervisor position?

11   A.  Yes.

12   Q.  Are there any outstanding offers?

13   A.  We had an offer that was declined, but we are -- we haven't

14   given up on that candidate.  We'll see what we can do.

15       We're really looking for the best.

16   Q.  And, Dr. Mehta, with respect to these supervisor positions,

17   have there been new collective bargaining agreements negotiated

18   between the unions and the state recently?

19   A.  Yes.  Just over the last few weeks.

20   Q.  And have those bargaining agreements between approved by

21   members?

22   A.  Yes.  They were voted to be approved.

23   Q.  Okay.  And the legislature approved them, and the Governor

24   signed off on them?

25   A.  Yes, that's my understanding.

1    Q.  And is it your understanding that those negotiated

2    collective bargaining agreements will impact compensation for

3    any of the five classifications at issue?

4    A.  Yes.

5    Q.  Dr. Mehta, under your telepsychology -- pardon me.  Under

6    the telepsychiatry policy and the telemental health policy that

7    was recently issued, who -- who acts as a telepresenter?

8    A.  So medical assistants are listed as the first in a long

9    list of people that can qualify, as I mentioned.  So CNAs,

10   LVNs, RNs, MDs, DOs -- a lot of acronyms; tell me if you want

11   me to spell any of them out -- but those positions as well as

12   the primary clinician, rec therapists, pretty much anyone

13   involved on that health care side at the institution.

14   Q.  Okay.  I'm going to go pull up page 5 of this document.

15   Thank you.

16       Dr. Mehta, on page 5, there is a category that says MA 50

17   and 50.  Do you see that?

18   A.  Yes.

19   Q.  What does that mean?

20   A.  So that was the number of allocated medical assistant

21   positions we requested to start.

22       And I will say, again, this is to start.  The whole BCP is

23   intended to be the -- the kind of birth of this program.  But

24   it can -- we can always go back and ask for different allocated

25   resources.

1    So the MAs, we wanted to conservatively take about a -- get

2    authority for about 100 positions.  And it says, 50 BY, that's

3    budget year.  So 50 in the first budget year, 2023/2024, and

4    then 50 from '24/'25.

5    But, again, these are rough estimates.  We get a certain

6    amount of authority.  We can fill more than that if we need to,

7    if we move more quickly than we anticipate, which would be

8    great.

9    Q.  Okay.  And you would acknowledge that based upon our

10   most -- the Defendants' most recently staffing reports, that

11   there are currently vacancies below the 90 percent fill rate

12   for MAs?

13   A.  Yes.  Yeah.

14   Q.  Okay.  And, however, you're going to add an additional 50

15   to 100 MAs into that category.  Why?

16   A.  Yeah.  I mentioned earlier that the telepresenting duty can

17   be done by a variety of classifications.  So some institutions

18   use those other classifications for various reasons.  We want

19   to make sure that, if needed, we can give the institution an

20   extra allocation for that telepresenter.

21   So we wanted one-to-one, roughly, for the number of people

22   that will be requiring telepresenting, so the number of

23   telemental health providers.  We want to make sure we're ready

24   to do that.  The institution may not need it, and they may have

25   different plans and solutions, but we want to be ready to

1    provide it if we can, if we need.

2    Q.  Dr. Mehta, again, we were talking about the number of --

3    numbers -- 77 or so and 41.  Even if those numbers were met --

4    based upon the most recent staffing reports, even if you got

5    that number -- that number which you said can go up -- you'd

6    still be below the 90 percent fill rate, correct?

7    A.  For those other classifications?

8    Q.  Correct.

9    A.  Yes, I believe we would.

10   Q.  And so how does that help you with respect to the 90

11   percent fill rates, in your mind?

12   A.  You know, we want to move as quick as is safe and

13   appropriate to build these departments.  We do a lot for these

14   providers in order to really take care of them.  We provide

15   continuing medical education; we have a journal club within our

16   group of teleproviders.  These are all just nice things that we

17   do to make the program more successful, to make those doctors

18   better trained, and we want to build the other programs the

19   same way.

20       So we will move as fast as we can.  I definitely, every

21   day, understand the urgency of filling these positions and

22   getting these patients seen.  We will move as fast as we can

23   but also build the program the right way.

24   Q.  And, Dr. Mehta, there has also been testimony in this

25   proceeding about some categories -- or some of the

1    classifications receiving pay differentials under the new

2    collective bargaining agreements based upon whether they work

3    on-site or whether they work remotely.

4        Do you understand that there are differences?

5    A.  Yes.

6    Q.  And those differences were negotiated pursuant to the

7    collective bargaining process?

8    A.  Yes, negotiated by the members of the union.

9    Q.  Dr. Mehta, do you believe that psychologists and

10   recreational therapists should be paid the same?

11            MS. ELLS:  Objection.  Calls for speculation.

12            THE COURT:  Sustained.

13   Q.  BY MR. MELLO:  Dr. Mehta, you are the head of the mental

14   health program at -- strike that.  Let me back up.

15       Dr. Mehta, are -- psychologists and clinical social

16   workers, do they have different educational requirements?

17   A.  Yes.

18   Q.  What's the difference?

19   A.  Clinical social workers typically have a master's level

20   degree, although they may go higher, of course.  And

21   psychologists have a PhD or PsyD advanced degree.

22   Q.  And do you know if, under the current compensation process,

23   those individuals are paid differently?

24   A.  Yes, they are paid differently.

25   Q.  And do you know why?

```
 1    A.   The education --

 2              MS. ELLS:  Objection.  Calls for speculation.

 3              THE COURT:  Just answer, first, yes or no.  Do you

 4    know why?

 5              THE WITNESS:  Yes.  Yes.

 6              THE COURT:  You can lay some foundation.

 7              MR. MELLO:  Okay.

 8    Q.   BY MR. MELLO:  Other than the differences in education and

 9    the fact that the agreements were negotiated by the unions, do

10    you have any other understanding as to why they might be

11    compensated differently?

12              MS. ELLS:  Objection.  Calls for speculation.

13              THE COURT:  Just yes or no.

14              THE WITNESS:  Yes.

15              THE COURT:  All right.  Next question.

16    Q.   BY MR. MELLO:  Dr. Mehta, during COVID, were -- did state

17    employees receive a cut in their compensation?

18    A.   They -- we received the Personal Leave Program, which was a

19    decrease in pay but compensated by the additional vacation days

20    that were given to kind of offset the cost of that year.

21    Q.   And was that directed solely at the clinicians and persons

22    who work for CDCR's Mental Health Delivery System?

23    A.   No.  My understanding is it was all -- all state workers --

24    civil service state workers; so at completely different

25    organizations, within different classifications.  In our own
```

 1  organization, it was -- it was pretty widespread.

 2  Q.  And do you know approximately how long that PLP -- because

 3  everything is an acronym -- program lasted?

 4  A.  I believe it was one year.

 5  Q.  And did -- during the last several years, did CDCR

 6  implement a pay differential for employees who work in the

 7  PIPs?

 8  A.  Yes.

 9  Q.  And do you know which classifications that applied to?

10  A.  Predominantly psychiatrists -- that includes supervisors

11  and line staff -- psychologists.  There were -- I believe

12  that's it.  I'm not sure if it's in the binder.  I could take a

13  look.

14  Q.  That's fine.  We'll just go generally.

15          THE COURT:  Let's go ahead and take our lunch break.

16  Be back at 1:00.  And maybe check your devices, make certain

17  any alerts work their way out of the system before we start

18  again.  And be back here at 1:00.

19          THE WITNESS:  Thank you very much.

20          THE COURT:  Thank you.

21    (Recess taken, 11:57 a.m. - 1:04 p.m.)

22          THE COURT:  You may be seated.

23    And you may continue, Mr. Mello.

24          MR. MELLO:  Thank you, Your Honor.

25  Q.  BY MR. MELLO:  Dr. Mehta, earlier in your testimony, we

1    were discussing whether the unlicensed individuals may affect

2    fill rates.  Would you like to revisit that issue?

3    A.  Yes.  I apologize.  I think I misspoke.

4        There have been a few different programs that we've been

5    looking at.  One of them had different counting.  But in our --

6    in our current fill rate system, the unlicensed do count, I

7    believe, in general.

8    Q.  Dr. Mehta, you have been the -- in your position, Deputy

9    Director, since when again?

10   A.  Three years.  So July 2020.

11   Q.  Are you aware of a -- a plan to assign MAs to psychiatrists

12   that may have predated your time as the Deputy Director?

13   A.  I am vaguely aware.  I don't have a lot of knowledge of how

14   that happened, though.

15   Q.  Are you aware of a plan to assign an MA to every

16   psychiatrist?  Do you have any understanding of that?

17   A.  No current plan, no.  We did the budget change proposal for

18   medical assistants for telepsychiatry while I was chief, and

19   that was my only exposure to that.

20   Q.  Earlier in this proceeding, there was some discussion of

21   working conditions at CDCR.  Would you agree that working

22   conditions are important to job satisfaction?

23   A.  Yes.  Absolutely.

24   Q.  And one of the subjects that was raised was the lack of

25   windows in facilities.  What, if anything, are you doing -- or

1    is the department doing to try to improve working conditions

2    for folks who work in your -- for clinicians in these

3    classifications who work in your program?

4    A.  We try to bring in as much -- as much extra space as we

5    can.  So I'm working at San Quentin out of the modules that

6    were brought in for telepsychiatry.  We didn't want to take

7    office space away from the on-site clinicians.  It's always a

8    struggle, I will say, but we do our best to get everyone

9    sufficient office space to see patients.  Some places, they'll

10   have separate office space and patient session rooms, which is

11   great when we can do it.

12       I don't think we're focused on windows so much.  In

13   emergency departments and clinics and things, the rooms often

14   don't have windows, but it would be nice.

15   Q.  Dr. Mehta, there has been testimony about the Defendants'

16   efforts and the department's efforts to fill these five

17   classifications.  What, if anything, more could you do,

18   pursuant to the rules that apply to you, to try to fill these

19   positions?

20   A.  I honestly can't think of anything else at my level or have

21   not heard ideas from other people.  If there were, I would be

22   doing them.  But I can't -- I don't know of any.

23              MR. MELLO:  Nothing more, Your Honor.

24              THE COURT:  All right.

25              MR. MELLO:  Thank you.

 1                    THE COURT:  Cross-examination.

 2                         CROSS-EXAMINATION

 3    BY MS. ELLS:

 4    Q.  Good afternoon, Doctor.

 5    A.  Good afternoon.

 6    Q.  Mr. Gonzalez, could you please pull up Defendants' 14.

 7         Doctor, you testified that this is -- this document is an

 8    example of the biannual allocations of staff that you oversee

 9    every January and July, right?

10    A.  Yes.

11    Q.  These adjustments are primarily driven by population,

12    correct?

13    A.  Correct.

14    Q.  Sometimes the targets go down, correct?

15    A.  Correct.

16    Q.  Mr. Gonzalez, could you pull -- display Defendants' 12,

17    please, page 4.

18         This is a chart that shows the allocations and fill rates

19    over time that was prepared by your counsel and has been

20    admitted into evidence.

21         This chart shows that in July 2019, the psychologist

22    allocation went down by 43 positions, right?  Do you see where

23    I'm speaking of?

24    A.  Yes.  Yeah.  That looks correct.  Yep.

25    Q.  On the same page, in September 2020, the psychologist

 1  allocation went down 56 positions, right?

 2  A.  Yes.

 3  Q.  And in January 2021, the psychologist allocation went down

 4  another 40 positions?

 5  A.  Yes.

 6  Q.  Could you please turn to page 6.

 7      And on this page -- let me find the month -- in

 8  September 2020, the social worker allocation went down by 39

 9  positions, right?

10  A.  Yes.  They go up and down month to month.  Yep.

11  Q.  You've made other changes that affect the allocations and

12  the fill rates as well, correct?

13  A.  Um --

14  Q.  I can give you some examples --

15  A.  Please.

16  Q.  -- so you know what I'm talking about.

17  A.  Sure.

18  Q.  That it includes, for instance, changes to the allocations

19  that are driven by changes to the 2009 Staffing Plan that we've

20  agreed upon and have been court ordered, correct?

21  A.  Yes, correct.

22  Q.  So, for instance, you now count psychiatric nurse

23  practitioners in the fill rates for psychiatrists, right?

24  A.  Yes.  Yes.

25  Q.  And you made reductions in the psychiatry allocations to

1    account for CCCMS class members who are not on medications for

2    more than six months, right?

3    A.  Correct.

4    Q.  And you made changes in the way psychiatrist supervisors

5    are allocated as well, right?

6    A.  Yes.  Um-hum.

7    Q.  And you will be adding telemental health providers to the

8    fill rates for the psychologists and the social workers

9    eventually, correct?

10   A.  Yes.  And the number of our supervisors has gone up over

11   the years.  Yeah.

12   Q.  The 2009 Staffing Plan ratios drive your biannual staffing

13   allocation, except as modified by subsequent changes, correct?

14   A.  Yes.

15   Q.  The 2009 Staffing Plan ratios take into account the lesser

16   need for care among the less acutely ill class members in the

17   system, right?

18   A.  Yeah.  There is a bigger patient-to-doctor ratio at the

19   lower levels, right.

20   Q.  So, for instance, the staffing ratios in the 2009 plan

21   account for the fact that CCCMS class members are seen by their

22   primary care provider every 90 days as opposed to every seven

23   days for EOP patients?

24   A.  At least every 90 days, yes.

25   Q.  I'm sorry.  What?

1  A.  At least every 90 days.

2  Q.  Per the policy at least, correct?

3  A.  Yes, correct.

4  Q.  That need for additional clinical contacts among EOPs as

5  opposed to CCCMS class members is baked into the ratios

6  already, right?

7  A.  Yes, I believe so.  I don't know how that was decided, but

8  yes.  Yeah.

9  Q.  Okay.  Mr. Gonzalez, could you pull up Plaintiffs' 35,

10  please.  And could you flip to the fourth page, please.  One

11  more, please.

12      Doctor, are you familiar with this report?

13  A.  Yes.

14  Q.  Okay.  Doctor, are positions that are in the blanket

15  reported in this chart anywhere?

16  A.  In the blanket.  I don't believe so.  The blanket refers to

17  the source of funding, but I -- yeah, so I don't believe so.

18  There may be a couple.  I don't want to speak, you know --

19  Q.  But to the extent there are any --

20  A.  Right.

21  Q.  -- would it appear in this report, to your knowledge?

22  A.  If there are blanket positions?

23  Q.  Yes.

24  A.  I don't think so.  I don't believe so.

25  Q.  Okay.

1    A.   No.

2    Q.   So -- and right now, I'd like to separate the allocation

3    columns from the filled columns.

4         So for the allocation columns, positions that are -- that

5    exist through funding in the blanket would not appear in the

6    allocation columns, correct?

7    A.   Funding in the blanket -- I'm not a hundred percent sure

8    what that means.  Sorry.  Can you ask that again?

9    Q.   So I believe you just testified that, to your knowledge,

10   positions that are funded through the blanket are not reflected

11   in this report; is that correct?

12   A.   Blanket positions are usually additional to the allocation,

13   yes.  Yeah.

14   Q.   Okay.  And so would those positions be reflected in the

15   fill rate?

16   A.   Right.  No, they would not be counted as filled positions.

17   Q.   So they'd be nowhere.

18        So if there was, for instance -- I'm just going to give you

19   a hypothetical.  A psychologist that was allocated through the

20   blanket -- or -- I'm sorry -- that was funded through the

21   blanket as opposed to the traditional allocation funding, that

22   psychologist would not appear anywhere on this chart?

23              MR. MELLO:  Objection.  Calls for speculation.  Lacks

24   foundation.  Incomplete hypothetical.

25              THE COURT:  Well, you can -- sustained in part as to

1    foundation.  If you want to lay a little more foundation.

2    Q.  BY MS. ELLS:  So the -- on this chart, the filled positions

3    in the columns that are marked "filled," my understanding is

4    they reflect all of the staff that are working at the

5    institution or, you know, telepsych program if that's the

6    position we're talking about, that every position for -- this

7    is a psychiatry report, but for all of the reports, my

8    understanding is that for the given classification that is

9    being reported in this report, every psychiatrist that exists

10    and is working for CDCR would be reflected in the fill rate --

11    is that your understanding?  No matter how they are funded?

12          MR. MELLO:  So it lacks foundation and calls for

13    speculation.

14          MS. ELLS:  Your Honor, may I respond?

15          THE COURT:  Overruled.

16    You can answer if you're able.  If you don't understand the

17    question or if you don't understand the chart, then you're free

18    to say so.  But if you're able to answer the question, you

19    should.

20          THE WITNESS:  Okay.  I will say we -- we talked

21    earlier about the hundred positions that are -- many of them

22    are psychiatrists that are not reflected in this chart that are

23    at the headquarters and regional levels and all those

24    positions.  So there is a lot more than is reflected in this

25    chart.

1    Q.  BY MS. ELLS:  Setting aside the headquarters position, for

2    the positions of people providing services, either supervisory

3    or clinical services, at an institution -- and for this

4    purpose, we can ignore the telepsych column at the bottom

5    because that's supervisory telepsychiatry -- would every person

6    that is providing some sort of services be reflected in the

7    fill rate?

8            MR. MELLO:  Same objection.

9            THE COURT:  Overruled.

10           THE WITNESS:  I believe so.  May I give an example?

11   Q.  BY MS. ELLS:  Sure.

12   A.  When we say blanket, sometimes we have a -- one of the

13   physicians may be retiring but have a bunch of extra vacation

14   time, so they will, quote/unquote, burn their time, meaning

15   they'll just keep using up that vacation time, and we'll hire

16   someone in the blanket to do their job, because that position

17   is already filled.  So we would typically count that as one

18   position.  There would be two people but one position.  One

19   goes on vacation, essentially.

20        And then sometimes we've also said -- recently, I think we

21   discussed this -- where we wanted to give the institutions more

22   help to run groups, for example, so we hired rec therapists

23   over and above the allocation.  And I don't recall exactly how

24   we counted that in.  I know we all discussed it and agreed, but

25   I don't remember exactly the agreement.

1    So I think I -- I understand, I think, what you're saying.

2    And, yes, by in large, this is reflective of the people at

3    the -- that are seeing patients and their direct supervisors.

4    But I just don't want to make a statement that excludes the

5    possibility of something else, because it's such a complicated

6    thing, if that makes sense.

7    Q.  I certainly appreciate that.  These reports are being

8    utilized to determine the potential sanctions in the case, so I

9    want to be certain that they are accurate and properly reflect

10   all of the clinicians that you have in your system.  And I'm

11   not clear --

12   A.  Yes.

13   Q.  -- from your answers whether that is true.

14       For instance, the rec therapists that you just discussed,

15   do you know if they are reflected in the rec therapist report?

16   A.  You know, I -- I don't recall exactly, but we always err on

17   the side of caution, where if that is not something that is

18   allocated per ratios or something, we don't count it even

19   though we're using that to provide a little bit of extra care,

20   a little bit of extra support at the institution.

21       When we round up on these allocations, you know, you have

22   .5 or something and we make it into one full allocation, we

23   don't -- we fill to that.  We fill to the rounded-up number.

24   So we'll have people that are above the ratio, because we

25   rounded up, that are in this chart.

1    Q.  Okay.  But I guess I'm talking about -- I'm not -- I'm not

2    concerned so much here right now about the allocated columns.

3    A.  Okay.

4    Q.  It sounds like from what you were testifying earlier just

5    now, that there may be some actual clinicians working in the

6    field that are not reflected in the filled columns on this

7    chart, including potentially these -- these rec therapists that

8    you referenced.

9        Is that your understanding, that they would not necessarily

10   be reflected in these charts?

11   A.  We err on the side of caution until it's decided.  So, for

12   example, we had nurse practitioners that were not -- they were

13   working at the institution, but until we agreed on that policy,

14   they were not counted.

15       So similar to the rec therapists and things, we may be

16   piloting things that we're going to talk about later and

17   negotiate later, where they are providing care, but we're not

18   counting that yet.

19   Q.  Are you aware right now of any of those positions and how

20   many they would be?

21   A.  Um --

22   Q.  In existence right now, just to be clear --

23   A.  Right.

24   Q.  -- not potentially in the future.

25   A.  Actual.

1    Q.   Yes.

2    A.   Other than those rec therapists that are over and above

3    allocation, I don't believe so.  We have -- no, they would be

4    counted.  Yeah, I think that's -- that's probably it.

5    Q.   Okay.  Mr. Gonzalez, could you move to, perhaps, page 10.

6    Could you find the rec therapist portion of this.  Thank you.

7         So I just want to be clear.  So this is the rec therapist

8    report.

9    A.   Um-hum.

10   Q.   Are you aware of any rec therapists currently working in

11   the system that are not reflected on this report in the fill

12   rate?

13   A.   So the -- the allocated rec therapist thing there is based

14   on the last biannual staffing adjustment.

15   Q.   To be clear, I'm talking about the filled column.

16   A.   Okay.

17   Q.   And the registry column.

18   A.   Got you.

19   Q.   Not about the allocated column.

20   A.   Right.  Right.  So if we had added on allocated positions

21   after the position -- I'm just trying to think of where they

22   would be.

23        So I don't recall, honestly, if we decided to count them --

24   if we agreed to count them in that filled column or not right

25   now.  I apologize.

```
 1   Q.  Okay.  That's okay.

 2   A.  Yeah.

 3   Q.  I'm just trying to get some clarity.

 4   A.  Sure.

 5   Q.  So it sounds like you're not confident either way --

 6   A.  Right.

 7   Q.  -- on this?

 8   A.  I don't recall in this case, yeah.

 9   Q.  Okay.

10   A.  Um-hum.

11   Q.  And in these charts --

12       Could you go back again to page 5.

13       Am I correct that people on short-term leave -- and by

14   that, I mean something akin to five or less months -- if

15   they're on leave, they would still show as filled on this

16   chart, correct?

17   A.  Yes --

18               MR. MELLO:  Lacks foundation.

19               THE WITNESS:  I believe -- sorry.

20               THE COURT:  Overruled.

21               THE WITNESS:  Apologies.  Sorry.

22       Yes, I believe that was what was negotiated when we were

23   deciding how to build the charts.  Yeah.

24   Q.  BY MS. ELLS:  And so it -- again, correct me if I'm wrong

25   -- it's only people that are formally on long-term leave, which
```

1    I understand to be six months or more, that would not appear in

2    the fill rate for these charts?

3                    MR. MELLO:  Lacks foundation.

4                    THE COURT:  Overruled.

5                    THE WITNESS:  I don't recall the cutoff for extended

6    medical leave.  But, yes, I think you're correct in that case.

7    If someone is on vacation for a few days or something, that

8    would not be reflected.

9    Q.  BY MS. ELLS:  Right.  Okay.  And what about people who are

10   working out of class?  So, for instance, somebody that is a

11   supervising psychiatrist who is serving as an acting chief,

12   would they -- where would they be reported on this chart?

13   A.  They would typically be in the position that they're

14   filling.

15   Q.  Okay.

16   A.  So the acting chief.  Yeah.

17   Q.  Okay.  Thank you.

18   A.  Yeah.

19   Q.  Mr. Gonzalez, could you turn to Defendants' 13, page 2,

20   please.

21       Doctor, you have not made any projections or estimates of

22   how long it will take to come into compliance for psychologist

23   staffing, correct?

24   A.  Correct.

25   Q.  Same answer for social workers?

1    A.    Right.

2    Q.    Same answer for rec therapists?

3    A.    Yes.

4    Q.    And for medical assistants as well?

5    A.    Yes.

6    Q.    So on this page which reports psychologists, every month

7    since May, CDCR has filled fewer psychologist positions,

8    correct?

9    A.    Every month since May, we've had fewer -- so in net -- we

10   may have hired a lot and lost a lot, but, yeah, in net, we've

11   had decreasing numbers in these three months.

12   Q.    Thanks.

13   A.    Yep.

14   Q.    And could you please turn to the next page.

15   A.    We also had, I think, increasing allocations in those

16   months.  So -- yeah.

17   Q.    And this is the chart that shows social worker positions.

18       On this chart, it shows that there were fewer social worker

19   positions filled in July than in June, correct?

20   A.    Yeah.  I mean, we had many more than prior months, but in

21   that exact two-month period, there were six less.

22   Q.    These are just the most recent points of data that we have.

23   A.    Sure.  Sure.

24   Q.    On page 4 which shows the medical assistant positions,

25   there were fewer medical assistant positions filled in July

1  than in June, May, or April, correct?

2  A.  Yes.  And we've cut it off at the point at which that

3  flipped.  It was going up, and then it went down -- or wait --

4  sorry.  Does it show the 60 -- sorry about that.

5  Q.  Could you pop that back up.  It sounds like he may want to

6  look again.

7  A.  My apologies.  Thank you.

8      So April to May, it went up; May to June, it went up; and

9  then June to July, it went down.

10  Q.  Yeah.  The question was there were fewer medical assistant

11  positions filled in July than in June, May, or April, right?

12  A.  Yes.  I'm sorry.  Yes, that's correct.  My apologies.  I

13  get that.

14  Q.  Next page, please.

15      And this is the chart that shows recreational therapists.

16  A.  Okay.

17  Q.  For every month since May, CDCR has had fewer recreational

18  therapist positions filled, correct?

19  A.  Yes.  By about three per month.

20  Q.  If things continue as they are, you cannot project

21  compliance at any particular time in the future, correct?

22          MR. MELLO:  Calls for speculation.

23          THE COURT:  Overruled, given this witness' position.

24      You may answer.

25          THE WITNESS:  If things continue as they are in the

1    exact months that you specified?

2    Q.  BY MS. ELLS:  No.  Given this data showing that for every

3    position, July was less than the month prior, you cannot

4    project compliance if things continue as they are with this

5    system as we have it right now, correct?

6            MR. MELLO:  Lacks foundation and calls for

7    speculation.

8            THE COURT:  Overruled.

9            THE WITNESS:  No.  Not correct.  I disagree with that

10   statement.  I think that we have hired more people since

11   January, and so we could continue to hire.  And we have a lot

12   of efforts, some of which have just come online recently, like

13   the union contracts and things like that, which could

14   contribute to that.  So --

15           MS. ELLS:  Sure.

16           THE WITNESS:  Yeah.

17   Q.  BY MS. ELLS:  By compliance, I mean 90 percent fill rate --

18   A.  Yes.

19   Q.  -- you understand that?

20       So you can predict compliance.  When will you be compliant?

21   A.  I can.  It doesn't mean I have.  I am not sure.  I think

22   it's a complicated thing.  We have to be able to guess what

23   effect all the union contracts will have.  We have to be able

24   to guess how quickly telemental health is going to --

25   Q.  So that sounds like a lot of speculation, correct?  You'd

1  have to guess a lot of things?

2  A.  We'd have to estimate intelligently, but, yeah, sure.

3  Q.  Okay.  So if the Court gave you some time, you could tell

4  her when you would be compliant with each of these positions

5  with the 90 percent fill rate?

6          MR. MELLO:  Calls for speculation and lacks

7  foundation.

8          MS. ELLS:  Your Honor, he testified that it was

9  possible.

10          THE COURT:  Overruled.

11          THE WITNESS:  I -- I still don't really agree with

12  that necessarily.  We couldn't have predicted COVID.  We

13  couldn't have predicted a lot of things that have changed

14  things.  So I am cautious about saying we will of course fill

15  this many by this date.  I think that that's just a way to set

16  us up for failure, ourselves, to be honest.  And so I -- I

17  wouldn't be able to kind of say that with full confidence, but

18  I don't think you'd say the opposite, that we will not reach

19  compliance either.

20  Q.  BY MS. ELLS:  You don't think it's impossible to fill the

21  existing mental health clinician vacancies, do you?

22          MR. MELLO:  Objection.  Calls for a legal conclusion.

23  It lacks foundation.  Calls for speculation.

24          THE COURT:  Overruled.

25      You can answer, but I won't construe the answer in any way

1    as a legal -- based on a legal opinion.

2              THE WITNESS:  I don't know.

3    Q.  BY MS. ELLS:  You don't have a role in the hiring process

4    for line psychologists at the institutions, correct?

5    A.  At the institutions, no.  Telepsychiatry is done through my

6    headquarters.

7    Q.  Okay.  You also don't have a role in the hiring process for

8    social workers at the institutions, correct?

9    A.  Correct.

10   Q.  Same thing for recreational therapists?

11   A.  Correct.

12   Q.  And for medical assistants as well?

13   A.  Correct.  Well -- sorry -- just want to make sure.

14       The medical assistant allocations are given to the

15   institution from headquarters.  So they don't just -- like, the

16   institution gets a certain number of psychology positions or

17   whatever; they don't get a certain number of medical assistant

18   positions.  If we give them a telepsychologist or whatever,

19   then they will -- we will often give them a medical assistant

20   classification, but they can't hire that until we give it to

21   them.

22   Q.  Okay.  And am I -- that isn't something I was aware of, so

23   I -- so for the medical assistants, headquarters -- and correct

24   me if I'm wrong -- headquarters allocates the positions

25   directly to the institutions when they identify a need; is that

1  correct?

2  A.  When we allocate teleproviders and they identify a need,

3  yeah.

4  Q.  Okay.  And so am I correct that it's a two-part assessment;

5  first, have you allocated a new teleprovider, and, second, do

6  they need that person?

7  A.  Yes.

8  Q.  In what circumstances would you determine that they don't

9  need the medical assistant after you've allocated a new

10  teleprovider?

11  A.  Some institutions are able to cover the telepresenting role

12  using other staff like we were talking about -- the CNAs or

13  things like that.  And then -- I don't know how far into the

14  weeds you want me to go, but we can -- we do our best to -- to

15  fill it however we can.  And if medical assistant is the best

16  option, we go for that.

17  Q.  Okay.

18  A.  Yeah.

19  Q.  Thank you.

20  A.  Um-hum.

21  Q.  Medical assistants are the only position allocated

22  specifically to be telepresenters, correct?

23  A.  They're the only position -- allocated specifically -- so

24  no in the sense -- sorry -- that we could -- if an institution

25  can't hire a medical assistant, we can convert that allocation

1    into a CNA, for example, certified nurse assistant, and then

2    they could fill that, and we would pay for it with the medical

3    assistant funding.

4    Q.  And would that CNA have other duties beyond being a

5    telepresenter?

6    A.  No.

7    Q.  Okay.

8    A.  In that case, they would not.

9    Q.  And how often does that occur?

10   A.  Fairly frequently, I would say.  Much less than half, but

11   it does happen.  Yeah.

12   Q.  But it sounds like your preference is to allocate a medical

13   assistant for that position -- for that role as a

14   telepresenter, correct?

15   A.  We try to.

16   Q.  Okay.

17   A.  Yeah.

18   Q.  And so -- again, if I'm misunderstanding, please correct

19   me.  It sounds like you move on to the other positions when you

20   are not confident that you could hire a medical assistant for

21   that position?

22   A.  Sometimes.  Sometimes we have rec therapists where the

23   population is down, or the yard is down and they don't have

24   groups running that day, and then the rec therapist will come

25   over and do the telepresenting for the day or for the time

1   period until their population goes up.  It's a very fluid

2   system.

3   Q.  Okay.  So sometimes you would use existing staff to perform

4   this duty?

5   A.  Yes.

6   Q.  Okay.

7   A.  Yes.

8   Q.  I think you testified earlier that sometimes you have

9   clinicians serve as a telepresenter; is that right?

10  A.  Correct.

11  Q.  Doctor, you've tried dual appointments to fill some

12  vacancies, correct?

13  A.  Yes.

14  Q.  And that's true for psychiatrists, social workers, and

15  psychologists; is that correct?

16  A.  I believe so, yeah.

17  Q.  The state's expert, Dr. Greulich, has found that dual

18  appointments have not led to a discernible improvement in

19  CDCR's vacancy rate, correct?

20       MR. MELLO:  Lacks foundation.

21       THE COURT:  Sustained.

22  You can lay foundation if you're able.

23  Q.  BY MS. ELLS:  Are you aware of the opinions expressed by

24  the state's expert, Dr. Greulich?

25  A.  No.  I -- I have looked at the report, but I wasn't able to

1    hear that.

2    Q.  So you've read the report?

3    A.  I've -- yeah.  I've skimmed it.  I'm not an expert, though.

4    Q.  Right.  Me either.

5        So in that report, Dr. Greulich found that dual appointment

6    programs have not led to a discernible improvement in CDCR's

7    vacancy rates; do you recall that?

8              MR. MELLO:  Lacks foundation.

9              THE COURT:  Overruled.

10              MS. ELLS:  He said he read it.

11              THE WITNESS:  I don't recall that specifically.

12              MS. ELLS:  Okay.

13    Q.  BY MS. ELLS:  Has that been your experience?

14    A.  Yes.  I would agree that, in general, dual appointments

15    were a good effort and they helped a little bit but not a huge

16    amount.

17    Q.  You've also tried salary increases to fill vacancies,

18    correct?

19    A.  Yeah.  Civil service through negotiation with a union and

20    contractors, yeah.

21    Q.  Have you found that to have a discernible effect?

22    A.  We haven't seen a huge impact after the 15 percent civil

23    service pay raise, for example.  I think in --

24    Q.  Could I just clarify which one you're referring to there?

25    A.  Sorry.  That's one of the pay differentials where -- staff

1    at the PIPs as opposed to any other place.

2    Q.   The PIP?

3    A.   Yes.  So they got a 15 percent, kind of, bonus pay.  That

4    has not led to a big swing in our PIP staffing, unfortunately.

5        When we changed the registry rates as well, I don't believe

6    that led to a big swing either.  It does attract some but not a

7    lot, yeah.

8    Q.   So you have not generally found that it's worth it to try

9    salary increases --

10   A.   I think we --

11   Q.   -- in terms of affecting your fill rate in a meaningful

12   way?

13   A.   I think we keep trying.  And, like I said, I think it can

14   affect around the edges sometimes.  But if this is helpful,

15   sometimes it does help move people from one institution to

16   another where we need more help or something like that.

17   Q.   Could I go back one second to our discussion about the 2009

18   Staffing Plan and that report that shows the allocation and

19   fill rates that is filed monthly with the Court.

20       When you do the July and January allocations, the

21   institutions just get those staff members, correct, and they

22   decide how to use the staff members that they have, correct?

23            MR. MELLO:  Lacks foundation.  It's vague.

24            THE COURT:  Overruled.

25       If you're able to answer, please do.

1          THE WITNESS:  The institution assigns allocations,

2    yeah.  We give them the pool, and they distribute.

3    Q.  BY MS. ELLS:  Thanks.

4          In 2013, the Special Master reported that there was a pilot

5    program at California Men's Colony to use licensed marriage and

6    family therapists, which I'm going to refer to as LMFTs?

7          Did you know about that pilot?

8    A.  No.  2000 what?

9    Q.  '13.

10   A.  That was the year I was hired, so I'm not sure, yeah.

11   Q.  And nobody has told you about it?

12   A.  About the LMFTs, no, I don't believe so.

13   Q.  To your knowledge, CDCR has not made any further efforts to

14   explore the use of LMFTs in their mental health program, right?

15   A.  Well, so we don't have an allocation for it from the 2009

16   Staffing Plan.  However, I know ISUDT, the Integrated Substance

17   Use Disorder Treatment, we recently created that classification

18   for the State of California, and they have begun hiring in

19   those positions that would otherwise be filled by social

20   workers in some cases, for example.

21   Q.  Okay.  And those positions are specifically to function in

22   the ISUDT program, which is overseen by the receiver and CCHCS,

23   correct?

24   A.  Correct.

25   Q.  And that's separate from the mental health program?

1    A.  Yes.

2    Q.  So the LMFTs that are hired for that program would not be

3    providing services in the MHSDS.  I understand --

4    A.  Yes.

5    Q.  Just to clarify, I understand that there are class members

6    in the ISUDT program.

7    A.  Yeah.

8    Q.  But in terms of the Program Guide requirements and clinical

9    care requirements, the LMFTs that are being hired by the

10   receiver would not perform those duties, correct?

11   A.  You're right.  That is correct.  We just established that

12   classification, so we haven't even been able to discuss it yet.

13   Q.  Okay.

14   A.  Yeah.

15   Q.  The ISUDT program has mental health components like

16   cognitive behavioral treatment, right?

17   A.  They call it cognitive behavioral intervention, CBI, but

18   it's the same thing.

19   Q.  Thank you.

20       Could you pull up Defendants' 14, please.

21       Okay.  So we were talking about -- I'm sorry.  Just to --

22   this is the allocation from July of this year that you were

23   discussing with Mr. Mello.  And we were discussing this section

24   on the very bottom, the last bullet point, that says:  All

25   clinical psychologist intern positions shall be LT in the 918

1    blanket.  The fiscal year 2023/2024 operational authority is --

2    and then the rest doesn't really matter.

3        I was a little bit confused from your testimony about

4    whether this program refers to existing psychology intern

5    positions or -- the interns that are currently within CDCR.

6    A.  I believe it does.  If you don't mind flipping to the next

7    page.

8    Q.  Sure.

9    A.  The numbers will give me a sense.  And --

10   Q.  I'm happy to explain to you why I'm --

11   A.  Please do.

12   Q.  So my understanding is you're in the process of

13   establishing a new initiative to bring psychology practicum

14   students and social work interns into CDCR.  Is that different

15   than this program?

16   A.  It's the same -- the same class of provider, essentially.

17   We are trying to get more of those people more support so that

18   when they are all trained up, they stay with us in our system.

19       And so we -- we're working on that by, I think I mentioned,

20   adding supervision from people outside the institution, which

21   is -- which can be more regular, that sort of thing.  I

22   honestly -- I apologize.  I don't recall exactly the numbers

23   between one program or the other, so I can't tell.

24   Q.  That's fine.  I'm more seeking to clarify whether this is a

25   new initiative or if it's essentially the same group of people

1  and you're changing the supervisory structure.

2      Can you clarify?

3  A.  Yeah.  It is -- it is adding something to the old system.

4  I would say it's -- the old system would have the supervisors,

5  often at the institution, but would only have a certain

6  capacity of people that -- because you need a ratio of

7  supervisees to supervisors, so this would essentially take some

8  of that burden off the institution, get us the real strong

9  supervision from people with statewide experience, and help us

10  retain those people.

11      So I would say it is adding something.  And going along

12  with the negotiated extra pay for people who are supervising

13  is, I think, going to make a bit of a difference.

14  Q.  Okay.  But the pool of interns and students is the same

15  pool, correct?  It's the same -- it's not -- for instance, it's

16  not people that have graduated their program and are working

17  toward their hours to be licensed these are -- it -- is that

18  the group that you're talking about?

19  A.  I --

20          MR. MELLO:  Objection.  Compound.

21          THE COURT:  Overruled.

22      Answer if you're able.

23          THE WITNESS:  I -- is it the practicum versus the

24  intern?  Is that what you're saying?

25  Q.  BY MS. ELLS:  Yes.

1    A.  I don't want to give you the wrong answer, and I'm not a

2    hundred percent.  It's not my area, so I'm not sure.  I'm

3    sorry.

4    Q.  But regardless of whether or not they are sort of still in

5    their program or graduated but working towards licensing,

6    they're still unlicensed, correct?

7    A.  Yes.  And we -- sometimes we do have to turn away good

8    candidates because we don't have enough supervisors, so this is

9    meant to bring those people in.

10   Q.  Okay.  So they have to be supervised closely by licensed

11   psychologists and social workers, then, it sounds like?

12   A.  Correct.

13   Q.  And you mentioned a ratio that was limiting your ability to

14   take on more of them because of the need to supervise these

15   people.  What is the ratio that you utilize for that?

16   A.  So there is no specific ratio.  I just meant, like, in

17   the -- in a general sense, you can't have more supervisees,

18   that kind of thing.  So no specific number.  I don't believe

19   the board has a specific number either.

20   Q.  Okay.

21   A.  Yeah.

22   Q.  But these people cannot be supervised by unlicensed

23   clinicians?

24   A.  That's correct.

25   Q.  Approximately how many of your current psychologists are

1    unlicensed statewide?

2    A.   I honestly don't know.  Sorry.

3    Q.   Do you know -- do you have an estimate?

4    A.   I don't.

5    Q.   Is the same answer true of your current licensed clinical

6    social workers?

7    A.   Yes.

8    Q.   Okay.  So you don't know how many of those are unlicensed

9    either?

10   A.   I don't.

11   Q.   Okay.  You testified earlier about Program Guide mandates

12   and required frequencies of contacts.  Do you recall that?

13   A.   Yes.

14   Q.   And we referred to charts in the stipulated facts that sort

15   of outlined the Program Guide requirements; do you recall that?

16   A.   Yes.

17   Q.   That's the policy, correct?

18   A.   That -- sorry.  That's based on the Program Guide policy;

19   is that what you --

20   Q.   Correct.

21   A.   Yes.

22   Q.   Are you testifying that all class members are receiving

23   those required contacts on a routine basis currently?

24            MR. MELLO:  Lacks foundation.  Calls for speculation.

25            THE COURT:  Overruled.

 1              THE WITNESS:  I'm not testifying to that or the

 2    opposite.

 3    Q.  BY MS. ELLS:  The Special Master is responsible for

 4    monitoring compliance with the Program Guide requirements in

 5    this case, right?

 6    A.  I mean, we are responsible, but, yes, the Special Master

 7    does as well.

 8    Q.  But according to the Court's order --

 9    A.  Yes.

10    Q.  -- that is his primary responsibility, correct?

11    A.  Yes.  I believe so.

12    Q.  So you -- and he produces compliance reports, right?

13    A.  Yes.

14    Q.  You've read those reports, right?

15    A.  Yes.  The monitoring rounds --

16    Q.  Yes, the monitoring rounds.

17         So you're aware that the most recent Special Master reports

18    have found that CDCR is not complying with many of the Program

19    Guide requirements, correct?

20    A.  Yeah.  Different for different institutions.  And I -- I

21    think the 30th round is in draft right now, and I haven't read

22    that, but yes.

23    Q.  And the Court has adopted the prior order -- the prior

24    findings of the last Special Master round, correct?

25    A.  Correct.

1    Q.  You talked a little bit about triaging, and you discussed

2    how sometimes that's just a routine part of the job for

3    clinicians to try and assess where to best utilize their

4    resources; is that accurate?

5    A.  Yes.

6    Q.  Okay.  But it can also be of necessity sometimes, correct?

7        So, for instance, low staffing can cause staff to have to

8    choose between completing some treatment requirements at the

9    expense of others in a given time frame, correct?

10            MR. MELLO:  Lacks foundation.  Calls for speculation.

11            THE COURT:  Overruled.

12       You can answer if you're able.

13            THE WITNESS:  Clinicians are always triaging.  And,

14   yes, sometimes there's a need for more versus less.  Is that

15   what you're asking?

16   Q.  BY MS. ELLS:  Low staffing can be one of those things that

17   causes additional triaging needs, correct?

18   A.  Could be.

19   Q.  You've directed some institutions -- let me start over.

20       You or your staff that work for you have directed some

21   institutions to create triage plans to address staffing

22   shortages recently, correct?

23   A.  No.

24            MR. MELLO:  Lacks foundation.

25            THE COURT:  Overruled.

1    Q.  BY MS. ELLS:  You mentioned earlier that you oversee the

2    suicide prevention team within headquarters; is that correct?

3    A.  Yes.

4    Q.  And that team is required to do an annual suicide -- pardon

5    me.

6         That team is required to produce an annual suicide report

7    and provide it to this Court and the legislature every year,

8    correct?

9    A.  Yes.

10   Q.  Now, I was on your website yesterday, and I found the 2002

11   suicide report, and it was provided to the legislature just two

12   days ago, right?

13   A.  Did you say 2002?

14   Q.  Yes.  The report discussing 2002 suicides.  Is that

15   clearer?

16   A.  2002?  2020?

17   Q.  2002.

18   A.  2022?

19   Q.  Thank you.  I'm confusing you.  The 2022 suicide report was

20   just provided to the legislature two days ago, right?

21   A.  Right.  Different date, different requirements, so

22   different deadlines, yes.

23   Q.  Okay.  And you posted it on your website?

24   A.  Yes.

25   Q.  And you're familiar with this report?

```
 1   A.   Yes.

 2   Q.   You've read it?

 3   A.   Yes.

 4   Q.   Mr. Gonzalez, could you pull that report up from their

 5   website, and turn to page 7.

 6        So this report provided to the legislature two days ago

 7   confirms that understaffing affected suicide prevention efforts

 8   last year.  I'll read this to you:

 9        This report on suicides that occurred in CDCR during 2022

10   would be remiss if it did not discuss the fact that there are

11   significant and persistent staffing shortages that plagued many

12   of the prisons in the CDCR system.  While it is difficult to

13   determine a direct nexus between staffing shortages and deaths

14   by suicide in CDCR custody, it is important to recognize the

15   impacts of reduced staffing.  Provision of clinical care at

16   levels consistent with the MHSDS Program Guide has been

17   challenging at many institutions.

18        Do you agree with that?

19   A.   Yes.

20   Q.   Also on the same page, it says that care is being triaged

21   due to a lack of clinical staffing.  And I quote, as a result

22   of these difficulties, institutions focus their limited

23   clinical staff on the more acute and emergent needs of their

24   programs.

25        Do you agree with that?
```

 1    A.    Yes.

 2    Q.    The 2022 -- let me start over.

 3          The 2022 suicide report your staff just submitted to the

 4    legislature this week also found that fulfilment of certain

 5    suicide prevention measures has fallen this year due to

 6    staffing shortages.   Right?

 7    A.    That's a whole area in itself, but, yes, I think generally

 8    speaking.

 9    Q.    So, for instance, on page 64, there is a discussion here

10    about how the suicide risk evaluation or SRE mentoring training

11    levels dropped significantly this year to 74 percent.

12          And, Mr. Gonzalez, if you could also flip to the next page

13    where the -- Figure 22 is reflected.

14          So it dropped this year to 74 percent from prior years

15    where it was much higher.

16          And I'll flip back to the last page where it actually says

17    that number so you can see it.

18    A.    Okay.

19    Q.    It's at the bottom right there.

20          So here it says that the decrease in staff trained can be

21    attributed to the staff shortages statewide.   Specifically,

22    some institutions experienced a loss of certified mentors,

23    which impaired the ability for new clinicians to be mentored.

24    Further, a loss of clinical staff at institutions resulted in

25    increased need for primary clinicians to focus on providing

1  direct patient care, which resulted in less time allocated for

2  mentors to mentor other clinicians.

3      Do you agree with that?

4  A.  Yes.

5  Q.  And there were other suicide prevention efforts that were

6  curtailed due to staffing shortages last year, such as the

7  chart audit tool of treatment plans in the MHCBs.

8      Mr. Gonzalez, could you turn to page 58.

9      Are you familiar with that initiative?

10 A.  Yes.

11 Q.  That's a process by which CDCR audits and assesses the

12 adequacy of treatment planning for acutely suicidal patients,

13 right?

14 A.  Correct.

15 Q.  And this report says here, on page 58, that the audit was

16 made optional that year due to staffing shortages, correct?

17 A.  Yeah.  That is something that CDCR does to monitor its own

18 quality; it's not court ordered.

19 Q.  I understand it's one of your initiatives.  And you think

20 it's an important initiative, I assume?

21 A.  I think it's helpful, yes.

22 Q.  And you would also agree that the SRE mentoring program is

23 an important suicide prevention initiative, correct?

24 A.  So yes.  We -- we think that there is a lot of additional

25 stuff in there right now that may not be particularly

1  clinically useful.  And it's worth noting that in the middle of

2  COVID, when we had very little training and everything else,

3  our suicide numbers were the lowest they've ever been in recent

4  history.  So I don't think that there is a -- like, a

5  one-to-one correlation there, but yeah.

6  Q.  I understand.  But you agree it's an important

7  initiative --

8  A.  Sure.

9  Q.  -- right?

10  A.  Yes.

11  Q.  And -- and you're actually in the midst of proposing some

12  modifications, I believe, to the SRE form itself in order to

13  try and simplify it, correct?

14  A.  That's what I was referring to.

15  Q.  And we've already had discussions around that.

16  A.  Yeah.

17  Q.  Now, you discussed the fact that the suicide rate was

18  extremely low during COVID.  But this year, you've had 22

19  suicides already this year, correct?

20  A.  I believe so.

21  Q.  And there are three more months remaining in the year,

22  right?

23  A.  Correct.

24  Q.  And the 22 suicides in CDCR so far this year are more than

25  in all of last year, correct?

 1    A.    Correct.

 2    Q.    And last year, in 2022, there were more suicides in CDCR

 3    than the year before that, right?

 4    A.    Yes.

 5    Q.    And, in fact, there have been two suicides just since this

 6    trial started, right?

 7    A.    Yes, over the weekend.

 8    Q.    One on September 30th at KVSP and another on October 1st at

 9    CTF, correct?

10    A.    Yes.  I don't think there's anything to be drawn from the

11    clustering --

12    Q.    I'm just asking if that's a true fact.

13    A.    Yeah.

14    Q.    You sign the final suicide reports for each CDCR suicide,

15    correct?

16    A.    Yes.

17    Q.    And those are prepared by clinicians on your team, under

18    your leadership, correct?

19    A.    Yes.

20    Q.    And you also sign each memo addressing the implementation

21    of quality improvement plans or QIPs which are designed to

22    address deficiencies identified in those suicide reports,

23    right?

24    A.    Correct.

25    Q.    So you're aware that multiple final suicide reports

1    prepared by your staff in the last year expressly identified

2    staffing deficiencies as playing a role in individual suicides,

3    correct?

4            MR. MELLO:  Lacks foundation.

5            THE COURT:  Overruled.

6            THE WITNESS:  As playing a role in the provision of

7    care at that institution.  I don't think that's the same as

8    saying that they were causative to the suicide.

9    Q.  BY MS. ELLS:  I'm not asking if it was causative.

10   A.  Okay.

11   Q.  I'm asking if they were identified -- if staffing

12   deficiencies were expressly identified as playing a role in

13   individual suicides last year --

14           MR. MELLO:  Asked and answered.

15   Q.  -- in your suicide reports prepared by your staff.

16           THE COURT:  I'm going to allow it to clarify your

17   answer to that question.

18           THE WITNESS:  Okay.  I don't know how to parse

19   playing a role, but the language that's in the report is the

20   language that I agree with.

21   Q.  BY MS. ELLS:  Okay.  And so you're also aware that there

22   are multiple QIP memos submitted to you and your staff from

23   institution staff in the last year which also identified

24   staffing deficiencies as playing a role in individual suicides?

25           MR. MELLO:  Lacks foundation.  And it's asked and

 1    answered.

 2              THE COURT:  Overruled.

 3              MS. ELLS:  To be clear, this is about QIP reports and

 4    not suicide reports.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  So you're saying that they played a

 7    role in suicides as described in the QIP reports?

 8    Q.  BY MS. ELLS:  The QIP reports identified that staffing

 9    deficiencies played a role in individual suicides in 2022.

10    A.  I would say whatever language was in the QIP is the

11    language I agree with, yes.  I don't know if playing a role was

12    the words they used, but, yes.

13    Q.  Do you remember an October 18, 2022, QIP memo from

14    leadership at the substance abuse treatment facility saying

15    that a CCCMS patient who killed himself had not received a

16    single primary clinician contact in the eight months before his

17    death because of severe understaffing at that institution?

18    A.  I would need to see it to refresh my memory.

19    Q.  Okay.  I'll just represent to you that you personally

20    signed that memo accepting the QIP report on November 1, 2022.

21         We also sent CDCR a letter on May 1, 2023, identifying,

22    based on our review of the suicide reports and QIPs, six 2022

23    suicides in which your staff clinicians identified a link

24    between poor staffing and suicides.

25         Do you recall that letter?

1    A.  The letter from your team?

2    Q.  Yes.

3    A.  I apologize.  I think I'd have to see it to recall.  But

4    yeah.

5    Q.  So you don't recall it right now?

6    A.  I don't recall it in enough detail to be able to answer

7    questions about it, but yeah.

8    Q.  We actually re-sent that letter last week after CDCR

9    confirmed another additional 2022 suicide.

10        You still don't remember that letter?

11   A.  I am over a week behind in e-mail, so it may be in there.

12            MS. ELLS:  I have nothing further.  Thank you for

13   your time.

14            THE WITNESS:  Thank you very much.

15            THE COURT:  All right.  Mr. Mello, any redirect?

16            MR. MELLO:  Yes, Your Honor.  Thank you.

17                      REDIRECT EXAMINATION

18   BY MR. MELLO:

19   Q.  Dr. Mehta, if you can pull up -- sorry -- Plaintiffs' 35.

20        If we can pull up Plaintiffs' 35, it's the most recent

21   staffing vacancy report.  Hopefully I have that number written

22   down right.  And if we can go -- go to page 4.  Page 5?

23        Dr. Mehta, do you prepare this report?

24   A.  I work with HR.  HR ultimately prepares this report.

25   Q.  Dr. Mehta, in the 2022 suicide report that was put up on

1   the screen, the term direct nexus was used.  What does that
2   mean?
3   A.  It's a good question.  I -- I think that it can mean a lot
4   of different things.  I think in this case, we're acknowledging
5   that there -- they were both going on at the same time.  It
6   certainly couldn't have helped.  I think that's fair.
7   Q.  Okay.  And, Dr. Mehta, are there any other initiatives that
8   you haven't spoken about already that are in the works to
9   address staffing?
10  A.  We honestly try so much.  We try, like, in different
11  settings, different institutions.  I'm sure there are.  I -- I
12  wouldn't be able to recall all of them off the top of my head.
13  But I know that Ms. Muhammad spoke to several of the things
14  we're doing.  We're changing the way we advertise a lot as
15  we're switching from -- not switching but adding psychologists
16  and social workers.  They go to different conferences.  They
17  read different journals, different publications, so we have to
18  change the way in which we approach the hiring.  So there is a
19  lot of things that we're doing, yeah.
20  Q.  And do you remain open to additional new ideas going
21  forward?
22  A.  Oh, yes.  We -- we poll people in the field regularly.  We
23  talk about this a lot.  Probably the most out of any issue.
24          MR. MELLO:  Thank you.  I have nothing further.
25          THE COURT:  All right.  Anything further, Ms. Ells?

```
 1                    MS. ELLS:  Nothing further for this witness.  Thank

 2      you.

 3                    THE COURT:  Is Dr. Mehta excused as a witness?

 4                    MR. MELLO:  Yes, Your Honor.  Thank you.

 5                    MS. ELLS:  Yes, Your Honor.  Thank you.

 6                    THE COURT:  You're excused, sir.  You may step down.

 7                    THE WITNESS:  Thank you.

 8                    MS. ELLS:  Your Honor, I realize that I forgot to

 9      move the 2022 suicide report into -- well, I -- because we only

10      received it two days ago when I found it on the CDCR website,

11      it's not been premarked as an exhibit and was not on our

12      initial list of exhibits.  We would, however, like to mark it

13      as Exhibit Plaintiffs' 110 and move it into evidence.

14                    THE COURT:  All right.  Any objection, Mr. Mello?

15                    MR. MELLO:  Can we -- I mean, it's hearsay.

16                    THE COURT:  Your response to that, Ms. Ells?

17                    MS. ELLS:  It's a business record required by the

18      legislature, Your Honor.  It's not hearsay.

19                    THE COURT:  All right.  Have you provided a copy to

20      the defense so they know exactly what you're referring to?

21                    MS. ELLS:  I will.  I have not.  I don't have a

22      printer.

23                    THE COURT:  All right.

24                    MS. ELLS:  But I certainly will.  It's on their

25      website, so I believe they have it.
```

 1              THE COURT:  Just make certain you're looking at the

 2    same thing.  I'll defer a final decision.

 3              MS. ELLS:  I will, Your Honor.  Just to be clear,

 4    it's also a public document.

 5              THE COURT:  All right.

 6         All right.  Does that conclude the Defendants' presentation

 7    of evidence?

 8              MR. MELLO:  Yes, Your Honor.

 9              THE COURT:  All right.  Is plaintiff prepared, then,

10    to start with its case?  We'd have about half an hour until our

11    break.

12              MS. ELLS:  Yes, Your Honor, we're ready.

13              THE COURT:  All right.  Let's go forward, then.

14              MS. ELLS:  Your Honor, we're calling Dr. Timothy

15    Brown.

16              THE COURT:  All right.

17              THE CLERK:  Dr. Brown, please come forward.  Step

18    into the witness stand and remain standing.

19         Please raise your right hand.

20         (The Witness, Timothy Brown, is sworn.)

21              THE WITNESS:  Can I affirm that?

22              THE CLERK:  Yes.

23              THE WITNESS:  I affirm, yes.

24              THE CLERK:  Thank you.  You may be seated.

25         Will you please say and spell your first and last name for

1    the record.

2             THE WITNESS:  My name is Timothy Brown.

3    T-I-M-O-T-H-Y, Brown, B-R-O-W-N.

4             THE COURT:  You may proceed.

5             MS. HATTON:  Your Honor, I have a cellphone with me

6    just to keep track of time.  Is that okay?

7             THE COURT:  As long as it makes no noise and is not

8    recording.

9             MS. HATTON:  And, for the record, I'm Marissa Hatton.

10                       DIRECT EXAMINATION

11   BY MS. HATTON:

12   Q.  Good afternoon, Dr. Brown.

13       Can you please briefly explain your employment history to

14   the Court, including your current employment.

15   A.  Sure.  I have -- I taught online courses in an MBA

16   programs --

17             THE COURT REPORTER:  I'm sorry.  I can't hear you.

18             THE WITNESS:  Sorry.

19       I taught online courses for an online MBA program for a

20   number of years in managerial economics and in business

21   statistics.

22       And then I also have worked at the University of

23   California, Berkeley in both research positions and in teaching

24   positions.  And that's my current employment right now.

25   Q.  BY MS. HATTON:  What is your current title at your

1   employment?

2   A.  My title is Associate Adjunct Professor of Health

3   Economics --

4           THE COURT REPORTER:  I'm sorry.  I missed that.

5   Please repeat that.  My title is...

6           THE WITNESS:  My title is, Adjunct Associate

7   Professor of Health Economics.  And I also hold a position of

8   Associate Director for Research at the Berkeley Center of

9   Health Technology.  Both of those are within the School of

10  Public Health at U.C. Berkeley.

11  Q.  BY MS. HATTON:  What economics courses have you taught at

12  the university level?

13  A.  These are both graduate courses.  I taught the

14  Microeconomics of Health Care Policy to master's students.  And

15  I also teach the doctoral seminar, Health Economics, to

16  doctoral students.

17  Q.  Do you teach any classes on methodology -- economic

18  methodology?

19  A.  Right.  I also teach a course on -- it's called -- I know

20  it as PH 231A.  It's basically a compression of five -- five

21  kinds of courses.  So it's econometrics, statistical

22  application of statistics to economics; it also includes

23  quasi-experimental design, experimental design, systematic

24  research and metanalysis and questionnaire design.

25  Q.  Can you explain your educational background to the Court,

 1    please.

 2    A.   Sure.  I have a bachelor's degree in business

 3    administration, with options in accounting and management

 4    information systems, graduated cum laude; that's from the

 5    California State University East Bay.

 6        Also from that university, I have a Master of Arts in

 7    economics.  I wrote my thesis in an area of health economics on

 8    selection bias in health insurance choice.

 9        My PhD is in health services and policy analysis.  That's

10    recently been -- that's been changed -- I teach in the same

11    program I got it in -- to health policy with a specialization

12    in health economics.  And I -- for part of that, I took the

13    standard coursework that a labor economist would take,

14    including the full year of doctoral seminars in labor

15    economics.  And I wrote my dissertation in a labor economics

16    topic.  It was three essays on labor market.  It looked at

17    clinicians; it looked at labor supply for advanced practice

18    nurses, both in the primary job and secondary jobs; and we

19    looked at the effect of -- the scope of practice regulations on

20    the wages of advanced practice nurses.

21    Q.   Okay.  For -- with regard to the courses that you took on

22    labor economics, how would those differ from the requirements

23    of someone who has a labor economics specialty in their PhD?

24    A.   They're identical.  I was in class with those people.

25    Q.   What are your research specialties?

1    A.   I work in the area of health care labor economics.

2    Insurance design.  I do work in mental health economics.  I do

3    a fair amount of policy evaluation and program evaluation.  And

4    then I do some work in social epidemiology using fancy

5    econometric techniques; that's where the economics comes into

6    it.

7    Q.   And I realize that you didn't say this, and I just have it

8    memorized, so I thought you said it, where did you get your PhD

9    from?

10   A.   University of California, Berkeley.

11   Q.   How many peer-reviewed articles have you published on the

12   topics of economics, labor economics, and health economics?

13   A.   Overall, I've published 80 peer-reviewed articles, 10 this

14   year.  In terms of health economics, probably 49 of those are

15   in health economics proper.  Perhaps 7 of them are on health

16   care economics related to health care -- labor economics

17   related to health care.  Latest one was this year, where I

18   looked at the effect of parental unemployment on whether or not

19   that affected child mental health relative to being out of

20   school.

21   Q.   Okay.  I'm sorry.  You said that was 7 articles on labor

22   economics?

23   A.   About 7.

24   Q.   Can you describe for the Court and everyone here, in case

25   they're not familiar, what is health economics?

1    A.  Health economics is an applied field where we take the --

2    the standard fields of economics and apply them specifically to

3    health care.

4        So the standard fields would include things like labor

5    economics, industrial organization, public finance, behavioral

6    economics.  There is actually a field called organizational

7    economics.  There are things that I'm leaving out, but it's --

8    that's basically what we do.

9        But we also focus a lot on health care institutions.  So

10   we're able to apply these principles in a way that actually

11   takes into account the institutional idiosyncrasies of health

12   care.

13   Q.  How long have you been teaching at UC Berkeley?

14   A.  Teaching.  I want to say since about 2009.

15           MS. HATTON:  Your Honor, at this time, I'd like to

16   move to qualify Dr. Brown on the following fields:  Economics,

17   applied economics as it applies to labor economics, and health

18   economics.

19           THE COURT:  Any objection?

20           MR. CIRELLI:  Your Honor, based on his deposition, my

21   understanding is that his specialization is in health

22   economics, not the other areas.

23           THE COURT:  In terms of what was covered during

24   deposition, anything to say, Ms. Hatton?

25           MS. HATTON:  I would say that health economics is an

1   applied field, so it is a specialty in economics as Dr. Brown

2   just described.  And he's just, in more full detail, given all

3   of the bases for his expertise.  Whether or not someone asked

4   him better questions at the deposition doesn't really change

5   Dr. Brown's expertise.

6           THE COURT:  Is there anything in his report that

7   identifies the scope of expertise that you can point the Court

8   to?

9           MS. HATTON:  Let me take a look really quickly.

10          THE COURT:  I've been looking at his CV.

11      First page:  My conclusions as a professional health

12  economist.

13      Is there anything, Mr. Cirelli, you're pointing to in the

14  deposition that narrowed the scope of what Dr. Brown relied on

15  in reaching his conclusions?

16          MR. CIRELLI:  I asked him in his deposition what his

17  specialization is, and he identified health economics.

18      I then asked him later on in his deposition what work he

19  has done in the field of labor economics in the last five

20  years, and he said none.

21      I asked him how much work has touched on labor economics in

22  the last ten years, and he identified two projects, one of

23  which was the impact of occupational licensure on wages.  And

24  then he went on to say it has the effect of regulations on

25  dental hygienist influences on income and labor hours of

1    dentists and dental hygienists.

2        And then he described being on the dissertation committee

3    for a doctoral student where the dissertation by that student

4    was on the effect of unions on something to do with nurses.

5        And those two -- the first one was in 2013, and the second

6    one was in 2014, and that was the only times that he identified

7    as -- as working in the area of labor economics.

8            MS. HATTON:  I don't --

9            MR. CIRELLI:  Looking at pages 74, Your Honor,

10   through 76.

11           THE COURT:  It's not disputed, is it, Dr. Brown is

12   qualified in the area of health economics, correct?

13           MS. HATTON:  Correct.

14           THE COURT:  All right.  So he can testify within

15   that -- within that area of expertise.  If there are objections

16   to specific questions, I'll rule on them as they come up.

17           MS. HATTON:  May I ask Dr. Brown two clarifying

18   questions?

19           THE COURT:  You may.  And if Mr. Cirelli wants full

20   voir dire, he can have that before I make a further

21   clarification, if you're seeking still to expand the scope.

22   Q.  BY MS. HATTON:  Dr. Brown, you said you did your -- I'm

23   sorry -- was it your dissertation in labor economics?

24   A.  Labor economics was the topic.

25   Q.  Okay.  And that was your PhD dissertation?

1    A.   Yes.

2    Q.   So you earned your PhD on the labor economics topic?

3    A.   Yes.

4    Q.   And you told me that health economics is the application of

5    labor economics to the health care sector; is that correct?

6    A.   Health economics includes labor economics as one of the

7    tools that we use to answer questions about health care,

8    because labor markets are a critical part of health care,

9    nursing, mental health specialists, physicians.  It's a

10   critical part of health economics.  And in health economics,

11   there is a huge section on labor economics parts of health

12   economics.

13        MS. HATTON:  Your Honor, I would seek to have the

14   scope of his expertise include labor economics which he earned

15   his doctorate degree in.

16        THE COURT:  Given he's defined health economics, why

17   doesn't it allow you to ask what you need to?  He's defined it

18   as more inclusive than labor economics -- including labor

19   economics.

20     Mr. Cirelli.

21        MR. CIRELLI:  Yes.  He is -- in his report, he

22   identifies his conclusions as a professional health economist.

23   That's what he says in the very beginning and the introduction.

24   And when I explored his experience and expertise with labor

25   economic issues, he identified two in the last ten years.

 1              THE COURT:  That's what you already reviewed for the

 2     Court.

 3              MR. CIRELLI:  Yes, Your Honor.

 4              THE COURT:  Right.  I'm allowing him --

 5              MR. CIRELLI:  I don't think that makes him --

 6              THE COURT:  I'm allowing him to testify as a health

 7     economist, but he's defined it.  This may be a tempest in a

 8     teapot.  We shall see.

 9              MR. CIRELLI:  Thank you, Your Honor.

10              MS. HATTON:  Yes, Your Honor.  And I believe the

11     Court correctly noted that he's identified it as broader than

12     what was said before.  So that will make the record clear.

13     Thank you.

14     Q.  BY MS. HATTON:  Dr. Brown, I'm sure you understand why

15     we're here today.  The Department of Corrections has not kept

16     up with bare minimum staffing levels necessary to provide care

17     for people living in California prisons.  And the Defendants

18     have come back and said two primary things:  One, that it's

19     impossible for them to hire in this labor market.  And the

20     next, that they've taken all reasonable steps to fill the

21     vacancies that they have.

22          So I want to get into your opinions in detail, but I first

23     just want to hear from you, at a high level, what's your

24     response to the idea that it's impossible to hire mental health

25     professionals in the current labor market?  Do you agree with

1  that?

2  A.  No, not at all.  The federal government, which is

3  legislatively required to track the labor markets for health

4  care through the CARES Act, they say that in 2023, just in

5  terms of need -- this is not in terms of economic demand; it's

6  in terms of clinical need -- there is 140 percent of the need

7  for psychologists in California.

8       And nationally, in terms of social workers that deal with

9  mental health, there is about 130 percent more social workers

10  than there are needed to meet the clinical needs.

11       This is apart from whether people get paid; it's just could

12  they meet the clinical need.

13            MR. CIRELLI:  Your Honor, I did not want to interrupt

14  Dr. Brown as he was talking, but I would just belatedly

15  interpose an objection which I think is in line with what Your

16  Honor has ruled in the past.  To the extent this calls for a

17  legal conclusion, I object, but not as an economist.

18            THE COURT:  All right.  That objection is recorded.

19  It can be a standing objection.  It's overruled.  I will not

20  construe anything the doctor says as a legal conclusion.

21            MR. CIRELLI:  Thank you, Your Honor.

22  Q.  BY MS. HATTON:  Just to clarify, Doctor, you said it is at

23  140 percent of the need.  What's the "it" that's at 140

24  percent?

25  A.  The supply.  The number of -- supply of psychologists in

1   California.

2   Q.  Are there --

3         MR. CIRELLI:  Your Honor, I need to interpose another

4   objection.

5     If we are going to start discussing supply and demand with

6   respect to psychiatrists or psychologists, this is one of those

7   areas that goes beyond the scope of what was in Dr. Brown's

8   report and what he testified to -- with respect to in his

9   deposition.

10        MS. HATTON:  May I respond, Your Honor?

11        THE COURT:  You may.

12        MS. HATTON:  There are nine pages of graphs that

13  Dr. Brown created and put in his report about the supply of

14  psychologists in California.

15        THE COURT:  What pages?

16        MS. HATTON:  I believe it's starting on page 9 --

17  actually, I'll grab his report.  Just a moment.

18    Page 6 has -- is the topic for this section, but those

19  graphs that Dr. Brown calculated specifically about the supply

20  and demand of psychologists in California start on page 9, and

21  they go through page 26.

22        THE COURT:  I see reference to oversupply at one

23  point.  So these are the charts that -- the heading of the

24  chart is Psychiatrists Meet Hourly Earnings, for example, but

25  those are about supply?

1          MS. HATTON:  I shouldn't answer that.  Is it okay if

2    I have Dr. Brown answer that?

3          THE COURT:  Given what I'm seeing on page 6, I'm

4    overruling the objection.  I'm overruling the objection.

5          MR. CIRELLI:  Your Honor, may I just respond briefly?

6          THE COURT:  Respond.  Are you responding to the

7    Court, or are you reserving the right to cross-examine

8    vigorously?  I would suggest the latter might be your role

9    here.

10         MR. CIRELLI:  The only thing that I wanted to point

11   out, Your Honor, is all of those charts that begin on page 9

12   have absolutely nothing to do with supply.

13      Dr. Brown's testimony during deposition --

14         THE COURT:  I understand your position, and I

15   don't -- I see the heading.  I'm going to allow questioning,

16   and ultimately, you can continue to make objections if you'd

17   like.

18         MR. CIRELLI:  Okay.  Thank you, Your Honor.

19   Q.  BY MS. HATTON:  So maybe we should just get this out of the

20   way.  Is measuring wage trends over time a way to measure

21   whether or not there is a labor shortage?

22   A.  Yes.  I published papers on this -- specific paper on that.

23   Q.  There seems to be a bit of confusion here about whether or

24   not these charts and measurements on hourly earnings can tell

25   us anything about a labor supply.  Can you just talk quickly

1   about why that is?

2   A.  What the wages tell you is looking at the direction of the

3   wages over time.  So if there are more -- I'll use my paper.

4   If there are more dental hygienists that dentists want to hire

5   than there are dental hygienists, the only way that they can

6   get a dental hygienist to their practice is by paying more and

7   luring them away from another practice.  And when that happens

8   a lot, you get these -- you get an increase in real wages.

9   Real wages means we adjust for inflation.  That's the

10  definition of a labor shortage.

11  Q.  Is that --

12  A.  Economic labor shortage.

13  Q.  Is that a commonly accepted definition of an economic labor

14  shortage in your field?

15  A.  Yes.  It's generally accepted.

16  Q.  Okay.  We were talking about you looking at the number of

17  providers that are in California, whether -- whether or not the

18  data shows that there are enough of them to meet the need.  And

19  so I'm just saying that to get us back on track.

20      My question is this:  Are there enough psychologists in

21  California for CDCR to hire a couple hundred of them?

22  A.  Oh, right.  Yes, there are.  There is about 15,000

23  psychologists in California.  Yes, there is definitely enough

24  for a small number like that to be hired, especially when we

25  have 40 percent more than clinically needed.

1    Q.  Dr. Greulich made it sound like there just aren't enough

2    mental health clinicians to hire -- to even try to hire.  Do

3    you have a response to that?

4    A.  The federal government says otherwise.

5    Q.  What do you mean by that?

6    A.  The data that I'm drawing this from is from the Health

7    Resources and Service Administration, HRSA.  They -- they --

8    they're the organization that the federal government charges to

9    determine these things.

10   Q.  And what does HRSA say about labor shortages?

11   A.  I'm not sure what your question is.  More specific?

12   Q.  Sure.  I was asking whether or not there are enough mental

13   health clinicians in the market for CDCR to try to hire them.

14   And you're telling me that HRSA, the federal government and

15   their data, suggests otherwise.

16   A.  Right.

17   Q.  What, specifically, does the HRSA data show?

18   A.  With regard to psychologists, it shows that there are 40

19   percent more psychologists in California to meet the clinical

20   need than there is clinical need.  This is as of 2023.

21   Q.  Dr. Greulich said that mental health clinicians are

22   retiring at higher rates as a result of the pandemic.  How do

23   we reconcile that with what the HRSA data is showing?

24   A.  The HSRA data says it takes into account retirements.

25       For retirements to actually have an impact where there

1   wouldn't be enough to meet the clinical need, you'd have to

2   have that 40 percent be gone, and then you still have enough.

3   So I -- I don't see that huge number of psychologists leaving

4   the labor force.

5   Q.  Dr. Greulich says that there aren't enough clinicians to

6   serve the general population of California.  How is that

7   relevant, if at all, to CDCR's ability to hire enough mental

8   health clinicians to serve its population?

9   A.  Well, first, it's wrong.

10  Q.  Why?

11  A.  Because the -- the federal government says that for

12  psychologists, we have 40 percent more than we need.  So that's

13  clinical need for the population of California.  There is more

14  than enough to meet the need for clinical care in California.

15  Q.  And so what does that mean for CDCR's ability to hire

16  enough mental health clinicians overall?

17  A.  They should be able to take 200 out of 15,000.  I think

18  that would be a feasible thing to do.

19  Q.  What affect did the COVID-19 pandemic have, if any, on the

20  market of health care professionals?

21  A.  Well, before COVID, just the general market for all

22  occupations, unemployment ran at about four and a half percent.

23  At the peak of COVID, unemployment was about 15 percent -- this

24  is in California -- and now we're back down to about four and a

25  half percent unemployment.  So there definitely was a problem

1    during COVID, but we're pretty much back to normalcy now.

2    Pretty close to it at least.

3    Q.   I want to move on to the second piece of CDCR's main

4    response here to why they are not filling the vacancies that

5    the Court has ordered that they fill.  They say that they've

6    taken all reasonable steps to fill their staffing vacancies.

7         Based on what you've reviewed, what's your response to

8    that, and do you agree?

9    A.   No.  The latest union agreement doesn't even keep up with

10   the inflation that occurred between 2020 and 2023, which was 17

11   percent.  So in terms of the actual purchasing power of the

12   wages at the time pre-COVID, now they're actually -- the

13   purchasing power is less than it was pre-COVID.

14   Q.   Did you look at CDCR's salary ranges from prior to 2020?

15   A.   Yes.

16   Q.   Okay.  And do those indicate to you that CDCR is taking all

17   reasonable steps to fill its vacancies?

18   A.   I don't think so.  If you want people to move to places

19   that are less desirable, less desirable places, you have to pay

20   much higher wages.

21        The issue is a distribution.  We have lots of mental health

22   professionals, but they're not located in the places we'd like

23   them to be.  So if we want them to move to the places that we

24   want them to be, there has to be an economic incentive for them

25   to move.

1    Q.  And does CDCR's salary ranges reflect the level of economic

2    incentive you're talking about?

3    A.  No, they do not.

4    Q.  I am going to reference what's been marked as Plaintiffs'

5    25 -- Exhibit 25.  And just ask Mr. Gonzalez to throw it up on

6    the screen.  And could you scroll down to the -- what I

7    consider the first page.  Yes.  Thank you.

8        Dr. Brown, do you recognize this?

9    A.  Yes.

10   Q.  What is it?

11   A.  This is my report.

12   Q.  I want to go to page 6, which I know the Court has already

13   turned to at one point, and talk about your opinion that there

14   is no statewide shortage of psychologists and psychiatrists.

15       Is it fair to say that the graphs on pages 9 through 26

16   show your basis for that opinion?

17   A.  Partially, yes.

18   Q.  Who created these graphs?

19   A.  I did.

20   Q.  And what data did you rely on?

21   A.  I used the Bureau of Labor Statistics' MB3 data.

22       So the MB3 data is a special adjusted data that is

23   attempting to correct a problem in the usual BLS data.  The

24   usual BLS data is collected across three years, where you've

25   got a third of the market measured, another third of the

1   market, another third of the market.  So they recommend that

2   you not use that data until you do year-over-year comparisons,

3   because these thirds may not represent the whole market.

4       So they did some very sophisticated econometrics --

5   econometrics is the application of statistics to economic data

6   -- to make it so that you could compare these year over year.

7       So far, they've released data from 2015 to 2020.  They're

8   due to release more data, but that's the length of the data

9   that they have released at this point.

10  Q.  Is that why your graphs only use data up through 2020?

11  A.  Yes.

12  Q.  Do you have an opinion about whether there are labor

13  shortages in California for social workers, medical assistants,

14  and recreational therapists?

15  A.  I have an opinion about whether there are economic

16  shortages for psychiatrists, for psychologists, and for mental

17  health social workers, the clinicians.  I don't have an opinion

18  on the recreational therapists or the medical assistants.

19      Medical assistant is very much an on-the-job training kind

20  of job.  It's pretty low -- lower pay, low skill profession.

21  And recreational therapists aren't clinicians.

22  Q.  For the clinicians --

23  A.  Mental health clinicians.

24  Q.  For the clinicians, what's your opinion as to whether there

25  is an economic labor shortage in California?

1  A.  There is no economic labor shortage for psychiatrists, no

2  economic labor shortage for psychologists, and no economic

3  labor shortages for mental health social workers.

4         THE COURT:  We should take a break.  So we're going

5  to take a 15-minute break.

6     Doctor, be back there in 15 minutes.

7     (Recess taken, 1:35 p.m. - 1:50 p.m.)

8         THE COURT:  You may be seated.

9     And you may continue.

10        MS. HATTON:  Thank you.

11 Q.  BY MS. HATTON:  Dr. Brown, I'm going to turn to what I'm

12 referring to now as opinion number 2 of yours.  It's the next

13 big heading; it's on page 27 of your report.

14    It says:  CDCR is likely affected by needs-based labor

15 shortages for health providers as opposed to economic labor

16 shortages, and, therefore, it must offer significant economic

17 incentives to have significant impacts on filling positions.

18    Before we go deeper into the section, can you just explain

19 to the Court what the difference is between a needs-based

20 shortage and an economic labor shortage?

21 A.  Sure.  Needs are about patients and providers.  Are there

22 enough providers to -- for the health treatment that the

23 patient needs, irrespective of payment.

24    Economic shortages are about employers and employees,

25 whether or not the employer can pay enough money to get the

1    employee to come work for them.

2    Q.   Okay.  So if the mental health needs at CDCR are high and

3    sometimes unmet, what does that mean for CDCR as an employer

4    trying to recruit?

5    A.   So they are dealing with the issue of distributional --

6    maldistribution probably is the best way to put it.  So there

7    is plenty of, for example, psychologists in California, but

8    they're not located in the place where we want them to be.

9    They tend to be located in --

10             THE COURT:  Is there an issue with the microphone?

11             THE WITNESS:  I don't --

12             MS. ELLS:  It's sounding a little --

13             THE WITNESS:  -- metropolitan areas, and there is

14    fewer of them in rural areas.

15        So the federal government realizes that this is a problem,

16    so they will look at the -- the needs, the ratio of providers

17    to population in given areas, and they'll designate certain of

18    these areas what is called a health professional shortage area

19    based on the need -- the clinical need, whether there is enough

20    psychologists, in this case, to meet the clinical need of the

21    people in the area.

22        So the reason that they do that is so they can offer

23    economic incentives to get the people who are living in the

24    areas where there is more psychologists to areas where there is

25    less psychologists.

1      And in this system, there is 33 prisons.  21 of them are

2   located in mental health HPSAs, health professional shortage

3   areas.  And, in fact, 16 of the organizations are -- their

4   facilities are recognized as a health professional shortage

5   facility.  16 out of the 33.  So in those places, there are

6   clinically not enough psychologists and other health

7   professionals to meet the needs of the people who are there.

8   Q.  BY MS. HATTON:  For those prisons, does that necessarily

9   mean that there is a labor shortage, that there is not enough

10   employees for CDCR to get to work there?

11   A.  No.  The problem is getting the large proportion of

12   psychologists that exist to relocate to that area.  But, you

13   know, the issue is if you want people to move to a less

14   desirable place, you have to pay a much higher wage.

15   Q.  So given what you're saying about the need for

16   redistribution, would it make sense for CDCR to be setting its

17   wage ranges on a statewide basis or an institution-wide basis?

18   A.  They would want to do it prison-by-prison, because they're

19   going to be in different labor markets often.

20   Q.  What kind of problems would you expect if they just set one

21   wage range statewide?

22   A.  The prisons that are located not inside of a HPSA and

23   closer to metropolitan areas will probably be okay.  But the

24   ones that are located further away and have a higher HPSA

25   score, that's kind of the -- the degree of the problem there;

1   they'll have a worse problem in terms of filling vacancies.

2   Q.  I want to turn to your opinions about CDCR salaries in

3   general and what's needed to fill the current vacancies.

4       You provide a formula to find what wages will be needed to

5   fill CDCR's vacancies.  Let me turn to that really quickly.

6       Okay.  So this section starts on page 35 of your report,

7   and you really explain the formula in detail on page 37.  And

8   then you give some examples of how the formula can work on page

9   38.

10      Does that all sound right?

11  A.  Yes.

12  Q.  Okay.  Can you explain the formula to me?  Where does it

13  come from?

14  A.  The technical term for that is elasticity.  It's the

15  percentage change -- in that case, employment from a percentage

16  change in wages.  So the concept of the elasticity, basically

17  wages or the sensitivity sometimes applied to present

18  sensitivity is something that's taught in econ 101, and it

19  permeates all fields of economics.  We're just applying it here

20  to the labor economics of mental health professionals.

21  Q.  And how did you determine what values to input into the

22  formula for this report?

23  A.  So we have wage -- so what's in my report is an example of

24  just how the formula works.

25      The -- if you were going to actually apply it in real life,

1    the wages -- you have the wages; you know what they are because

2    they're publicly -- they're available within the prison system.

3    You also know what the fill rate or vacancy rate is in any

4    given prison.  That's another parameter that you need.  And the

5    last one would be the actual elasticity measure, the -- how

6    much do people respond, how sensitive are people to wages when

7    they move.  So that is the piece that I had to go to the

8    literature in order to find.

9        So there have been a number of studies that specifically

10   ask the question, what do we need to do to move physicians to

11   places where there's a lot of need where they wouldn't

12   otherwise go?  And so they will have different sets of economic

13   incentives, different -- different compensation packages to get

14   people to move to these places, and they measure how sensitive

15   they are.

16       And the range that I give in my table there is the range

17   that occurs in that literature.

18   Q.  Okay.  You ultimately say, in applying your formula -- and

19   I'm looking at paragraph 39 [sic] on the second paragraph --

20   you say that if CDCR needs to increase its psychiatrist,

21   psychologists, and social workers supply from a 70 percent fill

22   rate to meet a 90 percent threshold, CDCR wages would need to

23   be 57.1 percent to 285.7 percent higher than starting market

24   wage.

25       The Defendants have said in their trial brief that

1    Dr. Brown says you have to offer the highest wage possible just

2    to see what happens.

3        So here is my question:  Are you saying that CDCR should

4    offer salaries at 258 percent higher than market wage?

5    A.  No.  Only in a very rare theoretical case should that ever

6    occur.

7        So the application of this formula you learn at econ 101

8    and labor econ classes requires that you know the fill rate,

9    how much do you have to fill.  And the bigger that is, the

10   bigger wage increase you need.

11       It also requires that you know how sensitive people are to

12   wages.  The less sensitive they are, the bigger wage increase

13   you need.

14       So if you were going to actually apply this, you'll start

15   at a relatively low level.  And the only way you would ever get

16   up to the highest level is if you started with the lower level

17   and you get no takers.  And then you run it up the ladder

18   quickly, and you still get no takers.  You're at 58 percent;

19   you take it up to 75 percent.  No takers.  Zero takers.  No one

20   is doing it.  You go up another ladder to 100 percent.  There

21   is no takers at all.  The only time you would ever go up to

22   that top figure is if there are zero takers at every other

23   lower level.  But you would never do that.  The rational

24   organization ones that don't -- don't want to pay more than

25   they have to pay for anybody.

1       So if you were going to actually apply this formula in real

2   life, you would take a relatively high end of the wage; you'd

3   have a range that you would advertise, make sure this is

4   advertised all over the place, and then when people come in you

5   do your interviews and such and you tell them this is a -- a --

6   we can negotiate, it's not a give or take, you know --

7   take-it-or-leave-it offer, and then probably offer in the

8   middle of the range, and then you see if you can come to a

9   meeting of the minds, an agreement.  And if you find, after a

10  number of those trials, you can't, then you have to move that

11  up again.  And you keep doing that.

12      So it's theoretically possible you could get to that very,

13  very high wage, but it's not very likely.

14  Q.  Is this process that you're describing to me right now what

15  you refer to in your report as trial and error?

16  A.  Yes.  Trial and error.  Even if you had -- if you knew

17  exactly what the historical sensitivity to wages was, labor

18  markets are in flux, and so you'd still have to do some trial

19  and error to see where people will actually meet the wage.

20      And, plus, there's always going to be a distribution of

21  people.  Some will be willing to take a little bit less, some a

22  little bit more.  There -- that's why we have auctions where

23  people will pay different prices, because people have different

24  values, so it's the same thing in the labor market.

25  Q.  If an employer doesn't know the precise elasticity for a

1    particular group of professionals, so there's been no large

2    study done telling them this is exactly how sensitive these

3    workers are to changes in wages, how does the employer figure

4    out what wages they should offer to try to attract employees?

5    A.   What you're describing is the usual case.  So the employer

6    would probably look at the BLS labor statistics for what's the

7    going wage in their area and start off with that.  And if they

8    don't find that -- these are always with a lag.  They're always

9    with a lag.  If that doesn't work, you raise the wage.  And you

10   keep doing that until you are able to get people that you need.

11        And depending on the profession, these things can swing,

12   because the -- especially in the tech sector.  But in the

13   health care sector, changes in the demand for various mental

14   health professions can happen, too.  For example, recently,

15   there's a new treatment for depression using psychedelics,

16   which is pretty effective, so you might expect demand -- some

17   more demand for people who can provide that.  That would be

18   psychiatrists in that case.

19   Q.   All right.  I want to point the Court towards page 38 of

20   your report, after Table 3.  There is a note right after the

21   table, but I'm looking at the paragraph after that.  It says:

22   The estimates in Table 3 are merely starting points to

23   determine what will work in any specific situation.  Labor

24   market conditions vary by time and place and require rapid

25   trial and error to determine what will be effective.

1        Why is it important that trial and error is rapid?

2   A.   Because in a situation where you are a relatively high

3   level person -- so psychiatrist, psychologist or a social

4   worker -- when you are looking for a job, oftentimes you'll

5   have multiple offers that you're getting, and you have to

6   decide, and the offers will expire at a certain point.  They

7   give you, we need to know by X time.  And if one employer

8   either hasn't given an offer or lags in responding to you, they

9   just automatically lose, especially if they're in a less

10  desirable place and the wage is not as high.

11  Q.   The deputy director of human resources for the California

12  Correctional Health Care System testified to the Court

13  yesterday that when CDCR sends a tentative employment offer, it

14  always starts at the minimum salary.  Every time.

15       What effect, if any, does that have on recruitment?

16  A.   I was stunned when I saw that.  That would put you at a

17  massive disadvantage, because other employers are going to try

18  to pay in order to hire.  That's not -- that sounds like a

19  policy that doesn't pay attention to what the actual -- how

20  many people we want to hire and how quickly do we want to get

21  them in the door.

22  Q.   The deputy director of HR for -- I'm going to refer to it

23  as CCHCS -- also testified that up until recently, CDCR took,

24  on average, 108 business days to complete the hiring process

25  after they receive an application.

1      What effect, if any, does that have on recruitment?

2   A.   108 business days, that's 50 weeks [sic].  There's 56 [sic]

3   weeks in a year.  I'm surprised that they had anybody being

4   hired.

5   Q.   CDCR -- and, again, this came from the deputy director of

6   HR -- thinks that they can hopefully get that down to 65

7   business days.  Do you think that that's reasonable for an

8   employer seeking to fill vacancies the way that CDCR is?

9   A.   That's 13 weeks, so a little over three months.  Other

10  employers, if someone -- a psychologist has offers in front of

11  them, the other offers are going to come in far quicker than

12  that, and they're going to require decisions.  So if one is

13  taking 13 weeks, over three months, to come in, they lose.

14  Q.   This rapid trial and error that we're talking about, the

15  negotiation process that employers need to engage in to be able

16  to fill positions, can you name a government agency that uses

17  that method?

18  A.   My university does.  When people are being hired for

19  positions -- it happened just recently -- if they're applying

20  for Berkeley, they're also applying other places, and we have

21  to match, if we want the person, other offers, and we have to

22  do it in a timely manner.  And sometimes we win, and sometimes

23  we lose.  Recently won; we got an international superstar in

24  my department.  He's four offices away from me.

25  Q.   I'm going to give you a hypothetical, if that's all right.

1    Let's say that you were hired as a health economist to

2    consult to a state agency -- which has actually happened for

3    you before, right?

4    A.  Yes.

5    Q.  Okay.  This state agency has clinician vacancies, and

6    patients are actually dying because of the clinician vacancies.

7    And let's also say that they're in a health shortage area, a

8    HPSA, and let's also say they're subject to a federal court

9    order requiring them to provide minimum numbers of staffing.

10   What would be your advice to them to try to fill their

11   vacancies?

12        MR. CIRELLI:  Your Honor, I just interpose the

13   objection, incomplete hypothetical.

14        THE COURT:  All right.  Overruled.

15        THE WITNESS:  I would set up a wage range, advertise

16   as a range with a fairly high end.  I would advertise this

17   widely.  And then when people came in, I would offer them right

18   in the middle, but I would tell them explicitly that this is a

19   negotiation, and we expect some negotiation.  And, of course,

20   how much we negotiate depends on how many places that are left

21   you have to fill.

22        And if you got no one to come in, then you have to raise

23   that.  But you've got to do this fast, and you have to make

24   sure that you make the offer and the counteroffers happen in a

25   rapid way, because these people that you are hiring are also

1    interviewing with other employers who will have a rapid

2    approach.

3         The other thing that I would do is I would look at the

4    numbers of folks who are doing internships -- in the prisons in

5    this case -- to get their licensure, social workers and

6    psychologists.  And you know these people.  You're around them

7    a long time.  You can talk to them and get a pretty good idea

8    of what they're going to need to stay, and I would try to pay

9    them so that they stay.

10        The other thing I would do is I would widely advertise.

11   You know, you want get a focus on women; you want to make sure

12   you get minorities.  As wide net as possible.

13        The other thing you would do is -- it's not only going to

14   be wages; that's the primary thing, but there is going to be

15   different amenities.  You know, do you have -- is your commute

16   subsidized.  Do you have personal days off you can take.  Is

17   there child care.  Some places will have meals.  Is your office

18   a nice place to work.  And you want to -- it to be a nice place

19   to go to work.  You want to advertise that we have the same

20   amenities as these private institutions have, and they're

21   better.  So, you know, all the things are better if you come

22   and work for the prison system.

23   Q.  BY MS. HATTON:  And are all of those reasonable ways to try

24   to increase recruitment?

25   A.  Yes, but the primary one is going to be the wage.

1  Q.  And those methods of trying to increase recruitment, were

2  they available to state agencies last year?

3  A.  Were they available?

4  Q.  Um-hum.

5          MR. CIRELLI:  I'm going to interpose an objection,

6  Your Honor.  Vague and ambiguous.  And also sounds like it may

7  be an incomplete hypothetical.

8          THE COURT:  Sustained as to vague.

9          MS. HATTON:  I'll rephrase.

10 Q.  BY MS. HATTON:  The advice that you would give, that you

11 just told me, to a state agency trying to fill its vacancies,

12 would that have still been good advice, let's say, a year ago?

13 A.  A year ago, we were in the middle of COVID.  So it was

14 difficult all-around.  You still would want to try.  Given the

15 situation that you gave me where there's a deadline, you have

16 to hit the deadline, then, yes, you should be doing those

17 things.

18 Q.  And that advice that you just gave me, if you were

19 consulting a state agency, would that also have been good

20 advice as far back as 2009?

21 A.  Yes.  It's always good advice.

22 Q.  If you were asked -- and I understand you have not rendered

23 an opinion about whether CDCR has taken all reasonable efforts

24 to fill its vacancies, but if you were asked to do that, to

25 tell this Court that as an economist, you can reliably say that

1    CDCR has taken all reasonable efforts to fill its vacancies,

2    what information would you want to see -- what information

3    would you need to see from CDCR?

4    A.  I would want to see the advertisements that they're sending

5    out, how widely they're distributed.  I would want to see

6    the -- the offers that are made to each person, how long it

7    takes for the offers to happen, is there a counteroffer, and is

8    that accepted, and what those numbers are so you can see the

9    pattern of people walking away.  You know, if it's a really

10   long time before offers come or if the wage is low, if they

11   give the reason, I would want to know that.

12       I would want to know what are the facilities like that

13   people are working in.  You know, it matters a fair amount,

14   because you're spending most of your life in there, and you

15   want to have a nice place to work.  Paint isn't expensive.

16       I would want to know what are the various other aspects of

17   a compensation package, what does the retirement look like.

18       I'd want to know what -- what the insurance plans that

19   are -- health insurance plans that are available.

20       I'd want to know about child care policies.  I'd want to

21   know about personal time off policies.  I'd want to know about

22   flexible time, flexible hours.  Those kinds of things.

23   Q.  Have you looked at the new bargaining unit contracts for

24   the mental health clinicians at issue in this case?

25   A.  I have.

1    Q.  Do those allow for sufficient trial and error so as to

2    likely allow CDCR to fill its vacancies?

3    A.  Well, the -- the contracts will not allow the -- the

4    workers to even make what they are making prior to COVID.

5    Again, there was a 17 percent increase in inflation from 2020

6    to 2023.  So just to break even with inflation, you need to pay

7    at least 17 percent, and that's not what's being paid.  So, no,

8    it's not going to -- not going to help very much.

9    Q.  The unions ended up accepting those contracts.  What, if

10   anything, does that say to you about whether the wage increases

11   are sufficient to fill mental health vacancies?

12   A.  Doesn't tell me too much.  The unions are not responsible

13   to fill vacancies, and it's unlikely that their goal was to

14   find a way to fill vacancies.

15   Q.  I am going to transition now to talk about Dr. Greulich's

16   report.

17        So if I could ask Mr. Gonzalez to pull up Defendants' 5.

18        Dr. Brown, do you recall Dr. Greulich's regression analysis

19   and her conclusion from it?

20   A.  Yes.

21   Q.  What is your response, if any, to her conclusion from that

22   regression analysis?

23   A.  Remind me of the conclusion so I'm --

24   Q.  Sure.  She said that she could not say that there was a

25   non-zero relationship between wages and fill rates.  In other

1    words, she couldn't -- she can't tell us if the wage rates have

2    worked in the past or not.

3    A.    Right.  The model does not allow you to do that, because

4    the model is constructed in a way that won't allow that to

5    happen.  She can't tell you it's zero; she can't tell you it's

6    .1, .2, .3, .4, .5, depending on what the confidence intervals

7    are.  The basic issue there is that there's too few data points

8    to be able to precisely estimate the model.

9        What Dr. Greulich did was look at the five years of data

10   semiannually, so it's 2 data points per year, but five years,

11   so let's call that 10 data points per year.  And we have five

12   occupations, so 10 times five is 50.  She used 45; let's call

13   it 50 to make the discussion easier.

14       What I would suggest you do is also account for

15   seasonalities.  So there is a -- markets slow down certain

16   times of the year, and they -- they're higher other times of

17   the year, so you don't want to use monthly data.  So instead of

18   five times two, you would have five times 12, so you would have

19   60.  And then you have five occupations, so that's 300.  300

20   observations.

21       And then I would say you don't want to look at just five

22   years, because the CDCR has been working at doing this for a

23   long time.  We'd want at least ten years of data.  So instead

24   of the 300, we would -- data points, you would have 600 data

25   points.  So we can look at this over a longer period of time,

1    see the movements and the attempts to change the wages, and see

2    how effective they were.

3         And then the final thing is we don't really care so much

4    about the overall state average.  We care about it across each

5    prison.  So we have 33 prisons.  You would want to have this

6    data for each prison, so 600 times 33 brings us up to 19,800

7    data points.

8    Q.   How many data points did Dr. Greulich use?

9    A.   She used 45.

10   Q.   And -- I'm sorry --

11   A.   We'll call it 50.

12   Q.   -- I may have interrupted you.  Were you going to say

13   something else?

14   A.   When you have as many data points as I am suggesting, it

15   allows you to get additional information.

16        So, for example, not all of the prisons are in HPSAs.  Most

17   of them are.  Two thirds of them are.  And 16 of them are

18   actually HPSA facilities.  But you could actually figure out

19   what the sensitivity to wages is in those areas that aren't in

20   HPSAs versus those that are in HPSAs.

21        And then you could -- if you separated these equations out

22   into five separate equations, they would have 3,960

23   observations in each one; you could get a separate elasticity

24   for each of these occupations, including whether they -- how it

25   differed whether they were inside of a HPSA versus outside of a

 1   HPSA.

 2   Q.  Mr. Gonzalez, could I get you to pull up Table 20 in this

 3   report.  I'm pretty sure it's on page 36, but I'm not certain.

 4            THE COURT:  There is a table 20?  Oh, this isn't

 5   Dr. Greulich's.  That's right.

 6            MS. HATTON:  I believe it's Table 20.  Let me grab a

 7   copy and look.

 8            THE COURT:  Or Figure 20.  Is it Filled Positions

 9   Regression Analysis?

10            MS. HATTON:  Yes.

11            THE COURT:  It's Figure 20 on page 78 of Exhibit 5.

12   Page 71 of the report itself.

13            MS. HATTON:  Thank you, Your Honor.

14   Q.  BY MS. HATTON:  Dr. Brown, I want to talk about this

15   regression analysis which purportedly shows the relationship

16   between filled positions and CDCR salaries.

17        First, how reliable is Dr. Greulich's finding of a

18   potential for relationship of zero between wages and vacancies?

19   A.  Well, those -- so the dots there indicate the actual

20   estimate in the model, and the lines indicate the possible

21   actual it might be.  So it can be anywhere along that line; we

22   don't know.  So a lot of this is I don't know.

23        But what's interesting is that a number of these -- the

24   clinical social worker, the psychologist -- they actually have

25   a statistically significant; they don't include the zero, and

1    what they say in this model is that if you lower wages, you're

2    going to get more people to come for psychologists and for

3    clinical social workers.  And that's -- it's nonsensical.

4    Q.  How reliable is this regression analysis overall?

5    A.  It is not reliable.

6    Q.  Why?

7    A.  Because where we would like to know the numbers, we can't

8    figure it out, because it doesn't give us any information.  We

9    just know here is the -- here is the huge number of

10   possibilities; the truth is somewhere in here; we don't know

11   where.  And then when it does tell you that it's not zero, it

12   actually says what the CDCR should do is lower wages, and

13   they'll get more people to come.

14   Q.  When you're talking about it's not telling us much, are you

15   talking about the confidence along the bottom there?

16   A.  Yes.

17   Q.  So explain to us -- because 95 percent confidence actually

18   sounds pretty high to a lay person, I'll admit.  Why is that

19   line where Dr. Greulich measures the relationship between

20   salary and filled positions and the dot is very close to zero

21   -- why isn't that reliable?

22   A.  The CDCR salary?

23   Q.  Yes.

24   A.  So what it's saying is that the actual sensitivity to

25   wages, it might be the case that if we raise wages a little

1    bit, we'll get a lot of people to come; or it could be we raise

2    a little, and a few people will come; or it could be the case

3    if we raise wages -- we could lower wages, and people will

4    come.  We don't know where it is in there.  It could be

5    anywhere in there.

6        95 percent confidence means that the truth is anywhere in

7    that line.  95 percent confident that it's somewhere in there.

8    In other words, it's something.  We're confident that it's

9    something.  And we are confident, but it doesn't give us any

10   useful information to actually act.

11   Q.  Is the confidence interval of this size -- and I will say

12   that in Dr. Greulich's report, she identifies that bottom line

13   as the basis for her finding a zero relationship or close to --

14   I think she says positive insignificant relationship between

15   wages and filled positions.  Is a confidence interval of that

16   size publishable?

17   A.  It -- you might be able to pay a junk journal, a scam

18   journal, to publish it.  But, no, you couldn't publish this.

19   Q.  What would you tell your PhD students about this regression

20   model?

21   A.  I would say you didn't follow my instructions in my course.

22   Q.  And what are your instructions in your course?

23   A.  My instructions are there are certain principles that you

24   want to avoid, because they'll result in this.  And one of them

25   is having too small -- too few data points.  You need to have

1    lots of data in order to have confidence that the actual value

2    that you want -- 95 percent confidence is in a narrow range.

3    That's what you want to find out.  Somewhere in this narrow

4    range, we know that the -- that that's the actual estimate, not

5    this huge range, because it could be anything.  And this

6    graphic could be 15.  It could be that we raise wages 1

7    percent, we get a 15 percent increase in responses.  Or it

8    could be, you know, negative 7.  If we lower wages by 1 -- by 1

9    percent, we'll get an increase of 7 percent of folks coming in

10   to our filled positions.

11   Q.  Do employers need to do regression models to figure out

12   whether or not wages will fill their vacancies?

13   A.  No.  They don't need to do that.

14   Q.  So what would an employer do, short of a regression model,

15   to figure out the right wages to fill its vacancies?

16   A.  So this is one of the reasons why the Bureau of Labor

17   Statistics exist.  So they publish the wages for hundreds and

18   hundreds of occupations, and they're all publicly available.

19   You look on there, and you can see what the mean is; you can

20   see what the max is; you can see what the -- the range is.  And

21   then you can decide, we'll start at that point.  We'll offer

22   people a wage, and if for some reason we don't get anyone

23   accepted, we go up.  So it just -- it gives you the starting

24   point.

25   Q.  Did you do a regression analysis to figure out how

1  responsive CDCR employees are to wage changes?

2  A.  No, I did not.

3  Q.  Why not?

4  A.  Because in the time that it would take to do a regression

5  analysis -- the one I described took about three months if we

6  had the data right away -- you could actually use trial and

7  error and figure out what the actual value is.

8      And once I provided the model to you, you still would have

9  to do some trial and error, because labor markets will have

10  changed.  It's a whole quarter of time, three months between

11  the time I provided the model using historical data.  It won't

12  even be -- it would be right up to the current time, so it --

13  it wouldn't be a good use of resources.  It would be more

14  useful to just do the trial and error approach that I suggest.

15  Q.  This is my last question.  Do you have any other criticisms

16  of Dr. Greulich's report that the Court should be aware of?

17  A.  Well, if I understand the report correctly, Dr. Greulich is

18  saying there is a great need -- clinical need; wages don't

19  help.  In fact, in some cases, if we lower wages, we'll get

20  more people in.  So -- which is nonsensical.  And, basically,

21  there is no solution to the problem that's given.

22      There is a need in these prisons.  People do need these

23  mental health providers.  16 of them -- the facilities -- are

24  actually health professional shortage facilities, and throw up

25  our hands, and I don't think that's good policy.

1   Q.  Do you believe that there is a solution to CDCR's

2   vacancies?

3   A.  Yes.

4           MS. HATTON:  Nothing further, Your Honor.

5           THE COURT:  All right.  Cross-examination.

6                       CROSS-EXAMINATION

7   BY MR. CIRELLI:

8   Q.  Good afternoon, Doctor.

9   A.  Good afternoon.

10  Q.  It's nice to see you again, except this time in person

11  rather than remotely on a screen.

12  A.  It is nice.

13  Q.  One of the things you just said was what CDCR should do is

14  take a look at the data that exists with respect to wages for,

15  you know, various occupations, and here we're talking about --

16  we're focused on five occupations in this area.  You understand

17  that, correct, Doctor?

18  A.  Yes.

19  Q.  And you understand -- what are those five occupations?

20  A.  They are psychiatrists, psychologists, mental health social

21  workers, recreational therapists, and medical assistants.

22  Q.  And do you understand, Doctor, that, in fact, CDCR, with

23  the exception of potentially medical assistants, is paying

24  above -- consistently above benchmarks both for California

25  wages and for national wages --

 1    A.  Yes.

 2    Q.  -- to the four categories other than --

 3        We have to wait for each other to speak.

 4        -- other than the -- for the four categories other than

 5    medical assistants?

 6    A.  Yes.

 7    Q.  So they're paying above the benchmarks for psychiatrists,

 8    correct?

 9    A.  Yes, they are.

10    Q.  They're paying above the benchmarks for psychologists?

11    A.  Yes.

12    Q.  They're paying above the benchmarks for clinical social

13    workers?

14    A.  Yes.

15    Q.  And they're paying above the benchmarks for recreational

16    therapists?

17    A.  Yes.

18    Q.  So that starting point you said they should start at,

19    they're already doing that, correct?

20    A.  Right.  Yes.  Unsuccessful.

21    Q.  And you've talked about the -- the regression analysis.

22    And I think what you said, in summary, during your deposition

23    was you would just design it differently; is that fair?

24    A.  If I was going to do this -- if I was writing a paper and I

25    wanted to show, you know, what the policy should be, I would

1    design it differently, yes.

2    Q.   And you understand what this regression analysis was

3    intended to do was to look at if a relationship exists between

4    salaries and filled positions and salaries and net hires?

5    A.   Right.

6    Q.   And you had Dr. Greulich's report and the regression

7    summary in Appendix 2 since August of this year, correct?

8    A.   Yes.

9    Q.   August 31st, I think is when the report was issued.

10   A.   Yes.

11   Q.   But that's not the first time that Dr. Greulich had done a

12   regression analysis very similar to this one in this very case;

13   is that correct?

14   A.   That is correct, yeah.

15   Q.   She did one in 2018?

16   A.   Yes.

17   Q.   And the one she did in 2018 focused on psychiatrists, but

18   it was basically the -- the same type of regression analysis

19   that was done here, correct?

20   A.   Yes.

21   Q.   And you were critical then of -- in pretty much the same

22   way of that regression analysis?

23   A.   Yes.

24   Q.   And -- but at -- even at that time, since -- when -- in

25   fact, your criticisms, we can find some of those in your

1    report.  At the end of your report, you do address her 2018

2    opinion or report that she did with Dr. Fowdur, I think it is?

3    A.  Yes.

4    Q.  And despite all that, you did not -- I think we just heard

5    this -- run your own regression analysis to see if you could,

6    in fact, determine whether or not there is a relationship

7    between salaries and net hires or salaries and filled

8    positions?

9    A.  That's right.

10   Q.  I'd like to go back, Doctor, for a moment and talk a little

11   bit about your background.  We discussed a little bit of it

12   earlier.

13       You are primarily a -- a health economist, correct?

14   A.  I'm a health economist, yes.

15   Q.  And you understand that Dr. Greulich is a labor economist?

16   A.  That's what she says she is, yes.

17   Q.  And I raised this issue a little bit when we were talking

18   about your qualifications, but I'm going to ask.

19       I did ask you in your deposition whether you have done work

20   in the field of labor economics in the last five to ten years;

21   do you recall that?

22   A.  Yes.

23   Q.  And do you recall that you did, in fact, tell me that in

24   the last five years, you've done no work in the field of labor

25   economics?

1  A.  Yes, I did.  But in thinking about it more, I realized that

2  I actually had published one that touches on labor economics

3  this year.

4  Q.  And I think you mentioned that one earlier, but you didn't

5  mention that during your deposition?

6  A.  That's right.

7  Q.  What you did mention in your deposition was one that you

8  did in 2013 with respect to occupational licensure on wages.

9  And that was described in more detail by you as looking at the

10  effect of regulations on dental hygienist influences on the

11  income and labor hours of dentists and dental hygienists.

12      Do you recall that?

13  A.  Yes.

14  Q.  And the other instance in which you did anything relating

15  to labor economics was when you were on the dissertation

16  committee for a graduate student who gave their dissertation on

17  the effect of unions on something to do with nurses, I think is

18  the way you described it.

19  A.  Right.

20  Q.  And your assignment here was to determine if one can use

21  economic incentives to obtain desired fill rates or hires,

22  correct?

23  A.  Correct.  For health care professions.

24  Q.  And this is the first occasion in the context of litigation

25  where you've been retained to do that type of an analysis,

1  correct?

2  A.  This particular kind of analysis, yes.

3  Q.  And putting aside litigation, in all of your work, this is

4  the first time ever that you've done this type of analysis

5  looking at whether economic incentives can be used to attain

6  desired hires?

7  A.  The first time that I've -- no.  Um, I've done a paper that

8  looked at the migration of physicians, specialists and

9  generalist physicians, to see whether or not they move away or

10  move towards HMO.  HMOs tend to have lower pay.  So there was

11  an incentive there, and it did directly address their movement.

12  Q.  I'd like to take a look at your deposition, Doctor, page

13  73, line 23, through page 74, line 7.

14      And I can actually provide you with a copy.  It will be up

15  on the screen, but would you like a hard copy, Doctor?

16  A.  That would be helpful, yes.

17           THE COURT:  Do we have a sealed copy of that

18  deposition, Mr. Cirelli?

19           MR. CIRELLI:  They were hidden under a bench.

20           THE COURT:  Pardon me?

21           MR. CIRELLI:  My copies were hidden under a bench.

22  Would you like an extra copy?

23           THE COURT:  I'm supposed to have a sealed copy of all

24  depositions.

25           MR. CIRELLI:  I believe it was delivered.

 1                   THE COURT:  Ms. Schultz isn't locating it.  If there

 2      is an objection, I'll need a --

 3                   MS. ELLS:  We gave it to you on Tuesday.

 4                   THE COURT:  It was provided by Plaintiffs?

 5                   MS. ELLS:  I apologize.  I thought you were talking

 6      about the Greulich deposition.

 7                   THE COURT:  No.

 8                   MR. CIRELLI:  Did you need another copy, Your Honor?

 9                   THE COURT:  Only if there is an objection.  Typically

10      I get a sealed copy; we unseal it in court to make certain

11      it's --

12                   MR. CIRELLI:  Absolutely, Your Honor.  I understood

13      that it was delivered by Plaintiffs' counsel.  It's their

14      expert, so they would have had the sealed copy.  So I thought

15      that you --

16                   THE COURT:  Unless and until there is an objection I

17      need to resolve, I don't need to have a copy.  As long as

18      you're displaying on the screen what you're referencing.

19                   MR. CIRELLI:  May I approach the witness, Your Honor?

20                   THE COURT:  You may.

21                   MR. CIRELLI:  Thank you.

22      Q.  BY MR. CIRELLI:  So what I'm referring you to, Dr. Brown,

23      is your deposition at page 73, line 23, through page 74, line

24      7.

25          And I asked you about your prior work with respect to the

1    use of economic incentives to attain desired fill rates or

2    higher.  And the question that I asked you at the time:

3        And apart from litigation, which I know you have been

4    retained -- have not been retained in any litigation to do that

5    type of assignment or work, but not focusing solely on prison

6    systems, have you been retained as a consultant to look at the

7    use of economic incentives in the hiring process to increase

8    hiring?

9        Answer:  No.

10        Question:  This is the first time you've done this type of

11    assignment; is that fair?

12        Answer:  Yes.

13        MS. HATTON:  Objection, Your Honor.  Hearsay.  And

14    vague as to this type of assignment and consultant.

15        THE COURT:  Well, for impeachment value, the reading

16    of the deposition excerpt stands.

17        MR. CIRELLI:  Thank you, Your Honor.

18    Q.  BY MR. CIRELLI:  Doctor, how much time, up to the time of

19    your deposition, did you spend actually working on this matter?

20        I believe Dr. Greulich and her team, she indicated, spent

21    about 1100 hours.

22    A.  I don't know how much they spent.  How much I spent on this

23    report?

24    Q.  Yes.

25    A.  54 hours.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    Q.  And since the report and up to your deposition, I think you

2    said you had spent another 6 or 7 hours; is that accurate?

3    A.  Yes.

4    Q.  So the sum total of the time you spent on this project was

5    about 60 hours?

6    A.  I've spent time since then.

7    Q.  Fair enough.  To get ready for your testimony?

8    A.  Yes.

9    Q.  But up until your deposition, it was about 60 hours?

10   A.  Roughly.

11   Q.  And I just wanted to clarify something, because maybe I

12   misheard you.

13       Did I hear you say that 108 days equates to 50 weeks?

14   A.  108 business days is 5 days a week times 10 -- it would be

15   10 weeks.  I'm sorry --

16   Q.  It would be, I think, 20 weeks.  5 -- if you took a hundred

17   and divided it by 5, you'd get to 20.  So 108 would be 21 days

18   [sic] and a couple of days, assuming you don't have any

19   holidays.  So we'll call it 20 instead of 50 weeks, right?

20   A.  I made a math error.  So ask your question again.

21   Q.  Sure.  If I heard you correctly during your earlier

22   testimony, you testified that the 108 business days equates to

23   20 weeks -- I mean 50 weeks.  And I'm asking isn't it the case

24   that --

25   A.  Yeah.  That's a mistake.

 1  Q.  -- 108 business days, if you had no holidays during that

 2  period of time, would be about 21 weeks, correct?

 3  A.  Yeah.  I'm tired.

 4  Q.  So before I ask you some questions about your opinions -- I

 5  want to dig into those a little bit -- there were some

 6  questions that Ms. Hatton asked Dr. Greulich that I want to run

 7  by you with respect to background as well.

 8      You are not a medical doctor, correct?

 9  A.  No, I'm not a medical doctor.

10  Q.  And you do not have any expertise on determining the

11  adequacy of medical -- of mental health care for any given

12  patient, correct?

13  A.  I do not.

14  Q.  Your study does not show that increasing salaries by any

15  percentage will necessarily result in better outcomes for -- or

16  treatment for any individual patient, correct?

17  A.  I didn't address that question.

18  Q.  And as an economist, you cannot say with any certainty that

19  any fill rate guarantees good patient outcomes or better care,

20  correct?

21  A.  I could say -- when I write papers, I usually am writing

22  them with other people.  So usually, it will have a physician

23  as part of a team.  So they -- a physician would be the person

24  who would tell us what the appropriate measure would be in this

25  kind of situation -- or some other government body.

1    Q.  Right.  Not you?

2    A.  Not me.

3    Q.  And so just to go back, you have, as Ms. Hatton indicated,

4    basically two opinions, or buckets of opinions, correct?

5    A.  I don't remember what -- what -- tell me the opinions, and

6    I'll tell you.

7    Q.  Sure.  Your first opinion is that there is no economic

8    shortage of psychiatrists or psychologists.  And, to be

9    specific, you say that as of 2020, there was not a statewide

10   economic labor market shortage of psychiatrists but rather an

11   oversupply, and the statewide labor market for psychologists

12   was in equilibrium.

13       That's your first opinion, correct, Doctor?

14   A.  Yes.

15   Q.  Then your second opinion relates to increasing staffing by

16   increasing salaries.  And in particular, what your opinion is,

17   that Ms. Hatton read, which I believe is in your report at

18   Bates page 3 if I have this right, for physicians, the economic

19   literature suggests that to attract mental health providers to

20   new positions, the increase in real wages needed is on the

21   order of 57.1 percent to 285.7 percent.

22       Correct, Doctor?

23   A.  That is true, given the other assumptions in the model of

24   20 percent movement in the fill rate and the range of

25   elasticities.

1    Q.  I'm just reading from your report as to what you say your

2    opinion is, and then we'll talk about those assumptions and the

3    math in a moment.

4        But those are the two basic opinions that you have in this

5    case, correct?

6    A.  Yes.

7    Q.  Apart from the critiques of Dr. Greulich.

8    A.  Right.  And there -- they require qualification, of course.

9    Q.  And in order to address the -- your first opinion with

10    respect to whether or not there is an economic labor shortage,

11    you did an analysis?

12    A.  Yes.

13    Q.  And I think we saw that that analysis begins on -- I think

14    it was page 9, but it begins on Bates page 10 of your report,

15    which is Plaintiffs' Exhibit 25, I believe.

16        Correct, Doctor?

17    A.  I don't know.  I don't know exactly what you're talking

18    about.

19    Q.  Oh, you don't have your report?

20    A.  I have it here, but I don't think it's paginated the same

21    way as yours is.

22    Q.  They put Bates numbers.  It's going to be your report page

23    9.

24    A.  My report page 9.

25    Q.  Yes.

1    A.   Okay.   Okay.

2    Q.   So you did your own -- you did your own analysis, that the

3    results of which appear on the various charts beginning on page

4    9 of your report, Bates page 10 of Plaintiffs' Exhibit 25.

5    A.   Yes.

6    Q.   And it is common when you're looking at something like

7    this, this topic of labor shortages, for an economist to do a

8    review of the authoritative literature for treatises and other

9    peoples' studies as well, correct?

10    A.   Yes.

11    Q.   And that's what Dr. Greulich did here.  She did an analysis

12    or did a litigation [sic] review, together with her colleague

13    Dr. Dutra, of literature with respect to whether there is a

14    labor shortage for mental health care providers in five

15    categories that we are discussing here today, both in

16    California and nationally, correct?

17    A.   No.  It wasn't of the economic literature.  It was of the

18    health policy literature, needs-based literature.

19    Q.   She would differ with you.  But she did do a litigation

20    review -- rather a literature review, correct?

21    A.   She did do a kind of literature review, sure.

22    Q.   And I believe that you told me that you have -- you

23    personally have -- well, you personally did not do any type of

24    literature review, correct?  You did your own analysis?

25    A.   Oh, yes, I did a literature review.  Of course I did.

1    Q.  With respect to the issue of labor shortages with respect

2    to mental health care providers?

3    A.  My understanding from looking at this is there is no

4    economic literature on mental health providers with regard to

5    economic shortages.  I couldn't find anything on it.

6    Q.  And that's what I was going to ask you is you have not

7    seen, in your work, any literature that indicates such a

8    shortage?

9    A.  The only literature that exists has to do with whether

10   there is a clinical need issue, and that work is generally not

11   done by economists.  Sometimes there are some economists

12   involved, generally not.

13   Q.  But you're aware that Dr. Greulich has indicated that the

14   literature she found does in fact focus on whether or not there

15   is an economic labor shortage with respect to those five

16   categories of health care providers?

17   A.  No, did not say anything about economic shortage.  Talked

18   about shortage, general, and the literature that was reviewed

19   had to do with needs-based shortage.

20   Q.  Well, I think that her testimony -- the record will be what

21   it is.  So we'll let that record stand.

22       But looking at your analysis, what you have done is --

23   appears beginning on page 9, correct?

24   A.  Yes.

25   Q.  And this analysis is based solely on wages?

1  A.  It is.

2  Q.  It is looking solely at whether wages are going up or down

3  over a period of time?

4  A.  Yes, it is.  Real wages.

5  Q.  And this analysis, I think you indicated earlier, stops at

6  2020?

7  A.  This one does, yes.

8  Q.  And so you don't have any data or statistical information

9  with respect to whether there is currently a labor shortage,

10  correct --

11  A.  Well -- I --

12  Q.  -- for psychiatrists, psychologists, and social workers?

13  A.  Well, I do.  The data -- the Bureau of Labor Statistics

14  data does go up to 2023.  And if you relax the assumption about

15  comparing it year over year, you say -- say we can compare it

16  year over year, then it shows that there is economic

17  equilibrium in the labor markets for psychiatrists, for

18  psychologists, and for mental health social workers.

19  Q.  For all three?

20  A.  All three.

21  Q.  But that is not reflected anywhere in your report, and you

22  didn't tell me about that during your --

23  A.  Yes.

24  Q.  -- deposition, correct?

25  A.  That's right.

1    Q.  You've done that work since your deposition?

2    A.  Yeah.  I had the -- the spreadsheet already set up with

3    the -- the earlier data, because I was working on it for

4    psychologists and psychiatrists before I saw, well, here is

5    better data, so I took 15 minutes, and I popped the social

6    workers in, and here I am, extended it out to '23.

7              MR. CIRELLI:  I would move, Your Honor, to strike

8    that testimony with respect to those efforts that are not

9    reflected either in his report or in his testimony.

10              THE COURT:  Ms. Hatton, agreed?  Not reflected in the

11   report?

12              MS. HATTON:  Can Mr. Cirelli just clarify, is he

13   meaning for data after 2020?

14              MR. CIRELLI:  Yes.  The analysis.

15              MS. HATTON:  That's fine.

16              THE COURT:  All right.  All right.  Granted.

17   Q.  BY MR. CIRELLI:  And with respect -- if we look at the

18   information on page 9, that analysis, here what you're doing is

19   you are looking at average wages and plotting them from 19 --

20   from 2015 to 2020, correct?

21   A.  Yes.  Yes.

22   Q.  And your opinion is that there is an oversupply of

23   psychiatrists during this period of time?

24   A.  Yes.

25   Q.  And the horizontal lines are confidence intervals for

1  psychiatrist wages, correct?

2  A.  Yes, they are.

3  Q.  And you're using a confidence interval of 95 percent; we've

4  heard that percentage before?

5  A.  Yes, I am.

6  Q.  And what that 95 percent means is that 95 out of a hundred

7  times, the wages will be somewhere in that horizontal line; is

8  that correct?

9  A.  It means that we can be 95 percent confident that the

10  actual wage is somewhere in that line, yes.

11  Q.  And if there is an overlap, even at this point in time up

12  until 2020, with respect to the horizontal lines, that would

13  suggest an equilibrium, not a surplus, even up to 2020,

14  correct?

15  A.  Please repeat your question.

16  Q.  Sure.  If we look at the horizontal lines -- so let's look

17  specifically at 2017 through 2020.  We see where the horizontal

18  line goes down to somewhere between 140 and 160 is the wage,

19  correct?

20  A.  Yes.

21  Q.  And if we go across to 2020 and we look at the horizontal

22  line with respect to wages, that goes from somewhere a little

23  bit above 120 to somewhere close to 160.  There is an overlap

24  in those lines, correct?

25  A.  Overlap in the lines -- you mean between 2015 and 2020?

1    Q.  I'm looking at 2017 to --

2    A.  2017.  For the way that you -- statistical significance

3    does not have to do with whether there is any overlap between

4    the confidence intervals.  It has to be above a certain level

5    before you can -- you can say that there is not a statistical

6    difference between the two.

7    Q.  But aren't you -- but by looking at this and, in fact,

8    there being this overlap, it is telling us that potentially,

9    because of the confidence intervals, wages remained consistent

10   during that period of time and, therefore, were in equilibrium

11   rather than there being a surplus?

12   A.  I would have to actually run that particular calculation to

13   tell.  I didn't test 2017.

14   Q.  But just looking at what we're looking at here on the

15   graph, it would indicate that, correct, Doctor?  You'd agree

16   with me at least --

17   A.  No.  You don't look at it; you do the calculation.  If they

18   don't overlap or there is tiny, tiny overlap, then you can say

19   they're statistically different.

20   Q.  But if there is overlap, it would indicate equilibrium

21   rather than a shortage.  If there was -- you did your

22   calculations and there was overlap, it would be indicia of

23   equilibrium rather than a surplus?

24   A.  Between 2017 and 2020?

25   Q.  Yes.

1    A.  Yes, it would.

2            THE COURT:  Can you just mark on the chart -- I think

3    I'm following you, but just mark what you -- what you're

4    identifying as the overlap.

5            MR. CIRELLI:  Certainly, Your Honor.

6        So, Ms. Pooni, if you could, so Your Honor can see it on

7    the screen --

8            THE COURT:  Are you able to do that just using your

9    finger on the electronic screen?

10           MR. CIRELLI:  I don't know that -- can I do it on

11   the -- by using my finger on the screen?  Okay.

12       So if we look at -- are you going to come show me how to do

13   this?  I'm learning something new, Your Honor.

14           THE COURT:  You should be able to circle exactly what

15   you mean by the overlap.  I want to make certain I'm tracking.

16           MR. CIRELLI:  The monitor is not working, Your Honor.

17       So if I can, Your Honor, if you were to look at 2017 --

18           THE COURT:  Correct.

19           MR. CIRELLI:  -- and you see that above 2017, there

20   is a horizontal line going from $180, right?

21           MS. WOLFF:  It's a vertical line.

22           MR. CIRELLI:  Vertical line --

23           THE COURT:  Is that -- you kept saying horizontal.

24   Every time you said horizontal, did you mean vertical?

25           MR. CIRELLI:  I did, Your Honor, although Mr. --

1    Dr. Brown was getting what I was saying and --

2              THE COURT:  That was what confused me.  I understand

3    now exactly what you were saying.

4              MR. CIRELLI:  Vertical line.

5              THE COURT:  All right.

6              MR. CIRELLI:  Dr. Brown, it has been a long day.

7              THE COURT:  And you -- you were translating -- I

8    think you were both using horizontal in the same way.

9         You understood what Mr. Cirelli meant when he said

10   horizontal?

11             THE WITNESS:  Yes.

12             THE COURT:  All right.

13   Q.  BY MR. CIRELLI:  So if the vertical lines are crossed, in

14   essence, that is an indicia of equilibrium?

15   A.  If they cross sufficiently.  It has to be more than just

16   cross.

17   Q.  And then if we were to look to page 10, and here we see the

18   psychologist hourly earnings for, again, the period 2015 to

19   2020, and again looking at 2017 through 2020, here we are

20   looking at a 95 percent confidence interval, correct?

21   A.  Yes.

22   Q.  And here, if we look at the vertical lines for -- for wages

23   in 2017, it goes a little short of 60.  And if we look at the

24   vertical line for wages in 2020, it is right at 60.  So those

25   two do not cross, at least on this chart, correct?

1    A.  That is correct.

2    Q.  And by their not crossing, it would show for psychologists,

3    in this period going up to 2020, that there was, in fact, a

4    labor shortage rather than equilibrium, because the -- it would

5    appear that the wages are going up, correct?

6    A.  No.

7    Q.  It -- it doesn't show that the wages --

8    A.  It doesn't indicate -- it does not indicate it -- sorry.

9    Go ahead and talk.

10   Q.  I'm just saying it doesn't indicate that with the line

11   going in an upward trajectory, that means that the wages are

12   going in an upward trajectory?

13   A.  The wages are flat from 2018 to 2020.  So they're not

14   moving.  So they're in equilibrium at that point.  They did go

15   up between 2017 and 2018.  The line sufficiently crossed the --

16   we could say that there was a shortage between, say, 2015 and

17   2018, but then it -- it became equilibrated from 2018 to 2020.

18   Q.  But going from 2017 to 2020, it would show that, in fact,

19   the wages are going up during that period of time; there is no

20   crossover, correct?

21   A.  They went up between those two periods of time, but they

22   were flat between 2018 and 2020.

23   Q.  And if wages -- as I understand it from your testimony, if

24   wages are increasing, that is indicia of a shortage, because if

25   there is a shortage, people will pay more money?

 1   A.  People are paying more money.  That's why -- that's why you

 2   see the wages going up.  This graph shows that there was a

 3   shortage before 2018, and then it equilibrated.

 4   Q.  And, Doctor, you have not looked at and have no opinion

 5   with respect to whether there is a national shortage currently

 6   with respect to these various categories of mental health

 7   providers, correct?

 8              MS. HATTON:  Objection.  Compound.

 9              THE COURT:  Overruled.  You can answer generally, and

10   then you can break it down.

11              THE WITNESS:  So is your question have I -- do I have

12   an opinion on whether there is a national economic shortage?

13   Q.  BY MR. CIRELLI:  For these categories of mental health

14   providers, yes.

15   A.  I don't have an opinion.  I haven't looked at it.

16   Q.  Thank you, Doctor.

17       And so your analysis with respect to whether or not there

18   is an economic shortage with respect to any of these five

19   categories of mental health providers solely looked at the

20   movement in wages; is that fair, Doctor?

21   A.  I didn't look at two of the categories, medical assistant

22   and recreational therapists.  I looked at the clinical

23   categories.

24   Q.  Correct.

25       So with that correction, with respect to psychiatrist,

1    psychologists, and clinical social workers, what you looked at

2    was solely the movement of wages in reaching your determination

3    as to whether or not there is a labor shortage in those

4    categories of workers, correct?

5    A.   That's right.

6    Q.   You did not look at whether or not there is a demand that

7    exceeds the supply in that respect, right?

8    A.   Well, the wage is the -- represents the data point where

9    the wages intersect.  It represents the intersection of demand

10   and supply at a given time.

11   Q.   But you didn't specifically look at what is the demand for

12   psychiatrists, psychologists, and social workers compared to

13   supply in determining whether or not there was a labor

14   shortage?

15   A.   No.  That would require a very complicated econometric

16   model, multiple equations.

17   Q.   And that is part of the definition as to whether or not

18   there is, in fact, a labor shortage, correct, whether the

19   demand exceeds the supply?

20   A.   When the demand exceeded the supply, that's indicated by a

21   rising wage.

22   Q.   But it is true that the definition of an economic labor

23   shortage is an instance where the demand exceeds the supply,

24   correct?

25   A.   Yes, that's what caused the wages to go up.

1    Q.  And you did not look at what the demand and supply was for

2    psychiatrists, psychologists, and clinical social workers in

3    your work here; I think you just told us that, correct, Doctor?

4    A.  I looked at the intersection of demand and supply.  That's

5    what I looked at.  That's what those data points represent.

6    Q.  You looked at the wages.

7    A.  Right.  That's the intersection of demand and supply in the

8    labor market.  In order to separate the supply side and the

9    demand side, it would require, again, a very, very complicated

10   econometric model.

11   Q.  Correct.  Which you didn't do?

12   A.  Nobody has done it here, yes.

13   Q.  And so your other opinion is with respect to increasing

14   salaries and -- as a way to meet staffing levels.

15   A.  Right.

16   Q.  And what your opinion is in that regard is that for

17   physicians, the economic literature suggests that to attract

18   mental health providers to new positions, the increase in real

19   wages needed is on the order of 57.1 percent to 285.7 percent.

20   A.  If you have to make a change in the vacancy rate -- the

21   fill rate from 70 percent to 90 percent, yes.

22   Q.  And in the literature that you're referring to or looking

23   at, it's only with respect to physicians, correct?

24   A.  Yes.

25   Q.  So in this analysis, the only physicians that are at issue

1    in this case are psychiatrists, correct?

2    A.   Yes.

3    Q.   So this analysis only applies to psychiatrists, correct?

4    A.   What analysis only applies to psychiatrists?

5    Q.   The analysis that you did to determine what the wage

6    increase would be that would be needed in order to increase the

7    hires, the staffing, if you're assuming that your current

8    levels are 70 percent and you want to get to 90 percent, which

9    is what I understand you did the math on.

10   A.   Right.  No.  It would apply to any occupation.

11   Q.   But with respect to the wage elasticity, the data that you

12   had only related to physicians generally, correct?

13   A.   That's where the data came from, yes.

14   Q.   And we'll talk about that in a second.

15        But, in essence, at the end of the day, what this is is

16   doing math, once you have the equation, based on certain

17   assumptions?

18   A.   Yes.

19   Q.   And if we were to look at Table 3 in your report --

20        Which I believe is Bates page 39, Ms. Pooni.

21        -- this is the table where you did the calculations to

22   determine what the percentage increase in wages would need to

23   be in order to fill to 90 percent, assuming you start at 70

24   percent --

25   A.   Yes.

```
 1   Q.  -- correct, Doctor.
 2        And one of the keys here is the first column, the supply
 3   responsiveness to changes in real wages --
 4   A.  Yes.
 5   Q.  -- correct, Doctor?
 6        And that is -- another way to phrase that is wage
 7   elasticity?  We've heard that term as well.
 8   A.  The wage elasticity, yes.
 9   Q.  And I think you told us that what that measures is how
10   sensitive people are to wages when they're going to move; is
11   that accurate?
12   A.  Yes.  In this particular case, that's the specific
13   elasticity we're looking at.
14   Q.  And where you obtained the wage elasticity was from
15   literature that is listed on Bates page 38, Table 2, correct?
16   A.  It also comes from the previous pages in the discussion of
17   the studies where they looked at physician movement and
18   incentive programs to get physicians to move.  You get the same
19   range.
20   Q.  And the three studies that we're looking at here, two of
21   them are for physicians, correct?
22   A.  Yes.
23   Q.  Not specific to psychiatrists, correct?
24   A.  I don't remember, but I -- I don't remember that they were
25   specific to psychiatrists.  I believe they were not specific to
```

1    psychiatrists.

2    Q.   That's, I believe, what you testified to before.

3    A.   Yeah.

4    Q.   And one of them, the Schroeder article from 2018, it was

5    not specific even to physicians; it was just specific to

6    people?

7    A.   That was a mistake.  It should have been Baltagi.  The --

8    Baltagi is the first reference in that particular paper.  And

9    the Baltagi reference looks at physicians in Norway, but it did

10   come out with the elasticity of .3.

11   Q.   Okay.

12   A.   That was my error.

13   Q.   And this piece of literature, the Schroeder 2016 literature

14   that you put into your chart in error, it not only did not

15   relate to physicians, but rather just occupations generally; it

16   also only studied men between the ages of 25 and 55, correct?

17   A.   Yeah.  We shouldn't be looking at that piece of literature.

18   Q.   And with respect to the data dates that this literature

19   looked at, two of pieces of literature, Marvasti and Schroeder,

20   their data is pre-2000 -- it's pre-turn of the century,

21   correct?

22   A.   That data is, but there are other articles that are very,

23   very recent.

24   Q.   And the data in Chen is from 2008 to 2013, relatively, in

25   the world of economics, old, fair?  Ten years old.

1  A.  Yeah.  There -- the -- they were published a while back,

2  yeah.

3  Q.  So how that factors in -- we can take a look at the -- the

4  calculations, but before we do that, I want to kind of put this

5  into perspective.

6      Are you aware of -- and looking at psychiatrists, are you

7  aware of what the current salary range is for psychiatrists at

8  CDCR?

9  A.  It's higher than the -- than the market that I showed.

10  Q.  So if we could turn to Exhibit 12.  Plaintiffs' Exhibit 12.

11      And you should have behind you, Doctor -- there should be

12  binders with exhibits in them, and they should be labeled on

13  the side.  And we want to look at Plaintiffs' Exhibit 12.

14  A.  Okay.

15  Q.  And if you go to page 11, you were talking about how CDCR

16  should put out ads, advertising for mental health

17  professionals.  Correct, Doctor?

18  A.  Which page of what document are we talking about?

19  Q.  We're talking about Exhibit 12.  Plaintiffs' Exhibit 12.

20  And there is a Bates page in the bottom right-hand corner,

21  although this document is photocopied sideways, so you have to

22  turn it sideways and look at the right-hand corner.

23  A.  I actually don't understand what you mean when you say

24  Bates page.

25  Q.  There is, in the very bottom -- are you looking at

1    Plaintiffs' Exhibit 12?

2    A.  I believe I am.

3    Q.  Is the first thing in that exhibit an e-mail dated March 6,

4    2023?

5    A.  No.

6    Q.  Then you may be looking at Defendants' Exhibit 12.

7              THE COURT:  I'm looking at Plaintiffs' 12, identified

8    as Nunez declaration.

9              MR. CIRELLI:  This is the one, Your Honor, that I

10   believe was amended, and the declaration was removed, and the

11   parties agreed to Plaintiffs' Exhibit 12 only being one of the

12   exhibits to the declaration.

13             THE WITNESS:  You were right.  I was looking at the

14   wrong one.

15             MR. CIRELLI:  That's okay, Doctor.  I can't get

16   vertical and horizontal straight, so it's okay if you're not

17   finding the right binder at this hour.

18             THE WITNESS:  Okay.  I think I have the correct

19   document.

20   Q.  BY MR. CIRELLI:  And so if we go -- when I say Bates page,

21   if you look at the very first page, you'll see down in the

22   lower right-hand corner, it says PL-012-- that is the exhibit

23   number -- and then dot 001 -- that is page 1.

24   A.  Correct.  Thank you.

25   Q.  So I'd want you to flip, looking at those page numbers at

1    the bottom, to page 11, which is an ad for psychiatrists.

2    A.    Okay.

3    Q.    And I will tell you, Doctor, that the testimony has been

4    that this ad and this salary level was before the recent

5    collective bargaining agreement and the agreement to increase

6    salaries for various of the mental health providers at CDCR,

7    including psychiatrists.  So this is the salary level at the

8    beginning of the year, 2023 --

9    A.    Okay.

10   Q.    -- okay, Doctor.

11        So to put your percentages into perspective, I mean, if we

12   applied the 285.7 percent increase to the low end of this

13   salary range, to the $285,948 per year, that would get us, just

14   doing the math, to an annual salary of $1,000,103 -- thousand

15   dollars -- let me start over again -- $1,103,759.  Does that

16   sound about right?

17   A.    Why would -- that would never be done, because my

18   understanding is that the psychiatrists are pretty close to 90

19   percent, so the -- 28 -- whatever the number is would not be

20   appropriate.

21   Q.    Yeah.  I'm just trying to put in perspective what these

22   numbers translate to.  Since your opinion is -- I don't want

23   to --

24   A.    My wife has a friend who is a psychiatrist for Kaiser,

25   about to leave to get a job that pays $1,200 an hour.

1    Q.   Right.  But I just wanted to put your opinion, Doctor, into

2    perspective.  And that opinion being that for physicians, which

3    would include psychiatrists, the economic literature suggests

4    that to attract mental health providers to new positions, the

5    increase in real wages needed is on the order of 57.1 to 285.7

6    percent, so I was just showing an illustration of what the

7    actual numbers would translate to.

8         Now, I understand --

9    A.   But that's wrong, because it doesn't apply to a 20 percent

10   fill rate.  So that's a totally inappropriate application of

11   my -- my work.

12   Q.   I'm just reading your opinion, Doctor.  But I recognize

13   that, and I was going to go to that.

14        So do you know what the fill rate was for psychiatrists in

15   July of 2023?

16   A.   I don't have it handy.

17   Q.   If we take a look -- you just said something that is

18   important, Doctor.  If, in fact, the fill rate, the percentage

19   of filled positions, is at 90 percent or higher, then based on

20   the theory you're applying and the math that we're applying,

21   you would not need to raise wages at all in order to attract

22   more psychiatrists or psychologists or social workers,

23   whichever category it is, if they're above the 90 percent fill

24   rate?

25   A.   No.  No.  I'm assuming that the required fill rate would be

1    90 percent.  That's the target you're trying to hit.

2    Q.  Correct.  And if you hit that target, you don't need to,

3    under the math -- just using the formula and the methodology

4    that you set out in your paper, you would not need to raise

5    wages at all to -- to hire more people, correct?

6    A.  You wouldn't need to hire more people.

7        If you wanted to go past that point, then you put those

8    numbers in.  Say you wanted to move from 90 percent to 91

9    percent, then you'd have the 1 percent difference, and you'd

10   apply that.  So you definitely could go above 90 percent, but

11   you'd have to put in the difference between where you are and

12   where you want to go.

13   Q.  Fair enough.  So let's look at what that 1 percent does in

14   this context.

15       So if you look at the joint list of stipulated facts, which

16   I don't believe is in a binder -- I think everybody in the room

17   has a copy because we've been going through it, but let me --

18            MR. CIRELLI:  Your Honor, may I approach?

19            THE COURT:  You may.

20   Q.  BY MR. CIRELLI:  If you go to paragraph 17, which is on

21   page 6, do you see there, Doctor, what the fill rate is for

22   psychiatrists in 17-A?

23   A.  Yes.  It says 89 percent.

24   Q.  So if we wanted to use your model -- or the model that is

25   set out in your paper and use, you know, the highest wage

1    elasticity of .1, we could do a calculation to determine how

2    much wages would need to be raised in order to get to a fill

3    rate of 90, correct, Doctor?

4    A.  Yes.

5    Q.  And what we would do -- and I think your formula is set out

6    at the -- the bottom of -- the bottom of page -- Bates page 38

7    of your report, Exhibit 25.  It's actually page 37 of the

8    report itself.  The formula is set out there, correct, Doctor?

9    A.  Yes.

10    Q.  So what we would do is we would take our goal fill rate of

11    90, minus what it currently is, 89 -- that's 1 -- and divide it

12    by the current fill rate of 89 to come up with what percentage

13    increase you need to get to 90, correct?

14    A.  You would plug in all the appropriate numbers and find out

15    what the percentage is.

16    Q.  If we do that math, 1 divided by 89, what we get is 1.12

17    percent.  Does that sound right?

18    A.  I'd have to do the calculation to see.

19    Q.  Sure.  If you want to test me, I believe I have a fancy

20    solar powered calculator here.

21            MR. CIRELLI:  May I approach, Your Honor?

22            THE COURT:  You may.

23            THE WITNESS:  You know, I have this in a spreadsheet

24    in my computer.  That would be easier to do.

25    Q.  BY MR. CIRELLI:  I don't see your computer here, though,

1  Doctor.

2  A.  It's right over there.

3  Q.  Well, this is simple math.  I can -- we can do it with that

4  calculator.

5  A.  The reason I use spreadsheets is to avoid making mistakes.

6  Q.  So if you've got a fill rate of 89 percent and you want to

7  get to 90 percent, we're calculating what percentage wage

8  increase the methodology that you set out in your report would

9  arrive at, correct?

10  A.  So --

11  Q.  So you do 90 minus 89, which is 1 -- you're just going up 1

12  percentage, correct?

13  A.  Yes.

14  Q.  Divided by where you are right now, 89, and that gets you

15  to 1.12 percent.

16  A.  So it would be .112 percent.

17  Q.  Which translates to 1.12 percent, right?

18  A.  No.  The fill rate is actually -- is actual percentage.

19  All these numbers are percentage.  So if you were going to do

20  it as a decimal, it's --

21  Q.  I understand.  You're doing --

22  A.  -- .001, and you divide that by that, yeah.

23  Q.  And then if you take that and divide it by the .1

24  elasticity amount, you get 11.2 percent increase?

25  A.  You get .112 percent.

 1    Q.  Okay.

 2            THE COURT:  I think this can be continued after our

 3    break.  15-minute break.  We'll be back.

 4            THE WITNESS:  If I can put it in my spreadsheet, then

 5    I'll get the right answer.

 6            THE COURT:  Be back there in 15 minutes.

 7            MR. CIRELLI:  Thank you, Your Honor.

 8        (Recess taken, 3:20 p.m. - 3:36 p.m.)

 9            THE COURT:  You may be seated.

10        You may continue.

11            MR. CIRELLI:  Thank you, Your Honor.

12    Q.  BY MR. CIRELLI:  So, Doctor, when we took a break, we were

13    trying to do the calculation of what the percentage increase in

14    salary would need to be based on the model that is in your

15    report if you wanted to go from an 89 percent fill rate to a 90

16    percent fill rate.

17    A.  That's right.

18    Q.  And I'm looking at the bottom -- and maybe I have this

19    wrong -- of page 37 of your report, Bates page 38, which gives

20    an example as to how you do the math.  And what it tells us is

21    the first thing you do is you determine the -- what percentage

22    increase is required to go from 70 to 90 percent.  And to come

23    to that percentage, you take 90 minus 70 -- where you want to

24    be minus where you are -- divided by where you are, 70.

25            So if we were to do that here, 90 minus 89 -- where you

 1    want to be and where you are -- which is 1, divided by where

 2    you are, 89, you get 1.12 percent, correct?

 3    A.  I did the calculation on my spreadsheet, and 11.2 percent

 4    is correct.

 5    Q.  The 11.2 percent is correct with respect to if you have a

 6    .1 wage elasticity?

 7    A.  That's right.

 8    Q.  Okay.  And if you have a .5 wage elasticity, then it would

 9    be 2.24 percent?

10    A.  I don't know if that's correct, but I'll take your word for

11    it.

12    Q.  I left you the calculator if you want to test me.  Take

13    1.12 divided by --

14    A.  I think that's fine.

15    Q.  So that is based on your model; if you wanted to go from an

16    89 fill rate -- which is, in actuality, what it was in July of

17    2023 -- to a 90 percent fill rate, you would increase salaries

18    somewhere between 2.24 and 11.2 percent, fair, Doctor?

19    A.  Fair.

20    Q.  And based on the recent collective bargaining agreement, do

21    you know what percentage wage increase psychiatrists have

22    received, whether it's in that range or not?

23    A.  Now, this is real wages.  I don't remember the specific

24    number from the union agreement, no.

25    Q.  And if you're doing this type of analysis as to what

1    percentage increase you need in order to raise a fill rate,

2    you've got to look at what the actual fill rate is at any given

3    time, correct?

4    A.  Yes.

5    Q.  And as you indicated, if it's at 90 percent, then obviously

6    you don't have to give any raises to get to 90 percent,

7    correct?

8    A.  Right.

9    Q.  And you're aware, are you not, Doctor, that throughout the

10   period from January of 2018 to December of 2022, that five-year

11   period of time, that with respect to all four categories that

12   we've been talking about -- putting aside the medical

13   assistants, let's just focus on the three categories that

14   you've been talking about: psychiatrists, psychologists, and

15   clinical social workers.  During that five-year period, for

16   every single one of them, there was a period of time when they

17   had a fill rate of 90 percent or above, correct?

18   A.  I -- I don't remember, but -- I don't have a dispute with

19   that.

20   Q.  If you wanted, I can show you Dr. Greulich's report where

21   she's done some graphs that show that period of time.

22        Would you agree with me, though, that that is --

23   A.  I've seen those graphs.

24   Q.  Okay.  So during those periods, you wouldn't need to raise

25   salaries at all in order to -- to hire people based on the

1   model, correct?

2   A.  You wouldn't need to raise wages at all because you

3   wouldn't need to hire anybody.

4   Q.  And, Doctor, if you -- if CDCR was to offer telehealth as

5   an option, that could decrease the wages needed to fill

6   positions, correct?

7   A.  It depends on the nature of the program.

8   Q.  Okay.  But under -- under some circumstances, if you offer

9   telehealth to employees, that could decrease the wages that are

10  needed in order to fill positions, correct?

11          MS. HATTON:  Objection.  Speculation.

12          THE COURT:  Sustained.

13  Q.  BY MR. CIRELLI:  Doctor, during your deposition, you gave

14  me an answer to that question, correct?

15  A.  I don't recall.

16  Q.  And you weren't speculating during your deposition,

17  correct?

18  A.  I would have to see what I said and what your question was.

19  Q.  Sure.  To refresh your memory, Doctor -- you've got the

20  deposition in front of you -- could you take a look at page --

21  sorry -- you've got a lot of things in front of you.

22  A.  That's fine.  That's fine.

23  Q.  Page 128, line 3 through line 22.

24  A.  Okay.  So I -- I see the section.

25  Q.  And do you recall telling me that telehealth would be a

 1  nice way to make it cheaper for the prison system to make your

 2  work environment really nice?

 3  A.  I did say that.

 4  Q.  And before you said that -- in answer to my question, did

 5  you tell me that -- that there would be some substitution for

 6  wages, that is, the tradeoff is about -- so the more horrible

 7  the environment, the more you've got to pay; you make the

 8  environment better, you don't have to pay as much.

 9      Correct?

10  A.  Right.  So the issue with telehealth would be whether

11  someone needs to move or not.

12  Q.  But it would also be the environment that they would be

13  working in, correct?

14  A.  Part of it would be that, too.

15  Q.  The working from your own home would be, in most instances,

16  a nicer environment than working at a prison, fair?

17  A.  For some people.

18  Q.  And you have no opinion, Doctor, as to how large an

19  increase in pay is needed at any point in time, correct?

20  A.  For what?

21  Q.  To increase staffing.

22  A.  No.  I don't think anyone could tell you that.

23          MR. CIRELLI:  I have no further questions, Doctor.

24  Thank you.

25          THE COURT:  All right.  Any redirect?

1          MS. HATTON:  Yes, Your Honor.  Very quickly.

2                    REDIRECT EXAMINATION

3     BY MS. HATTON:

4     Q.  Dr. Brown, I have just a couple of questions in response to

5     Mr. Cirelli's questioning, so they're going to feel a little

6     bit haphazard in the way that they're presented.

7          My first one is you said that you used BLS data in your

8     graphs analyzing whether or not there is an economic labor

9     shortage, correct?

10    A.  That's correct.

11    Q.  What does the BLS say about using its post-2020 data for

12    year-over-year comparisons?

13    A.  It says you are not supposed to compare year-over-year

14    comparisons --

15    Q.  When --

16    A.  -- because it's not designed to do that.  You can go over

17    three years.

18    Q.  Is using wage trends to determine the existence of a

19    labor -- an economic labor shortage a generally accepted

20    methodology in economics?

21    A.  Yes.

22    Q.  We talked about the literature review that Dr. Greulich

23    did.  How did you characterize her literature review?

24    A.  It was a review of the needs-based literature, the health

25    policy side of this whole issue.  It did not look at the

1  economic literature on this issue.

2  Q.  What can Dr. Greulich's literature review tell us about the

3  existence of an economic labor shortage?

4  A.  It doesn't say anything about it.

5  Q.  Mr. Cirelli gave you an example of a month in which CDCR

6  had achieved a fill rate of 90 percent and asked how much wages

7  would have to raise.

8      My question is is one month of data on fill rates at 90

9  percent enough for CDCR to say our job here is done, we don't

10 need to look at our wages?

11 A.  Um, I wouldn't do it that way.  I'd want to see it

12 sustained over a period of time.

13 Q.  Why would you want that?

14 A.  If that's what my -- what -- whatever -- whomever

15 organizations require me to hit, I would go with whatever

16 requirements they had.  If it was 90 percent for one month,

17 that's fine.  But if it was 90 percent over a sustained period

18 of time, then I would have to use that.  So it's an externally

19 provided benchmark -- or goal, rather, and that's what will

20 determine how I would go about that.

21 Q.  I want to pull up your report again.  It's Plaintiffs'

22 Exhibit 25.  And, Dr. Brown, if you have it in front of you,

23 I'm looking at page 2 of the report itself.  Let me know when

24 you're there.

25 A.  I'm there.

1   Q.   Okay.  I'm going to read the first full sentence on the

2   page.  It starts at the top in the middle with the words Supply

3   conditions:

4        Supply conditions are very different for each of these

5   three professions -- clinical professions.  In the first

6   quarter of 2023 in California, there were approximately 15,780

7   mental health and substance abuse social workers, 8,780

8   clinical and counseling psychologists, but only 5,630

9   psychiatrists.  In other words, all things equal, this means

10  that psychologists and social workers are likely to have higher

11  supply responsiveness to changes in real wages, and thus are

12  more likely than psychiatrists to increase the level of mental

13  health services supplied to employers due to a given percentage

14  increase in real wage offers.

15       There is also a section below in the third paragraph, seven

16  lines down on the right-hand side.  It starts with, For other

17  mental health workers:

18       For other mental health workers, such as psychologists and

19  licensed clinical social workers, filling positions at 90

20  percent rates should be relatively easier than filling

21  psychiatrist positions, due to the likely relatively higher

22  supply responsiveness to changes in real wages in these groups.

23       My question is this:  You described wages as the

24  intersection of supply and demand, right?

25  A.   Yes.

1    Q.  So when you're citing these figures, the supply conditions

2    for mental health and substance abuse social workers,

3    psychologists, psychiatrists, is that telling us anything about

4    supply?

5    A.  It's telling you how many there are, yes.

6    Q.  Does it tell us anything about whether or not there is an

7    adequate supply?

8    A.  By itself, no.

9    Q.  Why is it relevant that the supply of social workers and

10   psychologists is higher than psychiatrists?

11   A.  Psychologists and social workers are akin to nurse -- nurse

12   practitioners are to physicians or physician assistants are to

13   physicians or, you know, hygienists are to dentists.  They can

14   do part of what the higher level can do.  So the reason they

15   exist is to take -- take the -- some of the burden off of the

16   more expensive provider.

17       Ask your question again.

18   Q.  Sure.  Yes.

19       So you note in your report that the supply conditions are

20   very different for those professions, that in the first quarter

21   of 2023, there were 15,780 mental health and substance abuse

22   social workers, 8,780 clinical and counseling psychologists,

23   but only 5,630 psychiatrists.

24       Why did you feel, in the context of this case, that it was

25   relevant to note that the supply of social workers and

1    psychologists is higher than psychiatrists?

2    A.   To the extent that they can substitute for psychiatrists --

3    and they can substitute for a lot of what psychiatrists do,

4    they can't prescribe drugs -- then you just don't need as many

5    psychiatrists.

6    Q.   One last thing that I want to talk about.

7        On page 35 of your report, you're talking about how you

8    came to arrive at some of the values that you put into your

9    equation.  And I'm looking at under heading five, the third

10   paragraph.  And near the middle of that paragraph, you say:

11       While there is little to no vigorous literature measuring

12   the responsiveness of these groups -- and earlier you defined

13   them as psychiatrists, licensed clinical social workers,

14   recreational therapists, and medical assistants -- so there is

15   little to no vigorous literature measuring the responsiveness

16   of these specific groups to real wage changes, they have

17   relatively fewer opportunities to earn high real wages compared

18   to physicians and thus can be more easily incentivize by

19   competitive real wages and benefits.

20       I have a few questions on this.

21       One, the lack of literature on some of these groups, in

22   particular medical assistants and recreational therapists,

23   that's something that you and Dr. Greulich agree on, right?

24   A.   If she said there is not literature on that, then I agree,

25   yes.

1  Q.  So if there is not literature on some of these other

2  positions other than psychiatrists, how does your -- how is

3  your equation applicable beyond psychiatry?

4  A.  Well, you -- the only -- the only number at issue here is

5  the elasticity estimate.  So if you -- I would choose the

6  highest level on that chart and start there and see what

7  happens.

8      I mean, you don't -- I -- I would -- I would think this

9  is -- this is a professional judgment, that you would -- they

10  would not be as -- they don't have as many opportunities, so it

11  should be higher.

12  Q.  And you note underneath Table 3 on page 38 of your report

13  -- and it's literally the note under the table, the last

14  sentence of it that's italicized says:  Thus this approach can

15  be used for any mental health clinician.

16      Can you just explain to us why that is?

17  A.  Because elasticity applies universally to occupations, so,

18  therefore, it also applies to mental health occupations, any

19  occupation.  The issue here would be what elasticity we start

20  with.

21          MS. HATTON:  Okay.  That's all I have.

22          THE COURT:  Great.

23      Anything further, Mr. Cirelli?

24          MR. CIRELLI:  Briefly, Your Honor.

25          THE COURT:  Does Ms. Hatton have one final question?

1          MS. HATTON:  Can I have a moment, Your Honor?

2          THE COURT:  You may.

3      (Pause in proceedings.)

4          MS. HATTON:  My apologies, Your Honor.  I have just a

5   couple more questions.

6          THE COURT:  All right.

7          MR. CIRELLI:  Can I sit or just stand?

8          THE COURT:  Might as well take a seat.  We have nine

9   minutes left today.

10  Q.  BY MS. HATTON:  So, Dr. Brown, I want to go back to page 2

11  of your report, where we're talking about the clinical

12  professions, so the approximately 15,780 mental health and

13  substance abuse social workers, the 8,780 clinical and

14  counseling psychologists, and the 5,630 psychiatrists.  And,

15  again, you say:

16      All things equal, this means that psychologists and social

17  workers are likely to have higher supply responsiveness to

18  changes in real wages and are thus more likely than

19  psychiatrists to increase the level of mental health services

20  supplied to employers due to a given percentage increase in

21  real wage offers.

22      So if you could just explain to the non-economists in the

23  room why is it that licensed clinical social workers and

24  psychologists are more responsive to wage changes?

25          MR. CIRELLI:  I think this has been asked and

1    answered, Your Honor.

2            THE COURT:  Overruled.  If you want to say you've

3    answered it, you may.

4            THE WITNESS:  Ask the question again.

5            MS. HATTON:  Sure.  Yeah.

6    Q.  BY MS. HATTON:  Why is it -- and I'm just trying to get

7    clarification here.  Why is it that clinical social workers and

8    psychologists are more responsive to wage changes?

9    A.  I think let's go with the asked and answered.

10           THE COURT:  Objection sustained.

11           MR. CIRELLI:  It's the first time I've had an

12   opposing expert sustain one of my objections, Your Honor.  I'm

13   putting that in my memoir.

14           MS. HATTON:  Nonetheless, I'm still going to go on.

15   Q.  BY MS. HATTON:  Given the fact that you say that social

16   workers and psychologists are more responsive to wages -- wage

17   increases and given the supply that you note exists in

18   California -- the over 15,000 social workers and the 8,000

19   psychologists -- 8,780 psychologists -- what does that mean in

20   terms of CDCR's chances at filling its vacancies?

21   A.  It means that they would only need a small proportion of

22   each of those groups to fill their vacancies.

23   Q.  And are there reasonable measures available to them to do

24   that?

25   A.  Yes.

1   Q.  Have you seen them try to do that in the data that you

2   looked at?

3   A.  I'm not aware that they have.

4          MS. HATTON:  That's it.  Thank you.

5          THE COURT:  All right.  Mr. Cirelli.

6                      RECROSS EXAMINATION

7   BY MR. CIRELLI:

8   Q.  Doctor, you do not know if they have or they haven't

9   actually done that, correct?

10  A.  Whether they have made the sharp increases in wages, I

11  don't see it in the data.

12  Q.  But they could undertake, as you said earlier, other

13  efforts to try to entice people with things like telework,

14  potentially, or other types of benefits, correct?

15  A.  Sure.

16  Q.  And when Ms. Hatton just asked you about the fact that

17  there is no literature that -- that addresses the wage

18  elasticity for, I think she said, psychologists and social

19  workers -- she may have said recreational therapists -- there

20  is also no literature specifically with respect to

21  psychiatrists, correct?

22  A.  No.  The closest thing is physicians more generally.

23  Q.  So given that there is -- by there being no literature,

24  what that means is there is no studies out there with respect

25  to what the wage elasticity is with respect to all four of

1   these categories we're talking about -- I'll narrow it to the

2   three you addressed, which is psychiatrist, psychologist, and

3   clinical social workers, correct?

4   A.   There is literature for physicians.  I'm not aware of any

5   literature at all for psychologists.  I'm not aware of any

6   literature at all for clinical social workers.

7   Q.   And you said you started at the highest, which is .5

8   elasticity, correct?

9   A.   Right.

10  Q.   But since there are no studies, the elasticity could be

11  higher than five, it could be lower than five, we just don't

12  know because there is no analysis out there anywhere with

13  respect to what it is for these categories of mental health

14  providers, correct?

15  A.   That's why you use trial and error, yes.

16  Q.   Thank you, Doctor.

17  A.   To quickly determine which direction it was going as soon

18  as you started the process.

19  Q.   I understand.  You want to offer wages, negotiate with

20  people, and see how high you have to go?

21  A.   And if you overshot and everyone accepted, then you know

22  you can bring it down.

23  Q.   But you're stuck with those people that accepted?

24  A.   If you hire them, yes, but you wouldn't hire more than you

25  needed.

```
 1                    MR. CIRELLI:  Thank you, Doctor.

 2                    THE COURT:  Ms. Hatton?

 3                    MS. HATTON:  No further questions, Your Honor.

 4                    THE COURT:  Is Dr. Brown excused as a witness,

 5     Ms. Hatton?

 6                    MS. HATTON:  Yes.

 7                    THE COURT:  Mr. Cirelli?

 8                    MR. CIRELLI:  If he's going to continue to sustain my

 9     objections, I may want him to stay, Your Honor.

10                    THE COURT:  All right.

11                    MR. CIRELLI:  Yes, he's excused.

12                    THE COURT:  See if you can work something out with

13     him.

14          Doctor, you are excused.  You may step down.

15          All right.  We'll start at 9:00 tomorrow morning.

16          I heard something along the lines of the parties think

17     we're ahead of schedule and might even conclude tomorrow.  Do I

18     have that right?  Recognizing that estimates can be off.

19                    MS. ELLS:  Yes, Your Honor.  We think that's a

20     reasonable estimate at this point.

21                    THE COURT:  All right.  But you'll be ready with

22     Dr. Bick first thing?

23                    MS. ELLS:  Yes.

24                    MR. MELLO:  Correct.

25                    MS. ELLS:  All of the witnesses are prepared to
```

1    attend tomorrow.

2            THE COURT:  All right.  And you're calling the one

3    additional witness the Court said it would allow.

4            MS. ELLS:  Yes, Your Honor, Angela Reinhold.

5            THE COURT:  All right.  I will see you tomorrow

6    morning at 9:00.

7            THE CLERK:  Court is in recess.

8               (Proceedings adjourned, 5:02 p.m.)

9                      ---oOo---

10   I certify that the foregoing is a correct transcript from the

11   record of proceedings in the above-entitled matter.

12

13                    /s/ Kimberly M. Bennett
                      KIMBERLY M. BENNETT
14                    CSR No. 8953, RPR, CRR, RMR

15

16

17

18

19

20

21

22

23

24

25