# EXHIBIT B

1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
2

3    Ralph Coleman, et al.,
              Plaintiffs,              Sacramento, California
4                                      No. 2:90-cv-00520
     vs.                               Thu., Oct. 05, 2023
5                                      9:09 a.m.
     Gavin Newsom, et al.,
6           Defendants.
     _____/
7
                         TRANSCRIPT OF HEARING
8        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
                            ---oOo---
9
     APPEARANCES:
10
       For the Plaintiffs:            Rosen, Bien, Galvan and
11                                    Grunfeld, LLP
                                      101 Mission Street
12                                    Sixth Floor
                                      San Francisco, CA  94105
13                                    By:  Lisa Adrienne Ells
                                      Jenny Snay Yelin
14                                    Alexander Ross Gourse
                                      Adrienne Pon Harrold
15                                    Attorneys at Law

16
       For the Defendants:           Hanson Bridgett, LLP
17                                   1676 N. California Blvd.,
                                     Suite 620
18                                   Walnut Creek, CA  94596
                                     By: Paul B. Mello
19                                   Laurel O'Conner,
                                     Attorneys at Law
20   (Appearances continued on following page)

21     Official Court Reporter:      Kimberly M. Bennett,
                                     CSR, RPR, RMR, CRR
22                                   501 I Street
                                     Sacramento, CA 95814
23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer-aided transcription

25

1
                              APPEARANCES CONTINUED
2
        For the Plaintiffs:           Prison Law Office
3                                     1917 Fifth Street
                                      Berkeley, CA  94710
4                                     By: Marissa Hatton
                                      Attorney at Law
5

6       For the Defendants:           Hanson Bridgett, LLP
                                      425 Market Street, 26th Floor
7                                     San Francisco, CA  94105
                                      By: Samantha Derin Wolff
8                                     Lawrence Michael Cirelli
                                      David C. Casarrubias
9                                     Attorneys at Law

10      For the Defendants:           Office of the Attorney
                                      General
11                                    1300 I Street, Suite 125
                                      Sacramento, CA  94244
12                                    By: Elise Owens Thorn
                                      Deputy Attorney General
13

14      For the Defendants:           Office of the Attorney
                                      General
15                                    455 Golden Gate Ave.
                                      Suite 11000
16                                    San Francisco, CA  94102
                                      By: Damon Grant McClain
17                                    Namrata Kotwani
                                      Deputies Attorney General
18

19

20

21

22

23

24

25

1                                 INDEX

2

   <u>WITNESSES:</u>                                      <u>PAGE:</u>
3
   ALEXANDRA DAVID
4  DIRECT EXAMINATION BY MR. GOURSE.....................5
   CROSS-EXAMINATION BY MR. CASARRUBIAS...............38
5  REDIRECT EXAMINATION BY MR. GOURSE.................49

6  KELLEY FRANCESCHI
   DIRECT EXAMINATION BY MS. HARROLD...................52
7  CROSS-EXAMINATION  BY MS. THORN.....................89

8  SHELLY MINOR
   DIRECT EXAMINATION BY MR. GOURSE....................94
9  CROSS-EXAMINATION BY MS. THORN.....................128
   REDIRECT EXAMINATION BY MR. GOURSE................132
10
   ANGELA REINHOLD
11 DIRECT EXAMINATION BY MS. HARROLD..................134
   CROSS-EXAMINATION BY MS. THORN.....................159
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to order of the court, 9:09 a.m.)

 2              THE CLERK:  Calling civil case 90-520, Coleman, et

 3   al. versus Newsom, et al.

 4         This is on for enforcement hearing, day four.

 5              THE COURT:  All right.  Good morning.

 6         All counsel are present.  Plaintiff is prepared to proceed

 7   with its next witness?

 8              MS. ELLS:  Yes, Your Honor.  We're calling

 9   Dr. Alexandra David.

10              MR. MELLO:  Your Honor, if I may, we have an

11   additional attorney at counsel table today, David Casarrubias.

12              THE COURT:  I noted that, yes.

13              MR. MELLO:  He will be handling one of the witnesses.

14   Thank you.

15              THE COURT:  All right.  Your appearance is noted,

16   Mr. Casarrubias.

17              MR. CASARRUBIAS:  Thank you, Your Honor.

18              THE COURT:  All right.  Plaintiff is retrieving

19   Dr. David?

20              MS. ELLS:  Technically, defendants are retrieving

21   her, I believe.  She's an employee of defendants.

22              MR. CASARRUBIAS:  It's a team effort, Your Honor.

23              THE CLERK:  Raise your right hand, please.

24         (The Witness, Alexandra David, is sworn.)

25              THE WITNESS:  I do.
```

```
 1              THE CLERK:  If you'll please sit, and then state your

 2   name and spell it for the record.

 3              THE WITNESS:  My name is Alexandra David,

 4   A-L-E-X-A-N-D-R-A.  Last name D-A-V-I-D.

 5              THE COURT:  All right.  You may proceed.

 6              MR. GOURSE:  Thank you, Your Honor.

 7              THE COURT:  The court reporter is clear on who you

 8   are?

 9              MR. GOURSE:  Yes.  I'm Alex Gourse for the

10   Plaintiffs.

11              THE COURT:  All right.  You may proceed.

12                           DIRECT EXAMINATION

13   BY MR. GOURSE:

14   Q.  Hi there, Dr. David.

15      Are you currently employed by CDCR, Dr. David?

16   A.  Yes.

17   Q.  And what is your current position?

18   A.  Chief of Mental Health.

19   Q.  And that's at the California Medical Facility?

20   A.  Yes.

21   Q.  How long have you been in that position?

22   A.  A little over two years -- two and a half years.

23   Q.  And what was your position before you became Chief of

24   Mental Health?

25   A.  I was a Chief Psychologist.
```

1    Q.  Was that also at CMF?

2    A.  Yes.

3    Q.  Was it in a particular program?

4    A.  Yes.  I was the Chief Psychologist for the L1 PIP and

5    Specialty Services.

6    Q.  What degrees do you hold?

7    A.  I hold a bachelor's of social work, a bachelor of arts in

8    sociology, a master's of science in criminal justice, a

9    master's in clinical psychology, and a doctorate in clinical

10   psychology.

11   Q.  You worked as a social worker before you went to graduate

12   school for psychology, correct?

13   A.  Yes, in Massachusetts.  And here in California, I was a

14   Deputy Director while I was a social worker, so I was never

15   licensed in the state of California.

16   Q.  And you're currently licensed as a clinical psychologist?

17   A.  Yes.

18   Q.  Can you describe your job duties as Chief of Mental Health?

19   A.  Sure.  Up until three months ago, I was over on solely the

20   outpatient and crisis bed specialty areas.

21       As of July 14, I also became over all of the PIPs, all of

22   our acute and ICF.  So I currently oversee all of the mental

23   health programming at CMF.  I do program development,

24   implementation; I oversee the development of our triage plan

25   secondary to our staffing, and I meet with staff and assist

1    team development.  Right now, with our supervisor shortage, I

2    am also doing some direct patient care and direct supervisory

3    duties as well.

4    Q.  And just to confirm, I believe you just stated this, but I

5    just want to make sure; you have been charged with overseeing

6    the non-PIP programs ever since you started as Chief -- as

7    Chief of Mental Health, correct?

8    A.  Yes.

9    Q.  Great.  Thank you.

10        Do you know the approximate vacancy rate, as of this week,

11    for line psychologist positions in the non-PIP programs at CMF?

12    A.  I do.  I just was looking at it the other day.

13        So as of this week, we are around a 70 percent vacancy rate

14    functionally with about a 30, 35 percent functional fill rate

15    for psychologists.

16    Q.  Can you explain what you mean by functional fill rate?

17    A.  So I am counting boots on the ground.  So anyone who is out

18    on long-term medical leave or long-term leave of any type, I

19    don't count in the functional fill rate.

20        Currently, we have two psychologists who are out on

21    long-term leave, so those two bodies are removed.  So even if

22    you included those, our fill rate would only be about 36

23    percent.

24    Q.  And that's the fill rate, not the vacancy rate?

25    A.  That is the fill rate.  Yes.

1  Q.  Do you know whether the vacancy reports that Defendants

2  file with the Court in these cases include those staff who are

3  on long-term leave?

4          MR. CASARRUBIAS:  Objection.  Lacks foundation.

5          THE COURT:  Yes or no.  Overruled.

6      Yes or no to begin with, and then wait for the next

7  question.

8          THE WITNESS:  No.

9  Q.  BY MR. GOURSE:  Do you know how long the vacancy rate in

10  the non-PIP programs have been over 50 percent for line

11  psychologists?

12  A.  Yeah.  I believe I first reported in March 2022 that we had

13  hit 50 percent -- or less than 50 percent.

14  Q.  And it's stayed above 50 percent, the vacancy rate --

15  A.  Yes.

16  Q.  -- ever since then?

17  A.  It's gotten worse since then, yeah.

18  Q.  What's the current vacancy rate for clinical social worker

19  positions in the non-PIP programs?

20          MR. CASARRUBIAS:  Objection.  Lacks foundation.

21          THE COURT:  Lay a foundation.

22  Q.  BY MR. GOURSE:  Dr. David, do you know what the vacancy

23  rate is for -- for clinical social worker positions in the

24  non-PIP programs at CMF?

25  A.  Yes.

1    Q.  Can you tell us what it is?

2    A.  Yes.  So we're currently hovering at around approximately

3    -- without the numbers right in front of me, a 45 to 50ish

4    percent vacancy rate for clinical social workers.

5    Q.  And do you know how long the vacancy rate for clinical

6    social workers has been above, say, 30 percent?

7    A.  I believe it's been for about as long as it has for

8    psychologists.  I was looking at psychologists more in

9    outpatient.  Our staffing numbers, we don't have a large pool

10   of social workers, so I think there is only, like, 12 in the

11   service or 16, something like that.  So we're staffed mostly

12   with psychologists for position control.

13   Q.  Got it.  Thank you.

14       And just to clarify, you testified that the vacancy rate

15   for social worker positions has been above 30 percent since

16   approximately March 2022?

17   A.  Yeah.  I believe, if memory serves, that they also steadily

18   declined around the same time.

19   Q.  Are you involved in the hiring process for new mental

20   health staff at CMF?

21   A.  Yes, as far as our local procedures.

22   Q.  What are your responsibilities with regard to hiring mental

23   health staff?

24   A.  The field liaison analyst or regional HR will reach out to

25   me once they receive the list of candidates.  I work with my

1    team to set up the interview panels, set up dates, get that

2    information back to them.

3        We then interview the candidates, check the references, and

4    let the field liaison analyst or regional HR know which

5    candidates we'll be selecting or which we won't, at which point

6    the process is handed over to them for the remaining duties.

7    Q.  There was no field liaison at CMF for an extended period of

8    time over the last couple years, correct?

9            MR. CASARRUBIAS:  Objection.  Lacks foundation.

10   Q.  BY MR. GOURSE:  Was there a field liaison at CMF

11   consistently for the last two years?

12   A.  No.

13   Q.  And what effects did that have on the hiring process?

14   A.  It slowed down everything.  We were moved from field

15   liaison to field liaison every, seemed like, three or four

16   months.  So candidates got lost; wires got crossed; job

17   postings closed; cert lists weren't sent to the institution --

18   that's the list of candidates.  It was just very messy.

19   Q.  When you say candidates got lost, can you explain what you

20   mean by that?

21   A.  Sure.  We haven't interviewed very many people for line

22   staff positions over the last few years.  But with this -- for

23   example, there was a Senior Psychologist Specialist list, and

24   we kept asking -- it closed -- where's the list?  Where's the

25   list?  Where's the list?  By the time they got us the list of

1    candidates, it was right near the time it timed out, so a

2    couple of months old.  And when we reached out for interviews,

3    none of the candidates were interested anymore.

4    Q.  And who is the "they" who you kept reaching out to?

5    A.  The FLAs that we were assigned to and the regional person

6    that oversees them during the course of that time.

7    Q.  And you used the term cert lists, that's the list of

8    candidates who have applied for a position, right?

9    A.  Um-hum.

10    Q.  And who compiles that -- those cert lists?

11    A.  I believe that's the FLAs.

12    Q.  The FLAs?

13    A.  Yeah.  Um-hum.

14    Q.  And then they send the cert list to you?

15    A.  They don't send me the list.  They send me an interview

16    request sheet, saying that they have a list, how many

17    candidates are on it, and when do I want to set up an

18    interview.  Unless I get that from them, we can't move forward.

19    Q.  And you -- I believe you stated that at certain points,

20    cert lists had timed out?

21    A.  Um-hum.

22    Q.  Can you explain what you mean by that?

23    A.  Yes.  For example, so I was on calls -- we do a critical

24    staffing call every week in response to a lot of these

25    slowdowns.  I think we've done it for the last year.  And we

 1  kept being told that there had been a Senior Psychiatrist

 2  Supervisor position that had closed.  And I kept asking for the

 3  cert list.  And they kept saying they would get it to me.  And

 4  we never got it.  And it had timed out.

 5      So there were candidates on that list.  We weren't able to

 6  interview them.  And we've had our Senior Psychiatrist

 7  Supervisor position in outpatient vacant for at least two

 8  years, maybe more.

 9  Q.  When you say it timed out, does that mean that the

10  candidates had moved on?

11  A.  We have time frames -- I don't know exactly what they are

12  because it's not my department -- that we need to meet in order

13  to interview and offer after the list is closed.  So when it

14  times out, we were no longer in compliance with those

15  timelines, and that candidate pool was not useful.

16  Q.  So you had to start the process over?

17  A.  Um-hum.

18  Q.  How many times has that happened over the last two years?

19  A.  It's hard to say, because the information that we would get

20  wasn't exactly transparent without an FLA.  It got -- we got

21  really conflicting information about candidate pools and what

22  was being flown.  And at times, vacant positions that we asked

23  to be flown weren't being flown at all.  So it's hard to say.

24  To my knowledge, at least a handful, we've lost over -- over

25  the time.

1    Q.  And you mentioned FLA; that's the field liaison, right?

2    A.  Yes.  Sorry.  Acronyms.  CDCR.

3    Q.  And what do the field liaisons do?

4             MR. CASARRUBIAS:  Objection.  Lacks foundation.

5    Q.  BY MR. GOURSE:  Do you know what the field liaisons do,

6    Doctor?

7    A.  Yes, I know what they do, and I've worked with them.

8    Q.  Can you tell us about what their role is?

9    A.  Sure.  So generally when we have them on-site, I would go

10   to them or e-mail her and let her know, hey, can you fly this

11   position?  We've got a resignation letter from this person.  We

12   need to fly the position.

13        They would fly the position.  They would let me know when

14   the position was closing.  They would then let me know when

15   they got the candidate list, which is generally about three

16   weeks after the position closes.

17        They would then work with me on setting up the interviews

18   in the candidate pool and who we were putting in the panel.

19   And then they would send me the hiring packets, everything

20   else.

21        At the end of interviews, we would return the packet

22   directly to their office, and they would go through the process

23   of reaching out to the candidates for the tentative offers.

24        They also did our monthly position control meetings, where

25   they go through every vacant position for all the units in

1    health care -- mental health is 220 -- and where they are in

2    the hiring process for those vacant positions, if there're cert

3    lists, etc., and e-mailed out that Excel spreadsheet to all of

4    the managers so we could better track it and keep track who was

5    out of class in our positions, who was limited term, who was

6    filling each position number, etc.

7    Q.  You mentioned that you have weekly conference calls about

8    staffing matters; is that right?

9    A.  Yes.  Our CEO and regional -- her boss, the regional MHA,

10   started them, I think, about 12 months ago.

11   Q.  And who else participates in these calls?

12   A.  Oh, so many people.  So, CHU, the Centralized Hiring Unit;

13   RHU, Regional Hiring Unit; contracts analysts; the Region 1 HR

14   supervisor, whoever oversees the FLAs; my CEO; we have some

15   regional headquarters representatives that call in; and then

16   the various different hiring authorities in my institution, so

17   myself, the CME, CNE -- the Chief Medical Executive, Chief

18   Nurse Executive, the Chief Support Executive -- the Chief

19   Psychiatrist, both PIP and outpatient.  And there is more

20   people on there who I don't recall.

21   Q.  And what's the purpose of these weekly meetings?

22            MR. CASARRUBIAS:  Objection.  Lacks foundation.

23            THE COURT:  Overruled.

24       You may answer if you're able.

25            THE WITNESS:  Okay.  Sorry.  Yes.  So the purpose of

 1   these meetings, as I understand it, is to give us real-time

 2   updates.

 3        Also, because so many things were getting lost, it gives me

 4   a chance to -- and everyone else who is on the call, with

 5   pending hires or vacancies that we believe have been posted or

 6   cert lists that we believe we should have gotten, contract

 7   updates -- to ask the people that are driving those different

 8   departments in real-time and make sure we get follow-up.

 9        So I keep a running list of everything that I'm reviewing,

10   everyone's day, in that meeting, and ask everyone's day.

11   Q.  BY MR. GOURSE:  So you regularly work with staff -- excuse

12   me.

13        So you regularly work with CDCR staff from outside of CMF

14   as part of your role in the hiring process, correct?

15   A.  Um, so my understanding is the FLAs aren't with -- they're

16   under Jasinda Muhammad's department, so I don't know if that's

17   with CDCR or someone else.  But, yes, I work with them.

18             THE COURT:  They're under what department?

19             THE WITNESS:  Jasinda Muhammad's, I believe.

20             THE COURT:  Okay.

21   Q.  BY MR. GOURSE:  Are there any other personnel from outside

22   of CMF who you regularly communicate with during the hiring

23   process?

24   A.  Well, there's the CHU people and the RHU people and the

25   contracts analysts.  So I don't know if they're with the HR

1   shop or if they're with the CDCR shop, but, yeah, we

2   communicate with all of them.

3   Q.  And you said that you select candidates who will receive

4   offers for positions at CMF, right?

5   A.  Um-hum.  Yes.  Sorry.

6   Q.  What's your role once a candidate receives an offer?

7   A.  So when we have made the candidate selection and let the

8   FLAs know who our selection is, they reach out to the candidate

9   to give them a tentative offer.  If the candidate accepts the

10  tentative offer, then they go into all the paperwork, the

11  fingerprinting, the credentialing.  At that point, they go on

12  my list for the Wednesday meeting, and I'm following up every

13  week, because onboarding, at that point, seemed to take a

14  while.

15  Q.  How long does that onboarding process usually take?

16  A.  For example, I have a Senior Psychiatry Social Worker who

17  received a tentative offer three months ago, and I still don't

18  have any updates on where she is in the process.

19  Q.  And you've asked for updates on this?

20  A.  I asked yesterday.

21  Q.  And just to clarify, who did you ask?

22  A.  I asked Michael Brunett.  He's the Region 1 supervisor for

23  the FLAs.

24  Q.  What was his response?

25              MR. CASARRUBIAS:  Objection.  Calls for hearsay.

```
 1              MR. GOURSE:  It's the statement of an opposing party
 2    that was made within the scope of that employee's job duties.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  He said he didn't know and he would
 5    look into it.
 6    Q.  BY MR. GOURSE:  And you haven't gotten any further response
 7    from him?
 8    A.  Checked my e-mail this morning.
 9    Q.  Do you know why this onboarding process takes so long?
10              THE COURT:  Just answer yes or no.
11              THE WITNESS:  Not really, no.
12    Q.  BY MR. GOURSE:  Thank you.
13         Do you conduct exit interviews with psychologists who leave
14    the non-PIP programs at CMF?
15    A.  I have, yes.
16    Q.  All of them?
17    A.  The majority of them.  My Chief Psychologist has done some
18    and submitted the paperwork to me, so I've read all of them.
19    Q.  And do you conduct exit interviews with social workers who
20    are leaving the non-PIP programs as well?
21    A.  Either myself or my chief will do it.
22    Q.  What have you learned during these exit interviews about
23    the reasons that clinical staff are leaving?
24              MR. CASARRUBIAS:  Objection.  Calls for hearsay.
25              MR. GOURSE:  Same rationale as the last one.  It's
```

1    the statement of an opposing party's employee that was made

2    while they were an employee, and that's on a matter that's

3    within the scope of their employment.

4            MR. CASARRUBIAS:  May I be heard?

5            THE COURT:  You may.

6            MR. CASARRUBIAS:  Your Honor, the employees are not

7    authorized to speak on behalf of the Defendants in this case.

8    And counsel hasn't offered any proof to show that they are

9    authorized to speak.  It's a title, not their job

10   responsibilities, where they work.

11           MR. GOURSE:  There is no requirement that the

12   statement be authorized.  That's a different hearsay exception.

13           THE COURT:  I'll allow the answer.  I'm overruling

14   the objection at this point.  This is without prejudice to a

15   focused motion to strike in closing briefing.

16           MR. CASARRUBIAS:  Thank you, Your Honor.

17           THE COURT:  You may answer.  Are you clear on the

18   question?

19           THE WITNESS:  I am, yes.

20       So overwhelmingly, there were three different things that

21   brought -- kept coming up over and over and over again.

22       One was the documentation requirements being overwhelming.

23   People thought that in a 50-minute clinical hour, it was 40 to

24   45 minutes of documentation and button clicks versus 15 minutes

25   of patient care.

1          The second one was the salaries.  They were being

2     overwhelmingly recruited by outside agencies within the

3     Vacaville area with salaries that were much higher, signing

4     bonuses, COVID bonuses, things that we didn't get.

5          The third was the lack of telemedicine.  A lot of the

6     places that were recruiting them either did hybrid telemedicine

7     models -- where you worked from home two days a week, on-site

8     two days a week, thereabouts -- or a hundred percent telework.

9     And so we saw a mass exodus of staff around that March 2022

10    point.

11         And those were overwhelmingly the reasons that were

12    provided.

13    Q.   BY MR. GOURSE:  And these -- these were reasons that were

14    cited by psychologists and social workers who were leaving?

15    A.   Yes.

16    Q.   And they were -- they told you about these reasons while --

17    during the exit interviews that you had initiated and asked

18    them to speak about, correct?

19    A.   Yes.

20    Q.   And you're their supervisor?

21    A.   Well, I was the chief, so, like, I was the supervisor above

22    their supervisor.

23    Q.   You personally applied for a position at Kaiser for the

24    purpose of investigating why so many mental health staff were

25    leaving CMF; is that right?

```
1              MR. CASARRUBIAS:  Objection.  Leading.

2              MR. GOURSE:  She's an adverse witness, Your Honor.

3              THE COURT:  Agreed, Mr. Casarrubias?

4              MR. CASARRUBIAS:  No.

5              MR. GOURSE:  She testified that she's the employee --

6    that she's an employee of the Defendant in this case.

7              THE COURT:  And that automatically makes her adverse?

8              MR. GOURSE:  Yes.

9              THE COURT:  Well, here again, I'm going to overrule

10   the objection, but subject to a motion to strike.

11             MR. CASARRUBIAS:  Your Honor, just for the record,

12   Dr. David was called by the Plaintiffs, so I just want to put

13   that on the record.

14             THE COURT:  I understand that.

15             MR. CASARRUBIAS:  Thank you, Your Honor.

16             THE COURT:  But at this point, you haven't done more

17   to lay a foundation for declaring the witness a hostile

18   witness.  Nonetheless, at this point, I'm sustaining the

19   objection.

20             MR. GOURSE:  Thank you, Your Honor.

21             THE COURT:  I mean I'm overruling the objection and

22   allowing the record to develop, subject to a motion to strike.

23             MR. CASARRUBIAS:  I got excited, Your Honor.

24             THE WITNESS:  Okay.  Yes, at that time, we were

25   losing a lot of staff to Kaiser, and Kaiser was not posting
```

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    salaries or benefits online, so I decided to figure out what

2    was going on.

3    Q.  BY MR. GOURSE:  And what did you learn?

4    A.  So I applied for a line staff position as a crisis

5    counselor in the Vacaville Emergency Department.  And when I

6    was called by the person that calls and vets you and sort of

7    explains what was going on, the starting salary would have been

8    about 20, 30 thousand dollars, I think, more than what our

9    starting salary is for psychologists at CMF.  And it was work

10    from home three days a week, work on-site in the emergency

11    department one day a week, and they would call you or bing you

12    in when they needed emergency triage, and you would do it over

13    the computer.  And then the day that you went in, you ran a

14    group.

15             MR. CASARRUBIAS:  Move to strike as hearsay.

16             THE COURT:  Overruled -- I mean denied.  Sorry.

17    Q.  BY MR. GOURSE:  Dr. David, do you know whether other

18    employees -- whether other employers near CMF offer higher

19    salaries to psychologists than CDCR does?

20    A.  Yes.

21    Q.  How do you know?

22    A.  People who have left have told me what they're making when

23    they leave.

24    Q.  Do you know what the -- how much higher the salary is being

25    offered to social workers by other employers in the region?

1          MR. CASARRUBIAS:  Lacks foundation.

2    Q.  BY MR. GOURSE:  Are other employers in the region offering

3    higher salaries to social workers than --

4          MR. CASARRUBIAS:  Lacks foundation.  Calls for

5    speculation.

6          THE COURT:  Just answer yes or no.

7          THE WITNESS:  Yes.

8    Q.  BY MR. GOURSE:  And how do you know that?

9    A.  The social workers who have left reported to me what

10   they're going to be making at these outside agencies.

11   Q.  And how much higher are the salaries that they told you

12   they've been offered?

13          MR. CASARRUBIAS:  Calls for speculation.

14   Inadmissible hearsay.  Calls for speculation.

15          THE COURT:  Overruled.

16          THE WITNESS:  One social worker who left for UC Davis

17   probation and parole program is making 30 to 40 thousand

18   dollars more a year than she was making at the top of her range

19   at CMF.

20          MR. CASARRUBIAS:  Move to strike as multiple levels

21   of hearsay.

22          THE COURT:  Denied.

23   Q.  BY MR. GOURSE:  Have you heard about other employers in the

24   region offering higher salaries to social workers?

25   A.  Social workers specifically, no.

```
 1   Q.   What about psychologists?

 2   A.   Yes.

 3   Q.   Can you tell us about what -- I will rephrase that.

 4        What have you learned about the salaries being offered to

 5   psychologists by other --

 6             MR. CASARRUBIAS:  Lacks foundation.

 7   Q.   -- employers in the region?

 8             MR. CASARRUBIAS:  Calls for speculation.  And

 9   inadmissible hearsay.

10             THE COURT:  Overruled.

11             THE WITNESS:  So I know the most about Kaiser,

12   because the majority of my people left for Kaiser.  But I've

13   also had people leave for Sutter, UC Davis, and they all

14   reported making higher salaries.  How much more, I don't know,

15   but these were people at the top of their range at CMF, so --

16             MR. CASARRUBIAS:  Move to strike as hearsay.

17             THE COURT:  Denied.

18   Q.   BY MR. GOURSE:  Salaries for mental health -- excuse me.

19   I'll start over.

20        Were salaries for mental health staff at CMF reduced in

21   2020?

22   A.   We were furloughed.

23   Q.   Can you explain what that means?

24   A.   Um, so we got two extra vacation days a week for mental

25   health staff, and I believe it was an 8 percent reduction in
```

 1  our salary during the COVID pandemic.

 2  Q.  And did that apply to all mental health staff at CMF?

 3  A.  I believe it was all state workers period.

 4  Q.  It applied to you, too?

 5  A.  Yes, it did.

 6  Q.  Do you think that that pay cut had an effect on the morale

 7  of the mental health staff at CMF?

 8  A.  Yes.

 9  Q.  Can you describe what that effect was?

10  A.  Sure.  We were essential workers.  It was the beginning of

11  a global pandemic.  We didn't know what PPE to wear.  We -- the

12  rules were changing constantly.  We were on the front line, on

13  isolation units, didn't know what we were possibly bringing

14  home to our families.  And then to have the governor furlough

15  us during all of that was a difficult pill for the staff to

16  swallow.  It was a very stressful time.

17  Q.  Do you know whether any non-PIP mental health staff at CMF

18  are eligible for recruitment and retention bonuses?

19            MR. CASARRUBIAS:  Objection.  Vague as to time.

20            MR. GOURSE:  Currently.

21            THE COURT:  Can you clarify time?

22  Q.  BY MR. GOURSE:  Currently.

23  A.  The recruitment and retention bonus, yes, that's available

24  to psychologists currently, and now it's available to social

25  workers as well under the new bargaining unit contract that

1    went into effect October 1st.

2    Q.  And that's the contract that was signed by the governor

3    last month, correct?

4    A.  Yes.  Yes.  So initially, it was available for

5    psychologists only, as long as you started your career with

6    CDCR and hadn't worked as a psychologist for any other state

7    entity prior to that, and it's now available for social

8    workers.

9    Q.  So for the past -- so before this collective bargaining

10   agreement went into effect, social workers were not eligible

11   for those bonuses, correct?

12   A.  The recruitment and retention, correct.

13   Q.  And do you know when psychologists became eligible for

14   those bonuses?

15   A.  I think it was back about eight months ago, I think,

16   thereabouts.

17   Q.  Do you know whether any psychologists were still denied

18   recruitment and retention bonuses even after they became

19   formally eligible?

20   A.  Yes.

21   Q.  Do you know why?

22   A.  So all of us who started with DSH within the CMF location

23   or within any CDCR location that lifted and shifted, we've all

24   been denied the recruitment and retention bonus because we

25   started with DSH.  And although we lifted and shifted, they're

1    considered that we transferred, and so they denied it for all

2    of us who started at DSH within the CDCR facilities.

3    Q.  Are there staff who this applies to who are currently

4    working or were working in the non-PIP programs at CMF?

5             MR. CASARRUBIAS:  Objection.  Lacks foundation.

6             THE COURT:  You can lay a foundation.  Sustained.

7    Q.  BY MR. GOURSE:  Dr. David, do you know whether any of the

8    staff you just mentioned who had been denied the recruitment

9    and retention bonuses -- were some of them employed in the

10   out -- in the outpatient programs, the -- the non-PIP programs

11   at CMF?

12            MR. CASARRUBIAS:  Objection.  Vague.

13            THE COURT:  Are you able to answer the question?  If

14   so, you may answer yes or no.

15            THE WITNESS:  Yes.

16   Q.  BY MR. GOURSE:  Thank you.

17       Did these -- did these restrictions on the recruitment and

18   retention bonuses have an impact on the morale of mental health

19   staff at CMF?

20            MR. CASARRUBIAS:  Objection.  Calls for speculation.

21   Q.  BY MR. GOURSE:  Do you have -- did any of your mental

22   health staff in the non-PIP programs tell you that the denial

23   of these bonuses had an impact on their morale?

24            MR. CASARRUBIAS:  Objection.  Calls for hearsay.

25            THE COURT:  Overruled.

```
 1                    THE WITNESS:  Yes.
 2   Q.  BY MR. GOURSE:  Can you -- what kind of effect did they
 3   tell you that it had?
 4   A.  They were mad.  They felt devalued.  They felt like it
 5   wasn't a recruitment and retention bonus and that it was more a
 6   I got lucky and started my career at CDCR bonus.  People were
 7   and still are very angry about it.
 8                    MR. CASARRUBIAS:  Move to strike as hearsay.
 9                    THE CLERK:  Denied.
10                    MR. CASARRUBIAS:  Thank you.
11   Q.  BY MR. GOURSE:  Did mental health staff working in the PIP
12   programs at CMF receive a 15 percent salary increase in 2022?
13                    MR. CASARRUBIAS:  Objection.  Lacks foundation.
14                    MR. GOURSE:  The foundation for this has already been
15   laid --
16                    THE COURT:  Overruled.
17                    MR. GOURSE:  -- during these proceedings, Your Honor.
18                    THE WITNESS:  Yes.  The PIP pay diff, they did, yes.
19   Q.  BY MR. GOURSE:  And mental health staff in the non-PIP
20   programs were excluded from that pay increase, correct?
21                    MR. CASARRUBIAS:  Objection.  Leading.
22   Q.  BY MR. GOURSE:  Were non-PIP staff included in that pay
23   increase?
24                    MR. CASARRUBIAS:  Lacks foundation.
25                    THE COURT:  Sustained.
```

1    Q.  BY MR. GOURSE:  Do you know whether non-PIP staff received

2    that 15 percent pay differential that you mentioned just a

3    minute ago?

4    A.  Yes, I do know.

5    Q.  Can you -- and -- and did they receive it?

6    A.  No.

7            MR. CASARRUBIAS:  Vague as to "they."

8            THE COURT:  Overruled.

9            THE WITNESS:  No.

10   Q.  BY MR. GOURSE:  Thank you.

11       And did that exclusion from the 15 percent pay differential

12   have an impact on the morale of those staff in the non-PIP

13   program?

14           MR. CASARRUBIAS:  Objection.  Calls for speculation

15   and hearsay.

16           THE COURT:  Overruled for now.

17       You may answer.

18           THE WITNESS:  Yes, it did.

19   Q.  BY MR. GOURSE:  And what kind of effect did it have on

20   their morale?

21   A.  People quit, and they were really angry.  We had been

22   working towards cross-coverage and building bridges between the

23   PIP and the outpatient side.  At that point, we were under two

24   different leaderships.  And because staffing was so bad on both

25   sides of the house, we were doing a lot of cross-coverage; we

 1    were getting people trained, and it derailed all of that

 2    because all of a sudden, outpatient people were refusing to go

 3    work in the PIP; as long as they did 50 percent, they didn't

 4    make all the more money.

 5        Crisis bed -- we lost staff in crisis bed because they felt

 6    like they were inpatient and working with the most acute

 7    patients and weren't receiving it.

 8        And all of our state psychiatrists quit and went to the PIP

 9    overnight.

10    Q.  Based on your experience working to hire mental health

11    staff at CMF, do you think that CDCR salaries for mental health

12    staff should be higher than the salaries for comparable

13    positions in the region?

14            MR. CASARRUBIAS:  Objection.  Lacks foundation.

15    Calls for speculation.  Calls for expert testimony.

16            THE COURT:  Sustained.

17    Q.  BY MR. GOURSE:  Are there any conditions that mental health

18    staff at CMF endure during their workday that -- that make the

19    position -- that -- that staff have complained to you about?

20            MR. CASARRUBIAS:  Objection.  Vague and ambiguous as

21    to "conditions endured."

22            THE COURT:  Overruled.

23        You may answer to the extent you believe you can.

24            THE WITNESS:  CMF is an old facility.  We were built

25    in the 50s, I think.  So there are areas of the prison that

1    don't have adequate heating or air conditioning during the

2    hottest and coldest times of the year.

3        It breaks during rainstorms.  The ceiling leaks in multiple

4    places.  We had flooding in the O tower treatment center last

5    year that took out three clinical offices.

6        Some people work in converted cells on housing units, two

7    to a cell; it's a tight squish.

8        Since the COVID pandemic, at CMF, we're now under Cal-OSHA

9    facial hair guidelines, so for someone to come and work at CMF,

10   unless you have a religious or medical exemption, you have to

11   shave your face to a very specific set of facial hair styles

12   provided by Cal-OSHA in order for the N95 mask to seal

13   properly.

14       No cellphones.  No Airbuds.  No AirPods.  Nothing that you

15   would be able to bring with you if you worked in a community

16   setting.

17       And you have to sign a hostage policy and an asbestos

18   policy.

19   Q.  BY MR. GOURSE:  What is a hostage policy?

20   A.  Basically that you acknowledge that if you're taken hostage

21   in the course of your duties, they will not negotiate for your

22   return.

23   Q.  Have you ever seen rodents in the mental health work spaces

24   at CMF?

25              MR. CASARRUBIAS:  Leading.

1            THE COURT:  Sustained.

2    Q.  BY MR. GOURSE:  Are there any other conditions that mental

3    health staff have complained to you about or any other

4    conditions -- I'll start with the first part of that.

5            MR. CASARRUBIAS:  Calls for hearsay.

6            THE COURT:  Overruled.

7            THE WITNESS:  We had a report of mice in a clinical

8    work area yesterday, had to get vector control out there.  You

9    know, it's an old prison.  There are smells and sometimes

10   rodents.  And, like I said, heating and air that doesn't work.

11   It's -- it's an old building.

12   Q.  BY MR. GOURSE:  Dr. David, at your deposition, you stated

13   that understaffing at CMF has created, quote, extreme patient

14   safety concerns in the non-PIP programs.  Do you remember that?

15   A.  I do.

16   Q.  Can you explain what you meant?

17   A.  We have a hundred percent of our beds open in outpatient

18   and crisis bed and a 30 percent functional fill rate.  We are

19   on triage plans across every single level of care and have been

20   for well over a year.

21       We can't provide Program Guide services.  We're not even

22   providing what you could consider to be standard of care in the

23   community at this point.  Clinical continuity is nonexistent.

24       We're doing the best we can, and it is nowhere good enough

25   for the needs of our patients.

1   Q.  You mentioned triage plans.  Can you explain what that term

2   means?

3   A.  Yes.  So as our staffing started to decrease, I believe we

4   started the first set of plans about a year and a half ago, and

5   then they have morphed and changed.  We write them, and they

6   get reviewed by our regional headquarters counterparts.

7       It's -- the difficult decisions that I have to make is what

8   from Program Guide are we keeping and what do we get rid of.

9   What can we not do.  What are we focusing on.  They're horrible

10  decisions to have to make, but you have to make them because if

11  not, you're going to burn out your remaining staff, and then no

12  one is going to get any treatment, because at a 30 percent

13  functional fill rate, you cannot do a hundred percent of your

14  patient duties.  There is absolutely no way.

15      So every level of care -- EOP, CCC, EOP ASU, and MHCB --

16  are currently under iterations of triage plans.

17  Q.  And what Program Guide requirements are -- are --

18  Dr. David, just to clarify, you -- you just testified that

19  these triage plans involve complying with certain program

20  requirements but not others, correct?

21  A.  Yes.

22  Q.  Which requirements are you not complying with?

23  A.  Do you want me to go program by program?

24  Q.  Let's start with the CCCMS program.

25  A.  So CCCMS was one of the first major triage plans that we

1    did when the EOP staffing went under 50 percent and we

2    recognized that we needed to move clinical staff from CCC to

3    EOP to service our patients at a higher acuity level.  So we

4    basically shut down CCC.  We canceled all CCC groups.  They had

5    been canceled during COVID; we never restarted them.

6        CCC only does initial and discharge IDTTs or IDTTs for

7    issues that may arise that necessitate one.  We're not doing

8    routine IDTT in CCC.  We haven't for about a year and a half.

9        CCC patients also aren't seen regularly by an MHPC.  They

10   need to submit a 7362 or a staff member will submit an MH5 or

11   someone will call the crisis line to have those patients seen.

12   We have one psychologist with a caseload of about 498 CCC

13   patients.  And it's been that way for about a year and a half,

14   maybe more.

15   Q.  And that -- that one -- that one psychologist with the

16   caseload of over 400 patients, that's the only psychologist

17   working in the CCCMS program?

18   A.  Yes.  For our mainline CCCMS.  And then we have a .5 social

19   worker for G Tower and hospice CCCMS.

20   Q.  Thank you.  What do the triage plans for EOP involve?

21   A.  So EOP has had multiple iterations.  Staffing has decreased

22   since we first put them online about a year and a half ago.

23       Currently, we have 9 clinicians out of 22.5 in EOP.

24   Caseloads are hovering anywhere between 65, 75, 80, depending

25   on EOP census.  Average caseload for EOP is 1 to 30 to 35.  So

1    our triage plans for EOP, there are no PC contacts unless

2    clinically indicated or the patient puts in a 7362, staff

3    member puts in an MH5, or the patient is a member of the high

4    risk program.

5        Other than that, they're getting caseload groups.  We've

6    switched to 100 percent group-based program in EOP to try to

7    maximize the amount of out-of-cell clinical hours and treatment

8    hours that our patients are getting.

9        There are no routine IDTTs conducted anymore in EOP.  We

10   prioritize doing the initial IDTTs and then discharge IDTT if

11   the patient needs to go to ICF or have their care reduced to

12   CCC out of the program.

13       And those are the main EOP modifications.

14           THE COURT:  Just to let you know that you've used 45

15   minutes, which is what your estimate was.

16           MR. GOURSE:  Thank you, Your Honor.  I just have one

17   or two more questions if that's all right.

18           THE COURT:  They were estimates, but as I did with

19   the other side, I'm just letting you know.

20           MR. GOURSE:  Thank you.

21           MR. CASARRUBIAS:  We're okay with two questions, Your

22   Honor.

23   Q.  BY MR. GOURSE:  Dr. David, at your deposition, you stated

24   that you walk into work every day with an ethical quagmire,

25   because I know that we can't provide the services that we need

1    to provide to the patients at any level of care that I have at

2    CMF.

3        Do you remember that?

4            MR. CASARRUBIAS:  Objection.  Leading and hearsay.

5            THE COURT:  Sustained.

6    Q.  BY MR. GOURSE:  Dr. David, do you have any ethical concerns

7    about the care being provided at CMF in the non-PIP programs?

8            MR. CASARRUBIAS:  Objection.  Vague as to "ethical."

9            THE COURT:  Overruled.

10           THE WITNESS:  Yes.

11           THE COURT:  Wait.  Wait for the next question.

12   Q.  BY MR. GOURSE:  Can you describe those ethical concerns?

13   A.  Yes.  My concern that we're violating the ethics of our

14   ethical code as far as the Board of Psychology is concerned,

15   no.  But when you look at the guidelines that guide our

16   treatment, clinical malfeasance, you know, things -- things of

17   that nature, yes, I have existential concerns.  We are not able

18   to provide the care to these patients we say we're giving to

19   them when they come into a certain level of care.  We haven't

20   been for a very long time.  And I have been very open and

21   forthright with that in conversations that I have had with --

22   with people.

23       I have patient safety concerns every day.  It's exhausting

24   and draining and difficult to know that we have men in our care

25   who are ill, who are sick, who are coming to us for help, and

1   we are not able to give them the help that they need.  It is

2   not why I came into this field.  It is not why my employees

3   came into this field.

4   Q.  Who have you communicated those concerns to?

5   A.  Regional mental health and headquarters leadership.

6   Q.  Do you remember anybody in -- any individuals in

7   particular?

8   A.  Um-hum.  Dr. Bunn, Dr. Ceballos, Dr. Mehta, Tennille

9   Atchley, Dr. Huntington, Dr. Ball, Dr. Bick.  They've all been

10  on calls and e-mails.

11  Q.  Do you remember when any of these calls took place?

12  A.  The last one was August 2nd.

13  Q.  And did you get a response when you raised these ethical

14  concerns?

15  A.  They said that they were looking into it.

16          MR. CASARRUBIAS:  Objection.  Move to strike as

17  hearsay.  It's also vague as to who said that.

18          THE COURT:  Overruled.  And denied.

19          MR. CASARRUBIAS:  Thank you.

20  Q.  BY MR. GOURSE:  And did you get any response to the ethical

21  concerns you raised during that call?

22  A.  No.

23  Q.  Have any of the mental health staff who have left CMF told

24  you that they had similar concerns?

25          MR. CASARRUBIAS:  Objection.  Leading and vague as to

1    "similar concerns."

2    Q.  BY MR. GOURSE:  Have --

3              THE COURT:  Sustained.

4    Q.  BY MR. GOURSE:  Have any -- have any mental health staff

5    who told you they were leaving CMF told you that they were

6    leaving in part because they also had ethical concerns about

7    the care being provided at CMF?

8              MR. CASARRUBIAS:  Objection.  Leading.  Hearsay.

9    Mischaracterizes the witness' prior testimony.

10              THE COURT:  Sustained.

11    Q.  BY MR. GOURSE:  Dr. David, have you discussed these ethical

12    concerns during any exit interviews with candidates who -- with

13    mental health staff who are leaving CMF?

14    A.  My ethical concerns?

15    Q.  Yours or the person -- or the employee you were speaking

16    to.

17              MR. CASARRUBIAS:  Objection.  Leading.  And assumes

18    facts not in evidence.

19              THE COURT:  Sustained.

20    Q.  BY MR. GOURSE:  Your ethical concerns -- have you discussed

21    your ethical concerns during those exit interviews?

22    A.  No.  That's a time for the staff to tell me about their

23    concerns.

24    Q.  Have any staff mentioned ethical concerns during those

25    interviews?

```
 1              MR. CASARRUBIAS:  Objection.  Calls for hearsay.
 2   Leading.
 3              THE COURT:  Sustained.
 4   Q.  BY MR. GOURSE:  Dr. David, what concerns do staff raise
 5   during those exit interviews?
 6              MR. CASARRUBIAS:  Objection.  Asked and answered.
 7   Calls for hearsay.  Assumes facts not in evidence.
 8              THE COURT:  Sustained as to asked and answered.
 9              MR. GOURSE:  Okay.
10              THE COURT:  Do you have additional questions?
11              MR. GOURSE:  Yeah.  I'm just making sure I covered
12   them.  Give me one moment.
13          (Pause in proceedings.)
14              MR. GOURSE:  That's all, Your Honor.
15              THE COURT:  All right.
16              MR. GOURSE:  Thank you.
17              THE COURT:  Cross-examination.
18              MR. CASARRUBIAS:  Yes, Your Honor.
19                          CROSS-EXAMINATION
20   BY MR. CASARRUBIAS:
21   Q.  Good morning, Dr. David.
22   A.  Good morning.
23   Q.  Before I begin, can we just establish for the record that
24   during my questioning, when I use CMF, that stands for
25   California Medical Facility?
```

 1  A.  Yes.

 2  Q.  And CMF is just one of the 33 prisons in California,

 3  correct?

 4  A.  Correct.

 5  Q.  Can we also establish for the record that during my

 6  questioning, CDCR will stand for California Department of

 7  Corrections and Rehabilitation?

 8  A.  Yes.

 9  Q.  Thank you.

10      Dr. David, do you recall testifying that you are the Chief

11  of Mental Health at CMF?

12  A.  Yes.

13  Q.  Are you the Chief of Mental Health for any other prison in

14  the state of California?

15  A.  No.

16  Q.  Have you worked for any other prison in the state of

17  California in any capacity?

18  A.  No.

19  Q.  Are you the Chief of Mental Health for CDCR as a whole?

20  A.  No.

21  Q.  Do you oversee mental health in any capacity for any other

22  prison in the state of California?

23  A.  No.

24  Q.  Dr. David, do you recall being asked about hiring of mental

25  health staff at CMF during your direct examination?

```
 1    A.  Yes.

 2    Q.  And do you recall testifying that you sit on hiring panels

 3    involved in hiring mental health staff at CMF?

 4    A.  Yes.

 5    Q.  Are you involved with hiring mental health staff at any

 6    other prison in the state of California?

 7    A.  No.

 8    Q.  Do you recall being asked about vacancies and fill rates

 9    for mental health staff at CMF?

10    A.  Yes.

11    Q.  Have you ever conducted a study of vacancies and fill rates

12    for mental health staff at any other prison?

13    A.  No.

14    Q.  Have you ever reported to CDCR the vacancies and fill rates

15    for mental health staff at any other prison?

16    A.  No.

17    Q.  Do you recall discussing some reasons why CMF has seen

18    increases in vacancies for certain mental health positions?

19    A.  Yes.

20    Q.  And do you recall referencing certain paperwork

21    requirements?

22    A.  Um-hum.  Yes.

23    Q.  Can you explain to the Court what you mean by paperwork

24    requirements?

25    A.  Yes.  So the PC -- the primary clinicians who are either
```

 1   social workers or the psychologists -- since the advent of the

 2   Electronic Health Record System many years ago, have seen their

 3   documentation load grow and grow and grow and grow.

 4        So, for example, you have our SRASHE, our Suicide Risk and

 5   Self Harm Evaluation that's done.  The normal SRASHE document,

 6   I think, has anywhere between 15, 17 -- maybe a little less,

 7   maybe a little more -- individual tabs that need to be

 8   completed.  Each of these tabs have multiple checkboxes, text

 9   boxes.  The information is redundant across tabs.  It's

10   redundant with tabs in the IDTT document.  It's redundant with

11   tabs in the MH consult inpatient that's done for a referral.

12   It takes a very long time.

13        So, for example, if you're a clinician in crisis bed, which

14   currently has a 30 percent fill rate and a hundred percent beds

15   open, and you're doing a discharge of a patient to PIP acute or

16   ICF level of care, you now have to do your IDTT document,

17   which, before we got the modification, was about another 15

18   tabs of lengthy data.  You had to do your SRASHE, 15 tabs of

19   lengthy data.  You had to do a SPI, safety planning

20   intervention, if the patient reported any suicidality while

21   they were in crisis bed or came in for danger to self.  That is

22   another lengthy form with lots of text boxes.  You have to do

23   an MH consult inpatient, which is your reason for referral to

24   the PIP.  And then you also have to do your progress note to

25   sort of tie up the whole thing in a bow.

 1      All that paperwork can take, dependent on the complexity of

 2   the case, a couple of hours.  If the case is really easy,

 3   sometimes less.  If the case is really complicated, sometimes

 4   more.

 5      You're discharging from crisis bed to lower level of care;

 6   you're sending them to enhanced outpatient or CCC; that SRASHE

 7   is going to take a lot more time, right, because you're sending

 8   them to a less restrictive setting, so you really want to make

 9   sure that you're truly encapsulating your clinical reason why.

10      I've had staff come out and tell me that they were quitting

11   because of the documentation requirements.  I think that when

12   you look at staffing as a whole -- and this is purely my

13   opinion from working the line, moving up over years, and

14   talking with all my clinicians and staff who have left --

15   higher salaries might help with recruitment and bringing staff

16   in, but as long as we continue to work under the same

17   documentation requirements we currently have, we will not

18   retain good people, because in the community, you complete a

19   SOAP note, not six different forms of documentation with

20   redundant clinical information.

21   Q.  And just for the record and for the Court's edification,

22   what is a SOAP note?

23   A.  It's a style of writing a clinical note, subjective,

24   objective -- I think the P stands for progress -- evaluation.

25   It's just a way of -- of formulating your clinical

 1   documentation.  It's, like, maybe a page.

 2            THE COURT:  What's the acronym?

 3            THE WITNESS:  S-O-P-E.  SOPE note.  S-O-A-P.  Sorry.

 4   Q.  BY MR. CASARRUBIAS:  Based on your training and experience,

 5   that's industry standard in the line of work you do?

 6   A.  Everywhere I've worked in the community, and from people I

 7   know that still work in the community, they complete a SOAP

 8   note.

 9   Q.  What is your understanding of where those paperwork

10   requirements you just mentioned -- where do those come from?

11   A.  My understanding is that they stem from court orders.

12            MR. GOURSE:  Objection.  Calls for speculation.

13            THE COURT:  Overruled.

14            MR. CASARRUBIAS:  Thank you, Your Honor.

15   Q.  BY MR. CASARRUBIAS:  Do you recall discussing a time when

16   you applied for a job at Kaiser to see what Kaiser would offer

17   you?

18   A.  Yes, I do.

19   Q.  And you testified that Kaiser did make you an offer,

20   correct?

21   A.  Well, I didn't go to the interview.  I just asked them what

22   the position would pay when they did the -- the call where they

23   call you afterwards.  I forget what it's called.

24   Q.  Like a screening call?

25   A.  Yeah.  I wasn't going to waste my time with the interview

1   because I wasn't actually leaving.

2   Q.  But they gave you an actual figure?

3   A.  Yes, they gave me an actual figure.

4   Q.  Do you know what factors Kaiser considered in making their

5   offer to you -- or giving you that figure?

6   A.  They said length of time licensed, job experience, etc.,

7   etc.

8   Q.  So your current role as Chief of Mental Health at CMF

9   likely factored into that figure?

10          MR. GOURSE:  Objection, Your Honor.  Calls for

11  hearsay.

12          THE COURT:  Overruled.

13          THE WITNESS:  I don't know.  They said it was based

14  on my time being a psychologist.

15  Q.  BY MR. CASARRUBIAS:  Do you recall discussing the

16  difference in salaries between Kaiser and your current salary?

17  A.  With Kaiser?

18  Q.  Yes.

19  A.  Oh, yeah.  They weren't going to match my current salary.

20  I wasn't line staff at that point.

21          MR. GOURSE:  Objection.  Hearsay.

22          THE COURT:  Overruled.

23  Q.  BY MR. CASARRUBIAS:  In that discussion with -- that you

24  had with Kaiser and based on what you learned from the figure

25  Kaiser was offering you, do you know if that figure included

1  benefits?

2  A.  No.  I think that they were just telling me what the

3  take-home figure would be.  I don't know what their benefit

4  package is.

5  Q.  Do you know what is the monetary value of the benefits CDCR

6  offers for mental health staff?

7  A.  No.

8  Q.  So you've never had a chance to compare the monetary value

9  of CDCR's benefit package with Kaiser's benefit package, for

10  example?

11  A.  No.  But people that were leaving were leaving based on

12  take-home, so that's what I was looking for.

13  Q.  So do you recall mentioning -- I think you said CDCR HR at

14  some point, but did you mean Cal HR?

15  A.  Yes.  Yes.

16  Q.  So during your direct, you meant Cal HR when you were

17  talking about HR?

18  A.  I believe so.  Yes.  I think that they're the ones that run

19  the whole HR department.  I'm not quite sure how that whole

20  thing works.

21  Q.  You discussed various bonuses that arose from the COVID-19

22  pandemic that were not offered to CMF mental health staff

23  during your direct.  Do you recall that?

24  A.  I do.

25  Q.  Did any staff member who left CMF ever express to you that

```
 1    they left because they did not receive a COVID bonus?

 2    A.   Yes.  They left because they got them offered to them

 3    elsewhere.

 4    Q.   What staff member?

 5    A.   It was Dr. Sarah Hahn.  She was a supervisor, and she

 6    demoted to line staff at Kaiser, and they offered her an

 7    undisclosed signing package.

 8    Q.   So she specifically said, I'm leaving because I didn't get

 9    a COVID bonus?

10    A.   No.  But she said that part of the reason why she was

11    leaving was because they offered her a signing package that she

12    couldn't turn down.

13              MR. CASARRUBIAS:  I'll move to strike everything

14    after no, Your Honor.

15              THE COURT:  Denied.

16    Q.   BY MR. CASARRUBIAS:  Do you recall discussing ethical

17    concerns you have with current staffing levels?

18    A.   Yes.

19    Q.   Do you believe you've personally committed ethical

20    malpractice as Chief of Mental Health at CMF?

21    A.   No.

22              MR. GOURSE:  Objection.  Calls for speculation.

23              THE COURT:  Overruled.

24              MR. GOURSE:  Lack of foundation.

25              THE COURT:  Overruled.
```

1          THE WITNESS:  No.

2      Do you want me to answer?

3          MR. CASARRUBIAS:  No.  You already answered.  Thank

4  you.  I only have a few more questions.

5  Q.  BY MR. CASARRUBIAS:  You also mentioned -- or you discussed

6  furloughs with my friend Mr. Gourse.  Do you remember?

7  A.  I do.

8  Q.  And did you -- I just want to clarify the record.  Did you

9  say that furloughs are two days a week or --

10  A.  It was two days a month, so we were docked two days a month

11  pay.

12  Q.  I just --

13  A.  Got two holiday days a month, and I think the dock was

14  about 8 percent.

15  Q.  I just wanted to clarify, because I think I heard two days

16  a week, and I wanted to make sure --

17  A.  If I said that, that was a misspeak on my part.  It was two

18  days a month.

19  Q.  Okay.  Just wanted to -- thank you for clarifying.

20      At various points throughout your direct testimony you were

21  asked about your opinions on subjects ranging from vacancies to

22  salaries, etc.  Do you recall?

23  A.  I do.

24  Q.  Do your opinions reflect the official opinions of CDCR?

25  A.  No.

1  Q.  Dr. David, are you authorized to speak on behalf of CDCR on

2  the subject of mental health staffing?

3  A.  No.

4  Q.  Are you authorized to speak on behalf of CDCR on any

5  subject?

6          MR. GOURSE:  Objection, Your Honor.  Calls for

7  speculation.

8          THE COURT:  Overruled.

9          THE WITNESS:  I think I'm authorized to speak on

10  behalf of CMF.

11  Q.  BY MR. CASARRUBIAS:  Other than CMF --

12  A.  No.

13  Q.  -- are you authorized to speak on behalf of the Office of

14  the Governor of the State of California on the subject of

15  mental health staffing?

16  A.  No.

17  Q.  Are you authorized to speak on behalf of the Department of

18  State Hospitals on the subject of mental health staffing?

19  A.  No.

20  Q.  Are you authorized to speak on behalf of the Department of

21  Finance on the subject of mental health staffing?

22  A.  No.

23  Q.  Finally, the Defendants in this case are Governor Gavin

24  Newsom, CDCR Secretary Jeff Macomber, CDCR Undersecretary Diana

25  Toche, CDCR Deputy Director Amar Mehta, DSH Director Stephanie

1    Clendenin, and Department of Finance Director Joe Stephenshaw.

2        You are not authorized to speak on behalf of any of those

3    Defendants, are you?

4    A.  No.

5            MR. CASARRUBIAS:  Thank you, Your Honor.  I have no

6    further questions.

7            THE COURT:  All right.  Any redirect?

8            MR. GOURSE:  Yes, Your Honor.  Just a couple

9    questions.

10                    REDIRECT EXAMINATION

11   BY MR. GOURSE:

12   Q.  Dr. David, during your cross-examination, you described

13   certain onerous documentation requirements --

14   A.  Um-hum.

15   Q.  -- in EHRS, correct?

16   A.  Um-hum.

17            THE COURT:  Yes or no.

18            THE WITNESS:  Yes.  Sorry.

19   Q.  BY MR. GOURSE:  And just for clarification, EHRS is the

20   Electronic Health Records System?

21   A.  Yes.

22   Q.  Do you know who created EHRS?

23   A.  I believe it was CDCR, in tandem with the software

24   developers.

25   Q.  And do you know who created any of the forms you described?

```
 1   A.  I believe that CDCR, in tandem with the Special Master,

 2   creates them.

 3   Q.  How do you know that?

 4   A.  It's what I've been told.

 5   Q.  And do you know who -- do you remember who told you that?

 6   A.  I -- I don't.  It's just word on the street.

 7   Q.  Your testimony on direct about the effect of staffing

 8   shortages on the care provided at CMF -- sorry.  Let me back

 9   up.

10      Dr. David, you testified on direct about the effects of

11   staffing shortages on the care provided at CMF, correct?

12          MR. CASARRUBIAS:  Objection.  Outside the scope of

13   the cross.

14          THE COURT:  Sustained.

15      (Pause in proceedings.)

16          MR. GOURSE:  That's all for us, Your Honor.  Thank

17   you.

18          THE COURT:  All right.  Anything further,

19   Mr. Casarrubias?

20          MR. CASARRUBIAS:  No, Your Honor.

21          THE COURT:  All right.  Is this witness excused,

22   Mr. Gourse?

23          MR. GOURSE:  Yes, Your Honor.

24          THE COURT:  Mr. Casarrubias?

25          MR. CASARRUBIAS:  Yes.
```

```
 1                THE COURT:  All right.  You're excused, ma'am.  You

 2    may step down.

 3                THE WITNESS:  Thank you.

 4                THE COURT:  Next witness.

 5                MS. ELLS:  Plaintiffs call Dr. Kelley Franceschi.

 6                THE CLERK:  If you'll remaining standing when you

 7    step in.

 8         Do you prefer to swear or affirm?

 9                THE WITNESS:  Swear.

10                THE CLERK:  If you'll just raise your right hand.

11         (The Witness, Kelley Franceschi, is sworn.)

12                THE WITNESS:  Yes, I do.

13                THE CLERK:  Okay.  You can lower your hand.

14         When you sit, will you please state your name and spell it

15    for the record.

16                THE WITNESS:  Yes.

17                THE COURT:  The microphone is rubbing against your

18    blouse.  That's what's making the noise.

19         Now that you're seated, it should be all right.

20                THE WITNESS:  Thank you.  I'm sorry.  My name is

21    Kelley Franceschi.  K-E-L-L-E-Y, Franceschi, F-R-A-N, as in

22    Nancy, C-E-S, as in Sam, C-H-I.

23                THE COURT:  You may proceed.

24    ///

25    ///
```

```
 1                        DIRECT EXAMINATION

 2   BY MS. HARROLD:

 3   Q.  Good morning, Dr. Franceschi.

 4   A.  Good morning.

 5   Q.  My name is Adrienne Harrold.  I'm an attorney for the

 6   Coleman Plaintiffs.  It's nice to meet you.

 7   A.  Nice to meet you.

 8   Q.  Let's dive in with basic background.

 9       Who do you work for?

10   A.  I work for the California Department of Corrections and

11   Rehabilitation.

12   Q.  If I use the acronym CDCR, would that make sense?

13   A.  Yes.

14   Q.  And how long have you worked for CDCR?

15   A.  Since 2005, about roughly 18 years.

16   Q.  And what is your current position?

17   A.  My current position is Chief of Mental Health.

18   Q.  At what institution?

19   A.  At the California Health Care Correctional Facility, CHCF.

20   Q.  Thank you.

21       And how long have you held that position?

22   A.  I started September 25th of 2023.

23   Q.  And before that, what was your position?

24   A.  Before that, I was Chief of Mental Health, Chief

25   Psychologist at CSP Sacramento.
```

1   Q.  And if I use the term Sac, would you understand what I'm

2   referring to?

3   A.  Yes.

4   Q.  Great.  For California State Prison, Sacramento.

5       And how long did you hold the title of Chief of Mental

6   Health at Sac?

7   A.  I held the title of Chief of Mental Health at Sac since

8   April 2021.

9   Q.  And why did you leave Sac for CHCF?

10  A.  I left Sac for CHCF because I felt like we had made

11  progress at CSP Sac, and I wanted to have some new challenges

12  and was very excited about the mission of CHCF and to learn to

13  be in charge of a prison -- a state prison hospital setting.

14  Q.  Thank you.

15      Are you a licensed psychologist?

16  A.  I am.

17  Q.  And for how long?

18  A.  Since 2007.

19  Q.  Dr. Franceschi, I'm going to ask you to explain a bit more

20  about what your role entails.  Can you describe your current

21  role?

22  A.  My current role at CHCF as Chief of Mental Health is to

23  direct patient care and anything related to personnel and

24  staffing matters, to ensure compliance with the Coleman Court

25  Program Guide.

1    Q.  Who reports to you?

2    A.  I am not sure of the exact number, but I think it's 331

3    staff of various disciplines, including Senior Psychologist

4    Supervisors, Senior Psychologist Specialists; Chiefs directly

5    report to me.  I have three Chiefs and a Senior Psychologist

6    Supervisor right now.

7    Q.  And who do you report to?

8    A.  I report to the CEO, the Chief Executive Officer.

9    Q.  And who is that?

10   A.  I'm sorry?

11   Q.  Who is that?  Their name?

12   A.  Joseph Garland.

13   Q.  When you were Chief of Mental Health at Sac, what were your

14   job duties?

15   A.  It was very similar to my role at CHCF.  I did the

16   direction of care, patient care.  I had a staff of -- I don't

17   know -- remember how many, but I had staff -- the same similar

18   positions to implement the Coleman Program Guide.

19   Q.  Great.  You mentioned delivery of care.  Did you ever

20   assist in clinical supervision?

21   A.  Can you define clinical supervision?

22   Q.  Did you lend, say, clinical expertise?

23   A.  At times, I could.  I was never anyone's direct clinical

24   supervisor.

25   Q.  Thank you for clarifying.

1    Would you be responsible for -- when you were Chief of

2    Mental Health at Sac, were you responsible for implementing

3    policies and procedures that came from headquarters?

4    A.  Yes.

5    Q.  Would you meet regularly with the CEO and other mental

6    health leadership?

7    A.  Yes.

8    Q.  And you mentioned you -- you deal with everything relating

9    to personnel.  Did that include managing the work schedules of,

10   say, line psychologists?

11           MS. THORN:  Objection.  Misstates the witness'

12   testimony.

13           THE COURT:  Overruled.

14       You can answer.

15           THE WITNESS:  Can you repeat the question?

16           MS. HARROLD:  Yes.

17   Q.  BY MS. HARROLD:  Did you manage the work schedules of line

18   psychologists while you were Chief of Mental Health at Sac?

19   A.  Yes.

20   Q.  And what about clinical social workers?

21   A.  Yes.

22   Q.  And, again, when you were Chief of Mental Health at Sac,

23   who did you report to?

24   A.  I reported to Carrie Oglesby, the Chief Executive Officer

25   at my -- there were other CEOs, too, at the time, but she was

1    the current one at the end of my tenure there.

2    Q.   And which classifications reported directly to you?

3    A.   I supervised a Chief Psychologist, Senior Psychologist

4    Specialists, and a couple line staff who held coordinator

5    positions.

6    Q.   Did you -- did the social work supervisors report to you?

7    A.   Yes.

8    Q.   Do you currently have a role in hiring of mental health

9    staff?

10   A.   Yes.

11   Q.   And you also had a role in hiring when you were Chief of

12   Mental Health at Sac, right?

13   A.   Yes.

14   Q.   At Sac, what were your responsibilities as to hiring?

15   A.   My hiring responsibilities at Sac were to interview the

16   candidates that came to us to see if they were competitive for

17   hire, check references, work with HR to go through the process,

18   and then -- on-site HR, and then work with setting up a start

19   date and then onboarding.

20   Q.   And at Sac, what positions did you have a role in the

21   hiring of?

22   A.   Psychologists, social workers, rec therapist, office

23   technicians, Senior Psychologist Supervisor, Senior

24   Psychologist Specialists, Chief Psychologist.  I believe those

25   are the primary categories.

1    Q.   And I apologize if you said this and I just missed.  It,

2    did you have a role in interviewing these candidates?

3    A.   Yes.

4    Q.   How were interviews conducted at Sac, in your experience?

5    A.   We did Teams -- through the COVID times, we did Teams

6    invites that could also, previous to COVID times, be in person.

7    Since I took over as Chief of Mental Health, we did most of

8    them via Teams, via teleconference.

9    Q.   And I realize my question was a bit vague.

10        Is it just you who does the interviews?

11   A.   No.  We have a panel of two to three or four, depending on

12   however -- the position and who was available, but at least two

13   to four people sit on the panel with me.

14   Q.   Who else is typically on the panel with you?

15   A.   It depends on what we are looking for.  If it's an office

16   technician, then the supervisor of that position would be on

17   there -- the OSS II.  And then if it was a social worker, I

18   would like the Senior Psychologist Social Worker to sit on

19   there.  If it was a -- if it was a line staff, I'd like a

20   Senior Psychologist Supervisor to sit in there.  And then we

21   would try to pick another discipline, either from the Allied

22   Health Services or from the quality management positions that

23   could be on the panel to sit on the panels with us.

24   Q.   Because your move to CHCF is relatively recent, I'm going

25   to focus the rest of my questions on your time at Sac.  But if

 1    you're ever confused, let me know, but I'll be asking these

 2    questions based on your experience at Sac.

 3        Did you have a role in selecting which candidates were

 4    brought in for interviews?

 5    A.  I did not.

 6    Q.  How were you usually notified of which candidates to

 7    interview?

 8    A.  Through e-mail.

 9    Q.  And do you remember who those -- who sent those e-mails?

10    A.  At various times, there have been different people that --

11    different processes and procedures.

12        For most of my first part, it was the on-site HR.  People

13    would apply specifically to Sac.  More recently, afterwards, it

14    became a global process.  And so the process has changed

15    multiple times throughout my tenure.

16        So can you repeat the question, please.

17    Q.  Yes.  I can clarify.

18        Most recently, before you left Sac, if you were notified

19    for a candidate to interview, who notified you?

20    A.  Well, then it went back to -- it was our local HR or the

21    Centralized Hiring Unit.

22    Q.  Have you ever reached out to the Central Hiring Unit

23    because you had not received any social worker applicants in a

24    very long time?

25              MS. THORN:  Objection.  Leading.

```
 1                    THE COURT:  Sustained.
 2                    MS. HARROLD:  May I respond, Your Honor?
 3                    THE COURT:  You may.
 4                    MS. HARROLD:  This is a witness identified with an
 5       adverse party under Federal Rule of Evidence 611(c)(2).
 6            I would also be happy to rephrase if that's --
 7                    THE COURT:  Why don't you try rephrasing.
 8                    MS. HARROLD:  Okay.
 9       Q.  BY MS. HARROLD:  Would you ever -- in your experience
10       hiring, as Chief of Mental Health at Sac, did you ever have
11       periods where you hadn't received a social worker applicant in,
12       say, three months or more?
13       A.  Yes.
14       Q.  And when that happened, would you ever reach out to, say,
15       the Central Hiring Unit, which I believe you mentioned is --
16       was one of the entities that might reach out to you about
17       candidates?
18       A.  Yes.
19       Q.  When was the last time you did that, if you recall?
20       A.  I don't recall.
21       Q.  Do you remember if you've reached out any time in the last
22       two years?
23       A.  Yes.
24       Q.  And, similarly, in your experience in hiring at Sac, were
25       there ever periods where you hadn't received psychologist
```

1    candidates in a while?

2    A.  Yes.

3    Q.  And when that occurred, would you ever reach out to the

4    Central Hiring Unit to inform them?

5    A.  Yes.

6    Q.  And how often have you done that in this past year, so

7    since October 2022, if -- approximately?

8    A.  Sure.  It was monthly, if not every other week.

9    Q.  And what might prompt you to reach out that way to the

10   Central Hiring Unit?

11   A.  We would probably be going through some other type of

12   interviews, like the OT interviews, and then I would say, Oh, I

13   should probably reach out and see if there is any candidates or

14   anything has changed in the process of hiring, just to check in

15   -- a brief check-in.

16        And then I would send spreadsheets over for the hirings

17   that we did have in process.  And so in that -- in that e-mail,

18   I would often say, please let me know if there is any others in

19   the pipeline or candidates that I could interview.

20   Q.  And just to be clear, those e-mails where you sent that

21   helpful spreadsheet, who did you send those to, usually?

22   A.  Aisha Wright of the Central Hiring Unit.  And then towards

23   the end, Cambria Caps at the local level.

24   Q.  And by local level, do you mean Sac or regional?

25   A.  Sac.

 1   Q.  Thanks.

 2       And after you on the panel interviewed someone and you

 3   decided you wanted to hire them, who did you communicate that

 4   decision to?

 5   A.  Right back to the Centralized Hiring Unit or the --

 6   whatever the process was going on that month or -- yeah, that

 7   time.

 8   Q.  And, to your knowledge, how long did it generally take,

 9   after you communicated that decision, for the candidate to

10   receive an offer?

11          MS. THORN:  Objection.  Calls for speculation.  Lack

12   of foundation.

13          THE COURT:  Sustained as to lack of foundation.

14   Q.  BY MS. HARROLD:  Dr. Franceschi, would you typically be

15   notified when an offer went out?

16   A.  No.

17   Q.  Would you sometimes be notified?

18   A.  I would sign the RPA, and then it would go out.  And I

19   would know that the offer would follow.

20   Q.  What's an RPA?

21   A.  It's a document -- it's, like, a regional -- we call it an

22   RPA.  I don't know.

23          THE COURT:  What effect would it have?  Just describe

24   it.

25          THE WITNESS:  It's the document for hire that

1  allows -- like, it passes, like, all the background checks, all

2  the things that they hired through.  And then we would sign it,

3  and the CEO would sign it, and then they would be able to make

4  a tentative offer.  And so when -- when I was signing those,

5  then I knew that a tentative offer would be to follow.  And

6  then I would follow up with an e-mail thereafter, saying, Did

7  they accept?

8  Q.  BY MS. HARROLD:  Who did you send that e-mail to?

9  A.  Aisha Wright.

10  Q.  And how long did it generally take between those two steps

11  of informing the Central Hiring Unit that you want to hire

12  someone after their interview and the RPA being sent?

13  A.  I don't have a good average for that time frame.

14  Q.  Are you familiar with the process candidates go through

15  after they receive an offer, before -- the steps they need to

16  take next before they officially join?

17  A.  No.

18  Q.  Did you ever speak with candidates, after they've been

19  offered a position, before they join or decline it?

20  A.  Only if there was a hiccup that I could help with.

21  Q.  What kind of hiccups would that be?

22  A.  Sometimes they would -- sometimes HR would e-mail, and I

23  would be on an e-mail thread where they would say, Hey, you've

24  got to get your Live Scan in.  And then I would reply, Please

25  let me know if there's anything I can do to help with this

1    process.  I would be more than happy to answer any questions.

2    Q.  In your experience, are you aware of people ever getting

3    delayed in that hiring process?

4    A.  Yes.

5    Q.  How often?

6    A.  I don't know.

7    Q.  Was it -- to your knowledge, was it more often than not

8    that there would be a delay in the hiring process?

9    A.  More often than not, there would be some delay in the

10   hiring process.

11   Q.  And based on your experience, were you aware of some causes

12   of the delay?

13   A.  Some delays were either on the employee side with getting

14   the Live Scan done or some tuberculosis clearances.

15       And then on the health care side or the -- the HR side,

16   they would say that it was stuck up at -- waiting for

17   signatures and review and/or credentialing.

18   Q.  Did you ever talk to employees who are -- did you ever talk

19   to any of your staff who are resigning, or seem like they might

20   be on the verge of leaving, to try to get them to stay?

21   A.  Yes.

22   Q.  You refer to these as stay conversations, correct?

23   A.  I do.

24   Q.  What kind of questions did you usually ask people in these

25   stay conversations?

1          MS. THORN:  Objection.  Calls for hearsay.

2          THE COURT:  Overruled.

3          THE WITNESS:  So answer?

4          THE COURT:  Yes.

5          THE WITNESS:  Thank you.

6     During those stay conversations, I would often try to

7  problem-solve, see what was -- their issues were.  We had

8  multiple departments and programs at Sac that we could shuffle

9  people around to if they were not feeling like they were having

10  fun or a good time or, you know, just being engaged in their

11  work in one program.  We would often talk about maybe another

12  program or in any way try to help with the satisfaction and

13  problem-solve issues that they might bring up.

14  Q.  BY MS. HARROLD:  So is it accurate to say that you asked

15  people, as part of many questions you would ask, what they

16  might be unhappy about?

17  A.  Sure.

18  Q.  And what did you learn during those conversations?

19          MS. THORN:  Objection.  Calls for hearsay.

20          MS. HARROLD:  I'm asking about adverse party

21  statements under Federal Rule of Evidence 801(d)(2)(D) made by

22  the party's employee on a matter within the scope of that

23  relationship while it still existed.

24          MS. THORN:  Your Honor --

25          THE COURT:  Same decision as before.  Overruled.

1          THE WITNESS:  Can you repeat the question?

2   Q.  BY MS. HARROLD:  What did you learn during these stay

3   conversations?

4   A.  I learned that each person was very unique to what was

5   going on with their -- their processes in terms of why they

6   were unhappy or why they were choosing to leave.

7   Q.  What were some of the factors that people brought up in

8   these conversations?

9   A.  Some people didn't like the type of patients that were at

10  Sac.  They were having a hard time with navigating access to

11  care issues; they felt that was very frustrating for them.

12  They were having issues with the number of patients that they

13  were required to see.  They were having issues with -- some

14  were having issues with their supervisors.

15      Those are some of the broad categories.

16  Q.  Thank you.  Are there any others that you can remember?

17  A.  I mean, those are the big, broad categories that, like, I

18  would put people into.  Like, are they having a hard time with

19  their job?  Are they having a hard time with the people they

20  work with?  Are they having a hard time with patient care?  Are

21  they having a hard time with -- oh, money -- like, sometimes

22  salaries would come up in terms of, like, I'm leaving because

23  I -- I'm going here.

24      Those are the broad categories.

25  Q.  Thank you for outlining the broad categories.

1          In any setting, formal or informal, did you ever

2     communicate what you learned during these stay conversations

3     with the CEO?

4               MS. THORN:  Objection.  Calls for hearsay.

5               THE COURT:  Just answer yes or no.

6               THE WITNESS:  Yes.

7     Q.  BY MS. HARROLD:  While you were Chief of Mental Health at

8     Sac, were you aware of the salary ranges offered to your

9     psychologists?

10    A.  I would not be able to say specific ranges.  I knew general

11    ranges -- range salaries.

12    Q.  You mentioned that in the stay conversations, one category

13    of -- what people were unhappy about that would come up was

14    money and salaries.  Can you speak a bit more about that?

15              MS. THORN:  Objection.  Calls for speculation.  Calls

16    for a narrative.

17              THE COURT:  Sustained.

18    Q.  BY MS. HARROLD:  In your stay conversations and managing

19    your staff, have you received feedback that the salaries CDCR

20    paid psychologists is one of the factors that has contributed

21    to people wanting to leave?

22    A.  Yes.

23              THE COURT:  We're at time for a break, so let's take

24    a 15-minute break.  Come back at 10:55.

25         (Recess taken, 10:40 a.m. - 10:55 a.m.)

1              THE COURT:  Do we have a witness?

2       You may be seated.

3              MS. HARROLD:  I believe she's coming, Your Honor.

4              THE COURT:  All right.  Welcome back.  You continue

5       to testify subject to the oath you took earlier.

6              THE WITNESS:  Okay.

7              THE COURT:  All right.  You may proceed.

8    Q.  BY MS. HARROLD:  Hello again.

9    A.  Hi.

10   Q.  So before the break, you outlined some broad categories of

11   concerns that staff have raised in your stay conversations; is

12   that right?

13   A.  Yes.

14   Q.  And one of those broad categories was salary.  And in these

15   stay conversations, can you tell me a bit more about what your

16   staff have told you about why they are concerned about

17   salaries?

18              MS. THORN:  Objection.  Calls for speculation.  Calls

19   for hearsay.

20              THE COURT:  Overruled.

21              THE WITNESS:  Can you repeat the question?

22   Q.  BY MS. HARROLD:  Yeah, what have you learned from your

23   staff about the concerns they've had about salaries?

24   A.  That they are not paid compensation-wise to what they could

25   make out in the community, specifically Kaiser.

1    Q.  In what way was it not comparable?

2    A.  It was too low.

3    Q.  And based on your experience in hiring staff and in these

4    stay conversations, do you believe that the range of salaries

5    CDCR offers to line psychologists at Sac is competitive?

6            MS. THORN:  Objection.  Calls for speculation.  Lacks

7    foundation.

8            THE COURT:  Sustained.

9    Q.  BY MS. HARROLD:  You mentioned staff pointed to Kaiser as a

10   place that offered a higher salary; is that right?

11   A.  That's right.

12   Q.  Do you have any sense from them in those conversations what

13   that differential in pay was?

14           MS. THORN:  Objection.  Calls for speculation.  Lacks

15   foundation.  Calls for hearsay.

16           THE COURT:  Just answer yes or no.

17           THE WITNESS:  No.  Can you repeat the question?  I'm

18   sorry.

19   Q.  BY MS. HARROLD:  So you mentioned that staff sometimes --

20   often cited Kaiser as an employer that offered higher

21   compensation.  Did they ever tell you roughly how much more

22   they would make if they went to Kaiser in those conversations?

23           MS. THORN:  Objection.  Calls for hearsay.  Lacks

24   foundation.  Calls for speculation.

25           THE COURT:  Just answer yes or no.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1          THE WITNESS:  Yes.

2    Q.  BY MS. HARROLD:  And what did they tell you?

3          MS. THORN:  Objection.  Calls for hearsay.

4          THE COURT:  Overruled.

5          THE WITNESS:  They would say that they -- they would

6    often say what I'm making -- what I was making as a chief, they

7    could make as a line staff at Kaiser.  That's how they would

8    phrase it.

9    Q.  BY MS. HARROLD:  And during your time as Chief of Mental

10   Health at Sac, did the vacancy rate for psychologists go up?

11   A.  Yes.

12   Q.  Another broad category you mentioned was the type of

13   patients.  Can you explain that a bit more?

14   A.  Sure.  Sac is a Level 4 maximum security prison in Folsom,

15   California.  It has a large administrative segregation

16   population with one of the only psychiatric services units,

17   PSU, for men in the state of California.  We have one of the

18   largest rules violation reports and violence in -- in the

19   system.  And so the patients there often have personality

20   disorders, dual diagnosis of significant mental health

21   concerns, and along with that, some Axis II disorders that make

22   it very challenging to treat and make headway or progress in

23   the treatment of their mental illness.

24   Q.  Can you speak a bit more about -- this might be obvious.

25   I'm not a mental health clinician.  What -- in what ways do the

1    factors you mentioned make it challenging for clinicians?

2    A.  A lot of them expressed a lot of fear for getting assaulted

3    and/or having multiple reports of suicidal ideation throughout

4    the day that would then interrupt their other work that was

5    going on.

6        They had very -- a population that needed to be seen

7    multiple times a week in order to kind of help promote their

8    wellness.  And so the patients presented with a lot of

9    impulsivity and a lot of anger that needed to be treated that

10   otherwise doesn't exist in other populations in the state.

11   Q.  Thank you.

12       And this might be what we're talking about already, but are

13   you familiar with the term high security mission?

14   A.  Yes.

15   Q.  And what does that mean?

16   A.  It's a Level 4 -- I'm sorry -- Level 4 high security

17   mission in Sac -- CPS Sac is.

18   Q.  So just to make sure I understand.  Is there a high

19   security mission at Sac?

20   A.  There is a high security mission at Sac.

21   Q.  Another broad category you mentioned was navigating access

22   to care issues.  What did you mean by that?

23   A.  It -- every day at CSP Sac, we have ducats, appointments

24   that need to get completed, and patients need to get to work,

25   patients need to get to one-to-ones, patients need to be seen

1    timely and with efficiency.  And so every day at Sac, we're

2    trying to solution and create the best way to access those

3    patient care on time, and with those ducats and getting people

4    to groups throughout the week is -- continues to be a

5    challenge.

6    Q.  You used the word ducat.  For the court reporter's benefit,

7    I think that's D-U-C-A-T, if I spelled it correctly?

8    A.  Yes.

9    Q.  Thanks for explaining access to care.

10        What makes it hard to navigate at Sac, in your experience?

11   A.  The yards will get shut down a lot due to violence on the

12   yards.  The feet and distance that a patient has to come --

13   travel to at Sac can be an issue with trying to get all the

14   escorts done, because you're escorting from administrative

15   segregation unit to the treatment center, and that can have a

16   two-on-one escort or one-on-one escort, and that could take

17   some time to get everybody in the right place, at the right

18   time, doing the right thing.  If you have any interruptions or

19   disruptions in services due to custody issues or any other

20   things, that's going to highly impact treatment and the

21   delivery of services.

22   Q.  You mentioned custody interruptions, if I heard you

23   correctly; is that right?

24   A.  Right.

25   Q.  What does that mean?

1   A.  Like, if there was an alarm on the yard or if a patient --

2   a patient could be expressing chest pains, and that would have

3   to shut down the unit so that we could deal with the medical

4   emergency, and that would use up resources to then do the

5   escorts or other interventions to other appointments.

6   Q.  And you mentioned a bit about the feet distance they have

7   to travel.

8   A.  The feet distance, yes.

9   Q.  So can you speak a bit more about Sac's physical setup and

10  whether that poses any challenge?

11  A.  Sure.  So on a yard, as an example, a 5 is on the B side of

12  the whole yard, and the treatment center is located down here.

13  So you have to cross the whole yard and then come into the

14  treatment center, put the patient into a treatment module, get

15  him all situated, and then go get the next patient.  And all --

16  and all of that, even if we're coordinating getting ready and

17  the patient is ready up here to go, it can be a long process

18  that has to start on -- if you want to start on time, you're --

19  you're hustling pretty quickly in the morning to try to make

20  all that happen.

21  Q.  So clinicians -- when you say you -- that you have to

22  hustle to make that happen, do you mean clinicians have to be

23  involved in that hustle?

24  A.  No.  Custody would be involved in getting the patient to

25  the right place at the right time.  Clinicians need to be

 1    present and available for their appointments and not anywhere

 2    else in their offices.  They should be in the unit in the

 3    treatment center at the time of the appointment to get the

 4    appointment completed.

 5    Q.  Sounds complicated for patients to get to where they need

 6    to be.

 7    A.  Right.

 8    Q.  Do the clinicians -- the clinicians you supervise, do they

 9    also ever have to travel throughout the institution during the

10    day?

11    A.  Yes.  Absolutely.

12    Q.  And for what reasons?

13    A.  A patient may not show up for their appointment, and so we

14    mark that as a no-show, and then we have to go up -- we will go

15    up to the block to do a welfare check or a wellness check.

16        We want to check to see if they really refused or what was

17    going on, if there was a conflicting appointment that was in

18    their way or if -- if something had gotten into the way of the

19    appointment coming, or if maybe they just didn't want to come,

20    what were they doing.  How -- and then to check on them to see

21    if their cell looks good, if it's, you know -- if they look

22    healthy, if they look good, if they're alert and oriented times

23    four.  Anything that -- we would want to check in with the

24    officers.  Mr. Smith didn't come today.  Was he agitated?

25    Impulsive?  Did he talk to you?  You know, things of that

1    nature.

2        So if a patient refuses to come to the treatment center, we

3    then go up to the blocks to check on the patient.

4        We would go up -- sometimes if the patient is in crisis, we

5    would go and respond to the unit.  We also do welfare checks up

6    there, five-day follow-ups, 497s.  These are all processes that

7    are in place to help make sure and ensure the patients are

8    getting seen and are doing well.

9    Q.  What are maybe some other reasons why clinicians might need

10   to cross multiple yards throughout a day?

11       You mentioned checking in on patients who don't show up,

12   crisis.  Are there any other reasons?

13   A.  A patient -- we might cross yards if there's a continuity

14   of care issue.  For example, if a patient moved from A Yard to

15   B Yard but had a really good rapport with their clinician or

16   the clinician wanted to, they could go and travel over to a

17   different yard to see the patient, check in with them.

18       Our crisis triage crosses multiple yards daily to try to

19   make sure that we take care of every emergent consult and

20   urgent consult.

21   Q.  Another broad category you mentioned was the number of

22   patients.  What did you mean by that?

23   A.  Can you ask that again?

24   Q.  Yeah.  In the stay conversations you've had, I believe you

25   mentioned that -- and you can correct me if I'm misstating --

1  that another broad category of concerns someone would raise

2  would be the number of patients that they had to see.  Can you

3  speak a bit more about that?

4          MS. THORN:  Objection.  Calls for narrative.

5          THE COURT:  Sustained.

6  Q.  BY MS. HARROLD:  Around the time of your departure from

7  Sac, did you know how many CCCMS primary clinicians were

8  employed?

9          MS. THORN:  Objection.  Calls for speculation.  And

10 vague.

11         THE COURT:  Just answer yes or no.

12         THE WITNESS:  Yes.

13 Q.  BY MS. HARROLD:  How many CCCMS primary clinicians did you

14 have?

15         MS. THORN:  Objection.  Calls for speculation.  And

16 vague as to time.

17         THE COURT:  Overruled.

18         THE WITNESS:  We had one.

19 Q.  BY MS. HARROLD:  What's your best estimate of how many

20 patients were on the CCCMS caseload at Sac?

21 A.  When I left?

22 Q.  Yes.

23 A.  About 3 -- I don't know.  B Yard was getting more CCCMS

24 patients, so I'm not sure as to the exact number.  It was

25 between 350 -- 250 and 300.

1  Q.  I should have clarified that.  Approximation is perfect.

2  A.  Okay.  Yeah.

3  Q.  To make sure I understand that, a single clinician had a

4  caseload of approximately 300 patients?

5  A.  Yes.

6  Q.  And around the time of your departure from Sac, did you

7  know the approximate average caseload for a typical primary

8  clinician working in the EOP mainline program?

9  A.  Yes.

10  Q.  And what was it?

11  A.  It was 1-to-60.

12  Q.  And based on your experience, has increasing workloads had

13  a negative effect on the way that remaining clinicians feel

14  about their work?

15         MS. THORN:  Objection.  Calls for speculation.  Lacks

16  foundation.

17  Q.  BY MS. HARROLD:  From what you've heard in the stay

18  conversations.

19         MS. THORN:  Objection.  Calls for hearsay.

20         THE COURT:  Sustained.

21  Q.  BY MS. HARROLD:  I'd like to return to how you mentioned

22  number of patients as a concern people raised in the stay

23  conversations.

24     Can you -- I think when I first asked that, it may have

25  been confusing, but do you -- do you have a sense of what you

1   meant when you said that?

2          MS. THORN:  Objection.  Calls for speculation.  Lacks

3   foundation.

4          THE COURT:  Are you able to answer?  If you're able

5   to answer, you may.

6          THE WITNESS:  I don't know.  Can you -- I don't know

7   what -- you said "that."  What I mean by "that."  I don't

8   remember --

9          THE COURT:  So rephrase.

10          MS. HARROLD:  I'll rephrase.  That was a long

11   question.

12   Q.  BY MS. HARROLD:  I'll take a step back.

13       As you talked to staff who are thinking of leaving, and

14   trying to encourage them to stay, do they ever raise their

15   caseloads as a concern?

16   A.  Yes.

17   Q.  And what do you learn in those conversations?  What have

18   they told you?

19          MS. THORN:  Objection.  Calls for hearsay.

20          THE COURT:  Overruled.

21   Q.  BY MS. HARROLD:  You can answer.

22   A.  They're worried about their patients.

23   Q.  What are they worried about?

24   A.  They're worried that they can't see all their patients and

25   something bad will happen.

1    Q.  And, again, I'm not a mental health clinician.  What --

2    A.  Sorry.

3    Q.  So it's helpful for me if you can explain what type of bad

4    things you mean.

5    A.  Decompensation.  They're worry they will miss the patient

6    becoming more psychotic or more depressed or more anxious or

7    more impulsive, even, if -- as their caseload increases.

8    Q.  Are there any other reasons why they might be concerned

9    about their patients while caseloads increase, aside from

10    decompensation?

11    A.  Like -- you mean, like, the potential for suicide?

12    Q.  That could be one, yes.

13    A.  I -- potential for suicide, a potential for missing things

14    that might go on in their lives that would contribute to

15    stress, which is decompensation, though.  So that's generally.

16    Q.  Thank you.  Are you familiar with the term silent

17    suffering?

18    A.  I am.

19    Q.  What does that mean?

20    A.  To me, it's a -- it's a term that we -- that the patient is

21    suffering in a way that we cannot see overtly, or needs a lot

22    of extra questioning, extra monitoring, to make sure that we

23    see their suffering and treat it.

24    Q.  So to make sure I understand, patients who are speaking up

25    about, say, being suicidal, they're not silently suffering; is

1  that right?

2           MS. THORN:  Objection.  Misstates the testimony.

3           THE COURT:  I'll allow an answer, just for

4  clarification.

5           THE WITNESS:  Yes.  I wouldn't -- I mean, if you're

6  vocal about it, it would be very difficult to say you're

7  silent.  You're suffering, but maybe not silently so.

8  Q.  BY MS. HARROLD:  So silently suffering means reaching --

9  does it mean reaching below to see -- to see what might be

10  going on for the people who aren't speaking up?

11          MS. THORN:  Objection.  Lacks foundation and

12  misstates the testimony.

13          THE COURT:  Sustained.

14  Q.  BY MS. HARROLD:  Dr. Franceschi, were you concerned about

15  some patients at Sac silently suffering while you were Chief of

16  Mental Health and overseeing the delivery of care?

17  A.  Yes.

18  Q.  Can you tell me more about why you were concerned?

19          MS. THORN:  Objection.  Calls for a narrative.

20          THE COURT:  Sustained.

21  Q.  BY MS. HARROLD:  In your experience, is there a link

22  between staffing shortages and the risk of patients silently

23  suffering at Sac?

24          MS. THORN:  Objection.  Calls for speculation.  Lacks

25  foundation.

 1          THE COURT:  Overruled.

 2          THE WITNESS:  Can you repeat the question?

 3  Q.  BY MS. HARROLD:  Yes.  In your experience, is there a link

 4  between staffing shortages and the risk of patients silently

 5  suffering?

 6  A.  Yes.

 7  Q.  What is that link?

 8  A.  The link exists because if we cannot see the patients

 9  frequently enough that there is a chance, especially at Sac,

10  that the patients will go unnoticed.

11  Q.  And I think you already spoke to this, but why at Sac in

12  particular?

13  A.  Because of the type of population.  You have patients that

14  are very impulsive; you have patients that are very angry,

15  aggressive; but then you have this very quiet population, too.

16  Q.  Switching gears a little bit, you mentioned that -- let me

17  just ask it again.

18      Were you directly involved in determining the day-to-day

19  work schedule of clinicians?

20  A.  Yes.

21  Q.  And is it fair to say that almost all shifts for primary

22  clinicians have them work between eight and ten hours?

23  A.  Yes.

24  Q.  And do you know whether primary clinicians, on top of those

25  scheduled work hours, ever worked additional hours?

1              MS. THORN:  Objection.  Calls for speculation.  Lacks

2    foundation.

3              THE COURT:  Just answer yes or no.

4              THE WITNESS:  Yes.

5    Q.  BY MS. HARROLD:  And in your experience managing the work

6    schedules, how often did primary clinicians go beyond their

7    scheduled work hours?

8              MS. THORN:  Objection.  Leading.

9              THE COURT:  Overruled.

10             THE WITNESS:  I don't know.

11   Q.  BY MS. HARROLD:  Do you have a sense of if -- if it was

12   more often than not that someone would have to work overtime --

13   primary clinicians?

14             MS. THORN:  Objection.  Calls for speculation.  And

15   leading.

16             THE COURT:  Overruled.

17             THE WITNESS:  I don't know.

18   Q.  BY MS. HARROLD:  In your experience, what are some reasons

19   that a primary clinician would need to work overtime?

20             MS. THORN:  Objection.  Calls for speculation.

21             THE COURT:  Overruled.

22             THE WITNESS:  Can you repeat the question?

23   Q.  BY MS. HARROLD:  What are some reasons that primary

24   clinicians might need to work overtime?

25             MS. THORN:  Same objection.

1                    THE COURT:  Overruled.

2                    THE WITNESS:  Some reasons that a primary clinician

3      might work overtime is a use of force would occur, to which

4      they would have to respond to.  Many of them said that their

5      high caseloads with high paperwork demand would keep them

6      over -- working more than their 40 hours.  And then responding

7      to a crisis would keep them working more hours than the 40.

8      Q.  BY MS. HARROLD:  You mentioned that -- access to care

9      issues.  Would that ever be a reason why someone would need to

10     work overtime?

11                   MS. THORN:  Objection.  Misstates the testimony and

12     calls for speculation.

13                   THE COURT:  Sustained.

14                   MS. HARROLD:  I can move on.

15     Q.  BY MS. HARROLD:  In your experience in these stay

16     conversations and managing your staff, did people ever cite

17     their work hours as a reason they were unsatisfied in their

18     positions?

19                        MS. THORN:  Objection.  Calls for hearsay.

20                        THE COURT:  Overruled.

21                        THE WITNESS:  No.

22     Q.  BY MS. HARROLD:  So just to be clear, in stay

23     conversations, no one -- in stay conversations, did work hours

24     ever come up?

25                        MS. THORN:  Objection.  Asked and answered and calls

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

 1   for hearsay.

 2           THE COURT:  Overruled, just for the purposes of

 3   clarification.  Yes or no.

 4           THE WITNESS:  Yes.  The -- yeah.

 5   Q.  BY MS. HARROLD:  And in those conversations, did staff ever

 6   cite -- were they ever concerned about their -- the number of

 7   hours they worked?

 8           MS. THORN:  Objection.  Hearsay and calls for

 9   speculation.

10           THE COURT:  Overruled.

11           THE WITNESS:  They were concerned, but it was -- they

12   were very willing to do the work that was presented.  I just

13   want to make that very clear.  They were very -- the staff are

14   very dedicated.  They want to do whatever it takes.  And so

15   while they might have said, I work a lot of hours, none of them

16   said, I'm leaving because I work a lot of hours.

17   Q.  BY MS. HARROLD:  Thank you.  I appreciate the

18   clarification.

19       Are you aware of the pension reform established by the

20   California Public Employees Pension Reform Act, also known as

21   PEPRA?

22   A.  Yes.

23   Q.  What is your understanding of what PEPRA changed about the

24   pension program?

25           MS. THORN:  Objection.  Lacks foundation.  Calls for

1    speculation.  And calls for a legal conclusion.

2            THE COURT:  Sustained.  Also, you're just past the

3    time you had allocated for this witness, based on your

4    estimate.  Just so you know.

5            MS. HARROLD:  Okay.  Thank you, Your Honor.  I'll try

6    to be brief.

7    Q.  BY MS. HARROLD:  Before we went on break, you mentioned

8    that there has been -- there was an increase in psychologist

9    vacancies while you were Chief of Mental Health.

10   A.  Yes.

11   Q.  And you, since the break, have testified as to the

12   caseloads, at least for two positions, I believe.  How does --

13   how do the staffing shortages affect the morale of your staff,

14   from what you've heard?

15           MS. THORN:  Objection.  Leading and calls for

16   speculation.

17           THE COURT:  Overruled.

18           THE WITNESS:  I would say that the staffing issue

19   impacts morale negatively.

20   Q.  BY MS. HARROLD:  In what way?

21   A.  People are very concerned, when a person leaves, about

22   what's going to happen to the rest of their caseload, what is

23   going to happen to their program, what is going to happen to

24   the patients.

25   Q.  What are concerns they have about their program?

1  A.  The team, right -- what it -- how much work is going to

2  have to be absorbed by the team; is management going to be able

3  to shift and solution the issues from just one person leaving.

4  Q.  Are you aware that in 2022, CDCR implemented a 15 percent

5  pay increase for mental health staff working in the psychiatric

6  inpatient programs but not to outpatient clinicians?

7          MS. THORN:  Objection.  Lacks foundation.  Calls for

8  speculation.  And it's irrelevant.

9          THE COURT:  Just answer yes or no.

10         THE WITNESS:  Yes.

11 Q.  BY MS. HARROLD:  Did you have concerns about that?

12         MS. THORN:  Objection.  Lacks foundation.

13         THE COURT:  Overruled.

14     Just answer yes or no.

15         THE WITNESS:  Yes.

16 Q.  BY MS. HARROLD:  And what were your concerns?

17         MS. THORN:  Objection.  Lacks foundation.  Calls for

18 speculation.  Irrelevant.

19         THE COURT:  Overruled.

20 Q.  BY MS. HARROLD:  Let me ask it in a more narrow way.  That

21 was pretty broad.

22 A.  Yeah.

23 Q.  Do you think that a similar -- do you think a similar pay

24 increase should be extended to all mental health staff at Sac?

25         MS. THORN:  Objection.  Lacks foundation.  Vague as

1    to similar increase.

2         THE COURT:  Sustained.

3    Q.  BY MS. HARROLD:  What concerns -- did you have concerns

4    about this 15 percent pay increase for the psychiatric

5    inpatient program staff?

6    A.  Yes.

7    Q.  And what was your concern?

8    A.  My concern was that it would fill up the psychiatric

9    inpatient patients so we would lose staff from Sac to go to a

10   higher paying job and that it was unfair to, especially, Sac

11   that was working so hard.

12   Q.  Did you ever raise that concern with anyone in CDCR

13   leadership?

14   A.  I believe on a call when -- we have a Region 1 check-in.  I

15   believe all chiefs were on the call.  We raised concerns

16   generally and broadly.

17   Q.  Who did you raise the concern to, if you recall?

18   A.  Oh, it was Laura Savios.  She was in Region 1.

19   Q.  For EOP mainline patients, they should see their primary

20   clinician weekly for one-on-one routine treatment interactions,

21   right?

22   A.  Yes.

23   Q.  Around the time of your departure from Sac, how often were

24   EOP mainline patients seeing their primary clinicians for those

25   one-on-one treatment interactions?

```
 1                    MS. THORN:  Objection.  Lacks foundation.  Calls for
 2        speculation.
 3                    THE COURT:  Overruled.  Overruled.
 4            You can answer if you're able.
 5                    THE WITNESS:  Once a month.
 6        Q.  BY MS. HARROLD:  Was that due to staffing shortages?
 7        A.  Yes.
 8        Q.  And have you heard the term triage plan or triaging patient
 9        care?
10        A.  Yes.
11        Q.  Did you have a triage plan at Sac?
12        A.  Yes.
13        Q.  Were you directly involved in creating the triage plans?
14        A.  Yes.
15        Q.  And did you share those triage plans with regional
16        management?
17        A.  Yes.
18        Q.  And what was the triage plan in place -- or I can -- let me
19        rephrase.
20            What was prioritized in the triage plan that was in place
21        around the time you left Sac?
22                    MS. THORN:  Objection.  Misstates prior testimony.
23        Lacks foundation.
24                    THE COURT:  Overruled.
25                    THE WITNESS:  The triage plan at Sac called for the
```

 1  monthly EOP one-to-ones, prioritization of 7362, urgent and

 2  emergent consults, and had -- that's all I can remember at this

 3  point.

 4  Q.  BY MS. HARROLD:  For treatment events -- just make sure I

 5  understand.  For treatment events that were not prioritized

 6  under the triage plan, did those sometimes not happen?

 7          MS. THORN:  Objection.  Calls for speculation.  Lacks

 8  foundation.

 9          THE COURT:  Overruled.

10          THE WITNESS:  I'm just not clear of the question.

11  Q.  BY MS. HARROLD:  So you --

12          THE COURT:  It's pretty vague.  That was not an

13  objection this time.

14  Q.  BY MS. HARROLD:  Have your triage plans -- I can just move

15  on.

16  A.  Okay.

17  Q.  Have your triage plans ever changed based on staffing

18  levels?

19  A.  Yes.

20  Q.  Have you ever changed a triage plan because of a staffing

21  shortage?

22          MS. THORN:  Objection.  Leading.  Calls for

23  speculation.  Lacks foundation.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yes.

1   Q.   BY MS. HARROLD:   In what ways did the triage plan change in

2   the context of the staffing shortage?

3   A.   Oh, well, um, so we were trying caseload groups for a

4   really long time.   We were trying to do a lot of -- keep --

5   maintain PC continuity of care for a while.   So we were

6   continuing to have higher caseloads but still run these

7   treatment -- these caseload groups.

8        And then as staffing dwindled, we had to get rid of the

9   caseload groups, and then we moved to the once-a-month model.

10        And then we tried a bunch of different things on CCCMS for

11   the staffing shortages out there.   As the population ebbed and

12   flowed out there, at different times, they had different

13   compliance.   And so -- but as we continued to lose staffing, we

14   had to pull resources from CCCMS at times to staff crisis

15   triage.

16        MS. HARROLD:   Thank you, Dr. Franceschi.

17   I have no further questions at this time, Your Honor.

18        THE COURT:   All right.   Cross.

19        CROSS-EXAMINATION

20   BY MS. THORN:

21   Q.   Good morning, Dr. Franceschi.

22   A.   Good morning.

23   Q.   Dr. Franceschi, are you authorized to speak on behalf of

24   CDCR today?

25   A.   I am not.

1    Q.  Do you agree that the opinions and statements you've given

2    here today are your personal opinions and are not based on the

3    opinions of CDCR?

4    A.  Absolutely, yes.

5    Q.  The Defendants in this case are the Office of the Governor,

6    CDCR Secretary Jeff Macomber, CDCR Undersecretary Diana Toche,

7    CDCR Deputy Director Amar Mehta, Department of State Hospitals

8    Director Stephanie Clendenin, and the Department of Finance

9    Director Joe Stephenshaw.

10       Are you authorized to speak on behalf of any of those

11    Defendants?

12    A.  I am not.

13              THE COURT:  I'm sorry.  Is there an objection?

14              MS. HARROLD:  Objection.

15              THE COURT:  You need to pull the microphone closer

16    and be quicker on the draw.

17              MS. HARROLD:  Yes.

18              THE COURT:  What's the objection?

19              MS. HARROLD:  Calls for speculation.

20       My apologies, Your Honor.

21              THE COURT:  Overruled.  The answer will stand.

22       Is there a question pending?

23              MS. THORN:  Thank you, Your Honor.

24    Q.  BY MS. THORN:  Dr. Franceschi, you're not authorized to

25    speak on behalf of any of the people I just named as Defendants

1    in this case, right?

2    A.  I am not.

3    Q.  Dr. Franceschi, on direct testimony, you mentioned that you

4    had spoken with some of your staff in what you call exit

5    conversations or stay conversations --

6    A.  Yes.

7    Q.  -- is that right?

8    A.  Um-hum.

9    Q.  Okay.  And you mentioned that some of them told you about

10   salaries that they were potentially getting from Kaiser,

11   correct?

12   A.  Correct.

13   Q.  And do you know the details about those salaries?

14   A.  I do not.

15   Q.  Do you know what comprised the salary information that the

16   staff relayed to you?

17   A.  I do not.

18   Q.  Have you ever done any analysis of the staff -- of the

19   salaries that mental health staff are provided from Kaiser or

20   from any other mental health provider in the state of

21   California?

22   A.  I have not.

23   Q.  Dr. Franceschi, you mentioned just now on direct regarding

24   the triage plan, I think you called it, correct?

25   A.  Correct.

1  Q.  And you, I think, mentioned that part of the triage plan

2  was the one-on-one patient contacts?

3  A.  Yes.

4  Q.  And what level of care are those patient contacts that you

5  mentioned?

6  A.  EOP.

7  Q.  And what was the requirement for the EOP contacts that are

8  required?

9  A.  Per Program Guide, the contacts are once a week.

10  Q.  And what was the contact frequency under the triage plan?

11  A.  Once a month.

12  Q.  So even though you might not have met that Program Guide

13  requirement for the -- under the triage plan, were your

14  patients at Sac still being seen on an as-needed basis?

15  A.  Yes.

16        MS. HARROLD:  Objection.  Calls for speculation.

17        THE COURT:  You need to speak up.  Is your microphone

18  on?

19        MS. HARROLD:  I don't know if it is.  Would it be

20  okay if I --

21        THE COURT:  Just switch seats or pull a different

22  microphone over if you can.  Hold on one second.

23        MS. HARROLD:  Testing.

24        THE COURT:  Yes.  Much better.

25    All right.  So the objection was speculation, and I'm going

1  to overrule the objection.  So the answer stands.  Yes.

2  Q.  BY MS. THORN:  Dr. Franceschi, have you committed

3  malpractice as a result of any of the staffing shortages you

4  described this morning?

5           MS. HARROLD:  Objection.  Calls for speculation.

6  Improper opinion.  Lack of foundation.

7           THE COURT:  Sustained.

8  Q.  BY MS. THORN:  Dr. Franceschi -- that's fine.  I'll move

9  on.

10           MS. THORN:  Nothing further for this witness.  Thank

11  you.

12           THE COURT:  All right.  Anything further,

13  Ms. Harrold?

14           MS. HARROLD:  No, Your Honor.

15           THE COURT:  Is this witness excused?

16           MS. HARROLD:  Yes, Your Honor.

17           THE COURT:  All right.  Excused, Ms. Thorn?

18           MS. THORN:  Yes, Your Honor.

19           THE COURT:  All right.  You're excused, Doctor.  You

20  may step down.

21           THE WITNESS:  Thank you.

22           THE COURT:  Next witness.

23           MS. ELLS:  Your Honor, Plaintiffs call Dr. Shelly

24  Minor.

25           THE CLERK:  If you'll remain standing and raise your

1    right hand.

2        (The Witness, Shelly Minor, is sworn.)

3            THE WITNESS:  Yes.

4            THE CLERK:  When you sit, please state your name and

5    spell it for the record.

6            THE WITNESS:  It's Shelly Minor.  S-H-E-L-L-Y

7    M-I-N-O-R.

8            THE COURT:  You may proceed.

9                        DIRECT EXAMINATION

10   BY MR. GOURSE:

11   Q.  Hi, Dr. Minor.  I'm Alex Gourse.  It's good to see you.

12       Are you currently employed by CDCR, Dr. Minor?

13   A.  Yes.

14   Q.  And how long have you worked for CDCR?

15   A.  20 years.

16   Q.  And what's your current position?

17   A.  Chief of Mental Health -- I mean Chief Psychologist for the

18   intermediate program.

19   Q.  And that's at California Health Care Facility, correct?

20   A.  Yes.

21   Q.  And how long have you been in that position?

22   A.  Approximately two years.

23   Q.  And what was your position before that?

24   A.  The Chief of Mental Health and the Executive Director for

25   the PIP.

1    Q.  And was that also at CHCF?

2    A.  Yes.

3    Q.  What are your responsibilities in your current position?

4    A.  Currently, since we do have the Chief of Mental Health

5    since I last testified, I'm working in the intermediate program

6    of the PIP.

7    Q.  When did the Chief of Mental Health position get filled?

8    A.  I'm not sure of the exact fill time.

9    Q.  Was -- was there -- was the Chief of Mental Health position

10   at CHCF filled in August of this year?

11   A.  I'm not sure what the HR -- I'm not sure when that all

12   happened.

13   Q.  Prior to September of this year, did you also have

14   oversight responsibilities -- oversight responsibilities with

15   regards to the non-PIP programs at CHCF?

16   A.  Yes.  That stopped on -- in September on the 25th when

17   Dr. Franceschi arrived.

18   Q.  Thank you.

19       Can you describe what those oversight responsibilities were

20   for the non-PIP programs?

21   A.  I dealt with a lot of the E Yard EOP programming and helped

22   with organizing caseloads and workloads, as well as working in

23   my second area at the PIP.

24   Q.  Were you involved in the hiring process for non-PIP mental

25   health staff at CHCF?

```
 1   A.  Yes.

 2   Q.  Can you describe your role in that process, please.

 3   A.  We would get a panel after the closing of the advertisement

 4   and have arrangements by HR for interview process.  And then we

 5   would interview the applicants and complete the references and

 6   submit all the documentation from the interviews to HR.

 7   Q.  So you mentioned that you would arrange and conduct

 8   interviews; is that right?

 9   A.  The arrangement of the interviews was done by the HR

10   department -- organizing, getting the actual dates and times,

11   interfacing with the applicants.  And then our job was to

12   conduct the interviews, do the references, and submit our

13   paperwork.

14   Q.  So HR would provide you with the name of a candidate and

15   the times when they were available to interview, and then you

16   would conduct the interview?

17   A.  Yes.

18           MS. THORN:  Objection.  Leading.

19           THE COURT:  Overruled.

20   Q.  BY MR. GOURSE:  Prior to September 25th of this year,

21   did -- did you have a role in selecting which candidates would

22   receive offers for mental health positions on the -- in the

23   non-PIP programs?

24   A.  Yes.

25   Q.  Can you describe that role, please?
```

1    A.  As I mentioned, we would conduct the interviews, we would

2    rate their answers, we would provide HR with the references and

3    the applicants for hire, and we would submit the paperwork.

4    Q.  In your role in the hiring process that we've been

5    discussing, did you -- did you communicate regularly with staff

6    from outside of CHCF about the hiring process?

7    A.  I don't understand the question.  If you could rephrase it.

8    Q.  So you testified that you would receive the names of

9    candidates who -- who you were charged with interviewing from

10    HR, correct?

11    A.  Yes.

12    Q.  And were -- those employees from HR are not institution

13    level staff, correct?

14          MS. THORN:  Objection.  Calls for speculation.  Lacks

15    foundation.  Vague.

16          THE COURT:  Overruled.

17       Answer if you're able.

18          THE WITNESS:  I'm -- I believe our department had --

19    had tried to streamline HR, and at that time, they moved all of

20    the local hiring to headquarters.

21       And then we also adjusted it to now, currently, it's now at

22    the regional level to help streamline the hiring process.  And

23    that's the answer.

24    Q.  BY MR. GOURSE:  Other than receiving the names and

25    availability of candidates for you to interview and -- and

 1  telling HR which candidates should receive an offer, did you --

 2  do you work with non-CHCF level staff on any other matters

 3  relating to staffing?

 4          MS. THORN:  Objection.  Leading.  Misstates the

 5  testimony.  Lack of foundation.

 6          THE COURT:  Overruled.

 7      You may answer.

 8          THE WITNESS:  I actually need you to re-ask the

 9  question.  Sorry.

10  Q.  BY MR. GOURSE:  So you testified that you received the

11  names and availability of candidates for mental health

12  positions at CHCF on the non-PIP side, correct?

13  A.  Yes.

14  Q.  And you testified that you then interviewed the candidates

15  and then make recommendations to HR as to who should receive an

16  offer, correct?

17  A.  Yes.

18  Q.  Do you also work with either the regional level HR staff or

19  headquarters level HR staff on any other matters relating to

20  staffing?

21          MS. THORN:  Objection.  Leading.  Compound.  Lack of

22  foundation.

23          THE COURT:  Overruled.

24          THE WITNESS:  We have regular meetings for psychiatry

25  with the regional team and following the registry staff.

1    Q.  BY MR. GOURSE:  Who attends those meetings?

2    A.  The Regional Psychiatrist Specialist and two chiefs of our

3    institution, as well as our Management Solutions liaison,

4    myself, and my colleague Dr. Potter.

5    Q.  Are there similar meetings for other mental health

6    positions other than psychiatrists?

7           MS. THORN:  Objection.  Leading.

8           THE COURT:  Overruled.

9           THE WITNESS:  No.

10   Q.  BY MR. GOURSE:  Do you know why not?

11   A.  No.

12   Q.  After a candidate receives an offer, there is a period of

13   time before they can start work, correct?

14          MS. THORN:  Objection.  Leading.  Lack of foundation.

15          THE COURT:  Overruled.

16          THE WITNESS:  Yes.

17   Q.  BY MR. GOURSE:  Do you know how long that period usually

18   lasts?

19   A.  Yes.

20   Q.  About how long does it usually last?

21   A.  Between 30 and 60 days.

22   Q.  Are those business days or calendar days?

23   A.  Calendar days.

24   Q.  Do you remember testifying at your deposition that it often

25   takes three to four months?

1        MS. THORN:  Objection.  Vague.

2        THE COURT:  Overruled.

3    Just answer yes or no.

4        THE WITNESS:  No.

5        MR. GOURSE:  One moment.

6        THE COURT:  Are you looking for the deposition?

7        MR. GOURSE:  Yeah.

8    Mr. Gonzalez, could you pull up page 70 of Shelly Minor's

9    deposition, please.

10   Q.  BY MR. GOURSE:  Dr. Minor, do you see, beginning on line

11   number 4, it states:  Typically a hire will take -- from the

12   beginning of the process of getting the references in and then

13   forward, it has been as long as three to four months.  That was

14   prior to HR being centralized at headquarters.  And since we

15   have centralized it at headquarters, that has decreased in

16   length to two months, two and a half months.

17       MS. THORN:  Your Honor, I object to this line of

18   questioning and the use of deposition.  It is inconsistent with

19   the question that was asked of the witness.

20       THE COURT:  Overruled.  I'm allowing it for

21   clarification.

22   Is there a question?

23       MR. GOURSE:  Yes, Your Honor.

24   Q.  BY MR. GOURSE:  So in your deposition, you testified that

25   there has been a change where it has changed from about three

1    to four months to two to two and a half months, correct?  When

2    did that change start to happen?

3              MS. THORN:  Objection.  Vague as to time and as to

4    what was changing.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes.  It -- I do recall making those

7    statements, and it was due to the Centralized Hiring Unit.  I

8    don't know the exact date that it went into effect, but

9    approximately a year ago.

10   Q.  BY MR. GOURSE:  Okay.  Thank you.

11       Based on your involvement in the hiring process, do you

12   think that it would be easier to hire mental health staff for

13   the non-PIP programs at CHCF if the process moved more quickly?

14             MS. THORN:  Objection.  Calls for speculation.  Lack

15   of foundation.

16             THE COURT:  Sustained.

17   Q.  BY MR. GOURSE:  Have any candidates declined an offer

18   because so much time had passed since they -- since they

19   received the offer before they could start work?

20             MS. THORN:  Objection.  Lack of foundation.  Calls

21   for speculation.

22             THE COURT:  Overruled.

23       Answer if you're able.

24             THE WITNESS:  Yes.

25   Q.  BY MR. GOURSE:  About how many?

1    A.  I don't have the exact number.

2    Q.  Is it common?

3              MS. THORN:  Objection.  Calls for speculation.  Lacks

4    foundation.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes, particularly before the

7    Centralized Hiring Unit came on board during COVID.

8    Q.  BY MR. GOURSE:  Before September 25th of this year, when

9    you still had oversight responsibilities with regard to the

10   non-PIP programs at CHCF, did mental health staff complain to

11   you about any of the -- about any of their working conditions

12   at CHCF?

13   A.  Yes.

14   Q.  What were some of the more common complaints?

15             MS. THORN:  Objection.  Calls for speculation.  And

16   hearsay.

17             THE COURT:  Overruled.

18             THE WITNESS:  In a particular instance in our E Yard

19   EOP, I had a meeting with the staff, along with the supervisors

20   of the area, and they were complaining that their caseloads,

21   with them being above 60 -- which the average caseload for EOP

22   is about 26 -- 26, 25 -- that there was some real issues and

23   concerns about the patients and about their care and about

24   their ability to see them.

25   Q.  BY MR. GOURSE:  Could you clarify.  I was a little

1    confused.  At one point, you -- you said that the caseloads for

2    staff in EOP were over 60 patients per staff member, and then

3    you also mentioned the number 26.  Can you clarify?

4         MS. THORN:  Objection.  Calls -- vague.  And calls

5    for speculation.  And lack of foundation.

6         THE COURT:  Sustained.

7    Q.  BY MR. GOURSE:  What's a typical caseload for a primary

8    clinician working in the EOP program at CHCF?

9    A.  25.

10   Q.  And is that currently?

11   A.  No.

12   Q.  When was the typical caseload 25 patients per primary

13   clinician?

14   A.  I don't know the exact time frame.  I know since COVID,

15   that's been the number, 60-plus.

16   Q.  So since COVID, the typical caseload per primary clinician

17   has been 60 patients or more?

18   A.  Yes.

19   Q.  Thank you.

20       And you mentioned that mental health staffing in the

21   outpatient -- in the non-PIP programs complained to you about

22   the effect of these high caseloads on the care they could

23   provide to their patients; is that right?

24       MS. THORN:  Objection.  Leading.

25       THE COURT:  Sustained.

1    Q.  BY MR. GOURSE:  What did primary clinicians say to you

2    about the effect of these high caseloads on their -- on the

3    care they provide to their patients?

4            MS. THORN:  Objection.  Lacks foundation.  Calls for

5    speculation.  And calls for hearsay.

6            THE COURT:  Overruled.

7            THE WITNESS:  They expressed liability issues.  We

8    lost a registry social worker for that exact reason.  She was

9    very concerned about the patients, and so was the other

10   providers that were providing the care.  They expressed the

11   inability to see them in a one-to-one situation in a private

12   room.  They were having to go out to the units to do

13   emergencies, and it was difficult for them to attend to

14   their -- their schedule that was -- the patients that were

15   already scheduled, so they weren't able to see them on that

16   day.

17   Q.  BY MR. GOURSE:  You -- you used the term liability

18   concerns; is that right?

19   A.  Yes.

20   Q.  Can you explain what you mean by that?

21           MS. THORN:  Objection.  Calls for a narrative.

22           THE COURT:  Sustained.

23   Q.  BY MR. GOURSE:  You testified that mental health staff

24   working in the non-PIP programs expressed concerns about being

25   subject to liability; is that correct?

```
 1                    MS. THORN:  Objection.  Leading.

 2                    THE COURT:  Well, overruled.

 3         Just to clarify, you may answer if you're able, whatever

 4    the answer may be.

 5                    THE WITNESS:  Yes.

 6    Q.  BY MR. GOURSE:  And what was your understanding as to the

 7    meaning of the term liability in that context?

 8                    MS. THORN:  Objection.  Calls for speculation.

 9                    THE COURT:  Overruled.

10                    MS. THORN:  Hearsay.

11                    THE WITNESS:  The providers were reporting that they

12    were concerned, particularly the ones that had licenses, which,

13    of the four, there was one, and that was a registry social

14    worker.  And the other three that were unlicensed were worried

15    that it would affect their license if there was a negative

16    outcome with a patient.  And they had concerns about that,

17    considering they weren't able to provide the care that they

18    felt was reasonable and appropriate for the patients in their

19    care.

20    Q.  BY MR. GOURSE:  Did you share that concern?

21    A.  Yes.

22    Q.  Can you say a little bit more about why?

23                    MS. THORN:  Objection.  Calls for a narrative.

24                    THE COURT:  Sustained.

25    Q.  BY MR. GOURSE:  Why were you concerned about the care being
```

 1    provided to patients?

 2            MS. THORN:  Objection.  Misstates the witness'

 3    testimony.  Calls for speculation.

 4            THE COURT:  Overruled.

 5            THE WITNESS:  I was concerned because the providers

 6    in this meeting had -- it was true.  I had 14 years on the

 7    ground as a psychologist working with this population and 20

 8    years overall and have a lot of experience working with this

 9    population and with the providers.  They were correct.  It

10    was -- it was a very high caseload, so we made some adjustments

11    to assist so that patients could be seen more frequently.

12    Q.  BY MR. GOURSE:  What were those adjustments that you made?

13    A.  We were able to take -- take away some of the extra work

14    that other providers could provide.  So we utilized our Senior

15    Psychologist Specialists to take on the roles for the RVRs.

16        We also had the specialist come over and have emergencies

17    -- deal with emergencies so that the providers with the

18    caseloads that were very high could start to see the patients

19    and have those one-to-ones that were really necessary.

20    Q.  And when did you start having these psychologist

21    supervisors take on these roles?

22    A.  It was -- it was about six weeks now that we had these

23    providers take over.

24    Q.  So in August of this year?

25    A.  Yes.

 1    Q.  Thank you.

 2        Were those supervisors performing these roles in addition

 3    to their other job responsibilities?

 4                MS. THORN:  Objection.  Leading.

 5                THE COURT:  Overruled.

 6                THE WITNESS:  I want to make a clarification that

 7    they're not supervisors; they're specialists.

 8    Q.  BY MR. GOURSE:  These are Senior Psychologist --

 9    A.  Specialists.

10    Q.  Okay.  Thank you for clarifying that.

11    A.  But they did have jobs.  Some of them are just hired, so we

12    had the opportunity, because we are allotted 14 Senior

13    Psychologist Specialists, so considering the crisis that was

14    going on, the supervisor and myself decided it would be

15    appropriate to utilize them for this emergency situation, and

16    they were still doing their job duties.  Some of them had more

17    free time than others, and some of them hadn't been assigned

18    yet.

19    Q.  Thank you.  I believe you used the term emergency and the

20    term crisis just now; is that correct?

21    A.  Yes.

22    Q.  What was the crisis you were -- the crisis that you were

23    referring to?

24    A.  The caseloads and the inability for them, the providers, to

25    see their patients on a one-to-one basis.

 1   Q.   And what was the emergency that you referred to?

 2   A.   That specific area that they had caseloads that were very

 3   high.  There was a lot more added work now with regards to

 4   higher level of care decisions.  And so they were really having

 5   a difficult time -- the providers -- and had been having this

 6   caseload for some time.  So for them, especially, it was a

 7   crisis.  They needed to physically be okay and -- as well as

 8   the patients.

 9   Q.   Why were the caseloads for these providers so high?

10   A.   Because we have a lot of vacancies.

11   Q.   Do you know the current vacancy rate for non-PIP

12   psychologist positions an CHCF?

13          MS. THORN:  Objection.  Calls for speculation.  Lack

14   of foundation.

15          THE COURT:  Just answer yes or no.

16          THE WITNESS:  No, I don't know the exact number.

17   Q.   BY MR. GOURSE:  Do you know what the vacancy rate for

18   non-PIP psychologist positions at CHCF was as of the end of

19   August of this year?

20          MS. THORN:  Objection.  Calls for speculation.

21          THE COURT:  Just answer yes or no.

22          MS. THORN:  Lack of foundation.

23          THE COURT:  Just answer yes or no.

24          THE WITNESS:  No, I don't know the exact number.

25   Q.   BY MR. GOURSE:  Do you know the approximate number?

```
1              MS. THORN:  Same objection.  Lack of foundation.
2    Calls for speculation.
3              THE COURT:  Just answer yes or no.
4              THE WITNESS:  No, I can't speculate.
5    Q.  BY MR. GOURSE:  Do you track those numbers?
6    A.  Yes.
7              THE COURT:  It's 12:00, so we should take our lunch
8    break.
9              MR. GOURSE:  Thank you.
10             THE COURT:  So be back in your chair there at 1:00.
11        (Recess taken, 12:00 p.m. - 1:02 p.m.)
12             THE COURT:  You may be seated.
13        All right.  Continuing with Dr. Minor.
14   Q.  BY MR. GOURSE:  Hi again, Dr. Minor.
15   A.  Hello.
16   Q.  Prior to September 25th of this year, did you hear
17   complaints about inadequate salaries from -- from -- from
18   psychologists working in the non-PIP programs at CHCF?
19   A.  Yes.
20   Q.  And what did the people who -- who complained about their
21   salaries say?
22   A.  The theme of the salary concerns were related to other
23   institutions.  Like, we lost several to Kaiser who had higher
24   wages, and it was not a forensic environment.  And so those
25   were the primary concerns.
```

1    Q.   Can you explain what you mean by not a forensic

2    environment?

3    A.   Well, CDCR is a forensic environment.  You're working with

4    patients that have violence potential as well as other issues

5    related to them.  They're complex.  You have to have a lot of

6    experience, and it can be difficult at times working with

7    multidisciplinary teams.  Kaiser is -- you're working with

8    regular individuals in the community.  Much of it is

9    telemedicine.  It's a different environment.

10   Q.   When you say that patients in the non-PIP programs are

11   complex, what do you mean by that?

12   A.   As a psychologist, working with population for 20 years,

13   beginning in the Department of Juvenile Justice, we recognize

14   that the patients we work with start very early in life with a

15   lot of difficulties -- family difficulties, trauma, a lot of

16   emotional dysregulation, a lot of impulsivity, and it really

17   doesn't change as they grow older.

18        When I switched over to the adult side -- I really enjoyed

19   the younger population -- however, I realized they were big

20   bodies with younger minds.  So it was very refreshing to be

21   able to work with that population and to be able to help them

22   grow.  They're very damaged individuals with a lot of history

23   of various issues.

24   Q.   Thank you.

25        You testified just a minute ago that staff have complained

1   about -- or that psychologists, specifically, I believe, have

2   complained about salaries at Kaiser being higher than in CDCR;

3   is that correct?

4   A.  Yes.  We just lost another psychologist to Kaiser this

5   week.

6   Q.  Do you know how much higher the salaries are?

7           MS. THORN:  Objection.  Calls for speculation.  Lack

8   of foundation.

9           THE COURT:  Just answer yes or no.

10          THE WITNESS:  No.

11  Q.  BY MR. GOURSE:  Thank you.  Do you know about how many

12  psychologists have left CHCF --

13          MS. THORN:  Objection.  Sorry.

14          THE COURT:  Just answer yes or no.

15     Are you withdrawing the question?

16          MR. GOURSE:  Yeah.  I'd like to finish the question

17  if that's all right.

18  Q.  BY MR. GOURSE:  Do you know how many psychologists have

19  left the non-PIP programs at CHCF over the last year?

20          MS. THORN:  Objection.  Calls for speculation.  Lack

21  of foundation.

22          THE COURT:  Just answer yes or no.

23          THE WITNESS:  I don't know the exact number.  I know

24  our Chief of Mental Health went to Kaiser.

25          THE COURT:  Just wait for the next question.

1    Q.  BY MR. GOURSE:  Did your Chief of Mental Health go to

2    Kaiser?

3    A.  Yes.

4    Q.  When was that?

5    A.  Approximately two years ago.

6    Q.  Do you think -- based on your experience overseeing

7    clinical staff in the non-PIP programs and based on your

8    involvement in the hiring process, do you think that it would

9    be easier to hire more psychologists for the non-PIP programs

10   if salaries were higher?

11           MS. THORN:  Objection.  Leading.  Calls for

12   speculation.  Lack of foundation.

13           THE COURT:  Sustained.

14   Q.  BY MR. GOURSE:  Do you think that there is anything CDCR

15   could do to make it easier to hire clinicians?

16           MS. THORN:  Objection.  Calls for speculation.  Lack

17   of foundation.

18           THE COURT:  Sustained.

19   Q.  BY MR. GOURSE:  Dr. Minor, are you aware that mental health

20   staff in the PIPs received a 15 percent pay increase in 2022?

21           MS. THORN:  Objection.  Leading.

22           THE COURT:  Just answer yes or no.

23           THE WITNESS:  Yes.

24   Q.  BY MR. GOURSE:  Do you know whether mental health staff in

25   the non-PIP programs were eligible for that pay increase?

```
 1              MS. THORN:  Objection.  Lack of foundation.  Calls

 2   for speculation.

 3              THE COURT:  Just answer yes or no.

 4              THE WITNESS:  Can you repeat the question, please?

 5   Q.  BY MR. GOURSE:  Do you know whether mental health staff

 6   working in the non-PIP programs at CHCF were eligible for this

 7   pay increase?

 8              MS. THORN:  Same objection.

 9              THE COURT:  Overruled.

10              THE WITNESS:  No.

11   Q.  BY MR. GOURSE:  You don't know or --

12   A.  No, they were not eligible.

13   Q.  Thank you for clarifying.

14      Do you think that that's made it harder to recruit new

15   mental health staff to the non-PIP programs at CHCF?

16              MS. THORN:  Objection.  Calls for speculation.  Lack

17   of foundation.

18              THE COURT:  Sustained.

19   Q.  BY MR. GOURSE:  Have you been able to hire any new mental

20   health staff for the non-PIP programs since that salary

21   differential went into effect?

22   A.  Yes.

23   Q.  Do you know about how many?

24   A.  I believe we've hired two, one registry and one civil

25   service.
```

1    Q.    And which classifications were those?

2    A.    Social worker.

3    Q.    Do you think that based on your interactions with the

4    non-PIP mental health staff, that their ineligibility for that

5    pay increase had an impact on their morale?

6              MS. THORN:  Objection.  Leading.  Calls for

7    speculation.  Lack of foundation.  And vague.

8              THE COURT:  Just answer yes or no.

9              THE WITNESS:  Yes.

10   Q.  BY MR. GOURSE:  Has anyone told you that that -- that their

11   ineligibility for that pay increase affected their morale?

12             MS. THORN:  Objection.  Calls for hearsay.

13             THE COURT:  Overruled.

14             THE WITNESS:  Yes.

15   Q.  BY MR. GOURSE:  Why?

16             MS. THORN:  Objection.  Calls for hearsay.  Lack of

17   foundation.

18             THE COURT:  Overruled.

19             THE WITNESS:  The supervisors as well as the line

20   staff, we were -- we were bringing together the whole

21   institution at CHCF under one broad team, and the 15 percent

22   increase not eligible for the outpatient side caused a lot of

23   negative emotions, verbally stating that there is preferential

24   treatment for the inpatient PIP side.  And it was very

25   unfortunate.  Because -- because of that, even the supervisors

```
 1   were upset, because the supervisors in the PIP were able to

 2   have face-to-face and get the 15 percent.

 3   Q.  BY MR. GOURSE:  Did anyone tell you that they were quitting

 4   because they didn't get that salary increase?

 5              MS. THORN:  Objection.  Calls for hearsay.  Lack of

 6   foundation.

 7              THE COURT:  Overruled.  Just yes or no.

 8              THE WITNESS:  No.

 9   Q.  BY MR. GOURSE:  Does CDCR provide recruitment and retention

10   bonuses to any of the mental health staff working at CHCF?

11   A.  Yes.

12   Q.  Do you know which job classifications are eligible?

13   A.  Yes.  It was psychologists and psychiatrists.

14   Q.  Were social workers excluded from the -- from those

15   recruitment and retention bonuses?

16              MS. THORN:  Objection.  Lack of foundation.  Calls

17   for speculation.

18   Q.  BY MR. GOURSE:  Do you know whether social workers were

19   ineligible for those recruitment and retention bonuses?

20   A.  Yes.

21   Q.  Yes, you know or --

22   A.  Yes, I know.

23   Q.  And were they ineligible?

24   A.  Yes.

25   Q.  Did that affect their -- their morale?
```

```
 1                    MS. THORN:  Objection.  Calls for speculation.
 2    Q.  BY MR. GOURSE:  Did anyone complain --
 3                    THE COURT:  You can answer to the extent you know.
 4                    THE WITNESS:  Yes.  It was a real impact on the
 5    morale.  Again, divisive between the psychologist discipline
 6    and the social worker discipline.  And there was a lot of
 7    negative feelings that were verbalized in the meetings with the
 8    social workers and psychologists.
 9    Q.  BY MR. GOURSE:  Did anybody tell you that they were leaving
10    their position because they were ineligible for that bonus?
11                    MS. THORN:  Objection.  Calls for hearsay.  Lack of
12    foundation.
13                    THE COURT:  Just yes or no.
14                    THE WITNESS:  No.
15    Q.  BY MR. GOURSE:  How many primary clinicians are currently
16    assigned to work in the CCCMS program at CHCF?
17                    MS. THORN:  Objection.  Lack of foundation.  Calls
18    for speculation.
19    Q.  BY MR. GOURSE:  Do you know how many primary clinicians are
20    assigned to the CCCMS program at CHCF?
21    A.  Yes.
22    Q.  How many?
23    A.  One.
24    Q.  And do you know what the caseload is for that clinician?
25    A.  Yes.
```

1    Q.  Can you tell us what it is?

2    A.  It's over 500.

3    Q.  Over 500 patients.

4       And you testified earlier that the typical caseload for a

5    primary clinician working in the EOP program is about 60

6    patients, right?

7    A.  Can you repeat the question?

8    Q.  Earlier during this examination, you testified that the --

9    that the typical caseload for a clinician working in the EOP

10   program is approximately 60 patients; is that correct?

11   A.  Yes.

12   Q.  Do these high caseloads limit the services that mental

13   health staff are able to provide in the non-PIP programs at

14   CHCF?

15   A.  Yes.

16          MS. THORN:  Objection.  Argumentative.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes.

19   Q.  BY MR. GOURSE:  Is there a triage plan for the non-PIP

20   programs at CHCF?

21          MS. THORN:  Objection.  Lacks foundation.

22          THE COURT:  You may answer if you know.

23          THE WITNESS:  Yes.

24   Q.  BY MR. GOURSE:  Can you tell us what's in that plan?

25          MS. THORN:  Objection.  Calls for a narrative.

 1                     THE COURT:  That's fair.

 2        Can you refine the question?

 3   Q.  BY MR. GOURSE:  Does the triage plan call for prioritizing

 4   certain requirements over others?

 5   A.  Yes.

 6   Q.  Which requirements are being prioritized?

 7   A.  The first part of the triage plan is that the SRASHEs are

 8   always first priority; that's suicide risk assessment.

 9        The second is that all the initial IDTTs are done.

10        And then we also have a plan in place where the patients

11   are -- when they need to see their provider in EOP, that

12   they -- they allow a 7362, a request to be seen.  So in case

13   there is an emergency or a need, that they can be seen by their

14   provider.

15        There is no ongoing routine IDTTs for now unless it's

16   needed.

17   Q.  And is that in the EOP program?

18   A.  Yes.

19   Q.  Is that also true in the CCCMS program?

20   A.  Yes.

21   Q.  Are any IDTTs happening in the CCCMS program?

22   A.  Yes.

23   Q.  Only the -- but it's only the -- the initial IDTT?

24             MS. THORN:  Objection.  Lacks foundation.  Vague.

25             THE COURT:  Overruled.

```
 1              THE WITNESS:  For the CCCMS program -- we have two

 2   CCCMS programs.  One is in C and D; it has a clinician.  One is

 3   in E.  Because we don't have a clinician in CCCMS in our E

 4   Yard, we focus on the SRASHEs, and we do as much as we can to

 5   see the patients, but, unfortunately, the treatment teams are

 6   not able to be completed at this time.

 7   Q.  BY MR. GOURSE:  So there are no -- no Interdisciplinary

 8   Treatment Team meetings for the patients in CCCMS on E Yard; is

 9   that right?

10   A.  Yes.  Yes.

11   Q.  Are those patients on E Yard seeing their primary

12   clinicians for -- for routine appointments?

13   A.  Can you repeat the question, please?

14   Q.  Are those CCCMS patients on E Yard seeing their primary

15   clinicians for -- for routine appointments?

16   A.  No.

17   Q.  Are they seeing their primary clinicians for any

18   appointments?

19   A.  They're asked to complete the 7362 for emergencies.

20   They're also assigned a psychiatrist, and the triage plan is

21   that the psychiatrist will alert the supervisor and bring a

22   patient in for any emergencies.  And so that is how we're

23   covering the individual contacts for CCCMS.

24   Q.  Are there any routine services being provided by the mental

25   health program in E Yard?
```

1          MS. THORN:  Objection.  Vague.  Calls for

2   speculation.

3          THE COURT:  Overruled.

4          THE WITNESS:  I need clarification, if you're -- what

5   program you're referring to.

6   Q.  BY MR. GOURSE:  The CCCMS program.  Are there multiple

7   programs in E Yard?

8   A.  Yes.

9   Q.  Thank you.  I didn't understand that.

10      So for the CCCMS patients, are they -- are there any

11   routine services being provided by the mental health staff?

12   A.  No.

13   Q.  What about the EOP patients?

14   A.  Yes.

15   Q.  Are they -- are they getting the care you described

16   earlier, where it's -- they receive initial IDTTs, but -- what

17   services are the EOP patients receiving on E Yard?

18   A.  As I mentioned, we have the triage plan.  And then about a

19   month and a half ago, when I was looking into the -- what was

20   being provided and heard from the providers, we increased the

21   assistance from the Senior Psychologist Specialists to take

22   over the rules violation mental health assessments, as well as

23   the emergent care that they would have to do, and take care of

24   some of the other consults.  So that increased their ability to

25   see their patients in a one-to-one environment.

 1          THE COURT:  Again, just so you know, you've been

 2   going about the time you estimated for this witness.

 3          MR. GOURSE:  Okay.  Thank you.

 4   Q.  BY MR. GOURSE:  Are the CCCMS patients on the other yards,

 5   meaning other than the E Yard, receiving more services than on

 6   the E Yard?

 7          MS. THORN:  Objection.  Lacks foundation.

 8          THE COURT:  Overruled.

 9          THE WITNESS:  I would say yes, because the E Yard

10   providers are not available.  There isn't one assigned.  And

11   the C and D have a provider for that caseload.

12   Q.  BY MR. GOURSE:  And that's the provider whose caseload is

13   over 500 patients?

14   A.  Um-hum.  Yes.

15   Q.  Are there any other services that are not being provided in

16   the non-PIP programs pursuant to the triage plan?

17   A.  Yes.

18   Q.  Can you tell us what those are?

19   A.  Clinical groups by the psychologists and social workers.

20   Q.  So there are no clinical groups happening?

21   A.  Two of the providers that are in -- do a group, but that's

22   very difficult for them to do, but they feel it's important.

23   But there aren't any clinical groups other than those two

24   groups.

25   Q.  And what are those two groups that are being offered?

1   A.   I don't have the names of the groups.

2   Q.   Do you know whether they are leisure groups?

3   A.   No.

4   Q.   Do you know what the term leisure groups -- does that term

5   mean anything to you?

6   A.   Yes.

7   Q.   And are those two groups that are being offered leisure

8   groups?

9   A.   No.   They're core clinical groups.

10   Q.   Thank you.

11        And is that being offered in the EOP program or the CCCMS

12   program?

13   A.   The E Yard EOP program, by two of the providers.

14   Q.   Are there EOP patients on other yards?

15   A.   Yes.

16   Q.   Are any clinical groups available to them?

17   A.   No.

18   Q.   How long has that been the case?

19   A.   I'm -- I'm not sure.   Over -- before COVID.

20   Q.   Since before COVID?

21   A.   Yes.

22   Q.   Thank you.   Do you think that the lack of routine care is

23   hard on the patients in these programs?

24             MS. THORN:   Objection.   Calls for speculation.

25             THE COURT:   Sustained.

```
 1                  MS. THORN:  Lacks foundation.

 2                  THE COURT:  Sustained.

 3                  THE WITNESS:  In my 20 years --

 4                  THE COURT:  Wait.  Wait.  I sustained, so wait for

 5      the next question.

 6                  THE WITNESS:  I apologize.

 7                  THE COURT:  No problem.

 8      Q.  BY MR. GOURSE:  Do you think that the lack of routine care

 9      in the non-PIP programs has an effect on the patients in those

10      programs?

11                  MS. THORN:  Objection.  Lacks foundation.  Calls for

12      speculation.

13                  THE COURT:  Overruled.

14      Q.  BY MR. GOURSE:  So what kinds of effects does it have?

15      A.  In my 20 years experience working as a psychologist in the

16      forensic environment, as you can imagine, as I described

17      before, these patients are very fragile; they're very

18      emotionally dysregulated; they have trust issues; they have

19      problems connecting with others.  And when they're not seen,

20      they tend to act out; they decompensate; they will get in

21      physical altercations, do different kinds of things.  And what

22      I have seen in my experience is that elevates their level of

23      care.  So if I'm EOP and I'm not being seen, I end up in the

24      crisis bed or I end up in the acute program and into the

25      intermediate program and the PIP.
```

1    Q.  Has the number of RVRs that patients in the non-PIP

2    programs receive gone up since the vacancy rates have been as

3    high as they are currently?

4            MS. THORN:  Objection.  Leading and lack of

5    foundation.

6    Q.  BY MR. GOURSE:  Do you know whether the number of RVRs

7    received by patients in the non-PIP program has gone up over

8    the past two years?

9            MS. THORN:  Objection.  Leading.

10            THE COURT:  Overruled.

11        Just yes or no.

12            THE WITNESS:  Yes.

13    Q.  BY MR. GOURSE:  Do you attribute that to the lack of mental

14    health staffing?

15            MS. THORN:  Objection.  Leading.

16            THE COURT:  Sustained.

17    Q.  BY MR. GOURSE:  What do you think has caused that rise in

18    RVRs in the non-PIP programs?

19    A.  As I mentioned before, these patients have a lot of mental

20    health issues.  They have grown up in environments where being

21    physical is a part of their coping.  We have seen an increase

22    in the non-PIP rules violations.  They're approximately 35, and

23    last month -- the month before last, they went up to a hundred.

24    So we are seeing an uptick in the rules violations that our

25    patients have.

1    Q.  And do you believe that that is related to the lack of

2    routine care being provided in those programs?

3              MS. THORN:  Objection.  Calls for speculation.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6    Q.  BY MR. GOURSE:  And do you think that the lack of routine

7    care is related to the understaffing --

8              MS. THORN:  Objection.

9    Q.  -- in the non-PIP programs?

10             MS. THORN:  Objection.  Calls for legal conclusion.

11   Lack of foundation.  Calls for speculation.

12             THE COURT:  You may answer just in your capacity as

13   you've described during your testimony here.

14             THE WITNESS:  Yes.

15   Q.  BY MR. GOURSE:  Are there crisis intervention teams in the

16   non-PIP programs right now?

17   A.  No.

18   Q.  Is that because there are not enough clinicians to staff

19   them?

20             MS. THORN:  Objection.  Calls for speculation.  And

21   lack of foundation.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes.

24   Q.  BY MR. GOURSE:  Do you see an increase in self-harm

25   incidents in the non-PIP programs when patients are not getting

1    enough clinical contacts?

2            MS. THORN:  Objection.  Leading and lack of

3    foundation.

4            THE COURT:  Overruled.

5        You can answer if you're able.

6            THE WITNESS:  Yes.

7    Q.  BY MR. GOURSE:  What about other -- what about acting out

8    behaviors?

9    A.  Yes.

10   Q.  So when patients in the non-PIP programs are not getting

11   seen frequently due to staffing shortages, their -- their

12   conditions sometimes worsen or regress; is that right?

13           MS. THORN:  Objection.  Leading.

14           THE COURT:  Sustained.

15   Q.  BY MR. GOURSE:  You testified earlier that -- that you --

16   that based on your experience, it's more likely for patients in

17   the lower levels of care who are not receiving routine services

18   and clinical contacts -- it's more likely for them to need

19   higher levels of care, correct?

20           MS. THORN:  Objection.  Vague and misstates the prior

21   testimony.

22           THE COURT:  Sustained.

23   Q.  BY MR. GOURSE:  In -- in your experience, does a lack of

24   clinical contact cause patients' conditions to deteriorate?

25           MS. THORN:  Objection.  Lack of foundation.  Calls

```
 1   for speculation.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.

 4   Q.  BY MR. GOURSE:  And does that sometimes -- back up.

 5       Does that sometimes result in patients requiring a higher

 6   level of care because they have not received the intervention

 7   that they needed at a lower level of care?

 8              MS. THORN:  Objection.  Leading.

 9              THE COURT:  Sustained.

10   Q.  BY MR. GOURSE:  Are there any other services that you

11   haven't mentioned yet that are not being provided in the

12   non-PIP programs pursuant to the triage plan you mentioned

13   earlier?

14              MS. THORN:  Objection.  Vague.  Lacks foundation.

15   Calls for a narrative.

16              THE COURT:  Overruled.

17              THE WITNESS:  The prerelease program is not available

18   in the outpatient program.

19   Q.  BY MR. GOURSE:  Any others?

20   A.  No.

21              MR. GOURSE:  No further questions for now, Your

22   Honor.

23              THE COURT:  All right.  Cross-examination.

24              MS. THORN:  Thank you.

25   ///
```

                          CROSS-EXAMINATION

 1   BY MS. THORN:

 2   Q.  Good afternoon, Dr. Minor.

 3       Dr. Minor, Mr. Gourse was just asking you about things that

 4   contribute to a rise or an increase in RVRs.  And can you

 5   describe the types of things that could contribute to RVRs, in

 6   addition to the things you mentioned on direct testimony?

 7   A.  Can you repeat that again?

 8   Q.  Sure.  I'll rephrase.

 9   A.  Okay.

10   Q.  I'll rephrase.

11       Do you agree that changes in population -- strike that.

12       Has CHCF experienced a change in its population recently?

13   A.  Not that I'm aware of.

14   Q.  Are there things that could increase the incidents of RVRs,

15   for example, at CHCF that are related to the inmates' security

16   level, for example?

17           MR. GOURSE:  Objection.  Lack of foundation.  Calls

18   for speculation.

19           THE COURT:  In terms of foundation on this point, is

20   there anything more you would like?

21           MS. THORN:  No, Your Honor.  If the -- if she knows,

22   that's fine.

23           THE COURT:  All right.  Well, answer if you're able.

24           THE WITNESS:  No.

 1  Q.  BY MS. THORN:  Dr. Minor, when did you start working at

 2  CHCF?

 3  A.  Right when it opened.

 4  Q.  What year was that?

 5  A.  2013.

 6  Q.  And have you remained employed and working at CHCF since

 7  that time?

 8  A.  Yes.

 9  Q.  You have not worked at any other prison?

10  A.  No.

11  Q.  Are you involved with hiring mental health staff at any

12  other prison other than CHCF?

13  A.  No.

14  Q.  Have you been since your tenure as CHCF?

15  A.  No.

16  Q.  Earlier, you testified about staff complaining to you about

17  inadequate salaries, and I believe you mentioned that they were

18  being compared to salaries at Kaiser.

19  A.  Yes.

20  Q.  Do you know what components of salaries were being

21  discussed by those employees?  In other words, was it straight

22  salary?  Did it include benefits?

23  A.  Straight salary.

24  Q.  And do you have specific details on the salary levels that

25  were being discussed?

1   A.  No.

2   Q.  And do you have any information on the benefit package

3   being offered by Kaiser at or around the time you discussed

4   those salaries -- higher salaries at Kaiser with your staff?

5   A.  No.

6   Q.  Dr. Minor, you discussed, in some of your testimony in

7   response to Mr. Gourse's questions, a triage plan at CHCF.  Do

8   you recall that?

9   A.  Yes.

10  Q.  And as part of the triage plan, do patients -- are patients

11  seen by clinical staff on an as-needed basis?

12  A.  Yes.  Through the 7362 process, patients can submit a

13  request, and they can -- and a lot of staff sometimes place

14  requests using the same format, and then the patient is seen.

15  Q.  And that would be also in addition to, I think you

16  mentioned earlier, that psychiatrists can also refer them to be

17  seen?

18  A.  Yes.

19  Q.  Dr. Minor, at various points throughout your testimony in

20  response to Mr. Gourse's questions, you were asked your opinion

21  on subjects ranging from staffing vacancies, hiring, staff

22  concerns, and salaries, as well as access to care.  Do you

23  recall that testimony?

24  A.  Yes.

25  Q.  The opinions you gave, do they reflect the official

1    opinions of CDCR?

2    A.  No.

3    Q.  Are you authorized to speak on behalf of CDCR on the

4    subject of mental health staffing?

5    A.  No.

6    Q.  Are you authorized to speak on behalf of CDCR on any

7    subject?

8    A.  No.

9    Q.  Are you authorized to speak on behalf of the Office of the

10   Governor of the State of California on the subject of mental

11   health staffing?

12   A.  No.

13   Q.  Are you authorized to speak on behalf of the Department of

14   State Hospitals on the subject of mental health staffing?

15   A.  No.

16   Q.  Are you authorized to speak on behalf of the Department of

17   Finance on the subject of mental health staffing?

18   A.  No.

19            MS. THORN:  No further questions.  Thank you.

20            THE COURT:  All right.  Any redirect?

21            MR. GOURSE:  Yes.  Just a couple questions, Your

22   Honor.

23            THE COURT:  All right.

24   ///

25   ///

                              REDIRECT EXAMINATION

1   BY MR. GOURSE:

2   Q.  Dr. Minor, have you worked at any other prisons other than

3   CHCF?

4   A.  Yes.

5   Q.  Can you tell us which ones?

6   A.  As I mentioned in the beginning, I started in the

7   Department of Juvenile Justice; I worked OH Close with the

8   young population, under 12.  And then I also worked with the

9   Chaderjian, which was an older population.  And moved to Mule

10  Creek; I worked there for many years -- five, six years -- with

11  the population in EOP and CCC.  And then I went to the crisis

12  bed in CMF, worked with their program, ended up in CHCF, and

13  activated the crisis bed.

14  Q.  Were you involved in the hiring process for mental health

15  staff at any of those other institutions?

16          MS. THORN:  Objection.  Exceeds the scope of

17  cross-examination.

18          THE COURT:  Sustained.

19  Q.  BY MR. GOURSE:  Dr. Minor, have you shared the triage plan

20  that's in place at CHCF with anyone from CDCR headquarters?

21  A.  Yes.

22  Q.  Do you remember who you shared it with?

23  A.  The regional team.  And it also goes through our

24  subcommittee -- mental health subcommittee.

1   Q.  And did you get any response when you shared it with them?

2   A.  No.

3           MR. GOURSE:  No further questions, Your Honor.

4           THE COURT:  All right.  Anything further, Ms. Thorn?

5           MS. THORN:  No, Your Honor.

6           THE COURT:  Is this witness excused, Mr. Gourse?

7           MR. GOURSE:  Yes.

8           THE COURT:  Ms. Thorn?

9           MS. THORN:  Yes.

10          THE COURT:  All right.  You are excused, Dr. Minor.

11          THE WITNESS:  Thank you.

12          THE COURT:  Plaintiffs' next witness.

13          MS. ELLS:  Plaintiffs call Angela Reinhold.

14          THE COURT:  Do you have an estimate of time for this

15  witness?

16          MS. HARROLD:  I believe in the Galvan declaration

17  filed with the motion in limine briefing, we estimated 30

18  minutes.

19          THE CLERK:  Please step into the box.  If you'll

20  remaining standing, raise your right hand.

21      (The Witness, Angela Reinhold, is sworn.)

22          THE WITNESS:  I do.

23          THE CLERK:  When you sit, will you please state your

24  name and spell it for the record.

25          THE WITNESS:  Angela Reinhold.  A-N-G-E-L-A,

1    Reinhold, R-E-I-N-H-O-L-D.

2              THE COURT:  You may proceed.

3                        DIRECT EXAMINATION

4    BY MS. HARROLD:

5    Q.  Good afternoon, Ms. Reinhold.

6    A.  Good afternoon.

7    Q.  So we've never met?

8    A.  No.

9    Q.  Let me introduce myself.  My name is Adrienne Harold.  I'm

10   an attorney.  I work for a law firm called Rosen, Bien, Galvan,

11   & Grunfeld.  And I represent the Coleman Plaintiffs.

12       It's nice to meet you.

13   A.  Nice to meet you.

14   Q.  Thank you for coming such a long ways to be here and

15   provide your testimony today.

16   A.  Yes.  Thank you for asking me here.

17   Q.  And because we've never spoken before and I haven't taken

18   your deposition or anything, I'll just very briefly explain

19   what's going on.

20   A.  Thank you.

21   Q.  A lot of it is pretty obvious.  You're in a court.  You're

22   under oath.  What I'll do is ask you some questions that I

23   have.  Opposing counsel might object to my questions.  The

24   objection will be resolved, and we'll move forward.  That

25   should all be pretty -- you'll pick up what's going on pretty

 1    fast.

 2    A.  Right.

 3    Q.  And then I don't think we'll be here long, but I appreciate

 4    you taking the time to be here today.

 5    A.  Sure.  Thank you.

 6    Q.  So I'll start with a couple questions about your

 7    background.  And you might see me look down.  I've written down

 8    the questions I want to ask you.

 9    A.  No worries.

10    Q.  Can you explain who you work for?

11    A.  I work for the Department of Corrections and

12    Rehabilitation.

13    Q.  Okay.  And I can use the acronym CDCR, right?

14    A.  CDCR, yes.

15    Q.  What's your position?

16    A.  I'm a Supervising Psychiatric Social Worker I.

17    Q.  And what institution do you work at?

18    A.  CCI in Tehachapi.  California Correctional Institution in

19    Tehachapi.

20    Q.  And how long have you worked for CDCR?

21    A.  It will be ten years at the end of this month on Halloween.

22    Q.  Easy date to remember.

23    A.  Yes.

24    Q.  And how long have you held your current position of being a

25    Supervising Social Worker?

1    A.   I had an acting position before, but my permanent position

2    for a year and a half.

3    Q.   And what position did you have before that?

4    A.   I was a line staff.

5    Q.   Have you worked at any other institutions?

6    A.   No.

7    Q.   And, Ms. Reinhold, why did you become a social worker?

8    A.   So that's a great question.  I never knew that this

9    position existed.  I come from a place where college wasn't

10   discussed.  So I have four children, and when my third one was

11   three, she was diagnosed with cancer.  She's fine now, but it's

12   always emotional to talk about it.

13   Q.   Absolutely.

14   A.   So I met my very first social worker at the Children's

15   Hospital in Madera.  His name was Alister, and he was amazing.

16   Q.   Do you like being a social worker?

17   A.   Yeah, I do.

18   Q.   What do you like about being a social worker?

19   A.   The social work profession teaches us to advocate for those

20   who can't advocate for themselves, which is the reason why I'm

21   here.

22       So, yeah, we have a lot of flexibility in the things that

23   we can do.  We can work in hospitals; we can work Child

24   Protective Services, prisons, schools.  There is a lot of

25   flexibility.

1    I'm a psychiatric social worker, so it's different than a

2    hospital social worker.  As a psychiatric social worker, I'm

3    able to assess, diagnosis, and treat for mental disorders of

4    all kinds.  In the hospital setting, it's different.

5    Q.  Thank you for explaining that.

6        So it's interesting to hear that the role -- there is a lot

7    of flexibility --

8    A.  Um-hum.

9    Q.  -- but why did you choose to work at CDCR?

10   A.  My first degree was in criminal justice, and so it was a

11   good pairing because of the two degrees but also because of my

12   background.  I grew up in a very impoverished neighborhood in

13   Oakland, California, and so I got to see firsthand the -- the

14   need for mental health to be provided for that type of

15   population.  And so in the prison setting, it helps me to be of

16   service to that population that's incarcerated.

17   Q.  So, Ms. Reinhold, on September 15, 2023, you e-mailed staff

18   of this court, correct?

19   A.  Correct.

20   Q.  And then later that day, you forwarded that e-mail letter

21   to my law firm, attorneys at Rosen, Bien, Galvan, & Grunfeld;

22   is that right?

23   A.  That is correct.

24   Q.  Do you remember if you sent that e-mail from your CDCR

25   e-mail address?  If you don't remember, that's okay.

 1    A.  Yeah, I don't remember.  I'm sorry.

 2    Q.  Not a problem at all.

 3        Do you recall whether you included in that -- who you sent

 4    the e-mail to -- someone with a CDCR e-mail address?

 5            MS. THORN:  Objection.  Calls for hearsay.

 6    Relevance.

 7            THE COURT:  Overruled.

 8        You may answer if you're able.  First of all, do you

 9    recall?  Yes or no.

10            THE WITNESS:  I believe I e-mailed straight to the

11    Coleman attorneys, your office only.

12    Q.  BY MS. HARROLD:  Prior to that e-mail, you hadn't had any

13    contact with Plaintiffs' counsel?

14            MS. THORN:  Objection.  Leading.

15            THE COURT:  Overruled.

16            THE WITNESS:  No.

17    Q.  BY MS. HARROLD:  And after you sent that e-mail to

18    Plaintiffs' counsel, is it accurate to say the next thing you

19    know, you got a subpoena to be here?

20    A.  Yes.

21    Q.  You know, I've never gotten a subpoena myself.  I know it's

22    very -- it's written by lawyers, looks very formal.  So just

23    thank you, again, for being here.

24    A.  Yeah.

25    Q.  And is it accurate to say that since you received the

 1   subpoena, the only communications you've had with Plaintiffs'

 2   counsel have been e-mails about the logistics of you appearing

 3   today, on which CDCR's counsel have always been included?

 4          MS. THORN:  Objection.  Leading.

 5          THE COURT:  Overruled.

 6      You may answer.

 7          THE WITNESS:  Yes.

 8   Q.  BY MS. HARROLD:  And I believe maybe a brief conversation

 9   in the hallway earlier today about logistics, with CDCR counsel

10   present as well; is that right?

11   A.  That is correct.

12   Q.  So I'll want to ask about that letter.

13      But before that, I hope to understand more about your role

14   in staffing at CCI.  Can you explain what your job duties are?

15   A.  I supervise -- currently, we have three yards that are

16   open.  We've had two closed within the past few years.  And so

17   the three yards that are currently open are levels of

18   security -- two Level 4s, which are the worst -- you know, the

19   highest level of security.  So we have two Level 4s and one

20   Level 3.  And I am the supervisor to the clinicians on those

21   three yards, excluding OHU and ad seg.

22   Q.  Is there any other supervising social worker at CCI in the

23   mental health program?

24   A.  No.

25   Q.  And who reports directly to you?

1    A.    Psychologists, social workers.  Because I am the supervisor

2    of the yards for the mental health department, I also have the

3    ability to direct psychiatrists with regards to their lines and

4    coverage.  MAs, that's medical assistants.  We have rec

5    therapists as well that are on my yard.

6    Q.    And how many clinical social workers work for you?

7    A.    Currently, one just left -- one.  One.

8    Q.    You mentioned one just left.

9    A.    Um-hum.

10    Q.    Did you talk to this staff member about why they left?

11                MS. THORN:  Objection.  Calls for hearsay.  Lack of

12    foundation.

13                THE COURT:  Overruled.

14        Just yes or no.

15    Q.    BY MS. HARROLD:  I can repeat the question.

16    A.    Yes, please.

17    Q.    You mentioned one staff member just left.  Did you talk to

18    the staff member about why they left?

19    A.    Yes.

20    Q.    And you may have said this and I missed it.  What was that

21    staff member's classification?

22    A.    Social worker.

23    Q.    And what did that staff member tell you about why they were

24    leaving?

25                MS. THORN:  Objection.  Calls for hearsay.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1          THE COURT:  Overruled.

2          THE WITNESS:  The social worker wanted a different

3   institution where it's close to the ocean.  She actually went

4   to a state hospital where they pay more.  So yeah.

5   Q.  BY MS. HARROLD:  Thank you.  Do you know how many clinical

6   social workers are allocated and are supposed to be on your

7   staff at CCI?

8   A.  I know that we hired -- officially, we are -- we -- we

9   agreed to hire one and a half about three months ago, and we're

10  still waiting for those two people.  It's one and a half

11  positions but two individuals.  We're still waiting for them to

12  go through the process of getting -- being able to come on

13  staff.

14      As far as open positions, I don't know total.  I believe

15  there are more -- I know that, but I don't know the exact

16  number.

17  Q.  Did I hear you right that there are two staff members

18  you're waiting to join you?

19  A.  Correct.  Yes.  We have interviewed them and decided to

20  hire them, but they have not started yet.

21  Q.  How long has it been -- it might be different for each of

22  them.  How long have you been waiting for them to start?

23  A.  One of them, it's been seven weeks, and the other one has

24  been closer to three months.

25  Q.  For the one that it's been closer to three months, have you

1    followed up with anyone at CDCR about the status of that

2    candidate?

3    A.  Yes.

4    Q.  Who did -- who have you spoken with or --

5              MS. THORN:  Objection.  Calls for hearsay.  Lack of

6    foundation.

7              THE COURT:  Overruled.

8    Q.  BY MS. HARROLD:  You may answer.

9    A.  I don't know her exact title, but she is the person that

10   processes the paperwork and deals with region on getting the

11   candidate hired.

12   Q.  And what did you ask that person?

13             MS. THORN:  Objection.  Calls for hearsay.

14             THE COURT:  Sustained.

15   Q.  BY MS. HARROLD:  In speaking with this person, did you

16   learn anything about why it has taken three months?  And you

17   can answer just yes or no to start.

18   A.  No.  Sorry.  I'm remembering --

19             THE COURT:  Just wait for the next question.

20   Q.  BY MS. HARROLD:  I saw you hesitate there.  Is there any

21   clarification you wanted to offer?

22   A.  I'm remembering the conversation.  So there has been delays

23   in the paperwork, with signing, and going back and forth

24   between the regional office and CCI.

25   Q.  I'm not very familiar with the hiring process, but can

1  you -- can you explain a bit more about what you mean by

2  paperwork going in between?

3          MS. THORN:  Objection.  Calls for a narrative.  And

4  speculation.  And lack of foundation.

5          MS. HARROLD:  I'm just asking for clarification, Your

6  Honor.

7          THE COURT:  You can answer briefly.

8          THE WITNESS:  My honest answer is I don't know the

9  entire process.  I just know that region has -- paperwork goes

10  to region, and so the staff member that's in charge of the

11  paperwork for hiring has to work with region to some capacity.

12  Q.  BY MS. HARROLD:  Okay.  Just to make sure I understand,

13  you -- are you saying there's been a delay in that part of the

14  process?

15  A.  Yes.

16  Q.  Okay.  For this one candidate?

17  A.  Um-hum.

18  Q.  So going back to the staffing levels for clinical social

19  workers at CCI who you supervise, I'll represent to you that

20  the most recent vacancy report filed by CDCR reported that

21  there are 9.5 clinical social worker positions allocated at

22  CCI, with 4.88 of the positions filled.  Does that sound at all

23  right to you?

24          MS. THORN:  Objection.  Leading.  Lack of foundation.

25  Calls for speculation.

1          THE COURT:  Sustained.

2    Q.  BY MS. HARROLD:  You mentioned that not all of the clinical

3    social worker positions are filled, correct?

4    A.  Correct.

5    Q.  And that you're involved in the hiring process; is that

6    right?

7    A.  Yes.  I'm on the interviewing panel.

8    Q.  What's your best estimate to the proportion of positions

9    allocated for clinical social workers among your staff that are

10   filled?

11          MS. THORN:  Objection.  Calls for speculation and

12   lack of foundation.  Also asked and answered.

13          THE COURT:  Sustained.

14          MS. HARROLD:  I'll ask a different question.

15   Q.  BY MS. HARROLD:  Do clinical social workers serve as

16   primary clinicians in CDCR?

17   A.  Yes.

18   Q.  And do psychologists also serve as primary clinicians?

19   A.  Yes.

20   Q.  And can you please describe the job duties of clinical

21   social workers?

22   A.  It is the exact same as psychologists.  We have an initial

23   assessment when an inmate comes into the prison.  We're

24   assessing for suicidality, mental health diagnoses, whether or

25   not -- you know, what the criteria is that they meet in order

1    to be in the mental health program, and what we're going to be

2    doing to treat them so that they -- that their symptoms are

3    alleviated and they can go back to regular programming without

4    the mental health services.

5        So they do initial assessments, and they go to an IDTT,

6    which is -- it stands for Interdisciplinary Treatment Team.  It

7    is a formal meeting where the psychiatrist, the clinician, and

8    custody staff -- certain custody staff are in a meeting, where

9    it's a collaboration of minds, in addition to the inmate, where

10   it would discuss what the inmate has agreed is the treatment

11   plan and what they're going to be doing to work towards making

12   that person better.

13       And then the line staff, the clinician, sees the inmate on

14   one-to-one therapy sessions, working towards that treatment

15   goal.

16   Q.  Ms. Reinhold, what did you mean just now when you said that

17   social workers have the exact same job duties as psychologists?

18   A.  Meaning that we do the exact same work.  We -- we have the

19   initial assessment.  We go through the IDTT process.  We -- and

20   I'm going to say we because I'm a social worker, even though

21   I'm a supervisor.  We have one-to-one therapy sessions.  We do

22   all of the other extra duties that are associated with what is

23   required from the mental health program, to include RVR

24   assessments, evaluations.  Any kind of emergent situations

25   where an inmate is actively suicidal or reporting he's actively

 1    suicidal, we go and do those assessments to determine

 2    appropriate level of care.  We do the exact same as

 3    psychologists.

 4    Q.  Ms. Reinhold, are you a member of a labor union?

 5    A.  Yes.

 6    Q.  Which union?

 7    A.  As a supervisor, it is ACSS.  For line staff, it is AFSCNE.

 8    Don't ask me what that stands for.  I have no idea.

 9    Q.  So you mentioned AFSCNE, A-F-S-C-N-E, right?

10    A.  Correct.

11    Q.  Do you know whether AFSCNE Bargaining Unit 19 recently

12    reached a new agreement with the State?

13    A.  Yes.

14    Q.  And how do you know that?

15    A.  Because we -- it's kind of a long story.  Because I was

16    invited as a social worker to the platform where they had Teams

17    meetings.  They had several before the -- the voting process

18    started on the bargaining agreement.

19        So I attended, as did a lot of people throughout the state,

20    where I got to hear what the -- what the agreement was that was

21    reached.  And during that meeting on Teams -- or Zoom, I

22    believe it was, they informed us that it would go to a vote.

23    And then, of course, when the vote came out, colleagues, my

24    social workers on staff, informed me of what the results were.

25    Q.  In the letter you wrote to the Court and forwarded to

1    Plaintiffs' counsel, did you raise concerns about the recent

2    MOU?

3    A.  Yes.

4              MS. THORN:  Objection.  Calls for hearsay.  Lack of

5    foundation.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    Q.  BY MS. HARROLD:  Now, Ms. Reinhold, what were the main

9    concerns that you wanted to share?

10              MS. THORN:  Objection.  Calls for a narrative.

11              MS. HARROLD:  I'm asking for just the main concerns

12    here.

13              MS. THORN:  Objection.  Calls for a narrative.

14              THE COURT:  Understood.  I'll allow the answer as

15    concisely as possible.

16              THE WITNESS:  Pay disparity, lack of upward mobility.

17    Q.  BY MS. HARROLD:  Sorry.  What was the word you just used?

18    A.  Lack of upward mobility.  The difference in retention

19    bonus.

20    Q.  You mentioned pay disparity.  What do you mean?

21    A.  In the new contract, rec therapists that hold a bachelor's

22    level, with their pay raise, they will be making more than a

23    social worker that comes into the prison.

24        Psychologists received -- in addition to the general salary

25    increase that we all are going to be getting, psychologists

1    received a 10 percent raise.  Social workers received between

2    2.65 and 3 percent raise.  The rec therapists received a 9

3    point -- I believe it's 9.66 percent.

4    Q.  And why was that concerning to you?

5    A.  For a number of reasons.  I've been working for CDCR for

6    almost ten years now; it will be ten on Halloween.  And in the

7    number of years that I have been employed with the State of

8    California, every union contract, we've been promised -- social

9    workers -- that we would be highlighted or we would be

10   recognized in the next bargaining unit.  And in my ten years,

11   or just about, that has not happened.

12       I've had a lot of line staff who have left as a result of

13   the pay disparities that have been shown between the

14   psychologists, social workers, and now rec therapists.  And

15   just a feeling of not being valued as a -- in my profession.

16   Q.  And just to be clear, not being valued in what way?

17   A.  In the sense that now a bachelor's level employee is going

18   to make more than a master's level.

19       I do believe that -- well, I -- I've worked in the prison

20   setting for almost ten years now.  It's a very difficult,

21   challenging setting.  And so I do believe that everyone that is

22   receiving raises -- substantial raises, they do deserve it,

23   because it's such a challenging setting to work in.  But I -- I

24   believe that social workers also deserve the pay increase that

25   is more comparable to what we can be making outside of the

1  prison setting.

2  Q.  What's your basis for saying -- strike that.

3      When you say -- that was someone else.

4      Did I just hear you say more comparable to outside the

5  prison setting?

6  A.  Yes.

7  Q.  What do you mean by that?

8          MS. THORN:  Objection.  Lack of foundation for this

9  entire line of questioning.

10          THE COURT:  Understood.  The objection stands, but

11  overruled.

12  Q.  BY MS. HARROLD:  You can answer.

13          THE COURT:  Brief explanation.

14          THE WITNESS:  I have people that worked for CDCR that

15  have moved on to positions where they make more outside of

16  state service.  And I've done research.

17  Q.  BY MS. HARROLD:  Have you done research recently?

18  A.  Yes.

19  Q.  What did you research recently?

20  A.  I researched USA Jobs for social workers, looking at what I

21  could be making outside of the prison setting, in addition to

22  Kaiser.

23  Q.  Do you recall what employers you saw when you did this

24  search?

25  A.  Well, Kaiser was one of them.  There is -- in San Jose,

1  there are social worker positions, a number of them.  There is

2  a number of places throughout California.  I actually have them

3  printed.

4  Q.  You're prepared.  But no need.  Although I do print a lot

5  with me, too.

6  A.  Thank you.  Okay.

7  Q.  So when you're looking -- in this recent research you did

8  and what you described, did you look at the job descriptions

9  for these positions?

10  A.  Yes.

11  Q.  And what's your understanding of how the jobs compare to

12  your current job in a prison setting?

13  A.  There are a lot of similarities with regards to diagnosing

14  and treating, especially in the Kaiser setting.  There are also

15  social worker positions where it's more social services, CPS,

16  which is something that I did prior to prison work.  So yeah.

17  Q.  And how did the salaries compare to the salaries -- to your

18  salary and the salary CDCR pays social workers?

19        MS. THORN:  Objection.  Calls for speculation.  Lack

20  of foundation.  And hearsay.

21        THE COURT:  You can answer to the extent you're able.

22        THE WITNESS:  The very minimum line staff first going

23  in starts at over $106,000 for supervisors.  I've seen as high

24  as 256,000, I believe it was.

25  Q.  BY MS. HARROLD:  Are you talking about CDCR or the jobs you

1    researched?

2    A.  Outside.

3    Q.  And how does that compare to the salaries you've received

4    at CDCR?

5            MS. THORN:  Objection.  Lack of foundation.  Calls

6    for speculation.  And hearsay.

7            THE COURT:  Overruled.

8    Q.  BY MS. HARROLD:  So you can answer.

9    A.  I have reached my top pay as a Supervising Psychiatric

10   Social Worker.  I can't go any higher in my profession, at

11   least at CCI.  There is a Social Worker II position, but CCI

12   does not offer that.  So I make $10,049 a month before taxes,

13   so that's about 120,000 a year, give or take a little bit more.

14   Q.  You mentioned one of the concerns that you had about --

15   that you wanted to share in your letter about the MOU was the

16   lack of upward mobility?

17   A.  Correct.

18   Q.  What did you mean when you said that?

19           MS. THORN:  Objection.  Vague and calls for a

20   narrative.

21           MS. HARROLD:  I'm asking for a clarification.

22           THE COURT:  Overruled.

23           THE WITNESS:  Within CDCR, in the mental health

24   program, I can't go any higher than where I'm at.  They don't

25   offer positions for social workers for, say, Chief of Mental

1  Health or things of that nature.

2       MS. HARROLD:  I'm going to look at my notes for a

3  moment.

4       THE WITNESS:  Sure.

5       MS. HARROLD:  Thank you.

6    (Pause in proceedings.)

7  Q.  BY MS. HARROLD:  I believe you mentioned that after the

8  MOU, this agreement, was reached with the State, some of your

9  staff told you about it; is that right?

10  A.  That is correct.

11  Q.  And in speaking with your staff about the MOU, have they

12  shared whether they have any concerns about it?

13       MS. THORN:  Objection.  Lack of foundation.  Calls

14  for hearsay.  And speculation.

15       THE COURT:  Overruled.

16       THE WITNESS:  Yes.

17  Q.  BY MS. HARROLD:  And what are the concerns that they shared

18  with you, to the best of your memory?

19  A.  They stated, similar to what I wrote in that e-mail, that

20  they feel that they're not valued from the State.  They feel

21  that, just like me, they've been holding on for -- for pay

22  increases that the union has told us over the course of their

23  tenure that would happen for social workers and haven't.

24     They feel angered by the retention bonus that was given to

25  psychologists and psychiatrists.  And social workers, when that

1   came out last year, weren't even mentioned in the excluded list

2   of professions.  We didn't make the cut of even the excluded

3   list.  So there has been a lot of tension.

4   Q.  You also mentioned, I believe, in your answer just now,

5   too, a concern about the retention bonuses --

6   A.  Yes.

7   Q.  -- in the MOU?

8   A.  Yes.

9   Q.  What was that concern?

10  A.  Although social workers are grateful that we're looking at

11  getting something, it isn't to the caliber that the

12  psychologists are receiving, because they're still currently

13  receiving up to $35,000.  As social workers, if we started

14  before some date in 2016 -- I can't remember the date; maybe

15  January 1st, but I don't remember -- we get up to $10,000.

16  Anyone that started after 2016, they will get a percentage

17  based on the number of years that they've been employed at

18  CDCR, up to 7 percent of their pay.  Monthly pay.

19  Q.  Thank you.  I'm going to look at my notes again.  Just bear

20  with me.

21  A.  Okay.  I'm just going to breathe.

22  Q.  You and me both.

23      Ms. Reinhold, earlier you mentioned one social worker who

24  had just left.  Zooming back out to, say, the past year, have

25  any -- have any of your staff left CDCR?

1    A.  Yes.

2    Q.  How many, if you can remember, approximately?

3            MS. THORN:  Objection.  Asked and answered.

4            MS. HARROLD:  I don't think we've -- I've asked about

5    the past year, Your Honor.

6            THE COURT:  Well, just to be certain, you may answer.

7            THE WITNESS:  I would say probably a handful.

8    Q.  BY MS. HARROLD:  And like you did for the one who left

9    recently, who we talked about, did you talk to any of that

10   handful about the reasons why they were leaving?

11   A.  Yes.

12   Q.  And what did they say?

13           MS. THORN:  Objection.  Calls for hearsay.

14           THE COURT:  Overruled.

15           THE WITNESS:  One is a very good friend of mine.  She

16   went to Kaiser.  She left because of the retention bonus that

17   was given to psychologists.  She had more experience than I did

18   in the prison setting, and she got tired.  So she is making

19   more money now at Kaiser.  She's -- she's very excited that she

20   gets a bathroom with two-ply toilet paper, not to mention the

21   other office equipment that's state of the art, and treatment

22   space, and an office that has a view, and she's not risking her

23   safety with her patients, and she gets to telework three times

24   a week.  So it's really a lot of added bonuses that we don't

25   get here in the prison setting.

1    Q.  BY MS. HARROLD:  Did you talk to any -- aside from your

2    friend who went to Kaiser, any other of the handful who left

3    within this past year, did you talk to them about the reasons

4    why they're leaving?

5                   MS. THORN:  Objection.  Calls for hearsay.

6                   THE COURT:  Overruled.

7        Just answer yes or no.

8                   THE WITNESS:  Yes.

9    Q.  BY MS. HARROLD:  And what are -- did you hear any concerns

10   from them?

11                  MS. THORN:  Objection.  Calls for hearsay.

12                  THE COURT:  Overruled.

13                  THE WITNESS:  Can you repeat the question?  Sorry.

14   Q.  BY MS. HARROLD:  So now we're talking about the handful who

15   have left in this past year, minus the friend who went to

16   Kaiser.  What did you learn in speaking with them about their

17   reasons that they are leaving?

18                  MS. THORN:  Objection.  Leading and calls for

19   hearsay.

20                  THE COURT:  Overruled.

21                  THE WITNESS:  They are happy that they left.  They

22   are making more money and have much more professional

23   environment that they're working in so --

24   Q.  BY MS. HARROLD:  You mentioned the working environment.

25   Are there any aspects of the working environment for you and

1   your staff that can be challenging?

2   A.  Yes.

3            MS. THORN:  Objection.  Calls for speculation.  Lack

4   of foundation.

5            THE COURT:  Overruled.

6            THE WITNESS:  Yes.

7   Q.  BY MS. HARROLD:  What are some of those challenges?

8   A.  Treatment space is one.  Supplies.  Office space.  I

9   currently hold an office that has Record Storage on the door.

10  I am literally in a closet.  Yeah.

11  Q.  What do you mean by supplies?

12  A.  Psychologists would like to do testing -- psych testing,

13  but they don't have a scoring machine.  They don't have the

14  testing materials that are needed.  It's -- it's a challenge to

15  get -- I mean, even our furniture is 1970s at best.  It's a

16  challenge to -- to get equipment.

17  Q.  I think you mentioned a kind of machine.  What did you say?

18  I didn't hear it?

19  A.  Scoring machine for psych testing.

20  Q.  And what did you mean when you said treatment space?

21            MS. THORN:  Objection.  Lack of foundation.

22            THE COURT:  Overruled.

23            THE WITNESS:  At my prison -- I can only speak to my

24  prison -- on both of my Level 4 yards, we have two new medical

25  offices, medical space.  The mental health program gets the

```
 1   leftovers of whatever -- whatever medical isn't going to use,
 2   or -- so in both yards, we have been given two offices.  My
 3   bravo yard, which is the yard that has the most clinicians
 4   currently, in those two offices, we have -- one, two, three,
 5   four, five, six -- six clinicians and two psychiatrists.  So
 6   six psychologists and social workers and two psychiatrists for
 7   two offices.
 8   Q.  BY MS. HARROLD:  You mentioned that your colleague who left
 9   for Kaiser mentioned safety.
10   A.  Um-hum.
11   Q.  What did you mean by that?
12            MS. THORN:  Objection.  Leading.
13            THE COURT:  Overruled.
14            THE WITNESS:  In the prison setting, we have our --
15   our patients are people who are incarcerated for various
16   crimes, the most heinous being murder, rape, things of that
17   nature.  So being in a room with someone who has been convicted
18   of those type of crimes with no -- nothing more than a -- if
19   you can imagine an old garage door opener, that is what's
20   called a PAD -- it's an alarm device -- I don't know what the P
21   stands for -- that works, hopefully, most of the time -- and a
22   whistle.  So those are the conditions that we work under with
23   the patients that we service.
24       And so at Kaiser, because you asked about my Kaiser person,
25   I believe she's currently in an office with a lot of people
```

1  around and the general public that, you know, are there

2  receiving services because they -- I don't want to speculate.

3  It's a professional setting where the person doesn't -- isn't

4  always in a situation that could be dangerous.

5  Q.  BY MS. HARROLD:  Ms. Reinhold, do you have a private

6  practice?

7          MS. THORN:  Objection.  Relevance.

8          THE COURT:  Overruled.

9          THE WITNESS:  I see patients after hours, yes.

10 Q.  BY MS. HARROLD:  Is that -- do you have a private practice

11 at all to supplement your pay?

12         MS. THORN:  Objection.  Leading.

13         THE COURT:  Sustained.

14 Q.  BY MS. HARROLD:  Why do you have a private practice?

15 A.  I have a private practice because of needing the extra

16 income to help with our future.  My husband is retired now;

17 he's not making the money that he used to.  And at some point,

18 I'd like to retire, so I need to be able to pay off student

19 loans and, you know, different things.

20 Q.  Have you ever considered resigning from CDCR?

21 A.  Yes.

22 Q.  And why did you consider that?

23 A.  Because I can make more money outside of CDCR and not have

24 to work two jobs.

25 Q.  Thank you.

 1          Ms. Reinhold, is there anything else you think the Court

 2   should know about the treatment of clinical social workers and

 3   your experience at CCI?

 4               MS. THORN:  Objection.  Calls for speculation.

 5   Vague.  And lacks foundation.

 6               THE COURT:  Sustained.

 7               MS. HARROLD:  No further questions at this time.

 8   Thank you.

 9               THE WITNESS:  Thank you.

10               THE COURT:  All right.  Cross-examination?

11               MS. THORN:  Yes, Your Honor.

12               THE COURT:  All right.  You can go for five minutes,

13   and then we'll take our break.

14               MS. THORN:  Very well.

15                         CROSS-EXAMINATION

16   BY MS. THORN:

17   Q.  Good afternoon, Ms. Reinhold.

18   A.  Good afternoon.

19   Q.  My name is Elise Thorn.  I'm a Deputy Attorney General.  I

20   believe we spoke on the phone when you first sent your e-mail

21   and you were subpoenaed, as counsel had asked you questions

22   about earlier today.

23   A.  Yes.

24   Q.  Do you recall that conversation?

25   A.  Yes.

1    Q.  We had a brief call?

2    A.  Yes.  There were two of you.  I don't remember who the

3    other one was.

4    Q.  All right.  What did you do to prepare for your testimony

5    today?

6    A.  I reread my e-mail.  I received support from my husband and

7    my mom and my children.  But I couldn't really -- I couldn't

8    really prepare, because I didn't know what I was going to be

9    asked.

10   Q.  Did you meet with anyone, other than your husband and your

11   mom, in preparation for your testimony today?

12           MS. HARROLD:  Objection.  Relevance.

13           THE COURT:  Overruled.

14           THE WITNESS:  I spoke with my Chief of Mental Health

15   to let him know.  Turned out he knew before me.  But I like --

16   I like transparency, so I wanted to make sure he knew, from me,

17   that I was going to be testifying, because I was subpoenaed.

18       I also let my other supervising staff know, because I would

19   be out of the prison, and someone needed to supervise my staff

20   in my absence.  So my staff knew because I'm -- I wouldn't -- I

21   wasn't going to be available today and tomorrow.  That's about

22   it.

23   Q.  BY MS. THORN:  Did you speak with anyone else regarding

24   your testimony today in preparation for -- strike that.

25       Did you speak with anyone else in preparation for your

1    testimony today, other than anyone at CCI and your husband and

2    your mom?

3    A.  No.

4    Q.  I think you've testified that you have been working at CCI

5    for ten years; is that correct?

6    A.  It will be ten on Halloween.

7    Q.  Okay.  That's right.  Halloween.  And as a clinical --

8    licensed clinical social worker, correct?

9    A.  Correct.

10   Q.  And you're still employed there today?

11   A.  Correct.

12   Q.  Ms. Harrold asked you about a -- the Bargaining Unit 19

13   contract -- the new contract.  Do you recall that testimony?

14   A.  Yes, I remember her asking me about it.

15   Q.  And isn't it a fact that your license -- your licensed

16   clinical social worker staff, who work under you as members of

17   that union, ratified that contract?

18   A.  Ratified?  I'm sorry?

19   Q.  They approved -- the union members approved the contract

20   that was signed and entered into?

21          MS. HARROLD:  Objection.  Lacks foundation.  Calls

22   for speculation.

23          THE COURT:  Sustained.  But you can attempt to lay

24   foundation.

25   Q.  BY MS. THORN:  Okay.  So Ms. Harrold was asking you about

1    the new contract that the State entered into with Bargaining

2    Unit 19.

3    A.  Correct.

4    Q.  Okay.  And what do you understand that contract to cover?

5    What -- which workers?

6    A.  Psychologists, rec therapists, social workers.  There is a

7    bunch of different professions.

8    Q.  And do you understand that the union members approved the

9    contract that was ultimately entered into?

10            MS. HARROLD:  Objection.  She -- I -- there is not

11    enough foundation here.

12            THE COURT:  Overruled.

13        Just answer if you're able to.

14            THE WITNESS:  It was voted upon, I know.

15    Q.  BY MS. THORN:  And was it approved?  Did the vote approve

16    the contract?

17    A.  Yes.

18    Q.  Thank you.

19        Ms. Reinhold, you agree, right -- you agree that the

20    educational requirements for psychologists who work for the

21    statewide mental health program are more robust than the

22    educational requirements for the licensed clinical social

23    workers?

24            MS. HARROLD:  Objection.  Asking for a lay opinion.

25            THE COURT:  Overruled.

```
 1                THE WITNESS:  I don't know if it's more robust.  I've
 2   never been in that program.  There are more years required.  We
 3   both --
 4   Q.  BY MS. THORN:  I'll ask that differently.  I apologize.
 5   That was probably --
 6                THE COURT:  Actually, let's go ahead and take our
 7   break.  15-minute break.  Just be back there in 15 minutes.
 8   You can step down and come back.
 9        Is this Plaintiffs' last witness?
10                MS. ELLS:  Yes, Your Honor.
11                THE COURT:  No rebuttal case planned?
12                MR. MELLO:  No.
13                THE COURT:  All right.  So see you in 15 minutes.
14        (Recess taken, 2:31 p.m. - 2:46 p.m.)
15                THE COURT:  You may be seated.
16        And you may continue.
17                MS. THORN:  Thank you, Your Honor.  I'd like to
18   withdraw my last question concerning the differences in the
19   educational level of the psychologist and licensed clinical
20   social workers.
21                THE COURT:  All right.
22                MS. THORN:  Thank you.
23   Q.  BY MS. THORN:  Ms. Reinhold, you are not authorized to
24   speak on behalf of CDCR, are you?
25   A.  Not to my knowledge.
```

1    Q.  And you're not authorized to speak on behalf of the State

2    of California or any of its agencies or departments?

3    A.  No.

4    Q.  Are you authorized to speak on behalf of Bargaining Unit

5    19?

6    A.  Not to my knowledge.

7                MS. THORN:  No further questions.

8                THE COURT:  All right.  Any redirect?

9                MS. HARROLD:  No, Your Honor.

10               THE COURT:  All right.  Is Ms. Reinhold excused?

11               MS. HARROLD:  Yes, Your Honor.

12               THE COURT:  Excused, agreed?

13               MS. THORN:  Yes.

14               THE COURT:  All right.  That didn't take long.

15   You're excused.  You may step down.

16               THE WITNESS:  Thank you.

17               THE COURT:  That concludes Plaintiffs' presentation

18   of evidence?

19               MS. ELLS:  Yes, Your Honor.

20               THE COURT:  All right.  And just confirming, no

21   rebuttal case?

22               MR. MELLO:  Correct, Your Honor.

23               THE COURT:  All right.  Let's just talk about

24   housekeeping going forward.

25       I believe the Court previously had said briefing was in 14

1   days.  Is that still -- is that agreeable?

2          MR. MELLO:  I'm -- I'm sure we wouldn't mind more

3   time, but I don't want to speak for Plaintiffs' counsel.

4          MS. ELLS:  We understand that is the Court's order.

5          THE COURT:  All right.  So briefing would be due

6   October 20th.

7      My thought is that I would schedule -- I would schedule

8   oral argument, because I undoubtedly will have some questions,

9   and so I'm wondering if we can do that now.  Would either

10  October 27th or November 2nd or 3rd be possibilities?  I have a

11  civil law and motion on the 3rd, which I believe right now is

12  quite impacted.

13         MR. MELLO:  I know that I am out of state on all of

14  those dates, Your Honor.  If it could be virtual, the answer

15  would be -- not the 27th, because I'm speaking at a conference,

16  but if it could be virtual, it could be that other date that

17  you mentioned, Your Honor.

18         THE COURT:  Ms. Ells, your thoughts?  I'm amenable to

19  virtual, I believe.

20         MS. ELLS:  That's fine with us.  But I lost track of

21  the second date in early November.

22         MR. MELLO:  The 2nd or 3rd of November.

23         MS. ELLS:  Okay.

24         THE COURT:  Yeah, November 2nd or 3rd.  I'm just

25  pulling up my calendar.

1          MS. ELLS:  I believe that either of those dates are

2     fine for us, so far as I know.

3          THE COURT:  I think November 2nd.  This is assuming

4     the trial I have showing goes away, which I understand it will.

5     So let's say November 2nd at 10:00 a.m., we'll reserve for oral

6     argument focused on the Court's questions based on the

7     briefing.  And if I have the opportunity beforehand, I'll give

8     you a sense of my questions.

9          MS. ELLS:  Thank you.

10          THE COURT:  You're going to meet and confer and let

11     me know your proposed schedule for a session on the other

12     matters.

13          MR. MELLO:  Correct.

14          MS. ELLS:  Yes.

15          THE COURT:  All right.  Is there anything else we

16     need to discuss today?

17          MR. MELLO:  There are a couple of matters that

18     counsel and I have discussed.

19       The one is -- the first is the joint exhibit list.  The

20     parties are still meeting and conferring, and we anticipate

21     filing the updated joint exhibit list tomorrow.  That's number

22     one.

23       We are still meeting and conferring on the waitlist date

24     for a hearing.  And Defendants also would like to reserve the

25     right to file a motion to strike with respect to Ms. Reinhold's

1    testimony, and if they do so, they will do it on or before the

2    time they file their closing brief.  So I'm just informing the

3    Court of that.

4        And then, lastly, I know that in your Court -- ECF 7918,

5    the Court indicated that she would be amenable to discussing

6    the tours at the close of this proceeding.  I know that counsel

7    has a position as to when the proceeding is closed.  But if the

8    Court has -- our position is we would like the tours to start

9    again.  And, if not, Defendants would like to have the

10   opportunity to brief, on an expedited basis, a motion to resume

11   the tours as soon as possible and are prepared to file a motion

12   in the next couple of days to resume tours, Your Honor.

13           THE COURT:  Can you bundle that up with the briefing

14   following this hearing, file it on the same date?

15           MR. MELLO:  We can file our motion earlier.  We can

16   file our motion tomorrow or --

17           THE COURT:  Why don't you work on a schedule for

18   briefing so that we can also discuss that on November 2nd.

19           MR. MELLO:  Okay.  So we won't even have a hearing on

20   our motion to resume touring for six weeks?

21           THE COURT:  Well --

22           MS. ELLS:  I don't believe that's six weeks.

23           MR. MELLO:  I'm sorry.

24           THE COURT:  I'm just -- I was looking for the

25   earliest possible hearing date after your briefing, giving me

1    time to read your briefing.  And so it's four weeks.

2                MR. MELLO:  I'm sorry.

3                THE COURT:  And you're not available on the 27th,

4    right?

5                MR. MELLO:  But somebody else could argue that

6    motion, Your Honor.

7                THE COURT:  There is such urgency that waiting until

8    November 2nd would prejudice the Defendants?

9                MR. MELLO:  Defendants' tours stopped in early

10   August, Your Honor, and have been paused since then.  And we

11   believe that they should resume.

12      And, again, I -- I feel like we've gotten along well during

13   this proceeding, so I do not -- I'm not trying to be hostile,

14   but it's my clients' position we would like to resume those

15   tours as soon as possible, and they have now stopped what will

16   the equivalent of three months if we have a hearing on --

17   approximately three months if we wait to have a hearing on this

18   issue.

19      We are prepared to file a brief now.  We don't need oral

20   argument.  We could file it on an expedited basis.

21               THE COURT:  All right.  Unless you work out a

22   schedule, then you're free to file a motion for -- and seek

23   expedited hearing.

24               MR. MELLO:  Thank you, Your Honor.

25               THE COURT:  All right.  Also, Dr. Burton, I believe I

1   am receiving a fully marked up depo transcript, and I'll rule

2   on those quickly so you know the Court's rulings for the

3   purposes of the final briefing.

4           MS. ELLS:  Thank you.

5           THE COURT:  All right.  Any other housekeeping,

6   Ms. Ells?

7           MS. ELLS:  No, I believe that's it.

8           THE COURT:  All right.  Very well.  I will see you by

9   video conference on November 2nd, if not before.

10          (Proceedings adjourned, 2:54 p.m.)

11                      ---oOo---

12  I certify that the foregoing is a correct transcript from the

13  record of proceedings in the above-entitled matter.

14

15                  /s/ Kimberly M. Bennett
                    KIMBERLY M. BENNETT
16                  CSR No. 8953, RPR, CRR, RMR

17

18

19

20

21

22

23

24

25