1  Rob Bonta, State Bar No. 202668
   Attorney General of California
2  Monica N. Anderson, State Bar No. 182970
   Senior Assistant Attorney General
3  Damon McClain, State Bar No. 209508
   Supervising Deputy Attorney General
4  Elise Owens Thorn, State Bar No. 145931
   Namrata Kotwani, State Bar No. 308741
5  Deputy Attorneys General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone: (916) 210-7318
    Fax: (916) 324-5205
8   E-mail: Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:   925-746-8460
Facsimile:   925-746-8490
*Attorneys for Defendants*

9

10                **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF CALIFORNIA**

12                   **SACRAMENTO DIVISION**

13

14  RALPH COLEMAN, et al.,                    Case No. 2:90-CV-00520- KJM-DB

15            Plaintiffs,                      **DEFENDANTS' CLOSING BRIEF**

16        v.

17  GAVIN NEWSOM, et al.                       Judge:   Hon. Kimberly J. Mueller

18            Defendants.

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION.................................................................................................1

II.     PROCEDURAL HISTORY ................................................................................3

III.    LEGAL STANDARD ........................................................................................5

IV.     CONTEMPT SANCTIONS ARE UNWARRANTED........................................7

    A.    Defendants Are In Actual Or Substantial Compliance With This Court's Mandatory 90% Fill Rate Requirement. ........................................7

        1.    Since This Court's February 28, 2023 Order, Defendants Have Achieved *Actual Compliance* With The 90% Fill Rate Requirement for Psychiatry and Recreational Therapist Positions...................9

        2.    Defendants Have Substantially Complied With The Court's 90% Fill Rate Requirement. .................................................................10

    B.    Where Defendants Have Not Achieved Compliance, They Have Taken All Reasonable Measures To Improve Fill Rates.....................12

        1.    CDCR Reviews Position Allocations Twice Yearly To Align Staffing Levels With The Patient Population................................13

        2.    Expansion of Telework Opportunities Through Telepsychiatry and Telemental Health Programs ............................................13

        3.    Salaries and Financial Incentives ............................................15

            a.    Recently Negotiated MOUs .........................................16

        4.    Streamlined Hiring Processes....................................................16

            a.    Lean Six Sigma Greenbelt Project ..............................17

            b.    Creation of a regional hiring unit ................................17

            c.    One-day hiring events ..................................................17

        5.    Expanded marketing and advertising efforts.............................18

        6.    CDCR contracted with Merritt Hawkins, the national leader in recruiting clinical providers. .......................................................19

        7.    CDCR contracts with registry providers to fill in staffing gaps..................19

    C.    Statewide and Nationwide Staffing Shortages Among Mental Health Providers Render Defendants Unable To Comply With This Court's 90% Fill Rate Threshold Across All Categories Of Providers.........................20

    D.    Defendants Are Not Required To Take *Unreasonable* Measures............................22

1       1.  Requesting waivers of state law is not a reasonable measure ......................22

2       2.  Raising salaries between 57-286% in rapid trial and error is neither
         reasonable nor supported by the evidence...................................................23

    E. Evidence Pertaining To Quality Of Care And Harm Is Irrelevant And
     Should Be Excluded. ................................................................................27

    F. If This Court Finds Defendants In Contempt, Defendants Must Be Afforded
     An Opportunity To Purge................................................................................29

V.  CONCLUSION ...............................................................................................31

VI.  CERTIFICATION...........................................................................................32

20039638.8           ii       Case No. 2:90-CV-00520- KJM-DB

DEFENDANTS' CLOSING BRIEF

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Unites for Kids v. Rousseau,*
  985 F.3d 1075 (9th Cir. 2021) ................................................................................. 31

*International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821,
  827 (1994) ................................................................................................... 5, 7, 30

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,*
  10 F.3d 693 (9th Cir. 1993) ............................................................................. 10, 11

*E.E.O.C. v. Gen. Tel. Co. of Nw.,*
  885 F.2d 575 (9th Cir. 1989) .................................................................................. 24

*F.T.C. v. Affordable Media,*
  179 F.3d 1228 (9th Cir. 1999) ............................................................... 5, 11, 12, 20

*Facebook, Inc. v. Power Ventures, Inc.,*
  No. 08-cv-05780-LHK, 2017 WL 3394754 (N.D. Cal. Aug. 8, 2017) .................. 9

*Forsythe v. Brown,*
  281 F.R.D. 577 (D. Nev. 2012) ............................................................................. 29

*Gen. Signal Corp. v. Donallco, Inc.,*
  787 F.2d 1376 (9th Cir. 1986) ............................................................................... 10

*J.L. v. Cuccinelli,*
  No. 18-cv-04914-NC, 2020 WL 2562895 (N.D. Cal. Feb. 20, 2020) ................. 22

*Kelly v. Wengler,*
  822 F.3d 1085 (9th Cir. 2016) ................................................................... 6, 22, 29

*Maggio v. Zeitz,*
  333 U.S. 56 (1948) ................................................................................................... 5

*Milliken v. Bradley,*
  433 U.S. 267 (1977) ................................................................................................. 5

*N.L.R.B. v. Trans Ocean Export Packing, Inc.,*
  473 F.2d 612 (9th Cir. 1973) .............................................................................. 5, 20

*Parsons v. Ryan,*
  949 F.3d 443 (9th Cir. 2020) ........................................................................... 30, 31

*S.E.C. v. Hickey,*
  322 F.3d 1123 (9th Cir. 2003) ............................................................................... 29

*Sekaquaptewa v. MacDonald,*
   544 F.2d 396 (9th Cir. 1976), cert. denied, 430 U.S. 931 (1977) ............................................ 6

*Sekaquaptewa v. MacDonald,*
   544 F.3d 396 (9th Cir. 1976) ........................................................................................ 5

*Shell Offshore Inc. v. Greenpeace, Inc.,*
   815 F.3d 623 (9th Cir. 2016) ....................................................................................... 30

*Shillitani v. U.S.,*
   384 U.S. 364 (1966) ...................................................................................................... 5

*Shuffler v. Heritage Bank,*
   720 F.2d 1141 (9th Cir. 1983) ............................................................................ 5, 9, 28

*Spallone v. U.S.,*
   493 U.S. 265 (1990) ...................................................................................................... 5

*Stone v. City and County of San Francisco,*
   968 F.2d 850 (9th Cir. 1992) .................................................................. 6, 22, 23, 31

*U.S. v. Ayres,*
   166 F.3d 991 (9th Cir. 1999) .............................................................................. 5, 20, 22

*U.S. v. City of Yonkers,*
   856 F.2d 444 (2nd Cir. 1988) ....................................................................................... 5

*U.S. v. Drollinger,*
   80 F.3d 389 (9th Cir. 1996) ......................................................................................... 20

*U.S. v. Rylander,*
   460 U.S. 752 (1983) ...................................................................................................... 6

*United States v. Bright,*
   596 F.3d 683 (9th Cir. 2010) ......................................................................................... 9

*United States v. Dillon,*
   No. 1:17-CV-00498-BLW, 2023 WL 6391152 (D. Idaho Oct. 2, 2023) ........................ 29

*United States v. United Mine Workers of America,*
   330 U.S. 258 (1947) .............................................................................................. 27, 28

*Whitcomb v. Chavis,*
   403 U.S. 124 (1971) ...................................................................................................... 5

**Federal Statutes**

28 U.S.C.
   § 1291 ............................................................................................................................ 29

DEFENDANTS' CLOSING BRIEF

**Other Authorities**

Alan O. Sykes, *An Introduction to Regression Analysis*, The Inaugural Coase
    Lecture, Coase-Sandor Institute for Law & Economics Working Paper No. 20
    (1993) ........................................................................................................................ 24, 25

1    I.      **INTRODUCTION**

2           CDCR's Mental Health Services Delivery System (MHSDS) does not remotely resemble

3    the system that was in place in 1990 when this case was filed, in 1994 when Magistrate Judge

4    Moulds issued his Findings and Recommendations, in 2009 when the Staffing Plan was filed, or

5    even in 2017 when the Court ordered Defendants to fill allocated mental health positions to no less

6    than 90%.  CDCR's fiscal year 1992-93 budget contained just 376.6 authorized mental health care

7    positions to serve an incarcerated population of 113,000.  ECF No. 547 (June 6, 1994 Findings

8    and Recommendations) at 39:10-13.  This year's State budget allocated 3,202.5 positions to adult

9    mental health services to serve an incarcerated population of 95,096.[1]  How much the State spends

10   on mental healthcare has also grown exponentially.  The budget for the provision of mental

11   healthcare services to CDCR's inmates has increased from approximately $40 million in 1990[2] to

12   $650,370,000 in 2023-2024.[3]  The State's commitment to provide adequate mental healthcare to

13   the incarcerated population has had the following results:  *Coleman* class members now have

14   significantly greater access to mental health care than the general adult population of California,

15   even accounting for the greater demand among incarcerated persons.  (Defendants' Exhibit (Defs.'

16   Ex.) 5, ¶¶ 12 & 100.)

17          These significant improvements to CDCR's MHSDS did not come about by chance.

18   Defendants have worked tirelessly to improve the care that is provided to their patients, and

19   continue to strive for improvement.  Increased staffing of mental health providers is part of that

20   process.  And, as hiring needs and challenges evolve, so does Defendants' approach to recruitment

21   and retention.  While job security and state pensions used to be the primary tools for recruitment

22   and retention, candidates in a post-pandemic world also prioritize job flexibility, like telework.  To

23   ───────────────

24   [1] CDCR's Total Population Report for September 27, 2023, available at

25   https://www.cdcr.ca.gov/research/2023-weekly-total-population-reports-tpop1-archive/; 2023-24
     State Budget, Department of Corrections and Rehabilitation, available at

26   https://ebudget.ca.gov/budget/2023-24EN/#/Department/5225.

27   [2] https://lao.ca.gov/analysis/1990/09_corrections_1990.pdf

28   [3] https://ebudget.ca.gov/budget/2023-24EN/#/ExpendituresPosistions/5225

1  meet candidates' demands, CDCR has implemented numerous measures to recruit and retain

2  mental health providers including increased salaries, pay differentials, expansion of recruitment

3  and retention bonuses, hiring candidates above minimum salary range, paying the majority of

4  providers at the top end of the pay scale, streamlined hiring processes, contracts with registry

5  providers and increased registry pay, a contract with the national leader on clinical recruitment,

6  updated marketing targets and materials, and expansion of CDCR's telemental health program.

7  *See* Section IV.B, *infra*.  These efforts are not "business as usual," as Plaintiffs suggest.  (9/29 RT

8  27:11-12.)

9        Even with their extraordinary efforts, however, Defendants have been unable to

10 simultaneously fill and maintain 90% staffing levels in all five classifications in 2023.  But the

11 evidence presented shows that Defendants' inability to meet Court mandated staffing levels is not

12 a result of low salaries.  In fact, Defendants' expert, Dr. Greulich, testified that CDCR salaries

13 lead the State *and nation* – a point unrefuted by either Plaintiffs or their expert.  Dr. Greulich's

14 regression analysis also did not find evidence that past CDCR salary increases relative to

15 community benchmarks corresponded with increases in fill rates among those mental health

16 professionals.  This testimony was also not refuted.  Indeed, ample evidence established the

17 reasons and support for this determination.  Put simply, money is just one factor that employees

18 consider.  Work-life balance, location, commute, and benefits are among other important

19 candidate concerns, especially in the post-pandemic era.[4]  After completing a thorough analysis,

20 Dr. Greulich determined that CDCR has taken reasonable measures to increase employment and to

21 meet court-mandated employment levels and vacancy rates among the five classifications at issue.

22 And as one of Plaintiffs' witnesses noted, Program Guide requirements, which literally elevate

23 completing forms over the substance of patient care, contribute to clinician dissatisfaction.[5]

24 _____

25 [4] Notably, Plaintiffs' expert only reviewed data from 2017-2020, altogether ignoring the radically different labor market that followed that timeframe.  (10/4 RT 202:5-6; *see also* 208:13-14; Pltfs.'
26 Ex. 25.)

27 [5] Dr. David testified that primary clinicians "have seen their documentation [requirements] grow and grow and grow and grow," noting, for example, "anywhere between 15, 17 … individual tabs
28 that need to be completed" with multiple check boxes for the Suicide Risk and Self Harm

1    While Plaintiffs argue that Defendants simply are not paying staff enough and salaries are

2  both the root cause and solution to the staffing problem, Plaintiffs failed to present any evidence to

3  back up this claim.  In fact, Plaintiffs' own expert had no opinion as to how large an increase in

4  pay is needed at any point to increase staffing and didn't "think anyone could tell you that."

5  (10/4/23 Transcript of Hearing ("RT") at 226:22.)  Plaintiffs' expert also did not study or opine on

6  whether the demand for mental health professionals exceeded the supply, expressed no opinion

7  about whether as of 2023 there is any shortage of mental health care providers, and did not opine

8  on whether CDCR has taken all reasonable efforts to fill its vacancies.

9    In short, because Defendants have been in actual or substantial compliance with the 90%

10  staffing fill rate requirement for most positions at issue, and have taken all *reasonable* measures to

11  improve fill rates across all positions, a finding of contempt is unwarranted.

12  **II.    PROCEDURAL HISTORY**

13    In June 2002, this Court ordered Defendants to "maintain the vacancy rate among

14  psychiatrists and case managers at a maximum of ten percent, including contracted services."

15  ECF No. 1383 (June 13, 2002 Order) at 4:1-2.  Seven years later, in June 2009, this Court ordered

16  Defendants to prepare a staffing plan "under the guidance of the Special Master following the

17  model that was used to develop the activation schedules and the short-term and intermediate plan

18  before the court."  ECF No. 3613 (June 18, 2009 Order) at 2:26-3:2.  On September 30, 2009,

19  Defendants filed the Court-ordered staffing plan which set forth "a comprehensive, optimal

20  staffing model."  ECF No. 3693 (Defs.' Staffing Plan) at 9.  Defendants cautioned that not "all of

21  the programs and/or staffing identified in the Plan are required by the *Coleman* Court," and did not

22  concede that the "proposed staffing and services are constitutionally required" or that the Staffing

23

24  _____

Evaluation that is "redundant" and "takes a very long time" to complete.  (10/5 RT 40:25-41:25.)
25  According to Dr. David, completion of *Coleman*-mandated forms can take a couple of hours *per case*, and she has "had staff come out and tell me that they were quitting because of the
26  documentation requirements."  (*Id.* at 41:1-11.)  Dr. David noted that "higher salaries might help
27  with recruitment and bringing staff in, but as long as we continue to work under the same
documentation requirements we currently have, we will not retain good people" because these
28  onerous requirements do not exist in the community as they do within *Coleman*.  (*Id.* at 41:15-20.)

1    Plan would satisfy the Prison Litigation Reform Act.  *Id.* at 7 fn. 1.

2          In October 2017, this Court discussed Defendants' historical staffing challenges and noted

3    that "defendants must do more to address ongoing mental health staffing shortages, particularly

4    among psychiatrists, in order to achieve long-overdue complete remediation."  ECF No. 5711

5    (Oct. 10, 2017 Order) at 28:17-19.  Notably, in October 2017, Defendants were well-staffed

6    among all other provider categories that existed at that time: psychologists (at 96%), social

7    workers (96%), and recreation therapists (96%).  (Defs.' Ex. 12.003, 12.005, 12.009.)  The Court

8    set a one-year deadline for Defendants to achieve the required staffing levels, and set future status

9    conferences to discuss Defendants' progress on staffing and to address "as necessary, any required

10   enforcement orders and the time staffing levels must be maintained at court-ordered levels, under

11   court supervision, in order for the court to be satisfied the remedy has been achieved and is

12   durable."  *Id.* at 28:26-29:2.

13          The Court's timeline for staffing was ultimately delayed by the Golding proceedings as

14   well as the COVID-19 pandemic.  *See* ECF No. 7742 (Feb. 28, 2023 Order) at 2:7-9, 4:16-18.  On

15   February 28, 2023, as the state emerged from a global pandemic and in the midst of the Great

16   Resignation, this Court ordered Defendants to include in their monthly staffing vacancy reports a

17   calculation of fines for vacant positions up to the 90% fill rate using the average of the maximum

18   salary for each class in the state's salary schedules, then doubling the total sum of the category-by-

19   category calculations.  *Id.* at 5-6.  Even though there was a well-documented national shortage of

20   health care workers, and CDCR was reporting an unprecedented increase in vacancies for

21   psychologists and clinical social workers that started during the pandemic, the Court said it would

22   set a hearing date for findings of contempt and payment of fines if fines accumulated for three

23   consecutive months.  *Id.* at 7:11-14.  On June 12, 2023, the Court set this matter for hearing for

24   consideration of findings of contempt and imposition of fines.  ECF No. 7856 (June 12, 2023

25   Order).

26   / / /

27   / / /

28   / / /

III.     **LEGAL STANDARD**

Courts have the "inherent power to enforce compliance with their lawful orders through civil contempt" where a person "willfully disobeys a specific and definite order requiring him to do or to refrain from doing an act." *Shillitani v. U.S.*, 384 U.S. 364, 371 (1966); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir. 1983).  Civil contempt proceedings are generally designed to compensate or coerce a party to act when that party has failed to take "'all the reasonable steps within [its] power to insure compliance with the [court's] order.'"  *Shuffler*, 720 F.2d at 1146-1147, *quoting Sekaquaptewa v. MacDonald*, 544 F.3d 396, 406 (9th Cir. 1976); *see also International Union, Mine Workers of America v. Bagwell*, 512 U.S. 821, 827-829 (1994).  However, a court's remedial powers "are not unlimited." *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971). As the Supreme Court has recognized, "'in selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed.'"  *Spallone v. U.S.*, 493 U.S. 265, 276 (1990), quoting *U.S. v. City of Yonkers*, 856 F.2d 444, 454 (2nd Cir. 1988) (internal quotations omitted).  Indeed, "'the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.'"  *Spallone*, 493 U.S. at 276, quoting *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977).

Plaintiffs carry the initial burden of proof to show by clear and convincing evidence that Defendants violated a specific and definite order of the Court.  *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).  Defendants here do not dispute that Plaintiffs have met their initial burden of showing that Defendants did not comply with the Court's orders mandating staffing fill rates of 90% across all categories at all times relevant here.

The burden then shifts to the Defendants to demonstrate why they were unable to comply, including a present inability to comply with the court's order.  *F.T.C.*, 179 F.3d 1239; *see Maggio v. Zeitz*, 333 U.S. 56, 75-76 (1948).  The burden is on the defendant to show "categorically and in detail" why he is unable to comply, or what defenses may excuse some level of noncompliance. *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973); *U.S. v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999).  A party's inability to comply with a judicial order constitutes a

1    defense to a charge of civil contempt. *F.T.C.*, 179 F.3d at 1239; *U.S. v. Ayres*, 166 F.3d 991, 994

2    (9th Cir. 1999).  Similarly, a party in violation of a court order may avoid civil contempt sanctions

3    by "showing it took *all* <u>reasonable</u> steps to comply with the order." *Kelly v. Wengler*, 822 F.3d

4    1085, 1096 (9th Cir. 2016), italics original, underlining added; *see also Stone v. City and County*

5    *of San Francisco*, 968 F.2d 850, 856-857 (9th Cir. 1992) ("This Circuit's rule with regard to

6    contempt has long been whether the defendants have performed 'all reasonable steps within their

7    power to insure compliance' with the court's orders"), citing *Sekaquaptewa v. MacDonald*, 544

8    F.2d 396, 404 (9th Cir. 1976), cert. denied, 430 U.S. 931 (1977).  "Where compliance is

9    impossible, neither the moving party nor the court has any reason to proceed with the civil

10   contempt action." *U.S. v. Rylander*, 460 U.S. 752, 757 (1983).

11          Here, standards for civil coercive contempt must guide the parties and this Court, as the

12   Court has stated it intended to coerce compliance through contempt, and that the proceedings are

13   not criminal in nature.  *See* ECF No. 7872 at 2:22-24; *see also*, *e.g.*, ECF Nos. 5711 ("the court

14   recently issued an enforcement order intended to bring defendants into full and permanent

15   compliance"), 7742 (referencing imposition of "monetary sanctions to compel compliance with

16   the court's orders on staffing").  In an April 19, 2017 Order, the Court "notifie[d] defendants that

17   the provisions of this order requiring them to come into full and permanent compliance … will be

18   enforceable by civil contempt proceedings, imposition of monetary sanctions to *coerce*

19   compliance."  ECF No. 5610 (April 19, 2017 Order) at 9:26-10:2.  While this order related to

20   transfer timelines, the Court later referenced this order in a subsequent October 10, 2017 order

21   pertaining to staffing.  *See* ECF No. 5711 at 27:25-27.  The Court has also subsequently

22   referenced the imposition of "monetary sanctions to *compel* compliance with the court's orders on

23   staffing, among other topics."  ECF No. 7742 at 3:1-3, emphasis added. Accordingly, the nature of

24   the sanctions contemplated in the Court's contempt proceedings regarding staffing can only be

25   understood to be civil coercive.  *See also* ECF No. 7916 at 2:1-6 (referencing orders that

26   established procedures and parameters for staffing contempt proceeding and citing as one of those

27   orders ECF No. 5726); *see also* ECF No. 5726 at 2:15-16 (citing ECF No. 5610 and stating: "By

28   its terms, the [Court's contempt] order is 'enforceable by civil contempt proceedings and, if

1   necessary, imposition of monetary sanctions to *coerce* compliance.'"  Emphasis added.).

2          Specific to a finding of civil coercive contempt, courts must give the contemnor the

3   opportunity to purge its contempt—*i.e.*, the opportunity for the contemnor to avoid the fines by

4   coming into compliance with the court's order.  *Bagwell*, 512 U.S. at 829.  Indeed, the opportunity

5   to purge is essential, and has been described as a choice the contemnor has the liberty to make:

6   "[T]he contemnor is able to purge the contempt and obtain his release by committing an

7   affirmative act, and thus carries the keys of his prison in his own pocket."  *Id.* at 828 (internal

8   quotations omitted).  Accordingly, while a court can find a party in contempt and determine the

9   amount of the fine, the court must hold the fines in abeyance subject to an opportunity to purge.

10  *See id.* at 833-34 (holding that summary adjudications of indirect contempt (*i.e.* those that take

11  place outside of court) are improper, especially those involving "out-of-court disobedience to

12  complex injunctions").

13  **IV.    CONTEMPT SANCTIONS ARE UNWARRANTED.**

14         Contempt is an extraordinary remedy, and is inappropriate where, as here, a party has

15  taken all reasonable efforts to comply with a court order, but compliance nonetheless remains out

16  of reach.  Sustained compliance with this Court's 90% staffing threshold across five mental health

17  provider classifications is complicated and challenging, particularly in the midst of a national labor

18  shortage among mental health providers.  Nonetheless, Defendants have been able to achieve both

19  actual and substantial compliance across various provider categories at various points in time –

20  further demonstrating the variable nature of this issue.  And critically, Defendants have taken, and

21  continue to take, all reasonable steps to alleviate vacancies among provider classifications.

22         **A.    Defendants Are In Actual Or Substantial Compliance With This Court's**
               **Mandatory 90% Fill Rate Requirement.**
23

24         In 2002, this Court ordered Defendants to "maintain the vacancy rate among psychiatrists

25  and case managers at a maximum of 10 percent, including contracted services."  ECF No. 1383 at

26  4:1-2.  The 90% fill rate requirement for case managers included psychologists and social worker

27  positions.  *See* ECF No. 7742 at 6:18-20.  The Court also found in March 2022 that the 90% fill

28  rate requirement applies to Chief Psychiatrist and Senior Psychiatrist supervisor positions as well.

1   ECF No. 7504 (March 18, 2022 Order).  In April 2023, two months after this Court issued its

2   February 28th Order, the Court expanded the 90% fill rate requirement to recreational therapists

3   and medical assistants.  ECF No. 7806.

4           Plaintiffs now contend that 90% "is not full compliance with the staffing plan."  ECF No.

5   7952 (Pltfs.' Opening Brief) at 7:2-3.  However, this Court's June 13, 2002 Order clearly

6   established an allowable vacancy rate of not more than 10%.  ECF No. 1383 (June 13, 2002

7   Order) at 4:1-2.  This Court could have set the threshold at 100%, but it did not.  Plaintiffs'

8   attempts to rewrite prior orders and requirements, which clearly set a 90% fill rate threshold, are

9   therefore unavailing.[6]  Where Defendants have attained a 90% fill rate, they have attained *actual*

10  compliance with the Court-imposed threshold of 90%.

11          That ensuring a 90% fill rate across all classifications is a challenging, constantly evolving

12  endeavor is not in dispute.  Even Plaintiffs acknowledged in their Opening Brief "the precise

13  character of Defendants' understaffing crisis has shifted.  Most of the vacancies are now among

14  psychologist and social worker positions, rather than psychiatrist positions."  ECF No. 7952

15  (Pltfs.' Opening Brief) at 3:9-11.  Nonetheless, each of the five classifications have had historical

16  periods of compliance, even though two of the categories were not subject to the 90% fill rate

17  requirement until April 2023.  *See* ECF No. 7806.

18          Psychiatry positions in the aggregate historically achieved a 90% fill rate for much of

19  2021, and the fill rate has since hovered close to 90% since that time.  Defs.' Ex. 12.002.

20  Psychology positions maintained a fill rate of 90% or higher for much of 2014, 2017-2019, and

21  briefly in the beginning of 2021, before the effects of the pandemic on staffing became

22  pronounced.  *Id.* at 12.003-12.004.  Combined social worker positions maintained a fill rate at or

23  above 90% for nearly eight consecutive years—from April 2014 through August 2021.  *Id.* at

24  12.005-12.006.  In fact, fill rates were at or exceeded 100% for social worker positions for 29

25  _____

26  [6] No organization providing healthcare at scale could fulfill 100 percent staffing over a sustained
    period of time, given that providers are resigning, terminated, or being hired at all times for a
27  plethora of legitimate reasons.  A fill rate such as 90% is a realistic target, and substantial
    compliance should correspond to fulfilling a substantial portion of such a reasonable target fill
28  rate.

1    months during those years. *Id.* Medical assistant positions were not allocated to CDCR's

2    MHSDS until July 2020, and quickly became filled at 90% or above from March 2021 through

3    June 2021. *Id.* at 12.007-12.008. And recreation therapists have maintained a fill rate at or above

4    90% for January through June 2015 and much of the period from March 2017 through August

5    2021. *Id.* at 12.009-12.010. This historical data shows how compliance has varied over time and

6    demonstrates the constantly shifting challenges associated with maintaining the high levels of staff

7    demanded by this Court.

8         More importantly, during the timeframe relevant to the Court's consideration of contempt

9    here – from February 28, 2023 through September 29, 2023 – Defendants demonstrated that they

10   were in actual compliance with the Court's 90% fill rate requirement in two of the five

11   classifications for the majority of that time, and were in substantial compliance at various times

12   across other classifications. In light of Defendants' actual and substantial compliance, and

13   Defendants' good faith and reasonable efforts to comply with staffing orders, contempt is not an

14   appropriate remedy. *See Facebook, Inc. v. Power Ventures, Inc.*, No. 08-cv-05780-LHK, 2017

15   WL 3394754, at *8 (N.D. Cal. Aug. 8, 2017) (citing *United States v. Bright*, 596 F.3d 683, 694

16   (9th Cir. 2010).

17            **1.    Since This Court's February 28, 2023 Order, Defendants Have**
18                  **Achieved *Actual Compliance* With The 90% Fill Rate Requirement for**
                  **Psychiatry and Recreational Therapist Positions.**

19         Where Defendants have actually complied with a court order, they may not be found in

20   contempt. *See Shuffler*, 720 F.2d at 1148 ("[w]hen the sole coercive purpose of the civil contempt

21   order [is] satisfied … the necessity for any coercive sanction end[s], and the sanction should [ ]

22   terminate[].") Since this Court's February 28, 2023 Order, Defendants have achieved a 90% fill

23   rate or better for psychiatry positions in the aggregate during the months of March 2023, April

24   2023, May 2023, June 2023, and August 2023. *See* ECF No. 7956 (Joint Statement of Stipulated

25   Facts) at ¶ 21; *see also* ECF No. 7984 (Defs.' Monthly Mental Health Staffing Vacancy Reports

26   for August 2023) at Ex. A, p. 5; *see* Defs.' Ex. 13; *see* ECF No. 7952 (Pltfs.' Opening Brief) at

27   5:20-22 ("Since the Court issued its February 28, 2023 Order, Defendants were substantially

28   compliant with the ratios in the 2009 Staffing Plan for staff psychiatrist positions and with the

ratios for recreation therapist positions in all months except July 2023.").  It is also undisputed that, during this same period, the State achieved at least a 90% staffing fill rate statewide for recreational therapist positions during the months of March 2023, April 2023, May 2023, June 2023, and August 2023.  *See* ECF No. 7956 (Joint Statement of Stipulated Facts) at ¶ 21; *see also* ECF No. 7984 (Defs.' Monthly Mental Health Staffing Vacancy Reports for August 2023) at Ex. A, p. 8; *see* ECF No. 7952 at 5:20-22.

Because Defendants have demonstrated actual compliance with this Court's 90% fill rate requirement for psychiatry and recreational therapist positions for the months of March through June and August 2023, Defendants cannot be held in contempt for non-compliance across these classifications.[7]  One month of noncompliance (July, just following staffing allocations, when psychiatrists and recreational therapists narrowly missed the 90% threshold by 1 and 2%, respectively) should not warrant a finding of contempt.  ECF No. 7933 (Defs.' Monthly Mental Health Staffing Vacancy Reports for July 2023) at Ex. A, pp. 5, 8); *see In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).  Indeed, Plaintiffs appear to concede this point in their Opening Brief, acknowledging that months following the twice-yearly staffing allocations that occur in January and June should warrant some level of acceptance of noncompliance because Defendants should have time to fill the new positions if allocations increase.  *See* ECF No. 7952 at 7:22-24.

**2.    Defendants Have Substantially Complied With The Court's 90% Fill Rate Requirement.**

Substantial compliance with a court order is a defense to an action for civil contempt and it is "not vitiated by a few technical violations where every reasonable effort has been made to comply."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).  Nor do "inadvertent violations" support a finding of civil contempt where the violating

---

[7] Notably, the Court did not expand the 90% fill rate requirement to recreational therapists or medical assistants until April 2023.  ECF No. 7806.  Thus, any fines calculations should exclude vacancy rates for February, March, and April 2023 for recreational therapists and medical assistants.

1  party has taken all reasonable steps.  *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379

2  (9th Cir. 1986).

3      This Court previously set the threshold for compliance at 90%.  ECF Nos. 1383 at 4:1-2;

4  7742 at 6:18-20; 7806.  Substantial compliance with this Court-ordered 90% fill rate threshold

5  must therefore equate to something less than 90%.  *See In re Dual-Deck*, 10 F.3d at 695; *see*

6  *F.T.C.*, 624 F.3d at 590-591.  Here, Defendants' failure to reach required staffing thresholds,

7  particularly among psychologists and social worker positions, was the inadvertent result of the

8  COVID-19 pandemic and its lasting changes on the labor economy.[8]  Staffing among both of these

9  classifications was compliant with this Court's 90% threshold (or extraordinarily close at 87% or

10 higher) leading into the pandemic.  Defs.' Ex. 12.004, 12.006.  In fact, staffing among clinical

11 social workers exceeded 100% in early 2020.  *Id.* at 12.006.  Moreover, these two classifications

12 had been compliant with this Court's 90% fill rate threshold (or within a few percentage points)

13 for a number of years leading into 2020.  Defs.' Ex. 12.003-12.004 (demonstrating psychology fill

14 rates of 85%-96% from January 2013 through July 2020); Defs.' Ex. 12.005-12.006

15 (demonstrating clinical social worker fill rates of 89%-108% from January 2014 through August

16 2021).

17      But the Great Resignation that was precipitated by the COVID-19 pandemic significantly

18 impacted these two classifications in particular.  Roughly one-third of CDCR's psychologists and

19 social workers left CDCR in search of better work/life balance, including telemental health

20 opportunities.  (10/4 RT 83:24-84:5, 89:24-90:3, 90:20-23.)  Plaintiffs' witness similarly testified

21 that clinical staff left, in part, because of a lack of telemedicine which would have enabled them to

22 work from home at least part of the time, and that there was a "mass exodus of staff around that

23 March 2022 point."  (10/5 RT 17:22-23, 19:5-10.)  This dramatic loss in mental health

24 professionals was not unique to CDCR.  Between June 2021 and May 2022, 668 mental health

25

26 ---

[8] Medical Assistant positions were not allocated to this classification until July 2020 – in the midst
27 of the pandemic.  While these positions experienced some period success in attaining a 90% fill
rate, particularly in early 2021, they too were plagued by staffing challenges associated with the
28 pandemic.  *See* Defs. Ex. 12.008.

1    clinicians left Kaiser, equating to "nearly double the number that left in the 12 preceding months."

2    (Plaintiffs' Exhibit (Pltfs.' Ex.) 24.036 at ¶ 71.)  During this time, "[m]ental health telehealth

3    startups have also been credited with drawing providers away from public sector jobs" because

4    "[t]elehealth and private sector jobs are perceived as offering better work-life balance, greater

5    flexibility and more frequent interactions with patients."  (*Id.* at 24.036 at ¶ 72.)  Dr. Greulich

6    opined that "COVID-19 appears to have affected providers' preferences regarding telehealth," and

7    that "[s]uch preferences and expectations make it more difficult for employers to hire individuals

8    for on-site positions if those individuals desire and are able to find opportunities to work via

9    telehealth, possibly from home, for other employers."  (*Id.* at 24.042 at ¶ 88.)

10         This mass exodus of psychologists and clinical social workers happened notwithstanding

11    CDCR's concurrent efforts to address COVID staffing challenges, including through its expanded

12    use of telehealth opportunities.  (*See* 10/3 RT 238:6-9.)  And while CDCR continues to build out

13    its telemental health program and expand those opportunities to psychologists and clinical social

14    workers, the damage to the staffing fill rates among those classifications has been done.  But

15    Defendants' non-compliance with the 90% fill rate threshold among psychologists and clinical

16    social workers was certainly inadvertent, and occurred despite Defendants' reasonable efforts to

17    curtail the impact of the pandemic on these classifications.  Thus, it would be "inequitable to

18    impose contempt sanctions" where, as here, Defendants have taken all reasonable steps to attain

19    compliance but nonetheless fell short.  *F.T.C.*, 624 F.3d at 590-591.

20    **B.    Where Defendants Have Not Achieved Compliance, They Have Taken All Reasonable Measures To Improve Fill Rates.**

21

22         Over the thirty-year lifespan of this case, hiring processes and candidate expectations have

23    evolved significantly.  For example, while pensions, job security, and a commitment to civil

24    service used to be candidates' primary considerations, in recent years, flexibility and telework

25    options have become more critical.  This broader cultural mindset shift became particularly

26    pronounced during and after the COVID-19 pandemic.  To keep up with candidates' evolving

27    expectations and to remain competitive, Defendants have implemented every reasonable

28    recruitment and retention measure available within the confines of California law.

**1.    CDCR Reviews Position Allocations Twice Yearly To Align Staffing Levels With The Patient Population.**

As part of its ongoing efforts to ensure adequate staffing to support a constantly-shifting patient demographic, CDCR conducts a biannual staffing adjustment where it trues up the number of staffing allocations to the number of patients at the various institutions.  (RT 10/4 74:16-19; *see* Defs.' Ex. 14.)  In January and July of each year, CDCR applies the 2009 Staffing Plan ratios (including minor adjustments thereto that have since been ordered) to the number of patients at each level of care at each institution to determine the correct number of allocated clinicians needed to treat that population.  (RT 10/4 74:24-75:4.)  To the extent new positions are included in the allocations, institutions must hire to that new level of staffing moving forward.  (*Id.* at 75:11-12.)  Of course, monthly staffing reports that immediately follow the new allocations will indicate higher vacancies among provider categories where new positions have been allocated but not yet hired.

**2.    Expansion of Telework Opportunities Through Telepsychiatry and Telemental Health Programs**

Generally speaking, how and where mental health providers want to work is different in a post-pandemic world.  Clinicians in 2023 expect to have at least some component of telework, if not an entirely remote role.  (10/3 RT 76:1-7.)  Defendants have seen great success in filling mental health provider roles through the expansion of their telepsychiatry program.  (10/3 RT 76:76-77:4; 225: 18-23; 10/4: 10:17-21.)  Indeed, Dr. Greulich testified that "CDCR's expanded use of telepsychiatry throughout the 2018 to 2022 period coincided with a … large reduction in the vacancy rate among CDCR psychiatrist positions."  (RT 9/29 82:1-4.)  This is in part because CDCR is able to recruit for telepsychiatry positions from a bigger pool of candidates in metropolitan areas where most doctors and clinicians are based, away from CDCR's remote institutions.  (10/3 RT 229:18-24.)  Defendants' ability to fill allocated positions for psychiatrists has fluctuated historically but at present, the vacancy rate in psychiatry is lower than in the other classifications at issue and has generally not exceeded 10% since this Court's February 28, 2023 Order.  (See Defs.' Exs. 12 & 13.)  And, with telepsychiatry, "[i]t's not difficult" to fill vacant

1   psychiatrist positions because there is "pretty much always [ ] more interest in the [telepsychiatry]

2   position than openings available." (10/3 RT 230:20-23.)  In fact, CDCR retains an informal list of

3   interested applicants to contact when additional telepsychiatry positions become available, though

4   hiring for these positions is very competitive.  (10/3 RT 230:18-231:1.)

5          Aiming to replicate their success in telepsychiatry, Defendants took affirmative steps to

6   expand telemental health within CDCR to include telepsychology and telesocial work.  In May

7   2023, Defendants submitted a Budget Change Proposal (BCP) seeking $45.1 million to help build

8   out the expanded program, noting that "CDCR has already implemented a successful tele-

9   psychiatry program that has improved access to mental health care services and reduced staffing

10  shortages." (Defs.' Ex. 1.002.)  Through the expansion of telemental health, the BCP notes that

11  CDCR will "provide an additional opportunity to support recruitment and retention of hard-to-fill

12  clinical positions." (Defs.' Ex. 1.002.)  As the BCP indicates, "[t]ele-psychiatrists are located

13  across the state to allow access to candidate pools that otherwise would not be able to serve the

14  CDCR population." (*Id.*)  The telemental health program seeks to fill existing staffing vacancies

15  with telesocial workers and telepsychologists.  (10/3 RT 225: 3-7 & 228:13-17.)  Accordingly, the

16  BCP seeks to fund additional supervisory and support positions that will be needed, but the

17  funding for the line staff positions has already been allocated via the vacant onsite positions.  (10/4

18  RT 95:4-16; 10/3 RT 236:2-8, 14-18.)

19         Following the Legislature's approval of the telemental health BCP, in June 2023

20  Defendants began to roll out their telemental health program, including by hiring an Assistant

21  Deputy Director to oversee the build-out of the program.  (10/3 RT 200:1-19.)  CDCR also

22  procured the equipment needed to expand the program and is in the process of hiring leadership.

23  (10/3 RT 221:24-222:7.)  As of the date of the contempt hearing, CDCR had 44 applicants for one

24  Chief telepsychologist position and 13 applicants for two senior telepsychology positions. (10/3

25  RT 223:13-17.)  Additionally, the first of two Supervising Psychiatric Social Worker I positions

26  was already filled.  (10/3 RT 226:9-15.)  Once these initial leadership roles are filled, those leaders

27  will hire line staff and get the telemental health program up and running.  (10/3 RT 223: 25-

28  224:4.)  Given their success filling telepsychiatry roles, and barring any unforeseen limitations

1   imposed upon the program, Defendants reasonably expect to begin filling vacant onsite

2   psychology and clinical social worker roles through the telemental health program, beginning as

3   soon as December of this year.  (10/4 RT 14:12-24.)  Defendants anticipate providing additional

4   access to care through the telemental health program over the course of the next several months

5   into early 2024, with the program in full operation over the course of the next 12-24 months. (10/3

6   RT 224:9-14.)

7          The goal of telemental health is to fill vacant provider roles and also to help retain existing

8   on-site providers by decreasing their workload and making their jobs easier. (10/4 RT 9:21-10:16.)

9   Moreover, given the success of telepsychiatry, Defendants reasonably expect that the expansion of

10  the telemental health program will significantly improve staffing fill rates among psychologists

11  and social workers.  *See* ECF No. 7682-1 (Decl. Joseph Penn MD Supp. Defs.' Position on the

12  Use of Telepsychiatry) at pp. 188 ¶ 57, 189 ¶ 59, 190-191 ¶ ¶ 60 & 63.

13              **3.    Salaries and Financial Incentives**

14          In recognition that salary remains one important component of recruiting and retaining

15  mental health providers, Defendants pay psychiatrists, psychologists, licensed clinical social

16  workers, and recreational therapists well above both state and national average salaries.  (Defs.'

17  Ex. 5.055-5.062.)  Defendants' expert examined the average salaries for the different

18  classifications over the period 2018-2022 and found as follows:

19  •   CDCR's staff psychiatrists'[9] base pay is between 7-31% more than other
20      psychiatrists in California and 31-44% more than psychiatrists nation-wide. (Defs.'
        Ex. 5-057.)

21  •   CDCR's clinical psychologists' base pay is between 4-15% more than other
22      psychologists in California and 35-39% more than psychologists nation-wide.
        (Defs.' Ex. 5-059.)

23  •   CDCR's licensed social workers' base pay is between 15-24% more than other
24      licensed social workers in California and between 54-66% more than licensed
        social workers nation-wide.  (Defs.' Ex. 5-060-061.)

25  •   CDCR's recreational therapists' base pay is between 9-29% higher than other
26      recreational therapists in California and between 64-71% more than recreational

27  _____

[9] To offer a conservative evaluation, Defendants' expert excluded from these calculations chief,
supervising and senior-level psychiatrists, psychologists, and licensed clinical social workers, who

28  make even higher salaries.  (Pls.' Ex. 24.056. 058, and 060.)

therapists nation-wide.  (Defs.' Ex. 5-060-062.)

Plaintiffs' expert did not dispute that CDCR is paying above the benchmarks across each of these provider categories.[10]  (10/4 RT 188:22-189:20.)

CDCR average salaries are also typically higher and often substantially higher than those paid to Federal Bureau of Prisons psychiatrists, psychologists, and social workers in California.  (Defs.' Ex. 5-065.)  Moreover, 70.5% of providers within the five classifications at issue are paid at the top end of their salary range.  (Defs.' Ex. 15.)  And, while employees new to state service are usually hired at the minimum salary for their salary range, to help increase staffing, psychiatrists, psychologists, and clinical social workers who are new to state service are eligible to be hired above the minimum salary in their salary range.  (10/3 RT at 74:11-75:4.)

### a.    Recently Negotiated MOUs

On top of being paid higher salaries than other providers statewide and nationally, the state recently demonstrated its commitment to retaining current employees and giving CDCR another tool to recruit new employees by significantly increasing the pay for all five classifications at issue in this hearing.  The MOUs the state entered into provide a range of general salary increases, special salary adjustments, wage equity adjustments, pay differentials, increases in hourly pay for clinical supervision, and additional workload pay.  (Defs.' Exs. 6-8.)  The three MOUs will cost the State over $5.3 billion over the course of the next four years, though these funds are not limited to the five classifications at issue.  (*See id.*)  While the increase in compensation differs for each classification based upon negotiations between the respective unions and the State, all five classifications will benefit from higher pay as a result of the MOUs.  (*See id*.)

### 4.    Streamlined Hiring Processes

In addition to expanding telework options, paying well above average salaries, and recent compensation increases, Defendants have also spent time evaluating and streamlining their hiring process in order to help ensure that interested qualified candidates get hired.

---

[10] Plaintiffs offered hearsay testimony concerning salary levels but those witnesses did not have or provide comprehensive compensation data.

1          a.    Lean Six Sigma Greenbelt Project

2          In 2022, Defendants undertook a statewide Lean Six Sigma greenbelt project to identify

3   and address redundancies and delays in the hiring process.  (10/3 RT 40:18-41:2, 125:15-20.)

4   Lean Six Sigma is a process-improvement approach that can be applied to any industry to improve

5   performance by reducing waste.  Defendants identified ways to standardize the hiring process and

6   significantly reduce the timeframes between application and hiring.  (*Id.* at 41:4-12.)  A pilot of

7   the new streamlined process has been rolled out at one institution so far and Defendants anticipate

8   rolling it out statewide in the coming months.  (*Id.* at 41:21-42:1.)

9          b.    Creation of a regional hiring unit

10         Another recent effort to help bolster the hiring process for hard-to-fill vacancies is

11  Defendants' creation of a regional hiring unit in June 2023 solely focused on hiring psychologists

12  and clinical social workers which are, at present, the most challenging roles to fill.  (10/3 RT 42:7-

13  25.)  This function was previously performed by Defendants' centralized hiring unit which is also

14  tasked with hiring psychiatrists and medical staff.  (*Id*. and 10/3 RT 122:12-123:2.)  Defendants

15  anticipate increased success with the regional hiring unit solely dedicated to recruiting and hiring

16  psychologists and social workers.

17         c.    One-day hiring events

18         Defendants also created and implemented an end-to-end hiring model that was conceived

19  in Autumn 2021 and swiftly rolled out in January 2022.  (10/3 RT 36:23-40:9.)  During these

20  events, candidates test and are placed on the civil service list, apply for roles, interview, receive an

21  offer, and get fingerprinted all in one day.  (*Id*.)  This streamlined event consolidates almost all

22  steps[11] in the hiring process into one day, fast-tracking candidates from application to offer and

23  eliminating time that normally elapses between each step.  (10/3 RT 41:16-20.)  The events are

24  hosted at locations near institutions to pull candidates local to the institutions where they would be

25  hired.  (Pltfs.' Ex. 12-004-005.)  Defendants hosted 13 one-day hiring events in 2022, which

26  resulted in 47 job offers to providers within the five classifications.  (10/3 RT 38:18-24.)  As of

27  _____

28  [11] The credentialing process happens separately. (10/3 RT 113:12-15.)

the contempt proceedings, Defendants hosted 10 one-day hiring events in 2023, resulting in 31 job offers to providers within the five classifications. (10/3 RT 38:25-39:10.) Defendants will host three more one-day hiring events in 2023 and will continue hosting these events throughout 2024. (10/3 RT 39:11-15, 49:14-17.) The hiring events have also achieved great success beyond the five classifications at issue, including total job offers to approximately 1500 providers with approximately 1300 offers accepted. (*Id.* at 39:23-40:1.) Creative efforts like these demonstrate that CDCR's recruitment and retention efforts are not "business as usual," as Plaintiffs assert.

### 5. Expanded marketing and advertising efforts

In addition to an ongoing presence at national, regional, and local events, Defendants have expanded their marketing efforts on virtual platforms and on social media, including creation of a marketing campaign centered on mental health employees and careers in correctional health. (Pltfs' Ex. 12, p. 002-003.) Additionally, Defendants have:

- Partnered with Doximity, the social network site used by 80% of all physicians for job searches, in order to target candidates who are actively and passively looking for new roles;

- Expanded their digital campaign for clinical social workers, psychologists, and psychiatrists with updated advertisements emphasizing pay differentials to ensure saturation of branding and career opportunities across professional journals, organizational websites, and recruitment platforms like LinkedIn, Indeed, National Health Career Network, and ZipRecruiter;

- Worked on a campaign with I Heart Media designed to target mental health professionals through digital display advertisements;

- Implemented a geo-targeted direct mail and email campaign to reach psychiatrists, clinical social workers, and psychologists across California; and

- Partnered with educational entities to introduce students to correctional health care through virtual "meet the experts" seminars where students can learn about correctional health care job opportunities from Defendants' mental health providers.

1   (Pltfs.' Ex. 12, p. 002-003.)  These extensive marketing campaigns are further evidence of

2   Defendants' significant and ongoing recruitment efforts.

3           **6.      CDCR contracted with Merritt Hawkins, the national leader in
                       recruiting clinical providers.**

4

5           To augment Defendants' efforts to fill staffing vacancies, in 2019, CDCR contracted with

6   the national leader in recruiting clinical providers, Merritt Hawkins.  (10/3 RT 47:3-48:14.)  The

7   original contract with Merritt Hawkins sought to target recruitment of physicians and psychiatrists

8   but was later amended in 2022 to add psychologists and clinical social workers.  (*Id.*)  While

9   Merritt Hawkins was able to help fill some of the vacancies, the partnership was not as successful

10  as CDCR hoped.  (*Id.*)  Merritt Hawkins faced the same hiring challenges that CDCR faces

11  generally, including labor shortages and candidates who are unwilling to work in a correctional

12  setting.  (*Id.*)  Nonetheless, CDCR's partnership with Merritt Hawkins demonstrates its ongoing

13  efforts to improve staffing among mental health positions.

14          **7.      CDCR contracts with registry providers to fill in staffing gaps**

15          CDCR's preference is to fill staffing vacancies with civil service providers, who generally

16  provide a more stable workforce.  (10/3 RT 76:14-20; 143: 7-11.)  However, when CDCR's

17  extensive efforts to fill staffing vacancies with civil service providers are unsuccessful, CDCR

18  relies on contracted registry providers who have the same duties and skills as civil service

19  providers. (10/3 142:17-22 & 143: 4-6.)  CDCR contracts with one such registry provider,

20  Management Solutions, to provide temporary health care staffing, including for the five

21  classifications at issue.  (10/3 RT 144:19-146:6.)

22          CDCR liaises closely with Management Solutions and the institutions who submit orders

23  for registry providers to ensure timely fulfillment.  (10/3 RT 146: 18-147: 20.)  CDCR pays

24  Management Solutions a "registry rate" for supplying registry providers that includes the overhead

25  cost of Management Solutions as well as the rate paid to the provider.  (10/3 RT 150: 22-151:4.)

26  The contract requires Management Solutions to offer a comparable market rate to registry

27  providers.  (10/3 RT 151:20-25.)  Registry rates set forth in the contract are often higher than

28  community registry rates and take into account a variety of factors including geographic location,

1   patient population, and work environment.  (10/3 RT 152:1-11, 20-24.)

2        The Management Solutions contracts build in tiers for registry rates that vary by

3   classification and institution. (10/3 RT 153: 4-19.)  Using a tiered approach allows flexibility to

4   move institutions into different tiers when community registry rates change and enables CDCR to

5   be competitive in the registry market as labor conditions fluctuate.  (*Id*.)  A summary of the tier

6   rates for the two most recent contracts between CDCR and Management solutions shows

7   significant increases in registry rates for all tier levels of psychologists, social workers, and

8   recreational therapists.  (Defs.' Ex. 20.)  These increases are intended to keep CDCR competitive

9   with community registry rates.  (10/3 RT 160:6-19.)  To fund registry staffing, CDCR relies on a

10  dedicated budget line item as well as "salary savings," which is the amount of money saved on

11  allocated but unfilled mental health positions.  (10/3 RT 163: 6-15.)  Exclusive of registry staffing

12  in Psychological Inpatient Program units, during the past five fiscal years ending in June 2023,

13  CDCR spent $331,260,848 on registry to staff the five classifications at issue, which includes

14  more than $58 million in fiscal year 2018-2019, over $60 million in 2019-2020, nearly $70 million

15  in 2020-2021, nearly $65 million in 2021-2022, and nearly $79 million in 2022-2023.  (Defs' Ex.

16  22.)

17        **C.      Statewide and Nationwide Staffing Shortages Among Mental Health Providers
                     Render Defendants Unable To Comply With This Court's 90% Fill Rate**
18   **                Threshold Across All Categories Of Providers.**

19        A party's inability to comply with a judicial order also constitutes a defense to a charge of

20  civil contempt.  *F.T.C.*, 179 F.3d at 1239; *U.S. v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999).  To

21  assert an "impossibility" defense, a party must show "'categorically and in detail'" why it is

22  unable to comply with the Court's order.  *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d

23  612, 616 (9th Cir. 1973); *F.T.C.*, 179 F.3d at 1241.  A court should "'weigh all the evidence

24  properly before it determines whether or not there is actually a present ability to obey.'" *Ayres*,

25  166 F.3d at 994, quoting *U.S. v. Drollinger*, 80 F.3d 389 (9th Cir. 1996).  Here, Defendants'

26  expert persuasively testified that there is a nationwide staffing shortage among mental health

27  providers (*see* Pltfs.' Ex. 24.012 at ¶ 17), rendering Defendants unable to comply with this Court's

28  90% fill rate requirement.

Dr. Greulich explained that there is a shortage of mental health professionals both nationwide and within California.  (9/29 RT 49:17-18.)  She based that conclusion upon a review of relevant literature, including academic studies, press articles, trade press, government reports, and projections.  (*Id.* at 49:20-23.)  As Dr. Greulich's Report notes, "[t]he demand for mental health services has historically exceeded the supply, and the COVID-19 pandemic has only worsened this disparity."  (Pltfs.' Ex. 24.012.)  Demand for mental health services continues to grow "due to increased recognition of mental health needs, which is in turn driven by an aging population, the opioid epidemic, and legislative goals intended to improve care and reduce healthcare costs."  (*Id.* at 24.013.)  This increasing demand for mental health services "coupled with insufficient and unevenly distributed provision of mental health services has led to shortages of mental health care throughout the U.S."  (*Id.* at 24.014.)  In fact, 77% of counties across the U.S. have severe shortages of mental health providers.  (*Id.*)  In short, it is "well-accepted that there are shortages nationwide."  (9/29 RT 51:8-9.)

By contrast, Dr. Brown's evaluation of whether a labor shortage exists presently is problematic for several reasons.  First, he limited his analysis to only psychiatrists and psychologists in California.  (*Id.* at 143:22-24.)  He therefore has no opinion as to the labor market that exists for clinical social workers, recreation therapists, or medical assistants.  He also ignored extensive literature and published studies and analyses detailing labor shortages of mental health providers throughout California and the United States.  (9/29 RT 141:24-142:9.)  Further, Dr. Brown's evaluation of psychiatrist and psychologist labor shortages stops as of 2020, and in so doing, he excluded the most recent and relevant time period (2020-2023), and ignores the impact of the COVID-19 pandemic on provider availability.  (*Id.* at 142:10-15.)  This is significant because two of the provider categories at issue – psychologists and clinical social workers – experienced significant staffing challenges in the midst of the pandemic.  (Defs.' Exs. 12.004, 12.006.)  Finally, Dr. Brown relies upon a "completely unsupported definition" for a labor shortage, and could not point to any literature or other studies using the same definition to determine whether a labor shortage exists.  (*Id.* at 144:11-17.)  In short, Dr. Brown's opinions are based on stale data and have limited-to-no value in this proceeding where the *current* labor market

1  for *all* providers must be considered.

2      Expert testimony therefore established that it is likely impossible to comply with this

3  Court's 90% fill rate threshold in light of the severe mental health provider shortages that persist

4  both within California and nationally across the provider categories at issue here.  And where, as

5  here, there is actually a present inability to comply with a court order, Defendants' noncompliance

6  does not warrant a finding of contempt.  *Ayres*, 166 F.3d at 994.

7      **D.    Defendants Are Not Required To Take *Unreasonable* Measures.**

8      Notwithstanding challenging labor market conditions, Defendants must take "all

9  reasonable steps *within their power* to comply" but need not take *unreasonable* measures.  *See J.L.*

10  *v. Cuccinelli*, No. 18-cv-04914-NC, 2020 WL 2562895, *3 (N.D. Cal. Feb. 20, 2020), emphasis

11  added; *see Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016); *see also Stone v. City and*

12  *County of San Francisco*, 968 F.2d 850, 856-857 (9th Cir. 1992).  While Defendants explained

13  *supra* the extent of the reasonable measures the State has taken and continues to take to improve

14  its mental health staffing notwithstanding nationwide challenges, the State is only required to take

15  those reasonable measures that are within its power.  *J.L.*, 2020 WL 2562895 at *3.

16      Here, however, Plaintiffs suggest that Defendants should have taken *unreasonable*

17  measures to avoid contempt—including requesting waivers of state law and implementing an

18  increase in provider wages by up to 285.7% in "rapid trial and error."  (*See* 10/3 RT 130:8-14

19  (waiver), 130:23-25 (waiver), 131:5-9 (waiver), 132:2-7 (waiver), 132:25-133:5 (waiver); Pltfs.'

20  Ex. 25.002 ("increases in real wages are likely on the order of 57.1% to 285.7%."), 25.039 ("rapid

21  trial and error").)  Plaintiffs' suggested measures are demonstrably unreasonable, and Defendants

22  were therefore not required to implement these measures to avoid a finding of contempt.

23      **1.    Requesting waivers of state law is not a reasonable measure**

24      Though Plaintiffs asserted throughout the staffing contempt hearing that Defendants have

25  not sought waivers of state law to implement higher salaries or "address staffing shortages"

26  generally, they have not identified any state laws that stand in the way.  (*See* 10/3 RT 132:2-10.)

27  Nor could they, since Defendants recently implemented higher salaries through the collective

28  bargaining process within the bounds of applicable state law, and continue to implement creative

1    measures, such as the expansion of telemental health, to improve staffing fill rates.  *See* Defs.'

2    Exs. 6, 7, 8; *see also* Section IV.B, *supra*.

3          Waivers of state law are only appropriate as a measure of last resort when no other

4    alternatives exist to remedy a problem.  While "otherwise valid state laws or court orders cannot

5    stand in the way of a federal court's remedial scheme if the action is essential to enforce the

6    scheme," such is not the case here, where no state laws violate this Court's remedial scheme or

7    otherwise preclude its implementation.  *Stone v. City and County of San Francisco*, 968 F.2d 850,

8    862 (9th Cir. 1992).  Indeed, "federal courts should always seek to minimize interference with

9    legitimate state activities in tailoring remedies."  *Id.* at 861.  Thus, Defendants must work within

10   the structure that is mandated by law unless a specific state law prevents implementation of a

11   federal court remedial scheme—that is demonstrably not the case here.

12          The situation here is also distinguishable from the State's past requests for waivers of state

13   law pertaining to licensure of beds in the L-Wing at California Medical Facility (CMF).  In that

14   instance, Defendants sought to waive state licensing requirements to convert 113 cells at CMF into

15   110 temporary unlicensed Intermediate Care Facility level of care beds and three observation and

16   restraint rooms for high custody patients.  ECF No. 4120.  In granting the waiver, this Court

17   recognized "the urgent need by class members for access to timely inpatient psychiatric care," and

18   determined that "state licensing requirements must temporarily give way on an emergency basis."

19   *Id.* at 2:9-11.  By contrast, there exist numerous alternatives to state law waivers here – including

20   one-day hiring events and creation of a regional hiring unit to speed up the hiring process,

21   increased salaries, retention bonuses, expanding telemental health, and onsite pay differentials, to

22   name a few – and indeed Defendants are implementing those measures currently.  *See* Section

23   IV.B, *supra*.  Accordingly, state law waivers are not necessary or even appropriate here, where

24   Defendants are implementing reasonable and creative steps to improve staffing within the

25   applicable framework.  *Id*.

26          **2.    Raising salaries between 57-286% in rapid trial and error is neither
              reasonable nor supported by the evidence.**

27

28          It is similarly unreasonable to expect the State to implement wage increases of up to

1    285.7% in rapid trial and error to improve recruitment.  Plaintiffs' expert, Dr. Brown – who has

2    done limited work in the field of labor economics – testified that to attract physician mental health

3    providers to new positions, CDCR had to dramatically increase how much it pays mental health

4    staff and overhaul how it hires them.  With respect to wages, Dr. Brown said CDCR should

5    increase its real wages "on the order of 57.1% to 285.7%."  (RT 10/4 198:18-23.)  He further

6    stated that CDCR should engage in trial and error with respect to salaries, that such efforts must be

7    rapid, and that the hiring authority should not always start with the minimum salary.  (*Id.* at 174:1-

8    18.)  In fact, Dr. Brown was "stunned" when he learned that new employment offers always start

9    at the minimum salary.  (*Id.* at 174:11-16.)  But, in fact, new employees could be offered to start

10   above the minimum salary where there are recruitment challenges or the new employee possesses

11   "extraordinary skills."  (10/3 RT 74:11-23.)

12          Further, under Dr. Brown's proposal, a provider hired in a high-scarcity period should be

13   offered a higher salary than peers at the same institution.  However, Dr. Brown fails to account for

14   the disruption and dissatisfaction in workforce that occurs when peers in the same institution with

15   the same qualifications make wildly different salaries depending on the time period they were

16   hired in.  Dr. Brown's proposal is also unreasonably unstable and could result in rapidly changing

17   offers in response to short-term variations in the job market.  This would leave CDCR with

18   employees who are paid well above-market just because they were hired when the market was

19   experiencing a short-term anomaly.  Dr. Brown's proposal might be appropriate for an academic

20   economics experiment, but it is neither rooted in reality nor how a large-scale public employer

21   designs long-term salary schedules and effectively recruits and retains employees.

22          Moreover, Dr. Brown's opinion that increased wages alone will result in increased fill rates

23   is belied by the evidence.  Defendants' expert, Dr. Greulich, conducted a regression analysis,[12] to

24

25   [12] A regression analysis is a common statistical tool frequently used by economists to measure
     relationships between variables. (9/29 RT 117:14-17.)  Regression analyses are typically used "to
26   isolate the influence of one particular factor . . . on a dependent variable"—for example, the effect
     of gender on salary, or the effect of level of education on income, or the level of a price increase
27   on the demand for a product. *E.E.O.C. v. Gen. Tel. Co. of Nw.*, 885 F.2d 575, 577 (9th Cir. 1989)
     (internal quotations and citations omitted); Alan O. Sykes, *An Introduction to Regression Analysis*,

1  evaluate whether CDCR's historical increases in compensation among these provider categories

2  were associated with corresponding increases in fill rates.  (*See*  9/29 RT 119:3-7.)  She found that

3  her statistical analysis "failed to yield evidence that CDCR's compensation differences relative to

4  benchmarks, be it California or nationwide, … had impacted its filled positions or its net hires

5  through civil service over the past five years," and did not find any evidence "to suggest that this

6  would be any different in the future."  (RT 9/29 48:17-25.)

7          Regression analysis "plays an important role in allowing economists to test a hypothesis or

8  a theory about whether there is a relationship or not between two variables."  (9/29 RT 117:19-21.)

9  While Dr. Brown poked criticisms at Dr. Greulich's regression analysis, he did not perform one

10  himself, despite being aware of a similar regression analysis Dr. Greulich previously performed

11  with respect to psychiatrists in 2018.  (10/4 RT 190:11-191:9.)  He therefore failed to present any

12  evidence that a regression analysis accounting for the purported shortcomings he identified in Dr.

13  Greulich's study would have yielded a different result.  In short, his criticisms are meaningless in

14  the absence of any actual evidence contradicting Dr. Greulich's findings.

15          Moreover, his criticisms of Dr. Greulich's regression analysis lack merit.  First, Dr. Brown

16  criticized that the time period in Dr. Greulich's analysis was too short.  But she used five years of

17  data – the most recent data available – which "are the most relevant years for assessing the

18  relationship between CDCR's pay … [to] filled positions."  (9/29 RT 133:20-23.)  Dr. Brown also

19  argued the data was too aggregated, but "some level of aggregation is unavoidable" because data

20  has to be measured over time for purposes of the analysis and the data that Dr. Greulich used to

21

22  The Inaugural Coase Lecture, Coase-Sandor Institute for Law & Economics Working Paper No.

23  20 (1993), at 1, *available at* https://chicagounbound.uchicago.edu/law_and_economics/51/.  To
    determine the impact of a factor on a dependent variable, "the investigator assembles data" on the

24  dependent variable as well as the factors which may influence the dependent variable and
    "employs regression to estimate the quantitative effect."  *Id.*  For instance, a regression could show

25  that an increase of $x in price might result in a y% decrease in demand.  Regression techniques
    have "long been central to econometrics" and have become important to litigators as well.  *Id.*

26  (collecting cases where regression has been offered as evidence of liability under Title VII of the
    Civil Rights Act of 1964; as evidence of racial bias in death penalty litigation; as evidence of

27  damages in contract actions; as evidence of violations under the Voting Rights Act; and as
    evidence of damages in antitrust litigation).

28

1  evaluate filled positions and net hires over time is only updated biannually, while the data on

2  average salaries in California and the U.S. is only available on an annual basis.  (*Id.* at 133:24-25.)

3  To further disaggregate the data, as Dr. Brown suggests, would require making assumptions, for

4  instance how annual or semiannual data would change from week to week or month to month.

5  (*Id.* at 135:1-11, 136:8-10.)  And in the end, "that would make it much more likely that the

6  conclusion would be the same."  (*Id.* at 136:10-12.)

7          Additionally, Dr. Brown contended that the analysis should have accounted for inflation,

8  but he was mistaken because the analysis looked at how CDCR salaries related to benchmark

9  salaries, and "any inflation adjustment that would be [ ] made to CDCR's salaries would also have

10  to be made to the benchmark salaries, and the relationship would be the same."  (*Id.* at 136:23-

11  137:10.)  And Dr. Brown criticized that Dr. Greulich's analysis "'imputed' the average salaries for

12  CDCR" – in other words, that Dr. Greulich did not use the exact salary for every single mental

13  health employee in her analysis.  (*Id.* at 137:15-19.)  But Dr. Greulich used information on the

14  maximum and minimum salaries available to employees and the number of employees earning the

15  minimum and maximum over time.  (*Id.* at 137:18-22.)  Based on that information, she calculated

16  an average.  (*Id.*)  Lastly, Dr. Brown criticized the model that Dr. Greulich used to perform her

17  analyses, but again, these criticisms are misplaced for a number of reasons, including because Dr.

18  Greulich's Appendix 1 did address one purported shortcoming, and PIP data was properly

19  excluded from the analysis because PIP facilities are not at issue in these proceedings.  Most

20  critically, Dr. Greulich's regression models are reasonable and supportable given the available

21  data, and Dr. Brown failed to identify any legitimate shortcomings.  (9/29 RT 140:19-21.)

22          Dr. Brown conceded that this was the first time he was retained to determine if one can use

23  economic incentives to obtain desired fill rates or hires.  (10/4 RT at 186:25-187:2, 102:20-103:2.)

24  But because he failed to conduct *any* statistical analysis on whether raising salary correlates to

25  improved fill rates, his suggestion to rapidly increase salaries by 57.1% to 285.7% is patently

26  unreasonable and cannot form the basis for a finding of contempt.

27  / / /

28  / / /

1    **E.    Evidence Pertaining To Quality Of Care And Harm Is Irrelevant And Should**
2    **Be Excluded.**

3    Throughout the contempt proceedings, Plaintiffs repeatedly sought to elicit testimony

4    pertaining to the impact of reduced staffing levels on patient care.  (*See*, *e.g.*, 10/5 RT 31:12-25,

5    77:13-25, 78:3-15, 80:3-10, 123:8-25.)  But, as this Court has previously determined, "[i]t is

6    patently not the court's role to evaluate the adequacy of care provided to individual class

7    members."  ECF No. 5726 (Nov. 6, 2017 Order) at 9:14-16.  Instead, this Court correctly noted

8    that "[t]he focus of any contempt hearing will be on defendants' systemic efforts" to attain

9    compliance.  *Id.* at 9:18-19.  Accordingly, testimony that relates to harm or impacts to individual

10   class members must be excluded by this Court, consistent with its prior ruling.

11   In expressing their views on whether the November 6, 2017 Order applies to these

12   proceedings,[13] Plaintiffs argued that evidence of patient harm is only relevant some of the time.

13   Specifically, Plaintiffs argued that evidence of individualized patient care should be excluded if

14   offered by Defendants, presumably, to "attack[ ] the underlying staffing requirements," but should

15   not be excluded if offered by Plaintiffs, presumably, to "measure 'the character and magnitude of

16   the harm threatened by continued contumacy.'"  ECF No. 7952 (Pls.' Opening Brief) at 12:9-15,

17   quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947).  Plaintiffs

18   cannot have it both ways.  Either evidence of individualized harm is relevant to contempt

19   proceedings or it is not, and as this Court has previously ruled, it is not.  *See* ECF No. 5726 at 9.

20   Additionally, Plaintiffs' reliance on *United Mine Workers* is misleading.  In that case, the

21   Supreme Court advised that a court should consider "the character and magnitude of the harm

22   threatened by continued contumacy" in the context of "the probable effectiveness of any suggested

23

24   ───────────────
[13] Defendants interpreted this task more broadly, stating in their Opening Brief that they did not
25   believe the Court's November 6, 2017 Order – as it related to an analysis of divestiture of
jurisdiction following appeal and compliance with transfer timelines – pertained to these instant
26   proceedings because the November 6, 2017 Order is unrelated to the issue of staffing.  However,
to the extent the Court's question was more narrowly focused on whether its prior ruling as it
27   relates specifically to the presentation of evidence of individualized harm should be applicable
here, Defendants agree with the Court's original rationale in excluding such evidence.
28

sanction in bringing about the result desired." *United Mine Workers*, 330 U.S. at 304. The Court explained further that, "in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, [courts should] consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *Id.* By contrast, where a court intends to compensate a complainant, "[s]uch fine must of course be based upon evidence of complainant's actual loss." *Id.* In other words, Plaintiffs conflate these two standards and consideration of "the character and magnitude of the harm" pertains to an evaluation of the seriousness of the financial burden to compel compliance, not to the harm or loss suffered by the complainant, and certainly not to whether the conduct constitutes sanctionable conduct. *See id.*

Moreover, this Court has consistently echoed its intent that these proceedings are for imposing civil *coercive* sanctions, if warranted. *See*, *e.g.*, ECF Nos. 5610, 5711, 7742, 7916. Consistent with that approach to contempt, this Court's relevant orders never indicated that the purpose of these proceedings was to impose civil *compensatory* sanctions. ECF Nos. 5610, 5711, 7742, 7916. This distinction is important because the purpose of each type of contempt is distinct and any corresponding fines are calculated differently depending on the type or purpose of contempt sanction. Whereas civil coercive sanctions are intended to "compel or coerce obedience to a court order," by contrast, civil compensatory sanctions are designed to "compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance." *Shuffler*, 720 F.2d at 1147. Evidence of injuries and impacts that are allegedly attributable to Defendants' noncompliance is therefore irrelevant to the imposition of civil coercive sanctions, which are intended to compel compliance, not reimburse class members. *See id.*

Nor can harm be presumed – to the extent it is even considered. Indeed, even Plaintiffs' expert stated that he could not say with any certainty that any particular fill-rate guarantees good patient outcomes or better care. (10/4 RT 197:18-198:2.) Generalized allegations of harm, including by reference to canceled groups or a reduction in compliance with onerous *Coleman* requirements, do not demonstrate actual harm to individual patients. (10/4 RT 56:15-57:1; *see* 10/4 RT 139:5-14.) Indeed, Plaintiffs offer no evidence that correlates reduced staffing to actual

1    bad outcomes among individual patients.  (*See* 10/4 RT 140:4-5 (Dr. Mehta stating there is not a

2    one-to-one correlation between training programs and suicide reduction).)  Accordingly, evidence

3    of patient outcomes or purported harm caused by staffing shortages must not be considered by this

4    Court in its evaluation of contempt.[14]

5          **F.    If This Court Finds Defendants In Contempt, Defendants Must Be Afforded**
                     **An Opportunity To Purge.**

6

7          In the event that the Court finds Defendants in contempt – despite Defendants' extensive

8    efforts to fill its staffing vacancies – Defendants must subsequently be given an opportunity to

9    purge.  Contempt proceedings are initiated by a party's filing or a court's issuing of an order to

10   show cause as to why contempt should not issue.  *United States v. Dillon*, No. 1:17-CV-00498-

11   BLW, 2023 WL 6391152, at *3 (D. Idaho Oct. 2, 2023); citing *Forsythe v. Brown*, 281 F.R.D.

12   577, 587 (D. Nev. 2012).  However, this Circuit has acknowledged that "[i]nforming [a party] of

13   the prospective fine schedule was not itself a sanction."  *Kelly v. Wengler*, 822 F.3d 1085, 1097

14   (9th Cir. 2016), *cf. S.E.C. v. Hickey*, 322 F.3d 1123, 1127-28 (9th Cir. 2003) (holding a contempt

15   order announcing a fine is not final for purposes of 28 U.S.C. § 1291 until the court imposes the

16   fine).  Likewise, when this Court issued its February 28, 2023 Order, it provided notice to

17   Defendants of a prospective fine schedule, but it did not constitute a sanction or an order to show

18

19   _____
     [14] Plaintiffs seek to admit into evidence CDCR's 2022 Annual Report on Suicides and Suicide
20   Prevention Efforts in the CDCR ("Report").  Defendants object to the admission of this document
     into evidence on grounds of relevance and hearsay.  Specifically with respect to relevance, the
21   Report itself states while there are "significant and persistent staffing shortages," it did not
     determine "a direct nexus between staffing shortages and deaths by suicide in CDCR custody."
22   (Report at 7.)  Moreover, CDCR's overview report (that responds to the Special Master's and
     Plaintiffs' responses to the draft suicide report) indicates that "[a] clear line between institutional
23   vacancies and the number of suicides is not apparent in 2022.  For instance, there were no suicides
     at California Health Care Facility, despite having a 33 percent fill rate of psychologists and 42
24   percent fill rate for social workers as of December 2022,  (ECF No. 7717 at 6-7.)  Conversely,
     California Men's Colony had four suicides in 2022, the most of any institution, yet had a 73
25   percent psychologist fill rate and 94 percent social worker fill rate in December 2022."  (ECF No.
     8017 at 12.)  For this reason, and because it is not this Court's role to evaluate the adequacy of
26   care but instead to evaluate Defendants' systemic efforts to achieve compliance, this Report is
     irrelevant and should not be admitted into evidence.  To the extent this Court does decide to admit
27   this Report into evidence, it should be accorded little weight in light of these limitations.

28

1  cause. Thus, to the extent this Court makes a finding of contempt, Defendants must be given the

2  opportunity to purge.

3          Courts have regarded the ability to purge as "perhaps the most definitive characteristic of

4  coercive civil contempt." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir.

5  2016); *see also Bagwell*, 512 U.S. at 829 ("[w]here a fine is not compensatory, it is civil only if

6  the contemnor is afforded an opportunity to purge."). As this Circuit has recognized, "[c]oercive

7  sanctions may only be imposed 'after a reasoned consideration' of 'the character and magnitude of

8  the harm threatened by the continued contumacy, and the probable effectiveness of any suggested

9  sanction in bringing about the result desired.'" *Parsons v. Ryan*, 949 F.3d 443, 456 (9th Cir.

10 2020) (upholding compensatory contempt order against defendants where district court found

11 plaintiffs' injuries *resulted* from defendants' noncompliance). In *Parsons*, defendants entered into

12 an agreement to comply with certain "performance measures" designed to improve healthcare at

13 their state prisons. *Id.* at 451. The parties' agreement gave the court the express authority to

14 enforce the agreement "through all remedies provided by law," including "an injunction requiring

15 specific performance." *Id.* at 454. The court issued an order to show cause that required

16 defendants to comply with specific performance measures and required defendants to "show cause

17 why the Court should not impose a civil contempt sanction of $1,000 per incident of non-

18 compliance commencing the month of December 2017." *Id.* at 452. The court found defendants

19 in civil contempt, reasoning, in part, that the district court's contempt order was *not* based on

20 violations of the parties' agreement, but rather, "explicitly based on violations of the Order to

21 Show Cause."

22         *Parsons* is distinguishable from the instant case in several key ways. First, as discussed

23 *supra*, this Court has consistently expressed its intent to impose civil *coercive* sanctions, if

24 warranted. *See*, *e.g.*, ECF Nos. 5610, 5711, 7742, 7916. But notably, the Court has not provided

25 any notice that these proceedings relate to civil *compensatory* sanctions. *Id.*; *see also Bagwell*,

26 512 U.S. at 829 ("[w]here a fine is not compensatory, it is civil only if the contemnor is afforded

27 an opportunity to purge.") Second, to the extent the Court considers evidence of harm – which

28 would be inconsistent with its prior orders – the harm required under a compensatory contempt

1  analysis must be specific, and related to staffing vacancies.  *Am. Unites for Kids v. Rousseau*, 985

2  F.3d 1075, 1089 (9th Cir. 2021) (recognizing that a sanction counts as compensatory "only if it is

3  calibrated to the damages caused by the sanctionable conduct on which it is based.")  As

4  previously discussed, this Court correctly noted that "[t]he focus of any contempt hearing will be

5  on defendants' systemic efforts" to attain compliance – not harm, which this Court has previously

6  held is not relevant to the proceedings.  *See* ECF No. 5726 at 9.

7       Finally, the *Parsons* court clarified that "contempt is only available when the district court

8  finds by clear and convincing evidence that a party "violated a specific and definite order of the

9  court."  *Parsons*, 949 F.3d at 454 (quoting *Stone v. City and County of San Francisco*, 968 F.2d

10  850, 856 (9th Cir. 1992)).  But unlike the defendants in *Parsons* – who were issued a contempt

11  order "explicitly based on violations of the Order to Show Cause" – the issue before this Court is

12  whether Defendants are in compliance with their own 2009 Staffing Plan.  Indeed, the Court's

13  February 28, 2023 Order, on which the contempt hearing was predicated, did not constitute an

14  order to show cause.  *See* ECF No. 7742 (Feb. 28, 2023 Order).  Nor did it contain the hallmarks

15  of an order to show cause that were included in the district court's order in *Parsons*.[15]

16       Accordingly, even if the Court finds Defendants in contempt, such contempt would be

17  coercive and therefore Defendants must be afforded an opportunity to purge thereafter.

18  **V.    CONCLUSION**

19       Notwithstanding a state and nationwide mental health provider staffing shortage among the

20  categories of providers at issue, Defendants have been either compliant or substantially compliant

21  with this Court's 90% fill rate requirement across nearly all classifications at nearly all times from

22  February 28, 2023 through the contempt hearing.  Where Defendants have fallen short of the 90%

23  mandate, they have taken all reasonable measures to reduce vacancies.  Those efforts are

24  extensive, targeted, and ongoing.  Indeed, it will take time to see the full impact of some of

25

26  ───────────────
[15] The Contempt Order in *Parsons* required Defendants to pay a "financial penalty" as "a result"

27  of their failure to "take all reasonable steps to comply with the Court's [Order to Show Cause]," in
    light of Defendants' "knowledge" of the Order to Show Cause and the fact that Defendants had an

28  "opportunity to be heard about their noncompliance."

1   Defendants' efforts on staffing vacancies – like the expanded telemental health program and the

2   newly negotiated and approved compensation increases.  Accordingly, at this time, a contempt

3   finding against Defendants is unwarranted.  Moreover, if the Court does find Defendants in

4   contempt, the Court should give Defendants a reasonable period of time to purge – time which

5   would at least allow Defendants' efforts to reach fruition.

6          In the event that the Court denies Defendants the opportunity to purge and proceeds to

7   issue fines, the fine calculation must take into account the aggregated fill-rate for each

8   classification (i.e., for psychiatrists, psychologists, and social workers, all seniority levels should

9   be combined).  The calculation should also consider the state and nationwide mental health

10  staffing shortage as well as Defendants' substantial compliance across all classifications over time,

11  and be reduced accordingly.

12  **VI.     CERTIFICATION**

13         The undersigned certify that they have reviewed the following orders in the preparation of

14  this motion:  ECF Nos. 547, 1010, 1198, 1262, 1383, 3613, 3665, 3693, 4120, 5610, 5711, 5726,

15  7504, 7806, 7742, 7856, 7872, 7916, 8016.

16  DATED: October 19, 2023                    ROB BONTA
                                               Attorney General of California
17

18
                                         By:_____*/s/ Damon McClain*_____
19                                           DAMON MCCLAIN
                                             Supervising Deputy Attorney General
20                                           ELISE OWENS THORN
                                             Deputy Attorney General
21                                           *Attorneys for Defendants*

22  DATED: October 19, 2023                    HANSON BRIDGETT LLP

23

24
                                         By:_____*/s/ Samantha Wolff*_____
25                                           LAWRENCE M. CIRELLI
                                             PAUL B. MELLO
26                                           SAMANTHA D. WOLFF
                                             LAUREL E. O'CONNOR
27                                           *Attorneys for Defendants*

28