# EXHIBIT A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MARCIANO PLATA , et al.,                )
                                        )    NO.  C01-1351-T.E.H.
    Plaintiffs              )
                                        )    **RECEIVER'S MOTION FOR A**
      v.               )    **WAIVER OF STATE LAW**
                                        )
                                        )
ARNOLD SCHWARZENEGGER,       )
 et al.,                               )
                                        )
    Defendants,             )
_____)

**PLAINTIFF'S EXHIBIT**

CASE NO.  2:90-cv-520-KJM-DB

EXHIBIT NO.  PL-001

# TABLE OF CONTENTS

Page

I.    Introduction ................................................................ 1

II.   Background ............................................................... 2

III.  Facts Supporting the Need for Salary Increases .................................. 3

    A.    Introduction ........................................................ 3

    B.    The Crisis Level of Shortages of Clinical Personnel Continues ................. 4

    C.    Constitutionally Adequate Medical Care in California's Prisons Cannot
Be Delivered Without Continuity of Care ................................... 5

    D.    Salary Increases Are Necessary .......................................... 6

    E.    The Salary Increases Proposed by the Receiver Are Reasonable and
Necessary to Begin the Process of Bringing the Health Care in California's
Prisons Up to Constitutional Standards .................................... 7

IV.   The Receiver Has Made All Reasonable Efforts to Excise His Power
Consistent with State Law Concerning This Motion for Waiver ..................... 8

    A.    Introduction ........................................................ 8

    B.    The Office of the Receiver's Communications with DPA ..................... 9

    C.    The Office of the Receiver's Communications with the Office of the
Governor ........................................................... 10

V.    State Law or Inaction by Defendants is Clearly Preventing the Receiver from
Carrying Out His Duties .................................................... 11

    A.    Introduction ........................................................ 11

    B.    The Receiver Questions Whether it is State Law or State Inaction
Which Prevents the Necessary Salary Increases ............................ 11

VI.   Request for Waiver ........................................................ 13

    A.    Introduction ........................................................ 13

    B.    Request for Waiver ................................................... 14

i.

PL-001.002

# I

# INTRODUCTION

On February 14, 2006, the Court ordered the appointment of Robert Sillen as the Receiver to take control over the delivery of medical services for California prisoners confined by the California Department of Corrections and Rehabilitation ("CDCR").  That order vested the Receiver with the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal and other operational functions of the medical delivery component of the CDCR.   Pursuant to that order the Receiver must make all reasonable efforts to exercise his powers in a manner consistent with California state laws, regulations and labor contracts.  In the event, however:

> that the Receiver finds that a state law, regulation, contract, or state action or inaction is clearly preventing the Receiver from developing or implementing a constitutionally adequate medical health care system, or otherwise preventing the Receiver from carrying out his duties as set forth in this Order, and that other alternatives are inadequate, the Receiver shall request the Court to waive the state law or contractual requirement that is causing the impediment.

Order at p 5, paragraph II.D., lines 1-11.

The crisis with clinical staffing within California's prisons, previously reported by the Court and the Court's Correctional Expert, continues to disrupt medical care operations.  To a large degree the crisis has been created by the long-term and grossly inadequate salaries offered by the State of California to clinical personnel who seek employment in its prisons.  Nevertheless, the State is either unable or unwilling to correct this situation.  As explained below, the Receiver cannot begin the implementation of a constitutionally adequate medical care system within California's prisons without the appropriate number and quality of clinical personnel including, for example, physicians, mid-level practitioners, nurses, and pharmacists.

Accordingly, the Receiver motions the Court for a waiver of state laws and regulations in order to provide salary incentives necessary to achieve the purpose of the Receivership.  The waiver sought by the Receiver has been narrowly crafted, as discussed in detail below.  Furthermore, both plaintiffs and defendants, as well as the affected labor organizations, indicate

1

1   that they do not oppose this waiver.

2

## II

## BACKGROUND

4       The serious and negative impact that chronic shortages of clinical personnel has had on

5   inmate/patient care in California's prisons is not in dispute. See, e.g. *Findings of Fact and*

6   *Conclusions of Law Re Appointment of Receiver* filed October 3, 2005 16:22-24 [RT 579:11-

7   13]). Nor is it disputed that, despite testimony concerning crisis levels of staffing shortages in

8   May and June of 2005, by November 2005 the staffing crisis in California's prisons actually

9   worsened. *See Correctional Expert's Report re Clinical Staff* filed November 14, 2005.

10       Chief among the expert's findings was that CDCR's failure to hire and retain adequate

11   health care providers was *inter alia* due to inaction by the Department of Personnel

12   Administration ("DPA") and Department of Finance ("DOF"), and cumbersome, bureaucratic

13   hiring processes. For example, the Correctional Expert found registered nurse and physician

14   salaries were inadequate for purposes of recruitment and retention. He also concluded that salary

15   compaction between clinicians, clinical supervisors and clinical managers created a vacuum in

16   clinical leadership.[1]

17       As emphasized by the Court at the November 28, 2005 hearing, the Correctional Expert's

18   Report powerfully underscored the depth of the CDCR medical care crisis. Instead of voicing an

19   aggressive commitment to the reforms recommended by the Correctional Expert, however,

20   defendants (including the Governor, CDCR correctional officials, and CDCR health care

21   officials) were content to invoke bureaucratic red tape and 'business as usual' procedures as

22   roadblocks.[2] To prevent Defendants from "twiddl[ing] their collective thumbs" until the

23   Receiver was appointed, the Court determined that it was necessary to adopt measures

24   recommended by the Correctional Expert to avoid a further deterioration of services. The Court,

25

---

26   [1] *Correctional Expert's Report re Clinical Staffing, supra*, pp. 12-13.

27   [2] *Order re Interim Remedies Relating to Clinical Staffing* filed December 1, 2005, pp. 1-2.

28

PL-001.004

1   therefore, ordered interim salary differentials for physicians, registered nurses, mid-level

2   practitioners and certain supervisory personnel.  When doing so the Court noted these pay

3   differentials were only intended to address the then-current crisis and once appointed, the

4   Receiver would have the option of modifying the differentials in response to future

5   circumstances or making other structural changes with regard to salaries as may be appropriate.[3]

6                                        **III**

7              **FACTS SUPPORTING THE NEED FOR SALARY INCREASES**

8        A.  Introduction.

9        The Receiver and his staff have, over a period of several months, engaged in an

10  exhaustive survey concerning the adequacy of clinical staffing within California's prison medical

11  system, both inside the prisons and within the CDCR Central Office in Sacramento.  The Office

12  of the Receiver also carefully reviewed the sufficiency of the compensation provided to clinical

13  personnel essential to the adequate delivery of medical services in CDCR institutions. This

14  review included an evaluation of salary surveys and comparisons to other large California health

15  care providers.  Based on this evaluation, the Receiver makes the following findings:

16              1.  Staffing levels in CDCR institutions are so inadequate that the remedial

17         programs necessary to bring prison medical care up to constitutional levels clearly

18         cannot begin to be implemented without significant increases in clinical

19         personnel.

20              2.  The programs and services needed to provide constitutionally adequate

21         care to prisoner/patients with chronic diseases, health problems that involve both

22         medical and mental health issues, and long-term and aging issues clearly cannot

23         begin to be implemented until California prisons stop relying upon short-term

24         registry personnel and commence the hiring of adequate numbers of permanent

25         full time State employees.

26              3.  The salaries offered by the State to applicants for clinical positions in

27  ---
    [3] *Order re Interim Remedies Relating to Clinical Staffing*, supra, p. 6, fn. 1.

28                                        3

its prisons are so low that the prison system is unable to hire and retain an

adequate number of qualified clinical personnel at all clinical levels, including

physicians, mid-level practitioners, registered nurses, licensed vocational nurses,

pharmacists and other necessary professions.  To remedy this problem, salary

increases are necessary as an initial step to begin to correct the health care delivery

crisis in California's prisons.

B.  The Crisis Level of Shortages of Clinical Personnel Continues.

1.  *Physician/Mid-Level Practitioner Primary Care Providers.*

In response to the Correctional Expert's Report re Clinical Staffing, defendants took the

position that institutions with physician vacancy rates above 20% are in crisis.[4]  As of July 31,

2006, CDCR reports that 20% of the primary care positions statewide were vacant.  At six (6)

prisons that rate climbs to more than 30%.  At two (2) prisons it is more than 50%.  At one prison

the vacancy rate is 90%.   *See* CDCR report entitled "Primary Care Providers: Vacancy Rate by

Institution," attached as Exhibit 1.

To some degree these statistics paint a picture of care that is more positive on paper than

in reality.  For example, the CDCR further reports that the vacancy rate during fiscal year

2005/2006 prompted the use of registry personnel for 128,216 hours of primary care at a cost of

more than $17 million.   *See* CDCR report entitled "Registry by Speciality for Impacted

Classifications" attached as Exhibit 2.  However, as explained below, the use of short term

registry personnel does not provide an adequate system to address the need for carefully planned

and coordinated care concerning the complicated, long-term health care needs for a significant

percentage of prisoner/patients

2.  *Nurses.*

In November 2005, the Correctional Expert's Report re Clinical Staffing found the

vacancy rate for registered nurses was 39%.  By March 2006, CDCR reports that the vacancy rate

---

[4] *Correctional Expert's Report*, supra, 9: 4-5.

4

1  dropped to 15% in response to the December 2005 Order (which increased nurse salaries by

2  approximately 18%).  However, since March 2006 there has been no decline in the vacancy rate,

3  suggesting the need for further increases.  *See* CDCR report entitled "Summary of Clinical

4  Hiring Result" attached as Exhibit 3.  This is particularly so for the Bay area prisons[5]  where

5  CDCR reports the registered nurse vacancy rate was 51% as recently as July 21, 2006.  Also

6  noteworthy is the fact that on July 1, 2006 CDCR reports indicate that there were 167 vacant

7  registered nurse positions.  By the end of the month, that number rose to 182 vacancies[6].

8        3.  *Pharmacists*.

9        As detailed in the Maxor Report (attached as an exhibit to the Receiver's *First Bi-*

10 *Monthly Report*), the California prison pharmacy system is in crisis, providing inadequate patient

11 care while at the same time wasting millions of dollars of taxpayer resources each year . One of

12 the reasons for the pharmacy melt-down is a system wide staffing shortage.  For example, CDCR

13 informs the Receiver that thirty-nine (39%) percent of the Pharmacy Technician positions were

14 vacant on July 21, 2006.  Forty-two (42%) of the Pharmacist II positions were vacant as of that

15 date, as well as forty-two (42%) percent of the Pharmacist I positions.

16        4.  *Other Critical Positions*.

17        CDCR reports indicate that 26% of the medical transcriber positions, 26% of the medical

18 records technician positions, 44% of the Radiological Technician positions, and 63% of the

19 Clinical Dietician positions remain vacant.

20        C.  Constitutionally Adequate Medical Care in California's Prisons Cannot be

21          Delivered Without Continuity of Care.

22        Continuity of care is a fundamental element of a constitutionally adequate prison medical

23 delivery system particularly given California's prisoner/patient demographics.  California's

24 prisons confine tens of thousands of "Lifers," aged prisoners, prisoners with long-term and

---

[5] Throughout this Request for Waiver, the term "Bay area" refers to San Quentin State Prison, Salinas Valley State Prison, and the Correctional Training Facility at Soledad.

[6] Some of the increase was due to resignations and some due to establishing new positions.

5

1  chronic diseases, and prisoners with inter-related medical and mental health problems.

2  Correctional health care in the California system cannot be as safely or effectively provided by

3  those who do not have an on-going relationship with their patients and colleagues.  A continuous

4  provider-patient relationship must be the cornerstone of health care, for without it

5  communication suffers, information is lost, trust is lessened, expertise is squandered and

6  outcomes are deficient.  To provide the requisite continuity the prisons must be staffed with

7  permanent State clinicians rather than short term registry personnel.  *See* the Declarations of Dr.

8  Terry Hill and R.N. Jayne Robinson, attached as Exhibits 4 and 5.

9          D.  Salary Increases Are Necessary.

10          Neither party disputes the fact that salaries presently offered by the State to prison

11  physicians, mid-level practitioners, registered nurses, and licensed vocational nurses are not

12  adequate enough to attract the number and quality of clinicians needed to bring the health care in

13  California's correctional institutions up to constitutional standards.  Testimony concerning salary

14  inadequacies concerning these clinical positions was presented to the Court during the hearings

15  of 2005, and additional evidence, including salary surveys which documented the low level of

16  clinical pay offered by the CDCR, was submitted in the *Correctional Expert's Report re Clinical*

17  *Staff* filed November 14, 2005.

18          These salary inadequacies continue, and as a result tens of millions of dollars are spent by

19  the CDCR each year for private registries to bring into the prisons clinical personnel who are

20  paid at hourly rates far above the rates provided to State employees.  For example, during fiscal

21  year 2005/06 CDCR reports having acquired almost 406,000 hours of work from registry nurses

22  at a cost of approximately $27 million.  The CDCR paid approximately $67 per hour for the

23  contract nurses (Exhibit 2) while paying about $38[7] per hour to its civil service nurses.

24          While the evidence at the hearings did not focus on all positions for which the Receiver

25  seeks salary increases, the Receiver has found that the same salary inadequacies which preventhe

26  _____

[7] With benefits this amount increases to approximately $49 per hour

27

28                                                6

1  California prison system from hiring doctors and nurses also negatively impacts on the hiring of

2  other crucial professions.  For example:

3      1. *Pharmacists.*

4      The State set the *maximum* salary for Pharmacist I at $5,748 even though its own salary

5  survey reveals the statewide *median* salary for pharmacists in the public sector is 43% higher,

6  and *median* public sector salary in the Bay Area is 54% higher.  Despite the vacancies and

7  despite the crisis, the collective bargaining agreement negotiated by the Department of Personnel

8  Administration (DPA) on behalf of the Governor only increases the Pharmacist I salaries by 3.5%

9  effective July 1, 2006.

10     2. *Clinical Dieticians.*

11     In similar fashion, the American Dietetic Association's 2005 compensation survey

12  indicates the California-statewide hourly rate at the 50th percentile is $28.50 while the State only

13  pays a *maximum* of $22.28 per hour.  Annualized this means working for CDCR results in a loss

14  of more than $12, 937 every year.  The State's newly negotiated labor agreement only raises the

15  Clinical Dieticians' maximum annual salary by $1,620 effective July 1, 2006.

16     E.  The Salary Increases Proposed by the Receiver Are Reasonable and Necessary to

17         Begin the Process of Bringing the Health Care in California's Prisons Up to

18         Constitutional Standards.

19     The proposed salary ranges recommended by the Receiver are set forth in Exhibit 6.  The

20  increases are essentially based on the salary ranges offered by the State through the University of

21  California health care system, with limited geographical adjustments to address the present

22  difficulties hiring in the Bay Area and for the more remote Southern institutions.  These increases

23  represent a reasonable and necessary first step toward bringing the health care in California's

24

25

26

27

28                                    7

1  prisons up to constitutional standards.[8][9]

2        As explained below, prior to filing this motion the Receiver and his staff provided

3  documentation of the proposed increases to the State's control agencies and the Office of the

4  Governor for review, as well as to counsel and involved labor organizations.  No party has

5  objected to the specifics of the proposed recommended increases.

6        It should be noted that filling clinical vacancies with full time permanent State employees

7  will offset the need for temporary employees acquired by contract through private registries. This

8  is beneficial for at least three reasons.

9        First, CDCR reports the total cost for contract and registry personnel during fiscal year

10 2005/06 was approximately $90 million.   Replacing contract personnel with full time State

11 employees should reduce this figure considerably.

12        Second, lessening the need for temporary employees will minimize or eliminate the

13 friction between permanent and temporary employees due to the difference in salaries.  For

14 example, CDCR reports paying approximately $49 per hour for contract dieticians and $22.28 to

15 its permanent employees.  CDCR reports paying an *average* of $170 per hour for contract

16 primary care providers at the same time its permanent physicians make approximately $80 per

17 hour.

18        Third, replacing temporary employees with a permanent staff results in improved

19 continuity of care, which, as explained above, is a fundamental element of a constitutionally

20 adequate prison medical delivery system.

21

22

23

24        [8]   The salary ranges proposed by the Receiver have also been designed to eliminate the
       cumbersome, confusing, and at times inconsistent recruitment and retention differentials currently
25     provided for certain clinical positions and for certain prisons.  Thus, on the effective date of the new
       salaries, existing differentials will cease.
26

27        [9]  With one exception, the Receiver intends the salary modifications to have an effective date of
       September 1, 2006.
28

**IV.**

**THE RECEIVER HAS MADE ALL REASONABLE EFFORTS TO**

**EXCISE HIS POWER CONSISTENT WITH STATE LAW**

**CONCERNING THIS MOTION FOR WAIVER**

A. Introduction.

Before filing this motion, the Receiver and his staff engaged in several weeks of negotiations and numerous unsuccessful attempts to effectuate salary increases and structural change through Defendants.

B. The Office of the Receiver's Communications with DPA.

Salary setting by the Governor and Legislature is generally delegated by law to the DPA. This California control agency is vested with authority to establish and adjust salary ranges subject to certain restrictions and considerations.[10] DPA may establish more than one salary range, rate or method of compensation for a classification given unusual working conditions and prevailing rates for comparable services in the public and private sector.[11] To the extent that these measures impact rank-and-file employees they must be bargained[12] unless as observed by DPA there is an emergency or the unions waive their right to bargain.

Therefore, on August 8, 2006, the Receiver's attorneys Jared Goldman and Linda Buzzini met with DPA Director David Gilb. Director Gilb was provided with a copy of salaries determined necessary by the Receiver, effective September 1, 2006. At the meeting DPA was asked whether it would effectuate the salary adjustments deemed necessary by the Receiver. In addition, DPA was asked to determine whether the State had the authority to raise salaries, and if so, whether the State would exercise that authority. These issues were again discussed by DPA representatives on August 14, 2006, at which time the Governor's representative, Louis Mauro,

---

[10] Gov. Code section 19826, 19829.

[11] Gov. Code section 19829.

[12] Gov. Code section 3512 et seq.

9

1   was also present.

2       The DPA responded in writing concerning the Receiver's request. *See* Paul M. Starkey's

3   letter of August 15, 2006 attached as Exhibit 7. DPA concluded that a court order was

4   "appropriate and necessary to remove statutory barriers that prevent DPA from implementing the

5   proposed salary increases" for the following reasons:

6       1. DPA is required to bargain salary increases with the unions, unless their right to

7   bargain is waived or there is an emergency, citing California Gov. Code § 19816; 3512 et seq.

8       2. The State's classification system requires that all positions with similar characteristics

9   be assigned to the same classification. DPA emphasizes that when assigning positions to a

10  particular classification it must do so where the same schedule of compensation can be made to

11  apply with equity to each similarly classified position, citing California Gov. Code § 19818.

12      3. DPA is required to administer a statewide pay plan based on the principle that like

13  salaries shall be paid for comparable duties and responsibilities, citing California Government

14  Code section 19826, subdivision (a).[13]

15      C. The Office of the Receiver's Communications with the Office of the Governor.

16      On August 20, 2006, the Receiver's Chief of Staff, John Hagar, sent a letter to the

17  Governor's Office attempting to determine whether it concurs with DPA's analysis and

18  conclusions (Exhibit 8). The Governor's Legal Affairs Secretary, Andrea Hoch replied on

19  August 25, 2006 (Exhibit 9). In the reply, the Office of the Governor concluded as follows:

20      1. Absent a statutory waiver by the Federal court, DPA is legally obligated to meet and

21  confer [bargain] with the unions.

22      2. The Receiver correctly observes that DPA may establish more than one salary range or

23  rate or method of compensation within a classification given unusual working conditions, hours

24  of work and where necessary to meet provisions of State law, or prevailing rates for comparable

---

25  [13] DPA also provided the Receiver with a list of additional statutes it believes are implicated by
26  the Receiver's request. The Office of the Receiver finds, however, that virtually all of the statutes cited are irrelevant to this motion. For example, DPA cites all laws pertaining to itself irrespective
27  of the fact that most of them do not pertain to salary setting.

28                                    10

1    services in public and private business.  *See* Government Code section 19829, subdivision (a).

2         3.  While case law has permitted some flexibility, the principle of like pay for like work

3    as set forth in Government Code section 19826 cannot be ignored in the absence of a statutory

4    waiver by the Court.

5         The Governor's Secretary for Legal Affairs concludes that while it appears as if the State

6    has the authority to implement the salary increases, she cannot say for certain that it would

7    implement the proposed increases for represented employees because doing so is dependent on

8    variables such as successful negotiations and a possible need for Legislative ratification of any

9    agreement reached with the unions which exceeds $250,000.  *See* Government Code section

10   3517.63.[14]

11                                          **V.**

12   **STATE LAW OR INACTION BY DEFENDANTS IS CLEARLY PREVENTING THE**

13                **RECEIVER FROM CARRYING OUT HIS DUTIES**

14        A.  Introduction.

15        Defendants' response to the Receiver's request that they implement the salary increases

16   necessary to begin to implement the programs necessary to bring the medical care in California's

17   prisons up to constitutional standards supports a finding that either:

18        (1) California law prevents the State from implementing salary increases and structural

19   change in the salary program in order to carry out the purpose of the Receivership (as suggested

20   by State officials) or;

21        (2) Defendants' inaction is clearly preventing the Receiver from developing a

22   constitutionally adequate medical care system by their failure to provide adequate salaries for

23   prison clinical personnel.

24        The Order Appointing Receiver establishes either as grounds for seeking judicial

25   _____

26   [14]  The Governor's Office did not comment about the Receiver's proposed increases for
     supervisors and managers who are not afforded the right to collectively bargain agreements with the
27   State.

28                                          11

PL-001.013

1 intervention.  It also provides for waiving State requirements causing the impediment, and it

2 provides for contempt proceedings regarding Defendant and all persons in concert and

3 participation with Defendant who fail to fully cooperate with the Receiver in the discharge of his

4 duties.[15]

5     B.  The Receiver Questions Whether it is State Law or State Inaction Which Prevents the

6     Necessary Salary Increases.

7     As discussed above, both the Office of the Governor and the DPA take the position that

8 in the absence of a Court ordered waiver of the law, California's statutory scheme requires DPA

9 to bargain salary increases and submit any of them which exceed $250,000 to the Legislature for

10 potential ratification.  The Receiver, however, remains skeptical about whether it is State law

11 rather than inaction on the part of the State which is preventing him from carrying out his duties.

12 The Receiver's uncertainty stems from the following.

13     First, Government Code section 3517.63 requires DPA to submit labor agreements for

14 $250,000 or more to the Legislature if the funds are not already contained in the Budget Act.

15 The Receiver questions the relevance of this section for two reasons:

16     1.  The Order Appointing Receiver states the Receiver shall determine the annual CDCR

17 medical health care budget.[16]

18     2.  The Receiver has been allocated $100 million in budgeted funds which the Receiver

19 intends to use for the salary increases.

20     Second, Government Code section 3516.5 relieves DPA of the duty to bargain before

21 making a change when there is an emergency.  In the Order re Interim Remedies Relating to

22 Clinical Staffing, the Court determined there was a staffing crisis that supported the need for pay

23 differentials.  The State has not provided any evidence which suggests that the crisis has abated;

24 to the contrary, the State appears to agree that the crisis is continuing.  On the other hand, the

25 shortage of clinicians in the prisons and the resulting failure to deliver adequate medical care in

26  [15] *Order Appointing Receiver* at pages 5 and 8.

27  [16] *Order Appointing Receiver*, p. 3.

28                                    12

PL-001.014

1    the CDCR, while a crisis, may not be, from the State's perspective, the type of emergency which

2    activates the relief provision of section 3516.5.

3         Third, even though the unions may waive their right to bargain, DPA has not asked

4    whether they are willing to do so.  DPA's failure is significant because the Service Employees

5    International Union which represents various medical classifications (including nurses) has

6    agreed to a one time waiver of statutory, regulatory or contractual requirements relied upon by

7    DPA to block the Receiver's efforts to implement the agreed upon salary increases (*see* Exhibit

8    10), the American Federation of State, County and Municipal Employees which represents

9    pharmacy staff and dieticians supports the salary increases sought by the Receiver (Exhibit 11),

10   as does the Union of American Physicians and Dentists which represent physicians (Exhibit 12),

11   the California Correctional Supervisors Organization which represents supervising nurses

12   (Exhibit 13), and the Association of California State Supervisors (Exhibit 14).

13        For all of these reasons the Receiver questions whether California law is an actual

14   impediment requiring waiver, as Defendants suggest, or whether the defendants choose not to

15   exercise their authority under the law to increase salaries as requested by the Receiver.

16        In raising this uncertainty, however, the Receiver emphasizes that he does not interpret

17   defendants' reluctance to implement the salary increases as a demonstration of bad faith

18   cooperation or interference which calls for the sanctions described in the Order Appointing

19   Receiver at page 8, paragraph VI.  Concerning this issue defendants have responded in a timely

20   manner to Office of the Receiver inquiries, they made diligent efforts to assure coordinated

21   responses from California's control agencies, and most important, they have indicated in their

22   correspondence and at the meetings that they do not oppose the overall increases, nor the

23   specifics of the Receiver's proposal.  For example, see Cabinet Secretary Fred Aguiar's letter of

24   August 30, 2006 stating, "[i]f such an order were to be drafted and issued by the Court, the

25   administration stands ready to offer its assistance, technical and otherwise, to successfully

26   implement the order" (Exhibit 15 at page 1).  In essence, defendants appear to seek protections

27   that may be afforded them by a Federal Court remedial order.  Therefore, in an abundance of

28                           13

1 | caution, the Receiver has decided to work with defendants and pursue a waiver of the law.

2 | **VI.**

3 | **REQUEST FOR WAIVER**

4 | A. <u>Introduction</u>.

5 | The Receiver requests a narrowly drawn waiver of California law and a corresponding

6 | order. The waiver is not intended to relieve the State of its duties and responsibilities under

7 | California law, including the obligation to collectively bargain regarding salaries. Rather, the

8 | waiver is intended to make way for the Receiver to direct the implementation, adjustment and

9 | administration of the proposed salaries and structural changes to the pay system. To emphasize,

10 | the waiver only applies to actions and determinations made by the Receiver and not to any other

11 | party.

12 | B. <u>Request for Waiver</u>.

13 | Based on the facts set forth above, the Receiver requests the following:

14 | 1. That the Court order defendants to cooperate fully with the Receiver concerning the

15 | implementation, administration, and adjustments of the salary ranges established by the Receiver

16 | in Exhibit 6.[17]

17 | 2. That the Court waive the following statutes and regulations to the extent necessary for

18 | the Receiver to direct the implementation, administration, and adjustment of the salary ranges

19 | established by Exhibit 6.

20 | A. <u>Government Code section 19816</u> (which vests DPA with duties, purposes,

21 | responsibilities and jurisdiction with respect to the administration of salaries for civil service and

22 | exempt employees).

23 | B. <u>Government Code section 19826</u> (which designates DPA as the agency responsible

---

[17] Consistent with prior Court orders, and with the previous salary recommendations of the Court's Correctional Expert, the Receiver recommends that the waiver and salary increases apply to Pelican Bay State Prison.

14

1  for establishing and adjusting salary ranges for civil service classifications). [18]

2        C. Government Code section 19829 (which requires DPA to provide for intermediate

3  steps with salary ranges which govern the extent of the salary adjustment an employee may

4  receive at any one time, and providing for DPA to establish more than one salary range or rate or

5  method of compensation within a classification).

6        D. Government Code section 19832 (which authorizes DPA to set standards of efficiency

7  applied for purposes of granting employees annual merit salary adjustments, as implemented

8  through California Code of Regulations, title 2, section 599.683).[19]

9        E. Government Code section 19836 (which vests DPA with authority to approve

10  payment of salaries at any step above the minimum of the salary range for recruitment purposes;

11  to obtain persons with extra ordinary qualifications or as credit for prior State service).

12        F. Government Code section 3516.5 (which requires DPA to provide written notice to

13  employee unions, and provide them an opportunity to meet and confer (bargain) when there is a

14  change that falls within the scope of representation (e.g., wages)).[20]

15        G. Government Code section 3517 (which requires the Governor or his representative

16  (DPA) to bargain in good faith regarding wages, hours and other terms and conditions of

17  employment prior to arriving at a determination of policy or course of action).[21]

18

19        [18]  In making the request the Receiver emphasizes that he does not intend to abrogate in any
20  manner the salary setting principles set forth in section 19826.

21        [19]  The purpose of the waiver of Government Code sections 19829 and 19832 is to provide the
   Receiver with authority to control the salary ranges for a limited number of health care positions
22  (e.g., Director of Division of Correctional Health Care Services, Physicians and Surgeons) after
   taking into consideration performance, extraordinary qualifications, recruitment and retention issues,
23  prevailing rates in the public and private sector, patient needs and the position of applicable labor
   organizations.

24        [20]  In making this request, it is the Receiver's intent that the State's independent duty to bargain
25  concerning the salary modifications established by the Receiver (as set forth in Exhibit 6) remains
   unaltered.

26        [21]  In making this request, it is the Receiver's intent that the State's independent duty to bargain
27  concerning the salary modifications established by the Receiver (as set forth in Exhibit 6) remains
   unaltered.

28                                          15

1    H.  California Code of Regulations, Title 2, section 599.681 (which sets forth the

2    methodology for determining salaries when employees move between ranges in the same

3    classification).

4    3.  That the Court order the waivers set forth above be ongoing in the event that the

5    Receiver determines additional salary modifications are necessary to effectuate the purposes of

6    the Receivership, subject to the following procedure:

7    A.  No less than forty-five (45) days prior to establishing additional salary modifications

8    the Receiver shall provide written notice to the Office of the Governor, DPA, counsel, and the

9    affected labor organizations concerning his proposed salary modifications.

10    B.  The Receiver or delegated staff from the Office of the Receiver shall thereafter

11    contact, and if necessary confer with the Office of the Governor, DPA, counsel, and the affected

12    labor organizations concerning the proposed salary modifications.

13    C.  In the event that the Office of the Governor, DPA, counsel, or affected labor

14    organizations believe that the additional salary modifications proposed by the Receiver are

15    prohibited by law, regulation or contract (other than the laws and regulation waived by this

16    motion), they shall submit to the Receiver a written explanation of their concerns not more than

17    twenty (20) days following their receipt of the Receiver's proposed salary modifications.

18    D.  In the event that written objections from the Office of the Governor, DPA, counsel, or

19    the affected labor organizations are submitted to the Receiver, the Receiver or delegated staff

20    from the Office of the Receiver shall confer with the objecting party to determine if the objection

21    can be resolved.  In the event the objections cannot be resolved, the Receiver shall request the

22    Court to waive the law, regulation or contract at issue.

23

24

25

26

27

28                                          16

1    E.  In the event that no written objections are submitted to the Receiver, or in the event

2    that written objections are resolved as set forth in paragraph D above, the Receiver shall direct

3    and implement the proposed additional salary modifications forty-five (45) days after providing

4    the Office of the Governor, DPA, counsel, and the affected labor organizations with written

5    notice of his intention to establish additional salary modifications.

6

7    Dated: September 12, 2006

8

9    _____

10   Robert Sillen
     Receiver

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    17

1                     **PROOF OF SERVICE BY MAIL**

2       I, Kristina Hector, declare:

3       I am a resident of the County of Alameda, California; that I am over the age of eighteen (18) years of age and not a party to the within titled cause of action. I am employed as the Inmate

4 Patient Relations Manager to the Receiver in Plata v. Schwarzenegger.

5       On September 12, 2006 I arranged for the service of a copy of the attached documents described as RECEIVER'S MOTION FOR WAIVER OF STATE LAW on the parties of record

6 in said cause by sending a true and correct copy thereof by pdf and by United States Mail and addressed as follows:

7

8 ANDREA LYNN HOCH
Legal Affairs Secretary
Office of the Governor

9 Capitol Building
Sacramento, CA 95814

10

PETER FARBER-SZEKRENYI, DR., P.H.

11 Director
Division of Correctional Health Care Services

12 CDCR
P.O. Box 942883

13 Sacramento, CA 94283-0001

14 J. MICHAEL KEATING, JR.
285 Terrace Avenue

15 Riverside, Rhode Island 02915

16 JONATHAN L. WOLFF
Deputy Attorney General

17 455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

18

STEVEN FAMA

19 DON SPECTER
ALISON HARDY

20 Prison Law Office
General Delivery

21 San Quentin, CA 94964-0001

22 PAUL MELLO
JERROLD SCHAEFER

23 Hanson Bridgett
425 Market Street, 26th Floor

24 San Francisco, CA 94105

25 BRUCE SLAVIN
General Counsel

26 CDCR-Office of the Secretary
P.O. Box 942883

27 Sacramento, CA 94283-0001

28

KATHLEEN KEESHEN
Legal Affairs Division
California Department of Corrections
P.O. Box 942883
Sacramento, CA 94283

RICHARD J. CHIVARO
JOHN CHEN
State Controller
300 Capitol Mall, Suite 518
Sacramento, CA 95814

MOLLY ARNOLD
Chief Counsel, Department of Finance
State Capitol, Room 1145
Sacramento, CA 95814

LAURIE GIBERSON
Staff Counsel
Department of General Services
707 Third Street, 7th floor, Suite 7-330
West Sacramento, CA 95605

MATTHEW CATE
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780

DONNA NEVILLE
Senior Staff Counsel
Bureau of State Audits
555 Capitol Mall, Suite 300
Sacramento, CA 95814

WARREN C. (CURT) STRACENER
PAUL M. STARKEY
Labor Relations Counsel
Department of Personnel Administration
Legal Division
1515 "S" Street, North Building, Suite 400
Sacramento, CA 95814-7243

GARY ROBINSON
Executive Director
UAPD
1330 Broadway Blvd., Suite 730
Oakland, CA 94612

19

1   YVONNE WALKER
    Vice President for Bargaining
2   CSEA
    1108 "O" Street
3   Sacramento, CA 95814

4   PAM MANWILLER
    Director of State Programs
5   AFSME
    555 Capitol Mall, Suite 1225
6   Sacramento, CA95814

7   RICHARD TATUM
    CSSO State President
8   CSSO
    1461 Ullrey Avenue
9   Escalon, CA95320

10  TIM BEHRENS
    President
11  Association of California State Supervisors
    1108 O Street
12  Sacramento, CA95814

13      I declare under penalty of perjury under the laws of the State of California that the foregoing
    is true and correct.  Executed on September 12, 2006 at San Francisco, California.

14

15

16  Kristina Hector

17

18

19

20

21

22

23

24

25

26

27

28
                                            20