DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
MARISSA HATTON – 348678
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. 2:90-CV-00520-KJM-DB <br><br> **PLAINTIFFS' CLOSING BRIEF FOR HEARING ON STAFFING** <br><br> Date:   Nov. 2, 2023 <br> Time:   10:00 a.m. <br> Crtrm.: 3 <br><br> Judge:  Hon. Kimberly J. Mueller |

[4374143.7]

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................ 1

I.      THERE IS NO GENUINE DISPUTE THAT DEFENDANTS HAVE NOT
        COMPLIED WITH THE COURT'S SPECIFIC AND DEFINITE
        STAFFING ORDERS. ........................................................................................ 1

II.     DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING
        THAT COMPLIANCE IS IMPOSSIBLE............................................................ 2

III.    DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING
        THAT THEY TOOK ALL REASONABLE STEPS TO COMPLY........................ 3

        A.      Defendants Have Not Taken All Reasonable Steps To Provide
                Competitive Salaries To Psychologists, Social Workers, Recreation
                Therapists, or Medical Assistants in Non-PIP Programs. ............................... 4

        B.      Defendants Have Not Taken All Reasonable Steps To Streamline
                Their Hiring Process........................................................................................ 9

        C.      Defendants' Other Measures Are Plainly Insufficient .................................... 9

        D.      Defendants' Telepsychiatry and Telemental Health Program Does Not
                Absolve Them of their Obligation to Take All Reasonable Steps With
                Regard to Non-Psychiatry Positions............................................................. 11

        E.      Defendants' Brand New Tele-Psychology and Tele-Social Work
                Programs Are Too Little Too Late. ............................................................... 12

IV.     THE COURT CAN AND SHOULD HOLD DEFENDANTS LIABLE FOR
        THE FINES THAT HAVE ACCUMULATED SINCE FEBRUARY 2023........... 14

        A.      The Fines Are Properly Calibrated to Advance Both Coercive and
                Compensatory Purposes. .............................................................................. 14

        B.      The Court Provided Ample Opportunity to Purge ........................................ 16

        C.      If The Court Remains Concerned About Due Process, Its Order
                Should Temporarily Suspend Payment of the Fines That Have
                Accrued To Date, Pending Defendants' Full Compliance By A Date
                Certain in 2024. ........................................................................................... 19

        D.      Fines Alone Are Not Likely to Bring About Compliance. ............................ 19

V.      THE 2022 ANNUAL REPORT ON SUICIDES AND SUICIDE
        PREVENTION EFFORTS IN CDCR IS ADMISSIBLE TO SHOW THE
        CONNECTION BETWEEN UNDERSTAFFING AND HARM TO THE
        CLASS............................................................................................................ 20

CONCLUSION.............................................................................................................. 22

[4374143.7]

i

1

## INTRODUCTION

2   It has been more than 13 years since Defendants adopted their 2009 Staffing Plan

3   for the non-PIP programs and more than six years since this Court ordered Defendants to

4   fully comply with that Plan within one year.  *See* ECF No. 3693; ECF No. 5711 at 30.  For

5   the first decade following adoption of their Plan, Defendants consistently failed to fill at

6   least 90 percent of the psychiatry positions called for in that Plan.  *See generally* PL-006,

7   ECF No. 5564; ECF No. 6695.  Since 2020, Defendants have improved psychiatry

8   staffing.  But they allowed the vacancy rates for the other clinical positions required by the

9   Plan to skyrocket.  *See, e.g.*, ECF No. 7984 at 6 (showing a 43 percent vacancy rate

10  systemwide for clinical psychologist positions as of August 2023); *id.* at 7 (showing a 27

11  percent vacancy rate for clinical social worker positions systemwide as of August 2023).

12   Throughout this period, Defendants "demonstrated no sense of the required urgency

13  for a meaningful implementation" of their Staffing Plan.  Special Master's Report On The

14  Status Of Mental Health Staffing And The Implementation Of Defendants' Staffing Plan,

15  ECF No. 5564, Feb. 6, 2017.  Defendants argue that they have done as much as they can.

16  But the evidence shows that Defendants have simply continued with business as usual.

17  Nearly three years have passed since the scale of Defendants' current staffing crisis

18  became clear.  Yet the salaries Defendants provide to psychologists and social workers still

19  do not come close to compensating them for the abysmal working conditions they must

20  endure.  The byzantine hiring process Defendants have set up for mental health positions

21  remains excruciatingly slow.  And the brand new telepsychology and telesocial work

22  programs Defendants described at trial are both too little and too late to excuse

23  Defendants' longstanding noncompliance.  For the reasons explained below, the Court

24  should issue findings of contempt and order Defendants to pay the full amount of fines that

25  have accumulated pursuant to the Court's Order of February 28, 2023.  *See* ECF No. 7742.

26  **I.    THERE IS NO GENUINE DISPUTE THAT DEFENDANTS HAVE NOT**
    **COMPLIED WITH THE COURT'S SPECIFIC AND DEFINITE STAFFING**
27  **ORDERS.**

28   "Civil contempt … consists of a party's disobedience to a specific and definite court

1

order by failure to take all reasonable steps within the party's power to comply." *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 945 (9th Cir. 2014) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993)).   Here, there is no genuine dispute about whether the relevant orders are specific and definite, or whether Defendants have complied with those orders. Defendants have never argued that the Court's orders were unclear or provided inadequate notice of their obligations.  *See CBS Broadcasting, Inc. v. FilmOn.com, Inc.,* 814 F.3d 91, 98 (2d Cir. 2016) ("An injunction is sufficiently clear and unambiguous [to be enforced through civil contempt] if it leaves 'no doubt in the minds of those to whom it was addressed … precisely what acts are forbidden.'").  Nor have Defendants disputed any of the evidence in the record showing their severe, ongoing non-compliance with those obligations.  *See* ECF No. 7952 at 3-7.  Indeed, Defendants stipulated to much of that evidence, *see* ECF No. 7956 ¶¶ 21-22, and have conceded that they are out of compliance with regard to at least some of the categories of mental health staff at issue in these proceedings.  Tr. 9-29-23 at 8:7-25.  Defendants also conceded that the burden of proof has shifted to them to prove their defenses.  *Id.* at 8:22-25; *see Stone v. City and Cnty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (alleged contemnor bears the burden of proving they took every reasonable step to comply); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (same).  There is no genuine dispute that Defendants are non-compliant with the Court's specific and definite staffing orders, and have been for many years.

## II.   DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING THAT COMPLIANCE IS IMPOSSIBLE.

Defendants' opening brief argued that "compliance with the 2009 Staffing Plan— even at 90% fill rates—is impossible in the current labor market."  ECF No. 7951 at 17. But Defendants all but abandoned this position at trial, and the minimal evidence they presented falls far short of satisfying their "difficult" burden of demonstrating "categorically and in detail" that compliance is impossible.  *See Fotin v. Commissioner of Mass. Dep't of Public Welfare*, 692 F.2d 790, 796 (1st Cir. 1982); *NLRB v. Trans Ocean*

1 | *Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

2 |      Not a single witness for Defendants testified that it was impossible to comply with

3 | the Court's mandates.  Defendants' expert witness, Dr. Erica Greulich, refused to testify

4 | that labor market conditions make it impossible for Defendants to fill at least 90 percent of

5 | the positions at issue in these proceedings.  Although she suggested that labor market

6 | conditions have made hiring mental health staff more "difficult" for Defendants, Dr.

7 | Greulich explicitly disavowed any claim that compliance with the Court's orders is

8 | impossible.  *See, e.g.*, Tr. 10-3-23 at 6:4-8.  When asked whether it is "impossible for

9 | CDCR to hire psychologists," for example, Dr. Greulich responded "No, I'm not offering

10 | that opinion."  Tr. 9-29-23 at 174:10-12.  Similarly, when asked if it was her opinion that

11 | CDCR could not hire 63 of the roughly 26,000 social workers in California (that is, the

12 | number of social workers needed to raise Defendants' systemwide fill rate to 90 percent),

13 | Dr. Greulich responded that she had no opinion at all as to "what CDCR can and can't

14 | hire."  Tr. 10-3-23 at 22:21-23:3-6.  Likewise, Dr. Greulich would not opine that CDCR

15 | cannot hire the 281 psychologists necessary to meet the compliance threshold out of the

16 | 17,251 psychologists in California. Tr. 10-3-23 at 24:22-25:1. Amar Mehta, CDCR's

17 | Deputy Director of Statewide Mental Health, similarly refused to testify that it is

18 | impossible for Defendants to comply with the Court's staffing orders.  *See* Tr. 10-4-23 at

19 | 121:20-122:2.

20 |      This is a far cry from the kind of categorical, detailed evidence required to sustain

21 | an impossibility defense.  The Court should reject Defendants' unsubstantiated

22 | impossibility defense outright.

23 | **III.   DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING THAT THEY TOOK <u>ALL</u> REASONABLE STEPS TO COMPLY.**

24 |      Because Defendants did not show that it was impossible for them to comply with

25 | the Court's staffing orders, to avoid contempt they needed to show that they "took every

26 | reasonable step to comply."  *Stone*, 968 F.2d at 856 n.9.  They did not do so.  Instead, the

27 | evidence at trial showed that Defendants failed to take multiple reasonable steps and

1   continued with business as usual while clinical vacancies – especially among psychologists

2   and social workers -- skyrocketed.  *See Kelly*, 822 F.3d at 1096 (affirming contempt where

3   prison administrator "failed to take several reasonable steps to ensure compliance" with

4   staffing obligations).

5   
6   **A.    Defendants Have Not Taken All Reasonable Steps To Provide Competitive Salaries To Psychologists, Social Workers, Recreation Therapists, or Medical Assistants in Non-PIP Programs.**

7       The most obvious step Defendants could have taken to reduce vacancies was to

8   substantially increase the salaries of mental health staff in the non-PIP programs.   It is

9   undisputed that Defendants did not try this and do not plan to try it.[1]  Instead, Defendants

10  argue that it would not be "reasonable" to offer substantially higher salaries because

11  (1) they purportedly already offer higher average salaries than the regional and statewide

12  averages for the positions at issue in these proceedings, and (2) these salary "premiums"

13  have not been effective at increasing fill rates in the past.   Neither argument is persuasive.

14      Defendants' first argument ignores the abysmal working conditions for mental

15  health staff in CDCR, which make substantially higher salaries not just "reasonable" but

16  necessary.  On-site mental health staff in CDCR work in rodent-infested prisons with

17  inadequate or non-functioning air-conditioning systems and ceilings that leak during

18  rainstorms.  *See* Tr. 10-5-23 at 29:24-30:16; 31:2-11 (Dr. David).  They are crammed into

19  a limited number of offices, some of which are located in windowless rooms or converted

20  prison cells.  *See* ECF No. 7999 at 95:16-24, 98:9-99:24 (Dr. Burton); Tr. 10-5-23 at

21  29:24-30:16 (Dr. David).  They work with uniquely challenging patient populations and

22  have unmanageably high caseloads that require them to work long hours.  Tr. 10-5-23 at

23  69:12-72:5, 81:23-82:7 (Dr. Francecshi).  And they face greater safety risks than their

24  peers working outside of CDCR, as evidenced by the "hostage policy" they must

25  
---

26  [1] Defendants' recently adopted collective bargaining agreements with the unions
representing CDCR mental health staff provide only small pay increases to certain mental
27  health staff and do not substantially depart from CDCR's existing, unsuccessful framework
for compensating mental health staff.  *See* Tr. 10-3-23 at 95:13-96:9, 96:18-97:3, 98:19-
28  99:7, 99:20-25; DEFS 006-008.

[4374143.7]

4

1    acknowledge in writing, which states that CDCR will not negotiate for their return if they
2    are taken hostage on the job.  Tr. 10-5-23 at 30:17-22 (Dr. David).  In light of working
3    conditions like these, it would have been entirely reasonable for Defendants to pay mental
4    health staff large salary premiums far above the salaries paid to comparable providers
5    outside of a prison setting.

6          Defendants' second argument—that CDCR's salary "premiums" have not
7    significantly reduced vacancies—simply restates what is self-evident from the record
8    already: CDCR's existing salaries are not high enough to attract and retain a sufficient
9    number of mental health staff.  But the legally relevant question is whether it would have
10   been "reasonable" for CDCR to offer *larger* premiums than what they offer now or have
11   offered in the past.  Defendants' expert offered little of value on this question.  Dr.
12   Greulich's regression analysis found that, with two exceptions, the size of the premiums
13   CDCR offered between 2015 and 2022 did not have a statistically significant effect on fill
14   rates for the positions at issue in these proceedings. Tr. 9-29-23 at 125:14-126:6.  But her
15   regression model was so deeply flawed—it included far fewer data points than it should
16   have, in no small part because CDCR refused to provide her with the data she asked for,
17   *see* Tr. 10-3-23 at 9:1-9 (Dr. Greulich)—that it showed a statistically significant *negative*
18   relationship between salary and fill rates for psychologists.  *See* Tr. 9-29-23 at 125:14-
19   126:6 (Dr. Greulich).  In other words, the statistical model that forms the backbone of
20   Defendants' defense stands for the proposition that  CDCR could fill *more* psychologist
21   positions by offering *lower* salaries.  *See* Tr. 10-4-23 at 183:17-184:3 (Dr. Brown).  That is
22   nonsensical as a commonsense matter, even if Plaintiffs' expert had not identified other
23   serious methodological flaws.

24         Even if the Court assumes Dr. Greulich's methodology was reliable, she admitted
25   that she did not study the impact of larger salary premiums than what CDCR has
26   previously offered and did not attempt to answer the question of whether larger salary
27   premiums would be more effective at increasing fill rates.  Tr. 10-3-23 at 10:1-6 (Dr.
28   Greulich).   Dr. Greulich agreed that her analysis leaves significant "uncertainty" about

[4374143.7]

5

whether substantially higher premiums would be more effective at increasing fill rates, Tr. 10-3-34 at 12:12-18, though at her deposition she was not "uncertain" about this point at all—she testified it was her "expectation that…the response is going to change as the premiums increase." Tr. 10-3-23 at 19:8-15. Even if the Court credits Dr. Greulich's trial testimony on this point, the "uncertainty" she identified is exactly why CDCR needed to *try* offering higher premiums before concluding they wouldn't work. Their failure to do so proves that they did not take all reasonable steps to comply with the Court's orders and should be held in contempt.

Nor do Defendants' own actions suggest they believe that raising salaries has no effect on fill rates. Time and time again, they have raised salaries, including in the most recent MOU negotiations, and registry rates, including with the newest contract. It is not that Defendants do not understand that money talks. It appears instead that they are simply unwilling to pay what it takes to compete with other employers or even to keep up with inflation, which has resulted in their failure to take any numbers of commonsense, reasonable steps to attract and retain sufficient numbers of clinicians.

For instance, Defendants did not take the reasonable step of raising salaries to match what they pay mental health staff in the Psychiatric Inpatient Programs (PIPs). In May 2022, CDCR provided a 15 percent pay increase to all mental health staff working in the PIPs but excluded mental health staff working in CDCR's non-PIP programs—the very programs at issue in these proceedings. Tr. 10-3-23 at 100:13-101:7 (Muhammad). When asked why a similar pay increase was not extended to non-PIP mental health staff as well, the Deputy Director of Human Resources for the California Correctional Health Care Services, Jasinda Muhammad, stated only that "we were focused on increasing staffing in the PIP." Tr. 10-3-23 at 91:13-14.

Defendants' witnesses offered no reason why it would not have been reasonable to "focus" on staffing in the non-PIP programs as well. At the time the PIP pay increase went into effect, Defendants were subject to the Court's October 2017 order requiring them to fully comply with the 2009 Staffing Plan (which applies only to non-PIP

1 programs). *See* ECF No. 5711 at 30.  CDCR officials are aware that this Court had

2 previously issued a series of orders to prevent staffing shortages caused by pay disparities

3 among clinicians serving inpatient and outpatient class members.  Tr. 10-3-23 at 102:8-14

4 (Muhammad); ECF No. 2301; ECF No. 2134; ECF No. 2236.   And they were aware of

5 the worsening staffing crisis among social workers and psychologists for approximately 18

6 months before May 2022.  Tr. 10-4-23 at 89:20-90:3 (Dr. Mehta).  By then, vacancy rates

7 for non-PIP social workers and line psychologists were regularly exceeding 20 percent and

8 30 percent, respectively. *See* PL-091; PL-092; PL-093; PL-094; PL-095.  Extending the 15

9 percent PIP pay increase to non-PIP mental health staff would have been entirely

10 reasonable under these circumstances—particularly given the entirely foreseeable risks

11 that a substantial number of non-PIP staff would leave to work in the PIPs and that morale

12 would suffer among staff who remained.  *See, e.g.*, Tr. 10-3-23 at 100:13-101:7

13 (Muhammad); Tr. 10-5-23 at 28:11-29:9 (Dr. David),  (Dr. Minor), 86:3-18 (Dr.

14 Franceschi).

15       Defendants also failed to take the reasonable steps of offering candidates more than

16 the bare minimum salary for each position and informing them that they might be eligible

17 to negotiate higher salaries on an individualized basis.  Jasinda Muhammad testified that

18 CDCR's initial offers of employment to candidates for vacant mental health positions

19 always list only the bare minimum salary for the position, regardless of whether the

20 candidate's experience makes him or her eligible for a higher salary through the "Hiring

21 Above Minimum" (HAM) process.  Tr. 10-3-23 at 106:16-107:21.  Ms. Muhammad

22 further testified that it is each candidate's responsibility to affirmatively seek out

23 information about HAM eligibility during the hiring process, Tr. 10-3-23 at 108:15-109:2;

24 that even candidates with extraordinary experience are not eligible for salaries above the

25 maximum salary band for their position, *id.* at 109:25-110:4; that current employees who

26 are dissatisfied with their salary are categorically excluded from the HAM process, *id.* at

27 110:5-15; and that CDCR has not requested waivers or any other exceptions from the rules

28 governing the HAM process, *id.* at 110:16-18.  These practices put CDCR at a "massive

1   disadvantage" when trying to hire for the positions at issue in these proceedings, and that

2   the continuation of these practices in spite of CDCR's current staffing crisis suggests that

3   Defendants are making only minimal efforts to fill vacant positions.  Tr. 10-4-23 at

4   174:11-21 (Dr. Brown).  Defendants' failure to change these practices further shows that

5   they have not taken all reasonable steps to comply with their staffing obligations.

6          There are still more reasonable steps Defendants did not take to provide adequate

7   compensation to mental health staff.  They did not ensure that psychologist and social

8   worker salaries keep pace with inflation.  Tr. 10-4-23 at 163:3-13.  They did not make

9   psychologists eligible for "recruitment and retention" bonuses until approximately 18

10  months after vacancy rates began to skyrocket, and then waited another 14 months after

11  that to extend the bonuses to social workers.  Tr. 10-3-23 at 103:16-104:3 (Muhammad);

12  PL-041.  They allowed registry rates to remain essentially static for five years between

13  2017 and 2022, even though they knew existing rates were not yielding sufficient

14  candidates, and then in April 2023 increased registry rates at only certain institutions while

15  leaving rates all but unchanged at some of the most severely understaffed facilities.  Tr.

16  10-3-23 175:19-176:18, 177:11-25, 179:11-182:6, 187:3-19 (Ponciano); *Compare* DEFS-

17  018.149-151 (identifying institutions that remained in the lowest tiers of compensation

18  rates for psychologists and social workers), *with* ECF No. 7849 at 6-7.   They did not take

19  steps to mitigate the impact of pension reforms on recruitment and retention, ECF No.

20  7999 at 84:22-86:2 (Dr. Burton), and didn't even discuss the possibility of obtaining

21  waivers of state law at any point since 2017, let alone submit formal requests.  Tr. 130:23-

22  24, 131:5-9 (Muhammad).  And they did not try to match the salaries of employers like

23  Kaiser Permanente that have successfully lured numerous clinicians away from CDCR

24  institutions with particularly acute staffing shortages, such as CMF, CHCF, and CSP-SAC.

25  Tr. 10-5-23 at 19:1-4, 21:3-23:15 (Dr. David), 67:10-69:8 (Dr. Franceschi); 109:16-25 (Dr.

26  Minor).

27         Given the severity of Defendants' non-compliance with their staffing obligations,

28  they needed to take all of these steps to ensure that their compensation for mental health

remained competitive.   Because they did none of them, the Court should hold them in contempt.

**B.      Defendants Have Not Taken All Reasonable Steps To Streamline Their Hiring Process.**

Defendants also have not taken all reasonable steps to reduce unnecessary bureaucratic delays in their hiring process, which multiple witnesses identified as a major barrier to filling the vacant mental health positions at issue in these proceedings.  Jasinda Muhammad testified that it generally takes 108 *business* days for her staff to complete the hiring process for new mental health clinicians in the non-PIP programs.  Tr. 10-3-23 at 128:15-24.  Recent initiatives to reduce this time lag to 65 business days, which Defendants began working on *six years ago*, are limited to just one prison.  Tr. 10-3-23 at 125:15-24, 126:4-14 (Muhammad).  Multiple institution-level chiefs of mental health, all of whom testified that they are closely involved in the hiring process, agreed that it frequently takes months for HR staff to contact applicants for interviews and/or extend formal offers of employment to successful interviewees, and that as a result of these delays many (and sometimes all) applicants for a position at their institution accept offers from other employers before CDCR even contacts them.  *See* Tr. 10-5-23 at 11:15-12:17 (Dr. David), 59:9-60:8, 63:2-17  (Dr. Franceschi); ECF No. 7999 at 63:4-67:20, 71:14-72:23 (Dr. Burton).  Ms. Muhammad further testified that her department would have been able to review applications and contact candidates more quickly with additional staff of their own, but that Defendants did not submit a budget request for additional HR positions until recently.  Tr. 10-3-23 at 118:9-120:6.

The Court should issue findings of contempt because Defendants have not taken all reasonable steps to reduce unnecessary delays in their process for hiring new mental health staff.

**C.      Defendants' Other Measures Are Plainly Insufficient**

Defendants have taken no steps to investigate the potential use of Licensed Marriage and Family Therapists in their mental health system, even though CDCR has

1   repeatedly piloted (and abandoned) a program evaluating exactly that possibility

2   specifically to address difficulties in recruiting psychologists.  10-4-23 Tr. 128:4-129:4

3   (Dr. Mehta); *see* Special Master 21st Round Monitoring Report (July 31, 2009), ECF No.

4   3638-4 at 32 (LMFT pilot at CSP-Corcoran started to "offset the difficulty in recruiting

5   individuals into long-standing staff psychology vacancies"), ECF No. 3638-5 at 41 (LMFT

6   pilot also started at CMC); *see also* Special Master 25th Round Monitoring Report (Jan. 18,

7   2013), ECF No. 4298 at 288 (LMFT pilot at CMC ultimately abandoned due to "staffing

8   cuts").  This is true despite their knowledge that the Receiver has begun utilizing that

9   classification to provide clinical care in CCHCS's integrated substance use disorder

10  treatment program (ISUDT), which, inter alia, provides class members mental health care

11  including cognitive behavioral treatment.  10-4-23 Tr. 128:4-129:18 (Dr. Mehta); *see* Defs-

12  019.351.

13          Despite complaints from the field, Defendants also have failed to provide adequate

14  administrative support for clinical staff, including abandoning without notice their court-

15  ordered plan to provide each psychiatrist with a medical assistant as a means of improving

16  retention. *See* ECF No. 7999 at 40:25-50:1, 50:5-53:4, 53:1-54:12 (Dr. Burton) (MAs

17  would improve patient care and staff retention, and the lack of MAs for in-person

18  psychiatrists has been raised with CDCR leadership several times), 86:18-87:20 (more

19  clinical support services could certainly help with recruitment and retention), 95:25-96:5,

20  96:21-97:23 (lack of administrative support staff and MAs for psychiatrists hurts

21  retention), 100:12-101:4 (lack of admin staff for on-site psychiatrists is a problem across

22  CDCR, and he has raised the lack of admin staff with HQ); *see also* 4/11/23 Order, ECF

23  No. 7806 at 5-6.

24          Defendants also have not sought any waivers of state law to address their staffing

25  crisis since at least 2017, despite their knowledge that the Receiver has sought and

26  received such waivers to address shortages of medical staff on multiple occasions,

27  including for the specific purpose of raising salaries, with no opposition from

28  Defendants.  *See* Pls' RJN Ex. A at 1 & Ex. B (*Plata* Receiver Sept. 12, 2006 motion and

1  supportive exhibits, Dkts. 543-544, seeking waivers to address "crisis with clinical staffing

2  within California's prisons" driven by "the long-term and grossly inadequate salaries

3  offered by the State of California to clinical personnel who seek employment in its

4  prisons"); Pls' RJN Ex. C at 10-12 (10/17/06 *Plata* Order, Dkt. 554, granting Receiver's

5  motion for waivers of state law to raise medical staff salaries where Defendants have failed

6  to act and "the history of this case demonstrates that salary increases can effectively

7  address the high vacancies rates that have chronically plagued the CDCR's ability to

8  attract and retain qualified medical clinicians"); *see also* Pls' RJN Ex. D (11/3/08 *Plata*

9  Order, Dkt. 1754, granting Receiver's motion for waivers of state law to increase salaries

10  for executive positions).

11       Indeed, while Defendants' mental health system is plagued by staffing levels far, far

12  worse than those precipitating the original *Plata* waivers (*see* Pls' RJN Ex. C at 3),

13  medical staffing under the Receiver's leadership remains robust today despite the pressures

14  of the pandemic.  *See* Pls' RJN Ex. E (CCHCS Primary Care Provider Vacancy/Coverage

15  Report dated May 1, 2023, ECF No. 3865, showing systemwide primary care provider fill

16  rate of 97.94%, not including additional pending hires).  Nonetheless, Defendants have not

17  requested that the *Plata* Receiver assume responsibility for mental health hiring even

18  though that possibility was specifically contemplated by the formal court-approved

19  coordination agreements.  *See* Pls' RJN Ex. F at 6 (May 29, 2007 Order Approving

20  Coordinated Agreements in *Plata, Coleman*, and *Perez*, filed at *Plata* Dkt. 2247,

21  authorizing the *Plata* Receiver to assuming responsibility for medical hiring and noting

22  Receiver would consider assuming responsibility for mental health hiring in the

23  future).  This is true even though Plaintiffs invited just such a remedy.  *See* Feb. 10, 2023

24  Status Conf. Tr., ECF No. 7726 at 13:1-20.

25       **D.    Defendants' Telepsychiatry and Telemental Health Program Does Not
                 Absolve Them of their Obligation to Take All Reasonable Steps With
26               Regard to Non-Psychiatry Positions.**

27       At trial, Defendants elicited extensive testimony about their existing telepsychiatry

28  program and its role in reducing the number of vacant psychiatrist positions systemwide.

1  The telepsychiatry program is relevant to this proceeding only insofar as it amounts to one

2  step Defendants have taken to reduce psychiatrist vacancies.  It does not absolve

3  Defendants of their obligation under the Court's October 2017 Order to fully implement

4  their 2009 Staffing Plan, as amended, and it is not relevant to the question of whether

5  Defendants have taken all reasonable steps to fill at least 90 percent of their psychologist,

6  social worker, recreation therapist, and medical assistant positions.  *See Parsons v. Ryan*,

7  No. CV-12-0601-PHX-DKD, 2018 WL 3239691, at *10 (D. Ariz. June 22, 2018)

8  (compliance efforts must be "geared toward the specific issues precluding compliance"),

9  *aff'd*, 949 F.3d 443 (9th Cir. 2020).

10    **E.    Defendants' Brand New Tele-Psychology and Tele-Social Work
             Programs Are Too Little Too Late.**

11

12        Defendants also elicited extensive testimony about their brand new telepsychology

13  and telesocial work programs, which they first proposed and sought funding for in the

14  summer of 2023.  *See* ECF No. 7935 at 1; Tr. 10-4-23 at 16:18-17:3 (Dr. Martello).

15  Unlike Defendants' telepsychiatry program, their new telepsychology and telesocial work

16  programs are relevant to the key question that is before the Court: whether Defendants

17  have taken all reasonable steps to fill at least 90 percent of their psychologist and social

18  worker positions outside of the PIPs.  But even if the new programs could be implemented

19  promptly—and the evidence at trial clearly showed they cannot[2]— they still would not

20  save Defendants from contempt because they are both too little and too late.

21        The programs do too little because even if fully implemented they would add only

22  77 telepsychologists and only 41 telesocial workers—far below what is needed for

23  Defendants to reach a 90 percent fill rate for either classification.  *See* Tr. 10-4-23 at

24  20:23-21:19, 23:22-24:6 (Dr. Martello).  Although Dr. Martello testified that it is

25  _____

26  [2] *See, e.g.*, Tr. 10-4-23 at 17:10-18:4 (Dr. Martello testifying that none of the programs'
    line telepsychologist and line telesocial worker positions have been filled), 19:5-21

27  (candidate for chief telepsychologist position declined offer because it did not pay
    enough), 20:19-22 (programs not expected to be fully operational for at least two years);

28  22:23-24:8 (authority and funding for program expansion uncertain); 30:9-25
    (telepresenters won't be hired until after telemental health clinicians hired).

1  "possible" the telepsychology program will grow in the future, she admitted that she was

2  "not confident" CDCR would be able to obtain funding or legislative authorization to

3  expand the program.  Tr. 10-4-23 at 22:5-23:8.  Any expansion would also require the

4  hiring of additional telepresenters on top of the 100 new medical assistants that will need

5  to be hired for the programs in their current iteration to function.

6        The programs also do too little because at least some of the telehealth providers will

7  almost certainly be existing clinicians who transition from on-site to telework.  Dr.

8  Martello admitted that at least "some" of the applications they have received thus far are

9  from current CDCR psychologists and social workers.  Tr. 10-4-23 at 34:12-35:10.  She

10 also admitted that the sole person hired into either program thus far was an existing CDCR

11 social worker.  Tr. 10-4-23 at 35:4-17.   Notably, Defendants chose not to offer pay

12 incentives for on-site psychologist or social work positions to discourage this kind of

13 poaching from the existing clinical programs, despite offering such differential pay for on-

14 site psychiatrists.

15       The telepsychology and telesocial work programs also come too late to excuse

16 Defendants' longstanding non-compliance.  Defendants began utilizing telepsychiatry in

17 approximately 2010, and Dr. Martello testified that it has been effective at reducing

18 psychiatry vacancies.  Tr. 10-4-23 at 15:23-16:8.  Yet they did not even propose a

19 telepsychology program or telesocial work program until after four months after these

20 proceedings were initiated, two and a half years after the vacancy rates for psychologists

21 and social workers began to sky rocket, and approximately 13 years after they began using

22 telepsychiatry.  ECF No. 7935 at 1; Tr. 10-4-23 at 15:23-16:1, 16:18-17:3 (Dr. Martello).

23 *See Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1113-14 (D. Idaho 2013) ("long overdue

24 move" did not support all-reasonable-steps defense because it was "part of the reasonable

25 steps [the defendant] should have taken years ago"), *aff'd*, 822 F.3d 1085 (9th Cir. 2016);

26 *A.B. by & through Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-

27 1178 MJP, 2023 WL 4407539, at *11 (W.D. Wash. July 7, 2023) (health services agency

28 did not take all reasonable steps where it "fail[ed] to prepare for and react swiftly to" a

1  sudden increase in demand for inpatient beds).

2  **IV.  THE COURT CAN AND SHOULD HOLD DEFENDANTS LIABLE FOR THE FINES THAT HAVE ACCUMULATED SINCE FEBRUARY 2023.**

3
4          On February 28, 2023—more than thirteen years after Defendants first adopted their

5  2009 Staffing Plan, and more than five years after the Court gave Defendants one year to

6  comply with the patient/staff ratios in that Plan, ECF No. 5711 at 30 ("October 2017

7  Order")—the Court issued a schedule of prospective, conditional fines that would begin

8  accumulating "month to month" if, and only if, Defendants remained non-compliant with

9  their staffing obligations after a grace period.  ECF No. 7742 at 5-6 ("February 2023

10 Order").  Defendants argue in their opening brief that this Court cannot impose any of the

11 fines that have accrued pursuant to the February 2023 Order, even if it holds Defendants in

12 contempt, because the Court did not previously issue findings of contempt in either its

13 October 2017 or February 2023 orders.  According to Defendants, "fines that pre-date a

14 future finding of contempt cannot be imposed" because "Defendants must be afforded an

15 opportunity to purge following any finding of civil contempt[.]"  ECF No. 7951 at 20.

16         For the reasons explained below, the Court can and should impose the fines

17 **A.      The Fines Are Properly Calibrated to Advance Both Coercive and Compensatory Purposes.**

18         Because civil contempt sanctions can be imposed without the full slate of

19 procedural protections available to criminal defendants, they must serve "remedial" rather

20 than "punitive" ends.  *International Union, United Mine Workers of America v. Bagwell*,

21 512 U.S. 821, 826-27 (1994) (quoting *Gompers v. Bucks Stove & Range Co*., 221 U.S.

22 418, 444 (1911)).  Where the sanctions at issue are monetary fines, as here, the fine is civil

23 and remedial if it is designed either to "coerce the defendant into compliance with the

24 court's order, [or] … compensate the complainant for losses sustained."  *United States v.*

25 *United Mine Workers of America*, 330 U.S. 258, 303-04 (1947).  Where a fine is purely

26 coercive, "it is civil only if the contemnor is afforded an opportunity to purge"—that is, to

27 "reduce or avoid the fine through compliance."  *Bagwell*, 512 U.S. at 829.

28         Defendants assert that the fines in these proceedings have no compensatory purpose

and are purely coercive.  But this is incorrect.  There is little doubt that the fines in this case are intended *in part* to coerce Defendants into compliance.  The Court took great care to structure the fines in a manner that ensures Defendants have just enough of an incentive to fill their mental health positions rather than leaving them vacant, taking into account the amount Defendants would save in salaries and benefits by failing to fill the positions.  *See* ECF No. 7742 at 5-6; *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947) (structure of coercive contempt fine must take into account, among other things, its "probable effectiveness…in bringing about the result desired").  And the record in this case includes ample evidence that the fines are also properly structured to address "the character and magnitude of the harm threatened by continued contumacy" and "the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant."  *United Mine Workers*, 330 U.S. at 304; *see* Tr. 10-5-23 at 31:12-34:13 (Dr. David) ("We can't provide Program Guide services. We're not even providing what you could consider to be standard of care in the community at this point. Clinical continuity is nonexistent. We're doing the best we can, and it is nowhere good enough for the needs of our patients."), Tr. 10-5-23 at 35:6-36:22 (Dr. David) ("I have patient safety concerns every day. It's exhausting and draining and difficult to know that we have men in our care who are ill, who are sick, who are coming to us for help, and we are not able to give them the help that they need. It is not why I came into this field. It is not why my employees came into this field."); Tr. 10-5-23 at 116:19-117:15, 120:12, 122:14-21, 124:6-125:5, 125:15-23, 126:24-127:3: (Dr. Minor) (high caseloads in non-PIP programs at CHCF limits care that can be provided and has led to increases in RVRs and self-harm incidents); Defs.' 2022 Annual Report on Suicides in CDCR, PL-110 at 7, 58, 64-65 & Fig. 24 (noting institutions' inability to comply with Program Guide requirements and suspension of certain suicide prevention measures due to inadequate staffing).[3]

---

[3] On October 18, 2023, the Court directed the parties to address admissibility of PL-110 in the closing briefing.  This is addressed in Section V, below.

1    But the record in this case shows that the fines will serve compensatory purposes as

2    well: namely, to "meet the mental health needs of inmates in a reasonable manner and

3    within the standard of care."  ECF No. 5711 at 15 (quoting ECF No. 4539 at 54-55); *see*

4    *Parsons*, 949 F.3d at 456 (contempt fines directed at defendant-prison administrators

5    deemed compensatory as well as coercive because the fines would "address Plaintiffs'

6    injuries" and "further compliance with the healthcare requirements" of the underlying

7    consent decree).  The Court has made no orders about the use of any fines that are

8    eventually paid, and retains discretion to order them used for compensatory purposes.  The

9    $50 million in fines accrued thus far, divided by approximately 33,000 *Coleman* class

10   members, yields a per class member sum of $1,515.  While this is far too little to

11   compensate the class for long-standing deprivations of minimally adequate mental health

12   care, it may still be possible to fashion a use of the funds that benefits the *Coleman* class.

13       Even without paying the fines directly to the *Coleman* class, the Court has authority

14   to order a payment structure that incents filling the positions necessary to provide adequate

15   care for the class.  For example, the Court has the authority to find the Defendants' liable

16   for the accumulated fines, but to suspend the payment obligation, and at the same time

17   allow future compliance to purge the accumulated liability over time.  This could be done

18   by giving Defendants a certain amount of credit against the accumulated fines for each

19   month in which they comply with the staffing plan. *See* Section IV.C below.

20   Alternatively, the Court could direct the use of the funds on improvements on the mental

21   health system to benefit the Coleman class.

22       **B.    The Court Provided Ample Opportunity to Purge**

23       Because the fines in this case are compensatory as well as coercive, due process

24   demands less in terms of purging opportunity than what the Court has already provided to

25   Defendants.  *See Bagwell*, 512 U.S. at 838 ("Our holding…leaves unaltered the

26   longstanding authority of judges…to enter broad compensatory awards for all contempts

27   through civil proceedings,").  But the Court has provided Defendants with ample

28   opportunity to purge regardless of whether the fines serve coercive purposes,

1   compensatory purposes, or both. .

2          The Court issued its schedule of fines more than 13 years after Defendants adopted

3   their 2009 Staffing Plan, and more than five years after the Court ordered Defendants to

4   come into full compliance with that Plan within one year.  As a result, when the Court

5   issued this schedule of fines, both the substantive requirements and the deadlines relating

6   to Defendants' staffing obligations were already "well known to the parties and reviewed

7   in numerous court orders, including the October 10, 2017 order, ECF No. 5711, and most

8   recently in the court's January 6, 2023 order, ECF No. 7699."  ECF No. 7742 at 3.

9   Nonetheless, the Court built in even more advance notice and opportunity for Defendants

10  to reduce or avoid the fines through compliance.  The Court ordered that no payment

11  hearing would take place unless fines "accumulate for three consecutive months."  *Id* at 6.

12  If Defendants had come into compliance for even one month out of every three after

13  February 2023, they would not be in the position of having to account for the violations by

14  contempt.

15          Defendants mischaracterize the "purgeability" requirement for coercive civil

16  contempt fines.  "Prospective, conditional fines" are "the paradigmatic coercive civil

17  contempt sanction," *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020), and can be

18  imposed so long as the alleged contemnor is provided an opportunity to "reduce or avoid

19  the fine through compliance."  *Bagwell*, 512 U.S. 821, 829 (1994) (quoting *Penfield Co. of*

20  *Cal. v. SEC*, 330 U.S. 585, 588 (1947); *see also Coleman v. Brown*, No. 2:90-CV-0520-

21  KJM-DBP, 2017 WL 1398828, at *5 (E.D. Cal. Apr. 19, 2017), *aff'd*, 756 F. App'x 677

22  (9th Cir. 2018).  This is all that is required for a fine to be labeled "purgeable."  There is no

23  rule requiring that formal findings of contempt precede the accrual of prospective,

24  conditional fines, like those in this case—so long as the schedule of fines was announced

25  before the fines began to accrue, thereby giving the alleged contemnor the requisite notice

26  and opportunity to reduce or avoid the fines through compliance.  *See NLRB v.*

27  *Ironworkers Local 433,* 169 F.3d 1217, 1218, 1221 (9th Cir. 1999) (rejecting due process

28  defense where contempt judgment followed accrual of fines pursuant to enforcement

provisions in earlier consent decree); *Salazar ex rel. Salazar v. D.C.,* 602 F.3d 431, 435, 437-40 (D.C. Cir. 2010) (same).  In fact, a rule requiring formal contempt findings to precede the accrual of fines would make little sense, as it would mandate *less* notice than what the Court provided here: advance warning not only of the risk of fines but also of the risk of a contempt judgment in the first place.

Defendants' cases are not to the contrary.  *CBS Broadcasting* does not say that courts *must* issue their formal contempt findings before fines start to accrue.  *See* 814 F.3d 91, 101-02 (2d Cir. 2016).  Rather, it says that courts *can* structure contempt proceedings in this way—at least where there is a *second* contempt judgment that follows the opportunity to reduce or avoid the fines through compliance.  *Id.*

Nor do the references in *Bagwell* to "summary adjudication of indirect contempts" involving "complex injunctions" help Defendants here.  ECF No. 7951 at 12-13 (citing *Bagwell*, 512 U.S. at 833-34).  The Court has not conducted a "summary adjudication" of the contempt charges in this case—it held a full evidentiary hearing that lasted four court days.  And *Bagwell*'s separation-of-powers rationale for holding "complex injunctions" to a stricter standard of due process does not apply here because Defendants themselves came up with the Plan they have failed to implement, not the Court.  *See* ECF No. 5711 at 3; *Bagwell*, 512 U.S. at 840 (Scalia, J., concurring) (arguing that the purported fusion of legislative, executive, and judicial functions in structural reform litigation raises unique due process concerns); *Ironworkers Local 433*, 169 F.3d at 1220 ("[T]he Court in *Bagwell* was clearly concerned about the possible abuse of power when a judge orders oppressive sanctions for violations of complex standards of the judge's own making.").

Regardless of the exact amount of process due in these circumstances, Defendants have had more than sufficient opportunity to reduce or avoid the Court's prospective, conditional fines through compliance.  Those fines only began to accumulate on March 31, 2023—more than *thirteen years* after Defendants developed and adopted their 2009 Staffing Plan, and more than *five* years after the Court issued the October 10, 2017 that Defendants are now charged with violating.  ECF No. 7742 at 5.  The Court also gave

Defendants an additional three-month grace period following its February 2023 Order, during which Defendants needed only to show compliance for one month out of every three to avoid contempt. *Id.* at 6. The Court also structured the fines such that the amount owed is determined by the magnitude of Defendants' non-compliance each month. *Id.* at 5-6. As a result, Defendants can reduce (and have reduced) the amount of the fines they will owe through partial compliance.

### C. If The Court Remains Concerned About Due Process, Its Order Should Temporarily Suspend Payment of the Fines That Have Accrued To Date, Pending Defendants' Full Compliance By A Date Certain in 2024.

As explained above, it is well within the Court's authority to hold Defendants in contempt and order them to pay all fines that have accrued pursuant to the Court's February 28, 2023 Order. *See* ECF No. 7742. But in the event the Court has doubts, any remaining due process concerns can easily be addressed by temporarily suspending Defendants' obligation to the pay the fines, pending full compliance by a date certain in 2024. *See Bagwell*, 512 U.S. at 829-30; *United Mine Workers*, 330 U.S. at 305. If the Court opts for this approach, its order should also provide for a kind of fine forgiveness program, whereby only a portion of the suspended fines that have accrued to date are forgiven for each month that Defendants are fully compliant. Structuring the suspended fine in this way would ensure that Defendants have an incentive not only to come into compliance but to *stay* in compliance long enough for the entire amount of the fine to be forgiven.

### D. Fines Alone Are Not Likely to Bring About Compliance.

Even with the fines accumulating over months, Defendants have not acted with enough urgency to fill positions. The evidence reviewed above shows many reasonable steps they could implement, including a more flexible salary setting system, better use of registry, a faster recruiting process, improvements in working conditions, greater efforts to recruit from the unlicensed clinicians who work at CDCR to get their pre-licensing hours, and expanding the use of additional types of licensed clinicians, such as Marriage and Family Therapists, just to name a few. Additional court orders may be necessary to

1   require Defendants to implement such reasonable measures.

2   **V.      THE 2022 ANNUAL REPORT ON SUICIDES AND SUICIDE PREVENTION**
        **EFFORTS IN CDCR IS ADMISSIBLE TO SHOW THE CONNECTION**
3       **BETWEEN UNDERSTAFFING AND HARM TO THE CLASS.**

4            Exhibit P-110 is admissible over Defendants' hearsay and relevancy objections.

5   The document is titled "California Department of Corrections and Rehabilitation's 2022

6   Annual Report to the Legislature on Suicides in the California Department of Corrections

7   and Rehabilitation and Annual Suicide Report."  This is the same report that Defendants'

8   filed with this Court on October 18, 2023.  *See* ECF No. 8017 at 47-131.

9            P-110 is relevant to show the magnitude of harm caused by understaffing, which

10  goes to whether the monetary sanctions are set at an appropriate level.  *See United Mine*

11  *Workers,* 330 U.S. at 304.  Defendants' Chief of Mental Health, Dr. Mehta testified he

12  agreed with the following statement in the report:

13           [Q] . . . So this report provided to the legislature two days ago

14           confirms that understaffing affected suicide prevention efforts

15           last year. I'll read this to you:

16           This report on suicides that occurred in CDCR during 2022

17           would be remiss if it did not discuss the fact that there are

18           significant and persistent staffing shortages that plagued many

19           of the prisons in the CDCR system. While it is difficult to

20           determine a direct nexus between staffing shortages and deaths

21           by suicide in CDCR custody, it is important to recognize the

22           impacts of reduced staffing. Provision of clinical care at

23           levels consistent with the MHSDS Program Guide has been

24           challenging at many institutions.

25           Do you agree with that?

26           A. Yes.

27           Q. Also on the same page, it says that care is being triaged

28           due to a lack of clinical staffing. And I quote, as a result

[4374143.7]

20

1    of these difficulties, institutions focus their limited

2    clinical staff on the more acute and emergent needs of their

3    programs.

4         Do you agree with that?

5         A. Yes.

6         Tr. 10/4/23 at 137:6-138:1.  Dr. Mehta's testimony confirms the relevancy of the

7    report to show how failure to comply with the required staffing levels undermines care.

8    Dr. Mehta further testified that he agreed with the report's conclusion that fulfilment of

9    certain suicide prevention measures had fallen due to staffing shortages. *Id.* at 138:3-8.

10        P-110 is not hearsay; it is a party-admission under Rule 801(d)(2) of the Federal

11   Rules of Evidence.  CDCR's reports have been received as party admissions in this case

12   throughout the history of this litigation, and the Court has characterized hearsay arguments

13   as to these motions as "bordering on frivolous." *See Coleman v. Brown*, 922 F. Supp. 2d

14   1004, 1024 (E.D. Cal. 2013)   The 2022 Suicide Report falls under the rule for authorized

15   statements by agents of the California Department of Corrections.  FRE 801(d)(2)(C).  Dr.

16   Mehta testified that the report was prepared by his team under his oversight.  Tr. 10/4/2023

17   at 136:1-137:3.  *See Coleman v. Wilson*, 912 F. Supp. 1282, 1294 (E.D. Cal. 1995)

18   (overruling hearsay objection to statements of correctional director).

19        In addition to being the work of an authorized agent, the 2022 Suicide Report was

20   adopted by Defendants when they filed it with Court on October 18, 2023, under a cover

21   identifying it as "the California Department of Corrections and Rehabilitation's (CDCR)

22   2022 Annual Report to the Legislature on Suicides in CDCR and the 2022 Annual Suicide

23   Report."  ECF No. 8017 at 4.  It is thus an adoptive statement under FRE 801(d)(2)(B).

24   CDCR's filing of the report with this Court is conduct that "manifested the intent that it

25   adopted or believed [it] to be true."   FRE 801(d)(2)(B).  In addition, the filing of the

26   document in this Court with a cover pleading representing that it is CDCR's report is a

27   binding judicial admission that it is the statement of CDCR and its authorized agents, and

28   therefore non-hearsay. *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 557

1  (9th Cir. 2003).

2      Even if P-110 were not a party admission—which it plainly is—it would fall under

3  one or more hearsay exceptions.  P-110 is a report by CDCR to the California Legislature,

4  and thus falls under the public records hearsay exception of FRE 803(8).  *See Coleman,*

5  922 F. Supp 2d at 1024 (overruling hearsay objection to CDCR report to Receiver as both

6  party admissions and FRE 803(8) public records).

7                                         **CONCLUSION**

8      In light of the foregoing, Plaintiffs request that the Court find that Defendants' non-

9  compliance with their staffing plan is not excused by impossibility, nor by having taken all

10 reasonable measures to comply, and find Defendants are liable for the accumulated

11 contempt fines.

12                                      **CERTIFICATION**

13     Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

14 filing: ECF Nos. 1383, 2134, 2236, 2301, 4539, 5711, 7504, 7699, 7742, 7806, 7916,

15 7961, 7976, 7977, 7981, 8006, 8016.

16

17

18 DATED:  October 19, 2023          Respectfully submitted,

19                                            ROSEN BIEN GALVAN & GRUNFELD LLP

20

21                                            By:  */s/ Ernest Galvan*

22                                                   Ernest Galvan

23                                            Attorneys for Plaintiffs

24

25

26

27

28