# EXHIBIT 1

1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   MARISSA HATTON – 348678
3  PRISON LAW OFFICE
   1917 Fifth Street
4  Berkeley, California 94710-1916
   Telephone:  (510) 280-2621
5
   CLAUDIA CENTER – 158255
6  DISABILITY RIGHTS EDUCATION
   AND DEFENSE FUND, INC.
7  Ed Roberts Campus
   3075 Adeline Street, Suite 210
8  Berkeley, California 94703-2578
   Telephone:  (510) 644-2555
9

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830

Attorneys for Plaintiffs

10

11              UNITED STATES DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA

13

14  RALPH COLEMAN, et al.,

15              Plaintiffs,

16        v.

17  GAVIN NEWSOM, et al.,

18              Defendants.

Case No. 2:90-CV-00520-KJM-DB

**REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF PLAINTIFFS'
CLOSING BRIEF REGARDING
STAFFING CONTEMPT**

Judge:  Hon. Kimberly J. Mueller

19

20

21

22

23

24

25

26

27

28

[4378748.2]

REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201, Plaintiffs request that the Court take judicial notice of the following items, all of which are either (1) publicly-filed documents in this case or in *Plata v. Newsom*, 01-CV-01351-JST (N.D. Cal.), or (2) publicly available facts provided by government agencies whose accuracy cannot reasonably be questioned. All of these items are directly relevant to the defenses Defendants raised in the staffing contempt proceedings.

1.      Plaintiffs' Exhibit 1 (PL-001):  Receiver's Motion for Waiver of State Law, filed at ECF No. 543 in *Plata v. Newsom*, 01-CV-01351-JST (N.D. Cal.) (hereinafter "*Plata*"), a true and correct copy of which is attached hereto as **Exhibit A**.

2.      Plaintiffs' Exhibit 2 (PL-002):  Appendix of Exhibits Supporting Receiver's Motion for Waiver of State Law, filed at ECF No. 544 in *Plata*, a true and correct copy of which is attached hereto as **Exhibit B**.

3.      Plaintiffs' Exhibit 3 (PL-003):  Order Re: Receiver's Motion for A Waiver of State Law, filed October 17, 2006, at ECF No. 554 in *Plata*, a true and correct copy of which is attached hereto as **Exhibit C**.

4.      Plaintiffs' Exhibit 5 (PL-005):  Order Granting Receiver's Application for Order Waiving State Statutes, Regulations and Procedures Regarding Salary Grids for Receiver Executive Assignments, filed November 3, 2008, at ECF No. 1754 in *Plata*, a true and correct copy of which is attached hereto as **Exhibit D**.

5.      Plaintiffs' Exhibit 13 (PL-013):  California Correctional Health Care Services (CCHCS) Primary Care Provider Vacancy/Coverage Report, dated May 1, 2023, filed June 1, 2023, at ECF No. 3865 in *Plata*, a true and correct copy of which is attached hereto as **Exhibit E**.

6.      Plaintiffs' Exhibit 100 (PL-100):  Order re Coordinated Agreements in *Coleman*, *Plata*, and *Perez*, filed May 29, 2007, at ECF No. 2247 in this case, a true and correct copy of which is attached hereto as **Exhibit F**.

7.      **California CPT Calculator Fact: From February 2020 to August 2023, inflation rose 17% in California**.  This is calculated using the California Consumer Price

1   Index (CPI) inflation calculator, available on the State of California Department of

2   Industrial Relations' website. *See* State of California Department of Industrial Relations,

3   Consumer Price Index Calculator,

4   https://www.dir.ca.gov/oprl/CPI/CPICalculator/CpiCalculator.aspx (last accessed October

5   19, 2023). This calculator computes 17.2% by selecting (1) the California index; (2) the

6   All Urban Consumers index type; (3) February 2020 as the beginning month and year (the

7   earliest month available for 2020 because California CPI values are available for even-

8   numbered months only); and (4) August 2023 as the ending month and year (the even-

9   numbered month closest to September 2023, when proceedings began).

10         8.   **Federal CPT Calculator Fact: : From February 2020 to August 2023,**

11   **inflation rose 19% nationally**. This is calculated using the federal CPI inflation

12   calculator, available on the U.S. Bureau of Labor Statistics' website. *See* U.S. Bureau of

13   Labor Statistics, CPI Inflation Calculator,

14   https://www.bls.gov/data/inflation_calculator.htm (last accessed October 19, 2023). This

15   calculator computes 19% by selecting (1) $1.00; (2) January 2020 as the start date; and

16   (3) September 2023 as the end date. That is, using the same months as the California CPI

17   calculation above, the federal CPI calculator shows that that $1.00 in January 2020 has the

18   same buying power as $1.19 in September 2023, or 19% inflation.

19         Rule 201 of the Federal Rules of Evidence allows a federal court to take judicial

20   notice of facts that are "not subject to reasonable dispute because" they "can be accurately

21   and readily determined from sources whose accuracy cannot reasonably be questioned."

22   Fed. R. Evid. 201(b)(2). Judicial notice is an appropriate mechanism for supplementing

23   the record, and may be taken at any stage in the proceeding. Fed. R. Evid. 201(d).

24         Courts routinely "take judicial notice of undisputed matters of public record,

25   including documents on file in federal or state courts." *Harris v. County of Orange*, 682

26   F.3d 1126, 1132 (9th Cir. 2012) (internal citation omitted). This includes taking judicial

27   notice of filings in other court cases. *See, e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,

28   442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of "court filings"); *Burbank-*

1    *Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998)

2    (taking judicial notice of "pleadings filed in a related state court action").

3        Here, **Exhibits A** though **E** are publicly-filed court records on the *Plata v. Newsom*

4    docket in the Northern District of California, and **Exhibit F** is a publicly-filed court record

5    in this case pertaining to a coordinated agreements in this case and *Plata*.  These

6    documents are directly relevant to Defendants' defense that they have taken all reasonable

7    steps to try to come into compliance with the Court's staffing orders.  As explained in

8    more detail in Plaintiffs' concurrently-filed closing trial brief, Defendants have not taken

9    the step of seeking waivers of state law to address their staffing crisis since at least 2017,

10   despite their knowledge that the *Plata* Receiver has sought and received such waivers to

11   address shortages of medical staff on multiple occasions, including for the specific purpose

12   of raising salaries, with no opposition from Defendants.

13       In addition, courts routinely deem online calculators provided by official

14   government agencies judicially noticeable because their accuracy can be readily

15   determined from sources that cannot reasonably be questioned.  *See, e.g.*, *Bourban v. AXA*

16   *Equitable Life Ins. Co.*, No. CV 20-3376-MWF-PJW, 2020 WL 3171466, at *3 (C.D. Cal.

17   June 15, 2020) (recognizing that courts may take judicial notice of the Social Security

18   Administration's standard life expectancy calculator "taken from an official governmental

19   agency"); *In re Pomeroy*, No. 15-26465-D-7, 2016 WL 3564378, at *4 (Bankr. E.D. Cal.

20   June 21, 2016), *aff'd*, No. BAP EC-16-1196-TABJU, 2017 WL 1457941 (B.A.P. 9th Cir.

21   Apr. 24, 2017) (similar).; *Smith v. Homecoming Fin.*, No. 110CV52, 2010 WL 3943839, at

22   *3 n.4 (W.D.N.C. Oct. 7, 2010), *aff'd sub nom. Smith v. Homecomings Fin.*, No.

23   1:10CV52, 2010 WL 4817999 (W.D.N.C. Nov. 22, 2010) (taking judicial notice of the

24   same BLS calculator Plaintiffs present here, explaining, this calculator "maintained by the

25   Federal Bureau of Labor Statistics" is "inherently reliable.").

26       Here, the facts in paragraphs 7 and 8 above from California and the federal

27   government provide that, from February 2020 to August 2023, inflation rose 17% in

28   California and 19% nationally.  These facts are directly relevant to Defendants' defenses

1  that compliance with the Court's order is impossible and that Defendants have taken all

2  reasonable steps.  Defendants insist that they have been committed to raising salaries.  *See,*

3  *e.g.*, Defendants' Opening Trial Brief,  ECF No. 7951 at 5-6, 8-9, 18-19.  However, as

4  Plaintiffs' economic expert explained at trial, and as Plaintiffs explain again in their

5  concurrently-filed closing brief, Defendants' salary raises have not kept up with inflation.

6  *See* ECF No. 8013 at 163:9-13 (Dr. Brown testifying, "The latest union agreement doesn't

7  even keep up with the inflation that occurred between 2020 and 2023, which was 17

8  percent. So in terms of the actual purchasing power of the wages at the time pre-COVID,

9  now they're actually -- the purchasing power is less than it was pre-COVID.").

10         The Court should take judicial notice of these calculations based on governmental

11  agency calculators because the accuracy and sources of the calculations cannot be

12  reasonably be quested.  As the federal CPI inflation calculator explains:  "The CPI

13  inflation calculator uses the Consumer Price Index for All Urban Consumers (CPI-U) U.S.

14  city average series for all items, not seasonally adjusted. This data represents changes in

15  the prices of all goods and services purchased for consumption by urban households."

16  U.S. Bureau of Labor Statistics, CPI Inflation Calculator,

17  https://www.bls.gov/data/inflation_calculator.htm (last accessed October 19, 2023); *see*

18  *Trundle v. Astrue*, No. 09-CV-02058-JLT, 2010 WL 5421418, at *11 n.10 (E.D. Cal. Dec.

19  20, 2010), *aff'd sub nom. Trundle v. Comm'r of Soc. Sec. Admin*., 484 F. App'x 94 (9th

20  Cir. 2012) ("The United States Department of Labor, Bureau of Labor Statistics, is a

21  source whose accuracy cannot reasonably be questioned, and judicial notice may be taken

22  [of the] website of the government agency.").  The same applies to the California CPI

23  calculator.  The California CPI is maintained on the state government website, is computed

24  by the Office of the Director – Research Unit of the State of California Department of

25  Industrial Relations; and is computed based on the data issued by the U.S. Bureau of Labor

26  Statistics.  *See* State of California Department of Industrial Relations, Consumer Price

27  Index-California, https://www.dir.ca.gov/oprl/CPI/PresentCCPI.PDF (last updated

28  10/13/2023).

1

2                                    **CONCLUSION**

3          For the foregoing reasons, Plaintiffs' request for judicial notice should be granted.

4

5                                    **<u>CERTIFICATE</u>**

6          Plaintiffs' counsel certifies that she reviewed the following orders in preparing this

7   filing: ECF Nos. 5711, 7742, 8016.

8

9

10  DATED:  October 19, 2023              Respectfully submitted,

11                                        ROSEN BIEN GALVAN & GRUNFELD LLP

12

13                                        By:  */s/ Adrienne Pon Harrold*

14                                             Adrienne Pon Harrold

15                                        Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MARCIANO PLATA , et al.,            )

    Plaintiffs            )

      v.            )

ARNOLD SCHWARZENEGGER,            )
et al.,            )

    Defendants,            )

NO.  C01-1351-T.E.H.

**RECEIVER'S MOTION FOR A**
**WAIVER OF STATE LAW**

**PLAINTIFF'S EXHIBIT**

CASE NO. 2:90-cv-520-KJM-DB

EXHIBIT NO. PL-001

PL-001.001

**TABLE OF CONTENTS**

Page

I.   Introduction .................................................................. 1

II.  Background ................................................................... 2

III. Facts Supporting the Need for Salary Increases ................................... 3

    A.   Introduction ............................................................. 3

    B.   The Crisis Level of Shortages of Clinical Personnel Continues ................. 4

    C.   Constitutionally Adequate Medical Care in California's Prisons Cannot
        Be Delivered Without Continuity of Care .................................... 5

    D.   Salary Increases Are Necessary ............................................ 6

    E.   The Salary Increases Proposed by the Receiver Are Reasonable and
        Necessary to Begin the Process of Bringing the Health Care in California's
        Prisons Up to Constitutional Standards ..................................... 7

IV.  The Receiver Has Made All Reasonable Efforts to Excise His Power
    Consistent with State Law Concerning This Motion for Waiver .................... 8

    A.   Introduction ............................................................. 8

    B.   The Office of the Receiver's Communications with DPA ...................... 9

    C.   The Office of the Receiver's Communications with the Office of the
        Governor ................................................................. 10

V.   State Law or Inaction by Defendants is Clearly Preventing the Receiver from
    Carrying Out His Duties ........................................................ 11

    A.   Introduction ............................................................. 11

    B.   The Receiver Questions Whether it is State Law or State Inaction
        Which Prevents the Necessary Salary Increases ............................. 11

VI.  Request for Waiver ........................................................... 13

    A.   Introduction ............................................................. 13

    B.   Request for Waiver ...................................................... 14

i.

# I

## INTRODUCTION

On February 14, 2006, the Court ordered the appointment of Robert Sillen as the Receiver to take control over the delivery of medical services for California prisoners confined by the California Department of Corrections and Rehabilitation ("CDCR"). That order vested the Receiver with the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal and other operational functions of the medical delivery component of the CDCR. Pursuant to that order the Receiver must make all reasonable efforts to exercise his powers in a manner consistent with California state laws, regulations and labor contracts. In the event, however:

> that the Receiver finds that a state law, regulation, contract, or state action or inaction is clearly preventing the Receiver from developing or implementing a constitutionally adequate medical health care system, or otherwise preventing the Receiver from carrying out his duties as set forth in this Order, and that other alternatives are inadequate, the Receiver shall request the Court to waive the state law or contractual requirement that is causing the impediment.

Order at p 5, paragraph II.D., lines 1-11.

The crisis with clinical staffing within California's prisons, previously reported by the Court and the Court's Correctional Expert, continues to disrupt medical care operations. To a large degree the crisis has been created by the long-term and grossly inadequate salaries offered by the State of California to clinical personnel who seek employment in its prisons. Nevertheless, the State is either unable or unwilling to correct this situation. As explained below, the Receiver cannot begin the implementation of a constitutionally adequate medical care system within California's prisons without the appropriate number and quality of clinical personnel including, for example, physicians, mid-level practitioners, nurses, and pharmacists.

Accordingly, the Receiver motions the Court for a waiver of state laws and regulations in order to provide salary incentives necessary to achieve the purpose of the Receivership. The waiver sought by the Receiver has been narrowly crafted, as discussed in detail below. Furthermore, both plaintiffs and defendants, as well as the affected labor organizations, indicate

1

1  that they do not oppose this waiver.

## II

## BACKGROUND

The serious and negative impact that chronic shortages of clinical personnel has had on inmate/patient care in California's prisons is not in dispute.  See, e.g. *Findings of Fact and Conclusions of Law Re Appointment of Receiver* filed October 3, 2005 16:22-24 [RT 579:11-13]).  Nor is it disputed that, despite testimony concerning crisis levels of staffing shortages in May and June of 2005, by November 2005 the staffing crisis in California's prisons actually worsened.  *See Correctional Expert's Report re Clinical Staff* filed November 14, 2005.

Chief among the expert's findings was that CDCR's failure to hire and retain adequate health care providers was *inter alia* due to inaction by the Department of Personnel Administration ("DPA") and Department of Finance ("DOF"), and cumbersome, bureaucratic hiring processes.  For example, the Correctional Expert found registered nurse and physician salaries were inadequate for purposes of recruitment and retention.  He also concluded that salary compaction between clinicians, clinical supervisors and clinical managers created a vacuum in clinical leadership.[1]

As emphasized by the Court at the November 28, 2005 hearing, the Correctional Expert's Report powerfully underscored the depth of the CDCR medical care crisis.  Instead of voicing an aggressive commitment to the reforms recommended by the Correctional Expert, however, defendants (including the Governor, CDCR correctional officials, and CDCR health care officials) were content to invoke bureaucratic red tape and 'business as usual' procedures as roadblocks.[2]  To prevent Defendants from "twiddl[ing] their collective thumbs" until the Receiver was appointed, the Court determined that it was necessary to adopt measures recommended by the Correctional Expert to avoid a further deterioration of services.  The Court,

---

[1] *Correctional Expert's Report re Clinical Staffing*, *supra*, pp. 12-13.

[2] *Order re Interim Remedies Relating to Clinical Staffing* filed December 1, 2005, pp. 1-2.

2

1 therefore, ordered interim salary differentials for physicians, registered nurses, mid-level

2 practitioners and certain supervisory personnel.  When doing so the Court noted these pay

3 differentials were only intended to address the then-current crisis and once appointed, the

4 Receiver would have the option of modifying the differentials in response to future

5 circumstances or making other structural changes with regard to salaries as may be appropriate.[3]

6                                                **III**

7                **FACTS SUPPORTING THE NEED FOR SALARY INCREASES**

8          A.  Introduction.

9          The Receiver and his staff have, over a period of several months, engaged in an

10 exhaustive survey concerning the adequacy of clinical staffing within California's prison medical

11 system, both inside the prisons and within the CDCR Central Office in Sacramento.  The Office

12 of the Receiver also carefully reviewed the sufficiency of the compensation provided to clinical

13 personnel essential to the adequate delivery of medical services in CDCR institutions. This

14 review included an evaluation of salary surveys and comparisons to other large California health

15 care providers.  Based on this evaluation, the Receiver makes the following findings:

16          1.  Staffing levels in CDCR institutions are so inadequate that the remedial

17          programs necessary to bring prison medical care up to constitutional levels clearly

18          cannot begin to be implemented without significant increases in clinical

19          personnel.

20          2.  The programs and services needed to provide constitutionally adequate

21          care to prisoner/patients with chronic diseases, health problems that involve both

22          medical and mental health issues, and long-term and aging issues clearly cannot

23          begin to be implemented until California prisons stop relying upon short-term

24          registry personnel and commence the hiring of adequate numbers of permanent

25          full time State employees.

26          3.  The salaries offered by the State to applicants for clinical positions in

27 _____
   [3] *Order re Interim Remedies Relating to Clinical Staffing*, supra, p. 6, fn. 1.

28                                                3

its prisons are so low that the prison system is unable to hire and retain an

adequate number of qualified clinical personnel at all clinical levels, including

physicians, mid-level practitioners, registered nurses, licensed vocational nurses,

pharmacists and other necessary professions.  To remedy this problem, salary

increases are necessary as an initial step to begin to correct the health care delivery

crisis in California's prisons.

B.  The Crisis Level of Shortages of Clinical Personnel Continues.

1.  *Physician/Mid-Level Practitioner Primary Care Providers.*

In response to the Correctional Expert's Report re Clinical Staffing, defendants took the

position that institutions with physician vacancy rates above 20% are in crisis.[4]  As of July 31,

2006, CDCR reports that 20% of the primary care positions statewide were vacant.  At six (6)

prisons that rate climbs to more than 30%.  At two (2) prisons it is more than 50%.  At one prison

the vacancy rate is 90%.  *See* CDCR report entitled "Primary Care Providers: Vacancy Rate by

Institution," attached as Exhibit 1.

To some degree these statistics paint a picture of care that is more positive on paper than

in reality.  For example, the CDCR further reports that the vacancy rate during fiscal year

2005/2006 prompted the use of registry personnel for 128,216 hours of primary care at a cost of

more than $17 million.  *See* CDCR report entitled "Registry by Speciality for Impacted

Classifications" attached as Exhibit 2.  However, as explained below, the use of short term

registry personnel does not provide an adequate system to address the need for carefully planned

and coordinated care concerning the complicated, long-term health care needs for a significant

percentage of prisoner/patients

2.  *Nurses.*

In November 2005, the Correctional Expert's Report re Clinical Staffing found the

vacancy rate for registered nurses was 39%.  By March 2006, CDCR reports that the vacancy rate

---

[4] *Correctional Expert's Report*, supra, 9: 4-5.

4

1    dropped to 15% in response to the December 2005 Order (which increased nurse salaries by

2    approximately 18%). However, since March 2006 there has been no decline in the vacancy rate,

3    suggesting the need for further increases. *See* CDCR report entitled "Summary of Clinical

4    Hiring Result" attached as Exhibit 3. This is particularly so for the Bay area prisons[5] where

5    CDCR reports the registered nurse vacancy rate was 51% as recently as July 21, 2006. Also

6    noteworthy is the fact that on July 1, 2006 CDCR reports indicate that there were 167 vacant

7    registered nurse positions. By the end of the month, that number rose to 182 vacancies[6].

8           3. *Pharmacists*.

9           As detailed in the Maxor Report (attached as an exhibit to the Receiver's *First Bi-*

10   *Monthly Report*), the California prison pharmacy system is in crisis, providing inadequate patient

11   care while at the same time wasting millions of dollars of taxpayer resources each year . One of

12   the reasons for the pharmacy melt-down is a system wide staffing shortage. For example, CDCR

13   informs the Receiver that thirty-nine (39%) percent of the Pharmacy Technician positions were

14   vacant on July 21, 2006. Forty-two (42%) of the Pharmacist II positions were vacant as of that

15   date, as well as forty-two (42%) percent of the Pharmacist I positions.

16          4. *Other Critical Positions*.

17          CDCR reports indicate that 26% of the medical transcriber positions, 26% of the medical

18   records technician positions, 44% of the Radiological Technician positions, and 63% of the

19   Clinical Dietician positions remain vacant.

20          C. Constitutionally Adequate Medical Care in California's Prisons Cannot be

21             Delivered Without Continuity of Care.

22          Continuity of care is a fundamental element of a constitutionally adequate prison medical

23   delivery system particularly given California's prisoner/patient demographics. California's

24   prisons confine tens of thousands of "Lifers," aged prisoners, prisoners with long-term and

25          [5] Throughout this Request for Waiver, the term "Bay area" refers to San Quentin State Prison,
     Salinas Valley State Prison, and the Correctional Training Facility at Soledad.

26

27          [6] Some of the increase was due to resignations and some due to establishing new positions.

28                                              5

1    chronic diseases, and prisoners with inter-related medical and mental health problems.

2    Correctional health care in the California system cannot be as safely or effectively provided by

3    those who do not have an on-going relationship with their patients and colleagues. A continuous

4    provider-patient relationship must be the cornerstone of health care, for without it

5    communication suffers, information is lost, trust is lessened, expertise is squandered and

6    outcomes are deficient. To provide the requisite continuity the prisons must be staffed with

7    permanent State clinicians rather than short term registry personnel. *See* the Declarations of Dr.

8    Terry Hill and R.N. Jayne Robinson, attached as Exhibits 4 and 5.

9         D.  Salary Increases Are Necessary.

10        Neither party disputes the fact that salaries presently offered by the State to prison

11   physicians, mid-level practitioners, registered nurses, and licensed vocational nurses are not

12   adequate enough to attract the number and quality of clinicians needed to bring the health care in

13   California's correctional institutions up to constitutional standards. Testimony concerning salary

14   inadequacies concerning these clinical positions was presented to the Court during the hearings

15   of 2005, and additional evidence, including salary surveys which documented the low level of

16   clinical pay offered by the CDCR, was submitted in the *Correctional Expert's Report re Clinical*

17   *Staff* filed November 14, 2005.

18        These salary inadequacies continue, and as a result tens of millions of dollars are spent by

19   the CDCR each year for private registries to bring into the prisons clinical personnel who are

20   paid at hourly rates far above the rates provided to State employees. For example, during fiscal

21   year 2005/06 CDCR reports having acquired almost 406,000 hours of work from registry nurses

22   at a cost of approximately $27 million. The CDCR paid approximately $67 per hour for the

23   contract nurses (Exhibit 2) while paying about $38[7] per hour to its civil service nurses.

24        While the evidence at the hearings did not focus on all positions for which the Receiver

25   seeks salary increases, the Receiver has found that the same salary inadequacies which preventhe

26   _____

27   [7]  With benefits this amount increases to approximately $49 per hour

28                                  6

PL-001.008

1  California prison system from hiring doctors and nurses also negatively impacts on the hiring of
2  other crucial professions.  For example:
3      1. *Pharmacists*.
4      The State set the *maximum* salary for Pharmacist I at $5,748 even though its own salary
5  survey reveals the statewide *median* salary for pharmacists in the public sector is 43% higher,
6  and *median* public sector salary in the Bay Area is 54% higher.  Despite the vacancies and
7  despite the crisis, the collective bargaining agreement negotiated by the Department of Personnel
8  Administration (DPA) on behalf of the Governor only increases the Pharmacist I salaries by 3.5%
9  effective July 1, 2006.
10      2. *Clinical Dieticians*.
11      In similar fashion, the American Dietetic Association's 2005 compensation survey
12  indicates the California-statewide hourly rate at the 50th percentile is $28.50 while the State only
13  pays a *maximum* of $22.28 per hour.  Annualized this means working for CDCR results in a loss
14  of more than $12, 937 every year.  The State's newly negotiated labor agreement only raises the
15  Clinical Dieticians' maximum annual salary by $1,620 effective July 1, 2006.
16      E.  <u>The Salary Increases Proposed by the Receiver Are Reasonable and Necessary to</u>
17          <u>Begin the Process of Bringing the Health Care in California's Prisons Up to</u>
18          <u>Constitutional Standards.</u>
19      The proposed salary ranges recommended by the Receiver are set forth in Exhibit 6.  The
20  increases are essentially based on the salary ranges offered by the State through the University of
21  California health care system, with limited geographical adjustments to address the present
22  difficulties hiring in the Bay Area and for the more remote Southern institutions.  These increases
23  represent a reasonable and necessary first step toward bringing the health care in California's
24
25
26
27
28                                          7

1  prisons up to constitutional standards.[8][9]

2      As explained below, prior to filing this motion the Receiver and his staff provided

3  documentation of the proposed increases to the State's control agencies and the Office of the

4  Governor for review, as well as to counsel and involved labor organizations. No party has

5  objected to the specifics of the proposed recommended increases.

6      It should be noted that filling clinical vacancies with full time permanent State employees

7  will offset the need for temporary employees acquired by contract through private registries. This

8  is beneficial for at least three reasons.

9      First, CDCR reports the total cost for contract and registry personnel during fiscal year

10  2005/06 was approximately $90 million.  Replacing contract personnel with full time State

11  employees should reduce this figure considerably.

12      Second, lessening the need for temporary employees will minimize or eliminate the

13  friction between permanent and temporary employees due to the difference in salaries. For

14  example, CDCR reports paying approximately $49 per hour for contract dieticians and $22.28 to

15  its permanent employees. CDCR reports paying an *average* of $170 per hour for contract

16  primary care providers at the same time its permanent physicians make approximately $80 per

17  hour.

18      Third, replacing temporary employees with a permanent staff results in improved

19  continuity of care, which, as explained above, is a fundamental element of a constitutionally

20  adequate prison medical delivery system.

21

22

23

24  ───────────────

[8]  The salary ranges proposed by the Receiver have also been designed to eliminate the
25  cumbersome, confusing, and at times inconsistent recruitment and retention differentials currently
    provided for certain clinical positions and for certain prisons. Thus, on the effective date of the new
26  salaries, existing differentials will cease.

27  [9]  With one exception, the Receiver intends the salary modifications to have an effective date of
    September 1, 2006.

28

PL-001.010

IV.

**THE RECEIVER HAS MADE ALL REASONABLE EFFORTS TO**

**EXCISE HIS POWER CONSISTENT WITH STATE LAW**

**CONCERNING THIS MOTION FOR WAIVER**

A. <u>Introduction</u>.

Before filing this motion, the Receiver and his staff engaged in several weeks of negotiations and numerous unsuccessful attempts to effectuate salary increases and structural change through Defendants.

B. <u>The Office of the Receiver's Communications with DPA</u>.

Salary setting by the Governor and Legislature is generally delegated by law to the DPA. This California control agency is vested with authority to establish and adjust salary ranges subject to certain restrictions and considerations.[10] DPA may establish more than one salary range, rate or method of compensation for a classification given unusual working conditions and prevailing rates for comparable services in the public and private sector.[11] To the extent that these measures impact rank-and-file employees they must be bargained[12] unless as observed by DPA there is an emergency or the unions waive their right to bargain.

Therefore, on August 8, 2006, the Receiver's attorneys Jared Goldman and Linda Buzzini met with DPA Director David Gilb. Director Gilb was provided with a copy of salaries determined necessary by the Receiver, effective September 1, 2006. At the meeting DPA was asked whether it would effectuate the salary adjustments deemed necessary by the Receiver. In addition, DPA was asked to determine whether the State had the authority to raise salaries, and if so, whether the State would exercise that authority. These issues were again discussed by DPA representatives on August 14, 2006, at which time the Governor's representative, Louis Mauro,

---

[10] Gov. Code section 19826, 19829.

[11] Gov. Code section 19829.

[12] Gov. Code section 3512 et seq.

9

1   was also present.

2          The DPA responded in writing concerning the Receiver's request.  *See* Paul M. Starkey's

3   letter of August 15, 2006 attached as Exhibit 7.  DPA concluded that a court order was

4   "appropriate and necessary to remove statutory barriers that prevent DPA from implementing the

5   proposed salary increases" for the following reasons:

6          1.  DPA is required to bargain salary increases with the unions, unless their right to

7   bargain is waived or there is an emergency, citing California Gov. Code § 19816; 3512 et seq.

8          2.  The State's classification system requires that all positions with similar characteristics

9   be assigned to the same classification.  DPA emphasizes that when assigning positions to a

10  particular classification it must do so where the same schedule of compensation can be made to

11  apply with equity to each similarly classified position, citing California Gov. Code § 19818.

12         3.  DPA is required to administer a statewide pay plan based on the principle that like

13  salaries shall be paid for comparable duties and responsibilities, citing California Government

14  Code section 19826, subdivision (a).[13]

15         C.  <u>The Office of the Receiver's Communications with the Office of the Governor</u>.

16         On August 20, 2006, the Receiver's Chief of Staff, John Hagar, sent a letter to the

17  Governor's Office attempting to determine whether it concurs with DPA's analysis and

18  conclusions (Exhibit 8).  The Governor's Legal Affairs Secretary, Andrea Hoch replied on

19  August 25, 2006 (Exhibit 9).  In the reply, the Office of the Governor concluded as follows:

20         1.  Absent a statutory waiver by the Federal court, DPA is legally obligated to meet and

21  confer [bargain] with the unions.

22         2.  The Receiver correctly observes that DPA may establish more than one salary range or

23  rate or method of compensation within a classification given unusual working conditions, hours

24  of work and where necessary to meet provisions of State law, or prevailing rates for comparable

25  _____
    [13]  DPA also provided the Receiver with a list of additional statutes it believes are implicated by
26  the Receiver's request.  The Office of the Receiver finds, however, that virtually all of the statutes
    cited are irrelevant to this motion.  For example, DPA cites all laws pertaining to itself irrespective
27  of the fact that most of them do not pertain to salary setting.

28                                                    10

1    services in public and private business.  *See* Government Code section 19829, subdivision (a).

2        3.  While case law has permitted some flexibility, the principle of like pay for like work

3    as set forth in Government Code section 19826 cannot be ignored in the absence of a statutory

4    waiver by the Court.

5        The Governor's Secretary for Legal Affairs concludes that while it appears as if the State

6    has the authority to implement the salary increases, she cannot say for certain that it would

7    implement the proposed increases for represented employees because doing so is dependent on

8    variables such as successful negotiations and a possible need for Legislative ratification of any

9    agreement reached with the unions which exceeds $250,000.  *See* Government Code section

10   3517.63.[14]

11                                           **V.**

12   **STATE LAW OR INACTION BY DEFENDANTS IS CLEARLY PREVENTING THE**

13   **RECEIVER FROM CARRYING OUT HIS DUTIES**

14       A.  Introduction.

15       Defendants' response to the Receiver's request that they implement the salary increases

16   necessary to begin to implement the programs necessary to bring the medical care in California's

17   prisons up to constitutional standards supports a finding that either:

18       (1) California law prevents the State from implementing salary increases and structural

19   change in the salary program in order to carry out the purpose of the Receivership (as suggested

20   by State officials) or;

21       (2) Defendants' inaction is clearly preventing the Receiver from developing a

22   constitutionally adequate medical care system by their failure to provide adequate salaries for

23   prison clinical personnel.

24       The Order Appointing Receiver establishes either as grounds for seeking judicial

25   _____

26   [14]  The Governor's Office did not comment about the Receiver's proposed increases for
     supervisors and managers who are not afforded the right to collectively bargain agreements with the
27   State.

28                                           11

1  intervention.  It also provides for waiving State requirements causing the impediment, and it

2  provides for contempt proceedings regarding Defendant and all persons in concert and

3  participation with Defendant who fail to fully cooperate with the Receiver in the discharge of his

4  duties.[15]

5      B.  The Receiver Questions Whether it is State Law or State Inaction Which Prevents the

6          Necessary Salary Increases.

7      As discussed above, both the Office of the Governor and the DPA take the position that

8  in the absence of a Court ordered waiver of the law, California's statutory scheme requires DPA

9  to bargain salary increases and submit any of them which exceed $250,000 to the Legislature for

10  potential ratification.  The Receiver, however, remains skeptical about whether it is State law

11  rather than inaction on the part of the State which is preventing him from carrying out his duties.

12  The Receiver's uncertainty stems from the following.

13      First, Government Code section 3517.63 requires DPA to submit labor agreements for

14  $250,000 or more to the Legislature if the funds are not already contained in the Budget Act.

15  The Receiver questions the relevance of this section for two reasons:

16      1.  The Order Appointing Receiver states the Receiver shall determine the annual CDCR

17  medical health care budget.[16]

18      2.  The Receiver has been allocated $100 million in budgeted funds which the Receiver

19  intends to use for the salary increases.

20      Second, Government Code section 3516.5 relieves DPA of the duty to bargain before

21  making a change when there is an emergency.  In the Order re Interim Remedies Relating to

22  Clinical Staffing, the Court determined there was a staffing crisis that supported the need for pay

23  differentials.  The State has not provided any evidence which suggests that the crisis has abated;

24  to the contrary, the State appears to agree that the crisis is continuing.  On the other hand, the

25  shortage of clinicians in the prisons and the resulting failure to deliver adequate medical care in

26  ───────────────
   [15] *Order Appointing Receiver* at pages 5 and 8.

27  [16] *Order Appointing Receiver*, p. 3.

28                                          12

1  the CDCR, while a crisis, may not be, from the State's perspective, the type of emergency which

2  activates the relief provision of section 3516.5.

3         Third, even though the unions may waive their right to bargain, DPA has not asked

4  whether they are willing to do so.  DPA's failure is significant because the Service Employees

5  International Union which represents various medical classifications (including nurses) has

6  agreed to a one time waiver of statutory, regulatory or contractual requirements relied upon by

7  DPA to block the Receiver's efforts to implement the agreed upon salary increases (*see* Exhibit

8  10), the American Federation of State, County and Municipal Employees which represents

9  pharmacy staff and dieticians supports the salary increases sought by the Receiver (Exhibit 11),

10  as does the Union of American Physicians and Dentists which represent physicians (Exhibit 12),

11  the California Correctional Supervisors Organization which represents supervising nurses

12  (Exhibit 13), and the Association of California State Supervisors (Exhibit 14).

13         For all of these reasons the Receiver questions whether California law is an actual

14  impediment requiring waiver, as Defendants suggest, or whether the defendants choose not to

15  exercise their authority under the law to increase salaries as requested by the Receiver.

16         In raising this uncertainty, however, the Receiver emphasizes that he does not interpret

17  defendants' reluctance to implement the salary increases as a demonstration of bad faith

18  cooperation or interference which calls for the sanctions described in the Order Appointing

19  Receiver at page 8, paragraph VI.  Concerning this issue defendants have responded in a timely

20  manner to Office of the Receiver inquiries, they made diligent efforts to assure coordinated

21  responses from California's control agencies, and most important, they have indicated in their

22  correspondence and at the meetings that they do not oppose the overall increases, nor the

23  specifics of the Receiver's proposal.  For example, see Cabinet Secretary Fred Aguiar's letter of

24  August 30, 2006 stating, "[i]f such an order were to be drafted and issued by the Court, the

25  administration stands ready to offer its assistance, technical and otherwise, to successfully

26  implement the order" (Exhibit 15 at page 1).  In essence, defendants appear to seek protections

27  that may be afforded them by a Federal Court remedial order.  Therefore, in an abundance of

28                                     13

1   caution, the Receiver has decided to work with defendants and pursue a waiver of the law.

2

## VI.

## REQUEST FOR WAIVER

A. <u>Introduction</u>.

The Receiver requests a narrowly drawn waiver of California law and a corresponding order. The waiver is not intended to relieve the State of its duties and responsibilities under California law, including the obligation to collectively bargain regarding salaries. Rather, the waiver is intended to make way for the Receiver to direct the implementation, adjustment and administration of the proposed salaries and structural changes to the pay system. To emphasize, the waiver only applies to actions and determinations made by the Receiver and not to any other party.

B. <u>Request for Waiver</u>.

Based on the facts set forth above, the Receiver requests the following:

1. That the Court order defendants to cooperate fully with the Receiver concerning the implementation, administration, and adjustments of the salary ranges established by the Receiver in Exhibit 6.[17]

2. That the Court waive the following statutes and regulations to the extent necessary for the Receiver to direct the implementation, administration, and adjustment of the salary ranges established by Exhibit 6.

A. <u>Government Code section 19816</u> (which vests DPA with duties, purposes, responsibilities and jurisdiction with respect to the administration of salaries for civil service and exempt employees).

B. <u>Government Code section 19826</u> (which designates DPA as the agency responsible

---

[17] Consistent with prior Court orders, and with the previous salary recommendations of the Court's Correctional Expert, the Receiver recommends that the waiver and salary increases apply to Pelican Bay State Prison.

14

1    for establishing and adjusting salary ranges for civil service classifications). [18]

2          C.  Government Code section 19829 (which requires DPA to provide for intermediate

3    steps with salary ranges which govern the extent of the salary adjustment an employee may

4    receive at any one time, and providing for DPA to establish more than one salary range or rate or

5    method of compensation within a classification).

6          D.  Government Code section 19832 (which authorizes DPA to set standards of efficiency

7    applied for purposes of granting employees annual merit salary adjustments, as implemented

8    through California Code of Regulations, title 2, section 599.683).[19]

9          E.  Government Code section 19836 (which vests DPA with authority to approve

10   payment of salaries at any step above the minimum of the salary range for recruitment purposes;

11   to obtain persons with extra ordinary qualifications or as credit for prior State service).

12         F.  Government Code section 3516.5 (which requires DPA to provide written notice to

13   employee unions, and provide them an opportunity to meet and confer (bargain) when there is a

14   change that falls within the scope of representation (e.g., wages)).[20]

15         G.  Government Code section 3517 (which requires the Governor or his representative

16   (DPA) to bargain in good faith regarding wages, hours and other terms and conditions of

17   employment prior to arriving at a determination of policy or course of action).[21]

18

19         [18]  In making the request the Receiver emphasizes that he does not intend to abrogate in any
       manner the salary setting principles set forth in section 19826.
20
         [19]  The purpose of the waiver of Government Code sections 19829 and 19832 is to provide the
21     Receiver with authority to control the salary ranges for a limited number of health care positions
       (e.g., Director of Division of Correctional Health Care Services, Physicians and Surgeons) after
22     taking into consideration performance, extraordinary qualifications, recruitment and retention issues,
       prevailing rates in the public and private sector, patient needs and the position of applicable labor
23     organizations.

24         [20]  In making this request, it is the Receiver's intent that the State's independent duty to bargain
       concerning the salary modifications established by the Receiver (as set forth in Exhibit 6) remains
25     unaltered.

26         [21]  In making this request, it is the Receiver's intent that the State's independent duty to bargain
       concerning the salary modifications established by the Receiver (as set forth in Exhibit 6) remains
27     unaltered.

28                                             15

1    H.  <u>California Code of Regulations, Title 2, section 599.681</u> (which sets forth the

2  methodology for determining salaries when employees move between ranges in the same

3  classification).

4    3.  That the Court order the waivers set forth above be ongoing in the event that the

5  Receiver determines additional salary modifications are necessary to effectuate the purposes of

6  the Receivership, subject to the following procedure:

7    A.  No less than forty-five (45) days prior to establishing additional salary modifications

8  the Receiver shall provide written notice to the Office of the Governor, DPA, counsel, and the

9  affected labor organizations concerning his proposed salary modifications.

10    B.  The Receiver or delegated staff from the Office of the Receiver shall thereafter

11  contact, and if necessary confer with the Office of the Governor, DPA, counsel, and the affected

12  labor organizations concerning the proposed salary modifications.

13    C.  In the event that the Office of the Governor, DPA, counsel, or affected labor

14  organizations believe that the additional salary modifications proposed by the Receiver are

15  prohibited by law, regulation or contract (other than the laws and regulation waived by this

16  motion), they shall submit to the Receiver a written explanation of their concerns not more than

17  twenty (20) days following their receipt of the Receiver's proposed salary modifications.

18    D.  In the event that written objections from the Office of the Governor, DPA, counsel, or

19  the affected labor organizations are submitted to the Receiver, the Receiver or delegated staff

20  from the Office of the Receiver shall confer with the objecting party to determine if the objection

21  can be resolved.  In the event the objections cannot be resolved, the Receiver shall request the

22  Court to waive the law, regulation or contract at issue.

23

24

25

26

27

28                                                        16

1    E.  In the event that no written objections are submitted to the Receiver, or in the event

2  that written objections are resolved as set forth in paragraph D above, the Receiver shall direct

3  and implement the proposed additional salary modifications forty-five (45) days after providing

4  the Office of the Governor, DPA, counsel, and the affected labor organizations with written

5  notice of his intention to establish additional salary modifications.

6

7  Dated: September 12, 2006

8

9

10                    Robert Sillen
                      Receiver

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              17

PL-001.019

**PROOF OF SERVICE BY MAIL**

I, Kristina Hector, declare:

I am a resident of the County of Alameda, California; that I am over the age of eighteen (18) years of age and not a party to the within titled cause of action. I am employed as the Inmate Patient Relations Manager to the Receiver in Plata v. Schwarzenegger.

On September 12, 2006 I arranged for the service of a copy of the attached documents described as RECEIVER'S MOTION FOR WAIVER OF STATE LAW on the parties of record in said cause by sending a true and correct copy thereof by pdf and by United States Mail and addressed as follows:

ANDREA LYNN HOCH
Legal Affairs Secretary
Office of the Governor
Capitol Building
Sacramento, CA 95814

PETER FARBER-SZEKRENYI, DR., P.H.
Director
Division of Correctional Health Care Services
CDCR
P.O. Box 942883
Sacramento, CA 94283-0001

J. MICHAEL KEATING, JR.
285 Terrace Avenue
Riverside, Rhode Island 02915

JONATHAN L. WOLFF
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

STEVEN FAMA
DON SPECTER
ALISON HARDY
Prison Law Office
General Delivery
San Quentin, CA 94964-0001

PAUL MELLO
JERROLD SCHAEFER
Hanson Bridgett
425 Market Street, 26th Floor
San Francisco, CA 94105

BRUCE SLAVIN
General Counsel
CDCR-Office of the Secretary
P.O. Box 942883
Sacramento, CA 94283-0001

```
1   KATHLEEN KEESHEN
    Legal Affairs Division
2   California Department of Corrections
    P.O. Box 942883
3   Sacramento, CA 94283

4   RICHARD J. CHIVARO
    JOHN CHEN
5   State Controller
    300 Capitol Mall, Suite 518
6   Sacramento, CA 95814

7   MOLLY ARNOLD
    Chief Counsel, Department of Finance
8   State Capitol, Room 1145
    Sacramento, CA 95814
9
    LAURIE GIBERSON
10  Staff Counsel
    Department of General Services
11  707 Third Street, 7th floor, Suite 7-330
    West Sacramento, CA 95605
12
    MATTHEW CATE
13  Inspector General
    Office of the Inspector General
14  P.O. Box 348780
    Sacramento, CA 95834-8780
15
    DONNA NEVILLE
16  Senior Staff Counsel
    Bureau of State Audits
17  555 Capitol Mall, Suite 300
    Sacramento, CA 95814
18
    WARREN C. (CURT) STRACENER
19  PAUL M. STARKEY
    Labor Relations Counsel
20  Department of Personnel Administration
    Legal Division
21  1515 "S" Street, North Building, Suite 400
    Sacramento, CA 95814-7243
22
    GARY ROBINSON
23  Executive Director
    UAPD
24  1330 Broadway Blvd., Suite 730
    Oakland, CA 94612
25

26

27

28
```

19

1  YVONNE WALKER
   Vice President for Bargaining
2  CSEA
   1108 "O" Street
3  Sacramento, CA 95814

4  PAM MANWILLER
   Director of State Programs
5  AFSME
   555 Capitol Mall, Suite 1225
6  Sacramento, CA95814

7  RICHARD TATUM
   CSSO State President
8  CSSO
   1461 Ullrey Avenue
9  Escalon, CA95320

10  TIM BEHRENS
    President
11  Association of California State Supervisors
    1108 O Street
12  Sacramento, CA95814

13      I declare under penalty of perjury under the laws of the State of California that the foregoing
    is true and correct.  Executed on September 12, 2006 at San Francisco, California.

14

15

16  Kristina Hector

17

18

19

20

21

22

23

24

25

26

27

28                                          20

# EXHIBIT B

1

2

3 **IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

4

5

6 MARCIANO PLATA , et al.,           )
                                   )    NO.  C01-1351-T.E.H.
7        Plaintiffs                )
                                   )    **APPENDIX OF EXHIBITS SUPPORTING**
8        v.                        )    **RECEIVER'S MOTION FOR WAIVER**
                                   )    **OF STATE LAW**
9                                  )
                                   )
10 ARNOLD SCHWARZENEGGER,          )
   et al.,                         )
11                                 )
         Defendants,               )
12 _____  )

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S**
**EXHIBIT**

CASE  2:90-cv-520-
NO.    **KJM-DB**

EXHIBIT
NO.   **PL-002**

1              **APPENDIX OF EXHIBITS**

2  **Exhibit #'s**

3      1.   Primary Care Providers Vacancy Rate By Institution Chart – July 1-31, 2006 Reporting

4          Period

5      2.   Registry By Specialty for Impacted Classifications – July 1, 2005 through June 30, 2006

6      3.   August 4, 2006 Performance Management Report Summary

7      4.   Declaration of Terry Hill

8      5.   Declaration of Jane Robinson

9      6.   Proposed Salaries Effective September 1, 2006 – Chart

10     7.   August 15, 2006 Letter to Linda Buzzini, Counsel to the Receiver from Paul Starkey,

11         DPA Labor Relations Counsel

12     8.   August 20, 2006 Letter to Louis Mauro, Chief Deputy Legal Affairs Secretary Office of

13         the Governor from John Hagar, Chief of Staff to the Receiver

14     9.   August 25, 2006 Letter to John Hagar, Chief of Staff to the Receiver from Andrea Hoch,

15         Legal Affairs Secretary Office of the Governor

16     10.  August 24, 2006 Letter to Linda Buzzini, Counsel to the Receiver from Yvonne Walker

17         SEIU Vice President for Bargaining

18     11.  August 21, 2006 Letter to Linda Buzzini, Counsel to the Receiver from Pam Manwiller,

19         AFSCME Director of State Programs

20     12.  August 25, 2006 Letter to Linda Buzzini, Counsel to the Receiver from Gary Robinson,

21         UAPD Executive Director

22     13.  August 22, 2006 Letter to Robert Sillen, Receiver from Richard Tatum, CCSO State

23         President

24     14.  August 30, 2006 Letter to Robert Sillen, Receiver from Tim Behrens, Assoc of

25         California State Supervisors President

26     15.  August 30, 2006 Letter to Robert Sillen, Receiver from Fred Aguiar, Cabinet Secretary

27         Office of the Governor

28

# EXHIBIT 1

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Performance Management Report

Report 1 - Primary Care Providers:  Vacancy Rate By Institution

Reporting Period:  July 1-31, 2006

| | Institution | Class | Total Established Positions* | Total Filled Positions** | Total Vacant Positions* | Vacancy Rate | # of Staff Away From Institution* | Actual No. of Filled Positions* | Actual No. of Vacant Positions | Registry Contract PY Equivalents*** (Self Reporting for 7/1/06 - 7/23/06) | Emergency Contract Information (Self Reporting for 7/1/06 - 7/23/06) | Institution "Adjusted" Vacant Positions** | Institution "Adjusted" Vacancy Rate** | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ASP | P&S | 7.00 | 6.00 | 1.00 | 14% | (1.50) | 4.50 | 2.50 | 0.00 | 0.95 | 1.55 | 22% | An additional 64 "On-Call" hours not included in the P&S Emergency Contract hours. |
| | ASP | NP | 1.00 | 1.00 | 0.00 | 0% | 0.00 | 1.00 | 0.00 | 0.19 | 0.00 | (0.19) | -19% | |
| | ASP | PA | 2.00 | 1.00 | 1.00 | 50% | 0.00 | 1.00 | 1.00 | 0.43 | 0.00 | 0.57 | 29% | |
| | ASP | Total PCPs | 10.00 | 8.00 | 2.00 | 20% | (1.50) | 6.50 | 3.50 | 0.62 | 0.95 | 1.94 | 19% | |
| 2 | CAL | P&S | 4.50 | 3.00 | 1.50 | 33% | (2.00) | 1.00 | 3.50 | 0.00 | 0.00 | 3.50 | 78% | |
| | CAL | NP | 2.00 | 2.00 | 0.00 | 0% | 0.00 | 2.00 | 0.00 | 0.00 | 0.09 | (0.09) | -5% | |
| | CAL | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 1.06 | 0.00 | (1.06) | N/A | |
| | CAL | Total PCPs | 6.50 | 5.00 | 1.50 | 23% | (2.00) | 3.00 | 3.50 | 1.06 | 0.09 | 2.35 | 36% | |
| 3 | CCC | P&S | 5.00 | 5.00 | 0.00 | 0% | 0.00 | 5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | CCC | NP | 1.00 | 1.00 | 0.00 | 0% | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | CCC | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.72 | 0.00 | (0.72) | N/A | |
| | CCC | Total PCPs | 6.00 | 6.00 | 0.00 | 0% | 0.00 | 6.00 | 0.00 | 0.72 | 0.00 | (0.72) | -12% | |
| 4 | CCI | P&S | 6.00 | 3.00 | 3.00 | 50% | (1.00) | 2.00 | 4.00 | 0.00 | 2.09 | 1.91 | 32% | An additional 144 "On-Call" hours not included in the P&S Emergency Contract hours. |
| | CCI | NP | 1.00 | 0.00 | 1.00 | 100% | 0.00 | 0.00 | 1.00 | 1.96 | 0.00 | (0.96) | -96% | |
| | CCI | PA | 2.00 | 2.00 | 0.00 | 0% | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | CCI | Total PCPs | 9.00 | 5.00 | 4.00 | 44% | (1.00) | 4.00 | 5.00 | 1.96 | 2.09 | 0.95 | 11% | |
| 5 | CCWF | P&S | 8.50 | 8.50 | 0.00 | 0% | 0.00 | 8.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | CCWF | NP | 1.00 | 1.00 | 0.00 | 0% | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | CCWF | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | CCWF | Total PCPs | 9.50 | 9.50 | 0.00 | 0% | 0.00 | 9.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| 6 | CEN | P&S | 5.00 | 3.00 | 2.00 | 40% | 0.00 | 3.00 | 2.00 | 0.00 | 1.25 | 0.75 | 15% | |

Provision 1A.1 of the Dec. 14, 2005 Court Report
(Replaces 1A.1)

PL-002.004

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Performance Management Report

Report 1 - Primary Care Providers:  Vacancy Rate By Institution

Reporting Period:  July 1-31, 2006

| Institution | Class | Total Established Positions* | Total Filled Positions** | Total Vacant Positions** | Vacancy Rate | # of Staff Away From Institution* | Actual No. of Filled Positions | Actual No. of Vacant Positions | Regular Contract PY Equivalents*** (Self Reporting for 7/1/06 - 7/31/06) | Emergency Contract Information/ Self Reporting for Institution (7/1/06 - 7/31/06) | **Adjusted** Vacant Positions**** | Institution **Adjusted** Vacancy Rate**** | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CEN | NP | 1.00 | 1.00 | 0.00 | N/A | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| CEN | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| **CEN** | **Total PCPs** | **6.00** | **4.00** | **2.00** | **33%** | **0.00** | **4.00** | **2.00** | **0.00** | **1.25** | **0.75** | **13%** | |
| 7 CIM | P&S | 15.50 | 15.50 | 0.00 | 0% | 0.00 | 15.50 | 0.00 | 0.71 | 0.00 | (0.71) | -5% | |
| CIM | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| CIM | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| **CIM** | **Total PCPs** | **15.50** | **15.50** | **0.00** | **0%** | **0.00** | **15.50** | **0.00** | **0.71** | **0.00** | **(0.71)** | **-5%** | |
| 8 CIW | P&S | 6.00 | 6.00 | 0.00 | 0% | (1.95) | 4.05 | 1.95 | 1.44 | 0.00 | 0.51 | 9% | |
| CIW | NP | 2.00 | 2.00 | 0.00 | 0% | (0.55) | 1.45 | 0.55 | 0.00 | 0.00 | 0.55 | 28% | |
| CIW | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| **CIW** | **Total PCPs** | **8.00** | **8.00** | **0.00** | **0%** | **(2.50)** | **5.50** | **2.50** | **1.44** | **0.00** | **1.06** | **13%** | |
| 9 CMC | P&S | 16.50 | 15.50 | 1.00 | 6% | (1.70) | 13.80 | 2.70 | 0.47 | 0.00 | 2.23 | 13% | |
| CMC | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| CMC | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| **CMC** | **Total PCPs** | **16.50** | **15.50** | **1.00** | **6%** | **(1.70)** | **13.80** | **2.70** | **0.47** | **0.00** | **2.23** | **13%** | |
| 10 CMF | P&S | 18.00 | 11.00 | 7.00 | 39% | (1.00) | 10.00 | 8.00 | 0.00 | 6.21 | 1.79 | 10% | |
| CMF | NP | 6.90 | 6.90 | 0.00 | 0% | 0.00 | 6.90 | 0.00 | 0.62 | 1.89 | (2.51) | -36% | |
| CMF | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| **CMF** | **Total PCPs** | **24.90** | **17.90** | **7.00** | **28%** | **(1.00)** | **16.90** | **8.00** | **0.62** | **8.11** | **(0.72)** | **-3%** | |

Provision 1A.1 of the Dec. 14, 2005 Court Report
(Replaces 1A.1)

PL-002.005

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Performance Management Report

Report 1 - Primary Care Providers:  Vacancy Rate By Institution

Reporting Period:  July 1-31, 2006

| | Institution | Class | Total Established Positions* | Total Filled Positions** | Total Vacant Positions** | Vacancy Rate | # of Staff Away From Institution* | Actual No. of Filled Positions | Actual No. of Vacant Positions | Registry Contract PY Equivalents (Self Reporting for 7/1/06 - 7/31/06) | Emergency Contract Information* (Self Reporting for 7/1/06 - 7/31/06) | Institution "Adjusted" Vacant Positions* (Self Reporting for Institution) | Institution "Adjusted" Vacancy Rate** | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | COR | P&S | 10.50 | 6.50 | 4.00 | 38% | (3.00) | 3.50 | 7.00 | 0.00 | 0.90 | 6.10 | 58% | |
| | COR | NP | 4.00 | 4.00 | 0.00 | 0% | 0.00 | 4.00 | 0.00 | 0.51 | 0.00 | (0.51) | -13% | |
| | COR | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | COR | Total PCPs | 14.50 | 10.50 | 4.00 | 28% | (3.00) | 7.50 | 7.00 | 0.51 | 0.90 | 5.59 | 39% | |
| 12 | CRC | P&S | 8.00 | 8.00 | 0.00 | 0% | (3.75) | 4.25 | 3.75 | 0.00 | 0.00 | 3.75 | 47% | |
| | CRC | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | CRC | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | CRC | Total PCPs | 8.00 | 8.00 | 0.00 | 0% | (3.75) | 4.25 | 3.75 | 0.00 | 0.00 | 3.75 | 47% | |
| 13 | CTF | P&S | 10.00 | 8.50 | 1.50 | 15% | 0.00 | 8.50 | 1.50 | 0.00 | 0.00 | 1.50 | 15% | |
| | CTF | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | CTF | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | CTF | Total PCPs | 10.00 | 8.50 | 1.50 | 15% | 0.00 | 8.50 | 1.50 | 0.00 | 0.00 | 1.50 | 15% | |
| 14 | CVSP | P&S | 3.00 | 2.00 | 1.00 | 33% | (3.00) | (1.00) | 4.00 | 0.00 | 0.00 | 4.00 | 133% | |
| | CVSP | NP | 2.00 | 2.00 | 0.00 | 0% | 0.00 | 2.00 | 0.00 | 0.71 | 0.00 | (0.71) | -36% | |
| | CVSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | CVSP | Total PCPs | 5.00 | 4.00 | 1.00 | 20% | (3.00) | 1.00 | 4.00 | 0.71 | 0.00 | 3.29 | 66% | |
| 15 | DVI | P&S | 7.00 | 6.50 | 0.50 | 7% | (1.00) | 5.50 | 1.50 | 0.00 | 0.25 | 1.25 | 18% | |
| | DVI | NP | 1.00 | 1.00 | 0.00 | 0% | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | DVI | PA | 1.00 | 1.00 | 0.00 | 0% | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | DVI | Total PCPs | 9.00 | 8.50 | 0.50 | 6% | (1.00) | 7.50 | 1.50 | 0.00 | 0.25 | 1.25 | 14% | |

Provision 1A.1 of the Dec. 14, 2005 Court Report
(Replaces 1A.1)

PL-002.006

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Performance Management Report

Report 1 - Primary Care Providers:  Vacancy Rate By Institution

Reporting Period:  July 1-31, 2006

| | Institution | Class | Total Established Positions* | Total Filled Positions** | Total Vacant Positions* | Vacancy Rate | # of Staff Away From Institution* | Actual No. of Filled Positions | Actual No. of Vacant Positions | Registry Contract PY Equivalents*** Self Reporting for 7/1/06 - 7/31/06 | Emergency Contract Information (Self Reporting for 7/1/06 - 7/31/06) | Institution "Adjusted" Vacant Positions* | Institution "Adjusted" (Vacancy) Rate | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | FSP | P&S | 6.00 | 6.00 | 0.00 | 0% | 0.00 | 6.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | FSP | NP | 1.00 | 1.00 | 0.00 | 0% | (0.40) | 0.60 | 0.40 | 0.00 | 0.00 | 0.40 | 40% | |
| | FSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | FSP | Total PCPs | 7.00 | 7.00 | 0.00 | 0% | (0.40) | 6.60 | 0.40 | 0.00 | 0.00 | 0.40 | 6% | |
| 17 | HDSP | P&S | 4.00 | 2.00 | 2.00 | 50% | (1.00) | 1.00 | 3.00 | 0.00 | 0.24 | 2.76 | 69% | |
| | HDSP | NP | 2.00 | 2.00 | 0.00 | 0% | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | HDSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | HDSP | Total PCPs | 6.00 | 4.00 | 2.00 | 33% | (1.00) | 3.00 | 3.00 | 0.00 | 0.24 | 2.76 | 46% | |
| 18 | ISP | P&S | 4.00 | 4.00 | 0.00 | 0% | (0.50) | 3.50 | 0.50 | 0.00 | 0.00 | 0.50 | 13% | |
| | ISP | NP | 1.00 | 1.00 | 0.00 | 0% | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | ISP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | ISP | Total PCPs | 5.00 | 5.00 | 0.00 | 0% | (0.50) | 4.50 | 0.50 | 0.00 | 0.00 | 0.50 | 10% | |
| 19 | KVSP | P&S | 4.00 | 3.00 | 1.00 | 25% | 0.00 | 3.00 | 1.00 | 0.00 | 0.28 | 0.72 | 18% | |
| | KVSP | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | KVSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | KVSP | Total PCPs | 4.00 | 3.00 | 1.00 | 25% | 0.00 | 3.00 | 1.00 | 0.00 | 0.28 | 0.72 | 18% | |
| 20 | LAC | P&S | 7.00 | 5.00 | 2.00 | 29% | (1.00) | 4.00 | 3.00 | 0.00 | 0.00 | 3.00 | 43% | |
| | LAC | NP | 1.00 | 1.00 | 0.00 | N/A | 0.00 | 1.00 | 0.00 | 0.28 | 0.00 | (0.28) | N/A | |
| | LAC | PA | 2.00 | 2.00 | 0.00 | 0% | (1.00) | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 50% | |
| | LAC | Total PCPs | 10.00 | 8.00 | 2.00 | 20% | (2.00) | 6.00 | 4.00 | 0.28 | 0.00 | 3.72 | 37% | |

Provision 1A.1 of the Dec. 14, 2005 Court Report
(Replaces 1A.1)

PL-002.007

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Performance Management Report

Report 1 - Primary Care Providers:  Vacancy Rate By Institution

Reporting Period:  July 1-31, 2006

| | Institution | Class | Total Established Positions* | Total Filled Positions** | Total Vacant Positions** | Vacancy Rate* | # of Staff Away From Institution* | Actual No. of Filled Positions* | Actual No. of Vacant Positions | Region Contract FY Equivalents*** (Self Reporting for 7/1/06 - 7/31/06) | Emergency Contract Information (Self Reporting for 7/1/06 - 7/31/06) | Institution "Adjusted" Vacant Positions** | Institution "Adjusted" Vacancy/ Rate*** | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | MCSP | P&S | 4.00 | 4.00 | 0.00 | 0% | (1.00) | 3.00 | 1.00 | 0.00 | 0.00 | 1.00 | 25% | |
| | MCSP | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | MCSP | PA | 1.50 | 1.50 | 0.00 | 0% | 0.00 | 1.50 | 0.00 | 0.79 | 0.00 | (0.79) | -53% | |
| | MCSP | Total PCPs | 5.50 | 5.50 | 0.00 | 0% | (1.00) | 4.50 | 1.00 | 0.79 | 0.00 | 0.21 | 4% | |
| 22 | NKSP | P&S | 10.00 | 8.00 | 2.00 | 20% | 0.00 | 8.00 | 2.00 | 0.00 | 0.00 | 2.00 | 20% | |
| | NKSP | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | NKSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | NKSP | Total PCPs | 10.00 | 8.00 | 2.00 | 20% | 0.00 | 8.00 | 2.00 | 0.00 | 0.00 | 2.00 | 20% | |
| 23 | PBSP | P&S | 4.00 | 3.00 | 1.00 | 25% | (2.00) | 3.00 | 3.00 | 0.00 | 2.18 | 0.82 | 21% | |
| | PBSP | NP | 3.00 | 3.00 | 0.00 | 0% | 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | PBSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | PBSP | Total PCPs | 7.00 | 6.00 | 1.00 | 14% | (2.00) | 4.00 | 3.00 | 0.00 | 2.18 | 0.82 | 12% | |
| 24 | PVSP | P&S | 6.00 | 0.00 | 6.00 | 100% | 0.00 | 0.00 | 6.00 | 0.00 | 7.34 | (1.34) | -22% | An additional 651 "On-Call" hours not included in the P&S Emergency Contract hours. |
| | PVSP | NP | 3.70 | 1.00 | 2.70 | 73% | 0.00 | 1.00 | 2.70 | 1.03 | 0.00 | 1.67 | 45% | 1.0 Reclass of P&S to NP. |
| | PVSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.43 | 0.00 | (0.43) | N/A | |
| | PVSP | Total PCPs | 9.70 | 1.00 | 8.70 | 90% | 0.00 | 1.00 | 8.70 | 1.46 | 7.34 | (0.10) | -1% | |
| 25 | RJD | P&S | 9.50 | 7.50 | 2.00 | 21% | (4.00) | 3.50 | 6.00 | 0.00 | 0.00 | 6.00 | 63% | |
| | RJD | NP | 4.00 | 1.00 | 3.00 | 75% | 0.00 | 1.00 | 3.00 | 1.14 | 0.00 | 1.86 | 47% | |
| | RJD | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | RJD | Total PCPs | 13.50 | 8.50 | 5.00 | 37% | (4.00) | 4.50 | 9.00 | 1.14 | 0.00 | 7.86 | 58% | |

Provision 1A.1 of the Dec. 14, 2005 Court Report
(Replaces 1A.1)

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Performance Management Report

Report 1 - Primary Care Providers:  Vacancy Rate By Institution

Reporting Period:  July 1-31, 2006

| | Institution | Class | Total Established Positions* | Total Filled Positions** | Total Vacant Positions** | Vacancy Rate | # of Staff Away From Institution | Actual No. of Filled Positions | Actual No. of Vacant Positions | Registry Contract P/V Equivalents*** (Self Reporting for 7/1/06 - 7/31/06) | Emergency Contract Information** (Self Reporting for 7/1/06 - 7/31/06) | Institution "Adjusted Vacant Positions"**** | Institution "Adjusted Vacancy Rate"**** | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | SAC | P&S | 6.00 | 6.00 | 0.00 | 0% | (1.65) | 4.35 | 1.65 | 0.00 | 0.47 | 1.18 | 20% | |
| | SAC | NP | 0.00 | 0.00 | 0.00 | N/A | (1.00) | (1.00) | 1.00 | 0.19 | 0.00 | 0.81 | N/A | |
| | SAC | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | SAC | Total PCPs | 6.00 | 6.00 | 0.00 | 0% | (2.65) | 3.35 | 2.85 | 0.19 | 0.47 | 1.99 | 33% | |
| 27 | SATF | P&S | 9.00 | 3.00 | 6.00 | 67% | (2.00) | 1.00 | 8.00 | 0.00 | 5.44 | 2.56 | 28% | |
| | SATF | NP | 2.00 | 2.00 | 0.00 | N/A | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | SATF | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | SATF | Total PCPs | 11.00 | 5.00 | 6.00 | 55% | (2.00) | 3.00 | 8.00 | 0.00 | 5.44 | 2.56 | 23% | |
| 28 | SCC | P&S | 7.00 | 7.00 | 0.00 | 0% | (1.00) | 6.00 | 1.00 | 0.00 | 0.00 | 1.00 | 14% | |
| | SCC | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | SCC | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | SCC | Total PCPs | 7.00 | 7.00 | 0.00 | 0% | (1.00) | 6.00 | 1.00 | 0.00 | 0.00 | 1.00 | 14% | |
| 29 | SOL | P&S | 6.00 | 6.00 | 0.00 | 0% | 0.00 | 6.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | SOL | NP | 2.00 | 2.00 | 0.00 | N/A | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | SOL | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | SOL | Total PCPs | 8.00 | 8.00 | 0.00 | 0% | 0.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| 30 | SQ | P&S | 10.00 | 7.50 | 2.50 | 25% | 0.00 | 7.50 | 2.50 | 0.00 | 3.79 | (1.29) | -13% | |
| | SQ | NP | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 1.12 | 1.42 | (2.54) | N/A | |
| | SQ | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.71 | 0.00 | (0.71) | N/A | |
| | SQ | Total PCPs | 10.00 | 7.50 | 2.50 | 25% | 0.00 | 7.50 | 2.50 | 1.83 | 5.21 | (4.54) | -45% | |

Provision 1A.1 of the Dec. 14, 2005 Court Report
(Replaces 1A.1)

PL-002.009

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Performance Management Report

Report 1 - Primary Care Providers:  Vacancy Rate By Institution

Reporting Period:  July 1-31, 2006

| | Institution | Class | Total Established Positions* | Total Filled Positions** | Total Vacant Positions** | Vacancy Rate | # of Staff Away From Institution* | Actual No. of Filled Positions | Actual No. of Vacant Positions | Registry Contract FY Equivalents (Self Reporting for 7/1/06 - 7/31/06) | Emergency Contract Information (Self Reporting for Emergency Contract) | Institution "Adjusted" Vacant Positions for Institution | Institution "Adjusted" Vacancy Rate** | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | SVSP | P&S | 4.00 | 0.00 | 4.00 | 100% | (0.38) | (0.38) | 4.38 | 1.12 | 2.86 | 0.39 | 10% | An additional 64 "On-Call" hours not included in the P&S Emergency Contract hours. |
| | SVSP | NP | 3.00 | 3.00 | 0.00 | 0% | 0.00 | 3.00 | 0.00 | 1.25 | 0.00 | (1.25) | -42% | |
| | SVSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | SVSP | Total PCPs | 7.00 | 3.00 | 4.00 | 57% | (0.38) | 2.62 | 4.38 | 2.38 | 2.86 | (0.86) | -12% | |
| 32 | VSPW | P&S | 5.00 | 5.00 | 0.00 | 0% | (2.00) | 3.00 | 2.00 | 0.00 | 0.95 | 1.05 | 21% | |
| | VSPW | NP | 4.00 | 4.00 | 0.00 | 0% | 0.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | VSPW | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | VSPW | Total PCPs | 9.00 | 9.00 | 0.00 | 0% | (2.00) | 7.00 | 2.00 | 0.00 | 0.95 | 1.05 | 12% | |
| 33 | WSP | P&S | 10.00 | 7.00 | 3.00 | 30% | (0.30) | 6.70 | 3.30 | 0.00 | 0.00 | 3.30 | 33% | |
| | WSP | NP | 1.00 | 1.00 | 0.00 | 0% | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | |
| | WSP | PA | 0.00 | 0.00 | 0.00 | N/A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | N/A | |
| | WSP | Total PCPs | 11.00 | 8.00 | 3.00 | 27% | (0.30) | 7.70 | 3.30 | 0.00 | 0.00 | 3.30 | 30% | |
| | Total | P&S | 246.00 | 192.00 | 54.00 | 22% | (36.73) | 155.27 | 90.73 | 3.74 | 35.20 | 51.78 | 21% | |
| | Total | NP | 50.60 | 43.90 | 6.70 | 13% | (1.95) | 32.00 | 17.97 | 9.00 | 3.41 | (3.75) | -7% | |
| | Total | PA | 8.50 | 7.50 | 1.00 | 12% | (1.00) | 6.50 | 2.00 | 4.13 | 0.00 | -2.13 | -25% | Due to no established positions, formula is overriden, refer to total for all PCPs. |
| | | All PCPs | 305.10 | 243.40 | 61.70 | 20% | (39.68) | 193.77 | 110.70 | 16.87 | 38.61 | 45.90 | 15% | |

*Based on the most current State Controllers Office MIRS report.
**Based on the current Office of Workforce Planning's Plata Vacancy Report, which provdes vacancy information as of the last day of the reporting period and the number of positions filled is adjusted based on OWP reported vacancies.
***Registry contract hours reported are based on self reporting by the institution. Emergency contract information reflects invoices received from "Emergency Contractors" for dates of services during this reporting period.  It is possible that the numbers may need to be adjusted for this time frame.  This is considered a conservative estimate of the primary contract usage during this period.

Provision 1A.1 of the Dec. 14, 2005 Court Report
(Replaces 1A.1)

PL-002.010

# EXHIBIT 2

**Registry by Specialty for Impacted Classifications**
**FY 05/06 - July 1, 2005 through June 30, 2006**

| Specialty | Annual Contract Hours | Annual Contract Expenditures | Average Cost Per Hour (July-June) | Average of Full-Time Contract Employees Used/Month |
|---|---|---|---|---|
| Registry - Dietary | 13,559 | $667,076 | $49.20 | 6.52 |
| Registry - LVN | 662,740 | $31,820,780 | $48.01 | 318.63 |
| Registry - Pharmacist | 92,265 | $7,430,590 | $80.54 | 44.36 |
| Registry - Pharmacist in Charge | 37,790 | $3,658,734 | $96.82 | 18.17 |
| Registry - Pharmacy Tech | 77,902 | $1,722,226 | $22.11 | 37.45 |
| Registry - Physician/RNP - Emergency Contracts | 88,169 | $15,012,890 | $170.27 | 42.39 |
| Registry - RN | 405,986 | $26,951,019 | $66.38 | 195.19 |
| Registry - RNP | 40,047 | $2,633,233 | $65.75 | 19.25 |
| Registry - Surgical Nurse | 469 | $53,659 | $114.41 | 0.23 |
| Registry - X-Ray | 13,285 | $607,220 | $45.71 | 6.39 |
| **Total Contract Services** | **1,432,212** | **$90,557,427** | **$63.23** | **688.58** |

*Based on actual FY 2005/06 benefit rates for classfication
/1 Includes $12,000 (1,000/month) differential
/2 Includes $14,544 (1,212/month) in differentials does not includes Plata bonuses as they are not ongoing
/3 Includes $1,750 differential (per month), does not include Plata bonuses as they are not ongoing
/4 Includes $14,544 differential ($1,212/month), does not include Plata bonuses as they are not ongoing

# EXHIBIT 3

Department of Correction and Rehabilitation
Division of Correctional Health Care Services

**For Discussion Only**

Performance Management Report Summary
August 4, 2006
Summary of Clinical Hiring Results

Primary Care Providers

| Reporting Period | Established Positions | Filled Positions | Vacancy Rate[1] | Adjusted Vacancy Rate[2] | Apps Received | Apps Accepted | Interviews Held | Offers Made | Started Work |
|---|---|---|---|---|---|---|---|---|---|
| 12-1 / 12-15 | 282.3 | 212 | 26% | 19% | 25 | 23 | 19 | 12 | 1 |
| 12-16 / 12-3 | 284.8 | 209.5 | 26% | 18% | 75 | 61 | 44 | 25 | 2 |
| 1-1 / 1-15 | 282.8 | 212.5 | 25% | 17% | 19 | 14 | 21 | 9 | 1 |
| 1-16 / 1-31 | 284.8 | 220 | 23% | 18% | 47 | 43 | 37 | 18 | 4 |
| 2-1 / 2-15 | 291.4 | 225 | 23% | 15% | 30 | 30 | 33 | 8 | 4 |
| 2-16 / 2-28 | 287.8 | 232.3 | 19% | 14% | 8 | 8 | 11 | 13 | 2 |
| 3-1 / 3-15 | 288.8 | 236.3 | 18% | 8% | 27 | 27 | 16 | 9 | 10 |
| 3-16 / 3-31 | 288.8 | 236.3 | 18% | 5% | 28 | 29 | 19 | 11 | 4 |
| 4-1 / 4-15 | 287.8 | 233 | 19% | 10% | 5 | 5 | 8 | 2 | 5 |
| 4-16 / 4-30 | 284.2 | 227.5 | 20% | 7% | 32 | 32 | 11 | 3 | 1 |
| 5-1 / 5-15 | 291.2 | 229 | 21% | 13% | 29 | 29 | 20 | 3 | 6 |
| 5-16 / 5-31 | 300.2 | 233 | 22% | 14% | 2 | 2 | 5 | 6 | 2 |
| 6-1 / 6-15 | 300.2 | 237.5 | 21% | 26% | 34 | 35 | 4 | 0 | 7 |
| 6-16 / 6-30 | 300.2 | 238.5 | 21% | 17% | 25 | 25 | 17 | 3 | 1 |
| 7-1/7-31 | 305.1 | 243.4 | 20% | 15% | 50 | 50 | 29 | 14 | 2 |
| Total | - | - | - | - | 436 | 413 | 294 | 136 | 52 |

Registered Nurse

| Reporting Period | Established Positions | Filled Positions | Vacancy Rate1 | Apps Received | Apps Accepted | Interviews Held | Offers Made | Started Work |
|---|---|---|---|---|---|---|---|---|
| 12-1 / 12-15 | 1177 | 785 | 33% | 80 | 80 | 83 | 54 | 7 |
| 12-16 / 12-3 | 1117 | 723 | 38.6% | 230 | 217 | 180 | 121 | 37 |
| 1-1 / 1-15 | 1176 | 791 | 32.7% | 24 | 23 | 84 | 45 | 29.5 |
| 1-16 / 1-31 | 1176 | 910 | 23% | 23 | 23 | 83 | 71 | 40 |
| 2-1 / 2-15 | 1200 | 981 | 18% | 193 | 193 | 88 | 71 | 52 |
| 2-16 / 2-28 | 1187 | 990 | 17% | 104 | 104 | 43 | 20 | 24 |
| 3-1 / 3-15 | 1189.49 | 1015.18 | 15% | 128 | 128 | 93 | 49.5 | 41 |
| 3-16 / 3-31 | 1188.29 | 1028.59 | 13% | 128 | 128 | 53 | 36 | 28 |
| 4-1 / 4-15 | 1188.29 | 1024.9 | 14% | 69 | 69 | 40 | 23 | 18 |
| 4-16 / 4-30 | 1188.32 | 1040.93 | 12% | 67 | 67 | 42 | 25 | 20 |
| 5-1 / 5-15 | 1211.19 | 1084.8 | 10% | 49 | 49 | 71 | 22 | 21 |
| 5-16 / 5-31 | 1245.11 | 1097.72 | 12% | 110 | 110 | 57 | 19 | 8 |
| 6-1 / 6-15 | 1245.11 | 1114.62 | 10% | 28 | 28 | 39 | 6 | 20 |
| 6-16 / 6-30 | 1280.51 | 1113.82 | 13% | 28 | 28 | 59 | 24 | 15 |
| 7/1-7/31 | 1325.29 | 1142.68 | 14% | 225 | 225 | 105 | 48 | 30 |
| Total | - | - | - | 1486 | 1472 | 1120 | 634.5 | 390.5 |

[1] Vacancy Rate:  The vacancy rate does not adjust for long-term absence of civil service employees or contractor hours.
[2] Adjusted Vacancy Rate: the adjusted vacancy rate adjusts for long-term absence of civil service employees and contractor hours converted to full-time equivalents.

Note:  The vacancy rates for this reporting period have increased slightly due to new positions being established.

1 of 3

PL-002.014

# EXHIBIT 4

PL-002.015

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MARCIANO PLATA , et al.,          )
          Plaintiffs          )        NO.  C01-1351-T.E.H.
                              )        **DECLARATION OF TERRY HILL**
          v.                  )
                              )
ARNOLD SCHWARZENEGGER,        )
 et al.,                      )
          Defendants,         )
_____)

I, TERRY HILL, declare that if called I could and would competently testify as follows:

1.  I am a medical doctor licensed to practice in the State of California.  I am presently employed as the Chief Medical Officer for the Office of the Receiver.  Previously I was the Senior Medical Director for Lumetra which is the Medicare Quality Improvement Organization for California.  From 1999-2004, I was the Medical Director for Laguna Honda Hospital.  I am on the core faculty of the Stanford Geriatric Education Center and an Assistant Clinical Professor in the Department of Medicine, UC San Francisco. I am on the Board of the California Institute for Health Systems Improvement, and a consultant to the California Medical Association's Committee on Quality Care.

2.  Continuity of care is a fundamental aspect of any medical care delivery system. Continuity is especially important for patients with chronic diseases and patients who suffer from a variety of medical and mental health complications, the type of problems that are common among a significant percentage of California prisoners.

3.  In response to serious staffing shortages, the California Department of Corrections and

1

PL-002.016

1    Rehabilitation (CDCR) has been fortunate in obtaining the services of contract medical care
2    providers, some of whom are qualified and professional. However, health care cannot be as safely
3    or effectively provided by those who do not have an on-going relationship with their patients and
4    colleagues. A continuous provider-patient relationship is the cornerstone of health care, including
5    correctional health care.

6         4. Without a continuous provider-patient relationship communication suffers, information
7    is lost, trust is lessened, expertise is squandered and outcomes are deficient. Effective long term
8    medical care cannot be provided for California prisoners with the existing degree of CDCR reliance
9    on registry clinicians. Replacing temporary, contract providers with permanent State employees is
10   entirely consistent with the mission of the Receivership. The increased use of permanent State
11   employee clinicians will, without question, improve the continuity of care and, therefore, medical
12   care to inmate-patients in CDCR's institutions.

13        I declare under penalty of perjury that the foregoing is true and correct to the best of my
14   knowledge. Executed this 7th of September, 2006, at San Quentin State Prison, California.

15
16                                     _____
17                                     Terry Hill, MD
                                       Declarant
18
19
20
21
22
23
24
25
26
27
28                          2

# EXHIBIT 5

1

2

3 **IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

4

5

6 MARCIANO PLATA , et al.,                )
                                          )    NO.  C01-1351-T.E.H.
7       Plaintiffs                        )
                                          )    **DECLARATION OF JANE ROBINSON**
8       v.                                )
                                          )
9                                         )
                                          )
10 ARNOLD SCHWARZENEGGER,                 )
    et al.,                               )
11                                        )
       Defendants,                        )
12 _____      )

13

14 I, JANE ROBINSON, declare that if called I could and would competently testify as follows:

15      1.  I am a Registered Nurse licensed to practice in the State of California. I am presently

16 employed as the Regional Director of Nursing, Northern Region for the California Department of

17 Corrections and Rehabilitation (CDCR). I have held this position since March of 2006. Prior to my

18 employment with CDCR I was employed by the Department of Corrections in the State of

19 Washington as the Health Care Manager for the McNeil Island Correction Center. I was employed

20 by the Washington Department of Corrections for eight years.  Before that I was employed as a Care

21 Coordinator for an acute care psychiatric unit at a community based hospital in Grand Forks, North

22 Dakota. I have been a Registered Nurse since 1986.

23      2.  Patients in the correctional setting often have complex and dynamic health care needs.

24 Nursing processes are used for assessment; the creation of nursing care plans; implementation of

25 those plans; and, to evaluate the patient's response to nursing intervention. In addition, nurses

26 coordinate the patient's plan of care with the other health care disciplines along the continuum of

27 health services or levels of care.  Each of these nursing functions is part of establishing and

28                                          1

1  maintaining a continuity of care.

2        3. Consistency in nurse-patient interactions is the foundation for a professional, therapeutic

3  relationship. It is through repeated encounters that trust is formed. Patients disclose more information

4  and the nurses are able to elicit more information pertaining to the patient's long term and short term

5  health care needs. Nurses who are familiar with the details and history of a patient's condition can

6  anticipate an exacerbation or a difficulty more readily, and intervene to promote better patient

7  outcomes.  Patients and the health care team rely on constancy among staff for nursing follow-

8  through, patient advocacy and accountability.

9        4. The CDCR currently relies heavily on the use of contract or "Registry" nurses to provide

10  care for the patients. The qualifications of these nurses can vary significantly.  Furthermore, registry

11  nurses with adequate experience in correctional health care are not usually available. Registry nurses

12  can provide essential care in some areas, such as Urgent Care and Emergency Response, where the

13  nursing care is immediate to a specific problem. The majority of patient care activities in a prison

14  occur however in the ambulatory care setting where continuity of staff, especially nursing is

15  essential.  The long term needs California prison inmates cannot be adequately provided by a health

16  care system that relies heavily upon registry personnel.  Replacing the contract, temporary nursing

17  staff with permanent State employees will provide significant benefits to inmate/patients by

18  improving continuity of care which will result in better patient outcomes.

19        I declare under penalty of perjury that the foregoing is true and correct to the best of my

20  knowledge.   Executed this 7th day of September, 2006, at San Quentin State Prison, California.

21

22  _____

23  Jane Robinson
    CDCR Regional Director of Nursing

24

25

26

27

28                                        2

# EXHIBIT 6

**PROPOSED SALARIES**
**Effective September 1, 2006**

| Classification | Proposed Incumbents $ | | | Proposed New Hires $ | |
|---|---|---|---|---|---|
| | Min | Max | | Min | Max |
| **Nursing Services:** | | | | | |
| **Registered Nurse** | | | | | |
| Bay area | $ 8,154 | $ 8,989 | | $ 7,766 | $ 8,989 |
| All others | $ 7,397 | $ 8,154 | | $ 7,045 | $ 8,154 |
| **Nurse Instructor** | | | | | |
| Bay area | $ 7,740 | $ 9,408 | | $ 7,740 | $ 9,408 |
| All others | $ 7,021 | $ 8,534 | | $ 7,021 | $ 8,534 |
| **Nurse Anesthetist** | | | | | |
| Bay area | $ 8,406 | $ 10,218 | | $ 8,406 | $ 10,218 |
| All others | $ 7,626 | $ 9,269 | | $ 7,626 | $ 9,269 |
| **Public Health RN** | | | | | |
| Public Health Nurse I | | | | | |
| Bay area | $ 7,424 | $ 9,024 | | $ 7,424 | $ 9,024 |
| All others | $ 6,735 | $ 8,186 | | $ 6,735 | $ 8,186 |
| Public Health Nurse II | | | | | |
| Bay area | $ 7,924 | $ 9,632 | | $ 7,924 | $ 9,632 |
| All others | $ 7,189 | $ 8,738 | | $ 7,189 | $ 8,738 |
| **Surgical Nurse** | | | | | |
| Surgical Nurse I | | | | | |
| Bay area | $ 7,185 | $ 8,733 | | $ 7,185 | $ 8,733 |
| All others | $ 6,518 | $ 7,923 | | $ 6,518 | $ 7,923 |
| Surgical Nurse II | | | | | |
| Bay area | $ 7,653 | $ 9,302 | | $ 7,653 | $ 9,302 |
| All others | $ 6,942 | $ 8,438 | | $ 6,942 | $ 8,438 |
| **Supervising RN** | | | | | |
| Supervising RN I | | | | | |
| Bay Area | $ 8,345 | $ 10,143 | | $ 8,345 | $ 10,143 |
| All Others | $ 7,571 | $ 9,203 | | $ 7,571 | $ 9,203 |
| Supervising RN II | | | | | |
| Bay Area | $ 8,345 | $ 10,143 | | $ 8,345 | $ 10,143 |
| All Others | $ 7,571 | $ 9,203 | | $ 7,571 | $ 9,203 |

FINAL

PL-002.022

**PROPOSED SALARIES**
**Effective September 1, 2006**

| Classification | Proposed Incumbents $ | | Proposed New Hires $ | |
|---|---|---|---|---|
| | Min | Max | | Min | Max |
| Supervising RN III | | | | | |
| Bay Area | $ 8,715 | $ 10,593 | $ 8,715 | $ 10,593 |
| All Others | $ 7,905 | $ 9,609 | $ 7,905 | $ 9,609 |
| | | | | |
| **Nurse Consultant (hdqtrs)** | | | | |
| Nurse Consultant I | $ 8,392 | $ 10,201 | $ 8,392 | $ 10,201 |
| | | | | |
| Nurse Consultant II | $ 8,475 | $ 10,302 | $ 8,475 | $ 10,302 |
| | | | | |
| Nurse Consultant III (spec) | $ 8,558 | $ 10,403 | $ 8,558 | $ 10,403 |
| | | | | |
| Nurse Consultant III (supvr) | $ 8,861 | $ 10,771 | $ 8,861 | $ 10,771 |
| | | | | |
| Nursing Consultant, PR | $ 8,725 | $ 10,605 | $ 8,725 | $ 10,605 |
| | | | | |
| Nursing Consultant, PR (lead) | $ 9,128 | $ 11,095 | $ 9,128 | $ 11,095 |
| | | | | |
| **Directors of Nursing** | | | | |
| Regional DON (exempt) | $ 9,106 | $ 11,068 | $ 9,106 | $ 11,068 |
| | | | | |
| Statewide DON (exempt) | $ 9,980 | $ 12,131 | $ 9,980 | $ 12,131 |
| | | | | |
| **LVN** | | | | |
| Bay Area | $ 3,800 | $ 4,619 | $ 3,800 | $ 4,619 |
| All Others | $ 3,385 | $ 4,114 | $ 3,385 | $ 4,114 |
| **CNA** | $ 2,200 | $ 2,674 | $ 2,200 | $ 2,674 |
| | | | | |
| **Pharmacy Services** | | | | |
| **Pharmacist Tech** | | | | |
| Bay area | $ 2,894 | $ 3,518 | $ 2,894 | $ 3,518 |
| All others | $ 2,650 | $ 3,221 | $ 2,650 | $ 3,221 |
| | | | | |
| **Pharmacist I** | $ 8,942 | $ 9,389 | $ 8,942 | $ 9,389 |
| | | | | |
| **Pharmacist II** | $ 9,836 | $ 10,328 | $ 9,836 | $ 10,328 |
| | | | | |
| **Pharmacy Svcs Manager** | $ 9,836 | $ 10,328 | $ 9,836 | $ 10,328 |

FINAL

PL-002.023

**PROPOSED SALARIES**
**Effective September 1, 2006**

| Classification | Proposed Incumbents $ | | Proposed New Hires $ | |
|---|---|---|---|---|
| | Min | Max | Min | Max |
| **Transcriptionists:** | | | | |
| Medical Transcriber | $ 2,661 | $ 3,234 | $ 2,661 | $ 3,234 |
| Sr Medical Transcriber | $ 2,977 | $ 3,619 | $ 2,977 | $ 3,619 |
| **X-Ray:** | | | | |
| Radiological Tech | $ 4,602 | $ 5,203 | $ 4,602 | $ 5,203 |
| Sr Radiological Tech (spec) | $ 4,786 | $ 5,411 | $ 4,786 | $ 5,411 |
| Sr Radiological Tech (supvr) | $ 5,073 | $ 5,628 | $ 5,073 | $ 5,628 |
| **Laboratory Services:** | | | | |
| Laboratory Assistant | (No change currently, still reviewing class) | | (No change currently, still reviewing class) | |
| Sr Laboratory Assistant | (No change currently, still reviewing class) | | (No change currently, still reviewing class) | |
| Clinical Laboratory Tech | (No change currently, still reviewing class) | | (No change currently, still reviewing class) | |
| Sr Clinical Laboratory Tech | (No change currently, still reviewing class) | | (No change currently, still reviewing class) | |
| Supvg Clinical Laboratory Tech | (No change currently, still reviewing class) | | (No change currently, still reviewing class) | |
| **Dietary Services:** | | | | |
| Clinical Dietician | $ 4,054 | $ 4,928 | $ 4,054 | $ 4,928 |
| Food Administration I | $ 4,054 | $ 4,928 | $ 4,054 | $ 4,928 |
| **Health Records:** | | | | |
| Health Records Tech I | $ 3,256 | $ 3,559 | $ 3,256 | $ 3,559 |
| Health Records Tech II | $ 3,578 | $ 3,911 | $ 3,578 | $ 3,911 |
| Health Records Tech III | $ 3,931 | $ 4,297 | $ 3,931 | $ 4,297 |
| MR Director | $ 4,320 | $ 5,251 | $ 4,320 | $ 5,251 |

FINAL

PL-002.024

**PROPOSED SALARIES**
**Effective September 1, 2006**

| Classification | Proposed Incumbents $ | | | Proposed New Hires $ | |
| --- | --- | --- | --- | --- | --- |
| | Min | Max | | Min | Max |
| Mid-Level Practitioners: | | | | | |
| Nurse Practitioner | | | | | |
| Bay area | $ 9,162 | $ 9,989 | | $ 8,766 | $ 9,989 |
| All others | $ 9,162 | $ 9,620 | | $ 8,766 | $ 9,620 |
| | | | | | |
| Physician Assistant | | | | | |
| Bay area | $ 9,162 | $ 9,989 | | $ 8,766 | $ 9,989 |
| All others | $ 9,162 | $ 9,620 | | $ 8,766 | $ 9,620 |

*Salary for Director, DCHCS to be set and adjusted within the range identified below at the discretion of the Receiver.*

| | Proposed Incumbents $ | | Proposed New Hires $ | |
| --- | --- | --- | --- | --- |
| Director, DCHCS | Annual Min | Annual Max | Annual Min | Annual Max |
| Current Incumbent 1/ | $325,000 | $450,000 | $325,000 | $450,000 |

1/ - Current incumbent is Peter Farber-Szekrenyi.  Increase retroactive to May 1, 2006.

*For classifications identified below, salaries will range up to $300,000 at the discretion of the Receiver:*

| Physicians: |
| --- |
| Asst Deputy Dir, HCSD, CEA |
| Statewide Medical Director |
| Regional Medical Director |
| Chief Deputy Clin Svcs |
| Chief Medical Officer |
| Chief Physician/Surgeon |
| Physicians |
| Podiatrist |

FINAL

PL-002.025

# EXHIBIT 7

PL-002.026

STATE OF CALIFORNIA                                                    ARNOLD SCHWARZENEGGER, *Governor*

# DEPARTMENT OF PERSONNEL ADMINISTRATION
LEGAL DIVISION
1515 "S" STREET, NORTH BUILDING, SUITE 400
SACRAMENTO, CA 95814-7243
(916) 324-0512    FAX (916) 323-4723



August 15, 2006

**SENT VIA E-MAIL AND U.S. MAIL**

Linda Buzzini
Counsel to the Receiver
California Prison Heath Care Receivership
501 J Street, Suite 605
Sacramento, CA 95814

Re:  Plata; Proposed Salary Increases

Dear Ms. Buzzini:

This responds to the Receiver's request for an analysis by the Department of Personnel Administration concerning the issue presented below.  Accompanying this letter is 1) a table identifying statutes and regulations re implementing salary increases; 2) a table comparing proposed and current salaries; and 3) a list of considerations relating to increasing salaries.  We have attempted to respond fully to the request posed to DPA.  If there are issues or concerns not adequately addressed by this response, please contact me.

## ISSUE PRESENTED

Does the Department of Personnel Administration (DPA) have power to implement increased salaries for California Department of Correction and Rehabilitation (CDCR ) health care employees, at the direction of the Office of Receiver, without a federal court order?

## SHORT ANSWER

No.  Salary setting for state employees is a matter of Legislative concern and governed by statute.  DPA must act within statutory requirements.  (1) For employees represented by an exclusive representative, increased salaries must be negotiated prior to implementation, absent waiver by the exclusive representative or emergency.  (2) In setting salaries, DPA must act consistently with administration of the state personnel classification plan.  Salaries must be comparable for like work.  Salaries must comply with all other statutory requirements.

PL-002.027

Linda Buzzini
August 15, 2006
Page 2

## DISCUSSION

On August 8, 2006, the Office of the Receiver, through its counsel, Linda Buzzini, informed DPA that the Receiver intended to provide increased salaries to CDCR health care providers, as set forth in a proposed salary schedule. Ms. Buzzini asked DPA to answer whether DPA could implement the increased salaries without a court order and to provide a response by August 15, 2006.

**Background**

The duties, power and authority of the Receiver are established by federal court order dated February 14, 2006. In exercising "executive management," the Receiver "shall have the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component of the CDCR." (Order, p. 2.) The Receiver has "all powers necessary" to fulfill the Receiver's duties. (Order, p. 4.) The powers of the CDCR Secretary with respect to health care are suspended, and the Receiver assumes those powers. (Order, p. 4.) The Receiver has "all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical heath care system. (Order, p. 4.) With respect to personnel, the Receiver has power to do all of the following: "hire, fire, suspend, supervise, promote, transfer, discipline, and take all other personnel actions regarding CDCR employees or contract employees who perform services related to the delivery of medical health care to the class members." (Order, p. 4.) The Receiver has power "to negotiate new contracts and to renegotiate existing contracts, including contracts with labor unions, in the event that such action is necessary for the Receiver to fulfill his duties under this Order." (Order, p. 4.) The Receiver is to exercise powers under the order "in a manner consistent with California state laws, regulations, and contracts, including labor contracts." (Order, p. 5.) If the Receiver is unable to perform his charge without a change in State law, he may request that the court set aside the state law:

> In the event, however, that the Receiver finds that a state law, regulation, contract, or other state action or inaction is clearly preventing the Receiver from developing or implementing a constitutionally adequate medical health care system, or otherwise clearly preventing the Receiver from carrying out his duties as set forth in this Order, and that other alternatives are inadequate, the Receiver shall request the Court to waive the state or contractual requirement that is causing the impediment. Upon receipt of any such request, the Court shall determine the appropriate procedures for addressing such request on a case-by-case basis."

(Order, p. 5.)

PL-002.028

Linda Buzzini
August 15, 2006
Page 3

**Analysis**

The Department of Personnel Administration is created "for the purposes of managing the non-merit aspects of the state's personnel system." (Gov. Code, § 19815.2.) Among other things, the Director of DPA has power to "administer and enforce laws pertaining to personnel" and serves "as the Governor's designated representative" to negotiate with represented employees. (Gov. Code, § 19815.4; referencing § Gov. Code, § 3517 [Dills Act requirement for good faith negotiations].) DPA administers salaries and has authority to set the salaries of managers and supervisors  (Gov. Code, §§ 19816, 19825) and Career Executive Appointments (CEA) (Gov. Code, § 19889).  DPA administers a personnel classification plan, "including the allocation of every position to the appropriate class in the classification plan."  (Gov. Code, § 19818.)  In setting salaries, DPA is required to set like salary ranges for comparable duties and responsibilities (Gov. Code, § 19826.)

A.  A Court Order is Necessary to Relieve DPA from its Bargaining Obligation to the Exclusive
     Representative of its Represented Employees

DPA has authority to set salaries of represented employees, subject to the collective bargaining process. (Gov. Code, §§ 19816; 3512 et seq.[Dills Act].)  The Dills Act requires collective bargaining in good faith between the State Employer and the exclusive representative of its employees concerning matters within the scope of representation.  Matters are within the scope of representation (1) if they involve the employment relationship and are of such concern to management and labor that conflict is likely and (2) the mediatory influence of collective bargaining is an appropriate means to resolve the conflict.  Salaries are a mandatory subject of bargaining, and the State Employer cannot implement salary increases without first meeting and conferring with the exclusive representative.  (Gov. Code, § 3516.)  The parties must exhaust the Dills Act procedures until they reach agreement or impasse.  (Gov. Code, § 3517.) (See generally, *California Department of Transportation* (1983) PERB Dec. No. 361-S, 7 PERC 14295, p. 1184, *State of California* (1992) 927-S, 16 PERC 23061, p. 213; *California Department of Personnel Administration* (1992) 928-S, 16 PERC 23063, p. 217.)  In rare cases of "emergency," the employer may implement a unilateral change and bargain "at the earliest practical time" after the fact. (Gov. Code, § 3516.5.)  While we recognize the emergency nature of the situation here—as earlier stated by the court—at this time, without a court order, it is uncertain whether implementation of increased salaries constitutes an "emergency" within the meaning of the Dills Act.  The "emergency" exception is narrowly construed to favor the policy of collective bargaining.  (See generally, Zerger, et al., *California Public Sector Labor Relations* (Matthew Bender 2006), Duty to Bargain, § 10.07[8].)

Linda Buzzini
August 15, 2006
Page 4


Under the Dills Act, then, DPA cannot implement salary increases without prior agreement of the union or reaching impasse after negotiations. The limited exception for cases of emergency still requires DPA to bargain as soon as practical. As a result, the lawful, speedy implementation of salary increases depends upon union agreement, impasse, or an emergency that prevents "the mediatory influence of collective bargaining."

A court order is necessary to accomplish the Receiver's objective, (1) given the Receiver's intention to expedite implementation of increased salaries for recruitment and retention, (2) the Dills Act requirements clearly prevent speedy, unilateral action by DPA, and (3) there is no other adequate alternative under state law. (See Order, p. 5.)

B.  A Court Order is Necessary to Relieve DPA from Other Statutory Requirements relating to the Proposed Salary Increases.

While DPA has authority to set salaries, it must do so within the requirements of existing statutes. Thus, salaries must be consistent with the state classification plan. (Gov. Code, § 19818; 2 Cal. Admin. Code, §§ 599.666 and 599.666.1.) Also, salaries must satisfy the principle of comparable pay for like work. (Gov. Code, § 19826.)

Government Code section 19818.6, relative to a state classification plan, provides:

> The department shall administer the Personnel Classification Plan of the State of California including the allocation of every position to the appropriate class in the classification plan. The allocation of a position to a class shall derive from and be determined by the ascertainment of the duties and responsibilities of the position and shall be based on the principle that all positions shall be included in the same class if:
>    (a) The positions are sufficiently similar in respect to duties and responsibilities that the same descriptive title may be used.
>    (b) Substantially the same requirements as to education, experience, knowledge, and ability are demanded of incumbents.
>    (c) Substantially the same tests of fitness may be used in choosing qualified appointees.
>    *(d) The same schedule of compensation can be made to apply with equity.*

(Emphasis added.)

The proposed salaries are set well above the salary ranges provided for under the current classification plan. The proposed salary schedule is based on considerations independent of the state plan requirement. The requirements of the statute prevent DPA from implementing the proposed salary increases.

Linda Buzzini
August 15, 2006
Page 5

Also, the proposed salary schedule is inconsistent with the statutory principle of comparable pay for like work.  Government Code section 19826, subdivision (a) provides:

> The department shall establish and adjust salary ranges for each class of position in the state civil service subject to any merit limits contained in Article VII of the California Constitution. *The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities.* In establishing or changing these ranges, consideration shall be given to the prevailing rates for comparable service in other public employment and in private business. The department shall make no adjustments that require expenditures in excess of existing appropriations that may be used for salary increase purposes. The department may make a change in salary range retroactive to the date of application of this change.

(Emphasis added.)

Again, the proposed salary increases are premised on satisfying the court's order with respect to recruitment and retention for health care employees in the prisons.  Because the statute requires DPA to administer a state-wide pay system, the statute's requirements are an impediment in this instance.

### CONCLUSION

A court order is appropriate and necessary to remove statutory barriers that prevent DPA from implementing the proposed salary increases.

Sincerely,

Paul M. Starkey
Labor Relations Counsel

PMS:rw

Enclosures

cc:    John Hagar
       Dr. Peter Farber
       Brigid Hansen
       James Tilton
       Bill Curtis
       Jon Wolff

PL-002.031

**PLATA**

**TABLE IDENTIFYING STATUTES AND REGULATIONS Re IMPLEMENTING
SALARY INCREASES**

(Table below provides statutory reference, description, responsible agency, whether a
federal court order may be required, indicated by (X) or n/a (not applicable to salary
issue, and notes.  Note:  Table is sorted by order needed (X), then cite.)

| Cite | Code | Description | Agency | Order (X) | Notes |
|---|---|---|---|---|---|
| 3512 | GC | Dills Act | PERB | X | 3512-3524 |
| 3525 | GC | Excluded Employees Bill of Rights | DPA | X | 3525-3539.5 |
| 18801.1 | GC | DPA designates managerial positions | DPA | X | See Dills Act, Gov. Code, § 3513 |
| 18807 | GC | Establishes 5% "salary step" rule | SPB | X | |
| 19815 | GC | DPA Laws | DPA | X | 19815-19999.21 |
| 19816 | GC | DPA administers salaries of employees exempt from civil service and within range adjustments | DPA | X | |
| 19818.6 | GC | DPA administers Personnel Classification Plan "including the allocation of every position to the appropriate class in the classification plan" | DPA | X | 19818-19818.21 |
| 19819.7 | GC | DPA Labor Relations represents the Governor for labor relations | DPA | X | 19819.7 |
| 19826 | GC | Requires DPA to pay like salaries, ranges for comparable duties and responsibilities | DPA | X | |
| 19827.2 | GC | To establish a State policy of setting salaries for female-dominated jobs | DPA | X | |
| 19828 | GC | Requires DPA to provide reasonable opportunity to any employee to be heard when affected by a change in salary for his or her position | DPA | X | Dills Act, Gov, Code, § 3517.5 |
| 19829 | GC | Requires DPA to establish minimum and maximum salaries with intermediate steps | DPA | X | Possible issue |
| 19829.5 | GC | Requires DPA to provide MOU to Office of Legislative Analyst | DPA | X | |
| 19832 | GC | Establishes annual MSAs for | DPA | X | |

| Cite | Code | Description | Agency | Order (X) | Notes |
|---|---|---|---|---|---|
| | | employees who meet standards of efficiency | | | |
| 19835.5 | GC | Submitting budgetary requirements to the Director of Finance | DPA | X | |
| 19836 | GC | Provides for hiring at above minimum salary limit in specified instances | DPA | X | |
| 19837 | GC | Authorizes rates above the maximum of the salary range when a person's position is downgraded (Red Circle rates) | DPA | X | |
| 19889 | GC | DPA administers salaries of CEAs | DPA | X | |
| 599.666 | AC2 | Definitions of Salary Terms | DPA | X | |
| 599.688 | AC2 | Effect of salary upon reallocation | DPA | X | |
| 599.689 | AC2 | Effect of salary upon salary range changes | DPA | X | |
| 599.666.1 | AC2 | Definitions of Salary Terms for Nonrepresented Employees | DPA | X | |
| 19824 | GC | Establishes monthly pay periods | DPA | n/a | |
| 19825 | GC | Exempt salary setting in the Executive Branch | DPA | n/a | |
| 19833 | GC | Provides for annual salary increase for employees compensated at a fixed amount of unit of work | DPA | n/a | |
| 19834 | GC | Requires MSA payments to qualifying employees when funds are available | DPA | n/a | |
| 19835 | GC | Provides employees with the right to cumulative adjustments for a period not to exceed two years when MSAs are denied due to lack of funds | DPA | n/a | |
| 19838 | GC | Provides for methods of collecting overpayments and correcting payroll errors to employees. (Units 1, 4, 11, & 20 only) | DPA | n/a | |
| 431 | AC2 | Salary and Class Level Comparisons | SPB | n/a | |
| 433 | AC2 | Voluntary Transfers Between Classes | SPB | n/a | |
| 599.669 | AC2 | Definitions of Full-Time and Less Than Full-Time Rates | DPA | n/a | |
| 599.681 | AC2 | Salary movement between Alternate Ranges | DPA | n/a | |

2

PL-002.033

| Cite | Code | Description | Agency | Order (X) | Notes |
|------|------|-------------|--------|-----------|-------|
| 599.682 | AC2 | Qualifying service for Merit and Special In-Grade Salary Adjustment | DPA | n/a | |
| 599.683 | AC2 | Merit Salary Adjustment | DPA | n/a | |
| 599.687 | AC2 | Effects of breaks in State service on Merit and Special In-Grade Salary Adjustments | DPA | n/a | |
| | | | | | |

GC = Government Code
AC2 = California Administrative Code, Title 2

Link to Government Codes:  Right click on link below, click on Open Hyperlink
http://leginfo.public.ca.gov/calaw.html

Link to DPA Salary Rules: Right click on link below, click on Open Hyperlink
http://government.westlaw.com/linkedslice/search/default.asp?RS=GVT1.0&VR=2.0&SP=CCR-1000

Link to DPA website: Right click on link below, click on Open Hyperlink
http://www.dpa.ca.gov/statesys/dpa/welcome.shtm

PL-002.034

**Health Care Salary Relationship Comparisons**
**between**
**Receiver Proposed Salaries and Existing Civil Service Salaries**

| CDCR Receiver proposed maximum base salaries for "All others" (locations other than "Bay Area") | | Existing civil service maximum base salaries as of 7/1/06 | |
|---|---|---|---|
| Sup RN I, CF ($9203) – RN, CF ($8989) | 12.9% | **Sup RN I, CF ($5290) – RN, CF ($5613) | minus 5.5% |
| ***Sup RN II, CF ($9203) – ***Sup RN I, CF ($9203) | 0% | **Sup RN II, CF ($5833) – **Sup RN I, CF ($5290) | 10.3% |
| Sup RN III, CF ($9609) – Sup RN II, CF ($9203) | 4.4% | **Sup RN, III, CF ($6381) – **Sup RN II, CF ($5833) | 9.4% |
| *Public Health Nurse III, CF ($8738) – Public Health Nurse I, CF ($8186) | 6.7% | **Public Health Nurse III, CF ($6328) – Public Health Nurse I, CF ($5640) | 12.2% |
| *Public Health Nurse III, CF ($8738) – Public Health Nurse II, CF ($8590) | 1.8% | **Public Health Nurse III, CF ($6328) – Public Health Nurse II, CF ($6151) | 2.9% |
| Public Health Nurse II, CF ($8590) - Public Health Nurse I, CF ($8186) | 4.9% | Public Health Nurse II, CF ($6151) – Public Health Nurse I, CF ($5640) | 9.1% |
| Surgical Nurse II, CF ($8438) – Surgical Nurse I, CF ($7923) | 6.5% | Surgical Nurse II, CF ($6121) – Surgical Nurse I, CF ($5631) | 8.7% |
| Nurse Consultant III (Sup) ($10,771) – Nurse Consultant II ($10,302) | 4.6% | **Nurse Consultant III (Sup) ($6328) – Nurse Consultant II ($6289) | 0.6% |
| Nurse Consultant II ($10,302) – Nurse Consultant I ($10,201) | 1.0% | Nurse Consultant II ($6289) – Nurse Consultant I ($5757) | 9.2% |
| Nursing Con, Prog Rev ($10,605) – Nurse Consultant III (Spec) ($10,403) | 1.9% | **Nursing Con, Prog Rev ($6639) – Nurse Consultant III (Spec) ($6877) | minus 3.5% |
| Sup RN I, CF ($9203) – LVN ($3768) | 144.2% | **Sup RN I, CF ($5290) – LVN (Safety) | 72.3% |
| Sup RN I, CF ($9203) – CNA, CF ($2674) | 244.3% | **Sup RN I, CF ($5290) – CNA, CF | 105.2% |
| Pharmacy Svs Mgr ($10,328) – Pharmacy Technician ($3221) | 220.7% | **Pharmacy Svs Mgr ($6958) – Pharmacy Technician ($3103) | 124.2% |
| ***Pharmacy Svs Mgr ($10,328) – ***Pharmacist II ($10,328) | 0% | **Pharmacy Svs Mgr ($6958) – **Pharmacist II ($6312) | 10.2% |

PL-002.035

| | |
|---|---|
| Pharmacist II ($10,328) –              10%<br>Pharmacist I ($9389) | **Pharmacist II ($6312) –              6.1%<br>Pharmacist I ($5949) |
| Sr Radiologic Tech, CF (Sup) ($5628) – 8.2%<br>Radiologic Tech, CF ($5203) | **Sr Radiologic Tech, CF (Sup) ($3783) – 4.7%<br>Radiologic Tech, CF ($3951) |
| Sr Radiologic Tech, CF (Spec) ($5411) – 4%<br>Radiologic Tech, CF ($5203) | Sr Radiologic Tech, CF (Spec) ($3765) –  4.2%<br>Radiologic Tech, CF ($3614) |
| Clinical Lab Tech classes - Receiver's review<br>not yet completed | **Sup Clinical Lab Tech, CF ($5211) –      5.3%<br>Sr Clinical Lab Tech, CF ($4951) |
| | **Sup Clinical Lab Tech, CF ($5211) –    15.9%<br>Clinical Lab Tech, CF ($4496) |
| | Sr Clinical Lab Tech, CF ($4951 –     10.1%<br>Clinical Lab Tech, CF ($4496) |
| Laboratory Assistant classes – Receiver's<br>review not yet completed | Sr Lab Assistant, CF ($2931) –     15.9%<br>Lab Assistant, CF ($2528) |
| ***Food Administrator I, CF ($4928) –       0%<br>***Clinical Dietitian, CF ($4928) | **Food Administrator I, CF ($4349) –     8.8%<br>Clinical Dietitian, CF ($3996) |
| Medical Record Director ($5251) –       22.2%<br>Health Record Tech III ($4297) | **Medical Record Director ($4449) –    16.6%<br>**Health Record Tech III ($3817) |
| Health Record Tech III ($4297) –          9.9%<br>Health Record Tech II ($3911) | **Health Record Tech III ($3817) –       10%<br>Health Record Tech II (Spec) ($3470) |
| Health Record Tech II ($3911) –           9.9%<br>Health Record Tech I ($3559) | **Health Record Tech II (Sup) ($3355) –  8.1%<br>Health Record Tech I ($3103) |
| | Health Record Tech II (Spec) ($3470) –  11.8%<br>Health Record Tech I ($3103) |

*assumption that Receiver salaries for the Public Health Nurse II and III were transposed in typing.  chart reflects the Public Health Nurse III receives the higher maximum salary.

**supervisory/managerial salaries do not reflect an anticipated 2006 excluded employee compensation program.

***anomaly in salary relationship between classes.

PL-002.036

**Considerations for Implementing CDCR Receiver Proposed Health Care Salaries**

A. When adjusting base salaries of existing classes to the levels identified by the Receiver, the following questions apply:

    1. Are the MOU provisions impacted?  Yes, DPA is responsible for negotiating salaries for rank-and-file classes in accordance w/the Dills Act (Gov Code 3512 – 3524)

    2. Are DPA laws impacted?  Yes, DPA sets salaries for employees excluded from collective bargaining (Gov Code 19816 and 19825).

    3. Are SPB laws and rules impacted?  No.

    4. Are costs associated with adjusting the salaries?  Yes, Department of Finance identifies/approves funding for the higher salaries and retirement costs; the Legislature approves and authorizes expenditure of those funds through an appropriations bill.

    5. Are there other legal considerations?  Yes, 'like pay for like work' provisions. Gov Code 19826 requires DPA to pay like salaries for comparable duties and responsibilities.

B. In creating/establishing new health care classes to be used solely within CDCR, the following questions apply:

    1. Are MOU provisions impacted?  Yes, each MOU contains specific language on the need for DPA to conduct formal discussion/negotiation with the union when establishing a new class and its proposed salary (Dills Act and MOUs 4, 11, 16, 19, and 20).

    2. Are DPA laws impacted?  Yes, DPA sets salaries for employees excluded from collective bargaining (19816 and 19825).

    3. Are SPB laws impacted?  Yes, SPB adopts classification changes and/or the establishment of new classes (Gov Code 18800).

    4. Would the proposed new classes be designated 'safety' for retirement purposes?  Yes; the level of care classes would continue to meet existing criteria for designating classes "safety."

**PROOF OF SERVICE**

CASE NAME:    *Plata, et al. v. Schwarzenegger, et al.*

CASE NUMBER:    USCD #C-01-1351 TEH

I, Renee Whitehead, declare:

I am employed in the County of Sacramento, California.  I am over the age of 18 years, and not a party to the within action.  My business address is 1515 S Street, North Building, Suite 400, Sacramento, California 95814-7243.  I am readily familiar with my employer's business practice for collection and processing of correspondence for UPS, U.S. Mail, Fax Transmission and/or Personal Service.

On August 15, 2006 I caused the following documents to be served:

**Correspondence to Linda Buzzini dated August 15, 2006**

on the parties listed as follows:

__XX__        via e-mail to:  Linda.Buzzini@cdcr.ca.gov on August 15, 2006;

__XX__        by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail on August 16, 2006.

Linda Buzzini
Counsel to the Receiver
California Prison Heath Care Receivership
501 J Street, Suite 605
Sacramento, CA 95814

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 15, 2006, at Sacramento, California.

Renee Whitehead

# EXHIBIT 8

PL-002.039

**CPR**   Office of the California Prison Receivership
Robert Sillen, Receiver

█████████████

Federal District Courthouse
Law Library 18ᵗʰ Floor
450 Golden Gate Avenue
San Francisco, CA 94102

August 20, 2006

BY E-MAIL (PDF) AND BY REGULAR MAIL

Louis Mauro
Chief Deputy Legal Affairs Secretary
Office of Governor Arnold Schwarzenegger
State Capitol
Sacramento, CA  95814

Subj:   Proposed Salary Increases

Dear Mr. Mauro:

    Receiver Robert Sillen has determined that salary increases for certain clinical classifications are necessary to carry out the purpose of the receivership.  For the past several weeks the Receiver has endeavored to ascertain whether State law or inaction by State officials impedes his ability effectuate these salary increases.  The Receiver has encountered a problem concerning his inquires and requested that I write to you for assistance.

*Introduction.*

    It is our understanding that Government Code section 19826 vests the Department of Personnel Administration (DPA) with authority to establish and adjust salary ranges, subject to certain considerations and limitations.  Consequently, on August 8, 2006, the Receiver's attorneys Jared Goldman and Linda Buzzini met with DPA Director David Gilb and representatives from his staff to provide DPA with a copy of the salary increases determined necessary by the Receiver.  DPA was then asked whether the State would effectuate these salary adjustments.  In addition, DPA was asked to determine whether the State had the authority to raise salaries, and if so, whether the State would exercise that authority.  DPA was also asked to provide a list of all relevant laws that may impact on this decision; for example statutes relating to DPA laws, the Dills Act (Gov. Code § 3512 et seq.), statutes pertaining to the State Personnel Board laws, and statutes pertaining to the Department of Finance.  These issues were again discussed with DPA representatives on August 14, 2006, at a meeting which you attended.

1

DPA responded to this request, through its attorney, on August 15, 2006. That letter is attached. DPA concludes that statutes requiring DPA to administer a statewide pay system present an impediment which prevents DPA from implementing the salary increases as requested by the Receiver. It is the opinion of the Office of the Receiver that the August 15, 2006 letter ("Letter") raises four problems which require your attention. To begin, we are uncertain whether you were consulted prior to the transmission of the Letter. Second, the analysis in the Letter appears to be flawed. Third, the list of statutes attached to the Letter appear, for the most part, to be entirely irrelevant to the salary increases contemplated by the Receiver. Finally, we are concerned that the Letter may present an incomplete analysis in that there are no references to relevant statutes which involve the State Personnel Board or Department of Finance. We set forth in more detail our concerns relative to problems two through four below.

*Problem 2: DPA's Legal Analysis.*

    A.    Duty to Bargain.

The Letter opines that DPA is statutorily obligated to bargain salaries, unless there is an emergency. The emergency concerning the delivery of medical care in California's prisons, however, has been determined by the Federal court. Nevertheless, the Letter appears to take the position that the "emergency" exception to bargaining is a narrow exception which leaves DPA "uncertain" about whether implementing salary increases constitutes an emergency within the meaning of the Dills Act. This position seems unfounded given the factual findings which led to the appointment of a Receiver. Furthermore, the affected bargaining units have indicated that they support the salary increases determined to be necessary by the Receiver.

    B.  Classification Plan.

DPA takes the position that it must administer salaries consistent with Government Code section 19818.6, which provides for allocating every position to a classification if *inter alia* the same schedule of compensation can be made to apply with equity. We agree with this general proposition; however, Government Code section 19829 is also relevant concerning this issue in that it provides DPA with authority to establish more than one salary range and more than one rate or method of compensation within a classification given unusual working conditions, and prevailing rate practices for comparable services in other public and private businesses. No one disputes that the clinical staff employed in California's prison face work challenges far different from those encountered by clinical personnel in other State entities.

    C.  Comparable Salaries For Comparable Duties.

The Letter also suggest that Government Code section 19826, subdivision (a) prevents DPA from establishing salary ranges as determined necessary by the Receiver, taking the position that Section 19826 provides for salary ranges based on the principle that like salaries shall be paid for comparable duties and responsibilities. Again, this position denies the reality of the medical delivery crisis in California's prisons. It also ignores two important and undisputed facts: (a) DPA has for many years approved of pay differentials for prison employees because of

2

unusual working conditions resulting in recruitment and retention problems; and (b) DPA's own salary surveys demonstrates that prison employees are underpaid in comparison to the public and private sector.

*Problem 3: DPA's Submission of Irrelevant Statutes.*

Because DPA establishes and adjusts salary ranges, it was asked to provide a list of all statutes related to implementing the proposed salaries. The Receiver's objective for this request was to identify what statutes, if any, may require waiver by Court order. As I am sure you can appreciate, any such order should be narrowly drawn. The DPA response, however, appears to be an invitation for the Court to waive a wide variety of statutes that are not relevant to the issue at hand. For example:

1. *Every single* statute relating to DPA's authority, irrespective of whether it concerns compensation in any manner whatsoever. (Gov. Code § 19815-19999.21)

2. DPA's authority to determine managerial positions. (Gov. Code § 18801.1)

3. DPA's authority to represent the Governor in bargaining. (Gov. Code § 19819.7)

4. DPA's responsibility to analyze information relevant to salary setting for female dominated occupations, and its responsibility to prepare a corresponding report for the Legislature. (Gov. Code § 19827.2)

5. DPA's duty to submit collective bargaining agreements to the Legislature. (Gov. Code § 19829.5)

6. The duty of every state department to notify the Department of Finance of funding needs growing out of automatic, annual merit salary increases due employees. (Gov. Code § 19835.5)

It would not be appropriate for the Receiver to recommend waiver concerning laws that do not inhibit his obligations under the Order filed February 14, 2006. It is therefore critical that the State focus its analysis to the relevant issue: the need to increase clinical salaries for the State employees who deliver medical care in California's prison.

3

PL-002.042

*Problem 4: The Failure to Address Other and Possibly Relevant Laws.*

At prior meetings staff from the Office of the Receiver specifically asked DPA to provide an analysis of all relevant California law relating the need to increase salaries, including those pertaining to the State Personnel Board and the Department of Finance. Unfortunately, the Letter does not respond to this request.

Thanks to your assistance, the Department of Finance has since responded by opining the only law regarding salaries is in Item 9800 of the annual Budget Act for the general fund, special fund and for non-governmental costs. Item 9800 states as follows:

> "The funds appropriated in this item are for employee compensation increases and increases, in benefits related thereto, whose compensation or portion thereof is chargeable to …. be allocated by executive order by the Department of Finance to the several state offices, departments, boards, bureaus, commissions, and other state agencies, in augmentation of their respective appropriations or allocations, in accordance with approved memoranda of understanding or, for employees excluded from collective bargaining, in accordance with salary and benefit schedules established by the Department of Personnel Administration."

This proviso, combined with Government Code section 19826[1], seems to suggest that absent a specific appropriation for salaries *per se* in the Budget Act, the executive branch of government is precluded from raising salaries, except insofar as any increase falls within the existing appropriation for salaries. Overlaying this possibility, however, is the $100 million fund which has made available for the Receiver's use. The Receiver therefore renews his request for an analysis of the law with this issue specifically addressed, along with all other laws governing the finances of the State.

To summarize, the Receiver requests an independent appraisal from the Office of the Governor concerning this entire issue, as well as a response to the following question: will the State of California implement these necessary salary increases without a court order? If the State is not prepared to implement the increases, inform the Receiver whether it is because the State is prevented from doing so by law, or whether as a matter of policy the State is electing not to exercise its discretion to increase salaries. When responding, please provide a list of all *relevant* statutes and California Constitutional provisions which bear upon this issue.

---

[1] The Department of Personnel Administration shall make no [salary] adjustments that require expenditures in excess of existing appropriations that may be used for salary increase purposes. (Gov. Code § 19826)

4

PL-002.043

Given the delay already encountered and the need to move forward with salary increases in a timely manner, please respond no later than Friday, August 25, 2006. If questions arise, do not hesitate to call at (415) 341-6569. I will be available through noon Friday, August 25, 2006, and on vacation the week following. If concerns arise after August 25, 2006 please contact Linda Buzzini at (916) 323-1263. Thank you for your attention to this request.


Sincerely,

John Hagar
Chief of Staff


Cc.  Robert Sillen (with attachment)
      Jared Goldman (with attachment)
      Linda Buzzini (with attachment)
      Dave Gilb (with attachment)
      Paul Starkey (with attachment)
      Molly Arnold (with attachment)

5

PL-002.044

# EXHIBIT 9

PL-002.045



# OFFICE OF THE GOVERNOR

August 25, 2006

*Via Electronic and U.S. Mail*

John Hagar
Chief of Staff
Office of the California Prison Receivership
Federal District Courthouse
Law Library, 18th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re:    Proposed Salary Increases

Dear Mr. Hagar:

Thank you for your letter to my office dated August 20, 2006. We appreciate the opportunity to assist you and to respond to the Receiver's concerns.

Before responding to the specific comments in your letter, it may be helpful to set forth my understanding of the context of our correspondence. I understand that your August 20, 2006 letter was sent on behalf of Receiver Robert Sillen pursuant to the authority vested in him by the Court's order filed on February 14, 2006 in *Plata et al. v. Schwarzenegger et al.*, case no. C01-1351 TEH. Your letter mentioned that the Receiver has determined that salary increases for certain clinical classifications are necessary to carry out the purposes of the receivership. The Court's order provides that the Receiver shall make all reasonable efforts to exercise his powers in a manner consistent with California laws, regulations and contracts, including labor contracts. Accordingly, the Receiver and his staff have been working to identify applicable California laws.

On August 15, 2006, the Department of Personnel Administration (DPA) sent Linda Buzzini, counsel to the Receiver, a summary of certain California laws. Your letter to us indicated that the DPA summary was flawed and incomplete, and you requested our assistance. It is my understanding that you are not seeking legal advice, as the Governor's Legal Affairs Office provides counsel to the Governor and the Receiver has retained his own counsel to advise

PL-002.046

Mr. John Hagar
August 25, 2006
Page 2

him regarding applicable law. Nonetheless, to the extent we can help coordinate the flow of information, we are pleased to be of assistance.

      With this context in mind, I turn to the specific comments in your letter.[1]

**Uncertainty As To Whether DPA Consulted With The Governor's Office Of Legal Affairs Before Issuing The Summary To Linda Buzzini.**

      We interpret this concern as expressing the Receiver's desire for a protocol to ensure prompt and responsive communications on legal issues. To avoid confusion in the future, we suggest that requests for legal information be submitted in writing and copied to Chief Deputy Legal Affairs Secretary Louis Mauro. This will help us track the requests, and we will be in a better position to know if a particular communication is responsive to the request.

**DPA's Legal Analysis.**

      **DPA's Duty To Meet And Confer.**

      Your letter paraphrases DPA's reference to Government Code sections 3517 and 3516.5. Section 3517 requires the Governor or his representative to meet and confer in good faith with representatives of recognized employee organizations regarding wages and other terms and conditions of employment. Section 3516.5 provides that "[i]n cases of emergency when the employer determines that a law, rule, resolution, or regulation must be adopted immediately without prior notice" to a union, the employer "shall provide such notice and opportunity to meet and confer in good faith at the earliest practical time . . . ." These provisions are part of the State Employer-Employee Relations Act. In discussing these requirements, DPA made reference to the Court's prior statements, but noted that under California law, the definition of "emergency" as used in section 3516.5 is not clear. We conducted our own search of California authorities and did not find any published appellate decision defining the term "emergency" as used in section 3516.5. Moreover, Government Code section 3513 does not define the word "emergency" as used in the Act. Administrative decisions do not appear to apply in the instant context. In any event, there should be no dispute that California law requires the employer to meet and confer. Your letter mentions that the affected bargaining units support the salary increases, but absent a Court waiver, DPA still has a legal obligation to meet and confer.

      **Personnel Classification Plan.**

      As you acknowledge in your letter, Government Code section 19818.6 provides that positions shall be included in the same classification if, among other things, "[t]he same schedule of compensation can be made to apply with equity." You correctly note, however, that DPA may establish more than one salary range or rate or method of compensation within a classification for positions with "unusual conditions or hours of work or where necessary to meet

---

[1] This response pertains only to represented employees in the State civil service system.

Mr. John Hagar
August 25, 2006
Page 3

the provisions of state law . . . ." (Gov. Code, § 19829, subd. (a).)  Again, we have found no published California appellate decision interpreting the phrase "unusual conditions or hours of work," or setting forth the kind of showing necessary to make such a determination.  Even if such a determination were made, however, DPA would still have a legal obligation to meet and confer on the issue absent a waiver by the Court.

**Comparable Salaries For Comparable Duties.**

Government Code section 19826 states that the "salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities."  You do not question the language of section 19826, but you suggest that special circumstances exist that would permit a deviation from this principle.

The Attorney General opined in 1964 that comparable pay is not necessary if special circumstances exist.  (43 Ops.Cal.Atty.Gen. 319 (1964).)  But in 1976, the Court of Appeal for the Third Appellate District held that "like-pay-for-like-work" is a cardinal objective of the Civil Service Act, and the statutory directive does not grant any discretion.  (State Trial Attorneys' Assn. v. State of California (1976) 63 Cal.App.3d 298, 304.)  The Court concluded that there is no authority under California law to fix salary ranges in violation of the principle "that like salaries shall be paid for comparable duties and responsibilities." (Ibid.)  Subsequent cases have permitted some flexibility, but the principle cannot be ignored in the absence of a waiver.

**DPA's List Of Statutes.**

This part of my letter responds to your comments on pages 3 and 4 of your letter.  There appears to have been a misunderstanding.  In an email from Linda Buzzini to this office on August 15, 2006, at 7:34 p.m., Ms. Buzzini said the Receiver's Office had requested "a list of all statutes which the State believes are implicated when increasing salaries."  On August 16, 2006, at 1:55 p.m., we sent an email to Ms. Buzzini asking her to confirm the broad scope of the request.  Ms. Buzzini responded with an email at 6:05 p.m., reaffirming that the focus of the inquiry "is all laws implicated."  We were never told that the focus should be "laws that should be waived."  And Ms. Buzzini asked for a "list" of statutes, not an "analysis" of statutes as is suggested on page 4 of your letter.  Although DPA did not identify every state statute that could be implicated, it did submit to Ms. Buzzini a broad list of statutes pertaining to DPA.  We asked other departments and agencies to submit their own lists in an effort to comply with Ms. Buzzini's request.[2]  Because the request was for all laws implicated, it was our understanding that we should err on the side of over-inclusion.

---

[2]  As you note in your letter, the Department of Finance responded right away.  Other agencies and departments have also responded.  In addition to the list of statutes provided to you by DPA, the State Personnel Board cited the following Government Code sections as possibly being implicated: 18500, 18522, 18523, 18702, 18800, and 18802.  CalPERS cited Government Code sections 22750 et seq. and 22871.5-22871.9.  And an entity within the Labor and Workforce Development Agency cited Labor Code section 141, subd. (b).

Mr. John Hagar
August 25, 2006
Page 4

We agree that the Receiver should not recommend waiver of every statute contained on those lists. The lists were not prepared for that purpose. In fact, we question whether it would be appropriate for the State to advise the Receiver about which California laws should be waived. In any event, it is our understanding that the Receiver is tasked by the Court's order to make all reasonable efforts to comply with California law. Accordingly, we are working to assist the Receiver by identifying California laws that could be implicated.

**State Action To Raise Salaries.**

You concluded your letter by asking whether the State will implement the salary increases without an order from the Court. It appears that the State would have the *authority* to implement the salary increases for represented employees if bargaining was successful, and/or if appropriate and sufficient findings and determinations were made. But absent an order from the Court, there are variables involved in the process, and we cannot say for certain right now that the State *would* implement the proposed salary increases for represented employees in the time frame envisioned by the Receiver. One such variable, of course, is the meet-and-confer process. Another is that the Legislature retains and exercises fiscal oversight of collectively bargained agreements, and any modification of an existing, properly ratified labor agreement that involves expenditures of $250,000 relating to salary or benefits that is not already approved by the Legislature must be submitted for review and possible ratification by the Legislature. (Gov. Code, §§ 3517.7, 3517.63.)

The State will continue to assist you by providing helpful information. I am informed that the Department of Finance is also responding to your August 20, 2006 letter, and that other agencies intend to submit policy-related information to you next week. The Governor and his Administration are committed to achieving true and meaningful reform of California's prison healthcare system. By working together, I am confident we can achieve this common goal.

I hope this response has been helpful. Please do not hesitate to contact our office if we can be of further assistance.

Sincerely,

ANDREA LYNN HOCH
Legal Affairs Secretary

cc: Linda Buzzini

PL-002.049

# EXHIBIT 10

PL-002.050



**LOCAL 1000**

**SEIU**

**Stronger Together**

JIM HARD
*President*

CATHY HACKETT
*Vice President
and Secretary-Treasurer*

MARC BAUTISTA
*Vice President
for Organizing/Representation*

YVONNE WALKER
*Vice President for Bargaining*

SERVICE EMPLOYEES
INTERNATIONAL UNION

1108 O Street
Sacramento, CA 95814
(916) 444-8134
(916) 326-4215 (fax)
www.seiu1000.org

August 24, 2006

Linda Diane Buzzini, Counsel to the Receiver
California Prison Health Care Receivership
501 J Street, Suite 605
Sacramento, CA 95814

Re:     **Proposed Salary Increases for CDCR Health Care
Classifications**

Dear Ms. Buzzini:

This letter constitutes SEIU Local 1000's (Local 1000) response to the
position of the Department of Personnel Administration (DPA) in its
August 15, 2006, letter to you concerning the receiver's plan to
implement salary increases for Local 1000 represented employees.
Local 1000 is disappointed with DPA's response which amounts to
nothing more than a series of obstacles and roadblocks to achieving
reform of the system of medical care delivery in the Department of
Corrections and Rehabilitation (CDCR). In contrast, Local 1000 is
amenable to the receiver taking immediate action on these matters as
outlined herein.

In his February 14, 2006, court order, Judge Henderson empowered
the receiver with the ability to negotiate and renegotiate contracts with
labor unions. Since that order, Local 1000 has conducted a series of
meetings with the receiver and his staff to discuss the need to
immediately address the salary inequities of prison health care staff
represented by our Union. On August 6, 2006, the receiver proposed
salary increases for numerous health care classifications in CDCR.
As the exclusive representative of most CDCR health care employees,
Local 1000 has agreed to the increases proposed by the receiver.

In their August 15, 2006, letter to you, DPA refuses to implement our
agreed upon salary increases, and instead recommends that the
receiver seek a federal court order to implement any salary increases.
DPA's primary argument is that their statutory obligation to bargain
with the Union prevents speedy implementation of any salary
increases. However, DPA's position, once again, stalls progress.
Local 1000 has already agreed to the salary increases, so the

**Linda Diane Buzzini**
**August 24, 2006**
**Page 2 of 2**

Union is in no way the obstacle.  In fact, for the past year (two years for registered nurses), DPA has consistently rejected Local 1000 proposals to increase the salaries of health care classifications.

DPA is the sole obstacle blocking the receiver's efforts to implement the much needed reforms to the state prison medical system.  As such, Local 1000 supports the need for a federal court order to implement this specific action if it is necessary to remedy the impediments imposed by DPA.  For the purposes of obtaining and implementing such an order, the Union waives any statutory, regulatory or contractual requirements which would otherwise be an impediment to the implementation of these salary increases.  This waiver is made on a one-time basis and is limited to the matters raised herein and does not extend or apply to any other matter or for any other purpose.

Sincerely,

Jim Hard
President

Yvonne Walker
Vice President for Bargaining

Cc:   Larry Perkins, Chair, Bargaining Unit 4
      Connie Kabeary, Chair, Bargaining Unit 11
      Nancy Lyerla, Chair, Bargaining Unit 17
      Rionna Jones, Chair, Bargaining Unit 20
      Arnold Schwarzenegger, Governor, State of California
      David Gilb, Director, DPA
      James Tilton, Acting Secretary, CDCR

# EXHIBIT 11

PL-002.053



**American Federation of State, County, and Municipal Employees Local 2620, AFL–CIO**

555 Capitol Mall, Suite 1225, Sacramento, CA 95814          514 Shatto Place, Suite 215, Los Angeles, CA 90020
916.441.0833  •  916.441.0842 fax                                            213.388.9902  •  213.388.9921 fax
www.afscme2620.org

August 21, 2006

Linda Diane Buzzini
Counsel to the Receiver
California Prison Health Care Receivership

Dear Ms. Buzzini:

I am writing, on behalf of our affected members, to thank Mr. Sillen for his efforts to address the salary lags that impact the recruitment and retention of AFSCME dietitians, physician assistants and pharmacists.

Despite the valiant efforts of our bargaining team and the information provided by the Department of Personnel Administration's salary survey regarding vacancies created by tremendous salary lags, DPA refused to address these issues in a meaningful way.

Our members in the above referenced classifications and AFSCME, BU 19, applaud and appreciate the efforts of the Receiver to respond to the salary inequities which should fill the huge number of vacancies this lag has created.

We believe that it is unfortunate that when we are at the table armed with all relevant data to solve recruitment and retention difficulties that have existed for many years, DPA responds with 5%. This will not solve any existing problems, and while we attempted to resolve these issues through collective bargaining, DPA was unwilling to resolve these issues through this accepted method. Therefore, we welcome and appreciate the efforts of the Receiver to rectify the recruitment and retention problems for our members employed by CDCR. We support the salary increases from the Receiver to solve these problem.

Thank you for all of your efforts and intervention on behalf of our members.

Very truly yours,

Pam Manwiller
Director of State Programs

PL-002.054

# EXHIBIT 12

PL-002.055



**UNION OF AMERICAN
PHYSICIANS & DENTISTS**
*Affiliated with AFSCME, AFL-CIO*

1330 BROADWAY, SUITE 730 ● OAKLAND, CA 94612-2506
PHONE (510) 839-0193 ● FAX: (510) 763-8756 ● TOLL FREE (800) 622-0909
E-MAIL: uapd@uapd.com ● WEBSITE: http://www.uapd.com

ROBERT L. WEINMANN, M.D.
president
STUART A. BUSSEY, M.D., J.D.
vice president
MICHAEL H. LISIAK, M.D.
vice president
CHARLES D. GOODMAN, M.D.
secretary
PETER A. STATTI, M.D.
treasurer

August 25, 2006

Ms. Linda Buzzini
Counsel to the Receiver
California Prison Health Receivership
501 J Street, Suite 605
Sacramento, CA 95814

Dear Ms. Buzzini,

There are many vacancies in the physician and surgeon classification in CDCR. The Union of American Physicians and Dentists supports the actions of CDCR receiver Mr. Bob Sillen to increase the salaries of the physicians in the department to substantially improve the recruitment and retention of physicians.

Kaiser in Southern California is currently hiring primary care physicians at $180,000 per year. Kaiser has a fringe benefit package comparable to that of the State of California. The California Department of Corrections and Rehabilitation, because of its difficult work locations and poor reputation as an employer, must pay doctors substantially more than $180,000 per year in order to fill its vacancies. The UAPD looks forward to working with the receiver to ensure that pay raises are compatible with the collective bargaining agreement and sufficient to solve the serious staffing problem.

Sincerely yours,

Gary Robinson
Executive Director

PL-002.056

# EXHIBIT 13

PL-002.057

# CALIFORNIA CORRECTIONAL SUPERVISORS ORGANIZATION

1461 Ulrey Avenue ~ Escalon, CA 95320
ccso@charterinternet.com ~ www.ccsonet.org
(800) 446-2940 ~ (209) 838-2940
Fax: (209) 838-6799 ~ 24 HR. Information Line: (888) 904-6100

August 22, 2006

Robert Sillen
California Prison Health Care Receivership
501 J Street, Suite 605
Sacramento, CA 95814

Dear Mr. Sillen:

The California Correctional Supervisors Organization (CCSO) is a labor organization that represents excluded employees in the California Department of Corrections and Rehabilitation (CDCR). CCSO membership is comprised of supervisors and managers working in all areas of CDCR. Currently, CCSO represents approximately 40% of supervising nurses and is rapidly welcoming into this Organization various medical supervising and managerial employees (pharmacists, dentist, etc.).

CCSO does not have collective bargaining rights, as we do not represent rank and file employees. CCSO does not negotiate contracts, and can only meet and confer with the Department of Personnel Administration to recommend enhanced wages, benefits and working conditions for CDCR supervisors and managers.

To date the DPA meet and confers regarding medical personnel in CDCR have been to no avail. The wages for CDCR medical employees is well below the salaries given in the private sector. Working within a prison environment is stressful and dangerous and if CDCR expects to recruit qualified medical personnel, salaries and benefits must be raised.

The California Correctional Supervisors Organization strongly supports Receiver Sillen's long awaited RN salary increases along with the pay increases for various other clinical classifications (see attached).

Cordially,

Richard Tatum
CCSO State President

Copy to:     Linda Buzzini, Counsel to the Receiver
             CCSO State Board
             CCSO Pat Le Sage, Chief Operations & Financial Officer
Enclosure

PL-002.058

# EXHIBIT 14



**Association of**
# CALIFORNIA STATE SUPERVISORS
Representing the "State's Management Team"

August 30, 2006

Robert Sillen
Receiver
501 J St., Suite 605
Sacramento, Calif. 95814

Attention: Linda Buzzini

Dear Mr. Sillen:

On behalf of the members of my organization, I would like to formally support your recommendations for staffing improvements and salary adjustments for the California Department of Corrections and Rehabilitation.

ACSS has agreed to the salary increases you have proposed; therefore, we find there are no reasons why the Department of Personnel Administration should not immediately implement those salary increases.

To provide you information about the Association of California State Supervisors, we are a 6,000-member volunteer organization whose members are managers, supervisors, confidential and exempt employees in California state service. ACSS serves the individual and collective interests of our members by educating the State's elected leaders about the issues and concerns of over 30,000 excluded employees who comprise the "State's Management Team." ACSS also participates in meet and confer sessions with DPA to discuss all matters relating to employment conditions, wages, hours and terms for our members.

I thank you for your thorough examination of the CDCR problems with staffing and salary levels and concur with your final recommendations.

Respectfully,

Tim Behrens
President

1100 O Street, Suite 205    |    Sacramento, California    |    95814
Toll-free (800) 624-2137  |  (916) 326-4257  |  Fax (916) 326-4340  |  Web www.ACSSonline.org

PL-002.060

# EXHIBIT 15

PL-002.061



# OFFICE OF THE GOVERNOR

August 30, 2006

Mr. Robert Sillen
Receiver
Office of California Prison Receivership
1731 Technology Drive, Suite 700
San Jose, California 95110

Dear Mr. Sillen,

I am taking this opportunity to write you in an effort to bring resolution to a request made by the Office of the Receiver to increase various medical salaries for employment classes impacted by Plata v. Schwarzenegger.

I understand your staff has been in communications with various state agencies in an attempt to determine whether or not the administration could legally increase salaries without a direct order by the court. If a determination were made that legal impediments prevented the administration from doing so, you asked to be provided with a basis for this determination. Conversely, if a determination were made that the administration could legally increase salaries for various employment classes under Plata, it is my understanding that you wanted to know if the state was willing to do so.

It is in this context that I provide the following response:

In her letter of August 25, Ms. Hoch presents to the Office of the Receiver, a legal analysis questioning the administration's authority to unilaterally increase the salaries of identified classes impacted by Plata in a timely manner. The essence of the analysis is that moving forward with implementing your request unilaterally, without the benefit of a court order, is uncertain at best and brings with it risks and challenges that may not be easily overcome.

It is the conclusion of the administration that these legal questions and uncertainties could easily be averted if the Court were to issue an order directing the salary changes. If such an order were to be drafted and issued by the Court, the administration stands ready to offer its assistance, technical or otherwise, to successfully implement the order.

Notwithstanding this decision, the complications and uncertainties identified for represented employees by Ms. Hoch do not, however, impact our authority to adjust salaries for certain excluded employees. These incumbents are not part of a collective bargaining agreement and they are exempt from other various civil service protections provided under current law.

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

PL-002.062

Mr. Robert Sillen
August 30, 2006
Page two

For this reason, the administration is prepared to comply with your prior request to adjust the salaries of the following positions:

- Regional Director of Nursing, Central
- Regional Director of Nursing, North
- Regional Director of Nursing, South
- Statewide Director of Nursing
- Director, Division of Correctional Health Care Services
- Statewide Medical Director
- Assistant Deputy Director, HCSD
- Chief Deputy Clinical Services
- Chief Physician
- Chief Surgeon

The documents accompanying the Office of the Receiver's original request for salary increases indicated a range of salaries, but did not specifically direct a salary level within the requested range. If the Office of the Receiver desires to have the salaries adjusted for current incumbents holding these limited number of exempt positions, please provide written instructions regarding the salary you wish to be granted to these incumbents.

For those positions listed which are currently vacant, please provide written confirmation of the salary range you desire. This information will be helpful in recruitment documents currently being developed by the California Department of Corrections and Rehabilitation and the Governor's Office. The administration is committed to working with the Office of the Receiver in identifying qualified candidates. However it is important to note that these positions are gubernatorial appointments and as such, necessitate an enhanced level of candidate evaluation and review. Further, appointments into exempt positions do require the concurrence of the Governor's Office.

I want to reiterate my desire to assist and respond to your concerns. Together, I am confident we can work to bring lasting reform to our prison system.

Regards,

*Fred Aguiar*
Fred Aguiar
Cabinet Secretary

cc: Dr. Peter Farber-Szekrenyi, Ph.D.
    Secretary James Tilton, CDCR
    Mr. Dave Gilb, Director of DPA
    Ms. Susan Kennedy, Chief of Staff
    Mr. Mike Genest, Director of Finance
    Ms. Andrea Lynn Hoch, Legal Secretary

PL-002.063

1    **PROOF OF SERVICE BY MAIL**

2      I, Kristina Hector, declare:

3      I am a resident of the County of Alameda, California; that I am over the age of eighteen (18) years
of age and not a party to the within titled cause of action.  I am employed as the Inmate Patient
4    Relations Manager to the Receiver in Plata v. Schwarzenegger.

5      On September 12, 2006 I arranged for the service of a copy of the attached documents described
as APPENDIX OF EXHIBITS SUPPORTING RECEIVER'S MOTION FOR WAIVER OF STATE
6    LAW on the parties of record in said cause by sending a true and correct copy thereof by pdf and by
United States Mail and addressed as follows:

7

8    ANDREA LYNN HOCH
Legal Affairs Secretary
9    Office of the Governor
Capitol Building
10   Sacramento, CA 95814

11   PETER FARBER-SZEKRENYI, DR., P.H.
Director
12   Division of Correctional Health Care Services
CDCR
13   P.O. Box 942883
Sacramento, CA 94283-0001

14   J. MICHAEL KEATING, JR.
285 Terrace Avenue
15   Riverside, Rhode Island 02915

16   JONATHAN L. WOLFF
Deputy Attorney General
17   455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

18
STEVEN FAMA
19   DON SPECTER
ALISON HARDY
20   Prison Law Office
General Delivery
21   San Quentin, CA 94964-0001

22   PAUL MELLO
JERROLD SCHAEFER
23   Hanson Bridgett
425 Market Street, 26th Floor
24   San Francisco, CA 94105

25   BRUCE SLAVIN
General Counsel
26   CDCR-Office of the Secretary
P.O. Box 942883
27   Sacramento, CA 94283-0001

28

1    KATHLEEN KEESHEN
     Legal Affairs Division
2    California Department of Corrections
     P.O. Box 942883
3    Sacramento, CA 94283

4    RICHARD J. CHIVARO
     JOHN CHEN
5    State Controller
     300 Capitol Mall, Suite 518
6    Sacramento, CA 95814

7    MOLLY ARNOLD
     Chief Counsel, Department of Finance
8    State Capitol, Room 1145
     Sacramento, CA 95814
9
     LAURIE GIBERSON
10   Staff Counsel
     Department of General Services
11   707 Third Street, 7th floor, Suite 7-330
     West Sacramento, CA 95605
12
     MATTHEW CATE
13   Inspector General
     Office of the Inspector General
14   P.O. Box 348780
     Sacramento, CA 95834-8780
15
     DONNA NEVILLE
16   Senior Staff Counsel
     Bureau of State Audits
17   555 Capitol Mall, Suite 300
     Sacramento, CA 95814
18
     WARREN C. (CURT) STRACENER
19   PAUL M. STARKEY
     Labor Relations Counsel
20   Department of Personnel Administration
     Legal Division
21   1515 "S" Street, North Building, Suite 400
     Sacramento, CA 95814-7243
22
     GARY ROBINSON
23   Executive Director
     UAPD
24   1330 Broadway Blvd., Suite 730
     Oakland, CA 94612
25
     YVONNE WALKER
26   Vice President for Bargaining
     CSEA
27   1108 "O" Street
     Sacramento, CA 95814
28

1   PAM MANWILLER
    Director of State Programs
2   AFSME
    555 Capitol Mall, Suite 1225
3   Sacramento, CA 95814

4   RICHARD TATUM
    CSSO State President
5   CSSO
    1461 Ullrey Avenue
6   Escalon, CA 95320

7   TIM BEHRENS
    President
8   Association of California State Supervisors
    1108 O Street
9   Sacramento, CA 95814

10      I declare under penalty of perjury under the laws of the State of California that the foregoing is
    true and correct. Executed on September 12, 2006 at San Francisco, California.

11

12

13      Kristina Hector

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

**PLAINTIFF'S EXHIBIT**

CASE NO. 2:90-cv-520-KJM-DB

EXHIBIT NO. PL-003



ORIGINAL FILED

2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA, et al.,

                Plaintiffs,

    v.

ARNOLD SCHWARZENEGGER, et al.,

                Defendants.

NO. C01-1351 TEH

CLASS ACTION

ORDER RE: RECEIVER'S MOTION
FOR A WAIVER OF STATE LAW

       This matter comes before the Court on the Receiver's Motion for a Waiver of State Law, filed September 12, 2006.  Pursuant to this Court's Order of September 15, 2006, the parties filed their responses to the Receiver's Motion on September 26, 2006.[1]  No party has objected to the Receiver's motion although the State has requested certain clarifications.

---

     [1] On September 14, 2006, Defendants filed a "Request for Procedure Re Motions By the Receiver."  The motion summarily requests that the Court set forth "briefing schedules so that parties, and other organizations noticed by the Receiver, have the opportunity to comment, support, object, and, when appropriate, submit evidence in support of their positions regarding motions filed by the Receiver." Request at 1-2.  The Court set such a schedule for the instant motion in its Order of September 15, 2006.  With respect to any future motions, the Court already addressed this issue in its February 14, 2006 Order Appointing Receiver.  Defendants fail to address this Order or otherwise explain why the Court should deviate from it at this juncture.  The Court further notes that since the circumstances surrounding future motions may vary, there is no apparent advantage to imposing a specific briefing schedule or procedure in advance.  Accordingly, the request for a standardized process is denied. The parties can be assured, however, that they will always be afforded, as requested, a full opportunity to "comment, support, object, and, when appropriate, submit evidence in support of their positions regarding motions filed by the Receiver."

Having carefully considered the Receiver's Motion, the parties' responses, and the entire record herein, the Court grants the requested waiver with certain clarifications as set forth below.

I. BACKGROUND

In February 2006, this Court appointed a Receiver to take control of the delivery of medical services for prisoners confined in California state prisons. The Court took this extraordinary step of last resort because the State's conceded inability to discharge its constitutional obligations has led to such a crisis in the delivery of medical care in California state prisons that, on average, "one inmate needlessly dies every six to seven days due to constitutional deficiencies." *See* October 3, 2005 Findings of Fact and Conclusions of Law Re Appointment of Receiver at 1. It is also uncontested that the crisis is due, in significant part, to the chronic failure of the California Department of Corrections and Rehabilitation ("CDCR") to adequately staff clinical positions at California state prisons – positions which are often situated in remote locations and/or present a far more challenging work environment than presented by other employment opportunities. For example, in June 2005, the Court heard undisputed testimony that clinical vacancies "plague" the CDCR; that any efforts to address the issue become mired in bureaucracy; that compensation levels for medical staff are "simply too low"; and that the CDCR's own study shows that it paid registered nurses 20-40 % below market, and some of its supervising nurses up to 57 % below market. *Id*. at 17.

By November 2005, the staffing crisis had worsened. *See* Correctional Expert's November 14, 2005 Report re Clinical Staff. In December 2005, this Court concluded that Defendants still failed to grasp the gravity of the situation and were "content to invoke bureaucratic red tape and 'business as usual' procedures as roadblocks to reform." *See* Dec. 1, 2005 Order at 1. Accordingly, the Court ordered Defendants to, *inter alia*, streamline their hiring processes and implement certain salary differentials as an interim measure pending

2

1  appointment of the Receiver.  The Court explained, however, that the Receiver would have

2  the option of modifying the differentials or making other structural changes to compensation

3  if necessary. *Id*. at 3.

4          Since the effective date of his appointment in April 2006, the Receiver has undertaken

5  a thorough review of (1) the adequacy of clinical staffing within CDCR institutions as well

6  as in its headquarters in Sacramento, California, and (2) the adequacy of compensation

7  provided to clinical personnel essential to the adequate delivery of medical services in CDCR

8  institutions.  *See* Receiver's Motion for Waiver of State law at 3.  This review revealed,

9  among other things, that, as of July 31, 2006, CDCR institutions had a 20% vacancy rate

10 statewide for primary care positions, and that this rate increased to 30% at six prisons, 50% at

11 two prisons, and 90% at one.  It also showed that while nursing vacancy rates declined from

12 39% in November 2005 to 15% in March 2006, due to the differentials ordered by the Court

13 in December 2005, that the vacancy rate since then has remained steady, and is as high as

14 51% in the San Francisco Bay Area. *Id*. at 4-5.[2]  Other critical clinical positions are also

15 severely understaffed.  For example, 39-42 % of pharmacy staff, 44% of Radiological

16 Technicians, and 63% of Clinical Dietician positions remain vacant.  None of these findings

17 are disputed by Defendants. *See* Receiver's Mot. at 5.

18         Nor do Defendants dispute the fact that the CDCR's current salary structure lags

19 significantly behind that available to clinicians in other settings.  The CDCR's own survey,

20 for example, shows that the median salary for pharmacists in the public sector is

21 43% higher (and in the San Francisco Bay Area, 54% higher) than that paid to CDCR

22 pharmacists. *See*  Receiver's Mot. at 7.  Nor do Defendants dispute that its current salary

23 structure has made it impossible overcome its chronically high vacancy rates and to attract

24

25

26

27

28

_____

[2] Three institutions lie within the San Francisco Bay Area: San Quentin State Prison, Salinas Valley State Prison, and the Correctional Training Facility at Soledad.

3

*United States District Court*
*For the Northern District of California*

and retain sufficient numbers of qualified clinicians to bring its medical health care system up to constitutional standards.

Because Defendants are consistently unable to fill their clinical positions they have been forced to rely upon short-term contract personnel and Registries (who provide short-term personnel) as a stop-gap method of providing partial coverage for vacant positions. This approach has not only proven extremely costly for the State[3] but it also prevents Defendants from providing the continuity of care that is critical to providing constitutionally adequate medical services to California's inmates, particularly given that the roughly 170,000 plus inmate population now includes many older inmates and inmates who suffer from chronic and long-term diseases. As Jane Robinson, CDCR's Regional Director of Nursing, states "[c]onsistency in nurse-patient interactions is the foundation for a professional, therapeutic relationship." *See* Receiver's Mot., Ex. 5 (Robinson Dec.) at 1-2; *id.* Ex. 4 (Hill Dec.) at 1 ("Continuity of care is a fundamental aspect of any medical care delivery system.").

After completing his review of the CDCR's staffing patterns and compensation for clinicians, the Receiver made the following findings:

> 1. Staffing levels in CDCR institutions are so inadequate that the remedial programs necessary to bring prison medical care up to constitutional levels clearly cannot begin to be implemented without significant increases in clinical personnel.
>
> 2. The programs and services needed to provide constitutionally adequate care to prisoner/patients with chronic diseases, health problems that involve both medical and mental health issues, and

---

[3] Registry and contract personnel cost the State substantially more than full-time state employees. For example, CDCR pays approximately $67 per hour for contract nurses while its civil service nurses cost approximately $49 per hour including benefits. *See* Receiver's Mot. at 6 and n. 7. CDCR also reports paying an average of $170 per hour for contract primary care providers while its permanent physicians make approximately $80 per hour. *Id.* at 8. For just the fiscal year 2005-06, the CDCR spent approximately $90 million for contract and registry personnel. *Id.* at 8. The Receiver has also found that the pay differentials between contract and state employees leads to friction between temporary and permanent employees which detracts from the institution's ability to provide effective medical care. *Id.* at 8.

4

PL-003.004

United States District Court
For the Northern District of California

long-term and aging issues clearly cannot begin to be implemented until California prisons stop relying upon short-term registry personnel and commence the hiring of adequate numbers of permanent full time State employees.

3. The salaries offered by the State to applicants for clinical positions in its prisons are so low that the prison system is unable to hire and retain an adequate number of qualified clinical personnel at all clinical levels, including physicians, mid-level practitioners, registered nurses, licensed vocational nurses, pharmacists and other necessary professions. To remedy this problem, salary increases are necessary as an initial step to begin to correct the health care delivery crisis in California's prisons.

*Id*. at 3-4. Defendants do not dispute any of these findings.

In light of these findings, the Receiver developed adjusted salary ranges for CDCR clinicians that are more consistent with those paid by the State to clinicians employed at hospitals operated by the University of California health care system. *See* Receiver's Mot., Ex. 6. The Receiver and his staff then spent several weeks discussing this matter with Defendants and the relevant state agencies. Defendants did not dispute either the reasonableness of the recommended salary ranges or the necessity of implementing them promptly. They declined, however, to unilaterally implement them because of questions regarding constraints imposed upon them by state law. *See* Receiver's Mot., Ex. 7 (Letter from Paul Starkey, Labor Relations Counsel for Department of Personnel Administration ("DPA"), Ex. 9 (Letter from Andrea Hoch, Legal Affairs Secretary to the Governor), Ex. 15 (Letter from Fred Aguiar, Cabinet Secretary to the Governor). Defendants also indicated that while the State would have the "*authority* to implement the salary increases for represented employees *if bargaining was successful* . . . we cannot say for certain right now that the State *would* implement the proposed salary increases for represented employees in the time frame envisioned by the Receiver." *See id*. at Ex. 9 at 4 (emphasis in original and added).

Although Defendants concluded that they could not implement the recommended salary adjustments promptly on their own, they invited the Receiver to request a waiver of those state laws that posed obstacles to making the recommended salary adjustments in a timely fashion, and offered to assist the Receiver in their implementation:

5

> The essence of the [Defendants' position] is that moving forward with implementing [the Receiver's request unilaterally, without the benefit of a court order is uncertain at best and brings with it risks and challenges that may not be easily overcome. It is the conclusion of the administration that these legal questions and uncertainties could easily be averted if the Court were to issue an order directing the salary changes. If such an order were to be drafted and issued by the Court, the administration stands ready to offer its assistance, technical or otherwise, to successfully implement the order.

*See* Receiver's Mot., Ex. 9 (Aguiar letter) at 1. Accordingly, the Receiver subsequently filed the instant Motion for Waiver of State Law. The Motion requests that the Court waive the following state requirements so as to permit the Receiver to "direct the implementation, adjustment and administration of the proposed salaries and structural changes to the pay system" attached to his motion as Exhibit 6. *See* Receiver's Mot. at 14 and Ex. 6.[4]

Government Code Sections:

| | |
|---|---|
| Section 19816 | (vesting DPA with duties, purposes, responsibilities and jurisdiction with respect to the administration of salaries for civil service and exempt employees). |
| Section 19826 | (designating DPA as the agency responsible for establishing and adjusting salary ranges for civil service classifications). |
| Section 19829 | (requiring DPA to provide for intermediate steps with salary ranges which govern the extent of the salary adjustment an employee may receive at any one time, and providing for DPA to establish more than one salary range or rate or method of compensation within a classification). |
| Section 19832 | (authorizing DPA to set standards of efficiency applied for purposes of granting employees annual merit salary adjustments, as implemented through California Code of Regulations, title 2, section 599.683). |
| Section 19836 | (vesting DPA with authority to approve payment of salaries at any step above the minimum of the salary range for recruitment purposes; to obtain persons with extraordinary qualifications or as credit for prior State service). |

---

[4] The job classifications affected are: Nursing Services, Pharmacy Services, Medical Transcriptionists, Radiology, Laboratory Services, Dietary Services, Health Records, Mid-Level Practitioners (Nurse Practitioners and Physician Assistants), Podiatrist, Physicians, Chief Medical Officers and managerial positions within CDCR's Health Care Services Division).

6

| | |
|---|---|
| Section 3516.5 | (requiring DPA to provide written notice to employee unions, and provide them an opportunity to meet and confer (bargain) when there is a change that falls within the scope of representation (e.g., wages)). |
| Section 3517 | (requiring the Governor or his representative (DPA) to bargain in good faith regarding wages, hours and other terms and conditions of employment prior to arriving at a determination of policy or course of action). |

California Code of Regulations

| | |
|---|---|
| Title 2, § 599.681 | (setting forth the methodology for determining salaries when employees move between ranges in the same classification). |

## II. DISCUSSION

In its February 14, 2006 Order Appointing Receiver the Court stated that the "Receiver shall make all reasonable efforts to exercise his powers, as described in this Order, in a manner consistent with California state laws, regulations, and contracts, including labor contracts." *Id.* at Section II (D). The Court further provided, however, that the Receiver could request a waiver of state law in the event such waiver became necessary and other alternatives were inadequate:

> In the event, however, that the Receiver finds that a state law, regulation, contract, or other state action or inaction is clearly preventing the Receiver from developing or implementing a constitutionally adequate medical health care system, or otherwise clearly preventing the Receiver from carrying out his duties as set forth in this Order, and that other alternatives are inadequate, the Receiver shall request the Court to waive the state or contractual requirement that is causing the impediment.

*Id.*

In his motion, the Receiver questions Defendants' assertion that state law requirements prevent them from implementing the proposed salary adjustments in a timely manner. Defendants' position, he suggests, may instead just be yet another example of the State's inability to break out of its "business-as-usual" bureaucratic frame of mind and invoke its full authority to address the constitutional violations at issue. Specifically, the Receiver notes that at least some of the statutes invoked by Defendants may present less of a

7

United States District Court
For the Northern District of California

barrier than suggested.  For example, while California Government Code § 3517 requires the Governor or his representative to meet and confer in good faith with recognized employee organizations regarding wages and other terms and conditions of employment, this requirement can, as DPA acknowledges, be waived by the employee organization. *See* Receiver's Mot., Ex. 7 (Letter from counsel for DPA explaining that salaries must be negotiated prior to implementation "absent waiver").   Yet DPA never made any effort to obtain such waivers.  Given that the Receiver obtained letters endorsing the recommended salary adjustments from all affected bargaining units, it appears likely that DPA could  have obtained such waivers had the effort been made. *See* Receiver's Mot. at 13, and Exs. 10-14.

In their response to the Receiver's motion, Defendants do not discuss any of the statutes at issue.  Rather, they simply reaffirm their support for the proposed salary adjustments and the need for a waiver given the requirements of California law. *See* Defs.' Response at 1-2 ("Specifically, Defendants confirm that they support the salary increases requested in the Receiver's Motion.  Although Defendants have explained that they are not able to proceed as quickly as the Receiver desires in effectuating the salary increases because Defendants must comply with the requirements of California law, Defendants recognize the need to move faster and they support the Receiver's request for a waiver of certain state law in this particular instance.").  Plaintiffs also filed a response supporting the Receiver's request for a waiver.

Having carefully considered this matter, the parties' responses, and the record herein, the Court concludes that the standard set forth in this Court's February 14, 2006 Order is satisfied, and therefore the requested waiver should be granted in this instance.

First, regardless of whether Defendants could arguably take the position that it has the authority to unilaterally implement the salary adjustments at issue in a timely manner without running afoul of any state law, the critical point is that they have not taken this position.  Instead, they clearly refuse to take any action to implement the salary adjustments in the time frame requested by the Receiver, invoking state law requirements.  Defendants' position –

8

United States District Court
For the Northern District of California

1  and inaction – has thus required the Receiver to seek relief from this Court in order to

2  implement the salary adjustments. In fact, Defendants have expressly invited the requested

3  waiver.

4          Second, there is no doubting – and no party disputes – that the on-going crisis existing

5  with respect to the delivery of medical care in California state prisons is costing lives on a

6  weekly basis. Thus, the Court can not, consistent with its jurisprudential obligations, permit

7  the State to attempt to address the issue of inadequate salaries through normal collective

8  bargaining channels – which would take months if not years – when lives are unnecessarily

9  being lost. Moreover, the Court has zero confidence that the State would succeed in

10 adequately raising salaries through the normal collective bargaining process since it has

11 already had this opportunity and failed. For example, despite the State being fully aware of

12 the salary issues discussed in this Order, and despite a CDCR study finding pharmacy

13 salaries 43% below the public sector market, it recently concluded an agreement that raised

14 pharmacy position salaries by only 3.5%. *See* Receiver's Mot. at 7. Accordingly, the Court

15 does not view reliance on the normal collective bargaining process as a viable alternative to a

16 waiver in this instance.

17         Third, it is similarly clear that the alternative of using short-term contract and registry

18 personnel is not a reasonable alternative. Indeed, as the record in this case makes all too

19 painfully clear, Defendants' practice of relying heavily on such personnel to at least partially

20 reduce the vacancy rate and deliver a constitutionally adequate system of medical care has

21 been an abject failure, and as noted above, a costly exercise. Further, as the Receiver has

22 found, and no party disputes, "[t]he programs and services needed to provide

23 constitutionally adequate care to prisoner/patients with chronic diseases, health problems that

24 involve both medical and mental health issues, and long-term and aging issues clearly cannot

25 begin to be implemented until California prisons stop relying upon short-term registry

26 personnel and commence the hiring of adequate numbers of permanent full time State

27 employees." *See* Receiver's Mot. at 3.

28

9

United States District Court
For the Northern District of California

1    Finally, the Court notes that the history of this case demonstrates that salary increases

2    can effectively address the high vacancy rates that have chronically plagued the CDCR's

3    ability to attract and retain qualified medical clinicians. As noted above, the interim salary

4    differential applied to nurses in December 2005 has been credited with reducing the vacancy

5    rate from 39% to 15% in a matter of months.

6    In sum, and given all of the above, the Court makes the following findings, which as

7    discussed above, are essentially undisputed:

8    1.  The recommended salary adjustments are appropriate and necessary to attract and

9    retain qualified permanent, full-time, clinical employees within the CDCR, and without such

10   adjustments Defendants will be unable to address their chronically high vacancy rates in the

11   area of medical health care.

12   2.  Satisfactorily addressing the chronically high vacancy rates within CDCR's health

13   care division is a necessary predicate to achieving a constitutionally adequate medical health

14   delivery system.

15   3.  Defendants have been given every opportunity to address this issue in a timely

16   manner and are unable or unwilling to remedy the chronically high vacancy rates on their

17   own and this inaction is clearly preventing the Receiver from developing or implementing a

18   constitutionally adequate medical health care system and otherwise carrying out his duties as

19   set forth in this Court's February 14, 2006 Order.

20   4.  The requested waiver, as invited by Defendants, is necessary because there are no

21   adequate alternatives that have been presented to the Court.

22   In light of these findings the Court concludes that the Receiver has satisfactorily

23   demonstrated that he has satisfied the standard for obtaining a waiver set forth in this Court's

24   February 14, 2006 Order.  Specifically, he has shown that he has  "made all reasonable

25   efforts to exercise his powers . . . in  a manner consistent with California state laws" but that

26   a "state law" or "state inaction" is "clearly preventing him from developing or implementing

27

28

10

1    a constitutionally adequate medical health care system" and that "other alternatives are

2    inadequate." *See* February 14, 2006 Order at Section II (D).

3

4         Accordingly, and good cause appearing, it is HEREBY ORDERED that:

5         1. The following state law requirements shall be waived *for the sole and limited*

6    *purpose* of enabling the Receiver to direct the implementation, adjustment, and

7    administration of the proposed salaries and structural changes to the pay system set forth in

8    Exhibit 6 to the Receiver's Motion for Waiver:

9

10        California Government Code Sections: 19816, 19826, 19829, 19832, 19836, 3516.5, 3517.

11        California Code of Regulations:        Title 2, section 599.681

12   In granting this limited waiver, the Court clarifies that such waiver is not intended to relieve

13   Defendants or the State of any of their duties and responsibilities under California law,

14   including the obligation to collectively bargain regarding salaries.

15        2.  Defendants shall cooperate fully with the Receiver concerning the implementation,

16   administration, and adjustments of the salary ranges established by the Receiver in Exhibit

17   6.[5]

18        3.  The Court further finds, pursuant to 18 U.S.C. § 3626 (a) (1), that the above

19   remedy is narrowly drawn to remedy the constitutional violations at issue, extends no further

20   than necessary to correct a current and ongoing violation of a federal right, and is the least

21   intrusive means necessary to correct these violations.  The Court also is amply satisfied that

22

23

24

25

26

27        [5]  As Defendants have expressly affirmed their commitment to the prompt implementation of the proposed adjustments, and the remedial process in the case in general,

28   the Court does not anticipate any problems in this regard.

11

United States District Court
For the Northern District of California

PL-003.011

United States District Court
For the Northern District of California

1 | this relief will impose no unnecessary burden on defendants and will have no adverse impact

2 | on either the safety of the public or the operation of the criminal justice system.[6]

3

4 | As noted above, Defendants seek two "clarifications" with respect to the Receiver's

5 | motion which the Court will now address. First, they raise the concern that if the waiver only

6 | "applies to" the Receiver, then State employees will not be able to assist the Receiver in

7 | implementing the salary adjustments. This confusion arises because the Receiver's motion

8 | suggests that the waiver would apply only to the Receiver. This language was only used,

9 | however, in an effort to emphasize that the waiver is *not*, as explained above, intended to

10 | relieve Defendants or the State of its usual collective bargaining obligations under the

11 | statutes at issue. The waiver does not, however, in fact, attach to particular persons; rather,

12 | the waiver attaches to the statute for the limited purpose of the waiver. Thus, any state

13 | employee will be fully able to assist the Receiver in implementing the proposed salary

14 | adjustments, set forth in Exhibit 6, and such actions shall be governed by the waiver granted

15 | herein. In fact, as noted above, the Court has specifically directed Defendants to cooperate

16 | in this endeavor.

17 | Second, Defendants request that the Court clarify that the requested waiver not be

18 | ongoing but of limited duration. The Court agrees that while an "on-going waiver" might

19 | prove more efficient in the event that the Receiver determines that additional salary

20 | modifications are necessary, it does not sufficiently maintain the balance required by Section

21

22 | _____

23

24 | [6] The Prison Litigation Reform Act also provides that a Court can not order any prospective relief that requires or permits a government official to exceed his or her authority under State law unless certain findings can be made. *See* 18 U.S.C. § 3626 (B). The Court

25 | concludes that the standard set forth in paragraph II (D) of the Court's February 14, 2006 Order is consistent with findings required under § 3626(B), and that the findings set forth

26 | above are sufficient to comply with this section. In an abundance of caution, however, the Court also expressly finds that (1) federal law requires the relief ordered herein because it is

27 | necessary to cure the constitutional violations at issue, (2) the relief ordered herein is necessary to correct the violation of a federal right, and (3) no other relief will correct the

28 | violation of the federal right at issue.

12

United States District Court
For the Northern District of California

1  II(D) of the Court's February 14, 2006 Order. Accordingly, the Court declines the

2  Receiver's request to make the waiver "on-going."

3          In the event that the Receiver determines that additional salary modifications are

4  necessary to achieve a constitutionally adequate medical health care system, the Receiver

5  shall meet and confer with the parties. In the event that the parties agree that all of the

6  requirements of section II.D of the Court's February 14, 2006 Order continue to be satisfied,

7  the Receiver may submit a stipulation to this effect in lieu of the motion required by this

8  section. If, however, disputes remain, the Receiver shall proceed with the procedure set forth

9  in the February 14, 2006 Order. [7]

10

11  IT IS SO ORDERED.

12

13  Dated: October 17, 2006

                                THELTON E. HENDERSON
14                              UNITED STATES DISTRICT JUDGE

15

16

17  _____

18

19          [7] As a final comment, Defendants reference a letter from counsel for the Department
    of Finance which discusses potential impacts from a waiver and asks the Court to "consider
20  these matters when ruling on the Receiver's motion." *See* Defs.' Response at 4. Defendants'
    purpose in making this comment is unclear since Defendants have otherwise expressly
21  confirmed their support of the Receiver's motion and requested salary increases.
    In any event the Court has considered the letter which raises two primary points. First, it
22  raises the concern that employees from other agencies may seek employment with the CDCR
    shortly before they intend to retire in an attempt to increase their retirement benefits which
23  would have a fiscal impact for the State. The Court is confident, however, that the Receiver
    can adequately screen out such persons during the application and hiring process and is
24  specifically directed by way of this Order to make all reasonable efforts to do so. Further, if
    the Department of Finance is truly concerned that the issue is of sufficient magnitude to
25  justify some type of intervention, it can seek a legislative remedy. Second, the letter raises
    the concern that employees may leave other state agencies to work at the CDCR in such
26  numbers that it could adversely affect those agencies. The Court, however, can not subjugate
    its obligations to remedy constitutional violations – violations that involve, in this instance,
27  issues of life and death – because of speculative impacts on other agencies not under court
    order. Again, however, if this becomes a serious concern the Department of Finance can
28  work with the legislature to address this broader governmental issue.

13

PL-003.013

# EXHIBIT D

1  FUTTERMAN & DUPREE LLP
   MARTIN H. DODD (104363)
2  JAMIE L. DUPREE (158105)
   160 Sansome Street, 17th Floor
3  San Francisco, California 94104
   Telephone: (415) 399-3840
4  Facsimile: (415) 399-3838
   martin@dfdlaw.com

5
   *Attorneys for Receiver*
6  J. Clark Kelso

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

11  MARCIANO PLATA, et al.,              Case No. C01-1351 TEH

12          *Plaintiffs,*               ~~[PROPOSED]~~ **ORDER GRANTING**
                                        **RECEIVER'S APPLICATION FOR**
13      v.                              **ORDER WAIVING STATE STATUTES,**
                                        **REGULATIONS AND PROCEDURES**
14  ARNOLD SCHWARZENEGGER, et al.,      **REGARDING SALARY GRIDS FOR**
                                        **RECEIVER CAREER EXECUTIVE**
15          *Defendants.*               **ASSIGNMENTS**

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S
EXHIBIT

CASE NO. 2:90-cv-520-KJM-DB

EXHIBIT NO. PL-005

FUTTERMAN &
DUPREE LLP

1      The Receiver submitted his Application for an order waiving a number of State statutes

2  and regulations governing the administration of salaries for executives hired into certain Receiver

3  Career Executive Assignment ("RCEA") classifications to permit the Receiver to implement

4  compensation grids with respect to RCEA classifications.  The Court has considered the

5  Application, and finds that implementation of such salary grids for RCEA classifications is

6  necessary to permit the Receiver to bring the prison medical care system up to constitutional

7  standards and furthers the goals of this Court's Orders dated July 3, 2007 and September 11,

8  2007 (Docket ## 758 and 827), that the Department of Personnel Administration ("DPA") does

9  not oppose the Application, that the statutes and regulations which are the subject of the

10  Application are clearly preventing the Receiver from carrying out his duty to bring the prison

11  medical care system up to constitutional standards and that no adequate alternatives under State

12  law exist.  In addition, Plaintiffs and Defendants were given an opportunity to file objections to the Receiver's application, and no objections were received.

13      Accordingly,

14      IT IS HEREBY ORDERED that the following State statutes and regulations and

15  procedures are waived with respect to implementation of the proposed salary grids:

16      Cal. Gov't Code § 19826 (only to the extent that it grants DPA the power to set salaries

17  within prescribed ranges);

18      Cal. Gov't Code § 19829 (establishing requirements for salary ranges);

19      Cal. Gov't Code § 19832 (governing yearly increases);

20      Cal. Gov't Code § 19834 (providing for automatic salary adjustments);

21      Cal. Gov't Code § 19835 (providing for right to automatic salary adjustments);

22      Cal. Gov't Code § 19836 (authorizing DPA to make salary adjustments);

23      2 Cal. Code Regs. § 599.679 (governing employee retention of salary above maximum

24  when moving between classes);

25      2 Cal. Code Regs. § 599.680 (governing termination of salary above maximum);

26      2 Cal. Code Regs. § 599.682 (governing qualifying service for salary adjustments);

27      2 Cal. Code Regs. § 599.683 (governing yearly increases); and

28      2 Cal. Code Regs. § 599.685 (governing in-grade salary increases).

1

FUTTERMAN &
DUPREE LLP

[PROPOSED] ORDER RE RECEIVER'S RECEIVER'S WAIVER APPLICATION RE RCEA SALARY GRIDS
CASE NO. C01-1351 TEH

1      IT IS SO ORDERED.

2

3  Dated: _11/03_ , 2008.

Hon. Thelton E. Henderson
United States District Judge

Judge Thelton E. Henderson

2

# EXHIBIT E

# APPENDIX 1



**PLAINTIFF'S EXHIBIT**

CASE NO. 2:90-cv-520-KJM-DB

EXHIBIT NO. PL-013

PL-013.001



**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**
**Primary Care Provider Vacancy / Coverage Report**
**May 01, 2023**

| Institution | Total Authorized Positions at Institutions | Telemedicine Positions Redirected from Institutions | Total Authorized Positions | Filled with PCP Onsite (No Telemed) | % Filled by Civil Service Onsite | Civil Service Vacancies Onsite | TM Budgeted by Institution | Telemedicine Coverage | % Filled by Civil Service & Telemedicine | Civil Service Vacancies | Filled with Registry (FTE) | Total % Filled | Net Adjusted Vacancies | Candidates in Pipeline | Pending Civil Service Hires | Registry Open Orders | Pending Registry Hires | Projected Fill Rate w/ Pending Hires |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 10.50 | 0.00 | 10.50 | 9.50 | 90.48% | 1.00 | 0.00 | 0.00 | 90.48% | 1.00 | 1.00 | 100.00% | 0.00 | - | 1.00 | 1.00 | - | 109.52% |
| CAC | 4.00 | 0.00 | 4.00 | 4.00 | 100.00% | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 | 0.00 | 100.00% | 0.00 | - | - | - | - | 100.00% |
| CAL | 5.50 | 0.00 | 5.50 | 4.50 | 81.82% | 1.00 | 0.00 | 1.00 | 100.00% | 0.00 | 0.00 | 100.00% | 0.00 | 1.00 | - | - | - | 100.00% |
| CCI | 8.50 | 1.00 | 9.50 | 6.50 | 76.47% | 2.00 | 0.00 | 2.00 | 89.47% | 1.00 | 0.50 | 94.74% | 0.50 | - | - | 3.00 | - | 94.74% |
| CCWF | 11.00 | 0.00 | 11.00 | 10.00 | 90.91% | 1.00 | 0.00 | 0.00 | 90.91% | 1.00 | 3.75 | 125.00% | (2.75) | - | - | - | - | 125.00% |
| CEN | 5.50 | 1.00 | 6.50 | 3.00 | 54.55% | 2.50 | 0.00 | 2.00 | 76.92% | 1.50 | 0.00 | 76.92% | 1.50 | - | - | 1.50 | - | 76.92% |
| CHCF | 36.00 | 0.00 | 36.00 | 33.00 | 91.67% | 3.00 | 0.00 | 0.00 | 91.67% | 3.00 | 3.00 | 100.00% | 0.00 | 2.00 | - | - | - | 100.00% |
| CHCF-PIP | 0.00 | 0.00 | 0.00 | 0.00 | n/a | 0.00 | 0.00 | 0.00 | n/a | 0.00 | 0.00 | n/a | 0.00 | - | - | - | - | n/a |
| CIM | 15.00 | 0.00 | 15.00 | 17.00 | 113.33% | (2.00) | 0.00 | 0.00 | 113.33% | (2.00) | 0.00 | 113.33% | (2.00) | - | - | - | - | 113.33% |
| CIW | 6.50 | 0.00 | 6.50 | 6.00 | 92.31% | 0.50 | 0.00 | 0.00 | 92.31% | 0.50 | 0.00 | 92.31% | 0.50 | - | - | 0.50 | 0.50 | 100.00% |
| CMC | 12.50 | 0.00 | 12.50 | 11.00 | 88.00% | 1.50 | 0.00 | 1.00 | 96.00% | 0.50 | 1.00 | 104.00% | (0.50) | - | - | - | - | 104.00% |
| CMF | 13.70 | 0.00 | 13.70 | 11.00 | 80.29% | 2.70 | 0.00 | 1.00 | 87.59% | 1.70 | 0.50 | 91.24% | 1.20 | - | 3.00 | 1.70 | - | 113.14% |
| CMF-PIP | 8.80 | 0.00 | 8.80 | 6.00 | 68.18% | 2.80 | 0.00 | 0.00 | 68.18% | 2.80 | 0.00 | 68.18% | 2.80 | - | - | 1.80 | - | 68.18% |
| COR | 11.50 | 1.00 | 12.50 | 9.00 | 78.26% | 2.50 | 0.00 | 3.00 | 96.00% | 0.50 | 0.00 | 96.00% | 0.50 | - | - | 0.50 | - | 96.00% |
| CRC | 7.50 | 0.00 | 7.50 | 6.00 | 80.00% | 1.50 | 0.00 | 0.00 | 80.00% | 1.50 | 1.00 | 93.33% | 0.50 | - | 1.50 | - | - | 113.33% |
| CTF | 9.50 | 2.00 | 11.50 | 8.00 | 84.21% | 1.50 | 0.00 | 2.00 | 86.96% | 1.50 | 0.00 | 86.96% | 1.50 | - | - | 1.50 | - | 86.96% |
| CVSP | 5.00 | 0.50 | 5.50 | 1.00 | 20.00% | 4.00 | 1.00 | 2.00 | 72.73% | 1.50 | 1.00 | 90.91% | 0.50 | 1.00 | 1.00 | - | - | 109.09% |
| FSP | 8.00 | 0.00 | 8.00 | 8.00 | 100.00% | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 | 0.00 | 100.00% | 0.00 | - | - | - | - | 100.00% |
| HDSP | 5.50 | 1.00 | 6.50 | 5.00 | 90.91% | 0.50 | 0.00 | 1.00 | 92.31% | 0.50 | 1.00 | 107.69% | (0.50) | - | - | 1.00 | - | 107.69% |
| ISP | 2.50 | 3.00 | 5.50 | 3.00 | 40.00% | 1.50 | 0.00 | 3.00 | 72.73% | 1.50 | 1.00 | 90.91% | 0.50 | - | - | 0.50 | - | 90.91% |
| KVSP | 8.00 | 1.00 | 9.00 | 6.00 | 75.00% | 2.00 | 0.00 | 3.60 | 106.67% | (0.60) | 0.00 | 106.67% | (0.60) | - | 1.00 | - | - | 117.78% |
| LAC | 10.50 | 0.00 | 10.50 | 8.00 | 76.19% | 2.50 | 0.00 | 0.00 | 76.19% | 2.50 | 2.50 | 100.00% | 0.00 | 1.00 | - | - | - | 100.00% |
| MCSP | 16.50 | 0.00 | 16.50 | 14.00 | 84.85% | 2.50 | 0.00 | 0.00 | 84.85% | 2.50 | 0.00 | 84.85% | 2.50 | - | 1.00 | 2.50 | 2.50 | 106.06% |
| NKSP | 11.50 | 1.00 | 12.50 | 11.00 | 95.65% | 0.50 | 0.00 | 1.00 | 96.00% | 0.50 | 0.50 | 100.00% | 0.00 | - | - | - | - | 100.00% |
| PBSP | 4.00 | 1.00 | 5.00 | 2.00 | 50.00% | 2.00 | 0.00 | 2.00 | 80.00% | 1.00 | 1.00 | 100.00% | 0.00 | 1.00 | - | 1.00 | - | 100.00% |
| PVSP | 6.00 | 0.00 | 6.00 | 5.00 | 83.33% | 1.00 | 0.00 | 1.00 | 100.00% | 0.00 | 0.00 | 100.00% | 0.00 | - | - | - | - | 100.00% |
| RJD | 16.00 | 0.00 | 16.00 | 16.50 | 103.13% | (0.50) | 0.00 | 0.00 | 103.13% | (0.50) | 0.00 | 103.13% | (0.50) | - | - | - | - | 103.13% |
| SAC | 6.50 | 1.00 | 7.50 | 7.00 | 107.69% | (0.50) | 0.00 | 1.00 | 106.67% | (0.50) | 1.00 | 120.00% | (1.50) | - | - | - | - | 120.00% |
| SATF | 15.00 | 2.50 | 17.50 | 11.00 | 73.33% | 4.00 | 0.00 | 3.00 | 80.00% | 3.50 | 1.50 | 88.57% | 2.00 | - | 2.00 | - | - | 100.00% |
| SCC | 6.00 | 1.00 | 7.00 | 6.00 | 100.00% | 0.00 | 0.00 | 1.00 | 100.00% | 0.00 | 0.00 | 100.00% | 0.00 | - | - | - | - | 100.00% |
| SOL | 8.50 | 2.00 | 10.50 | 5.00 | 58.82% | 3.50 | 0.00 | 2.00 | 66.67% | 3.50 | 1.00 | 66.67% | 3.50 | 1.00 | 0.50 | 1.50 | 0.75 | 78.57% |
| SQ | 13.00 | 1.00 | 14.00 | 11.40 | 87.69% | 1.60 | 0.00 | 2.00 | 95.71% | 0.60 | 1.00 | 102.86% | (0.40) | 0.50 | 1.00 | - | - | 110.00% |
| SVSP | 8.70 | 1.00 | 9.70 | 5.00 | 57.47% | 3.70 | 0.00 | 2.00 | 72.16% | 2.70 | 3.00 | 103.09% | (0.30) | - | - | - | - | 103.09% |
| SVSP-PIP | 3.30 | 0.00 | 3.30 | 1.00 | 30.30% | 2.30 | 0.00 | 0.00 | 30.30% | 2.30 | 2.25 | 98.48% | 0.05 | - | - | - | - | 98.48% |
| VSP | 8.50 | 2.00 | 10.50 | 7.00 | 82.35% | 1.50 | 0.00 | 2.00 | 85.71% | 1.50 | 1.00 | 95.24% | 0.50 | - | - | 0.50 | - | 100.00% |
| WSP | 10.50 | 1.50 | 12.00 | 8.00 | 76.19% | 2.50 | 0.00 | 2.00 | 83.33% | 2.00 | 4.00 | 116.67% | (2.00) | - | - | - | - | 116.67% |
| **TOTALS** | 339.50 | 24.50 | 364.00 | 283.40 | 83.48% | 56.10 | 1.00 | 40.60 | 89.29% | 39.00 | 31.50 | 97.94% | 7.50 | 7.50 | 12.50 | 18.00 | 3.75 | 102.40% |

| Compliance | # by Civil Service Onsite | # by Civil Service & Telemed | # by Civil Service, Telemed, & Registry | # of Pending Civil Service Hires | # of Pending Registry Hires | Projected # if Candidates and Registry Hired |
|---|---|---|---|---|---|---|
| ≥ 90% | 12.00 | 18.00 | 29.00 | 9.00 | 0.50 | 31.00 |
| 80% - 90% | 9.00 | 9.00 | 3.00 | 3.00 | 2.50 | 1.00 |
| < 80% | 14.00 | 8.00 | 3.00 | 0.50 | 0.75 | 3.00 |
| n/a | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 |

**19 Delegated Institutions**
**13 Institutions Receiving 15% Pay Differential**

PL-013.002

# EXHIBIT F

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURTS

7              FOR THE EASTERN DISTRICT OF CALIFORNIA

8            AND THE NORTHERN DISTRICT OF CALIFORNIA

9   RALPH COLEMAN, et al.,

10              Plaintiffs,            No. CIV S-90-0520 LKK JFM P (E.D.Cal.)

11        vs.

12   ARNOLD SCHWARZENEGGER,
    et al.,
13
                Defendants.
14   _____/

15   MARCIANO PLATA, et al.,

16              Plaintiffs,            No. C 01-1351 TEH (N.D.Cal.)

17        vs.

18   ARNOLD SCHWARZENEGGER,
    et al.,
19
                Defendants.
20   _____/

21   CARLOS PEREZ, et al.,

22              Plaintiffs,            No. C 05-05241 JSW (N.D.Cal.)

23        vs.

24   JAMES TILTON, et al.,            ORDER

25              Defendants.

26   _____/

                              1



PLAINTIFF'S
EXHIBIT

CASE  2:90-cv-520-
NO.     KJM-DB

EXHIBIT
NO.    PL-100

PL-100.001

1          The Receiver in <u>Plata</u>, the Special Master in <u>Coleman</u>, and the Court

2  Representatives in <u>Perez</u> have presented to the judges in the above-captioned cases six

3  agreements that they have reached during the coordination meetings that they have held to date.

4  The agreements, which are attached to this order, are presented to the undersigned for review and

5  approval.  The undersigned are aware that there is a hearing scheduled on June 1, 2007 in the

6  <u>Perez</u> matter with respect to increasing dental salaries and a hiring and management plan.  All

7  parties are advised that this hearing shall go forward and the motion shall be considered on its

8  own merits.

9          Good cause appearing, IT IS HEREBY ORDERED that the parties in the above-

10  captioned cases are granted until June 15, 2007 to file and serve a response to the request for

11  court approval of these agreements.  Any response to this order shall be filed in each of the

12  above-captioned cases and served on all of the parties to all of the cases and on the Receiver, the

13  Special Master, and the Court Representatives.  Thereafter, the request for approval of the

14  agreements will be taken under submission for individual and joint consideration by the

15  undersigned.

16  DATED: 5/29/07

17

18                                         LAWRENCE K. KARLTON
                                        SENIOR JUDGE

19                                         UNITED STATES DISTRICT COURT
                                        EASTERN DISTRICT OF CALIFORNIA

20  DATED: 5/29/07

21                                         /s/
                                        THELTON E. HENDERSON

22                                         UNITED STATES DISTRICT JUDGE
                                        NORTHERN DISTRICT OF CALIFORNIA

23  DATED: 5/29/07

24                                         /s/
                                        JEFFREY S. WHITE

25                                         UNITED STATES DISTRICT JUDGE
                                        NORTHERN DISTRICT OF CALIFORNIA

26

PL-100.002

**CIM-GACH**

The Receiver and the Special Master have agreed that the General Acute Care Hospital (GACH) license at the California Institute for Men (CIM) should be suspended. The physical unit will remain open and house 40-45 Mental Health Crisis Beds (MHCBs). Staffing levels will not change for mental health care.

The Receiver and the Special Master are concerned that defendants will not be allowed to operate MHCBs in unlicensed facilities. A state court decision, *Budd, et al. v. Cambra, et al.*, Case No.319578, required the California Department of Corrections and Rehabilitation (CDCR) to bring its correctional treatment centers (CTCs) into compliance with state law licensing requirements. Counsel for the parties may argue that *Budd* requires defendants to provide inpatient health services to inmates presently below an acute level of care in a licensed facility.

The *Coleman* Special Master has agreed to explore whether a CTC license is necessary to operate a MHCB. If such a license is necessary, the Special Master will seek an emergency order from the *Coleman* Court to allow for the operation of the MHCBs at CIM, as was done in the case of CMC.

On May 1, 2006, when faced with a MHCB crisis, the *Coleman* Court ordered the establishment of 36 MHCBs in the former locked observation unit (LOU) at California Men's Colony (CMC). The LOU at CMC had been closed and reopened as an outpatient housing unit, in light of *Budd*. The *Coleman* Court stated that until further notice and on a temporary emergency basis "defendants shall not close any intermediate inpatient bed or mental health crisis bed on the basis of state licensing requirements without approval of the special master." In its order, the Court stated that "it is essential to provide immediately mental health crisis beds to critically ill inmates in the CDCR…Under present circumstances, state licensing requirements must temporarily give way to measures necessary to remedy the Eighth Amendment violations that remained unsolved in this action." (See *Coleman* Order dated May 1, 2006, document number 1800).

The purpose of the order was to provide, on an interim basis, sufficient temporary MHCBs until the 50-bed MHCB projects at CMF and CMC were completed. Allowing the license to remain for the 40-45 agreed upon MHCBs at CIM-GACH could possibly avoid *Budd*-driven complications.

3

PL-100.003

1

2                                                **Contracts**

3            Effective April 17, 2006 the Receiver assumed responsibility for overseeing the
State's compliance with the Federal Court's mandate (1) that "all current outstanding, valid, and
4    CDCR-approved medical invoices" be paid within 60 days of March 30, 2006; and (2) that under
the direction of the Receiver, the CDCR and State entities responsible for contracts develop and
5    institute health care-oriented policies and standards to govern the CDCR medical contract
management system considering both the need for timely on-going care and the fiscal concerns of
6    the State.

7            The Receiver has created a Contract Pilot Unit that includes personnel from
CDCR's Office of Business Services, staff who now report directly to the Office of the Receiver
8    through the *Plata* Support Division.  In addition, selected personnel from the Health Care
Operations Support Section of the DCHCS, as well as personnel from the Health Care Cost and
9    Utilization Program have been added to the Pilot, as have staff at four prisons (San Quentin State
Prison, Pelican Bay State Prison, California Medical Facility, and the Central California
10   Women's Facility) and two Regional Accounting Offices (North Coast and Corcoran).  Upon
successful completion of the Pilot, the new streamlined contract procurement and payment
11   policies established by the Pilot will be adopted by all CDCR facilities according to a time-phase
schedule which has not yet been determined.

12

13           These new policies are supported by a newly created, computerized Health Care
Document Management System (HCDMS) which will manage all medical contracts, replacing
14   the former paper based system.  The HCDMS has three primary components in that it:

15       •   Assists CDCR staff by utilizing uniform contract templates for the creation of
             contracts that do not permit deviation from health care policies and standards.
16       •   Stores all health care contracts in a database accessible to all authorized users.
         •   Establishes an effective payment system designed to receive, store and
17           communicate invoices electronically.  By computerizing all contracts and
             invoices, the HCDMS eliminates the time spent transferring paper copies
18           throughout CDCR and electronically prints invoices with their governing
             contracts for faster information retrieval.

19           The Receiver will assume responsibility for direct oversight of the contracting
functions for medical, dental and mental health programs.  The *Coleman* Special Master and
20   *Perez* Court appointed experts will participate in the design and implementation of periodic
reports to monitor the status of contract management.  The *Coleman* Special Master and *Perez*
21   Court appointed experts, along with defendants' mental health and dental administrators, will
also be involved in establishing standards (including proposed rates of reimbursement for
22   contract clinicians) for registry contracts within their respective areas of concern.

23

24

25

26

                                                    4

PL-100.004

**Credentialing**

**Credentialing** is the process of obtaining, verifying, and assessing the qualifications of an applicant to provide patient care, treatment, and services in a California Department of Corrections and Rehabilitation (CDCR) medical facility. The credentials review process is the basis for making appointments to the clinical staff; it also provides information for granting clinical privileges to licensed independent practitioners. The purpose of verifying credential data is to ensure that the individual requesting privileges is in fact the same individual that is identified in the credentialing documents. In addition, it is to ensure that the applicant has attained the credentials as stated, that the credentials are current, and that there are no challenges to any of the credentials.

**Privileging** is the process used to grant to a specific practitioner the authorization to provide specific inmate-patient care services. Privileging ensures that the individual is capable of providing those services in accordance with the standard of care of the Division of Correctional Health Care Services (DCHCS).

These processes are performed at time of appointment and at least every two years to ensure the credentials remain current. Final approvals of credentialing/privileging are made by the chief of either the medical, dental or mental health programs as appropriate.

These functions are currently performed by the Division of Correctional Health Care Services Pre-Employment Credential Unit which consists of three positions. These positions are all classified as Staff Services Analyst/Associate Governmental Program Analyst. The Receiver will assume responsibility for the credentialing/privileging functions for the medical, mental health, and dental programs to include direct oversight of the Pre-Employment Credential Unit.

The *Coleman* Special Master and the *Perez* Court experts will consult with the defendants' mental health and dental administrators and will participate in, and have final approval of, the establishment of credentialing/privileging standard within their respective disciplines.

PL-100.005

**Hiring**

The Receiver has established the *Plata* Support Division to provide administrative support for the reform initiatives he has established.  The Personnel Services and Staff Development Section have implemented new recruiting and hiring programs to improve the retention of medical staff (including creating new or revising current job classifications, implementing salary increases for specified classifications, designing new hiring and on-boarding processes, establishing training programs for institution personnel staff and for new supervisors, and improving the credentialing process of medical staff).  This section has assumed full responsibility for all human resources-related functions for the *Plata* classifications, removing those functions from the CDCR's Support Services Division.

The *Plata* Workforce Development Section is working to recruit and hire additional medical professionals to fill the many vacancies that exist throughout California's prison system.  To ensure that proactive steps are taken on a daily basis to fill medical professions vacancies in an expeditious manner, a pilot for "one-day hiring" was rolled out February 22, 2007.

The Receiver will assume responsibility for hiring of medical personnel only. However, *Plata* Support Division staff will provide consultation to the *Coleman* Special Master and *Perez* Court experts, as well as to defendants' mental health and dental administrators, on recruitment and hiring practices.

The Receiver will consider assuming responsibility for hiring dental and mental health personnel only after:

- The *Plata* hiring programs are fully implemented and the future workload has been assessed.

PL-100.006

**IT**

The objective of the Receiver's long term IT program is to construct and support the California Correction Health Care Information System based on the importance of "correct data at the point of care." The core design is based on an Electronic Medical Record (EMR) for each inmate/patient. The EMR will be paperless, medical information gathered in one location for physicians and clinicians to access, at various locations, and thereby enable them to make informed and safe medical decisions. All data obtained will be patient centric to allow for an "Information at the Point of Care" system.

To support the establishment of an EMR, a foundation will be formed. It will contain four components: 1) technical infrastructure, 2) clinical infrastructure, 3) data infrastructure, and 4) operational infrastructure. The technical infrastructure will provide a high-speed connection to a network of multiple sites. The clinical infrastructure will provide a repository of standardized data through verifiable data processes and compile medical data across all compliant data sources into a unified database that can be used to generate information valuable for patient care and healthcare management. The data infrastructure will implement a secure clinical web-based portal tool that allows clinical staff appropriate access to verified and standardized patient data at the point of care or clinical work areas (i.e. university hospitals, local specialty care centers). The operational infrastructure will provide clinical informatics with a near zero fault tolerance system to support various operations (i.e. Maxor Pharmaceuticals). Upon this foundation, the EMR will be supported by uniform clinical data provided by two types of clinical information systems: 1) clinical business systems and 2) clinical systems. The Clinical Business System will sustain such areas as access tracking, scheduling, correctional interface, clinical resource scheduling, clinical contracting, credentialing, and CME (define acronym) verification. The clinical systems will sustain such areas as laboratory, radiology, pharmacy, clinical department workflow, telemedicine, digital imaging, dental systems and mental health systems.

Based on these systems the EMR will facilitate:

- a clinical data warehouse
- views on data - patient, clinician, administrator portals and reports
- integrated patient care at the a regional level
- clinical/case management and outcome reporting
- chronic disease registries
- enterprise wide/common scheduling
- supported clinical decisions
- cost effective and timely patient-centered care
- telemedicine delivery

The Receiver will assume responsibility for implementation of the long term IT program to include the medical, dental and mental health programs. The *Coleman* Special Master, the *Perez* Court experts, and defendants' mental health and dental administrators will be kept informed of the progress of this long range project and will provide necessary input concerning mental health and dental clinical data needs.

Telemedicine is a critical component of the Receiver's plan to bring the California Prison Health Care system to a constitutional standard. The Receiver has determined that the

PL-100.007

1    current Telemedicine program managed by the Division of Correctional Health Care Services
2    (DCHCS) has been mismanaged resulting in lack of utilization and understaffing.  The Receiver
     will assume responsibility for the telemedicine program serving the medical, dental and mental
     health programs to include direct oversight of the office of telemedicine services comprised of
3    eight personnel (4 RNs, 2 SSAs, 1 HRT II, and 1 TCA II).  The *Coleman* Special Master will
     consult with defendants' mental health administrators to assist in establishing clinical guidelines
4    for the mental health component of the telemedicine program.

5        The Receiver will assume responsibility to support the current Mental Health
     Tracking System until it can be integrated into the long term IT program.

6        The *Perez* Court experts will meet with the Receiver's IT staff to determine:

7
         •    Whether the "intermediate" dental IT system ordered by Judge White can
8             be implemented within the prescribed time constraints?
         •    If it cannot be implemented as directed, whether the Court experts should
9             seek a modification of the court order to integrate the dental IT system
              within the infrastructure and timeline of the long term IT program?

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

8

PL-100.008

**Pharmacy**

In late 2006 the Office of the Receiver entered into an agreement with Maxor National Pharmacy Services Corporation (Maxor) to provide pharmacy management consulting services. That contract was effective January 1, 2007. On March 30, 2007 the Receiver's request for an order *nunc pro tunc* to waive state law applicable to this agreement was granted by the Court.

Maxor has developed a "road map" designed to restructure and manage a constitutionally adequate pharmacy services delivery system. The primary objective of the road map is to produce sustainable, patient-centered, outcome-driven processes, with the ultimate goal of creating a CDCR-managed and operated "best practice" pharmacy system within three years. The road map consists of the following interior goals for pharmacy operations that will serve medical, dental and mental health delivery systems:

- Develop meaningful and effective centralized oversight, control and monitoring of the pharmacy services program.
- Implement and enforce clinical pharmacy management processes including formulary controls, Pharmacy and Therapeutics (P&T) committee, disease management guidelines, and the establishment of a program of regular institutional operational audits.
- Establish a comprehensive program to review, audit and monitor pharmaceutical contracting and procurement processes to ensure cost efficiency in pharmaceutical purchases.
- Develop a meaningful pharmacy human resource program that effectively manages staffing, compensation, job descriptions, competency, performance, assessment, discipline, training, and use of the workforce including temporary employees and non-pharmacist staff.
- Redesign and standardize overall institution level pharmacy drug distribution operations for inpatient and outpatient needs. Design, construct and operate a centralized pharmacy facility.
- Design and implement a uniform pharmacy information management system needed to successfully operate and maintain the CDCR pharmacy operation in a safe, effective and cost efficient way, based on a thorough understanding of a redesigned work process.
- Develop a process to assure that CDCR pharmacy meets accreditation standards of the designated healthcare review body (NCCHC or ACA) and assist in obtaining accredited status.

The Receiver through Maxor will assume oversight of pharmacy operations serving medical, dental and mental health programs. *Coleman* and *Perez* Court appointed experts will consult with defendants' mental health and dental administrators and participate in the P&T committee in development of formularies within their respective areas of concern. Maxor will provide periodic reports to the Receiver, the *Coleman* Special Master and the *Perez* Court appointed experts concerning road map compliance.

PL-100.009