DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
MARISSA HATTON – 348678
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**NOTICE OF ERRATA RE: ECF NO. 8021**

Judge:   Hon. Kimberly J. Mueller

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

On October 19, 2023, Plaintiffs filed their Closing Brief for Hearing on Staffing (ECF No. 8021).  Plaintiffs inadvertently failed to include certain citations and inadvertently included incorrect page numbers in certain citations.  Plaintiffs also inadvertently included an incorrect title of the exhibit marked as PL-110.  The Closing Brief as filed also omitted the Table of Authorities which is now included.

/ / /

/ / /

/ / /

1     Plaintiffs respectfully submit this errata to correct these errors.  A corrected version

2   of Plaintiffs' Closing Brief for Hearing on Staffing, with all changes in redline, is attached

3   as **Exhibit 1**.  A clean version of the corrected Closing Brief is attached as **Exhibit 2**.

4

5   DATED:  October 20, 2023          Respectfully submitted,

6                                    ROSEN BIEN GALVAN & GRUNFELD LLP

7                                    By:  */s/ Ernest Galvan*

8                                          Ernest Galvan

9                                    Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
MARISSA HATTON – 348678
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>        v.<br><br>GAVIN NEWSOM, et al.,<br><br>            Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' CLOSING BRIEF FOR HEARING ON STAFFING**<br><br>Date:    Nov. 2, 2023<br>Time:    10:00 a.m.<br>Crtrm.: 3<br><br>Judge:  Hon. Kimberly J. Mueller |

[4374143.9]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

I.   THERE IS NO GENUINE DISPUTE THAT DEFENDANTS HAVE NOT
     COMPLIED WITH THE COURT'S SPECIFIC AND DEFINITE
     STAFFING ORDERS. .................................................................... 1

II.  DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING
     THAT COMPLIANCE IS IMPOSSIBLE. ......................................... 2

III. DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING
     THAT THEY TOOK ALL REASONABLE STEPS TO COMPLY. ........ 3

     A.   Defendants Have Not Taken All Reasonable Steps To Provide
          Competitive Salaries To Psychologists, Social Workers, Recreation
          Therapists, or Medical Assistants in Non-PIP Programs. .............. 4

     B.   Defendants Have Not Taken All Reasonable Steps To Streamline
          Their Hiring Process. .................................................................. 9

     C.   Defendants' Other Measures Are Plainly Insufficient. .................. 9

     D.   Defendants' Telepsychiatry and Telemental Health Program Does Not
          Absolve Them of their Obligation to Take All Reasonable Steps With
          Regard to Non-Psychiatry Positions ......................................... 11

     E.   Defendants' Brand New Tele-Psychology and Tele-Social Work
          Programs Are Too Little Too Late. .............................................. 12

IV.  THE COURT CAN AND SHOULD HOLD DEFENDANTS LIABLE FOR
     THE FINES THAT HAVE ACCUMULATED SINCE FEBRUARY 2023. .......... 14

     A.   The Fines Are Properly Calibrated to Advance Both Coercive and
          Compensatory Purposes. ............................................................ 14

     B.   The Court Provided Ample Opportunity to Purge ......................... 16

     C.   If The Court Remains Concerned About Due Process, Its Order
          Should Temporarily Suspend Payment of the Fines That Have
          Accrued To Date, Pending Defendants' Full Compliance By A Date
          Certain in 2024. ........................................................................ 19

     D.   Fines Alone Are Not Likely to Bring About Compliance. .............. 19

V.   THE 2022 ANNUAL REPORT ON SUICIDES AND SUICIDE
     PREVENTION EFFORTS IN CDCR IS ADMISSIBLE TO SHOW THE
     CONNECTION BETWEEN UNDERSTAFFING AND HARM TO THE
     CLASS. ...................................................................................... 20

CONCLUSION ................................................................................. 22

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*A.B. by & through Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
No. C14-1178 MJP, 2023 WL 4407539 (W.D. Wash. July 7, 2023) .................... 13

*CBS Broadcasting, Inc. v. FilmOn.com, Inc.*,
814 F.3d 91 (2d Cir. 2016) ......................................................................... 2, 18

*Coleman v. Brown*,
922 F. Supp. 2d 1004 (E.D. Cal. 2013) ........................................... 21, 22

*Coleman v. Brown*,
No. 2:90-CV-0520-KJM-DBP, 2017 WL 1398828 (E.D. Cal. Apr. 19,
2017), *aff'd*, 756 F. App'x 677 (9th Cir. 2018) ........................................ 17

*Coleman v. Wilson*,
912 F. Supp. 1282 (E.D. Cal. 1995) ............................................... 21, 22

*Fotin v. Commissioner of Mass. Dep't of Public Welfare*,
692 F.2d 790 (1st Cir. 1982) .......................................................... 2

*Gompers v. Bucks Stove & Range Co.*,
221 U.S. 418 (1911) ..................................................................... 14

*Gospel Missions of Am. v. City of Los Angeles*,
328 F.3d 548 (9th Cir. 2003) ......................................................... 22

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
10 F.3d 693 (9th Cir. 1993) ............................................................ 2

*Institute of Cetacean Research v. Sea Shepherd Conservation Society*,
774 F.3d 935 (9th Cir. 2014) ......................................................... 2

*International Union, United Mine Workers of America v. Bagwell*,
512 U.S. 821 (1994) ........................................................... passim

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ................................................ 2, 4

*Kelly v. Wengler*,
979 F. Supp. 2d 1104 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir. 2016) ........ 13

*NLRB v. Ironworkers Local 433*,
169 F.3d 1217 (9th Cir. 1999) ............................................. 17, 18

*NLRB v. Trans Ocean Export Packing, Inc.*,
473 F.2d 612  (9th Cir. 1973) ...................................................... 3

*Parsons v. Ryan*,
    No. CV-12-0601-PHX-DKD, 2018 WL 3239691 (D. Ariz. June 22, 2018),
    *aff'd*, 949 F.3d 443 (9th Cir. 2020) ........................................................................ 12

*Parsons v. Ryan*,
    949 F.3d 443 (9th Cir. 2020) .......................................................................... 16, 17

*Penfield Co. of Cal. v. SEC*,
    330 U.S. 585 (1947) ............................................................................................ 17

*Salazar ex rel. Salazar v. D.C.*,
    602 F.3d 431 (D.C. Cir. 2010) ............................................................................ 18

*Stone v. City and Cnty. of S.F.*,
    968 F.2d 850 (9th Cir. 1992) .......................................................................... 2, 3

*United States v. United Mine Workers of America*,
    330 U.S. 258 (1947). ................................................................ 14, 15, 19, 20


**<u>RULES</u>**

Fed. R. Evid. 801 .................................................................................................... 21

Fed. R. Evid. 803 .................................................................................................... 22

PLAINTIFFS' CLOSING BRIEF FOR HEARING ON STAFFING

**INTRODUCTION**

It has been more than 13 years since Defendants adopted their 2009 Staffing Plan for the non-PIP programs and more than six years since this Court ordered Defendants to fully comply with that Plan within one year.  *See* ECF No. 3693; ECF No. 5711 at 30.  For the first decade following adoption of their Plan, Defendants consistently failed to fill at least 90 percent of the psychiatry positions called for in that Plan.  *See generally* PL-006, ECF No. 5564; ECF No. 6695.  Since 2020, Defendants have improved psychiatry staffing.  But they allowed the vacancy rates for the other clinical positions required by the Plan to skyrocket.  *See, e.g.*, ECF No. 7984 at 6 (showing a 43 percent vacancy rate systemwide for clinical psychologist positions as of August 2023); *id.* at 7 (showing a 27 percent vacancy rate for clinical social worker positions systemwide as of August 2023).

Throughout this period, Defendants "demonstrated no sense of the required urgency for a meaningful implementation" of their Staffing Plan.  Special Master's Report On The Status Of Mental Health Staffing And The Implementation Of Defendants' Staffing Plan, ECF No. 5564, Feb. 6, 2017.  Defendants argue that they have done as much as they can.  But the evidence shows that Defendants have simply continued with business as usual.  Nearly three years have passed since the scale of Defendants' current staffing crisis became clear.  Yet the salaries Defendants provide to psychologists and social workers still do not come close to compensating them for the abysmal working conditions they must endure.  The byzantine hiring process Defendants have set up for mental health positions remains excruciatingly slow.  And the brand new telepsychology and telesocial work programs Defendants described at trial are both too little and too late to excuse Defendants' longstanding noncompliance.  For the reasons explained below, the Court should issue findings of contempt and order Defendants to pay the full amount of fines that have accumulated pursuant to the Court's Order of February 28, 2023.  *See* ECF No. 7742.

**I.     THERE IS NO GENUINE DISPUTE THAT DEFENDANTS HAVE NOT COMPLIED WITH THE COURT'S SPECIFIC AND DEFINITE STAFFING ORDERS.**

"Civil contempt … consists of a party's disobedience to a specific and definite court

order by failure to take all reasonable steps within the party's power to comply." *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 945 (9th Cir. 2014) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993)).  Here, there is no genuine dispute about whether the relevant orders are specific and definite, or whether Defendants have complied with those orders. Defendants have never argued that the Court's orders were unclear or provided inadequate notice of their obligations.  *See CBS Broadcasting, Inc. v. FilmOn.com, Inc.,* 814 F.3d 91, 98 (2d Cir. 2016) ("An injunction is sufficiently clear and unambiguous [to be enforced through civil contempt] if it leaves 'no doubt in the minds of those to whom it was addressed … precisely what acts are forbidden.'").  Nor have Defendants disputed any of the evidence in the record showing their severe, ongoing non-compliance with those obligations.  *See* ECF No. 7952 at 3-7.  Indeed, Defendants stipulated to much of that evidence, *see* ECF No. 7956 ¶¶ 21-22, and have conceded that they are out of compliance with regard to at least some of the categories of mental health staff at issue in these proceedings.  Tr. 9-29-23 at 8:7-25.  Defendants also conceded that the burden of proof has shifted to them to prove their defenses.  *Id.* at 8:22-25; *see Stone v. City and Cnty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (alleged contemnor bears the burden of proving they took every reasonable step to comply); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (same).  There is no genuine dispute that Defendants are non-compliant with the Court's specific and definite staffing orders, and have been for many years.

## II. DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING THAT COMPLIANCE IS IMPOSSIBLE.

Defendants' opening brief argued that "compliance with the 2009 Staffing Plan—even at 90% fill rates—is impossible in the current labor market."  ECF No. 7951 at 17. But Defendants all but abandoned this position at trial, and the minimal evidence they presented falls far short of satisfying their "difficult" burden of demonstrating "categorically and in detail" that compliance is impossible.  *See Fotin v. Commissioner of Mass. Dep't of Public Welfare*, 692 F.2d 790, 796 (1st Cir. 1982); *NLRB v. Trans Ocean*

1    *Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

2         Not a single witness for Defendants testified that it was impossible to comply with

3    the Court's mandates.  Defendants' expert witness, Dr. Erica Greulich, refused to testify

4    that labor market conditions make it impossible for Defendants to fill at least 90 percent

5    of the positions at issue in these proceedings.  Although she suggested that labor market

6    conditions have made hiring mental health staff more "difficult" for Defendants,

7    Dr. Greulich explicitly disavowed any claim that compliance with the Court's orders is

8    impossible.  *See, e.g.*, Tr. 10-3-23 at 6:4-8.  When asked whether it is "impossible for

9    CDCR to hire psychologists," for example, Dr. Greulich responded "No, I'm not offering

10   that opinion."  Tr. 9-29-23 at 174:10-12.  Similarly, when asked if it was her opinion that

11   CDCR could not hire 63 of the roughly 26,000 social workers in California (that is, the

12   number of social workers needed to raise Defendants' systemwide fill rate to 90 percent),

13   Dr. Greulich responded that she had no opinion at all as to "what CDCR can and can't

14   hire."  Tr. 10-3-23 at 22:21-23:3-6.  Likewise, Dr. Greulich would not opine that CDCR

15   cannot hire the 281 psychologists necessary to meet the compliance threshold out of the

16   17,251 psychologists in California. Tr. 10-3-23 at 24:22-25:1. Amar Mehta, CDCR's

17   Deputy Director of Statewide Mental Health, similarly refused to testify that it is

18   impossible for Defendants to comply with the Court's staffing orders.  *See* Tr. 10-4-23 at

19   121:20-122:2.

20        This is a far cry from the kind of categorical, detailed evidence required to sustain

21   an impossibility defense.  The Court should reject Defendants' unsubstantiated

22   impossibility defense outright.

23   **III.   DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING THAT
          THEY TOOK <u>ALL</u> REASONABLE STEPS TO COMPLY.**
24

25        Because Defendants did not show that it was impossible for them to comply with

26   the Court's staffing orders, to avoid contempt they needed to show that they "took every

27   reasonable step to comply."  *Stone*, 968 F.2d at 856 n.9.  They did not do so.  Instead, the

28   evidence at trial showed that Defendants failed to take multiple reasonable steps and

1   continued with business as usual while clinical vacancies – especially among psychologists

2   and social workers -- skyrocketed.  *See Kelly*, 822 F.3d at 1097~~6~~ (affirming contempt

3   where prison administrator "failed to take several reasonable steps to ensure compliance"

4   with staffing obligations).

5       **A.    Defendants Have Not Taken All Reasonable Steps To Provide**
        **Competitive Salaries To Psychologists, Social Workers, Recreation**
6       **Therapists, or Medical Assistants in Non-PIP Programs.**

7       The most obvious step Defendants could have taken to reduce vacancies was to

8   substantially increase the salaries of mental health staff in the non-PIP programs.   It is

9   undisputed that Defendants did not try this and do not plan to try it.[1]  Instead, Defendants

10  argue that it would not be "reasonable" to offer substantially higher salaries because

11  (1) they purportedly already offer higher average salaries than the regional and statewide

12  averages for the positions at issue in these proceedings, and (2) these salary "premiums"

13  have not been effective at increasing fill rates in the past.   Neither argument is persuasive.

14      Defendants' first argument ignores the abysmal working conditions for mental

15  health staff in CDCR, which make substantially higher salaries not just "reasonable" but

16  necessary.  On-site mental health staff in CDCR work in rodent-infested prisons with

17  inadequate or non-functioning air-conditioning systems and ceilings that leak during

18  rainstorms.  *See* Tr. 10-5-23 at 29:24-30:16; 31:2-11 (Dr. David).  They are crammed into

19  a limited number of offices, some of which are located in windowless rooms or converted

20  prison cells.  *See* ECF No. 7999 at 95:16-24, 98:9-99:24 (Dr. Burton); Tr. 10-5-23 at

21  29:24-30:16 (Dr. David); Tr. 10-5-23 at 156:7-10 (Reinhold).  They work with uniquely

22  challenging patient populations and have unmanageably high caseloads that require them

23  to work long hours.  Tr. 10-5-23 at 69:12-72:5, 81:23-82:7 (Dr. Francecshi); Tr. 10:5-23 at

24  157:8-158:4 (Reinhold).  And they face greater safety risks than their peers working

25

26  [1] Defendants' recently adopted collective bargaining agreements with the unions
    representing CDCR mental health staff provide only small pay increases to certain mental
27  health staff and do not substantially depart from CDCR's existing, unsuccessful framework
    for compensating mental health staff.  *See* Tr. 10-3-23 at 95:13-96:9, 96:18-97:3, 98:19-
28  99:7, 99:20-25; DEFS 006-008.

1  outside of CDCR, as evidenced by the "hostage policy" they must acknowledge in writing,

2  which states that CDCR will not negotiate for their return if they are taken hostage on the

3  job.  Tr. 10-5-23 at 30:17-22 (Dr. David).  In light of working conditions like these, it

4  would have been entirely reasonable for Defendants to pay mental health staff large salary

5  premiums far above the salaries paid to comparable providers outside of a prison setting.

6       Defendants' second argument—that CDCR's salary "premiums" have not

7  significantly reduced vacancies—simply restates what is self-evident from the record

8  already:  CDCR's existing salaries are not high enough to attract and retain a sufficient

9  number of mental health staff.  But the legally relevant question is whether it would have

10  been "reasonable" for CDCR to offer *larger* premiums than what they offer now or have

11  offered in the past.  Defendants' expert offered little of value on this question.

12  Dr. Greulich's regression analysis found that, with two exceptions, the size of the

13  premiums CDCR offered between 2015 and 2022 did not have a statistically significant

14  effect on fill rates for the positions at issue in these proceedings.  Tr. 9-29-23 at 125:14-

15  126:6.  But her regression model was so deeply flawed—it included far fewer data points

16  than it should have, in no small part because CDCR refused to provide her with the data

17  she asked for, *see* Tr. 10-3-23 at 9:1-9 (Dr. Greulich)—that it showed a statistically

18  significant *negative* relationship between salary and fill rates for psychologists.  *See* Tr. 9-

19  29-23 at 125:14-126:6 (Dr. Greulich).  In other words, the statistical model that forms the

20  backbone of Defendants' defense stands for the proposition that CDCR could fill *more*

21  psychologist positions by offering *lower* salaries.  *See* Tr. 10-4-23 at 183:17-184:3

22  (Dr. Brown).  That is nonsensical as a commonsense matter, even if Plaintiffs' expert had

23  not identified other serious methodological flaws.

24       Even if the Court assumes Dr. Greulich's methodology was reliable, she admitted

25  that she did not study the impact of larger salary premiums than what CDCR has

26  previously offered and did not attempt to answer the question of whether larger salary

27  premiums would be more effective at increasing fill rates.  Tr. 10-3-23 at 10:1-6

28  (Dr. Greulich).  Dr. Greulich agreed that her analysis leaves significant "uncertainty"

about whether substantially higher premiums would be more effective at increasing fill rates, Tr. 10-3-34 at 12:12-18, though at her deposition she was not "uncertain" about this point at all—she testified it was her "expectation that…the response is going to change as the premiums increase." Tr. 10-3-23 at 19:8-15. Even if the Court credits Dr. Greulich's trial testimony on this point, the "uncertainty" she identified is exactly why CDCR needed to *try* offering higher premiums before concluding they wouldn't work. Their failure to do so proves that they did not take all reasonable steps to comply with the Court's orders and should be held in contempt.

Nor do Defendants' own actions suggest they believe that raising salaries has no effect on fill rates. Time and time again, they have raised salaries, including in the most recent MOU negotiations, and registry rates, including with the newest contract. It is not that Defendants do not understand that money talks. It appears instead that they are simply unwilling to pay what it takes to compete with other employers or even to keep up with inflation, which has resulted in their failure to take any numbers of commonsense, reasonable steps to attract and retain sufficient numbers of clinicians.

For instance, Defendants did not take the reasonable step of raising salaries to match what they pay mental health staff in the Psychiatric Inpatient Programs (PIPs). In May 2022, CDCR provided a 15 percent pay increase to all mental health staff working in the PIPs but excluded mental health staff working in CDCR's non-PIP programs—the very programs at issue in these proceedings. Tr. 10-3-23 at 100:13-101:7 (Muhammad). When asked why a similar pay increase was not extended to non-PIP mental health staff as well, the Deputy Director of Human Resources for the California Correctional Health Care Services, Jasinda Muhammad, stated only that "we were focused on increasing staffing in the PIP." Tr. 10-3-23 at 91:13-14.

Defendants' witnesses offered no reason why it would not have been reasonable to "focus" on staffing in the non-PIP programs as well. At the time the PIP pay increase went into effect, Defendants were subject to the Court's October 2017 order requiring them to fully comply with the 2009 Staffing Plan (which applies only to non-PIP programs). *See*

1  ECF No. 5711 at 30.  CDCR officials are aware that this Court had previously issued a

2  series of orders to prevent staffing shortages caused by pay disparities among clinicians

3  serving inpatient and outpatient class members.  Tr. 10-3-23 at 102:8-14 (Muhammad);

4  ECF No. 2301; ECF No. 2134; ECF No. 2236.   And they were aware of the worsening

5  staffing crisis among social workers and psychologists for approximately 18 months before

6  May 2022.  Tr. 10-4-23 at 89:20-90:3 (Dr. Mehta).  By then, vacancy rates for non-PIP

7  social workers and line psychologists were regularly exceeding 20 percent and 30 percent,

8  respectively. *See* PL-091; PL-092; PL-093; PL-094; PL-095.  Extending the 15 percent PIP

9  pay increase to non-PIP mental health staff would have been entirely reasonable under

10  these circumstances—particularly given the entirely foreseeable risks that a substantial

11  number of non-PIP staff would leave to work in the PIPs and that morale would suffer

12  among staff who remained.  *See, e.g.*, Tr. 10-3-23 at 100:13-101:7 (Muhammad); Tr. 10-5-

13  23 at 28:11-29:9 (Dr. David),  (Dr. Minor), 86:3-18 (Dr. Franceschi).

14       Defendants also failed to take the reasonable steps of offering candidates more than

15  the bare minimum salary for each position and informing them that they might be eligible

16  to negotiate higher salaries on an individualized basis.  Jasinda Muhammad testified that

17  CDCR's initial offers of employment to candidates for vacant mental health positions

18  always list only the bare minimum salary for the position, regardless of whether the

19  candidate's experience makes him or her eligible for a higher salary through the "Hiring

20  Above Minimum" (HAM) process.  Tr. 10-3-23 at 106:16-107:21.  Ms. Muhammad

21  further testified that it is each candidate's responsibility to affirmatively seek out

22  information about HAM eligibility during the hiring process, Tr. 10-3-23 at 108:15-109:2;

23  that even candidates with extraordinary experience are not eligible for salaries above the

24  maximum salary band for their position, *id.* at 109:25-110:4; that current employees who

25  are dissatisfied with their salary are categorically excluded from the HAM process, *id.* at

26  110:5-15; and that CDCR has not requested waivers or any other exceptions from the rules

27  governing the HAM process, *id.* at 110:16-18.  These practices put CDCR at a "massive

28  disadvantage" when trying to hire for the positions at issue in these proceedings, and that

1   the continuation of these practices in spite of CDCR's current staffing crisis suggests that

2   Defendants are making only minimal efforts to fill vacant positions. Tr. 10-4-23 at

3   174:11-21 (Dr. Brown). Defendants' failure to change these practices further shows that

4   they have not taken all reasonable steps to comply with their staffing obligations.

5       There are still more reasonable steps Defendants did not take to provide adequate

6   compensation to mental health staff. They did not ensure that psychologist and social

7   worker salaries keep pace with inflation. Tr. 10-4-23 at 163:3-13. They did not make

8   psychologists eligible for "recruitment and retention" bonuses until approximately 18

9   months after vacancy rates began to skyrocket, and then waited another 14 months after

10  that to extend the bonuses to social workers. Tr. 10-3-23 at 103:16-104:3 (Muhammad);

11  PL-041; Tr. 10-5-23 at 152:11-153:18; 154:8-25 (Reinhold). They allowed registry rates

12  to remain essentially static for five years between 2017 and 2022, even though they knew

13  existing rates were not yielding sufficient candidates, and then in April 2023 increased

14  registry rates at only certain institutions while leaving rates all but unchanged at some of

15  the most severely understaffed facilities. Tr. 10-3-23 175:19-176:18, 177:11-25, 179:11-

16  182:6, 187:3-19 (Ponciano); *Compare* DEFS-018.149-151 (identifying institutions that

17  remained in the lowest tiers of compensation rates for psychologists and social workers),

18  *with* ECF No. 7849 at 6-7. They did not take steps to mitigate the impact of pension

19  reforms on recruitment and retention, ECF No. 7999 at 84:22-86:2 (Dr. Burton), and didn't

20  even discuss the possibility of obtaining waivers of state law at any point since 2017, let

21  alone submit formal requests. Tr. 10-3-23 at 130:23-24, 131:5-9 (Muhammad). And they

22  did not try to match the salaries of employers like Kaiser Permanente that have

23  successfully lured numerous clinicians away from CDCR institutions with particularly

24  acute staffing shortages, such as CMF, CHCF, and CSP-SAC. Tr. 10-5-23 at 19:1-4, 21:3-

25  23:15 (Dr. David), 67:10-69:8 (Dr. Franceschi); 109:16-25 (Dr. Minor); Tr. 10-5-23 at

26  149:20-151:13 (Reinhold).

27      Given the severity of Defendants' non-compliance with their staffing obligations, they

28  needed to take all of these steps to ensure that their compensation for mental health remained

1    competitive.  Because they did none of them, the Court should hold them in contempt.

2    **B.    Defendants Have Not Taken All Reasonable Steps To Streamline Their Hiring Process.**

3

4    Defendants also have not taken all reasonable steps to reduce unnecessary

5    bureaucratic delays in their hiring process, which multiple witnesses identified as a major

6    barrier to filling the vacant mental health positions at issue in these proceedings.  Jasinda

7    Muhammad testified that it generally takes 108 *business* days for her staff to complete the

8    hiring process for new mental health clinicians in the non-PIP programs.  Tr. 10-3-23 at

9    128:15-24.  Recent initiatives to reduce this time lag to 65 business days, which

10   Defendants began working on *six years ago*, are limited to just one prison.  Tr. 10-3-23 at

11   125:15-24, 126:4-14 (Muhammad).  Multiple institution-level chiefs of mental health, all

12   of whom testified that they are closely involved in the hiring process, agreed that it

13   frequently takes months for HR staff to contact applicants for interviews and/or extend

14   formal offers of employment to successful interviewees, and that as a result of these delays

15   many (and sometimes all) applicants for a position at their institution accept offers from

16   other employers before CDCR even contacts them.  *See* Tr. 10-5-23 at 11:15-12:17

17   (Dr. David), 59:9-60:8, 63:2-17  (Dr. Franceschi); ECF No. 7999 at 63:4-67:20, 71:14-

18   72:23 (Dr. Burton); *see also* Tr. 10-5-23 at 141:5-142:24 (Reinhold).  Ms. Muhammad

19   further testified that her department would have been able to review applications and

20   contact candidates more quickly with additional staff of their own, but that Defendants did

21   not submit a budget request for additional HR positions until recently.  Tr. 10-3-23 at

22   118:9-120:6; 123:19-21.

23   The Court should issue findings of contempt because Defendants have not taken all

24   reasonable steps to reduce unnecessary delays in their process for hiring new mental health

25   staff.

26   **C.    Defendants' Other Measures Are Plainly Insufficient.**

27   Defendants have taken no steps to investigate the potential use of Licensed Marriage

28   and Family Therapists in their mental health system, even though CDCR has repeatedly

1  piloted (and abandoned) a program evaluating exactly that possibility specifically to address

2  difficulties in recruiting psychologists. 10-4-23 Tr. 128:4-129:4 (Dr. Mehta); *see* Special

3  Master 21st Round Monitoring Report (July 31, 2009), ECF No. 3638-4 at 32 (LMFT pilot at

4  CSP-Corcoran started to "offset the difficulty in recruiting individuals into long-standing

5  staff psychology vacancies"), ECF No. 3638-5 at 41 (LMFT pilot also started at CMC); *see*

6  *also* Special Master 25th Round Monitoring Report (Jan. 18, 2013), ECF No. 4298 at 288

7  (LMFT pilot at CMC ultimately abandoned due to "staffing cuts"). This is true despite their

8  knowledge that the Receiver has begun utilizing that classification to provide clinical care in

9  CCHCS's integrated substance use disorder treatment program (ISUDT), which, inter alia,

10  provides class members mental health care including cognitive behavioral treatment. 10-4-

11  23 Tr. 128:4-129:18 (Dr. Mehta); *see* Defs-019.351.

12       Despite complaints from the field, Defendants also have failed to provide adequate

13  administrative support for clinical staff, including abandoning without notice their court-

14  ordered plan to provide each psychiatrist with a medical assistant as a means of improving

15  retention. *See* ECF No. 7999 at 40:25-50:1, 50:5-53:4, 53:1-54:12 (Dr. Burton) (MAs

16  would improve patient care and staff retention, and the lack of MAs for in-person

17  psychiatrists has been raised with CDCR leadership several times), 86:18-87:20 (more

18  clinical support services could certainly help with recruitment and retention), 95:25-96:5,

19  96:21-97:23 (lack of administrative support staff and MAs for psychiatrists hurts

20  retention), 100:12-101:4 (lack of admin staff for on-site psychiatrists is a problem across

21  CDCR, and he has raised the lack of admin staff with HQ); *see also* 4/11/23 Order, ECF

22  No. 7806 at 5-6.

23       Defendants also have not sought any waivers of state law to address their staffing

24  crisis since at least 2017, despite their knowledge that the Receiver has sought and

25  received such waivers to address shortages of medical staff on multiple occasions,

26  including for the specific purpose of raising salaries, with no opposition from Defendants.

27  *See* Pls' RJN Ex. A at 1 & Ex. B (*Plata* Receiver Sept. 12, 2006 motion and supportive

28  exhibits, Dkts. 543-544, seeking waivers to address "crisis with clinical staffing within

1   California's prisons" driven by "the long-term and grossly inadequate salaries offered by the

2   State of California to clinical personnel who seek employment in its prisons"); Pls' RJN Ex.

3   C at 10-12 (10/17/06 *Plata* Order, Dkt. 554, granting Receiver's motion for waivers of state

4   law to raise medical staff salaries where Defendants have failed to act and "the history of

5   this case demonstrates that salary increases can effectively address the high vacancies rates

6   that have chronically plagued the CDCR's ability to attract and retain qualified medical

7   clinicians"); *see also* Pls' RJN Ex. D (11/3/08 *Plata* Order, Dkt. 1754, granting Receiver's

8   motion for waivers of state law to increase salaries for executive positions).

9          Indeed, while Defendants' mental health system is plagued by staffing levels far, far

10  worse than those precipitating the original *Plata* waivers (*see* Pls' RJN Ex. C at 3),

11  medical staffing under the Receiver's leadership remains robust today despite the pressures

12  of the pandemic.  *See* Pls' RJN Ex. E (CCHCS Primary Care Provider Vacancy/Coverage

13  Report dated May 1, 2023, ECF No. 3865, showing systemwide primary care provider fill

14  rate of 97.94%, not including additional pending hires).  Nonetheless, Defendants have not

15  requested that the *Plata* Receiver assume responsibility for mental health hiring even

16  though that possibility was specifically contemplated by the formal court-approved

17  coordination agreements.  *See* Pls' RJN Ex. F at 6 (May 29, 2007 Order Approving

18  Coordinated Agreements in *Plata, Coleman*, and *Perez*, filed at *Plata* Dkt. 2247,

19  authorizing the *Plata* Receiver to assuming responsibility for medical hiring and noting

20  Receiver would consider assuming responsibility for mental health hiring in the future).

21  This is true even though Plaintiffs invited just such a remedy.  *See* Feb. 10, 2023 Status

22  Conf. Tr., ECF No. 7726 at 13:1-20.

23          **D.    Defendants' Telepsychiatry and Telemental Health Program Does Not
                    Absolve Them of their Obligation to Take All Reasonable Steps With
24                  Regard to Non-Psychiatry Positions.**

25          At trial, Defendants elicited extensive testimony about their existing telepsychiatry

26  program and its role in reducing the number of vacant psychiatrist positions systemwide.

27  The telepsychiatry program is relevant to this proceeding only insofar as it amounts to one

28  step Defendants have taken to reduce psychiatrist vacancies.  It does not absolve

1   Defendants of their obligation under the Court's October 2017 Order to fully implement

2   their 2009 Staffing Plan, as amended, and it is not relevant to the question of whether

3   Defendants have taken all reasonable steps to fill at least 90 percent of their psychologist,

4   social worker, recreation therapist, and medical assistant positions.  *See Parsons v. Ryan*,

5   No. CV-12-0601-PHX-DKD, 2018 WL 3239691, at *10 (D. Ariz. June 22, 2018)

6   (compliance efforts must be "geared toward the specific issues precluding compliance"),

7   *aff'd*, 949 F.3d 443 (9th Cir. 2020).

8       **E.    Defendants' Brand New Tele-Psychology and Tele-Social Work
            Programs Are Too Little Too Late.**

9

10      Defendants also elicited extensive testimony about their brand new telepsychology

11  and telesocial work programs, which they first proposed and sought funding for in the

12  summer of 2023.  *See* ECF No. 7935 at 1; Tr. 10-4-23 at 16:18-17:3 (Dr. Martello).

13  Unlike Defendants' telepsychiatry program, their new telepsychology and telesocial work

14  programs are relevant to the key question that is before the Court: whether Defendants

15  have taken all reasonable steps to fill at least 90 percent of their psychologist and social

16  worker positions outside of the PIPs.  But even if the new programs could be implemented

17  promptly—and the evidence at trial clearly showed they cannot[2]— they still would not

18  save Defendants from contempt because they are both too little and too late.

19      The programs do too little because even if fully implemented they would add only

20  77 telepsychologists and only 41 telesocial workers—far below what is needed for

21  Defendants to reach a 90 percent fill rate for either classification.  *See* Tr. 10-4-23 at

22  20:23-21:19, 23:22-24:6 (Dr. Martello).  Although Dr. Martello testified that it is

23  "possible" the telepsychology program will grow in the future, she admitted that she was

24

25  _____

26  [2] *See, e.g.*, Tr. 10-4-23 at 17:10-18:4 (Dr. Martello testifying that none of the programs'
    line telepsychologist and line telesocial worker positions have been filled), 19:5-21

27  (candidate for chief telepsychologist position declined offer because it did not pay
    enough), 20:19-22 (programs not expected to be fully operational for at least two years);
    22:23-24 3:8 (authority and funding for program expansion uncertain); 30:9-25

28  (telepresenters won't be hired until after telemental health clinicians hired).

1   "not confident" CDCR would be able to obtain funding or legislative authorization to

2   expand the program.  Tr. 10-4-23 at 22:5-23:8.  Any expansion would also require the

3   hiring of additional telepresenters on top of the 100 new medical assistants that will need

4   to be hired for the programs in their current iteration to function.

5          The programs also do too little because at least some of the telehealth providers will

6   almost certainly be existing clinicians who transition from on-site to telework.

7   Dr. Martello admitted that at least "some" of the applications they have received thus far

8   are from current CDCR psychologists and social workers.  Tr. 10-4-23 at 34:12-35:10.

9   She also admitted that the sole person hired into either program thus far was an existing

10  CDCR social worker.  Tr. 10-4-23 at 35:4-17.   Notably, Defendants chose not to offer pay

11  incentives for on-site psychologist or social work positions to discourage this kind of

12  poaching from the existing clinical programs, despite offering such differential pay for on-

13  site psychiatrists.

14         The telepsychology and telesocial work programs also come too late to excuse

15  Defendants' longstanding non-compliance.  Defendants began utilizing telepsychiatry in

16  approximately 2010, and Dr. Martello testified that it has been effective at reducing

17  psychiatry vacancies.  Tr. 10-4-23 at 15:23-16:8.  Yet they did not even propose a

18  telepsychology program or telesocial work program until after four months after these

19  proceedings were initiated, two and a half years after the vacancy rates for psychologists

20  and social workers began to sky rocket, and approximately 13 years after they began using

21  telepsychiatry.  ECF No. 7935 at 1; Tr. 10-4-23 at 15:23-16:1, 16:18-17:3 (Dr. Martello).

22  *See Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1113-14 (D. Idaho 2013) ("long overdue

23  move" did not support all-reasonable-steps defense because it was "part of the reasonable

24  steps [the defendant] should have taken years ago"), *aff'd*, 822 F.3d 1085 (9th Cir. 2016);

25  *A.B. by & through Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-

26  1178 MJP, 2023 WL 4407539, at *11 (W.D. Wash. July 7, 2023) (health services agency

27  did not take all reasonable steps where it "fail[ed] to prepare for and react swiftly to" a

28  sudden increase in demand for inpatient beds).

1   **IV.    THE COURT CAN AND SHOULD HOLD DEFENDANTS LIABLE FOR
2          THE FINES THAT HAVE ACCUMULATED SINCE FEBRUARY 2023.**

3          On February 28, 2023—more than thirteen years after Defendants first adopted their

4   2009 Staffing Plan, and more than five years after the Court gave Defendants one year to

5   comply with the patient/staff ratios in that Plan, ECF No. 5711 at 30 ("October 2017

6   Order")—the Court issued a schedule of prospective, conditional fines that would begin

7   accumulating "month to month" if, and only if, Defendants remained non-compliant with

8   their staffing obligations after a grace period.  ECF No. 7742 at 5-6 ("February 2023

9   Order").  Defendants argue in their opening brief that this Court cannot impose any of the

10  fines that have accrued pursuant to the February 2023 Order, even if it holds Defendants in

11  contempt, because the Court did not previously issue findings of contempt in either its

12  October 2017 or February 2023 orders.  According to Defendants, "fines that pre-date a

13  future finding of contempt cannot be imposed" because "Defendants must be afforded an

14  opportunity to purge following any finding of civil contempt[.]"  ECF No. 7951 at 20.

15         For the reasons explained below, the Court can and should impose the fines.

16         **A.    The Fines Are Properly Calibrated to Advance Both Coercive and
17               Compensatory Purposes.**

18         Because civil contempt sanctions can be imposed without the full slate of

19  procedural protections available to criminal defendants, they must serve "remedial" rather

20  than "punitive" ends.  *International Union, United Mine Workers of America v. Bagwell*,

21  512 U.S. 821, 826-2~~8~~7 (1994) (quoting *Gompers v. Bucks Stove & Range Co*., 221 U.S.

22  418, 444 (1911)).  Where the sanctions at issue are monetary fines, as here, the fine is civil

23  and remedial if it is designed either to "coerce the defendant into compliance with the

24  court's order, [or] … compensate the complainant for losses sustained."  *United States v.*

25  *United Mine Workers of America*, 330 U.S. 258, 303-04 (1947).  Where a fine is purely

26  coercive, "it is civil only if the contemnor is afforded an opportunity to purge"—that is, to

27  "reduce or avoid the fine through compliance."  *Bagwell*, 512 U.S. at 829.

28         Defendants assert that the fines in these proceedings have no compensatory purpose

1   and are purely coercive.  But this is incorrect.  There is little doubt that the fines in this

2   case are intended *in part* to coerce Defendants into compliance.  The Court took great care

3   to structure the fines in a manner that ensures Defendants have just enough of an incentive

4   to fill their mental health positions rather than leaving them vacant, taking into account the

5   amount Defendants would save in salaries and benefits by failing to fill the positions.  *See*

6   ECF No. 7742 at 5-6; *United States v. United Mine Workers of America*, 330 U.S. 258, 304

7   (1947) (structure of coercive contempt fine must take into account, among other things, its

8   "probable effectiveness…in bringing about the result desired").  And the record in this

9   case includes ample evidence that the fines are also properly structured to address "the

10  character and magnitude of the harm threatened by continued contumacy" and "the amount

11  of the defendant's financial resources and the consequent seriousness of the burden to that

12  particular defendant."  *United Mine Workers*, 330 U.S. at 304; *see* Tr. 10-5-23 at 31:12-

13  34:13 (Dr. David) ("We can't provide Program Guide services.  We're not even providing

14  what you could consider to be standard of care in the community at this point.  Clinical

15  continuity is nonexistent. We're doing the best we can, and it is nowhere good enough for

16  the needs of our patients."), Tr. 10-5-23 at 35:6-36:22 (Dr. David) ("I have patient safety

17  concerns every day.  It's exhausting and draining and difficult to know that we have men in

18  our care who are ill, who are sick, who are coming to us for help, and we are not able to

19  give them the help that they need.  It is not why I came into this field.  It is not why my

20  employees came into this field."); Tr. 10-5-23 at 116:19-117:15, 120:10-12, 122:14-21,

21  124:6-125:5, 125:15-23, 126:24-127:3: (Dr. Minor) (high caseloads in non-PIP programs

22  at CHCF limits care that can be provided and has led to increases in RVRs and self-harm

23  incidents); Defs.' 2022 Annual Report on Suicides in CDCR, PL-110 at 7, 58, 64-65 &

24  Fig. 24 (noting institutions' inability to comply with Program Guide requirements and

25  suspension of certain suicide prevention measures due to inadequate staffing).[3]

26

27  _____

28  [3] On October 18, 2023, the Court directed the parties to address admissibility of PL-110 in
    the closing briefing.  This is addressed in Section V, below.

1       But the record in this case shows that the fines will serve compensatory purposes as

2  well: namely, to "meet the mental health needs of inmates in a reasonable manner and

3  within the standard of care." ECF No. 5711 at 15 (quoting ECF No. 4539 at 54-55); *see*

4  *Parsons v. Ryan*, 949 F.3d 443, 456 (9th Cir. 2020) (contempt fines directed at defendant-

5  prison administrators deemed compensatory as well as coercive because the fines would

6  "address Plaintiffs' injuries" and "further compliance with the healthcare requirements" of

7  the underlying consent decree). The Court has made no orders about the use of any fines

8  that are eventually paid, and retains discretion to order them used for compensatory

9  purposes. The $50 million in fines accrued thus far, divided by approximately 33,000

10  *Coleman* class members, yields a per class member sum of $1,515. While this is far too

11  little to compensate the class for long-standing deprivations of minimally adequate mental

12  health care, it may still be possible to fashion a use of the funds that benefits the *Coleman*

13  class.

14       Even without paying the fines directly to the *Coleman* class, the Court has authority

15  to order a payment structure that incents filling the positions necessary to provide adequate

16  care for the class. For example, the Court has the authority to find the Defendants' liable

17  for the accumulated fines, but to suspend the payment obligation, and at the same time

18  allow future compliance to purge the accumulated liability over time. This could be done

19  by giving Defendants a certain amount of credit against the accumulated fines for each

20  month in which they comply with the staffing plan. *See* Section IV.C below.

21  Alternatively, the Court could direct the use of the funds on improvements on the mental

22  health system to benefit the Coleman class.

23      **B.**     **The Court Provided Ample Opportunity to Purge**

24       Because the fines in this case are compensatory as well as coercive, due process

25  demands less in terms of purging opportunity than what the Court has already provided to

26  Defendants. *See Bagwell*, 512 U.S. at 838 ("Our holding…leaves unaltered the

27  longstanding authority of judges…to enter broad compensatory awards for all contempts

28  through civil proceedings,"). But the Court has provided Defendants with ample

1  opportunity to purge regardless of whether the fines serve coercive purposes,

2  compensatory purposes, or both.

3      The Court issued its schedule of fines more than 13 years after Defendants adopted

4  their 2009 Staffing Plan, and more than five years after the Court ordered Defendants to

5  come into full compliance with that Plan within one year.  As a result, when the Court

6  issued this schedule of fines, both the substantive requirements and the deadlines relating

7  to Defendants' staffing obligations were already "well known to the parties and reviewed

8  in numerous court orders, including the October 10, 2017 order, ECF No. 5711, and most

9  recently in the court's January 6, 2023 order, ECF No. 7699."  ECF No. 7742 at 3.

10  Nonetheless, the Court built in even more advance notice and opportunity for Defendants

11  to reduce or avoid the fines through compliance.  The Court ordered that no payment

12  hearing would take place unless fines "accumulate for three consecutive months."  *Id* at 6.

13  If Defendants had come into compliance for even one month out of every three after

14  February 2023, they would not be in the position of having to account for the violations by

15  contempt.

16      Defendants mischaracterize the "purgeability" requirement for coercive civil

17  contempt fines.  "Prospective, conditional fines" are "the paradigmatic coercive civil

18  contempt sanction," *Parsons*, 949 F.3d at 455, and can be imposed so long as the alleged

19  contemnor is provided an opportunity to "reduce or avoid the fine through compliance."

20  *Bagwell*, 512 U.S. 821, 829 (1994) (quoting *Penfield Co. of Cal. v. SEC*, 330 U.S. 585,

21  588 (1947); *see also Coleman v. Brown*, No. 2:90-CV-0520-KJM-DBP, 2017 WL

22  1398828, at *5 (E.D. Cal. Apr. 19, 2017), *aff'd*, 756 F. App'x 677 (9th Cir. 2018).  This is

23  all that is required for a fine to be labeled "purgeable."  There is no rule requiring that

24  formal findings of contempt precede the accrual of prospective, conditional fines, like

25  those in this case—so long as the schedule of fines was announced before the fines began

26  to accrue, thereby giving the alleged contemnor the requisite notice and opportunity to

27  reduce or avoid the fines through compliance.  *See NLRB v. Ironworkers Local 433,* 169

28  F.3d 1217, 1218, 1221 (9th Cir. 1999) (rejecting due process defense where contempt

1  judgment followed accrual of fines pursuant to enforcement provisions in earlier consent

2  decree); *Salazar ex rel. Salazar v. D.C.,* 602 F.3d 431, 435, 437-40 (D.C. Cir. 2010)

3  (same).  In fact, a rule requiring formal contempt findings to precede the accrual of fines

4  would make little sense, as it would mandate *less* notice than what the Court provided

5  here: advance warning not only of the risk of fines but also of the risk of a contempt

6  judgment in the first place.

7         Defendants' cases are not to the contrary.  *CBS Broadcasting* does not say that

8  courts *must* issue their formal contempt findings before fines start to accrue.  *See* 814

9  F.3d 91, 101-02 (2d Cir. 2016).  Rather, it says that courts *can* structure contempt

10 proceedings in this way—at least where there is a *second* contempt judgment that follows

11 the opportunity to reduce or avoid the fines through compliance.  *Id.*

12        Nor do the references in *Bagwell* to "summary adjudication of indirect contempts"

13 involving "complex injunctions" help Defendants here.  ECF No. 7951 at 12-13 (citing

14 *Bagwell*, 512 U.S. at 833-34).  The Court has not conducted a "summary adjudication" of

15 the contempt charges in this case—it held a full evidentiary hearing that lasted four court

16 days.  And *Bagwell*'s separation-of-powers rationale for holding "complex injunctions" to

17 a stricter standard of due process does not apply here because Defendants themselves came

18 up with the Plan they have failed to implement, not the Court.  *See* ECF No. 5711 at 3;

19 *Bagwell*, 512 U.S. at 840 (Scalia, J., concurring) (arguing that the purported fusion of

20 legislative, executive, and judicial functions in structural reform litigation raises unique

21 due process concerns); *Ironworkers Local 433*, 169 F.3d at 1220 ("[T]he Court in *Bagwell*

22 was clearly concerned about the possible abuse of power when a judge orders oppressive

23 sanctions for violations of complex standards of the judge's own making.").

24        Regardless of the exact amount of process due in these circumstances, Defendants

25 have had more than sufficient opportunity to reduce or avoid the Court's prospective,

26 conditional fines through compliance.  Those fines only began to accumulate on March 31,

27 2023—more than *thirteen years* after Defendants developed and adopted their 2009

28 Staffing Plan, and more than *five* years after the Court issued the October 10, 2017 that

1    Defendants are now charged with violating.  ECF No. 7742 at 5.  The Court also gave

2    Defendants an additional three-month grace period following its February 2023 Order,

3    during which Defendants needed only to show compliance for one month out of every

4    three to avoid contempt.  *Id.* at 6.  The Court also structured the fines such that the amount

5    owed is determined by the magnitude of Defendants' non-compliance each month.  *Id.* at

6    5-6.  As a result, Defendants can reduce (and have reduced) the amount of the fines they

7    will owe through partial compliance.

8    **C.    If The Court Remains Concerned About Due Process, Its Order Should Temporarily Suspend Payment of the Fines That Have Accrued To Date, Pending Defendants' Full Compliance By A Date Certain in 2024.**

9

10          As explained above, it is well within the Court's authority to hold Defendants in

11    contempt and order them to pay all fines that have accrued pursuant to the Court's

12    February 28, 2023 Order.  *See* ECF No. 7742.  But in the event the Court has doubts, any

13    remaining due process concerns can easily be addressed by temporarily suspending

14    Defendants' obligation to the pay the fines, pending full compliance by a date certain in

15    2024.  *See Bagwell*, 512 U.S. at 829-30; *United Mine Workers*, 330 U.S. at 305.  If the Court

16    opts for this approach, its order should also provide for a kind of fine forgiveness program,

17    whereby only a portion of the suspended fines that have accrued to date are forgiven for each

18    month that Defendants are fully compliant.  Structuring the suspended fine in this way

19    would ensure that Defendants have an incentive not only to come into compliance but to *stay*

20    in compliance long enough for the entire amount of the fine to be forgiven.

21          **D.    Fines Alone Are Not Likely to Bring About Compliance.**

22          Even with the fines accumulating over months, Defendants have not acted with

23    enough urgency to fill positions.  The evidence reviewed above shows many reasonable

24    steps they could implement, including a more flexible salary setting system, better use of

25    registry, a faster recruiting process, improvements in working conditions, greater efforts to

26    recruit from the unlicensed clinicians who work at CDCR to get their pre-licensing hours,

27    and expanding the use of additional types of licensed clinicians, such as Marriage and

28    Family Therapists, just to name a few.  Additional court orders may be necessary to

1    require Defendants to implement such reasonable measures.

2    **V.    THE 2022 ANNUAL REPORT ON SUICIDES AND SUICIDE PREVENTION**
3    **EFFORTS IN CDCR IS ADMISSIBLE TO SHOW THE CONNECTION**
     **BETWEEN UNDERSTAFFING AND HARM TO THE CLASS.**

4        Exhibit P-110 is admissible over Defendants' hearsay and relevancy objections.

5    The document is titled "California Department of Corrections and Rehabilitation's 2022

6    Annual Report ~~to the Legislature~~ on Suicides ~~in the California Department of Corrections~~

7    ~~and Rehabilitation and Annual Suicide Report~~and Suicide Prevention Efforts in the

8    CDCR."  PL-110.001.  This is the same report that Defendants' filed with this Court on

9    October 18, 2023.  *See* ECF No. 8017 at 47-131.

10       P-110 is relevant to show the magnitude of harm caused by understaffing, which

11   goes to whether the monetary sanctions are set at an appropriate level.  *See United Mine*

12   *Workers,* 330 U.S. at 304.  Defendants' Chief of Mental Health, Dr. Mehta testified he

13   agreed with the following statement in the report:

14       [Q] . . . So this report provided to the legislature two days ago

15       confirms that understaffing affected suicide prevention efforts

16       last year. I'll read this to you:

17       This report on suicides that occurred in CDCR during 2022

18       would be remiss if it did not discuss the fact that there are

19       significant and persistent staffing shortages that plagued many

20       of the prisons in the CDCR system. While it is difficult to

21       determine a direct nexus between staffing shortages and deaths

22       by suicide in CDCR custody, it is important to recognize the

23       impacts of reduced staffing. Provision of clinical care at

24       levels consistent with the MHSDS Program Guide has been

25       challenging at many institutions.

26       Do you agree with that?

27       A. Yes.

28       Q. Also on the same page, it says that care is being triaged

1    due to a lack of clinical staffing. And I quote, as a result

2    of these difficulties, institutions focus their limited

3    clinical staff on the more acute and emergent needs of their

4    programs.

5    Do you agree with that?

6    A. Yes.

7    Tr. 10/4/23 at 137:6-138:1. Dr. Mehta's testimony confirms the relevancy of the

8    report to show how failure to comply with the required staffing levels undermines care.

9    Dr. Mehta further testified that he agreed with the report's conclusion that fulfilment of

10   certain suicide prevention measures had fallen due to staffing shortages. *Id.* at 138:3-8.

11   P-110 is not hearsay; it is a party-admission under Rule 801(d)(2) of the Federal

12   Rules of Evidence. CDCR's reports have been received as party admissions in this case

13   throughout the history of this litigation, and the Court has characterized hearsay arguments

14   as to these motions as "bordering on frivolous." *See Coleman v. Brown*, 922 F. Supp. 2d

15   1004, 1024 (E.D. Cal. 2013). The 2022 Suicide Report falls under the rule for authorized

16   statements by agents of the California Department of Corrections. FRE 801(d)(2)(C).

17   Dr. Mehta testified that the report was prepared by his team under his oversight. Tr.

18   10/4/2023 at 136:1-137:3. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1294 (E.D. Cal.

19   1995) (overruling hearsay objection to statements of correctional director).

20   In addition to being the work of an authorized agent, the 2022 Suicide Report was

21   adopted by Defendants when they filed it with Court on October 18, 2023, under a cover

22   identifying it as "the California Department of Corrections and Rehabilitation's (CDCR)

23   2022 Annual Report to the Legislature on Suicides in CDCR and the 2022 Annual Suicide

24   Report." ECF No. 8017 at 4. It is thus an adoptive statement under FRE 801(d)(2)(B).

25   CDCR's filing of the report with this Court is conduct that "manifested the intent that it

26   adopted or believed [it] to be true." FRE 801(d)(2)(B). In addition, the filing of the

27   document in this Court with a cover pleading representing that it is CDCR's report is a

28   binding judicial admission that it is the statement of CDCR and its authorized agents, and

1  therefore non-hearsay.  *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 557

2  (9th Cir. 2003).

3       Even if P-110 were not a party admission—which it plainly is—it would fall under

4  one or more hearsay exceptions.  P-110 is a report by CDCR to the California Legislature,

5  and thus falls under the public records hearsay exception of FRE 803(8).  *See Coleman,*

6  922 F. Supp 2d at 1025̶4 (overruling hearsay objection to CDCR report to Receiver as both

7  party admissions and FRE 803(8) public records).

8                              **CONCLUSION**

9       In light of the foregoing, Plaintiffs request that the Court find that Defendants' non-

10  compliance with their staffing plan is not excused by impossibility, nor by having taken all

11  reasonable measures to comply, and find Defendants are liable for the accumulated

12  contempt fines.

13                              <u>**CERTIFICATION**</u>

14       Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

15  filing:  ECF Nos. 1383, 2134, 2236, 2301, 4539, 5711, 7504, 7699, 7742, 7806, 7916,

16  7961, 7976, 7977, 7981, 8006, 8016, *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.

17  1995).

18

19  DATED:  October 20, 2023              Respectfully submitted,

20                                        ROSEN BIEN GALVAN & GRUNFELD LLP

21

22                                        By:  */s/ Ernest Galvan*

23                                             Ernest Galvan

24                                        Attorneys for Plaintiffs

25

26

27

28

# Exhibit 2

DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
MARISSA HATTON – 348678
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' CLOSING BRIEF FOR HEARING ON STAFFING**<br><br>Date:    Nov. 2, 2023<br>Time:    10:00 a.m.<br>Crtrm.:  3<br><br>Judge:  Hon. Kimberly J. Mueller |

[4374143.9]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

I.    THERE IS NO GENUINE DISPUTE THAT DEFENDANTS HAVE NOT
      COMPLIED WITH THE COURT'S SPECIFIC AND DEFINITE
      STAFFING ORDERS. ................................................................................ 1

II.   DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING
      THAT COMPLIANCE IS IMPOSSIBLE.................................................. 2

III.  DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING
      THAT THEY TOOK ALL REASONABLE STEPS TO COMPLY. ........................ 3

      A.   Defendants Have Not Taken All Reasonable Steps To Provide
           Competitive Salaries To Psychologists, Social Workers, Recreation
           Therapists, or Medical Assistants in Non-PIP Programs. ............................. 4

      B.   Defendants Have Not Taken All Reasonable Steps To Streamline
           Their Hiring Process. .................................................................... 9

      C.   Defendants' Other Measures Are Plainly Insufficient. ................................ 9

      D.   Defendants' Telepsychiatry and Telemental Health Program Does Not
           Absolve Them of their Obligation to Take All Reasonable Steps With
           Regard to Non-Psychiatry Positions................................................. 11

      E.   Defendants' Brand New Tele-Psychology and Tele-Social Work
           Programs Are Too Little Too Late. .................................................. 12

IV.   THE COURT CAN AND SHOULD HOLD DEFENDANTS LIABLE FOR
      THE FINES THAT HAVE ACCUMULATED SINCE FEBRUARY 2023........... 14

      A.   The Fines Are Properly Calibrated to Advance Both Coercive and
           Compensatory Purposes. ............................................................. 14

      B.   The Court Provided Ample Opportunity to Purge ..................................... 16

      C.   If The Court Remains Concerned About Due Process, Its Order
           Should Temporarily Suspend Payment of the Fines That Have
           Accrued To Date, Pending Defendants' Full Compliance By A Date
           Certain in 2024. ...................................................................... 19

      D.   Fines Alone Are Not Likely to Bring About Compliance. ........................... 19

V.    THE 2022 ANNUAL REPORT ON SUICIDES AND SUICIDE
      PREVENTION EFFORTS IN CDCR IS ADMISSIBLE TO SHOW THE
      CONNECTION BETWEEN UNDERSTAFFING AND HARM TO THE
      CLASS................................................................................... 20

CONCLUSION.............................................................................. 22

1

## TABLE OF AUTHORITIES

2

**Page**

3

<u>**CASES**</u>

4

*A.B. by & through Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
   No. C14-1178 MJP, 2023 WL 4407539 (W.D. Wash. July 7, 2023) .................... 13

*CBS Broadcasting, Inc. v. FilmOn.com, Inc.*,
   814 F.3d 91 (2d Cir. 2016) ................................................................................ 2, 18

*Coleman v. Brown*,
   922 F. Supp. 2d 1004 (E.D. Cal. 2013) ............................................................ 21, 22

*Coleman v. Brown*,
   No. 2:90-CV-0520-KJM-DBP, 2017 WL 1398828 (E.D. Cal. Apr. 19,
   2017), *aff'd*, 756 F. App'x 677 (9th Cir. 2018) ...................................................... 17

*Coleman v. Wilson*,
   912 F. Supp. 1282 (E.D. Cal. 1995) ................................................................. 21, 22

*Fotin v. Commissioner of Mass. Dep't of Public Welfare*,
   692 F.2d 790 (1st Cir. 1982) ................................................................................... 2

*Gompers v. Bucks Stove & Range Co.*,
   221 U.S. 418 (1911) .............................................................................................. 14

*Gospel Missions of Am. v. City of Los Angeles*,
   328 F.3d 548 (9th Cir. 2003) ................................................................................ 22

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*,
   10 F.3d 693 (9th Cir. 1993) .................................................................................... 2

*Institute of Cetacean Research v. Sea Shepherd Conservation Society*,
   774 F.3d 935 (9th Cir. 2014) .................................................................................. 2

*International Union, United Mine Workers of America v. Bagwell*,
   512 U.S. 821 (1994) ....................................................................................... passim

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir. 2016) ............................................................................ 2, 4

*Kelly v. Wengler*,
   979 F. Supp. 2d 1104 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir. 2016) ......... 13

*NLRB v. Ironworkers Local 433*,
   169 F.3d 1217 (9th Cir. 1999) ........................................................................ 17, 18

*NLRB v. Trans Ocean Export Packing, Inc.*,
   473 F.2d 612  (9th Cir. 1973) .................................................................................. 3

*Parsons v. Ryan*,
    No. CV-12-0601-PHX-DKD, 2018 WL 3239691 (D. Ariz. June 22, 2018),
    *aff'd*, 949 F.3d 443 (9th Cir. 2020) ........................................................................... 12

*Parsons v. Ryan*,
    949 F.3d 443 (9th Cir. 2020) ........................................................................... 16, 17

*Penfield Co. of Cal. v. SEC*,
    330 U.S. 585 (1947) ........................................................................... 17

*Salazar ex rel. Salazar v. D.C.*,
    602 F.3d 431 (D.C. Cir. 2010) ........................................................................... 18

*Stone v. City and Cnty. of S.F.*,
    968 F.2d 850 (9th Cir. 1992) ........................................................................... 2, 3

*United States v. United Mine Workers of America*,
    330 U.S. 258 (1947). ........................................................................... 14, 15, 19, 20


**RULES**

Fed. R. Evid. 801 ........................................................................... 21

Fed. R. Evid. 803 ........................................................................... 22

1

**INTRODUCTION**

2   It has been more than 13 years since Defendants adopted their 2009 Staffing Plan

3   for the non-PIP programs and more than six years since this Court ordered Defendants to

4   fully comply with that Plan within one year.  *See* ECF No. 3693; ECF No. 5711 at 30.  For

5   the first decade following adoption of their Plan, Defendants consistently failed to fill at

6   least 90 percent of the psychiatry positions called for in that Plan.  *See generally* PL-006,

7   ECF No. 5564; ECF No. 6695.  Since 2020, Defendants have improved psychiatry

8   staffing.  But they allowed the vacancy rates for the other clinical positions required by the

9   Plan to skyrocket.  *See, e.g.*, ECF No. 7984 at 6 (showing a 43 percent vacancy rate

10  systemwide for clinical psychologist positions as of August 2023); *id.* at 7 (showing a 27

11  percent vacancy rate for clinical social worker positions systemwide as of August 2023).

12  Throughout this period, Defendants "demonstrated no sense of the required urgency

13  for a meaningful implementation" of their Staffing Plan.  Special Master's Report On The

14  Status Of Mental Health Staffing And The Implementation Of Defendants' Staffing Plan,

15  ECF No. 5564, Feb. 6, 2017.  Defendants argue that they have done as much as they can.

16  But the evidence shows that Defendants have simply continued with business as usual.

17  Nearly three years have passed since the scale of Defendants' current staffing crisis

18  became clear.  Yet the salaries Defendants provide to psychologists and social workers still

19  do not come close to compensating them for the abysmal working conditions they must

20  endure.  The byzantine hiring process Defendants have set up for mental health positions

21  remains excruciatingly slow.  And the brand new telepsychology and telesocial work

22  programs Defendants described at trial are both too little and too late to excuse

23  Defendants' longstanding noncompliance.  For the reasons explained below, the Court

24  should issue findings of contempt and order Defendants to pay the full amount of fines that

25  have accumulated pursuant to the Court's Order of February 28, 2023.  *See* ECF No. 7742.

26  **I.    THERE IS NO GENUINE DISPUTE THAT DEFENDANTS HAVE NOT COMPLIED WITH THE COURT'S SPECIFIC AND DEFINITE STAFFING ORDERS.**

27

28  "Civil contempt … consists of a party's disobedience to a specific and definite court

order by failure to take all reasonable steps within the party's power to comply." *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 945 (9th Cir. 2014) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993)).  Here, there is no genuine dispute about whether the relevant orders are specific and definite, or whether Defendants have complied with those orders. Defendants have never argued that the Court's orders were unclear or provided inadequate notice of their obligations.  *See CBS Broadcasting, Inc. v. FilmOn.com, Inc.,* 814 F.3d 91, 98 (2d Cir. 2016) ("An injunction is sufficiently clear and unambiguous [to be enforced through civil contempt] if it leaves 'no doubt in the minds of those to whom it was addressed … precisely what acts are forbidden.'").  Nor have Defendants disputed any of the evidence in the record showing their severe, ongoing non-compliance with those obligations.  *See* ECF No. 7952 at 3-7.  Indeed, Defendants stipulated to much of that evidence, *see* ECF No. 7956 ¶¶ 21-22, and have conceded that they are out of compliance with regard to at least some of the categories of mental health staff at issue in these proceedings.  Tr. 9-29-23 at 8:7-25.  Defendants also conceded that the burden of proof has shifted to them to prove their defenses.  *Id.* at 8:22-25; *see Stone v. City and Cnty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (alleged contemnor bears the burden of proving they took every reasonable step to comply); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (same).  There is no genuine dispute that Defendants are non-compliant with the Court's specific and definite staffing orders, and have been for many years.

## II.    DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING THAT COMPLIANCE IS IMPOSSIBLE.

Defendants' opening brief argued that "compliance with the 2009 Staffing Plan— even at 90% fill rates—is impossible in the current labor market."  ECF No. 7951 at 17. But Defendants all but abandoned this position at trial, and the minimal evidence they presented falls far short of satisfying their "difficult" burden of demonstrating "categorically and in detail" that compliance is impossible.  *See Fotin v. Commissioner of Mass. Dep't of Public Welfare*, 692 F.2d 790, 796 (1st Cir. 1982); *NLRB v. Trans Ocean*

1    *Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

2         Not a single witness for Defendants testified that it was impossible to comply with

3    the Court's mandates.  Defendants' expert witness, Dr. Erica Greulich, refused to testify

4    that labor market conditions make it impossible for Defendants to fill at least 90 percent of

5    the positions at issue in these proceedings.  Although she suggested that labor market

6    conditions have made hiring mental health staff more "difficult" for Defendants,

7    Dr. Greulich explicitly disavowed any claim that compliance with the Court's orders is

8    impossible.  *See, e.g.*, Tr. 10-3-23 at 6:4-8.  When asked whether it is "impossible for

9    CDCR to hire psychologists," for example, Dr. Greulich responded "No, I'm not offering

10    that opinion."  Tr. 9-29-23 at 174:10-12.  Similarly, when asked if it was her opinion that

11    CDCR could not hire 63 of the roughly 26,000 social workers in California (that is, the

12    number of social workers needed to raise Defendants' systemwide fill rate to 90 percent),

13    Dr. Greulich responded that she had no opinion at all as to "what CDCR can and can't

14    hire."  Tr. 10-3-23 at 22:21-23:6.  Likewise, Dr. Greulich would not opine that CDCR

15    cannot hire the 281 psychologists necessary to meet the compliance threshold out of the

16    17,251 psychologists in California. Tr. 10-3-23 at 24:22-25:1. Amar Mehta, CDCR's

17    Deputy Director of Statewide Mental Health, similarly refused to testify that it is

18    impossible for Defendants to comply with the Court's staffing orders.  *See* Tr. 10-4-23 at

19    121:20-122:2.

20         This is a far cry from the kind of categorical, detailed evidence required to sustain

21    an impossibility defense.  The Court should reject Defendants' unsubstantiated

22    impossibility defense outright.

23    **III.    DEFENDANTS HAVE NOT MET THEIR BURDEN OF SHOWING THAT**

24    **THEY TOOK ALL REASONABLE STEPS TO COMPLY.**

25         Because Defendants did not show that it was impossible for them to comply with

26    the Court's staffing orders, to avoid contempt they needed to show that they "took every

27    reasonable step to comply."  *Stone*, 968 F.2d at 856 n.9.  They did not do so.  Instead, the

28    evidence at trial showed that Defendants failed to take multiple reasonable steps and

1  continued with business as usual while clinical vacancies – especially among psychologists

2  and social workers -- skyrocketed.  *See Kelly*, 822 F.3d at 1097 (affirming contempt where

3  prison administrator "failed to take several reasonable steps to ensure compliance" with

4  staffing obligations).

5      **A.  Defendants Have Not Taken All Reasonable Steps To Provide
           Competitive Salaries To Psychologists, Social Workers, Recreation
6          Therapists, or Medical Assistants in Non-PIP Programs.**

7          The most obvious step Defendants could have taken to reduce vacancies was to

8  substantially increase the salaries of mental health staff in the non-PIP programs.   It is

9  undisputed that Defendants did not try this and do not plan to try it.[1]  Instead, Defendants

10  argue that it would not be "reasonable" to offer substantially higher salaries because

11  (1) they purportedly already offer higher average salaries than the regional and statewide

12  averages for the positions at issue in these proceedings, and (2) these salary "premiums"

13  have not been effective at increasing fill rates in the past.   Neither argument is persuasive.

14          Defendants' first argument ignores the abysmal working conditions for mental

15  health staff in CDCR, which make substantially higher salaries not just "reasonable" but

16  necessary.  On-site mental health staff in CDCR work in rodent-infested prisons with

17  inadequate or non-functioning air-conditioning systems and ceilings that leak during

18  rainstorms.  *See* Tr. 10-5-23 at 29:24-30:16; 31:2-11 (Dr. David).  They are crammed into

19  a limited number of offices, some of which are located in windowless rooms or converted

20  prison cells.  *See* ECF No. 7999 at 95:16-24, 98:9-99:24 (Dr. Burton); Tr. 10-5-23 at

21  29:24-30:16 (Dr. David); Tr. 10-5-23 at 156:7-10 (Reinhold).  They work with uniquely

22  challenging patient populations and have unmanageably high caseloads that require them

23  to work long hours.  Tr. 10-5-23 at 69:12-72:5, 81:23-82:7 (Dr. Franceschi); Tr. 10-5-23 at

24  157:8-158:4 (Reinhold).  And they face greater safety risks than their peers working

25

26  _____

    [1] Defendants' recently adopted collective bargaining agreements with the unions
27  representing CDCR mental health staff provide only small pay increases to certain mental
    health staff and do not substantially depart from CDCR's existing, unsuccessful framework
28  for compensating mental health staff.  *See* Tr. 10-3-23 at 95:13-96:9, 96:18-97:3, 98:19-
    99:7, 99:20-25; DEFS 006-008.

1  outside of CDCR, as evidenced by the "hostage policy" they must acknowledge in writing,

2  which states that CDCR will not negotiate for their return if they are taken hostage on the

3  job.  Tr. 10-5-23 at 30:17-22 (Dr. David).  In light of working conditions like these, it

4  would have been entirely reasonable for Defendants to pay mental health staff large salary

5  premiums far above the salaries paid to comparable providers outside of a prison setting.

6      Defendants' second argument—that CDCR's salary "premiums" have not

7  significantly reduced vacancies—simply restates what is self-evident from the record

8  already:  CDCR's existing salaries are not high enough to attract and retain a sufficient

9  number of mental health staff.  But the legally relevant question is whether it would have

10  been "reasonable" for CDCR to offer *larger* premiums than what they offer now or have

11  offered in the past.  Defendants' expert offered little of value on this question.

12  Dr. Greulich's regression analysis found that, with two exceptions, the size of the

13  premiums CDCR offered between 2015 and 2022 did not have a statistically significant

14  effect on fill rates for the positions at issue in these proceedings.  Tr. 9-29-23 at 125:14-

15  126:6.  But her regression model was so deeply flawed—it included far fewer data points

16  than it should have, in no small part because CDCR refused to provide her with the data

17  she asked for, *see* Tr. 10-3-23 at 9:1-9 (Dr. Greulich)—that it showed a statistically

18  significant *negative* relationship between salary and fill rates for psychologists.  *See* Tr. 9-

19  29-23 at 125:14-126:6 (Dr. Greulich).  In other words, the statistical model that forms the

20  backbone of Defendants' defense stands for the proposition that CDCR could fill *more*

21  psychologist positions by offering *lower* salaries.  *See* Tr. 10-4-23 at 183:17-184:3

22  (Dr. Brown).  That is nonsensical as a commonsense matter, even if Plaintiffs' expert had

23  not identified other serious methodological flaws.

24      Even if the Court assumes Dr. Greulich's methodology was reliable, she admitted

25  that she did not study the impact of larger salary premiums than what CDCR has

26  previously offered and did not attempt to answer the question of whether larger salary

27  premiums would be more effective at increasing fill rates.  Tr. 10-3-23 at 10:1-6

28  (Dr. Greulich).   Dr. Greulich agreed that her analysis leaves significant "uncertainty"

about whether substantially higher premiums would be more effective at increasing fill rates, Tr. 10-3-34 at 12:12-18, though at her deposition she was not "uncertain" about this point at all—she testified it was her "expectation that…the response is going to change as the premiums increase." Tr. 10-3-23 at 19:8-15. Even if the Court credits Dr. Greulich's trial testimony on this point, the "uncertainty" she identified is exactly why CDCR needed to *try* offering higher premiums before concluding they wouldn't work. Their failure to do so proves that they did not take all reasonable steps to comply with the Court's orders and should be held in contempt.

Nor do Defendants' own actions suggest they believe that raising salaries has no effect on fill rates. Time and time again, they have raised salaries, including in the most recent MOU negotiations, and registry rates, including with the newest contract. It is not that Defendants do not understand that money talks. It appears instead that they are simply unwilling to pay what it takes to compete with other employers or even to keep up with inflation, which has resulted in their failure to take any numbers of commonsense, reasonable steps to attract and retain sufficient numbers of clinicians.

For instance, Defendants did not take the reasonable step of raising salaries to match what they pay mental health staff in the Psychiatric Inpatient Programs (PIPs). In May 2022, CDCR provided a 15 percent pay increase to all mental health staff working in the PIPs but excluded mental health staff working in CDCR's non-PIP programs—the very programs at issue in these proceedings. Tr. 10-3-23 at 100:13-101:7 (Muhammad). When asked why a similar pay increase was not extended to non-PIP mental health staff as well, the Deputy Director of Human Resources for the California Correctional Health Care Services, Jasinda Muhammad, stated only that "we were focused on increasing staffing in the PIP." Tr. 10-3-23 at 91:13-14.

Defendants' witnesses offered no reason why it would not have been reasonable to "focus" on staffing in the non-PIP programs as well. At the time the PIP pay increase went into effect, Defendants were subject to the Court's October 2017 order requiring them to fully comply with the 2009 Staffing Plan (which applies only to non-PIP programs). *See*

1   ECF No. 5711 at 30.  CDCR officials are aware that this Court had previously issued a

2   series of orders to prevent staffing shortages caused by pay disparities among clinicians

3   serving inpatient and outpatient class members.  Tr. 10-3-23 at 102:8-14 (Muhammad);

4   ECF No. 2301; ECF No. 2134; ECF No. 2236.   And they were aware of the worsening

5   staffing crisis among social workers and psychologists for approximately 18 months before

6   May 2022.  Tr. 10-4-23 at 89:20-90:3 (Dr. Mehta).  By then, vacancy rates for non-PIP

7   social workers and line psychologists were regularly exceeding 20 percent and 30 percent,

8   respectively. *See* PL-091; PL-092; PL-093; PL-094; PL-095.  Extending the 15 percent PIP

9   pay increase to non-PIP mental health staff would have been entirely reasonable under

10  these circumstances—particularly given the entirely foreseeable risks that a substantial

11  number of non-PIP staff would leave to work in the PIPs and that morale would suffer

12  among staff who remained.  *See, e.g.*, Tr. 10-3-23 at 100:13-101:7 (Muhammad); Tr. 10-5-

13  23 at 28:11-29:9 (Dr. David),  (Dr. Minor), 86:3-18 (Dr. Franceschi).

14       Defendants also failed to take the reasonable steps of offering candidates more than

15  the bare minimum salary for each position and informing them that they might be eligible

16  to negotiate higher salaries on an individualized basis.  Jasinda Muhammad testified that

17  CDCR's initial offers of employment to candidates for vacant mental health positions

18  always list only the bare minimum salary for the position, regardless of whether the

19  candidate's experience makes him or her eligible for a higher salary through the "Hiring

20  Above Minimum" (HAM) process.  Tr. 10-3-23 at 106:16-107:21.  Ms. Muhammad

21  further testified that it is each candidate's responsibility to affirmatively seek out

22  information about HAM eligibility during the hiring process, Tr. 10-3-23 at 108:15-109:2;

23  that even candidates with extraordinary experience are not eligible for salaries above the

24  maximum salary band for their position, *id.* at 109:25-110:4; that current employees who

25  are dissatisfied with their salary are categorically excluded from the HAM process, *id.* at

26  110:5-15; and that CDCR has not requested waivers or any other exceptions from the rules

27  governing the HAM process, *id.* at 110:16-18.  These practices put CDCR at a "massive

28  disadvantage" when trying to hire for the positions at issue in these proceedings, and that

1   the continuation of these practices in spite of CDCR's current staffing crisis suggests that

2   Defendants are making only minimal efforts to fill vacant positions. Tr. 10-4-23 at

3   174:11-21 (Dr. Brown). Defendants' failure to change these practices further shows that

4   they have not taken all reasonable steps to comply with their staffing obligations.

5           There are still more reasonable steps Defendants did not take to provide adequate

6   compensation to mental health staff. They did not ensure that psychologist and social

7   worker salaries keep pace with inflation. Tr. 10-4-23 at 163:3-13. They did not make

8   psychologists eligible for "recruitment and retention" bonuses until approximately 18

9   months after vacancy rates began to skyrocket, and then waited another 14 months after

10  that to extend the bonuses to social workers. Tr. 10-3-23 at 103:16-104:3 (Muhammad);

11  PL-041; Tr. 10-5-23 at 152:11-153:18; 154:8-25 (Reinhold). They allowed registry rates

12  to remain essentially static for five years between 2017 and 2022, even though they knew

13  existing rates were not yielding sufficient candidates, and then in April 2023 increased

14  registry rates at only certain institutions while leaving rates all but unchanged at some of

15  the most severely understaffed facilities. Tr. 10-3-23 175:19-176:18, 177:11-25, 179:11-

16  182:6, 187:3-19 (Ponciano); *Compare* DEFS-018.149-151 (identifying institutions that

17  remained in the lowest tiers of compensation rates for psychologists and social workers),

18  *with* ECF No. 7849 at 6-7. They did not take steps to mitigate the impact of pension

19  reforms on recruitment and retention, ECF No. 7999 at 84:22-86:2 (Dr. Burton), and didn't

20  even discuss the possibility of obtaining waivers of state law at any point since 2017, let

21  alone submit formal requests. Tr. 10-3-23 at 130:23-24, 131:5-9 (Muhammad). And they

22  did not try to match the salaries of employers like Kaiser Permanente that have

23  successfully lured numerous clinicians away from CDCR institutions with particularly

24  acute staffing shortages, such as CMF, CHCF, and CSP-SAC. Tr. 10-5-23 at 19:1-4, 21:3-

25  23:15 (Dr. David), 67:10-69:8 (Dr. Franceschi); 109:16-25 (Dr. Minor); Tr. 10-5-23 at

26  149:20-151:13 (Reinhold).

27          Given the severity of Defendants' non-compliance with their staffing obligations, they

28  needed to take all of these steps to ensure that their compensation for mental health remained

1    competitive.  Because they did none of them, the Court should hold them in contempt.

2    **B.    Defendants Have Not Taken All Reasonable Steps To Streamline Their Hiring Process.**

3

4    Defendants also have not taken all reasonable steps to reduce unnecessary

5    bureaucratic delays in their hiring process, which multiple witnesses identified as a major

6    barrier to filling the vacant mental health positions at issue in these proceedings.  Jasinda

7    Muhammad testified that it generally takes 108 *business* days for her staff to complete the

8    hiring process for new mental health clinicians in the non-PIP programs.  Tr. 10-3-23 at

9    128:15-24.  Recent initiatives to reduce this time lag to 65 business days, which

10   Defendants began working on *six years ago*, are limited to just one prison.  Tr. 10-3-23 at

11   125:15-24, 126:4-14 (Muhammad).  Multiple institution-level chiefs of mental health, all

12   of whom testified that they are closely involved in the hiring process, agreed that it

13   frequently takes months for HR staff to contact applicants for interviews and/or extend

14   formal offers of employment to successful interviewees, and that as a result of these delays

15   many (and sometimes all) applicants for a position at their institution accept offers from

16   other employers before CDCR even contacts them.  *See* Tr. 10-5-23 at 11:15-12:17

17   (Dr. David), 59:9-60:8, 63:2-17  (Dr. Franceschi); ECF No. 7999 at 63:4-67:20, 71:14-

18   72:23 (Dr. Burton); *see also* Tr. 10-5-23 at 141:5-142:24 (Reinhold).  Ms. Muhammad

19   further testified that her department would have been able to review applications and

20   contact candidates more quickly with additional staff of their own, but that Defendants did

21   not submit a budget request for additional HR positions until recently.  Tr. 10-3-23 at

22   118:9-120:6; 123:19-21.

23   The Court should issue findings of contempt because Defendants have not taken all

24   reasonable steps to reduce unnecessary delays in their process for hiring new mental health

25   staff.

26   **C.    Defendants' Other Measures Are Plainly Insufficient.**

27   Defendants have taken no steps to investigate the potential use of Licensed Marriage

28   and Family Therapists in their mental health system, even though CDCR has repeatedly

1   piloted (and abandoned) a program evaluating exactly that possibility specifically to address

2   difficulties in recruiting psychologists.  10-4-23 Tr. 128:4-129:4 (Dr. Mehta); *see* Special

3   Master 21st Round Monitoring Report (July 31, 2009), ECF No. 3638-4 at 32 (LMFT pilot at

4   CSP-Corcoran started to "offset the difficulty in recruiting individuals into long-standing

5   staff psychology vacancies"), ECF No. 3638-5 at 41 (LMFT pilot also started at CMC); *see*

6   *also* Special Master 25th Round Monitoring Report (Jan. 18, 2013), ECF No. 4298 at 288

7   (LMFT pilot at CMC ultimately abandoned due to "staffing cuts").  This is true despite their

8   knowledge that the Receiver has begun utilizing that classification to provide clinical care in

9   CCHCS's integrated substance use disorder treatment program (ISUDT), which, inter alia,

10  provides class members mental health care including cognitive behavioral treatment.  10-4-

11  23 Tr. 128:4-129:18 (Dr. Mehta); *see* Defs-019.351.

12          Despite complaints from the field, Defendants also have failed to provide adequate

13  administrative support for clinical staff, including abandoning without notice their court-

14  ordered plan to provide each psychiatrist with a medical assistant as a means of improving

15  retention.  *See* ECF No. 7999 at 40:25-50:1, 50:5-53:4, 53:1-54:12 (Dr. Burton) (MAs

16  would improve patient care and staff retention, and the lack of MAs for in-person

17  psychiatrists has been raised with CDCR leadership several times), 86:18-87:20 (more

18  clinical support services could certainly help with recruitment and retention), 95:25-96:5,

19  96:21-97:23 (lack of administrative support staff and MAs for psychiatrists hurts

20  retention), 100:12-101:4 (lack of admin staff for on-site psychiatrists is a problem across

21  CDCR, and he has raised the lack of admin staff with HQ); *see also* 4/11/23 Order, ECF

22  No. 7806 at 5-6.

23          Defendants also have not sought any waivers of state law to address their staffing

24  crisis since at least 2017, despite their knowledge that the Receiver has sought and

25  received such waivers to address shortages of medical staff on multiple occasions,

26  including for the specific purpose of raising salaries, with no opposition from Defendants.

27  *See* Pls' RJN Ex. A at 1 & Ex. B (*Plata* Receiver Sept. 12, 2006 motion and supportive

28  exhibits, Dkts. 543-544, seeking waivers to address "crisis with clinical staffing within

1   California's prisons" driven by "the long-term and grossly inadequate salaries offered by the
2   State of California to clinical personnel who seek employment in its prisons"); Pls' RJN Ex.
3   C at 10-12 (10/17/06 *Plata* Order, Dkt. 554, granting Receiver's motion for waivers of state
4   law to raise medical staff salaries where Defendants have failed to act and "the history of
5   this case demonstrates that salary increases can effectively address the high vacancies rates
6   that have chronically plagued the CDCR's ability to attract and retain qualified medical
7   clinicians"); *see also* Pls' RJN Ex. D (11/3/08 *Plata* Order, Dkt. 1754, granting Receiver's
8   motion for waivers of state law to increase salaries for executive positions).

9           Indeed, while Defendants' mental health system is plagued by staffing levels far, far
10  worse than those precipitating the original *Plata* waivers (*see* Pls' RJN Ex. C at 3),
11  medical staffing under the Receiver's leadership remains robust today despite the pressures
12  of the pandemic.  *See* Pls' RJN Ex. E (CCHCS Primary Care Provider Vacancy/Coverage
13  Report dated May 1, 2023, ECF No. 3865, showing systemwide primary care provider fill
14  rate of 97.94%, not including additional pending hires).  Nonetheless, Defendants have not
15  requested that the *Plata* Receiver assume responsibility for mental health hiring even
16  though that possibility was specifically contemplated by the formal court-approved
17  coordination agreements.  *See* Pls' RJN Ex. F at 6 (May 29, 2007 Order Approving
18  Coordinated Agreements in *Plata, Coleman*, and *Perez*, filed at *Plata* Dkt. 2247,
19  authorizing the *Plata* Receiver to assuming responsibility for medical hiring and noting
20  Receiver would consider assuming responsibility for mental health hiring in the future).
21  This is true even though Plaintiffs invited just such a remedy.  *See* Feb. 10, 2023 Status
22  Conf. Tr., ECF No. 7726 at 13:1-20.

23          **D.    Defendants' Telepsychiatry and Telemental Health Program Does Not
               Absolve Them of their Obligation to Take All Reasonable Steps With
24             Regard to Non-Psychiatry Positions.**

25          At trial, Defendants elicited extensive testimony about their existing telepsychiatry
26  program and its role in reducing the number of vacant psychiatrist positions systemwide.
27  The telepsychiatry program is relevant to this proceeding only insofar as it amounts to one
28  step Defendants have taken to reduce psychiatrist vacancies.  It does not absolve

1  Defendants of their obligation under the Court's October 2017 Order to fully implement

2  their 2009 Staffing Plan, as amended, and it is not relevant to the question of whether

3  Defendants have taken all reasonable steps to fill at least 90 percent of their psychologist,

4  social worker, recreation therapist, and medical assistant positions.  *See Parsons v. Ryan*,

5  No. CV-12-0601-PHX-DKD, 2018 WL 3239691, at *10 (D. Ariz. June 22, 2018)

6  (compliance efforts must be "geared toward the specific issues precluding compliance"),

7  *aff'd*, 949 F.3d 443 (9th Cir. 2020).

8        **E.    Defendants' Brand New Tele-Psychology and Tele-Social Work
              Programs Are Too Little Too Late.**
9

10        Defendants also elicited extensive testimony about their brand new telepsychology

11  and telesocial work programs, which they first proposed and sought funding for in the

12  summer of 2023.  *See* ECF No. 7935 at 1; Tr. 10-4-23 at 16:18-17:3 (Dr. Martello).

13  Unlike Defendants' telepsychiatry program, their new telepsychology and telesocial work

14  programs are relevant to the key question that is before the Court: whether Defendants

15  have taken all reasonable steps to fill at least 90 percent of their psychologist and social

16  worker positions outside of the PIPs.  But even if the new programs could be implemented

17  promptly—and the evidence at trial clearly showed they cannot[2]— they still would not

18  save Defendants from contempt because they are both too little and too late.

19        The programs do too little because even if fully implemented they would add only

20  77 telepsychologists and only 41 telesocial workers—far below what is needed for

21  Defendants to reach a 90 percent fill rate for either classification.  *See* Tr. 10-4-23 at

22  20:23-21:19, 23:22-24:6 (Dr. Martello).  Although Dr. Martello testified that it is

23  "possible" the telepsychology program will grow in the future, she admitted that she was

24

25  _____

26  [2] *See, e.g.*, Tr. 10-4-23 at 17:10-18:4 (Dr. Martello testifying that none of the programs'
    line telepsychologist and line telesocial worker positions have been filled), 19:5-21

27  (candidate for chief telepsychologist position declined offer because it did not pay
    enough), 20:19-22 (programs not expected to be fully operational for at least two years);

28  22:23-23:8 (authority and funding for program expansion uncertain); 30:9-25
    (telepresenters won't be hired until after telemental health clinicians hired).

1   "not confident" CDCR would be able to obtain funding or legislative authorization to

2   expand the program.  Tr. 10-4-23 at 22:5-23:8.  Any expansion would also require the

3   hiring of additional telepresenters on top of the 100 new medical assistants that will need

4   to be hired for the programs in their current iteration to function.

5          The programs also do too little because at least some of the telehealth providers will

6   almost certainly be existing clinicians who transition from on-site to telework.

7   Dr. Martello admitted that at least "some" of the applications they have received thus far

8   are from current CDCR psychologists and social workers.  Tr. 10-4-23 at 34:12-35:10.

9   She also admitted that the sole person hired into either program thus far was an existing

10  CDCR social worker.  Tr. 10-4-23 at 35:4-17.   Notably, Defendants chose not to offer pay

11  incentives for on-site psychologist or social work positions to discourage this kind of

12  poaching from the existing clinical programs, despite offering such differential pay for on-

13  site psychiatrists.

14         The telepsychology and telesocial work programs also come too late to excuse

15  Defendants' longstanding non-compliance.  Defendants began utilizing telepsychiatry in

16  approximately 2010, and Dr. Martello testified that it has been effective at reducing

17  psychiatry vacancies.  Tr. 10-4-23 at 15:23-16:8.  Yet they did not even propose a

18  telepsychology program or telesocial work program until after four months after these

19  proceedings were initiated, two and a half years after the vacancy rates for psychologists

20  and social workers began to sky rocket, and approximately 13 years after they began using

21  telepsychiatry.  ECF No. 7935 at 1; Tr. 10-4-23 at 15:23-16:1, 16:18-17:3 (Dr. Martello).

22  *See Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1113-14 (D. Idaho 2013) ("long overdue

23  move" did not support all-reasonable-steps defense because it was "part of the reasonable

24  steps [the defendant] should have taken years ago"), *aff'd*, 822 F.3d 1085 (9th Cir. 2016);

25  *A.B. by & through Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-

26  1178 MJP, 2023 WL 4407539, at *11 (W.D. Wash. July 7, 2023) (health services agency

27  did not take all reasonable steps where it "fail[ed] to prepare for and react swiftly to" a

28  sudden increase in demand for inpatient beds).

**IV.   THE COURT CAN AND SHOULD HOLD DEFENDANTS LIABLE FOR THE FINES THAT HAVE ACCUMULATED SINCE FEBRUARY 2023.**

On February 28, 2023—more than thirteen years after Defendants first adopted their 2009 Staffing Plan, and more than five years after the Court gave Defendants one year to comply with the patient/staff ratios in that Plan, ECF No. 5711 at 30 ("October 2017 Order")—the Court issued a schedule of prospective, conditional fines that would begin accumulating "month to month" if, and only if, Defendants remained non-compliant with their staffing obligations after a grace period.  ECF No. 7742 at 5-6 ("February 2023 Order").  Defendants argue in their opening brief that this Court cannot impose any of the fines that have accrued pursuant to the February 2023 Order, even if it holds Defendants in contempt, because the Court did not previously issue findings of contempt in either its October 2017 or February 2023 orders.  According to Defendants, "fines that pre-date a future finding of contempt cannot be imposed" because "Defendants must be afforded an opportunity to purge following any finding of civil contempt[.]"  ECF No. 7951 at 20.

For the reasons explained below, the Court can and should impose the fines.

**A.   The Fines Are Properly Calibrated to Advance Both Coercive and Compensatory Purposes.**

Because civil contempt sanctions can be imposed without the full slate of procedural protections available to criminal defendants, they must serve "remedial" rather than "punitive" ends.  *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826-28 (1994) (quoting *Gompers v. Bucks Stove & Range Co*., 221 U.S. 418, 444 (1911)).  Where the sanctions at issue are monetary fines, as here, the fine is civil and remedial if it is designed either to "coerce the defendant into compliance with the court's order, [or] … compensate the complainant for losses sustained."  *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947).  Where a fine is purely coercive, "it is civil only if the contemnor is afforded an opportunity to purge"—that is, to "reduce or avoid the fine through compliance."  *Bagwell*, 512 U.S. at 829.

Defendants assert that the fines in these proceedings have no compensatory purpose

1   and are purely coercive.  But this is incorrect.  There is little doubt that the fines in this

2   case are intended *in part* to coerce Defendants into compliance.  The Court took great care

3   to structure the fines in a manner that ensures Defendants have just enough of an incentive

4   to fill their mental health positions rather than leaving them vacant, taking into account the

5   amount Defendants would save in salaries and benefits by failing to fill the positions.  *See*

6   ECF No. 7742 at 5-6; *United States v. United Mine Workers of America*, 330 U.S. 258, 304

7   (1947) (structure of coercive contempt fine must take into account, among other things, its

8   "probable effectiveness…in bringing about the result desired").  And the record in this

9   case includes ample evidence that the fines are also properly structured to address "the

10  character and magnitude of the harm threatened by continued contumacy" and "the amount

11  of the defendant's financial resources and the consequent seriousness of the burden to that

12  particular defendant."  *United Mine Workers*, 330 U.S. at 304; *see* Tr. 10-5-23 at 31:12-

13  34:13 (Dr. David) ("We can't provide Program Guide services.  We're not even providing

14  what you could consider to be standard of care in the community at this point.  Clinical

15  continuity is nonexistent. We're doing the best we can, and it is nowhere good enough for

16  the needs of our patients."), Tr. 10-5-23 at 35:6-36:22 (Dr. David) ("I have patient safety

17  concerns every day.  It's exhausting and draining and difficult to know that we have men in

18  our care who are ill, who are sick, who are coming to us for help, and we are not able to

19  give them the help that they need.  It is not why I came into this field.  It is not why my

20  employees came into this field."); Tr. 10-5-23 at 116:19-117:15, 120:10-12, 122:14-21,

21  124:6-125:5, 125:15-23, 126:24-127:3: (Dr. Minor) (high caseloads in non-PIP programs

22  at CHCF limits care that can be provided and has led to increases in RVRs and self-harm

23  incidents); Defs.' 2022 Annual Report on Suicides in CDCR, PL-110 at 7, 58, 64-65 &

24  Fig. 24 (noting institutions' inability to comply with Program Guide requirements and

25  suspension of certain suicide prevention measures due to inadequate staffing).[3]

26  _____

27  [3] On October 18, 2023, the Court directed the parties to address admissibility of PL-110 in
28  the closing briefing.  This is addressed in Section V, below.

1   But the record in this case shows that the fines will serve compensatory purposes as

2   well: namely, to "meet the mental health needs of inmates in a reasonable manner and

3   within the standard of care."  ECF No. 5711 at 15 (quoting ECF No. 4539 at 54-55); *see*

4   *Parsons v. Ryan*, 949 F.3d 443, 456 (9th Cir. 2020) (contempt fines directed at defendant-

5   prison administrators deemed compensatory as well as coercive because the fines would

6   "address Plaintiffs' injuries" and "further compliance with the healthcare requirements" of

7   the underlying consent decree).  The Court has made no orders about the use of any fines

8   that are eventually paid, and retains discretion to order them used for compensatory

9   purposes.  The $50 million in fines accrued thus far, divided by approximately 33,000

10  *Coleman* class members, yields a per class member sum of $1,515.  While this is far too

11  little to compensate the class for long-standing deprivations of minimally adequate mental

12  health care, it may still be possible to fashion a use of the funds that benefits the *Coleman*

13  class.

14  Even without paying the fines directly to the *Coleman* class, the Court has authority

15  to order a payment structure that incents filling the positions necessary to provide adequate

16  care for the class.  For example, the Court has the authority to find the Defendants' liable

17  for the accumulated fines, but to suspend the payment obligation, and at the same time

18  allow future compliance to purge the accumulated liability over time.  This could be done

19  by giving Defendants a certain amount of credit against the accumulated fines for each

20  month in which they comply with the staffing plan.  *See* Section IV.C below.

21  Alternatively, the Court could direct the use of the funds on improvements on the mental

22  health system to benefit the Coleman class.

23  **B.    The Court Provided Ample Opportunity to Purge**

24  Because the fines in this case are compensatory as well as coercive, due process

25  demands less in terms of purging opportunity than what the Court has already provided to

26  Defendants.  *See Bagwell*, 512 U.S. at 838 ("Our holding…leaves unaltered the

27  longstanding authority of judges…to enter broad compensatory awards for all contempts

28  through civil proceedings,").  But the Court has provided Defendants with ample

1  opportunity to purge regardless of whether the fines serve coercive purposes,

2  compensatory purposes, or both.

3          The Court issued its schedule of fines more than 13 years after Defendants adopted

4  their 2009 Staffing Plan, and more than five years after the Court ordered Defendants to

5  come into full compliance with that Plan within one year.  As a result, when the Court

6  issued this schedule of fines, both the substantive requirements and the deadlines relating

7  to Defendants' staffing obligations were already "well known to the parties and reviewed

8  in numerous court orders, including the October 10, 2017 order, ECF No. 5711, and most

9  recently in the court's January 6, 2023 order, ECF No. 7699."  ECF No. 7742 at 3.

10  Nonetheless, the Court built in even more advance notice and opportunity for Defendants

11  to reduce or avoid the fines through compliance.  The Court ordered that no payment

12  hearing would take place unless fines "accumulate for three consecutive months."  *Id* at 6.

13  If Defendants had come into compliance for even one month out of every three after

14  February 2023, they would not be in the position of having to account for the violations by

15  contempt.

16          Defendants mischaracterize the "purgeability" requirement for coercive civil

17  contempt fines.  "Prospective, conditional fines" are "the paradigmatic coercive civil

18  contempt sanction," *Parsons*, 949 F.3d at 455, and can be imposed so long as the alleged

19  contemnor is provided an opportunity to "reduce or avoid the fine through compliance."

20  *Bagwell*, 512 U.S. 821, 829 (1994) (quoting *Penfield Co. of Cal. v. SEC*, 330 U.S. 585,

21  588 (1947); *see also Coleman v. Brown*, No. 2:90-CV-0520-KJM-DBP, 2017 WL

22  1398828, at *5 (E.D. Cal. Apr. 19, 2017), *aff'd*, 756 F. App'x 677 (9th Cir. 2018).  This is

23  all that is required for a fine to be labeled "purgeable."  There is no rule requiring that

24  formal findings of contempt precede the accrual of prospective, conditional fines, like

25  those in this case—so long as the schedule of fines was announced before the fines began

26  to accrue, thereby giving the alleged contemnor the requisite notice and opportunity to

27  reduce or avoid the fines through compliance.  *See NLRB v. Ironworkers Local 433*, 169

28  F.3d 1217, 1218, 1221 (9th Cir. 1999) (rejecting due process defense where contempt

1  judgment followed accrual of fines pursuant to enforcement provisions in earlier consent

2  decree); *Salazar ex rel. Salazar v. D.C.,* 602 F.3d 431, 435, 437-40 (D.C. Cir. 2010)

3  (same).  In fact, a rule requiring formal contempt findings to precede the accrual of fines

4  would make little sense, as it would mandate *less* notice than what the Court provided

5  here: advance warning not only of the risk of fines but also of the risk of a contempt

6  judgment in the first place.

7         Defendants' cases are not to the contrary.  *CBS Broadcasting* does not say that

8  courts *must* issue their formal contempt findings before fines start to accrue.  *See* 814

9  F.3d 91, 101-02 (2d Cir. 2016).  Rather, it says that courts *can* structure contempt

10  proceedings in this way—at least where there is a *second* contempt judgment that follows

11  the opportunity to reduce or avoid the fines through compliance.  *Id.*

12         Nor do the references in *Bagwell* to "summary adjudication of indirect contempts"

13  involving "complex injunctions" help Defendants here.  ECF No. 7951 at 12-13 (citing

14  *Bagwell*, 512 U.S. at 833-34).  The Court has not conducted a "summary adjudication" of

15  the contempt charges in this case—it held a full evidentiary hearing that lasted four court

16  days.  And *Bagwell*'s separation-of-powers rationale for holding "complex injunctions" to

17  a stricter standard of due process does not apply here because Defendants themselves came

18  up with the Plan they have failed to implement, not the Court.  *See* ECF No. 5711 at 3;

19  *Bagwell*, 512 U.S. at 840 (Scalia, J., concurring) (arguing that the purported fusion of

20  legislative, executive, and judicial functions in structural reform litigation raises unique

21  due process concerns); *Ironworkers Local 433*, 169 F.3d at 1220 ("[T]he Court in *Bagwell*

22  was clearly concerned about the possible abuse of power when a judge orders oppressive

23  sanctions for violations of complex standards of the judge's own making.").

24         Regardless of the exact amount of process due in these circumstances, Defendants

25  have had more than sufficient opportunity to reduce or avoid the Court's prospective,

26  conditional fines through compliance.  Those fines only began to accumulate on March 31,

27  2023—more than *thirteen years* after Defendants developed and adopted their 2009

28  Staffing Plan, and more than *five* years after the Court issued the October 10, 2017 that

1   Defendants are now charged with violating.  ECF No. 7742 at 5.  The Court also gave

2   Defendants an additional three-month grace period following its February 2023 Order,

3   during which Defendants needed only to show compliance for one month out of every

4   three to avoid contempt.  *Id.* at 6.  The Court also structured the fines such that the amount

5   owed is determined by the magnitude of Defendants' non-compliance each month.  *Id.* at

6   5-6.  As a result, Defendants can reduce (and have reduced) the amount of the fines they

7   will owe through partial compliance.

8         **C.**    **If The Court Remains Concerned About Due Process, Its Order Should**

               **Temporarily Suspend Payment of the Fines That Have Accrued To**

9                  **Date, Pending Defendants' Full Compliance By A Date Certain in 2024.**

10         As explained above, it is well within the Court's authority to hold Defendants in

11   contempt and order them to pay all fines that have accrued pursuant to the Court's

12   February 28, 2023 Order.  *See* ECF No. 7742.  But in the event the Court has doubts, any

13   remaining due process concerns can easily be addressed by temporarily suspending

14   Defendants' obligation to the pay the fines, pending full compliance by a date certain in

15   2024.  *See Bagwell*, 512 U.S. at 829-30; *United Mine Workers*, 330 U.S. at 305.  If the Court

16   opts for this approach, its order should also provide for a kind of fine forgiveness program,

17   whereby only a portion of the suspended fines that have accrued to date are forgiven for each

18   month that Defendants are fully compliant.  Structuring the suspended fine in this way

19   would ensure that Defendants have an incentive not only to come into compliance but to *stay*

20   in compliance long enough for the entire amount of the fine to be forgiven.

21         **D.**    **Fines Alone Are Not Likely to Bring About Compliance.**

22         Even with the fines accumulating over months, Defendants have not acted with

23   enough urgency to fill positions.  The evidence reviewed above shows many reasonable

24   steps they could implement, including a more flexible salary setting system, better use of

25   registry, a faster recruiting process, improvements in working conditions, greater efforts to

26   recruit from the unlicensed clinicians who work at CDCR to get their pre-licensing hours,

27   and expanding the use of additional types of licensed clinicians, such as Marriage and

28   Family Therapists, just to name a few.  Additional court orders may be necessary to

1   require Defendants to implement such reasonable measures.

2   **V.    THE 2022 ANNUAL REPORT ON SUICIDES AND SUICIDE PREVENTION**
3   **EFFORTS IN CDCR IS ADMISSIBLE TO SHOW THE CONNECTION**
    **BETWEEN UNDERSTAFFING AND HARM TO THE CLASS.**

4          Exhibit P-110 is admissible over Defendants' hearsay and relevancy objections.

5   The document is titled "California Department of Corrections and Rehabilitation 2022

6   Annual Report on Suicides and Suicide Prevention Efforts in the CDCR."  PL-110.001.

7   This is the same report that Defendants' filed with this Court on October 18, 2023.  *See*

8   ECF No. 8017 at 47-131.

9          P-110 is relevant to show the magnitude of harm caused by understaffing, which

10  goes to whether the monetary sanctions are set at an appropriate level.  *See United Mine*

11  *Workers,* 330 U.S. at 304.  Defendants' Chief of Mental Health, Dr. Mehta testified he

12  agreed with the following statement in the report:

13         [Q] . . . So this report provided to the legislature two days ago

14         confirms that understaffing affected suicide prevention efforts

15         last year. I'll read this to you:

16         This report on suicides that occurred in CDCR during 2022

17         would be remiss if it did not discuss the fact that there are

18         significant and persistent staffing shortages that plagued many

19         of the prisons in the CDCR system. While it is difficult to

20         determine a direct nexus between staffing shortages and deaths

21         by suicide in CDCR custody, it is important to recognize the

22         impacts of reduced staffing. Provision of clinical care at

23         levels consistent with the MHSDS Program Guide has been

24         challenging at many institutions.

25         Do you agree with that?

26         A. Yes.

27         Q. Also on the same page, it says that care is being triaged

28         due to a lack of clinical staffing. And I quote, as a result

[4374143.9]

20

1    of these difficulties, institutions focus their limited

2    clinical staff on the more acute and emergent needs of their

3    programs.

4       Do you agree with that?

5       A. Yes.

6       Tr. 10/4/23 at 137:6-138:1. Dr. Mehta's testimony confirms the relevancy of the

7    report to show how failure to comply with the required staffing levels undermines care.

8    Dr. Mehta further testified that he agreed with the report's conclusion that fulfilment of

9    certain suicide prevention measures had fallen due to staffing shortages. *Id.* at 138:3-8.

10      P-110 is not hearsay; it is a party-admission under Rule 801(d)(2) of the Federal

11   Rules of Evidence. CDCR's reports have been received as party admissions in this case

12   throughout the history of this litigation, and the Court has characterized hearsay arguments

13   as to these motions as "bordering on frivolous." *See Coleman v. Brown*, 922 F. Supp. 2d

14   1004, 1024 (E.D. Cal. 2013). The 2022 Suicide Report falls under the rule for authorized

15   statements by agents of the California Department of Corrections. FRE 801(d)(2)(C).

16   Dr. Mehta testified that the report was prepared by his team under his oversight. Tr.

17   10/4/2023 at 136:1-137:3. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1294 (E.D. Cal.

18   1995) (overruling hearsay objection to statements of correctional director).

19      In addition to being the work of an authorized agent, the 2022 Suicide Report was

20   adopted by Defendants when they filed it with Court on October 18, 2023, under a cover

21   identifying it as "the California Department of Corrections and Rehabilitation's (CDCR)

22   2022 Annual Report to the Legislature on Suicides in CDCR and the 2022 Annual Suicide

23   Report." ECF No. 8017 at 4. It is thus an adoptive statement under FRE 801(d)(2)(B).

24   CDCR's filing of the report with this Court is conduct that "manifested the intent that it

25   adopted or believed [it] to be true." FRE 801(d)(2)(B). In addition, the filing of the

26   document in this Court with a cover pleading representing that it is CDCR's report is a

27   binding judicial admission that it is the statement of CDCR and its authorized agents, and

28   therefore non-hearsay. *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 557

1  (9th Cir. 2003).

2       Even if P-110 were not a party admission—which it plainly is—it would fall under

3  one or more hearsay exceptions.  P-110 is a report by CDCR to the California Legislature,

4  and thus falls under the public records hearsay exception of FRE 803(8).  *See Coleman,*

5  922 F. Supp 2d at 1025 (overruling hearsay objection to CDCR report to Receiver as both

6  party admissions and FRE 803(8) public records).

7                          **CONCLUSION**

8       In light of the foregoing, Plaintiffs request that the Court find that Defendants' non-

9  compliance with their staffing plan is not excused by impossibility, nor by having taken all

10 reasonable measures to comply, and find Defendants are liable for the accumulated

11 contempt fines.

12                        **<u>CERTIFICATION</u>**

13      Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

14 filing:  ECF Nos. 1383, 2134, 2236, 2301, 4539, 5711, 7504, 7699, 7742, 7806, 7916,

15 7961, 7976, 7977, 7981, 8006, 8016, *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.

16 1995).

17

18 DATED:  October 20, 2023            Respectfully submitted,

19                                    ROSEN BIEN GALVAN & GRUNFELD LLP

20

21                                    By:  */s/ Ernest Galvan*

22                                         Ernest Galvan

23                                    Attorneys for Plaintiffs

24

25

26

27

28