1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   DAMON MCCLAIN, State Bar No. 209508
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    NAMRATA KOTWANI, State Bar No. 308741
5   Deputy Attorneys General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone:  (916) 210-7318
    Fax:  (916) 324-5205
8   E-mail:  Elise.Thorn@doj.ca.gov
    Attorneys for Defendants
9

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
   1676 N. California Boulevard, Suite 620
   Walnut Creek, CA 94596
   Telephone:  (925) 746-8460
   Fax:  (925) 746-8490
   E-mail:  PMello@hansonbridgett.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S SEPTEMBER 21, 2023 REPORT RE THIRD LEVEL DATA REMEDIATION DISPUTE ON THE TIMELY COMPLIANCE METHODOLOGY** |

**INTRODUCTION**

In his report on the Timely Compliance Methodology (TCM Report), the Special Master recommends that this Court order the California Department of Corrections and Rehabilitation (CDCR) to provide the following methodologies for 26 key performance indicators:  (1) data and summary statistics using the Special Master's approach–inclusive of flexible scoring; (2) "a degree of impact statistic" that shows the extent of non-compliance for the  data; and (3) data and summary statistics using Defendants' proposed methodology.[1]  (ECF No. 7954.)

---

[1] An inordinate portion of the TCM Report discusses the Golding Report and the Neutral Expert's findings, none of which are germane to any of the TCM methodologies discussed in the

1

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1

Defendants object to the TCM Report because it fails to correct the deficiencies with the Special Master's proposed methodologies identified in Defendants' Level 2 Dispute Statement. Namely, the TCM Report fails to provide the necessary definitions and parameters to analyze or actually construct the proposed methodologies and indicators, fails to identify evidence-based support for the Special Master's methodology, and contains inaccurate descriptions of the purpose and scope of data remediation.

Defendants object to the conclusions and recommendations set forth at pages 31 to 34 of the TCM Report on the following bases:

- The Special Master's proposed compromise that would allow CDCR to self-monitor using its proposed methodology while the Special Master monitors and reports using the Special Master's methodology is really no compromise because CDCR can only use its preferred methodology "internally," while the Special Master's preferred and untested method will become the de facto method for monitoring and reporting purposes;

- The Special Master's proposed methodologies are vague, overly complex, inconsistent with the Special Master's prior reports on compliance; will result in less than fully transparent reporting; and are not appropriate for use as compliance metrics; and

- The Special Master's recommendation that the stakeholders rely on multiple measurements for at least 26 key performance indicators will result in divergent and inconsistent findings that will cause confusion for the Court and the Statewide Mental Health Program and potentially provide the Court with misleading data, which is inconsistent with the purpose of data remediation.

The Special Master's proposed methodologies are incomplete, confusing, and vague, and, if adopted, will obfuscate relevant data that would otherwise be plainly and transparently presented through Defendants' methodology. In fact, the Special Master's proposed methodologies seem specifically designed to hide relevant information rather than present it in a straightforward and transparent manner.

Accordingly, Defendants ask that the Court approve the TCM Report's recommendation that allows CDCR to provide data and summary statistics using CDCR's transparent and

---

TCM Report, or Defendants' legitimate concerns about the TCM Report's recommendations. Accordingly, Defendants will not address those portions of the report and leave the Court to draw its own conclusions about why the Special Master felt it necessary to take that approach.

19900160.1

1    straightforward proposed methodology but modified to expand its use for monitoring and

2    reporting purposes as outlined in Defendants' Level 2 Dispute filed as part of the TCM Report.

3    (ECF No. 7954-1.)  The Court should reject the remaining two recommendations that would

4    allow the Special Master to use only his proposed methodologies for monitoring and reporting

5    purposes.

6           But if the Court decides to fully adopt the Special Master's recommendations, the Court

7    should order the Special Master to provide a report that sets forth the proposed methodologies as

8    applied to each affected indicator, including the recommended internal threshold, the

9    recommended reporting period, and how the degree of impact statistic will be applied, and further

10   order that any future reporting by the Special Master that references statistics generated by  his

11   proposed methodologies must also reference statistics from Defendants' methodology for the

12   same indicators.  Absent such an order, the Court would receive a report that fails to set forth

13   relevant and transparent information concerning compliance.

14                                          **DISCUSSION**

15          The discussion below, and Defendants' objections in general, refer to a group of

16   provisionally approved key indicators that measure timely compliance with Program Guide

17   requirements and other mental health policies.  (ECF No. 7954 at 11-12.)[2]

18   **I.    DEVELOPMENT OF THE COMPETING TIMELY COMPLIANCE METHODOLOGIES.**

19          "[T]he process of data remediation is fundamentally to equip defendants to accurately and

20   transparently report data to replicate the substance of Special Master's monitoring."  (ECF No.

21   7954 at 2, citing, May 23, 2023 Order, ECF No. 7847 at 7.)  Historically, the Special Master's

22   monitoring has focused on whether mental health services were provided to patients under the

23   time requirements set forth in the Program Guide.  While those time requirements have not

24   _____

25         [2]  The TCM Report includes those indicators but states that "[a]s of the time of this
     writing, CDCR had not made the documentation for MM5, MM6, MM7, MM8, MM9.1 available
26   to the stakeholders.  Therefore, these five items were not included in the original list of 19 TCM
     indicators."  CDCR disagrees with the reported status of the medication management indicators.
27   During BRMR on September 26, 2023, the Special Master's team acknowledged that indicators
     MM5 through -MM9.1 were previously reviewed in BRMR, but that changes were needed.
28   Defendants have in fact made the required revisions and the indicators will go through
     stakeholder review again.  (Cartwright Decl. ¶ 35.)

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1

1    changed, the Special Master has now endorsed a new and vague methodology that measures

2    compliance by only counting those individual patients who have received all (or some unspecified

3    amount) of the Program Guide required services within some undefined reporting period.  The

4    endorsement is premature as the Special Master has not field tested this methodology during his

5    monitoring tours.  Defendants' methodology, on the other hand, is consistent with the Program

6    Guide and historical monitoring in this case by focusing on whether mental health services were

7    provided to patients under the time requirements set forth in the Program Guide.

8        **A.    Defendants' Methodology.**

9        CDCR's methodology is described in detail in Defendants' Level 2 Dispute Statement,

10   filed as an attachment to the TCM Report.  (ECF No. 7954-1.)  CDCR's methodology measures

11   the percentage of service requirements (e.g., psychiatry contacts, primary clinician contacts,

12   interdisciplinary treatment team meetings) completed on time out of the total services required.

13   (ECF No. 7954-1 at 2.)  For example, the Program Guide requires weekly primary clinician (PC)

14   contacts for patients in Enhanced Outpatient Programs (EOP).  Using CDCR's methodology, if a

15   patient was required to be offered four PC contacts in a calendar month, but was only offered

16   three timely contacts, a 75-percent compliance rate would be reported.  Similarly, if a patient

17   required four PC contacts in a calendar month, but was only offered two timely contacts, that

18   individual patient would be 50 percent compliant under Defendants' methodology.

19       In actual use, CDCR's methodology will look at a particular service requirement to see if

20   the service requirement was delivered on time to multiple patients over a specific period such as

21   those patients in a particular housing unit or treatment program.  So if the two patients above

22   were the total population of a housing unit or treatment program, CDCR's methodology would

23   put the total number of timely contacts (five) over the total number of required contacts (eight) to

24   determine that PC contacts were offered timely 62.5 percent of the time to that population.

25   //

26   //

27

28

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1

1    The TCM Report endorses Defendants' methodology to some extent by recommending that

2    the Court approve Defendants' use of that methodology for all affected timely compliance

3    indicators.[3]  (ECF No. 7954 at 34-35.)

4        **B.    The Special Master's All-or-None Methodology.**

5        As detailed in Defendants' Level 2 Dispute Statement, the Special Master has not provided

6    a written explanation of his proposed methodologies.  (ECF No. 7954-1 at 4, fn. 4.)  In fact, even

7    after Defendants expressed this concern, the TCM Report does not provide an official definition

8    for the methodologies.  Defendants' understanding of the currently proposed methodologies is

9    based on the Level 1 discussions with the Special Master's team.  Defendants' understanding is

10   set forth in their Level 2 Dispute Statement and explained below.  (See ECF No. 7954-1 at 4.)

11       Using the example above in which EOP patients should be offered four weekly PC contacts

12   in each calendar month, the Special Masters' proposed All-or-None methodology would only

13   measure whether each individual patient was offered all of the care required during the month.  If

14   one of the four weekly contacts was late, that patient would simply be counted as having received

15   noncompliant care for the entire month.  No credit would be given for treatment that was

16   provided timely.  To calculate a compliance rate, the Special Master's All-or-None methodology

17   would use the number of fully compliant patients as the numerator and the total number of

18   patients as the denominator.  Thus, for two patients, one compliant (4/4) and one partially

19   compliant (3/4), the compliance score would be 1/2 or 50 percent because the patient who had

20   one late contact would not get credit for the three timely contacts and would simply be counted as

21   noncompliant.

22       The TCM Report provides an example of how the Special Master's data expert expects his

23   proposed methodology to work.  (See ECF No. 7954 at 13-14, calculating a 70 percent

24   compliance score for a population of ten patients, seven of which received *all* contacts timely.)

25       [3] Two of the items on the Special Master's list of affected indicators were inconsistent
     with CDCR's records: SC8: Timely Submission of MH RVR Assessment Results, and SC8.7:
26   Timely RVR MH Assessment Requests. CDCR raised these inconsistencies on October 6, 2023
     and it was discussed in the BRMR meetings on October 10 and 17.  On October 23, the Special
27   Master's team called Defendants' counsel to notify Defendants that they had made a mistake in
     adding SC8.7 to the list of indicators subject to this dispute.  The Special Master team further
28   advised that the Special Master would be filing an errata to remove the indicator from the list.

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

1    Although seven of ten patients received all contacts timely, the Special Master's proposed

2    methodology tells you nothing about the levels of compliance for the remaining three patients.

3         Another hypothetical demonstrates how misleading the Special Master's proposed

4    methodology could be.  Assume there are ten patients who each require ten contacts in a given

5    review period.  Two of the patients received all ten contacts timely, the other eight received

6    contacts for all but one contact timely, which happens one day late.  Under the Special Master's

7    proposed methodology, the compliance rate for this population of ten is 20%.  Given that 92% of

8    the contacts for these ten patients were timely, the compliance rate provided by the Special

9    Master's proposed methodology is not only unhelpful as a measure of the performance of the

10   system, but is also misleading.

11        As discussed more fully below, the usefulness of Special Master's proposed

12   methodologies hinge significantly on what the review period is for each of the affected indicators.

13        **C.    The Evolution of the Special Master's Proposed Methodologies**

14        The Special Master's presentation of his proposed methodology has undergone numerous

15   iterations, including changes in pre-calculations, summary statistic calculations, and ad-hoc

16   calculations.  (Cartwright Decl. ¶ 7.)  These transformations have made it challenging to maintain

17   a consistent understanding of what the methodology actually entails.  (*Id.*)  The TCM report does

18   little to clarify these concerns.  During the evolution of the Special Master's proposed

19   methodology, he attempted to address some of the deficiencies identified by Defendants.  While

20   originally thought to be an all-or-none methodology, following conversations with the parties, the

21   Special Master proposed a modified version of his methodology that could be applied flexibly.

22   However, despite recommending that "[d]efendants provide data and summary

23   statistics…*inclusive of flexible scoring"* (ECF No. 7954 at 35, emphasis added), the Special

24   Master has failed to define what a "flexible" scoring approach would look like, including by

25   defining internal thresholds for *any* of the affected indicators that are necessary for a full

26   understanding of the methodology and for the design and programming of the affected

27

28

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1

1  indicators.[4]

2      On May 11, 2023, the Special Master's data expert revealed for the first time,

3  approximately 26 months after the Special Master's data expert commenced TCM discussions

4  with CDCR, that the Special Master's proposed methodology requires the application of two

5  different methodologies: All-or-None and a "flexible" option.  (Cartwright Decl. ¶ 10.)

6  Defendants' understanding of All-or-None is explained above.  The "flexible" option would

7  purportedly measure whether each patient was offered some subset of care required in a given

8  time period.  Assuming a "flexible" methodology threshold of 90 percent as the subset of required

9  care, if one of the four contacts required in a one month period was late, those services would be

10  counted as noncompliant because the patient only received 75 percent of the required care timely

11  during the period.  (Cartwright Decl. ¶ ¶ 10-14.)  However, for the above hypothetical about ten

12  patients who needed ten contacts, the "flexible" methodology would again obscure true

13  compliance because it would score those ten patients as having received 100 percent compliant

14  care despite having only received 92 percent of their contacts on time.

15      The "flexible" methodology, according to the Special Master's data expert, would then

16  further apply what is termed a "degree of impact" statistic to show the degree of lateness for each

17  late service.  (Id. ¶ 14.)  The role of the degree-of-impact statistic has changed repeatedly and is

18  still not clearly defined.  (Id. ¶ 15.)  The Special Master's data expert initially suggested that the

19  degree of impact could be used to define the compliance threshold.  (Id.)  At other times, he

20  suggested that it would be used as an improvement metric that would identify patients with the

21  most late or latest appointments.  (Id.)  The TCM report sheds little light on its true purpose or

22  how it would interface with the overarching summary statistic produced by each of the twenty-six

23  indicators.  And the factors that allow for flexibility will not be readily apparent in the resulting

24  indicator report, which would simply state a potentially misleading compliance rate.  (Id. ¶ 16.)

25      As reflected in Defendants' Level 2 Dispute Statement, the Special Master's proposed

26  methodology, augmented by the degree-of-impact statistic, remains a half-baked, inappropriate,

27      [4] The Special Master appears to defer to the court to set the internal thresholds for each of the twenty-six indicators.  (ECF No. 7954 at 5.)  As discussed in more detail below, the Special
28  Master misconstrues what thresholds the court will set.

1    and potentially misleading compliance measure for the delivery of mental health care.

2    **II.    CDCR'S PROPOSED METHODOLOGY IS A STRAIGHTFORWARD, COMMON-SENSE,
        AND PATIENT-BASED APPROACH TO MEASURE AND REPORT THE DELIVERY OF
3        MENTAL HEALTH SERVICES.**

4        The goal of data remediation as it applies to the key performance indicators is to capture the

5    substance of the Special Master's monitoring for the requirements measured by the indicators.

6    (ECF No. 7847 at 7.)  The Special Master monitors the provision of mental healthcare to patients

7    and the best way to do that is to monitor the Statewide Mental Health Program's processes for

8    delivery of care to ensure they are effective and sustainable such that mental health patients

9    receive the care required under the Program Guide.

10        CDCR's proposed methodology measures requirements at the process level because any

11    interventions needed to remedy an identified deficiency would be at the process level.

12    (Cartwright Decl. ¶ 4.)  It follows that the methodology used to assess compliance should focus

13    on the processes using individual patient data (*i.e.,* the number of services offered to each

14    patient).  This is in line with the Court's past instructions that "it is patently not the court's role to

15    evaluate the adequacy of care provided to individual class members" but to instead to assess and

16    enforce compliance with the requirements of defendants' remedial plan.  (ECF No. 5726 at 9:12-

17    20.)

18        If CDCR provides timely contacts for a subset of the patient population at a rate of 92%, it

19    should have an indicator that reports compliance at 92%, not 20%, as the above hypothetical

20    demonstrated the Special Master's proposed methodology would do.  The dispute is that simple.

21    CDCR's methodology would provide accurate straightforward data about the real compliance

22    rate, and the Special Master's methodology would not.

23        **A.    The TCM Report Confirms CDCR's Proposed Methodology is Useful.**

24         Regardless of what the TCM Report says, even the Special Master acknowledges

25    Defendants' proposed methodology provides useful information which Defendants should be

26    permitted to use.  (ECF No. 7954 at 21-22.)  This statement signals approval of the methodology

27    even though it is the Special Master's recommendation that Defendants use their proposed

28

19900160.1

1  methodology for internal use and not for the purpose of monitoring and reporting data.  (*Id.* at 26

2  and 35.)

3  **B.    CDCR's Methodology is Based on Patient Data.**

4  The TCM Report echoes recent criticism by the Special Master's experts that Defendants'

5  methodology is somehow inferior to the Special Master's methodology because it is not "patient

6  centric."  (ECF No. 7954 at 22 and 34.)  The Special Master believes that his proposed

7  methodology is superior because it measures whether each patient receives all of his or her

8  designated mental health services and explicitly states that "defendants do not (and cannot) argue

9  that their methodology provides patient-centered data and summary statistics."  (ECF No. 7954 at

10  32.)  The TCM Report is wrong.

11  First, the TCM Report does not define the terms "patient-centric" or "patient-centered."

12  Instead, the report uses the terms generally to describe the data expert's proposed methodologies.

13  Second, the underpinnings of the Special Master's methodologies have not been recognized

14  as a generally accepted method in academic research or industry standards in measuring

15  compliance.  (Cartwright Decl. ¶ 20.)  Rather, its application to CDCR's system is a creation of

16  the Special Master's data expert.[5]  Labeling this methodology with a term that superficially

17  implies greater patient-centricity serves only to obfuscate the actual mechanics and implications

18  of the approach.  (*Id.* ¶ 21.)  The Special Master's preference for a methodological approach based

19  on its title rather than its functionality is troubling because it creates the false impression that the

20  methodology provides useful patient-level data when it in fact does not.

21  Third, CDCR's methodology measures whether patients timely received services required

22  by the Program Guide and uses data obtained on a patient-by-patient basis to monitor and

23  improve its system.  The assertion that CDCR's proposed methodology is inferior because it is

24  not described as "patient centric" is simply false.  CDCR's proposed methodology uses each

25  required patient contact or care event as the measurement unit.  The measures are specifically

26

27  [5] The TCM Report is silent as to any authority that supports the application of the Special Master's proposed methodology to CDCR's monitoring and data reporting.  The data expert provided only one article that referenced a link to a diabetes tracking metric.  (ECF No. 7523-1 at 12.)

28

9

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1

structured to evaluate CDCR's ability to provide accessible, timely and adequate care throughout the system.  (Cartwright Decl. ¶23.)  This aligns with the goals of data remediation (ECF No. 7954 at 33) by ensuring that "the Court has clear data and easy-to-understand statistics about whether patients are receiving Program Guide required services."  (*Id*.)

Finally, in the patient level drill down available under CDCR's methodology, non-compliant contacts or care events are grouped, easily showing patterns in missed timelines.  (Cartwright Decl. ¶23.)  Individual patient data is also available either through On Demand Reports or through the patient's Electronic Health Records System file.  (Cartwright Decl. ¶ 23.)  Contrary to the Special Master's assertion, it is unnecessary to shift the methodology to his proposed methodology for the 26 indicators to provide patient centric information when CDCR's myriad reports already provide detailed individual patient data on demand.  (ECF No. 7954 at 33-34.)  In other words, CDCR's methodology does not suffer the same shortcomings as the Special Master's methodologies because it clearly identifies where patients have and have not received the care to which they are entitled under the Program Guide.

There is no doubt here that the report's statement that the Special Master's proposed methodology is not meant to supplant, but to augment the existing metrics is either misleading or simply wrong.  (ECF No. 7954 at 26.)  And any claim that the Special Master's methodology is superior or even workable remains an unsubstantiated claim.[6]  Also, the fact that Defendants' methodology could not be used for monitoring and reporting belies the claim that the Special Master's proposed methodology is complimentary to or augments existing metrics.  The Special Master's assertions about his proposed methodology are not based on empirical evidence or experience, and the methodology is not a sound or reasonable way to measure the performance of the Statewide Mental Health Program.

/ /

/ /

---

[6] The Special Master has never, to Defendants' knowledge, used his proposed methodologies during any monitoring tours.

19900160.1

**III.    THE SPECIAL MASTER'S PROPOSED METHODOLOGIES ARE IMPROVEMENT METRICS THAT ARE NOT APPROPRIATE MEASURES FOR TIMELY COMPLIANCE**

The TCM Report suggests that the "degree of impact" metric would serve as an adequate counterbalance to Defendants' concerns about the limitations of the Special Master's proposed methodology, despite failing to provide any details as to the methodology of those metrics or exactly how they would alleviate Defendants' concerns.  (ECF No. 7954 at 5.)  While the offer of a mitigation strategy seems to be a concession that Defendants' concerns are valid, the proposed mitigation strategy, regardless of the methodology, will not remedy the deficiencies with the All-or-None approach.  The new compliance measurement system (somehow integrating a degree of impact statistic) imposes new standards and, according to the TCM Report, requires new court-defined thresholds.  It does not address the limitations of the Special Master's untested proposed methodology.  The degree-of-impact measure is not a cure-all for these concerns because it fails to address the fundamental differences between compliance and improvement metrics and adds an unnecessary layer of complexity.  (Cartwright Decl. ¶ 17.)

Compliance metrics and improvement metrics serve different purposes.  (Cartwright Decl. ¶ 18.)  Compliance metrics reveal whether applicable standards are being met.  (*Id.*)  For instance, a compliance metric would measure whether or not patients are being offered timely mental health contacts by evaluating the percentage of contacts offered on time or early.  (*Id.*)  In contrast, improvement metrics are aspirational—they identify opportunities for enhancing or refining the provisions of care and are not tied to legal or regulatory requirements.  (*Id.*)  By definition, improvement metrics do not measure whether current legal requirements regarding the provision of care are being met.  (*Id.*)  Improvement metrics, thus, exceed the four-corners of court-ordered remediation process.

**IV.    THE SPECIAL MASTER'S PROPOSED METHODOLOGIES ARE VAGUE, COMPLEX, AND LACK SUFFICIENT DETAIL.**

The recommendation to require the Special Master's proposed methodology should be rejected because the TCM Report fails to provide sufficient explanation and details necessary to understand and implement the methodology.  Three critical pieces of information that are needed

19900160.1

1  to understand and implement the Special Master's proposed methodology are (1) the internal

2  thresholds, (2) the degree of impact statistics, and (3) the applicable reporting periods that will be

3  used to measure compliance.  (ECF No. 7954-1 at 4-6.)  This information is necessary to fully

4  understand the Special Master's proposed flexible methodology and to fully evaluate their

5  accuracy and pitfalls.  The Special Master has taken the position that his proposed methodology

6  does not require perfection, but without this information (internal thresholds, the degree of impact

7  statistics, and reporting periods), the methodology can in fact require perfection to count services

8  as compliant.  See examples in Section IV.C., *infra.*

9        Also, CDCR requires the internal threshold and the reporting periods to build indicators.

10  (Cartwright Decl. ¶ 24.)  Defendants requested this information during the level-one data

11  remediation discussions.  (ECF No. 7954-1 at 4-5.)  Defendants wanted to know what time period

12  would be used to run the data, what percent of care would be required to achieve compliance for

13  each patient, and the threshold for the "degree of impact" statistic.  (Cartwright Decl. ¶ 24.)  The

14  Special Master's team declined to provide the requested information, while continuing to

15  minimize or dismiss Defendant's concerns. (ECF No. 7954-1 at 4-5.)  But without this essential

16  information, to fully understand and develop of these twenty-six indicators under the Special

17  Master's methodology, if ordered, may prove impossible.  (*Id.*)

18        **A.    The Special Master's Proposed Methodology Lacks Internal Thresholds.**

19        The TCM Report maintains that identifying an internal threshold is unnecessary because

20  only the Court may make determinations regarding the required threshold for compliance.  (ECF

21  No. 7954-1 at 4-5.)  This is false, erroneously conflates internal thresholds with constitutional

22  thresholds, and is inconsistent with the Court's directions to the Special Master concerning

23  compliance monitoring and reporting.  (ECF No. 7954 at 35.)  As pointed out in Defendants'

24  Level 2 Dispute Statement, even though the ultimate decision on constitutional compliance is for

25  the Court, the Special Master has been directed to "file findings and recommendations

26  recommending different compliance rates, if any, for one or more of the key indicators on the

27  completed list…."  (ECF No. 6996 at 9.)

28

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1

1    It is unclear why the Special Master's team has refused to provide their recommendation

2  regarding the required internal thresholds for the Special Master's proposed "flexible"

3  methodology.  Under the Special Master's proposed "flexible" methodology, a patient could be

4  counted as compliant if the patient received a certain percent of the contacts required in a given

5  reporting period.  That "certain percentage" is the variable that must be known to determine

6  whether the services for that patient are counted towards compliance.  In other words, the Special

7  Master's proposed "flexible" methodology asks what percent of patients received "x" percent of

8  services over a period of time.  The "x" variable is the internal compliance factor that must be

9  determined for each of the 26 indicators in order for them to pass through stakeholder review and

10  be programmed.  Without defining the "x" variable—the internal compliance threshold—the

11  indicators remained stalled in place.  (Cartwright Decl. ¶ 25.)

12    But the Special Master has not defined any internal compliance thresholds in his proposed

13  "flexible" methodology.  Such thresholds are necessary to fully evaluate the proposed

14  methodology and are critical for programming and verifying the indicators.  (Cartwright Decl. ¶

15  26.)  The Court need not weigh in on internal thresholds.  As the Special Master is aware, the

16  stakeholders have approved other indicators with established internal thresholds where no court

17  intervention was necessary, including QC3: Treatment Plans with Satisfactory Documentation

18  (Cartwright Decl., Ex. A); SP23: Quality of Selected SRASHE Documentation (Cartwright Decl.,

19  Ex. B); QC10 Primary Clinician Continuity of Care (Cartwright Decl., Ex. C),  SP3: Quality of

20  Safety Planning to Reduce Suicide Risk (Cartwright Decl., Ex. D), and QC11: Psychiatry

21  Continuity of Care (Cartwright Decl., Ex. E), (Cartwright Decl. ¶ 27, Exs. A-E-F, copies of the

22  data remediation documentation.)  A clear example of such an internal threshold agreed to by the

23  parties and the Special Master's team is that compliance is met for the Continuity of Care

24  indicators where a patient saw the same primary clinician or psychiatrist 70 percent of the time.

25  (*Id.*, Exs. C and E.)  Thus, the Continuity of Care indicator measures the percentage of patients

26  who saw the same clinician at least 70 percent of the time—70 percent being the indicator's

27  internal threshold.

28

19900160.1

These internal thresholds are a necessary component of data remediation.  Moreover, without defined thresholds, it is not possible to determine whether or to what extent the Special Master's methodology is actually flexible.

**B.    The Degree of Impact Statistic Does Not Clarify the Special Master's Proposed Measurements.**

The Special Master recommends creating a "degree of impact statistic" to "pair" with his proposed methodologies.  (ECF No. 7954 at 23.)  The Special Master offered the degree of impact statistic to address some of the short-comings of the Special Master's proposed methodology.  However, it remains unclear how the degree of impact statistic will be applied or reported and how it will impact overall compliance because the degree of impact statistic remains undefined.  As described above in Section I, the potential methodology for the degree of impact statistic has evolved over time and it is unclear what exact methodology the Special Master is proposing.  The TCM Report offers no detail on the degree of impact statistic, including cut offs for late appointments or methodology in measuring this novel statistic.  Nor does the Special Master specify which, if any, of the twenty-six indicators would be appropriate for degree of impact statistics or how the statistic would interact with each indicator's overarching summary statistic measuring compliance with a given policy.  The addition of this proposed, undefined methodology is simply not necessary to discern simple levels of compliance and seems almost designed to create confusion and hide relevant information.  Development of this methodology and the twenty-six indicators would be near impossible given the dearth of information provided in the TCM report about how the degree of impact statistic would operate.

**C.    The Special Master's Proposed Methodology Lacks Defined Reporting Periods.**

The TCM Report states that the Special Master's proposed methodology includes "the number of patients who received minimally adequate mental health care, for a given reporting period."  (ECF No. 7954 at 34.)  This misstates the methodology.  The Special Master's proposed "flexible" methodology measures the number of patients who received an unspecified percentage of required mental health care for an unspecified reporting period.  (Cartwright Decl. at ¶ 10.)  But the TCM Report does not recommend or define the reporting periods for the affected

14

19900160.1

1  individual key performance indicators needed to build the indicators or to use the Special Master's

2  proposed methodology.  (*See* ECF No. 6996.)  There is no legitimate excuse for failing to identify

3  reporting periods because the parties have specifically negotiated reporting periods for many

4  other indicators.  (Cartwright Decl. at ⁋ 28.)  The lack of reporting period suffers from the same

5  failures as the lack of thresholds discussed above.

6       The TCM Report claims that the "flexible" scoring approach is most similar to the Special

7  Master's historic monitoring approach, and is most appropriate for the task at hand because it can

8  adjust to whatever compliance thresholds the Court ultimately establishes for the 26 indicators.

9  (ECF No. 7954 at 26.)  The TCM Report also dismisses Defendants' concern that the Special

10 Master's proposed methodology inappropriately focuses on "perfect scores" because the

11 "flexible" variation of the Special Master's proposed methodology does not require perfect

12 compliance.  But examples applying the methodologies demonstrate that compliance will

13 fluctuate depending on the internal threshold selected and the length of the reporting period,

14 leaving Defendants to guess how this vague methodology will actually score compliance.

15      Defendants' staff cannot understand the full extent of their compliance burden during data

16 remediation if the reporting period is indeterminate.  (Cartwright Decl. ⁋ 13.)  One example

17 illustrates how the compliance is radically affected by the reporting period if the Special Master's

18 proposed "flexible" methodology is utilized. (*Id.* ⁋ 29.)  For the indicator *AC 2.1 Timely PC*

19 *Contacts*, assume a "flexible" threshold of 90 percent, whereby a patient who receives 90 percent

20 of their PC Contacts on time could be counted towards the broader court-set criteria for

21 compliance.  In this hypothetical, the still undefined reporting period becomes critical in

22 determining compliance.   For instance, if the reporting period is set to one-month, absolute

23 perfection would be required in PC contacts; otherwise, the provider would be deemed entirely

24 non-compliant, as three out of four on-time contacts (75 percent) falls below the "flexible"

25 threshold of 90 percent.  (*Id.*)  The same issue persists if the reporting period is defined as two

26 months: any slight imperfection would lead to non-compliance, as seven out of eight equals 87.5

27 percent, and even eight out of nine only amounts to 88 percent.  (*Id.*)

28

1    In essence, for a "flexible" 90 percent threshold to function as intended for weekly care

2    requirements, the reporting period would need to extend to at least three months.  (Cartwright

3    Decl. ⁋ 30.)  Yet, this clashes with the Special Master's data experts' own admission that

4    compliance rates trend toward zero as the length of the reporting period increases.  (*Id.*)  This

5    contradiction exposes fundamental issues in the proposed methodology, limiting its applicability

6    and reliability.  (*Id.*)  Such a non-intuitive and punitive methodology, which provides such

7    radically different results for almost the same provision of care should be rejected out of hand.

8    This vagueness problem persists in the application of the methodology to MAPIP

9    Measures.  The challenges inherent in the Special Master's proposed "flexible" methodology are

10   further exacerbated when applied to more complex clusters of requirements, such as those found

11   in the MAPIP program.  (Cartwright Decl. ⁋ 31.)  It remains unclear how the "Patient-wise"

12   approach would adequately account for diagnostic measures that involve diverse types of

13   requirements (lab tests, vital signs, and medication consents) each with their own distinct

14   timeframes.  (*Id.*)  Remarkably, this issue was not addressed in the TCM Report, even though half

15   of the twenty-six indicators under consideration pertain to MAPIP measures.  This lack of

16   methodological specificity raises significant concerns with the feasibility and reliability of the

17   proposed methodology and its ability to capture a comprehensive view of patient care

18   compliance.

19   **V.    LIMITATIONS IN THE SPECIAL MASTER'S PROPOSED METHODOLOGY MAKE IT**
20   **INAPPROPRIATE.**

21   There are inherent limitations in the Special Master's proposed all-or-none  methodology.

     First, the hyper-stringent rule that can result in a zero compliance depending on the reporting
22
     period does not reflect the realities of healthcare delivery and does nothing to help improve
23
     systemic care.
24
     Second, there is a lack of consistency in how the methodology counts or measures the
25
     number of days a service is provided late.  The Special Master's proposed methodology
26
     inconsistently penalizes late appointments, leading to exaggerated and inaccurate non-compliance
27
     scores.  Consider a scenario where the reporting period is defined as a calendar month.  If an
28

1    appointment initially scheduled for January 10 is offered a day late, the patient will be marked as

2    non-compliant for the month of January under the all-or-nothing approach. However, if another

3    appointment set for January 31 is also delayed by just one day, that patient would be considered

4    non-compliant for not just January, but also for the following month of February. This

5    discrepancy in how late appointments are penalized, depending on their position within the

6    reporting period, undermines the integrity and reliability of the proposed methodology.

7    (Cartwright Decl. ¶ 32.)

8          Third, The Special Master's methodologies also cause a bottleneck in reporting timelines.

9    The bottleneck occurs because monthly compliance cannot be definitively evaluated until all

10    relevant appointments for that month—extending even into the next month—are either completed

11    or officially marked as late. (Cartwright Decl. ¶ 33.) To illustrate, consider a patient required to

12    have weekly appointments. If the week of January 30 to February 3 includes one of these

13    appointments, compliance data for January can't be finalized until this last appointment is either

14    fulfilled or declared late in February. (*Id.*) In such cases, any delay or non-compliance in

15    February retroactively affects January's data, making it non-compliant as well. (*Id.*) This lag in

16    reporting grows exponentially when measuring monthly, quarterly, and annual Program Guide

17    requirements. (*Id.*) Moreover, it hampers the mental health program's ability to implement

18    timely corrective measures, directly conflicting with the imperative for expedient compliance

19    evaluations. (*Id.*) This will delay any mental health program's ability to take timely corrective

20    action, contradicting the stated need for swift compliance measures.

21          Fourth, the methodology requires multiple steps that ignore the complexity of the MHSDS

22    system. The Special Master's proposed methodology will not provide information on the

23    timeliness of patient contacts, but only whether individual patients received all or some subset of

24    the required contacts. (ECF No. 7954-1 at 22-25.) It is clear that the flexibility of Special

25    Master's proposal means that it lacks standardization and that staff will be left to guess which

26    requirements are permissible deviations from the Program Guide minimum standard. The user

27    will then be required to look at another data point for each patient (one of thousands) to see

28    whether those patients who were marked as non-compliant received any contacts for the reporting

1    period ("the degree of impact statistic would allow the user to differentiate between, for example,

2    students who missed a passing score by one percentage point and a student who failed to answer

3    any question correctly"). (*Id.*)

4         Fifth, the Special Master's proposed methodology will greatly increase CDCR's workload.

5    The TCM Report states that there is "no technical or workload barrier to developing these

6    summary statistics" (ECF No. 7954 at 35.) This is wrong. The Special Master's

7    recommendation that CDCR use multiple methodologies to monitor the timely compliance

8    indicators will require more than minimal work. If CDCR is required to build both the Special

9    Master's and CDCR's proposed methodologies, it will require both the creation of 26 indicators

10   reflecting CDCR's proposed methodology and 26 indicators reflecting the Special Master's

11   proposed methodologies. (Cartwright Decl. ¶34.) This is a total of at least 52 additional items

12   that CDCR will have to document, put through stakeholder review, program code (*i.e.,* add

13   changes to databases), and verify. (*Id.*)

14        The TCM Report fails to address these critical limitations and instead defers key decisions

15   for application of the methodology to the ultimate compliance decision for the Court. (ECF No.

16   7954 at 4-5.) Such an approach undermines CDCR's sustained efforts to maintain and improve

17   healthcare standards.

18   **VI.    THE SPECIAL MASTER'S PROPOSED METHODOLOGIES ARE NOT CONSISTENT WITH
            METHODOLOGIES USED IN OTHER CORRECTIONAL SYSTEMS OR OTHER LARGER
19          HEALTH CARE SYSTEMS.**

20        Defendants have requested that the data expert provide examples of other correctional or

21   large healthcare systems that use the Special Master's proposed methodology. (Cartwright Decl.

22   ¶ 36.) Instead of providing that information to the Court and the parties, the TCM Report simply

23   states that "[b]usiness rules for large health care systems and correctional systems are not widely

24   available." (ECF No. 7954 at 29.) The TCM Report then makes an unnecessary and improper

25   comment to further deflect from answering the question: "[m]ore than likely, the business rules

26   for a comparable state department of corrections found to have knowingly presented misleading

27   information to a federal court in aid of their efforts to demonstrate durable remedial compliance"

28   are even less 'widely available.'" (*Id.*) Such a statement is not responsive to the simple request

                                                    18

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1

and is not the type of guidance Defendants expect from the Court's Special Master. The report

should have simply confirmed that the Special Master is aware of no such examples. As this

Court has reminded Defendants on a number of occasions, the Special Master has a team of

nationally-recognized experts and yet they are either unwilling or unable to explain whether the

Special Master's proposed methodology is consistent with data reporting from other correctional

systems.

**VII.  THE SPECIAL MASTER'S PROPOSED METHODOLOGIES PRESENT A SIGNIFICANT
SHIFT FROM CURRENT AND PRIOR MONITORING PRACTICES.**

It cannot be disputed that the Special Master's proposed methodologies are a shift from

how the Special Master has previously monitored. As Defendants described in the Level 2

Dispute Statement, the Special Master has historically monitored compliance with timely contacts

by calculating whether each patient received all or a certain subset of care over the reporting

period. (ECF No. 7954-1 at 8.) Similarly, compliance with transfer timelines was not historically

based on whether all steps in the transfer process were completed on time. (*Id.*) As stated above,

instead of addressing whether the historic methodology for calculating compliance in the

monitoring reports is actually more akin to the methodology proposed by CDCR, as demonstrated

by specific examples in footnote 9 of the Level 2 Dispute Statement, the TCM Report simply

states that the Special Master's proposed methodology is patient-centric so it is the most

appropriate. (ECF No. 7954 at 29.)

The goal of data remediation as it applies to the CQIT key indicators is to capture the

substance of the Special Master's monitoring in the requirements measured by the indicators.

(ECF No. 7847 at 7.) Additionally, Defendants' designed their data system to with the Special

Master's guidelines for monitoring and reporting patient services under the Program Guide.

(Cartwright Decl. ¶ 9.) But when Defendants presented their methodology that is intended to

align with the Special Master's monitoring and reporting on services offered or provided to

patients, the Special Master's data expert adjusted or augmented his preferred methodology with

increasingly complex and ill-defined parameters. (Cartwright Decl. ¶ 9.) Yet now that CDCR

has put forth a methodology that is substantially similar to how the Special Master has monitored

19900160.1

for years, if not decades, the Special Master has decided to adopt a new and completely untested methodology—a radical shift that should not be countenanced this many years into remedial monitoring.

## VIII. DEFENDANTS HAVE WORKED COLLABORATIVELY TO COMPLETE DATA REMEDIATION.

In their Level 2 Dispute Statement, Defendants expressed that the Special Master's proposed methodologies are not a simple building of indicators, but will also require the stakeholders to review all of the indicators at issue.  Each indicator would have to go through the data remediation process and there may be disputes on how the undefined methodologies proposed by the Special Master's team are applied to some or all of the indicators.  (ECF No. 7954-1 at 9.)  The Special Master, as reflected in the TCM Report, took this as an invitation to criticize Defendants for being uncooperative and reported that "in recent weeks, defendants have increasingly tended to reject the Special Master's teams' recommendations to bridge the divide between the parties."  (ECF No. 7945 at 32.)  Such an antagonistic tone was not called for and Defendants' concern was based on an expressed concern for the workload that will occur should the Court approve the Special Master's proposed methodologies.  It seems that as a result of the Special Master's accusations, at least in part, the Court has now short-circuited the dispute resolution process.  (ECF No. 8008.)

The characterization of Defendants as uncooperative is false.  Defendants, including CDCR and the California Correctional Healthcare Services Quality Management, have spent months rebuilding the Medication Management indicators to avoid disputes.  (Cartwright Decl. ¶37.)  In addition, CDCR has made ninety-two major compromised changes to data business rules, including (1) the creation or the plan to create 13 new KPIs, (2) the development of seventeen new business rules; (3) the development of three new reports; (4) the development of six new audits; (5) the development of one new application; (6) revisions of fourteen methodologies, excluding the timely compliance methodologies; and (7) 15 sampling size adjustments and 4 application/IT changes.  (*Id.*)  Only a small fraction of the total number of indicators have gone through to a Level 3 dispute.  And the Special Master also glossed over the fact that the project

19900160.1

1   was designed to address the simple and non-controversial indicators in the beginning, leaving the

2   complex and more likely contested indicators for last.  (ECF No. 7415 at 6 (ECF 7415 at 6

3   ("[p]rocessing less complex indicators first allowed CDCR to test the data remediation process at

4   full speed;" and "[m]oving forward, the remaining indicators will be increasingly complex.

5   Consequently, even though CDCR has successfully completed data remediation steps for less

6   complex indicators ahead of schedule, that lead-time will likely be used to process more

7   complicated indicators and mitigate contingencies that may move the overall estimated

8   completion date.").)  The TCM Report chose to ignore that record of cooperation and instead

9   asserts a false narrative.

10                                        **CONCLUSION**

11         The TCM Report did not address or respond to the points raised in Defendants' Level 2

12  Dispute Statement.  Because the deficiencies identified above have not been addressed, the Court

13  should only approve the TCM Report's recommendation that allows CDCR to provide data and

14  summary statistics using CDCR's transparent and straightforward methodology as outlined in

15  Defendants' Level 2 Dispute filed as part of the TCM Report and reject the remaining two

16  recommendations that would require all monitoring and reporting to use the Special Master's

17  proposed methodologies.

18         The Special Master's proposed compromise to allow CDCR to use its proposed

19  methodology for internal monitoring only would require CDCR to build and implement the

20  Special Master's undefined and untested methodologies that will then become the de facto

21  method for monitoring and reporting purposes—despite their significant flaws—in place of

22  CDCR's proposed methodology.  The Special Master has not explained how his proposed

23  methodologies will provide transparent reporting or how the impact statistic will obviate the

24  concerns Defendants raised in the Level 2 Dispute Statement, as summarized in the above-stated

25  objections.  The Special Master's proposed methodologies remain an undefined black box in a

26  remediation process where Defendants have been required to have transparent, fully-documented,

27  indicator specifications.  On that basis alone, any order approving their use should be provisional

28  until the Special Master can demonstrate their viability for use as a reporting mechanism.

1    Defendants further request that should the Court decline to approve CDCR's proposed

2  methodology as the only necessary methodology, that it order the Special Master to provide a

3  report that sets forth the proposed methodologies as applied to each affected indicator, including

4  the internal threshold, the reporting period, and how the degree of impact statistic will be applied.

5  The parties should be provided the opportunity to formally object to such a report.  Absent such

6  critical information it remains uncertain whether any of these twenty-six indicators can ever be

7  fully developed or implemented.

8    Finally, should the Court adopt the Special Master's recommendations, the Court should

9  further order that any future reporting by the Special Master that references statistics generated by

10  the his proposed methodologies must also reference statistics from Defendants' proposed

11  methodology for the same indicators.  A failure to do so would result in the Court receiving

12  incomplete and misleading data in the monitoring reports.

13                                      **CERTIFICATION**

14    Defendants' counsel certifies that they reviewed the following orders relevant to this

15  filing:  ECF Nos. 640, 5092, 5726, 6646, 6846, 6996, 7216, 7283, 7285, 7847, and 8008.

16

17  Dated: October 23, 2023                    Respectfully submitted,

18                                            ROB BONTA
                                            Attorney General of California
19                                            DAMON MCCLAIN
                                            Supervising Deputy Attorney General

20
                                            */s/ Elise Owens Thorn*
21                                            Elise Owens Thorn
                                            Deputy Attorney General
22                                            *Attorneys for Defendants*

23
    Dated:  October 23, 2023                  HANSON BRIDGETT LLP
24

25                                            */s/ Samantha Wolff*
                                            PAUL MELLO
26                                            SAMANTHA D. WOLFF
                                            *Attorneys for Defendants*

27

28

Defs.' Objections to the Special Master's Report on Timely Compliance Methodology (2:90-cv-00520 KJM-DB (PC))

19900160.1