1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   DAMON MCCLAIN, State Bar No. 209508
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    NAMRATA KOTWANI, State Bar No. 308741
5   Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone: (916) 210-7318
     Fax: (916) 324-5205
8    E-mail: Elise.Thorn@doj.ca.gov
    Attorneys for Defendants

    PAUL B. MELLO, State Bar No. 179755
    SAMANTHA D. WOLFF, State Bar No. 240280
    KAYLEN KADOTANI, SBN 294114
    DAVID C. CASARRUBIAS, SBN 321994
    CARSON R. NIELLO, SBN 329970
    HANSON BRIDGETT LLP
     1676 N. California Boulevard, Suite 620
     Walnut Creek, CA 94596
     Telephone: (925) 746-8460
     Fax: (925) 746-8490
     E-mail: PMello@hansonbridgett.com
    Attorneys for Defendants

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14
    **RALPH COLEMAN, et al.,**                    2:90-cv-00520 KJM-DB (PC)
15
                               Plaintiffs,        **DECLARATION OF STEVEN**
16                                                **CARTWRIGHT, Psy.D. IN SUPPORT OF**
                                                  **DEFENDANTS' OBJECTIONS TO THE**
17          v.                                    **SPECIAL MASTER'S SEPTEMBER 21,**
                                                  **2023 REPORT RE THIRD LEVEL DATA**
18   **GAVIN NEWSOM, et al.,**                    **REMEDIATION DISPUTE ON THE**
                                                  **TIMELY COMPLIANCE**
19                             Defendants.        **METHODOLOGY  (ECF NO. 7954)**

20

21

22

23

24

25

26

27

28

                                         1

### DECLARATION OF STEVEN CARTWRIGHT, Psy.D.

I, Steven Cartwright, Psy.D., declare as follows:

1.      I am currently employed as the Assistant Deputy Director of the California Department of Corrections and Rehabilitation's (CDCR) Statewide Mental Health Services Delivery System (MHSDS). I have held this position since July 17, 2020. I have been employed by CDCR since January 1, 2016. I offer this declaration in support of Defendants' Objections to the Special Master's September 21, 2023 Report Re Third Level Data Remediation Dispute on the Timely Compliance Methodology.  (ECF No. 7954.)  I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2.      In my capacity as Assistant Deputy Director, I oversee Defendants' data remediation efforts.  I participate in all stages of validation and verification, including data analysis, planning, change management, reporting, and monitoring.  I work closely and regularly with Daniel Potter, the Special Master's data expert.  Additionally, I attend meetings related to data remediation to ensure that CDCR's efforts align with the requirements of Court orders on data remediation and the objectives of the data remediation project - documentation, validation, and verification of the mental health reporting system.  By actively participating in the various stages of data remediation, I ensure that we identify the root cause of data quality issues and determine the most effective remediation approach.  I work with the team to develop a comprehensive plan that outlines the scope, timelines, and resources required for data remediation.  I also oversee the implementation of workflows and procedures to ensure that remediated data is accurate, complete, and produce data sufficient to measure compliance with the business requirement.  Attending meetings related to data remediation allows me to stay informed and enables me to collaborate with stakeholders and communicate the progress of our data remediation efforts effectively.  Through ongoing reporting and monitoring, I track the progress of data remediation efforts and identify areas for further improvement.

3.      I am very familiar with the data remediation dispute concerning the development of the timely compliance methodology as outlined in the Special Master's September 21, 2023

DECL. OF S. CARTWRIGHT, Psy.D. ISO OBJECTIONS TO THE TCM REPORT (2:90-cv-00520 KJM-DB (PC))

19376383.4

1   report (TCM Report), including the Defendants' Level 2 Dispute Statement, attached and filed as

2   part of the TCM Report.

3   **CDCR's Proposed Methodology to Measure Timely Compliance**

4       4.      CDCR's proposed methodology to measure timely compliance indicators

5   measures requirements using a systematic approach, enabling swift identification and targeted

6   intervention for any identified deficiencies. This granularity allows for precise corrective action,

7   fostering higher levels of compliance and overall quality of care.

8       5.      CDCR's proposed methodology uses each Program Guide-required patient contact

9   or care event as the measurement unit.  The measures are specifically structured to evaluate

10  CDCR's ability to provide accessible, timely, and adequate care throughout the system in

11  accordance with Program Guide requirements.

12      6.      CDCR's proposed methodology was designed to align with the Special Master's

13  monitoring and reporting on services offered or provided to patients.  This methodology measures

14  the percentage of service requirements (e.g., psychiatry contacts, primary clinician contacts,

15  interdisciplinary treatment team meetings) completed on time out of the total services required by

16  the Program Guide.  (ECF No. 7954-1 at 2.)  For example, the Program Guide requires weekly

17  primary clinician (PC) contacts for patients in Enhanced Outpatient Programs (EOP).  Using

18  CDCR's methodology, if a patient must be offered four PC contacts in a month, but was only

19  offered three timely contacts for the month, a 75-percent compliance rate would be reported.

20  Similarly, if a patient required four PC contacts in a month, but was only offered two timely

21  contacts for the month, that individual patient would be 50 percent compliant under CDCR's

22  methodology.

23  **Evolution of the Special Master's All-or-None Methodology**

24      7.      The Special Master's proposed methodology for measuring timely compliance has

25  undergone numerous iterations, including changes in pre-calculations (e.g., January 2022, –

26  normalized time overdue—, then in January 2023,  – Time-on-Time) , summary statistic

27  calculations (e.g., August 2021,  – patient-wise and patient-wise-by-month—, then in May 2023,

28  – patient-wise flexible), and ad-hoc calculations (e.g., October 2021,  – area under the curve or

1  degree of lateness—, then in May 2023,  – degree of impact).  These transformations have made
2  it challenging to maintain a consistent understanding of what the methodology actually entails.

3      8.      Initially, when the stakeholders first addressed the timely compliance indicators,
4  the Special Master's data expert advocated for an all or none methodology for evaluating
5  compliance at the patient level. He clarified that this approach calculates the proportion of
6  patients seen on the prescribed schedule over a specific time frame, noting that the compliance
7  rate tends to approach zero as the time period measured lengthens.

8      9.      When CDCR presented its methodology to stakeholders, which was designed to
9  align with the Special Master's guidelines for monitoring and reporting patient services under the
10  Program Guide, the Special Master's data expert responded by modifying his own preferred
11  approach. However, these adjustments introduced increasingly complex and ambiguously defined
12  parameters, muddying the clarity and straightforwardness originally sought in the compliance
13  measurement process.

14      10.      On May 11, 2023, the Special Master's data expert revealed for the first time that
15  the proposed methodology could be the application of two concurrent methodologies: the all or
16  none methodology and the flexible methodology.  The all or none methodology measures the
17  number of patients who received all required mental health care for a given reporting period.  And
18  the flexible methodology measures the number of patients who received an unspecified
19  percentage of required mental health care during an unspecified reporting period.

20      11.      Since the initial discussions about methodology, CDCR  have consistently
21  expressed concerns about the all-or-none approach during meetings with Dr. Potter and other
22  members of the Special Master's team.  Those concerns include the fact that such an approach
23  will paint a misleading picture of the status or care being provided.  When CDCR revisited these
24  concerns during the May 11, 2023, level-one dispute-resolution meeting, the response was to
25  create a "flexible methodology." However, this new approach incorporates another nebulous and
26  undefined variable—a performance standard that is less than 100 percent. As a result, the
27  methodology remains undefined, vague, and open to multiple interpretations, making it difficult
28  to rely on for accurate compliance measurement.

19376383.4

12.     As set forth in the Special Master's TCM Report, the current iteration of the Special Master's methodology requires that all mental health services in a yet-to-be-defined period be offered to each patient on time in order for any of the services to be counted towards compliance.  (ECF No. 7954 at 3-4 and 13-14.)  Application of this methodology to the Program Guide requirements for weekly services will presumably be measured (although that is not yet defined) as a monthly group of services that were either all on time and compliant or all noncompliant due to some degree of lateness.  This is also known as an all-or-none approach.

13.     The Special Master has failed to define what a flexible approach would look like, including by defining the internal thresholds for the affected indicators that are necessary for a full understanding of the methodology and for the design and programming of the affected indicators.  Without understanding how this approach would be operationalized, it is impossible for Defendants to provide their full assessment.

14.     Under the Special Master's flexible methodology, assuming a flexible threshold of 90 percent as the subset of required care (though neither the Special Master nor his data expert have stated what the flexible threshold will be), if one of the four monthly Primary Clinician contacts is late, that patient would be counted as noncompliant because the patient only received 75 percent of the required care timely during the period.  The flexible methodology, according to the Special Master's data expert, would then further apply what is termed a "degree of impact" statistic to show the degree of lateness for each late service.

15.     The role of the degree of impact statistic has changed repeatedly since it was first introduced to stakeholders in October 2021 (at the time labeled "area under the curve" then, "degree of lateness" and most recently "degree of impact") and it is still not clearly defined.  Initially, the Special Master's data expert suggested that the degree of impact could be used to define the compliance threshold.  At other times, he suggested that it would be used as an improvement metric that would identify patients with the greatest number of late or latest appointments.  However, the TCM Report sheds little light on its true purpose or how it would interface with the overarching summary statistic produced by each of the affected indicators.

19376383.4

16.     The Special Master's methodology with the degree-of-impact statistic will not further the goals of transparency and fair evaluation of the care being delivered because the methodology will allow for some undefined level of late service to count as compliant. The factors that allow for flexibility will not be readily apparent in the resulting indicator report, which would simply state a potentially misleading compliance rate. In other words, the report would not accurately reflect the care that is actually being provided to patients.

17.     The degree of impact statistic is not a cure-all for these concerns because it fails to address the fundamental differences between compliance and improvement metrics and adds an unnecessary layer of complexity.

18.     Compliance metrics and improvement metrics serve different purposes. Compliance metrics reveal whether applicable standards are being met. For instance, a compliance metric would measure whether or not patients are being offered timely mental health contacts by evaluating the percentage of contacts offered on-time. In contrast, improvement metrics are aspirational—they identify opportunities for enhancing or refining the provisions of care and are not tied to legal or regulatory requirements. By definition, improvement metrics do not measure whether current legal requirements regarding the provision of care are being met.

**CDCR's Methodology Uses Patient Level Data**

19.     The Special Master's expert contends that CDCR's methodology is less effective than his own, primarily because it is not "patient-centric." However, the mere act of labeling a methodology as "patient-wise" does not automatically render CDCR's methodology inferior or devoid of patient data consideration. In reality, our methodology is rooted in patient data and strives for a comprehensive view of care quality, challenging the assumption that it is somehow less suitable for measuring compliance.

20.     The term "patient-wise" has not been recognized as a generally accepted method in academic research or industry standards in measuring compliance. Rather, its application to CDCR's system is a creation of the Special Master's data expert.

21.     Labeling the Special Master's methodology with a term that superficially implies greater patient-centricity serves only to obfuscate the actual mechanics and implications of the

5

1    approach.  The title creates the false impression that the methodology provides useful patient-
2    level data when it in fact does not.

3           22.    The Special Master's methodology with the degree-of-impact statistic permits a
4    certain, albeit undefined, level of late service as long as it falls within an unspecified threshold for
5    compliance.  Furthermore, it aims to quantify the number of compliant patients based on a yet-to-
6    be-determined set of Program Guide requirements.  Unfortunately, the factors contributing to this
7    "flexibility" will not be transparent in the subsequent indicator reports, potentially leading to a
8    misleading representation of the actual compliance rate.

9           23.    CDCR's methodology is no less patient-based than the Special Master's proposed
10   all or none and flexible methodologies.  CDCR's methodology measures whether patients timely
11   received services required by the Program Guide and uses data obtained on a patient basis.  The
12   assertion that it is not patient centric is simply false.  The methodology uses each required patient
13   contact or care event as the measurement unit.  The measures are specifically structured to
14   evaluate CDCR's ability to provide accessible, timely, and adequate care throughout the system.
15   In the patient level drill down available under CDCR's methodology, non-compliant contacts or
16   care events are grouped, easily showing patterns in missed timelines.  Individual patient data is
17   also available either through On Demand Reports or through the patient's Electronic Health
18   Records System file.  In other words, CDCR's methodology does not suffer the same
19   shortcomings as the Special Master's methodologies because it clearly identifies where patients
20   have and have not received the care to which they are entitled under the Program Guide.

21   **CDCR Needs the Internal Thresholds and Reporting Periods for the Methodologies.**

22          24.    CDCR requires the internal threshold and the reporting periods to build indicators.
23   My team requested this information during the level-one data-remediation discussions with the
24   Special Master's data expert.  We wanted to know what time period would be used to run the
25   data, what percent of care would be required to achieve compliance for each patient, and the
26   threshold for the "degree of impact" statistic in order to build the associated indicators.  The
27   Special Master's team declined to provide the requested information, while continuing to
28   minimize or dismiss CDCR's concerns.  (ECF No. 7954-1 at 4-5.)  Without this essential

19376383.4

1    information, development of these twenty-six indicators under the Special Master's methodology,

2    if ordered, may prove impossible.

3         25.    It is unclear why the Special Master's team has refused to provide their

4    recommendation regarding the required internal thresholds for his proposed flexible

5    methodology.  Under the Special Master's flexible methodology, a patient could be counted as

6    compliant if the patient received a certain percent of the contacts required in a given reporting

7    period.  That "certain percentage" is the variable that must be known to determine whether the

8    services for that patient are counted towards compliance.   In other words, the Special Master's

9    methodology asks what percent of patients received x percent of services over a period of time.

10   The "x" variable is the internal compliance factor that must be determined for each of the 26

11   indicators in order for them to pass through stakeholder review and be programmed. Without

12   defining the "x" variable—the internal compliance standard—the indicators remained stalled in

13   place.

14        26.    To date, the Special Master has not defined the internal threshold in his proposed

15   flexible methodology.  Such thresholds are necessary to fully evaluate the proposed methodology,

16   and are critical for programming and verifying the indicators.

17        27.    The stakeholders have approved other indicators with established internal

18   thresholds.  Attached as exhibits A, B, C, D, and E, are true and correct copies of the data

19   remediation documentation on the following indicators that provide such thresholds:  QC3:

20   Treatment Plans with Satisfactory Documentation (Exhibit A); SP23: Quality of Selected

21   SRASHE Documentation (Exhibit B); QC10 Primary Clinician Continuity of Care (Exhibit C),

22   SP3: Quality of Safety Planning to Reduce Suicide Risk (Exhibit D), and QC11: Psychiatry

23   Continuity of Care (Exhibit E).  A clear example of such a threshold agreed to by the parties and

24   the Special Master's team is that compliance is met for the Continuity of Care indicators where a

25   patient saw the same primary clinician or psychiatrist 70 percent of the time.  Thus, the

26   Continuity of Care indicator measures the percentage of patients who saw the same clinician at

27   least 70 percent of the time.

28

19376383.4

1    28.    Over the course of data remediation, the stakeholders have also negotiated

2    reporting periods for many indicators.

3    29.    One example illustrates how the compliance is radically affected by the reporting

4    period if the Special Master's proposed flexible methodology is utilized.  Consider the indicator

5    AC 2.1 for Timely PC Contacts. For the sake of argument, let's hypothesize an internal "flexible"

6    threshold of 90 percent, whereby a patient who receives 90 percent of their PC Contacts on time

7    could be counted towards the broader court-set criteria for compliance. In this hypothetical, the

8    still undefined reporting period becomes critical in determining compliance. For instance, if the

9    reporting period is set to one-month, absolute perfection would be required in PC contacts;

10   otherwise, the provider would be deemed entirely non-compliant, as three out of four on-time

11   contacts (75 percent) falls below the "flexible" threshold of 90 percent. The same issue persists if

12   the reporting period is defined as two months: any slight imperfection would lead to non-

13   compliance, as seven out of eight equals 87.5 percent, and even eight out of nine amounts to only

14   88 percent.

15   30.    In essence, for a "flexible" 90 percent threshold to function as intended for weekly

16   care requirements, the reporting period would need to extend to at least three months. Yet, this

17   clashes with the Special Master's data expert's own admission that compliance rates trend toward

18   zero as the length of the reporting period increases.  This contradiction exposes fundamental

19   issues in the proposed methodology, limiting its applicability and reliability.

20   31.    The challenges inherent in the Special Master's proposed "flexible" methodology

21   are further exacerbated when applied to more complex clusters of requirements, such as those

22   found in the MAPIP program. It remains unclear how the "Patient-wise" approach would

23   adequately account for diagnostic measures that involve diverse types of requirements (lab tests,

24   vital signs, and medication consents) each with their own distinct timeframes.  Remarkably, this

25   issue was not addressed in the TCM Report, even though half of the twenty-six indicators under

26   consideration pertain to MAPIP measures. This lack of methodological specificity raises

27   significant concerns with the feasibility and reliability of the proposed methodology and its ability

28   to capture a comprehensive view of patient-care compliance.

8

32.    The Special Master's methodologies also introduce inconsistencies in penalizing late appointments, resulting in potentially inflated and misleading non-compliance rates. Consider a scenario where the reporting period is defined as a calendar month.  If an appointment initially scheduled for January 10 is offered a day late, the patient will be marked as non-compliant for the month of January under the "Patient-wise" approach.  However, if another appointment set for January 31 is also delayed by just one day, that patient would be considered non-compliant for not just January, but also for the following month of February.  This discrepancy in how late appointments are penalized, depending on their position within the reporting period, undermines the integrity and reliability of the proposed methodology.

33.    The Special Master's methodologies also cause a bottleneck in reporting timelines. The bottleneck occurs because monthly compliance cannot be definitively evaluated until all relevant appointments for that month—extending even into the next month—are either completed or officially marked as late.  To illustrate, consider a patient required to have weekly appointments.  If the week of January 30 to February 3 includes one of these appointments, compliance data for January cannot be finalized until this last appointment is either fulfilled or declared late in February.  In such cases, any delay or non-compliance in February retroactively affects January's data, making it non-compliant as well.  This lag in reporting grows exponentially when measuring monthly, quarterly, and annual Program Guide requirements.  Moreover, it hampers the mental health programs' ability to implement timely corrective measures, directly conflicting with the imperative for expedient compliance evaluations.

**Implementation of two different methodologies.**

34.    If CDCR is required to build both the Special Master's proposed all or none and flexible methodologies as well as its own methodology, it will require both the creation of 26 indicators reflecting CDCR's proposed methodology and 26 indicators reflecting the Special Master's methodologies.  This is a total of at least 52 additional items that CDCR will have to document, put through stakeholder review, program, code (i.e., add changes to databases), and verify.  CDCR estimates that this additional workload will at least take an additional 60 weeks to

9

19376383.4

1    complete, as it would occur simultaneous with and after CDCR finishes creating the placeholder

2    and new indicators once all of the provisionally approved list of indicators are completed.

3        35.    CDCR had initially objected to the Special Master's exclusion of five medication

4    management indicators. (ECF No. 7954-1 at 2, n. 1 and n. 2.)  The TCM Report includes those

5    indicators but states that "[a]s of the time of this writing, CDCR had not made the documentation

6    for MM5, MM6, MM7, MM8, MM9.1 available to the stakeholders.  Therefore, these five items

7    were not included in the original list of 19 TCM indicators."  CDCR disagrees with the reported

8    status of the medication management indicators.  During BRMR on September 26, 2023, the

9    Special Master's team acknowledged that indicators MM5 through -MM9.1 were previously

10    reviewed in BRMR, as CDCR had initially shared with the stakeholders on February 27, 2023,

11    but that changes were needed.  CDCR made the required revisions and the indicators will go

12    through stakeholder review again.

13        36.    My team has requested that the Special Master's data expert provide examples of

14    other correctional or large healthcare systems that use the Special Master's proposed

15    methodologies.  Despite these requests, we have not been provided with references to such other

16    uses. Nor am I aware of any other systems that use his suggested methodology.

17        37.    The TCM Report's characterization of Defendants as uncooperative is false.

18    Defendants, including CDCR and the California Correctional Healthcare Services Quality

19    Management, have spent months rebuilding the Medication Management indicators to avoid

20    disputes.  In addition, CDCR has made ninety-two major compromised changes to data business

21    rules, including (1) the creation or the plan to create 13 new KPIs, (2) the development of

22    seventeen new business rules; (3) the development of three new reports; (4) the development of

23    six new audits; (5) the development of one new application; (6) revisions of fourteen

24    methodologies, excluding the timely compliance methodologies; and (7) 15 sampling size

25    adjustments and 4 application/IT changes.  Only a small fraction of the total number of indicators

26    have gone through to a Level 3 dispute.

27    / /

28    / /

19376383.4

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Executed on this 23rd day of October, 2023, at San Rafael, California.

4

5    */s/ Steven Cartwright*
     Steven Cartwright, Psy.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF S. CARTWRIGHT, Psy.D. ISO OBJECTIONS TO THE TCM REPORT (2:90-cv-00520 KJM-DB (PC))

19376383.4

# Exhibit A



# Treatment Plans with Satisfactory Documentation

Published 7/3/2023

## **Summary**

Percentage of treatment plans that received a passing score on CAT Audit 6:  Treatment Planning – Satisfactory Score on Treatment Plan (Quarterly).

---

| Numerator | Denominator |
| --- | --- |
| The count of audits from the denominator with a passing score on the audit.<br><br>A passing score is 11 if the answer to Question 12 is not N/A and a passing score is 10 if the answer to Question 12 is N/A.*<br><br>The questions are:<br>1. Does the clinical summary include a brief synopsis of treatment over time including inpatient treatment history and a brief description of current mental health symptoms? (NOTE: information pulled-forward but not updated with any current information will not meet the expectations of this item.)<br>2. Is the clinical summary consistent with the symptoms, the DSM diagnoses (problems), and interventions? (The MTP should consider those MH related problems specifically listed, and not just generic problems.)<br>3. If the medication section on the MH Master Treatment Plan Psychiatry Review reflects that the patient is prescribed psychotropic medications, did the psychiatrist complete the core target symptoms table? | The count of the CAT Audit 6:  Treatment Planning – Satisfactory Score on Treatment Plan (Quarterly) audits completed during the review period. |

4. Are the identified GOALS individualized and measurable to target the specified problems to target current DSM diagnoses (problems), symptoms, and functional impairments?

5. Are the identified INTERVENTIONS individualized and measurable to target current DSM diagnoses (problems), symptoms, and functional impairments?

6. Does each intervention support achieving each treatment goal?

7. Are active MH Interdisciplinary Plans of Care (MH IPOC's) ordered, updated (if applicable), and indicate which discipline is responsible for the interventions?

8. When compared to the last treatment plan, has the treatment plan been updated to address the patient's current functioning and mental health treatment progress? (NOTE: information pulled-forward but not updated will not meet the expectations of this item).

9. Is the treatment plan based on the patient's history, past treatment, and factors that cause the current symptoms to persist?

10. Is the rationale for the IDTT LOC decision patient specific and consistent with the current clinical presentation and degree of functional impairment? (NOTE: information pulled-forward but not updated or documented that patient's status has not changed will not meet the expectations of this item.)

11. Is there a meaningful discharge plan, (must include: how symptoms and functioning have improved.  Discharge to appropriate level of care is not an appropriate response)-for future treatment needs?

12. For ML EOP Initial IDTT's ONLY, was a 128C Chrono generated after the IDTT, addressing eligibility for program assignment? i.e., education, work, vocational, etc. (Mark N/A only if the TX plan being reviewed is not for a ML EOP initial IDTT.)

 *For scoring algorithm, see "Additional Information" section below.

## Component Business Rules

Treatment Plans with Satisfactory Documentation

## Reporting Location

The institution and placement where the CAT audit was completed.

## Pop-up

Click here for general pop-up information.

KPI-specific pop-up information:

11: Date: The "Performance Date" the user entered on the CQIT application.

12: Percentage: 1 = audit pass. 0 = audit fail. The percentage is hyperlinked to the corresponding audit.

13. Details:  Information on audit score.

**Quick List: CDCR**
**Treatment plans with satisfactory documentation from 11/01/22 thru 4/30/23**
**Placement: ASU,ASU EOP Hub,Condemned,IN_TRANSIT,Institution Wide,LTRH,MHCB,ML,ML CCCMS,ML EOP,PSU,RC,RC CCCMS,RC EOP,SHU,STRH**
**Data last refreshed 4/27/2023 11:51:00 PM**

|  | Measurements | Percentage | Compliance |
|---|---|---|---|
| Treatment plans with satisfactory documentation | 102 | 0.3 | 27% |
| Treatment plans with satisfactory documentation | 102 | 0.3 | 27% |

| Audit | Placement | Inst | CDC# | Name | Cellbed | Date | Percentage | Details |
|---|---|---|---|---|---|---|---|---|
| Treatment plans with satisfactory documentation (102) | MHCB | PBSP |  |  |  | 11/4/2022 12:00:00 AM | 1 | Performed On date of the document audited : 11/04/2022 Score : 11/11 |
|  | MHCB | PBSP |  |  |  | 11/9/2022 12:00:00 AM | 1 | Performed On date of the document audited : 11/09/2022 Score : 11/11 |
|  | MHCB | PBSP |  |  |  | 11/9/2022 12:00:00 AM | 1 | Performed On date of the document audited : 11/09/2022 Score : 11/11 |
|  | MHCB | PBSP |  |  |  | 11/14/2022 12:00:00 AM | 1 | Performed On date of the document audited : 11/14/2022 Score : 11/11 |
|  | MHCB | PBSP |  |  |  | 11/23/2022 12:00:00 AM | 1 | Performed On date of the document audited : 11/23/2022 Score : 11/11 |
|  | MHCB | RJD |  |  |  | 11/24/2022 12:00:00 AM | 1 | Performed On date of the document audited : 11/24/2022 Score : 11/11 |
|  | MHCB | PBSP |  |  |  | 11/28/2022 12:00:00 AM | 1 | Performed On date of the document audited : 11/28/2022 Score : 11/11 |
|  | ASU | PBSP |  |  |  | 1/4/2023 12:00:00 AM | 1 | Performed On date of the document audited : 01/04/2023 Score : 11/11 |
|  | MHCB | PBSP |  |  |  | 1/6/2023 12:00:00 AM | 1 | Performed On date of the document audited : 01/06/2023 Score : 11/11 |
|  | MHCB | PBSP |  |  |  | 1/11/2023 12:00:00 AM | 1 | Performed On date of the document audited : 01/11/2023 Score : 10/11 |
|  | MHCB | HDSP |  |  |  | 1/11/2023 12:00:00 AM | 1 | Performed On date of the document audited : 01/11/2023 Score : 11/11 |
|  | ML CCCMS | PBSP |  |  |  | 1/17/2023 12:00:00 AM | 1 | Performed On date of the document audited : 01/17/2023 Score : 10/11 |
|  | ASU | PBSP |  |  |  | 1/25/2023 12:00:00 AM | 1 | Performed On date of the document audited : 01/25/2023 Score : 11/11 |
|  | ML CCCMS | PBSP |  |  |  | 1/31/2023 12:00:00 AM | 1 | Performed On date of the document audited : 01/31/2023 Score : 11/11 |
|  | ML CCCMS | HDSP |  |  |  | 2/1/2023 12:00:00 AM | 1 | Performed On date of the document audited : 02/01/2023 Score : 11/11 |
|  | ML CCCMS | PBSP |  |  |  | 2/2/2023 12:00:00 AM | 1 | Performed On date of the document audited : 02/02/2023 Score : 11/11 |

Screenshot taken 5/1/2023.

**Release Note**
Release Note 62.0.

## **Additional Information**

Audits are included based on the month of the "Performance date" entered by auditor, not the date the audit was entered. For example, if the "Performance date" was May and the audit was completed in July, the audit findings will show up in the May report not the July report.

A passing score is 11 if the answer to Question 12 is not N/A and a passing score is 10 if the answer to Question 12 is N/A.*

Scoring algorithm:

1. Does the clinical summary include a brief synopsis of treatment over time including inpatient treatment history and a brief description of current mental health symptoms? (NOTE: information pulled-forward but not updated with any current information will not meet the expectations of this item.)
   All checkboxes checked, except None of the above = 1 point
   Less than all checkboxes checked or none of the above checked= 0 point
2. Is the clinical summary consistent with the symptoms, the DSM diagnoses (problems), and interventions? (The MTP should consider those MH related problems specifically listed, and not just generic problems.)
   All checkboxes checked, except None of the above = 1 point
   Less than all checkboxes checked or none of the above checked = 0 point
3. If the medication section on the MH Master Treatment Plan Psychiatry Review reflects that the patient is prescribed psychotropic medications, did the psychiatrist complete the core target symptoms table?
   Yes or N/A – Not prescribed MHMD medications = 1 point
   No = 0 point
4. Are the identified GOALS individualized and measurable to target the specified problems to target current DSM diagnoses (problems), symptoms, and functional impairments?
   All checkboxes checked, except None of the above = 1 point
   Less than all checkboxes checked or none of the above checked = 0 point
5. Are the identified INTERVENTIONS individualized and measurable to target current DSM diagnoses (problems), symptoms, and functional impairments?
   All checkboxes checked, except None of the above = 1 point
   Less than all checkboxes checked or none of the above checked = 0 point
6. Does each intervention support achieving each treatment goal?
   Yes = 1 point
   No = 0 point
7. Are active MH Interdisciplinary Plans of Care (MH IPOC's) ordered, updated (if applicable), and indicate which discipline is responsible for the interventions?
   All checkboxes checked, except None of the above = 1 point
   Less than all checkboxes checked or none of the above checked = 0 point
8. When compared to the last treatment plan, has the treatment plan been updated to address the patient's current functioning and mental health treatment progress? (NOTE: information pulled-forward but not updated will not meet the expectations of this item).
   All checkboxes checked, except None of the above = 1 point
   Less than all checkboxes checked or none of the above checked = 0 point

Case 2:90-cv-00520-KJM-SCR    Document 8025-1    Filed 10/23/23    Page 18 of 49

9. Is the treatment plan based on the patient's history, past-treatment, and factors that cause the current symptoms to persist?

   Yes = 1 point

   No = 0 point

10. Is the rationale for the IDTT LOC decision patient specific and consistent with the current clinical presentation and degree of functional impairment? (NOTE: information pulled-forward but not updated or documented that patient's status has not changed will not meet the expectations of this item.)

    All checkboxes checked, except LOC decision inconsistent with one or more of the above criteria = 1 point

    Less than all checkboxes checked or " LOC decision inconsistent with one or more of the above criteria" checked = 0 point

11. Is there a meaningful discharge plan, (must include: how symptoms and functioning have improved. Discharge to appropriate level of care is not an appropriate response)-for future treatment needs?

    Yes = 1 point

    No = 0 point

12. For ML EOP Initial IDTT's ONLY, was a 128C Chrono generated after the IDTT, addressing eligibility for program assignment? i.e., education, work, vocational, etc. (Mark N/A only if the TX plan being reviewed is not for a ML EOP initial IDTT.)

    Yes = 1 point

    No = 0 point

    N/A = question will be excluded from scoring.

**Question Versions:**

Question No. 2: Is the clinical summary consistent with the symptoms, the DSM diagnoses (problems), and interventions? Effective Date 10/1/2022 through 3/7/2023.

Question No. 3: Does the psychiatry treatment plan list the medications with the target symptoms, dosage, and frequency? (Refer to MH Master Treatment Plan Psychiatry Review for audit) - Effective Date 10/1/2022 through 3/7/2023.

Question No. 11: Is there a meaningful discharge plan for future treatment needs? Effective Date 10/1/2022 through 3/7/2023

For internal use only: Item #QC3.

## Rationale
None.

## Known Issues
None found.

## Potential limitations
Global Chart Audit Tool (CAT) limitations

## Verification
Verification testing implemented in production on April 27, 2023.

**FAQs**

None.

---

## CAPC approval date

2/16/2023

| Treatment Plans with Satisfactory Documentation (684931) |
|---|
| **Category** <br> Quality of Care |
| **Business Rule** <br> • Treatment Plans with Satisfactory Documentation |
| **Effective Period** <br> 10-1-2022 to present |
| **First Release Date** <br> 3/10/2023 |
| **Latest Release Date** <br> 3/10/2023 |

| Links |
|---|
| Performance Report |

| SPO Version | Version # |
|---|---|
| Previous | 0.1 |
| Approved by CAPC | 1.0 |
| Verified | 2.0 |
| Current | 5.0 |

EDA Result

# Exhibit B

Case 2:90-cv-00520-KJM-SCR    Document 8025-1    Filed 10/23/23    Page 22 of 49



# Quality of Selected SRASHE Documentation

Published 5/24/2023

## Summary

Percentage of suicide risk evaluations that meet audit criteria.

| Numerator | Denominator |
|---|---|
| Number of suicide risk evaluations audited from the denominator that have a score of 10 or higher on Question 1 to 3.<br>1. If patient refused SRASHE, did the clinician document the steps taken to encourage participation or increase the patient's ability to participate in the SRASHE?<br>2. If History of Suicide Attempts was endorsed are details of previous attempt(s) provided?<br>3. Does the narrative of risk justification address the following? (check all that apply) | Number of 7. Suicide Evaluation / Prevention - Suicide Risk Evaluations That Meet Audit Criteria (Quarterly) completed during reporting period. |

## Component Business Rules

Quality of Selected SRASHE Documentation

## Reporting Location

The institution and area user entered on the Chart Audit in the CQIT application.

## Pop-up

Click here for general pop-up information

11. Date: The "Performance date" user entered on the Chart Audit in CQIT Application

12. Percentage: 1 = audit pass. 0 = audit fail. Clicking on the number will direct the user to the specific audit on audit report.

13. Details "Performance date" user entered on the Chart Audit in CQIT Application



Screenshot taken on 12/9/2022

## Release Note
Release Note 58.0.
Release Note 59.0.

## Additional Information

Audits are included based on the month in which documentation audited was performed, not the date of the audit. For example, if a document audited had a performed date in May and audited in July, it will show up in the May report but not the July report.

When there is duplicate audit (i.e. same audit item with the same CDCR number and same date entered for the document audited), only the most recently created audit will be included in the indicator calculation.

Question Versions:

Question No. 1: If patient refused SRASHE, did the clinican document the steps taken to encourage participation or increase the patient's ability to participate in the SRASHE? - Effective Date 11/4/2021 through 3/23/2023.

Question No. 2: If History of Suicide Attempts was endorsed are details of previous attempt(s) provided? (If patient does not have history of Suicide Attempts, mark N/A.) - Effective Date 11/4/2021 through 3/23/2023.

For internal use only: Item #SP23.

## Known Issues

N/A.

## Potential limitations

Global Chart Audit Tool limitations

## Verification

Data verified beginning July 1, 2022.

## FAQs

None.

---

| Quality of Selected SRASHE Documentation (1182972) |
| --- |
| **Category** |
| Suicide Prevention |
| Quality of Selected SRASHE Documentation |

| Links |
| --- |
| Performance Report |

| SPO Version | Version # |
| --- | --- |
| Previous | 0.1 |
| To BRMR | 1.1 |
| To Stakeholder Review | 3.0 |
| Approved by CAPC | 3.2 |
| Verified | 5.0 |
| Current | 9.0 |

# Exhibit C

# KPI:

# Mental Health Primary Clinician Continuity of Care

## Summary

Percentage of EOP and EOP Mod patients who were seen by the same Primary Clinician for more than 70% of appointments in a six-month period.

| Numerator | Denominator |
|---|---|
| Patients from the denominator who were seen by the same Primary Clinician for more than 70% of completed appointments during the past 6 months. | All EOP/EOPmod patients who have been EOP or EOP mod for the past 6 months at the end of the reporting period. |

## Component Business Rules

Mental Health Primary Clinician Continuity of Care

## Reporting Location

The institutions and placements where EOP/EOP Mod patients are housed on the last date of the reporting period.

## Pop-up

Click here for general pop up information

KPI specific pop-up information:

11. Date: The last date of the 6-month period. For example, in July, this will show 7/31. The data collected is from 2/1 to 7/31. In Aug, the data collected is from 3/1 to 8/31.

12. Count: 1= when patient was seen by the same PC for more than 70% during the past 6 months. 0 = when patient was not seen by the same PC for more than 70% during the past 6 months.

13. Details: Provide information on the highest 3 providers and percentage of the appointment.

## Release Note
There is no relevant release note on or after Release Note 15.0.

## Additional Information
This indicator is not computed for the current month because a full six months of data are required. This measure is based on a rolling six months of data.

EOP/EOP Mod level of care for six continuous months.

If the EOP or EOPMod patient was referred to MHCB, then continued to be EOP or EOP Mod after the referral was rescinded or the patient was clinically discharged from the MHCB program, the patient will be included but we will "out count" the MHPC contacts while the patient is at MHCB MHI.

If the MHI before MHCB was not EOP/EOPMod but is made EOP after MHCB, the six months clock will start when patient's MHI changes to EOP or EOPMod.

MHI changes to Acute or ICF will not reset the clock. Appointments completed for Acute or ICF patients in outpatient housing will count. If the patient is admitted to PIP (ACUTE/ICF) and later discharged to EOP, the clock will restart after the patient is discharged from PIP.

MHI changes from EOP to EOPMod or vice versa will not reset the clock.

For internal use only: Item #QC10.

## Rationale
None.

## Known Issues
None found.

## Potential limitations
None.

## Verification

## FAQs

[CAPC] **Approval Date**

The date the KPI was approved by the Mental Health Change Committee
(CAPC: Change Advisory Prioritization Committee)

| **Mental Health Primary Clinician Continuity of Care (204350)** |
| --- |
| **Category** |
| Quality of Care |
| Mental Health Primary Clinician Continuity of Care |

| **Links** |
| --- |
| Performance Report |

| SPO Version | Version # |
| --- | --- |
| Previous | |
| Approved by CAPC | |
| Verified | |
| Current | |

EDA Result

# BR:

# Mental Health Primary Clinician Continuity of Care

| Mental Health Primary Clinician Continuity of Care |
| --- |
| **Effective Period** |
| TBD |
| **First Release Date:** |
| N/A |
| **Latest Release Date:** |
| TBD |

| Links |
| --- |
| KPI Link |
| Workflow Link |
| On Demand Homepage Link |

| SPO Version | Version # |
| --- | --- |
| Previous | |
| Approved by CAPC | |
| Verified | |
| Current | |

## Overview

Measurement of EOP and EOP Mod patients who were seen by the same Primary Clinician for more than 70% of appointments in a six-month period.

## Policy

There is no relevant policy.

## Rule Population

Any patient who has been EOP/EOP Mod for the past six months. (*:*.*:EOP/EOPmod)

## Trigger

Last date of the reporting period.

## Exception

MHPC contacts that occur while patient is in MHCB level of care are excluded.

## Suspending Events

EOP/EOP Mod patients who have been housed in MHCB program; the period will continue after they are placed back in EOP/EOP Mod.

EOP/EOP Mod level of care for six continuous months:

If the EOP or EOPMod patient was referred to MHCB, then continued to be EOP or EOP Mod after the referral was rescinded or the patient was clinically discharged from the MHCB program, the patient will be included but we will "out count" the MHPC contacts while the patient is at MHCB MHI.

If the MHI before MHCB was not EOP/EOPMod but is made EOP after MHCB, the six months clock will start when patient's MHI changes to EOP or EOPMod.

## Fulfillment

The following appointments checked in and out by Primary Clinicians:

- Any appointments under category the  PC Contact
- MHPC Routine Consult
- MHPC PREA Routine Consult
- IDTT: If checked in by MHPC, count towards MHPC continuity of care


*Note: All appointments that are checked in and out under those categories will be counted, including "Wellness Checks Only," "IDTTs held in absentia" and non-confidential appointments, etc. Refused and canceled appointments are not included.


## Time Frame

n/a.


## Release Note

There are no relevant release notes on or after Release Note 15.0.


## Rationale

None.


## Known Issues

None found.

## Potential limitations

None.

## Additional Info

This indicator is not computed for the current month because a full six months of data are required. The most recent data for this indicator can be seen by running the performance report for the last full calendar month.

Please note that the trigger does not restart when patient moves programs or to a different institution.

MHI changes to Acute or ICF will not reset the clock. Appointments completed for Acute or ICF patients in outpatient housing will count. If the patient is admitted to PIP (ACUTE/ICF) and later discharged to EOP, the clock will restart after the patient is discharged from PIP.

MHI changes from EOP to EOPMod or vice versa will not reset the clock.

For internal use only: Item #QC10.

## Verification

## FAQs

**Approval Date**

The date the Business Rule was approved by the Mental Health Change Committee
(CAPC: Change Advisory Prioritization Committee)

# Exhibit D



# Quality of Safety Planning to Reduce Suicide Risk

Published 8/11/2023

**Summary**

Percentage of audited Safety Plan, completed for patients housed in inpatient/outpatient housing, that met documentation quality criteria.

| Numerator | Denominator |
|---|---|
| The count of audits from the denominator where the sum of answers to the following questions in the audits is 16-18 points.<br><br>1. **Warning Signs**: Does the clinician document an appropriate patient response/refusal AND provide individualized interventions that target the warning signs? (Interventions should do more than describe the modality.) Select one:<br>2. **Warning Signs**: Does the clinician document an appropriate patient response/refusal AND provide individualized interventions that could reduce suicidality and/or self-harm? Select one:<br>3. **Warning Signs**: Does the clinician document an appropriate patient response/refusal AND provide individualized interventions that could enhance the patient's willingness to reduce their suicide risk? Select one:<br>4. **Self-Harm to Affect External Changes**: Does the clinician document an appropriate patient response/refusal AND provide clinical impressions of what has been effective in resolving the use of self-harm behaviors in the past? Select one: | The count of the CAT Audit 14: Safety Planning to Reduce Suicide Risk audits completed during the reporting period. |

5. **Environment/Safety Concerns**: Does the clinician document an appropriate patient response/refusal AND provide individualized interventions that address the clinical impact of reported safety concerns? Select one:

6. **Environment/Safety Concerns**: Does the clinician document an appropriate patient response/refusal AND provide individualized interventions that address the clinical impact of reported environmental concerns? Select one:

7. **Protective Factors**: Does the clinician document an appropriate patient response/refusal AND provide clinical impressions of protective factors most helpful to the patient in reducing suicide risk? Select one:

8. **Protective Factors**: Does the clinician document an appropriate patient response/refusal AND provide individualized interventions that could enhance protective factors? Select one:

9. **Refusals**: If the patient refused to participate: Did the clinician document the reason for refusal and identify an individualized intervention to address the patient's suicide risk within the safety plan? Select one:

*For scoring rubric, see "Additional Information" in CAT Audit 14: Safety Planning to Reduce Suicide Risk completed.

## Component Business Rules

Quality of Safety Plans to Reduce Suicide Risk.

## Reporting Location

The institution and placement where the CAT audit was completed.

## Pop-up

Click here for general pop up information

KPI specific pop up information:

11: Date: Performance date = the performed on date from the reviewed MH Safety Plan PowerForm
12: Percentage: 1 = audit pass. 0 = audit fail. The percentage is hyperlinked to the corresponding audit.
13. Details: Information on audit score.

**Quick List: CDCR**
**Quality of Safety Planning to Reduce Suicide Risk from 4/01/23 thru 7/31/23**
Placement: ASU,ASU EOP Hub,Condemned,IN_TRANSIT,Institution Wide,LTRH,MHCB,ML,ML CCCMS,ML EOP,PSU,RC,RC CCCMS,RC EOP,SHU,STRH
Data last refreshed 8/4/2023 12:24:00 AM

|  | Measurements | Percentage | Compliance |
|---|---|---|---|
| Quality of Safety Planning to Reduce Suicide Risk | 3 | 0.3 | 33% |
| Quality of Safety Planning to Reduce Suicide Risk | 3 | 0.3 | 33% |

**Details**

| Audit | Placement | Inst | CDC# | Name | Cellbed | Date (11) | Percentage (12) | Details (13) |
|---|---|---|---|---|---|---|---|---|
| Quality of Safety Planning to Reduce Suicide Risk (3) | ASU EOP Hub | CHCF | AX6481 | HERSTEDT, ERIC | D 301B1105001L | 7/26/2023 12:00:00 AM | 1 | Test Record Performed On date of the document audited : 07/26/2023 Score: 18/18 |
|  | MHCB | CHCF | BR5600 | RADILLO, OSCAR | B 307B1119001L | 7/26/2023 12:00:00 AM | 0 | Test Record Performed On date of the document audited : 07/26/2023 Score: 0/18 |
|  | Institution Wide | CHCF | AW9627 | HASKIN, EDDIE | E 303A1002125L | 7/26/2023 12:00:00 AM | 0 | Test Record Performed On date of the document audited : 07/26/2023 Score: 9/18 |

screenshot from August 4th 2023

## Release Note

Release Note 67.

## Additional Information

Audits are included based on the month of the "Performance date" entered by the auditor, not the date the audit was entered. For example, if the "Performance date" was May and the audit was completed in July, the audit findings will show up in the May report not the July report.

*For scoring rubric, see "Additional Information" in CAT Audit 14: Safety Planning to Reduce Suicide Risk completed.

Question Scoring:
    1. Q1, 2, 3, 7 & 8:

- The first choice selected = 2 points
- The second choice selected = 1 point
- Third choice (None of the above) selected = 0 points

    2. Q4, 5, 6& 9:
- The first choice selected = 2 points
- The second choice selected = 1 point
- Third choice (None of the above) selected = 0 points
- Fourth choice (Not Applicable) selected = 2 points

Score Calculation:
- Numerator is the sum points of all responses.
- Denominator is the maximum possible points

- Passing score is 89%.

For internal use only: Item #SP3.4

## **Rationale**
None.

## **Known Issues**
None Found.

## **Potential limitations**
Global Chart Audit Tool (CAT) limitations

## **Verification**

## **FAQs**
None.

---

### CAPC approval date

7/13/2023

| Quality of Safety Planning to Reduce Suicide Risk (1220238) |
|---|
| **Category**<br>Suicide Prevention |
| Business Rule<br>• **Quality of Safety Planning to Reduce Suicide Risk** |
| **Effective Period.**<br>Effective 7-1-2023 to present. |
| **First Release Date:**<br>08-01-2023 |

**Latest Release Date:**
8-14-2023

| Links |
|---|
| Performance Report |

| SPO Version | Version # |
|---|---|
| Previous | 0.1 |
| Approved by CAPC | 0.3 |
| Verified | 1.0 |
| Current | 2.0 |

EDA Result

# Exhibit E

# KPI:

# Mental Health Psychiatrist Continuity of Care

## Summary

Percentage of EOP and EOP Mod patients who were seen by the same psychiatrist for more than 70% of appointments in a six-month period.

| Numerator | Denominator |
|---|---|
| Patients from the denominator who were seen by the same psychiatrist for more than 70% of completed appointments during the past 6 months. | All EOP/EOPmod patients who have been EOP or EOP mod for the more than 6 months at the end of the reporting period. |

## Component Business Rules
Mental Health Psychiatrist continuity of care

## Reporting Location
The institutions and placements where EOP/EOP Mod patients are housed on the last date of the reporting period.

## Pop-up
Click here for general pop up information

KPI specific pop-up information:

11. Date: The last date of the 6-month period. For example, in July, this will show 7/31. The data collected is from 2/1 to 7/31.

12. Count: 1= when patient was seen by the same Psychiatrist for more than 70% during the past 6 months. 0 =_when patient was not seen by the same Psychiatrist for more than 70% during the past 6 months.

13. Details: Provide information on the highest 3 providers and percentage of the appointment.

## Release Note
There is no relevant release note on or after Release Note 15.0.

## Additional Information
This indicator is not computed for the current month because a full six months of data are required. This measure is based on a rolling six months of data.

For internal use only: Item #QC11.

EOP/EOP Mod level of care for six continuous months

If the EOP or EOPMod patient was referred to MHCB, then continued to be EOP or EOP Mod after the referral was rescinded or the patient was clinically discharged from the MHCB program, the patient will be included but we will "out count" the MHMD contacts while the patient is at MHCB MHI.

If the MHI before MHCB was not EOP/EOPMod but is made EOP after MHCB, the six months clock will start when patient's MHI changed to EOP or EOPMod.

MHI changes to Acute or ICF will not reset the clock. Appointments completed for Acute or ICF patients in outpatient housing will count. If the patient is admitted to PIP (ACUTE/ICF) and later discharged to EOP, the clock will restart after the patient is discharged from PIP.

MHI changes from EOP to EOPMod or vice versa will not reset the clock.

## Rationale

None.

## Known Issues

None found.

## Potential limitations

None.

## Verification

## FAQs

None.

[CAPC] **Approval Date**

The date the KPI was approved by the Mental Health Change Committee
(CAPC: Change Advisory Prioritization Committee)

| Mental Health Psychiatrist Continuity of Care (204352) |
|---|
| Category |
| Quality of Care |
| Mental Health Psychiatrist Continuity of Care |

| Links |
|---|
| Performance Report |

| SPO Version | Version # |
|---|---|
| Previous | |
| Approved by CAPC | |
| Verified | |

| Current | |
|---|---|

**EDA Result**

# BR:

# Mental Health Psychiatrist Continuity of Care

| Mental Health Psychiatrist Continuity of Care |
|---|
| **Effective Period** |
| TBD |
| **First Release Date:** |
| N/A |
| **Latest Release Date:** |
| TBD |

| Links |
|---|
| KPI Link |
| Workflow Link |
| On Demand Homepage Link |

| SPO Version | Version # |
|---|---|
| Previous | |
| Approved by CAPC | |
| Verified | |
| Current | |

# Overview

Measurement of EOP and EOP Mod patients who were seen by the same psychiatrist for more than 70% of appointments in a six-month period.

## Policy

There is no relevant policy.

## Rule Population

Any patient who has been EOP/EOPMod LOC for the past six months.

(*:*.*:EOP/EOPmod)

## Trigger

Last date of the reporting period.

## Exception

MHMD contacts occurring while a a patient is in MHCB level of care are excluded.

## Suspending Events

EOP/EOP Mod patients who have been housed in MHCB program; the period will continue after they are placed back in EOP/EOPMod.

EOP/EOP Mod level of care for six continuous months:

If the EOP or EOPMod patient was referred to MHCB, then continued to be EOP or EOP Mod after the referral was rescinded or the patient was clinically discharged from the MHCB program, the patient will be included but we will "out count" the MHPC contacts while the patient is at MHCB MHI.

If the MHI before MHCB was not EOP/EOPMod but is made EOP after MHCB, the six-month clock will start when patient's MHI changes to EOP or EOPMod.

## Fulfillment

The following appointments checked in and out by Senior Psychiatrist, Psychiatrist and Tele psychiatrist:

- Any appointments under category PSY Contact
- MHMD Routine Consult
- IDTT: If checked in by MHMD, count towards MHMD continuity of care
- Non-critical Med non-adherence
- Critical Med non-adherence


*Note: All appointments that are checked in and out under those categories will be counted, including "Wellness Checks Only," "IDTTs held in absentia" and non-confidential appointments, etc. Refused and cancelled appointments are not included.


## Time Frame
N/A.


## Release Note
There are no relevant release notes on or after Release Note 15.0.


## Rationale
None.


## Known Issues
None found.

## Potential limitations

None.

## Additional Info

This indicator is not computed for the current month because a full six months of data are required. The most recent data for this indicator can be seen by running the performance report for the last full calendar month.

Please note that the trigger does not restart when a patient moves programs or to a different institution.

MHI changes to Acute or ICF will not reset the clock. Appointments completed for Acute or ICF patients in outpatient housing will count. If the patient is admitted to PIP (ACUTE/ICF) and later discharged to EOP, the clock will restart after the patient is discharged from PIP.

If the patient is admitted to PIP (ACUTE/ICF) and later discharged to EOP, the clock will restart after the patient is discharged from PIP.

For internal use only: Item #QC11.

## Verification

## **FAQs**

**Approval Date**

The date the Business Rule was approved by the Mental Health Change Committee
(CAPC: Change Advisory Prioritization Committee)