1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
    1300 I Street, Suite 125
6  P.O. Box 944255
   Sacramento, CA 94244-2550
7  Telephone:  (916) 210-7318
   Fax:  (916) 324-5205
8  E-mail:  Elise.Thorn@doj.ca.gov
   Attorneys for Defendants

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone:  (925) 746-8460
  Fax:  (925) 746-8490
  E-mail:  PMello@hansonbridgett.com
Attorneys for Defendants

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14  **RALPH COLEMAN, et al.,**                 2:90-cv-00520 KJM-DB (PC)

15                            Plaintiffs,      **NOTICE OF SUBMISSION OF THE
                                               CALIFORNIA DEPARTMENT OF**
16                                             **CORRECTIONS AND
       v.                                      REHABILITATION'S 2023 ANNUAL**
17                                             **REPORT TO THE LEGISLATURE ON
                                               SUICIDES IN CDCR AND 2022 ANNUAL**
18  **GAVIN NEWSOM, et al.,**                  **SUICIDE REPORT**

19                            Defendants.

20

21

22          On July 25, 2022, the Court adopted in full the California Department of Corrections and

23  Rehabilitation's Annual Suicide Report Proposal for Assuming the Annual Suicide Monitoring

24  Report.  (ECF No. 7574 and ECF No. 7592.)  The proposal requires the California Department of

25  Corrections and Rehabilitation (CDCR) to file for each year, its annual report to the legislature on

26  suicides in CDCR, the annual suicide report, and the individual suicide reports.  (ECF No. 7574 at

27  15.)  The proposal provides for a preliminary approval process that requires the parties, under the

28

                                              1

                                                                        18950011.1

1   guidance of the Special Master, to meet and confer and for the Special Master to file a brief

2   recommendation with the court as to whether the proposal should become final.  (*Id*.)

3          On January 30, 2023, Defendants filed the 2021 Annual Report on Suicides in CDCR.

4   (ECF No. 7710.)  On March 7, 2023, the Court adopted the 2021 Annual Suicide Report in full.

5          The Court extended the provisional approval process in CDCR's Proposal for Assuming the

6   Annual Suicide Monitoring Report for one year to allow for the approval process to take place

7   following the submission of Defendants' 2022 Annual Suicide Report.  (ECF No. 7861 at 10-11.)

8          Attached is a letter from CDCR, dated October 19, 2023, enclosing: (1) CDCR's overview

9   report that responds to the Special Master's and Plaintiffs' responses to the draft 2022 Annual

10  Suicide Report; (2) letters from the Special Master and Plaintiffs setting forth their responses to

11  the draft 2022 Annual Suicide Report, attached to the overview report as Exhibits A and B

12  respectively; and (3) CDCR's 2022 Annual Report on Suicides in the CDCR.

13         Defendants will conditionally lodge the individual suicide reports under seal pursuant to the

14  Court's February 25, 2020 order (ECF No. 6482 at 3-4) and LR 141 for the conditional filing of

15  documents under seal.

16

17  Dated: October 19, 2023                          Respectfully submitted,

18                                                   ROB BONTA
                                                     Attorney General of California
19                                                   DAMON MCCLAIN
                                                     Supervising Deputy Attorney General

20

21                                                   /s/ *Elise Owens Thorn*
                                                     Elise Owens Thorn
22                                                   Deputy Attorney General
                                                     *Attorneys for Defendants*

23

24  Dated: October 19, 2023                          HANSON BRIDGETT LLP

25

26                                                   /s/ *Samantha Wolff*
                                                     PAUL MELLO
27                                                   SAMANTHA D. WOLFF
                                                     *Attorneys for Defendants*

28

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                                   GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 18, 2023

Damon McClain, Esq.
Elise Thorn, Esq.
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

VIA EMAIL

RE: CDCR 2022 Annual Report to the Legislature on Suicides in CDCR and 2022 Annual
Suicide Report

Dear Mr. McClain and Ms. Thorn:

As required under the order adopting CDCR's Annual Suicide Report Proposal for Assuming the
Annual Suicide Monitoring Report and the order extending the provisional approval process for
one year, enclosed for filing with the *Coleman* court are the following documents: (1) CDCR's
overview report that responds to the Special Master's and Plaintiffs' responses to the draft
suicide report; (2) letters from the Special Master and Plaintiffs setting forth their responses to
the draft suicide report attached to the overview report as Exhibits A and B respectively; and (3)
CDCR's 2022 Annual Report on Suicides in the CDCR.


Sincerely,


*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs

California Department of Corrections and Rehabilitation's 2022 Annual Report to the Legislature on Suicides in the California Department of Corrections and Rehabilitation and Annual Suicide Report

## I.        Introduction and Background

Attached is the California Department of Corrections and Rehabilitation's (CDCR) 2022 Annual Report to the Legislature on Suicides in CDCR and the 2022 Annual Suicide Report.  Individual suicide reports for suicides completed in 2022 will be served on the Special Master and Plaintiffs and Defendants will seek leave to file them under seal.  This is CDCR's second Annual Suicide Report submitted to the Court pursuant to its June 28, 2022 Proposal for Assuming the Annual Suicide Monitoring Report (Proposal).  (ECF No. 7574 at 13, adopted by Orders ECF Nos. 7592 at 7598.)

As discussed in detail within the report, 19 individuals died by suicide in 2022 within CDCR, resulting in a suicide rate of 19.6 suicides per 100,000 incarcerated individuals.[1]  This was a significant decrease from the suicide rate in 2020, 27.3, but an increase from the rate in 2021, 15.2. While an increased rate over the course of one year may appear to be concerning, readers should be cautious before drawing any conclusions from it.  As noted by Lindsay Hayes, the Special Master's suicide prevention expert, "[a]nnual suicide rates are more meaningful and reliable when viewed over a sustained period of time." (A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, January 13, 2016, ECF No. 5396 at 31.  See also Mr. Hayes' Second Reaudit, ECF No. 5672 at 21, Third Reaudit, ECF No. 5994 at 36, Fourth Reaudit, ECF No. 6879-1 at 46, and Fifth Reaudit, ECF No. 7636-1 at 66.)[2]  Nonetheless, CDCR continues to assess and improve upon its suicide prevention program to address deficiencies found as a result of 2022 suicide case reviews.

Noted in the report is the impact of staffing throughout the state on suicide prevention initiatives. CDCR has found no definitive nexus between suicide deaths and staffing fill rates in 2022, though some suicide prevention programs have seen impacts such as the SRE mentoring training rates (74% in 2022 versus 84% in 2021) and crisis bed treatment plan audits, which were made optional. Precipitants of deaths by suicide have always been multifactorial and, even when institutions have been more fully staffed, CDCR's suicide case reviews have revealed lapses in timelines or poor quality of treatment plans or assessments.  CDCR remains focused on staffing and ensuring that adequate care, including suicide prevention initiatives, are in place for CDCR patients.

The report includes comprehensive assessments of suicide trends, corrective actions, suicide prevention initiatives, and discussion of Quality Improvement Plans (QIP) by identifying types, trends, implementation status, and efficacy.[3]  Defendants expect that this summation of trends,

---

[1] Four days before finalization of the 2022 Report, a county coroner's office informed CDCR that it had determined another 2022 death was a suicide.  CDCR has commenced its review of this late reported death and will update the 2022 Report if indicated.

[2] In the 20-year period from 2003 to 2022, CDCR averaged 30 deaths by suicide each year.  (Report at 9.)

[3] CDCR published the report on its public facing website to promote transparency.
(See https://www.cdcr.ca.gov/reports/, last accessed on September 29, 2023.)

precipitants, deficiencies, and suicide prevention initiatives will help improve patient care and reduce suicides. Additionally, CDCR will append and conditionally lodge under seal each individual suicide case review report at issue in the annual suicide report. The case reviews have been recognized by Mr. Hayes, as comprehensive and the source of thoughtful and targeted quality improvement plans for correcting deficiencies and improving suicide prevention practices. (ECF No. 6897-1 at 37; *see also* ECF No. 5993-1 at 29-30.)

Once CDCR shares the draft annual suicide report with the Special Master and Plaintiffs, they then have 30 days to submit responses to the report. Plaintiffs have ten days after CDCR files the final report to file formal objections with the Court.

After CDCR filed its 2021 Annual Suicide Report in 2022, the Court extended the approval process under the agreement for one year. (December 15, 2022, Order, ECF No. 7681.) That order provides the parties a 30-day period following approval of CDCR's 2022 Annual Suicide Report to meet and confer to determine whether CDCR's Proposal should become final. (*Id.* at 10-11.) The Special Master was directed to file a brief recommendation to the Court on whether to adopt the Proposal. (*Id.* at 11.)

II.      Responses from the Special Master and Plaintiffs.

On July 20, 2023, CDCR provided the Special Master and Plaintiffs with a draft of its 2022 Annual Suicide Report (Draft Report). The Special Master and Plaintiffs submitted written responses on August 18, and August 23, 2022, respectively. Those letters are attached as Exhibits A and B, respectively. The Special Master and Plaintiffs requested the opportunity to review an updated version of the Draft Report before it is filed.   (Ex. A at 1, fn.1; Ex. B at 2, fn.2.) CDCR was unable to accommodate those requests due to the number of comments received, alterations to the Draft Report, and the need to finalize and submit the report to the Legislature by October 1, as required by Penal Code section 2064.1.[4]

CDCR reviewed approximately 77 requests for alterations to the Draft Report. The Special Master and Plaintiffs' written comments criticize the progress and contents of CDCR's annual suicide reports and complain that the Draft Report "falls [] short" of meeting court ordered obligations. (Ex. A at 1 and Ex. B at 7, 13.) As explained in greater detail below, CDCR considered the comments provided by the Special Master and Plaintiffs and either updated the report based on their comments or explained why a particular recommendation was not incorporated into the final report.

After full consideration of the criticisms received from Plaintiffs and the Special Master, CDCR stands by its report. CDCR is unaware of any other correctional system that has such a robust, thorough, self-critical, and transparent reporting process for both its individual and annual reports.[5]

---

[4] Because October 1, 2023 fell on a Sunday, CDCR submitted its report to the legislature on September 29, 2023.

[5] The Special Master and his team of experts provide no examples of other systems' similar reporting processes.

The Court should adopt the 2022 Annual Report as well as the 2022 Proposal and allow CDCR to assume the annual reporting process going forward.

A.      Responses to the Special Master's Comments to the Draft Report.

The Special Master provided written comments requesting that CDCR provide: (1) an enhanced discussion on the efficacy of QIPs, (2) additional analysis, correction, and clarification of suicide rates, (3) clarification regarding deaths by suicide in segregated housing, (4) additional analysis and clarification of training compliance, (5) clarification of the Chart Audit Tool (CAT) Data, and (6) clarification of statements that seem inconsistent with the history of *Coleman v. Newsom*. The Special Master also provided some general comments, addressed at the end of this section.  The Special Master's requests and CDCR's responses are addressed below.

1.      Discussion on Quality Improvement Plans.

First, the Special Master recommended that CDCR substantially revise the discussion of the QIP efficacy as required by the Court's December 14, 2022 Order.  (Ex. A at 1.)  In lieu of foreseeability and preventability analyses, CDCR committed to provide enhanced discussions on QIPs including a discussion on trends, systemic or institution-specific, what meaningful steps are being implemented, whether a QIP has been fully implemented, and if not, what the delays and barriers are.  The Special Master criticized the QIP efficacy discussion because although the suicide prevention coordinators track QIPs, the report lacked evidence that the tracking system is robust.  (*Id.* at 3.)  CDCR disagrees with the Special Master's criticism is unfounded.  The "Analysis of Improvement Efforts" section of the Report, beginning at page 41, details what happens with the majority of the QIPs at the institution level.  The Report also provides additional detail broken down by region.

Second, the Special Master takes issue with CDCR's established process for determining when a QIP has been resolved in a sustainable manner because the process was unilaterally created by CDCR.[6]  The Special Master requested that a meet and confer with Plaintiffs should be held to develop a process for closing out QIPs.  (*Id*. at 4.)  The established process is more than sufficient for determining whether an institution has complied with a QIP, and satisfies the four basic steps— plan, do, check, and act—of standard quality improvement that the Special Master references at page 3, footnote 4, of his letter.[7]  As outlined in the "Determination and Tracking of Quality Improvement Plans" subsection, CDCR's established process consists of (1) assigning a QIP to an

---

[6] This line of objections is troubling as Defendants' proposal, negotiated at length with the Special Master and Plaintiffs, expressly contemplated such analysis in its final report.  In the proposal (ECF No. 7574 at 14), CDCR committed to discussing "whether the QIPs have been fully implemented" and whether regional coordinators are "ensur[ing] that the QIPs as designed were appropriate to effectively address the problems in the first instance and that *sustained improvement* has been made."  (*Id.*, emphasis added.)  Any ambiguity as to the meaning of this arm's length negotiated agreement should have been raised before it was finalized.

[7] The Special Master's letter stated: "Standard quality improvement efforts involve 4 basic steps – 1) plan, 2) do, 3) check, and 4) act (American Society for Quality, https://asq.org/quality-resources/pdca-cycle).  CDCR's reported process appears to cease at step two.  There is no evidence that CDCR monitors the changes that may have resulted from the planned action or acts to make any improvements where efforts may have fallen short."

institution to remediate the issue—the "plan" step—and submit proof of practice within 60 days of receipt—the "do" step, (2) Headquarters reviewing the submitted documentation, (3) a Regional Suicide Prevention Coordinator auditing the efficacy of the remedy during their regular onsite monitoring—the "check" step, (4) ongoing reporting of the QIP status to the institutional Suicide Prevention Response Focused Improvement Team (SPRFIT) Coordinator, and (5) the assignment of a formal Corrective Action Plan (CAP) if an institution cannot comply with the QIP—the "act" step.  In short, all four basic steps are satisfied.

Third, and in regard to the Special Master's criticism of CDCR's established process for determining when a QIP has been resolved, the Special Master believes the term "appears" is "weak" and vague.  (*Id*.)  As mentioned in the above paragraph clarifying the process, CDCR disagrees and believes the established process is sufficient and well-defined.  The QIP process is monitored by trained licensed professionals who can, in their expertise and professional judgment, determine whether an issue appears to have been resolved.

Fourth, the Special Master believes that the term "sustained manner" in CDCR's established process for determining when a QIP has been resolved, lacks a definition.  (*Id*.)  As further detailed in the final Report, an "institution is determined to be compliant if, after two consecutive onsite visits, the issue appears to have been resolved in a sustained manner."  (Report at 42.)  The Report is careful to note that not all QIPs are the same.  Some issues may be immediately corrected, while others may need observation over a period of time.  (*Id*.)  CDCR's final Report defines sustained at page 44, noting that "[o]nce an institution has demonstrated *sustained compliance,* measured by their own metrics and with external reviews by the statewide suicide prevention team, the QIP is deemed to be effective in resolving the specific issue."  (Report at 43, emphasis added.)

Fifth, in regard to the Special Master's criticism of CDCR's established process for determining when a QIP has been resolved, the Special Master is confused as to why some QIPs required audits and other QIPs were completed without any discussion.  (Ex. A at 4.)  CDCR revised the Report to add that "[e]ach case is unique, therefore, some QIPs will have no follow up because of the nature of the QIP while other QIPs will be closed after one review," and provided examples of different types of QIPS and their respective auditing approaches.  (Report at 43.)

Sixth, the Special Master notes that the Report states that only one QIP required a CAP[8] and assumes that 122 QIPs were remedied.  (Ex. A at 4.)  The Special Master requests that the Report include data on the initial and sustained compliance with all issues identified in the 122 QIPs in order for CDCR to provide a robust analysis on the efficacy of the QIPs.  (*Id*.)  The Special Master provides as an example of this issue, QIPs assigned to institutions for delayed activation of 911 emergency medical services.  The Special Master requests that the report include a discussion of whether staff referred for investigation decreased the number of similar QIPs, and the status of each investigation.  (*Id*. at 4-5.)  In response, CDCR modified the report to include a robust discussion regarding the QIPs issued for delayed activation of 911, and the number of

---

[8] Corrective Action Plans are assigned to institutions failing to comply with their QIPs following audits by CDCR suicide prevention coordinators.

investigations that are open, resolved, or still pending.   (See Report at pages 53-54, Efficacy of Quality Improvement Plans.)

Seventh, as part of a headquarters' QIP to train all clinical staff on the revised safety planning policy, the Special Master requests the status of completion as of the date the Report was written. (Ex. A at 5.)  CDCR modified the Report to reflect that the training is now anticipated to be completed by the end of October 2023.  (Report at 43.)  The requested information will not be available and accurate until after that date.  The Report already provides the number and percentage of the clinical staff who completed the Safety Planning Training for 2020-2022.

Eighth, the Special Master notes that the Report lacks discussion of whether there were any repeating QIPs at each facility for the past two-to-three years.  (Id.)  CDCR modified the report to include this discussion.  (See Report at 44, 53.)

Ninth, the Special Master believes that Table 21[9] on page 46 of the Report fails to provide information on the efficacy of the "action taken" to address the issues identified.  (Ex. A at 5.)  The Special Master uses "treatment planning" in Table 21 as an example because the "action taken" only states "audit conducted; training provided," with no further discussion.  The Special Master requests further discussion on the efficacy because the Report states treatment planning QIPs were the most common in the past three years, and that in 2022, 56[10] percent of cases had treatment planning concerns.  (Id.)  According to the Special Master, the Report concludes that inadequate treatment planning has been resolved statewide because "one should assume that all cases across all facilities, the issue . . . has been resolved."  (Id.)  The Special Master then contradicts his assumption by referring to the number of treatment planning concerns identified in 2023 at seven different institutions.  (Id.)  CDCR disagrees with the Special Master's assumption and narrow reading of the entire Report.  Table 21's "action taken" column is not the sole discussion on the efficacy of QIPs.  Nor is Table 21 meant to summarize the efficacy of the QIPs.  CDCR acknowledges that work remains on treatment planning, notwithstanding suicide prevention processes.  The report acknowledges that in 2022, treatment planning was a common issue identified in suicide case reviews and remains the most prevalent type of issue identified over the past three years.  (Report at 48.)  Treatment planning is discussed throughout the 2022 report including in the section "Progress Toward Completing 72-Hour Treatment Plans in a Sufficient Manner." (Report at 57.)  The entire report should be considered to determine whether a discussion on the efficacy of a QIP is robust rather than making incorrect assumptions based on an isolated interpretation of a single column from one table.

### 2.    Suicide Rates.

The Special Master questions whether an increase of suicide rates from 2021 to 2022 was "significant", noting that while the Report addresses the "'significant decrease' in the suicide rate from 2020 to 2021, it curiously does not assess the magnitude of the increase" between 2021 and

---

[9] Table 21 indicates the frequency of QIPs at Institutions Experiencing Suicide in 2022.  Table 21 also provides a brief statement of the "action taken" to remedy the "issues identified".
[10] CDCR's final Report modified "56 percent" to "53 percent" following data validation.

2022. (*Id*. at 5-6.) The Special Master's question is in response to the statement that "[t]he 2021 rate of 15.2 was a significant decrease from 2020's rate of 27.3. The rate reached 30.3 in 2019, the highest since 1985." (Report at 13.) An increase of 4.4 suicides per 100,000 incarcerated individuals is not as significant as a decrease of 12.1 suicides per 100,000 incarcerated individuals. Whether this is an upward trend or "significant" remains to be seen.

The Special Master identifies a typographical error in table 13 on pages 27 and 28 of the Report. (Ex. A at 6.) CDCR has corrected the table to reflect the suicide rate per 100,000 as 19.6, and the 10-Year average as 21.4.

The Special Master recommends that the Report remove the word "slight" on pages 5, 7, and 73. (*Id*.) CDCR has deleted the word "slight" in all three sections.

### 3. Deaths by Suicide in Restricted Housing.

The Special Master notes that the discussion on pages 20-21 of the Report is inconsistent with the information in Table 6, and requests that the discussion reflect that there were seven, not five, deaths by suicide in restricted housing units. (*Id*.) CDCR has modified the discussion accordingly.

The Special Master requests that Table 6 separate out the deaths by suicide in an EOP Hub from non-Mental Health Services Delivery System (MHSDS) restricted housing units, and Correctional Treatment Centers (CTC) from Mental Health Crisis Beds (MHCB). (*Id*. at 6, fn. 5.) CDCR will separate out EOP Hubs (or EOP Restricted Housing Units more generally) from non-MHSDS restricted housing units, and CTCs from MHCBs in future reports.

The Special Master recommends clarifying whether the suicide rate in restricted housing of 168 per 100,000 was for 2022 or a range of years. (*Id*. at 6.) CDCR clarified that the rate was for 2022.

Finally, the Special Master recommends modifying Table 6 to reflect that there were two deaths by suicide by Correctional Clinical Case Management System patients housed in the Short Term Restricted Housing unit rather than one. (*Id*. at 7.) CDCR has modified Table 6 accordingly.

### 4. Training Compliance.

The Special Master recommends changing the word "provides" to "offers" training to staff throughout the report to clarify that CDCR offers all staff training as opposed to the statement that all staff were trained in 2022. (*Id*.) CDCR clarified the Report accordingly.

The Special Master believes the Report at page 61 inaccurately states the overall compliance rate for completing the suicide prevention training amongst custody and healthcare staff. (*Id*.) In 2022, there were 43,084 active staff (excluding staff on long term leave) required to take the training. (Report at 61.) Of those 43,084 staff, 24,186 were custody staff and 8,853 were healthcare staff (including mental health, medical, dental and nursing), who were 96 percent and 89 percent compliant respectively with the training. (*Id*.) Not reported in the report are another 10,045 non-healthcare CCHCS staff who were required to take the training as well, with an 87 percent compliance rate.

The Special Master recommends clarifying whether the 72-hour Treatment Planning continued after 2020 because the Report only states that the training was developed and delivered to all institutions that had a MHCB in 2019 and 2020. (Ex. A. at 7.) CDCR modified the report accordingly. (Report at 58.)

The Special Master notes that Figure 24 and the corresponding discussion states that only 74 percent of required mental health staff were trained in the Suicide Risk Evaluation (SRE) Mentoring and asks whether there is an explanation for the drop in training compliance between 2021 and 2022. (Ex. A at 8.) CDCR modified the report to explain that the drop was attributed to staffing shortages. (Report at 64.)

       5.       Chart Audit Tool Audit Data.

The Special Master notes that page 7 of the Report states that there was an increase in the range of CAT pass rates from 2021. (*Id*.) The Special Master states that page 7 of the Report lacks a discussion of how this is an improvement from 2021 and does not describe which institutions fell within the pass rate range of 70% and 83%. (*Id*.) The Special Master asks that CDCR clarify this discussion and include a table listing institutional CAT compliance rates. (*Id*.) The discussion of the CAT pass rates can be found in the "Risk Evaluation Audits Using the Chart Audit Tool" section at page 55 of the Report. CDCR will provide a table listing each institution's CAT compliance rates in the body of future reports.

The Special Master requests that the treatment plan audits discussion on page 58 of the Report include a discussion of the most problematic audit criteria and whether there were any patterns of deficiencies. (*Id*.) The "Risk Evaluation Audits Using the Chart Audit Tool" section at page 55 of the Report discusses the most commons reasons for a risk evaluation form to fail an audit.

The Special Master notes that CAT audits were made optional due to staffing shortages, and asked whether the institutions that had staffing challenges were less likely to be audited, and if so, how did that impact the audit results. (*Id*.) Audits continued through 2022 and the results are reported at pages 55-56 of the Report, including reasons for scores that fell below the 85% threshold.

       6.       Consistency With *Coleman v. Newsom*.

The Special Master requests that the Report modify its references to Mr. Hayes' re-audit reports by deleting the word "new". (*Id*. at 8-9.) CDCR modified the Report accordingly. (See Report at 8.)

The Special Master requests that the Report should be updated to reflect the current status of the Court's January 5, 2023 Order adopting Mr. Hayes' Fifth Re-Audit Report in full. (Ex. A at 9.) CDCR has updated the report accordingly. (Report at 8, 65.)

The Special Master notes that the Report at page 37 describes his team's role in the suicide case review process and requests the language to be modified to: "Since late 2015, experts from the *Coleman* OSM have participated in the SCR process and provided critiques of the preliminary draft report that have resulted in some revisions, including additional QIPs, of those reports." (Ex. A at 9.) CDCR has modified the report accordingly. (Report at 37.)

The Special Master notes that page 67 of the Report states that a formal announcement of the activation of an automated report to track the use of intake cells was released to all institutions in April 2023.  (Ex. A at 9.)  The Special Master requests that this language be modified because the automated report was announced but was not activated in April 2023.  (*Id*.)  CDCR has modified the report accordingly by deleting references to "activation".

The Special Master recommends that page 68 of the Report reiterate Mr. Hayes' Fifth Re-Audit Report's findings regarding mental health and suicide risk evaluations in full.  (*Id*.)  CDCR has modified the report accordingly.  (Report at 68.)

The Special Master recommends that page 67 of the Report should note that the SPRFIT coordinators' findings were inconsistent with Mr. Hayes' findings in his Fifth Re-Audit Report.  (Ex. A at 9.)  CDCR updated the report accordingly.

The Special Master recommends that the Report should be revised to indicate that the Court adopted Mr. Hayes' recommendation to include his 19 suicide prevention audit measures in CDCR's Continuous Quality Improvement process.  (Ex. A at 10.)  CDCR has revised the report accordingly.  (Report at 70.)

The Special Master recommends that the Report's discussion on Reception Centers should note that Mr. Hayes continued to find deficiencies in two of the three Reception Centers in his Fifth Re-Audit Report.  (Ex. A at 10.)  CDCR has modified the report accordingly.  (Report at 72.)

7.    General Comments.

First, the Special Master recommends revising or removing the terms "suicide cluster" and "clustering."  (Ex. A at 10.)  CDCR has revised the report accordingly.

Second, the Special Master recommends that CDCR clarify the reference to a "cluster effect" because there were no specific clusters of suicides for the reporting period.  (*Id*.)  CDCR has clarified the paragraph accordingly.

Third, the Special Master refers to the "Departmental Initiatives" on page 8 of the Report and asks for additional detail.  (*Id*.)  CDCR revised the sentence as follows:

> CDCR is considering options for how to collect data in different ways that can help identify global trends related to suicide attempts where statewide initiatives may be able to be developed to improve the safety of patients contemplating self-harm. CDCR recognizes the importance of continuously reviewing this data, as it can provide critical information about vulnerabilities in suicide prevention practices.

All other initiatives that CDCR is employing to reduce the number of suicides are discussed throughout the report.

Fourth, the Special Master requests that the Report note that three patients had received inpatient services in the year prior to their deaths by suicide rather than just one patient.  (*Id*. at 10-11.)  CDCR modified the report to: "Three individuals were housed in inpatient settings during the year

prior to their death however only one of these individuals had been psychiatrically hospitalized during the year prior to the death."

Fifth, the Special Master recommends that CDCR note whether any of the five decedents under custody discharge checks, Guard 1 checks, or nursing observations at the time of death were also found in rigor mortis at the time of discovery. (*Id*. at 11.) The Special Master requests that the report be updated to identify whether QIPs were assigned to concerns about inadequate custody or welfare checks related to the death by suicide. (*Id*.) CDCR updated the report to reflect that "[t]wo of the three decedents [in rigor mortis] were on Guard 1 checks at the time of death, which resulted in QIPs being assigned to their respective institution." (Report at 17.)

Sixth, the Special Master requests that the Report be supplemented with commonalities between institutions with mental health staffing vacancies and institutions that have historically had the highest average number of suicides. (Ex. A at 11.) A clear line between institutional vacancies and number of suicides is not apparent in 2022. For instance, there were no suicides at California Heath Care Facility, despite having a 33 percent fill rate of psychologists and 42 percent fill rate for social workers as of December 2022. (ECF No. 7717 at 6-7.) Conversely, California Men's Colony had four suicides in 2022, the most of any institution, yet had a 73 percent psychologist fill rate and 94 percent social worker fill rate in December 2022. (Id.) Similarly, Kern Valley State Prison had two suicides in 2022 with an 85 percent psychologist fill rate and an 83 percent social worker fill rate in December 2022. (Id.) And Valley State Prison also had two suicides in 2022 but had a 98 percent psychologist fill rate and a 100 percent social worker fill rate in December 2022. (Id.)

The 2022 Report's "Executive Summary" also acknowledges the impact of staffing shortages at institutions. While staffing shortages have impacted some suicide prevention programs – such as by making the crisis bed treatment plan Chart Audit Tool optional or resulting in a decrease in SRE Mentoring Training compliance in 2022 (74%), as compared to 2021 (84%) – CDCR has not identified a direct nexus between staffing shortages at any one program or institution to deaths by suicide. Precipitants of deaths by suicide have always been multifactorial, and even when institutions are more fully staffed, CDCR's suicide case reviews have revealed lapses in timelines or poor quality of treatment plans or assessments. CDCR continues to direct resources to the more acute and emergent needs of an institution's programs, including suicide prevention measures.

Seventh, the Special Master recommends including additional information regarding Table 5 at page 20 of the Report because the four suicides at California Men's Colony (CMC) resulted in a higher average than CMC's ten-year average of suicides per year. (Ex. A at 11.) CDCR believes Table 5 and further discussions in the Report adequately capture this fact.

Eighth, the Special Master recommends that page 17 of the Report provide a deeper analysis on the average number of intra-facility transfers because of the increase between 2021 (0.9 per decedent) and 2022 (9.7 per decedent). (*Id*.) CDCR has modified the Report accordingly.

Ninth, the Special Master recommends that footnote 35 on page 55 of Report be revised because it inadequately describes safety planning and provides verbiage to revise the footnote. (*Id*. at 11-12.) CDCR modified the footnote accordingly.

Tenth, the Special Master recommends that the discussion of supervisory reviews of safety plans and custody welfare checks on pages 67 and 68 of the Report should be supplemented with key findings from those reviews. (*Id*. at 12.) CDCR modified the Report for supervisory reviews of safety plans and CDCR commits to providing key findings for custody welfare checks in future reports.

### 8. Additional Comments.

First, the Special Master recommends that page 28 of the Report state whether screening occurred in 2022, whether the 19 incarcerated individuals that died by suicide were screened, and whether any of the decedents were in their first year of incarceration at the time of their death by suicide. (*Id*.) CDCR modified the Report accordingly.

Second, the Special Master recommends that pages 28 and 29 of the Report state whether any of the decedents were enrolled in the Suicide Risk Management Program at the time of death (*Id*.) CDCR modified the Report accordingly.

Lastly, the Special Master notes that page 33 of the Report states that two deaths were later determined to be suicides after receiving the coroner's report and asks whether there was an additional review to determine whether the coroners identified issues that the CDCR reviewers did not. (*Id*.) CDCR modified the report to state: "[i]nitially, CDCR psychologists did not deem the two cases to be suicides, however the opinion was changed upon receipt of the autopsy." (Report at 33.)

### B. Responses to Plaintiffs' Comments to the Draft Report.

Plaintiffs provided written comments requesting that CDCR: (1) revise the Report to ensure the report is neutral and even-handed, (2) update the report to account for a death by suicide that was clarified in May 2023, (3) enhance the discussion on QIPs, (4) enhance the discussion on emergency response issues, (5) more generally align the Report with the Special Master's annual suicide reports, (6) enhance discussion regarding staffing shortages, (7) enhance the discussion on case reviews, (8) enhance discussion on timelines for case reviews, (9) modify references to Mr. Hayes' suicide prevention recommendations, (10) clarify implementation dates, (11) and address vagueness and errors. Several of Plaintiffs' comments are similar, if not identical, to the Special Master's comments. CDCR refers its responses to those comments in Section II.A. Plaintiffs' comments and CDCR's responses are addressed below.

### 1. Tone.

Plaintiffs request that the report be "neutral and even-handed" and recommend deleting the word "slight" when referencing the increase in the number of deaths by suicides from 2021. (Ex. B at 2.) CDCR has made edits to the Report accordingly.

### 2. Death by Suicide Notification in May 2023.

Plaintiffs believe that a death by suicide that was first noticed in May 2023 raises the overall total number of suicides from 19 to 20. (*Id*.) The death by suicide that was first noticed in May 2023 was the 18th death by suicide for calendar year 2022. Another suicide was noticed in July 2023

which was the 19th death by suicide.  As noted separately, CDCR was made aware of a potential 20th death by suicide on September 25, 2023.  CDCR will address that death, if necessary, in a future report.

        3.       Discussion on Quality Improvement Plans.

In their letter, Plaintiffs echo many of the Special Master's comments regarding the 2022 Report's discussion of QIP efficacy.  Many of their comments are addressed above.  (See Section II(A)(1).)  Additional responses follow.

First, Plaintiffs note that the "Efficacy of Quality Improvement Efforts" section lacks additional discussion on the efficacy of custody and nursing QIPs.  (*Id*.)  CDCR increased the discussion on the efficacy of custody and nursing QIPs related to the delay on activating emergency medical services.  (Report at 52-54.)

Second, Plaintiffs request that CDCR name the institution that was issued a CAP and explain why the initial response to the QIP was not effective.  (*Id*. at 4-5.)  The discussion in the "Efficacy of Quality Improvement Efforts" section provides sufficient information about the CAP and corresponding QIP.   (Report at 53-54.)

Third, Plaintiffs recommend including the number of QIPs that were completed, or remain open, in Region II and for 2022; identify the number of nursing and custody QIPs; and state which institutions encountered deficiencies.  (Ex. B at 5.)  CDCR can commit to providing a table showing the total number of open and completed QIPs per region in future reports.

Fourth, Plaintiffs note that CDCR does not disclose who was trained, what they were trained on, or whether all relevant staff attended the training.  (*Id*.)  The topic of training depends on the type of QIP, and relevant staff sign a CDCR Form 844, "Training Participation Sign-In Sheet."  The institution submits the signed CDCR Form 844 to the Statewide Mental Health Program, which is then attached to the final case review and the QIP is considered complete.  The 844s are also logged in the employee's personnel record.  The 2022 Report provides a high-level overview of training QIPs.

Fifth, Plaintiffs request that the Report include a concise statement of the total number of QIPs that were, or were not, fully implemented and any barriers preventing full implementation.  (*Id*. at 6.)  The "Analysis of Improvement Efforts" contains a discussion on the most common QIPs that were issued during 2022.  (Report at 41-47.)

Sixth, Plaintiffs request that the Report include a comprehensive description of the common deficiencies that led to a QIP.  (Ex. B at 6.)  The "Commonalities in Individual Case Reviews" includes a description of the common deficiencies that led to a QIP.  (Report at 47-53.)

Seventh, Plaintiffs request that the underlying deficiencies leading to QIPs be described with more details.  (Ex. B at 6.)  Descriptions of the underlying deficiencies are provided in Appendix B. (Report at 81.)

Eighth, Plaintiffs request the number of QIPs where a deficiency was referred to internal affairs for investigation, or a CDCR Form 989 was submitted, and a description of the deficiencies.  (Ex.

B at. 6-7.)  CDCR modified the "Determination and Tracking of Quality Improvement Plans" section of the Report accordingly.  (Report at 41-43.)

4.  Emergency Response.

Plaintiffs request a discussion on the total number of cases involving emergency-related deficiencies, the number of cases involving the removal of hand-cuffs or restraints before the individual received emergency care, a trend for both matters, and the steps an institution took in response to the QIP.  (Ex. B at 7.)  CDCR modified the discussion in the "Commonalities in Individual Case Reviews" accordingly.  (Report at 48, 52-53.)

5.  Conflicts with the Special Master's Reports.

First, Plaintiffs claim that the Report does not adequately discuss mental health assessments, communication between disciplines regarding patients, and SREs.  (Ex. B at 8.)  CDCR modified the "Progress Toward Completing Adequate Suicide Risk Evaluations" section accordingly. (Report at 55-57.)

Second, Plaintiffs raised several issues regarding the discussion on: (1) the failure to refer a patient to a higher level of care, (2) the impact of inadequate welfare checks, (3) COVID impacts on the provision of mental health care, and (4) decedents discovered in rigor mortis.  (Ex. B. at 8-9.) Items 1, 2, and 4 are addressed in Section II.A, *supra*.  Regarding item 3, whether care provided during COVID impacted 2022 suicides, none of the suicide reports authored for 2022 suicides noted case impacts caused by COVID as a factor.

Third, Plaintiffs' request for data on deaths in restricted housing is addressed in Section II(A)(3), *supra*.  (Ex. B at 9.)

6.  Enhance Discussion on Staffing Challenges.

Plaintiffs requested that the Report include an in-depth discussion on the impact staffing challenges had on the number of suicides.  (*Id*. at 9-10.)  As discussed earlier, the 2022 Report's "Executive Summary" acknowledges the impact of staffing shortages at institutions.  While staffing shortages have impacted some suicide prevention programs – such as by making the crisis bed treatment plan Chart Audit Tool optional or resulting in a decrease in SRE Mentoring Training compliance in 2022 (74%), as compared to 2021 (84%) – CDCR has not identified a direct nexus between staffing shortages at any one program or institution to suicides.  Precipitants of deaths by suicide have always been multifactorial and even when institutions are more fully staffed, CDCR's suicide case reviews have revealed lapses in timelines or poor quality of treatment plans or assessments. CDCR continues to direct resources to the more acute and emergent needs of an institution's programs, including suicide prevention measures.

7.  Discussion in the Case Review Section.

Plaintiffs request that the Report include an explanation of the number of cases with deficient SREs and why the SRE was deficient.  (*Id*.)  No additional detail is necessary.  CDCR describes the SRE's deficiencies in the case reviews that are lodged with the Court under seal.

8.      Discussion on Timelines for Case Reviews.

Plaintiffs request that the Report provide the reason for delays at each step of the suicide case review process and to clarify any steps to improve timeliness for case reviews. (*Id*.) CDCR modified the "Timeliness of Suicide Case Reviews and Suicide Reports" section accordingly. (Report at 38.)

9.      References to Mr. Hayes' Suicide Prevention Recommendations.

Plaintiffs make several requests about references to Mr. Hayes's reports that mirror those of the Special Master. Except for the request addressed in the following paragraph, those other requests are addressed in Section II(A)(6), *supra*.

Plaintiffs, referring to the health screening discussion on page 65 of the Report, request clarification about the ongoing non-compliance. (Ex. B at 11.) CDCR modified the "Initial Health Screening and Receiving and Release (R&R) Environment" section accordingly.

10.      Implementation Dates.

Plaintiffs request that the Report include the implementation date when North Kern State Prison and Wasco State Prison were scheduled to have their R&R screening rooms modified. (*Id*.) CDCR modified the "Initial Health Screening and Receiving and Release (R&R) Environment" section accordingly. (Report at 65.)

Plaintiffs request that the Report reflect the revised safety planning policy and training anticipated roll out date of July 2023. (Ex. B at 11-12.) Changes to the report have been made and are reflected at page 43.

11.      Vagueness and Errors.

Plaintiffs make several requests for clarity in the report that mirror those requests made by the Special Master and are addressed in Section II(A), *supra*.

Plaintiffs also request that the "project" referenced on page 8 of the Report be explicitly named. (*Id*.) CDCR changed the word "project" to "undertakings" as reference to the general undertakings CDCR is taking to reduce suicides.

Finally, Plaintiffs point out several purported errors in the Report which mirror those made by the Special Master. Those issues are addressed in Sections II(A) and II(B)(2), *supra*.

III.      Conclusion.

CDCR's 2022 Annual Suicide Report is a broad review of suicide trends, suicide prevention policies and suicide prevention undertakings over the past calendar year. While there was an increase in the number of deaths by suicide between 2021 and 2022, CDCR continues to assess and improve upon its suicide prevention system to help reduce suicides. This annual Report, like the ones before it, is a vital tool in CDCR's suicide prevention system. CDCR looks forward to providing future reports to the Court and to working with the Special Master and Plaintiffs to ensure its reports remain comprehensive and meaningful.

EXHIBIT A

**PANNONE LOPES**
**DEVEREAUX** & **O'GARA** LLC

*counselors at law*

August 18, 2023

***VIA EMAIL:*** ***Melissa.Bentz@cdcr.ca.gov***

Melissa C. Bentz, Esq.
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation

     Re:    2022 Annual Suicide Report

Dear Ms. Bentz:

     This letter provides the Special Master's preliminary comments and questions regarding CDCR's draft Annual Suicide Report for calendar year 2022, which defendants distributed to the Special Master and plaintiffs' counsel on July 20, 2023 [hereinafter "Draft Report"].

     In addition to adding findings regarding the one case of death by suicide still under review as of the time of the Draft Report's writing,[1] CDCR should also substantially revise the Draft Report's discussion of Quality Improvement Plan (QIP) efficacy to align with the requirements of the Court's December 14, 2022 Order.  ECF No. 7681.  The Draft Report provides little evidence that CDCR is tracking outcomes of its corrective actions related to deaths by suicide or otherwise examining its QIPs with an eye toward efficacy.  As currently constituted and as will be discussed in greater detail below, the Draft Report falls short of meeting CDCR's obligations under the Court's prior orders regarding defendants' provisionally approved Annual Suicide Report Proposal.  This is especially concerning considering the Draft Report is CDCR's second attempt at satisfying the commitments it made in its June 28, 2022 Annual Suicide Report Proposal, ECF No. 7574 at 13-15, and its court ordered obligations.  *See generally* July 22, 2022 Order, ECF No. 7592; December 14, 2022 Order, ECF No. 7681.

     CDCR should also attend to the various comments, questions, and requests for clarification and correction included below prior to finalizing the Draft Report.  *See infra* Parts II-VII.

---

[1] Defense counsel's July 20, 2023 email regarding the Draft Report indicated CDCR will need to revise the Draft Report to include specific findings regarding one death by suicide still under review at the time of the Draft Report's distribution.  Email from Ms. Melissa Bentz, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and Plaintiffs' Counsel (July 20, 2023), attached hereto as Exhibit A.  The Special Master requests CDCR distribute an updated version of the Draft Report including the revisions related to the unreported death by suicide prior to defendants' filing the final version of the 2022 Annual Suicide Report with the Court.

Melissa C. Bentz, Esq.
August 18, 2023
Page 2

## I.      The Draft Report's Discussion of QIP Efficacy Remains Deficient

Examining and discussing QIP efficacy within the Annual Suicide Report is central to the provisionally approved annual suicide report process agreed to by the Special Master and parties.[2] Indeed, the Special Master's agreement to forgo a discussion of "foreseeability" and "preventability" of deaths by suicide among incarcerated persons was predicated largely on defendants' commitment to including an "enhanced" discussion of QIP efficacy and implementation in their annual suicide reports going forward.[3]

---

[2] In its December 14, 2022 Order, the Court highlighted the centrality of the annual suicide report's coverage of QIP efficacy to the Special Master's and parties' provisional agreement to delegate the report to defendants:

> In relevant part, [CDCR's June 28, 2022 Annual Suicide Report] Proposal contemplates a shift away from the analysis of each individual inmate suicide used in the Special Master's Expert's annual suicide reports, based on whether the suicide was "foreseeable" and/or "preventable" as the definition of those terms has been used in this action for more than two decades. The new analysis will focus instead on the efficacy of CDCR's quality improvement plans (QIP) resulting from those suicides, as they play a key role in suicide prevention and response in CDCR's Mental Health Services Delivery System (MHSDS).

ECF No. 7681 at 2 (internal citations omitted).

[3] As noted in the Special Master's September 8, 2022 correspondence regarding the Draft 2021 Annual Suicide Report:

> CDCR's court-approved proposal for assuming the annual suicide report indicated the 2021 annual suicide report would "continue to track the contents and analysis found in the reports written by" the Special Master's expert. ECF No. 7574 at 13. Significantly, the parties and Special Master agreed that CDCR would "enhance" the section of the annual suicide report discussing Quality Improvement Plans (QIPs). *Id.* at 14. CDCR is required to provide "a comprehensive review of the QIPs for each discipline," including: discussing "the frequency or trends of QIPs in each category for a given year," "identify[ing] the number of QIPs assigned to institutions vs. those assigned to the statewide suicide prevention program for issues that are more systemic, rather than localized;" and "identify[ing] what meaningful steps are being taken to address the deficiency and improve the policies associated with care expected at the institutional level." *Id.* The annual report will "focus…on an analysis of the more frequent QIPs that are assigned" and "will consider the trends of similar QIPs, frequency of repeated QIPs assigned to particular institutions, and frequency in which QIPs are assigned to the statewide suicide prevention program." *Id.* Finally, *CDCR is required to include "a discussion about whether QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation," and "an analysis of the efficacy of the QIPs*." *Id.*



Melissa C. Bentz, Esq.
August 18, 2023
Page 3

Both the Special Master and plaintiffs found the 2021 Annual Suicide Report's "enhanced" discussion of QIPs and QIP efficacy to be deficient. *See* ECF No. 7615 at 17 (Special Master's comments to draft 2021 Annual Suicide Report, noting "additional 'enhancements'" to the draft report's discussion of QIP efficacy were "required to fully satisfy CDCR's annual suicide report writing responsibilities."); *see also* ECF No. 7621 at 3 (Plaintiffs' response to Defendants' 2021 Annual Suicide Report, noting "Defendants' 2021 suicide report does not include any analysis of QIP efficacy."). In addition, defendants themselves acknowledged that the 2021 Annual Suicide Report's discussion of QIP efficacy needed to be "more robust" going forward, citing the newness of CDCR's regional suicide prevention coordinator program as justification for the 2021 Annual Suicide Report's deficiencies. *See* ECF No. 7615 at 7 ("Further information will be contained in the 2022 Annual Suicide Report when a more robust analysis can be performed based upon the work the regional suicide prevention coordinators have done throughout calendar year 2022. CDCR will also consider folding that information into Table 18 in the 2022 report as appropriate."); *see id.* at 9 ("Given that the regional suicide prevention coordinator program is relatively new, further information regarding their findings will be contained in the 2022 Annual Suicide Report when a more robust analysis can be performed based upon the work done throughout calendar year 2022."); *see also* Defendants Response to Plaintiffs' Objections to Defendants' 2021 Annual Suicide Report, ECF No. 7659 at 3 (acknowledging that "the monitoring and reporting of [QIP] efficacy was not yet developed for the 2021 Annual Report").

Based in part on defendants' representations about the "more robust analysis" of QIP implementation and efficacy that would be included in the 2022 Annual Suicide Report, rather than reject or require defendants to amend the 2021 Annual Suicide Report, the Court instead "extend[ed] the provisional approval process for one year." ECF No. 7681 at 5; *see also id.* at 7 ("The court anticipates that the required robust process will be fully developed so that defendants' 2022 Annual Suicide Report contains a full discussion of whether QIPs approved during the reporting year have been fully implemented and, if not, what the barriers to such implementation are.").

Unfortunately, for the second consecutive year, this critical section of the annual suicide report is deficient when weighed against CDCR's commitments and court-ordered obligations. Similar to CDCR's initial draft 2021 Annual Suicide Report, to which the Special Master provided comments in a September 8, 2022 letter, ECF No. 7615 at 15-24, the Draft Report notes that suicide prevention coordinators track QIPs but provides no evidence that either the QIPs themselves or CDCR's internal QIP tracking is "robust." For instance, the Draft Report includes a number of statements about what CDCR "can" do or policies that have been implemented with little evidence that they have actually been implemented. Also, there is limited evidence that CDCR is looking at the QIPs with a focus on whether the implemented action(s) resulted in their intended outcome(s). Most QIPs involve "training and auditing" but the Draft Report does not discuss the outcomes of these efforts.[4]

---

ECF No. 7615 at 15.
[4] Standard quality improvement efforts involve 4 basic steps – 1) plan, 2) do, 3) check, and 4) act (American Society for Quality, https://asq.org/quality-resources/pdca-cycle). CDCR's reported process appears to cease at step two. There is no evidence that CDCR monitors the changes that may



Melissa C. Bentz, Esq.
August 18, 2023
Page 4

In addition, the Draft Report indicates CDCR has unilaterally implemented the following standard for determining if an institution is compliant with its QIPs:

> The Suicide Prevention Coordinators in each of the regions track all QIPs after they have been completed by the institutions in their regions.  During their regular onsite monitoring, the coordinators will report on the ongoing status of the originally identified deficiency and discuss with the institutional SPRFIT Coordinator any concerns.  An institution is determined to be compliant if, after two consecutive onsite visits, the issue appears to have been resolved in a sustained manner.

Draft Report at 40.  The language describing this new unilateral standard is weak and leaves the reader guessing as to how CDCR staff determines if "the issue *appears* to have been resolved in a sustained manner."

Further, CDCR has provided no definition or measurement to demonstrate what "sustained manner" means.  CDCR modifies this statement later in the report by asserting: "Some QIPs will have no follow up because of the nature of the QIP while other QIPs will be closed after one review." Draft Report at 41.  However, there is no description of when or how determinations are made regarding which QIPs do not require further follow-up or are not required to demonstrate ongoing, sustained compliance.  Simply put, CDCR should not unilaterally develop and implement such QIP compliance standards without considering meaningful input from the Special Master, his clinical experts, his suicide prevention expert, and plaintiffs' counsel.  To the extent defendants have a proposal regarding QIP compliance standards, they should convene a meet and confer with the plaintiffs' and Special Master's team.

CDCR reports that in 2022 there were 123 individual QIPs assigned.  *Id.*  Of the 123 QIPs, it was reported that only one QIP required a corrective action plan (CAP), meaning that the remaining 122 QIPs were "remedied."  Draft Report at 49.  If robust analyses on the efficacy of all QIPs were completed by defendants, there should be data effectively demonstrating initial and ongoing, sustained compliance with all issues identified in the 122 QIPs, yet no such data were provided in the Draft Report.  Instead, in the section devoted to discussing efficacy of QIPs, defendants list the number of QIPs assigned to each region and note how the QIPs were "completed" without any discussion about whether the actions were effective in resolving the identified issues which underlie each QIP.

One example of the Draft Report's failure to discuss the efficacy of a QIP was related to delays in activating 911.  Draft Report at 42.  CDCR reported that staff were referred to internal affairs (pursuant to CDCR's Confidential Request for Internal Affairs Investigation / Notification of Direct Adverse Action (Form CDC 989)) and received corrective action letters, yet no information

have resulted from the planned action or acts to make any improvements where efforts may have fallen short.



Melissa C. Bentz, Esq.
August 18, 2023
Page 5

was provided as to whether delays in activation of 911 had decreased as a result of these actions. Further, there was no documentation in the report regarding the status of "989 investigations," i.e., the number during 2021-2022 and whether they were open, resolved, or still pending. Again, as 989 actions are part of the QIP process, the status of such investigations must be reported as part of the annual review of QIPs.

Beyond failing to address efficacy of QIPs, CDCR provided little to no detailed information about the majority of QIPs that were required in 2022. For example, one of the headquarters QIPs related to the implementation of a revised safety planning policy and training. CDCR provided information regarding completion of the updated policy and related forms and noted that all sites were expected to complete training for "all clinical staff," Draft Report at 41, with an anticipated end date of July 2023. However, CDCR provided no information about the status of the training across the system. It is not known if 0 percent of clinical staff or 99 percent of clinical staff had been trained at the time the Draft Report was written. A "robust" process for monitoring QIP compliance would be expected to include basic data related to the status of QIP implementation.

At the individual institution level, CDCR chose to examine whether QIPs were "repeated" at facilities that had more than one death by suicide in 2022 but failed to assess whether there were repeated issues across years at each facility. Draft Report at 42. In other words, there was no analysis of whether issues that were identified at a given institution during suicide case reviews over the past two to three years were present again in 2022. A robust analysis would examine whether prior years' QIPs proved effective and sustained in subsequent years.

Table 21 (on page 43) is a glaring example of insufficient analysis. CDCR chose to report on common issues identified across and among facilities as well as the "action taken" to address these issues yet failed to provide any information as to the efficacy of those actions. For example, ten QIPs were required in 2022 to address issues related to treatment planning. The table appears to indicate that in all ten cases, the actions taken were "audit conducted; training provided" without any discussion of what the audits found or how the training impacted practice. The graph on the top of page 45 shows that treatment planning concerns have been the most frequent concern for the past three years, indicating that prior QIPs have not proved effective in reducing the number of inadequate treatment plans for individuals who died by suicide. On page 49 of the report, it is noted that 56 percent of the cases of patients who died by suicide had concerns related to treatment planning and some specific concerns are listed. Given that all but one QIP was reported to have been remedied, deductively, one should assume that in all cases across all facilities, the issue of inadequate treatment planning has been resolved. Yet, for instance, suicide case review reports have identified treatment planning concerns for individuals who died by suicide in 2023 across at least seven institutions.

## II.     The Draft Report's Discussion of Suicide Rates Requires Additional Analysis, Correction, and Clarification

The Draft Report states the following regarding the 2022 suicide rate: "The annual suicide rate in CDCR in 2022 was 19.6 deaths per 100,000 incarcerated individuals, based on 19 suicides. The *2021 rate of 15.2 was a significant decrease from 2020's rate of 27.3*." Draft Report at 10-11 (emphasis added). While the Draft Report focuses on the "significant decrease" in the suicide rate



Melissa C. Bentz, Esq.
August 18, 2023
Page 6

from 2020 to 2021, it curiously does not assess the magnitude of the increased suicide rate observed in 2022 compared to 2021.  Was the increase from 15.2 to 19.6 deaths by suicide per 100,000 a significant increase?

In addition, the table on page 26 appears to include an inaccurate "Total Population Rate" for 2022, as it reports a suicide rate of 17.5 per 100,000, whereas the Draft Report earlier states the 2022 suicide rate was 19.6 per 100,000.  CDCR should revise the table to correct the 2022 suicide rate and re-calculate the 10-Year Average reported in the same table as necessary.

Finally, in multiple sections, the Draft Report describes the change in the suicide rate between 2021 and 2022 as a "slight" increase.  *See* Draft Report at 5, 7, 73.  We recommend revising this language as there is nothing "slight" about four additional incarcerated persons dying by suicide in 2022 compared to 2021.

### III.    The Draft Report's Discussion of Deaths by Suicide in Segregated Housing Is Misleading

The discussion of suicides in segregated housing on page 21 is inconsistent with the information included in Table 6 ("Frequency and Percent of Housing Placements of CDCR Suicide Decedents, 2017-2021 and 2022") on pages 19-20.  Table 6 indicates there were five suicides in Administrative Segregation, inclusive of ASU EOP Hubs,[5] one in PSU, and one in STRH, for a total of seven suicides in segregated housing.  This calculation is consistent with the Draft Report's definition of segregated housing.  *See* Draft Report at 20 n. 18 ("For this report, segregated housing includes: Administrative Segregation (ASU), Short-Term Restricted Housing (STRH), Long-Term Restricted Housing (LTRH), ASU-EOP Hubs, Psychiatric Services Units (PSU), Security Housing Units (SHU), and Condemned Housing.").  However, the discussion on page 21 reports a total of five suicides in segregated housing.  This should be corrected to note that seven suicides, or 37 percent of the 19 deaths by suicide in 2022 occurred in segregated housing settings.  Suicide rates in segregated housing should also be recalculated based on this correction.

Relatedly, on page 20, the Draft Report reports a suicide rate in segregated housing of 168 per 100,000.  Is this the rate for 2022 or a range of years?  This should be clarified when the Draft Report is finalized.

---

[5] It is unclear why ASU EOP Hubs are grouped together with non-MHSDS administrative segregation in Table 6 whereas the other specialized MHSDS segregated housing programs are reported on separately in the same table.  CDCR should revise the Table 6 to separate deaths by suicide in ASU EOP Hubs from those that occurred in non-MHSDS administrative segregation.  The Special Master also notes that Correctional Treatment Centers (CTC) and Mental Health Crisis Beds (MHCB) are inappropriately grouped together in Table 6.  CDCR should decouple deaths by suicide in these settings in the final report.



Melissa C. Bentz, Esq.
August 18, 2023
Page 7

Finally, the Draft Report states that there was one death by suicide in an STRH unit, Draft Report at 19 (Table 6), but there were two decedents at the 3CMS level of care at the time of their death by suicide in segregated housing.  Draft Report at 20.  Assuming the patient who died by suicide in an STRH unit (as reflected in Table 6) was at the 3CMS level of care, where was the other 3CMS patient housed at the time of their death by suicide?

### IV.      The Draft Report's Discussion of Training Compliance Requires Additional Analysis and Clarification

CDCR should make several corrections and clarifications to the Draft Report's discussion of various trainings provided to staff.  For instance, on page 5, the Draft Report indicates, "CDCR provides **all** CDCR staff members suicide prevention training every year."  Draft Report at 5 (emphasis in original).  This appears to be inaccurate, as, on the next page, the Draft Report notes that 91 percent of staff received suicide prevention training.  *Id.* at 6.  We recommend revising the statement on page 5 (quoted above) by changing the word "provides" to "offers" to ensure internal consistency within the Draft Report and avoid misleading the reader into believing 100 percent of staff were trained in 2022.

In addition, similar to the 2021 Annual Suicide Report, *see infra* note 6, the Draft Report includes confusing statistics regarding compliance with suicide prevention training on page 57: "In 2022, 43,084 staff members were required to take this training: of these, 23,280 custody staff and 9,786 health care staff completed the training, with an overall compliance rate of 96% for custody and 89% compliance rate for health care staff."  Draft Report at 57.  However, the combined percentage of custody and health care staff that completed the training (76.7 percent)[6] is lower than the reported 96 percent compliance rate for custody staff and 89 percent compliance rate for health staff.  CDCR should review these figures and clarify as necessary.[7]

The discussion of "training designed to improve the quality of 72-hour treatment planning" on page 54 may require clarification.  The Draft Report indicates this training "was developed and delivered during 2019 and 2020 in all institutions that have MHCB units."  Draft Report at 54.  Did this training continue after 2020?  Was the training efficacious?

---

[6] To arrive at 76.7 percent, the Special Master added the number of custody (23,280) and health care (9,786) staff who received training, for a total of 33,066.  The sum (33,066) was divided by the total number of staff who were required to receive suicide prevention training (43,084), and the quotient (0.767) was multiplied by 100 to arrive at 76.7 percent.

[7] The Special Master notes he made similar comments to the 2021 Draft Report.  *See* ECF No. 7615 at 21 ("The reported figures are confusing, as the overall compliance rate appears to be 75%, which is lower than the separate compliance rates for custody (85%) and health care (90%) staff.").



Melissa C. Bentz, Esq.
August 18, 2023
Page 8

In addition, Figure 24 and the accompanying text indicate 74 percent of required mental health staff were trained in SRE Mentoring.  Draft Report at 60-61.  Is there an explanation for the drop in training compliance between 2021 and 2022?

## V.      The Draft Report's Discussion of CAT Audit Data Requires Clarification

The Draft Report states the following: "Compliance with the Chart Audit Tool (CAT) pass rate fluctuated between 70% and 83%, which is an improvement from the prior year's range of 66% and 73%."  Draft Report at 6.  As was the case with the Draft 2021 Annual Suicide Report, *see* ECF No. 7615 at 21, the Draft Report's discussion of the Chart Audit Tool (CAT) pass rate includes ranges of percentages which have limited meaning as presented.  The reported percentage ranges only represent an "improvement" over 2021 if individual institutional pass rates increased, which is not clear here.  Also, the range does not reveal how many facilities were at 70% vs. 83%.  If this year, all but one facility was at 70%, and last year, all but one facility was at 73%, then this is not improvement.  CDCR should clarify this discussion and include a table listing institutional CAT compliance rate for the reporting period.

The discussion of treatment plan audits, beginning on page 54, calls for additional information.  The Draft Report states the following:

> Audits review and assess whether a summary of mental health symptoms and treatment is present; whether the diagnosis and clinical summary are consistent with the problems found; whether medications are listed that target symptoms; if the goals and interventions include individualized, measurable objectives; if progress was discussed among team members and with the patient; if there is a meaningful discussion of a discharge plan or future treatment needs; if the rationale for the level of care is sound; and whether the plan is updated to reflect current functioning.

Draft Report at 54.  What have the auditors found to be the most problematic audit criteria?  Have the auditors observed any patterns of deficiencies?

Later in the section, the Draft Report notes that CAT audits were "made optional due to staffing shortages."  *Id.*  Were the sites with more significant staffing challenges less likely to be audited, and if so, how did that impact the audit results?

## VI.     The Draft Report Requires Additional Information and Clarifications to Comport with the Record in *Coleman*

There are several sections of the Draft Report which require additional information and/or clarification to accurately reflect the record in this case.  For instance, the Draft Report states that each of Mr. Hayes' re-audits "has raised *new* issues or concerns that CDCR continues to address."  Draft Report at 6 (emphasis added).  This is misleading as the most recent Re-Audit Reports have generally



Melissa C. Bentz, Esq.
August 18, 2023
Page 9

addressed lingering deficiencies that have plagued CDCR's system for years.  In addition, the Draft Report's reference to the current implementation status of the Hayes recommendations on page 6 should be updated to reflect the current status as of the Court's January 5, 2023 Order adopting the Fifth Re-Audit Report.  Similarly, on page 61, the Draft Report should be revised to note that the Court adopted the Fifth Re-Audit Report in full on January 5, 2023.  *See generally* ECF No. 7696.

The Draft Report discusses the Special Master's team's role in the suicide case review process. *See* Draft Report at 36 ("Since late 2015, experts from the OSM are present by phone and, having reviewed the draft report, may raise additional concerns or issues.").  The quoted language should be revised to be consistent with the 2021 Annual Suicide Report, which more accurately describes the Special Master's participation in suicide case reviews.  *See* ECF No. 7615 at 89 ("Since late 2015, experts from the *Coleman* OSM have participated in the SCR process and provided critiques of the preliminary draft report that have resulted in some revisions, including additional QIPs, of those reports.); *see also id.* at 23 (Special Master's recommendation to revise the same language in the draft 2021 Annual Suicide Report "for accuracy").

Regarding DAI's automated report to track the use of intake cells, the Draft Report states: "A formal announcement of activation of this report was released to all institutions in April 2023."  Draft Report at 63.  This is misleading, as the automated report was announced but not activated earlier this year.  Please review and revise this language.

Regarding mental health referrals and suicide risk evaluations, the Draft Report states: "In the fifth re-audit, Mr. Hayes stated that CDCR remains below the 100% compliance rate."  Draft Report at 63.  For transparency and context, Mr. Hayes' fifth re-audit findings should be noted in full, as follows:

> Although 100 percent compliance is required for this issue, the current (fifth re-audit) assessment found that only 61 percent (14 of 23) of audited facilities achieved over 90 percent compliance with the required completion of SRASHEs.  The nine facilities under 90 percent compliance were: CIM, CMC, CSATF, CSP/LAC, KVSP, MCSP, NKSP, SVSP, and WSP.  Only one (SQ) of the 23 facilities was at 100 percent compliance with this measure.  This finding was slightly lower than the preceding assessment, which found 65 percent of facilities were over 90 percent compliance.

Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs, ECF No. 7636-1 at 35.

Similarly, on the following page, regarding the regional SPRFIT coordinators' finding that "the institutions were at 99% compliance on MH Consults for Suicidality Ordered as Emergent," Draft Report at 64, the Draft Report should note that these findings were inconsistent with Mr. Hayes' findings in the Fifth Re-Audit.



Melissa C. Bentz, Esq.
August 18, 2023
Page 10

On page 65, the Draft Report states: "CDCR, in consultation with the OSM experts, has agreed to monitor 19 suicide prevention audit items through a CQI process."  The Draft Report should be revised to indicate that the Court adopted Mr. Hayes' recommendation that his 19 suicide prevention audit measures be included in defendants' CQI process in its Order adopting in full the Third Re-Audit Report.  *See* Third Re-Audit Report, ECF No. 5993-1 at 29 (Mr. Hayes' recommendation: "The reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQIT-formatted report for each facility, and not in various "regional reports" as described in defendants' May 2018 CAP."); *see also* July 3, 2019 Order, ECF No. 6212 at 14.

The Draft Report's discussion of Reception Centers should be modified to note that Mr. Hayes continued to find deficiencies at two of the three Reception Centers in his Fifth Re-Audit Report.  *See* Draft Report at 67.

### VII.  The Draft Report Requires Additional Corrections and Clarifications

#### A.  *Use of the Term "Suicide Cluster"*

CDCR's use of the term "suicide cluster" or "clustering" on page 5 of the Draft Report is inappropriate and should be revised.  *See* Draft Report at 5 (misuse of term "clusters of suicides").  Relatedly, it is unclear why the Draft Report refers to cluster effects on page 16 even though there is no reference to specific clusters of suicides occurring in CDCR during calendar year 2022.  *See id.* at 16 (general reference to cluster effects without providing examples of clusters within CDCR).  CDCR should clarify this paragraph as well.

#### B.  *"Departmental Initiatives"*

The section entitled "Departmental Initiatives" (beginning on page 7) requires clarification.  First, it is unclear which initiative is referred to in the following sentence: "One project identifies specific occurrences in time when incarcerated persons are thought to be at increased risk…."  Draft Report at 7.  What specifically is being done to address these "specific occurrences" that are "thought" to put patients at risk?  Were any of these initiatives implemented in 2022?

Moreover, have any of CDCR's efforts to "examine serious suicide attempts to learn new ways to improve prevention," *id.*, been efficacious?  Are improvements being measured?

#### C.  *Inpatient Settings*

On page 10, the Draft Report reveals that two patients were in inpatient settings at the time of their death by suicide: one patient was receiving MHCB care and one was receiving inpatient psychiatric care at the time of their deaths by suicide.  Draft Report at 10.  It appears three individuals had been housed in inpatient settings in the year prior to their death by suicide, inclusive of these two patients who were housed in inpatient settings at the time of their death and one patient who had been discharged from an inpatient setting in the year prior to their death.  *Id.*  However, the Draft Report only states "[o]ne individual had been psychiatrically hospitalized during the year prior to the death."



Melissa C. Bentz, Esq.
August 18, 2023
Page 11

*Id.*  This is misleading.  CDCR should clarify and note that three patients had received inpatient services in the year prior to their death by suicide.[8]

### D.  *Rigor Mortis*

The discussion of decedents found in rigor mortis also requires additional information.  The Draft Report states "three (16%) of the 19 decedents were found in rigor mortis" at the time of their death by suicide.  Draft Report at 15.  In addition, "five (26%) of the 19 decedents were under custody discharge checks/guard 1 checks/nursing observations at the time of their death."  *Id.* at 16.  However, the Draft Report does not indicate if any of the five decedents on custody discharge checks, Guard One checks, or nursing observations were found in rigor mortis.  CDCR should update the Draft Report to include this critical information.  Similarly, the Draft Report should be updated to identify if there were any cases in 2022 where "concern[s] about inadequate custody/welfare checks related to the death by suicide" were identified, as it does for 2019 and 2020.  *Id.*

### E.  *Institution at the Time of Death and Inter-Facility Transfers*

The section entitled "Institution at Time of Death" should be supplemented with additional relevant information.  For instance, the Draft Report states, "The institutions that have the highest average annual suicides, such as Salinas Valley State Prison (SVSP), are those where high security Level IV incarcerated individuals are housed and being treated for severe and chronic mental health and behavior problems."  *Id.*  The Special Master notes that there are also severe staffing shortages at SVSP and other similarly situation institutions.  Accordingly, CDCR should examine whether there are any commonalities regarding mental health staffing vacancies among institutions that have historically had the highest average number of suicides.

In addition, the Draft Report should include additional information on the four suicides that occurred at CMC in 2022, which is significantly above the institution's ten-year average of 1.1 suicides per year.  Draft Report at 18 (Table 5).

Finally, the Draft Report's discussion of inter-facility transfers calls for deeper analysis, given the significant difference between the average number of inter-facility transfers observed in 2022 (9.7 per decedent) compared to the prior year (0.9 per decedent).  Draft Report at 16.

### F.  *Safety Planning*

Footnote 36 on page 51 contains an inadequate description of safety planning and should be revised to the following: "A safety plan includes a specific strategy that describes signs, symptoms,

---

[8] This form of reporting this data point is consistent with the Special Master's expert's annual suicide reports and should be replicated in the Final Report.  *See, e.g.*, 2019 Annual Suicide Report, ECF No. 7239 at 32 ("Fourteen inmates, or 36.8 percent, of those who died by suicide in 2019 had been admitted to an inpatient setting within the 12 months prior to their suicidal acts.").



Melissa C. Bentz, Esq.
August 18, 2023
Page 12

and the circumstances in which the risk for suicides is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician can take if suicidal thoughts do occur."

Regarding supervisory review of safety plans, the Draft Report indicates what the supervisory reviews "are designed" to do without any information on what supervisors have found in their monitoring of safety plans.  Draft Report at 64.  CDCR should supplement this section with information about key findings from supervisory reviews and the outcomes of any corrective actions taken in response to observed deficiencies.  Similarly, on the next page, the Draft Report indicates that "[t]he process of auditing [discharge custody checks] is ongoing."  *Id.* at 65.  What have the audit results indicated to date?

G.      *Additional Comments*

The section entitled "Screening on Initial Arrival to CDCR" on page 26 appears to report what screenings are required to take place without any information on whether those screenings actually occurred in 2022.  At minimum, the Draft Report should include information about whether required screenings were done for the 19 incarcerated individuals who died by suicide in 2022 or the three individuals who died by suicide within the first year of incarceration.

Regarding the Draft Report's discussion of its Suicide Risk Management Program, Draft Report at 27, were any of the 19 incarcerated persons who died by suicide in 2022 enrolled in this program during their incarceration or at the time of their death?

The Draft Report states that, "[u]pon receipts of the coroners' report, two of these deaths [classified as unknown] were later determined to be suicides."  Draft Report at 31.  Was any review done in these two cases to determine what the coroners identified that the CDCR reviewers did not identify?

**VIII.   Conclusion**

Thank you for your consideration and attention to my team's serious concerns with the Draft Report's discussion and analysis of QIP efficacy and our other comments, questions, and requests for correction and clarification discussed herein.  We look forward to reviewing the final version of the 2022 Annual Suicide Report.

Sincerely,

/s/ *Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr., Esq.
Special Master

CC:   *Coleman* Team (RBGG)
        Steven Fama, Esq.



# EXHIBIT A

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Coleman Team - RBG Only; Coleman Special Master; Steve Fama |
| **Cc:** | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; v_Damon.McClain@doj.ca.gov; v_Namrata.Kotwani@doj.ca.gov; David C. Casarrubias; Laurel E. O"Connor; Carson R. Niello; Kaylen Kadotani; Weber, Nicholas@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR |
| **Subject:** | Coleman: CDCR"s Draft 2022 Annual Report to the Legislature on Suicides in the CDCR |
| **Date:** | Thursday, July 20, 2023 12:34:13 PM |
| **Attachments:** | 2022 Annual Report Final Version 07.19.2023.pdf |

All,

Attached is CDCR's draft 2022 Annual Report to the Legislature on Suicides in the CDCR ("Draft Report"). Please note that CDCR was recently notified that a 2022 death was determined to be a suicide by the county coroner. CDCR has begun the suicide review process for this patient and will amend the Draft Report with information regarding this patient prior to finalization. CDCR has noted the areas in the Draft Report (through comments and highlights) we anticipate will require revision after the suicide review process for the recently identified patient is completed.

The agreed upon comment period is 30 days. However, as the 30th day would fall on a weekend, CDCR requests any comments or objections be submitted by August 21st.

Please let me know if you have any questions.

Respectfully,

*Melissa C. Bentz*
Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

EXHIBIT B



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email: mnunez@rbgg.com

August 23, 2023


<u>VIA ELECTRONIC MAIL ONLY</u>

Melissa Bentz                          Matthew A. Lopes, Jr.
Nicholas Weber                         *Coleman* Special Master
Sundeep Thind                          Pannone Lopes Devereaux & O'Gara LLC
Dillon Hockerson                       1301 Atwood Avenue, Suite 215 N
CDCR Office of Legal Affairs           Johnston, RI  02919
Melissa.Bentz@cdcr.ca.gov              mlopes@pldolaw.com
Nicholas.Weber@cdcr.ca.gov
Sundeep.Thind@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

   Re:  *Coleman v. Newsom*:  Plaintiffs' Comments on Defendants' Draft 2022
      Annual Report to the Legislature on Suicides and Suicide Prevention
      Efforts in the CDCR
      <u>Our File No. 0489-03</u>

Dear All:

   I write to share Plaintiffs' comments on Defendants' Draft 2022 Annual Report to
the Legislature on Suicides in the CDCR ("Draft Report"), which we received on July 20,
2023.  The Draft Report enters into a disturbing context wherein the Court has initiated
enforcement proceedings, including the accrual of contempt fines, against Defendants for
failing to fully implement a majority (15) of the Special Master's suicide prevention
expert Lindsay Hayes' recommendations despite the passage of over eight years since the
Court ordered Defendants to implement them and Defendants' expenditure of millions of
dollars on suicide prevention.  Order (Feb. 28, 2023), ECF No. 7743 at 4-5.[1]  Especially
given that context, we are discouraged to see that Defendants' Draft Report entirely
lacks, or has serious deficiencies in, several foundational elements of what the Court

---

[1] Page citations to filed documents are based on ECF pagination.  Citations to the Draft
Report are based on pagination printed on the document.  Citations to other documents
that are not filed are based on pagination printed on those documents where available.

[4339210.3]

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 2

ordered must be included in the annual suicide reports, despite the clear requirements in the court-ordered suicide reporting plan and subsequent direction in the December 15, 2022 Order (ECF No. 7681). Most notably, the Draft Report's discussion of QIP efficacy and implementation is deficient, as it was in Defendants' 2021 Suicide Report. Defendants must address the concerns discussed below in the final report, so that Plaintiffs, the Special Master, and the Court can be assured that Defendants are ready to take on this important responsibility going forward.[2]

As an initial matter, it is essential that Defendants revise the Draft Report to ensure that its discussion of 2022 suicides is neutral and even-handed. Throughout the Draft Report, for example, defendants describe the number of 2022 suicides as representing a "slight" increase from the number of 2021 suicides. Draft Report at 5, 7, 72. However, suicides increased by a third, from fifteen in 2021 to twenty in 2022, which is a substantial increase. Such minimization of suicides has no place in what should be a neutral, self-critical analysis of suicides that occurred in 2022.

1.      **Defendants Must Update the Report to Account for the Death of**

The Draft Report incorrectly states throughout that there were nineteen suicides in 2022, and therefore erroneously reports a suicide rate of 19.6 per 100,000 individuals based on nineteen suicides. *See, e.g.*, Draft Report at 5, 7. There were in fact 20 suicides in CDCR in 2022, because CDCR determined in May 2023 that the death of                was a suicide. *See* Updated Death Notification for                (May 10, 2023). CDCR must revise the number of 2022 CDCR suicides, the 2022 suicide rate, and the other 2022 suicide statistics throughout the Draft Report accordingly.

2.      **The Draft Report Does not Provide Sufficient Analysis of Quality Improvement Plans**

As Defendants know, Plaintiffs' provisional agreement that Defendants' annual suicide reports could omit the foreseeability and preventability analysis that has been the hallmark of the Special Master's annual suicide reporting for decades was contingent on Defendants' agreement to replace that analysis with a robust and in-depth analysis of its QIP system. Accordingly, the closely negotiated, court-ordered annual suicide reporting plan requires that Defendants' report include a comprehensive analysis of Quality Improvement Plans (QIPs) that incorporates several specific components, including a

---

[2] If Defendants issue an updated draft suicide report as requested by the Special Master, Plaintiffs request an opportunity to review and comment on that updated draft report before Defendants finalize and file the Report.

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 3

review of the efficacy of the QIPs in changing policy and practice.  The other enumerated requirements include:

- "a review of the identified areas for improvement within the suicide case reviews that lead to the assignment of QIPs";

- "a comprehensive review of the QIPs for each discipline";

- "discussion about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation";

- "an analysis of the efficacy of the QIPs […], including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPS as designed were appropriate to effectively address the problems in the first instance and that sustained improvement has been made"; and

- "A description of ongoing work with institutions by CDCR's Suicide Prevention Coordinators in each region."

Report and Recommendation Regarding the California Department of Corrections and Rehabilitation's Proposal for Assuming the Annual Suicide Monitoring Report ("Suicide Reporting Plan"), ECF No. 7574 at 13-14; Order (Jul. 25, 2022), ECF No. 7592.

In the 2021 Suicide Report, Defendants represented that they were not prepared to report on QIP efficacy or QIP implementation but that they would be able to report this information in future annual suicide reports.  Notice of Submission of the Cal. Dep't of Corrs. And Rehabilitation's 2021 Annual Report to the Legislature on Suicides in CDCR and 2021 Annual Suicide Report (Sept. 29, 2022), ECF No. 7615 at 7, 9.  The Court extended the pilot Suicide Reporting Plan to provide Defendants additional time to demonstrate that they could report on QIP efficacy and implementation in compliance with the Plan.  Dec. 15, 2022 Order at 5-7.

Despite the additional time, for the reasons articulated below, the QIP analysis in the Draft Report is deficient in several ways.

**(a)    The Draft Report Lacks Analysis of the Efficacy of QIPs**

Defendants are required to analyze the efficacy of the QIPs in the report, "including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPS as designed were appropriate to

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 4

effectively address the problems in the first instance and that sustained improvement has been made." ECF No. 7574 at 14; *see also* Dec. 15, 2022 Order at 5.

This analysis, entitled Efficacy of Quality Improvement Efforts, is inadequate in the Draft Report because it is vague and incomplete. *See* Draft Report at 49-50. It does not clearly state which or how many QIPs were effective—that is, how many QIPs resolved the deficiency they were meant to correct, and how. *See id.* The Draft Report states that 123 QIPs were issued in 2022. *Id.* At 40. It suggests that, aside from one QIP which resulted in a CAP due to ongoing problems and two other QIPs that remain open for monitoring, all other mental health related QIPs were effective, but it offers no support for such a conclusion. *Id.* At 49-50. Furthermore, it says nothing about the efficacy of custody and nursing QIPs. *Id.*

The Draft Report also contains what appears to be a vague standard for determining whether a QIP was effective. Draft Report at 40. It states:

> An institution is determined to be compliant if, after two consecutive onsite visits, the issue appears to have been resolved in a sustained manner. Some QIPs will have no follow up because of the nature of the QIP while other QIPs will be closed after one review. Compliance may be demonstrated through direct observation or review of documentation, by the Suicide Prevention Coordinator, of the noted concern noted in the QIP. It can also be demonstrated through improved rates of compliance on automated metrics, if applicable.

*Id.* This standard should be revised to address the following questions: How was this standard developed, when was it adopted, and is it documented anywhere other than in this Draft Report? How do regional coordinators determine whether an "issue appears to have been resolved in a sustained manner"? Are these QIP efficacy determinations documented? If so, how are they documented? Which types of QIPs are closed after one review? Which types of QIPs do not require any follow up?

Furthermore, the Draft Report lacks an analysis of the efficacy of any of the QIPs that were issued in prior years. *See* Draft Report at 42-43, 49-50. A robust analysis of QIP efficacy must include an analysis of whether QIPs issued in prior years proved effective at preventing the underlying issues that the QIPs were issued to correct, especially given that Defendants' 2021 Suicide Report was devoid of any analysis of the efficacy of QIPs issued in 2021 in the first instance.

Defendants must add a clear statement about how many 2022 QIPs Defendants deemed effective, explain the criteria that the Regional Suicide Prevention Coordinators

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 5

used to determine whether QIPs were effective, set forth the result of their efficacy analysis of QIPs on an institution-by-institution basis, and report on the efficacy of QIPs issued in prior years. In addition, the Draft Report should name the institution in Region III that was placed under a CAP for failing to adequately address the QIP, and the Draft Report should explain why the institution's initial response to the QIP was not effective. Draft Report at 49. **We also request that Defendants produce a copy of this CAP for us pursuant to the QIP reporting process**.

### (b)   Insufficient Information Regarding Whether the QIPs Have Been Fully Implemented

Defendants' Report must "contain[] a full discussion of whether QIPs approved during the reporting year have been fully implemented and, if not, what the barriers to such implementation are." Dec. 15, 2022 Order at 7. The Draft Report briefly describes how many mental health-related QIPs were completed and closed in CDCR Regions 1, 3, and 4, as well as actions taken in response to certain QIPs. *See* Draft Report at 41-42, 43-44, 49-50. However, the Draft Report does not identify (1) the number of QIPs that were completed and the number that remain open in Region II, (2) the total number of 2022 QIPs that have been *fully* implemented, (3) the total number of 2022 QIPs that remain open, (4) the number of custody and nursing 2022 QIPs that have been fully implemented, (5) the number of custody and nursing 2022 QIPs that remain open, and (6) which institutions encountered each deficiency. *Id.*

In addition, information in the Draft Report regarding actions taken in response to many QIPs is vague and incomplete. *See* Draft Report at 43-44, 49-50. The Draft Report states that many of the QIPs resulted in audits and training, but does not summarize audit findings and does not identify who was trained, what the training covered, whether all relevant staff were trained (a point of concern in prior Special Master Reports), or whether the training or audits resulted in changes to relevant practices or procedures. *Id.*; Special Master 2020 Suicide Report, ECF 7405-1 at 30 ("[w]hat was not possible to determine from the responses submitted was whether all required staff actually received the training."); Special Master 2019 Suicide Report, ECF 7239 at 35 ("What was not possible to determine was whether all required staff actually received the training."). Most concerning, there was no documentation in the Draft Report regarding the status of "989 investigations" initiated in response to 2022 suicides—whether they were open, resolved, or still pending.

To provide an adequate discussion regarding full implementation of QIPs as required by the court-ordered suicide reporting plan, CDCR should:

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 6

- Add additional detail into the Draft Report regarding actions taken in response to QIPs for which Defendants have not already included this information, including summarizing audit results and identifying on what topics training was provided, as well as whether all relevant staff were trained; and

- Add a concise statement setting forth the total number of 2022 QIPs that have been fully implemented, the total number of 2022 QIPs that have not been fully implemented, and what barriers exist to implementation of those QIPs.

**(c)     Inadequate Review of Underlying Problems that Led to QIPs**

The Draft Report also does not contain a complete "review of the identified areas for improvement within the suicide case reviews that lead to the assignment of QIPs," as required by the court-ordered plan.  ECF No. 7574 at 13.  Defendants must revise the report to provide a comprehensive description of all the common underlying deficiencies that led to QIPs as the Special Master's annual suicide reports have done.  Order (Dec. 15, 2022), ECF No. 7681 at 6; ECF No. 7609 at 10 n.4; ECF No. 7574 at 13.  The Special Master's suicide reports provide succinct, specific descriptions of all common deficiencies that led to QIPs, such as "[r]eferral or mental health contact required timelines not met," "[f]ailure to document observation levels or rationale for observation levels," "[f]ailure to provide the individual with property or privileges as required by policy," and "[f]ailure to address an incarcerated individual's victimization concerns." Special Master's 2020 Suicide Report (Dec. 21, 2021), ECF No. 7405-1 at 30, ECF No. 7405-2 at 167 (App'x B4); *see also* Special Master's 2019 Suicide Report (July 16, 2021), ECF No. 7239 at 35, App'x B4.

The Draft Report purports to offer similar data.  *See* Draft Report at 44-45. However, the Draft Report's descriptions of underlying deficiencies—such as "level of care," "staff action response," and "emergency response"—are so vague that they fail to communicate the essence of the deficiencies.  *Id.* at 45.  In addition, the Special Master's suicide reports specifically identify the total number of suicides that involved referrals to the Office of Internal Affairs for investigation of possible staff misconduct, and the total number of QIPs that could not be fully implemented due to the pending investigations. *See* Special Master's 2020 Suicide Report at 30-31; Special Master's 2019 Suicide Report at 36.  Although the Draft Report notes some instances when investigations were initiated in response to underlying deficiencies that led to QIPs, the Draft Report fails to list the total number of cases for which internal affairs investigations were initiated in response to deficiencies that were identified, or whether those investigations prevented implementation of any QIPs.  *See* Draft Report at 44-45.

[4339210.1]

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 7

      To remedy these shortcomings, Defendants should revise the descriptions of deficiencies so that they are as descriptive and detailed as those in the Special master's prior reports, and Defendants should include information about 989 investigations and their impact on QIPs comparable to that found in prior Special Master reports.

**3.      The Report Lacks a Discussion of Emergency Response Issues Comparable to that Found in Prior Special Master Reports**

      The Suicide Reporting Plan requires that Defendants report on "emergency response factors" in a manner comparable to the analysis in the Special Master's prior annual suicide reports.  Suicide Reporting Plan at 13; Dec. 15, 2022 Order at 7.  To track the content and analysis found in the Special Master's prior reports as required by the Suicide Reporting Plan, the Report must specifically include the number of cases involving each emergency-response-related deficiency identified by suicide reviewers.  Defendants must also analyze the trend across years in the number of cases involving emergency response deficiencies, and discuss how many cases involved application of cuffs or restraints to patients before or during administration of emergency medical care, as well as the trend over years in the number of such cases.  *See* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide Report at 33-34.

      Defendants' Report falls far short of meeting these requirements.  The Draft Report has almost no discussion of emergency response issues, which contrasts to the robust discussions of these issues in prior Special Master reports.  *See* Special Master's 2020 Suicide Report at 27-28 (four paragraph section); Special Master's 2019 Suicide Report at 33-34 (same).  The Draft Report only briefly addresses emergency response issues in passing at a few points in the section regarding QIPs.  Draft Report at 42, 44-45, 49.  The Report does not identify how many 2022 cases involved each type of emergency-response-related deficiency, does not analyze the trend over years in cases involving emergency response deficiencies, and does not address whether any 2022 cases involved application of restraints to patients before or during provision of emergency medical care.  *Id.*

      Defendants must revise the Report to include a section that specifically analyzes emergency response deficiencies identified in the 2022 suicides, which must mirror the Special Master's reports.  ECF No. 7574 at 13; *see* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide Report at 33-34.

      Finally, either in this section or in the section analyzing QIPs, the final report must include a discussion of *all* the QIPs issued to resolve identified emergency response deficiencies, including a description of the steps that institutions took in response to the QIPs and an informed assessment of whether the QIPs have resolved the emergency response problems.

[4339210.3]

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 8

**4.      The Draft Report Fails to Address Other Important Issues in the Special
        Master's Annual Suicide Reports**

   **(a)      The Draft Report Entirely Omits Analysis of Several Issues Covered in
           Prior Special Master Reports**

   Defendants are required to include an analysis of statistics and trends of suicides
found in the Special Master's prior reports.  Dec. 15, 2022 Order at 8-9; ECF No. 7609 at
10 n.4; ECF No. 7574 at 13.  Their Draft Report entirely omits some of this analysis.  The
missing metrics include: (1) inadequate and absent mental health assessments, *see, e.g.*,
Special Master's 2020 Suicide Report at 3, 25; Special Master's 2019 Suicide Report at
31; (2) failures of staff to communicate between disciplines regarding patients, *see, e.g.*,
Special Master's 2020 Suicide Report at 27; Special Master's 2019 Report at 33; and
(3) inadequate Suicide Risk Evaluations, Special Master's 2020 Suicide Report at 24-25;
Special Master's 2019 Suicide Report at 30-31.[3]

   The Special Master's reports demonstrate that these issues have been salient to
CDCR suicides for years.  *See, e.g.*, Special Master's 2020 Suicide Report at 24-25, 27;
Special Master's 2019 Suicide Report at 30-31, 33.  Given this history, Defendants'
Report must be clear.  If the 2022 suicides did not involve any of these types of
deficiencies, then the Report should say that.  Otherwise, the Report must include
analysis  to "track the contents and analysis found in the reports written by the Office of
the Special Master."  Suicide Reporting Plan at 13; *see also* Dec. 15, 2022 Order at 8-9;
Aug. 29, 2022 Order at 10 n.4 (providing that "[t]he content and analysis of the annual
suicide reports will continue to cover the same topics").

   **(b)      The Draft Report's Analysis of Several Other Issues Is Not
           Comparable to that Found in Prior Special Master Reports**

   Defendants must also revise and clarify the discussion regarding (1) evidence of
failures to refer patients to higher levels of care, (2) inadequate custody/welfare checks,
(3) failure to provide mental healthcare related to COVID-19, and (4) decedents
discovered in *rigor mortis* to make them comparable to the Special Master's prior
reports.  The Draft Report includes brief and vague information about level of care
issues and some information about how COVID-19 issues related to the 2022 suicides.
Draft Report at 16, 30, 44-45.  However, the Draft Report does not explain whether the

---

[3] The Draft Report also fails to recommend any steps that CDCR should take to remedy
deficiencies identified through analysis of the 2022 suicides as prior Special Master
annual suicide reports have done.  *See, e.g.*, Special Master's 2020 Suicide Report at 33;
Special Master's 2014 Suicide Report (Mar. 29, 2016), ECF No. 5428 at 16-17.

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 9

level of care issues specifically involved evidence of failures to refer patients to higher levels of care, as opposed to other level of care deficiencies, as prior Special Master Reports have done. Special Master's 2020 Suicide Report at 26-27; Special Master's 2019 Suicide Report at 32.

In addition, nowhere does the Draft Report expressly state the number of 2022 suicides that involved lack of access to mental health treatment due to COVID-19, as prior Special Master reports have done. Special Master's 2020 Suicide Report at 26. The Draft Report states that five cases involved patients who were "under custody discharge checks/guard 1 checks/nursing observations" at the time of their death but does not specify how many cases involved concerns about *inadequate* or insufficiently frequent welfare checks as prior special Master suicide reports have done. *Compare* Draft Report at 16 *with* Special Master's 2020 Suicide Report at 19 *and* Special Master's 2019 suicide Report at 25-26.[4] The Draft Report provides the number of patients found in *rigor mortis* but fails to report the type of housing in which these decedents resided, as Special Master suicide reports have done. Draft Report at 15-16; Special Master 2020 Suicide Report at 9-10; Special Master's 2019 Suicide Report at 16-17.

Finally, Defendants must ensure that the Draft Report's discussion of suicides in segregation consistently includes suicides in all types of segregated housing to parallel the analysis found in prior Special Master suicide reports. The discussions of suicides in segregation in past Special Master Suicide Reports include suicides in all forms of segregated housing, including the ASU, STRH, LTRH, PSU, and condemned housing. Special Master's 2020 Suicide Report at 2, 17-18; Special Master's 2019 Suicide Report at 24-25. However, part of the Draft Report's discussion of suicides that occurred in segregation appears to include only suicides in the ASU and STRH but not other segregated housing and incorrectly states that there were only five 2022 suicides in segregation. Draft Report at 20-21. Not only is this inconsistent with the discussion of suicides in segregation in the Special Master's prior reports, but it is inconsistent with information elsewhere in the Draft Report identifying seven suicides in segregated housing, including the PSU, ASUs, and the STRH. Draft Report at 19 (Table 6).

## 5.   Defendants Should Include An Analysis of How Inadequate Staffing Contributed to 2022 Suicides

Despite the Court's orders spanning over twenty years requiring Defendants to maintain mental health staffing vacancy rates at or below ten percent, Defendants have never managed to maintain adequate mental health staffing, and mental health staffing

---

[4] Defendants should also supplement this section by specifying whether any of the patients subject to welfare checks at the time of their death were found in rigor mortis.

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 10

has reached a crisis level in recent years, with Defendants facing the prospect of tens of millions of dollars of contempt fines for their staffing deficiencies.  In Plaintiffs' 2022 suicide review letter, Plaintiffs identified at least six 2022 suicides in which inadequate mental health staffing contributed to inadequate mental healthcare provided to the patient or impacted the staff response to the suicide.  Plaintiffs' Amended 2022 Suicide Review Letter (Aug. 2, 2022), at 13-14.  However, Defendants' draft report does not discuss the impact that staffing vacancies had on the 2022 suicides and makes only passing references to the very serious staffing vacancies.  *See*, *e.g.*,  Draft Report at 54. Defendants must add an analysis of how staffing vacancies impacted 2022 suicides into the Report.

6.      **Defendants Should Include Additional Information in the "Audits of Suicide Case Review Quality" Section of the Draft Report**

In the "Audits of Suicide Case Review Quality" section, the Draft Report notes that the 2022 suicide case reviews scored lowest in audits of the evaluations of SREs, but the Draft Report does not provide any explanation of the number of cases in which SRE evaluations were deficient and in what way the SRE evaluations were deficient.  Draft Report at 38.  CDCR should add this information into the final report.

7.      **Defendants Should Expand the section of the Draft Report Addressing Compliance with Timelines in the Suicide Reporting Process**

The Timeliness of Suicide Case Reviews and Suicide Reports section is vague and incomplete and should be revised.  Draft Report at 36-37.  Aside from explaining the delays in holding the Suicide Case Review Conferences and circulating a Final QIP Report, the draft report provides only "potential" and "likely" reasons for the delays in the suicide reporting process, or no explanation at all, and does not state the *actual* reasons for delays at each step in the suicide reporting process.  *Id.*  CDCR should revise this section to explain the specific reasons for the delays, if known, or at a minimum state that CDCR does not know the reason for the delays and the reason for CDCR's ignorance (*e.g.*, CDCR investigated the issue but could not determine the reasons or CDCR has not investigated the issue).  In addition, this section mentions steps that CDCR will take to improve compliance with timelines for only one step in the suicide reporting process, timely submission of the institutional internal reviews to the SMHP.  *Id.*  CDCR should revise this section to clarify what steps it will take, if any, to improve compliance with all the other suicide reporting timelines for which delays occurred, or explain why it has declined to take any corrective action.

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 11

**8.  Defendants Should Update and Clarify Information in the Section of the Draft Report Reporting on Implementing Mr. Hayes' Suicide Prevention Recommendations**

Defendants should clarify the Draft Report's discussion regarding the status of implementation of Mr. Hayes' suicide prevention recommendations.[5]  In the section discussing the Mental Health Referrals and Suicide Risk Evaluations recommendation, The Draft Report states:  "[i]n the previous audit of institutions (2018), Mr. Hayes found a compliance rate of 74% for the 23 institutions audited.  In his 2020 report, he notes that seven of 20 institutions remain out of compliance with completion of suicide risk evaluations when required.  There is also a sub-component of ensuring that referrals with suicidality are appropriately classified as emergent.  In the fifth re-audit, Mr. Hayes stated that CDCR remains below the 100% compliance rate."  Draft Report at 63.  To neutrally and transparently report on compliance with this recommendation, Defendants should add the specific compliance rates that Mr. Hayes found in his Fourth and Fifth Re-Audits into this discussion of compliance with this recommendation.  *Id.*

In the section discussing implementing the health screenings recommendation, the Draft Report states that a "standardized screening was introduced in 2018, which by and large, resolved this portion of the recommendation, although adherence to asking all required questions does occur periodically."  *Id.* at 61.  It is not clear what "adherence to asking all required questions does occur periodically" means, and Defendants should revise this language to clarify what the ongoing non-compliance is.  Defendants should update the discussion of Mr. Hayes' Re-Audits on page 6 of the Draft Report to reflect that Mr. Hayes' Fifth Re-Audit is complete, that the Court has adopted Mr. Hayes' Fifth Re-Audit Report, and that Mr. Hayes' is currently conducting institution tours for his Sixth Re-audit.  See generally ECF No. 7696.

**9.  CDCR Must Update Implementation Dates Throughout the Report**

In the final report, Defendants should update and clarify the anticipated rollout and implementation dates provided throughout the report.  For example, the Draft Report states that NKSP and WSP were scheduled to finish physical modifications to their R&R screening areas by May 2023.  Draft Report at 62.  In the final version of the Report, Defendants should specify whether NKSP and WSP finished these modifications or, if not, that the modifications have not yet been completed and the expected completion date.  In the discussion regarding implementation of HQ QIPs, the Draft Report states

---

[5] This section of the Draft Report should also reference the recommendation number of each of Mr. Hayes' recommendations discussed to make the section more transparent and accessible.

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 12

that Defendants expected to roll out a new training by August 15, 2023.  *Id.* at 41. Defendants should update this section to reflect whether the training has been rolled out and, if it has not, update the anticipated roll out date.

**10.    Defendants Should Clarify Vague Sections and References Throughout the Report**

Defendants should clarify the Draft Report's vague discussion regarding the Chart Audit Tool.  The Draft Report states that "[c]ompliance with the Chart Audit Tool (CAT) pass rate fluctuated between 70% and 83%, which is an improvement from the prior year's range of 66% and 73%."  Draft Report at 6.  This data shows overlapping compliance ranges, not a clear improvement.  The reported percentage ranges only represent an overall improvement over 2021 if individual institutional pass rates increased, which is not clear here.  The Draft Report does not provide enough information, such as each institution's pass rate, to demonstrate to the reader that compliance did in fact improve from 2021 to 2022.

Defendants should also revise language in the Draft Report's introduction to clarify the reference to "clusters of suicides."  Draft Report at 5.  The Draft Report states "[i]n 2022, there were 12 decedents in Level III or Level IV, 5 decedents in Level I or Level II, and 1 decedent in a Reception Center, leading to more frequent clusters of suicides consistent with previous years."  *Id.*  It is not clear how listing the 2022 suicides broken down by security level demonstrates that there were clusters of suicides. Defendants should revise this language to better explain the reference to clusters of suicides.  Defendants should also revise the vague, passing reference to "cluster effects" on page 16 by either removing the reference or adding additional detail to explain it.  *Id.* at 16 ("[t]here are fluctuations in the number of suicides occurring at an institution due to cluster effects").

In addition, Defendants should clarify the Departmental Initiatives section of the Draft Report.  The first initiative discussed in that section is referenced only in passing as a "project" that "identifies specific occurrences in time when incarcerated individuals are thought to be at increased risk."  Draft Report at 7.  To improve clarity and transparency, the Report should name the "project" explain how it will identify when incarcerated people are at increased risk, and whether and how it will address those risks.

The Draft Report's discussion regarding supervisory reviews of safety plans is incomplete.  Draft Report at 64.  It states that Defendants agreed to require supervisory review of safety plans upon discharge of patients from MHCBs, but it does not discuss the results of the supervisory reviews.  *Id.*  Defendants should supplement this discussion by

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 13

describing the findings from supervisor reviews of safety plans and whether these reviews have resulted in any other changes to policy or improvements in discharge safety plans.

The Section titled "Screening on Initial Arrival to CDCR" lacks information clearly tying it to 2022 suicides.  Draft Report at 26.  Defendants should supplement this section by stating whether the twenty patients who died by suicide in 2022, or at least the three patients who died within a year of arrival, were properly screened.

Finally, the Draft report states that two deaths that were initially identified as unknown deaths were classified as suicides after receipt of the Coroner' report.  Draft Report at 31.  This section reads as incomplete.  Defendants should revise this discussion by explaining why the deaths were initially classified as unknown and what the Coroner's report found that led Defendants to reclassify the two deaths as suicides.

## 11.    Defendants Should Correct Errors in the Draft Report

Defendants should also correct errors throughout the Report.  For example, Page 10 of the Draft Report incorrectly states that there was only one patient who had been psychiatrically hospitalized in the year before death even though the preceding sentence notes that one patient died in inpatient care and a second died in the MHCB.  Page 26 of the Draft Report incorrectly states that the 2022 suicide rate is 17.5.  This rate is incorrect even if the rate was calculated based on nineteen suicides rather than the twenty suicides that actually occurred in 2022.

The Draft Report's discussion of the rate of completion of suicide prevention training also appears to be inaccurate.  Draft Report at 57.  The Draft Report states that 43,084 staff were required to complete this training and reports an overall training completion compliance rate of 96% for custody and 89% for healthcare.  *Id.*  However, adding the number of custody staff and healthcare staff required to complete the training yields a total of 33,066, which is just 76.5% of the total number of staff required to complete the training.  Defendants must either correct the statistics in this section or, if the statistics in the Draft Report are somehow accurate, provide an explanation and/or additional information in the final version of the Report so that readers can confirm the accuracy of the reported suicide training compliance rates.

\*   \*   \*

Although the Draft Report contains a detailed analysis of 2022 suicides and some examination of shortcomings in CDCR's mental health practices, it falls far short of the standard that it must meet to demonstrate that CDCR is capable of preparing an even-handed, critical self-examination of suicides in CDCR institutions on a permanent basis.  Plaintiffs request that Defendants include substantial revisions in their final 2022

Office of Legal Affairs and Matthew A. Lopes, Jr.
August 23, 2023
Page 14


suicide report, including most importantly to address our concerns regarding reporting on QIPs and including analysis of suicides comparable to that found in the Special Master's suicide reports in accordance with the court-ordered provisional suicide reporting process.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael S. Nunez*

By:   Michael S. Nunez
      Senior Counsel

MSN:can

California Department of Corrections and Rehabilitation

# 2022 Annual Report on Suicides and Suicide Prevention Efforts in the CDCR

# Table of Contents

Table of Figures ................................................................................................................................. 3

Table of Tables .................................................................................................................................. 4

Executive Summary ........................................................................................................................... 6

Introduction ...................................................................................................................................... 8

Statistical Summary of 2022 Suicides ............................................................................................. 11

   Suicide Definitions and Terms Used ........................................................................................... 11

   Review of Findings ...................................................................................................................... 12

   Sociodemographic Factors ......................................................................................................... 13

      Gender .................................................................................................................................... 13

      Race/Ethnicity ........................................................................................................................ 14

      Age .......................................................................................................................................... 14

      Marital Status ......................................................................................................................... 14

      Education, Juvenile Criminal History, and Work History ....................................................... 15

      Languages Spoken .................................................................................................................. 15

      Health Factors ........................................................................................................................ 15

      Temporal Factors .................................................................................................................... 16

   Custodial and Correctional Factors ............................................................................................ 17

      Institution at Time of Death ................................................................................................... 17

      Housing Type ........................................................................................................................... 20

      Segregated Housing ................................................................................................................ 21

      Time in Segregated Housing ................................................................................................... 22

      Offense Type ........................................................................................................................... 23

      Security Level .......................................................................................................................... 23

      Sentence Length ..................................................................................................................... 24

      Cell Occupancy ....................................................................................................................... 25

      Job/School Assignment .......................................................................................................... 25

      Method of Suicide ................................................................................................................... 25

   Mental Health Factors ................................................................................................................ 26

      Mental Health Level of Care ................................................................................................... 26

      Mental Health Treatment Prior to Incarceration ................................................................... 27

      Screening on Initial Arrival to CDCR ...................................................................................... 28

Psychiatric Medication ............................................................................................................... 28

History of Admissions to CDCR Psychiatric Inpatient Programs ................................................ 28

Psychiatric Diagnoses ................................................................................................................ 29

Suicide Attempt History ............................................................................................................. 30

Suicide Precipitants and Behavior ............................................................................................. 30

Determination of Unknown Causes of Death ................................................................................. 32

Self-Injury Incidents, Including Suicide Attempts .......................................................................... 33

Suicide Response Procedures ........................................................................................................ 34

Reporting of a suicide to stakeholders ...................................................................................... 34

Institutional internal review process ......................................................................................... 35

External review processes .......................................................................................................... 35

DAI Mental Health Compliance Team (MHCT) reviews ............................................................. 35

Nursing reviews .......................................................................................................................... 36

CCHCS Mortality Review Committee ......................................................................................... 36

Statewide Mental Health Program (SMHP) reviews .................................................................. 36

Determination and tracking of QIPs .......................................................................................... 37

Timeliness of Suicide Case Reviews and Suicide Reports .......................................................... 38

Audits of Suicide Case Review quality ....................................................................................... 39

Analysis of Improvement Efforts ................................................................................................... 41

Determination and Tracking of Quality Improvement Plans ..................................................... 41

Headquarters-Assigned QIPs ..................................................................................................... 43

Institution-Assigned QIPs ........................................................................................................... 44

Commonalities in Individual Case Reviews ................................................................................ 47

Efficacy of Quality Improvement Efforts .................................................................................... 53

Progress of Suicide Prevention Efforts in CDCR ............................................................................ 55

Progress Toward Completing Adequate Suicide Risk Evaluations ............................................. 55

Risk Evaluation Audits Using the Chart Audit Tool ................................................................ 55

Suicide Risk Assessment Training and Mentoring ................................................................. 56

Progress Toward Completing 72-Hour Treatment Plans in a Sufficient Manner ..................... 57

Audits of Treatment Plans ..................................................................................................... 58

Timeliness of MHCB Treatment Plans .................................................................................... 59

Progress Toward Ensuring That All Required Staff Receive Training Related to Suicide Prevention and
Response ..................................................................................................................................... 60

Progress in Implementing the Recommendations Made by the Special Master Regarding Inmate Suicides and Attempts ................................................................................................................ 65

Initial Health Screening and Receiving and Release (R&R) Environment ............................................. 65

Psychiatric Technician Practices ......................................................................................................... 66

Use of Suicide Resistant Cells for Those Newly Admitted to Administrative Segregation ................ 66

MHCB Practices for Observation Status, Clothing, and Privileges ...................................................... 67

Mental Health Referrals and Suicide Risk Evaluations ....................................................................... 67

Suicide Risk Evaluation Trainings ........................................................................................................ 68

Safety Planning for Suicidal Individuals .............................................................................................. 68

Inpatient and Alternative Housing Discharge – Efficacy of Custody Welfare Checks and Five Day Follow-Ups ........................................................................................................................................... 69

Local Suicide Prevention Programs ..................................................................................................... 69

Continuous Quality Improvement (CQI) ............................................................................................. 70

Suicide Prevention Training ................................................................................................................ 71

Reception Centers ............................................................................................................................... 71

Progress in Identifying and Implementing Initiatives Designed to Reduce Risk Factors Associated with Suicide ...................................................................................................................................................... 72

Ongoing Projects ................................................................................................................................. 74

Progress Toward Expanding the Process of Notification Pursuant to Penal Code Section 5022 .......... 77

Summary ...................................................................................................................................................... 77

Appendix A .................................................................................................................................................. 78

Appendix B .................................................................................................................................................. 81

## Table of Figures

Figure 1: Graph of Adult Suicide Rates by Sex, 2002-2020* ......................................................................... 9

Figure 2: Comparison of Suicide Rates, 2000-2022 (US Jail, US State, CDCR, US Adult Males) .................... 9

Figure 3: Rate of Suicide in CDCR, 1990-2022 ........................................................................................... 10

Figure 4: CDCR Suicide Rate, Frequency, and Population, 2001-2022 ........................................................ 12

Figure 5: Monthly Suicides, 2020, 2021, 2022 and 10 Year Average ........................................................... 16

Figure 6: Percentage of Suicides in Segregated Housing, 2013-2022 .......................................................... 22

Figure 7: Method of Suicide, 2017-2022 .................................................................................................... 25

Figure 8: Frequency and Rates of Suicides Post-Inpatient Discharge, 2017-2022 ...................................... 29

Figure 9: Proportion of Suicide Case Review QIPs by Discipline, 2020, 2021, and 2022 ............................. 41

Figure 10: Most Frequent Mental Health QIPs, 2020-2022 ......................................................................... 47

Figure 11: Most Frequent Custody QIPs, 2020-2022 .................................................................................. 49

Figure 12: Most Frequent Nursing QIPs, 2020-2022 .................................................................................. 49

Figure 13: Most Frequent Interdisciplinary QIPs, 2020-2022 ...................................................................... 50
Figure 14: Suicide Risk Evaluation Audits, 2020-2022 ............................................................................... 56
Figure 15: Compliance with Suicide Prevention and SRASHE Core Competency Building, 2020-2022 ...... 56
Figure 16: Compliance with SRE Mentoring, 2020-2022 ........................................................................... 57
Figure 17: Results of Semester Audits of the Quality of MHCB Treatment Plans, 2021-2022 .................. 59
Figure 18: Timeliness of MHCB Interdisciplinary Treatment Teams, 2020-2022 ...................................... 60
Figure 19: Compliance with IST Suicide Prevention Training, Custody Staff, 2020-2022 ........................... 62
Figure 20: Compliance with IST Suicide Prevention Training, Healthcare Staff, 2020-2022 ..................... 62
Figure 21: Compliance with IST Suicide Prevention Training, Mental Health Staff, 2020-2022 ................ 63
Figure 22: Compliance with Suicide Prevention and SRASHE Core Competency Building Training, 2020-
2022 .......................................................................................................................................................... 63
Figure 23: Compliance with Safety Planning Training, 2020-2022 ............................................................ 64
Figure 24: Compliance with SRE Mentoring Training, 2020-2022 ............................................................. 64

## Table of Tables

Table 1: Annual Frequency, Population, and Rate of Suicide by Gender and Total, 2002-2022 ................ 13
Table 2: Frequency and Percent of CDCR Suicide Decedents by Race/Ethnic Group, 2018-2022 ............ 14
Table 3: Frequency & Percent of CDCR Suicide Decedents by Age Group, 2018-2022 .............................. 14
Table 4: 2022 CDCR Suicides by Institution, Security Level and Available Mental Health Programs ........ 18
Table 5: Frequency of Suicide by CDCR Institution, 2012-2021, 10-Year Total, and 10-Year Annual
Average ...................................................................................................................................................... 19
Table 6: Frequency and Percent of Housing Placements of CDCR Suicide Decedents, 2017-2021 and 2022
.................................................................................................................................................................... 20
Table 7: Frequency and Percent of Commitment Offenses of Suicide Decedents, 2017-2021, 2022, and
CDCR Proportions for 2022 ....................................................................................................................... 23
Table 8: Frequency and Percent of Security Levels of Suicide Decedents, 2017-2021, 2022, and CDCR
Proportions in 2022 ................................................................................................................................... 23
Table 9: Frequency and Percent of Sentence Length of Suicide Decedents, 2017-2021 and 2022 .......... 24
Table 10: Frequency and Percent of Time Served at Time of Death of Suicide Decedents, 2017-2021 and
2022 .......................................................................................................................................................... 24
Table 11: Frequency and Percent of Time Left to Serve of Suicide Decedents, 2017-2021 and 2022 ...... 25
Table 12: Frequency of Suicide by MHSDS Level of Care and Percent of Total Annual Suicides, 2013-2022
.................................................................................................................................................................... 26
Table 13: Suicide Rate (per 100,000) of Mental Health, Non-Mental Health, & Total CDCR Populations,
2013-2022 ................................................................................................................................................. 27
Table 14: Frequency of Mental Health Diagnoses of Suicide Decedents, 2022 and 2019-2021 ............... 30
Table 15: Suspected Precipitants/Drivers of Suicide in CDCR, 2022 ......................................................... 31
Table 16: Non-Suicidal Self-Injury Incidents in CDCR by Mental Health Level of Care and Injury Severity,
2022 (excluding incidents with unknown intent) ...................................................................................... 33
Table 17: Self-Injury Incidents in CDCR with Intent to Die, by Mental Health level of Care and Injury
Severity, 2022 (excluding incidents with unknown intent) ....................................................................... 34
Table 18: Suicide Case Review Tasks and Timelines as Specified by the MHSDS Program Guide ............. 38
Table 19: Compliance with MHSDS Program Guide Timelines for Suicide Case Reviews ......................... 38

Table 20: Results of Quality Audits, 2022 Suicide Case Review Reports ..................................................... 40

Table 21: Frequency of QIPs at Institutions Experiencing Suicide, 2021 and 2022 ................................... 46

Table 22: QIPs by Institution, 2021-2022 ................................................................................................... 50

## Executive Summary

In 2022, 128,209 discrete individuals spent at least one night confined in the California Department of Corrections and Rehabilitation (CDCR). Out of that population, 19 individuals died by suicide during their time in confinement. This was an increase from the previous year of 15 deaths by suicide. The 2022 rate is 19.6 suicides per 100,000 inmates.

This report, submitted pursuant to Penal Code Section 2064.1, provides information about suicide prevention initiatives and improvements in suicide prevention efforts made during calendar year 2022. This report describes CDCR's efforts, identifies successes in preventing suicides over the prior calendar year, and includes a section that provides a more in-depth look at notable key trends from the suicide-related deaths that occurred that same year.

Seventeen (89%) of the 19 suicide decedents were patients in the statewide mental health program, and 8 of these decedents had a previous suicide attempt in the community or in CDCR. In 2022, Hispanics had the highest number of suicides with 11 decedents. This is similar to 2021 where Hispanics were the highest number of suicides however differs from 2020 where Caucasians were the highest number of deaths by suicide. The rest of the decedents in 2022 were five Caucasians and three African Americans. The age group with the highest number of deaths by suicide was 25-34 in 2022 and 2020 while 2021 was evenly distributed between age groups 25-34, 35-44, and 45-54 with four in each of those groups. In 2022, there were 12 decedents in Level III or Level IV, 5 decedents in Level I or Level II, and 1 decedent in a Reception Center, consistent with previous years.  Additionally, the vast majority of self-harm incidents were non-suicidal, consistent with prior years.

Each suicide in prison is a devastating tragedy that takes a profound toll on family and friends separated from their loved ones by distance and incarceration. Each suicide also significantly impacts staff and other incarcerated people within CDCR. Each and every suicide within CDCR is one too many and must be carefully examined for lessons and insights on how to prevent similar tragedies in the future. For over thirty years, CDCR has dedicated tens of millions of dollars to developing a robust suicide prevention program employing nationally established best practices and a comprehensive system of quality mental health care for patients that few other state correctional systems can match. CDCR provides *all* CDCR staff members suicide prevention training every year and ensures all potential first responders to suicides in progress are trained in emergency procedures and lifesaving skills, such as cardiopulmonary resuscitation and basic life support. CDCR offers extensive training to the talented and dedicated mental health clinicians in suicide risk assessment and has systems in place for identifying individuals at risk of suicide and referring them to proper care. CDCR provides special care for individuals who are placed in higher-risk administrative segregation settings and regularly offers individuals suicide prevention information through videos, posters and pamphlets, and institutional suicide prevention events.

Since 1995, the *Coleman* Special Master has monitored CDCR's mental health care system and reports his findings and recommendations to the *Coleman* court. The *Coleman* Special Master's team, referred to as the Office of Special Master (OSM), includes dozens of experts, consultants, and attorneys. Of that team, the Special Master has a subset of experts who provide oversight to CDCR's suicide prevention program. CDCR has implemented numerous recommendations from five separate audit reports by the OSM's suicide prevention expert. CDCR has a comprehensive suicide prevention program in place, which includes suicide risk assessment, safety planning, screenings, and other components.  Many of the policies and procedures aimed at suicide prevention and response are compiled in the court-ordered Mental Health Services Delivery System (MHSDS) Program Guide.

The COVID-19 pandemic affected all aspects of medical and mental health care in CDCR. Despite changes necessitated by the COVID-19 emergency, which continued throughout the 2022 calendar year, CDCR's mental health program was able to continue providing services to patients in need of mental health treatment. CDCR worked closely with the *Coleman* parties and the federal Receiver, who oversees the medical operations of CDCR, and is appointed under *Plata v. Newsom*, to develop and implement appropriate policies and procedures related to providing treatment.

This report on suicides that occurred in CDCR during 2022 would be remiss if it did not discuss the fact that there are significant and persistent staffing shortages that plagued many of the prisons in the CDCR system. While it is difficult to determine a direct nexus between staffing shortages and deaths by suicide in CDCR custody, it is important to recognize the impacts of reduced staffing. Provision of clinical care at levels consistent with the MHSDS Program Guide has been challenging at many institutions. As a result of these difficulties, institutions focus their limited clinical staff on the more acute and emergent needs of their programs.

Progress in implementing each of the Penal Code requirements is discussed at length in this report. The following is a summary of the findings:

*Suicide Risk Evaluations*: In 2022, Department clinicians conducted more than 5,000 suicide risk evaluations per month on average, totaling over 60,000 suicide risk evaluations over the course of the year. The monthly average includes 4,900 evaluations completed in compliance with the Program Guide requirements. An additional 1,200 evaluations were completed by clinicians based on clinical judgment and patient's clinical need. Ninety-eight percent of suicide risk evaluations during the year were required by policy (e.g., admissions and discharges from inpatient psychiatric settings, required follow-up evaluations, and others), and the remainder were completed based on clinicians' judgment of clinical need.

Each risk evaluation is a complex clinical task that requires clinicians to make important clinical decisions. According to CDCR's policy, risk evaluations occur whenever an individual expresses suicidal ideation, makes a statement regarding self-harm, or makes a suicide attempt, at a number of key evaluation points, and during known higher-risk times for the patient. To improve the quality of the risk evaluations, CDCR is revising the Suicide Risk Evaluation Mentoring policy and training and has implemented regional oversight to assist in auditing suicide risk evaluations and to provide direct feedback to clinical teams at the institutions.

*Treatment Plans*: In 2022, clinicians completed initial treatment plans for patients within 72 hours of admission to a Mental Health Crisis Bed (MHCB) unit in 98% of the cases. CDCR continues to improve the quality of these plans by ensuring clinical factors associated with individual suicidal risk are incorporated into each patient's treatment, and when indicated, that treatment goals are specifically targeted towards reducing the patient's suicidal risk.  CDCR continues its efforts to ensure that the treatment plans meet quality standards set by the Statewide Mental Health Program (SMHP) through improved training and the use of quality improvement tools and audits. Compliance with the Chart Audit Tool (CAT) pass rate fluctuated between 70% and 83%, which is an improvement from the prior year's range of 66% and 73%.

*Training*: CDCR conducts a broad range of suicide prevention and response trainings. By the end of 2022, 91% of employees had completed their annual training. This average reflects high rates of compliance among custody, health care, and mental health staff.

*Court Recommendations Agreed to and Adopted by the Department*: The OSM's initial suicide audit from 2015 included 32 recommendations, three of which have been withdrawn, and 29 of which have been addressed and implemented or which are the subject of current policy development and physical plant

improvements.  The OSM's suicide prevention expert has conducted five subsequent re-audits.  Each re-audit has raised issues or concerns that CDCR continues to address, and those are described more fully in this report. In the 5th re-audit, which the Court adopted in full on January 5th, 2023, the OSM's expert conducted visits from May 2021 to April 2022. As of December 3, 2020, the *Coleman* court found CDCR to be in compliance with 13 of the initial 29 recommendations and partial compliance with one recommendation. CDCR is currently working with the OSM and the parties to implement the remaining 15 recommendations.

***Next-of-Kin (NOK) Notification***: During 2020, CDCR and the California Correctional Health Care Services (CCHCS) designed a NOK notification system for inmates who engage in suicide attempts, and the system was implemented in April 2021. In June 2022, the Health Care Department Operations Manual (HCDOM) Section 3.1.19, Next of Kin Notification for Death, Serious Illness, or Serious Injury, was published.

***Departmental Initiatives***: In addition to initiatives developed to address Coleman recommendations, CDCR has undertaken numerous suicide prevention projects. CDCR continues to examine serious suicide attempts to learn new ways to improve prevention.  CDCR is considering options for how to collect data in different ways that can help identify global trends related to suicide attempts where statewide initiatives may be able to be developed to improve the safety of patients contemplating self-harm. CDCR recognizes the importance of continuously reviewing this data, as it can provide critical information about vulnerabilities in suicide prevention practices.

Many of CDCR's suicide prevention undertakings continued to see progress in 2022. CDCR continued its construction activities to improve the physical conditions in the housing units by adding  more suicide-resistant intake cells in Administrative Segregation Units (ASU); CDCR also continued developing and implementing policies essential to the improvement of CDCR's suicide prevention mission, including the NOK notification plan, and implementing  the Transitional Help Rehabilitation in a Violence-Free Environment (THRIVE) program in CDCR's two large reception center institutions, and developing initiatives that began in prior years, such as the  replacing the safety planning intervention, and updating local suicide prevention programs.

CDCR continues to focus on improving and expanding its suicide prevention practices, including by assessing the effectiveness of its initiatives and monitoring their quality and sustainability. The lessons learned from the suicides that occurred in 2022 are invaluable, and the analyses of these deaths is an essential part of a robust suicide prevention system.

Previous reports in this series proved helpful to CDCR and the State of California in identifying areas of improvement and areas that require more innovative thinking to address the unique needs of those who are most vulnerable.

## Introduction

In the United States (U.S.), 1.2 million suicide attempts were reported in 2020.[1] The number of adult suicides in the U.S. increased by more than 50% between 2000 and 2019, from fewer than 30,000 per year to over 45,000 per year, while the overall U.S. population grew by only 22%. Prior to 2020, the rate of suicides in the U.S. was the highest rate in the country since the 1930s, during the Great Depression.[2] However, in 2020, there was a slight decrease in all adult suicides in the U.S. In 2022, 19 inmates died by

---

[1] National Institutes of Mental Health: https://nimh.nih.gov/health/statistics/suicide, accessed on 02/16/2023

[2] Drapeau, C. W., & McIntosh, J. L. (for the American Association of Suicidology). (2020). *U.S.A. suicide: 2018 Official final data.* Washington, DC: American Association of Suicidology, dated February 12, 2020, downloaded from http://www.suicidology.org.

suicide in CDCR. This was an increase from the 15 suicides in 2021. By contrast, in 2020, there were 31 deaths by suicide. During the twenty years spanning 2003 through 2022, CDCR averaged 30 suicides per year. The rate of suicide in CDCR during 2022 was 18.5 suicide deaths per 100,000 incarcerated individuals compared to the 15.2 suicide deaths per 100,000 incarcerated individuals in 2021. The U.S. Bureau of Justice Statistics estimates the suicide rate among state prison inmates nationally was 27 per 100,000 in 2019, the most recent data available.[3]

*Figure 1: Graph of Adult Suicide Rates by Sex, 2002-2020\**



Data accessed April 4, 2022 from CDC Web-based Injury Statistics Query and Reporting System (WISQARS), https://www.cdc.gov/injury/wisqars/fatal.html

Suicide prevention is a societal and complex public health problem that has frustrated the efforts of federal, state, and local agencies alike. In the U.S., suicide has long been more prevalent in jails than in prisons, and there have been significant increases in the number of suicides in jails in recent years. Among those detained in U.S. jails, the rate of suicide increased from 39 per 100,000 in 2005 to 42 per 100,000 in 2010. It reached 52 per 100,000 in 2015 before dropping in 2018 to 46 per 100,000 but climbed to 49 per 100,000 in 2019.[4]  The rate of suicide for those incarcerated in all state prisons nationwide ranged from 14 per 100,000 to 27 per 100,000 from 2001 to 2019.[5] The rates of suicide among adult males in the U.S. and those in jails and prisons are shown in Figure 2.

*Figure 2: Comparison of Suicide Rates, 2000-2022 (US Jail, US State, CDCR, US Adult Males)*

---

[3] Carson, E.A. (2020). Mortality in State and Federal Prisons, 2001-2018 – Statistical Tables, Report NCJ 256002. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC.

[4] *Mortality in Local Jails, 2000-2019 – Statistical Tables* (NCJ 256002, Bureau of Justice Statistics, October 2021)

[5] *Mortality in State and Federal Prisons, 2000-2019 – Statistical Tables* (NCJ 255970, Bureau of Justice Statistics, October 2021)



* Most recent data from Bureau of Justice Statistics, CDCR, and WISQARS.

In prison systems, suicide deaths have multiple contributing factors that can include longstanding medical and mental health issues, court and sentencing issues, issues involving family, lack of purposeful activity, conditions of the specific prison environment, and the stress of adjusting to incarceration.[6] In 1990, CDCR began tracking the annual suicide frequency and rate. The annual rate of suicide for each year is shown below in Figure 3. The highest rate of suicide occurred in 2019 with a rate of 30.3 per 100,000 and 38 suicides in total. In 2022, CDCR's rate of suicide was 19.6 per 100,000 with 19 suicides total.[6]

*Figure 3: Rate of Suicide in CDCR, 1990-2022*



Over the last thirty years, CDCR has expended significant resources to develop and fully implement policies to improve CDCR's suicide prevention program. Federal court oversight of those efforts continues

---

[6] https://www.psychiatryadvisor.com/home/topics/suicide-and-self-harm/preventing-suicide-in-prison-inmates/
 6 The CDCR suicide rate uses the mid-year June 30 CDCR population.

with the Coleman Special Master's expert conducting six comprehensive audits of the suicide prevention efforts at individual prisons and reporting his findings to the federal court following each audit. The most recent audit was conducted from 2021 into 2022. At the time of the writing of this report, the findings from the fifth re-audit were submitted to the *Coleman* court in October 2022. CDCR has a comprehensive suicide prevention system in place for suicide risk screening, risk evaluation, and treatment planning, and remains committed to continuing to work and improve this system.   CDCR has made significant improvements in the development of its Statewide MHSDS. With respect to suicide prevention and response, these improvements include new and enhanced suicide prevention training for all staff, specialized emergency procedures training for all potential first responders to suicide attempts in progress, and training for mental health clinicians on suicide risk assessment, safety planning and treatment planning. Taking a public health approach to suicide prevention, the program targets both those inmates who receive mental health treatment and those who do not. Additionally, CDCR provides patients with a range of mental health services and has created a referral procedure for mental health evaluations, including procedures for protecting individuals during particularly vulnerable periods. CDCR has implemented policies to ensure safety concerns are addressed prior to a patient being discharged from an inpatient setting. The institutions are provided with suicide screening procedures and provides the prison population with suicide prevention information through videos, posters/pamphlets, and institutional suicide prevention events.

***Summary of 2022 Suicides****:* Suicides occurred in 12 CDCR institutions in 2022. Sixteen (84%) suicides occurred among incarcerated persons with violent offense histories. Five (26%) individuals were in segregated housing units,[7] and twelve (63%) suicides occurred in high-custody programs (Level III and Level IV). Thirteen (68%) incarcerated individuals who died by suicide were sentenced to eleven years or more. Seventeen (89%) of the suicides occurred among those participating in mental health treatment, including six (35%) suicides among Enhanced Outpatient Program (EOP) participants, nine (53%) in the Correctional Clinical Case Management System (CCCMS) population, one (6%) receiving Mental Health Crisis Bed (MHCB) care, and one (6%) individual receiving inpatient psychiatric care. Three individuals were housed in inpatient settings during the year prior to their death however only one of these individuals had been psychiatrically hospitalized during the year prior to the death. Eight of the 19 decedents (42%) had at least one prior suicide attempt. Two of those had only one attempt (25%) while six (77%) individuals had more than one suicide attempt during their lives.

***Annual Progress:*** The following sections describe, in detail, the ongoing work to enhance suicide prevention practices within CDCR institutions. CDCR has worked to improve the completion of suicide risk evaluations, 72-hour treatment plans, proper training specific to suicide prevention and response, implementing the recommendations made by the Special Master's expert regarding inmate suicides and attempts, and identifying and implementing initiatives to help reduce risk factors associated with suicide.

# Statistical Summary of 2022 Suicides

## Suicide Definitions and Terms Used

The MHSDS Program Guide, 2021 Revision, provides definitions of suicide and suicide attempts. Several terms used in the last 2009 revision of the PG are now considered obsolete within the field of suicidology and will not be used in this report. Specifically, the terms "self-mutilation" and "suicide gesture" are found

---

[7] These include Administrative Segregation, Security Housing Units, Short-Term Restricted Housing, Long-Term Restricted Housing, Psychiatric Services Units, and Condemned Housing.

in the MHSDS PG, 2021 Revision; however, a less-pejorative term, "non-suicidal self-injury" or NSSI, is used in this report and refers to self-injury for reasons other than death by suicide.

- <u>Suicide</u>: An intentional self-injurious behavior that causes or leads to death.
- <u>Suicide Attempt</u>: An intentional self-injurious behavior which is apparently designed to deliberately end one's life and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.
- <u>Suicidal Ideation</u>: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[8] (that is, dying by) suicide or the passive desire to be dead.
- <u>Suicidal Intent</u>: The intention to deliberately end one's own life.
- <u>Self-injurious Behavior</u>: A behavior that causes, or is likely to cause, physical self-injury.

## Review of Findings

The total population in CDCR in 2022 was 97,179. The annual suicide rate in CDCR in 2022 was 19.6 deaths per 100,000 incarcerated individuals, based on 19 suicides. The 2021 rate of 15.2 was a significant decrease from 2020's rate of 27.3. The rate reached 30.3 in 2019, the highest since 1985. Figure 4 shows the annual rate, frequency, and population of CDCR since 2001.[9]

*Figure 4: CDCR Suicide Rate, Frequency, and Population, 2001-2022*



In CDCR, the rate of suicide averaged almost 40 per 100,000 in the 1980s, dropping to an average of 16 per 100,000 in the 1990s as the incarcerated population grew by 72%. In the 2000s, the rate averaged 18 per 100,000 as the population peaked in 2007 and then began to decline. In the 2010s, the rate averaged 23 per 100,000 even though CDCR's incarcerated population fell by 29% due to litigation, decreasing crime rates, criminal justice reform, and the passage of Assembly Bill (AB) 109 (Public Safety Realignment) in

---

[8] The term" 'committing" is not used by current suicidal experts, as the term implies some sort of success in carrying out a pledge or obligation. The favored term is straightforward —" died by suicide."

[9] CDCR population counts are from the Office of Research June 30th Monthly Report of Population. Suicide counts are from the CDCR Statewide Mental Health Program (SMHP).

2011. The average annual number of suicides rose from 16 per year in the 1980s, to 20 in the 1990s, to 33 in the 2000s, and to 31 in the 2010s. The number of suicides was 31 in 2020, 15 in 2021, and 19 in 2022 with an average annual number of 22.

## Sociodemographic Factors

Sociodemographic characteristics do not directly cause suicide but are important risk factors with indirect effects. However, they are important in understanding risk and how risk factors evolve over time. These factors are highlighted in order to examine for potentially emerging trends that would necessitate intervention.

## Gender

Table 1 below presents the male, female, and overall frequency and rates of suicide in CDCR since 2002. In 2022, CDCR suicides were 19 individuals, all males, at a rate of 19.6 per 100,000. The trends for the last five years are consistent with the trends for the last 20 years with the majority being males who died by suicide. Since 2018, CDCR had a total of 133 male suicides and 4 female suicides.

*Table 1: Annual Frequency, Population, and Rate of Suicide by Gender and Total, 2003-2022\**

| Year | Male Frequency | Male Pop. | Male Rate | Female Frequency | Female Pop. | Female Rate | Total Frequency | Total Pop. | Total Rate |
|------|------|------|------|------|------|------|------|------|------|
| 2003 | 37 | 150,851 | 24.5 | 0 | 10,080 | 0.0 | 37 | 160,931 | 23.0 |
| 2004 | 23 | 152,859 | 15.0 | 3 | 10,641 | 28.2 | 26 | 163,500 | 15.9 |
| 2005 | 37 | 153,323 | 24.1 | 0 | 10,856 | 0.0 | 37 | 164,179 | 22.5 |
| 2006 | 39 | 160,812 | 24.3 | 4 | 11,749 | 34.0 | 43 | 172,561 | 24.9 |
| 2007 | 33 | 161,424 | 20.4 | 1 | 11,888 | 8.4 | 34 | 173,312 | 19.6 |
| 2008 | 36 | 159,581 | 22.6 | 0 | 11,392 | 0.0 | 36 | 170,973 | 21.1 |
| 2009 | 25 | 156,805 | 15.9 | 0 | 11,027 | 0.0 | 25 | 167,832 | 14.9 |
| 2010 | 34 | 155,721 | 21.8 | 1 | 10,096 | 9.9 | 35 | 165,817 | 21.1 |
| 2011 | 33 | 152,803 | 21.6 | 0 | 9,565 | 0.0 | 33 | 162,368 | 20.3 |
| 2012 | 32 | 128,829 | 24.8 | 1 | 6,409 | 15.6 | 33 | 135,238 | 24.4 |
| 2013 | 29 | 126,992 | 22.8 | 1 | 5,919 | 16.9 | 30 | 132,911 | 22.6 |
| 2014 | 21 | 129,268 | 16.2 | 2 | 6,216 | 32.2 | 23 | 135,484 | 17.0 |
| 2015 | 22 | 123,268 | 17.8 | 2 | 5,632 | 35.5 | 24 | 128,900 | 18.6 |
| 2016 | 24 | 122,874 | 19.5 | 3 | 5,769 | 52.0 | 27 | 128,643 | 21.0 |
| 2017 | 28 | 125,289 | 22.3 | 2 | 5,971 | 33.5 | 30 | 131,260 | 22.9 |
| 2018 | 33 | 123,511 | 26.7 | 1 | 5,906 | 16.9 | 34 | 129,417 | 26.3 |
| 2019 | 37 | 119,781 | 30.9 | 1 | 5,691 | 17.6 | 38 | 125,472 | 30.3 |
| 2020 | 31 | 108,682 | 28.5 | 0 | 4,721 | 0.0 | 31 | 113,403 | 27.3 |
| 2021 | 13 | 94,562 | 13.7 | 2 | 3,910 | 51.2 | 15 | 98,472 | 15.2 |
| 2022 | 19 | 93,510 | 20.3 | 0 | 3,669 | 0.0 | 19 | 97,179 | 19.6 |

*All populations are mid-year monthly as of June 30th of each year. Total population includes camps, institutions, in-state and out-of-state contract beds.

## Race/Ethnicity

Of the 19 suicide deaths in 2022, eleven were by Hispanic individuals, five were Caucasian individuals and three were African American individuals. This is the second consecutive year where Hispanics represent the highest number of suicides. Table 2 breaks down the last five years of death by suicide based on race as well as provides the overall CDCR Population by racial/ethnic group. The category of Other includes American Indian, Asian, and Pacific Islander.

*Table 2: Frequency and Percent of CDCR Suicide Decedents by Race/Ethnic Group, 2018-2022*

| Racial/Ethnic Group | 2018 | 2019 | 2020 | 2021 | 2022 | 2022 Overall CDCR Population |
|---|---|---|---|---|---|---|
| African American | 1 (3%) | 8 (21%) | 5 (16%) | 4 (27%) | 3 (16%) | 27.9% |
| Hispanic | 17 (50%) | 11 (29%) | 9 (29%) | 6 (40%) | 11 (58%) | 45.5% |
| Caucasian | 9 (26%) | 13 (34%) | 12 (39%) | 5 (33%) | 5 (26%) | 20.1% |
| Other | 7 (21%) | 6 (16%) | 5 (16%) | 0 (0%) | 0 (0%) | 6.5% |

## Age

Table 3 shows annual age group suicides for the five-year period 2018 through 2022 and the percentage of suicides in each group as well as the overall CDCR population for each age group. In 2022, the number of total suicides between the ages of 25 and 34 represented the highest number of suicides. The average age of a suicide decedent in 2022 was 42 years, same as 2021.

*Table 3: Frequency & Percent of CDCR Suicide Decedents by Age Group, 2018-2022*

| Age Group | 2018 | 2019 | 2020 | 2021 | 2022 | 2022 Overall CDCR Population |
|---|---|---|---|---|---|---|
| 18-24 | 3 (9%) | 1 (3%) | 4 (13%) | 4 (27%) | 1 (5%) | 5% |
| 25-34 | 11 (32%) | 10 (26%) | 9 (29%) | 6 (40%) | 7 (37%) | 29% |
| 35-44 | 9 (27%) | 15 (40%) | 5 (16%) | 5 (33%) | 3 (16%) | 28% |
| 45-54 | 8 (24%) | 9 (24%) | 6 (19%) | 0 (0%) | 3 (16%) | 19% |
| 55+ | 3 (9%) | 3 (8%) | 7 (23%) | 2 (13%) | 5 (26%) | 20% |

## Marital Status

Of the 19 individuals who died by suicide in CDCR during 2022, four (21%) were married at the time of their death, three (16%) were divorced, twelve (63%) were single, and none were widowed. In 2021, one (7%) was married at the time of their death, three (20%) were divorced, eleven (73%) were single, and none were widowed.  The figures between 2021 and 2022 were similar except for married individuals.

### Education, Juvenile Criminal History, and Work History

In 2022, 10 (53%) of the 19 had less than a high school education. Five decedents (26%) finished 12 years of schooling and two (11%) had a GED certificate. One individual is not listed as it was unclear from the records if the decedent received a GED or finished high school. None of the decedents had a college degree. Four individuals were in special education classes although none of the decedents had a DDP designation.

Among the 19 individuals in CDCR custody who died by suicide in 2022, twelve (63%) had a history of crime as juveniles with an average age at first arrest of 14 years. Of these twelve individuals, nine (75%) had some level of gang involvement either inside or outside of prison.  This is higher than 2021 where only three individuals had prior or gang involvement at the time of death.

Twelve (61%) of the 2022 suicide decedents had information about employment outside CDCR. The percentage is based on 18 instead of the 19 decedents as there was not information regarding employment for one individual. Of the 12 who had employment histories, seven were skilled workers while five were unskilled workers.  Seven (37%) of the decedents had job placements while incarcerated.

### Languages Spoken

For 16 (84%) of 2022's suicide decedents, English was their primary spoken language. An additional six English speaking individuals listed Spanish as their secondary spoken language. For three individuals (16%), Spanish was their primary spoken language.

### Health Factors

Incarcerated populations have higher rates of both chronic medical conditions and infectious diseases than members of the community at large[10,] and medical conditions increase the risk of suicide-[11]

Seven (37%) of the 19 individuals who died by suicide in 2022 had both past and current medical conditions at the time of their death. This is significantly lower than the thirteen (87%) of the 15 individuals who died by suicide in 2021. One individual had chronic anemia, degenerative disc disease, diabetes mellitus with neuropathy, hyperlipidemia, hypertension, inguinal hernia, and recurrent skin lesions as well as had a significant apical wall motion abnormality with moderate left ventricle (LV) dysfunction. The second individual had chronic leg pain as a result of a gunshot wound he received while in the community. The third individual reported severe stomach pain that despite medical interventions, did not remit prior to his death. The fourth individual had reported hip pain. The fifth individual had skin cancer and eczema that was reported to be painful. The sixth individual reported shoulder and lower back pain. Lastly, the seventh individual had hypertension, hyperlipidemia, hyperbilirubinemia, and a past COVID-19 diagnosis.

In contrast, for 2021, four individuals had a past COVID-19 diagnosis with one of these individuals being diagnosed with COVID-19 long hauler's syndrome. Other medical conditions present in the decedents included AIDS, kidney disease, type 2 diabetes, degenerative joint disease, hyperlipidemia, hypertension,

[10] Maruschak, L.M. & Berzofsky, M. (2016). "Medical Problems of State and Federal Prisoners and Jail Individuals, 2011-12." Report NCJ 251920. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC. Available at: https://www.bjs.gov/pub/pdf/mpsfpji1112.pdf.
[11] Ahmedani, B. K., Peterson, E. L., Hu, Y., Rossom, R. C., Lynch, F., Lu, C. Y., et al.  (2017). Major Physical Health Conditions and Risk of Suicide. *American Journal of Preventive Medicine*, *53*(3), 308–315. https://doi.org/10.1016/j.amepre.2017.04.001

seizure disorder, heart murmur, scoliosis, asthma, gastroesophageal reflux disease (GERD), and hepatitis C. One individual had a gunshot wound prior to his incarceration however had no medical or health issues due to the wound at the time of death.

## Temporal Factors

Over the years, annual reports have inspected the distribution of suicides by custody watches (1st, 2nd, 3rd), day of week, quarter of year, and month to see if it was more likely that suicide deaths occurred during one temporal domain rather than another.

The distribution of 2022 suicides by day of week, time of day (watch), day of week, month, quarter, and time of year was tested against the hypothesis that all things being equal, suicides would be distributed evenly across these temporal sequences. The analyses found that, in 2022, no day of week, time of day, month, quarter, or holiday season was statistically more likely to have more suicide deaths than any other.

It is commonly believed suicide increases around the winter holidays of Thanksgiving and Christmas, though broader data does not support this.[12] Data from the Centers for Disease Control show that spring and early summer typically have a higher number of suicides, and CDCR's data over the long-term mirror this finding. In 2022, death by suicide was lower than prior years apart from 2021 which saw four fewer suicides. June and July had four suicides, the most of any other months in 2022. Figure 5 shows the 2022 number of suicides by month.

*Figure 5: Monthly Suicides, 2020, 2021, 2022 and 10 Year Average*



In 2022, there were seven suicides on a Saturday, three on a Monday, three on a Tuesday, three on a Wednesday, and one each on a Thursday, Friday, and Sunday. First watch (10 PM to 6 AM) had three

---

[12] See: Suicide Rate is Lower During Holidays  But Holiday-Suicide Myth Persists | The Annenberg Public Policy Center of the University of Pennsylvania

suicides, 2nd watch (6 AM to 2 PM) had eight suicides, and 3rd watch (2 PM to 10 PM) had eight suicides. In contrast, for 2021, Thursday had five suicides, three on a Monday, two on a Wednesday, two on a Saturday, two on a Sunday, and one on a Tuesday. First watch (10 PM to 6 AM) had five suicides, 2nd watch (6 AM to 2 PM) had two suicides, and 3rd watch (2 PM to 10 PM) had eight suicides.

Rigor mortis[13] is a condition of the body after death that involves stiffening of the musculature due to post-mortem chemical reactions and indicates a person has been deceased for a period ranging from two to six hours. In 2022, three (16%) of the 19 decedents were found in rigor mortis. Two of the three decedents were on Guard 1 checks at the time of death, which resulted in QIPs being assigned to their respective institutions. This was a slight increase compared to 2021 where two (13%) of the 15 decedents were found in rigor mortis. In 2020, two of the 31 decedents (6%) were found in rigor mortis. In 2022, five (26%) of the 19 decedents were under custody discharge checks/guard 1 checks/nursing observations at the time of their death. In 2021, five (33%) of the 15 decedents were under checks at the time of their death. In 2020, one individual (3.2%) included a concern about inadequate custody/welfare checks related to the death by suicide whereas in 2019, there were 5 (13.2%) cases with custody/welfare checks concerns.

The number of rules violation reports (RVRs) received by the 19 decedents ranged from 0 – 36 RVRs with an average of 8.2. The decedents averaged 8.1 years served of their sentence. In 2021, the range of RVRS for the 15 decedents was from 0 – 23 RVRs with an average of 5.5, which is fewer than this year.

In 2022, there was a range of 0 – 42 inter-facility transfers for the 19 decedents with a total average of 9.7 transfers (1.2 transfers per year). One decedent had 0 transfers, 12 decedents had less than 10 transfers, 3 decedents had more than 10 but less than 20 transfers, one decedent had more than 20 but less than 30 transfers, one decedent had more than 30 but less than 40 transfers, and one decedent had 42 transfers, having spent over 33 years in prison at the time of his death. In comparison, in 2021, there was also a range of 0 – 25 inter-facility transfers for the 15 decedents with a total average of 0.9 transfers.

## Custodial and Correctional Factors

The environment of any institution can have an impact on an individual's risk of suicide. Understanding these unique correctional factors is particularly important to determine if intervention is needed to protect individuals during incarceration.

### Institution at Time of Death

In 2022, suicides occurred in 12 CDCR institutions (Table 4). Institutions vary in the number of patients in the mental health program[14], the acuity of the mental health mission, the predominance of violent offenders, and the total number of individuals housed. There are fluctuations in the number of suicides occurring at an institution due to changes in the use or mental health mission of the institution, and other factors. There are also subsets of suicides that occur during, or upon, transfer of an individual from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently.

---

[13] Rigor mortis is "the state of postmortem stiffening." It "starts developing within 1 to 2 hours after death," "becomes apparent in the small muscle groups first" including "eyelids, lower jaw, face," "but on an average it may be said to commence 2-4 hours after death…" Kori (2018). Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 1-9.*

[14] Levels of care in the Mental Health Services Delivery System (MHSDS): Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient Program (EOP); Mental Health Crisis Bed (MHCB); and Psychiatric Inpatient Program (PIP)

Suicides are more frequent in institutions with intensive mental health programming (e.g., EOP institutions). Suicides are also more frequent in higher security (Level III or Level IV) institutions than in lower security settings. The institutions that have the highest average annual suicides, such as Salinas Valley State Prison (SVSP), are those where high security Level IV incarcerated individuals are housed and being treated for severe and chronic mental health and behavior problems.

*Table 4: 2022 CDCR Suicides by Institution, Security Level and Available Mental Health Programs[15]*

| Institution | Level I and II | Level III | Level IV | Unclassified | Mental Health Programs Available |
|---|---|---|---|---|---|
| California Correctional Institution | 0 | 0 | 1 | 0 | CCCMS |
| California Men's Colony | 2 | 2 | 0 | 0 | CCCMS, EOP, EOP-ASU, MHCB, DDP |
| Kern Valley State Prison | 0 | 0 | 2 | 0 | CCCMS, EOP, MHCB |
| Valley State Prison | 2 | 0 | 0 | 0 | CCCMS, EOP |
| California State Prison-LAC | 1 | 0 | 1 | 0 | CCCMS, EOP, EOP-ASU, MHCB |
| California State Prison-SAC | 0 | 0 | 1 | 0 | CCCMS, EOP, EOP-ASU, MHCB, PSU, DDP |
| Wasco State Prison | 0 | 0 | 0 | 1 | RC, CCCMS, MHCB |
| Richard J. Donovan Correctional Facility | 1 | 0 | 0 | 0 | CCCMS, EOP, EOP-ASU, MHCB, DDP |
| North Kern State Prison | 0 | 0 | 1 | 0 | RC, CCCMS, MHCB |
| Salinas Valley State Prison | 0 | 0 | 2 | 0 | CCCMS, EOP, PIP, MHCB, DDP |
| Substance Abuse Treatment Facility | 0 | 0 | 1 | 0 | CCCMS, EOP, MHCB, DDP |

---

[15] Levels of mental health care are: Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient Program (EOP); Mental Health Crisis Bed (MHCB); and Psychiatric Inpatient Program (PIP), Developmental Disabilities Program (DDP)

| Institution | Level I and II | Level III | Level IV | Unclassified | Mental Health Programs Available |
|---|---|---|---|---|---|
| California Medical Facility | 0 | 0 | 1 | 0 | CCMCS, EOP, EOP-ASU, MHCB, PIP, DDP |
| Total (percent) | 6 (32%) | 2 (11%) | 10 (53%) | 1 (5%) | |

Table 5 presents the data on suicides in each institution over the ten-year period 2013-2022 along with the 10-year annual average per institution. One institution had, on average, at least two suicides per year while twelve institutions had at least one suicide per year. These twelve institutions represented 170 of the 271 (63%) of all suicides over the 10 years, accounting for an average of 14 per year.

*Table 5: Frequency of Suicide by CDCR Institution, 2013-2022, 10-Year Total, and 10-Year Annual Average[16]*

| Institution | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Annual Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CSP Sacramento | 1 | 2 | 3 | 3 | 1 | 2 | 9 | 3 | 0 | 1 | 2.4 |
| Salinas Valley SP | 2 | 2 | 0 | 4 | 2 | 2 | 1 | 1 | 2 | 2 | 1.8 |
| California Correctional Institute | 1 | 3 | 1 | 2 | 0 | 2 | 2 | 4 | 1 | 1 | 1.7 |
| Kern Valley SP | 1 | 1 | 0 | 3 | 1 | 5 | 2 | 2 | 0 | 2 | 1.7 |
| San Quentin SP | 3 | 2 | 3 | 0 | 2 | 2 | 1 | 1 | 1 | 0 | 1.5 |
| CSP LA County | 1 | 0 | 0 | 2 | 4 | 2 | 2 | 2 | 0 | 2 | 1.5 |
| Corcoran SP | 2 | 0 | 2 | 0 | 2 | 3 | 4 | 2 | 0 | 0 | 1.5 |
| Mule Creek SP | 2 | 2 | 0 | 0 | 2 | 2 | 2 | 2 | 2 | 0 | 1.4 |
| RJ Donovan | 3 | 1 | 2 | 0 | 1 | 4 | 0 | 1 | 1 | 1 | 1.4 |
| California Medical Facility | 2 | 1 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 1 | 1.2 |
| Deuel Vocational Institute* | 0 | 0 | 3 | 0 | 4 | 1 | 3 | 0 | 0 | N/A | 1.2 |
| California Men's Colony | 0 | 0 | 3 | 3 | 0 | 1 | 0 | 0 | 0 | 4 | 1.1 |
| California Institute for Women | 1 | 2 | 2 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 1.0 |
| High Desert SP | 1 | 1 | 0 | 0 | 0 | 2 | 1 | 3 | 0 | 0 | 0.8 |
| Correctional Training Facility | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 3 | 0 | 0 | 0.8 |
| Wasco SP | 1 | 0 | 0 | 0 | 4 | 0 | 0 | 2 | 0 | 1 | 0.8 |
| California Institute for Men | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 3 | 0 | 0.7 |

[16] Chuckawalla Valley SP, Avenal SP, Centinela CP, Sierra Conservation, and California City CF had no suicides during the ten years 2013-2022.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Substance Abuse & Training Facility | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | **1** | 0.6 |
| California Health Care Facility | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 0 | **0** | 0.5 |
| North Kern SP | 1 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | **1** | 0.5 |
| Pleasant Valley SP | 1 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | **0** | 0.4 |
| Folsom SP | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | **0** | 0.4 |
| California Correctional Center | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | **0** | 0.4 |
| Pelican Bay SP | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | **0** | 0.3 |
| Valley SP | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | **2** | 0.4 |
| Out-of-State Institutions | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | **0** | 0.3 |
| CSP Solano | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | **0** | 0.3 |
| Central California Women's Facility | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | **0** | 0.3 |
| Calipatria SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | **0** | 0.1 |
| Ironwood SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | **0** | 0.1 |
| Centinela SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0.0 |
| Sierra Conservation Center | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0.0 |
| Avenal SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0.0 |
| Total | 30 | 23 | 25 | 26 | 30 | 34 | 38 | 31 | 15 | **19** | 27.1 |

*Deuel Vocational Institute closed in 2021

## Housing Type

Incarcerated individuals in CDCR are housed in a variety of physical settings, from dormitory settings with up to 200 people, to the most common type, celled housing, which house one or two persons. Table 6 presents the number and percentage of suicides in each type of CDCR housing from 2017 – 2022.

The types of housing where an incarcerated person lives can be associated with prison-related difficulties. For instance, individuals entering CDCR with a new prison term or whose parole has been revoked are initially housed in Reception Center institutions. During 2022, one individual died in a Reception Center institution. During 2021, no one died by suicide in a Reception Center institution which was a decrease from 2020 where one individual died in 2020 in a Reception Center institution. Currently, there are two Reception Center institutions designed to house males (NKSP and WSP) and one designed to house females (CCWF).

*Table 6: Frequency and Percent of Housing Placements of CDCR Suicide Decedents, 2017-2021 and 2022*

| Housing Type | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportion in 2022* |
|---|---|---|---|---|---|---|---|
| Administrative Segregation (including EOP Hub units) | 10(33%) | 4(12%) | 6 (16%) | 3 (10%) | 4(27%) | **5(26%)** | **8%** |

| Housing Type | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | CDCR Population Proportion in 2022* |
|---|---|---|---|---|---|---|---|
| Condemned Housing | 0 (0%) | 2 (6%) | 1 (3%) | 1 (3%) | 1 (7%) | 0 (0%) | 2% |
| Psychiatric Services Units | 1 (3%) | 0 (0%) | 5 (13%) | 1 (3%) | 0 (0%) | 1 (5%) | 0.2% |
| Short-Term Restricted Housing | 0 (0%) | 2 (6%) | 1 (3%) | 5 (16%) | 2(13%) | 1 (5%) | 1% |
| Long-Term Restricted Housing | 0 (0%) | 0 (0%) | 0 (0%) | 1 (3%) | 0 (0%) | 0 (0%) | 0.1% |
| Security Housing Units | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0.1% |
| Sensitive Needs Yard | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 2(13%) | 5(26%) | 14% |
| Psychiatric Inpatient Program (PIP) | 0 (0%) | 1 (3%) | 1 (3%) | 2 (6%) | 2(13%) | 1 (5%) | 0.1% |
| Reception Centers | 6 (20%) | 2 (6%) | 3 (8%) | 1 (3%) | 0 (0%) | 1 (5%) | 7% |
| Outpatient Housing Unit (Medical) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (6%) | 0 (0%) | 1 (5%) | 1% |
| Correctional Treatment Center/MHCB | 2 (6%) | 1 (3%) | 0 (0%) | 0 (0%) | 0 (0%) | 1 (5%) | 1% |
| General Population | 11 (37%) | 22(65%) | 21(82%) | 15(48%) | 4(27%) | 3(16%) | 29% |

*Does not equal 100%. There are other lesser used classifications that comprise the rest of the population

## Segregated Housing

Individuals alleged to be, or found guilty of, committing certain disciplinary infractions are typically placed in segregated housing. If found guilty, sanctions can include loss of time credits, loss of privileges, or other consequences.  Incarcerated individuals can also be placed in segregated housing at their own request for protection due to perceived interpersonal safety risk[17]. In 2022, 2,969 individuals, or 3% of the total CDCR population, were housed in segregated housing.

The units and cells in segregated housing are often physically similar to other housing units. But the regulations and routines of segregated housing restrict an individual's movements and privileges, which can affect their mental status and functioning. The conditions of confinement in segregated housing may result in significant distress for some people, and for some, placement in segregated housing increases the risk of self-injury.

Over the last twenty years, CDCR has implemented policies and programs to increase mental health services and to reduce the risk of suicide in segregated housing. In the early 2000s, the department created specialized ASU "Hub" units and Psychiatric Services Units (PSU) for EOP patients. In 2015, CDCR developed the Short-Term and Long-Term Restricted Housing (STRH/LTRH) units for incarcerated persons

---

[17] For this report, segregated housing includes: Administrative Segregation (ASU), Short-Term Restricted Housing (STRH), Long-Term Restricted Housing (LTRH), ASU-EOP Hubs, Psychiatric Services Units (PSU), Security Housing Units (SHU), and Condemned housing.

at the CCCMS level of care. These units correspond to the ASU and Security Housing Units for the non-MHSDS population, respectively.

During 2022, seven (37%) out of the 19 decedents were housed in CDCR segregated housing units. Of these, five were participants in the MHSDS – two at the CCCMS level of care and three at the EOP level of care. The remaining two individuals were not participants in the MHSDS at the time of their death.

Suicide rates for segregated housing are higher than in the rest of CDCR, 168 per 100,000, in 2022. For reference, the rate of suicide in segregated housing in 2021 was 197 per 100,000, in 2020 was 236 per 100,000 and between 2015 and 2019 the rate was 218 per 100,000. In the past few years, the annual total of suicides and the percentage of total CDCR suicides that occurred in ASU/STRH has trended downward. However, in 2021, while the annual total of suicides in restricted housing units significantly decreased, the percentage increased. This was due to the lower number of deaths by suicide in 2021. Figure 6 shows the number and percentage of total CDCR suicides that occurred in ASU and STRH from 2013 through 2022.

*Figure 6: Percentage of Suicides in Segregated Housing, 2013-2022*



| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 16 | 15 | 8 | 8 | 11 | 10 | 13 | 8 | 6 | 7 |
| Percentage | 43% | 65% | 29% | 30% | 37% | 29% | 34% | 26% | 40% | 37% |

Frequency ——  Percentage ——  Frequency Trend - - -  Percentage Trend - - -

## Time in Segregated Housing

The initial few days in ASU or STRH can be very stressful for some individuals, especially those who are in mental health treatment. Similarly, extended stays (greater than 30 days) can also lead to a deterioration of an individual's mental well-being.[18] In 2007, CDCR began a program to retrofit a number of ASU cells as "intake" cells. These cells have physical modifications which include removing ligature attachment sites to increase the safety of the cells. Incarcerated people who are moved to ASU or STRH are assigned to these intake cells for their initial 72 hours in the unit before transitioning to regular ASU or STRH housing. If an individual is double celled upon placement in ASU, he or she is not required to be placed in an ASU

---

[18] Haney, C. (2018). Restricting the use of solitary confinement. *Annual Review of Criminology, 1.* 285-310. https://doi.org/10.1146/annurev-criminol-032317-092326

intake cell. In 2022, five individuals were in ASU or STRH at the time of their death. The average time from ASU/STRH entry to death by suicide was 62 days with a range from 8 days to 125 days. In contrast, in 2021, the average time from ASU/STRH entry to death by suicide was 39 days with a range from 7 days to 75 days. Compared to the previous five years (2017-2021), the average time from ASU/STRH entry to suicide was 68 days, similar to 2022.

## Offense Type

A common finding in state prisons is the high proportion of suicides among individuals whose commitment offenses were crimes against persons.[19] Individuals incarcerated for a violent crime have a rate of suicide death more than twice the rate for those committed for non-violent crimes.[20] Table 7 shows the number and proportion types of crimes committed by CDCR suicide decedents in 2017-2021, 2022, and the overall proportion of these crimes of the CDCR population.

*Table 7: Frequency and Percent of Commitment Offenses of Suicide Decedents, 2017-2021, 2022, and CDCR Proportions for 2022*

| Type of Offense | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportions in 2022 |
|---|---|---|---|---|---|---|---|
| Violent Crimes | 23 (77%) | 24 (71%) | 31 (82%) | 24 (77%) | 9 (60%) | **13 (68%)** | 73% |
| Property Crimes | 2 (7%) | 1 (3%) | 3 (8%) | 2 (7%) | 3 (20%) | **4 (21%)** | 3% |
| Sex Crimes | 2 (7%) | 7 (21%) | 3 (8%) | 5 (16%) | 3 (20%) | **2 (11%)** | 21% |
| Other Crimes | 3 (10%) | 2 (6%) | 1 (3%) | 0 (0%) | 0 (0%) | **0 (0%)** | 2% |

## Security Level

In 2022, 10 of 19 suicide decedents had Level IV classification points, the highest security level (Table 8). Two decedents were at Level III. Four decedents were at Level II. Two decedents were at Level I. One decedent was listed as unclassified, as he died by suicide when he was housed in a reception center institution in the first weeks of his incarceration and as a result had not completed processing to determine classification score.  As can be seen in Table 8, the pattern of classification levels for the higher levels are similar to that of the prior years.

*Table 8: Frequency and Percent of Security Levels of Suicide Decedents, 2017-2021, 2022, and CDCR Proportions in 2022*

| Security Level | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportions in 2022 |
|---|---|---|---|---|---|---|---|
| Level IV | 16 (53%) | 20 (59%) | 24 (63%) | 18 (58%) | 8 (53%) | **10 (53%)** | 23% |
| Level III | 5 (17%) | 6 (18%) | 5 (13%) | 3 (10%) | 1 (7%) | **2 (11%)** | 15% |

---

[19] Most inmates are charged and found guilty of multiple charges. The charges in Table 7 are the primary charges. The CDCR and the California Department of Justice define crimes against persons as violent offenses and make a distinction between those crimes and property and other crimes. Although sex crimes are considered crimes against persons, they are separated out in this report. See https://openjustice.doj.ca.gov/resources/glossary

[20] Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

| Security Level | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | CDCR Population Proportions in 2022 |
|---|---|---|---|---|---|---|---|
| Level II | 2 (7%) | 5 (15%) | 5 (13%) | 8 (26%) | 5 (33%) | **4 (21%)** | 49% |
| Level I | 2 (7%) | 1 (3%) | 1 (3%) | 2 (7%) | 1 (7%) | **2 (11%)** | 9% |
| Unclassified | 5 (17%) | 2 (6%) | 3 (8%) | 0 (0%) | 0 (0%) | **1 (5%)** | 4% |

## Sentence Length

Another variable that is unique to suicides in correctional settings is sentence length. Specifically, the total length of the sentence; how much time an incarcerated person served prior to the suicide death; and how much time left to serve in prison at time of death. Tables 9, 10, and 11 capture these variables. Length of sentence can have implications for the mental state of incarcerated individuals at the beginning of their prison term. Table 9 presents the sentence lengths of suicide decedents during the 2022 year as well as the past five years. In 2022, 6 (32%) of the 19 decedents were serving a life sentence without the possibility of parole (LWOP) and 4 (21%) of the 19 decedents were sentenced to 21+ years. This is a contrast to 2021, where almost half of the decedents were serving sentences between 11-20 years, three of which were sentenced to over 20 years.

*Table 9: Frequency and Percent of Sentence Length of Suicide Decedents, 2017-2021 and 2022*

| Sentence Length | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| 1-5 years | 7 (23%) | 4 (12%) | 1 (3%) | 5 (16%) | 2 (13%) | **2 (11%)** |
| 6-10 years | 6 (20%) | 3 (9%) | 5 (13%) | 4 (13%) | 1 (7%) | **3 (16%)** |
| 11-20 years | 3 (10%) | 4 (12%) | 5 (13%) | 1 (3%) | 7 (47%) | **2 (11%)** |
| 21+ years | 9 (30%) | 9 (26%) | 10 (26%) | 6 (19%) | 3 (20%) | **4 (21%)** |
| Life w/ Possible Parole | 5 (17%) | 7 (21%) | 10 (26%) | 12 (39%) | 1 (7%) | **7 (37%)** |
| Life w/out Parole | 0 (0%) | 5 (15%) | 6 (16%) | 2 (7%) | 0 (0%) | **1 (5%)** |
| Condemned | 0 (0%) | 2 (6%) | 1 (3%) | 1 (3%) | 1 (7%) | **0 (0%)** |

Table 10 shows time spent in CDCR during the current admission by individuals who died by suicide from 2017 to 2022. During 2022, the amount of time served at the time of death ranged from just 23 days to over 33 years. In 2022, ten decedents had served more than 6 years in CDCR custody.

*Table 10: Frequency and Percent of Time Served at Time of Death of Suicide Decedents, 2017-2021 and 2022*

| Time Served | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| 0-1 year | 14 (47%) | 7 (21%) | 5 (13%) | 4 (13%) | 0 (0%) | **5 (23%)** |
| 1-5 years | 9 (30%) | 9 (26%) | 12 (32%) | 8 (19%) | 6 (40%) | **4 (21%)** |
| 6-10 years | 3 (10%) | 6 (18%) | 7 (18%) | 6 (23%) | 4 (27%) | **4 (21%)** |
| 11-20 years | 4 (13%) | 10 (29%) | 11 (29%) | 5 (39%) | 5 (33%) | **5 (23%)** |
| 21+ years | 0 (0%) | 2 (6%) | 3 (8%) | 8 (26%) | 0 (0%) | **1 (5%)** |

Table 11 shows the length of time remaining in sentences for those who died by suicide from 2017 – 2022. In 2022, the majority of decedents had over 16 years left to serve. This differs from 2021 which saw the highest number within the 1 – 5 year range of time left to serve.

*Table 11: Frequency and Percent of Time Left to Serve of Suicide Decedents, 2017-2022*

| Time Left to Serve | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** |
|---|---|---|---|---|---|---|
| 0-1 year | 8 (27%) | 3 (9%) | 4 (11%) | 4 (13%) | 2 (13%) | **3 (16%)** |
| 1-5 years | 6 (20%) | 5 (15%) | 7 (18%) | 8 (26%) | 5 (33%) | **4 (21%)** |
| 6-10 years | 2 (7%) | 6 (18%) | 5 (13%) | 2 (7%) | 3 (20%) | **1 (5%)** |
| 11-15 years | 1 (3%) | 4 (12%) | 5 (13%) | 1 (3%) | 3 (20%) | **1 (5%)** |
| 16+ years | 13 (43%) | 16 (47%) | 17 (45%) | 16 (52%) | 2 (13%) | **10 (53%)** |

## Cell Occupancy

It is not uncommon for individuals to attempt suicide when they are alone in their assigned housing. They may be alone because they have not been assigned a cellmate, are assigned a single cell, they are housed in single cell designated housing (CTC, MHCB, ASU/STRH intake cells, condemned housing), or their cellmate is away from the cell. In 2022, sixteen (84%) suicide decedents were either housed on single-cell status (N = 10, 63%) or were housed alone although eligible for a cellmate (N = 6, 38%) at the time of their death. Three (16%) individuals died while being housed in a double cell, although were alone at the time.

## Job/School Assignment

In 2022, of the 19 individuals who died by suicide, ten had a job or school assignment during their incarceration. The jobs included kitchen work, yard work, electrician, and porter. This is higher than 2021, where six out of the 15 individuals who died by suicide had a job or school assignment during their incarceration.

## Method of Suicide

As in most years, ligature hanging predominated as the method of suicide with 13 individuals (68%) using it in 2022, similar to 2021. For these 13 deaths by suicide this year, the noose was tied to the bunk (31%; 4 individuals), air vent (31%; 4 individuals), window (15%; 2 individuals), light fixture (15%; 2 individuals), or ladder (8%; 1 individual). The remaining six individuals died by asphyxiation (3 individuals) and laceration (3 individuals). In contrast, for the 13 deaths by hanging in 2021, the noose was tied to the top bunk (38%; 5 individuals), air vent (31%; 4 individuals), cell door (8%; 1 individual), toilet bar (8%; 1 individual), top of the holding cell (8%; 1 individual), or bed frame (8%; 1 individual). In 2021, the remaining two individuals (13%) died by asphyxiation. Figure 7 shows the proportions of the different methods of suicide from 2017-2022.

*Figure 7: Method of Suicide, 2017-2022*



## Mental Health Factors

Mental Health factors are important to review and understand about those that die by suicide. Those with mental health conditions are associated with an increased risk of suicide[21]. The mental health level of care provided by CDCR for individuals are extensive and based on the individual's need.

### Mental Health Level of Care

The CDCR Mental Health Services Delivery System (MHSDS) provides mental health services to incarcerated people. The MHSDS is designed to provide an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of the individual. CDCR's MHSDS is divided into levels of care corresponding to the intensity of treatment. CCCMS and EOP are outpatient programs. The MHCB units and the Acute and Intermediate PIPs are inpatient programs with 24-hour nursing care provided.

In both the community and correctional settings, individuals suffering from mental illness are overrepresented in the number of suicide deaths. In 2022, there were 32,840 individuals in MHSDS. CCCMS had 24,734 individuals, EOP had 6776 individuals, MHCB had 197 individuals, APP had 292 individuals, and ICF had 841 individuals. In 2022, 89% (N = 17) of incarcerated persons who died by suicide in CDCR were participants in the MHSDS. Two individuals were not in the MHSDS at the time of their death, both were never included in the MHSDS during their incarceration. Table 12 shows the frequency of suicides among the levels of care for 2013 through 2022 and the percent of total annual suicides for each year.

*Table 12: Frequency of Suicide by MHSDS Level of Care and Percent of Total Annual Suicides, 2013-2022*

---

[21] Yeh, H., Westphal, J, Hu, Y., Peterson, E., et.al (2019). Diagnosed Mental Health Conditions and Risk of Suicide Mortality. *Psychiatric Services* 70(9), https://doi.org/10.1176/appi.ps.201800346

| Year | CCCMS | EOP | Inpatient | Percent of Total Annual Suicide Deaths in MHSDS |
|------|-------|-----|-----------|-------------------------------------------------|
| 2013 | 9 | 6 | 1 | 53% |
| 2014 | 12 | 9 | 1 | 96% |
| 2015 | 9 | 5 | 0 | 58% |
| 2016 | 7 | 15 | 0 | 82% |
| 2017 | 8 | 10 | 2 | 67% |
| 2018 | 12 | 10 | 1 | 68% |
| 2019 | 11 | 16 | 0 | 71% |
| 2020 | 11 | 7 | 3 | 68% |
| 2021 | 5 | 3 | 2 | 67% |
| 2022 | 9 | 6 | 2 | 89% |

## Mental Health Treatment Prior to Incarceration

Seventeen (89%) of the 19 suicide decedents in 2022 had indications in their records that they had treatment for mental health problems in the community. Most of these individuals reported treatment as children or adolescents. In contrast, in both 2021 and 2020, the percentage was 67% of individuals who died by suicide reported some history of mental health treatment in the community.  Table 13 shows the annual suicide rates of those incarcerated persons receiving mental health treatment in CDCR, those not receiving treatment, and the total CDCR populations from 2013 through 2022.[22]

*Table 13: Suicide Rate (per 100,000) of Mental Health, Non-Mental Health, & Total CDCR Populations, 2013-2022*

| Year | Mental Health Population | Non-Mental Health Population | Total Population Rate |
|------|--------------------------|------------------------------|-----------------------|
| 2013 | 46.4 | 15.5 | 24.1 |
| 2014 | 56.3 | 2.2 | 18.2 |
| 2015 | 40.4 | 9.8 | 18.6 |
| 2016 | 58.3 | 5.5 | 21.0 |
| 2017 | 51.9 | 10.8 | 23.0 |
| 2018 | 60.9 | 12.0 | 26.3 |
| 2019 | 74.7 | 12.5 | 30.3 |
| 2020 | 70.7 | 13.2 | 17.3 |
| 2021 | 30.7 | 12.3 | 15.2 |
| 2022 | 46.1 | 3.2 | 19.6 |

---

[22] This information was obtained from the CCHCS Health Care Placement Oversight Programs (HCPOP) monthly trends reports and the CDCR Office of Research Data Points series. The population totals vary slightly from other referenced population totals within this report, as the data from HCPOP is collected at different points of time and utilizes total population average.

| Year | Mental Health Population | Non-Mental Health Population | Total Population Rate |
|---|---|---|---|
| 10-Year Average | 56.7 | 9.7 | 21.4 |

### Screening on Initial Arrival to CDCR

All newly arrived individuals are administered an initial health screening, completed by nursing, and a questionnaire, completed by mental health, that contains several mental health questions. Within seven days of arrival, a brief mental health screening questionnaire is also administered. The questionnaires cast a relatively wide net to identify individuals who need an in-depth evaluation. Those who screen positive on the health screening are referred to the mental health program. Those who screen positive on the mental health screening are provided a more comprehensive mental health evaluation within 18 days of arrival. All 19 individuals were screened upon arrival, according to policy. Of the 19 individuals who died by suicide during 2022, three individuals died within one year of their incarceration. Of the 19 individuals, 17 were found to require further mental health evaluations and were placed in the MHSDS.

### Psychiatric Medication

Of the seventeen suicide decedents receiving mental health treatment at the time of their deaths, ten were prescribed psychiatric medications as part of their treatment. Suicide case reviewers noted that medication compliance (either outright refusal or intermittent adherence) was an issue in only one case of those who were prescribed psychiatric medications. A small number of MHSDS patients are subject to involuntary psychiatric medication orders per Penal Code Section 2602 due to severe mental illness and poor compliance with prescribed medications.[23] In 2022, one mental health patient was subject to an involuntary medication order at the time of death, similar to 2021.

### History of Admissions to CDCR Psychiatric Inpatient Programs

Both in the community[24] and in correctional settings, one of the highest risk periods for suicide is after discharge from inpatient psychiatric hospitalization. Seventeen of the 19 decedents in 2022 were in the MHSDS at the time of their death, one (6%) of these 17 was discharged from inpatient within a year from his death, specifically 12 days after his discharge from inpatient. Eight decedents had been hospitalized in a CDCR inpatient psychiatric facility at some time during their CDCR tenure.

Of the eight, one individual was at the CCCMS (i.e., outpatient) level of care at the time of his death had been discharged from a CDCR inpatient psychiatric program within 12 months of their death. For reference, in 2021, three of the 8 individuals who were at CCCMS or EOP level of care at the time of their death had been discharged from an inpatient psychiatric program within 12 months of their death. Historically the number of suicides that occurred shortly after an individual was discharged from an inpatient psychiatric program has proven concerning. As such, in 2021, CDCR finalized an overhaul to its High Risk Management Program. CDCR changed the program's title to the Suicide Risk Management

---

[23] Penal Code § 2602 provides for the involuntary administration of psychiatric medication if a psychiatrist determines that an inmate suffers from a "serious mental disorder" and "as a result of that disorder, the inmate is gravely disabled and does not have the capacity to refuse treatment with psychiatric medications or is a danger to self or others." Inmates are entitled to a hearing and the psychiatrist must certify that alternative methods of treatment "are unlikely to meet the needs of the patient."

[24] Chung, D. T., Ryan, C. J., Hadzi-Pavlovic, D., Singh, S. P., Stanton, C., & Large, M. M. (2017). Suicide rates after discharge from psychiatric facilities. *JAMA Psychiatry, 74*(7), 694-9. doi.org/10/1001/jamapsychiatry.2017.1044

Program (SRMP) to reflect the focused attention on patients at increased risk for suicide. Additionally, specific parameters were placed around inclusionary criteria, expectations for providing treatment for individuals within the program, and guidance on when to consider a patient for removal of the program. CDCR built an automated report to aid treatment teams in identifying patients for the program, based upon the inclusionary criteria. There were no decedents enrolled in SRMP during their incarceration or at the time of their deaths, although there were 6 decedents who were found to have an underestimation of suicide risk.

*Figure 8: Frequency and Rates of Suicides Post-Inpatient Discharge, 2017-2022*



## Psychiatric Diagnoses

It is not uncommon for a formal psychiatric diagnosis to be associated with individuals who die by suicide. In fact, research has found that for incarcerated individuals, the presence of a psychiatric diagnosis is associated with suicide[25]. The mental health diagnoses of individuals who died by suicide during 2022 as well as prior years are summarized in Table 14. Although many individuals use and abuse alcohol and illegal substances while incarcerated, substance-related and alcohol use diagnoses in Table 14 are included *only* when formally reported as a diagnosis in the medical record. All diagnoses are based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5). As comorbidity is the rule rather than the exception among mental health patients, nine of 2022 suicide decedents had two or more diagnoses recorded.

Of the fourteen individuals with DSM-5 mental health disorders in 2022, the most common category of disorder was mood disorders, which include Major Depressive Disorder, Depressive Disorder Not-Otherwise-Specified, and Bipolar Disorder, which accounted for nine diagnoses. Psychotic disorders (Schizophrenia, Schizoaffective Disorder, Delusional Disorder, and Psychotic Disorder Not-Otherwise-Specified) accounted for five, Substance Use Disorder accounted for five, and personality disorders accounted for two.

[25] Zhong, S., Senior, M., Yu, R., Perry, A., Hawton, K., Shaw, J., & Fazel, S. (2021). Risk factors for suicide in prisons: A systematic review and meta-analysis. *The Lancet Public Health, 6*(3), e164–e174. https://doi.org/10.1016/s2468-2667(20)30233-4

*Table 14: Frequency of Mental Health Diagnoses of Suicide Decedents, 2020-2022*

| Diagnosis | 2020 | 2021 | 2022 |
|---|---|---|---|
| Major Depressive Disorder | 7 | 2 | 6 |
| Unspecified Depressive Disorder | 4 | 0 | 4 |
| Bipolar Disorder | 1 | 2 | 1 |
| Schizophrenia and Schizoaffective Disorder | 2 | 5 | 2 |
| Psychotic Disorder Not-Otherwise-Specified | 2 | 0 | 4 |
| Delusional Disorder | 1 | 0 | 0 |
| Anxiety Disorder | 4 | 3 | 3 |
| Adjustment Disorder | 4 | 1 | 2 |
| Post-Traumatic Stress Disorder | 2 | 2 | 3 |
| Personality Disorders | 7 | 4 | 2 |
| Alcohol Abuse or Dependence | 1 | 0 | 0 |
| Any Substance Use-related Disorder | 5 | 3 | 4 |
| Other Diagnoses | 4 | 1 | 0 |

## Suicide Attempt History

In 2022, 47% (N=9) of suicide decedents had a history of suicide attempts in the community and/or while in CDCR custody. Of these, five (56%) had documented reports of community suicide attempts but no attempts in CDCR custody. There was evidence by self-report or documentation that seven (78%) had multiple suicide attempts in the past. The overall percentage of 2022 suicide decedents with a history of suicide attempts were lower than the five previous years (2017-2021), when, on average, 63% of suicide decedents had a history of CDCR or community suicide attempts.

## Suicide Precipitants and Behavior

When an individual dies by suicide, oftentimes there are stressful life events in the weeks or months prior to death that can play a role in triggering an individual's decision to make a suicide attempt[26]. These events are often identified as "precipitating" events.  In many cases, the precipitants or drivers were not entirely clear or definitively established. Rather, those identified by suicide case reviewers should be considered clinically presumptive about each individual's specific reasons for ending their life, based on available records and information reviewed posthumously.

Rarely can one precipitant or driver be identified as the sole reason someone made the decision to end their life. More often, there are multiple precursors that accumulate on top of pre-existing vulnerabilities. Reviewers identified 17 separate precipitants and drivers among the 19 suicides, many of which similar precipitants were experienced from several individuals totaling 40 precipitants. The frequency of

---

[26] Buchman-Schmitt, J. M., Chu, C., Michaels, M. S., Hames, J. L., Silva, C., Hagan, C. R., Ribeiro, J. D., Selby, E. A., & Joiner, T. E. (2017). The role of stressful life events preceding death by suicide: Evidence from two samples of suicide decedents. *Psychiatry Research, 256*, 345-352. https://doi.org/10.1016/j.psychres.2017.06.078

precipitants and drivers is greater than the total number of suicides, as nearly all suicide case reviews identified more than one precursor.

In 2022, mental health symptoms were identified by reviewers as significant in 7 (37%) of suicide decedents, the most frequent precipitant or driver found, and similar to previous years. These individuals had what might be termed crises of despair, isolation, loss, and hopelessness which appeared to drive them to attempt suicide. This category accounted for 35% of all the precipitants or drivers. Three individuals had substance use issues while two individuals reported having not enough contact with mental health.

The interpersonal culture of prison may include coercion and threats of outright violence. [27] Thus, the general category of "safety concerns" figured prominently in multiple suicides during 2022. These concerns can center on prison gang issues, threats based on a commitment offense (particularly sex crimes), gambling or drug debts, and/or medical vulnerabilities (supported or unfounded). Reviewers identified five instances where the record suggested that safety concerns were a precipitant or driver to an individual's suicide death. This category accounted for 14% of all precipitants or drivers.

*Table 15: Suspected Precipitants/Drivers of Suicide in CDCR, 2022*

| Precipitant and Drivers Category | Frequency | Percentage of All Precipitants and Drivers Identified |
|---|---|---|
| Mental health symptoms, e.g., anxiety, psychosis, depression | 7 | 19% |
| Safety concerns, drug debts, fears of victimization | 5 | 14% |
| Crises of despair and hopelessness, interpersonal losses, isolation, loneliness | 6 | 16% |
| Medical illness and/or pain issues; medical disability | 5 | 14% |
| Substance-related issues (use, withdrawal, etc.) | 3 | 8% |
| Custodial issues (adverse transfer, long sentence, poor adjustment to prison, new charges, new court proceedings, etc.) | 11 | 30% |
| COVID-19 issues (fears about illness; loss of support through illness) | 0 | 0% |
| Board of Prison Hearings issues | 0 | 0% |
| History of childhood trauma | 0 | 0% |

Of the 19 individuals who died by suicide during 2022, five (26%) left suicide notes. This percentage is higher than is found in community (one in six) samples,[28] and higher than the 19% in the previous five years of CDCR suicide deaths.

---

[27] See e.g., Toch, H. & Adams, K. (2002). *Acting Out: Maladaptive Behavior in Confinement*. American Psychological Association, Washington, DC.
[28] See Gelder, Mayou, and Geddes (2005). "Incidence of note-leaving remains constant despite increasing suicide rates." *Psychiatry and Clinical Neurosciences*, 4(1). And also: Cerel, J., Moore, M., Brown, et al. (2014). "Who leaves suicide notes? A six year population-based study." *Suicide and Life-Threatening Behavior 45*(3), 326-334. https://dx.doi.org/10.1111/sltb.12131 57 The *Plata* Three-Judge panel recognized in 2011 that state-by-state comparisons are of "limited value" when they fail to "control for demographics of each state's inmate population." ECF No. 3641 at 88.

## Determination of Unknown Causes of Death

When a death occurs in CDCR for which there is no obvious cause, it is classified as an "Unknown Death." These cases receive special attention until the cause and manner of death is determined, particularly when suicidal intent needs to be determined in a timely fashion or is unclear. If a death notification lists the cause of death as unknown or undetermined, the SMHP tracks the case until the death is classified. In some instances, the cause and manner of death is quickly classified during an institutional medical review. In other cases, the cause of death remains undetermined pending the receipt of autopsy or toxicology results. In such cases, the CCHCS Mortality Review Committee (MRC) will investigate the death and produce an initial cause of death as well as a final cause and manner of death determination. In the meantime, the SMHP communicates with the institution and with the MRC about these cases until the cause and manner of death is finalized. A member of the SMHP also sits on the MRC to ensure all unknown deaths are reviewed and, when applicable, that the possibility of suicide has been closely and objectively considered. The SMHP member of the MRC may discuss unknown or undetermined deaths with the headquarters SPRFIT Committee, particularly when a history of suicide attempts is present or if there's some suspicion an overdose was intentional, rather than accidental.

The following guidelines were developed for suicide reviewers to use when determining unknown deaths:

*Reviewer Guidelines for Determination of Unknown Deaths*

1. Review the method of death to determine if there may have been an alternative reason (other than suicide) for the behavior (e.g., autoerotic asphyxiation, confusion, inability to form intent, purposeful intoxication, etc.).
2. If an overdose on substances, is it reasonable that the substance (illicit or prescribed) may have been used to become intoxicated? (e.g., Tylenol is not likely to be used to become intoxicated; Klonopin may be).
3. Review recent mental health history and any past history of suicide attempts/self-injury behavior (check self-harm tracking). Did the individual:
   - Voice suicidal ideation (including conditional ideation)?
   - Have admissions to an MHCB unit?
   - Engage in self-injury behavior?
   - Have a history of depression or mood disturbance?
   - Have a history of psychosis?
4. Review substance abuse history.
   - What substances were used?
   - Have there been any past overdoses?
     - If yes, what did the individual say about them at the time?
   - What substance abuse treatment was offered?
   - How recent are reports of current use?
5. Review recent custodial information.
   - Was the individual facing criminal charges?
   - Did the individual lose an appeal?
   - Did the individual have any recent losses?
   - Was there any "bad news" readily apparent?

6. Review medical information for the presence of:
   - Chronic pain
   - Terminal illness
7. Was there a suicide note or a note that could be construed as such?

In 2022, 86 individuals' deaths were classified as unknown. Upon receipts of the coroners' reports, two of these deaths were later determined to be suicides. Initially, CDCR psychologists did not deem the two cases to be suicide however the opinion was changed upon receipt of the autopsy. One individual was thought to be a victim of homicide due to marks on his body. The second individual was thought to have had an traumatic intracranial hemorrhage due to an accidental fall that resulted in injury. Of importance, this number can change depending on subsequent coroners' reports of these 86 individuals.

## Self-Injury Incidents, Including Suicide Attempts

Self-injury among incarcerated persons is a serious problem. A 2011 national survey collected data from 39 state and federal prison systems in the United States. The study's authors found that "in the average prison system less than 2% of individuals per year engaged in self-injurious behavior…."[29] Most systems surveyed reported that these types of incidents are at least somewhat disruptive to facility operations and consumed significant mental health resources.[30]

In 2017, CDCR established an electronic system to track incidents of self-injury. Suicide prevention coordinators in each institution enter data about intent, medical severity, method, and disposition into the electronic health record system. The On-Demand reporting system generates a real-time report available statewide that can be used to track individuals and injuries across all settings.

In 2022, the system reported 5,382 separate incidents of self-injury by 1,973 unique individuals. The majority of these incidents (N = 4,674) resulted in no or minor injury. Most incidents of self-injury during 2022 (4,265 or 80% of all reported self-injury where the intent was known) were non-suicidal (Table 16). However, 377 (7%) were considered suicide attempts (self-injury with intent to die), of which 17 (0.3% of total incidents and 5% of all incidents with intent) resulted in death by suicide (Table 17). There were also 10 incidents where intent could not be determined. For reference, in 2021, the system reported 5,348 separate incidents of self-injury by 1,869 unique individuals. The majority of these incidents (N = 3,984) resulted in no or minor injury. Most incidents of self-injury during 2021 (4,573 or 86% of all reported self-injury where the intent was known) were non-suicidal. However, 493 (9%) were considered suicide attempts (self-injury with intent to die), of which 15 (0.3% of total incidents and 3% of all incidents with intent) resulted in death by suicide. There were also 282 incidents where intent could not be determined.

*Table 16: Non-Suicidal Self-Injury Incidents in CDCR by Mental Health Level of Care and Injury Severity, 2022 (excluding incidents with unknown intent)*

| Level of Care | No Injury | Minor | Moderate | Severe |
|---|---|---|---|---|
| GP | 25 | 41 | 17 | 2 |
| CCCMS | 129 | 308 | 51 | 5 |
| EOP | 342 | 1064 | 170 | 18 |

---

[29] Although two percent may appear small, across a national state prison population of more than 1.3 million individuals, two percent is more than 25,000 individuals who have self-harmed themselves

[30] Appelbaum, K., Savageau, J., Trestman, R., Metzner, J., & Baillargeon, J. (2011). A national survey of self- injurious behavior in American prisons. *Psychiatric Services 62*(3), 285. https://dx.doi.org/10.1176/ps.62.3.pss6203_0285

| Level of Care | No Injury | Minor | Moderate | Severe |
|---|---|---|---|---|
| MHCB | 224 | 628 | 72 | 3 |
| ICF | 191 | 534 | 59 | 3 |
| ACUTE | 197 | 571 | 76 | 11 |
| Total | 1108 | 3145 | 445 | 42 |

Of the 302 non-lethal incidents with intent to die, 109 (36%) had moderate or severe injuries ("serious" attempts). The majority of self-injury incidents with intent to die resulted in no or minor injury. Table 17 gives a breakdown of these incidents, including the ones which resulted in death in 2022. For reference, in 2021, of the 476 non-lethal incidents with intent to die, 156 (33%) had moderate or severe injuries ("serious" attempts). The majority of self-injury incidents with intent to die resulted in no or minor injury.

*Table 17: Self-Injury Incidents in CDCR with Intent to Die, by Mental Health level of Care and Injury Severity, 2022 (excluding incidents with unknown intent)*

| Level of Care | No Injury | Minor | Moderate | Severe | Death |
|---|---|---|---|---|---|
| GP | 8 | 11 | 6 | 3 | 2 |
| CCCMS | 14 | 37 | 28 | 9 | 9 |
| EOP | 17 | 41 | 33 | 8 | 5 |
| EOP Mod | 0 | 0 | 1 | 0 | 1 |
| MHCB | 14 | 20 | 10 | 3 | 1 |
| ICF | 12 | 10 | 4 | 0 | 0 |
| Acute | 6 | 3 | 3 | 1 | 0 |
| Total | 71 | 122 | 85 | 24 | 18[31] |

Of the 4,754 incidents of non-suicidal self-injury, 489 (10%) were classified as moderate or severe in medical severity. The most common methods of NSSI were lacerations followed by ingestion or insertion. More than 89% of the NSSI lacerations were classified as No Apparent or Minor Injury. For reference, in 2021, Of the 4,573 incidents of non-suicidal self-injury, 582 (13%) were classified as moderate or severe in medical severity. The most common methods of NSSI were laceration and ingestion or insertion. More than 87% of the NSSI lacerations were classified as No Apparent or Minor Injury.

## Suicide Response Procedures

The process of responding to and reviewing suicide deaths is governed by the MHSDS Program Guide, 2021 Revision, Chapter Ten: Suicide Prevention and Response (12-10-23 to 12-10-28), and internal timelines of the Suicide Prevention Unit of the Statewide Mental Health Program.

### Reporting of a suicide to stakeholders

When an inmate dies by suicide, members of the SMHP complete two formal notification processes. First, a death notification is written and sent to the OSM and contains details of the suicide. Second, a summary of the suicide is composed and sent to the Deputy Director of the SMHP and the Undersecretary of the

---

[31] Data from the analysis lists the number of deaths as 18 not 19.

DHCS as well as the Governor's office. The Public Information Officer at the institution is assigned with any local notifications or reports regarding the death, including notifying the next of kin of the suicide.

## Institutional internal review process

The internal process for reviewing suicides at CDCR institutions includes reviews by mental health, custody, and nursing/medical personnel employed at the site. The reviews are conducted first within disciplines and then within joint institutional reviews, such as during SPRFIT and emergency medical response committee meetings.

Each CDCR institution has a SPRFIT committee, chaired by a Senior Psychologist Specialist assigned to coordinate local suicide prevention and response efforts. The institution's SPRFIT is established and maintained by the Mental Health Program subcommittee, with both committees being part of local Quality Management Committee. Each institutional SPRFIT is responsible for monitoring and tracking all self-harm events and ensuring that appropriate treatment and follow-up interventions occur. When deaths by suicide occur, the local SPRFIT coordinator is required to notify the SMHP, provide assistance to mental health, custody, and nursing suicide reviewers, and ensure the implementation of any QIPs resulting from the suicide review.

## External review processes

CDCR's response to suicides includes external reviews by nursing, medical, custody, and mental health staff. Within three days of the suicide, headquarters reviewers from each discipline are assigned to review the case. The role of each discipline's review is discussed separately below, but these disciplines collaborate with each other during the suicide review process, sharing initial findings, conducting reviews together, etc.

Trained custody and mental health reviewers conduct an on-site visit together within seven days of a suicide. Reviewers inspect the decedent's property, listen to recorded phone calls, check trust account records, and talk with the institutional Investigative Services Unit (ISU). Reviewers evaluate emergency response actions and review the medical and mental health services rendered in the case, if applicable. Reviewers will also talk with officers, clinicians, work or school supervisors, and incarcerated peers who may have known the patient. Reviewers may gather information from other sources as well, e.g., interviews of family members. After a thorough documentation review, reports are generated and incorporated into the final report by each discipline, and this report is distributed and discussed during the SCR.

SCR meetings review findings in the case within and across disciplines while sharing information with institutional leadership. The Suicide Report contains QIPs that are presented at the SCR; these plans cross disciplines as well. Nursing, medical, and mental health disciplines additionally have peer review bodies that are able to review staff performance when indicated. The external review process is completed when all QIPs have been successfully implemented or resolved in the case.

## DAI Mental Health Compliance Team (MHCT) reviews

The reviews completed by DAI's MHCT focus on the performance of custody staff members related to the death by suicide. The MHCT member reviews custody documentation and institutional records (i.e., SOMS). The MHCT member's role is to determine whether departmental suicide prevention practices and

policies were followed by custody staff involved in the case. The MHCT reviewer, for example, evaluates whether custody staff followed procedure during the emergency response, how quickly the response was called once the suicide attempt was discovered, and whether all custody staff responding to the incident had received required training (e.g., in CPR) within set timelines (e.g., annually). The context of the suicide may necessitate additional review items. Most notably, if the individual was placed in a segregated housing unit at the time of the suicide, the MHCT reviewer will evaluate performance on tasks such as timeliness and quality of welfare checks, as specified by policy, whether inmates new to an ASU were placed in intake cells, and so forth. The MHCT reviewer also constructs a timeline for the emergency response and for significant events leading up to the suicide. Finally, the MHCT reviewer will document any concerns noted and will recommend corrective action/QIPs.

## Nursing reviews

At the same time as a death by suicide is reviewed by DAI's MHCT, a Nurse Consultant Program Reviewer (NCPR) is assigned by a Headquarters Chief Nurse Executive. The NCPR does not make an on-site visit but reviews all healthcare record documentation in EHRS as to the quality of nursing care in the case. All nursing suicide prevention practices including the Licensed Psychiatric Technician rounds are covered within the nursing review. The NCPR and mental health case reviewer frequently consult on cases during the review period.

The NCPR generates a Nursing Death Review Summary (NDRS). The NDRS lists the primary cause of death, notes whether coexisting conditions were present prior to the death, summarizes medical history, reports what medications and medical treatment the patient was receiving, and documents significant events that occurred medically for the patient prior to and at the time of discovery. The NCPR determines if nursing standards of care were met within the emergency response to the suicide and whether nursing standards of care were met in the overall medical care of the patient prior to the time of death.

## CCHCS Mortality Review Committee

The CCHCS Mortality Review Committee reviews all causes of inmate mortality within CDCR. When a suicide occurs, the Mortality Review Committee assigns a physician to serve as the medical reviewer. This physician works with the NCPR to examine all aspects of health care received by the patient and will yield an opinion as to the cause of death. As needed, the SMHP reviewer may also consult with the CCHCS physician reviewer. The physician and NCPR produce a Combined Death Review Summary (CDRS) on each case. The CDRS contains both an administrative review and a clinical mortality review of the case. In cases of suicide, the suicide report (discussed below) is reviewed by the Mortality Review Committee and addends or is integrated with the CDRS. The findings of the NDRS and CDRS are then considered by the CCHCS Mortality Review Committee for corrective actions on either an institutional or individual basis.[32]

## Statewide Mental Health Program (SMHP) reviews

Simultaneous to custody, medical, and nursing reviews, a trained member of the SMHP is assigned to review each suicide. The assigned Mental Health Suicide Reviewer, typically a Senior Psychologist Specialist, is tasked with completing a Suicide Case Review. The Mental Health Suicide Reviewer schedules an on-site visit with the institution and is accompanied by the custody reviewer. The site visit is conducted

---

[32] CCHCS Health Care Department Operating Manual (HCDOM), Sec. 1.2.10

within seven calendar days of the death. The site review consists of an inspection of the location of the suicide and of the means used in the death, an inspection of the decedent's personal property, and interviews of incarcerated peers, officers, medical, or mental health staff members who knew, interacted with, and/or treated the deceased. The decedent's property is inspected to see if there is any information present related to the suicide, such as a suicide note, letters to the inmate informing him/her of bad news, and other information associated with the death. Interviews focus on behavior and statements made in the days prior to the suicide, with questions about anything the decedent may have said about being distressed or suicidal in past days, weeks, or months. Photographs of the scene at the time of death and photographs of the autopsy are made available, as are phone records, trust accounts, toxicology reports, and other information. The Mental Health Suicide Reviewer may contact family members of the deceased to gain additional information about the individual's state of mind, statements made prior to the suicide, etc.

In addition to the on-site review, the Mental Health Suicide Reviewer reviews extensive documentation from medical and custodial files. The focus of the Mental Health Suicide Reviewer will vary based on the factors in the case, though all relevant information is reviewed in each case. In some cases, the review will concentrate on mental health treatment received while in CDCR; in others, on the quality of suicide risk assessment; in yet others, on the presence or absence of distress when an inmate is placed in administrative segregation, and so on. SMHP psychiatry staff review the psychiatric care and consult with the Mental Health Suicide Reviewer. The Mental health Suicide Reviewer will review information from each of the institutions where the deceased resided and will look at whether mental health policy and procedure was followed at each setting.

### Determination and tracking of QIPs

Each Suicide Case Review report may include formal QIPs as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing, medical, or mental health case reviewers. QIPs may represent areas of deviation from policy or procedure, departures from standards of care, or systemic issues that require examination, modification, or innovation. Occasionally a QIP will request that an institution's hiring authority determine whether a formal investigation take place involving one or more aspects of a death. QIPs may be written for any discipline and can focus on the specific institution where the suicide occurred, or at another institution where a decedent spent time during the final year of their life. If systemic issues are identified, the QIP can be directed to the SMHP SPRFIT, a team that can address statewide policies and practices. The DCHS SPRFIT team includes representatives from nursing, custody, legal, mental health, and mental health quality management. This representation allows the team to review issues and find solutions in a manner that is inclusive of disciplines and effective in addressing problems.

SCR meetings are held by teleconference so that staff from the institution can attend. During the meeting, the case reviewer will read sections of the Suicide Report. The Suicide Case Review Committee (SCRC) is made up of members of the CDCR SMHP, DAI MHCT, Nursing Executives, CDCR's Office of Legal Affairs, and medical personnel (as needed). The SCRC also discusses the QIPs raised within the Suicide Case Review with the institution. Institutional staff can respond to, or clarify, concerns raised in the report, can raise additional concerns, or can discuss ways of meeting the requirements of the QIPs. Since late 2015, experts from the *Coleman* OSM have participated in the SCR process and provided critiques of the preliminary draft report that have resulted in some revisions, including additional QIPs, of those reports.

QIPs can also be written as pending concerns that need to be addressed if a fact or finding awaits further information, such as awaiting the results of a coroner's report to determine the time of death.

## Timeliness of Suicide Case Reviews and Suicide Reports

The process of responding to suicides, completing reviews, writing, and editing reports, tracking QIP compliance, and so on, is complex. Timelines for each step of suicide response are specified in the MHSDS Program Guide, 2021 Revision. Internal deadlines have also been developed to ensure timelines for each step of the suicide response process are met. The number of days for each step of the response to a suicide as specified in the Program Guide are shown in Table 18.

*Table 18: Suicide Case Review Tasks and Timelines as Specified by the MHSDS Program Guide*

| Case Review Actions | Number of Days after the DoD within which the action must be completed |
|---|---|
| Suicide reviewer assigned | 2 |
| Site visit | 7 |
| Institutional Internal Review submitted to the SMHP | 10 |
| Custody & Nursing Report due to MH Reviewer | 22 |
| Suicide Report received by the SMHP | 25 |
| Suicide Case Review conference | 45 |
| Final suicide report to institution approved and signed by MH/DAI | 60 |
| QIPs completed at the institution and submitted to the SMHP | 60 (30 days from the receipt of the final report) |
| Final QIP Report reviewed and approved/signed by MH and DAI leadership | 120 |
| Final QIP report electronically transmitted to the OSM | 180 |

The SMHP tracks adherence with the tasks reported above for each suicide that occurs. Table 19 provides a review of the compliance of steps for the suicides that occurred in 2022.

*Table 19: Compliance with MHSDS Program Guide Timelines for Suicide Case Reviews*

| MHSDS Program Guide Timelines | Compliance |
|---|---|
| Suicide reviewer assigned | 79% |
| Site visit within 7 days | 16% |
| Institutional Internal Review submitted to the SMHP | 68% |
| Suicide Case Review conference | 58% |
| Final suicide report to institution approved and signed by MH/DAI | 74% |
| Final QIP Report reviewed and approved/signed by MH and DAI leadership | 94%* |

*Percentage is based on 18 out of 19 reports due to late notification of a death listed as suicide

In reviewing the timeliness of the reporting and review process for 2022 suicides: assignment of the suicide reviewer was completed within two days in 15 (79%) of 19 cases. Of the review team (mental health and custody) site visits, only three were completed within seven days of the date of the individual's death. At times, there are delays in scheduling site visits due to the availability of MH reviewer and DAI Lieutenants. Thirteen (68%) of the institutional internal reviews were submitted to the SMHP in a timely manner. It must be submitted within 10 days from the date of the death. A potential reason is that the institutional SPRFIT coordinators are not sure who they need to submit it to and send it to the wrong people and by the time it is received, it is late. To improve that process, the suicide prevention and response unit should issue a new memo with clear instructions on the format of the review and the process of its submission. Nine (47%) of reports were completed within 25 days of death and the remaining ten (53%), were completed, on average, within 42 days; averaging seventeen days past due. The delays were likely due to the complexity of the cases. The average time for a draft report to be transmitted to the OSM was 30 days from the date of death. One report was sent 43 days after the date of death. Eleven SCR meetings (58%) were held on time. Four (21%) additional meetings were held within one week of the required timeframe. The remaining four late meetings ranged from 12 to 15 days late due to the complexity of the cases. For instance, for one of the meetings, a delay was necessary due to extensive records of the decedents as well as additional training for the reviewer on the case.

After suicide reports are reviewed at the SCR meeting, final edits are completed, and a finished report is sent to the institutions within 60 days after the date of death. In 2022, fourteen reports (74%) were sent to institutions within 60 days. The remaining five reports were sent between 62 to 67 days, being overdue between two to seven days. QIPs are required to be reported back to headquarters where they are reviewed and eventually transmitted to the OSM. The timeframe for return of completed QIPs to headquarters is 120-days post death. In 2022, 17 (94%)[33] reports were returned by the 120-day mark. One report was returned after the 120-day mark, at 155 days. This particular case required an addendum to be added to the original report with the addition of two QIPs.

There were some cases that were complicated that led to missed timelines due to the complexity of a specific case. Many of the cases are complex, in nature, and these were barriers that reflect that the failures to meet the timelines were not in CDCR control and were exclusively the result of the case itself. CDCR continues to aim to improve timeliness and meet SCR deadlines as soon as possible.

## Audits of Suicide Case Review quality

The SMHP's Suicide Prevention and Response Unit audits all SCRs for quality and adherence to a standard set of fifteen elements, found in Table 20. The Suicide Case Reviews are scored with required elements marked as present or absent. SCRs are audited for the presence or absence of 15 elements considered necessary for an adequate review. The 15 elements can be found in Table 20. Of the SCRs completed in 2022, only one audit item fell below 100%.

The compliance rate in 2022 was 99%. One category fell below 100% compliance. The rest of the categories that were at 100% compliant: The quality of the past-year's suicide risk assessments and the Quality Improvement Plans recommendations being adequate to address the concerns. Not all cases have all audit items, and so the number of applicable cases is often less than the number of total cases over

---

[33] Percentage based on 18 out of 19 suicides due to late notification of a death listed as suicide.

the three years. The audit was completed by SMHP staff who do not write SCRs but do participate in the review of cases. Audit results are presented in Table 20.

*Table 20: Results of Quality Audits, 2022 Suicide Case Review Reports*

| Audit Item | Applicable Cases | Compliance |
|---|---|---|
| 1. Does the Executive Summary describe the means of death, the emergency response taken, and the Mental Health (MH) LOC of the patient? | 19 | 100% |
| 2. Are the sources for the Suicide Case Review (SCR) identified? | 19 | 100% |
| 3. Are substance abuse issues reported, if applicable? | 18 | 100% |
| 4. Does the Institutional Functioning section include information on institutional behavior, including disciplinary history? | 19 | 100% |
| 5. Does the Mental Health History review the adequacy of mental health care and screening? | 19 | 100% |
| 6. Are medical concerns discussed (e.g., chronic pain, terminal illness) or is the absence of medical conditions noted? | 19 | 100% |
| 7. Is the quality of the most recent suicide risk evaluations (past year) reviewed, with comment on risk level, safety planning, and risk and protective factors? | 15 | 93% |
| 8. Does the Suicide History section review all prior attempts, as applicable? | 14 | 100% |
| 9. Are significant pre-suicide events discussed (e.g., receipt of bad news or existence of a safety concern)? | 19 | 100% |
| 10. Was a risk formulation offered specific as to why the person was vulnerable to suicide? | 19 | 100% |
| 11. Does the review comment on the adequacy of the emergency response? | 19 | 100% |
| 12. Are all violations of policy and breaches of standards of care in mental health, medical, and nursing addressed in the reviewer's concerns, if applicable? | 19 | 100% |
| 13. Were custody policies followed? If not, were violations noted in the report? | 19 | 100% |

| Audit Item | Applicable Cases | Compliance |
|---|---|---|
| 14. Were all concerns raised by reviewers (custody, nursing, and mental health) represented in Quality Improvement Plan recommendations? | 19 | 100% |
| 15. Were the Quality Improvement Plan recommendations adequate to address the concerns? (e.g., QIP should not simply say conduct an inquiry and report findings). | 19 | 100% |
| Compliant Items/Total Items | 275 | 99% |

## Analysis of Improvement Efforts

The purpose of assigning quality improvement plans is to ensure remediation occurs for policy violations or deviations from standards of care.  It is essential to close the feedback loop when a QIP is assigned to demonstrate improvement in practice. This section describes the tracking of QIPs to include the proportion of QIPs by discipline, commonalities in individuals SCRs, and efficacy in QIPs.

### Determination and Tracking of Quality Improvement Plans

QIPs are developed based on concerns or departures from policies and procedures identified by custody, nursing, medical, and mental health case reviewers regardless of whether the concern or departure led to the suicide. The plans are designed to remedy specific issues raised within each review, though in some cases the plans developed address statewide policy or prevention initiatives. Once a QIP has been assigned to an institution, the assigned party has 60 days from the receipt of the final report to determine the action that will resolve the identified problem and provide proof of practice that remediation was completed. Historically, this is where the process ended. The Suicide Prevention and Response Unit at Mental Health Headquarters would review the documentation and determine if it was resolved, assuming all relevant information was provided. Figure 9 shows the proportion of QIPs assigned by discipline for 2020, 2021, and 2022.

*Figure 9: Proportion of Suicide Case Review QIPs by Discipline, 2020, 2021, and 2022*



CDCR has recognized that this process does not allow for a full determination that the remediation was effective at reducing future incidences of similar non-compliance and/or policy violations. With the allocation and hiring of the Suicide Prevention Coordinators in each region, which was finalized in June 2021, CDCR was able to begin developing the process of monitoring QIP efficacy. A more robust feedback loop to track the ongoing efficacy of the interventions employed by an institution was in its infancy. The Suicide Prevention Coordinators in each of the regions track all QIPs after they have been completed by the institutions in their regions. During their regular onsite monitoring, the coordinators will report on the ongoing status of the originally identified deficiency and discuss with the institutional SPRFIT Coordinator any concerns. An institution is determined to be compliant if, after two consecutive onsite visits, the issue appears to have been resolved in a sustained manner. Each case is unique, therefore, some QIPs will have no follow up because of the nature of the QIP while other QIPs will be closed after one review. Different QIPs have different standards for compliance. For example, poor justification of risk in a SRASHE can require auditing, training, and reauditing which could also be done throughout the CAT audit process for specific clinicians. Another example is if there was a missed Guard 1 Check during the time of the death would require the completion of the 989 processes. In 2022, there were five 989 referrals for further investigation open, all for Custody cases. There were two issues with welfare checks, two issues with a failure to respond to the incident in a timely manner, and one issue with 1:1 observation. Compliance may be demonstrated through direct observation or review of documentation, by the Suicide Prevention

Coordinator, of the noted concern noted in the QIP. It can also be demonstrated through improved rates of compliance on automated metrics, if applicable. If an institution continues to demonstrate non-compliance with an issue that was identified as a QIP, a formal CAP will be assigned, and the institution will be required to establish a new intervention to improve performance in a sustained manner or the institution may be directed to add it to their project pipeline.

As the statewide Suicide Prevention and Response Unit reviews issues that arise in Suicide Case Reviews, it also identifies issues across institutions that appear to be systemic and necessitate intervention at an agency level, rather than relying on institutions to resolve the concerns locally.  When these issues emerge, the statewide SPRFIT Committee will take on the onus of remediation and the development of statewide solutions. This can come in the form of policy language revisions, introduction of new policies or procedures, or development of new programs or interventions.

In 2022, of the 123 QIPs assigned, 66 were MH-related, 29 were Custody-related, 34 were Nursing-related and 2 were Multidisciplinary. While this totals 131, the grand total is 124 QIPs as some of the QIPs assigned were assigned jointly between disciplines. For instance, a 911 activation QIP can be jointly assigned to Custody and Nursing as both disciplines have different roles in how that QIP should have been handled.  For the majority of the QIPs, the expectation was for the institutional leadership to identify remediation and resolve the concerns within their respective institution. Institutional leadership, tasked with ensuring timely completion of actions deemed necessary to address the concerns identified in the QIP, implemented specific remediation following the suicide case review call with stakeholders. Once these remedial efforts are made, the suicide prevention coordinators assigned to each region notate the action and conduct their own reviews of the originally identified deficiency during their regular onsite reviews. Once an institution has demonstrated sustained compliance, measured by their own metrics and with external reviews by the statewide suicide prevention team, the QIP is deemed to be effective in resolving the specific issue.   Two of the QIPs were assigned to headquarters to address, as they were systemic concerns. For comparison, in 2021, of the 110 QIPs assigned, 61 were MH-related, 31 were Custody-related, 17 were Nursing-related and 1 was Multidisciplinary.

## Headquarters-Assigned QIPs

One HQ QIP was related to safety planning deficiency. Safety planning has been an area of focus at the statewide level because of ongoing universal concerns, therefore, a revision to the safety planning policy and training was initiated. As such, the QIP required HQ to provide a status update regarding the implementation of the Safety Plan Policy/Procedure and form anticipated for December 2022. The supporting documentation required HQ would outline in a memorandum the progress of the implementation of the Safety Plan Policy/Procedures and training. The status update indicated that the safety plan training-for-trainers (T4T) was scheduled to begin on February 15, 2023. The associated policy and procedure were scheduled to be released to the field on February 13, 2023 and the form went live in EHRS on February 27, 2023. Once the T4T concluded in March 2023, sites had 90 days from the date of the T4T they attended to roll out the training to all clinical staff at their respective institutions. The anticipated end date for this roll out will be October 2023.

The second HQ QIP involved multiple clinical concerns that were identified in a specific case that included: underestimation of psychotic symptoms, connection of substance abuse and ongoing noncompliance with treatment to the decedent's mental illness, underestimation of suicide risk, lack of consultation between medical and mental health providers, lack of appropriate treatment goals and IPOCs, and

unclear review of records. The QIP required that the HQ SPRFIT and Training units shall provide a Learning Management System (LMS) training to mental health clinicians regarding differential diagnosis and complex case formulation. Areas of focus in this training include recognition of psychotic symptoms, substance abuse concerns complicating diagnosis, accurate risk assessment with uncooperative patients, and the importance of record review and consultation in complex cases. Once this training has been developed, it will be placed on LMS and will be required for all primary clinicians statewide. The supported documentation require that HQ will develop the LMS training and will provide the training materials as part of the QIP response. Once HQ has released the training on LMS, all clinicians will have a specified period of time in which to complete the training and 844s will be required to demonstrate completion. The status outcome provided that HQ SPRFIT team and the HQ Training Unit have commenced to draft the training. Once developed, the training shall be placed on the LMS, and is slated to take approximately two hours in a self-paced online format. This training is expected to be completed and placed on LMS by October 23, 2023. Clinicians at institutions statewide will be expected to complete this training by February 15, 2024.

In 2021, two of the QIPs were assigned to headquarters to address, as they were systemic concerns. One HQ QIP was completed by the regional coordinator who went out to the institution to train on documentation and determination of clinically appropriate issue and observation levels for patients in inpatient settings. The second HQ QIP involved the HQ tele-psychiatry unit, which is working on a policy to help with concerns about no-show appointments. As previously stated, tablets have begun to be utilized and psychiatrists in the field found this to be helpful in reducing refusals for psychiatry appointments. This should continue to be monitored to establish sustained progress. There was a third HQ QIP that was not a systemic concern, in that it was not identified across multiple suicides, rather it is an issue that was found to be part of a broader initiative CDCR was undertaking as it pertains to gender identity of the incarcerated population. This QIP resulted in a training developed by HQ to specifically address the clinical significance of appropriately documenting the correct gender identified by a transgender individual. The training was implemented, and no further issues were identified.

## Institution-Assigned QIPs

Many QIPs were issues that were handled by their respective institutions. These QIPs involved training and mentoring that was needed to help prevent, among other things, issues with documentation and knowledge and application of policy. The addition of the Suicide Prevention Coordinators in 2021 help address these ongoing issues. The coordinators monitor their assigned institutions to determine if there are trends within the institution on reported deficiencies. Additionally, they assess for any delays and barriers to the implementations of the QIP. Some concerns which arose in more than one suicide case review or at more than one institution are considered at the statewide level to explore whether there are systemic issues that need to be addressed.

An in-depth review was conducted to determine if there were any pervasive issues within an institution that had more than one death by suicide in 2022. CMC had four individuals who died by suicide. CMC had a total of 14 QIPs:  6 MH QIPs, 5 Custody QIPs, and 3 Nursing QIPs (one joint with Custody and one joint with Pharmacy). There was no overlap between the individuals' QIPs, meaning no two individuals had violations of the same, or similar nature which would have led to repeated QIPs. This is dissimilar than last year which saw overlap with two individuals. Six MH QIPs involved three individuals with the following issues: Clinical Decision-Making Concerns, Confidentiality Setting, DDP Issues, Psychiatry PG Timelines, MH Documentation, and IDTT Issues. The five Custody QIPs involved two individuals with the

following issues. 911 Activation (joint with Nursing), Cut Down Tool/Kit, Emergency Response, Rigor Mortis, and Security/Guard 1 Checks. The three Nursing QIPs involved two individuals with the following issues: Emergency Response, 911 Activation (joint with Custody), and Medication Issue (joint with Pharmacy).

KVSP, SVSP, and LAC each had two individuals each die by suicide. KVSP had a total of 14 QIPS: 7 MH QIPs, 6 Custody QIPs, and 1 Nursing QIP. There were commonalities among the two cases pertaining to institutional issues. Regarding MH, both individuals had QIPs for Treatment Planning. For both individuals, there were concerns with four MH Master Treatment Plans. The QIP stated that KVSP shall 1) review the authoring clinician's documentation for 5 inmate-patients over a 12-month period (to include initial assessments, treatment plans, progress notes, and suicide risk assessments) to determine if this issue represents an ongoing pattern; and 2) based on the results of this review, the Chief of Mental Health shall determine the best course of action, which may include additional training to address any deficiencies. The results of the audit showed that the MH Treatment Plan and Progress Notes authored by the clinician did not clearly reflect the progress of mental health symptoms over time, they were not individualized consistently across all of the cases reviewed and in one instance was missing IPOCs. Additional training for the clinician was recommended, however the clinician in question left state service. Supervisors continue to audit treatment plans and provide training when necessary. Regarding Custody, both individuals had QIPs for 911 Activation and Staff Action Concern. For both individuals, the activation of the Emergency Medical System (calling 911) did not take place until approximately five minutes and seven minutes, respectively, after the emergency was observed.  The outcome of these two QIPs for the first decedent resulted in the Health Care Unit Captain referring the employee to the Office of Internal Affairs by filing out CDCR form: Causes of Adverse Action. The outcome of these two QIPs for the second decedent resulted in the Health Care Unit Captain providing the employee with corrective action, via a Letter of Instruction for the 911 Activation QIP and On the Job Training for the Safety Concern QIP.

SVSP had a total of 9 QIPs: 7 MH QIPs, 1 Custody QIP, and 1 Nursing QIP. There were no commonalities among the two cases pertaining to institutional issues.

LAC had a total of 16 QIPs: 10 MH QIPs, 1 Custody QIP, 3 Nursing QIPs, and 2 Multisystem QIPs. There were no commonalities among the two cases pertaining to institutional issues. Of significance, LAC was the only institution to have Multisystem QIPs in 2022. Multisystem QIPs consist of more than one system, either within the institution or headquarters which they work in conjunction to complete a QIP. The Multisystem issues were Justification of Risk, which is joint with LAC MH and Policy Issue/Violation, which is joint with training units. Both Multisystem QIPs were discussed in depth earlier in this section.

The Statewide Suicide Prevention and Response Unit reviews these trends regularly to determine if intervention is required. Work remains to refine the various concerns identified above and specific work is underway to address these concerns. For example, an ongoing concern that has been found across many suicide case reviews at nearly all institutions is adequate suicide risk justification. The current suicide risk evaluation has been an item under consideration for revision to assist clinicians in making more accurate risk justifications and streamlining the process of gathering critical information to aid in this decision making. As a result, in 2022, a workgroup convened with the *Coleman* OSM, representatives from CDCR Statewide Mental Health Program, and field leadership to review the current SRASHE form and make recommendations on how to improve the form. The workgroup is continuing to develop a new suicide risk evaluation for the field to use that addresses correctional-specific suicide risk factors and enhances clinicians' ability to assess and reduce suicide risk.

Once an institution has been assigned a QIP, the local leadership is tasked with developing the remediation necessary to ensure sustained correction has been achieved for the identified concern. Table 21 summarizes the actions taken by either individual institutions or Headquarters. The table below shows the breakdown by discipline of issues that were identified more than twice, which could be viewed as a pattern of concern. Of importance, the number of issues represents the number of instances in which the concern was present, not different individual decedents. The issues identified are generated from the QIP descriptors (Appendix B). For example, there are 10 instances of issues with MH Treatment Planning similar to 2021 however, in 2022, these issues came from 9 decedents whereas last year these issues came from only three of the 15 decedents.

*Table 21: Frequency of QIPs at Institutions Experiencing Suicide, 2022*

| Discipline | Issue Identified | Frequency of QIPs | Institutions Involved | Action Taken |
|---|---|---|---|---|
| Mental Health | Treatment Planning | 10 | RJD, CCI, KVSP (2), SATF, SVSP, VSP, LAC, WSP, CMF | Audit conducted; Training provided |
| | MH Documentation | 5 | NKSP, SAC, CMC, CTF (2) | Audit conducted; Training provided |
| | PIP Frequency of Contacts | 5 | KVSP, CMF-PIP (2), SVSP-PIP, SQ-PIP | Training provided; Chief Psychiatrist will conduct ongoing reviews to ensure proper documentation |
| | Continuity of Care/ Clinician to Clinician Contacts | 4 | RJD, SVSP, LAC, VSP | Training provided |
| | Level of Care | 6 | RJD, KVSP, LAC, SVSP, CMF, CHCF,COR | Training provided |
| Custody | 911 Activation | 5 | KVSP (2), CMC, CMF-PIP, VSP | Training provided; Investigation opened in 1 of the cases |
| | Emergency Response | 4 | RJD (3), CMC | Training provided; Investigation opened in 1 of the cases |
| | ASU Policy/CDCR 114 issues | 3 | SAC (2), RJD | Training provided |
| | Staff Actions Response | 3 | KVSP (3) | Training provided; Investigation opened in 1 of the cases |

| Nursing | Nursing Documentation | 18 | RJD, SVSP, WSP, KVSP, SAC, NKSP (2), LAC, CMF-PIP (2), SQ-PIP (3), VSP (2), CMF, COR, CHCF | Training provided; Supervisors working with IT to allow updates to EHRS; Letter of Correction |
|---|---|---|---|---|
| | Checks/Rounds | 6 | RJD (2), SAC, CMF, LAC, VSP | Training provided; Weekly chart review completed by supervisors |

## Commonalities in Individual Case Reviews

In 2022, the most frequent Mental Health QIPs were: Treatment Planning at 10 QIPs, Level of Care at 6 QIPs, MH Documentation and PIP Frequency of Contacts at 5 QIPs each, and Continuity of Care/Clinician to Clinician Contacts at 4 QIPs. Figure 10 shows the Mental Health QIPs for the last three years.

*Figure 10: Most Frequent Mental Health QIPs, 2020-2022*



In 2022, the most frequent Custody QIPs were: 911 Activation at 5 QIPs, Emergency Response at 4 QIPs, and ASU Policy/CDCR 114 Issues, Policy Violation and Staff Action Concerns at 3 QIPs each. Figure 11 shows the Custody QIPs for the last three years.

*Figure 11: Most Frequent Custody QIPs, 2020-2022*



In 2022, the most frequent Nursing QIPs was Nursing Documentation at 18 QIPs. Second to Nursing Documentation was Nursing Checks/Rounds at 6 QIPs. Figure 12 shows the Nursing QIPs for the last three years.

*Figure 12: Most Frequent Nursing QIPs, 2020-2022*



In 2022, the two Interdisciplinary QIPs were: Policy Violation and Justification of Risk at 1 QIP each. Figure 13 shows the Interdisciplinary QIPs for the last three years.

*Figure 13: Most Frequent Interdisciplinary QIPs, 2020-2022*



Table 22 shows the QIPs by Institution in 2021 and 2022. In parenthesis are the number of suicides that occurred at the respective institution in that specific year. In 2022, RJD had 17 QIPs assigned to the institution. LAC had a total of 16 QIPs assigned to the institution. KVSP had 14 QIPs assigned to the institution. Some institutions such as: SATF, CCI, RJD, SVSP, SVSP-PIP, CMF, CMF-PIP, and VSP had QIPs in both 2021 and 2022.

*Table 22: QIPs by Institution, Number of Suicides in Parentheticals, 2021-2022*

| Institution | 2021 | 2022 |
|---|---|---|
| SATF | 7 (1) | 3 (1) |
| CCI | 2 (1) | 3 (1) |
| CMC | 0 | 11 (4) |
| NKSP | 0 | 5 (1) |
| WSP | 0 | 4 (1) |
| KVSP | 0 | 14 (2) |
| SAC | 0 | 8 (1) |
| CTF | 0 | 3 |
| LAC | 0 | 16 (2) |

| RJD | 4 (1) | 17 (1) |
|---|---|---|
| SQ | 1 (1) | 0 |
| SQ-PIP | 0 | 4 |
| SVSP | 15 (1) | 9 (2) |
| SVSP-PIP | 14 (1) | 1 |
| CHCF | 0 | 5 |
| CHCF-PIP | 5 | 0 |
| CIW | 2 (1) | 0 |
| CIW-PIP | 7 | 0 |
| CMF | 4 | 6 (1) |
| CMF-PIP | 5 | 12 |
| ISP | 2 (1) | 0 |
| CCWF | 8 | 0 |
| VSP | 3 (1) | 8 (1) |
| CAL | 1 | 0 |
| COR | 0 | 3 |
| CIM | 13 (3) | 0 |
| MCSP | 5 (2) | 0 |

Case reviewers found a number of commonalities among the 19 suicides in 2022. Most of these variables are complex systemic issues that cross disciplinary and professional lines. Case reviews assess elements such as an individual's care, functioning, and behavior in the year leading up to their death and evaluate the institutional response to the suicide attempt.

When an element is found to be lacking or of poor quality, the reviewer will almost always recommend implementation of a QIP. Risk assessments are scrutinized closely to make sure they capture the essential elements and are accurate reflections of the individual's risk state. Other elements of cases may or may not result in QIPs, depending on the severity of deviation from policy and procedure, how directly the element is related to the suicide death, and other issues tangential to the suicide. In SCR reports, reviewers *may* comment on what was done well within an institution and *may* state areas where policy was correctly followed. However, these comments are not required, as the expectation is that staff members follow policy and will act professionally in all of their work with individuals. In contrast, reviewers *must* identify departures from policy or from standards of care by creating formal QIPs

applicable to each identified issue. Reviewers may also point to clinical, medical, or custodial practices that could be improved either at an institutional level or throughout all institutions; these practice suggestions can be addressed through QIP processes as well. Institutional responses to QIPs are sent to the SMHP and DAI leadership for review. If a QIP response is inadequate, the SMHP and DAI will request clarification, additional development, or implementation of the QIP. QIPs are not considered final until approved at the Headquarters level.

Poor quality mental health treatment planning can affect an individual's ability to adequately program in the prison environment. Suicide risk assessment and formulation of risk is an important aspect of treatment planning. Additionally, if suicide risk is not recognized by clinicians and their team, then adequate management of that risk is not possible. Of the 19 suicide cases in 2022, 53% were subsequently judged by case reviewers to have had inadequate treatment planning. Issues identified by the reviewers included poor discharge planning from inpatient settings, insufficient efforts in dealing with the patient's poor treatment participation, and inadequate recognition of and efforts to deal with chronic suicidal ideation. Specific to Mental Health, there were 5 issues with MH Documentation, 5 concerns with PIP Frequency of Contacts, 4 issues with Continuity of Care/Clinician to Clinician Contacts, and 6 questions about Level of Care Issues.

Mental Health and Nursing had issues with documentation. Mental Health had 5 instances of improper documentation while Nursing had 18 instances. Specific to Nursing, nursing documentation attributed to over 50% of the QIPs assigned to Nursing. As part of Nursing's efforts to address the documentation issues they implemented several monthly and quarterly audits as well as provided training to ensure compliance on nursing deficiencies. Effective January 2023, the process of monthly audits of the Initial Health Screening was implemented in R&R areas, to ensure screening and documentation is completed consistent with policy.  Institutional nursing leadership provided a summary of deficiencies and corrective action plans, if applicable. Suicide watch audits are conducted monthly utilizing the MH Observation Reporting Tool and the compliance percentage of suicide watch documentation is submitted monthly. Effective February 2023, the practice of submitting these audits to the institutional SPRFIT Coordinator was implemented. Regional CNEs present the results of these audits to the HQ SPRFIT Committee monthly. Headquarters Nursing continues to meet with Regional CNEs and RHCEs to discuss the results of the audits to monitor operations for overall compliance. In April 2023, MH Nursing HQ's team provided eight MH Nursing Training Webinars. These trainings were created to assist with documentation compliance and with the monitoring of Suicide Watch and Suicide Precaution.Regarding Custody, a prompt, vigorous, and timely emergency response can save a life. The response of staff is considered in CDCR's ratings of emergency response. Reviewers had concerns focused on emergency response in 9 instances for 6 individuals, during 2022 to include emergency response (4) and delay to call 911 (5). In the first case, the activation of Emergency Medical System (calling 911) did not take place until approximately five minutes after the emergency was first observed and reported. In the second case, which resulted in three separate QIPs being issued, it was noted custody staff failed to respond to the incident location in a timely manner. In the third case, the activation of the Emergency Medical System did not take place until approximately six minutes after the emergency was observed. In the fourth case, the activation of the Emergency Medical System did not take place until approximately seven minutes after the emergency was first observed and reported. In the fifth case, it appeared that multiple staff members failed to positively identify live breathing flesh when conducting security welfare checks. Medical documentation clearly indicated the presence of rigor mortis in various areas of the decedent's body upon being removed from the cell. In the sixth case, there was a 12-minute delay in initiating the 911 call. This specific QIP was joint with Nursing. All cases resulted in providing training for those staff involved. In a couple of cases, staff was referred for further investigation.

Regarding Nursing, the delay in activation of 911 and lack of complete emergency medical response documentation was noted.  Mental Health (MH) Nursing Leadership met with the Emergency Medical Response Program (EMRP) HQ team to review the 2022 QIP's related to emergency response.  The EMRP initiated the program and training in 2021 and has continued through 2023 statewide. Twenty-two institutions have completed the EMRP and the training continues to be in a variety of phases at our remaining institutions. The institutions that received the training in 2021 did not have nursing QIPS related to emergency medical response in 2022. The institutions identified to have had incidents pertaining to emergency medical response are in the process of completing the EMRP training. EMRP training continues to be provided at the institutional level, annually, and as needed to ensure adherence to policy.

There were also commonalities when comparing 2021 QIPs to 2022 QIPs. SATF, CCI, RJD, SVSP, SVSP-PIP, CMF, CMF-PIP, and VSP all had QIPs assigned to them in 2021 and 2022. CCI and SVSP-PIP were the only two that did not have repeat issues in both years. RJD had the most repeated issues in 2021 and 2022. Those issues included: MH Documentation, Emergency Response, Cut Down issues, Custody Training, and Nursing Documentation. SVSP had concerns with Program Guidelines, Psychiatry No Referral for Non-Compliance, Level of Care issues, and Treatment Planning in both 2021 and 2022. VSP had Program Guidelines, 911 Activation, and Nursing Checks/Rounds concerns in both 2021 and 2022. CMF had Treatment Planning and SRE/Justification of Risk concerns in both 2021 and 2022. SATF had concerns with Program Guidelines in 2021 and 2022. CMF-PIP had concerns with PIP Frequency of Contacts in both 2021 and 2022.

## Efficacy of Quality Improvement Efforts

The regional Suicide Prevention Coordinators track adherence to QIPs. They are in constant contact with the institutions and make quarterly visits. The coordinators provide training when appropriate and follow up on the QIPs assigned to their respective institution to ensure outcome results. Many of the institutions have provided additional training to staff members as part of the action required for the majority of the QIPs. This is consistent through the disciplines of MH, Custody, and Nursing. Furthermore, in Mental Health, supervisors at the institution have completed audits of treatment plans by random selection. The coordinators continue to keep up with the institutions to reach a level of compliance to remediate the QIPs, specifically if there are multiple QIPs in any given institution.

MH QIPs were followed up by the coordinators in their respective regions where the outcomes were tracked. If the QIP was remedied it was closed and if the QIP was not remedied, it would be re-assigned as a CAP. In 2022, there was one MH QIP, in Region III, that was assigned as a CAP. The QIP involved an individual housed in the MHCB unit and the individual's level of observation was changed to once-every-30-minute checks and was issued partial clothing. On October 29, 2013, the Divisions of Adult Institutions and Health Care Services issued a memorandum requiring (in part) that "Inmate-patients not on suicide precautions or watch" receive full clothing issue ("blues") "unless a clinical determination is made and documented … that there is a clinical reason these items should not be issued." No such documentation was found in clinical documentation for the individual. The HQ SPRFIT coordinator for Region III became aware of this issue and has a CAP in place as there continues to be concerns with this issue. The coordinator provided the institution with the following HQ memorandums: Clarification of allowable property for patients on suicide watch, April 24, 2020; Level of observation and property for patients in Mental Health Crisis Beds, March 15, 2016; State-issued clothing and bedding for mental health inmate-patients in the mental health crisis bed and outpatient housing unit, October 29, 2013 and its revision dated February 14, 2017; Mental Health Crisis Bed Privileges, June 23, 2016. Also provided were training

materials and examples addressing proper documentation of justification of issue and observation orders. The institution's MHCB supervisor provided this training to a sample of MHCB clinicians on November 9, 2022. However, a recent audit that was conducted by the coordinator suggested that weaknesses in this area persisted. As such, the coordinator provided a training on February 1, 2023. This training included the MHCB supervisor, the institutional SPRFIT coordinator, and the MHCB clinicians, some of whom had not received the training in November. That training material was shared with the institution.

In region 1, there were 2 suicides in 2022 which resulted in 11 MH QIPs that were completed with training of staff and audits of documentation.

In region 2, there were 9 suicides in 2022 which resulted in 31 MH QIPs. Trainings to staff and audits of documentation were provided for most of these QIPs. In one QIP, the individual was seen by the DDP Psychologist to assess his cognitive functioning and adaptive support needs. Documentation from both contacts indicated that the individual would receive follow up appointments to complete the California Adaptive Support Evaluation (CASE) in order to determine inclusionary criteria for the DDP.  However, it appears the patient did not receive follow up appointments and the CASE was not completed. The action taken was for the institution to review the DDP referral process and propose a detailed plan of action that will ensure DDP referrals are addressed within the required 21-day timeframe. As a result, a clinician was promoted to Sr. Psychologist Specialist who will devote approximately a quarter of their time to DDP CASE assessments.  ASU Supervisor and DDP Coordinator will properly assign and train ASU clinical staff to conduct required weekly DDP contacts so DDP Coordinator has more time to devote to CASE assessments. Facility specific supervisors now screen DDP 7362's so that the DDP Coordinator is only required to respond to appropriate DDP referrals.

In region 3, there were 8 suicides in 2022 which resulted in 23 MH QIPs. The majority of the QIPs were completed and closed. There are three QIPs currently open, one of which was a CAP that was discussed above. The first two QIPs involved a treatment plan that was nearly identical to prior treatment plans. There was also an absence of pertinent clinical updates in the clinical summary and case formulation section of the treatment plan regarding the individual's functioning or presentation. An audit was conducted as well as memorandum detailing the results of this audit (including dates and CDCR numbers of charts reviewed), and all actions taken to address this QIP.  As a result, the institution developed and provided a thorough IDTT refresher training that was presented. Follow up to these QIPs include this training to be presented on an ongoing basis to new hires at this institution thus requiring these QIPs to remain open for monitoring purposes.

In region 4, there was one suicide in 2022 which resulted in 6 MH QIPs, all of which have been completed and closed. Of these QIPs, one was open after the initial review by the coordinator and eventually closed after additional follow up from the coordinator. The institution created a new training entitled "Clinical Documentation and Required Processes" which addressed referrals to adjunctive therapy as well as documentation requirements while the individual is waiting for the treatment to begin. At the time of the subsequent coordinator review, there were five pending referrals for adjunctive therapy.  All five charts clearly documented that the patients had been referred for additional treatment. Additionally, all of them clearly indicated that the treatment would be delayed as the interns would not be available for treatment until a later date in 2022 which was a significant improvement from the June 2022 review, therefore, the coordinator closed the QIP.

# Progress of Suicide Prevention Efforts in CDCR

Senate Bill 960 (Leyva) (Chapter 782, Statues of 2018) added Penal Code Section 2064.1 to require CDCR to submit a report to the Legislature on or before October 1 of each year, to "include, among other things, descriptions of progress toward meeting the department's goals related to the completion of suicide risk evaluations, progress toward completion of 72 hour treatment plans, and progress in identifying and implementing initiatives that are designed to reduce risk factors associated with suicide." The bill requires the report to be posted on the Department's Internet Web site. The following sections delve into each category required of CDCR in Senate Bill 960.

## Progress Toward Completing Adequate Suicide Risk Evaluations

It is CDCR's goal to ensure that adequate and appropriate suicide risk evaluations are completed accurately and timely. The Suicide Risk Assessment and Self-Harm Evaluation (SRASHE), a set of electronic forms in the Electronic Healthcare Record System (EHRS), is the primary way that suicide risk evaluations are documented. The SRASHE is composed of 1) a standardized set of questions about suicide-related ideation and behavior – the Columbia-Suicide Severity Rating Scale;[34] 2) a review of the individual's history of self-injury; 3) a checklist of risk and protective factors and warning signs; 4) a risk formulation and its justification; and 5) a safety plan,[35] when clinically indicated. Under CDCR's policies, a suicide risk evaluation is conducted whenever any individual expresses suicidal ideation, makes suicidal threats, or makes a suicide attempt at a number of key evaluation points and during known high risk times.

The initial mental health evaluations for placement in the MHSDS, while problematic in the past, did not present an issue in 2022. The SREs had deficiencies, particularly as they relate to under estimation of risk and repetitive SRASHEs. Despite training and other remedial efforts, improvement has not been sustained. Thusly, a workgroup comprised of experts from the OSM and CDCR was convened to review the current SRASHE and recommend revisions to the form to address these ongoing concerns. The communication across disciplines with mental health assessments have become more problematic in recent years and it continues to be a problem in 2022. There were two instances of miscommunication in 2022 – one between psychiatry and custody and the other between the suicide prevention coordinator and the psychiatric social worker.

## Risk Evaluation Audits Using the Chart Audit Tool

The SMHP uses a standardized audit method — the Chart Audit Tool (CAT) — for evaluating the quality of key mental health documents, including suicide risk evaluations (Appendix A). Audits are conducted on a quarterly basis, with results available to the mental health leadership at institutions, regional mental health administrators, and headquarters. A sample of risk evaluation forms are audited quarterly for quality. In addition, each mental health clinician's risk evaluation form is audited twice per year for completion and quality, using criteria first proffered by the California State Auditor in its 2017 report.[36] The pass rate is 85%.  In 2022, institutional compliance rates show that the pass rate fluctuated 68% and 71% which is similar to 2021 which saw rates between 66% and 73%. For reference, in 2020, the rates were between 50% and 74%. Common reasons for a risk evaluation form to fail an audit include poor

---

[34] See: https://cssrs.columbia.edu/

[35] A safety plan includes a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicides is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician can take if suicidal thoughts do occur.

[36] See: https://www.auditor.ca.gov/pdfs/reports/2016-131.pdf page 23

justification of suicide risk, under-estimation of suicide risk, and non-individualized safety planning. Currently, statewide figures still fall below the pass rate. A detailed description of one of the primary tasks CDCR is undertaking to improve the quality of the suicide risk evaluations is provided below. Figure 14 shows the rates of the SRE audits as they are broken down by semesters for 2020-2022.

*Figure 14: Suicide Risk Evaluation Audits, 2020-2022*



### Suicide Risk Assessment Training and Mentoring

In 2021, CDCR began considering possible revisions to the suicide risk evaluation. In early 2022, a workgroup was created and comprised of CDCR Headquarters staff, institution leadership, and experts from the OSM to review alternatives to the form. The workgroup's purpose was to refine the risk evaluation's utility and to enhance its efficacy for patients who are in crisis. Additionally, in 2022 CDCR finalized significant changes to the suicide risk evaluation mentoring program, which included revised policy and procedural language as well as a new comprehensive assessment tool for mentors to use when providing the mentoring to other clinicians. For 2022, the rate of compliance was 95%. For reference, in 2021, the rate of compliance was 94% and in 2020, despite suspension of live training for some time due to the COVID-19 pandemic, the rate of compliance system-wide remained over 95%. Figure 15 shows mental health staff compliance with SRASHE from 2020-2022.

*Figure 15: Compliance with Suicide Prevention and SRASHE Core Competency Building, 2020-2022*



Figure 16 shows the mental health staff compliance with SRE Mentoring from 2020-2022. There was a decrease of 10% in compliance from 2021 to 2022. The decrease was likely due to the roll out of the new SRE mentoring training that occurred in 2022.



*Figure 16: Compliance with SRE Mentoring, 2020-2022*



## Progress Toward Completing 72-Hour Treatment Plans in a Sufficient Manner

CDCR recognizes that patients in acute crisis require timely treatment to address their mental health symptoms. The treatment plan is an individualized plan that identifies patient-specific treatment and individualized treatment goals to address the patient's clinical needs. Patients in crisis are transferred to a MHCB unit, where an evaluation and initial treatment plan is developed within 24 hours of admission.[13] To ensure the inpatient treatment is appropriately targeting the patient's risk factors and symptoms the treatment team must develop an initial treatment plan that maps out the interventions that will be employed to reduce the most distressing symptoms. It is CDCR's goal to ensure that a full treatment plan

in MHCB units is completed for all patients within 72 hours of admission.[37]  The 72-hour treatment plan is discussed in the patient's Interdisciplinary Treatment Team (IDTT) meeting in the MHCB unit, which the patient attends. Treatment teams are composed of, at a minimum, the patient's assigned psychiatrist and primary clinician (typically a psychologist), a member of the MHCB unit nursing staff, a correctional counselor and the patient. The team members are responsible for ensuring that the treatment plan created is within timelines and meets the quality standards set by CDCR.

In 2017, the State Auditor's Report cited the completion and quality of the 72-hour treatment plans in MHCB units as a chief concern. The State Auditor noted several incidents where sections of the 72-hour treatment plans were left blank and reported several other deficiencies. Those deficiencies included: inadequate treatment methods, including a lack of information on the frequency of interventions and who was responsible for the intervention; poor post-discharge follow-up plans; poor treatment goals or goals without measurable outcomes; and missing documentation of medication dosage and frequency.

CDCR expends considerable resources on training for staff to apply appropriate treatment team processes and quality treatment planning. Quarterly audits are conducted both in person by Regional Mental Health teams and in quarterly chart documentation audits. Training[38] designed to improve the quality of 72-hour treatment planning was developed and delivered during 2019 and 2020 in all institutions that have MHCB units. The training emphasizes the importance of the treatment plan to MHCB supervisors and clinicians. The training focuses on the role of the 72-hour treatment planning conference in suicide prevention and crisis resolution and reinforces good treatment team practice and high-quality documentation. The training, which is currently ongoing e, complements existing treatment team process training. The documentation is audited through the CAT process and the Mental Health Compliance teams continuous work with the institutions to review compliance and implement CAPs for ongoing deficiencies.

## Audits of Treatment Plans

Mental Health Crisis Bed treatment plan audits are required for both 72-hour treatment plans and discharge treatment plans. Results of the chart audits are monitored by regional and institutional mental health supervisors and managers. Audits review and assess whether a summary of mental health symptoms and treatment is present; whether the diagnosis and clinical summary are consistent with the problems found; whether medications are listed that target symptoms; if the goals and interventions include individualized, measurable objectives; if progress was discussed among team members and with the patient; if there is a meaningful discussion of a discharge plan or future treatment needs; if the rationale for the level of care is sound; and whether the plan is updated to reflect current functioning. Audits of the treatment plans are conducted by clinical supervisors or senior psychologists who oversee the programs. Auditors use findings to provide feedback to staff and to develop plans to improve documentation.

The audit results related to quality of MHCB treatment planning documentation during 2022 ranged from 65% to 74% of MHCB treatment plans complying with all audit criteria.[39] There were 211 audits conducted in the first half of the year with a 74% pass rate and 48 audits in the second half of the year with a 65% pass rate. Of importance, the CAT was made optional due to staffing shortages. Additionally, CAT audits

---

[37] MHSDS Program Guide page 12-5-12 17
MHSDS Program Guide page 12-5-11
[38] Other IDTT Trainings currently exist, such as "IDTT: An overview of the clinical thinking and process," a seven-hour training for treatment planning for all levels of care.
[39] Due to the COVID-19 emergency, CAT audits were halted in Q2 2020

are not court mandated. In 2021, the pass rate in the first half of the year was a 67% pass rate and 73% in the second half of the year. Figure 17 shows the results of Semester Audits of MHCB Treatment Plans for 2021 and 2022.

CDCR has set a pass rate of 85% for audited treatment planning documents. Institutions with pass rates under 85% are required to develop and implement corrective action plans to remedy the quality of their documentation for all audits that are included in the statewide performance improvement priorities. Currently, quality of suicide risk evaluations is included as one of the priorities, and corrective action plans are sent to Regional Mental Health leadership each month. Institutions may also set Performance Improvement Work Plans to prioritize treatment plan quality through the site's Quality Management Committee. In 2021, several initiatives were implemented to improve the CAT audit process. Specifically, webinars for the field have been streamlined to focus on how to conduct a CAT audit and how to achieve inter-rater reliability. Methodology and traceability are both being further defined through a larger data remediation effort, in collaboration with the *Coleman* Special Master.

*Figure 17: Results of Semester Audits of the Quality of MHCB Treatment Plans, 2021-2022*



### Timeliness of MHCB Treatment Plans

The timeliness of MHCB treatment plans is tracked by CDCR's Performance Report, a tool used for quality management purposes. Timeliness is defined by policy as whether a treatment planning session occurred within 72 hours of admission for initial treatment plans, and then within seven days following the initial treatment planning session for routine treatment plans. In 2022, the overall timeliness of treatment plans completed by MHCB treatment teams was 95%. Over 19,000 MHCB treatment team sessions were conducted, with 8,527 Initial or 72-hour, and 10,848 Routine treatment plans completed. Timeliness of routine treatment plans in MCHBs, including discharge treatment plans ranged from 97% to 98% in each half of 2022. The compliance for initial treatment plans were 92% in each half of 2022.[40] For reference, in 2021, the overall timeliness of treatment plans completed by MHCB treatment teams was 95%. Over 18,000 MHCB treatment team sessions were conducted, with 7,089 Initial or 72-hour, and 11,223 Routine treatment plans completed. Timeliness of routine treatment plans in MHCBs, including discharge

---

[40] Performance Report "Timely IDTTs" data extracted on 3/24/2023

treatment plans ranged from 97% to 98% in each half of 2021. The compliance for initial treatment plans ranged from 93% to 94% in each half of 2021. This was a slight increase from 2020 where the timeliness of routine treatment plans in MHCBs, including discharge treatment plans ranged from 89% to 95% in each quarter of 2020 and the compliance for initial treatment plans ranged from 91% to 93% in each quarter of 2020. Figure 18 displays the timeliness of MHCB Interdisciplinary Treatment Teams for 2020 – 2022.

*Figure 18: Timeliness of MHCB Interdisciplinary Treatment Teams, 2020-2022*



## Progress Toward Ensuring That All Required Staff Receive Training Related to Suicide Prevention and Response

CDCR has a number of suicide prevention and response trainings, some of which are required for all staff members and others that are customized for specific disciplines. Some suicide prevention training is meant to be provided over a brief period, such as training on a new procedure or an updated form. Other suicide prevention training is meant to be ongoing, used both as a way for new employees to learn suicide prevention and response practices and to update staff members about their responsibilities in these areas.

CDCR has efforts underway to improve how staff training is tracked. These efforts range from granular, institution-specific generation of compliance data and tracking, with supervisors expected to ensure staff's compliance in completing training, to broad efforts to adopt sophisticated training compliance tools using the intra-departmental Learning Management System (LMS). The LMS is a computer-based teaching and tracking tool that provides online training with options for offering recorded video and for requiring embedded knowledge checks. Each staff member is notified via email of the need to complete required trainings. The email includes a link to the LMS site. The LMS automatically records information about training completion status, which is accessible to the SMHP and CDCR's Division of Adult Institutions for compliance tracking.

Revisions to existing In-Service Training (IST) curricula were completed and adopted by CDCR's Office of Training and Professional Development (OTPD) in late 2019. Subsequently, live training for new IST

facilitators was conducted in all regions in May and July 2021. The mental health and suicide prevention training for the correctional officer academy courses was revised during 2020 and was first delivered to cadets in June 2021.

CDCR has a system in place to identify and remedy the lack of compliance. When individual employees are non-compliant with required training, non-compliance is identified by IST offices at institutions via the use of compliance tracking logs. Lists of non-compliant staff are sent to the supervisors of each discipline. For CCHCS employees, compliance is tracked with the LMS. The CCHCS Staff Development Unit reports this data directly to the SMHP, which then sends the information to the institutional Chief Executive Officers (CEOs). This information is also given to the regional Suicide Prevention and Response Focused Improvement Team (SPRFIT) coordinators who can follow up with the local institutions.

In addition to the annual training delivered to all disciplines and new employees, custodial officers and nursing staff receive additional suicide prevention and response trainings. Compliance with required cardiopulmonary resuscitation and Basic Life Support classes is also tracked for potential first responders (custody and nursing), psychiatrists, and psychiatric nurse practitioners.[41]

CDCR provides broad training in suicide prevention and response to all employees upon their initial hiring and annually thereafter. Suicide prevention training is provided through the IST departments at all institutions. In its 2017 report, the State Auditor identified variable attendance[42] at this training between disciplines, with custodial attendance percentages often above those of mental health and other health care personnel. Improved compliance with this training is noted within all staff disciplines. In 2022, 43,084 staff members were required to take this training: of these, 23,280 custody staff and 9,786 health care staff completed the training, with an overall compliance rate of 96% for custody and 89% compliance rate for health care staff.[43]  Specific to mental health, 1,660 of the 1,836 active mental health staff completed the training, a 90% compliance rate. For reference, in 2021, 43,963 staff members were required to take this training: of these, 20,804 custody staff and 12,319 health care staff completed the training, with an overall compliance rate of 85% for custody and 90% compliance rate for health care staff.  Specific to mental health, 1,828 of the 1,928 active mental health staff completed the training, a 95% compliance rate.

In an effort to ensure that medical and mental health program staff comply with annual training requirements, Headquarters and Regional Mental Health staff track compliance and send updates and reminders to CEOs, Wardens, Chief Nursing Executives, and Chiefs of Mental Health. These institutional leaders are responsible for ensuring that their staff are attending required training. Compliance data about suicide prevention-specific trainings is reviewed by the statewide SPRFIT Committee and non-compliance results in the regional Suicide Prevention Coordinator working with the institution to establish corrective action. While data is not yet available to analyze the impact that the regional Suicide Prevention Coordinators' CAPs for institutions have had on compliance for 2022 annual suicide prevention training, CDCR is hopeful this approach will prove successful.

Mental health clinicians receive a significant number of additional tailored suicide risk evaluation and risk management classes as a requirement of employment. For mental health staff, the training related to suicide prevention is mandatory and tracked for compliance. Several additional training courses are available to CDCR clinicians as optional trainings. These courses provide mental health clinicians with

---

[41] Memorandum dated 12/3/18, *Psychiatry and Psychiatric Nurse Practitioners Basic Life Support Certification,* tracking occurs through the Credentialing and Privileging Support Unit.

[42] www.auditor.ca.gov'/pdfs/reports/2016-131.pdf pages 43-45; 55-57.

[43] Data on custodial staff is from Division of Adult Institutions and Clinical Support. Data for CCHCS and SMHP staff are from Clinical Support. Health care staff include mental health, medical, nursing, ancillary, and administrative staff and does not include staff on long-term leave.

opportunities to enhance skills when evaluating or working with suicidal patients. Several of these courses have Continuing Education Units (CEUs) available as well.

In 2019, CDCR introduced a comprehensive Safety Planning Initiative training to address ongoing concerns related to deficient safety planning found in both internal and external audits of suicide risk assessments. Additionally, CDCR updated and delivered the seven-hour Suicide Risk Evaluation course in 2019. Institutions are required to train newly hired mental health clinicians within 90 days on the topic of suicide prevention and institutional mental health leadership is responsible for tracking completion of required training within this period. Figure 19 displays the compliance percentages with IST Suicide Prevention Training for Custody Staff for 2020 – 2022. There was an increase of 11% from 2021 to 2022.

*Figure 19: Compliance with IST Suicide Prevention Training, Custody Staff, 2020-2022*



Figure 20 displays the compliance percentages with IST Suicide Prevention Training for Healthcare Staff for 2020 – 2022. Healthcare staff includes both Mental Health and Medical providers. There was a slight decrease from 92% in 2021 to 89% in 2022.

*Figure 20: Compliance with IST Suicide Prevention Training, Healthcare Staff, 2020-2022*



Figure 21 displays the compliance percentages with IST Suicide Prevention Training for Mental Health Staff for 2020 – 2022. There was a slight decrease from 95% in 2021 to 90% in 2022.

*Figure 21: Compliance with IST Suicide Prevention Training, Mental Health Staff, 2020-2022*



Figure 22 displays the compliance with Suicide Prevention and SRASHE Core Competency Building Training for 2020 – 2022. The figure displays the total number of MH staff and the number of staff trained. The number of MH staff decreased from 1442 in 2021 to 1301 in 2022. There was also a decrease in the staff trained from 1349 in 2021 to 1231 in 2022.

*Figure 22: Compliance with Suicide Prevention and SRASHE Core Competency Building Training, 2020-2022*



Figure 23 demonstrates compliance with Safety Planning Training for 2020 – 2022. The graph displays the number of MH staff and the number trained. In 2022, there were 1,301 MH staff and 1,231 (95%) were trained.

*Figure 23: Compliance with Safety Planning Training, 2020-2022*





Figure 24 demonstrates compliance with SRE Mentoring Training for 2020 – 2022. The graph displays the total number MH staff as well as the staff trained. In 2022, there was 1,087 MH staff. Of these, 805 (74%) were trained. The decrease in staff trained can be attributed to the staff shortages statewide. Specifically, some institutions experienced a loss of certified mentors, which impaired the ability for new clinicians to be mentored. Further, a loss of clinical staff at institutions resulted in increased need for primary clinicians to focus on providing direct patient care, which resulted in less time allotted for mentors to mentor other clinicians.

*Figure 24: Compliance with SRE Mentoring Training, 2020-2022*



## Progress in Implementing the Recommendations Made by the Special Master Regarding Inmate Suicides and Attempts

On July 12, 2013, the *Coleman* court ordered CDCR, the *Coleman* Plaintiffs, and the Special Master to convene a Suicide Prevention Management Workgroup. In 2015, the Special Master's expert, Lindsay Hayes, made 32 recommendations related to suicide prevention practices, which were ordered to be implemented by the court that same year[44]. Since 2015, CDCR has worked to implement the recommendations made by the workgroup and continues to meet with the OSM's experts to discuss progress on those recommendations. In 2018, three of those recommendations were withdrawn[45].

The OSM's expert has completed six audits since 2013 and has issued reports for each of these audits. Mr. Hayes' fifth re-audit covered 23 prisons and the five psychiatric inpatient programs (PIPs) managed by CDCR. He visited these institutions between May 2021 and April 2022. The final report was submitted to the *Coleman* court in October 2022[46] and adopted by the Court in January 2023. In this report, the Special Master's expert notes that CDCR has not fully implemented 15 of the 29 recommendations.

For the items that remain not fully implemented, CDCR continues to work with individual institutions to find sustainable solutions for each of the below items.

### Initial Health Screening and Receiving and Release (R&R) Environment

The purpose of this recommendation is to ensure that all individuals entering a CDCR facility receive an initial health screening, in a confidential setting, which includes specific questions targeted at understanding the individual's suicide risk. A standardized screening was introduced in 2018, which by and large, resolved this portion of the recommendation, although adherence to asking all required questions does occur periodically. This is due to ongoing compliance concerns related to nursing not asking all of the required questions on the health screening. Additionally, there are areas of non-

---

[44] Electronic Court Filing (ECF) 5259, filed 1/14/15, and ECF 5271, filed 2/3/2015
[45] ECF 5762, filed 1/25/2018
[46] ECF 7636-1, filed 10/24/2022

compliance related to not maintaining a confidential space by leaving the door open. For example, until the completion of construction at NKSP and WSP, the swing space used during construction led to ongoing deficiencies related to non-confidential setting. The 4th re-audit found continued problems related to confidentiality and privacy in the screening environment. Mr. Hayes found that 15 of 20 institutions audited had adequate screening practices in their R&R areas, similar to his previous findings. In the 5th re-audit, Mr. Hayes acknowledged that CDCR met the requirements for Recommendation 6 – Intake Screening should be conducted in only the nurse's office within the R&R unit.

Five institutions have open CAP items related to confidentiality and physical plant issues in R&R areas. California Correctional Institution (CCI) has identified an interim solution to its physical plant issues and the Region III suicide prevention coordinator monitored their progress toward a permanent solution until completion. NKSP and WSP worked towards completion to be fully compliant by the end of May 2023. Currently, construction of the new clinics has been completed at both institutions and R&R nursing screens are now being done in a confidential setting at both NKSP and WSP-RC. PVSP has completed its physical plant modifications and all R&R screenings are occurring in a confidential setting. In the 5th re-audit, Mr. Hayes found that the issues from the prior re-audit at CMC, CMF and SQ were resolved, but CCI continued to have problems, as well as four other facilities (CSP-SAC, NKSP, PBSP, and WSP).

## Psychiatric Technician Practices

Mr. Hayes has identified the quality and consistency of required Psychiatric Technician (PT) rounds in restricted housing units.   A process of ongoing fidelity checks of rounding has been implemented at each site under the supervision of the Chief Nursing Executives. Further, quarterly audits of PT rounds are conducted and reported to the institutional SPRFIT committees and forwarded to the statewide SPRFIT Committee with recommended remediation reported, as necessary.  In his most recent 5th re-audit report, Mr. Hayes identified compliance rates of 86% as opposed to 75% compliance found in the 4th re-audit. He found deficiencies at the CIM, SATF, and SQ institutions.

## Use of Suicide Resistant Cells for Those Newly Admitted to Administrative Segregation

Individuals placed in administrative segregation are to be housed in single-occupancy suicide resistant intake cells for the first 72 hours of their placement. They may occasionally need to be placed in non-intake cells, which is permissible, if housed with another individual.

Mr. Hayes' Fifth Re-Audit report recommended CDCR to develop CAPs at CCI, CMF, SATF, and CSP-LAC in order to ensure the institutions adhere to policies surrounding the use of the intake cells. Previously Mr. Hayes' Fourth Re-Audit report noted problems with seven institutions related to either retaining inmates in intake cells for longer than 72 hours or placing some new arrivals in administrative segregation in non-intake cells. Mr. Hayes recommended CAPs be developed for the seven institutions to create "additional retrofitted cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available."[47]

---

[47] ECF 7636-1, filed 10/24/2022

The 2020 Budget Act included funds to convert 64 existing ASU cells in 14 institutions to ASU intake cells. Design efforts for these conversions were underway in late 2020. Design and construction continued through the entirety of 2021. As of March 30, 2022, all new intake cell conversions have been completed.

In addition to construction of new intake cells, the Division of Adult Institutions (DAI) created an automated report in its Strategic Offender Management System (SOMS) to track the usage of the intake cells at each institution. This report allows DAI to recognize when institutions are using the intake cells appropriately, transferring inmates out of intake cells timely, and when they are in need of additional intake cells. A formal announcement of this report was released to all institutions in April 2023.

## MHCB Practices for Observation Status, Clothing, and Privileges

Three issues related to MHCB practices have been identified by Mr. Hayes: Problems with nursing documentation of observation of suicidal patients, errors in allowable property for patients, and the provision of out-of-cell activities and other privileges (e.g., access to a telephone).

In the fifth re-audit, multiple facilities were audited and were found to have "problematic practices regarding Privileges for Inmates in MHCBs, ranged from MHCB patients not receiving out-of-cell activities due to their maximum-security custody status, misunderstanding/misinterpretation of COVID-19 quarantine directives, incorrect belief that patients could only receive out-of-cell activities when they were approved for 'full issue' clothing, and clinical misuse of safety smocks." OSM stated there was regression in compliance in comparison to the fourth re-audit which found improvements in a number of institutions. Regional teams continue to audit the suicide observation practices in MHCBs across the state.

In collaboration with CCHCS Quality Management, Nursing Services developed an automated reporting tool that allows institutional leadership and regional/headquarters staff to look at real-time compliance with suicide precaution rounding orders.  This report provides patient-level data to look at how many of the rounds were missed and the length of time between each rounding. Information in this reporting tool is used to develop focused improvement projects at the institutional level to improve compliance.

As of June 2021, physical plant renovations at COR, CCWF, and WSP to allow out-of-cell time for MHCB patients are either completed (WSP), in the design phase (CCWF), or are being monitored by the regional suicide prevention coordinator. CDCR's Facility Planning, Construction and Management (FPCM) is finalizing a proposal for renovations at a third institution (COR).

In addition, several institutions (SOL, LAC, and SATF) have made changes to local procedures to ensure that observation schedules, out-of-cell privileges, and proper patient issue are in compliance with statewide policy, although these findings are inconsistent with Mr. Hayes' fifth re-audit. Regional suicide prevention coordinators actively monitor these institutions.

## Mental Health Referrals and Suicide Risk Evaluations

When there is an emergent or urgent referral due to a patient reporting suicidality, in every case, it is expected that a mental health clinician conducts a suicide risk evaluation prior to determining the best course of action to address the patient's crisis. Mr. Hayes audits this process and given the acute risk for patient safety, a compliance rate of 100% is expected. In the previous audit of institutions (2018), Mr. Hayes found a compliance rate of 74% for the 23 institutions audited. In his 2020 report, he notes that

seven of 20 institutions remain out of compliance with completion of suicide risk evaluations when required. There is also a sub-component of ensuring that referrals with suicidality are appropriately classified as emergent. In the fifth re-audit, Mr. Hayes "found that only 61 percent (14 of 23) of audited facilities achieved over 90 percent compliance with the required completion of SRASHEs. The nine facilities under 90 percent compliance were: CIM, CMC, CSATF, CSP/LAC, KVSP, MCSP, NKSP, SVSP, and WSP. Only one (SQ) of the 23 facilities was at 100 percent compliance with this measure. This finding was slightly lower than the preceding assessment, which found 65 percent of facilities were over 90 percent compliance.[48]

Changes were made to the EHRS to ensure that when orders for Urgent Mental Health Consults are placed by a clinician, the clinician may not include self-injurious behavior or suicidal ideation as a reason for the consult. This change in the EHRS was completed in the winter of 2021 and was available to users in February 2021. In addition, monthly audits of Emergent and Urgent consults are being completed by the regional suicide prevention coordinators and then reported to the statewide SPRFIT committee. For 2022, the coordinators found that the institutions were at 99% compliance on MH Consults for Suicidality Ordered as Emergent.

## Suicide Risk Evaluation Trainings

Suicide risk assessment is the process of conducting risk assessment that include interviewing the individual, record review, conduct collateral contacts, case formulation, risk determination, and safety plan. The Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) and the Safety Planning Intervention (SPI) are included in the Suicide Risk Evaluation (SRE). The SRASHE is an electronic tool to input suicidality and self-harm information to assist in determination of the individual's overall chronic and acute risk. The SPI is intended to help individuals lower their imminent risk of suicidal behavior.  In 2022, compliance with required suicide risk evaluation trainings was 95% statewide, indicating that 1,231 of the 1,301 Mental Health staff were trained.

## Safety Planning for Suicidal Individuals

In both 2017 and 2018, OSM experts noted difficulties with the quality of safety plans written within suicide risk evaluations. During discussions, CDCR and the OSM experts agreed to supervisory[49] monitoring of all safety plans written in suicide risk evaluations at the time of discharge from MHCB. The number of safety plans reviewed is dependent upon the number of discharges per week at any given institution. The supervisory reviews are designed to ensure that MHCB discharge safety plans were of good quality, reflected consultation with receiving treatment teams when indicated, and helped to ensure risk management efforts were described effectively.  Over the course of 2022, CDCR identified that there remains deficiencies in many institutions with the completion of these supervisory reviews. In some instances, the supervisors are not completing these reviews on a regular basis; in other institutions, the supervisors have conducted the reviews on an intermittent basis. In still other institutions, the supervisors are conducting the reviews but there are significant concerns about the efficacy of those reviews, as they demonstrate results that are inconsistent with the reviews conducted by external auditors' review of the same discharge safety plans. As such, the SMHP has reviewed the process for these reviews and developed

---

[48] ECF No. 7636-1, page 35
[49] While MHCB program supervisors are the most likely reviewers of discharge safety plans, at times a qualified designee, such as a SPRFIT coordinator or covering Sr. Psychologist, Supervisor or Specialist may act as a reviewer.

some modifications to data collection and will be finalizing a performance metric related to timely completion of the reviews.

In the fourth re-audit of 20 institutions, OSM experts found deficiencies in the safety planning process at a majority of the institutions visited. In collaboration with OSM experts and other members of the OSM, CDCR began a process in the fall of 2020 to re-design the safety plan intervention. In the fifth re-audit of 23 institutions, OSM experts stated that "although most of the audited facilities had compliance rates over 90 percent for safety planning intervention (SPI) training, the SPI model was problematic and is being replaced, thus a new training program is required". During the time of the audits, CDCR reviewed policy language and built the necessary forms in the EHRS. CDCR also tested the new format at several institutions to test its utility and determine if outcomes improved. It was finalized, approved, and implemented in February 2023.

## Inpatient and Alternative Housing Discharge – Efficacy of Custody Welfare Checks and Five Day Follow-Ups

When patients are discharged from Alternative Housing, inpatient beds in CDCR's PIPs and DSH, or an MHCB, custody officers in housing units upon which the patient returns to, must complete welfare checks every 30 minutes for at least 24 hours. After the first 24 hours, a mental health clinician must evaluate the patient and notify the housing officers about the patient's adjustment to the unit. This process can re-occur at 24-hour intervals for up to 72-hours. Additionally, when a patient is discharged from either Alternative Housing or an MHCB, mental health clinicians must re-evaluate the patient daily, recording their assessment on a Five-Day Follow-Up form. The form requires clinicians to ask about suicidal thoughts, signs of distress, while instructing the clinician to review MHCB discharge documents, and to review and/or revise the patient's safety plan.

In early 2020, discussions began about modifications to the Inpatient and Alternative Housing Custody Check Sheet, CDCR 7497 form and the necessary training. By late 2020, the form had been finalized and was approved pending labor notifications and approval. The new form was released to the field in the spring of 2021. A standardized audit tool and guide was also released to the field in summer 2021, which requires institutional mental health and custody staff to review the CDCR 7497 forms for compliance on barriers to full compliance with policy. Any deficiencies found in this auditing process will be reviewed by the regional Suicide Prevention Coordinators. The process of auditing is ongoing.

In the fifth re-audit, OSM experts stated that "low compliance rates were found in almost all audited facilities regarding mental health clinician requirement to accurately complete Page 1 of the 'Discharge Custody Check Sheet' (CDCR MH- 7497) form". CDCR continues to audit this indicator in all institutions. Given the continued struggles at many institutions, SMHP and DAI have initiated a workgroup to study common reasons for deficiencies in order to develop a plan to improve compliance.

## Local Suicide Prevention Programs

A critical component of any suicide prevention program is a governing body that continually assesses the quality of the program and takes necessary action to resolve deficiencies. The quality of the local SPRFIT Committees continues to be an area of focus for Mr. Hayes.  In 2020, the Statewide Mental Health Program, in coordination with CCHCS Quality Management, initiated a workgroup to begin to enhance the institutional SPRFIT committees. This workgroup included representatives from the suicide prevention unit within the SMHP, CCHCS QM, regional mental health teams, and the OSM. By 2022, the workgroup

members had developed a comprehensive package of training materials, automated reports, measurement plans and schedules, and administrative support tools designed to utilize validated quality management techniques for improved committee functioning. All required members of the SPRFIT Committees from every institution received a four-day training, known as the SPRFIT Committee Reboot, by the end of 2022.  In addition to the quality of the institutional SPRFIT Committee, the fourth re-audit report recommended prioritizing the completion of local operating procedures and High-Risk Management Programs. In addition, the OSM experts recommended further work with the local institutions on "bad news" policies and implementing the Root Cause Analysis (RCA) policy, which is currently being reviewed for possible changes. While the RCA policy is being reviewed for possible changes, institutions continue to be required to complete thorough reviews of all serious suicide attempts.

## Continuous Quality Improvement (CQI)

CDCR, in consultation with the OSM experts, has agreed to monitor 19 suicide prevention audit items through a CQI process. In 2018, CDCR worked with the OSM on a final CQI report format. The Court adopted Mr. Hayes' recommendation that his 19 suicide prevention audit measures be included in the CQI process in the Third Re-Audit Report[50]. This format integrates suicide prevention audit findings with other CQI assessments, with the comprehensive group of findings detailed in a written report. The CQI Tool (CQIT) involves reviewers from multiple disciplines within each institution (e.g., custody, nursing, and mental health disciplines) to ensure that the audit is done comprehensively. A self-audit guidebook containing these items was distributed to institutions. The CQIT is currently under discussion with the *Coleman* Special Master and plaintiffs' counsel.

In the fourth re-audit report, OSM experts restated the necessity of including all 19 audit items in any tool or report used to evaluate an institution's suicide prevention program. As part of the collaboration between CCHCS quality management and SMHP quality management, a manual self-assessment tool has been developed for institutions to conduct their own reviews of the health of their suicide prevention programs and identify areas for improvement, which is part of the SPRFIT re-boot. Simultaneously, the SMHP has created suicide prevention onsite guidebook to allow the regional Suicide Prevention Coordinators to complete reviews of the suicide prevention programs across the state. This onsite guidebook utilizes approved CQIT indicators and also incorporates additional qualitative assessments related to various aspects of suicide prevention policies and procedures.

In the fifth re-audit, the OSM experts offered no new recommendations, instead reiterated from the last report "that 'CDCR immediately: (1) incorporate all of this reviewer's 19 "Suicide Prevention Audit Checklist" measures into any CQI Guidebook, and (2) any CQI audit report of an individual facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures.' To date, although a suicide prevention audit guidebook is in a first draft, CDCR has not yet implemented either of these recommendations." CDCR has drafted a Suicide Prevention On-Site Audit Guidebook, which incorporates all of Mr. Hayes' recommendations. This guidebook has been reviewed by Mr. Hayes and he has indicated general approval of the guidebook.  Due to the intersection between many of the indicators in this guidebook and the data remediation project underway, as required by the *Coleman* court, full implementation of the guidebook cannot be completed until the data remediation of all items in that guidebook has been finished.

---

[50] ECF No. 5993-1

## Suicide Prevention Training

Mr. Hayes attended selected in-service training (IST) annual suicide prevention classes held within audited institutions. He opined that the course content was too large for a two-hour class, yet still did not include important topics. Mr. Hayes made recommendations for course content that has been since integrated into a revised training. The revised training was reviewed by Mr. Hayes and sent to the OTPD in the spring of 2020 for review. It was approved in August 2020 and the new revision was released to the field in January 2021.

In the fifth re-audit, the OSM experts stated that "with the exception of CMF-PIP and CHCF-PIP, high rates of compliance with annual suicide prevention training for custody, medical, and mental health staff were found in the other three PIPs.  In addition, all of the PIPs had high compliance rates for safety plan training. Both CIW-PIP and SQ-PIP had high compliance rates for mental health clinician completion of both SRE mentoring program and the seven-hour SRE training, whereas clinicians at CMF-PIP, CHCF-PIP, and SVSP-PIP had compliance rates under 90 percent for both the SRE mentoring program and the seven-hour SRE training." In his fifth re-audit report, the OSM experts recommended that eight institutions (CMF, CCWF, CHCF, CTF, CSP-Solano, NKSP, RJD, and SVSP) develop CAPs to improve training compliance that had completion rates under 90 percent for both the seven-hour SRE training and SRE mentoring program training. In the SPRFIT Committee Meeting held on January 23, 2023, it was reported that the training compliance at the 8 institutions were: CMF at 89% (CMF- PIP was at 95%), CCWF at 100%, CHCF at 97% (CHCF-PIP was at 88%), CTF at 96%, CSP-Solano at 94%, NKSP at 77%, RJD at 97%, and SVSP at 100% (SVSP-PIP was at 76%).

The mental health program's training unit, which tracks training compliance for all suicide prevention trainings, reports that in 2022 the overall compliance with the seven-hour suicide risk evaluation training was 95%. The overall rate for IST suicide prevention training was also over 90% for the entire system in 2022. Training for suicide risk evaluation mentoring was 74% for the year and compliance with safety planning intervention training was 96%. The regional Suicide Prevention Coordinators work with institutional SPRFIT Coordinators to establish corrective action for deficiencies.

## Reception Centers

Reception Centers are prisons where individuals committed to CDCR are received from county jails for initial processing. There was a cluster of suicides in Reception Center institutions in 2018. Some of the issues identified as impacting suicide prevention in reception included inconsistent posting of suicide prevention posters and difficulties receiving jail mental health records in a timely manner. Regional Mental Health Compliance Teams are directed to inspect reception center institutions for suicide prevention posters on a routine basis. The SMHP released a memorandum to the field in January 2021 providing direction to reception center mental health clinicians regarding expectations for obtaining and reviewing jail records for newly received individuals.

The THRIVE program, developed to assist individuals adjusting to living in an institution, is underway at WSP and NKSP. CDCR's Division of Rehabilitative Programs (DRP) has been working with subject matter experts within CDCR to develop an orientation for offenders in Reception Centers. DRP's goal is to place modules and video content on eReader tablets that will be checked out to offenders. The modules provide an overview of credit earning, rehabilitative programs, basic institutional rules, appeals process, disability policies and procedures, financial responsibilities, and family visiting. DRP has been working with SMHP to develop a module specifically informing offenders how to take care of their physical and mental health

while in prison. The development of this module for the THRIVE program was initially halted in 2020 due to the COVID-19 pandemic but work on the program has resumed. The program continues to be offered at the reception centers via the eReader tablets. Additionally, at NKSP, Peer Mentor Literacy mentors assist with the instruction.

In the 5th re-audit, Mr. Hayes provided no new recommendations, rather restated his recommendation from the 4th re-audit that "CDCR should provide verification to the Special Master that all RC facilities (CCWF, NKSP, and WSP) are aware of their suicide prevention responsibilities," including (1) placement of suicide prevention posters in the offices utilized for direct patient care by RC nurses and RC diagnostic clinicians, as well as RC housing unit bulletin boards and RC pill call windows; (2) diagnostic clinicians are required to review the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained within the EHRS and SOMS for each inmate; (3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the screening process if a prior history of mental health treatment is reported; and (4) diagnostic clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if the screening and/or inmate's behavior suggest a possible current risk for suicide."[51] Additionally, Mr. Hayes continued to find deficiencies at two of the three Reception Centers in his Fifth Re-Audit Report.

## Progress in Identifying and Implementing Initiatives Designed to Reduce Risk Factors Associated with Suicide

There are many potential sources of information to consider in identifying initiatives for suicide prevention: input and innovation of institutional staff and leadership, input from the incarcerated population and their family or loved ones, information from the field of suicidology, the results of suicide reviews and reviews of serious incidents of self-injury, quality management reviews, the findings of CDCR's informatics system and healthcare data warehouse, the dissemination of best practices at institutions, the practices of other agencies or states, the review of community or agency suicides or suicide attempts, insights from formal research on correctional populations, and the adoption and implementation of Crisis Intervention Teams.

All incarcerated persons in CDCR, patients and non-patients alike, are important sources of information about the issues affecting them individually and as a group, what external stressors may be contributing to the development of suicidal thoughts and behaviors in some individuals, and what they find helpful to reduce the risk for suicide. Individuals incarcerated in CDCR may tell custody officers, nurses, or other staff members about certain stressors, such as peers who are in danger from other peers. Individuals living in CDCR may divulge personal issues or stressors contributing to their thoughts of suicide and identify those unique risk factors that may have application beyond the individual case.

The field of suicidology is represented nationally by the American Association of Suicidology (AAS). Most major suicide prevention agencies are members or affiliates of the AAS. CDCR is a corporate member of AAS, meaning any staff member employed by CDCR may join the AAS without cost, which allows the staff member to gain access to the association's journal *Suicide and Life-Threatening Behavior*, informational webinars, libraries, and discounted attendance fees to AAS events. CDCR staff are reminded how to join and access AAS materials routinely via videoconferences, with documents regarding how to join the AAS

---

[51] ECF 7636-1, filed 10/24/2022

posted on the suicide prevention SharePoint site. SMHP staff attend the annual AAS conference and have given presentations and trainings for correctional staff from across the country.

Reviews of suicide deaths and attempts inform the practice of suicide prevention. The pace of efforts derived from findings from suicide reviews continued in 2022. Below are three continually important projects that emerged from suicide case reviews:

- PIP and MHCB unit discharge workgroup.

- PIP suicide prevention program coordinator positions were filled in all PIP programs.

- Release of the PIP suicide prevention policy.

There are many quality management processes occurring at institutions as well as Patient Safety and Quality Management Committees at institutions. These institutional efforts are supported by regional healthcare, mental health, nursing, and custody staff members. The various quality management activities monitor many institutional functions, highlighting when programs are underperforming, and leading to innovation in determining how quality can be improved. In 2020, CDCR began hiring a Suicide Prevention Coordinator for each of CDCR's four regions. These new positions are an extension of the Suicide Response and Prevention unit at CCHCS Headquarters but based in their respective regions.  While not directly reporting to the Regional Mental Health Administrators, all regionally based Suicide Prevention Coordinators work directly with their respective multidisciplinary regional teams. These positions afford CDCR's suicide prevention efforts an extended reach to provide assistance to the local institutions on improving and sustaining compliance, and developing institution-specific suicide prevention approaches that are consistent with statewide policy.  The Suicide Prevention Coordinators are actively involved in all statewide suicide prevention processes, including suicide case reviews and at suicide prevention quality management activities.

Currently, CCHCS Quality Management provides comprehensive management and executive reports, operational tools, resources for local committees and subcommittees, leadership tools and training, and best practice information to institutions. The Quality Management portal contains, for example, information on conducting Performance Improvement Work Plans and Lean Six Sigma projects. They are also assisting in suicide prevention initiatives with the CIT Reporting Tool and the Nursing Observation Reporting Tool. Institutional leadership can review performance on a variety of metrics across units, programs, and facilities over periods of time, allowing leaders to adjust staffing, identify and address problems, and manage compliance issues.

The Mental Health Performance Report, an automated computerized quality management tool, among other indicators, supplies metrics to mental health leadership regarding quality and compliance, including timeliness of transfers and required evaluations, the number of treatment hours received by patients at different levels of care, and so forth. The timeliness of suicide risk evaluations, five-day follow-ups, treatment plans, inpatient discharges, outpatient appointments, and amount of treatment scheduled and completed is updated and reported daily. Compliance rates can be compared between institutions and can be addressed by regional resources, as well as institutional leadership. The Performance Report is updated regularly to reflect changes in program requirements.

This robust mental health quality management structure and reporting capability has led to a natural process of information and best practices sharing. Institutional programs that are not meeting standards often reach out to institutions that are meeting standards. Alternatively, regional staff members share what is working in one institution to other institutions in their region as best practices and as ways to improve on specific indicators. For example, institutions which were not meeting compliance standards

regarding the completion of MHCB Discharge Custody Checks were assisted by regional staff by identifying methods used by high-performing institutions. In addition, CEOs at institutions meet with institutional quality management staff members and with other executives regularly, allowing for information to be shared from high-performing institutions with other sites. Best practices (discussed further below) can be highlighted in discussions within and between institutions.

The SMHP and the Receiver's medical staff jointly administer a healthcare data warehouse to house information and analyze system-wide data. The warehouse is a repository for data from the EHRS and other health care databases. The warehouse links to CDCR's custodial data system, Strategic Offender Management System (SOMS). This wealth of data is then aggregated and disseminated for quality improvement purposes. This shared data warehouse allows CDCR to analyze variables found in self-harm and death by suicide to inform policy decisions. The use of informatics allows mental health leadership to look at "big picture" items, sharing this information with other stakeholders (e.g., custody leadership).

CDCR, in collaboration with the Receiver's medical staff, has implemented numerous ways in which staff members and institutions can inform others or review best practices. Staff members at all levels are able to become involved in learning and using tools for performance improvement, with opportunities to inform institutional leadership and statewide leadership on specific projects or issues. Several methods are available to train staff in leadership skills, focused improvement projects, and projects that promote efficiency. In turn, each of these methods result in identifying best practices, which are then available for dissemination.

## Ongoing Projects

***Inpatient Discharge Work Group***: Recognizing that the risk of suicide is elevated in the period after a patient discharges from a PIP unit, the SMHP has been working to improve outcomes in this group. This is especially important since 14 suicide deaths in 2019 were among this population. The workgroup began work in the fall of 2018 and since mid-2020 has met over 40 times with representatives of the SMHP, DAI, and the OSM. Among the recommendations are:  1) A streamlined workflow for safety concerns to be reported by mental health staff and reviewed by custody, while patients are in an inpatient mental health setting. 2)  In conjunction with the prior recommendation, patients in a PIP cannot be discharged to a lower level of care until reported safety concerns are resolved by custody staff. Patients endorsing safety concerns in a MHCB setting can be clinically discharged to a lower level of care prior to resolution of the safety concerns, but an enhanced review by mental health leadership shall occur prior to discharge. The memo related to this new process in recommendations 1 and 2 continues to be reviewed by the workgroup to prepare for release to the field. 3) Improvements to the Master Treatment Plan/Acute ICF Master Treatment Plan that enables mental health staff to document conversation and coordination with custody related to safety concerns and prompts to identify clinical interventions should safety concerns be assessed to contribute to increased suicide risk. The changes to the Master Treatment Plan were implemented on September 30, 2021. 4) Creation of a policy that requires patients with a mental health single cell designation to be reviewed prior to EOP discharge from the PIP to determine if a single cell remains clinically indicated. This policy was released to the field on July 26, 2021, and training was also released at the same time. 5) Streamline the high-risk list, which was accomplished by the Suicide Risk Management Policy rolled out in June 2021. As of September 6, 2022, the work group was disbanded as it resolved all of their outstanding tasks.

***Suicide Prevention SharePoint Site****:* Like most SharePoint sites, the Suicide Prevention SharePoint allows users to share documents, post articles of interests, and share training materials. The site currently contains over 320 research or clinical articles, archived suicide prevention slide shows from monthly

instructional video conference presentations (2011 to present), instructions on joining the AAS, groups of presentations made at the CDCR's Suicide Summits, contact lists for institutional suicide prevention program coordinators and headquarters suicide prevention staff, resources for staff suicide prevention, and resources for the entire CDCR population (videos, pamphlets, and posters). The information sharing occurring on SharePoint sites is another way of disseminating best practice information.

The SMHP has started to revise its intranet site with a best practices library. The library is available to all CDCR intranet users. Once created, existing documents from other sites that are not readily available to all users will be added to the library in archival fashion, such as best practice information from the Suicide Prevention SharePoint site.

***Statewide Suicide Prevention Coordinator Conference Calls***: In addition to monthly suicide prevention video conferences that can be viewed by all staff, Suicide Prevention Program coordinators from headquarters and from all institutions have held quarterly conference calls since 2014 to discuss issues impacting suicide prevention efforts statewide. These calls continued during 2022.

***Leadership Meetings Related to Suicide Prevention***: In past years, the SMHP has held Mental Health Leadership conferences and one three-day Suicide Prevention Summit conference annually. Mental Health Leadership conferences are meant to disseminate best practice information in a variety of areas, including suicide prevention. The Suicide Prevention Summit is focused more specifically on advancements within CDCR as to policy, procedure, best practices, innovations, and interventions to improve suicide prevention and response. With general recognition outside of California, attendance has increased nationally. In 2022, leadership meetings were held on November 16th and 17th both in person and virtually.

In 2022, topics presented at the Suicide Prevention Summit included: "Suicide in the Aging Population", "Redefining Transgender Care", "Stress Behind the Badge: Understanding the Law Enforcement Culture and How it Affects the Officer and Family", "The Push & Pull of Crisis Response Work in the Correctional Setting: Seeing a Way Through the Challenges", "Life after Death: Minimizing Psychiatric & Suicide Risk with the Transfer of Death Sentenced Inmates", "HQ Mental Health Nursing Suicide Prevention Initiatives", "A Survivor's Story and its IMPACT", "Compassionate Consideration of Inmates Attending Funeral Services via Video Conference", "Hope, Community, and Addressing Childhood Trauma: The Antidote to Suicide in Prison (and Everywhere Else)", "Hunger Strikes and Suicidal Intent", "Clinician's Suicide Loss: What We Know and What We Can Do", and "A Clinician's Experience". All presentations from the 2022 Suicide Summit are found on the Suicide Prevention SharePoint site.

***Psychiatry Trainings and Consultants***: Psychiatrists and other interested staff are able to attend weekly Grand Rounds and earn Continuing Medical Education credits. Grand Rounds offer presentations from academic and forensic psychiatrists and are broadcast throughout the state using video-conferencing technology. Much of the content of the series is related to psychopharmacology and psychiatric illness, but there is also a lecture series on forensics and the assessment of suicidality. These educational sessions encourage the use of evidence-based best practices in forensic settings. On August 24, 2020, the CDCR implemented a tele-psychiatry policy, which enabled psychiatrists to utilize videoconferencing to facilitate real-time evaluations and treatment for the patient.

The statewide psychiatry program's psychopharmacological consultant continues to be available for consultation statewide. Psychopharmacological approaches are important as some psychiatric

medications, for example, clozapine [52] and lithium, [53] are associated with lower suicide rates among vulnerable patients with particular diagnoses. In addition, psychopharmacological treatment itself lowers all causes of death (including suicidality) among patients with serious mental illness.[54] The expertise of the consulting psychiatrist, and her relationship with and ability to consult with nationally renowned experts, supported CDCR psychiatrists in 2022, helped patients to improve, and ultimately helped to decrease suicidality and deaths from other causes.

Beginning in 2018, CDCR implemented the U.S. Substance Abuse and Mental Health Services Administration's evidenced-based *Illness Management and Recovery*[55] group curriculum to address co-occurring disorders in CDCR's EOP population. In addition, at the end of 2019, Medication-Assisted Treatment (MAT) became available in all CDCR institutions, with medications such as buprenorphine, methadone, and naloxone available as treatment options. Additionally, Cognitive Behavioral Interventions (CBI) are offered. CBI for SUD is being standardized statewide across all institutions. The new CBI model will require six hours (two-hour time blocks for three days) or 10 hours (two-hour time blocks for five days) of treatment per week for 12 months. The classes will be in two-hour time blocks, with the overall goal of allowing participants more flexibility to attend school, hold jobs, and participate in other programs. The frequency of primary care visits regarding MAT will be determined on an individual basis. As of the end of 2022, the Integrated Substance Use Disorder Treatment (ISUDT) program was providing MAT to over 15,000 patients in CDCR.[56]

***Crisis Intervention Teams***: Previous reports to the Legislature noted the establishment of Crisis Intervention Teams in CDCR institutions. These teams have been adapted through a partnership between mental health, nursing and custodial personnel to provide an interdisciplinary team to intervene in crisis situations. If an individual reports a desire to kill themself, the team will evaluate the situation, identify sources of distress, attempt to resolve or mitigate the sources of distress at the point of service, and arrange follow-up (which may or may not include placement in an inpatient unit). For example, if an individual is distressed by a perceived lack of medical attention, the presence of a nurse may help to clear any misunderstanding. A relatively common example of the value of a Crisis Intervention Team is suicidal thoughts associated with interpersonal conflicts. These conflicts can create significant distress and can quickly develop into significant fears for one's safety. Whereas mental health clinicians may not be able to address safety concerns directly, they can work collaboratively with custody personnel who may be able to work out a reasonable solution, thus relieving the distress. The Crisis Intervention Teams help to problem-solve issues related to prison life that may not be directly related to a mental health issue.

The initial Crisis Intervention Teams were established at 22 institutions between late 2018 and early 2020. In 2022, the teams had 4,375 contacts with individuals, an average of 364 each month. Twenty-eight percent (N = 1,237) of the contacts resulted in admission to a MHCB unit. Fifty-five percent (N = 2,427) were returned to their housing, less than one percent (N = 10) were provided conflict resolution skills and returned to their housing unit, and one percent (N = 42) were educated regarding a custody process. The resolution of an additional 466 contacts were a mix of referrals to Mental Health, housing changes, and custody consultations. Prior to the inception of CITs, it was most likely that a much higher proportion of

[52] Meltzer, H., et al. (2003) Clozapine Treatment for Suicidality in Schizophrenia, Archives of General Psychiatry, 60(1):82-91. doi:10.1001/archpsyc.60.1.82
[53] Lewitzka, U., et al. (2015). The suicide prevention effect of lithium: more than 20 years of evidence. International Journal of Bipolar Disorders, 3: 15. https://doi.org/10.1186/s40345-015-0032-2
[54] Tiihonen, J., et al. (2009). 11-year follow-up of mortality in patients with schizophrenia: a population-based cohort study. The Lancet, 374, 620-627. DOI:10.1016/S0140- 6736(09)60742-X
[55] https://store.samhsa.gov/product/Illness-Management-and-Recovery-Evidence-Based-Practices-EBP-KIT/SMA09-4463
[56] Data accessed on March 21, 2023 from the ISUDT dashboard. Public data is available at: ISUDT Dashboard | CCHCS (ca.gov).

individuals with crisis issues would have been admitted to costly inpatient psychiatric beds around the state.  CDCR cannot definitively state that the use of the CIT was able to prevent specific individuals from attempting, or dying by, suicide. However, the data does suggest the CITs have been effective at identifying root causes of patient crises and providing the most effective intervention for the individuals' crises, which includes inpatient hospitalization for acutely suicidal individuals.

## Progress Toward Expanding the Process of Notification Pursuant to Penal Code Section 5022

CDCR is committed to expanding the process for notifying next of kin, to include events involving an individual who commits an act of self-injury with the intent to die, while ensuring that it complies with federal laws designed to protect patients' medical records and other health information.

CDCR collects and maintains notification lists, commonly referred to as Next of Kin Designations. A CDCR Next-of-Kin form is completed regularly and is renewed at least annually with all individuals who agree to do so. However, in order to ensure protected personal healthcare information is appropriately provided only to a Next-of-Kin designee, the patient must also complete a Health Care Release of Information form, which allows a patient to designate an individual to receive protected health information for medical and mental health purposes.

In 2020, CDCR assembled a workgroup involving DAI, the SMHP, and CCHCS to develop uniform guidance on Next of Kin designations and the Health Care Release of Information process. The Health Care Department Operations Manual (HCDOM) Section 3.1.19, Next of Kin Notification for Death, Serious Illness, or Serious Injury, was published in June 2022 and remains in effect.

## Summary

Of the more than 128,000 individuals who spent a night in CDCR custody in 2022, 19 of them died by suicide during their time in confinement. This was an increase from 2021 but remains a decrease from previous years with higher numbers of suicides. The majority of decedents died by hanging, similar to previous years. The decedents were all men. Hispanics represented the majority of those who died by suicide. The ages of the decedents ranged from 23 to 65 years, with the largest represented group between 25-34 years of age. Most of the decedents were Level IV custody level, similar to previous years. Additionally, the vast majority of self-harm incidents were non-suicidal, consistent with prior years. Seventeen of the 19 suicide decedents were patients in the statewide mental health program, with the majority of those 17 decedents in outpatient care within CDCR. Notably, this is the second consecutive year in which there were less than 20 deaths by suicide, a departure from years prior which had over 30 deaths by suicide. CDCR always continues to strive for improvement and will continue to assess effectiveness and monitor for quality and timeliness of suicide risk evaluations, treatment plans, and suicide prevention plans. CDCR continues to follow policies and procedures provided in the MHSDS Program Guide and continues to utilize its resources to improve upon and expand its initiatives to help reduce the number of suicides in any given year.

## Appendix A
### Chart Audit Tool

6/12/2020 CAT7 – New Form



**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**

## Mental Health Survey - Suicide Evaluation/Prevention - Suicide Risk Evaluations That Meet Audit Criteria (Quarterly)

Institution: [ ] Area: [ ] * MHI: [ ] *

CDCR#: [ ] * Form Author: [ ]

Document Date: [ ] *

**1. If patient refused SRASHE, did the clinician document the steps taken to encourage participation or increase the patient's ability to participate in the SRASHE?**

☐ Yes
☐ No
☐ N/A

**2. If History of Suicide Attempts was endorsed are details of previous attempt(s) provided? (If patient does not have history of Suicide Attempts, mark N/A.)**

☐ Yes
☐ No
☐ N/A

**3. Does the narrative of risk justification address the following? (check all that apply)**

☐ Chronic Risk
☐ Acute Risk
☐ IS PATH WARM warning signs
☐ Protective factor

**4. If the safety plan is required per policy, is a plan documented?**

☐ Yes
☐ No
☐ N/A

**5. Safety Plan audit:**

      **Step 1: Which of the following is true for step 1:**

ochcssites/dept/MentalHealth/_layouts/FormServer.aspx?XsnLocation=http://ochcssites/dept/MentalHealth/CAT7/Forms/template.xsn&ClientInstalled=... 1/3

6/12/2020                                      CAT7 - New Form

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized
☐ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs
☐ Not documented but reason noted
☐ None of the above

**Step 2: Which of the following is true for step 2:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized
○ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs
○ Not documented but reason noted
○ None of the above

**Step 3: Which of the following is true for step 3:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized
○ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs
○ Not documented but reason noted
○ None of the above

**Step 4: Which of the following is true for step 4:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized
○ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs
○ Not documented but reason noted
○ None of the above

**Step 5: Which of the following is true for step 5:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized
○ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs
○ Not documented but reason noted
○ None of the above

**Step 6: Which of the following is true for step 6:**

6/12/2020                                      CAT7 - New Form

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

○ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

○ Not documented but reason noted

○ None of the above

**Step 7: Which of the following is true for step 7:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

○ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

○ Not documented but reason noted

○ None of the above

Comment:

Submit

## Appendix B

QIP Descriptors

| MH QIPs |
|---|
| **Clinical Care** |
| **5 Day Follow/Up (e.g., not completed as required; not of adequate quality; failure to tie to safety plan)** |
| **Clinical Decision Making Concerns - Multiple clinical components going on within a QIP (e.g., discharging diagnoses outside of IDTT, not addressing the clinical issues in 7362s, no consideration of LOC change or no rationale for LOC change, lack of interventions to mitigate risk, no rationale for clinical decisions, no plan for follow-up care)** |
| **Confidential Setting (e.g., lack of use, lack of availability; seen cell-front by MHPC without documentation of reason why in progress note)** |
| **Continuity of Care/Clinician to Clinician Contacts** |
| **DDP Issues (e.g., failure to complete required assessments, lack of timely assessments, lack of inclusion of adaptive supports, failure to adequate provide adaptive supports; victimization issues)** |
| **Diagnosis Issues (e.g., lack of diagnosis, conflicting diagnoses, diagnostic disagreement not addressed)** |
| **IDTT Issues (e.g., lack of required membership;; not adequately updated)** |
| **Issue and Observation – including Alternative Housing, TMHU (2020), MHCB, and PIP (e.g., failure to order properly, failure to complete orders daily, failure to provide what was ordered; poor rationale)** |
| **MHCB: Issue and Observation (e.g., failure to order properly, failure to complete orders daily, failure to provide what was ordered; poor rationale)** |
| **MHCB: Other** |
| **Policy Issues/ Violations (includes lack of policy, inadequate policy) (Catchall for Policy Violations not otherwise categorized)** |
| **Program Guide Timelines (includes contacts and)** |
| **Records Review/** |
| **Requests/Missing Records (e.g., failure to request records, failure to review available records)** |
| **ROI Issues -- (e.g., ROI not on file, verbal consent instead of written as required, no follow-up with family, family request to speak to clinician not properly forwarded to Mental Health)** |
| **Self-Harm Reporting (e.g., failure to track,)** |
| **Treatment Planning (e.g., failure to do a treatment plan, treatment and treatment plan disconnect; inadequate treatment plan, failure to update treatment plan)** |
| **RVR MHA issues (e.g., not completed, inadequate, poor rationale)** |
| **Failure to address patient victimization issues (e.g., safety concerns, PREA evaluation/referrals)** |
| **Not offered required programming/lack of access to out of cell programming** |
| **Other** |
| **Documentation** |
| **MH Documentation (e.g., includes failure to document adequately, copied documentation, incomplete documentation; inaccurate documentation)** |
| **MH Referrals (e.g., failure to refer, failure to document response to referral adequately, failures in communication between disciplines)** |
| **Missing MH Documentation/Chrono** |
| **Suicide Risk Assessment** |
| **Missing SRE/No SRE** |
| **Poor SRE Documentation** |
| **Safety Planning (e.g., lack of safety plan, inadequate safety plan)** |

| MH QIPs |
|---|
| SRE/Justification of Risk (e.g., poor justification of risk; inadequate justification of risk; failure to include identified risk factors) |
| Over reliance on patient self-report |
| **Psychiatry** |
| 2602 Issues (e.g., not sought when indicated, not renewed, not followed) |
| Psychiatry Clinical Care (e.g., not provided, inadequate) |
| Psychiatry Documentation (e.g., copy and paste issues, inadequate, inconsistent, not present, not timely) |
| Program Guide Timelines not met |
| Psychiatry No Referral for Non-Compliance, No show |
| Psychiatry Policy Violations |
| Medication discontinued without face-to-face |
| Other |
| **Psychiatric Inpatient Program (PIP)** |
| Frequency of Contacts – (e.g., MHMD/MHPC/RT contacts and group treatment) |
| Housing Review Recommendation |
| Issue and Observation (e.g., failure to order properly, failure to complete orders daily, failure to provide what was ordered; poor rationale) |
| Missing PIP Documentation – (e.g., MHMD/MHPC/RT missing progress notes for individual contacts, group treatment, and assessments; RT documentation re: in-cell treatment materials provided) |
| PIP Policy Violation |
| Program Guide Timelines |
| Programming Issues |
| Quality of PIP Documentation – (e.g., copy and paste/pulled-forward without change from a previous assessment at same or different facility) |

| CUSTODY QIPs |
|---|
| 911 Activation (e.g., failure to activate, delayed activation) |
| ASU Policy/CDCR 114 issues |
| BPH Issues |
| Confidential Setting -  (e.g., joint QIP with mental health in which lack of confidential setting utilized) |
| Crime Scene Preservation |
| Custody Documentation (e.g., poor documentation, conflicting documentation) |
| Custody Training (e.g., not timely, not done, inadequate) |
| Cut Down Tool/Kit |
| Emergency Response (e.g., CPR issues, failure to activate personal alarm, delayed cell entry, failure to don proper PPE) |
| ICC Issues |
| IDTT Issues – (e.g., no correctional counselor present in IDTT; custody failed to bring patient to IDTT) |
| Inappropriate GP Inmate Restraint |
| Policy Violation |
| PREA Issues |
| Referrals (e.g., failure to make referral when indicated) |
| Rigor – should this be under security/guard one checks? |
| R & R Issues – (e.g., property did not transfer with patient to a new institution as required per policy) |
| RVR Issues – (e.g., lack of evidence to support guilty finding on RVR by hearing officer) |

| CUSTODY QIPs |
| --- |
| Security/Guard 1 Checks (e.g., not completed, not timely) |
| Self-Harm Issues – (e.g., joint issues with Mental Health- poor communication and documentation of suicide attempts; 837 incident package not completed as required by policy; post suicide hand-written note in patient's clothing stated in part "police just came, saw rope hanging, said nothing"; joint QIP with Nursing- tried to strangle self under the blanket with a blue shirt while on suicide watch) |
| Staff Actions Concern |
| Universal Precautions |
| Visibility of the Cell |
| Failure to provide property/privileges |
| Failure to adequately address safety concerns/victimization issues (not PREA) |

| NURSING QIPs |
| --- |
| 5 Day Follow/Up (e.g., not completed as required; not of adequate quality; failure to tie to safety plan) |
| 911 Activation (e.g., failure to activate, delayed activation) |
| 7362 Processing Issues |
| Administration of Narcan |
| Emergency Response (e.g., CPR/AED issues, delayed treatment, inadequate treatment, improper treatment) |
| Hunger Strike Issue |
| ISUDT Issues |
| Medication Issue (e.g., failure to follow 2602 order, failure to provide medication, failure to notify psych of med misses) |
| Nursing Checks/Rounds |
| Nursing Documentation (e.g., failure to document, inadequate documentation, conflicting documentation) |
| Patient Care/Continuity of Care |
| Policy Violation |
| PREA Issues |
| Referrals (e.g., failure to refer, delayed referral, communication issues between disciplines) |
| Self-Harm Issues |
| Universal Precautions |
| Other |

| SPRFIT-Multisystem QIPs |
| --- |
| 911 Activation (e.g., failure to activate, delayed activation) |
| Bad News Issues |
| DDP Issues – (e.g., assessment and treatment of DDP patients in PIP; victimization concerns; custody responsibility for moving inmates with victimization concerns) |
| HQ Psychiatry Issues |
| Impression Management |
| Inappropriate GP Inmate Restraint |
| ISUDT Issues |
| Missing Documentation – This refers to policy required documentation (e.g., Mental Health 5 Day Follow-up combined with Custody Check form; self-harm attempts must be documented on specific forms when there is a suicide attempt, which may then generate a 837) versus records that might be unable to be located for some reason (Records Review/Request/Missing Records category) |
| NCAT |

| SPRFIT-Multisystem QIPs |
|---|
| Next of Kin issues |
| Physical Plant (e.g., cell/structural safety issues) |
| PIP Policy (includes lack of policy) |
| Policy Issues/Violation (includes lack of policy, inadequate policy) |
| Poor SRE Documentation (e.g., not done when required, inadequate, incomplete, not updated, failed to incorporate prior information) |
| PREA Issues |
| Program Guide Timelines |
| Records Review/Request/Missing Records |
| Referrals (e.g., making referrals, responding to referrals, documenting referrals) |
| RVR MHA Issues (e.g., not done, inadequate, poor rationale) |
| Safety Concerns not addressed |