1   ROB BONTA, State Bar No. 202668
Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
3   DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
5   Deputy Attorneys General
    1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone: (916) 210-7318
    Fax: (916) 324-5205
8   E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE:  925-746-8460
FACSIMILE:  925-746-8490
Attorneys for Defendants

9

10              **UNITED STATES DISTRICT COURT**

11            **EASTERN DISTRICT OF CALIFORNIA**

12                **SACRAMENTO DIVISION**

13

| 14  RALPH COLEMAN, et al., | Case No. 2:90-CV-00520- KJM-DB |
| 15           Plaintiffs, | **OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTES: (1) AC5: Treatment Offered – Measuring "Confidential" Groups** |
| 16      v. | |
| 17  GAVIN NEWSOM, et al. | |
| 18          Defendants. | |
| 19 | Judge:    Hon. Kimberly J. Mueller |

20   **I.    INTRODUCTION**

21        This dispute centers on whether the California Department of Corrections and

22   Rehabilitation (CDCR) must track and report whether group treatment led by primary clinicians or

23   psychiatrists ("provider-led" or "clinician-led" groups) occurred in a confidential setting.[1]  The

24   focus of the indicator – part of AC5, the Treatment Offered indicator – is to measure whether

25   Enhanced Outpatient Program (EOP) patients were offered the Program Guide-required ten hours

26

27   ───────────────
[1] A copy of the Special Master's *Proposed Resolution of Data Remediation Dispute: AC5:*
28   *Treatment Offered – Confidential Groups* is attached as **Exhibit 1.**

20065617.5

OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTES

of "structured therapeutic activities."  Defendants and the Special Master agree on two critical issues relevant to this dispute: 1) the Program Guide does *not* mandate that these ten hours of structured therapeutic activities for EOP patients be provided in a confidential setting and 2) the Special Master has historically counted group treatment that occurs in a non-confidential setting in his assessment of weekly hours of structured treatment offered to EOP patients.

Where they disagree is whether, notwithstanding Program Guide standards and the Special Master's historical monitoring of those standards, CDCR should nonetheless be required to track and report whether the group treatment led by primary clinicians or psychiatrists is occurring in a confidential or non-confidential setting.  Because key indicators must necessarily "signify the material provisions of the Program Guide" (July 1, 2021 Order, ECF No. 7216 at 4) and the Program Guide indisputably does not mandate that which the Special Master seeks to track, AC5 similarly need not track this information.

Finally, even if CDCR were to implement the Special Master's proposed resolution, technical limitations would result in the compilation of incomplete data.  CDCR's Electronic Health Records System (EHRS) cannot track the classification of a staff member for groups that patients refuse to attend.  Thus the data will only track groups attended and will result in a significant undercounting of treatment offered.  Second, the staff member who checks attending patients in and out of the group appointment may not be the same staff member who facilitates the group.  Data regarding the classification of the staff member facilitating the group could therefore be unreliable in such a situation.  For these reasons, Defendants object to the Special Master's proposed resolution.

## II.     BACKGROUND OF THE DISPUTE

During remediation of Continuous Quality Improvement (CQI) indicator AC5, a dispute arose between the parties as to whether this indicator should track and score whether provider-led EOP group treatment was conducted in a confidential setting.  To resolve this dispute, the Special Master proposed that the AC5 indicator be modified to include information on whether the primary clinician or psychiatrist led groups were conducted in a confidential setting in a drill down, including a summary statistic reporting the percentage of groups documented as being

1  conducted in a confidential setting.  The Special Master does not, however, "recommend adjusting

2  the scoring of AC5 based on whether group treatment was conducted in a confidential setting."

3  (Special Master's Proposed Resolution of Data Remediation Dispute: AC5 (Treatment Offered) –

4  Confidential Groups (OSM Proposed Resolution) at p. 1.)  In other words, the Special Master's

5  proposal would track whether certain group treatment is provided in a confidential or non-

6  confidential setting, but the results of that information would not affect whether CDCR was

7  compliant with the overall Program Guide requirement to offer ten hours of structured treatment to

8  EOP patients.  As explained below, Defendants do not agree to the Special Master's proposal.

9  **III.    ARGUMENT**

10      While Defendants agree with the Special Master that CDCR's compliance should not be

11  affected under AC5 by whether primary clinician or psychiatry-led group treatment was conducted

12  in a confidential setting, as explained below, Defendants do not agree that any tracking of this

13  information as part of AC5 drilldown or summary statistic is appropriate or necessary.

14      **A.    The Program Guide And Court Orders Do Not Require Confidential Group
            Treatment.**

15

16      While the Program Guide is replete with references to "confidential" and "confidentiality"

17  throughout, that term is noticeably absent from the discussion pertaining to the requirement at

18  issue here.  (*See* Program Guide, ECF No. 7333-1 at 58-63.)  Indeed, the Special Master states in

19  his Proposed Resolution of this dispute that, unlike the Program Guide's requirements regarding

20  confidentiality of individual treatment and structured treatment in STRH and LTRH settings, "the

21  Program Guide does not specify that the ten hours of structured treatment required for EOP

22  patients must be provided in confidential settings."  (OSM Proposed Resolution, p. 3.)

23      That the Program Guide demonstrably does *not* require confidentiality in provider-led

24  group treatment is significant here because key indicators must be tethered to Program Guide

25  requirements.  Both this Court and the Special Master have emphasized that key indicators should

26  be a "distil[lation]" of the "most salient elements" of the Program Guide (May 6, 2023 Special

27  Master's CQIT Report, ECF No. 7151 at 4), and should "signify the material provisions of the

28  Program Guide and Compendium."  (July 1, 2021 Order, ECF No. 7216 at 4 (internal citations

20065617.5

3

1   omitted).)  It must logically follow that key indicators should therefore not be designed to measure

2   confidentiality in provider-led group treatment which is not mandated under the Program Guide.

3        Similarly, no orders of this Court mandate the confidentiality of group treatment to satisfy

4   Program Guide requirements.  While this Court has previously determined that *individual*

5   psychiatry contacts must be confidential to satisfy Program Guide requirements, that

6   determination was guided by Program Guide language applicable specifically to individual clinical

7   encounters.  (Aug. 14, 2019 Order, ECF No. 6242 at 8.)  No such similar language appears in the

8   Program Guide with respect to group treatment.  (*See* OSM Proposed Resolution at p.3; *see also*

9   Program Guide, ECF No. 7333-1 at 58-623.)

10       Because the Program Guide and prior Court orders do not require confidentiality of

11  provider-led group treatment, the AC5 indicator should not be designed to track or measure

12  whether such group treatment is occurring in confidential spaces.

13       **B.     The Special Master's Proposed Resolution Is Inconsistent With The Special
              Master Team's Current Monitoring Practices and Duplicates Other
14            Indicators.**

15       "[T]he process of data remediation is fundamentally to equip defendants to accurately and

16  transparently report data to replicate the substance of Special Master's monitoring."  (ECF No.

17  7954 at 2, citing, May 23, 2023 Order, ECF No. 7847 at 7.)  Here, the Special Master agrees that

18  he "has not historically excluded group treatment hours provided in non-confidential space from

19  his assessment of weekly hours of structured treatment offered to EOP patients."  (OSM's

20  Proposed Resolution at p. 2.)  While the Special Master does note in his monitoring reports any

21  concerns about the lack of confidentiality or other factors that could impact treatment, two other

22  provisionally approved key indicators (AC13 Group Treatment in a Confidential Setting and

23  FEC1 Adequate Group Treatment Spaces) already report on the adequacy of confidential

24  treatment space.  AC13 tracks group appointments held in a confidential setting, excluding yard

25  groups.  The current recommendation from the Special Master seeks the same information just

26  presented in a slightly different way.  Because the confidentiality of groups is already part of

27  another measurement, Defendants should not be required to provide such data as part of AC5.

28       Plaintiffs' position, that such information must also be monitored by AC5, not only strays

20065617.5                                          4

1    from the Special Master's past monitoring practices, but would also render these previously-

2    remediated indicators (AC13 and FEC1) duplicative and obsolete.  Because the Special Master's

3    recommendation to track confidentiality for primary clinician and psychiatry-led groups is neither

4    required by the Program Guide nor part of the Special Master's past monitoring, CDCR should not

5    be required to track this information, particularly where information regarding group

6    confidentiality is already being captured by other key indicators.

7          **C.**    **Technical Limitations Associated With the Special Master's Recommended Approach Would Produce Incomplete Data**

8

9          Implementation of either the Plaintiffs' approach to AC5 (which calls for only counting

10    confidential clinician-led groups)[2] or the Special Master's Proposed Resolution would result in the

11    reporting of potentially unreliable data due to technical limitations for two reasons.  First, EHRS

12    cannot track the classification of a staff member for groups that patients refuse to attend.  Second,

13    the staff member who checks attending patients in and out of the group appointment may not be

14    the same staff member who facilitates the group.  Third, a data bug was recently found in EHRS

15    that can unintentionally lead to data regarding group confidentiality not being saved in the

16    system.[3]  The first limitation would result in a significant undercounting of treatment because

17    patients who are offered group treatment but choose not to attend will not be counted since it is

18    _____

19    [2] Fundamentally, it appears that the parties' data remediation disputes stem from Plaintiffs' efforts

20    to unfairly undercount Defendants' compliance with various requirements in this case.  Here, Plaintiffs have asserted that non-confidential treatment groups led by clinicians should not count

21    toward the fulfillment of the Program Guide's 10-hours of treatment required for EOP patients, despite the fact that the Program Guide includes no requirement that such groups be confidential.

22    This approach would severely undercount the treatment that is actually offered to EOP patients. Once CQIT is fully developed and established, it is intended to serve as "the primary mechanism

23    for defendants to demonstrate not only that they have achieved compliance with the Court's remedial orders at a given point in time, but also that they have developed the internal structures

24    needed to sustain that compliance."  (Special Master's Report on the CQIT Key Indicators, ECF No. 7151 at 3.)  Thus, efforts to move the goal posts by setting impossible metrics or establishing

25    requirements where none previously existed can only be seen to create insurmountable thresholds which only serve to perpetuate this long-standing case.

26

27    [3] Mitigation strategies are in place to help staff identify errors caused by the bug and allow staff to correct any mistakes.  CDCR is also working with CERNER to find a permanent fix to address

28    this issue but does not have a timeline as to when the problem may be corrected.

1  not possible to delineate whether the offered (but refused) treatment was confidential or not.  And

2  the second limitation could result in inaccurate information – both undercounting and

3  overcounting are possible.  The third limitation may lead to incomplete data regarding group

4  confidentiality until the bug is addressed.  These significant shortcomings should prevent

5  implementation of Plaintiffs' approach.

6       Additionally, institutions must rely upon accurate and complete data in making program

7  decisions.  But reports which may, unbeknownst to institutions, contain misleading or incomplete

8  data would lead to flawed decision-making in the context of treatment programs offered.  Thus,

9  while CDCR can provide the data contemplated by the Special Master in his Proposed Resolution,

10  these technical limitations could improperly impact institutional decision-making.

11  **IV.    DEFENDANTS' PROPOSAL**

12       As explained above, Defendants disagree that any data pertaining to whether clinician-led

13  group treatment for EOP patients occurs in a confidential setting is relevant or required to be

14  tracked in indicator AC5.  However, should the Court order Defendants to provide the information

15  recommended by the Special Master, Defendants propose separating the requested data from AC5.

16  Defendants propose creating a separate report that provides data regarding whether completed

17  mental health group appointments were documented as confidential or not, and what classification

18  led those groups.  This approach is preferable to the Special Master's Proposed Resolution

19  because a separate report, rather than drill downs and summary statistics within AC5, is less likely

20  to create confusion, particularly because the Special Master and CDCR agree that none of the

21  requested data should be included in the calculations for compliance in AC5.

22       While Defendants put forward this alternative proposal, should the Court order Defendants

23  to provide the data recommended by the Special Master, it bears noting that Defendants' approach

24  would still suffer from the same technical limitations described above.  It is nonetheless preferable

25  because it would eliminate confusion that would stem from the reporting of data under the AC5

26  indicator.

27  / / /

28  / / /

1    **V.    CONCLUSION**

2         Defendants agree that compliance with the Program Guide requirements measured in AC5

3    should not be affected by whether clinician-led group treatment of EOP patients occurred in a

4    confidential setting since there is no corresponding Program Guide requirement.  But Defendants

5    do not agree that this information should be tracked because such data is not relevant to

6    monitoring Defendants' implementation of the remedy.  Accordingly, Defendants object to the

7    Special Master's Proposed Resolution of this dispute.

8    **VI.    CERTIFICATION**

9         The undersigned certify that they have read the following orders in preparing these

10   objections: ECF Nos. 6242, 7216, 7847, 7954, 8008, 8028.

11   DATED: October 27, 2023                    ROB BONTA
                                                Attorney General of California
12                                              DAMON MCCLAIN
                                                Supervising Deputy Attorney General
13

14                                        By:        */s/ Elise Owens Thorn*
                                                ELISE OWENS THORN
15                                              Deputy Attorney General
                                                *Attorneys for Defendants*
16

17
     DATED: October 27, 2023                    HANSON BRIDGETT LLP
18

19                                        By:        */s/ Samantha Wolff*
                                                LAWRENCE M. CIRELLI
20                                              PAUL B. MELLO
                                                SAMANTHA D. WOLFF
21                                              KAYLEN KADOTANI
                                                LAUREL O'CONNOR
22                                              DAVID C. CASARRUBIAS
                                                CARSON R. NIELLO
23                                              Attorneys for Defendants

24

25

26

27

28

OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION
DISPUTES

# EXHIBIT 1

# EXHIBIT 1

**Special Master's Proposed Resolution[1] of Data Remediation Dispute: AC5 (Treatment Offered) – Confidential Groups**

I.    Brief Statement of Dispute

This dispute[2] involves the parties' disagreement as to whether group treatment led by primary clinicians and/or psychiatrists must be conducted in a confidential setting in order to count toward the Program Guide requirement to offer at least "ten hours per week of scheduled structured therapeutic activities" to patients at the Enhanced Outpatient Program (EOP) level of care. 2021 Program Guide Update, ECF No. 7333-1 at 59.

II.    Date Proposed Resolution was Delivered to the Parties

This proposed resolution was provided to the parties on October 18, 2023.

III.    Special Master's Proposed Resolution

The Special Master does not recommend adjusting the scoring of AC5 based on whether group treatment was conducted in a confidential setting. Instead, the Special Master proposes that AC5 be modified to include information on whether the primary clinician or psychiatrist led groups were conducted in confidential settings in a drill down, including a summary statistic reporting the percentage of groups documented as being conducted in a confidential setting. The Special Master understands that CDCR's EHRS documentation for group treatment allows the clinician to check a box indicating whether the session was conducted in a confidential setting.

---

[1] This proposal is made in accordance with the Court's October 11, 2023 Order modifying the data remediation dispute resolution process. ECF No. 8008 at 2 ("For any dispute that remains unresolved at the end of a two-week discussion period, the Special Master shall within seven days thereafter provide the parties with a proposed written resolution of the dispute, including a brief statement of reasons for the proposed resolution and the date on which the proposed resolution was delivered to the parties.").

[2] The parties each submitted statements on this dispute under the former dispute resolution process. *See* Exhibit A (Plaintiffs' position statement) and Exhibit B (Defendants' position statement).

The Special Master further understands that defendants confirmed during the August 17, 2023 dispute resolution meeting that they had the technical capacity to modify AC5 to include this information in a drill down.

IV.     Brief Statement of Reasons for the Proposed Resolution

All stakeholders agree that confidentiality of mental health treatment is of vital importance.[3]  *See* Exhibit A at 3 (Plaintiffs' position statement, arguing that counting non-confidential clinician led groups toward the EOP structured treatment requirement "is contrary to the clear intent of the Program Guide and this Court's orders"); *see* Exhibit B at 2 (Defendants' position statement, noting "CDCR acknowledges the importance of confidentiality").  Indeed, the Special Master regularly monitors and reports on confidentiality of treatment space, including group treatment space, during his monitoring rounds.

However, the Special Master has not historically excluded group treatment hours provided in non-confidential space from his assessment of weekly hours of structured treatment offered to EOP patients.  Instead, the Special Master observes IDTTs and group treatment sessions while on site, noting any concerns about lack of confidentiality or other environmental factors impacting provision of treatment.  *See, e.g.*, ECF NO. 7715 at 196 ("Treatment space in [CMF] O-wing was generally adequate and confidential.  However, unit N-1's 'chow hall' was also used for EOP treatment groups, despite extremely hot temperatures due to a broken fan and visual and auditory distractions due to dayroom windows."); *id.* at 230 ("The [CHCF recreation therapist] reported that groups were routinely scheduled for more patients, but there were many

---

[3] Confidentiality is of particular importance when conducting clinician-led groups which tend to address sensitive, personal topics; indeed, patients at the EOP level of care can be seen every other week in a group setting in lieu of an individual contact with their primary clinician.

refusals and groups were held in the non-confidential day room.  As each MHCB unit had two group rooms, it was unclear why groups were held in the non-confidential day room."); *id.* at 237 ("Group treatment rooms [at CHCF] for EOP patients were sufficient and confidential."); *id.* at 528 ("[RJD] Facility E's mental health clinic had sufficient confidential treatment space for individual and group contacts, and IDTTs.").

In presenting this proposed resolution, the Special Master notes (as did defendants in their position statement, *see* Exhibit B at 2) that there are at least two other provisionally approved key indicators (FEC1 and AC13) which report on the adequacy of confidential treatment space.

Further, unlike the Program Guide's requirements regarding confidentiality of individual treatment (across levels of care)[4] and structured treatment in STRH and LTRH settings,[5] the Program Guide does not specify that the ten hours of structured treatment required for EOP patients must be provided in confidential settings.  *See* ECF No. 7333-1 at 59 (requiring "[t]en hours per week of scheduled structured therapeutic activities").

Finally, the Special Master observes that, similar to the Court's observations regarding the Special Master's recommendation to resolve the parties' dispute regarding the STRH/LTRH transfer timeframe dispute, this proposed compromise "will result in accurate reporting" of the

---

[4] *See* ECF No. 7333-1 at 636 (February 7, 2020 Memorandum included in 2021 Program Guide Update requiring that "[e]ach patient shall be afforded *individual treatment in a confidential setting*"); see also id. ("To be considered a *clinical contact that meets Mental Health Services Delivery System (MHSDS) Program Guide requirements, the patient must be seen: 1. In a confidential setting*, OR 2. In a non-confidential setting in response to: a. The patient's refusal, as defined below, OR b. Temporary Medical Isolation that requires confinement to quarters or isolation in a medical setting…").

[5] *See* ECF No. 7333-1 at 452-53 (January 15, 2015 Memorandum included in 2021 Program Guide Update, requiring 3CMS patients housed in STRH and LTRH units to be "offered 90 minutes [per week] of *confidential* structured therapeutic activity").

relevant remedial requirement while also "provid[ing] a solid foundation for ultimate questions of compliance when those are before the court."  ECF. No. 8010 at 10.

# EXHIBIT A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

August 25, 2023

VIA ELECTRONIC MAIL ONLY

Kerry Walsh
Deputy Special Master
kwalsh@pldolaw.com

  Re: *Coleman v. Newsom*: Plaintiffs' Level 2 Data Dispute Statements
    Our File No. 0489-03

Dear Kerry:

  Plaintiffs' position statements for the following disputes are attached for consideration by the Special Master and the Secretary during their August 29, 2023 Level 2 dispute resolution meeting:

1) AC 2.1 – Timely PC Contacts

  a) Definition of "weekly" as 7 days

2) AC5 – Treatment Offered

  a) Group Treatment – Confidentiality

  b) Group Treatment – Core Groups

3) PIP Placeholder

  a) Review of Max Custody patients in compliance with CDCR policy

          Sincerely,

          ROSEN BIEN
          GALVAN & GRUNFELD LLP

          */s/ Cara E. Trapani*

      By: Cara E. Trapani

[4344320.4]

Kerry Walsh
August 25, 2023
Page 2

## Definition of "Weekly" as 7 Days

**Issue:**  Should compliance with the Program Guide's weekly primary clinician contact requirement for various levels of care be measured as "every 7 days," as opposed to once a week, which would allow up to 14 days between contacts?

**Affected indicator:** AC2.1 – Timely PC Contacts

**Plaintiffs' Position:** Yes.  The reasonable interpretation of the Program Guide's weekly primary clinician ("PC") contact requirement is that patients should be seen at least once every seven days.  The business rules for the Timely PC Contacts (AC2.1) indicator should adhere to this logic, which aligns with the Court's reasoning in 2019 that CDCR's decision to define "monthly" as more than 30 days was misleading.  *See* Dec. 17, 2019 Order, ECF No. 6427 at 29.

CDCR argues that "weekly" should be defined in a way that would allow up to 14 calendar days between clinical contacts (though they claim that at most 11 days would elapse between contacts under CDCR's proposed methodology because clinicians do not schedule appointments on the weekends).  When the Court faced a similar dispute over divergent interpretations of the Program Guide during the 2019 evidentiary hearing, it turned to the Special Master's reports for clarity.  Here, those reports provide the answer.  The Special Master has consistently interpreted "weekly" to be "every 7 days."  *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 224 ("Seven of ten required weekly routine PC contacts occurred every seven days."); 307 (measuring mainline EOP routine PC contacts as having to occur every seven days); *id.* at 300 (measuring routine PC contacts in the STRH and LTRH using the 7 calendar days requirement); *id.* at 190 (measuring EOP Hub routine PC contacts as having to occur "every seven days"); *id.* at 297 (measuring PSU routine PC contacts as having to occur "every seven days"); *see also* Special Master's 29th Round Report Part D – CCCMS Compliance, ECF No. 7716 at 267, 291, 326.

Not only is the Special Master's interpretation of "weekly" to be "every 7 days" reasonable, it must be incorporated into the business rules under the Court's May 24, 2023 Order.  *See* ECF No. 7847 at 7 ("[E]ach key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities."); *id.* at 8 ("If an indicator requires modification to thoroughly capture information monitored by the Special Master on the topic covered by the indicator, each party has all relevant information: the Special Master's monitoring reports and all relevant court orders.").

Kerry Walsh
August 25, 2023
Page 3

## Group Treatment – Confidentiality

**Issue:** Should mental health treatment groups led by social workers, psychologists, and psychiatrists be counted towards fulfillment of structured treatment requirements when they occur in non-confidential settings?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** No. Clinician-led groups (i.e., those led by an LCSW, psychologist, or psychiatrist) should be confidential in order to be counted towards fulfillment of the Program Guide's structured treatment requirements.

The Program Guide contemplates that a varied slate of structured therapeutic activities will be offered to class members, including group therapy and psycho-educational groups led by qualified clinicians focusing on highly sensitive issues including symptom management, family issues, specific mental health issues such as depression, anger management and offense-specific therapy. *See* 2021 Program Guide, ECF No. 7333-1 at 60-62. However, CDCR maintains that essentially any group[1] can be held in non-confidential settings—including on the dayroom floor and in the middle of the yard with custody officers and other incarcerated people milling around—and still qualify as structured therapeutic treatment. This includes any and all groups led by psychologists, social workers, and psychiatrists, which are more likely to involve private issues requiring a strong and trusting therapeutic alliance that only confidentiality can provide, than those facilitated by recreational therapists or nurses, such as hygiene and leisure groups. The net effect is that CDCR could provide zero hours of confidential structured therapeutic activity to each and every class member on a permanent basis—either because it offers no core groups of any sort, or because core groups are offered in a non-confidential setting that defeats the therapeutic alliance—and still be deemed compliant. That is contrary to the clear intent of the Program Guide and this Court's orders.

CDCR does not dispute the fact that it already tracks both the confidentiality of all structured treatment, and whether the therapeutic activity was led by a PC or psychiatrist versus, for instance, a recreational therapist. Nor is it possible to dispute that CDCR must only count confidential structured therapeutic activities offered to STRH and LTRH class members, which are measured in AC5, as compliant. *See* 2021 Program Guide, ECF No. 7333-1 at 444 ("All [STRH] patients shall be offered 90 minutes of confidential structured group therapeutic activity weekly."); *id.* at 453 ("[I]nmates placed into the CCCMS-LTRH will be offered 90 minutes of confidential structured therapeutic

---

[1] The parties agree that mental health groups that occur cell-front (including patients' completion of in-cell treatment packets) should *not* count towards fulfillment in AC5.

Kerry Walsh
August 25, 2023
Page 4

activity."); *id.* at 452 ("CCCMS female inmates or CCCMS inmates undergoing RC processing will be offered 90 minutes of out-of-cell activity consisting of confidential structured therapeutic activity.").

The Court rejected Defendants' argument that psychiatry contacts need not be confidential to satisfy Program Guide requirements. *See* Aug. 14, 2019 Order, ECF No. 6242 at 7. Given that clinician-led groups address many of the same sensitive, private issues discussed by patients and their psychiatrists in individual MHMD contacts, it is reasonable to extend this Order's confidentiality requirement to clinician-led groups.

The Special Master regularly monitors whether groups occurred in a confidential setting; this goes to both the place itself where the group is conducted and also that it is reasonably free of intrusions (e.g., the setting is private, but has a refrigerator in it and staff interrupt the group to retrieve their lunches). *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 230 ("[I]t was unclear why groups were held in the non-confidential day room."); 298 ("The EOP hub certifications suggested that non-confidential cell-front treatment groups conducted in the corridor of the PSU were counted toward treatment group hours."); 318 ("The observed treatment space for STRH and LTRH patients was non-confidential and located in the dayroom …"). The Special Master's history of monitoring this issue supports Plaintiffs' position that AC5 should into account whether clinical groups were confidential. *See* May 24, 2023 Order, ECF No. 7847 at 7-8.

[4344320.4]

Kerry Walsh
August 25, 2023
Page 5

## Group Treatment – Core Groups

**Issue:** Should Defendants create a summary statistic showing the percentage of mental health groups that are led by a primary clinician or psychiatrist, as opposed to a nurse, recreational therapist, or other provider?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** Yes. A plain reading of the Program Guide indicates that leisure activities cannot comprise the entirety of a patient's structured treatment. *See, e.g.*, 2021 Program Guide, ECF No. 7333-1 at 60-62 (listing numerous exemplar substantive EOP treatment groups). However, AC5 does not currently provide information on which groups were PC- or psychiatrist-led (a.k.a "core groups") as opposed to purely leisure groups (such as watching a movie, playing video games, coloring, etc.). The Program Guide also requires that "[o]ccupational or recreational therapy is counted as structured activity only if an appropriate clinician … is present and supervising the activity," but this is also not being measured. *Id.* at 59-60. To address these limitations in the indicator's current design, Plaintiffs proposed that CDCR create an informational summary statistic in AC5 that would show the percentage of groups that are led by a PC or MHMD, without implicating the overall numerator/denominator calculation of the indicator. CDCR refused.

The Special Master has monitored this issue, finding that staffing shortages and other factors contribute to patients receiving too many recreational groups and not enough clinical/process groups. *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. at 67 (May 17, 2022) ("Long-standing staffing vacancies left clinicians with high caseloads and, consequently, limited to no time to conduct core mental health groups."); Special Master's 28th Round Monitoring Report, ECF No. 7074 at 291 ("Inmates further reported that refusals were due to an insufficient number of core groups and too many recreational groups."); *id.* at 1206 ("Mental health leadership acknowledged the validity of inmate complaints that groups with nominally clinically-oriented titles were in actuality run as leisure groups."). Although the Special Master has not previously reported on the percentage of overall groups that were core vs. leisure, this is likely due to the fact that CDCR has never made this information available.

Plaintiffs understand that every mental health appointment that appears EHRS has a provider attached to it, and that there is a table of provider/position types in CDCR's data warehouse, making it possible to discern which groups were led by PCs and MHMDs as opposed to other providers. Although the data warehouse does not store historical changes to providers' position type at present, CDCR is correcting this problem. Given that the Program Guide clearly contemplates the provision of some amount of core

Kerry Walsh
August 25, 2023
Page 6

structured therapeutic activity and the Special Master monitors whether core groups are being offered, CDCR must provide this information, which it concedes it has, to ensure this critical aspect of class member care is effectuated.

Kerry Walsh
August 25, 2023
Page 7

**Review of Max Custody patients in compliance with CDCR policy**

**Issue:** Should CDCR create the Special Master's requested new PIP indicator titled *Timely Review of Max Custody Patients and In Compliance with CDCR Policy*?

**Affected indicator:** This would be a new indicator, created pursuant to the PIP Placeholder item on provisionally approved key indicator list (ECF No. 7151).

**Plaintiffs' Position:**  Yes.  The Special Master's request for an indicator that measures compliance with Defendants' stipulated, Court-approved plan to treat maximum ("max") custody patients in the PIPs is justifiable for several reasons, notwithstanding the parties' agreement in paragraph 15 of the stipulation that "Defendants' plan shall not be included in the MHSDS Program Guide or Compendium."   ECF No. 7392 at 5.

First, long before the parties' stipulation, the Special Master reported on the systemically inadequate treatment provided to max PIP patients, with no objection from Defendants. *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. 7555 at 43-44 ("[M]any *Coleman* patients on maximum custody status received virtually no structured treatment and limited out-of-cell time during the monitoring round and have not for years.  Remedying this deficiency is essential for these class members to receive treatment consistent with their rights under the Eighth Amendment."); Defs.' Objections to 29th Round Inpatient Report, ECF No. 7559.  When the Special Master reported on the state of Defendants' compliance with the max custody plan in his most recent report, Defendants similarly did not object.  *See* Special Master's 30th Round Monitoring Report Part A – PIP Compliance, ECF No. 7833 at 29-33; June 9, 2023 Order, ECF No. 7854 at 1-2 (adopting report and noting neither party filed objections).  Given the requirement that "each key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master," this history requires Defendants to create the requested Max custody indicator. *See* May 24, 2023 Order, ECF No. 7847 at 7.

Second, the Court empowered the Special Master, not the parties, to determine whether to add this indicator to the provisional key indicator list.  When the Court approved paragraph 15 of the parties' stipulation, it "referred to the Special Master for consideration as to whether [the provisions regarding Therapeutic Treatment Modules ("TTMs")] are, or should be, reflected in the list of CQIT indicators currently under review."  Feb. 7, 2022 Order, ECF No. 7456 at 4.  Defendants voluntarily dismissed their appeal of this Order in October 2022.  *See* Ninth Cir. Case No. 22-15369.

Third, development of a functioning CQIT system is itself a freestanding remedial requirement in this case.  *See* Sept. 3, 2020 Order, ECF No. 6846 at 10.  The CQIT system cannot be robust without closely monitoring max custody issues in the PIPs.

[4344320.4]

Kerry Walsh
August 25, 2023
Page 8


Fourth, while the Court has held that "the 'key indicators' in CQIT are likely equivalent to the material provisions of the Program Guide and the Compendium," *see* Sept. 3, 2020 Order, ECF No. 6846 at 24 n.11, other requirements such as staffing have also been turned into indicators throughout the data remediation process.

Finally, according to an email from Melissa Benz on June 23, 2023, the performance report data that Plaintiffs have historically relied on to obtain information and trends about the statewide max custody census may not be accurate because it "is an older report and not one that has or will be reviewed in data remediation." Nor have Defendants committed to providing transparent, accurate information necessary to monitor these issues in any other way. As such, because CDCR's information-sharing obligations under the parties' stipulation expire after two years, which will run at the end of December 2023 (ECF No. 7392 at 3), Plaintiffs and other stakeholders will have no validated data on the max population absent this indicator. Given the persistent systemic deficiencies in the provision of care provided to max patients in the PIPs identified by the Special Master, and in the absence of any proposed alterative offered by CDCR, the creation of a new indicator is warranted and necessary.

# EXHIBIT B

Defendants' Level 2 Dispute Statement:
AC5: Treatment Offered- Measuring Confidential Groups[1]

Plaintiffs believe that all groups led by a Primary Clinician (PC), generally a social worker or psychologist, or a Psychiatrist (MHMD) must be confidential to be counted as compliant in the indicator built to measure whether patients are offered the required amount of structured treatment per week, also known as AC5. Defendants disagree as Plaintiffs' position is not clinically supported, would obscure the most salient function of AC5, is not consistent with how group confidentiality is considered by the Special Master's team, and is not rooted in any remedial requirement.

     I.       Plaintiffs' Attempt to Discount Treatment Provided By PCs And MHMDs Is Not Clinically Supported.

The determination of whether group treatment counts as structured treatment cannot be solely based on the location or the provider. Treatment is a complex and nuanced process that should not be confined to overly rigid definitions. While confidentiality is undoubtedly vital in specific scenarios, a blanket requirement for confidentiality to groups facilitated by PCs and MHMDs will hinder rather than enhance treatment accessibility and quality. CDCR disagrees with Plaintiffs' attempt to discount non-confidential group treatment led by PCs or MHMD for many reasons.

First, not all treatment sessions require strict confidentiality. Some groups benefit from more open settings, allowing patients to interact and share with others in a manner that fosters growth and understanding. Both Plaintiffs and the Special Master's team have acknowledged this when talking about groups designed to engage patients in social activities. Such groups are often led by recreational therapists, but not always. Under Plaintiffs' proposal, an art therapy group led by a licensed clinical social worker would not count as compliant unless it was confidential, despite recognition by the parties that such therapeutic activities are not required to be confidential.

Second, Plaintiffs' position pre-supposes that groups led by PCs and MHMDs are not therapeutic structured treatment unless confidential. This is incorrect. If a psychologist leading a talk-therapy group decides to open the door to the group room because the room is humid, that does not render the group therapeutically meaningless. While the psychologist may limit conversation of confidential patient experiences due to the open door, they can still provide valuable tools and insights and have meaningful conversations with the patients attending the group. Under

---

[1] CDCR reserves the right to make new objections to any future writings from Plaintiffs or the the Special Master regarding this issue. To date, CDCR has not received the Special Master's position on this issue in writing. The Court recently noted that under the Order of Reference, "the court does not consider any objections to a report or recommendation by the Special Master 'unless an identical objection was previously submitted….'" ECF No. 7847 at 10 (citing ECF No. 640 at 8). However, the cited section of the Order of Reference applies to compliance reports filed under paragraph A(5). ECF No. 640 at 8. Under paragraph A(5), the Special Master provides a draft report and each party has 30 days to provide informal objections. *Id*. at 4-5. That is not the case here. No written report has been provided here. CDCR maintains its right to supplement these objections should a written report be issued in the future or if Plaintiffs' position statement raises new issues.

Plaintiffs' proposal, such a group would not count as structured treatment, although treatment was actually provided. The application of Plaintiffs' proposal in such scenarios may in fact create perverse incentives not to offer out-of-cell opportunities to patients if they do not count as structured treatment.

While CDCR acknowledges the importance of confidentiality, CDCR firmly believes that the Plaintiffs' restrictive stance again overlooks the nuanced nature of mental health treatment.

> II.    Measuring Group Confidentiality In AC5 Understates How Much Structured Treatment Is Actually Offered to EOP Patients.

The primary focus of AC5 is to measure whether EOP patients are offered 10 hours of structured treatment per week. Yet, as demonstrated in the above examples, requiring all PC and MHMD led groups to be confidential will lead to an undercounting of the treatment actually offered to EOP patients. Non-confidential groups, whether led by a PC, MHMD, or other classification, are therapeutic and appropriate structured treatment. Discounting such treatment would provide inaccurate data regarding the amount of structured treatment EOP patients receive.

> III.    Plaintiffs' Request Is Inconsistent With How the Special Master's Team Looks At Group Confidentiality.

Plaintiffs' proposal to require confidentiality for PC and MHMD led groups as a pre-requisite for compliance is inconsistent with the Special Master's monitoring practices. The Special Master does not look at confidentiality of PC or MHMD led groups as a prerequisite for whether EOP patients are offered 10 hours of structured treatment per week. Instead, like CDCR's indicators, the Special Master's team separately audits treatment hours offered and confidentiality of group treatment space. They also audit group quality while on-site.

CDCR has already created two indicators that mirror these monitoring practices: AC13: Group Treatment in a Confidential Setting and FEC1: Adequate Group Treatment Space. Both items went through data remediation, were agreed upon by the parties and the Special Master's team, and were remediated by the Special Master's data expert on June 26 and July 3, 2023, respectively. Requiring PC and MHMD groups to be confidential to be compliant structured treatment not only strays from the Special Master's prior monitoring practices, but also renders AC13 and parts of FEC1 duplicative and obsolete. The agreement to review group confidentiality via AC13 and FEC1 is the appropriate way to monitor this issue.

> IV.    The Program Guide Does Not Support Plaintiffs' Position.

The Program Guide lists many different types of allowable structured therapeutic activities for EOP patients, including group therapy, psycho-educational groups, individual therapy, recreational therapy, and occupational therapy. 2021 Program Guide at 12-4-9. Examples of treatment activities include groups regarding daily living skills, medication education, symptom management, specific mental health issues, social skills/communication, anger management, stress management, substance abuse group, health issues, offense specific therapy, rational behavior/reality and decision-making, family issues, therapeutic community meetings, and

clinical pre-release groups. *Id.* at 12-4-10 to 12-4-12. The Program Guide does not differentiate between groups led by PCs or MHMDs and other classifications and does not state, explicitly or implicitly, that certain groups can only be led by PCs or MHMDs. It is unclear what Plaintiffs rely upon to support their position that PC and MHMD groups are required to be confidential. Plaintiffs attempt to delineate between different types of structured treatment allowed by the Program Guide and what must be confidential is unsupported.

CDCR's mental health staff of all classifications are trained in the course of their schooling and licensure to understand what types of information should be discussed in a private or confidential setting. They use their clinical discretion and training when determining what to discuss during groups based on the curriculum, patients, and group location. The parties and the Special Master's team agree that there are many forms of appropriate structured treatment that are not required to be confidential. While CDCR agrees that confidentiality is appropriate for some groups, it should be dictated by the content of the group as determined by the facilitator, not a broad stroke application of an arbitrary and unsupported requirements, such as the classification of the facilitator.

V.    There Are Technical Limitations to Implementing Plaintiffs' Proposal.

CDCR does not agree with Plaintiffs' request to only count confidential PC and MHMD groups in AC5 for the above reasons. However, even if CDCR is required implement this proposal there are technical limitations that may make the data unreliable. First, the staff classification is not available in EHRS for groups (appointments) that patients refuse to attend. Second, the staff member who checks the attending patients in and out of the appointment may not be the staff member who facilitates the group. This could occur if a supervisor checks patients in and out while a line staff member, maybe a new recreational therapist or nurse, facilitates the group. The technical limitations further support CDCR's position. Monitoring the exact location and provider for each treatment session would require significant investments in technology and manpower that are better spent directly improving patient care.

VI.    Conclusion.

Plaintiffs' position that all PC and MHMD led EOP groups must be confidential to be counted as appropriate structured treatment is clinically unsupported, could lead to inaccurate data regarding structure treatment offered to EOP patients, is inconsistent with the Special Master's monitoring practices, and is not supported by the Program Guide. CDCR should be allowed to continue AC5 through data remediation without further changes.