1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone: (916) 210-7318
     Fax: (916) 324-5205
8    E-mail: Elise.Thorn@doj.ca.gov
   Attorneys for Defendants

   HANSON BRIDGETT LLP
   LAWRENCE M. CIRELLI, SBN 114710
   PAUL B. MELLO, SBN 179755
   SAMANTHA D. WOLFF, SBN 240280
   KAYLEN KADOTANI, SBN 294114
   LAUREL O'CONNOR, SBN 305478
   DAVID C. CASARRUBIAS, SBN 321994
   CARSON R. NIELLO, SBN 329970
   1676 N. CALIFORNIA BLVD., SUITE 620
   WALNUT CREEK, CALIFORNIA 94596
   TELEPHONE:  925-746-8460
   FACSIMILE:  925-746-8490
   Attorneys for Defendants

9

10              UNITED STATES DISTRICT COURT

11             EASTERN DISTRICT OF CALIFORNIA

12                 SACRAMENTO DIVISION

13

14  RALPH COLEMAN, et al.,              Case No. 2:90-CV-00520- KJM-DB

15              Plaintiffs,             **OBJECTIONS TO THE SPECIAL
                                        MASTER'S PROPOSED RESOLUTION
16         v.                           OF DATA REMEDIATION DISPUTES:
                                        AC5: Treatment Offered – Measuring
17  GAVIN NEWSOM, et al.                "Core Groups"**

18              Defendants.

19                                      Judge:    Hon. Kimberly J. Mueller

20  **I.     INTRODUCTION**

21         This dispute centers around the Continuous Quality Improvement (CQI) indicator created

22  to measure whether the required amount of structured treatment was offered to Enhanced

23  Outpatient Program (EOP) patients, also known as AC5 (Treatment Offered).[1]  The issue is

24  whether Defendants should be ordered to include drill down information and a summary statistic

25  reporting how many and what percentage of group treatment hours utilized to measure the

26

27  _____
    [1] A copy of the Special Master's *Proposed Resolution of Data Remediation Dispute: AC5:*
28  *Treatment Offered – Measuring "Core Groups"* is attached as Exhibit 1.

    20063300.5
    _____
    OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION
    DISPUTES

requirement to offer ten hours of structured treatment weekly were conducted by a psychiatrist or primary clinician. The Special Master does not recommend that this information be considered in scoring AC5, but nonetheless recommends that the information be reported. Defendants oppose the recommendation.

## II.      BACKGROUND OF THE DISPUTE

During remediation of CQI indicator AC5, a dispute arose between the parties as to whether this indicator should track "core groups" and include a summary statistic showing whether patients are receiving said groups.[2]  Plaintiffs concede that the Special Master has not previously reported the percentages for the types of group treatment offered, but now contend that such percentages must be reported because the Program Guide prescribes that leisure activities cannot comprise the entirety of a patient's structured treatment.  Defendants, on the other hand, argue that the concept of "core groups" is not a Program Guide requirement, and that including such information in the AC5 indicator would pose both practical and technical limitations that are unwarranted in light of the fact that the information will not be considered in scoring AC5.

To resolve this dispute, the Special Master proposes that the indicator include drill down information and a summary statistic reporting how many and what percentage of group treatment hours utilized toward fulfilling the requirement to offer ten hours of structured treatment weekly were conducted by a psychiatrist or primary clinician. But as noted, the Special Master does not recommend this information be considered in scoring AC5.

## III.     OBJECTIONS

Defendants object to the Special Master's proposed resolution on three grounds.  *First*, as stated in the Special Master's proposed resolution "[a]ll stakeholders acknowledge that the Program Guide does not define or otherwise refer to 'core groups'; nor does it distinguish between psychiatrist or primary clinician-led groups and other forms of treatment." (Exhibit 1 at p. 2.) Both

---

[2] There has been significant dispute about how a "core group" is defined as the term is not used in the Program Guide or any other CDCR policy.  For purposes of this dispute, the question is whether groups lead by primary clinicians or psychiatrists should be specially tracked and reported on.

1   this Court and the Special Master have emphasized that key indicators should be a "distill[ation]"

2   of the "most salient elements" of the Program Guide (May 6, 2023 Special Master's CQIT Report,

3   ECF No. 7151 at 4), and should "signify the material provisions of the Program Guide and

4   Compendium." (July 1, 2021 Order, ECF No. 7216 at 4 (internal citations omitted).) It must

5   logically follow that key indicators should therefore not be designed to measure that which is not

6   mandated under the Program Guide.

7        *Second*, "the process of data remediation is fundamentally to equip defendants to

8   accurately and transparently report data to replicate the substance of Special Master's monitoring."

9   (ECF No. 7954 at 2, citing, May 23, 2023 Order, ECF No. 7847 at 7.) Here, the Special Master

10  acknowledges that "[t]he data provided to the Special Master's monitoring teams regarding

11  treatment hours offered to EOP patients has historically not distinguished between clinician-led

12  groups and other forms of group treatment (i.e. recreational or leisure groups)." (Exhibit 1 at p. 2.)

13  The Special Master's monitoring reports also do not present information regarding the percent of

14  overall clinician-led groups. While the Special Master does comment on the availability of

15  clinician-led groups as part of case reviews or patient or staff interviews, that is vastly different

16  than what he is currently recommending. Because the Special Master's recommendation to track

17  primary clinician and psychiatry-led groups is neither required by the Program Guide nor part of

18  the Special Master's past monitoring, CDCR should not be required to track this information,

19  particularly where information pertaining to clinician-led groups is already available to Plaintiffs

20  and the Special Master.

21        *Third*, measuring clinician-led groups fails to align with the mental health needs of patients

22  and overlooks the flexibility required to provide appropriate treatment. The Special Master's

23  recommendation to report separately on clinician-led groups is premised upon an assumption that

24  primary clinician or psychiatrist-led groups are *ipso facto* better (either more therapeutic or

25  helpful) to patients than those led by other classifications. This is simply incorrect. Treatment

26  should be individualized based on patient needs and level of functioning. Highlighting clinician-

27  led groups in a separate drilldown and summary statistic within AC5 could lead institution staff to

28  overemphasize the need for groups lead by primary clinicians or psychiatrists. This could result in

OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION
DISPUTES

1  inappropriate group placements, de-individualization of treatment plans, and potentially harmful

2  consequences for the patient.

3        The request to measure groups lead by primary clinicians or psychiatrists also risks

4  drawing erroneous assumptions about the clinical relevance of these groups to individual patient

5  treatment plans. The classification of the person leading the groups does not fully dictate the topic

6  or quality of the group. For example, nothing in the Program Guide prevents a primary clinician or

7  psychiatrist from leading the same group traditionally led by a Social Worker or Recreational

8  Therapist. This would create additional hurdles without improving the quality of the patient's

9  clinical experience or staff morale. CDCR firmly believes that the focus should remain on the

10  clinical relevance and appropriateness of treatment groups to each patient's specific diagnosis and

11  treatment plan, rather than on rigid categorizations that may misrepresent the true quality of care

12  or benefit provided.

13        Finally, even if Defendants can technically provide the requested drilldown and summary

14  statistic, there are several limitations that may undermine the underlying data's accuracy.

15  Primarily, the suggested drill down report will only show completed mental health group

16  appointments—it will not include group appointments that patients refused to attend. This is

17  because staff classifications are not available in the Electronic Health Record System (EHRS) for

18  groups that patients refuse to attend.  Separately, the staff member who checks the attending

19  patients in and out of the group may not be the staff member who facilitates the group.  This could

20  occur, for example, where a supervisor checks patients in and out while a line staff member—*i.e.* a

21  recreational therapist or nurse—facilitates the group. Thus, there is a risk that the classification of

22  the individual leading the group could be misreported.

23  **IV.    DEFENDANTS' PROPOSAL**

24        Defendants propose that the Court maintain the status quo.  This makes the most sense

25  particularly here, where the additional data requested would *not* affect the compliance with the

26  AC5 indicator and the alternative would impose further onerous documentation requirements on

27  staff.

28        Alternatively, if the Court is inclined to order Defendants to engage in additional data

1  collection and reporting, Defendants propose that they be given time to work with their IT staff to

2  develop a reporting mechanism independent of AC5 such that would not further complicate the

3  indicator with non-scored data.  Such a report would be summary/operational that shows the count

4  of attended groups provided by the following classifications: Primary clinician, psychiatrist,

5  recreational therapists, and all other mental health provider types.

6  **V.    CONCLUSION**

7      While Defendants agree with the Special Master that the AC5 indicator should not score

8  "core groups" since there is no corresponding Program Guide requirement, Defendants cannot

9  agree that this information should nonetheless be tracked.  It is unclear why such data should be

10  monitored via another *Coleman* report when it is not a Program Guide requirement or part of the

11  Special Master's historical monitoring in this way. Further, the requested information is already

12  available to the Special Master's monitoring teams via chart reviews and patient and staff

13  interviews. Accordingly, Defendants object to the Special Master's Proposed Resolution of this

14  dispute.

15  **VI.    CERTIFICATION**

16      The undersigned certify that they have read the following orders in preparing these

17  objections: ECF Nos. 6242, 7216, 7847, 7954, 8008, 8028.

18  DATED: October 27, 2023                    ROB BONTA
                                                Attorney General of California
19                                              DAMON MCCLAIN
                                                Supervising Deputy Attorney General
20

21                                              By:_____*s/ Elise Owens Thorn*_____
                                                ELISE OWENS THORN
22                                              Deputy Attorney General
                                                *Attorneys for Defendants*
23

24

25

26

27

28

1    DATED: October 27, 2023                HANSON BRIDGETT LLP

2
                                           By:_____s/ Samantha D. Wolff_____
3                                               LAWRENCE M. CIRELLI
                                                PAUL B. MELLO
4                                               SAMANTHA D. WOLFF
                                                KAYLEN KADOTANI
5                                               LAUREL O'CONNOR
                                                DAVID C. CASARRUBIAS
6                                               CARSON R. NIELLO
                                                Attorneys for Defendants
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION
DISPUTES

# EXHIBIT 1

# EXHIBIT 1

**Special Master's Proposed Resolution[1] of Data Remediation Dispute: AC5 (Treatment Offered) – Core Groups**

I.    Brief Statement of Dispute

This dispute[2] involves the parties' disagreement about whether AC5, the indicator measuring the number of weekly hours of structured treatment offered to patients at the Enhanced Outpatient Program (EOP) level of care, *see* 2021 Program Guide Update, ECF No. 7333-1 at 59, should, as plaintiffs proposed, include a summary statistic reporting the percentage of groups conducted by psychiatrists or primary clinicians, otherwise known as "core" groups. Defendants rejected this proposal. Importantly, plaintiffs acknowledge that their proposed summary statistic would not be considered in the indicator's scoring. *See* Exhibit A at 5 (Plaintiffs' position statement at 5, noting "Plaintiffs proposed that CDCR create an informational summary statistic in AC5 that would show the percentage of groups that are led by a [primary clinician] or [psychiatrist], without implicating the overall numerator/denominator calculation of the indicator.").

II.    Date Proposed Resolution was Delivered to the Parties

This proposed resolution was provided to the parties on October 18, 2023.

---

[1] This proposal is made in accordance with the Court's October 11, 2023 Order modifying the data remediation dispute resolution process. ECF No. 8008 at 2 ("For any dispute that remains unresolved at the end of a two-week discussion period, the Special Master shall within seven days thereafter provide the parties with a proposed written resolution of the dispute, including a brief statement of reasons for the proposed resolution and the date on which the proposed resolution was delivered to the parties.").

[2] The parties each submitted statements on this dispute under the former dispute resolution process. *See* Exhibit A (Plaintiffs' position statement) and Exhibit B (Defendants' position statement).

III.    <u>Special Master's Proposed Resolution</u>

The Special Master proposes modifying AC5's documentation to include drill down information and a summary statistic reporting how many and what percentage of group treatment hours utilized toward fulfilling the requirement to offer ten weekly hours of structured treatment were conducted by a psychiatrist or primary clinician; the Special Master does not recommend this information be considered in scoring AC5. Although clinician-led groups are a critical component of clinician treatment, because the Program Guide does not refer to or define "core" groups, and does not require that any specific percentage of groups be conducted by a primary clinician or psychiatrist, the Special Master does not propose classifying psychiatrist or clinician-led groups as "core"; and he concurs with plaintiffs that this summary statistic need not factor into the indicator's scoring.

IV.    <u>Brief Statement of Reasons for the Proposed Resolution</u>

All stakeholders acknowledge that the Program Guide does not define or otherwise refer to "core groups"; nor does it distinguish between psychiatrist or primary clinician-led groups and other forms of group treatment. However, each stakeholder also acknowledges that the Special Master has historically monitored and reported on the challenges defendants have faced offering clinician led groups due to, for instance, staffing shortages. The data provided to the Special Master's monitoring teams regarding treatment hours offered to EOP patients has historically not distinguished between clinician-led groups and other forms of group treatment (i.e., recreational or leisure groups). However, because of the importance of clinician-led groups, the Special Master's monitoring teams obtain information regarding clinician-led groups through chart reviews and patient and staff interviews.

The Special Master understands AC5, as currently constituted, will include drill down information distinguishing between individual treatment, group treatment, Integrated Substance Use Disorder Treatment (ISUDT), and Nursing Led Therapeutic Groups (NLTGs).  In addition, and in order to more fully align AC5 with the totality of the Special Master's monitoring of this issue, the Special Master proposes that the indicator include drill down information and a summary statistic reporting how many and what percentage of group treatment hours utilized toward fulfilling the requirement to offer ten weekly hours of structured treatment were conducted by a psychiatrist or PC; as noted, the Special Master does not recommend this information be considered in scoring AC5.

# EXHIBIT A



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

August 25, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Kerry Walsh
Deputy Special Master
kwalsh@pldolaw.com

Re:   *Coleman v. Newsom*: Plaintiffs' Level 2 Data Dispute Statements
      <u>Our File No. 0489-03</u>

Dear Kerry:

Plaintiffs' position statements for the following disputes are attached for consideration by the Special Master and the Secretary during their August 29, 2023 Level 2 dispute resolution meeting:

1)   AC 2.1 – Timely PC Contacts

     a)   Definition of "weekly" as 7 days

2)   AC5 – Treatment Offered

     a)   Group Treatment – Confidentiality

     b)   Group Treatment – Core Groups

3)   PIP Placeholder

     a)   Review of Max Custody patients in compliance with CDCR policy

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:   Cara E. Trapani

[4344320.4]

Kerry Walsh
August 25, 2023
Page 2

## Definition of "Weekly" as 7 Days

**Issue**:  Should compliance with the Program Guide's weekly primary clinician contact requirement for various levels of care be measured as "every 7 days," as opposed to once a week, which would allow up to 14 days between contacts?

**Affected indicator**: AC2.1 – Timely PC Contacts

**Plaintiffs' Position**: Yes.  The reasonable interpretation of the Program Guide's weekly primary clinician ("PC") contact requirement is that patients should be seen at least once every seven days.  The business rules for the Timely PC Contacts (AC2.1) indicator should adhere to this logic, which aligns with the Court's reasoning in 2019 that CDCR's decision to define "monthly" as more than 30 days was misleading.  *See* Dec. 17, 2019 Order, ECF No. 6427 at 29.

CDCR argues that "weekly" should be defined in a way that would allow up to 14 calendar days between clinical contacts (though they claim that at most 11 days would elapse between contacts under CDCR's proposed methodology because clinicians do not schedule appointments on the weekends).  When the Court faced a similar dispute over divergent interpretations of the Program Guide during the 2019 evidentiary hearing, it turned to the Special Master's reports for clarity.  Here, those reports provide the answer.  The Special Master has consistently interpreted "weekly" to be "every 7 days."  *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 224 ("Seven of ten required weekly routine PC contacts occurred every seven days."); 307 (measuring mainline EOP routine PC contacts as having to occur every seven days); *id.* at 300 (measuring routine PC contacts in the STRH and LTRH using the 7 calendar days requirement); *id.* at 190 (measuring EOP Hub routine PC contacts as having to occur "every seven days"); *id.* at 297 (measuring PSU routine PC contacts as having to occur "every seven days"); *see also* Special Master's 29th Round Report Part D – CCCMS Compliance, ECF No. 7716 at 267, 291, 326.

Not only is the Special Master's interpretation of "weekly" to be "every 7 days" reasonable, it must be incorporated into the business rules under the Court's May 24, 2023 Order.  *See* ECF No. 7847 at 7 ("[E]ach key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities."); *id.* at 8 ("If an indicator requires modification to thoroughly capture information monitored by the Special Master on the topic covered by the indicator, each party has all relevant information: the Special Master's monitoring reports and all relevant court orders.").

Kerry Walsh
August 25, 2023
Page 3

## Group Treatment – Confidentiality

**Issue:** Should mental health treatment groups led by social workers, psychologists, and psychiatrists be counted towards fulfillment of structured treatment requirements when they occur in non-confidential settings?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** No.  Clinician-led groups (i.e., those led by an LCSW, psychologist, or psychiatrist) should be confidential in order to be counted towards fulfillment of the Program Guide's structured treatment requirements.

The Program Guide contemplates that a varied slate of structured therapeutic activities will be offered to class members, including group therapy and psycho-educational groups led by qualified clinicians focusing on highly sensitive issues including symptom management, family issues, specific mental health issues such as depression, anger management and offense-specific therapy.  *See* 2021 Program Guide, ECF No. 7333-1 at 60-62.  However, CDCR maintains that essentially any group[1] can be held in non-confidential settings—including on the dayroom floor and in the middle of the yard with custody officers and other incarcerated people milling around—and still qualify as structured therapeutic treatment.  This includes any and all groups led by psychologists, social workers, and psychiatrists, which are more likely to involve private issues requiring a strong and trusting therapeutic alliance that only confidentiality can provide, than those facilitated by recreational therapists or nurses, such as hygiene and leisure groups.  The net effect is that CDCR could provide zero hours of confidential structured therapeutic activity to each and every class member on a permanent basis—either because it offers no core groups of any sort, or because core groups are offered in a non-confidential setting that defeats the therapeutic alliance—and still be deemed compliant.  That is contrary to the clear intent of the Program Guide and this Court's orders.

CDCR does not dispute the fact that it already tracks both the confidentiality of all structured treatment, and whether the therapeutic activity was led by a PC or psychiatrist versus, for instance, a recreational therapist.  Nor is it possible to dispute that CDCR must only count confidential structured therapeutic activities offered to STRH and LTRH class members, which are measured in AC5, as compliant.  *See* 2021 Program Guide, ECF No. 7333-1 at 444 ("All [STRH] patients shall be offered 90 minutes of confidential structured group therapeutic activity weekly."); *id.* at 453 ("[I]nmates placed into the CCCMS-LTRH will be offered 90 minutes of confidential structured therapeutic

---

[1] The parties agree that mental health groups that occur cell-front (including patients' completion of in-cell treatment packets) should *not* count towards fulfillment in AC5.

Kerry Walsh
August 25, 2023
Page 4

activity."); *id.* at 452 ("CCCMS female inmates or CCCMS inmates undergoing RC processing will be offered 90 minutes of out-of-cell activity consisting of confidential structured therapeutic activity.").

The Court rejected Defendants' argument that psychiatry contacts need not be confidential to satisfy Program Guide requirements. *See* Aug. 14, 2019 Order, ECF No. 6242 at 7. Given that clinician-led groups address many of the same sensitive, private issues discussed by patients and their psychiatrists in individual MHMD contacts, it is reasonable to extend this Order's confidentiality requirement to clinician-led groups.

The Special Master regularly monitors whether groups occurred in a confidential setting; this goes to both the place itself where the group is conducted and also that it is reasonably free of intrusions (e.g., the setting is private, but has a refrigerator in it and staff interrupt the group to retrieve their lunches). *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 230 ("[I]t was unclear why groups were held in the non-confidential day room."); 298 ("The EOP hub certifications suggested that non-confidential cell-front treatment groups conducted in the corridor of the PSU were counted toward treatment group hours."); 318 ("The observed treatment space for STRH and LTRH patients was non-confidential and located in the dayroom …"). The Special Master's history of monitoring this issue supports Plaintiffs' position that AC5 should into account whether clinical groups were confidential. *See* May 24, 2023 Order, ECF No. 7847 at 7-8.

Kerry Walsh
August 25, 2023
Page 5

## Group Treatment – Core Groups

**Issue:** Should Defendants create a summary statistic showing the percentage of mental health groups that are led by a primary clinician or psychiatrist, as opposed to a nurse, recreational therapist, or other provider?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** Yes. A plain reading of the Program Guide indicates that leisure activities cannot comprise the entirety of a patient's structured treatment. *See, e.g.*, 2021 Program Guide, ECF No. 7333-1 at 60-62 (listing numerous exemplar substantive EOP treatment groups). However, AC5 does not currently provide information on which groups were PC- or psychiatrist-led (a.k.a "core groups") as opposed to purely leisure groups (such as watching a movie, playing video games, coloring, etc.). The Program Guide also requires that "[o]ccupational or recreational therapy is counted as structured activity only if an appropriate clinician … is present and supervising the activity," but this is also not being measured. *Id.* at 59-60. To address these limitations in the indicator's current design, Plaintiffs proposed that CDCR create an informational summary statistic in AC5 that would show the percentage of groups that are led by a PC or MHMD, without implicating the overall numerator/denominator calculation of the indicator. CDCR refused.

The Special Master has monitored this issue, finding that staffing shortages and other factors contribute to patients receiving too many recreational groups and not enough clinical/process groups. *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. at 67 (May 17, 2022) ("Long-standing staffing vacancies left clinicians with high caseloads and, consequently, limited to no time to conduct core mental health groups."); Special Master's 28th Round Monitoring Report, ECF No. 7074 at 291 ("Inmates further reported that refusals were due to an insufficient number of core groups and too many recreational groups."); *id.* at 1206 ("Mental health leadership acknowledged the validity of inmate complaints that groups with nominally clinically-oriented titles were in actuality run as leisure groups."). Although the Special Master has not previously reported on the percentage of overall groups that were core vs. leisure, this is likely due to the fact that CDCR has never made this information available.

Plaintiffs understand that every mental health appointment that appears EHRS has a provider attached to it, and that there is a table of provider/position types in CDCR's data warehouse, making it possible to discern which groups were led by PCs and MHMDs as opposed to other providers. Although the data warehouse does not store historical changes to providers' position type at present, CDCR is correcting this problem. Given that the Program Guide clearly contemplates the provision of some amount of core

Kerry Walsh
August 25, 2023
Page 6

structured therapeutic activity and the Special Master monitors whether core groups are being offered, CDCR must provide this information, which it concedes it has, to ensure this critical aspect of class member care is effectuated.

Kerry Walsh
August 25, 2023
Page 7

## Review of Max Custody patients in compliance with CDCR policy

**Issue:** Should CDCR create the Special Master's requested new PIP indicator titled *Timely Review of Max Custody Patients and In Compliance with CDCR Policy*?

**Affected indicator:** This would be a new indicator, created pursuant to the PIP Placeholder item on provisionally approved key indicator list (ECF No. 7151).

**Plaintiffs' Position:** Yes. The Special Master's request for an indicator that measures compliance with Defendants' stipulated, Court-approved plan to treat maximum ("max") custody patients in the PIPs is justifiable for several reasons, notwithstanding the parties' agreement in paragraph 15 of the stipulation that "Defendants' plan shall not be included in the MHSDS Program Guide or Compendium." ECF No. 7392 at 5.

First, long before the parties' stipulation, the Special Master reported on the systemically inadequate treatment provided to max PIP patients, with no objection from Defendants. *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. 7555 at 43-44 ("[M]any *Coleman* patients on maximum custody status received virtually no structured treatment and limited out-of-cell time during the monitoring round and have not for years. Remedying this deficiency is essential for these class members to receive treatment consistent with their rights under the Eighth Amendment."); Defs.' Objections to 29th Round Inpatient Report, ECF No. 7559. When the Special Master reported on the state of Defendants' compliance with the max custody plan in his most recent report, Defendants similarly did not object. *See* Special Master's 30th Round Monitoring Report Part A – PIP Compliance, ECF No. 7833 at 29-33; June 9, 2023 Order, ECF No. 7854 at 1-2 (adopting report and noting neither party filed objections). Given the requirement that "each key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master," this history requires Defendants to create the requested Max custody indicator. *See* May 24, 2023 Order, ECF No. 7847 at 7.

Second, the Court empowered the Special Master, not the parties, to determine whether to add this indicator to the provisional key indicator list. When the Court approved paragraph 15 of the parties' stipulation, it "referred to the Special Master for consideration as to whether [the provisions regarding Therapeutic Treatment Modules ("TTMs")] are, or should be, reflected in the list of CQIT indicators currently under review." Feb. 7, 2022 Order, ECF No. 7456 at 4. Defendants voluntarily dismissed their appeal of this Order in October 2022. *See* Ninth Cir. Case No. 22-15369.

Third, development of a functioning CQIT system is itself a freestanding remedial requirement in this case. *See* Sept. 3, 2020 Order, ECF No. 6846 at 10. The CQIT system cannot be robust without closely monitoring max custody issues in the PIPs.

[4344320.4]

Kerry Walsh
August 25, 2023
Page 8

Fourth, while the Court has held that "the 'key indicators' in CQIT are likely equivalent to the material provisions of the Program Guide and the Compendium," *see* Sept. 3, 2020 Order, ECF No. 6846 at 24 n.11, other requirements such as staffing have also been turned into indicators throughout the data remediation process.

Finally, according to an email from Melissa Benz on June 23, 2023, the performance report data that Plaintiffs have historically relied on to obtain information and trends about the statewide max custody census may not be accurate because it "is an older report and not one that has or will be reviewed in data remediation." Nor have Defendants committed to providing transparent, accurate information necessary to monitor these issues in any other way. As such, because CDCR's information-sharing obligations under the parties' stipulation expire after two years, which will run at the end of December 2023 (ECF No. 7392 at 3), Plaintiffs and other stakeholders will have no validated data on the max population absent this indicator. Given the persistent systemic deficiencies in the provision of care provided to max patients in the PIPs identified by the Special Master, and in the absence of any proposed alterative offered by CDCR, the creation of a new indicator is warranted and necessary.

# EXHIBIT B

Defendants' Level 2 Dispute Statement:
AC5: Treatment Offered- Measuring "Core" Groups[1]

Plaintiffs define "core" groups as those led by Primary Clinicians (PCs) and Psychiatrists (MHMD) and maintain that CDCR must flag "core" groups as part of the indicator created to measure whether the required amount of structured treatment was offered to EOP patients, also known as AC5. They have also requested that AC5 include a summary statistic showing whether patients are receiving "core" groups. Defendants disagree as "core" groups are not a requirement for EOP patients under the *Coleman* remedy.

As background, the parties and the Special Master's team have agreed that the Program Guide does not use the term "core" groups. The parties and the Special Master's team have also agreed that the information sought by Plaintiffs' counsel is purely informational and would not factor into the compliance score for AC5. Despite these agreements, Plaintiffs have pushed this dispute to Level 2 of the dispute resolution process.

     I.      "Core" Groups (Under Any Definition) Are Not Part of The *Coleman* Remedy For EOP Patients And, Thus, Should Not Be Required As Part Of A CQI Key Indicator.

"The 'key indicators' in CQIT 'signify the material provisions of the Program Guide and the Compendium that must be durably implemented' in order to satisfy the Eighth Amendment.'" ECF No. 7214 at 4 (citing ECF No. 6846 at 28; December 16, 2020 Order, ECF No. 6996, at 8). The Program Guide lists many different types of allowable structured therapeutic activities for EOP patients, including group therapy, psycho-educational groups, individual therapy, recreational therapy, and occupational therapy. 2021 Program Guide at 12-4-9. Examples of treatment activities include groups regarding daily living skills, medication education, symptom management, specific mental health issues, social skills/communication, anger management, stress management, substance abuse group, health issues, offense specific therapy, rational behavior/reality and decision-making, family issues, therapeutic community meetings, and clinical pre-release groups. *Id.* at 12-4-10 to 12-4-12.

Despite all of those details about EOP groups in the Program Guide, the term "core" group is not used. Plaintiffs argue this is not relevant because the Special Master has monitored "core" groups as Plaintiffs have defined it. This is incorrect. However, even if the Special Master had monitored "core" groups as defined by Plaintiffs, nonetheless, monitoring of an issue does not

---

[1] CDCR reserves the right to make new objections to any future writings from the Special Master regarding this issue. To date, CDCR has not received the Special Master's position on this issue in writing. The Court recently noted that under the Order of Reference, "the court does not consider any objections to a report or recommendation by the Special Master 'unless an identical objection was previously submitted....'" ECF No. 7847 at 10 (citing ECF No. 640 at 8). However, the cited section of the Order of Reference applies to compliance reports filed under paragraph A(5). ECF No. 640 at 8. Under paragraph A(5), the Special Master provides a draft report and each party has 30 days to provide informal objections. *Id.* at 4-5. That is not the case here. No written report has been provided here. CDCR maintains its right to supplement these objections should a written report be issued in the future or if Plaintiffs' position statement raises new issues.

transmute that item into a remedial requirement. This is particularly true here, where this item appears nowhere in the Program Guide.

II.     Emphasizing A Difference Between PC Or MHMD Led Groups and Those Led by Other Classifications Ignores Individual Patient Needs and Communicates The Wrong Message To Institution Staff.

Plaintiffs' request to provide a measure of "core" groups lead by PCs and MHMDs within AC5 is underpinned by a well-intended desire to ensure quality treatment. Yet this request is not only impractical, but also potentially detrimental to patient care.

Measuring "core" groups fails to align with the mental health needs of patients and overlooks the flexibility required to provide appropriate treatment. Plaintiffs' push for their definition of "core" groups seems to be premised upon a misunderstanding that PC or MHMD led groups are *ipso facto* better (either more therapeutic or helpful) to patients than those led by other classifications. This is simply incorrect. Treatment should be individualized based on patient needs and level of functioning. Highlighting "core" groups in a separate measurement within AC5 could lead institution staff to overemphasize the need for "core" groups. This could result in inappropriate group placements, de-individualization of treatment plans, and potentially harmful consequences for the patient.

The request to measure "core" groups also risks drawing erroneous assumptions about the clinical relevance of these groups to individual patient treatment plans. This would create additional hurdles without improving the quality of the patient's clinical experience or staff morale. CDCR firmly believes that the focus should remain on the clinical relevance and appropriateness of treatment groups to each patient's specific diagnosis and treatment plan, rather than on rigid categorizations that may misrepresent the true quality of care or benefit provided.

III.     Plaintiffs' Definition of "Core" Groups is Inconsistent with How the Term Has Been Used in this Case.

As mentioned above, "core" groups, under any definition, are not required by the Program Guide or any other *Coleman* remedy. Should the Special Master decide to recommend that CDCR measure "core" groups, it is necessary to note that neither the Court's recent references to "core" groups, nor the Special Master's monitoring are consistent with Plaintiffs' definition.

In the August 23, 2023 order, the Court referenced the "core" groups provided at the Department of State Hospitals (DSH). *See* ECF No. 7924. DSH defines "core" groups in their Continuous Quality Improvement (CQI) reports as "therapeutic groups that focus on meeting treatment expectations, educating patients regarding psychiatric and psychological disorders and/or specific skills for managing those disorders.  This includes but is not limited to groups focused on mental health education, symptom management, coping skills, social skills, relaxation, stress management, anger management, substance recovery, life skills and problem solving. These groups follow a specific lesson plan or group protocol with specific objectives for each weekly session and are documented in My Activity Participation Plan (MAPP) Module in WaRMSS." ECF No. 7812-1 at 15. These "core" groups mirror the examples of structured treatment listed in

2

the Program Guide. Notably, DSH's "core" groups are not defined by which classification leads the groups.

The Special Master's team has also used the term "core" groups in previous monitoring reports in relation to EOP groups, but the definition as to what constitutes a "core" group is more focused on the topic of the group than what classification led the group. To the extent the Special Master does consider what classifications led groups when defining "core" groups in his monitoring, it does not appear he has limited the "core" groups to those led by PCs and MHMDs. For instance, in the 29th Round, the Special Master notes that core groups were lacking because of "the redirection of nurses caused by staffing vacancies." ECF No. 7715 at 349. He also noted that core groups were conducted by "recreation therapists." *Id.* at 489. The Special Master further defined core groups broadly as those that "include[] anger management, life/coping skills, mood management, stress management, social skills, and other therapeutic activities provided in an open topic group." *Id.* Criminal thinking was also noted to be core group topic. *Id.* at 530.

None of the above examples of "core" groups are predicated on the classification facilitating the group, as suggested by Plaintiffs' proposed definition.

IV.    There Are Technical Limitations to Completing Plaintiffs' Request.

CDCR does not agree with Plaintiffs' request to measure "core" groups in AC5 for the above reasons. However, even if CDCR is required to measure "core" groups there are technical limitations that may make the data unreliable. First, the staff classification is not available in EHRS for groups (appointments) that patients refuse to attend. Second, the staff member who checks the attending patients in and out of the appointment may not be the staff member who facilitates the group. This could occur if a supervisor checks patients in and out while a line staff member, maybe a new recreational therapist or nurse, facilitates the group.

V.    Conclusion.

Plaintiffs' position that PC and MHMD groups should be flagged as "core" groups in AC5 is not rooted in any remedial requirement. Further, it is potentially contrary to patient welfare and a nuanced understanding of the complex nature of mental health treatment. The rigidity of defining and measuring "core groups" overlooks the intricacies of individualized patient care, the practical limitations of data tracking, and the potential for unintended negative consequences.