ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7318
Fax: (916) 324-5205
E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
LAUREL O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S OCTOBER 18, 2023 PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE: PLACEHOLDER– PIP–MAX CUSTODY REVIEW** |

**INTRODUCTION**

The Special Master recommends the creation of new indicators to measure compliance with at least six aspects of the California Department of Corrections and Rehabilitation's (CDCR) policy to review Maximum custody ("Max custody") Psychiatric Inpatient Program (PIP) patients.[1]  That policy was developed as part of a settlement agreement between Plaintiffs and Defendants in this action and is not part of the Program Guide or Compendium.  (ECF No. 7392.)  The Special Master's resolution would violate the terms of the stipulation and order that

---

[1] A copy of the Special Master's *Proposed Resolution of Data Remediation Dispute: Placeholder– Pip–Max Custody Review* is attached at Appendix A and contains pagination in the lower right hand corner for ease of reference as A-001 through A-017.

1

20070272.1

were critical to Defendants' ultimate agreement to settle the issue and to forego litigating the right to use Therapeutic Treatment Modules (TTMs) to treat Max custody patients in the PIPs. (ECF Nos. 7392 and 7456.) Accordingly, Defendants object to the Special Master's proposed resolution.

## I.    BACKGROUND OF THE DISPUTE

On July 26, 2021, the Court ordered the parties to engage in settlement negotiations with the assistance of a magistrate judge to address disagreements concerning Defendants' use of TTMs in the PIPs. (ECF No. 7246.) The parties met and discussed CDCR's use of TTMs in the PIPs for the treatment of patients on Max custody with Magistrate Judge Kendall Newman and the *Coleman* Special Master on September 15, October 5, and November 1, 2021. (ECF No. 7392 at 1:23-28.) Following extensive negotiations, the parties agreed to the terms of a settlement and memorialized that settlement agreement in a stipulation that was ultimately approved by the Court (TTM Stipulation). (ECF No. 7392 at 6 and ECF No. 7456 at 4-5.)

The express purpose of the settlement was to improve access to inpatient mental health care for the *Coleman* class members on Max Custody status in the PIPs by agreeing to CDCR's use of TTMs at all PIPs for Max Custody patients. (ECF No. 7392 at 1-2.) Plaintiffs insisted that CDCR finalize a plan to conduct regular custody reviews of Max custody patients needing inpatient treatment or already receiving inpatient treatment as a means to reduce the number of Max custody patients referred to the PIPs. Defendants agreed and attached a draft of the memorandum to the stipulation filed on November 19, 2021. (ECF No. 7381 at 2:4-10.) CDCR implemented the *Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants* Memorandum (Max Custody Review Memo) on March 9, 2022. (Thorn Decl. ¶ 2, Exhibit A.) Critical to Defendants' assent to the stipulation was the inclusion of Paragraph 15, which provided in relevant part: "The parties agree that Defendants' plan shall not be included in the MHSDS Program Guide or Compendium." (ECF No. 7381 at ¶ 15; *see also* ECF Nos. 7380 at 4-5 (the language in paragraph 15 was "critical in particular to Defendants' agreement to the Stipulation") & 7412 at 2 (same).) Also critical to Defendants' assent are Paragraphs 9 through 11 of the TTM stipulation that provides for a two-year document production, allows Plaintiffs to

1   observe Max custody reviews for two years, and outlines a meet and confer process to discuss

2   whether further document production or observations are required beyond the initial two-year

3   period.

4        To Defendants' surprise, on June 14, 2023 the Special Master identified plans to create an

5   indicator to track the custody reviews provided for in the 2022 Memorandum that was the product

6   of the TTM Stipulation.  (Thorn Decl., Exhibit B, 6/28/23 letter from M. Bentz to M. Lopes.)

7   CDCR reminded the Special Master of the TTM stipulation and voiced objections to the creation

8   of indicators tied to the provisions of the stipulation on the basis of the Court order that "CQIT

9   key indicators must be operationalized to properly measure the core requirements of the Program

10   Guide and Compendium."  (ECF No. 7847 at 6.)  The parties specifically agreed in Paragraph 15

11   that Defendants' plan outlined in the TTM stipulation shall not be included in the MHSDS

12   Program Guide or Compendium.  (ECF No. 7392 at 5.)  CDCR advised the Special Master that to

13   include provisions from the TTM stipulation as Continuous Quality Improvement (CQI) key

14   indicators directly contradicts the parties' Court-approved agreement, automatically extends

15   Defendants' obligation to provide data and documentation to Plaintiffs on the custody reviews

16   beyond the agreed-upon two-year period, and constitutes an impermissible end-run around the

17   parties' prior court-ordered agreement. (*Id.*)

18   **II.    THE PROPOSED RESOLUTION IMPROPERLY EXPANDS THE REMEDY.**

19        The TTM stipulation expressly excludes the Max Custody Review Memo from the remedy

20   in this case: "Defendants' plan shall not be included in the MHSDS Program Guide or

21   Compendium."  (ECF No. 7392 at 5.)  That provision was approved by the Plaintiffs and

22   conditionally approved by the Court pending "pending final resolution of what updating process

23   the court will adopt for the Program Guide in the future."  The Court's May 24, 2023 order

24   reiterated that "CQIT key indicators must be operationalized to properly measure the core

25   requirements of the Program Guide and Compendium."  (ECF No. 7847 at 6.)

26        Inclusion of provisions from the Max Custody Review Memo as CQI key indicators now

27   would directly contradict the Court' December 9, 2021 and May 24, 2023 orders.  (ECF Nos.

28   7392 and 7847 at 6.)  Indeed, the parties made clear in their joint response to the Court's

3

1  November 8, 2021 order to show cause that Section III of the TTM Stipulation, which includes

2  Paragraph 15, was critical to reaching an agreement on this issue and that Defendants would

3  withdraw their agreement from all parts of the stipulation if any language in Section III was

4  struck.  (ECF No. 7380 at 4:13-5:5.)

5       Yet the Special Master's proposed resolution would circumvent this stipulation by creating

6  an indicator or set of indicators that measure performance under the Max Custody Review Memo.

7  Specifically, The Special Master's proposed resolution seeks to create indicators that measure the

8  following components of the Max Custody Review Memo: (1) pre-transfer Institution

9  Classification Committee (ICC) review for Max custody patients referred to the Intermediate

10  Care Facility level of care; (2) PIP ICC review of Max custody patients within 10 calendar days

11  of arrival; (3) Mental Health Compliance Team (MHCT) bi-weekly review of Max custody

12  patients; (4) Division of Adult Institutions Deputy Director results of bi-weekly videoconference

13  of Max custody PIP patients; (5) the number and percent of PIP patients retained on Max custody;

14  and (6) the number and percent of PIP patients removed from Max custody.  (Appendix A at A-

15  002-A-003.)  But these measurements are not required as part of CDCR's CQI, which is limited,

16  by Court order, to "measure the core requirements of the Program Guide and Compendium."

17  (ECF No. 7847 at 6.)  Because the Max Custody Review Memo is explicitly *not* part of the

18  remedy, it is not subject to monitoring under CQI.

19  **III.   THE PROPOSED RESOLUTION UNDERMINES THE DOCUMENT SHARING PROVISIONS**
20         **OF THE SETTLEMENT AGREEMENT.**

21       The settlement agreement puts limits on post-implementation monitoring.  As described in

22  paragraphs 9 through 11 of the settlement agreement, the stipulation requires two years of

23  document production (paragraph 9) and allows Plaintiffs two years to observe Max custody ICCs

24  (paragraph 10) before requiring a meet and confer process to discuss whether further document

25  production or observations are required (paragraph 11).  Requiring the creation of new indicators

26  to measure provisions of the TTM stipulation in perpetuity disregards its express limits on post-

27  implementation monitoring and would impermissibly expand access beyond that which is

28  contemplated in the parties' agreement.

1    The TTM stipulation requires CDCR to share data on the status of the implementation of

2 the Max Custody Review Memo in quarterly status reports for a period of "two years following

3 the initial implementation report." (ECF No, 7392 at 3:17-4:5.) The data includes the status of

4 *Coleman* class members in PIPs who are on Max custody; a roster of patients the MHCT

5 recommended for removal from Max custody during the reporting period; a report with

6 information regarding the bi-weekly MHCT and Deputy Director reviews and subsequent ICCs

7 for the reporting period, including comments as to why a patient was retained or placed on Max

8 custody; and ICC determinations, including the classification chrono, rules violation report

9 packet(s), and supporting documents, excluding confidential memoranda, for a random sample of

10 the patients retained or placed on Max custody during the reporting period.. (*Id.*) CDCR issued

11 its initial implementation report in September 2022. (Thorn Decl., Exhibit A.) Subsequently,

12 CDCR negotiated the exact content and form of the required data and document production with

13 Plaintiffs' counsel and the first quarterly production began in April 2023. (Thorn Decl., ¶ 3,

14 Exhibit C.)

15    The Special Master's proposed resolution seeks to create an indicator to measure six

16 different requirements of the parties' settlement agreement. His proposal would effectively turn a

17 two-year monitoring period into an ongoing and permanent reporting obligation. That was not

18 anticipated as part of the TTM stipulation and imposes an obligation that Defendants would not

19 have accepted under the terms of the settlement.

20    Under the TTM stipulation, CDCR agreed to provide the above-described data and

21 documentation for two years following the initial implementation report, which was provided in

22 September 2022. (ECF No, 7392, Par. 11 at 4:8-9.) Paragraph 11 of the TTM stipulation

23 provides that the parties will meet and confer about the frequency and scope of the data and

24 document production at the end of the two-year period. (*Id.*) Creating indicators auditing

25 provisions of the TTM stipulation automatically extends Defendants' obligation to provide data

26

27

28

20070272.1

1    and documentation indefinitely, and usurps their authority to negotiate further productions, if any

2    under paragraph 11.[2]

3    　　　Plaintiffs improperly speculate that "the creation of a new indicator is warranted and

4    necessary" because without it Defendants will stop providing transparent, accurate information

5    necessary to monitor the Max custody reviews and the status of Max Custody patients in the PIPs.

6    (Appendix A, A-014.) But this is literally what Plaintiffs' bargained for and they should be bound

7    by the settlement agreement.

8    　　　But as Plaintiffs acknowledge in their position statement, CDCR has "historically" shared

9    information and trends about the Max custody census even before the parties' settlement.  (*Id.*)

10   CDCR provides Plaintiffs with a plethora of data on demand or as part of the monthly reporting.

11   Much of that production is voluntary, not court-ordered.  The agreement to share data for a

12   limited period of time as part of a settlement agreement does not translate into a requirement to

13   develop additional indicators to measure policies that are not part of the Program Guide or

14   Compendium.  The creation of indicators to audit provisions of the TTM stipulation would

15   automatically extend Defendants' data production obligation beyond the agreed upon period and

16   improperly modifies a court-ordered agreement, without the consent of both parties.

17   **IV.   REFERRAL OF THE ISSUE TO THE SPECIAL MASTER DOES NOT MODIFY THE
18         COURT-ORDERED TTM STIPULATION.**

19   　　　The Special Master predicates his proposed resolution on the Court's referral of issues to

20   him in its February 7, 2022 order.  (Appendix A, A-001.)  The relevant provision of the

21   February 7, 2022 order states:

22   　　　　　The court gives FINAL APPROVAL to Paragraph 15 of the
     　　　　　parties' stipulation regarding the use of Therapeutic Treatment
23   　　　　　Modules (TTMs) in inpatient settings, *see* Stipulation and Order,
     　　　　　ECF No. 7392, at 6, and the parties' agreement over the use of
24   　　　　　TTMs in inpatient settings, which the court otherwise previously
     　　　　　approved on December 9, 2021, ECF No. 7392, **with the**
25

26   _____
         [2] The Special Master's proposed resolution will require the parties to renegotiate the
27   document production.  The creation of indicators always requires significant negotiation,
     including the creation of summary statistics and negotiations regarding what constitutes
28   compliance.  These questions were not contemplated during the negotiations last year with
     Plaintiffs' counsel, as the goal was to provide information, not determine issues of compliance.

6

1
2
3

**provisions regarding TTMS referred to the Special Master** for consideration as to whether they are, or should be, reflected in the list of CQIT indicators currently under review during the Twenty-Ninth Monitoring Round.

4    (ECF No. 7456 at 3:27-4:6.)  The referral to the Special Master asked him to consider whether

5    provisions regarding TTMs should be reflected in the list of provisionally-approved CQI

6    indicators and does not reference the Max Custody Review Memo.

7         CDCR acknowledges that the Court's February 7, 2022 order refers the issue of whether

8    provisions of the TTM stipulation are, or should be, reflected in the list of provisionally approved

9    CQI indicators.  But that referral does not provide authority for the proposed resolution and does

10   not invalidate, override, or modify any terms of the Court-approved stipulation.

11                                **CONCLUSION**

12        Following negotiations that spanned over six weeks, including three days of mediation

13   with Magistrate Judge Kendall Newman during which the Special Master was also present, the

14   parties entered into an agreement regarding the use of Therapeutic Treatment Modules to deliver

15   mental health care to class members on Max custody status in PIPs.  This work resulted in a

16   bargained for settlement agreement that expressly conditioned the plan concerning TTMs and the

17   custody reviews of Max Custody patients on the fact that issues addressed in the TTM stipulation

18   would not be part of the Program Guide or the Compendium.  CDCR objects to the creation of

19   any new indicators that would circumvent the parties' agreement for these reasons.  Any proposed

20   resolution that circumvents or otherwise violates the terms of the parties' stipulation will chill

21   future agreements between the parties, and may require Defendants' reevaluation of (and possibly

22   relief from) the current stipulation.  The Special Master's proposed resolution is dismissive of

23   these significant and impactful concerns.  Nor does the Special Master's proposed resolution

24   provide any legal authority for creating a set of indicators to measure data for a custody policy

25   that is not part of the Program Guide or the Compendium.  As such, the Court should reject the

26   resolution outright.

27   ///

28   ///

7

Defs.' Obj. to the SM's Proposed Resolution on PIP Max Custody Reviews (2:90-cv-00520 KJM-DB (PC))

20070272.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATION**

Defendants' counsel certify that they reviewed the following orders relevant to this filing:

ECF Nos. 640, 7246, 7392, 7456, 7847, 8008, and 8028.

Dated: October 27, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General

*/s/ Elise Owens Thorn*
Elise Owens Thorn
Deputy Attorney General
*Attorneys for Defendants*

Dated:  October 27, 2023                    HANSON BRIDGETT LLP

*/s/ Samantha D. Wolff*
PAUL MELLO
SAMANTHA D. WOLFF
*Attorneys for Defendants*

8

Defs.' Obj. to the SM's Proposed Resolution on PIP Max Custody Reviews (2:90-cv-00520 KJM-DB (PC))

20070272.1

# APPENDIX A

**Special Master's Proposed Resolution[1] of Data Remediation Dispute: Placeholder – PIP – Max Custody Review**

I.     Brief Statement of Dispute: Placeholder Indicators – PIP – Max Custody Review

In response to the directive contained in the Court's February 7, 2022 Order,[2] the Special Master recommended creation of a new placeholder indicator[3] to measure adherence to CDCR's policy regarding max custody patients housed in psychiatric inpatient programs (PIPs).  *See* ECF No. 7863-1 at 8.  Specifically, the Court referred provisions contained in a stipulated agreement regarding treatment of max custody patients in PIPs "to the Special Master for consideration as to whether they are, or should be, reflected in the list of CQIT indicators currently under review…."  ECF No. 7456 at 4.  The Court referred this matter to the Special Master notwithstanding paragraph 15 of the stipulation and order, which stated: "The parties agree that Defendants' plan shall not be included in the MHSDS Program Guide or Compendium.  This

---

[1] This proposal is made in accordance with the Court's October 11, 2023 Order modifying the data remediation dispute resolution process.  ECF No. 8008 at 2 ("For any dispute that remains unresolved at the end of a two-week discussion period, the Special Master shall within seven days thereafter provide the parties with a proposed written resolution of the dispute, including a brief statement of reasons for the proposed resolution and the date on which the proposed resolution was delivered to the parties.").

[2] The February 7, 2022 Order provided the following: "*The court gives FINAL APPROVAL to Paragraph 15 of the parties' stipulation regarding the use of Therapeutic Treatment Modules (TTMs) in inpatient settings*, *see* Stipulation and Order, ECF No. 7392, at 6, and the parties' agreement over the use of TTMs in inpatient settings, which the court otherwise previously approved on December 9, 2021, ECF No. 7392, *with the provisions regarding TTMs referred to the Special Master for consideration as to whether they are, or should be, reflected in the list of CQIT indicators currently under review during the Twenty-Ninth Monitoring Round*."

[3] As the Special Master described in his June 30, 2023 data remediation status update, the placeholder indicators were "included in the original provisionally approved list of key indicators, but not yet developed in detail at the time the original list was filed with and provisionally approved by the court."  ECF No. 7863 at 11-12.

stipulation sets forth the entirety of the remedy to the issues set forth above."  ECF No. 7366 at 5.

Based on the language of paragraph 15, *see supra*, and paragraphs 9-11, defendants oppose creation of a new indicator to measure these requirements related to max custody PIP patients.  Exhibit B at 2 ("CDCR objects to the creation of any new indicators that would circumvent the parties' agreements in the TTM stipulation and are concerned that any recommendation that circumvents or violates the terms of the parties' stipulation will chill future agreements between the parties.").  Plaintiffs support creation of this indicator.  *See* Exhibit A at 8 ("Given the persistent systemic deficiencies in the provision of care provided to max patients in the PIPs identified by the Special Master, and in the absence of any proposed alternative offered by CDCR, the creation of a new indicator is warranted and necessary.").[4]

II.    Date Proposed Resolution was Delivered to the Parties:

The Special Master provided this recommendation to the parties on October 18, 2023.

III.    Special Master's Proposed Resolution

The Special Master maintains his recommendation that defendants create a new PIP placeholder indicator to measure timely review of max custody patients in accordance with CDCR policy related to the same.  Specifically, the Special Master recommends the following requirements be measured by this indicator:

- Pre-transfer ICC review for Max custody patients referred to the ICF level of care;

- PIP ICC review of Max custody patients within 10 calendar days of  arrival;

- MHCT bi-weekly review of Max custody patients;

---

[4] The parties each submitted position statements on this dispute under the former dispute resolution process.  *See* Exhibit A (plaintiffs' position statement) and Exhibit B (defendants' position statement).

- DAI Deputy Director results of bi-weekly videoconference of Max custody PIP patients;

- The number and percent of PIP patients retained on Max custody; and

- The number and percent of PIP patients removed from Max custody.

IV.    Brief Statement of reasons for the proposed resolution

For years, defendants have provided woefully inadequate mental health care to the most acutely mentally ill members of the plaintiff class (i.e. those at the ICF and APP levels of care) who are placed on maximum custody status.[5]  In February 2022,[6] the Court approved the parties' stipulation permitting defendants to use Therapeutic Treatment Modules (TTMs) in the PIPs as part of a strategy to remove barriers to access to mental health treatment for max custody patients.  Also included in the stipulated agreement regarding the use of TTMs in the PIPs is defendants' agreement to issue a memo entitled "Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants," which includes a number of measures to "provide direction regarding the preference for and ability to remove designations of max custody from

---

[5] *See*, *e.g.*, Twenty-Ninth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation, ECF 7555 at 30-31 and FN 26 ("Findings from the review period and at the time of the site visits could not be clearer: many *Coleman* patients on maximum custody status received virtually no structured treatment and limited out-of-cell time during the monitoring round and have not for years. Remedying this deficiency is essential for these class members to receive treatment consistent with their rights under the Eighth Amendment."); Thirtieth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation, ECF 7833 at 56 ("While relative improvement in maximum custody patients' access to mental health treatment was noted during the current monitoring round, this subpopulation of *Coleman* class members continued to experience significant access to care issues in nearly all PIP institutions.")

[6] The Court approved paragraphs one through 14 of the parties' stipulation on December 9, 2021, ECF No. 7392, and granted final approval of paragraph 15 on February 7, 2022.  ECF No. 7456 at 3-4.

Coleman class members in PIPs when appropriate." ECF No. 7366 at 2; *see generally* ECF No. 7366-1. The indicator is designed to measure adherence to key elements of that policy.

The Special Master has consistently monitored and reported his findings regarding treatment inadequacies for PIP patients on max custody status. *See, e.g.*, *supra* note 5. Likewise, the Special Master has consistently identified the lack of mental health treatment provided to max custody patients – particularly those housed in the PIPs – to be a highly concerning deficiency. The memo issued by defendants as part of the parties' stipulated agreement appears intended to remedy this longstanding deficiency. *See* ECF No. 7367 at 2 ("The objective of the California Department of Corrections and Rehabilitation (CDCR) is to enhance the treatment milieu in the PIP programs, improve access to mental health treatment and remove patients from MAX custody when it is safe to do so."). Moreover, the Special Master considers it a foundational element of defendants' efforts to improve access to care for these patients that should be measured by a key indicator.

As noted, the Special Master is under a specific directive[7] to recommend whether the max custody policy requirements *"are, or should be, reflected in the list of CQIT indicators."* Consistent with his historic practice of monitoring the quantity and quality of mental health treatment provided to class members on max custody status, the Special Master has determined that the requirements of the Max Custody Memo, aimed at removing barriers to access to mental health treatment for these patients, should be measured by a key indicator as part of defendants' ongoing full implementation of CQIT. The Special Master notes this recommendation is

---

[7] The Special Master acknowledges language in the parties' stipulated agreement which contemplates a process for resolving "issues related to the enforcement or interpretation of the commitments set forth in" the stipulated agreement, ECF No. 7366 at 4 (paragraph 12 of parties stipulated agreement) but does not have the authority to resolve that aspect of defendants' stated objections.

consistent with the Court's orders regarding the role of CQIT and its key indicators in this action.[8]

---

[8] *See, e.g.*, ECF No. 5092 at 4-5 ("[D]efendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action. It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have implemented a durable remedy for the Eighth Amendment violations in the delivery of that care. A key component of a durable remedy is the development and implementation of an adequate quality improvement process by which defendants will self-monitor and, as necessary, self-correct inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons."); ECF No. 6996 at 7-8 ("[T]he quality improvement process serves an integral remedial function in this action: defendants' assumption of responsibility for self-monitoring the adequacy of mental health care delivered to the plaintiff class. This function is as essential to the constitutional remedy as are individual components measured by CQIT. Viewed through this lens, defendants' contention that CQIT includes components that exceed constitutional minima is misplaced. While key CQIT indicators must be identified as an aid to measurement of compliance with remedial plans in this action, namely the Program Guide and the Compendium, that identification is but a component of full implementation of CQIT and the quality improvement process…. full implementation of CQIT and the quality improvement process is required as part of the constitutional remedy in this action to the same extent as all other court-ordered remedies.").

# EXHIBIT A



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

August 25, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Kerry Walsh
Deputy Special Master
kwalsh@pldolaw.com

    Re:    *Coleman v. Newsom*: Plaintiffs' Level 2 Data Dispute Statements
           <u>Our File No. 0489-03</u>

Dear Kerry:

    Plaintiffs' position statements for the following disputes are attached for consideration by the Special Master and the Secretary during their August 29, 2023 Level 2 dispute resolution meeting:

1)    AC 2.1 – Timely PC Contacts

    a)    Definition of "weekly" as 7 days

2)    AC5 – Treatment Offered

    a)    Group Treatment – Confidentiality

    b)    Group Treatment – Core Groups

3)    PIP Placeholder

    a)    Review of Max Custody patients in compliance with CDCR policy

                 Sincerely,

                 ROSEN BIEN
                 GALVAN & GRUNFELD LLP

                 */s/ Cara E. Trapani*

        By:  Cara E. Trapani

Kerry Walsh
August 25, 2023
Page 2

## Definition of "Weekly" as 7 Days

**Issue:**  Should compliance with the Program Guide's weekly primary clinician contact requirement for various levels of care be measured as "every 7 days," as opposed to once a week, which would allow up to 14 days between contacts?

**Affected indicator:** AC2.1 – Timely PC Contacts

**Plaintiffs' Position:** Yes.  The reasonable interpretation of the Program Guide's weekly primary clinician ("PC") contact requirement is that patients should be seen at least once every seven days.  The business rules for the Timely PC Contacts (AC2.1) indicator should adhere to this logic, which aligns with the Court's reasoning in 2019 that CDCR's decision to define "monthly" as more than 30 days was misleading.  *See* Dec. 17, 2019 Order, ECF No. 6427 at 29.

CDCR argues that "weekly" should be defined in a way that would allow up to 14 calendar days between clinical contacts (though they claim that at most 11 days would elapse between contacts under CDCR's proposed methodology because clinicians do not schedule appointments on the weekends).  When the Court faced a similar dispute over divergent interpretations of the Program Guide during the 2019 evidentiary hearing, it turned to the Special Master's reports for clarity.  Here, those reports provide the answer.  The Special Master has consistently interpreted "weekly" to be "every 7 days."  *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 224 ("Seven of ten required weekly routine PC contacts occurred every seven days."); 307 (measuring mainline EOP routine PC contacts as having to occur every seven days); *id.* at 300 (measuring routine PC contacts in the STRH and LTRH using the 7 calendar days requirement); *id.* at 190 (measuring EOP Hub routine PC contacts as having to occur "every seven days"); *id.* at 297 (measuring PSU routine PC contacts as having to occur "every seven days"); *see also* Special Master's 29th Round Report Part D – CCCMS Compliance, ECF No. 7716 at 267, 291, 326.

Not only is the Special Master's interpretation of "weekly" to be "every 7 days" reasonable, it must be incorporated into the business rules under the Court's May 24, 2023 Order.  *See* ECF No. 7847 at 7 ("[E]ach key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities."); *id.* at 8 ("If an indicator requires modification to thoroughly capture information monitored by the Special Master on the topic covered by the indicator, each party has all relevant information: the Special Master's monitoring reports and all relevant court orders.").

Kerry Walsh
August 25, 2023
Page 3

**Group Treatment – Confidentiality**

**Issue:** Should mental health treatment groups led by social workers, psychologists, and psychiatrists be counted towards fulfillment of structured treatment requirements when they occur in non-confidential settings?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** No.  Clinician-led groups (i.e., those led by an LCSW, psychologist, or psychiatrist) should be confidential in order to be counted towards fulfillment of the Program Guide's structured treatment requirements.

The Program Guide contemplates that a varied slate of structured therapeutic activities will be offered to class members, including group therapy and psycho-educational groups led by qualified clinicians focusing on highly sensitive issues including symptom management, family issues, specific mental health issues such as depression, anger management and offense-specific therapy.  *See* 2021 Program Guide, ECF No. 7333-1 at 60-62.  However, CDCR maintains that essentially any group[1] can be held in non-confidential settings—including on the dayroom floor and in the middle of the yard with custody officers and other incarcerated people milling around—and still qualify as structured therapeutic treatment.  This includes any and all groups led by psychologists, social workers, and psychiatrists, which are more likely to involve private issues requiring a strong and trusting therapeutic alliance that only confidentiality can provide, than those facilitated by recreational therapists or nurses, such as hygiene and leisure groups.  The net effect is that CDCR could provide zero hours of confidential structured therapeutic activity to each and every class member on a permanent basis—either because it offers no core groups of any sort, or because core groups are offered in a non-confidential setting that defeats the therapeutic alliance—and still be deemed compliant.  That is contrary to the clear intent of the Program Guide and this Court's orders.

CDCR does not dispute the fact that it already tracks both the confidentiality of all structured treatment, and whether the therapeutic activity was led by a PC or psychiatrist versus, for instance, a recreational therapist.  Nor is it possible to dispute that CDCR must only count confidential structured therapeutic activities offered to STRH and LTRH class members, which are measured in AC5, as compliant.  *See* 2021 Program Guide, ECF No. 7333-1 at 444 ("All [STRH] patients shall be offered 90 minutes of confidential structured group therapeutic activity weekly."); *id.* at 453 ("[I]nmates placed into the CCCMS-LTRH will be offered 90 minutes of confidential structured therapeutic

---

[1] The parties agree that mental health groups that occur cell-front (including patients' completion of in-cell treatment packets) should *not* count towards fulfillment in AC5.

[4344320.4]

Kerry Walsh
August 25, 2023
Page 4

activity."); *id.* at 452 ("CCCMS female inmates or CCCMS inmates undergoing RC processing will be offered 90 minutes of out-of-cell activity consisting of confidential structured therapeutic activity.").

The Court rejected Defendants' argument that psychiatry contacts need not be confidential  to satisfy Program Guide requirements.  *See* Aug. 14, 2019 Order, ECF No. 6242 at 7.  Given that clinician-led groups address many of the same sensitive, private issues discussed by patients and their psychiatrists in individual MHMD contacts, it is reasonable to extend this Order's confidentiality requirement to clinician-led groups.

The Special Master regularly monitors whether groups occurred in a confidential setting; this goes to both the place itself where the group is conducted and also that it is reasonably free of intrusions (e.g., the setting is private, but has a refrigerator in it and staff interrupt the group to retrieve their lunches).  *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 230 ("[I]t was unclear why groups were held in the non-confidential day room."); 298 ("The EOP hub certifications suggested that non-confidential cell-front treatment groups conducted in the corridor of the PSU were counted toward treatment group hours."); 318 ("The observed treatment space for STRH and LTRH patients was non-confidential and located in the dayroom …").  The Special Master's history of monitoring this issue supports Plaintiffs' position that AC5 should into account whether clinical groups were confidential.  *See* May 24, 2023 Order, ECF No. 7847 at 7-8.

Kerry Walsh
August 25, 2023
Page 5

**Group Treatment – Core Groups**

**Issue:** Should Defendants create a summary statistic showing the percentage of mental health groups that are led by a primary clinician or psychiatrist, as opposed to a nurse, recreational therapist, or other provider?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** Yes. A plain reading of the Program Guide indicates that leisure activities cannot comprise the entirety of a patient's structured treatment. *See, e.g.*, 2021 Program Guide, ECF No. 7333-1 at 60-62 (listing numerous exemplar substantive EOP treatment groups). However, AC5 does not currently provide information on which groups were PC- or psychiatrist-led (a.k.a "core groups") as opposed to purely leisure groups (such as watching a movie, playing video games, coloring, etc.). The Program Guide also requires that "[o]ccupational or recreational therapy is counted as structured activity only if an appropriate clinician … is present and supervising the activity," but this is also not being measured. *Id.* at 59-60. To address these limitations in the indicator's current design, Plaintiffs proposed that CDCR create an informational summary statistic in AC5 that would show the percentage of groups that are led by a PC or MHMD, without implicating the overall numerator/denominator calculation of the indicator. CDCR refused.

The Special Master has monitored this issue, finding that staffing shortages and other factors contribute to patients receiving too many recreational groups and not enough clinical/process groups. *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. at 67 (May 17, 2022) ("Long-standing staffing vacancies left clinicians with high caseloads and, consequently, limited to no time to conduct core mental health groups."); Special Master's 28th Round Monitoring Report, ECF No. 7074 at 291 ("Inmates further reported that refusals were due to an insufficient number of core groups and too many recreational groups."); *id.* at 1206 ("Mental health leadership acknowledged the validity of inmate complaints that groups with nominally clinically-oriented titles were in actuality run as leisure groups."). Although the Special Master has not previously reported on the percentage of overall groups that were core vs. leisure, this is likely due to the fact that CDCR has never made this information available.

Plaintiffs understand that every mental health appointment that appears EHRS has a provider attached to it, and that there is a table of provider/position types in CDCR's data warehouse, making it possible to discern which groups were led by PCs and MHMDs as opposed to other providers. Although the data warehouse does not store historical changes to providers' position type at present, CDCR is correcting this problem. Given that the Program Guide clearly contemplates the provision of some amount of core

Kerry Walsh
August 25, 2023
Page 6

structured therapeutic activity and the Special Master monitors whether core groups are being offered, CDCR must provide this information, which it concedes it has, to ensure this critical aspect of class member care is effectuated.

Kerry Walsh
August 25, 2023
Page 7

### Review of Max Custody patients in compliance with CDCR policy

**Issue:** Should CDCR create the Special Master's requested new PIP indicator titled *Timely Review of Max Custody Patients and In Compliance with CDCR Policy*?

**Affected indicator:** This would be a new indicator, created pursuant to the PIP Placeholder item on provisionally approved key indicator list (ECF No. 7151).

**Plaintiffs' Position:** Yes. The Special Master's request for an indicator that measures compliance with Defendants' stipulated, Court-approved plan to treat maximum ("max") custody patients in the PIPs is justifiable for several reasons, notwithstanding the parties' agreement in paragraph 15 of the stipulation that "Defendants' plan shall not be included in the MHSDS Program Guide or Compendium."   ECF No. 7392 at 5.

First, long before the parties' stipulation, the Special Master reported on the systemically inadequate treatment provided to max PIP patients, with no objection from Defendants. *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. 7555 at 43-44 ("[M]any *Coleman* patients on maximum custody status received virtually no structured treatment and limited out-of-cell time during the monitoring round and have not for years.  Remedying this deficiency is essential for these class members to receive treatment consistent with their rights under the Eighth Amendment."); Defs.' Objections to 29th Round Inpatient Report, ECF No. 7559.  When the Special Master reported on the state of Defendants' compliance with the max custody plan in his most recent report, Defendants similarly did not object.  *See* Special Master's 30th Round Monitoring Report Part A – PIP Compliance, ECF No. 7833 at 29-33; June 9, 2023 Order, ECF No. 7854 at 1-2 (adopting report and noting neither party filed objections).  Given the requirement that "each key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master," this history requires Defendants to create the requested Max custody indicator. *See* May 24, 2023 Order, ECF No. 7847 at 7.

Second, the Court empowered the Special Master, not the parties, to determine whether to add this indicator to the provisional key indicator list.  When the Court approved paragraph 15 of the parties' stipulation, it "referred to the Special Master for consideration as to whether [the provisions regarding Therapeutic Treatment Modules ("TTMs")] are, or should be, reflected in the list of CQIT indicators currently under review."  Feb. 7, 2022 Order, ECF No. 7456 at 4.  Defendants voluntarily dismissed their appeal of this Order in October 2022.  *See* Ninth Cir. Case No. 22-15369.

Third, development of a functioning CQIT system is itself a freestanding remedial requirement in this case.  *See* Sept. 3, 2020 Order, ECF No. 6846 at 10.  The CQIT system cannot be robust without closely monitoring max custody issues in the PIPs.

[4344320.4]

Kerry Walsh
August 25, 2023
Page 8


Fourth, while the Court has held that "the 'key indicators' in CQIT are likely equivalent to the material provisions of the Program Guide and the Compendium," *see* Sept. 3, 2020 Order, ECF No. 6846 at 24 n.11, other requirements such as staffing have also been turned into indicators throughout the data remediation process.

Finally, according to an email from Melissa Benz on June 23, 2023, the performance report data that Plaintiffs have historically relied on to obtain information and trends about the statewide max custody census may not be accurate because it "is an older report and not one that has or will be reviewed in data remediation." Nor have Defendants committed to providing transparent, accurate information necessary to monitor these issues in any other way. As such, because CDCR's information-sharing obligations under the parties' stipulation expire after two years, which will run at the end of December 2023 (ECF No. 7392 at 3), Plaintiffs and other stakeholders will have no validated data on the max population absent this indicator. Given the persistent systemic deficiencies in the provision of care provided to max patients in the PIPs identified by the Special Master, and in the absence of any proposed alterative offered by CDCR, the creation of a new indicator is warranted and necessary.

# EXHIBIT B

Defendants' Level 2 Dispute Statement:
Therapeutic Treatment Module Stipulation Indicators[1]

On June 14, 2023, the Special Master wrote to the parties recommending new and extended indicators. Among those new indicators was a request for the Defendants to develop an indicator for "[t]imely review of max custody patients in compliance with CDCR policy" for patients referred and admitted to Psychiatric Inpatient Programs (PIP). CDCR's Max Custody policy for PIP patients arose from a 2021 stipulation to resolve a dispute over the use of Therapeutic Treatment Modules (TTMs) in PIPs. CDCR responded to this request via letter on June 28, 2023 and, in line with its position below, disagreed with the Special Master's recommendation. Unusually, this issue was placed on the August 3, 2023 Level 1 Dispute Resolution calendar, despite not arising from a BRMR discussion of an existing court-ordered key indicator. See ECF No. 7556 at 9, outlining the Dispute Resolution process. CDCR objected to inclusion of this issue on the Dispute Resolution calendar.[2] Despite this, the issue has been added to the Level 2 Dispute Resolution process.

CDCR objects to the inclusion of provisions of the TTM stipulation as key indicators. "CQIT key indicators must be operationalized to properly measure the core requirements of the Program Guide and Compendium." ECF No. 7847 at 6. The parties specifically agreed in Paragraph 15 of their stipulation pertaining to the use of TTMs in the PIPs, which was approved by the Court, that "Defendants' plan outlined in the TTM stipulation shall not be included in the MHSDS Program Guide or Compendium." ECF No. 7381. Inclusion of provisions from the TTM stipulation as CQIT key indicators now would directly contradict both the parties' Court-approved agreement and this Court's May 24, 2023 order. ECF Nos. 7847 at 6; 7392. Indeed, Defendants made clear that Section III of the parties' TTM agreement, which includes Paragraph 15, was critical to reaching an agreement on this issue and Defendants would withdraw their agreement from all parts of the stipulation if any language in Section III was struck. *See* ECF No. 7380 at 4-5.[3]

---

[1] CDCR reserves the right to make new objections to any future writings from the Special Master regarding this issue. To date, CDCR has not received the Special Master's position on this issue in writing. The Court recently noted that under the Order of Reference, "the court does not consider any objections to a report or recommendation by the Special Master 'unless an identical objection was previously submitted....'" ECF No. 7847 at 10 (citing ECF No. 640 at 8). However, the cited section of the Order of Reference applies to compliance reports filed under paragraph A(5). ECF No. 640 at 8. Under paragraph A(5), the Special Master provides a draft report and each party has 30 days to provide informal objections. *Id*. at 4-5. That is not the case here. No written draft report has been provided here. CDCR maintains its right to supplement these objections should a written report be issued in the future or if Plaintiffs' position statement raises new issues.

[2] On August 11, 2023, CDCR emailed Plaintiffs' counsel and the Special Master's team stating that this issue should be removed from the data remediation dispute resolution process and instead resolved through the dispute resolution process outlined in the TTM stipulation. During the August 15, 2023 BRMR meeting, a member of the Special Master's team informed the parties that unless the parties agreed, this item would continue through the data remediation dispute resolution process. Plaintiffs stated their belief that this item should continue in the data remediation dispute resolution process. Defendants reiterate our objection to continued discussion of this topic in the data remediation process and reserve the right to invoke the dispute resolution clause of the settlement agreement in the future.

[3] In addition to the joint statement, the parties filed a revised stipulation with minor clarifications to Section II. ECF No. 7381.

1

Requiring CDCR to create indicators that measure the provisions of the TTM stipulation also disregards Paragraphs 9 and 11 of the stipulation, which outline what data and documents Defendants will produce to Plaintiffs and the Special Master. Per the agreement, Defendants will provide the agreed-upon data and documentation for two years following the initial implementation report, which was provided in September 2022. *Id*. Paragraph 11 states that the parties will meet and confer about the frequency and scope of the data and document production at the end of the two-year period. *Id*. Creating indicators auditing provisions of the TTM stipulation automatically extends Defendants' data production obligation beyond the agreed-upon period and improperly modifies a court-ordered agreement, without the consent of both parties.

Plaintiffs dismissed these clear deviations from the parties' stipulation by arguing that the Court has referred this issue to the Special Master. CDCR acknowledges that the Court's February 7, 2022 order refers the issue of whether provisions of the TTM stipulation are, or should be, reflected in the list of provisionally approved CQIT indicators. Such a referral does not invalidate, override, or modify any terms of the court-approved stipulation. Both parties and the Special Master are bound by the terms of the TTM stipulation. To the extent a recommendation is made to modify or otherwise deviate from any part of the TTM stipulation over CDCR's objection, Defendants reserve their right to withdraw their agreement from all parts of the stipulation.

The parties worked together to carefully craft an agreement regarding the use of TTMs in the PIPs. The resulting agreement was then approved by the Court. CDCR objects to the creation of any new indicators that would circumvent the parties' agreements in the TTM stipulation and are concerned that any recommendation that circumvents or violates the terms of the parties' stipulation will chill future agreements between the parties.