1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-4431
7    Fax:  (415) 703-5843
     E-mail:  Namrata.Kotwani@doj.ca.gov
8  *Attorneys for Defendants*

   HANSON BRIDGETT LLP
   PAUL B. MELLO, State Bar No. 179755
   SAMANTHA D. WOLFF, State Bar No. 240280
   KAYLEN KADOTANI, SBN 294114
   DAVID C. CASARRUBIAS, SBN 321994
   CARSON R. NIELLO, SBN 329970
     1676 N. California Boulevard, Suite 620
     Walnut Creek, CA 94596
     Telephone:  (925) 746-8460
     Fax:  (925) 746-8490
     E-mail:  PMello@hansonbridgett.com
   *Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF ELISE OWENS THORN IN SUPPORT OF DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S OCTOBER 18, 2023 PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE: PLACEHOLDER– PIP–MAX CUSTODY REVIEW** |

1

19387675.5

**DECLARATION OF ELISE OWENS THORN**

I, Elise Owens Thorn, declare as follows:

1.    I am a Deputy Attorney General in the California's Attorney General's Office, counsel of record for Defendants. I am licensed to practice before all of the courts of the State of California, and am admitted to practice before this Court. I submit this declaration in support of Defendants' Objections to the Special Master's Proposed Resolution of Data Remediation Dispute: Placeholder—PIP—Max Custody Review. I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2.    Attached as Exhibit A is a true and correct copy of an e-mail that I received from California Department of Corrections and Rehabilitation (CDCR) Office of Legal Affairs (OLA) attorney Melissa Bentz, dated September 9, 2022, transmitting CDCR's Report Regarding the Implementation of the Agreements in the November 19, 2021 TTM Stipulation to the Special Master.

3.    Attached as Exhibit B is a true and correct copy of a letter dated June 28, 2023 from OLA attorney Melissa Bentz, copied to me, that responds to Special Master Lopes' June 14, 2023, letter regarding the identification of "placeholder" indicators.

4.    Attached as Exhibit C is a true and correction copy of a chain of e-mails dated beginning in November 2022 through April 7, 2023, that reflect the parties' communications to meet and confer on data production under the November 19, 2021 stipulation (ECF No. 7392.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 27th day of October, 2023, at Sacramento, California.

*/s/ Elise Owens Thorn*
Elise Owens Thorn

1

Thorn Decl. ISO Objections To Prop. Resolution Re: PIP Max Custody Reviews(2:90-CV-00520 KJM-DB (PC))

19387675.5

# EXHIBIT A

**Elise Thorn**

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> |
| **Sent:** | Friday, September 9, 2022 2:09 PM |
| **To:** | 'Lopes Matthew'; 'Coleman Special Master'; 'Coleman Team - RBG Only'; 'Steve Fama' |
| **Cc:** | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; Weber, Nicholas@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR |
| **Subject:** | RE: Coleman: CDCR's Report regarding Implementation of the TTM Stipulation |
| **Attachments:** | PIP Max Custody Report- 9-9-22.pdf |

All,

Apologies. Please review this revised report instead.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD
COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Bentz, Melissa@CDCR
**Sent:** Friday, September 9, 2022 1:45 PM
**To:** Lopes Matthew <mlopes@pldolaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Weber, Nicholas <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon <Dillon.Hockerson@cdcr.ca.gov>; Sundeep Thind (SUNDEEP.THIND@cdcr.ca.gov) <SUNDEEP.THIND@cdcr.ca.gov>
**Subject:** Coleman: CDCR's Report regarding Implementation of the TTM Stipulation

All,

Attached is CDCR's report regarding implementation of the TTM stipulation.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

**California Department of Corrections and Rehabilitation's Report Regarding the Implementation of the Agreements in the November 19, 2021 TTM Stipulation**

September 9, 2022

## I.     Introduction and Background

On July 26, 2021, the Court ordered the parties to engage in settlement negotiations with the assistance of a magistrate judge to address disagreements concerning Defendants' use of Therapeutic Treatment Modules (TTMs) in inpatient settings. ECF No. 7246. The parties met and discussed the California Department of Corrections and Rehabilitation's (CDCR) use of TTMs in Psychiatric Inpatient Programs (PIPs) and the treatment of patients on Maximum (Max) custody. The parties agreed to the terms set forth in the TTM stipulation that was approved by the Court on December 9, 2021. ECF No. 7392.

As part of the stipulation, CDCR agreed to "submit a report to the Special Master and Plaintiffs on the status of implementation of the *Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants* memorandum and on the designation of *Coleman* class members in PIPs on Max custody within nine months from the Court's approval of this stipulation." *Id*. at 3. In the nine months since the court approved the stipulation, CDCR has focused on providing in depth training to all appropriate staff members regarding when it may be appropriate to release PIP patients from Max custody, when IDTTs should refer a patient for an ICC for a Max custody review, and how mental health treatment should be targeted to address behaviors that result in placement or continuation on Max custody if the patient's mental health symptoms may have contributed to that behavior. CDCR has also focused on reviewing PIP patients at an institution and headquarters level for potential release from Max custody when appropriate. Headquarters staff have seen a marked improvement in the review of PIP patients on Max custody and the release of appropriate patients. Below CDCR provides details regarding the steps that have been taken to implement the stipulation and the agreed upon memorandum.

## II.     Release of Memorandum and Training

In paragraphs two and three of the stipulation, defendants agreed to develop a plan to implement the memorandum titled, "*Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants,*" within 90 days following the court's approval of the stipulation. *Id*. at 2. Defendants have developed and implemented that memorandum, which is dated March 9, 2022, and which provides direction regarding the ability to remove the designation of Max custody from *Coleman* class members in PIPs when appropriate.

In paragraph three of the stipulation, defendants agreed to develop training for custody and mental health staff on the Max custody review process. *Id*. Defendants have developed and implemented on-the-job training (OJT) for all correctional counseling staff, classification committee chairpersons, and mental health clinicians. Part of that OJT required staff to read the "*Maximum Custody Reduction*

1

*Reviews for Psychiatric Inpatient Program Participants"* memorandum and sign an acknowledgement that they were using the Learning Management System (LMS) by April 8, 2022.  Upon review of statewide training records, of those staff required to complete OJT, CDCR reports 88% training compliance as of September 8, 2022.

In addition to the required OJT, the Division of Adult Institutions (DAI) and the Statewide Mental Health Program developed  E-learning courses in LMS to ensure adequate and interactive training was provided to the appropriate staff.  Plaintiffs' counsel received copies of both E-learning courses and were provided with the opportunity to provide comments as required by paragraph 3 of the stipulation.  *Id*. at 2.  CDCR made adjustments to the trainings in response to these comments prior to implementation.

The DAI training was provided to all Chairpersons and Correctional Counselors.  DAI required these staff to complete the training by August 12, 2022 and currently reports 75% compliance. DAI provided a reminder to institutions of this mandate, and will continue to run training data monthly to ensure compliance with both training mandates.

The Statewide Mental Health Program also created a training for clincical staff regarding the interdisciplinary treatment team (IDTT) referral process. The training discussed the memorandum titled, "*Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants*." The training also focused on discussing the changes to the Electronic Health Record System (EHRS) to require the IDTT to assess PIP Max custody patients for recommendation to the ICC for a Max custody review and ensuring that treatment in the PIPs targets behaviors that result in a patient being places or continued on Max custody if mental health symptoms may have contributed to the behavior.  *Id*. at 3.  The training for mental health staff was implemented on August 3, 2022, with a required completion date of November 1, 2022.  Statewide Mental Health will monitor compliance as staff begin to complete the mandated training.

### III.    Installation of TTMs

Paragraph four of the stipulation states that "Defendant will install TTMs for use under this stipulation at the California Health Care Facility and other PIPs as necessary." *Id*. at 2.  Since the court's approval of the stipulation, CDCR sent notice that two TTMs would be installed at the California Medical Facility PIP. That installation has occurred. CDCR also sent notice that 30 TTMs would be installed at the California Health Care Facility (CHCF) PIP. To date, 8 of the 30 TTMs at CHCF have been installed. The remaining TTMs scheduled for install at CHCF are on order and will be installed expeditiously once received.

### IV.    Interdisciplinary Treatment Team Referral

In paragraph five of the stipulation, CDCR agreed to take steps necessary to revise the EHRS to require that the IDTT assess each Max custody patient for recommendation to the ICC for a Max custody review.  *Id*. at 3.  This change was made in a timely manner.  In addition, as described above, CDCR provided guidance to the field regarding this requirement via the March 9, 2022 memorandum and the E-learning course for mental health staff.  Per the direction and training provided, the treatment

teams are required to determine whether mental health symptoms may have contributed to the behavior(s) that led to Max custody or continuance of Max custody. If so, the treatment team is to address these symptoms specifically during treatment planning and provide documentation in the Master Treatment Plan, including treatment goals targeting those behaviors. The treatment teams are also required to make a referral to ICC for review of Max custody when the treatment goals related to Max custody have been accomplished.

If the treatment team recommends suspension of Max custody, this recommendation shall be documented on a CDCR Form 128-B Informational Chrono, and the patient will be referred to the ICC. Review of the documentation contained in the Master Treatment Plan demonstrated that since March 9, 2022, 586 IDTTs of 9,114 IDTTs conducted referred patients to ICC for consideration of Max custody suspension.

**V.**    **Status of Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants**

CDCR agreed to implement the memorandum titled "Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants." The following summarizes the status of this implementation:

**1.    Intermediate Care Facility Referral Review**

CDCR agreed to review patients designated Max custody and referred to the Intermediate Care Facility (ICF) level of care, with the goal of suspending Max custody or the SHU term when possible before those patients' transfers to ICF programs. The participation and input of the Mental Health clinician present in the referring institution's Institution Classification Committee (ICC) is documented in the Classification Chrono, including the appropriate clinical recommendation for ICF placement to address mental health concerns. In reviewing those patients referred to the ICF level of care every week, the Mental Health Compliance Team (MHCT) noted a decrease in cases that would have typically been referred back to the institution for consideration of Max custody suspension before transfer. This trend indicates that referring institutions are reviewing patients and ensuring suspension of Max custody before those patients' transfers to ICF programs is occurring when safe to do so.

**2.    Initial Institution Classification Committees**

CDCR agreed that an ICC shall occur no later than ten calendar days from arrival at the endorsed PIP location for any patient designated Max custody. The intent of this provision is to provide a process to confirm that patients are housed in the least restrictive environment upon arrival. The ICC is required to clearly articulate this review in the Classification Chrono as "Max Custody Reduction Review." This review is to justify either retaining or removing Max custody. In reviewing a small sample of ICC actions, DAI determined that the ICC is documenting information relayed from clinical staff regarding whether the patient has been compliant with medication(s), whether the patient has

3

been attending programs and treatment, and the patient's current behavior, in addition to providing recommendations concerning whether the patient is potentially suitable for Max custody reduction. ICC is also documenting clinical input, reviewing the patient's disciplinary history, and eliciting information from the housing unit staff when determining whether to suspend Max custody. The documentation reviewed confirms that the review process is working as intended and that clinical and custody staff are working collaboratively to determine whether the patient would benefit from the suspension of Max custody.

### 3. IDTT Required Attendance

CDCR agreed to ensure oversight within the IDTT setting. A Captain (or designee) or a Mental Health Supervisor (or designee) will attend some of the PIP Max Custody IDTTs for one day on alternating weeks, and this attendance will be documented in the Acute Psychiatric Program/Intermediate Care Facility Master Treatment Plan. The IDTTs are monitored to ensure that the treatment team is addressing behaviors or symptoms that may have contributed to Max custody at each IDTT, as well as ensuring collaborative discussions are occurring among the treatment team members. CDCR is working with the PIPs to fully implement this requirement and to find a way to reliably track required attendance. CDCR has followed up with institutional leadership to ensure the appropriate supervisors are attending PIP Max Custody IDTTs as required and will continue monitoring attendance to ensure compliance is met.

### 4. Mental Health Compliance Team ICF Referral Review

CDCR agreed to direct the MHCT to conduct weekly pre-reviews of those patients referred to the ICF level of care. The MHCT provides recommendations for those cases in which the ICC may consider suspending the patient's Max custody or SHU Term. In March and April of 2022, of those cases identified by the MHCT for consideration of Max custody suspension, 100% (11 of 11) were released from Max custody prior to transfer. In the subsequent months (May–August), the MHCT did not identify cases in which Max custody suspension was warranted based on the referral list provided. However, it should be noted that there were many cases in which the institutions suspended Max custody without recommendations from the MHCT during this same time frame. The data reviewed shows that ICCs are reviewing ICF referrals and considering Max custody suspension when it is safe to do so, even without prompting from the MHCT.

### 5. Mental Health Compliance Team Bi-Weekly Review

CDCR agreed that the MHCT would conduct bi-weekly reviews of Max custody PIP patients. The MHCT implemented this review process before the stipulation was finalized in order to ensure ICCs were evaluating whether PIP patients could be appropriately released from Max custody as soon as possible. The March 9, 2022 memorandum provided the field with examples of appropriate suspensions of Max custody and SHU terms. Based on a review of ICC actions, CDCR has determined that a majority of those offenses for which Max custody was suspended include: battery without

serious bodily injury, indecent exposure, safety/enemy concerns, threats/harassment, and assault. Upon review, the classification committees are utilizing this guidance and applying it to those cases warranting Max custody suspension.  DAI began the MHCT Bi-Weekly Reviews prior to release of the March  memorandum.   In January and February of 2022, the MHCT recommended 38 patients for consideration of Max custody suspension, and 22 patients subsequently had their Max custody reduced.    Between the release of the March 9 memorandum and July 31, 2022, the MHCT recommended 62 cases for consideration of Max custody suspension, and 47 patients subsequently had their Max custody reduced.  This demonstrates ICCs are diligently reviewing the recommended cases and ensuring that Max custody is suspended when it is safe to do so.

### 6.  Bi-Weekly Deputy Directore Videoconference

Lastly, CDCR agreed to conduct Bi-Weekly Deputy Director Videoconference calls to ensure insitutions are in compliance with the newly enacted requirements.  Upon implementation, CDCR has mandated and conducted Bi-Weekly Deputy Director video conference calls for those PIP institutions in which cases were recommended for consideration of Max custody suspension on behalf of the MHCT.    During the Bi-Weekly video conference calls, all required institutions have ensured attendance and provided detailed information regarding cases in which an ICC has determined that retaining a patient on Max custody is warranted.  DAI leadership has encouraged those institutions to continue to monitor and evaluate potential Max custody suspension for all cases identified within the respective PIP locations.

# EXHIBIT B

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 28, 2023


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1201 Atwood Avenue
Johnston, RI 02919

*VIA EMAIL ONLY*


Special Master Lopes:

I write in response to your June 14, 2023, letter regarding the identification of "placeholder" indicators. The California Department of Corrections and Rehabilitation (CDCR) appreciates the opportunity to comment on the Special Master's recommendations regarding new and existing indicators. Discussed below are points of agreement and disagreement.

      I.      New Indicators

CDCR agrees to create a number of new indicators, as discussed in detail below. However, although the June 14, 2023 letter represents there are only 14 new indicators recommended, many of the new indicators seek to measure multiple items. Thus, more than 14 new indicators are actually recommended.[1] CDCR's assessment of the increased number of new indicators, coupled with the expanded indicators, makes it impossible to complete data remediation this calendar year. However, of all the recommended new indicators, CDCR only objects to the creation of three.

              A.  New Indicators CDCR Agrees to Create[2]

CDCR agrees to create the following new indicators[3]:

- Additional Use of Force: Total number of mental health and custody staff required to attend UOF training and total number that attended.
- Psychiatric Inpatient Program (PIP): Number of SIRS/Sentinel Events

---

[1] At least one "extended" indicator will require the development of an entirely new indicator as well. See Section II(C), *infra.*

[2] CDCR's agreement to create new indicators or extend existing indicators does not signify agreement that each indicator has an appropriate compliance threshold. Defendants will address the issue of compliance thresholds when the parties and Special Master discuss that topic.

[3] CDCR's agreement to create these indicators is based on the understanding that each item is only one indicator. CDCR reserves the right to object to expansions of the above items.

- PIP: Custody Staff with CPR Training
- Custody and Mental Health Partnership Plan (CMHPP): Was the CMHPP huddle report used to document required attendees during each program's required huddle during second and third shift?
- CMHPP: Did all custody, mental health, and nursing staff attend the mandatory one hour off-post CMHPP training annually?

CDCR will begin building any new indicators once the indicators on the provisionally approved key indicator list have completed verification.[4] Please let us know if the Special Master believes these new indicators should be prioritized in a different manner.

> i. CDCR Agrees to Measure the Following Six Topics, but It Will Require CDCR to Build More than Six Indicators

A handful of the new indicators recommended by the Special Master are posed as a single question (or indicator), yet seek to measure multiple requirements. Because each recommended new indicator seeks to measure multiple requirements, CDCR will need to create multiple indicators per question. CDCR agrees to create these new indicators; however, creation of multiple indicators per question will take more time than envisioned in the June 14, 2023 letter. Even if the Special Master treats each topic as a singular indicator, it is crucial to note that the workload involved will be equivalent of creating multiple indicators given the need for different rules and documentation for each part of the question. The stakeholders should be transparent about the work required to create the recommended new indicators as it is paramount to provide a realistic understanding of the time needed to complete data remediation.

> 1. Sustainability Process: Are sustainability visits and reports occurring in accordance with the sustainable process order?

Yesterday, the parties and the Special Master's team discussed the recommendation to create a new Sustainability Process (SusPro) indicator. Based on that conversation, CDCR understands that the Special Master's team is interested in measuring the following requirements: 1. Whether the SusPro visits occurred at the required frequency in accordance with Defendant's 2012 Sustainable Process plan; 2. Whether the appropriate participants attended the SusPro tours; and 3. Whether the SusPro reports were issued as required. Please let us know if we have misinterpreted the Special Master's recommendation.

Based on the above understanding, CDCR agrees to create the SusPro indicators above. However, it must be noted that the Special Master's team is recommending that CDCR audit three separate requirements, which will require CDCR to build at least three indicators.

---

[4] Data remediation is comprised of numerous steps: 1. Preparation of documents; 2. Pre-Stakeholder review; 3. Stakeholder review; 4. Pre-BRMR meeting; 5. BRMR with all stakeholders including Plaintiffs' counsel and the Special Master's team; 6. Approval by the Change Advisory Prioritization Committee (CAPC); 7. Programming; 8. Release to statewide users; 9. Verification by CDCR; and 10. Remediation by the Special Master's data expert. All stakeholders agree to an indicator in BRMR before it can move forward in the process. Disputes in BRMR that any stakeholder believes must be resolved to remediate the indicator are resolved through the agreed upon dispute resolution process. *See* ECF No. 7556-2. The indicator will not move forward to subsequent steps until the dispute is resolved either through agreement of the stakeholders or Court order.

    2.  PIP: LRH policy adhered to in implementation

Yesterday, the parties and the Special Master's team discussed the Special Master's recommendation to create an indicator that measures the Least Restrictive Housing (LRH) policy. Based on that conversation, CDCR understands that the Special Master's team is focused on how PIP IDTTs are addressing each patients who are housed outside of their LRH and is interested in measuring the following requirements: 1. Timely review of LRH housing during the IDTT; 2. Whether clinical barriers to patient's LRH placement are documented in the Master Treatment Plan; 3, Correctional Counselor review of LRH during IDTT with an appropriate response; and 4, The number of PIP patients housed outside of their LRH. Please let us know if we have misinterpreted the Special Master's recommendation.

Based on the above understanding, CDCR agrees to create the LRH indicators. However, it must be noted that the Special Master's team is seeking four separate pieces of information, which may require CDCR to build at least four indicators.

    3.  CMHPP: Did all required staff, by required housing unit and required watches, attend the quarterly round table training, facilitated by the required staff?

The above question asks whether two separate requirements were met: 1. Did all required staff attended the quarterly round table training?; and 2. Was the quarterly round table training facilitated by the required staff? This effectively translates into the construction of two new indicators, each involving its own set of rules and documentation.

    4.  CMHPP: Was monthly joint executive rounding attended by required staff and conducted as required for programs?

The above question asks whether two separate requirements were met: 1. Did the required staff attend the monthly joint executive round?; and 2. Was monthly joint executive rounding conducted as required? This effectively translates into the construction of two new indicators, each involving its own set of rules and documentation.

    5.  CMHPP: Did 3CMS CMHPP activities (supervisor weekly meeting, monthly IAC meeting, monthly joint supervisory program tours) occur as required with required staff?

The above question asks whether three separate activities were completed. It also asks whether the required staff participated in the activities. To appropriately capture this information, CDCR will need to create at least three separate indicators – one indicator to correspond with each activity, each involving its own set of rules and documentation.

6. CMHPP: In the preceding month, were all newly placed patients into EOP level of care scheduled for four required intro to EOP groups led by required facilitators?

The above question asks about two separate requirements: 1. Were patients newly placed into EOP scheduled for the four Introduction to EOP groups?; and 2. Were the Introduction to EOP groups led by the required facilitators? This effectively translates into the construction of two new indicators, each involving its own set of rules and documentation.

B. New Indicators CDCR Does Not Agree to Create

CDCR objects to the creation of the following indicators.

i. Additional Use of Force: What is the total number of Institutional Executive Review Committee (IERC) UOF reviews that required corrective action?

The Special Master's team does not currently ask for information regarding use of force reviews that required corrective action in their monitoring document request. The Special Master does not report on use of force reviews that required corrective action. While use of force is part of the *Coleman* remedy, employee discipline is not. CDCR objects to creating a new indicator that does not measure a Program Guide, Compendium, or Court ordered requirement and is not currently monitored by the Special Master.

ii. PIP: Number of Behavior Management Plans Developed and Number of Those Implemented

Behavior management plans and the positive behavioral support team (PBST) are not *Coleman* requirements. The Special Master acknowledged this in his 30th round report. *See* ECF No. 7833 at fn. 23. "CQIT key indicators must be operationalized to properly measure the core requirements of the Program Guide and Compendium." ECF No. 7847 at 6. CDCR objects to the creation of a new indicator measuring PBST or behavior management plans as neither are Program Guide or Compendium requirements.

iii. PIP: Timely Review of Max Custody Patients and In Compliance with CDCR Policy[5]

On November 4, 2021, the parties filed a stipulation regarding the use of Therapeutic Treatment Modules (TTMs) in the PIPs. ECF No. 7366. Paragraph 15 of the stipulation states "The parties agree that Defendants' plan shall not be included in the MHSDS Program Guide or

---

[5] Yesterday, the parties and the Special Master's team discussed the Special Master's recommendation to create this new indicator. Based on that conversation, CDCR understands that the Special Master's team is interested in creating indicators regarding the following topics: 1. Pre-transfer ICC review for Max custody patients referred to the ICF level of care; 2. PIP ICC review of Max custody patients within 10 calendar days of arrival; 3. MHCT bi-weekly review of Max custody patients; 4. The number and percent of PIP patients retained on Max custody; and 5. The number and percent of PIP patients removed from Max custody.

Compendium." *Id.* at 5. On November 8, 2021, the Court issued an order to show cause why the Court should not decline to approve Section III of the stipulation, which includes Paragraph 15. ECF No. 7368. In response, the parties filed a joint statement explaining that Section III, including Paragraph 15, was critical to reaching an agreement on this issue and Defendants would withdraw their agreement from all parts of the stipulation if any language in Section III was struck. ECF No. 7380 at 5.[6]

On December 9, 2021, the Court approved paragraphs 1 through 14 of the TTM stipulation and conditionally approved Paragraph 15. ECF No. 7392 at 6. The Court granted final approval of Paragraph 15 on February 7, 2022, and referred the question of whether the provisions of the TTM are, or should be, reflected in the list of CQIT key indicators to the Special Master. ECF No. 7456 at 3-4.

CDCR objects to the inclusion of provisions of the TTM stipulation as key indicators. "CQIT key indicators must be operationalized to properly measure the core requirements of the Program Guide and Compendium." ECF No. 7847 at 6. The parties specifically agreed in Paragraph 15, which was approved by the Court, that Defendants' plan outlined in the TTM stipulation shall not be included in the MHSDS Program Guide or Compendium. ECF No. 7381. To now include provisions from the TTM stipulation as CQIT key indicators directly contradicts the parties' Court-approved agreement, which Defendants made clear was critical to reaching an agreement on this issue.

Requiring indicators to measure provisions of the TTM stipulation also disregards Paragraphs 9 and 11 of the stipulation which outline what data and documents Defendants will produce to Plaintiffs and the Special Master. Per the agreement, Defendants will provide the agreed-upon data and documentation for two years following the initial implementation report, which was provided in September 2022. *Id.*  Paragraph 11 states that the parties will meet and confer about the frequency and scope of the data and document production at the end of the two-year period. *Id.* Creating indicators auditing provisions of the TTM stipulation automatically extends Defendants' obligation to provide data and documentation beyond the agreed-upon period.

The parties worked together to carefully craft an agreement regarding the use of TTMs in the PIPs. The resulting agreement was then approved by the Court. CDCR objects to the creation of any new indicators that would circumvent the parties' agreements in the TTM stipulation.

## II.    Extended Indicators

CDCR agrees to extend most of the existing indicators recommended in the Special Master's June 14, 2023 letter. CDCR will agree to extend several other indicators pending clarifications and will agree to partially extend two other indicators. Notably, at least nineteen indicators recommended for extension to the PIPs do not require extension at all because they already apply to the PIP population. Finally, CDCR objects to the extension of one indicator, as discussed below.

---

[6] In addition to the joint statement, the parties filed a revised stipulation with minor clarifications to Section II. ECF No. 7381.

A. Existing Indicators CDCR Agrees to Extend, Extend Pending Clarification, or Partially Extend[7]

The Special Master's June 14, 2023 letter provides insight into how the existing indicators were considered while determining the recommended measurements for each placeholder indicator. The letter notes that "the workgroup sought to utilize existing provisionally approved key indicators that measure requirements in one setting (e.g., EOP) and apply those indicators to another setting, such as the PIPs, rather than create new indicators." Based on this statement, as well as discussions in yesterday's Business Rules and Methodology Review (BRMR) meeting, CDCR understands that the existing indicators will be extended to include the PIP in the rule population or audit area, or in some cases to include PIP-specific policy requirements. However, the intent is not to create (or re-create) indicators that have already been approved by the stakeholders. CDCR does not agree to re-review parts of existing indicators that have already been reviewed and agreed upon in BRMR, unless revisions are made as a result of the expanded rule population/audit area or PIP-specific policy requirements.

i. Existing Indicators CDCR Agrees to Extend

CDCR agrees to extend the following existing indicators to the PIP:

- SP4: Suicide-Resistant PIP Patient Rooms (MHCB indicator released to statewide users on June 5, 2023; Pending remediation)
- SP14: PIP Records with Rationale for Limited Issue of Clothing and Bedding (MHCB indicator remediated on September 22, 2022, but the Special Master's team requested additional changes after remediation; Revised indicator released to statewide users on June 19, 2023)
- QC3: Treatment Plans with Satisfactory Documentation (Approved by CAPC on February 16, 2023; Pending remediation)
- QC12: IDTTs with Observed Interactive Process (Remediated on August 19, 2022)
- SC1: Percentage of RVR MH Assessment Where the Patient was Informed of the Limits of Confidentiality (Remediated December 2, 2022)
- SC2: RVRs Recommended for Mitigation with Custody Documentation (Remediated March 22, 2023)
- SC3: RVRs Where the Captain Disagreed with PC's Rec. to Doc. In Alt. Manner & Doc. Rationale for Disagreement on 128B (Remediated January 23, 2023)
- SC4: Percentage of Days Where Heat Plan was Activated and Alternative Out of Cell Activities were Offered to Heat Alert Patients (Approved by CAPC on December 1, 2022; Pending remediation)

---

[7] The existing indicator names included in this letter mirror those used in the Special Master's June 14, 2023 letter for ease of reference. However, as explained in footnote 7 of that letter, some indicator names have been updated through the data remediation process. Attachment A to this letter includes a chart providing the updated name for each indicator on the provisionally approved key indicator list as of June 26, 2023. The chart also shows which indicators were split into multiple indicators as a result of the data remediation process and provides the indicator identification number.

- • SC5: Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM
- • SC7: Thermometer Checks Completed and Accurate (Remediated on July 29, 2022)
- • SC9: RVRs Recommended for Mitigation that were Mitigated (Released to statewide users on August 12, 2022; Pending remediation)
- • FEC1: Adequate Group Treatment Space (Released to statewide users on July 12, 2022; Pending remediation)
- • FEC2: Adequate IDTT Space (Released to statewide users on August 5, 2022; Pending remediation)
- • FEC3: Adequate Individual Treatment Space (Released to statewide users on July 12, 2022; Pending remediation)
- • AC5: Treatment Offered (Currently in BRMR)[8]
- • SP11: Housing Unit/Patient Living Areas with Emergency Response Equipment and Inventoried Daily (Remediated July 29, 2022)

To increase efficiency, CDCR recommends completing review of the indicators that require a simple expansion of the rule population or audit location via email, instead of re-reviewing the items in BRMR, as no substantive changes other than inclusion of the PIP will be required. Please let us know if the Special Master and Plaintiffs' counsel agree to a truncated review process for such items.

> ii.  Existing Indicators CDCR Agrees to Extend Pending Clarification

CDCR agrees to extend three other existing indicators to include the PIP, per the Special Master's recommendation (SP15: PIP Property and Privileges; PS3.1: Seclusion; and PS3.5: Restraint), but requires clarification as to the scope of the recommendation. During the data remediation process, the Special Master's team and the parties agreed to split all three indicators into eleven different indicators. It is unclear from the letter whether the Special Master recommends extending all of the split indicators or only some indicators to the PIPs.

> 1.  SP15: PIP Property and Privileges

During data remediation, the MHCB Property and Privileges indicator on the provisionally approved key indicator list was split into five separate indicators: 1. SP15.1: MHCB Out of Cell

---

[8] CDCR's understanding, from discussions with the Special Master's team during BRMR yesterday, is that the recommendation is to simply extend the treatment offered indicator created for the required outpatient programs to the PIP. In other words, any decisions or agreements made regarding reasonable modifications to the existing indicator or the methodology used to calculate the summary statistic would also be applied to the PIP treatment offered indicator. CDCR agrees with this proposal. However, there are several outstanding issues regarding AC5. First, AC5 is impacted by the timely compliance methodology dispute that is currently in Level 2 of dispute resolution. CDCR maintains its position on that dispute. Second, the Special Master's team has recently requested indicators regarding treatment attended, scheduled, canceled, and refused. The Special Master's team views their request as a reasonable modification to AC5. CDCR has agreed to consider this position and will provide a response shortly. Third, the stakeholders are still discussing AC5 in BRMR, so there is the possibility that other disputes will arise. Finally, the PIP minimum treatment requirements are currently before the Court. CDCR cannot build the PIP treatment offered indicator without resolution of the issues before the Court.

Activities – Yard; 2. SP15.2: MHCB Out of Cell Activities – Phone Calls; 3. SP15.3: MHCB
Out of Cell Activities – Visits; 4. SP15.4 MHCB Out of Cell Activities – Showers; and 5. SP15.5
MHCB Out of Cell Activities – Dayroom. All of the indicators were approved by CAPC on
April 20, 2023. CDCR agrees to extend SP15 to the PIPs as appropriate per policy. However, it
is unclear whether the Special Master is recommending that all or just some of the indicators be
extended. Please clarify which of the five property and privileges indicators are recommended
for extension.

### 2. PS3.1: Seclusion

During data remediation, the seclusion indicator on the provisionally approved key indicator list
was split into three separate indicators: 1. PS3.1: Seclusion Incidents; 2. PS3.2: Seclusion
Incidents per Patient; and 3. PS3.3: Seclusion Duration Greater than 8 Hours. CDCR agrees to
extend PS3.1: Seclusion Incidents to the PIPs. Given the specificity of the numbering used in the
Special Master's letter, it is CDCR's understanding that only PS3.1 is recommended for
extension. Please clarify whether the Special Master will recommend any of the other seclusion
indicators for extension.

### 3. PS3.5: Restraint

The provisionally approved key indicator list included only one restraint indicator: Percentage of
Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria. This indicator was
remediated on March 13, 2023. During data remediation, CDCR agreed to create three other
restraint indicators: 1. PS3.5: Restraint Incidents; PS3.6: Restraint Incidents per Patient; 2.
PS3.7; and 3. Restraint Duration Greater than 4 Hours. CDCR agrees to extend PS3.5: Restraint
Incidents to the PIPs. Given the specificity of the numbering used in the Special Master's letter,
it is CDCR's understanding that only PS3.5 is recommended for extension. Please clarify
whether the Special Master will recommend any of the other restraint indicators for extension.

### iii. Existing Indicators CDCR Agrees to Extend in Part

The Special Master recommends extending SP23: SREs that Met All Audit Criteria and SP24:
Discharges from MHCB w/ Clinician Review of D/C Summary (SRASHE) to include the PIPs.
CDCR agrees to that extension. However, at footnote 9 of the June 14, 2023 letter, the Special
Master also recommends that "these indicators should be modified to measure timeliness and
quality of SREs required under defendants' PIP Suicide Prevention Policy." This
recommendation comes despite the fact that the parties and the Special Master's team have
already agreed upon the scope of SP23 and SP24. Moreover, both indicators were remediated by
the Special Master's data expert in December 2022.[9]

Both SP23 and SP24 are qualitative indicators that do not assess whether SREs were timely. The
scope of these indicators was discussed at length in BRMR and were ultimately agreed upon
despite not assessing the timeliness of SREs. Plaintiffs' counsel and the Special Master's team
had an opportunity to raise either indicator through the dispute resolution process (*see* ECF No.
7556-2) if they believed a reasonable modification of the indicator was necessary, yet that

---

[9] SP23 was remediated on December 9, 2022 and SP24 was remediated on December 16, 2023.

process was not utilized. To the extent the Special Master is now seeking an indicator regarding the timeliness of SRE that would require the creation of a new indicator. CDCR does not agree to modify the existing SP23 and SP24 indicators to assess timeliness.

   B. Indicators that Do Not Require Any Adjustment

The Special Master recommends an extension of the below nineteen existing indicators to the PIPs. However, all nineteen indicators already include PIP requirements. No further changes to these indicators are necessary.

    i. SPSTR1-11 and SPSTR14: PIP Staffing Indicators

The parties and the Special Master's team have agreed to use the Court ordered staffing reports to provide the information for the staffing indicators on the provisionally approved key indicator list. The Psychiatry Vacancy report[10] and the monthly Mental Health Vacancy reports for the other classifications were reviewed and approved in BRMR. The Psychiatry Vacancy report was remediated in December 2022 and the other monthly Mental Health Vacancy reports are currently in verification. All of the reports already include information regarding staffing in the PIPs for the positions listed on the provisionally approved key indicator list. *See* ECF No. 7849. Because the staffing indicators already include PIP staff and have been agreed to by the Special Master's team and the parties in BRMR, no further extension of these indicators is necessary.

The one caveat to these staffing indicators is SPSTR6, Senior Psychiatrist Specialists. During a January 2023 QAC meeting and a February 2023 BRMR meeting, the stakeholders agreed to decommission this indicator because the position is a headquarters position and not assigned to any institution. Please confirm your understanding of this and remove SPSTR6 from the list of recommended extensions.

    ii. SC8: Timely MH RVR Assessments

The Timely MH RVR Assessments indicator is currently on hold due to the dispute regarding the timely compliance methodology. However, the business rule and data element related to this indicator were reviewed and approved in BRMR and have been approved by CAPC. The agreed-upon business rule includes all mental health RVR evaluation orders in the rule population, meaning this indicator will capture all mental health assessments ordered regardless of the patient's program. Because this indicator already includes mental health assessments for PIP patients, no further extension is necessary.

---

[10] The Psychiatry Vacancy report was remediated prior to the Court's March 17, 2023 order requiring Defendants to separate the allocated and filled positions under the 2009 Staffing Plan and its modifications separately from the positions allocated and filled under the PIP Staffing Plan. ECF No. 7766. However, the remediated Psychiatry Vacancy report included information regarding allocated and filled PIP psychiatry positions for the required classifications. CDCR will update the reports for the psychiatry staffing positions to those required in the Court's March 17, 2023 order as part of the annual update process.

iii.     SP6: SRE Mentor Program and Training

SP6 measures Mental Health clinical staff in all Mental Health programs who have completed Suicide Risk Evaluation Mentoring. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of mental health clinical staff at the institution. This is inclusive of PIP staff.

| Numerator | Denominator |
| --- | --- |
| **SRE Mentoring (N1):** The number entered for each institution from the denominator in the field: "# of MH Clinical Staff Trained", entered on the Suicide Risk Evaluation (SRE) Mentoring Program from the Court Ordered Training Site. | **SRE Mentoring (D1):** The number entered for each institution in the "Total # of MH Clinical Staff" field on Suicide Risk Evaluation (SRE) Mentoring Program from Court Ordered Training Site during the review period. |
| **Biennial Training (N2):** The number entered for each institution from the denominator in the field: "# of "MH Clinical Staff Trained", entered on the Suicide Prevention and SRASHE Core Competency Building from the Court Ordered Training Site. | **Biennial Training (D2):** The number entered for each institution in the "Total # of MH Clinical Staff" field on the Suicide Prevention and SRASHE Core Competency Building from the Court Ordered Training Site. during the review period. |

SP6 was completed in BRMR on June 14, 2023 and approved by CAPC on June 22, 2023. It is currently in the programming step. Because SP6 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

iv.     SP9: Percentage of Timely Nursing Rounds in PIPs for Patients on Suicide Watch and Precaution Recorded in Electronic Healthcare Records System (EHRS) Clearly Marked, On Time, and Documented on Correct Form

The Mental Health Observations Reporting Tool is the report agreed upon to measure the timely completion of mental health observation rounds, including Suicide Watch and Suicide Precaution rounds in the EHRS. The report already includes all mental health observation rounds, including those conducted in the PIP. This report has been discussed numerous times in BRMR. There are a few outstanding questions regarding the report, but those issues should be resolved shortly so this item can move forward to verification and remediation. Therefore, no further extension of this indicator is necessary.

v.    SP10: Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correction Documentation Used

SP10 was revised during the data remediation process to focus on Receiving and Release (R&R) screenings for patients. The new title agreed upon for SP10 is Observed Initial Health Screenings in a Confidential Setting. The source for the SP10 KPI is a CQIT on-site audit. The April 27, 2023 CQIT Guidebook provides instructions for the R&R on-site audit. A screenshot is provided below.

> **Receiving and Release (R&R) Screening – Hayes Item 1**
> a) General Instructions:
> - Observe R&R process to see if they are conducted confidentially.
> - Check to see if all of the questions are being asked.
> - Respond for each R&R Screen observed (e.g., if five are observed, complete the audit five times).
> - If multiple nursing staff assigned to the R&R during the on-site assessment, audit each nurse
> - Sample size: Five inmates per nurse assigned to perform screens during the observation of the R&R screening process. If there are less than five inmate screens per nurse, observe all.
> - CQIT Audit Fields (see CQIT Audit Fields section for field definitions):
>   o Start Date
>   o Sub Area

The instructions require the auditor to observe the R&R process for confidentiality for inmates offered screenings at the time of the audit regardless of the patient's level of care. Therefore, PIP patients are already included in this audit if they are in R&R at the time of the audit. The indicator and the CQIT Guidebook instructions were reviewed in BRMR; the indicator was released to statewide users on April 3, 2023. Because SP10 already includes PIP patients and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

vi.    SP18: Nursing Staff Current with CPR Training

SP18 measures nursing staff current with CPR training. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of nursing staff employed at the institution at the time of the on-site audit. This is inclusive of PIP staff.

| Numerator | Denominator |
|---|---|
| The response to following question from the audits in the denominator:<br>• Of those nursing staff, how many completed CPR training within the last 730 days? | The response to the following question in CQIT Audit: Cardiopulmonary Resuscitation (CPR) Training during the on-site audit:<br>• How many nursing staff were employed at the time of the on-site audit? |

This indicator was reviewed in BRMR and released to statewide users on June 5, 2023. It is currently pending remediation. Because SP18 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

> vii.    SP19: Percentage of Health Care Staff with Annual Suicide Prevention Training

SP19 measures the percentage of health care staff with annual suicide prevention training. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of health care staff (nursing, mental health, and medical) employed at the institution at during the last calendar year. This is inclusive of PIP staff.

| Numerator | Denominator |
| --- | --- |
| The sum of the numbers entered in response to the questions below from the CQIT: Annual IST Suicide Prevention Training Compliance - Hayes Item 16. | The sum of the numbers entered in response to the following questions below from the CQIT: Annual IST Suicide Prevention Training Compliance - Hayes Item 16. |
| **Nursing:**<br>• Of those, how many nursing staff were trained in suicide prevention in the last calendar year? | **Nursing:**<br>• How many currently employed nursing staff (excluding staff currently on long-term leave) were employed during the last calendar year? |
| **Mental Health:**<br>• Of those, how many mental health staff were trained in suicide prevention in the last calendar year? | **Mental Health:**<br>• How many currently employed mental health staff (excluding staff currently on long-term leave) were employed during the last calendar year? |
| **Medical:**<br>• Of those, how many medical staff were trained in suicide prevention in the last calendar year? | **Medical:**<br>• How many currently employed medical staff (excluding staff currently on long-term leave) were employed during the last calendar year? |

This indicator was reviewed in BRMR and released to statewide users on May 1, 2023. It is currently pending remediation. Because SP19 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

Case 2:90-cv-00520-KJM-SCR     Document 8039-1     Filed 10/27/23     Page 23 of 46
Special Master's copy
Page 13

        viii.    SP20: Percentage of Custody Staff with Annual Suicide Training

SP20 measures custody staff current with annual suicide training. Below is a screenshot of the numerator and denominator for the KPI. The denominator is the total number of custody staff employed at the institution during the last calendar year. This is inclusive of PIP staff.

| Numerator | Denominator |
|---|---|
| The number entered in the following question in CQIT: Custody Training from the denominator:<br><br>• Of those, how many custody staff were trained in suicide prevention in the last calendar year? | The number entered in the following question in CQIT: Custody Training<br><br>• How many custody staff were employed (less long term leave) in the last calendar year? |

This indicator was reviewed in BRMR and is currently in verification. It is pending release to statewide users and remediation. Because SP20 already includes PIP staff and has been agreed to by the Special Master's team and the parties in BRMR, no further extension of this indicator is necessary.

      C.  CDCR Does Not Agree to "Extend" SC10: UOF Involving MH Inmates

The Special Master's team and Plaintiffs' counsel reviewed SC10 in BRMR and agreed to the below numerator and denominator:

| Numerator | Denominator |
|---|---|
| The sum of the numbers entered in response to Questions #2 and #4 on CQIT audit: Use of Force from the denominator:<br><br>• What is the total number of controlled use of force incidents involving MH patients?<br>• What is the total number of immediate use of force incidents involving MH patients? | The sum of the numbers entered in response to Questions #1 and #3 on CQIT audit: Use of Force:<br><br>• What is the total number of controlled use of force incidents?<br>• What is the total number of immediate use of force incidents? |

The parties and the Special Master's team agreed that SC10 would reflect the percent of use of force incidents that involved mental health patients. SC10 was remediated by the Special Master's data expert on November 18, 2022.

Now, despite remediation of SC10 and agreement between the parties as to the scope of the indicator, the Special Master seeks to "extend" SC10 to "include a qualitative review of a certain percentage of controlled and immediate UOF incidents for compliance with CDCR UOF policy." This is not merely an extension of SC10. The Special Master recommends not one, but several new indicators.

The Special Master also recommends that SC10 "should also track whether a mental health assessment was included in the process." *Id*. RH35: Controlled Use of Force MH Assessments Meeting Documentation Requirements was reviewed by the Special Master's team and Plaintiffs' counsel in BRMR and the stakeholders agreed to the qualitative review of the mental health assessments completed for controlled use of force incidents. RH35 was remediated by the Special Master's data expert on December 23, 2022. To the extent the Special Master's recommended extension of tracking mental health assessments is not measured in RH35, it is a request for a new indicator.

The scope of SC10 and RH35 were discussed at length in BRMR, yet were ultimately agreed to and remediated. Plaintiffs' counsel and the Special Master's team had an opportunity to raise the indicator through the dispute resolution process (*see* ECF No. 7556-2) if they believed a reasonable modification of the indicator was necessary, yet that process was not utilized for either indicator.

CDCR generally objects to any indicator, new or extended, that requires CQIT auditors to conduct a qualitative review of use of force incidents. CDCR already has internal processes for reviewing use of force incidents at both the institution and Headquarters levels. Requiring duplicative audits not only burdens resources, but may also cause potential inconsistencies due to reasonable varied views of the same incident by different review teams.

III.    Timing of Remediation for New/Extended Indicators

The June 14, 2023 letter states that remediation of the indicators recommended by the Special Master should commence forthwith so they are remediated before December 31, 2023. Such a deadline is impossible to meet and is not in line with CDCR's September 2021 activation schedule.

The Special Master is recommending at least 14 new indicators and the extension of 41 existing indicators.[11] It has been nearly two years since the Court provisionally approved the Special Master's list of CQIT key indicators. As of June 2, 2023, only 42 indicators of the initial 139 indicators have been successfully remediated. Expecting the stakeholders to remediate an additional 55 new or expanded indicators, on top of the 97 initial indicators not yet remediated, in just six months, despite taking nearly two years to remediate only 42 indicators, is unrealistic.

---

[11] As discussed above, many of the new indicators recommended are in fact recommendations for multiple new indicators. Thus, the total number of new recommended indicators is well above 14. However, CDCR has identified some indicators that are recommended for extension to the PIP that already include PIP staff or requirements. Therefore, the total number of indicators recommended for extension may be less than 41.

On September 29, 2021, Defendants filed CDCR's preliminary activation schedule for completion of data remediation. ECF No. 7334. As required by the Court's August 26, 2021 order, CDCR included "all contingencies of which they are aware that preclude at this time development of final activation schedules for completion of data remediation." ECF No. 7283 at 6-7.

CDCR's preliminary data activation schedule specifically identified two contingencies related to new or unknown indicators that would have a major effect on the data remediation timeline. First, CDCR noted that expanding or reducing the number and scope of key indicators would affect the timeline. ECF No. 7334 at 11. "If the number of indicators changes or the scope of the current indicators are revised, the timeline will be significantly impacted." *Id*. As seen in Attachment A, the number of indicators has changed through the data remediation process. The scope of many indicators has also changed. CDCR has been able to absorb these changes by working with stakeholders to make the process more efficient. However, adding over 50 new indicators, even though some of those indicators are expansions of current indicators, significantly changes the total number and scope of indicators to be remediated, thus extending the overall timeline.

Second, CDCR identified the Special Master's placeholder indicators – those not yet built or clearly defined – as a contingency with a high impact on the timeline to complete data remediation. *Id*. at 12. CDCR created the initial timeline with six placeholder indicators included on the provisionally approved key indicator list.[12] The estimated time attributed to remediation of any of these placeholder indicators was the same as any other single indicator. Now, instead of six indicators, the Special Master is recommending over 50 additional indicators or extensions for review and remediation.

The December 2023 timeline was based on the indicators and subcomponents known to CDCR at the time of the September 2021 data activation schedule. Since that time, the scope and number of indicators has changed unpredictably and the workload associated with each indicator has become clearer than it did in 2021. CDCR could not possibly have known in September 2021 that six placeholder indicators might be expanded to include 45 additional indicators. Nor could it have accurately projected an end date for remediation of those placeholders. As detailed above, CDCR has agreed to create many of the recommended new indicators and expand the recommended existing indicators. But all of that will take time that was not accounted for in the original December 2023 deadline.

CDCR is committed to completing data remediation as expeditiously as possible, but the timeline for completion must be realistic given the significantly increased scope of work. CDCR recommends finishing the current batch of known indicators and then developing a new activation schedule to account for the list of new or expanded indicators.

---

[12] The Special Master's June 14, 2023 letter did not include the placeholder titled "Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here). Given there are no new or expanded indicators for this placeholder, please remove the indicator from the provisionally approved key indicator list. Similarly, the Special Master has not recommended any new or extended indicators for "ASU EOP Hub Certification." Please remove this item from the provisionally approved key indicator list as well.

IV.    Conclusion

CDCR agrees to create many of the new indicators and extend many of the existing indicators recommended by the Special Master in the June 14, 2023 letter. The few objections provided are based on prior agreements or recommendations to measure non-*Coleman* requirements. To the extent Plaintiffs' counsel recommends additional new or extended indicators, CDCR requests the opportunity to respond.

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney III
Office of Legal Affairs
California Department of Corrections and Rehabilitation

# **Attachment A**

| Indicator Number | Provisionally Approved Indicator Names | Current Indicator Name |
|---|---|---|
| AC1 | Timely MH Referrals | Timely MH Referrals |
| AC2 | Timely PC Contacts | Timely PC Contact |
| AC3 | Timely Psychiatry Contacts | Timley Psychiatry Contacts |
| AC4 | Timely IDTTs | Timely IDTT |
| AC5 | Treatment Offered | Treatment Offered |
| AC6 | Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes | Transfer to STRH/LTRH within Timeframes |
| AC7 | Timely Transfers to CCCMS/EOP | Timely Transfers to EOP |
| AC8 | Timely Admissions to Inpatient Care | CDCR Inpatient Program Referrals: Compliance with Program Guide Timeframes fro Acute and Intermediate Admissions within 10 and 30 days |
| AC9 | Inpatient Transfer Deadlines for PIPs and DSH | Timelines of IDTT Acute/ICF Referrals and IRU Review |
| AC10 | Effective Communication Achieved | Effective Communication Achieved |
| AC11 | IDTTs in a Confidential Setting | IDTTs in a Confidential Setting |
| AC13 | Group Treatment in a Confidential Setting | Group Treatment in a Confidential Setting |
| AC14 | MHSDS Patients Transferred out of Desert Institutions | MHSDS Patients Transferred Out of Desert Institutions |
| AC15 | Observed RC Screens Conducted in a Confidential Setting | Percentage of Observed Reception Center MH Screens in a Confidential Setting |
| AC16.1 | MH Screens (Split Indicators) | ASU Pre-Screen |
| AC16.2 | N/A | ASU GP Screens |
| AC16.3 | N/A | RC MH Screens |
| AC17 | Appointments Cancelled Due to Custody | Appointments Cancelled Due to Custody |
| AC18 | Appointments Seen as Scheduled | Scheduled Appointments Completed or Refused |
| AC19 | Housing Units where 128 MH-5s are Accessible and Available to Housing Unit Staff | Housing Units Where 128-MH-5s Are Available and Accessible to Housing Unit Staff |
| AC20 | Custody MH Referrals | Custody MH Referrals |
| AC21 | MHSDS inmates in ASU transferred within policy requirements | MHSDS inmates in ASU transferred within policy requirements |
| SP1 | Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs.  MHCB, Alternative Housing, DSH, and PIPs | Timely Clinical Discharge Follow-ups |
| SP2 | Emergent/urgent MH referrals that result in SRASHEs | Emergent/urgent MH referrals that result in SRE |
| SP3 | Safety planning to reduce suicide risk | MHCB/PIP Discharge Safety Plans |
| SP3.4 | N/A | Quality of Safety Planning to Reduce Suicide Risk |

| SP4 | Suicide-resistant MHCBs | Suicide Resistant Cells |
|---|---|---|
| SP5 | APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days | Documentation of Acute/ICF Discharges with Clinician to Clinician Contact within 5 days |
| SP6 | SRE Mentor Program | Percentage of Required MH Clinical Staff with Completed SRE Mentoring |
| SP7 | Patients referred to MHCB on Continuous Direct Visual Observation | Patients Referred to MHCB on Continuous Direct Visual Observation |
| SP8 | Patients in Alt Housing on continuous observation and provided suicide-resistant bed | Patients in Alternative Housing with a Bed |
| SP9 | Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | Mental Health Observations Reporting Tool |
| SP10 | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | Observed Initial Health Screenings in a Confidential Setting |
| SP11 | Housing Unit/Inmate Living Areas with emergency response equipment and Inventoried Daily | Housing Unit/Inmate Living Areas with Emergency Response Equipment and Daily Inventories |
| SP12 | Custody Follow Ups for MHCB Discharges/7497 Forms | Custody Follow Ups 7497 Forms |
| SP13 | Orders Reviewed with Properly Documented Observation Orders | Observation Orders Reviewed That Are Properly Documented |
| SP14 | MHCB Records with Rationale for Limited Issues of Clothing and Bedding | MHCB Records with Rationale for Partial Issue |
| SP15.1 | MHCB property and privileges (Split Indicator) | MHCB Out of Cell Activities - Yard |
| SP15.2 | N/A | MHCB Out of Cell Activities - Phone Calls |
| SP15.3 | N/A | MHCB Out of Cell Activities - Visits |
| SP15.4 | N/A | MHCB Out of Cell Activities - Showers |
| SP15.5 | N/A | MHCB Out of Cell Activities - Dayroom |
| SP16 | ASU Intake Inmates Appropriately Housed | ASU Intake Inmates Appropriately Housed |
| SP17.1 | Percentage of ASU Welfare Checks audited that were not completed on time and staggered | Segregated Housing Unit Security/Welfare Check Discrepancies with an Explanatory Memo |
| SP17.4 | N/A | Audited Security Welfare Checks in Segregated Housing that Included the Required Visual Observation |
| SP18 | Percentage of nursing staff current with CPR training | Nursing Staff Current with CPR Training |
| SP19 | Percentage of Health Care Staff with Suicide Prevention Training | Healthcare Staff Current with Suicide Prevention Training |

| | | |
|---|---|---|
| **SP20** | Percentage of Custody Officers with Suicide Prevention Training | Custody Staff with Suicide Prevention Training |
| **SP21** | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | N/A |
| **SP22** | MHCB Daily Provide Checks | MHCB Daily Provider Contacts |
| **SP23** | SREs that Met All Audit Criteria | Quality of Selected SRASHE Documentation |
| **SP24** | Discharges from MHCB with Clinician Review of D/C Summary (SRASHE) | Discharges from MHCB with clinician review of d/c summary |
| **SP25** | Satisfactory SPR FIT Meeting | Institution SPRFIT Meetings Observed that Satisfy All Audit Criteria |
| **SP25.4** | N/A | Institution SPRFIT Meeting Minutes Reviewed that Satisfy All Audit Criteria |
| **QC1** | IDTT Staffing | IDTT Required Staffing |
| **QC2** | Cases with Documentation of Appropriateness of LOC Discussed for Patients Identified by 7388B as Potentially Requiring Higher LOC | Cases w/doc. of appropriateness of LOC discussed for pts identified by 7388B as potentially requiring HLOC |
| **QC3** | Treatment Plans with Satisfactory Documentation | Treatment Plans with Satisfactory Documentation |
| **QC4** | Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers | Treatment Plans with reason for refusal and intervention documented for high refusers |
| **QC5** | Treatment Plans with Documented and Implemented Pre-Release Plans | Treatment Plans with Documented and Implemented Pre-Release Plans |
| **QC6** | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT |
| **QC7** | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT |
| **QC9** | EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation | EOP IDTTs Addressing Accommodations and Clinical Appropriateness for Work and Education |
| **QC10** | Primary Clinician Continuity of Care | Mental Health Primary Clinician Continuity of Care |
| **QC11** | Psychiatrist Continuity of Care | Mental Health Psychiatrist Continuity of Care |
| **QC12** | IDTTs Meeting All Audit Criteria | IDTTs with Observed Interactive Process |
| **QC13** | IDTT Patient Attendance | IDTT Patient Attendance |
| **SC1** | Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality | Percentage of RVR MH Assessments where the Patient was Informed of the Limits of Confidentiality |
| **SC2** | RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation | RVRs Recommended for Mitigation with Custody Documentation |

| SC3 | RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B | RVR MHAs where Captain Disagreed with Mitigation and Documented Rationale |
|---|---|---|
| SC4 | Percentage of Days Where Heat Plan was Activated, and Alternative Out of Cell Activities were Offered to Heat Alter Patients | Days Alternative Out-of-Cell Activities were Offered to Patients on Heat Alert Medications when Indicated |
| SC5 | Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM | MHCB Patients Placed in TTM According to Policy |
| SC6 | Percentage of 128Bs Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients | The Use and Documentation of Mechanical Restraints Among Non-MAX Custody Patients in MHCB Units |
| SC7 | Thermometer Checks Completed and Accurate | Thermometer Checks Completed and Accurate |
| SC8 | Timely MH RVR Assessments | Timely Submission of MH RVR MH Assessment Results |
| SC8.7 | N/A | Timely RVR MH Assessment Request |
| SC9 | RVRs Recommended for Mitigation That Were Mitigated | RVRs Recommended for Mitigation That Were Mitigated |
| SC10 | Use of Force involving MH Inmates | Use of Force involving MH Inmates |
| MM20 | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | Medication Administration: Chronic Care Medications Historical Administration (Psychiatrist Prescribed Meds) |
| MM22 | Medication Admin: Outpatient Provider New Medication Orders (Psychiatrist) | Medication Administration: Outpatient Provider New Medication Orders (Psychiatrist Prescribed Medications) |
| MM3 | Diagnostic Monitoring-Antipsychotics | Diagnostic Monitoring-Antipsychotics |
| MM4 | Diagnostic Monitoring-Clozapine | Diagnostic Monitoring-Clozapine |
| MM11.1 | Diagnostic Monitoring-Mood Stabilizers | Diagnostic Monitoring – Carbamazepine |
| MM11.2 | N/A | Diagnostic Monitoring – Lamotrigine |
| MM11.3 | N/A | Diagnostic Monitoring – Lithium |
| MM11.4 | N/A | Diagnostic Monitoring – Oxcarbazepine |
| MM11.5 | N/A | Diagnostic Monitoring – Valproic Acid |
| MM14 | Diagnostic Monitoring-Antidepressants | Diagnostic Monitoring-Antidepressants |
| MM10 | Diagnostic Monitoring-QT Prolongation EKG 12 Months | Diagnostic Monitoring - QT Prolongation EKG 12 Months |
| MM5 | Continuity of Meds Upon Inter-Institutional Transfer at R&R | Medication Management: All Medications Administered Timely - Inter-System Arrival |
| MM6 | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | Medication Management: All Medications Administered Timely - Intra-System Non-Restricted/Non-Inpatient Housing Arrival |

| MM7 | Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers | Medication Management: All Medications Administered Timely - Arrival at MH Inpatient - MHCB/PIP/Alt. Housing |
|---|---|---|
| MM8 | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | Medication Management: All Medications Administered Timely - Intra-System - Restricted Housing - ASU/PSU/SHU Arrival |
| MM9 | Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH | Medication Management: All Medications Administered Timely - Arrival at Medical HLOC - Medical - CTC/Hospital |
| MM12 | Medication Compliance with PC 2602, Involuntary Meds: Court Order | Involuntary Medication Court Orders |
| MM13 | Medication Compliance with PC 2602, Involuntary Meds: Med Order | Controlled Use of Force Incidents Required to Administer PC2602 Medication |
| MM15 | Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here) | N/A |
| RH1 | Placement of ASU EOPs in Appropriate Housing Within Timeframes | Placement of ASU EOPs in Appropriate Housing Within Timeframes |
| RH2 | NDS timely expedited transfers | Required NDS Transfers that Occurred within 72 Hours |
| RH3 | Psych Tech Rounds Completed According to PG Requirements | PT Rounds Completed in Segregated Housing Units |
| RH5 | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | Note: Proposed to decommission |
| RH7 | ICCs with Mental Health Clinicians present, and relevant information provided | ICCs with Mental Health Clinicians Present and Relevant Information Provided |
| RH9 | (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices | Cells Reviewed where Inmates are Allowed Approved Entertainment Devices |
| RH10 | Percentage of Unclothed Body Searches Conducted in a Private Area | Percentage of Staff Who Report Unclothed Body Searches Conducted in a Private Area |
| RH11 | ASU Screens that are Conducted in Confidential Settings | Observed ASU GP Screens Conducted in Confidential Settings |
| RH12 | ASU Out of Cell Time Offered | ASU & PSU Out of Cell Time Offered |
| RH13 | Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy | STRH/LTRH Custody Out of Cell Time Offered |
| RH14 | Weeks in which Shower Access in ASU was Offered as Required | ASU & PSU Showers |

| | | |
|---|---|---|
| **RH15** | Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property | Percentage of Custody Staff who Can Identify all NDS Patients |
| **RH15.4** | N/A | Weeks where NDS Patients are Offered Required Phone Calls |
| **RH15.7** | N/A | NDS Patients Provided Personal Property |
| **RH16** | Warden Review of Cases Over 90 Days | Note: Combined with RH18 |
| **RH17** | ASU LOS for MHSDS v. Non-MHSDS Patients | Segregation LOS |
| **RH18** | EOP Hub CCII and Captain Review for LOS Over 90 Days | CCII, Captain and Warden Reviews of ASU EOP Hub Patients with LOS Over 90 Days |
| **RH19** | Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed on Time | Percentage of Patients with LOS Over 150 Days for whom Long-Term Segregated Case Conferences Were Completed on Time |
| **RH21** | Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival | Initial ICCs Reviewed that were Held within 10 Calendar Days of Arrival to Segregation Placement |
| **RH22** | Number of EOP and CCCMS Patients in ASU | Census (CQIT) |
| **RH24** | High Refusers Due to Custody Reasons with Documented Plan of Action | High Refusers Due to Custody Reasons with Documented Plan of Action |
| **RH25** | High Refusers in which 128B was Completed | High refusers for whom a 128B was completed |
| **RH26** | Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Calendar Days | High Refusing EOP Patients in Segregation for Whom a Meeting Between MH and Custody was Conducted |
| **RH27** | Inmates Who Received ASU MH Guide | ASU Inmates Who Received an ASU MH Guide |
| **RH28** | Percentage of Psych Tech Round Documentation That Meets All Audit Criteria | Psychiatric Technician Rounds Documentation Audited that Meets All Audit Criteria |
| **RH29** | Psych Tech Rounds Where EC and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as Indicated | Observation of PT Rounds Where Effective Communication, Interaction, and Referrals Met All Audit Criteria |
| **RH30** | Percentage of IDTTs Observed in which a Health Record and C-File were Available | IDTTs Observed in Which Pt Electronic Health Records and SOMS are Available |
| **RH31** | Percentage of Peace Officers Observed to Carry their CPR Mouth Shield | Percentage of Peace Officers Observed to Carry Their CPR Mouth Shield |
| **RH32** | Percentage of Eligible MHSDS Patients Receiving Milestone Credits | MHSDS Earned Milestone Credit |
| **RH33** | RVR MH Assessments Where All Documentation Requirements Were Met | RVR Assessments where documentation Requirements were Met |

| RH34 | RVR MH Assessments Conducted in Private Setting | RVR MH Assessments Conducted in a Private Setting |
|---|---|---|
| RH35 | Use of Force MH Assessments Meeting Documentation Requirements | Controlled Use of force MH assessments meeting documentation requirements |
| RH37 | Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs | RVRs Issued |
| RH37.2 | N/A | RVRs Issued to Non-MHDS Participants |
| RH37.3 | N/A | RVRs Issued to Patients at the CCCMS Level of Care |
| RH37.4 | N/A | RVRs Issued to Patients at the EOP Level of Care |
| RH37.5 | N/A | RVRs Issued to Patients at the MHCB Level of Care |
| RH37.6 | N/A | RVRs Issued to Patients at the Acute Level of Care |
| RH37.7 | N/A | RVRs Issued to Patients at the ICF Level of Care |
| PS1 | Number of Episodes of Heat Related Illness Occurring in MHSDS | Heat Related Illness Incidents for MHSDS Patients Prescribed Heat Alert Medications |
| PS2 | Percentage of Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria | Clinical Restraint Occurrences Meeting All of the Audit Criteria |
| PS3 | Seclusion, Frequency, and Duration | Seclusion Incidents |
| PS3.2 | N/A | Seclusion Incidents per Patient |
| PS3.3 | N/A | Seclusion Duration Incidents greater than 8 Hours |
| PS3.5 | N/A | Restraint Incidents |
| PS3.6 | N/A | Restraint Incidents per Patient |
| PS3.7 | N/A | Restraint Duration Incidents greater than 4 Hours |
| URM1 | MHCB Clinical Stays within Timeframes | MHCB Clinical Stays within Timeframes |
| URM3.1 | Timely admission to MHCB | Timely admission to MHCB |
| FEC1 | Adequate Group Treatment Space | Adequate Group Treatment Spaces |
| FEC2 | Adequate IDTT Space | Adequate IDTT Spaces |
| FEC3 | Adequate Individual Treatment Space | Adequate Individual Treatment Spaces |
| SPTSR1 | Chief Psychiatrist | Allocated and Filled Psychiatrist Positions |
| SPTSR2 | Chief Psychologist, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| SPTSR3 | Senior Psychologist, Correctional Facility (Supervisor) | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |

| **SPTSR4** | Senior Psychiatrist (Supervisor), Correctional and Rehabilitative Services (Safety) | Allocated and Filled Psychiatrist Positions |
|---|---|---|
| **SPTSR5** | Supervising Psychiatric Social Worker I, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR7** | Senior Psychologist, Correctional Facility (Specialist) | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR8** | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | Allocated and Filled Psychiatrist Positions |
| **SPTSR9** | Recreation Therapist, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR10** | Psychologist-Clinical, Correctional Facility | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR11** | Clinical Social Worker (Health/Correctional Facility) – Safety | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **SPTSR14** | Allocated and filled positions | Allocated and Filled Psychologist, Social Workers, Recreational Therapist, and Medical Assistants |
| **AddKPI1** | Sustainability Process | N/A |
| **AddKPI2** | ASU EOP Hub Certification | N/A |
| **AddKPI3** | PIP (To be developed) | N/A |
| **AddKPI4** | Custody and Mental Health Partnership Collaboration | N/A |
| **NM1** | Timely response to Critical Med non-adherence notification | Timely response to Critical Med non-adherence notification |
| **NM2** | Timely response to Non-critical Med non-adherence notification | Timely Response to Non-Critical Med Non-Adherence Notification Reviewed Within 7 Days |
| **NM3** | Timely Response to Non-Critical Non Adherence Notification Seen Within 30 Days | Timely Response to Non-Critical Med Non-Adherence Notification Seen within 30 Days |

# EXHIBIT C

**Elise Thorn**

| | |
|---|---|
| **From:** | Marc Shinn-Krantz <MShinn-Krantz@rbgg.com> |
| **Sent:** | Friday, April 7, 2023 6:19 PM |
| **To:** | Thind, Sundeep@CDCR |
| **Cc:** | Ernest Galvan; Amy Xu; Walsh Kerry F.; Weber, Nicholas@CDCR; Hockerson, Dillon@CDCR; Coleman Team - RBG Only; Coleman Special Master; Steve Fama; Elise Thorn; Namrata Kotwani; Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Baker, Eric@CDCR; Richardson, Lisa@CDCR |
| **Subject:** | RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440] |

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks, Sundeep.  And have a great weekend.

Marc

---

**From:** Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Sent:** Friday, April 7, 2023 6:17 PM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Cc:** Ernest Galvan <EGalvan@rbgg.com>; Amy Xu <AXu@rbgg.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>; Richardson, Lisa@CDCR <Lisa.Richardson2@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

> [EXTERNAL MESSAGE NOTICE]

Marc,

I just wanted to close the loop on this group email even though we were corresponding separately. As I mentioned in the other email string, our admin team has provided access to RGBB's group email which is copied above. Since the Prison Law Office does not have access to your general team inbox, we have provisioned Steve Fama and Ashley Kirby to have access to the documentation as well.

Thank you,

*Sundeep Thind*
Attorney
Office of Legal Affairs, CDCR
Work Cell: (916) 215-4043
Email:  Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Friday, April 7, 2023 2:22 PM
**To:** Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Ernest Galvan <EGalvan@rbgg.com>; Amy Xu <AXu@rbgg.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>; Richardson, Lisa@CDCR <Lisa.Richardson2@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Sundeep,

At least two of us are unable to get access and I've copied the error message I got at the bottom of this email.  Can you either use the SharePoint site, which is working for us, or ensure our staff are granted access on Watchdox?

If we use Watchdox preferably you could grant our full team access, but at least the following addresses will do for now:
Greg Gonzalez <GGonzalez@rbgg.com>
Gail LaPurja <GLaPurja@rbgg.com>
Hannah Potter <HPotter@rbgg.com>
Yesi Murillo <ymurillo@rbgg.com>
Amy Xu <AXu@rbgg.com>
Ernest Galvan <EGalvan@rbgg.com>
Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>
Steve Fama <sfama@prisonlaw.com>
Ashley Kirby <akirby@prisonlaw.com>



## You do not have permission to access this folder

This account has no access to '2023-02-13 RBGG- MHCT Quarterly Production'

**User:mshinn-krantz@rbgg.com**

**Site:cdcr.watchdox.com**

What would you like to do?

| Switch accounts | Request permissions |

Thank you,
Marc

**Marc J. Shinn-Krantz**
(he/him)
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
MShinn-Krantz@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at mshinn-krantz@rbgg.com.

---

**From:** Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Sent:** Friday, April 7, 2023 1:10 PM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Cc:** Ernest Galvan <EGalvan@rbgg.com>; Amy Xu <AXu@rbgg.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>; Richardson, Lisa@CDCR <Lisa.Richardson2@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

Marc,

CDCR uploaded the first quarterly production regarding MAX custody data for October to December 2022 to our shared watchdox folder with Plaintiffs on February 13, 2023. There was a communication error between CDCR admin staff and myself regarding notifying Plaintiffs that the items had been uploaded to the shared folder, so I apologize not sending a confirmation email after uploading the documents to watchdox. All files pertaining to the first quarterly production regarding MAX custody data  can be found by clicking on the link to the shared folder below:

https://cdcr.watchdox.com/ngdox/workspaces/463681/Production%20to%20Plaintiffs%7C2023-02-13%20RBGG-%20MHCT%20Quarterly%20Production

CDCR is currently working on providing the second quarterly production, which covers the first three months of 2023. We will circulate those to you through watchdox once we have those ready.

Please let me know if your administrative staff is not able to access the above shared folder on watchdox.

Thank you,

*Sundeep Thind*
Attorney
Office of Legal Affairs, CDCR

Work Cell: (916) 215-4043
Email: Sundeep.Thind@cdcr.ca.gov

*Pronouns – She, her, hers*

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information including, but not limited to, the attorney/client privilege and/or the attorney work product doctrine. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

---

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Friday, April 7, 2023 10:30 AM
**To:** Kerry F. Walsh <kwalsh@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Ernest Galvan <EGalvan@rbgg.com>; Amy Xu <AXu@rbgg.com>
**Cc:** Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata.Kotwani@doj.ca.gov; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Nick,

What is the status of Defendants' first quarterly production regarding MAX custody data required by the MAX-PIP stip and order, ECF No. 7392, Paragraph 9? We understood Defendants would send us the first production by the end of January 2023 at the latest.

As discussed at our Dec. 5, 2022 meet and confer, we requested that Defendants produce the data from all four of the attached sample reports, which I have numbered 1, 2, 3, and 4 for ease of reference. We also requested that Defendants add a column similar to the comments column in the 8-31-21 sample report provided in October 2021 for the settlement conference, which Ernie circulated after the meeting.

We agreed with Defendants' proposed methodology for producing ICC decision packets as part of the quarterly production pursuant to Paragraph 9(c) of the stip and order. Specifically Defendants will:

- Gather all patient names listed on report numbers 3 and 4 for the quarter.
- De-duplicate.
- Randomly select 10% of the patients from each of the reports.
- For all selected patients, produce packets of information from Stipulation paragraph 9(c) ("ICC determinations, including the classification chrono, rules violation report packet(s), and supporting documents, excluding confidential memoranda").

Thank you,
Marc

---

**From:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Sent:** Tuesday, November 29, 2022 3:56 PM
**To:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>

**Cc:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata.Kotwani@doj.ca.gov; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** Re: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

Nick - I will attend.

Sent from my iPhone

> On Nov 29, 2022, at 6:23 PM, Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov> wrote:

Yes.  Is the Special Master team available at that time?

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Tuesday, November 29, 2022 3:23 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>
**Cc:** White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Nick,

Monday 12/5 at noon works for us.  Will CDCR circulate an invite?

Best,
Marc

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Monday, November 28, 2022 4:39 PM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>

**Cc:** White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

Marc,

We are available Monday the 5th from 9:30 – 11:00 or 12:00 – 2:00.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


---

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Monday, November 28, 2022 4:08 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>
**Cc:** White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.


Nick,

We hope you had a good Thanksgiving.  Thank you for these initial responses.  We agree a call makes sense, below is our availability next week.  Do any of these times work for Defendants?

1. 12/5 except 1-2 pm and 3:30 to 5 pm
2. 12/6
3. 12/7 after 11 am except 2:30 to 4 pm.
4. 12/8 until noon

Best,
Marc

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Wednesday, November 23, 2022 9:22 AM
**To:** Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>
**Cc:** White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

Hi Ernie,

A call make sense. I'll try to answer some of your questions below to streamline things a bit.

  1. ICF MHCT Pre-Review Spreadsheet:
Plaintiffs ask, "[d]oes this include both of these sets of people: (1) people MHCT recommended for review at both the weekly pre-transfer review, and (2) people MHCT recommended for review at the bi-weekly review of all patients currently housed at a PIP location? Currently the spreadsheet appears to show only the former."

There are 2 reports which capture the following:
  1. The Pre-Review by the MHCT for those MAX custody inmates who were referred to the ICF level of care and
  2. Post review by the MHCT for those Max custody inmates who are currently housed at the PIP

Next, Plaintiffs ask, "[e]very person on this sample roster for August 2022 has the following entered in the Column labelled "Notes from Bi-Weekly DD Videoconference:" "No Discussion-MAX custody suspended." Were there any people whom MHCT recommended review whose MAX custody status was not suspended? If there had been any such people would they also be included on the roster?"

The report example only provide the snapshot for August. If a case was retained by ICC, there would be notes under the Bi-Weekly column to reflect the decision and discussion.

  2. Random Sampling.
Plaintiffs ask for a sample of the two reports from which a sample will be pulled. A snapshot of August is attached. Each month, approximately 40 cases are on the ICF Referral report (about 120 a quarter). About 130 post-review cases appear on the post-review report each month.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA 95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential

and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Ernest Galvan <EGalvan@rbgg.com>
**Sent:** Friday, November 18, 2022 4:55 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>
**Cc:** White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** RE: Coleman - PIP Max Custody Quarterly Reporting [IMAN-DMS.FID12440]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Nick—

In response to the reporting plan, we do have some questions, which are probably worth setting a meeting or call to talk about.

ICF MHCT Pre-Review Spreadsheet:
•       Does this include both of these sets of people:  (1) people MHCT recommended for review at both the weekly pre-transfer review, and (2) people MHCT recommended for review at the bi-weekly review of all patients currently housed at a PIP location?  Currently the spreadsheet appears to show only the former.
•       Every person on this sample roster for August 2022 has the following entered in the Column labelled "Notes from Bi-Weekly DD Videoconference:" "No Discussion-MAX custody suspended." Were there any people whom MHCT recommended review whose MAX custody status was not suspended?  If there had been any such people would they also be included on the roster?

MHCT PIP Max Custody Post-Review
•       The sample shows only the cases where both the MHCT and Dep. Director review resulted in a recommendation and action to remove the person from MAX.  The stipulation, however, calls for information on all of the reviewed cases and subsequent ICCs "including comments as to why a patient was retained or placed on Max custody."
•       In order to track the stipulation, the report should look more like the report dated 8/31/2021 that was produced during the settlement negotiations, with information on all cases reviews and comments regarding the decision to retain or place a person on Max.

Random Sampling.
•       Can you provide samples of the two new reports which track total max custody referral population and cases reviewed in the biweekly process?
•       Over the course of a quarter, how many people total are on the reports?
•       Depending on that answer to that question, the 10-person sample might be too small to be representative.

Ernest Galvan
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 296-2293 (direct)
(415) 694-3606 (mobile)
(415) 433-7104 (fax)
egalvan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from
disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly
prohibited. If you think that you have received this e-mail message in error, please e-mail the sender
at rbg@rbgg.com

---

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Wednesday, November 9, 2022 12:10 PM
**To:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master
<colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Elise Thorn
<Elise.Thorn@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>;
Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello
<Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>
**Cc:** White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Baker, Eric@CDCR <Eric.Baker@cdcr.ca.gov>
**Subject:** Coleman - PIP Max Custody Quarterly Reporting

[EXTERNAL MESSAGE NOTICE]

All,

I write regarding CDCR's reporting requirement outlined in the Psychiatric Inpatient Program MAX
Custody stipulation from December 9, 2021. (ECF No. 7392.) Paragraph nine of that stipulation requires
that CDCR produce quarterly reports on the status of implementation of the Maximum Custody
Reduction Reviews for Psychiatric Inpatient Program Participants memorandum. That includes:

> a. A roster of patients the MHCT recommended for removal from Max custody during the
> reporting period;
> b. A report with information regarding the bi-weekly MHCT and Deputy Director reviews and
> subsequent ICCs for the reporting period, including comments as to why a patient was retained
> or placed on Max custody. The parties will meet and confer regarding the contents and format
> of this report; and
> c. ICC determinations, including the classification chrono, rules violation report packet(s), and
> supporting documents, excluding confidential memoranda, for a random sample of the patients
> retained or placed on Max custody during the reporting period. The parties will work together to
> develop a random sampling methodology for this production.

(Id. at 3-4.) Attached for your review are two reports which correspond with items (a) and (b), above.

For item (c), CDCR has developed two population reports which track the total max custody ICF referral
population and cases reviewed in the biweekly process. The ICF referral population reports are weekly
point-in-time reports and the biweekly process reports are also point-in-time drawn every other
week. Using the data for each report, over the course of a quarter, CDCR will use Excel to randomly
select ten percent of the patients on both sets of report. Duplicates will be removed from the

population prior to randomly selecting a sample. Once the sample population is defined, CDCR will produce the documents required by item (c), above.

CDCR further proposes to begin data collection on October 1, 2022 and end it on December 31, 2022 (reporting quarter) and produce the information required under paragraph nine by the end of January 2023.  Future quarterly reports would be due every ninety days thereafter.

Please let us know your thoughts on this approach and the attached reports.  We are available to meet and confer as well.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.