Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7318
Fax: (916) 324-5205
E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
Paul B. Mello, SBN 179755
Samantha D. Wolff, SBN 240280
Kaylen Kadotani, SBN 294114
Laurel O'Connor, SBN 305478
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
1676 N. California Boulevard, Suite 620
Walnut Creek, CA 94596
Telephone: (925) 746-8460
Fax: (925) 746-8490
E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>　　　　　　　　　　　Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S OCTOBER 18, 2023 PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTE: AC2.1 (TIMELY PC CONTACTS) – DEFINITION OF "WEEKLY"** |

**INTRODUCTION**

This dispute concerns how the Program Guide requirement for "weekly" clinical contacts should be measured. The Special Master interprets the requirement to mean that such contacts must occur at least every seven days and his proposed resolution reflects that position.[1] Defendants have long interpreted the Program Guide requirement to mean that such contacts must occur at least once every calendar week, which is a reasonable common sense reading of the Program Guide requirement that this Court should adopt. Such a reading prioritizes patient-based

---

[1] A copy of the Special Master's *Proposed Resolution of Data Remediation Dispute: AC2.1 (Timely PC Contacts) – Definition of "Weekly"* is attached at Appendix A and contains pagination in the lower right hand corner for ease of reference as A-001 through A-018.

1

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

care and is consistent with the practical aspects of the provision of weekly Primary Clinician (PC) contacts or patients' one-on-one appointments with their Primary Clinicians. It is also supported by clinical insights and practical realities that focus on patients' well-being and the efficient provision of care, and protects against a mechanistic approach that would degrade the quality of treatment and hinder the progress of many patients within the California Department of Corrections and Rehabilitation's (CDCR) mental health care system. CDCR's interpretation of weekly is not only grounded in practical concerns but is also deeply rooted in the nuances of mental health care and clinical integrity for the reasons outlined below.

The Special Master's proposed resolution disregards such practical applications of this Program Guide requirement and would have a deleterious effect on CDCR's mental health system. Indeed, adopting Plaintiffs' and the Special Master's definition of "weekly" would damage patient and provider flexibility, reduce continuity of care, reduce mental health provider job satisfaction, over-report non-compliance when a patient has the right to refuse or is not available, and create a system that favors dashboard compliance over patient care. Accordingly, the Special Master's proposed resolution should not be adopted.

I. **BACKGROUND OF THE DISPUTE**

This dispute first surfaced during the July 18, 2023 Business Rules Methodology Review meeting (BRMR) where Plaintiffs and the Special Master team disclosed that they interpret the term "weekly" to mean every seven days. (Appendix A at A-014.) Since the inception of its policy requiring weekly PC contacts for EOP patients, CDCR has consistently interpreted "weekly" to mean at least once per calendar week. (*Id.*) CDCR has applied the same rule for other "weekly" clinical contacts, such as for Correctional Clinical Case Management System (CCCMS) patients in restricted housing settings.

When the issue could not be resolved at the first level of dispute resolution, the parties submitted their Level 2 Dispute statements to the Special Master who discussed the issue with CDCR Secretary Jeff Macomber. (*Id.* at A-003.) The Special Master claims that he offered to "engage in further discussions regarding possible flexibility in the operationalization of the business rule" but that "Defendants declined to engage in any further conversations." (*Id.* at A-

2

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

003.) But he fails to note that his team was unwilling to propose any such flexible options in writing and that his current proposed resolution likewise fails to include "possible flexibility in the operationalization of the business rule" to address Defendants' stated concerns. On September 7, 2023, Secretary Macomber expressed his concerns about the need for flexible options and the inability to operationalize the indicator with a seven-day rule:

> My staff and I agree that it is appropriate to have flexibility around holidays, vacations, illness, and other days off that occur in the regular course of business and your experts agreed. There may also be other instances where we agree that it is appropriate to reschedule a contact to a later date even if it is beyond the 7 day timeline. However, it would be impossible to operationalize all of these appropriate exceptions or suspension with a hard 7 day timeline. That is a primary reason we maintain our interpretation that "weekly" PC contacts are required once every week."

(Weber Decl., Exhibit A.)

## II. CDCR'S INTERPRETATION OF WEEKLY IS CONSISTENT WITH THE PROGRAM GUIDE

The Program Guide requires Enhanced Outpatient Program (EOP) patients to have "weekly clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week." (ECF No. 7333-1 at 59; Program Guide at 12-4-9.) Implicit in this key definition is that contacts occur once every calendar week and the frequency of contacts is not described in terms of the number of days. PCs can hold a psychotherapy group one week and an individual clinical contact on alternating weeks - "at least every other week." It is unreasonable to read "every other week" as anything but every other calendar week. Thus, when the weekly contact requirement is read in full, it is clear that PC contacts must occur once each calendar week, not on a rigid seven-day cycle. Where the Program Guide intended a requirement based on seven calendar days, that rule is expressly stated. *See e.g.* Program Guide 12-5-13, requirement that the Interdisciplinary Treatment Team (IDTT) "shall review each crisis case as often as necessary, but at least every **seven days**, and update the treatment plan accordingly." (*Id.* at 84.) That is not the case for the required PC contacts—"weekly" not seven-days is clearly the intended requirement.

3

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

A clinical contact is part of an EOP patient's milieu. EOP patients are also required to be offered ten hours of structured therapeutic activities "per week." (*Id*., see also Program Guide at 12-4-8 and 12-4-9.) The Program Guide further expands by describing the EOP PC's duties as requiring "[w]eekly clinical contacts (either individual or group psychotherapy) with assigned inmate-patients. Individual clinical contacts must occur at least every other week." (*Id.* At 64, Program Guide, 12-4-15.) The Program Guide uses identical language to dictate PC frequency for condemned EOP patients as well. (*Id*. at 69, Program Guide at 12-4-19.) The Program Guide is clear—PCs must meet individually with their patient "at least every other week," not every other seven days.

The same Program Guide sections that requires weekly clinical contact or a weekly psychotherapy group, also require ten hours of structured treatment per week. (*Id*. at 58, 59, 68, and 69, Program Guide 12-4-8, 12-4-9, 12-4-18, and 12-4-19.) Additionally, the Program Guide even requires development of a "weekly activity schedule incorporating" the individual and group treatment descriptions. (*Id.* at 62, Program Guide, 12-4-12.) The term "weekly" is being used the same throughout this section of the Program Guide—that is, patients shall receive the care at least once per calendar week.

If EOP patients were meant to have PC contacts every seven days, the Program Guide would have specified that timeline as it did in other instances. Other Program Guide requirements that must be completed within a seven-day timeline include Mental Health screening at Reception Centers (*Id.* at 23, Program Guide at 12-2-2), and Mental Health Crisis Bed Interdisciplinary Treatment Teams (*Id.* at 84, Program Guide at 12-5-13). In those instances, the Program Guide clearly specifies that the patient must be seen within seven days, not just weekly. This stands in stark contrast to the Program Guide language at issue here, which uses the term "weekly" and sets a clear expectation that weekly EOP contacts means once every calendar week.

### III.     STAKEHOLDERS AGREE THAT WEEKLY MEANS CALENDAR WEEK

CDCR's interpretation of weekly for the purposes of clinical contacts also aligns with how the parties have agreed to operationalize AC5 – Treatment Offered, which measures whether ten

4

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

hours of structured treatment are offered each calendar week, defined as Monday through Sunday. (Mehta Decl. ¶ 5.) Included among the eligible types of structured treatment offered each calendar week are individual PC contacts and group psychotherapy. (*Id.*, see also Ex. A to Mehta Decl., which outlines the agreed upon scope of what counts as structured treatment under CDCR's business rules.) These contacts and groups also count towards fulfilling AC5's requirement for CCCMS patients in restricted housing who also require weekly PC contacts. (*Id.*; ECF No. 7333-1, Program Guide at 444 and 470.)

If "weekly" means every seven days, then a PC caseload group occurring on a Monday would require every patient on that caseload to be seen on Monday for every following week. (Mehta Decl. ¶ 6.) In fact, with an every-seven-day definition of weekly, every week every patient would need to be seen on the same day or sooner than in the prior week. (*Id.*) This would lead to earlier and earlier appointments in an attempt to meet timelines. (*Id.*) Eventually, every patient would be scheduled for a Monday contact, and any distribution over the week would result in contacts considered "late." (*Id.*) Any single day that the clinician was out for sickness, vacation, regular day off, or any other reason would automatically result in a missed appointment. (*Id.*) This level of extreme inflexibility is not the intent of the Program Guide.

Within the scope of data remediation, the stakeholders have routinely interpreted multiple policies requiring weekly services as requiring that those services be completed every calendar week. (Mehta Decl. ¶ 7.) Amongst those indicators, most of which have already been remediated, are those measuring compliance with policies requiring weekly phone calls, weekly shower access, weekly audits of crisis bed records, and weekly out-of-cell time. (Mehta Decl. ¶¶ 8-13.) There is no justification for treating weekly clinical contacts any differently.

### IV. THIS DISPUTE IS NOT THE SAME AS THE BUSINESS RULE DISPUTE THAT WAS BEFORE THE COURT IN 2019.

The proposed resolution inappropriately cites to a December 19, 2019 order as support for the statement that "[r]evelations contained in Dr. Michael Golding's whistleblower report regarding defendants' efforts to change the definition of "monthly" . . . serve as a guidepost to this disputed definition." (Appendix A at A-002.) The reference to the Golding proceedings here

5

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

can only be for one purpose—to inflame the reader. It is both misleading and unhelpful. The Court's actual finding regarding the change in the business rule that measures the Program Guide requirement for "monthly" contacts states:

> The change in the business rule from 30 to 45 days was a material change that was inconsistent with implementation of the relevant Program Guide requirement as established through more than a decade of practice. The change should have been thoroughly vetted before it was implemented; thorough vetting would have included, at a minimum, consultation with Deputy Director Tebrock and Dr. Golding and reporting to the Special Master in advance of the change.

(ECF No. 6427 at 29.) The issue during the Golding proceedings was not the propriety or reasonableness of the business rule, but whether the rule was changed without notice. (*Id.* 25-30.) As the cited order makes clear, the evidence presented during the Golding proceedings focused on whether the change to a business rule was transparent, not the validity of the rule.[2] Here, the only evidence that the Special Master relies on to support his belief that "weekly" means "every seven days" are a handful of statements in his 2023 report, which was drafted well after the current dispute arose.

The proposed resolution also states that "the same concept would be true here if the defendants' definition of weekly was adopted." (Appendix A at A-002.) While the resolution's reference to concept is unclear, what is clear is that there is nothing similar between the evidence presented during the Golding proceeding and this dispute. The Special Master has not presented any evidence that somehow CDCR is interpreting the word weekly to mean something other than a calendar week or that CDCR has improperly reprogrammed a longstanding business rule to change the timeframe to conduct routine contacts. The Special Master also argues that CDCR's interpretation "would allow for clinical contacts to occur up to thirteen days apart at times, if for example, one appointment was scheduled on a Sunday in one week and then on a Saturday in the following week." (*Id.*) But this fringe hypothetical is factually impossible; as the Special Master is aware, routine PC contacts are not scheduled on weekends.

---

[2] Defendants acknowledge that Dr. Golding did not agree with the change in the business rule at issue.

6

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

### V. WITHOUT THE SPECIAL MASTER'S METHODOLOGY, DEFENDANTS CANNOT ASCERTAIN HOW THE MONITORING REPORTS APPLY THE WEEKLY PC CONTACT REQUIREMENT

The Special Master claims that his proposed resolution (equating the term "weekly" to "every seven days") is consistent with the methodology his team applied in both the Twenty-Eighth and Twenty-Ninth Round Monitoring Reports. (A-003, citing ECF No. 7715 at 552.) He asserts that Defendants did not object to his interpretation at that time. (*Id.*) But Defendants did in fact object to the Twenty-Ninth Round Monitoring based on the lack of transparency in the report and the applied methodology. (ECF No. 7733 at 3-4.) Defendants have also raised the Special Master's refusal to share his methodology in the data remediation context. (*See* ECF Nos. 7805 at 5.)

The Twenty-Ninth Round Monitoring Report references PC contacts as occurring "within" or "every" seven days, but also provides the following description of weekly contacts: "[w]hile the patient remained in the ASU, he was being seen regularly, often within seven days of the last appointment and always weekly (*i.e.*, each week but sometimes with ten days between appointments.)" (*Id.* at 815.) Without access to the Special Master's data and his monitoring methodology, Defendants cannot ascertain whether the references to "seven days" fell within a calendar week. It is not possible to extrapolate this information from these reports.

### VI. CLINICAL STANDARD OF CARE IN THE COMMUNITY DOES NOT INTERPRET WEEKLY AS ONCE EVERY SEVEN DAYS

CDCR's interpretation of weekly is consistent with how the term is commonly defined, including in the community context. Merriam Webster's dictionary defines "weekly" as every week; once a week; by the week.[3] And, as detailed above, CDCR's interpretation is also consistent with the Program Guide.

Adopting Plaintiffs' and Special Master's interpretation of "weekly" would unnecessarily restrict the ability of providers to see patients in a manner consistent with the community standard of care. For example, providers in the community have the flexibility to reschedule patients if

---

[3] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/weekly.

7

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

their weekly appointment lands on a holiday or if the appointment must be cancelled for any unforeseen reason. If a standing Monday medical or mental health appointment is cancelled due to Memorial Day or Labor Day, then the provider generally requests that the standing appointment either be rescheduled later during the same week or requests the patient to skip that appointment altogether. But under Plaintiffs' and the Special Master's definition, to ensure timely weekly encounters where a regular appointment occurs on a holiday, the patient would need to be seen twice within the same week (e.g., on Monday and then again at some point before the following holiday Monday). This level of rigidity is not anticipated in the Program Guide and sets, again, an impossibly high standard where one previously did not exist. This inflexibility cannot be sustained.

### VII. A SEVEN-DAY DEFINITION WILL INTERFERE WITH PATIENTS' PRE-EXISTING SCHEDULES, MENTAL WELL-BEING, AND THERAPEUTIC INTERACTIONS WITH THEIR PRIMARY CLINICIANS

Plaintiffs argue that scheduling MHSDS patients for a PC contact every seven days will provide more consistency for patients because they will expect to be seen every seven days on the same day each week. However, that is unrealistic, and it does not capture the reality of operationalizing a business rule to ensure a contact occurs every seven days. Plaintiffs' proposal does not appreciate that scheduling patients for a contact every seven days is challenging, including because of the difficulty finding one hour to meet with a patient on a regular basis given patients' tight schedules around their treatment groups, work, school, medical and dental appointments, and other activities. Nor does it account for any changes in a provider's schedule or availability.

Defining "weekly" as every seven days in an organization as large as CDCR will give rise to a set of disruptive and unintended consequences that will interfere with patients' daily routines that include work, school, and other clinical treatment schedules that providers are unable to control. For example, an urgent referral may arise, requiring the PC to use their clinical discretion to prioritize another patient on that day, bumping a patient to the next calendar day. But a strict seven-day schedule would deprive PCs of the flexibility that a calendar week allows

8

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

to complete all routine contacts once they have spent as much time needed to respond to the urgent referral.

Patients' own urgent needs may disrupt this process as well. If a patient is seen in week one on a Wednesday, under the Special Master's definition, he would have to be seen again by the following Wednesday. But if that patient has an urgent medical appointment that disrupts that Wednesday follow-up appointment, then the appointment will be delayed, perhaps by only a day, but will be deemed non-compliant.

When unforeseen circumstances prevent a scheduled PC contact from occurring, the strict seven-day compliance rule might unintentionally discourage rescheduling later in the same week, even though continuity of care will be in the patient's best interest. Rather than risk falling out of compliance by moving the PC contact a day or two that week, the seven-day requirement will necessitate bringing in another PC to "cover" the appointment before the seven-day timeline runs out. This would likely send the wrong message to CDCR PCs—that CDCR values compliance over patient care—and could lead to job dissatisfaction at a time when CDCR is working hard to improve provider retention.[4]

## VIII. DEFENDANTS' DEFINITION OF "WEEKLY" AVOIDS UNINTENDED CONSEQUENCES BROUGHT ON BY THE RIGIDITY OF A SEVEN-DAY SCHEDULE

Under CDCR's long-standing scheduling system, EOP patients are scheduled for a PC contact at least once every calendar week in accordance with policy. (Mehta Decl. ¶ 3.) As a result, patients requiring weekly contacts are scheduled at least fifty-two times each year. Ideally, with the seven-day rule, patients will be scheduled at least fifty-two times each year as well so there would be no difference in the number of times the patient is seen by his PC under both definitions. However, using a rigid seven-day rule would expand the number of routine PC contacts beyond fifty-two times a year, because appointments would need to be scheduled more frequently, such as every five or six days, to maintain a buffer for rescheduling due to unforeseen circumstances, patient unavailability, holidays, or a PC's scheduled time off. This presents a

---

[4] This scenario is even more likely to occur given that many PCs work four day work week schedules.

9
Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

considerable logistical challenge in scheduling, will result in unnecessary routine appointments, further reduces PCs' availability for patients who truly need more than one contact per week, and strips away PC clinical discretion in balancing patient needs and priorities.

While it might seem that more frequent treatment is preferable, this is not necessarily the case. Mental health care is complex and individualized, and clinicians must have the flexibility to design treatment plans that meet the unique needs of each patient.

Under the seven-day approach, patients are also less likely to experience continuity of care, particularly because many clinicians work four-day schedules. Implementing the Special Master's seven-day definition would create a rigid structure that may require providers to abandon their preferred four ten-hour day schedule. But a flexible work schedule is, in part, what attracts some PCs to state service. Losing that flexibility may cause staff to consider leaving state service to work for private mental health providers where they will have greater flexibility and autonomy in patient care decisions, which is the norm in community settings.

There is no clinical reason to change the definition of weekly to refer to every seven days. (Mehta Decl. ¶ 4.) The Special Master's experts have agreed that no sudden or sharp increase in risk occurs between days seven and eleven, as the seven-day requirement itself is a general recommendation that is not firmly grounded in evidence or research. (*Id.*) The challenge here is to balance compliance with a rule against the nuanced needs of mental health care. A rigid interpretation of weekly removes necessary scheduling flexibility and could impact the continuity of care, prioritizing administrative standards over individual patient needs. The complexity of mental health care requires a more flexible approach than this new seven-day interpretation allows, one that allows clinicians to prioritize patient care and individualized treatment over a mechanistic adherence to a rigid schedule.

### IX. AUTOMATING THE WEEKLY PC CONTACTS UNDER THE "EVERY SEVEN DAYS" RULE IS NOT OPERATIONALLY SOUND.

If CDCR is forced to measure "weekly" as every seven days, it will increase the risk of human-error mistakes made by staff. Staff will no longer have the option to automatically set up weekly recurring appointments on the same day. Instead, staff members will need to schedule

10

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

patients manually with a buffer of every five or six days. There are myriad reasons why weekly routine PC contacts need to be rescheduled, including conflicting medical appointments, out to court, changes in a patient's daily living schedules, yard restrictions/alerts, illness and other unforeseen reasons. Under CDCR's definition of weekly, if an appointment is moved from Monday to Thursday, the following week's appointments will not be impacted. But with the seven-day rule, every time the scheduler manually moves an appointment, the subsequent contacts will be moved to the seventh day from the date the action is taken, causing the scheduler to spend additional time to schedule appointments so that they comply with the every seven-day rule. This impact of using the seven-day rule will likely be confusing for patients who expect to see their PC the same day every week. Even a one day change to an appointment can create a ripple effect, making it challenging for patients to remember their regular PC contact day.

## CONCLUSION

The Special Master's proposed resolution is inconsistent with the clear language of the Program Guide and with the data remediation stakeholders' approved timeframes and remediated indicators, will negatively impact patient care (in terms of less provider continuity and more frequent encounters regardless if they are clinically appropriate), and will further strip away provider decision-making in favor of a more rigid and automated approach to mental health care. This is not in the best interest of the patients or the clinicians who treat them, and will further add to the ever-expanding list of onerous *Coleman* requirements that are disfavored by providers. *See e.g.* (ECF No. 8013, 10/5/23 Transcript of Hearing at 40:25-41:25.) Defendants therefore urge the Court to adopt as an alternative resolution the business rule that defines weekly as "once every calendar week."

## CERTIFICATION

Defendants' counsel certify that they reviewed the following orders relevant to this filing: ECF Nos. 640, 5092, 5726, 6846, 6996, 7216, 7283, 7847, 8008, and 8028.

11
Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1

| | | |
|---|---|---|
| 1 | Dated: October 27, 2023 | Respectfully submitted, |
| 2 | | ROB BONTA<br>Attorney General of California |
| 3 | | DAMON MCCLAIN<br>Supervising Deputy Attorney General |
| 4 | | |
| 5 | | */s/ Elise Owens Thorn*<br>Elise Owens Thorn |
| 6 | | Deputy Attorney General<br>*Attorneys for Defendants* |
| 7 | | |
| 8 | Dated: October 27, 2023 | HANSON BRIDGETT LLP |
| 9 | | */s/ Samantha D. Wolff* |
| 10 | | PAUL MELLO |
| 11 | | SAMANTHA D. WOLFF<br>*Attorneys for Defendants* |

12

Defs.' Obj. to the SM's Proposed Resolution on Weekly PC Contacts (2:90-cv-00520 KJM-DB (PC))

20072732.1