1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

   MICHAEL W. BIEN – 096891
   ERNEST GALVAN – 196065
   LISA ELLS – 243657
   JENNY S. YELIN – 273601
   THOMAS NOLAN – 169692
   MICHAEL S. NUNEZ – 280535
   MARC J. SHINN-KRANTZ – 312968
   ALEXANDER GOURSE – 321631
   GINGER JACKSON-GLEICH – 324454
   ADRIENNE PON HARROLD – 326640
   AMY XU – 330707
   MAYA E. CAMPBELL – 345180
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
   Telephone:   (415) 433-6830

9
10 Attorneys for Plaintiffs

11                    UNITED STATES DISTRICT COURT

12                    EASTERN DISTRICT OF CALIFORNIA

13

14 RALPH COLEMAN, et al.,                  Case No. 2:90-CV-00520-KJM-DB

15        Plaintiffs,                      **PLAINTIFFS' OBJECTIONS TO DEFENDANTS' 2022 SUICIDE REPORT (DKT NO. 8027)**

16    v.

17 GAVIN NEWSOM, et al.,                   Judge: Hon. Kimberly J. Mueller

18        Defendants.

[4378534.9]

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................................... 1

I.    The Report's Analysis of QIPs Is Inadequate ............................................................. 2

    A.    The Report's Analysis of QIP Efficacy Is Deficient........................................ 3

    B.    The Report Does not Contain Sufficient Information Regarding Whether the QIPs Have Been Fully Implemented. ........................................ 5

    C.    The Report Contains An Inadequate Review of Underlying Problems that Led to QIPs.......................................................................................... 7

II.    The Report's Analysis of Emergency Response Issues Is Deficient........................... 9

III.    The Report's Analysis of Several Other Issues Is Not Comparable to that Found in Prior Special Master Reports ..................................................................... 10

IV.    The Court Should Require Defendants to Update Their Report to Address the Recently Noticed 2022 Suicide Before Adopting the 2022 Suicide Report ............ 11

CONCLUSION............................................................................................................................. 12

CERTIFICATION ........................................................................................................................ 13

# INTRODUCTION

CDCR's 2022 annual suicide report ("Report" or "Defendants' Report") is Defendants' second attempt to perform the annual suicide reporting function in accordance with the pilot process approved by the Court. Notice of Submission of the CDCR's Annual Report to the Legislature on Suicides in CDCR and 2022 Annual Suicide Report (Oct. 24, 2023), ECF No. 8027; Report and Recommendation Regarding the CDCR's Proposal for Assuming the Annual Suicide Monitoring Report ("Suicide Reporting Plan"), ECF No. 7574; Order (Jul. 25, 2022), ECF No. 7592.

Defendants' 2022 Report suffers from several of the same key failings present in their 2021 suicide report that led the Court to order Defendants to file a revised 2021 report. Order (Dec. 15, 2022), ECF No. 7681 ("Dec. 15, 2022 Order"). Defendants' analyses of QIP efficacy, QIP implementation, and the underlying problems that led to issuance of QIPs—all of which are essential components of the analysis of QIPs—are deficient. The Suicide Reporting Plan requires this analysis as a replacement for the determinations of foreseeability and preventability that have long provided a systemic examination of gaps in Defendants' suicide prevention efforts. *See Brown v. Plata*, 563 U.S. 493 (2011). Other sections in Defendants' Report addressing analyses of emergency response issues, level of care problems, and rigor mortis, are not comparable to the analyses found in prior Special Master reports as required by the Suicide Reporting Plan. The Court should also require Defendants to include in their updated Report the additional 2022 suicide that was noticed on September 25, 2023 (*see* Report at 14), or if they determine it was not a suicide, provide an explanation to the Court and Plaintiffs as to why.

Given the serious deficiencies in Defendants' Report, Plaintiffs continue to have serious concerns about whether Defendants are prepared to take on this important reporting function on a permanent basis. The Court should order Defendants to file a revised 2022 Report that fully complies with the requirements of the Suicide Reporting Plan. Defendants' willingness to incorporate such content into their annual suicide reports in the first instance will likely animate the parties' discussions in the court-ordered meet and

1  confer process regarding whether to make the Suicide Reporting Plan permanent.  *See*
2  December 15, 2022 Order at 2, 10.[1]

### I. The Report's Analysis of QIPs Is Inadequate

The foreseeability and preventability standards have historically provided specific guidance to CDCR on how to identify and fix practices and lapses that increase risk of suicides.  *See Brown*, 563 U.S. at 493.  The parties agreed in the Suicide Reporting Plan that Defendants' reports may forego that analysis, but must instead include an enhanced and in-depth analysis of CDCR's system to remedy suicide prevention deficiencies through Quality Improvement Plans (QIPs).  The Plan requires Defendants' suicide report to include several elements in its QIP analysis, including but not limited to, (1) "an analysis of the efficacy of the QIPs," (2) "a review of the identified areas for improvement within the suicide case reviews that lead to the assignment of QIPs," and (3) "discussion about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation." Suicide Reporting Plan at 13-14.

Each of these components of the QIP analysis are key tools for reporting on the efficacy of CDCR's existing suicide prevention practices and CDCR's efforts to improve those practices to resolve identified deficiencies. Plaintiffs' agreement to the closely negotiated pilot process was premised on Defendants' willingness to include the specific components of the QIP analysis required by the Suicide Reporting Plan.

The QIP analysis in Defendants' 2021 Suicide Report, Defendants' first report pursuant to the Plan, lacked analyses of QIP efficacy and QIP implementation.  Defendants promised to provide a more robust analysis in their 2022 Report when, according to Defendants, their monitoring and reporting infrastructure would have been in place long enough to produce the required analysis.  Notice of Submission of the Cal. Dep't of Corrs. And Rehabilitation's 2021 Annual Report to the Legislature on Suicides in CDCR and 2021 Annual Suicide Report (Sept. 29, 2022), ECF No. 7615 at 7, 9; *see also* Defendants'

---

[1] Page citations to documents on the docket are based on PDF pagination.

Redacted Amended 2021 Suicide Report (March 9, 2023), ECF No. 7710.  The Court extended the provisional Suicide Reporting Plan for another year to give Defendants an opportunity to demonstrate that they can and will comply with the Plan's requirements regarding the specific components of the QIP analysis.  Dec. 15, 2022 Order at 5-7.  Unfortunately, Defendants 2022 Suicide Report again lacks a meaningful analysis of QIP efficacy, and other components of the QIP analysis in the Report are inadequate.

### A.    The Report's Analysis of QIP Efficacy Is Deficient

Defendants are required to analyze the efficacy of the QIPs in the report, "including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPs as designed were appropriate to effectively address the problems in the first instance and that sustained improvement has been made." Suicide Reporting Plan at 14; *see also* Dec. 15, 2022 Order at 5.

The efficacy analysis in the Report is inadequate.  It does not clearly state which or how many QIPs were effective—that is, how many QIPs addressed the deficiency they were meant to correct, such that further auditing and review from Regional and local suicide prevention teams has not identified continued issues with that problem at that institution. *See* Report at 88-101.  The Report is not even clear regarding the number of QIPs that were issued in 2022, at one point stating that 123 were issued and, in the next sentence, stating that there were a total of 124 QIPs. *Id.* at 90.  The Report suggests that, aside from one QIP which resulted in a CAP due to ongoing problems, two headquarters QIPs that are still being rolled out, and two other QIPs in Region III that remain open for monitoring, all other mental health related QIPs were effective, but it offers no specific information to support that conclusion. *Id.* at 90-91, 100-01.  To address this issue, the Report should include much more detail regarding efficacy of the implemented QIPs in the region-by-region efficacy section, including a report on how many QIPs in each region corrected the deficiency that they were issued to correct (per regional audits), how many QIPs were not effective in each region, for how many QIPs in each region Defendants cannot yet determine efficacy, and the basis for Defendants' efficacy determinations for

each QIP or each group of similar QIPs.

The Report also entirely omits an analysis of the efficacy of nursing and custody QIPs. Plaintiffs raised this issue in their comments on Defendants' draft Report. Report at 36. In response, Defendants asserted that they "increased the discussion on the efficacy of custody and nursing QIPs related to the delay on activating emergency medical services." *Id.* At 14. First of all, delays in emergency services are not the only category of QIPs directed at custody and nursing staff, but the Report's new language only addresses that category. *See* Report at 93-94 (noting four total categories of custody QIPs and two categories of nursing QIPs issued in response to the 2022 suicides, including "ASU Policy/CDCR 114 issues," "staff actions," and "nursing documentation," which do not appear to be emergency response-related); *id.* at 129-130 (in the list of QIP descriptors, listing "ASU Policy/CDCR 114 issues," "Staff Actions Concern," and "nursing documentation" separately from 911 activation and emergency response issues). Moreover, the added discussion in the revised Report does not actually address *efficacy* of the nursing and custody QIPs, including what steps CDCR took to ascertain whether the changes required by the QIPs had been made, and what the results of their inquiries were. *Id.* at 99-100. Instead, it only describes the reasons the QIPs were initiated and the actions taken to implement the QIPs, including a training program for nursing staff through the Emergency Medical Response Program, which started in 2021, before the 2022 suicides occurred. *Id.* at 100. The Report contains no meaningful analysis of whether the QIPs from the 2022 suicides have improved the issues with delays in emergency response activation at the relevant institutions, nor whether and how CDCR has made that determination. *Id.*

The Report briefly describes the new monitoring process the regional Suicide Prevention Coordinators use to track QIPs, including how they determine if a QIP was effective. *See* Report at 89 ("[a]n institution is determined to be compliant if, after two consecutive onsite visits, the issue appears to have been resolved in a sustained manner."). But the Report fails to provide enough detail about what criteria the Regional staff use to

determine that a deficiency leading to a QIP "appears to have been resolved in a sustained manner" and their methodology for monitoring QIP efficacy.  And it omits any accounting of how many of the 2022 QIPs the Coordinators determined to have been effective through their monitoring, and why.

Plaintiffs raised questions and concerns about CDCR's vague standard for determining QIP efficacy in their comments on Defendants' draft Report.  *Id.* at 36.  Defendants revised this discussion in their filed Report.  *See id.* at 7, 89-90.  However, the revised discussion, which asserts that "[e]ach case is unique," and therefore the required follow up and standards of compliance differ depending on the QIP, does not provide sufficient insight into how Defendants determine whether each QIP has been effective or whether or why Defendants determined that any of the 2022 QIPs were effective.  *Id.*

Before adopting Defendants' Report, the Court should require Defendants to revise the Report by including: (1) additional detail about the criteria the regional staff use to evaluate QIP efficacy and their methodology for monitoring QIP efficacy; and (2) additional information in the QIP efficacy section of the Report regarding how many 2022 QIPs Defendants deemed effective, how many QIPs Defendants deemed ineffective, and for how many QIPs Defendants cannot yet determine QIP efficacy—both overall and on a region-by-region basis.

### B. The Report Does not Contain Sufficient Information Regarding Whether the QIPs Have Been Fully Implemented.

Defendants' Report must "contain[ ] a full discussion of whether QIPs approved during the reporting year have been fully implemented and, if not, what the barriers to such implementation are."  Dec. 15, 2022 Order at 7.  QIP implementation is different from QIP efficacy.  A QIP is fully implemented when the relevant actors, either QIP or headquarters, has taken all actions required by the QIP, regardless of whether those actions ultimately correct the underlying deficiency.

The Report briefly describes how many mental health-related QIPs have been "completed" or "closed" for three of the four regions .  *See* Report at 101.  As to Region 2,

however, it is impossible to tell how many of the 31 QIPs initiated in response to 2022 suicides in that region have now been fully implemented. *Id.* The Report also entirely fails to report the total number of QIPs that have been fully implemented and the total number of QIPs that remain open for the disciplines of custody and nursing, and therefore it is impossible to tell the total number of "closed" and "open" QIPs across all disciplines. *Id.* The table on pages 93 and 94 does not even purport to give this breakdown because it does not list all QIPs, only those that "were identified more than twice." *Id.* at 93-94. This information would be valuable to inform the Court, Plaintiffs, and the public about how responsive custody and nursing have been to implementing suicide prevention measures.

The report's discussion regarding actions taken in response to many QIPs is also so vague as to be of minimal use. Report at 93-94, 99-101. The Report states that many of the QIPs resulted in audits and training, but does not summarize audit findings and does not identify who was trained, what the training covered, whether all relevant staff were trained (a point of concern in prior Special Master Reports), or whether the training or audits resulted in changes to relevant practices or procedures. *Id.*; Special Master's 2020 Suicide Report (Dec. 21, 2021), ECF 7405-1 ("Special Master's 2020 Suicide Report") at 30 ("[w]hat was not possible to determine from the responses submitted was whether all required staff actually received the training."); Special Master's 2019 Suicide Report (Jul. 16, 2021), ECF 7239 ("Special Master's 2019 Suicide Report") at 35 (same). Plaintiffs raised the concerns listed above in their comments on Defendants' draft Report. Report at 36-37. However, Defendants declined to revise their Report to address these concerns. *See id.* at 14.

Finally, the Report notes that five 989 investigations were initiated related to 2022 suicides. Report at 89. However, the Report appears to provide information regarding the status or outcome of only two of these investigations. *See id.* at 92, 99.

The Court should require Defendants to file a revised version of their Report containing: (1) a concise statement regarding the total number of 2022 QIPs that have been fully implemented, the total number of 2022 QIPs that have not been fully implemented, the total number of nursing and custody QIPs that have been fully implemented, and the total

number of nursing and custody QIPs that have not been fully implemented, as well as a summary of the barriers to full implementation of QIPs that have not yet been fully implemented; (2) additional detail regarding actions taken in response to QIPs for which Defendants have not already included this information; and (3) the status or outcome of all five 989 investigations that arose from the 2022 suicides.

### C. The Report Contains An Inadequate Review of Underlying Problems that Led to QIPs

The Suicide Reporting Plan requires that Defendants' Report include a "review of the identified areas for improvement within the suicide case reviews that lead to the assignment of QIPs." Suicide Reporting Plan at 13. The Plan also requires that Defendants' Report include analysis comparable to that in the Special Master's prior suicide reports. The Special Master's prior reports contain a concise list of every specific underlying problem common to more than one suicide that led to a QIP in each year, such as "failure to conduct confidential contacts" or "failure to make adequate custody checks," and how many cases involved each problem. *See*, *e.g.*, Special Master's 2020 Suicide Report App'x B4 at 167; *see also* Special Master's 2019 Suicide Report at 35, App'x B4. This list is crucial in identifying trends in suicide prevention deficiencies across institutions in a single year, and over time.

Defendants' Report does not include analysis of underlying deficiencies comparable to that found in the Special Master's prior annual suicide reports. First, although the Report contains some information regarding underlying problems that led to QIPs, nowhere does the Report contain a concise list that clearly identifies every underlying problem common to more than one suicide that gave rise to a QIP, as prior Special Master reports have done. Report at 93-100. Table 21 on pages 93 and 94 of the Report addresses only issues that were identified "*more than twice*," not *more than once* as was done in prior Special Master reports.

Second, many of the descriptions of the underlying problems in the Report are so vague that they fail to convey the essence of the problems. *Id.* at 93-97 (vague

descriptions of problems, including "level of care," "staff action response," and "emergency response"). In response to this concern in Plaintiffs' comments on Defendants' draft Report, Defendants point to Appendix B to their Report, but Appendix B does not describe the trends in QIPs in 2022; it is simply a list of the types of deficiencies suicide reviewers *may* identify that would merit generating a QIP. *See* Report at 14, 128-31. The Report makes no attempt to relate the more specific categories of QIPs in Appendix B to the actual set of QIPs utilized in response to the 2022 suicides, and it is impossible to tell from the cursory descriptions in Table 21 which of the QIP descriptors in Appendix B pertain to which set of QIPs described in Table 21. *Id.* at 93-97, 128-131. For example, "level of care" in Table 21 could be a reference to the QIP of "Clinical Decision Making Concerns . . .no consideration of LOC change or no rationale for LOC change," or it could reference "Continuity of Care/Clinician to Clinician Contacts," "Program Guide Timelines," "MH Referrals (e.g., failure to refer, failure to document response to referral adequately…," or something else entirely. *Id.*

Third, the Report fails to state whether pending Office of Internal Affairs ("OIA") investigations arising from the 2022 suicides prevented implementation of any QIPs and, if so, how many, as prior Special Master reports have done. *See* Special Master's 2020 Suicide Report at 30-31; Special Master's 2019 Suicide Report at 36.

Clearly and comprehensively identifying the common underlying deficiencies that led to QIPs is necessary for Defendants to identify and fix the policy violations or gaps which contributed to suicides in 2022—especially across institutions or programs—and to discern whether specific suicide prevention measures are in need of improvement. The Court should require Defendants to further revise this section of their report to be consistent with the analysis in the Special Master's prior reports. The Report should include a clear and comprehensive list of all underlying problems common to more than one suicide that gave rise to a QIP, clearer, more detailed descriptions of the underlying problems that led to the QIPs, and it should specifically report the number of QIPs, if any, which could not be fully implemented due to pending OIA investigations.

## II. The Report's Analysis of Emergency Response Issues Is Deficient

The Suicide Reporting Plan requires that Defendants report on "emergency response factors" in a manner comparable to the analysis in the Special Master's prior annual suicide reports. Suicide Reporting Plan at 13; Dec. 15, 2022 Order at 7. To track the content and analysis in the Special Master's prior reports, the Report must specifically discuss how many cases involved application of cuffs or restraints to patients before or during administration of emergency medical care, as well as the trend over years in the number of such cases. *See* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide Report at 33-34.

The Report does not address whether any 2022 cases involved application of restraints to patients before or during provision of emergency medical care or the trend over years. *See* Report at 95-96, 99-100. This is true even though Plaintiffs identified four 2022 suicides involving the improper use of restraints by staff during the emergency response in a May 1, 2023 letter to Defendants, to which Plaintiffs received no response. Plaintiffs requested that Defendants add this information into the final Report. Report at 39. Defendants implied that they revised the Report to address this issue, see Report at 15, but the filed Report still contains no discussion of the application of restraints to patients before or during provision of emergency medical care, including on the pages on which Defendants claim to have "modified their discussion." *Id.* (referencing pp. 48, 52-53 of internal report [95, 99-100 of PDF].)

The absence of this discussion is not a mere technical violation of the Suicide Reporting Plan. Reporting on restraining unconscious or barely conscious patients before providing them with emergency medical care is important because it runs contrary to CDCR policy and it is a problem that has plagued Defendants' emergency responses for years. *See* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide Report at 33-34. The Program Guide requires "[a]ll peace officers who respond to a medical emergency […] to provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures." MHSDS Program Guide (Sep. 29,

2021), ECF No. 7333-1 at 188 (12-10-21). First responders may delay provision of life sustaining emergency measures only in specific circumstances, including to "neutralize any *significant* security threats." *Id.* (emphasis added); *see also* Health Care Department Operations Manual § 3.7.1 at 3, https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-ch03-art7.1-1.pdf (custodial practices may not "unreasonably delay medical care during a medical emergency unless the safety of staff, patient, or the general public would be compromised"). Unconscious patients in the middle of a suicide attempt are not "significant security threats" because they cannot realistically harm anyone. As such, the Program Guide does not permit responding officers to handcuff such patients before initiating the provision of potentially life-saving medical treatment.

The Court should require Defendants to incorporate this analysis into their 2022 Report before the Court adopts it.

### III. The Report's Analysis of Several Other Issues Is Not Comparable to that Found in Prior Special Master Reports

Defendants' analyses of level of care issues and patients found in rigor mortis are also not comparable to those found in the Special Master's prior reports.  The Report includes brief and vague information about level of care issues.  Report at 75, 93-95, 99-100.  However, the Report does not explain whether the level of care issues specifically involved failures to refer patients to higher levels of care, as opposed to other level of care deficiencies, as prior Special Master Reports have done.  Special Master's 2020 Suicide Report at 26-27; Special Master's 2019 Suicide Report at 32.  The Report provides the number of patients found in rigor mortis, but fails to report the type of housing in which these decedents resided, as prior Special Master suicide reports have done, and which is necessary in order to assess whether there are systemic deficiencies with the welfare checks required in segregated housing units.  *Compare* Report at 64 *with* Special Master 2020 Suicide Report at 9-10 *and* Special Master's 2019 Suicide Report at 16-17.

Plaintiffs raised these concerns in their comments on Defendants' draft Report, but these deficiencies remain in the filed Report despite Defendants' assertion that Defendants

1  addressed them.  Report at 15.  The Court should direct Defendants to revise these sections
2  before adopting the Report to ensure that the Report "track[s] the contents and analysis
3  found in the reports written by the Office of the Special Master." Suicide Reporting Plan at
4  13; *see also* Aug. 29, 2022 Order, ECF 7609 at 10 n.4 (providing that "[t]he content and
5  analysis of the annual suicide reports will continue to cover the same topics").

**IV.  The Court Should Require Defendants to Update Their Report to Address the Recently Noticed 2022 Suicide Before Adopting the 2022 Suicide Report**

There were twenty suicides in 2022, including a suicide about which CDCR provided notice to Plaintiffs and the Special Master on September 25, 2023, after completion of a county coroner's review.  Defendants' Report at 4 n.1.  Defendants suggest that they did not include the suicide noticed on September 25 in their Report because they learned of it "four days before finalization of the 2022 Report."  Defendants' Report at 4 n.1.  Defendants also appear to question whether the suicide noticed on September 25, 2023 was actually a suicide, describing it as a "potential" suicide that Defendants would address "if necessary, in a future report."  Defendants' Report at 14.

Defendants' must update the Court and the parties after they assess the suicide noticed on September 25, 2023.  If Defendants' assessment confirms that this death was a suicide, then Defendants must issue an updated 2022 Report that addresses this suicide. That Defendants learned about a 2022 suicide four days before they finalized their suicide report for submission to the California State Legislature is not on its own a valid justification for permanently excluding this suicide from Defendants' annual suicide reporting to this Court and the *Coleman* parties.  If Defendants determine that the suicide noticed on September 25, 2023 was not in fact a suicide, then Defendants must notify the Court and the parties about their determination and explain why they determined that the death was not a suicide despite the coroner's determination to the contrary.

The Court should order Defendants to update the Court and the parties after Defendants assess the suicide noticed on September 25, 2023.  Defendants must either file an updated Report that fully incorporates this suicide into the Report, including updating

1  the 2022 suicide rate and all other statistics, charts, tables, and graphs in the Report that
2  incorporate, or are based at least in part on, the number of suicides in 2022 other than the
3  QIPs,[2] or file a notice with the Court informing the Court and the parties that the suicide
4  noticed on September 25, 2023 was not in fact a suicide, including an explanation for this
5  determination. The Court should also provide Plaintiffs with an opportunity to object to
6  any such notice, or the section(s) of the updated report that incorporate the analysis of the
7  new suicide, to the extent that they raise issues to which Plaintiffs could not have
8  previously objected.

## CONCLUSION

Plaintiffs respectfully request that the Court decline to adopt Defendants' 2022 Report as drafted, and order Defendants to file a revised 2022 suicide report that contains all the content and analysis required by the Suicide Reporting Plan, including: (1) a clear and robust analysis of QIP efficacy; (2) a clear and comprehensive list of common underlying problems that led to issuance of QIPs; (3) a clear summary of QIP implementation; (4) an analysis of emergency response problems comparable to that found in the Special Master's annual suicide reports; and (5) an analysis of the 2022 suicide reports that involved the specific issues discussed in Section IV, *supra*. Plaintiffs also request that, before the Court adopts the Defendants' Report, the Court require Defendants to update the parties regarding the suicide noticed on September 25, 2023, either by submitting an updated Report that incorporates this suicide or, if Defendants determine that this death was not actually a suicide, by notifying the Court and the parties of their determination. Only with these necessary changes can the parties and Special Master engage in a meaningful discussion of Defendants' capability to permanently take over annual suicide reporting, as contemplated by the Court's December 15, 2022 order.

---

[2] If Defendants confirm that the suicide noticed on September 25, 2023 was in fact a suicide, if Defendants issue QIPs based on this suicide, and if the Court permits Defendants to prepare the 2023 annual suicide report, then the Court should require Defendants to report on the QIPs issued in response to this 2022 suicide in their 2023 annual suicide report.

**CERTIFICATION**

Plaintiffs' counsel certifies that he reviewed the following orders relevant to this filing: ECF Nos. 7681, 7592, 7609, *Brown v. Plata*, 563 U.S. 493 (2011).

DATED:  October 30, 2023          Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Michael S. Nunez*
    Michael S. Nunez

Attorneys for Plaintiffs