| | |
|---|---|
| Rob Bonta, State Bar No. 202668<br>Attorney General of California<br>Monica N. Anderson, State Bar No. 182970<br>Senior Assistant Attorney General<br>Damon McClain, State Bar No. 209508<br>Supervising Deputy Attorney General<br>Elise Owens Thorn, State Bar No. 145931<br>Namrata Kotwani, State Bar No. 308741<br>Deputy Attorneys General<br>  1300 I Street, Suite 125<br>  P.O. Box 944255<br>  Sacramento, CA 94244-2550<br>  Telephone: (916) 210-7318<br>  Fax: (916) 324-5205<br>  E-mail: Elise.Thorn@doj.ca.gov<br>*Attorneys for Defendants* | HANSON BRIDGETT LLP<br>Lawrence M. Cirelli, SBN 114710<br>Paul B. Mello, SBN 179755<br>Samantha D. Wolff, SBN 240280<br>Kaylen Kadotani, SBN 294114<br>Laurel O'Connor, SBN 305478<br>David C. Casarrubias, SBN 321994<br>Carson R. Niello, SBN 329970<br>1676 N. California Blvd., Suite 620<br>Walnut Creek, California 94596<br>Telephone: 925-746-8460<br>Facsimile: 925-746-8490<br>*Attorneys for Defendants* |

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.<br><br>    Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF**<br><br>Date:    November 2, 2023<br>Time:    10:00 a.m.<br>Crtrm.:  3<br><br>Judge:    Hon. Kimberly J. Mueller |

# INTRODUCTION

On October 24, 2023, this Court issued an order inviting the parties to file concise supplemental briefs addressing a number of specific questions relating to economic expert testimony, possible other steps Defendants could take, and the absence of testimony from persons with ultimate authority.  Defendants respond to each of those questions below.

## I. QUESTIONS REGARDING ECONOMIC EXPERT TESTIMONY

**1.**  ***Question:*** The Eighth Amendment and numerous court orders applying the Eighth Amendment require defendants to hire enough mental health staff "'to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'"  *Coleman v. Wilson*, 912 F. Supp. 1282, 1306 (E.D. Cal. 1995) (internal citation omitted).  It is settled that the level of staffing required to satisfy the Eighth Amendment and court orders in this case is determined by the ratios of staff to inmate-patients in defendants' 2009 Staffing Plan, ECF No. 3693, as modified, at a ten percent maximum vacancy rate.  *See generally*, *e.g.*, February 28, 2023 Order, ECF No. 7742.  Does the fact that defendants are required by the Eighth Amendment and court orders to meet the demand for mental health staff affect an application of market analysis in this context?  If so, how is that analysis affected?

***Defendants' Response:*** No, Defendants' Eighth Amendment obligations do not affect an application of the labor-market analysis in this context.  That is because the "context" is a proceeding to determine whether Defendants should be held in contempt and fined due to their inability to fully comply with staffing orders, and not a proceeding to determine whether Defendants have satisfied their Eighth Amendment obligations with respect to staffing.

Defendants readily acknowledge their Eight Amendment obligation to hire sufficient mental health providers to provide constitutionally adequate mental health treatment to all Mental Health Services Delivery System (MHSDS) patients.  *Coleman v. Wilson*, 912 F. Supp.1282, 1306 (E.D. Cal. 1995) ("defendants must employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders,'" *quoting Balla v. Idaho State Bd. Of Corrections*, 595 F. Supp. 1558, 1577 (D. Id. 1984)).  However, as they have repeatedly stated, Defendants do not agree that it is settled that the

ratios set forth in the court-ordered 2009 Staffing Plan reflect the constitutionally minimum. *See* Defs.' Staffing Plan, ECF No. 3693 at 7, fn. 1 [Defendants "do not concede that all of the programs and/or staffing identified in the Plan are required by the *Coleman* Court" or "that the proposed staffing and services are constitutionally required."]. Defendants cautioned that they did not believe the 2009 Staffing Plan could pass muster with the Prison Litigation Reform Act, which requires that prospective relief be narrowly drawn, extend no further than necessary to correct the alleged violation of the federal right, and be the least intrusive means necessary to correct the alleged violation. ECF No. 3693 at 7, fn. 1; 18 U.S.C. § 3626(a)(1)(A).

But irrespective of whether the ratios set forth in the court-ordered 2009 Staffing Plan reflect the constitutional minimum, the standards for constitutional compliance and imposition of coercive civil contempt sanctions are separate and distinct. Indeed, as defense counsel explained in the State's opening statement, "Defendants are not suggesting that impossibility is a defense to their Eighth Amendment obligations to the patient class, but, importantly, it is a defense to civil contempt." (9/29/23 Hearing Tr. at 21:21-23.) Thus, while current labor market conditions do not excuse noncompliance with Eighth Amendment obligations to provide constitutionally adequate mental health care, such conditions are relevant to a determination of whether the imposition of civil contempt sanctions is appropriate.

As Defendants have established in their Closing Brief, a party's inability to comply with a judicial order constitutes a defense to a charge of civil contempt. *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999); *see also* Defs.' Closing Brief, ECF No. 8019 at 11-13. Where a party shows that compliance is impossible—due to prevailing labor market conditions, for instance—and that it has otherwise taken all reasonable steps to comply with the order, contempt sanctions should not issue. *U.S. v. Rylander*, 460 U.S. 752, 757 (1983); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016); *Stone v. City and County of San Francisco*, 968 F.2d 850, 856-857 (9th Cir. 1992). Here, it is Defendants' position that they should not be sanctioned because they have taken all reasonable measures to comply with this Court's staffing orders, though compliance remains out of reach across several provider classifications due to current labor market conditions. *See* Defs.' Closing Brief, ECF No. 8019 at 18-28. Thus, while impossibility and

exhaustion of reasonable measures is not a defense to an Eighth Amendment violation, it is a valid defense to contempt and must be considered by this Court here. *See id.*; *see also Wengler*, 822 F.3d at 1096; *Stone*, 968 F.2d at 856-867; *see also* Defs.' Closing Brief, ECF No. 8019 at 18-28 (describing all reasonable measures Defendants have taken to improve fill rates and labor market challenges rendering compliance impossible).

**2.** ***Question:*** Did the defense experts consider inflation? If so, how? If not, why not?

***Defendants' Response:***[1] As explained in Defendants' Closing Brief, the defense experts' report did not analyze inflation because it was unnecessary for purposes of their analysis. (Defs.' Closing Brief at 32:7-11 (noting that any inflation adjustment that would be made to CDCR salaries would also have to be made to the benchmark salaries and the relationship would be the same).) This is because the defense experts focused their analysis on how CDCR's compensation compared to market compensation in each period, whereas controlling for inflation would be important if the defense experts were analyzing the purchasing power of an individual or a group of individuals over time.[2] Thus, in this context, inflation is irrelevant.

Mental health professionals' employment decisions are reasonably expected to respond to changes in the compensation offered by CDCR vis-à-vis other employers in the market, in each period. Inflation in a given period would affect employees' purchasing power to exactly the same

---

[1] Defendants note that the information contained in their responses to Questions I.2 through I.8 is drawn from data and evidence that was included in the Dutra-Greulich Report (Defendants' Exhibit 5 or Plaintiffs' Exhibit 24), presented in the form of testimony from Defendants' expert, Dr. Greulich, and Plaintiffs' expert, Dr. Brown, or was included in data and documents produced to Plaintiffs' counsel in advance of the proceedings. Specific references to those sources are included throughout Defendants' responses. However, to the extent this Court would prefer that information be included in a supporting declaration, Defendants can provide such a declaration upon request. A supplemental declaration was not provided in support of this response because both parties confirmed the conclusion of their presentation of evidence, and the information is independently available. (10/04/23 RT at 147:6-8 (Mr. Mello confirming the conclusion of Defendants' presentation of evidence); 10/05/23 RT at 164:17-19 (Ms. Ells confirming the conclusion of Plaintiffs' presentation of evidence).)

[2] This is shown visually in the Dutra-Greulich Report Figures 15 through 19 (Dutra-Greulich Report, Pltfs.' Exhibit 24 at PL-24.049 – PL-024.56), and a similar cross-sectional approach was applied in the regression analyses reported in Figures 20, 21 and 23 (PL-24.071, 24.073, 24.076) and Appendix 2.

extent regardless of whether their compensation comes from CDCR or a different employer. For example, if CDCR's compensation is 1.5 times the benchmark (market) compensation in a given period, CDCR's compensation adjusted for inflation is also precisely 1.5 times the benchmark (market) compensation adjusted for inflation in that same period. (*See* 09.29.23 at RT 136:21-137:10 (discussion of inflation).) Put another way, if the defense experts adjusted CDCR's salaries for inflation, they would have also had to adjust the benchmark salaries for the same levels of inflation in the corresponding time periods. Thus, because such an adjustment—made equally to both CDCR salaries and benchmark salaries—would not affect the outcome, the defense experts did not need to consider inflation in their analysis.

**3.** **Question:** Assume for sake of argument that California Department of Corrections and Rehabilitation (CDCR) wages generally are higher than wages paid by other employers in California and the United States at large. Do the defense experts' reports disprove that defendants (1) could increase hiring and retention by raising wages further or (2) cannot use other measures to increase hiring and retention?

**Defendants' Response:** First, no assumption is necessary. The Dutra-Greulich Report shows that CDCR wages are generally higher than average wages paid by employers in California and in the United States for the mental health professionals considered in this case, and Plaintiffs presented no countervailing evidence. (Pltfs.' Exhibit 24 [Dutra-Greulich Report] at PL-24.057 – PL-024.058.) And, with the exception of Medical Assistants, CDCR wages have been consistently higher, sometimes much higher, than average wages paid by employers in California and in the United States for the mental health professionals considered in this case. (*Id.* at PL-24.057 – PL.024.065.)

Further, the defense experts conducted a regression analysis analyzing the relationship between pay and civil service employment or net hiring. (*See* Pltfs.' Ex. 24 at PL-024.077 – 024.085.) Regression analyses do not prove or disprove a hypothesis. Regression analyses only provide statistical evidence indicating whether existing data corroborate a hypothesis, such as the hypothesis that larger pay premiums enhance hiring and retention. Here, there is a lack of empirical evidence that CDCR can increase its civil service filled positions or net hires through

increased wages. During the 2018-2022 period, CDCR increased salaries, and its salary premiums relative to benchmark averages increased, on numerous occasions. Those increases did not result in statistically significant augmentation of filled positions. As Dr. Greulich testified, the regression analyses did not yield evidence that CDCR's compensation differences relative to benchmarks have impacted its net hires or its ability to fill vacancies through civil service over the last five years. (09/29/2023 Hearing Transcript ("RT") at 44:1-17 & 117:7-132:19.) Given current and recent labor market conditions, defense experts did not find evidence to suggest that this will change in the foreseeable future. (09/29/23 RT at 48:14-49:3.)

Thus, while the analyses in the Dutra-Greulich Report cannot disprove that Defendants could increase hiring and retention by further increasing monetary compensation, Drs. Dutra and Greulich found no credible evidence to support that this would be the case. This conclusion takes into account not only the regression analyses but also the breadth of evidence considered, which includes but is not limited to registry rates, dual appointment opportunities, and fringe benefits. (*See generally* Dutra-Greulich Report, Pltfs.' Ex. 24 at PL-024.055 – 024.073.)

Moreover, other measures to increase hiring and retention were beyond the scope of the regression analysis conducted by the defense experts. And, while the defense experts acknowledge the potential impact of other measures including use of telehealth, telework from home, increased pay and benefits, enhanced registry rates, differential pay, internships, on-site hiring events, and additional professional outreach efforts,[3] their report seeks neither to prove nor disprove whether Defendants can use other measures to increase hiring and retention. However, the defense experts did note, for example, that "CDCR's expanded use of telepsychiatry during the COVID-19 pandemic coincides with a reduction in the psychiatrist vacancy rate at CDCR." (Pltfs.' Ex. 24 at PL-024.010 – 024.011.)

**4.** *Question:* Do the defense experts rely on academic studies about whether and how healthcare providers respond to changes in wages? If so, are their opinions about those studies

---

[3] Dutra-Greulich Report, Pltfs.' Ex. 24 at PL-024.010 – 024.011, PL-024.042 – 024.044, PL-024.054 – 024.055, PL-024.073 – PL-024.075, & PL-024.086 – PL-024.088.. *See also* Greulich testimony 10.03.23 RT at pp. 15:1-6.

reflected in their reports? Please provide pin citations. If not, why not?

**Defendants' Response:** No. The defense experts' literature review was aimed at documenting current and recent labor market conditions (*e.g.*, the widespread existence of shortages in California and nationwide, the impacts of COVID and telehealth on shortages) for the classifications of employees currently at issue. To assess CDCR's experience in recent years with actual employees' and potential hires' responses to changes in wages, the defense experts relied on data and empirical analyses.

The absence of such reliance is unremarkable. Plaintiffs' experts' report and testimony indicated that there are few studies about how healthcare providers respond to changes in wages. (10/04/23 RT at 213:16-22.) Dr. Brown identified three (*id.*); only two of the studies assessed supply responsiveness of healthcare providers. (*Id.* at 213:23-214:3.) Both relied on very dated estimates of supply responsiveness and were relevant to physicians generally (they were not specific to psychiatrists). (*Id.* at 214:18-215:2.) With respect to the third study he cited in his report, Dr. Brown admitted that "[w]e shouldn't be looking at that piece of literature." (*Id.* at 214:17.) Accordingly, there is no meaningful evidence in the record with respect to other types of healthcare providers generally, and no evidence with respect to mental health care providers specifically.

5.  **Question:** Did the defense experts test how well the regression models reported in Appendix A of the Greulich report explained variations in the data, such as by using an r-squared measurement, F-test or a similar method? If so, what were the results of these tests, and how should the court interpret those results?

**Defendants' Response:** Yes, the defense experts tested how well the regression models reported in Appendix A of the Dutra-Greulich Report explained variations of the data. They also provided all the necessary data and codes to reproduce the test results.[4] Using the data files, Stata and R code in the workpapers to the Dutra-Greulich Report to run the regressions reported in

---

[4] Data files: SECRETARIAT-002530, SECRETARIAT-002532, SECRETARIAT-002533 and SECRETARIAT-002538. Stata code: SECRETARIAT-002524. R code: SECRETARIAT-002515. Readme file for regression analyses: SECRETARIAT-002514.

Appendix 2, the $R^2$, adjusted $R^2$, F statistic and its associated p-value for each model are as follows:

| Model | R2 | Adj. R2 | F stats | Numerator df | Denominator df | p-value |
|---|---|---|---|---|---|---|
| (1)  | 0.9995 | 0.9993 | 6870.2  | 10 | 35 | 0.0000 |
| (2)  | 0.9995 | 0.9994 | 7588.1  | 10 | 35 | 0.0000 |
| (3)  | 0.9993 | 0.9991 | 5601.1  | 9  | 36 | 0.0000 |
| (4)  | 0.9993 | 0.9992 | 5941.3  | 9  | 36 | 0.0000 |
| (5)  | 0.9993 | 0.9990 | 4256.4  | 10 | 31 | 0.0000 |
| (6)  | 0.9994 | 0.9992 | 4841.7  | 10 | 31 | 0.0000 |
| (7)  | 0.9993 | 0.9990 | 4748.8  | 9  | 32 | 0.0000 |
| (8)  | 0.9994 | 0.9992 | 5516.0  | 9  | 32 | 0.0000 |
| (9)  | 0.9999 | 0.9999 | 42270.4 | 14 | 31 | 0.0000 |
| (10) | 0.9999 | 0.9999 | 41744.8 | 14 | 31 | 0.0000 |
| (11) | 0.9997 | 0.9996 | 7785.0  | 13 | 32 | 0.0000 |
| (12) | 0.9997 | 0.9996 | 7910.5  | 13 | 32 | 0.0000 |
| (13) | 0.7165 | 0.6134 | 6.9     | 8  | 22 | 0.0001 |
| (14) | 0.7526 | 0.6626 | 8.4     | 8  | 22 | 0.0000 |
| (15) | 0.7137 | 0.6266 | 8.2     | 7  | 23 | 0.0001 |
| (14) | 0.7458 | 0.6684 | 9.6     | 7  | 23 | 0.0000 |
| (17) | 0.7207 | 0.6031 | 6.1     | 8  | 19 | 0.0006 |
| (18) | 0.9999 | 0.9999 | 31777.6 | 8  | 19 | 0.0000 |
| (19) | 0.9999 | 0.9999 | 34498.0 | 7  | 20 | 0.0000 |
| (20) | 0.9999 | 0.9999 | 35383.0 | 7  | 20 | 0.0000 |

$R^2$ values range from 0 to 1 (0% to 100%) and measure the "goodness of fit" of the regression.[5] A high $R^2$ or adjusted $R^2$ indicates a "good fit," meaning that the independent variables in the regression model collectively explain a substantial portion of the variation in the

---

[5] Both $R^2$ and adjusted $R^2$ statistics measure the "goodness of fit" of a regression model. A model's $R^2$ only increases as more independent variables are added to the model, regardless of whether they are expected to have a relationship with the dependent variable. Conversely, adjusted $R^2$ values adjust for the number of independent variables in the model and can be thought of as penalizing the inclusion of independent variables that have no reason for being in the model. Because of this, many researchers prefer to report adjusted $R^2$ values.

1  dependent variable.[6]  An $R^2$ of zero indicates that the regression model does not explain any of the

2  variation in the dependent variable.[7]  As the table above shows, adjusted $R^2$ values for the filled

3  positions regressions reported in Appendix 2 (models (1)-(12)) range from 0.9990 to 0.9999.

4  Adjusted $R^2$ values for the net hires regressions reported in Appendix 2 (models (13)-(20)) range

5  from 0.6031 to 0.9999.  From these results, defense experts conclude that each model explains a

6  substantial portion of the variation and in many cases nearly all of the variation in CDCR's filled

7  positions or net hires over the 2018-2022 period.

8        For F tests, a p-value less than 0.05 indicates a statistically significant result, namely that

9  the F test fails to reject the null hypothesis that the independent variables in the regression

10 collectively fail to explain variation in the dependent variable.[8]  As the table above shows, p-

11 values for the F statistics in every single one of the regressions reported in Appendix 2 are less

12 than 0.05, indicating that the coefficients in each regression are statistically jointly significant.[9]

13 Defense experts conclude that variation among the collective set of independent variables in each

14 model explains the variation of filled civil service positions or net hires better than an intercept-

15 only model, and this finding is unlikely to have occurred by chance.

16       Despite the fact that the testing data was provided to Plaintiffs, they did not comment on

17 those tests, and their expert did not challenge the results of the tests or otherwise testify about

18 them.

19       **6.**    *Question:* In several of the regression models reported in Appendix A to the

---

[6] The dependent variable in regressions (1)-(12) is filled positions and the dependent variable in regressions (13)-(20) is net hires.

[7] Because adjusted $R^2$ values penalize the inclusion of useless independent variables they can be negative.

[8] More specifically, the F-test values reject the null hypothesis that the fit of those models and the fit of alternative intercept-only models were equal. In general, an F test in regression models is used to compare fits of distinct linear models. Unlike t-tests that assess one regression coefficient at a time, F tests assess multiple coefficients simultaneously.

[9] The dependent variable in regressions (1)-(12) is filled positions and the dependent variable in regressions (13)-(20) is net hires.

Greulich report, it appears none of the coefficients was statistically significant. *See*, *e.g.*, Appendix Table A1 (results reported in column (1)). Does this mean none of these variables had any observed effects on filled positions? How should the court interpret those results and other similar results reported in Appendix A?

**Defendants' Response:** In a regression model, one may have a set of independent variables that is *jointly* significant while none of the independent variables are *individually* statistically significant. The F test results for the defense experts' regression analyses, presented above in response to Question I.5, indicate that in each regression model that the defense experts ran, the set of independent variables were *collectively* significant. However, as the results presented in Appendix 2 to the Dutra-Greulich Report indicate, in some models none of the independent variables are *individually* statistically significant.[10] In such cases, we conclude—as stated above in the response to Question I.5 above—that the model explains the variation of filled civil service positions or net hires better than an intercept-only model, and this finding is unlikely to have occurred by chance. This is a valid conclusion even if none of the independent variables individually have a statistically discernable effect on filled positions.

      The models reported in Appendix 2 of the defense experts' report rely on available data and account for the structure of factors impacting CDCR's filled positions and hires. In particular, BLS data are only available on an annual basis, and the number of CDCR authorized positions changes infrequently, generally every 6 months. (9/29/23 RT at 134:12-135:24.)

      Generally speaking with sufficiently voluminous data it is almost inevitable that individual variables' coefficients would be *statistically* significant, *i.e.*, measured with precision. However, coefficients that are precisely measured in hypothetical voluminous data need not be *economically* significant, *e.g.* one may very precisely measure the relationship between pay and employment

---

[10] Dutra-Greulich Report, Appendix 2 Tables A1-A5. In other models, such as (9)-(12) which specify separate classification-specific relationships between CDCR pay or pay premiums and filled positions, one or more variables are individually statistically significant in addition to the set of all independent variables being jointly significant.

1 levels and that precisely measured relationship is zero.[11]

2     For example, suppose hypothetically that a regression model similar to model (1) in Appendix Table A1 of the Dutra-Greulich Report but estimated using millions of observations results in a point estimate of 0.00001. Suppose further that this estimate is measured precisely, such that the 95% confidence interval is (0.0000095, 0.0000105). Since zero does not fall within the confidence interval, one can say that this estimate is statistically significantly different from zero at a 95% confidence level. However, the interpretation of this result is that CDCR filled positions for the mental health classifications at issue are 0.001% higher for every 1% increase in CDCR pay, controlling for the same factors as are included in model (1) in Appendix Table A1. Although this hypothetical result is statistically significant, it is not economically meaningful. A 1% increase in pay is associated with only a 0.001% (one one-thousandth of one percent) increase in filled positions. There were 1,313 civil service filled positions for the 5 classifications at issue at non-PIP facilities as of December 2022. Applying this hypothetical statistically significant estimate suggests that one would expect a 1% increase in pay to fill 0.013 additional positions.

    It could simply be the case that pay is not the chief motivating factor that incentivizes individuals to accept employment and remain employed at CDCR. Other factors, such as working conditions, location, and the availability of telework may have a more substantial impact than pay on mental health providers' employment decisions. This is not an explicit opinion in the defense experts' report, but the findings of that report are consistent with such a hypothesis.

    **7.** *Question:* Is it reasonable to expect factors other than wages, the coronavirus pandemic, a time trend, and the other variables reported in the defense experts' regression models to explain differences in hiring and retention? For example, is it reasonable to expect working

---

[11] "With a huge sample, even a tiny effect will be highly significant…With a large enough sample, a statistician could compute an impressively small p-value. This p-value would confirm that the difference does not result from chance, but it would not convert a trivial difference…into a substantial one." Federal Judicial Center, Reference Manual on Scientific Evidence 252-253 (3d ed. 2011). Also: "Practical significance means that the magnitude of the effect being studied is not de minimis—it is sufficiently important substantively for the court to be concerned…However, it is possible with a large dataset to find statistically significant coefficients that are practically insignificant." *Id.* at 318-319.

conditions, location, and the availability of telework to have an effect on hiring and retention? How should the court consider the omission of these variables in evaluating the coefficient estimates reported in Appendix A to the Greulich report?

***Defendants' Response:*** The scope of the defense experts' regression analyses was limited to assessing the relationship between pay and either employment or hiring. The defense experts agree that other factors such as working conditions, location and commute times, and ability to telework likely affect employment and hiring at CDCR.[12] Due to a lack of quantifiable data on these measures (not just for CDCR but for all employers among which CDCR employees and potential hires consider employment opportunities), the defense experts were unable to control explicitly for these factors in their regression analysis.

However, it is reasonable to assume that other factors such as working conditions, location, commute times, and ability to telework are partially reflected in the variables included in the defense experts' regression analyses, in particular the CDCR, California and U.S. salary measures. To the extent that these other factors affect pay, they are likely capitalized into the base pay measures in defense experts' regressions. Similarly, the time trend and COVID indicator variables may capture a portion of the time-dependent variation in working conditions, location and commute times, ability to telework, and other factors at CDCR relative to other employers. To the extent the variables in the defense experts' regression analyses do not capture these factors, they are incorporated within the error term in each regression.

Moreover, the fact that the defense experts did not find evidence indicating that CDCR's mental health employees and potential hires respond to changes in base pay is consistent with a hypothesis that factors other than base pay are impacting their decisions on where to work. However, to the defense experts' knowledge, systematic, quantifiable data on such other factors for all employers (not just CDCR) does not exist. Thus, this hypothesis cannot be tested explicitly for each potentially-influencing factor.

---

[12] This is also acknowledged in Defendants' response to Question I.3, above. *See* Pltfs.' Ex. 24 at PL-024.010 – 024.011, PL-024.042 – 024.044, PL-024.054 – 024.055, PL-024.073 – PL-024.075, & PL-024.086 – PL-024.088; *see also* 10/03/23 RT at 15:1-6.

8. *Question:* Do the regression models reported in Appendix A to the Greulich report disprove that larger increases in wages could increase employment and retention?

*Defendants' Response:* See above response to Question I.3. Although Question I.3 refers to the defense experts' reports instead of the regression models in Appendix A, it otherwise appears to seek the same information and elicits the same response from Defendants.

## II. POSSIBLE OTHER STEPS DEFENDANTS COULD TAKE?

1. *Question:* What inferences, if any, can or should the court draw from the absence of evidence concerning any other options available to defendants to come into compliance with the court's staffing orders, including but not limited to clustering of *Coleman* class members at locations most easily staffed with mental health clinicians and/or voluntary reduction of the mentally ill prison population?

*Defendants' Response:* While it is Defendants' burden to demonstrate that they took all reasonable measures but were nonetheless unable to comply with the Court's staffing orders setting a 90% threshold for compliance, it is not their obligation to demonstrate why they have not taken unreasonable measures. *See F.T.C.*, 179 F.3d 1239 (discussing burden); *see also* Defs.' Closing Brief, ECF No. 8019 at 28-32 (discussing why Defendants are not obligated to take unreasonable measures). Clustering and a reduction of the State's incarcerated mentally ill population are inherently unreasonable measures.

The parties discussed the concept of further clustering of patients within the MHSDS over five years ago. As CDCR indicated at that time in the parties' October 11, 2018 Joint Status Report, which Defendants incorporate herein, at the Special Master's request, CDCR "explored whether further clustering would improve staffing fill rates and has determined that it would not" for several reasons. Joint Status Report Re Oct. 11, 2018 Status Conf., ECF No. 5922 at 18; *see also id.* at 17, 19-29. First, EOP patients frequently have difficulty following directions and generally require more time and attention from all staffing, including mental health, custody, nursing and medical. *Id.* at 18-19. An institution that is entirely populated with EOP patients would likely increase staff burnout and job dissatisfaction, leading to higher staff turnover. *Id.* Second, clustering would create additional population challenges insofar as inmates have

additional case factors, such as physical or developmental disabilities or medical needs that make them difficult to place. *Id.* at 19-20. Third, history has shown that grouping high acuity inmates in geographically desirable locations does not guarantee that CDCR will be able to hire the staff to provide care to such a large, higher acuity population. *Id.* at 20-21. In 2018, CDCR noted that of the 15 institutions that housed EOP inmates, 9 were located in large metropolitan or geographically desirable areas, and CDCR clustered approximately 70% of the EOP patients at those 9 institutions. *Id.* at 20. But despite the location of these institutions, seven of the nine had psychiatry vacancy rates greater than 10 percent. *Id.* In short, "further clustering of the [Enhanced Outpatient Program (EOP)] populations is not a viable solution to resolve its staffing challenges due to the constraints placed on population management and timely transfers, the limited effect further clustering would have on staffing recruitment, the need for adequate office and treatment space at the institutions, and the adverse effects on staff morale and retention caused by housing the sickest patients together." *Id.* at 10:6-10.

Moreover, while clustering EOP and CCCMS patients is not a viable solution to address staffing shortages, providing treatment via telemental health is. The vast majority of CDCR's MHSDS is comprised of patients at the EOP and CCCMS levels of care. Joint List of Stipulated Facts, ECF No. 7956 at ¶ 18. The patients at these lower levels of care can and do regularly receive treatment via telepsychiatry. (10/03/23 RT at 203:1-2; 10/04/23 RT at 12:24-13:3.) And, as Defendants demonstrated during the evidentiary hearing in this matter, CDCR is in the process of rapidly expanding telepsychology and telesocial work. (10/03/23 RT at 238:19-24; 10/04/23 RT at 14:12-24.) Defendants have experienced great success in filling vacant psychiatry positions through their telepsychiatry program, in part because CDCR can recruit for these positions from a bigger pool of candidates in metropolitan areas. (9/29/23 RT at 82:1-4; 10/03/23 RT 76:76-77:4, 225:18-23, 229:18-24, 240:2-8; 10/4/23 RT at 10:17-21.) Defendants expect to begin filling vacant onsite psychology and clinical social worker roles through telemental health as soon as December 2023. (10/04/23 RT 14:12-24.) And if history is any indication, Defendants expect to see their expansion of telemental health coincide with a large reduction in the vacancy rate among psychologists and social workers. (*See* 9/29/23 RT at 82:1-4; 10/04/23 RT 12:24-13:3.)

Nor is a reduction in the State's incarcerated mentally ill population a reasonable measure that Defendants must implement in order to avoid a finding of contempt. As an initial matter, there is no evidence that the incarcerated population would experience greater access to mental health care services outside of CDCR custody. To the contrary, Defendants' expert testified that CDCR inmates enjoy greater access to mental health services than California's adult population. In fact, in 2022, CDCR inmates had roughly 18.3 times greater access to psychiatrists, 13.7 times more access to psychologists, and 3.9 times more access to social workers than California's adult population. (Pltfs.' Ex. 24 [Dutra-Greulich Report] at PL-024.051 ¶ 99; *see also id.* at Table 2 at PL-024.052.) CDCR inmates' access to each of these three providers—psychiatrists, psychologists, and social workers—has exceeded that of California's adult population since at least 2018. (*Id.*) This testimony was not refuted or contradicted in any manner by Plaintiffs or their expert. In this context, it is not reasonable for the State to consider a measure that demonstrably will expose class members to *fewer* mental health resources than they currently experience.

Finally, the State must balance competing concerns of the utmost importance, including adequate staffing on the one hand, and risk to public safety, victim's rights, and risk of recidivism on the other. CDCR's institution and camps population decreased by 23,688—or 20 percent—since the start of the COVID-19 pandemic.[13] Thousands of incarcerated persons were released from institutions and camps through the COVID-19 early-release programs. *See Plata v. Newsom*, No. 4:01-cv-01351-JST (N.D. Cal.) at ECF Nos. 3389 at 2:4-5:4 & 3530 at 11:8-15. But these and other early-release programs were discretionary in nature and even persons who may be *eligible* for parole may nonetheless be determined not to be *suitable* for parole due to the unreasonable risk of current danger they pose. Given that CDCR's inmate population is among the lowest level it has been in decades,[14] a further reduction is not appropriate or helpful at this time.

---

[13] This figure is calculated by taking the difference between the total population in institutions and camps on March 11, 2020 and October 25, 2023. Weekly population reports can be found at https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2/.

[14] *See* Molly Sullivan, *California prison population drops below 100,000 for the first time in 30*

### III. ABSENCE OF TESTIMONY FROM PERSONS WITH ULTIMATE AUTHORITY?

**2.** *Question:* At hearing, defendants did not offer testimony from any person with the ultimate decision-making authority for defendants with respect to budgeting, hiring, class member housing locations or population management. What inferences, if any, can or should the court draw from this aspect of the record?

***Defendants' Response:*** As stated above, to defend against a finding of civil contempt, Defendants must demonstrate that they have taken all reasonable steps to comply with this Court's staffing orders. *See Kelly*, 822 F.3d at 1096. To do so, Defendants called as witnesses those persons most knowledgeable about CDCR's efforts to improve recruitment and retention among mental health professionals—Jasinda Muhammad, Angela Ponciano, Dr. Toni Martello, and Dr. Amar Mehta. While these persons may not possess "ultimate decision-making authority," they represent the person at the highest leadership level within the State with the most knowledge over their particular subject matter. Moreover, there is not simply one "ultimate decision maker" with respect to CDCR's budgeting, hiring, class member housing locations or population management. Thus, the fact that someone at a higher leadership level—but with an inferior knowledge of the State's specific recruitment and retention efforts—did not testify is therefore irrelevant and no inferences should be drawn.

### IV. CERTIFICATION

The undersigned certify that they have reviewed the following orders in the preparation of this filing: *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal. 1995); 183, 3613, 7742, 7808.

DATED: October 31, 2023

ROB BONTA
Attorney General of California

By: _____*/s/ Damon McClain*_____
DAMON MCCLAIN
Supervising Deputy Attorney General
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

---

*years*, July 31, 2020, https://www.sacbee.com/news/local/crime/article244633057.html.

1

2  DATED: October 31, 2023                HANSON BRIDGETT LLP

3

4
                                          By:    /s/ Samantha Wolff
5                                             LAWRENCE M. CIRELLI
                                              PAUL B. MELLO
6                                             SAMANTHA D. WOLFF
                                              LAUREL E. O'CONNOR
7                                             *Attorneys for Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20076741.3                    16                  Case No. 2:90-CV-00520- KJM-DB
DEFENDANTS' SUPPLEMENTAL BRIEF