DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
MARISSA HATTON - 348678
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' BRIEF ADDRESSING QUESTIONS IN ORDER OF OCT. 25, 2023, ECF NO. 8031**<br><br>Date: Nov. 2, 2023<br>Time: 10:00 am<br>Crtrm.: Remote<br><br>Judge: Hon. Kimberly J. Mueller |

[4381811.6]

# INTRODUCTION

## I. QUESTIONS REGARDING ECONOMICS EXPERT TESTIMONY

### A. Bullet 1, Market Analysis and Satisfying Eighth Amendment and Court Orders.

*The Eighth Amendment and numerous court orders applying the Eighth Amendment require defendants to hire enough mental health staff "'to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" Coleman v. Wilson, 912 F. Supp. 1282, 1306 (E. D. Cal. 1995) (internal citation omitted). It is settled that the level of staffing required to satisfy the Eighth Amendment and court orders in this case is determined by the ratios of staff to inmate-patients in defendants' 2009 Staffing Plan, ECF No. 3693, as modified, at a ten percent maximum vacancy rate. See generally, e.g., February 28, 2023 Order, ECF No. 7742. Does the fact that defendants are required by the Eighth Amendment and court orders to meet the demand for mental health staff affect an application of market analysis in this context? If so, how is that analysis affected?*

No, the fact that defendants are required by the Eighth Amendment and court orders to meet the demand for mental health staff does not affect an application of market analysis in this context. Neither the Eighth Amendment nor the remedial orders in this case require Defendants to conduct a market analysis. Defendants chose a labor market analysis as a method of proof in a failed attempt to show either that hiring mental health practitioners is impossible or that their efforts up to now comprised all reasonable measures to comply. In the context of civil contempt, a labor market analysis is no more important than any other method of proof. While it is conceivable that a more rigorous standard could apply to a contemnor's methods of proof where, as here, their underlying violation jeopardizes basic human needs, the Court need not reach that question. Defendants have failed to meet their high burden—through any method of proof—to show "categorically and in detail" that compliance with this Court's orders is impossible. See *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973); *Fotin v. Commissioner of Mass. Dep't of Public Welfare*, 692 F.2d 790, 796 (1st Cir. 1982).

Indeed, Defendants' market analysis did not enable their expert to opine, categorically, that CDCR is unable to fill its vacancies for any of the five clinician categories at issue here. See, e.g., Tr. 09-29-23, 167:11–16 (Dr. Greulich) (psychologists); Tr. 10-3-23, 23:3–11 (social workers); 23:24–24:5 (medical assistants); 6:23–7:2 ("I'm sure they can

continue to hire recreational therapists."). Similarly, the market analysis done by the defense experts does not support the conclusion that it is impossible for CDCR to hire in the current market; at trial, the strongest position their expert could take was that filling positions in the current market is "more difficult." Tr. 10-3-23, 6:4–10. The defense experts did not—and could not— offer opinions on whether CDCR has taken all reasonable steps to comply with the Court's orders, See Tr. 10-03-23, 24:14–19, and their abstract market analysis does not compensate for a lack of practical, real-life evidence that CDCR has taken all reasonable steps to comply with the Court's orders (such as evidence that CDCR made attempts to improve working conditions or raise salaries substantially, to no avail). Defendants' market analysis does not show that it is impossible to hire clinicians and it does not meet their high burden to justify continued noncompliance with the Court's orders, regardless of the Constitutional right that underlies those orders.

For the reasons stated above, Defendants' asserted defenses of "impossibility" and "all reasonable measures" would fail even if this were not a Constitutional case.  The failure of these defenses is all the more profound because of the basic human needs at stake. Defendants offered no testimony from the policy makers with power to add budgetary resources to their compliance efforts.  Instead, they offered testimony from four officials charged with trying to comply within the resources already budgeted.  The "reasonableness" of the available compliance steps is not measured by existing state budgets.  See *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 392, (1992).  Defendants had the burden to show that deployment of *additional resources* beyond what the State has already budgeted would have been unreasonable, and they presented no witness with first-hand knowledge to testify on that question.  (See Section III below.)

In summary, the answer to the Court's question is "no," because the only role of market analysis in this proceeding is as Defendants' chosen method of trying to prove either "impossibility" or "all reasonable measures," and the analysis showed neither thing.

### B. Bullet 2, Inflation

*Did the defense experts consider inflation?  If so, how? If not, why not?*

The defense experts did not consider inflation where it mattered: in their unsubstantiated attempt to blame CDCR's 2020–2023 vacancy trends on the COVID-19 pandemic, despite CDCR's failure to offer wages that kept up with double-digit inflation during the same time.

The defense experts' report suggested that the COVID-19 pandemic was related to CDCR's staffing difficulties between 2020 and 2023, a narrative that Dr. Greulich echoed at trial. However, the defense experts assumed a relationship between the pandemic and CDCR's deficient staffing without making any attempt to control for—or exclude as a contributing factor—CDCR's failure to keep up with inflation during that same time. In a seeming reversal of opinion, Dr. Greulich testified on cross examination that she was *not* drawing the conclusion that CDCR's vacancy rates were "related" to the COVID-19 pandemic, and instead that her singular focus on the pandemic was "just an observation" that CDCR's chronic vacancies and the pandemic were "coincident." Tr. 9-29-23, 172:15–23. Beyond noting a coincidence—a concept that has no value in scientific analysis—the defense experts did not attempt to offer an economic analysis of the relationship between the pandemic and vacancy rates. The defense experts did not consider whether CDCR's failure to keep up with inflation between 2020 and 2023 accounted for the spike in vacancies at that same time. Nor did they consider the compounding impact of both CDCR's stagnant wages and the stresses of the pandemic on mental health workers (and particularly those working in prisons) as a possible reason for spike in vacancies. Instead, Dr. Greulich testified that she and her colleagues "did not look into -- do an evaluation comparing the possible reasons for the spike." Tr. 9-29-23, 171:8–15.

### C. Bullet 3, Wages

*Assume for sake of argument that California Department of Corrections and Rehabilitation (CDCR) wages generally are higher than wages paid by other employers in California and the United States at large. Do the defense experts' reports disprove that defendants (1) could increase hiring and retention by raising wages further or (2) cannot use other measures to increase hiring and retention?*

The defense expert did not offer opinions on whether (or how) CDCR could increase hiring and retention through any means. See Tr. 10-3-23, 16:5–18. At trial the defense expert was unaware of the steps CDCR has taken to increase hiring and retention and testified at trial that she was unable to say if CDCR had taken all reasonable steps to increase hiring. Tr. 10-2-23, 23:7–25:9. With respect to the Court's specific questions:

(1) The defense experts' report did not disprove that raising wages could increase CDCR's hiring and retention, nor could it. Dr. Greulich testified that she and her colleagues did not even consider the impact of higher salaries on hiring and retention in rendering their opinions. See Tr. 10-3-23, 13:11–14 (Q: "You did not assess whether higher salaries would have an impact on vacancies, though, right?" Greulich: "Again, if you're asking if we plugged in hypothetical values of higher salaries, the answer is no."). While Dr. Greulich admitted that "there are salary premiums that CDCR can offer to get more people to stay in their jobs," she offered no opinion on what magnitude of premiums—whether small or large—would actually be needed to fill vacancies. Tr. 10-3-23, 14:20–25.

(2) The defense experts cannot disprove what they did not attempt to study. At trial, defense expert Dr. Greulich testified that, with the exception of telehealth, she had no opinion on how CDCR's working conditions could be improved to increase hiring and retention. Tr. 9-29-23, 166:22–167:2. While Dr. Greulich noted that increasing wages "is one of many options in [CDCR's] arsenal" to enhance hiring, Tr. 10-3-23, 13:20–25, she and her colleagues did not study the potential effects of nonmonetary options available to CDCR. Tr. 9-29-23, 166:22–167:2; Tr. 10-3-23, 15:7–12; 16:15–18 (Q: "You didn't attempt to study what the nonmonetary compensation would need to be to get people to take jobs in CDCR, right?" Greulich: "No.").

**D.   Bullet 4, Responsiveness to Wage Changes**

*Do the defense experts rely on academic studies about whether and how healthcare <u>providers respond to changes in wages?</u> If so, are their opinions about those studies reflected in their reports? Please provide pin citations. If not, why not?*

The defense expert did not testify regarding employee responsiveness to wage changes (which is an economic concept), and instead testified on patient-provider shortages in the community (a health policy concept). The defense experts' report contains no

discussion of employee responsiveness to wage changes, also known as wage elasticity.

### E. Bullet 5, Tests of Regression Model

*Did the defense experts test how well the regression models reported in Appendix A of the Greulich report explained variations in the data, such as by using an r squared measurement, F-test or a similar method? If so, what were the results of these tests, and how should the court interpret those results?*

The defense expert made no mention of an r-squared measurement, F test, or similar measurement during trial, and there is no mention of any such measurement in the defense experts' report. It is important to have both tests, because is possible to have a high r-squared value but a statistically insignificant F-test. See Federal Judicial Center, Reference Manual on Scientific Evidence 293, 345 and fn. 86 (3d ed. 2011) ("As a general rule, courts should be reluctant to rely solely on a statistic such as $R^2$ to choose one model over another. Alternative procedures and tests are available. . . . [t]hese include *F*-tests and specification error tests."). Because a core defect in the defense experts' regression model is that it used too few data points to be able to detect any statistically significant relationship, an F-test is necessary to evaluate whether their model is statistically significant as a whole. It is standard for all commercially-available software used for regression analyses to automatically run both of these tests and to make them available.

### F. Bullet 6, Regression Model Coefficients

*In several of the regression models reported in Appendix A to the Greulich report, it appears none of the coefficients was statistically significant. See, e.g., Appendix 34 Table A1 (results reported in column (1)). <u>Does this mean none</u> of these variables 35 had any observed effects on filled positions? How should the court interpret those 36 results and other similar results reported in Appendix A?*

Many of the regression models in Appendix A purport to show no statistically significant coefficient. If the model had been constructed reliably, this lack of observed effects could potentially provide useful information about the relationship between wage increases on filled positions—albeit limited only to the effectiveness of wage increases that CDCR has already tried. Tr. 10-3-23, 9:22–25; 14: 10–13 ("We did not consider the impacts of hypothetical salaries."). However, as described immediately below, the regression model uses too few variables—despite the availability of the absent data—to reliably capture

CDCR employees' responsiveness to wages. The lack of reliability in the defense experts' regression model is evidenced by the fact that some of its results defy common sense. For instance, the defense experts' analysis purported to find a statistically significant negative relationship between salary and filled positions for CDCR's psychologists, meaning that the lower CDCR's wages go, the more positions it will fill. See Def. Ex. 5 at p. 70 (Figure 20). Moreover, the defense experts identified their expected relationship between wages and filled positions through a confidence interval—which is the range of numbers that they are 95% certain could be the true numerical value of the relationship—that spans the entire graph; meaning true responsiveness to wages could be as low as -8% or as high as 16%. See *id.* (Figure 20, bottom line).

### G.  Bullet 7, Factors Other Than Wages

*Is it reasonable to expect factors other than wages, the coronavirus pandemic, a time trend, and the other variables reported in the defense experts' regression models to explain differences in hiring and retention? For example, is it reasonable to expect working conditions, location, and the availability of telework to have an effect on hiring and retention? How should the court consider the omission of these variables in evaluating the coefficient estimates reported in Appendix A to the Greulich report?*

The defense expert testified at trial that nonmonetary attributes of a job, such as location, working conditions, and availability of telework do indeed matter for hiring and retention. Tr. 10-3-23, 15:1-6; 9-29-23, 76:19-21. Omission of these and other variables results in an unreliable model. Tr. 10-4-23, 181: 3–8.

Where the defense experts could have used data for the existence and/or availability of telework at different prisons (33 data points), they did not consider tele-mental health availability at all (0 data points). See Def. Ex. 5, Appendix A at vii–xi (describing variables used in regression model). Where the defense experts could have used monthly salary data over five years to account for seasonal variation in the market (60 data points), they only looked at two data points in each of those five years (10 data points). See *id*. Monthly salary data points over five years for all five positions at issue would have resulted in 300 data points. On the other hand, two data points per year for those same five positions would yield

a total of 50 data points. The defense experts used only 45 data points, presumably because biannual data was not available for the second half of 2023. See *id.* at xi (Appendix Table A 1) and xiii (Appendix Table A 3) (showing maximum number of observations, or "Num. Obs.," as 45 data points).

Where the defense experts could have accounted for location by using individualized data for all of CDCR's 33 prisons (33 data points), they instead lumped together every prison in every differing location into a single measurement (1 data point). Factoring the thirty-three prisons' unique locations across salary and position would have yielded 19,800 data points to measure employee responsiveness to wages in particular locations. Instead, the defense expert's' model uses 45 data points, and does not account for location. See *id.*; see also Tr. 10-4-23, 180:21–181:8; 182:3–7 (Dr. Brown).

### H. Bullet 8, Do Regressions Disprove that Larger Increases in Wages Could Increase Employment and Retention.

*Do the regression models reported in Appendix A to the Greulich report disprove that larger increases in wages could increase employment and retention?*

No, as stated by Dr. Greulich during trial. She explained that the regression models are "generalizable within small . . . increase[s] relative to historical premiums" and that an application of the models to "a larger increase on top of what's been historically observed" at CDCR comes "with greater uncertainty." Tr. 10-3-23, 20:3–13. Dr. Greulich could not say what magnitude of salary increases her model would reliably apply to. Tr. 10-3-23, 20:19–21:1 ("[A]t what point, you know, it starts becoming more uncertain, I don't have an opinion on that."). Dr. Greulich testified that "it's possible" that "[i]ncreased rates of premiums could result in a different type of responsiveness than previously seen in workers" and "might decrease vacancies." See Tr. 10-3-23, 21:2–9.  However, she did not study, and offered no opinion on, what magnitude of salary would be effective at increasing hiring and retention at CDCR. See Tr. 10-3-23, 15:21–16:18. In other words, the regression model cannot be generalized to larger increases that might attract and retain workers, and it cannot disprove the effect of such increases on hiring and retention.

## II. POSSIBLE OTHER STEPS DEFENDANTS COULD TAKE

*What inferences, if any, can or should the court draw from the absence of evidence concerning any other options available to defendants to come into compliance with the court's staffing orders, including but not limited to clustering of Coleman class members at locations most easily staffed with mental health clinicians and/or voluntary reduction of the mentally ill prison population?*

For any options or steps available to the Defendants and within their power—but absent from their presentation of evidence—the Court should draw the inference that Defendants have not considered or taken those steps. Defendants agreed that they bear the burden to demonstrate that they took all reasonable steps.  Tr. 9-29-23, 8:22-25.  Defendants offered almost nothing on improving work conditions. *See* Tr. 10-4-23, 104:20-105:14 (adding some modules at San Quentin, no focus on providing workspaces with windows for clinicians).  As for other options, Dr. Mehta offered none when asked twice by Defendants' counsel for other things that could be done.  Tr. 10-4-23, 105:15-22 (direct); 145:7-23 (re-direct). Defendants offered no evidence of attempts to improve working conditions for mental health staff who spend their days in rodent-infested prisons, under leaking ceilings, without adequate or functioning air-conditioning systems, and without even the most basic of comforts.  *See* Tr. 10-5-23, 29:17-30:16; 31:2-11.

Plaintiffs presented evidence and questioned defense witnesses about non-compensation reasonable measures that Defendants have not pursued.  Defendants have not pursued filling some social work functions with Licensed Marriage and Family Therapists (LMFT), a category that CDCR employs for substance abuse programs, and that CDCR previously piloted for the mental health program.  Tr. 10-4-23, 128:13-129:18 (Dr. Mehta); (Pl. Corrected Closing Brief, ECF No. 8023 at 43-44.).  They have not pursued improving the basic working environment for clinicians.  (Pl. Corrected Closing Brief, ECF No. 8023 at 38-39.).  They have not pursued previous plans to provide more non-clinical support for clinicians.  (*Id.* at 44.)  They have not sought waivers of state laws on hiring despite evidence that such waivers helped to fill medical positions.  (*Id.* at 44-45.)  And they have not rolled out changes to streamline their extremely lengthy hiring process beyond a single

prison, despite identifying concrete steps to shorten the process from 108 business days to 65 business days over a year ago after studying the problem for six full years. (Pl. Corrected Closing Brief, ECF No. 8023 at 43.).

To avoid contempt Defendants had to show that they took "all reasonable steps within the party's power" to come into compliance. *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 945 (9th Cir. 2014); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016). Defendants offered no evidence to show why the steps identified above were not reasonable and not within their power. Indeed, as discussed in the following section, they failed to present witnesses with the requisite authority to testify to the full extent of what is within CDCR's power.

The Court's two examples, clustering and voluntary population reduction, are within Defendants' power. Defendants offered no evidence that either measure is unreasonable. The Special Master has recommended, and the Court ordered, Defendants to develop clustering plans that would place "higher acuity inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained." *See* Order, ECF No. 5711 at 26. On July 2, 2020, the Court ordered briefing on whether clustering "is a feasible option for achieving full and durable compliance with the Program Guide and other remedial requirements of this action sooner rather than later." ECF No. 6750 at 1-2.

In their response to the July 2, 2020 Order, Defendants did not assert that further clustering was outside their power. Indeed, they stated that "CDCR already clusters class members." ECF No. 6769 at 7-8 (describing in detail existing clustering of patients). Defendants stated that they had analyzed further clustering prospects in response to prior Court orders and determined that further clustering would not improve compliance with staffing requirements. *Id.* at 9-12. This analysis is now over three years old. Testimony at the recent evidentiary hearing confirmed that staffing is harder in some locations than in others. Tr. 10-3-2023, 48:11-14 (Ms. Muhammad testifying that CDCR's contract recruiter has difficulty filling positions in "less desirable locations; the remote institutions proved a challenge.") The lack of any recent attention to clustering shows that Defendants have not

exhausted all reasonable measures to come into to compliance.

The same July 2020 order that directed briefing on clustering also directed briefing on "[w]hether defendants are or soon will be planning for additional voluntary releases or sentencing reforms that would reduce the size of the plaintiff class in sufficient numbers" to achieve compliance. ECF No. 6750 at 2. Defendants' response asserted that there were more than sufficient beds for the *Coleman* class, while conceding in a footnote that "[s]taffing continues to be an urgent priority." ECF No. 6769 at 15 & *id.* n.5. Defendants acknowledged that voluntary population reductions are within their power, and that they had started such reductions in response to the pandemic. *Id.* at 16:3-18:3. What Defendants have never done, however, is target voluntary population reductions to the *Coleman* class. Indeed, the number of incarcerated persons with severe mental illness has remained above 31,000 people, even while CDCR's population dropped from 125,686 in 2019 to 96,792 in 2022. *See* Defendants' Exhibit 027 at page 2. As a percentage of the total in-custody population, the *Coleman* class increased from just under 29% in 2019 to over 33% in 2022. *Id.* The recent evidentiary hearing testimony confirms that number of mental health patients drives the need for staffing, as staffing allocations rise and fall as the patient population rises and falls. Tr. 10-4-23, 74:9-75:12 (Dr. Mehta describing twice a year staffing adjustments), 106:7-107:10 (Dr. Mehta testifying that staffing allocations go down when population goes down). The pandemic-era population reduction shows that voluntary reduction is within Defendants' power. The absence of any evidence that Defendants even considered such measures shows that they have not taken all reasonable measures to comply. It is not necessary, however, for the Court to address whether voluntary population reduction was a reasonable step that Defendants omitted. Their omission of so many other reasonable steps more than justifies their liability for contempt, without adding an additional reason that unnecessarily raises questions regarding limits on the single-judge court's power under the Prison Litigation Reform Act. *See* 18 U.S.C. Section 3626(g)(4) (defining "prisoner release order" to include "any order . . . that has the purpose or effect of reducing or limiting the prison population . . .").

## III. ABSENCE OF TESTIMONY FROM PERSONS WITH ULTIMATE AUTHORITY

*At hearing, defendants did not offer testimony from any person with the ultimate decision making authority for defendants with respect to budgeting, hiring, class member housing locations or population management. What inferences, if any, can or should the court draw from this aspect of the record?*

The absence of testimony from any person with ultimate decision-making authority with respect to wages, budgeting, hiring, class member housing locations, or population management supports an inference that the Defendants persisted in business as usual, even in the face of contempt sanctions for failing to comply with the 2009 Staffing Plan. Defendants presented testimony from well-meaning officials describing how Defendants' ordinary recruitment, hiring and retention programs work. *See*, *e.g.* Tr. 10-4-23, 105:15-22 (Q: "What, if anything, more could you do, *pursuant to the rules that apply to you*, to try to fill these positions?" Dr. Mehta: "I honestly can't think of anything else *at my level*" that could be done (emphasis added); Tr. 10-3-23, 88:1–7 (Q: "What, if any, additional steps could you take, *consistent with state rules and regulations*, that you believe you have not taken to date, if any?" Muhammad: "I think that I would just continue to assess the filled vacant rates, consider any strategies or approaches that we haven't taken, and then make -- *make changes that are within my purview to do so*." (emphasis added)); *see also* Tr. 10-3-23, 133:6-12 (Muhammad confirming she knows of no additional available steps possible to her "that are within [her] purview and consistent with state law").

Defendants presented no evidence that they had escalated the issue to persons with authority to change recruitment, hiring and retention programs, much less to persons with any authority over population management or class member housing locations.

Drs. Mehta and Martello, as well as Ms. Ponciano and Ms. Muhammad, testified as to the efforts they could make with the resources they were given. But reasonableness of Defendants' efforts to comply with the Eighth Amendment and this Court's orders is not measured by the resources currently allocated to the task. The limits imposed by existing government budgets are not a defense to a failure to comply with Court orders grounded in violations of constitutional rights. See *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 392, (1992) ("[F]inancial constraints may not be used to justify the creation or perpetration

of Constitutional violations."); *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir.1992); *Craft v. Cnty. of San Bernardino,* 468 F. Supp. 2d 1172, 1178 (C.D. Cal. 2006) ("The Court is not unsympathetic to a governmental entity's contention that it must operate within a budget; however, the Court is precluded from excusing noncompliance with the Constitution on that basis. A lack of funds does not justify what is otherwise a constitutional violation.").

Defendants had the burden to show that deploying the *additional resources* needed to comply would have been unreasonable. Only higher officials responsible for budgeting, hiring, and population movement would have had firsthand knowledge on whether such a deployment of additional resources would have been unreasonable. No such officials testified. The absence of defense witnesses competent to so testify is fatal to the defense against contempt.

## **CERTIFICATION**

Plaintiffs' counsel certifies that he reviewed the following orders relevant to this filing: *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal. 1995); ECF Nos. 1383, 3613, 5711, 6750, 7742, 7699, 7916, 8031.

DATED: October 31, 2023         Respectfully submitted,

                                            ROSEN BIEN GALVAN & GRUNFELD LLP

                                            By: */s/ Ernest Galvan*
                                                      Ernest Galvan

                                            Attorneys for Plaintiffs