DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
MAYA E. CAMPBELL – 345180
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S PROPOSED RESOLUTION OF DATA REMEDIATION DISPUTES (AC5 – CORE GROUPS) (ECF NO. 8037)**

Judge: Hon. Kimberly J. Mueller

[4383357.2]

## INTRODUCTION

The Special Master has recommended that Defendants be required to track how many and what percentage of group treatment hours were conducted by a psychiatrist or primary clinician in their indicator related to treatment offered (AC5). That is the outcome mandated by the Program Guide and the longstanding monitoring practices of the Special Master, and it is what is best for patients. Defendants' arguments to the contrary are unavailing for the reasons discussed below.

## I. BACKGROUND

The AC5 indicator measures the structured treatment CDCR offers to patients. Plaintiffs did not request, and the Special Master does not recommend, that Defendants be *scored* on how many and what percentage of structured group treatment hours were conducted by a psychiatrist or primary clinician. The dispute turns only on whether Defendants should be required to report this information in a drill down report and a summary statistic, as the Special Master recommends. Defendants oppose this recommendation, while Plaintiffs and the Special Master maintain such reporting is necessary.

## II. DISCUSSION

First, Defendants' contention that tracking primary clinician- and psychiatry-led groups is "not mandated under the Program Guide," *see* ECF No. 8037 at 3, is simply incorrect. The Program Guide dictates that recreational or leisure activities cannot comprise the entirety of a patient's structured treatment. *See, e.g.*, 2021 Program Guide, ECF No. 7333-1 at 59–62 (listing numerous exemplar substantive EOP treatment groups, such as anger management, stress management, substance abuse group, and offering focused on rational behavior). Without tracking whether particular groups are leisure groups or more substantive clinical groups led by a primary clinician or psychiatrist, it is not possible to determine whether the former impermissibly comprise all of a patient's structured treatment. Thus, in order to comply with this Program Guide requirement, Defendants *must* track and report the types of groups offered to patients, and Defendants

offer no alternative way of doing so in lieu of the Special Master's recommendation. Defendants attempt to marshal the lack of a specific definition of "core groups" in the Program Guide to evade this obligation, but the Special Master's proposal—which does not count toward the scoring of AC5—strikes the proper balance between acknowledging the Program Guide's requirements and adapting to its occasional ambiguities.

Second, Defendants' assertion that tracking primary clinician- and psychiatry-led groups has not been "part of the Special Master's past monitoring," ECF No. 8037 at 3, is similarly inaccurate. As the Special Master explains, "monitoring teams obtain information regarding clinician-led groups through chart reviews and patient and staff interviews." *Id.* at 9. The Special Master's monitoring reports frequently highlight the fact that patients are receiving very few clinician-led groups, which is likely only becoming more true with the explosion of clinician staffing shortages. *See, e.g.*, Special Master's 28th Round Monitoring Report, ECF No. 7074 at 291 (Mar. 5, 2021) ("[EOP Patients] further reported that refusals were due to an insufficient number of core groups and too many recreational groups."); Special Master's 29th Round Monitoring Report Part C – EOP Compliance, ECF No. 7715 at 345 (Feb. 7, 2023) (noting that "[p]atients reported a desire to have more clinically oriented groups" including those covering topics such as "coping with mental illness, understanding one's diagnosis, and substance abuse"). To the extent the Special Master has not reported *the percentage* of groups that are clinician-led, that is only because CDCR has not made that information available. *See* ECF No. 8037 at 9 (Special Master recommendation noting that "[t]he data *provided to* the Special Master's monitoring team" has not distinguished between clinician-led and other groups (emphasis added)). And regardless, the Special Master's recommendation would not require factoring that information into the compliance measure of treatment offered, as noted above.

Third, Defendants' contention that the Special Master's proposed resolution will interfere with "the mental health needs of patients" and impede "the flexibility required to provide appropriate treatment" is nonsensical. Nothing about the proposal suggests an

assumption "that primary clinician or psychiatrist-led groups are *ipso facto* better (either more therapeutic or helpful) to patients than those led by other classifications." ECF No. 8037 at 3. For one thing, the mere tracking—without any effect on the scoring of AC5—of clinician- and psychiatry-led groups does not indicate a preference for those groups over others. And while Defendants assert that "the focus should remain on the clinical relevance and appropriateness of treatment groups to each patient's specific diagnosis and treatment plan," they point to no indicator that purports to measure this. *Id.* at 4. Moreover, as discussed above, the Program Guide prohibits the provision of *only* recreational or leisure groups as structured treatment; accordingly, the tracking proposed by the Special Master makes it possible to see whether there are issues with the relative mix of group treatment at a particular institution's EOP program and take appropriate action if necessary. Likewise, nothing about the proposal impedes the flexibility needed to treat patients effectively and on an individual basis. Tracking clinician- and psychiatry-led groups will not incentivize institution staff to inappropriately assign patients to those groups (even accepting the absurd implication of Defendants' statement that a glut of clinicians are available to conduct unnecessary clinical groups in the midst of the current abject staffing crisis); it will merely help to ensure that patients receive *at least some* such groups.

Nor do Defendants' unsubstantiated claims of technical limitations provide a basis to reject the Special Master's recommendation. Defendants claim first that EHRS cannot track the classification of a staff member for groups that patients refuse to attend, which they assert will result in an undercounting. *See* ECF No. 8037 at 4. This is a red herring. While Defendants may not track this information *in EHRS*, they do not—and cannot—dispute that they track in their underlying database each of the necessary elements to report the required information—what group was offered to the patient, and which classification of staff member conducted that group. Even if the patient in question refused to attend the offered group, Defendants nonetheless track who conducted that group—indeed, they must, in order to report it for the patients who did attend. That information exists in Defendants' data

warehouse, and Defendants have presented no evidence that it would be difficult or burdensome, much less impossible, to pull the necessary data to allow for reporting that will conform to the Special Master's existing monitoring practices—particularly given the availability of the Special Master's data expert to provide any necessary technical assistance.

Second, Defendants claim, without substantiation, that different staff members "*may*" check patients in and out of groups than the staff person conducting the group. *See* ECF No. 8037 at 4 (emphasis added). This, however, is contrary to Defendants' established workflow, and is a problem best addressed through training. Indeed, from Defendants' recitation, it appears to be a rare, largely hypothetical concern. *See id.* ("This [problem] *could* occur if a supervisor checks patients in and out while a line staff member, *i.e.* a new recreational therapist or nurse - facilitates the group." (emphasis added)). Defendants do not even insinuate that this is a large enough problem to meaningfully affect accuracy, and the stakeholders have routinely addressed known limitations of this sort by noting them transparently in the indicator documentation. Particularly because this information will not affect scoring, Defendants' objection is not well taken.

Defendants propose the creation of a new "reporting mechanism"—independent of AC5—that would "show[] the count of attended groups provided by the following classifications: Primary clinician, psychiatrist, recreational therapists, and all other mental health provider types." ECF No. 8037 at 5. This proposal is insufficient to capture what the Special Master puts forth in this proposed resolution for several reasons. First, by measuring the confidentiality of *attended*, rather than *offered* groups, Defendants fail to measure what the Program Guide requires, which is the *offering* of group treatment. Second, Defendants' proposed approach will inevitably report a larger percentage of confidential groups than would the Special Master's recommendation. That is because patients are more likely to attend confidential groups, and to refuse nonconfidential ones, as the Special Master has reported. *See, e.g.*, ECF No. 7074 at 497 ("During interviews several EOP inmates reported that one of the reasons they refused to attend group treatment was because it was held in the dayroom.") Third, Defendants' proposed

reporting mechanism would report a count, rather than a percentage, affords little to no useful information without more context. To the extent the Court is inclined to order a separate report, rather than a summary statistic, Plaintiffs request that the report go through the data remediation process.

**CONCLUSION**

For the reasons outlined above, Defendants should be required to track—by including drill down information and a summary statistic—how many and what percentage of group treatment hours were conducted by a psychiatrist or primary clinician. Plaintiffs agree with the Special Master's recommendation that this information not be considered in scoring AC5.

**CERTIFICATION**

Plaintiffs' counsel certifies that she reviewed the following Orders relevant to this filing: 7216, 7847, 7954, 8008, 8028.

DATED: November 3, 2023

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Ginger Jackson-Gleich*
Ginger Jackson-Gleich

Attorneys for Plaintiffs