ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' NOTICE OF ERRATA OF ECF NO. 8041** |

On October 27, 2023, Defendants filed objections to the Special Master's October 18, 2023 Proposed Resolution of Data Remediation Dispute: AC2.1 (Timely PC Contacts) – Definition of "Weekly." (ECF No. 8041.) Defendants intended to file the Special Master's October 18 proposed resolution at Appendix A. (*Id.* at 1, n. 1.) On November 6, 2023, the Court issued a minute order providing notice that Defendants did not include the Appendix A. That omission was inadvertent. This notice corrects Defendants' October 27 filing by submitting Appendix A, which is a copy of the Special Master's *Proposed Resolution of Data Remediation Dispute:*

1  *AC2.1 (Timely PC Contacts) – Definition of "Weekly,"* with pagination in the lower right hand

2  corner for ease of reference as A-001 through A-018.

3  Dated: November 6, 2023                    Respectfully submitted,

4                                              ROB BONTA
                                               Attorney General of California
5                                              DAMON MCCLAIN
                                               Supervising Deputy Attorney General
6

7                                              /s/ *Elise Owens Thorn*
                                               Elise Owens Thorn
8                                              Deputy Attorney General
                                               *Attorneys for Defendants*
9
   Dated:  November 6, 2023                    HANSON BRIDGETT LLP
10

11                                             /s/ *Samantha D. Wolff*
                                               PAUL MELLO
12                                             SAMANTHA D. WOLFF
                                               *Attorneys for Defendants*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX A

**Special Master's Proposal[1] for Resolving Data Remediation Dispute: AC2.1 (Timely PC Contacts) – Definition of "Weekly"**

I.     Brief Statement of Dispute

This dispute centers on the disagreement between the Special Master, plaintiffs and defendants regarding the definition of "weekly" for purposes of the following Program Guide requirement for frequency of routine primary clinician (PC) contacts for patients at the Enhanced Outpatient Program (EOP) level of care:

REQUIRED TREATMENT

… 2. *Weekly* clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week.

2021 Program Guide Update, ECF No. 7333-1 at 59 (emphasis added).

The Special Master interprets "weekly" as meaning the clinical contact must occur at least every seven days.  Defendants prefer a definition whereby "weekly" would mean the clinical contact must occur at least once every calendar week.  Plaintiffs agree with the Special Master's definition.[2]

II.    Date Proposed Resolution was Delivered to the Parties

This proposed resolution was delivered to the parties on October 18, 2023.

III.   Special Master's Proposed Resolution

The Special Master proposes that the definition of "weekly" for clinical contacts

---

[1] This proposal is made in accordance with the Court's October 11, 2023 Order modifying the data remediation dispute resolution process.  ECF No. 8008 at 2 ("For any dispute that remains unresolved at the end of a two-week period, the Special Master shall within seven days thereafter provide the parties with a proposed written resolution of the dispute, including a brief statement of reasons for the proposed resolution and the date on which the proposed resolution was delivered to the parties.").

[2] The parties each submitted position statements on this dispute under the former dispute resolution process.  *See* Exhibit A (plaintiffs' position statement) and Exhibit B (defendants' position statement).

be interpreted to mean that contacts must occur at least every seven days for this indicator.

IV.     Brief Statement of Reasons for the Proposed Resolution

The revelations contained in Dr. Michael Golding's whistleblower report regarding defendants' efforts to change the definition of "monthly" in the Timely Psychiatry Contact indicator for purposes of the Program Guide requirement that "[a] psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues" serve as a guidepost to this disputed definition.  ECF No. 7333-1 at 59.  Ultimately, the Court found defendants' efforts to change the definition of "monthly" from at least every 30 days to at least every 45 days "was a material change that was inconsistent with implementation of the relevant Program Guide requirement as established through more than a decade of practice."  December 17, 2019 Order, ECF No. 6427 at 29.  The same concept would be true here if the defendants' definition of weekly was adopted.  Such an interpretation would allow for clinical contacts to occur up to thirteen days apart at times, if for example, one appointment was scheduled on a Sunday in one week and then on a Saturday in the following week.

As a result of the need for clarity in interpretation of Program Guide requirements revealed by the Golding Report, the Special Master began explicitly noting his interpretation of "weekly" to mean every seven days in his Twenty-Eighth Round Monitoring Report.  *See, e.g.*, ECF No. 7074 at 558 ("Weekly clinical contact with the primary clinician was required to occur either individually or in group psychotherapy with individual clinical contact[s] occurring at least every other week.  Weekly primary clinician contacts were considered compliant if they occurred every seven days in an individual confidential setting (unless the inmate refused the confidential contact), or the inmate was seen every other week in a primary clinician-specific group."); *id.* at 688 ("A review of seven-day time frames indicated 30 that required primary clinician contacts

every seven days [at CSP/LAC].  Of these, 18 of 30 included primary clinician contacts within seven days.").  This same methodology of calculating compliance for weekly primary clinician contacts was used in the Special Master's Twenty-Ninth Round Monitoring Report.  *See, e.g.*, ECF No. 7715 at 552.  No objections were filed by defendants to the use of this definition by the Special Master in the compliance measure in either the Twenty-Eighth Round Monitoring Report or the Twenty-Ninth Round Monitoring Report.

As the Special Master communicated to the defendants during their August 29, 2023 meeting regarding this dispute, he was willing to have his team engage in further discussions regarding possible flexibility in the operationalization of the business rule.  Despite the Special Master's acknowledgement, willingness and recommendation to revisit defendants' concerns in another forum and discuss a possible compromise, defendants declined to engage in any further conversations.

# EXHIBIT A

**RBGG** | **ROSEN BIEN GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

August 25, 2023

VIA ELECTRONIC MAIL ONLY

Kerry Walsh
Deputy Special Master
kwalsh@pldolaw.com

Re:    *Coleman v. Newsom*: Plaintiffs' Level 2 Data Dispute Statements
       Our File No. 0489-03

Dear Kerry:

Plaintiffs' position statements for the following disputes are attached for consideration by the Special Master and the Secretary during their August 29, 2023 Level 2 dispute resolution meeting:

1)    AC 2.1 – Timely PC Contacts

      a)    Definition of "weekly" as 7 days

2)    AC5 – Treatment Offered

      a)    Group Treatment – Confidentiality

      b)    Group Treatment – Core Groups

3)    PIP Placeholder

      a)    Review of Max Custody patients in compliance with CDCR policy

                                     Sincerely,

                                     ROSEN BIEN
                                     GALVAN & GRUNFELD LLP

                                     */s/ Cara E. Trapani*

                              By:    Cara E. Trapani

Kerry Walsh
August 25, 2023
Page 2

## Definition of "Weekly" as 7 Days

**Issue:**  Should compliance with the Program Guide's weekly primary clinician contact requirement for various levels of care be measured as "every 7 days," as opposed to once a week, which would allow up to 14 days between contacts?

**Affected indicator:** AC2.1 – Timely PC Contacts

**Plaintiffs' Position:** Yes.  The reasonable interpretation of the Program Guide's weekly primary clinician ("PC") contact requirement is that patients should be seen at least once every seven days.  The business rules for the Timely PC Contacts (AC2.1) indicator should adhere to this logic, which aligns with the Court's reasoning in 2019 that CDCR's decision to define "monthly" as more than 30 days was misleading.  *See* Dec. 17, 2019 Order, ECF No. 6427 at 29.

CDCR argues that "weekly" should be defined in a way that would allow up to 14 calendar days between clinical contacts (though they claim that at most 11 days would elapse between contacts under CDCR's proposed methodology because clinicians do not schedule appointments on the weekends).  When the Court faced a similar dispute over divergent interpretations of the Program Guide during the 2019 evidentiary hearing, it turned to the Special Master's reports for clarity.  Here, those reports provide the answer. The Special Master has consistently interpreted "weekly" to be "every 7 days."  *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 224 ("Seven of ten required weekly routine PC contacts occurred every seven days."); 307 (measuring mainline EOP routine PC contacts as having to occur every seven days); *id.* at 300 (measuring routine PC contacts in the STRH and LTRH using the 7 calendar days requirement); *id.* at 190 (measuring EOP Hub routine PC contacts as having to occur "every seven days"); *id.* at 297 (measuring PSU routine PC contacts as having to occur "every seven days"); *see also* Special Master's 29th Round Report Part D – CCCMS Compliance, ECF No. 7716 at 267, 291, 326.

Not only is the Special Master's interpretation of "weekly" to be "every 7 days" reasonable, it must be incorporated into the business rules under the Court's May 24, 2023 Order.  *See* ECF No. 7847 at 7 ("[E]ach key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master as part of his monitoring responsibilities."); *id.* at 8 ("If an indicator requires modification to thoroughly capture information monitored by the Special Master on the topic covered by the indicator, each party has all relevant information: the Special Master's monitoring reports and all relevant court orders.").

Kerry Walsh
August 25, 2023
Page 3

## Group Treatment – Confidentiality

**Issue:** Should mental health treatment groups led by social workers, psychologists, and psychiatrists be counted towards fulfillment of structured treatment requirements when they occur in non-confidential settings?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** No. Clinician-led groups (i.e., those led by an LCSW, psychologist, or psychiatrist) should be confidential in order to be counted towards fulfillment of the Program Guide's structured treatment requirements.

The Program Guide contemplates that a varied slate of structured therapeutic activities will be offered to class members, including group therapy and psycho-educational groups led by qualified clinicians focusing on highly sensitive issues including symptom management, family issues, specific mental health issues such as depression, anger management and offense-specific therapy. *See* 2021 Program Guide, ECF No. 7333-1 at 60-62. However, CDCR maintains that essentially any group[1] can be held in non-confidential settings—including on the dayroom floor and in the middle of the yard with custody officers and other incarcerated people milling around—and still qualify as structured therapeutic treatment. This includes any and all groups led by psychologists, social workers, and psychiatrists, which are more likely to involve private issues requiring a strong and trusting therapeutic alliance that only confidentiality can provide, than those facilitated by recreational therapists or nurses, such as hygiene and leisure groups. The net effect is that CDCR could provide zero hours of confidential structured therapeutic activity to each and every class member on a permanent basis—either because it offers no core groups of any sort, or because core groups are offered in a non-confidential setting that defeats the therapeutic alliance—and still be deemed compliant. That is contrary to the clear intent of the Program Guide and this Court's orders.

CDCR does not dispute the fact that it already tracks both the confidentiality of all structured treatment, and whether the therapeutic activity was led by a PC or psychiatrist versus, for instance, a recreational therapist. Nor is it possible to dispute that CDCR must only count confidential structured therapeutic activities offered to STRH and LTRH class members, which are measured in AC5, as compliant. *See* 2021 Program Guide, ECF No. 7333-1 at 444 ("All [STRH] patients shall be offered 90 minutes of confidential structured group therapeutic activity weekly."); *id.* at 453 ("[I]nmates placed into the CCCMS-LTRH will be offered 90 minutes of confidential structured therapeutic

---

[1] The parties agree that mental health groups that occur cell-front (including patients' completion of in-cell treatment packets) should *not* count towards fulfillment in AC5.

Kerry Walsh
August 25, 2023
Page 4

activity."); *id.* at 452 ("CCCMS female inmates or CCCMS inmates undergoing RC processing will be offered 90 minutes of out-of-cell activity consisting of confidential structured therapeutic activity.").

The Court rejected Defendants' argument that psychiatry contacts need not be confidential  to satisfy Program Guide requirements.  *See* Aug. 14, 2019 Order, ECF No. 6242 at 7.  Given that clinician-led groups address many of the same sensitive, private issues discussed by patients and their psychiatrists in individual MHMD contacts, it is reasonable to extend this Order's confidentiality requirement to clinician-led groups.

The Special Master regularly monitors whether groups occurred in a confidential setting; this goes to both the place itself where the group is conducted and also that it is reasonably free of intrusions (e.g., the setting is private, but has a refrigerator in it and staff interrupt the group to retrieve their lunches).  *See, e.g.*, Special Master's 29th Round Report Part C – EOP Compliance, ECF No. 7715 at 230 ("[I]t was unclear why groups were held in the non-confidential day room."); 298 ("The EOP hub certifications suggested that non-confidential cell-front treatment groups conducted in the corridor of the PSU were counted toward treatment group hours."); 318 ("The observed treatment space for STRH and LTRH patients was non-confidential and located in the dayroom …").  The Special Master's history of monitoring this issue supports Plaintiffs' position that AC5 should into account whether clinical groups were confidential.  *See* May 24, 2023 Order, ECF No. 7847 at 7-8.

Kerry Walsh
August 25, 2023
Page 5

## Group Treatment – Core Groups

**Issue:** Should Defendants create a summary statistic showing the percentage of mental health groups that are led by a primary clinician or psychiatrist, as opposed to a nurse, recreational therapist, or other provider?

**Affected indicator:** AC5 – Treatment Offered

**Plaintiffs' Position:** Yes.  A plain reading of the Program Guide indicates that leisure activities cannot comprise the entirety of a patient's structured treatment.  *See, e.g.*, 2021 Program Guide, ECF No. 7333-1 at 60-62 (listing numerous exemplar substantive EOP treatment groups).  However, AC5 does not currently provide information on which groups were PC- or psychiatrist-led (a.k.a "core groups") as opposed to purely leisure groups (such as watching a movie, playing video games, coloring, etc.).  The Program Guide also requires that "[o]ccupational or recreational therapy is counted as structured activity only if an appropriate clinician … is present and supervising the activity," but this is also not being measured.  *Id.* at 59-60.  To address these limitations in the indicator's current design, Plaintiffs proposed that CDCR create an informational summary statistic in AC5 that would show the percentage of groups that are led by a PC or MHMD, without implicating the overall numerator/denominator calculation of the indicator.  CDCR refused.

The Special Master has monitored this issue, finding that staffing shortages and other factors contribute to patients receiving too many recreational groups and not enough clinical/process groups.  *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. at 67 (May 17, 2022) ("Long-standing staffing vacancies left clinicians with high caseloads and, consequently, limited to no time to conduct core mental health groups."); Special Master's 28th Round Monitoring Report, ECF No. 7074 at 291 ("Inmates further reported that refusals were due to an insufficient number of core groups and too many recreational groups."); *id.* at 1206 ("Mental health leadership acknowledged the validity of inmate complaints that groups with nominally clinically-oriented titles were in actuality run as leisure groups.").  Although the Special Master has not previously reported on the percentage of overall groups that were core vs. leisure, this is likely due to the fact that CDCR has never made this information available.

Plaintiffs understand that every mental health appointment that appears EHRS has a provider attached to it, and that there is a table of provider/position types in CDCR's data warehouse, making it possible to discern which groups were led by PCs and MHMDs as opposed to other providers.  Although the data warehouse does not store historical changes to providers' position type at present, CDCR is correcting this problem.  Given that the Program Guide clearly contemplates the provision of some amount of core

[4344320.4]

Kerry Walsh
August 25, 2023
Page 6

structured therapeutic activity and the Special Master monitors whether core groups are being offered, CDCR must provide this information, which it concedes it has, to ensure this critical aspect of class member care is effectuated.

Kerry Walsh
August 25, 2023
Page 7

**Review of Max Custody patients in compliance with CDCR policy**

**Issue:** Should CDCR create the Special Master's requested new PIP indicator titled *Timely Review of Max Custody Patients and In Compliance with CDCR Policy*?

**Affected indicator:** This would be a new indicator, created pursuant to the PIP Placeholder item on provisionally approved key indicator list (ECF No. 7151).

**Plaintiffs' Position:**  Yes.  The Special Master's request for an indicator that measures compliance with Defendants' stipulated, Court-approved plan to treat maximum ("max") custody patients in the PIPs is justifiable for several reasons, notwithstanding the parties' agreement in paragraph 15 of the stipulation that "Defendants' plan shall not be included in the MHSDS Program Guide or Compendium."   ECF No. 7392 at 5.

First, long before the parties' stipulation, the Special Master reported on the systemically inadequate treatment provided to max PIP patients, with no objection from Defendants. *See, e.g.*, Special Master's 29th Round Monitoring Report Part A – PIP Compliance, ECF No. 7555 at 43-44 ("[M]any *Coleman* patients on maximum custody status received virtually no structured treatment and limited out-of-cell time during the monitoring round and have not for years.  Remedying this deficiency is essential for these class members to receive treatment consistent with their rights under the Eighth Amendment."); Defs.' Objections to 29th Round Inpatient Report, ECF No. 7559.  When the Special Master reported on the state of Defendants' compliance with the max custody plan in his most recent report, Defendants similarly did not object.  *See* Special Master's 30th Round Monitoring Report Part A – PIP Compliance, ECF No. 7833 at 29-33; June 9, 2023 Order, ECF No. 7854 at 1-2 (adopting report and noting neither party filed objections).  Given the requirement that "each key indicator must be designed and operationalized to accurately capture the corresponding information gathered and reported on by the Special Master," this history requires Defendants to create the requested Max custody indicator. *See* May 24, 2023 Order, ECF No. 7847 at 7.

Second, the Court empowered the Special Master, not the parties, to determine whether to add this indicator to the provisional key indicator list.  When the Court approved paragraph 15 of the parties' stipulation, it "referred to the Special Master for consideration as to whether [the provisions regarding Therapeutic Treatment Modules ("TTMs")] are, or should be, reflected in the list of CQIT indicators currently under review."  Feb. 7, 2022 Order, ECF No. 7456 at 4.  Defendants voluntarily dismissed their appeal of this Order in October 2022.  *See* Ninth Cir. Case No. 22-15369.

Third, development of a functioning CQIT system is itself a freestanding remedial requirement in this case.  *See* Sept. 3, 2020 Order, ECF No. 6846 at 10.  The CQIT system cannot be robust without closely monitoring max custody issues in the PIPs.

[4344320.4]

Kerry Walsh
August 25, 2023
Page 8

Fourth, while the Court has held that "the 'key indicators' in CQIT are likely equivalent
to the material provisions of the Program Guide and the Compendium," *see* Sept. 3, 2020
Order, ECF No. 6846 at 24 n.11, other requirements such as staffing have also been
turned into indicators throughout the data remediation process.

Finally, according to an email from Melissa Benz on June 23, 2023, the performance
report data that Plaintiffs have historically relied on to obtain information and trends
about the statewide max custody census may not be accurate because it "is an older report
and not one that has or will be reviewed in data remediation." Nor have Defendants
committed to providing transparent, accurate information necessary to monitor these
issues in any other way. As such, because CDCR's information-sharing obligations
under the parties' stipulation expire after two years, which will run at the end of
December 2023 (ECF No. 7392 at 3), Plaintiffs and other stakeholders will have no
validated data on the max population absent this indicator. Given the persistent systemic
deficiencies in the provision of care provided to max patients in the PIPs identified by the
Special Master, and in the absence of any proposed alterative offered by CDCR, the
creation of a new indicator is warranted and necessary.

# EXHIBIT B

Defendants' Level 2 Dispute Statement:
AC2.1 Timely PC Contacts - Weekly v. 7-days

Patients at the Enhanced Outpatient Program level of care shall be seen "weekly" by their Primary Clinician (PC) either individually or in group psychotherapy.  During the July 18, 2023, BRMR meeting, Plaintiffs and the Special Master team told CDCR that they both interpret the term "weekly" to mean every seven days. CDCR disagrees with that interpretation.[1] CDCR has consistently interpreted "weekly" to mean at least once per calendar week. This issue was brought to a Level 1 Dispute Resolution meeting on August 3, 2023. No resolution could be reached at Level 1, so this issue has now been elevated to Level 2.

CDCR's interpretation of weekly is consistent with how the term is commonly defined.  Merriam Webster's dictionary defines "weekly" as every week; once a week; by the week.[2] CDCR's interpretation is also consistent with the community standard of care and how the term is used throughout the Program Guide.

Adopting Plaintiffs and the Special Master's definition of weekly would have deleterious effects on CDCR's mental health system, eviscerating patient and provider flexibility, reducing continuity of care, further reducing provider job satisfaction, and creating a system that favors dashboard compliance over patient care. CDCR's interpretation of weekly is not only grounded in practical concerns but also is deeply rooted in the nuances of mental health care and clinical integrity for the reasons outlined below.

I.      CDCR's Interpretation Of Weekly Is Consistent With The Program Guide.

The Program Guide requires EOP patients to have "weekly clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week." (Program Guide at 12-4-9.)  Implicit in this key definition is that contacts occur once every calendar week.  PCs can hold psychotherapy group one week and an individual clinical contact on alternating weeks - "at least every other week." It cannot be reasonable to interpret "every other week" as anything but every other calendar week.  Thus, when the weekly contact requirement is read in full, it is clear that PC contacts must occur once each calendar week, not on a rigid seven-day cycle.[3]

---

[1] CDCR reserves the right to make new objections to any future writings from the Special Master regarding this issue. To date, CDCR has not received the Special Master's position on this issue in writing. The Court recently noted that under the Order of Reference, "the court does not consider any objections to a report or recommendation by the Special Master 'unless an identical objection was previously submitted….'" ECF No. 7847 at 10 (citing ECF No. 640 at 8). However, the cited section of the Order of Reference applies to compliance reports filed under paragraph A(5). ECF No. 640 at 8. Under paragraph A(5), the Special Master provides a draft report and each party has 30 days to provide informal objections. Id. at 4-5. That is not the case here. No written report has been provided here. CDCR maintains its right to supplement these objections should a written report be issued in the future or if Plaintiffs' position statement raises new issues.

[2] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/weekly.

[3] The Special Master provided no formal notice to CDCR when he began interpreting weekly as every seven days as a part of his 28th round monitoring report. Reports prior to the 28th round do not explicitly interpret weekly in the same respect.

Similarly, EOPs are required to be offered ten hours of structured therapeutic activities "per week." (*Id.*, see also Program Guide at 12-4-8.) On the same page, the Program Guide requires a weekly clinical contact, a weekly psychotherapy group, and ten hours of structured treatment per week. The term weekly is being used the same throughout this section of the Program Guide– that is, patients shall receive the care at least once per calendar week. CDCR's interpretation of weekly for the purposes of clinical contacts also aligns with how the parties have agreed to operationalize AC5 – treatment offered, which measures whether ten hours of structured treatment are offered each calendar week.

If EOP patients were meant to have PC contacts every seven days, the Program Guide would have specified that timeline. There are other Program Guide requirements that must be completed within a seven-day timeline, such as Mental Health screening at Reception Centers (Program Guide at 12-2-2) and Mental Health Crisis Bed Interdisciplinary Treatment Teams (*Id.* at 12-5-13). In those instances, the Program Guide clearly states that the patient must be seen within seven days, not just weekly. Instead, the Program Guide requires weekly EOP contacts.

II.    Clinical Standard Of Care In The Community Does Not Interpret Weekly As Once Every Seven Days.

Adopting the Plaintiffs and Special Master's interpretation of weekly would unnecessarily restrict the ability of providers to see patients in a manner inconsistent with the community standard of care. Providers in the community have the flexibility to reschedule patients if their weekly appointment lands on a holiday or if the appointment must be cancelled for any unforeseen reason. For instance, if a standing Monday medical or mental health appointment is cancelled due to Memorial Day or Labor Day, then the provider generally requests that the standing appointment either be rescheduled later during the same week or requests the patient to skip that appointment altogether.

III.    A Seven-Day Definition Will Interfere With MHSDS Patients' Pre-Existing Schedules, Mental Well-Being, And Therapeutic Interactions With Their PC.

Plaintiffs argue that scheduling MHSDS patients for a PC contact every seven days will provide more consistency for patients because they will expect to be seen every seven days on the same day each week. However, that is unrealistic, and it does not capture the reality of operationalizing a business rule to ensure a contact occurs every seven days. Plaintiffs' proposal does not appreciate that scheduling patients for a contact every seven days is challenging, including because of the difficulty finding one hour to meet with a patient on a regular basis given patients' tight schedules around their treatment groups, work, school, medical and dental appointments, and other activities.

Defining weekly as every seven days in an organization as large as CDCR will give rise to a set of disruptive and unintended consequences that will interfere with patients' naturally occurring work, school, and other clinical treatment schedules that may not be in the control of the patients' PCs. For example, an urgent referral may arise, requiring the PC to use their clinical discretion to prioritize their patients that day. But a strict seven-day schedule would hinder PCs from having

the same flexibility that a calendar week would allow to complete all routine contacts once they have spent as much time needed to respond to the urgent referral.

When unforeseen circumstances prevent a scheduled PC contact from occurring, the strict seven-day compliance rule might unintentionally discourage rescheduling later in the same week, even though continuing care may still be in the patient's best interest. Rather than falling out of compliance by moving the patient to be seen that week by their own PC, the seven-day requirement will necessitate another PC to "cover" the appointment. This would likely send the wrong message to CDCR PCs – that CDCR values compliance over patient care – and could lead to job dissatisfaction at a time when CDCR is working hard to improve provider retention.

    IV.    **CDCR's Interpretation Of Weekly Will Still Result In A Patient Being Seen 52 Times A Year Without The Negative Impacts That Would Come With The Enforcement Of A Rigid Seven-Day Schedule.**

Under CDCR's current scheduling system, EOP patients are scheduled for a PC contact at least once every calendar week. As a result, patients requiring weekly contacts are scheduled at least fifty-two times each year. If the Special Master's and Plaintiffs' interpretation of weekly is adopted it would expand the number of contacts beyond 52 times a year because a strict seven-day requirement presents a considerable practical challenge in scheduling, as explained above. This will result in unnecessary appointments and will, further reduce PCs' availability for patients who truly need more than one contact per week.

To maintain compliance with and in operationalizing this rigid rule, clinicians will be compelled to schedule contacts more frequently, such as every five or six days to maintain a buffer allowing a day or two for rescheduling due to unforeseen circumstances ensuring that the seven-day requirement is met. As a result, if the business rule is automated as every seven days, instead of every calendar week, every time a contact is scheduled every five to six days then another contact appointment will automatically populate, resulting in the PC seeing the patient more often than is clinically necessary in some cases. And as many clinicians work four-day schedules, a stricter scheduling cycle makes it more likely that continuity of care will decrease.

The calendar week approach will keep CDCR's clinical institutional staff focused on ethical and clinically sound decision-making. This interpretation of weekly ensures a greater level of adaptability, allowing clinicians to design treatment plans around what is most clinically appropriate for each patient without being anchored to a tight seven-day timeline. It ensures that the patient is seen 52 times each year without the negative impacts that would come with the enforcement of a rigid seven-day schedule.

In the realm of mental health care, treatment must be tailored to the individual needs of each patient rather than adhere to a strict, one-size-fits-all schedule. While it might seem that more frequent treatment is preferable, this is not necessarily the case. Mental health care is complex and individualized, and clinicians must have the flexibility to design treatment plans that meet the unique needs of each patient.

Many healthcare providers within CDCR, as part of their civil servant position, often work longer hours but fewer than five days per week, such as four ten-hour days. This allows them to take a scheduled Regular Day Off (RDO) every Monday or Friday. Implementing the Special Master's definition of weekly as every seven days would create a rigid structure that may require providers to abandon their preferred four ten-hour days schedule. But a flexible work schedule that permits RDOs is what attracts some PCs to state service and losing that flexibility may cause staff to consider CDCR's competitors in healthcare. To the extent a seven-day definition would require changes to providers' schedules and elimination of a four ten-hour schedule, this would negatively impact recruitment and retention.

For example, the following three scenarios demonstrate how the increase in the number of weekly contacts where a clinician strives to schedule a contact every 6 days can interfere with the patient-centered approach:

1. If a PC has Monday RDOs, one-on-one contacts with patients will increase from 52 to 71 annually, an increase of 137%.
2. If a PC has Friday RDOs, contacts will increase from 52 to 70 annually, an increase of 135%.
3. Without RDOs and striving for compliance with weekly contacts, one-on-one contacts will increase from 52 to 65 annually, an increase of 125%.

While it may seem that more contact is automatically beneficial, the reality is that this approach may result in unnecessary appointments for many patients, reducing the clinician's availability for those who truly need more than one contact per week.

The challenge here is to balance compliance with a rule against the nuanced needs of mental health care. A rigid interpretation of weekly removes necessary scheduling flexibility and could impact the continuity of care, prioritizing administrative standards over individual patient needs. CDCR urges that the complexity of mental health care be recognized, and that a more flexible approach be adopted, one that allows clinicians to prioritize patient care and individualized treatment over a mechanistic adherence to a rigid schedule.

V.    If CDCR Is Forced To Automate Weekly As Every Seven Days, It Will Increase The Risk Of Mistakes Made By The Scheduler.

If CDCR is forced to automate weekly as every seven days, it will increase the risk of mistakes made by staff. Schedulers will have to manually schedule the appointment on a different date within the seven-day timeframe of that same week if an appointment needs to be cancelled or rescheduled for any unforeseen reason. Every time the scheduler manually moves an appointment, the subsequent contact will be moved to the seventh day from the date the action is taken, causing the scheduler to spend precious time they could have used to see patients to schedule appointments that comply with the every seven-day requirement. The absence of recurring appointments will increase the risk of mistakes and decrease the ability to prioritize other essential scheduling needs. Additionally, increased scheduling needs may make the scheduler feel that they must prioritize scheduling weekly PC contacts over other contacts.

4

VI.    Conclusion

CDCR's interpretation of weekly prioritizes patient-centered care and practicality, supported by clinical insights and practical realities that focus on patients' well-being and the efficient provision of care. It protects against a mechanistic approach that would degrade the quality of treatment and hinder the progress of many patients within the CDCR's mental health care system. Thus, CDCR respectfully urges the Special Master to recognize the depth and nuance of these concerns and to support this interpretation in the Level 2 Dispute process.

A-018