1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                    No. 2:90-cv-0520 KJM DB P

12                 Plaintiffs,                 ORDER

13        v.

14   GAVIN NEWSOM, et al.,

15                 Defendants.

16

17        On October 18, 2023, the Special Master provided the parties with five proposed

18   resolutions for pending data remediation disputes, as directed by this court in its October 11, 2023

19   order modifying the data remediation dispute resolution process.  *See* ECF No.7556-2 (original

20   data remediation process); October 11, 2023 Order, ECF No. 8008 (order modifying process).

21   On October 27, 2023, after receiving a short extension of time, defendants filed objections to all

22   five proposed resolutions.  October 24, 2023 Order, ECF No. 8028 (order granting extension);

23   ECF Nos. 8036, 8037, 8039, 8040, and 8041 *as supplemented by* ECF No. 8057.  On

24   November 3, plaintiffs filed responses to four of the objections.  ECF Nos. 8051 (responding to

25   ECF No. 8039), 8052 (responding to ECF No. 8040), 8053 (responding to 8037), and 8054

26   (responding to 8036).  The court resolves the objections presented by ECF Nos. 8036 and 8037 in

27   this order.  To resolve the objections presented by ECF No. 8039, the court must first resolve

28   certain threshold questions.  The court in this order provides instructions for motion practice to

                                          1

1  bring those questions before the court for resolution.  The court defers resolution of the objections

2  presented by ECF Nos. 8040 and 8041 for a period of thirty days, as explained below.

3  **I.      BACKGROUND**

4          In issuing this order, the court is guided by certain fundamentals, well-established in this

5  action.  The data remediation process began in 2020 after the court found defendants had

6  knowingly presented misleading information to the court and the Special Master.  *See generally*

7  *Coleman v. Newsom*, 424 F. Supp. 3d 925 (E. D. Cal. 2019).  The remediation process currently is

8  ongoing, and the court anticipates substantial completion by the end of this year.  ECF No. 8008

9  at 2.[1]

10         At the same time, defendants continue to develop their mental health quality management

11  system, also known as the Continuous Quality Improvement (CQI) process.  *See generally*

12  December 17, 2020 Order, ECF No. 6996.  An adequate quality management system is a required

13  part of the remedy in this action.  *See id*. at 2 (citing *Coleman v. Wilson*, 912 F. Supp. 1282, 1308

14  (E. D. Cal. 1995)).  "Quality assurance and quality improvement are components of an adequate

15  quality management system: quality assurance focuses on quantification of system performance,

16  while quality improvement focuses on the quality of that same system's performance."  ECF

17  No. 6996 at 2 (citing ECF No. 4205 at 74-75); *see also* May 24, 2023 Order, ECF No. 7847, at 2

18  (quoting August 30, 2012 Order, ECF No. 4232, at 5, for proposition improved quality

19  improvement process will enable defendants to "address issues with the quality of care that is

20  delivered").

21         The continuous quality improvement tool (CQIT), which defendants will use to measure

22  and quantify "'all degrees of compliance with monitored [remedial] requirements, from zero

23  percent to 100 percent'" is part of the larger mental health quality management system.  *See*

24  *generally* ECF No. 6996.[2]  CQIT comprises numerous indicators that measure various

---

[1] In this order citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to the page numbers assigned by the ECF system and located in the upper right-hand corner of the page.

[2] The court more recently has recognized "a small group of key indicators that are not susceptible to measurement by percentage" and directed the Special Master to "identify those

1   components of the California Department of Corrections and Rehabilitation (CDCR) Mental

2   Health Services Delivery System (MHSDS).  *See id.* at 4-5.  The "key indicators" in CQIT are

3   "the functional equivalent of 'benchmarks' that. . . signify the material provisions" of the

4   remedial plans in this action "that must be durably implemented to a degree of compliance" to be

5   confirmed by the court at a later date.  September 30, 2020 Order, ECF No. 6846, at 28.  Other

6   CQIT indicators serve functions integral to full implementation and adequacy of defendants'

7   mental health quality management system.  *See* ECF No. 6996 at 5.

8        In July 2021, the court gave provisional approval to a preliminary list of CQIT key

9   indicators.  *See generally* July 1, 2021 Order, ECF No. 7216 (approving list of key indicators

10  found at pages 21 through 26 of the Special Master's May 6, 2021 Report on the [CQIT]

11  Indicators, ECF No. 7151).  Because "[d]ata systems now play a critical role in monitoring

12  delivery of mental health care to the plaintiff class and the required custody remedies . . .

13  finalization of the list of CQIT key indicators '"is progressing jointly" with the ongoing data

14  remediation process."'"  ECF No. 7847 at 6 (quoting January 4, 2023 Order, ECF No. 7695, at 2)

15  (internal citation omitted).

16       In May 2022, then-CDCR Secretary Kathleen Allison confirmed "the staff assigned to

17  work on data remediation including its technical writers are sufficient in number and

18  qualifications to complete data remediation before December 2023" and "committed to ensuring

19  additional staff, as may be necessary, will be assigned to the project."  Allison Decl., ECF

20  No. 7556 at 3.  Between May 2022 and October, resolution of data remediation disputes was

21  governed by a three-step process agreed to by the Special Master and then-Secretary Allison.  *Id.*

22  at 3 and Ex. B.  On October 11, 2023, with the December 2023 deadline to complete data

23  remediation approaching, the court modified the process "to ensure more timely dispute

24  resolution."  ECF No. 8008 at 1.

25  /////

indicators and either stakeholder agreement, or, alternatively, his proposal for how those
indicators should be used in measuring compliance."  ECF No. 7847 at 5 n.5.  The Special Master
is to include information regarding measurement of this small group of indicators in his final
report on CQIT key indicators.  *Id.*

Overall, the remedial goals relevant to this order are a transparent and accurate data reporting system, *see generally Coleman v. Newsom*, 424 F. Supp. 3d 925, and a sustainable quality management system defendants will use to "'achieve and maintain compliance' with constitutional requirements [and] transition. . . into self-monitoring and . . . *eventual removal of federal court oversight*.'"  ECF No. 7847 at 5 (quoting ECF No. 4323 at 4-5 (quoting ECF No. 4205 at 65) (emphasis in original)).

With the foregoing in mind, the court turns to defendants' pending objections to the Special Master's proposed resolution of the five pending data remediation disputes.

## II.   DISPUTES

### A.   AC5:  Treatment Offered – Confidential Groups

#### 1.   Special Master's Proposal

The Special Master recommends that the indicator identified as AC5 (Treatment Offered) "be modified to include information on whether the primary clinician or psychiatrist led groups were conducted in confidential settings in a drill down,[3] including a summary statistic reporting the percentage of groups documented as being conducted in a confidential setting."  ECF No. 8036 at 9.  This proposal addresses a substantive dispute between the parties over whether group treatment led by primary clinicians or psychiatrists and offered to Enhanced Outpatient Program (EOP) inmates must be held in a confidential setting to count toward the Program Guide requirement that EOP inmate-patients must be offered "at least 'ten hours per week of scheduled structured therapeutic activities.'"  *Id*. (quoting 2021 Program Guide Update, ECF No. 7331 at 59).  The Special Master recommends collecting drill down data to understand the percentage of offered groups led by primary clinicians or psychiatrists that are held in confidential settings with no adjustment to the scoring for this indicator based on the information gleaned from the drill down data.  ECF No. 8036 at 9.

---

[3] Drill downs allow users "to look for something on a computer or website by moving from general information to more detailed information."  *See* https://dictionary.cambridge.org/us/dictionary/english/drill-down.

### 2.     Defendants' Objections

Defendants raise the following objections to this proposed resolution:

- The Program Guide does not require these groups to be held in confidential settings and, therefore, they should not be required to track whether they are.  ECF No. 8036 at 2.

- CDCR's Electronic Health Records System (EHRS) cannot track the classification of a staff member for groups that patients refuse to attend and, therefore, the data will only track attended groups and result in significant undercounting.  *Id.* Relatedly, the classification of staff members who check inmates into and out of groups may be different from that of the staff members who facilitate the group, also leading to unreliable data.  *Id.*

- The Special Master does not currently exclude non-confidential groups from his assessment of whether the weekly requirement is met in EOP units.  *Id.* at 4.

- Two other indicators "report on the adequacy of confidential treatment space," and adding this drill down data would make those two indicators "duplicative and obsolete."  *Id.* at 4-5.

- A bug recently has been discovered in EHRS "that can unintentionally lead to data regarding group confidentiality not being saved in the system" and therefore incomplete reporting.  *Id.* at 6.

Finally, although defendants do not agree the information needs to be tracked, if the court does require tracking, defendants propose a separate report that "provides data regarding whether completed mental health groups were documented as confidential or not, and what classification led those groups."  *Id.*  According to defendants, this would avoid confusion caused by reporting the same data as a drill down under the AC5 indicator.  *Id.*

### 3.     Plaintiffs' Response

Plaintiffs raise the following in response to defendants' objections.

- The need for confidentiality in group treatment, though not express, can be inferred from a number of provisions of the Program Guide.  ECF No. 8054 at 3.

5

- "Confidentiality in group treatment for EOP patients is critically important because the Program Guide allows group treatment to serve as the required weekly primary clinician contact every other week" and it is undisputed confidentiality is required for the weekly clinical contacts. *Id.*

- Defendants' approach would eliminate any way to know whether CDCR provides any hours of confidential structured therapeutic activity because the information would not be tracked. *Id.*

- The Special Master's proposal aids in accurate and transparent data reporting.

- The Special Master does monitor and report on confidentiality of group treatment space, so his proposal does track his monitoring. *Id.* at 4.

- Neither of the indicators cited by defendants collect the information that would be collected under the Special Master's proposal because one measures the confidentiality of all group treatment appointments as a percentage of total group treatment appointments, while the other reports on the percentage of group treatment areas that have confidential space; neither focuses on how often individual patients are offered confidential treatment and the Special Master's proposal would allow this information to be collected. *Id.* at 5.

- Defendants must resolve the purported limitations on tracking the classification of staff members who lead confidential groups to measure whether groups in short and long-term restricted housing units are confidential. *Id.*

- Whether or not this information is tracked in the EHRS, defendants "track in their underlying database each of the elements necessary to implement the proposed resolution: what group was offered to the patient, whether the group was confidential, and which classification of staff member conducted the group." *Id.* at 5. Defendants have not shown it would be burdensome to use the underlying database for the proposed drill down information.

- Defendants must fix the identified data bug for many other indicators. *Id.* at 6.

/////

1    With respect to defendants' proposed alternative, plaintiffs argue it would only measure

2    completed groups, not offered groups, contrary to the Program Guide requirement that EOP

3    patients be offered ten hours of group per week.  Second, the proposal would miss capturing data

4    on the number of EOP inmates who refuse to attend nonconfidential groups.  *Id*. at 7 (quoting

5    ECF No. 7074 at 497 (report from Special Master that several EOP inmates reported refusing to

6    attend group treatment held in a dayroom).

7                                    **4.      Discussion**

8    The AC5 indicator is on the list of CQIT key indicators the court has provisionally

9    approved.  ECF No. 7151 at 21.[4]  The indicator measures treatment offered as part of the group of

10   provisionally approved key indicators that measure access to care.  *Id*.  The Special Master's

11   proposal arises from a dispute between the parties

12          as to whether group treatment led by primary clinicians and/or psychiatrists must be
13          conducted in a confidential setting in order to count toward the Program Guide
14          requirement to offer at least "ten hours per week of scheduled structured therapeutic
15          activities" to patients at the EOP level of care.

16   ECF No. 8036 at 9 (quoting 2021 Program Guide Update, ECF No. 7333-1 at 59).

17   In relevant part, the Program Guide requires EOP inmate-patients to have weekly clinical

18   contact with their primary clinicians "either individually or in group psychotherapy," "individual

19   clinical contact at least every other week," and "[t]en hours per week of scheduled structured

20   therapeutic activities."  ECF No. 7333-1 at 59.  The list of treatment activities, which includes

21   both individual and group therapy, is wide-ranging.  *Id*. at 59-62.  Structured activities may be led

22   by primary clinicians, psychiatrists, or other mental health staff.  *See id*.  It is undisputed that the

23   Special Master counts group treatment provided in non-confidential settings toward the weekly

24   ten-hour requirement.  *See* ECF No. 8036 at 2, 10.  The precise dispute here is whether group

25   treatment led by a primary clinician or psychiatrist must be offered in a confidential setting in

26   order to count toward the Program Guide's ten hour per week structured therapeutic activity.

27   /////

---

[4] All the disputes resolved by this order involve indicators in the group of approved key indicators that measure access to care (AC).  *See id*.

The Special Master's proposed resolution is entirely consistent with the purpose of the data remediation process, the development and finalization of CQIT, and the development of an adequate quality assurance process.  His resolution allows data reports to capture the percentage of time group activities led by primary clinicians and/or psychiatrists in EOP units are held in confidential settings.  The Program Guide requires EOP inmate-patients to have weekly clinical contact with their primary clinician, ECF No. 7333-1 at 59, and that such clinical contacts must be in a confidential setting unless the patient refuses to speak to the clinician or signs a form refusing "to attend a confidential encounter." *Id*. at 636-37.  On a biweekly basis, meaning every other week, that clinical contact can be in group psychotherapy; on alternating weeks the contact must be individual clinical contact. *Id*. at 59.  At a minimum, the proposed drill down data is necessary to determine whether biweekly participation in group therapy satisfies the relevant weekly clinical contact requirement.  For this reason alone, the drill down data must be collected.

Collection of the drill down data also is required for finalization of CQIT.  It is not unsurprising that data remediation and finalization of CQIT would uncover the need for clarification of certain core remedial requirements, as the substantive dispute underlying the Special Master's recommendation illustrates.  Specifically, the dispute illuminates a need to clarify whether a group therapeutic activity led by a primary clinician -- generally a psychologist or social worker -- or a psychiatrist counts toward the weekly ten-hour requirement if it is not held in a confidential setting.  Ultimately, if the parties cannot agree on a resolution of this dispute it will have to be resolved by the court as part of its overall assessment of what constitutional compliance requires in this complex case.  The court is not required to resolve that issue to resolve defendants' objections because, as noted, the data must be gathered at a minimum to determine whether biweekly group therapy can count toward weekly clinical contact requirements.  Moreover, the Special Master's proposed resolution does not impact the way this indicator is scored; it ensures relevant data is available.

As noted above, accurate data collection is central to an adequate quality assurance program.  Consistent with the Program Guide, EOP inmate-patients must be offered at least ten hours of structured therapeutic activity each week. *Id*. at 58.  EOP inmate-patients who are

scheduled for less than ten hours per week must be reviewed regularly to determine whether they require referral to a higher level of care; less than ten hours of structured therapeutic activity per week can signal a clinical need for a higher level of care. *See id.* The drill down data the Special Master recommends be collected tracks information necessary to an adequate quality improvement process, namely, whether there are "problem areas" in the delivery of group treatment and how those can be improved "to make [group treatment] more effective and efficient." ECF No. 4205 at 74. The Special Master has reported about the impacts of a lack of confidentiality on patient participation in group therapy, *see*, *e.g.*, ECF No. 8036 at 10 (citing ECF No. 7715 at 196, 230, 237, 528), identifying the issue as a potential problem area for delivery of adequate care to class members housed in EOP units. Defendants cannot know whether, or to what extent, a lack of confidentiality in groups led by primary clinicians and/or psychiatrists is an obstacle to attendance in such groups unless they collect the drill down data as the Special Master recommends.

The technical objections raised by defendants do not support a different result. As noted, the former CDCR Secretary represented the number of qualified staff required for timely completion of the data remediation project would be available and assigned as needed to ensure completion of the project before the end of this year. *See* Allison Decl., ECF No. 7556 at 3. If defendants require additional staff and/or additional expertise to resolve technical issues, consistent with former Secretary Allison's representation, those staff must be assigned to the project forthwith.

Finally, the court will not require development of defendants' alternative proposal instead of the Special Master's proposal because the alternative proposal would measure only the confidentiality of attended groups and not, more inclusively, offered groups that an inmate-patient refuses. For the reasons explained in this section, the Special Master is correct this latter data must be included as drill down data in this indicator.

### 5.    Conclusion

For the foregoing reasons, the court will overrule defendants' objections to the Special Master's proposal to modify the AC5 indicator to include drill-down information on whether

1   clinician-led groups were held in confidential settings and a summary percentage of confidential

2   groups.

3         **B.**     **AC5:  Treatment Offered – Measuring "Core Groups"**

4             **1.**     **Special Master's Proposal**

5         The Special Master recommends the documentation for AC5 also be modified to include

6   drill down information and a summary statistic reporting how many and what percentage of group

7   treatment hours counted toward the requirement to offer EOP inmate-patients ten hours weekly of

8   structured therapeutic activity are conducted by a psychiatrist or primary clinician, also known as

9   "core" groups, without changing the scoring for the AC5 indicators.  ECF No. 8037 at 9.

10             **2.**     **Defendants' Objections**

11       &bull;  The Program Guide does not define or refer to "core" groups, nor does it

12           distinguish groups led by primary clinicians or psychiatrists from other treatment

13           activities.  ECF No. 8037 at 2.

14       &bull;  Because CQIT "key indicators" are supposed to "'signify the material provisions

15           of the Program Guide and Compendium'" it "must logically follow" that CQIT

16           key indicators should not be designed to measure things not required by the

17           Program Guide.  *Id*. at 3 (quoting ECF No. 7216 at 4).

18       &bull;  The Special Master has not historically monitored this issue, so defendants should

19           not be required to track it.

20       &bull;  This measurement "fails to align with the mental health needs of patients and

21           overlooks the flexibility required to provide appropriate treatment."  ECF

22           No. 8037 at 3.  It could lead to overemphasis on the need for groups led by

23           primary clinicians or psychiatrists and risks "erroneous assumptions about the

24           clinical relevance of these groups to individual patient treatment plans."  *Id*. at 4.

25       &bull;  The drill down data would be subject to the same limitations on accuracy posed by

26           the Special Master's proposal for AC5-Treatment Options.

27         If the court does require additional data and reporting in this area, defendants propose a

28   summary report "that shows the count of attended groups provided by the following

classifications:  Primary clinician, psychiatrist, recreational therapists, and all other mental health type providers." *Id*. at 5.

### 3.   Plaintiffs' Response

- Defendants' assertion that the Program Guide does not mandate tracking groups led by primary clinicians and psychiatrists is incorrect.  The Program Guide requires substantive clinical group as part of EOP inmate-patients' weekly structured therapeutic activity.  ECF No. 8053 at 2 (citing ECF No. 7333-1 at 59-62).  Without tracking this information, it is not possible to tell whether an EOP inmate-patients' weekly structured therapeutic activity includes these groups.

- Defendants also are incorrect in their assertion that the Special Master has not tracked whether groups are led by primary clinicians and psychiatrists in his monitoring.  ECF No. 8053 at 3.

- Defendants' suggestion that the Special Master's proposed resolution will interfere with mental health treatment and impede flexibility in providing appropriate care "is nonsensical."  *Id*. at 4.  Nothing in the recommendation suggests groups led by primary clinicians or psychiatrists are better than other groups.

- Defendants' claims of technical limitations are unsubstantiated and do not provide a basis for rejecting the recommendation.  *Id*. at 4-5.

Finally, defendants' alternative proposal would measure only attended groups, not completed groups.  In addition, the report would include counts, rather than percentages, which are not useful without more context.[5]

/////

---

[5] Plaintiffs also contend defendants' alternative proposal "will inevitably report a larger percentage of confidential groups than would the Special Master's recommendation" because patients are more likely to attend confidential groups.  *Id*. at 5.  It appears inclusion of this contention, which consists of two sentences identical to sentences in plaintiffs' response to defendants' objections to the Special Master's proposal for the AC5—Treatment Groups – Confidential Groups, *see* ECF No. 8054 at 6-7, is inadvertent; the specific argument does not apply in the context of this dispute.

1                    **4.    Discussion**

2          The Special Master's proposal arises from defendants' rejection of plaintiffs' proposal to

3    include in this indicator "a summary statistic reporting the percentage of groups conducted by

4    psychiatrists or primary clinicians."  ECF No. 8037 at 8.  The principal reason given by the

5    Special Master for his recommendation is that he "has historically monitored and reported on the

6    challenges defendants have faced offering clinician led groups due to, for instance, staffing

7    shortages."  *Id*. at 9.  Though this information has not been included in the data defendants have

8    provided to the Special Master about the treatment hours offered to EOP patients, his monitoring

9    teams "obtain information regarding clinician-led groups through chart reviews and patient and

10   staff interviews."  *Id*.

11         It is clear the Program Guide contemplates provision of groups to EOP inmate-patients

12   that provide substantive clinical treatment.  *See* ECF No. 7333-1 at 59-62.  Given the current

13   chronic and severe staffing shortages among primary clinician classifications, *see*, *e.g.*, ECF

14   No. 7956 at 6, and the historical chronic and severe staffing shortages among psychiatrist

15   classifications, *see*, *e.g.*, October 10, 2017 Order, ECF No. 5711, at 9,[6] data that captures

16   defendants' capacity to staff and offer groups led by clinicians is important to development of an

17   adequate quality management system.  It also will capture, in a more efficient manner, the

18   information already monitored by the Special Master.

19         For the reasons explained in Section IIA(4), above, the technical objections raised by

20   defendants do not support a different result.  As noted, the former CDCR Secretary represented

21   sufficient staff would be available for timely completion of the required data remediation.

22         Finally, the court will not require development of defendants' alternative proposal instead

23   of the Special Master's proposal because the alternative proposal would count only the number of

24   /////

---

        [6] The record as a whole currently shows decreased vacancy rates among psychiatrists but significant shortfalls among psychologists and social workers.  *See*, *e.g.*, Joint List of Stipulated Facts, ECF No. 7956, at 6.  As defense counsel acknowledged during recent staffing enforcement proceedings, compliance with staffing requirements in each classification has "varied over time." Reporter's Transcript of Hearing, ECF No. 8013, at 8.

groups led by specific classifications of mental health clinicians, which by itself would have only limited, if any, utility for required quality improvement and quality assurance tasks.

### 5.    Conclusion

For the foregoing reasons, the court will overrule defendants' objections to the Special Master's proposal to modify the AC5 indicator to include drill-down information and a summary statistic reporting how many and what percentage of group treatment hours counted toward the requirement to offer EOP inmate-patients ten hours weekly of structured therapeutic activity are conducted by a psychiatrist or primary clinician.

### C.    PLACEHOLDER—PIP—MAX CUSTODY REVIEW

The Special Master recommends creation of a new indicator to measure compliance with CDCR's policy to review maximum custody inmate-patients placed in PIPs.  ECF No. 8039 at 10. Defendants object to his recommendation on the ground that it violates terms of a stipulation and order setting out a settlement agreement between the parties.  *Id*. at 1-2, citing ECF Nos, 7392, 7456.

On February 7, 2022, the court referred to the Special Master the question of whether the provisions of that settlement agreement "regarding TTMS . . . are, or should be, reflected in" the list of CQIT key indicators.  February 7, 2022 Order, ECF No. 7456, at 2.  Defendants' objections are predicated in large part on their position that by its terms the settlement agreement excluded its provisions from the Program Guide and, therefore, none of what is covered by that agreement should be the subject of a CQIT key indicator.

To ensure a complete record on this question, the court will direct defendants to bring an appropriate motion focusing for the court the question whether this policy should be included in CQIT; the motion should be filed within fourteen days.  Plaintiffs shall file a response to the motion within fourteen days thereafter.  The court may seek additional input from the Special Master as necessary to resolve the motion.  The court will defer resolution of this objection pending resolution of defendants' motion.

**D.    AC7.1 and AC7.4 – Timely Transfer to EOP and CCCMS [Correctional Clinical Case Management System] – Suspending Events**

**1.    Special Master's Proposal**

The Special Master proposes that the medical hold language be removed from the documentation for these two indicators that covers suspending events and that transfers to CCCMS and EOP settings that exceed timeframes required by the Program Guide be scored as not meeting those requirements.  ECF No. 8040 at 11.  Defendants also should modify the indicators to include drill down information regarding any reasons for such delayed transfers.  *Id*.

**2.    Defendants' Objections**

Defendants present the following arguments in support of their objections.

- The Special Master's proposal creates a conflict with CDCR's Health Care Departmental Operations Policy, set out in the Health Care Departmental Operations Policy (HCDOM), which "authorizes CDCR physicians to temporarily hold a patient's transfer due to an overriding medical concern." *Id*. at 2.  His proposal is therefore "clearly erroneous." *Id*. at 5.

- Defendants contend they should not be "scored as non-compliant" or "penalized" when their physicians exercise medical judgment and prioritize medical and mental health needs. *Id*. at 2.

- Departmental policy concerning medical holds can be "read harmoniously" with Program Guide transfer timeline requirements. *Id*.

- Data remediation should not be focused on policy disputes. *Id*. at 6.  The court and the Special Master should give deference to CDCR's interpretation of its own policies unless those "interpretations clearly exceed constitutional bounds." *Id*.

- The Special Master's proposal does not "align with well-reasoned clinical judgment." *Id*.

- The Special Master's recommendation for drill down data is "technically infeasible" because there are on average 885 inter-institution transfers per month and the potential universe of reasons for delayed transfers is "extensive." *Id*. at 7.

14

1          **3.      Plaintiffs' Response**

2      Plaintiffs respond to defendants' objections as follows:

3          • The Special Master's proposal is grounded in the same analysis the court upheld

4              over defendants' objections in the context of transfers to short term restricted

5              housing (STRH) and long-term restricted housing (LTRH).  ECF No. 8052 at 2.

6              Defendants do not explain why that analysis is different in the context of transfers

7              to CCCMS and EOP units, nor do they address the court's October 11, 2023 order,

8              ECF No. 8010, in any meaningful way.

9          • Plaintiffs repeatedly have offered for the past year "to negotiate a policy change to

10             amend Program Guide transfer requirements to include a narrow medical hold

11             exception and present the proposed change to the Court, as the parties did in the

12             context of MHCB [Mental Health Crisis Bed] and PIP [Psychiatric Inpatient

13             Program] transfers."  *Id*. at 4.  Defendants continuously have refused.  *Id*. at 4-5.

14         • Defendants raise for the first time that they have a practice of having mental health

15             transfers involving medical holds evaluated by multi-disciplinary treatment teams.

16             *Id*. at 5.  The cited portion of the HCDOM requires only collaboration between

17             medical and mental health; it does not require medical practitioners to consider

18             mental health clinical input when making medical hold decisions, or to balance

19             medical and mental health needs; the court-ordered medical hold exceptions for

20             inpatient and MHCB transfers do contain these requirements.  *Id*.  Nor does the

21             cited portion of the HCDOM require CDCR to provide appropriate mental health

22             treatment while transfer is pending.  *Id*.  The cited portion of the HCDOM is not

23             part of the Program Guide nor a monitoring requirement in CQIT.  The cited

24             portion of the HCDOM does not justify departure from these Program Guide

25             requirements.

26         **4.      Discussion**

27     The Special Master explains that the stakeholders agreed to defer further consideration of

28 the dispute over whether medical holds should suspend timelines for transfer to CCCMS and EOP

                                                   15

1    units pending the court's resolution of a similar dispute regarding transfer timelines to STRH and

2    LTRH units.  ECF No. 8040 at 10.  The court resolved the latter dispute in its order filed

3    October 11, 2023, ECF No. 8010.

4          The HCDOM provisions, raised for the first time here by defendants,[7] are not incorporated

5    by reference or otherwise into the applicable provisions of the Program Guide, nor do the

6    HCDOM provisions reference the applicable provisions of the Program Guide.  *Compare*

7    HCDOM, Health Care Transfer, 3.1.9[8] *with* ECF No. 7333-1 at, *e.g.*, 17-19.  The HCDOM

8    provisions are not comparable to the court-approved medical exceptions for transfers to MHCBs

9    and inpatient care; the HCDOM provisions defendants cite do not even mention the relevant

10   Program Guide timelines, let alone require their suspension.  *Cf.* ECF No. 8010 at 8.

11         To the extent there is a conflict between the HCDOM and the transfer timeline

12   requirements of the Program Guide, it is not created by the Special Master's proposal. Given the

13   fact that defendants are subject to ongoing court supervision over the provision of both mental

14   health care and medical care, it is not unsurprising that a need is being identified to reconcile

15   particular processes in the two delivery systems during the data remediation process.  These

16   disputes must be worked through in the well-established processes for such conflict resolution,

17   including meaningful meet and confers supervised by the Special Master and, as necessary in

18   coordination meetings with the *Plata*[9] Receiver.  *See, e.g.*, May 8, 2020 Order, ECF No. 6661, at

19   8-9 (describing coordination process established more than fifteen years ago to "'avoid any

20   surprises in the remedial proceedings in either case'").

21         Moreover, defendants' attempt to transform the identified conflict as presenting them with

22   "an unnecessary Catch-22" is an overstatement at best.  The Eighth Amendment requires

---

[7] All parties are reminded that they must "take all steps necessary to ensure that persons with full decision-making authority and required subject matter expertise are at the [Business Rules and Methodology Review] (BRMR) meetings" during which data remediation disputes are discussed.  ECF No. 8008 at 2.  Implied in this requirement is the corollary that all material and arguments relevant to data remediation must be presented at these meetings so that they are presented to the Special Master before he submits a recommended resolution to the court.

[8] Available at https://cchcs.ca.gov/wpcontent/uploads/sites/60/HC/HCDOM-ch03-art1.9.pdf.

[9] *Plata v. Newsom*, Case No. 01-1351-JST (N. D. Cal.).

1    defendants to provide constitutionally adequate medical and mental health care.  As a

2    consequence, when inmate-patients have need for both medical and mental health care,

3    defendants must develop and implement policies that balance potentially competing medical and

4    mental health needs appropriately.  It does not mean defendants always must "yield CCCMS and

5    EOP transfers to medical holds," ECF No. 8040 at 5, nor does it mean CDCR must transfer

6    inmate-patients to CCCMS or EOP units within Program Guide timelines notwithstanding

7    medical conditions.  In short, for defendants to comply with the Eighth Amendment this policy

8    conflict, identified during the data remediation process, must be resolved.

9           The Special Master's proposed resolution is consistent with this court's reasoning in its

10   October 11, 2023 order resolving a dispute the parties all agreed was analogous to the present

11   dispute.  The proposal also is entirely within the confines of this action, which also is appropriate

12   given the Special Master's role.  However, for the reasons explained in this order, this is an

13   instance where medical policy and mental health policy must be reconciled.  For this reason, the

14   court will defer further consideration of the Special Master's proposed resolution for suspending

15   events in indicators AC7.1 and AC7.4 for a period of thirty days.  During that period, the parties

16   shall take all steps necessary to meet and confer under the supervision of the Special Master to

17   develop proposed exceptions to the Program Guide timelines for transfer to CCCMS and EOP

18   levels of care that comport with other court-approved exceptions to Program Guide transfer

19   timelines and avoid unnecessary conflict with relevant provisions of the HCDOM.  The court will

20   consider a request for extension of time to complete this task only if the Special Master

21   determines more time is required to complete the required meet and confer or the Special Master

22   deems it necessary to resolve the conflict through the established process for coordination

23   between this action and *Plata*.[10]

---

[10] This is the second time the medical hold exception has impacted the data remediation process requiring court intervention.  Should the medical hold exception be the subject of a dispute at any further point in the data remediation process, the Special Master shall require a full and unconditional meet and confer of the parties to reconcile potential conflicts between this provision of the HCDOM and Program Guide requirements.  In the event this meet and confer is required, the Special Master may, as necessary, request an extension of the time within which he must submit a proposed written resolution of the dispute to the parties.  *See* ECF No. 8008 at 2.

1      **E.**    **AC2.1:  (Timely PC Contacts) – Definition of Weekly**

2              **1.**    **Special Master's Proposal**

3      The Program Guide requires EOP inmate-patients have "weekly clinical contact with PC

4 [primary clinician] either individually or in group psychotherapy; individual clinical contact every

5 other week."  2021 Program Guide Update, ECF No. 7333-1 at 59.  The Special Master proposes

6 that "weekly" be defined in this indicator to require contacts to occur at least every seven days.

7 ECF No. 8057 at 4-59.

8              **2.**    **Defendants' Objections**

9      Defendants contend they have interpreted this Program Guide requirement, as well as the

10 same requirement for other weekly clinical contacts, to require contact every calendar week,

11 defined as Monday through Sunday, not every seven days.  This is a "reasonable common sense

12 reading" of the requirement that the court should adopt as it is both practical and appropriately

13 prioritizes patient-based care.

14      Defendants do not dispute that the Special Master offered to engage in further discussions

15 regarding this dispute, but defendants refused, contending the Special Master "was unwilling to

16 propose any . . . flexible options in writing" and his current proposal does not include any

17 flexibility.  ECF No. 8041 at 2-3.  Defendants contend the Special Master's citation to the court's

18 December 19, 2019 order on whistleblower proceedings that involved how "monthly" would be

19 defined for Program Guide requirements is inappropriate and only designed "to inflame the

20 reader."  *Id*. at 6.  Defendants point out the Special Master's Twenty-Ninth Round Monitoring

21 Report includes at least one definition of "weekly" as "each week but sometimes with ten days

22 between appointments."  *Id*. at 7 (quoting ECF No. 7715 at 814.)  Defendants contend their

23 proposed definition of weekly comports with the community standard of care, that a seven-day

24 definition will interfere with patients' treatment, and that their definition avoids unintended

25 consequences caused by a rigid schedule.  *Id*. at 8-10.  Defendants also contend it will be hard to

26 operationalize a rigid seven-day rule.  *Id*. at 10.

27 /////

18

1          **3.      Plaintiffs' Response**

2          Plaintiffs did not file a response to defendants' objections.  In their position statement

3   submitted to the Special Master, they agreed with his proposal.  *See* ECF No. 8057 at 4, 9.

4          **4.      Discussion**

5          The Special Master explains the whistleblower proceedings on the report from

6   Dr. Michael Golding made clear the need for clarity in the definition of terms used in the Program

7   Guide to define units of time, such as monthly and weekly.  ECF No. 8057 at 5.  He therefore

8   began in his Twenty-Eighth Monitoring Round to explicitly note he interprets "weekly" to mean

9   "every seven days," *id*. at 5-6 (quoting ECF No. 7074 at 558, 688; citing ECF No. 7715 at 552),

10  and he notes defendants did not object to the use of this definition, *id*. at 6.  The Special Master

11  also explains he communicated to defendants his willingness to have further discussions about

12  this issue, but they declined.  *Id*.

13         The proceedings on Dr. Golding's whistleblower report are the reason for the ongoing

14  data remediation proceedings:  the record made there is a cautionary tale about the critical

15  importance of transparency, clear communication, and common understanding of terms in the

16  collection and reporting of mental health data.  The court reads the Special Master's proposed

17  resolution for this dispute as placing it in an appropriate historical context with no intent to

18  inflame; nor is the proposal reasonably construed as inflammatory.  The record suggests the data

19  remediation proceedings illuminated a difference in the interpretation of "weekly" as used by

20  defendants contrasted to the definition used by the Special Master in his monitoring.  This is

21  precisely the type of difference best addressed in thorough discussions among all stakeholders.

22         The Special Master offered to continue discussions.  Defendants declined because the

23  Special Master would not provide them with a written proposal.  Defendants' reason for declining

24  is based on a premise entirely inconsistent with the role of the Special Master in this case in

25  general and in the data remediation project in particular.  The Special Master's "principal

26  responsibilities . . . are to provide expert advice to defendants to ensure that their decisions

27  regarding the provision of mental health care to class members conforms to the requirements of

28  the federal constitution and to advise the court regarding assessment of defendants' compliance

1   with their constitutional obligations."  December 11, 1995 Order of Reference, ECF No. 640, at 2

2   (citing *Coleman v. Wilson*, 912 F. Supp. at 1324 n.63).  The Special Master is required to work

3   with defendants and is granted unlimited access to CDCR staff, documents, and facilities to

4   perform his duties.  ECF No. 640 at 3, 5-7.  Part of his job includes "work[ing] closely with

5   defendants" as they develop and implement mental health quality management systems.

6   February 18, 2020 Order, ECF No. 6467, at 4.  The ongoing data remediation process is a critical

7   component of the larger quality management effort.  *See*, *e.g.*, *id.* at 2.

8          Fundamentally, the Special Master is not a party in this action; he is an arm of the court.

9   As such, defendants may not require the Special Master to provide them with "written proposals"

10  as a precondition for their participation in discussions the Special Master deems necessary to the

11  performance of his duties.  *See generally* ECF No. 640.  To the contrary, defendants are required

12  to cooperate fully in response to the Special Master's requests and direction.

13         In the face of defendants' refusal to continue discussions about this indicator, the Special

14  Master acted well within his authority and the scope of the data remediation project to make the

15  proposal currently before the court, which is consistent with relevant parts of his monitoring

16  practice.  *See* ECF No. 7847 at 7 (each CQIT key indicator must track the Special Master's

17  monitoring practice).[11]  Nonetheless, the Special Master has made clear his view that this issue

18  would benefit from further discussion.  This dispute should not have to be resolved by, or brought

19  back to, the court if all parties return to discussions in a good faith effort to address all

20  stakeholder perspectives and practices and achieve a workable resolution.  The court defers

21  /////

---

[11] Defendants acknowledge the Special Master's references in his Twenty-Ninth Round Monitoring Report to primary clinician contacts "as occurring 'within' or 'every' seven days" but, as noted above, they cite to one review of a patient's chart in the Twenty-Ninth Round Monitoring Report that includes a definition of weekly as "each week but sometimes within ten days between appointments."  *See* ECF No. 8041 at 7 (citing ECF No. 7715 at 814).  They contend that "[w]ithout access to the Special Master's data and his monitoring methodology [they] cannot ascertain whether the [Special Master's] "references to 'seven days' fell within a calendar week."  ECF No. 8041 at 7.  Again, the Special Master is not a party in this action; he is an arm of the court.  Defendants' contention here points only to the need for further focused discussion on this topic to ensure definitional clarity and congruence.

1   resolution of defendants' objections in this respect for a period of thirty days to allow those

2   discussions to be completed.

3         **F.**    **Conclusion**

4        In this order, the court resolves two of five objections to the Special Master's proposals to

5   resolve disputes that have arisen during the ongoing data remediation process.  The court defers

6   resolution of three other disputes pending further proceedings as required by this order.  The data

7   remediation process should be nearing its conclusion, and to that end the parties must maintain a

8   proper focus to ensure fulfillment of the essential purposes of data remediation: to build a

9   transparent and accurate system for reporting mental health data in the larger context of

10  development of an adequate mental health quality management system.

11       In accordance with the above, IT IS HEREBY ORDERED that:

12       1. Defendants' October 27, 2023 Objections to the Special Master's Proposed Resolution

13  of Data Remediation Disputes:  AC5:  Treatment Offered – Measuring Confidential Groups, ECF

14  No. 8036, are OVERRULED.  The Special Master's proposed resolution, ECF No. 8036 at 9-10,

15  is APPROVED.

16       2.  Defendants' October 27, 2023 Objections to the Special Master's Proposed Resolution

17  of Data Remediation Disputes:  AC5:  Treatment Offered – Measuring "Core Groups", ECF

18  No. 8037, are OVERRULED.  The Special Master's proposed resolution, ECF No. 8037 at 9, is

19  APPROVED.

20       3.  Within fourteen days from the date of this order defendants shall bring an appropriate

21  motion raising the question whether the PIP Max Custody Review Policy should be included in

22  CQIT.  Plaintiffs shall file a response to the motion within fourteen days thereafter.  The court

23  may, as necessary, seek additional input from the Special Master as necessary to resolve the

24  motion.  Resolution of defendants' October 27, 2023 Objections to the Special Master's Proposed

25  Resolution of Data Remediation Dispute:  Placeholder—PIP—Max Custody Review is

26  DEFERRED pending resolution of the defense motion required by this order.

27       4.  Resolution of defendants' October 27, 2023 Objections to the Special Master's

28  Proposed Resolution of Data Remediation Dispute on AC7.1 (Timely Transfer to EOP) and

1    AC7.4 (Timely Transfer to CCCMS) – Suspending Events is DEFERRED for a period of thirty

2    days in accordance with the provisions of this order. The parties shall file a short joint statement

3    informing the court of the status of this dispute at the end of the thirty-day period.

4       5.  Resolution of defendants' October 27, 2023 Objections to the Special Master's

5    October 18, 2023 Proposed Resolution of Data Remediation Dispute: AC2.1 (Timely PC

6    Contacts) – Definition of "Weekly" is DEFERRED for a period of thirty days in accordance with

7    the provisions of this order.  The parties shall file a short joint statement informing the court of

8    the status of this dispute at the end of the thirty-day period.

9       IT IS SO ORDERED.

10    DATED:  November 15, 2023.

11

                       CHIEF UNITED STATES DISTRICT JUDGE