1                IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
2

3      RALPH COLEMAN, ET AL.,
              PLAINTIFFS,              SACRAMENTO, CALIFORNIA
4                                      NO. 2:90-CV-00520
       VS.                             TUE., NOV. 07, 2023
5                                      9:05 A.M.
       GAVIN NEWSOM, ET AL.,
6             DEFENDANTS.
       _____/
7
                         TRANSCRIPT OF HEARING
8        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
                            ---OOO---
9
       APPEARANCES:
10
         FOR THE PLAINTIFFS:          ROSEN, BIEN, GALVAN AND
11                                    GRUNFELD, LLP
                                      101 MISSION STREET
12                                    SIXTH FLOOR
                                      SAN FRANCISCO, CA  94105
13                                    BY:  MICHAEL BIEN
                                      LISA ADRIENNE ELLS
14                                    JENNY SNAY YELIN
                                      ADRIENNE PON HARROLD
15                                    ATTORNEYS AT LAW

16
         FOR THE DEFENDANTS:          HANSON BRIDGETT, LLP
17                                    425 MARKET STREET, 26TH FLOOR
                                      SAN FRANCISCO, CA  94105
18                                    BY: SAMANTHA DERIN WOLFF
                                      LAWRENCE MICHAEL CIRELLI
19                                    ATTORNEYS AT LAW
       (APPEARANCES CONTINUED ON FOLLOWING PAGE)
20

21      OFFICIAL COURT REPORTER:      KIMBERLY M. BENNETT,
                                      CSR, RPR, RMR, CRR
22                                    501 I STREET
                                      SACRAMENTO, CA 95814
23

24      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
       PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
25

```
 1                          APPEARANCES CONTINUED
 2
 3     FOR THE DEFENDANTS:           OFFICE OF THE ATTORNEY
                                     GENERAL
 4                                   1300 I STREET, SUITE 125
                                     SACRAMENTO, CA  94244
 5                                   BY: ELISE OWENS THORN
                                     DEPUTY ATTORNEY GENERAL
 6
 7     FOR THE DEFENDANTS:           OFFICE OF THE ATTORNEY
                                     GENERAL
 8                                   455 GOLDEN GATE AVE.
                                     SUITE 11000
 9                                   SAN FRANCISCO, CA  94102
                                     BY: DAMON GRANT MCCLAIN
10                                   NAMRATA KOTWANI
                                     DEPUTIES ATTORNEY GENERAL
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          (CALL TO ORDER OF THE COURT, 9:05 A.M.)

2          THE CLERK:  CALLING CIVIL CASE 90-520; COLEMAN, ET

3    AL. VERSUS NEWSOM, ET AL.

4       THIS IS ON CALENDAR FOR ENFORCEMENT HEARING, DAY SIX.

5          THE COURT:  ALL RIGHT.  GOOD MORNING.

6       APPEARANCES, PLEASE, FOR PLAINTIFFS.

7          MR. BIEN:  GOOD MORNING, YOUR HONOR.  MICHAEL BIEN,

8    LISA ELLS, JENNY YELIN AND ADRIENNE HARROLD FOR PLAINTIFFS.

9          THE COURT:  ALL RIGHT.  GOOD MORNING TO YOU ALL.

10      AND FOR THE DEFENSE.

11         MR. MCCLAIN:  GOOD MORNING, YOUR HONOR.  DAMON

12   MCCLAIN, NAMRATA KOTWANI, ELISE THORN, LAWRENCE CIRELLI, AND

13   SAMANTHA WOLFF FOR DEFENDANTS.

14         THE COURT:  ALL RIGHT.  GOOD MORNING TO YOU ALL.

15      THIS IS ON FOR INPATIENT TRANSFER TIMELINES AND THE UNMET

16   BED NEEDS ASSESSMENT.  NO EVIDENTIARY HEARING.

17      I'VE REVIEWED WHAT THE PARTIES HAVE PROVIDED.  I HAVE A --

18   I THINK A RELATIVELY FEW QUESTIONS, BUT THEN I WOULD ALLOW YOU

19   TO SAY ANYTHING FURTHER.  I'LL FLOAT SOME SUGGESTIONS.  YOU CAN

20   LET ME KNOW WHAT YOU THINK.  AND THEN I'LL ISSUE AN ORDER

21   FOLLOWING HEARING.

22      SO ON INPATIENT TRANSFER TIMELINES, THANK YOU FOR THE BAR

23   GRAPH WHICH SATISFIES THE GENERALIST JUDGE'S DESIRE FOR SOME

24   ILLUSTRATION.  I UNDERSTAND THE PLAINTIFFS' CONCERNS ABOUT THE

25   GRAPH.  I DO -- BOTTOM LINE, I -- THE COURT IS TRACKING

1    ACCUMULATED FINES IN A WAY THAT REFLECTS THE TOTAL DAYS OF

2    DELAY.  AND SO I'M -- I THINK I HAVE MY FINGER ON THAT.  I

3    THINK AS OF AUGUST IT'S ABOUT 4.2 MILLION THAT HAVE ACCRUED ON

4    PAPER.

5        SO HERE ARE MY QUESTIONS.  RECOGNIZING THAT THERE -- YOU

6    KNOW, THERE ARE SEVERAL MONTHS NOW WITH NO -- NO FINES

7    ACCRUING.  IN TERMS OF THE PILOTING OF CHANGES TO AID CLASS

8    MEMBER ACCESS TO THE DSH PROGRAMMING, JUST HELP ME UNDERSTAND,

9    FROM THE DEFENSE' PERSPECTIVE, WHEN WILL THERE BE MEANINGFUL

10   INFORMATION BASED ON THE -- THE PILOTING?

11            MR. MCCLAIN:  BY "PILOTING" I BELIEVE YOU'RE

12   REFERRING TO THE NEW DSH REVIEW PROCESS?

13            THE COURT:  YES.

14            MR. MCCLAIN:  OKAY.  YES.  SO -- I COULD GIVE YOU

15   SOME VERY, VERY PRELIMINARY DATA RIGHT NOW IF YOU WOULD LIKE TO

16   HEAR THAT.  BUT --

17            THE COURT:  HAVE YOU SHARED THAT WITH PLAINTIFFS?

18            MR. MCCLAIN:  I HAVE NOT.

19            THE COURT:  ALL RIGHT.  IN A NUTSHELL.  JUST GIVE ME

20   AN EXECUTIVE SUMMARY.

21            MR. MCCLAIN:  IN A NUTSHELL, AN EXECUTIVE SUMMARY IS

22   THAT UNDER THAT NEW PROCESS, DSH HAS BEGUN TO REVIEW ICF

23   PATIENTS IN PIPS WHO ARE -- THEIR CUSTODY LEVEL ALLOWS THEM TO

24   BE IN UNLOCKED DORMS.  SO THEY HAVE REVIEWED A NUMBER OF THOSE

25   PATIENTS AND DECIDED TO CLINICALLY RECOMMEND SOME OF THEM FOR

1    TRANSFER TO DSH.

2        AND I CAN GIVE YOU THE NUMBERS IF YOU WOULD LIKE ME TO.

3            THE COURT:  YEAH.  WHY DON'T YOU DO THAT.

4            MR. MCCLAIN:  SO, SO FAR THEY HAVE LOOKED AT 47

5    PATIENTS IN THE PIPS.  AND AFTER A VERY CAREFUL AND THOROUGH

6    REVIEW OF THOSE PATIENTS, DSH HAS CLINICALLY RECOMMENDED 22 OF

7    THEM FOR DSH.

8            THE COURT:  ALL RIGHT.

9            MR. MCCLAIN:  ADDITIONAL --

10           THE COURT:  AND THEN THERE IS -- THE -- THE REVIEW IS

11   EVERY 30 TO 45 DAYS?

12           MR. MCCLAIN:  THAT'S CORRECT.

13           THE COURT:  ALL RIGHT.

14           MR. MCCLAIN:  WE EXPECT TO HAVE SORT OF A BETTER

15   AMOUNT OF INFORMATION, SOMETHING THAT WILL BE A LITTLE MORE

16   INFORMATIVE, BY MID-FEBRUARY.  AND WE EXPECT TO HAVE MORE

17   COMPLETE -- A MORE COMPLETE DATASET BY MID-APRIL.

18           THE COURT:  ALL RIGHT.

19       SO PLAINTIFFS ARE HEARING THE NUMBERS FOR THE FIRST TIME.

20   ANYTHING TO SAY BASED ON WHAT YOU'VE HEARD?  IS THIS MS. ELLS?

21           MS. ELLS:  YES, YOUR HONOR.

22       YOU KNOW, THIS -- WE -- WE THINK THIS IS A VALUABLE

23   PROCESS.  IT WAS NOT SORT OF DISCUSSED WITH US IN ADVANCE OF

24   BEING ROLLED OUT, SO WE HAVE A NUMBER OF QUESTIONS ABOUT IT

25   INCLUDING, FOR INSTANCE, WHETHER THESE PATIENTS THAT HAVE BEEN

1   CLINICALLY RECOMMENDED ARE ACTUALLY GOING TO TRANSFER TO DSH.

2   IT'S NOT CLEAR TO US.

3        IT ALSO, TO US, SUGGESTS THAT THE EXISTING LRH PROCESS IS

4   NOT WORKING, WHICH IS SOMETHING THAT THE SPECIAL MASTER HAS

5   BEEN DOCUMENTING FOR A LONG TIME, AND WHICH DEFENDANTS

6   ESSENTIALLY CONCEDE IN THEIR JOINT STATEMENT, THAT STAFFING IS

7   SIGNIFICANTLY UNDERMINING THE IMPLEMENTATION OF LRH.

8        HOWEVER, ALL THAT ASIDE, IT IS -- APPEARS TO BE A VALUABLE

9   PROCESS.  AND WE NOTE THAT THIS KIND OF MOVEMENT IS CONSISTENT

10  WITH EVERY OTHER TIME THAT DSH HAS DONE AN EXAMINATION OF

11  WHETHER OR NOT EXISTING PATIENTS ARE ELIGIBLE TO MOVE, DESPITE

12  THE CLINICAL BARRIERS BEING ESTABLISHED BY CDCR AS DOCUMENTED,

13  AGAIN, IN THEIR JOINT REPORT.

14       SO WE ARE INTERESTED IN RECEIVING -- WE HAVE SOME QUESTIONS

15  ABOUT THIS.  AND, YOU KNOW, WE IMAGINE THAT DEFENDANTS WILL BE

16  AMENABLE TO MEETING AND CONFERRING WITH US TO PROVIDE FURTHER

17  INFORMATION AND UPDATES ALONG THE WAY.

18            THE COURT:  IS THAT TRUE, MR. MCCLAIN?

19            MR. MCCLAIN:  WELL, NOT EVERYTHING SHE SAID WAS FAIR,

20  BUT THE LAST PART WAS FAIR.

21            THE COURT:  I'M ASKING ABOUT MEETING AND CONFERRING

22  AND SHARING INFORMATION.

23            MR. MCCLAIN:  YES.  THAT'S ABSOLUTELY FAIR.

24            THE COURT:  AND CHARACTERIZING IT AS A VALUABLE

25  PROCESS SOUNDS HOPEFUL.

1      SPEAKING OF LRH, PLAINTIFFS, I THINK, HAVE THE

2   UNDERSTANDING THAT IN CONNECTION WITH AGREEING TO CONTINUE THE

3   HEARING, WHICH THE COURT APPROVED, THERE WAS AN UNDERSTANDING

4   THERE WOULD BE MEET AND CONFER ABOUT LRH IN PARTICULAR.

5      IS THAT FAIR, MR. MCCLAIN?

6          MR. MCCLAIN:  I BELIEVE THAT'S FAIR, YES.

7          THE COURT:  LRH, LEAST RESTRICTIVE HOUSING POLICY.

8      ALL RIGHT.  I WANT TO TALK A BIT MORE ABOUT THAT BEFORE WE

9   CONCLUDE TODAY.

10     JUST CHECKING WITH YOU, MR. MCCLAIN, ALSO IN TERMS OF THE

11  CHCF AND CMF PIPS OPERATING AT -- I BELIEVE IT'S 88 PERCENT OF

12  CAPACITY?

13         MR. MCCLAIN:  FOR CMF IT'S 88 PERCENT.

14         THE COURT:  ALL RIGHT.

15         MR. MCCLAIN:  FOR CHCF I BELIEVE IT'S 81 PERCENT.

16         THE COURT:  81.  ALL RIGHT.

17     AND THERE IS A -- THE DEFENSE RECOGNIZES -- THE DEFENDANTS

18  RECOGNIZE THAT MORE BEDS WERE OPENING -- WILL OPEN AS STAFFING

19  IMPROVES.  A LOT OF -- A LOT OF WHAT WE'RE TALKING ABOUT TODAY

20  DOES INTERSECT WITH STAFFING ISSUES.

21     IS THERE ANY UPDATE AS TO WHEN THE DEFENSE THINKS THE PIPS

22  WILL BE ON TRACK FOR FULL STAFFING?

23         MR. MCCLAIN:  WELL, I DON'T THINK I HAVE AN UPDATE AS

24  FAR AS THE TIMING OF THAT.  DEFENDANTS ARE WELL AWARE THAT THE

25  COURT HAS ORDERED DEFENDANTS TO COME INTO COMPLIANCE ON PIP

1    STAFFING AND THEY'RE WORKING ON IT.  BUT I DON'T THINK I HAVE

2    AN UPDATE, YOUR HONOR, AS TO WHEN EXACTLY THAT WILL BE.

3              THE COURT:  ALL RIGHT.  WE'LL ALSO TALK A LITTLE BIT

4    MORE ABOUT THAT.

5         IN TERMS OF THE PERSONALITY DISORDER QUESTION, THE DEFENSE

6    RECOGNIZES THAT THERE IS A SIGNIFICANT POPULATION WITH

7    PERSONALITY DISORDERS THAT NEEDS A DIFFERENT APPROACH?

8              MR. MCCLAIN:  SO THE -- WHAT THE UNA FOUND WAS THAT

9    THERE ARE 470 PERSONALITY DISORDERED PATIENTS WHO ARE NOT IN

10   NEED OF INPATIENT CARE AND WHO MAY BENEFIT FROM SOME SORT OF

11   OTHER INTERVENTION.  AND THAT'S THE ISSUE THAT DEFENDANTS WOULD

12   LIKE TO DIG INTO MORE OVER THE NEXT 12 MONTHS, AND TAKE A

13   CLOSER, HARDER LOOK AT THOSE INDIVIDUAL PATIENTS AND ALSO DO

14   SOME RESEARCH ON WHAT TYPES OF INTERVENTIONS MAY WORK.

15        THIS GROUP OF PERSONALITY DISORDERED PATIENTS, THEY ARE NOT

16   HOMOGENOUS.  SO AT LEAST CURRENTLY DEFENDANTS DO NOT BELIEVE

17   THAT THERE IS, LIKE, SOME SINGLE PROGRAM THAT COULD BE

18   IMPLEMENTED THAT WOULD BENEFIT ALL OF THE MEMBERS OF THIS

19   GROUP.

20             THE COURT:  THE DEFENDANTS HAVE, IN THE PAST,

21   PROPOSED PROGRAMS, RIGHT, BUT NEVER IMPLEMENTED THEM?  DO I

22   HAVE THAT RIGHT?

23             MR. MCCLAIN:  UM --

24             THE COURT:  SO IT'S NOT AS IF THE DEFENSE IS STARTING

25   FROM SCRATCH.

1              MR. MCCLAIN:  I WOULDN'T SAY THEY'RE STARTING

2    COMPLETELY FROM SCRATCH.  THERE WAS AT ONE POINT IN TIME AT CMF

3    A DBT PROGRAM.  IT -- IT WAS ENDED WHEN IT WAS DETERMINED THAT

4    IT DIDN'T SEEM TO BE WORKING THE WAY THAT IT HAD BEEN

5    ANTICIPATED IT WOULD.

6       SO CDCR DOES HAVE SOME VERY LIMITED EXPERIENCE WITH A DBT

7    TYPE OF PROGRAM.

8              THE COURT:  DBT, DIALECTICAL BEHAVIORAL TREATMENT.

9              MR. MCCLAIN:  YES.

10             THE COURT:  WHICH PLAINTIFFS NOTE IN THE JOINT

11   REPORT.

12      GIVEN THE INFORMATION AVAILABLE, GIVEN THE SIZE OF THAT

13   POPULATION, EVEN ACCEPTING IT'S NOT HOMOGENEOUS, ISN'T THERE

14   ENOUGH TO START A PILOT PROGRAM SOONER, NOT TAKE 12 MONTHS TO

15   STUDY THE QUESTION?

16             MR. MCCLAIN:  WELL, ALL I CAN REPORT, YOUR HONOR, IS

17   WHAT THE EXPERTS IN CDCR HAVE SAID, WHICH IS THAT THEY REALLY

18   DO NEED THAT TIME.

19      AND I BELIEVE ONE OF THE PROPOSALS WAS TO IMMEDIATELY START

20   A PROGRAM FOR BORDERLINE PERSONALITY DISORDER PATIENTS.  AND

21   THE -- THE HOMOGENEOUS ISSUE APPLIES TO THEM AS WELL BECAUSE

22   MANY OF THOSE PATIENTS HAVE OTHER COINCIDING DIAGNOSES AND

23   ISSUES.  SO, YOU KNOW, SOME TIME WOULD HAVE TO BE SPENT LOOKING

24   AT EACH OF THE PATIENTS WHO MIGHT BENEFIT FROM SOME PROGRAM

25   LIKE THAT.

1            THE COURT:  ALL RIGHT.

2       PLAINTIFFS' RESPONSE TO WHAT THEY'VE HEARD?  I THINK I'M

3  CLEAR ON PLAINTIFFS' POSITION, BUT ANYTHING MORE BASED ON WHAT

4  YOU'VE HEARD JUST NOW?

5            MS. ELLS:  YOU KNOW, YOUR HONOR, IT'S ALREADY BEEN 4

6  MONTHS, AND THEN ASKING FOR 12 MORE AND THAT IS SIMPLY TO STUDY

7  THE QUESTION, THAT DOES NOT INVOLVE A COMMITMENT TO ACTUALLY

8  ROLLING A PROGRAM OUT.

9       AND, YOU KNOW, IN ADDITION TO THE DBT PROGRAM THAT WAS

10  DISCUSSED, THERE ALSO WAS A WORKGROUP THAT CDCR DEDICATED TO

11  EVALUATING THIS CLASS OF PATIENTS IN 2020 THAT CAME UP WITH

12  SOME, YOU KNOW, PROPOSALS THAT WERE NEVER IMPLEMENTED.

13       THERE WAS ALSO THE POSITIVE BEHAVIORAL SUPPORT TEAM

14  PROGRAM.

15       YOU KNOW, THIS IS NOT A NEW PROBLEM.  IT'S SOMETHING THAT

16  DEFENDANTS HAVE BEEN STUDYING FOR A LONG TIME.  AND, YOU KNOW,

17  TO SAY THAT THIS IS A HETEROGENEOUS [SIC] GROUP OF PATIENTS

18  WITH DIFFERENT NEEDS IS TRUE OF ANY INPATIENT PROGRAM AND ANY

19  INDIVIDUAL AND MENTAL HEALTH TREATMENT IN GENERAL.

20       SO I DON'T SEE THE -- PARTICULARLY AT THIS POINT IT WOULD

21  BE 16 MONTHS AT A MINIMUM.  I DON'T SEE ANYTHING TO

22  SUBSTANTIATE THAT, PARTICULAR FOR -- PARTICULARLY FOR THE

23  BORDERLINE PERSONALITY PEOPLE AS TO WHOM EVERYBODY AGREES THERE

24  IS A VERY CLEAR PROTOCOL.  THAT'S 152 PEOPLE THAT HAVE BEEN

25  IDENTIFIED TO DATE.

1              THE COURT:  IN TERMS OF THAT DBT PROGRAM, DO

2      PLAINTIFFS HAVE AN UNDERSTANDING OF THE DEFENSE' POSITION THAT

3      IT DIDN'T WORK?

4              MS. ELLS:  I DON'T HAVE A RECOLLECTION OF THAT.

5      PERHAPS OTHERS ON MY TEAM DO, BUT THAT IS NOT SOMETHING THAT I

6      WAS AWARE OF.  ALL I KNOW IS THAT IT WAS ABANDONED.

7              THE COURT:  THERE IS ALSO STILL -- DO I HAVE THAT

8      RIGHT -- THE PBST, POSITIVE BEHAVIORAL SUPPORT TEAM PROGRAM,

9      THAT THAT IS STILL OPERATING BUT PLAINTIFFS SAY NOT FULLY

10     SUPPORTED, MR. MCCLAIN?

11             MR. MCCLAIN:  I DON'T ACTUALLY KNOW THE DETAILS ON

12     THAT PROGRAM.  SORRY, YOUR HONOR, I CAN'T REALLY SPEAK TO THAT.

13             THE COURT:  ALL RIGHT.  WELL, I DO -- I WANT TO KEEP

14     SOME FOCUS ON THE -- THE POPULATION WITH PERSONALITY DISORDERS

15     BUT I HAVE A FEW MORE QUESTIONS BEFORE WE COME BACK TO THAT.

16        IN TERMS OF REPORTING, THE DEFENDANTS -- AND JUST LOOKING

17     AT THE ISSUE OF THE DATA ABOUT REFERRAL DECISIONS AND REFERRALS

18     THAT ARE RESCINDED, REJECTED, OR PAROLED/DISCHARGED AFTER

19     PROGRAM GUIDE TIMELINES EXPIRE, THE DEFENDANTS HAVE PROVIDED A

20     STANDALONE REPORT BUT HAVE NOT INCLUDED THAT IN THE OTHER DATA

21     REPORTS.

22        DO YOU AGREE THAT THAT MANNER OF REPORTING AFFECTS THE

23     RELIABILITY OF THE UNMET BED NEED STUDY, MR. MCCLAIN?

24             MR. MCCLAIN:  NO.

25             THE COURT:  IS IT MISLEADING TO COUNT THE

1  CANCELLATIONS AS COMPLIANT WITH PROGRAM GUIDE REQUIREMENTS?  DO

2  YOU -- DO YOU AGREE WITH THAT?

3          MR. MCCLAIN:  UNDER THE -- UNDER THE POLICY AND THE

4  PROGRAM GUIDE, I DO AGREE WITH THAT -- OR THAT I -- IT IS -- IT

5  IS NOT MISLEADING TO REPORT TIMELY TRANSFERS THE WAY CDCR

6  HAS -- HAS BEEN DOING IT.  BUT A COUPLE OF POINTS THERE.

7      ONE IS THE DETAILED INFORMATION ON RECISIONS AND

8  REJECTIONS, PAROLES AND DISCHARGES, HAS BEEN PROVIDED TO

9  PLAINTIFFS AND THE SPECIAL MASTER FOR MANY YEARS, AND FOR SOME

10  PERIOD OF TIME IT WAS EVEN FILED WITH THE COURT IN A REPORT

11  THAT -- THAT IS STILL PROVIDED BUT IS NO LONGER FILED WITH THE

12  COURT.  SO THE -- THE INFORMATION CONTAINED IN THAT STANDALONE

13  REPORT HAS -- HAS BEEN -- WAS ALREADY PRODUCED TO PLAINTIFFS

14  AND THE SPECIAL MASTER, IT JUST WASN'T PRODUCED IN THE FORMAT

15  OF THAT STANDALONE REPORT.

16      AND, ADDITIONALLY, DEFENDANTS, AFTER PRODUCING THAT

17  STANDALONE REPORT, THEY HAVE ADDED AN EXHIBIT TO THE -- THE

18  MONTHLY FILING ON TRANSFERS, IT'S THE LAST EXHIBIT NOW, I THINK

19  IT'S EXHIBIT G, THAT -- THAT NOW PROVIDES THAT INFORMATION ON A

20  MONTHLY BASIS.

21          THE COURT:  ALL RIGHT.  ALSO, HELP ME UNDERSTAND.  I

22  THINK IT'S NOT DISPUTED THERE'S BEEN A LARGE AND SUSTAINED DROP

23  IN INPATIENT REFERRALS SINCE THE BEGINNING OF THE PANDEMIC, BUT

24  AT LEAST IN WHAT IS BEFORE THE COURT, DEFENDANTS HAVE NOT

25  PROVIDED THEIR ANALYSIS OR EXPLANATION OF THAT.

1          MR. MCCLAIN:  THAT'S TRUE, YOUR HONOR.  SO THERE

2   ARE -- WELL, FIRST OF ALL, YOU KNOW, THE UNA WAS NOT DESIGNED

3   TO TRY TO ANSWER THAT QUESTION.

4          THE COURT:  RIGHT.  FAIR.

5          MR. MCCLAIN:  THERE ARE SOME OTHER DATA THAT WE

6   INCLUDED.  AND, I'M SORRY, I CAN'T REMEMBER WHICH FILING IT WAS

7   IN NOW.  BUT WE DID INCLUDE SOME DATA THAT COULD SHED SOME

8   LIGHT ON SOME POSSIBLE REASONS WHY THERE ARE FEWER REFERRALS.

9    DATA ABOUT THE STATUS OF -- OF PATIENT'S MENTAL HEALTH

10   THROUGHOUT THAT PERIOD, THE NUMBER OF SUICIDES AND ATTEMPTED

11   SUICIDES WAS ALSO DOWN DURING THAT PERIOD.

12    SO -- BUT WE PROVIDED THAT DATA JUST TO SHED SOME LIGHT.

13   WE CAN'T SAY -- WE CAN'T SAY EXACTLY WHAT THE CAUSE IS.

14   THAT -- THAT ISSUE HAS NOT BEEN STUDIED.

15    WHAT WE DO KNOW FROM THE UNA IS THAT THERE -- THERE IS NO

16   UNMET NEED.

17          THE COURT:  I UNDERSTAND THAT'S -- THAT'S A

18   CONCLUSION.

19    HELP ME -- EVEN IF THE UNA WASN'T DESIGNED TO ANSWER THE

20   QUESTION ABOUT THE DROP IN REFERRALS, DOES THAT INFORMATION

21   REGARDING THE DROP AFFECT THE RELIABILITY OF THE UNA STUDY

22   CONCLUSIONS?

23          MR. MCCLAIN:  ABSOLUTELY NOT.

24          THE COURT:  OKAY.  ALL RIGHT.

25    ON THE UNA, JUST A FEW QUESTIONS.  FIRST ON THE

 1   METHODOLOGY, THE DEFENDANTS REPEATEDLY REFER TO THE METHODOLOGY

 2   AS THE SPECIAL MASTER'S, BUT I THINK THAT'S NOT QUITE FAIR.

 3   ALL STAKEHOLDERS AGREED TO THE METHODOLOGY, RIGHT, MR. MCCLAIN?

 4         MR. MCCLAIN:  WELL, ACTUALLY I'M NOT SURE ABOUT THAT,

 5   YOUR HONOR.  I KNOW THAT DEFENDANTS OBJECTED TO CERTAIN ASPECTS

 6   OF THE METHODOLOGY.

 7     I BELIEVE -- IN THE COURT'S ORDER SETTING UP THE PROCESS, I

 8   BELIEVE THE COURT SAID THAT THE SPECIAL MASTER WOULD HAVE THE

 9   FINAL SAY ON WHAT THE METHODOLOGY IS.  AND I BELIEVE HE DID

10   HAVE THE FINAL SAY.  AND DEFENDANTS THEN IMPLEMENTED THAT.

11         THE COURT:  DO THE PLAINTIFFS HAVE ANYTHING TO SAY

12   ABOUT THAT?  OR IS THAT --

13         MS. ELLS:  ONLY THAT I'M UNAWARE OF WHAT OBJECTIONS

14   HE IS REFERRING TO.  I DON'T -- I DON'T REMEMBER THEM BEING

15   SPECIFICALLY MAINTAINED.  MY UNDERSTANDING WAS THAT THERE WAS

16   AGREEMENT.

17         THE COURT:  ARE THOSE IN THE RECORD SOMEPLACE,

18   MR. MCCLAIN?

19         MR. MCCLAIN:  I DON'T BELIEVE THERE IS A LIST OF

20   DEFENDANTS' OBJECTIONS, WHICH I BELIEVE OCCURRED DURING THE --

21   THE PROCESS OF COMING UP WITH THE METHODOLOGY, IN THOSE

22   MEETINGS.

23         THE COURT:  I'M JUST MAKING CERTAIN I'M ASKING ONLY

24   THE QUESTIONS I NEED TO.

25     ON THE DEFENSE' POSITION THAT PLAINTIFFS HAVEN'T POINTED TO

1  A SINGLE INSTANCE OF UNMET NEED, ANYTHING MORE TO SAY ABOUT

2  THAT, MS. ELLS?

3          MS. ELLS:  YOUR HONOR, I'M NOT SURE WHAT EXACTLY THAT

4  MEANS.

5    WE'VE CERTAINLY IDENTIFIED A SIGNIFICANT PROBLEM WITH THE

6  LRH PROCESS WHERE PATIENTS IN NEED AND DESERVING OF TREATMENT

7  AT LOWER CUSTODY SETTINGS, INCLUDING AT DSH, ARE NOT BEING

8  CAUGHT BY THIS PROCESS.  SOME OF THAT IS BY DESIGN.  SOME OF

9  THAT IS BY IMPLEMENTATION.

10    BUT THE OTHER -- YOU KNOW, THE FUNDAMENTAL POINT IS

11  PLAINTIFFS WERE ONLY ALLOWED TO OBSERVE A RELATIVELY SMALL

12  PORTION OF THE UNA PROCESS.  WE WERE NOT AT EVERY MEETING.  WE

13  COULD NOT POSSIBLY HAVE TRACKED EVERY REFERRAL BECAUSE WE

14  SIMPLY WERE NOT AT ALL OF THE MEETINGS; NOR WERE WE ALLOWED TO

15  BE AT ALL OF THE MEETINGS.

16    SO TO SAY THAT WE HAVE FAILED TO IDENTIFY UNMET NEED, YOU

17  KNOW, OUR POINT MORE IS THAT WE THINK THERE ARE SYSTEMIC

18  PROBLEMS THAT ARE PREVENTING THE IDENTIFICATION OF NEED.  IN

19  PARTICULAR, THE MASSIVE STAFFING SHORTAGE WE THINK AFFECTED THE

20  ENTIRETY OF THE STUDY.  THE DEPRESSED REFERRAL RATES.  JUST

21  RESPONDING BRIEFLY TO WHAT MR. MCCLAIN SAID.

22    YOU KNOW, THE PROBLEM IS NOT SO MUCH THAT REFERRALS

23  DECREASED DURING THE PANDEMIC, I THINK THAT IS SOMEWHAT TO BE

24  EXPECTED GIVEN THAT PATIENTS WERE NOT TRANSFERRING, SO WHY

25  WOULD CLINICIANS BOTHER TO SUBMIT REFERRAL PAPERWORK?  THE

1  PROBLEM IS THAT THE REFERRAL RATE NOW, IN 2023, IS LOWER THAN

2  IT WAS IN 2020 OR 2021 OR 2022.  SO NOT ONLY IS THE REFERRAL

3  RATE DEPRESSED FROM PRE-PANDEMIC LEVELS -- AND ALMOST BY HALF

4  -- IT IS NOT AT ALL INCREASING.

5      AND THE REFERENCES TO THE RELATIVELY LOW SUICIDE RATE

6  DURING THE PANDEMIC THAT MR. MCCLAIN WAS DISCUSSING AND

7  REFERENCING ARE NOT MODERN.  THAT IS NOT CONTEMPORANEOUS.

8      THE CURRENT SUICIDE RATE, AS DR. MEHTA TESTIFIED TO DURING

9  THE CONTEMPT TRIAL, IS HIGHER THIS YEAR THAN IT WAS LAST YEAR,

10  AND LAST YEAR WAS HIGHER THAN IT WAS THE YEAR BEFORE, AND THAT

11  WAS HIGHER THAN IT WAS THE YEAR BEFORE.  THIS YEAR WE'RE AT A

12  RELATIVELY ASTRONOMICAL RATE ALREADY TO DATE.

13      SO I THINK ALL OF THESE ARE -- THE -- THE DEPRESSED

14  REFERRAL RATES ARE A REAL ISSUE THAT I THINK UNDERMINES THE

15  VALIDITY OF THIS STUDY, ALONG WITH, YOU KNOW, THE UNEXPLAINED

16  DATA IRREGULARITIES AND THE STAFFING ISSUES.

17      AND, YOU KNOW, FINALLY, JUST -- THIS CONCEPT THAT THERE

18  WERE AN EQUAL NUMBER OF REFERRALS IDENTIFIED OUTSIDE OF THE UNA

19  PROCESS WHILE THE UNA PROCESS WAS OCCURRING IS VERY STRANGE.

20  AND IT'S NOT ROUTINE.  AND I DON'T THINK SIMPLY PASSING IT OFF

21  AS EXISTING PROCESSES WORKING NORMALLY IS A REASONABLE

22  INTERPRETATION OF WHAT WAS HAPPENING.

23      SO ALL OF THOSE TO US SUGGEST THAT THIS IS A STUDY THAT

24  REALLY SHOULD BE UNDERSTOOD IN TERMS OF ITS SORT OF -- THE

25  POWER OF ITS FINDINGS SHOULD BE UNDERSTOOD TO HAVE SOME REAL

1   LIMITATIONS THAT ARE NOT FULLY ACCOUNTED FOR IN THE REPORT

2   ITSELF, SOME OF WHICH I'M NOT SURE COULD HAVE BEEN ACCOUNTED

3   FOR IN THE METHODOLOGY, BUT CERTAINLY LIMIT THE APPLICABILITY,

4   I THINK, OF THE FINDINGS GOING FORWARD.

5           THE COURT:  ALL RIGHT.  I UNDERSTAND THAT ARGUMENT

6   GENERALLY.

7       JUST A SIDE NOTE ON SUICIDES.  TODAY IS NOT A FOCUSED

8   SESSION, BUT THE COURT HAS THAT ISSUE ON ITS RADAR AND PLANS TO

9   TURN TO THAT NEXT, ONCE WE GET THROUGH THIS SERIES OF

10  PROCEEDINGS.

11      IN TERMS OF THE REFERRAL RATES NOT RETURNING TO PRE-COVID

12  LEVELS, LET ME ASK YOU FIRST, MS. ELLS, AND THEN MR. MCCLAIN,

13  WOULD A FULLY FUNCTIONAL QUALITY IMPROVEMENT AND ASSURANCE

14  PROGRAM HELP PROVIDE THE ANSWERS TO THE OUTSTANDING QUESTION

15  THERE?

16          MS. ELLS:  I -- I THINK THAT IS A GOOD SUGGESTION.

17  I'D HAVE TO THINK EXACTLY WHAT THAT WOULD LOOK LIKE, BUT I

18  CERTAINLY THINK THAT'S A PART OF THE PUZZLE.

19          THE COURT:  AND THAT'S A WORK IN PROGRESS --

20          MS. ELLS:  YES.

21          THE COURT:  -- WITHIN CDCR.

22      AGREED ON THAT POINT, MR. MCCLAIN?

23          MR. MCCLAIN:  I -- I AGREE THAT -- THAT THAT COULD

24  HELP.  BUT, YOU KNOW, THE QUESTION ASSUMES THAT -- THAT THERE

25  IS A PROBLEM WITH THE LEVEL OF REFERRALS AND I WOULDN'T CONCEDE

1    THAT THERE IS A PROBLEM WITH THE LEVEL OF REFERRALS.

2              THE COURT:  ANYTHING TO SAY -- ANYTHING MORE TO SAY

3    ABOUT THE -- MS. ELLS' OBSERVATION ABOUT THE STRANGE NATURE OF

4    THE REFERRALS?

5              MR. MCCLAIN:  THAT'S A COMPLICATED ISSUE.  I KNOW WE

6    FULLY ADDRESSED IT IN OUR RESPONSE TO PLAINTIFFS' OBJECTIONS.

7         BUT I WOULD JUST POINT OUT THAT THIS WAS THE MOST

8    COMPREHENSIVE, ROBUST STUDY OF ITS KIND THAT HAS EVER BEEN

9    PERFORMED IN CDCR.  NEARLY EVERY SINGLE -- NEARLY, NOT ALL --

10   BUT ALMOST EVERY SINGLE MENTAL HEALTH PATIENT IN THE SYSTEM WAS

11   SCREENED.  WE HAD THE -- THE LARGEST NUMBER EVER BY FAR OF

12   PATIENTS WHO WERE -- WHO WENT TO PHASE 2 WHO WERE THEN LOOKED

13   AT MORE CAREFULLY FOR POSSIBLE REFERRAL.  I THINK SOMETHING

14   LIKE 24,000 HOURS OF -- OF TIME WENT INTO THIS.  THERE WERE 70

15   DEDICATED STAFF MEMBERS WORKING ON THIS AROUND THE CLOCK.  THIS

16   WAS A THOROUGH, WELL DONE STUDY.

17             THE COURT:  IT WAS A ROBUST STUDY.  AND IT -- IT

18   REFLECTS A LOT OF DILIGENCE, EVEN IF THERE ARE SOME UNANSWERED

19   QUESTIONS.

20        JUST THINKING MORE ABOUT THE STAFFING, MR. MCCLAIN, CAN YOU

21   TELL THE COURT IF THERE ARE ANY PLANS TO DECOMMISSION INPATIENT

22   BEDS?

23             MR. MCCLAIN:  I HAVE NOT -- YOU'RE TALKING ABOUT

24   CLOSING INPATIENT BEDS BECAUSE OF STAFFING?

25        I HAVE NOT HEARD ANYTHING FROM MY CLIENTS ABOUT ANY PLANS

1    TO DO THAT.  I HAVEN'T SPECIFICALLY ASKED THEM ABOUT THAT BUT I

2    HAVEN'T HEARD ANYTHING FROM THEM ON THAT.

3              THE COURT:  ALL RIGHT.

4       SO HERE -- HERE ARE MY TENTATIVE THOUGHTS, AND THEN I'D

5    ALLOW YOU TO MAKE ANY FINAL ARGUMENT.  I -- I -- I DO PLAN TO

6    SET A FURTHER HEARING BASED ON WHAT I'M SEEING AND HEARING.  I

7    THINK IT WOULD BE MID TO LATE APRIL; MAYBE THE WEEK OF APRIL

8    22ND OR THE VERY END OF APRIL.  AND THAT WOULD FOCUS ON AN

9    UPDATE ON THE STATUS OF COMPLIANCE WITH INPATIENT TRANSFER

10   TIMELINES AND COMPLIANCE WITH THE COURT'S OCTOBER 11TH ORDER ON

11   THE PIP STAFFING.

12      I AM INCLINED -- WITHOUT TRYING TO CREATE A LOT OF EXTRA

13   WORK, I'M INCLINED TO DIRECT THE PARTIES TO MEET AND CONFER

14   UNDER THE SPECIAL MASTER'S SUPERVISION -- AND I SHOULD

15   ACKNOWLEDGE THE SPECIAL MASTER IS PRESENT.  SPECIAL MASTER

16   LOPES IS HERE.  I DIDN'T ASK HIM TO IDENTIFY HIMSELF, BUT HE IS

17   PRESENT.  I WOULD DIRECT THE PARTIES TO MEET AND CONFER WITH

18   HIM TO DISCUSS REVISIONS -- POSSIBLE REVISIONS TO THE LEAST

19   RESTRICTIVE HOUSING POLICY, FOLLOWING UP ON WHAT I UNDERSTOOD

20   WAS THE PARTIES' AGREEMENT, OR AT LEAST THE PLAINTIFFS' REQUEST

21   WHEN THEY AGREED TO CONTINUE THE ENFORCEMENT PROCEEDINGS.

22      AND THEN ALSO DISCUSS, IF NOT IMMEDIATE, MORE PROMPT

23   DEVELOPMENT OF PROGRAMS TO TREAT THE COMPLEX POPULATION WITH

24   PERSONALITY DISORDERS.

25      AND, SPECIFICALLY, THAT -- THE QUESTION THE COURT HAS IS

 1    WHY COULD NOT THE DEFENDANTS, THROUGH DISCUSSIONS AND ON THEIR

 2    OWN INITIATIVE, COME WITH A PILOT PROJECT WITHIN THREE MONTHS

 3    AND THEN BEGIN IMPLEMENTATION WITHIN SIX MONTHS THEREAFTER TO

 4    DRAW ON WHAT THE DEFENDANTS ALREADY KNOW ABOUT THAT POPULATION,

 5    HOWEVER COMPLEX IT MAY BE.

 6        SO THOSE ARE MY TENTATIVE CONCLUSIONS.  BUT, AGAIN, I'LL --

 7    I'LL ONLY MAKE THOSE FINAL OR MODIFY THEM BASED ON WHAT I HEAR

 8    FROM YOU FURTHER NOW.

 9        SO, MS. ELLS, ANYTHING MORE YOU'D LIKE TO SAY?

10        MS. ELLS:  YOUR HONOR, I -- THOSE ALL SOUND

11    APPROPRIATE.

12        THE ONE OTHER ITEM THAT WE WOULD SUGGEST BE ADDED TO THE

13    MEET AND CONFER PROCESS IS THE NEW DSH REVIEW PROCESSES FOR

14    PATIENTS WHO MAY BE ELIGIBLE TO TRANSFER TO DSH.  I THINK THAT

15    WOULD BE -- THAT'S ANOTHER IMPORTANT COMPONENT OF THIS.

16        THE COURT:  ALL RIGHT.  MR. MCCLAIN?

17        MR. MCCLAIN:  THAT'S FINE, YOUR HONOR.  WE WOULD

18    WELCOME THAT.

19        YOU KNOW, WE BELIEVE THAT THE LRH PROCESS WORKS WELL BUT

20    COULD USE REFINEMENT, WHICH IS THE REASON FOR THIS -- THIS TEST

21    PROCESS WITH THE DSH REVIEWS.  AND WE ANTICIPATE THAT IT'S

22    GOING TO INCREASE THE NUMBER OF TRANSFERS TO DSH.

23        THE COURT:  ALL RIGHT.

24        MR. MCCLAIN:  AND, YOUR HONOR, I -- I HAVE ONE SORT

25    OF HOUSEKEEPING THING WHEN WE'RE DONE WITH THIS.

```
1              THE COURT:  ALL RIGHT.  ANYTHING ELSE ON EITHER OF

2    THESE ISSUES?

3         THERE IS A LOT THERE.  IT DOESN'T MEAN WE NEED TO TAKE A

4    LOT OF COURT TIME.  I THINK WE NEED TO KEEP ON TRACK THESE TWO

5    ISSUES, BUT RECOGNIZE THAT -- THAT THERE IS A LOT OF PROGRESS

6    THAT HOPEFULLY CAN BE CONSOLIDATED, AND WITH REFINEMENT THAT

7    DEFENDANTS ARE, IN FACT, ON TRACK TO SUSTAINABLY MEETING THE

8    TRANSFER TIMELINE REQUIREMENTS.

9         SO ANYTHING ELSE, MR. MCCLAIN, BEFORE THE HOUSEKEEPING?

10             MR. MCCLAIN:  JUST A CLARIFICATION ON THE COURT'S

11   COMMENTS ABOUT THREE MONTHS TO COME UP WITH SOME SORT OF A

12   PLAN.

13             THE COURT:  PROPOSED PILOT FOR THE -- FOR THE

14   PERSONALITY DISORDER POPULATION.

15             MR. MCCLAIN:  RIGHT.  IS THAT SOMETHING THAT YOU'RE

16   ASKING THE PARTIES TO MEET AND CONFER ABOUT, AS IN WHETHER THAT

17   IS SOMETHING THAT'S FEASIBLE OR REASONABLE TO DO?

18             THE COURT:  GIVEN THAT I'M SUGGESTING A MEET AND

19   CONFER SUPERVISED BY THE SPECIAL MASTER, YES, BUT I THINK THAT

20   SHOULD BE THE GOAL.

21        AND SO I WOULD ASK THE SPECIAL MASTER TO UPDATE ME BEFORE

22   THE THREE MONTHS EXPIRES WHERE -- WHERE ARE THE PARTIES IN

23   THEIR DISCUSSIONS, COULD THEY COME FORWARD BEFORE WE CONVENE

24   AGAIN IN APRIL WITH A STIPULATED PROPOSAL.

25             MR. MCCLAIN:  OKAY.  AND THAT'S FINE.
```

```
 1        I -- I WOULD JUST CAUTION THAT I KNOW FROM SPEAKING TO MY
 2   CLIENTS THAT THERE ARE A NUMBER OF IMPORTANT CONSIDERATIONS
 3   THAT WILL HAVE TO BE, YOU KNOW, FULLY ADDRESSED AND CONSIDERED
 4   IN ORDER TO -- TO DO SOMETHING LIKE THAT ON THAT TYPE OF A
 5   TIMELINE.  I THINK IT WILL BE EXTREMELY CHALLENGING IF IT'S
 6   FEASIBLE AS ALL.
 7        BUT I UNDERSTAND THAT WE ARE TO MEET AND CONFER ABOUT IT,
 8   AND WE CAN FULLY DISCUSS THOSE FACTORS AND CONSIDERATIONS WHEN
 9   WE DO THAT.
10             THE COURT:  ALL RIGHT.
11        ANYTHING ELSE, BIG PICTURE, MS. ELLS?
12             MS. ELLS:  NO, YOUR HONOR.
13             THE COURT:  ALL RIGHT.  THEN I'LL ISSUE AN ORDER
14   DIRECTING THE MEET AND CONFERS.
15        I'LL SET A FURTHER HEARING TO CONSIDER WHETHER OR NOT THERE
16   IS ANY NEED FOR ENFORCEMENT.  I THINK, BASED ON WHAT I'M
17   HEARING, THAT -- THAT THE WEEK OF APRIL 22ND WE'D HAVE ALL THE
18   INFORMATION NEEDED FROM THE DEFENSE' POINT OF VIEW.
19        IS THAT FAIR, MR. MCCLAIN?
20             MR. MCCLAIN:  ARE YOU REFERRING TO INFORMATION
21   REGARDING THE NEW DSH REVIEW PROCESS?
22             THE COURT:  I THINK THAT'S -- YOU SAID YOU'D HAVE
23   SOMETHING BY MID-APRIL?
24             MR. MCCLAIN:  YES.  THAT'S -- YES.  SO THAT'S
25   ACCURATE.
```

1          THE COURT:  ALL RIGHT.  SO WHAT DOES THE END OF THE

2   WEEK OF APRIL 22ND LOOK LIKE, MS. SCHULTZ?

3          THE CLERK:  THAT DATE IS AVAILABLE, YOUR HONOR.  THAT

4   FRIDAY MORNING IS AVAILABLE.

5          THE COURT:  APRIL 26TH AT 10 A.M.  DOES THAT WORK,

6   MS. ELLS?

7          MS. ELLS:  YES, YOUR HONOR.

8          THE COURT:  MR. MCCLAIN?

9          MR. MCCLAIN:  YES, YOUR HONOR.

10          THE COURT:  ALL RIGHT.  SO THAT WILL BE OUR NEXT

11   HEARING.

12      I'LL ISSUE AN ORDER CLARIFYING THE CONTOURS OF THE MEET AND

13   CONFER.  I WOULD EXPECT A JOINT STATUS REPORT BEFORE THE

14   HEARING FOCUSED IN PARTICULAR ON THE ISSUES COVERED BY THE MEET

15   AND CONFER.  I'LL HOPE TO HEAR SOMETHING ABOUT A PERSONALITY

16   DISORDER PILOT BEFORE.  THAT'S MY HOPE.

17      SO THE HOUSEKEEPING MATTER, MR. MCCLAIN?

18          MR. MCCLAIN:  OKAY.  SO LAST WEEK YOU ASKED

19   DEFENDANTS TO FILE AN UPDATED SALARY SCHEDULE BY THURSDAY OF

20   THIS WEEK.  AFTER CONFERRING WITH THE STATE CONTROLLER'S

21   OFFICE, WE LEARNED THAT THEY HAVE NOT FINALIZED THE NEW SALARY

22   INFORMATION IN THEIR SYSTEM AND SO ARE -- ARE NOT ABLE TO GIVE

23   US AN OFFICIAL SALARY SCHEDULE AT THIS TIME.

24      IF YOUR HONOR WOULD LIKE US TO, WE COULD SUBMIT ON THURSDAY

25   AN ESTIMATED SALARY SCHEDULE WHICH WE BELIEVE, IF NOT

1   COMPLETELY ACCURATE, WOULD BE VERY CLOSE TO ACCURATE.

2          THE COURT:  WHEN DOES THE CONTROLLER'S OFFICE EXPECT

3   TO HAVE THE ACTUAL NUMBERS FINALIZED?

4          MR. MCCLAIN:  THE BEST INFORMATION THAT WE COULD GET

5   FROM THE CONTROLLER'S OFFICE WAS THAT IT SHOULD BE DONE BEFORE

6   THE END OF THE YEAR.

7      AND REGARDLESS OF WHETHER YOU ASK US TO FILE AN ESTIMATE ON

8   THURSDAY OR NOT, WE WILL FILE THE ACTUAL OFFICIAL SALARY

9   SCHEDULE WITH THE COURT WITHIN THREE DAYS OF WHEN WE'RE ABLE TO

10  GET THAT FROM THE STATE CONTROLLER'S OFFICE.

11         THE COURT:  ALL RIGHT.  I THINK ESTIMATES FOR NOW,

12  GIVEN THE TIMING, AND THEN AS SOON AS POSSIBLE.

13         MR. MCCLAIN:  OKAY.

14         THE COURT:  THE THREE DAYS SOUNDS FINE.

15         MR. MCCLAIN:  AND ALL OF THAT ASIDE, I JUST WANT TO

16  MAKE SURE THAT THE COURT UNDERSTANDS THAT SALARY INCREASES ARE

17  RETROACTIVE ALL THE WAY BACK TO JULY, REGARDLESS OF WHEN THE

18  OFFICIAL SCHEDULE IS ISSUED.

19         THE COURT:  ALL RIGHT.  YOU CAN INCLUDE THAT IN THE

20  ESTIMATES THAT YOU PROVIDE.  JUST PUT IT IN WRITING SO IT'S

21  PART OF THE RECORD.

22         MR. MCCLAIN:  OKAY.

23         THE COURT:  ALL RIGHT.

24      ALL RIGHT.  IS THERE ANYTHING ELSE WE NEED TO DISCUSS

25  TODAY, MS. ELLS?  MR. BIEN?

1          MR. BIEN:  NO, YOUR HONOR.

2          MS. ELLS:  NO, YOUR HONOR.

3          THE COURT:  MR. MCCLAIN?

4          MR. MCCLAIN:  NO, YOUR HONOR.

5          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  I'LL

6   ISSUE AN ORDER SHORTLY.

7          THE CLERK:  COURT IS IN RECESS.

8               (PROCEEDINGS ADJOURNED, 9:42 A.M.)

9                    ---OOO---

10  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

11  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

12

13                    /S/ KIMBERLY M. BENNETT
                     KIMBERLY M. BENNETT
14                   CSR NO. 8953, RPR, CRR, RMR

15

16

17

18

19

20

21

22

23

24

25