```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
 2


 3      RALPH COLEMAN, ET AL.,
                PLAINTIFFS,          SACRAMENTO, CALIFORNIA
 4      VS.                          NO. 2:90-CV-00520
                                     THU., NOV. 02, 2023
 5      VS.                          10:03 A.M.

 6      GAVIN NEWSOM, ET AL.,
                DEFENDANTS.
        _____/
 7
                     TRANSCRIPT OF ZOOM/IN-PERSON HYBRID HEARING
 8         BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
                                ---OOO---
 9
        APPEARANCES:
10
          FOR THE PLAINTIFFS:        ROSEN, BIEN, GALVAN AND
11                                   GRUNFELD, LLP
                                     101 MISSION STREET
12                                   SIXTH FLOOR
                                     SAN FRANCISCO, CA  94105
13                                   BY:  ERNEST GALVAN
                                     LISA ADRIENNE ELLS
14                                   ATTORNEYS AT LAW

15
          FOR THE DEFENDANTS:        HANSON BRIDGETT, LLP
16                                   1676 N. CALIFORNIA BLVD.
                                     SUITE 620
17                                   WALNUT CREEK, CA  94596
                                     BY:  PAUL B. MELLO
18                                   ATTORNEY AT LAW

19      (APPEARANCES CONTINUED ON FOLLOWING PAGE)

20

21        OFFICIAL COURT REPORTER:   KIMBERLY M. BENNETT,
                                     CSR, RPR, RMR, CRR
22                                   501 I STREET
                                     SACRAMENTO, CA 95814
23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
          PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
25
```

```
 1                           APPEARANCES CONTINUED
 2
 3     FOR THE PLAINTIFFS:           PRISON LAW OFFICE
                                     1917 FIFTH STREET
                                     BERKELEY, CA  94710
 4                                   BY:  MARISSA HATTON
                                     ATTORNEY AT LAW
 5
 6     FOR THE DEFENDANTS:           HANSON BRIDGETT, LLP
                                     425 MARKET STREET, 26TH FLOOR
 7                                   SAN FRANCISCO, CA  94105
                                     BY:  SAMANTHA DERIN WOLFF
 8                                   LAWRENCE MICHAEL CIRELLI
                                     ATTORNEYS AT LAW
 9
10     FOR THE DEFENDANTS:           OFFICE OF THE ATTORNEY
                                     GENERAL
11                                   1300 I STREET, SUITE 125
                                     SACRAMENTO, CA  94244
12                                   BY:  ELISE OWENS THORN
                                     DEPUTY ATTORNEY GENERAL
13
14     FOR THE DEFENDANTS:           OFFICE OF THE ATTORNEY
                                     GENERAL
15                                   455 GOLDEN GATE AVE.
                                     SUITE 11000
16                                   SAN FRANCISCO, CA  94102
                                     BY:  DAMON GRANT MCCLAIN
17                                   DEPUTY ATTORNEY GENERAL
18
19
20
21
22
23
24
25
```

```
 1              (CALL TO ORDER OF THE COURT, 10:03 A.M.)

 2              THE CLERK:  CALLING CIVIL CASE 90-520, COLEMAN, ET

 3   AL. VERSUS NEWSOM, ET AL.

 4       THESE ARE ENFORCEMENT PROCEEDINGS, DAY FIVE.

 5              THE COURT:  ALL RIGHT.  GOOD MORNING.

 6       APPEARANCES, PLEASE, FOR PLAINTIFFS, LEAD COUNSEL.

 7              MS. ELLS:  GOOD MORNING, YOUR HONOR.  THIS IS LISA

 8   ELLS FOR PLAINTIFFS.  I'LL BE SERVING AS LEAD COUNSEL TODAY.

 9       WITH ME ARE ERNEST GALVAN AND MARISSA HATTON.

10              THE COURT:  ALL RIGHT.  GOOD MORNING TO YOU ALL.  I

11   SEE YOU ALL ON THE SCREEN.

12       THESE ARE PRIMARILY VIRTUAL PROCEEDINGS.  THE JUDGE IS IN

13   THE COURTROOM AND THE COURTROOM IS OPEN TO THE PUBLIC.  AND THE

14   ZOOM PHONE LINE -- THE PHONE LINE IS AVAILABLE SO PEOPLE CAN

15   LISTEN IN AS WELL, JUST SO THAT'S CLEAR.

16       FOR THE DEFENDANTS, LEAD COUNSEL.

17              MR. MELLO:  GOOD MORNING, YOUR HONOR.  THIS IS PAUL

18   MELLO FROM HANSEN BRIDGETT.

19       I'M JOINED BY SAMANTHA WOLFF, LARRY CIRELLI, DAMON MCCLAIN,

20   AND MS. THORN FROM THE ATTORNEY GENERAL'S OFFICE.

21       I WILL BE ACTING AS LEAD COUNSEL.  MR. CIRELLI MAY ADDRESS

22   ISSUES IF THE COURT HAS QUESTIONS REGARDING EXPERT ISSUES.  HE

23   HANDLED THOSE ISSUES AT THE EVIDENTIARY PROCEEDING.  THANK YOU.

24              THE COURT:  ALL RIGHT.  FOR LEAD COUNSEL, PLEASE FEEL

25   FREE TO IDENTIFY WHOMEVER YOU WOULD LIKE TO YIELD TO IF THAT'S
```

1    YOUR REQUEST.

2        GOOD MORNING, MR. MELLO.  I SEE MS. WOLFF ON MY SCREEN.  SO

3    PERHAPS MY SCREEN JUST DOESN'T ACCOMMODATE EVERYONE, BUT

4    EVERYONE ELSE THAT MR. MELLO IDENTIFIED IS -- IS THERE,

5    MS. SCHULTZ?

6            THE CLERK:  YES, YOUR HONOR.

7            THE COURT:  ALL RIGHT.  THANK YOU.

8        AND THEN THE SPECIAL MASTER IS MONITORING THE HEARING, SO

9    THE RECORD IS CLEAR IN THAT RESPECT.  ARE YOU ABLE TO -- I

10    THINK I DO SEE HIM NOW ON THE SMALLER SCREEN.

11        SPECIAL MASTER LOPES, CAN YOU IDENTIFY YOURSELF IF, IN

12    FACT, YOU ARE THERE?  I THINK YOU'RE MUTED.

13            MR. LOPES:  GOOD MORNING, YOUR HONOR.  THIS IS

14    MATTHEW LOPES, THE SPECIAL MASTER.

15            THE COURT:  ALL RIGHT.  GOOD MORNING TO YOU.

16        IS THERE ANYONE ELSE YOU WISH TO IDENTIFY FOR THE RECORD,

17    SPECIAL MASTER LOPES?

18            MR. LOPES:  YOUR HONOR, OTHER MEMBERS OF MY TEAM ARE

19    ON THE PHONE.  THEY'RE NOT GOING TO APPEAR ON THE ZOOM.  THAT

20    WOULD BE DEPUTY SPECIAL MASTER KERRY WALSH, DEPUTY SPECIAL

21    MASTER PATRICIA WILLIAMS, LATRI-CEA MCCLENDON-HUNT, MICHAEL

22    RYAN, DR. JEFFREY METZNER AND --

23            THE COURT REPORTER:  I DIDN'T HEAR THE LAST THING HE

24    SAID.  THEY CAN'T HEAR ME.

25            THE COURT:  THE COURT REPORTER IS ASKING YOU TO

 1    REPEAT THE LAST PERSON YOU IDENTIFIED, SPECIAL MASTER LOPES.

 2              MR. LOPES:  HENRY DLUGACZ.  D-L-U-G-A-C-Z.

 3              THE COURT:  ALL RIGHT.  GOT THAT?

 4              THE COURT REPORTER:  (NODDING.)

 5              THE COURT:  ALL RIGHT.  THE COURT HAS REVIEWED THE

 6    PARTIES' CLOSING BRIEFS AND THE SUPPLEMENTAL BRIEFING.  I HAVE

 7    SEVERAL QUESTIONS.  I'D LIKE TO WORK THROUGH THOSE.  THEN I

 8    WOULD PROVIDE EACH SIDE AN OPPORTUNITY TO MAKE ANY FINAL

 9    ARGUMENT IT WISHES WITHOUT REPEATING WHAT'S IN THE BRIEFS OR

10    OUR DISCUSSION.

11        I ACKNOWLEDGE SOME OUTSTANDING ISSUES WITH RESPECT TO THE

12    RECORD; A REQUEST FOR JUDICIAL NOTICE THAT'S OPPOSED; A MOTION

13    TO STRIKE; OBJECTIONS REGARDING CERTAIN WITNESS' TESTIMONY.  I

14    WILL ADDRESS THOSE IN AN ORDER, SO THE RECORD IS CLEAR, WITH

15    RESPECT TO THE ORDER ON ENFORCEMENT THAT I ISSUE.

16        I FIRST HAVE QUESTIONS ABOUT THE LABOR ECONOMICS ISSUE.

17        I JUST WANT TO MAKE CERTAIN I UNDERSTAND, DID THE

18    DEFENSE -- THE DEFENSE' EXPERT RELIED ON OR MADE SOME

19    ASSUMPTIONS ABOUT SALARIES.  IS IT CLEAR TO ME FROM THE RECORD

20    WHAT SALARY INFORMATION THE DEFENSE' EXPERT RELIED ON,

21    MR. MELLO?

22              MR. MELLO:  AGAIN, I'M GOING TO DEFER TO MR. CIRELLI.

23    THANK YOU, YOUR HONOR.

24              THE COURT:  ALL RIGHT.  MR. CIRELLI, CAN YOU JUST

25    IDENTIFY WHERE IN THE RECORD I CAN CONFIRM WHATEVER YOU'RE

1    GOING TO TELL ME?

2              MR. CIRELLI:  WITH RESPECT TO THE SALARY INFORMATION,

3    IT COMES UP IN TWO PLACES.  IT COMES UP IN THE COMPARISON OF

4    THE CDCR SALARIES TO THE BENCHMARKS, WHICH IS FOUND IN THE

5    REPORT AND TO WHICH DR. GREULICH TESTIFIED DURING HER

6    TESTIMONY.  IT BEGINS WITH FIGURE 15, AND IT IS FIGURES 15, 16,

7    17, 18, AND 19.  AND THAT INDICATES WHERE THE SALARY

8    INFORMATION CAME -- YOU'LL RECALL THOSE ARE THE GRAPHS, YOUR

9    HONOR, WHERE SHE HAS THE AVERAGE CDCR SALARY FOR EACH OF THE

10   FIVE CATEGORIES OF MENTAL HEALTH PROFESSIONALS THAT ARE AT

11   ISSUE IN THIS MATTER.

12       AND SO FOR EACH ONE SHE HAS A LINE FOR THE AVERAGE CDCR

13   SALARY, AND THEN THE NATIONAL AVERAGE AND THE STATE AVERAGE.

14   AND THE SOURCES ARE INDICATED ON THOSE GRAPHS AND IN THE

15   NARRATIVE THAT GOES ALONG WITH THOSE GRAPHS, YOUR HONOR.  IT'S

16   THE BUREAU OF LABOR STATISTICS MAINLY THAT IT COMES FROM.

17              THE COURT:  ALL RIGHT.

18              MR. CIRELLI:  AND THEN THE SALARY INFORMATION IS ALSO

19   USED IN THE REGRESSION ANALYSIS.

20       AND IF YOU LOOK AT, FOR EXAMPLE -- THE REGRESSION ANALYSIS

21   IS DESCRIBED IN THE BODY OF THE REPORT AS WELL AS APPENDIX 2

22   FOR THE REPORT.  IN APPENDIX 2 THERE ARE VARIOUS TABLES, A-1,

23   A-2, A-3, AND IT GOES ON TO A-4 AND A-5.  AND IN ALL OF THOSE

24   YOU WILL SEE WHERE SHE INCLUDES THE SALARY INFORMATION THAT WAS

25   INPUT FOR THE VARIOUS -- THERE WERE 20 MODELS THAT SHE RAN IN

1    THE REGRESSION.  AND YOU'LL SEE THERE THAT SHE HAS CDCR

2    SALARIES, US SALARIES, CALIFORNIA SALARIES, AND THEN ITERATIONS

3    OF THOSE IN THE REGRESSION ANALYSIS.

4           THE COURT:  ALL RIGHT.  WHAT ABOUT FUTURE FILL RATES?

5           MR. CIRELLI:  PARDON ME?

6           THE COURT:  WHAT ABOUT -- DID SHE ALSO RELY ON DATA

7    WITH RESPECT TO FUTURE FILL RATES?  AND, IF SO, WHERE IS THAT?

8           MR. CIRELLI:  DID SHE RELY ON SALARY INFORMATION IN

9    CONNECTION WITH FILL RATES?  I'M NOT SURE WHAT YOUR HONOR IS

10   ASKING WITH RESPECT TO, YOU KNOW, FUTURE FILL --

11          THE COURT:  LET ME ASK MS. ELLS.  AND IF SHE'S

12   YIELDING TO SOMEONE, THAT'S FINE.

13     BUT FIRST, WITH RESPECT TO THE SALARY INFORMATION, DO YOU

14   AGREE WITH MR. CIRELLI'S CHARACTERIZATION OF THE RECORD

15   REGARDING WHAT THE DEFENSE' EXPERT RELIED ON?

16          MS. ELLS:  EXCUSE ME.  YES, YOUR HONOR.  EXCEPT WE

17   WANT TO EMPHASIZE THAT THE SALARY DATA FOR CDCR WAS AVERAGED.

18   THE EXPERT ASKED FOR AND WAS NOT GIVEN THE ACTUAL SALARY

19   INFORMATION --

20          THE COURT:  IS THAT --

21          MS. ELLS:  -- BUT YES.

22          THE COURT:  IS THAT FAIR, MR. CIRELLI?

23          MR. CIRELLI:  THEY -- THE EXPERT WAS GIVEN THE SALARY

24   INFORMATION WITH RESPECT TO THE HIGH AND THE NUMBER OF PEOPLE

25   IN THE HIGH, THE LOW AND THE NUMBER OF PEOPLE IN THE LOW, BUT

1    NOT IN THE -- THE NUMBER OF PEOPLE THAT ARE IN-BETWEEN THE HIGH

2    AND THE LOW BECAUSE THERE IS A MAXIMUM AND A MINIMUM SALARY, AS

3    YOUR HONOR WILL PROBABLY REMEMBER, FOR EACH OF THE CATEGORIES.

4        AND THEN WHEN SHE DID HER ANALYSIS, IN ORDER TO HAVE AS

5    CONSERVATIVE A COMPARISON AS POSSIBLE BETWEEN THE BENCHMARKS,

6    THE LABOR STATISTICS -- THE BUREAU OF LABOR STATISTICS AND

7    CDCR'S ACTUAL SALARY, SHE DID NOT INCLUDE SUPERVISOR SALARIES

8    OR CHIEF SALARIES THAT WOULD BE AT THE HIGHER END.  SO THAT THE

9    AVERAGE THAT SHE WAS USING FOR CDCR WAS ACTUALLY LOWER THAN

10   NORMALLY WOULD BE IF YOU WERE TO INCLUDE ALL OF THE SALARIES

11   INCLUDING THE CHIEFS AND THE SUPERVISORS.

12        THE COURT:  SO, MS. ELLS, WITH THAT CLARIFICATION,

13   AGREED?

14        MS. ELLS:  YES.  NOTWITHSTANDING WHAT -- WHAT

15   MR. CIRELLI HAS SAID, SHE ASKED FOR AND WAS NOT GIVEN

16   INDIVIDUAL ACTUAL SALARY INFORMATION.

17        AND I WILL ALSO NOTE THAT WHAT SHE USED WAS NOT A TRUE

18   AVERAGE.  AS MR. CIRELLI DESCRIBES, SHE WAS GIVEN THE TOP OF

19   THE RANGE, THE BOTTOM OF THE RANGE, AND THE NUMBER OF PEOPLE AT

20   THE TOP AND THE NUMBER OF PEOPLE AT THE BOTTOM, AND ASSUMED AN

21   AVERAGE IN BETWEEN.

22        THE COURT:  I'M GOING TO KEEP ASKING UNTIL I -- UNTIL

23   I MAKE CERTAIN I'M CLEAR ON WHETHER OR NOT THERE IS A REAL

24   DISPUTE HERE.

25        YOU AGREE WITH THAT, MR. CIRELLI?

1          EVEN IF YOU DISAGREE THAT IT'S A TRUE AVERAGE, DO YOU AGREE

2     THAT MS. ELLS IS PROPERLY CHARACTERIZING WHAT THE EXPERT DID --

3               MR. CIRELLI:  THE ONLY --

4               THE COURT:  -- AND WHAT INFORMATION SHE GOT FROM THE

5     DEFENSE?

6               MR. CIRELLI:  THE ONLY CAVEAT IS, MY MEMORY IS WITH

7     RESPECT TO THOSE IN THE MIDDLE, SINCE SHE DID NOT KNOW WHO WAS

8     IN THE MIDDLE, SHE USED THE BOTTOM SALARY.

9               THE COURT:  BUT DID SHE GET DATA ON WHO IS IN THE

10    MIDDLE?

11              MR. CIRELLI:  SHE GOT DATA AS TO WHO IS IN THE

12    MINIMUM, AND SHE HAD DATA WITH RESPECT TO WHO WAS IN THE

13    MAXIMUM, AND THEREFORE ASSUMED EVERYBODY ELSE WAS IN THE

14    MIDDLE.

15              THE COURT:  ALL RIGHT.  SO, MS. ELLS, ON FUTURE FILL

16    RATES, I THINK THE PLAINTIFFS' POSITION IS THE DEFENSE' EXPERT

17    DID NOT OBTAIN OR USE OR RELY ON INFORMATION -- PROPER

18    INFORMATION ABOUT FUTURE FILL RATES.

19       DO I HAVE THAT RIGHT?

20              MS. ELLS:  I BELIEVE I UNDERSTAND WHAT YOU'RE ASKING,

21    AND PLEASE CORRECT ME IF THIS IS NOT WHAT YOU'RE ASKING --

22              THE COURT:  FEEL FREE TO CORRECT ME IF YOU THINK I'M

23    PHRASING IT INCORRECTLY.

24              MS. ELLS:  THERE IS NOTHING ABOUT THE REPORT OR THE

25    REGRESSION ANALYSIS THAT IS FUTURE LOOKING AT ALL.

1          THE COURT:  YEAH.

2          MS. ELLS:  SO THERE IS NOTHING ABOUT FUTURE FILL

3  RATES, FUTURE WAGES, FUTURE ANYTHING.  IT IS ENTIRELY BACKWARD

4  LOOKING.

5          THE COURT:  ALL RIGHT.  I HAVE A QUESTION RELATED TO

6  THAT SO I DON'T NEED MORE ON THAT.

7      LET ME JUST ASK, IS THERE ANY REASON I CAN'T TAKE JUDICIAL

8  NOTICE OF SALARY INFORMATION THE DEFENDANTS HAVE FILED WITH THE

9  COURT AS RECENTLY AS FEBRUARY, MR. CIRELLI?

10         MR. CIRELLI:  WITH RESPECT TO SALARY INFORMATION THAT

11  IS INCLUDED -- AND I MAY HAVE TO DEFER TO MR. MELLO ON THIS

12  BECAUSE HE WOULD KNOW WHAT HAS BEEN FILED WITH THE COURT IN THE

13  PAST.  IF YOU'RE REFERRING TO THE STIPULATED FACTS, OF COURSE,

14  YOUR HONOR.  BUT I DON'T KNOW WHAT OTHER INFORMATION WAS

15  PROVIDED TO THE COURT WITH RESPECT TO SALARY INFORMATION.

16         THE COURT:  MR. MELLO?

17         MR. MELLO:  IF YOUR COURT -- IF YOUR HONOR IS

18  REFERRING TO THE MONTHLY VACANCY REPORTS --

19         THE COURT:  UM-HUM.

20         MR. MELLO:  -- AND THE SALARIES USED IN THOSE VACANCY

21  REPORTS, THEN THAT WOULD BE THE MOST CURRENT INFORMATION FOR

22  PURPOSES OF -- I THINK THAT'S YOUR HONOR'S QUESTION.  IF SO,

23  YES, THOSE -- THAT'S THE CURRENT SALARY INFORMATION.

24         THE COURT:  THAT IS WHAT I'M REFERRING TO.

25      AGREED, MS. ELLS, I COULD TAKE NOTICE OF THAT?

1                MR. MELLO:  CAN I ADD, YOUR HONOR, HOWEVER, I'M NOT A

2     HUNDRED PERCENT SURE THAT THE NEW SALARIES PURSUANT TO THE

3     NEWLY NEGOTIATED MOUS ARE IN PLACE.  THAT'S THE ONLY CAVEAT.

4     BECAUSE I'M AN ATTORNEY, WE'RE GOING TO CAVEAT.  BUT THAT'S MY

5     ONLY PAUSE, YOUR HONOR.

6                THE COURT:  ALL RIGHT.  UNDERSTOOD.

7         MS. ELLS?

8                MS. ELLS:  YES, THEY ARE JUDICIALLY NOTICEABLE.

9         IT IS ALSO OUR UNDERSTANDING THAT THE NEW PAY INCREASES

10    HAVE NOT ACTUALLY HIT ANYONE'S POCKETS YET.

11               THE COURT:  THEY HAVE NOT WHAT?

12               MS. ELLS:  HIT ANYONE'S POCKETS YET.  THEY HAVE NOT

13    ACTUALLY BEEN RECEIVED IN THE FIELD.

14               THE COURT:  DO THE PARTIES AGREE ON WHEN THEY WILL

15    START?  I DON'T KNOW THAT IT'S MATERIAL HERE.  BUT IT'S THIS

16    YEAR YET, MR. MELLO?

17               MR. MELLO:  YEAH.  I THINK THERE WAS TESTIMONY IN THE

18    RECORD THAT IT -- THE PROCESS TAKES SOME TIME.  I'M NOT SURE IF

19    THEY'VE HIT PEOPLE'S POCKETS OR NOT, BUT IF IT HASN'T HAPPENED

20    I ASSUME IT WILL HAPPEN SHORTLY.

21               THE COURT:  AS LONG AS WE'RE ON SALARIES, MR. MELLO,

22    THE DEFENSE -- THE RECORD DOES SHOW -- IS IT FAIR TO SAY THAT

23    WITH THE INCREASES, RECREATIONAL THERAPISTS ARE MAKING MORE

24    THAN SOCIAL WORKERS?

25               MR. MELLO:  YOU KNOW, I'D HAVE TO -- I'D HAVE TO

 1   DEFER TO WHAT WAS IN THE RECORD.

 2       I'M -- I HAVE TO ADMIT, I'M NOT A HUNDRED PERCENT SURE THAT

 3   THEY WOULD BE MAKING MORE OR NOT.  IF THAT'S WHAT THE MOUS AND

 4   THE TESTIMONY PROVIDED, THEN, YOU KNOW, I'M NOT GOING TO

 5   DISPUTE WHAT THE EXPERT -- WHAT THE WITNESSES SAID AND WHAT THE

 6   DOCUMENTS DEMONSTRATED THAT WERE PRESENTED AT THE TRIAL.

 7             THE COURT:  MS. ELLS, ON THAT POINT?

 8             MS. ELLS:  I CAN'T CONFIRM EITHER, YOUR HONOR.  I'D

 9   BE HAPPY TO GO BACK AND CHECK AND PROVIDE YOU THAT --

10             THE COURT:  THERE WAS AT LEAST -- THERE WAS TESTIMONY

11   TO THAT EFFECT.

12       SO HERE IS A SECOND QUESTION RELATED TO THE LABOR ECONOMICS

13   QUESTION.

14       FOR -- STARTING WITH MR. MELLO OR MR. CIRELLI, IF HE YIELDS

15   TO HIM, IS IT FAIR TO SAY THE DEFENSE' EXPERTS DID NOT TEST

16   WHETHER TELEPSYCHIATRY OPTIONS HAD ANY EFFECT ON VACANCY RATES

17   INCLUDING AFTER NOT CONTROLLING FOR OTHER FACTORS LIKE

18   SALARIES, LOCATION, PASSAGE OF TIME, PANDEMIC?  IS THAT --

19             MR. MELLO:  AGAIN, I'LL YIELD -- I'LL YIELD TO

20   MR. CIRELLI.  BUT I WILL NOTE THAT WE KNOW THAT TELEPSYCHIATRY

21   GREATLY INCREASED STAFFING FOR THE PSYCHIATRISTS.

22       BUT I'LL YIELD TO MR. CIRELLI FOR THE QUESTION REGARDING

23   EXPERTS, IF HE HASN'T FORGOTTEN IT AS I SPOKE.

24             THE COURT:  MR. CIRELLI.

25             MR. CIRELLI:  I DIDN'T FORGET IT.

1      WITH RESPECT TO TELEPSYCHIATRY, THAT IS NOT ONE OF THE --

2   IF I REMEMBER CORRECTLY -- THE INDEPENDENT FACTORS THAT'S

3   INCLUDED IN THE REGRESSION ANALYSIS, IF THAT'S WHAT YOUR HONOR

4   IS ASKING SPECIFICALLY.

5      HOWEVER, TO THE EXTENT THE OPTION OF TELEPSYCHIATRY WOULD

6   HAVE AN IMPACT ON SALARIES -- WHAT, YOU KNOW, PEOPLE ARE

7   WILLING TO ACCEPT WITH RESPECT TO SALARIES, AND THEREFORE WHAT

8   THE SALARY RANGES ARE, IT COULD HAVE AN IMPACT ON THAT NUMBER

9   THAT IS INCLUDED.

10      WITH RESPECT TO SPECIFICALLY LOOKING AT THE IMPACT OF

11   TELEPSYCHIATRY, DR. GREULICH DID LOOK AT THE IMPACT THAT

12   TELEPSYCHIATRY HAD ON VACANCY RATES.

13      AND IF I COULD GO FOR ONE SECOND HERE AND FIND THAT PART, I

14   BELIEVE WHAT SHE -- WHAT SHE RELIED UPON IS FIGURE 6 IN HER

15   REPORT.  I BELIEVE THAT THAT IS ON PAGE -- IT'S AROUND 30 -- I

16   THINK IT'S 35 OR 36 -- IT IS PAGE 36 OF HER REPORT.  YOU SEE

17   THERE FIGURE 6 IS THE -- IT SHOWS THE -- IT SHOWS THE VACANCY

18   RATES, AND VARIOUS INFORMATION ABOUT THE VACANCY RATES OVER A

19   PERIOD OF TIME, THE FIVE YEARS FROM 2018 TO 2022.

20      AND IF YOU LOOK AT FIGURE 6, THE YELLOWISH MUSTARD LINE IS

21   THE LINE THAT SHOWS THE VACANCY RATE AT THE VARIOUS PERIODS OF

22   TIME.  AND THE GRAY LINE IS THE LINE THAT SHOWS THE TELEHEALTH.

23   AND YOU SEE THE TELEHEALTH IS BELOW VACANCY ONCE -- ONCE THE

24   TELEPSYCHIATRY CAME INTO PLAY, YOU SEE THAT THE VACANCY RATE

25   GOES DOWN, THE YELLOW LINE.  SO AS THE GRAY LINE GOES UP, IT

1  CROSSES AT ABOUT SOMETIME IN FALL OF 2022, VACANCY RATE DROPS.

2      SO THAT IS WHAT STATISTICALLY SHE LOOKED AT WITH RESPECT TO

3  THE IMPACT OF -- OF TELEPSYCHIATRY ON THE VACANCY RATE WITH

4  RESPECT TO PSYCHIATRISTS.

5          THE COURT:  AND YOU SAID "STATISTICALLY"?  YOU WOULD

6  SAY THAT'S A STATISTICAL ANALYSIS?

7          MR. CIRELLI:  WELL, IT'S A NUMERICAL ANALYSIS.  I

8  MEAN, IT'S A GRAPH.  SHE JUST -- SHE IS PLOTTING THE NUMBERS.

9  AND YOU CAN SEE THAT WHEN TELEHEALTH GOES UP, THE VACANCY RATE

10 IS GOING DOWN.

11         THE COURT:  MS. ELLS, ON THAT POINT, ANYTHING TO SAY?

12         MS. ELLS:  YES, YOUR HONOR.  JUST CONFIRMING WHAT

13 MR. CIRELLI WAS IMPLICITLY SAYING, WHICH IS SHE DID NOT INCLUDE

14 TELEWORK OR TELEMENTAL HEALTH OR TELEPSYCHIATRY OF ANY SORT IN

15 HER REGRESSION ANALYSIS.  IT'S NOT ONE OF THE LISTED VARIABLES

16 OR COEFFICIENTS.

17     SECOND OF ALL, WHAT, AGAIN, WE ARE NOTING HERE IS THAT SHE

18 ONLY LOOKED AT ASSOCIATIONAL EFFECTS; DID TWO THINGS HAPPEN AT

19 THE SAME TIME.  THAT COULD ALSO BE A COINCIDENCE.  SHE DID NO

20 ANALYSIS TO DETERMINE IF THERE WAS ANY CAUSAL RELATIONSHIP OF

21 ANY SORT.  SHE DID WHAT ANY LAY PERSON COULD DO, WHICH IS SAY,

22 IN THIS TIME PERIOD, TELEPSYCHIATRY INCREASED.

23         THE COURT:  MR. CIRELLI, I THINK THAT'S FAIR, ISN'T

24 IT?  SHE TESTIFIED SHE FOUND COINCIDENCE.

25         MR. CIRELLI:  WELL, WHAT SHE FOUND WAS ONCE IT CAME

1    INTO PLAY, THE VACANCY RATE DID GO DOWN AND IT STAYED DOWN.  IT

2    STAYED IN THE -- YOU KNOW, IT'S NOW IN THE TEN PERCENT RANGE

3    STILL TODAY.  I THINK IT WAS 11 PERCENT IN THE LAST REPORT.  89

4    PERCENT FILL RATE.

5             THE COURT:  ALL RIGHT.  LET ME ASK, AGAIN, JUST TO

6    CONFIRM THAT I AM INTERPRETING THE BRIEFING HERE, AM I CORRECT

7    IN UNDERSTANDING THAT NO ONE HAS ATTEMPTED, AND THEREFORE

8    DOESN'T BELIEVE, IT'S USEFUL TO ESTIMATE A RELEVANT SUPPLY

9    CURVE?

10       I MEAN, IS THERE FIXED DEMAND?  THERE IS NO WAY -- YOU

11   KNOW, THE SIMPLEMINDED GENERALIST JUDGE WAS THINKING MAYBE A

12   SUPPLY DEMAND CURVE WOULD SHOW A MARKET CLEARING WAGE, BUT

13   I'M -- I THINK I'M CONCLUDING THAT'S NOT THE WAY TO THINK ABOUT

14   THIS AND THAT YOU ALL AGREE.

15       DO I HAVE THAT RIGHT, MR. CIRELLI?

16             MR. CIRELLI:  SO WITH RESPECT TO SUPPLY AND DEMAND,

17   WE'RE LOOKING AT, YOU KNOW, WHETHER THERE IS A SHORTAGE OR NOT,

18   YOUR HONOR, WITH RESPECT TO MENTAL HEALTH PROVIDERS.  I THINK

19   THAT'S WHERE SUPPLY AND DEMAND COMES INTO PLAY.

20       DR. BROWN TESTIFIED THAT HE DID NOT DO THAT TYPE OF

21   ANALYSIS AND IT WOULD BE -- IT WOULD TAKE A SIGNIFICANT AMOUNT

22   OF WORK IN ORDER TO DO THAT ANALYSIS.  HE RELIED ON SALARY.

23   WHETHER SALARIES ARE GOING UP OR GOING DOWN, REAL SALARIES.

24       WITH RESPECT TO DR. GREULICH'S WORK, WHAT SHE DID TO

25   DETERMINE WHETHER OR NOT THERE IS A LABOR SHORTAGE IS DID THE

```
 1   LITERATURE REVIEW.  SHE DID NOT DO AN INDEPENDENT ANALYSIS OF
 2   SUPPLY/DEMAND, BUT RATHER LOOKED AT THE ANALYSES THAT WERE DONE
 3   BY OTHERS IN THE FIELD IN HER LITERATURE REVIEW TO COME TO THE
 4   CONCLUSION THAT THERE IS, IN FACT, A SHORTAGE OF MENTAL HEALTH
 5   PROVIDERS BOTH NATIONWIDE AND STATEWIDE IN CALIFORNIA.
 6            THE COURT:  MS. ELLS?
 7            MS. ELLS:  YES.  CHECKING TO SEE IF I WAS OFF MUTE.
 8   YES.
 9        SO, YES, THE SUPPLY CURVE WOULD BE ONE ECONOMIC WAY TO
10   MEASURE IT.  BUT THE WAY THAT DR. BROWN APPROACHED IT, WHICH
11   WAS WAGE INCREASES OVER TIME, IS ANOTHER ECONOMIC WAY TO
12   MEASURE IT.  THAT IS THE WAY THAT HE DETERMINED THAT THERE WAS
13   NO ECONOMIC SHORTAGE FOR THESE CLINICAL CATEGORIES.
14        ON THE OTHER HAND, THE LITERATURE REVIEW CONDUCTED BY
15   DEFENDANTS' EXPERT LOOKED ONLY AT HEALTH POLICY DATA AND
16   INFORMATION AND ARTICLES.  THERE WAS NO ECONOMIC ANALYSIS, NO
17   ACADEMIC LITERATURE ANALYSIS, AND HEALTH POLICY IS NOT
18   DR. GREULICH'S FIELD.
19            THE COURT:  ALL RIGHT.  WITH REGARD TO --
20            MR. CIRELLI:  YOUR HONOR, IF I MAY?
21            THE COURT:  YES.
22            MR. CIRELLI:  MAY I JUST QUICKLY RESPOND TO THAT?
23            THE COURT:  YOU MAY.
24            MR. CIRELLI:  DR. GREULICH DID TESTIFY THAT THE
25   LITERATURE THEY LOOKED AT DID INCLUDE STUDIES AND ECONOMIC
```

1    ANALYSIS, BOTH GOVERNMENT STUDIES AND OTHER STUDIES THAT WERE

2    DONE.

3         AND I WOULD JUST POINT OUT, AS YOUR HONOR MAY RECALL, THE

4    ANALYSIS THAT -- THAT DR. BROWN DID WAS ONLY CALIFORNIA.  HE

5    DID NOT HAVE AN OPINION WITH RESPECT TO THE -- WHETHER THERE IS

6    A NATIONWIDE SHORTAGE OR NOT, HE TESTIFIED TO.  AND THE

7    ANALYSIS HE DID WITH RESPECT TO SALARIES, IT ONLY WENT UP TO

8    2020.  HE DID NOT DO AN ANALYSIS, AND DOES NOT HAVE AN OPINION

9    -- THERE IS NO OPINION IN THE RECORD FROM HIM AS TO WHETHER

10   THERE IS CURRENTLY, OR SINCE 2020, OR DURING COVID THERE WAS

11   ANY TYPE OF LABOR SHORTAGE EITHER IN THE UNITED STATES OR

12   CALIFORNIA.  HIS ANALYSIS ON SALARY STOPPED AT 2020.

13        THE COURT:  ALL RIGHT.  IS THAT FAIR, MS. ELLS?

14      MS. ELLS, IS THAT FAIR?

15        MS. ELLS:  YES.  EXCUSE ME.  YES.  AND THE REASON FOR

16   THAT, OF COURSE, IS BECAUSE THE BUREAU OF LABOR STATISTICS,

17   WHICH KEEPS ALL THIS DATA, SAYS NOT TO USE THE DATA AFTER 2020.

18   IT'S NOT STABLE.

19        THE COURT:  ALL RIGHT.  ON THE REGRESSION ANALYSIS, I

20   JUST WANT TO MAKE CERTAIN I UNDERSTAND THE DEFENSE' POSITION.

21      DOES THE DEFENSE AGREE THAT IF DR. GREULICH HAD USED MORE

22   VARIABLES IT WOULD PROVIDE SOUNDER INFORMATION?

23        MR. CIRELLI:  I DON'T THINK WE AGREE WITH THAT, YOUR

24   HONOR, THAT IT WOULD PROVIDE SOUNDER INFORMATION.

25      THERE IS NO EVIDENCE THAT IF, IN FACT, THERE WAS MORE DATA

1    INPUT THAT THE OUTCOME WOULD BE ANY DIFFERENT THAN WHAT

2    DR. GREULICH DID.

3         AND DR. BROWN DID NOT DO ANYTHING TO TEST THAT -- TO TEST

4    THE THEORY THAT THERE NEEDED TO BE EXTRA DATA.  HE KNEW SINCE

5    2018 THAT DR. GREULICH HAD DONE THE REGRESSION ANALYSIS THAT

6    SHE DID, AND WHAT SHE RELIED UPON, AND HE DID NOT IN ANY WAY

7    TEST WHETHER OR NOT WHAT HE IS ADVOCATING SHOULD HAVE BEEN DONE

8    WOULD HAVE CHANGED THE RESULT OF ANYTHING.

9              THE COURT:  IS THERE SOMETHING IN THE RECORD THAT

10   HELPS ME DETERMINE, IF I NEED TO, WHAT A SUFFICIENT NUMBER OF

11   VARIABLES IS?  IS IT JUST RELYING ON DR. GREULICH'S EXPERTISE

12   AND HER -- HER SAYING SHE FOUND THESE VARIABLES TO BE

13   SUFFICIENT?

14             MR. CIRELLI:  SHE, I BELIEVE, HAS TESTIFIED THAT THE

15   VARIABLES THAT SHE USED, THAT ARE SPELLED OUT, AGAIN, IN

16   APPENDIX 2, WERE SUFFICIENT.  AND -- AND THAT HER ANALYSIS, YOU

17   KNOW, WAS REASONABLE AND VALID.

18             THE COURT:  ALL RIGHT.  I UNDERSTAND THAT.

19        MS. ELLS, ON THAT POINT?

20        I HAVE REVIEWED THE BRIEFING, OF COURSE.  AND I SEE, IN

21   PARTICULAR, VARIABLES IDENTIFIED IN YOUR CLOSING BRIEF, I

22   BELIEVE AT PAGES 7 AND 8, INCLUDING THE OBSERVATION ABOUT

23   LOCATION.

24        ANY -- ARE YOU POINTING ME TO A DIFFERENT AUTHORITY TO

25   SUGGEST MORE VARIABLES ARE NEEDED TO PROVIDE A VALID OPINION?

```
1              MS. ELLS:  YOUR HONOR, THE POINT IS MORE THAT MORE
2    DATA -- AND I THINK SHE ACTUALLY CONCEDES THIS IN THE
3    SUPPLEMENTAL BRIEFING -- MORE DATA WOULD PROVIDE FOR MORE
4    INFORMATION AND NARROW THE CONFIDENCE INTERVAL.
5        THE CONFIDENCE INTERVAL IS VERY, VERY BROAD, AND MORE DATA
6    WOULD HELP NARROW THAT.  AND, NONETHELESS, SHE DID NOT USE --
7    SHE WAS NOT GIVEN AND SHE DID NOT USE MORE DATA THAT WAS
8    AVAILABLE THAT SHE COULD HAVE USED TO TRY AND NARROW THAT
9    INTERVAL.
10       AND THE REASON THAT MATTERS IS BECAUSE WITH AN INTERVAL
11   THIS LARGE, THE TRUE ANSWER OF WHAT THE EFFECT ON FILL RATES
12   FROM INCREASING WAGES -- WITH THE, YOU KNOW, CAVEAT THAT WE'RE
13   LOOKING ONLY AT THE WAGES -- WAGES THAT HAVE BEEN TRIED TO DATE
14   -- IS IT COULD BE ZERO OR IT COULD BE THE OPPOSITE END OF THE
15   SPECTRUM, WHICH IS WITHIN THE RANGE OF POSSIBILITIES THAT SHE
16   IDENTIFIED, WHICH IS THAT A ONE PERCENT INCREASE IN WAGES COULD
17   CAUSE A 16 PERCENT INCREASE IN FILL RATES.
18       AND THE PROBLEM WITH USING VERY LIMITED DATA IS THAT THERE
19   IS NO ABILITY TO NARROW ANYTHING IN TERMS OF WHERE THE TRUE
20   RELATIONSHIP IS FROM THE AMOUNT OF DATA THAT SHE USED.
21       SO, YOU KNOW, THE -- THE NO HYPOTHESIS, WHICH IS THAT THERE
22   IS NO EFFECT, IS WHAT SHE WAS SEEKING, ESSENTIALLY.  AND THE
23   LACK OF SIGNIFICANT DATA TO DISPROVE OR FIND WHERE ALONG THAT
24   RANGE THE REAL RELATIONSHIP IS IS WHAT YOU WOULD GET IF YOU
25   USED MORE DATA.
```

1        AND SO, YOU KNOW, I THINK THE SALIENT POINT HERE IS, YOU

2   KNOW, THERE IS A POINT AT WHICH, IN RESPONSE TO QUESTION 6,

3   WHERE SHE DISCUSSES THAT -- THAT YOU CAN HAVE A SIGNIFICANT

4   EFFECT THAT IS NOT ECONOMICALLY SIGNIFICANT.  AND SHE USES THE

5   POSSIBILITY THAT THERE COULD BE -- THAT WITH MORE DATA SHE MAY

6   HAVE BEEN ABLE TO IDENTIFY A .001 PERCENT CHANGE, AND THAT

7   WOULD NOT BE ECONOMICALLY SIGNIFICANT.

8        BUT THE POINT OF THAT STATEMENT IS THAT SHE'S PICKED A

9   HYPOTHETICAL.  THERE COULD ALSO BE A RELATIONSHIP THAT IS 16

10  PERCENT EFFECTIVE.

11       AND THE POINT IS IS THAT WITH THIS REGRESSION ANALYSIS AND

12  THE EXPERT TESTIMONY WE SIMPLY DON'T KNOW.  AND WE COULD HAVE

13  KNOWN MORE HAD SHE INCLUDED MORE DATA.  SHE -- I BELIEVE SHE

14  ADMITS IN RESPONSE TO QUESTION 6 THAT MORE DATA WOULD HAVE

15  HELPED HER HAD A MORE REFINED ANALYSIS OF WHAT THE TRUE

16  RELATIONSHIP IS.

17       AND, YOU KNOW, IN RESPONSE TO QUESTION 3, SHE SPECIFICALLY

18  SAYS THAT THE ONLY PURPOSE OF HER REGRESSION IS TO SEE IF ALL

19  EXISTING DATA FIT THE HYPOTHESIS.  AND WHEN YOU HAVE A VERY

20  SMALL AMOUNT OF EXISTING DATA TO LOOK AT, YOU DON'T GET A WHOLE

21  LOT OF HELPFUL INFORMATION.

22            THE COURT:  ALL RIGHT.  MR. CIRELLI, AGREED THAT MORE

23  DATA COULD HAVE NARROWED THE -- COULD HAVE ALLOWED DR. GREULICH

24  TO NARROW THE CONFIDENCE INTERVAL?

25            MR. CIRELLI:  I DON'T KNOW THE ANSWER TECHNICALLY TO

1   THAT, BUT I WOULD ADDRESS THE ISSUE WITH RESPECT TO THE

2   INTERVAL -- THE TIME INTERVAL.

3       SHE USED --

4           THE COURT:  ALL RIGHT.

5           MR. CIRELLI:  SHE USED -- SHE EXAMINED FIVE YEARS.

6   SHE EXAMINED THE TIME PERIOD FROM 2018 TO 2022.  AND SHE USED

7   SIX-MONTH INTERVALS.  AND THE REASON SHE USED SIX-MONTH

8   INTERVALS WAS BECAUSE OF THE DATA, IN PART, THAT WAS AVAILABLE.

9       FOR EXAMPLE, THE WAGE DATA FROM THE BENCHMARKS, THE LABOR

10  STATISTICS, THAT IS ANNUAL.  THAT IS ONLY ONCE A YEAR.

11      AND WITH RESPECT TO -- ANOTHER ONE OF THE THINGS SHE LOOKED

12  AT IS AUTHORIZED POSITIONS.  THOSE ARE REVIEWED, AS YOUR HONOR

13  KNOWS, EVERY SIX MONTHS.  AND BECAUSE OF THAT SIX-MONTH TIME

14  PERIOD, THAT'S WHY SHE USED THE SIX-MONTH TIME INTERVAL.  AND

15  SHE LOOKED AT FIVE YEARS.  THAT GIVES YOU TEN, IN ESSENCE, DATA

16  POINTS FOR EACH OF THE VARIOUS INDEPENDENT VARIABLES.  THAT

17  COMES UP TO 45 OBSERVATIONS BECAUSE WITH RESPECT TO ONE OF THE

18  MEASURES, WHICH IS THE SALARY WITH RESPECT TO MEDICAL

19  ASSISTANTS, THAT INFORMATION WAS ONLY AVAILABLE FOR TWO AND A

20  HALF YEARS SO THERE IS -- WOULD HAVE BEEN ONLY FIVE, RATHER

21  THAN TEN, OBSERVATIONS.

22          THE COURT:  ALL RIGHT.  JUST, FINAL QUESTION --

23          MR. CIRELLI:  SO, AGAIN --

24          THE COURT:  GO AHEAD.  GO AHEAD.

25          MR. CIRELLI:  I WAS JUST GOING TO SAY, AT THE END OF

1    THE DAY, WHATEVER ADDED DATA DR. BROWN ADVOCATES SHOULD HAVE

2    BEEN INCLUDED, HE COULD HAVE DONE IT AND HE DIDN'T.  AND WE

3    DON'T KNOW THAT IT WOULD HAVE IMPACTED OR CHANGED ANYTHING.

4        THE OTHER THING THAT I WOULD LIKE TO POINT OUT, YOUR HONOR,

5    IS THAT THE REGRESSION ANALYSIS, WE FOCUS A LOT ON IT BECAUSE

6    IT'S A FAIRLY COMPLICATED TOPIC THAT I DON'T KNOW THAT I'M, YOU

7    KNOW, ACTUALLY, THE -- YOU KNOW, AN EXPERT.  I'M CERTAINLY NOT

8    AN EXPERT IN THAT FIELD.  AND ONE THING I WAS GOING TO OFFER

9    YOUR HONOR IS IF YOU DO WANT MORE CLARIFICATION WITH RESPECT TO

10   ANY OF THESE TECHNICAL POINTS, WE WOULD BE MORE THAN HAPPY TO

11   BRIEF THEM.  IF YOU WANTED TO GIVE US MORE WRITTEN QUESTIONS WE

12   COULD EVEN SUBMIT A DECLARATION BY DR. GREULICH.  AND I'M

13   ASSUMING THAT COUNSEL FOR PLAINTIFFS WOULD BE WILLING TO SUBMIT

14   A DECLARATION BY DR. BROWN.  WE'RE GETTING INTO THESE

15   TECHNICALITIES.

16       BUT WHAT I WOULD SAY WITH RESPECT TO THE REGRESSION

17   ANALYSIS, THAT IS JUST ONE OF SEVEN INDICIA THAT DR. GREULICH

18   LOOKED AT IN COMING TO HER ULTIMATE CONCLUSION WITH RESPECT TO

19   THE REASONABLENESS OF CDCR'S CONDUCT.  THERE ARE MANY OTHER

20   THINGS THAT SHE LOOKED AT THAT SUPPORT HER ULTIMATE CONCLUSION.

21   AND I WOULD SAY THAT EVEN IF THE REGRESSION ANALYSIS HAD NOT

22   BEEN DONE, SHE WOULD HAVE, IN ALL LIKELIHOOD, THE SAME OPINION.

23       IN FACT, DR. BROWN TELLS US THAT A REGRESSION ANALYSIS, IN

24   ATTEMPTING TO DETERMINE WHETHER OR NOT A SALARY -- WHAT THE

25   APPROPRIATE SALARY LEVEL IS, THAT THAT IS NOT WHAT YOU WOULD DO

1   IN ORDER TO FIGURE OUT, YOU KNOW, WHETHER OR NOT WAGES WILL

2   FILL VACANCIES.

3       WHAT HE SAYS -- AND I'M GOING TO QUOTE DIRECTLY FROM HIS

4   TESTIMONY AT THE HEARING WHICH WAS ON -- I BELIEVE IT WAS DAY

5   THREE, WHICH WAS OCTOBER 4TH IF I REMEMBER CORRECTLY, AT PAGE

6   116.  I'M READING FROM LINES 11, JUST FOR THE RECORD, TO 24.

7       THE QUESTION IS ASKED:  DO EMPLOYERS NEED TO DO A

8   REGRESSION MODEL TO FIGURE OUT WHETHER OR NOT WAGES WILL FILL

9   THEIR VACANCY?

10      HIS ANSWER:  NO.  THEY DO NOT NEED TO DO THAT.

11      QUESTION:  WHAT WOULD AN EMPLOYER DO, SHORT OF A REGRESSION

12  MODEL, TO FIGURE OUT THE RIGHT WAY TO FILL ITS VACANCIES?

13      ANSWER:  SO THIS IS ONE OF THE REASONS WHY THE BUREAU OF

14  LABOR STATISTICS EXISTS.  SO THEY PUBLISH THE WAGES FOR

15  HUNDREDS AND HUNDREDS OF OCCUPATIONS, AND THEY'RE ALL PUBLICLY

16  AVAILABLE.  YOU KNOW, ON THERE YOU CAN SEE WHAT THE MEAN IS;

17  YOU CAN SEE WHAT THE MAX IS; YOU CAN SEE WHAT THE -- THE RANGE

18  IS.  AND THEN YOU CAN DECIDE, WE'LL START AT THAT POINT.  WE'LL

19  OFFER PEOPLE A WAGE, AND IF FOR SOME REASON WE DON'T GET ANYONE

20  ACCEPTED, WE GO UP.  SO IT JUST -- IT GIVES YOU THE STARTING

21  POINT.

22      HE'S TALKING ABOUT YOU DON'T REALLY NEED TO DO A REGRESSION

23  ANALYSIS, WHAT YOU DO IS YOU LOOK AT THE BENCHMARKS.  YOU LOOK

24  AT WHAT THE DATA IS THAT'S OUT THERE.  AND THAT'S EXACTLY WHAT

25  CDCR -- CDCR HAS DONE.  I MEAN, THEY HAVE ACTUALLY OFFERED,

```
 1   WITH THE EXCEPTION, POTENTIALLY, OF MEDICAL ASSISTANTS, MORE
 2   THAN THE BENCHMARKS, MORE THAN THE LABOR STATISTICS SHOW THE
 3   AVERAGE SALARIES FOR PSYCHIATRISTS, PSYCHOLOGISTS, SOCIAL
 4   WORKERS, AND RECREATIONAL THERAPISTS ARE BOTH IN THE UNITED
 5   STATES AS A WHOLE AND IN CALIFORNIA.
 6       SO I JUST WANTED TO HIGHLIGHT THAT WE SPENT A LOT OF TIME,
 7   BECAUSE IT'S SUCH A COMPLICATED ISSUE, ON THE REGRESSION
 8   ANALYSIS, BUT THAT IS JUST ONE OF THE SEVEN INDICIA THAT SHE'S
 9   LOOKING AT.  AND DR. BROWN WOULD SAY WHAT YOU REALLY NEED TO
10   FOCUS ON IS THE BENCHMARK.
11           THE COURT:  ALL RIGHT.  MS. ELLS, IF YOU WISH TO;
12   RESPOND TO THE LAST POINT MADE ABOUT THE -- THE WEIGHT TO GIVE
13   A REGRESSION ANALYSIS IN THIS CONTEXT.  AND THEN I THINK YOU
14   HAD SOMETHING ELSE TO SAY.
15           MS. ELLS:  YEAH.  CAN I START AT THE ORIGINAL POINT I
16   WAS GOING TO MAKE?
17           THE COURT:  SURE.  YES.
18           MS. ELLS:  OKAY.  SO, YOU KNOW, JUST WITH THIS
19   CONCEPT THAT -- THAT TIME INTERVAL USED -- THE TWICE A YEAR
20   INFORMATION FOR FIVE -- FOUR AND A HALF YEARS WAS SUFFICIENT, I
21   MEAN, IT'S NOT ACCURATE.  THAT ALLOCATION'S ONLY CHANGED
22   BIANNUALLY.  YOU CAN LOOK AT DEFENDANTS' EXHIBIT 12 AND YOU'LL
23   SEE THAT'S NOT ACCURATE.
24       THERE ARE MONTHLY FILINGS THAT TRACK ALLOCATIONS.  AND,
25   MORE IMPORTANTLY, EVEN IF ALLOCATIONS ONLY CHANGE TWICE A YEAR,
```

1   FILL RATES CHANGE LITERALLY ALL THE TIME.  SO THAT INFORMATION

2   WAS AVAILABLE.  IT WAS NOT UTILIZED.

3        AND, YOU KNOW, SIMILARLY, AS YOU'VE ALREADY NOTED, THERE IS

4   OTHER INFORMATION THAT COULD HAVE BEEN USED TO REFINE THIS

5   MODEL LIKE LOCATION, THE EXISTENCE OF TELEWORK, AND OTHER

6   THINGS LIKE THAT.

7        AND I THINK, SIMILARLY, LOOKING AT ONLY FIVE YEARS OF

8   INFORMATION, WE KNOW THAT BLS DATA GOES BACK AT LEAST AS LONG

9   AS THE LIFESPAN OF THIS CASE.  WE KNOW THAT THE FILL RATE

10  INFORMATION HAS BEEN TRACKED FOR MUCH, MUCH LONGER THAN FIVE

11  YEARS.  IN FACT, AGAIN, THEIR EXHIBITS 12 AND 13 GO BACK FAR

12  FURTHER THAN THAT.  SO THERE CERTAINLY WAS PLENTY OF DATA

13  AVAILABLE TO REFINE THIS MODEL, IT JUST WAS NOT UTILIZED, AND

14  IN SOME RESPECTS WAS NOT GIVEN TO THE EXPERT WHEN SHE ASKED FOR

15  IT.

16       I WOULD ALSO -- YOU KNOW, THIS POINT THAT DR. BROWN COULD

17  HAVE RUN HIS OWN REGRESSION ANALYSIS, TWO POINTS.

18       FIRST IS THAT THE BURDEN IS NOT ON OUR SIDE TO ESTABLISH

19  THAT THIS REGRESSION ANALYSIS HAS ANY RELEVANCE TO THE

20  QUESTIONS AT HAND.

21       AND EVEN IF DR. BROWN HAD WANTED TO RUN AN ANALYSIS, WHICH

22  HE CERTAINLY COULD HAVE, HE TESTIFIED THAT IT COULD PROVIDE NO

23  USEFUL INFORMATION BECAUSE IT IS PURELY BACKWARD LOOKING.  AND

24  THE QUESTION HERE IS NOT DID WHAT WE PREVIOUSLY PAID PEOPLE

25  WORK TO FILL THE CLINICAL ROLES.  WE ALL KNOW THAT'S NOT TRUE.

```
 1    I'M NOT EVEN SURE THERE NEEDED TO BE A REGRESSION ANALYSIS OR A

 2    LABOR ECONOMIST TO MAKE THAT POINT.  WE CAN SIMPLY LOOK AT THE

 3    RECORD AND KNOW THAT THE RATE INCREASES TO DATE WERE NOT

 4    SUFFICIENT.  THEY DIDN'T WORK.

 5        THE QUESTION AT HAND IS WHAT WOULD WORK IN THE FUTURE.  AND

 6    THERE WAS NO ATTEMPT BY DEFENDANTS' EXPERTS TO EITHER CONFIRM

 7    IMPOSSIBILITY, WHICH THEY EXPRESSLY DISCLAIMED, OR TO LOOK WHAT

 8    WOULD HAVE WORKED IF THEY HAD CONSIDERED HYPOTHETICAL SALARIES.

 9        THEY EXPRESSLY DID NOT LOOK AT HYPOTHETICAL INFORMATION.

10    THEY DID NOT TRY AND PREDICT WHAT THE MAGNITUDE OF PAY

11    INCREASES WOULD NEED TO BE TO FILL THE RATES [SIC], EVEN THOUGH

12    THEY ACKNOWLEDGE THAT THERE ARE PLENTY OF CLINICIANS IN THE

13    MARKET TO FILL THE POSITIONS AND THAT MONEY IS A SIGNIFICANT --

14    THE MOST IMPORTANT FACTOR IN DRIVING PEOPLE TOWARD NEW JOBS;

15    EVEN THOUGH, YOU KNOW, THEY ALSO ACKNOWLEDGE -- AND WE ALL

16    ACKNOWLEDGE -- THERE IS NO DISPUTE THAT THERE ARE PLENTY OF

17    OTHER FACTORS AS WELL AND THEY DID NOT LOOK AT THOSE FACTORS.

18    SO --

19            THE COURT:  ALL RIGHT.  SO I UNDERSTAND THAT

20    ARGUMENT.

21        MR. CIRELLI, AGREED THE DEFENSE' EXPERT MADE NO PREDICTION

22    AS TO WHEN THE REQUIRED FILL RATES WOULD BE REACHED, LET ALONE

23    SUSTAINED, RIGHT?

24        SHORT ANSWER THIS TIME.  I NEED TO MOVE ON TO OTHER AREAS.

25            MR. CIRELLI:  I'M SORRY, YOUR HONOR, DID --
```

```
 1              THE COURT:  MS. ELLS IS CORRECT, THE EXPERT MADE NO

 2   PREDICTION AS TO WHEN FILL RATES WOULD BE ACHIEVED?

 3              MR. CIRELLI:  I DON'T BELIEVE THAT DR. GREULICH

 4   LOOKED AT PREDICTING WHEN IT WOULD BE ACHIEVED.

 5      BUT THE OTHER THING THAT SHE INDICATED WAS THAT THERE

 6   WAS -- THAT DR. GREULICH DID NOT LOOK AT WHAT SALARIES WOULD

 7   NEED TO BE IN THE FUTURE IN ORDER TO REACH THE FILL RATES.

 8   AND, AGAIN, SHE DID NOT DO SO BUT NEITHER DID DR. BROWN.

 9      AND, IN FACT, DR. BROWN, AGAIN, DURING HIS TESTIMONY, I'M

10   READING FROM PAGE 226, LINES 18 TO --

11              THE COURT:  I -- I CAN CHECK THE TRANSCRIPT, SO JUST

12   CITING TO IT IS SUFFICIENT AT THIS POINT.

13              MR. CIRELLI:  AND HE TESTIFIES THERE THAT HE AND --

14   HE DOESN'T THINK ANYBODY COULD TELL YOU HOW LARGE AN INCREASE

15   IN PAY IS NEEDED AT ANY POINT IN TIME TO INCREASE THAT.

16              THE COURT:  ALL RIGHT.  AGAIN, YOU'LL HAVE A CHANCE

17   FOR BRIEF WRAP-UP, SO HOLD ANY FURTHER THOUGHTS IF YOU REALLY

18   NEED TO CONVEY MORE TO THE COURT ON THE LABOR ECONOMICS

19   QUESTIONS AND THE EXPERTS -- THE DEFENSE' EXPERT'S WORK IN

20   PARTICULAR.

21      IN TERMS OF PAY INCREASES, I WANT TO MAKE CERTAIN I

22   UNDERSTAND THE DEFENSE' POSITION.

23      THE PLAINTIFFS SUGGEST IT WOULD HAVE BEEN REASONABLE TO

24   EXTEND THE 15 PERCENT PIP PAY INCREASE TO NON-PIP MENTAL HEALTH

25   STAFF TO STAUNCH LATERAL TRANSFERS AND MAINTAIN MORALE.
```

1          THE DEFENSE' POSITION ON THAT, MR. MELLO?

2              MR. MELLO:  YES.  THANK YOU, YOUR HONOR.

3          SO, INITIALLY, JUST DEFENDANTS DO NOT CONCEDE THAT THERE IS

4     AN OVERSUPPLY OF PROVIDERS OUT THERE.  I THINK THE EVIDENCE

5     DEMONSTRATES THE OPPOSITE.

6          PLAINTIFFS AND THE SPECIAL MASTER HAVE MADE CLEAR

7     THROUGHOUT THIS PROCEEDING THAT THE MOST AT RISK PATIENTS ARE

8     THOSE PATIENTS IN THE PIPS.  AND SO THE FOCUS WAS TO TRY TO

9     INCREASE STAFFING TO PROVIDE CARE TO THOSE PATIENTS WHO WERE AT

10    RISK.  NEVER DURING THE PROCESS DID PLAINTIFFS' COUNSEL OR THE

11    SPECIAL MASTER'S TEAM OBJECT TO THE IDEA OF OFFERING PIP

12    DIFFERENTIALS.  REMEMBER, THEY ARE DIFFERENTIALS TO TRY TO

13    INCREASE STAFFING.

14         AND I BELIEVE THAT THE EVIDENCE DEMONSTRATES THAT NOT ONLY

15    ARE THOSE PIP DIFFERENTIALS GOING FORWARD PURSUANT TO THE NEW

16    MOUS, BUT WE ARE ALSO OFFERING 15 PERCENT MORE.  SO THEY ARE

17    STILL CONTINUING TO BE A DIFFERENCE.  WE'RE STILL GOING TO

18    OFFER MORE MONEY TO THOSE FOLKS TREATING THE MOST AT RISK, MOST

19    ACUTE PATIENTS.

20         BUT THE IDEA THAT SOMEHOW DEFENDANTS OFFERING A

21    DIFFERENTIAL TO TRY TO INCREASE STAFFING TO THOSE WHO ARE AT

22    MOST RISK DEMONSTRATES ANYTHING IS INTERESTING, AND ESPECIALLY

23    BECAUSE THERE WAS NEVER A COMPLAINT DURING THE PROCESS.  IN

24    FACT, THERE WAS ENCOURAGEMENT TO TRY TO INCREASE STAFFING IN

25    THE PIPS.

1    SO I THINK I DON'T HAVE ANYTHING MORE ON THAT PARTICULAR 15

2    PERCENT PAY DIFFERENTIAL, WHICH AGAIN IS GOING FORWARD, AS WELL

3    AS THE INCREASES THAT THE LINE STAFF ACCRUED -- RECEIVED THAT

4    ARE NOT IN THE PIPS.

5    THANK YOU.

6         THE COURT:  ON THAT, MS. ELLS?  JUST BRIEF RESPONSE

7    TO WHAT YOU JUST HEARD?

8         MS. ELLS:  WE CERTAINLY DON'T DISPUTE THAT THERE ARE

9    MASSIVE STAFFING SHORTAGES IN THE PIPS.  HOWEVER, THERE IS

10   EVIDENCE THAT THE OUTPATIENT PROGRAMS LOST CLINICIANS WITH THAT

11   PAY DIFFERENTIAL, AND THAT IS THE REASON THAT THERE ARE PAY

12   PARITY ORDERS WITH DSH, TO STEM EXACTLY THAT KIND OF PROCESS.

13   SO WHILE WE DID NOT OBJECT, WE ALSO DO NOT BELIEVE THAT

14   THAT MEANS THAT IT WOULD BE UNREASONABLE TO ALSO EXTEND

15   ADDITIONAL SALARY INCREASES TO THE NON-PIP PROGRAMS WHEN THEY

16   ARE SO FAR BELOW COMPLIANCE AS THEY ARE RIGHT NOW.

17        THE COURT:  REGARDING SALARIES GENERALLY, WHAT'S --

18   WHAT'S THE NEXT FILING?  JUST REMIND ME, WHEN WILL THE COURT

19   NEXT SEE UPDATED INFORMATION ON SALARIES, MR. MELLO, AS

20   RELEVANT FOR ALL THE CLASSES AT ISSUE HERE?

21        MR. MELLO:  I ASSUME IN THE NEXT MONTHLY REPORT.  IF

22   WE ARE STILL INDICATING POTENTIAL FINES, I THINK THAT IT WILL

23   BE IN THERE.  BUT I'M NOT A HUNDRED PERCENT SURE.  I'M GLAD TO

24   PROVIDE YOU AN ANSWER IN WRITING TO THAT QUESTION, YOUR HONOR.

25   TO JUST HAVE CLARITY, I WANT TO MAKE SURE I ANSWER THE QUESTION

1    RIGHT.

2          THE COURT:  ALL RIGHT.  I THINK --

3          MR. MELLO:  IF I MAY GO BACK --

4          THE COURT:  IF I COULD DIRECT YOU TO FILE AN UPDATED

5    SALARY SCHEDULE WITHIN 7 DAYS, DOES THAT WORK?

6          MR. MELLO:  YES.

7          THE COURT:  ALL RIGHT.

8          MR. MELLO:  SO THAT WOULD BE BY THE 9TH?  SO NOT THE

9    10TH, BY THE 9TH, RIGHT?

10          THE COURT:  CORRECT.

11          MR. MELLO:  BY THE 9TH.

12          THE COURT:  CORRECT.

13          MR. MELLO:  OKAY.  THANK YOU.

14      IF I COULD BACK UP.

15      IF WE'RE TRYING TO INCENTIVIZE FOLKS TO GO INTO THESE PIP

16    POSITIONS, HOW WOULD A 15 PERCENT PAY DIFFERENTIAL FOR ALL

17    PEOPLE -- IF SALARY IS ONE FACTOR, AND AN IMPORTANT FACTOR, HOW

18    WOULD IT INCREASE -- IF EVERYBODY WAS BEING PAID THE SAME, HOW

19    WOULD IT INCREASE --

20          THE COURT:  I UNDERSTAND THE POINT.  I UNDERSTAND THE

21    POINT.  THERE IS ALSO THE ISSUE OF LATERAL TRANSFERS.  BUT I

22    UNDERSTAND YOUR POSITIONS.  I WAS JUST TRYING TO MAKE CERTAIN I

23    DID UNDERSTAND THE DEFENSE' POSITION AND I DO BETTER NOW.

24      IN TERMS OF OTHER STAFFING ISSUES, I THINK IT'S UNDISPUTED

25    THAT THE DEFENDANTS ABANDONED THE PSYCHIATRIC MEDICAL ASSISTANT

 1    PROGRAM DESIGNED TO HELP WITH RECRUITMENT AND RETENTION OF

 2    PSYCHIATRISTS.

 3         DO I HAVE THAT RIGHT, MR. MELLO?

 4              MR. MELLO:  AGAIN, I BELIEVE DR. MEHTA TESTIFIED TO

 5    THIS AT THE HEARING.  HE TESTIFIED THAT DEFENDANTS DEFINITELY

 6    PIVOTED AWAY FROM IT.  ABANDONED -- AND, AGAIN, IT CAME INTO

 7    PLACE BEFORE HE WAS THE HEAD OF MENTAL HEALTH.  I THINK

 8    ABANDONED MIGHT NOT BE THE TERM BUT, YES, THEY DID NOT

 9    IMPLEMENT THAT PILOT PROGRAM.  CORRECT.

10         INSTEAD, THEY HAVE BEEN FOCUSING MAS ON PROVIDING OTHER

11    ANCILLARY SERVICES, INCLUDING TELEPRESENTER POSITIONS.  THOUGH,

12    OF COURSE, AS THE EVIDENCE MADE QUITE CLEAR AT THE PROCEEDING,

13    MANY CLASSIFICATIONS CAN PROVIDE THOSE TELEPRESENTER FUNCTIONS,

14    INCLUDING MAS.

15              THE COURT:  BUT THE MEDICAL ASSISTANTS COULD HAVE

16    PROVIDED SUPPORT IN THE AREA OF DOCUMENTATION, WHICH, LIKE IT

17    OR NOT, IS CRITICAL IN A CASE IN WHICH DEFENDANTS HAVE TO

18    DEMONSTRATE COMPLIANCE, RIGHT?  AND THE MEDICAL ASSISTANTS WERE

19    KEY PLAYERS IN THAT ESSENTIAL FUNCTION.

20              MR. MELLO:  FOR SURE, YOUR HONOR.

21         AND TO BE CLEAR, THOSE MAS WERE GOING TO ASSIST

22    PSYCHIATRISTS.  PSYCHIATRISTS ARE CURRENTLY A POSITION FOR

23    WHICH WE ARE AT OR AROUND 90 PERCENT.  SO IF THE MAS WOULD HELP

24    US WITH PSYCHIATRY HIRING, YET WE'RE STILL AT COMPLIANCE LEVEL,

25    I'M KIND OF -- I'M KIND OF WONDERING WHAT THE ISSUE IS IN TERMS

1    OF REASONABLE EFFORTS BECAUSE WE'RE AT 90 PERCENT -- OR ABOUT

2    90 PERCENT FOR PSYCHIATRISTS.

3         TO ME -- IT SEEMS LIKE A BIT OF A RED HERRING TO -- TO ME,

4    YOUR HONOR.  THANK YOU.

5              THE COURT:  UNDERSTOOD.

6         BUT SO DOES THAT MEAN THE DOCUMENTATION CONCERN THE DEFENSE

7    DROPS REFERENCES TO THROUGHOUT THE BRIEFING, THE CONCERN ABOUT

8    THE ONEROUS NATURE OF THE DOCUMENTATION, THAT'S NOT AN ISSUE

9    FOR PSYCHIATRISTS, IT'S ONLY NONPSYCHIATRIC CLINICAL STAFF?

10             MR. MELLO:  REMEMBER, THAT WAS ONE OF PLAINTIFFS'

11   WITNESSES WHO TESTIFIED ABOUT THE ONEROUS NATURE OF -- AND I'M

12   NOT SURE THAT MAS GET TO FILL OUT DOCUMENTATION FOR

13   PSYCHIATRISTS ON THINGS LIKE SRASHES AND THOSE TYPES OF THINGS.

14   I'M JUST NOT SURE.  I CAN'T IMAGINE THAT YOU CAN DEFER CERTAIN

15   HIGH-LEVEL RESPONSIBILITIES TO STAFF IN THIS PARTICULAR

16   SITUATION.

17        AND I DON'T WANT TO LOSE TRACK OF THE FACT THAT THOSE MA --

18   THAT MA PILOT WAS GOING TO HELP US FILL PSYCHIATRY POSITIONS,

19   AND OUR PSYCHIATRY POSITIONS ARE CURRENTLY AT OR AROUND 90

20   PERCENT.

21             THE COURT:  I HEARD THAT.

22             MR. MELLO:  THANK YOU.

23             THE COURT:  HELP ME UNDERSTAND DOCUMENTATION

24   REQUIREMENTS AS RELATED TO NONPSYCHIATRIC CLINICAL STAFF.

25        DO YOU HAVE A SENSE, IN AN 8-HOUR DAY, HOW MUCH TIME IS

```
 1   SPENT ON DIRECT PATIENT CARE AND HOW MUCH SPENT ON

 2   DOCUMENTATION AND MEETINGS?

 3              MR. MELLO:  DO I, YOUR HONOR?

 4              THE COURT:  SO --

 5              MR. MELLO:  I'M --

 6              THE COURT:  DO YOU HAVE AN ESTIMATE, OR IS THERE

 7   SOMEONE YOU CAN YIELD TO, TIME SPENT IN DIRECT PATIENT CARE,

 8   DOCUMENTATION, MEETINGS, DEAD TIME?

 9              MR. MELLO:  NO.  I THINK WE HAD EVIDENCE, AGAIN, FROM

10   SEVERAL POSITIONS -- SEVERAL PEOPLE WHO WERE CALLED BY

11   PLAINTIFFS AT THE INSTITUTIONS.  I WOULD HAVE TO DEFER TO WHAT

12   IS IN THE RECORD.  OF COURSE, THAT INFORMATION IS IN THE RECORD

13   WITH RESPECT TO THOSE INSTITUTIONS.  BUT I -- I DON'T HAVE THAT

14   INFORMATION.  I DON'T BELIEVE THAT INFORMATION IS IN THE RECORD

15   AND I DEFINITELY DON'T WANT TO SPEAK TO SOMETHING THAT I DON'T

16   HAVE PERSONAL KNOWLEDGE OF.

17              THE COURT:  IS THERE A SUGGESTION --

18              MR. MELLO:  I CAN'T IMAGINE ANYBODY ON OUR TEAM CAN

19   ANSWER THAT QUESTION.

20              THE COURT:  ALL RIGHT.  I'LL LET THE -- AGAIN, YOU

21   CAN ALWAYS YIELD IF YOU WANT TO.

22      IS THE DEFENSE SAYING THAT ANY OF THE DOCUMENTATION

23   REQUIREMENTS ARE -- ARE FLATLY UNNECESSARY, AND SUGGESTING

24   THERE IS A NEED TO STREAMLINE THEM?  I MEAN, THIS IS A -- THIS

25   IS HARDLY A NEW ISSUE IN THIS CASE --
```

```
1              MR. MELLO:  SO --

2              THE COURT:  -- THE NEED FOR DOCUMENTATION AND -- GOOD

3    DATA AND GOOD DOCUMENTATION.

4              MR. MELLO:  AGAIN, I HATE TO GET IN FRONT OF MY

5    CLIENTS.  RIGHT?  THEY WERE NOT ASKED THESE QUESTIONS.

6    PLAINTIFFS' COUNSEL ASKED THESE QUESTIONS OF ONE OF DEFENDANTS'

7    EMPLOYEES WHO THEY CALLED.  AND -- BUT, AGAIN, REALLY GETTING

8    OUTSIDE OF MY LANE, YOUR HONOR.

9         I THINK INDISPUTABLY THAT THE DOCUMENTATION AND AUDITING

10   FUNCTIONS THAT OCCUR HERE ARE DETRACTING.  WHAT ARE TERMS THAT

11   WE'VE HEARD -- I DON'T KNOW THAT WE HEARD IT -- WE TREAT PAPER

12   AS OPPOSED TO PATIENTS AT TIMES.  IT SEEMS TO ME THAT THAT IS

13   ONEROUS AND UNFORTUNATE.  AND I BELIEVE DR. DAVID TESTIFIED

14   THAT WE MIGHT BE ABLE TO RECRUIT PEOPLE BUT WE'RE NOT GOING TO

15   BE ABLE TO RETAIN PEOPLE BECAUSE OF THESE ONEROUS REQUIREMENTS.

16        BUT I CAN'T TELL YOU THE LEVEL OR THE MAGNITUDE, BUT I

17   THINK THAT IT WOULD BE HARD TO DISPUTE THAT ALL OF THE

18   REQUIREMENTS ARE NOT IMPACTING EMPLOYEE SATISFACTION.  BUT I

19   CAN'T SPEAK TO SPECIFICS, YOUR HONOR.

20             MS. ELLS:  MAY I ADDRESS --

21             THE COURT:  HOLD ON.  I HAVE SOME MORE QUESTIONS FOR

22   MR. MELLO AND THEN I'LL CALL ON YOU, MS. ELLS.

23        I JUST -- THIS COURT IS NO FAN OF UNNEEDED BUREAUCRACY.

24   BUT THERE HAS TO BE GOOD DOCUMENTATION.  I'M JUST -- I'M TRYING

25   TO UNDERSTAND.
```

1        MR. MELLO, IS IT POSSIBLE TO VIEW THE ARGUMENT REGARDING

2    DOCUMENTATION AS SUGGESTING -- GIVEN THE NEED FOR GOOD

3    REPORTING TO THIS COURT, IS THE ARGUMENT SUGGESTING THE

4    STAFFING RATIOS DON'T ADEQUATELY ACCOUNT FOR NECESSARY

5    DOCUMENTATION, AND IN THAT WAY IN AND OF ITSELF THE DEFENDANTS

6    ARE UNDERSTAFFED?

7             MR. MELLO:  THAT WOULD BE AN INTERESTING WAY TO FLIP

8    IT AROUND.  SO BECAUSE THE REQUIREMENTS ARE SO ONEROUS, WE NEED

9    MORE EMPLOYEES TO DO PAPERWORK AS OPPOSED TO TREAT PATIENTS.  I

10   THINK DEFENDANTS' DESIRE IS TO TREAT PATIENTS FIRST.

11             THE COURT:  AND -- AND ACHIEVE --

12             MR. MELLO:  I THINK YOU --

13             THE COURT:  AND ACHIEVE CONSTITUTIONAL COMPLIANCE, I

14   ASSUME, AND BE ABLE TO DEMONSTRATE THAT TO THE COURT.

15             MR. MELLO:  ABSOLUTELY.  I THINK IT'S IMPOSSIBLE TO

16   CONCLUDE THAT DEFENDANTS ARE NOT ABSOLUTELY AIMED AT TRYING TO

17   IMPROVE CARE.  I THINK DR. MEHTA SAYS, I WANT THE BEST SYSTEM,

18   I DON'T WANT A MINIMUM SYSTEM.  AND I THINK THAT'S DEFENDANTS'

19   MOTIVATIONS.

20        BUT I DON'T THINK DEFENDANTS ARE SAYING THAT -- THAT

21   ACTUALLY THEY'RE EVEN MORE UNDERSTAFFED BECAUSE THEY HAVE THESE

22   ONEROUS REQUIREMENTS.  AGAIN, THAT CAME UP DURING PLAINTIFFS'

23   TESTIMONY.  BUT I THINK IT IS PRETTY MUCH UNDISPUTED THAT

24   PEOPLE BELIEVE THERE IS A LOT OF DOCUMENTATION ISSUES IN THIS

25   CASE.

1        THE COURT:  SO IS A REASONABLE STEP THE DEFENDANTS

2   COULD TAKE TO MAKE AN ALTERNATE PROPOSAL FOR DEMONSTRATING

3   COMPLIANCE WITH THE PROGRAM GUIDE REQUIREMENTS IF THIS IS SUCH

4   AN ISSUE?

5        MR. MELLO:  I MEAN, IF -- IF YOU'RE SAYING THERE ARE

6   ALTERNATE THINGS DEFENDANTS COULD DO TO DEMONSTRATE THAT

7   THEY'RE TAKING ALL REASONABLE MEASURES TO TRY TO COMPLY WITH

8   THESE ORDERS, THAT'S ONE ISSUE.

9     IF THE QUESTION IS DO DEFENDANTS HAVE PROPOSALS ABOUT

10  DOCUMENTATION REQUIREMENTS, THEN, AGAIN, I THINK WE MIGHT, AND

11  WE'D LOVE TO -- PROBABLY -- AGAIN, I DON'T WANT TO GET IN FRONT

12  OF MY CLIENTS -- TALK TO PLAINTIFFS' COUNSEL AND THE SPECIAL

13  MASTER ABOUT THOSE ISSUES SO THAT WE CAN STREAMLINE THINGS.

14     BUT, AGAIN, IF IT'S ABOUT DOCUMENTATION AND ALL REASONABLE

15  EFFORTS TO COMPLY WITH THE COURT'S ORDERS, WE ARE NOT CONCEDING

16  THAT WE DID NOT TAKE ALL REASONABLE EFFORTS TO COMPLY WITH THE

17  COURT'S ORDERS.

18        THE COURT:  JUST -- DR. DAVID, I KNOW YOU'VE CITED TO

19  HER TESTIMONY, SHE ALSO NOTED THAT THERE HAD BEEN NO FIELD

20  LIAISON AT HER FACILITY FOR THE LAST TWO YEARS, SUGGESTING THAT

21  THAT POSITION WAS CRITICAL TO STAYING ON TOP OF HIRING.

22     DO DEFENDANTS AGREE THAT FIELD LIAISONS ARE CRITICAL TO

23  HIRING AND THERE'S BEEN A -- A LACK OF FILL OF THOSE POSITIONS?

24        MR. MELLO:  SO, AGAIN, SHE TESTIFIED -- FIRST, SHE

25  DIDN'T SPEAK FOR THE STATE.  SHE ADMITTED THAT.

1        SECOND OF ALL, SHE TESTIFIED ABOUT HER INSTITUTION AND HER

2   IMPRESSIONS AT HER INSTITUTION.  AND THERE WAS A PLETHORA OF

3   EVIDENCE ABOUT THE EFFORTS DEFENDANTS HAVE TAKEN, BOTH BEFORE

4   THIS COURT ISSUED ITS DECEMBER -- FEBRUARY 28TH ORDER -- BEFORE

5   AND AFTER TO STREAMLINE AND IMPROVE HIRING, INCLUDING ONE-DAY,

6   THE LEAN SIX SIGMA GREEN BELT PROJECT, VARIOUS THINGS.

7        SO I CAN'T -- HER TESTIMONY IS HER TESTIMONY WITH RESPECT

8   TO HER INSTITUTION.

9             THE COURT:  ALL RIGHT.  MS. ELLS, RESPONSE TO WHAT

10  YOU'VE HEARD, AS CONCISELY AS POSSIBLE?

11            MS. ELLS:  YES, YOUR HONOR.  BRIEFLY.

12       FOR THE MAS WE WILL NOTE THAT THE TELEPSYCHIATRY POLICY --

13  THERE ARE MULTIPLE INSTITUTIONS THAT ARE OUT OF COMPLIANCE WITH

14  THAT POLICY BECAUSE THEY CANNOT HIRE ONSITE STAFF, ONSITE

15  PSYCHIATRISTS, RIGHT NOW AND CONSISTENTLY.  THAT IS TRUE.

16       AND THE STATED POLICY PREFERENCE IS TO HAVE ONSITE

17  PSYCHIATRY, AND THAT IS WHY THERE IS A 15 PERCENT ONSITE PAY

18  DIFFERENTIAL IN THE NEW MOU FOR PSYCHIATRISTS.  SO THE MAS ARE

19  DEFINITELY RELEVANT.  THEY ARE ONE OF THE REASONS THAT

20  DEFENDANTS CANNOT MAINTAIN SUFFICIENT ONSITE STAFF TO COMPLY

21  WITH THEIR POLICIES.

22       SECOND, THE DOCUMENTATION REQUESTS.  I HAVE A NUMBER OF

23  THINGS TO SAY BUT I'LL KEEP THEM BRIEF.

24       THE FIRST IS THAT THE DOCUMENTATION THAT HAS LARGELY BEEN

25  COMPLAINED ABOUT IS IN THE ELECTRONIC HEALTH RECORD SYSTEM

1   WHICH WAS DESIGNED BY THE DEFENDANTS.

2       SECOND OF ALL, AS DR. MEHTA TESTIFIED, WE HAVE BEEN

3   APPROACHED, AND THE SPECIAL MASTER HAS BEEN APPROACHED, TO

4   STREAMLINE THE MASTER TREATMENT PLAN AND A COUPLE OF OTHER

5   FORMS.  WE'VE ENGAGED IN THOSE DISCUSSIONS.  WE WEREN'T

6   APPROACHED UNTIL, I BELIEVE, JUNE TO DO THAT.  SO TO SAY THAT

7   THERE IS SOME INABILITY OF DEFENDANTS TO TAKE REASONABLE

8   MEASURES TO STREAMLINE THEIR OWN DOCUMENTATION, OR THAT WE OR

9   THE COURT OR THE SPECIAL MASTER ARE A BARRIER TO THAT IS SIMPLY

10  UNFOUNDED.  AND DR. MEHTA'S TESTIMONY CONFIRMS THAT, AS DOES

11  THE RECORD.

12      AND I THINK THAT'S -- I THINK THAT'S ALL I WANT TO SAY

13  ABOUT THOSE.

14          THE COURT:  ALL RIGHT.  MS. ELLS, IN THE BRIEFING,

15  THE PLAINTIFFS MAKE REFERENCE TO THE RECEIVER'S HIRING IN THE

16  PLATA CASE.  ARE PLAINTIFFS SUGGESTING NOW, TO THE EXTENT

17  PLAINTIFFS SAY, IF THE COURT GETS THERE, MORE THAN FINES MAY BE

18  NEEDED, THAT THE COURT SHOULD CONSIDER THE POSSIBILITY OF THE

19  RECEIVER ASSUMING RESPONSIBILITY FOR MENTAL HEALTH HIRING?

20          MS. ELLS:  YES.  WE THINK THAT IS ONE REASONABLE STEP

21  DEFENDANTS COULD HAVE TAKEN, TO VOLUNTARILY CEDE THAT

22  RESPONSIBILITY TO THE RECEIVER.

23      BUT WE ALSO THINK THAT THE RECORD SO FAR WITH THESE

24  PROCEEDINGS HAS SHOWN THAT THE CONTEMPT FINES THAT ARE ACCRUING

25  ARE HAVING NO EFFECT ON THE RESPONSE TO THIS CRISIS.

1    SO WE DO THINK IT WOULD BE APPROPRIATE TO CONSIDER CEDING

2    RESPONSIBILITY FOR HIRING TO THE RECEIVER, WHO HAS BEEN MUCH

3    MORE SUCCESSFUL IN THAT RESPECT FOR MEDICAL.

4         THE COURT:  MR. MELLO, ON THAT POINT?

5         MR. MELLO:  SO, FIRST OF ALL, I DON'T BELIEVE THAT

6    THE SPECIAL MASTER OR PLAINTIFFS' COUNSEL HAVE EVER FORMALLY

7    REQUESTED THAT THE RECEIVER TAKE -- OR FILED A MOTION

8    REQUESTING THAT THE RECEIVER TAKE CONTROL.  REMEMBER, THE

9    RECEIVER IS OVER THE PLATA MENTAL HEALTH PROGRAM.

10   BUT I DO THINK IT IS WORTH NOTING THAT PLAINTIFFS' COUNSEL,

11   AGAIN, ON ONE HAND IS CHAMPIONING THE EFFORTS OF THE RECEIVER,

12   AND ON THE OTHER HAND SENDING MEMOS TO THE RECEIVER ASKING

13   QUESTIONS LIKE, WHAT ACTIONS IS THE RECEIVER TAKING TO ADDRESS

14   MEDICAL AND RECRUITMENT AND RETENTION CHALLENGES?  WHAT EFFORTS

15   IS THE RECEIVER DOING TO ADDRESS HIGH VACANCY RATES AMONG

16   NURSING STAFF AND ALLIED HEALTH AND DIETARY SERVICES?

17   SO THEY REALLY ARE PLAYING PLATA VERSUS COLEMAN.  AND THEY

18   REALLY ARE IGNORING -- AND MAYBE IT'S THE PLO THAT IS SENDING

19   THOSE COMMUNICATIONS REGARDING THE RECEIVER'S EFFORTS.  BUT I

20   THINK A FULSOME RECORD ON THE ISSUE IS -- AND IF THEY ARE

21   ASKING FOR THE RECEIVER TO TAKE OVER COLEMAN, I'M JUST NOT SURE

22   WHAT THE ASK IS HERE.

23   AND I'M NOT SURE THAT ANY OF THOSE THINGS DEMONSTRATE THAT

24   DEFENDANTS HAVE NOT TAKEN ALL REASONABLE EFFORTS -- IN LIGHT OF

25   THE NATIONAL SCARCITY FOR WHICH THEY OPERATE, IN LIGHT OF THE

1   CHANGED EXPECTATIONS OF EMPLOYEES SINCE THE PANDEMIC, IN LIGHT

2   OF THE GREAT RESIGNATION THAT DEFENDANTS HAVEN'T TAKEN ALL

3   REASONABLE EFFORTS TO FILL POSITIONS.

4          THE COURT:  I THINK THE QUESTION IS NOT WHETHER OR

5   NOT THE RECEIVER SHOULD TAKE OVER THIS CASE -- IF ONLY IT WERE

6   THAT EASY -- BUT THE QUESTION IS WOULD IT HAVE BEEN AN

7   ADDITIONAL REASONABLE STEP.

8      IF DEFENDANTS ARE REQUIRED TO SHOW AT THIS POINT THAT

9   THEY'VE TAKEN ALL REASONABLE -- UNDERSCORE REASONABLE -- STEPS,

10  IS ONE OF THOSE REASONABLE STEPS TO HAVE SOUGHT THE -- THE

11  AUTHORITY FOR THE RECEIVER TO ASSUME RESPONSIBILITY FOR HIRING

12  IN THE MENTAL HEALTH AREA, GIVEN THE GREATER ROBUSTNESS THE

13  RECEIVER APPEARS TO HAVE ACHIEVED IN PLATA, RELATIVELY

14  SPEAKING.

15         MR. MELLO:  OKAY.  AGAIN, FOUNDATIONALLY, YOUR HONOR,

16  NUMBER ONE, PLAINTIFFS, AGAIN, ON ONE HAND ARE SAYING ROBUST

17  SUCCESS IN PLATA, AND THEN SENDING MEMOS TO THE RECEIVER SAYING

18  YOU'RE FAILING --

19         THE COURT:  I'M NOT TAKING -- I'M NOT GOING TO TAKE

20  NOTICE OF ANYTHING HAPPENING IN PLATA.  I'M LOOKING AT WHAT'S

21  IN MY RECORD HERE.

22     I HEAR WHAT YOU'RE SAYING, BUT IS IT RELATIVELY -- HAS THE

23  RECEIVER ACHIEVED RELATIVELY GREATER SUCCESS IN THE CATEGORY OF

24  HIRING WHERE HE HAS FULL AUTHORITY THAN DEFENDANTS HAVE WITH

25  RESPECT TO MENTAL HEALTH POSITIONS?

1          MR. MELLO:  SO ON THAT NOTE, REMEMBER, THE RECEIVER

2    STANDS IN THE SHOES OF THE SECRETARY.  SO THE RECEIVER IS

3    COMPLYING WITH STATE LAW IN HIS PROCESS.  MOREOVER, AS ALL THE

4    WITNESSES TESTIFIED, MS. PONCIANO AND MS. MUHAMMAD, THEY HAVE

5    DUAL REPORTING REQUIREMENTS.  SO THEY REPORT TO BOTH MS. TOSOH

6    AND THE RECEIVER.  SO CCHCS WORKS FOR BOTH THE RECEIVER AND FOR

7    CDCR.  AND, AGAIN, HE STANDS IN THE SHOES OF THE STATE.  HE IS

8    NOT USING WAIVERS OF STATE LAW TO FILL POSITIONS IN PLATA.

9          AND SO, AGAIN, THIS IS AN INTERESTING QUESTION OF WHETHER

10   HE COULD HAVE A MORE FULSOME POSITION.  BUT REMEMBER, HE STANDS

11   IN THE SHOES, HE'S COMPLYING WITH STATE LAWS IN PLATA, AND

12   MS. MUHAMMAD AND MS. PONCIANO REPORT TO HIM.

13         AND, AGAIN, I KNOW -- IT'S GOOD TO KNOW THAT WE'RE NOT

14   GOING TO TAKE JUDICIAL NOTICE OF THINGS IN PLATA, BUT IT IS

15   WORTH NOTING THAT PLAINTIFFS ON ONE SIDE OF THEIR MOUTH ARE

16   SAYING THAT HE IS SUCCESSFUL AND ON THE OTHER HAND ARE SENDING

17   HIM MEMOS ABOUT HIS LACK OF SUCCESS.

18         THE COURT:  ALL RIGHT.  WELL, I DON'T -- I'M NOT

19   GOING TO MAKE A CREDIBILITY DETERMINATION ON THIS POINT.  BUT

20   ANYTHING BRIEFLY TO SAY, MS. ELLS?

21         MS. ELLS:  I MEAN, THOSE -- I DON'T EVEN KNOW WHAT HE

22   IS READING FROM.  THEY WERE OBVIOUSLY NOT SENT WITHIN THE

23   CONFINES OF THE COLEMAN CASE, AS COLEMAN COUNSEL.  THEY --

24   WHATEVER HE IS READING IS ABOUT THE PLATA CASE.

25         AND I THINK, YOU KNOW, THE RECORD SHOWS THAT EVEN IN THE

1   INSTANCES WHERE THE PLATA RECEIVER SOUGHT WAIVERS THAT THE

2   CRISIS THAT HE IDENTIFIED -- THE CRISIS LEVEL VACANCIES WERE SO

3   MUCH LESS SIGNIFICANT THAN WHAT WE ARE FACING HERE, AND HE

4   SOUGHT AND RECEIVED WAIVERS TO CIRCUMVENT THE HIRING PROCESSES

5   AND IT WORKED.  AND THE HIRING LEVELS AND THE VACANCY LEVELS

6   ARE MUCH BETTER IN PLATA THAN THEY ARE IN THIS CASE.

7        AND SO, YOU KNOW, I -- WHILE THERE MAY BE IMPROVEMENTS --

8   FURTHER IMPROVEMENTS TO BE MADE WITHIN THE MEDICAL STAFFING AND

9   HIRING PROCESS THAT I WOULD HAVE TO DEFER TO PLATA COUNSEL ON,

10  WHICH OBVIOUSLY MY FIRM IS NOT EVEN INVOLVED IN, WE WOULD JUST

11  POINT TO THE RECORD WHICH SHOWS THAT THERE IS A MUCH GREATER

12  SUCCESS IN THAT CASE WITH HIRING AND WITH SEEKING WAIVERS AT

13  LEVELS OF VACANCIES THAT ARE FAR, FAR LESS THAN WHAT WE HAVE IN

14  THIS CASE.

15           THE COURT:  ALL RIGHT.  LET ME MOVE ON TO A COUPLE OF

16  OTHER CATEGORIES.  I WANT TO TALK BRIEFLY ABOUT TELEMENTAL

17  HEALTH; OTHER REASONABLE STEPS, JUST A FEW QUESTIONS; REMEDIES.

18       ON TELEMENTAL HEALTH, DOES THE RECORD ALLOW ME TO DETERMINE

19  WHEN DEFENDANTS BELIEVE THEY COULD SATISFY THE REQUIRED FILL

20  RATES THROUGH THEIR NEW TELEMENTAL HEALTH EFFORTS?

21       I MEAN, I -- IT -- MY UNDERSTANDING IS THAT -- THAT THERE

22  ARE ONE, MAYBE TWO PEOPLE; THERE HAVE BEEN SOME OFFERS MADE, I

23  DON'T KNOW IF THAT'S CHANGED SINCE THE HEARING; THAT THE

24  EARLIEST THERE MIGHT BE SOME DEVELOPMENT OF THE PROGRAM IS A

25  COUPLE OF YEARS DOWN THE ROAD, EVEN IF IT'S BEGINNING NOW.

1        DOES ANYTHING ALLOW ME TO CONCLUDE THAT THIS PROGRAM IS

2    GOING TO GET THE DEFENDANTS TO FULL COMPLIANCE?  AND, IF SO, BY

3    WHEN?

4        MR. MELLO?

5            MR. MELLO:  SO, AGAIN, I BELIEVE THAT DR. MARTELLO

6    AND DR. MEHTA BOTH SPOKE ABOUT THE ROLLOUTS OF THE TELEMENTAL

7    HEALTH PROGRAM.  I BELIEVE THERE HAVE BEEN SOME DEVELOPMENTS

8    WITH RESPECT TO POSTING POSITIONS, ETC.  I BELIEVE THEY THOUGHT

9    THAT IT WOULD TAKE A YEAR TO TWO YEARS TO FULLY ROLL OUT

10   TELEMENTAL HEALTH, BUT THERE WOULD BE INCREMENTAL IMPROVEMENTS.

11   I THINK THE RECORD WAS CLEAR.

12       I KNOW THAT THERE WAS SOME TESTIMONY OR QUESTIONS ABOUT

13   EVEN IF YOU FILL ALL THE POSITIONS ALLOCATED YOU'RE NOT GOING

14   TO BRIDGE THE GAP.  I THINK A COUPLE OF THINGS ABOUT THAT.

15       ONE, DEFENDANTS DIDN'T SET A SET NUMBER OF POSITIONS,

16   RATHER THEY WERE GOING TO ROLL IT OUT AND THEY WOULD INCREASE

17   SUPERVISORS IF THEY HAD SUCCESS LIKE THEY ANTICIPATE.

18       TWO, TELEMENTAL HEALTH SERVES MULTIPLE PURPOSES.  BEYOND

19   FILLING POSITIONS, IT ALSO FREES UP AND BETTERS THE WORKING

20   CONDITIONS FOR THOSE WHO WORK ONSITE, AND SO IT WILL ALSO HELP

21   WITH RETENTION.

22       BUT I BELIEVE THE EVIDENCE WAS THEY THOUGHT IT WOULD TAKE A

23   YEAR OR MORE TO FULLY OPERATE.  AND, AGAIN, I DON'T KNOW WHAT

24   FULLY OPERATE MEANS IN THIS POSITION, BUT IT IS A REASONABLE

25   EFFORT.  IT'S DEMONSTRATED SUCCESS IN THE PAST.  AND I KNOW

1   THEY ARE MAKING EFFORTS TO EVEN SPEED IT MORE -- UP MORE, YOUR

2   HONOR.

3       BUT I DON'T THINK IT'S SET A DATE CERTAIN.  I DON'T THINK

4   IT'S SET A NUMBER CERTAIN, THAT THE -- THE EVIDENCE IN THE

5   RECORD.  I THINK THAT IS ABSOLUTELY CORRECT, YOUR HONOR, AND I

6   CAN'T DISPUTE THAT.

7           THE COURT:  MS. ELLS, ANYTHING MORE TO SAY HERE?

8   I'VE READ YOUR BRIEFING.  I THINK YOU WOULD ESSENTIALLY AGREE

9   WITH THAT CHARACTERIZATION OF THE RECORD.

10          MS. ELLS:  WELL, YES, EXCEPT THAT DR. MARTELLO SAID

11  REALISTICALLY A COUPLE OF YEARS.  SHE DID NOT SAY ONE TO TWO

12  YEARS.  SO, YOU KNOW, I THINK IT'S -- THE TIMELINE IS OUT.

13      THE OTHER THING -- TWO QUICK POINTS TO MENTION.

14      EVEN ACCEPTING THAT THEY COULD EXPAND THE PROGRAM TO

15  ACTUALLY FILL ALL OF THE GAPS, WHICH IS NOT ANTICIPATED BY THE

16  BUDGET CHANGE PROPOSAL THAT THEY PROVIDED AND PRESUMABLY

17  WOULDN'T HAPPEN FOR MORE THAN TWO YEARS AFTER THEY GET THE

18  EXISTING PROGRAM UP AND RUNNING, THE EVIDENCE IS RIGHT NOW

19  THEY'RE ALREADY SEEING PEOPLE APPLY TO JUMP SHIP FROM THE

20  ONSITE PROGRAMS TO THE NEW PROGRAM.

21      SO, YOU KNOW, THE NOTION THAT WE'LL SIMPLY GET MORE

22  CLINICIANS AND KEEP THE EXISTING ONES OR EVEN MAYBE HAVE BETTER

23  RETENTION FOR THE EXISTING ONSITE CLINICIANS IS UNFOUNDED.  THE

24  ONLY POSITION THEY HAVE HIRED SO FAR WAS FROM AN ONSITE

25  FACILITY.

```
 1        AND THE FINAL THING IS IS THAT NONE OF THIS ACCOUNTS FOR

 2   THE HUNDRED ADDITIONAL MAS THE BCP SAYS ARE CRITICAL TO THE NEW

 3   PROGRAM.  AND IF THEY HIRE MORE CLINICIANS, THEY'LL NEED MORE

 4   THAN A HUNDRED.  SO NONE OF THAT ACCOUNTS FOR THE MASSIVE

 5   INFLUX OF MAS THAT THEIR OWN BCP SAYS ARE CRITICAL TO RUNNING

 6   THIS PROGRAM WHERE THEY'RE ALREADY SHORT AND THEY'RE ALREADY

 7   PAYING LESS THAN THE STATE AVERAGE, AND THAT'S CONFIRMED BY

 8   THEIR EXPERT.

 9        THE COURT:  ALL RIGHT.  UNDERSTOOD.

10        LET ME ASK YOU THIS MORE BROADLY, MS. ELLS, AND THEN

11   MR. MELLO.  I THINK THE PLAINTIFFS AGREE THERE IS A ROLE FOR

12   TELEMENTAL HEALTH, EVEN IF IT DOESN'T, YOU KNOW, EXCUSE OR SHOW

13   THAT THE DEFENDANTS HAVE TAKEN ALL REASONABLE STEPS AND

14   ACHIEVING COMPLIANCE IS IMPOSSIBLE.  BUT SHOULD I, ON A

15   SEPARATE TRACK -- AND RECOGNIZING THE DEFENDANTS ARE MOVING

16   FORWARD WITH AN EXPANDED TELEMENTAL HEALTH POLICY, SHOULD I

17   AUTHORIZE THE SPECIAL MASTER TO SUBMIT A PROPOSAL FOR USE OF

18   TELEMENTAL HEALTH FOR THE COURT TO BLESS IN THIS CASE,

19   MS. ELLS?

20        MS. ELLS:  I WILL CEDE TO MY COCOUNSEL MR. GALVAN ON

21   THIS.

22        THE COURT:  ALL RIGHT.  I KNOW I'VE SIGNED OFF ON A

23   STIPULATION, BUT I THINK THE PLAINTIFFS HAD RESERVED SOME

24   RESERVATIONS.  SO I'M TRYING TO UNDERSTAND.

25        AND, AGAIN, I'M TAKING A BIT OF A -- I'M GOING OFF ON A
```

1    TANGENT HERE, BUT I THINK IT'S APPROPRIATE TO GET CLARITY NOW.

2        MR. GALVAN.  I CAN'T HEAR YOU.

3            MR. GALVAN:  I APOLOGIZE, YOUR HONOR.

4        YES, I THINK IT WOULD BE USEFUL TO HAVE THE SPECIAL MASTER

5    LOOK AT THE TELEMENTAL HEALTH IMPLEMENTATION TO ENSURE THAT

6    WHAT I THINK -- I THINK WHAT DEFENDANTS' COMMITMENT IS IS TO

7    HAVE TELEMENTAL HEALTH SUPPLEMENT BUT NOT REPLACE ONSITE

8    STAFFING.  AND -- BUT I STILL THINK THAT IT'S GOING TO BE SO

9    IMPORTANT IN THIS CASE THAT -- TO HAVE -- IT WOULD BE NECESSARY

10   TO HAVE THE SPECIAL MASTER LOOK AT IT AS IT IS BEING RAMPED UP.

11           THE COURT:  MR. MELLO, ANY PROBLEM WITH THAT REFERRAL

12   IF I MAKE IT?

13           MR. MELLO:  SO THIS WOULD BE -- DEFENDANTS -- THERE

14   IS NOTHING IN THE PROGRAM GUIDE THAT LIMITS DEFENDANTS' ABILITY

15   TO USE TELEMENTAL HEALTH.  THEY'VE EVALUATED THE POSITIONS OF

16   THE SPECIAL MASTER -- WHICH AREN'T IN WRITING -- AND THE

17   PLAINTIFFS ON THEIR TELEMENTAL HEALTH POLICY THEN THEY'VE

18   ISSUED A POLICY.

19       AND WHAT I DON'T WANT TO SEE IS DOORS BEING CLOSED OR

20   LIMITATIONS BEING PLACED ON A MECHANISM TO INCREASE STAFFING.

21       SO ON ONE HAND WE'RE BEING TOLD TO INCREASE STAFFING.

22   WE'RE EMBRACING A MODALITY THAT IS ACCEPTED EVERYWHERE, AND

23   MORE ACCEPTED SINCE THE ONSET OF THE PANDEMIC AND THE GREAT

24   RESIGNATION.  AND ON THE OTHER HAND WE'RE GOING TO SLOW DOWN

25   AND MAYBE PLACE ARTIFICIAL LIMITATIONS ON THE USE OF TELEMENTAL

1    HEALTH.

2         AND TO ME IT SEEMS LIKE ON ONE HAND WE SHOULD BE ENCOURAGED

3    TO INCREASE ACCESS TO PATIENTS THAT IS BASED UPON ACADEMIC

4    REVIEW AND STUDY BY OUR EXPERTS.  "OUR EXPERTS" BEING OUR

5    CLIENT EXPERTS.  AND ANYTHING THAT WOULD LIMIT OR IMPEDE IN ANY

6    WAY SEEMS BOTH UNFAIR AND NOT REQUIRED PURSUANT TO THE PROGRAM

7    GUIDE OR THE ORDER OF REFERENCE.

8         AND SO I THINK DEFENDANTS HAVE IMPLEMENTED THEIR POLICY,

9    AND UNLESS THE COURT IS GOING TO PROHIBIT THEM FROM

10   IMPLEMENTING THEIR POLICY, THEY WANT TO ROLL IT OUT, AND THEY

11   WANT TO -- OF COURSE HE COULD MONITOR IT IN HIS ROLE AS SPECIAL

12   MASTER, BUT I DON'T THINK THAT WE NEED THE SPECIAL MASTER TO

13   EVALUATE THE POLICY THAT HAS ALREADY BEEN EVALUATED AND IS

14   BEGINNING TO BE ROLLED OUT.

15             THE COURT:  ALL RIGHT.  UNDERSTOOD.

16             MR. MELLO:  ESPECIALLY IN THE FACE OF FINES FOR

17   STAFFING.

18             THE COURT:  WELL, ANY REFERRAL WOULD MAKE CLEAR NO

19   ARTIFICIAL LIMITATIONS.

20        TO THE EXTENT THERE ARE ANY STANDING OBJECTIONS FROM THE

21   PLAINTIFFS, AND GIVEN THE COURT'S OPENNESS TO TELEPSYCHIATRY,

22   TELEMENTAL HEALTH, IT'S A MATTER OF MAKING CERTAIN THERE IS NOT

23   SOMETHING FESTERING THERE THAT REARS UP AT A LATER POINT.

24        THAT'S REALLY -- I'M TRYING TO GET AHEAD OF THIS WITHOUT --

25   WITHOUT GETTING IN DEFENDANTS' WAY, BUT ALSO NOTING THAT THE

1    COLEMAN CLASS POSES SPECIAL CONSIDERATIONS.  THAT'S ALL.

2         MR. MELLO:  UNDERSTOOD, YOUR HONOR.  I JUST WANT TO

3    MAKE SURE, DO PLAINTIFFS AND THE SPECIAL MASTER HAVE THE

4    ABILITY TO STOP DEFENDANTS FROM IMPLEMENTING POLICIES?  AND

5    THAT SEEMS TO BE THE QUESTION HERE.

6         THE COURT:  NO, THAT IS NOT THE QUESTION.  I THINK

7    YOU'RE OVERREACTING.  BUT I UNDERSTAND YOUR CONCERN AND I WILL

8    DO MY BEST, AGAIN, TO CLARIFY THE WAY IN WHICH THE COURT IS

9    OPERATING HERE.

10       JUST A COUPLE MORE QUESTIONS.

11        MR. MELLO:  DEFENDANTS, JUST FOR THE RECORD, OBJECT

12   TO ANY CHANGES TO THEIR POLICY.  THEY'VE EVALUATED THE

13   POSITION.  THIS IS THEIR POLICY.  THEY ARE NOT LOOKING TO MAKE

14   CHANGES TO THEIR POLICY.  IF PLAINTIFFS HAVE A PROBLEM WITH THE

15   ROLLOUT THEY CAN FILE A MOTION THAT SAYS DEFENDANTS CANNOT

16   EMBRACE THIS MODALITY AND PROVIDE CARE TO THEIR CLIENTS.

17        THE COURT:  WELL, MOTIONS TAKE TIME AND COST MONEY,

18   AND THE COURT HAS DONE WHAT IT COULD TO TRY TO LIMIT THAT KIND

19   OF EXPENDITURE AT THE PUBLIC'S EXPENSE.

20       MS. ELLS, THE PLAINTIFFS' CLEAR SUGGESTION IS, AGAIN, IF

21   THE COURT WERE TO ACTUALLY ORDER THE FINES PAID, THAT MAY NOT

22   BE ENOUGH.  IS THE PLAINTIFFS' THOUGHT THAT THE WAY THIS WOULD

23   ROLL OUT, IF THE COURT ACCEPTED -- THIS IS SAKE OF ARGUMENT

24   ONLY -- THE PLAINTIFFS' POSITION, THE COURT WOULD FIRST IMPOSE

25   FINES, WAIT AND SEE, AND THEN LATER COME BACK TO THE QUESTION

1   OF WHETHER MORE IS NEEDED, OR ARE YOU ASKING THE COURT TO

2   CONSIDER SOMETHING MORE IN PARTICULAR NOW?

3           MS. ELLS:  I -- I THINK THAT WE -- THEY MAY HAVE TO

4   OCCUR AT THE SAME TIME, BUT THAT WE WOULD BRING A MOTION TO

5   SUBSTANTIATE WHATEVER REQUEST WE MAKE FOR ADDITIONAL RELIEF ON

6   TOP OF THE FINES.

7           THE COURT:  SO ARE YOU --

8           MS. ELLS:  WE DO THINK --

9           THE COURT:  I'M TRYING TO UNDERSTAND, AGAIN,

10  PROCEDURALLY.  SO IF --

11          MS. ELLS:  YEAH.

12          THE COURT:  FOR SAKE OF ARGUMENT ONLY, IF I WERE TO

13  ACCEPT PLAINTIFFS' ARGUMENT, I'D FIND DEFENDANTS NOT IN

14  COMPLIANCE, THEY HAVEN'T DEMONSTRATED IMPOSSIBILITY AND THAT

15  THEY'VE TAKEN ALL REASONABLE STEPS, WOULD I THEN CALL FOR

16  FURTHER BRIEFING ON THE REMEDY?  IS THAT YOUR PROPOSAL?

17  BECAUSE I'VE ALREADY LAID OUT THE REMEDY OF IMPOSING FINES.

18          MS. ELLS:  CORRECT.  AND WE -- WE -- I -- TO BE

19  CLEAR, I THINK THAT THERE MAY NEED TO BE MORE THAN ONE REMEDY

20  TO ADDRESS THIS.

21      BECAUSE -- SO IN ADDITION TO THE FINES -- WE THINK THE

22  FINES SHOULD PROCEED, ASSUMING THIS COURT FINDS THAT THEY ARE

23  WARRANTED ON THE RECORD.  WE DID OUTLINE A PROCESS -- A

24  POTENTIAL PROCESS TO ADDRESS THE DUE PROCESS CONCERNS STATED BY

25  THE DEFENSE WHEREBY THERE COULD BE SOME SORT OF PROCESS FOR

1  WORKING DOWN SOME OF THE FINES BY ENSURING SUSTAINED COMPLIANCE

2  AND DEMONSTRATING --

3          THE COURT:  I'M CLEAR ON THAT.  I'M CLEAR ON THAT.

4  BUT TO THE EXTENT YOU'RE SAYING THERE IS MORE, ARE YOU JUST

5  SUGGESTING THE COURT ON ITS OWN FIGURE OUT WHAT THE MORE IS, OR

6  HOW DO I LEARN MORE FROM YOU?  BECAUSE YOU HAVEN'T LAID OUT --

7          MS. ELLS:  YOU'VE MADE CLEAR THAT'S NOT HOW YOU LIKE

8  TO PROCEED AND WE UNDERSTAND THAT.  SO WE WOULD BE PROCEEDING

9  BY A MOTION FOR ADDITIONAL RELIEF.

10          THE COURT:  ALL RIGHT.

11          MS. ELLS:  AND WE WOULD -- RIGHT.

12          THE COURT:  ALL RIGHT.  DO YOU AGREE WITH THE

13  DEFENDANTS' POSITION, I BELIEVE IT'S ON PAGE 16 OF THEIR BRIEF,

14  THAT IF I DO GET THERE IT'S A CLASS BY CLASS CALCULATION, THAT

15  THERE IS COMPLIANCE IN SOME AREAS AND THEY SHOULD GET CREDIT

16  FOR THAT?

17          MS. ELLS:  WE HAD NOT UNDERSTOOD THAT TO BE THE WAY

18  THAT THE COURT WAS PROCEEDING GIVEN THE WAY THE COURT HAS

19  ORDERED THE REPORTING, BROKEN OUT BY SPECIFIC ROLE OR

20  CLASSIFICATION WITHIN EACH OF THE FIVE CLINICAL CATEGORIES, AND

21  THE WAY THAT THE FINES HAVE BEEN ACCRUING AND CALCULATED.  WE

22  HAVE NOT UNDERSTOOD THE COURT TO BE PROCEEDING THAT WAY.

23          THE COURT:  ALL RIGHT.

24          MS. ELLS:  AND -- YEAH.

25          THE COURT:  BUT MORE IMPORTANTLY, THAT'S NOT YOUR

1  POSITION?  YOU DO NOT AGREE THAT THAT'S THE WAY TO APPROACH

2  THIS --

3          MS. ELLS:  THAT --

4          THE COURT:  -- GIVEN WHAT THE COURT HAS SAID IN THE

5  PAST, PERHAPS, OR BASED ON AN INDEPENDENT POSITION YOU'VE

6  DEVELOPED?

7          MS. ELLS:  THAT IS CORRECT, YOUR HONOR.

8     I THINK, YOU KNOW, THE BRIEFING AROUND THE TEN PERCENT

9  VACANCY RATE AS APPLIED TO SUPERVISORS, WE THINK THE -- YOU

10 KNOW, ALL OF THESE POSITIONS ARE NECESSARY UNDER THE 2009

11 STAFFING PLAN AS AMENDED.  AND, FOR INSTANCE, YOU KNOW, THE

12 LARGE SHORTAGES IN THE PSYCHIATRIC SUPERVISING POSITION CAUSED

13 REAL HARM TO OUR PATIENTS.

14    THERE IS A LOT OF TESTIMONY IN THE RECORD, INCLUDING THE

15 PROCEEDINGS AND AFTERWARDS, ABOUT THE IMPORTANT ROLE THAT

16 SUPERVISORS PLAY.  AND LEAVING THOSE POSITIONS UNFILLED FOR

17 LONG PERIODS OF TIME AS DEFENDANTS HAVE DONE, ACCRUING 6

18 MILLION IN FINES FOR JUST THOSE POSITIONS, WARRANTS ACTION

19 BECAUSE THEY'RE NOT TAKING STEPS TO FILL THOSE POSITIONS.

20         THE COURT:  ALL RIGHT.  SO I'M READY TO HEAR -- IF

21 YOU HAVE ANYTHING THAT DOES NOT REPEAT WHAT'S IN THE BRIEFING

22 OR WHAT WE'VE JUST COVERED, I'D GIVE YOU EACH A RELATIVELY

23 SHORT PERIOD OF TIME FOR ANY WRAP-UP.

24    MS. ELLS, YOU CAN GO FIRST.  AND MR. MELLO WOULD HAVE THE

25 LAST WORD.

1          ANYTHING ELSE, MS. ELLS?

2               MS. ELLS:  YES.

3          ONE QUICK NOTE THAT WE WOULD LIKE THE COURT TO TAKE ACTION

4     ON, WHICH IS A PENDING OBJECTION FROM THE TRIAL.

5          DEFENDANTS HAVE REPEATEDLY CITED THIS CONCEPT THAT THERE IS

6     GREATER ACCESS FOR COLEMAN CLASS MEMBERS TO MENTAL HEALTH

7     CLINICIANS IN THE COMMUNITY BY FIGURES OF MORE THAN TEN

8     PERCENT.  I THINK THE CROSS-EXAMINATION OF DEFENDANTS' EXPERT

9     CONFIRMED THAT SHE HAS NO BASIS TO TESTIFY TO THAT.  SHE HAS NO

10    IDEA WHAT THE ACUITY LEVEL IS COMPARED TO THE GENERAL

11    POPULATION IN THE COLEMAN CLASS.

12         THERE IS TESTIMONY FROM THE EXPERT -- FROM THE WITNESSES

13    PLAINTIFFS CALLED THAT IT'S A MUCH MORE COMPLICATED PATIENT

14    POPULATION THAN IN THE COMMUNITY.

15         AND THERE IS A LOT OF EVIDENCE, INCLUDING FROM THE

16    WITNESSES PLAINTIFFS CALLED, THAT THE LEVEL OF ACCESS SHOWN BY

17    MERE NUMBERS, WHICH IS WHAT DR. GREULICH RELIED ON, DOES NOT

18    ACCOUNT FOR THE REALITIES OF LIFE IN THE PRISON AND HOW LITTLE

19    TIME THAT PATIENTS ACTUALLY HAVE WITH THEIR CLINICIANS.  AND

20    THAT IS WELL-DOCUMENTED IN THE SPECIAL MASTER'S REPORTS WHICH

21    ARE, OF COURSE, COURT FINDINGS AND JUDICIALLY NOTICEABLE IN

22    THEIR OWN RIGHT.

23         AND, THEN -- SO BEYOND THAT, THE BROADER PICTURE IS THAT

24    DEFENDANTS HAD THE OPPORTUNITY TO ESTABLISH THROUGH REAL LIFE

25    EVIDENCE THAT THE SALARIES AND WAGES THEY HAVE ESTABLISHED TO

 1   DATE EITHER ARE IMPOSSIBLE TO FILL THE FILL RATES, BUT THEIR

 2   EXPERTS AND THEIR LEADERSHIP CONFIRMED THAT'S NOT TRUE, THEY DO

 3   NOT BELIEVE THAT IT IS IMPOSSIBLE TO FILL THESE POSITIONS, OR

 4   THEY COULD HAVE ESTABLISHED THROUGH TRIAL AND ERROR OR SOME

 5   OTHER MEANS THAT LARGER SALARIES HAVE NO EFFECT, DO NOT WORK,

 6   DO NOT DRAW CLINICIANS TO THESE JOBS.

 7       BUT THE REALITY IS THEY DIDN'T TRY EITHER ONE OF THOSE.

 8   AND THEY DIDN'T PROVIDE THE PEOPLE AT THE TOP LEVEL OF THEIR --

 9   OF THESE DEPARTMENTS TO ESTABLISH THAT THE EXISTING BUDGET

10   CONSTRAINTS CANNOT BE EXPANDED TO ALLOW FOR GREATER

11   COMPENSATION BECAUSE THAT WOULD BE UNREASONABLE.  THEY RELY

12   SIMPLY ON THEIR OWN ESTIMATIONS, AS COUNSEL, OF WHAT WOULD BE

13   REASONABLE FOR INCREASES IN SALARIES.

14       BUT AT THE SAME TIME THERE IS SIGNIFICANT TESTIMONY FROM

15   THE WITNESSES IN THIS CASE -- THE WITNESSES PLAINTIFFS CALLED

16   ABOUT THE VERY, VERY -- THE VERY BAD WORKING CONDITIONS,

17   FRANKLY, INCLUDING RODENT-INFESTED PRISONS, INCLUDING LACK OF

18   AIR CONDITIONING AND HEAT, LACK OF TWO-PLY TOILET PAPER.  THESE

19   ARE THINGS THAT ARE VERY REAL WHEN IT COMES TO RECRUITMENT AND

20   RETENTION.  AND DEFENDANTS' TESTIMONY IS THAT THEY'VE TAKEN NO

21   STEPS TO ADDRESS THAT.  DR. GREULICH DIDN'T STUDY THE EFFECTS

22   OF WORKING CONDITIONS.

23       AND, YOU KNOW, ON THE ONE HAND THEY DON'T WANT TO PAY MORE

24   MONEY TO HIRE CLINICIANS.  THEY CAN'T RULE OUT, HOWEVER, THAT

25   THAT WOULD CLOSE THE GAPS HERE.  AND THEY ALSO HAVE NOT TAKEN

1   STEPS TO ADDRESS WORKING CONDITIONS.  AND AT THE SAME TIME A

2   NUMBER OF OTHER REASONABLE STEPS THEY COULD HAVE TAKEN TO

3   STREAMLINE HIRING, PROVIDE GREATER RECRUITMENT AND RETENTION

4   EFFORTS.  YOU KNOW, ALL OF THESE THINGS THAT ARE IN OUR

5   BRIEFING ARE REASONABLE STEPS THAT HAVE NOT BEEN TAKEN.

6       AND THE COURT IDENTIFIED ANOTHER, WHICH IS CLUSTERING.

7   THEY HAVEN'T EXAMINED CLUSTERING IN FIVE YEARS.  ON THE ONE

8   HAND THEY'RE SAYING THAT 2018 ESTIMATIONS FOR CLUSTERING ARE

9   MORE THAN SUFFICIENT TO ESTABLISH THAT IT'S UNREASONABLE TO

10  REVISIT THAT.  BUT ON THE OTHER HAND THEY'RE SAYING THAT

11  DR. BROWN'S RELIANCE ON DATA FROM 2020 IS SO OLD THAT IT'S

12  USELESS BECAUSE THAT'S NOT ACCOUNTING FOR THE PANDEMIC.  SO YOU

13  CAN'T HAVE IT BOTH WAYS.

14      THERE ARE STEPS THAT COULD HAVE BEEN TAKEN HERE TO ACHIEVE

15  GREATER FILL RATES AND TO ACHIEVE COMPLIANCE WITH THIS COURT'S

16  ORDERS, THE LARGEST AMONG THEM BEING ACTUALLY TRYING TO PAY

17  SIGNIFICANTLY MORE MONEY THAN WHAT THEY HAVE IN THE PAST TO

18  DRAW PEOPLE TO THESE VERY DIFFICULT WORKING CONDITIONS AND THEY

19  HAVE NOT TRIED THAT.  AND THAT IS, YOU KNOW, PERHAPS THE MOST

20  IMPORTANT POINT OF THIS ENTIRE PROCEEDING.

21          THE COURT:  ALL RIGHT.  JUST SO IT'S CLEAR, AGAIN, ON

22  ANY OBJECTIONS, I WILL RESOLVE OUTSTANDING OBJECTIONS.  AND MY

23  PLAN IS TO DO THAT EITHER AT THE BEGINNING OF THE ORDER THAT I

24  ISSUE ON THE SUBSTANCE OF THESE PROCEEDINGS OR IN A SEPARATE

25  ORDER ISSUED CONCURRENTLY SO THAT THE RECORD IS CLEAR.

1          AND SO I'M AWARE OF THE -- OF THE OBJECTIONS.  I'VE STARTED

2     TO WORK THROUGH THEM.  I COULDN'T GET THEM ALL OUT BEFORE THIS

3     HEARING.  THERE HAVE BEEN SOME LATE-BREAKING FILINGS.

4          SO I WILL CLARIFY THE RECORD AS A THRESHOLD MATTER, BASED

5     ON WHAT'S PENDING BEFORE ME, AND THEN I WILL PROCEED TO

6     CONSIDER ONLY WHAT'S IN THE RECORD FOLLOWING MY RULINGS ON

7     OBJECTIONS AND THE MOTION TO STRIKE OBJECTION TO JUDICIAL

8     NOTICE.

9          DOES THAT WORK, MS. ELLS?

10          MS. ELLS:  YES, YOUR HONOR.  I NEED TO MAKE ONE

11    CLARIFICATION, WHICH IS THAT YOU AGREED TO CONSIDER WHAT

12    WEIGHT, IF ANY, TO GIVE TO THAT TESTIMONY.  IT'S NOT

13    TECHNICALLY AN OBJECTION, BUT THE -- YOU KNOW, OUR POSITION

14    STANDS.

15          THE COURT:  GOT IT.  ALL RIGHT.  THERE IS A LOT THERE

16    FOR ME TO RESOLVE.  AND IN SOME CASES I AM -- I'LL BE

17    OVERRULING OBJECTIONS IN OTHER CASES AND APPLYING APPROPRIATE

18    WEIGHT.  BUT YOU'LL SEE IT ALL SPELLED OUT.

19          ALL RIGHT.  MR. MELLO, ANY WRAP-UP?

20          MR. MELLO:  A COUPLE CLARIFYING POINTS, YOUR HONOR.

21          NUMBER ONE, DR. GREULICH'S TESTIMONY AS TO CERTAIN ISSUES

22    WITH RESPECT TO -- THAT'S IN THE RECORD.  HER REPORT SPOKE TO

23    SOME OF THOSE ISSUES AND I DON'T NEED TO RESTATE THEM.

24          WITH RESPECT TO CLUSTERING, AGAIN, OUR SUPPLEMENTAL

25    BRIEFING ADDRESSED THAT ISSUE AND IT CITES SPECIFICALLY TO THE

 1   ISSUE.  IT DEMONSTRATED THAT CLUSTERING ACTUALLY LEADS TO

 2   BURNOUT, AND IT WASN'T THE -- THE SOLVE THAT PEOPLE THOUGHT IT

 3   MIGHT BE.  AND THAT WAS DISCUSSED IN THE PAST.  IT HASN'T BEEN

 4   BROUGHT UP AGAIN BY PLAINTIFFS' COUNSEL OR DEFENDANTS OR THE

 5   SPECIAL MASTER'S TEAM.

 6        AND IN TERMS OF BOTH WAYS, I MEAN, THE IRONY OF THAT IS --

 7   BOTH WAYS -- WITH RESPECT TO BOTH WAYS, HIRE STAFF, BUT DON'T

 8   EXPAND TELEMENTAL HEALTH WITHOUT OUR BLESSING.  IT'S UNUSUAL.

 9   I THINK THERE IS A COUPLE OF SORT OF OVERALL POINTS THAT NEED

10   TO BE MADE.

11        THERE IS NOTHING ABOUT DEFENDANTS' EFFORTS IN COLEMAN THAT

12   ARE BUSINESS AS USUAL UNLESS BUSINESS AS USUAL IS THOSE LEADERS

13   WORKING HARD TO IMPROVE ACCESS TO CARE TO THEIR PATIENTS.

14   THERE IS NOTHING BUSINESS AS USUAL ABOUT SPENDING MILLIONS AND

15   MILLIONS OF DOLLARS.  REMEMBER, IN 1990 THEY SPENT $40 MILLION

16   A YEAR ON MENTAL HEALTH CARE DELIVERY SYSTEM, THEY NOW SPEND

17   $650 MILLION A YEAR.

18        THERE IS NOTHING BUSINESS AS USUAL OF THEIR EFFORTS TO

19   ADDRESS STAFFING.  THEY RECOGNIZED PRIOR TO THESE PROCEEDINGS,

20   WAY BACK, THAT THEY NEEDED TO TRY TO SPEED UP STAFFING AND

21   HIRING.  AND MS. MUHAMMAD, WHO IS JUST THIS INCREDIBLE PERSON,

22   DEDICATED TO HELPING, TESTIFIED AS TO ALL THOSE THINGS THAT

23   THEY'VE DONE, LIKE ONE-DAY HIRING EVENTS.  BUT THERE ARE SOME

24   THINGS THAT REALLY -- YOU KNOW, THERE WAS A LOT OF DISCUSSION

25   ABOUT IT, BUT THEY CAN'T HONESTLY OR REASONABLY BE DISPUTED,

1   AND THAT IS THAT THERE IS A NATIONWIDE SHORTAGE OF MENTAL

2   HEALTH PROVIDERS, THAT THERE IS NATIONWIDE AND STATEWIDE

3   SCARCITY OF THESE POSITIONS.

4       WE HEARD A LOT ABOUT KAISER IN THIS PROCEEDING AND A LOT OF

5   ANECDOTAL EVIDENCE.  THEY ATTRIBUTE STATE LEVEL THINGS TO THREE

6   OR FOUR PERSONS WHO WORK AT INSTITUTIONS.  BUT WE HEARD A LOT

7   ABOUT ANECDOTAL AND HEARSAY TESTIMONY ABOUT KAISER, AND ABOUT

8   OTHER PUBLIC AND PRIVATE ENTITIES.  BUT YOU KNOW WHAT'S

9   UNDISPUTED AND CAN'T REASONABLY BE DISPUTED?  THAT IS THAT

10  EVERYBODY IS HAVING A DIFFICULT TIME RECRUITING AND RETAINING

11  THESE TYPES OF STAFF.  KAISER JUST WAS SUBJECT TO THE LARGEST

12  HEALTHCARE STRIKE EVER.  EVER.  SO -- SO THAT IS UNDISPUTED.

13      WITH THE POSSIBLE EXCEPTION OF MAS -- WHAT ALSO CAN'T BE

14  DISPUTED, WITH THE POSSIBLE EXCEPTION OF MAS, CDCR PAYS WELL

15  ABOVE STATE AND NATIONAL BENCHMARKS.

16      AND WHAT ALSO CAN'T BE DISPUTED IS THAT CDCR DOES NOT

17  RECRUIT AND RETAIN THESE STAFF PERSONS IN A VACUUM.  THEY DO SO

18  IN THE FACE OF UNDISPUTED NATIONWIDE AND STATEWIDE SCARCITY;

19  THEY DO SO SINCE THE PANDEMIC WHEN WORKERS' EXPECTATIONS

20  CHANGED; THEY DO SO SINCE THE GREAT RESIGNATION.

21      WE'VE HEARD ABOUT THE TYPE OF -- I DON'T WANT TO LOSE THE

22  ISSUE, YOUR HONOR, AND IT'S FULLY BRIEFED -- THE TYPE OF NOTICE

23  DEFENDANTS WERE PROVIDED, THE TYPE OF CIVIL CONTEMPT THAT WAS

24  CONTEMPLATED, AND THE IDEA THAT IF THIS COURT MAKES A FINDING

25  OF CONTEMPT, DEFENDANTS SHOULD HAVE THE OPPORTUNITY TO PURGE.

 1   OF COURSE ANY POTENTIAL ORDER ON CONTEMPT, IT DOESN'T MATTER

 2   WHAT IT'S CALLED, IT MATTERS WHAT IT AMOUNTS TO.  IT'S LIKE AN

 3   INDEPENDENT CONTRACTOR VERSUS AN EMPLOYEE.  SO OF COURSE IF

 4   THERE IS AN ORDER ON CONTEMPT, IT DOESN'T MATTER WHAT LABELS

 5   ARE APPLIED TO IT, WHAT MATTERS IS ACTUALLY WHAT OCCURS.  AND

 6   DEFENDANTS PRESERVE ALL RIGHTS WITH RESPECT TO THOSE ISSUES.

 7        DEFENDANTS HAVE TO EVALUATE -- OR THE COURT SHOULD EVALUATE

 8   DEFENDANTS' EFFORTS WITH RESPECT TO IMPOSSIBILITY OR ALL

 9   REASONABLENESS UNDER THOSE UNDISPUTED FACTS THAT THERE IS A

10   NATIONWIDE SCARCITY.  WE -- THE EVIDENCE IS CLEAR THAT

11   DEFENDANTS HAVE TAKEN ALL REASONABLE STEPS.  THEY DON'T HAVE TO

12   TAKE UNREASONABLE STEPS.  THEY DON'T HAVE TO REQUEST WAIVERS OF

13   STATE LAW.  THEY DON'T HAVE TO REDUCE POPULATION MORE.  AND

14   RECOGNIZE THE POPULATION NOW IN CDCR, WHAT IT WAS BEFORE.

15   THOSE ARE THINGS THAT THEY DON'T HAVE TO DO.

16        PLAINTIFFS HAVE NOT EVEN IDENTIFIED WHAT WAIVERS OF STATE

17   LAW DEFENDANTS SHOULD HAVE SOUGHT.  THEY RELY UPON -- AND,

18   AGAIN, I'M GLAD THE COURT ISN'T GOING TO TAKE JUDICIAL NOTICE

19   OF PLATA THINGS.  THEY RELY UPON EFFORTS IN 2006, BUT THEY

20   DON'T TELL US WHICH ONES SPECIFICALLY.  AND, AGAIN, OUR

21   OBJECTIONS TO THAT REQUEST FOR JUDICIAL NOTICE MAKE IT QUITE

22   CLEAR THAT YOU TAKE JUDICIAL NOTICE OF FACTS IF YOU MEET THE

23   THRESHOLD REQUIREMENTS, YOU DON'T TAKE JUDICIAL NOTICE OF ITEMS

24   OR DOCUMENTS.

25        DEFENDANTS' EFFORTS -- PLAINTIFFS HAVE NOT SHOWN THAT THERE

1    ARE SPECIFIC LAWS THAT NEED TO BE WAIVED, NOR COULD THEY

2    CONSIDERING THAT THE STATE WAS ABLE TO INCREASE STAFFING AMONG

3    PSYCHIATRISTS -- AGAIN WITH THE USE OF TELEMENTAL HEALTH --

4    FROM AN ALL-TIME LOW OF 67 PERCENT IN MAY OF 2016 TO 91 PERCENT

5    IN AUGUST OF 2023, AND THEY DID SO WITHOUT WAIVING ANY STATE

6    LAWS.

7         I THINK IT'S IMPORTANT TO NOTE THAT WHEN THIS COURT ISSUED

8    ECF 57-11, WELL BEFORE I WAS INVOLVED IN THIS CASE, THE COURT

9    SAID THAT DEFENDANTS HAD TO REACH THE 90 PERCENT THRESHOLD

10   WITHIN A YEAR.  AND THAT WAS IN, I BELIEVE, OCTOBER OF 2017.

11   WELL, IN OCTOBER OF 2017, THE EVIDENCE DEMONSTRATED THAT THE

12   FILL RATES WERE 82 PERCENT FOR PSYCHIATRISTS AND 96 PERCENT AT

13   THAT TIME.  SO IF THIS PROCEEDING WOULD HAVE OCCURRED THEN,

14   DEFENDANTS WERE FULLY COMPLIANT IN ALL OF THE CLASSIFICATIONS

15   EXCEPT FOR MAS -- RIGHT? -- BECAUSE MAS WEREN'T ESTABLISHED

16   UNTIL 2020.

17        AT THE END OF THE DAY, THE EFFORTS OF THE STATE, WHEN

18   VIEWED THROUGH THE LENS OF NATIONWIDE SCARCITY, WHEN VIEWED

19   THROUGH THE LENS OF BENCHMARKS, WHEN VIEWED THROUGH THE LENS

20   THAT SALARY ISN'T IMPORTANT, IT IS JUST ONE FACTOR, AND THAT

21   THEY HAVE RECENTLY NEGOTIATED NEW COMPENSATION PACKAGES (AUDIO

22   INTERRUPTION) --

23             THE COURT REPORTER:  I'M SORRY.

24             THE COURT:  HOLD ON ONE SECOND.  WE'VE GOT SOME

25   STATIC.  I DON'T KNOW.  THE LONGER YOU SPEAK, MR. MELLO, IT'S

```
 1   GETTING WORSE.

 2            MR. MELLO:  I APOLOGIZE.

 3            THE COURT:  I DON'T MEAN TO MAKE LIGHT OF THIS, BUT

 4   WE'RE HEARING STATIC ON OUR END.

 5            MR. MELLO:  I THINK IT'S MR. GOURSE' PHONE.

 6            THE COURT:  WHO?

 7            MR. MELLO:  HOW IS IT NOW, YOUR HONOR?  IT'S STILL

 8   THERE.

 9            THE COURT:  LET'S TRY AGAIN.  I JUST WANT TO MAKE

10   CERTAIN I HEAR YOU AND THE COURT REPORTER HEARS YOU.  SO YOU

11   CAN -- YOU'VE GOTTEN EVERYTHING SO FAR?

12            THE COURT REPORTER:  UNTIL THE INTERFERENCE.

13            THE COURT:  OKAY.  UNTIL THE INTERFERENCE.  AND YOU

14   WERE REFERENCING -- THERE IS SOME --

15            MR. MELLO:  I LOST MY TRAIN OF THOUGHT.

16       I WILL JUST CLOSE WITH THE DEFENDANTS HAVE TAKEN ALL

17   REASONABLE EFFORTS WHEN VIEWED THROUGH THE LENSES BY WHICH THEY

18   OPERATE.  THE DEFENDANTS DO NOT OPERATE IN A VACUUM.

19   DEFENDANTS HAVE TAKEN STEPS TO INCREASE FILL RATES THROUGH

20   REGISTRY.  AGAIN, THEY HAVE REGISTRY CONTRACTS THAT WERE

21   RECENTLY NEGOTIATED AND RAISED.  THOSE REGISTRY CONTRACTS,

22   HOWEVER, PRIOR TO THIS COURT'S ORDERS HAD TIERS WHICH ALLOWED

23   THEM TO MOVE FACILITIES TO DIFFERENT AREAS TO INCREASE

24   COMPENSATION.  THEY'VE TAKEN EFFORTS TO STREAMLINE HIRING.

25   THEY'VE TAKEN EFFORTS TO INCREASE COMPENSATION.  BUT, AGAIN,
```

1    THAT -- THAT PROCESS IS THROUGH THE COLLECTIVE BARGAINING

2    PROCESS.

3        AND THIS WHOLE IDEA OF TRIAL AND ERROR, IT IGNORES SOME OF

4    THE REALITIES.  FIRST OF ALL, AS MR. CIRELLI SAID, DR. BROWN

5    DIDN'T TELL THE STATE -- OR DIDN'T EVEN IDENTIFY WHAT SALARY

6    WAS NEEDED TO INCREASE.  BUT THERE ARE IMPACTS OF SALARY

7    INCREASES.  THE STATE CAN'T ENGAGE IN RAPID TRIAL AND ERROR.

8    WHAT DOES THAT DO FOR THE CURRENT WORKERS?  WHAT DOES IT DO FOR

9    THEM?  DO YOU CREATE RETENTION PROBLEMS?  WHAT DOES IT DO FOR

10   ALL THE OTHER STATE AGENCIES THAT ALSO EMPLOY?

11       MS. ELLS SPOKE ABOUT PAY PARITY.  WHAT DOES IT DO FOR ALL

12   THE INSTITUTIONS THAT ALSO RELY UPON SIMILAR PROVIDERS?  THE

13   PROCESS -- IT'S DEMOCRACY.  UNION MEMBERS SELECT THEIR LEADERS.

14   THEIR LEADERS NEGOTIATE ON THEIR BEHALF WITH THE STATE.  THAT

15   THEN GOES TO THE LEGISLATURE, WHICH ISN'T EVEN HERE -- RIGHT?

16   -- BECAUSE THEY'RE ANOTHER BRANCH OF GOVERNMENT.  AND THEN THEY

17   AGREE WITH THE MOUS AND THEN IT GOES TO THE GOVERNOR FOR

18   APPROVAL.  DEMOCRACY WORKED.  NEGOTIATIONS BETWEEN UNION

19   REPRESENTATIVES AND THE STATE OCCURRED.  IT WAS APPROVED BY THE

20   LEGISLATURE.  AND WE NEED TO SEE HOW IT WORKS, JUST LIKE WE

21   NEED TO SEE HOW TELEMENTAL HEALTH, HOPEFULLY WITHOUT

22   INTERFERENCE, ROLLS OUT.

23       THIS -- AS I SAID DURING MY OPENING, THIS IS NOT THE STUFF

24   OF CIVIL COERCIVE CONTEMPT.  THIS IS NOT THE STUFF OF SUCH A

25   FINDING AND DEFENDANTS ARE HOPEFUL THAT THE COURT WILL FIND IN

1   THEIR FAVOR.

2       AND I APPRECIATE THE COURT'S TIME, BOTH ALLOWING THE

3   PARTIES TO PRESENT THEIR EVIDENCE AT THE HEARING, WE APPRECIATE

4   THE LENGTHY AMOUNT OF TIME YOU GAVE US FOR THIS CLOSING

5   ARGUMENT.

6       AND WITH THAT I HAVE NOTHING FURTHER, YOUR HONOR.  THANK

7   YOU.

8           THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  I WILL

9   LOOK FOR THE SALARY INFORMATION WITHIN 7 DAYS.

10      I WOULD LIKE TO ASK -- THE COURT WOULD LIKE TO START THE

11  PROCEEDINGS ON TUESDAY NOW AT 9:00 A.M.

12      ANY PROBLEM WITH THAT, MR. MELLO?

13          MR. MELLO:  I'LL DEFER TO MR. MCCLAIN.

14          MR. MCCLAIN:  NO PROBLEM WITH THAT, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  MS. ELLS?

16          MS. ELLS:  THAT WOULD BE FINE, YOUR HONOR.

17          THE COURT:  ALL RIGHT.  SO TUESDAY THE HEARING IS

18  ADJUSTED TO START AT 9:00 A.M.  THIS IS ISSUES RELATED TO

19  TIMELINESS OF TRANSFER AND UNMET BED NEEDS.

20      ALL RIGHT.  THE TIME ALLOWED IS PROPORTIONATE TO THE

21  IMPORTANCE OF THIS ISSUE.  IT'S A VERY, VERY IMPORTANT ISSUE.

22  I APPRECIATE THE PARTIES' ASSISTANCE IN HELPING THE COURT MAKE

23  CERTAIN IT'S CLEAR ON THE RECORD AND THE ISSUES INVOLVED.

24      I'LL LET YOU KNOW IF YOU DO NEED MORE.  THANK YOU.

25          THE CLERK:  COURT IS IN RECESS.

1          (PROCEEDINGS ADJOURNED, 11:33 A.M.)

2                      ---oOo---

3  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

4  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6                      /S/ KIMBERLY M. BENNETT
                       KIMBERLY M. BENNETT
7                      CSR NO. 8953, RPR, CRR, RMR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25