# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
  **Plaintiffs**

         **v.**                                    **No. CIV S-90-0520 KJM DB P**

**GAVIN NEWSOM, et al.,**
  **Defendants**

**THIRTIETH ROUND MONITORING REPORT – PART B: SPECIAL MASTER'S MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
December 15, 2023

## ACRONYMS AND ABBREVIATIONS

3CMS: Correctional Clinical Case Management System

ADLs: Activities of Daily Living

APP: Acute Psychiatric Program

BCP: Budget Change Proposal

CCAT: Correctional Clinical Assessment Team

CCWF: Central California Women's Facility

CDCR: California Department of Corrections and Rehabilitation

CHCF: California Health Care Facility

CHCF-PIP: California Health Care Facility Psychiatric Inpatient Program

CIM: California Institution for Men

CIW: California Institution for Women

CIW-PIP: California Institution for Women Psychiatric Inpatient Program

CMC: California Men's Colony

CMF: California Medical Facility

CMF-PIP: California Medical Facility Psychiatric Inpatient Program

COAC:  Clinical Operations Advisory Council

CSATF: California Substance Abuse Treatment Facility

CSP/LAC: California State Prison/Los Angeles County

CSP/Sac: California State Prison/Sacramento

CTC: Correctional Treatment Center

DBT: Dialectical Behavior Therapy

DSH: Department of State Hospitals

DSH-Atascadero: Atascadero State Hospital

DSH-Coalinga: Coalinga State Hospital

DSH-Patton: Patton State Hospital

ECT: Electroconvulsive Therapy

EHRS: Electronic Health Records System

EKG: Electrocardiogram

EOP: Enhanced Outpatient Program

HAS:  Hospital Access System

HS: *Hora Somni*/Hour of Sleep

HSS:  Health Service Specialist

ICF: Intermediate Care Facility

ICP:  inter-compound privileges

IDTT: Interdisciplinary Treatment Team

IPOC: Interdisciplinary Plan of Care

LOP: Local Operating Procedure

LRH: Least Restrictive Housing

MCSP: Mule Creek State Prison

MDO: Mentally Disordered Offender

MERD: Minimum Eligible Release Date

MHCB: Mental Health Crisis Bed

MOU:  Memorandum of Understanding

NKSP: North Kern State Prison

OMD:  Offender with a Mental Health Disorder

PC:  California Penal Code

PC 1370: Incompetent to Stand Trial

PC 2602: Involuntary Medication Order

PC 2684: Mentally Ill Prisoners transferred from CDCR

PIP: Psychiatric Inpatient Program

PTSD: Post-Traumatic Stress Disorder

QIP: Quality Improvement Program

RJD: Richard J. Donovan Correctional Facility

RN: Registered Nurse

RT: Rehabilitation Therapist

RVR: Rules Violation Report

SIRs:  Serious Incident reports

SQ: San Quentin State Prison

SVSP-PIP: Salinas Valley State Prison Psychiatric Inpatient Program

SVSP: Salinas Valley State Prison

TCMP: Transitional Case Management Program

UNA: Unmet Needs Assessment

WIC: California Welfare and Institutions Code

## TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ........................................................................ i

INTRODUCTION ........................................................................................................ 1

    Parties' Responses to Draft Report ...................................................................... 3

    Plaintiffs' Comments to the Draft Report ........................................................... 4

    Defendants' Responses and Objections to the Draft Report ............................... 6

PART I. .................................................................................................................... 11

A.    UPDATE ON THE SPECIAL MASTER'S MONITORING ACTIVITIES AND RELEVANT *COLEMAN* CASE DEVELOPMENTS ..................................... 12

    1.    Unidentified Needs Assessment (UNA) ................................................ 13

    2.    Update on PIP Staffing and Treatment Standard Meet and Confer Process .......... 14

    3.    CMF PIP Master Treatment Plan ......................................................... 18

    4.    Telepsychiatry and Tele-Mental Health ............................................... 19

        a.    Telepsychiatry from Home ........................................................ 19

        b.    Tele-Mental Health ................................................................... 20

B.    AREAS OF FOCUS: ISSUES DEFENDANTS NEED TO ADDRESS REGARDING INPATIENT CARE ............................................................. 22

    1.    Staffing ................................................................................................. 22

    2.    Access to DSH Facilities ...................................................................... 23

    3.    Referrals and Transfers ......................................................................... 24

    4.    Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group, Therapy, and Individual Treatment ........................... 25

PART II. THE SPECIAL MASTER'S FINDINGS AT THE DEPARTMENT OF STATE HOSPITALS ......................................................................................... 26

A.    CENSUS ........................................................................................................ 26

B.    STAFFING .................................................................................................... 27

C.    TREATMENT AND CLINCIAL SERVICES ............................................. 31

1.     Interdisciplinary Treatment Teams (IDTTs) ..................................................... 31

2.     Group Therapy .................................................................................................. 32

3.     Individual Treatment ......................................................................................... 33

4.     Psychiatric Services .......................................................................................... 33

5.     Medication Management ................................................................................... 35

6.     Other Treatment Issues ..................................................................................... 43

D.     QUALITY OF CARE ISSUES IN THE HOSPITAL PROGRAMS .............................. 45

1.     Overall Quality of Care ..................................................................................... 45

2.     IDTT Processes ................................................................................................. 46

3.     Treatment Planning Concerns ........................................................................... 47

4.     Delivery of Treatment Interventions and Treatment Hours ............................. 48

5.     Diagnostic Concerns ......................................................................................... 49

6.     Clinical Documentation Issues ......................................................................... 50

7.     Discharge Concerns .......................................................................................... 51

8.     Suicide Risk Assessment and Suicide Prevention ........................................... 52

E.     SUICIDE PREVENTION ............................................................................................... 54

F.     PATIENT ACCESS TO TREATMENT ........................................................................ 55

G.     REFERRALS .................................................................................................................. 55

H.     TRANSFERS, ADMISSIONS, AND DISCHARGES .................................................. 56

I.     PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE .......................... 58

       Patient Disciplinary Process ........................................................................................ 58

       Use of Force .................................................................................................................. 59

J.     UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR
       MISSES/SENTINEL EVENTS ..................................................................................... 59

K.     USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT ......... 60

L.     EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS ......................... 61

M.     QUALITY MANAGEMENT AND UTILIZATION REVIEW ...................................... 62

N.     PATIENT COMPLAINTS/PATIENT SATISFACTION ............................................... 63

O.     *COLEMAN* POSTINGS ................................................................................................ 64

P.     LAUNDRY AND SUPPLY ISSUES .............................................................................. 65

Q.     VISITATION ..................................................................................................................... 65

R.     LAW LIBRARY ACCESS ............................................................................................... 66

S.     MILESTONE CREDITS ................................................................................................... 67

CONCLUSION AND RECOMMENDATIONS ......................................................................... 67

RECOMMENDATIONS ............................................................................................................. 71

APPENDIX A1 Atascadero State Hospital (DSH – Atascadero) .................................................. 72

APPENDIX A2 Coalinga State Hospital (DSH – Coalinga) ......................................................... 92

APPENDIX A3 Patton State Hospital (DSH – Patton) ............................................................... 109

APPENDIX B1 Atascadero State Hospital (DSH – Atascadero) Case Reviews ....................... 125

APPENDIX B2 Coalinga State Hospital (DSH – Coalinga) Case Reviews .............................. 163

APPENDIX B3 Patton State Hospital (DSH – Patton) ............................................................... 201

APPENDIX C ACTIVITIES OF THE SPECIAL MASTER ..................................................... 221

## <u>INTRODUCTION</u>

This report encompasses the Special Master's review of the inpatient mental health care programs at the California Department of State Hospitals (DSH) facilities that provide inpatient mental health treatment to patients incarcerated in the California Department of Corrections and Rehabilitation (CDCR): Atascadero State Hospital (DSH-Atascadero), Coalinga State Hospital (DSH-Coalinga), and Patton State Hospital (DSH-Patton).  Among the three hospitals, there are 336 beds designated for *Coleman* class members: 256 beds at DSH-Atascadero, 50 at DSH-Coalinga, and 30 at DSH-Patton (for female class members).  The Special Master previously filed his Thirtieth Round Monitoring Report – Part A on CDCR's Psychiatric Inpatient Programs on May 11, 2023.  ECF No. 7833.[1]

In the preceding monitoring report on the DSH hospitals with *Coleman*-designated beds, the Special Master noted that "generally those *Coleman* class members who are admitted to DSH beds receive higher quality inpatient mental health care than is provided in the Lift and Shift PIPs [psychiatric inpatient programs]," a finding that was consistent with that of prior monitoring reports on inpatient care.[2]  Twenty-Ninth Round Monitoring Report – Part B, ECF No. 7625 at 80.[3]  Based on his findings in the Twenty-Ninth Monitoring Round, the Special Master

---

[1] References to page numbers for documents filed in the Court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.  Internal citations within the body of this report are to the page numbers included at the bottom of each page.

[2] *See* Special Master's Report on the Current Status of *Coleman* Class Members' Access to Inpatient Care in the Department of State Hospitals, ECF No. 6565 at 8 (describing DSH-Atascadero, DSH-Coalinga, and DSH-Patton as "three of the more appropriate therapeutic milieus…available to CDCR's patients who are clinically and custodially eligible for placement in the hospitals.").

[3] Regarding the phrase "Lift and Shift PIP," see ECF No. 7555 at 14 (defining "Lift and Shift PIPs" as comprising CDCR's largest PIPs: California Medical Facility-Psychiatric Inpatient Program (CMF-PIP), California Health Care Facility-Psychiatric Inpatient Program (CHCF-PIP), and Salinas Valley State Prison-Psychiatric Inpatient Program (SVSP-PIP)).

concluded that "effective ongoing monitoring of the DSH hospitals may be achieved by paper review during the next monitoring round with the Special Master retaining his authority to resume site visits should he deem that in-person visits are warranted." *Id.* This report includes the monitor's and monitor's expert's[4] findings from the paper reviews of the three DSH hospitals with *Coleman*-designated beds. Within the Report, the Special Master identifies several deficiencies in DSH defendants' responses to the Special Master's document request. The Special Master notes that in order for the DSH hospitals to remain on paper review status, it is critical that the DSH defendants thoroughly respond to the Special Master's document requests.

The monitoring focus areas were:

A.    Census

B.    Staffing

C.    Treatment and Clinical Services

D.    Quality of Care Issues in the Hospital Programs

E.    Suicide Prevention

F.    Patient Access to Treatment

G.    Referrals

H.    Transfers, Admissions, and Discharges

I.    Patient Disciplinary Process and the Use of Force

J.    Unusual Occurrences/Serious Incidents/Near Misses/Sentinel Events

K.    Use of Observation Cells/Rooms, Seclusion, and Restraint

L.    Emergency Response and the Death Review Process

---

[4] While the collected data and findings in this report reflect the findings of different monitoring teams, the various monitors are collectively referred to as "the monitor." The Special Master's staff of mental health experts are collectively referred to as "the monitor's expert."

M.     Quality Management and Utilization Review

N.     Patient Complaints/Patient Satisfaction

O.     *Coleman* Postings

P.     Laundry and Supply Issues

Q.     Visitation

R.     Law Library Access

S.     Milestone Credits

Following the format of preceding inpatient care reports, this report is comprised of two major sections. Part I provides updates on recent *Coleman* case developments and the state of access to inpatient mental health care for *Coleman* class members. Part II of this Report contains the Special Master's summaries of his findings at the three hospitals. The summaries in Part II are organized by monitoring focus area.

The Special Master's individual summaries of his findings at each hospital are provided in Appendices A1-A3. His expert's clinical case reviews for these programs are found in Appendices B1-B3. Appendix C is a list of the Special Master's monitoring activities since the filing of the Special Master's Thirtieth Round Monitoring Report – Part A.

**Parties' Responses to Draft Report**

On May 31, 2023, the Special Master provided the *Coleman* parties with a draft version of the Thirtieth Round Monitoring Report – Part B, covering DSH facilities (hereinafter "Draft Report"). As required by the Order of Reference, the parties were given 30 days to provide any preliminary objections or comments to the Draft Report. On June 30, 2023, both plaintiffs and defendants sent letters to the Special Master responding to the Draft Report. *See* plaintiffs' letter with comments from Alexander Gourse, Esq., attached hereto as Exhibit A, and defendants'

3

responses and objections from Deputy Attorney General Elise Owens Thorn, Esq., attached

hereto as Exhibit B.

The Special Master carefully reviewed the plaintiffs' comments and defendants'

responses and objections and revised the final version of the Report as discussed in greater detail

below.

### Plaintiffs' Comments to the Draft Report

The plaintiffs made five requests for modifications or clarifications to the Draft Report.

First, because "the referral and transfer process between CDCR and DSH is inherently

interconnected," plaintiffs requested that the Special Master "change his recommendation to

require *all* Defendants – not just DSH – to take 'all necessary steps to prioritize the identification

and referral of all appropriate *Coleman* patients to DSH, eliminate any barriers to admission to

DSH hospitals, and end any underutilization of *Coleman*-designated beds." Exhibit A at 2.

Because the inter-agency referral and transfer process that provides *Coleman* class members with

access to DSH is in fact intertwined, the Special Master made the requested change to this

recommendation.

Second, plaintiffs noted that the Draft Report indicated that chart review analysis

revealed that "several initial psychiatric evaluations reported that the patient was admitted under

PC 1370 (Incompetent to Stand Trial), rather than PC 2684." Exhibit A at 3. Plaintiffs further

stated that "the laws governing the treatment of patients under these statutes varied," and

inquired whether patients were "denied treatment due to psychiatrists' inaccurate assumptions

about the legal basis for admission to DSH." *Id.* In response to plaintiffs' comments, the Special

Master notes that he did not document that these errors related to patient admission negatively

impacted patient care.  Accordingly, the Special Master did not modify the Report based on this comment.

Third, plaintiffs inquired whether DSH-Atascadero's use of restraints and/or seclusion "dramatically fewer times than in the prior monitoring period" was related to "the similarly dramatic reduction in the number of *Coleman* patients at ASH since the previous monitoring period."  Exhibit A at 3.  Notably, from the data provided by DSH, the Special Master was unable to determine whether the reduced number of restraint and/or seclusion incidents was related to the lower DSH-Atascadero population.  As such, the Special Master did not change the Report in response to this comment.

Fourth, plaintiffs asked whether CDCR was properly calculating milestone credits for DSH patients, noting that the Draft Report states "that DSH offers opportunities to earn milestone credits and then provides 'data to CDCR, which calculated patients' milestone credits.'"  Exhibit A at 3.  Since it is not possible to report on CDCR's calculation of milestone credits for *Coleman* class members at DSH in this Draft Report, pursuant to plaintiffs' request, the Special Master will attempt to obtain necessary information and report on the attainment of milestone credits by *Coleman* class members while housed in DSH during the Thirty-First Monitoring Round.

Finally, due to DSH's failure "to provide adequate information and/or documentation in response to the Special Master's requests during the Thirtieth Round," among other issues, plaintiffs requested that the Special Master resume in-person tours of DSH during the Thirty-First Monitoring Round.  The Special Master will monitor the DSH hospitals via paper review in the next monitoring round but will take plaintiffs' concerns under advisement going forward.

**Defendants' Responses and Objections to the Draft Report**

I.    *Findings and Recommendations Related to Staffing*

The Report's second recommendation is "(t)hat DSH-Atascadero undertake all necessary steps to comply with the DSH Staffing Plan to reduce its staffing vacancies to no more than ten percent for the disciplines of psychiatry, psychology, social work, and rehabilitation therapy." Defendants' objected to this recommendation stating that they are "already taking the steps identified in the DSH Staffing Plan to reduce staffing vacancies." Exhibit B at 2. Defendants' further opined that "there is no current order and no basis to impose an order that DSH maintain a ninety percent fill rate for its staff in the *Coleman* programs." *Id.*

Defendants' position is erroneous for the simple reason that the DSH Staffing Plan itself acknowledges that the ten percent vacancy rate applies to DSH. Specifically, the DSH Staffing Plan, in addressing the facilities' staffing for calendar year 2020, states that "DSH successfully staffed its *Coleman* units at or above 90% of the total required staffing." ECF No. 7078-1 at 2. The DSH Staffing Plan further elaborated that:

> for every month in calendar year 2020, DSH also successfully staffed its Coleman units at or above 90% of its total allocated staffing for psychiatrists, clinical social workers, and rehabilitation therapists. For psychologists, DSH provided above 90% of its total allocated positions for two months of the year and maintained an 83% rate for ten months of the year.

*Id.* It is thus incongruous for defendants to now assert that DSH does not have to maintain a 90 percent fill rate for its *Coleman* program staff. Moreover, the Court itself has recognized that "a review of the (DSH Staffing) plan shows it assumes that a 10 percent vacancy rate applies." August 23, 2023 PIP Staffing Order (ECF No. 7923 at 12).

II.    *Findings and Recommendations Related to Quality of Care Issues*

Defendants' objected to the Report's "various findings that criticize DSH for providing inadequate care and a recommendation that 'all DSH hospitals take the necessary steps to provide patients with sufficient group and individual therapy.'"  Exhibit B at 4.  In so stating, defendants indicated that the Draft Report's "criticisms do not demonstrate systemic issues and ignore the existing policies that set forth the required treatment for inpatient mental health care."  *Id.*

First, defendants opined that DSH "provides *Coleman* class members with sufficient group therapy as required under the Program Guide and mental health policies and regulations."  *Id.*  In so stating, defendants provided additional review period data regarding core and supplemental groups, and individual treatment, for the DSH facilities.  This data has been added to the Report.

Specifically, this supplemental data reported that DSH-Atascadero patients were offered a weekly average of 7.5 hours of core groups, attending 5.5 hours, and were also offered a weekly average of 5.9 hours of supplemental groups, attending 5.7 weekly hours.  As for DSH-Coalinga, this additional data indicated that patients were offered more than ten weekly hours of core groups during five of six months of the review period, as well as being offered an average of between 28.28 and 46.31 weekly hours of supplemental groups.  Overall, DSH-Coalinga patients reportedly attended a total of between 14.39 and 18.05 weekly hours of group therapy.  Further, DSH-Patton patients were offered a weekly average of 9.69 hours of core groups, attending 7.76 hours, as well as being offered a weekly average of 1.79 hours of supplemental groups, attending 1.7 weekly hours.  Exhibit B at 6 -7.  Notably, the amount of group treatment

provided at both DSH-Atascadero and DSH-Patton was insufficient, although DSH-Coalinga provided sufficient group treatment.

Relatedly, defendants also provided supplemental data regarding individual treatment at the three hospitals, which has also been added to this Report. This additional data indicated that DSH-Patton provided sufficient individual therapy, but neither DSH-Atascadero nor DSH-Coalinga provided adequate individual treatment.

Second, defendants' objected that the Draft Report contained clinical reviews of only 19 of 192 or approximately ten percent of patients who were treated at DSH during the review period, which they alleged constituted a "very small subset of the total number of patients treated." Exhibit B at 5. Defendants further maintained that many of the monitor's expert's criticisms of these clinical reviews "concern individual treatment issues that represent differing clinical opinions between the Special Master's experts and DSH clinicians," that "(s)uch opinions are not evidence of inadequate care or a systemic lack of access to care," and that "the criticisms lodged do not identify that any patient decompensated or suffered an adverse mental health outcome as a result of the purported criticisms or inadequacies." *Id.*

Notably, the monitor's expert actually conducted 63 clinical reviews of DSH patients, representing approximately one-third of the 192 patients that DSH treated during the review period, and not only 19 or ten percent of DSH patients, as defendants alleged. Further, the Special Master's clinical reviews revealed that 22 of 63 or 35 percent of reviewed patients received inadequate treatment. Moreover, the absence of decompensation and/or suffering of the reviewed patients does not indicate that the provided treatment was adequate; rather, patient improvement and progress toward treatment goals constitutes adequate treatment. Further, defendants' inadequate care also ignores the suffering, and possibly worsened prognosis, that

patients may have endured during the time when they were undertreated, as well as what this reveals about their system of care.

Third, defendants' also objected to the Report's allegation "that the lack of individual therapy resulted in patients not receiving adequate treatment." Exhibit B at 5. In so asserting, defendants alleged that "(t)here is no requirement to provide individual therapy in the Program Guide, in Title 22, or in any other mental health policy applicable to the DSH programs that treat *Coleman* class members." *Id.* Nonetheless, at least three case reviews found that the lack of individual therapy resulted in patients not receiving adequate treatment. *See infra* pp. 160 – 162, 180 – 182, and 184 – 186. As such, the Special Master will clarify the final Report to reflect that the lack of individual therapy resulted in *some* patients not receiving adequate treatment.

Fourth, defendants take issue with the Draft Report's criticism of DSH programs not having behavior plans for *Coleman* class members, opining that "the Report does not provide any authority for such a requirement for every patient." Exhibit B at 8. However, the Special Master does not seek for *every* patient to have a behavior plan. Rather, the Special Master notes the dearth of such plans at all DSH facilities, and its unavailability for patients for whom they may be clinically indicated. It should be further noted that the Special Master has historically monitored the use of behavioral plans and will continue to do so in the future. Accordingly, the Special Master did not modify the Report based on this objection.

### III.    *Mischaracterization of Suicide Risks*

Defendants asserted that the Report reviewed three cases that allegedly involved an inadequate suicide risk assessment, but further noted that they did not indicate "any suicide attempts or serious self-injury that occurred at DSH or within 30 days of discharge back to CDCR." Exhibit B at 8. As such, defendants' requested that "the Report clarify the reporting of

these issues and provide additional factual bases for the purported findings." *Id.* However, because the Report is clear and unambiguous and the cases speak for themselves, the Special Master declines to provide any additional factual bases. Further, the actual absence of any ensuing suicide attempts, serious self-injury, or other negative outcomes is not evidence of adequate suicide risk assessments.

IV.    *Recommendation Related to the Referral of all Appropriate Coleman Patients to DSH*

Defendants note that the Special Master's first recommendation stated that:

1. In keeping with patients' needs, and the findings of the UNA study, DSH shall take all necessary steps to prioritize the identification and referral of all appropriate Coleman patients to DSH, eliminate any barriers to their admission to DSH hospitals, and end any underutilization of Coleman-designated beds;

In response to this recommendation, defendants' stated that "DSH is already taking all necessary and required steps under current policies to prioritize the identification and referral of appropriate *Coleman* patients to DSH." Exhibit B at 1 – 2. Defendants' further elaborated that "DSH beds are appropriately used for APP and ICF patients who qualify for placement and treatment in the unlocked dorm setting." *Id.* at 8.

The Special Master disagrees that DSH is taking all necessary and required steps under current policies to prioritize the identification and referral of all appropriate *Coleman* patients to DSH. In fact, a trend identified during the prior reporting period, namely, low referral rates to DSH hospitals and resultant low *Coleman* patient censuses at them, continued throughout the review period. *See infra* p. 24. Indeed, during the Thirtieth Round, the use of DSH-Atascadero beds by *Coleman* patients reached historic lows. "It appears that the underuse of *Coleman*-designated beds at DSH is in part attributable to the fact that many patients referred to inpatient care require a higher LRH than unlocked dorms, resulting in underutilization of the DSH beds."

ECF No. 7833 at 49.  As a result, CDCR and DSH are currently involved in lease restrictive

housing (LRH) reviews of patients eligible for placement in DSH, which may be indicative that

all necessary steps have not previously been taken to increase admissions to DSH.  *See* email

from Kristopher Kent dated October 6, 2023, attaching the Trial Processes for DSH Review of

*Coleman* Patients, attached hereto at Exhibit C.  As such, the Special Master believes that this

recommendation is appropriate.

## PART I.

The findings reported herein are largely consistent with those reported in the preceding

monitoring report on the three DSH hospitals with *Coleman*-designated beds.  *See generally*

Twenty-Ninth Round Monitoring Report – Part B, ECF No. 7625.  First, consistent with the

preceding round, the largest of the three hospitals with *Coleman*-designated beds (DSH-

Atascadero) faced staffing challenges while DSH-Coalinga and DSH-Patton were fully staffed.

*See infra* p. 22 (reporting vacancy/functional vacancy rates in excess of 20 percent for the four

mental health classifications at DSH-Atascadero and no functional vacancies at DSH-Coalinga

or DSH-Patton); *see also* ECF No. 7625 at 31 (reporting functional vacancy rates in excess of ten

percent for the four major mental health disciplines at DSH-Atascadero but no functional

vacancies at DSH-Coalinga or DSH-Patton).  Further, similar to the preceding round, quality of

care was variable at the three hospitals.  While the monitor's expert highlights specific observed

deficiencies below, the quality of care in the DSH facilities exceeded that of the largest CDCR

PIPs.  *Compare infra* p. 45 ("Of the 63 individual cases reviewed, 41 cases (65 percent) received

adequate care."), *with* ECF No. 7833 at 64 ("The majority of patients, 77 cases, or 64 percent,

received care of inadequate quality during the review period.").  Finally, a trend identified in the

preceding monitoring report – low referral rates to DSH hospitals and resultant low *Coleman*

patient censuses at the hospitals – continued throughout the review period.  Indeed, during the

11

Thirtieth Round, *Coleman* patient utilization of DSH beds at DSH-Atascadero reached historic lows. *See infra* p. 26 ("On December 31, 2022, DSH-Atascadero's Program V housed 67 CDCR intermediate care *Coleman* patients….[D]uring the reporting period, the hospital had an average monthly census of 80 *Coleman* patients. …Compared to the prior reporting period, when DSH-Atascadero housed 136 *Coleman* patients, the *Coleman* population had decreased by 51 percent.").

Given the "critical significance" of "*Coleman* class members' access to inpatient mental health care at DSH hospitals" in this case, these low census numbers remain concerning to the Special Master. The Special Master understands CDCR and DSH leaders are in the process of renegotiating the memorandum of understanding (MOU) governing referral and transfer of *Coleman* patients to DSH hospitals. The Special Master looks forward to reviewing revisions to the MOU and encourages the agencies to work collaboratively to refer more *Coleman* patients to DSH hospitals – not solely to get the census numbers up, but to ensure as many patients can benefit from the therapeutic milieu that exists in the DSH hospitals and is absent from CDCR's Lift and Shift PIPs.[5] *See* ECF No. 7625 at 78.

## A.  UPDATE ON THE SPECIAL MASTER'S MONITORING ACTIVITIES AND RELEVANT *COLEMAN* CASE DEVELOPMENTS

This section provides brief status updates on a number of ongoing projects, including several that were highlighted in the Special Master's Thirtieth Round Monitoring Report – Part A.[6]

---

[5] The Special Master noted the following in his recently filed Thirtieth Round Monitoring Report – Part A: "It appears that the underuse of *Coleman*-designated beds at DSH is in part attributable to the fact that many patients referred to inpatient care require a higher LRH than unlocked dorms, resulting in underutilization of the DSH beds." ECF No. 7833 at 49.

[6] The developments discussed in this section are generally applicable to *Coleman* and do not necessarily relate to the DSH-defendants. Moreover, data remediation developments are not

1.    **Unidentified Needs Assessment (UNA)**

As previously reported, the court-ordered Unidentified Needs Assessment (UNA) commenced in April 2022.  Twenty-Ninth Round Monitoring Report – Part B, ECF No. 7625 at 21.  In the Thirtieth Round Monitoring Report – Part A, the Special Master reported that defendants had "completed all phases of the UNA clinical case review process."  ECF No. 7833 at 37.  After the Special Master filed the Thirtieth Round Monitoring Report – Part A, defendants distributed a draft version of their 2022 UNA study and requested the Special Master's and plaintiffs' comments to the draft report by June 15, 2023.

Defendants filed the UNA study with the Court on June 30, 2023.  ECF No. 7865.  The UNA study conducted patient reviews from April 2022 through March 2023.  Notably, the UNA study "addressed the issues of whether there were unmet needs for inpatient care, unmet needs for patients with personality disorders, whether there were sufficient crisis beds, and whether the Sustainable Process was sustainable."  ECF No. 7865-3 at 8.  In the UNA study, defendants concluded there was no unmet need for inpatient care within CDCR, defendants' existing sustainable process was effective, there were a sufficient number of MHCBs, and the question of whether there was an unmet need for patients with personality disorders required further study. *Id.* at 8 – 9.

Thereafter, on August 1, 2023, plaintiffs' filed objections to defendants' UNA study, ECF No. 7900, and defendants filed their Response to Plaintiffs' Objections.  On October 17, 2023, the Court issued a minute order, ECF No. 8015, setting this matter for hearing on November 7, 2023.  After the November 7, 2023 hearing, the Court issued an Order, noting the UNA Report

---

discussed in this section as the Special Master filed a report on the general status of data remediation and as it particularly pertained to finalization of the list of CQIT indicators on June 30, 2023.  *See also* January 3, 2023 Order, ECF No. 7695 at 2.

was "persuasive in its finding that CDCR has enough inpatient beds and mental health crisis beds (MHCBs) to meet class member need for these levels of care" and identifying "some question not intended to be answered by the UNA or the Report but nonetheless best addressed promptly in aid of a sustainable remedy."[7]  ECF No. 8066 at 3.  The Court issued one order based on the UNA results, directing the parties to "meet and confer under the supervision of the Special Master…to discuss more prompt development of programs for class members with personality disorders including a possible pilot program…." *Id.* at 5.  As of the time of this writing, the meet and confer process required by the Court's November 15, 2023 Order is ongoing.

### 2.    Update on PIP Staffing and Treatment Standard Meet and Confer Process

In the Thirtieth Round Monitoring Report – Part A, the Special Master provided an update on the PIP staffing and treatment standards meet and confer process that emerged out of the Court's August 29, 2022 and January 5, 2023 Orders.  ECF No. 7833 at 26-29.  As noted in that report, the Court had referred two of the Special Master's prior recommendations[8] regarding

---

[7] "Those question include why referrals to inpatient mental health care have not returned to the referral levels that preceded the onset of the COVID-19 pandemic; what lessons were learned during the UNA study about the impact of staffing shortages on access to care and interdisciplinary treatment team (IDTT) referral decisions; what are reason(s) for the significant number of inpatient referrals made outside the UNA process during Phase II of the UNA Study; and whether patients whose UNA referrals were rejected by IDTTs were subsequently referred to inpatient care."  ECF No. 8066 at 3-4.

[8] *See* Thirtieth Round Monitoring Report – Part A, ECF No. 7833 at 26-27 ("The Special Master's deep concern with the state of mental health staffing and treatment in the PIPs has resulted in multiple recommendations in recent years.  In his 2021 Monitoring Report on the Mental Health Inpatient Care Programs, the Special Master recommended that CDCR continue working with the Special Master to 'complete staffing plans for their inpatient programs covering all disciplines.'  In his Twenty-Ninth Round Monitoring Report – Part A, the Special Master recommended '[t]hat CDCR be ordered to develop a comprehensive plan within 30 days, under the guidance and supervision of the Special Master, and with input from the plaintiffs' as appropriate, to remedy the seriously deficient staffing levels at the Lift and Shift PIPs'") (citing ECF No. 7555 at 164); *see also id.* at 27 ("Likewise, regarding mental health treatment, in recent years the Special Master has twice recommended that CDCR be ordered to 'develop minimum standards for the provision of structured therapeutic activities, unstructured out of cell activities,

CDCR's PIP staffing vacancies and the need to develop minimum PIP treatment standards to "focused discussions" between the Special Master and the CDCR Secretary. *Id.* at 27. In its January 5, 2023 Order, the Court vacated part of its August 29, 2022 Order and directed the parties to meet and confer regarding PIP staffing and treatment standards and file a joint status report and "as appropriate, either a stipulated resolution or a schedule for motion practice if one or both issues remains unresolved." ECF No. 7697 at 3.

The parties engaged in the meet and confer process between January – February 2023, ECF No. 7833 at 27-28, and filed their Joint Response to the Court's January 6, 2023 Order on March 13, 2023. *See id.* at 28-29 (discussing same). The parties were unable to reach an agreement on either PIP treatment standards or PIP staffing deficiencies and, therefore, proposed a briefing schedule on those issues, which the Court approved in a March 17, 2023 Order. ECF No. 7765.

Since the filing of the Thirtieth Round Monitoring Report – Part A, the parties have proceeded with their briefing schedule. As previously summarized:

> [T]he parties have filed a number of documents in accordance with their briefing schedule. On March 28, [2023], defendants filed CDCR's Plans to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs and to Recruit and Retain Psychiatric Inpatient Staff. ECF No. 7787. On April 17, 2023, plaintiffs filed two motions related to defendants' plans. First, plaintiffs filed a Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs as Inadequate to Remedy Defendants' Eighth Amendment Violations. ECF No. 7812. On the same date, plaintiffs filed a Motion to Reject Defendants' Plan to Recruit and Retain Psychiatric Inpatient Program Staff as Non-Compliant with Court's Orders. ECF No. 7813. Defendants filed their oppositions to plaintiffs' motions on May 5, 2023. *See* ECF Nos. 7827, 7828.

---

treatment planning, and individual treatment, consistent with a psychiatric inpatient level of care.'").

ECF No. 7833 at 29 n. 10.  On May 16, 2023, plaintiffs filed replies in support of their motions to reject defendants' plans.  *See* ECF Nos. 7838, 7839.

In addition, in an April 19, 2023 Order, the Court noted that "[t]his action is at a critical juncture" and thereafter invited the United States Department of Justice to respond to plaintiffs' motions to reject defendants' plans.  ECF No. 7817 at 2.  As invited by the Court, on May 22, 2023, the United States Department of Justice filed its response related to minimum treatment standards and staffing for psychiatric inpatient programs.  ECF No. 7846.

In its response, the United States reiterated it was "not in a position to opine on the factual issues raised by the parties' filings," but was able to "outline[] the types of remedial measures the United States employs to resolve similar situations."  *Id*. at 2.  Regarding minimum treatment standards for inpatient psychiatric care, the United States noted the following:

> Our more recent [Civil Rights of Institutionalized Persons Act] CRIPA corrections consent decrees include definite requirements for therapy and out of cell time. Specifically, we have required a minimum of 10 hours of structured therapy per week, and at least 10 hours of unstructured out of cell time per week….
>
> In other corrections cases, the remedial measures call more generally for access to adequate in-patient psychiatric care when clinically appropriate.

*Id.* at 3-4.[9]  Regarding staffing for psychiatric inpatient settings, the United States noted that it "agree[d] that adequate staffing is essential to ensuring constitutional mental health care."  *Id.* at 4.  Moreover, the United States noted that "Defendants may not avoid their duty to ensure adequate mental health care by arguing that they have made efforts to provide adequate staffing."

---

[9] In a footnote, the United States noted the following: "As Plaintiffs noted, outside the correctional context, the United States' now-dismissed 2007 consent decree with the California Department of Mental Health required a minimum of 20 hours of active treatment per week, plus another minimum of 20 hours of 'adequate active psychosocial rehabilitation' in certain California State Hospitals." ECF No. 7846 at 3 n.1 (quoting *United States v. California*, No. CV 06-2667, Amended Consent Judgment, ECF No. 9 (C.D. Cal. 2007)).

*Id.* While the steps outlined in defendants' PIP staffing proposal were generally "consistent with the strategies the United States has negotiated to address the issue of understaffing in its CRIPA cases," the United States noted that where it "has encountered extended non-compliance, we have sought more specific relief, as Plaintiffs seek here." *Id.* at 4-5.

Thereafter, the parties filed supplemental briefing. Specifically, defendants' filed Defendants' Response to the Court's June 9, 2023 Order Inviting Supplemental Briefing on Minimum Treatment Standards and PIP Staffing (ECF No. 7854). ECF No. 7864. Further, on June 30, 2023, plaintiffs filed a Supplemental Memorandum in Support of Motion to Reject Defendants' Plan to Provide Minimum Treatment Standards for Psychiatric Inpatient Programs (ECF No. 7787) as Inadequate to Remedy Defendants' Eighth Amendment Violations. ECF No. 7867. Plaintiffs also filed a Supplemental Memorandum in Support of Motion to Reject Defendants' Psychiatric Inpatient Program Staff Recruitment and Retention Plan (ECF No. 7813). ECF No. 7868.

The Court issued two orders addressing these issues on August 23, 2023. As for minimum treatment standards, the Court concluded that "defendants' plan for minimum treatment standards in the CDCR PIPs is inadequate." ECF No. 7924 at 10. The Court elaborated that "(d)efendants have presented this inadequate plan two years after defendants promised, and failed, to develop a plan for minimum treatment standards for the CDCR PIPs. *Id.* Accordingly, the Court directed defendants "to forthwith adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process, which the court previously has approved." *Id.*

Additionally, the Court denied plaintiffs' April 17, 2023 motion as "to the request to reject defendants' plan for recruitment and retention of (mental health) staff in the CDCR PIPs,"

but granted it "as to the request to set a deadline for the full implementation of defendants' 2021 PIP Staffing Plan.  ECF No. 7923 at 14 – 15.  The Court further held that within 14 days of this order the parties shall meet and confer under the Special Master's supervision … in an effort to agree on an appropriate maximum vacancy rate for clinical staff in the CDCR PIPs and to file within fourteen days a joint statement of the results of the meet and confer."  *Id.*

Thereafter, following the parties filing of the Joint Report Regarding PIP Staffing Vacancy Rate (ECF No. 7937), wherein they were unable to reach agreement, the Court ordered that "(d)efendants shall maintain a maximum mental health staffing vacancy rate of ten percent in the CDCR PIPs."  ECF No. 8009 at 3.  In so ordering, the Court gave defendants six months "to take all steps necessary to come into complete compliance with the staffing ratios in their 2021 CDCR PIP Staffing Plan and the maximum ten percent vacancy rate required by this order."  *Id.*

###   3.    CMF PIP Master Treatment Plan

In his Thirtieth Round Monitoring Report – Part A, the Special Master provided an update on developments related to CMF and CMF-PIP.  Due to the overwhelming staffing vacancies at the institution, defendants had requested a number of programming modifications specific to that institution.  ECF No. 7833 at 24-25.  As of the time of the filing of the Thirtieth Round Monitoring Report – Part A, defendants had not yet distributed draft revisions to the master treatment plan form for CMF-PIP.

On May 18, 2023, defense counsel sent a formal request to streamline the electronic health records system (EHRS) treatment plan form for the CMF-PIP in an effort to offer relief to the overburdened mental health clinicians who remained at the CMF-PIP.  Email from Sundeep Thind, Esq., CDCR Office of Legal Affairs to Special Master Lopes and Plaintiffs' Counsel (May 18, 2023), attached hereto as Exhibit D.  Subsequent meetings attended by the Special

18

Master's team, plaintiffs, and defendants on June 9, 2023 and August 17, 2023 continued to discuss defendants' proposed CMF-PIP treatment plan form modifications.

### 4. Telepsychiatry and Tele-Mental Health

#### a. Telepsychiatry from Home

On May 5, 2023, the parties filed a stipulation and proposed order approving the parties' agreed-upon modifications to the final, court-approved telepsychiatry policy. ECF No. 7826. Specifically, defendants requested that plaintiffs "stipulate to modify the Court adopted Policy to permit telepsychiatrists to continue to work from home," as they had been permitted to during the COVID-19 pandemic. *Id.* at 2. Defendants noted that "work from home is a critical tool for retaining current telepsychiatrists, all of whom are civil servants, and therefore is the most urgent issue that requires immediate action."[10] *Id.*; *see also id.* at 2-3 ("Defendants explained their concern that CDCR would be at a considerable disadvantage in recruiting and retaining psychiatrists in this highly competitive market if CDCR telepsychiatrists were required to work from an office setting, while other health care employers across the state, such as Kaiser, allow mental health workers to work from home.").

On May 8, 2023, the Court approved the parties' stipulation, noting that "[n]othing in the stipulation of the parties or the proposed revision to the Telepsychiatry Policy conflicts with [the Special Master's findings contained in his Report and Recommendation Regarding a Final Telepsychiatry Policy] or with the strictures of this court's orders regarding the use of telepsychiatry." ECF No. 7830 at 4-5.

---

[10] In the parties' Stipulation and Proposed Order, defendants made clear they did "not intend to waive any appellate rights concerning the Court's April 12, 2023 order" by stipulating to the work-from-home policy modification. ECF No. 7826 at 2 n.3. Six days later, defendants appealed the Court's April 12, 2023 Order regarding the final telepsychiatry policy to the Ninth Circuit. May 11, 2023 Notice of Appeal, ECF No. 7834.

b.    Tele-Mental Health

In the months preceding the Special Master's distribution of the Draft Report, defendants

alluded to their plans to use telehealth for classifications other than psychiatry (tele-mental

health) in several filings and in their communications with the Special Master's team. *See, e.g.*,

Defendants' Response to March 29, 2021 Order Requiring Defendants to File Report on the

Lessons Learned from the COVID-19 Pandemic, ECF No. 7196 at 51 (Defendants' COVID-19

Lessons Learned Report: "The overall success of the expansion of telehealth services to

psychologists and social workers naturally leads CDCR and many other health care organizations

to think about ways to expand telemental health services as appropriate and in areas that are

needed."); *see also* Defendants Objections to Special Master's Report and Recommendation

Regarding Final Telepsychiatry Policy, ECF No. 7702 at 9-10 ("The COVID-19 pandemic

further drives the vital need for the continued growth, implementation, and expansion of

telepsychiatry and other types of telehealth for incarcerated individuals regardless of their

housing setting/classifications.").

Defendants are moving forward with their intent to utilize telehealth for classifications

outside of psychiatry.  In a Budget Change Proposal (BCP) published on May 12, 2023 as part of

the California Governor's so-called "May Revise" budget proposal, CDCR requested $11.0

million and 85.0 positions in FY 2023-2024 and $17.3 million and 144.0 positions in FY 2024-

2025 to "expand the use of Tele-Mental Health services to include psychology and social work

in addition to psychiatry."  *Budget Change Proposal: Expansion of the Statewide Tele-Mental

Health Program* (May 12, 2023), attached hereto as Exhibit E at 1.[11]  In addition to adding 144

---

[11] Exhibit E was retrieved from the California Department of Finance's website at
https://esd.dof.ca.gov/Documents/bcp/2324/FY2324_ORG5225_BCP7061.pdf on May 25, 2023.

new positions, the May 12, 2023 BCP indicates that "CDCR/CCHCS are redirecting 100 line staff psychologists and social workers (66-77 psychologists and 30-41 social workers)" from on-site to the new tele-mental health program. *Id.* at 4. Further, CDCR indicated that the newly requested positions include 100 medical assistant positions to support tele-mental health providers as telepresenters, *id.* at 5, along with more than 40 other "operational, supervisory, and administrative support" positions to staff the new program. *Id.* at 3.

Thereafter, on July 21, 2023, defendants distributed a draft Telemental Health Policy to the Special Master and plaintiffs' counsel, and requested comments by August 21, 2023. ECF No. 7935 at 1. The Court subsequently issued an order on August 3, 2023, directing the parties to "meet and confer under the supervision of the Special Master concerning defendants' draft Telemental Health Services Policy" and to thereafter "file a joint report to the court on the outcome of the meet and confer." ECF No 7901 at 2. Under the Special Master's supervision, the parties met and conferred on August 29 and August 31, 2023 (ECF No. 7935 at 2) and timely filed their joint report on the outcome of the meet and confer. On September 21, 2023, defense counsel distributed the final version of CDCR's Telemental Health Services Policy, which was released to the field on the same day.[12]

---

[12] As the Special Master informally notified the Court, defense counsel sent a "non-final" version of the Telemental Health Services Policy to the Special Master and plaintiff's counsel on September 19, 2023. This "non-final" version limited the use of telemental health in higher levels of care to "emergency" situations and included language indicating that on-site services were "preferred" in MHCBs and PIPs. This language was removed from the September 21, 2023 "final" version of the policy. The Special Master will discuss the status of the Telemental Health Services Policy in more detail in his forthcoming Thirtieth Round Monitoring Report – Part C, covering CDCR's institutions with Enhanced Outpatient Programs (EOPs).

**B.    AREAS OF FOCUS: ISSUES DEFENDANTS NEED TO ADDRESS REGARDING INPATIENT CARE**

In prior monitoring reports on defendants' system of psychiatric inpatient care, the Special Master has identified "core areas…which defendants must address to sustain any progress that has been achieved related to problems with access to and the provision of adequate mental health care for incarcerated persons in CDCR custody."  ECF No. 7833 at 15.  These core areas include staffing vacancies, referrals and transfers, access to DSH facilities, and clinical services and treatment in inpatient programs.  This subsection provides a brief summary of key findings from the paper review of the three hospitals related to these core areas, with more detailed summaries included in Part II of the Report below.

**1.    Staffing**

In his Thirtieth Round Monitoring Report – Part A, covering CDCR's PIPs, the Special Master noted the following:

> [T]he significant mental health staffing vacancies observed during the monitoring round have pervasive, negative impacts on the *Coleman* class.  Moreover, the potential harm to members of the *Coleman* class - especially those class members whose illness requires inpatient hospitalization - who go without needed treatment due to these vacancies is unacceptable.  As the Special Master noted in the preceding monitoring report on CDCR's PIPs, "[t]he *Coleman* class cannot afford further delays in remedying the staffing crisis that exists in the Lift and Shift PIPs.

ECF No. 7833 at 43 (quoting ECF No. 7555 at 37).

While the Lift and Shift PIPs remain in a staffing crisis, the DSH hospitals with *Coleman*-designated beds generally fared better than their CDCR counterparts.  The two smaller programs from a *Coleman* perspective – DSH-Coalinga and DSH-Patton – filled all positions in the disciplines of psychiatry, psychology, social work, and rehabilitation therapy during the review period and all executive positions.  *See infra* pp. 94 and 111.

Unfortunately, staffing vacancies at DSH-Atascadero, the hospital with the most *Coleman*-designated beds, were significant and in excess of 20 percent for each of the four mental health disciplines. *See infra* p. 68-69 (reporting DSH-Atascadero's mental health vacancies as follows: psychiatry (22 percent functional vacancy rate); psychology (33 percent vacancy rate); social work (44 percent functional vacancy rate); and rehabilitation therapy (22 percent functional vacancy rate). Significantly, the functional vacancy rates among the four key mental health classifications at DSH-Atascadero had increased compared to the preceding review period.

## 2.    **Access to DSH Facilities**

In his Twenty-Ninth Round Monitoring Report – Part A, the Special Master reported the following:

> Access to DSH programs was a concern throughout the monitoring round. Defendants' monthly inpatient census reports indicated historically low *Coleman* patient censuses at both DSH-Atascadero and DSH-Coalinga during the round. With more than 100 of DSH-Atascadero's 256 *Coleman*-designated beds routinely remaining empty during the monitoring round, the Special Master identified the low *Coleman* patient counts at DSH facilities as a concern in a variety of workgroup and All-Parties meetings and urged defendants to admit eligible patients to DSH programs to alleviate stress elsewhere in defendants' inpatient mental health care system.

ECF No. 7555 at 63 (emphasis added). As referenced above and reported on more fully below, the patient census at DSH-Atascadero reached new historic lows during the review period, with only 67 *Coleman* patients occupying the hospital's 256 *Coleman*-designated beds. *See infra* p. 67.

The Special Master's identification of the low patient census at DSH-Atascadero as a concern should not be viewed as a suggestion of impropriety in DSH's consideration of *Coleman* referrals.

However, it must be noted that the precipitous drop in the *Coleman* census at DSH-Atascadero occurred simultaneously with defendants' apparent "backsliding on timely transfer of Intermediate Care Facility (ICF) referrals to the PIPs" observed in the Thirtieth Round Monitoring Report – Part A.  ECF No. 7833 at 45.  As the Special Master has previously observed, there appears to be a mismatch between the security levels of defendants' inpatient mental health bed supply and the *Coleman* patients who require inpatient mental health services. *See Id.* at 49 ("It appears that the underuse of *Coleman*-designated beds at DSH is in part attributable to the fact that many patients referred to inpatient care require a higher least restrictive housing (LRH) than unlocked dorms, resulting in underutilization of the DSH beds.").

The parties should utilize the opportunity presented by the UNA study as well as the renegotiation of the MOU between CDCR and DSH to ensure defendants' mental health system has a sufficient supply of inpatient mental health beds at appropriate security levels for the *Coleman* population.

3. **Referrals and Transfers**

In the preceding monitoring report on the DSH hospitals, the Special Master observed the following:

> Notably, there was a significant decrease in the number of referrals to DSH during the review period.  Compared to the prior review period, there was a 65 percent decrease in the number of *Coleman* patients who were referred to DSH-Atascadero and DSH-Coalinga, while referrals to DSH-Patton declined by 47 percent.

ECF No. 7625 at 33.  As reported below, referrals to DSH trended downward further during the review period.  Specifically, there were fewer male *Coleman* patients referred to DSH during the review period (92) compared to the preceding review (113).  Transfers to DSH-Atascadero were timely, while transfers to DSH-Coalinga were not.

24

Consistent with the preceding review period, there were few male *Coleman* patient referrals that were rejected during the review period.  However, a significant portion (41 percent) of male referrals to DSH-Atascadero were rescinded, which was not observed in the preceding review period.  *See infra* p. 86 (reporting that 38 of 92 male *Coleman* patient referrals to DSH-Atascadero were rescinded).  With these rescissions accounted for, there were 48 percent fewer "accepted referrals to DSH-Atascadero during this review period as compared to the prior reporting period."  *Infra* p. 56.  DSH and CDCR must work together to determine the cause of and remedy this marked increase in rescissions.

Notably, in April 2023, defendants disbanded the DSH small workgroup that had been regularly meeting since the onset of the COVID-19 pandemic.  *See* ECF No. 7833 at 469.  The DSH small workgroup members included the Special Master's clinical experts and representatives for both CDCR and DSH.  As previously reported, the DSH small workgroup was a forum that facilitated the Special Master's close monitoring of referrals to DSH hospitals.  *See* ECF No. 7555 at 38; *see also* ECF No. 7625 at 33.

### 4.  Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group, Therapy, and Individual Treatment

From a quality of care perspective, the DSH hospitals with *Coleman*-designated beds continued to outperform the largest of CDCR's PIPs, the Lift and Shift PIPs.  *Compare infra* p. 45 ("Of the 63 individual cases reviewed, 41 cases (65 percent) received adequate care."), *with* ECF No. 7833 at 64 ("The majority of patients, 77 cases, or 64 percent, received care of inadequate quality during the review period.").  This is consistent with both the Special Master's findings from the preceding review period and historic trends in this case.

During the review period, IDTTs were "timely completed and generally included goals that were appropriate to patients' needs."  *Infra* p. 31.  Lack of attendance of required staff at

IDTTs was a deficiency noted at both DSH-Atascadero and DSH-Coalinga. *Infra* p. 31-32. In addition, the monitor's expert's review of treatment plans noted the failure to update treatment plans when clinically indicated as a deficiency across all three hospitals. *Infra* p. 69-70.

Consistent with all of the Special Master's prior monitoring reports on the DSH hospitals, group treatment was the primary source of treatment for the *Coleman* population. *See infra* p. 32-33. The number of group treatment hours offered to *Coleman* patients housed at DSH-Atascadero and DSH-Patton was inadequate. *Infra* pp. 69, 114. In contrast, DSH-Coalinga reported providing sufficient group treatment. *Infra* p. 97. As for individual treatment, only DSH-Patton provided adequate treatment. *Infra* p. 110.

## PART II.
## THE SPECIAL MASTER'S FINDINGS
## AT THE DEPARTMENT OF STATE HOSPITALS

### A.    CENSUS

On December 31, 2022, DSH-Atascadero's Program V housed 67 CDCR intermediate care *Coleman* patients who were in the hospital pursuant to California Penal Code (PC) 2684; during the reporting period, the hospital had an average monthly census of 80 *Coleman* patients. At the time of this review, *Coleman* patients comprised approximately seven percent of the hospital's population and 26 percent of the 256 beds that DSH-Atascadero designated for *Coleman* patients. Compared to the prior reporting period, when DSH-Atascadero housed 136 *Coleman* patients (ECF No. 7625 at 45), the *Coleman* population had decreased by 51 percent.

On December 31, 2022, DSH-Coalinga's Unit 21 housed 27 intermediate care *Coleman* patients. This census was 29 percent higher than its 21-patient census during the prior review. *Id.*, at 46. During this reporting period, the monthly *Coleman* census averaged 22 patients, while it averaged 25 patients during the previous reporting period. *Id.*, at 47.

26

DSH-Patton operated a 30-bed facility that treated female *Coleman* PC 2684 patients within the 50–bed Unit 33.  On December 31, 2022, DSH-Patton housed one acute and three intermediate care *Coleman* patients, which was 60 percent less than the hospital's *Coleman* census of ten patients for the prior review period.  *Id.*, at 47.  The hospital's average monthly *Coleman* census during the review period was 7.5 patients; it was nine patients during the prior review period.  *Id.*, at 136.

**B.    STAFFING**

DSH-Atascadero reported significant staffing vacancies, while the staffing situation was very good at both DSH-Coalinga and DSH-Patton.  All three hospitals reported filling all of their executive/management/leadership positions.  Regrettably, DSH-Atascadero reported appreciable Program V vacancies/functional vacancies exceeding ten percent for the four disciplines of psychiatry, psychology, social work, and rehabilitation therapy.  On the other hand, DSH-Coalinga's Unit 21 and DSH-Patton's Unit 33 filled all the positions for these four disciplines.  All three institutions satisfied the 1:30 staff-to-patient staffing ratio.

Specifically, DSH-Atascadero reported that all of Program V's four executive positions of executive director, clinical administrator, hospital administrator, and medical director were filled.  The three management positions of program director, program assistant, and nurse coordinator were also filled.

As for psychiatry, the hospital reported that the senior supervising psychiatrist position has been vacant since 2011.  Only two of nine of DSH-Atascadero's psychiatry positions were filled, for a 77 percent vacancy rate.  This psychiatry vacancy rate was higher than the 67 percent psychiatry vacancy rate reported for the prior review period.  ECF No. 7625 at 89.  Further, contractors filled five positions, reducing the functional vacancy rate to 22 percent, which was

higher than the 11 percent psychiatry functional vacancy rate reported for the prior review period. *Id.*

The supervising psychologist was primarily assigned to another program at DSH-Atascadero, resulting in this position's vacancy. The supervising psychologist nonetheless provided coverage for Program V. Six of nine psychology positions were filled, for a 33 percent vacancy rate, which was higher than the 22 percent psychology vacancy rate of the previous review period. *Id.*

DSH-Atascadero reported that six of nine social worker positions were filled, for a 33 percent vacancy rate. One social worker was on an extended leave, increasing the functional vacancy rate to 44 percent. These social worker vacancies were appreciably higher than the 11 percent social worker vacancy rate that the prior report identified. *Id.*

Eight of nine of the hospital's rehabilitation therapy positions were filled, for an 11 percent vacancy rate. One rehabilitation therapist was on an extended leave, increasing the functional vacancy rate to 22 percent, which was comparable to DSH-Atascadero's 22 percent rehabilitation therapist (RT) vacancy rate of the prior review period. *Id.,* at 90.

The hospital reported a 26 percent vacancy rate for registered nurses, with 26 of 35 registered nurse (RN) positions being filled. One registered nurse was on an extended leave, increasing the functional vacancy rate to 29 percent, which was comparable to the prior review period's 31 percent vacancy rate. *Id.* There were respective functional vacancy rates of 33 and 21 percent for senior psych techs and psych techs.

DSH-Atascadero had a 1:30 clinician-to-patient ratio for the four disciplines of psychiatry, psychology, social work, and rehabilitation therapy. At the time of review, the hospital satisfied this ratio for all four disciplines.

Like during the prior reporting period, DSH-Coalinga filled all leadership positions, including those for the executive director, clinical and hospital administrators, and program director. *Id.,* at 116. The medical director position's was filled by staff acting out of class.

As for psychiatry, positions for the senior supervising psychiatrist, and both psychiatrists, were filled; during the prior review period, the senior supervising psychiatrist position was also filled, but telepsychiatry provided some of the services of the two psychiatrists. *Id.* Further, like during the prior review period, both positions for psychologists, social workers, and rehabilitation therapists were also filled. *Id.*

As for nursing, similar to the prior review period, all nursing positions were filled. *Id.,* at 117. Specifically, the nursing coordinator's position was filled, as were all seven positions for registered nurses, and the nurse practitioner's position. The three senior psych tech and all 30 psych tech positions were also filled. During the prior review period, there was a nine percent psych tech vacancy rate. *Id.*

DSH-Coalinga satisfied the 1:30 staffing ratio for psychiatry, psychology, social work, and rehabilitation therapy. Because Unit 21's census was less than 30 patients during the review period, one full clinical team was utilized in other areas of the hospital.

Like during the prior review period, DSH-Patton reported that all of its administrative positions were filled. *Id.,* at 136. Specifically, positions for the executive director, chief psychiatrist, medical director, clinical, hospital, and nurse administrators, program director, and both program assistants and nursing coordinators, were filled; however, an "acting" staff member covered the medical director's position.

DSH-Patton's senior psychiatrist position was filled, as it was during the prior review period, but contractors covered both psychiatry positions. During the last review period, one of the hospital's psychiatry positions was filled by a civil servant. *Id.*

Positions for the supervising psychologist, both psychologists, the supervising social worker, both social workers, the supervising rehabilitation therapist, and both rehabilitation therapists, were filled. These positions were also filled during the prior review period. *Id.,* at 136 – 137.

The unit supervisor position was filled. As for nursing, seven of nine registered nurses' positions were filled, for a 22 percent vacancy rate, with a contractor covering one position and reducing the functional vacancy rate to 11 percent. The hospital reported a 33 percent RN vacancy rate during the prior review period. *Id.,* at 137. The nurse practitioner position was filled. Positions for two of three senior psych techs were filled, reflecting a 33 percent vacancy rate; during the prior reporting period, there were no senior psych tech vacancies. *Id.* Further, 22 of 33 psych tech positions were filled, reflecting a 33 percent vacancy rate, with contractors covering three psych tech positions, decreasing the functional vacancy rate to 24 percent. This was an improvement from the prior review period, which reported a 38 percent psych tech vacancy rate. *Id.*

DSH-Patton reported that the hospital satisfied the 1:30 staff-to-patient ratio for psychiatrists, psychologists, social workers, and rehabilitation therapists.

<u>Telepsychiatry</u>

DSH-Atascadero's Program V and DSH-Patton's Unit 33 did not use telepsychiatry during the review period.

During July 2022, a psychiatrist was made available to DSH-Coalinga through the use of

30

telepsychiatry services. These services included clinical contacts, evaluations, discharges, and medication management, and reflected 45 patient assessments.

C.    **TREATMENT AND CLINCIAL SERVICES**

    1.    **Interdisciplinary Treatment Teams (IDTTs)**

The quality of IDTT meetings at the three hospitals was assessed based on documentation and individual case reviews for patients treated there during the reporting period. Overall, IDTTs were timely completed and generally included goals that were appropriate to patients' needs, and appropriate interventions. Nonetheless, there were significant concerns with treatment planning at all three hospitals, which included treatment plans not being updated despite clinical indications to do so. There was also a lack of required staff's attendance at IDTTs at two of the hospitals.

The quality of DSH-Atascadero's IDTT meetings was assessed based on 25 patients who were treated there during the reporting period. IDTTs were timely completed and generally included goals appropriate to patients' needs, and appropriate interventions. Regrettably, treatment plans were not updated despite clinical indications to do so in 28 percent of reviewed cases, including instances when they should have been updated to address patients' lack of treatment participation, substance use needs, or behavioral issues. Other issues with the hospital's IDTTs included required staff's lack of attendance, including nonattendance by primary clinicians, nursing, and other necessary staff members.

The quality of IDTT meetings at DSH-Coalinga was assessed based on 25 patients who received treatment at the hospital during the review period. All but two of the hospital's IDTTs were timely completed. With one exception, treatment plans included goals appropriate to patients' needs, and interventions to achieve them. Unfortunately, 36 percent of reviewed DSH-Coalinga cases indicated a lack of attendance by required staff. Psychiatrists and psychologists

were the treatment team members who were most often absent from IDTT meetings.  Treatment plans were also not updated despite clinical indications to do so in 12 percent of reviewed cases, including instances where they should have been updated to address patients' lack of progress and/or engagement in treatment secondary to ongoing symptoms.

The quality of DSH-Patton IDTTs was assessed based on individual case reviews for 13 patients treated there during the reporting period.  Overall, IDTTs occurred timely and were adequate, with required participants consistently in attendance.  Treatment planning documentation largely included goals that targeted patients' needs and adequate interventions to assist them attain these goals.  Nevertheless, concerns with IDTTs and treatment planning were noted in 23 percent of reviewed records.  They included a lack of rationale for the reliance on group therapy, the lack of individual therapy to address patients' needs, two inadequate treatment plans containing goals and interventions that were not updated when clinically indicated, and the failure to address diagnostic uncertainties and develop an effective treatment plan to address the patient's needs, which included elevated suicide risk.

## 2.  Group Therapy

At DSH-Atascadero and DSH-Patton, the number of offered hours of group treatment was inadequate for an inpatient care program.  However, the amount of group treatment at DSH-Coalinga was sufficient.

DSH-Atascadero patients were offered a weekly average of 7.5 hours of core groups and attended an average of 5.5 weekly hours.  They were also offered a weekly average of 5.9 hours of supplemental groups and attended a weekly average of 5.7 hours.  DSH-Atascadero did not provide data on patient refusals but cancelled four percent of groups.

At DSH-Coalinga, core groups offered to patients exceeded ten weekly hours during five months of the review period; during December 2022, only 8.22 weekly hours of core groups

were offered.  Further, during the review period DSH-Coalinga offered patients an average of between 28.28 and 46.31 weekly hours of supplemental activities.  Overall, patients attended a total of between 14.39 and 18.05 weekly hours of group treatment during the review period.  The hospital further reported that supplemental group hours reflected the practice of offering all patients every available supplemental activity.

DSH-Patton provided 19 core groups and seven supplemental group activities to patients. The hospital further reported offering patients an average of 9.69 weekly hours of core groups, with patients attending a weekly average of 7.76 core group hours.  DSH-Patton patients were also offered a weekly average of 1.79 hours of supplemental group hours, and attended 1.7 weekly hours.

### 3.    Individual Treatment

Like prior reports also indicated, DSH-Atascadero and DSH-Coalinga did not routinely utilize individual treatment with *Coleman* patients, while DSH-Patton regularly used individual treatment.  This lack of individual therapy resulted in some patients not receiving adequate treatment.

DSH-Atascadero provided individual therapy to 44 *Coleman* patients, with patients being offered and attending 0.9 weekly hours of individual treatment.  DSH-Coalinga provided individual treatment to 12 *Coleman* patients, who were offered and attended an average of 0.5 weekly hours of such treatment.  Overall, DSH-Patton offered patients an average of 3.83 weekly hours of individual treatment, with patients attending a weekly average of 2.97 hours of individual treatment.

### 4.    Psychiatric Services

Overall, case reviews from all three hospitals generally indicated adequate initial psychiatric assessments, which were also typically, but not always, timely completed.  There

33

were many instances of psychiatrists routinely seeing patients as clinically indicated, and of psychiatry documentation including clear indications and treatment interventions that targeted patients' symptoms. Case reviews nonetheless also revealed numerous concerns with psychiatric treatment. These concerns included a lack of continuity of care, as there were many instances of psychiatrists often changing over the course of patients' hospital stays, as well as poorly justified medication changes. There were also concerns with suicide prevention, including the completion of suicide risk assessments and safety planning interventions.

At DSH-Atascadero, on-site psychiatrists performed all psychiatric care. All 25 reviewed cases from the hospital included adequate initial psychiatric assessments that were timely completed. Psychiatrists also routinely saw patients as clinically indicated. There were, however, concerns with the medication changes of two patients, which documentation did not adequately justify. Nevertheless, overall psychiatry documentation included clear indications that treatment interventions targeted the symptoms that patients' experienced and patients' responses to treatment were consistently documented.

DSH-Coalinga on-site psychiatrists performed most psychiatric care. Of the 25 reviewed cases, only two lacked initial psychiatric assessments. However, continuity of care was concerning in a number of reviewed cases. Psychiatrists frequently changed over the course of patients' hospital stays, while documentation did not always adequately justify medication changes. There was poor continuity of care in six or 24 percent of DSH-Coalinga cases, while the lack of justification for medication changes was noted in five or 20 percent of cases. For some patients, these issues appeared to be related as different psychiatrists engaged in different medication practices resulting in a lack of continuity of care. Individual cases demonstrated a variety of other concerns with DSH-Coalinga psychiatric care, including identical psychiatric

34

progress notes being entered into the patient's record on different dates, and psychiatric interventions failing to address the patients' identified needs.

DSH-Patton on-site psychiatrists also performed all psychiatric care. Initial psychiatric assessments were largely adequate and conducted timely. Still, concerns with DSH-Patton psychiatric care included poor justification for medication changes, handwritten documentation, which was difficult to decipher, and concerns with suicide prevention efforts, including the failure to complete a suicide risk assessment and utilize safety prevention efforts.

### 5. **Medication Management**

The monitor's expert reviewed ten charts each from DSH-Atascadero, DSH-Coalinga, and DSH-Patton to assess the quality of medication management provided to patients receiving treatment. Of these 30 total charts, 22 were adequate and eight were inadequate. Both DSH-Atascadero and DSH-Coalinga had seven adequate and three inadequate cases. DSH-Patton had eight adequate and two inadequate cases. Several of the charts deemed adequate nonetheless had deficiencies, but these shortcomings did not rise to the level of rendering the medication management insufficient.

As was seen during the prior review period, the three hospitals demonstrated many strengths in their patients' medication management. Overall, psychiatrists were proficient at managing complex conditions, which frequently required the use of several medications. In large part, the symptoms and diagnoses listed supported the medications used. Psychiatrists also appropriately used evidence-based treatments that too often were underutilized, including long-acting injectable antipsychotics, lithium, and clozapine.

Despite these positive aspects, the monitor's expert discovered multiple deficiencies in the charts reviewed. Among them, documentation of the rationale for some medication changes was inadequate, there were often changes in the psychiatrist in charge of the patient, resulting in

35

frequent changes to diagnoses and medication approaches, while several initial psychiatric evaluations reported that the patient was admitted under PC 1370 (Incompetent to Stand Trial), rather than PC 2684; regrettably, this was important, as the laws governing the treatment of patients under these statutes varied. Reviewed charts also indicated unclear rationales for some patient discharges. Further, several charts revealed documentation issues, which were potential impediments to patient care, and all seemed to be related to DSH's use of paper charts.

DSH-Atascadero demonstrated many strengths with medication management. Listed symptoms frequently supported stated diagnoses, and the medications used aligned with stated diagnoses. The hospital's psychiatrists were adept at managing complicated psychiatric conditions that frequently required the use of several medications. The hospital's psychiatrists also often used evidence-based treatments that were underutilized in the community, including long-acting injectable antipsychotics, lithium, and clozapine.

Additionally, several DSH-Atascadero patients had complex medical and psychiatric needs. With rare exception, the hospital handled these cases in a clinically appropriate manner indicating collaboration among the respective disciplines. One such case exhibited strong collaboration with medical and nursing staff, permitting the patient to be resumed on the critically important medication clozapine. In another case, a patient required intravenous fluids and placement of a tube from his stomach to his skin to receive nutrition. Given the severity of the patient's impairments, the facility worked with CDCR to transfer the patient to an outside hospital to receive medical care and electroconvulsive therapy.

Despite these positive aspects of medication management, the monitor's expert nonetheless found shortcomings in DSH-Atascadero's reviewed charts. In several cases, documentation of the rationale for medication changes was inadequate and risked the patient

requiring uses of force to administer injectable medications.  In another case, the psychiatrist inadequately justified the addition of a powerful antipsychotic medication chlorpromazine "due to difficulty sleeping."  In yet another case, the monitor's expert was concerned about the dosage of gabapentin, a medicine used to treat seizures.

The monitor's expert was also concerned about some cases involving the discharge of patients to CDCR.  In one case, the DSH-Atascadero treatment team discharged a patient with profound psychosis and five prior suicide attempts after only a brief stay.  The reason for discharge appeared to be the possible diversion of the medication buprenorphine/naloxone, used to treat Opioid Use Disorder.  The monitor's expert was concerned by this decision, given how extensively impaired the patient was prior to arrival at the hospital.  The chart did not adequately reflect additional interventions that DSH-Atascadero undertook prior to discharging the patient.

Further, the degree of coordination seen internally within DSH-Atascadero did not consistently extend to outside agencies.  The lack of documented coordination with other agencies, including CDCR and outside hospitals, was concerning.  In one case, due to medical issues, a complex patient was sent to an outside hospital.  The DSH-Atascadero psychiatrists had worked admirably to find a medication to reduce the patient's severe aggression.  The neurology consultant stopped the medication and replaced it with a medication more traditionally used for seizures.  The monitor's expert opined that closer coordination of services may have avoided such changes.

DSH-Coalinga also exhibited many strengths with their patients' medication management.  Psychiatrists were competent at managing complex conditions, which frequently required using several medications.  In most cases, the symptoms and diagnoses listed supported the medications used.  The hospital's psychiatrists also frequently used evidence-based

treatments that were underutilized in the community, including lithium and clozapine. In one particular case, the psychiatrist used advanced and complex psychopharmacologic interventions to try to alleviate the patient's severe symptoms.

Unfortunately, reviewed DSH-Coalinga charts also demonstrated multiple deficiencies in patient care. Two such cases revealed frequent changes to diagnoses and medication approaches. The largest contributing factor to these changes appeared to be the number of psychiatrists who cared for patients. In another case, the patient saw a telepsychiatrist for a discharge meeting, but reported not having many of the records necessary to complete the discharge summary.

DSH-Patton also demonstrated numerous strengths with medication management. Psychiatrists were adept at managing sophisticated psychiatric conditions that often required the use of several medications. In most reviewed cases, the listed symptoms and diagnoses supported the medications used. DSH-Patton psychiatrists also frequently used evidence-based treatments that the community underutilized. In one reviewed case, the psychiatrist arranged for a treatment-refractory patient to undergo electroconvulsive therapy (ECT) at Metro State Hospital. This was admirable, given the complexities required to perform ECT in the incarcerated population.

Unfortunately, the monitor's expert also discovered multiple deficiencies in DSH-Patton's reviewed charts. Common difficulties included several patients with an admission psychiatric evaluation noting that they were receiving treatment under the PC 1370 statute rather than PC 2684. In another case, the psychiatrist wrote that the patient's PC 2602 involuntary medication order from CDCR did not transfer to the DSH setting, which was incorrect.

Further, two reviewed cases revealed the psychiatrist being unnecessarily assertive in increasing the dose of an antipsychotic, without documenting a rationale. In one case, the

38

psychiatrist quadrupled the dose of antipsychotic medication, without intervening dosage titration. This risked unnecessary, and possibly serious, side effects, without justification that the possible benefits of this change outweighed these risks.

### a.    Clozapine

As was seen during the prior review period, all DSH facilities demonstrated clear and clinically appropriate use of the antipsychotic clozapine, a medication that was often effective when other medications had failed. Given the possible life-threatening side effects of clozapine, all hospitals had clinically appropriate policies and procedures in place surrounding its safe use.

The three hospitals had a total of 34 patients who were prescribed clozapine during the review period. Of these, there were five initiations of the medication, and 29 medication continuations. The monitor's expert's review of nine cases of patients taking clozapine indicated strong clinical rationales for the clozapine's use, with the required laboratory monitoring being performed in all cases. However, in one DSH-Patton case, the chart required stronger documentation of the risk of clozapine worsening seizures for a patient with a pre-existing seizure disorder.

All three hospitals also had policies that facilitated clozapine's use. DSH-Atascadero had a "clozapine clinic" that assisted with the monitoring of patients who were prescribed clozapine. Further, DSH-Coalinga had detailed and clinically appropriate policies and procedures concerning clozapine's use, while DSH-Patton referenced comprehensive and up to date DSH protocol on the use of clozapine.

### b.    PC 2602 Involuntary Medications

The three hospitals consistently demonstrated clear policies and procedures about the PC 2602 involuntary medication process. All were knowledgeable about the logistics of this procedure and had designated staff who served as medication court administrators. None of the

three hospitals reported having to use force to administer involuntary medications during the reporting period.

DSH-Atascadero reported that 32 *Coleman* patients received PC 2602 involuntary medications during the reporting period.  Fourteen renewal petitions were granted, and one renewal petition was denied.  There were no involuntary medication order initiations.

DSH-Coalinga reported that nine patients received PC 2602 involuntary medications. The hospital submitted five PC 2602 petitions during the reporting period; one was a renewal petition, which was granted.  The remaining four petitions were initial petitions; one was denied on clinical grounds.  DSH-Coalinga's medication court administrator uploaded information related to PC 2602 petitions to a secure CDCR platform, and the documents were emailed to CDCR's Office of Legal Affairs.

DSH-Patton reported that one patient had a PC 2602 involuntary medication order during several days of the review period; the hospital discharged this patient on July 7, 2022. Otherwise, during the review period, no PC 2602 involuntary medication orders were initiated, renewed, or pending.  The hospital had a detailed policy to track and report PC 2602 cases.

In one DSH-Patton case, the psychiatrist incorrectly wrote that the patient's PC 2602 order obtained in CDCR did not transfer to DSH, which was erroneous, and he did not continue involuntary medications.  The longer-term treating psychiatrist caught this error and wrote appropriate orders.

### c.  Prescriptions and Verbal Orders

All three hospitals had clear policies about prescriptions, which permitted psychiatrists to write them for a maximum of 45 days.  None of the three hospitals used bridge orders.

DSH-Atascadero and DSH-Coalinga had clear policies for verbal and telephone orders. These orders were allowed but limited to urgent situations.  Further, the psychiatrist had to sign

40

the telephone or verbal order within 24 hours at DSH-Coalinga and within 48 hours at DSH-Atascadero.  DSH-Patton did not submit a policy for verbal and telephone orders for review.

At DSH-Coalinga, although applicable policy stated that doctors were to be notified when prescription orders were to expire, the process by which this occurred was not explained.

DSH-Patton reported that 14 days prior to a medication's expiration, the pharmacy printed a list of expiring patient medications.  The hospital did not report its policy on verbal and telephone orders, but submitted a clear policy that addressed the daily review of orders in the chart, which had been updated in February 2023.

### d.    Non-Formulary Medications

All hospitals had clear and clinically appropriate policies and procedures for the approval of non-formulary medications.  The process required input from the pharmacy, and approval by a physician reviewer.  All facilities had clear exemptions to the approval process.  Importantly, this allowed patients taking non-formulary medications at the time of DSH admission to continue on their medication for up to 30 days, prior to approval through the non-formulary process. However, there were charts that demonstrated a misunderstanding of the policy.  Regrettably, a reviewed DSH-Coalinga case revealed discontinuation of medication pending approval through the non-formulary process.  The patient subsequently reported worsening symptoms of depression.

DSH-Atascadero's non-formulary approval process procedure did not specify a timeframe for a decision on the request.  The hospital also had an appeals process if the initial request was denied.

DSH-Coalinga's non-formulary medication policy gave the hospital 96 hours to approve or disapprove the medication.  The hospital identified several situations that allowed the patient to receive a non-formulary medication without prior approval, which included when there was an

41

urgent clinical need, or when the patient was admitted on a non-formulary medication.  The psychiatrist then had 30 days to submit the formal non-formulary request for review.

DSH-Patton's clear non-formulary process required a decision from the pharmacy and a physician reviewer within three days.  There were appropriate exemptions to this approval process based on pressing clinical need, or in instances where the patient was already prescribed this medication prior to arrival at DSH-Patton.

### e.    **Polypharmacy Reviews**

All three hospitals had clear guidelines for reviewing patients who were prescribed multiple psychiatric medications.  Although there were slight differences between the facilities, these reviews generally occurred when patients were prescribed two or three medications from the same class, or six or more total psychiatric medications for longer than 90 days.

At DSH-Atascadero, polypharmacy review triggers included the patient being prescribed two or more antipsychotics, three agents in the same medication class, or six or more psychotropic medications.

DSH-Coalinga conducted polypharmacy reviews when two or more psychiatric medications from the same class, or six or more total psychiatric medications, were prescribed for more than 90 days.

At DSH-Patton, the two triggers for a polypharmacy review were six or more prescriptions, or multiple prescriptions from the same medication class.  The monitor's expert noted a concerted effort by DSH-Patton psychiatrists to minimize multiple medications, including ones associated with significant medical risks.

### f.    **HS Medications**

None of the three hospitals reported challenges with the administration of prescriptions written at *Hora Somni*/Hour of Sleep (HS).

DSH-Atascadero indicated writing HS medications for 77 patients, and for four patients "ordered HS medication after 2000." The hospital further reported that it lacked aggregate data as to whether or not these medications were properly administered at HS.

DSH-Coalinga prescribed a total of 15 medications at HS. Significantly, the hospital's nursing policy permitted the administration of HS medications one hour before or one hour after the ordered time.

At DSH-Patton, between zero and three patients were prescribed HS medications during the reporting period; each patient only received one HS medication.

### 6. Other Treatment Issues

#### a. Behavioral Management

Only one hospital patient had a behavioral plan during the review period.

Although DSH-Atascadero had an updated behavioral plan policy, none of the hospital's *Coleman* patients had behavioral plans. DSH-Coalinga similarly reported that no patients had behavioral plans. Further, one DSH-Patton patient had a behavioral plan in effect during the review period. The plan was implemented prior to the review period in April 2022 and targeted self-harm.

#### b. Pre-release Planning

Both DSH-Atascadero and DSH-Coalinga provided pre-release planning services during the review period. DSH-Patton did not provide these services.

DSH-Atascadero social workers provided nine *Coleman* patients with pre-release planning, which included individual patient contacts and pre-release planning groups. To facilitate pre-release planning, the social worker and the patient's treatment team also participated in Coordinated Clinical Assessment Team (CCAT) meetings. The CCAT reviewed information about the patient's current functioning and discharge needs, including housing and

43

transportation, and established a discharge plan for the patient.  Transitional Case Management Program (TCMP) services for DSH-Atascadero patients were provided through the California Men's Colony (CMC) and included applications for SSI/SSDI, Medi-Cal/Medicare, and veterans' benefits.  Review period data indicated approval for two of six patients who applied for Medi-Cal, while another discharging patient had his Medi-Cal reinstated; two other patients refused to apply for Medi-Cal.  As for SSI, there were three patient applications and four reinstatements; two patients refused to apply.

Three DSH-Coalinga patients received pre-release planning services.  TCMP services provided to these patients included social security and Medi-Cal application assistance.

DSH-Patton did not provide pre-release planning services during the review period.

### c.    Access to Meaningful Jobs and Educational Opportunities

Patients at two of the three hospitals had meaningful employment positions, but none of the facilities provided patients with meaningful educational opportunities of five or more weekly hours.

DSH-Atascadero reported that on average ten patients held employment assignments, with such employment ranging from six to 16 patients.  Although seven *Coleman* patients participated in academic education, none had meaningful education opportunities of five or more weekly hours.

DSH-Coalinga reported that on average nine of 22 or 41 percent of *Coleman* patients held meaningful employment positions on a monthly basis, with actual employment ranging from five to 13 patients.  None of the hospital's patients attended more than five weekly hours of education.

During the review period, DSH-Patton reported that no *Coleman* patients held a meaningful employment position of more than five weekly hours and no *Coleman* patients were enrolled in educational programs.

**D.    QUALITY OF CARE ISSUES IN THE HOSPITAL PROGRAMS**

**1.    Overall Quality of Care**

Sixty-three patient healthcare records were reviewed in detail to determine the quality of care provided during the reporting period across the DSH facilities providing care to individuals in CDCR's custody.  In addition to analyses of IDTT processes, treatment planning, delivery of treatment, diagnostic issues, documentation, suicide prevention, and discharge planning, an overall assessment of the adequacy of treatment was provided for each case.  Of the 63 individual cases reviewed, 41 cases (65 percent) received adequate care.  The remaining patients, 22 cases, or 35 percent, were assessed to have received care of inadequate quality.



| | DSH – Atascadero | DSH - Coalinga | DSH – Patton | ALL |
|---|---|---|---|---|
| **Adequate** | 68% | 64% | 62% | 65% |
| **Inadequate** | 32% | 36% | 38% | 35% |

### 2.    **IDTT Processes**

The IDTT process required a number of elements for an effective, collaborative process which supported adequate patient care, including timely meetings, having the necessary members of the patient's treatment team present during treatment discussions (including the patient), providing an updated summary and formulation of the patient's clinical presentation, reviewing treatment progress since prior IDTT meetings, and addressing any significant changes in the patient's presentation since the previous IDTT.

Across all DSH facilities, IDTTs were generally conducted in a timely manner.  There were two cases, both at DSH-Coalinga, in which IDTT meetings were late or not held as required (Patient D and Patient Q).

There was noncompliance for required staff's attendance at IDTTs; necessary staff members were present during 51 of 63 or 81 percent of IDTT meetings across all sites. Moreover, at DSH-Coalinga nine of the 25 cases reviewed (36 percent) did not consistently include required members.  It was noted that psychiatrists and psychologists were the members most often absent from the IDTT meetings at DSH-Coalinga, but a few cases included no social worker.  Also, there were three cases at DSH-Atascadero (12 percent of the 25 cases reviewed) in which the required members were not consistently present for IDTT meetings (Patient B, Patient H, and Patient S).  Patients were consistently present for their IDTT meetings, unless they refused to attend, across facilities.

Clinical case summaries and case formulations developed during the IDTT process were determined to be adequate, with two cases, one at DSH-Atascadero and one at DSH-Patton, in which poor case formulations were noted.

###  3.    Treatment Planning Concerns

Treatment plans consistently identified patient needs.  Goals and interventions were documented to address patients' needs based on the completion of initial assessments by psychiatry, psychology, and social work staff.  There were five cases (eight percent of the 63 cases reviewed) in which initial psychological or psychiatric assessments were either not completed in a timely manner or were determined to be of inadequate quality.  These included DSH-Coalinga Patient E (neither the initial psychological nor psychiatric assessment were completed prior to the initial IDTT), DSH-Coalinga Patient L (the initial psychiatric assessment was inadequate in that it failed to address the reason for the patient's referral to the inpatient setting and evidenced an inadequate record review), DSH-Coalinga Patient P (no initial psychological assessment was completed), and DSH-Patton Patient C and Patient E (the initial psychiatric assessment included erroneous information for both patients).

One significant concern noted in 11 cases and across all three facilities was the failure to adequately update a patient's treatment plan to address clinically relevant changes in the patient's presentation.  This issue was identified in seven cases at DSH-Atascadero (Patient A, Patient B, Patient M, Patient P, Patient W, Patient X, and Patient Y), three cases at DSH-Coalinga (Patient B, Patient L, and Patient O), and one case at DSH-Patton (Patient B).  For the majority of these cases, treatment plans were not updated to address the lack of patient progress toward meeting initially identified goals and/or failed to develop goals to address behavioral problems exhibited by patients.

### 4.    Delivery of Treatment Interventions and Treatment Hours

Quality care required the provision of adequate and coordinated treatment interventions in keeping with the goals of the patient's treatment plan. In 97 percent of reviewed cases, 61 of 63 cases, the services provided to patients was in keeping with the interventions outlined in the patients' treatment plans. There were two cases at DSH-Coalinga (Patient B and Patient E) in which there was little evidence in the record of the provision of treatment interventions outlined in the patients' treatment plans. Of note, the majority of interventions provided to patients across facilities were group therapy and psychotropic medications. Individual treatment interventions were rarely listed as a planned intervention and rarely provided to patients.

There were seven cases (11 percent of the 63 cases reviewed) in which the content of treatment contacts and/or the timing of treatment contacts were not in keeping with the patients' identified needs. This included two cases at DSH-Atascadero (Patient B and Patient Y), three at DSH-Coalinga (Patient B, Patient D, and Patient V) and two at DSH-Patton (Patient B and Patient D).

As examples, DSH-Atascadero Patient Y was admitted to the inpatient facility following a serious suicide attempt with treatment targets of developing a safety plan and addressing the patient's suicidal ideation. The patient was not seen for individual therapy sessions to address the need for safety planning and suicidal ideation at any point during his stay at DSH-Atascadero. For DSH-Coalinga Patient D, there was no documentation of any clinical interventions being provided to the patient between December 15, 2022, and his discharge to CDCR on March 8, 2023. For DSH-Patton Patient D, documentation revealed that despite a complex presentation by the patient including elevated suicide risk, psychosis, and unregulated behavior, the patient was not adequately treated and was subsequently discharged to the

Enhanced Outpatient Program (EOP) level of care with a number of identified concerns deferred to be managed by the outpatient team following discharge.

Further, there were five cases (DSH-Atascadero Patient K and Patient L, and DSH-Coalinga Patient D, Patient E, and Patient Q) in which clinical documentation did not provide adequate information regarding interventions being provided to assist the patient in obtaining identified goals. Specifically, the DSH-Atascadero's patients' records included psychology notes that were scant in regard to clinical information and did not address how the contacts addressed the patients' treatment needs. DSH-Coalinga patients' records included limited clinical documentation overall during the course of their inpatient stays.

The monitor's expert identified concerns with inadequate rationale for medication changes in nine of the 63 cases reviewed (14 percent) including two cases at DSH-Atascadero (Patient N and Patient T), five cases at DSH-Coalinga (Patient N, Patient T, Patient U, Patient W, and Patient Z) and two cases at DSH-Patton (Patient C and Patient E).

Across all DSH facilities, the number of treatment hours provided to patients was not consistently documented. In many cases, patient participation in group and individual therapy was documented monthly and was reported in terms of percentages of attendance, with the raw number of hours offered often omitted from documentation. There were a few cases at all three facilities in which specifics regarding the number of hours offered and attended by the patients were clearly documented but not enough to provide an assessment of the adequacy of those hours across the 63 cases reviewed.

### 5.   Diagnostic Concerns

In 15 of the 63 cases reviewed, or 24 percent, diagnostic concerns were identified including poor diagnostic rationale and/or the need for diagnostic clarification. Concerns also included inconsistency among treatment team members as to the patient's provided diagnosis.

49

Diagnostic concerns were identified in the records of six DSH-Atascadero patients (Patient L, Patient R, Patient T, Patient U, Patient W, and Patient X), six DSH-Coalinga patients (Patient B, Patient M, Patient N, Patient O, Patient U, and Patient Z), and three DSH-Patton patients (Patient A, Patient B, and Patient D).

As examples, DSH-Atascadero Patient T was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, opioid use disorder, obsessive compulsive disorder, and body dysmorphic disorder at the time of admission. Upon discharge, the diagnoses no longer included obsessive compulsive disorder or body dysmorphic disorder, without rationale as to why these diagnoses were removed. DSH-Coalinga Patient B was provided the diagnoses of major depressive disorder, recurrent episode with psychotic features, and cocaine use disorder, severe by the psychiatrist and schizoaffective disorder, depressive type; opioid use disorder, severe in sustained remission in a controlled environment; and stimulant use disorder, cocaine, in sustained remission in a controlled environment by the psychologist. There was no documentation in the record acknowledging these discrepancies or attempting to reconcile the different perspectives on the patient's presentation. DSH-Patton Patient A was admitted to the hospital with diagnoses of schizophrenia, post-traumatic stress disorder (PTSD), and bipolar disorder. Over the course of the patient's DSH-Patton stay, provided diagnoses were changed to unspecified schizophrenia spectrum and other psychotic disorder, amphetamine use disorder, and cannabis use disorder. The rationale for these changes was not well documented in the healthcare record.

### 6. Clinical Documentation Issues

Eight cases, or 13 percent of the 63 cases reviewed, included inconsistencies within clinical documentation either between treatment providers or internally within the documentation of a single provider. These included four cases at DSH-Atascadero (Patient A, Patient L, Patient

N, and Patient Y) and four cases at DSH-Coalinga (Patient B, Patient L, Patient M, and Patient U). As examples, the record for DSH-Atascadero Patient A included a social worker note describing the patient as medication adherent despite psychiatry documenting that the patient had refused all psychotropic medications. Further, the record for DSH-Coalinga Patient B included statements about the patient's participation in groups yet also noted that the patient had not participated in any treatment groups during the same period.

Five cases, namely, of four DSH-Coalinga patients (Patient D, Patient E, Patient P, and Patient Q) and DSH-Patton Patient E, evidenced a lack of adequate clinical documentation in the record. Specifically, DSH-Coalinga Patient P was admitted to the hospital on November 3, 2022, and discharged on January 19, 2023. The only documentation of monthly psychiatric contact was dated November 17, 2022, and signed on December 12, 2022. Clearly, required psychiatric documentation was not entered into the record. Two cases, DSH-Coalinga Patient Q and DSH-Patton Patient E included clear evidence that documentation had been copied and entered into the record unchanged at a later date.

### 7.    Discharge Concerns

Significant concerns regarding discharge planning were identified across all three facilities. These included 14 cases (22 percent of the 63 cases reviewed) in which patients were discharged from inpatient care despite not meeting identified goals and/or demonstrating evidence of continued need for inpatient care. This issue was most significant at DSH-Atascadero where ten cases (40 percent of the 25 cases reviewed) evidenced this concern (Patient A, Patient B, Patient D, Patient L, Patient P, Patient R, Patient T, Patient W, Patient X, and Patient Y). Generally, these patients had not met their identified treatment goals at the time of discharge, were rapidly discharged to an outpatient level of care following a behavioral incident (when ongoing placement in an inpatient setting was clinically indicated), or were noted as no

longer benefiting from inpatient placement without any clear indication of whether this was due to making adequate progress or failing to make adequate treatment progress. In cases of the latter, an updated treatment plan was likely indicated rather than discharging the patient to a lower level of care. There was one case of a premature discharge at DSH-Coalinga (Patient M) as the patient had not achieved identified goals, and three instances at DSH-Patton (Patient C, Patient D, and Patient G) in which patients were discharged prior to meeting their treatment goals or despite ongoing serious symptomatology.

Additionally, discharge summaries were noted to be inadequate in nine cases including five cases at DSH-Atascadero (Patient B, Patient R, Patient W, Patient X, and Patient Y), two at DSH-Coalinga (Patient X and Patient Z), and two at DSH-Patton (Patient C and Patient G). While a number of these cases corresponded to premature discharges, which resulted in inadequate descriptions of patient readiness for discharge as outlined above, there were additional concerns identified regarding poor continuity of care recommendations for four DSH-Atascadero patients (Patient B, Patient W, Patient X, and Patient Y), discharge recommendations inappropriate to an outpatient setting (DSH-Patton Patient C), and unclear discharge dispositions (DSH-Atascadero Patient R, and DSH-Coalinga Patient X and Patient Z).

### 8.    Suicide Risk Assessment and Suicide Prevention

While concerns related to suicide prevention were rare across the records reviewed (three cases at DSH-Patton and one case at DSH-Atascadero), the seriousness of concerns in this area warranted discussion within the report. There were three primary areas of concern: suicide risk assessments not completed as clinically indicated (DSH-Patton Patient D), poor rationale for assessed level of suicide risk (DSH-Atascadero Patient Y), and concerning or unsupported suicide prevention interventions for three DSH-Patton patients (Patient B, Patient D, and Patient E).

For DSH-Atascadero Patient Y, a suicide risk assessment noted that the patient provided "yes" responses to wishing to be dead, active suicidal thoughts, some intent to act, and specific plan to act. The intensity of suicidal ideation was at the highest possible rating, yet the evaluating clinician rated his suicide risk as moderate without supporting rationale. In the case of DSH-Patton Patient B, a suicide prevention intervention from the psychiatrist included an attempt to use a non-suicide contract (unsupported clinical intervention) instead of a suicide risk assessment and safety plan (evidence-based intervention) in response to the patient's expressed urges to self-harm. Fortunately, the patient did not agree to refrain from self-harm on that date, and was appropriately placed on one-to-one direct observation.

For DSH-Patton Patient D, concerns included that on the day of the patient's discharge to an outpatient level of care, the patient reported to the psychiatrist recent thoughts about wrist-cutting; the patient also presented with current command auditory hallucinations to engage in suicidal behavior, delusional and bizarre statements, visual hallucinations, and negative emotions resulting from being ignored by family for wrongdoing. The statements during this final contact did not result in the completion of a suicide risk assessment or safety plan review. With regard to DSH-Patton Patient E, the patient was placed on direct one-to-one observation for danger-to-self concerns upon arrival; however, those observations were completed by audiovisual surveillance rather than direct observation and the observation period's duration was not documented, so when the patient was transferred to a different unit, the patient was no longer under observation. Additionally, the suicide risk assessment completed the following day assessed the patient's suicide risk as low, despite the very recent suicide observation for danger-to-self concerns.

E.    **SUICIDE PREVENTION**

None of the three hospitals reported completed suicides nor self-injurious behaviors resulting in *Coleman* patients' serious injury.  Both DSH-Atascadero and DSH-Coalinga had anti-ligature efforts that identified hospital areas that had increased risks for potential patient hanging.

DSH-Atascadero did not report any completed suicides.  There were also neither suicide attempts nor self-injurious behaviors that resulted in *Coleman* patients' serious injury.

DSH-Atascadero continued implementing its ligature risk identification and heat map project.  As of February 2023, the hospital had replaced 26 percent of all identified ligature risks.

The hospital also conducted monthly suicide prevention committee meetings throughout the review period; required participants attended.  Reviewed meeting minutes reflected a comprehensive suicide prevention program.

DSH-Coalinga reported neither completed suicides nor serious incidents related to suicide attempts or self-injurious behaviors.  The hospital had not made any changes to its suicide prevention policy since the prior review period.  In addition to required training, psychologists trained *Coleman* staff on responding to suicide crises.  DSH-Coalinga also replaced all patient furniture, including patient beds, end tables, chairs, and shelves, with anti-ligature furniture to reduce suicide risk.

DSH-Patton did not report any completed suicides, suicide attempts, or serious incidents related to self-injurious behavior.  The hospital also completed suicide risk assessments for all admissions and conducted monthly audits of suicide assessments and annual psychological assessments.

F.    **PATIENT ACCESS TO TREATMENT**

DSH-Atascadero and DSH-Coalinga continued to use the Hospital Access System (HAS) policy to promote positive patient behavior and treatment participation, and to access programming and privileges.  DSH-Patton did not track the HAS program but reported that it was developing a tracking system for future reporting.

DSH-Atascadero's HAS policy was unchanged from the previous review period and consisted of five distinct levels; the hospital admitted patients at Level 1, and, as the treatment team determined, patients could progress to Level 5.  Tellingly, each higher level allowed patients greater hospital access and more privileges.  During the reporting period, DSH-Atascadero *Coleman* patients spent an average of 40 days at Level 1, 21 days at Level 2, 59 days at Level 3, 187 days at Level 4, and 10.5 days at Level 5.

DSH-Coalinga updated its HAS policy during September 2022.  The hospital did not provide the number of patients or individual patient lengths of time at each level during the reporting period.

DSH-Patton did not track the HAS policy but was in the process of developing a patient tracking system for future reporting.  The hospital indicated that *Coleman* patients had access to inter-compound privileges (ICPs), known as "grounds."  After a seven-day observation period, DSH-Patton granted ICPs to patients, which the treatment team assessed for approval or delay. Patients who were not granted privileges were escorted to various treatments and activities.

G.    **REFERRALS**

There were referrals to all three hospitals during the review period.

Of 92 male *Coleman* patients who were referred to DSH-Atascadero, 53 were accepted, 38 were rescinded, and one was rejected.  Referral packets were timely submitted for 38 of 53 or 72 percent of DSH-Atascadero's accepted referrals.  There were 48 percent less accepted

referrals to DSH-Atascadero during this review period as compared to the prior reporting period, when there were 101 accepted referrals.

Twenty patients were referred to DSH-Coalinga. Referral packets were timely completed for 13 of 20 or 65 percent of referrals. The 20 referrals to DSH-Coalinga included five patients each from the California Substance Abuse Treatment Facility (CSATF) and Mule Creek State Prison (MCSP), three patients each from the CHCF-PIP and VSP, two patients from CHCF, and one patient each from California Institution for Men (CIM) and CMC.

There were eight California Institution for Women (CIW) patients who were referred to DSH-Patton, of which four were accepted, four were rescinded, and none were rejected. Referral packets were timely submitted for the accepted patients. There were 50 percent less accepted referrals to the hospital during this review period in comparison to the previous reporting period, when there eight accepted referrals.

## H.    TRANSFERS, ADMISSIONS, AND DISCHARGES

There were 34 admissions to DSH-Atascadero during the reporting period, which was 66 percent less patients than the 101 patients who were admitted to the hospital during the prior review period. Incomplete data reported that 32 of 34 or 94 percent of admissions to DSH-Atascadero timely transferred within 30 days. The remaining two patients' transfers were late by 17 and 34 days, respectively. Thirty of 34 or 88 percent of the admissions to DSH-Atascadero were within 72 hours of a bed assignment.

During the review period, DSH-Atascadero discharged 72 patients, which were 19 or 21 percent less patients than were discharged during the prior reporting period. The clinical lengths of stay for 55 patients that the hospital provided data for was 292 days; the physical stays for 71 patients for whom DSH-Atascadero provided data was 275 days. There was one patient discharged by the hospital whose clinical and physical stays were almost 11 years. All but two

of the 56 patients with reported clinical and physical stays were physically discharged within 72 hours of a bed assignment. Incomplete data further indicated 60 DSH-Atascadero patient discharges to CDCR, and five to other DSH hospitals.

DSH-Coalinga reported 22 admissions, which were ten patient admissions or 83 percent more than the 12 patient admissions during the prior review period; this included patients who were referred to the hospital prior to the review period but admitted during the reporting period. Eighteen of 22 or 82 percent of these admissions timely transferred within 30 days. Seven of 22 or 38 percent were admitted within 72 hours of a bed assignment.

DSH-Coalinga discharged 12 patients during the review period, which was 13 patients or 52 percent less than were discharged during the prior review period. Reported data for 11 discharged patients indicated clinical lengths of stay averaging 176 days, and physical stays that averaged 169 days for 12 discharged patients. Only five of 11 patients were physically discharged within 72 hours of clinical discharge.

DSH-Patton admitted six patients, which was two patients or 25 percent less than the hospital admitted during the prior reporting period. The hospital's admissions during this review period included two patients who were referred prior to the review period; the hospital did not provide the referral dates for these two patients. Incomplete data indicated that four admissions were from CIW.

One of four intermediate care patients who was referred and admitted to DSH-Patton during the review period timely transferred. Due to incomplete data, it could not be determined whether the other three patients timely transferred.

DSH-Patton discharged 11 patients; during the prior review period the hospital discharged nine patients. Reported data indicated that nine of the 11 patients discharged during

this review period had clinical stays averaging 144 days, while all 11 discharged patients had physical stays that averaged 151 days. Only four of nine reported patients were physically discharged within 72 hours of clinical discharge.

**I.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE**

**Patient Disciplinary Process**

DSH-Atascadero and DSH-Coalinga issued rules violation reports (RVRs) during the review period. Mental health assessments were completed for all of the RVRs. DSH-Patton did not issue any RVRs.

DSH-Atascadero issued six RVRs. Review of all six indicated custody staff timely sending the mental health assessment to mental health, who timely completed and returned the assessment to custody; 67 percent of the assessments were conducted confidentially. Further, five of six or 83 percent of mental health assessments recommended penalty mitigation and one recommended alternative discipline due to mental illness strongly influencing the patient's behavior at the time of the RVR. DSH-Atascadero did not provide the senior hearing officers' findings about the RVRs.

DSH-Coalinga reported one RVR for indecent exposure. Custody did not timely refer the assessment to mental health, but mental health timely completed and returned the assessment. The assessment was conducted confidentially and opined that mental health factors did not contribute to the patient's behavior. Documentation addressing any penalty mitigation recommendation was not provided. At the time of review, the RVR's disposition was still pending.

DSH-Patton did not issue any RVRs to *Coleman* patients.

### Use of Force

Both DSH-Atascadero and DSH-Coalinga patients experienced use of force incidents during the reporting period. DSH-Patton did not report any uses of force involving *Coleman* patients.

DSH-Atascadero reported two use of force incidents. Neither met criteria for review by the incident management review committee. Review of both incidents indicated compliance with applicable policy.

There were two immediate uses of force at DSH-Coalinga. One incident found officers using OC pepper spray and handcuffs to restrain a patient during a pat down and room search; in the other, a patient was handcuffed and physically restrained after attempting to flee. Both incidents reflected the appropriate use of force.

No use of force involving *Coleman* patients were reported by DSH-Patton.

### J.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

Both DSH-Atascadero and DSH-Patton reported unusual occurrences during the reporting period. All three hospitals had serious incident reports (SIRs).

There were seven unusual occurrences at DSH-Atascadero; one was also a sentinel event because it was related to an unexpected death. In that incident, following a fall the patient was admitted to an off-site hospital's intensive care unit, where he was diagnosed with acute renal injury and advanced chronic kidney disease, and died four days later. The other unusual occurrences consisted of falls, physical assaults among patients, and alleged abuse.

DSH-Atascadero also reported 127 SIRs. Of these, 36 or 28 percent were for aggression, 60 or 47 percent were for medical reasons, 14 or 11 percent were for suicide/self-harm, and 17 or 13 percent were classified as other.

DSH-Coalinga did not have any unusual occurrences but reported three SIRs involving two patients; all resulted from patients' medical conditions. One incident necessitated the patient's transfer to a hospital, another required further staff monitoring, and the third required a medical assessment.

DSH-Patton reported six unusual occurrences. Three of four that were investigated were closed without deficiencies; the remaining incident was pending closure. Documentation reflecting five unusual occurrences revealed two involving the same patient. In one instance, the patient was hospitalized after feeling lethargic; in the other, the patient ingested Suboxone obtained from a peer. Two other unusual occurrences stemmed from hospitalizations for dizziness and an altered mental status; another involved a patient who alleged that a male staff member had slammed her multiple times.

DSH-Patton also reported seven SIRs for four individual patients. One patient had three separate instances of adverse medication reactions; a SIR was completed in each instance. Another patient had two separate SIRs after falling due to dizziness. The other two SIRs were related to medical interventions for two distinct patients. In one case, staff observed the patient vomiting; in the other, the patient presented with an "altered mental status."

## K.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

None of the three hospitals used observation cells. DSH-Atascadero and DSH-Coalinga reported seclusion incidents. All three hospitals had restraint episodes.

DSH-Atascadero's use of seclusion dramatically decreased from 16 incidents during the prior reporting period to three during this review. Seclusion incidents averaged 9.23 hours and ranged from 30 minutes to 20 hours.

DSH-Atascadero's restraint incidents also significantly decreased from 26 during the prior review period to seven during this reporting period. They averaged ten hours, ranging from

20 minutes to 28.33 hours.  Five restraint incidents involved full-bed restraints; the other two were non-ambulatory.  The hospital did not indicate the clinical rationales for restraint use.

DSH-Coalinga reported five seclusion episodes.  Four reflected patients' aggression as the precipitating factor.  The remaining incident necessitated seclusion to secure the patient's physical safety.  Seclusion incidents averaged four hours and 29 minutes, with ranges from 17 minutes to 11 hours and 21 minutes.

DSH-Coalinga also reported two restraint incidents.  One involved a patient's attempt to hang himself and aggression toward staff; restraints were used to ensure the patient's safety.  In the other incident, restraints were necessary to calm down an agitated patient who was aggressive toward staff.  The average restraint time was three hours and 46 minutes.

DSH-Patton reported no seclusion incidents but four five-point restraint episodes involving three patients.  They averaged 19.2 hours and ranged from four to 48.33 hours.

## L.     EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

All three hospitals had emergency response processes.  DSH-Atascadero reported one patient death but there were no deaths at the other two hospitals.

As a result of COVID-19 precautions, hospital-wide emergency response drills were on hold during the review period at DSH-Atascadero.  The hospital nonetheless provided medical emergency response evaluation audits for Program V drills, which demonstrated compliance.  Program V did not report any medical emergencies during the reporting period.

During the review period, DSH-Atascadero's Mortality Interdisciplinary Review Committee assessed the circumstances surrounding a *Coleman* patient's death.  The report revealed that the patient was not under the hospital's care at the time of death but assessed provided care up until the patient's transfer to the outside hospital.  Significantly, the report did not identify any gaps in staff performance or facility procedures at DSH-Atascadero that affected

the quality of care, and neither identified performance improvement concerns nor recommended corrective actions.

DSH-Coalinga conducted five emergency response mock drills during the review period. Each drill included a code blue scenario. However, the hospital implemented a modified mock code schedule and process due to COVID-19 precautions during the review period.

DSH-Patton completed emergency response drills during the review period for *Coleman* Unit 33. During the third quarter, DSH-Patton conducted three drills targeting possible heat strokes or metabolic disturbance, while the fourth quarter's three drills focused on opioid overdoses.

## M.    QUALITY MANAGEMENT AND UTILIZATION REVIEW

All three hospitals operated robust quality improvement programs. The Joint Commission accredited DSH-Atascadero but not DSH-Coalinga.

Like during the prior review period, DSH-Atascadero's comprehensive quality improvement and risk management programs were comprised of numerous committees that also conducted multiple audits. The quality council, which met weekly, provided oversight and identified action items and monitored the status of their implementation and completion. Additional quality improvement committees addressed emergency care, medical risk management, risk/utilization management, suicide prevention, and violence prevention.

DSH-Atascadero had regular interactions with the Clinical Operations Advisory Council (COAC), which worked with the hospital on quality assurance improvements, assessment of current clinical treatment, and collaborated to develop objectives for clinical practices. COAC also collaborated with the hospital to conduct various audits.

DSH-Coalinga continued to operate a multi-layered, comprehensive quality improvement program (QIP), with the quality council serving as the hub for quality improvement activities.

62

QIP activities included various individual committees that addressed workplace violence prevention, injury and illness prevention, utilization/risk management, and enhanced observation. The hospital also developed and implemented statewide standards audits for *Coleman* patients that addressed treatment planning, facilitator observation, groups, clozapine use, nursing progress notes, admission assessments, emergency responses, rehabilitation therapy documentation, seclusion and restraints, and other issues. No corrective action plans were developed during the review period.

DSH-Coalinga had regular interactions with COAC on matters including quality assurance improvements, assessments of current clinical treatment, and collaborations to develop clinical practice objectives. COAC and the hospital also collaborated to conduct various audits.

DSH-Patton's quality council oversaw the hospital's robust quality improvement program and attempted to ensure compliance with applicable policies and procedures. Quality improvement measures initiated during the review period included reimplementation of the group hours and individual therapy quality improvement projects, data collection challenges concerning supplemental hours, and the procurement of tablets for patients. The hospital also conducted audits for admission assessments, treatment planning, treatment group observation, use of seclusion and restraints, mask compliance, rehabilitation therapy service, and issues related to psychologists and social workers, among other matters.

## N.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Patients filed 44 complaints at DSH-Atascadero, 35 at DSH-Coalinga, and six at DSH-Patton. Some complaints were withdrawn. Patient satisfaction surveys conducted at all three hospitals typically reported satisfaction with provided treatment.

Twenty-eight DSH-Atascadero patients filed 44 complaints about medical care and treatment concerns, advocacy services, religious practices, access to and/or use of personal

possessions, telephone access, and various daily living issues.  Two complaints were withdrawn.  The hospital's patient satisfaction surveys reported greater than 90 percent positive responses to 13 of 14 queries.

Nine DSH-Coalinga patients filed 35 complaints but three were withdrawn.  More than half of the complaints addressed mental health and medical care and treatment, medication side effects, and involuntary medications; the remaining complaints addressed legal issues, daily living, advocacy services, and physical exercise/recreation/out of doors time.

Five of eight discharged DSH-Coalinga patients completed patient satisfaction surveys.  Four of these patients reported that, overall, their treatment at DSH-Coalinga was extremely helpful; the other patient rated his treatment as not helpful.  Four patients also reported that the treatment team was informative and included them in their treatment, and that they felt better when they were discharged than when they entered the hospital.  All five patients stated that they received sufficient time out of their rooms and reported that friends and family could visit them.

Four DSH-Patton patients made six complaints; two complaints were withdrawn.  Complaints addressed the confidentiality of treatment and records, medical care, personal funds, and legal issues.  Only one of 11 discharged patients completed a patient satisfaction survey.  This patient generally reported that treatment at DSH-Patton was helpful, strongly agreeing that the referral, program, treatment planning, medications, staff, and environment were adequately explained and beneficial.

## O.   *COLEMAN* POSTINGS

At DSH-Atascadero, the executive director's inspection team's compliance reports noted the posting of *Coleman* posters in English and Spanish in all Program V units.  It was further reported that *Coleman* posters in English and Spanish were posted in DSH-Coalinga's Unit 21, and DSH-Patton's Unit 33, which housed *Coleman* patients.

**P.** **LAUNDRY AND SUPPLY ISSUES**

None of the hospitals reported problems with laundry or supply issues.

DSH-Atascadero patients were reportedly provided with clean clothing two times weekly, and their bed linens were also exchanged weekly. Reviewed logs indicated that clothing and other items were laundered off-site and were bundled, counted, and sorted prior to being returned to the hospital.

DSH-Coalinga maintained up to date policies for clothing and linen ordering, shelf rotation and stocking, soiled laundry pick-up, and stock clerk coverage. The hospital maintained but did not provide laundry logs.

DSH-Patton provided up to date policies pertaining to clothing and linen, including those that addressed inspection, sorting, monitoring, storage, transportation, and mending. Unit supervisors were responsible for ensuring that there was an adequate supply of clean clothing and linens.

**Q.** **VISITATION**

All three hospitals had visitation policies in place. At DSH-Atascadero and DSH-Patton, COVID-19 mitigation policies affected patient visitation.

DSH-Atascadero's visitation policy required that COVID-19 mitigation protocols remained in place. Non-quarantine housing units permitted in-person visitation four days weekly and tele-visits on the remaining three days.

DSH-Coalinga allowed in-person visitation five hours daily, for seven days weekly. A pertinent administrative directive described protocols for approved items for visitation, visitor registration and security processing, and group visitation, as well as visitation restrictions, terminations, and revocations, among other matters. Tele-visits were also permitted. There had not been any modifications to the visitation policies since the prior review period.

DSH-Patton only permitted one weekly pre-approved visitation for both vaccinated and unvaccinated patients. However, the local operating procedure (LOP) for non-quarantined housing units allowed daily in-person visitation and tele-visits during weekdays. The hospital changed its COVID-19 mitigation protocols in November 2022 to require all visitors to submit to on-site temperature checks, symptom screening, and contact tracing for individuals who tested positive for COVID-19 within 14 days of their scheduled visit. The hospital no longer required visitors to show proof of vaccination, or a negative COVID-19 test result.

**R.  <u>LAW LIBRARY ACCESS</u>**

Patients at all three hospitals had access to the law library.

DSH-Atascadero lifted COVID-19 restrictions for its law library in September 2022. Patients were permitted law library access on a first-come, first-serve basis, with a maximum of 15 patients using the library at one time. This policy was consistent with the hospital's library policy for the review period prior to COVID-19 restrictions taking effect. Overall, patients' access to legal materials appeared to be adequate. The relevant administrative directive stated that while non-*pro se* patients were allowed two weekly hours of library access, court-approved *pro se* patients could request additional library access.

DSH-Coalinga's law library was open seven days weekly. Although *Coleman* patients were scheduled for one weekly hour of library, *pro* se *Coleman* patients were allowed up to two, nonconsecutive daily hours of library use. Patients could also submit a request to obtain copies of law materials. Further, library kiosks were scheduled for daily use of up to two hours, but no patients requested to use the library kiosks during the review period.

DSH-Patton patients were permitted unescorted access to both the west library and the east/central library when their housing unit was assigned to grounds during hours when the library was in operation. The west library was open three weekdays for 4.5 hours and the

66

east/central library was open on two other weekdays for four hours.  Patient access to legal

materials included both hard copy materials, kiosks for virtual legal research, computers, and

copy machines.

S.    **MILESTONE CREDITS**

All three hospitals provided *Coleman* patients with the opportunity to earn milestone

credits.  The hospitals then provided the milestone credit data to CDCR, which calculated

patients' milestone credits.

<strong><u>CONCLUSION AND RECOMMENDATIONS</u></strong>

While this Report identifies notable shortcomings, including the possible underutilization

of DSH beds designated for *Coleman* patients, staffing shortages at DSH-Atascadero, and

deficiencies with provided care, the DSH hospitals continued to provide better inpatient mental

health care than CDCR's three largest PIPs, the so-called "Lift and Shift PIPs," namely, CMF-

PIP, CHCF-PIP, and SVSP-PIP.  ECF No. 7833 at 22 – 23; *see, also,* ECF No. 7555 at 14; ECF

No. 6565 at 17.

The continuing possible underutilization of *Coleman*-designated beds was concerning.

Over the course of the last three review periods, DSH-Atascadero's *Coleman* population had

decreased from 249 patients, representing 97 percent of the hospital's 256-bed capacity for

*Coleman* patients in February 2020 (ECF No. 7039 at 52), to 136 patients in March 2022 (ECF

No. 7625 at 45), to 67 patients at the time of this review in December 2022.  DSH-Patton's

*Coleman* population had similarly decreased from ten patients during the two prior reporting

periods (*see* ECF No. 7039 at 53; ECF No. 7625 at 47) to four patients at the time of the current

review.  Only DSH-Coalinga reported a slight increase in its *Coleman* population from the prior

to current review periods, from 21 (ECF No. 7625 at 46) to 27 patients; however, both of these

67

previously reported DSH-Coalinga *Coleman* populations were appreciably less than the

hospital's *Coleman* population of 49 patients reported for January 2020. ECF No. 7039 at 53.

The Special Master remains concerned with the DSH hospitals' possible underutilization

of *Coleman*-designated beds. It is axiomatic that defendants prioritize the identification and

referral of all appropriate *Coleman* patients to inpatient care, as well as eliminate any barriers to

their admission to DSH. As discussed, both the UNA study and the MOU between CDCR and

DSH present opportunities to ensure defendants are taking all steps to meet the inpatient mental

health care needs of the *Coleman* class, including utilization of the *Coleman*-designated beds at

the DSH hospitals.

Both DSH-Coalinga's Unit 21 and DSH-Patton's Unit 33 reported very good staffing,

and filled all of their executive positions, as well as all positions for the four disciplines of

psychiatry, psychology, social work, and rehabilitation therapy during the review period.

Although DSH-Atascadero's Program V, which had by far the most *Coleman* beds, also filled all

of its executive positions, the hospital reported vacancies/functional vacancies exceeding ten

percent for all four major disciplines. These DSH-Atascadero vacancies included a 77-

psychiatry vacancy, which contractors reduced to 22 percent, a 33 percent psychology vacancy

rate, and functional vacancy rates of 44 percent for social workers, and 22 percent for

rehabilitation therapists.

The Special Master remains concerned with DSH-Atascadero's reported vacancies above

ten percent for the four disciplines of psychiatry, psychology, social work, and rehabilitation

therapy. DSH-Atascadero must satisfy these minimum staffing requirements in its attempt to

provide *Coleman* patients with adequate care and to comply with the DSH Staffing Plan that it

filed on March 11, 2021 (ECF No. 7078-1), which this Court approved on December 19, 2022. ECF No. 7688.

Reviewed documentation from all three hospitals typically reflected timely IDTTs and treatment plans with appropriate interventions and goals that adequately addressed patients' needs. Initial psychiatric assessments were also acceptable and typically conducted timely, while psychiatrists otherwise routinely saw patients as clinically indicated. All three hospitals' treatment planning nonetheless reflected shortcomings, which included the failure to update treatment plans despite clinical indications to do so, and the lack of required staff's attendance at IDTTs at DSH-Atascadero and DSH-Coalinga. Concerns with psychiatric treatment also included a lack of continuity of care, poorly justified medication changes, and some concerns with suicide prevention efforts, which included suicide risks not being completed as clinically indicated.

As for group therapy, only DSH-Coalinga provided sufficient treatment through core groups and supplemental activities; DSH-Atascadero's and DSH-Patton's offered group treatment was inadequate. Regrettably, neither DSH-Atascadero nor DSH-Coalinga routinely utilized individual therapy to treat *Coleman* patients. At DSH-Patton, patients were offered an average of 3.83 weekly hours of individual treatment, and attended 2.97 weekly hours.

Approximately three-quarters of reviewed charts from the three hospitals reflected adequate medication management. Overall, psychiatrists adeptly managed complex medication situations that often involved the use of several medications, and appropriately used evidence-based treatments that were frequently underutilized, such as long-acting antipsychotics, lithium, and clozapine. All three hospitals also demonstrated clinically appropriate use of the antipsychotic clozapine, clear procedures regarding the PC 2602 involuntary medication process,

and acceptable polypharmacy policies for reviewing patients who were prescribed multiple psychiatric medications.  There were no reported challenges with the administration of HS prescriptions.

Further, while reviewed charts indicated that identified symptoms and diagnoses generally supported prescribed medications, they also identified diagnostic concerns, including poor diagnostic rationale and/or the need for diagnostic clarification.  Other medication management concerns included inadequate rationales for some medication changes, frequent changes in the psychiatrist in charge of the patient, significant concerns with some patients' discharge planning, and documentation issues related to DSH's use of paper charts.

As for other matters, DSH-Atascadero reported compliance for timely patient transfers, but DSH-Coalinga indicated noncompliance; due to incomplete data, the timeliness of patient transfers to DSH-Patton could not be determined.  None of the three hospitals reported completed suicides or self-injurious behaviors leading to *Coleman* patients' serious injury, while two of the three hospitals had anti-ligature initiatives that identified hospital areas with increased risks of potential patient hanging.  All three hospitals had robust quality improvement programs. Patient satisfaction surveys from all three hospitals generally reported satisfaction with provided treatment.

Tellingly, there were also some problems with DSH's responses to the Special Master's document request.  They included DSH-Coalinga not providing the number of patients or individual patient lengths of time at each HAS level during the reporting period.  Further, due to the provision of incomplete data by DSH-Patton, it could not be determined whether most patients who were referred to DSH-Patton timely transferred.

The Special Master will monitor the DSH hospitals via paper review during the Thirty-First Monitoring Round.[13]  The Special Master reiterates his observation that in order for the DSH hospitals to remain on paper review status, it is critical that the DSH defendants thoroughly respond to the Special Master's document requests.  *See supra* p. 2.

## **RECOMMENDATIONS**

In view of the findings contained herein, the Special Master recommends that the *Coleman* Court enter an order directing the following:

1.    In keeping with patients' needs, and the findings of the UNA study, all defendants shall take all necessary steps to prioritize the identification and referral of all appropriate *Coleman* patients to DSH, eliminate any barriers to their admission to DSH hospitals, and end any underutilization of *Coleman*-designated beds.

2.    That DSH-Atascadero undertake all necessary steps to comply with the DSH Staffing Plan to reduce its staffing vacancies to no more than ten percent for the disciplines of psychiatry, psychology, social work, and rehabilitation therapy.

3.    That all DSH hospitals take the necessary steps to provide patients with sufficient group and individual therapy.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr., Esq.
Special Master

December 15, 2023

---

[13] On August 29, 2022, the Court issued an order adopting the findings contained in the Special Master's Twenty-Ninth Round Monitoring Report – Part A, wherein the Court directed as follows: "Going forward, the Special Master shall have full authority to determine how he will accomplish his monitoring duties at each institution, and he may proceed by institutional visits, paper review, or some combination of the two, without seeking further leave of court."  ECF No. 7608 at 6.

## APPENDIX A1
### Atascadero State Hospital (DSH – Atascadero)

**Department of State Hospitals (DSH) - Atascadero**
(Paper Review)

## I.    SUMMARY OF FINDINGS

- At the time of this review, DSH-Atascadero's 67-patient *Coleman* census of intermediate care patients was 51 percent lower than the census of 136 *Coleman* patients that was reported during the prior review conducted in March 2022.

- *Coleman* patients, who were housed in Program V, comprised 26 percent of DSH-Atascadero's 256-bed capacity that was designated for *Coleman* patients.

- All of Program V's four executive and three management positions were filled.

- The senior supervising psychiatrist position had been vacant since 2011, while only two of nine psychiatry positions were filled, for a 77 percent psychiatry vacancy rate. Five contractors reduced the psychiatry functional vacancy rate to 22 percent.

- Program V's supervisory psychologist was primarily assigned to another program, reflecting its vacancy, while there was a 33 percent psychology vacancy rate.

- The institution reported functional vacancy rates of 44 and 22 percent for social workers and rehabilitation therapists, respectively.

- Telepsychiatry was not used during the reporting period.

- Due to DSH-Atascadero's low *Coleman* census, Program V satisfied the 1:30 staff-to-patient ratio for the disciplines of psychiatry, psychology, social work, and rehabilitation therapy.

- Reviewed documentation and case reviews indicated that IDTTs were completed timely and generally included goals appropriate to the patients' needs along with adequate interventions to address them. However, treatment plans were not updated despite clinical indications to do so in 28 percent of reviewed cases.

- Patients were offered a weekly average of 7.5 hours of core groups, and attended a weekly average of 5.5 hours of these groups. They were also offered a weekly average of 5.9 hours of supplemental groups, and attended a weekly average of 5.7 hours. These offered hours of core and supplemental groups were insufficient for an inpatient program.

- DSH-Atascadero did not typically provide individual treatment to *Coleman* patients, who were offered and attended 0.9 weekly hours of individual treatment. This offered individual treatment was inadequate.

- All 25 reviewed case reviews included adequate, timely, initial psychiatric

assessments, while psychiatrists routinely saw patients as clinically indicated. Reviewed psychiatry documentation revealed that treatment interventions targeted patients' symptoms.

- The monitor's expert's review of ten charts to assess the quality of DSH-Atascadero medication management provided to *Coleman* patients indicated adequate medication management for seven of ten reviewed charts.

- Regarding medication management, chart review revealed that listed symptoms frequently stated diagnoses, and the medications used aligned with stated diagnoses.

- Chart review also indicated that DSH-Atascadero treated multiple medically complex cases that indicated collaboration between the medical, nursing, and psychiatry disciplines.

- Reviewed charts nonetheless revealed multiple deficiencies as to medication management, including inadequate documentation of the rationale for medication changes, and the lack of documented coordination between DSH and other agencies.

- The hospital had a "clozapine clinic" that assisted with patients' monitoring; the monitor's expert's review of four cases where the patient was prescribed clozapine indicated adequate management.

- There were no uses of force to administer PC 2602 involuntary medication orders.

- No *Coleman* patients had behavioral plans during the reporting period.

- There were neither completed suicides nor suicide attempts or self-injurious behaviors resulting in *Coleman* patients' serious injury.

- DSH-Atascadero continued to utilize the HAS program to promote positive patient behavior and treatment participation.

- Fifty-three of 92 referrals to DSH-Atascadero were accepted; 38 referrals were rescinded, and one was rejected.

- Incomplete data indicated that 32 of 34 or 94 percent of admissions to DSH-Atascadero timely transferred within 30 days.

- The use of seclusion dramatically decreased from 16 incidents during the prior review period to three during the current period.

- Restraint use appreciably declined from 26 episodes during the previous reporting period to seven during this review period.

- Similar to the prior review period, the hospital continued to conduct comprehensive quality improvement and risk management programs.

- Patient satisfaction surveys were overwhelmingly positive.

## II.    CENSUS

On December 31, 2022, DSH-Atascadero housed 67 CDCR intermediate care *Coleman* patients who were in the hospital pursuant to PC 2684.  During the review period, DSH-Atascadero's average monthly *Coleman* census was 80 patients.  At the time of this review, *Coleman* patients comprised approximately seven percent of DSH-Atascadero's population.  As the facility designated 256 beds for *Coleman* patients, during this review *Coleman* patients comprised 26 percent of bed capacity.  All *Coleman* patients were housed in Program V.  There were 11 patients in Program V's Unit 30, nine in Unit 32, 35 in Unit 33, and 12 in Unit 34. Compared to the prior reporting period, when DSH-Atascadero housed 136 *Coleman* patients, the *Coleman* population had decreased by 51 percent.

## III.    STAFFING

### 1.    Administrative and Clinical Staffing

DSH-Atascadero reported that all of Program V's four executive positions of executive director, clinical administrator, hospital administrator, and medical director were filled.  The three management positions of program director, program assistant, and nurse coordinator were also filled.

Senior Supervising Psychiatrist:  The senior supervising psychiatrist position has been vacant since 2011.

Psychiatrists:  Two of nine psychiatrist positions were filled, for a 77 percent vacancy rate.  Contractors filled five positions, reducing the psychiatry functional vacancy rate to 22 percent.

Supervising Psychologist:  The supervising psychologist was primarily assigned to another program at the hospital, resulting in this position's vacancy; however, the supervising psychologist provided coverage for Program V.

Psychologists:  Six of nine psychology positions were filled, for a 33 percent vacancy rate.

Social Workers:  Six of nine social worker positions were filled, for a 33 percent vacancy rate.  One social worker was on an extended leave, increasing the functional vacancy rate to 44 percent.

Rehabilitation Therapists:  Eight of nine rehabilitation therapist positions were filled, for an 11 percent vacancy rate.  One rehabilitation therapist was on an extended leave, increasing the functional vacancy rate to 22 percent.

Registered Nurses (RNs):  Twenty-six of 35 RN positions were filled, for a vacancy rate of 26 percent.  One registered nurse was on an extended leave, increasing the functional vacancy rate to 29 percent.

Senior Psych Techs:  Fourteen of 18 senior psych tech positions were filled, for a 22 percent vacancy rate.  One senior psych tech was acting out of class.  Two senior psych techs were on extended leave, augmenting the functional vacancy rate to 33 percent.

Psych Techs:   Ninety-one of 106 psych tech positions were filled, for vacancy rate of 14 percent.  Seven psych techs were on extended leave, increasing the functional vacancy rate to 21 percent.

Health Service Specialist (HSS):  Both HSS positions were filled.

**2.     Telepsychiatry**

Telepsychiatry was not used during the review period.

76

### 3.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

DSH-Atascadero's intermediate care clinician-to-patient ratio for psychiatry, psychology, social work, and rehabilitation therapy was 1:30. At the time of review, due to the low *Coleman* census, the hospital satisfied this ratio for all four disciplines.

## IV.    TREATMENT AND CLINICAL SERVICES

### 1.    Interdisciplinary Treatment Teams (IDTTs)

The quality of IDTT meetings at DSH-Atascadero was assessed based on documentation and individual case reviews for 25 patients treated during the reporting period. IDTTs were completed timely and generally included goals appropriate to the patients' needs along with appropriate interventions to address them. However, treatment plans were not updated despite clinical indications to do so in seven or 28 percent of the reviewed cases. For example, Patient A was consistently assigned to only three treatment hours weekly throughout his stay. Despite consistent attendance and participation, his treatment plan was not updated to include more groups. For Patient M, the treatment plan was not updated to address his lack of participation in treatment; for Patient P, his treatment goals were not updated to address his substance use needs. Patient W and Patient X's treatment goals were not updated to address behavioral issues.

Further, IDTT meetings did not include required or expected staff members in three or 12 percent of reviewed records. For example, Patient B's treatment team meetings were noted as poorly attended and lacked primary clinician and nursing representation at two of three reviewed IDTTs. Patient S's IDTT meetings lacked nursing staff attendance. Patient H's IDTT meetings were also not consistently attended by all required staff members. Moreover, one reviewed case lacked an appropriate rationale for treatment interventions on the treatment plan and another lacked a coherent case formulation.

### 2.    **Group Therapy**

Patients were offered a weekly average of 7.5 hours of core groups and attended an average of 5.5 weekly hours.  They were also offered a weekly average of 5.9 hours of supplemental groups and attended an average of 5.7 weekly hours.  This number of hours of offered groups was insufficient for an inpatient program.

DSH-Atascadero did not provide data on patient refusals but cancelled four percent of groups.  Reasons for cancellations included staff training, COVID-19 outbreak management, and a lack of available providers.

### 3.    **Individual Treatment**

As prior reports also indicated, DSH-Atascadero did not routinely provide individual treatment to *Coleman* patients.  During the reporting period, the hospital provided individual therapy to 44 *Coleman* patients.  Patients were offered and attended 0.9 weekly hours of individual treatment.  The number of hours of offered individual treatment was inadequate for an inpatient program.

### 4.    **Psychiatric Services**

On-site psychiatrists performed all psychiatric care at DSH-Atascadero.

All 25 reviewed case reviews from DSH-Atascadero included adequate initial psychiatric assessments that were completed in a timely manner.  Patients were also routinely seen by psychiatrists as clinically indicated.  However, there were concerns with the medication changes of Patient N and Patient T, which documentation did not adequately justify.  For Patient B, there was an indication in the record that involuntary medications were clinically indicated, yet a PC 2602 order was not pursued.  Overall, however, psychiatry documentation included clear

indications that treatment interventions targeted the symptoms that patients' experienced and patients' responses to treatment were consistently documented.

5.    **Medication Management**

The monitor's expert reviewed ten charts to assess the quality of DSH-Atascadero medication management provided to *Coleman* patients. Overall, seven of ten reviewed cases indicated adequate medication management. However, although some of the adequate cases contained deficiencies, they did not rise to the level of rendering provided medication management inadequate.

DSH-Atascadero demonstrated many strengths concerning the medication management of its patients. Listed symptoms frequently supported stated diagnoses, and the medications used aligned with stated diagnoses. Psychiatrists were competent at managing complex psychiatric conditions that frequently required the use of several medications. The hospital's psychiatrists also often used evidence-based treatments that were underutilized in the community, including long-acting injectable antipsychotics, lithium, and clozapine.

Additionally, several DSH-Atascadero patients had complex medical and psychiatric needs. With rare exception, the hospital handled these cases in a clinically appropriate manner that reflected collaboration among the respective disciplines. One such case exhibited strong collaboration with medical and nursing staff, permitting the patient to be resumed on the critically important medication clozapine. This would not have been possible without such teamwork. In another case, a patient required intravenous fluids and placement of a tube from his stomach to his skin to receive nutrition. Given the severity of the patient's impairments, the facility worked with CDCR to transfer the patient to San Quentin State Hospital to receive medical care and electroconvulsive therapy.

The hospital also demonstrated extensive collaborations with patients, such as in taking or changing medications. This was especially prominent in working with patients receiving Medication Assisted Treatment for Opioid Use Disorder.

Despite these positive aspects of medication management, the monitor's expert discovered multiple deficiencies in the reviewed charts. In several cases, the documentation of the rationale for the medication changes made were inadequate. In one example, a patient had a history of medication noncompliance requiring a PC 2602 involuntary medication order. On the day of admission, the psychiatrist stopped the long-acting injectable form of the antipsychotic and changed the patient to an oral form of the medication. There was scant rationale listed for such a decision. The psychiatrist did not know this patient well, having met with the patient only once. This change risked the patient requiring uses of force to administer injectable medications, should the patient refuse his oral medication. Thankfully, the patient was compliant with the prescribed oral medication.

In another reviewed case, the psychiatrist inadequately justified the addition of a powerful antipsychotic medication chlorpromazine "due to difficulty sleeping." Additionally, the psychiatrist insufficiently justified the assertive dosing of sertraline, a medication commonly used for anxiety and depression.

In yet another case, the monitor's expert was concerned about the dosage of gabapentin, a medicine used to treat seizures, that the medical service started on the patient. While the monitor's expert was focused on the psychiatric care that the patient received, given the possible safety issue involved, the monitor's expert referred this to institutional leadership for review by medical leadership.

Further, the degree of coordination seen internally within DSH-Atascadero did not consistently extend to outside agencies. The lack of documented coordination with other agencies, including CDCR and outside hospitals, was concerning. In one such case, a complex patient was sent to an outside hospital due to medical issues. The DSH-Atascadero psychiatrists had worked admirably to find a medication to reduce the patient's severe aggression. The neurology consultant stopped the medication and replaced it with a medication more traditionally used for seizures. The monitor's expert opined that closer coordination of services may have avoided such changes.

In yet another case, a patient was discharged from DSH-Atascadero to CDCR. The chart was unclear, both to the level of care and the institution to which the patient would go. The chart listed three different institutions and two different levels of care. The monitor's expert understood that the decision about which institution the patient would transfer to was a CDCR decision; however, given that transfers were a period of elevated risk for adverse patient outcomes, information had to be conveyed to the receiving team in a clear manner.

### A.    Clozapine

DSH-Atascadero reported that 25 patients were prescribed clozapine during the review period. Of these, three were initiated at the hospital. The facility had a "clozapine clinic" which assisted with these patients' monitoring and management. The monitor's expert reviewed four cases in which the patient took clozapine during a portion of their hospitalization. In terms of the use of clozapine, the management of these patients was adequate.

### B.    PC 2602 Medication Orders

DSH-Atascadero had clear policies and procedures about the PC 2602 involuntary medication process and had staff who served as a medication court administrator.

The hospital reported that 32 *Coleman* patients received PC 2602 involuntary medications during the reporting period. Fourteen renewal petitions were granted, and one renewal petition was denied. The hospital did not report any medication refusals that required a use of force to administer the medication.

### C.    Prescriptions and Verbal Orders

DSH-Atascadero allowed psychiatrists to write prescriptions for a maximum of 45 days. The hospital did not use bridge orders.

Verbal and telephone orders were limited to urgent situations and had to be signed within 48 hours. If an order remained unsigned after 24 hours, staff was to send an email to the provider and the medical director or designee.

### D.    Non-Formulary Medications

DSH-Atascadero submitted their procedure for the approval of non-formulary medications, which required input from pharmacy and approval from a physician reviewer. The procedure did not specify the timeline for a decision made on the request. Patients arriving at the hospital on a non-formulary medication could continue the medication for a maximum of 30 days before approval was required. There was also an appeals process, should the initial request be denied.

### E.    Polypharmacy Reviews

DSH-Atascadero submitted a policy for the review of polypharmacy cases. Triggers that necessitated a review included the patient taking two or more antipsychotics, three agents in the same medication class, or six or more psychotropic medications.

### F.    HS Medications

The hospital did not report difficulties with the administration of HS medications before 8:00 p.m. During the review period, it reported that HS medications were written for 77 patients,

as well as four patients "ordered HS medication after 2000."  It further reported that it was not possible to determine whether or not medications were delivered, and if delivered, at what time, without reviewing individual paper charts; however, there was no reported way to obtain this information electronically.

### 6.    Other Treatment Issues

#### A.    Behavioral Management

DSH-Atascadero had an updated behavioral plan policy.  However, no *Coleman* patients had behavioral plans during the review period.  Consistent with the MOU, this was not unusual as most patients who required a behavioral plan were referred to a PIP.

#### B.    Pre-Release Planning

Nine *Coleman* patients received pre-release planning discharge services during the review period.  Social workers provided paroling patients with such discharge services, which included individual patient contacts and pre-release planning groups; however, the hospital did not provide further information about these contacts or groups.  To facilitate pre-release planning, the social worker and the patient's treatment team also participated in CCAT meetings. The CCATs included other entities and the CMC pre-release coordinator, who provided discharge resources for the hospital's *Coleman* patients, as well as other stakeholders, including TCMP staff.  The CCAT reviewed information about the patient's current functioning and discharge needs, including housing and transportation, and established a discharge plan for the patient.  All nine discharged *Coleman* patients had a CCAT.

TCMP services were provided through CMC and included applications for SSI/SSDI, Medi-Cal/Medicare, and veterans' benefits.  Review period data indicated approval for two of six patients who applied for Medi-Cal; the hospital did not report whether the four other Medi-Cal applicants were approved.  Another discharging patient had his Medi-Cal reinstated, while

two others refused to apply for Medi-Cal. As for SSI, there were three patient applications and four reinstatements; two patients refused to apply. The hospital did not report data on veterans' benefits.

### C.    Access to Meaningful Jobs and Educational Opportunities

An average of ten patients had employment assignments during the review period; patient employment ranged from six to 16 patients. Seven *Coleman* patients also participated in academic education, but no patients attended five or more weekly hours of education classes.

## V.    SUICIDE PREVENTION

There were no completed suicides at DSH-Atascadero during the review period. There were also no suicide attempts or self-injurious behaviors that resulted in a *Coleman* patient's serious injury.

DSH-Atascadero continued implementation of its ligature risk identification and heat map project. As of February 16, 2023, the hospital had replaced 26 percent of all identified ligature risks. The project's anticipated completion date was July 2027.

The hospital also conducted monthly suicide prevention committee meetings throughout the review period, with attendance by required participants. Reviewed meeting minutes indicated that DSH-Atascadero had a comprehensive suicide prevention program.

Regarding suicide prevention, the monitor's expert chart review reflected concern about the treatment team's discharge to CDCR of a patient who had profound psychosis and five prior suicide attempts after only a short stay at DSH-Atascadero. The reason for discharge appeared to be the possible diversion of the medication buprenorphine/naloxone, used to treat Opioid Use Disorder. The monitor's expert was concerned by this decision, given how extensively impaired the patient was prior to arrival at the hospital. The reviewed chart did not adequately reflect additional interventions the facility undertook prior to discharging the patient.

84

## VI.    PATIENT ACCESS TO TREATMENT

DSH-Atascadero continued to utilize the HAS policy to promote positive patient behavior and treatment participation, and patient access to programming and privileges. The HAS was unchanged from the prior review period and consisted of Levels 1 through Level 5. Patients were admitted at Level 1, and as determined by the treatment team, could progress to Level 5. Each higher level gave patients additional hospital access and more privileges.

During the review period, *Coleman* patients spent an average of 40 days at Level 1, which was an increase of eight days since the prior review period. Two outlier patients remained at Level 1 for an average of 494 days. *Coleman* patients spent an average of 21 days at Level 2, a slight increase of two days from the preceding reporting period. At Level 3, *Coleman* patients spent an average of 59 days, which was a decrease of four days from the last review period. *Coleman* patients also spent an average of 187 days at Level 4, an increase of ten days from the prior review period. During this review period, *Coleman* patients also spent an average of 10.5 days at Level 5.

## VII.    REFERRALS

During the review period, 92 male *Coleman* patients who were referred to DSH were referred to DSH-Atascadero. Fifty-three of these referrals were accepted, 38 were rescinded, and one was rejected. The accepted referrals to DSH-Atascadero during this review period were 48 percent less than the 101 accepted referrals to the hospital during the prior review period. For the accepted patients, referral packets were timely submitted for 38 of 53 or 72 percent of patients.

## VIII.    TRANSFERS, ADMISSIONS AND DISCHARGES

### 1.    Admissions

Incomplete data reported that 32 of 34 or 94 percent of admissions to DSH-Atascadero timely transferred within 30 days; during the prior site visit, 88 of 101 or 87 percent of patients transferred timely to the hospital.  During this review period, two patients' transfers were late by 17 and 34 days, respectively.  Reasons for delays were not provided.  Thirty of 34 or 88 percent of the reported DSH-Atascadero admissions were admitted within 72 hours of a bed assignment.

### 2.    Discharges

DSH-Atascadero discharged 72 patients, which was 19 patients or 21 percent less than the hospital discharged during the prior review period.  The clinical lengths of stay for 55 patients that the hospital provided data for was 292 days; the physical stays for 71 patients for whom DSH-Atascadero provided data was 275 days.  There was one patient who was clinically and physically discharged after spending almost 11 years at DSH-Atascadero.  Of the 56 patients with reported clinical and physical lengths of stay, all but two were physically discharged within 72 hours of clinical discharge.  In one instance, the delay was due to issues with the scheduling of transportation during a holiday week; in the other, the delay was due to the patient's medical complications, which took priority over the level of care transfer.  Incomplete data further reported 60 patient discharges to CDCR facilities, and five to other DSH hospitals.  Monthly discharges ranged from two to 24 patients to CDCR, and zero to one patient to other DSH hospitals.

## IX.    PATIENT DISCIPLINARY PROCESS

During the review period, DSH-Atascadero issued six RVRs to patients.  The monitor's review of all six revealed custody staff timely sending the mental health assessment to mental

health, who timely completed and returned the assessment to custody.  Sixty-seven percent of mental health assessments were conducted confidentially.

Five of six or 83 percent of mental health assessments recommended penalty mitigation. One assessment recommended alternative discipline due to the patient's behavior being strongly influenced by mental illness.  DSH-Atascadero did not provide the senior hearing officers' findings.

## X.    <u>USE OF FORCE</u>

There were no revisions to the use of force policy since the prior reporting period.  The use of force policy was last updated in December 2021.

There were two use of force incidents during the review period.  Neither met criteria for review by the incident management review committee.  Review of both incidents indicated compliance with applicable policy.  Neither use of force related to the administration of PC 2602 medication.

## XI.    <u>UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS</u>

There were seven unusual occurrences during the review period.  One such occurrence was also a sentinel event because it was related to an unexpected death.  Notably, document review revealed that following a fall, the patient experienced severe dizziness and abdominal pain, and was admitted to an off-site hospital's intensive care unit, where he was diagnosed with acute renal injury and stage three chronic kidney disease.  The patient died four days later.  The other unusual occurrences included falls, physical assaults among patients, and alleged abuse.

DSH-Atascadero reported 127 serious incident reports.  Of these, 36 or 28 percent were for aggression, 60 or 47 percent were for medical reasons, 14 or 11 percent were for suicide/self-harm, and 17 or 13 percent were classified as other.

## XII.  USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

As reported during the previous review period, DSH-Atascadero did not use observation cells.

The use of seclusion dramatically decreased from 16 incidents during the prior reporting period to three during this review.  The average time in seclusion was 9.23 hours, with a range of 30 minutes to 20 hours.  The hospital did not provide information about seclusion rooms.

The number of restraint incidents also significantly decreased from 26 incidents during the prior review period to seven during this reporting period.  These restraint incidents averaged ten hours and ranged from 20 minutes to 28.33 hours.  Five restraint incidents involved full-bed restraints.  The remaining two incidents were non-ambulatory, but DSH-Atascadero did not specify the alternative mechanism of restraint.  The hospital neither provided information about the restraint rooms nor charts of patients who required restraints and the clinical rationales for restraint use.

A new administrative directive dated October 2022 addressed post-incident debriefing procedures, and required the entering of patient information into a unit psychiatric sick call book, and treatment plan reviews.

## XIII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.  Emergency Response

DSH-Atascadero reported that hospital-wide emergency response drills were on hold during the review period due to COVID-19 precautions.  The hospital nonetheless provided medical emergency response evaluation audits for Program V drills, which reflected compliance. There were no medical emergencies in Program V during the reporting period.

2.      **Death Review Process**

A Mortality Interdisciplinary Review Committee meeting conducted during August 2022 reviewed the circumstances of a *Coleman* patient's death.  The report revealed that the patient was not under DSH-Atascadero's care at the time of death but nonetheless reviewed provided DSH-Atascadero care up until the patient's transfer to the outside hospital.  The report did not identify any gaps in staff performance or facility procedures while the patient was housed at DSH-Atascadero that affected the quality of care.  The report neither identified performance improvement concerns nor recommended corrective actions.

XIV.  **QUALITY MANAGEMENT AND UTILIZATION REVIEW**

The Joint Commission accredited DSH-Atascadero.  Like during the prior review period, DSH-Atascadero continued to sustain comprehensive quality improvement and risk management programs consisting of various committees that conducted multiple audits throughout the year. The quality council met weekly and was the oversight committee to which other committees reported.  The quality council identified action items and monitored the status of their implementation and completion.  Additional quality improvement committees included those on emergency care, medical risk management, risk/utilization management, suicide prevention, and violence prevention, and the hospital advisory council.

DSH-Atascadero reported regular interaction with the COAC.  The COAC worked with DSH-Atascadero on quality assurance improvements, assessment of current clinical treatment, and collaboration to develop objectives for clinical practice throughout the review period; COAC and DSH-Atascadero staff met to facilitate these activities.  COAC also collaborated with DSH-Atascadero to conduct various audits.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, 28 patients made 44 complaints about medical care and treatment concerns, advocacy services, religious practices, access to and/or use of personal possessions, telephone access, and various daily living issues.  Two complaints were withdrawn. The hospital did not provide additional information or the complaints' outcomes.  Reviewed patient satisfaction surveys revealed greater than 90 percent positive responses to 13 of 14 queries; the only inquiry which failed to achieve 90 percent patient satisfaction addressed whether staff explained patients' rights during their hospital stay.

## XVI.    *COLEMAN* POSTINGS

DSH-Atascadero reported that the executive director's inspection team's compliance reports indicated the posting of *Coleman* posters in English and Spanish in all Program V units.

## XVII.    LAUNDRY AND SUPPLY ISSUES

DSH-Atascadero revised the laundry LOP in March 2022.  Patients were reportedly provided with clean clothing two times weekly, and their bed linens were exchanged weekly. Reviewed logs revealed that clothing and related items were routinely laundered off-site and were bundled, counted, and sorted prior to being returned to the institution.

## XVIII. VISITATION

During the review period, DSH-Atascadero's visitation policy required that COVID-19 mitigation protocols remained in place.  The LOP for non-quarantined housing units allowed in-person visitation four days weekly and tele-visits on the remaining three days.

## XIX.    LAW LIBRARY ACCESS

COVID-19 restrictions for DSH-Atascadero's law library were lifted in September 2022. The hospital reported that due to its security and operational needs, patients were permitted law

library access on a first-come, first-serve basis, with a maximum of 15 patients using the library at one time.  This policy was consistent with the review period prior to COVID-19 restrictions taking effect.  Patient access to legal materials appeared adequate and included access to the California State Law Library if the materials were relevant to the patient's legal commitment. The relevant administrative directive also indicated that while non-*pro se* patients were entitled to two hours of weekly library access, court-approved *pro se* patients could request additional library access.

## XX.    <u>MILESTONE CREDITS</u>

DSH-Atascadero reported that it was CDCR's responsibility to calculate *Coleman* patients' milestone credits.  Specifically, DSH uploaded information concerning *Coleman* patients' milestone credits to a CDCR database, which CDCR utilized to calculate milestone credits.

**APPENDIX A2**
**Coalinga State Hospital (DSH – Coalinga)**

## Department of State Hospitals (DSH) – Coalinga
(Paper Review)

I.    **SUMMARY OF THE FINDINGS**

- On December 31, 2022, DSH-Coalinga's census of 27 intermediate care *Coleman* patients housed on Unit 21 was 29 percent higher than the 21-patient *Coleman* census that was reported during the prior review in February 2022.

- Like during the prior review period, DSH-Coalinga reported that all leadership positions were filled; however, the medical director's position was filled by staff acting out of class.

- All of the hospital's positions for the four disciplines of psychiatry, psychology, social work, and rehabilitation therapy were filled with civil service staff.

- During July 2022, a psychiatrist was made available to DSH-Coalinga through the use of telepsychiatry.

- DSH-Coalinga satisfied the 1:30 clinician-to-staff ratio for psychiatry, psychology, social work, and rehabilitation therapy.

- Reviewed documentation and case reviews revealed that IDTTs were overwhelmingly timely, with treatment plans including goals appropriate to patients' needs, and interventions to achieve identified goals. However, required staff attendance at IDTTs was a concern in approximately one-third of reviewed cases.

- Patients were offered a weekly average of more than ten hours of core groups during five of six months of the review period, as well as an average of between 28.28 and 46.31 weekly hours of supplemental treatment. The total average attended weekly group treatment per patient ranged from 14.49 to 18.05 hours. This amount of group treatment was adequate.

- DSH-Coalinga did not routinely provide *Coleman* patients with individual treatment; 12 patients were offered and attended an average of 0.5 weekly hours of individual treatment, which was insufficient for an inpatient program.

- Regarding psychiatric services, reviewed case reviews typically included adequate initial psychiatric assessments, but also reflected some continuity of care challenges; there were instances of changes in the patients' psychiatrist during the course of treatment, while reviewed documentation did not always adequately justify medication changes.

- The monitor's expert's review of ten charts to assess the quality of DSH-Coalinga medication management provided to *Coleman* patients revealed adequate medication management for seven of ten reviewed charts.

93

- The hospital generally appropriately treated psychiatrically complex patients with rationale medication management.

- DSH-Coalinga psychiatrists often utilized evidence-based treatments that the community underutilized, including the use of lithium and clozapine.

- Nonetheless, chart review indicated numerous deficiencies, which included shortcomings related to multiple doctors treating some patients, and confusion about the use of non-formulary medications.

- DSH-Coalinga had extensive, detailed, and clinically appropriate policies and procedures with respect to the use of clozapine.

- No use of force was required to administer involuntary medications.

- No *Coleman* patients had behavioral plans during the review period.

- On average, on a monthly basis 41 percent of *Coleman* patients held meaningful employment positions, but none attended more than five weekly hours of education.

- DSH-Coalinga reported neither completed suicides nor serious incidents related to suicide attempts or self-injurious behavior during the reporting period.

- DSH-Coalinga continued to utilize the HAS policy to promote positive patient behavior and treatment participation, and to access programming and privileges.

- Eighteen of 22 or 82 percent of patients timely transferred to DSH-Coalinga within 30 days.

- DSH-Coalinga was not accredited by the Joint Commission, and there were no licensing surveys during the reporting period.

- The hospital continued to operate a multi-layered, comprehensive, quality improvement program, with the quality council serving as the hub for quality improvement activities.

- DSH-Coalinga developed and implemented statewide standards audits for *Coleman* patients.

- Four of five discharged patients who completed patient satisfaction surveys reported that their overall treatment at DSH-Coalinga was extremely helpful.

## II.    <u>CENSUS</u>

On December 31, 2022, DSH-Coalinga's Unit 21 housed 27 intermediate care Coleman patients.  The hospital's *Coleman* census was 29 percent higher than its 21-patient census during the prior review in February 2022.  During this review period, the monthly *Coleman* census averaged 22 patients, while it averaged 25 patients during the previous reporting period.

## III.    <u>STAFFING</u>

### 1.    <u>Administrative and Clinical Staffing</u>

Like during the previous reporting period, DSH-Coalinga filled all leadership positions, including those for the executive director, clinical and hospital administrators, and program director.  The medical director positions was also filled, but by staff acting out of class.

<u>Senior Supervising Psychiatrist</u>:  The senior supervising psychiatrist position was filled.

<u>Psychiatrists</u>:  Both psychiatrist positions were filled.

<u>Psychologists</u>:  Both psychologist positions were filled.

<u>Social Workers</u>:  Both social worker positions were filled.

<u>Rehabilitation Therapists (RT)</u>:  Both RT positions were filled.

<u>Nursing Coordinator</u>:  The nursing coordinator position was filled.

<u>Registered Nurses</u>:  All seven positions for registered nurses were filled.

<u>Nurse Practitioner</u>:  The nurse practitioner position was filled.

<u>Senior Psych Techs</u>:  All three senior psych tech positions were filled.

<u>Psych Techs</u>:  All 30 psych tech positions were filled.

<u>Health Service Specialists (HSS)</u>:  The HSS position was filled.

## 2. **Telepsychiatry**

During July 2022, a psychiatrist was made available to DSH-Coalinga through the use of telepsychiatry services.  These services included clinical contacts, evaluations, discharges, and medication management, and reflected 45 patient assessments.

## 3. **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

In accordance with policy, DSH-Coalinga maintained a 1:30 staffing ratio for psychiatry, psychology, social work, and rehabilitation therapy.  Because Unit 21's census was less than 30 patients during the review period, one full clinical team was diverted to and utilized in other areas of the hospital.

## IV. **TREATMENT AND CLINICAL SERVICES**

## 1. **Interdisciplinary Treatment Teams (IDTTs)**

The quality of IDTT meetings at DSH-Coalinga was assessed based on documentation and individual case reviews for 25 patients treated during the reporting period.  IDTTs were completed in a timely manner in all but two cases (Patient D and Patient Q).  In both cases, a treatment plan was not located in the record despite it having been due to be completed.  With the exception of Patient E, treatment plans included goals appropriate to the patients' needs, and interventions to achieve the identified goals.  Patient E's case was significant in that the patient did not have initial assessments completed by any IDTT member prior to his initial treatment plan, and therefore goals could not be developed.  Further, it was noted that neither his assigned psychiatrist nor psychologist were present for his initial treatment team meeting.  Required staff attendance was concerning in eight other reviewed cases, for a total of 36 percent, including Patient A, Patient B, Patient C, Patient Q, Patient R, Patient T, Patient W, and Patient Z.

Psychiatrists and psychologists were the members most often absent from IDTT meetings; however, in a few instances, the social worker did not attend the IDTTs.

Treatment plans were not updated despite clinical indications to do so in three or 12 percent of the reviewed cases. Patient B, Patient L, and Patient O's treatment plans were not updated to address their respective lack of progress and/or engagement in treatment secondary to ongoing symptoms. Additionally, there were indications that both Patient L and Patient O would have benefitted from behavioral interventions that were not discussed or addressed in treatment planning.

###    2.    **Group Therapy**

During the review period, DSH-Coalinga offered patients a weekly average of more than ten hours of core groups during five of six months. However, during December 2022, patients were only offered an average of 8.22 weekly hours of core groups. Further, the institution offered patients a weekly average of between 28.28 and 46.31 hours of supplemental activities during every month of the review period. Overall, patients attended a weekly average of between 14.39 and 18.05 hours of such treatment, but DSH-Coalinga did not indicate whether such attendance reflected attendance at core or supplemental groups. This amount of group treatment was adequate. Further, the hospital reported that the supplemental group hours reflected the practice of offering all patients every available supplemental activity.

Notably, cancellations did not negatively impact the provision of group therapy. All cancellations resulted from the lack of coverage and staffing.

###    3.    **Individual Treatment**

As prior reports noted, DSH-Coalinga did not routinely provide individual treatment to *Coleman* patients. During the reporting period, the hospital provided individual treatment to 12

*Coleman* patients, who were offered and attended an average of 0.5 weekly hours of such treatment. This amount of individual therapy was inadequate for an inpatient program.

### 4. <u>Psychiatric Services</u>

On-site psychiatrists performed most psychiatric care at DSH-Coalinga. Psychiatric care was assessed based on case reviews and other documentation.

Of the 25 reviewed case reviews, two did not include adequate initial psychiatric assessments. An initial assessment was not completed for Patient E; for Patient L, the initial psychiatric assessment was insufficient in that it failed to address the reason for the patient's referral to the inpatient setting and indicated that an adequate record review was not completed.

Further, continuity of care was concerning in a number of reviewed cases. Psychiatrists frequently changed over the course of patients' stays at DSH-Coalinga and the documentation did not always adequately justify medication changes. There was poor continuity of care in six or 24 percent of cases, while the lack of justification for medication changes was noted in five or 20 percent of cases. For Patient T, Patient U, and Patient W, these issues appeared to be related as different psychiatrists engaged in different medication practices resulting in a lack of continuity of care. For Patient L, the frequent changes in psychiatric providers revealed discrepancies in documentation that indicated poor communication and coordination of care amongst psychiatric providers. For Patient U, diagnostic profiles were inconsistent across psychiatric providers but also within documentation written by one psychiatrist on the same date.

Individual cases showed a variety of other concerns with psychiatric care at DSH-Coalinga. For Patient D, psychiatric contacts did not occur in keeping with minimum expectations; there was no psychiatric documentation in the record from December 16, 2022 through the patient's discharge on March 8, 2023. For Patient Q, it was noted that two identical

psychiatric progress notes were entered into the patient's record on January 3, 2023 and January 30, 2023. For Patient B, who was admitted in part to have adjustments made to his medication regimen to address ongoing depression, psychiatric interventions failed to address this identified need throughout his stay and alternative medications were not identified.

5.    **Medication Management**

The monitor's expert reviewed ten charts to assess the quality of DSH-Coalinga medication management provided to intermediate care *Coleman* patients. Overall, seven of ten reviewed cases reflected adequate medication management. Although several of the charts deemed adequate had deficiencies, any shortcomings did not rise to the level of rendering the medication management insufficient.

DSH-Coalinga demonstrated many strengths concerning their patients' medication management. Psychiatrists were proficient at managing complex conditions, which frequently required the use of several medications. In most cases, the symptoms and diagnoses listed supported the medications used. The hospital's psychiatrists frequently used evidence-based treatments that were underutilized in the community, including lithium and clozapine. In one particular case, the psychiatrist used advanced and complex psychopharmacologic interventions to try to alleviate the patient's severe symptoms.

Nonetheless, and unfortunately, reviewed charts indicated multiple deficiencies in patient care. In two cases, there were frequent changes to diagnoses and medication approaches. The largest contributing factor to these changes appeared to be the number of psychiatrists who cared for the patients. In another case, the patient saw a telepsychiatrist for a discharge meeting; however, the telepsychiatrist reported not having many of the records necessary to complete the discharge summary.

In one case, the psychiatrist discontinued a patient's non-formulary antidepressant medication. The chart rationale stated that the medication "must be discontinued, as not available at DSH-C, even with nonformulary." However, this strayed from the non-formulary policy that DSH-Coalinga submitted for review, which allowed for the continuation of a non-formulary medication for up to 30 days. The patient reported worsening depressive symptoms over the following week, until the non-formulary was approved, and the medication was resumed.

### A.    Clozapine

Four DSH-Coalinga patients were prescribed clozapine during the review period. Three were prescribed clozapine prior to admission; the remaining patient was initiated on the medication while at the hospital. The monitor's expert's review of two of the cases of patients who were prescribed clozapine indicated adequate clozapine management. Further, the hospital had extensive, detailed, and clinically appropriate policies and procedures governing clozapine's use.

### B.    PC 2602 Medication Orders

During the review period, DSH-Coalinga reported that a total of nine patients received PC 2602 involuntary medications. The hospital submitted five PC 2602 petitions during the reporting period. Of these, one was a renewal petition, which was granted. The remaining four were initial petitions, of which one was denied on clinical grounds.

No use of force was required to administer involuntary medications.

The hospital had clear policies and was knowledgeable about the logistics of the PC 2602 process. DSH-Coalinga's medication court administrator uploaded information related to PC

2602 petitions to a secure CDCR platform, and the documents were emailed to CDCR's Office of Legal Affairs.

### C.    Prescriptions and Verbal Orders

DSH-Coalinga administrative directive 538, dated September 20, 2022, permitted psychiatrists to write prescriptions for up to 45 days.  The directive stated that doctors "shall be notified when orders are due to expire," but the process by which this occurred was not explained.  Verbal and telephone orders were allowed, but were limited to urgent situations, and the psychiatrist had to sign this order within 24 hours.  The hospital did not use bridge prescriptions.

### D.    Non-Formulary Medications

The hospital's non-formulary medication policy, dated July 2019, stated that the chief psychiatrist or designee reviewed non-formulary medication requests and had 96 hours to approve or disapprove them.  It also indicated several situations that allowed the patient to receive a non-formulary medication without prior approval.  These appropriately included when there was an urgent clinical need, or when the patient was admitted on a non-formulary medication.  The psychiatrist then had 30 days to submit the formal non-formulary request for review.

### E.    Polypharmacy Reviews

DSH-Coalinga conducted polypharmacy reviews when two or more psychiatric medications from the same class, or six or more total psychiatric medications, were prescribed for more than 90 days. The Medication Review Committee or Therapeutic Review Committee performed the review.

### F.  HS Medications

DSH-Coalinga reported that nine patients were prescribed a total of 15 medications at HS.  The nursing policy permitted giving HS medications one hour before or one hour after the ordered time.

### 6.  Other Treatment Issues

### A.  Behavioral Management

No *Coleman* patients had behavioral plans during the review period.

### B.  Pre-Release Planning

Three patients received pre-release planning services during the review period and prior to their scheduled discharge.  Provided TCMP services included social security and Medi-Cal application assistance.

### C.  Access to Meaningful Jobs and Educational Opportunities

On average, nine of 22 or 41 percent of *Coleman* patients held meaningful employment positions on a monthly basis; actual monthly employment ranged from five to 13 patients.  No patients attended more than five weekly hours of educational activities.

## V.  SUICIDE PREVENTION

There were neither completed suicides nor serious incidents related to suicide attempts or self-injurious behavior during the review period.  No changes were made to the suicide prevention policy since the preceding review period.

Psychologists trained *Coleman* staff on responding to suicide crises, which was in addition to required training.

Tellingly, DSH-Coalinga replaced all patient furniture, including patient beds, end tables, chairs, and shelves, with anti-ligature furniture to reduce suicide risk.

## VI.    PATIENT ACCESS TO TREATMENT

Due to COVID-19 precautions, *Coleman* Unit 21 remained on modified programming throughout the review period.

DSH-Coalinga updated its HAS policy on September 20, 2022.  The hospital continued to use the HAS to promote positive patient behavior and treatment participation, and to access programming and privileges.  DSH-Coalinga did not provide the number of patients or individual patient lengths of time at each level during the review period.

## VII.    REFERRALS

Twenty patients were referred to DSH-Coalinga during the review period.  Referral packets were timely completed for 13 of 20 or 65 percent of referrals.  Of the 20 referrals to DSH-Coalinga, there were five patients each who were referred from CSATF and MCSP, and three patients each referred from the CHCF-PIP and VSP, as well as two patients referred from CHCF, and one patient each referred from CIM and CMC.

## VIII.    TRANSFERS, ADMISSIONS AND DISCHARGES

### 1.    Admissions

Including patients who were referred to DSH-Coalinga prior to the review period but were admitted during the reporting period, there were 22 admissions to DSH-Coalinga; this was 83 percent more than the prior review period's 12 admissions.  During this review period, 18 of 22 or 82 percent of admissions timely transferred within 30 days.  Seven of 22 or 38 percent of patients were admitted within 72 hours of a bed assignment.

### 2.    Discharges

DSH-Coalinga discharged 12 patients during the review period, which was 52 percent less discharges than the 25 patients who the hospital discharged during the prior review period.

103

Eleven patients – one patient was an Offender with a Mental Health Disorder (OMD) - had clinical lengths of stay averaging 176 days, with ranges from 95 to 342 days. The 12 discharged patients had physical stays averaging 169 days, ranging from 42 to 345 days. Only five of 11 patients were physically discharged within 72 hours of clinical discharge.

## IX.    PATIENT DISCIPLINARY PROCESS

The institution generated one RVR for indecent exposure. The mental health assessment was not timely referred by custody to mental health staff, but mental health timely completed and returned the assessment to custody. The assessment was conducted confidentially and opined that mental health factors did not contribute to the patient's behavior. Documentation about any penalty mitigation recommendations was not provided. At the time of review, the RVR's disposition was still pending.

## X.    USE OF FORCE

The institution's use of force policies were up-to-date and adequately defined and identified appropriate and excessive uses of force, different use of force classifications, and best practices for documenting and reporting use of force incidents.

DSH-Coalinga reported two immediate use of force episodes. In one case, officers used OC pepper spray and handcuffs to restrain a patient during a pat down and room search. In the other, a patient was handcuffed and physically restrained after attempting to flee. Both incidents reflected the appropriate use of force.

## XI.    UNUSUAL OCCURENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

There were no unusual occurrences, but DSH-Coalinga reported three serious incident reports involving two patients. One incident required the patient's transfer to a hospital, another

necessitated further staff monitoring, and the third required a medical assessment. All three incidents resulted from patients' medical conditions.

## XII.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

DSH-Coalinga did not use observation cells.

There were five seclusion episodes during the review period. Four involved patients' aggression as the precipitating factor. The remaining incident required seclusion to secure the patient's physical safety. The average time in seclusion was four hours and 29 minutes, with ranges from 17 minutes to 11 hours and 21 minutes.

There were also two restraint incidents. One incident involved a patient attempting to hang himself and the patient's aggression toward staff, who used restraints to ensure the patient's safety. In the other incident, a patient was agitated and aggressive toward staff; restraints were necessary to calm the patient down. One of the patients required minor first aid with restraint placement. The average restraint time was three hours and 46 minutes.

There were no reported changes to the seclusion or restraint policies since the prior review period.

## XIII.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 3.    Emergency Response

DSH-Coalinga performed five emergency response mock drills during the review period. Each drill included a code blue scenario. However, the hospital implemented a modified mock code schedule and process due to COVID-19 precautions during the review period.

### 4.    Death Review Process

There were no patient deaths during the review period.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Coalinga was not accredited by the Joint Commission, and there were no licensing surveys during the review period.

The hospital continued to operate a multi-layered, comprehensive QIP, with the quality council serving as the hub for all quality improvement activities.  QIP activities included numerous individual committees that addressed workplace violence prevention, injury and illness prevention, utilization/risk management, and enhanced observation, as well as data review and analysis processes, environment of care inspections, and a process concerning actual or potential medication variances.

DSH-Coalinga also developed and implemented statewide standards audits for *Coleman* patients that addressed numerous issues, including treatment planning, facilitator observation, groups, clozapine use, nursing progress notes, admission assessments, emergency responses, rehabilitation therapy documentation, and seclusion and restraints.

No corrective action plans were developed during the review period, and no audits or reports were generated by the Mortality and Incident Review Committee for *Coleman* patients.

DSH-Coalinga reported regular interaction with the COAC, which worked with DSH-Coalinga concerning quality assurance improvements, assessments of current clinical treatment, and collaborations to develop clinical practice objectives.  COAC also collaborated with DSH-Coalinga to conduct various audits.  COAC visited DSH-Coalinga from June 7 -9, 2022.

## XV.  PATIENT COMPLAINTS/PATIENT SATISFACTION

Nine DSH-Coalinga patients filed 35 complaints; three complaints were withdrawn. Over half of the complaints were related to mental health and medical care and treatment,

medication side effects, and involuntary medications; the remaining complaints addressed legal issues, daily living, advocacy services, and physical exercise/recreation/out of doors time.

Five of eight discharged patients completed a patient satisfaction survey; the remaining three patients refused to complete the survey. Four patients reported that their overall treatment at DSH-Coalinga was extremely helpful; the other patient rated his treatment as not helpful. Four patients also reported that the treatment team was informative and included them in their treatment, and that they felt better when they were discharged from the hospital than when they entered. All five patients agreed that they received sufficient time out of their rooms and reported that friends and family could visit them. Three patients also indicated feeling safe at DSH-Coalinga; one patient reported feeling unsafe, and another was "unsure."

## XVI.  *COLEMAN* POSTINGS

DSH-Coalinga reported that *Coleman* posters in English and Spanish were posted in Unit 21, which housed *Coleman* patients.

## XVII.  LAUNDRY AND SUPPLY ISSUES

DSH-Coalinga maintained up-to-date policies and procedures for clothing and linen ordering, shelf rotation and stocking, soiled laundry pick-up, and stock clerk coverage. An administrative directive detailed the patient dress code. The hospital maintained but did not provide laundry logs.

## XVIII.  VISITATION

The administrative directive governing patient visitation at DSH-Coalinga was up-to-date and allowed in-person visitation five hours daily, seven days weekly. It also described protocols for approved items for visitation, visitor registration and security processing, group visitation, and visitation restrictions, terminations, and revocations, among other matters. Tele-visits were

also permitted, and their protocols were described in an August 6, 2020, memorandum. There were no modifications to the visitation policies from the previous review period.

## XIX.  <u>LAW LIBRARY ACCESS</u>

The law library was open seven days weekly. *Coleman* patients were scheduled for one weekly hour of library. However, *pro* se *Coleman* patients were allowed up to two, nonconsecutive daily hours of library use.

Library kiosks were scheduled for daily use of up to two hours. Patients could request use of the kiosk through their unit supervisor, who then scheduled an appointment with the program assistant. No patients requested to use the library kiosks during the review period. Patients could also submit a request to obtain copies of law materials. If the request was granted, copies were required to be available to the patient within 72 hours of the request.

## XX.  <u>MILESTONE CREDITS</u>

While the institution offered milestone credit courses, the related data was provided to CDCR, which then established milestone credits.

**APPENDIX A3**
**Patton State Hospital (DSH – Patton)**

## Department of State Hospitals (DSH) – Patton
(Paper Review)

## I.     SUMMARY OF FINDINGS

- DSH-Patton operated a 30-bed facility that treated female PC 2684 *Coleman* patients within the 50-bed Unit 33.

- At the time of this review, DSH-Patton's four-patient *Coleman* census was 60 percent lower than the ten-patient *Coleman* census that was reported during the prior review in March 2022.

- The hospital's average monthly *Coleman* census during the review period was 7.5 patients.

- All of DSH-Patton's 11 administrative positions were filled.

- All of the hospital's positions for the four disciplines of psychiatry, psychology, social work, and rehabilitation therapy were filled with civil service staff except for both psychiatry positions, which contractors covered.

- Telepsychiatry was not used during the review period.

- Unit 33 satisfied the 1:30 staff-to-patient ratio for the four disciplines of psychiatry, psychology, social work, and rehabilitation therapy.

- Reviewed documentation and case reviews indicated that IDTTs were generally conducted timely and were adequate, with required participants in attendance; treatment plan documentation typically included goals targeting patients' needs, and adequate interventions.

- DSH-Patton reported offering an average of 9.69 weekly hours of core groups to patients during the review period, with patients attending a weekly average of 7.76 hours of core groups.  The hospital further indicated offering patients a weekly average of 1.79 hours of supplemental treatment hours, with patients attending 1.7 weekly hours.  This amount of group treatment was inadequate.

- DSH-Patton also offered patients a weekly average of 3.83 hours of individual treatment; patients attended 2.97 weekly hours of individual treatment.  This amount of individual treatment was adequate.

- As for psychiatric services, although initial psychiatric assessments were typically adequate and were performed timely, there were some concerns with psychiatric care, including poor justification for medication changes, and issues addressing and assessing suicide risk.

- The monitor's expert's review of ten charts to assess the quality of medication management provided to *Coleman* patients indicated adequate medication management for eight of ten reviewed charts.

- DSH-Patton psychiatrists adeptly managed complex psychiatric conditions that often required the use of several medications.

- DSH-Patton psychiatrists utilized evidenced-based medication interventions including long-acting injectables, clozapine, and ECT where appropriate.

- Regrettably, chart reviews also indicated medication management deficiencies, including documentation issues and significant, inappropriate increases in medication doses.

- There were no use of force incidents for the administration of PC 2602 involuntary medication orders.

- The monitor's expert expressed concern with DSH-Patton's ordering of injectable as-needed medications as ongoing, rather than one time, as this permitted nursing staff to use injectable medication without prior notification of the psychiatrist.

- One *Coleman* patient had a behavioral plan during the reporting period.

- No *Coleman* patients had meaningful employment positions or were enrolled in educational programs.

- There were no completed suicides, suicide attempts, or serious incidents involving self-injurious behavior.

- DSH-Patton did not track patients' status within the HAS program but indicated that it was developing a tracking system for future reporting.

- One of four intermediate care patients who were referred and admitted to DSH-Patton during the review period timely transferred within 30 days. Due to incomplete data, it could not be determined whether the other three patients timely transferred.

- Only four of nine discharged patients physically discharged within 72 hours of clinical discharge.

- DSH-Patton did not issue any RVRs to *Coleman* patients and there were no use of force incidents involving *Coleman* class members.

- DSH-Patton continued to have a robust quality improvement program overseen by the quality council, while the hospital also conducted numerous audits related to quality management.

## II.    CENSUS

DSH- Patton operated a 30-bed facility that treated female *Coleman* PC 2684 patients within the 50–bed Unit 33.  On December 31, 2022, DSH-Patton housed one acute and three intermediate care *Coleman* patients, for a total of four *Coleman* patients, which was 60 percent less than what the hospital reported during the prior review period.  The hospital's average monthly *Coleman* census during the review period was 7.5 patients; it was nine patients during the prior review period.

## III.    STAFFING

### 1.    Administrative and Clinical Staffing

DSH-Patton reported that all 11 of its administrative positions were filled.  Specifically, positions for the executive director, chief psychiatrist, medical director, clinical, hospital, and nurse administrators, program director, and both program assistants and nursing coordinators, were filled; however, an "acting" staff member covered the medical director's position.

Senior Psychiatrist:  The senior psychiatrist position was filled.

Psychiatrists:  Contractors filled both psychiatry positions.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  Both psychologist positions were filled.

Supervising Social Worker:  The supervising social worker position was filled.

Social Workers:  Both social worker positions were filled.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was filled.

Rehabilitation Therapists:  Both rehabilitation therapist positions were filled.

Unit Supervisor:  The unit supervisor position was filled.

Registered Nurses:  Seven of nine positions for registered nurses were filled, for a 22 percent vacancy rate.  A contractor covered one position, reducing the functional vacancy rate to 11 percent.

Nurse Practitioner:  The nurse practitioner position was filled.

Senior Psych Techs:  Two of three senior psych tech positions were filled.

Psych Techs:  Twenty-two of 33 psych tech positions were filled, reflecting a 33 percent vacancy rate.  Contractors filled three positions, decreasing the functional vacancy rate to 24 percent.

Health Services Specialist (HSS):  All three HSS positions were filled.

**2.      Telepsychiatry**

The institution did not utilize telepsychiatry during the review period.

**3.      Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

DSH-Patton reported that the hospital satisfied the 1:30 staff-to-patient ratio for psychiatrists, psychologists, social workers, and rehabilitation therapists.

**IV.    TREATMENT AND CLINICAL SERVICES**

**1.      Interdisciplinary Treatment Teams (IDTTs)**

The quality of IDTT meetings at DSH-Patton was assessed based on documentation and individual case reviews for 13 patients treated during the reporting period.  Overall, IDTTs were noted to be timely and adequate with required participants consistently in attendance.  Treatment planning documentation largely included goals that targeted patients' needs, as well as adequate interventions to assist patients in attaining those goals.

Issues with IDTTs and treatment planning were noted in three cases, or in 23 percent of reviewed records.  For Patient A, there was a lack of rationale for the reliance on group therapy

and an absence of individual therapy to address the patient's needs.  For Patient B, two treatment plans were noted to be inadequate in that treatment goals and interventions were not updated when clinically indicated to address the lack of progress and a number of goals were noted to be unrealistic.  Of note, the unrealistic nature of the goals was addressed in a subsequent treatment plan.  Patient D's IDTT failed to address diagnostic uncertainties and failed to develop an effective treatment plan to address her needs, including elevated suicide risk.

### 2.    Group Therapy

During the review period, DSH-Patton provided 19 core groups and seven supplemental group activities.  The hospital further reported offering patients a weekly average of 9.69 hours of core groups, with patients attending a weekly average of 7.76 hours.  Patients were also offered a weekly average of 1.79 supplemental hours of groups, and attended a weekly average of 1.7 hours of supplemental groups.  This amount of group treatment was insufficient for an inpatient care program.

### 3.    Individual Treatment

During the review period, DSH-Patton offered patients a weekly average of 3.83 hours of individual treatment, with patients attending a weekly average of 2.97 hours.  This amount of individual treatment was sufficient for an inpatient care program.

### 4.    Psychiatric Services

On-site psychiatrists performed all psychiatric care at DSH-Patton.  Psychiatric care was assessed based on case reviews and other documentation.

Initial psychiatric assessments were adequate and timely in all but two or 15 percent of the reviewed cases.  For Patient C, the admitting psychiatrist failed to include the patient's active PC2602 order and inaccurately documented that the patient was admitted for restoration to

114

competency. Additionally, the admitting psychiatrist discontinued the patient's long-acting injectable medication, despite the patient's good response, and changed the patient to an oral form of the medication, which she subsequently refused. For Patient E, the initial psychiatric assessment included what appeared to be templated language noting that the patient was admitted for restoration to competency, which was inaccurate. Additionally, when Patient E was transferred to care with a different psychiatrist, the newly assigned psychiatrist documented a poor initial assessment which consisted of mostly copied text from a prior entry.

Some additional concerns were noted regarding psychiatric care. For Patients C and E, there was poor justification for medication changes. Patient B's psychiatrist used handwritten documentation, which was difficult to decipher. Additionally, in Patient B's case, a significant concern was an attempt by the psychiatrist to use a non-suicide contract with the patient to address suicide risk rather than utilizing evidence-based safety planning interventions. For patient D, the psychiatrist failed to complete a suicide risk assessment after the patient reported thoughts of self-harm and command auditory hallucinations to kill herself. Additionally, no safety plan was discussed with the patient. For Patient C, the psychiatrist indicated at the time of discharge that the patient should have daily access to a psychiatrist and a psychologist to avoid rapid deterioration; the psychiatrist nonetheless recommended placement in an EOP program, where the patient would not necessarily have access to daily clinical contacts with these clinicians, indicating an inappropriate discharge plan to outpatient care.

### 5. **Medication Management**

The monitor's expert reviewed ten charts to assess the quality of DSH-Patton medication management provided to PC 2684 *Coleman* patients. Overall, eight of ten reviewed cases reflected adequate medication management. Nonetheless, some of the adequate cases indicated

deficiencies, but these shortcomings did not rise to the level of rendering the provided medication management inadequate.

DSH-Patton demonstrated numerous strengths in terms of medication management. Psychiatrists were adept at managing complex psychiatric conditions that frequently required the use of several medications. In most reviewed cases, the listed symptoms and diagnoses supported the medications used. DSH-Patton psychiatrists also frequently used evidence-based treatments that were underutilized in the community, including long-acting injectable antipsychotics, lithium, and clozapine. In one reviewed case, the psychiatrist arranged for a treatment-refractory patient to undergo ECT at Metro State Hospital. This was admirable, given the complexities required to perform ECT in the incarcerated population.

Unfortunately, the monitor's expert also discovered multiple deficiencies in the reviewed charts. Common difficulties included several patients with an admission psychiatric evaluation noting that they were receiving treatment under the PC 1370 statute (Incompetent to Stand Trial) rather than PC 2684. In another case, the psychiatrist opined that the patient's PC 2602 involuntary medication order from CDCR did not transfer to the DSH setting, which was erroneous, and he did not continue involuntary medications. The long-term treating psychiatrist caught this error and wrote an appropriate order.

In two reviewed cases, the psychiatrist was unusually assertive with raising the dose of an antipsychotic, without documenting a rationale for doing so. In one case, the psychiatrist quadrupled the dose of antipsychotic medication, without intervening dosage titration. This risked unnecessary, and possibly serious, side effects, without justification that the possible benefits of this change outweighed these risks.

116

### A.    <u>Clozapine</u>

During the review period, DSH-Patton started one new patient on clozapine and maintained four others on this medication.  Reviewed cases indicated the timely performance of required laboratory monitoring.  The hospital also referenced DSH protocol on clozapine, which was detailed, comprehensive, and up to date.

### B.    <u>PC 2602 Medication Orders</u>

DSH-Patton reported that one patient had a PC 2602 involuntary medication order during several days of the review period; the hospital discharged this patient on July 7, 2022.  Otherwise, during the reporting period, no PC 2602 involuntary medication orders were initiated, renewed, or pending.  There were no use of force incidents associated with medication administration.

The hospital had a detailed policy to track and report PC 2602 cases.  The monitor's expert requested clarification of the non-renewal process, and whether a formal non-renewal notice was filed.  The medication court administrator reported that, to their knowledge, this had not recently occurred.

In one DSH-Patton case, the psychiatrist incorrectly wrote that the patient's PC 2602 order obtained in CDCR did not transfer to DSH, which was erroneous, and he did not continue involuntary medications.  The longer-term treating psychiatrist caught this error and wrote appropriate orders.

The monitor's expert observed the psychiatrist ordering injectable as-needed medications as ongoing, rather than one time, orders.  These were apart from injectable back-up medications for refusing a PC 2602 medication.  On-site leadership reported that this was only undertaken for patients with an active PC 2602 medication order in place.  The monitor's expert expressed

concern about this policy, as it allowed nursing staff to use injectable medication without prior notification of the psychiatrist.  On-site leadership reported that all injectable medication uses were reported the next morning.  Leadership also indicated that policy provided that nursing was to attempt the least restrictive intervention possible, which would typically be trying to give an oral as-needed medication first and prior to an injectable one.

### C.      Prescriptions and Verbal Orders

DSH-Patton permitted psychiatrists to write prescriptions for a maximum of 45 days. The hospital further reported that 14 days prior to a medication's expiration, the pharmacy printed a list of such expiring patient medications.  DSH-Patton did not use bridge prescriptions.

The hospital did not report its policy on verbal and telephone orders.  However, it submitted a clear policy addressing the daily review of orders in the chart, which had been updated in February 2023.

### D.      Non-Formulary Medications

DSH-Patton had a clear non-formulary process, which required input and approval from the pharmacy and a physician reviewer within three days.  There were appropriate exemptions in place for this approval process, based on pressing clinical need, or in instances where the patient was already taking this medication prior to arrival at DSH-Patton.

### E.      Polypharmacy Reviews

Applicable policy indicated that the two triggers for a polypharmacy review were six or more prescriptions, or multiple prescriptions within the same medication class.  In cases where these criteria were met, a review was required every 90 days.  The monitor's expert noted a concerted effort by psychiatrists to minimize multiple medications, including ones associated with significant medical risks.

F.    **HS Medications**

DSH-Patton did not report any difficulties administering HS medications.  The number of patients prescribed HS medications ranged from zero to three during the reporting period; each patient only received one HS medication.

6.    **Other Treatment Issues**

A.    **Behavioral Management**

One behavioral plan was in effect during the review period.  The plan was implemented prior to the reporting period in April 2022 and targeted self-harm with interventions to address and decrease the behavior.

B.    **Pre-release Planning**

DSH-Patton did not provide pre-release planning services during the review period.

C.    **Access to Meaningful Jobs and Educational Opportunities**

During the review period, no *Coleman* patients held meaningful employment positions of more than five weekly hours and no *Coleman* patients were enrolled in educational programs.

V.    **SUICIDE PREVENTION**

There were no completed suicides or suicide attempts during the review period.  There were also no serious incidents related to self-injurious behavior.

DSH-Patton completed suicide risk assessments on all admissions and annual psychological assessments.  The hospital also conducted monthly audits of suicide assessments.

VI.    **PATIENT ACCESS TO TREATMENT**

DSH-Patton did not track patients' status within the HAS during the review period but was in the process of developing a tracking system for future reporting.  The hospital further reported that *Coleman* patients had access to ICPs, otherwise called "grounds."  Following a

seven-day observation period, DSH-Patton granted ICPs to patients, and the treatment team evaluated the approval or delay of these privileges.  Patients who were not granted privileges were escorted to various treatments and activities.

## VII.    REFERRALS

During the review period, eight CIW patients were referred to DSH-Patton.  Of these patient referrals, four were accepted, four were rescinded, and none were rejected.  The four accepted referrals to DSH-Patton were 50 percent less than the eight accepted referrals during the prior review period.  Referral packets were timely submitted for all accepted patients.

## VIII.    TRANSFERS, ADMISSIONS AND DISCHARGES

### 1.    Admissions

DSH-Patton admitted six patients during the review period, including two patients who were referred prior to the review period.  There were 25 percent less admissions in comparison to the prior review period, when there were eight admissions.  The hospital did not provide the referral dates for the two patients who were referred prior to the review period but admitted during the reporting period.  Incomplete data indicated that four admissions were from CIW.

One of four intermediate care patients who was referred and admitted to DSH-Patton during the review period timely transferred.  Due to incomplete data, it could not be determined whether the other three patients timely transferred.

### 2.    Discharges

DSH-Patton discharged 11 patients during the review period, which were two patients more than the nine patients that the hospital discharged during the previous reporting period. Nine of these patients – two patients were OMDs -- had clinical lengths of stay averaging 144 days, with ranges from 37 to 398 days.  The 11 discharged patients had physical stays averaging

151 days and ranges from 42 to 398 days.  Only four of nine patients were physically discharged within 72 hours of clinical discharge.

## IX.    PATIENT DISCIPLINARY PROCESS

DSH-Patton did not issue any RVRs to *Coleman* patients.

## X.    USE OF FORCE

No use of force incidents involving *Coleman* patients were reported by the hospital.

## XI.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

DSH-Patton reported six unusual occurrences during the reporting period.  Of these, four were investigated; three closed without deficiencies and one was pending closure.  The remaining two incidents were not investigated and were closed.  DSH-Patton provided documentation for five of the unusual occurrences.  All involved intermediate care patients.  Two occurrences involved the same patient.  In one instance, the patient was hospitalized after appearing lethargic; in the other, the patient ingested Suboxone obtained from a peer.  Another unusual occurrence involved a patient who alleged violation of her rights after a male staff member "slammed her (six) times."  The remaining two unusual occurrences stemmed from hospitalizations for dizziness and an altered mental status, respectively.

Seven SIRs were completed for four individual patients.  One patient had three separate instances of adverse medication reactions and a SIR was completed in each case.  Another patient had two separate SIRs after falling due to dizziness.  The other two SIRs were related to medical interventions for two distinct patients.  In one case, staff observed the patient vomiting; in the other, the patient presented with an "altered mental status."

## XII.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

DSH-Patton did not use observation cells.

There were no seclusion incidents during the review period.

DSH-Patton reported four five-point restraint episodes involving three patients.  They averaged 19.2 hours per patient and ranged from four to 48.33 hours.

## XIII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.  Emergency Response

DSH-Patton completed emergency response drills during the review period for *Coleman* Unit 33.  During the third quarter, DSH-Patton conducted three drills targeting altered levels of consciousness, namely, possible heat stroke or metabolic disturbance.  During the fourth quarter, three drills focused on altered levels of consciousness, specifically, opioid overdoses.

### 2.  Death Review Process

DSH-Patton did not report any deaths during the review period.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Patton continued to have a robust quality improvement program.  The quality council oversaw the quality improvement program and attempted to ensure compliance with applicable policies, directives, and procedures.  The hospital had recently filled the quality improvement coordinator's position to assist with the analysis of audit data.  Quality improvement measures initiated during the review period included reimplementation of the group hours and individual therapy quality improvement projects, data collection challenges concerning supplemental hours, and the procurement of tablets for patients.  The hospital also conducted numerous audits that addressed many topics, including admission assessments, treatment planning, group observation, use of seclusion and restraints, mask compliance, rehabilitation therapy service, and issues related to psychologists and social workers.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Four patients made six complaints during the review period; two complaints were withdrawn.  Complaints addressed the confidentiality of treatment and records, medical care, personal funds, and legal issues.

Only one of 11 discharged patients completed a patient satisfaction survey.  Overall, the responding patient reported that DSH-Coalinga's program was helpful and strongly agreed that the referral, program, treatment planning, medications, staff, and environment were adequately explained and beneficial.  However, the patient was unsure about family visits, meals, and clothing.

## XVI.    *COLEMAN* POSTINGS

DSH-Patton reported that current *Coleman* posters were posted in English and Spanish on *Coleman* Unit 33.

## XVII.    LAUNDRY AND SUPPLY ISSUES

As for clothing and linen, DSH-Patton provided up-to-date policies for inspection, sorting, monitoring, storage, transportation, and mending.  It was the responsibility of unit supervisors to ensure that there was an adequate supply of clean clothing and linens.

## XVIII.    VISITATION

During the review period, there was one weekly pre-approved visitation for both vaccinated and unvaccinated patients.  However, the LOP for non-quarantine housing units allowed daily in-person visitation and tele-visits Monday through Friday.  In November 2022, DSH-Patton changed its COVID-19 mitigation protocols to require all visitors to submit to on-site temperature checks, symptom screening, and contact tracing for individuals who tested

positive for COVID-19 within 14 days of their scheduled visit.  However, the institution no longer required visitors to show proof of vaccination, or a negative COVID-19 test result.

## XIX.   LAW LIBRARY ACCESS

DSH-Patton patients were permitted unescorted access to both the west library and the east/central library when their housing unit was assigned to grounds during library hours of operation.  Based on staffing availability, the west library was open for three weekdays for 4.5 hours and the east/central library was open on two other weekdays for four hours.  Patient access to legal materials included both hard copy materials, kiosks for virtual legal research, computers, and copy machines.

## XX.    MILESTONE CREDITS

DSH-Patton offered patients' opportunities to obtain milestone credits and provided the data to CDCR, which calculated patients' milestone credits.

**APPENDIX B1**
**Atascadero State Hospital (DSH – Atascadero)**
**Case Reviews**

**Atascadero State Hospital (DSH-Atascadero)**
**March 16 – 17, 2023**

**Patient A**

This 28-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental healthcare provided at DSH-Atascadero.  This patient arrived at CDCR for his current term on February 22, 2022.  He was admitted to DSH-Atascadero on July 1, 2022, after he was referred from CRC.  He was referred to the mental health crisis bed (MHCB) due to ongoing depression and anxiety, active command auditory hallucinations to kill himself, and continued suicidal ideation.  The patient was described as cooperative with MHCB treatment and was transferred to DSH-Atascadero for further stabilization.  The patient had a history of psychiatric hospitalizations in the community secondary to suicidal ideation and one previous suicide attempt by hanging when he was age 14.  The patient's diagnoses upon admission and throughout his stay at DSH-Atascadero were schizoaffective disorder, depressive type; opioid use disorder, moderate; amphetamine-type use disorder, mild; and cocaine use disorder, mild.

Timely and appropriate intake and initial assessments were provided by the members of the treatment team.  Soon after admission, the patient had a positive COVID-19 test and was placed on the COVID-19 unit from July 8 to July 18, 2022.  Review of the healthcare record indicated that the patient was observed to be "psychiatrically and behaviorally stable" throughout his treatment at DSH-Atascadero.  He did not require the use of seclusion or restraints throughout his hospitalization.

The initial treatment plan on July 1, 2022 documented treatment goals including reduced depression and anxiety, reduced suicidal ideation, and teaching the patient to manage his auditory hallucinations.  Primary interventions provided in the initial treatment plan included referral to appropriate groups and weekly individual primary clinician contacts to address anxiety and suicidal ideation.  Review of ongoing treatment plans revealed that, although the assigned group topics were appropriate for the patient's needs, the frequency of those groups was severely deficient, as the patient was only enrolled in three scheduled hours of treatment weekly.  Further, despite the patient attending 100 percent of assigned groups and several unscheduled "drop-in" groups, his participation and engagement in the groups was consistently described as poor.

At the last treatment team meeting on October 3, 2022, nine days prior to his discharge and parole, the patient reported that his medications were helpful with his symptoms; however, he continued to rate his depression as high.  The treatment team also provided an update that the patient had not fully met any of his treatment goals prior to discharge.  Treatment goals of reduction of anxiety and depression and reduction of suicidal ideation were not met, and teaching the patient to manage his auditory hallucinations was only partially met.

Psychotropic medications were adjusted and modified during the DSH hospitalization.  The patient was prescribed olanzapine, benztropine, haloperidol, hydroxyzine, and lithium.  On August 1, 2022, trazodone was added to the medication regimen.  On August 19, 2022, the patient reported tremors, and haloperidol was discontinued.  Lithium was subsequently

discontinued on September 1, 2022.  Medications at the time of discharge on October 12, 2022, included hydroxyzine, olanzapine, sertraline, and trazodone.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was inadequate.

Although the patient was described as behaviorally and psychiatrically stable throughout his stay at DSH-Atascadero, he did not fully meet or achieve any of his treatment goals at the time of discharge.

The patient was only scheduled for three treatment hours weekly, and although he reportedly had 100 percent attendance, his participation and engagement while in the groups was noted as poor. Further, notwithstanding his relative stability regarding communication of his thoughts and needs to staff and reporting motivation toward treatment, his depression and anxiety reportedly did not improve throughout the hospitalization.  The very low number of scheduled treatment hours provided was inadequate, particularly considering the chronic nature and severity of the patient's anxiety and depressive symptoms and reported lack of engagement when attending groups.

**Patient B**

This 29-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental healthcare provided at DSH-Atascadero.  He was admitted to DSH-Atascadero on September 23, 2022, after referral from the CHCF-PIP.  He was provided with a diagnosis of schizophrenia at the time of DSH-Atascadero admission.  The patient was assessed with low risk of danger-to-self or others at the time of admission.

This patient arrived at CDCR for his current term on November 19, 2020.  The patient had no RVRs throughout his incarceration and had never presented with an elevated risk for suicidal ideation or self-injurious behaviors.  His mental health and functioning reportedly declined significantly and decompensated sharply in February or March 2022.  His cell was reportedly filled with trash and rotting food, and he did not attend to his personal hygiene and Activities of Daily Living (ADLs).  The patient was also described as malodorous with increased belligerence toward staff.  He refused to leave his cell 90 percent of the time and refused to participate in treatment.  The patient also presented with flat affect, response to internal stimuli, impaired concentration, and pacing in his cell.  He also denied having a mental illness.

The patient was reportedly medication adherent and demonstrated adequate ADLs while in the CHCF-PIP acute program; however, when his status was changed to ICF, his medication adherence ceased, and his mental status declined significantly.  At the time of referral, the patient was medication nonadherent, and he did not participate in treatment at CHCF-PIP.

Documentation indicated that the patient demonstrated symptoms and behaviors consistent with a psychotic disorder for at least six months, and possibly up to several years prior to DSH-Atascadero admission.  Observed symptoms and behaviors included hallucinations, persecutory delusions, disorganized thinking, and grossly disorganized behavior.  The CHCF-PIP psychiatrist

opined that it was unclear whether the patient would meet criteria for grave disability; notably, an Interdisciplinary Plan of Care (IPOC) for grave disability was included in the CHCF-PIP treatment plans. Clinical staff at CHCF-PIP did not attempt to pursue a PC 2602 involuntary medication order prior to the patient's referral to DSH-Atascadero. The CDCR treatment outcome expectations included increasing medication adherence to 95 percent, identifying two leisure activities and engaging at least weekly, improving ADLs by having a clean and organized cell daily, attending primary clinician sessions 75 percent of the time, and participating in 50 percent of groups. The patient was assigned to clinically appropriate groups, including mental health wellness, aggression reduction, and drug education.

Review of the treatment plans indicated that treatment team meetings occurred monthly but were often poorly attended. The September 29, 2022 treatment team meeting was attended by the patient, psychiatrist, PC, and RT. The October 25, 2022 treatment team meeting was attended by only the psychiatrist and RT, and the patient refused to attend. The November 23, 2022 treatment team meeting was attended by the patient, psychiatrist, and an RN.

The patient made limited to no clinical progress during his stay at DSH-Atascadero. He refused to attend the October 25, 2022 treatment team meeting, thus the psychiatrist met with the patient in his dormitory. There, the patient was described as responsive to internal stimuli with withdrawn and isolative behavior, flat affect, wide eyes, and repetitive movements.

The patient was only enrolled in four hours of group treatment weekly. He attended 90 percent of scheduled groups between September 11 and October 8, 2022, but his attendance declined in October 2022. The treatment team notes stated that the treatment team thought it prudent to continue to encourage the patient to continue in treatment. Dependent upon the patient's response to this encouragement, a determination would be made whether to either continue treatment at DSH-Atascadero, attempt to obtain an involuntary medication order, or return the patient to CDCR.

At the November 23, 2022 treatment team meeting, the patient's mental status and functioning were described as unchanged. An attached RN note reported that the patient had trouble following minimal rules, and was belligerent and argumentative when staff attempted to redirect him. Additionally, the RN noted that the patient had displayed no physical aggression; however, he refused medications, groups, laboratory studies, flu vaccine, ECG, weights, vitals, and the COVID booster. His ADLs had reportedly improved slightly; however, he continued to require prompting to shower.

The discharge summary noted that the patient did not attend any groups, did not always present for meals, and refused all medications throughout his hospitalization. The treatment team decided that the patient had reached maximum benefit and would be returned to CDCR for placement at the EOP level of care. The final discharge recommendations included medication monitoring and continued psychiatric treatment.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was severely inadequate.

This patient demonstrated symptoms of a severe and chronic psychotic disorder throughout his stay at DSH-Atascadero, and he did not demonstrate improvement. Treatment outcome expectations were not met prior to discharge. It was unclear why the treatment team never pursued a PC 2602 order, despite documentation in the healthcare record that the patient had previously responded well to antipsychotic medication treatment while in the Acute Psychiatric Program (APP). The patient also likely met the criteria for grave disability. The patient was prematurely discharged from DSH-Atascadero, and the interventions provided were insufficient to address his mental health needs.

**Patient C**

This 60-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental healthcare provided at DSH-Atascadero. This patient was admitted to DSH-Atascadero on October 14, 2022, and was discharged on December 16, 2022. At the time of DSH-Atascadero admission, he was provided with diagnoses of major depressive disorder, borderline personality disorder, and dependent personality disorder; these diagnoses remained essentially unchanged during the hospitalization, with the addition of the diagnosis of unspecified anxiety disorder at discharge.

The patient entered CDCR for his current term on June 14, 2021 with an EPRD of July 26, 2023. Prior to DSH-Atascadero admission, the patient received mental health services at the EOP level of care at CMC. He was classified as DD1.

The patient had one prior DSH-Atascadero hospitalization between July and August 2020. More recently, he was admitted to an MHCB from July 8 to July 11, 2022. During the six months prior to DSH-Atascadero admission, the patient demonstrated significant anger, anxiety, paranoia, perseveration, and thoughts of self-harm that were atypical for him. He had reportedly demonstrated increasing paranoia towards staff and had interpersonal conflicts.

The October 25, 2022 treatment plan identified treatment goals that included developing and maintaining a therapeutic alliance with the treatment team, identifying three to five adaptive coping skills, identifying two triggers for self-harm and two coping strategies, identifying three ways to manage aggressive impulses, identifying three ways substance abuse had impacted his life, developing recreational interests, and identifying three symptoms and two coping strategies to utilize in symptom management. He was assigned six hours of group therapy weekly targeted at addressing his goals and expected treatment outcomes. Group assignments were appropriate.

At the November 15, 2022 treatment team meeting, the patient reportedly demonstrated adequate ADLs with neat and clean appearance, appropriate interactions with staff, and adherence with the unit rules and routine. The attached nursing note indicated that the patient had made significant improvement since admission, that he presented with stable mood, and that he was treatment adherent. The patient reportedly attended 99 percent of the ten hours of scheduled groups and

also attended additional drop-in groups.  The treatment team determined that discharge from DSH-Atascadero with return to the CMC EOP was indicated, as the patient had reached maximum treatment benefit during his inpatient stay.  The discharge summary stated that although the patient remained with personality disorders, he had relative stability of his depression and anxiety after treatment with Prozac. He was described as respectful toward staff and peers and did not require any seclusion or restraint episodes throughout his stay.  His overall treatment attendance was 89 percent.  He was prescribed Prozac at the time of discharge.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate and appropriate.

The patient received timely treatment team meetings with the appropriate staff in attendance. Treatment plans were appropriate to the patient's clinical presentation, and he made significant progress during his hospitalization.  At the time of discharge, the patient demonstrated mood stability, a more optimistic attitude and outlook, and good treatment and medication adherence.

**Patient D**

This 46-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental healthcare provided at DSH-Atascadero.  He had received mental health treatment at the MCSP EOP when he was referred to the ICF level of care on August 4, 2022.  Provided diagnoses upon DSH-Atascadero admission included major depressive disorder, recurrent, severe, and opioid use disorder, severe.  At the time of admission, the patient was prescribed Lexapro, Remeron, Trileptal, and Suboxone to address his mental health and substance use disorder symptoms.  The medications were subsequently adjusted, and the prescribed medications at discharge were Lexapro, Remeron, gabapentin, and Suboxone.

The patient was reportedly stable, and he functioned well at the EOP level of care until he experienced an increase in stressors in June 2022.  He reportedly faced a possible third strike for an RVR he received in 2019; the psychiatrist adjusted his medications, but the patient continued to decompensate and was referred to DSH-Atascadero for ICF level of care.

The patient had a history of recurrent depressive episodes, chronic passive suicidal ideation, and multiple suicide attempts.  His most recent suicide attempt occurred by an attempted heroin overdose in 2015.  At the time of DSH-Atascadero admission, the patient was assessed with moderate risk for danger-to-self and others due to his history of suicidal and self-injurious behaviors and aggressive behavior toward others.

The treatment team meetings usually included the necessary participants, as each meeting was attended by at least the psychiatrist, PC, and social worker.  The treatment outcome expectations were identified at the initial treatment team meeting on September 1, 2022.  Identified treatment outcome expectations included reducing depression from September 10, 2022 to February 10, 2023 for 90 days, reducing suicidal ideation from August 10, 2022 to January 10, 2023 for 90 days, developing three positive coping skills, and addressing sleep hygiene and reducing

episodes when he remained awake all night. At the September 22, 2022 treatment team meeting, the patient reportedly expressed a strong desire to attend groups and to pursue substance abuse treatment. He was enrolled in one hour of weekly group treatment but attended zero percent of those groups from August 7 to September 3, 2022. The patient did attend several drop-in groups during that period.

A treatment team meeting occurred on October 11, 2022, after the patient transferred to a different unit due to a seizure disorder. The team on that unit continued the treatment plans from the previous unit. At an October 27, 2022 treatment team meeting, the patient was described as pleasant and cooperative, and his baseline mood was euthymic and appropriate. He demonstrated good ADLs, with 100 percent group attendance at the time of the treatment team meeting. Group assignments were appropriate and aligned with the patient's treatment goals. The patient was enrolled in nine scheduled hours of group treatment weekly, with overall attendance between September 17 and October 8, 2022 at 87.5 percent. Documentation indicated that the patient received three individual therapy sessions with his PC, as well as other ad hoc primary clinician contacts. Psychology notes documenting these sessions were comprehensive and clinically relevant.

The patient was discharged from DSH-Atascadero on November 29, 2022, after he reportedly demonstrated a consistent pattern of drug seeking behaviors, collecting and selling medications, and using Suboxone for intoxication. Although the clinical goals and treatment outcome expectations had not been met, the treatment team determined that the patient's behaviors made the unlocked dorm hospital setting inappropriate for the patient, and he was discharged to the EOP level of care. The patient had not fully met any of his treatment outcome expectations prior to discharge.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate; however, discharge to the EOP was premature.

The treatment team should have considered and placed a referral to a PIP for continuing ICF level of care rather than reducing the patient's level of care to EOP. The patient responded well to groups, medications, individual therapy, and support. A more restrictive housing unit may have assisted the patient in achieving his clinical goals given the interaction between his symptoms, behaviors, and psychopathology.

**Patient E**

This 65-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental healthcare provided at DSH-Atascadero. This patient was admitted to DSH-Atascadero on May 12, 2021, and was discharged on February 16, 2023. Provided diagnoses upon admission included bipolar disorder, most recent episode mixed with psychotic features; dementia with Lewy bodies; alcohol use disorder, severe; and cannabis use disorder, severe. These diagnoses remained essentially unchanged throughout the DSH-Atascadero stay apart

from an update of the bipolar I disorder diagnosis upon discharge to indicate that the most recent episode was manic.

The patient was referred to DSH-Atascadero from the CMF MHCB on May 1, 2021, due to psychotic decompensation causing grave disability.  He was reportedly stable at the EOP level of care until April 14, 2021; however, he subsequently decompensated with reported tangential and delusional thinking, paranoia, hyper-religiosity, and impulsivity.  The patient also made statements to other inmates that could result in his assault.

The treatment outcome expectations from CDCR included review of delusional and paranoid thinking to decrease anxiety surrounding those thoughts, learning grounding and self-soothing techniques to assist in remaining present-focused and feeling a sense of safety, and integrating reality-based feedback to address unremitting thoughts that contributed to acute distress.

Suicide and violence risk assessments were performed upon admission, and the patient was assessed with low current risk of violence toward others and low current risk for suicide or self-injurious behaviors.  There were two documented previous suicide attempts.  The first involved an impulsive attempt to overdose on Ritalin at age 14.  The second attempt occurred in 2009 when the patient cut his wrists and stabbed himself in the abdomen after he killed his mother; the patient called 911, and he received medical treatment.

Since arrival at DSH-Atascadero in May 2021, the patient received several psychological and neuropsychological evaluations.  He was provided a diagnosis of unspecified neurocognitive disorder on July 21, 2022 after a neuropsychological evaluation.  His baseline was noted as "constant severe anxiety and forgetfulness and coarse tremor."  On December 19, 2022, he was prescribed hydroxyzine, lamotrigine, mirtazapine, olanzapine, and Haldol.  The patient reportedly requested as-needed medications excessively rather than attempting to learn and apply appropriate coping skills.  There were no episodes of self-harm or outwardly aggressive or disruptive behaviors documented during this hospitalization.

Two treatment team meetings occurred during the review period, on August 11, 2022 and November 10, 2022.  The August treatment plan described the patient as pleasant and cooperative, with 95 percent group attendance (eight hours scheduled), having unstable mood due to anxiety, and that he was requesting as-needed medications for racing thoughts.  The patient identified reading the Bible, praying, attending group, and resting in his room as coping skills.  The treatment team reported that the patient had met all treatment outcome expectations for the previous quarter.

The patient was enrolled in seven hours of group treatment weekly at the November 2022 meeting.  The assigned groups were appropriate to the patient's clinical presentation and goals.  The patient reportedly met his treatment outcome expectations at the November treatment team meeting.  The team determined that the patient demonstrated no abnormal findings, was pleasant and cooperative on the unit, was euthymic and often anxious, attended to his ADLs, and tended to isolate in his dorm.  The patient subsequently discharged from DSH-Atascadero on February 16, 2023.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate.

The patient made appropriate, incremental progress and improvement in his mental health status. The group assignments and clinical interventions provided were individualized and appropriate to the patient's presentation. He received psychological and neuropsychological testing which identified the presence of a neurocognitive disorder that informed the course of treatment. The patient responded well to the interventions and treatment provided; he appeared to achieve stability, and his discharge was timely and appropriate.

**Patient F**

This 59-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental healthcare provided at DSH-Atascadero. He was admitted to DSH-Atascadero on August 5, 2022, and was discharged on December 20, 2022, when he returned to CDCR for parole. The patient was referred to DSH-Atascadero from CSATF on July 18, 2022, due to refusing to take medications and exhibiting manic and psychotic behavior. Diagnoses upon DSH-Atascadero admission included schizoaffective disorder, bipolar type; amphetamine use disorder, in remission; and alcohol use disorder, in remission. Those diagnoses remained unchanged throughout the DSH hospitalization.

This patient served multiple CDCR prison terms. He was most recently released from CDCR in September 2021, but was rearrested in April 2022 and placed at CMC. Documentation indicated that the patient discontinued his psychotropic medications during April 2022 with rapid decompensation, including psychosis and mania. He transferred to CSATF near the end of June 2022, and was soon referred to mental health by custody on July 8, 2022, as he reportedly displayed bizarre, aggressive, and uncharacteristic behaviors. He reportedly refused to resume his medications prior to arrival at DSH-Atascadero. The patient agreed to resume medications upon admission to DSH-Atascadero, and he was subsequently prescribed Depakote and Risperdal.

Treatment plans and progress notes indicated that the patient was motivated for treatment, as he stated during admission that he wanted to resume medications and recognized that he was experiencing manic symptoms. Treatment plan documentation indicated that the patient was medication and treatment adherent throughout his DSH-Atascadero stay with good treatment response.

Psychology progress notes indicated continued progress as the patient responded to medication treatment. The patient reported a significant decrease in symptoms, with less anxiety and grandiosity, improved cognition and thinking, and the ability to regulate sleep patterns. He was enrolled in nine hours weekly of scheduled group therapy, and his attendance improved each month until discharge when his attendance reached 100 percent. He was described as psychiatrically stable, not requiring the use of as-needed medications, and not having any seclusion or restraint episodes during hospitalization.

133

At the time of DSH-Atascadero discharge, the patient's mental status was described as normal with good insight regarding his mental illness and the need for ongoing mental health treatment. He denied psychotic symptoms and was fully alert and oriented. The patient was discharged and paroled from CDCR to a drug treatment program, and he reportedly eagerly anticipated ongoing treatment.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate.

The patient responded well to the prescribed psychotropic medication regimen. His medications were adjusted appropriately over time, and the psychiatrist considered patient input and potential medical contraindications. He was assigned to appropriate groups to address and support his clinical mental health needs. His mental status improved consistently and significantly during the course of hospitalization, and the treatment team appeared to prepare him appropriately for transition to a community drug treatment program.

**Patient G**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Atascadero. He was admitted to DSH-Atascadero on September 21, 2021, and discharged 13 months later on October 28, 2022. Upon admission to DSH-Atascadero, he was provided with diagnoses of schizoaffective disorder, bipolar type; amphetamine-type substance use disorder, moderate, in a controlled environment; alcohol use disorder, moderate, in a controlled environment; and antisocial personality disorder.

The patient had a long and extensive history of severe mental illness. Immediately prior to his admission in September 2021, the patient reported to staff that people were urinating in his food with persecutory delusional thinking about other inmates. Additionally, he refused to leave his cell due to paranoia and safety concerns, and he had increased visual and auditory hallucinations with disorganized thinking, catatonia, assaultive behaviors, impulsivity, poor sleep, and medication nonadherence. Although he denied mental health treatment in the community, his CDCR mental health history was significant for two prior admissions to DSH-Atascadero in 2006 and 2008, ECT at DSH-Metropolitan in 2020, numerous MHCB, APP, and ICF admissions, and medication trials of various antipsychotics and mood stabilizers including clozapine, olanzapine, lorazepam, valproic acid, risperidone, and Haldol. This patient received his psychotropic medications by a PC 2602 order due to grave disability since 2012.

Several treatment outcome expectations were developed that included the patient remaining fully medication adherent, reduction of paranoia and delusional behaviors, discontinuation of suicidal thoughts and behaviors, attendance in at least 80 percent of scheduled groups, and attendance to ADLs. The psychiatrist with the treatment team worked diligently to determine the appropriate medications for this patient, and the healthcare record contained several psychiatric consultations to the Psychiatric Resource Network at DSH-Patton. Psychotropic medication adjustments occurred ongoing, and the patient appeared to respond best to the combination of Depakote and Zyprexa. Although improvement was noted in mood stability, paranoia and psychotic symptoms

remained. During August 2022, the patient's requests for as-needed medications was high (total of 45 incidents); however, the use of these medications significantly decreased during September and October 2022, when only one medication was requested. At the time of discharge, he was prescribed olanzapine, paliperidone palmitate, and valproic acid.

Treatment team meetings occurred annually during the review period. At that meeting, the patient was described as able to clearly communicate his thoughts and needs to select staff, and he stated motivation to participate in treatment and demonstrated some insight into his mental illness. The patient also, however, continued to exhibit paranoid delusional thinking about staff and other patients, appeared annoyed when prompted to complete his ADLs, continued to report command auditory hallucinations, and sometimes became argumentative when discussing treatment. When asked, the patient reported that he "feels alright" toward patients and staff. He did not require seclusion or restraints during the hospitalization and was never placed on individual enhanced observation.

At the time of discharge, the patient reportedly engaged more with staff and attended some scheduled treatment groups. He received individual therapy from the primary clinician during August and September 2022 and reportedly engaged well in the sessions. He also reportedly attended to his ADLs and followed unit rules. Despite self-reporting ten of ten (highest level of depression) at discharge, his clinical presentation reportedly did not match that self-report, and his mood and presentation were significantly more stable and improved since admission. The patient was subsequently discharged to the EOP level of care, as the treatment team determined that he had received maximum benefit from the DSH program; additionally, they acknowledged that they were unable to fully meet the CDCR treatment outcome expectations.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate.

The treatment team attempted several psychopharmacological and therapeutic approaches to address the patient's symptoms. This patient had a long history of severe mental illness, and he was prescribed many different medication regimens over time. Although they did not meet all of the treatment outcome expectations provided by CDCR, the treatment team at DSH-Atascadero appeared to make every effort to stabilize this patient and provide appropriate treatment.

**Patient H**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Atascadero. He was directly admitted to DSH-Atascadero on November 3, 2022, and administratively transferred from the CHCF-PIP on November 16, 2022. His mental health diagnoses upon admission were schizoaffective disorder, bipolar type; amphetamine-type substance use disorder, severe; and cannabis use disorder, moderate. He was prescribed olanzapine, Depakote, and amantadine upon DSH-Atascadero admission. The patient's status upon admission to DSH-Atascadero was as a PC 2684 patient; however, he administratively paroled on November 24, 2022, and was retained as a Mentally Disordered Offender (MDO) pending further stabilization.

This patient entered CDCR for his most recent term on May 26, 2021, with a three-year sentence for robbery. Upon intake, he was initially placed at the Correctional Clinical Case Management System (3CMS) level of care, but his level of care was increased to EOP approximately two weeks later. He received services at the EOP level of care until he was placed in the MHCB on December 5, 2021. A PC 2602 application was filed on December 8, 2021, and he was referred to the APP on December 10, 2021. The patient reportedly was not showering, was eating from the trash, and was taking food from other inmates; this behavior placed the patient at risk for assault. He was also described as psychotic. He reportedly threatened staff and received an RVR for gassing on January 7, 2022, while awaiting transfer to the APP. He transferred to the APP on January 12, 2022, where he responded well to treatment, and was placed at the ICF level of care (single cell) on March 30, 2022.

The patient's symptoms during the past year at CDCR were described as delusional, erratic, hypomanic, and hyper-religious, with decreased showering and self-care, eating from the trash, shouting vulgarities, assuming bizarre fighting stances, and threatening to assault others, as well as exhibiting agitation and collecting feces on his food with open masturbation. He responded well to treatment and was subsequently referred for ICF unlocked dorms on October 4, 2022. He was subsequently admitted to DSH-Atascadero to complete his sentence and prepare for eventual parole as an MDO.

The patient was provided with several treatment outcome expectations when he was transferred from CDCR. Specifically, he was expected to refrain from impulsive behavior, develop safe and socially appropriate methods of expressing feelings, develop new coping skills, attend more than 70 percent of scheduled groups, demonstrate 100 percent medication adherence, and independently manage perceived stress. Although the treatment team meetings did not always include the necessary participants, the patient was provided with appropriate interventions to support his clinical needs. Review of psychology and psychiatric progress notes indicated alignment with treatment plan interventions. His medications remained unchanged throughout his hospitalization and the review period, and he appeared to exhibit increased stability in response to medication treatment. Group assignments were appropriate and primarily consisted of substance abuse, medication management, and pre-release groups. At the February 1, 2023 treatment team meeting, the patient was described as medication and treatment adherent, and there were no psychotic behaviors or symptoms noted by staff. The patient reported clear thinking and attended 81.5 percent of his groups between November 6, 2022, and January 28, 2023.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate.

The patient was admitted for ongoing treatment and stabilization pending parole and transition from his status as a PC 2684 patient to an MDO. He appeared to respond well to treatment at DSH-Atascadero, and his mental status continued to improve and stabilize throughout his hospitalization and as he prepared for parole. The psychiatrist and patient worked collaboratively regarding medication management, and the patient achieved and maintained

medication adherence.  His group assignments were appropriate to his needs, and he demonstrated appropriate group participation.

**Patient I**

This 45-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Atascadero.  The patient was admitted to DSH-Atascadero on October 18, 2021 from the CMF MHCB.  He was admitted to the CMF MHCB on September 24, 2021 due to suicidal ideation after he reported a significant increase in command auditory hallucinations, described a plan to hang himself, and had fashioned a noose.  The record indicated there was no clear, identifiable trigger for the patient's sudden decompensation.  Upon admission to DSH-Atascadero, the patient reported "My voices got worse, I was ready to act on killing myself."

At the time of DSH-Atascadero admission, the patient was provided with a diagnosis of schizoaffective disorder, depressive type.  His risk for self-harm and suicide was assessed as moderate throughout the hospitalization.  The patient had a long and significant history of suicidality, and received his psychotropic medications by a PC 2602 order due to danger to self.  He had previously reported between seven and 20 suicide attempts and a history of up to 25 psychiatric hospitalizations in the community.  There were two prior admissions to DSH-Atascadero from June 12 to July 21, 2017, and from October 17 to October 22, 2017, both for competency restoration.

The patient was reportedly stable for several months at the EOP level of care at CMF prior to his MHCB admission on September 24, 2021.  He reported ongoing moderate depression and auditory hallucinations.  When he was admitted to DSH-Atascadero, the patient was prescribed olanzapine and sertraline.  He remained 100 percent medication adherent throughout his hospitalization.  Olanzapine was adjusted during the hospitalization due to medication side effects that included weight gain, hypertension, and diabetes.  The patient refused to consider other medications despite developing these symptoms of metabolic syndrome, choosing instead to vigorously exercise.  Despite successfully losing weight, some of his laboratory studies remained problematic.  The treatment team appropriately recommended that the next treatment team continue to encourage the patient to consider a different antipsychotic medication given his development of metabolic syndrome.

The patient was provided with several treatment outcome expectations when he transferred from CDCR.  The treatment outcome expectations focused on reducing the patient's residual suicidal ideation, learning coping techniques for managing suicidal ideation, mastering techniques to cope with hallucinations, maintaining 100 percent medication adherence, evaluation for methamphetamine use, and referral to appropriate groups.  At the July 18, 2022 treatment team meeting, the patient was described as clearly communicating his thoughts and needs to staff and was independently socializing with peers.  The patient was reportedly motivated to participate in treatment and was responsive to staff interventions.  He reported that his auditory hallucinations rated as four of ten on a ten-point scale.

Review of treatment plans and clinical progress notes indicated that the patient was relatively stable throughout the course of his DSH-Atascadero stay. At discharge on December 16, 2022, he had continued 100-percent medication adherence. He was described as demonstrating stable mood, with denial of suicidal ideation, improved social engagement, and linear, goal-directed thinking. He reported that he experienced very mild psychotic symptoms and paranoid ideation; for example, the patient reported that he occasionally heard a voice at night saying, "people are following me" and a voice telling him to "kill myself" when he was falling asleep. The patient articulated to the treatment team several coping skills and stated he was able to disregard the voices telling him to kill himself. He rated his depression as very mild (three of ten), and he attended 60 percent of his groups in the month prior to discharge. The treatment team and the patient agreed that the patient had met his CDCR treatment outcome expectations, and he was appropriately discharged to the EOP level of care.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate.

The patient's mental status improved during his hospitalization, and he was able to meet the CDCR treatment outcome expectations prior to discharge. The patient achieved and maintained 100 percent medication adherence, and the prescribed psychotropic medications were effective in symptom control. Attempts were made by the psychiatrist to mitigate the medication side effects, and the medication dosages were adjusted appropriately while maintaining efficacy. The patient reported no suicidal ideation at the time of discharge, with significant reduction in psychotic symptoms; further he was able to articulate coping skills and techniques to address his auditory hallucinations and psychotic symptoms when they occurred. He also participated in substance abuse groups.

**Patient J**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care and treatment at DSH-Atascadero. The patient was admitted on June 17, 2022 from North Kern State Prison (NKSP), and was discharged on December 4, 2022, when he returned to CDCR for parole. His mental health diagnoses at admission included unspecified schizophrenia spectrum and other psychotic disorders; amphetamine use disorder, severe; cannabis use disorder, severe; and pedophilic disorder, exclusive type, sexually attracted to both.

The patient entered CDCR for his most recent term on April 20, 2022 for possession of a controlled substance and failing to register as a sex offender, both parole violations. He was immediately admitted to the MHCB on April 20, 2022, where he remained until May 1, 2022. He was again referred and admitted to the MHCB between May 12 and May 23, 2022. He was admitted to DSH-Atascadero on June 17, 2022, due to suicidal ideation, anxiety, and depression; specifically, "treatment of mood and psychotic symptoms complicated by significant medication side effects."

The patient's risk for suicide and self-injurious behaviors upon admission to DSH-Atascadero was assessed as moderate. He reported a history of four suicide attempts, the most recent

occurred approximately two to three weeks prior to DSH-Atascadero admission when he attempted to overdose on Remeron. He reportedly appeared isolated, and he reported and demonstrated evidence of auditory hallucinations and visual hallucinations, with minimal participation in treatment. Treatment outcome expectations provided by CDCR focused on the patient gaining the ability to identify three triggers for suicidality, exploring his feelings of despair and identifying unresolved issues in his life, developing three coping mechanisms to reduce distress and to remain free of self-injurious behaviors, and taking his prescribed medications.

The documentation of the patient's psychotropic medication record was inconsistent and unclear, as the CDCR record included multiple antipsychotic and mood stabilizing medications that the patient denied ever taking. The medications listed in the patient's healthcare record included quetiapine, hydroxyzine, risperidone, Haldol, divalproex, mirtazapine, propranolol, and benztropine. At the time of admission, the patient presented with significant bilateral upper extremity tremors. His medications were immediately adjusted and closely monitored by the psychiatrist throughout his hospitalization to address any additional medication side effects. He was prescribed Depakote and mirtazapine at the time of DSH discharge; these medications were reportedly effective in addressing the patient's psychotic and mood symptoms with minimal to no reported medication side effects.

Review of treatment plans and progress notes indicated that the patient was initially cooperative and responsive to treatment. He denied suicidal and homicidal ideation, auditory hallucinations, and self-injurious behaviors at the initial treatment team meeting. He was placed on polydipsia protocols on July 27, 2022. He required enhanced one-to-one observation for a total of 375 hours between August 17 to September 8, 2022, primarily for polydipsia protocol. The patient reportedly had an episode of extreme verbal aggression on August 15, 2022, when he spat at and punched the window of the nurse's station, resulting in placement in full bed restraints for 11 hours between August 15 to August 16, 2022. This event was discussed with the patient at the August 16, 2022 treatment team meeting, and he described being "in a downward spiral." The treatment team recommended a dialectical behavior therapy (DBT) group for the patient to improve his coping skills. Between August 17 and September 17, 2022, the patient reportedly appeared anxious at times with pacing.

There was documentation of discussion between the patient and the treatment team in early September 2022 when the treatment team encouraged the patient to focus on his treatment outcome expectations and to try to "move away from the polydipsia." The team reportedly told the patient that his behaviors were highly problematic and disruptive to his treatment and the unit, and if he did not discontinue the polydipsia, he would be returned to CDCR to complete his sentence. The patient's behavior reportedly improved quickly and significantly, as he began to attend most groups and scheduled appointments. Polydipsia monitoring was discontinued successfully on September 8, 2022.

Quetiapine was also discontinued in September 2022, and the patient reported that he slept well without anxiety or auditory and visual hallucinations in the prior five months. The patient received frequent individual contacts with the PC, and the interventions provided in those sessions were appropriate. He was encouraged to attend groups; he was provided DBT skills

139

training, and motivational interviewing techniques were utilized as the patient approached discharge and parole.

The November 28, 2022 discharge summary noted that the patient reported euthymic mood, and his overall group attendance was 85.4 percent.   He was active and social on the unit, as he participated in unit government and was named sergeant-at-arms by his peers on November 2, 2022.  He denied medication side effects and demonstrated normal mental status, full affect, euthymic mood, and linear thought processes.  The patient had no suicidal or homicidal ideation or auditory or visual hallucinations at discharge, and his mental health symptoms had reduced significantly.

**Findings**

The care and treatment provided to this patient at DSH-Atascadero was adequate.

The patient's medications were adjusted and monitored appropriately to maximize clinical effectiveness while minimizing and/or eliminating medication side effects.  The patient worked collaboratively with the psychiatrist and responded well to the medication regimen; he denied auditory and visual hallucinations, and suicidal ideation throughout much of his hospitalization and at discharge.  His polydipsia was addressed appropriately, and the treatment team was able to motivate the patient to reengage in treatment.  His group attendance increased over time, as did his engagement with the PC, and the treatment team encouraged the patient to enroll in a community-based drug treatment program upon discharge and parole.

**Patient K**

This 60-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero.  The referring treatment team at the CMF MHCB originally referred the patient to the acute level of care; however, due to interval progress, this referral was changed to the intermediate level of care.  The patient was admitted to DSH-Atascadero on July 2, 2021.  His diagnoses at the time of admission included schizoaffective disorder, depressed type, and cannabis use disorder.

The patient had a history of multiple MHCB, acute, and intermediate level of care placements.  The patient had prior hospitalizations at DSH-Atascadero in 2009, 2017, and 2019.  These admissions generally occurred due to paranoia that someone would hurt him.

Treatment outcome expectations from CDCR included improved reality testing, reducing paranoia, engaging in ADLs, refraining from self-injury, and attending individual and group sessions.  DSH-Atascadero treatment goals included stabilization of psychotic, mood, and behavioral symptoms; enhancing healthy coping; abstinence from substance use; and medication adherence to maintain mental stability.

Upon admission, the Columbia Suicide Severity Rating Scale (C-SSRS) was administered, assessing moderate suicide risk; however, the risk level was subsequently reduced to low.  The patient had an extensive history of hanging and cutting his wrists, as well as headbanging.  His

140

last suicide attempt occurred in 2019 by wrist cutting. Contributing factors for suicidality were auditory hallucinations, limited impulse control, and low frustration tolerance. The patient's violence risk assessment on July 5, 2022 was low.

The patient was prescribed clozapine and haloperidol for treatment of psychosis, hydroxyzine for anxiety, and atropine to address side effects from clozapine. The patient was also prescribed hydroxyzine for anxiety and haloperidol for agitation on an as-needed basis. There was good documentation regarding the patient's use of the as-needed medications. The patient did not receive his psychotropic medications by a PC 2602 order.

During January 2023, the patient experienced increased paranoia requiring further medication adjustment. He was actively involved in treatment, and frequently attended all offered groups. Progress notes contained statements indicating that the patient would be enrolled in eight hours of treatment groups weekly; however, it was not always clear whether the groups actually occurred due to COVID-19 restrictions. The patient attended DBT skills and aggression reduction groups. He was medication adherent. He denied the presence of hallucinations, and suicidal or homicidal ideation.

The patient had episodes of agitation including verbal aggression toward others. Staff addressed these behaviors using redirection and when required, as-needed medication. The patient was followed by the clozapine clinic where he was monitored for common medication side effects. The treatment team also obtained medication blood levels, as appropriate. The patient had medical issues which required the discontinuation of the antipsychotic medication clozapine. Unfortunately, the patient subsequently had clinical worsening of his symptoms.

Some psychology progress notes were undated, and the notes contained scant clinical information.

At the time of review in March 2023, the patient remained hospitalized at DSH-Atascadero at the intermediate level of care.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The provided diagnoses were supported by clinical documentation in the healthcare record. The treatment plan supported the diagnosis and current challenges, and contained realistic, time-limited goals. The treatment plan contained meaningful updates on the evolving clinical status of the patient.

The patient was prescribed two antipsychotic medications, and the clinical justification for this practice was clearly documented.

Deficits in care included some undated notes by the psychologist; additionally, it was unclear how these contacts addressed treatment plan goals.

**Patient L**

This 62-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The patient had one prior psychiatric hospitalization after a suicide attempt in 2018.

The patient was referred by the Richard J. Donovan Correctional Facility (RJD) for more intensive inpatient treatment. The patient was admitted to DSH-Atascadero on May 20, 2022. Documentation stated that the patient's depression began approximately five years prior, and his psychotic symptoms started approximately ten years prior.

The patient was provided with diagnoses of major depressive disorder, with psychotic features; alcohol use disorder; cocaine use disorder; amphetamine-type substance use disorder; opioid use disorder; and antisocial personality disorder.

The patient was prescribed haloperidol and olanzapine to treat psychosis, lithium for mood stabilization, venlafaxine and mirtazapine for treatment of depression, and trazodone for insomnia. Other relevant medications included gabapentin prescribed for pain. The patient did not receive his psychotropic medications by a PC 2602 order.

The referring CDCR facility's treatment outcome expectations related to medication changes and adherence, reduction in psychotic symptoms and distress, and increase in group attendance and socialization.

The patient's suicide and self-harm risk level was assessed as moderate. The patient experienced command auditory hallucinations to harm himself and others. His violence risk was assessed as low.

The patient's psychiatric treatment at DSH-Atascadero was complicated by complex medical needs, requiring treatment at an outside hospital from September 3 – 19, 2022.

The patient only partially met his treatment goals. Despite being offered ten hours of supplemental activities per week, he often remained in his room. The patient attended 26.7 percent of treatment during the last month of his stay. Healthcare documentation indicated infrequent contact with the psychologist. The patient progressed to HAS level two during treatment. While the patient did not have significant improvement in command auditory hallucinations, he fortunately did not feel compelled to respond to the hallucinations.

On November 18, 2022, the patient was discharged to CSATF at the EOP level of care.

**Findings**

The treatment provided to this intermediate level of care patient was adequate.
The patient had profound functional impairment due to his mental illness, and his care was complicated by complex medical needs. Notably, there was close coordination between psychiatry and medical services. As for medication management, psychiatric documentation

clearly identified the symptoms treated by each medication. Additionally, the psychiatrist clearly explained the rationale for using multiple medications.

While there were several positive aspects regarding the care provided to this patient, several deficiencies were also noted. While the referring institution provided a diagnosis of schizoaffective disorder, depressed type, the diagnosis was revised to major depressive disorder, with psychotic features at DSH-Atascadero. For a diagnosis of major depressive disorder with psychotic features, the patient would have the onset of depression followed by psychotic symptoms. The psychotic symptoms would only exist in the presence of the depressive episode. Documentation from DSH-Atascadero instead noted that the patient's psychotic symptoms emerged several years prior to the onset of depression. While this did appear diagnostically inconsistent, it did not appear to impair treatment, as the treatment for both conditions required antipsychotic and antidepressant medications.

Regarding the choice of medications, the psychiatrist-initiated treatment with the antidepressant medication mirtazapine. This was noteworthy as the patient had pre-existing obesity, and mirtazapine frequently caused side effects of increased appetite and weight gain. Additionally, the patient was already prescribed several other medications with the possible side effect of weight gain. The documentation should have more strongly supported the use of this medication, rather than an alternative that did not result in these side effects. Documentation in the healthcare record was inconsistent regarding whether or not the patient had an allergy to gabapentin. This issue was resolved by the time of discharge in one portion of the healthcare record, but it was not resolved in other areas of the record.

The patient had few documented sessions with the psychologist. Progress notes from the psychologist were sparse in content and did not clearly align with the patient's treatment goals. Treatment plans were sometimes unsigned by the psychiatrist and the psychologist. Finally, documentation of the rationale for discharge was inadequate, as the patient had not met many of his treatment goals.

**Patient M**

This 46-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The patient had worsening suicidal ideation and hallucinations, necessitating a rapid escalation in his levels of care. The patient heard the voice of the devil with commands to die. His depression was compounded by physical and emotional challenges from loved ones. At NKSP, the patient moved rapidly from the EOP to the MHCB level of care. He then transferred to the intermediate level of care at the SVSP-PIP, where he was treated from March 18 - April 15, 2022. The patient was admitted to DSH-Atascadero on April 15, 2022, and was discharged on November 19, 2022.

The patient received mental health services at the 3CMS level of care in 2002. His level of care was increased to EOP in 2013. He had a history of eight prior MHCB placements, most recently in February 2022 for suicidal ideation with plan to hang himself or to overdose on heroin. The patient had a history of prior treatment at DSH-Atascadero from 2016 to 2019. He was originally placed at DSH-Atascadero under a PC 2684 order; however, subsequently his status

changed to a PC 2962 order (Mentally Disordered Offender, now known as Offenders with a Mental Health Disorder).

The patient was provided with diagnoses at time of admission that included major depressive disorder, recurrent, severe; opioid use disorder; alcohol use disorder; amphetamine use disorder; and antisocial personality disorder. The discharge summary also mentioned a possible history of PTSD.

The DSH treatment team indicated the belief that the patient may have amplified symptoms of psychosis. His reported mood symptoms were congruent with observations by the treatment team.

The suicide risk assessment and violence risk assessment both assessed low risk. The patient had a history of at least five suicide attempts by overdose and hanging. The most recent attempt was estimated to have occurred six years prior when he attempted to hang himself in prison.

The patient was prescribed fluoxetine, sertraline, and mirtazapine for depression, as well as diphenhydramine for insomnia, and hydroxyzine for anxiety on an as-needed basis. He did not receive his psychotropic medications by a PC 2602 order. Other relevant medications included buprenorphine for opioid use disorder and gabapentin for seizure disorder. The medical provider noted that the patient had a seizure disorder and placed the patient on gabapentin at a dosage of 1200 mg twice daily, without first titrating the dosage.

The referring facility's treatment outcome expectations focused on reducing suicidal ideation, depression, and anxiety, and increasing medication adherence and participation in treatment.

During his treatment course, the patient had a reduction in his HAS level due to reportedly having contraband items, as well as bartering items. Notes indicated that the social worker would assist the patient in preparing for his parole date. As the patient approached release, his group attendance declined. There was a lack of documentation regarding how the treatment team addressed this issue or how treatment goals were modified.

The patient paroled on November 19, 2022.

**Findings**

The treatment provided to this intermediate level of care patient was adequate.

The provided diagnoses were supported by clinical documentation in the healthcare record. Treatment goals were consistent with the patient's diagnoses. Pharmacologic management appeared reasonable and conformed to the stated diagnoses. The treatment team worked with the patient regarding tapering and discontinuation of buprenorphine; however, as cravings returned, they worked collaboratively with the patient to resume the medication. As noted in other DSH-Atascadero patient care reviews, limited groups were provided due to COVID-19 restrictions. While activities off of the unit were limited, the facility attempted to supplement with on unit activities.

While the focus of this review was on the mental health treatment provided, the expert was nonetheless concerned regarding the initiation of high-dose gabapentin by the medical provider for the patient's reported seizure disorder. While on-site, the expert recommended that the case be referred for medical review.

Given the patient's prior lengthy hospitalization at DSH under both PC 2684 and PC 2962 orders, better pre-release planning was warranted.

**Patient N**

This 23-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero.

The patient originally received mental health services at the EOP level of care at the California State Prison/Los Angeles County (CSP/LAC). Due to worsening psychosis and danger-to-self and others, the patient was referred to a higher level of care. The patient was subsequently admitted to the CMF-PIP in the High-Custody Intermediate Care Unit, prior to transfer to DSH-Atascadero. While at the CMF-PIP intermediate level of care, the patient required transfer to the acute care unit, apparently due to clinical worsening.

The patient had a prior history of MHCB placements; however, the dates and duration of these placements were unclear in the records reviewed. The patient had a prior hospitalization at DSH-Atascadero from August to December 2019, due to paranoia and persecutory delusional thinking.

The referring facility listed the following treatment outcome expectations: development of coping skills and reality testing to address psychosis; reduction of anxiety; and medication adherence.

The DSH-Atascadero treatment team assessed the patient with moderate risk of self-harm. The patient denied any prior suicide attempts.

The patient was provided with diagnoses of schizophrenia, amphetamine-type substance use disorder, and antisocial personality disorder.

At the time of admission, the patient was prescribed oral olanzapine and risperidone long-acting injectable antipsychotic medication. The DSH-Atascadero psychiatrist adjusted the patient's medications. Upon admission, the psychiatrist discontinued the long-acting injectable risperidone, and instead prescribed the oral version. The rationale for this medication change was not well documented.

During the course of treatment at DSH-Atascadero, the psychiatrist prescribed olanzapine, risperidone, chlorpromazine and haloperidol for treatment of psychosis, and diphenhydramine for insomnia. He was also prescribed olanzapine for agitation, hydroxyzine for anxiety, and benztropine to treat antipsychotic-induced side effects; all were prescribed on an as-needed basis.

145

At the time of arrival to DSH-Atascadero, the patient received his psychotropic medications by a PC 2602 order due to grave disability. The hospital did not renew the PC 2602 petition, as the patient was medication adherent, and the order subsequently expired on June 18, 2022.

While the patient made overall progress, there was one instance of hitting a wall in May 2022, due to auditory hallucinations. The patient had no resultant significant injury. He was placed in seclusion on October 14, 2022, due to worsening auditory hallucinations and homicidal ideation. Notably, the staff attempted less restrictive measures, including administering an as-needed medication which was only partially beneficial.

The patient had good treatment participation prior to discharge. While contacts by the social worker were consistently well documented, the only psychology notes present in the healthcare record were those associated with treatment team meetings. Of note, the list of medications in the psychiatrist's discharge summary was incomplete, as it did not contain prescribed medications ordered on an as-needed basis.

The patient was discharged to CSP/LAC at the EOP level of care on October 20, 2022.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The provided diagnoses were supported by clinical documentation in the healthcare record. The treatment goals and medications were appropriate, based on the given diagnoses, symptoms, and clinical presentation. While the patient required seclusion on one occasion, this occurred after less restrictive alternatives were implemented, and there was adequate documentation for the rationale for seclusion placement.

Although the patient had a history of medication nonadherence and received his psychotropic medications by PC 2602 order, the DSH-Atascadero psychiatrist changed the patient's medications on the day of admission from a long acting injectable to an oral form of the medication. The psychiatrist inadequately documented the rationale and justification for such a change. Additionally, the discharge summary did not contain a list of all medications prescribed to the patient. This was clinically important, as the discharge summary was one of the most important documents used to convey clinical information upon the patient's return to CDCR.

**Patient O**

This 60-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The patient was referred from the CSATF MHCB due to worsening psychotic symptoms. He was admitted to DSH-Atascadero on April 15, 2022, and was discharged on December 23, 2022.

The patient had several prior admissions to DSH, under both PC 1370 (Incompetent to Stand Trial) and PC 2684 statutes.

The patient had an extensive history of severe psychotic symptoms that sometimes resulted in violent behavior. His controlling offense of murder occurred due to the presence of auditory hallucinations. Upon admission, the patient had extensive delusions of grandiosity, as well as delusional thinking that he was pregnant. He refused his medication for diabetes as he feared it would harm his baby. He was disheveled with a recent weight loss of approximately 40 pounds over the preceding few months.

The patient was provided with a diagnosis of schizophrenia. Relevant medical illnesses included diabetes mellitus with a history of diabetic ketoacidosis, a life-threatening complication.

Treatment outcome expectations included increased oral intake and weight; improved showering; increased ability to engage in coherent conversation; consideration of a trial of the antipsychotic clozapine; and medication adherence.

Upon admission, the patient was assessed with moderate risk for self-harm and suicide. His violence risk assessment noted low risk. Prior to DSH-Atascadero discharge, the psychiatrist noted that the patient was at low risk for self-harm, suicide, and violence.

At the time of admission, the patient was prescribed paliperidone long-acting injectable and ziprasidone for treatment of psychosis, and fluoxetine for depression. While at DSH, the psychiatrist tapered and discontinued ziprasidone. The psychiatrist tried twice to initiate treatment with the antipsychotic medication clozapine, but this was complicated by medical side effects. Eventually, the patient was able to tolerate the medication. Additional medications ordered on an as-needed basis included haloperidol for agitation or refusal of clozapine, and hydroxyzine for anxiety. The patient received his psychotropic medications by a PC 2602 order.

Due to medical issues and resultant fall risk, the patient required close medical and nursing monitoring and intervention.

The patient had limited group attendance, partially due to his complex medical needs. On December 23, 2022, the patient was discharged to the CMF correctional treatment center (CTC) for more intensive medical care.

**Findings**

The care provided for this intermediate level of care patient was adequate.

The provided diagnoses were supported by clinical documentation in the healthcare record. The treatment goals and medications were appropriate based on the given diagnoses, symptoms, and clinical presentation. This patient was severely impaired by his profound psychiatric illness. DSH initiated a trial of clozapine, a medication shown to improve psychotic symptoms, even in previously intractable cases.

The care provided by the nursing staff was commendable. The patient required close monitoring for falls and assistance with his ADLs. The close coordination between nursing, medical and psychiatry was of the utmost importance in the management of this complex patient.

**Patient P**

This 29-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The CHCF EOP referred the patient to the intermediate level of care due to suicidal ideation. Documentation indicated that the patient began to experience worsening auditory hallucinations in April 2022. In June 2022, the patient had a decline in program attendance. He was on quarantine during July 2022, and was reportedly seen at cell front by his clinician. In August 2022, the patient was flagged by UNA due to poor ADLs and hygiene. He was admitted to the intermediate level of care on September 29, 2022.

The patient had two prior admissions to the acute level of care, in September 2017 and April 2018. The patient had one prior admission to DSH intermediate level of care from May to August 2018, after treatment at the acute level of care. These acute and intermediate care hospitalizations were in response to worsening psychosis, with command auditory hallucinations to harm himself.

The patient was provided diagnoses of schizoaffective disorder, bipolar type and opioid use disorder. The treatment outcome expectations included adjustment of medications, reduction of social withdrawal, and management of ADLs.

Upon DSH-Atascadero admission, the patient was assessed with moderate risk for suicide and self-harm. He had a history of approximately five suicide attempts by hanging, overdosing, and cutting. The most recent attempt occurred in 2018 by hanging. His risk of violence was assessed as low.

The patient was prescribed clozapine for psychosis, fluoxetine for depression, atomoxetine for attentional impairment, and propranolol and metformin to treat antipsychotic-induced side effects. The patient also was prescribed haloperidol for psychosis and hydroxyzine for anxiety on an as-needed basis. Additionally, the patient was prescribed buprenorphine/naloxone for medication-assisted treatment for opioid use disorder.

During his treatment at DSH-Atascadero, the psychiatrist adjusted the medication dosages. The patient had approximately 75 percent group attendance. Frequent urine drug screens were performed for buprenorphine. Based on these results, the treatment team opined that the patient engaged in diversion of his medication. A progress note subsequently indicated that the patient had "stability of his hallucinations and depressive" symptoms, he "will not benefit from further care and treatment" at DSH-Atascadero.

On November 3, 2022, the patient was discharged to MCSP at the EOP level of care.

**Findings**

The care provided to this intermediate level of care patient was inadequate.

Although the patient received adequate care during the first portion of his brief stay, the decision to discharge the patient prior to meeting treatment goals was perplexing and poorly justified in the healthcare record. This critical decision rendered his care inadequate.

Documentation indicated concern about the possible diversion of buprenorphine/naloxone used for treatment of the patient's opioid use disorder. However, documents reviewed did not show that DSH-Atascadero attempted to change treatment goals to address this concern prior to making the decision to discharge the patient. The treatment team should have considered discontinuation of the patient's buprenorphine; or if continued treatment was required, to consider a long-acting injectable version of the medication. The reviewer was concerned that the notes and discharge summary reported that the patient's mood and psychotic symptoms had stabilized only after the concern for diversion emerged. The documentation did not clearly state whether the patient was discharged due to alleged diversion of buprenorphine, or because treatment goals had been met. The treatment team stated simply that the patient would not benefit from further treatment at DSH-Atascadero.

## Patient Q

This 56-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero.

The patient had a complex treatment history. The patient had been incarcerated since 2012 and was treated at DSH-Atascadero from 2012 to 2020. The patient also had two prior stays at CMF for inpatient treatment, and the documentation was unclear whether this treatment was for the acute or intermediate level of care. As for his most recent admission to DSH-Atascadero, the patient was referred from the SVSP-PIP due to "limited progress in his course of treatment." The patient was admitted to DSH-Atascadero on January 30, 2022.

His symptoms of psychosis began at age 24. These symptoms included paranoia of others harming him and auditory hallucinations from God. The patient's controlling offense was murder with a firearm.

He was provided with a diagnosis of schizophrenia.

The patient was prescribed clozapine for psychosis; phenobarbital, an anti-seizure medication rarely used in psychiatry, prescribed in this case due to severe agitation; lorazepam for anxiety and agitation; and hydroxyzine for anxiety. The patient received his psychotropic medications by a PC 2602 order. Additionally, the patient was under a Probate Code Section 3200 order, authorizing involuntary medical treatment.

The patient's treatment course was complicated by multiple medical issues, including pneumonia and severe weight loss. He required intravenous fluids, as well as placement of a percutaneous endoscopic gastrostomy tube (a feeding tube through his skin into the stomach). Additionally, the patient had low white blood cell counts, likely due to treatment with clozapine. This necessitated the use of a medication to increase production of white blood cells. Additionally, the patient was at an elevated risk for falls, requiring frequent observation by nursing staff.

During his course of treatment, clozapine was discontinued, due to medical issues. Dishearteningly, the patient subsequently had a "severe relapse" of his symptoms.

The patient exhibited physical aggression toward staff on October 27, 2022. The team made the decision to not use restraints, due to the severity of his medical issues. In the past, the patient fought so hard against restraints that he caused muscle breakdown that triggered kidney problems. Due to the severity of his aggression, limited response to more traditional medications, and the need to use a medication with limited risk for kidney damage, the patient was started on the anticonvulsant medication phenobarbital.

The patient had significant medical concerns, including a seizure that required treatment at an outside hospital. While admitted there, a neurologist discontinued phenobarbital and started divalproex; reportedly, the neurologist was unaware that the phenobarbital was prescribed for aggression and sedation, and not for the treatment of seizures.

After medical stabilization, the patient was subsequently transferred to the San Quentin State Prison (SQ) CTC to receive ECT.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The care team at DSH-Atascadero should be commended for the care provided to this exceptionally complex patient. Not only did the patient present with psychiatrically complex symptomatology with a strong propensity for psychosis-driven aggression, but he also had myriad medical issues requiring close intervention by medical and nursing staff. The close collaboration with CDCR to facilitate treatment by ECT at the SQ CTC was exemplary.

Deficiencies in the provision of care included limited documented discussions in treatment team or psychiatric notes about the rationale for pursuing ECT, and the lack of close coordination with the outside hospital as evidenced by the hospital neurologist changing medications without understanding the rationale behind that treatment. Finally, there was extensive carryover of information in progress notes and treatment team meeting notes, including information from many years prior to the current episode of treatment.

**Patient R**

This 35-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The patient was referred to DSH-Atascadero by the California State Prison/Sacramento (CSP/Sac) due to delusional thinking and mood instability. The date of admission was December 12, 2022.

The patient had approximately ten prior admissions to various PIP and DSH facilities, from 2008 with the most recent in 2017. The prior admissions were due to danger-to-self and others. The patient also had a history of psychiatric hospitalizations in the community.

The patient had diagnoses of schizophrenia (by DSH) versus schizoaffective disorder (by CDCR), and antisocial personality disorder. He was also included in the *Clark* program as DD2.

The referral packet from CDCR included treatment outcome expectations of optimizing the dose of clozapine, determining the specific medications needed to address the patient's mood problems, performing a "more sustained functional assessment," increasing programming, and maintaining hygiene with adaptive supports.

The patient's suicide risk was assessed as moderate, due to recent passive suicidal thoughts and a history of command auditory hallucinations to harm himself. The patient denied suicidal thoughts at the time of admission. The exact number of suicide attempts and details surrounding them were unclear. He had one documented suicide attempt by jumping from the second tier of a housing unit. The patient was unable to provide details, but there may have been up to five additional attempts. The suicide risk assessment also incorporated the risk factors of substance use and impulsivity.

The patient was prescribed clozapine for psychosis and valproic acid as a mood stabilizer. He was also prescribed injectable olanzapine for refusal of clozapine, hydroxyzine for anxiety, and haloperidol on an as-needed basis for psychosis. He received his psychotropic medications by a PC 2602 order.

At the time of admission, the patient presented with delusional thinking, disorganization, social withdrawal, and mood instability. The psychiatrist adjusted the psychotropic medications. On January 25, 2023, the patient was placed into restraints after he reportedly assaulted someone due to gang affiliation. The dose of clozapine was increased. The patient reportedly assaulted another patient on February 1, 2023. This second assault occurred after the psychiatrist completed the discharge summary.

The patient attended 81 percent of programming from October 2022 through January 2023.

Nursing notes indicated that the patient had adequate ADLs at the time of discharge.

The patient was discharged from DSH-Atascadero on February 3, 2023. The notes were unclear regarding his disposition. The undated note from the medical director (or designee) stated that the patient would discharge to the CMC EOP. The transfer form noted discharge to CSP/Sac; however, the level of care was unclear. DSH staff reported to the monitor's expert that the patient actually discharged to the California State Prison/Corcoran MHCB.

**Findings**

The care provided to this intermediate level of care patient was inadequate.

While the initial treatment interventions appeared appropriate, concerns were again noted regarding the manner of discharge for this patient.

151

While the treatment team at DSH revised the patient's diagnosis from schizoaffective disorder to schizophrenia, they did not adequately explain why the mood stabilizing medication was continued. Substance use issues were inadequately addressed. The combination of substance use, a psychotic illness, and DD2 status converged into a high-risk situation for both the patient and others.

Although it was understandable that the psychiatrist needed to complete the discharge summary prior to the actual discharge of the patient, the psychiatrist did not amend the summary after the patient allegedly assaulted another patient on February 1, 2023. Any substantial clinical change such as this should have prompted an addendum to the discharge summary.

The unclear documentation surrounding the patient's discharge was disconcerting. When patients transfer from one facility to another, this is a period of elevated risk of harm for the patient. Information must be conveyed to the receiving team in a clear manner. This was of the utmost importance in this case, given the patient's degree of psychosis and recent violence.

As was seen in other cases reviewed, the psychiatrist stated that the patient would not benefit from continued treatment at DSH-Atascadero. The rationale for this statement was unclear. If the patient required return to CDCR due to aggression, this transfer was allowed in the governing documents between CDCR and DSH, and the rationale should have been clearly stated. The lack of documentation justifying discharge to a lower level of care was particularly striking. Documentation was not provided regarding the rationale for the patient not transferring to a CDCR PIP, but instead to an MHCB, a lower level of care.

**Patient S**

This 46-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The CMC-EOP referred the patient to the intermediate level of care due to worsening depression, anxiety, and suicidal thoughts.

The patient reported long-standing depressive symptoms since age 12. The patient had multiple MHCB placements, most recently in 2019; these placements were often triggered by family issues such as deaths. The patient had no prior treatment at DSH.

The patient had diagnoses of major depressive disorder, severe, recurrent, and unspecified trauma and stressor related disorder.

The treatment goal expectations from CDCR included reducing depression and suicidal thoughts, decreasing anxiety, increasing food intake, and improving socialization and group attendance.

The patient was prescribed fluoxetine, sertraline, and venlafaxine for depression and anxiety. The patient was also prescribed as-needed doses of olanzapine for agitation, and hydroxyzine for anxiety. The patient did not receive his psychotropic medications by a PC 2602 order.
The suicide risk assessment upon admission assessed low acute and elevate chronic suicide risk. The patient had six prior suicide attempts, including wrist cutting, making but not using a noose,

152

swallowing razors, and attempting to shoot himself in his youth. His risk of violence was assessed as low.

The patient was treated with individual and group therapy. The patient met with the psychologist at least weekly, and topics including treatment goals, depression, and triggers of prior traumas were discussed. Group topics appeared clinically appropriate, and group attendance was good. The patient progressed in the HAS system to level four. Treatment teams occurred timely and generally included required members, except nursing staff who had intermittent attendance. The patient had no episodes of seclusion or restraint.

On November 16, 2022, the patient was discharged to CMC at the EOP level of care.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The patient received frequent group and individual therapy. Medication management was appropriate, based on symptoms and reported diagnoses. There was documented collaboration between the various treating disciplines. The treatment goals appeared clinically appropriate. The treatment team documented clear progress toward treatment goals. Additionally, clear progress in the HAS system and rationale for such advancement was documented. However, nursing staff did not sign some treatment team plans.

**Patient T**

This 27-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The patient was referred from the SVSP EOP due to making limited progress and requiring frequent usage of the CIT.

The patient had prior treatment at DSH-Atascadero from September 2018 to February 2019, under the PC 1370 (Incompetent to Stand Trial). While the notes referenced one admission to the MHCB in 2020, the details were unclear.

The patient's diagnoses changed during treatment. At the time of admission, he was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, opioid use disorder, obsessive compulsive disorder, and body dysmorphic disorder. Upon discharge, the diagnoses no longer included obsessive compulsive disorder or body dysmorphic disorder, without rationale why these diagnoses were removed.

At the time of admission, the psychiatrist noted symptoms of anxiety, depression, and bizarre behavior. The psychiatrist also noted that the patient had excessive concern about his appearance, as well as biting his nails and lips.

The patient was prescribed aripiprazole, risperidone, and chlorpromazine for psychosis; sertraline and venlafaxine for depression, anxiety, and possibly for obsessive compulsive disorder and body dysmorphic disorder; and hydroxyzine for anxiety.

The psychiatrist-initiated treatment with sertraline at a dosage of 75 milligrams, while the usual starting doses were from 25 to 50 milligrams. The psychiatric notes indicated that the patient "was prescribed Thorazine in addition to Risperdal due to difficulty sleeping. It is recommended that the next clinician make the decision about utilizing either Thorazine or Risperdal but not both." The patient received his psychotropic medications by a PC 2602 order.

The patient struggled to participate in programming, attending zero percent of one group, and 16 percent of another. He had no seclusion or restraint use during his stay.

On March 1, 2023, the patient was discharged to SVSP at the EOP level of care. The discharge summary stated that the patient would not benefit from continued treatment at DSH-Atascadero.

**Findings**

The care provided to this intermediate level of care patient was inadequate.

The patient's psychiatric diagnoses changed in the last week of treatment; however, psychiatric notes did not indicate the rationale for this change. Evidence-based obsessive-compulsive disorder and body dysmorphic disorder treatments required specific therapy interventions which the patient did not receive. Additionally, the psychiatrist noted symptoms of depression and anxiety; however, neither of these symptoms were considered for diagnosis.

The rationale for using the antipsychotic medication chlorpromazine was poorly justified in the healthcare record; the psychiatrist indicated that the medication was prescribed for sleep, and this was an inappropriate treatment indication. One of the main reasons for referral to DSH was to stabilize the patient's medications. Thus, the psychiatrist's statement that the patient should be prescribed one antipsychotic medication; however, the decision to make that medication change would be deferred to the EOP treatment team was particularly perplexing. Additionally, the dosing of certain medication such as sertraline was concerning, as there was no documented rationale for initiating the medication at a higher than standard dosage.

Finally, the reason for discharge from the intermediate level of care was unclear. The discharge summary noted that the patient would not benefit from continued treatment; however, whether discharge was due to the patient making substantial clinical progress, or alternatively, to lack of progress, was ambiguous and not clearly delineated.

**Patient U**

This 51-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Atascadero. The patient had several prior inpatient hospitalizations; the most recent was an acute care admission following a significant Effexor overdose and related seizure. The patient transferred to DSH-Atascadero on or around July 27, 2022. The referring institution's treatment team referenced a history of multiple Effexor and other non-prescribed substance overdoses, as well as ongoing suicidal thoughts, depression, disorientation, confusion, delusions, and increased auditory hallucinations, with occasional commands to harm himself.

154

The referring institution also noted concerns about poor hygiene, and the patient had packed his belongings due to delusional thinking that he would be released from CDCR.

The patient was provided with diagnoses of schizoaffective disorder, depressive type; alcohol use disorder; cocaine use disorder; amphetamine-type substance use disorder; and opioid use disorder. The DSH-Atascadero psychiatrist prescribed olanzapine that was administered by crush and float, Invega Sustenna, and sertraline. The patient did not receive his psychotropic medications by a PC 2602 order. The medications were adjusted during the hospitalization, including as recently as January 2023.

The initial psychiatric assessment was completed on the date of admission. The psychiatrist referenced the patient's DD2 status in CDCR, adding that it was unclear whether the patient had an intellectual disability, a life-long developmental deficit, or a neurocognitive disorder involving loss of prior functioning. The psychiatrist further documented that psychological testing should be considered for diagnostic clarification.

Treatment plans targeted the patient's psychotic symptoms, insight into mental illness, sobriety, participation in treatment, and medication adherence. Treatment goals were measurable and progress updates were documented in subsequent treatment team and individual provider notes. The patient was assigned to approximately ten hours of treatment groups weekly.

Clinical notes suggested that the patient demonstrated steady progress toward treatment and discharge objectives throughout the hospitalization. Medication adherence improved by November 2022. In February 2023, the patient was reportedly working toward his GED, attended 80 percent of treatment groups, consistently denied suicidal thoughts, and exhibited no behavioral concerns in the unit. On March 4, 2023, the treatment team noted that, except for insight into mental illness and attention to sobriety, the patient partially met his treatment goals and was at or near his baseline level of functioning.

Suicide risk assessments were updated during the hospitalization, and the most recent assessment documented decrease in suicide risk from moderate to low risk.

On March 16, 2023, the patient remained in the intermediate care program at DSH-Atascadero. The most recent clinical documentation indicated that, while the patient continued to experience non-distressing auditory hallucinations, he independently attended to his ADLs, actively participated in treatment activities, presented with logical and coherent speech and thinking, exhibited improvement in mood, and was approved for a job assignment in the housekeeping program. Further, the treatment team noted that the patient attended more than 85 percent of assigned treatment groups.

**Findings**

The care provided to this patient was adequate.

Treatment plans targeted the patient's presenting problems with relevant interventions and measurable goals. The treatment team and individual provider documentation were thorough and

included status updates on symptoms and functioning, as well as objective signs of progress toward discharge objectives. Additionally, nursing documentation suggested that the patient's attention to ADLs was closely monitored with improvement over time. Suicide risk assessments were appropriately updated to demonstrate risk reduction. Overall, the patient appeared to benefit from the treatment team interventions provided during DSH-Atascadero hospitalization.

**Patient V**

This 44-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Atascadero. The patient was initially admitted to the CHCF-PIP for inpatient care in May 2022; however, he transferred to DSH-Atascadero on or around July 29, 2022, for treatment at his LRH for ongoing auditory hallucinations, paranoid delusions, and bizarre behaviors. He had a history of inpatient treatment at the acute and intermediate levels of care, as well as for competency restoration.

At the time of admission, the patient was provided diagnoses of schizophrenia and amphetamine-type substance use disorder. Specific diagnostic criteria were included to support these diagnoses. The psychiatrist prescribed risperidone for psychotic symptoms and BuSpar for anxiety. The patient generally remained medication adherent and did not require an involuntary medication order.

Treatment plans appropriately targeted the sending institution's concerns for inpatient referral. Treatment goals were realistic and measurable when indicated. The treatment plans were also modified and tailored to the patient's specific needs during hospitalization. For example, the treatment plan indicated that the patient would be seated near the exit door during group treatment to alleviate his anxiety. He was assigned to nine hours of weekly treatment groups, and all appeared clinically relevant. The patient was also assigned to a pre-release planning group based on his upcoming EPRD.

The psychiatrist met with the patient at least monthly. The psychologist met with the patient every one to two months, primarily to update risk assessments, although there were two psychology contacts that focused on therapeutic interventions. The social work progress notes suggested that they met with the patient individually every one to three months. Individual and group treatment providers routinely documented status of symptoms and functioning, allowing treatment teams to track progress and address treatment obstacles. Monthly group summary notes also provided individualized, clinically relevant information.

Clinical documentation suggested that the patient demonstrated noteworthy progress by October 2022. He reported a significant decrease in psychotic symptoms, improvement in mood, and the use of new coping strategies for managing anxiety and distress. Nursing routinely observed the patient engaging in exercise, reading, studying, and attending courtyard time. The treatment team noted an absence of behavioral concerns during hospitalization, ongoing medication adherence, active participation in treatment groups, and attention to relapse prevention for monitoring and managing his symptoms after discharge. In November 2022, his group treatment attendance increased to 95 percent, and he was approved for a job assignment.

156

The patient discharged from DSH-Atascadero on November 21, 2022.  The psychiatric discharge summary was thorough and provided a detailed description of the hospitalization, including the patient's response to various treatment interventions.  The psychiatrist also documented objective evidence of discharge readiness and included recommendations for continuity of care.  Documentation suggested that the patient may have discharged to the community directly from DSH.  Pre-release planning services were provided during hospitalization, and the social worker noted that the patient would receive services at a community transitional program in Los Angeles.

**Findings**

The care provided to this patient was adequate.

Treatment goals were measurable, individualized, and realistic.  Interventions were generally appropriate, and the patient appeared to respond well to the group therapy, medication management, and therapeutic milieu at DSH-Atascadero.  Clinical notes from the treatment team and individual providers included useful status updates for tracking progress toward treatment and discharge objectives.  The clinical discharge was appropriately justified, and the discharge summary offered useful information about the patient's response to treatment and post-release needs.  Pre-release planning was appropriately provided; this was important to assist the patient in successful transition to the community.

**Patient W**

This 46-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Atascadero.  The patient transferred from MCSP to DSH-Atascadero on or around August 25, 2022.  MCSP referred the patient due to depression, chronic suicidal ideation, increased distress, and possible grief resulting from reported family deaths.  MCSP also referenced three reported suicide attempts in the community.

Upon admission, the patient was provided diagnoses of major depressive disorder; PTSD; antisocial personality disorder; and substance use disorders including opioids, alcohol, and cocaine.  The psychiatrist also included provisional diagnoses of malingering and borderline personality disorder.  Although the psychiatrist documented the importance of performing psychological testing for diagnostic clarification during the first month of hospitalization, clinical notes suggested that ongoing diagnostic uncertainties persisted throughout the hospitalization.

Psychotropic medications were adjusted in response to adverse side effects and/or patient complaints.  In October 2022, Depakote and venlafaxine were discontinued after laboratory studies revealed elevated liver enzymes, and the patient also reported that the medications were ineffective.  Suboxone was also discontinued around that time.  Although the psychiatrist recommended other medications, the patient only agreed to take sertraline, and this medication continued throughout the hospitalization.

Documentation suggested that the patient exhibited some initial progress and cooperation at DSH-Atascadero.  During this period, he achieved a position in ward government and attended

100 percent of assigned treatment groups. By October 2022, however, provider documentation referenced various behavioral issues and reported an increase in symptom severity. The behavioral concerns included medication and treatment nonadherence, conflicts and threats to harm peers, aggressive posturing, and attempts to control others. Treatment teams noted that the patient tearfully portrayed himself as a victim; then subsequently, was observed laughing with peers and presenting himself as a "shot-caller."

Despite the lack of diagnostic clarification and failure to demonstrate progress toward treatment and discharge objectives during the two-month hospitalization, the treatment team decided to discharge the patient to a lower level of care with a return to CDCR in late October 2022. The psychiatric discharge summary described the patient as somewhat volatile, angry, and worried in response to learning of his planned discharge, with a report of high ratings for depression and anxiety. The social worker documented that the patient had not met any of the treatment outcome expectations and that he remained at moderate suicide risk at the time of discharge. Additionally, the patient reportedly informed the treatment team that he did not receive the help that he needed at DSH-Atascadero.

Despite the lack of progress in intermediate care, the discharge notes stated that the patient reached maximum therapeutic benefit from the care at DSH-Atascadero, and he was recommended for a lower level of care in the CDCR EOP. The discharging psychiatrist stated that it was difficult to adequately provide a diagnosis of malingering, and the psychiatrist recommended DBT and low dose antipsychotic medication treatment to address probable prominent personality traits. The psychiatrist did not provide recommendations regarding the patient's suicide risk, worsening symptoms of depression and anxiety, or the ongoing need for diagnostic clarification.

The patient discharged and transferred to an EOP on October 28, 2022.

**Findings**

The care provided to this patient was inadequate.

Despite diagnostic uncertainties and recommendations to pursue psychological testing for diagnostic clarification noted upon admission, there was no referral for a diagnostic assessment and testing. Treatment plans were not appropriately modified to address behavioral issues. While the psychiatrist recommended DBT and antipsychotic medication at the time of discharge, it was unclear why these interventions were not actively pursued during the DSH hospitalization. The discharge appeared to be based solely on DSH-Atascadero's inability to manage the patient's behavioral issues, as opposed to the patient achieving maximum therapeutic benefit. Further, the discharging psychiatrist did not document a level of care rationale to support the recommendation for EOP rather than continued intermediate care at a PIP; this despite the social worker noting ongoing concerns regarding suicide risk, symptom severity, and failure to demonstrate progress toward any treatment outcome expectations.

**Patient X**

This 37-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Atascadero.  MCSP referred this patient from the EOP level of care to intermediate care on August 4, 2022.  His recent history was significant for two MHCB hospitalizations for grave disability, threats of self-harm, and somatic delusional thinking.  He had two prior DSH admissions for competency restoration, pursuant to PC 1370.

The MCSP referral noted that the patient presented with bizarre somatic delusions since February 2022.  His somatic complaints included beliefs that his chest and intestines were leaking and that his brain was hemorrhaging.  Additionally, he had tactile hallucinations or delusional thinking that mites were crawling on his skin and around his eyes.  Stemming from these delusional beliefs, the patient frequently demanded medical intervention.  He became increasingly agitated and frustrated with staff, with threats of self-harm to receive medical attention in June and July 2022.  He was retained in the MCSP MHCB for almost 20 days during the first admission that occurred from June 17 through July 6, 2022, and for ten days during the second admission that occurred from July 15 through July 25, 2022.  He was discharged to the EOP level of care with a referral for intermediate care, as he was unwilling to engage in treatment and was unable to demonstrate progress in the outpatient program or at the MHCB level of care.  Among other inpatient treatment recommendations, MCSP requested diagnostic clarification to determine whether the patient met the criteria for delusional disorder, schizophrenia, or schizoaffective disorder.

The patient was admitted to DSH-Atascadero on or around August 19, 2022.  The psychiatrist completed the initial assessment on this date; he was provided a diagnosis of unspecified schizophrenia spectrum disorder and other psychotic disorder.  The psychiatrist documented in the reason for admission section of the assessment that the patient requested that Wellbutrin be continued at a dose of 100 mg twice daily.  Although the patient arrived with a prescription for Wellbutrin from CDCR and believed that this was the only effective medication, the medication was discontinued.  Instead, he was initially prescribed aripiprazole, mirtazapine, and Abilify.  In October 2022, Abilify was discontinued and replaced with trifluoperazine for treatment of psychosis.  The patient was only intermittently medication adherent during the hospitalization.

During the hospitalization, the patient received extensive medical testing to eliminate a medical cause for his somatic complaints.  As was noted with other DSH-Atascadero PC 2684 patients reviewed, group treatment and medication interventions were the primary treatments offered; however, the treatment approach was not modified in response to the patient's lack of progress or when he attended fewer groups, refused medications, or engaged in behaviors related to his delusional beliefs.  Despite documentation suggesting ongoing diagnostic uncertainties, his diagnosis was changed to delusional disorder.

The DSH psychiatrist stated that the patient demonstrated psychiatric and behavioral challenges during hospitalization; however, the inappropriate behavior appeared to be directly related to his mental illness.  For example, DSH staff noted that the patient was frequently argumentative about his medical needs and requested numerous complaint forms.  He was found in possession of excessive clothing during a contraband search, attempted to acquire and hide more clothing

159

from staff, exercised poor boundaries with another patient, and was observed sharing his prescription cream with a peer.

After three months in intermediate care, the treatment team discharged the patient on October 22, 2022. The social worker documented at the time of discharge that the patient had not demonstrated progress toward any of his treatment objectives. The psychiatrist wrote, "Because (the patient) has not been cooperative with psychiatric treatment requests and has been demanding his own requested treatments, he appears to be unsuitable to the treatment program here in DSH-A." The psychiatrist did not document sufficient rationale for discharging the patient to a lower level of care or indicate how the patient's needs could be better met in the outpatient setting of the prison environment. Further, the treatment team noted that diagnostic clarification was pending, which suggested that they were unable to resolve diagnostic uncertainties prior to discharge.

**Findings**

The care provided to this patient during the three-month hospitalization was inadequate.

The statement by the psychiatrist that the patient had achieved maximum benefit was not supported in the documentation. DSH-Atascadero did not address the referral concerns during hospitalization, including the request for diagnostic clarification. The treatment team also failed to develop an adequate case conceptualization. The social worker documented that the patient was unable to demonstrate progress toward any of his treatment objectives prior to discharge; however, the treatment approach was not modified in response to this lack of progress. The discharge appeared to be based on the patient's inability to adhere to the rigid treatment approach at DSH-Atascadero and the patient's behavioral symptoms that clearly stemmed from delusional thinking and lack of insight into his mental illness.

Prior to discharge to an outpatient program in the prison setting, the treatment team should have completed the psychological testing and assessment for diagnostic clarification. It should also have considered a behavior plan to address the behavioral manifestations of his mental illness, including hoarding of clothing, poor interpersonal skills, inability to follow unit rules, and treatment and medication nonadherence.
Lastly, the discharging psychiatrist did not document sufficient level of care rationale or explain how the patient's unresolved treatment needs might be better addressed in the prison's outpatient program.

**Patient Y**

This 45-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Atascadero. He was serving a 30-year term for sexual assault of a child under the age of 14, and there was evidence of safety concerns related to his charges. Prior to the inpatient admission, the patient engaged in a serious suicide attempt on July 15, 2022; he was found unconscious with a shoelace tied around his neck, and he required transport to a community hospital for medical care. Upon return to CMC, the patient was admitted to the MHCB after expressing disappointment that he had survived. The MHCB admission suicide risk

evaluation noted that the patient had observed his mother's suicide attempts as a child, attempted suicide for the first time at age nine, and subsequently had four other suicide attempts. He also stated that he had been waiting 20 or more years for his mother to die before ending his life by suicide.

During the CMC MHCB stay, the patient refused psychotropic medications, would not engage in treatment, and reported that his only goal was suicide. Despite strong evidence for an acute care referral, the CMC MHCB treatment team referred the patient to an intermediate care program five days after the serious suicide attempt on July 20, 2022; in so doing, the treatment team stated that treatment should address continued suicidal ideation with detailed plan and intent.

The patient was admitted to DSH-Atascadero on or around July 29, 2022. Upon arrival, the patient was provided diagnoses of persistent depressive disorder and major depressive disorder, recurrent episode, moderate. Despite agreeing to a trial of Lexapro upon admission, the patient accepted only one dose of this medication before refusing all psychotropic medications. The case formulation indicated that the patient had a history of intermittent severe depressive episodes, including suicide attempts.

The suicide risk assessment was updated on August 2, 2022; it noted affirmative responses to wishing to be dead, active suicidal thoughts, some intent to act, and specific plan to act. The intensity of suicidal ideation was at the highest possible rating of five and indicated that the patient was more likely to act on his suicidal thoughts if returned to the CDCR EOP level of care. While the healthcare records suggested that the patient remained at high suicide risk, the evaluating clinician rated his suicide risk as moderate. The psychologist recommended medication adherence and group treatment to address the presenting concerns. Development of a suicide prevention safety plan for the outpatient setting was also recommended. Individual therapy was not considered despite clinical indications for this treatment.

The treatment plan was developed on August 5, 2022. The plan contained numerous discharge objectives, including absence of self-harm and suicide attempts for 30 consecutive days, development of a suicide prevention safety plan, processing of grief, refraining from impulsive behaviors for 30 days, and learning and implementing problem solving and distress tolerance skills. The number and hours of group therapy offered were unclear; the treatment team documented that the patient would be assigned ten hours of group, but also noted that scheduled group treatment continued to be negatively impacted by COVID-19 restrictions.

On August 23, 2022, the social worker documented that the patient was sleeping when an interview was attempted. The social work progress note suggested that the patient often isolated in his cell resting or sleeping, interacted minimally with staff and peers, and required prompting to attend groups. The social worker noted that he had 66 percent group attendance, but the total number of groups offered and refused were not documented. The patient was reportedly medication adherent on this date; however, the psychiatrist documented that he had refused all psychotropic medications.

On August 26, 2022, the patient was assaulted by another patient on the unit. According to the psychiatric note, the patient responsible for the assault was placed in restraints for three days and

released on August 29, 2022. Within 15 minutes of that patient's release, the patient reportedly attempted to strike the other patient with a metal water spigot; however, staff intervened and subsequently placed the patient in full bed restraints for 12 hours. On August 31, 2022, the patient informed staff that he no longer felt safe at DSH-Atascadero and requested return to CDCR. He added that he did not think that he had received adequate treatment; he further stated that his mood was stable and that he no longer was suicidal.

Based on the patient's request to return to CDCR and self-reported stability on August 31, 2022, DSH-Atascadero granted his request, and the patient was abruptly discharged on that date. The psychiatric discharge summary did not provide rationale for discharge to a lower level of care; this despite the lack of progress toward treatment and discharge objectives, ongoing suicide risk, evidence of diagnostic uncertainty, and failure to develop a suicide prevention safety plan for the outpatient setting. The psychiatrist seemingly attempted to justify the inpatient discharge by stating that the patient was unwilling to take psychotropic medication, was not in a position to benefit from treatment at this level of care, was potentially violent, and did not present with vegetative symptoms; this statement regarding the lack of vegetative symptoms was irrelevant for this patient. The psychiatrist also referenced the patient's tablet tampering while in CDCR, also without explanation of how this information was relevant to discharge at that time. The discharge justification failed to focus on the reason for admission, provide evidence of suicide risk reduction, mention the patient's safety concerns, or provide recommendations for the receiving institution to manage the ongoing suicide risk.

**Findings**

The care provided to this patient was inadequate.

DSH-Atascadero clearly had concerns about their ability to manage this patient based on his safety concerns and reaction to being assaulted. While their decision to discharge the patient based on the violent outburst may have been justified, they failed to document a sufficient reason for discharge to a lower level of care. The patient had a serious suicide attempt prior to admission, and there was minimal progress toward treatment outcome expectations during the one-month intermediate care hospitalization. Of additional concern was the lack of development of a suicide prevention safety plan for the outpatient setting. Safety concerns were also not sufficiently addressed or communicated to the receiving institution.

The treatment team should have recommended transfer to a CDCR PIP for ongoing intermediate care with interventions focused on suicide risk reduction and safety planning.

Lastly, more frequent individual treatment should have been considered for this patient given his presenting problems upon admission and lack of engagement with staff and peers on the unit.

**APPENDIX B2**
**Coalinga State Hospital (DSH – Coalinga)**
**Case Reviews**

**Coalinga State Hospital (DSH – Coalinga)**
**March 22 – 23, 2023**

**Patient A**

This 50-year-old patient was housed at DSH-Coalinga.  He transferred there on October 14, 2022, from CMC where he had been treated at the acute level of care due to a recent suicide attempt and ongoing danger-to-self.  He was admitted for continuation of care and further stabilization after his attempted suicide.

Documentation indicated that the patient had been housed at RJD where he was found bleeding inside his cell alone; he had inflicted a severe laceration to his neck by a razor requiring 12 sutures.  He had not given any prior indication of suicidality to mental health or custody staff at RJD.  The patient reported peer challenges and enemy concerns that resulted in his suicide attempt.  He was admitted to the MHCB on August 24, 2022, and was subsequently transferred to CMC on September 2, 2022.

The patient was provided with diagnoses of schizoaffective disorder, bipolar type; alcohol use disorder, severe; and cannabis use disorder, severe.  He was prescribed olanzapine, Haldol, Depakote, Benadryl, and BuSpar; he was also prescribed trazodone, Benadryl, Haldol, and olanzapine on an as needed basis at the time of DSH-Coalinga admission.  The patient had a TABE of 0.0.  His Minimum Eligible Release Date (MERD) was April 26, 2023.

The patient reported a long history of depressive symptoms with eight community hospitalizations for depression and suicide attempts, as well as a history of hospitalization at DSH-Atascadero.  He also reported a long history of multiple suicide attempts and treatment with Haldol.  His first suicide attempt occurred at age seven by hanging; many of his subsequent suicide attempts were serious with intent to die and required medical intervention.  He also had a history of self-injurious behavior without intent to die.  The patient had a significant history of marijuana and alcohol use.

The initial DSH-Coalinga treatment plan documented treatment outcome expectations that included the absence of active and passive suicidal ideation for at least two months, identification of two replacement thoughts/distractions to engage in when active suicidal ideation was experienced, learning at least three distress tolerance skills, engaging in group treatment five times weekly, identification of three triggers to depressive symptoms, identification of three practice coping skills to manage depressive symptoms prior to EOP discharge, and no engagement in any self-harm for 60 days prior to discharge.  Additional treatment outcome expectations included enhancing the patient's understanding of the impact of substance use on his mental health and identifying at least three strategies to support sobriety.  He was assessed with moderate acute and high chronic suicide risk.

Initial assessments were completed by the psychiatrist, nursing, psychologist, and RT on or around the date of admission.  BuSpar and some as needed medications were discontinued after the initial psychiatric assessment, and the psychiatrist generally continued the medication

164

regimen initiated at CMC-APP. A 30-day psychosocial assessment was completed by the social worker on November 17, 2022.

Appropriate foci of treatment were identified by the treatment team, including dangerousness and impulsivity, specific psychiatric and psychological foci, hope and spirituality, substance abuse, leisure and recreation, and community integration. The initial treatment team included the necessary participants, including the psychiatrist, psychologist, rehabilitation therapist, social worker, RN, and psych tech; the patient was also present at the meeting.

The subsequent treatment team meeting occurred on November 10, 2022. This meeting addressed the treatment foci; it was noted that the patient experienced chronic suicidal ideation and delusional thinking and was involved in multiple psychoeducation groups and prescribed psychotropic medications to address these symptoms. It was also noted that the patient was administered psychological testing that indicated the presence of some cognitive difficulties, reflecting a history of childhood traumatic brain injury. It was further indicated that the patient was involved in dialectical behavior therapy. It was also noted that the patient attended all scheduled groups with average participation, as well as approximately 18 supplemental activities in the preceding month. Most of the treatment outcome expectations had not been fully met at the time of that meeting. The necessary participants attended the meeting, including the patient.

Treatment team meetings occurred monthly, and the next meeting occurred on December 8, 2022. At that time, it was noted that the patient's estimated suicide risk had decreased and was assessed as low. The patient continued to participate in all groups and supplemental activities. The foci of treatment were either not met or were partially met. The necessary participants including the patient attended the meeting, except for the psychologist.

The patient was seen by the psychiatrist on December 21, 2022, when he reported ongoing anxiety, and he requested resumption of BuSpar; the psychiatrist reordered BuSpar at that time.

A suicide risk assessment on January 4, 2023, again noted low suicide risk with medication adherence, denial of suicidal ideation and intent, and reported strong feelings of social family support.

Documentation noted at least monthly social work and psychiatric contacts; contacts by the RT and psychologist occurred less frequently.

**Findings**

The care provided to this patient appeared adequate.

The patient was seen consistently by mental health clinicians and the RT. His symptoms appeared to stabilize during his DSH-Coalinga hospitalization with good treatment participation.

The appropriate laboratory testing and monitoring for treatment with Depakote and other psychotropic medications were conducted, including medication blood levels. Additionally, medication management appeared to be clinically appropriate.

**Patient B**

This 64-year-old patient was admitted to DSH-Coalinga on November 3, 2022, from MCSP for stabilization of suicidal ideation and psychiatric stabilization while tapering and discontinuing bupropion.  He was a participant in the Mental Health Services Delivery System in CDCR at the EOP level of care since 2015 and had a long history of self-harm thoughts.  He had no history of suicide attempts while in CDCR, but reportedly attempted suicide by hanging in 2014 while in the county jail, as well as several other past attempts.  He reported daily auditory hallucinations that began in 2006 after using methamphetamine.  He stated that he could not remember a time while in CDCR when he was not prescribed bupropion.

The patient was provided with psychiatric diagnoses of major depressive disorder, recurrent episode with psychotic features, and cocaine use disorder, severe.  Alternatively, the psychologist provided diagnoses of schizoaffective disorder, depressive type; opioid use disorder, severe in sustained remission in a controlled environment; and stimulant use disorder, cocaine, in sustained remission in a controlled environment.  He was prescribed BuSpar, bupropion, Thorazine, and Melatonin.  He had a history of receiving medication-assisted treatment and was prescribed Naloxone; however, he discontinued the medications in April 2022.  At the time of the admission psychiatric assessment, the nurse practitioner noted that bupropion was not allowed in CDCR, with planned taper and discontinuation of that medication.

Initial assessments were completed by the psychiatrist, nurse, psychologist, social worker, and RT on or near the day of admission.  The initial treatment plan was completed on November 9, 2022; in attendance at the initial treatment team meeting were the patient, psychiatrist, RT, social worker, psych tech, and RN.  The psychologist did not attend the meeting.  The treatment outcome expectations included the following: managing suicidal ideation with reduction to once per week for 90 days, maintenance of medication adherence for 90 days, learning and practicing two coping skills once per week for 90 days, challenging lack of motivation for not wanting to live at least weekly, and identifying two triggers to suicidal thoughts to decrease from every morning to one to two times per week.  A suicide risk assessment noted moderate current suicide risk.  Some, but not all, foci of treatment were identified and targeted; specifically, the RT and social worker provided detailed treatment objectives and interventions.

An initial suicide risk assessment completed on November 9, 2022, assessed moderate acute and high chronic suicide risk.

The next treatment team meeting occurred on November 30, 2022.  The suicide risk assessment remained unchanged.  At this meeting, the treatment outcome expectations were revised to include demonstrating reduction in suicide risk by maintaining low risk for the next 90 days.  Documentation noted that the patient did not attend any scheduled groups during the reporting period and indicated that this information should be verified.  The patient had only been enrolled in the Walk & Talk group on the day of review, so his level of participation was not yet known.  He reportedly participated in four of the ten supplemental activities offered weekly.  All but one of the treatment outcome expectations indicated that the objective had not been met; development of leisure-based coping strategies to manage depression and suicidal ideation had

been partially met. The psychologist and social worker were not present at this meeting, but the patient was present.

On December 10, 2022, the RT noted that the patient only participated in four of ten supplemental activities weekly. A 30-day psychosocial assessment was completed by the social worker on December 8, 2022.

The December 27, 2022, treatment plan documented the same treatment outcome expectations and suicide risk assessment. As was reported during the prior monthly treatment team meeting, documentation indicated that the patient had not attended any scheduled groups during the preceding month. There was mention of participation in art therapy and medication education groups; however, the documentation was unclear. Documentation regarding the Walk & Talk group noted that the patient had not attended any of the two groups that were conducted during the review period and indicated that the RT would follow-up with the patient regarding his lack of participation. The patient attended five of the ten supplemental activities offered weekly. It was noted that the patient had been medication-adherent since admission. All but one of the treatment outcome expectations indicated that the objectives had not been met; development of leisure-based coping strategies to manage depression and suicidal ideation had been partially met. All the listed staff and the patient attended the treatment team meeting except for the RT.

A clinical social worker progress note dated December 27, 2022, stated that the patient had not made significant progress toward his barriers to discharge, with high levels of depression and no utilization of effective coping skills.

A suicide risk assessment was completed on January 4, 2023, and the patient was assessed with moderate current suicide risk.

**Findings**

The care provided to this patient was inadequate.

The patient was admitted to DSH-Coalinga due to depression and stabilization of suicidal ideation. He remained with depressive symptoms at the time of review without documentation of specific interventions that were provided to adequately address these symptoms. Although the treatment team identified treatment foci, interventions, and objectives, there was little documentation that these interventions were implemented even with continued symptomatology. The patient was minimally adherent with treatment participation; however, there was little documentation that this issue that could have been a symptom of depression was adequately addressed.

Lastly, one of the reasons for admission was to stabilize the patient's depressive symptoms while tapering and discontinuing bupropion. There was a lack of psychiatric documentation to indicate that this issue had been appropriately addressed, including initiation or even consideration of alternative antidepressant medication despite the patient's ongoing depressive symptoms.

**Patient C**

This 53-year-old patient was admitted to DSH-Coalinga from VSP on November 22, 2022, for psychiatric stabilization and treatment for symptoms including poor insight and ADLs, auditory hallucinations, and poor group attendance. The patient had a long history of mental illness. In addition, he was involved in a motor vehicle accident, resulting in traumatic brain injury and cognitive impairment. He had several prior DSH and acute/ICF PIP admissions. The patient was serving a life sentence with the possibility of parole.

Documentation indicated that the patient required the assistance of goldcoats and housing staff to prompt him to attend programming in CDCR. He was placed on EOP modified programming to decrease the number of required groups, as the patient continued to forget to attend them or became distracted and confused. Two recent Developmental Disability Program referrals determined that his cognitive impairments were due to mental illness and traumatic brain injury, and it was noted that he might require future placement in a memory care facility.

The patient was provided with diagnoses of schizophrenia; diffuse traumatic brain injury with loss of consciousness of unspecified duration, sequela; and major frontotemporal neurocognitive disorder without behavioral disturbance. He was prescribed Zyprexa, Depakote, and Cogentin. His TABE was 1.8, and he was classified as NCF.

The initial psychiatric assessment was completed on the day of admission, and documentation indicated that the assessment was performed by telepsychiatry. The psychiatrist noted the patient's history of psychotropic medication treatment, including consideration of Clozaril; however, he reportedly functioned best on his current medication regimen. The psychiatrist also noted the patient's report of chronic auditory hallucinations and cognitive impairment. The admission psychological assessment was also completed on the day of admission. Documentation indicated that the patient presented with disorganized thinking and speech as well as auditory hallucinations. The admission rehabilitation therapy assessment was completed on November 29, 2022; this assessment indicated that although the patient's primary language was Farsi, he was able to communicate and write in English. The RT noted that the patient was at times difficult to understand due to his heavy accent as English was his second language, and his tendency to perseverate on certain topics with echolalia. A nursing admission assessment was also completed on the day of admission.

The seven-day initial treatment plan was completed on November 29, 2022; all listed staff and the patient attended the meeting except for the social worker and psychologist. The treatment outcome expectations were for the patient to independently attend to his ADLs and ducats, and to gain the ability to advocate for his needs for at least two months prior to transfer to the EOP. The treatment plan noted an inconsistent history of suicide attempts. The patient's acute and chronic suicide risk was assessed as low. Included in the foci of treatment was the plan to assist the patient in developing healthy leisure outlets, socialization, and group attendance.

A psychiatric progress note on the same date as the initial treatment team meeting on November 29, 2022, noted that the patient was seen in person and was adjusting well to the unit. He

presented with continued perseveration and auditory hallucinations.  Cogentin was discontinued at that time due to medication side effects.

On December 12, 2022, the psychiatrist-initiated treatment with Geodon due to the patient's continued hallucinations; the medication would begin after an electrocardiogram (EKG) was performed.  The appropriate laboratory testing was also obtained including medication blood levels.  On the following day, the psychiatrist noted that the patient was yelling in Farsi at night in response to the auditory hallucinations.  On December 19, 2022, the psychiatrist noted that Geodon had not started as the EKG was pending.  Risperdal was started on that date.

At the next monthly treatment team meeting on December 22, 2022, all listed staff and the patient were in attendance.  Revised treatment outcome expectations were developed as follows: demonstration of increased treatment engagement as evidenced by maintaining at least 80 percent group attendance within the next 90 days, and demonstration of increased insight regarding mental health symptoms as evidenced by identifying at least one symptom experienced within the next 90 days.  The foci of treatment were also updated; documentation indicated that the patient was enrolled in four groups but did not attend any sessions for two of the groups and only attended one session each of the other two groups.  It was also noted that the patient exhibited ongoing cognitive impairment during one of the attended groups.  Regarding supplement activities, the patient was enrolled in the Walk & Talk group to assist in socialization; however, he did not attend any of the three groups conducted.  Of the ten hours of supplemental activities offered weekly, the patient attended approximately four activities per week.  None of the identified foci of treatment objectives had been met at the time of this treatment team meeting.

A note by the RT on the same date as the treatment team meeting (December 22, 2022) provided very useful clinical information.  The patient presented with poor ADLs requiring significant prompting on a regular basis.  He reportedly adhered to unit rules and was medication adherent.  The RT also noted that the patient declined the use of an interpreter indicating that he might not fully understand them due to different Farsi dialects and language changes.  The RT noted the patient's written English proficiency.

A 30-day psychosocial assessment was also completed on the date of the December 22, 2022 treatment team meeting.  The social worker noted similar clinical observations documented by the RT; in addition, the social worker reported that the patient had incidents when he was loud and yelled in his dorm.

An undated social work note during December 2022 indicated that the patient was encouraged to attend his groups.  The social worker indicated that the patient was medication adherent and that he followed unit rules and policies.

**Findings**

The care provided to this severely ill patient was adequate.

The patient was seen timely by the treatment team, who attempted to address his persistent psychosis and treatment nonadherence.

The appropriate laboratory and preliminary testing for treatment with psychotropic medications was performed.  Medication management was appropriate.

The patient's primary language was Farsi, although documentation indicated that he could write and speak English.  The psychiatrist indicated that effective communication was achieved with extra time.  Although the patient declined the use of an interpreter, an adequate assessment by a clinician would have been useful to definitively determine whether language barriers contributed to the patient's impaired communication.

## Patient D

This 61-year-old patient was admitted to DSH-Coalinga from CHCF on November 18, 2022 for continuation of care for anxiety, paranoia, and auditory hallucinations.  The patient had a long history of mental health treatment and incarceration since childhood that included hospitalizations as DSH-Atascadero, DSH-Patton, and DSH-Coalinga.  He also had a history of significant suicide attempts, some by very lethal methods including hanging and overdose.  The patient killed his father when he was age 13, reportedly due to abuse of him and his mother.

The patient was provided with diagnoses of schizoaffective disorder, bipolar type; phencyclidine use disorder, mild; antisocial personality disorder; borderline personality disorder; and unspecified convulsions.  He was prescribed olanzapine, Seroquel, lithium, Benadryl, Cogentin and clonidine.  His ERPD was January 12, 2031.

An admission psychiatric assessment was completed on the day of admission.  The psychiatrist noted that the patient experienced auditory and visual hallucinations and delusional thinking as well as mood disorder with mania, hypomania, and depression that included suicidal and homicidal ideation.  An admission nursing assessment was also completed on the day of admission.

The patient was seen for follow-up by the psychiatrist on November 21, 2022.  A suicide risk assessment completed on the same date by the psychologist noted the patient's report of command auditory hallucinations, passive suicidal ideation, and an aborted suicide attempt within the past three months.  The psychologist also noted that the patient did not exhibit current evidence or documentation of past response to hallucinations.  He was assessed with low current suicide risk.  An admission psychological assessment was also completed on that date that confirmed the above-mentioned diagnoses; additionally, a social work admission note was documented on that date.

The patient was seen by the RT on December 15, 2022.  The 30-day psychological assessment was also completed on that date, as well as the only documented treatment team meeting.  All listed staff attended the treatment team meeting, including the patient.  The treatment team provided treatment outcome expectations that included the following: remaining free from self-harm behaviors for 60 days, attending and actively participating in at least 80 percent of offered

therapeutic programming for 60 days, maintaining 100 percent medication adherence for 60 days, learning and practicing two new coping skills to manage symptoms, learning and practicing cognitive behavioral therapy techniques to challenge automatic and paranoid thoughts, identifying two triggers to suicidal ideation other than voices, identifying two triggers to isolation and non-participation, and identifying three reasons for living.

Revised treatment outcome expectations included demonstrating an increase in the ability to manage distress as evidenced by remaining free from non-suicidal, self-injurious behavior within the next 90 days, demonstrating an increase in treatment engagement as evidenced by maintaining at least 80 percent group attendance within the next 90 days, maintaining at least 90 percent medication adherence during the next 90 days, demonstrating an increased ability to manage distress by identifying and describing at least two coping skills learned since admission in the next 90 days, demonstrating increased ability to regulate cognitive processes as evidenced by identifying and describing at least two triggers for suicidal ideation other than auditory hallucinations within the next 90 days, demonstrating increased insight into isolative behaviors as evidenced by identifying and describing at least two triggers within 90 days, and demonstrating increased feelings of hopefulness as evidenced by identifying and describing at least two things that provided a sense of hope or purpose during the next 90 days.

The treatment plan also noted the patient's assessment of low chronic and acute suicide risk. Foci of treatment included medication management, group therapy, and supplemental activities. The patient was enrolled in several treatment groups, and reportedly attended all provided groups. Documentation also indicated that he was medication-adherent. He reportedly attended 4.5 of the ten hours of supplemental activities offered. The treatment team noted that the patient had not yet met discharge criteria at the time of the meeting.

The patient was also seen by the social worker on December 19, 2022. The social worker stated that the patient requested return to CDCR and was unable to identify any skill achieved since DSH-Coalinga admission. The patient reported continued high levels of depression and anxiety.

The last documentation of clinical contact was by the psychiatrist, also on December 19, 2022, when the psychiatrist indicated the plan to increase Seroquel in response to the patient's request and report of poor sleep, and to obtain a lithium level and additional laboratory studies.

The patient was discharged from DSH-Coalinga to CDCR on March 8, 2023.

**Findings**

The care provided to this patient was inadequate.

There was limited documentation of consistent, timely, clinical contacts by the psychiatrist, social worker, and psychologist. Additionally, documented contacts appeared to occur on the day of the treatment team meeting.

There was no documentation that an initial treatment team meeting occurred timely; the only documented treatment team meeting occurred on December 15, 2022, approximately one month after admission.

The appropriate laboratory and preliminary testing for treatment with psychotropic medications was performed.

Lastly, documentation indicated that the patient was discharged on March 8, 2023; however, the last documentation of clinical contact was dated December 19, 2022, by the psychiatrist.  It was unclear what, if any, treatment was provided from that date until the patient's discharge in March 2023.  It was also unclear if the patient's treatment outcome expectations were met at the time of discharge to CDCR.

**Patient E**

This 65-year-old patient was admitted to DSH-Coalinga on December 2, 2022, from CSATF, as he required continuation of care because he was unable to program in the EOP due to significant depressive symptoms and poor self-care.

The patient was provided with a diagnosis of bipolar I disorder, current or most recent episode manic, severe.  He was prescribed aripiprazole and carbamazepine.  It appeared that the patient was transferred to unit 5 on isolation status due to symptomatic COVID-19 infection upon DSH-Coalinga arrival.  He was prescribed Paxlovid for five days.  His MERD was August 2, 2033.

The admission nursing assessment was completed on the day of admission.  The seven-day initial treatment plan occurred on December 8, 2022.  There was no documentation provided of clinical mental health contact prior to this treatment team meeting other than the admission nursing assessment.  The treatment plan included treatment outcome expectations that included encouraging attendance at outdoor groups to encourage exercise, encouraging the patient to attend one indoor group to encourage socialization, and to refer the patient to the psychiatrist for medication consultation.  The treatment plan noted that the patient had been assessed with moderate current suicide risk, low non-suicidal self-injurious behavior risk, and moderate risk for violence.  As the patient had not yet met with the psychiatrist, social worker, RT, or psychologist, treatment foci objectives and interventions were not provided.  The psychiatrist and psychologist were not present at the treatment team meeting.

A note by a primary care physician on December 12, 2022, indicated that the patient was COVID-19 positive, but now asymptomatic after treatment with Paxlovid.  The patient was also seen by the psychiatrist on that date when it was noted that he was admitted to unit 22.  He reported poor sleep and nightmares; the patient was incarcerated after killing his father who had dementia while the patient cared for him.  His psychotropic medications were resumed after having been held during Paxlovid treatment.  He was seen again by the psychiatrist three days later when Remeron was prescribed.

Documentation of group therapy participation from December 4 – 26, 2022 was provided; these documents all indicated that the patient chose not to participate and that he had not made any clinical progress.

**Findings**

The care provided to this patient was inadequate.

There was very limited documentation of clinical encounters during the DSH-Coalinga hospitalization. Although the patient had COVID-19 upon arrival with placement in isolation, it was unclear why there was no documentation of any clinical assessment other than nursing prior to the seven-day treatment team meeting. This treatment team documentation even included a treatment outcome expectation that the patient would be referred to see the psychiatrist for medication consultation. Further and of more concern, subsequent clinical and group contacts were not documented after December 2022.

**Patient F**

This 50-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. On or around August 5, 2022, the patient transferred from the MCSP EOP to the intermediate care program at DSH-Coalinga for further stabilization and treatment. Specific concerns noted by the referring institution included depression, psychosis, hopelessness, anxiety, impaired functioning, and treatment nonengagement. Prior suicide risk assessments referenced a history of self-harming behaviors as recently as January 2021, and five to six suicide attempts with the most recent occurring in February 2021.

The patient was provided a diagnosis of schizoaffective disorder, depressive type. The psychiatrist also noted that the patient likely met criteria for borderline personality disorder based on his history. Prescribed psychotropic medications included hydroxyzine for insomnia and anxiety, prazosin for nightmares and PTSD symptoms, Lexapro for depression, Risperdal and fluphenazine for psychosis, and Cogentin for treatment of medication side effects. The patient was generally medication adherent throughout the current hospitalization.

A telepsychiatrist completed the initial assessment on the date of admission. This assessment was thorough and included a summary of the patient's response to prior psychotropic medications, a meaningful case formulation, and a recommendation for diagnostic clarification through ongoing monitoring of symptoms.

The psychologist completed the initial assessment within five days of admission. This assessment included recommendations for group assignment; all recommended groups appeared relevant for the patient's presenting problems. The assigned psychologist generally met with the patient every 30 to 60 days. Rehabilitation therapists documented monthly summaries.

The DSH treatment team modified the referring institution's treatment outcome expectations during the initial treatment meeting. Treatment plans were well-organized, individualized, and inclusive of numerous measurable objectives. Assigned treatment groups included grief and

loss, DBT, seeking safety through art therapy, managing mental illness, medication education, trauma, and a 12-step study group. Group treatment progress notes were completed monthly and included some individualized information. The treatment team routinely documented the percentage of treatment groups attended to track progress; however, the patient attended only 30 percent of his assigned groups in recent months.

The social worker progress notes were comprehensive. These notes referenced specific interventions implemented during individual encounters, response to treatment interventions, and a description of overall progress toward discharge objectives. One social worker appropriately completed and documented a termination session with the patient before transitioning to another provider.

The patient met with several different psychiatrists during the current hospitalization; some psychiatrists documented meaningful interventions beyond medication management. Psychotropic medications were modified on a few occasions due to lack of progress or patient complaints. One psychiatrist recommended a trial of Clozaril; however, the patient refused after being informed of the potential adverse side effects and the necessity to obtain blood for regular laboratory studies.

Nursing documentation provided meaningful collateral information, including observations and interventions over time. For example, nursing routinely noted that the patient required some prompting to leave the dorm, to isolate less, and to participate in milieu activities.

Suicide risk assessments were updated regularly. The most recent suicide risk assessment on January 12, 2023, assessed low risk.

Recent clinical notes referenced evidence of progress, including medication adherence and reduced self-harm risk. Although the patient clearly benefitted from his vocational assignment, providers noted that he was terminated due to being unable to recall or to provide his social security number on February 14, 2023.

The patient remained in the intermediate care program at DSH-Coalinga at the time of review in March 2023.

**Findings**

Although the overall care provided to this patient was adequate, some concerns were identified.

Treatment plans were individualized and were appropriately modified when indicated. Clinical notes offered clear updates regarding the patient's response to interventions and ongoing issues that required attention prior to discharge. The decision to retain the patient in the intermediate program was also appropriate.

There was, however, a lack of care continuity in psychiatric providers, and the telepsychiatrist responsible for the initial assessment inappropriately documented that suicide and self-harm risk were "absent," despite recent suicidal ideation, hopelessness, and a history of self-harm and

174

suicide attempts. Additionally, the termination of the patient from his vocational position for being unable to recall his social security number was very unfortunate, as he appeared to benefit and find purpose in his work. The treatment team should have coordinated an alternative assignment while they attempted to obtain the patient's social security number.

## Patient G

This 40-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. According to the DSH initial psychiatric evaluation, the patient transferred from VSP to DSH-Coalinga for intermediate care on or around August 22, 2022, due to disorganized speech, grossly disorganized behavior, negative symptoms of schizophrenia, and minimal improvement in symptoms and participation in treatment.

The patient was provided diagnoses of schizophrenia and unspecified amphetamine-type disorder. He was prescribed aripiprazole and Abilify. He received his psychotropic medications by a PC 2602 order due to grave disability since May 2022.

The psychiatric initial assessment referenced a history of suicidal ideation, three hospitalizations in the community for danger-to-self, and multiple incidents of self-harm. Despite these concerns and other suicide risk factors noted in the CDCR documentation, the psychiatrist inappropriately documented that suicide risk was "absent" for this patient.

The CDCR treatment outcome expectations were appropriately modified following admission. Treatment plans targeted presenting concerns and included realistic and measurable objectives.

The psychiatrist, psychologist, and social worker documented monthly clinical contacts. These progress notes did not indicate whether additional contacts were offered in the interim. The patient reported benefitting from group treatment, and he was assigned 17 groups during hospitalization. As of March 2023, he attended 80 percent of assigned groups overall and had perfect attendance in the wellness and recovery action plan group.

Between January and March 2023, the patient demonstrated significant improvement in symptoms and functioning. He also maintained a vocational position. Although the patient remained medication adherent during hospitalization, he continued to inform staff that he would no longer take medication after the involuntary medication order expired.

On or around March 6, 2023, the patient discharged to the EOP level of care. There was no discharge summary located in the healthcare record.

## Findings

Overall, the care provided to this patient was adequate.

While the psychiatrist inappropriately documented an absence of suicide risk, the treatment plans and implemented interventions were appropriate. Clinical notes suggested that the patient

175

responded well to these interventions, and progress notes supported eventual discharge in March 2023.

**Patient H**

This 46-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. The patient transferred from CSP/Sac to the intermediate care program at DSH-Coalinga on or around February 11, 2022, to address symptoms of depression, persistent suicidal ideation, auditory hallucinations, and grief. The referring institution also noted a history of inpatient hospitalizations, trauma, self-injurious behavior, and paranoid ideation that included fear of food tampering and related meal refusals.

The referring institution provided diagnoses of "unspecified mood affective disorder" and antisocial personality disorder. While DSH-Coalinga retained the antisocial personality disorder diagnosis, the primary diagnoses were changed to schizoaffective disorder, depressive type; alcohol use disorder; and cannabis use disorder. The rationale for this diagnostic change was well documented. The patient was prescribed sertraline, mirtazapine, Abilify Maintena, and hydroxyzine ordered on an as-needed basis. At the time of admission, the patient received his psychotropic medications by a PC 2602 order with an expiration date of October 6, 2022.

During the initial assessment, the patient rated his depression as extremely high (ten of ten) and reported passive suicidal ideation. While the patient also reported command auditory hallucinations with voices telling him to harm himself, psychiatric documentation indicated that there were no objective signs of psychosis. Still, the patient was placed on direct one-to-one observation for danger-to-self on the day of arrival. The observation level was changed to 15-minute checks on February 15, and increased monitoring was discontinued on February 22, 2022.

The psychologist, social worker, and psychiatrist documented monthly clinical contacts. These progress notes did not indicate whether additional contacts were offered in the interim; however, the quality of documentation was otherwise adequate. The patient was assigned multiple groups, including DBT, psychoeducational, grief and loss, cognitive behavior therapy, and symptom management.

Clinical notes referenced only one behavioral incident in August 2022, and this was limited to a verbal altercation with a peer. More recent clinical documentation described the patient as medication adherent, actively engaged in group treatment, and exhibiting objective improvement in coping skills and distress tolerance. The psychiatrist noted that the PC 2602 order was not renewed due to the patient's ongoing medication adherence, stability, and insight into his mental illness and the need for psychotropic medication treatment. The patient discharged to the EOP level of care on or around September 8, 2022.

**Findings**

The care provided to this patient was adequate.

Treatment plans and group assignments were individualized. Treatment team members consistently documented meaningful interventions, objective signs of improvement, and overall progress toward treatment objectives. Clinical notes included sufficient rationales for observation levels, diagnostic changes, involuntary medication non-renewal, and lower level of care discharge. Overall, it appeared that the patient benefitted from the treatment provided at DSH-Coalinga.

**Patient I**

This 45-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. The patient transferred from CMC to DSH-Coalinga on April 15, 2022, for intermediate care to address ongoing depressed mood, hopelessness, and suicidal ideation. The healthcare record referenced three suicide attempts, with two that occurred in 2017, as well as a DDI designation from CDCR.

At the time of the initial assessment, the patient was provided diagnoses of major depressive disorder, moderate, with recurrent episodes; alcohol use disorder; and mild intellectual disability. During hospitalization, the psychiatrist made several psychotropic medications changes, and the treatment team changed the primary diagnosis from major depressive disorder to other specified bipolar and related disorder (hypomanic/manic episodes with insufficient symptoms and major depressive episodes). The most recent medication regimen included lithium, Remeron, and hydroxyzine.

The treatment team appropriately modified the CDCR treatment outcome expectations during the initial treatment meeting. Treatment plans were detailed and targeted depression management, suicide risk, and hopelessness, and several measurable goals for each target were included. The patient was assigned to monthly individual therapy with a psychologist, multiple treatment groups, and other milieu activities; all were appropriate for his presenting problems. Assigned treatment groups included DBT, community reintegration for parolees, anger management, and trauma.

Clinical notes from the psychiatrist, psychologist, social worker, rehabilitation therapist, and nursing staff were sufficiently detailed and included observations, interventions, and response to treatment efforts. The psychiatrist often met with the patient weekly, and these progress notes included rationale for medication adjustments, responses to different medications, and references to detailed discussions regarding medication options and side effects.

Documentation indicated that the patient began demonstrating noteworthy progress following a medication adjustment in July 2022. His engagement in trauma treatment appeared to result in an increase in depressive symptoms and irritability in August and September 2022; however, the psychiatrist noted that the absence of aggression and violence was evidence of clinical progress.

Prior to discharge on October 19, 2022, the patient was attending 90 percent of assigned treatment groups, maintaining a janitorial job in his housing unit, and was described as relatively stable and discharge ready. The October 19, 2022, psychiatric discharge summary offered a

detailed description of the hospital course and included a clear rationale for discharge to the EOP level of care.

**Findings**

The care provided to this patient was adequate.

Treatment plans were thorough, individualized, and inclusive of evidenced-based interventions. There were several documented consultations found in the healthcare record, suggesting ongoing multidisciplinary collaboration between required treatment team meetings. Documentation suggested that the patient responded well to treatment interventions, as well as the therapeutic milieu. When obstacles to progress did arise, they were appropriately documented and addressed with individual therapy and medication management. Clinical notes supported discharge to the EOP level of care in October 2022, and the psychiatric discharge summary provided useful information for care continuity in the outpatient setting.

**Patient J**

This 52-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. The patient transferred from RJD to DSH-Coalinga on or around June 24, 2022, for intermediate care to address significant impairments in functioning, poor medication and treatment adherence, hypomania, and increased aggression. The referring institution also noted a history of five suicide attempts and PTSD, as well as grandiose and paranoid delusional thinking during episodes of mania.

At DSH-Coalinga, the patient was provided diagnoses of bipolar I disorder, most recent episode manic; alcohol use disorder; and antisocial personality disorder. Symptoms were appropriately documented to justify each diagnosis. The patient was prescribed hydroxyzine and aripiprazole.

The psychiatrist, psychologist, and social worker documented monthly clinical contacts. The progress notes did not indicate whether additional contacts were offered in the interim. Assigned groups included a 12-step study group, coping skills, DBT, interpersonal effectiveness skills, mindfulness, grief and loss, houses of healing, anger management, medication education, and discharge transition.

Treatment plans were sufficiently detailed, individualized, and inclusive of measurable objectives when indicated. The treatment team routinely documented progress toward treatment objectives at the time of each treatment team meeting.

The patient's manic symptoms resolved early during the hospitalization. Subsequently, the patient demonstrated progress toward his other treatment objectives. By September 2022, the patient was attending 90 percent of treatment groups, was medication adherent, and was described as self-motivated in treatment. The patient also exhibited objective signs of improvement in symptoms and functioning, as he reportedly maintained a daily routine that included regular exercise and participation in treatment and other unit activities.

The patient discharged from DSH-Coalinga on or around October 5, 2022. The psychiatric discharge summary was comprehensive and offered a detailed description of the hospitalization. This provider also included recommendations for the receiving institution to consider.

**Findings**

The care provided to this patient was adequate.

The diagnoses and interventions were appropriately justified. Treatment plans were detailed and individualized with measurable goals. Assigned groups were clinically relevant. The treatment team routinely documented status updates to monitor changes in symptoms and progress toward treatment and discharge objectives. The patient evidenced subjective and objective improvement in symptoms and functioning during the months preceding discharge. Additionally, the progress notes supported the decision to discharge the patient to a lower level of care on October 5, 2022.

**Patient K**

This 42-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. At age 15, the patient was sentenced to life with the possibility of parole for first degree murder, second degree robbery, carjacking, kidnap/robbery, and a firearm enhancement. The patient transferred from CSATF to DSH-Coalinga for intermediate care on or around September 15, 2022. Prior to DSH admission, the patient received mental health services at the 3CMS level of care. Documentation from the referring institution indicated that, despite the patient's request for an increase in his level of care from 3CMS to EOP, he was instead referred to intermediate care for "establishment of self-safety, stabilization, and development of skills to assist with controlling impulsive behavior and lability of mood." The patient had multiple prior suicide attempts during his CDCR prison term; the most recent occurred in June 2022.

DSH-Coalinga provided the patient with diagnoses of major depressive disorder, recurrent, with psychotic features; antisocial personality disorder; and polysubstance dependence. Trials of several different psychotropic medications occurred during the hospitalization, including treatment with Wellbutrin, lithium, and Effexor. The most recent medication regimen included Prozac, mirtazapine, and Benadryl.

Documented symptoms upon admission included hopelessness, worthlessness, anhedonia, sadness, isolation, and poor sleep. The patient also reported increased anxiety and panic attacks due to a pending court date, and he informed staff that he would likely be denied parole due to recent RVRs.

Treatment plans targeted self-harm, social skills, insight, anxiety, depression, and coping. Treatment goals were measurable, and assigned groups were appropriate for the patient's presenting concerns. Clinicians also worked closely with the patient to help prepare him for the pending court appearance. Assessments for suicide risk and violence risk were routinely updated, including prior to discharge. The most recent suicide risk assessment resulted in a moderate suicide risk rating.

The patient appeared to respond well to the treatment team's interventions and groups. More recent clinical notes indicated that he was very respectful toward staff, verbalized his stress and fear appropriately, and engaged in activities, routines, and coping skills to better manage his anxiety prior to the court hearing. The patient also remained medication adherent during hospitalization.

On January 4, 2023, after serving 37-years in prison, the court reversed the patient's sentence and ordered his release to the community. Documentation indicated that the DSH-Coalinga treatment team and other staff quickly responded by attempting to coordinate housing and develop release plans for community reintegration. The DSH-Coalinga social worker also wrote a detailed memorandum outlining instructions for CDCR and the patient; this document referenced the patient's ability to utilize public transportation, his housing plan at a residential program in San Francisco, and the need for additional resources for successful community reintegration. The social worker also contacted the patient's family and confirmed that they had his social security card and birth certificate.

The psychiatric discharge summary on January 10, 2023, described the patient as calm, cooperative, appropriately groomed, and no longer exhibiting or reporting significant symptoms or functional impairments at the time of release. The psychiatrist also documented that the patient would be provided a 30-day supply of medication upon release.

**Findings**

The care provided to this patient was adequate.

The treatment team appropriately targeted the patient's anxiety and intervened to help the patient better tolerate distress and prepare for his pending court hearing. Risk assessments were administered timely. Assigned groups were relevant to the patient's needs. Medications were adjusted when indicated based on the patient's medication response and symptomatology. Additionally, following the patient's unexpected release to the community, DSH-Coalinga staff coordinated a reasonable release plan within a very short timeframe.

**Patient L**

This 51-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient transferred from the CHCF-PIP acute care program to DSH-Coalinga for intermediate care on or around August 11, 2022. The referring institution referenced a suicide attempt by overdose prior to the PIP acute care admission and recommended further treatment in an intermediate care program due to ongoing psychotic symptoms, suicide risk, and poor ADLs.

Upon DSH admission, the patient was provided with diagnoses of bipolar I disorder, most recent episode depressed; antisocial personality disorder; and polysubstance abuse disorder. The treatment team subsequently changed the primary diagnosis to schizophrenia. Various trials of different psychotropic medications occurred at DSH; however, nursing noted medication adherence concerns during the hospitalization, including for psychotropic medication and

insulin.  The most recent medication regimen included Abilify, Zyprexa, Paxil, Remeron, and melatonin.

The treatment outcome expectations were appropriately revised during the initial treatment team meeting.  Treatment plans were collaborative, individualized, realistic, and inclusive of measurable objectives when indicated.  Assigned groups were relevant, and the monthly group treatment progress notes included individualized information.

While the telepsychiatrist completed the initial psychiatric assessment timely on the date of admission, the quality of the initial assessment was inadequate.  The telepsychiatrist failed to reference the referral documentation and to indicate the reason for admission.  The provider also inappropriately documented that self-harm risk was absent, despite the patient's recent suicide attempt and other risk factors noted in the most recent CDCR suicide risk evaluation.  The telepsychiatrist also left the suicide and violence risk rationale section of the assessment blank.  Psychiatric continuity of care was also problematic.  Monthly psychiatric progress notes did, however, offer sufficient detail, including justifications for medication changes, mental status updates, and responses to medication interventions over time.

The assigned psychologist completed the initial assessment timely.  The psychologist generally met with the patient every 30 days to update risk assessments and to briefly check in.  The documentation of some of the psychologist contacts included meaningful therapeutic interventions as well.  The social worker documented contacts every 30 to 60 days.  The social worker notes provided status updates on symptoms, functioning, and progress toward treatment and discharge objectives.

In March 2023, the assigned social worker documented that the patient exhibited moderate improvement during hospitalization, participated in 80 percent of treatment groups, and adhered to prescribed medication.  However, other clinical documentation during March 2023 suggested that the patient had been medication nonadherent, acutely psychotic, and significantly impaired.  For example, healthcare staff noted that the patient continued to require frequent prompting to participate in showers and group, exhibited auditory hallucinations, bizarre behaviors, poor insight, paranoid and grandiose delusional thinking, and word salad (stringing together unrelated words in a single sentence).  The patient also frequently wrote letters to staff that healthcare providers described as nonsensical.  Nursing staff also documented refusal of medical care and insulin during March 2023.  Additionally, the psychiatrist adjusted the patient's medication as recently as March 2023 due to ongoing symptom concerns.

This patient remained in the intermediate care program at DSH-Coalinga at the time of review on March 22, 2023.

**Findings**

Although there were positive aspects of the treatment provided that were identified during this review, including decisions to retain the patient at the current level of care and to adjust medications in March 2023, the overall care provided was inadequate.

181

The initial assessment by the telepsychiatrist was inadequate, as it failed to reference critical collateral information and included an inappropriate and inaccurate suicide risk rating. Psychiatric continuity of care was poor throughout the hospitalization, and discrepant documentation among the various disciplines suggested insufficient communication and collaboration. Treatment interventions did not address the patient's medication and medical care refusals. In response to the lack of progress, including behavioral concerns, medication nonadherence, and reliance on prompting from nursing for self-care in the context of psychotic symptoms, the patient should have received closer monitoring by increased individual encounters with mental health providers and a positive behavior support plan.

**Patient M**

This 38-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. The patient transferred to the intermediate care program at DSH-Coalinga on or around April 29, 2022, to evaluate and monitor medications, to reduce odd and bizarre behaviors, and to increase insight related to his mental illness and the need for medication treatment.

Upon admission, the patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder; antisocial personality disorder; and alcohol use disorder. He was prescribed Lexapro, Abilify, and Zyprexa.

The DSH treatment targets and objectives were appropriate. Assigned groups were relevant for the patient's presenting concerns. The psychiatrist, psychologist, and social worker generally documented monthly contacts.

In August 2022, the treatment team changed the primary diagnosis from unspecified schizophrenia spectrum disorder to adjustment disorder with disturbance of conduct. This diagnostic change was not justified in the clinical documentation, as the rationale noted historical and recently observed bizarre and uncharacteristic behaviors, disorganization, and concerns about his safety. During that time, the patient also reportedly stood at his door for several hours watching staff. Further, there was no reference to the patient meeting adjustment disorder criteria or an explanation for continuing antidepressant, mood stabilizing, and antipsychotic medications despite the diagnostic change.

During hospitalization, the patient reportedly remained medication adherent, socialized with peers, and participated in approximately 80 percent of offered group treatment. While the psychiatrist documented that the patient responded well to the antidepressant medication, other treatment team members continued to note that the patient endorsed depressive symptoms through August 2022.

Suicide risk assessments were consistently updated. In August 2022, the psychologist assessed the patient with low suicide risk.

The discharge contact and discharge summary were completed by a telepsychiatrist on August 4, 2022. The telepsychiatrist, however, did not reference consultation with other members of the treatment team or provide a sufficient discharge rationale. Instead, the telepsychiatrist wrote a

vague statement indicating that the patient had "met maximum benefit" and would be discharged to the EOP level of care. The physical discharge date was August 10, 2022.

**Findings**

The care provided to this patient was inadequate.

There appeared to be discrepant observations and opinions regarding the patient's diagnosis and overall progress. It was difficult to determine how the treatment team addressed the patient's insight into his mental illness when there was evidence of diagnostic uncertainty among the treatment team. The diagnostic change to adjustment disorder was not supported by the provider's rationale, the patient's history, or the prescribed psychotropic medications. The discharge rationale also did not provide sufficient information to justify the level of care change or indicate whether the discharge objectives were met. Further, the treatment team did not address the referring institution's concerns, provide an explanation for the patient's bizarre behaviors throughout the hospitalization, or explore the underlying reasons for his stated safety concerns.

**Patient N**

This 51-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. The patient transferred from MCSP to DSH-Coalinga for intermediate care on or around August 12, 2022, to address ongoing auditory and visual hallucinations, anxiety, depressed mood, and disturbed sleep. The referring institution also referenced a history of military combat-related PTSD symptoms.

At DSH-Coalinga, the patient was provided diagnoses of schizoaffective disorder, PTSD, alcohol use disorder, amphetamine use disorder, and cocaine use disorder. Various medications were prescribed during the inpatient hospital admission, including clozapine. Most recently, the patient was prescribed Depakote for mood stabilization, BuSpar for PTSD, prazosin for nightmares, and Suboxone for opioid use. Wellbutrin was also prescribed for PTSD.

The psychiatrist, psychologist, and social worker documented monthly contacts. These progress notes did indicate whether additional contacts occurred between those monthly contacts. Assigned groups included DBT, symptom management, trauma, substance abuse, and distress tolerance.

By early November 2022, healthcare staff documented ongoing medication adherence, cooperation with staff, a lack of behavior incidents, socialization with peers, and cessation of suicidal thoughts. The patient was also adherent with individual provider and group treatment contacts.

On November 30, 2022, the treatment team discharged the patient to a lower level of care. The psychiatric discharge summary offered a detailed description of the patient's hospitalization course and included evidence of progress toward treatment objectives. The level of care rationale was appropriate. However, despite noting an absence of objective signs of psychotic

symptoms during admission, the diagnosis of schizoaffective disorder was retained at discharge. Discharge medications included Wellbutrin, Depakote, Suboxone, prazosin, and BuSpar.

**Findings**

Overall, the care provided to this patient was adequate.

Treatment plans were appropriate, and providers routinely documented updates on progress toward treatment objectives during individual encounters and treatment team meetings. When the patient transitioned to a new social worker, the former social worker appropriately and ethically completed a termination session. The discharge was supported by recent clinical notes, and the discharge rationale was appropriate. The psychiatrist, however, should have documented a rationale for retaining the schizoaffective diagnosis and for prescribing Wellbutrin to address PTSD symptoms.

**Patient O**

This 47-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Coalinga. The patient transferred to DSH-Coalinga for intermediate care on or around February 18, 2022. The referring institution noted concerning symptoms and behaviors that included isolation, agitation, lack of treatment participation, hopelessness, and depressed mood. The patient also had a history of development disability designations of DD1 and DD2 while in CDCR. Prior to the current DSH hospitalization, the patient had two documented suicide attempts; the most recent occurred in 1992 by hanging.

The patient was seen frequently by various psychiatric providers during the current hospitalization, including intermittently by a telepsychiatrist. Each provider appeared to have a different opinion regarding the patient's diagnoses and medication needs based on the number of changes during a short period of time. In April 2022, the patient was provided a diagnosis of bipolar I disorder; on May 2, 2022, with unspecified depressive disorder and antisocial personality disorder; on May 6, 2022, with schizoaffective disorder, depressive type, and no mention of a personality disorder; and on September 8, 2022, with major depressive disorder and borderline traits. Psychiatric progress notes also included a diagnosis of unspecified intellectual disability; however, this was not referenced in the social worker or psychologist assessments or progress notes.

Numerous psychotropic medications were prescribed during this hospitalization, including a range of several antipsychotic, mood stabilizing, and antidepressant medications. Medication adherence was an ongoing problem. Despite several factors including intermittent diagnosis of a psychotic disorder, treatment with an antipsychotic medication, and concerns regarding the patient's danger-to-self, psychiatric providers did not document consideration or initiation of a PC 2602 order.

Assigned treatment groups included DBT, "drama treatment," anger management, grief and loss, medication education, and trauma. The treatment team noted that while the patient attended 100

percent of his anger management groups, he did not attend any grief and loss groups, and minimally attended others.

Treatment teams routinely documented reports of suicidal ideation, behavioral incidents, and problems with treatment and medication adherence. On May 6, 2022, drugs were reportedly found in the patient's room. During July 2022, the patient refused meals, telepsychiatry appointments, and psychotropic medications. He also reported ongoing depressive symptoms and a lack of motivation to take medications and to engage in treatment activities during that month.

While psychiatric contacts were offered more frequently, the treatment team did not consider increasing the frequency of individual therapy appointments with the social worker or psychologist in response to the lack of group treatment participation. Further, the treatment team did not refer the patient for a behavior plan to address ongoing behavioral concerns noted throughout the hospitalization.

On August 11, 2022, Zoloft was tapered and eventually discontinued due to refusals. Subsequently, the patient was seen by a psychiatrist on August 15, 2022, when he reported feeling "quite depressed." On August 24, 2022, he reportedly removed his toenails in response to receiving bad news about two family members and experiencing interpersonal problems with his roommates. The patient informed staff that he felt better after engaging in self-harm. On August 31, 2022, staff intervened when the patient attempted to hang himself. The patient was subsequently placed in physical restraints for danger-to-self and others, and he continued to report plans to end his life once released from restraints. While psychiatry noted that the patient had refused as-needed medication on this date, there was no documentation suggesting involuntary medication was considered. DSH-Coalinga referred the patient for acute care at a CDCR PIP the following day on September 1, 2022.

Following the patient's release from physical restraints, he remained on one-to-one observation for danger-to-self and others until his eventual transfer to a PIP on September 8, 2022. A psychiatric progress note on September 2, 2022, described the patient as attention seeking and very manipulative. Between September 4 and the date of discharge on September 8, 2022, the patient refused all medications, including insulin. On September 4, 2022, the patient reported to staff ongoing thoughts of suicide and stated that the *Coleman* team would be visiting that week and that a *Coleman* team member had informed him of their plans to "shut down" the facility and to remove their license. On September 6, 2022, the patient was sprayed with OC pepper spray, reportedly to halt assaultive behavior. Clinical notes indicated that the patient was retained in a seclusion room between September 6 and the date of discharge on September 8, 2022. On September 7, 2022, the patient was observed throwing items, shouting, urinating on the floor, and presenting with combative and uncooperative behavior toward staff.

At the time of discharge, the patient was prescribed Wellbutrin, and his diagnosis was changed from schizoaffective disorder to major depressive disorder, alcohol use disorder, unspecified intellectual disability, and borderline personality traits.

**Findings**

The care provided to this patient was inadequate.

Poor psychiatric continuity of care appeared to contribute to rapidly shifting diagnoses and medication changes that were not sufficiently explained in the clinical documentation. Diagnostic discrepancies were not reviewed during treatment team meetings with other providers.  Considering the patient achieved 80 percent group attendance and attended 100 percent of his treatment groups early during the hospitalization, the treatment team should have explored the underlying reasons for the behavioral changes by more frequent individual therapy contacts with a consistent provider, referral for a diagnostic clarification evaluation with psychological testing, and consideration of development of a behavior plan with incentives to address treatment adherence and other behavioral concerns.  Lastly, while the patient was appropriate for acute care at the time of discharge, psychiatry did not document sufficient rationale for not pursuing a PC 2602 order for involuntary medications when the patient met criteria.

**Patient P**

This 61-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Coalinga.  The patient served multiple CDCR prison terms; he most recently was incarcerated for a four-year term with an EPRD of January 24, 2023.  The patient was admitted to DSH-Coalinga on November 3, 2022, after he was referred from the CHCF-PIP where he was receiving treatment at the acute level of care.  The patient had multiple MHCB admissions for suicidal ideation and was referred for structured inpatient care and 24-hour nursing supervision due to serious mental illness and impairment in functioning.  The referring treatment team reportedly believed that the patient would benefit from treatment emphasizing coping skills, ADLs, and medication adherence.

The patient was provided with a diagnosis of schizoaffective disorder, bipolar type upon admission to DSH-Coalinga.  The initial psychiatric assessment indicated an assessment of low acute suicide risk in the current inpatient setting; however, the suicide risk assessment performed by the psychologist assessed moderate acute and high chronic suicide risk.  Upon DSH-Coalinga admission, the patient reported that he had not experienced suicidal ideation for several months, and the psychiatrist noted that the patient was currently motivated to adhere with treatment for clinical improvement.

The patient had an extensive history of mental health treatment, including multiple community and CDCR psychiatric hospitalizations.  Prior to the CHCF-PIP admission, the patient received treatment at the CHCF MHCB.  He reportedly engaged in self-injurious behavior on July 20, 2022, and was subsequently admitted to the CHCF-PIP acute care program on July 27, 2022.  At the time of PIP admission, the patient endorsed and presented with command auditory hallucinations, hypomania, depression with hopelessness, and anxiety.  He reported intermittent suicidal ideation with intent and plan; however, he indicated that he would not act on the plan due to the lack of access to means in the inpatient setting.  The patient also reported a history of

two traumatic brain injuries and multiple (10 to 15) previous suicide attempts.  CDCR records documented a history of two suicide attempts; on May 12, 2018 by hanging, and on July 20, 2022 when he tied a shirt around his neck in an attempt to asphyxiate.

The initial psychiatric assessment was timely and adequate; however, no initial psychological assessment was documented.  Treatment team meetings also occurred timely with the necessary staff in attendance during the hospitalization.  The treatment team appropriately updated the treatment goals during hospitalization.  Group assignment was also clinically appropriate; the patient was assigned to clinical and recreational groups that included DBT, managing mental illness, cognitive therapy for psychotic symptoms, and WRAP groups.

The only documentation of monthly psychiatric contact was dated November 17, 2022 and signed on December 12, 2022.  That note indicated that the patient denied suicidal ideation since admission, and demonstrated medication adherence, adequate group attendance, and denial of auditory hallucinations and delusional thinking.  He also reported the desire to remain sober.  At the final treatment team meeting on December 29, 2022, the patient reportedly demonstrated bright mood and affect, hope for the future, and anticipation of parole.  He demonstrated some affective and mood instability with difficulties establishing meaningful relationships with peers on the unit; the note indicated that this problem of developing relationships was due to the patient's disposition and hyperverbal behavior that at times annoyed his peers.

Psychotropic medications were adjusted appropriately during the hospitalization.  The patient achieved and maintained medication adherence, and the medications appeared to reduce symptoms and levels of distress.  Upon admission, the patient was prescribed paliperidone, olanzapine, Depakote, fluoxetine, and mirtazapine.  Depakote was discontinued on November 9, 2022, and the remaining medications were unchanged during the hospitalization.

The patient was discharged to CDCR for parole on January 19, 2023.

**Findings**

Although the overall care and treatment provided to this patient at DSH-Coalinga was adequate, clinical documentation was inadequate and severely deficient.

The treatment team focused treatment on parole preparation, which was clinically appropriate as the patient would parole after DSH-Coalinga discharge.  The patient was medication adherent, and his mental status improved steadily during hospitalization.  Rehabilitation therapy group progress notes indicated that the patient demonstrated acceptable participation and progress in the groups.

However, clinical documentation was poor and inconsistent.  There was no formal discharge summary located in the healthcare record.  Additionally, no psychology progress notes or assessments were located in the healthcare record.  The only monthly psychiatric progress note was dated November 17, 2022 and was not signed until December 12, 2022.

**Patient Q**

This 49-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Coalinga. The patient was admitted to DSH-Coalinga on December 23, 2022, after he was referred from VSP. He was provided with a diagnosis of schizophrenia. The patient reportedly had delusional thinking that others were entering his room at night and cutting his hair. He also had homophobic beliefs, and refused to attend groups with the belief that he would contract diseases if he sat next to others.

The patient reported to the unit social worker that he only came to DSH-Coalinga to avoid receiving an RVR for refusing to house. The initial psychological assessment at DSH-Coalinga provided a diagnosis of delusional disorder, persecutory type, multiple episodes, currently in acute episode. Suicide risk assessments at the time of admission indicated that the patient had low risk for suicide and self-harm.

The poor organization and content of the healthcare record made the review of treatment progress difficult. The only treatment team meeting and treatment plan located in the healthcare record was the seven-day initial treatment plan dated December 28, 2022; the necessary participants were not documented to be in attendance. The treatment expectation outcomes focused on decreasing delusional symptoms, engaging in treatment by actively participating in groups, and achieving medication adherence. The patient was referred to several groups that focused on DBT skills, managing mental illness, and emotional regulation skills.

Two identical monthly psychiatric progress notes were included in the healthcare record; one note was signed on January 3, 2023, and the other was signed on January 30, 2023. This documentation indicated that the patient was previously prescribed Abilify; however, he now refused all medications stating that they slowed him down, which was dangerous in jail and prison. The patient reportedly denied the need for mental health treatment, and exhibited persecutory delusional thinking, and impaired judgment and insight. The patient reportedly agreed to attend groups, but consistently refused hydroxyzine prescribed on an as-needed basis. There was no documentation that the patient ever attended his assigned groups.

Only one social work progress note was located in the healthcare record; the note was labeled "Late Note for January 2023" and was dated February 2, 2023. The note referenced a Special Incident Report generated on January 30, 2023, when the patient was involved in a verbal altercation with a peer; however, no additional details were provided. The social worker also described the patient as paranoid and distrustful of others, and his medication nonadherence was noted. Additionally, the social worker indicated that the patient had not made significant progress toward barriers to discharge.

**Findings**

The care and treatment provided to this patient at DSH-Coalinga was inadequate.

The documentation of important assessments, treatment team meetings, and clinical contacts was severely deficient; only one treatment team meeting was documented, and there were very few

instances of documented clinical contacts. There were no psychology progress notes present in the healthcare record, and the two psychiatric monthly progress notes were identical although they were dated and signed one month apart. The only social work progress note present in the record indicated that the patient had not made significant progress toward discharge; however, the note was devoid of details that might inform the reader of the patient's response to interventions or his prognosis.

**Patient R**

This 37-year-old male patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga.

The patient was admitted to DSH-Coalinga on April 22, 2022, and discharged on February 17, 2023. The patient was originally admitted to the CIM MHCB prior to transfer to the CHCF acute care program on August 10, 2021.

The patient had a history of psychiatric hospitalizations in 2010 and 2011; however, documentation was unclear whether the hospitalizations occurred while he was incarcerated or in the community. He had a history of suicidal ideation since childhood that included chronic, almost daily, suicidal ideation. The patient had a history of two suicide attempts more than one year prior to his recent MHCB admission.

Provided diagnoses included schizophrenia; cannabis use disorder; alcohol use disorder; phencyclidine (PCP) use disorder; amphetamine use disorder; and cocaine use disorder.

Upon admission, the patient had a profound inability to care for his ADLs, and he smelled of feces. He also exhibited thought blocking, which was a symptom of psychosis resulting in impaired thinking and concentration, as well as auditory hallucinations of speaking with God and receiving messages from famous individuals. The patient also had psychogenic polydipsia, a condition in which patients drank excessive amounts of water. Despite the treatment team repeatedly warning the patient about the risks of consuming excess water, the patient reported that he would continue to consume water as he felt it was good for him. Throughout his stay, the psychiatrist followed the patient's sodium levels; this was clinically indicated due to the concerns of excessive water consumption.

The patient was prescribed olanzapine for psychosis, and divalproex for mood stabilization; these medications were adjusted as was clinically indicated. The patient received his psychotropic medications by a PC 2602 order due to grave disability; as such, an order for injectable olanzapine was provided if oral medications were refused. No use of force was necessary to administer medications to the patient.

Treatment outcome expectations included increased insight into his mental illness and engaging in treatment, including group attendance. The patient reportedly partially met his goals. Unfortunately, he stopped attending most groups prior to discharge. Additionally, he did not believe that he needed psychotropic medications, and he stated that he would discontinue them upon CDCR release, as the PC 2602 order would not follow him into the community.

The patient was offered but declined individual therapy. The psychiatric discharge summary was dated February 10, 2023. The psychiatrist recommended that the patient be evaluated for an involuntary psychiatric hold under the California Welfare and Institutions Code (WIC) 5150 statute, due to the risk from excessive water consumption.

The last treatment team meeting occurred on February 16, 2023, the day prior to discharge, and the psychiatrist was not in attendance.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The documented symptoms supported the psychiatric diagnoses. The psychiatric medications were appropriate based on the diagnoses, although stronger justification for the use of the mood stabilizing medication divalproex was warranted. The psychiatrist appropriately monitored the patient's sodium levels, which was critically important given his excessive water consumption. The psychiatrist's absence from the last treatment team meeting prior to discharge was puzzling, and there was no rationale provided in the healthcare record. The decision for involuntary detainment under WIC 5150 appeared well-justified.

**Patient S**

This 47-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga. The patient was treated there from April 21 to or through October 20, 2022.

The treatment team at SQ referred the patient to the intermediate level of care due to frequent paranoia and delusional thinking that had worsened during the prior six months. The patient was treated in the CMF MHCB from March 19 to 25, 2022. While in the MHCB, he had some decrease in psychotic symptoms; however, the treatment team believed this was due to fewer interactions with peers, instead of reflecting true clinical improvement. The patient sought frequent reassurance that his delusions were untrue. He experienced delusional thinking that others were altering his central file.

The patient had a prior suicide attempt at age 13 or 14, when he ingested acetaminophen and alcohol in an overdose, requiring a two-week hospitalization. The patient denied suicidal ideation at the time of admission to DSH-Coalinga. He had no known history of self-injurious behavior. His acute and chronic suicide risk were assessed as low.

The patient was provided diagnoses of delusional disorder; cocaine use disorder; alcohol use disorder; and cannabis use disorder. He was prescribed olanzapine for psychosis and hydroxyzine on an as-needed basis for anxiety.

The treatment outcome expectations included diagnostic clarification, medication stabilization, and improved reality testing.

190

During his treatment at DSH-Coalinga, the patient made gradual but consistent progress, with a reduction in psychotic symptoms. Due to concern for the atypical presentation of his symptoms, the DSH-Coalinga psychiatrist obtained an MRI of the brain; no abnormality was noted. The patient actively participated in treatment. Groups included substance use groups, DBT, and mindfulness groups. The treatment outcome expectations of diagnostic clarification and medication stabilization were met; however, the treatment outcome expectation of improved reality testing was not met.

The patient was discharged back to SQ to receive mental health services at the EOP level of care.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The patient's symptoms were consistent with the psychiatric diagnoses provided. Psychotropic medications were appropriate based on the diagnoses. Given the atypical presentation of the patient's symptoms, the decision by the psychiatrist to obtain an MRI was clinically reasonable. Group treatment was individualized and clinically appropriate. The patient made clear progress during his DSH-Coalinga hospitalization.

**Patient T**

This 55-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga. The patient was admitted to DSH-Coalinga on July 14, 2022, and he remained hospitalized at the time of review on March 23, 2023.

Prior to admission to DSH-Coalinga, the patient received treatment at the CHCF acute care program. He was referred for intermediate care due to bizarre behaviors in the context of medication nonadherence, such as walking on all fours, defecating in his bed, and remaining naked in his cell. Documentation indicated that the patient was excessively focused on religion, was talking and laughing to himself, and was frequently seen crying.

The patient had a long history of depression and hallucinations, dating back to his 20s. He had a history of multiple suicide attempts and self-injurious behavior by cutting and ingestion. He had multiple prior MHCB and DSH admissions.

The patient was provided with a diagnosis of schizoaffective disorder; additional diagnoses of delusional disorder and intellectual disability were also under consideration. Relevant medical diagnoses included diabetes mellitus and chronic kidney insufficiency.

The patient was prescribed olanzapine and paliperidone for psychosis; lorazepam and buspirone for anxiety; divalproex for mood stabilization; and benztropine, valbenazine, and amantadine for medication side effects.

At time of admission to DSH-Coalinga, the patient's suicide risk was assessed as low, and self-injury and violence risks were determined to be absent.

Treatment outcome expectations included medication adherence, reducing the degree of distress due to delusions, and increasing the patient's ability to distinguish between reality and psychotic symptoms. The social worker notes indicated that there was clear progress on meeting the treatment outcome expectations.

The patient developed multiple medical issues during his stay. He had abnormal movements of his jaw, which were deemed likely due to treatment with antipsychotic medication. Despite this, the patient initially did not want to decrease the dose of antipsychotic medication. Appropriate laboratory studies were closely monitored. Later in treatment, the psychiatrist lowered the dosage of antipsychotic medications, apparently due to concern for antipsychotic medication-induced side effects.

The patient was seen by multiple psychiatrists during his hospitalization at DSH-Coalinga, and medication changes occurred frequently. The patient developed dizziness, required the use of a walker and wheelchair for ambulation, and was subsequently placed on one-to-one observation for safety. Some documentation mentioned that medications were changed but did not always indicate when these changes occurred. The psychiatrist was not present at the most recent treatment team meeting on February 23, 2023.

A social worker note on March 16, 2023, stated that the patient would be discharged. The patient remained at the hospital at the time of the site visit on March 22, 2023.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The patient's symptoms were consistent with the psychiatric diagnoses provided. Psychotropic medications were appropriate based on the diagnoses. The patient made clear progress in treatment.

Concerns that were noted included unclear documentation regarding when medication changes occurred, and the lack of continuity of the treating psychiatrists.

**Patient U**

This 52-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga. The patient was admitted to DSH-Coalinga on August 17, 2022, and he remained hospitalized at the time of review on March 23, 2023.

The treatment team at the MCSP MHCB referred the patient to the intermediate level of care due to worsening mood, paranoia, auditory hallucinations, and delusional belief that multiple objects were communicating with him.

The patient had a long-standing history of suicidal ideation. He reported multiple prior suicide attempts by attempting to shoot himself, attempting to overdose on alcohol, and making a noose to hang himself when he was interrupted.

The patient had a complicated history of treatment at higher levels of care. Since 2020, he had two prior placements in an MHCB, and one prior stay at the acute level of care followed by intermediate care treatment. The patient also reported a history of two hospitalizations at DSH-Vacaville; however, the specific date of treatment was unclear.

Provided psychiatric diagnoses frequently changed. These diagnoses included major depressive disorder with psychotic features; bipolar disorder; schizoaffective disorder, bipolar type; schizophrenia; anxiety disorder; and opioid use disorder. Not only did the diagnoses vary between psychiatrists, but they also varied with the same treating psychiatrist. A confusing example included notes from December 6, 2022, when the psychiatrist wrote a handwritten note as well as a dictated note. The handwritten note indicated that the diagnoses were "severe anxiety, and mood disorder with depression, chronic insomnia." The dictated note included diagnoses of schizophrenia; PTSD; amphetamine use disorder; alcohol use disorder; and opioid use disorder.

The patient was prescribed fluphenazine, risperidone, and chlorpromazine for psychosis; sertraline and mirtazapine for depression; buspirone and hydroxyzine for anxiety; trazodone and amitriptyline for insomnia; and benztropine for side effects of antipsychotic medications. These medications were adjusted as indicated. Additional relevant medications included a buprenorphine/naloxone combination for medication-assisted treatment to address opioid use disorder, and gabapentin for restless leg syndrome.

Treatment outcome expectations were modified from those received from CDCR. The goals focused on increased group attendance, and reduced hopelessness, suicidal thoughts, and distress. Social worker notes were comprehensive, and the interventions provided were consistent with those documented in the treatment plans.

**Findings**

The treatment provided to this patient was inadequate.

The documentation did not clearly support the diagnoses which changed frequently in the healthcare record. The patient had multiple, and sometimes simultaneous, medication changes. Continuity of psychiatric care was poor.

Positive aspects of the treatment included appropriate provided individual and group treatment.

**Patient V**

This 36-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga. He was admitted to DSH-Coalinga on September 15, 2021, and discharged on August 26, 2022.

The CSP/LAC EOP treatment team referred the patient to the intermediate level of care due to ongoing severe depressive symptoms.

The patient was provided with diagnoses of major depressive disorder; PTSD; borderline personality disorder; alcohol use disorder; and cannabis use disorder. Additional documentation also mentioned a history of opioid use disorder. Pertinent medical diagnoses included prior traumatic brain injury after being hit on the head, and meningitis resulting in a two-month hospitalization in 2002.

The patient had an extensive history of suicide attempts, including multiple episodes of cutting his forearms and wrists, placing blades in his rectum, and pill overdoses. The most recent suicide attempt occurred in 2022 by cutting his forearm.

The patient was assessed with moderate chronic and low acute suicide risk.

He was prescribed duloxetine, sertraline, and mirtazapine for depression; clozapine for depression and suicidal ideation; lurasidone and quetiapine for antidepressant augmentation; clonidine and cyproheptadine for nightmares; doxepin for insomnia; tiagabine, gabapentin, diphenhydramine, and hydroxyzine for anxiety; and atropine for side effects from clozapine. Other relevant medications included topiramate for migraine headaches.

The patient had no history of hospitalizations in the community.

The treatment outcome expectations included reducing suicidal ideation and nightmares, increasing reasons for living, and using coping skills.

The patient reportedly denied acute suicidal ideation at the time of admission; however, documents also stated that he had a history of long-standing suicidal ideation. He engaged in self-injury by biting his knuckles and reported nightmares and flashbacks.

The patient was actively engaged in treatment. He attended many relevant groups, including DBT and mindfulness. The patient also had a behavioral management plan created to address his knuckle biting. The treatment team attempted to perform trauma-focused work. The work occurred off the unit, for privacy. Unfortunately, this was impeded by staff absences and quarantines.

The patient was attacked on three occasions that were unprovoked when fellow patients punched him in the head and face. No significant injuries were reported.

On August 25, 2022, the patient asked to speak with the unit psychologist. The patient did not want to return to MCSP due to fear of conflict with a peer. The note reflected, "I know there's going to be a fight when I get there." The psychologist told the patient that he would inform someone; the psychologist documented that an email was sent to the utilization management coordinator "informing her that she might want to pass the information to the appropriate individuals." Despite this, the patient was discharged to MCSP at the EOP level of care.

**Findings**

The care provided to this intermediate level of care patient was adequate.

This complex case displayed multiple positive aspects of treatment at DSH-Coalinga. The facility used advanced medication management strategies to address the patient's chronic, treatment-resistant depression. Therapists attempted to perform evidence-based trauma work; however, this was interrupted due to staff absences and quarantines.

Unfortunately, the case also demonstrated significant concerns. The patient was assaulted multiple times on the unit, raising questions of the unit safety. Additionally, the psychologist's response to the patient's concerns of having to fight if returned to MCSP was insufficient.

**Patient W**

This 27-year-old-male was chosen for healthcare record review to evaluate the quality of intermediate care provided at DSH-Coalinga.

The patient was treated at the RJD MHCB after a suicide attempt by ingesting heroin, alcohol, and medications. The patient transferred to the CHCF-PIP acute care program where he actively participated in treatment from February 20, 2022 to August 11, 2022. He had intermittent suicidal ideation, poor impulse control, mood instability, anxiety, and depression. The patient transferred to DSH-Coalinga intermediate level of care on or around August 11, 2022. He remained hospitalized at DSH-Coalinga at the time of review on March 22, 2023.

The patient had a history of multiple suicide attempts, including hanging, foreign body ingestion, and overdose. His last suicide attempt occurred on January 31, 2022, which prompted his admission to the RJD MHCB. Although the psychiatrist documented consideration of high risk for this patient in the initial psychiatric evaluation, no risk formulation was documented.

Diagnoses varied during treatment at DSH-Coalinga; they included major depressive disorder, with psychotic features; bipolar disorder; borderline personality disorder; polysubstance abuse; alcohol use disorder; amphetamine use disorder; opioid use disorder; and antisocial personality disorder.

Mirroring these diagnostic changes, multiple treating psychiatrists made frequent medication changes. The patient was prescribed the following medications during the hospitalization: aripiprazole, brexpiprazole, quetiapine, and ziprasidone for treatment of mood instability and possible psychosis; gabapentin and lithium for mood stabilization; bupropion, mirtazapine, and sertraline for depression; buspirone and diphenhydramine for anxiety; lorazepam and chlorpromazine for insomnia; and buprenorphine/naloxone combination, naltrexone, and clonidine for treatment related of opioid use disorder.

The admission psychiatric evaluation did not document that the patient was recently prescribed buprenorphine/naloxone as medication-assisted treatment for opioid use disorder. Another

psychiatrist saw the patient on the day after admission. The patient asked about his medication-assisted treatment medication. The psychiatrist then resumed this medication. Two days later, another doctor who appeared to be a physical health provider noted that the patient "violated rules by using drugs, so I will start a taper off the Suboxone." The plan was to start the medication naltrexone instead. Yet another psychiatrist saw the patient a few days later when significant changes were again made to the patient's medication regimen.

The psychiatric notes were at times difficult to follow, with the use of ambiguous abbreviations for certain diagnoses and unclear corrections. The psychiatrists made frequent simultaneous medication changes, and medications were prescribed in unconventional manners. As an example, on January 22, 2023, the patient reported insomnia, and the psychiatrist ordered lorazepam, gabapentin, and chlorpromazine. This combination of medications was not consistent with accepted clinical practice for the treatment of insomnia.

Treatment outcome expectations addressed suicidality and coping skills. The patient received group treatment with DBT and coping skills. A treatment plan on February 23, 2023, indicated that neither a psychiatrist nor a social worker were present at the treatment team meeting. The notes from the psychologist and social worker were clinically relevant and were consistent with the treatment plan goals.

**Findings**

The care provided to this intermediate care patient was inadequate.

While the treatment provided by the social worker and psychologist was adequate, issues regarding psychiatric treatment rendered the overall care provided inadequate.

As was noted in other reviewed DSH-Coalinga cases, there was very poor psychiatric continuity of care. This led to multiple changes in diagnoses and medications, with no clear and consistent plan for medication management.

Additionally, there were divergent opinions on the use of medication-assisted treatment. It appeared that psychiatric and medical providers differed in their plan of care. Better coordination between psychiatric and medical providers about the appropriate medication treatment for medication-assisted treatment was indicated, particularly for this psychiatrically unstable patient.

Ambiguous and confusing clinical documentation, such as "BPD" which was used by some providers to mean bipolar disorder and others to mean borderline personality disorder, resulted in difficulty determining specific diagnostic treatment focus, and could result in poor continuity of care. Additionally, some psychiatrists made corrections to their notes by writing over portions of the health care documentation, resulting in confusion and poor legibility. This issue of poor documentation required corrective action.

**Patient X**

This 52-year-old-male was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga.  The patient was treated at DSH-Coalinga from August 5, 2022 to January 12, 2023.

The patient received mental health services at the EOP level of care prior to DSH-Coalinga hospitalization.  He was referred to the intermediate level of care due to psychosis.  At CDCR, the patient declined certain recommended medications; however, the psychiatrist opined that an involuntary PC 2602 medication petition was not warranted, as the patient was adherent with prescribed aripiprazole.  The patient had a history of five hospitalizations in the community, being under conservatorship, and receiving treatment at Napa State Hospital.
The initial DSH-Coalinga psychiatric evaluation was completed by a telepsychiatrist.  The note indicated that the patient was difficult to follow due to his degree of psychotic thought disorganization.

Psychiatric diagnoses included schizoaffective disorder, bipolar type; amphetamine use disorder; and cannabis use disorder.

The patient was prescribed aripiprazole, paliperidone, and olanzapine for psychosis; oxcarbazepine for mood stabilization; and hydroxyzine as-needed for agitation.  The psychiatrist filed a non-emergent involuntary medication PC 2602 petition, which was denied.  The psychiatrist subsequently refiled an emergent petition, which was granted.

Treatment outcome expectations included increased insight and reality testing, and increased attendance and participation in groups.  During the treatment course, the patient required seclusion due to verbal aggression.  Nursing staff had to activate an alarm, as the patient charged at a cart, possibly related to paranoia.  He displayed delusions that he was the psychiatrist who owned the hospital, and imposters had stolen his money.

Due to the severity of the patient's symptoms, including aggression, he transferred to the CHCF-PIP, but his level of care was unclear.  There was no psychiatric discharge summary located in the healthcare record.

**Findings**

The care provided to this intermediate level of care patient was adequate.

Medication management was clinically appropriate.  The psychiatrist appropriately refiled the PC 2602 petition after the first petition was denied.  Treatment plan goals and groups were appropriate.

Significant issues were noted regarding poor healthcare record documentation.  It was exceedingly difficult to locate critically important information.  Additionally, there was no discharge summary located in the healthcare record.

**Patient Y**

This 55-year-old male patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga.

The patient was previously housed in the MCSP EOP.  The reasons for intermediate level of care referral included ongoing, severe psychotic symptoms, believing that a puppet master controlled parts of his body, and auditory hallucinations to kill himself.  The patient was admitted to DSH-Coalinga on August 12, 2022, and remained hospitalized there at the time of review.

The patient had a history of inpatient community hospitalizations, and three MHCB placements, as well as a Psychiatric Services Unit term from 2012 to 2013.  Due to his auditory hallucinations, the patient had a history of violence toward others, including gassing and the use of weapons.  The patient also had a history of suicide attempts; he overdosed on pills in 1999 and tried to hang himself in 2009.  He also had a history of self-injury by hitting himself in the face.  His acute suicide risk was assessed as moderate.

He was provided diagnoses of schizoaffective disorder, depressed type; panic disorder; anxiety; and antisocial personality disorder.  Other relevant medical conditions included a history of multiple concussions and chronic nerve pain.  The patient also contracted COVID-19 during his hospitalization at DSH-Coalinga.

He was prescribed clozapine, chlorpromazine, lurasidone, and paliperidone for psychosis; fluoxetine and duloxetine for mood stabilization; and hydroxyzine as-needed for anxiety.  Other relevant medications included gabapentin for nerve pain.

The treatment outcome expectations included participation in treatment and decreasing suicidal and psychotic symptoms.  His assigned groups included cognitive therapy for psychotic symptoms, distress tolerance, mindfulness, and medication education.  The social worker involved outside sources of support for the patient, including having the patient's friend attend a treatment team.  Notes reflected continued improvement in the patient's psychotic symptoms.

**Findings**

The care provided to this intermediate level of care patient was adequate.

The patient's symptoms supported his psychiatric diagnoses.  Medication management was appropriate, based on the diagnoses and clinical presentation.  The psychiatrist adjusted medications appropriately based on relevant medical conditions; for example, psychotropic medication adjustments occurred with COVID-19 medication treatment due to medication interactions.  However, stronger justification was warranted for the concomitant use of fluoxetine and duloxetine, two closely related medications.

The treatment provided by the social worker was exemplary, including contacting and obtaining outside sources of support for the patient that were beneficial in treatment.

**Patient Z**

This 46-year-old male patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga. The patient received treatment at DSH-Coalinga from July 8, 2022 to on or around March 16, 2023.

Prior to DSH-Coalinga admission, the patient had religious-based delusional thinking and a subsequent hanging attempt on December 24, 2021. He was referred to the MHCB, and subsequently to the acute level of care at CMF-PIP. The patient had a history of self-injury by cutting in response to external stressors. He also had a history of MHCB admissions for suicidal ideation, with his last admission in 2015. He had a history of suicide attempts by cutting his wrists and ingesting alcohol and medications.

His provided diagnoses included schizoaffective disorder, bipolar type; bipolar disorder; borderline personality disorder; and antisocial personality disorder. The provided diagnoses were markedly inconsistent. While the initial psychiatric evaluation included a diagnosis of schizoaffective disorder, bipolar type, the initial treatment plan listed a diagnosis of bipolar disorder, type I, most recent episode depressed. Further, nursing notes listed the indication for antipsychotics as schizophrenia. A psychiatric note on August 4, 2022 included delusional disorder as the primary diagnosis. Additional diagnoses included borderline personality disorder and antisocial personality disorder. Relevant medical conditions during hospitalization included rhabdomyolysis, a condition with extensive muscle breakdown resulting in possible kidney damage, which necessitated outside hospital treatment.

The patient was prescribed aripiprazole for psychosis; lithium for mood stabilization; bupropion for depression; buspirone for anxiety; melatonin and as-needed trazodone for insomnia; and as-needed benztropine for side effects to antipsychotic medications.

The initial psychiatric evaluation documented a low assessment of acute suicide risk, but the chronic suicide risk was elevated. The evaluation indicated that the risk for self-injurious behavior and violence was absent.

At admission, bupropion was discontinued, as this medication was not included in the hospital formulary. A subsequent progress note stated that the patient had worsened mood and energy. A non-formulary medication request was approved, and bupropion was resumed.

Treatment outcome expectations included development of coping skills, and improved showering, group, and medication adherence. The initial treatment plan noted that the psychiatrist was not present at the treatment team meeting. Subsequent treatment team meetings did not include necessary participants, such as psychology, rehabilitation therapy, and nursing. The patient attended groups, including social skills, DBT, and cognitive therapy for psychosis groups.

The patient made gradual progress, with reduction in suicidal thoughts, improved group attendance, and increased independence.

On or around March 16, 2023, the patient discharged; however, healthcare record documentation was unclear regarding his disposition.

**Findings**

The care provided to this intermediate level of care patient was adequate.

Medication management was clinically appropriate and was consistent with the patient's history and presenting symptoms. Assigned groups appeared appropriate for the patient's diagnosis and presentation.

Despite these positive aspects, several concerns were noted regarding this case. The psychiatrist discontinued the antidepressant medication bupropion as it was nonformulary; however, this was inconsistent with the hospital's nonformulary policy that contained an exemption for patients arriving to the facility on a nonformulary medication.

The primary diagnosis changed in the healthcare record without strong rationale. The patient was treated for anxiety; however, no formal diagnosis of anxiety disorder was provided.

Additionally, treatment team meetings lacked necessary members, including the psychiatrist at the initial treatment team meeting.

Lastly, improved documentation regarding the patient's location and level of care upon discharge was warranted.

## APPENDIX B3
## Patton State Hospital (DSH – Patton)

**Patton State Hospital**
**March 28 – 29, 2023**

**Patient A**

This 30-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Patton.  The patient transferred from the CIW EOP to DSH-Patton for intermediate care on or around July 18, 2022 to address suicidal ideation, command auditory hallucinations to kill herself, somatic delusions, disorganized thoughts, and limited insight regarding her mental illness.  Her somatic delusions included beliefs that she was pregnant, and that she had a cell phone implanted in her vagina, with physical pain in other areas of her body.  Clinical notes referenced one suicide attempt by overdose in January 2021.

The referring institution provided the patient with diagnoses of schizophrenia, PTSD, and bipolar disorder.  During the DSH-Patton admission, her diagnoses was changed to unspecified schizophrenia spectrum and other psychotic disorder, amphetamine use disorder, and cannabis use disorder.  The rationale for the change in diagnoses was not well documented in the healthcare record.  The patient was prescribed olanzapine and haloperidol for psychosis, buspirone for anxiety, trazodone for insomnia, and prazosin for nightmares, and her medications were adjusted during the hospitalization.

The initial treatment team convened on August 9, 2022 when the initial treatment plan was developed.  Treatment plans targeted medication adherence, treatment participation, suicide risk, attention to ADLs, and insight into the link between medication adherence, mental illness, and criminal behavior.  The treatment team also recommended prompting to address ADLs and relapse prevention planning for symptom tracking and management.  Treatment teams primarily recommended group treatment without documenting a rationale for the lack of consistent individual therapy offered.  Assigned treatment groups included coping with incarceration, exercise, mind body healing, and medication education.  During subsequent treatment team meetings in September and October 2022, treatment plans were reviewed and revised, as was clinically indicated.

Psychiatric contacts occurred weekly during the first eight weeks of hospitalization, then monthly thereafter.  Individual contacts with the social worker generally occurred monthly.  There was no documentation of contacts by the psychologist after the initial assessment on August 23, 2022.  Group progress notes were documented monthly with individualized information provided that was useful for the treatment team.

On August 9, 2022, a social worker documented that the patient was adjusting well to the unit, described her mood as good, expressed motivation for treatment, interacted appropriately with peers, and attended most of the assigned groups.  Despite these positive developments, the patient continued to experience nightmares, with poor insight regarding her mental illness, poor attention to ADLs, and an unkempt appearance.

During the next three months of hospitalization, the patient responded well to therapeutic interventions and continued to demonstrate progress toward treatment outcome expectations.

The treatment team noted that she participated in 90 percent or more of her assigned treatment groups, remained medication adherent, attended to her ADLs with less prompting, maintained a low suicide risk rating, and reported improvement in her mood and psychotic symptoms. The patient remained with poor insight regarding her mental illness, and the treatment team documented that the patient struggled to understand her diagnosis and planned OMD commitment upon discharge.

On or around October 10, 2022, the patient's commitment status changed from PC 2684 to PC 2962. Discharge documentation indicated that the patient only partially met her discharge objectives prior to DSH-Patton release and transition to OMD commitment.

**Findings**

Although the changes in the patient's diagnoses were not well justified in healthcare record documentation, the overall care provided to this patient was adequate.

The clinical documentation was otherwise comprehensive and provided clear updates regarding responses to interventions and progress toward treatment and discharge objectives. Treatment plans were individualized, and assigned groups were relevant to the patient's presenting concerns. Treatment goals were measurable and clinically reasonable, and the goals were modified when indicated. Overall, the patient responded well to the treatment provided during her hospitalization.

**Patient B**

This 62-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Patton. The patient's mental health history was significant for ten DSH hospitalizations, five prior suicide attempts, and multiple incidents of self-harm. The patient had a serious suicide attempt on October 20, 2020 by overdose, and a self-harm incident as recently as November 2020. The intermediate care referral referenced her history of suicide attempts, self-injurious behavior, ongoing suicidal ideation, and auditory hallucinations. The patient transferred from CIW to DSH-Patton for intermediate care on or around November 24, 2020.

Prior to the current DSH admission, the patient was provided diagnoses of major depressive disorder, with psychotic features; borderline personality disorder; and antisocial personality disorder. Upon DSH admission, her diagnoses were changed to unspecified schizophrenia spectrum and other psychotic disorder; alcohol use disorder; stimulant use disorder; and opioid use disorder. Psychotropic medications prescribed upon admission included long-acting injectable risperidone, olanzapine, bupropion, propranolol, amitriptyline, and levothyroxine. The patient did not receive her psychotropic medications by a PC 2602 order.

Several significant medical diagnoses were documented in the healthcare record, including chronic kidney disease, hypothyroidism, chronic pain syndrome, sleep apnea, pre-diabetes, and cervical cancer. There was a documented plan for the patient to continue radiation and chemotherapy through December 2022.

The psychological initial assessment indicated that the patient was placed on direct one-to-one suicide watch upon arrival to DSH-Patton, as she attempted suicide one day prior.  The initial suicide risk assessment, however, assessed the patient's suicide risk as moderate.  The psychiatric initial assessment occurred on November 24, 2020.  During this assessment, the patient endorsed auditory hallucinations involving whispering, visual hallucinations of her sister's playing volleyball, and delusions of reference of messages emanating from a fan on the unit.  The patient was seen consistently by the psychiatrist, with documentation of daily contacts during the one-to-one observation periods; however, these notes were handwritten and often difficult to decipher.

In September 2022, the patient reported suicidal thoughts and urges to self-harm.  At that time, she was undergoing radiation and chemotherapy.  She was placed on one-to-one direct observation for her safety.  Also, during September 2022, her electroconvulsive treatment was discontinued due to memory impairment, as well as the need to focus on her cancer treatments.

Treatment plans between November 2020 and March 2023 were inadequate.  Treatment targets and interventions proved ineffective over time; however, they were not modified as clinically indicated.  Several goals were also unrealistic.  More recently, on January 24, 2023, the treatment team seemingly acknowledged that some of the treatment goals were unrealistic.  Additionally, a recent treatment plan referenced a suicide prevention intervention from the psychiatrist.  Specifically, the psychiatrist attempted to utilize a contract for suicide instead of a suicide risk assessment and safety plan in response to the patient's expressed urges to self-harm.  The patient did not agree to refrain from self-harm on that date, and she was appropriately placed on one-to-one direct observation.

During the hospitalization, the patient's psychotic symptoms, including paranoia and auditory hallucinations, improved with medication treatment.  During February 2023, she was enrolled in more than ten hours of weekly treatment groups, of which she attended 82 percent.  She also attended all of her individual sessions.  Despite these positive treatment developments, the patient required one-to-one observation at least monthly due to danger-to-self concerns, and she frequently engaged in superficial scratching to relieve stress with experienced persistent thoughts of self-harm.  The most recent self-harm incident occurred on February 13, 2023, and the most recent one-to-one suicide watch order occurred on March 1, 2023.

Despite the patient's frequent orders for suicide watch, engagement in self-harm, and threats of suicide with plans throughout the hospitalization and as recently as March 2023, her risk for suicide and self-injurious behavior was assessed as low.

A utilization management consultation during March 2023 resulted in a recommendation for diagnostic clarification to guide effective treatment planning.  Subsequently, the primary diagnosis was changed again from unspecified schizophrenia spectrum and other psychotic disorder to schizoaffective disorder, depressive type.  An additional diagnosis of other specified disruptive impulse control and conduct disorder was also added.

At the time of review on March 28, 2023, the patient remained in the intermediate care program at DSH-Patton.

**Findings**

The overall care, suicide risk assessment, and management practices provided to this patient were inadequate.

Treatment plans were ineffective, most likely due to diagnostic ambiguity and insufficient attention to case formulation; this was concerning as the patient remained at DSH-Patton for two and a half years. The most recent suicide risk assessment assessed the patient with low suicide and self-harm risk; this assessment was clearly inaccurate and not supported by historical and very recent documentation. Additionally, the psychiatrist inappropriately attempted to use a contract for safety as a suicide prevention intervention; this practice was not supported by research and was inconsistent with the standard of care. Diagnostic clarification was needed due to apparent diagnostic uncertainty; additionally, DBT and a positive behavioral support plan with incentives and collaboration from all disciplines to address self-harming behaviors were also indicated. The utilization management team appropriately recognized the need for diagnostic clarification to improve the effectiveness of treatment planning.

Based upon the concerns noted regarding suicide prevention practices, the psychiatrist and psychologist involved in this case should be provided additional training, with a focus on suicide risk assessment and interventions.

**Patient C**

This 47-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Patton. The patient had three prior DSH commitments for competency restoration pursuant to PC 1370, including two hospitalizations in 2014 and one in 2019. The patient transferred from the acute care program at the CIW-PIP to DSH-Patton, pursuant to PC 2684 for intermediate care on or around March 1, 2022.

The patient was provided diagnoses of schizoaffective disorder, bipolar type; alcohol use disorder; and cannabis use disorder. The referring institution noted ongoing delusional thinking, ideas of reference, paranoid ideation, anxiety, impulsivity, bizarre behavior, interpersonal issues, poor insight, and aggression.

The initial psychiatric assessment at DSH-Patton indicated that the patient was acutely psychotic upon admission. She had placed pads in her ears to prevent mites from crawling into them, perseverated about the belief that the Haldol injections caused her hands and feet to freeze, and she presented with paranoia and behavior that was difficult to redirect. She also was medication nonadherent with fearfulness of specific mental health staff.

Although the patient arrived with an active PC 2602 order, the admitting psychiatrist incorrectly documented both that the PC 2602 order did not transfer to DSH-Patton and that the patient was admitted under PC 1370. The psychiatrist discontinued Haldol decanoate upon admission, which was concerning as prior records noted the patient's good response to Haldol decanoate injections, as evidenced by behavioral improvements and resolution of psychotic symptoms. The

psychiatrist instead prescribed oral haloperidol and risperidone for psychosis; hydroxyzine for anxiety; and benztropine, amantadine, and bromocriptine for adverse side effects resulting from antipsychotic medications.  The patient denied the need for psychotropic medication treatment throughout the hospitalization; however, she was reportedly adherent with prescribed risperidone.

Treatment plans were comprehensive, targeting medication adherence, insight, group participation, aggression, social skills, and psychotic symptoms.  The patient was assigned to 14 hours of weekly treatment groups in addition to supplemental individual therapy with her assigned social worker.  She reportedly attended more than 90 percent of her assigned treatment groups from March to June 2022.

Treatment team and individual provider notes routinely included updates on progress toward treatment outcome expectations and discharge goals.  The patient exhibited some progress during her hospitalization with less prompting from staff, reduced anxiety and paranoia, fewer somatic complaints, cooperation with staff directives, and group treatment attendance.  However, the patient continued to demonstrate poor insight about her mental illness, as she maintained the belief that psychotropic medications caused her symptoms of schizophrenia.

While the psychiatric discharge summary included recommendations for the receiving EOP treatment team, some were unrealistic and suggested that the patient may not have been ready for CDCR outpatient treatment.  For example, the psychiatrist recommended daily access to a psychiatrist and psychologist, as well as daily access to as-needed medication in both injectable and oral forms.  Further, the psychiatrist stated that the patient would likely rapidly deteriorate and exhibit symptoms of psychosis without needed treatment, and she would likely be overwhelmed and require close monitoring at the highest level of care following custodial changes.

On July 7, 2022, the patient was discharged to the EOP level of care with return to CDCR.

**Findings**

The care provided to this patient was inadequate.

Upon admission, the psychiatrist failed to review the patient's healthcare record, discontinuing her court ordered psychotropic medication, and inaccurately noting that her admission was for competency restoration and that her PC 2602 order was no longer valid.

While there was some evidence of progress during hospitalization, the patient continued to require daily monitoring and prompts by the treatment team to take her medications, to adhere to unit rules, to avoid aggressive responses to triggering events, and to follow staff directions. Further, the psychiatric discharge recommendations were unrealistic for the outpatient setting and suggested that the discharge to outpatient treatment was premature.

**Patient D**

This 33-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Patton. Prior to the current DSH-Patton admission, the patient had four MHCB admissions in a three-month period for danger-to-self and grave disability concerns. The referring institution noted that the patient tended to rapidly decompensate in the EOP, with thought disorganization, disorientation, thoughts of suicide and self-harm, obsessive thinking, poor communication, and interpersonal problems. Her history was significant for five to six prior suicide attempts and an incident in 2016 when she stabbed herself in the abdomen.

The patient arrived at DSH-Patton on July 18, 2022. Upon admission, she reported symptoms of depression and anxiety, auditory and visual hallucinations, thoughts of cutting her wrists with a razor, and voices commanding her to kill herself. The patient was placed on one-to-one direct observation on the day of admission.

The patient was provided diagnoses of unspecified schizophrenia and other psychotic disorder; alcohol use disorder; and amphetamine use disorder. She had a history of traumatic brain injury and a diagnosis of seizure disorder and required a helmet to prevent injury. The psychiatrist prescribed fluphenazine, Haldol decanoate, and Abilify Maintena for psychosis; divalproex for mood stabilization; hydroxyzine for anxiety and insomnia; and benztropine for adverse side effects due to antipsychotic medications. She was also prescribed levothyroxine for hypothyroidism and levetiracetam for seizures.

The social work assessment referenced apparent cognitive deficits, flat affect, reliance on redirection from staff, and tangential thinking. Cognitive limitations were documented in other individual provider notes as well. While the DSH treatment team also noted diagnostic uncertainties, cognitive limitations, a history of traumatic brain injury, and a possible diagnosis of schizoaffective bipolar type, they stated that diagnostic clarification would be deferred to CDCR clinicians.

Treatment plans targeted participation in groups and unit programming, impulse control, symptom management, psychoeducation, medication adherence, and aggression, as well as suicide and self-harm risk.

The patient remained unstable during July and August 2022. In addition to placement on suicide watch in early July 2022, she was placed in five-point restraints for psychotically driven aggression toward staff on two occasions at the end of July. In September 2022, clinical documentation indicated that, although the patient was observed interacting appropriately with peers in the unit, attending to her ADLs, and participating in treatment groups, she continued to exhibit disorganized thinking, thought blocking, and objective signs of paranoia during interactions with staff and peers. On September 15, 2022, the treatment team indicated that treatment outcome expectations were only partially met.

Despite demonstrating only mild to moderate improvement during the last month of intermediate care hospitalization, the patient was discharged to the EOP level of care on or around October 3, 2022. The discharge summary, dated October 3, 2022, contained very concerning information

that suggested that the patient was not ready for discharge to a CDCR outpatient program. During the final contact on this date, the psychiatrist noted that the patient thought about cutting her wrists two weeks prior and presented with current command auditory hallucinations with voices telling her to kill herself, delusional and bizarre statements that doctors removed her "memory code" at birth, visual hallucinations of being in a different place and time, and negative emotions resulting from being ignored by family for wrongdoing. Her statements during this final contact did not result in the completion of a suicide risk assessment or safety plan review. Instead, she was discharged to the EOP with return to CDCR.

**Findings**

The care provided to this patient was inadequate.

While medication interventions during hospitalization were appropriate, the discharge to EOP was clearly premature and not supported by recent provider notes. The patient remained at high risk for self-harm based on her recent history and suicide-related statements on the date of discharge. The discharging psychiatrist did not complete a suicide risk assessment or review the patient's suicide prevention safety plan in response to her suicidal statements at the time of discharge. The treatment team also failed to address diagnostic uncertainties to develop effective treatment planning; instead, they acknowledged the patient's complex presentation and deferred diagnostic clarification to CDCR.

**Patient E**

This 41-year-old patient's healthcare record was reviewed to assess the care provided at DSH-Patton. In May 2022, the patient was admitted to CIW-PIP for acute care to address grave disability concerns. Subsequently, she was discharged to the intermediate level of care for treatment to address ongoing thought disorganization, selective mutism, suicidal ideation, medication nonadherence, and poor social skills and self-care. The referring institution also noted that the patient had a history of catatonic episodes, seizures, and one suicide attempt.

On or around August 4, 2022, the patient transferred to DSH-Patton for intermediate care. The psychiatrist completed the initial assessment on the date of admission, noting that the patient presented with persecutory delusions, guardedness, disorganized thinking, negative symptoms of schizophrenia, poor insight, and refusal to answer some interview questions.

The patient was provided diagnoses of schizophrenia and various substance use disorders, including for cannabis, amphetamines, and cocaine. The treating psychiatrist prescribed three medications for psychosis, namely, clozapine, olanzapine, and fluphenazine. Although this provider failed to document indications for other prescribed medications, the patient was likely prescribed lithium for mood stabilization, sertraline for depression and/or anxiety, and bromocriptine for antipsychotic medication side effects. During the hospitalization, the patient exhibited adverse medication side effects, including hypotension, that was likely due to clozapine. Medical diagnoses included chronic kidney disease, seizure disorder, and hypothyroidism.

A social worker documented that the patient received an order for direct one-to-one observation for danger-to-self concerns upon arrival. The social worker further indicated that the observation for danger-to-self concerns occurred by audiovisual surveillance rather than direct observation. While the provider did not document the duration of the observation period, the patient transferred to a different unit and was no longer under observation by August 9, 2022. The suicide risk assessment completed on August 10, 2022, assessed suicide risk as low, despite the very recent suicide observation for danger-to-self concerns.

Treatment plans targeted group treatment attendance, medication adherence, effective communication, self-harm and suicidal ideation, and insight into the benefits of program participation. Although the treatment team appropriately referred the patient for psychological testing, the patient was reportedly unable to participate in September 2022 due to selective mutism and ultimate refusal to participate.

During September 2022, the patient remained psychiatrically unstable. Clinical documentation indicated that she required regular prompting for group attendance and self-care, reported suicidal ideation, and continued to exhibit objective signs of psychosis, isolative and withdrawn behavior, and limited social skills. While the treatment team suggested that the patient may have exaggerated her report of suicidal thoughts, they did not provide sufficient justification for this assumption. On September 29, 2022, the patient was described as internally preoccupied and selectively mute, with catatonic posturing and intense staring. At that time, the psychiatrist prescribed midodrine for clozapine-induced orthostasis.

In October 2022, the patient was transitioned to a new psychiatric provider. The psychiatrist met with the patient on October 6, 2022 and prescribed hydroxyzine on an as-needed basis. The documentation of this encounter was poor, as the provider copied and pasted most of the text from a prior entry. In mid-October 2022, treatment team notes suggested that the patient exhibited significant improvement in symptoms and functioning during the preceding month. The patient reportedly attended 100 percent of her assigned treatment groups, was observed implementing new coping skills, remained medication adherent, and journaled her thoughts and feelings.

On November 14, 2022, the patient was discharged to the EOP level of care. The treatment team determined that the patient met all treatment outcome expectations, including improved group attendance, communication, interpersonal skills, and program participation, medication adherence, and decreased suicide risk. The patient also reportedly attended to her ADLs without prompting, participated in suicide prevention planning, and identified triggers for suicidal ideation.

**Findings**

The overall care provided to this patient was inadequate due to deficiencies in suicide prevention practices, medication management, and clinical documentation.

Clinical notes suggested that one-to-one observation for danger-to-self was completed by audiovisual monitoring; DSH-Patton confirmed that one nurse might be responsible for

observing more than one patient by this means. The suicide risk assessment completed following the patient's release from one-to-one observation for danger-to-self underestimated her suicide risk with a low assessment of risk. The treatment team appropriately referred the patient for psychological testing; however, she was unable to participate due to psychosis and refusal, and they did not consider re-referring the patient after she stabilized and was able to participate in testing.

Regarding medication management, psychiatric documentation of treatment decisions was insufficient. Specifically, documentation did not include the risk and rationale for the rapid increase in fluphenazine, the use of lithium and sertraline without diagnostic justification, the increase in lithium and related risks to renal function, specific clozapine risks for patients with seizure disorders, and the negative and potential paradoxical effects of prescribing levetiracetam for patients with mood instability. Additionally, as was noted in the review of other DSH-Patton healthcare records, the admission psychiatric evaluation contained inaccurate templated language, including reference to commitment for PC 1370.

**Patient F**

This 47-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. The patient was admitted to DSH-Patton on June 8, 2022, after she was referred from the Central California Women's Facility (CCWF) EOP due to the need for intermediate level of care. The patient had a history of two prior MHCB admissions in CDCR for depression and suicidal ideation, on May 16, 2021 and July 29, 2021, with frequently dysphoric mood, auditory hallucinations, delusional thinking, impulse control problems, and suicidal ideation. Her first psychiatric hospitalization occurred at age 24, and she also had several WIC 5150 community hospitalizations. Upon DSH-Patton admission, the patient presented with auditory hallucinations, persecutory and bizarre delusions, disorganized thinking and behavior, mood instability, poor insight, and suicidality. She was provided with diagnoses of schizoaffective disorder, bipolar type, and amphetamine-type substance use disorder, moderate. The patient was assessed with moderate suicide risk and low risk for self-harm at the time of admission.

Monthly IDTT meetings occurred timely during the hospitalization. The necessary participants attended the IDTT meetings, and the patient attended all but one of the meetings. The treatment plans indicated that the patient had a positive response to treatment, and her mental status and clinical presentation improved significantly over time. At the initial seven-day IDTT meeting on June 14, 2022, the patient demonstrated psychotic thinking; however, she indicated that she felt safe on the unit and denied suicidal ideation since DSH-Patton arrival. She was assigned appropriate groups that included coping skills, medication education, and coping with incarceration. At the next IDTT on August 11, 2022, the patient continued to report severe auditory hallucinations, as well as delusional thinking, depression, and amotivation. The auditory hallucinations reportedly improved after treatment with clozapine. Review of subsequent IDTT and psychiatric monthly progress notes indicated that the patient remained medication adherent throughout her stay at DSH-Patton, and she achieved 100 percent group attendance by November 2022. Although her psychotic symptoms never completely resolved, she indicated that her symptoms were manageable. At the final IDTT on January 23, 2023, the

treatment team determined that the patient had met treatment outcome expectations, and she told the treatment team that she was ready to return to prison.

Psychotropic medications were adjusted and modified during the DSH-Patton hospitalization. Upon admission, she was prescribed BuSpar, Haldol, Lamictal, Zoloft, and Effexor. The patient's mental status and symptoms appeared to respond very well to clozapine, and she was prescribed clozapine, risperidone, and Vistaril at discharge when she was described as medication adherent with no reported negative medication side effects.

**Findings**

The care and treatment provided to this DSH-Patton patient was adequate.

She was seen timely for clinical contacts and IDTT meetings. The medications were adjusted appropriately by the psychiatrist, and she responded well to prescribed medications. Review of progress notes and treatment plans indicated that her program participation and engagement with treatment increased significantly as her mental status improved. She achieved the treatment outcome expectations requested by CDCR prior to discharge and was reportedly motivated and ready to return to prison.

**Patient G**

This 49-year-old transgender patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. The patient was admitted to DSH-Patton on August 29, 2022 after referral from the CIW EOP due to depression, anxiety, irritability, conditional suicidal ideation when not feeling safe, paranoia regarding medications and prison staff, not showering regularly, and poor socialization with peers. The patient reportedly requested daily mental health contacts immediately prior to admission and refused to participate in groups due to paranoia. He had an extensive mental health history of severe depression, physical and sexual abuse, PTSD, suicidal ideation, and suicide attempts. He had two community hospitalizations and one prior MHCB admission from March 27 to May 18, 2022, after endorsing suicidal ideation. His condition reportedly deteriorated during July 2022, and the patient demonstrated increasing paranoia and persecutory thinking about custody staff, and he refused all psychotropic and medical medications due to paranoia. Upon admission to DSH-Patton and at discharge, he was provided with diagnoses of unspecified depressive disorder; cannabis use disorder, moderate; and amphetamine-type substance use disorder, moderate.

The patient was assessed with moderate suicide risk at the time of admission on August 30, 2022. He reported two suicide attempts in the previous three years, by overdose in 2020 while in administrative segregation, and more recently in March 2021, when he again attempted suicide by overdose. The patient also reported significant suicidal ideation several months prior, and he stated that he kept a bag of pills hidden should he decide to engage in a repeat attempt. He also reported constant suicidal ideation.

One IDTT meeting occurred during the DSH-Patton hospitalization. The initial seven-day IDTT meeting occurred timely on September 8, 2022, and it was well attended by the patient,

211

psychiatrist, PC, social worker, recreation therapist, and psych tech. The CDCR treatment outcome expectations included medication adherence for 90 days, no suicidal ideation, no suicide attempts or self-injurious behaviors for 90 days, increased coping skills, decrease in depression and paranoia by 50 percent for 90 days, attendance at 75 percent of groups for 90 days, and maintenance of ADLs for 90 days. In response to the treatment outcome expectations, the patient was appropriately assigned to group therapy. The patient was prescribed Vistaril and Clonidine on an as-needed basis upon admission; however, he reportedly did not request the as-needed medications after September 14, 2022.

Psychiatric progress notes stated that the patient was easily triggered and that he overly personalized mundane and innocuous behaviors by others. The psychiatrist hypothesized that the patient's social misinterpretations were more consistent with Cluster B personality traits rather than psychosis or actual paranoia; for example, the patient interpreted the enforcement of unit rules as racist or transphobic attacks. The final psychiatric progress note on October 3, 2022, stated that the patient was doing well with normal mood, thinking, sleep, and behavior. The patient further stated "I don't need to be here. I want to know when can I go back?" Documentation indicated that the patient remained with maladaptive behavior patterns including argumentativeness with staff, nonadherence with unit rules, depression, anxiety, and irritability. He also remained suspicious with social withdrawal. He requested to be returned to prison, and he denied active symptoms, suicidal ideation, self-injurious behavior, or intent. The psychiatric discharge summary noted that the patient had not demonstrated aggression or danger toward others until October 5, 2022, when he was placed on one-to-one observation due to danger-to-others; he remained on this level of monitoring until discharge on October 10, 2022. A social work discharge summary noted that the patient was stable and that he managed his thoughts and feelings of suicidal ideation and depression adequately.

**Findings**

The care and treatment provided to this DSH-Patton patient was inadequate, and his discharge was premature.

Discharge documentation was unclear and inadequate regarding important information about the patient's progress and response to treatment. The discharge rationale, aside from the patient reporting to the treatment team that he was ready to return to CDCR, was absent or inadequate. At the time of discharge, documentation indicated that the patient continued to exhibit significant paranoia toward custody staff, nonadherence with unit rules, and medication nonadherence. The patient did not achieve any of the CDCR treatment outcome expectations, and it did not appear that he made sufficient improvement in treatment engagement or appropriate programming participation to justify the decision to discharge him for return to CDCR.

**Patient H**

This 29-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. This patient was admitted to DSH-Patton on December 16, 2021. She was provided diagnoses of unspecified depressive disorder; borderline personality disorder; stimulant use disorder, severe in controlled environment; and alcohol use

212

disorder, severe in controlled environment. Her mental health history was significant for numerous psychiatric hospitalizations in CDCR and in the community. She had a history of multiple MHCB and PIP admissions due to anxiety, substance use, and difficulty managing her symptoms in the EOP dormitory setting. Upon admission, the patient's suicide and self-injurious behavior risk was assessed as high; her most recent suicide attempt prior to DSH-Patton admission occurred in 2019 when she attempted to overdose with lithium. The treatment outcome expectations provided by CDCR included learning new coping skills, using these coping skills to manage anxiety, and learning to set healthy boundaries.

At admission, the patient was prescribed fluphenazine, mirtazapine, naltrexone, sertraline, venlafaxine, and hydroxyzine. Medications were adjusted during the hospitalization, and at discharge she was prescribed sertraline, venlafaxine, mirtazapine, Depakote, quetiapine, and hydroxyzine. Documentation indicated that the patient responded well to medication management, and she had the best clinical results with Seroquel and Depakote prescribed in combination with antidepressant medications.

The goals and treatment outcomes provided in treatment plans were clinically appropriate, and the patient received appropriate interventions and support. Her symptoms included brief periods of depressed mood, mood lability, constant need for attention, unstable relationships, superficial self-injurious behavior with minor scratching, drug cravings, and some episodes of aggression. She accrued a total of nine serious incident reports during the DSH-Patton hospitalization that occurred at least on a monthly basis. Two of these serious incident reports resulted in placement in five-point restraints briefly during February 2022; the remaining serious incident reports involved superficial self-injurious behavior such as minor scratching and making false reports to staff that she had swallowed foreign objects. In response to these symptoms and behaviors, the patient received pharmacological and psychotherapeutic support and interventions.

The patient completed a three-month course of cognitive processing therapy from June to September 2022, participated in a six-month anger management course, participated in 96 percent of her groups, and engaged in all scheduled individual therapy sessions. At her final IDTT on January 17, 2023, the patient reported no severe depression in four months, and reported her intention to remain medication adherent. The treatment team noted that she demonstrated euthymic mood, linear thinking, congruent affect, and no overt psychotic symptoms. She had not demonstrated self-injurious behavior or danger-to-others for the past 30 days, had not demonstrated severely depressed mood since October 2022, denied any self-harm urges, and was future oriented with a focus on her upcoming parole. The patient discharged from DSH-Patton on January 24, 2023. Two of the three treatment outcome expectations were completely met, and the remaining treatment outcome expectation was partially met.

**Findings**

The care and treatment provided to this patient during her DSH-Patton hospitalization was adequate.

She was provided clinically appropriate interventions in addition to medication management, including cognitive processing therapy and anger management groups. Medications were

adjusted as clinically appropriate. The treatment outcome expectations were almost completely met prior to discharge. It appeared that the treatment team appropriately addressed the patient's borderline personality disorder symptoms, with significant improvement in her coping skills.

**Patient I**

This 41-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. She was admitted to DSH-Patton on September 15, 2022, after referral from the MHCB for stabilization of mood and psychotic symptoms. Upon DSH-Patton admission, the patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorders. The patient returned to CDCR on June 1, 2022 for her second prison term for a parole violation; she reportedly had not been medication adherent at the time of her return to CDCR.

Although the patient reportedly denied any previous history of mental health treatment, documentation indicated a long and significant history of depression, anxiety, and suicidal ideation that resulted in six community hospitalizations and seven MHCB admissions for suicidal gestures and attempts. She was admitted to the MHCB in early August 2022 after refusing housing, demanding release from prison stating that she had not been sentenced and stating that her identity had been switched and the wrong person had been incarcerated. She was agitated, would not confirm her basic demographic information, refused an assessment or evaluation by medical and mental health staff, appeared to experience auditory and visual hallucinations, and demonstrated bizarre and delusional behaviors.

The CDCR treatment outcome expectations included 100 percent medication adherence, reduction of delusional thinking, development of insight into her mental illness and need for treatment, identification and demonstration of three coping skills, and no incidents of aggression or physical boundary violations with staff or peers for at least 60 days. The patient initially presented with acute delusional thinking and physically aggressive behavior. It was noted that the patient transferred to an outside hospital on September 16, 2022, due to the report of chest pain; the patient "bear hugged" a nurse there when she was informed that she would return to DSH-Patton. She was placed into restraints due to this incident. She was also placed in restraints on September 25, 2022, after demanding to be taken to the emergency room for somatic complaints and then refusing evaluation by DSH-Patton medical staff. She was described as verbally aggressive with threatening gestures and demeanor toward staff. After she voluntarily allowed restraint placement, she was provided psychotropic medications. She did not demonstrate subsequent aggressive or self-harming behavior throughout the remainder of her DSH-Patton hospitalization.

Prior to DSH-Patton admission, the patient was prescribed risperidone and Haldol. Upon admission to DSH-Patton, risperidone was discontinued, and Haldol was increased. A trial of lithium was initiated on September 27, 2022, but it was soon discontinued after the patient declined to allow an increase in dosage. Zyprexa was initiated on September 29, 2022, and the medication was adjusted in collaboration with the patient on October 24, 2022. At discharge, she was prescribed Haldol and Zyprexa.

IDTT meetings and clinical contacts occurred timely during the hospitalization. IDTT meetings occurred weekly during the first month of hospitalization, then monthly in October and November 2022 as the patient improved. Despite demonstrating verbally aggressive and posturing behavior toward staff and requiring five-point restraint placement on September 25, 2022, a psychology progress note on October 28, 2022, stated that the patient had made significant improvement; she regularly attended groups, learned and implemented anger management and coping skills, was medication adherent, actively participated in unit programming, and helped others on the unit. The October 27, 2022 IDTT indicated that the patient described the hospital as depressing, and she requested return to prison. A monthly psychiatric progress note indicated that the patient routinely inquired about discharge, was medication adherent, and provided good feedback about medication effectiveness and side effects.

The psychiatric discharge summary described the patient's symptoms as gradually well-controlled in response to treatment; and at discharge, the patient reportedly denied auditory hallucinations; denied beliefs consistent with delusional thinking; demonstrated no evidence of manic, depressive, or anxiety symptoms; exhibited improved insight and judgment; and consistently attended groups.

The social work discharge summary noted that the patient no longer made unfounded medical complaints or demonstrated behavioral explosiveness. She was described as socially appropriate with staff and peers with improved coping skills. The November 10, 2022 IDTT note indicated that the patient's October 2022 group attendance was 85 percent, and the patient was informed that she had met her treatment outcome expectations and would be discharged to CDCR. She was subsequently discharged on November 21, 2022.

**Findings**

The care and treatment provided to this DSH-Patton patient was adequate.

The patient received appropriate group and individual therapy to address her symptoms and to develop insight and coping skills. Her mental status and symptoms responded well to treatment with improvement during the course of hospitalization. Her medications were adjusted appropriately, and the psychiatrist worked collaboratively with the patient to determine the best medication regimen. The CDCR treatment outcome expectations were met prior to discharge; and at the time of discharge, the patient expressed her desire to return to prison.

**Patient J**

This 39-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. The patient was referred from the CIW-PIP to DSH-Patton on August 1, 2022, and was admitted to DSH-Patton on August 16, 2022. The patient presented with depressed mood, generalized anxiety, and constant auditory hallucinations. However, she had organized thinking, behavior, and speech. She was admitted to the CIW-PIP at the acute level of care on July 6, 2022 after a suicide attempt on June 23, 2022, when she was

found hanging from a vent in her cell. She was reportedly unconscious when she was discovered; subsequently, she was cut down and transferred for medical treatment.

At admission, the patient was provided with diagnoses of schizoaffective disorder, depressed type; dissociative disorder; and posttraumatic stress disorder. Those diagnoses were updated during the hospitalization, and she was provided diagnoses of major depressive disorder, recurrent with psychotic features; posttraumatic stress disorder; and unspecified intellectual disability, likely mild at the time of discharge. The patient was classified as DD2. She had a significant history of suicidal ideation and two prior suicide attempts, including the most recent attempt on June 23, 2022, which precipitated the PIP acute care admission. Her acute self-injurious behavior and suicide risk upon admission was assessed as low in the hospital setting.

Despite the patient's initial expression of pessimism regarding psychotropic medication treatment and the potential for symptom improvement, she was medication adherent throughout her DSH-Patton hospitalization. At admission, she was prescribed propranolol, hydroxyzine, lithium, lurasidone, and venlafaxine. She was initially resistant to medication changes, and her admission medications were unchanged until October 21, 2022, when she reported worsening depressive symptoms and suicidal ideation; she then agreed to an increase in venlafaxine, lurasidone, and lithium. Lithium was soon discontinued due to medication side effects. The patient responded to medication management with improvement in mood, and she began to express a desire to return to CCWF to be closer to her family and support system.

IDTT meetings occurred timely during the DSH-Patton hospitalization. The CDCR treatment outcome expectations and treatment plan goals focused on development of coping skills to manage auditory hallucinations, thoughts of self-harm, healthy relationships, and boundaries. Primary interventions identified in the treatment plans were individual therapy twice weekly, and the patient was assigned to appropriate group therapy, including self-help and safety groups. The patient demonstrated positive response to treatment and consistent improvement of symptoms.

During the initial several weeks after admission, the patient reported significant depressive symptoms and auditory hallucinations. During that initial period, she reportedly attended over 90 percent of her groups but did not participate; and although she was medication adherent, she wanted to discontinue her medications to "be normal." She was reportedly evasive about suicidal ideation at the October 11, 2022 IDTT; she did not want to be placed on enhanced observation, but later admitted to the psychiatrist on October 21, 2022 of ongoing suicidal ideation. Her psychotropic medication was increased at that time. She responded well to the medication change, and on November 8, 2022, she was described as noticeably less anxious and depressed, with no suicidal ideation for two weeks and a decrease in cognitive distortions. At the final DSH-Patton IDTT meeting on December 13, 2022, the patient denied suicidal ideation, described her voices as manageable, was future-oriented, and was able to identify her coping skills to manage auditory hallucinations and anxiety.

A social work progress note on January 30, 2023, indicated that the patient was enrolled in 21 hours of group treatment and actively participated in individual therapy focused on cognitive behavioral therapy and psychoeducation regarding coping skills. A social work note on February 6, 2023, the date of discharge, noted that the patient demonstrated euthymic mood, linear

216

thinking, and mood-congruent affect. She was reportedly enthusiastic about discharge to CCWF and demonstrated a generally stable mood and improved coping skills. She reportedly demonstrated no suicidal ideation after November 2022; and despite facing several significant stressors in November and December 2022, she did not exhibit decompensation or demonstrate significant increase in anxiety or distress. The patient reportedly met the CDCR treatment outcome expectations prior to discharge with planned discharge to CCWF at the EOP level of care.

**Findings**

The care and treatment provided to this DSH-Patton patient was adequate.

Progress notes and IDTT documentation indicated that appropriate and individualized treatment planning and engagement was provided by the treatment team. The patient demonstrated improvement and positive response to treatment. The CDCR treatment outcome expectations were fully met at discharge on February 6, 2023. The patient was able to articulate and activate appropriate coping skills. Despite several significant stressors, including the anniversary of her mother's death in December 2022, and being slapped by a psychotic peer in January 2023 without retaliation, she was able to activate her coping skills and to remain stable. The treatment team also advocated for EOP placement at her desired institution closer to her support system.

**Patient K**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. The patient was admitted on October 27, 2021 after experiencing a marked decline of functioning across all domains of functioning. She reportedly experienced daily persistent auditory hallucinations and fixed delusional thinking, required constant reminders and prompting about ADLs, and was observed responding to internal stimuli daily to the extent that she was unable to engage with treatment providers. The patient also demonstrated significant confusion, memory issues, and abuse vulnerability. At admission, she was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorders.

The patient had a significant history of more than 20 community hospitalizations and three DSH admissions for competency restoration. She also had a history of traumatic brain injury after she was knocked unconscious in a fight. She reported ten prior suicide attempts by various methods, including wrist and throat cutting, hanging, and jumping from a building. The patient was assessed with low risk for self-harm during the DSH-Patton hospitalization.

The CDCR treatment outcome expectations focused on increased ability to engage in reality testing and discussion of delusional beliefs, completion of ADLs without prompting seven days weekly for six months, and 100 percent participation in mental health programming for six months. IDTT meetings occurred timely during the hospitalization. Documentation indicated that the patient initially presented with significant psychotic symptoms including paranoia and disorganization. She reportedly responded well to treatment, including medication and individual therapy and appropriate group assignment, and on April 2022, the patient was

217

medication adherent, attended 100 percent of her groups, and attended to her ADLs and showered daily. The patient continued to demonstrate stability and positive treatment response during the remainder of DSH-Patton treatment, and the CDCR treatment outcome expectations were achieved prior to discharge on July 18, 2022. A primary clinician progress note on June 22, 2022, indicated that the patient was prepared for discharge, maintained her ADLs, and engaged in treatment. The psychiatric discharge summary noted that the patient adhered to unit rules, was medication adherent, continued to report auditory hallucinations but was able to ignore them, and socialized well with roommates with normal sleep.

**Findings**

The care and treatment provided to this DSH-Patton patient was adequate.

Treatment planning was individualized and appropriate to the patient's clinical presentation. She was assigned to appropriate group therapy, and it appeared that she responded well to individual therapy sessions provided by the therapist. Her psychotic symptoms significantly decreased over time, and the patient was able to develop adequate coping skills to manage remaining symptoms. The patient significantly reduced her reliance on as-needed medications during the course of the hospitalization, and she was medication adherent. The treatment outcome expectations were met for the duration of six months prior to discharge, as requested by CDCR.

**Patient L**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. The patient was admitted to DSH-Patton on March 7, 2023. She was referred from the CIW-PIP intermediate care program on February 24, 2023 for placement at her least restrictive housing of unlocked dorm.

At DSH-Patton admission, the patient was provided diagnoses of bipolar I disorder, current or most recent episode depressed with psychotic features; stimulus use disorder, amphetamine type, severe in controlled environment; and opioid use disorder, moderate, in a controlled environment. According to an unsigned and undated note in the healthcare record, the patient's precipitating symptoms included delusional and disorganized behaviors, hypersexuality, poor self-care, depression, anxiety, and irritability and agitation requiring highly structured inpatient psychiatric care and long-term stabilization. Her suicide history was significant for five prior attempts, with the most recent occurring three to four years prior by overdose; however, her acute suicide and self-injurious behavior risk at the time of DSH-Patton admission was assessed as low. The initial psychiatric assessment occurred timely.

The patient's mental health history was significant for five community, but no CDCR, hospitalizations. She previously received treatment at the 3CMS level of care until November 2022, when she was placed at the EOP level of care due to significant decompensation. Since November 2022, the patient exhibited bizarre behavior, delusional and hypersexual thinking, significant weight loss, preoccupation with internal stimuli, and lack of attention to ADLs. She was described at admission as presenting with depression, anxiety, and auditory hallucinations. However, she had calm behavior, maintained her hygiene, gained insight, maintained medication

218

adherence, and was more cooperative with treatment, and attended groups and yard appropriately.

CDCR treatment outcome expectations included maintaining 100 percent medication adherence for 90 days, initiating and maintaining organized verbal communication with staff, with no aggressive or threatening behaviors toward others, maintaining 100 percent weekly out-of-cell activities attendance with the therapist, and reducing the intensity of distress related to delusional thought content.

One IDTT meeting occurred during the review period. Documentation indicated that the patient would likely parole soon, as her assessment at the initial Board of Parole hearing was favorable. The patient expressed her preference to remain at DSH-Patton for the remainder of her prison term, and the initial treatment plan suggested that the patient might parole to mentally disordered offender status. The patient was reportedly medication adherent, and she also adhered to unit rules. She was assigned unit-based groups and individual ongoing supportive psychotherapy. Documentation indicated that the patient and psychiatrist collaborated regarding medication management, and the patient demonstrated increased stability in response to medication treatment. At admission, she was prescribed olanzapine, quetiapine, benztropine, bromocriptine, and propranolol; benztropine was discontinued, and Seroquel was initiated. Approximately one week later, the medications were updated to amantadine, bromocriptine, hydroxyzine, propranolol, Seroquel and olanzapine. The patient continued to respond well to the medication management, and at the time of review, she had notable progress toward meeting treatment outcome expectations. A monthly psychology progress note on March 24, 2023, indicated that the patient attended 100 percent of groups, was 100 percent medication adherent, and adjusted well to the unit.

**Findings**

The care and treatment provided to this DSH-Patton patient was adequate.

Treatment was individualized, and the patient was assigned to appropriate group treatment with 100 percent group attendance. Medications were adjusted appropriately and collaboratively, and the patient reported good response and minimal medication side effects. Psychological and psychiatric progress notes documented improvement and stability during the course of hospitalization. At the time of review, the patient was nearing achievement of the CDCR treatment outcome expectations.

Lastly, the treatment team worked with the patient regarding discharge planning and recommended treatment after parole.

**Patient M**

This 57-year-old patient's healthcare record was reviewed to evaluate the quality of inpatient mental health care provided at DSH-Patton. The patient was admitted to DSH-Patton on February 15, 2023 from the CIW-PIP. The DSH-Patton admission diagnosis was unspecified schizophrenia spectrum and other psychotic disorder, and the patient reportedly experienced

severe auditory hallucinations and persecutory delusional thinking.  Her mental health history was significant for multiple DSH hospitalizations and commitments from December 2000 to February 2002, October 2003 to November 2003, October 2004 to April 2005, December 2009 to February 2010, July 2011 to March 2012, and September 2021 to March 2022.  After the most recent discharge in March 2022, the patient was reportedly stable in the outpatient setting until September 2022.  During September 2022, she exhibited paranoia regarding her cellmates and suspicion that they took her belongings; she was not, however, described as violent or aggressive toward her cellmates.  She had impairment in her ADLs but was responsive to prompts to shower.  The patient reportedly had little insight regarding the reason for her hospitalization stating, "I flunked the EOP program because I missed group."  The CDCR treatment outcome expectations included reduction in the severity of delusional thinking and its impact on her mood through medication management and reality testing, reduction in the level of distress due to auditory hallucinations by increased insight, and reduction in the presence of delusional thinking and auditory hallucinations.

The patient was enrolled in appropriate group therapy, and medications were monitored and modified appropriately.  The initial IDTT occurred on February 16, 2023, and a subsequent IDTT occurred on March 23, 2023.  She was assigned to groups that focused on coping skills, anger management, seeking safety, and discharge planning, and the patient also received individual therapy.  At the March 23, 2023 IDTT meeting, documentation indicated that the patient attended and participated in group therapy; however, she required daily prompting regarding ADLs.

Weekly psychiatric progress notes indicated that medication therapy was effective, and medication side effects were minimal.  She was prescribed fluphenazine, lithium, hydroxyzine, and amantadine at DSH-Patton admission.  She was medication adherent and participated in groups.  Psychology monthly progress notes documented the patient's 100 percent group attendance and decreased need for prompting to shower and to maintain ADLs.

**Findings**

The care and treatment provided to this DSH-Patton patient was adequate.

Clinical contacts occurred timely and were clinically appropriate, and treatment planning was individualized.  Medications were adjusted appropriately, and the patient reported and exhibited positive response and reduction in symptoms.  Treatment was collaborative and included the patient's input.  Treatment team meetings included the necessary participants, and documentation indicated that the patient actively participated in group treatment.  The patient's ADLs also improved, and she required fewer prompts to shower and to maintain her daily ADLs.

# APPENDIX C
# ACTIVITIES OF THE SPECIAL MASTER

**ACTIVITIES OF THE SPECIAL MASTER <u>SINCE</u> THE FILING OF THE THIRTIETH ROUND MONITORING REPORT – PART A: SPECIAL MASTER'S MONITORING REPORT ON THE PSYCHIATRIC INPATIENT PROGRAMS FOR MENTAL HEALTH PATIENTS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ON MAY 11, 2023, ECF NO. 7833**

**DATA REMEDIATION ACTIVITIES**

- Business Rules and Methodology Review Workgroup – 42 meetings
- Level 1 Data Dispute Meetings – 13 meetings
- Level 2 Data Dispute Meetings – Two meetings
- <u>Indicator Status</u> (based on CDCR report given at the November 21, 2023 Business Rules and Methodology Review Meeting)

| | |
|---|---|
| Total Number of KPI | 175 |
| Remediated (Validated and Verified) | 77 |
| Completed Programming | 124 |
| Completed Indicator Testing | 105 |
| Undergoing Stakeholder Review | 28 |

**COURT COORDINATION MEETINGS**

- Four

**POLICIES**

- Statewide Master Treatment Plan Forms, release to the field November, 3, 2023 and November 21, 2023
- Psychiatrist Placement of Medical Holds, released to the field October 31, 2023
- PIP Policy – Housing Review/Least Restrictive Housing (LRH), released to the field September 26, 2023
- Telemental Health Services Policy, released to the field September 19, 2023
- Use of Mechanical Restraints in Mental Health Crisis Beds Policy, released to the field September 5, 2023
- Policy and Procedure Regarding Pre-Release Program, released to the field August 21, 2020
- Policy and Procedures regarding RVR MHAs, released to the field July 17, 2023
- Inmate Patient Property in the PIP, released to the field July 11, 2023
- SRE Mentoring Policy, released to the field June 7, 2023

- Updates to Enhancements to SPRFIT, released to the field June 14, 2023

## SPECIAL MASTER REPORTS ISSUED IN 2023

- Twenty-Ninth Monitoring Round Report – Part C: Special Master's Monitoring Report on the California Department of Corrections and Rehabilitation's Institutions with Enhanced Outpatient Programs Compliance with Provisionally Approved Plans, Policies, and Protocols, Filed February 7, 2023, ECF No. 7715

- Twenty-Ninth Monitoring Round Report – Part D: Special Master's Monitoring Report on the California Department of Corrections and Rehabilitation's Institutions with Correctional Clinical Case Management Programs Compliance with Provisionally Approved Plans, Policies, and Protocols, Filed February 7, 2023, ECF No. 7716

- Special Master's Report and Recommendations Regarding Third-Level Data Remediation Disputes Pursuant to the Data Remediation Dispute Resolution Process, March 9, 2023, ECF No. 7755

- Thirtieth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation, Filed May 11, 2023, ECF No. 7833

- Special Master's Report in Response to the Court's January 3, 2023 Order (ECF 7695) on the Status of *Coleman* Data Remediation, Filed June 30, 2023, ECF No. 7863

- Special Master's Response to the Court's May 24, 2023 Order, Filed August 8, 2023, ECF No. 7907

- Special Master's Report and Recommendation re Third Level Data Remediation Dispute Regarding Timely Compliance Methodology, Filed September 21, 2023, ECF No. 7954

- Special Master's Data Remediation Status Report, Filed October 13, 2023, ECF No. 8011