# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs


    v.                       No. CIV S-90-0520 KJM DB P


GAVIN NEWSOM, et al.,

    Defendants




**THIRTIETH ROUND MONITORING REPORT – PART C: SPECIAL MASTER'S MONITORING REPORT ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S INSTITUTIONS WITH ENHANCED OUTPATIENT PROGRAMS COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS**

Matthew A. Lopes, Jr., Esq.

Special Master

PANNONE LOPES DEVEREAUX & O'GARA LLC

Northwoods Office Park, Suite 215-N

1301 Atwood Avenue

Johnston, RI 02908

(401) 824-5100

Fax: (401) 824-5123

December 22, 2023

## ACRONYMS AND ABBREVIATIONS

1:1:                One-to-One

3CMS:               Correctional Clinical Case Management System

ADA:                Americans with Disabilities Act

AGPA:               Associate Governmental Program Analyst/Assistant

AIMS:               Abnormal Involuntary Movement Scale

ASU:                Administrative Segregation Unit

BWC:                Body Worn Camera

C&PR:               Classification and Parole Representative

CAP:                Corrective Action Plan

CBC:                Complete Blood Count

CBT:                Cognitive Behavioral Therapy

CC I:               Correctional Counselor I

CC II:              Correctional Counselor II

CCAT:               Correctional Clinical Assessment Team

CCHCS:              California Correctional Health Care Services

CCWF:               Central California Women's Facility

CDCR:               California Department of Corrections and Rehabilitation

CEO:                Chief Executive Officer

CHCA:               Correctional Health Care Administrator

CHCF:               California Health Care Facility

CHSA:               Correctional Health Services Administrator

CIT:                Crisis Intervention Team

CIW:                California Institution for Women

| | |
|---|---|
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMHPP: | Custody and Mental Health Partnership Plan |
| CMP: | Comprehensive Metabolic Panel |
| CNA: | Certified Nursing Assistant |
| CPR: | Cardiopulmonary Resuscitation |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CSR: | Classification Staff Representative |
| CTC: | Correctional Treatment Center |
| DA: | District Attorney |
| DAR: | Daily Activity Report |
| DBT: | Dialectical Behavior Therapy |
| DDP: | Developmental Disability Program |
| DSH: | Department of State Hospitals |
| DOT: | Directly Observed Therapy |
| EHRS: | Electronic Health Records System |
| EKG: | Electrocardiogram |
| EMRRC: | Emergency Medical Response Review Committee |
| EOP: | Enhanced Outpatient Program |

| | |
|---|---|
| EPRD: | Estimated Parole/Release Date |
| FIT: | Focused Improvement Team |
| FTE: | Full-Time Equivalent |
| GP: | General Population |
| HCPOP: | Health Care Placement Oversight Program |
| HLOC: | Higher Level of Care |
| HPS: | Health Program Specialist |
| HS: | *Hora Somni*/Hour of Sleep |
| IAC: | Inmate Advisory Council |
| ICC: | Institutional Classification Committee |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IPOC: | Interdisciplinary Plan of Care |
| IRU: | Inpatient Referral Unit |
| ISUDT: | Integrated Substance Use Disorder Treatment |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LGBTQ: | Lesbian, Gay, Bisexual, Transgender, Queer/Questioning |
| LOP: | Local Operating Procedure |
| LOC: | Level of Care |
| LRH: | Least Restrictive Housing |
| LTRH: | Long-Term Restricted Housing |
| LVN: | Licensed Vocational Nurse |

MAPIP:          Medication Administration Process Improvement Program

MCA:            Medication Court Administrator

MCSP:           Mule Creek State Prison

MERD:           Minimum Eligible Release Date

MHCB:           Mental Health Crisis Bed

MHSDS:          Mental Health Services Delivery System

MIS:            MHSDS Management Information Summary

MSF:            Minimum Support Facility

NA:             Nurse-Administered

NDS:            Non-Disciplinary Segregation

NKSP:           North Kern State Prison

NLTG:           Nursing-Led Therapeutic Groups

OHU:            Outpatient Housing Unit

OIA:            Office of Internal Affairs

OIG:            Office of the Inspector General

OSS:            Office Services Supervisor

PC              Primary Clinician

PIP:            Psychiatric Inpatient Program

PIWP:           Performance Improvement Work Plan

PNP:            Psychiatric Nurse Practitioner

POWER:          Prisoners Organizing Workshops for Effective Rehabilitation

PREA:           Prison Rape Elimination Act

PRN:            Pro Re Nata – Take prescription as-needed

PRPA:              Pre-Release Program Assessment

PSR:               Program Status Report

PSU:               Psychiatric Services Unit

PTSD:              Post-Traumatic Stress Disorder

QIP:               Quality Improvement Plan

QIT:               Quality Improvement Team

QMC:               Quality Management Committee

QMSU:              Quality Management Services Unit

R&R:               Receiving and Release

RAC:               Rehabilitative Achievement Credit

RHU:               Restricted Housing Unit

RJD:               Richard J. Donovan Correctional Facility

RN:                Registered Nurse

ROI:               Release of Information

RT:                Recreation Therapist

RVR:               Rules Violation Report

SAFER:             Survey Analysis for Evaluating Risk

SHO:               Senior Hearing Officer

SHU:               Security Housing Unit

SNY:               Sensitive Needs Yard

SOMS:              Strategic Offender Management System

SPRFIT:            Suicide Prevention and Response Focused Improvement Team

SQ:                San Quentin State Prison

SRASHE:                Suicide Risk and Self-Harm Evaluation

SRMP:                  Suicide Risk Management Program

SSI:                   Supplemental Security Income

SSRI:                  Selective Serotonin Reuptake Inhibitor

STAs:                  Structured Treatment Activities

STOP:                  Specialized Treatment for Optimized Programming

STRH:                  Short-Term Restricted Housing

SVSP:                  Salinas Valley State Prison

TAU:                   Treatment as Usual

TCU:                   Transitional Care Unit

TCMP:                  Transitional Case Management Program

TTM:                   Therapeutic Treatment Module

TTA:                   Triage and Treatment Area

UNA:                   Unmet Needs Assessment

VSP:                   Valley State Prison

## TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ......................................................... i

THE *COLEMAN* SPECIAL MASTER'S  THIRTIETH ROUND MONITORING
REPORT – PART C ................................................................................ 1

I.      INTRODUCTION ......................................................................... 1

        A.      The Staffing Crisis Identified in the Twenty-Ninth Round Monitoring
                Report Continued Unabated During the Review Period ........................ 22

        B.      The EOP Population Continued to Grow During the Review Period ............ 31

        C.      Update on Mental Health Policy Development ................................. 35

                1.      Tele-Mental Health Policy ......................................... 35

                2.      RHU Regulations and Policies ...................................... 39

        D.      Findings Related to RVR Process Revealed Concerning Trends Which
                Require Further Investigation ............................................ 41

II.     SUMMARY OF THE SPECIAL MASTER'S FINDINGS ............................ 44

        A.      Mental Health Vacancy Rates Overall and by Discipline During the
                Thirtieth Monitoring Round ............................................. 44

        B.      Quality Management ................................................... 51

        C.      Quality of Care in CDCR's Mental Health Process  Impact of Primary
                Clinician Staffing Vacancies on Patient Care ........................... 55

        D.      Overall Quality of Care Reflected in Case Reviews ..................... 63

        E.      Medication Management ................................................ 73

                1.      Psychiatry Measures .............................................. 74

                2.      Clozapine/Clozaril Institutions .................................. 77

                3.      Continuity, Compliance, Observation, and Administration Matters ... 77

        F.      Access to Higher Levels of Care ...................................... 87

        G.      Custody and Mental Health Partnership Plan ........................... 91

        H.      Review of the RVR Process ............................................ 103

I.    Use of Force ...................................................................................... 107

J.    Program Access ................................................................................ 113

K.    MHSDS Patients in Segregated Housing........................................... 122

CONCLUSION ........................................................................................... 127

APPENDIX A SPECIAL MASTER'S ACTIVITIES ................................................. 132

APPENDIX B INSTITUTIONAL SUMMARIES ...................................................... 135

APPENDIX B-1 RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD) .......... 136

APPENDIX B-2 MULE CREEK STATE PRISON (MCSP) ............................... 176

APPENDIX B-3 SALINAS VALLEY STATE PRISON (SVSP).......................... 217

APPENDIX B-4 CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY
(CSATF) .................................................................................... 259

APPENDIX B-5 CALIFORNIA MEDICAL FACILITY (CMF) ....................... 298

APPENDIX B-6 VALLEY STATE PRISON (VSP) ........................................ 336

APPENDIX B-7 CALIFORNIA STATE PRISON/SACRAMENTO (CSP/Sac)............... 371

APPENDIX B-8 CALIFORNIA HEALTH CARE FACILITY (CHCF)........................... 422

APPENDIX B-9 CALIFORNIA MEN's COLONY (CMC).................................. 463

APPENDIX B-10 KERN VALLEY STATE PRISON (KVSP) .......................... 495

APPENDIX B-11 CALIFORNIA INSTITUTION FOR WOMEN (CIW)......................... 536

APPENDIX B-12 SAN QUENTIN STATE PRISON (SQ) ................................. 573

APPENDIX B-13 CALIFORNIA STATE PRISON/CORCORAN (CSP/Corcoran).......... 610

APPENDIX B-14 CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF).............. 653

APPENDIX B-15 CALIFORNIA STATE PRISON/LOS ANGELES COUNTY
(CSP/LAC).................................................................................. 689

APPENDIX C CLINICAL CASE REVIEWS ......................................................... 729

APPENDIX C-1 Richard J. Donovan Correctional Facility (RJD)...................... 730

APPENDIX C-2 Mule Creek State Prison (MCSP) ........................................ 747

APPENDIX C-3 Salinas Valley State Prison (SVSP) ........................................... 783

APPENDIX C-4 California Substance Abuse Treatment Facility (CSATF) ...................... 797

APPENDIX C-5 California Medical Facility (CMF) ........................................... 830

APPENDIX C-6 Valley State Prison (VSP) .................................................... 858

APPENDIX C-7 California State Prison/Sacramento (CSP/Sac) .................................. 877

APPENDIX C-8 California Health Care Facility (CHCF) ...................................... 932

APPENDIX C-9 California Men's Colony (CMC) ............................................... 946

APPENDIX C-10 Kern Valley State Prison (KVSP) ........................................... 962

APPENDIX C-11 California Institution for Women (CIW) .................................... 1002

APPENDIX C-12 San Quentin State Prison (SQ) ............................................. 1017

APPENDIX C-13 California State Prison/Corcoran (CSP/Corcoran)............................. 1035

APPENDIX C-14 Central California Women's Facility (CCWF).................................. 1061

APPENDIX C-15 California State Prison/ Los Angeles County (CSP/LAC) .................. 1080

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
  **Plaintiffs,**

  **vs.**                                             **No. 2:90-cv-0520 KJM DB**

**GAVIN NEWSOM, et al.,**
  **Defendants.**

**THE *COLEMAN* SPECIAL MASTER'S**
**THIRTIETH ROUND MONITORING REPORT – PART C**

## I.    INTRODUCTION

The Special Master's Thirtieth Round Monitoring Report – Part C comes at a pivotal time in this longstanding civil rights case, with the Court in the midst of enforcement proceedings related to defendants' ongoing failure to meet their constitutional obligation to "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders." *Coleman v. Wilson*, 912 F. Supp. 1282, 1306 (E.D. Cal., Sept. 13, 1995).

Sadly, this Report's findings paint a bleak picture of defendants' progress toward a durable remedy, driven in large part by the reverberating impact of the ongoing mental health staffing crisis on essentially all aspects of the California Department of Corrections and Rehabilitation's (CDCR) Mental Health Services Delivery System (MHSDS). Indeed, the mental health staffing crisis identified in the Twenty-Ninth Monitoring Round continued virtually unabated, significantly curtailing mental health treatment and programming across the 15 Enhanced Outpatient Program (EOP) institutions and placing *Coleman* class members at grave and unacceptable risk of harm. The staffing vacancies observed during the review period – and the resultant diminution in both the quantity and quality of mental health care provided to

1

members of the plaintiff class – are indisputably among the worst in recent memory and could be among the worst in the history of the *Coleman* case.

Of course, in its 1995 opinion, the Court found "[t]he overwhelming weight of the evidence before this court demonstrates that the California Department of Corrections is significantly and chronically understaffed in the area of mental health care services." *Id.* at 1307. Moreover, the Court found "[t]he Department does not have sufficient staff to treat large numbers of mentally ill inmates in its custody." *Id.* In the intervening years, defendants developed and received court approval for a plan to remedy the Eighth Amendment violations identified at trial (the Program Guide) and a staffing plan to ensure CDCR's institutions had adequate mental health staff to implement the components of their remedial plan. During the monitoring round, defendants were not fully compliant with either the Program Guide or CDCR's staffing plan (or the Court's orders related to maximum vacancies among mental health staff), all to the detriment of the seriously mentally ill members of the plaintiff class.

Astonishingly, nearly 30 years after the Court's 1995 opinion, defendants now assert "there is no quantifiable staffing threshold that is required by the Constitution, and that any arbitrary maximum vacancy rate is not an appropriate proxy for measuring Defendants' constitutional compliance." Joint Report Regarding Psychiatric Inpatient Program (PIP) Staffing Vacancy Rate, ECF No. 7937 at 2; *but see* United States' Response to the Court's January 6, 2023 Order, ECF No. 7713 at 6 ("Where defendants are aware that their efforts have not resulted in adequate staffing to meet the needs of the prison population, they are aware of—and liable for—failing to ensure constitutional conditions of confinement. If defendants cannot provide

constitutionally adequate services with their existing mental health staff, they must increase staff or reduce caseloads.").[1]

As reported below, during the monitoring round, CDCR expanded its mental health "triaging" practice to at least 12 institutions, including ten of the 15 institutions covered in this report.[2] During the review period, this triaging process resulted in a hodgepodge of modifications to Program Guide requirements for the frequency of clinical contacts and interdisciplinary treatment teams (IDTTs) across institutions. While the specific mental health program modifications varied across institutions according to the severity of their respective mental health staffing crises, these triage plans, unilaterally imposed by defendants, all shared at least one commonality: they all called for and authorized institutions to provide *less* than the minimum level of services mandated by the Program Guide, "defendants' plan, approved by the court, to remedy identified violations in the delivery of mental health care to the plaintiff class." September 3, 2020 Order, ECF No. 6846 at 4 (citing ECF No. 4361 at 2-6). And in the meantime, *Coleman* patients went without the adequate mental health services to which they

---

[1] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system. References to page numbers in the Report are to page numbers at the bottom of each page.

[2] In his Twenty-Ninth Round Monitoring Report – Part C, the Special Master described CDCR's then-developing "pivot" to patient triaging:

> As revealed at CDCR's Mental Health Leadership Conference on November 16, 2022, the dire state of CDCR's mental health staffing levels has led Mental Health leadership to authorize a "patient triaging" process at twelve institutions. While the details of any statewide triaging process or any institutional triaging plans have not been shared with the Special Master, the Special Master's expert observes that this development likely means CDCR is using its limited staff to attend to only the most critical patient needs.

ECF No. 7715 at 33.

have an "absolute, undeniable right."  December 17, 2019 Order, ECF No. 6427 at 45; *see also infra* pp. 26-27 (finding "four in five EOP patients were housed in institutions that, based on defendants' failure to provide necessary staff, were wholly unable to provide the mental health services they were entitled to under the Program Guide.").

The Special Master's Thirtieth Round Monitoring Report – Part C includes the Special Master's findings from full-scale monitoring tours of the following 15 CDCR institutions: California Health Care Facility (CHCF), California Institution for Women (CIW), California Medical Facility (CMF), California Men's Colony (CMC), California State Prison, Corcoran (CSP/Corcoran), California State Prison, Los Angeles County (CSP/LAC), California State Prison, Sacramento (CSP/Sac), California Substance Abuse Treatment Facility (CSATF), Central California Women's Facility (CCWF), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), San Quentin State Prison (SQ), and Valley State Prison (VSP).

Consistent with the Twenty-Ninth Round Monitoring Report, this report includes findings on the following monitoring focus areas: mental health staffing vacancies, quality management, quality of care in CDCR's mental health programs and as reflected in case reviews, medication management, access to higher levels of care, Custody and Mental Health Partnership Plan (CMHPP), review of the rules violation report (RVR) process, use of force, program access, and MHSDS patients in segregated housing.

The summaries of the monitoring focus areas appear below in Part II Sections A through K.  Appendix A is a list of the Special Master's activities since the filing of the Special Master's Thirtieth Round Monitoring Report – Part A.[3]  Appendix B is comprised of institution-by-

---

[3] As reflected in Appendix A, the Special Master has filed eight reports in calendar year 2023.

institution summaries of the monitor's findings during the monitoring round.  Finally, Appendix C is comprised of the monitor's expert's clinical reviews of individual patient cases.

**Special Master's Response to Defendants' Objections to the Draft Report**

On October 2, 2023, the Special Master provided the *Coleman* parties with a draft version of the Thirtieth Round Monitoring Report – Part C ("Draft Report"), covering CDCR institutions with EOP programs.  As required by the Order of Reference, ECF No. 640 at 4-5, 8, defendants provided their preliminary comments and objections to the Draft Report on November 1, 2023. *See* Letter from Melissa Bentz, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (November 1, 2023), attached hereto as Exhibit A.  Plaintiffs did not provide comments to the Draft Report.

The Special Master carefully reviewed defendants' comments and objections to the Draft Report and made revisions to the final version of the report as warranted.  Below is a brief summary of the Special Master's responses to defendants' comments and objections.

1.  *"CDCR Objects to The Draft Report's Use of Conclusory Statements on the Constitutionality of Care Provided to the* <u>Coleman</u> *Class"*

In their response, defendants objected to the Draft Report's statements that "defendants were not fully compliant with either the Program Guide" or CDCR's staffing plan," that CDCR's mental health triaging practice resulted in patients receiving "less than the minimum level of services mandated by the Program Guide," and that "*Coleman* patients went without the adequate mental health services to which they have an 'absolute, undeniable right.'" Exhibit A at 1 (quoting *supra* p. 3-4).

In support of their objections, defendants argued:

The fact that [*Coleman* class members] may not be receiving Program Guide level care does not automatically establish an inference that constitutionally inadequate care is being provided.  Nor is it the role of the Special Master to decide whether

treatment provided satisfies the Constitution. The Program Guide sets forth the remedy in this case, but the requirements included within the Program Guide are not necessarily tethered to the constitutional minimum.

Exhibit A at 1.

These objections to the Draft Report are analogous to objections defendants have unsuccessfully made for years. *Compare id.*, *with* Amended Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master, ECF No. 4347 at 4 ("Yet the special master's report fails to convey this crucial information because he has not even attempted to assess the system against [a constitutional] standard."); *see also* February 28, 2013 Order, ECF No. 4361 at 2-3.[4]  This objection is without

---

[4] With respect to defendants' objections to the Special Master's Twenty-Fifth Round Monitoring Report, the Court noted:

> Defendants' main contention, which pervades their objections, is that the Special Master 'has not even attempted to assess' defendants' mental health care delivery system against a constitutional standard.  As will appear, *this objection betrays a fundamental misunderstanding of the history of this action and its remedial process*.  In fact, the Special Master is not tasked with 'assessing whether the State's prison mental health care system satisfies constitutional standards.'  That assessment is for this court.  It is true that in working with defendants to create a remedial plan, the Special Master gave 'due regard for the constitutional deficiencies' in the prison's mental health care system.'  However, with respect to the Report, the Special Master's task is to measure the State's compliance with 'any remedial plan that this court may order.'  At this time, the Revised Program Guide is the primary remedial plan in this action, and therefore properly the focus of the Special Master's monitoring and compliance reporting.

> …[T]he Revised Program Guide represents defendants' considered assessment, made in consultation with the Special Master and his experts, and approved by this court, of what is required to remedy the Eighth Amendment violations identified in this action and meet their constitutional obligation to deliver adequate mental health care to seriously mentally ill inmates.  *Because the Revised Program Guide is grounded in this requirements of the Eighth Amendment as they have been developed in the context of this action, the Special Master's Report to the court on defendants' compliance with the provisions of the Revised Program Guide is also grounded in the requirements of the Eighth Amendment and is precisely in accordance with his duties.*

merit and the Special Master will not expend judicial resources explaining, again, why he

measures defendants' performance against the minimum standards established in the Program

Guide.  *See* April 5, 2013 Order, ECF No. 4539 at 8 n.5 ("This court has considered and rejected

defendants argument that the Special Master is not monitoring with reference to a constitutional

standard.") (citing ECF No. 4361 at 3-6); *see also* August 30, 2012 Order, ECF No. 4232 at 4 n.2

("The Special Master's time is a resource that going forward need not be spent on objections that

have been raised and, as evidenced by defendants' decision not to tender them to the court, he has

resolved. While the parties are required to raise before the Special Master any objection they

intend to raise here, the Special Master is not required to respond to any objections that are

frivolous or repetitive of objections that were previously resolved or withdrawn.").

Further, Defendants alleged the Special Master's used "sensational language" to describe

his findings, which they contended "undermine[d] the potential to have productive relations that

could result in identifying solutions" and "demonstrate[d] an adversarial approach that is

contrary to the neutral and objective approach an arm of the Court should employ."  Exhibit A at

2 (objecting to "adverbs and adjectives such as 'sadly,' 'astonishingly,' 'deplorably,' and

commentary such as 'among the worse in recent [memory]' and 'among the worst in the history

of the *Coleman* case.'").  Defendants' argument here is baseless.  The language used in the Draft

Report is direct, clear, and brings proper focus to the significance of defendants' failure to recruit

and retain mental health staff and its impact on members of the plaintiff class.  It was with deep

frustration and concern that the Special Master described his Thirtieth Monitoring Round

findings as "among the worst in recent memory" and, further, that they "could be among the

---

ECF No. 4361 at 2-3 (emphasis added).

worst in the history of the *Coleman* case." *Supra* p. 2. However, this continues to be the Special Master's assessment of defendants' provision of mental health services to members of the *Coleman* class during the monitoring round and, accordingly, he did not revise the Draft Report in response to this objection.[5]

2.    *"CDCR Objects to the Draft Report's Incorrect and Misleading Staffing Calculations"*

Defendants objected to the Draft Report's discussion of mental health staffing vacancies, alleging the Draft Report "improperly and intentionally parse[d] the staffing data to dramatize vacancy rates." Exhibit A at 2. Specifically, defendants objected to the Special Master's longstanding practice of reporting separate vacancy rates for civil service and registry mental health staff. *Id.* ("[T]he data is reported by separating civil service line staff vacancy and overall vacancy rates including registry staff."); *id.* at 3 ("It is … inappropriate to exclude registry providers from any vacancy rate calculation."). In response, the Special Master notes defendants' objection ignored the fact that CDCR's monthly reports regarding mental health staffing fill rates filed with the Court organize staffing data in precisely the manner the Special Master has utilized in his monitoring reports for years. Thus, this objection is without merit.

Accordingly, the Special Master did not remove the Report's delineation of separate vacancy rates for civil service positions, registry positions, nor the application of the 90 percent

---

[5] The Special Master provided no response to defendants' discussion of National Correctional Health Care Commission standards because it is largely irrelevant to the Special Master's findings regarding defendants' compliance with their remedial plan in this case, the Program Guide. *See, e.g.*, June 30, 2021 Order, ECF No. 7216 at 2 ("The 'primary court-approved remedial documents in this action are the California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guide…and the Compendium of Custody Related Remedial Measures." (quoting ECF No. 6846 at 4)); *see also Coleman v. Brown*, 756 Fed. Appx. 677, 679 (9th Cir. 2018) (noting it is "established that the Program Guide sets out the objective standards that the Constitution requires in this context.").

fill rate threshold to individual institutions as defendants requested. *See* Exhibit A at 2-3.

However, the Special Master modified the Report's discussion of psychiatry vacancy rates by

more clearly identifying vacancies among on-site psychiatry positions, as well as adding a

combined vacancy rate accounting for all eligible staff psychiatry positions, including on-site

civil service, on-site registry, telepsychiatry, and psychiatric nurse practitioner positions. *See*

*infra* pp. 44-47.

3.    *"CDCR Objects to the Observations in the Draft Report About the Potential Need to Cluster EOP Patients"*

The Special Master acknowledges defendants' opposition to patient clustering but did not

revise the Draft Report in response to their objection. *See infra* pp. 34-35 (quoting August 9,

2016 Order, ECF No. 5477 at 5). The Special Master strongly disagrees that the Draft Report's

brief mention of clustering was "irrelevant." Exhibit A at 4. Indeed, additional patient

clustering remains a potential option for defendants to consider and the Special Master's

discussion of this option was appropriate. *See* October 24, 2023 Order, ECF No. 8031 at 3

(requiring briefing on the following question in advance of the November 2, 2023 Oral

Argument: "What inferences, if any, can or should the court draw from the absence of evidence

concerning any other options available to defendants to come into compliance with the court's

staffing orders, *including but not limited to clustering of Coleman class members at locations*

*most easily staffed with mental health clinicians* and/or voluntary reduction of the mentally ill

prison population?") (emphasis added).[6]

---

[6] Defendants supplemental brief responding to this part of the Court's October 24, 2023 Order is found at ECF No. 8045 at 13-15; the relevant portion of plaintiffs' supplemental brief is found at ECF No. 8046 at 9-11.

4.      *"The Draft Report Should Strike Questions or Doubts Regarding the Success of the Telepsychiatry Program"*

In their response to the Draft Report, defendants argued that the Draft Report "question[ed] whether telepsychiatry has been a success" and asked that "any statements questioning or doubting the success of the [telepsychiatry] program" be removed from the Draft Report.[7]  Defendants based this objection on the Special Master's use of the phrase "[w]hatever 'success' can be attributed to the telepsychiatry policy…" in a discussion regarding CDCR's newly implemented Tele-Mental Health Policy.  *Infra* p. 36 ("Whatever 'success' can be attributed to [CDCR's] telepsychiatry policy, the Special Master is not persuaded that its implementation to date lends support to CDCR's Tele-Mental Health Policy because the policies are fundamentally different in their treatment of EOPs and higher levels of care.").  Here, defendants mischaracterized the Draft Report's discussion regarding telepsychiatry and tele-mental health.

The Draft Report acknowledged defendants' position that CDCR's telepsychiatry program has been a success, *see, e.g.*, Defendants' Opening Trial Brief, ECF No. 7951 at 19,[8] and reported, further, that defendants based their Tele-Mental Health Policy on "the success" of the existing Telepsychiatry Program.  *Infra* p. 35 ("Defendants base their efforts [regarding tele-mental health] in part on what they describe as the success of CDCR's telepsychiatry policy.").  Thereafter the Draft Report discussed the Special Master's stance that CDCR's implementation

---

[7] Indeed, the record is clear that the Special Master endorsed CDCR's telepsychiatry policy in his December 2022 Telepsychiatry Report, though did not endorse defendants' proposed wholesale rewrite of that policy in contravention of controlling orders. *E.g.*, ECF No. 7682 at 45-46.

[8] "For instance, CDCR has implemented its telepsychiatry program with *great success* and often must turn away or waitlist qualified candidates."

of its telepsychiatry policy to date does not "lend[] support to CDCR's Tele-Mental Health

Policy because the policies are fundamentally different in their treatment of EOPs and higher

levels of care." *Infra* p. 36.

In the paragraphs that follow, the Special Master noted key differences between the

court-approved Telepsychiatry Policy and defendants' Tele-Mental Health Policy:

> Significantly, the final [Tele-Mental Health] policy tracks the substance of defendants' preferred (though not court-approved) version of the telepsychiatry policy. For instance, compared to the court-approved telepsychiatry policy, the final Tele-Mental Health Policy has no requirement for on-site PCs in EOPs, includes permissive language regarding the use of tele-mental health at higher levels of care (MHCBs and PIPs), calls for less frequent site visits by tele-PCs, and contains no requirement for CDCR to continue recruiting on-site PCs. In other words, the Tele-Mental Health Policy omits many of the carefully negotiated provisions included in the court-approved telepsychiatry [policy] that were intended to safeguard against the wholesale replacement of on-site services. Importantly, the Telepsychiatry Policy, inclusive of the aforementioned safeguards, has had a positive impact on defendants' psychiatry staffing levels and allows defendants to utilize telepsychiatry without limitation for 3CMS patients, who comprise the vast majority of the *Coleman* class.

> The Special Master and his expert have significant concerns about the lack of safeguards contained in the Tele-Mental Health Policy, particularly its facilitation of the replacement of on-site services for EOPs (as opposed to the Telepsychiatry Policy, where remote services only "supplement" on-site services in EOPs). The concerns that led to the inclusion of the limitations on the use of telepsychiatry in EOPs ("supplement" to on-site services) and inpatient settings (in emergency situations) are at least as applicable to the use of tele-mental health at these levels of care. The prospect of defendants' mental health programs operating with little-to-no on-site psychiatrists or primary clinicians – which the cumulative impact of the court-approved Telepsychiatry policy and defendants' Tele-Mental Health policy would permit – is deeply concerning. Even in the EOP program, where the telepsychiatry policy requires a minimum onsite presence for psychiatry, the care of individual patients could be planned and provided by a treatment team having neither the patient's psychiatrist nor primary clinician present in the facility where the patient resides.

*Infra* pp. 38-39.

The Draft Report's comparison of the Court-approved Telepsychiatry policy and CDCR's Tele-Mental Health Policy was appropriate and, accordingly, the Special Master did not revise the Draft Report based on this preliminary objection.

5. *"The Draft Report Should Clearly Describe Defendants' Position Regarding the Use of Telepsychiatry and the Current Status of the Telemental Health Policy."*

Defendants objected to the Draft Report's discussion of CDCR's Telepsychiatry and Tele-Mental Health policies and requested that the Special Master "include information regarding Defendants' disagreement with the restrictions in the Telepsychiatry Policy." The Special Master did not change the substance of the tele-mental health discussion but added additional citations and specifically noted defendants pending appeal of the Court's April 12, 2023 Order, ECF No. 7807, adopting the provisionally approved telepsychiatry policy as final. *See infra* note 39.

Defendants also objected to the Draft Report's statement that "defendants issued the [Tele-Mental Health] policy to the field while the issue was still pending before the Court." In response, the Special Master revised the sentence to state: "Concerningly, defendants issued the policy to the field *prior to resolving plaintiffs' and the Special Master's experts' questions and concerns about the policy*."

6. *"The Draft Report Should Include Information Regarding the Methodology for Adequacy or Compliance."*

Defendants objected to the Draft Report's "many statements finding Defendants 'adequate,' 'marginally or minimally adequate,' 'inadequate,' compliant,' or 'non-compliant' with various Program Guide or Court ordered requirements." Exhibit A at 6. Defendants argued "there is no detailed information regarding the methodology or criteria the Special Master used

to make these determinations" and "little-to-no information regarding the sample size of patients or requirements underlying each determination." *Id.*

Here, defendants have revived objections the Court recently rejected in its Order adopting the preceding monitoring round report. In response to similar objections to the Twenty-Ninth Round Monitoring Report,[9] the Court found "[t]he words 'adequate' and 'inadequate' are clear on their face, and [the Twenty-Ninth Round Monitoring] Report Part D clearly states that marginally adequate care means there were concerns about the care of the patient that bordered on inadequacy." ECF No. 7808 at 9-10. Further, the Court noted that the Special Master had used the phrase "marginally adequate" in prior reports without objections from defendants. *Id.* at 10. The Court has also rejected defendants' prior requests for additional information regarding methodology and sample sizes, noting that the objection "identifie[d] no error" in the Special Master's findings and was "effectively a discovery request." *Id.* at 5; *see also id.* ("Defendants may not use objections to seek discovery from the Special Master as though he were an opposing party."); *see also* November 16, 2023 Order, ECF No. 8069 at 20.

Because the Court previously overruled the substance of these objections in a prior order, the Special Master did not revise the Draft Report. *See* August 30, 2012 Order, ECF No. 4232 at 4 n.2 ("The Special Master's time is a resource that going forward need not be spent on objections that have been raised and, as evidenced by defendants' decision not to tender them to

---

[9] In their objections to the Twenty-Ninth Round Monitoring Report – Part C, defendants argued they were "severely hamstrung" in the ongoing data remediation process because the Special Master "continue[d] to deny Defendants' oft-repeated requests for the Special Master's guidebook, business rules, sample size methodology and other necessary documents to properly replicate" the Special Master's monitoring process. ECF No. 7733 at 3. Defendants also objected to the preceding monitoring round report for its use of "undefined terms to report on quality of treatment," including the terms "adequate," "marginally adequate," and "inadequate." *Id.* at 12.

the court, he has resolved. While the parties are required to raise before the Special Master any objection they intend to raise here, the Special Master is not required to respond to any objections that are frivolous or repetitive of objections that were previously resolved or withdrawn.").

7.    *"The Draft Report Should Revise References to Medication Administration Process Improvement Program (MAPIP) Measures to Remove the 90 Percent Threshold and More Thoroughly Explain the Methodology."*

Defendants objected to the Draft Report's "application of a 90 percent threshold for both MAPIP sub-measures and composite measures because the indicators count patient refusals as non-compliant." Exhibit A at 9. Here, defendants appear to be objecting to how their own data is measured and reported, specifically with respect to patient refusals. The Special Master notes that many MAPIP indicators are going through the data remediation process as of the time of this writing and defendants' concerns are best addressed in that forum. Moreover, the Special Master notes the MAPIP measures report compliance for both individual and aggregate metrics, consistent with the Special Master's reporting practice. In addition, as defendants' correspondence acknowledged, the "Court has deferred the issue of compliance thresholds for the provisionally approved key indicators." Exhibit A at 9 n.4. Accordingly, the Special Master did not revise the Draft Report in response to this objection.

8.    *"The Draft Report Requires Certain Clarifications or Additional Information."*

Defendants objected to language included in the CSATF institutional summary because it "raise[d] concerns with the accuracy of the scheduled structured treatment activity data and

14

assume[d] that any potential inaccuracies within that data "*presumably* inflat[es] offered hours." Exhibit A at 9.  In response, the Special Master revised "presumably" to "potentially."[10]

Defendants objected to the Draft Report's discussion of the ASU EOP Hub at CSP/Sac as follows: "The Draft Report assumes that CDCR reopened CSP/Sac's EOP ASU Hub 'without resolving the significant administrative segregation EOP population overage and without considering the impact of the institution's critically low staffing levels on mental health treatment offerings in their mainline EOP, STRH, and mainline 3CMS programs.'  No evidence is provided to support that assumption."  Exhibit A at 9.  Here, defendants cited to a footnote which referenced part of CSP/Sac's institutional summary.  Draft Report at 363-365.  The pages preceding the phrase defendants found objectionable provided ample evidence for the Draft Report's finding, including:

> The administrative segregation EOP population exceeded the capacity for both the EOP hub unit and all three PSU housing units from November 2022 through March 2023, resulting in the use of a mainline EOP housing unit (A-8) for the population overage… At the time of the site visit, there were 114 administrative segregation EOP patients; 63 were appropriately housed in the designated EOP hub and 51 were housed in three PSU housing units….
>
> According to leadership, despite CSP/Sac maintaining an administrative segregation EOP population overage in the PSU consistently since 2019, CDCR

---

[10] Defendants cited to page 12 footnote 15 of the Draft Report which includes a reference to the CSATF institutional summary (at page 261 of the Draft Report): "EOP patients, staff, and leadership confirmed that mainline EOP recreation therapy yard groups lacked structured activities of any kind and that patients' interactions with recreation therapists during yard groups were generally limited to checking in for attendance. Interviewed recreation therapists reported being directed by leadership to count all three yard group hours toward offered structured treatment activity whenever at least one recreation therapist was present during the scheduled time and whether or not the yard ended early. Further compromising the accuracy of structured treatment activity data, the regional mental health team found that when EOP patients moved to different housing units, they were scheduled for the new housing unit's group track without being removed from their former housing unit's group track; this resulted in some patients with multiple moves being scheduled for up to 50 hours of structured treatment activity, presumably inflating offered hours."

15

had not adjusted their staffing allocations to account for the difference in established caseload ratios.  According to the chief of mental health, the established primary clinician caseload ratio was 1:9 for the EOP Hub and 1:14 for the PSU.

Leadership reported that CSP/Sac attempted to offer patients in overflow units Program Guide required care.  However, with a 47 percent vacancy rate among primary clinicians and a consistent administrative segregation EOP population overage, mental health staff struggled to meet certification and Program Guide requirements each month.  CSP/Sac also temporarily modified Program Guide requirements due to staffing limitations, including by no longer requiring primary clinician contacts for the administrative segregation EOP high refusers in overflow cells.  Additionally, the mixing of maximum custody administrative segregation EOP and non-maximum custody mainline EOP patients in Facility A-8 negatively impacted treatment and programming for both populations, with the most significant impact occurring from November 2022 through January 2023….

For the review period, CSP/Sac's EOP hub remained closed to intake from September through November 2022.  However, CSP/Sac reported that it continued to receive an influx of new administrative segregation EOP patients from other institutions while closed to intake, maintaining administrative segregation EOP patients in overflow units, and struggling to provide minimally adequate care with limited staffing.

In November 2022, CSP/Sac's EOP hub reopened to intake. Unfortunately, the reopening occurred without resolving the significant administrative segregation EOP population overage and without considering the impact of the institution's critically low staffing levels on mental health treatment offerings in their mainline EOP, STRH, and mainline 3CMS programs. CSP/Sac closed to intake again after failing to offer minimally adequate care to certify the EOP hub and PSU in December 2022 and January 2023.

*Infra* p. 383-84.  Accordingly, the Special Master did not revise the final Report in response to this objection.

Defendants requested that the Draft Report be revised to remove statements indicating registry staff were not used to fill vacant supervisory positions.  Exhibit A at 10.  The Special Master revised the final Report accordingly.

Defendants requested the following statement be removed from the final version of the Report: "CSP/Sac addressed a significant rise in emergent referrals, which coincided with body camera activation in February 2023; *it was suspected that prior to this activation, custody*

*officers may not have been referring patients when indicated.*"  Exhibit A at 10.  The CSP/Sac institutional summary provides additional context for this statement: "CSP/Sac was currently attempting to better understand and address their 'astronomical rise in emergent evaluations' primarily during first and third watch hours, a matter that came to their attention in February 2023 and reportedly coincided with the activation of body warn cameras.  Upon further inquiry, mental health staff explained that, prior to the implementation of body warn cameras, they suspected custody staff may not have been referring patients when indicated during these watches."  *Infra* p. 375.  Upon review, the Special Master added an internal citation to ensure this statement is read in appropriate context but did not remove the statement.  *Infra* note 50.

Defendants objected to the Draft Report's discussion of the number of hours of treatment offered to EOP patients at MCSP, arguing that "[t]he statement that no EOP patients at MCSP were offered ten hours of structured treatment per week during the reporting period should be stricken unless it can be supported by data."  Exhibit A at 10.  In response, the Special Master revised the Draft Report to include language regarding treatment hours offered to EOP patients that was inadvertently omitted from the draft MCSP institutional summary.  *Infra* p. 199.

Defendants objected to the Draft Report's discussion of CIW's compliance with Program Guide timeframes for initial and routine Primary Clinician contacts.  Defendants requested that the Special Master "provide the data underlying" the conclusion that some Primary Clinician contacts were noncompliant, "including the names and CDCR numbers of the patients reviewed, as well as the methodology used to determine compliance."  Exhibit A at 10.  As noted, the Court has rejected defendants' prior efforts to obtain the Special Master's methodology.  *See* ECF No. 7808 at 5.  Therefore, the Special Master declines to provide the information defendants seek and notes that defendants themselves identified a potential explanation for any

discrepancies between the Special Master's analysis and that of defendants. *See* Exhibit A at 10 n. 5.

Similar to their objections to the Twenty-Ninth Round Monitoring Report, defendants objected to the Draft Report's statement that "The Program Guide provides for a clinical stay of up to 10 days in the MHCB." Defendants objected to the paragraphs following this statement because they "report on compliance with this alleged requirement." Exhibit A at 10. Defendants made identical objections to the Twenty-Ninth Round Monitoring Report. *See* ECF No. 7733 at 11 ("The Special Master refused to correct this section of the Report that states that the 'Program Guide provided for a length of stay of up to ten days in the MHCB.' The Report further states that four institutions had average lengths of stay exceeding ten days. Defendants reassert these objections as the Reports misstate the policy and Defendants' compliance.").

Like the Twenty-Ninth Round Report, the Draft Report accurately states that "[t]he Program Guide provides for a clinical stay of up to ten days in the MHCB" and reports on average clinical lengths of stay observed during the review period. Draft Report at 69; *see also* ECF No. 7808 at 9 (noting the Twenty-Ninth Round Monitoring Report "set out the statement defendants contend is incomplete: that the Program Guide provides for a clinical length of stay of up to ten days in MHCBs. These statements are followed by factual findings concerning the average length of MHCB stays at the various prison institutions."). Further, consistent with Twenty-Ninth Monitoring Round Report, the Draft Report did not "characterize any institution as 'noncompliant'" for having average lengths of stay in excess of ten days. ECF No. 7808 at 9. Because the Court previously resolved defendants' identical objection, *see id.*, the Special Master did not revise the Report in response to this objection. *See* August 30, 2012 Order, ECF No. 4232 at 4 ("While the parties are required to raise before the Special Master any objection

they intend to raise here, the Special Master is not required to respond to any objections that are frivolous or repetitive of objections that were previously resolved or withdrawn.").

Regarding the Draft Report's discussion of MHSDS participants enrolled in "education, vocations, or job assignments," defendants requested that the "Special Master revise the Draft Report to state whether patient eligibility is taken into account in the percentages provided, and if so, how." Exhibit A at 10. The Special Master revised the Report to include the clarifying information defendants requested. *See infra* note 51.

Defendants objected to the Draft Report's statement that "problems with continuity of care, lack of PC led groups assigned on individual patient need, and with individual sessions replaced with brief welfare checks, often completed at cell side" were attributable to the "dearth" of mental health staff in many EOP institutions. In support of their objection, defendants argued that "neither continuity of care, nor PC-led groups are Program Guide requirements"[11] and, further, that "there is no data in the Draft Report to support concerns regarding systemic welfare checks that were completed cell-side." Exhibit A at 11. In response, the Special Master revised the Report to include a footnote with additional citations to relevant findings within the Report and notes the following sections of the Report which provide support for the Special Master's findings regarding cell side contacts in lieu of individual clinical contacts due to staffing shortages:

- *Infra* p. 65: "In most cases, inadequacy of treatment at the EOP level of care was due to lack of adequate treatment planning (e.g., vague goals, lack of adequate planned interventions, interdisciplinary plans of care (IPOCs) that did not target identified symptoms or functioning deficits), failure in offering group and individual treatment in

---

[11] The Special Master notes the Court adopted the Special Mater's proposal to include drill-down information and summary statistics regarding clinician-led groups in relation to a dispute regarding the provisionally approved key indicator measuring treatment offered. ECF No. 8069 at 13.

keeping with Program Guide requirements, cell-front contacts for reasons other than patient refusal, and clinical contacts that did not address the needs of the patient."

- *Infra* p. 161: "Sixty percent [of routine primary clinician contacts] were conducted in a confidential setting. Reasons for non-confidentiality included appointments being held at cell front due to patient refusals or staffing shortages."

- *Infra* p. 230: "[Interviewed patients reported] many contacts occurred at cell front or in other non-confidential settings."

- *Infra* p. 234: "Although clinical staff had requested to conduct individual and group treatment in this outdoor yard, custody staff reported that this was not possible, due to safety and security concerns. This resulted in approximately 75 percent of MHCB contacts occurring at cell front or bedside."

- *Infra* p. 273: "Patients reported that cell-front contacts with primary clinicians were more commonly offered than out-of-cell contacts."

- *Infra* p. 320: "Patients further reported that most primary clinician contacts were at cell front and that many routine requests to be seen were ignored."

- *Infra* p. 376: "Contact compliance reviews revealed ongoing problems with cell-front contacts completed by psychiatry staff. During the site visit, the monitor's expert learned that psychiatry did not sufficiently investigate the issue to determine whether it was provider- or patient-driven, did not communicate with other disciplines toward developing effective interventions, and did not consider reminding treatment teams to collaboratively address out-of-cell participation."

- *Infra* p. 393: "The monitor's expert's concern for this stunningly high rate of non-confidential psychiatry contacts was only amplified given the facility had an active QIP as a result of a patient's death by suicide. The QIP mandated that CSP/Sac 'implement strategies to decrease the percentage of cell front visitations.'"

- *Infra* p. 395: "At the start of the site visit, leadership informed the monitoring team that they had modified Program Guide requirements in STRH by requiring biweekly individual encounters instead of weekly. However, as there were only two providers, one of whom was reportedly often absent and planning to go on extended medical leave, patients were often seen at cell front for brief check-ins during biweekly contacts. A few interviewed STRH patients confirmed they had not been invited out of their cell for a confidential individual contact in three to four weeks."

- *Infra* p. 405: reporting "15 percent of reviewed routine psychiatry contacts were conducted in confidential settings" and further that "[n]early all non-confidential routine psychiatry contacts were conducted at cell front due to patient refusals, staffing shortages, or COVID-19 restrictions."

- *Infra* p. 522: "Interviewed group participants spoke highly of the group and group facilitator. However, most did not find primary clinician contacts to be useful. They reported that receipt of ducats was variable and that most contacts were nonconfidential. They further reported that clinicians rarely asked them to come out of their cell and that they had to ask for a confidential contact. They further reported that officers were routinely present during cell-front contacts."

- *Infra* p. 519: "Sixty-nine percent [of routine PC contacts] were conducted in confidential settings. Reasons for non-confidentiality were mostly patient refusals; other reasons were lack of available treatment space, modified programming, and staff shortages which resulted in what KVSP termed 'wellness checks.'"

- *Infra* p. 635: "The EOP supervisor reported that patients were seen individually for weekly primary clinician contacts, but further reported that limited staffing and high caseloads resulted in individual clinical contacts typically consisting of patient wellness checks instead of meaningful therapeutic contacts."

- Exhibit B at 7, 8 (CHCF triage plan, noting the following for C-Yard 3CMS patients): "Cell front is default for contacts, but provider can either pull the patient out for a confidential session, or put in a referral to see the patient before the next routine contact."; *see also id.* (same standard for D-Yard 3CMS).

- Exhibit B at 9 (CMC triage plan): "MHPCs shall conduct cell front contacts for entire caseload each week to triage patients for 1:1 contacts" but only required primary clinicians to offer Program Guide required care for "two-thirds of their caseload."

- Exhibit B at 11 (CSP/Corcoran triage plan): "1:1 every other week and cell front every week" (LTRH)]

The Special Master removed the statement from page 456 of the Draft Report regarding the availability of TTMs at CMC as requested. Exhibit A at 11.

Finally, the Special Master corrected the Draft Report's discussion of the out of cell time requirements for patients housed in STRH in women's facilities, as requested. *Infra* p. 670.

9.    *"The Special Master Should Use Remediated Indicators in Future Monitoring."*

The Special Master made no changes to the Draft Report based on this objection and notes that he expects Defendants to provide remediated data derived from the provisionally approved key indicators upon conclusion of the data remediation process, subject to further instruction from the Court.

A. **The Staffing Crisis Identified in the Twenty-Ninth Round Monitoring Report Continued Unabated During the Review Period**

In his Twenty-Ninth Round Monitoring Report – Part C, the Special Master observed the following: "Far and away the most disturbing development since the filing of the Twenty-Eighth Round Monitoring Report has been the vacancy rate explosion among primary clinicians (psychologists and social workers). With the vacancy rates observed at some institutions, it was virtually impossible to provide anything close to Program Guide-compliant mental health care." ECF No. 7715 at 30. During the monitoring round, this "bona fide mental health staffing emergency," *id.* at 169, continued virtually unabated.

Astonishingly, as reported below, nearly half of the staff psychologist positions across the 15 EOP institutions were vacant. *See infra* p. 48 (reporting "an alarming vacancy rate of 52 percent" among staff psychologists, reduced to a "still abysmal functional vacancy rate of 45 percent" through the use of registry staff). Similarly, nearly a third of the clinical social worker positions were vacant. *See infra* p. 45 (reporting 32 percent functional vacancy rate among clinical social worker positions). Since the Twenty-Ninth Monitoring Round, the overall vacancy rates for both primary clinician classifications had in fact gotten worse. *Compare id.*, *with* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 73 (reporting "an overall 45 percent staff psychology vacancy rate, which registry staff reduced to a still shocking 37 percent" and an "overall functional vacancy rate[] of 30 percent for social workers.").

As displayed in the figure below, compared to the preceding monitoring round, functional vacancy rates among staff psychologists increased at 13 of the 15 EOP institutions. Similarly, functional vacancy rates among clinical social workers increased at seven of the 15 EOP institutions.





Nearly all institutions failed to fill the minimum number of psychology and social worker

positions required by the Court's June 13, 2002 order regarding maximum mental health staffing

vacancies: 14 EOP institutions had functional vacancy rates in excess of ten percent among staff

psychologists, and 13 EOP institutions had functional vacancy rates in excess of ten percent

among clinical social workers. *See infra* Part II(A).[12] Among the institutions with functional vacancy rates among psychologists greater than ten percent, vacancy rates ranged from 14 to 78 percent. Social worker vacancy rates ranged from 12 to 71 percent for those 13 institutions with vacancy rates in excess of ten percent.

More concerning still, as reflected in the table below, at six institutions, 50 percent or more staff psychology positions were vacant.

| Institution | 30th Round Functional Vacancy Rate: Psychology |
|---|---|
| CCWF | 29% |
| **CHCF** | **78%** |
| CIW | 0% |
| CMC | 44% |
| **CMF** | **67%** |
| **CSATF** | **63%** |
| **CSP/Corcoran** | **62%** |
| CSP/LAC | 37% |
| CSP/Sac | 37% |
| KVSP | 22% |
| **MCSP** | **61%** |
| RJD | 32% |
| SQ | 16% |
| **SVSP** | **70%** |
| VSP | 14% |

---

[12] In comparison, the Special Master observed the following in his Twenty-Ninth Round Monitoring Report:

> [D]uring the monitoring round, 13 of 15 institutions with enhanced outpatient programs (EOP) failed to fill 90 percent of allocated psychology positions; 11 of 15 were unable to fill 90 percent of allocated social worker positions. Of the institutions that failed to satisfy the Court's June 13, 2002 order regarding mental health staffing fill rates, functional vacancy rates for psychology positions ranged from 11 to 76 percent, while social worker functional vacancy rates ranged from 16 to 64 percent. At five of the 15 institutions, more than half of allocated psychology positions were vacant; two of 15 institutions had social worker vacancies at or in excess of 50 percent.

ECF No. 7715 at 31.

Similarly, four institutions failed to fill more than half of the social worker positions. As noted, these four institutions – CHCF, CSATF, MCSP, and SVSP – also failed to fill more than 50 percent of staff psychology positions.

| Institution | 30th Round Functional Vacancy Rate: Social Worker |
|---|---|
| CCWF | 17% |
| **CHCF** | **71%** |
| CIW | 29% |
| CMC | 20% |
| CMF | 42% |
| **CSATF** | **50%** |
| CSP/Corcoran | 22% |
| CSP/LAC | 22% |
| CSP/Sac | 0% |
| KVSP | 14% |
| **MCSP** | **54%** |
| RJD | 42% |
| SQ | 29% |
| **SVSP** | **59%** |
| VSP | 7% |

Because of the deplorably high staffing vacancy rates, the six institutions with more than 50 percent of psychology and/or social worker positions vacant operated under staffing "triage" plans for at least part of the review period. *See* Email from Mr. Dillon Hockerson, Esq., CDCR Office of Legal Affairs, to Plaintiffs' Counsel and Special Master (May 3, 2023), attached hereto as Exhibit A (attaching spreadsheet listing 14 CDCR institutions operating under staffing triage plans as of May 3, 2023).[13]  In all, as of May 3, 2023, 14 CDCR institutions, including ten of the 15 EOP institutions covered in this report, responded to severe staffing shortages by instituting staffing triage plans whereby limited staffing resources were directed to only the most urgent,

---

[13] In the Twenty-Ninth Round Monitoring Report, the Special Master first reported the emergence of these triage plans, observing "this development most likely means CDCR is using its limited staff to attend to only the most critical patient needs."  ECF No. 7715 at 33.

critical patient needs. [14]  As mental health leadership at one institution phrased it, "critical MHPC

[Mental Health Primary Clinician] shortages…ma[de] providing treatment as usual (TAU)

untenable at best."  *Infra* p. 318.  Here, needless to say, "treatment as usual" refers to Program

Guide-level mental health care.

As of July 31, 2023, the ten EOP institutions operating under triage plans during the

review period – CHCF, CMC, CMF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, RJD,

and SVSP – collectively housed 49 percent of the state's MHSDS population and 82 percent of

the statewide EOP population.[15]  Thus, during the review period, four in five EOP patients were

---

[14] *See also infra* p. 439-40 ("During the site visit, severe staffing shortages resulted in [CHCF's]
EOP program providing services according to a 'triage plan.'  Specifically, E yard EOP units
aimed to have clinicians offer four weekly core groups and 12 weekly confidential individual
contacts, which would result in one monthly individual patient contact, as well as facilitate four
weekly IDTTs, prioritizing initial, level of care change, and special IDTTs.  Other contacts that
were prioritized included emergent/urgent referrals, five-day follow-ups, SRASHEs, and initial
PC contacts."); *infra* p. 318 ("Due to staffing shortages, CMF began triaging its mainline EOP
program in April 2022.  In a memorandum dated April 13, 2022, mental health leadership
announced that CMF's 'critical MHPC staffing shortages…makes providing treatment as usual
(TAU) untenable at best.  Effective immediately the [mainline] EOP program will move to a
triage and rounding model for patient care….'  CMF also distributed subsequent memoranda for
triage and rounding in the mainline EOP programs.  A January 9, 2023, memorandum was in
effect during the site visit and indicated that CMF would be 'going to a group based model of
care with 1:1 [one-to-one] appointments for stable patients being done TBD only or by request.'
Moreover, routine IDTTs were suspended unless "clinically indicated."); *infra* p. 202 ("In March
2022, a facility-wide triage plan was implemented [at MCSP] that was still in effect during the
site visit.  The plan called for psychiatry staff to provide routine contacts for [Correctional
Clinical Case Management System] 3CMS patients on medications, and IDTTs were prioritized
and shortened to maximize the number of patients seen.").

[15] As of July 31, 2023, there were 33,629 MHSDS participants housed in CDCR institutions;
collectively, CHCF, CMC, CMF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, RJD,
and SVSP housed 16,569 MHSDS participants.  As of the same date, there were 7,086 EOP
patients housed in CDCR institutions; together, these ten institutions housed 5,802 EOP patients.
*See Coleman* Monthly Package Tab 6a, entitled "Summary of Mental Health Population by
Institution and Level of Care," reporting data as of July 31, 2023, attached hereto as Exhibit C
(reporting census data by institution and level of care).

housed in institutions that, based on defendants' failure to provide necessary staff, were wholly

unable to provide the mental health services they were entitled to under the Program Guide.

The mental health staffing crisis impacted virtually all institutions discussed in this

report, contributing to defendants' widespread remedial noncompliance and presenting grave and

unacceptable risk of harm to *Coleman* patients across levels of care.  In addition to the

noncompliance inherent to and authorized by defendants' staffing triage plans discussed above,

this Report discusses the various ways in which the ongoing staffing crisis frequently interfered

with the delivery of adequate mental health care, including:

- Line staff vacancy rates as high as 78 percent, *see supra* p. 24;

- Excessive patient caseloads, which significantly inhibited development and

  implementation of adequate treatment plans[16] and contributed to staff burnout;[17]

---

[16] *See infra* p. 69 ("During the record reviews, the monitor's expert noted patterns with regard to inadequate delivery of treatment across facilities and levels of care, including an absence of interventions documented on treatment plans, inadequate provision of treatment to meet patients' needs, failure to address issues noted in the healthcare record, poor continuity of care, a failure to deliver adequate structured treatment, and the lack of confidential clinical contacts.; *see also infra* p. 128 (noting "the high vacancy rate among primary clinicians led directly to unmanageably high caseloads" which "interfered with the development of clinically adequate treatment plans").

[17] *See, e.g., infra* p. 202 ("Although MCSP had three positions allocated per yard, due to significant staffing shortages only one primary clinician provided mental health services to 3CMS patients on each yard for A, B, and C yards, and a single primary clinician provided treatment to all 3CMS patients housed on D and E yards. 3CMS caseloads well exceeded the mandated ratio"); *infra* p. 285 ("[At CSATF] [p]sychiatry caseloads for 3CMS patients were within established staffing ratios.  *However, due to extreme staffing shortages, primary clinician caseloads exceeded the established ratio by as much as five times, with caseloads of up to 516 patients*."); *see also infra* p. 465 ("Numerous [CMC] primary clinicians reported they were burning out and seeking other jobs; some expressed concern that their inability to manage extremely high caseloads might result in bad patient outcomes.."); *infra* p. 624 ("The [CSP/Corcoran] STRH telepsychiatrist had a caseload within the established ratio.  Only one of four primary clinicians also had a caseload within the ratio.  Two others' exceeded the ratio; *one's caseload was more than double*."); *infra* p. 404 ("[EOP staff on CSP/Sac B yard] reported

- Untimely clinical contacts;[18]

- Untimely IDTTs;[19]

- Non-confidential wellness checks occurring in place of required confidential clinical assessments, *see, e.g.*, *infra* p. 635 ("The [CSP/Corcoran] EOP supervisor reported that patients were seen individually for weekly primary clinician contacts, but further reported that limited staffing and high caseloads resulted in individual clinical contacts typically consisting of patient wellness checks instead of meaningful therapeutic contacts.").[20]

- Untimely transfers to higher levels of care, *see infra* p. 87-88 (reporting 12 of 14 institutions failed to comply with the requirement to transfer acute care patients within ten days of referral); *see infra* p. 88 (reporting 14 of 15 institutions failed to comply with the requirement to transfer intermediate care patients within 30 days of referral);

---

staffing issues and vacancies were having the most impact on service delivery. *They described the workload and caseloads as 'overwhelming.'*") (emphasis added).

[18] *See, e.g.*, *supra* pp. 25-27 (discussing patient triaging processes featured at ten of 15 EOP institutions); *infra* p. 274 (noting 31 percent of required routine PC evaluations were conducted in CSATF's STRH program); *infra* p. 150 (noting 76 percent compliance for routine PC contacts in RJD's EOP hub).

[19] *See, e.g.*, *infra* p. 275 ("None of the five [CSATF STRH] patients had timely routine IDTTs every 90 calendar days."); *infra* p. 509 "[Sixty-nine] percent of routine primary clinician evaluations [at KVSP STRH] timely occurred at least every seven calendar days.  Nineteen percent were conducted confidentially").

[20] In its August 14, 2019 Order, the Court confirmed that "a plain reading of the Program Guide support[s] the conclusion" that psychiatric evaluations "must be confidential" to be considered Program Guide compliant.  ECF No. 6242 at 7.

- Failure to achieve certification of EOP Administrative Segregation Unit (ASU) hubs and Psychiatric Services Units (PSUs);[21]

- Woefully inadequate quality of mental health treatment;[22]

- Fewer than required ten weekly hours of treatment for EOP patients;[23]

---

[21] *See infra* p. 384-85 ("CSP/Sac provided their monthly certification chart for April 2022 through January 2023. The chart revealed that the EOP hub and PSU certified only twice at the local level during this timeframe. For the review period, CSP/Sac's EOP hub remained closed to intake from September through November 2022. In November 2022, CSP/Sac's EOP hub reopened to intake. Unfortunately, the reopening occurred without resolving the significant administrative segregation EOP population overage and without considering the impact of the institution's critically low staffing levels on mental health treatment offerings in their mainline EOP, STRH, and mainline 3CMS programs. CSP/Sac closed to intake again after failing to offer minimally adequate care to certify the EOP hub and PSU in December 2022 and January 2023."); *infra* p. 310 ("Related to significant staffing shortages, [CMF's] EOP hub was not certified during any month of the reporting period.").

[22] *See, e.g.*, *infra* p. 63 (reporting the monitor's expert's determination that 63 percent of reviewed cases received inadequate mental health care); *infra* p. 64 (reporting monitor's expert's finding that 69 percent of EOP cases reviewed received inadequate quality mental health care); *see also infra* p. 66-67 ("Treatment planning concerns were noted across facilities and programs during the Thirtieth Monitoring Round. Similar to findings in the Twenty-Ninth Monitoring Round, concerns included treatment goals which did not align with patients' identified symptoms and/or treatment targets, treatment goals that were not updated despite changes in patients' clinical presentations since prior IDTTs, vague or generic goals, nonspecific treatment interventions and/or a lack of treatment interventions documented, lack of discussion about patient progress or changes in functioning since the prior IDTT, and inadequately updated clinical summaries.").

[23] *See infra* p. 403 ("CSP/Sac remained noncompliant with Program Guide requirements for structured therapeutic activity hours and weekly individual primary clinician contacts throughout the review period."); *infra* p. 237 ("Between August 29, 2022 and April 14, 2023, EOP patients [at SVSP] were offered an average of 5.22 weekly hours of structured therapeutic activities, attended a weekly average of 2.23 hours, and refused a weekly average of 3.04 hours."); *infra* p. 282 ("[CSATF] EOP patients, staff, and leadership confirmed that mainline EOP recreation therapy yard groups lacked structured activities of any kind and that patients' interactions with recreation therapists during yard groups were generally limited to checking in for attendance. Interviewed recreation therapists reported being directed by leadership to count all three yard group hours toward offered structured treatment activity whenever at least one recreation therapist was present during the scheduled time and whether or not the yard ended early. Further compromising the accuracy of structured treatment activity data, the regional mental health team

- Supervisors covering various line staff duties;[24]

- Delayed requests for and completion of RVR mental health assessments, *see, e.g., infra* p. 105 ("CSP/Sac clinicians noted that issues with mental health assessments' timely completion were largely due to the high volume of RVRs and staffing deficiencies"); *infra* p. 214 ("MCSP staff reported that during the review period, the number of RVRs increased while mental health staffing decreased, ultimately delaying the completion of mental health assessments.");

- Program closures;[25]

- Lack of functioning Crisis Intervention Teams (CITs);[26]

---

found that when EOP patients moved to different housing units, they were scheduled for the new housing unit's group track without being removed from their former housing unit's group track; this resulted in some patients with multiple moves being scheduled for up to 50 hours of structured treatment activity, potentially inflating offered hours."); *infra* p. 479 ("CMC offered patients an average of six weekly hours of structured treatment.")

[24] *See infra* p. 260 ("Due to staffing shortages [at CSATF], the MHCB's supervising psychologist also served as the SPRFIT coordinator, supervised CIT and alternative housing clinicians, and performed daily primary clinician contacts in the MHCB."); *infra* p. 376 ("While CSP/Sac appropriately redirected mental health staff, including supervisors, to attend to patients in higher risk programs, leadership acknowledged that they currently did not have sufficient resources to effectively manage the size and complexity of the mental health populations within their institution.").

[25] *See infra* p. 434 (reporting the closure of CHCF's EOP hub during the review period and at the time of the site visit).

[26] *See infra* p. 156 ("RJD was not sufficiently staffed to maintain a functional CIT as conceptualized by the statewide CIT policy."); *infra* p. 589 ("[[D]ue to staffing shortages, [SQ's] CIT did not operate during the review period."); *infra* p. 197 ("[At MCSP] CIT had been disbanded due to significant staffing shortages."); *infra* p. 401 ("CSP/Sac reported that only one clinician was trained for the CIT at the time of the site visit."); *infra* p. 634 ("Due to severe staffing shortages, CSP/Corcoran lacked a CIT during the reporting period."); *infra* p. 438 ("Due to limited staffing, CHCF did not utilize the CIT during the review period or at the time of the site visit.")

- Limited pre-release programming; [27] and

- Continued challenges implementing all components of the CMHPP.[28]

Indeed, continuing to operate a correctional mental health program as large and complex as CDCR's MHSDS at the staffing fill rates observed during the review period is "untenable at best," *see infra* p. 318, and requires immediate corrective action.

**B.  The EOP Population Continued to Grow During the Review Period**

Six years ago, the Court warned that defendants' longstanding failure to maintain sufficient mental health staff "raise[d] a question about whether defendants will ever be able to hire sufficient staff to meet their constitutional obligations to members of the plaintiff class, as long as the size of the seriously mentally ill inmate population in California's prison system remains at current levels or continues to grow."  October 10, 2017 Order, ECF No. 5711 at 28. Since the time of that order, reductions in CDCR's overall population have far outpaced those of the plaintiff class.  *See, e.g.*, Twenty-Ninth Round Monitoring Report – Part A, ECF No. 7555 at 37 n. 16 (noting "reductions in the size of the *Coleman* population have not kept pace with

---

[27] *See infra* p. 245 ("Pre-release groups [at SVSP] were offered sporadically for EOP patients, but, due to staffing shortages, were not offered to 3CMS patients."); *infra* p. 165  ("Staffing shortages [at RJD] resulted in some yards not offering pre-release groups; available pre-release group staff were allocated to the yards with the most patients."); *infra* p. 206 ("Barriers to improving pre-release planning [at MCSP] were staffing shortages.").

[28] *See infra* p. 91 ("Similar to the previous review period, institutions implemented most CMHPP components with varying degrees of compliance and were negatively impacted by staffing shortages."); *infra* p. 96 ("Due to staffing shortages, CSP/Corcoran was unable to consistently conduct weekly 3CMS program supervisory meetings.  Two of four of SVSP's yards that housed 3CMS patients consistently held the supervisory meetings; due to staffing shortages, the other two yards did not conduct them."); *infra* p. 98 ("CMC, CSP/Sac, and MCSP did not offer [EOP orientation] groups during the review period; CMC and MCSP attributed this deficiency to staffing shortages.  Relatedly, CSP/LAC and SVSP reported group cancellations due to staffing shortages."); *infra* p. 249 ("Largely due to significant staffing shortages, there were serious shortcomings in the implementation of SVSP's Custody and Mental Health Partnership Plan.").

decreases in the overall incarcerated persons population.").  Indeed, changes in the size of the

*Coleman* class have been driven in large part by reductions in the size of the 3CMS population.[29]

As displayed in the charts below,[30] the EOP population, on the other hand, has grown

significantly in recent years.  Cognizant of these trends, the Special Master recently warned that

the recent growth in the EOP population was "particularly concerning" because "many patients

utilizing inpatient mental health care in CDCR come from and return to EOP program."  ECF

No. 7555 at 163.

Since the Three-Judge Court proceedings, the overall CDCR population has decreased

dramatically from well-over 150,000 to 94,015 on July 31, 2023, a reduction of nearly 40

percent.[31]  The MHSDS population, however, is only 3.5 percent lower, while the EOP

---

[29] On October 16, 2017, there were 29,136 *Coleman* class members at the 3CMS level of care. *See* September 2017 *Coleman* Monthly Report Tab 6b "MHSDS Management Information Summary (MIS) Report").  On July 31, 2023, 2023, there were 25,143 *Coleman* class members at the 3CMS level of care, a difference of 3,993.  *See* Joint List of Stipulated Facts (filed September 22, 2023), ECF No. 7956 at 7.  This difference in the 3CMS population accounts for 76 percent of the overall MHSDS population reduction of 5,259 between October 2017 and July 2023.  *Compare* September 2017 *Coleman* Monthly Report Tab 6b "MHSDS Management Information Summary (MIS) Report" (reporting total MHSDS population of 38,852), *with* Joint List of Stipulated Facts (filed September 22, 2023), ECF No. 7956 at 7 (reporting total MHSDS population of 33,593, 5,259 fewer patients than reported in October 2017).

[30] The population data included in the charts as of February 7, 2022 was reported in the Special Master's Twenty-Ninth Round Monitoring Report – Part A.  *See* ECF No. 7555 at 24 n. 16.

[31] *Compare* Statement of Undisputed Facts Regarding Phase I Issues, ECF No. 3301 at 3 ("The total CDCR prisoner population housed in in-state institutions…was 156,352."), *with* CDCR Monthly Population Report as of July 31, 2023, available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2023/08/Tpop1d2307.pdf (reporting total of 94,015 incarcerated persons housed in CDCR institutions).

population has actually *grown* by 41 percent since the time of the Three-Judge Court population reduction proceedings.[32]





---

[32] *Compare* Statement of Undisputed Facts Regarding Phase I Issues, ECF No. 3301 at 3 (reporting an MHSDS population of 34,831 patients, including 5,023 patients at the EOP level of care), *with* Joint List of Stipulated Facts (filed September 22, 2023), ECF No. 7956 at 7 (reporting total MHSDS population of 33,596 and EOP population of 7,090 as of July 31, 2023).



Indeed, the growth in the EOP population[33] in particular continues to "raise[] a question about whether defendants will ever be able to hire sufficient staff to meet their constitutional obligations to members of the plaintiff class."[34]  ECF No. 5711 at 28.  The Special Master reiterates his observation from the preceding monitoring round that it may be time for "CDCR to

---

[33] Relatedly, the Special Master's monitoring of CDCR's mental health headquarters has revealed numerous EOP programs closed to intake.  Also, the Special Master's mental health headquarters monitoring team began attending a weekly meeting entitled "Balancing Institutions Population and Intake Planning Session."  One stated aim of this meeting was to discuss plans to reduce staffing pressures statewide, particularly at EOP institutions.  Since the initial meeting in August 2023, the workgroup has discussed mental health staffing vacancies at EOP institutions compared to the EOP population.  The workgroup indicated that it would provide proposals to mental health leadership regarding which institutions would be suited to add EOP patients to their mission.  At the September 1, 2023 meeting, the monitors reminded CDCR that they were obligated to formally notify the Special Master of any mission changes that result from this process.  At the time of this report, we have not received notice of any mission changes derived from this meeting.

[34] The population trends reported above, coupled with the troubling findings reported herein regarding mental health staffing vacancies, suggest that one of the Court's original observations – that the "task" of providing constitutionally required mental health services in CDCR facilities "has been complicated by the fact that prisons have also become the repository of an enormous number of the state's mentally ill"—remains a concern to this day.  *Coleman v. Wilson*, 912 F. Supp. 1282, 1299 (E.D. Cal, Sept. 13, 1995).  However, the Court also made clear "that neither the dimension of the task, nor its difficulty, excuses compliance with a constitutional mandate." *Id.*

consider targeted EOP population reductions and 'potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained.'"  ECF No. 7555 at 164 (quoting August 9, 2016 Order, ECF No. 5477 at 5).

### C. Update on Mental Health Policy Development

Similar to the preceding monitoring round, CDCR continued to update a variety of policies, procedures, and regulations impacting the MHSDS.  The two most significant policy developments, which will be discussed briefly below, related to Tele-Mental Health and Restricted Housing Units (RHUs).

#### 1. Tele-Mental Health Policy

With the failure of their prior efforts to fill the many vacant mental health staff positions, defendants now are placing significant effort into expanding their use of telehealth, specifically tele-mental health delivered by remote psychologists and social workers.  Defendants base their efforts in part on what they describe as the success of CDCR's telepsychiatry policy.  *See* Exhibit D at 2 ("CDCR has already implemented a successful tele-psychiatry program that has improved access to mental health care services and reduced staffing shortages.  Expanding this program to include tele-psychology and tele-social work will further improve the delivery of mental health care service in the prison system.").

The Special Master must reiterate, however, that the telepsychiatry policy is predicated on remote psychiatry only being used in emergencies in mental health crisis beds (MHCBs) and PIPs, and supplementing (not replacing) on-site services in EOPs.  ECF No. 6539 at 7.  During

the monitoring round, the use of telepsychiatry varied across institutions[35] and, consistent with

what the Special Master reported in his December 15, 2022 Report and Recommendation on a

Final Proposed Telepsychiatry Policy, there remained "variability in CDCR's implementation of

the" Telepsychiatry Policy.  ECF No. 7682 at 41.[36]  Whatever "success" can be attributed to

telepsychiatry policy, the Special Master is not persuaded that its implementation to date lends

support to CDCR's Tele-Mental Health Policy because the policies are fundamentally different

in their treatment of EOPs and higher levels of care.

As previously reported, defendants have been signaling their intent to expand the use of

tele-mental health at least since the time of CDCR's report on "lessons learned" from the

COVID-19 pandemic.  *See* ECF 7196 at 9.  On July 21, 2023, defendants distributed a draft

---

[35] Telepsychiatry use was noted within 35 percent (39 of the 110 EOP patients) of the EOP cases reviewed.  Specifically, telepsychiatry was used in the treatment of EOP patients at CHCF (50 percent, or five of ten cases), CMF (70 percent, or seven of ten cases), CSP/Corcoran (50 percent, or five of ten cases), KVSP (36 percent, or four of 11 cases), CSP/Sac (ten percent, or one of ten cases), CSATF (70 percent, or seven of ten cases), SVSP (50 percent, or five of ten cases), and VSP (63 percent, or five of eight cases).  Additionally, there was one case at MCSP where telepsychiatry was being used within the EOP hub.

[36] For instance, there were connectivity issues observed in multiple institutions; *see, e.g.*, *infra* pp. 179, 241, and 656, some EOP patients reported difficulty building rapport with remote psychiatrists, *infra* pp. 262*,* 655, and on-site staff expressing concerns about telepsychiatrists' disconnection from the milieu.  *See infra* p. 220.  Elsewhere, there were few observed technical or connectivity issues, *infra* p. 199, and telepsychiatrists were observed to be engaged and empathic.  *Infra* p. 405.  As such, the Special Master's observations from the December 15, 2022 Report generally remained applicable during the monitoring round:

> There were some bright spots, as some institutions utilized excellent telepsychiatry equipment and experienced few connectivity challenges.  However, technological challenges persisted across and sometimes within institutions.  Indeed, technological and implementation challenges were not limited to internet connectivity….  Moreover, in some institutions, there was evidence of telepsychiatrists' disconnection from the treatment team and environment of care.

ECF No. 7682 at 41-42.

Tele-Mental Health Policy to the Special Master and plaintiffs' counsel, requesting comments by August 21, 2023. ECF No. 7935 at 1. On August 3, 2023, the Court issued an order directing the parties to "meet and confer under the supervision of the Special Master concerning defendants' draft Telemental Health Services Policy" and to thereafter "file a joint report to the court on the outcome of the meet and confer." ECF No. 7901 at 2. The parties met and conferred under the Special Master's supervision on August 29, 2023 and August 31, 2023. ECF No. 7935 at 2. Thereafter, the parties timely filed their joint report regarding the outcome of the meet and confer. *See id.*[37]

Shortly after filing the joint response to the Court's August 3, 2023 Order, on September 21, 2023, defense counsel distributed the final version of CDCR's Tele-mental Health Services Policy, which had been released to the field on that same day.[38] Concerningly, defendants issued the policy to field prior to resolving plaintiffs' and the Special Master's experts' questions and concerns about the policy. *See* ECF Nos. 7901, 7935.

The version of the policy issued to the field (which most closely resembles Exhibit D to the parties' September 5, 2023 joint filing, *see* ECF No, 7935-2) envisions a central office-led tele-mental health department supervising tele-psychologists and tele-social workers

---

[37] After the Special Master distributed the Draft Report to the parties, the Court issued an order directing the parties to "meet and confer under the supervision of the Special Master to clarify whether, and if so what, outstanding disputes remain over defendants' Telemental Health Services Policy." December 15, 2023 Order, ECF No. 8087 at 2. The Court directed the Special Master to "file a short report on the outcome" of the meet and confer process and to "include with his report … a proposed Telemental Health Services Policy for the court's approval." *Id.*

[38] As the Special Master informally notified the Court, defense counsel sent a "non-final" version of the Tele-Mental Health Services Policy to the Special Master and plaintiffs' counsel on September 19, 2023. Notably, this "non-final" version of the policy limited the use of tele-mental Health in higher levels of care to "emergency" situations and included language indicating that on-site services were "preferred" in MHCBs and PIPs. This language was removed from the September 21, 2023 "final" version of the policy.

(collectively "tele-primary clinicians" or "tele-PCs").  Structurally, this is similar to the

Department's telepsychiatry program.

Significantly, the final policy tracks the substance of defendants' preferred (though not

court-approved) version of the telepsychiatry policy.[39]  For instance, compared to the court-

approved telepsychiatry policy, the final Tele-Mental Health Policy has no requirement for on-

site PCs in EOPs, includes permissive language regarding the use of tele-mental health at higher

levels of care (including MHCBs and PIPs), calls for less frequent site visits by tele-PCs, and

contains no requirement for CDCR to continue recruiting on-site PCs.  In other words, the Tele-

Mental Health Policy omits many of the carefully negotiated provisions included in the court-

approved telepsychiatry that were intended to safeguard against the wholesale replacement of on-

site services.  Importantly, the Telepsychiatry Policy, inclusive of the aforementioned

safeguards, has had a positive impact on defendants' psychiatry staffing levels and allows

defendants to utilize telepsychiatry without limitation for 3CMS patients, who comprise the vast

majority of the *Coleman* class.  *See* Joint List of Stipulated Facts (filed September 22, 2023),

ECF No. 7956 at 7 (reporting a population of 33,593MHSDS patients, including 25,143 at the

3CMS level of care).

The Special Master and his expert have significant concerns about the lack of safeguards

contained in the Tele-Mental Health Policy, particularly its facilitation of the replacement of on-

site services for EOPs (as opposed to the Telepsychiatry Policy, where remote services only

"supplement" on-site services in EOPs).  The concerns that led to the inclusion of the limitations

---

[39] On April 12, 2023, the Court issued an order adopting "the Special Master's recommendation to adopt the provisionally approved telepsychiatry policy as final."  ECF No. 7807 at 10-11. Defendants have appealed this Order.  Defendants' Notice of Appeal to the United States Court of Appeals for the Ninth Circuit, ECF No. 7834.

on the use of telepsychiatry in EOPs ("supplement" to on-site services) and inpatient settings (in emergency situations) are at least as applicable to the use of tele-mental health at these levels of care. The prospect of defendants' mental health programs operating with little-to-no on-site psychiatrists or primary clinicians – which the cumulative impact of the court-approved Telepsychiatry policy and defendants' Tele-Mental Health policy would permit – is deeply concerning. Even in the EOP program, where the telepsychiatry policy requires a minimum onsite presence for psychiatry, the care of individual patients could be planned and provided by a treatment team having neither the patient's psychiatrist nor primary clinician present in the facility where the patient resides.

The history of this case and the Special Master's and his experts' collective experience working in and monitoring correctional mental health departments demonstrate the positive impact on-site mental health clinicians have on their patients' environment of care. Without the advocacy of mental health clinicians – on-site, fully immersed in the carceral environment their patients reside in, and empathic to the impact of that environment – the daily lives of many *Coleman* class members may likely be very different than it is today. Whether tele-PCs (many of whom will more than likely have never stepped foot in a CDCR prison)[40] can positively impact the milieu in the same manner as their on-site counterparts remains an open question.

### 2. RHU Regulations and Policies

The other significant tranche of policy changes under consideration at the time of this writing relates to defendants' proposed wholesale rewrite of regulations and policies governing

---

[40] *See* September 5, 2023 Joint Report, ECF No. 7935 at 4-5 ("Defendants' policy…will help CDCR to fill vacant positions by—among other things—attracting qualified candidates who would not otherwise consider working for CDCR…").

restrictive housing units (RHUs).  Defendants have provided draft regulations and mental health policies which would result in consolidation of the various categories of restricted housing. Defendants' proposal would eliminate the categories of Short-Term Restricted Housing (STRH), Long-Term Restricted Housing (LTRH), EOP hub, and Psychiatric Services Units (PSUs), replacing them with three general RHU settings:  RHU (for non-MHSDS participants), 3CMS RHU, and EOP RHU.

While the changes are generally favorable to the incarcerated population,[41] they also change material aspects of the Program Guide and Compendium and implicate numerous court orders.  CDCR implemented its RHU regulations on an emergency basis effective November 1, 2023.

CDCR's implementation of its RHU proposal must adequately account for all Court-ordered requirements related to housing Coleman class members in restricted housing.  The Special Master strongly suggests the parties work together to notify the Court of any prior orders, Program Guide, or Compendium components implicated by these regulatory and policy changes prior to defendants' implementation.  Specifically, the Special Master notes that CDCR recently acknowledged[42] its ongoing noncompliance with the Court's May 13, 2014 Order prohibiting the

---

[41] For instance, in a June 29, 2023 letter, defense counsel indicated CDCR anticipates the changes included in the RHU regulations will result in fewer incarcerated persons "being housed in restricted housing, shorter stays for those that do, enhanced property and out of cell time for some, and a reduction in number of RHU programs and beds statewide."  Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and Plaintiffs' Counsel (June 29, 2023), attached hereto as Exhibit E.

[42] *See* Letter from Dr. Amar Mehta, M.D., CDCR Deputy Director, Statewide Mental Health Program, to Special Master Lopes (October 27, 2023), attached hereto as Exhibit F at 2 ("As we have discussed clearly with the Office of the Special Master for several months, we continue to allow patients from the same institution to transfer to their institution's EOP ASU Hub even if currently closed, as institutions that do not have an EOP ASU Hub must be routed outside.  We recognize this is not in compliance with policy and make no representations otherwise.  This is

transfer of "any Coleman class member at the EOP level of care to any EOP ASU hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months."  ECF No. 5150 at 2-3.  CDCR's practice of admitting patients to ASU EOP Hubs that fail certification is concerning and defendants should use the RHU implementation process to end this practice and come into compliance with relevant Court-ordered requirements forthwith.

### D.  Findings Related to RVR Process Revealed Concerning Trends Which Require Further Investigation

Based on the findings reported on below and overall trends, the Special Master is increasingly concerned about the disproportionate impact of the defendants' disciplinary process on the seriously mentally ill members of the *Coleman* class.  Compared to the preceding monitoring round, the number of RVRs issued by the 15 EOP institutions increased by 39 percent.  *See infra* p. 103 (noting "the number of RVRs issued at the 15 institutions with EOP programs increased by 39 percent from the prior review period").  The number of RVRs issued to *Coleman* class members increased by 45 percent.  *Compare* ECF No. 7715 at 144 (reporting a total of 14,729 RVRs issued to MHSDS participants at the 15 EOP institutions), *with infra* p. 104 (reporting a total of 21,332 RVRs issued to MHSDS participants at the 15 EOP institutions).

Thus far in the Thirtieth Monitoring Round, EOP patients have received 6,374 RVRs, an increase of 1,542, or 32 percent compared to the combined total number of RVRs issued to EOP patients reported in Parts C and D of the Twenty-Ninth Round Monitoring Report.  *Compare* ECF No. 7715 at 144 and ECF No. 7716 at 85 (together reporting a total of 4,832 RVRs issued to EOP patients during the Twenty-Ninth Monitoring Round – 4,726 at the EOP institutions and 106 at the 3CMS institutions), *with infra* p. 104 (reporting a total of 6,374 RVRs issued to EOP

---

due to the limited number of beds available statewide at this time, and we hope to remedy this through a variety of interventions occurring over the coming months, including changes to restricted housing units statewide.").

patients at the 15 EOP institutions during the Thirtieth Round).  Likewise, CDCR has issued

13,872 RVRs to 3CMS patients, *see id.*, which is 47 percent more than the 9,419 RVRs issued to

3CMS patients by the EOP institutions in the prior round.  *See* ECF No. 7715 at 144.[43]



During the review period, the 15 EOP institutions issued 21,332 RVRs to MHSDS

participants, an astonishing 68 percent of the total number of RVRs (31,341) issued at the 15

EOP institutions.  *Infra* p. 104.  Moreover, EOP patients, who comprise less than eight percent of

the total CDCR population[44] received more than 20 percent of RVRs issued at these institutions

during the review period.  *Id*.  Similarly, these institutions issued a disproportionate percent of

RVRs to 3CMS patients (44 percent, *id.*) compared to their portion of the overall CDCR

population (26 percent).  *See supra* note 44 and sources cited therein.

---

[43] Including the 5,675 RVRs issued to 3CMS patients reported in the Twenty-Ninth Round
Monitoring Report – Part D, ECF No. 7716 at 85, 3CMS patients were issued a total of 15,094
RVRs in the Twenty-Ninth Monitoring Round, which is only 1,222 more than the total (13,872)
issued to 3CMS patients by the 15 EOP institutions during the review period.  *Infra* p. 104.

[44] *Compare* CDCR Monthly Population Report as of July 31, 2023, available at
https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2023/08/Tpop1d2307.pdf
(reporting total incarcerated persons population of 94,015), *with* ECF No. 7956 at 7 (reporting a
total of 7,090 EOP patients).

Against this backdrop of *Coleman* class members increasingly and disproportionately being subjected to defendants' disciplinary process, the findings reported below are all the more concerning.  *See infra* p. 103 ("CDCR's RVR mental health process continued to struggle to achieve compliance with basic requirements.").  Staff training related to mental health and the disciplinary process, for instance, remains woefully inadequate.  *Id.*  ("Regrettably, less than 30 percent of institutions were compliant with mental health assessment process training for both custody and mental health staff.").  Indeed, staff training related to the impact of mental health on patient behavior is a foundational remedial requirement in this action, so defendants' persistent noncompliance is particularly troubling.  *See Coleman v. Wilson*, 912 F.Supp. 1282, 1320 ("Judge Moulds found that 'mentally ill inmates who act out are typically treated with punitive measures without regard to their mental status.'  He further found that such treatment was the result of inadequate training of the custodial staff so that they are frequently unable to differentiate between inmates whose conduct is the result of mental illness and inmates whose conduct is unaffected by disease.").[45]

Regarding mental health assessments, another critical component of the RVR process,[46] not a single EOP institution reported compliance with the requirement to timely complete

---

[45] *See also id.* ("There is substantial evidence in the record of seriously mentally ill inmates being treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses.  One explanation for these incidents is that defendants have a policy or custom of intentionally inflicting severe harm on mentally ill inmates.  The magistrate judge found a less invidious reason, that the custody staff is inadequately trained in the signs and symptoms of serious mental illness.  The magistrate judge's generous inference is well supported in the record.").

[46] In his 2015 Report on RVRs, the Special Master noted the following regarding defendants' early efforts to remedy deficiencies related to the disciplinary process, including the mental health assessment requirements: "In 2003, CDCR further modified its RVR policies and procedures, mandating that all MHSDS inmates who had been designated for either the Mental

43

custody requests for RVR mental health assessments, while mental health staff at less than half of the institutions timely completed these assessments.  *See infra* p. 103.

As noted, reductions in the MHSDS population have not kept pace with reductions in the overall CDCR population.  Indeed, the EOP population continues to grow and, based on the trends noted above, these class members are increasingly subject to the discipline process.  Coupled with defendants' inability to resolve the mental health staffing crisis, which directly impacts their ability to satisfy foundational remedial requirements related to the RVR process, the Special Master is increasingly concerned about this aspect of the *Coleman* remedy.  Accordingly, the Special Master intends to conduct a focused review of CDCR's RVR process in 2024.

## II.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A.    Mental Health Vacancy Rates Overall and by Discipline During the Thirtieth Monitoring Round[47]

The 15 CDCR institutions with EOP programs continued to report high staff vacancy rates during the Thirtieth Monitoring Round.  Unfortunately, except for staff psychiatry, overall vacancy rates for all disciplines for the 15 EOP institutions exceeded ten percent.  The overall vacancy rate for chief psychiatrists was 33 percent, while the senior psychiatrist vacancy rate increased from 55 to 73 percent from the Twenty-Ninth to Thirtieth Monitoring Rounds.  There

---

Health Crisis Bed (MHCB) or Enhanced Outpatient Program inmate (EOP) levels of care, and who had been issued RVRs, were to receive mental health assessments.  In addition, all inmates at the Correctional Clinical Case Management System (3CMS) level of care (LOC), as well as inmates *not* within the MHSDS who exhibited or demonstrated 'bizarre, unusual, or uncharacteristic behavior' and who were issued RVRs, were required to receive mental health assessments as part of the RVR process."  ECF No. 5266 at 4-5.

[47] All data (except for psych techs) reflects Defendants' July 2023 Monthly Mental Health Staffing Vacancy Reports (ECF No. 7933).  Because psych tech staffing data was not included in the monthly report, the reported psych tech staffing data was obtained from the individual institutional reports for the Thirtieth Monitoring Round.

was also a 53 percent on-site staff psychiatry vacancy rate, which decreased to a 12 percent functional vacancy rate with the use of registry staff.  Nine of 12 institutions utilizing telepsychiatry reported vacancy rates less than ten percent; however, there was an overall telepsychiatry vacancy rate of 11 percent.  Accounting for telepsychiatry and psychiatric nurse practitioners,[48] the overall functional vacancy rate for staff psychiatry at the 15 EOP institutions was nine percent.

The combined vacancy rates for all psychology disciplines at the 15 EOP institutions exceeded ten percent.  Across the 15 institutions, chief and senior psychologists' vacancy rates were 17 and 18 percent, respectively.  Concerningly, the vacancy rate for staff psychologists increased from 48 percent during the Twenty-Ninth Monitoring Round to 52 percent during this review period; however, though still alarmingly high, registry staff reduced this functional vacancy to 45 percent.  Further, six institutions reported psychology functional vacancy rates exceeding 50 percent; CHCF had the highest at 78 percent.

Additionally, there were overall functional vacancy rates of 32 percent for social workers. Four institutions reported vacancy or functional vacancy rates above 50 percent; CHCF again was the highest at 71 percent.

There were functional vacancy rates of 14 percent for psych techs, 12 percent for recreation therapists, and 30 percent for medical assistants.

<u>Chief Psychiatrists</u>

Ten of 15 chief psychiatry positions were filled at the 15 institutions with EOP patients, reflecting a 33 percent vacancy rate.  Chief psychiatry positions were vacant at CIW, CSATF,

---

[48] CHCF, CMF, CSP/LAC, KVSP, CSATF filled a combined total of 4.94 psychiatric nurse practitioner positions as of July 2023.  ECF No. 7933 at 5.

CCWF, SQ, and VSP; this position was also vacant at VSP during the Twenty-Ninth Monitoring Round.

### Senior Psychiatrists

Eleven senior psychiatrist positions were allocated across ten institutions; three of these positions were filled at CMC, CSP/Sac, and RJD, reflecting a 73 percent vacancy rate. The two senior psychiatry positions at CHCF and the position at CSP/Corcoran were all vacant and had been vacant since the Twenty-Eighth Monitoring Round. There were also senior psychiatry vacancies at CMF, CSP/LAC, CSATF, MCSP, and SVSP.

### Staff Psychiatrists

Of 128.8 on-site staff psychiatry positions, 60.75 were filled for a 53 percent vacancy rate. The use of 51.99 registry staff reduced the number of on-site staff psychiatry vacancies to 16.06, reflecting a functional vacancy rate of 12 percent.

CHCF, CIW, CCWF, SVSP, and VSP reported having more on-site psychiatrists than allocated. CSP/Sac and RJD both reported functional vacancy rates, inclusive of registry staff, of five percent. The remaining eight institutions, namely, CMF, CMC, CSP/Corcoran, CSP/LAC, CSATF, KVSP, MCSP, and SQ, indicated on-site staff psychiatry functional vacancy rates exceeding ten percent; CSATF was 62 percent, KVSP was 51 percent, and six institutions were between 11 and 50 percent.

### Telepsychiatrists

There was an allocation of 65 telepsychiatry positions across the 12 institutions with EOP programs; CIW, CSP/Sac, and SQ did not utilize telepsychiatry. Of these positions, 58.15 were filled, indicating an 11 percent vacancy rate. There were no registry telepsychiatrists.

CMC had more telepsychiatrists than authorized.  CMF, CCWF, KVSP, and RJD reported no telepsychiatry vacancies; CSP/Corcoran, CSP/LAC, CSATF, and MCSP reported vacancy rates of less than ten percent.  Otherwise, CHCF, SVSP, and VSP reported vacancy rates between 11 and 50 percent.

Accounting for on-site psychiatry, telepsychiatry and psychiatric nurse practitioners,[49] CIW and CCWF had more combined staff psychiatry positions filled than authorized.  CHCF, CMF, CSP/Corcoran, CSP/Sac, KVSP, RJD, and SVSP had combined staff psychiatry vacancy rates less than ten percent.  Combined staff psychiatry vacancy rates exceeded ten percent at CMC, CSP/LAC, CSATF, MCSP, SQ, and VSP.

Chief Psychologists

All 15 EOP institutions reported having two authorized chief psychologist positions, for a total of 30 positions.  Twenty-five chief psychologist positions were filled, reflecting a 17 percent vacancy rate.

Ten institutions – CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, MCSP, RJD, and SVSP, reported that both of their chief psychology positions were filled.  The remaining five institutions, namely, CHCF, CCWF, KVSP, SQ, and VSP, reported that only one of two chief psychologist positions were filled, indicating 50 percent vacancy rates; CCWF, KVSP, SQ, and VSP reported the same during the Twenty-Ninth Monitoring Round.

Senior Psychologists

CDCR allocated 160 senior psychologist specialist and supervisor positions; 131 were filled, leaving an 18 percent vacancy rate.

---

[49] CHCF, CMF, CSP/LAC, KVSP, CSATF filled a combined total of 4.94 psychiatric nurse practitioner positions as of July 2023.  ECF No. 7933 at 5.

Only KVSP reported having more senior psychologists than authorized. CCWF and CSP/Corcoran indicated no senior psychologist vacancies, while RJD noted a nine percent vacancy rate. The 11 remaining institutions – CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac CSATF, MCSP, SVSP, SQ, and VSP, all reported vacancy rates ranging from 12 to 50 percent; CSATF reported the highest vacancy rate of 50 percent.

Staff Psychologists

Of the 550.8 staff psychologist positions, only 265.25 were filled for an alarming vacancy rate of 52 percent. Registry staff filled an additional 34.95 staff psychology positions, leaving a still abysmal functional vacancy rate of 45 percent.

For individual institutions, CIW had more staff psychologists than authorized. The remaining 14 institutions all had functional vacancy rates exceeding ten percent, ranging from 14 to 78 percent. The six highest functional vacancy rates all exceeded 50 percent and were reported by the following institutions: MCSP 61 percent, CSP/Corcoran 62 percent, CSATF 63 percent, CMF 67 percent, SVSP 70 percent, and CHCF 78 percent.

Social Workers

For social workers, 150.5 of 250.4 allocated positions were filled for a 40 percent vacancy rate. The use of 19.15 contractors decreased the functional vacancy rate to 32 percent.

CSP/Sac had more social workers than allocated while VSP reported a seven percent vacancy rate; otherwise, all institutions reported vacancy rates exceeding ten percent. CSP/LAC, CCWF, and KVSP had vacancy rates between 12 and 17 percent, and CIW, CMC, CSP/Corcoran, and SQ reported vacancy or functional vacancy rates ranging from 20 to 29 percent. Further, CMF and RJD indicated 42 percent functional vacancy rates, CSATF, MCSP,

and SVSP reported vacancy or functional vacancy rates ranging from 50 to 59 percent, and CHCF reported an astounding functional vacancy rate of 71 percent.

### Psych Techs

There were 985.31 allocated psych tech positions at 13 EOP institutions; 844.91 were filled, for a 14 percent vacancy rate. Twenty-four psych techs were on extended leaves while seven contractors filled vacant positions, resulting in a 16 percent functional vacancy rate. MCSP and VSP did not have psych tech positions.

CIW had more psych techs than authorized. Both CHCF and SQ reported functional vacancy rates of less than ten percent. Regrettably, the remaining ten institutions – CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, RJD, and SVSP, reported functional vacancy rates between 12 and 37 percent.

### Recreation Therapists

Of 255.6 authorized recreation therapist positions, 212.5 were filled, reflecting a 17 percent vacancy rate. The use of 12.33 registry staff reduced the functional vacancy rate to 12 percent.

CSP/Sac, CCWF, and RJD had more staff than allocated recreation therapist positions. VSP had no vacancies, and CIW, CSP/Corcoran, and MCSP had vacancies of less than one percent. Otherwise, CHCF, CMF, CMC, CSP/LAC, CSATF, KVSP, SVSP, and SQ reported vacancy rates of between 15 and 31 percent.

### Medical Assistants

Forty of 66 medical assistant positions were filled for a 39 percent vacancy rate. The use of 6.4 contractors reduced the functional vacancy rate to 30 percent.

CMF and CSP/Sac had more staff than allocated, including contractors, while CSP/Corcoran and CSP/LAC filled their medical assistant positions with full-time staff.

Otherwise, all institutions reported vacancy rates exceeding ten percent. Vacancy or functional vacancy rates ranged from 18 to 29 percent at CSATF, CCWF, KVSP, and VSP, and between 40 and 50 percent at CHCF, CMC, and MCSP. SVSP's functional vacancy rate was 85 percent while both of RJD's medical assistant positions were vacant. CIW and SQ did not have positions for medical assistants.

### Summary – Staffing

During the Thirtieth Monitoring Round, overall staff vacancy rates across all disciplines except staff psychiatry at all 15 institutions with EOP programs exceeded ten percent. This included an unacceptable 33 percent vacancy rate for chief psychiatrists, an alarming 73 percent vacancy rate for senior psychiatrists, and a 53 percent on-site staff psychiatry vacancy rate, which contractors reduced to 12 percent. There were respective 17 and 18 percent vacancy rates for chief and senior psychologists. Further, staff psychologists and social workers had functional vacancy rates of 45 and 32 percent, respectively; regrettably, CHCF carried functional vacancy rates above 70 percent for both disciplines.

Nine of the 12 institutions with telepsychiatrists reported vacancy rates of less than ten percent; the overall telepsychiatry vacancy rate was 11 percent, while the overall staff psychiatry vacancy rate was nine percent when accounting for all eligible positions. *See* supra p. 45 (noting overall nine percent staff psychiatry vacancy rate when accounting for filled on-site civil service, on-site registry, telepsychiatry, and psychiatric nurse practitioner positions). However, the psych tech functional vacancy rate was 14 percent, the functional vacancy rate for recreation therapists was 12 percent, and there was a 30 percent functional vacancy rate for medical assistants.

Overall, these significant staffing shortages very negatively impacted the provision of mental health treatment and compliance with Program Guide requirements.

   **B.  <u>Quality Management</u>**

In his Twenty-Ninth Monitoring Round Report, the Special Master noted that the CDCR defendants made "considerable progress in the development and implementation of quality management programs."  ECF No. 7715 at 78.  The Thirtieth Monitoring Round continued these efforts.

CDCR institutions with EOP programs continued with the development and execution of their quality management programs.  During the Thirtieth Monitoring Round, quality management bodies regularly met and addressed material aspects of mental health care.  Institutions typically reported holding regular meetings of the local governing body, quality management committee (QMC), and mental health subcommittee, and achieved quorums.  However, institutions varied in the chartering of Quality Improvement Teams (QITs) and Focused Improvement Teams (FITs), implementing corrective action plans (CAPs) and audits to address mental health concerns, and utilizing the Emergency Medical Response Review Committee (EMRRC).  Peer review and the processes to disseminate quality management information to line staff were limited and varied between institutions.

RJD continued to have a robust quality management program.  CMC and CCWF had active quality management programs with CCWF's leadership reporting improvement from the prior reporting period.  CSP/LAC's, CSP/Sac's, and CSATF's reasonable quality management programs suffered due to staffing issues.  CMC's quality management program was highlighted in the Twenty-Ninth Monitoring Round when it acquired a quality management specialist.  In the Thirtieth Monitoring Round, CMC's quality management program maintained its consistency and connection to line staff.  VSP's quality management process continued to effectively identify

and address issues.  SQ continued to report a comprehensive and useful quality management program.

The local governing bodies at CMC, CSATF, and SQ met monthly.  CHCF's and SVSP's local governing body met five times, while those at CMF, CSP/LAC, KVSP, and RJD met quarterly.  CSP/Corcoran's and CSP/Sac's local governing bodies met with appropriate frequency.  CCWF's local governing body met once.

Eleven institutions, namely CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, MCSP, and SQ, reported achieving quorums for all local governing body meetings.

Quality management committees met regularly.  Thirteen institutions – CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSATF, CCWF, KVSP, RJD, SVSP, SQ, and VSP – conducted monthly QMC meetings.  CSP/Sac's quality management committee met timely and MCSP's met with appropriate frequency.

Ten institutions – CHCF, CIW, CMF, CMC, CSP/LAC, CSP/Sac, CCWF, MCSP, SQ, and VSP, reported quorums for all quality management committee meetings.  CSP/Corcoran, CSATF, and SVSP reported quorums for five of six monthly meetings.

Most institutions' mental health subcommittees met regularly and achieved quorums.  CSATF's mental health subcommittee met every two weeks.  At ten institutions - CHCF, CIW, CMF, CMC, CSP/Corcoran, CCWF, MCSP, SVSP, SQ, and VSP – the subcommittee met monthly.  The mental health subcommittees at CSP/LAC and RJD met five times.  Meeting minutes suggested that KVSP's and CSP/Sac's mental health subcommittees convened with appropriate frequency.

Eight institutions, namely CHCF, CIW, CMF, CMC, CSP/Sac, CSATF, RJD, and VSP, reported attaining quorums at all mental health subcommittee meetings.  However, CHCF did not have mental health clinicians attend meetings due to staffing shortages.  CSP/Corcoran achieved a quorum for four of six months and SVSP achieved quorums when quorum documentation was included.

Some institutions utilized QIT/FITs and CAPs, and conducted audits.  CMC had an ongoing EOP hub QIT from the Twenty-Ninth Monitoring Round that addressed potential problem areas.  CCWF's EOP hub QIT met weekly.  MCSP had two FITs from the previous review period that addressed mainline EOP group treatment due to staffing challenges and COVID-19, and general EOP hub concerns.  CSP/Sac addressed a significant rise in emergent referrals, which coincided with body camera activation in February 2023; it was suspected that prior to this activation, custody officers may not have been referring patients when indicated.[50]

As for CAPs, CHCF audited timely PC contacts, IDTTs, and mental health referrals, which regional mental health representatives monitored.  CIW developed various CAPs which demonstrated efforts to self-identify and correct problems.  CMF implemented a successful CAP for referral timelines and another CAP regarding EOP treatment hours; the latter was closed due to staffing vacancies.  CMC had a CAP for offered treatment and timely IDTTs.

CSATF implemented CAPs including those related to timely primary clinician contacts in mainline EOP units, and supervisors' triaging routine 3CMS mental health referrals due to

---

[50] *See infra* p. 375 ("CSP/Sac was currently attempting to better understand and address their 'astronomical rise in emergent evaluations' primarily during first and third watch hours, a matter that came to their attention in February 2023 and reportedly coincided with the activation of body worn cameras.  Upon further inquiry, mental health staff explained that, prior to the implementation of body worn cameras, they suspected custody staff may not have been referring patients when indicated during these watches.").

staffing shortages. CCWF's CAP created in response to MHCB deficiencies was addressed appropriately at monthly meetings. MCSP's CAPs included those that addressed offered EOP treatment, placement of ASU/Security Housing Unit (SHU) 3CMS patients in STRH/LTRH, and timely primary clinician contacts; however, as was noted during the prior reporting period, MCSP did not provide measurable action plans to address deficiencies. RJD's CAPs focused on custody discharge checks, improving psychiatry productivity, timely IDTTs and primary clinician contacts, and offered treatment hours. CAPs at VSP addressed the lack of offered treatment to EOP patients, which determined that it was directly related to COVID-19 restrictions, and one that focused on deficiencies identified by the sustainable process.

As for audits, CMC assessed monthly contact compliance for MHCB, EOP hub, and the mainline EOP and 3CMS programs, and timely mental health referrals, among other matters, which were found to be methodologically sound. CCWF audited timely primary clinician initial assessment contacts for mainline 3CMS patients, the quality of safety blankets and gowns, and transport attire for MHCB patients. SQ undertook audits that addressed clinical discharge follow-ups, emergent and urgent referrals, transfer timelines, timely MHCB admissions, and use of force incidents.

Regarding the EMRRC, CMF's met regularly, and minutes were comprehensive. CSP/Corcoran's and KVSP's EMRRC met twice monthly. EMRCCs at MCSP, RJD, SQ, and VSP met regularly during the review period with minutes at SQ and VSP reflecting appropriate drills and system surveillance.

Like in the Twenty-Ninth Monitoring Round, there was limited peer review. CHCF and CSP/LAC did not have a peer review process in place due to staffing shortages. CCWF did not schedule any peer review committee meetings during the review period. CSP/Sac, MCSP, SQ,

and VSP engaged in the peer review process for psychiatry with only CSP/Sac having a primary clinician peer review process.  CMC, CSATF, CIW, and RJD did not conduct peer review as they were awaiting instructions from headquarters.

CMC, CSP/Sac, CSATF, MCSP, RJD, and SQ disseminated quality management information to line staff during weekly supervisory meetings.  RJD staff nonetheless reported a lack of familiarity with the quality improvement process.  MCSP disseminated performance improvement work plan progress updates through a monthly email to staff.  VSP uploaded QMC and mental health subcommittee meeting minutes to SharePoint, which were accessible to staff.  CSP/LAC appropriately disseminated quality assurance information within and across disciplines, including to line staff.

<div align="center">

**Summary – Quality Management**

</div>

During the Thirtieth Monitoring Round, CDCR institutions with EOP programs continued to progress with the development and implementation of quality management programs.  Tellingly, quality management entities regularly met, typically attained quorums, and addressed pertinent issues related to mental health.  Some institutions initiated QITs/FITs, CAPs, and audits to address mental health-related matters, and utilized EMRRC.  The use of peer review was not in place in many institutions due to staffing shortages and forthcoming headquarters' directives.  Some institutions had processes in place to record and disseminate quality management information to staff.

C.  **Quality of Care in CDCR's Mental Health Process**
     **Impact of Primary Clinician Staffing Vacancies on Patient Care**

During the Thirtieth Round Monitoring tours of CDCR institutions that housed the more severely and often chronically mentally ill patients who required intensive outpatient mental health services in the EOP, analyses of mental health care highlighted the adverse impact of

shortages among direct mental health care providers on treatment access and quality for all levels of care at these institutions.  While there were a few institutions with relatively less dire staffing concerns, several facilities that were previously easy to staff, such as CMC and RJD, experienced critically low staffing among primary clinicians.  These staffing deficiencies compromised these facilities' ability to provide minimally adequate mental health treatment, including for the subpopulation of severely and chronically mentally ill EOP patients.

Despite the Program Guide setting forth minimum requirements for mental health assessments, treatment team meetings, and individual and group contacts, the prevailing and severe staffing deficiencies within the vast majority of the 15 institutions that housed EOP patients significantly compromised the timeliness and quality of assessments, treatment team meetings, available treatments, and follow-up contacts.  Further, these shortcomings in mental health care had a cascading effect, ultimately leading to restricted access to care for many patients, with the most significant impact to patients in non-restricted housing or mainline EOP and 3CMS programs.

At several institutions, the repercussions of staffing shortages among mental health care providers and/or custody officers extended beyond direct patient care.  Findings from this review period included an upsurge in crisis referrals, encompassing crisis intervention team responses, alternative housing placements, and MHCB referrals.  Mental health providers at various institutions also reported an increase in behavioral concerns that resulted in program disruptions, restricted housing placements, including EOP patients in the EOP hub, and referrals for RVR mental health assessments.  Not surprisingly, during the review period CDCR experienced a shortage in MHCBs, longer wait times in alternative housing, and long-term use of overflow units for restricted housing.  CSP/LAC also reported that at one point the institution did not have

a sufficient number of transportation vehicles to timely move the volume of patients in alternative housing to available MHCBs.  Additionally, CSP/Sac maintained overflow restricted housing patients throughout the review period, and for a short period had to mix restricted housing EOP patients with mainline EOP patients, temporarily affecting offered programming.

While the MHCBs and restricted housing programs generally exhibited relatively better compliance for minimally required care due to the redirection of available staff to higher risk areas and clinical duties, compliance for services in the mainline EOP and 3CMS programs suffered.  Not surprisingly, comments from CDCR mental health providers and MHSDS patients underscored the need for sufficient staffing and preventative care to minimize crises resulting in MHCB admissions and behaviors resulting in discipline and restricted housing placements.

### Clinical Services and Programming

The foundation of adequate mental health care in correctional environments relies on the timely and comprehensive completion of clinical assessments and initial IDTT meetings.  These initial processes served to ascertain patients' symptoms, functional impairments, diagnoses, levels of care, and treatment interventions, including psychotropic medications.  Following the completion of primary clinician and psychiatry assessments and IDTT discussions, collaborative treatment plans were devised and subsequently administered based on the input of treatment team members, including the patients themselves, to ensure agreement and improve adherence.

#### Initial Assessments and Initial IDTTs

Overall, timeliness for initial PC assessments, psychiatry assessments, and IDTTs varied across programs and institutions.  While the majority of MHCB programs and most EOP hubs at the various institutions were generally compliant with initial assessments and initial IDTTs, compliance was relatively poor for initial assessments and IDTTs in the mainline EOP and

3CMS programs, and for SQ's mainline condemned status EOP patients. Further, the monitor's contact compliance reviews also revealed that some mainline 3CMS patients at various institutions never received their required initial psychiatry or primary clinician assessments.

Regarding the quality of initial IDTTs, many institutions failed to consistently discuss and/or document necessary information for effective care planning, including justifications for diagnoses and levels of care, case conceptualizations and functional impairments, collaborative care plans, and individualized and measurable treatment objectives. Perhaps more so than during the preceding review period, treatment teams notably failed to present basic and relevant background information during observed initial and routine IDTTs, even when assigned providers were present. Further, discussions about medication indications and adherence were often missing, and diagnostic discrepancies were rarely addressed when indicated.

<u>Routine Individual Care for Treatment Implementation and Medication Monitoring</u>

Quality mental health treatment in CDCR should encompass **routine individual primary clinician contacts** for ongoing monitoring and treatment interventions, routine consultations with psychiatrists for medication management, and group therapy based on level of care and presenting clinical concerns.

The monitor's contact compliance reviews revealed that psychiatrists at the 15 institutions with EOP patients were relatively better at completing timely initial psychiatric assessments and psychiatric routine contacts than primary clinicians; however, noncompliance with timely routine psychiatry contacts was identified at several institutions, primarily in their mainline EOP and 3CMS programs, and in SQ's condemned EOP program.

As for routine primary clinician contacts, various understaffed institutions that housed EOP patients reported a significant decline in compliance for these encounters. Of note,

noncompliance with routine primary clinician contacts was identified at the following

institutions: CHCF, CIW, CSP/Corcoran, CSP/Sac, CSATF, MCSP, RJD, SVSP, and VSP, as

well as CCWF's EOP hub, and SQ's mainline EOP and condemned EOP programs. Some of

these institutions also implemented planned temporary emergency modifications (i.e. "triage

plans") to Program Guide requirements for routine contacts in the mainline EOP and 3CMS

programs, including for routine primary clinician contacts and routine IDTTs. Among the

institutions that implemented these changes were CHCF, CSP/Sac, CSATF, MCSP, RJD, SVSP

and VSP. Additionally, at least two other institutions changed contact frequencies for STRH

individual contacts to every other week. While some programs at the aforementioned institutions

changed timeframes for required contact intervals, others removed some requirements altogether.

For example, unless there were urgent reasons for doing so, RJD did not require routine IDTTs

for some mainline EOP and 3CMS patients, and SVSP did not require non-urgent routine

individual contacts or IDTTs for 3CMS patients.

 Several interviewed patients reported that brief check-ins were often used in lieu of

confidential PC contacts when they eventually occurred. However, in contrast, EOP patients at

CMC and CSATF reported that while they did not meet with their clinicians timely, they

indicated that primary clinicians spent additional time providing quality treatment when able.

 For mainline EOP patients at the understaffed institutions, there was a general lack of

clinically meaningful treatment groups, a high frequency of group cancellations, and

modifications to individual treatment contact frequencies that resulted in many severely and

chronically mentally ill EOP patients not having access to clinically necessary and IDTT

recommended mental health treatment.

<u>Treatment Group Quality and Access</u>

While compliance with required treatment group hour offerings varied by program and institution, very few facilities offered clinically meaningful treatment-oriented groups during the review period.  Some institutions attempted to demonstrate offered treatment hours through a significant number of yard groups that were admittedly overcrowded and unstructured.  For example, staff reported that CMC credited itself for up to six hours of offered structured therapeutic activities for scheduling six hours of weekly yard groups per patient, which they admitted were unstructured and generally limited to roll call for attendance.

Compliance for required group treatment hours was reported at the following institutions and programs: CIW's STRH; CSP/Corcoran's EOP hub, EOP, STRH, and LTRH; CSP/LAC's EOP hub and STRH; CSATF's STRH; CCWF's EOP hub, EOP, and STRH; MCSP's EOP hub; and RJD's EOP hub.  Noncompliance with required structured treatment was identified in the following programs: CIW's EOP; CMF's EOP hub and EOP; CSP/Sac's STRH, EOP, and EOP hub/PSU; CSATF's EOP; KVSP's EOP; MCSP's EOP; SVSP's STRH and EOP; VSP's EOP; and CHCF's EOP; notably, CHCF's EOP hub remained closed during the review period.

High refusal rates for treatment groups were identified in several programs at various institutions during contact compliance reviews, despite numerous interviewed patients from various levels of care voicing their desire for increased access to both group and individual treatment sessions.  During patient interviews, reasons for high refusal rates emerged, including poor treatment quality (e.g., brief check-ins without therapeutic interventions), lack of consistency among providers, frequent cancellations resulting in decreased motivation, deviations by group facilitators from clinical group topics to leisure activities, safety concerns, and a lack of clinical groups to address their specific concerns.  Some of these concerns were

further supported by experts' onsite observations and comments from staff during interviews, emphasizing the need for clinically focused groups that effectively addressed patients' specific mental health or behavioral concerns, especially targeted groups for EOP patients to prevent further decompensation, learn skills for symptom management, and promote readiness for a less restrictive level of care.

While most institutions grappled with challenges related to the provision of treatment groups, primarily relying on recreation therapy leisure activities for this purpose, CIW distinguished itself by offering groups tailored to individual patient needs. Patients selected their own core clinical groups from a list during IDTT meetings, encouraged by IDTT members. Additionally, CIW demonstrated innovation through the implementation of incentive programs designed to enhance treatment adherence. This finding suggested that patient refusal rates could have been significantly reduced if clinically indicated treatments were made more readily available or if patients were granted some level of choice in the treatment groups to which they were assigned.

Routine IDTTs

Following implementation of planned treatment modalities, it is imperative for IDTTs to reconvene and assess the effectiveness of treatment plans and interventions based on progress and overall responses to prescribed interventions. These meetings are also essential for collaboratively determining whether treatment plans required modifications or whether patients required a higher or less restrictive level of care.

Compliance for routine IDTTs was most consistently observed in MHCB and EOP hub settings at the 15 institutions. Several institutions, however, struggled to meet requirements for

routine IDTTs, again most prominently in the mainline EOP and 3CMS programs, although SQ's condemned EOP patients were also impacted.

Of note, adequate IDTTs were observed in CMF's EOP hub; CSP/Sac's MHCB and EOP; KVSP's STRH; MCSP's EOP hub and EOP; and SQ's EOP and EOP condemned status program. Routine IDTTs at SVSP were conducted appropriately and collaboratively with some exceptions. Inadequate IDTTs were observed at CSP/Corcoran's EOP and 3CMS; CSATF's STRH, MHCB, and EOP; KVSP's EOP and 3CMS; MCSP's MHCB; and CIW's MHCB, STRH and LTRH; however, CIW's 3CMS IDTTs were of "exceptional quality." A lack of cohesion among IDTT members was observed during SVSP's MHCB IDTTs.

While there was variability in the quality of observed routine IDTTs, many IDTTs were lacking discussion and/or documentation of clinically relevant information for care planning. Absent during many IDTT discussions and review of related documentation were collaborative discussions regarding progress toward treatment objectives, effectiveness of treatment interventions/plans, plans for addressing known obstacles or new issues (e.g., reason for restricted housing placement), and level of care justifications.

### Summary – Quality of Care in CDCR's Mental Health Process

Overall, staffing shortages posed significant challenges to safely monitoring and providing effective, timely, and potentially preventative mental health services within the CDCR institutions that housed EOP patients. Furthermore, institutional staff should investigate patients' refusals to participate in the limited mental health services available to determine whether the underlying issues were related to quality, consistency, lack of interventions to increase motivation and adherence, or other factors, and intervene accordingly.

D. **Overall Quality of Care Reflected in Case Reviews**

During the Thirtieth Monitoring Round, the delivery of adequate mental health care was assessed across facilities through detailed healthcare record reviews.  In addition to analyses of treatment planning, treatment delivery, and documentation, an overall assessment of the adequacy of mental health treatment was provided for each case reviewed.  A total of 302 patient records were reviewed across levels of care including EOP, EOP hubs, MHCB, PSU, STRH, and 3CMS, and within reception centers.  Of the records reviewed, 87 patients, or 29 percent, were determined to have received adequate care.  An additional 25 patients, or eight percent, were found to have received care that was marginally or minimally adequate, meaning that the monitor's expert found concerns within the cases that bordered on inadequacy (e.g., absence of required IDTT meetings, failure to provide treatment hours or required clinical contacts, little evidence of adequate clinical interventions beyond medications).  The remaining 190 patients, or 63 percent, were determined to have received inadequate care.  The graph and table that follow illustrate the quality of care across the facilities reviewed.

| | CCWF | CHCF | CIW | CMC | CMF | CSP/Cor | KVSP | CSP/LAC | MCSP | RJD | CSP/Sac | CSATF | SQ | SVSP | VSP | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adequate** | 43% | 31% | 60% | 75% | 30% | 4% | 33% | 17% | 27% | 56% | 10% | 4% | 93% | 0% | 20% | 29% |
| **Marginally Adequate** | 29% | 0% | 0% | 0% | 20% | 24% | 17% | 4% | 10% | 6% | 0% | 0% | 0% | 0% | 0% | 8% |
| **Inadequate** | 29% | 69% | 40% | 25% | 50% | 72% | 50% | 78% | 63% | 39% | 90% | 96% | 7% | 100% | 80% | 63% |



Across levels of care, of the 110 cases for patients at the EOP level of care which were reviewed, 21 patients (19 percent) were determined to have received adequate treatment, 13 (12 percent) received marginally adequate treatment, and the majority, 76 cases (69 percent), were assessed to have received inadequate treatment. Of the 55 patients receiving treatment within the EOP hubs across facilities, 26 patients, or 47 percent received adequate care. An additional five patients (nine percent) received marginally adequate care, and the remaining 24 patients (44 percent) received inadequate care. At the PSU level of care, five patient records were reviewed, and two patients (40 percent) received adequate care. In total, records for 170 patients receiving treatment at the EOP level of care were reviewed (i.e., mainline EOP and EOP care delivered within restricted housing). The majority of those patients, 61 percent (103 patients) received inadequate care. Eighteen patients, or 11 percent, received marginally adequate care and the

remaining 49 patients (29 percent) received adequate treatment at the EOP level of care.  In most

cases, inadequacy of treatment at the EOP level of care was due to lack of adequate treatment

planning (e.g., vague goals, lack of adequate planned interventions, interdisciplinary plans of

care (IPOCs) that did not target identified symptoms or functioning deficits), failure in offering

group and individual treatment in keeping with Program Guide requirements, cell-front contacts

for reasons other than patient refusal, and clinical contacts that did not address the needs of the

patient.

At the MHCB level of care, just under half of the cases reviewed received adequate care

(26 of 54 patients, or 48 percent), while the remaining 28 cases (52 percent) received inadequate

care.  Inadequacies commonly identified included non-specific planned treatment interventions

and a failure to provide clinical contacts that addressed the identified needs of the patients in the

MHCB.

For patients at the 3CMS level of care, 44 of the 58 patient records reviewed, or 76

percent, received inadequate care.  This appeared to be due largely to staffing issues and the

failure to provide clinical contacts and inadequate treatment planning.  For the remaining 3CMS

patients, nine patients, or 16 percent, received adequate care and the remaining five patients, or

nine percent, received marginally adequate care.  Of the 16 patients reviewed who were

receiving care within STRH, 14 patients, or 88 percent, received inadequate treatment.   In total,

the records of 74 patients receiving treatment at the 3CMS level of care (i.e., mainline and

restricted housing settings) were reviewed.  The vast majority of those cases, 78 percent (58 of

the 74 patients) received inadequate care.  Five patients (seven percent) received marginally

adequate care and the remaining eleven patients (15 percent) received adequate care.

Finally, for the four cases reviewed for patients within a reception center, one was found to be receiving adequate care, two were receiving marginally adequate care, and one was determined to be receiving inadequate mental health treatment.  The graph below illustrates these findings.



**Treatment Planning Concerns**

Treatment planning concerns were noted across facilities and programs during the Thirtieth Monitoring Round.  Similar to findings in the Twenty-Ninth Monitoring Round, concerns included treatment goals which did not align with patients' identified symptoms and/or treatment targets, treatment goals that were not updated despite changes in patients' clinical presentations since prior IDTTs, vague or generic goals, nonspecific treatment interventions and/or a lack of treatment interventions documented, lack of discussion about patient progress or changes in functioning since the prior IDTT, and inadequately updated clinical summaries.

Treatment Goals

The monitor's expert noted that Interdisciplinary Plans of Care (IPOCs) were absent or did not address the patients' documented symptoms and/or treatment targets. This inadequacy was noted in 100 of the 302 cases reviewed (33 percent). At CSP/Corcoran, IPOCs did not match reported symptoms and/or treatment targets, or were simply absent from records, across most levels of care reviewed (3CMS, EOP, and EOP hub) for CSP/Corcoran Patients B, C, F, I, J, K, L, N, O, P, Q, R, S, and T. In fact, this was noted to be a concern in nine of the ten (90 percent) EOP records reviewed at CSP/Corcoran. Record review for KVSP EOP patients (KVSP Patients P, R, U, V, W, and DD) also evidenced this concern with IPOCs in the majority of cases reviewed, as did record reviews for the 3CMS, STRH and EOP hub at CSP/LAC (CSP/LAC Patients B, C, G, H, I, L, P, S, T, U, V, and W), the MCSP EOP level of care (MCSP Patients K, L, N, O, P, R, S, T, and U), the CSATF EOP and MHCB levels of care (CSATF Patients A, B, E, F, G, I, K, L, M, N, O, P, Q, R, S, and T), SVSP EOP patients (SVSP Patients C, E, G, H, and I) and the VSP EOP and 3CMS levels of care (VSP Patients A, B, C, E, G, H, and K). Of note, for the CSATF MHCB, all ten of the records reviewed were assessed to have inadequate or absent IPOCs.

In addition to the failure to document adequate IPOCs, the use of vague or inappropriate treatment goals were noted. This was especially concerning in the STRH and EOP hubs. At the facility level, the appropriateness and specificity of treatment goals were concerning in the majority of the cases reviewed for the CCWF EOP hub (CCWF Patients A, C, and D), CMF EOP hub (CMF Patients A, B, C, D, F, G, H, and I), CSP/LAC STRH and EOP hub (CSP/LAC Patients A, C, D, F, G, H, I, and J), CSP/Sac EOP hub (CSP/Sac Patients K, N, P, Q, and R), and CSATF STRH (CSATF Patients Z and AA).

Treatment goals were not updated despite changes in patients' clinical presentations since prior IDTTs at a number of facilities and levels of care. This was especially concerning for the KVSP 3CMS level of care, MCSP EOP level of care, CSP/Sac STRH and PSU, CSATF STRH and EOP level of care, and SQ EOP level of care. In these locations, lack of updates to treatment goals when clinically indicated was not present in 50 percent or more of the cases reviewed. One additional concern noted at CSATF within the STRH (CSATF Patients Z, AA, and BB) was a failure to document significant events which occurred for the patient since the prior IDTT. Moreover, a number of master treatment plans for patients in the CSATF MHCB had single entries of "x" in required sections, rather than any content. The document was essentially blank, but the psychologist could enter it into the healthcare record because there were "entries" in each required section.

<u>Treatment Interventions</u>

Nonspecific treatment interventions, a lack of appropriate treatment interventions, and even an absence of planned treatment interventions were noted as concerns in IDTT documentation. This issue was important as the treatment interventions included on treatment plans directed patient care and supported continuity of care across the IDTT, especially when there were staffing shortages and a high frequency of staff turnover. These concerns were evident in 50 percent or more of the cases in the MHCB at CHCF, CIW, CSP/Corcoran, and CSP/Sac. Within the EOPs, the lack of adequate interventions being included on the treatment plans was noted within the CSATF EOP in the majority of cases reviewed. The concern was also noted within restricted housing locations including the CMF EOP hub, CSP/LAC STRH and EOP hub, RJD EOP hub, CSP/Sac EOP hub and PSU, and CSATF STRH.

Review of Treatment and Treatment Progress

With regard to treatment reviews being completed during IDTT meetings, treatment plans were not adequately updated when clinically indicated at the PSU, STRH, and EOP level of care; with CSATF evidencing the issue frequently within the STRH and EOP level of care, CSP/Sac within the STRH and PSU, KVSP within the 3CMS level of care, MCSP within the EOP level of care, and SQ at the EOP level of care. At all of these levels of care, the concern was noted in 50 percent or more of the cases reviewed. Updated clinical summaries were absent routinely in the records reviewed for CSP/Corcoran's 3CMS, CSATF's EOP, MCSP's EOP, KVSP's 3CMS, and VSP's 3CMS level of care.

**Delivery of Treatment**

The provision of effective and adequate mental health services is essential to the delivery of adequate overall care. During the record reviews, the monitor's expert noted patterns with regard to inadequate delivery of treatment across facilities and levels of care, including an absence of interventions documented on treatment plans, inadequate provision of treatment to meet patients' needs, failure to address issues noted in the healthcare record, poor continuity of care, a failure to deliver adequate structured treatment, and the lack of confidential clinical contacts.

Treatment Interventions in Keeping with the Treatment Plan and Patients' Needs

Across a number of facilities and levels of care, it was noted that the treatment interventions contained within patients' treatment plans were not documented as being provided to patients. This was especially concerning in the CMF EOP hub, CSP/Corcoran EOP, CSP/Sac MHCB and STRH, CSATF EOP, SVSP MHCB, and VSP 3CMS level of care. The monitor's expert noted a number of cases where the treatment team was not responsive to the needs of

patients, as evidenced by the nature of the contact (e.g., failing to address identified concerns or follow-up on previously identified issues), timing of contacts, failing to meet with patients about medication changes, or failing to meet with patients in a timely manner in response to referrals. This was especially true within the EOP level of care across many facilities (CSP/Corcoran, CSATF, KVSP, MCSP, SVSP, and VSP), as well as in the majority of cases at the MHCBs at CSP/Corcoran, CSATF, and SVSP.  SVSP Patient G (EOP level of care) evidenced emotional distress and functional impairments, including being acutely psychotic, yet no Suicide Risk and Self-Harm Evaluation (SRASHE) was completed and no consideration for a MHCB referral was documented.  Further, IDTT documentation did not address the patient's psychotic symptoms and there was only one primary clinician progress note entered into the record during the six-month review period and it occurred in a non-confidential setting at the psychiatrist's request. CSP/Corcoran Patient U was being treated in the MHCB when he engaged in self-injury by head-banging, yet the IDTT documentation made no reference to this episode of self-injurious behavior.

Continuity of care deficits including frequent clinician changes, failure to address patient concerns identified within the healthcare record, inconsistencies across documentation by IDTT members, and inadequate termination were noted across a number of facilities and levels of care. Specifically, these issues were identified at the CCWF EOP; CHCF MHCB; CSP/Corcoran 3CMS, EOP, and MHCB; CSP/LAC STRH and EOP hub; CSP/Sac STRH and PSU; CSATF STRH and MHCB; and KVSP STRH and EOP.  For example, CSP/Corcoran Patient O's record included contradictory diagnoses, failure of the primary clinician to include a recent MHCB admission and peer assault in the initial assessment, and contradictory information regarding the patient's "stabilized" mental status despite ongoing symptom presentation.  KVSP Patient Y, who

was placed at the EOP level of care following discharge from a PIP with a PC 2602 order, was seen by two telepsychiatrists prior to his initial IDTT, neither of whom attended the patient's initial IDTT, while the IDTT documentation failed to incorporate symptoms reported by the patient or psychiatry input.

Adequate Structured Treatment

Adequacy of structured treatment delivery within the EOP, EOP hub, STRH, and PSU was assessed, in part, by determining if the group treatment included clinical topics beyond recreation and leisure groups. Both clinician-led and nursing-led treatment groups were considered clinical groups. The lack of clinical groups was noted to be a recurring issue in patient records at the CHCF EOP, CIW EOP, CSATF STRH, MCSP EOP, and SVSP EOP.

**Documentation Issues**

Initial primary clinician and/or initial psychiatric assessments were not updated or were not completed prior to a patient's initial IDTT meeting in a number of cases at the reception center at CCWF as well as the EOP level of care, CIW PSU, CSP/Corcoran 3CMS, KVSP EOP, MCSP EOP and EOP hub, CSP/Sac STRH, and CSATF 3CMS and MHCB levels of care. Of particular concern was that at the CSATF MHCB, both the primary clinician and psychiatrist failed to adequately complete initial assessments routinely. Additionally, changes to medication orders were made for patients within the CSATF MHCB without adequate documentation in the record from the psychiatrist and occasionally prior to completion of the initial psychiatric assessment (CSATF Patients K, L, and N). Further, records included contradictory information about patient's prescribed medications (CSATF Patient K).

Inadequate follow-up plans, either in formal discharge plans or documented in response to a specific patient need were noted in a number of cases in the KVSP MHCB (KVSP Patients

A, B, C, D, and E) and CSATF MHCB (CSATF Patients N, O, P, and Q).  For example, the discharge plan for KVSP Patient D did not include clinically necessary plans to assist the patient in avoiding readmission to the MHCB despite frequent admissions following brief periods outside of the MHCB.

One final documentation issue that has been noted in previous review periods was documentation that appeared to be copied from note to note, often resulting in inaccurate or contradictory information within a patient's record.  This issue was identified in several cases for the CMF EOP, CSP/LAC EOP hub, KVSP STRH, and CSP/Sac EOP hub.

<u>**Summary – Overall Quality of Care Reflected in Case Reviews**</u>

During the Thirtieth Monitoring Round, the overall assessment of the adequacy of provided mental health treatment through the review of 302 records for patients treated in the EOP, EOP hub, MHCB, PSU, STRH, 3CMS, and in reception centers, revealed very serious issues with provided treatment.  Alarmingly, overall only 29 percent of these patients were determined to have received adequate care, with eight percent receiving marginally or minimally adequate care, and the remaining 63 percent receiving inadequate care.

As for the respective levels of care, this review determined that for EOP patients, including both mainline EOP patients and those housed in the EOP hub and PSU, a shocking 61 percent received inadequate care, 11 percent received marginally adequate care, and only 29 percent received adequate treatment.  Reviewed patient records also indicated that 52 percent of MHCB patients received inadequate care.  Regarding 3CMS patients, including both mainline 3CMS patients and those treated in restricted housing, the vast majority -- 78 percent -- were found to receive inadequate care; seven percent received marginally adequate care and only 15 percent received adequate care.  Finally, for four reviewed reception center patients, one patient

received adequate care, two patients received marginally adequate care, and the remaining patient received inadequate mental health treatment.

### E.  Medication Management

The Court's decision in *Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal 1995) found CDCR's medication management process to be in violation of the Eighth Amendment. Subsequent efforts by the *Coleman* Special Master and the *Plata* Receiver to improve mental health's medication management requirements led to the creation of the Medication Administration Process Improvement Program (MAPIP) audit tool.  As summarized in the Twenty-Eighth Round Monitoring Report, MAPIP's mental health medication management components "focuses on specific medication compliance measures that report performance in each area, and identifies problematic medication management administration issues requiring attention by an institution."  ECF No. 7074 at 125 (citing ECF No. 5779 at 78).

During the Thirtieth Monitoring Round, all 15 institutions with EOP programs utilized MAPIP to evaluate medication management compliance.  In an unfortunate echoing of multiple prior monitoring rounds, institutions' MAPIP results reflected lamentable compliance for mental health's medication management.  Distressingly, not one of the 15 institutions reported compliance for all psychiatry measures during all months of the review period.  In a repeat of what was seen in the Twenty-Ninth Monitoring Report, compliance with monitoring atypical antipsychotics, Depakote, and lithium was particularly abysmal, with no institution demonstrating sustained compliance with these respective measures during the review period.

Of particular concern, no institution demonstrated sustained compliance for the continuity of medications for patients discharged from the MHCB, and only two institutions indicated compliance for Department of State Hospital (DSH) discharges.  Scarcely better, only one institution demonstrated sustained compliance with measures of medication continuity at

receiving and release (R&R), and transfer to restricted housing.  All of these transitions represented periods of increased risk of worsened mental health for patients, and thus discontinuity of medications was fraught with risk.  Facilities typically reported compliance for administering *hora somni*/hour of sleep (HS) medications at or after 8:00 p.m.  For administering psychiatric-prescribed medications, there was often compliance for chronic care medications and for outpatient provider new medication orders.  While most institutions had medication lines under required time limits, many facilities reported challenges with having protected places from the elements for patients to wait while in line -- a patient-reported barrier to medication adherence.

### 1. Psychiatry Measures

Psychiatry measures assessed compliance with laboratory tests and other matters for patients who were prescribed psychotropic medications.  Monthly institutional data addressed compliance for diagnostic monitoring for atypical antipsychotics, antidepressants, carbamazepine, Depakote, lamotrigine, and lithium, and for clozapine for institutions that were authorized to initiate or maintain clozapine.  MAPIP compliance of 90 percent or better for a psychiatry measure indicated compliance.  Notably, not one of the 15 institutions reported compliance with all applicable psychiatry measures for every month of the review period.

As for the specific measures, no institution reported compliance for all 11 diagnostic measures for atypical antipsychotics for all months of the reporting period.  These measures included those for monitoring critically important side effects, such as potentially permanent movement disorders, and increased risk of cardiovascular disease.  VSP was compliant for seven measures, CCWF and MCSP reported compliance for six, and KVSP was compliant for five

measures. The remaining institutions — CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, RJD, SVSP, and SQ, were compliant for a mere four measures.

Regarding diagnostic measures for antidepressants, only two institutions, CCWF and MCSP, indicated compliance for the reporting period. CIW, CMC, KVSP, and VSP were compliant for three measures for all six months. CHCF, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, RJD, SVSP, and SQ were only compliant with two measures.

The four required components of carbamazepine monitoring included, among other things, monitoring for potentially fatal low blood cell counts. As for patients who were prescribed carbamazepine, CMF, CMC, CSP/Corcoran, SQ, and VSP reported compliance for four required measures. CHCF, CIW, CSATF, CCWF, KVSP, RJD, and SVSP were compliant for three measures. MCSP was compliant for two measures. CSP/Sac was not compliant for any measure. CSP/LAC did not have patients on carbamazepine.

As noted in prior review periods, reported compliance for the four psychiatric measures for patients prescribed Depakote remained abysmally low. Some measures monitor for blood cell count abnormalities, organ damage, and elevated medication level thus posing a greater risk of toxicity. CIW, CCWF, and MCSP were compliant for one measure, while all remaining institutions — CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, KVSP, RJD, SVSP, SQ, and VSP, were noncompliant for all measures.

Regarding obtaining medication consents for lamotrigine, two institutions, namely, CHCF and MCSP, reported compliance for all six months of the reporting period. All remaining 13 institutions — CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, RJD, SVSP, SQ, and VSP, demonstrated inconsistent compliance.

The five psychiatric measures for patients prescribed lithium contained several critical components to monitor for toxicity, including screening for kidney damage, and therapeutic medication levels.  Shockingly, no institution maintained consistent compliance for the required measures.  MCSP and VSP were compliant for two measures, with the remaining 13 institutions — CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, RJD, SVSP, and SQ, failing to maintain compliance for a single measure.

Institutions pointed to COVID-19 challenges, limited laboratory staff, and patient refusals as the main reasons for poor MAPIP performance.  Examples of the nexus between staffing levels and poor MAPIP performance abounded.  SQ stated that turnover of psychiatry staff, combined with a rapid increase in population, impaired MAPIP metrics.  RJD reported that inadequate psychiatry staffing led to low MAPIP performance.  RJD also reported particular problems with Level IV yards in that there "seems to be lower commitment by corrections officers to facilitate appointment attendance and medication adherence in comparison to other facilities at RJD."

Poor staffing also impaired most institutions' ability to create and implement CAPs and performance improvement work plans (PIWPs).  When CAPs were present, they were often of limited utility, with generic interventions of unclear efficacy.  For example, KVSP had several CAPs for MAPIP measures, most of which centered on the same interventions of patient education, consideration of medication discontinuation, and referral to psychiatry to discover the underlying reasons for medication nonadherence.  As referral to psychiatry after medication nonadherence is standard CDCR practice, this CAP offered scant benefit.  A welcome exception to this pattern was VSP, which launched an in-depth quality improvement project regarding Depakote levels.

### 2.  Clozapine/Clozaril Institutions

On October 1, 2022, CDCR allowed psychiatrists in the MHCBs at CSP/Sac, CCWF, MCSP, RJD, and SQ to initiate clozapine.  These same institutions were approved for clozapine maintenance, along with CIW, CMF, CSP/Corcoran, and North Kern State Prison (NKSP).

Clozapine can be a life-saving medication, yet it requires close monitoring to avoid potentially fatal side effects.  Both CCWF and VSP were compliant for all 11 clozapine-related measures for all required months.  RJD was compliant for ten measures; MCSP was compliant with nine.  CIW, CSP/Sac, and SVSP were compliant for five measures.  CSP/Corcoran was compliant for four, and CHCF, CMF, and SQ indicated compliance for three.  CMC, CSP/LAC, CSATF, and KVSP did not report any patients taking clozapine during the review period.

### 3.  Continuity, Compliance, Observation, and Administration Matters

It should be noted that MAPIP also evaluates medication continuity for many other measures.  These measures include medication continuity following arrival at reception centers, for inter-institutional transfers at R&R, for Nurse-Administered (NA)/Directly Observed Therapy (DOT) medications with intra-institutional transfers excluding ASU/SHU/PSU and to ASU/SHU/PSU, for MHCB transfers, upon discharge/transfer from a community hospital and/or DSH or a CDCR PIP, and following parole/transfer to the community.  There are also measures for observation of the preparation and administration of HS and AM/PM medications, for psychiatrist-prescribed chronic care medications and outpatient provider new medication orders, and for compliance with PC 2602 involuntary medications.  Attainment of 90 percent or above for a measure indicates compliance.  This report also addresses PC 2602 petitions and medication lines.

In a disturbing echo of the psychiatry measures above, no institution reported compliance for all medication continuity measures for all required months of the review period.  Most facilities also reported noncompliance for the two measures of observation of the preparation and administration of AM/PM medications, and for HS medication administration at or after 8:00 p.m.  The peak performing metric was for psychiatric-prescribed chronic care medications, in which nine institutions demonstrated sustained compliance.  Compliance with subsequent metrics tumbled, reaching the nadir at continuity of medications after discharge from the MHCB, in which no institution achieved compliance for the entire review period.

    a.   <u>Continuity of Medication Upon Arrival at Reception Center</u>

CCWF, the only reception center reviewed in this report, reported compliance for medication continuity upon arrival at R&R at the reception center for only one of six months.

    b.   <u>Continuity of Medication for Inter-Institutional Transfers at R&R</u>

Of the 15 institutions with EOP programs, only VSP reported medication continuity compliance for inter-institutional transfers at R&R for all six months of the review period. CSP/Sac reported compliance for three months.  CHCF, CIW, CMC, CSP/Corcoran, CSATF, and CCWF reported compliance for two months.  MCSP and SQ reported compliance for one month. Regrettably, CMF, CSP/LAC, KVSP, RJD, and SVSP were not compliant for a single month of the reporting period.

    c.   <u>Continuity of Medication with Intra-Institutional Transfers</u>

Institutions also generally did not report compliance for all six months of the review period for continuity of NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU and to the ASU/SHU/PSU.

However, CIW, SQ, and VSP reported compliance with NA/DOT medication continuity following intra-institutional transfers excluding ASU/SHU/PSU for all six months.  Otherwise, CHCF and CMC indicated compliance for five months, while CSATF reported compliance for three months.  CSP/Corcoran, CCWF, and MCSP reported compliance for two months.  CMF and CSP/Sac achieved compliance for one month.  CSP/LAC, RJD, and SVSP failed to attain compliance for a single month.

For medication continuity upon intra-institutional transfers to ASU/SHU/PSU, only SQ reported compliance for all months of the review period.  MCSP reported compliance for five months, while CMC and VSP demonstrated compliance for four months.  CSP/Corcoran, CCWF, and KVSP reported compliance for three months.  CIW, CSP/Sac, CSATF, RJD, and SVSP reported compliance for two months.  CMF reported compliance for one month.  CSP/LAC was noncompliant for the entire review period.  CHCF had no restricted housing during the review period, and thus reported no cases.

    d.  <u>Continuity of Medication following MHCB, Community Hospital, or DSH Transfer, or Parole or Community Transfer</u>

No institution reported compliance for medication continuity following transfers from the MHCB for all months of the review period.  CIW and CSATF reported compliance for five months.  CCWF, MCSP, and VSP were compliant for four months.  SQ and CMC attained compliance for three and two months, respectively.  CHCF, CSP/Corcoran, and CSP/Sac were compliant for one month.  CMF, CSP/LAC, KVSP, RJD, and SVSP were not compliant for any month of the review period.

Similarly, most institutions did not indicate compliance for medication continuity for all six months of the review period following discharge/transfer from a community hospital and/or DSH or a CDCR PIP.  Nonetheless, CHCF and VSP reported compliance for this measure for all

six months.  On the other hand, SQ noted compliance for five months, and CIW, CMF and MCSP demonstrated compliance for four months.  CMC, CSP/Corcoran, and CCWF reported compliance for three months, and KVSP reported compliance for two months.  CSATF was compliant for one month.  CSP/LAC, CSP/Sac, RJD, and SVSP were noncompliant for all six months.

Most institutions did not report compliance during all six months of the review period for medication continuity upon parole or release/transfer to the community.  However, CCWF, KVSP, RJD, SVSP, SQ, and VSP reported compliance for all six months.  CHCF, CIW, CSP/LAC, CSP/Sac, and MCSP were compliant for five months.  CMC and CSP/Corcoran indicated compliance for four months.  CMF and CSATF demonstrated compliance for three and two months, respectively.

### e. *Hora Somni*/Hour of Sleep (HS) Medications

Five institutions — CHCF, CMF, CMC, SQ, and VSP, reported compliance for observation of the preparation and administration of HS medications for all six months of the reporting period.  CSATF reported compliance for three months, while CIW was compliant for one month.  Dishearteningly, CSP/Corcoran, CSP/LAC, CSP/Sac, CCWF, KVSP, RJD, and SVSP were noncompliant for the entire review period.  MCSP did not submit data for this metric.

Most institutions were compliant with the administration of HS medications after 8:00 p.m.  The process surrounding CIW's administration of medications traditionally given at HS deserved highlighting.  CIW leadership explained that due to COVID-19, nursing, medical, and psychiatry worked together to consolidate PM medications, which were given at 7:00 p.m., with HS medications, which were given at 8:00 p.m. or later.  Although staff noted that this difference was only one hour, in actuality HS medications must be given at or after 8:00 p.m., while PM medications could be administered two hours before or after the prescribed time, namely,

between 5:00 p.m. and 9:00 p.m.  Documentation reviewed showed that patients sometimes refused sedating medications, in order to not sleep prematurely resulting in nonadherence with prescribed medications.

f.  AM/PM Medications

With rare exception, institutions were noncompliant for the observation of the preparation and administration of AM/PM medications for all six months of the review period.  Specifically, CHCF, CIW, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, RJD, and SVSP all reported noncompliance.  However, CMC and SQ were compliant for six months, while VSP was compliant for four months.  MCSP did not report data on this metric.

g.  Psychiatric-Prescribed Chronic Care Medications

On a positive note, most institutions reported compliance with psychiatrist-prescribed chronic care medication orders during all six months of the review period.  Specifically, CHCF, CIW, CMF, CMC, CSATF, CCWF, MCSP, SQ, and VSP indicated sustained compliance. CSP/Sac was compliant for three months, while CSP/Corcoran and SVSP were compliant for two months.  CSP/LAC, KVSP, and RJD were noncompliant for all six months.

h.  Psychiatric-Prescribed Outpatient Provider New Medication Orders

Institutions reported variable compliance with psychiatrist-prescribed outpatient new medication orders.  CHCF, CIW, CMF, CMC, CSATF, SQ, and VSP reported compliance for all six months of the review period.  MCSP achieved compliance for five months, and CCWF attained four months' compliance.  CSP/Sac was compliant for three months.  CSP/Corcoran, CSP/LAC, KVSP, RJD, and SVSP were noncompliant for all six months of the review period.

i.  Medication Compliance for PC 2602 Involuntary Medication Orders

The *Coleman* court has long recognized the critical role that involuntary medications play in the treatment of class members.  Despite this, CDCR institutions failed to maintain consistent

MAPIP compliance. MAPIP monitored two interrelated aspects of the PC 2602 process, namely, the presence of a court involuntary medication order in the chart, and the presence of a psychiatrist involuntary medication order. Regarding the court order in the chart, a mere four institutions — CCWF, MCSP, RJD, and VSP, were compliant for all required months. Similarly, only four institutions, namely, CMF, CMC, KVSP, and VSP, demonstrated compliance for having a psychiatrist medication order in the chart.

Despite its clear importance, many institutions struggled to provide requested information around PC 2602 involuntary medication issues.

Institutions reported low uses of force to administer PC 2602 involuntary medications during the review period. CIW reported two, while CHCF, CMC, and CSP/Sac reported one. CSP/LAC, CCWF, MCSP, RJD, SVSP, SQ, and VSP reported no uses of force. CSP/Corcoran, CSATF, and KVSP did not report data.

During site visits, some institutions reported the number of current patients who received medications pursuant to PC 2602 involuntary medication orders, as follows: CIW (18); CMF (50); CMC (53); CSP/LAC (118); CSP/Sac (177); CSATF (28); MCSP (89); SVSP (46); SQ (27); and VSP (21). CHCF, CSP/Corcoran, CCWF, KVSP, and RJD did not report data.

j. PC 2602 Involuntary Medication Order Petitions

During the reporting period, CHCF submitted 45 PC 2602 petitions, including three initial petitions (two emergent and one non-emergent), 41 renewals, and one petition that was withdrawn.

CIW reported filing 33 total petitions, including five initial emergent, eight initial non-emergent, and 20 renewals. One petition was denied. One case was not renewed, on clinical grounds.

CMF reported 30 petitions, including seven initial emergent, three initial non-emergent, and 20 renewals.  They reported that four were "denied or withdrawn."

CMC filed 44 petitions, including six initial emergent, two initial non-emergent, and 36 renewal petitions.

CSP/Corcoran reported 25 total petitions, including three initial emergent, three initial non-emergent, and 19 renewals.  One case was not renewed, on clinical grounds.  Two petitions were denied.  One case was dropped in error as the patient transferred institutions.

CSP/LAC filed 69 petitions, including five initial non-emergent and 64 renewals.  Two petitions were denied, and two were withdrawn.

CSP/Sac filed 102 petitions, including three initial emergent, three initial non-emergent, and 96 renewals.  One case lapsed due to "poor tracking."  This case was resubmitted.

CSATF struggled to provide the requested information, reporting that six petitions were "served," but did not differentiate between initial and renewal petitions.  Additionally, one patient listed as receiving PC 2602 medications was not enrolled in the MHSDS; this issue remained unresolved during the site visit.  CSATF reported that there were no emergent petitions during the review period, and no petitions were withdrawn or denied due to procedural errors.

CCWF reported ten petitions submitted during the review period.  This included one initial non-emergent petition and nine renewal petitions.  One PC 2602 order was not renewed, on clinical grounds.

KVSP reported filing 29 petitions, including five initial emergent, four initial non-emergent, and 20 renewals.  One case was not renewed, due to patient parole.

MCSP reported one initial non-emergent petition submitted, but subsequently withdrawn due to patient compliance.  There were ten renewals, and one non-renewal.

RJD reported 16 initial petitions and 59 renewals. One petition was withdrawn due to a change in the patient's condition. Two were denied.

SVSP reported inconsistent data regarding the number of initial petitions submitted. There were 49 renewal petitions, with one denial. Concerningly, five petitions were not renewed due to the psychiatrists not submitting timely renewal declarations.

SQ reported 24 petitions, including one initial emergent, three initial non-emergent, and 20 renewals.

VSP submitted ten petitions, including one initial non-emergent, which was denied, and nine renewals. One case was not renewed, due to clinical grounds.

k.  Medication Lines

While institutions' reported variability for the duration of medication lines and the amount of time that patients waited in them, most medication lines were reported to be less than two hours in duration, with individual patient wait times under 30 minutes.

Notable exceptions included CSP/LAC, which had medication lines frequently over two hours in duration, which interfered with mental health groups. RJD intermittently exceeded two hours, due to urgent medical transports and fog. VSP intermittently exceeded two hours.

Facilities varied in the degree of protection from the elements afforded to patients while waiting in medication lines. CHCF and CMF reported that many patients received medication in the housing units. For those administered on the yard, CHCF reported protection from the elements, while CMF reported moving medication distribution indoors during inclement weather. CIW reported permanent structures with shade and shelter, and VSP reported an awning from inclement weather.

Unfortunately, CMC, CSP/LAC, CSATF, KVSP, MCSP, RJD, and SVSP again reported patients waiting in medication lines that had no or quite limited protection from the elements. Increased refusals during inclement weather were reported at CSP/LAC and MCSP.

Several institutions reported troubling issues regarding medication distribution. CCWF reported that while medication administration was supposed to occur on the yards except for patients in restricted housing, EOP, and the medical units, nursing often had to enter housing units for medication administration due to custody shortages. This resulted in the yards being shut down, which CCWF staff reported was required per statewide policy; nursing staff indicated that this was a daily occurrence on at least one yard, and sometimes involved all yards.

CIW reported that beginning in April 2023, correctional officers began the coercive practice of turning off patients' tablets if they refused to present for medication distribution. CIW leadership did not provide any statewide or local policy supporting this practice.

CDCR policy stated that patients at the 3CMS level of care could receive Selective Serotonin Reuptake Inhibitors (SSRIs)/duloxetine as Keep on Person (KOP), if deemed appropriate by the psychiatrist. While most institutions were compliant with this, two deviations deserved attention. CSP/LAC had a KOP prescription for topiramate, a heat medication used for various reasons including seizures, migraines, and mood stabilization. CSP/Sac had two patients at the EOP level of care receiving SSRIs as KOP. Most concerningly, both of these patients had admissions to DSH or the PIP in 2022. In reviewing these patients' medical records, the psychiatrist changed these medications to KOP due to reported patient nonadherence.

In the Thirtieth Monitoring Round, multiple examples were seen in which important medications such as antidepressants and antipsychotics traditionally given on a daily, scheduled basis were instead written as a PRN (*pro re nata/*as-needed) basis. Charts reviewed frequently

did not state the rationale. When a reason was listed, it was frequently due to patient noncompliance. While a patient not taking a regularly scheduled medication would trigger a psychiatry noncompliance appointment, a patient not taking a prescribed PRN medication would not.

## Summary – Medication Management

Although all 15 institutions with EOP programs used MAPIP to assess and report about medication management during the Thirtieth Monitoring Round, reported results again reflected variability, and notable noncompliance, for the review period. Concerningly, not one of the 15 institutions reported compliance for all psychiatry measures during all months of the review period. The low rate of medication continuity measures raised concerns about *Coleman* class members receiving consistent medication treatment. Similarly, most institutions reported noncompliance for observation of the preparation and administration of AM/PM medications, and for PC 2602 involuntary medication orders. Institutions were more likely to report compliance for the administration of HS medications on or after 8:00 p.m., and for psychiatric-prescribed chronic care medications. Medication line lengths and the amount of time that patients waited in medication lines were generally within specified timeframes. Instead of reporting interval progress, the Thirtieth Monitoring Round highlighted additional issues, including deviations from policies surrounding KOP medications, as well as non-standard prescribing of medications as PRNs. Taken in total, the medication management within CDCR, with limited exceptions, failed to meet required benchmarks.

**F.  <u>Access to Higher Levels of Care</u>**

**<u>Transfers to Inpatient Care</u>**

<u>Timely Referral to Inpatient Referral Unit (IRU)</u>

Pursuant to the Program Guide, institutional staff must submit acute inpatient referrals within two business days of IDTT referral or five days if a *Vitek* hearing is required.  For intermediate inpatient care, the Program Guide required the submission of referrals within five business days of IDTT referral or ten days if a *Vitek* hearing is required.

Eight institutions — CIW, CMC, CSP/Sac, KVSP, MCSP, SVSP, SQ, and VSP, were compliant with timely submission of both acute and intermediate care referrals to IRU within Program Guide timeframe guidelines.  CSP/LAC was compliant with the timely submission of acute inpatient care referrals and 89 percent compliant with intermediate inpatient care referrals.  CHCF timely submitted intermediate inpatient care referrals but was only 75 percent compliant with the timely submission of acute inpatient care referrals.  CMF and CSATF were not compliant with the timely submission of referrals to either acute or intermediate inpatient care, with compliance ranging from 42 percent to 73 percent.  Data was not reported at CSP/Corcoran, CCWF, and RJD.

<u>Transfers to Acute Inpatient Care</u>

Only CIW and SVSP complied with the transfer timeframe requirement to transfer patients to acute inpatient care within ten days of referral.  Twelve other institutions – CHCF, CMF, CSP/Sac, CMC, CSP/Corcoran, CSP/LAC, CSATF, KVSP, MCSP, RJD, SQ, and VSP, were noncompliant with the ten-day requirement.  The average compliance rate for those institutions was 35 percent; CMC and KVSP achieved the highest compliance at 84 percent and 73 percent, respectively.  However, CMF achieved only five percent, CSATF achieved 16

percent, and VSP had zero percent compliance. CCWF did not refer patients to acute inpatient care during the Thirtieth Monitoring Round.

### Transfers to Intermediate Inpatient Care

CIW was the only institution to timely transfer patients to intermediate inpatient care within 30 days of referral as required by the Program Guide. The remaining 14 institutions — CHCF, CMF, CSP/Sac, CMC, CSP/Corcoran, CSP/LAC, CSATF, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, were noncompliant with the 30-day requirement. These institutions averaged 33 percent compliance. CCWF and SQ achieved the greatest compliance at 83 percent and 75 percent, respectively. However, five institutions — CMF, CSP/Sac, CSP/Corcoran, CSATF, and MCSP, attained only 12 percent compliance or less. RJD noted zero percent compliance.

### MHCBs

### Transfers to MHCBs and Bed Availability

The Program Guide requires transfers to MHCBs within 24 hours of referral. Thirteen institutions -- CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, KVSP, MCSP, RJD, SVSP, SQ, and VSP, met this compliance standard. CCWF was 85 percent compliant, though patient refusals comprised 50 percent of their transfer delays. CSATF was compliant for internal MHCB admissions but achieved only 46 percent compliance for transfers to external MHCBs.

### MHCB Clinical Lengths of Stay

The Program Guide provides for a clinical stay of up to ten days in the MHCB. Thirteen institutions had open MHCBs during the Thirtieth Monitoring Round. Of those, eight – CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, KVSP, MCSP, RJD, and SQ, averaged clinical lengths of

stay of ten days or less.  CHCF had an average clinical length of stay of 10.7 days, with 27

percent of admissions exceeding ten days.  Both CMF and CMC reported that 68 percent of

patients had clinical stays exceeding ten days.  CSATF and SVSP had average clinical lengths of

stay of 13.7 and 12.7 days, with 31 and 35 percent of those patients staying longer than ten days.

CCWF's MHCB was closed, and VSP did not have an MHCB during the Thirtieth Monitoring

Round.

### **Restricted Housing**

#### Transfers to Psychiatric Services Unit (PSU)

Transfers to PSU must occur within 60 days of endorsement.  Six institutions — CMF,

CMC, CSP/Corcoran, CSP/LAC, CCWF, and SVSP, were compliant with transferring patients to

PSU within timeframe requirements.  CIW was a PSU institution, and there were no delays in

patient placement.  CSP/Sac was also a PSU institution, yet they only achieved 89 percent

compliance with patient placement within 60 days of endorsement.  Of note, CSP/Sac continued

to utilize the PSU cells to house EOP hub overflow patients.  MCSP noted zero percent

compliance, and five institutions — CHCF, CSATF, KVSP, SQ, and VSP, did not transfer

patients to PSU during the Thirtieth Monitoring Round.  RJD did not report PSU transfer data.

#### Transfers to Administrative Segregation EOP Hubs

EOP patients in administrative segregation must transfer to administrative segregation

EOP hubs within 30 days of placement.  Nine institutions — CHCF, CIW, CMF, CMC,

CSP/Corcoran, CSP/LAC, CCWF, MCSP, and RJD, were EOP hub institutions, and thus patients

did not require transfer to other EOP hub institutions.  CSP/Sac's EOP hub remained closed

during the review period due to certification failures; however, CSP/Sac continued to place

internal patients in the unit instead of transferring them to certified hubs as required.  Moreover,

CSP/Sac reported an influx of EOP hub patients from other institutions while closed to intake. CHCF and KVSP were compliant with transferring patients to EOP hub institutions within the 30-day requirement. SQ neared compliance at 89 percent. Three institutions — CSATF, SVSP, and VSP, were not compliant with transferring patients to an EOP hub within 30 days, with compliance rates of 75, 50, and 83 percent, respectively.

<u>Transfers to Short-Term Restricted Housing (STRH)</u>

Pursuant to the Program Guide, 3CMS patients must transfer to STRH within 30 days of administrative segregation placement. Seven institutions – CIW, CSP/Corcoran, CSP/LAC, CSATF, CCWF, KVSP, and SVSP, had STRHs; thus, there were no placement delays. CSP/Sac also had an STRH; however, they reported an 89 percent compliance rate for patient placement into the STRH within 30 days. Of the remaining institutions, only one, CHCF, was compliant with the timely transfer of 3CMS patients to STRH. The six other institutions, namely, CMF, CMC, MCSP, RJD, SQ, and VSP, were not compliant with the 30-day transfer requirement.

<u>Transfers to Long-Term Restricted Housing (LTRH)</u>

Transfers to LTRH must occur within 30 days of endorsement. CIW and CSP/Corcoran had LTRHs and thus experienced no placement delays. Three institutions – CHCF, CSATF, and RJD, were compliant with transfer to LTRH within 30 days of endorsement. CSP/LAC and CCWF were 78 percent and 82 percent compliant, respectively. Seven institutions – CMF, CMC, KVSP, MCSP, SVSP, SQ, and VSP, did not transfer patients to LTRH during the Thirtieth Monitoring Round. CSP/Sac did not provide LTRH transfer data.

**<u>Summary -- Access to Higher Level of Care</u>**

CDCR's compliance across all areas of access to higher levels of care plummeted during the Thirtieth Monitoring Round. Only 62 percent of reviewed institutions achieved compliance

with timely acute and intermediate inpatient referrals to IRU.  Moreover, of the 14 institutions that made referrals to acute care, only two met timeframe guidelines.  Likewise, only one of the 15 institutions that referred patients to intermediate care complied with timeframes.  Transfers within 24 hours to MHCBs also decreased from 100 percent during the Twenty-Ninth Monitoring Round to 87 percent during the Thirtieth Monitoring period.  Further, clinical lengths of stay increased in MHCBs; only 61 percent of the 13 institutions operating MHCBs had average lengths of stay of ten days or less.  At four institutions, 30 to 68 percent of patients had clinical lengths of stay longer than ten days.

For restricted housing transfers, 78 percent of institutions that transferred patients to PSU were compliant.  Compliance for administrative segregation EOP hub transfers also decreased to 73 percent.  Notably, compliance with STRH and LTRH transfer timeframes was staggeringly low at 53 and 63 percent, respectively.

### G. Custody and Mental Health Partnership Plan

Similar to the previous review period, institutions implemented most CMHPP components with varying degrees of compliance and were negatively impacted by staffing shortages.  Effective CMHPP implementation will require further attention from custody and mental health leadership.

Alignment of Institutional CMHPP LOPs with the Headquarters' Partnership Plan

All 15 CMHPP institutional Local Operating Procedures (LOPs) aligned with headquarters' partnership plan directive, marking improvement from the prior review period. Ten of the 15 LOPs – CMF, CMC, CSP/LAC, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and VSP – were current.  The remaining five LOPs from CHCF, CIW, CSP/Corcoran, CSP/SAC, and CSATF were outdated.

<u>Executive Leadership Joint Rounding</u>

Executive leadership joint rounding occurred monthly at eight institutions, namely, CIW, CMC, CSATF, CCWF, KVSP, MCSP, RJD, and VSP.  CHCF, CSP/Corcoran, CSP/LAC, CSP/Sac, and SQ conducted the rounding for five of six months.  SVSP conducted the rounding for four months, while CMF performed it for three months.  Required staff attended all of the rounding with the exception of required staff's attendance at one month of CHCF executive rounding.

Further, reviewed rounding documentation from all 15 institutions referenced staff and patient interviews.  Many institutions, including CMF, CSP/Corcoran, CSP/LAC, CSATF, CCWF, RJD, SVSP, and SQ, noted positive relations between mental health and custody staff.  Rounding documentation also indicated that staffing shortages had negatively impacted treatment at CSP/LAC and SVSP, put a strain on CMF staff, and was the reason for executive rounding not occurring during one month at CHCF.

Similar to the last reporting period, discussion of executive leadership joint rounding was mostly noncompliant in all three meeting forums that were responsible for its dissemination.  First, as for the warden's executive staff meeting minutes, only four institutions – CIW, CSP/Sac, SVSP, and SQ – produced executive minutes that reflected detailed discussions of the rounding for each month that it occurred.  Nonetheless, and regrettably, SQ's executive minutes also indicated the date and location of the next executive rounding, which violated applicable policy as the rounding was supposed to be unannounced.  All six months of CCWF's executive minutes reported the rounding dates and staff in attendance but lacked further details.  The executive minutes from five institutions, namely, CHCF, CSP/Corcoran, CSATF, MCSP, and

VSP, did not report the rounding. Five other institutions – CMF, CMC, CSP/LAC, KVSP, and RJD – did not produce executive minutes.

Second, only three institutions' quality management committee minutes, namely, CMC, KVSP, and MCSP, reflected detailed discussion of the rounding for all months that it occurred. CSP/LAC minutes for five months discussed the rounding in detail. QMC minutes from four institutions – CCWF, RJD, SQ, and VSP – referenced the rounding for all months that it occurred; however, CCWF, RJD, and SQ's minutes neglected to discuss the rounding in detail, while VSP's minutes only addressed the rounding in a detailed fashion for one month. Quality management committee minutes from CIW only addressed the rounding for two months, while those from CHCF only addressed it for one month, merely mentioning that staffing shortages resulted in the prior month's cancellation of the rounding. QMC minutes from CMF, CSP/Corcoran, CSATF, and SVSP failed to reference the rounding. CSP/Sac reported that its quality management committee did not discuss the rounding.

Finally, mental health subcommittee minutes from eight institutions – CIW, CMF, CMC, CSATF, KVSP, MCSP, SVSP, and VSP – reflected detailed discussion of the rounding for all months that it occurred. SQ's minutes also referenced the rounding for six months, but only sufficiently discussed it for five of these months. Only three of five months of provided subcommittee minutes from CSP/LAC addressed the rounding in detail. Finally, five institutions that referenced the rounding for all months, namely, CHCF, CSP/Corcoran, CSP/Sac, CCWF, and RJD, typically did not discuss the rounding in detail; only CHCF provided rounding details but only for one month.

<u>Huddles</u>

The monitor reviewed huddle forms from CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, MCSP, SVSP, and SQ and, during the site visits, observed huddles at all of the institutions with EOP programs except SQ. Reviewed forms reflected variability for required staff attendance and discussion of relevant issues. Further, most, but not all, observed huddles at the 14 institutions were attended by required staff and reflected comprehensive and collaborative discussions.

<u>Reviewed Huddle Forms</u>

Reviewed huddle forms consistently reflected required staff's attendance for one or more programs at the following institutions, namely, CHCF's MHCB and mainline EOP; CMC's ASU, MHCB, and mainline EOP; CSP/Corcoran's STRH; CCWF's mainline EOP; KVSP's STRH and mainline EOP; MCSP's ASU, MHCB, and mainline EOP; SVSP's STRH, MHCB, and mainline EOP and 3CMS programs; and SQ's ASU.

Minimal but consistent staff attendance was reported for CMF and CSP/Corcoran's EOP hubs and CSP/Corcoran's LTRH. Reviewed huddle sheets from CSP/LAC's EOP hub, MHCB, and mainline EOP, as well as CSP/Sac's ASU, PSU, STRH, Correctional Treatment Center (CTC) I, and mainline EOP, revealed that required staff attended most, but not all, reviewed huddles.

Deficient staff attendance was indicated for one or various programs at four institutions, namely, CMF's mainline EOP where psychiatry and custody staff did not attend huddles due to staffing shortages; CSATF's STRH, MHCB, and mainline EOP; CCWF's EOP hub/STRH; and SQ's mainline EOP. KVSP failed to produce huddle sheets for three of 14 requested days.

Reviewed huddle forms reflected comprehensive and collaborative reporting of relevant issues for CHCF's mainline EOP; CSP/Corcoran's EOP hub, STRH, and LTRH; CSATF's STRH, CCWF's EOP hub/STRH, and mainline EOP; KVSP's STRH and mainline EOP; SVSP's STRH, MHCB, and mainline EOP and 3CMS programs; and SQ's mainline EOP. Regrettably, huddle forms from CMF's EOP hub, CSP/Corcoran's mainline EOP, CSATF's mainline EOP, and SQ's ASU failed to document substantive and collaborative huddle discussions.

CSATF and SQ reported implementation of the specialized bed complete care model and produced relevant documentation. While CSATF's reflected minimal information not directly related to patient care and low staff attendance, SQ's reflected extensive, substantive information about all MHCB patients. CHCF, CIW, and MCSP all reported that they were not piloting the specialized bed complete care model.

#### Observed Huddles

Required staff attended observed huddles, which typically reflected comprehensive substantive and collaborative discussions.

Required staff attended, and relevant topics were addressed, at observed huddles in one or various programs across 12 institutions–namely, all observed areas at MCSP; CIW's PSU/EOP hub/mainline EOP, STRH/LTRH, and MHCB; EOP hubs at CMF, CMC, and CSP/Corcoran; CCWF's EOP hub/STRH; CSP/Corcoran's LTRH and STRH; KVSP's STRH; CHCF's MHCB; and mainline EOPs at CHCF, CMC, CSP/LAC, CSP/Sac, CSATF, CCWF, and VSP.

While required staff were in attendance, observed huddles were not collaborative for CMF's MHCB, CSATF's STRH, KVSP's mainline EOP, and SVSP's mainline EOP. For CSP/LAC's STRH, huddles not only were not collaborative but mental health staff also did not exhibit knowledge of the discussed patients or the general practices of the STRH.

Observed huddles were well-conducted, though lacked required staff, for CSP/Corcoran's mainline EOP, as well as RJD's MHCB, where custody staff did not attend.

Weekly 3CMS Program Supervisory Meetings

Eight institutions – CHCF, CIW, CMC, CSATF, KVSP, MCSP, RJD, and SQ – held weekly 3CMS program supervisory meetings throughout the review period. Two institutions, namely, CSP/LAC and CCWF, held the meetings for all but three or four weeks. VSP consistently held supervisory meetings, but most were conducted using the telephone. Due to staffing shortages, CSP/Corcoran was unable to consistently conduct weekly 3CMS program supervisory meetings. Two of four of SVSP's yards that housed 3CMS patients consistently held the supervisory meetings; due to staffing shortages, the other two yards did not conduct them. CMF and CSP/Sac did not provide documentation reflecting the supervisory meetings; CMF wrongfully reported the meetings' inapplicability to the institution and CSP/Sac reported not holding them.

Ten institutions – CIW, CMC, CSP/LAC, CSATF, CCWF, KVSP, MCSP, RJD, SVSP, and SQ – reported compliance for attendance by the 3CMS program supervisor and custody sergeant at the supervisory meetings. Required staff attended three quarters of CHCF's supervisory meetings.

Reviewed documentation demonstrated substantive discussion of relevant issues for the 3CMS program supervisory meetings held at seven institutions, namely, CHCF, CSP/LAC, CSATF, CCWF, KVSP, MCSP, and SVSP. Reviewed RJD reports were variable, with some being comprehensive and others containing minimal or no information. CMF and CSP/Corcoran's documentation identified relevant issues but provided little to no detail, and most reviewed CIW reports only contained attending staff's signatures.

Observed weekly 3CMS program supervisory meetings at CSATF, CCWF, SVSP, and VSP revealed adequate identification and discussion of pertinent issues.

<u>Monthly Joint Supervisory 3CMS Program Area Tours</u>

Eight institutions, namely, CHCF, CIW, CMC, CSP/LAC, CCWF, MCSP, RJD, and SQ, reported compliance for required monthly joint supervisory 3CMS program area tours. The tours occurred during five of six months at CSP/Corcoran, KVSP, and SVSP; and for four, three, and two months, respectively, at VSP, CSATF, and CSP/Sac. CMF erroneously reported that the tours were inapplicable to their institution.

Documentation from each institution where the tours occurred, except for CCWF and RJD, reflected appropriate detail regarding topics discussed during the program area tours. Regrettably, CCWF's documentation lacked detail and did not elaborate on noted deficiencies in mental health and custody relations. RJD's documentation was variable; some was comprehensive but other documentation contained minimal or no information.

An observed SVSP monthly joint supervisory 3CMS program area tour was well conducted, with required staff in attendance.

<u>3CMS Orientation Brochure</u>

All 15 institutions produced copies of the 3CMS orientation brochure. Eleven institutions, namely, CHCF, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, MCSP, SVSP, and VSP, also reported distributing the brochure to new 3CMS patients. Unfortunately, a MCSP primary clinician reported never having seen the brochure prior to the initial IDTT during which it was distributed.

EOP Orientation Groups

CSP/Corcoran, CSATF, CCWF, RJD, and SQ offered EOP orientation groups biweekly or more frequently.  CMF and CSP/LAC offered the groups for three and two months, respectively. While SVSP offered four-session EOP orientation groups to 82 patients, none attended all four sessions.  CMC, CSP/Sac, and MCSP did not offer these groups during the review period; CMC and MCSP attributed this deficiency to staffing shortages.  Relatedly, CSP/LAC and SVSP reported group cancellations due to staffing shortages.

Thirty patients attended EOP orientation groups at CMF.  The groups were offered to ten, 256, 202, 82, and 130 patients at CSP/Corcoran, CCWF, RJD, SVSP, and SQ, respectively. CSATF did not provide group attendance data.

The monitor observed EOP orientation groups at CMF, CCWF, and KVSP.  The CMF group was well conducted, with nine participants.  The KVSP group followed the established curriculum, and participants were actively engaged, though custody staff arrived late and reportedly did not always attend the groups.  At CCWF, custody participation was minimal.

Inmate Advisory Council

Similar to the previous reporting period, further collaboration between disciplines was required to improve implementation of monthly inmate advisory council (IAC) meetings.  IAC meetings consistently occurred during the review period at six institutions, namely, CIW, CSP/Corcoran, CCWF, KVSP, MCSP, and VSP.  Four other institutions – CSP/LAC, CSP/Sac, SQ, and RJD – held IAC meetings for most months on most facilities, though certain facilities at each institution did not hold the meetings during each month.  Four other institutions – CSATF, CHCF, SVSP, and CMC – held IAC meetings less frequently.  CSATF held meetings for four months; CHCF held meetings for four months on one yard; at SVSP, the IAC met for four, zero,

zero, and one month, respectively, on four facilities; and CMC only held the meetings for two months on one facility.  CMF did not report on IAC meetings.

Reviewed IAC minutes reflected variable discussion of mental health and 3CMS-related issues, as well as staff attendance.  Mental health issues were adequately addressed at IAC meetings at CSP/LAC, CSP/Sac, CSATF, CCWF, SVSP, and VSP.  To the contrary, IAC meetings did not address the 3CMS program at CHCF, CIW, or MCSP, and mental health issues were not discussed at all at CSP/Corcoran, KVSP, or SQ IAC meetings.

Required staff attended most IAC meetings at CSP/LAC and KVSP, but mental health staff infrequently attended IAC meetings at RJD.  Further, the 3CMS supervisor infrequently attended IAC meetings at SVSP, only attended one CHCF IAC meeting, and did not attend these meetings at CIW, CSATF, or MCSP.  SQ did not report staff attendance.

<u>Staff Misconduct</u>

All 15 institutions reported numerous staff misconduct complaints against custody and mental health staff.  For custody, there were 32 such complaints at CHCF, 357 at CMC, 710 at CSP/Corcoran, 665 at CSP/Sac, 208 at CCWF, 203 at KVSP, 337 at SVSP, and 136 at VSP.  CSATF reported no custody staff misconduct complaints and MCSP was unable to produce this data.  For mental health staff, there were 26 complaints at CMC, one at CSATF, 30 at CCWF, 15 at KVSP, 44 at MCSP, and four at VSP.  CSP/Corcoran and SVSP reported 18 and 45, respectively, against healthcare staff, and CSP/Sac reported 25 against mental health and medical staff.

Six institutions did not differentiate between types of staff and reported all staff misconduct complaints together; there were 193 such complaints at CIW, 562 at CSP/LAC, 708 at RJD, 268 at SQ, and 310 at CMF.

Concerningly, custody staff misconduct complaints at many institutions remained unresolved and for alarming lengths of time.  Of the 710 custody staff misconduct complaints at CSP/Corcoran, only 19 were completed, 569 were in progress, 104 were resolved but not sustained, 12 were resolved and sustained, and six were resolved without a finding.  At CSP/Sac, 276 of 665 complaints, or 42 percent, were still "in progress."  KVSP reported 203 complaints against custody; 139 or 66 percent were still in progress, and of those, 62 percent had been pending for six to nine months.  Two-hundred forty-three of the 337 custody complaints at SVSP, or 72 percent, were pending resolution.  At VSP, 82 of the 136 custody complaints, or 60 percent, were still under investigation or pending review.

Though staff misconduct complaints were not differentiated by type of staff, only 69 of 562 or 12 percent were approved for closure at CSP/LAC.  At RJD, 671 of 708 or 95 percent were reportedly "in progress;" 125 had been in progress for seven months at the time of the site visit.  At CMF, only 91 of 310 or 29 percent were resolved.

For investigations of staff misconduct toward patients not initiated through the appeals process, there were 20 at CHCF, 13 at CSP/Corcoran, 13 at CSP/Sac, 63 at CCWF -- of which 38 were still in progress – six at MCSP, five at SVSP, and 18 at VSP.

No custody or mental health staff were moved to another post because of a staff misconduct allegation at CHCF, CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CCWF, KVSP, SVSP, SQ, or VSP.  One custody staff member was moved to another post at CMC.

Quarterly Partnership Round Table Training

Quarterly partnership round table training was monitored at 14 institutions; regrettably, none demonstrated compliance.  Training attendance was not properly tracked at 11 institutions – CHCF, CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, MCSP, RJD, and

SVSP – and, thus, compliance could not be assessed. CMF reported significant noncompliance for both custody and mental health staff, while SQ reported noncompliance for custody staff; compliance could not be assessed for SQ mental health staff. CMC did not provide the round table training. MCSP further reported that the round table training would be discontinued due to significant mental health staffing vacancies.

Off-Post Training

KVSP reported that 96 percent of custody and 98 percent of mental health staff attended the annual off-post training; concerningly, this was the only institution that achieved compliance for both custody and mental health staff.

Ninety percent or more of custody staff attended the off-post training at nine institutions, namely, CHCF, CMF, CMC, CSP/LAC, CSP/Sac, CSATF, RJD, SVSP, and VSP. CIW, CMC, MCSP, and SQ all approached compliance for custody staff; attendance ranged from 84 to 88 percent. Sixty-five percent of CCWF custody staff attended the training. CSP/Corcoran reported that 1,003 custody staff completed the training but, since it did not report the number of staff who did not take it, compliance could not be assessed.

Regrettably, SQ was the only institution that achieved over 90 percent attendance by mental health staff at the off-post training. CMF and RJD indicated noncompliance. CMC, CSATF, and VSP all neared compliance with attendance ranging from 83 to 88 percent. CHCF, CSP/LAC, and MCSP reported 65, 67, and 60 percent attendance, respectively. SVSP reported 52 percent attendance, while CSP/Sac and CCWF reported 44 and 49 percent, respectively. CSP/Corcoran reported that 1,691 non-custody staff attended the training, but compliance could not be assessed. Three percent of mental health staff attended the training at CIW.

## Summary – Custody and Mental Health Partnership Plan

All institutional CMHPP LOPs aligned with headquarters' directive; 67 percent were current.  Most institutions conducted executive leadership joint rounding for at least five months of the review period, though the minutes for the warden's executive staff meeting, quality management committee, and mental health subcommittee typically reflected insufficient references to the rounding.

Reviewed huddle forms generally reflected their occurrence, and the discussion of relevant issues in detail, though some programs at various institutions reported minimal or deficient staff attendance.  Observed huddles were generally collaborative, with required staff in attendance.

Most institutions held weekly 3CMS program supervisory meetings for most or all weeks of the review period that required staff attended, though substantive discussion of relevant issues across institutions was variable.  Most institutions complied, and some noncompliant institutions approached compliance with the requirements of the monthly joint supervisory 3CMS program area tours.

All institutions provided copies of the 3CMS orientation brochure and most reported distributing it to new 3CMS patients.  EOP orientation groups, on the other hand, generally met infrequently.  There was variability in the occurrence of IAC meetings, and in the discussion of mental health and 3CMS-related issues.

Staff misconduct complaints were reported across institutions, though only one custody staff member was reassigned as a result.  Alarmingly, many institutions reported that staff misconduct complaints remained unresolved for many months.

Regrettably, not one institution was compliant for staff's attendance at quarterly partnership round table training, though compliance could not be assessed for most institutions. Institutions were overwhelmingly noncompliant for attendance by custody and mental health at the annual off-post training.

### H.  <u>Review of the RVR Process</u>

While the number of RVRs issued at the 15 institutions with EOP programs increased by 39 percent from the prior review period, CDCR's RVR mental health process continued to struggle to achieve compliance with basic requirements.  Notable improvements from the Twenty-Ninth to the Thirtieth Monitoring Round were the number of institutions where senior hearing officers' documented consideration of mental health assessments and the number of clinical recommendations for alternative discipline.  Regrettably, less than 30 percent of institutions were compliant with mental health assessment process training for both custody and mental health staff.  Further, reviewed samples indicated that no institution was compliant with custody staff timely requesting completion of mental health assessments, while slightly less than 50 percent of facilities were compliant with mental health staff timely completing and returning the assessments to custody.

As for custody staff training on the RVR mental health assessment process, only three of 15 or 20 percent of institutions, namely, CMC, KVSP, and VSP, reported compliance.  Eleven institutions – CHCF, CIW, CMF, CSP/Corcoran, CSP/Sac, CSATF, CCWF, MCSP, RJD, SVSP, and SQ, were not compliant.  CSP/Corcoran and CMF approached compliance at 88 and 87 percent, respectively, while SVSP was significantly below the threshold with 39 percent compliance.  CSP/LAC did not provide custody training data.

Four institutions, namely, CMC, CSP/Sac, SQ, and VSP, demonstrated 100 percent compliance for training mental health clinicians on the RVR mental health assessment process.

Ten others – CHCF, CIW, CMF, CSP/Corcoran, CSP/LAC, CCWF, KVSP, MCSP, RJD, and SVSP – were not compliant. Alarmingly, CHCF, CIW, and RJD did not achieve even ten percent compliance; at CMF, MCSP, and SVSP, only one or two mental health clinicians completed the training.

During the reporting period, 31,341 RVRs were issued at the 15 reviewed institutions, which was a 39 percent increase from the Twenty-Ninth Monitoring Round. Of these, 21,332, or 68 percent were issued to MHSDS patients. There were 204 RVRs issued to patients in acute or intermediate care, 866 issued to MHCB patients, 6,374 issued to EOP patients, 13,872 issued to 3CMS patients, and 16 RVRs issued to patients with an unidentified level of care. Thirty-two percent, or 10,009 RVRs, were issued to non-MHSDS patients.

Reviewed samples from the 15 institutions with EOP programs revealed that none demonstrated compliance for custody staff timely requesting completion of mental health assessments; the average compliance rate was 44 percent. Six institutions, namely, CMF, CSP/Corcoran, CSP/LAC, CCWF, SQ, and VSP, achieved compliance of between 50 and 80 percent. Nine institutions, including CHCF, CIW, CMC, CSP/Sac, CSATF, KVSP, MCSP, RJD, and SVSP, attained compliance of less than 50 percent.

Mental health clinicians at seven institutions – CHCF, CMF, CMC, CSP/Corcoran, KVSP, RJD, and SQ – were compliant for timely completing and returning mental health assessments to custody staff. Nonetheless, at CMF the clinicians who completed the assessments had not received the most recent training on the RVR mental health assessment process. Regrettably, the eight remaining institutions, namely, CIW, CSP/LAC, CSP/Sac, CSATF, CCWF, MCSP, SVSP, and VSP, reported noncompliance. However, CCWF approached compliance at 85 percent. Alarmingly, two institutions, CSP/LAC and SVSP, indicated less than 50 percent

compliance at 24 and 28 percent, respectively. CSP/Sac clinicians noted that issues with mental health assessments' timely completion were largely due to the high volume of RVRs and staffing deficiencies.

Fourteen institutions – CHCF, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and SVSP – reported completing mental health assessments in confidential settings less than 85 percent of the time. Moreover, nine of these institutions – CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CCWF, KVSP, MCSP, SVSP, and SQ, reported confidentially completing assessments less than 50 percent of the time. However, all such nonconfidential contacts were the result of patient refusals except for two nonconfidential settings at CSATF and RJD, where there was a lack of confidential treatment space.

A reviewed sample of adjudicated RVRs demonstrated that the senior hearing officer typically documented consideration of the mental health assessment at 11 institutions, namely, CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, MCSP, SVSP, and VSP. RJD and SQ were close to compliance at 88 percent, while KVSP reported 76 percent compliance.

The reviewed sample revealed that four institutions – CSATF, CCWF, KVSP, and SQ – were compliant with the senior hearing officer appropriately documenting penalty mitigation. The remaining 11 institutions, namely, CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, RJD, SVSP, and VSP, were not compliant. Tellingly, a CSP/Sac senior hearing officer did not mitigate in two instances where the clinician recommended penalty mitigation that the mental health assessment did not recommend. A CCWF senior hearing officer mitigated an additional three patients' penalties based on patients' prior disciplinary history.

The reviewed sample of adjudicated RVRs indicated 35 cases at eight institutions – CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, MCSP, SVSP, and VSP – where the mental health clinician recommended documenting the RVR in an alternative manner due to patients' behaviors being strongly influenced by mental illness. Reviewing captains at these eight institutions documented 28 of 35 or 80 percent of these cases in an alternative manner. At CIW, the captain documented eight of ten recommended cases in an alternative manner.

At CMF, one of two recommended cases was documented in an alternative manner. For the case that was not documented as such, the reviewing captain's decision did not reflect the clinician's judgment that the patient had trouble differentiating fantasy from reality at the time of the RVR. However, the reviewing captain opined that the patient knew that his behavior was against the rules and did not document the RVR in an alternative manner; the senior hearing officer found the patient guilty. Relatedly, at CSP/Sac, the only case recommending documentation in an alternative manner was not documented as such; the reviewing captain believed there was sufficient evidence to find the patient guilty by a preponderance of the evidence.

At MCSP, four RVRs were recommended for alternative discipline; three were documented as such. The remaining case was not documented as such even though the clinician noted that the patient was experiencing suicidal ideation at the time of the RVR. At SVSP, the hearing officer documented one of three cases in an alternative manner. Notably, at VSP, besides three cases that were recommended for documentation in an alternative manner, the senior hearing officer documented two more cases this way. Additionally, at CSP/LAC, the clinician indicated that the patient's symptoms at the time of the RVR stemmed from acute substance abuse and that his behavior was strongly influenced by mental illness. However, the clinician

also indicated that the patient had the ability to understand the rules and appreciate the consequences of his behavior and did not recommend documentation in an alternative manner.

Classification committee consideration of mental health factors when assessing SHU terms slightly decreased from 88 percent of the reviewed sample during the Twenty-Ninth Monitoring Round to 84 percent during this review period; 43 of 51 reviewed classification committee actions included consideration of mental health factors.

### Summary – RVR Process

Despite the significant increase in the number of issued RVRs across the 15 institutions with EOP programs, institutions' RVR mental health processes continued to reflect noncompliance with many Program Guide requirements and CDCR policy. Compliance for custody and mental health staff training on the mental health assessment process significantly declined from the prior review period. Equally concerning, reviewed samples demonstrated that not one facility was compliant with making timely requests for RVR mental health assessments; the average compliance was a mere 44 percent. Further, less than 50 percent of institutions' mental health staff timely completed and returned the assessments to custody staff. The reviewed sample also indicated the appropriate documentation of penalty mitigation at only four of the 15 institutions. On a positive note, hearing officers' documentation of consideration of the mental health assessment and the number of clinician recommendations for alternative discipline increased from the Twenty-Ninth to the Thirtieth Monitoring Round.

### I.  Use of Force

The Court ordered defendants to revise the use of force policies under the Special Master's supervision on April 10, 2014. ECF No. 5131 at 72. Following this directive, defendants completed and filed their updated use of force policies on August 1, 2014. ECF No. 5190. On August 11, 2014, the Court approved the revised policies. ECF No. 5196.

Notably, 11 of 15 institutions that housed EOP patients reported custody staff's compliance with attendance at the mandatory use of force training during the review period. Regrettably, only four of 15 institutions were compliant with required training of mental health staff. Of the 11 institutions that reported controlled use of force incidents involving mental health patients, seven indicated compliance with applicable policy, while there were CDCR policy violations and other concerns with some reviewed controlled uses of force at the remaining four facilities. Additionally, a reviewed sample of immediate use of force incidents involving mental health patients revealed compliance with applicable policy at ten facilities but concerns, including policy violations, at the remaining five institutions.

Training

The use of force policy requires training on the controlled and general uses of force for certain custody, mental health, nursing, and line staff. Eleven of 15 or 73 percent of institutions with EOP programs were compliant with training custody staff about these policies. Specifically, CMC trained 100 percent, CHCF trained 98 percent, and CSP/LAC, CSATF, KVSP, MCSP, RJD, SVSP, SQ, and VSP all trained over 94 percent. CCWF was also compliant with use of force training for custody staff.

The remaining four institutions indicated noncompliance for the training of custody staff on the use of force. CSP/Corcoran trained the warden, chief deputy warden, all captains and lieutenants, 98 of 99 sergeants, and 80 percent of correctional administrators, but only 35 percent of correctional officers. CIW, CMF, and CSP/Sac only trained approximately 60 percent of their custody staff on the use of force.

Like the Twenty-Ninth Monitoring Round, institutions with EOP programs reported significantly less compliance with use of force training for mental health staff. Only four of 15

or 27 percent of facilities housing EOP patients noted compliance; CMC, CCWF, and VSP all reported compliance above 94 percent, while CSP/LAC reported 90 percent compliance.

The remaining 11 institutions indicated noncompliance for required mental health staff completing training on the use of force policies.  CHCF just missed compliance, training 89 percent of mental health staff.  CSP/Corcoran, CSATF, KVSP, MCSP, and RJD reported training between 70 and 83 percent of mental health staff.  CIW trained 59 percent of mental health staff including two of four chiefs of staff, all supervisors, 95 percent of psychologists, 50 percent of psychiatrists, and all seven social workers, but only 18 percent of nurses and none of the 356 other mental health staff.  At CSP/Sac, one of three chief psychologists was trained, as were 88 percent of supervisory psychologists; however, only seven percent of nurses and 19 percent of other mental health staff were trained.  CMF trained some staff in each discipline but did not train the chiefs of psychiatry nor psychology.

SVSP trained neither the chief psychiatrist nor the chief psychologist, while only 20 percent of supervisory psychiatrists/psychologists/social workers were trained.  Further at SVSP, no psychiatrists, only ten percent of psychologists, 43 percent of social workers, and 32 percent of registered nurses were trained.  SQ trained one of three chiefs of psychology, 43 percent of psychiatrists, 44 percent of psychologists, and 70 percent of social workers, also reflecting noncompliance.

<u>Controlled Use of Force</u>

During the review period, 11 institutions reported a total of 56 controlled use of force incidents involving mental health patients as follows:  CMF (three), CSP/Corcoran (18), CSP/LAC (11), CSP/Sac (nine), CSATF (two), CCWF (one), KVSP (two), MCSP (one), RJD

(five), SVSP (three), and VSP (one).  CHCF, CIW, CMC, and SQ did not report any controlled uses of force involving MHSDS patients.

Of the sample of 35 reviewed controlled uses of force, those at CMF, CSP/Sac, CSATF, CCWF, MCSP, SVSP, and VSP all reflected compliance with applicable policy.  However, three reviewed incidents at CSP/Corcoran, and one each at CSP/LAC, KVSP, and RJD, indicated policy violations and/or other concerns.  There were other deficiencies with the use of force process at CSP/LAC as well.

At CSP/Corcoran, after using force following a patient's refusal to exit a small management yard, the incident report stated that the reasons for the use of force were to subdue an attacker, effect custody, overcome resistance, and gain compliance; however, this was not consistent with the patient's behavior of refusing to exit the small management yard.  In another CSP/Corcoran incident, required mental health and medical reports were not completed.  In the third incident, a STRH patient who experienced a forcible cell extraction for MHCB placement was issued an RVR for willfully obstructing a peace officer.  However, the issuance of an RVR in connection with a cell extraction for a patient's placement in an inpatient setting violated applicable CDCR policy.

At CSP/LAC, one viewed controlled use of force video was concerning since it did not indicate the patient being taken outside for decontamination after the use of OC spray; thus, the appropriateness of this use of force could not be adequately determined.  Further, at CSP/LAC, all controlled use of force incidents remained open, which was concerning since some dated as far back as December 2022.  The institution was, therefore, unable to produce incident reports for any of these controlled uses of force.  The use of force coordinator attributed the backlog of use of force reviews to ongoing staffing shortages.

One of the two KVSP controlled uses of force revealed several concerns.  These shortcomings included the failure to obtain registered nurse clearance prior to using chemical agents, which violated CDCR policy.  Further, the extraction team failed to identify themselves on the video, staff did not remain at the cell door during the entire cool down period, all staff did not wear respirators, and, although the patient alleged an excessive use of force, the mandated patient interview was not timely conducted.  Nonetheless, the identification of policy violations during the review process demonstrated compliance with CDCR policy and the ability to self-identify areas of concern.  At RJD, although one reviewed controlled use of force was compliant with applicable policy, there were nonetheless concerns about the collection of the camera video and logging it into evidence, and RJD's executive review.  The failure to log the camera video into evidence demonstrated noncompliance with the evidence chain of control.

Immediate Use of Force

All 15 institutions with EOP programs reported a total of 2,270 immediate use of force incidents, as follows:  CHCF (nine), CIW (36), CMF (132), CMC (69), CSP/Corcoran (322), CSP/LAC (433), CSP/Sac (340), CSATF (97), CCWF (134), KVSP (106), MCSP (102), RJD (141), SVSP (300), SQ (22), and VSP (27).

The monitor's review of a sample of immediate uses of force involving MHSDS patients indicated compliance with applicable policy at the following ten institutions:  CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, MCSP, and SVSP.

Reviewed immediate uses of force involving MHSDS patients at five institutions reflected policy violations and other concerns.  At CIW, two immediate use of force incidents revealed the spraying of OC within six feet of patients.  Reviewed KVSP immediate uses of force indicated several policy violations including not submitting reports timely and custody staff

not wearing protective gear.  At SQ, although a patient indicated a staff assault, no patient interview or further review of the allegation occurred, and all levels of review overlooked this omission and closed the incident without corrective action.

There were also concerns with immediate uses of force at RJD since only approximately ten percent that occurred during the review period had completed the review process and were closed.  This delay was caused by pending inquiries and awaiting results from the Office of Internal Affairs (OIA); however, these use of force incidents could not be closed until RJD was informed of the results of the OIA inquiries.  Notably, this delay in closing them was very concerning because CDCR was required to take adverse action against a correctional officer within one year of the date of an alleged incident.  Due to the significant delay in closing inquiries/complaints, the potential to exceed the one year maximum was a real concern; if the investigation exceeded one year, no adverse action could be taken against the staff member.

At VSP, one reviewed immediate use of force was unreasonable.  In this case, a handcuffed MHSDS patient, while being placed in a holding cell, kicked his leg back, striking the officer.  Although the patient was already in the cell and still handcuffed, the correctional officer, to reportedly prevent further injury to himself, pulled the patient out of the holding cell, and subdued him face down on the ground.  The patient suffered injuries to his front teeth, mouth, and trachea.  The level of force that the custody officer used on the patient was deemed unreasonable as there was an alternative method of closing the holding cell door to prevent further injury to the officer rather than pulling the patient out of the cell and forcing him to the ground while handcuffed.

**Summary – Use of Force**

Only 11 of 15 or 73 percent of institutions with EOP programs reported compliance for training custody staff on the revised use of force policy for the Thirtieth Monitoring Round. Even more concerning, only four of 15 or 27 percent of these institutions indicated compliance for required training of mental health staff.

Of the 11 institutions reporting controlled uses of force involving MHSDS patients, reviewed incidents from seven revealed compliance with applicable policy, while some reviewed incidents at four institutions indicated policy violations or other concerns. Four other institutions did not report any controlled use of force episodes involving mental health patients.

All 15 institutions reported immediate use of force incidents. Reviewed incidents revealed compliance with applicable policy at ten facilities, but some reviewed immediate uses of force at the other five institutions reflected policy violations and other concerns.

**J.  Program Access**

Similar to the previous review period, non-MHSDS incarcerated persons held more job assignments than MHSDS patients, with 3CMS patients holding considerably more than EOP patients. EOP patients also continued to be less likely than 3CMS and non-MHSDS incarcerated persons to hold academic assignments, but the percentage of 3CMS patients and non-MHSDS individuals with academic assignments was comparable.[51]

As for education assignments, most EOP programs enrolled a very small percentage of patients in vocational education assignments; however, a very low percentage of 3CMS patients and non-MHSDS individuals also had these assignments. EOP patients also had the lowest

---

[51] Unless otherwise noted, program access data provided by CDCR did not separate information based on patient eligibility.

percentage of voluntary education assignments; significantly more non-MHSDS incarcerated persons, and to a lesser extent 3CMS patients, had these assignments.

Overall, 11 institutions reported information about milestone credits, but only eight reported patients' eligibility to earn them. Similar percentages of EOP and 3CMS patients were housed out-of-level.

<u>Job Assignments</u>

Similar to previous reporting periods, non-MHSDS incarcerated persons held more job assignments than mental health caseload patients, with 3CMS patients holding significantly more job assignments than EOP patients.

Only one of the 15 institutions with EOP patients employed more than half of their EOP patients. Specifically, 57 percent of CCWF's EOP patients held job assignments. CMC and RJD respectively reported that 46 and 40 percent of EOP patients had such assignments. Four institutions, namely, CIW, CSP/LAC, KVSP, and SVSP, employed between 30 and 39 percent of EOP patients, while CMF and VSP reported that between 20 and 29 percent of EOP patients had job assignments. Six other institutions – CHCF, CSP/Corcoran, CSP/Sac, CSATF, MCSP, and SQ, employed between ten and 19 percent of EOP patients.

3CMS patients were slightly less likely to be employed than non-MHSDS incarcerated persons. However, similar to the prior review period, the percentage of 3CMS patients with job assignments significantly exceeded the percentage of employed EOP patients. Sixty percent of RJD's 3CMS patients held job assignments. CMC and CMF respectively reported that 57 and 50 percent of their 3CMS patients were employed, while CIW, CCWF, MCSP, and SVSP reported employing between 40 and 49 percent of 3CMS patients. Six other institutions – CHCF,

CSP/Corcoran, CSP/LAC, CSATF, KVSP, and VSP, employed between 30 and 39 percent of 3CMS patients. CSP/Sac and SQ employed between 20 and 29 percent of the 3CMS population.

Non-MHSDS incarcerated persons held more jobs than MHSDS patients. Sixty-three percent of RJD's non-mental health caseload incarcerated persons were gainfully employed. CMC, CSP/LAC, and KVSP employed between 50 and 59 percent of non-MHSDS individuals. Eight other institutions – CIW, CSP/Corcoran, CSP/Sac, CSATF, CCWF, MCSP, SVSP, and VSP, reported that between 40 and 49 percent of non-MHSDS incarcerated persons were employed. CHCF and CMF reported employing between 30 and 39 percent of the non-mental health caseload population; SQ employed 24 percent.

Academic Assignments

Academic assignments included educational programs such as adult high school, adult basic education, and other similar programs. Patients who obtained grade level scores of 6.0 or below typically were assigned academic assignments.

EOP patients held fewer academic assignments than either 3CMS patients or non-MHSDS incarcerated persons. RJD and CCWF respectively reported that 45 and 42 percent of EOP patients had academic assignments. Six institutions – CMF, CMC, CSATF, MCSP, SVSP, and VSP, reported that between 20 and 29 percent of EOP patients held these assignments. At CHCF, CSP/Corcoran, CSP/LAC, CSP/Sac, and KVSP, between ten and 19 percent of EOP patients held academic assignments. At CIW and SQ, only between one and ten percent of EOP patients held them.

Overall, a comparable percentage of 3CMS patients and non-MHSDS incarcerated persons held academic assignments. Notably, 54 percent of RJD's 3CMS patients held them. At CIW, CCWF, and SVSP, between 40 and 49 percent of 3CMS patients held academic

assignments, while CSP/LAC, CSATF, and VSP indicated that between 30 and 39 percent of 3CMS patients held them.  Seven other institutions – CHCF, CMF, CMC, CSP/Corcoran, CSP/Sac, KVSP, and MCSP, reported academic assignments for between 20 and 29 percent of 3CMS patients.  At SQ, 14 percent of 3CMS patients had these assignments.

Further, RJD reported that 67 percent of non-MHSDS incarcerated persons held academic assignments.  At CSP/LAC, CSP/Sac, CSATF, SVSP, and VSP, between 30 and 39 percent of non-mental health caseload incarcerated persons had them.  Seven other institutions – CHCF, CIW, CMC, CSP/Corcoran, CCWF, KVSP, and MCSP, reported that between 20 and 29 percent of this population maintained academic assignments.  At CMF and SQ, 17 percent of non-MHSDS individuals held them.

Education Assignments

A.  Vocational Education

Programs such as computer repair, electrical, painting, carpentry, heating, ventilation and air conditioning, plumbing, and welding constituted vocational education programs.

A very small percentage of patients were typically enrolled in vocational education.  However, EOP patients were enrolled in these programs at a lower percentage rate than both 3CMS patients and non-MHSDS individuals.

CMF enrolled 13 percent of EOP patients in vocational education.  Otherwise, nine institutions – CHCF, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/SAC, CSATF, MCSP, and RJD, enrolled less than seven percent of EOP patients in vocational education.  No EOP patients were enrolled in this program at CCWF, KVSP, SVSP, SQ, and VSP.

3CMS patients were more likely to be enrolled in vocational education than EOP patients.  Nonetheless, 3CMS patients' vocational education participation also remained low.

However, CMF enrolled 24 percent of 3CMS patients in vocational education, while 12 percent of CMC's 3CMS patients held these assignments. Otherwise, the remaining 13 institutions – CHCF, CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, enrolled less than ten percent of 3CMS patients in vocational assignments.

The enrollment of non-MHSDS incarcerated individuals in vocational education was also generally low. However, CMF enrolled 23 percent of non-MHSDS incarcerated persons in vocational education. Otherwise, at the remaining 14 institutions – CHCF, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, less than ten percent of the non-MHSDS population had vocational education assignments.

B. Voluntary Education

Voluntary education assignments include college courses.

EOP patients had a significantly lower percentage of voluntary education assignments compared to both 3CMS patients and non-MHSDS individuals. Only two institutions enrolled ten percent or more of EOP patients in voluntary education, with CMC and MCSP respectively enrolling 12 and ten percent. However, CIW, CMF, CSP/Corcoran, CSP/LAC, CCWF, SQ, and VSP all enrolled six percent or less of EOP patients in voluntary education, while RJD enrolled less than one percent. No EOP patients held voluntary education assignments at CHCF, CSP/Sac, CSATF, KVSP, and SVSP.

3CMS patients were enrolled in voluntary education at higher percentage rates than EOP patients. At MSCP, 35 percent of 3CMS patients held these assignments. CMC, CCWF, and VSP enrolled between 20 and 29 percent of 3CMS patients in these programs, while CIW, CMF, KVSP, and SQ enrolled between ten and 19 percent of 3CMS patients in them. CSP/LAC only enrolled four percent of 3CMS patients in voluntary education; CHCF enrolled less than one

percent.  CSP/Corcoran, CSP/Sac, CSATF, RJD and SVSP did not enroll any 3CMS patients in them.

For non-MHSDS incarcerated persons, CMC reported enrolling 66 percent of this population in voluntary education assignments.  Thirty-one percent of MCSP's non-MHSDS incarcerated persons held these assignments, as did between 20 and 29 percent of non-MHSDS individuals at CCWF and VSP.  CIW, KVSP, and SQ reported that between ten and 19 percent of the non-MHSDS population held voluntary education positions, while at CMF and CSP/LAC, less than ten percent of non-MHSDS individuals held this assignment.  No non-MHSDS individuals were enrolled in voluntary education at CHCF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, RJD, or SVSP.

Milestone Credits

Patients could reduce their incarceration stays by completing in-person rehabilitation programs and thereby earn milestone credits.  During the review period, patients earned these credits by participating in various educational and restorative programs such as academic assignments, substance abuse programs, and vocational education.

Of the 15 reviewed institutions, seven – CHCF, CMF, CMC, CSATF, CCWF, SQ, and VSP, provided the number of patients who were eligible for and earned milestone credits.  Overall, at these institutions 86 percent of eligible EOP patients earned milestone credits, as did 27 percent of eligible 3CMS patients, and 21 percent of eligible non-MHSDS individuals; however, SQ did not produce milestone credit information for non-MHSDS individuals.  Otherwise, CSP/LAC, MCSP, and SVSP did not report the number of eligible patients, but indicated the number of patients who earned milestone credits.  CIW reported patient eligibility

to earn milestone credits but did not report the number of patients who earned them.

CSP/Corcoran, CSP/Sac, KVSP, and RJD did not report any milestone credit information.

For EOP patients, both CMF and SQ reported that all eligible EOP patients earned milestone credits. CHCF indicated that 95 percent of eligible EOP patients earned the credit, while CMC and VSP respectively reported that 88 and 85 percent of EOP patients earned milestone credits. Seventy-six percent of eligible CCWF EOP patients earned them, as did 71 percent of eligible CSATF EOP patients. Although CSP/LAC, MCSP, and SVSP were unable to provide EOP patients' eligibility for the credits, 384 CSP/LAC EOP patients, 479 MCSP EOP patients, and 143 EOP patients at SVSP also earned them.

Eligible 3CMS patients earned substantially less milestone credits than EOP patients. Other than CMF, which reported that 81 percent of eligible 3CMS patients earned them, and SQ, which reported that all eligible 3CMS patients earned milestone credits, no other institution reported above 40 percent. CHCF, CMC, CCWF, and VSP all reported that between 31 and 40 percent of eligible 3CMS patients earned these credits. Regrettably, CSATF reported that only two percent of eligible 3CMS patients earned them. Further, 42 CSP/LAC 3CMS patients, 1,851 MCSP 3CMS patients, and 12 SVSP 3CMS patients earned these credits.

As for non-MHSDS incarcerated persons, 84 percent of CMF non-MHSDS incarcerated persons earned milestone credits. Otherwise, all five other institutions that reported that non-MHSDS patients earned milestone credits, namely, CHCF, CMC, CSATF, CCWF, and VSP, all indicated that less than 50 percent of eligible non-MHSDS individuals earned them. Further, CSP/LAC and SVSP respectively reported that only three and 22 non-MHSDS individuals earned these credits. MCSP did not report the number of milestone credits earned by individuals not on the mental health caseload.

119

<u>Out-of-Level Housing</u>

During the review period, most institutions with EOP programs housed many patients out-of-level; specifically, patients were housed at a custody security level that was inconsistent with their housing classification score. Overall, the institutions respectively housed 12 percent of EOP patients out-of-level, while 13 percent of 3CMS patients were housed out-of-level.

CMC reported that 34 percent of EOP patients were housed out-of-level, while SVSP and RJD respectively reported housing 28 and 22 percent of EOP patients out-of-level. CSP/Corcoran, CSATF, MCSP, SQ, and VSP housed between ten and 19 percent of EOP patients out-of-level. At CHCF, CMF, CSP/LAC, and KVSP, less than ten percent of EOP patients were housed out-of-level. No CSP/Sac EOP patients were housed out-of-level. CIW and CCWF did not house patients according to levels.

For 3CMS patients, RJD and CMF respectively reported housing 32 and 30 percent of 3CMS patients out-of-level. At CMC, 22 percent of 3CMS patients were housed out-of-level. Six institutions – CSP/Corcoran, CSP/LAC, CSATF, MCSP, SQ, and SVSP, housed from 19 to ten percent of 3CMS patients out-of-level. CHCF, KVSP, and VSP indicated that less than ten percent of 3CMS patients were housed as such. CSP/Sac did not house any 3CMS patients out-of-level. CIW and CCWF did not house patients according to levels.

<u>ADA Reasonable Accommodation and Grievance Procedures</u>

Fourteen of the 15 institutions indicated implementation of the Americans with Disabilities Act reasonable accommodation and grievance procedures. CSP/LAC could not confirm implementation.

Periodic Classification Score Reductions: EOP Patients

A review of CDCR 840's from 14 institutions, namely, CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSATF, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, revealed that EOP patients were granted classification score reductions for successful programing.

## **Summary – Program Access**

Similar to prior review periods, non-MHSDS incarcerated persons continued to hold more job assignments than MHSDS patients; among mental health patients, EOP patients held considerably less of these assignments than 3CMS patients. EOP patients also continued to be less likely to have academic assignments than 3CMS patients and individuals not on the mental health caseload.

All institutions typically enrolled a small percentage of patients and incarcerated individuals in vocational education assignments. Nonetheless, less EOP patients were enrolled in these assignments than 3CMS patients and non-MHSDS individuals. EOP patients also accounted for the lowest percentage of the incarcerated who were enrolled in voluntary education assignments; both 3CMS patients and non-MHSDS individuals had significantly more of these assignments.

Additionally, 11 institutions reported that patients earned milestone credits during the review period. However, only eight institutions reported information about patients' eligibility to earn them. Similar percentages of EOP and 3CMS patients were housed out-of-level.

Fourteen of 15 institutions indicated implementation of the Americans with Disabilities Act (ADA) reasonable accommodation and grievance procedures. Review of CDCR 840s from 14 institutions determined that EOP patients were granted classification score reductions for successful programming.

### K.  **MHSDS Patients in Segregated Housing**

The Court has mandated defendants' compliance with the requirements for the treatment of MHSDS patients in administrative segregation.  ECF No. 5779 at 133.

Across all restricted housing programs, many staffing ratios for both psychiatry and primary clinicians exceeded established ratios.  Primarily due to staffing shortages, numerous psychiatry and primary clinician contacts were not timely.  While required disciplines typically attended IDTTs, it was unclear whether patients' assigned clinicians attended them, as the Program Guide required.  Patients also were not offered adequate hours of structured treatment.

Psychiatric Services Unit

CSP/Sac and CIW had PSUs.  Regrettably, CSP/Sac's PSU only achieved certification twice during the review period, which was largely attributed to staffing issues and population overages.  CIW's PSU was consistently utilized.

At both CSP/Sac and CIW, psychiatrists' caseloads were within the established ratio. Although CIW's primary clinicians met the staffing ratio, CSP/Sac's primary clinicians did not.

For timely initial and routine psychiatry contacts, CSP/Sac reported noncompliance, while CIW indicated compliance.  For initial primary clinician contacts, CSP/Sac again reported noncompliance, and CIW again noted compliance.  Both CSP/Sac and CIW demonstrated noncompliance for routine primary clinician contacts.

CSP/Sac and CIW both reported compliance for timely completion of initial and routine IDTTs.  Unfortunately, CSP/Sac reported noncompliance for required staff and patients' attendance at both initial and routine IDTTs; CIW reported compliance for attendance by required staff at initial and routine IDTTs and for patients' attendance at routine IDTTs, but noncompliance for patients' attendance at initial IDTTs; however, the Program Guide required

attendance by the assigned psychiatrist and primary clinician at these IDTTs, which was not clearly discernable for all cases.

During the review period, CIW typically offered PSU patients ten weekly hours of structured treatment.  Regrettably, compliance for the offering of structured treatment to CSP/Sac PSU patients ranged from 59 to 90 percent.

Administrative Segregation EOP Hubs

CDCR institutions had ten EOP hubs; nine were open during the review period.  At five of the nine open EOP hubs -- CIW, CMF, CSP/LAC, CSP/Sac, and RJD, psychiatrists' caseloads were within the established ratio.  At the remaining four, namely, CMC, CSP/Corcoran, CCWF, and MCSP, psychiatrists' caseloads exceeded the ratio.  The CHCF EOP hub was closed during the review period and at the time of the site visit.

As for primary clinicians' caseloads, CIW, CSP/Sac, CCWF, and RJD indicated that they were within the established ratio.  Notably, CIW met this ratio due to a low census while RJD satisfied it after placing new hires in the EOP hub.  Primary clinicians' caseloads exceeded the staff-to-patient ratio at CMF, CMC, CSP/Corcoran, CSP/LAC, and MCSP.

Six institutions – CIW, CMC, CSP/LAC, CSP/Sac, MCSP, and RJD, reported compliance for timely initial psychiatry contacts.  CSP/Corcoran approached compliance at 88 percent.  CMF and CCWF were not compliant for these contacts.  As for routine psychiatry contacts, CSP/Corcoran, CCWF, and MCSP reported compliance, while CIW, CMF, CMC, CSP/LAC, CSP/Sac, and RJD indicated noncompliance.

Only CCWF reported compliance for timely initial primary clinician contacts.  The remaining eight institutions – CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, and RJD, all demonstrated noncompliance.  Regrettably, none of the institutions reported compliance

for routine primary clinician contacts, with some indicating shockingly low compliance rates; CSP/Sac, for example, reported 47 percent compliance for routine PC contacts.

Eight institutions – CIW, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CCWF, MCSP, and RJD, reported compliance for timely initial IDTTs. CMC was noncompliant. Further, CIW, CMF, CMC, CCWF, MCSP, and RJD were also compliant for timely routine IDTTs, but CSP/Corcoran, CSP/LAC, and CSP/Sac reported noncompliance.

On a positive note, all nine institutions were compliant for required staff's attendance at initial and routine IDTTs. However, reviewed documentation was typically unclear whether the assigned psychiatrists and primary clinicians were in attendance.

CIW, CMC, CSP/Corcoran, CSP/LAC, CCWF, and RJD offered patients a weekly average of ten hours of structured treatment. Due to inadequate staffing and quarantine issues, CSP/Sac was unable to offer ten weekly hours. CMF offered patients between 6.05 and 9.9 weekly hours of structured treatment.

<u>Long-Term Restricted Housing</u>

The caseload for the CSP/Corcoran telepsychiatrist assigned to LTRH was within the established ratio, but all three CSP/Corcoran LTRH primary clinicians' caseloads exceeded the ratio.

CIW's offered LTRH patients an average of 2.2 weekly hours of structured treatment, of which patients attended 1.7 weekly hours, and refused 0.5 hours. CSP/Corcoran offered LTRH patients more than the required minimum of weekly structured treatment. However, both institutions reported issues with available treatment space; CIW indicated that construction projects were the reason for the limited space, while CSP/Corcoran staffing deficiencies led to the regular cancellation of treatment groups.

CIW reported compliance for offering LTRH patients timely initial and routine psychiatry contacts, and initial primary clinician contacts, as well as timely initial and routine IDTTs; however, there was noncompliance for timely routine primary clinician contacts.

Similar to the Twenty-Ninth Monitoring Round, CSP/Corcoran's LTRH struggled to achieve compliance for timely provider contacts and IDTTs. Regrettably, CSP/Corcoran reported noncompliance for timely initial and routine psychiatry and PC contacts, and for timely initial and routine IDTTs. Further, as for the Program Guide's requirement that the assigned psychiatrist and primary clinician attend initial and routine IDTTs, this assignment was not clearly discernable for all cases.

A reviewed sample of patient records indicated that CIW offered patients ten weekly hours of yard, three weekly showers, and weekly linen exchange. However, for the reviewed sample, CSP/Corcoran offered patients adequate weekly yard for only two of 25 examined weeks and offered patients three weekly showers for only 19 of 25 reviewed weeks; however, there was weekly linen exchange.

<u>Short-Term Restricted Housing</u>

CSP/Corcoran, CSP/LAC, and CSATF reported that psychiatry caseloads were within the established ratio. CSP/Corcoran utilized telepsychiatry for these contacts. KVSP's primary clinicians' caseloads were also within the applicable ratio, but the caseloads of primary clinicians at CSP/Corcoran CSP/LAC, CSP/Sac, CSATF, and SVSP exceeded the ratio.

Only CIW indicated compliance for timely initial psychiatry contacts; the remaining institutions -- CSP/Corcoran, CSP/ LAC, CSP/Sac, CSATF, CCWF, KVSP, and SVSP, reported noncompliance. Only KVSP indicated compliance for timely routine psychiatry contacts.

CIW, CSP/LAC, and KVSP reported compliance for initial primary clinician contacts; the other institutions reported noncompliance. None of the STRH institutions was compliant for routine primary clinician contacts; shockingly, SVSP reported zero percent compliance for them. Staff generally attributed noncompliance to staffing shortages.

Only CIW reported compliance for timely initial IDTTs; the remaining institutions all reported noncompliance. As for routine IDTTs, only CSP/Sac and CSATF indicated compliance; the other institutions all reported noncompliance. Regrettably, it was unclear whether staff who attended initial and routine IDTTs were patients' assigned psychiatrists and primary clinicians.

Seven institutions -- CIW, CSP/Corcoran, CSP/LAC, CSATF, CCWF, KVSP, and SVSP, all offered adequate structured treatment. Due to critical staffing shortages, CSP/Sac was unable to offer adequate structured treatment hours, reporting a mere 70 percent compliance from December 2022 through February 2023.

CIW, CSP/Sac, CSATF, KVSP, and SVSP reported compliance for the weekly offering of 18.5 hours of out-of-cell activities to patients. CSP/LAC and CCWF indicated noncompliance. CSP/Corcoran custody staff did not document the offering of out-of-cell activities.

<u>Non-Disciplinary Segregation (NDS)</u>

CMC, CSP/Corcoran, CCWF, KVSP, and CSATF had patients placed on NDS status who transferred beyond required timelines during the review period; at CCWF, none of five patients' transferred within the appropriate timeline. At CSP/Corcoran, 29 patients were approved for accelerated transfer but only 11 timely transferred; late transfers were between one and 14 days. CMF, CSATF, and SQ had NDS patients who appropriately received their property and privileges. Although only 11 of 42 KVSP patients transferred timely, patients received all of their property.

## Summary – MHSDS Patients in Segregated Housing

The defendants' inability to secure adequate staffing to satisfy Program Guide ratios was a significant impediment for MHSDS patients in restricted housing receiving adequate mental health treatment. Regrettably, defendants were unable to meet basic requirements, which included patients receiving timely clinical contacts and IDTTs, and sufficient structured treatment, as well as adequate showers, yard, and linen exchange in the restricted housing setting.

## CONCLUSION

In its 1995 decision, the Court noted that the evidence at trial substantiating "significant[] and chronic[] understaff[ing] in the area of mental health care services," *Coleman v. Wilson*, 912 F. Supp. 1282, 1307 (E.D. Cal., Sept. 13, 1995), was undisputed. *See id.* at 1307 n. 34 ("The court notes in passing that defendants' experts did not dispute [plaintiffs' experts' testimony regarding 'significant understaffing within the system']". Nearly 30 years later, there can be no dispute that the historically high vacancy rates among mental health staff observed during the review period had a detrimental impact on the plaintiff class. Sadly, CDCR continues to lack "sufficient staff to treat large numbers of mentally ill" class members incarcerated in CDCR institutions. *Id.*[52]

In large part because of these vacancies, particularly among primary clinicians, the Special Master found widespread noncompliance with Program Guide requirements across the

---

[52] In addition, the Special Master notes that many of the then-existing recruitment and retention problems noted by the Court in its 1995 opinion persist to this day. *See Coleman v. Wilson*, 912 F. Supp 1282, 1318-19 (noting trial evidence that defendants "acknowledged serious problems with recruitment and retention of psychiatrists and psychologists at institutions within the CDC" and "attributed this problem to non-competitive salaries, undesirable geographical locations and clientele, and inadequate incentives.").

15 institutions covered in this Report.  Moreover, the lack of mental health staff at these institutions negatively impacted the quality of care.  For instance, the high vacancy rate among primary clinicians led directly to unmanageably high caseloads.  These excessive caseloads interfered with the development of clinically adequate treatment plans.  Even in cases where treatment plans were appropriately responsive to patients' problems, symptoms, and diagnoses, the dearth of staff interfered with the ability to implement clinical interventions as planned by the IDTT and the patient.  This was reflected in problems with continuity of care, lack of primary clinician led groups assigned on individual patient need, and with individual sessions replaced with brief welfare checks,[53] often completed at cell side.[54]

Perhaps these deficiencies were to be expected given defendants' transition of most of the institutions reviewed in this report to a "triage" model during the review period.  *See supra* pp. 25-27.  However, while the Special Master is cognizant of the tremendous pressure those

---

[53] *See supra* p. 71 ("The lack of clinical groups was noted to be a recurring issue in patient records at the CHCF EOP, CIW EOP, CSATF STRH, MCSP EOP, and SVSP EOP."); *infra* pp.161, 230, 234, 273, 320, 376, 393, 395, 405, 522, 635; *see also* Exhibit B at 7, 8, 9, 11 (CHCF, CMC, CSP/Corcoran triage plans); Appendix C at 767-768, 770-771, 771-773, 778-780; (case review discussion of wellness checks) *id.* at 748, 758-759, 875-876, 921-923, 923-925, 932, 932-933, 933-934, 940, 976-977, 983-984, 1035-1037, 1037, 1041, 1045-1046, 1046-1047, 1059-1060, 1078-1079, 1098-1099 (regarding poor continuity of care)

[54] Indeed, what the Special Master observed in his Twenty-Fifth Round Monitoring Report remained applicable during the review period:

> [R]egardless of the reason(s) why [an increase in mental health staff vacancies] has occurred, these vacancies need to be filled.  Clinical staff are the conduit for the delivery of care to patients.  Without necessary staff, the chain of care is broken and patients are not treated.  This sort of breakdown manifests itself in, among other things, inadequate attendance by required clinical staff at IDTT meetings, delays in clinical contacts, and untimely completion of referrals for inmates who require higher levels of care, all of which undermine progress that has been made with the delivery of care.

ECF No. 4298 at 47 (emphasis added).

overburdened clinicians who remain in the institutions are under, the dearth of mental health treatment services observed during the review period was unacceptable.

Critically, the mental health staffing crisis should not be allowed to normalize a standard of care that falls short of what the Program Guide requires.  While prioritizing high-risk patients may be clinically appropriate as an emergency measure in the face of dangerously high staffing vacancies, defendants must "come to terms with the substance of its staffing plan," ECF No. 6427 at 48, and reorient its system to providing Program Guide compliant mental health services to the plaintiff class.

Relatedly, the Special Master is deeply concerned with defendants' noncompliance with the Court's 2014 order regarding transfers to ASU EOP Hubs which fail certification. *See supra* pp. 40-41.  Defendants acknowledge their noncompliance, *see* Exhibit F at 1, but persist in the practice of admitting patients to these units.  Similar to the Special Master's observations regarding triaging noted above, the Special Master notes this practice, violative of court orders, should not become normalized and defendants must take steps forthwith to stop these transfers to ASU EOP Hubs which fail certification.

Against this backdrop, defendants appear on the verge of again[55] steering the remedial phase of this case away from substantive compliance and into another round of protracted litigation.[56]  For instance, more than 20 years after the Court's 2002 order establishing maximum

---

[55] *See* December 17, 2019 Order, ECF No. 6427 at 45 ("In sum, litigation once again has trumped substantive compliance, a path defendants have taken repeatedly.").

[56] Defense counsel acknowledged the possibility of a future termination motion in its letter announcing defendants' expert tours.  *See* ECF No. 7886 at 14 ("Please note that while Defendants have retained experts to evaluate the MHSDS, Defendants have not made any decision to move for termination and are therefore not providing notice pursuant to this Court's February 21, 2018 Order.  ECF No. 5794.  Defendants may, in the future, take action to terminate or modify all or parts of this case – or none at all – pending the experts' determination

vacancy rates for mental health staff, *see generally* ECF No. 1383, defendants now argue there is "no quantifiable staffing threshold that is required by the Constitution, and that any arbitrary maximum vacancy rate is not an appropriate proxy for measuring Defendants' constitutional compliance."  Joint Report Regarding PIP Staffing Vacancy Rate, ECF No. 7937 at 2. Concurrently, during the monitoring round, defendants dispatched a team of 30 experts ostensibly to "evaluate the MHSDS," Declaration of Damon McClain in Support of Defendants' Portion of the Joint Statement Regarding Defendants' Consultant Tours, ECF No. 7885-1 at 4, though notably the expert team has already arrived at the conclusion that the requirements of the Program Guide and CDCR's staffing plan "exceed[] nationwide standards."  *Id.* at 13.[57]

Regardless of either party's litigation strategy going forward, the findings contained in this Report speak for themselves:  thousands of seriously mentally ill incarcerated persons in California continue to go without the level of mental health services required by defendants' plan to remedy the Eighth Amendment violations in this case.

---

and recommendations(s), at which time Defendants will provide six months' notice as required by this Court's February 21, 2018 Order.").

[57] *See* Exhibit B to Declaration of Elizabeth Falcon, Psy.D., in Support of Defendants' Portion of Joint Statement Regarding Tour Dispute, ECF No. 7884-2 at 3 ("Notably, results from this study found that *CDCR's Program Guide exceeds nationwide standards*."); *id.* at 4 ("VRJS/Falcon found that *staffing levels required by the Program Guide exceed national consensus standards* and *exceed the levels needed for providing clinically adequate care for patients in a correctional setting.*  In many instances, it was also found that *CDCR's staffing plan exceeds staffing standards in other comparison states studied.*"); *id.* ("VRJS/Falcon recommends considering a *realignment of the Program Guide to align with nationwide standards* more closely, which allow for more efficient and effective allocations of staffing and improved outcomes for treatment and programming."); *see also* Declaration of Elizabeth Falcon, Psy.D., in Support of Defendants' Portion of Joint Statement Regarding Tour Dispute, ECF No. 7884 at 4 ("VRJS/Falcon found that CDCR's Program Guide exceeds nationwide standards and that staffing levels required by the Program Guide exceed national consensus standards and exceed the levels needed for providing clinically adequate care for patients in a correctional setting.").

Defendants' ongoing noncompliance with the Court's orders related to mental health staffing is before the Court.  *See generally* ECF No. 7856.  Accordingly, the Special Master offers no formal recommendations and makes no request for additional court orders.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

December 22, 2023

131

# APPENDIX A

## SPECIAL MASTER'S ACTIVITIES

**ACTIVITIES OF THE SPECIAL MASTER <u>SINCE</u> THE FILING OF THE THIRTIETH ROUND MONITORING REPORT – PART B: SPECIAL MASTER'S MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS ON DECEMBER 15, 2023, ECF NO. 8085**

**DATA REMEDIATION ACTIVITIES**

- Business Rules and Methodology Review Workgroup – Two meetings

- Level 1 Data Dispute Meetings – None

- Level 2 Data Dispute Meetings – None

- <u>Indicator Status</u> (based on CDCR report given at the November 21, 2023 Business Rules and Methodology Review Meeting)[1]

| | |
|---|---|
| Total Number of KPI | 170 |
| Remediated (Validated and Verified) | 86 |
| Completed Programming | 124 |
| Completed Indicator Testing | 103 |
| Undergoing Stakeholder Review | 37 |

**COURT COORDINATION MEETINGS**

- None

**POLICIES**

- Statewide Master Treatment Plan Forms, release to the field November, 3, 2023 and November 21, 2023
- Psychiatrist Placement of Medical Holds, released to the field October 31, 2023
- PIP Policy – Housing Review/Least Restrictive Housing (LRH), released to the field September 26, 2023
- Telemental Health Services Policy, released to the field September 19, 2023
- Use of Mechanical Restraints in Mental Health Crisis Beds Policy, released to the field September 5, 2023

---

[1] As of December 21, 2023, the Special Master's data expert has remediated an additional eight indicators.

- Policy and Procedure Regarding Pre-Release Program, released to the field August 21, 2020
- Policy and Procedures regarding RVR MHAs, released to the field July 17, 2023
- Inmate Patient Property in the PIP, released to the field July 11, 2023
- SRE Mentoring Policy, released to the field June 7, 2023
- Updates to Enhancements to SPRFIT, released to the field June 14, 2023

## SPECIAL MASTER REPORTS ISSUED IN 2023

- Twenty-Ninth Monitoring Round Report – Part C: Special Master's Monitoring Report on the California Department of Corrections and Rehabilitation's Institutions with Enhanced Outpatient Programs Compliance with Provisionally Approved Plans, Policies, and Protocols, Filed February 7, 2023, ECF No. 7715

- Twenty-Ninth Monitoring Round Report – Part D: Special Master's Monitoring Report on the California Department of Corrections and Rehabilitation's Institutions with Correctional Clinical Case Management Programs Compliance with Provisionally Approved Plans, Policies, and Protocols, Filed February 7, 2023, ECF No. 7716

- Special Master's Report and Recommendations Regarding Third-Level Data Remediation Disputes Pursuant to the Data Remediation Dispute Resolution Process, March 9, 2023, ECF No. 7755

- Thirtieth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation, Filed May 11, 2023, ECF No. 7833

- Special Master's Report in Response to the Court's January 3, 2023 Order (ECF 7695) on the Status of *Coleman* Data Remediation, Filed June 30, 2023, ECF No. 7863

- Special Master's Response to the Court's May 24, 2023 Order, Filed August 8, 2023, ECF No. 7907

- Special Master's Report and Recommendation re Third Level Data Remediation Dispute Regarding Timely Compliance Methodology, Filed September 21, 2023, ECF No. 7954

- Special Master's Data Remediation Status Report, Filed October 13, 2023, ECF No. 8011

- Thirtieth Monitoring Round Report – Part B: Special Master's Monitoring Report on the Inpatient Mental Health Care Programs at the California Department of State Hospitals, Filed December 15, 2023, ECF No. 8085

## **APPENDIX B**

## **INSTITUTIONAL SUMMARIES**

**APPENDIX B-1**
**RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD)**
**(April 11, 2023 – April 14, 2023)**

Census:

On April 7, 2023, RJD housed 2,887 incarcerated persons, which was a 14 percent decrease from the prior reporting period. The 1,988 MHSDS patients represented 69 percent of RJD's population and was a nine percent decrease from the previous review period.

The MHCB housed ten patients.

The 764 mainline EOP patients reflected a six percent decrease since the prior reporting period; the 1,076 mainline 3CMS patients were a 13 percent decrease.

The administrative segregation population of 187 included 70 EOP hub patients and 68 3CMS patients pending transfer to STRH.

Staffing:

Positions for the chief and senior psychiatrists were filled. Of 14 psychiatry positions, 7.5 were filled, for a 46 percent vacancy rate. The use of 6.125 contractors reduced the psychiatry functional vacancy rate to three percent.

Both telepsychiatry positions were filled.

Both chief psychologist positions were also filled. Positions for seven of eight senior psychologist supervisors, and seven of eight senior psychologist specialists, were filled, reflecting 13 percent vacancy rates for each. Thirty-six of 51 psychology positions were filled, for a 29 percent vacancy rate. Three contractors reduced the psychology functional vacancy rate to 24 percent. Seven psychologists were unlicensed.

The supervising social worker position was filled. Eleven of 23.5 social worker positions were also filled, for a 53 percent vacancy rate; however, 3.5 contractors decreased the social worker functional vacancy rate to 38 percent. Five social workers were unlicensed.

Of 27.5 recreation therapist positions, 25.5 were filled, indicating a seven percent vacancy rate. Two RT contractors covered the positions for two recreation therapists on extended leaves.

One of two senior psych tech positions were filled. Fifty-five of 78.8 psych tech positions were also filled, for a 30 percent vacancy rate. Four psych techs were on extended leaves, increasing the functional vacancy rate to 35 percent.

All 15 MHSDS registered nurse positions were filled.

Of 11.8 CNA positions, 8.6 were filled, reflecting a 27 percent vacancy rate. Registry CNAs also filled two medical assistant positions that were assigned to telepsychiatry.

The CHSA position was vacant. All four HPS I, one of two OSS II, and one of 1.5 AGPA positions were filled.

Of 27.5 mental health clerical positions, 21.5 were filled, for a 22 percent vacancy rate.

As for custody staffing, the warden and chief deputy warden's positions were filled, as were five of six associate wardens' positions, and all seven captains' positions. Positions for 33 of 33.8 lieutenants, 94 of 109.8 sergeants, and all 25 CC Is and seven CC IIs were also filled. The 83 vacancies for 945.2 correctional officer positions indicated a nine percent functional vacancy rate.

At the time of the site visit, 16 clinical supervisors were responsible for supervising 26 unlicensed RJD staff or students, namely, six doctoral students, seven unlicensed psychologists, eight psychology interns, and five unlicensed social workers.

Telepsychiatry:

Both telepsychiatrists provided services for 3CMS patients and had respective caseloads of 246 and 287 patients.

Telework:

RJD permitted telework for all mental health staff, including one day weekly for executive staff. During the review period, the chief psychiatrist teleworked one day weekly, while the chief psychologists, seven senior psychologist specialists, four psychologists, and the supervising social worker teleworked two days weekly. Some of the AGPA and HPS I staff were also permitted to telework for up to two days weekly, while most MHSDS clerical staff teleworked 2.5 days weekly.

Staff Recruitment:

RJD advertised staff openings on the "Cal Careers" (jobs.ca.gov) and CCHCS Changing Prison Health Care websites and participated in various career fairs.

Quality Management:

The institution continued to have an active quality improvement program, which appeared to have changed little from the prior reporting period.

The local governing body met quarterly. Meeting minutes for October 2022 indicated the warden's absence but other required members' attendance. Agenda items included review of minutes from the health care executive committee and the health care quality management committee, and review and approval of various policies, including those for the CTC. RJD did not provide the local governing body's minutes from January 2023.

The quality management committee met monthly. Reviewed minutes reflected robust agendas and detailed minutes. Agenda items included access to care reports, performance

improvement workgroup projects, emergency response summaries, subcommittee reports, electronic health care incident reporting, the CIT, and executive leadership joint rounding.

The mental health program subcommittee met five times. Reviewed minutes indicated useful meetings and good attendance by required staff. Agendas' addressed review of local operating procedures, the custody and mental health partnership plan, the CIT, patient safety issues, performance report monitoring, refused treatment, corrective action plans, suicide prevention, healthcare grievance reports, ISUDT, EOP hub certification reports, clozapine, and statewide and local initiatives, among other matters.

RJD also conducted quality improvement projects that addressed various issues, including timely psychiatry EOP routine contacts, which determined that the two main reasons for late appointments were late scheduling and rescheduling due to provider unavailability. Other quality improvement projects addressed medication continuity following community hospital returns, the HLOC project, and suicide precaution.

RJD corrective action plans addressed annual suicide prevention training, custody discharge checks, improving psychiatry productivity, timely IDTTs and primary clinician contacts, offered treatment hours, and eliminating suicide precaution rounding violations in the CTC.

The Emergency Medical Response Review Committee met monthly. Reviewed minutes demonstrated comprehensive reviews of relevant cases with documented discussions and recommendations.

RJD did not conduct QIT/FITs during the review period.

RJD did not perform peer review while it awaited a headquarters' directive about training and instruction for the peer review process.

Mental health leadership reported disseminating quality improvement information to mental health line staff by way of direct communications from supervisors to line staff. However, this was inconsistent with information obtained from line staff, who reported a lack of familiarity with the quality improvement process.

Medication Management:

RJD provided MAPIP results from September 1, 2022 through February 28, 2023 for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated that RJD was compliant for the entire review period for monitoring blood pressure, height, weight, and thyroid function tests. RJD was compliant with monitoring EKGs for four of six required months. As for medication consents, RJD was compliant for three months. There was compliance with required monitoring of glucose for only one month. Dishearteningly, RJD was noncompliant for the entire review period for the measures for Abnormal Involuntary Movement Scale (AIMS), Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), and lipids.

On October 1, 2022, RJD became a clozapine initiation and maintenance facility. At the time of the site visit, three RJD patients were prescribed clozapine. The institution reported that the senior psychiatrist closely monitored these cases in collaboration with the patients' psychiatrist. The MHCB performed all clozapine trials.

As for the close monitoring that was required for clozapine, for monitoring CBCs RJD was compliant for all three required months. RJD was also compliant for two of six required months for blood pressure, glucose, height, weight, CMP, and lipids. For EKGs, RJD was compliant for one of six required months. For monitoring AIMS, there was noncompliance for

one of six required months.  No data was required for medication consents or thyroid function tests.

For monitoring antidepressants, RJD was compliant for the duration of the reporting period for thyroid tests, and for blood pressure for patients taking venlafaxine.  For monitoring EKGs, RJD was compliant for one of three required months.  There was compliance for one month for medication consents.

For patients prescribed carbamazepine, RJD was compliant for one of six required months for obtaining medication consents.  CBC, CMP, and medication blood level monitoring were not required during the review period.

As for patients prescribed Depakote, there was compliance for three months for obtaining medication consents.  There was compliance for two months for monitoring CBC with platelets, and for only one month for both CMP and therapeutic medication level monitoring.

For lamotrigine, RJD was compliant for obtaining medication consent for five months.

Regarding lithium, RJD indicated compliance with medication consents for four months. There was compliance for two months for monitoring EKGs and thyroid tests, and for one month for monitoring medication blood level and for checking kidney function tests.

RJD explored the reasons for the low compliance with laboratory monitoring and found that refusals were particularly high for fasting labs.  The institution further reported that frequent changes in psychiatrists, due to staffing shortages, likely contributed to the low AIMS rate.  RJD reported difficulties, especially with patients completing appointments, taking medications, and obtaining laboratory studies on the Level IV facility.  It indicated that one contributing factor "seems to be lower commitment by corrections officers to facilitate appointment attendance and

medication adherence in comparison to other facilities at RJD."  Another identified factor was the high rate of substance use on that facility, with the resultant need for facility searches.

For medication management metrics reported by mental health headquarters, RJD reported compliance with medication continuity upon parole/transfer to the community for the duration of the reporting period.  There was compliance for two months for continuity of medications with intra-institutional transfer to ASU/SHU/PSU.

Shockingly, RJD was noncompliant for the entire reporting period for medication continuity upon inter-institution transfer at receiving and release (R&R), continuity of nurse administered and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity for MHCB transfers and following discharge/transfer from a community hospital and/or DSH, observation of HS medication preparation and medication preparation AM and PM, chronic care medications historical administration, and outpatient provider new medication orders.

RJD did not report the total number of mental health patients who were prescribed psychiatric medications, the total number of psychiatric prescriptions, or the number of patients prescribed Keep on Person (KOP) medications.  However, the institution indicated 104 KOP prescriptions, of which 81 were for SSRIs; the remaining 23 medications were for vitamins, iron supplements, and medications to address the psychiatric side effects of dry mouth.

Medication lines generally did not exceed two hours, while individual patient wait times were less than 30 minutes.  However, Facility C intermittently had medication lines exceeding two hours that were frequently due to urgent medical transports or fog.  The institution also reported that each medication window had an awning as protection from the elements and

inclement weather, but only during medication administration, and not while patients were waiting in line.

There was an approximate 12 percent rate for prescribing non-formulary medications. However, the method by which the data was submitted did not readily allow for a calculation of the number of patients who were prescribed non-formulary medications.

RJD reported 117 required polypharmacy reviews during the review period. The institution was generally compliant for physician review of the medications and obtaining required EKGs. RJD further indicated that mental health pharmacists paid particular attention to patients who were prescribed more than one antipsychotic medication, alerting psychiatrists when these were reported.

RJD did not separate the number of prescribed HS medications by medical and mental health. It was thus not possible to readily determine the number of mental health prescriptions prescribed at HS. However, RJD was generally timely for HS medication administration; when an HS medication was not administered, it was generally due to patient no-show or refusal.

During the review period, RJD submitted 75 PC 2602 involuntary medication petitions; there were 16 initial and 59 renewal petitions. One petition was withdrawn due to a change in the patient's clinical condition. Two petitions were denied. RJD did not report the number of patients who received PC 2602 involuntary medications at the time of the site visit.

RJD denied any logistical barriers with the PC 2602 process, such as difficulties uploading documents or scheduling hearings with the administrative law judge, or submitting packets to the Office of Legal Affairs. Psychiatry leadership reported weekly monitoring of the PC 2602 quality management registry, and closely monitoring order expiration dates, patient transfers, and related information.

RJD was compliant for the entire review period for having the PC 2602 court order in the chart. For the related metric of compliance with having the PC 2602 psychiatrist medication order in the chart, RJD was compliant for four months.

There were no use of force incidents to administer PC 2602 medications.

<u>Transfers</u>:

The regional teams' major and minor sustainable process reviews were suspended during the review period, as the regional senior psychologist specialists had been redirected to focus on the unmet needs assessment (UNA) project. The headquarters reviewer and RJD's inpatient care coordinator nonetheless continued to audit higher level of care documentation for patients with positive HLOC referral indicators. While the headquarters' reviewer's results were not provided, institutional audits revealed RJD clinicians' 76 percent noncompliance for HLOC documentation requirements, including non-referral rationales and the development of enhanced treatment plans in lieu of inpatient care referrals. RJD's inpatient care coordinator further reported that training that mental health staff had received since the prior site visit to address these deficiencies had not resulted in compliance, elaborating that staff vacancies and attention to higher priority tasks impeded their ability to implement additional corrective actions.

During the review period, there were 1,284 instances of patients considered for, but not referred to, higher levels of care.

RJD referred 29 patients to acute care; 20 were accepted, three were rescinded, one was referred to the MHCB, and five were discharged. Six of 20 or 30 percent of patients timely transferred within ten days.

RJD also referred 20 patients to intermediate care; 11 referrals were accepted, four were rescinded, three were referred to the MHCB, one was discharged, and one referral was still pending. None of the 11 patients transferred timely within 30 days.

There were eight *Vitek* hearings for six acute and two intermediate care patients. Data on *Vitek* hearings' timeliness was not provided. No patients prevailed.

Three patients with complex medical needs were transferred to inpatient care.

RJD made 936 MHCB referrals, of which 703 or 75 percent were rescinded. Of the 233 MHCB admissions, 12 or five percent took longer than 24 hours to transfer. The reasons for untimely admissions included five patients having medical holds, six patients being out to the hospital, and one patient refusing to transfer.

Three patients had three or more MHCB admissions.

There were 834 patients in alternative housing during the review period.

RJD did not provide PSU transfer data.

There were 118 patients who were endorsed to the administrative segregation EOP hub within 30 days of identification and 16 who were endorsed beyond 30 days.

During the reporting period, 53 patients' level of care was reduced from EOP to 3CMS.

Fifty-two of 158 or 33 percent of 3CMS patients housed in administrative segregation timely transferred to STRH within 30 days; late transfers ranged from one to 140 days. Reasons for delays were not provided.

Four patients were referred to LTRH; two timely transferred within 30 days, one referral was rescinded, and one was endorsed but had not yet transferred due to a temporary medical hold.

Programming:

MHSDS Patients in Administrative Segregation:

RJD's administrative segregation units were located on Facility B in housing units 6 and 7. Facility B-6 was the administrative segregation EOP hub, while Facility B-7 housed 3CMS patients awaiting transfer to STRH, and non-MHSDS incarcerated persons. MHSDS patients in restricted housing were escorted to and treated in a separate healthcare treatment building that was located behind these housing units; this building provided sufficient confidential space for IDTTs, and individual and group treatment. Group rooms contained either TTMs or restart chairs.

RJD prioritized the staffing of the administrative segregation programs, with management assigning nearly all newly hired clinicians to the unit. As a result, RJD satisfied the minimum structured treatment activity hours for EOP hub patients, and weekly PC contacts for 3CMS patients in administrative segregation. The institution also required new primary clinicians to cover at least one weekend day for at least six months although some new hires were unlicensed. The monitor's expert expressed concerns to leadership about an overreliance on inexperienced and unlicensed clinicians in restricted housing due to this populations' high-risk nature. The monitor's expert also noted that this administrative segregation staffing model was driven more by senior staff's resistance to or disinterest in working in restricted housing rather than the clinical needs of administrative segregation patients.

The monitor's expert observed 13 IDTTS for EOP and 3CMS patients housed in administrative segregation over a two-day period. All necessary treatment team members attended with access to patients' records. Although different primary clinicians presented, the IDTTs operated similarly with the same supervisor and psychiatrist present during all IDTTs.

After observing significant IDTT deficiencies on the first day, the monitor's expert met with the EOP hub supervisor to provide feedback. The monitor's expert highlighted concerns with the IDTTs' failure to review clinically relevant background information, including suicide history, treatment prior to administrative segregation placement, length of time at the current level of care, administrative segregation length of stay, and the reason for placement in segregation. The IDTTs also did not provide current suicide risk information and did not discuss safety concerns and case formulations, as well as neglecting to collaboratively determine diagnoses, level of care justifications, treatment interventions, and clinically indicated treatment plan modifications. While diagnoses, treatment interventions, and level of care plans were stated for most patients, this information generally came from only one provider. In two cases, the monitor's expert prompted the discussion of diagnostic uncertainties by the treatment team, who acknowledged the need for clarification.

The administrative segregation supervisor appeared to implement the monitor's expert's feedback, as IDTTs improved significantly on the second day of observation. During these IDTTs, primary clinicians presented cases appropriately, while the administrative segregation supervisor prompted staff or asked patients follow-up questions to attempt to ensure coverage of critical areas. Nonetheless, collaboration remained an area needing improvement; without it, team members operated in solos in determining diagnosis, level of care, and treatment foci.

Two non-clinical issues identified during IDTT observation involved custody officers' cuffing practices and conflicting programming/services that contributed to higher IDTT refusal rates. Two of five custody officers who escorted patients to IDTTs routinely locked patients in a TTM without removing their hand and waste cuffs. When the monitor addressed this issue with the administrative segregation mental health supervisor, it was reported that officers "usually"

asked patients whether they agreed to remain cuffed in the locked TTM before entering the IDTT room.  The monitor's expert raised this issue with the chief of mental health by opining that the administrative segregation supervisor should be checking in with each patient for confirmation and/or reminding custody staff to remove the cuffs upon the patient's placement in a locked TTM.  Notably, one patient who remained cuffed in the locked TTM was in the unit for safety reasons.

Six of 13 observed IDTTs occurred *in absentia* due to patient refusals.  Commonly reported refusal reasons were custody's failures to provide ducats and timely escorts,  which resulted in patients having to choose among conflicting programming.  Treatment team members stated that some patients whose IDTTs were completed *in absentia* prioritized showers, yard, or other activities occurring simultaneously.

Data for EOP hub patients indicated that they were generally offered the required minimum weekly hours of structured therapeutic treatment.  Specifically, on average they were offered 13.5 weekly hours of structured treatment activity, attending 6.25 hours and refusing 7.25 hours.

EOP hub patients had access to treatment groups led by clinicians, recreation therapists, and nursing staff.  The total number of primary clinician-led groups had increased to approximately two per patient since the prior review period.  EOP hub patients nonetheless expressed an interest in more structured clinical core groups that focused on curriculum-based learning, such as anger management, instead of unstructured and process-oriented groups.

Two observed clinician-led groups were unstructured, process-oriented, and similar to recreation therapy groups.  Although the patients were engaged, they needed curriculum-based groups focusing on relevant topics such as anger management, criminal thinking, conflict

148

resolution, and relapse prevention; this was especially true because clinician-led groups comprised only 20 percent of offered treatment.

Most administrative segregation staff and patients attributed delayed patient escorts to appointments to population overages and increasingly disruptive behaviors among administrative segregation patients. Staff and patients added that the delays often started with morning meals and medication pass, which then impacted subsequent scheduled appointments and other activities.

All required ICC members attended five observed ICCs, but patients only attended three ICCs. The ICC chairperson's decisions reflected consideration of mental health input. The ICCs released two patients from administrative segregation. Two of three patients were retained in the unit due to pending RVRs; the remaining patient was retained pending resolution of a safety issue.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP hub stays.

Fourteen of 15 or 93 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Thirty-three percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals and COVID-19 quarantines following transfers. None of the initial psychiatry assessments utilized telepsychiatry.

Twelve of 16 or 75 percent of routine psychiatry contacts timely occurred at least every 30 calendar days; only 25 percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, COVID-19 precautions, and lack of available treatment space. Telepsychiatry was not used for any reviewed routine psychiatry contacts.

All 17 patients who required initial primary clinician evaluations had timely contacts before the initial IDTT. Only 24 percent were indicated as having been held in a confidential setting. Reasons for non-confidentiality included patient refusals and COVID-19 quarantines following transfer to the EOP hub.

Twenty-nine of 38 or 76 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Forty-one percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, COVID-19 precautions, and custody modified program.

Thirteen of 14 or 93 percent of patients had required initial IDTTs within 14 calendar days of admission to the EOP hub. All required staff attended initial IDTTs, but patients only attended 36 percent. Reasons for holding initial IDTTs *in absentia* included patient refusals, custody modified program, and COVID-19 precautions.

All four patients who required routine IDTTs had timely routine IDTTs every 90 calendar days. Required staff attended all routine IDTTs; patients attended 50 percent. Reasons for holding routine IDTTs *in absentia* included patient refusals and COVID-19 precautions.

There were reported delays in administrative segregation with the provision of basic supplies, as well as delays in patients receiving hand crank radios and personal property. There were also reports of patients being served cold meals, unsanitary shower cells, and a lack of hot water within cells, and adequate reading materials on the units. Some patients had reportedly responded by going "man down" or flooding their cells in an attempt to have their needs met.

Interviewed administrative segregation patients, mental health clinicians, and nursing staff confirmed all of these concerns. Some healthcare staff expressed significant frustration and described the treatment of administrative segregation patients as "inhumane." While RJD had

recently resolved the hand crank radio issue, staff and patients reported ongoing problems with unsanitary shower conditions, a lack of hot water in cells, and delayed access to hygiene products, mattress pads, sheets/blankets, clean clothing, toilet paper, and toothbrushes.  Staff and patients also emphasized the importance of obtaining library books and in-cell packets, as administrative segregation lacked tablets and electrical outlets for televisions.  Several healthcare staff elaborated that administrative segregation patients' response to being "mistreated" resulted in a more challenging work environment.  Nursing stated that the resulting "chaos" in the units at times delayed medication pass and attendance at scheduled medical appointments.  Staff elaborated not being informed of any corrective actions to address these concerns, despite having elevated them verbally and in writing to leadership on several occasions.

Custody leadership also confirmed being aware of these issues.  Custody leadership further stated that, while there were no current plans to address the hot water issue, there was a plan to address the lack of basic items provided to new arrivals.  As for library books, the captain reported typically waiting for patients to leave a book behind or occasionally borrowing books from another unit.  Overall, the meeting with administrative segregation custody leadership demonstrated a perceived lack of appreciation of these issues' severity.

During the review period, the EOP hub was certified four times without explanation and twice with explanation.  There was compliance for all certification requirements from September through December 2022.  During January 2023, there was noncompliance with timely PC contacts and administrative segregation pre-screens.  During February 2023, there was noncompliance for sufficient showers and patient out-of-cell time.  Notably, mental health leadership opined that to achieve compliance with requirements for MHSDS administrative

segregation patients, staffing resources were often redirected from other programs, which suffered due to such redirection.

The monitor reviewed 12 weeks of 114-As for EOP hub patients. The 114-As for all 12 weeks reflected the offering of more than ten weekly hours of yard, while showers were offered at least three times weekly for nine of 12 weeks. Regrettably, none of the 114-As indicated the issuance of a radio to patients within 72 hours of placement. Although the 114-As also did not reflect the required offering of telephone calls to patients, custody staff produced a weekly list of EOP hub patients who made weekly phone calls. None of the reviewed 12 weeks noted the occurrence of weekly linen exchange.

Reviewed 114-As for eight weeks for 3CMS patients housed in administrative segregation indicated the offering or ten or more weekly hours of yard for six of eight weeks; patients were offered three weekly showers for four of eight weeks. None of the reviewed 114-As indicated the issuance of a radio within 72 hours of arrival, or weekly linen exchange. Only one patient's 114-A reflected the making telephone calls.

Non-Disciplinary Segregation:

Although the administrative segregation sergeant had a current NDS patient list, RJD lacked a coherent system that documented the issuance of personal property to NDS patients. Staff reported that patients had to request, complete, and return an NDS property form to custody, after which the property officer issued allowed items to the patient. RJD's LOP required notating the issuance of personal property to the patient on the 114-A; however, none of five reviewed NDS patients' 114-As reflected this notation.

<u>MHCB</u>:

RJD operated a 14-bed MHCB, which included two potentially available "non-designated" swing beds that medical services controlled. Four beds were ADA-compliant. Review indicated that property, bedding, mechanical restraints (cuffing), and movement restrictions were timely reviewed and relaxed when appropriate.

The MHCB's daily census averaged 11.8 patients. MHCB clinical lengths of stay averaged 8.9 days, with approximately 20 percent of patients having clinical stays exceeding ten days. Physical stays averaged 11.4 days; approximately 35 percent of patients had physical stays that were longer than ten days. Administrative discharge delays were typically due to transportation logistics.

The MHCB had a very high recission rate, which staff attributed to the high number of patients accidentally overdosing on illicit drugs and being sent to an emergency room. These patients frequently returned to RJD after hours and were placed on suicide precaution and referred to the MHCB by either the psychiatrist on duty or nursing staff. After assessment the following morning, the patient acknowledged that the overdose was accidental and not a suicide attempt, and the referral was rescinded.

All new MHCB admissions were given a history and physical within 24 hours, and an updated or new mental health assessment, which was generally, but not always, conducted confidentially. New MHCB admissions were also given a suicide risk assessment, if admitted for suicidal behavior, and an initial IDTT within 72 hours, where there was consideration of referral to a higher level of care. There was also a suicide risk assessment as part of patients' discharge planning. Reviewed discharge summaries were legible, clinically meaningful, and completed timely.

MHCB patients were neither offered dayroom nor yard, but yard was utilized for recreation therapy-directed treatment, which was usually provided individually. The yard, which was of adequate size, was not used for unstructured out-of-cell time due to custody staff allocation issues. This resulted in MHCB patients effectively being locked down and likely negatively impacted their speed of recovery, which was concerning.

Four observed MHCB IDTTs were attended by required staff. Two of the patients were being discharged and the IDTTs addressed their discharge plans. The IDTT process was very good, and all treatment team members contributed.

One of the IDTTs was for a transgender female who had been incarcerated for almost 50 years. Five days earlier, she had been re-sentenced as part of the three strikes legislation, resulting in a reduced sentence, and she was to be released on April 13, 2023. She was admitted to the MHCB on April 7, 2023, as she was overwhelmed with anxiety and suicidal ideation. The MHCB staff subsequently undertook herculean efforts to develop a viable release plan for her, for which she was appreciative, and which would at least give her a chance to successfully transition back to the community. Nonetheless, this release process made it very difficult due to the short timeframe.

MHCB staff appeared to be a very cohesive group who were very clinically competent and conscientious. MHCB concerns focused on physical plant limitations and custody staff allocations. Specifically, only one MHCB office space was available for clinical assessments and treatment. This had resulted in many nonconfidential clinical contacts, which had been a chronic problem and had seemingly resulted in non-confidential clinical contacts being "normalized." There were several potential remedies for this, which included converting the rarely used seclusion room to an office for clinical assessments or using it for clinical contacts

when it was not being used for seclusion.  One of the restraint rooms, which also was rarely used, could also be used for seclusion.  Otherwise, RJD should consider constructing an office adjacent to the small yard as, under most circumstances, it was not clinically appropriate to perform non-confidential clinical interventions.

Twenty MHCB charts were selected for review for compliance with Program Guide timeframes.

All 20 or 100 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 24 hours of patient arrival.  Fifty percent were conducted in a confidential setting.  Reasons for non-confidentiality included the lack of confidential treatment space, patient refusals, and custody modified program.  It was not possible to determine the reasons for non-confidentiality for two patients.  Telepsychiatry was not used for initial psychiatry assessments.

All 27 required twice weekly routine psychiatry contacts timely occurred.  Forty-four percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals, a lack of available confidential treatment space, and mental health modified program. Telepsychiatry was not utilized for these contacts.

Eighteen of 20 initial primary clinician evaluations timely occurred within 24 hours of admission.  Fifty percent were conducted in a confidential setting.  Reasons for non-confidentiality included patient refusals, a lack of available confidential treatment space, mental health modified program, and COVID-19 restrictions.

For routine primary clinician contacts, 174 of 175 or 99 percent timely occurred.  Forty-one percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals, a lack of available confidential treatment space, "weekend protocols," and mental health modified program.

155

All 19 or 100 percent of initial IDTTs timely occurred within 72 hours of patients'

arrival. Required staff attended 79 percent; patients attended 74 percent. Reasons initial IDTTs

were held *in absentia* included patient refusals, while one patient was out to the hospital.

Fourteen of 25 or 56 percent of routine IDTTs timely occurred every seven calendar

days. Required staff attended 96 percent; patients attended 84 percent. Reasons routine IDTTs

were held *in absentia* included patient refusals, while one patient was out to the hospital. Of

note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at

initial and routine IDTTs, but this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

RJD utilized neither seclusion nor restraint during the review period.

Crisis Intervention Team:

During the review period, there were 97 CIT interventions that resulted in 23 MHCB

referrals. However, RJD was not sufficiently staffed to maintain a functional CIT as

conceptualized by the statewide CIT policy. In reality, CIT clinicians frequently responded

alone.

EOP patients reported that they had to use the "magic words" of "man down" or report a

suicidal intent for custody staff to provide them with timely access to mental health staff when in

crisis. Staff shortages also negatively impacted the CIT. Custody and nursing vacancies resulted

in their delegation down the chain of command and sometimes to staff who were not appropriate

per the statewide CIT policy; for example, the unit officer would respond with the clinician

rather than a custody supervisor. Because of the many tasks required of staff, mental health

leadership reported that after a clinician had waited for approximately ten minutes for other CIT

members, the clinician would respond alone, though they reportedly consulted with custody or

nursing staff. Record review confirmed that it was common for the clinician to see the patient alone.

Alternative Housing:

Alternative housing staff included one full-time psychologist, and two part-time psychologists.

RJD reported 834 alternative housing placements. Two patients whose alternative housing placements exceeded 24 hours were in alternative housing for 24.1 and 30 hours; the latter placement was delayed due to the patient's refusal to transfer.

RJD's alternative housing LOP was outdated; however, the institution reported that the LOP was in the review process at the time of the site visit. In accordance with CDCR policy, the LOP identified the approved locations for alternative housing. However, mental health and custody staff further reported that alternative housing was also conducted in certain cells in Facilities B-6 or B-7 for administrative segregation patients, and certain other cells for general population patients, which were not in compliance with statewide policy.

EOP:

RJD housed EOP patients on Facilities A, C, and E. Facility A was a non-designated Level III mainline yard with a 300 EOP patient capacity; EOP patients were housed in housing units 1 and 2. Facility C was a Level IV SNY, but the EOP was non-designated; the capacity was also 300 EOP patients. Facility E was a Level II programming yard (similar to non-designated in that SNY and non-SNY were expected to live and program together) with an EOP capacity of 264 patients.

Due to RJD's staffing shortages, the institution prioritized clinical and administrative activities in different ways across yards; however, it recognized that it was unable to meet most

Program Guide timelines despite recent improvements.  No triage process was reported for the Facility E EOP program; Facility E patients reported being seen individually every other week by their clinician, having primary clinician groups on alternate weeks, and also being seen regularly by psychiatry.  The Facility A and E programs both reported the completion of some IDTTs *in absentia* when there was a program lockdown and/or due to patient refusals.  When patients refused primary clinician groups, they were typically not seen unless they were somehow prioritized (e.g., placed on the suicide risk management program, identified by the PC as "high risk," etc).  Cell-front PC contacts were allowed on all EOP yards even if not required based on triage status.  For example, PCs were not required to conduct cell-front contacts if a patient refused a primary clinician group, but mental health supervisors reported that many PCs conducted these cell-front contacts.  Telepsychiatry was not used for EOP patients on any of the EOP yards.

RJD was unable to provide the amount of structured treatment activity hours by EOP yard/program, as this data was aggregated for the entire population.  EOP aggregated data indicated that RJD offered an average of 11 weekly hours of structured treatment activities per patient on Facilities A, C, and E.  These patients attended a weekly average of 4.73 hours of structured treatment, refusing 57 percent of treatment.  Except for primary clinician "check in" groups, recreation therapists provided all group treatment.  Interviewed patients reported that this was a significant reason for their lack of attendance, elaborating that they did not believe that treatment groups were valuable.  Another reported reason for group nonattendance was recreation therapy groups' size and patients' fears of being around certain other patients and/or large amounts of people.  RT groups often combined structured and unstructured treatment.

Review of a random sample of records revealed that psychiatrists and primary clinicians generally did not see EOP patients, which was attributed to RJD's staffing shortages.  The site visit also identified another critical data compliance problem.  Specifically, primary clinician "check-in" groups were offered weekly, in an effort to ensure that PCs saw patients in some capacity.  However, there were often two to three weeks between primary clinician individual contacts, though the patient was seen in a PC "check-in" group, unless he refused.  When this indicator was reviewed with on-site and regional staff, it was determined that compliance was overestimated.  In other words, if a patient was only seen individually every three weeks for 12 weeks but was offered weekly PC groups, compliance would be calculated as 100 percent rather than 33 percent.  Further, PC check-in groups varied significantly across EOP yards and by provider (providers were given great flexibility in determining how the group would function), and did not fully meet the intended structure of PC alternate-week treatment groups (i.e., the original intent was that these would be treatment groups with specific treatment goals).

Seventeen observed EOP IDTTs across all yards revealed attendance by all required disciplines; however, the assigned psychiatrist and CC I were not always present, but they had nonetheless reviewed relevant records.

Overall, IDTTs varied in quality based on treatment teams, and primarily due to the primary clinician.  Attending supervisors solicited information that the PC did not provide.  Treatment teams knew patients and respectfully interacted with them and solicited additional treatment goals from patients.  The Facility A EOP supervisor and the Facility E EOP treatment team were particularly skillful in their abilities to positively interact with patients, utilize patient input, and prompt additional information from other treatment team members.  The IDTTs nonetheless did not adequately cover current symptoms and treatment interventions, while there

was insufficient discussion of treatment overall. Some treatment teams interacted more spontaneously and appeared more cohesive while others were primarily PC presentations. Higher level of care considerations were not routinely discussed and decided as a team.

RJD custody and mental health management reported that Facility E maintained a practice, which reportedly was in place since its activation, that intermingled EOP, 3CMS, and non-MHSDS incarcerated persons during yard, meals, canteen, and education. There were also patient reports of non-MHSDS inmates' access to Facility E EOP patients' living areas. However, because of Program Guide requirements regarding alternative education, work, and recreational opportunities for EOP patients, this intermingling violated the Program Guide. Mental health staff nonetheless reported that no concerns had been reported to them and custody leadership indicated that there had not been any serious "incidents." Several interviewed EOP patients also reported no major concerns with such intermingling. Nonetheless, some EOP patients reported feeling that some non-EOP individuals in groups looked down on them or did not always treat them respectfully, though they further reported that there was no violence or verbal aggression. The EOP patients nevertheless opined that they would prefer groups with only EOP participants.

Nineteen EOP patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Of the nine patients who required initial psychiatry assessments, four or 44 percent had one prior to the initial IDTT and within 14 calendar days of arrival or change in the level of care. Sixty-six percent were conducted in a confidential setting. Reasons for non-confidentiality included appointments being held at cell front due to patient refusal or COVID-19 movement restrictions.

Forty-eight of 73 or 66 percent of required routine psychiatry contacts timely occurred at least every 30 calendar days.  Fifty-seven percent were conducted confidentially.  Reasons for non-confidentiality again included appointments being held at cell front due to patient refusals or COVID-19 movement restrictions.

Nine EOP patients required initial primary clinician evaluations.  All nine had these required contacts within 14 calendar days of arrival or change in level of care.  Fifty-six percent were conducted in a confidential setting.

Forty-six of 92 or 50 percent of required routine primary clinician contacts timely occurred at least every seven calendar days.  Sixty percent were conducted in a confidential setting.  Reasons for non-confidentiality included appointments being held at cell front due to patient refusals or staffing shortages.

Eight of nine or 89 percent of initial IDTTs timely occurred within 14 calendar days of arrival or level of care change.  Required staff attended 89 percent of initial IDTTs; patients attended 66 percent.

Fifteen of 20 or 75 percent of required routine IDTTs timely occurred within 90 days.  Required staff attended 94 percent; patients attended 48 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, such assignment was not clearly discernable for all cases.

3CMS:

Mainline 3CMS patients were housed on Facilities A, B, C, D, and E.  Several primary clinicians' caseloads on these facilities exceeded staff-to-patient ratios.  Further, Facility B had

very recently transferred its one assigned mainline 3CMS clinician to cover inpatient care coordination duties.

During the site visit, the monitor's expert observed 3CMS IDTTs on Facilities C, D, and E. Unfortunately, IDTTs scheduled for Facility B were cancelled due to the redirection of the mainline 3CMS clinician. All required members attended observed IDTTs and had access to patients' healthcare and custody records. Facility D used telepsychiatry for IDTTs and there were no technology issues observed or reported by staff on this yard. Overall, observed IDTTs were adequate, with all treatment team members providing relevant input and collaboratively critical treatment plans. Nonetheless, given mental health staff's inability to timely meet with mainline 3CMS patients for routine referrals and scheduled contacts, the IDTTs should have further communicated with patients and provided examples of urgent and emergent requests to ensure that patients' needs were met.

Due to patient refusals, approximately half of observed 3CMS IDTTs were completed *in absentia.* While Facility D clinicians stated that they would approach these patients at cell front to check in and share the IDTTs' outcomes, due to staffing shortages Facility A and E clinicians generally did not follow-up with patients who refused to attend.

Several interviewed 3CMS patients expressed frustration, disappointment, and a "loss of faith" in mental health due to the lack of timely contacts, responses to healthcare requests, and the overall lack of communication about changing providers and realistic timelines for contacts. Some patients reported not having seen their providers in six months to one year.

3CMS patients had access to mental health treatment groups on Facilities A, C, and E. Treatment groups addressed criminal thinking, grief and loss, mindfulness/coping skills, substance use, and dialectical behavior treatment (DBT). Facility C also offered LGBTQ

support groups, and RJD was in the process of planning their second pride event with volunteer presenters from the community.  3CMS group schedules indicated the scheduling of 22 weekly groups on Facility A, and nine groups each on Facilities C and E.  During the review period, Facility B offered at least one group for 3CMS patients.  Facility D did not offer 3CMS groups during the review period or at the time of the site visit.  Despite the offering of 3CMS groups on most yards, interviewed 3CMS patients and group treatment waitlists indicated that a large number of 3CMS patients desired more groups.

Telepsychiatry was used for Facility D's 3CMS patients.  The program supervisor and staff reported no problems with its use, elaborating that the assigned telepsychiatrist was consistently available and worked well with patients and other treatment team members.  Further, no telepsychiatry issues were observed during Facility D's 3CMS IDTTs.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.  One patient was in 3CMS for too short a period and was therefore screened out of the review process.

Two of five or 40 percent of patients who required an initial psychiatry evaluation timely had one prior to the initial IDTT.  Only one initial psychiatry evaluation occurred in a confidential setting.  Reasons for non-confidentiality included COVID-19 restrictions.  Telepsychiatry was not used for initial psychiatry assessments.

Nineteen of 26 or 73 percent of required routine psychiatry contacts occurred at least every 90 days.  Sixty-eight percent were conducted in confidential settings.  Reasons for non-confidentiality included unplanned cell-front visits and patients refusing to attend confidential appointments.  Telepsychiatry conducted 56 percent of reviewed routine psychiatry contacts.

Two of five or 40 percent of patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. Forty percent were conducted confidentially. Reasons for non-confidentiality included COVID-19 regulations. No initial PC assessments were conducted using telehealth.

Seventeen of 31 or 55 percent of required routine primary clinician contacts timely occurred at least every 90 days. Fifty-one percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Regrettably, three patients were not seen by their PC at all during the review period. No routine PC contacts were conducted using telehealth.

Three of five or 60 percent of initial IDTTs timely occurred within 14 working days of arrival or a level of care change. Required staff attended 60 percent; patients attended 80 percent. One IDTT was held *in absentia* due to the patient's refusal to attend.

One of ten routine IDTTs at least occurred annually. Required staff attended 80 percent; patients attended 30 percent. Six of ten routine IDTTs were missing for patients who required them. One patient had not had an IDTT in over two years. Reasons routine IDTTs were held *in absentia* were due to the lack of custody transport. Of note, while a primary clinician and psychiatrist were in attendance at IDTTs, it could not be determined for every case whether the assigned treatment providers were in attendance as the Program Guide required.

Other Issues:

Pre-Release Planning:

RJD's pre-release coordinator was a social worker supervisor who had two backups, both of whom were also social workers. A TCMP supervisor and two staff members also provided services.

Like during the prior review period, RJD tracked patients who required pre-release planning, and the provided services.  Staffing shortages resulted in some yards not offering pre-release groups; available pre-release group staff were allocated to the yards with the most patients.

During the review period, RJD provided services to 170 patients who were within 90 days of release, of whom 162 paroled from the institution.  Of these 162 patients, 139 or 86 percent completed pre-release planning assessments (PRPA), and 160 or 99 percent completed applications for California identification cards.  Further, 132 patients submitted 205 benefits' applications; there were 129 applications for Medi-Cal, 72 SSI applications, and four applications for veterans' benefits.

Observed IDTTs conducted in administration segregation indicated that pre-release planning was not consistently addressed for EOP and 3CMS patients.  However, record review revealed primary clinicians occasionally addressing pre-release services.

Mainline EOP patients' record review revealed that pre-release services were a focus of clinical contacts.  Where applicable, pre-release services were included as a treatment goal and was discussed during EOP IDTTs.  Observed mainline 3CMS IDTTs did not consistently address pre-release planning.

Program Access:

a.     Job and Program Assignments

On March 1, 2023, RJD's 1,655 job assignments were held by 359 or 40 percent of EOP patients, 711 or 60 percent of 3CMS patients, and 585 or 63 percent of non-MHSDS incarcerated persons.

The 1,612 academic assignments were held by 361 or 45 percent of EOP patients, 645 or 54 percent of 3CMS patients, and 606 or 67 percent of non-mental health incarcerated persons.

The 94 vocational education assignments were held by 12 or one percent of EOP patients, 39 or two percent of 3CMS patients, and 43 or five percent of non-MHSDS incarcerated persons.

Three or less than one percent of EOP patients had voluntary education assignments. No other patients or incarcerated persons held these assignments.

The 374 substance abuse treatment assignments were held by 113 or 13 percent of EOP patients, 170 or 14 percent of 3CMS patients, and 91 or ten percent of non-MHSDS incarcerated persons.

b.      Milestone Credits

RJD did not report patient eligibility to earn milestone credits, or the number of patients who earned them.

c.      Out-Of-Level Housing

RJD reported that 24 EOP and ten 3CMS custody Level II patients, and four EOP and two 3CMS custody Level III patients, were placed in Level I housing. There were 57 EOP and 184 3CMS custody Level III patients, and two EOP custody Level IV patients, in Level II housing. There were also two EOP and one 3CMS custody Level I patients, and 11 EOP and 17 3CMS custody Level IV patients, in Level III housing. There was one EOP custody Level II, and 66 EOP and 126 3CMS Level III patients, in Level IV housing.

d.      ADA Reasonable Accommodation and Grievance Procedure

RJD provided an updated reference training manual for ADA accommodations but did not provide attendance sheets for either the accommodation or grievance procedures.

e.     Periodic Classification Score Reductions: EOP Patients

RJD provided CDCR Form 840s demonstrating that RJD was providing periodic classification score reductions for EOP patients.

f.     Unclothed Body Search

RJD provided the updated operations manual that contained the unclothed body search policy. EOP hub patients reported the conduct of unclothed body searches in their cells with the door open. They also indicated the conduct of searches when they arrived at the unit and whenever they attended yard. Notably, custody officers reported that unclothed body searches were performed in cells with the door closed prior to patients going to yard.

"C" Status:

On April 7, 2023, RJD's 15 "C" Status patients included three EOP and seven 3CMS patients, and five non-MHSDS incarcerated persons. All were on "C" Status for receiving multiple RVRs during a 180-day period.

Case by Case Reviews:

RJD reported that two EOP and five 3CMS patients met the requirement for 150-day reviews. Timely reviews were conducted for all seven patients, who were all retained in administrative segregation. These patients' administrative segregation stays' ranged from 164 to 1,041 days. The two longest stays, at 1,041 and 542 days, were for patients housed in administrative segregation at RJD for out-to-court purposes; RJD reported that there were no other housing options at the institution, other than administrative segregation, for them. Four other patients were pending RVR adjudication, and one patient was referred to the CSR for endorsement out of restricted housing at the completion of their SHU term in three months.

Twenty-one patients, including nine EOP and 12 3CMS patients, had 120-day pre-MERD reviews. These patients averaged 73 days in administrative segregation, with stays that ranged from five to 242 days. All 21 patients were pending RVR adjudication, with six patients being referred to the CSR for endorsement out of restricted housing once their SHU term expired. One patient was referred to the CSR for endorsement to the PSU with a SHU term expiration date of June 6, 2023.

Mental Health Referrals:

During the review period, RJD made 6,157 mental health referrals; there were 1,329 referrals to psychiatry and 4,828 referrals to primary clinicians. There were 998 emergent, 553 urgent, and 4,602 routine referrals, as well as four PREA referrals.

RJD reported an overall compliance rate of 91 percent for timely responding to mental health referrals. Regrettably, psychiatry only timely responded to two of three or 67 percent of emergent referrals, and to 23 of 40 or 58 percent of urgent referrals; however, there were timely responses to 1,183 of 1,286 or 92 percent of routine referrals. As for primary clinician referrals, there were timely responses to 876 of 995 or 88 percent of emergent referrals, 482 of 513 or 94 percent of urgent referrals, and 3,018 of 3,316 or 91 percent of routine referrals. Primary clinicians also timely responded to all four PREA referrals.

Some interviewed custody officers on Facilities A and C were unaware of the mental health referral process for patients; however, Facility D custody staff explained the correct procedure for responding to mental health referrals.

Custody and Mental Health Partnership Plan:

RJD's CMHPP LOP was compliant with statewide policy and current, having been revised in August 2022. Executive leadership joint rounding occurred monthly during the review

period, and utilized the correct form.  Reviewed rounding documentation revealed staff reporting a good working relationship between custody and mental health, but also indicating that staff vacancies were putting a strain on staff.  The joint rounding documentation also revealed patients' reporting a lack of programs and/or vocational opportunities, and requesting more groups.

Quality management committee and mental health subcommittee minutes identified executive leadership joint rounding as a standing agenda item, but only indicated the rounding's purpose without providing further details.  RJD did not provide minutes from the warden's executive staff meetings.

An observed MHCB huddle was well-attended by clinical staff and was clinically useful.  However, custody staff did not attend.

Reviewed documentation indicated that RJD conducted monthly joint supervisory 3CMS program area tours for all six months of the review period on all facilities, as well as weekly 3CMS supervisory meetings.  Nonetheless, reviewed documentation was variable; some was comprehensive and included significant, relevant information, while other documentation contained minimal or no information.

The institution had the 3CMS orientation brochure in both English and Spanish.

RJD scheduled weekly EOP orientation groups.  These groups were attended by 39 Facility A EOP patients, 64 Facility C EOP patients, and 99 Facility E EOP patients.  However, incomplete data did not indicate actual patient attendance at these groups.

Although RJD conducted inmate advisory council (IAC) meetings on all facilities, the meetings were not conducted monthly on all facilities, and mental health staff did not attend all IAC meetings.  Facilities A, B, and E conducted IAC meetings during four months of the review

period; Facility A mental health staff attended two of these meetings, but Facility B and E mental health staff did not attend any meetings. Facility C mental health staff attended four of five IAC meetings, while Facility D mental health staff attended one of two IAC meetings.

Patients filed 708 grievances during the review period, of which 671 or 95 percent were reported to be "in progress," which was concerning. Further, the 125 grievances filed in September 2022 were still "in progress," which was seven months prior to the date of the site visit. This inability to timely complete investigations was extremely worrisome, and it lead to patient frustration that their concerns were not being addressed.

RJD provided eight second watch sign-in sheets for the fourth quarter of 2022, but none for Facility D. Two of the sign-in sheets only reflected attendance by mental health staff. Overall, the sign-in sheets documented attendance by 23 custody staff and 70 mental health staff. However, because it could not be determined whether all required staff attended the training, there was noncompliance for attendance at the mandatory quarterly round table training.

As for attendance at the mandatory CMHPP off-post training, RJD reported attendance by four of five correctional administrators, five of six captains, 31 of 32 lieutenants, 78 of 88 sergeants, and 789 of 863 correctional officers. For mental health staff, 39 of 43 psychologists, and ten of 15 social workers, completed the training.

Heat Plan:

RJD's current heat plan LOP had been revised in June 2022 and was compliant with CDCR policy. There were seven Stage I heat alerts during the two months of the review period when the heat plan was in effect, but no Stage II or Stage III heat alerts. RJD reported one heat-related illness when a 3CMS patient reported discomfort due to ventilation issues upon returning to the housing unit.

A review of daily activity reports for five days when a Stage I heat alert was in effect reflected the reporting of the start and end times for these heat alerts, and documentation of the offering of the reasonable accommodation of dayroom to heat risk patients 60 percent of the time.

The monitor's review of logs reporting housing units' inside temperatures during September and October 2022 indicated these temperatures being recorded every three hours.

Twenty interviewed custody officers from nine different housing units revealed that 12 of 20 or 60 percent were knowledgeable about the heat plan. Regrettably, some custody staff did not know when the heat plan went into effect, how often the inside housing unit temperature was required to be logged, or how often the heat risk list was updated and issued to housing unit staff. Several staff also opined that, during a heat alert, heat risk patients were required to return to their housing units to take their prescribed heat risk medications.

Moreover, inside temperatures could not be measured in four of nine toured housing units because the temperature probe could not be located in the housing unit. In Facility C's housing units 14 and 15, the captain reported that the air conditioning units were recently updated, which may have resulted in the temperature probe's removal. The captain contacted the plant operations manager and discovered that parts had been ordered to replace the temperature probe.

RVRs:

RJD issued 2,597 RVRs during the review period, of which 2,161 or 83 percent were issued to MHSDS patients. Specifically, one RVR was issued to an acute care patient, ten were issued to intermediate care patients, 91 were issued to MHCB patients, 891 were issued to EOP patients, and 1,168 were issued to 3CMS patients.

The monitor reviewed 50 RVRs to assess compliance with CDCR policy. Custody staff timely referred the mental health assessment to mental health staff within two days in eight or 16 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days 100 percent of the time. Patients were confidentially interviewed for the mental health assessment in 27 of 50, or 54 percent of reviewed cases. The senior hearing officer documented consideration of the mental health assessment in 44 of 50 or 88 percent of reviewed cases; in the remaining six noncompliant cases, the SHO quoted the response to question three or four of the assessment without any statement of consideration.

Mental health staff recommended mitigation in 33 of the reviewed cases, of which the SHO actually mitigated the penalty pursuant to the assessment 88 percent of the time. The most frequent assessment recommendation concerning mitigation was no loss of phone, which 91 percent of assessments recommended. Of the 50 reviewed RVRs, the SHO assessed the maximum loss of credit for 29 RVRs or 58 percent of the time.

None of the mental health assessments recommended alternative discipline due to patients' mental illness significantly contributing to the behavior documented in the RVR. Rather, reviewed documentation reasoned for holding the patient accountable regardless of their mental illness, including behaviors that immediately preceded patients' MHCB admission.

The monitor reviewed 11 chronos to assess the ICC chairperson's consideration of mental health input into the assessment of a SHU term. Of the 11 reviewed chronos, only two patients had the assessment of the SHU term completed at RJD. Both chronos documented the ICC chairperson's consideration of mental health's input.

As for mental health assessment training, RJD reported that the warden and chief deputy warden had not attended this mandated training. The training was attended by one of five

correctional administrators, six of seven captains, 11 of 33 lieutenants, and 29 of 94 sergeants. As for mental health staff, none of the 16 chief psychiatrists or psychologists, or senior psychiatrists, psychologists, or social workers attended the training. Only one of 15 social workers and three of 43 psychologists completed the training.

Use of Force:

RJD reported five controlled use of force incidents during the review period; three occurred in the housing units, one in the TTA, and another in the CTC. Four of these controlled uses of force had not completed RJD's executive review.

Although review of four of the controlled use of force incidents demonstrated compliance with applicable policy, one reviewed use of force reflected concerns with the collection of the camera video, logging it into evidence, and RJD's executive review. When the monitor requested to review the controlled use of force video, he was informed that there was no video of this controlled use of force, and that only the body worn camera (BWC) video worn by the assigned camera operator was available for review. However, in watching the BWC video, one could see that this individual was holding an operating video camera that was also recording this controlled use of force. After seeing the use of this operable video camera upon reviewing the BWC video, the monitor was subsequently provided with a copy of the camera video used by the assigned camera operator. Apparently, this camera video had been located in the use of force coordinator's office. Regrettably, this camera video had not been logged into evidence and reflected noncompliance with the evidence chain of control.

There were 193 immediate uses of force, of which 141 or 73 percent involved MHSDS patients. Nineteen of 193 immediate uses of force had completed RJD's use of force review process and were closed. The delay in closing many of the other uses of force was attributed to

pending inquiries/complaints about them.  The closure of these use of force episodes could not occur until RJD was informed of the results of inquiries to the Office of Internal Affairs. However, this delay in closing use of force incidents and inquiries/complaints about them was very concerning because CDCR was required to take adverse action on a correctional officer within one year of the date of the alleged incident.  Due to the significant delay in closing inquiries/complaints, the potential to exceed the one year maximum was of serious concern when an employee was found to have violated policy.  If the investigation exceeded one year, no adverse action could be taken against the employee.  Otherwise, review of eight immediate use of force incidents revealed compliance with applicable policy.

RJD reported completion of the mandatory use of force training by the warden, chief deputy warden, six captains, and 32 lieutenants.  Four of five correctional administrators also attended the training, as did 81 of 88 sergeants, and 767 of 863 correctional officers.  As for mental health, all three chiefs and all 13 senior psychiatrists/psychologists/social workers and psychologists attended the training, as did ten of 18 psychiatrists, and eight of 15 social workers.

Lockdowns/Modified Programming:

RJD reported eight modified programming periods during the review period; seven were due to COVID-19 outbreaks and one resulted from a search after contraband was found.  Of the seven COVID-19-related modified programming periods, four lasted from three to five weeks; RJD did not provide documentation reflecting the lengths of the other three modified programming periods.  The modified programming stemming from the contraband search resulted in four days of controlled movement on one facility.

<u>Access to Care</u>:

A review of RJD's monthly Health Care Access Quality reports from September 2022 through February 2023 indicated a total of 234,274 issued mental health ducats and add-on appointments, of which 80,147 or 34 percent were completed, and 154,127 or 66 percent were not completed.  Of the non-completed appointments, one percent were not completed due to custody factors, 32 percent were not completed due to non-custody factors, and 67 percent were not completed due to patient refusals.

<u>*Coleman* Postings</u>:

There were *Coleman* postings in English and Spanish in appropriate areas of all toured housing units, including administration segregation and the EOP hub, with the exception of Facility C's housing unit 14.

**APPENDIX B-2**
**MULE CREEK STATE PRISON (MCSP)**
**(April 11, 2023 – April 14, 2023)**

Census:

MCSP's census remained relatively constant since the prior review period.  On April 7, 2023, MCSP housed 3,810 patients, or two percent more than during the previous site visit.  The 2,247 mental health caseload patients represented 59 percent of the institution's population and a two percent decrease since the preceding reporting period.

The MHCB housed eight patients.

There were 749 mainline EOP patients, seven more or a 0.9 percent increase since the preceding site visit.  Fifty-six EOP patients were housed in the EOP hub, which represented a 27 percent increase since the prior review period.

The 1,407 3CMS mainline population represented 44 fewer patients, for a three percent decrease since the prior review period.  There were 27 3CMS patients housed in administrative segregation, which was a reduction of seven patients or 21 percent since the preceding site visit.

Staffing:

The chief psychiatrist position remained filled, but the position for the senior psychiatrist had been vacant for more than four years.  Five of 8.5 psychiatry positions were filled for a 41 percent vacancy rate.  The use of 2.49 registry staff reduced the functional vacancy rate to 12 percent.

Both chief psychologist positions remained filled; one continued to serve as the chief of mental health.  All seven senior psychologist supervisor positions were filled, as were six of 7.5 senior psychologist specialist positions, reflecting a 20 percent vacancy rate.

Of 46 staff psychology positions, 18 were filled for a 61 percent vacancy rate. Registry staff covered 1.81 positions, one psychologist was on leave, and another psychologist had been redirected for the past three years, resulting in a functional vacancy rate of 61 percent. Four psychologists were unlicensed.

The supervising social worker position was filled. Thirteen of 23.5 social worker positions were filled for a 45 percent vacancy rate. Six social workers were unlicensed.

Eighteen of 24.5 recreation therapist positions were filled, reflecting a 27 percent vacancy rate. Registry staff filled 1.55 positions, for a 20 percent functional vacancy rate.

The CHSA II position was vacant. The AGPA position was filled, as were three of four HPS I positions. One of 1.5 OSS II positions was filled.

Twenty-one of 26.5 office tech positions were filled, resulting in a 21 percent vacancy rate.

Four of seven medical assistant positions were filled for a 43 percent vacancy rate.

As for custody, positions for the warden, chief deputy warden, associate wardens, captains, CC Is, and CC IIs were all filled. However, one of seven captains was on an extended leave, as were two of 31 CC Is, while four other CC Is were acting out of class in other positions, for a 19 percent functional vacancy rate. Thirty of 30.8 positions for lieutenants were filled; two lieutenants were also acting out of class, for a nine percent functional vacancy rate. Further, 65 of 70.4 sergeant positions were filled, but three sergeants were acting out of class, and one was on an extended leave, for a 13 percent functional vacancy rate. For custody officers, 709 of 739.2 positions were filled, indicating a four percent vacancy rate; 16 officers were on extended leaves resulting in a six percent functional vacancy rate.

Telepsychiatry:

Six of 6.5 telepsychiatry positions were filled, reflecting an eight percent vacancy rate. MCSP reported that telepsychiatry was used for IDTTs, individual clinical contacts for EOP and 3CMS patients, and for PC 2602 involuntary medication hearings. Telepsychiatry was not used in the MHCB or for on-call, after-hours, or crisis coverage. Telepsychiatry was not used to provide care to patients awaiting transfer to inpatient programs.

During the site visit, the monitor's expert observed two telepsychiatrists treat three EOP patients. The Cisco DX-80 computer set up had adequate screen resolution and sound quality, and the camera was fixed, requiring manual adjustment by the telepresenter.

The first telepsychiatrist only treated EOP patients, and reported good continuity of care. The first patient indicated doing well on his medication, and at his request, the visit was only a few minutes in length.

The second patient was primarily Spanish-speaking, and an approved correctional officer translator joined the session. While the patient reported hearing voices to kill himself, he stated that he did not want to do so. The psychiatrist completed a limited Abnormal Involuntary Movement Scale examination of the patient's hands and tongue to evaluate for movement side effects due to antipsychotics. The psychiatrist could not see that the patient was bouncing his leg continuously during the session, and the telepresenter did not report it to the telepsychiatrist. At the end of the interview, the monitor's expert alerted the telepsychiatrist; however, instead of examining the patient, she simply addressed medication for side effects. There was an inadequate examination of the movement itself, as well as its etiology, such as anxiety or medication side effects. During the monitor's expert's post-appointment interview, the patient

indicated that he preferred to speak with an on-site psychiatrist because he felt that they understood him better and helped more.

The monitor's expert was only able to observe one patient contact with the second telepsychiatrist due to multiple refusals, the yard being down, and medication pass. Although the telepsychiatrist took appropriate steps to build rapport with the patient, the visit was very brief at the patient's request.

For patient refusals, the psychiatrist and medical assistant reported attempting to confidentially see patients in housing units if custody staff provided an office. If an office was not provided or the patient refused to leave the cell, the contact was completed at cell front. The psychiatrist and medical assistant reported that cell side contacts occurred approximately once or twice weekly. The medical assistant also reported that internet connectivity in the housing units was variable and that sometimes there was a lag. Connectivity was reported to be better with the tablet rather than the laptop.

Several interviewed medical assistants reported high job satisfaction. They worked with one telepsychiatrist and helped with MAPIP-required tasks for other doctors, including on-site psychiatrists. They reported that there was a sufficient backup coverage system, though they also indicated significant staffing shortages that they opined could be abated by increased salaries as CDCR salaries were "a lot lower" than those in the community.

Another monitor's expert observed IDTTs for 3CMS patients on D yard attended by telepsychiatry. One IDTT began 30 minutes late due to the lack of a laptop, and once set up, the connectivity was poor, the call dropped twice, and the screen often froze. The chief psychiatrist reported connectivity issues on A and D yards due to a lack of the Cisco DX-80 telepsychiatry equipment on those two yards. It was reported that this equipment was available; however, there

was no place to store it on those facilities. Consequently, the medical assistant used a laptop computer that was not capable of producing the same quality picture and audio as the Cisco DX-80 telepsychiatry equipment.

Telework:

During the reporting period, 14 clinicians teleworked. Specifically, one chief psychologist, eight senior psychologist supervisors, four psychologists, and one supervising social worker worked remotely two days weekly. Additionally, 19 clerical staff worked remotely 2.5 days weekly, one AGPA and three HPS Is worked remotely two days weekly, and one CHCA worked remotely one day weekly.

At the time of the site visit, one chief psychologist, seven senior psychologist supervisors, four psychologists, and one supervising social worker teleworked one day weekly, as did 20 clerical staff, one AGPA, and four HPS Is.

Staff Recruitment:

Senior institutional leadership reported multiple barriers to hiring candidates, including the placement of applicants on the "cert" list in a timely fashion and a lengthy recredentialing process for lateral moves.

Quality Management:

The local governing body held two quarterly meetings on October 26, 2022, and January 25, 2023; however, MCSP submitted minutes for only one meeting. A quorum was met. The minutes were adequate and tracked germane mental health metrics, such as MHCB admissions, readmissions, lengths of stay, and higher level of care transfers. Other areas reviewed included staff privileging, policy and procedures, licensing, and institutional

management and planning.  MCSP leadership reported that information was disseminated to staff through staff meetings with supervisors.

The quality management committee achieved quorums for all meetings during the review period, although required voting members such as the chief psychiatrist or designee were not present for several meetings.  The respective committees for each program, such as the mental health program subcommittee, made regular reports to the QMC.  The QMC addressed a plethora of topics, including but not limited to performance improvement work plans, MAPIP metrics, local operating procedures, executive rounding, updates on mental health and medical services, SPRFIT, staffing, patient safety, emergency medical responses, access to care, audits, surveys, and program management.  Concerns were repeatedly noted with timely primary clinician contacts and the low number of EOP treatment hours scheduled, offered, and attended.  Further, healthcare leadership and a representative from quality management met monthly with staff from various areas in the facility to review how to elevate quality management issues to supervisors and leadership, as well as educate staff on progress with PIWPs.  Additionally, PIWP progress was circulated in a monthly email to staff.

Reviewed monthly mental health subcommittee meeting minutes indicated that attendance was adequate throughout the review period, except for one month when the chief psychiatrist or alternate did not attend.  Reviewed topics included quality management, critical staffing levels, access to care, COVID-19, executive rounding and CMHPP, CTC and nursing issues related to mental health, psychiatry issues, FIT workgroups, suicide prevention,  inpatient referrals, EOP, DDP, operational procedures, training, and the physical plant.

MCSP's CAPs included EOP treatment offered, placement of ASU/SHU 3CMS patients in STRH/LTRH, and timely PC contacts.  Additionally, the SPRFIT coordinator was working

with a custody measure on improving custody inpatient discharge checks.  As during the prior review period, when challenges and deficiencies were identified, MCSP did not provide measurable action plans to address deficiencies going forward.

The two FITs noted in the preceding reporting round continued during this review period. The mainline EOP group scheduling and standardization FIT monitored treatment hours scheduled, offered, attended, and refused.  While the FIT reportedly met monthly, MCSP did not provide meeting minutes.  The monitor's expert attended one EOP group FIT meeting.  While COVID-19 cases and resultant disruptions decreased during the review period, staffing challenges remained a severe impediment.  Encouragingly, due to recent RT hiring, the hours of offered treatment had recently improved.

The second FIT addressed the EOP hub.  This FIT met weekly and monitored scheduled treatment hours, staffing vacancies, documentation issues, performance metrics, and multidisciplinary concerns.  However, unchanged from the prior monitoring round, reviewed minutes revealed that the FIT operated more like a multidisciplinary meeting to discuss routine issues rather than a formal FIT.  Concerningly, while a psychiatrist was listed as a team member, there was no psychiatry attendance in the notes reviewed.

There were no active QITs during the reporting period.

The Emergency Medical Response Review Committee met monthly during the monitoring period.  Psychology leadership was present for only one meeting.  In all other months, no mental health representation was present, which was concerning given that multiple issues of relevance to mental health, including suicide attempts and overdoses, were discussed during the meeting.

The facility submitted an ongoing study on the rates of non-formulary prescriptions by psychiatrists. The study stated that beginning in December 2022, there was an increased emphasis on patients taking non-formulary medications who transferred to MCSP. If the prior institution had not tried formulary options or documented reasons for the use of the non-formulary medication, the MCSP psychiatrist considered discontinuation of the medication on a case-by-case basis. The institution continued to collect data on this issue, and did not yet have data for review.

In accordance with the statewide psychiatry peer review process policy, MCSP developed the psychiatry peer review LOP in October 2022. Pursuant to policy, meetings were to occur twice yearly; MCSP conducted one meeting in February 2023, and a second meeting was scheduled for August 2023. Two reviewers assessed each provider, although it was unclear what methodology was used to choose the reviewed charts. The chief psychiatrist reported that the committee communicated with the regional psychiatrist regarding substantive changes to improve the review tool.

MCSP did not have an active peer review committee for outpatient clinicians during the review period or at the time of the site visit.

<u>Medication Management</u>:

MCSP provided MAPIP psychiatric diagnostic and nursing measure compliance results for the six month review period.

MCSP was compliant with measurements for medication consent and thyroid monitoring for patients prescribed antidepressants. MCSP was also compliant with monitoring blood pressure for all six months for patients prescribed venlafaxine. No EKGs were required during the review period.

Diagnostic monitoring data for patients prescribed atypical antipsychotics indicated that MCSP was compliant with obtaining blood pressure, height, weight, lipids, thyroid monitoring, and medication consents for the entire review period.  MCSP was also compliant with monitoring blood sugar for five of six months, and for AIMS examination, CBC with platelets, and CMP, there was compliance for four months.  MCSP was compliant with obtaining EKG measures for only three months of the review period.

MCSP was compliant with obtaining measures for CMP for all six months for patients prescribed carbamazepine.  For CBC, MCSP was compliant for five months, and was compliant with medication consents for the two required months.  For obtaining carbamazepine levels, MCSP was compliant for one of three required months.

MCSP was an authorized clozapine maintenance facility, and was compliant for all six months of the review period with obtaining blood pressure, blood sugar, CBC, CMP, EKG, height, weight, lipids, and thyroid tests.  Medication consents were compliant for five months. MCSP indicated compliance with performing the AIMS examination for four months.

As for patients prescribed Depakote, MCSP was compliant with obtaining medication consents for all six months.  Psychiatric diagnostic measures showed MCSP was compliant with obtaining CBC with platelets for five months and for CMP for four months.  MCSP was compliant with measures of Depakote levels for only two of five required months.

For lamotrigine, MCSP was compliant with medication consent for all six months.

Regarding data for diagnostic measures for patients prescribed lithium, MCSP was compliant with thyroid and kidney function tests for all six months of the review period. Medication consent was compliant for five months, and EKGs and blood levels for patients prescribed lithium were compliant for only three months.

MCSP reported compliance during each month of the review period for medication administration for chronic care medications prescribed by a psychiatrist. The institution reported compliance for five months for three measures: medication continuity for intra-institutional transfers to ASU/SHU/PSU, medication continuity at parole or release to the community, and new psychiatric medication orders. For medication continuity for both MHCB transfers and discharges from community hospitals or acute or intermediate care/DSH, MCSP was compliant for four months. MCSP achieved compliance for continuity of NA or DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU) for two months. Concerningly, the facility was compliant for only one month for continuity of medications upon inter-institutional transfer at Receiving and Release. MCSP did not report data regarding the preparation and administration of HS and AM/PM medications.

MCSP was compliant for all six months with the initiation and renewal of PC 2602 court orders. For PC 2602 medication orders, there was compliance for four months.

The chief psychiatrist reviewed dashboard performance measures with psychiatrists monthly. MCSP used MAs to assist with MAPIP compliance; medical assistants reviewed the charts for all the psychiatrists, not only telepsychiatrists. If MAPIP-related measures were due, the MA flagged the chart for the psychiatrist and then later reviewed it to ensure that the labs were ordered. However, leadership reported that the significant lack of MAs impacted this function.

The maximum length of medications ordered by a MCSP psychiatrist was 180 days for 3CMS patients and 90 days for EOP patients; bridge orders were for 30 days.

Telephone and verbal orders were documented and tracked in EHRS by nursing, and MCSP required providers to sign the orders in EHRS.

MCSP reported 4381 prescriptions for mental health DOT medications; the number of patients was not reported.

There were 170 patients on KOP mental health medications. In accordance with policy, all were SSRIs to patients at the 3CMS level of care.

Nursing staff performed yard audits at least monthly on all yards. All reviewed audits indicated that medication lines lasted under two hours, and individual patients waited less than 30 minutes. Unfortunately, except for EOP patients for whom medication was distributed within the housing unit and patients in restricted housing, patients were not protected from inclement weather during pill line. As a result, leadership reported that the medication refusal rate increased during inclement weather.

MCSP permitted psychiatrists to prescribe non-formulary medications without approval from a secondary reviewer. The prescriber was required to document the non-formulary prescription in the EHRS appropriately. The six month average rate of non-formulary prescriptions was approximately five percent at MCSP.

Polypharmacy reviews occurred monthly through population management meetings. One major component of polypharmacy reviews was evaluating whether an EKG was required due to the patient's age or the potential cardiac side effects from certain combinations of medications. MCSP reported an innovative system to obtain these required EKGs. The chief psychiatrist instructed the psychiatrists to perform EKGs if the polypharmacy review indicated the patient required one. This requirement stood regardless of whether it was medical personnel that prescribed some of the medications triggering the need for an EKG. MCSP mental health, medical, and nursing staff worked collaboratively regarding this issue; psychiatry ordered the

EKGs, nursing obtained the EKG, and medical providers interpreted them. The patient remained in the clinic until the medical provider read the EKG.

MCSP reported that 697 patients had psychiatric medications prescribed at HS. MCSP was 98 percent compliant with the administration of HS medication at or after 8:00 p.m.

MCSP struggled to provide the number of active PC 2602 involuntary medication orders at the time of the site visit. However, after substantial effort, the facility reported that there were 89 patients. There were no emergency petitions submitted during the review period, and one non-emergent petition submitted was withdrawn due to the patient's ultimate compliance. There were ten renewals, and one non-renewal. One psychiatrist handled all PC 2602 issues, except in the MHCB, where the treating psychiatrist filed the petitions.

No use of force was required to administer PC 2602 medications during the review period.

Transfers:

MCSP had one major sustainable process review conducted remotely in December 2022. On-site sustainable process reviews were suspended to allow staff to participate in the Unmet Needs Assessment (UNA).

While MCSP reported that 89 percent of sustainable process data was adequate, the headquarters' team found only 71 percent. MCSP and headquarters differed in ten of the 55 cases reviewed. MCSP found the cases "good" in all discordant cases, while headquarters found them "unacceptable." Frequent deficiencies included insufficient treatment intervention documentation, carrying forward information, and not showing a clear nexus between the reasons the patient flagged for a given higher level of care indicator and the resultant clinical interventions. Overall, the sustainable process reviews appeared thorough. Recommendations

included the inpatient coordinator reviewing all higher level of care documentation before and after each IDTT and recommending that clinicians make necessary adjustments. The inpatient coordinator had been in that position for nine months and was knowledgeable, had a solid understanding of these requirements, and had a clear implementation process.

During the review period, 966 patients were considered, but not referred, to a higher level of care. The monitor's expert reviewed the treatment plans of five randomly selected patients on the non-referral log and found the listed rationales adequate.

MCSP made 47 referrals to acute care, of which two were rescinded, two patients paroled, one patient was referred to an MHCB, and 42 patients transferred. MCSP was compliant with completing acute care referral packets within two working days of identification for all but two patients. However, only eight or 19 percent of patients transferred timely. Reasons for the delays were not provided. All patients transferred within 72 hours of acceptance.

MCSP made 47 referrals to intermediate care, of which six were rescinded, two patients paroled, 13 were referred to MHCBs, and 26 were transferred. All intermediate care referral packets were timely completed within five working days of identification. Three of 26 patients, or 12 percent, were timely transferred to intermediate care within 30 days. Twenty-three of 26 patients, or 88 percent, transferred within 72 hours of acceptance. Reasons for untimely transfers were not provided.

MCSP held 13 *Vitek* hearings during the review period; no patients prevailed.

The inpatient coordinator reported that no inpatient care transfers were delayed or canceled due to impending paroles, disciplinary proceedings, or PC 2602 hearings. The inpatient coordinator also noted that prior delays related to COVID-19 had improved. One enduring

barrier to timely transfer was the lack of single cells for patients referred to the intermediate level of care.

There were no expedited transfers during the review period.

Regarding patient returns from inpatient care, MCSP's C&PR contacted the inpatient coordinator about impending returns. Unchanged since the prior monitoring round, MCSP continued to receive notice of a patient's return the same day or the day before discharge. The inpatient coordinator reported that in many returning cases, the discharge summary was not present in the EHR; however, discharge SRASHEs were generally present.

The inpatient coordinator reported no direct clinician-to-clinician contact between MCSP and the inpatient care programs.

MCSP referred 333 patients to MHCBs during the review period. Of those, 195, or 59 percent, were admitted and the remaining 138 or 41 percent were rescinded.

Of the 195 admitted patients, 118 were admitted to the MCSP MHCB, and 77 were admitted to outside MHCBs. All but two MHCB referrals timely transferred within 24 hours.

No patients had three or more MHCB admissions during the reporting period.

Four patients transferred to a PSU during the review period; none transferred within 60 days of endorsement. On April 11, 2022, no patients were awaiting PSU transfer.

MCSP patients requiring EOP hub placement were immediately placed in the institution's EOP hub. Likewise, MCSP patients requiring an EOP level of care were timely transferred to the institution's EOP program.

During the review period, 60 EOP patients were reduced to the 3CMS level of care, and 39 3CMS patients were increased to the EOP level of care.

MCSP reported that 37 patients transferred to STRH, with 20 or 54 percent of the transfers occurring timely.  The remaining patients took an average of 60 days to transfer, ranging from 30.7 to 102.9 days.  At the time of the site visit, there were 27 3CMS patients housed in administrative segregation.  Of those, five patients had been waiting to transfer for longer than 30 days, with a range in stays from 31 to 113 days.  Reasons for delays in transfers to STRH included refusing a bus seat, medical holds, and pending transfer updates.

MCSP did not transfer any patients to LTRH.

Programming:

MHSDS Patients in Administrative Segregation:

MCSP's EOP hub passed monthly certifications for all months during the review period.

During the reporting period, there were 1,193 placements of 485 patients in the EOP hub.

Over the six month reporting period, 41 EOP patients remained in the EOP hub for longer than 90 days.  The average length of stay was 188 days, with a range from 102 to 1,132 days.  Reasons for retention longer than 90 days were not provided; however, all patients were reviewed monthly.  While the documentation reflected the standard classification actions associated with managing administrative segregation caseloads, there was no documentation specifying that actions were taken to expedite investigations, DA referrals, disciplinary proceedings, or transfers.

On April 11, 2023, there were 49 EOP patients housed in MCSP's EOP hub; nine patients had been in the EOP hub longer than 90 days.  Reasons for delays included positive COVID-19 tests, medical holds, and enemy situations at the receiving institutions.

Caseloads for psychiatry and primary clinicians exceeded established ratios during the review period and at the time of the site visit.  Specifically, during the site visit, primary clinician

caseloads ranged from 16 to 19 patients, exceeding the 1:11 established ratio.  The one psychiatrist in the EOP hub carried a caseload of 79 patients as opposed to the established ratio of 64 patients.

Regarding IDTTs, all required staff attended the four that the monitor's expert observed. The teams were collaborative and included patient input in the treatment planning process. Goals and interventions were individualized, measurable, and appropriate to the patient's clinical presentation and symptoms.  Level of care discussions were present and appropriate at each IDTT.

Records indicated the offering of ten hours of weekly structured therapeutic activities.

Eight EOP hub patients were prescribed modified programming during the review period.

The monitor's expert observed two recreation therapy groups in the EOP hub; one group had two participants, and the other had five.  Patients were placed in TTMs for the duration of the groups.  The recreation therapist facilitators engaged with the patients and kept the group focused and on topic.  The patients were also active and engaged, and group content was appropriate.

Twenty patients were randomly selected to have their healthcare records reviewed for their EOP hub stays.  One patient was eliminated because the stay was too short to require contacts.

Eighteen patients required initial psychiatry evaluations, and 100 percent were completed timely.  Only 67 percent of initial psychiatry evaluations were conducted in a confidential setting due to patient refusals.  Telepsychiatry was not used for initial psychiatry assessments.

Eighteen of 20 or 90 percent of routine psychiatry contacts timely occurred within 30 days. Of those, 65 percent were conducted in confidential settings, though non-confidentiality was due to patient refusals. Telepsychiatry conducted none of the reviewed routine contacts.

One hundred percent of initial primary clinician evaluations were completed timely and before the initial IDTT. Four, or 21 percent, were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals or mental health modified program; however, there was no reason listed for non-confidentiality for many reviewed assessments.

For routine primary clinician contacts, 22 of 29 or 76 percent timely occurred at least every seven calendar days. Only 23 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals and staffing shortages, though many non-confidential appointment notes did not include an explanation.

One hundred percent of the 17 required initial IDTTs occurred timely within 14 calendar days of arrival to the EOP hub; 100 percent of required staff attended. Patients attended 76 percent of initial IDTTs. Reasons initial IDTTs were held *in absentia* included patient refusals and COVID-19 restrictions.

Three reviewed EOP hub patients required a routine IDTT; 100 occurred timely, and 100 percent of required staff attended. Patients attended 67 percent of routine IDTTs. The reason for routine IDTTs being held *in absentia* was patient refusals.

Review of 114-As reflected four hours of yard offering three times weekly.

Interviewed EOP hub patients indicated satisfaction with their mental health treatment.

Non-Disciplinary Segregation:

MCSP's LOP did not require that the lieutenant ordering placement of an MHSDS patient in ASU consider less restrictive housing alternatives if the lieutenant determined the

patient would likely be designated NDS by ICC.  Further, the LOP did not require the captain

conducting the administrative review to consider all reasonable alternative housing options prior

to a determination on retaining the MHSDS patient in administrative segregation.  Both of these

requirements were mandated pursuant to CDCR policy.  While the interviewed ASU captain

reported discussing alternative housing during administrative reviews, discussions were not

documented in the hearing section of the administrative segregation placement notice or

anywhere else.

        During the review period, there were nine MHSDS patients designated NDS status.  At

the time of the site visit, there were five MHSDS patients on NDS status.  MCSP staff reported

that NDS cases were prioritized for ICC and were presented at the next ICC rather than waiting

for the next 30-day review.  NDS status patients were referred to the CSR for accelerated

transfer.  MCSP timely cleared NDS patients for privileges and property consistent with their

privilege group prior to ASU placement in accordance with the LOP.  A review of CDCR 114-

As verified the offering of walk alone yard for four hours, three times weekly for NDS status

patients.

        The MCSP property officer tracked property issuance to NDS patients.  Reviewed

tracking revealed that it took an average of 5.25 days with a range of zero to 12 days to receive

property once designated NDS status.  Documentation and interviews also confirmed that

privileges and telephone calls were provided as required.

        The monitor observed 11 EOP hub ICC hearings during the site visit; nine were initial

ICCs.  All initial ICCs occurred within ten days of administrative segregation placement as

required.  However, there was no evidence that lieutenants ordering ASU placement or the

captions conducting administrative reviews considered less restrictive housing for patients likely to be designated NDS, as required.

Reasons for delays in NDS transfers during the review period were attributed to positive COVID-19 tests, medical holds, and enemy concerns.

MHCB:

The MHCB contained eight beds throughout the monitoring period; one cell was redlined from April 7 – 12, 2023.

Mental health staffing for the MHCB included one senior psychologist supervisor, two staff psychologists, a recreation therapist, a 0.25 FTE registry psychiatrist on Mondays, and a 0.75 FTE registry psychiatrist on Tuesdays, Wednesdays, and Fridays. Caseload ratios were maintained throughout the review period and at the time of the site visit for both psychiatry and psychologists.

The MHCB rooms contained a concrete slab with a mattress and a toilet/sink combo unit. The MHCB cells were not wheelchair accessible. Although the path of travel to the cells was wheelchair accessible and the doors were wide enough for wheelchair access, the combo unit toilets were not the required height, the sinks were not designed for wheelchair-user access, and none of the cells had the required 60-inch turning radius for wheelchair users. Staff reported that wheelchair-bound patients were transferred to the CHCF MHCB. At the time of the site visit, there was a part-time wheelchair user in one of the cells with his wheelchair next to the bed.

During the review period, the average daily MHCB census was seven patients. MCSP discharged 124 patients from its MHCB with an average clinical length of stay of 7.5 days; six patients, or five percent, had clinical stays exceeding ten days. Those patients' lengths of stay averaged 16.3 days, ranging from 11 to 37 days.

Physical lengths of stay averaged 10.1 days.  Forty-two patients or 34 percent exceeded ten days; these patients' average physical lengths of stay was 15.6 days, with a range from 11 to 44 days.  Reasons for delays in discharge included medical holds and refusal to move.

On April 11, 2023, MCSP's MHCB housed seven patients.  One MHCB patient was awaiting transfer to acute inpatient care and had not exceeded timeframe guideline requirements.

The monitor's expert observed seven patients' IDTTs in the MHCB.  All required IDTT members, including the patient, were present.  The IDTTs were confidential, with adequate space, light, and comfortable temperature.  There was a comprehensive review of medications. However, deficiencies included no case conceptualization, rare discussion of diagnoses, cursory discussion of symptoms and presenting problem, lack of treatment goals or of progress toward these goals, lack of initial evaluations prior to initial IDTT, limited safety planning, and a lack of knowledge of the patients, rendering the IDTTs more consistent with initial evaluations, rather than their intended treatment planning purposes.  Staff reported that the volume of recent admissions from outside facilities prevented them from evaluating patients before IDTT.

MHCB treatment space was limited to one room, hence requiring extensive coordination between the schedules of the psychiatrist, psychologists, and recreation therapist.  The treatment space was a portion of a larger room with a moveable divider in the middle, thus rendering it a non-confidential space as the non-treatment side of the room was the office for multiple MHCB staff.  MCSP staff documented contacts completed in the space as confidential because it was private from custody staff and fellow patients.  Nonetheless, the space remained non-confidential due to the lack of sound privacy.  Further, due to the limited availability of that space, many contacts were completed at cell front.

The treatment room had an ADA-compliant TTM for patients on administrative segregation status, as well as a table and chair for non-ASU patients. The staff clearly understood the appropriate use of the TTM based on custody or clinical factors and attempted to minimize its use.

Staff reported also meeting with patients in the outside yard; however, it was not protected from the elements, and thus, inclement weather limited its use. The outdoor yard had two TTMs; one was ADA-compliant. There were also tables for non-ASU patients. Yard use was typically limited to one patient at a time, and patients receiving medical and MHCB services had equal access to the yard yet did not mix. There was no fixed yard schedule for review; staff reported that this was precluded due to the complexities of the limited space.

There was no group treatment in the MHCB during the reporting period.

Interviewed patients reported satisfaction with the clinical services received in the MHCB but noted that the lack of staffing limited the amount of treatment they received.

Twenty patients' healthcare records were randomly selected for review of their MHCB stays.

Ten of 20 or 50 percent of initial psychiatry evaluations were timely and occurred prior to the initial IDTT. Forty percent were documented as confidential. Reasons for non-confidentiality included patient refusals, quarantine, or were unknown. Telepsychiatry was not used for initial psychiatry assessments.

Seventeen MHCB patients required two routine psychiatry contacts per week; 98 percent were completed timely. However, only 30 percent were documented as confidential. Reasons for non-confidentiality included patient refusals, patient aggression, assault on custody,

quarantine, or unknown.  Telepsychiatry was not used for the conduct of routine psychiatry contacts.

One hundred percent of initial primary clinician evaluations were completed within 24 hours of arrival.  Documentation was unclear whether initial primary clinician assessments were conducted in a confidential setting.  There were no initial assessments conducted via telehealth.

MCSP was 97 percent compliant with timely routine primary clinician contacts for all 20 patients reviewed.  However, only 34 percent were documented as confidential.  Reasons for non-confidentiality included patient refusals and lack of custody due to holidays.

MCSP completed 100 percent of initial IDTTs timely for the reviewed 20 MHCB patients.  All required staff were in attendance, and patients attended 85 percent of initial IDTTs.  Initial IDTTs held *in absentia* were due to patient refusals.

Seventeen of 20, or 85 percent, of reviewed patients who required routine IDTTs received them timely every seven calendar days following the initial IDTT.  All required staff attended 100 percent of reviewed IDTTs; patients attended 95 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Crisis Intervention Team:

MCSP's LOP was consistent with the statewide CIT policy.  However, at the time of the site visit, staff reported that the CIT had been disbanded due to significant staffing shortages.

There were 377 referrals to the CIT during the review period, of which 328 or 87 percent were MHCB patients, 38 or ten percent were EOP patients, and 11 or three percent were 3CMS patients.  CIT resolutions resulted in four patients' referral to the MHCB, six were moved to a

different MCSP housing unit, and 42 patients returned to their same housing unit. No patients were sent to outside hospitals.

Alternative Housing:

MCSP continued to maintain eight designated alternative housing cells located in Facility C-12, cells 147-150, and Facility C-13, cells 118-121. The cells included no-tear mattresses, and the custody officer produced no-tear blankets and smocks upon request. One psychologist was assigned to conduct patient evaluations in alternative housing.

MCSP placed 333 patients in alternative housing during the review period. Of those, 195, or 59 percent, were admitted to the MHCB, and 138, or 41 percent, were rescinded. Two patients remained in alternative housing longer than 24 hours; both were awaiting transport to outside MHCBs.

EOP:

MCSP's average mainline EOP census during the review period was 777 patients.

Primary clinician caseloads ranged from 48 to 58 patients, which exceeded the 1:26 mandated ratio. For psychiatry, all on-site psychiatrists had caseloads within ratio requirements. However, one of the six telepsychiatrists' caseload exceeded the 1:120 patient ratio by one patient.

The monitor's expert observed 13 IDTTs across Facilities A, B, and C. All required disciplines attended Facility A IDTTs; however, the attending primary clinician was not the assigned clinician for each patient, as required by the Program Guide. This was reportedly the result of staff callouts and mandatory staff training on that day. Team discussions were collaborative, goals and interventions were individualized and measurable, and appropriate case conceptualizations were provided. Custody participation varied. One IDTT held *in absentia* was

grossly inadequate as the team appeared preoccupied with the prior patient's IDTT.  There was very limited discussion about that patient, and no case conceptualization was provided.

On Facility B, all required disciplines were in attendance; the psychiatrists participated via telepsychiatry.  There was adequate video and audio connection, and the psychiatrists were able to engage with the patient and the treatment team appropriately.  Three of six observed patients did not receive an initial psychological assessment prior to their IDTT.  The primary clinician in attendance was an unlicensed psychologist with approximately two months of experience at MCSP; however, the EOP supervisor was present and provided appropriate support as needed.  Treatment planning was collaborative and individualized for each patient, and level of care considerations were addressed for each patient.

On Facility D, all required disciplines attended the IDTTs.  The primary clinician provided appropriate case conceptualizations, and treatment discussions were collaborative. Goals and interventions for each patient were individualized and measurable.

Due to severe staffing shortages, EOP patients at MCSP did not receive adequate Program Guide required structured treatment activities (STAs).  For each month of the reporting period, MCSP reported that between 75 to 96 percent of ML EOP patients were offered less than ten hours of structured treatment, in deviation from Program Guide requirements. MCSP offered ML EOP patients an average of 7.32 hours of structured treatment, with 4.41 refused, and 3.07 attended. The facility reported that the reasons for offering less than mandated treatment hours included COVID-19 quarantines, and staffing shortages for both clinical and custodial staff. Reported reasons for canceled structured treatment included custody staffing shortages and modified program due to inclement weather.  A total of 23 patients were on modified EOP programming during the reporting period, with 11 such patients at the time of the site visit.

Due to the lack of staff, MCSP conducted case management groups to supplement the lack of individual primary clinician contacts.  However, staff reported that these groups were ineffective, as evidenced by a marked increase in urgent and emergent referrals.

There were 23 patients prescribed modified treatment plans during the review period. Monthly IDTTs for these patients were inconsistent and varied from patient to patient.

The monitor's expert observed recreation therapy groups on each facility.  All groups were well run.  The facilitators and patients were all actively engaged, and the facilitators appropriately helped the group maintain focus on the discussion topics.  Of note, Facility A group participants indicated that 90 percent of patients on that yard used substances to cope due to a lack of mental health treatment at MCSP.

Interviews with staff highlighted the devastating impacts of the staffing shortages at MCSP.  Substance abuse was a significant problem on Facility A, and staff also described difficulties with custody issues preventing patients from leaving their housing units to attend groups.  Staff specifically noted that in the Facility A-2 EOP overflow, patients were "not getting what they need."  Facility B staff expressed concern regarding the violence in that facility, pointing to an attempted murder of an officer and a sexual assault of a recreation therapist that occurred within two weeks of this site visit.  Further, staff voiced concerns about the number of unlicensed clinicians providing treatment on the yard and excessive case ratios.  Facility D staff also expressed concerns about upcoming staff vacancies and the already reduced treatment provided to EOP patients.  Staff also noted that the relationship between clinicians and custody staff on Facility D was "contentious overall" and that clinicians experienced constant "pushback" when trying to provide patient treatment.

Patient interviews revealed a lack of treatment overall.  Patients elaborated that requests to be seen take "a long, long time" and that recreation therapy groups "have no clinical relevance."

Twenty patients were randomly selected to have their healthcare records reviewed for their EOP stays during the review period.

Nine of ten cases requiring initial psychiatry evaluations were completed timely and before the initial IDTT.  Ninety-percent percent were conducted confidentially; one patient refused the confidential setting.  Seventy percent were conducted utilizing telepsychiatry.

All 20 patients required routine psychiatry contacts; 80 percent occurred at least every 90 days.  Of those, 85 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals, modified programming, and unavailable confidential space.  Sixty-five percent of reviewed routine psychiatry contacts were conducted via telepsychiatry.

One hundred percent of initial primary clinician assessments were completed timely within 14 calendar days of arrival or a change in the level of care.  Seventy percent were conducted confidentially.  The reason for non-confidentiality was patient refusals.  No initial evaluation was conducted using telehealth.

Only 53 percent of routine primary clinician contacts occurred at least every seven calendar days.  Of those, 49 percent were conducted in a confidential setting.  Reasons for non-confidentiality included patient refusals, and cell-front and day room contacts.  No routine contact was conducted utilizing telework.

Nine of ten initial IDTTs occurred within 14 calendar days of arrival or a level of care change.  Required disciplines attended 100 percent; patients attended 60 percent.  Reasons initial

IDTTs were held *in absentia* included patient refusals and one patient being held for movement due to fights.

Eight of 17 or 47 percent of patients who required routine IDTTs received them every 90 days. Required staff attended 100 percent; patients attended 65 percent. Reasons routine IDTTs were held *in absentia* included patient refusals, while one patient was on confined to quarters status.

3CMS:

MCSP housed 3CMS patients in five mainline programs and a Minimum Security Facility. Although MCSP had three positions allocated per yard, due to significant staffing shortages only one primary clinician provided mental health services to 3CMS patients on each yard for A, B, and C yards, and a single primary clinician provided treatment to all 3CMS patients housed on D and E yards. During the review period and at the time of the site visit, 3CMS caseloads well exceeded the mandated ratio of 1:97 patients. Specifically, at the time of the site visit, the caseloads of the four primary clinicians ranged from 292 to 491 patients. All psychiatry caseloads were within ratio guidelines.

In March 2022, a facility-wide triage plan was implemented that was still in effect during the site visit. The plan called for psychiatry staff to provide routine contacts for 3CMS patients on medications, and IDTTs were prioritized and shortened to maximize the number of patients seen.

MCSP offered only one 3CMS group to DDP patients on Facility B once weekly. However, during the site visit, the group was not held due to staffing vacancies and the redirection of recreation therapy staff to administrative segregation and EOP units.

The monitor's expert observed IDTTs throughout the facilities during the site visit. No IDTTs occurred on Facility A due to staff shortages and mandatory training attendance.

As for four IDTTs observed on Facility B, all required disciplines attended, the psychiatrist attended in person, and the content of the meetings met all assessment criteria. Patients participated in treatment discussions as members of the team. The IDTTs' average length of time was 15 minutes.

On Facility C, measurable treatment goals were not always presented; however, the supervisor appropriately interjected. During one initial IDTT, the supervisor provided a copy of the 3CMS orientation brochure to a patient, although the primary clinician stated that he had not seen the brochures before. IDTTs were collaborative, with appropriate participation from team members, including patients. The psychiatrist attended in person. Patients were reminded how to contact mental health, if needed.

On Facility D, the IDTTs started 30 minutes late. The housing unit officer did not know whether IDTTs were occurring, where they would occur, or what patients to call. All required staff attended. The telepsychiatrist attended via laptop as opposed to the Cisco DX 80 equipment, and the connectivity and quality were inadequate. During the one initial IDTT, the 3CMS brochure was not provided to the patient, nor was a sufficient overview of the 3CMS program. Case formulations were well presented, and patient engagement was encouraged. Treatment goals and interventions were adequately discussed, and patients were informed how to contact mental health, if needed.

Interviewed 3CMS patients reported confusion regarding the role of the psychiatrist versus the primary clinician. One patient noted feeling betrayed because the psychiatrist was

"playing" another staff's role.  Patients raised issues with disrespect from custody staff and the overall lack of mental health services.

MCSP began offering nursing-led therapeutic groups (NLTGs) in March 2022 for 3CMS, EOP, and general population incarcerated persons.  The chief of mental health reported that NLTGs were voluntary and only provided credit for offered treatment if the patient attended.

One observed NLTG was entitled "Anxiety," but the nurse played a movie about recovery.  The material was outdated, and patients expressed dissatisfaction.

The monitor randomly selected and reviewed the healthcare records of 20 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays.

Notably, 100 percent of initial psychiatry evaluations were timely and occurred before the initial IDTT.  All initial psychiatry evaluations were conducted in a confidential setting.  A telepsychiatrist completed 14 percent of reviewed initial psychiatry evaluations.

For routine psychiatry contacts, 71 percent were timely and occurred at least every 90 days.  All were conducted in confidential settings.  Telepsychiatry conducted 34 percent of routine psychiatry contacts.

Five of seven or 71 percent of initial primary clinician evaluations were completed within ten working days of arrival or a change in level of care.  All were conducted in a confidential setting.  A tele-social worker conducted one initial primary clinician assessment.

Fourteen patients required routine primary clinician contacts; only 14 percent were timely and occurred at least every 90 days.  All were conducted in a confidential setting.  There were no routine primary clinician encounters conducted by telehealth.

Seven 3CMS patients required initial IDTTs; two, or 29 percent, occurred within 14 working days of arrival or a level of care change.  All required staff attended; patients attended

71 percent.  Reasons initial IDTTs were held *in absentia* included an emergency institutional lockdown and patient refusal.

Six of ten patients who required annual IDTTs received them timely.  All required staff and patients attended all routine IDTTs.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

The MCSP pre-release coordinator began in the role in October 2021.  The coordinator interfaced with internal and external agencies, including county mental health providers, probation, the Division of Adult Parole Operations (DAPO), and other community or state programs as needed.  During the review period, 38 of 39 patients on probation signed a release of information (ROI) form; one patient refused.  Additionally, TCMP provided services to 155 patients during the reporting period.

At the time of the site visit, 36 patients were within 120 days of parole; all 36 were offered pre-release services, including pre-release groups.  The monitor's expert observed one pre-release group attended by three patients.  The community resources group provided pertinent information about transportation, vocational resources, establishing positive relationships through religious organizations, self-help groups, and neighborhood resources.  The presentation was interactive and individualized based on patients' release dates and county; all patients were engaged.

The pre-release coordinator reported a collaborative relationship with MCSP clinicians, custody, and leadership, as well as community contacts. Barriers to improving pre-release planning were staffing shortages and the concomitant inability to fully train a back-up clinician.

Program Access:

a. Job and Program Assignments

On March 1, 2023, MCSP reported that of 1,514 available jobs, 129 EOP patients, or 15 percent of the EOP population, held job assignments. For 3CMS patients, 602 or 42 percent of the 3CMS population held job assignments, and for non-MHSDS incarcerated persons, 783 or 49 percent of the non-MHSDS population held them.

For the 1,031 academic assignments, MCSP reported that 228 or 26 percent of the EOP population held these assignments. For 3CMS patients, 407 or 28 percent of the 3CMS population held academic assignments, and for non-MHSDS, 396 or 25 percent of the non-MHSDS population held these assignments.

Of 115 vocational education assignments, eight or one percent of the EOP population held assignments, as did 61 or four percent of the 3CMS population, and 46 or three percent of the non-MHSDS population.

Of 1,086 voluntary education assignments, 85 or ten percent of the EOP population held assignments, as did 505 or 35 percent of the 3CMS population, and 496 or 31 percent of the non-MHSDS population.

Of 188 substance abuse treatment assignments, 65 or eight percent of the EOP population, 85 or six percent of the 3CMS population, and 38 or two percent of the non-MHSDS population, held assignments.

b.  Milestone Credits

MCSP did not report the number of EOP patients who were eligible to earn milestone credits during the review period, but indicated that 479 EOP patients earned milestone credits during that period.  MCSP also reported that 1,851 3CMS patients earned milestone credits. MCSP did not provide milestone credit information for non-MHSDS incarcerated persons.

c.  Out-of-Level Housing

MCSP reported that 14 EOP and five 3CMS custody Level I patients were placed in Level II housing.  One 3CMS custody Level I patient was placed in Level III housing.

There were three 3CMS custody Level II patients in Level I housing, 27 EOP and 126 3CMS custody Level II patients in Level III housing, and two EOP and five 3CMS custody Level II patients in Level IV housing.

Further, there were four EOP and three 3CMS custody Level III patients in Level II housing, and five EOP and 12 3CMS custody Level III patients in Level IV housing.

Additionally, there was one EOP custody Level IV patient in Level II housing, and 59 EOP and 97 3CMS custody Level IV patients in Level III housing.

d.  ADA Reasonable Accommodation and Grievance Procedure

MCSP provided training rosters and attendance sheets that demonstrated compliance with the implementation and reiteration of reasonable disability accommodation requirements, grievance procedures, and appeal processes.  MCSP also provided updated accommodation modification procedures for mechanical restraints.  All staff were required to sign an acknowledgment form once the required training memoranda were completed.

e.  Periodic Classification Score Reductions: EOP Patients

A review of 50 completed CDCR 840 forms reflected that MCSP provided classification score reductions for EOP patients.

f.  Unclothed Body Search

MCSP completed unclothed body searches in the EOP hub upon patient intake and departure from the housing unit.  All unclothed body searches were performed in TTMs located in the center of the housing unit.  Officers indicated that to ensure the patient's privacy, a plastic privacy screen was used to block one side of the treatment module, while push carts and other large objects were used as supplemental privacy devices.  It should be noted that the TTMs were stationed side-by-side, restricting the complete cover of a patient, and, therefore, were not completely private.  The housing unit supervisor indicated that a mesh covering, or similar device was not used during the unclothed body search process.  Visual inspection during unclothed body searches lasted approximately one minute and included a head-to-toe examination, including body cavities and any extensions of the body when possible (prosthetic appliances, canes, and walkers).  Hand-held metal detection devices were used regularly.  MCSP custody officers did not wear body cameras.

"C" Status:

MCSP reported that 16 patients were on "C" Status during the review period, including three EOP and 13 3CMS patients.  During the site visit, there were three EOP and 11 3CMS patients on "C" Status.  The three EOP patients were on "C" Status for an average of 60 days, with ranges from 13 to 112 days.  The 11 3CMS patients were on "C" Status for an average of 57 days, with ranges of 20 to 160 days.

Case-by-Case Reviews:

On April 11, 2023, MCSP reported that 26 patients were scheduled for 150 day case-by-case reviews. A review of case notes for patients who were retained in administrative segregation beyond 150 days indicated adherence to CDCR policy. There were nine patients awaiting resolution of an RVR and/or DA referral, while four patients elected to be retained pending transfer to their endorsed institution. Nine patients were transferred to their endorsed institution, and four patients were released to a MCSP housing unit.

MCSP provided information on 26 cases that satisfied the criteria for a 120-day pre-MERD review. Of those, one patient was released back to MCSP Facility A prior to their scheduled review. The 120-day pre-MERD reviews were completed for the remaining 25 cases with projected or active SHU terms. Thirteen of 25 of 120-day pre-MERD reviews were held 120 days prior to the expiration of the controlling MERD for each patient. Twenty-four of 26 cases were presented to the CSR for review, and the remaining cases were pending review. Regarding SHU term status, 23 cases had a pending projected MERD, three cases were pending SHU audit, and one case was audited and approved. Reviews were completed at initial ICCs for all patients. Seven patients were granted NDS 102 status, one was granted NDS 200 status, and one was pending NDS status resolution of a temporary medical hold.

Mental Health Referrals:

During the reporting period, MCSP made 4,562 mental health referrals; there were 902 referrals to psychiatry and 3,660 referrals to primary clinicians. MCSP was compliant with primary clinicians' responses to all referrals; however, psychiatry was only compliant with timely responding to routine referrals.

Specifically, MCSP was compliant with responding to the 697 emergent primary clinician referrals but did not respond timely to the one psychiatry emergent referral. Similarly, while MCSP was compliant with timely responses to the 135 urgent referrals to primary clinicians, it was only 18 percent compliant with timely responding to the 41 urgent referrals to psychiatry. Further, the institution was compliant with timely responding to the 2,828 routine referrals to primary clinicians as well as the 860 routine referrals to psychiatry.

<u>Custody and Mental Health Partnership Plan</u>:

MCSP mental health and custody staff reported a positive collaborative working relationship.

MCSP's CMHPP LOP was last revised in March 2023 and was aligned with headquarters' directive.

MCSP conducted executive leadership joint rounding during all six months of the review period. The chief deputy warden and chief of mental health participated in all rounding, and a different program on a different yard was rounded each month. Reports reflected that executive rounding addressed all prescribed topics, and MCSP completed appropriate follow-up where necessary.

Reviewed weekly warden's executive staff meeting minutes for 23 weeks did not reference executive leadership joint rounding or include rounding forms. All six months of quality management committee and mental health subcommittee minutes referenced the executive rounding.

The monitor and monitor's expert observed huddles in all areas where required by policy. All mandated staff was present, huddle discussions were comprehensive, custody and mental health staff were familiar with patients, and there was follow-up on previously discussed issues.

Staff completed all huddle reports as required.  Reviewed second and third watch mental health huddle reports for EOP, MHCB, and ASU reflected appropriate staff attendance.  However, housing unit logbooks revealed that huddles were recorded sporadically.

MCSP was not piloting Specialized Bed Complete Care Huddles on second watch at the time of the site visit.

MCSP conducted weekly 3CMS supervisory meetings and provided huddle reports for all yards, including the MSF.  The monitor reviewed a random sample of reports for different yards that reflected compliance with CMHPP policy.

During the review period, MCSP conducted monthly joint supervisory 3CMS program area tours on all yards with the sergeant and mental health supervisor in attendance.

Due to the staffing shortages, MCSP suspended EOP orientation groups.

Documentation reflected monthly inmate advisory council (IAC) meetings; however, minutes revealed that 3CMS supervisors were not present and the 3CMS program was not addressed as required by policy.

MCSP reported providing copies of the 3CMS brochure to patients during initial IDTT's; however, during one observed IDTT, the primary clinician noted never having seen the brochure prior to that meeting.  During the site visit, the monitor was provided with a copy of the brochure.

Patients filed 44 allegations of misconduct involving mental health staff.  Of those, 29 were determined to be unfounded, eight were found to be policy violations, and seven were not completed.  For custody grievances, MCSP reported that they were processed, tracked, and screened by the central screening team, but there was no internal tracking log or report available

for review.  There were also six allegations of staff misconduct not initiated through the inmate grievance process.

Seven custody employees were reassigned to other posts due to misconduct allegations; no mental health staff was reassigned.

MCSP staff reported that the quarterly partnership round tables would be discontinued due to significant mental health staffing vacancies.  Quarterly round table training was completed by 348 staff, including 60 percent of mental health staff.  However, MCSP did not provide a list of staff required to attend and therefore, compliance could not be assessed.

For annual partnership off-post training during the last 12 months, MCSP reported that one of three mental health chiefs and none of 12 mental health supervisors completed the training.  Seven of nine psychiatrists, four of 17 psychologists, and two of 15 social workers also completed the training.  Of nursing staff, 68 of 81 attended the training.

Regarding custody staff, 84 percent completed the training.  The warden and chief deputy warden did not complete the training.  Two of eight associate wardens, none of five captains, 13 of 18 lieutenants, and all 35 sergeants completed the training.  Further, 357 of 418 or 85 percent of correctional officers and 22 of 27 correctional counselors I, II, and III attended the training.

<u>Heat Plan</u>:

MCSP's heat plan LOP was updated in May 2022 and conformed with CDCR policy.

The heat plan was in effect at MCSP during two months of the review period; heat reports were completed and submitted to headquarters, as required.  During those months, there were 23 Stage I heat alerts but no Stage II or Stage III heat alerts.  No patients experienced heat-related illnesses.

All housing unit thermometers were operable and accurate, and most, but not all, interviewed housing unit officers were knowledgeable about the heat plan and the potential for patient heat-related illness.  Common errors included not knowing the specific temperatures that activated the respective heat plan stages, incorrectly identifying the heat plan stage when nursing/medical rounds were conducted, and not knowing how often the patient heat risk list was updated.

Regarding annual heat-related pathologies training, four correctional administrators, one CC I, four CC IIs, three captains, seven lieutenants, 20 sergeants, and 183 custody officers completed this training during the review period.  MCSP did not provide the total number of custody staff required to attend; therefore, it was not possible to assess compliance.

RVRs:

MCSP issued 2,697 RVRs during the review period, including 2,151 or 80 percent to MHSDS patients and 546 or 20 percent to non-MHSDS incarcerated persons.  There was one RVR issued to an acute care patient, seven issued to intermediate care patients, 25 issued to MHCB patients, 756 issued to EOP patients, and 1,362 issued to 3CMS patients.

The monitor reviewed 45 RVRs for compliance with CDCR policy.  Of those, clinicians indicated that mental health influenced the behavior that led to the RVR in 12 or 27 percent of cases.  Further, custody staff timely referred RVRs to mental health staff in 16 of 45 or 36 percent of cases.  Mental health staff timely completed and returned the mental health assessment in 35 or 78 percent of cases.  Patients were confidentially interviewed for the mental health assessment in 16 of 45, or 36 percent of reviewed cases.  The SHO documented consideration of the mental health assessment in all reviewed cases.  The clinician recommended

mitigation of penalties in 41 of 45 or 91 percent of reviewed cases; the SHO did not follow mitigation recommendations in six of 41 or 15 percent of those cases.

Four RVRs were recommended for alternative discipline; three resulted in counseling chronos. The fourth RVR was not documented in an alternative manner, even though the clinician noted in the mental health assessment that the RVR should be documented in an alternative manner because the patient expressed suicidal ideation.

MCSP staff reported that during the review period, the number of RVRs increased while mental health staffing decreased, ultimately delaying the completion of mental health assessments.

Regarding mental health assessment training, four of seven or 57 percent of correctional administrators, three of seven or 43 percent of captains, 13 of 21 or 62 percent of lieutenants, and 14 of 21 or 67 percent of sergeants attended the required training.

For mental health staff, one of three chiefs of psychology, mental health, and psychiatry attended mental health assessment training. None of the senior psychologists, psychiatrists, or social workers attended the training. Furthermore, no mental health supervisors or psychiatrists attended the training, and only one of 15 or seven percent of psychologists attended the training.

<u>Use of Force</u>:

MCSP reported one controlled and 109 immediate uses of force during the review period. The controlled use of force involved a 3CMS patient and the use of pepper spray. Of the 109 immediate uses of force, 102 or 94 percent involved MHSDS patients; 52 involved the use of pepper spray, three involved both the use of pepper spray and CS gas, 40 included the use of the 40mm launcher, three utilized the MEB, 47 involved the use of physical strengths and holds, and 13 involved a combination of use of force options.

There were no uses of force to administer involuntary medications.

There were 135 incidents of non-use of force, of which 107 involved MHSDS patients.

The monitor reviewed the one controlled and 20 immediate uses of force involving MHSDS patients. All 21 incidents complied with CDCR's use of force policies.

MCSP reported that 70 percent of mental health staff completed the required use of force training. Specifically, training was completed by all three mental health chiefs, all six psychiatrists, and all 13 social workers. Additionally, nine of 13 or 69 percent of mental health supervisors, 15 of 20 or 75 percent of psychologists, and 168 of 250 or 67 percent of nurses completed the training.

As for custody staff, 93 percent completed the required use of force training. However, neither the warden nor the chief deputy warden completed the training. Additionally, one of seven associate wardens, three of nine captains, 30 of 36 lieutenants, 71 of 74 sergeants, and 695 of 733 or 95 percent of correctional officers completed the training.

Lockdowns/Modified Programs:

PSRs did not significantly interrupt the delivery of mental health services during the reporting period.

There were no lockdowns during the monitoring period, but only modified programs. Reviewed PSRs for COVID-19 outbreaks reflected that healthcare and dental ducats were honored, and medication was dispensed at clinic windows, one building at a time, regardless of quarantine status. A PSR issued for a riot on Facility A on January 11, 2023, resulted in program modification from January 12 - 18, 2023. During that time, healthcare services were limited to priority ducats and cell-front medication distribution for Facility A only. On January 19, 2023, the yard returned to normal programming, and the modified program remained in place only for

recreation yard.  Other PSRs during the review period resulted in program modifications for alarm response training, flu vaccination, and electrical infrastructure maintenance; those program modifications lasted for between one and five hours.

    Access to Care:

    A review of MCSP's monthly Health Care Access Quality Reports from August 2022 to February 2023 reflected the issuance of 162,795 mental health ducats and add-on appointments, of which 83,940, or 52 percent, were completed and 78,855, or 48 percent, were not completed. Of the appointments that were not completed, six percent were due to custodial reasons, 22 percent were due to non-custodial reasons, and 72 percent were due to patient refusals.

    Placement of 3CMS Patients into Minimum Support Facilities:

    During the review period, MCSP placed seven 3CMS patients into the institution's MSF; two of those patients were prescribed psychotropic medications.  None were returned to a non-MSF facility, and none were changed to a higher level of care.  One patient exited the MHSDS. Three patients paroled from the MSF at the 3CMS level of care.  As of March 24, 2023, MCSP had four 3CMS housed in the MSF.

    *Coleman* Postings:

    All toured housing units contained current *Coleman* postings in English and Spanish, although the Facility B *Coleman* posting was in English only.

    Document Production Issues:

    MCSP struggled to produce medication management information for patients on PC 2602 involuntary medications, as well as the number of patients taking NA or DOT medications.

**APPENDIX B-3**
**SALINAS VALLEY STATE PRISON (SVSP)**
**(April 18, 2023 – April 21, 2023)**

Census:

On April 19, 2023, SVSP housed 2,904 incarcerated persons, which was six patients or a 0.2 percent increase from the prior reporting period.  The 1,385 mental health caseload patients represented 48 percent of the institution's population and an eight percent increase since the previous review period.

The MHCB housed eight patients and there was one patient in alternative housing.

The 233 mainline EOP and 1,044 mainline 3CMS patients represented a respective 0.4 percent population decrease and an 11 percent population increase from the prior review period.

The administrative segregation population included 15 EOP patients pending transfer to an EOP hub, and 84 3CMS patients housed in STRH.

Staffing:

SVSP staff described the institution's mental health staffing as being in even more of a state of crisis than it was during the prior review period.  This resulted in the prioritization of staffing assignments based on acuity by program and within programs.  Staff reported low morale, high "burnout," and an inability to provide satisfactory treatment.  They further stated that they remained at SVSP because they wanted to work under the chief of mental health and serve their patients.

Similar to the prior review period, the chief psychiatrist's position was filled, but the senior psychiatrist's position was vacant.

All 2.8 psychiatry positions were vacant but covered by 3.27 registry psychiatrists.

Both chief psychologist positions were filled.  Two of 3.5 senior psychologist supervisor

positions were also filled, for a 43 percent vacancy rate, while only one of 4.4 senior psychologist specialist positions were filled, reflecting a 77 percent vacancy rate. Alarmingly, only two of 28.3 psychology positions were filled, for a 93 percent vacancy rate; however, 6.72 contractors reduced the psychology functional vacancy rate to 69 percent.

One supervising social worker filled the 0.7 position. Four of 13.3 social worker positions were filled, for a 70 percent vacancy rate. One social worker was on an extended leave, but there were 2.65 contractors, reducing the social worker functional vacancy rate to 58 percent.

Nine of 10.8 recreation therapist positions were filled, for a 17 percent vacancy rate. Two recreation therapists were on extended leaves, for a 35 percent functional vacancy rate.

All 14 positions for supervising registered nurses were filled, but one was on an extended leave, for a seven percent functional vacancy rate. Thirty-four of 54.30 LVN positions were filled, for a 37 percent vacancy rate. However, 12 LVNs were on extended leaves, increasing the functional vacancy rate to 59 percent. Five of 10.6 CNA positions were filled, for a 53 percent vacancy rate.

Both senior psych tech positions were filled. Nineteen of 28.3 psych tech positions were also filled, for a 33 percent vacancy rate.

Positions for the OSS II, AGPA, CHCA, and 2.5 HPS Is were all filled.

As for custody staff, the warden's position was filled, as were all positions for chief deputy wardens and captains. Thirty-one lieutenants filled 30.4 lieutenants' positions, but one lieutenant was on an extended leave. Seventy-two of 88.8 sergeants' positions were filled. All 12 CC II and 26 CC I positions were filled. For correctional officers, 804 of 843.2 positions

were filled, for a five percent vacancy rate, but 69 correctional officers were on extended leaves, reflecting a 13 percent correctional officer functional vacancy rate.

Telepsychiatry:

SVSP utilized telepsychiatry for the EOP and 3CMS programs.  The EOP program used telepsychiatry for 20 hours weekly, while it was used 40 hours weekly for 3CMS patients.  Telepsychiatry was also used for on-call status after hours for between ten and 20 hours weekly.  Telepsychiatry was not used in the MHCB.  During the review period, telepsychiatrists conducted 1,727 individual patient contacts, which were not IDTTs, and also participated in 473 IDTTs.

The monitor's expert observed two EOP telepsychiatry appointments.  The telepsychiatrist, who worked from home, was engaged.  The utilized on-site equipment was a Cisco DX-80 with adequate sound and visual resolution; there were no technical issues.

In order to evaluate the process and technology for cell-front visits, the monitor's expert accompanied the telepresenter to the Facility A-5 housing unit to see a patient who did not attend his scheduled confidential telepsychiatry appointment.  The telepresenter spoke with the housing unit officer to obtain collateral information.  She then went cell front with the tablet, which exhibited good connectivity.  The patient agreed to exit the cell to speak with the telepsychiatrist on the dayroom floor.  The patient stated that he had missed his telepsychiatry appointment earlier in the day because he was sleeping and accepted the offer of a confidential session later that afternoon.

Overall, the telepresenter reported variable housing unit connectivity.  She reported that connectivity in Facility A-5 was generally good, but was often poor in Facilities A-2 and A-4.  She further indicated that due to high winds, approximately twice monthly there was no signal in the housing units, necessitating return to the office so the device could reconnect to the wi-fi

signal.  Senior leadership and staff reported that there were no backup tablets, despite having requested them from headquarters.  Tablets were assigned per telepresenter; if there were technological issues with a tablet, or if a covering telepresenter wasassisting, this presented a barrier to performing cell-front visits.  In contrast, the telepresenter reported that there were no challenges with the use of the fixed, wired equipment in the office that utilized the Cisco DX-80.

Most staff members, including senior leadership, supervisors, and line staff, reported that while telepsychiatry was essential to seeing patients at SVSP, they preferred on-site psychiatrists. They believed that telepsychiatrists generally did not fully grasp safety and security issues, as well as staff and patients' experiences.  Mental health leadership reported that many telepsychiatrists viewed the facility as "out of sight, out of mind."

Telework:

SVSP reported that only full-time state employees could utilize telework.  The chief psychiatrist and two psychologists teleworked two days weekly, while two senior psychologist supervisors teleworked one day weekly.

Staff Recruitment:

SVSP relied on central hiring for clinical staff but reported that it was difficult to hire staff for multiple reasons.  These reasons included the pay differential for mental health staff working in the PIPs, the high cost of living in the area surrounding SVSP, and central hiring taking too long to approve hires, which resulted in applicants accepting other positions during this waiting period.

Quality Management:

Overall, there were no significant changes to SVSP's quality management program since the prior site visit.

The local governing body met for five of six months of the review period. It never attained a quorum despite documentation erroneously reporting that a quorum was met. Reviewed minutes indicated that the local governing body typically reviewed policies and procedures, privileging and credentialing, institutional management and planning, and audit preparation. Reviewed minutes were useful and demonstrated a high level of meeting discussion. However, when deficiencies were noted, responses to identified issues reflected the need for improvement.

The quality management committee achieved quorums for five of six months of the review period. Addressed issues usually included organizational updates and announcements, performance improvement work plans, quarterly and subcommittee reports, local operating procedures, CTC policies and procedures, and healthcare dashboard and on-demand performance reports. Other issues that were variably addressed included patient safety and emergency medical responses. The reviewed minutes of identified issues were descriptive, but needed improvement for corrective actions to address deficiencies.

Reviewed monthly mental health subcommittee minutes were thorough and generally noted that the multiple access to care deficiencies were due to significant staffing shortages. When quorum documentation was included, it indicated a quorums' attainment. The mental health subcommittee typically addressed health care access, nursing, system performance, diagnostic monitoring, higher levels of care, program supervisors' and the inpatient coordinator's

reports, SPRFIT, training, patient safety, improvement projects, policies and procedures, and subcommittee improvement priorities.

Like during the prior reporting period, no QITs or FITs were chartered, while no other audits were conducted.

Medication Management:

SVSP provided MAPIP results for the six-month review period for diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated that SVSP was compliant for obtaining blood pressure, height, weight, and thyroid tests for all six months of the review period. SVSP obtained required EKGs for three of five required months. The institution was compliant with obtaining medication consents for one month. Unfortunately, SVSP was noncompliant with the measures for Abnormal Involuntary Movement Scale (AIMS), glucose, Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), and lipids for the entire review period.

SVSP's outpatient programs were not an authorized clozapine initiation or maintenance facility. No SVSP patients were prescribed clozapine during the review period.

As for required monitoring of antidepressants, SVSP was compliant for the entire review period with obtaining thyroid tests, and, for patients taking venlafaxine, monitoring blood pressure. In obtaining EKGs, SVSP was compliant for two of four required months.

For patients prescribed carbamazepine, SVSP was compliant for the one required month for monitoring blood levels, CBC, and CMP. For obtaining medication consents, the institution reported noncompliance for the one required month.

As for patients who were prescribed Depakote, medication consent documentation was compliant for one of five required months. SVSP was compliant for one month for CBC with platelets and CMP. There was noncompliance with obtaining medication blood levels for the entire review period.

For lamotrigine, SVSP was compliant in obtaining medication consent for three months.

As for lithium, SVSP was compliant with medication consent for three months. The institution was also compliant for one month for monitoring EKGs and thyroid tests. However, there was noncompliance both for checking kidney function tests and monitoring medication blood levels for the review period.

SVSP was compliant for all six months of the reporting period for continuity of medications upon parole/transfer to the community, and for two months for medication continuity with intra-institutional transfer to ASU/SHU/PSU, and chronic care historical administration of psychiatric medications. There was noncompliance for all six months for medication continuity upon inter-institutional transfer at receiving and release (R&R), MHCB transfer, and following discharge/transfer from a community hospital and/or DSH, as well as for continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU). There was also noncompliance for all six months for observation of HS medication preparation and AM and PM medication preparation, and outpatient provider new medication orders.

SVSP did not report the total number of patients who were prescribed psychiatric medications, the total number of psychiatric prescriptions, or the number of KOP psychiatric prescriptions.

The institution conducted 69 medication line wait-time audits, which revealed that patients waited an average of three-to-five minutes for medications.  The total duration of medication lines was under two hours, except intermittently during institutional PSRs.  In those cases, nursing staff went to the housing units to dispense medications, which took longer.  SVSP reported ongoing challenges with Facility D patients not having a place protected from the elements to wait while in the medication line; reviewed documentation stated that there was "no ability" to correct this situation.  While SVSP provided raincoats to patients with work assignments, and patients were able to purchase raincoats in the canteen, the chief nurse executive reported working with custody so that indigent patients had access to raincoats.  Notably, staff and patients reported frequently finding medications on the yards, especially on Facility D.  SVSP did not report any interference with mental health programming due to medication lines.

SVSP reported an average non-formulary rate of 17 percent during the review period.  At the time of the site visit, psychiatry prescribed 547 non-formulary prescriptions to an unknown number of patients.

The institution provided lists of patients who had completed polypharmacy reviews, but did not indicate the percentage of polypharmacy reviews that were completed.

SVSP also produced lists of patients taking HS medications, but did not separate medical and mental health medications.  The lists also did not contain the percentage of HS medications that were given after 8:00 p.m.

There was compliance for four months for PC 2602 involuntary medication orders.  For the related measure of compliance with entering the PC 2602 court order, SVSP was noncompliant for the entire review period.

Forty-six SVSP patients received PC 2602 involuntary medications at the time of the site visit. Data reflecting the number of initial petitions filed during the review period was inconsistent. The lack of evidence supporting one initial petition resulted in its withdrawal. There were also 49 PC 2602 renewal petitions, but one renewal petition was denied. Concerningly, five petitions were not renewed due to psychiatrists not submitting timely renewal declarations.

A CC II served as the medication court administrator (MCA). He denied any barriers in processing or conducting PC 2602 petitions. The MCA covered all of SVSP, including the PIP. While the MCA was quite adept at his job, he lacked adequate support, given the large number of PC 2602 cases.

SVSP submitted two LOPs germane to the PC 2602 process, namely LOP 418, which governed its administrative and legal aspects, and LOP 419, which addressed the ordering and administration of involuntary medications. Both were consistent with statewide policies.

SVSP did not report any uses of force to administer PC 2602 medications during the review period.

Transfers:

SVSP had one off-site sustainability review during the review period dated December 19, 2022. On-site sustainable process audits were paused to allow staff to participate in the Unmet Needs Assessment (UNA).

These sustainable process reviews involved a headquarters' audit to evaluate the quality and accuracy of a sample of higher level of care (HLOC) forms. The audits included whether the HLOCs were thoroughly completed and provided sufficient clinical justification for patient non-referral to a HLOC when there were positive referral indicators. The reviews also evaluated the

utility of the clinical interventions in instances of patient non-referral, as well as the interrater reliability between the headquarters' reviewer's judgment and that of SVSP's inpatient coordinator. While SVSP found that 65 percent of reviewed cases were "good," headquarters reported that only 54 percent met audit criteria. This represented a slight interval decrease from the prior audit, which found 58 percent to be "good."

The report listed several reasons for such inadequacies, including insufficient narratives and interventions, missing documentation, consideration incorrectly marked positive, and clinical inconsistencies. A review of treatment plans for patients awaiting transfer to higher levels of care revealed deficiencies including generic goals and interventions, and inaccurately marking higher level of care indicators as negative. The review led to the assignment of ten corrective action plans (CAPs) to SVSP. Some CAPs included sharing headquarters' findings with staff and supervisors, providing proof of on-the-job training, and changing how data was presented and discussed in the mental health program subcommittee.

The monitor's expert reviewed higher level of care considerations for five patients who were randomly selected from the non-referral log. While the monitor's expert agreed that referrals to higher levels of care were not warranted in these cases, documentation for three of them insufficiently justified non-referral. Deficiencies included inadequately addressing the positive level of care indicators, generic interventions, and an unclear nexus between the proposed treatment interventions and the expected clinical benefits.

SVSP's inpatient coordinator had held the position since October 2021. She did not have a back-up inpatient coordinator. During her very recent leave of absence, SVSP's staffing shortages had resulted in the chief of mental health assuming many of her responsibilities.

During the review period, there were 314 instances of 177 patients who were considered but not referred to inpatient care.

SVSP reported a total of 20 referrals to acute care; 15 were from the MHCB and five were from the EOP program. One referral was rescinded. All 20 referral packets were timely completed. All 19 acute care referrals timely transferred within ten days.

There were 32 referrals to intermediate care. Seven intermediate care referrals were rescinded, while another patient ultimately transferred to another institution's outpatient care program. All intermediate care referral packets were timely completed. Of the 24 intermediate care patient referrals who transferred, four transferred from the MHCB, and 20 transferred from the EOP program. Of these 24 transfers, only ten or 42 percent of patients timely transferred within 30 days. The 14 untimely intermediate care transfers took an average of 41 days to transfer, with a range of 32 to 53 days. The inpatient coordinator reported that the reasons for the late intermediate care transfers were frequently due to custody factors/the need for patients to be single-celled.

During the site visit, on April 19, 2023, one acute and three intermediate care patients were awaiting transfer to inpatient care. All were within transfer timeframes.

SVSP reported that it transferred one patient with complex medical needs to acute care during the review period.

There were three *Vitek* hearings for acute care patients, and nine for intermediate care patients. No patients prevailed.

The inpatient coordinator reported that she learned of patients who were returning to SVSP from inpatient care through the transport list that the CC II disseminated. She indicated typically receiving five-days' notice of patients' return, but reported instances when she received

less notification; sometimes, only 24-hours' notice was provided. She reported notifying clinicians of returning patients. She also kept an internal log containing relevant data, including patients' return dates and times, and the dates of five-day follow-ups and suicide risk assessments.

There were 115 admissions to SVSP's MHCB, which included admissions from SVSP, and other institutions. Seventy-two SVSP patients transferred to outside MHCBs, including 35 to CHCF, 30 to CMC, three each to CSP/Corcoran and CSP/Solano, and one to CSATF. All patients were admitted to outside MHCBs within 24 hours of referral.

Fifty patients had three or more higher level of care placements, which included placement in the MHCB and acute or intermediate care.

The one SVSP patient who transferred to the PSU transferred timely.

Thirty of 61 or 50 percent of patients timely transferred to an EOP hub.

SVSP patients requiring EOP level of care were timely transferred to the institution's EOP program.

SVSP reported that all patient transfers to STRH were internal and were immediate.

SVSP did not transfer any patients to LTRH.

Programming:

STRH:

During the reporting period, the STRH housed 433 patients. Overall, stays averaged 35 days and ranged from one to 335 days, including stays that began prior to the review period. EOP patients' stays averaged 26 days, and ranged from one to 231 days, while 3CMS patients' stays averaged 59 days, and ranged from one to 335 days. The STRH also housed 174 non-MHSDS incarcerated persons; stays averaged 67 days and ranged from one to 394 days.

Caseloads for STRH primary clinicians exceeded established ratios, but recreation therapists' caseloads were within ratios.

Required staff attended five observed STRH IDTTs. The psychiatrist attended by way of telepsychiatry, with no observed technical difficulties. Patients attended four of five IDTTs. Two initial IDTTs were untimely. Overall, IDTTs were generally conducted appropriately and were collaborative among the respective disciplines, except for very poor CC I participation. The IDTTs also reflected patient input and appropriate feedback.

Two patients attended an observed STRH recreation therapy group, which was well run and appeared to benefit the participants. Patients were not placed in TTMs but were locked to restraint desks. Staff reported that no recreation therapy groups had been conducted in STRH for several weeks prior to the site visit due to the unit recreation therapist being on leave. Significantly, the RT who ran the group was taken from Facility A to conduct a STRH group for the monitor's expert's observation. The group, which focused on psychoeducation for effective communication, demonstrated a creative and skillful approach to patient engagement, which kept the group on-topic. At the end of the group, the RT provided patients with in-cell activities related to the group's topic.

Interviewed STRH clinical staff described the situation in STRH and at SVSP as a whole as "challenging" and "exhausting," and generally attributed low staffing levels to the inability to provide clinically appropriate care, including individual clinical contacts and groups. They reported not being able to "handle EOP patients," and being "terrified of a (patient) suicide." Staff also reported that confidential space for individual contacts was very difficult due to the lack of office space and other confidential spaces, while utilization of the administrative segregation clinic was difficult due to the need to move patients between buildings. Nonetheless,

staff were very complimentary about mental health leadership and their supervisors, which was why they remained at SVSP.

Two interviewed STRH 3CMS patients nonetheless generally reported positive mental health treatment. They described their primary clinicians as "very good" and stated that they consistently received weekly individual primary clinician contacts with the same PC; however, they also noted that many contacts occurred at cell front or in other non-confidential settings. Both patients reported that it was very difficult, if not impossible, to see their PC outside of scheduled appointments. They further reported that psychiatry contacts typically occurred during ICC; neither patient could remember the last time they saw their psychiatrist for an individual contact.

Both patients indicated being offered three daily hours of yard and one weekly 90-minute recreation therapy group, although no groups had been offered for approximately three weeks prior to the site visit. They reported receiving daily psych tech rounds, having tablets, which they described as useful, and being provided with in-cell therapeutic activities and packets. Patients further opined that the STRH's mental health program would improve if they received more confidential individual clinical contacts and groups.

Nine observed ICCs all revealed the attendance of the mental health clinician. The clinician asked preliminary questions about patients' mental health, any suicidal or homicidal thoughts, and any difficulties understanding questions, as well as interjecting and offering feedback. One patient reported having judgment issues due to prescribed medications and diagnosis; the clinician responded that the patient would be scheduled for a mental health assessment later that day.

Three CC IIs rotated facilitating the ICCs.  All three tried to ensure that patients understood what was occurring during the hearings, as well as the ICC's process and recommendations.  For patients who disagreed with the ICC's recommendation, the CC IIs explained that they could file a grievance.

Review of a sample of 18 STRH 114-As indicated that ICCs were held timely.  The 114-As further reflected the offering of 18.5 weekly hours of yard, three weekly showers, and two weekly telephone calls.  Linen exchange occurred every other week.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.  One patient was eliminated from the assessment due to a brief STRH stay.

Eight of 12 or 67 percent of patients had timely initial psychiatry evaluations.  Regrettably, most initial psychiatry assessments appeared to be more of a check-in than a full evaluation.  Three patients did not have an initial psychiatry evaluation.  Seventy-eight percent were conducted confidentially; reasons for non-confidentiality included patient refusals.  Telepsychiatry conducted all reviewed initial psychiatry evaluations.

Eight of 11 or 73 percent of routine psychiatry contacts timely occurred at least every 90 days.  Twenty-seven percent were confidential; the reviewer also could not determine the confidentiality of three contacts.  Reasons for non-confidentiality included patient refusals.  Telepsychiatry conducted 64 percent of reviewed routine psychiatry contacts.

One of 14 or seven percent of initial primary clinician evaluations timely occurred within ten working days of arrival and before the initial IDTT.  One patient did not have an initial PC evaluation.  Sixty-nine percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals.

None of 59 routine primary clinician encounters timely occurred at least every seven calendar days.

None of 14 initial IDTTs timely occurred with 14 working days of arrival.  Four patients did not have an initial IDTT.  Required staff attended 90 percent; patients attended 50 percent.  Reasons for holding initial IDTTs *in absentia* included patient refusals.

Two of six routine IDTTs timely occurred every 90 days.  Required staff attended all reviewed routine IDTTs; patients did not attend any reviewed routine IDTTs.  Reasons for holding routine IDTTs *in absentia* included patient refusals.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

Non-Disciplinary Segregation:

SVSP did not report the number of patients on NDS status during the review period.

MHCB:

The MHCB contained ten beds.  During the site visit, on April 19, 2023, eight beds were filled; two patients' MHCB stays exceeded ten days.  No beds were redlined.

MHCB staff included one psychiatrist who was assigned to the unit for 50 hours weekly and one senior psychologist supervisor and two psychologists who were assigned for 40 hours weekly.  An inspected, unoccupied MHCB room revealed an elevated platform and a safety mattress.  The cell had a working sink and toilet, an operable call light, and a camera that projected at the nursing station.

MHCB staff reported that many MHCB admissions would be unnecessary if patients received better mental health treatment at lower levels of care.  During the review period, the MHCB's average daily census was 8.2 patients.  MHCB patients' clinical stays averaged 10.6

days; the maximum clinical stay was 35 days. Thirty-six patients' MHCB clinical stays exceeded ten days. The average patient's physical stay was 12.7 days, with the physical stays of 62 MHCB patients exceeding ten days.

Four observed IDTTs were conducted confidentially in a well-lit room at a comfortable temperature. All required staff attended and actively used computers. While the treatment team was empathic, and the primary clinician's presentations were clinically sound, similar to the prior reporting period there was an overall lack of cohesion among IDTT members. This lack of cohesion was particularly apparent with the psychiatrist, who was almost exclusively relegated to medication management issues.

An observed initial IDTT was more of an initial assessment than an actual IDTT. The psychologist addressed the patient's significant anxiety by utilizing coping skills techniques with the patient. The clinical discussion continued after the patient left the IDTT; the treatment team also addressed safety concerns and custodial issues, and the psychiatrist discussed medications.

Three observed routine IDTTs revealed that the treatment team required prompting to review higher level of care indicators; safety plans were reviewed in some, but not all, cases. The IDTT nonetheless had a productive discussion about one patient's higher level of care referral; although some treatment team members were reluctant to refer the patient, others effectively argued in favor of referral. By the end of the discussion, the IDTT team agreed that a referral was necessary, and decided on an acute care referral, which was clinically appropriate.

An IDTT for a maximum custody status patient reviewed this status and addressed the patient's need for mechanical restraints, which appeared both appropriate and in accordance with applicable policy.

Clinical staff reported a dearth of confidential treatment space in the MHCB, and multiple competing demands for it. There were two therapeutic treatment modules (TTMs); one was located in the psychiatrist's office and the other was in the dayroom. However, because patients frequently used the dayroom for telephone calls or to watch television, one of the TTMs was often not available for confidential contacts. Notably, MHCB staff's request for additional TTMs had been denied.

The MHCB also had an outdoor yard, with several seats. Although clinical staff had requested to conduct individual and group treatment in this outdoor yard, custody staff reported that this was not possible, due to safety and security concerns. This resulted in approximately 75 percent of MHCB contacts occurring at cell front or bedside. However, custody officers were nearby and could hear the conversations, so opinions differed as to whether this counted as a confidential contact; some staff believed that custody was part of the treatment team. As was also seen in the prior reporting period, MHCB patients expressed a desire for more confidential encounters.

MHCB clinical staff reported a strong working relationship between the various clinical disciplines, and a good working relationship with custody. There were nonetheless exceptions to this positive working relationship, which included challenges with custody staff not taking safety concerns seriously for issues on the yard and custody delays entering the cell when the psychiatrist ordered an injectable medication.

Review of 114-As for MHCB patients indicated that they were typically offered adequate showers, yard, and dayroom, and had the opportunity to make telephone calls during dayroom. However, there were many patient refusals.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.  Two patients were eliminated from the assessment because their stays were too short.

Eleven of 18 or 61 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 24 hours of arrival.  Eighty-nine percent were conducted in a confidential setting.  Reasons for non-confidentiality included patient refusals.  Telepsychiatry was not utilized for initial psychiatry assessments.

All 33 required twice weekly routine psychiatry contacts timely occurred.  All encounters were conducted confidentially.  Of note, many routine psychiatry contacts were marked as confidential yet also marked as taking place at patients' bedside.  Telepsychiatry conducted none of the reviewed routine psychiatry contacts.

Fourteen of 18 or 78 percent of initial primary clinician evaluations timely occurred within 24 hours of admission.  Seventeen percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals.

For routine primary clinician contacts, 142 of 148 or 96 percent timely occurred.  Seventy-seven percent were conducted in a confidential setting.  Reasons for non-confidentiality included patient refusals and a lack of custody escorts or confidential space.

Seventeen of 18 or 94 percent of initial IDTTs timely occurred within 72 hours of patients' arrival.  Required staff attended 56 percent of initial IDTTs; patients attended 78 percent.  Reasons for initial IDTTs being held *in absentia* included patient refusals, COVID-19 quarantine, and one patient being at an outside hospital.

Twenty-eight of 29 or 97 percent of routine IDTTs timely occurred every seven days.  Required staff attended 62 percent of routine IDTTs; patients attended 93 percent.  Reasons for

holding routine IDTTs *in absentia* included COVID-19 quarantine and conflicting appointments. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, but this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

The MHCB's seclusion and restraint rooms were clean and in good working order. The seclusion room had a grate in the floor to use as a toilet. Restraints were in place and conformed to statewide policy. The restraint room also had a toilet.

Seven patients had nine seclusion episodes during the review period. Reviewed documentation supported seclusion's use as a less restrictive alternative. Although there were no restraint incidents, mental health, nursing, and custody staff were knowledgeable about the process.

Crisis Intervention Team:

The institution's CIT LOP was consistent with statewide policy. The CIT operated between 7:00 a.m. and 7:00 p.m., except on Thursdays, due to staffing shortages. The CIT did not utilize telehealth.

There were 212 CIT referrals during the review period, of which 52 or 25 percent led to patients' referral to the MHCB. The CIT also referred three patients to outside hospitals. Staff reported that during the review period there had been increased CIT use, which was attributed to patients' insufficient treatment.

Alternative Housing:

Four psychologists and one licensed clinical social worker were assigned to alternative housing. There were 368 alternative housing placements during the review period. These stays

averaged 0.5 days (12 hours); five exceeded 24 hours, with the maximum alternative housing stay being 1.6 days.

EOP:

Caseloads for EOP program primary clinicians all exceeded established ratios, but the caseloads of psychiatry were within applicable ratios.

Mental health leadership reported that SVSP staff had been making a concerted effort to minimize the placement of EOP patients in overflow housing. During the site visit, nine patients were housed in overflow housing on Facility D-4, and one patient was so housed on Facility A-4.

Between August 29, 2022 and April 14, 2023, EOP patients were offered an average of 5.22 weekly hours of structured therapeutic activities, attended a weekly average of 2.23 hours, and refused a weekly average of 3.04 hours. During this same period, EOP patients on modified programming were offered an average of 4.97 weekly hours of structured therapeutic activities, attended 1.71 weekly hours, and refused a weekly average of 3.27 hours. At the time of the site visit, nine EOP patients were on modified programming.

Overall, staff reported varying degrees of satisfaction with SVSP. A recreation therapist attributed his 13 years of employment at the institution to competitive RT salaries in comparison to the community. A psychologist who had worked at SVSP for five years reported that despite the lack of a competitive salary and the ability to provide telehealth in the community, she remained committed to SVSP due to collegial teamwork and leadership. However, she also reported feeling that her own and peers' commitment was wavering due to burnout and increased anxiety about personal safety due to a recent staff assault and a perception that there had been an increase in violence at SVSP.

RT staff facilitated most EOP groups on both Facilities A and D.  Five hours of nursing led therapeutic groups (NLTG) were also scheduled daily.  Regrettably, there were very few core or clinically focused groups due to clinicians often being redirected to cover other urgent clinical needs.

Facility A

Three initial and one routine observed Facility A IDTTs were all overdue; the routine IDTT was ten months late.  Required staff and the EOP supervisor attended the IDTTs, which were led by the only primary clinician assigned to Facility A.  Patients attended three of four IDTTs.

Due to the lack of primary clinician individual treatment, IDTT discussions about the PC and patient working together toward patients' treatment goals constituted no more than empty promises.  The lack of routine treatment also resulted in the IDTTs having minimal clinical utility.

As for clinical presentations, overall IDTTs' content was disjointed and in need of improvement.  As an example, instead of beginning the IDTT with the patient's symptoms, impact on functioning, and diagnosis, the PC led with a case conceptualization that was not clearly connected to the patient's treatment needs.  Further, the case conceptualization for one patient addressed poor impulse control and problems with emotional regulation but was not clearly connected to the patient's symptoms of anxiety, depression, and passive suicidal ideation.  Rationales for diagnosis also needed improvement.

Moreover, IPOCs did not target all identified symptoms and interventions.  Treatment planning also was not collaborative as the primary clinician identified IPOCs and goals but only asked for team members' and patients' input after announcing an IPOC that the clinician

believed was not useful. Moreover, used clinical language, such as "maladaptive coping" and "genetic predisposition," exceeded the average patient's educational level. On a positive note, team members were empathic, supportive, and respectful to patients.

Psychiatry input during all four observed IDTTs was minimal and lacked spontaneity, as it occurred following prompting on psychiatry issues.

One IDTT patient stated that he had been refusing telepsychiatry due to his belief that his medications had been abruptly discontinued and he wanted a new psychiatrist. The provider explained that the patient had been previously informed that continued appointment refusals would result in the discontinuation of medications. It was reported that when that refusal threshold was met, a cell-front contact to inform him of the medication discontinuation was not feasible because the tablet was not working. Staff were asked whether in these circumstances an in-person psychiatrist could see the patient so there would be a face-to-face contact prior to any medication discontinuances. Staff responded that doing this would be unnecessarily burdensome for the on-site psychiatrist.

Six patients attended an observed recreation therapy social skills group. The RT personally greeted each patient by name upon arrival, demonstrating a level of professional comfort and rapport. The RT stated that patients could choose between using the Wii or watching a movie; both activities occurred simultaneously but were not disruptive. The RT introduced the movie and after 30 minutes engaged the patients in a discussion of their movie observations. Group members were attentive and engaged in their chosen activities.

An observed psych tech led NLTG group addressed physical health and wellness. For unclear reasons, the room's door remained open. The psych tech was comfortable with the patients and treated them with respect. Following a review of group rules, the psych tech

individually engaged with each patient before leading an educational discussion on symptoms, diagnostic assessment, and treatment of Fibromyalgia. However, because no group member had Fibromyalgia, more useful content would had addressed group members' needs.

Interviewed EOP patients reported that they did not receive adequate mental health care. Besides long overdue primary clinician contacts, they reported brief contacts focusing on current suicidal ideation, as opposed to a therapeutic interaction. One patient stated that a suicidal ideation disclosure was met with a response to submit a referral form. Patients further reported that some contacts were non-confidential and occurred at cell front. They attributed group treatment refusals to a lack of interest in or perceived benefit from the group.

Patients' assessment of mental health treatment varied. Some reported that "mental health does their best" but that custody staff "messes it up" by not allowing patients out to attend appointments or access mental health care when requested. Other patients opined that mental health staff was "lazy" or "apathetic," or overwhelmed, and that SVSP's mental health services were the "worst" that they had experienced. Patients also requested individual treatment and more out-of-cell time, estimating that they averaged 22 - 23 hours daily in their cell during the prior month. They also overwhelmingly reported difficulty managing the multiple lockdowns and reported a sense of increased agitation, and the risk of a riot, and that "lockdowns" disrupted access to canteen, packages, and visitation. They reported that although tablets were useful, connectivity issues were a source of frustration.

Staff reported that the ongoing staffing shortages continued to take a toll on them both professionally and personally. Professionally, they reported not feeling good about the lack of treatment and use of "drive by" contacts to see their mentally ill patients. They also indicated lacking the level of awareness of patient functioning that they had with smaller caseloads; when

they were aware of patient needs, they were not always able to service them. Personally, staff reported experiencing burnout and fearing for their and colleagues' safety given increases in violence.

Twenty patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their EOP stays. One patient was eliminated from the review because he left SVSP immediately after the start of the review period.

Three of ten patients had required initial psychiatry evaluations prior to the initial IDTT and within 14 calendar days of arrival or a level of care change. Eighty percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted 30 percent of initial psychiatry assessments.

Thirty-six of 62 or 58 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Ninety percent were conducted in confidential settings. Reasons for non-confidentiality included COVID-19 precautions. Telepsychiatry conducted 44 percent of reviewed routine psychiatry encounters. Significantly, it was noted in many records completed by telepsychiatrists that tablets were not available on-site for telepsychiatrists to conduct cell-front contacts. In violation of applicable policy, telepsychiatry contacts often did not document the telepresenter's identity.

Two of ten initial primary clinician evaluations timely occurred within 14 calendar days of arrival or a level of care change. Forty percent were confidential. Reasons for non-confidentiality included patient refusals.

None of 90 routine primary clinician contacts timely occurred at least every seven calendar days. Further, only 13 percent of required routine primary clinician contacts actually

occurred.  Twenty-nine percent of reviewed contacts were conducted confidentially.  Reasons for non-confidentiality included patient refusals and the custody modified program.

One of ten initial IDTTs occurred within 14 calendar days of arrival or a level of care change.  One patient did not have an initial IDTT.  Required staff attended all reviewed initial IDTTs; patients attended 78 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals.

One of 14 or seven percent of routine IDTTs timely occurred every 90 days.  Required staff attended 100 percent of reviewed IDTTs; patients attended 75 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

<u>3CMS</u>:

SVSP had four 3CMS programs for Level III and IV patients.  The institution reported that, aside from the Minimum Support Facility, mainline 3CMS patients were given the lowest priority of all MHSDS programs for treatment.  The caseloads of 3CMS primary clinicians also far exceeded Program Guide requirements.  On March 30, 2023, Facility A assigned one primary clinician and one RT for 332 3CMS patients, Facility B housed 195 3CMS patients but did not have an assigned primary clinician, Facility C housed 126 3CMS patients but no assigned PC, and Facility D housed 369 patients with one assigned primary clinician.

During the site visit, no IDTTs for mainline 3CMS patients were conducted.

Facility A and D 3CMS patients were provided NLTGs, which staff reported had full enrollment and provided 3CMS patients with some form of clinical contact and support.  Facility A and D primary clinicians reported that 3CMS patients received neither routine IDTTs nor

clinical contacts except for responses to emergent and urgent referrals; however, the CIT typically responded to them. Similarly, Facility B and C 3CMS staff indicated that these facilities were not offering IDTTs or groups, including RT groups, and that the CIT also covered both yards for emergent and urgent referrals. In actuality, 3CMS patients had to submit a referral request to receive clinical contacts, but they were not seen in a timely manner unless it was for a suicide risk assessment or an emergent referral; most non-emergent referrals did not receive clinical contacts.

As a result, primary clinicians and RTs admitted that SVSP's critical staffing shortages were having severe and deleterious effects on their ability to provide adequate mental health care. Leadership added that on some occasions, due to callouts and planned absences, only one primary clinician was available to cover all 3CMS patients. Two Facility D recreation therapists reported very unsafe conditions and frequent fights and other violence when conducting groups and further reported conducting groups of up to 60 patients without officers to maintain security.

The monitor's expert interviewed several Facility A and D 3CMS patients. All 3CMS patients reported not receiving routine IDTTs or individual primary clinician contacts but reported receiving NLTGs, which were described as helpful and clinically appropriate. Patients opined that staff did their best and cared about them, but there were insufficient staff to provide adequate care. They further reported being told to submit a referral request when they needed to be seen, but elaborated that these requests did not receive timely responses if they were responded to at all. They further reported significant problems with the commingling of 3CMS and EOP patients during yard, as there were frequent assaults of EOP patients by 3CMS and general population patients.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays. Two patients were eliminated from the assessment because their SVSP stays were too short to consider compliance.

Two of seven or 29 percent of patients had timely initial psychiatry evaluations before the initial IDTT. All reviewed initial psychiatry evaluations were conducted in a confidential setting. Telepsychiatry was used for 50 percent of initial psychiatry assessments.

Eight of 19 or 42 percent of routine psychiatry contacts timely occurred at least every 90 days. Eighty-four percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted 79 percent of reviewed routine psychiatry contacts.

None of eight initial primary clinician evaluations were timely completed within ten working days of arrival or a level of care change. Fifty percent of reviewed initial PC evaluations were conducted confidentially. Reasons for non-confidentiality included patient refusals.

One of 24 or four percent of routine primary clinician contacts timely occurred at least every 90 days. Many of the reviewed patients had not seen a primary clinician in over 18 months, with others not having been seen by a primary clinician since their arrival at SVSP. One patient was discharged from the MHCB to the 3CMS level of care without follow-up PC care noted in the records. Eighty percent of routine PC encounters were conducted confidentially. Reasons for non-confidentiality included the custody modified program.

None of the eight patients who required an initial IDTT had one within 14 working days of arrival or a level of care change; seven of eight reviewed patients did not have an initial IDTT.

Required staff attended the one reviewed initial IDTT, but the patient did not attend due to a refusal.

None of the patients had required timely annual IDTTs. There were thus no routine IDTTs to review to assess staff or patient attendance. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

SVSP assigned a part-time licensed social worker to conduct pre-release planning. The pre-release coordinator's caseload was approximately 40 patients, with responsibilities that included individual patient contacts, attending headquarters' coordination calls, and obtaining patient resources. Pre-release groups were offered sporadically for EOP patients, but, due to staffing shortages, were not offered to 3CMS patients. TCMP pre-release data was not available for review due to the lack of a statewide system to gather it. The pre-release coordinator reported that this data was only informally collected.

Program Access:

a.  Job and Program Assignments

On March 1, 2023, SVSP reported that of 1,305 job assignments, 84 were held by EOP patients, representing 30 percent of this population. 3CMS patients held 488 job assignments, representing 42 percent of the 3CMS population, as did 733 or 45 percent of non-MHSDS incarcerated persons.

The 1,143 academic assignments were held by 61 or 22 percent of EOP patients, 478 or 41 percent of 3CMS patients, and 604 or 37 percent of the non-MHSDS population.

The 44 vocational education assignments were held by no EOP patients, 11 or one percent of 3CMS patients, and 33 or two percent of non-MHSDS incarcerated persons.

No SVSP patients or other incarcerated persons held voluntary education assignments.

The 25 substance abuse treatment assignments were held by three or one percent of EOP patients, 11 or one percent of 3CMS patients, and 14 or one percent of the non-MHSDS population.

    b.  <u>Milestone Credits</u>

SVSP reported that 143 EOP and 12 3CMS patients, and 22 non-MHSDS incarcerated persons, earned milestone credits. However, the institution was unable to report on patient eligibility to earn milestone credits. An interviewed psychologist reported that Facility D patients were not earning milestone credits.

    c.  <u>Out-of-Level Housing</u>

SVSP reported that 157 *Coleman* patients, including 25 EOP and 132 3CMS patients, resided in a higher housing level than their established custody level. Further, 86 *Coleman* patients, including 41 EOP and 45 3CMS patients, resided in a lower housing level than their established custody level.

Further, SVSP reported that one custody Level I 3CMS patient was in Level III housing. There were 20 custody Level II EOP and 88 custody Level II 3CMS patients in Level III housing, and two custody Level II 3CMS patients in Level IV housing. There were also five custody Level III EOP and 41 custody Level III 3CMS patients in Level IV housing, and 41 custody Level IV EOP and 45 custody Level IV 3CMS patients in Level III housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedure</u>

SVSP provided a copy of the CDCR Form 1824 reasonable accommodation request process manual and confirmed implementation of the revised ADA accommodation, grievance

procedures, and appeals processes.  SVSP did not provide training rosters or attendance sheets reflecting the same.

e.  Periodic Classification Score Reductions: EOP Patients

SVSP provided a randomized sample of 30 completed CDCR Form 840s for MHSDS patients that reflected that the institution provided classification score reductions.

f.  Unclothed Body Search

Unclothed body searches in STRH were routinely completed following the patient's intake.  All such unclothed body searches were performed in closed-door cells with frosted windowpanes to try to ensure patient privacy.  Visual inspection of the patient during a search lasted approximately one minute and included a head-to-toe examination, which included body cavities.  Hand-held metal detection devices were used during searches.  Body cameras were not activated during the search procedure.

g.  Custody Officer Body Cameras

All SVSP custody officers were issued body cameras during the review period.  During the site visit, a STRH lieutenant and custody officer reported that their body cameras remained off when there were no patients/inmates present and that they were instructed to turn them on during patient interactions.  They further reported that at the end of every shift, their body camera footage was stored at the institution, with access to the footage controlled by a lieutenant.

"C" Status:

During the review period, 11 3CMS and 12 non-MHSDS patients were on "C" Status.  Review of the classification committee chronos for the 11 3CMS patients revealed that all had multiple serious RVRs within 180 days and were deemed to be program failures.  3CMS patients were placed on "C" Status for an average of 135 days, with a range of 35 to 180 days.

<u>Case-by-Case Reviews</u>:

During the review period, there were five patients who were housed in administrative segregation for longer than 150 days who had case-by-case reviews. Two patients were transferred to their endorsed institution and three were released from maximum custody. The full case factors, including patients' disciplinary histories and mental health treatment plans, were reviewed for each patient.

SVSP provided information on 20 cases that satisfied the criteria for a 120-day pre-MERD review. Reviews were completed for 15 cases with projected or active SHU terms and the remaining five cases were due for review. Eleven of 15, or 73 percent of the 120-day pre-MERD reviews, were held 120 days prior to the expiration of the controlling MERD.

<u>Mental Health Referrals</u>:

During the review period, SVSP made 3,953 mental health referrals; there were 657 referrals to psychiatry and 3,296 to primary clinicians. Overall, there was noncompliance for timely responding to these referrals. Specifically, for the 690 emergent referrals, there was 25 percent compliance for timely responding to four psychiatry referrals but 96 percent compliance for timely responding to 686 primary clinician referrals. Otherwise, for the 320 urgent referrals, there was 14 percent compliance for timely responding to 74 psychiatry referrals and 66 percent compliance for timely responding to 246 primary clinician referrals. As for the 2,927 routine referrals, there was 66 percent compliance for timely responding to 579 psychiatry referrals and 20 percent compliance for timely responding to 2,348 primary clinician referrals. Additionally, of the 16 PREA referrals to primary clinicians, there was 100 percent compliance for timely responding to one emergent and 15 routine referrals.

<u>Custody and Mental Health Partnership Plan</u>:

Largely due to significant staffing shortages, there were serious shortcomings in the implementation of SVSP's Custody and Mental Health Partnership Plan.

SVSP's Custody and Mental Health Partnership plan LOP was last revised in April 2022 and was aligned with headquarters' directive.  The institution reported that a revised LOP would be presented to the quality management committee by the end of April 2023.

SVSP conducted executive leadership joint rounding during four of six months of the review period.  This rounding did not occur in December 2022 due to a COVID-19 outbreak, and during January 2023 due to severe weather and scheduling conflicts.

Further, during the prior one-year period, which included the six-month period before the review period, executive leadership joint rounding occurred on 19 occasions.  As such, during some months, the rounding occurred more than once.  During this one-year period, and pursuant to the LOP, executive rounding occurred at least twice each in the MHCB, STRH, and EOP; the rounding occurred six times in the EOP programs.  The rounding also occurred for all four of SVSP's 3CMS programs.  Nonetheless, because there was no executive leadership joint rounding during December 2022 and January 2023, it failed to satisfy the LOP's requirement that it "shall be conducted monthly on at least one mental health program."

Required staff conducted executive leadership joint rounding, interviewed staff and patients, and reported their findings on the correct form.  The staff interviews indicated good morale between custody and mental health staff.  However, patients reported that staffing shortages were responsible for the general lack of programming, and untimely appointments.  Patients further reported being aware of protocols when experiencing a crisis or becoming

suicidal; however, one patient reported that he was discharged from the MHCB while experiencing suicidal ideation.

Documentation of the weekly warden's executive staff meetings reflected executive leadership joint rounding and included rounding forms. This documentation also reported patients' complaints about the lack of mental health treatment due to staffing shortages. Most mental health subcommittee program meeting minutes also referenced executive leadership joint rounding, and included forms documenting the rounding. However, quality management committee documentation did not reference this rounding.

Reviewed daily mental health huddle reports for the STRH, MHCB, EOP, and 3CMS programs reported pertinent information. They also identified patients who were new to the unit, returning from a higher level of care, exhibiting odd, unusual, bizarre, or aggressive behavior, or who had recently received bad news, as well as cancelled groups and clinical contacts, and other relevant information.

The EOP supervisor led an observed Facility A huddle also attended by a psychiatrist, primary clinician and two sergeants, one of whom was the designated sergeant; the other officer was covering for a colleague. Due to her coverage of EOP referrals, a 3CMS clinician also attended. The observed huddle essentially checked the boxes, but the spirit of the huddle (multidisciplinary, two-way exchange of information to improve patient identification and care) did not occur. Required huddle topics were reviewed but there was minimal context about patients' mental status. For example, regarding a patient who returned from a higher level of care, mental health staff reported that five-day follow-ups were completed; however, useful clinical information about the reason for HLOC placement, any precipitating events, current stressors or anticipated adjustment issues upon return, were not discussed, nor were signs and

symptoms for custody staff to attend to discussed.  For these same patients, custody staff was not asked and did not volunteer observations about their behavior or functioning on the unit.

During the review period, SVSP conducted weekly 3CMS supervisory meetings between the mental health program supervisor and the program sergeant on Facilities A and B; reviewed documentation addressed pertinent issues.  Regrettably, due to mental health supervisory staffing shortages, Facilities C and D did not conduct these meetings.

An observed weekly 3CMS supervisory meeting during the site visit revealed discussions between the mental health supervisor and sergeant about patients who they had concerns with, and patients who had received bad news and those with level of care changes, as well as new arrivals.  The meeting was informative.

Largely due to the lack of mental health supervisors or their unavailability, and/or scheduling conflicts, the monthly joint supervisory 3CMS program area tours infrequently occurred.  They did take place on Facility A during four months of the review period, but only occurred once on Facility C, and never occurred on Facilities B and D.  During the five occasions when these 3CMS program area tours occurred, reviewed documentation indicated the addressing of relevant issues.  Further, interviewed patients reported that due to inadequate mental health staffing, they were not seen for appointments and lacked group access.

An observed monthly joint supervisory 3CMS program area tour on Facility A was well-conducted, and attended by the mental health supervisor and the custody sergeant.  An interviewed correctional officer reported a good mental health and custody relationship, and was aware of some mental health patients on the housing unit who were experiencing certain mental health issues.  There was also discussion of patient level of care changes.

Three interviewed patients during these 3CMS program area tours reported conflicting information. One patient did not indicate any problems being seen by mental health when he submitted a referral. He further reported that there was a need for additional mental health staff and that the unit's custody officers were acceptable. This patient's main issue was with his lack of access to the canteen for the past two months. The patient expected to be released within two years and reported that he was working on a college degree in sociology.

Another interviewed patient reported numerous barriers to mental health care and stated that his requests to be seen were typically ignored. He reported that he had not attended a group since 2021. However, he also indicated that he felt comfortable requesting help when he felt suicidal but stated that the custody officers were not helpful.

The third interviewed patient reported that no one from mental health had seen him for six months, including his psychiatrist, and that his BuSpar prescription had not been renewed, which a subsequent communication with the chief psychiatrist confirmed.

SVSP offered four-session EOP orientation groups and reported scheduling 35 Facility A and 47 Facility D EOP patients for them. Regrettably, none of the 82 patients who were scheduled attended all four group sessions; many groups were also often cancelled due to mental health and custody staffing shortages. For some program dates, patients refused to attend.

Monthly inmate advisory council (IAC) meetings occurred on Facility A during four of six months of the review period and addressed relevant 3CMS issues; one of two instances when the Facility A IAC did not meet was due to staffing shortages. The meetings typically lasted 20 minutes and referenced mental health and custody staff reporting that SVSP's severe understaffing was the cause of the lack of programming and treatment; they also noted the routine cancellation of mental health groups and the lack of veterans' support groups. Facility

B's IAC never met during the review period due to either the unavailability of the mental health supervisor or scheduling conflicts. On Facility C, the mental health supervisor's unavailability resulted in the IAC not meeting for five months; the remaining meeting was cancelled due to patient disinterest. On Facility D, the IAC did not meet for five months due to the lack of mental health supervisors.

The monitor attended a meeting with six patient members of Facility A's IAC. They reported that 3CMS patients did not receive adequate care due to SVSP's many staffing shortages. They also stated that the institution's staffing had become worse since the COVID-19 pandemic and that there were no 3CMS mental health groups.

SVSP's IDTTs provided patients with a copy of the 3CMS orientation brochure, which was available in English and Spanish.

During the review period, patients filed 45 complaints against health care staff, of which 36 were determined to be unfounded, five were referred to the health care grievance office, and four were found to be policy violations. The four conclusive policy violations included custody officers taking the vitals of a patient, nursing staff making retaliation threats, patient charts being inappropriately documented, and medical staff failing to respond to a patient who stated that he was experiencing suicidal ideation after physically harming himself.

Patients also filed 337 complaints against custody staff, of which 94 were determined to be unfounded; the remaining were pending resolution.

There were also five other investigations of staff misconduct toward patients that were not initiated through the appeals process.

No SVSP staff were moved to another post due to an allegation of staff misconduct.

SVSP provided sign-in sheets for attendance at the quarterly partnership round table trainings scheduled during September, October, and December 2022. However, it could not be determined whether all required staff attended these trainings.

As for the annual partnership off-post training, SVSP reported attendance by both the chief of mental health and psychology, and by all four supervisors of psychiatry, psychology, and social work. However, only one of five psychologists attended the training, and none of nine psychiatrists completed it. Six of seven social workers also completed the training, as did 173 of 330 nurses. As for custody, neither the warden nor any of the six associate wardens attended the training. However, two of six captains attended, as did all 30 lieutenants and 73 sergeants. Thirty-five of 36 correctional counselors also attended the training, as did all 676 correctional officers.

Heat Plan:

Review of SVSP's heat plan LOP indicated compliance with headquarters' heat plan directive. The heat plan was only in effect during September and October 2022 of the reporting period, during which there were seven Stage I heat alerts, but neither Stage II nor Stage III heat alerts. No patients experienced a heat illness during the review period.

Review of a sample of temperature logs indicated the appropriate recording of temperatures. The litigation coordinator maintained all heat plan-related records, reports, and logs.

Interviewed custody officers were knowledgeable of heat plan protocols, and of what occurred at the three respective heat plan stages. They reported receiving a daily list of patients who were prescribed heat-sensitive medications. They further indicated offering the accommodation of dayroom to patients in response to a heat alert.

As for the annual heat-related pathologies training, three of four of the chiefs of psychology, mental health, and psychiatry attended the training, as did four of eight supervisory psychiatrists, psychologists, and social workers. This training was also completed by three of 12 psychiatrists, 11 of 22 psychologists, nine of 17 social workers, and 106 of 228 nurses. As for custody staff, the training was not completed by the warden, but was completed by five of six associate wardens, four of six captains, 24 of 30 lieutenants, 55 of 73 sergeants, 35 of 36 correctional counselors, and 565 of 676 correctional officers.

RVRs:

SVSP issued 2,708 RVRs during the review period, including 1,697 or 63 percent to mental health patients and 1,011 or 37 percent to non-MHSDS incarcerated persons. There were 45 RVRs issued to MHCB patients, 344 issued to EOP patients, and 1,308 issued to 3CMS patients.

The monitor reviewed 50 RVRs to assess compliance with CDCR policy. Of these, three RVRs recommended alternative discipline; the senior hearing officer documented one case in an alternative manner but not the other two.

Custody staff timely referred the mental health assessment to mental health staff in 16 of 50 or 32 percent of cases. Mental health staff timely completed and returned the assessment to custody in 14 of 50 or 28 percent of cases. Patients were confidentially interviewed for mental health assessments in 24 of 50 or 48 percent of reviewed cases. The SHO documented consideration of the mental health assessment in all 50 reviewed cases. The clinician recommended penalty mitigation in 31 of 50 or 62 percent of cases; the SHO mitigated the penalty in 22 of 31 or 71 percent.

SVSP reported that mental health assessment training was attended by none of the correctional administrators, one of six captains, 12 of 30 lieutenants, and 30 of 73 sergeants, reflecting noncompliance.  Regrettably, for mental health staff, only one social worker attended this training.

Use of Force:

SVSP reported three controlled uses of force and 300 immediate uses of force, which involved 257 mental health patients and 46 non-MHSDS incarcerated persons.

The monitor reviewed all three controlled uses of force and 19 immediate uses of force, as well as videos for five use of force incidents.  Review of all incidents indicated compliance with CDCR policy.

SVSP reported completion of the use of force training by the warden, chief deputy warden, all eight correctional administrators, four of six captains, 28 of 30 lieutenants, 67 of 73 sergeants, and all 676 custody officers.  For mental health staff, neither the chief psychiatrist nor chief psychologist attended the training.  However, one of five supervisors of psychiatry, psychology, or social work attended the training, as did one of ten psychologists.  No psychiatrists attended.  Three of seven social workers attended the training, as did 52 of 161 registered nurses.

Lockdowns/Modified Programs:

During the review period, SVSP experienced lockdowns/modified programing for 52 days, with program interruptions occurring on all facilities.  During such lockdowns/modified programing, patients lacked access to education and recreation programs, and dayroom, and had restricted access to canteen, package receipt, visitation, and phone privileges.  Priority health

care services were only offered on an emergent/urgent basis, while only critical workers actually worked.  However, medication distribution and clinical rounds occurred in the housing units.

Of the 52 days of program interruptions, two periods of modified programming exceeded ten consecutive days.  Specifically, Facility D, housing units 2 through 8 experienced modified programming from November 29 -- December 9, 2022, while the entire institution had modified programming from December 16 – 27, 2022.  There were two other periods of modified programming from October 23 -- 28, 2022, and February 8 - 14, 2023.

SVSP reported that modified programming also occurred upon activation of a 24-hour threat assessment, even though such activation did not require the creation of a Program Status Report.  During the review period, SVSP activated 16 24-hour threat assessments.

Access to Care:

A review of SVSP's monthly Health Care Access Quality Reports from September 2022 through February 2023 reflected the issuance of 63,000 mental health ducats and add-on appointments, of which 14,099 or 22 percent were completed, and 48,901 or 78 percent were not completed.  Of the non-completed appointments, 14 percent were not completed due to custody factors, 42 percent were not completed due to non-custody factors, and 44 percent were not completed due to patient refusals.

*Coleman* Postings:

All toured housing units contained the current *Coleman* posting in English and Spanish in areas that were accessible to patients.

Data Production Issues:

SVSP struggled to produce some requested medication management information.  This included the total number of psychiatry and KOP prescriptions and patients taking psychiatry

medications, and data related to polypharmacy reviews, medications administered after 8:00

p.m., and the number of initial PC 2602 petitions.

**APPENDIX B-4**
**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY (CSATF)**
**(May 1, 2023 -- May 5, 2023)**

Census:

On May 3, 2023, CSATF housed 4,598 incarcerated persons, which was a three percent increase from the previous reporting period. The 2,401 mental health caseload patients represented 52 percent of the institution's population and was an eight percent increase since the prior review period.

The MHCB housed 14 patients, including four patients each at the acute and intermediate levels of care.

There were 515 mainline EOP patients. The 1,872 3CMS patients included 63 3CMS patients in STRH, which respectively represented seven and 66 percent increases in these populations compared to the prior review period.

Despite several requests, CSATF did not provide the total number of incarcerated persons housed in restricted housing during the site visit.

Staffing:

The chief psychiatrist and senior psychiatrist positions were filled; both provided coverage in the MHCB.

Only one of five psychiatry positions were filled, reflecting an 80 percent vacancy rate; 1.5 registry staff reduced the psychiatry functional vacancy rate to 50 percent.

Ten of 11 telepsychiatry positions were filled, as were ten of 11 medical assistants' positions, reflecting nine percent vacancy rates.

CSATF had one psychiatric nurse practitioner but no established position.

Both chief psychologist positions were filled.  Only three of 6.5 senior psychologist specialist, and three of 6.5 senior psychologist supervisor positions were filled, indicating 54 percent vacancy rates.  Due to staffing shortages, the MHCB's supervising psychologist also served as the SPRFIT coordinator, supervised CIT and alternative housing clinicians, and performed daily primary clinician contacts in the MHCB as needed.  While admirable, the monitor's expert was concerned that these activities diverted from essential supervisory responsibilities.

There was a 62 percent psychology vacancy rate, with only 16.5 of 43.5 positions filled. Four psychologists were unlicensed.

For supervising social workers, 1.5 of two positions were filled, reflecting a 25 percent vacancy rate.  Thirteen of 25.5 social worker positions were also filled, for a 49 percent vacancy rate.  One registry social worker reduced the functional vacancy rate to 45 percent.  Two social workers were unlicensed.

Fifteen of 20.5 recreation therapist positions were filled, for a 27 percent vacancy rate. Two registry recreation therapists decreased the functional vacancy rate to 17 percent.

Sixty-two of 72.3 nursing positions were filled for a 14 percent vacancy rate.

All three senior psych tech positions were filled, as were 44 of 50.5 psych tech positions, for a 13 percent vacancy rate.

The OSS II and AGPA positions were filled, as were four of 4.5 HPS I positions.

For clerical staff, 22.5 of 27.5 positions were filled, reflecting an 18 percent vacancy rate.

Regarding custody staffing, positions for the warden and chief deputy warden were filled in acting capacities since October 2022.  Positions for five of seven associate wardens, six of eight captains, and all 40.8 lieutenants were also filled, although one lieutenant was on an

extended leave.  Further, 103 of 114.4 positions for sergeants were filled, but two sergeants were on extended leaves and two others were filling other positions out of class.  All 39 CC I positions, and 12 of 13 CC II positions, were also filled.  Of 876.4 correctional officer positions, 860 were filled, for a two percent vacancy rate.

Telepsychiatry:

CSATF utilized telepsychiatry for the EOP and 3CMS programs.  The EOP program used telepsychiatry for 144 hours per week, while it was used for 256 weekly hours for 3CMS patients.  Further, staff reported that telepsychiatry was utilized for most EOP patients, but there was no use of telepsychiatry at cell front; on-site psychiatrists conducted all cell-front contacts.  Telepsychiatry was also used for on-call services seven days weekly, including MHCB contacts.

CSATF staff did not report any issues with the fixed, wired Cisco DX-80 equipment; however, there were multiple technological issues with laptops and tablets.  The resolution was also much better with the Cisco DX-80.  Moreover, for use in IDTTs, some yards had Cisco DX-80 equipment, while others did not — those yards used laptops; the chief psychiatrist noted that laptops were suboptimal for use in IDTTs.  Observation of telepsychiatry's use across all yards verified the above-noted issues with laptops and tablets.  Specifically, laptops compromised the quality of telepsychiatrists' communications with patients and other IDTT members.

Moreover, Facility G-1 used an iPad connected to a laptop.  During the IDTT, there were connectivity issues, and the telepsychiatrist struggled to respond to questions, as she often misheard questions or statements from the team, patients, and the monitor's expert.  Further, the IDTT room's intercom speaker was extremely loud and repeatedly caused everyone in the room to stop speaking until officers finished their announcements.

Despite having two large telepsychiatry monitors in the Facility F 3CMS IDTT room, the telepsychiatrist joined using a laptop computer, as neither larger setup worked.  Staff reported that the monitors had not worked for quite some time, although no clear date was given.

 The chief psychiatrist reported that telepsychiatry generally worked well for EOP patients, and that patient requests to change to an on-site psychiatrist were rare.  Nonetheless, interviewed EOP patients indicated that they did not like telepsychiatry, as it was hard to establish rapport with the telepsychiatrist.  One patient reported that the telepsychiatrist could not see when he was profusely sweating one day, "so how would they be able to see if you were shaking or something was wrong?"  Another patient reported that telepsychiatrists did not understand prison, adding, "How could they understand it?"  Two patients reported the need for more personal interactions, which they deemed impossible with telepsychiatry.

Telework:

All clinical staff were allowed to telework for two hours at the end of every day to complete documentation and training.

Staff Recruitment:

The centralized hiring unit managed staff recruitment.  CSATF reported excessive amounts of time between job applications and hiring; the "cog in the wheel" was credentialing.

Quality Management:

CSATF maintained an appropriate hierarchical healthcare quality management reporting structure with meetings at each level that were timely, with required attendees to achieve quorums.  However, overall CSATF's mental health quality management program suffered since the prior review period, which was primarily due to high staff turnover and insufficient staffing to effectively address compliance issues.  To date, most of CSATF's implemented corrective

action plans (CAPs) had not resulted in compliance with Program Guide requirements. Clinicians reported that some CAPS, including those recommended for addressing inadequate clinical documentation, negatively impacted staff morale and contributed to burnout, and increased sick calls and resignations.

The local governing body met monthly and achieved quorums. All meeting minutes reflected the attendance of the chief of mental health and the CEO and/or the chief medical executive.

CSATF's quality management committee met monthly, but produced documentation did not include minutes for January 2023. While all meetings attained quorums, specific attendees were at times represented by designees. Meeting minutes appropriately referenced ongoing discussions about obstacles to care, medication management, compliance based on dashboard data and various audits, and status reports from the various subcommittees, including the mental health program subcommittee.

The mental health program subcommittee met biweekly. Meeting minutes reflected the attainment of quorums and the various disciplines' regular discussion of relevant topics such as the impact of staffing on compliance within each program, treatment obstacles, medication management, suicide prevention, executive leadership joint rounding, required trainings, higher level of care documentation issues, and open action items. Mental health program subcommittee meeting minutes were submitted to the quality management committee on a quarterly basis.

The mental health program subcommittee minutes indicated that in January 2023, the mainline EOP program had 11 primary clinicians for 581 patients and that compliance for required services significantly suffered due to these staffing shortages. Notably, CSATF developed a CAP to address timely primary clinician contacts, which were at 38 percent for

December 2022, that involved scheduling clinicians for ten to 12 daily individual treatment contacts and immediately scheduling patients for recreation therapy groups upon arrival to the mainline EOP units.  Other CAPs included requiring supervisors to triage all outstanding routine mental health referrals in 3CMS and deleting "duplicate appointments," addressing patterns of absences with progressive discipline, offering cell-front contacts to 3CMS patients to catch up on late routine referrals, and offering recreation therapists overtime hours to facilitate additional groups.

There were no QITs, FITs, or workgroups developed or implemented during the review period.

CSATF's health program specialist reported that executive staff routinely shared quality management related information during weekly supervisory meetings and biweekly all-staff meetings.

Some planned temporary modifications of Program Guide requirements were developed and communicated to staff during recent months.  Some of the modifications appeared to consider the needs of staff over the needs of patients.  For example, in January and February 2023, staff were inappropriately directed to prioritize RVR mental health assessments over emergent referrals and five-day follow-ups to avoid disruptions in the disciplinary process; staff provided two separate emails from leadership supporting this statement.

Additionally, in a reported effort to improve morale and retention among clinicians, leadership allowed providers to leave two hours early each day.  Interviewed recreation therapists, however, reported that the modification to clinicians' work schedules negatively impacted patient care and morale among RTs.  Recreation therapists explained that they were working extremely long hours as they had assumed responsibility for providing most mental

health care in the outpatient programs due to primary clinicians' inability to facilitate groups, meet with patients timely, and offer more than brief check-ins when individual contacts occurred.

CSATF did not conduct peer review during the review period or at the time of the site visit, indicating in writing that mental health headquarters informed the institution that the peer review process was not a priority at this time.

<u>Medication Management</u>:

Dishearteningly, CSATF did not achieve compliance for the reporting period for most metrics. For diagnostic monitoring, CSATF was only fully compliant with a mere ten of 29 or 34 percent of required measures. Unfortunately, things worsened when considering medication management metrics. Only two of 12 or 17 percent of required measures were fully compliant during the review period.

CSATF provided MAPIP results for September 2022 through February 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that CSATF was compliant with checking blood pressure, height, weight, and thyroid functions for all six months of the review period. The institution obtained medication consents for five months. There was compliance for four of five required months for obtaining EKGs. Dishearteningly, CSATF only obtained compliance for one month for the important Abnormal Involuntary Movement Scale (AIMS) measure, which screened for the development of potentially permanent movement disorders as a side effect from antipsychotic treatment. There was noncompliance for all six months for monitoring glucose, Complete Blood Counts (CBCs) with platelets, Comprehensive Metabolic Panels (CMPs), and lipid panels.

CSATF was not an authorized clozapine initiation or maintenance facility and no CSATF patients were prescribed clozapine during the review period.

For required monitoring of antidepressants, CSATF was compliant for all six months for monitoring thyroid function tests and blood pressure for patients prescribed venlafaxine. There was compliance for all three required months for measuring EKGs, and for two months for medication consents.

For patients prescribed carbamazepine, CSATF was compliant for obtaining medication consents for the one required month. There was noncompliance for the one required month for obtaining a medication level. CSATF reported that monitoring CBCs and CMPs was not required during the review period.

Medication consent documentation for patients prescribed Depakote was compliant for four months. CSATF was compliant for three months for CMPs, and for two months for CBCs and for monitoring therapeutic blood levels.

For lamotrigine, the institution reported compliance for obtaining medication consents for four months.

As for lithium, CSATF reported compliance for four months for medication consents and monitoring kidney function tests, for three months for monitoring thyroid tests, and for two months for monitoring EKGs. There was compliance for monitoring therapeutic medication blood levels for only one month.

For medication management metrics reported by mental health headquarters, CSATF was compliant with chronic care psychiatric medications and outpatient new medication orders for all six months of the reporting period. There was compliance for five months for medication continuity with MHCB transfers, and for three months for continuity of nurse administered (NA)

and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity upon parole/transfer to the community, and observation of HS medication preparation.  For continuity of medications upon both inter-institutional transfer at receiving and release and with intra-institutional transfer to ASU/SHU/PSU, CSATF was compliant for two months.  For continuity of medications following discharge/transfer from a community hospital and/or DSH, CSATF was compliant for an alarmingly low one month.  For observation of medication preparation AM and PM, CSATF was noncompliant for the entire reporting period.

As for prescribing practices, psychiatrists were allowed to write prescriptions for 180 days.  However, the institution did not specify the maximum length of bridge orders.

CSATF did not submit information on the number of patients who were prescribed KOP medications during the review period or at the time of the site visit.

The institution reported that there was no protection from the elements while patients waited in medication lines on any of the yards.  Medication line audits revealed that all lines were under two hours in total duration, with the exception of one audit each in September and October 2022, which were reportedly due to modified programming.  Individual patient wait times generally lasted between five and eight minutes.  CSATF did not indicate any issues with medication lines conflicting with mental health programming.

During the review period, 11 percent of mental health prescriptions were non-formulary.

CSATF did not provide information in a readily usable format that reflected the timely administration of psychiatric medications prescribed at HS.  However, interviewed nursing staff and patients did not report any challenges with HS medication administration prior to 8:00 p.m.

On May 1, 2023, 28 patients received PC 2602 involuntary medications.  CSATF did not provide reliable data for patients who received these medications during the review period.  For example, CSATF reported that six petitions were "served," but did not differentiate between initial and renewal petitions.  Additionally, one patient listed as receiving PC 2602 medications was not enrolled in the MHSDS; this issue remained unresolved during the site visit.  CSATF reported that there were no emergent petitions during the review period, and no petitions were withdrawn or denied due to procedural errors.

The institution achieved compliance with involuntary medication court orders for five months.  For the related metric of compliance with the involuntary medication psychiatrist orders, CSATF was compliant for four months.

A medical assistant served as the medication court administrator.  She reported no barriers in processing or conducting PC 2602 petitions.  However, she reported one data reporting issue in that the PC 2602 OnDemand report only pulled PC 2602 granted orders, and not also interim orders.  Interim orders for emergent PC 2602s allowed the psychiatrist to order medications for up to 21 days with the permission of the administrative law judge prior to the hearing.

CSATF's LOP governing the administration of involuntary medications, which was dated January 2022, complied with statewide policy.

Transfers:

During the reporting period, CSATF had one off-site major sustainability review dated November 2022.  On-site reviews were paused due to the redirection of resources for the UNA project.  Of the 32 cases reviewed, only seven or 22 percent of the HLOC non-referral documentation was deemed acceptable.  Similar to previous reports, the review highlighted

CSATF's failure to pass sustainable process audits for multiple consecutive quarters due to ongoing issues in the production of accurate and clinically appropriate higher level of care documentation.

During the review period, 345 patients were considered, but not referred, to higher levels of care on 777 occasions. The average compliance rate for adequate non-referral documentation from September through December 2022 was 31 percent, with a range from 20 to 48 percent.

CSATF made ten referrals to acute care and 69 referrals to intermediate care during the review period. Of the ten acute care referrals, one was rescinded, two were admitted to the MHCB, one discharged from CDCR, and six patients were placed in acute care. CSATF timely submitted 50 percent of referrals to IRU with a range of one to seven days late.

CSATF endorsed and timely transferred one of five patients to acute care. One patient took 109 days until physical admission and CSATF did not provide an explanation for the delay. The remaining patients transferred between seven to 12 days beyond timeframes.

As for the 69 intermediate care referrals, 29 were rescinded, one was referred to the MHCB, two were discharged, 35 were admitted, and two were pending transfer. Of the 37 admitted and pending referrals, CSATF timely referred 27, or 73 percent to IRU, with a delay of one to 34 days beyond timeframes. For the 35 admissions, three or nine percent were admitted within timeframe requirements. The average length of time to physical admission was 55 days, with a range of four to 143 days. Improvement was noted over the last two months of the reporting period (January and February 2023), wherein the average time to transfer was reduced to 40 days.

There were no *Vitek* hearings during the review period.

CSATF staff noted that physician clearance for transport and staff shortages were the greatest barriers to the timely completion of inpatient referrals.

The institution typically received less than 24 hours' notice of returning patients from inpatient care.  PIP discharge information was available via ERHS, and DSH discharge documentation arrived with the patient.

CSATF made 394 referrals to the MHCB during the reporting period, of which 158 were admitted and 236 were rescinded.  Of the 158 admissions, 103 or 65 percent were admitted to CSATF's MHCB, and 55 patients or 35 percent transferred to outside MHCBs.  None of the CSATF MHCB admissions took longer than 24 hours.  Patients admitted to outside MHCBs took an average of 13.4 hours to transfer with a range of 3.8 to 41.9 hours.  Eight or 15 percent of these patients transferred beyond timeframes.  One delay was due to an outside hospital stay and no reasons were provided for the remaining seven delays.

During the review period, CSATF reduced 55 patients' level of care from EOP to 3CMS. The institution did not further report any data about patients who subsequently returned to the EOP level of care.

There were no transfers to the PSU during the review period; no patients were pending PSU transfer during the site visit.

CSATF transferred eight patients to EOP hubs.  All but two transferred within 30 days; the remaining two took three and 80 days beyond transfer timeframes.  Reasons for the delays were not provided.

Two patients timely transferred to LTRH.

CSATF reported that all 3CMS patients requiring restricted housing were placed in STRH immediately. Likewise, patients requiring EOP level of care were timely placed in the institution's EOP.

No patients transferred to an MSF during the review period.

Programming:

STRH:

During the reporting period, 364 patients had 526 placements in CSATF's STRH. The average length of stay was 27 days with a range of one to 231 days. Retention over 30 days was largely due to pending RVR/district attorney action or the patient was pending investigation into security concerns or gang activity.

While psychiatry caseloads met required staffing ratios, the two primary clinicians' caseloads exceeded established ratios.

The monitor's expert observed five STRH IDTTs. The IDTTs were inadequate, unstructured, extremely inefficient, and a significant waste of limited staffing resources. The first IDTT lasted one full hour, and the duration of subsequent IDTTs was at least 30 minutes each. While the IDTTs had a long list of patients to review, they were only able to complete five IDTTs in three hours. Required staff attended all observed IDTTs; however, numerous additional staff remained in the room, serving little to no purpose. Despite three consecutive days of STRH group cancellations, the IDTTs included four to five primary clinicians, two psych techs, and a recreation therapist who was scheduled to facilitate groups during that time. The IDTTs also included two supervisors, one of whom attended via laptop and provided no input and another who attended in person but offered no useful input or guidance for structuring the meetings. In response to the monitor's expert's inquiries about the large group of attendees and

the IDTTs' length, CSATF leadership and staff confirmed that they had not modified their IDTT process for the purpose of the site visit.

Due to the overall lack of structure of the IDTTs, there was no consistency in addressing critical items during each IDTT. The correctional counselor generally provided sufficient input, and clinicians shared their subjective opinions about progress without tying it to goals. However, missing from discussions were background information, case conceptualizations, suicide risk data, impact of administrative segregation on symptoms and functioning, treatment plans that targeted reasons for restricted housing placement, and collaborative discussions to determine next steps in care. A great deal of time was spent interviewing patients and engaging in lengthy discussions that were more appropriate for individual treatment encounters.

Individual treatment began declining after August 2022; however, despite STRH clinicians reporting being unable to meet with patients weekly as required by the Program Guide, IDTTs continued to orient new patients to the unit by informing them that primary clinicians would see them weekly.

CSATF treatment hour data indicated compliance with the required minimum of 1.5 hours of weekly structured treatment activities during each month of the review period.

The STRH scheduled 90-minute groups, which included three stress management groups, two coping skills groups, one mood management group, two anger management groups, one social skills group, and one Spanish-speaking group with an undocumented topic. CSATF also scheduled one mental health "makeup group" at the end of the week. One recreation therapist was primarily responsible for providing STRH group treatment; no clinician-led groups were offered.

The monitor's expert attempted to observe multiple STRH treatment groups during the site visit. Unfortunately, the group schedules provided were inaccurate; the one assigned recreation therapist in the unit was absent the first day, left early the second day, and cancelled groups to attend IDTTs on the third day. Despite requesting updated group start times, STRH groups on the fourth day did not occur as scheduled.

STRH patients confirmed that both psych techs and the assigned recreation therapist routinely approach them at cell front and offered in-cell materials. Interviewed STRH patients reported that groups scheduled on Fridays were routinely cancelled, and that groups scheduled on other weekdays were often cancelled without explanation. STRH patients expressed a desire for more out-of-cell treatment in general, including weekly contacts with their assigned primary clinicians. Patients reported that cell-front contacts with primary clinicians were more commonly offered than out-of-cell contacts.

STRH patients confirmed that the unit had a sufficient supply of books, tablets, hot water, air conditioning, hot meals, daily yard, and phone calls, and that there were no laundry issues. During the site visit, televisions were not fully operational; however, custody staff reported that two channels were working and that a work order had been submitted.

Observed psych tech rounds were adequately conducted and included a review of patient records prior to approaching each cell. The psych tech provided in-cell activity packets to each patient.

A reviewed sample of CDCR 114-As indicated that CSATF was compliant with offering patients 18.5 weekly hours of yard time; STRH patients were offered three hours per day or 21 weekly hours. CSATF offered patients three weekly showers; however, one patient's CDCR 114-A reflected no record of offering showers during his first week in the unit.

CSATF conducted ICCs within ten days of STRH placement and hence was compliant.

The monitor randomly selected and reviewed the healthcare records of 20 STRH patients to assess compliance with Program Guide timeframes during their stays. Three patients were screened out due to having too short of a stay in STRH, leaving 17 patients to review.

Ten of 14 or 71 percent of patients had timely initial psychiatry evaluations before the initial IDTT. Forty percent were conducted in confidential settings. The reason for non-confidentiality was patient refusals, though some contacts had no reasons provided. Telepsychiatry conducted none of the initial psychiatry assessments.

Eight patients required routine psychiatry contacts; 87 percent timely occurred at least every 90 calendar days. Forty-three percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted none of the reviewed routine psychiatry contacts.

Twelve of 14 or 86 percent of initial primary clinician evaluations were timely completed within ten working days of patient admission and before the initial IDTT. Fifty percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and lack of available confidential treatment space; however, there were some contacts where no reason was provided.

Twelve patients required routine primary clinician contacts; only 31 percent timely occurred at least every seven calendar days. Twenty-four percent were conducted confidentially. The reason for non-confidentiality was patient refusals.

Eleven of 14 or 79 percent of initial IDTTs timely occurred within 14 working days of patient arrival. Required staff attended 100 percent of initial IDTTs; patients attended 64 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

None of the five patients had timely routine IDTTs every 90 calendar days. Required staff and patients attended 100 percent of reviewed routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Non-Disciplinary Segregation:

CSATF reported 33 NDS cases during the review period, of which 27 were NDS 200. Of those, four or 15 percent transferred within 72 hours of endorsement as required. For those that exceeded 72 hours, the average transfer time was ten days. Two delays were due to CSR rejection and reconsideration due to enemy concerns; however, there were no reasons provided for the remaining delayed cases. All five NDS cases reviewed were placed in either privilege group A or B and were granted access to personal property and canteen consistent with their privilege group.

MHCB:

CSATF maintained a 20-bed MHCB during the review period. At the time of the site visit, four beds were redlined; one had a damaged food port, another had a malfunctioning toilet, and two had issues related to the sprinkler system. On May 1, 2023, all available 16 beds were filled. Eight patients were on 1:1 suicide watch.

MHCB staff included three psychiatrists, two psychologists, and one recreation therapist.

During the review period, there were 103 admissions to CSATF's MHCB. The average daily census was 14 patients. Patients' clinical stays averaged 13.7 days, with a maximum clinical stay of 85 days. Thirty-six or 35 percent of patients' clinical stays exceeded ten days. The average physical length of stay during the review period was 31 days; 32 patients remained in the MHCB beyond 72 hours after clinical discharge with an addition of one hour to 54 days.

Twelve patients had three or more MHCB admissions during the reporting period; seven patients were admitted three times, three patients were admitted four times, and two patients had six admissions.

CSATF was not utilizing I-FLEX beds at the time of the site visit. No information was available regarding their use during the review period.

The monitor's expert observed five MHCB IDTTs, including one initial and four routine. All required members were present and actively used computers. The IDTT room was spacious, had a comfortable temperature and adequate light, and was conducive to the purpose; however, an air vent rendered hearing some patients difficult.

While observed IDTTs displayed positive aspects, including building rapport with the patient and the routine review of safety levels and privileges, fundamental deficiencies in all rendered them inadequate. Deficits included the lack of clear clinical conceptualizations, inconsistent setting of realistic and measurable treatment goals, and, with rare exceptions, the treatment team did not explore prior history of suicidality. This included one case of a patient admitted for depression who had prior treatment at DSH. In most cases, the team did not discuss indicators for higher levels of care in a systematic way; however, they did broadly discuss the appropriateness for certain levels of care. The primary clinicians polled treatment team members about level of care decisions, although some discussions regarding higher level of care inappropriately occurred in front of the patient.

Disconcertingly, the primary clinician opined on medication issues, such as stating that one reason for referring one patient to acute care was the "high dose" of an antipsychotic the patient was taking. Further, the CC I conveyed incorrect information about programming at the acute level of care, indicating that the patient would program with medical patients.

276

Except for during initial IDTTs, all patients were uncuffed and sat outside of the TTM. CSATF's universal continued practice of placing all initial IDTT patients in TTMs failed to reflect consideration of individual patient factors. For example, a patient with Parkinson's disease and a seizure disorder who required a cane for ambulation was placed into the TTM for the initial IDTT because it was standard procedure. Of note, the TTM was not ADA-compliant, and required the patient to step over the bottom portion of the TTM to enter and exit.

CSATF offered no groups in the MHCB during the review period.

MHCB patients utilized one of two dayrooms in the CTC; medical patients used the other dayroom. The dayroom contained a television, a metal table with benches, a TTM, and telephones. Patients were allowed in the dayroom individually or with the recreation therapist. Thus, it did not contribute meaningfully to a treatment milieu. Maximum custody patients were maintained in a TTM during dayroom.

A single yard was available for use by all MHCB patients, including MHSDS and medical patients. The yard contained two built-in cement benches, a toilet, sink, and water fountain.

Review of ten patients' CDCR 114-A's revealed the daily offering of showers, and the offering of an average of 4.7 weekly hours of dayroom and/or yard time over a 15-week period. Due to the number of patients that shared the one yard, it would be a significant challenge if all patients opted to utilize the yard. Regrettably, only 50 percent of reviewed MHCB patients were offered at least one telephone call during their stay. Visits for MHCB patients were reported to be extremely rare.

Staff reported concerns about the lack of confidential MHCB treatment space.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

Five of 20 or 25 percent of patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of admission. Five patients did not receive required initial psychiatry evaluations. Forty-seven percent of reviewed assessments were conducted in confidential settings. Reasons for non-confidentiality were not provided. Telepsychiatry was not utilized for initial psychiatry assessments.

Sixteen MHCB patients required twice weekly routine psychiatry contacts; 82 percent occurred timely. Of the reviewed routine psychiatry contacts, 28 percent were conducted confidentially. Reasons for non-confidentiality were not provided. Telepsychiatry was not used for routine psychiatry contacts.

Sixteen of 20 or 80 percent of initial primary clinician evaluations timely occurred within 24 hours of admission. One patient did not receive an initial PC assessment. Seventy-nine percent were conducted confidentially. Reasons for non-confidentiality included patient refusals or were not provided.

For routine primary clinician contacts, 84 percent timely occurred. Fifty-five percent were conducted in confidential settings. Reasons for non-confidentiality included lack of staffing, patient refusals, and safety concerns.

Fifteen of 20 or 75 percent of initial IDTTs timely occurred within 72 hours of patients' arrival. One patient did not receive an initial IDTT. All required staff attended 89 percent of reviewed initial IDTTs; patients attended 79 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

Ninety-two percent of required routine IDTTs timely occurred every seven days. Required staff attended 81 percent of routine IDTTs; patients attended 84 percent. Reasons routine IDTTs were held *in absentia* included patient refusals and appointment conflicts. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

The seclusion and restraint rooms were appropriate for their purpose and contained toilets and sinks. The seclusion room had a raised platform which was used as the bedframe; the restraint room had no such frame. The restraint bed was maintained in a storage area and not in the room.

Despite multiple attempts to clarify the normally straightforward information about seclusion and restraint, CSATF's data remained strikingly opaque. Consequently, the data was not amenable to analysis for compliance purposes. The monitor's expert recommended that CSATF reevaluate its data recording practices for seclusion and restraint usage.

Crisis Intervention Team:

CSATF's CIT operated from Tuesday through Thursday, from 9:00 a.m. through 10:00 p.m. For other weekdays, yard clinicians assessed their patients in crisis. On weekends, patients in crisis were brought to the Triage and Treatment Area (TTA) for evaluation by the alternative housing clinician.

CSATF's CIT LOP was last updated in November 2022 and was consistent with statewide policy. CSATF did not provide documentation indicating the primary clinician's completion of required CIT training.

There were 78 referrals to the CIT during the reporting period.  Of these, 27 or 35 percent resulted in MHCB referral.

Alternative Housing:

Alternative housing staff included one chief psychologist, one senior psychologist supervisor, two psychologists, and one clinical social worker.  CSATF's alternative housing LOP aligned with statewide policy and identified the alternative holding cells; it prioritized CTC cells first, followed by TTA cells.

CSATF reported 394 alternative housing admissions during the review period.  Of those, 158 or 40 percent were admitted to MHCBs, and 236 referrals or 60 percent were rescinded. Three patients' alternative housing stays exceeded 24 hours.

EOP:

While psychiatry caseloads were within required staffing ratios, primary clinician caseloads far exceeded them.  During the review period and at the time of the site visit, EOP primary clinicians managed caseloads near or above 60 patients.

Mainline EOP treatment rooms were located within the housing units, and space was generally adequate, with one noteworthy exception.  While there was enough space, the large rooms used for IDTTs and groups contained extremely loud intercom speakers that frequently interrupted groups and IDTTs to announce appointments and activity times for patients in the building.  Treatment stopped during the announcements, which happened frequently.

No EOP patients complained about inadequate out-of-cell time during patient interviews, which was an improvement from the prior review period.

Observed mainline EOP IDTTs in Facility G-1 were generally inadequate, unstructured, and a misuse of time and limited staffing resources.  All required members were present, with

psychiatric staff attending by way of telepsychiatry.  However, there was no consistency in the way the IDTTs operated.  IDTTs often failed to discuss resolutions for presented problems or obstacles.  Also routinely missing from IDTT discussions were background information, diagnostic considerations, specific treatment goals and interventions, suicide risk data, the need for treatment plans' modification, and establishment of effective communication.  While higher level of care was discussed, only acute and MHCB criteria were reviewed, suggesting the need for training on intermediate care program criteria.  Similar to the STRH IDTTs, a plethora of clinicians attended, including four primary clinicians and one supervisor.  The IDTTs were also unnecessarily long due to the overall lack of structure.

In one observed EOP unit, CSATF held IDTTs without the presence of any primary clinicians, resulting in an additional waste of time and resources.  The part-time mainline EOP supervisor, who was clearly unfamiliar with the patients, attempted to conduct the IDTTs with a telepsychiatrist; however, the IDTTs had no value as staff failed to present historical information, updates on progress toward goals, level of care considerations, and other patient-specific information beyond medication.  The majority of the observed IDTTs in this unit were conducted *in absentia*, as most patients requested to leave when they observed the absence of their assigned primary clinicians.  Considering that no changes occurred during these IDTTs, a better use of the part-time supervisor's time would be to prioritize needed services, round on patients, and facilitate groups.

Due to CSATF's significant staffing issues, mainline EOP patients did not receive clinically indicated treatment as required.  CSATF reported that from August 15, 2022, through February 28, 2023, it offered an average of 10.8 weekly hours of structured treatment activities to EOP patients; however, that average was dubious, as described below.  Of those, patients

attended 5.9 weekly hours and refused 4.9 hours.  CSATF data also indicated that an average of 67 percent of patients were offered ten hours of weekly structured treatment on a monthly basis.

During the site visit, regional staff, local leadership, staff, and patients reported that each patient's group schedule consisted of three hours of "recreation therapy yard group," which counted toward structured treatment activity hours offered whenever at least one recreation therapist was present.  Observation of one of these yard groups revealed no structured activities or interactions with recreation therapists.  EOP patients in units G3B and G3C reported that yard groups were "only yard" and that they did not interact with a recreation therapist.  While these patients reported that they appreciated yard time, they further indicated that it was not like other institutions' yard groups and described the counting of these hours toward treatment as "deceptive."  Additionally, during a Facility G-1 IDTT, a patient responded to the team's comment about his poor yard group attendance with, "Why would I?  They are not doing anything out there.  They are just going outside.  They ask us to go out there for three hours, but there is nothing to do.  I would rather wait for the indoor groups."

EOP patients, staff, and leadership confirmed that mainline EOP recreation therapy yard groups lacked structured activities of any kind and that patients' interactions with recreation therapists during yard groups were generally limited to checking in for attendance.  Interviewed recreation therapists reported being directed by leadership to count all three yard group hours toward offered structured treatment activity whenever at least one recreation therapist was present during the scheduled time and whether or not the yard ended early.

Further compromising the accuracy of structured treatment activity data, the regional mental health team found that when EOP patients moved to different housing units, they were scheduled for the new housing unit's group track without being removed from their former

housing unit's group track; this resulted in some patients with multiple moves being scheduled for up to 50 hours of structured treatment activity, potentially inflating offered hours.

Recreation therapists were also solely responsible for facilitating indoor mental health groups for EOP patients. CSATF scheduled up to 25 EOP patients for indoor recreation therapy groups, which were typically limited to movies and leisure activities. One recreation therapist reported that RTs were more involved in patient care and had become the new primary clinicians for the mainline EOP population.

Two observed Facility G-3 recreation therapy groups were each scheduled for 15 patients, but only eight and six patients attended; two patients left each of the two groups early. The recreation therapist facilitator was prepared, but the material was more appropriate for a higher-functioning group of patients. As such, only two to three patients in each of the groups participated. Regrettably, the facilitator did not attempt to explain the topic in simpler terms or engage silent or sleeping patients in the group. The group was structured, but it was not adequate to meet the needs of most EOP patients in attendance.

CSATF offered NLTG groups but was unable to rely on them to achieve treatment hour compliance. The institution's MHSDS staff reported that they were not informed of group cancellations, and did not know how to incorporate NLTG group data into their own OnDemand tracking. Interviewed EOP patients reported that NLTG groups lacked a set curriculum and that facilitators often did not show up to run them. The patients also reported that when the NLTG groups were offered, patients were not informed of the topic ahead of time, and that most patients immediately left the room if the introduced topic was not pertinent to their needs.

Due to extremely high caseloads, interviewed EOP clinicians reported being unable to meet with their patients weekly as required or spend sufficient time with patients offering

therapeutic interventions consistent with their treatment plans. Further, EOP supervisors and staff reported that weekly primary clinician caseload groups, which should only be counted toward weekly individual contacts every other week when facilitated by assigned primary clinicians, were often cancelled or covered by other providers. EOP patients reported that their individual contacts were generally limited to brief check-ins every other week.

Interviewed EOP patients reported that primary clinicians were doing their best and expressed concern about clinicians' leaving. Patients reported a lack of therapeutic services, as groups were solely run by RTs, individual contacts and caseload groups were limited to brief check-ins, and psychiatrists focused only on medicine.

During the site visit, CSATF housed eight EOP patients on non-EOP yards due to safety concerns pending transfer to other institutions. Reviewed documentation revealed that they received treatment commensurate to the other EOP patients at CSATF.

The monitor randomly reviewed the healthcare records of 20 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. Two patients were screened out; one was screened out for being in and out of various settings during the review period and another paroled too early to assess compliance.

Ten of 13 or 77 percent of EOP patients had timely required initial psychiatry evaluations before the initial IDTT and within 14 calendar days of arrival or a level of care change. Ninety-two percent were conducted confidentially. Telepsychiatry conducted all reviewed initial psychiatry assessments.

Forty-seven percent of required routine psychiatry contacts timely occurred at least every 30 calendar days. Ninety-eight percent were conducted in confidential settings. Telepsychiatry conducted 91 percent of reviewed routine psychiatry contacts.

Six of 13 or 46 percent of EOP patients had timely required initial primary clinician evaluations within 14 calendar days of arrival or a level of care change. Eighty-three percent were conducted confidentially. Reasons for non-confidentiality included patient refusals.

Twenty-eight percent of routine primary clinician contacts timely occurred at least every seven calendar days. Regrettably, many expected primary clinician contacts were missing; some patients went weeks without seeing a primary clinician. Ninety-four percent of the reviewed contacts were conducted confidentially.

Three of 13 or 23 percent of initial IDTTs occurred within 14 calendar days of arrival or a level of care change. Required staff and patients attended all reviewed initial IDTTs.

Eighty-three percent of required routine IDTTs timely occurred every 90 calendar days. Required staff attended 100 percent of routine IDTTs; patients attended 50 percent. Reasons routine IDTTs were held *in absentia* included patient refusals and COVID-19. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not always clearly discernable.

<u>3CMS</u>:

Psychiatry caseloads for 3CMS patients were within established staffing ratios. However, due to extreme staffing shortages, primary clinician caseloads exceeded the established ratio by as much as five times, with caseloads of up to 516 patients.

All required staff attended four observed IDTTs. A telepsychiatrist was present by way of a small tablet. As such, while the patient and the CNA telepresenter saw the telepsychiatrist, other treatment team members did not. The room was adequate in terms of size, light, and temperature.

All observed IDTTs were inadequate. Fundamental issues, including foundational issues such as formally stating the diagnoses and treatment goals, were frequently missed. The rationale and justification for continued treatment at the 3CMS level of care were also lacking, and there was no discussion of any possible indicators for the need for higher levels of care. Further, presentations were rote and included many of the same questions, regardless of the patients' presentation and diagnoses under discussion.

Of note, a fifth patient was scheduled for IDTT; however, when the patient arrived, the primary clinician asked, "Have we previously met?" The patient had not yet met with a primary clinician for an initial evaluation, and the Program Guide timeframe had been exceeded. As such, the primary clinician informed the patient that they could not hold the treatment team meeting as he had not yet been evaluated. The patient had recently been lowered from the EOP to 3CMS level of care.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Two of three patients had timely required initial psychiatry evaluations prior to the initial IDTT. All three initial psychiatry evaluations were conducted confidentially. Telepsychiatry completed all reviewed initial psychiatry assessments.

Fifty-five percent of required routine psychiatry contacts timely occurred at least every 90 days. All were conducted in confidential settings. Telepsychiatry conducted 85 percent of reviewed routine psychiatry contacts.

None of three patients had timely required initial primary clinician evaluations within ten working days of arrival or a level of care change. Two of these patients never had a required

initial primary clinician evaluation. The one completed initial assessment occurred in a confidential setting. Telehealth was not used for initial primary clinician evaluations.

Fifteen patients required routine primary clinician contacts; 80 percent were not completed at all during the review period. Of six reviewed contacts, five, or 83 percent, were timely and occurred at least every 90 days. All six reviewed routine contacts were conducted in confidential settings. Data also revealed that 12 of 15 reviewed patients did not receive a primary clinician contact throughout the entire review period, with each patient exceeding 180 days from their last clinical contact. No routine primary clinician contacts used telehealth.

One of three initial IDTTs timely occurred within 14 days of arrival or a level of care change. All required staff and the patient attended. IDTTs for the remaining two reviewed patients did not occur during the review period.

Only two of seven or 29 percent of patients had a timely annual IDTT. Three patients never received an annual IDTT. All required staff and patients attended four reviewed routine IDTTs.

Other Issues:

Pre-Release Planning:

At the time of the site visit, CSATF did not have a pre-release coordinator; one psychologist supervisor covered the position remotely. The supervisor initiated pre-release planning assessments (PRPAs) and request of information forms (ROIs), then forwarded them to the patient's assigned primary clinician for on-site completion. The supervisor also attended the monthly headquarters' pre-release planning call and ISUDT pre-release calls. CSATF did not offer any pre-release groups during the reporting period or at the time of the site visit.

During the review period, TCMP caseworkers met with 324 MHSDS patients, including 143 EOP and 181 3CMS patients. TCMP submitted benefits applications for 294 or 91 percent of these patients. Fifteen or five percent of eligible patients refused TCMP services. TCMP completed Medi-Cal applications for 286 or 88 percent of patients, as well as SSI applications for 151 or 46 percent of patients pending release. Veterans' benefits' applications were submitted for all eligible patients. TCMP staff reported no challenges completing their work with patients in a confidential space.

Program Access:

a.    Job and Program Assignments

On April 3, 2023, CSATF reported that, of 1,954 available job assignments, 88 EOP patients, or 15 percent of the EOP population, held them. For 3CMS patients, 764 or 39 percent of 3CMS patients held job assignments, and, for non-MHSDS incarcerated persons, 1,102 or 49 percent of the non-MHSDS population held job assignments.

For the 1,582 academic assignments, CSATF reported that 137 or 23 percent of the EOP population held these assignments, as did 601 or 31 percent of 3CMS patients, and 844 or 38 percent of the non-MHSDS population.

The 249 vocational education assignments were held by six or one percent of EOP patients, 80 or four percent of the 3CMS population, and 163 or seven percent of the non-MHSDS population.

No patients or non-MHSDS incarcerated persons held voluntary education assignments.

Of 754 substance abuse treatment assignments, 45 or eight percent of EOP patients held them, as did 361 or 19 percent of 3CMS patients, and 348 or 16 percent of the non-MHSDS population.

b.  Milestone Credits

All 529 EOP patients were eligible to earn milestone credits; 377 or 71 percent earned

them.  All 1,909 3CMS patients were also eligible to earn milestone credits, with 43 or two

percent earning milestone credits.  All but one of 4,704 non-MHSDS incarcerated persons were

eligible to earn milestone credits; 41 or one percent earned them.

c.  Out-of-Level Housing

CSATF reported that 85 EOP and 56 3CMS custody Level I patients were placed in

Level II housing.  Further, three EOP and 60 3CMS custody Level II patients were in Level III

housing, while nine 3CMS custody Level II patients were in Level IV housing.  There were also

four EOP and 17 3CMS custody Level III patients in Level II housing, and one EOP and 36

3CMS custody Level III patients in Level IV housing.  Further, there was one EOP custody

Level IV patient in Level II housing, and two EOP and 86 3CMS custody Level IV patients in

Level III housing.

d.  ADA Reasonable Accommodation and Grievance Procedure

CSATF provided a copy of the CDCR Form 1824 reasonable accommodation request

process manual and confirmed implementation of the revised ADA accommodation, grievance

procedure, and appeals process.  CSATF did not provide training rosters or attendance sheets

reflecting the same.

e.  Periodic Classification Score Reductions: EOP Patients

CSATF provided classification score reductions for EOP patients for the review period.

f.  Unclothed Body Search

 Unclothed body searches in STRH were routinely completed upon patient cell departure

and were performed inside their cell prior to exiting.  Officers indicated that to ensure patient

privacy, the officer administering the unclothed body search stood in front of the cell window to restrict vision into the cell.  However, it should be noted that the unclothed body searches were conducted in front of the patient's cellmate, and, therefore, were not private.  Visual inspection during unclothed body searches lasted approximately one minute and included a head-to-toe examination, including body cavities and any extensions of the body when possible (prosthetic appliances, canes, and walkers).  Hand-held metal detection devices were also used regularly. Correctional officers turned off their body cameras during the searches.

"C" Status:

On May 1, 2023, CSATF reported 23 incarcerated persons on "C" Status, including 14 3CMS patients and nine non-MHSDS incarcerated persons.  For the 3CMS patients, 12 had multiple RVRs within 180 days and were deemed program failures; two others had open RVRs pending further investigation.  CSATF was unable to provide "C" Status data for the review period.

Case-by-Case Reviews:

During the site visit, three patients were housed in STRH for longer than 150 days. CSATF appropriately completed case-by-case reviews and associate director case conferences for all three patients.  Review of case notes from nine deputy director case conferences conducted during the review period reflected attendance by all required members.

At the time of the site visit, 17 patients required a 120-day pre-MERD review.  A reviewed sample of eight cases indicated compliance with their completion at least 120 days prior to the projected MERD or expiration of the controlling MERD.

<u>Mental Health Referrals</u>:

CSATF maintained a reliable system for tracking responses to emergent, urgent, and routine mental health referrals. CSATF reported 4,165 mental health referrals, including 408 emergent, 318 urgent, and 3,439 routine referrals. There were 1,372 referrals to psychiatry and 2,793 primary clinician referrals. For emergent referrals, there were timely responses to two of four psychiatry referrals and to 341 of 404 or 84 percent of primary clinician referrals. For urgent referrals, there were timely responses to 42 of 63 or 67 percent of psychiatry referrals and to 230 of 255 or 90 percent of primary clinician referrals. For routine referrals, there were timely responses to 1,171 of 1,305 or 90 percent of psychiatry referrals and to 785 of 2,134 or 37 percent of primary clinician referrals. CSATF reported that staffing issues with psychologists and social workers had caused delays in timely responses to referrals during the review period.

<u>Custody and Mental Health Partnership Plan</u>:

CSATF's Custody and Mental Health Partnership LOP was updated in February 2022 and aligned with the headquarters' directive.

CSATF conducted executive leadership joint rounding on all yards during the reporting period. Documentation reflected that the warden, chief executive officer, chief deputy warden, chief of mental health, chief psychologist, and associate warden interchangeably participated in this rounding. Reviewed mental health subcommittee minutes substantively addressed the rounding and staff interviews revealed a strong working relationship between custody and mental health staff. However, CSATF reported that executive leadership joint rounding was not discussed during the warden's weekly executive staff meetings or quality management committee meetings.

Reviewed daily staff huddle reports for STRH, Facility F and G's EOP yards, and the MHCB reflected deficiencies in staff attendance and inclusion of relevant information. In all but one of 20 randomly selected STRH huddle forms, the mental health supervisor was absent, and the recreation therapist was absent for all reviewed huddles. The huddle forms nonetheless reflected a structured approach to evaluating the current STRH census. Although the huddle forms contained detailed mental health information, minimal to no custody information was provided. Observed STRH huddles were consistent with the reviewed reports and demonstrated that custody staff offered minimal input during them.

For Facility F and G's EOP yards, reviewed huddle forms indicated very low attendance by both custody and mental health staff. Neither attendance by the program sergeant nor the psych tech was indicated by any of the reviewed huddle forms; only three huddle forms reflected the EOP housing unit officer's signature. Further, forms were often incomplete, lacked detail, and did not contain input from custody staff.

Nonetheless, all required staff attended observed EOP huddles, which discussed detailed and pertinent information about individual patients. There was also robust collaboration between mental health and custody staff during huddle discussions, and all staff signed the huddle form as required.

Reviewed MHCB specialized huddle reports reflected minimal information not directly related to the patient's care. Very few staff attended.

During the review period, CSATF conducted weekly 3CMS supervisory meetings between the program sergeant and the mental health program supervisor. CSATF used the mental health huddle report template to document pertinent and meaningful information discussed during the meetings, including changes in a patient's level of care, medication refusals,

staffing shortages and absences, and COVID-19 concerns.  An observed weekly 3CMS supervisory meeting addressed relevant issues.

CSATF only provided documentation reflecting monthly joint supervisory 3CMS program area tours for Facility D for September 2022, Facility A for November 2022, and Facility B for February 2023.  While neither custody nor mental health reported any concerns with patient care, Facility A patients had consistent complaints about custody and mental health staff; however, these patients were reluctant to provide further details.  Interviewed patients on Facilities A and B reported preferring in-person psychiatry appointments to telepsychiatry appointments.

CSATF offered EOP orientation groups on the first and third week of every month.  The groups were led by supervising psychiatric social workers, senior supervising psychologists, and EOP supervisors and sergeants.  CSATF did not provide rosters or attendance records of patients who were offered the EOP orientation groups.

CSATF conducted monthly inmate advisory council (IAC) meetings from October 2022 through January 2023.  The chief of mental health attended some IAC meetings; however, reviewed documentation did not reflect attendance by the 3CMS supervisor.  IAC meetings addressed 3CMS issues, including patient concerns over behavioral changes in other patients and mental health staff's lack of response to patients' requests to be seen.  Other discussed topics included COVID-19 mitigation efforts, physical disability assistance, and healthcare operational concerns.

The institution provided a copy of the 3CMS orientation brochure.  The 3CMS supervisor confirmed that the brochure was provided to all 3CMS patients upon placement in the program.

There was one misconduct complaint against mental health staff during the review period.  However, CSATF was unable to produce documentation to indicate whether the complaint was resolved.  CSATF staff further reported that there were no complaints against custody staff during the reporting period.

CSATF reported that quarterly round table partnership training occurred during September 2022 in the EOP units, October 2022 in STRH, and November 2022 in the MHCB.  However, the institution did not provide information about the training topics.  Further, while CSATF provided a list of staff who attended the training, the institution did not identify staff who were required to attend the training.  Accordingly, compliance for attendance at the quarterly round table partnership training could not be determined.

Annual partnership off-post training occurred in November 2022 and was completed by 91 percent of custody staff and 83 percent of mental health staff.  Notably, the warden, associate wardens, captains, five psychologists, and two psychiatrists did not complete the training during the review period.

Heat Plan:

CSATF's heat plan LOP was current and aligned with statewide policy.  It was in effect during September and October of the review period, when there were 17 Stage I heat alerts, but no Stage II or Stage III heat alerts.

Interviewed custody officers were generally aware of heat plan policies and protocols on all toured units except Facility F-3.  Regrettably, in that housing unit, custody staff did not know the months when the heat plan was in effect, and how to access the heat medication patient list daily, while one of the tiers lacked a working thermometer; this was particularly troubling given that the interview occurred on May 1, which was the start of the heat season.

RVRs:

CSATF issued 2,877 RVRs during the review period, of which 1,915 or 67 percent were issued to MHSDS patients, and 962 or 33 percent were issued to non-MHSDS incarcerated persons.  There were 42 RVRS issued to MHCB patients, 351 issued to EOP patients, 1,515 issued to 3CMS patients, and seven issued to intermediate care patients awaiting transfer to inpatient care.

The monitor reviewed 38 RVRs to assess compliance with CDCR policy.  The reviewed sample indicated that CSATF did not meet the timeframe requirements for custody staff timely referring the mental health assessment to mental health nor for mental health staff timely completing and returning the assessment to custody.  Specifically, custody staff timely referred the assessment to mental health in only 11 of 38 or 29 percent of cases; delays beyond the two-day referral timeframe averaged 12 days.  Further, mental health staff timely completed and returned the assessment to custody in only 28 of 38 or 74 percent of cases; delays averaged six days beyond the eight day requirement.

CSATF assigned staff assistants when indicated.  Further, 35 of 38 or 92 percent of the reviewed RVRs included the senior hearing officers' (SHO) summary of the mental health assessment and how it was considered.  Clinicians recommended penalty mitigation in 16 cases and based on these recommendations, the SHO actually mitigated penalties in 15 or 94 percent of those cases.  Notably, the one case where the mitigation recommendation was not followed involved the introduction of a controlled substance, which required imposition of visiting sanctions, which the SHO could not mitigate.  Further, for the reviewed sample, the chief disciplinary officer reversed one loss of canteen privileges; all other dispositions were affirmed.

Staff reported that, except typically for patient refusals, mental health assessments were conducted confidentially.  Of the 38 reviewed assessments, 24 or 63 percent were conducted in confidential settings.  All but one indicated patient refusal for the lack of confidentiality; one clinician noted a lack of available confidential space.

CSATF did not provide data on any RVRs documented in an alternative manner; none of the reviewed sample included this recommendation.

During the review period, no RVRs were issued for suicidal or self-injurious behavior or in connection with patients' placement in restraints or seclusion.  Further, no RVRs were issued in connection with cell extractions, the administration of involuntary medication, or patient's transfer to an inpatient bed.

Reviewed ICC documentation indicated adequate participation by mental health clinicians, as well as review of mental health assessments, to determine whether mental health symptoms contributed to the behavior for which a SHU term was being considered.

As for mental health assessment training, CSATF reported training completion by all eight associate wardens, all eight captains, 34 of 41 lieutenants, and 67 of 101 sergeants.

<u>Use of Force</u>:

There were two controlled and 97 immediate use of force incidents involving MHSDS patients during the review period.  The monitor reviewed incident packages for the two controlled and 17 immediate uses of force, as well as video recordings from both controlled incidents and body-worn camera footage from ten of the immediate uses of force.  All reviewed incident packages, video recordings, and camera footage indicated reasonable uses of force and compliance with CDCR policy.  Notably, both controlled uses of force involved cell extractions due to patients' refusals to transfer to another institution.

As for required use of force training, 926 of 960 or 96 percent of custody staff and 32 of 40 or 80 percent of mental health staff completed the required training.

Lockdowns/Modified Programs:

During the review period, there was one modified program that lasted for eight days. Overall, there was no significant interruption in the delivery of mental health and medical services during this modified programming. Further, reviewed PSRs reflected that mental health and medical staff were present in the impacted buildings to dispense medications and otherwise provide health care and mental health services as needed, while priority ducats were honored.

Access to Care:

CSATF issued 216,712 mental health ducats and add-on appointments during the review period. Of those, 89,209 or 41 percent were completed, and 127,503 or 59 percent were not completed. Of the non-completed appointments, 12 percent were due to custodial reasons, seven percent were due to non-custodial reasons, and 81 percent were due to patient refusals.

*Coleman* Postings:

Current *Coleman* postings in English and Spanish were observed in all toured housing units.

Data Production Issues:

Similar to the prior review period, CSATF failed to provide numerous requested documents prior to the site visit, while the provided schedules of services were incorrect. As such, a significant amount of time was spent attempting to obtain accurate documentation and observing services that were scheduled at other times. Further, some documents uploaded prior to the site visit, including staffing information, appeared to be duplicated from the prior review period.

**APPENDIX B-5**
**CALIFORNIA MEDICAL FACILITY (CMF)**
**(May 2, 2023 – May 5, 2023)**

Census:

On April 28, 2023, CMF housed 1,627 incarcerated persons, which was a 19 percent decrease since the previous review period. The mental health caseload population of 922 patients represented 57 percent of the total population and was a one percent decrease in the MHSDS population since the prior reporting period.

The MHCB housed 46 patients.

There were 428 mainline EOP and 420 mainline 3CMS patients.

The administrative segregation population included 25 patients in the EOP hub and three 3CMS patients.

Staffing:

The chief psychiatrist position was filled. The senior psychiatrist position had been vacant for approximately one year. Of 9.8 psychiatry positions, 1.5 were filled for an 85 percent vacancy rate, but 5.5 contractors and one psychiatric nurse practitioner reduced the functional vacancy rate to 18 percent.

All five telepsychiatry positions were filled. Positions for three of five medical assistants, who were assigned to telepsychiatry, were also filled. Mental health leadership reported that CMF's inability to fill two of five medical assistant positions adversely affected its ability to use telepsychiatry.

One of two chief psychologist positions were filled, as were positions for three of five senior psychologist supervisors, and four of six senior psychologist specialists. Of 37.6 psychology positions, only 11.5 were filled, reflecting a 69 percent vacancy rate. One

psychologist was on an extended leave, but there was one registry psychologist. Two psychologists were unlicensed.

Six of 13.1 social worker positions were filled, indicating a 54 percent vacancy rate. The use of 1.5 registry social workers reduced the functional vacancy rate to 43 percent.

Sixteen of 21 recreation therapist positions were filled for a 24 percent vacancy rate.

Positions for all six senior psych techs were filled. Ninety of 102.6 psych tech positions were also filled, reflecting a 12 percent vacancy rate.

Forty-nine of 70.8 supervising registered nurse positions were filled, indicating a 31 percent vacancy rate. Three supervising registered nurses were on extended leaves, increasing the functional vacancy rate to 35 percent. All six MHSDS registered nurse positions were filled.

Seven of 17 office tech positions were filled, reflecting a 59 percent vacancy rate. Two office techs were on extended leaves, for a 71 percent functional vacancy rate. Mental health leadership reported that the high office tech vacancies were "dramatically impacting" CMF's ability to schedule patients, resulting in appointment backlogs.

CMF did not report significant custody staffing shortages. Positions for the warden, chief deputy warden, and all five associate wardens were filled, as were positions for five of six captains, 29 of 31.2 lieutenants, and 81 of 91.6 sergeants. Positions for 20 of 22 CC Is, five of six CC II supervisors, and seven of eight CC II specialists, were also filled. Of 769.6 correctional officer positions, 699 were filled, for a nine percent vacancy rate.

Telepsychiatry:

CMF used telepsychiatry for its EOP and 3CMS patients, but not in the MHCB. Three telepsychiatrists were assigned to the mainline EOP program, one was assigned to administrative

segregation serving both EOP and 3CMS patients, and another was assigned to the mainline

3CMS program.  Three of 4.5 mainline EOP psychiatry positions were filled by telepsychiatry.

Telework:

Other than telepsychiatry, no other CMF mental health staff teleworked.

Staff Recruitment:

CMF's mental health staffing vacancies had increased significantly since the prior review

period, profoundly impacting the institution's ability to provide adequate mental health care.

Further, line staff vacancies resulted in supervisors frequently having to provide coverage and

perform the duties of line staff.  Unfortunately, mental health leadership also reported that there

were few applicants for open positions but no prospective hires in the pipeline.

Retaining mental health staff was another significant challenge.  During the six weeks

preceding the site visit, CMF's mainline EOP program had lost three primary clinicians; one

clinician retired, another accepted a position at the PIP due to the PIP pay differential, and

another left CMF after accepting a promotion.  Due to such persistent vacancies, during the past

year CMF's mental health program for its EOP and 3CMS programs had been forced to adopt a

"triage and rounding" model in an attempt to provide treatment for the institution's mental health

population.

Quality Management:

CMF's quality management infrastructure, which included the local governing body,

quality management committee, and mental health subcommittee, remained in place but its nuts

and bolts, such as QITs, FITs, and clinical audits, were essentially on hold during the review

period due to significant clinical staffing vacancies.

Reviewed local governing body meeting minutes from October 2022 and January 2023 revealed useful meetings that addressed relevant topics and achieved quorums. Agenda items included policies and procedures, operations, infection control, OIG, the complete care model, and privileging.

The quality management committee met monthly and achieved quorums. Agenda items included subcommittee reports, COVID-19 updates, system surveillance, OIG audits, Joint Commission updates, local operating procedures, the 2022 performance improvement work plan, and the Project Pipeline/SAFER (Survey Analysis for Evaluating Risk) matrix.

The mental health subcommittee also met monthly and attained quorums. Agenda items included access to care, executive leadership joint rounding, health information management, quality management data review, workgroup updates, SPRFIT, staffing, psychiatry, higher level of care referrals, the sustainable process, and evaluations of the MHCB/CIT, mainline EOP and 3CMS programs, and EOP hub, RVRs, policy and procedure updates, peer review, and training. Notably, the mental health subcommittee did not perform audits related to clinical staffing vacancies because this issue was well known and did not require an audit to identify such issues.

Neither QITs or FITs were chartered during the review period.

The Emergency Medical Response Review Committee regularly met. Reviewed minutes were comprehensive.

Peer review had been suspended since EHRS implementation in 2017.

Mental health leadership regularly accessed the Dashboard to monitor certain Program Guide requirements, which resulted in the initiation of three corrective action plans (CAPs) during the review period. A CAP on referral timelines was closed after determining that the issue was a data entry problem. Two other CAPS on EOP treatment hours and EOP hub

certification were also closed because identified issues were directly related to staffing vacancies.

Medication Management:

CMF provided MAPIP results for September 1, 2022 through February 28, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics demonstrated that CMF was compliant for six months of the review period for blood pressure, height, weight, and thyroid function tests. There was compliance for five months for obtaining medication consents, and for four months for glucose monitoring. CMF reported compliance for three of five required months for EKGs. There was noncompliance for all six months for Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), lipids, and the Abnormal Involuntary Movement Scale (AIMS).

CMF was both a clozapine initiation and maintenance facility. Pursuant to policy, all outpatient clozapine initiations were performed in the MHCB. On April 13, 2023, CMF reported that 28 patients were prescribed clozapine.

As for the close monitoring that was required for clozapine, CMF was compliant for six months with monitoring blood pressure, CBC with platelets, and weight, for five months with monitoring glucose and height, and for four months for monitoring CMP. There was compliance for four of five required months for thyroid function tests, and for three months for EKGs and medication consents. CMF was only compliant for two months with monitoring lipids, and for one month for monitoring AIMS.

For required monitoring of antidepressants, CMF indicated compliance for six months for thyroid laboratory tests, and blood pressure for patients prescribed venlafaxine. There was

compliance for five months with obtaining medication consents, and for both required months for obtaining EKGs.

For patients prescribed carbamazepine, there was compliance for both required months for monitoring CMP, and for the one required month for both CBC and medication consents. CMF indicated that the monitoring of medication levels was not required.

As for required monitoring for patients who were prescribed Depakote, CMF reported compliance for one month for CBC with platelets and medication consents. There was noncompliance for all six months for monitoring CMP and therapeutic medication levels.

For lamotrigine, CMF was compliant in obtaining medication consents for four of five required months.

Regarding lithium, there was compliance for three months for obtaining medication consents and EKGs, and for two months for kidney function tests. CMF reported compliance for monitoring medication blood levels and thyroid laboratory tests for only one month.

CMF reported that the two main drivers for diagnostic measures not reaching compliance were COVID-19 related changes and patient refusals. As such, the institution undertook quality improvement measures, which included making an integrated effort for inpatient and outpatient services in quality management meetings. CMF had also created a new diagnostic performance improvement work plan.

For medication management metrics reported by mental health headquarters, CMF was compliant for all six months with observation of medication preparation HS, chronic care medications historical administration, and outpatient provider new medication orders. There was compliance for four months for medication continuity following discharge/transfer from a community hospital and/or DSH, and for two months for medication continuity upon

parole/transfer to the community. There was compliance for only one month with continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and continuity of medications with intra-institutional transfer to ASU/SHU/PSU. Concerningly, CMF was noncompliant for all six months for medication continuity upon inter-institution transfer at receiving and release, and with MHCB transfers, as well as for observation of medication preparation AM and PM.

CMF prescribed psychiatric prescriptions for a maximum of 180 days but did not report the length of bridge orders. CMF also did not report the number of patients who were prescribed psychiatric medications, the number who were prescribed medications as KOP, the number of psychiatric medications prescribed, or the number of medications prescribed as DOT.

CMF conducted 93 medication line audits, all of which were less than two hours in total length. However, the institution did not report on the duration of individual patient wait times. CMF denied any conflict between medication distribution and mental health programming.

CMF also denied any challenges with patients having to wait in line for medications during inclement weather. Notably, most medication administration occurred within housing units; only medication distribution for two dorms occurred outside, but during poor weather, nursing dispensed these medications in the housing units.

CMF reported an average non-formulary rate of 14 percent during the review period.

The institution submitted monthly percentages, but not the number, of polypharmacy reviews. Percentages of completed reviews averaged 85 percent and ranged from 76 to 95 percent. CMF did not submit information on how mental health headquarters used information from polypharmacy reviews.

During the review period, CMF reported that between 407 and 478 CMF patients were prescribed HS medications, but the number of prescribed HS medications was not provided. CMF did not indicate any challenges with the administration of HS medication at or after 8:00 p.m.

During the site visit, 50 patients were prescribed PC 2602 involuntary medications. There were 30 PC 2602 medication initiations during the review period; there were seven emergency and three non-emergency initiations, and 20 renewals. Four petitions were denied or withdrawn. No petitions were denied or withdrawn due to non-clinical reasons, such as poor tracking or mishandling.

CMF was noncompliant with having a PC 2602 involuntary medication court order in the electronic medical record for all six months. In contrast, there was compliance for all six months with having the PC 2602 involuntary medication psychiatrist order in the chart.

CMF reported that there was no data on the number of patients who were noncompliant with the PC 2602 involuntary medication process. However, it was unclear whether this was because no patients were noncompliant, or because the tracking of these patients was not performed.

Transfers:

CMF conducted both fourth quarter 2022 minor and first quarter 2023 major sustainability reviews during the reporting period. However, due to the unmet needs assessment (UNA) project, CMF's sustainable process reviews only involved off-site assessments for the first quarter of 2023 review.

The sustainable process reviews audited HLOC consideration documentation for quality, and the inter-rater reliability between the headquarters' reviewer and CMF's inpatient care

coordinator. They measured the quality of HLOC consideration documentation completed by CMF staff to assess whether documentation of reviewed cases adequately addressed the sufficiency of non-referral rationales, positive referral considerations, clinician consistency, and whether documentation was provided for the correct patient, as well as overall document quality and any documentation errors. The review also assessed the reliability of both the headquarters' reviewer and CMF's inpatient coordinator as to their findings regarding the quality of HLOC documentation.

The fourth quarter 2022 minor sustainable review indicated respective findings by CMF's inpatient care coordinator and the headquarters' reviewer reflecting that only 66 and 70 percent of HLOC forms were acceptable. Of the 47 reviewed cases considered for a higher level of care referral, the headquarters' review determined that 33 cases were good, and 14 cases were unacceptable; the CMF inpatient care coordinator found two less cases to be acceptable. Of the 14 cases found to be unacceptable by the headquarters' reviewer, five were due to insufficient treatment intervention documentation, three were due to insufficient non-referral narratives, four were due to missing documentation, one was due to clinical inconsistency, and one was due to an indicator being incorrectly marked as positive.

For the first quarter 2023 major sustainability review, the inter-rater reliability between the headquarters' reviewer and inpatient care coordinator was concerning; the former found that only 53 percent of reviewed cases were acceptable, while the latter determined 68 percent to be acceptable. Both reviews nonetheless indicated poor compliance. Overall, of the 34 reviewed cases, there were five where the inpatient care coordinator and the headquarters' reviewer disagreed about the acceptability of the higher level of care assessment. Of the 16 cases that the headquarters' reviewer found unacceptable, six were due to insufficient treatment intervention

documentation, which included not addressing the non-referral rationale and not being patient specific.  Overall, 13 of the 16 unacceptable cases were due to quality issues; three were due to documentation errors.

Similar to the prior review period, CMF had repeatedly failed to achieve compliance with the sustainable processes' data review and documentation component.  Since 2013, not one of CMF's quarterly sustainable process reviews had achieved compliance.

CMF had two inpatient care coordinator positions.

During the review period, there were 828 instances of patients being considered but not referred to a higher level of care.  The inpatient care coordinator reported that many of the reasons why patients were not referred to a higher level of care was because the referral indicators reflected patient treatment refusal which was "not clinically indicated" and MHCB overstays due to staffing shortages.  Notably, similar to the last review period, "not clinically indicated" continued to be a reason for patient non-referral, which was not a clinically sufficient rationale for patient non-referral.

CMF reported a total of 54 referrals to acute care.  Two referrals were rescinded, two were referred to the MHCB, and as of the site visit, two remained pending.  Thirty-seven of 54 or 69 percent of referral packets were timely completed within two working days of identification.  Regrettably, only two of 42 or five percent of acute care referrals timely transferred within ten days.  Transfer data was not provided for the six other patients.  However, 39 of 42 or 93 percent of patients transferred within 72 hours of a bed assignment, which was encouraging.

There were 93 referrals to intermediate care, of which 28 referrals were rescinded, nine patients were referred to MHCBs, and as of the site visit, ten patients remained pending transfer.  Thirty-six of 85 or 42 percent of intermediate care referral packets were timely completed within

five working days of identification; data was not provided for the remaining eight patients. Of the 46 patients who transferred to intermediate care, only three of 42 or seven percent timely transferred within 30 days; transfer data was not provided for the remaining four patients. CMF further reported that 37 of 42 or 88 percent of patients transferred within 72 hours of a bed assignment.

Sixteen patients had *Vitek* hearings. No patients prevailed.

The inpatient care coordinator indicated using protocols to expedite DSH referrals when clinically indicated. However, it was also reported that expedited referrals did not typically occur due to the CMF's MHCB being readily accessible.

The inpatient care coordinator also reported that headquarters typically handled all communications with the inpatient programs. However, if a patient had been waiting too long for an inpatient acceptance or transfer, she would normally reach out to headquarters for a status update. As for impending discharges from inpatient programs, the inpatient care coordinator indicated that the CMF PIP would normally contact the inpatient care coordinator if any patients were being discharged to CMF.

Further, the inpatient care coordinator reported that there was clinician-to-clinician contact between CMF and the inpatient programs when a patient returned from a higher level of care; CMF's primary clinician would typically handle this communication.

A total of 228 CMF patients were referred to the MHCB, but 44 MHCB referrals were rescinded. The remaining 184 patients were admitted to CMF's MHCB. All but six or three percent of patients were timely admitted to the MHCB within 24 hours of referral. CMF's MHCB admitted another 108 patients from other institutions.

Eighty-six patients had three or more MHCB admissions; readmissions ranged from three to 33 admissions.

Seven of eight patients who transferred to the PSU transferred timely. The remaining untimely PSU transfer was due to the patient refusing the PSU placement and subsequently being placed on COVID-19 quarantine status, which further contributed to the delay. No patients were endorsed for PSU transfer during the site visit.

CMF patients requiring EOP hub or EOP level of care were timely transferred to these programs at CMF.

During the review period, 12 patients' levels of care were reduced from EOP to 3CMS. No patients' level of care was increased from 3CMS to EOP.

Four of five patients timely transferred to STRH.

CMF did not transfer any patients to LTRH.

No MHSDS patients were placed in the MSF during the review period.

Programming:

MHSDS Patients in Administration Segregation:

During the site visit, Facility M-3 operated as an administrative segregation unit, housing the EOP hub, as well as 3CMS patients and non-MHSDS incarcerated persons. At this time, none of the three 3CMS patients in restricted housing had been housed there for more than 30 days.

CMF reported that insufficient EOP hub staffing adversely impacted provided mental health services; only two of the EOP hub's 5.1 primary clinician positions were filled. Otherwise, one telepsychiatrist covered the 0.85 position and there were two recreation therapists

for the 1.18 positions. The psychiatrist's caseload was within the established ratio, but primary clinicians' caseloads exceeded the ratio.

Related to significant staffing shortages, the EOP hub was not certified during any month of the reporting period.

CMF was unable to offer EOP hub patients the required ten weekly hours of structured treatment during any month of the review period; offered treatment averaged 8.53 weekly hours and ranged from 6.05 to 9.9 weekly hours. Patients attended 6.54 weekly hours of structured treatment and refused 1.98 weekly hours.

Further, 19 EOP hub patients were on modified programming for having refused more than half of offered treatment. These patients received weekly primary clinician contacts, daily psych tech rounds, and an IDTT every 30 days. The EOP hub supervisor reported that patients on modified programming typically graduated to full EOP programming. During the review period, EOP hub patients on modified programming were offered a weekly average of 5.11 hours of structured treatment, attending an average of 1.39 weekly hours and refusing 3.71 hours.

Four observed IDTTs were generally adequate and attended by required staff; the EOP hub supervisor also attended, while the psychiatrist attended by way of telepsychiatry. The CC I's participation was appropriate. Patients attended three IDTTs; due to a patient refusal, one was held *in absentia*.

Overall, the IDTTs exhibited collaboration and provided appropriate psychosocial histories and clinical conceptualizations for each patient. Although goals and interventions were not completely individualized, they were adequate given patients' clinical presentations and available treatment options due to staffing shortages. The treatment team also engaged in an appropriate discussion for the patient who refused to attend his IDTT, placing him on modified

310

programming.  The IDTT also properly referred patients to groups, while treatment plans reflecting increased individual primary clinician contacts were indicated for patients who were determined not to be appropriate for groups.

Two patients who were placed in TTMs attended an observed recreation therapy group on healthy habits.  The participants watched the film "Food, Inc.," with the RT occasionally pausing the movie for brief discussions.  Regrettably, the group lacked clinical utility and discussions frequently went off-topic.

The monitor's expert interviewed the two group participants, as well as another patient who was interviewed at cell front.  Patients expressed conflicting reports about the frequency of clinical contacts.  Both group participants reported not regularly receiving scheduled clinical contacts, but the patient interviewed at cell front indicated receiving weekly individual primary clinician contacts.  The group participants stated that they had to go "man down" or report being in crisis to be seen.  All three patients reported that psychiatry and PC individual contacts were "sometimes" confidential, but IDTTs were not timely.  All patients reported only leaving their cells for yard and groups.  They further reported receiving three hours of yard three days weekly and being offered four to five weekly RT groups.  The group participants reported receiving approximately three weekly psychiatry contacts at cell front while the cell-front patient had daily morning psych tech contacts.  All patients reported that a crank radio was their only electrical appliance as their cells lacked electrical outlets for other appliances or a television.

During the review period, CMF retained 19 EOP patients in the EOP hub for more than 90 days; stays ranged from 91 to 234 days.  CMF conducted weekly meetings composed of the chief deputy warden, associate wardens, captains, and the CC II to track and provide staff direction about possible actions to release patients from the EOP hub.  The reasons why these 19

EOP patients remained in the EOP hub for more than 90 days included nine pending RVR adjudications for battery/murder, six due to the unavailability of certain bed types at CMF, two pending investigations, and one each for possession of a weapon and an enemy situation.

Observation of one initial ICC and two subsequent ICCs found required staff in attendance. All three patients had been placed in restricted housing for safety concerns; the ICC released one patient from restricted housing to the mainline following completion of an investigation but retained the other two patients pending further investigations into their safety concerns. One of the two retained patients was assigned NDS status; the ICC did not discuss NDS for the other patient.

Twenty weeks of reviewed 114-As for the offering of yard, showers, linen exchange, and telephone calls revealed the offering of ten weekly hours of yard and three weekly showers to restricted housing patients for 19 of 20 weeks. Patients were offered a weekly linen exchange for 14 of 20 weeks. Three privilege group A patients were offered weekly telephone calls.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP hub stays. One patient was eliminated from the assessment.

Eleven of 13 or 85 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Eighty-five percent were conducted confidentially. Reasons for non-confidential conducts included patient refusals and medical quarantine. Telepsychiatry was utilized for 23 percent of initial psychiatry assessments.

Twenty-four of 32 or 75 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Sixty-four percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, medical quarantine, and custody modified program. Telepsychiatry was used for 39 percent of reviewed routine contacts.

All 13 patients had timely required initial primary clinician evaluations before the initial IDTT. Eighty-five percent were conducted confidentially. Reasons for non-confidential contacts included patient refusals and the lack of confidential space.

Twenty-six of 37 or 70 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Forty-six percent were confidential. Reasons for non-confidentiality included patient refusals and medical quarantines.

Thirteen of 14 or 93 percent of patients had required initial IDTTs within 14 calendar days of admission. All required staff attended; patients attended 86 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

All 14 required routine IDTTs timely occurred at least every 90 calendar days. Required staff attended all routine IDTTs; patients attended 25 percent. Reasons routine IDTTs were held *in absentia* included patient refusals, ducat conflicts, and medical quarantines. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, but this assignment was not clearly discernable for all cases.

Non-Disciplinary Segregation:

CMF did not have historical data reflecting the expedited transfer of NDS patients out of the EOP hub. During the site visit, one NDS restricted housing patient was approved for property and privileges, but there was no indication of the date of NDS approval. EOP hub staff also maintained an NDS list which was updated after weekly ICCs. Once the ICC designated an EOP hub patient as NDS, EOP hub staff issued allowable personal property within one to two days. Radios were reportedly issued to all new patients upon arrival; patients were permitted to keep the radio for their entire EOP hub stay. Observation revealed that the EOP hub had an adequate supply of radios.

MHCB:

The MHCB had 50 appropriate beds; one bed was redlined during the site visit.  Two were ADA-compliant.

The MHCB had two treatment teams, A and B.  As for staffing, positions were filled for three of 11.3 primary clinicians, 4.5 of 4.66 psychiatrists, and three of 6.08 recreation therapists. Except for two psychiatrists and one primary clinician, all MHCB caseloads' exceeded established ratios.  Regrettably, these staffing shortages had adversely impacted continuity of care and compliance with IDTT timeliness, with CMF utilizing overtime and limited term 0.25 FTE positions to cover some shifts to provide patient care.  MHCB staff were nonetheless conscientious and attempted to do their best to provide treatment under very difficult circumstances caused by staffing shortages.

Despite these staffing shortages, the MHCB maintained stable clinical supervision, which enabled it to adequately address the "culture of deference to custody" that CMF's exit call from the previous review period had addressed.  Patients were seen according to their custody level, with TTMs being used for maximum custody patients or those with a clinical "cuff chrono."

During the review period, the MHCB's daily census averaged 34.5 patients.  MHCB clinical lengths of stay averaged 13.5 days, with 126 patients' clinical stays exceeding ten days. Physical stays averaged 16.6 days; 228 patients' physical stays exceeded ten days.  Longer MHCB physical stays were generally attributed to waiting for custody staff to resolve the patients alleged safety concerns prior to MHCB discharge, as well as bed availability and transportation issues.

All new MHCB admissions were given a history and physical within 24 hours of admission, an updated or new mental health assessment, and, if admitted for suicidal behavior, a

suicide risk assessment.  Due to staffing vacancies, an initial IDTT within 72 hours did not occur.

Otherwise, the MHCB's significant mental health staffing vacancies led to various program modifications, such as psychiatry and primary clinician individual contacts taking place every other day.  However, recreation therapists saw patients individually on days when the psychiatrist or primary clinician did not see them.  Discharge SRASHEs were completed prior to patient's clinical discharge for patients admitted for suicidal thoughts/behavior; however, discharge IDTTs sometimes occurred after MHCB discharge due to staff's inability to conduct them at the time of discharge.  Patients were typically offered confidential clinical contacts.

All required staff attended and provided input for four observed IDTTs for patients on Team A.  Addressed issues included level of care and discharge planning.  Three observed IDTTs for Team B were also all adequately conducted.  Notably, all seven observed IDTTs involved patients whose primary issue was substance abuse.  Many of these patients were enrolled in the ISUDT.  Regrettably, these patients all demonstrated significant denial about their substance use disorders; most also reported minimal benefits from ISUDT participation.  The IDTTs reviewed patients' property, bedding, mechanical restraint (cuffing) and movement restrictions.  When approved by the IDTT, recreation therapy was offered to MHCB patients five days weekly in the outside walk-alone yards.

Seven weeks of 114-As for MHCB patients were reviewed for the offering of yard, showers, telephone calls, and linen exchange.  There was no policy for the offering of a minimum number of yard hours for MHCB patients.  For five of seven weeks, patients were offered ten or more hours of yard; they were offered three weekly showers for all seven weeks,

while linen exchange occurred during four of seven weeks. Telephone calls were documented as being offered multiple times weekly for all seven weeks.

Fifteen patients' 114-As were also reviewed for mechanical restraint use. Although all patients had the required mechanical restraint document, there was a discrepancy for one document which indicated that a particular patient should be in mechanical restraints, yet the custody officer stated that the patient was no longer on cuff status.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB. No patients were eliminated from the assessment.

Eighteen of 20 or 90 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 24 hours of patient arrival. Sixty-five percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and behavioral concerns. Telepsychiatry was not utilized for initial psychiatry evaluations.

Ninety-nine of 101 or 98 percent of twice weekly routine psychiatry contacts timely occurred. Sixty-seven percent were conducted confidentially.

Three of 20 or 15 percent of initial primary clinician evaluations timely occurred within 24 hours of admission. Forty-three percent of reviewed initial primary clinician assessments occurred in confidential settings. Reasons for non-confidentiality included patient refusals and behavioral concerns. Telehealth was not used for any initial primary clinician evaluations.

For routine primary clinician contacts, 122 of 164 or 74 percent timely occurred. Thirty-two percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telehealth was not utilized for any routine primary clinician contacts.

Fifteen of 20 or 75 percent of initial IDTTs timely occurred within 72 hours of patients' arrival. Required staff attended 100 percent of initial IDTTs; patients attended 95 percent.

Twenty of 27 or 74 percent of routine IDTTs timely occurred every seven calendar days. Required staff attended 93 percent of routine IDTTs; patients attended 100 percent. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

CTF did not use clinical restraints during the review period.

Crisis Intervention Team:

CMF's CIT LOP was consistent with statewide policy. During the review period, there were 159 referrals to the CIT, of which 132 or 83 percent were referred to the MHCB, with two patients being sent to outside hospitals.

During most of the review period, the CIT consisted of two psychologists and one social worker providing coverage seven days weekly. All three clinician were trained to handle CIT activations. However, after two of the three CIT members left the institution, and due to other staffing shortages, beginning on March 1, 2023, CMF mental health leadership suspended the CIT; thereafter, there were no full CIT activations. However, one psychologist remained assigned to the CIT and provided coverage two nights weekly between 1:00 p.m. and 11:00 p.m.

Otherwise, following the CIT's suspension, CMF largely reverted to using the traditional on-call model instead of the CIT. At the time of the site visit, CMF dedicated 1.5 positions to on-call coverage for daytime and evening coverage during the work week. Although there was adequate daytime on-call coverage, evening coverage was understaffed, resulting in the provision of additional evening coverage utilizing overtime, the psychiatrist on call, or, during weekends, through the use of MHCB staff.

Alternative Housing:

During the review period, 68 patients, including one intermediate care, one MHCB, 58 EOP, seven 3CMS, and one GP, were admitted to alternative housing.  Stays averaged 14 hours. No patients were placed in alternative housing for more than 24 hours.

CMF utilized alternative housing cells in two areas, namely, the MHCB and the TTA. There were four alternative housing cells and two overflow cells in the MHCB, and two alternative housing cells in the TTA.  The MHCB's alternative housing cells were appropriate for a suicidal patient, who was under constant observation during the alternative housing placement.  These patients were provided with a safety mattress, safety blanket, and safety smock.  Observed alternative housing cells in the MHCB and TTA were clean and had toilets.

EOP:

CMF's EOP program averaged 430 patients during the review period.  Although psychiatry caseloads were within the established ratio, PC caseloads exceeded the 1:26 ratio, ranging from 41 to 68 patients.  Unfortunately, the caseloads of five of eight primary clinicians were more than double the established caseload.

Due to staffing shortages, CMF began triaging its mainline EOP program in April 2022. In a memorandum dated April 13, 2022, mental health leadership announced that CMF's "critical MHPC staffing shortages…makes providing treatment as usual (TAU) untenable at best. Effective immediately the ML EOP program will move to a triage and rounding model for patient care…."  CMF also distributed subsequent memoranda for triage and rounding in the mainline EOP programs.  A January 9, 2023, memorandum was in effect during the site visit and indicated that CMF would be "going to a group based model of care with 1:1 appointments for

stable patients being done TBD only or by request."  Moreover, routine IDTTs were suspended unless "clinically indicated."

EOP patients were offered an average of 5.66 weekly hours of structured treatment. Regrettably, only two percent of EOP patients who were eligible for full programming were offered ten or more weekly hours of structured treatment.  Patients refused 49 percent of offered treatment; 73 patients who refused half or more of offered treatment were on modified programming.

The monitor's expert observed three IDTTs.  The three patients had different primary clinicians and psychiatrists, with one providing services utilizing telepsychiatry.  A registered nurse, CC I, and housing unit correctional officer also attended.  Patients attended all IDTTs. Except for the correctional officer, all staff and patients provided input.  The IDTTs adequately addressed patients' treatment and level of care.  Staff further reported that for at least several years, psychiatry coverage had primarily been provided using telepsychiatry and that they were comfortable with the telepsychiatry process.

The monitor's expert also observed six EOP IDTTs in the OHU.  Required staff attended all IDTTs; patients attended five.  The treatment team demonstrated a collaborative and cohesive process for the IDTTs.  The psychiatrist knew the patients and was attentive to their medications and potential side effects.  The primary clinician provided thorough and appropriate conceptualizations and for several complex patients, demonstrated a skillful clinical technique to engage patients in treatment.  The CC I also participated appropriately, knew the patients, and advocated for their treatment.  The IDTTs addressed level of care considerations for each patient. Notably, following the IDTT held *in absentia*, the entire treatment team visited the patient at his cell to check on his status and inform him of the IDTT's outcome.  Nonetheless, although IDTTs

were very well conducted and individualized, their goals and interventions were severely limited due to staff shortages and the lack of resources.

EOP patients typically had to request to be seen to receive an individual primary clinician contact.  In lieu of these contacts, they were provided primary clinician-led case management groups, which patients described as inadequate and a "poor" substitute for individual clinical contacts.  The patients' primary clinician led an observed case management group that seven patients attended.  The PC knew the patients well and appropriately engaged with them individually.  The group addressed numerous topics including coping skills, anger, healthy choices, and dealing with difficult custody officers.

Otherwise, EOP patients were not offered core clinical groups; group offerings were limited to recreation therapy groups which many patients stated consisted of watching movies or listening to music.  Patients further reported that these groups were often cancelled due to RT unavailability.

Nine EOP patients interviewed in a group reported not regularly receiving scheduled clinical contacts and that staffing vacancies were largely responsible for the lack of provided treatment.  Some patients reported having IDTTs every 90 days, but several indicated having had initial IDTTs but not routine IDTTs.  Patients stated not being offered clinical groups and that all groups were RT or leisure groups.  They generally reported timely telepsychiatry contacts and that the overall quality of psychiatry contacts was "good" but that the medical assistant's presence during telehealth was "intrusive."  Patients further reported that most primary clinician contacts were at cell front and that many routine requests to be seen were ignored.  Patients also expressed high levels of concern and fear around non-MHSDS inmates, who they reported preyed on EOP patients.  Patients reported that when they were not in group or yard, they were

either locked in their cells or confined to very small and cramped dayrooms on their housing units.

EOP inmates complained about their lack of access to the large mainline recreation yard and the condition of the EOP yard, which was dusty, lacked grass, and had broken glass. The warden elaborated that the EOP yards lacked grass due to water restrictions. However, there were early discussions about allowing EOP patients access to the mainline yard, where they would comingle with mainline general population inmates. The monitor's expert supported this plan but emphasized the need to notify the Special Master and plaintiffs for approval prior to implementation.

Twenty EOP patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their EOP stays.

Five of seven or 71 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 14 calendar days of arrival or a change in level of care; however, one initial psychiatry evaluation never occurred. All six reviewed initial psychiatry assessments were conducted confidentially. Telepsychiatry conducted all initial psychiatry evaluations.

Fifty-nine of 74 or 80 percent of required routine psychiatry contacts timely occurred at least every 30 calendar days. Eighty-six percent were confidential. Reasons for non-confidentiality included cell-front contacts, patient refusals, and modified programming. Telepsychiatry conducted 78 percent of reviewed routine psychiatry contacts.

Two of four initial primary clinician evaluations timely occurred within 14 calendar days of arrival or a change in the level of care; however, the other two PC evaluations never occurred. Both reviewed initial primary clinician assessments were conducted confidentially. No initial PC evaluations utilized telehealth.

Thirty-one of 102 or 30 percent of required routine primary clinician contacts timely occurred at least every seven calendar days. Sixty-six percent were conducted confidentially. Reasons for non-confidentiality included EOP caseload group contacts, patient refusals, and cell-front contacts. Moreover, 48 of 68 or 71 percent of reviewed routine primary clinician contacts never occurred. Telehealth was not used for any routine primary clinician contacts.

Six of eight initial IDTTs timely occurred within 14 calendar days of arrival or a level of care change. One initial IDTT never occurred. Required staff and patients attended the remaining seven reviewed initial IDTTs.

One of 13 or eight percent of required routine IDTTs timely occurred within 90 calendar days. Fourteen overdue routine IDTTs never occurred. Required staff attended 90 percent; patients attended 40 percent. Reasons routine IDTTs were held *in absentia* included patient refusals, COVID-19, and undisclosed reasons. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

3CMS:

CMF reported that due to significant mental health staffing vacancies, the 3CMS program only had one assigned clinician and psychiatric nurse practitioner. Although the PNP's caseload was within the established ratio, the primary clinician's caseload exceeded the ratio. During the site visit, a psychiatrist covered for the PNP.

Due to these severe staffing limitations, CMF had implemented a "triage" system for 3CMS patient care that resulted in treatment being grossly noncompliant with Program Guide requirements. In this regard, a May 31, 2022, memorandum stated that beginning June 30, 2022, all regular 3CMS patient care for both patients who were prescribed and not prescribed

psychiatry medications would be conducted by assigned 3CMS psychiatry staff.  It further

provided that 1.5 primary clinicians would be directed to provide services to EOP and 3CMS

patients in CMF's G-Tower medical units.  Moreover, routine IDTTs for 3CMS patients that

were not "clinically indicated" were suspended.  The May 31, 2022, memorandum elaborated

that these changes to the 3CMS program would enable CMF to "redirect resources to higher

levels of care while still providing services to the 3CMS population."

As CMF leadership reported, this resulted in 3CMS patients only being seen for emergent

referrals, initial, discharge, and level of care change IDTTs, and psychiatry appointments.  3CMS

patients were not offered clinical groups; available ISUDT groups were not considered part of

the mental health program.  Neither individual primary clinician contacts nor routine IDTTs were

provided, while responses to patient-generated requests to be seen were often delayed for

extended time periods of between several weeks to months.  Staff and patients nonetheless

reported confidential individual contacts when they occurred.  The sole 3CMS primary clinician

reported being "severely overwhelmed" and "burned out" due to the voluminous caseload.

Four observed 3CMS IDTTs revealed three patients in attendance; the remaining IDTT

was held *in absentia* due to the patient's refusal to attend.  Required staff attended.  No

difficulties were observed with telepsychiatry's use, and the psychiatrist was well connected with

a clear picture and sound.  The IDTTs were collaborative and appropriately addressed pertinent

issues, with relevant input by all participants, including the CC I.  The primary clinician provided

appropriate clinical conceptualizations for each patient, and there were level of care discussions,

while medications and diagnoses were appropriately discussed.  However, due to severely

limited treatment resources, treatment plans were not individualized, while patients' treatment

goals primarily consisted of medication adherence and maintaining stability; interventions were

limited to medication management, ISUDT, and peer-led groups, and sick call requests when one to one observation might be needed. The IDTTs were nonetheless adequate despite the inability to provide treatment according to Program Guide requirements.

Seventeen 3CMS patients interviewed in two group settings confirmed only being seen individually by a primary clinician in response to patient requests; however, their requests to be seen were not responded to timely. None of the interviewed 3CMS patients reported having an assigned primary clinician, resulting in a lack of continuity of care if they were seen. Patients nevertheless indicated reasonable access to psychiatry, which was typically through telepsychiatry, and did not express significant concerns with either the use of telepsychiatry or medication continuity. Patients nonetheless verbalized their distress about their lack of access to the treatment that they believed was necessary for their mental health.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Three of four or 75 percent of patients had timely initial psychiatry evaluations before the initial IDTT. All were conducted confidentially. Telepsychiatry conducted one initial psychiatry assessment.

Seven of 18 or 39 percent of routine psychiatry contacts timely occurred every 90 days. Ninety-five percent were conducted confidentially. Reasons for non-confidentiality included patient refusal. Telepsychiatry conducted 52 percent of reviewed routine psychiatry contacts.

One of three initial primary clinician assessments timely occurred within ten working days of arrival or a level of care change. All three were confidential. No initial PC evaluations were conducted using telehealth.

None of 17 routine primary clinician contacts timely occurred at least every 90 days. All three reviewed routine primary clinical encounters were conducted confidentially. None utilized telehealth.

Two of four initial IDTTs timely occurred within 14 working days of arrival or a level of care change. Required staff and patients attended all initial IDTTs.

Two of 13 of 15 percent of patients had required timely annual IDTTs. Required staff and patients attended both reviewed routine IDTTs. Approximately 55 percent of patients had not had a routine IDTT since 2021.

Other Issues:

Pre-Release Planning:

Although CMF allocated 1.42 positions for pre-release planning, due to staffing shortages the institution was only able to dedicate one full-time social worker for pre-release planning for both outpatient and inpatient programs. Further, the pre-release coordinator had teleworked during the two months prior to the site visit, and relied on the primary care physician to relay pre-release planning messages to patients. Prior to his leave, he saw patients individually and coordinated with TCMP.

CMF provided some type of pre-release planning services to virtually all of the nine MHCB, 66 EOP, and 20 3CMS eligible patients. However, staffing shortages resulted in CMF only offering five pre-release group meetings.

Further, TCMP screened 60 EOP and 20 3CMS patients for eligibility for benefits, of whom 93 percent submitted applications for Medi-Cal, while 97 percent of patients who were eligible for SSI also submitted applications. Three patients who were eligible for veterans' benefits refused services.

The community transition program also interviewed patients who were within six months of release, assisting with available programs in their home communities, including transitional housing programs such as STOP, substance abuse and educational programs, and resources for clothing, food, and shelter.  Of 36 patients who were eligible for STOP housing services, eight placements were approved, 12 referrals were pending, and the remaining 16 patients either refused or declined STOP placements.

Program Access:

a.   Job and Program Assignments

CMF reported that 701 job assignments were held by 119 or 24 percent of EOP patients, 212 or 50 percent of 3CMS patients, and 370 or 36 percent of non-MHSDS incarcerated persons.

The 387 academic assignments were held by 109 or 22 percent of EOP patients, 107 or 25 percent of 3CMS patients, and 171 or 17 percent of non-MHSDS incarcerated persons.

The 400 vocational education assignments were held by 63 or 13 percent of EOP patients, 102 or 24 percent of 3CMS patients, and 235 or 23 percent of non-MHSDS incarcerated persons.

The 151 voluntary education assignments were held by 29 or six percent of EOP patients, 45 or 11 percent of 3CMS patients, and 77 or seven percent of non-MHSDS incarcerated persons.

Only one non-MHSDS inmate had a substance abuse treatment assignment.

b.   Milestone Credits

CMF reported that all 16 EOP patients who were eligible to earn milestone credits earned them, as did 35 of 43 or 81 percent of 3CMS patients, and 56 of 67 or 84 percent of non-MHSDS patients.

c.  Out-Of-Level Housing

CMF reported that 22 EOP and 14 3CMS custody Level I patients were in Level II housing, and two 3CMS custody Level I patients were in Level III housing.  There were 78 3CMS custody Level II patients in Level III housing, and five EOP and two 3CMS custody Level III patients in Level II housing.  There were also 12 EOP and one 3CMS custody Level IV patients in Level II housing, and one EOP and 28 3CMS custody Level IV patients in Level III housing.

d.  ADA Reasonable Accommodation and Grievance Procedure

CMF provided an updated reference training manual for ADA accommodation and attendance sheets for both reasonable accommodation and grievance procedure trainings.

e.  Periodic Classification Score Reductions: EOP Patients

CMF provided CDCR Form 840s demonstrating that CMF was providing periodic classification score reductions for EOP patients.

f.  Unclothed Body Search

CMF's LOP regarding unclothed body searches was in compliance with CDCR policy. EOP hub staff further reported that unclothed body searches were conducted outside of the patient's cell in a confidential area using privacy screens.  Staff were knowledgeable of the unclothed body search policy and how CMF implemented it.

"C" Status:

There were no CMF patients on "C" Status during the review period.

Case-by-Case Reviews:

CMF reported scheduling 24 patients for 150-day case-by-case reviews.  Review of case notes for patients who were retained in administrative segregation beyond 150 days revealed

compliance with CDCR policy.  Specifically, two patients were awaiting resolution of a RVR and/or district attorney referral, one patient was awaiting CSR review, two patients were scheduled for ICC, three others were released from maximum custody pending transfer to their endorsed institution, and one patient was released on parole.  Fifteen patients were transferred to their endorsed institution, of whom three were released from maximum custody but were subsequently placed back on maximum custody status due to their RVR.

CMF provided information for 124 cases that satisfied the criteria for the 120-day pre-MERD review.  An ICC review was completed for 110 patients with projected or active SHU terms and the remaining 14 were pending review.  All but nine cases were referred to the CSR for review.

Mental Health Referrals:

During the reporting period, CMF made 936 mental health referrals; there were 339 referrals to psychiatry and 597 referrals to primary clinicians.  CMF reported noncompliance for timely responding to the three emergent and 39 urgent referrals to psychiatry, and to the 190 emergent and 121 urgent primary clinician referrals.  However, there was compliance for timely responding to the 297 routine psychiatry referrals and the 286 routine primary clinician referrals.

Nine interviewed housing unit correctional officers were knowledgeable about the mental health referral process, and were able to produce copies of the MH-5 form.

Custody and Mental Health Partnership Plan:

CMF's CMHPP LOP was current and in compliance with statewide policy.  Executive leadership joint rounding occurred during three of six months of the review period and used the correct form.  Reviewed rounding forms revealed staff reporting a good working relationship between custody and mental health, but also indicated that staff vacancies had put a strain on all

staff.  Patients did not report any complaints and noted a good relationship between custody and mental health staff.

Six months of reviewed quality management committee meetings revealed that the minutes did not identify executive leadership joint rounding as a standing agenda item and QMC minutes did not otherwise reference the rounding.  However, mental health subcommittee minutes identified executive rounding as a standing agenda item, and otherwise addressed the rounding.  CMF did not provide minutes for the warden's executive staff meetings.

Review of ten weeks of EOP hub huddle reports revealed use of the required form, which indicated attendance of the primary clinician and correctional officer at most.  On occasion, the sergeant, lieutenant, and/or mental health supervisor also attended; one huddle form noted the psychiatrist's attendance.  Regrettably, most forms lacked other substantive information; others contained minimal information, occasionally noting new patient arrivals or program modifications.

During the review period, due to the significant staffing vacancies, most of CMF's EOP mental health treatment team members simultaneously conducted huddles for all seven EOP housing units; however, psychiatry and custody staff did not attend.  Following the huddles, a primary clinician went to each EOP housing unit to inform a custody officer what the huddles discussed.  Unfortunately, this process did not comply with CMHPP requirements.

During the site visit, observed EOP hub huddles complied with CMHPP requirements. All required staff attended and collaboratively discussed patients.  However, an observed MHCB huddle did not reveal custody staff providing information, while mental health staff did not solicit any information from custody.

CMF did not provide information on weekly 3CMS supervisory meetings or monthly joint supervisory 3CMS program area tours, reporting their inapplicability to the institution. However, because CMF housed 3CMS patients, the institution's assessment was erroneous.

CMF scheduled weekly EOP orientation groups during three months of the review period. Thirty EOP patients attended some of these groups. The institution identified mental health and custody staff who provided these groups, as well as three patient facilitators.

The monitor's expert's observation of an "Introduction to EOP" group revealed nine group participants, including two EOP patient peer facilitators. The group facilitator informed patients that they would receive milestone credits for attending the group. Although the group facilitator read directly from an outline, the peer facilitators effectively provided context and additional information that was helpful to the EOP patients. Overall, the group was well conducted and provided an adequate introduction to the EOP program.

CMF did not report on inmate advisory council meetings during the review period.

CMF had a copy of the 3CMS brochure in both English and Spanish.

Patients filed 310 grievances during the review period, of which 91 or 29 percent were resolved, 217 or 70 percent were reported to be "in progress," and two were identified as duplicate. Regrettably, there was a continuing failure to timely conduct and respond to grievance inquiries, which was concerning as this led to patient frustration that their concerns were not being timely addressed.

Quarterly round table training was noncompliant with policy. CMF provided two review period IST reports of staff who attended a round table training during the past year. The reports for lesson plan three indicated attendance by 14 custody and 13 mental health staff, while five custody and four mental health staff attended the lesson four training. As all custody and mental

health staff working in the MHCB, EOP hub, EOP and 3CMS program were required to attend this training, this reported attendance demonstrated significant noncompliance.

The annual CMHPP off-post training was attended by three of four correctional administrators, all five captains, 28 of 29 lieutenants, 77 of 81 sergeants, and 645 of 699 correctional officers.  As for mental health, all psychiatrists, psychologists, social workers, and MHSDS registered nurses attended the training, as did five of 16 recreation therapists, 50 of 90 psych techs, and 43 of 97 LVNs.

Heat Plan:

CMF's LOP was current and complied with CDCR policy.  Nine interviewed correctional officers from six units housing MHSDS patients were all knowledgeable of the heat plan and the various requirements at each stage.

During September 2022, CMF reported ten Stage I heat alerts, two Stage II heat alerts, and two Stage III heat alerts.  The institution lacked documentation of accommodations provided to patients during heat alerts and of required nursing rounds during Stage III heat alerts.  Two non-MHSDS patients experienced a heat-related illness in September 2022.

The annual mandatory heat-related pathologies training was attended by 75 of 81 or 93 percent of sergeants, 28 of 29 or 97 percent of lieutenants, and 598 of 699 or 86 percent of correctional officers.  For mental health and nursing staff, four of 90 or four percent of psych techs attended the training, as did nine of 49 or 18 percent of nurses, and nine of 90 or ten percent of CNAs.

RVRs:

CMF issued 469 RVRs during the review period, including 343 or 73 percent that were issued to MHSDS patients and 126 or 27 percent issued to non-MHSDS patients. There were 37 RVRs issued to MHCB patients, 167 issued to EOP patients, and 139 issued to 3CMS patients.

The monitor reviewed 14 RVRs to assess compliance with CDCR policy. Custody staff timely referred the mental health assessment to mental health staff in seven of 14 or 50 percent of cases. Mental health staff timely completed and returned the assessment to custody in 13 of 14 or 93 percent of cases. The SHO documented consideration of the mental health assessment in all 14 reviewed cases and mitigated the penalty in 11 of 13 or 85 percent of the instances where the clinician recommended mitigation. Further, review indicated that the SHO assessed the maximum credit loss for eight or 57 percent of the reviewed RVRs.

Two reviewed mental health assessments indicated that the patient's mental illness "strongly influenced" the behavior documented in the RVR. In one case, the reviewing captain disagreed with the clinician's assessment, stating that the patient knew his behavior was against the rules as any battery or attempt to batter another individual was subject to an RVR. The mental health assessment stated that the patient was diagnosed with a major mental illness where he experienced difficulty differentiating fantasy from reality and was not currently taking medication. Further, during the RVR, the patient did not seem to comprehend the verbal statements and instructions given by the housing unit officers in a manner that was more suggestive of mental illness rather than cognitive impairment. Notably, the captain's statement that the patient knew that his behavior was against the rules did not match the judgment of the clinician completing the assessment. The SHO found the patient guilty, assessed a loss of credit

of 150 days but mitigated the loss of canteen, telephone calls, yard, and dayroom to zero due to the mental health assessment's recommendation.

In the second case, the captain's determination that the RVR should be reduced to a counseling chrono was not followed and the SHO heard the RVR, found the patient guilty, and assessed 90 days loss of credit; however, the SHO mitigated the loss of phone, yard, dayroom, and packages to zero due to the mental health assessment's recommendation. This RVR's adjudication resulting in a guilty finding and assessing a 90 day credit loss was a serious policy violation.

Six ICC chronos were reviewed to assess SHU terms. In five of six, the ICC chairperson documented consideration of the mental health assessment. During the ICC for the RVR noted above where the captain disagreed with the assessment's findings that the patient's behavior was "strongly influenced" by mental illness, recommending documentation in an alternative manner, the ICC affirmed the captain's review and adjudication of the RVR by stating in part that "(t)he mental illness likely contributed to the violation, but some ability to comprehend was displayed by the inmate eventually stopping his actions."

Notably, the failure to follow the assessment's detailed recommendation was identified as concerning by the CSR who subsequently reviewed the ICC's decision. As such, the CSR disapproved the SHU assessment noting that the captain neglected to provide the reasoning for the disagreement and proceeded with the disciplinary hearing; policy required that the captain document his or her reasoning for proceeding with the disciplinary hearing citing evidence contrary to the clinician's rationale. The CSR opined that the evidence cited by the captain was insufficient to contradict the clinician's rationale and returned the case to the ICC to vacate the SHU term.

The mental health assessment training was attended by two of four correctional administrators, four of five captains, 28 of 29 lieutenants, and 70 of 81 sergeants. For mental health, only one psychologist attended the training. A social worker who appeared to not have attended the required mental health assessment training completed 12 of 14 reviewed mental health assessments.

Use of Force:

CMF reported three controlled and 132 immediate use of force incidents. Review of all controlled and 16 immediate uses of force indicated compliance with CDCR policy.

As for attendance at the mandatory use of force training, CMF reported that the warden did not attend the training; however, the chief deputy warden attended. Further, neither the three correctional administrators nor the six captains attended the training. However, 51 of 81 sergeants attended the training, as did 15 of 30 lieutenants, and 420 of 713 or 59 percent of custody officers. For mental health staff, data indicated that the chief psychiatrists/psychologists did not attend the training. However, two supervisory psychologists, psychiatrists, and social workers attended the training, as did four psychiatrists, 12 psychologists, 11 social workers, and 124 registered nurses.

Lockdowns/Modified Programs:

CMF reported that there were no program lockdowns or modified programming during the reporting period.

Access to Care:

A review of monthly Health Care Access Quality reports from September 2022 through February 2023 reflected the issuance of 111,305 mental health ducats and add-on appointments, of which 31,383 or 28 percent were completed, and 79,922 or 72 percent were not completed.

Of the non-completed appointments, zero percent were reportedly not completed due to custody factors, 79 percent were due to non-custody factors, and 21 percent were due to patient refusals.

> *Coleman* Postings:

All nine toured housing units contained the current *Coleman* poster in English and Spanish.

**APPENDIX B-6**
**VALLEY STATE PRISON (VSP)**
**(May 9, 2023 – May 12, 2023)**

Census:

On May 8, 2023, VSP housed 3,024 incarcerated persons, which was a four percent increase from the prior review period.  The mental health caseload population of 1,355 patients represented 45 percent of the institution's population and was a one percent increase from the prior review period.

There were 347 mainline EOP and 969 mainline 3CMS patients.

The OHU housed three EOP and nine 3CMS patients.

There was one patient in alternative housing.

The administrative segregation population of 60 included 12 EOP patients and 14 3CMS patients.

Staffing:

The chief psychiatrist position had not been filled since 2021.  For psychiatry, 0.25 of one position was filled, for a 75 percent vacancy rate.

All six telepsychiatry positions were filled.

Five of eight medical assistants' positions were filled, reflecting a 38 percent vacancy rate.  Two contractors reduced the functional vacancy rate to 13 percent.

One of two chief psychologist positions was filled; the chief psychologist was also the chief of mental health.  All three senior psychologist supervisor positions were filled.  Four of five senior psychologist specialist positions were filled.

Twenty of 20.5 psychologist positions were filled, but one psychologist was on an extended leave, for a seven percent functional vacancy rate.  One psychologist was unlicensed.

The supervising psychiatric social worker position was vacant. All 14 social worker positions were filled.

Ten recreation therapists covered 9.5 positions.

The senior psych tech position was filled.

The OSS II position was filled, as were two of 2.5 HPS I positions. One AGPA covered the 0.5 position. The CHCA position was vacant.

Twelve of 13.5 mental health clerical positions were filled, but one MHSDS clerical staff member was on an extended leave, indicating a 19 percent vacancy rate.

As for custody staffing, the chief deputy warden covered the warden's position, and another institution's associate warden covered the chief deputy warden's position. All positions for four associate wardens and four captains were filled. For lieutenants, 23 of 26 positions were filled, for a 12 percent vacancy rate; two lieutenants were on extended leaves, but their positions were filled by other custody staff acting out of class. Fifty-eight of 59.4 sergeant positions were filled; three sergeants were on extended leaves, for a seven percent functional vacancy rate.

Further, eight of nine CC II positions were filled; one CC II was on an extended leave, while staff acting out of class filled one CC II position, for an 11 percent functional vacancy rate. Fifteen of 24 CC I positions were also filled; one CC I was on an extended leave, while seven CC I positions were filled out of class, reflecting a 13 percent functional vacancy percent. Of 442.6 positions for correctional officers, 434 were filled, but 17 officers were on extended leaves, resulting in a six percent functional vacancy rate.

Telepsychiatry:

Telepsychiatry provided the overwhelming majority of VSP's psychiatry services, with three of six telepsychiatrists' caseloads exceeding established ratios. Specifically, both

telepsychiatrists who exclusively worked in the EOP program had respective caseloads of 97 and 100 patients, which were within the established ratio. Two other telepsychiatrists who treated both EOP and 3CMS patients had caseloads of 101 and 337 patients; the latter exceeded established ratios. Further, two telepsychiatrists who largely treated 3CMS patients also had caseloads exceeding established ratios; the telepsychiatrist who treated 3CMS and OHU patients had a caseload of 344 patients; another telepsychiatrist who treated 3CMS and administrative segregation patients had a 367 patient caseload. For patients' who refused multiple telepsychiatry appointments, one contract psychiatrist was at VSP one day weekly; this psychiatrist did not have a caseload but also saw other patients.

Telepsychiatrists' typically worked from home, although one worked from a hub. Treatment teams reported being able to access telepsychiatrists and frequently consulted with them.

Staff reported infrequent technical difficulties with technology. Observed sessions using telepsychiatry revealed functioning technology and good sound quality. Interviewed EOP patients did not express any complaints with telepsychiatry.

An HPS I tracked telepsychiatrists' on-site visits. Two telepsychiatrists who provided 3CMS patient care were on-site during the prior six months, in accordance with policy. Although VSP reported that two of four telepsychiatrists who provided EOP care visited the institution in April 2023, VSP did not produce documentation reflecting their prior site visit to assess compliance. Two other telepsychiatrists who provided services for EOP patients were noncompliant with visiting the institution; one was due to a medical condition.

Telework:

VSP permitted mental health staff to telework on a case-by-case basis.  Four senior psychologist specialists teleworked three of four days weekly.  During the review period, one senior psychologist supervisor temporarily teleworked two days weekly, while one psychologist temporarily teleworked due to a medical issue.  Other than these individuals and the six telepsychiatrists, all other mental health staff worked on-site.  The chief of mental health further reported that due to the lack of equipment, VSP was not able to offer additional telework to employees.

Staff Recruitment:

The chief of mental health reported that except for continuing searches for a chief psychiatrist and chief psychologist, VSP generally did not experience the severe staffing shortages that other institutions reported.  The institution's good employee retention rates also contributed to the lack of staffing deficiencies.  VSP's recruiting efforts' included posting staff openings on the "Cal Careers" website (jobs.ca.gov) and participating in various career fairs.  Further, prior to the review period, VSP had implemented a psychology internship program through a CDCR-CCHCS consortium that employed four student interns; these interns were subsequently considered for employment at VSP.  Nonetheless, reported hiring barriers included lower salaries in comparison to private practice.

Quality Management:

VSP's quality management processes continued to effectively identify and address issues.

The quality management committee was active and useful, and held monthly meetings that attained quorums.  The QMC regularly addressed routine and special audits and metrics for mental health treatment.  The QMC reported that the chief of mental health and HPS I

continually reviewed the Dashboard and OnDemand to identify trends or issues that required further review.

The quality management committee also addressed the amount of offered, attended, and canceled treatment, self-harm incidents, non-formulary medications, the CIT, and implementation of the custody and mental health partnership plan.  It regularly reviewed and approved LOPs and addressed patient safety and emergency response issues but did not identify significant issues related to mental health.  The QMC also identified and addressed problem areas, with meeting minutes demonstrating evidence of monthly follow-up.  QMC meeting minutes were posted on SharePoint and were accessible to staff.

The mental health subcommittee operated effectively, held monthly meetings, and also attained quorums.  Monthly meetings reviewed prior action items, patient safety concerns, corrective action plans (CAPs), and routine audits.  Audits addressed standard metrics related to treatment including timely completion of initial assessments, IDTTs, and administrative segregation prescreens, offered treatment, continuity of psychiatry and primary clinician contacts, and clinical protocols following inpatient discharges.  The subcommittee identified concerns with clinician review of inpatient discharge documentation, 24-hour reviews following discharge, and completion of five-day follow-ups.  There was evidence of training and supervisor follow-up for identified issues.

The mental health subcommittee had an ongoing CAP addressing the lack of offered treatment to EOP patients that tracked findings on a monthly basis and concluded that the lack of treatment was directly related to COVID-19 restrictions.  Other CAPs addressed deficiencies identified by the sustainable process.  It could not be determined whether all required staff were trained to address these CAPs.

There was also a Green Belt quality improvement project to attempt to ensure the tracking of patient Depakote levels, which routine Dashboard monitoring had identified. During the reporting period, this project positively progressed through the study, improvement, and monitoring phases. There was also an initiative to address an identified challenge with laboratory testing not being ordered and completed within compliance timeframes. The data and methodology related to these quality improvement projects were sound, with clearly presented results.

Dashboard metrics that were less than the statewide threshold were marked for corrective action. Action items were created to address identified issues at each subcommittee meeting, including those identified during routine and focused audits. Follow-up on these items was consistently documented in subsequent meeting minutes. Subcommittee meeting minutes were posted on SharePoint and were accessible to staff.

There were no QITs or FITs during the reporting period.

Emergency Medical Response Review Committee (EMRRC) meetings were held during the reporting period and always achieved quorums. Minutes reflected routine training reviews, adequate equipment inspections, and drills. Case reviews for each emergency response were also reported with individual issues adequately addressed through action items. Ongoing deficiencies were noted in staff maintenance of CPR, basic life support, and advanced cardiac life support certification.

VSP's peer review LOP was dated October 2022 and addressed peer review for all psychiatrists and psychiatric nurse practitioners who provided direct patient care. It required the completion of peer review twice annually using a standardized form containing mostly quantitative and objective elements when reviewing four progress notes and one initial

evaluation completed by each provider.  Documentation reviews were anonymous, and every clinician was to be reviewed by two peers.  There was a clear mechanism for reporting serious concerns that the documentation identified.  Although the LOP complied with statewide policy, there was no provision describing outpatient psychiatry peer review committee meetings.

However, at the time of the site visit, psychiatry peer review was limited to one 3CMS telepsychiatrist completing peer review for EOP telepsychiatrists, and one EOP telepsychiatrist completing peer review for 3CMS telepsychiatrists.  Because VSP lacked a chief psychiatrist, the chief of mental health managed the process.

Medication Management:

VSP provided MAPIP results for September 1, 2022 through February 28, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that VSP was compliant for six months of the review period for blood pressure, glucose, height, weight, medication consents, thyroid function tests, and Abnormal Involuntary Movement Scale (AIMS).  VSP was compliant for four months for Comprehensive Metabolic Panel (CMP), and for three months for Complete Blood Count (CBC) with platelets.  There was compliance for three of four required months for monitoring EKGs.  Lipids were noncompliant for all six months.

While VSP was formerly a so-called clozapine institution, due to the lack of a chief or senior psychiatrist, VSP was not an authorized clozapine initiation or maintenance facility during the review period.  During this period, the only VSP patients who were prescribed clozapine were those who returned to the institution after being out to medical or out to court; however, the number of such patients was not specified.  There was also one patient who was prescribed clozapine who was erroneously transferred to VSP.  In this case, the sending institution

reportedly did not place the patient on a medical hold, which was required for patients who were prescribed clozapine, thereby preventing such a transfer. VSP elected to continue the patient's treatment, as the patient had an upcoming PC 2602 involuntary medication renewal, which the institution wanted to ensure was completed. No VSP patients were prescribed clozapine during the site visit.

For patients prescribed clozapine, VSP was compliant for all six months with measuring blood pressure, CBC, height, and weight. There was compliance for both required months for CMP, EKG, and thyroid tests, and for one required month for AIMS and glucose. No data was required for the review period for lipids and medication consents.

For required monitoring of antidepressants, VSP reported compliance for six months for medication consents, thyroid function tests, and blood pressure monitoring for patients prescribed venlafaxine. There was noncompliance for the one required month for EKG monitoring.

As for carbamazepine, VSP reported compliance for the one required month for medication consents. The institution reported that medication blood levels, CBC, and CMP were not required during the reporting period.

For patients prescribed Depakote, there was compliance for five months for obtaining medication consents and monitoring CMP, and for four months for obtaining CBC with platelets and therapeutic medication level monitoring.

Regarding lamotrigine, VSP reported compliance for obtaining medication consents for five months.

As for lithium, VSP indicated compliance for six months for medication consents and for kidney function tests. There was compliance for five months for monitoring medication blood

levels, and for four months for monitoring thyroid function tests.  For EKGs, VSP was compliant for three of five required months.

VSP reported implementing processes to address MAPIP deficiencies.  Among them, medical assistants sent psychiatrists weekly reports about blood work, EKGs, medication consents, and polypharmacy reviews that were due during the next month.  VSP also undertook a Green Belt project that addressed ordering laboratory studies for patients prescribed divalproex; VSP reported improvement in the measure, but a subsequent decline due to patient refusals. There was also an ongoing Green Belt project on improving lipid monitoring for patients who were prescribed antipsychotics.

For medication management metrics reported by mental health headquarters, VSP was compliant for six months for continuity of medications upon inter-institutional transfer at receiving and release, continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity following discharge/transfer from a community hospital and/or DSH, and upon parole/transfer to the community, observation of medication preparation and administration HS, chronic care medications historical administration, and outpatient provider new medication orders.  There was compliance for four months for continuity of medications for MHCB transfers, and with intra-institutional transfer to ASU/SHU/PSU, and for observation of medication preparation and administration AM and PM.

VSP's medication prescription LOP did not specify the length of time that psychiatrists could prescribe medications.  Bridge orders were allowed for up to 14 days.  Nursing staff had to "read back" verbal or telephone orders to the psychiatrist.  VSP did not specify the process for the subsequent signature of verbal and telephone orders.

The institution issued 1,837 prescriptions for psychiatric medications, but the number of patients who were prescribed them was not identified. There were 834 patients who received medications as DOT, and 157 patients who received 164 medications as KOP. Review of VSP's KOP LOP indicated alignment with statewide policy; it required the patient to be at the 3CMS level of care, meet certain clinical stability requirements, and be prescribed a medication from a list of Selective Serotonin Reuptake Inhibitors (SSRIs) or duloxetine.

VSP reported intermittent difficulties with the total number of pill lines exceeding two hours. Neither the total number of medication line audits, nor the number of times VSP exceeded the two-hour window, were reported. In one example from January 31, 2023, the medication line lasted two hours and four minutes, related to delayed patient release due to fog. However, the maximum time that an individual patient had to wait for medications was under two minutes. VSP did not report any challenges with patients having to wait outside during inclement weather, as an awning provided protection from the elements. No difficulties were reported with medication line length interfering with mental health programming.

VSP reported that 6.1 percent of all psychiatric prescriptions were non-formulary. There were a total of 136 non-formulary prescriptions, but the number of patients prescribed non-formulary medications was not specified.

The institution completed 99 percent of required polypharmacy reviews, but provided information did not indicate the number of polypharmacy reviews.

During the review period, 206 patients were prescribed 276 psychiatric HS medications. There were no reported barriers to administering HS medications at or after 8:00 p.m., as policy required.

During the site visit, 21 patients were prescribed PC 2602 involuntary medications. During the review period, VSP filed one non-emergent initial PC 2602 petition, which was denied, and nine renewals. There was one patient for whom the psychiatrist did not renew the petition, due to clinical improvement. VSP did not withdraw any petitions for clinical or non-clinical reasons. VSP reported compliance for all five required months for the related measures of compliance with the PC 2602 involuntary medication court order and having the medication order in the chart.

A senior psychologist specialist served as the medication court administrator. VSP lacked an LOP for the PC 2602 procedure, but the medication court administrator had a thorough checklist of requirements. It included a clear process to submit PC 2602 information to the Office of Legal Affairs.

There was one use of force to administer PC 2602 medications.

Transfers:

VSP had one sustainability review during the reporting period. The review involved evaluations conducted by a headquarters' reviewer and VSP's inpatient coordinator about the quality and accuracy of a random sample of higher level of care (HLOC) documentation. It included an assessment of whether the HLOCs were completed thoroughly, without documentation errors, and whether they provided adequate clinical justification for patient non-referral to a HLOC when there were positive referral indicators. Further, the sustainable process assessed the utility of clinical interventions in cases of patient non-referral, and the interrater reliability between the judgment of the headquarters' reviewer and VSP's inpatient coordinator.

This sustainable process reviewed 29 HLOC forms, of which VSP's inpatient coordinator determined that 24 or 86 percent were acceptable, while the headquarters' reviewer found that 23

or 83 percent were acceptable.  Of the five HLOC forms that both reviewers determined to be unacceptable, two were due to missing considerations or incorrectly endorsing considerations, two were due to document error, and one was due to an insufficient narrative.

VSP had one inpatient coordinator and a backup staff member.  The inpatient coordinator completed monthly audits of non-referral HLOC documentation and initiated corrective actions, which included revision of the documentation to reflect treatment modifications and/or referrals to inpatient treatment.  However, the monitor's expert review of a random sample of the audited cases found numerous inadequate non-referral clinical rationales.  The inpatient coordinator had a more liberal definition of an adequate clinical rationale and repetitive treatment modifications that resulted in more favorable opinions of VSP's HLOC process.

Observed IDTTs revealed that while the primary clinician and EOP supervisor had access to the sustainability report and indicated reviewing it prior to IDTTs, adequate consideration of subjective and objective indicators for HLOC referral consideration did not occur.  Treatment teams did not routinely address all indicators and neglected to have adequate referral discussions.

While VSP had referred more patients to inpatient care during this review period in comparison to the prior reporting period, the institution continued to demonstrate significant problems in this area.  Record review indicated patients who should have been referred timely but had their referrals delayed due to inadequate clinical justifications, or their referrals did not occur at all.  Clinical non-referral rationales were too frequently inadequate and often repeated. Patients were frequently judged to be "at baseline" without sufficient clinical documentation to support that the patient would not benefit from higher level of care placement.

During the review period, there were 101 instances of patients who were considered but not referred to a higher level of care.

VSP reported four acute care referrals. All four referral packets were timely completed within two working days of identification. However, three of these patients were placed in the MHCB. The remaining referral transferred to acute care, but did not transfer timely, and also did not transfer within 72 hours of a bed assignment. No patients were awaiting acute care transfer at the time of the site visit.

There were 18 referrals to intermediate care, of which three were rescinded, three patients were referred to MHCBs, and 12 patients transferred. All referral packets were timely completed within five working days of identification. Seven of 12 or 58 percent of patients timely transferred to intermediate care within 30 days. Reasons for delay included the psychiatrist being out sick, which delayed an IRU note, waitlist difficulties, and awaiting a COVID-19 test. No patients were awaiting intermediate care transfer during the site visit.

*Vitek* hearings were held for two patients. Neither patient prevailed.

The inpatient coordinator reported working with IRU, a specialist, and regional staff regarding protocols to expedite DSH referrals when clinically indicated. She also indicated that headquarters' handled communication with inpatient programs, but that there was clinician-to-clinician contact between VSP and the inpatient care programs.

VSP referred 123 patients to MHCBs, of whom 103 or 84 percent were admitted and 20 or 16 percent were rescinded. The 103 MHCB referrals were admitted to MHCBs at CMC, CMF, CSP/Corcoran, MCSP, CSATF, and CSP/Solano. All but one of the referrals timely transferred within 24 hours; the patient's untimely referral was due to a medical hold.

No patient transferred to the PSU during the review period.

VSP transferred 46 patients to an EOP hub. Thirty-eight or 83 percent of EOP hub transfers were timely. Reasons for delays included enemy concerns, pending CSR review, and

the endorsed institution requesting cancellation of the transfer due to its inability to accommodate the patient.

During the review period, 85 patients' level of care was reduced from EOP to 3CMS.

VSP reported that all patients requiring an EOP level of care were immediately and timely transferred to the institution's EOP program.

VSP transferred 102 patients to STRH. Eighty-nine or 87 percent timely transferred. Reasons for delays included patients' refusing this placement or pending a bus seat, CSR review, or being scheduled for a follow-up ICC.

No patient transferred to LTRH during the review period.

One patient transferred to an MSF.

Programming:

Restricted Housing:

An observed IDTT for a 3CMS patient occurred in adequate, confidential treatment space. The patient's assigned telepsychiatrist attended; the senior psychologist supervisor, psych tech, and CC I also attended. A supervisor covered for the primary clinician. The patient, who had a prosthetic leg, refused to attend the IDTT; it was reported that he refused to leave his cell because he did not like the extensive body search that was required due to his prosthetic device and also did not like to be handcuffed for movement. However, it was also reported that the patient readily engaged at cell front. The IDTT covered most requirements, but lacked a clear case conceptualization. There was also no discussion of either the patient's functional impairments due to mental health symptoms, or potential barriers to the patient achieving treatment goals.

Review of 20 114-As indicated the offering of showers three times weekly.  Following ICC, patients were offered at least ten weekly hours of yard.  However, some patients were not offered telephone calls.  Interviewed patients did not indicate any issues with receipt of their property.

VSP completed initial ICCs within ten days of patient placement.  A CC II ran seven observed administrative segregation ICC hearings.  The chief deputy warden, several CC IIs, and a captain, lieutenant, sergeant, and custody officers also attended, as did a mental health clinician.  The ICCs began with staff introductions and the reason for patients' placement in administrative segregation.  The clinician then asked preliminary questions about whether the patient had any concerns about mental health treatment, suicidal thoughts, or thoughts of harming themselves or others.  The clinician also addressed patients' treatment history and current diagnoses.  Notably, all attending staff attempted to ensure that each patient understood the various aspects of the hearing.

OHU/CTC:

At the time of the site visit, there was a one hour mental health group offered weekly in the OHU/CTC that was classified as a 3CMS treatment group.  The observed group began late and had four patients, all of whom had been housed in the OHU/CTC for at least 12 months due to chronic health problems.  Several patients who required hearing aids did not wear them, making participation difficult.  The facilitator was engaging, skillfully fostering patient participation, as well as being knowledgeable about the group topic.   Provided materials were consistent with the group topic.

Interviewed group participants reported satisfaction with their mental health treatment. They nonetheless expressed a major concern with nightly custody checks, during which custody

staff shined a flashlight directly into their eyes, awakening and startling them. This was particularly concerning for patients with PTSD symptoms. Accordingly, patients requested that custody direct their flashlights on the ceiling to allow sufficient light to flood the cell to enable the conduct of the checks without awakening them. Patients also stated that they were typically only released from their cells for group or other appointments and received no dayroom due to the lack of identified dayroom space. They also requested recreation equipment for the outdoor yard.

Crisis Intervention Team:

A senior psychologist supervisor oversaw VSP's CIT process. VSP dedicated four full-time psychologists to its CIT and the psychologist assigned to administrative segregation, who was available to participate as a CIT member when needed. The CIT's medical representative could be any nursing staff member who was trained in CIT procedures; however, there were occasional delays in nursing staff members' timely responses as only a limited number were trained in CIT procedures. All VSP lieutenants and sergeants had received the necessary training to be CIT members.

VSP's CIT LOP stated that the CIT operated between 7:00 a.m. and 5:00 p.m. Monday through Thursday, and from 7:00 a.m. to 8:00 p.m. Friday through Sunday. However, at the time of the site visit, the CIT was actually active until 10:00 p.m. daily except for Wednesdays, when it only operated until 5:00 p.m. The LOP adhered to statewide procedures, and clearly delineated VSP's CIT process, which on-site practices confirmed.

During previous site visits, VSP reported that the CIT did not always collectively respond to crises as a team but used a "scout" model where the psychologist would respond and provide

351

information to other team members.  This was no longer the case; all CIT responses were

typically made by the team.

There were 121 CIT activations during the reporting period, of which 68 patients were

placed in the MHCB, and 53 patients were sent back to the yard.  Of these 68 MHCB

placements, 62 involved mental health issues; 52 were primarily determined to be mental health

in nature, nine others were a combination of mental health and custody concerns, and one

combined mental health and medical concerns.  Thirty-four of 53 or 64 percent of patients

returned to the yard had mental health issues that were primarily or in combination with custody

and/or medical concerns.  Reported information did not allow for calculation of response times

to CIT activations.

<u>Alternative Housing</u>:

VSP's LOP for alternative housing was dated January 2023.

The institution used five Facility A-3 cells for alternative housing; staff reported they

were rarely, if ever, full.  The institution also had alternative housing cells in administrative

segregation and the OHU for patients housed in those units which were used until these patients'

transport to the MHCB or the referral's rescission.  All alternative housing cells had confidential

treatment space in the program office.  VSP did not use TTAs to temporarily house alternative

housing patients.

During the site visit, one patient was housed in alternative housing awaiting a cell move

after the MHCB referral was rescinded.  The monitor's expert briefly interviewed the patient at

cell front.  He reported that he was in the cell for less than 24 hours, had an observer throughout

his stay, had been interviewed by mental health staff, and that his concerns were safety related.

He further stated reporting suicidal ideation to get his level of care reduced from EOP to 3CMS

and that this was being addressed.  He reported frustration that his level of care could not be changed immediately.

EOP:

The EOP program was housed on Facility A, with a program capacity of 374 patients, and an average review period census of 334 EOP patients.  VSP did not have EOP overflow units during the review period or at the time of the site visit.

VSP reported having adequate staffing for EOP patients, and met established clinician-to-patient ratios.  The institution nevertheless indicated noncompliance for offering patients ten weekly hours of structured treatment.  During the review period, EOP patients were offered an average of 9.42 weekly hours of structured therapeutic activity, and attended 6.85 weekly hours, for a refusal rate of 27 percent.  VSP offered EOP patients on modified programming an average of 4.25 weekly hours of structured treatment, of which patients attended 2.64 weekly hours, for a 38 percent refusal rate.

EOP patients' voiced concerns about the lock/unlock process, opining that they did not receive adequate access and movement as other patients.  When custody and mental health leadership were queried during the site visit's entrance meeting, they stated being unaware of such concerns.  However, one observed IDTT was delayed because the patient had missed the lock/unlock window.  This resulted in the treatment team waiting approximately 20 minutes for the patient to be released to attend the IDTT because housing unit officers would not release the patient before the next unlock period.  Significantly, treatment teams were aware of the challenges EOP patients faced with the process, which patient interviews further confirmed.

Interviewed staff and patients further reported that prior housing unit officers had worked with EOP patients to facilitate the lock/unlock access concerns, prompting patients to be ready

and reminding them of their appointments.  However, following custody post and bid the

housing unit officers had changed, and the current officers were less flexible and helpful.

    At least one observed IDTT was initially delayed, but the treatment team waited for the

patient to be released at the next unlock so he could attend.  Telepsychiatry was used for all

IDTTs.  All disciplines were represented, but the attending telepsychiatrist was not always the

assigned psychiatrist.  An assigned CC I also had to leave during IDTTs and was replaced by a

CC I who was not the assigned CC I.  However, both the telepsychiatrist and CC Is were

knowledgeable about the patients and had reviewed relevant records prior to IDTTs.  Treatment

teams were generally adequate with comprehensive discussions with patients about their

treatment goals and the interventions to meet them.  Clinicians were encouraged to make sure

that the specific interventions discussed during IDTT were included in treatment plans; follow-

up document review confirmed that it occurred.

    Higher level of care consideration was a particular concern during IDTTs.  While

clinicians or the supervisor addressed aspects of indicators for HLOC referral consideration, the

treatment team did not consistently discuss patients' full presentations but only addressed

specific indicators or concluded that the patient was stable.  The process also revealed the

primary clinician strongly voicing an opinion regarding a referral to the patient and then asking

team members whether they agreed or disagreed.  However, there was no actual clinical

discussion to support the final decision.  This process demonstrated that the primary clinician,

and not the entire treatment team, was the final authority as to whether a patient was referred to a

higher level of care.

    While VSP provided psychological assessments, the waitlist was a minimum of three

months.  When IDTTs' identified patients who would benefit from psychological testing, the

treatment team would discuss the need further due to the waitlist.  Because psychological assessment was a key component of mental health treatment, it was critical for VSP and CDCR to identify necessary staffing and develop a policy for such referrals to minimize waitlists for this critical treatment component.

Nursing-led treatment groups (NLTGs) and ISUDT groups were also available to EOP patients.  Supervisory staff indicated that EOP patients' hours attending NLTG and ISUDT groups were counted toward their ten hours of structured treatment, although this could not be verified.  A group schedule for the month before the site visit only reflected ISUDT groups on Facility D, but none on Facility A, which housed EOP patients.  However, VSP offered NLTGs to Facility A EOP patients.  Otherwise, mental health groups were a combination of recreation therapy and primary clinician groups, with RT groups far outnumbering clinical groups. Observed treatment groups were well-facilitated, addressed pertinent topics, and demonstrated engaged patients.  Treatment groups included Dialectical Behavior Therapy (DBT), depression, trauma, and boundary management.

While EOP patients were regularly scheduled for NLTGs, staff reported poor communication between the programs.  Patients were told during IDTTs that if they were placed in a NLTG, they should report the group time and date to their primary clinician.  However, the EOP supervisor indicated that there could be a one week or longer delay in learning about a patient's assignment to an NLTG.  This would result in the patient's failure to attend mental health groups based on scheduling conflicts until the PC identified the cause and adjusted the patient's schedule.  Further, individuals from the programs did not attend IDTTs and the team's knowledge about patients' progress in these groups was typically quite limited.  Improved communication between programs would allow treatment teams to integrate the NLTG/ISUDT

into EOP treatment plans and utilize them as part of the mandatory minimum ten weekly hours of structured treatment.

Interviewed patients also reported that unit officers needed additional training about working with individuals with serious mental illness, and EOP patients specifically. They reported that some officers were disrespectful. Significantly, the monitor's expert observed a concerning interaction between a unit officer and several patients when she was in the EOP units. The officer was impatient, disrespectful, and unnecessarily escalated patients. Patients also complained about the ADA bathroom and shower in Facility A-1, which observation confirmed.

Twenty patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their EOP stays. One patient was eliminated from the review because he had frequent program changes.

All 11 patients had required initial psychiatry evaluations prior to the initial IDTT and within 14 calendar days of arrival or a level of care change. One hundred percent were conducted in confidential settings. Telepsychiatry was utilized for all initial psychiatry assessments.

Twenty-two of 49 or 45 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. One hundred percent were conducted confidentially. Telepsychiatry conducted 100 percent of reviewed routine psychiatry encounters.

All 11 or 100 percent of initial primary clinician evaluations timely occurred within 14 calendar days of arrival or a level of care change. Ninety-one percent were conducted in confidential settings. The reason for the non-confidential contact was a patient refusal.

Forty-three of 56 or 77 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Ninety-three percent were conducted in confidential settings.

Reasons for non-confidentiality included patient refusals, COVID-19 precautions, and conflicting appointments.

Nine of 11 or 82 percent of initial IDTTs timely occurred within 14 calendar days of arrival or a level of care change. Required staff attended 100 percent of initial IDTTs; patients attended 82 percent. Reasons initial IDTTs were held *in absentia* included custody issues and patient refusals.

Seventeen of 18 or 94 percent of routine IDTTs timely occurred every 90 days. Required staff attended 100 percent of routine IDTTs; patients attended 91 percent. Reasons routine IDTTs were held *in absentia* included patient refusals. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

3CMS:

VSP provided services to 3CMS patients without any significant barriers to care. Some but not all staff had individual offices in the infirmary or in the visiting building. Otherwise, staff had to share space and coordinate individual sessions. Patient no shows or frequent refusals were not reported to be a problem. Further, patients reported regularly seeing their assigned clinicians and having adequate access to them when needed for either routine requests or in times of distress. Most patients were seen every 90 days; based on clinical need, some were seen more frequently.

Collaboration with custody staff was noted to be adequate and there were no reported challenges seeing patients in any yards or specific housing units. During IDTTs, mental health and custody staff openly communicated and contacted housing unit staff when necessary for collateral information.

VSP reported discharging 85 patients from the EOP to 3CMS level of care, of whom 19 or 22 percent were subsequently placed at a higher level of care. Overall, 74 of 85 of 87 percent of patients whose level of care was reduced from EOP to 3CMS were able to function at the lower level of care.

Two telepsychiatrists exclusively provided services for 3CMS patients; two other 3CMS telespsychiatrists had caseloads that also included EOP patients. However, one registry psychiatrist who did not have a caseload was on-site one day weekly to see patients, including those who consistently refused telepsychiatry contacts. The telepresenters were typically medical assistants or CNAs.

The monitor's expert observed eight initial and three routine IDTTs. There were seven IDTTs scheduled for Facility B and four for Facility C.

All IDTTs were held in conference rooms that contained adequate space with computers for all staff. However, the rooms were set up similarly with a long straight table containing computer monitors and teleconferencing equipment in front of the tables. Most patients sat facing the teleconferencing equipment and focused on the telepsychiatrist rather than the treatment team as a whole. Further, the computer monitors along the tables also restricted patients' ability to clearly see team members, as well as team members' ability to see patients. The conference rooms also had a printer for staff's use, and storage space and lockers. During four of 11 observed IDTTs, custody staff entered the room. Regrettably, they did not knock or excuse themselves, while IDTT members also did not acknowledge custody's presence, but continued with confidential patient discussions. Given staff's behavior, this appeared to be a routine occurrence. Unfortunately, it resulted in what could have been sufficiently confidential

space being non-confidential and frequently disrupted.  The issue appeared to have a simple solution of posting a sign on the door that entry was suspended during confidential IDTTs.

All observed IDTTs were attended by patients' assigned telepsychiatrist and primary clinician, and a supervisor.  Although a correctional counselor attended all IDTTs, on Facility C the counselor was covering for the assigned counselor.  Nonetheless, the correctional counselor's contributions were of good quality.  Patients attended all IDTTs.  Overall, the meetings were collaborative and included conversations among all team members, including patients.  Patients were also familiar with their providers and for initial IDTTs, all patients had been assessed by both the psychiatrist and primary clinician prior to the meeting.

The IDTTs consistently discussed patient history, psychotropic medications, patient symptoms, and functional impairments.  When relevant, substance use, safety planning, and pre-release planning were also discussed.  Diagnoses were clearly stated in all but one IDTT.  However, case conceptualizations were inadequate or not presented during four IDTTs.  Nine of 11 IDTTs discussed treatment plans, but treatment goals were not explicitly discussed during two.  When discussed, treatment goals were objective, measurable, and realistic in all but two of the cases, when the goals were vague.  In all cases, identified goals and corresponding interventions were appropriate to patients' identified needs.  Treatment progress or barriers to treatment progress were discussed in all but two IDTTs.  Discussion and justification of the patients' level of care was also clearly discussed in all but one case.  Most patients were retained at the 3CMS level of care, but one patient was referred to EOP and two patients were discharged from the mental health program.

The Facility B IDTTs included the same telepsychiatrist but three different primary clinicians, two of whom attended utilizing teleconferencing equipment.  One PC was working

from home due to a medical condition; the other was at VSP but joined the meeting by video from another office. It was unclear why the clinician did not personally attend the IDTT; supervisors also did not know why the clinician did not attend in person. The quality of IDTT connections was adequate. However, IDTT observation revealed that two primary clinicians' telecommunication skills were noticeably inadequate as they often interrupted and could not clearly hear others.

During Facility B IDTTs, the attending senior psychologist supervisor often prompted primary clinicians to address treatment IPOCs for substance use, release planning, and symptoms being targeted by the psychiatrist through medications. PCs did not raise mental health groups. Rather, either patients raised questions about available groups, or correctional counselors presented group options. During one IDTT, a patient raised concerns about a new symptom, irritability, which led him to isolate himself from others, and he asked for help to address this issue. Unfortunately, the primary clinician responded by asking the patient to submit a request to be seen to discuss this issue. Moreover, the new symptom and the patient's request to address it were not added to the treatment plan, and the primary clinician did not schedule the patient for follow-up. In response to the monitor's expert's inquiry about the rationale for requesting the patient to submit a slip rather than scheduling the patient to be seen, the primary clinician stated that it was preferred to put the responsibility on the patient to request treatment. The monitor's expert assessed this as an unnecessary delay in care.

On a positive note, one of the patients seen during Facility B IDTTs was not functioning well and the IDTT referred him to the EOP level of care. The patient agreed with the decision and was informed that he would be moved to an EOP yard later that day.

The four Facility C IDTTs all included the same telepsychiatrist and two primary clinicians; the chief of mental health also attended.  There was a good teleconferencing connection with unimpeded communication with the psychiatrist.  The psychiatrist worked from home and not from a hub.  The clinicians appeared familiar with patients, who were actively involved in treatment discussions.  Patient histories and treatment targets were covered thoroughly.

VSP identified six group topics offered to 3CMS patients, including trauma, mindful self-compassion, mind over mood, and coping skills, as well as a 26-week group series entitled Prisoners Organizing Workshops for Effective Rehabilitation (POWER) and a group for sex offenders.  Eleven to 13 mental health groups were offered weekly to 3CMS patients.  Group size was between ten and 15 patients; most groups were offered for 12 consecutive weeks.  However, there was an extensive group waitlist.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

All nine patients had timely initial psychiatry evaluations before the initial IDTT.  All nine initial psychiatry evaluations were conducted confidentially.  Telepsychiatry was utilized to conduct all nine reviewed initial psychiatry assessments.

Four of nine or 44 percent of routine psychiatry contacts timely occurred at least every 90 days.  Ninety-two percent were conducted in confidential settings.  Telepsychiatry conducted all reviewed routine psychiatry contacts.

Five of nine or 55 percent of initial primary clinician evaluations were timely completed within ten working days of arrival or a level of care change.  Eighty-nine percent were conducted confidentially.  None utilized telehealth.

Twenty-two of 24 or 92 percent of routine primary clinician contacts timely occurred at least every 90 days. All reviewed routine primary clinician contacts were conducted in confidential settings. None used telehealth.

Three of nine patients who required an initial IDTT had one within 14 working days of arrival or a level of care change. Required staff and patients attended all initial IDTTs.

Five of six or 83 percent of patients had required timely annual IDTTs. Required staff and patients attended 83 percent of annual IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

VSP released 320 patients during the review period. The pre-release coordinator identified patients with upcoming release dates to complete pre-release planning assessments. The pre-release coordinator also worked with primary clinicians, other institutional staff, and probation and parole to attempt to obtain services within VSP to prepare patients for release, as well as community resources for patients upon release, including transportation services. Further, the pre-release coordinator participated in weekly VSP ISUDT pre-release meetings.

VSP conducted weekly pre-release groups led by social workers for EOP patients, which interviewed EOP patients confirmed. There were no regular pre-release groups for 3CMS patients.

Interviewed patients reported having contact with the pre-release coordinator, as well as having pre-release discussions with primary clinicians. They indicated that VSP's pre-release activities were helpful.

Program Access:

a.  Job and Program Assignments

VSP reported that of 1,181 job assignments, 65 were held by EOP patients, representing 22 percent of this population.  3CMS patients held 382 job assignments, representing 38 percent of the 3CMS population, as did 734 or 44 percent of non-MHSDS incarcerated persons.

The 1,639 academic assignments were held by 625 or 20 percent of EOP patients, 389 or 38 percent of 3CMS patients, and 625 or 37 percent of the non-MHSDS population.

As for vocational education assignments, no EOP patients participated in them, but 52 or five percent of 3CMS patients had these assignments, as did 108 or six percent of non-MHSDS incarcerated persons.

The 729 voluntary education assignments were held by eight or three percent of EOP patients, 269 or 26 percent of 3CMS patients, and 452 or 27 percent of non-MHSDS patients.

Only non-MHSDS patients had substance abuse treatment assignments, which were held by 123 or seven percent of non-MHSDS patients.

b.  Milestone Credits

VSP reported that 339 EOP patients were eligible to earn milestone credits, of whom 289 or 85 percent earned them, as did 289 of 887 or 33 percent of 3CMS patients, and 578 of 1,519 or 38 percent of non-MHSDS patients.

c.  Out-Of-Level Housing

VSP reported that 46 EOP and 41 3CMS custody Level II patients were housed in Level I housing.  There were also seven EOP and 48 3CMS custody Level III patients in Level II housing.

d. ADA Reasonable Accommodation and Grievance Procedure

VSP provided an updated reference training manual for ADA accommodation and attendance sheets for both reasonable accommodation and grievance procedure trainings. All 224 required staff completed reasonable accommodation training, but only eight of 17 required staff completed the grievance and appeals process training.

e. Periodic Classification Score Reductions: EOP Patients

VSP provided CDCR Form 840s demonstrating that the institution provided periodic classification score reductions for EOP patients during the reporting period.

f. Unclothed Body Search

Unclothed body searches took place in the EOP hub following intake and every time a patient left his cell, returned from yard or a medical appointment, or was discharged from the unit. One custody officer stood at the door of the shower where the searches occurred to ensure confidentiality.

"C" Status:

At the time of the site visit, three 3CMS patients were on "C" Status.

Case-by-Case Reviews:

VSP reported that one patient was scheduled for a 150-day case-by-case review. A review of case notes for this patient revealed compliance with CDCR policy; this patient was also retained in administrative segregation due to enemy concerns.

VSP provided information on four cases that satisfied the criteria for a 120-day pre-MERD review. All four patients were awaiting resolution of an RVR and/or district attorney referral, were retained in administrative segregation because they were classified as immediate threats to their safety or the safety of others, and were referred to the CSR for review.

<u>Mental Health Referrals</u>:

During the review period, VSP made 1,818 mental health referrals.  There were 443 referrals to psychiatry and 1,375 referrals to primary clinicians, including PREA referrals.  Overall, there were 149 emergent, 108 urgent, and 1,550 routine referrals, and 11 routine PREA referrals to primary clinicians.  VSP consistently responded to all emergent, urgent, and routine referrals in a timely manner.  Specifically, there were no emergent referrals to psychiatry, but there were timely responses to 143 of 149 or 96 percent of emergent referrals to primary clinicians.  For the urgent referrals, there were timely responses to 13 of 14 or 93 percent of psychiatry referrals and to 91 of 94 or 97 percent of primary clinician referrals.  For routine referrals, there were timely responses to 414 of 429 or 97 percent of psychiatry referrals and to 1,086 of 1,121 or 97 percent of primary clinician referrals.  There were also timely responses to all 11 PREA referrals to primary clinicians.

<u>Custody and Mental Health Partnership Plan</u>:

Mental health and custody leadership reported that a positive change since the prior reporting period was increased positive collaboration between mental health and custody staff.

VSP's Custody and Mental Health Partnership Plan LOP was dated January 2023 and was aligned with headquarters' directive.

VSP conducted executive leadership joint rounding during all six months of the review period.  Reviewed minutes indicated use of the required form and the interview of staff and patients.  Staff did not report any patients who they were concerned about during the rounding.  Patients indicated receiving ducats, not having any treatment issues, and further reported knowing how to contact mental health staff when they wanted to be seen.

Regrettably, the warden's weekly executive staff meeting minutes did not address joint rounding.  Reviewed quality management committee meetings for all six months referenced joint rounding, but only one month of QMC meeting minutes reported detailed findings.  However, all six months of mental health program subcommittee meeting minutes comprehensively discussed the rounding.

A mental health clinician conducted an observed Facility A EOP huddle, which was also attended by a captain and multiple custody officers.  All attending staff collaborated and contributed to the huddle.  Addressed topics included whether there were any patients of concern or who had received bad news, and whether any programming or groups had been canceled.

Participants at an observed Facility C weekly 3CMS supervisory meeting included the chief of mental health and a sergeant.  The meeting reviewed the standard list of huddle items, using the appropriate form.  Review of documentation of weekly 3CMS supervisory meetings for several months revealed that the huddles were consistently held but that most were conducted by telephone.

VSP conducted some but not all monthly joint 3CMS supervisory program area tours; these tours were not completed during November and December on Facility A due to the unavailability of supervisory staff.

Reviewed inmate advisory council meeting minutes addressed multiple issues related to patient care including pill lines, ISUDT, COVID-19 requirements, medication appointments, and patient updates.

VSP provided a copy of the 3CMS orientation brochure in English, which was reportedly provided to patients.

Patients filed four misconduct complaints against mental health staff, and 136 complaints against custody, of which 58 were resolved and 82 were under investigation or pending review. Patient allegations included unprofessional staff conduct, intimidation, missing property, sexual misconduct, dishonesty, use of force, retaliation, safety concerns, and ADA non-compliance. VSP also reported 18 other investigations of staff misconduct that were not initiated through the appeals process. No staff were reassigned to another post due to a patient complaint.

VSP reported attendance at the annual partnership off-post training by the warden and chief deputy warden, and by three of four associate wardens, all four captains, 19 of 22 lieutenants, 56 of 58 sergeants, 32 of 33 CC Is/CC IIs/CC IIIs, and 424 of 441 correctional officers. As for mental health staff's training attendance, the training was completed by the chief psychologist, all four supervising psychiatrists, psychologists, and social workers, all 20 psychologists, all six psychiatrists, all 14 social workers, and 209 of 257 or 81 percent of nurses.

Heat Plan:

The heat plan was in effect during two months of the review period, during which VSP reported 17 Stage I heat alerts, but no Stage II or Stage III heat alerts. One patient experienced a heat-related illness, which was appropriately documented in the heat incident log.

The monitor interviewed officers from Facilities A, B, C, and D. Regrettably, several A and D yard officers were not familiar with some of the heat plan's various requirements.

There were operable thermometers in all facilities, heat temperature readings were taken and appropriately logged, and the respective housing units had daily lists of patients who were prescribed heat medications. Officers reported that patients were permitted to remain in the day room during heat alerts.

RVRs:

VSP issued 1,190 RVRs during the review period, including 608 or 51 percent to mental health caseload patients and 582 or 49 percent to non-MHSDS incarcerated persons. There were 13 RVRs issued to MHCB patients, 123 issued to EOP patients, and 472 issued to 3CMS patients.

The monitor reviewed 31 RVRs to assess compliance with CDCR policy. Of these, three RVRs recommended alternative discipline; the senior hearing officer documented all three of these cases and two others in an alternative manner.

Excluding the five cases documented in an alternative manner, custody staff timely referred the mental health assessment to mental health staff in 15 of 26 or 58 percent of cases. Mental health staff timely completed and returned the assessment to custody in 14 of 26 or 54 percent of cases. Patients were confidentially interviewed for the mental health assessment in 21 of 26 or 81 percent of reviewed cases. The SHO documented consideration of the assessment in all reviewed cases. The clinician recommended penalty mitigation in 23 of 26 or 88 percent of cases; the SHO mitigated the penalty in 17 of 23 or 74 percent.

VSP reported that mental health assessment training was attended by the warden, chief deputy warden, all four associate wardens, all four captains, 11 of 14 lieutenants, 16 of 17 sergeants, and all 17 CC Is/CC IIs/CC IIIs, reflecting compliance. For mental health staff, the institution reported that the three psychologists and eight social workers who completed mental health assessments had been trained.

Use of Force:

VSP reported one controlled and 27 immediate use of force incidents involving mental health patients. The controlled use of force involved a patient extraction for MHCB placement.

All controlled use of force policy requirements were met, including a mental health clinician being present, video surveillance footage of the incident, an appropriate cool down period, multiple attempts by custody and mental health staff to gain the patient's compliance with vocal orders, and nursing review to confirm that the patient was not a high risk for exposure to chemical agents. The incident commander and clinical staff approved the use of chemical agents. The appropriate opportunities for decontamination were given to the patient following the incident.

Nine reviewed immediate uses of force reflected that custody staff used reasonable force in all but one incident. The unreasonable use of force involved an MHSDS patient who was handcuffed and, while being placed in a holding cell, kicked his leg back, striking the officer. Although the patient was already in the cell and still handcuffed, the correctional officer, to reportedly prevent further injury to himself, pulled the patient out of the holding cell, and subdued the patient face down on the ground. The patient suffered injuries to his front teeth, mouth, and trachea. The level of force that the custody officer used on the patient was deemed unreasonable as there was an alternative method of closing the holding cell door to prevent further injury to the officer rather than pulling the patient out of the cell and forcing him to the ground while handcuffed.

As for mandatory use of force training, VSP reported 95 percent compliance for custody staff. The warden, chief deputy warden, and all captains completed the training, as did three of four correctional administrators, 20 of 23 lieutenants, 56 of 61 sergeants, and 453 of 470 correctional officers. As for mental health staff's training attendance, the chief of mental health, and all supervisors, psychiatrists, and social workers completed the training, as did 19 of 20 psychologists, and two nurses. Neither medical assistants nor CNAs completed the training.

Lockdowns/Modified Programs:

From May 2 through October 28, 2022, COVID-19 outbreaks led to VSP's placement on modified programing, with programing interruptions on all facilities. During this period, priority health care services were only offered on an emergent or urgent basis, with patients being escorted to treatment areas. Medication distribution and responses to patients' requests to be seen occurred in the clinics. Patients also had modified educational opportunities and activity groups, with programs being administered at cell front. Only critical workers performed employment assignments. Patients' yard access was also limited for yards that experienced direct outbreaks. Visitation privileges rotated between in-person and video visitation based on housing units' outbreak status.

Access to Care:

Review of VSP's monthly Health Care Access Quality reports from September 2022 through February 2023 indicated the issuance of 90,090 total mental health ducats and add-on appointments, of which 57,549 or 64 percent were completed and 32,541 or 36 percent were not completed. Of the non-completed appointments, two percent were not completed due to custody factors, 39 percent were not completed due to non-custody factors, and 59 percent were not completed due to patient refusals.

*Coleman* Postings:

Several housing units in Facilities A and D lacked *Coleman* postings. However, *Coleman* postings were visible in both English and Spanish throughout Facilities B and C.

**APPENDIX B-7**
**CALIFORNIA STATE PRISON/SACRAMENTO (CSP/Sac)**
**(May 15, 2023 – May 19, 2023)**

Census:

On May 15, 2023, the total population at CSP/Sac was 1,472, which was a 24 percent decrease since the preceding site visit. The MHSDS caseload population of 1,035 comprised 70 percent of the total population and represented a zero percent decrease from the prior review period.

The MHCB unit housed 20 patients.

There were 114 administrative segregation EOP patients; 63 were in the EOP hub and 51 were housed in overflow. The mainline EOP population was 546.

The PSU housed 127 patients, which was a five percent increase from the prior review period.

There were 160 mainline 3CMS patients. The STRH population of 89 included 68 3CMS class members and 21 mainline incarcerated persons.

Staffing:

The chief psychiatrist, senior psychiatrist, and both chief psychologist positions were filled. Eight of 8.5 senior psychologist positions were filled, leaving a six percent vacancy rate. Of the 7.5 senior psychologist specialist positions, six were filled, for a 20 percent vacancy rate.

All 15.5 staff psychiatrist positions were filled. CSP/Sac also had two registry medical assistants who were assigned to help psychiatry staff.

CSP/Sac did not have any allocated telepsychiatrist positions. On-call coverage was provided by headquarters' telepsychiatry seven days a week from 6:00 p.m. to 7:00 a.m. On-site staff psychiatry was on call for back-up and any urgent needs on site.

Thirty-two of 59 staff psychologist positions were filled, for a 46 percent vacancy rate. Contract staff filled an additional 5.25 positions, leaving a functional vacancy rate of 37 percent.

The supervising social worker position was filled. Fourteen of 17 social worker positions were filled, reflecting an 18 percent vacancy rate. Contractors filled an additional 2.25 positions, reducing the functional vacancy rate to four percent.

All four senior psych tech positions were filled. Sixty-nine of 102 psych tech positions were also filled; six staff were on extended leaves and contract staff filled one position, for a functional vacancy rate of 37 percent.

For recreation therapists, 27 of 28 positions were filled, leaving a four percent vacancy rate.

There were 19 supervising registered nurse positions, of which 15 were filled, indicating a 21 percent vacancy rate; with two staff on extended leaves, the functional vacancy rate was 32 percent. Sixty of 77 registered nurse positions were filled, for a 22 percent vacancy rate; contract staff filled an additional seven positions leaving a 13 percent functional vacancy rate. All 17 LVN positions were filled. Of the 12 CNA positions, ten were filled; one staff member was on an extended leave, leaving a functional vacancy rate of 25 percent.

For MHSDS clerical staff, the vacancy rate was 25 percent, with 18 of 24 positions filled. The Office Services II position was vacant. The AGPA, HPS II, and CHCA II positions were all filled. One of two HPS I positions was filled.

According to the information provided by the institution, there were nine unlicensed psychologists, two unlicensed psychology interns, and two unlicensed social workers. All unlicensed staff worked in the EOP program.

For custody staff, the warden and chief deputy warden positions were filled, as were all six associate warden positions. All captain, lieutenant, and CC I positions were also filled. Seventy of 89.2 sergeant positions were filled, leaving a functional vacancy rate of 18 percent; for CC IIs the functional vacancy rate was six percent. Of 782.4 correctional officer positions, 615 were filled, for a functional vacancy rate of 15 percent.

Telepsychiatry:

CSP/Sac did not have any established telepsychiatry positions.

Staffing Caseloads:

Caseloads for all psychiatrists were well within established ratios. Primary clinicians all had caseloads exceeding established staffing plan ratios. According to the data provided by mental health leadership, the primary clinician caseload ratio for the 3CMS program was 1:148, for STRH 1:30, for mainline EOP A yard 1:46, for mainline EOP B yard 1:44, for EOP hub 1:15, for PSU A 1:21, and for PSU B 1:16.

CSP/Sac reported that with regard to staffing they prioritized the MHCB, PSU, and EOP hub programs, which often included pulling providers from other programs to cover behind absences. The frequent need to redirect mental health staff to these programs had the most significant impact on treatment access for the mainline EOP and 3CMS populations.

CSP/Sac also reported generally assigning licensed clinicians to the MHCB, EOP hub, and PSU, and unlicensed clinicians to the mainline EOP program. Mental health leadership explained that more experienced clinicians were needed in restricted housing units due to the inherent risks associated with the environment, as well as to assist with de-escalation and planned use of force events.

<u>On-Call Coverage</u>:

CSP/Sac reported that crisis calls were covered primarily by their crisis triage clinicians during regular work hours.  After-hours calls were handled by their crisis triage third watch staff. All licensed full-time staff with a designation of psychologist, social worker, or specialist were eligible for on-call assignment.

<u>Staff Recruitment</u>:

CSP/Sac's recruitment efforts for psychologists and social workers included participation in virtual hiring panels; however, the number of candidates to interview was limited.  Mental health leadership reported that in the last year, there were eight candidates for psychologist positions, resulting in five hires.  There were four offers made during the reporting period; two declined after acceptance as a result of the long wait time during the hiring process.  For social workers, three candidates were given offers during the reporting period; all accepted and had started work.  CSP/Sac participated in recruitment fairs in an attempt to fill office technician vacancies.

<u>Quality Management</u>:

The CEO chaired the local governing body.  Minutes provided for five local governing body meetings held during the review period indicated that a quorum was consistently achieved and that discussions included relevant topics, including updates on policies and hospital privileging.

The quality management committee met timely with a quorum during the review period. Minutes for the quality management committee referenced health care access, subcommittee reports, and program changes.  Health care compliance was reviewed during each meeting, and minutes included action items assigned to the various disciplines.

A review of the mental health subcommittee meeting minutes also suggested that meetings were timely and that a quorum was achieved. The minutes for these meetings were sufficiently detailed and covered important topics such as staffing, compliance issues, population trends, program updates, referrals, suicide prevention efforts, mitigation strategies, and audit results. Action items were developed and assigned to appropriate disciplines.

While the mental health department attempted to correct a problem with late group start times, a concern raised during the preceding monitoring round, their intervention proved ineffective "with no notable gain." CSP/Sac was currently attempting to better understand and address their "astronomical rise in emergent evaluations" primarily during first and third watch hours, a matter that came to their attention in February 2023 and reportedly coincided with the activation of body worn cameras. Upon further inquiry, mental health staff explained that, prior to the implementation of body worn cameras, they suspected custody staff may not have been referring patients when indicated during these watches.

CSP/Sac continued to routinely disseminate quality management information to staff during supervisory meetings, program specific line staff meetings (e.g., mainline EOP), and all mental health staff meetings.

The monitor's expert's review of quality management information and discussions with mental health leadership suggested CSP/Sac was very much aware of their deficiencies, as well as their limitations in addressing those deficiencies without sufficient staffing. CSP/Sac also provided multiple documents describing various mitigation strategies developed over time, including in response to modified programming and staff attrition. Additionally, while CSP/Sac maintained EOP hub patients in mainline EOP housing units, they routinely communicated requested assistance from headquarters, redirected staff from mainline EOP and 3CMS

programs, and held weekly meetings with the administrative segregation associate warden, CC II, and chief of mental health.

While CSP/Sac appropriately redirected mental health staff, including supervisors, to attend to patients in higher risk programs, leadership acknowledged that they currently did not have sufficient resources to effectively manage the size and complexity of the mental health populations within their institution. Of note, none of the mitigation strategies involved psychiatry staff.

Contact compliance reviews revealed ongoing problems with cell-front contacts completed by psychiatry staff. During the site visit, the monitor's expert learned that psychiatry did not sufficiently investigate the issue to determine whether it was provider- or patient-driven, did not communicate with other disciplines toward developing effective interventions, and did not consider reminding treatment teams to collaboratively address out-of-cell participation.

A peer review audit for the MHCB was conducted in June 2023. Findings were reported to the mental health quality management subcommittee. No significant concerns were identified.

Regarding outpatient peer review for primary clinicians, CSP/Sac assigned one civil service employee as peer review chair. The staff member was elected last year and would serve as the peer review chair for a two-year term. The peer review chair was currently retraining clinicians on the new peer review process, and CSP/Sac expected the program would be reinstated in June 2023.

Medication Management:

CSP/Sac provided MAPIP results for September 1, 2022 through February 28, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that CSP/Sac was compliant for six months with blood pressure, height, weight, and thyroid function tests. Regarding EKGs, the facility was compliant for two of five required months. CSP/Sac was noncompliant for all six months with the following measures: medication consents, glucose, Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), lipids, and the Abnormal Involuntary Movement Scale (AIMS).

CSP/Sac was a clozapine initiation and maintenance facility during the review period. As of May 12, 2023, CSP/Sac reported 23 patients who were prescribed clozapine. Regarding the close monitoring required for this medication, CSP/Sac was compliant for six months with monitoring blood pressure, CBC with platelets, height, weight, and thyroid function tests. The institution was compliant for four months with monitoring the AIMS examination. As for medication consents, there was compliance for four of five required months. CSP/Sac achieved compliance for three months for glucose and CMP, and for two months for EKGs. The monitoring of lipids was compliant for one of five required months.

For monitoring antidepressants, CSP/Sac was compliant for six months for thyroid function tests, and for monitoring blood pressure for patients taking venlafaxine. For EKGs when required, CSP/Sac was compliant for the one required month. CSP/Sac was noncompliant for all six months with obtaining medication consents.

For patients prescribed carbamazepine, the facility was noncompliant for the one required month. For CBC, CMP, and medication blood levels, no data was required.

For patients prescribed Depakote, CSP/Sac was compliant for two months with obtaining medication consents, and for one month with monitoring CBC with platelets. CSP/Sac was

noncompliant for all six months for monitoring CMP and therapeutic medication level monitoring.

For lamotrigine, there was compliance with obtaining medication consents for two of four required months.

Regarding lithium, CSP/Sac indicated compliance for five months with monitoring kidney function tests, for three months with monitoring EKGs, and for two months with measuring medication blood levels and thyroid laboratory tests. For obtaining medication consents, there was compliance for only one month.

For medication management metrics reported by mental health headquarters, CSP/Sac was compliant for five months with continuity of medications upon parole/transfer to the community. There was compliance for three months with continuity of medications upon inter-institutional transfer at receiving and release (R&R), chronic care medications historical administration, and outpatient provider new medication orders. As for continuity of medications with intra-institutional transfer to ASU/SHU/PSU, CSP/Sac was compliant for two months.

There was compliance for one month with continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and continuity of medications for MHCB transfers. Regrettably, CSP/Sac was noncompliant for all six months for continuity of medications from discharge/transfer from a community hospital and/or DSH, observation of medication preparation AM and PM, and observation of medication preparation HS.

CSP/Sac psychiatrists could prescribe medications for a maximum of 180 days; bridge prescriptions were for 30 days.

As of March 31, 2023, CSP/Sac reported that six patients were prescribed KOP medications. Four of these were SSRI medications prescribed to 3CMS patients, thus, they conformed to policy. In a deviation from policy, two EOP patients received SSRIs as KOP. Most concerningly, both of these patients had admissions to DSH or PIP in 2022. In reviewing these patients' medical records, the mediations were made KOP due to reported patient non-adherence.

The facility conducted 150 medication line wait time audits during the review period. Individual patient wait times were under 30 minutes, and the total duration of pill lines were under two hours. CSP/Sac noted intermittent delays in starting medication lines, due to alarm responses, late mealtimes, and custody coverage. Concerningly, 69 percent of morning medication lines went past 8:00 a.m. These lines frequently finished after 8:30 a.m., when mental health programming began.

CSP/Sac reported that all medication lines were indoors; there were thus no challenges with having a place protected from the elements for patients to wait while in medication line. For restricted housing patients, nursing dispensed medications at cell front.

In April 2023, CSP/Sac reported 2,952 non-formulary psychiatric prescriptions. However, the number of patients was not reported; some patients were prescribed multiple non-formulary medications. The average rate of psychiatric non-formulary medications was 19 percent.

CSP/Sac reported polypharmacy data in a way that made clear interpretation difficult. However, the vast majority of patients had polypharmacy reviews completed in a timely manner.

A total of 830 patients were prescribed 2,630 psychiatric medications at HS. CSP/Sac was generally timely with the administration of HS medications.

As of May 12, 2023, CSP/Sac reported 177 patients who received PC 2602 involuntary medications. During the review period, the institution filed 102 petitions. This included 96 renewals, three initial emergent, and three initial non-emergent petitions. CSP/Sac had two cases denied. One case expired due to "poor tracking." This case was subsequently resubmitted. The institution reported one patient who was noncompliant with the PC 2602 involuntary medication process.

The medication court administrator reviewed the daily movement sheet for all movement into and out of the institution. The medication court administrator denied any barriers with the submission of documents, CDCR legal review, or scheduling hearings with administrative law judges.

<u>Transfers</u>:

CSP/Sac had two assigned inpatient care coordinators who completed the local higher level of care audits for a portion of the review period. These inpatient care coordinators held videoconference meetings with a headquarters specialist to discuss their findings and corrective actions. However, the two clinicians were needed for direct patient care, and they were unable to focus on corrective actions after conducting their audits as a result.

CSP/Sac maintained compliance with timely submission of higher level of care referrals. Compliance for "acceptable" higher level of care non-referral documentation was not achieved, and the monitor's expert noted that there was poor interrater reliability between the local inpatient coordinators and headquarters' reviewers. For example, the fourth quarter 2022 audit by headquarters found 44 percent of higher level of care non-referral documentation was "acceptable," while the local reviewers reported 69 percent compliance for the same documentation.

In March 2023, a modified version of the minor sustainable process audit was conducted for the first quarter 2023.  The review focused on auditing documentation without on-site observation.  The headquarters' reviewer and local inpatient coordinator both found that documentation quality had worsened, and problems with interrater reliability continued.  While the local reviewers found 52 percent of HLOC non-referral documentation acceptable, the headquarters' reviewer reported only 39 percent.

During the site visit, the chief of mental health reported that a new inpatient coordinator had been trained on the HLOC process.  The institution expected that clinicians assigned to inpatient care coordination would continue to be redirected to attend to direct patient care.

According to CSP/Sac documentation, there were 1,451 instances of non-referral to inpatient care during the review period.

There were 72 acute care referrals during the reporting period; 69 patients were transferred to acute care beds.  Three acute care referrals were rejected and subsequently rescinded to EOP.  Staff reported that while bed assignments were timely, staffing issues made transferring within 72 hours a problem.  Examples included no staff to transport, or the lack of a treatment team at the receiving institution.  Of the 69 acute care transfers, 17 or 25 percent were timely.  At the time of the site visit, two patients were waiting to be transferred to acute care; both were within transfer timeframes.

Of the 59 intermediate care referrals, 49 patients transferred into intermediate care beds. All intermediate care referrals were completed within Program Guide timeframes.  There were three rejections; the reasons included dorm setting contraindicated, patient stabilized before placement, and inpatient setting not clinically indicated.  All three patients were rescinded to the EOP level of care.  Seven patients transferred to acute care.  Of the 49 intermediate care

transfers, three or six percent were timely. Reasons for untimely intermediate care transfers were also related to staffing and included lack of bed space due to unit closures, no available treatment team at the receiving institution, and not enough custody staff to transport the patient. During the site visit, four patients were waiting to be transferred to intermediate care; all were within transfer timelines.

There were 23 *Vitek* hearings; no patients prevailed.

CSP/Sac referred 284 patients to MHCBs during the review period; 77 referrals were rescinded. There were 244 admissions to CSP/Sac's MHCB, including 207 patients from CSP/Sac and 37 from outside institutions.

A total of 201 patients transferred to the PSU, of which 178 or 89 percent timely transferred.

Of the 28 patients who transferred to STRH, 25 or 89 percent transferred timely. CSP/Sac was unable to provide data on transfers to LTRH during the reporting period.

Programming:

MHSDS Patients in Administrative Segregation:

CSP/Sac housed 415 EOP patients in administrative segregation during the review period. Stays averaged 46 days with a range from one to 240 days.

CSP/Sac's EOP hub was located on Facility A-5, with a bed capacity of 64 patients. CSP/Sac maintained an administrative segregation EOP population overage during the review period, ranging from 34 to 62 patients. Throughout the review period and during the site visit, administrative segregation EOP patients were housed in overflow units on Facilities A-1, A-2, and B-7, which housed PSU patients.

The administrative segregation EOP population exceeded the capacity for both the EOP hub unit and all three PSU housing units from November 2022 through March 2023, resulting in the use of a mainline EOP housing unit (A-8) for the population overage and custody staff's use of paper logs for custody checks in the absence of the Guard One system.  At the time of the site visit, there were 114 administrative segregation EOP patients; 63 were appropriately housed in the designated EOP hub and 51 were housed in the three PSU housing units.

Despite maintaining administrative segregation EOP patients in overflow, CSP/Sac reported that all new arrivals to administrative segregation were appropriately placed in intake cells as required by statewide policy.

While CSP/Sac reported challenges with producing specific subpopulation data for the ASU EOP population overage during the review period, leadership reported that the overage included patients requiring an EOP hub, releases or "kick-outs" from administrative segregation and PSU, NDS patients, and recent returns from inpatient facilities awaiting mainline EOP bed availability.  The institution reported that NDS data was also complicated by the fact that they included both ASU/PSU "kickouts" and patients in segregation for safety reasons in their NDS data.

According to leadership, despite CSP/Sac maintaining an administrative segregation EOP population overage in the PSU consistently since 2019, CDCR had not adjusted their staffing allocations to account for the difference in established caseload ratios.  According to the chief of mental health, the established primary clinician caseload ratio was 1:9 for the EOP hub and 1:14 for the PSU.

Leadership reported that CSP/Sac attempted to offer patients in overflow units Program Guide required care.  However, with a 47 percent vacancy rate among primary clinicians and a

consistent administrative segregation EOP population overage, mental health staff struggled to meet certification and Program Guide requirements each month. CSP/Sac also temporarily modified Program Guide requirements due to staffing limitations, including by no longer requiring primary clinician contacts for administrative segregation EOP high refusers in overflow cells. Additionally, the mixing of maximum custody administrative segregation EOP and non-maximum custody mainline EOP patients in Facility A-8 negatively impacted treatment and programming for both populations, with the most significant impact occurring from November 2022 through January 2023.

CSP/Sac provided their monthly certification chart for April 2022 through January 2023. The chart revealed that the EOP hub and PSU certified only twice at the local level during this timeframe. For the review period, CSP/Sac's EOP hub remained closed to intake from September through November 2022. However, CSP/Sac reported that it continued to receive an influx of new administrative segregation EOP patients from other institutions while closed to intake, maintaining administrative segregation EOP patients in overflow units, and struggling to provide minimally adequate care with limited staffing.

In November 2022, CSP/Sac's EOP hub reopened to intake. Unfortunately, the reopening occurred without resolving the significant administrative segregation EOP population overage and without considering the impact of the institution's critically low staffing levels on mental health treatment offerings in their mainline EOP, STRH, and mainline 3CMS programs. CSP/Sac closed to intake again after failing to offer minimally adequate care to certify the EOP hub and PSU in December 2022 and January 2023.

While the administrative segregation EOP hub population overage was at 62 in February 2023, CSP/Sac's EOP hub certified that month and reopened to intake. Leadership confirmed

that EOP hub certification was achieved by redirecting staff from other programs, resulting in worsening compliance in the mainline EOP and 3CMS and STRH programs.

CSP/Sac reported noncompliance with offered structured treatment activity hours for EOP hub patients in October and December 2022, and January 2023.  While CSP/Sac attributed treatment hour noncompliance in October 2022 to patients on pre-transfer quarantine status, noncompliance for December 2022 (73 percent) and January 2023 (55 percent) was attributed to critically low staffing and the increased EOP hub population overage.  In January 2023, CSP/Sac also received 400 incarcerated individuals from the county jail due to flooding and experienced a power outage at the end of that month.

The monitor's expert observed nine initial IDTTs.  The IDTTs were appropriately staffed in accordance with Program Guide requirements.  Four were held *in absentia* due to patient refusals.  IDTTs were generally adequate with regard to treatment goals and interventions. Discussions among treatment team members were also collaborative and all disciplines participated, although CC I participation was mostly limited to presenting the patient's case factors at the beginning of the IDTT.  Two of the three primary clinicians appeared to know their patients very well, while the third primary clinician appeared to be performing the initial assessments during the IDTT.  For each patient, an adequate clinical history was provided, however, no psychosocial history or theoretical case conceptualization was provided for any patients.  Treatment goals and interventions were individualized to the degree possible given facility-wide staffing difficulties.

The monitor's expert observed a group in the EOP hub.  The group was clinically based and focused on DBT techniques and had two patients participating.  The facilitator placed particular emphasis on DBT skills training, values, and mindfulness.  Overall, the group was

clinically robust, and patients appeared to benefit from the skills taught and interventions provided by the recreation therapist.  The RT went above and beyond to provide clinically appropriate and relevant interventions to patients in her group.

Review of 40 weeks of Form 114-As indicated all patients received timely ICCs, were offered at least ten hours of yard time weekly, received linen changes biweekly, and were generally offered showers three times a week.  Notably, there were a few instances where yard time and showers were not offered due to staffing shortages.  Additionally, the documentation showed that phone calls were offered to seven of 14 or 50 percent of reviewed cases.

Interviewed patients reported no issues with receiving property.

The monitor observed ten ICCs.  A CC I conducted the initial introduction by introducing all staff in attendance to each patient.  Attendees included two additional CC Is, the chief deputy warden, a staff assistant, one captain, one sergeant, and a mental health clinician.  The clinician addressed each patient's treatment history and current progress, focusing on whether the patient was programming regularly and complying with their medications.  The clinician also asked whether the patient needed anything or had any questions.  Following the patient's mental health treatment synopsis, the CC I covered the patient's disciplinary history and explained why the committee decided on the final recommendation.  All committee members made sure that the patient understood the full ICC process.

Twenty patients were randomly selected to have their health care records reviewed to assess their administrative segregation EOP hub stays.  Three patients were screened out as their stay was too short to measure compliance.

Fifteen patients required initial psychiatry evaluations.  Of those, 14, or 93 percent had a timely initial psychiatry evaluation; four, or 27 percent were conducted in a confidential setting.

Reasons for non-confidentiality included patient refusals.  Telepsychiatry was not utilized for initial psychiatry assessments.

Fourteen patients required routine psychiatry contacts.  There were 30 expected timeframes, 21, or 70 percent were timely and occurred at least every 30 calendar days.  Of the 31 reviewed routine contacts, two, or six percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals, mental health staffing issues, and unplanned contacts.  Telepsychiatry was not utilized for any of the reviewed routine psychiatry contacts.

Fifteen patients required initial primary clinician evaluations; 100 percent were completed before the initial IDTT.  Six, or 40 percent of initial primary clinician assessments were conducted in a confidential setting.  Reasons for non-confidentiality included patient refusals and COVID-19.

Sixteen patients required routine primary clinician contacts.  There were 30 expected timeframes, 14, or 47 percent were timely and occurred at least every seven calendar days.  Eleven, or 24 percent, of the 46 reviewed routine contacts were conducted in a confidential setting.  Reasons for non-confidentiality included patient refusals, mental health staffing issues, and COVID-19.

Fifteen patients required initial IDTTs; 100 percent occurred within 14 calendar days of arrival.  Required staff attended 100 percent of initial IDTTs; patients attended 53 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals.

Eighty-one percent of routine IDTTs were timely.  Required staff attended 91 percent of routine IDTTs; patients attended 36 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals and COVID-19.  Of note, the Program Guide required attendance of the

assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

PSU:

CSP/Sac operated the only PSU for incarcerated males within CDCR, PSU A, which was composed of A-1 and A-2, and PSU B, which consisted of B-7.  PSU A housed patients in the DDP program, as well as those with mobility issues.  PSU A contained 128 cells, with an average census of 105 during the review period.  PSU B consisted of 64 cells, with an average census of 55.  CSP/Sac housed 445 EOP patients in the PSU during the review period, with an average length of stay of 106 days, ranging from one to 1,287 days.  Similar to the last reporting period, PSU B continued to house EOP hub overflow patients.

Multiple patients reported concerns about the cleanliness of the PSU, which the monitor's expert confirmed.  Patients also reported trouble with getting clean laundry in both PSU units.

Due to inadequate staffing, CSP/Sac implemented a program for PSU A entitled a "Two PC Caseload Model."  The plan included individual contacts with assigned primary clinicians every other week.  On alternating weeks, another primary clinician would run a check-in group.  The facility acknowledged that this plan deviated substantially from Program Guide requirements, which required the same clinician provide both the individual and group contacts.  Unfortunately, at the time of the site visit, the staffing had worsened even further, to the point of every other week clinical contacts.

The monitor's expert observed ten PSU IDTTs, five each from PSU A and PSU B.  The IDTT spaces were of adequate size, light, and temperature.  In PSU A, the setting was challenging due to noise from construction and a loud ventilation system.  All required members were present, and actively used their computers.

The preceding monitoring report noted excessive emphasis on custodial, rather than clinical, factors; this practice continued in PSU A.  Encouragingly, the PSU B IDTTs showed more of an appropriate emphasis on clinical factors.

The IDTTs displayed multiple serious limitations, including lack of clear case conceptualization, lack of measurable treatment goals, and unclear interventions to address high rates of treatment refusal.  The supervisor frequently had to prompt for measurable goals, safety plans, and higher level of care indicators.  Quite concerningly, one patient in the suicide risk management program (SRMP) did not have a copy of his safety plan.

Psychiatry input was relegated to medication management.  The assessing psychiatrist was frequently not the one present during IDTT.  In one case, the psychiatrist in IDTT, who had not met the patient prior, changed the diagnosis given by the assessing psychiatrist.

IDTTs also revealed how inadequate staffing resulted in patient impacts.  One patient reported that his privileges had not been advanced, despite him meriting it.  This was due to an office technician being out, and not processing the email from the treatment team.

PSU groups occurred in designated treatment areas.  Patients reported barriers including changes to group topics and schedule, consolidation of groups including combining multiple groups with low attendance into one group, and limited utility to groups which frequently showed movies or played music.  The patients would receive a ducat from a group to go to the treatment area but would not know which group it was.  Thus, many patients reported they refused the group.  These group limitations were directly related to inadequate mental health staffing.

The monitor's expert observed a PSU A group.  The two patients in attendance were not on the original patient roster.  The listed topic was "coping," led by a recreation therapist.

Instead, an RN facilitated a group on the topic of diabetes, largely reading from a sheet. The monitor's expert was informed it was not an NLTG. The RN reported that the group was started when two patients arrived and that patients often joined later. The staggered patient arrival times were a direct result of limited custodial staffing available to get patients to the treatment center. Thus, the group did not start at the same time, with the same participants. This was concerning, due to lack of continuity of the group facilitator, as well as group cohesion.

The monitor's expert attempted to observe a group in PSU B; however, the group did not occur. The reported reason was that all patients refused.

The monitor's expert had extreme concern for patients who had completed their SHU terms remaining in the PSU, due to lack of bed space. These patients had to undergo the same movement restrictions in the PSU, such as being stripped searched prior to attending treatment, wearing mechanical restraints such as waist chains, and requiring a two-on-one escort. As one example, a patient remained for six weeks in the PSU solely awaiting bed placement. The list of patients was exceedingly difficult to obtain, which indicated a lack of an organized, collaborative process between custody and mental health to place these patients in appropriate housing. This resulted in both local and systemic clinical impacts. The estimated count provided by the institution was approximately 20 patients.

Locally, patients became more frustrated and per staff report, engaging in maladaptive behaviors, due to being inappropriately housed in restricted housing. Systemically, this was a large barrier in transferring appropriate patients from both CSP/Sac and other institutions into the PSU, thus creating backlogs in already overwhelmed EOP hubs. As of May 18, 2023, 19 patients were awaiting CSP/Sac PSU placement. Two of these were in the CTC and MHCB,

thus leaving 17 patients waiting in administrative segregation EOPs across the state for beds in the sole male PSU in the state.

The PSU utilized a four-step behavioral incentive program. However, little of the plan was individualized based on patient needs. For example, patients advanced in steps based on set timeframes. This plan lacked the individualization required for effective behavioral management plans. The PSU did not have ready access to a Positive Behavioral Support Plan team.

The monitor was unable to observe ICCs due to scheduling discrepancies.

Interviewed patients reported no issues with receiving property.

Review of 36 weeks of Form 114-As indicated all patients were offered at least ten hours of yard time weekly and three showers per week. Of the nine patients reviewed, five were required to have initial ICCs; four of five were timely. Form 114-As reflected noncompliance with phone calls, showing that just two patients were offered one phone call.

Compliance for structured therapeutic activity hours offered to PSU patients during the review period ranged from 59 to 90 percent.

The monitor randomly selected and reviewed the health care records of 22 PSU patients to assess compliance with Program Guide timeframes during their stays. Of that number, four patients were screened out, as the patients had not remained in the PSU long enough to sufficiently access their mental health treatment.

Eighteen PSU patients required initial psychiatry evaluations. Of those, nine patients, or 50 percent had a timely initial psychiatry evaluation before the initial IDTT. For seven patients, or 39 percent, an initial psychiatry evaluation could not be located. Of the 11 reviewed initial psychiatry assessments, one, or nine percent were conducted in a confidential setting. Reasons

for non-confidentiality included patient refusals or, more frequently, no explanation was provided.

Eighteen PSU patients required routine psychiatry contacts.  There were 32 expected timeframes, 26, or 81 percent were timely and occurred at least every 30 calendar days.  Of the 32 reviewed routine contacts, 11, or 34 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals or custody escorts not being available.

Eighteen PSU patients required initial primary clinician evaluations; 16, or 89 percent were completed before the initial IDTT.  Fourteen, or 78 percent of initial primary clinician assessments were conducted in a confidential setting.  No reasons were given as to why initial primary clinician evaluations were non-confidential.

Eighteen PSU patients required routine primary clinician contacts.  There were 36 expected timeframes, 23, or 64 percent were timely and occurred at least every seven calendar days.  Eleven, or 31 percent, of the 36 reviewed routine primary clinician contacts were conducted in a confidential setting.  Reasons for non-confidentiality included patient refusals, no available custody escorts, or the reason was unknown.

Eighteen PSU patients required initial IDTTs; 17, or 94 percent occurred within 14 calendar days of arrival to the PSU.  Of the 18 initial IDTTs reviewed, required staff were present at ten or 56 percent; patients attended 14 or 78 percent.  Reasons initial IDTTs were held *in absentia* were not reported.

All 15 patients who required routine IDTTs received them.  Of the 26 expected routine IDTTs, 19, or 73 percent were timely.  Required staff attended 17, or 65 percent of routine IDTTs.  However, it could not always be determined if the patient's primary clinician was present.  Patients attended eight or 31 percent of routine IDTTs.  Reasons routine IDTTs were

held *in absentia* were not reported.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Notably, none of five interviewed PSU patients reported being offered confidential appointments with their psychiatrist.  CSP/Sac reported that from September 1, 2022 through February 28, 2023, only 83 of 856 contacts, or approximately ten percent, were confidential. The remaining 90 percent of cases were non-confidential.

The monitor's expert's concern for this stunningly high rate of non-confidential psychiatry contacts was only amplified given the facility had an active QIP as a result of a patient's death by suicide.  The QIP mandated that CSP/Sac "implement strategies to decrease the percentage of cell front visitations."

However, patients reported that they were frequently offered confidential primary clinician contacts, and then seen at cell front if they declined.  Patients generally reported satisfaction with their primary clinicians but stated that lack of continuity resulted in them being less likely to open up to them.

STRH:

STRH housed 237 patients during the reporting period.  The average length of stay was 78.8 days with a range of less than one day to 690 days; 33 patients had stays over 150 days. There were two primary clinicians and one recreation therapist assigned to the unit.  While the STRH had two assigned primary clinicians during the review period, mental health leadership learned during the week of the site visit that one of these providers was going out on an extended leave.  At the time of the site visit, STRH housed 68 3CMS patients and 21 GP individuals.

Due to critically low staffing, STRH primary clinicians met with patients biweekly

instead of weekly as required.  Clinicians were also unable to facilitate treatment groups or cover behind recreation therapists when they were absent or pulled to cover groups in other areas.

The monitor's expert observed IDTTs in STRH.  While the IDTTs started 40 minutes later than scheduled, all required members were present with computers for accessing patient information.  The primary clinician was familiar with each patient presented, even the patients that were assigned to another provider.  Missing from the IDTTs was relevant background information, including mental health history, reason for STRH placement, length of stay in STRH, and collaborative decision-making regarding diagnosis, treatment planning, and level of care.

During IDTT, the custody officer and primary clinician worked collaboratively, but the psychiatrist waited for their turn to speak about medication and did not interact with the primary clinician.  The primary clinician discussed measurable treatment goals, symptoms and diagnosis, and progress and obstacles related to treatment outcomes.  While the IDTT required more structure and did not cover some essential information, the staff attempted to resolve patients more immediate stressors in the room.

While CSP/Sac's STRH group schedule suggested there was a sufficient number of weekly groups scheduled for the current population, staff reported that the one available group room held only six or seven patients, and that groups were frequently cancelled as the assigned recreation therapists were routinely pulled to cover groups in other areas (e.g., EOP hub).

Interviewed STRH patients reported that while they looked forward to the recreation therapy groups, the groups were often cancelled, not offered as scheduled, and, at times, blocked by custody officers who were not informed that they were expected to attend.

A review of structured therapeutic activities data revealed that STRH patients were not

394

offered the required 90 minutes of weekly structured treatment during the review period. Compliance for structured therapeutic activities in the STRH was at its lowest, at or near 70 percent, from December 2022 through February 2023.

The monitor's expert attempted to observe two scheduled groups; however, there were no groups occurring upon arrival to the unit.

At the start of the site visit, leadership informed the monitoring team that they had modified Program Guide requirements in STRH by requiring biweekly individual encounters instead of weekly. However, as there were only two providers, one of whom was reportedly often absent and planning to go on extended medical leave, patients were often seen at cell front for brief check-ins during biweekly contacts. A few interviewed STRH patients confirmed they had not been invited out of their cell for a confidential individual contact in three to four weeks.

Patients confirmed that psych techs conducted daily rounds in the unit. All new arrivals to the STRH were offered a loaner radio and activity book. Tablets, self-help packets, and educational materials (basic adult education and college) were also available.

The monitor reviewed two weeks of 114-A data for ten STRH patients. Weekly linen exchanges, three offered showers, and 18.5 hours of offered yard time were all recorded for 18 of 20 or 90 percent of total weeks reviewed. Patients were frequently offered four showers per week and up to 21 hours of yard time per week.

Two observed STRH one-on-one treatment spaces had active video cameras mounted to the ceiling. The institution indicated that audio functionality was disabled but the monitor was not able to verify.

The monitor observed ten ICCs. All were attended by required staff. Staff demonstrated a collaborative relationship and extensive knowledge of each patient. Patient history, pending

RVRs, transfers, and less-restrictive housing options were thoroughly discussed with each patient. Staff also confirmed whether each patient understood the outcome of their ICC.

The monitor randomly selected and reviewed the health care records of 20 STRH patients to assess compliance with Program Guide timeframes during their stays. One patient was screened out due to a one-day stay.

Twelve STRH patients required initial psychiatry evaluations. Of those, seven, or 58 percent had a timely initial psychiatry evaluation before the initial IDTT; one, or ten percent was conducted in a confidential setting. Reasons for non-confidentiality included patient refusals, modified program, or no available treatment space. Two patients did not receive an initial psychiatry assessment. Telepsychiatry was not utilized for any of the reviewed initial psychiatry evaluations.

Five STRH patients required routine psychiatry contacts. There were eight expected timeframes, five, or 63 percent were timely. Of the six reviewed routine psychiatry contacts, one, or 17 percent was conducted in a confidential setting. Reasons for non-confidentiality included patient refusals or no reason was given. Telepsychiatry was not utilized for any of the reviewed routine psychiatry contacts.

Twelve STRH patients required initial primary clinician evaluations; eight, or 67 percent were timely. Four patients did not receive an initial primary clinician assessment. One, or 13 percent of reviewed initial primary clinician assessments, were conducted in a confidential setting. Reasons for non-confidentiality included staffing issues, unplanned contacts, or patient refusals.

Eighteen STRH patients required routine primary clinician contacts. There were 64 expected timeframes, 31, or 48 percent were timely and occurred at least every seven calendar

days.  Five, or seven percent, of the 70 reviewed routine contacts were conducted in a confidential setting.  The biggest reason for non-confidentiality was the installation of cameras inside the treatment rooms.  Other reasons for non-confidentiality included staffing issues, patient refusals, and custody modified program.

Fourteen STRH patients required initial IDTTs; nine, or 64 percent occurred within 14 working days of arrival to the STRH; all required staff attended.  Two patients did not have an initial IDTT.  Patients attended eight, or 67 percent of reviewed initial IDTTs.

Five or 100 percent of patients who required routine IDTTs every 90 calendar days received them timely.  Required staff attended 100 percent of routine IDTTs; patients attended 22 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

MHCB:

The MHCB was located in two separate buildings on Facility A.  The facility had 13 beds in CTC I, and 11 in CTC II, for a total of 24 MHCB beds.  In addition, CTC I also had a seclusion and restraint room, while CTC II had a restraint room.  Since the time of the preceding monitoring round, CSP/Sac closed the unlicensed MHCB overflow beds on Facility B.

On May 17, 2023, CTC I housed 12 patients, and CTC II housed ten patients.  CTC I had two cells redlined, due to a patient engaging in fecal smearing the week prior.  Despite intensive cleaning, repairs, and painting, the smell of feces remained on the unit.  The facility had multiple plant issues including a crack in the floor (now filled in) and intermittent air conditioner failures. Mental health and custody staff reported that the building was frequently hot in the summer, and

cold in the winter.  Interviewed officers knew the heat plan, and had ready access to ice from the nearby kitchen.

The MHCB did not assign patients to primary clinicians, which negatively impacted care continuity for this high-risk patient population.

The MHCB staff also covered medical patients who required mental health services.

CSP/Sac continued to struggle with inadequate treatment space for confidential sessions. This translated into many sessions being non-confidential and conducted at cell front.

The monitor's expert observed four IDTTs, three in CTC I and one in CTC II.  There were two initial and two routine IDTTs.  Overall, the MHCB IDTTs were well facilitated and clinically meaningful.  The teams routinely reviewed appropriateness for level of care, with the team referring one patient to intermediate inpatient care.  IDTTs systematically discussed diagnoses, medications, reasons for admission, progress since the prior IDTT (for routine IDTTs), safety planning, and privileges.  Deficiencies included lack of case conceptualization, frequent lack of computers by treatment team members, and inconsistently reviewing measurable treatment goals.  In cases in which treatment team members lacked computers, they had printed/written information which allowed meaningful participation.  All IDTTs were clinically adequate.

In CTC II, clinicians reported that there was no assigned clinician for the patients, and instead they were all involved in treatment.  This was reportedly driven by staffing and coverage issues.  The monitor's expert was concerned that this would lead to a lack of continuity of care, difficulty with building rapport, and opened up the possibility of missing important details.

Maximum custody patients sat cuffed outside the TTM, with a correctional officer present.

Interviewed patients reported daily clinical contacts, with either a primary clinician or a psychiatrist, finding these generally clinically meaningful. They reported that many encounters were non-confidential, reportedly due to the lack of space and staffing challenges.

One individual management yard was available for all patients in CTC I. The yard consisted of a metal bench, thermostat, sink and toilet, as well as a table outside of the yard for use during recreation therapeutic activities. During the visit to the crisis bed in CTC I, a patient was observed to be out for yard, with music playing. The recreation therapist was often responsible for getting patients out for yard activities. Additionally, an interview room was utilized as a dayroom, particularly to make phone calls, and it was equipped with a TTM for maximum custody patients.

There was no yard available for patients in the crisis beds in CTC II and no yard was offered to patients in CTC II during the week. The staff in CTC II reported that when custody staffing allowed, patients were offered the opportunity to go to the yard at CTC I, generally on the weekends. This required patients at the MHCB level of care to exit a locked unit and to cross a Level IV mainline EOP yard, including in inclement weather, in order to receive outdoor time with the RT.

CTC II had one room available for all activities, including committee activities. A TTM and phone were also available in this room for patient calls. Patients who utilized this area to make phone calls were unrestrained, but in locked TTMs while making the calls. The patients' 114-As often reflected these 15-minute phone calls as yard time. There were also two interview rooms available for non-contact confidential communications with patients in CTC II. One RT was assigned to the patients in CTC II.

Form 114-A was reviewed for 19 patients in CTC I and CTC II.  Overall findings indicated that patients accepted the showers offered 94 percent of the time.  Patients were offered an average of 1.8 weekly hours of out-of-cell time in the yard or dayroom in CTC I and II.  On average patients were offered one weekly phone call while in the crisis beds.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

All 20 MHCB patients required initial psychiatry evaluations.  Of those, 19 or 95 percent had a timely initial psychiatry evaluation.  Eight or 40 percent were conducted in a confidential setting.  Reasons for non-confidential meetings included patient refusals, modified programs, or concerning behavior.  Telepsychiatry was not utilized for initial psychiatry assessments.

There were 20 MHCB patients who required two weekly routine psychiatry contacts.  There were 56 expected contacts, of which 55 or 98 percent were timely.  Of the 56 reviewed routine contacts, 17, or 30 percent were conducted confidentially.  The reasons for non-confidentiality included patient refusals and modified programming.

Although all 20 MHCB patients required initial primary clinician evaluations, no initial primary clinician evaluations were located during the review.

Twenty MHCB patients required routine primary clinician contacts.  There were 134 expected contacts, of which 125, or 93 percent, were timely.  Of the 125 reviewed contacts, 21, or 17 percent were conducted in a confidential setting.  The reason for non-confidential meetings was primarily due to patient refusals.  Telehealth did not conduct any routine primary clinician contacts.

All 20 MHCB patients also required initial IDTTs; 100 percent occurred within 72 hours of arrival and 19, or 95 percent had required staff in attendance.  Patients attended 75 percent of

initial IDTTs.  Reasons initial IDTTs were held *in absentia* were either unknown or due to patient refusals.

For the 20 patients assessed, an additional 22 routine IDTTs were reviewed, and all were timely.  Required staff attended all routine IDTTs; patients attended 18 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.

Seclusion and Restraint:

CSP/Sac reported that no patients required seclusion or restraint during the review period.

Crisis Intervention Team:

CSP/Sac reported that only one clinician was trained for the CIT at the time of the site visit.  The institution's LOP was consistent with the statewide CIT policy.  There were 61 CIT referrals during the review period, of which five or three percent resulted in patients' MHCB referral; 52 referrals returned to the same housing unit, and four moved to different housing units.

Alternative Housing:

CSP/Sac's alternative housing LOP dated July 2022 was current and in alignment with headquarters' policy.  The institution designated 15 cells for alternative housing, including ten cells in B-7 and five cells in B-1, which changed from month-to-month.  Alternative housing cells in B-7 were observed to be clean.  Not all cells had mattresses, but mattresses were reported to be in storage and readily available for use.  No alternative housing cleaning logs were maintained by the institution.

CSP/Sac reported that it did not have mental health staff specifically assigned to alternative housing.  However, during regular business hours, requests for crisis evaluations were

made by contacting the crisis triage office, and after hours or on holidays and weekends, a crisis triage clinician was available for coverage.

The institution reported an average of 17 alternative housing placements monthly during the reporting period. Stays averaged 12.2 hours with a range of 1.6 to 40.1 hours. CSP/Sac reported three placements during the reporting period that exceeded 24 hours, with an average stay of 37.4 hours.

EOP:

CSP/Sac's EOP patients were housed in two programs, EOP A and EOP B. EOP A had a census of approximately 400 patients while EOP B had a census of approximately 173 patients.

The monitor's expert observed four IDTTs on EOP A yard. The IDTTs were staffed per Program Guide requirements and all required disciplines were in attendance. The treatment team demonstrated a collaborative and integrative process when discussing patients. Clinical histories were provided, however, each IDTT was lacking psychosocial history and theoretical case conceptualizations. Treatment goals and interventions were appropriate and individualized to the extent possible considering the current staffing crisis. Patients who had initial IDTTs were referred to groups. Custody participation was adequate and appropriate.

The monitor's expert observed five EOP IDTTs on B yard. These IDTTs were also very well conducted and collaborative. The EOPB supervisor ran the IDTTs very well and provided appropriate guidance when required. The majority of goals and interventions in the patients' treatment plans were individualized, measurable, and appropriate; however, IDTTs continued to lack case conceptualizations and four of five IDTTs lacked a psychosocial history. CC I participation was appropriate.

CSP/Sac temporarily modified Program Guide requirements for mainline EOP patients in response to critically low staffing among primary clinicians. Clinicians assigned to the mainline EOP were expected to meet biweekly instead of weekly for individual contacts, and they were not able to offer group treatment. While groups were scheduled with recreation therapists and nursing, there was no coverage available when staff were often redirected to other programs or when there were absences. As such, CSP/Sac remained noncompliant with Program Guide requirements for structured therapeutic activity hours and weekly individual primary clinician contacts throughout the review period. Compliance for structured therapeutic activity hours offered to EOP patients ranged from 15 to 64 percent.

The monitor's expert observed a RT coping skills group on EOPA. The group was originally scheduled as an EOPA primary clinician group; however, the primary clinician was out on leave and the group was changed. Patients and staff reported this happened often. The group was appropriately focused on the topic of coping skills. The RT worked within her scope of expertise and discussed various coping skills, including tablets, going to yard, and calls with family. It was clear that the group patients were struggling with the lack of services offered and required significantly more clinical support. EOPA patients were also offered two daily NLTGs with plans to add another NLTG on third watch. EOP-B patients were not offered NLTG groups.

The monitor's expert interviewed a group of six EOP patients from Facility A after their recreation therapy group. The patients reported timely IDTTs every 90 days and felt the treatment team was supportive and genuine in their efforts to provide appropriate treatment. EOPA patients reported biweekly 1:1 primary clinician contacts, elaborating that the biweekly schedule was "awful" and did not provide enough support. Patients reported 1:1 sessions with

their primary clinician were not confidential despite being held in the non-contact visitor booths

on the unit.  The booths featured closed doors and were supposed to be confidential for sound;

however, patients reported the booths were not soundproof and they could overhear what was

happening in the next booth or just outside the door in the hallway.

Patients reported psychiatry contacts were timely and occurred once monthly, but that the

contacts occurred at cell front and were very brief.  Patients prescribed heat sensitive

medications reported they were brought inside and provided ice and water as soon as the outside

temperature reached 90 degrees.  Several patients reported participating in work or education

programming.  When asked how to improve the EOP program at CSP/Sac, patients reported

more staff was needed to provide more frequent and robust clinical contacts, including 1:1

sessions and clinician-led core clinical groups.

The monitor's expert interviewed staff of various disciplines on EOP Ayard.  Staff

described the program on Ayard as "too big" at a census of approximately 400 patients.  They

elaborated that excessively high caseload ratios and limited treatment spaces had a significant

impact on service delivery.  Staff reported groups were often cancelled or combined

inappropriately when staff were absent.

The monitor's expert also interviewed EOP staff on Byard.  B yard staff reported staffing

issues and vacancies were having the most impact on service delivery.  They described the

workload and caseloads as "overwhelming."  Psychiatrists on EOP B yard described a

debilitating workload, often performing between six and ten initial assessments per week.  Staff

also reported difficulties with officers and custody notifying patients or letting patients out of

their cells or housing units to attend groups in the treatment center.

The monitor randomly selected and reviewed the healthcare records of 20 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. While no patients were screened out of the review, there were minimal contacts for four patients as a result of transfers and/or level of care changes.

Nine EOP patients required initial psychiatry evaluations. Of those, four or 44 percent were timely; three or 33 percent were conducted in a confidential setting. Non-confidential assessments were generally held at cell front due to patients refusing to attend their scheduled evaluation. None utilized telepsychiatry.

Nineteen EOP patients required routine psychiatry contacts. There were 74 expected timeframes; 45 or 61 percent were timely and occurred at least every 30 calendar days. Thirteen of 85 or 15 percent of reviewed routine psychiatry contacts were conducted in confidential settings. Nearly all non-confidential routine psychiatry contacts were conducted at cell front due to patient refusals, staffing shortages, or COVID-19 restrictions.

Nine EOP patients required initial primary clinician evaluations; all were timely and two, or 22 percent, were conducted in confidential settings. Assessments were conducted at cell front due to patient refusals and staffing shortages.

All 20 reviewed EOP patients required routine primary clinician contacts. There were 101 expected timeframes; 60 or 59 percent were timely, occurring at least every seven calendar days. Twenty of 105, or 19 percent, of routine primary clinician contacts were conducted in confidential settings. Reasons for non-confidentiality included staffing shortages, COVID-19 restrictions, and contacts being conducted at cell front due to patient refusals.

Nine EOP patients required initial IDTTs; eight or 89 percent were timely. Of the nine initial IDTTs, required staff attended eight or 89 percent of the time; patients attended four or 44 percent.

Eighteen patients required routine IDTTs. There were 24 expected timeframes, of which 18 or 75 percent were timely. Thirty-five routine IDTTs for 19 patients occurred during the review period. Required staff attended 32 of 35 or 91 percent of routine IDTTs; patients attended 13 or 37 percent. Reasons routine IDTTs were held *in absentia* included patient refusals.

3CMS:

At the time of the site visit, CSP/Sac's 3CMS patients were housed on Facilities A, B, and C. There was one primary clinician and two psychiatrists on-site who were responsible for the entire 3CMS caseload. CSP/Sac had recently begun accepting Level II 3CMS patients on Facility B, which staff reported only added to their already overwhelming and unmanageable caseloads.

The monitor's expert observed two 3CMS IDTTs on Facility A and three 3CMS IDTTs on Facility B. On Facility A, one routine IDTT was held with the patient present and one initial IDTT was held *in absentia* due to patient refusal after the patient reported he did not feel well. The IDTT space was a very small office with chairs for the patient, primary clinician, and CC I. The psychiatrist intended to participate in the IDTT via speakerphone, which was both surprising and troubling. The psychiatrist only walked over from a different yard within the facility to be physically present for the IDTT when the location was changed to a larger space to accommodate the observers.

The routine IDTT process was generally adequate with relatively minor deficiencies. Relevant psychosocial history was provided but there was no case conceptualization. The patient's diagnoses and medications were identified, and his symptoms appeared to support his diagnoses. The patient's goals were generally appropriate to his treatment needs but lacked measurability and specificity. The *in absentia* IDTT patient's level of care was very recently reduced from EOP to 3CMS and this was his initial IDTT; this IDTT was completed in under five minutes and lacked any specific information or details about the patient. There was no history or case conceptualization provided, no psychiatry input, and it appeared there was no initial primary clinician assessment completed as the PC did not have any firsthand knowledge of the patient and was not able to include any meaningful goals or interventions in the treatment plan.

The monitor's expert observed three 3CMS IDTTs on Facility B. The IDTTs were generally adequate. They were appropriately staffed, and each patient attended. A brief psychosocial history was provided for each patient and psychiatric medications were appropriately identified and discussed. Goals and interventions were individualized, and measurable, and functional impairments were discussed for each patient. The team was collaborative in their approach and CC I participation was adequate.

3CMS patients were not offered clinical mental health or recreation therapy groups at CSP/Sac during the review period or at the time of the site visit. Per documents reviewed and staff report, 3CMS patients were only offered pre-release groups when appropriate. These groups ran twice weekly and there was reportedly no waitlist.

The monitor's expert interviewed a group of nine 3CMS patients after a group in the treatment center. Patients described the sole 3CMS primary clinician as "excellent" and said she

was completely overwhelmed and overworked.  Most patients in the group reported they received timely routine 90-day contacts as per Program Guide requirements despite the clinician's caseload.  Patients reported they were always seen in a confidential setting. Timeliness of IDTTs was inconsistent, with some patients reporting timely IDTTs and others reporting delayed IDTTs.  All interviewed patients had jobs within the facility, and most were enrolled in education programs.  All patients requested the addition of some form of core group or clinical group, as they were unable to access mental health or NLTG groups.

It was reported that the sole 3CMS primary clinician responsible for Facilities A, B, and C was "literally drowning" with her current caseload and was experiencing symptoms of severe and extreme burnout.  This clinician had to complete several initial assessments and IDTTs weekly and it was anticipated that the volume would increase as more Level II 3CMS patients arrived at the facility.  It was reported that 1:1 session confidentiality was sometimes a problem on Facility A due to space limitations, resulting in the use of creative strategies such as meeting with patients on the yard away from other patients and staff.  Further, although Facilities B and C usually had available offices, those offices were not completely soundproof.

Twenty 3CMS patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Six patients required initial psychiatry evaluations.  Three or 50 percent occurred prior to the initial IDTT.  Two initial psychiatry evaluations never occurred.  The four initial assessments that occurred were conducted confidentially.  Telepsychiatry did not conduct any initial psychiatry assessments.

Five of 13 or 38 percent of routine psychiatry contacts timely occurred at least every 90 days.  Seven of 17 or 41 percent were conducted in confidential settings.  Reasons appointments

were not confidential were due to modified programming, medical restrictions, and cell-front contacts. Six patients did not receive a total of nine routine psychiatry contacts. No routine contacts were conducted by telepsychiatry.

Four patients required initial primary clinician evaluations. Two of four were timely completed within ten days of patient arrival or a level of care change. The remaining two initial primary clinician evaluations never occurred. The two initial primary clinician evaluations that occurred were conducted confidentially.

Nine of 15 or 60 percent of routine primary clinician contacts occurred at least every 90 days. Fourteen of 24 or 58 percent were conducted confidentially. Reasons appointments were not confidential were patient refusals, modified programming, and cell-front contacts. Seven patients did not receive the required primary clinician routine contact.

Eight patients required initial IDTTs. Four of eight or 50 percent had one within 14 working days of arrival or a level of care change. One initial IDTT never occurred.

One of two patients had a required timely routine IDTT. Required staff attended all reviewed initial and routine IDTTs.

Other Issues:

Pre-Release Planning:

CSP/Sac's LOP for its pre-release program was dated November 2022 and was consistent with headquarters' policy.

The institution had been able to maintain the pre-release coordinator position despite clinical staffing challenges. However, the pre-release coordinator was temporarily redirected to a caseload in September 2022, but was quickly returned to the position. The pre-release coordinator completed all pre-release planning assessments (PRPAs) for all patients scheduled

for release, as well as requests of information (ROIs) for probation releases, completed any required referrals on behalf of patients, facilitated all 3CMS pre-release groups, and oversaw the pre-release groups for EOP patients that were facilitated by recreation therapists. Pre-release groups were run weekly utilizing headquarters' curriculum. The pre-release coordinator also attended headquarters' monthly pre-release meeting and the biweekly ISUDT pre-release meeting. Additionally, the pre-release coordinator created and presented a PowerPoint training designed to educate CSP/Sac's clinical staff on the pre-release process and the pre-release coordinator's responsibilities, and continued to provide this training to newly hired staff.

The institution reported that of 48 patients scheduled for release during the review period, 34 were released to parole and 14 were released to probation. PRPAs were completed for 47, or 98 percent of patients. The ROI process was completed for 12 of 14 patients who required it. CSP/Sac reported obtaining California identification cards for ten of 48 patients, while nine patients were referred by the C&PR to the STOP program for housing.

TCMP staff and the pre-release coordinator worked collaboratively. During the review period, TCMP staff reported 48 patients were scheduled for release; 31 were EOP and 17 were 3CMS patients. They were able to successfully screen 46 of 48 patients, as one patient was out to court and one patient refused services. The total number of benefit applications completed on behalf of the groups screened was 65. Medi-Cal applications were submitted on behalf of 46 patients, or 96 percent of eligible patients. Applications for SSI benefits were submitted on behalf of 19 of 22 or 86 percent of potentially eligible patients. None of the patients that TCMP caseworkers met with during the reporting period were eligible for VA benefits.

Program Access:

    a.   Job and Program Assignments

On April 3, 2023, CSP/Sac's 423 job assignments were held by 142 or 18 percent of EOP patients, 61 or 28 percent of 3CMS patients, and 220 or 44 percent of the non-MHSDS population.

The 357 academic assignments were held by 122 or 15 percent of EOP patients, 55 or 25 percent of 3CMS patients, and 180 or 36 percent of non-MHSDS patients.

For vocational education, 44 EOP patients or six percent of the EOP population attended, as did eight patients or four percent of the 3CMS population, and 37 or seven percent of non-MHSDS incarcerated persons.

As for the 107 assignments to substance abuse treatment, 53 or seven percent were held by EOP patients, 15 or seven percent of 3CMS patients held such assignments, as did 39 or eight percent of the non-MHSDS population.

    b.   Milestone Credits

CSP/Sac did not provide milestone credit information in the format requested. As a result, the number of EOP and 3CMS patients, and non-MHSDS incarcerated persons eligible for milestone credits and who earned them, was not discernable from the information provided.

    c.   Out-of-Level Housing

CSP/Sac reported that on April 12, 2023 there were no patients in a housing level higher than classified.

    d.   ADA Reasonable Accommodation and Grievance Procedure

The ADA coordinator reported the reasonable accommodation and grievance procedures were current with the last update occurring in 2017.

e.  Unclothed Body Search

CSP/Sac provided DOM Section 52050.16.5 which addressed unclothed body searches in restricted housing.

Interviewed custody officers in the EOP hub and PSU units explained that unclothed body searches were conducted prior to patients exiting the unit.  Officers reported that unclothed body searches were normally completed in the cell or an alternative holding cell and that privacy linen carts were also used when appropriate.  Additionally, metal detectors were routinely used to aid each unclothed body search to ensure safety for patients and staff.

Unclothed body searches in the STRH were generally performed in the patient's cell; for double cells, the cellmate would be instructed to face the wall while the search was performed. Searches were performed on the yard if the cell could not be used.  Privacy screens were utilized on the yard and the monitor verified that an operable privacy screen was available.  Custody staff reported that body-worn cameras were turned off during all searches and that female officers exclusively performed transgender patient searches.  OP 054 specified the unclothed body search policies and procedures; a copy of the same was provided for review.

"C" Status:

Documentation provided by the institution indicated there were no patients on "C" Status during the reporting period or at the time of the site visit.  However, regional custody staff provided a list of 22 patients on "C" Status during the site visit.  RVR chronos were reviewed for eight; all were EOP patients.  "C" Status was imposed for the maximum 180 days for all patients reviewed.  All patients were assigned to "C" Status upon adjudication of an RVR.  Seven of the eight RVRs were adjudicated for indecent exposure, while the remaining RVR was for refusal to cooperate with a housing change.  While on "C" Status, no family visits were allowed, phone

calls were for emergency reasons only, patients were allowed only one-fourth of the canteen draw, yard access was limited with no access to other recreational or entertainment activities, and patients could receive only special purchase packages.  Per regional custody staff, mental health programming continued to be offered to "C" Status patients.

Case-by-Case Reviews:

CSP/Sac reported that 123 incarcerated persons met the criteria for 150-day case-by-case reviews during the reporting period; 93 were housed in administrative segregation, 29 were housed in the PSU, and one was unspecified as they were serving a SHU term.  Thirty-two individuals had RVRs pending DA referral at the time of their case review.  Provided documentation indicated that each patient's disciplinary history and mental health factors, including treatment progression, whether their mental health contributed to their behavior, and whether continued segregation would cause mental health decompensation, were considered in their case reviews.  Incarcerated persons that transferred (or were pending transfer) to other institutions were not specified.

The institution was unable to provide data on patients that received 120-day pre-MERD reviews during the review period.

Mental Health Referrals:

CSP/Sac reported 3,603 total mental health referrals, including 1,404 emergent, 229 urgent, and 1,970 routine referrals.  There were 765 referrals to psychiatry and 2,838 primary clinician referrals.  For emergent psychiatry referrals, there was only one referral over the six months which was not timely, while 96 percent of emergent primary clinician referrals were timely.  Regarding urgent psychiatry referrals, 65 percent were timely and 82 percent of urgent

PC referrals were timely.  For routine referrals, there were timely responses to 84 percent of psychiatry referrals and to 91 percent of routine PC referrals.

<u>Custody and Mental Health Partnership Plan</u>:

CSP/Sac's custody and mental health partnership plan LOP complied with statewide policy but was dated February 2022 and therefore outdated.

Executive leadership joint rounding forms were produced for each month of the reporting period except December; rounded facilities included EOP B yard, STRH, PSU B, 3CMS B3, EOP hub, CTC I, and 3CMS A8.  The rounding forms indicated that required staff attended and that staff and patients were interviewed for each month that the rounding occurred.

Warden's executive staff meeting minutes were produced for each month of the review period; these minutes thoroughly discussed the rounding tours from September, October, November, and January, though the February minutes only discussed the January rounding and not the February rounding.  The institution indicated that the quality management committee did not discuss the rounding.  Mental health subcommittee minutes for each month of the review period mentioned that the rounding occurred but did not provide further details.

Huddle sheets for second and third watch from ASU, PSU, EOP yards, STRH, and CTC I were produced for each month of the review period.  Review indicated that generally, mental health and custody staff attended; nursing and recreation therapists occasionally attended, although infrequently.  An observed third watch EOP huddle similarly reflected attendance by mental health and custody stuff.  Patient issues were discussed, and no pending patient arrivals or departures were noted.

Mental health leadership reported that CSP/Sac did not conduct weekly 3CMS supervisory meetings during the reporting period or at the time of the site visit and that any related issues were handled via email.

With respect to monthly joint supervisory 3CMS program area tours, documentation indicated that C-7 was toured in January 2023 and A-8 in February 2023. Required staff attended both tours and no significant concerns were noted. Produced documentation demonstrated that the following areas were last toured as follows: STRH in January 2022; A-8, B-2, B-3, B-4, C-1, and C-2 in February 2022; C-3 and C-4 in March 2022; C-5 and C-6 in April 2022; and C-7 and C-8 in June 2022.

No introduction to EOP groups were offered during the review period.

CSP/Sac distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were produced for September, October, December, and February for Facility A; September and October for Facility B; and each month of the reporting period for Facility C. Discussed topics included patient frustration with lack of programming stemming from staffing shortages, lack of access to mental health clinicians, and issues with visitation and the visitor center and tablets.

With respect to staff misconduct complaints, 665 were reportedly filed against custody staff; 374 were resolved, 276 were still "in progress," ten were created in error, three were labeled "subsequent source," one was labeled a duplicate, and the status of one was unlabeled. Twenty-five complaints were filed against mental health and medical staff; 24 were closed and one was awaiting approval. There were 13 investigations for misconduct toward a patient not

initiated through the appeal process.  No mental health staff were moved to another post because of a staff misconduct complaint.

The institution provided names of staff who attended quarterly round table training but did not track staff who were not trained; accordingly, compliance could not be assessed.

CSP/Sac reported that 224 of 508 or 44 percent of mental health staff and 703 of 725 or 97 percent of custody staff attended the annual partnership off-post training.  Untrained mental health staff included – but was not limited to – 20 of 41 or 49 percent of psychologists, seven of 19 or 37 percent of psychiatrists, ten of 20 or 50 percent of social workers, and 33 of 106 or 31 percent of nurses.

Heat Plan:

CSP/Sac provided the previous year's LOP, which expired in April 2023; the headquarters' heat plan memorandum with updates from the prior year was dated April 29, 2022. Updates were required for the 2023 heat season.  The institution provided documentation indicating no staff attended heat plan training during the reporting period; follow-up requests were unsuccessful in obtaining the training information.

During September 2022, 12 Stage I, seven Stage II, and two Stage III heat alerts were recorded.  No Stage I, II, or II heat alerts were recorded in October 2022, however, CTC 1 heat logs for October 3 – 16, 2022 were reported as missing.  There were no reports of patients with heat illnesses during the reporting period.

All CSP/Sac housing units were reported to be air-conditioned and custody officers also reported that on occasion fans were brought into some housing units.

Interviewed custody officers on Byard in the PSU, B-5 EOP, B-8 EOP, on Ayard in A-1 PSU, A-2 PSU, A-4, A-5, A-6 and A-7 were generally aware of the stages of the heat plan and

the requirements at each stage. All visited housing units had the daily list of patients on heat medications. Heat logs were being kept in the control center with temperatures recorded every three hours, with a few missed recordings in A-2 PSU.

Custody staff indicated that alternative activities were made available to patients returning from the yard due to a heat alert, excluding those patients in restricted housing units. Some alternative activities identified as available were dayroom, use of tablets or other entertainment devices, and phone calls. There was no indication that alternative activities provided during a heat alert were documented in the daily activity report (DAR). Shading and misters were available for use by patients on individual yards in restricted housing units. Water fountains were observed for patient use in most housing units and water coolers were also present in many housing units for use during medication distribution.

RVRs:

There were 2,240 RVRs for CSP/Sac patients including patients who were not physically at CSP/Sac when the violation occurred or when the hearing occurred. A total of 1,632 RVRs or 73 percent were issued to MHSDS patients. Nine were issued to acute care patients, 30 RVRs were issued to intermediate care patients, 81 RVRs were issued to MHCB patients, 1,194 or 53 percent were issued to EOP patients, 318 RVRs or 14 percent were issued to 3CMS patients, and 608 RVRs or 27 percent were issued to non-MHSDS incarcerated persons.

A total of 36 RVRs were reviewed for compliance with CDCR policy and procedure. Of the 36 RVRs reviewed, one mental health assessment recommended alternative discipline and 20 assessments indicated that mental health likely contributed to the behavior that led to the RVR. The senior housing officer (SHO) did not document the recommended case in an alternative manner on the rationale that there was enough evidence to find the patient guilty by the

preponderance of the evidence. Custody staff referred the RVR to mental health staff within policy timelines in 17 of 36 cases or 47 percent of the time. Mental health staff completed the mental health assessment and returned the RVR to custody staff timely in 24 of 36 cases or 67 percent of the time. Patients were confidentially interviewed for the mental health assessment in three of 36, or eight percent of reviewed cases.

The SHO documented consideration of the mental health assessment information in every case. The mental health assessment recommended penalty mitigation in 35 or 97 percent of cases. Of those 35, the senior housing officer mitigated 14 cases or 40 percent. However, in nine cases the SHO restricted recommended privileges. Additionally, in two cases, the SHO reported that the clinician recommended mitigation of penalties that the mental health assessment did not recommend. Eleven of the unmitigated cases did not contain a ruling restricting any of the mental health assessment recommended privileges.

The institution reported two of four correctional administrators, five of six captains, 24 of 36 lieutenants, and 39 of 71 sergeants attended RVR training. For mental health staff, only one psychologist and 13 staff who held an 'other' position attended the RVR training. CSP/Sac reported that all other mental health staff were previously trained.

Interviewed clinicians who completed or supervised the completion of mental health assessments reported that during the review period CSP/Sac had an RVR team made up of four clinicians who focused solely on the completion of mental health assessments. Due to staffing issues, the institution no longer had the team. The triage team in the MHCB and other clinicians currently helped with the completion of mental health assessments. Interviewed clinicians reported that compliance issues with the timely completion of mental health assessments were largely due to the high volume of RVRs received and staffing issues.

<u>Use of Force</u>:

CSP/Sac reported nine controlled use of force incidents during the review period.  The institution reported 340 immediate use of force incidents involving 290 MHSDS patients.

The monitor reviewed all nine controlled use of force incidents and 15 immediate use of force incidents; all incidents were determined to be in compliance with CDCR policy and procedure.

CSP/Sac reported that the warden attended use of force training.  The chief deputy warden did not attend the training.  Two of four correctional administrators, five of six captains, 31 of 36 lieutenants, 69 of 71 sergeants, and 555 of 587 correctional officers attended the training.  For mental health staff, one of three chief psychologists and psychiatrists attended the training, as did eight of nine supervisor psychologists, psychiatrists, and social workers, 40 of 41 psychologists, 11 of 19 psychiatrists, 17 of 20 social workers, eight of 106 nurses, and 61 of 310 staff holding other positions.

<u>Lockdowns/Modified Programming</u>:

CSP/Sac reported seven modified programming periods and no lockdowns during the reporting period.  The modified programming ranged from one to 15 days and stemmed from a COVID-19 outbreak, a homicide, a stabbing, a riot, an institution-wide contraband search, a large-scale inmate transfer due to flooding, and an institution-wide power failure.  Each PSR resulted in limited access to mental health and medical care for the extent of the modified programming periods.

Documentation of two separate PSRs for modified programming initiated on April 30, 2023 and May 1, 2023 were also produced.  The April 30 modified programming stemmed from an in-cell homicide on Facility C.  Modified programming lasted for four days and did not affect

access to mental health or medical care.  The May 1 modified programming stemmed from an attempted homicide on Facility A.  It lasted for three days and did not affect access to mental health or medical care.

Mental health leadership reported that the institution would enter what it called "modified programming" periods due to staffing shortages but would not file related PSRs.  On two such occasions – approximately around Thanksgiving and Christmas – mental health leadership sent out institution-wide emails requiring all psychiatry and primary clinician contacts to be conducted at cell front due to psychiatry, psychology, and custody staffing shortages.

Access to Care:

A review of CSP/Sac's monthly Health Care -Access Quality reports from September 2022 through February 2023 indicated there were a total of 112,998 mental health ducats and add on appointments.  Of this number, 29,380 or 26 percent were completed.  An additional 13,395 or 12 percent of the ducats were not completed due to non-custody reasons, not including patient refusals, while 3,983, or four percent were not completed due to custody reasons.

Placement of 3CMS Patients in Minimum Support Facilities:

The minimum supervision unit at CSP/Sac was closed in October 2022 and remained closed, in part due to staffing challenges.

*Coleman* Postings:

Up to date *Coleman* postings were observed in English and Spanish on B yard in the PSU and in EOP Buildings B-5 and B-8 and the treatment center for B yard PSU and EOP.  On A yard current postings were observed in the PSU-A1, PSU-A2, A-4, A-5, A-6, A-7, and administrative segregation (A-5), and in the MHCB in CTC I and CTC II.

<u>Document Production Issues</u>:

Several institutional documents in the upload were either not what was required or had to be corrected and reproduced on site.

**APPENDIX B-8**
**CALIFORNIA HEALTH CARE FACILITY (CHCF)**
**(June 5, 2023 – June 9, 2023)**

Census:

On June 2, 2023, CHCF housed 2,355 incarcerated persons, which was a 16 percent increase from the previous review period. The mental health caseload population of 1,074 patients represented 46 percent of CHCF's total population, and had decreased by one percent since the prior reporting period.

The MHCB housed 22 patients, including four acute and three intermediate care patients awaiting transfer.

There were 417 mainline EOP patients and 635 mainline 3CMS patients.

Staffing:

The chief psychiatrist position was filled. Both senior psychiatrist positions were vacant. Four of 12 psychiatry positions were filled, for a 67 percent vacancy rate, but 8.5 contractors eliminated these vacancies. All five telepsychiatry positions were filled. Six of ten positions for medical assistants assigned to telepsychiatry were filled. Both psychiatric nurse practitioner positions were also filled.

One of two chief psychologist positions was filled. Five senior psychologists covered 4.6 positions, while three of 5.5 senior psychologist specialist positions were filled, for a 45 percent vacancy rate. Alarmingly, only three of 41.2 psychology positions were filled, for a 93 percent vacancy rate. The use of 6.75 contractors reduced the psychology functional vacancy rate to 76 percent. Two psychologists were unlicensed.

The supervising social worker position was vacant. Four of 13 social worker positions were filled, indicating a 69 percent vacancy rate. The use of 1.69 contractors decreased the social worker functional vacancy rate to 56 percent. One social worker was unlicensed.

Twenty-one of 22.6 recreation therapist positions were filled, reflecting a seven percent vacancy rate. The use of 0.92 contractors reduced this functional vacancy rate to three percent.

Eighteen of 25.2 MHSDS clerical positions were filled for a 29 percent vacancy rate. A full-time staff member covered the 0.6 OSS II position. One of 2.5 AGPA positions was filled. There was one HPS II contractor but no established position. Both HPS I positions were filled. The CHCA position was vacant.

Although 120 of 147 supervising registered nurse positions were filled, four supervising registered nurses were on extended leaves, for a 21 percent functional vacancy rate. Of 716 MHSDS registered nurse positions, 498 were filled, but 21 registered nurses were on extended leaves, indicating a 33 percent functional vacancy rate. Of 258 LVN positions, 222 were filled, but 15 LVNs were on extended leaves, for a 20 percent functional vacancy rate. Further, of 515 CNA positions, 324 were filled, but 18 CNAs were on extended leaves, for a 41 percent functional vacancy rate.

Nineteen of 20 senior psych tech positions were filled, but two senior psych techs were on extended leaves, for a 15 percent functional vacancy rate. Of 276 psych tech positions, 258 were filled, but six psych techs were on extended leaves, for a nine percent functional vacancy rate.

As for custody staffing, positions for the warden and chief deputy warden were filled, as were positions for four of six associate wardens, two of five captains, 27 of 30.8 lieutenants, and 73 of 84.6 sergeants. Positions for 24 of 25 CC Is and all ten CC IIs were also filled. Some

custody positions were filled by staff acting out of class.  Of 958.8 correctional officer positions, 838 were filled, but 31 officers were on extended leaves, for a 16 percent vacancy rate.

Telepsychiatry:

CHCF used telepsychiatry extensively at both the EOP and 3CMS levels of care, but did not utilize telepsychiatry for MHCB patients.  The two telepsychiatrists who treated EOP patients had caseloads of 71 and 14 patients, while the three telepsychiatrists who covered the 3CMS program had caseloads of 105, 118, and 122 patients.  All of their caseloads were thus within established ratios.  Applicable policy mandated that telepsychiatrists visit the institution within 30 days of assignment, then quarterly for EOP telepsychiatrists, and biannually for 3CMS telepsychiatrists.  One of two EOP telepsychiatrists was compliant for quarterly visits; all three 3CMS telepsychiatrists were compliant for biannual visits.  However, compliance could not be ascertained for visiting CHCF within 30 days of assignment, as CHCF did not provide the dates of assignment.

The monitor's expert observed the use of telepsychiatry, both for an EOP patient IDTT, and for a routine clinical contact for an EOP patient.  The telepsychiatrist worked from a hub.  The telepsychiatrist was empathetic and knowledgeable about the patients, and was on a tablet for both communications.  While this allowed the telepsychiatrist and the patients to see one another, other treatment team members and the psychiatrist could not see each other.

For the individual patient appointment, the tablet provided less visual resolution and audio clarity when compared to the Cisco DX-80 equipment used for other telepsychiatry appointments.  However, there were no connectivity issues with the sessions observed.

Telework:

Except for the five telepsychiatrists, all CHCF clinical staff worked on site.  However, most support staff, including schedulers, analysts, and health program support, were allowed to telework 50 percent of the time.  CHCF mental health leadership reported that there were no plans for future expansion of the telehealth program.

Staff Recruitment:

CHCF reported that headquarters primarily handled staff recruitment.  Such efforts focused on emailing other government agencies about vacant positions, posting staff openings on the "Cal Careers" website (jobs.ca.gov), participating in career fairs, and offering tours to staff from other institutions who expressed an interest in employment at CHCF.  Nonetheless, significant barriers to CHCF's recruitment initiatives included current pay rates and telework opportunities offered by other public and private employers.  Staff also reported that the PIP staff pay increase was a significant factor in clinicians' preference to work in the PIP as opposed to outpatient treatment programs.

Quality Management:

During the past few years, CHCF had implemented a quality management services unit (QMSU) format.  The mental health subcommittee reported to the larger QMSU.

Local governing body meetings were scheduled monthly.  All but one meeting was held and no explanation was provided for the meeting's cancellation.  All meetings attained quorums. Meeting minutes addressed policy and peer review updates, privileging of providers, and upcoming audits/reviews, among other matters.  However, the local governing body's usefulness could not be ascertained from the minutes as meetings resembled status reviews that addressed the same issues on a monthly basis with little change in outcomes.  Although action items were

discussed, required actions were not completed timely and there were no consequences for the failure to make progress.

Quality management committee meetings were held monthly and attained quorums. Meetings typically addressed LOPs, subcommittees' presentations, performance improvement work plans (PIWPs), medication management, and specialized beds. Unfortunately, QMC minutes were hard to decipher in terms of what was due, when, and to whom.

Most items discussed in QMC meetings were the responsibility of subcommittees. The mental health subcommittee made quarterly presentations to the QMC about treatment deficiencies given staffing vacancies. However, one PIWP about hiring had been "put on a 3-month hold" since July 2022 and was being extended on a monthly basis. The December 2022 minutes noted an "HR improvement project" impacting this PIWP and that several inquiries to human resources were "unanswered." Despite indication in the December QMC minutes that this performance improvement work plan would be activated in January 2023 regardless of the human resources' response, it was not reactivated. Thereafter, the March 2023 QMC minutes suggested removing this PIWP from the QMC. However, due to CHCF's shocking staffing vacancies, addressing this issue should have been a priority.

Overall, CHCF's mental health subcommittee process was robust, adequately examining concerns and attempting to address deficiencies through actions targeted at root causes. The primary challenge to addressing them was CHCF's inadequate mental health staffing. Further complicating matters, the subcommittee's chairperson rotated between chief psychologists from the institution's inpatient and outpatient programs. Although mental health staff were invited to attend subcommittee meetings to better integrate quality management into service delivery, severe staffing shortages resulted in clinicians not attending these meetings.

The mental health subcommittee met monthly and achieved quorums. Addressed issues included compliance with the Dashboard's clinical performance measures, SPRFIT, *Coleman* training compliance, and the custody and mental health partnership plan, among other issues. CHCF's triage plan to address shortcomings in the delivery of care to EOP patients housed in medical units (C and D yards) was documented in October 2022. Further, in late 2022, subcommittee meeting minutes' included detailed results of noncompliance with Dashboard expectations, review of root causes/reasons for the deficiencies, and CAPs for each identified item. They were updated monthly and included thoughtful analyses.

The only active mental health CAPs were those that regional staff monitored, which included timely PC contacts, IDTTs, and referrals, and offered EOP treatment. Nonetheless, these CAPs had minimal content; the primary barrier was staffing shortages.

There were no specialized audits, QITs, or FITs during the review period.

Due to staffing shortages and the need to prioritize patient care, CHCF did not conduct peer review. Nonetheless, peer review LOPs were adopted, chairpersons were identified for the committees for psychiatry and psychology/social work peer review, and guidelines were developed for peer review's implementation for these disciplines. However, the chief psychiatrist reported that implementation of psychiatry peer review was hindered by the inadequate number of civil service psychiatrists and the high number of registry psychiatrists.

Medication Management:

CHCF provided MAPIP results for the six month review period regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that CHCF was compliant for all six months with blood pressure, glucose, weight, and thyroid function tests,

and for five months with Complete Blood Count (CBC) with platelets, height, and medication consents.  For monitoring EKGs, CHCF was compliant for two of five required months; no data was required for one month.  Unfortunately, there was noncompliance for all six months for Comprehensive Metabolic Panel (CMP), lipids, and the Abnormal Involuntary Movement Scale (AIMS).

While CHCF-PIP was a clozapine-initiation facility, CHCF's outpatient programs were neither a clozapine initiation nor maintenance institution.  Nonetheless, three CHCF patients housed in the CTC or OHU were prescribed clozapine during the review period.  At the time of the site visit, one CTC patient was prescribed clozapine.

Diagnostic monitoring for patients prescribed clozapine included patients in both the inpatient and outpatient programs.  As for required monitoring, CHCF was compliant for six months with blood pressure, CBC, and weight.  There was compliance for five required months for thyroid function tests, five months for EKG monitoring, four months for glucose monitoring, and three months for height and CMP.  For obtaining medication consents, CHCF was compliant for three of four required months, and there was compliance for two months for lipid monitoring. There was noncompliance for all six months for monitoring AIMS.

As for monitoring antidepressants, CHCF reported compliance for all six months for thyroid laboratory tests, and for blood pressure for patients prescribed venlafaxine.  There was compliance for four months for obtaining medication consents.  For EKGs there was compliance for three required months; no data was required for the other three months.

For patients prescribed carbamazepine, CHCF was compliant for monitoring CBC and CMP for all three required months.  There was compliance for one of two required months for monitoring medication levels.  No data was required for all six months for medication consents.

Regarding patients who were prescribed Depakote, CHCF was compliant for three months with obtaining medication consents, and for two months for monitoring CBC with platelets and CMP. There was noncompliance for monitoring therapeutic medication levels for all six months.

For lamotrigine, CHCF indicated compliance for obtaining medication consents for all six months.

As for lithium, CHCF reported compliance for three months for checking kidney function tests, and monitoring EKGs and medication blood levels. There was compliance for two months for medication consents, and one month for monitoring thyroid function tests.

For medication management metrics reported by mental health headquarters, CHCF was compliant for six months for continuity of medications following discharge/transfer from a community hospital and/or DSH, observation of HS medication preparation and administration, chronic care medications historical administration, and outpatient provider new medication orders. CHCF was also compliant for five months with continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and continuity of medications upon parole/transfer to the community. There was compliance for two months with continuity of medications upon inter-institutional transfer at receiving and release, and one month for medication continuity with MHCB transfers. CHCF was noncompliant for all six months with observation of medication preparation and administration AM and PM.

Because CHCF lacked an administrative segregation unit, it did not report on medication continuity with intra-institutional transfer to ASU/SHU/PSU.

CHCF psychiatrists prescribed medications for a maximum of 30 days in the CTC, and 90 and 180 days, respectively, for EOP and 3CMS patients.  Medications for discharge and parole were prescribed for 60 days, except for medications such as clozapine, which required closer monitoring and oversight.  Bridge medications for new arrivals were usually prescribed for 30 days.

Nursing staff read telephone and verbal orders back to the psychiatrist, entered the order into EHRS, and checked for duplicate orders.  Nursing staff then signed the order and routed it to the psychiatrist's message center in EHRS for review and signature.

CHCF did not report any patients being prescribed mental health medications KOP.

CHCF conducted 80 medication line audits that reflected patient wait times under four minutes.  Although the institution did not report the total duration of medication lines, interviewed staff and patients did not indicate concerns that they exceeded two hours.  CHCF did not report any conflicts between medication distribution times and mental health programming.

The institution denied any issues with patients waiting in line during inclement weather. Some medications were dispensed in the housing units, while E yard patients had a large overhead shelter, with benches and a misting system.  Given concerns about water contaminants, the misting system had a water filter.

Approximately 18 percent of mental health prescriptions were non-formulary.

Although CHCF reported that 156 polypharmacy reviews required completion during the review period, none were completed.

CHCF reported that on average 479 patients were prescribed 958 medications at HS.  No challenges were reported administering HS medications at 8:00 p.m. or later, which proof of practice confirmed.

CHCF submitted 45 PC 2602 involuntary medication petitions, of which 41 were renewals, two were initial emergency petitions, one was an initial non-emergency petition, and the remaining unknown petition was withdrawn due to the patient's transfer. No involuntary medication petitions were not renewed due to poor tracking or mishandling.

CHCF was noncompliant for all six months for having the PC 2602 court order in the chart. For the related measure of placing the psychiatrist PC 2602 medication order in the chart, CHCF was compliant for two months.

There was one controlled use of force incident to administer PC 2602 medications.

CHCF's medication court administrator (MCA) was an AGPA. There was daily monitoring of the OnDemand involuntary medication orders report and psychiatrists were notified in advance of upcoming PC 2602 expiration dates. The MCA did not report any challenges with the submission of petitions or interfacing with the offices of administrative hearings or legal affairs.

Transfers:

There was one sustainability process review that covered the fourth quarter of 2022. Due to the unmet needs assessment (UNA), it did not include a site visit. The headquarters' reviewer and CHCF institutional reviewer nevertheless assessed a sample of higher level of care (HLOC) documentation to determine whether HLOCs were thoroughly completed and contained adequate clinical justification for HLOC referral when there were positive referral indicators. The headquarters' reviewer determined that 48 percent of HLOC documentation was unacceptable based on insufficient interventions or failure to adequately document interventions, inadequate narratives, and missing documentation; the institutional review found that 44 percent of HLOC documentation was unacceptable.

The sustainability process review also noted deficiencies in CHCF's mental health subcommittee meeting minutes. These shortcomings included a lack of clarity about what was discussed during meetings, and a lack of documentation regarding completion of all requirements for patients discharged from inpatient settings. The regional mental health administrator provided training to address these issues in January 2023.

CHCF's two inpatient coordinators were new to the positions. One had started two months prior to the site visit, but had previously served as an inpatient coordinator for approximately 1.5 years prior to a headquarters' assignment. The second inpatient coordinator started one week prior to the site visit.

During the review period, there were 447 instances of 216 patients who were considered but not referred to inpatient care. CHCF did not track the reasons for non-referral. However, to assess the adequacy of non-referral rationales, a sample of ten charts were reviewed from the non-referral log. While the monitor's expert agreed with the clinical decision of not referring to a higher level of care in all cases, four of the ten cases contained inadequate documentation supporting non-referral rationales. Even when non-referral decisions were listed in the higher level of care section of the treatment plan, they frequently did not translate into appropriate goals to address targeted problems.

CHCF reported 36 referrals to acute care. Seven referrals were rescinded. None were rejected. One referral was pending as of the site visit. Twenty-four of 32 reported referral packets were timely completed. Nine of 28 or 32 percent of acute care referrals timely transferred within ten days. Reasons for transfer delays included delayed IRU review, endorsement delay, and the majority were reportedly due to data population issues.

There were 38 referrals to intermediate care. Seventeen referrals were rescinded. None were rejected. Nineteen of 21 of the referral packets were timely completed. Seven of 21 or 33 percent of patients timely transferred to intermediate care. CHCF reported some reasons for transfer delays which included LRH issues.

During the site visit, four patients who had been referred to acute care and three who had been referred to intermediate care were pending acceptance.

Four patients with complex medical needs were referred to inpatient care.

No *Vitek* hearings were held during the review period.

The inpatient coordinator denied any challenges with clinicians timely submitting inpatient referral packets, or in obtaining responses to requests for additional information. For non-referrals, she reported that while the decision not to refer the patient to a higher level of care was frequently clinically correct, the interventions proposed were unlikely to address the underlying reason for the patient's flagging on the sustainability report.

There were no reported requests to expedite a referral. The inpatient coordinator reported that she would facilitate an email from the clinical team to IRU if the clinical team wanted to expedite a patient transfer.

Overall, the relationship with IRU was reported to be collaborative. IRU had more questions about intermediate care referrals, compared to referrals to acute care. The inpatient coordinator believed that this was due to the greater number of possible reasons for intermediate care referral.

As for discharges from higher levels of care, the inpatient referral coordinator reported that patients were often in transit when she was notified of the patient's return. She reported that

HCPOP provided the notice of patient movement. The receiving clinical team performed the clinician-to-clinician contact with the discharging facility.

CHCF referred 76 patients to MHCBs during the review period, all of whom were housed in alternative housing. Of these 76 CHCF referrals to the MHCB, 46 or 61 percent were admitted. The remaining 30 MHCB referrals were rescinded. Two or four percent of the 46 MHCB admissions took more than 24 hours to transfer. There were also 181 admissions to CHCF's MHCB from other institutions, for a total of 257 admissions.

One patient had three or more MHCB admissions.

No patients transferred to the PSU during the review period.

CHCF timely transferred two patients to the EOP hub during the review period; at the time of the site visit, no patients awaited EOP hub transfer.

Ten patients' level of care was reduced from EOP to 3CMS. No patients level of care was increased from 3CMS to EOP.

All 37 patients who transferred to STRH or LTRH transferred timely. CHCF was unable to filter the data to determine whether these patients transferred to STRH or LTRH. At the time of the site visit, no patients were pending STRH or LTRH transfer.

Programming:

Restricted Housing:

CHCF's administrative segregation unit and EOP hub were closed during the review period and remained closed at the time of the site visit.

MHCB:

CHCF's MHCB had the capacity for 98 beds in units A1A, A1B, and A2A. Due to severe staffing shortages, only the 30-bed A1A unit was operational.

During the site visit, 22 of 30 MHCB beds were filled, which included four patients awaiting transfer to acute care, and three awaiting transfer to intermediate care. All seven patients were pending acceptance. CHCF did not flex MHCB beds for inpatient care. One cell was redlined.

During the review period, the MHCB's average daily census was 21.5 patients. For the 257 patients who were housed in CHCF's MHCB during the review period, which included patients who were admitted from institutions other than CHCF, clinical stays' averaged 10.7 days; 70 patients' clinical stays exceeded ten days. Physical stays averaged 15.2 days, with 144 patients' stays exceeding ten days. Further, 75 physical discharges occurred more than 72 hours after patients' clinical discharge.

MHCB staffing was prioritized over lower levels of care. Nonetheless, the MHCB still experienced staffing challenges, which resulted in limited continuity of care for individual clinical contacts and IDTTs. The MHCB attempted to mitigate this situation by pairing up psychiatrists and psychologists as a team, with two of each providing coverage to the same cohort of patients.

The MHCB's A1A unit was large, with adequate space for group treatment and patient socialization. All disciplines emphasized maximizing patient out-of-cell time. The MHCB offered recreation therapy activities. An observed group had five participants.

The MHCB completed psychiatry and primary clinician initial assessments for all patients within 24 hours of admission, and prior to the initial IDTT.

The monitor's expert's observation of eight initial and three routine IDTTs found all required treatment team members in attendance, actively using computers. Both IDTT rooms were spacious, with copious seating, adequate lighting, and a comfortable temperature. Patients

attended all but one IDTT and were seated outside the TTM in a chair, except for those on maximum custody status, and one patient with a recent history of impulsive aggression. Maximum custody patients were placed in the ADA-compliant TTM, and then uncuffed, in accordance with policy.

The IDTTs displayed many strengths, including an empathetic team who knew their patients, and reviewed safety issues, diagnoses, medications, compliance, and cuffing status. In most cases, the treatment team also reviewed higher level of care considerations. The CC II interacted exceptionally well with patients and provided useful information. Nonetheless, the IDTTs demonstrated shortcomings, which included a lack of clear and measurable goals, and attendance by covering staff, including psychiatry.

Interviewed MHCB staff, including psychiatrists and psychologists, raised concerns about the administration of injectable medications, including both urgent, one-time medications, and PC 2602 involuntary medications. As for involuntary one-time injectable medications, it was reported that custody staff made clinicians feel guilty and indicated that the clinicians should have been able to resolve the situation without using injectables, which required custody's assistance. Further, many of these medications were given during third watch, when there were fewer correctional officers on the units.

Psychiatrists reported a large work impact completing SRASHEs, further reporting having to often perform this task due to ongoing psychology shortages.

Numerous patients interviewed in a group format, and three patients interviewed individually, all generally spoke positively about the MHCB team and provided services.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

All 20 or 100 percent of MHCB patients had timely required initial psychiatry evaluations before the initial IDTT and within 24 hours of patient admission.  One hundred percent were conducted in confidential settings.  Telepsychiatry was not used for initial psychiatry assessments.

All 52 or 100 percent of required twice weekly routine psychiatry contacts timely occurred.  Sixty-nine percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals and mental health modified programming.  Telepsychiatry did not conduct any of the reviewed routine psychiatry contacts.

Sixteen of 20 or 80 percent of required initial primary clinician evaluations timely occurred within 24 hours of patient admission.  Eighty percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.  Telehealth was not used.

For routine primary clinician contacts, 171 of 173 or 99 percent timely occurred.  Fifty-five percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals, medical restrictions, mental health and custody modified programming, and lack of available office space.  Telehealth was not used.

Eighteen of 20 or 90 percent of initial IDTTs timely occurred within 72 hours of patients' arrival.  Required staff and patients attended 100 percent of initial IDTTs.

Eighteen of 20 or 90 percent of routine IDTTs timely occurred every seven calendar days.  Required staff and patients attended all reviewed routine IDTTs.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, but this assignment was not clearly discernable for all cases.

Review of eight 114-As for MHCB patients revealed that they were typically offered adequate out-of-cell time, including yard and recreation therapy groups, as well as showers, telephone calls, and linen exchange.

Seclusion and Restraint:

One patient required three restraint episodes, which ranged from two hours and 56 minutes to four hours and 20 minutes.  Review of the patient's chart indicated that, due to the degree of headbanging, and failure of less restrictive alternatives, such as talking with the patient, offering a time out, and other initiatives, restraints were an appropriate clinical intervention.  There were no seclusion incidents.

Crisis Intervention Team:

Due to limited staffing, CHCF did not utilize the CIT during the review period or at the time of the site visit.  Instead, during regular work hours, patients' assigned clinicians covered crisis calls.  In their unavailability, each program had assigned clinicians and supervisors of the day for crisis calls.  The psychiatry clinician on call covered crises after hours but there was no after-hours clinician.

Alternative Housing:

CHCF's LOP was compliant with the May 2021 headquarters' memorandum on the placement of patients in alternative housing pending MHCB transfer.

CHCF utilized three areas for alternative housing.  In order of preference, they were the licensed medical CTC beds on D yard, vacant OHU cells on C yard, and the Patient Management Unit.

CHCF reported 76 alternative housing placements during the review period, of which 13 exceeded 24 hours.

An interviewed senior psychologist supervisor reported that clinicians used confidential rooms in the CTC or OHU to interview alternative housing patients unless the patient refused.

Observed alternative housing cells in the CTC and OHU had a toilet/sink combo unit; however, the bed and storage area were removed. Each cell had a door posting indicating that they had been cleaned recently. The required safety mattress, blanket, and smock were not available in the CTC or OHU; the lieutenant explained that they were delivered from the MHCB when a patient arrived for alternative housing placement.

During the site visit, an observed patient in alternative housing in the CTC was being observed by a nurse assistant who sat in front of the cell door with a computer recording patient activity every ten minutes. Observation revealed that the cell contained a Stack-A-Bunk bed with a safety mattress and a "no-tear" blanket; the patient wore a "no-tear" smock. The cell had a toilet/sink combo unit. The following day, another patient was briefly placed in alternative housing. Subsequent document review of both placements indicated that clinicians saw both patients, whose MHCB referrals were rescinded, and both were released from alternative housing. Their respective stays were for 16 and 6.3 hours.

EOP:

Treatment for EOP patients was provided on E yard, which was a general population yard, and C and D yards, which respectively housed medical units and the OHU and CTC. The EOP program had an overall capacity of 300 patients, and an average review period census of 199 patients.

During the site visit, severe staffing shortages resulted in the EOP program providing services according to a "triage plan." Specifically, E yard EOP units aimed to have clinicians offer four weekly core groups and 12 weekly confidential individual contacts, which would

result in one monthly individual patient contact, as well as facilitate four weekly IDTTs, prioritizing initial, level of care change, and special IDTTs. Other contacts that were prioritized included emergent/urgent referrals, five-day follow-ups, SRASHEs, and initial PC contacts.

Further, the EOP programs on C and D yards prioritized contacts for emergent/urgent referrals, five-day follow-ups, and SRASHEs, with IDTTs only held for initial and level of care changes. Patients were also scheduled for individual contacts every other week, but only one monthly primary clinician contact was required to be confidential. Psychiatrists addressed emergent and urgent medication issues. Groups were scheduled for a minimum of five weekly hours. However, during the site visit, it was reported that primary clinicians were not providing groups on C or D yards, although one primary clinician provided groups on E yard. The only exception to this triage plan was that Suicide Risk Management Program (SRMP) patients were attempted to be seen according to the Program Guide.

To assess whether SRMP patients were being treated in accordance with the Program Guide, the monitor's expert reviewed the records of ten of the 37 SRMP patients at the time of the site visit. Regrettably, only one of these ten patients was offered an average of ten or more weekly hours of structured treatment activities. Although the psychiatrist saw that patient monthly, the primary clinician did not see him in accordance with the Program Guide. The one required IDTT was held timely and included required participants.

For the other nine patients, there was variability in the frequency of contacts with their psychiatrists, primary clinicians, and IDTTs. The psychiatrist saw most monthly. Primary clinicians inconsistently saw some patients weekly or biweekly, but for others, few, if any, PC contacts were documented. Although IDTTs were held as required for six patients, for most patients only one IDTT was required to be held during the review period, namely, the IDTT that

placed the patient on SRMP status.  Overall, none of the reviewed SRMP patients were seen according to the Program Guide during the reporting period.

There were no formal mechanisms or expectations for clinicians to review the medical status of patients on C or D yards to assess the relative impact of their medical and mental health conditions on their functioning.  Patients' medical needs were typically considered as primary, requiring mental health programming to work around medical scheduling.  Patients' needs were discussed during multidisciplinary huddles and specially scheduled meetings when comorbid conditions required accommodations.  Patients' medical and mental health needs were also discussed during patient safety meetings.

CHCF treated 415 individual EOP patients during the review period.  An average of 296 patients were treated weekly, with a range of 286 to 309 patients during any given week.  On average, 26 percent of patients who were eligible for full programming were offered at least ten weekly hours of structured treatment, but only five percent attended ten weekly hours of structured treatment.  Further, patients refused a weekly average of 3.4 hours of structured treatment; an average of 37 percent of scheduled groups were cancelled.

The monitor's expert reviewed ten healthcare records to assess the confidentiality of individual psychiatry and primary clinician contacts; reviewed records were for seven E yard patients, two patients housed in the OHU, and one patient housed in the CTC.  Notably, psychiatry contacts were confidential for all but one OHU patient.  Only E yard patients received confidential PC contacts, while OHU and CTC patients were seen in non-confidential settings. Further, only two of ten reviewed patients' records had documented treatment plans within the prior 90 days; five patients' IDTT documentation was last completed in 2022.

During the review period, 47 individual patients were placed on EOP modified programming for an average of 17.4 weeks. These patients were offered an average of 2.2 weekly hours of structured treatment and attended an average of 1.1 weekly hours, reflecting a 50 percent refusal rate. Forty-seven percent of groups scheduled for EOP patients on modified programming were cancelled.

Review of six records of patients on EOP modified programming to determine whether treatment was confidential and in accordance with their modified treatment plans revealed that the psychiatrist typically saw patients monthly in a confidential setting; however, telepsychiatry conducted 67 percent of these contacts. None of the EOP patients on modified programming had weekly primary clinician contacts; most were seen monthly by their primary clinicians, although some occasionally had PC contacts every two weeks. These six patients' IDTTs did not occur every 30 days. Rather, four patients had not had IDTTs since September 2022; the other two patients' last IDTTs were in January and February 2023.

IDTT documentation for three of six patients included specific group attendance expectations and clear rationales for providing patients with EOP modified programming. However, for the other three patients, the rationale supporting placement on modified programming was unclear, as was the amount of offered structured treatment. All but one patient were offered groups. The three patients with clear group expectations were offered group in accordance with their treatment plans.

The monitor's expert observed eight initial and three routine IDTT meetings; five IDTTs were conducted on C and D yards, and six were held on E yard. All were confidentially held in adequate space where staff had computer access. Required staff and patients attended all but one

IDTT.  However, the attending CC I was not the patient's assigned CC I for any observed IDTTs; some CC Is also attended by way of videoconference.

All observed IDTTs discussed patients' psychiatric history, psychotropic medications, diagnoses, and group enrollment participation.  Most were also collaborative and included discussion of patients' levels of care and appropriate rationales for retaining them at the EOP level of care.  When treatment goals were clearly stated, which occurred in nine of 11 IDTTs, the goals were measurable, objective, and realistic, and were appropriate to the patients' needs. Barriers to treatment progress were also consistently identified and most IDTTs appropriately addressed interventions.  Adequate case conceptualizations were presented in eight of 11 IDTTs. Safety planning was only reviewed when clinically indicated in three of five cases.

Most observed E yard IDTTs started late due to patients not receiving ducats and the PC not being available on time.  Initial psychiatry evaluations were not completed prior to many E yard initial IDTTs, and in two cases, no PC initial evaluation was completed.  Two primary clinicians conducting IDTTs were unlicensed and required some redirection from the acting chief psychologist.  However, the chief psychologist did not routinely attend these meetings.

E yard EOP groups were provided in three-month sessions.  They were scheduled daily, including weekends, and included between 27 and 42 groups that were scheduled each weekday. With one exception, all E yard groups were facilitated by recreation therapists or psych techs.

Group topics included coping skills, recreation therapy, current events, social skills, stress management, health issues, leisure activities, daily living, life skills, family issues, rational behavior and decisions, and mood management.  CHCF also offered process groups, dialectical behavior therapy (DBT) groups, and groups that addressed specific mental health issues. However, staff and patients reported that group titles did not necessarily correspond to the group

443

content material.  As an example, the monitor's expert attempted to observe a DBT group but learned that the psych tech who was facilitating it was neither trained nor qualified to instruct patients on DBT skills.  As such, the psych tech elected to provide education on addiction. Nursing-led therapy groups (NLTGs) were also offered to EOP patients on E yard.

For patients on C and D yards, four RTs offered a total of 24 groups each weekday, as well as six groups on weekends.  Nursing staff also offered one NLTG daily.  Group size averaged 7.6 patients.  These groups' content was largely in keeping with their titles.

Four interviewed recreation therapists who provided groups on C and D yards did not report any significant group access issues.  However, one recreation therapist reported that patients who went to off-site medical appointments for more than one day or patients who were relocated to another housing unit were automatically removed from the group lists and were not added back on, which resulted in these patients not being enrolled in any groups for weeks at a time.

An interviewed psych tech who provided groups on E yard reported frustration with being asked to provide groups for which neither training nor curricula were provided.  The psych tech reported taking personal time outside of work hours to research topics in order to have support materials to facilitate groups.

Two observed recreation therapy groups on C and D yards addressed stress management and communication skills.  Both recreation therapists were prepared, offered programming related to the topics, and effectively engaged all patients.

Eleven EOP patients who were housed on the medical units on C or D yards and 13 EOP patients who were housed on E yard were interviewed.  They reported seeing their psychiatrists monthly and seeing their primary clinicians approximately once every two weeks to once every

month.  Patients further reported relative consistency seeing their assigned psychiatrists and PCs, as opposed to covering clinicians.  Some patients saw on-site psychiatrists while others received telepsychiatry services.  Patients on C/D yards had difficulty recalling their most recent IDTT; many believed it had been over six months since the last IDTT.  Some E yard patients reported having IDTTs every 90 days, while others reported that it had been over six months since their last IDTT.  Patients who were recently transferred to CHCF reported having an IDTT upon arrival.  Most patients reported regularly attending recreation therapy groups but indicated receiving no clinical groups other than those recently started by PCs.  Patients reported being aware of how to contact mental health staff for emergent and routine needs, but most reported that routine responses were delayed significantly.

E yard patients expressed concerns that some peers were not functioning well, yet referrals were not being made to clinicians.  They also indicated concern about the lack of training of custody officers on the EOP units.  E yard patients also were concerned with the recent turnover in clinical staff, which made the building of trust and therapeutic rapport difficult.

Two psychiatrists and five primary clinicians who provided EOP care who were interviewed reported that the most significant barriers to care were large PC caseloads of between 52 and 70 patients, which exceeded the established ratio, challenges related to patients receiving timely ducats, ducats being non-specific such that patients did not know what appointments they were attending, lack of access to treatment space, and the overwhelming, and often redundant, amount of documentation required for patient contacts.  The chief psychologist echoed these concerns.

As for space, each EOP housing unit had two clinic rooms available for staff to see patients. During the site visit, one room on each E yard housing unit was being converted to a medication room such that access to treatment space was reduced to a single room shared by PCs, psychiatrists, and medical, ISUDT, and classification staff. In the C and D housing units, clinical space was already converted, or was in the process of being converted, for other uses including classification staff offices and nursing breakrooms. This was concerning as a number of OHU and CTC patients were unable to leave the housing units due to their health conditions, requiring individual and group sessions to be held on the units. With only one room available for patient confidential contacts on these units, the time available for treatment was limited. PCs and psychiatrists reported that given large caseloads and occasional challenges with ducats, having access to space for individual sessions on the housing units was critical. However, there was adequate space for individual contacts within the mental health clinic on E yard.

One additional concern voiced by E yard staff was the lack of supervisors and clinical supervision for unlicensed social workers. The E yard supervisor was on an extended leave. Although a "supervisor of the day" provided supervision, this individual was not located on the yard, making coordination of services more challenging. On the positive side, staff reported that custody officers were supportive of patients and helpful in coordinating patient movement to facilitate appointments.

Staff on C and D yards were primarily concerned with their inability to provide adequate care to EOP patients. PCs expressed dissatisfaction with the "triage process."

Twenty patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their EOP stays.

One of two patients had required initial psychiatry evaluations before the initial IDTT and within 14 calendar days of arrival or a level of care change. The other initial psychiatry evaluation was overdue and never occurred. The one reviewed initial psychiatry evaluation was confidentially conducted by telepsychiatry.

Sixty-one of 76 or 80 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Ninety-two percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, medical restrictions, and modified programming. Telepsychiatry conducted 46 percent of reviewed routine psychiatry contacts.

No EOP patients required initial primary clinician evaluations.

Five of 98 or five percent of routine primary clinician contacts timely occurred at least every seven calendar days. Seventy-four percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, modified programming, unavailable confidential space, and cell-front and day room contacts. No routine primary clinician contacts were conducted utilizing telehealth.

Two of three initial IDTTs timely occurred within 14 calendar days of arrival or a level of care change. Required staff and patients attended both reviewed initial IDTTs. One initial IDTT never occurred.

One of 12 routine IDTTs timely occurred every 90 calendar days. One hundred percent of required staff, and 80 percent of patients, attended routine IDTTs. Reasons routine IDTTs were held *in absentia* included patient refusals and COVID-19. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

3CMS:

3CMS patients were housed on C, D, and E yards.  Two 3CMS clinicians had caseloads of 368 and 273 patients, respectively, grossly exceeding the established ratio of 1:97.

The monitor's expert observed five 3CMS IDTTs on E yard; patients attended four and one was held *in absentia* due to patient refusal.  Three of the IDTTs were initials, and two were held to evaluate issues such as suitability for the male community reentry program or consideration of a work assignment change.  The IDTTs were held in various locations, including treatment centers and housing units.  All locations were adequate in terms of space, light, and temperature, and all staff actively used computers.  The one E yard primary clinician presented all cases.  All locations had on-site psychiatrists or PNPs in attendance.

While all observed IDTTs were inadequate and did not routinely address issues such as safety planning or goal setting, they demonstrated some positive points.  Notably, the treatment teams did their best to address CHCF's untenable staffing situation; the IDTTs' shortcomings directly resulted from inadequate staffing.  While the Program Guide mandated a minimum frequency of one visit every 90 days, two PNPs reported seeing their patients every six weeks in order to see them more frequently and to attempt to mitigate the severe PC staffing shortages.

The treatment team also exhibited care and concern for their patients.  For the patient who declined to attend his IDTT, the team had the correctional officer who had the best rapport with the patient speak with him.  After the patient again declined to attend, the primary clinician also attempted to persuade the patient to attend the IDTT.  While the patient ultimately decided against attending, these attempts were admirable.

The treatment team was also empathetic and validating for the IDTT to re-evaluate a work assignment, agreeing to recommend the suggested change.  The IDTT information revealed

a clear nexus between the patient's mental health symptoms and his desire for a work assignment change. The primary clinician also reported having multiple informal interactions with patients on the yard and in the housing units. He stated this strong rapport, bolstered by regularly walking through the housing units, helped to intervene early with issues and prior to their escalation.

Due to staffing shortages, there was a triage plan to see 3CMS patients. This triage plan prioritized the delivery of care for 3CMS patients to initial appointments, SRASHEs, and emergent/urgent referrals. As for IDTTs, the triage plan prioritized initial IDTTs and IDTTs for a level of care change. The chief psychologist reported that since implementation of the triage plan in May 2022, there had been a large increase in patient referrals to see a clinician. Due to staffing shortages, CHCF had not offered 3CMS groups since 2018.

An interviewed 3CMS supervisor reported that, due to the severity of C and D yard primary clinician vacancies, the chief psychiatrist had agreed to allow telepsychiatrists to also see patients who had submitted referrals to see primary clinicians. The supervisor reviewed these requests to determine which requests the telepsychiatrist could see, with the request being forwarded to the chief psychiatrist for actual assignment. Regrettably, CHCF did not track the number of patients who telepsychiatry saw in response to a primary clinician referral. The 3CMS supervisor nonetheless expressed concern with CHCF's inability to provide quality services in the form of primary clinician contacts.

Twenty-seven interviewed 3CMS patients from C and E yards revealed 18 who could not identify their primary clinician. They nonetheless reported being seen when requested. Nine E yard patients reported that psychiatry sessions lasted for between 30 and 45 minutes and indicated being seen at least once monthly by psychiatry.

CHCF offered NLTGs to 3CMS patients. An observed NLTG conducted by a registered nurse for 3CMS and general population patients addressed durable medical equipment.

Nurse practitioners covering 3CMS patients reported frustration about their salaries, which were not commensurate with those available in the community, and the lack of retention bonuses. Due to staffing shortages, they also reported seeing patients for referrals that primary clinicians typically addressed.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

All six patients who required initial psychiatry evaluations timely had one prior to the initial IDTT. All initial psychiatry evaluations were conducted in a confidential setting. Telepsychiatry performed 50 percent of initial psychiatry assessments.

Sixteen of 26 or 62 percent of required routine psychiatry contacts timely occurred at least every 90 days. Ninety-five percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted 65 percent of reviewed routine psychiatry contacts.

None of six patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. Two patients never received an initial primary clinician assessment. All four initial PC evaluations were conducted confidentially.

Ten of 42 or 24 percent of routine primary clinician contacts timely occurred at least every 90 days. Forty-six percent were conducted confidentially. Reasons for non-confidentiality included patient refusals.

None of six initial IDTTs timely occurred within 14 days of arrival or a level of care change. Three patients did not receive an initial IDTT. Required staff and patients attended the three untimely IDTTs. Telepsychiatry conducted 67 percent of initial IDTTs.

Only one of nine patients had a timely required annual IDTT. Required staff and the patient attended this annual IDTT. For the remaining eight patients who did not have a timely annual IDTT, the average amount of time that had elapsed since their previous IDTT was 616 days, with a range of 452 to 800 days. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

CHCF had neither an LOP for its pre-release program nor a pre-release planning coordinator. The institution did not provide pre-release planning groups during the review period.

CHCF's AGPA was the pre-release coordinator's assistant and reported that CHCF's last permanent pre-release coordinator had left the position in August 2021. Due to the vacancy in the pre-release coordinator's position, the AGPA prepared chronos and release of information (ROI) documentation but could not report whether such information was timely provided for patients with upcoming parole or release dates. The vacancy in the pre-release coordinator's position also resulted in pre-release services not being tracked.

The statewide pre-release coordinator oversaw TCMP services for CHCF patients, which were provided for 35 EOP and 70 3CMS patients.

Fifty-eight of 186 patients who paroled from CHCF during the review period were issued California identification cards. Further, 27 patients were not interested in these identification cards, while most of the remaining patients were denied identification cards for various reasons including ICE holds, unknown social security numbers, or not having a DMV record for the past ten years.

Program Access:

a.   Job and Program Assignments

On April 3, 2023, CHCF reported that of 741 job assignments, 75 were held by EOP patients, representing 19 percent of this population. 3CMS patients held 225 job assignments, representing 32 percent of the 3CMS population, as did 441 or 31 percent of non-MHSDS incarcerated persons.

The 501 academic assignments were held by 53 or 13 percent of EOP patients, 167 or 24 percent of 3CMS patients, and 281 or 20 percent of the non-MHSDS population.

The 54 vocational education assignments were held by eight or two percent of EOP patients, 16 or two percent of 3CMS patients, and 30 or two percent of non-MHSDS incarcerated persons.

Only two or 0.2 percent of 3CMS patients held voluntary education assignments. Neither EOP nor non-MHSDS incarcerated persons held these assignments.

The 365 substance abuse treatment assignments were held by 67 or 17 percent of EOP patients, 124 or 18 percent of 3CMS patients, and 174 or 12 percent of non-MHSDS incarcerated persons.

b.  Milestone Credits

CHCF reported that 367 of 395 or 93 percent of EOP patients were eligible to earn milestone credits, with 95 percent earning the credit.  Further, 646 of 702 or 92 percent of 3CMS patients were eligible to earn milestone credits, with 34 percent earning them.  Further, 1,257 of 1,407 or 89 percent of non-MHSDS incarcerated persons were eligible to earn milestone credits, with 20 percent earning the credit.

c.  Out-of-Level Housing

CHCF reported that 18 EOP and 31 3CMS custody Level I patients and two EOP and five 3CMS custody Level III patients were housed in Level II housing.  There were also four EOP custody Level IV patients in Level II housing.

d.  ADA Reasonable Accommodation and Grievance Procedure

CHCF provided memoranda confirming implementation of the revised ADA accommodation requirements and training rosters reflecting attendance at the reasonable accommodation requirements training.  As of the site visit, 75 percent of CHCF mental health and custody staff had completed this online training.

e.  Periodic Classification Score Reductions: EOP Patients

CHCF provided a sample of completed CDCR Form 840s which reflected that the institution provided classification score reductions for EOP patients.

f.  Unclothed Body Search

CHCF custody staff reported performing unclothed body searches during contraband searches and lockdowns.  All unclothed body searches were conducted in cells to attempt to ensure patient privacy.  The patient's visual inspection during these searches lasted

approximately one minute and included a head-to-toe examination of body cavities. Hand-held metal detection devices were utilized during searches.

"C" Status:

During the review period, CHCF reported that 13 patients were on "C" Status, including one acute and two intermediate care patients, and three EOP and seven 3CMS patients. During the site visit, one EOP and one 3CMS patient were on "C" Status. The EOP patient had been on "C" Status for 118 days, and was expected to remain on it for 150 days, while the 3CMS patient had been on "C" Status for 110 days, and was expected to remain on "C" Status for 179 days.

Case-by-Case Reviews:

During the review period, CHCF reported that no patients met the criteria for a 150-day case review or a subsequent review. All five cases that satisfied the criteria for a 120-day pre-MERD review had such reviews 120 days prior to the expiration of the controlling MERD.

Reviews were completed for all four cases with projected or active SHU terms. Of these cases, one patient was pending resolution of the RVR and district attorney action, another was released from maximum custody after being found not guilty of the RVR offense, and another was released from maximum custody for no longer posing a threat. One other patient was found guilty, but the committee did not impose the SHU term and released the patient from maximum custody; however, the patient was placed on "C" Status due to his disciplinary history.

Mental Health Referrals:

During the review period, CHCF made 1,639 mental health referrals; there were 482 referrals to psychiatry and 1,157 referrals to primary clinicians. There were 86 emergent referrals, 320 urgent referrals, and 1,233 routine referrals.

Overall, CHCF reported noncompliance for timely responding to psychiatry referrals, and to routine referrals to primary clinicians; there was only compliance for timely responding to emergent and urgent referrals to primary clinicians. Specifically, only five of 12 or 42 percent of emergent psychiatry referrals had timely responses, although there were timely responses to 67 of 74 or 91 percent of emergent primary clinician referrals. For urgent referrals, there were timely responses to 43 of 93 or 46 percent of psychiatry referrals; however, 207 of 227 or 91 percent of urgent referrals to primary clinicians had timely responses. Routine referrals reflected noncompliance; there were timely responses to 308 of 377 or 82 percent of psychiatry referrals and 624 of 856 or 73 percent of primary clinician referrals.

Custody and Mental Health Partnership Plan:

Mental health, custody, and nursing staff did not report any problems working together in the best interests of MHSDS patients.

CHCF's CMHPP LOP was aligned with headquarters' directive but was last updated in January 2022 and thus, was not current.

There was executive leadership joint rounding during five of the review period's six months. Staff unavailability resulted in the rounding's cancellation for one month. Rounding documentation reflected required participants' attendance during four of five months. Four of five rounding forms also contained substantive information reported by staff and patients that addressed relevant matters, including ducat issuance, program participation, access to clinicians, staff morale, communications between staff and patients, delays in the issuance of patient property, and mental health huddles, among other matters. However, the rounding forms did not address follow-up responses to identified issues. The remaining rounding form lacked

substantive information about the rounding's content and only contained a brief statement from a custody officer.

Neither CHCF's executive staff meeting agendas nor quality management committee minutes discussed executive leadership joint rounding; however, QMC minutes from January 2023 noted that the previous month's rounding did not occur due to staff shortages. On the other hand, all six months of mental health subcommittee minutes referenced the rounding, but only one month's minutes contained substantive information.

At the time of the site visit, CHCF conducted daily CMHPP huddles in the MHCB and EOP, but, due to the extended leave of the mental health program supervisor, did not conduct 3CMS huddles.

Required staff attended two observed MHCB huddles. Nursing staff facilitated the huddles, which addressed relevant topics, including the census, patients on suicide watch or precaution, admissions and discharges, medications, custody issues, nursing reports, treatment, patients' behaviors, symptoms, and complaints, RVRs, new arrivals, yard, showers, meals, IDTTs, and other relevant matters. Further, review of a random sample of MHCB huddle forms for the review period reported attendance by required staff.

Required staff attended an observed third watch E yard EOP huddle. Addressed topics included needed follow-ups, unusual patient behavior, custody issues, medication changes, patients receiving bad news, and possible higher level of care needs. Review of a sample of reviewed huddle reports for E yard's EOP program revealed the addressing of prescribed program issues and required staff's attendance.

The chief psychiatrist and chief psychologist reported that CHCF did not conduct specialized bed complete care huddles for the MHCB.

Reviewed E yard documentation indicated the conduct of weekly 3CMS supervisory meetings three-quarters of the time, but the sergeant or the 3CMS mental health program supervisor did not attend approximately one quarter of these meetings.  Reviewed documentation addressed pertinent topics and follow-up actions.  However, at the time of the site visit, these weekly huddles were not occurring due to the extended leave of the 3CMS mental health program supervisor.

CHCF conducted monthly joint supervisory 3CMS program area tours on E yard. Reviewed documentation reflecting these program area tours documented staff and patients' responses to questions, which did not raise any issues of major concern.  All six monthly program area tours reported "good" or "pretty good" working relationships between custody and mental health staff.

CHCF conducted five inmate advisory council (IAC) meetings during four months of the review period on E yard.  Reviewed minutes reflected attendance by the warden and other executive staff, but the 3CMS supervisor only attended one meeting.  None of the reviewed IAC minutes referenced the 3CMS program.

CHCF reported issuing the 3CMS orientation brochure to patients during initial clinical contacts.  The brochure was also available in the housing units.  The institution also provided a copy of the brochure to the monitor.

There were 32 misconduct allegations against custody staff.  In response to these allegations, one staff member received counseling, on-the-job-training was provided in two cases, six cases were pending with the Office of Internal Affairs (OIA), four cases were pending with the Allegations Inquiry Unit, 14 were pending with the local designated investigator, and five were determined to be unfounded.

Regarding other investigations of staff misconduct toward patients that were not initiated through the appeals process, CHCF reported accepting 12 central intake and eight direct action requests.

No CHCF staff were moved to another post as a result of a staff misconduct allegation.

As for attendance at the mandatory quarterly round table training, CHCF provided three sign-in sheets each for the fourth quarter of 2022 and the first quarter of 2023, reflecting the training of some second watch MHCB staff and second and third watch EOP staff. In addition to not providing sign-in sheets for the training of third watch MHCB staff, CHCF did not identify staff who did not attend the training. As such, it could not be determined whether all required staff attended the training, indicating noncompliance regarding attendance at this training.

As for attendance at the mandatory CMHPP off-post training, CHCF reported attendance by the warden, all four associate wardens, all four captains, all 23 lieutenants, all 59 sergeants, and 765 of 767 correctional officers. Further, 28 of 28 correctional counselors (Is, IIs, and IIIs) also completed the training. Regarding mental health, three of five chiefs completed the training, as did four of five senior psychologists, seven of 11 supervisors, nine of 13 psychologists, and 11 of 18 psychiatrists.

<u>Heat Plan</u>:

Review of CHCF's heat plan LOP revealed compliance with headquarters' directive. The heat plan was only in effect during October 2022 of the review period, when there were five Stage I heat alerts, but no Stage II or Stage III heat alerts. No patients experienced a heat-related illness during the review period.

Reviewed temperature logs for October 2022 indicated the hourly recording of outdoor temperatures. Because all CHCF housing units were air conditioned, the institution was not required to record indoor temperatures as long as the cooling system was operational.

Interviewed officers in several housing units displayed a working knowledge of the various procedures associated with activation of the heat plan and produced a "cheat sheet" with the steps to be taken at each heat plan stage. Specifically, they reported that patients prescribed heat-sensitive medications were required to go indoors during a Stage I heat alert. Interviewed patients who were prescribed heat-sensitive medications confirmed that they were required to leave the yard and return to their housing unit when the temperature reached 90 degrees. Interviewed officers were aware of the signs of heat-related illness and how to report them.

Housing officers in all toured units also produced the daily lists of patients who were prescribed heat-sensitive medications and were able to identify patients in their housing units who were on the list.

Housing officers produced digital thermometers at their workstations in some housing units; others pointed to an analogue thermometer high on the wall. There were no concerns related to the thermometers' accuracy.

One interviewed heat medication patient reported that he has had to stand in the medication line on the yard during heat plan activation and that he and other patients were told to stand in the shade. The patient further reported that most nurses completed medication pass in less than 30 minutes.

Although outside of the review period, review of three Daily Activity Reports (DAR) for Stage I heat alerts during May and June 2023 indicated the times of heat alert activation and deactivation. However, in violation of the LOP, the DARs did not reflect reasonable

accommodations afforded to patients on heat medications who were recalled from the yard during heat plan activations.

As for custody staff's attendance at heat-related pathologies on-the-job training, CHCF reported attendance at the training by both chief deputy administrators, two of four correctional administrators, all four captains, 18 of 25 lieutenants, 43 of 68 sergeants, 426 of 806 correctional officers, both CC IIIs, one of four CC II supervisors, four of six CC II specialists, and 15 of 19 CC Is. As for mental health staff, the training was completed by none of five chiefs, none of 16 senior psychologists, none of 11 supervisors, one of 16 psychologists, none of 18 psychiatrists, and only one of 59 other mental health employees. Regrettably, only two of 125 or two percent of mental health staff completed the training.

RVRs:

CHCF issued 730 RVRs during the review period, of which 454 or 62 percent were issued to MHSDS patients, including 25 RVRs issued to MHCB patients, 178 to EOP patients, and 251 to 3CMS patients.

The monitor reviewed 29 RVRs to assess compliance with CDCR policy. Custody staff timely referred the mental health assessment to mental health in 11 of 29 or 38 percent of cases. Mental health staff timely completed and returned the assessment to custody in 27 of 29 or 93 percent of cases. Patients were confidentially interviewed for the mental health assessment in 20 of 29, or 69 percent of reviewed cases. The SHO documented consideration of the mental health assessment in all 29 reviewed cases. Although none of the assessments recommended alternative discipline, the SHO documented three cases in an alternative manner. Further, the clinician recommended penalty mitigation in 24 of 29 or 83 percent of cases; the SHO actually mitigated the penalty in 21 of 24 or 88 percent.

As for mental health assessment training, CHCF reported that the training was attended by all four correctional administrators and all five captains, 18 of 25 lieutenants, and 34 of 64 sergeants. As for mental health staff, none of the chief psychiatrists/psychologists attended RVR training, while it was attended by only one of 16 senior psychologists, one of 11 mental health supervisors, one of 15 psychologists, and by none of 18 psychiatrists.

Use of Force:

CHCF reported no controlled use of force incidents involving MHSDS patients and only one involving a non-MHSDS inmate. There were also 102 immediate uses of force, of which nine involved MHSDS patients. There were also 212 non-use of force incidents, of which 20 involved mental health caseload patients.

The monitor reviewed the nine immediate uses of force involving one MHCB, eight EOP, and three 3CMS patients. Of these nine incidents, three only involved the use of physical force, one involved use of the expandable baton, four used pepper spray, and one incident involved the combination of physical force and pepper spray. CHCF properly used decontamination procedures for both patients and the premises when pepper spray was used. The use of force review was suspended for two incidents and the other seven were reported as closed.

CHCF reported completion of the mandatory use of force training by the warden and chief deputy warden, all four associate wardens, all three captains, all 26 lieutenants, all 67 sergeants, and 804 of 805 correctional officers. The training was also completed by the CC III, all four CC II supervisors, all five CC II specialists, and all 18 CC Is. As for mental health, the training was completed by both chief psychologists, two of three chief psychiatrists, all eight senior psychologists, all 11 supervisors, 12 of 14 psychologists, and 15 of 18 psychiatrists.

Lockdowns/Modified Programs:

 CHCF indicated that it did not experience any program lockdowns, 24-hour threat assessments, or modified programming during the reporting period.

Access to Care:

A review of CHCF's monthly Health Care Access Quality Reports from October 2022 to March 2023 reflected the issuance of 64,900 mental health ducats and add-on appointments, of which 24,157 or 37 percent were completed and 40,743 or 63 percent were not completed.  Of the non-completed appointments, zero percent were reportedly not completed due to custody factors, 25 percent were due to non-custody factors, and 75 percent were due to patient refusals.

*Coleman* Postings:

There were current *Coleman* posters in English and Spanish in all visited housing units.

**APPENDIX B-9**
**CALIFORNIA MEN's COLONY (CMC)**
**(June 6, 2023 – June 9, 2023)**

Census:

On June 6, 2023, CMC housed 3,131 incarcerated persons, which was a decrease of three percent since the prior review period. The mental health caseload population of 1,327 patients, which constituted 42 percent of CMC's total population, was a six percent decrease from the prior reporting period.

The MHCB housed 41 patients.

There were 570 mainline EOP and 614 mainline 3CMS patients.

The administrative segregation population included 102 MHSDS patients in the EOP hub.

Staffing:

Positions for the chief psychiatrist and senior psychiatrist were filled. Seven of 16 psychiatry positions were also filled, for a 56 percent vacancy rate. Registry filled 5.75 positions, reducing the functional vacancy rate to 20 percent.

All 2.5 telepsychiatry positions were filled, as was the medical assistant position. Both chief psychologist positions were filled; one served as the chief of mental health. Of 6.5 senior psychologist supervisor positions, 4.5 were filled for a vacancy rate of 30 percent. All 6.5 senior psychologist specialist positions were also filled, but one specialist was on an extended leave for a 15 percent vacancy rate.

Of 45 psychology positions, 21.75 were filled, for a 52 percent vacancy rate. One psychologist was on an extended leave, but contractors filled 2.75 positions, leaving a 48 percent functional vacancy rate. There were also two psychology interns.

The supervising social worker position was filled.  Fourteen of 17 positions for social workers were also filled, and there was one registry social worker, for a 12 percent functional vacancy rate.

Of 24.5 recreation therapist positions, 18.5 were filled, for a 25 percent vacancy rate.

All three senior psych tech positions were filled.  Of 59.6 psych tech positions, 49.6 were filled; however, five psych techs were on extended leave, and there were six contractors, for a 15 percent functional vacancy rate.

There were two OSS IIs for one position and one HPS II but no position.  Two of 2.5 HPS I positions were filled.  Both AGPA positions were filled, as was one of two CHSA positions.

As for custody staffing, positions for the warden and chief deputy warden were filled.  Although 35 of 36 lieutenant positions were filled, five lieutenants acted out-of-class in other positions, for a 17 percent functional vacancy rate.  Seventy-seven of 92.2 sergeant positions were filled, but ten sergeants were either acting out-of-class in other positions or on extended leaves, reflecting a 27 percent functional vacancy rate.  Of 763.2 positions for correctional officers, 644 were filled; however, 56 correctional officers were either on extended leaves or were acting out-of-class, for a 23 percent functional vacancy rate.

Telepsychiatry:

CMC's 2.5 telepsychiatry positions were filled.  One telepsychiatrist had a full-time EOP patient caseload, and another had a full-time 3CMS caseload.  A half-time telepsychiatrist covered PC 2602 involuntary medications.  Further, the telepsychiatry pool provided on-call coverage for nights, weekends, and holidays.

Telework:

CMC did not utilize telework.

Staff Recruitment:

At CMC's observed staff meeting, staff strongly advocated for increased wages as a means of recruiting and retaining primary clinicians. PCs' further opined that without increased wages, CMC would continue to lose existing clinicians and would be unable to recruit due to the surrounding area's high cost of living. Numerous primary clinicians reported they were burning out and seeking other jobs; some expressed concern that their inability to manage extremely high caseloads might result in bad patient outcomes.

The institution's mental health providers further described headquarters as "detached" and indicated that they did not support headquarters' plans to move toward a telehealth model when clinicians were willing to work in the institutions for increased salaries. Mental health clinicians further reported that while telehealth options were appealing, they expressed concerns about its use, further opining that patients' benefited from clinicians' on-site presence, which positively impacted patients' general advocacy.

Quality Management:

Staff reported that CMC's quality management process was "constantly improving."

The local governing body met monthly and always attained quorums. The chief of mental health did not attend three meetings and no mental health representative attended the October 2022 meeting. Reviewed minutes addressed staff appointments, privileging, committee reports, PIWPs, Lean Six Sigma improvement projects, and review of policies and procedures.

The quality management committee also met monthly and achieved quorums. Addressed items included PIWPs, subcommittee activities and reports, COVID-19 updates, Lean Six Sigma

projects, and institutional updates.  The quality management committee also oversaw three PIWPs that focused on the timeliness of emergency medical response reviews, primary care clinicians' medical backlogs, and staff improvement.

The mental health program subcommittee's monthly meetings' achieved quorums. Discussed topics included FIT and QITs, suicide prevention, the custody and mental health partnership plan, program updates, the sustainable process and unmet needs assessment (UNA), staffing, peer review, audits, DDP updates, and improvement projects.  The subcommittee addressed areas of concern and provided appropriate follow-up.  There were corrective action plans (CAPs) for offered treatment and timely IDTTs.

CMC implemented PIWPs to address improved staff IDTT participation in the CTC/MHCB and administrative segregation CIT activation for issues not leading to MHCB admission.  Quality management staff also regularly performed monthly audits of numerous issues, including contact compliance for the MHCB, EOP hub, and mainline EOP and 3CMS programs, and timely mental health referrals, among other matters.  The audits were methodologically sound.

CMC did not charter any new QITs or FITs and none were discontinued.  However, the headquarters' required ongoing EOP hub QIT and SPRFIT continued to meet weekly.

Staff reported that CMC was awaiting a start date from headquarters to implement psychiatry peer review.  MHCB peer review was conducted annually.

Quality management and mental health program subcommittee information was disseminated to program supervisors, who reportedly informed line staff at staff meetings.

Medication Management:

CMC provided MAPIP results for October 1, 2022 through March 31, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics demonstrated that CMC was compliant for all six months of the reporting period for monitoring blood pressure, height, weight, and thyroid function tests. CMC was compliant for five months for medication consents, and for four months for glucose, Comprehensive Metabolic Panel (CMP), and monitoring the Abnormal Involuntary Movement Scale (AIMS). There was compliance for three months for monitoring Complete Blood Count (CBC) with platelets, and for two months for monitoring lipids.

CMC was not an authorized clozapine initiation or maintenance facility but indicated that one patient was briefly placed on clozapine during the review period; however, this patient was subsequently redirected to a so-called clozapine institution. During his brief stay, CMC proactively performed an updated medication consent and AIMS examination for the one required month. Otherwise, blood pressure, glucose, CBC with platelets, CMP, EKG, height, weight, lipids, and thyroid function tests were not required.

For required monitoring of antidepressants, CMC indicated compliance for six months for medication consents, thyroid laboratory tests, and monitoring blood pressure for patients taking venlafaxine. For EKGs, there was compliance for the one required month.

For patients prescribed carbamazepine, CMC reported compliance for four required months for obtaining medication consents. For CBC, CMP, and medication blood levels, there was compliance for both required months.

Regarding Depakote, there was compliance for three months for obtaining medication consents, and for CBC with platelets and CMP. There was only one month of compliance for therapeutic medication level monitoring.

For lamotrigine, CMC reported compliance for obtaining medication consents for three months.

As for lithium, compliance was indicated for five months for obtaining EKGs, and for four months for medication consents and kidney function tests. Medication blood level monitoring and thyroid laboratory tests were compliant for three months.

The institution reported that a substantial cause of noncompliance for MAPIP measures was due to COVID-19 infection control measures, including delayed appointments and blood draws, and low staffing levels. CMC provided monthly feedback on MAPIP to each psychiatrist when warranted.

For medication management metrics reported by mental health headquarters, CMC was compliant for six months for observation of medication preparation HS and AM and PM, chronic care medications historical administration, and outpatient provider new medication orders. There was compliance for five months for continuity of nurse-administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and for four months for medication continuity with intra-institutional transfer to ASU/SHU/PSU and following parole/transfer to the community. There was compliance for three months for medication continuity following discharge/transfer from a community hospital and/or DSH. Regrettably, for the important metrics of medication continuity upon inter-institution transfer at receiving and release (R&R), and following MHCB transfers, there was compliance for only two months.

CMC's maximum duration for prescriptions was 180 days except for patients in the CTC/MHCB, for whom there was a 30-day maximum. Bridge orders' maximum length was 15 days.

The institution reported that telephone orders generally resulted from after-hours orders from the psychiatrist on duty. Nursing staff received the phone order and read it back for verification. Psychiatrists then received a message in EHRS to sign the order, which had to be completed on the next working day.

CMC reported that 973 patients were prescribed 2,502 psychiatric medications.

CMC prescribed 33 medications as KOP. While CDCR allowed prescriptions for SSRIs to be prescribed as KOP for 3CMS patients, one KOP prescription was for an antipsychotic medication. The monitor's expert informed the chief psychiatrist of this policy deviation, which was subsequently corrected.

CMC submitted audits for both individual patient wait times and for medication lines' total duration. Individual wait times averaged between two and seven minutes, while medication lines' total duration was under two hours. Unfortunately, CMC reported ongoing challenges with not having a place protected from the elements for patients to wait while in the pill line.

The institution was unable to report the percentage of its mental health medications that were non-formulary.

There were 409 patients who required polypharmacy reviews. CMC was generally compliant with both completing the review and obtaining required EKGs. However, it was unclear how psychiatrists' reviewed this information or how headquarters' utilized it.

A total of 267 patients were prescribed medications at HS; all doses were reportedly administered after 8:00 p.m.

At the time of the site visit, 53 patients received PC 2602 involuntary medications. During the review period, of eight initial petitions, six were emergent and two were non-emergent. There were also 36 renewal petitions.

CMC did not report any logistical challenges with obtaining PC 2602 involuntary medication orders. However, the institution was unable to track patients who were noncompliant with receiving PC 2602 medications. There was one use of force incident to administer court-ordered medications. Further, CMC reported six months' compliance for both having the PC 2602 court order and the physician's order in the chart for patients who received PC 2602 involuntary medications.

Transfers:

A modified sustainable process was conducted in April 2023 for the fourth quarter of 2022. The review focused on the quality of treatment plan documentation, mental health program subcommittee minutes, referral and non-referral reports, higher level of care (HLOC) monthly audits, housing unit reviews, alternative housing, and pending PIP referrals. Findings indicated that, except for alternative housing, all reviewed areas required follow-up. Regional leadership provided a corrective action plan (CAP) to address these issues.

Otherwise, CMC did not participate in a major or minor sustainable process audit during the review period due to the regional specialists' focus on the UNA project. However, CMC's two inpatient care coordinators conducted monthly audits of HLOC referrals and non-referral documentation.

During the review period, 351 patients were considered, but not referred, to higher levels of care on 815 occasions. Some of the reasons for non-referral included patients not exhibiting

chronic psychiatric symptoms or patients participating in less than an average of five hours of weekly structured treatment during the past three months.

CMC referred 29 patients to acute care. Two acute care referrals were rescinded, one was rejected, and one patient paroled. Twenty-eight of 29 referral packets were timely completed within two working days of identification. Twenty-one of 25 or 84 percent of patients timely transferred to acute care within ten days of referral.

CMC referred 50 patients to intermediate care. Twelve intermediate care referrals were rescinded. Forty-seven of 50 or 94 percent of intermediate care referral packets were timely completed within five working days of identification. Fifteen of 38 or 39 percent of patients timely transferred to intermediate care within 30 days of referral.

*Vitek* hearings were held for 16 patients. No patients prevailed.

During the site visit, one patient was awaiting transfer to intermediate care and remained within transfer timeframes.

There were 365 MHCB referrals, of which 231 patients were admitted; 134 MHCB referrals were rescinded. Of the 231 MHCB admissions, 220 patients transferred to CMC's MHCB; the remaining 11 patients transferred to crisis beds at other institutions. All transfers were timely.

No patients with complex medical needs transferred to inpatient care during the review period.

Thirty-nine patients timely transferred to the PSU.

Nine patients' level of care was reduced from EOP to 3CMS; two were subsequently returned to the EOP level of care.

Fifty-five of 72 or 76 percent of patients timely transferred to STRH.

No patients transferred to LTRH.

Programming:

MHSDS Patients in Administrative Segregation:

CMC reported that two psychiatrists were assigned to the EOP hub, with average caseloads of 51 patients that were within the established ratio. The six primary clinicians assigned to the EOP hub had caseloads averaging 16 patients, which exceeded the ratio.

During the review period, 678 patients had a total of 1,591 stays in the EOP hub. Stays averaged 25 days. Fifty-four patients were housed in the EOP hub for longer than 90 days during the reporting period.

The EOP hub self-certified for each month of the review period without needing explanation.

CMC offered EOP hub patients who were eligible for full programming an average of 14.42 weekly hours of structured treatment activities, of which patients attended a weekly average of 7.8 hours and refused 6.62 weekly hours.

Sixty-seven EOP hub patients were placed on modified programming for refusing half or more of all offered treatment. The patients received weekly primary clinician contacts, daily psych tech rounds, and an IDTT every 30 days. Modified programming patients were offered an average of 13.4 weekly hours of structured treatment, attending 2.4 weekly hours while refusing 11 hours.

Six observed IDTTs were attended by required staff, including two primary clinicians, a psychiatrist, senior psych tech, CC I, and the chief psychologist. Patients attended five IDTTs; the remaining IDTT was held *in absentia*. Observed IDTTs revealed collaborative treatment teams, and discussion of relevant psychosocial and clinical histories, as well as diagnoses and

medications.  Treatment goals and interventions were individualized, measurable, and clinically appropriate for each patient's symptoms and presentation, while level of care and safety planning discussions were appropriate.  Custody participation was also excellent; the CC I was very knowledgeable and engaged with patients and the treatment team.

Six patients who attended an observed recreation therapy group were placed in TTMs. The group consisted of patients making greeting cards to send to family members.  The recreation therapist provided crafting materials and thoughtfully interacted with the group participants, who were enthusiastic and engaged.  However, the group lacked a clinical basis.

EOP hub patients interviewed in a group reported at least weekly contacts with their primary clinician; several patients reported as many as three weekly PC contacts when necessary. Patients indicated receiving psychiatry contacts at least every 30 days.  Again, several patients stated that they received more frequent psychiatry contacts when needed.  All patients reported that clinical contacts were confidential unless the patient declined.  Patients also reported daily psych tech rounds, receiving their IDTT prior to ICC, timely IDTTs, and receiving three hours of yard three times weekly.  Several groups ran daily, and patients reported being able to obtain ducats for them.  A patient who was prescribed heat-sensitive medications reported that CMC was very responsive to the heat plan's requirements and when the heat alarm sounded, he was brought inside and provided with ice and water.

Regrettably, patients reported that most groups were repetitive and lacked clinical utility. Other expressed concerns were the lack of electrical outlets on the second tier, which prevented them from having electrical appliances or televisions, psych techs not providing in-cell packets or materials, and some cells lacking hot water "for days at a time."

Twenty weeks of reviewed 114-As revealed compliance for timely ICCs and for offering three weekly showers and ten weekly hours of yard, but indicated noncompliance for weekly linen exchanges, which occurred for only 15 of 20 or 75 percent of reviewed weeks.

Seven mental health patients' ICCs were observed in the EOP hub. All required treatment team members attended, and included the deputy warden, psychologist, CC II, and CC I. The CC I often acted as a staff assistant for the patients. Importantly, the team worked well together, was familiar with the patients, and tried to ensure that patients were included and informed at every stage of the ICC. Of note, team recommendations included terminating a SHU term, an NDS recommendation for property and privileges, patient transfers, and an extension of EOP hub housing pending completion of outstanding investigations.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP hub stays.

Thirteen of 15 or 87 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Forty-six percent were held in confidential settings. Two assessments did not indicate whether they were confidential. Reasons for non-confidentiality were overwhelmingly due to patient refusals. Telepsychiatry was not used for initial psychiatry assessments.

Twenty-six of 28 or 93 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Fifty-five percent were conducted confidentially. Reasons for non-confidential contacts included patient refusals and medical quarantines. Telepsychiatry did not conduct any reviewed routine psychiatry contacts.

All 15 patients had required initial primary clinician evaluations before the initial IDTT. Sixty-four percent were conducted confidentially. One assessment did not indicate whether it

was confidential.  Reasons for non-confidential assessments included patient refusals and medical quarantines.

Nineteen of 35 or 54 percent of routine primary clinician contacts timely occurred at least every seven calendar days.  Forty-seven percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals, medical quarantines, and custody staffing shortages.

Fourteen of 15 or 93 percent of patients had initial IDTTs within 14 calendar days of admission.  Required staff attended all reviewed initial IDTTs; patients attended 60 percent.

Only 50 percent of patients had routine IDTTs at least every 90 calendar days.  Required staff attended all reviewed routine IDTTs; patients attended 50 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

MHCB:

CMC operated 50 licensed CTC beds; there were 38 MHCBs and 12 acute/intermediate care flex beds.  The MHCB's A and B sides each contained 25 beds, one small interview room with a telephone for patient use, and one group room on each side.   Recreation therapists offered individual yard sessions and groups, but MHCB patients were not offered additional unstructured yard time.

During the review period, the MHCB had an average daily census of 26 patients.  There were 150 patients who were housed in the MHCB for more than ten days; these patients' stays averaged 21 days.

475

CMC reported that the MHCB was sufficiently staffed to achieve compliance with required contacts.  During the site visit, six psychiatrists and eight primary clinicians were assigned to the unit.

All required members and patients attended observed IDTTs, which demonstrated treatment team collaboration, with all members providing necessary and meaningful input.  The IDTTs began with treatment team members introducing themselves to patients and explaining the IDTT's purpose.  The IDTTs then covered all essential areas related to treatment, including relevant background information, symptoms and diagnostic considerations, suicide/self-harm risk, substance abuse issues, treatment adherence and response, and safety concerns and planning, when indicated.  Treatment goals were stated in measurable terms and in language that patients' understood.  Importantly, patients were generally aware of and in agreement with their treatment goals.

Overall, the monitor's expert noted significant improvements in IDTT quality since the prior review period.  However, while the IDTTs were adequate, MHCB staff would benefit from education about least restrictive housing and DSH eligibility, as the treatment team was unable to answer related questions to help patients set realistic expectations.

Reviewed 114-As for 15 MHCB patients indicated the provision of recreation therapy to patients for an average of 5.7 weekly hours.  MHCB patients were offered daily phone calls, but there was no visitation.

Twenty charts were selected for review for compliance with Program Guide timeframes. The MHCB utilized neither telepsychiatry nor telehealth.

All 20 patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of patient admission.  Eighty-five percent were conducted confidentially. Reasons for non-confidentiality included patient refusals.

All 48 or 100 percent of twice weekly routine psychiatry contacts timely occurred. Sixty percent were conducted in confidential settings.  Reasons for non-confidentiality were typically not noted but included patient refusals or custody issues.

Eighteen of 20 or 90 percent of initial primary clinician evaluations timely occurred within 24 hours of admission.  Two initial PC assessments did not occur.  Eighty-three percent occurred in confidential settings.  Patient refusals accounted for some of the non-confidential assessments.

For routine primary clinician contacts, 96 percent timely occurred.  Fifty-eight percent were conducted in confidential settings.  COVID-19 precautions, custody issues, and patient refusals were some reasons for non-confidential contacts.

Eighteen of 20 or 90 percent of initial IDTTs timely occurred within 72 hours of patients' arrival.  Required staff attended 90 percent of reviewed initial IDTTs; patients attended 75 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals.

Twenty-five of 26 or 96 percent of required routine IDTTs timely occurred every seven calendar days.  Required staff attended 92 percent of routine IDTTs; patients attended 80 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

CMC reported no seclusion or restraint incidents during the review period.

Crisis Intervention Team:

CMC had an active CIT during the review period.  The CIT operated between 8:00 a.m. and 8:00 p.m. from Sunday through Friday.  The two CIT psychologists each worked three, 13-hour shifts.  When either CIT psychologist was unavailable, other primary clinicians covered for them.  On Saturdays and holidays, MHCB staff responded to emergent referrals during the day.  During evening hours, CMC used telepsychiatrists as its first point of contact, but the institution also assigned one civil service psychiatrist as a second point of contact.  The CIT reported responding to all crisis calls with all required members, including custody and nursing staff.

Alternative Housing:

CMC failed to provide its LOP on alternative housing.  The institution nonetheless reported using up to 42 beds in Facility D-7 for alternative housing, although it primarily set aside 12 specific cells for regular use.  Observed cells were clean.

EOP:

The four EOP psychiatrists, including one telepsychiatrist, had caseloads averaging 140 patients, which exceeded the established ratio.  Primary clinicians' caseloads averaged 39 patients and also exceeded the staff-to-clinician ratio.

Interviewed EOP mental health providers and patients reported that primary clinician vacancies affected the quality and quantity of available services.  Due to these staffing shortages, EOP psychiatrists and recreation therapists attempted to spend more individual time with patients.

While EOP patients were generally housed on Facility D, during the site visit CMC housed 12 EOP patients in an overflow 3CMS/GP housing unit on Facility C.  CMC leadership further reported that the EOP overflow population had typically not exceeded 15 patients, with

maximum stays of up to eight days. Leadership and line staff reported that most EOP patients in overflow housing were recent discharges from the EOP hub, MHCB, or inpatient care; many had ongoing safety concerns.

Notably, CMC leadership reported that EOP patients housed in overflow housing programmed with Facility D EOP patients. To attend treatment, these patients had to exit Facility C's general population yard and walk to Facility D. Staff and EOP patients reported that having to cross from Facilities C to D for mental health treatment led to treatment refusals and safety concerns, as EOP patients were fearful that GP inmates might assault them upon learning their EOP status. Moreover, EOP staff reported that some custody officers who were not regularly assigned to gate coverage would not allow EOP patients to enter Facility D for treatment.

CMC offered patients an average of six weekly hours of structured treatment. Patients attended 4.4 weekly hours.

Observed EOP IDTTs found all required members in attendance. On the positive side, treatment team members appropriately interacted with patients, presented relevant historical information, and discussed treatment goals in measurable terms. Unfortunately, the IDTTs lacked reviews of higher level of care referral indicators, and collaborative discussions about diagnoses and next steps in care, group attendance, and specific interventions beyond medication. The psychiatrist and primary clinicians generally waited their turn to speak about patients and did not appear to be paying attention to one another during their case presentations. For two patients, the psychiatrist and primary clinician reported differing diagnoses without engaging in any related discussion to resolve this discrepancy, which was necessary to ensure effective and collaborative care. While the psychiatrist provided excellent diagnostic rationales

and case formulations, it was unclear whether the primary clinician was listening as the PC did not respond and was observed typing notes.

EOP leadership, clinicians, and recreation therapists confirmed that EOP patients' lacked access to treatment groups unless they were on the suicide risk management program (SRMP) list; SRMP patients were only assigned to one weekly treatment group with a clinician. Otherwise, EOP patients were scheduled for six hours of weekly yard groups, which lacked any structure or meaningful interactions with recreation therapists; these groups also overinflated the offered group hours and should not have counted toward them due to their lack of structure.

Both staff and patients indicated concerns about the lack of therapeutic groups that were available to EOP patients. CMC staff further reported that groups were routinely cancelled due to a lack of available recreation therapists and other providers to cover behind absences, as well as the regular practice of redirecting staff to cover higher priority EOP hub groups.

Six patients attended an observed clinician led DBT group, which was well-facilitated and meaningful. The primary clinician knew the patients very well and had excellent rapport with them. The group session included two mindfulness meditation exercises, psychoeducation about DBT, and DBT skills discussion. Patients were also provided a folder and DBT worksheets to complete between groups as homework.

CMC also offered NLTG groups to EOP patients, but they were often cancelled due to nurses being routinely pulled to cover other duties. Nursing confirmed that NLTG participants received rehabilitation activity credits (RAC), unless they were in restricted housing for disciplinary reasons. An assigned office tech tracked and entered NLTG data for RAC credits and treatment hours. One interviewed nurse assigned to the NLTGs expressed frustration that

they were not able to offer these groups as scheduled, as they were routinely pulled to cover other areas.

Five EOP patients who were interviewed after the DBT group reported confidential weekly 1:1 primary clinician contacts and monthly psychiatry contacts. Several patients reported receiving one full hour of individual therapy from the PC for their 1:1s. They further reported that IDTTs occur every 90 days and were generally adequate. Patients reported attending groups approximately one to three times weekly but indicated that groups were frequently cancelled due to staffing issues and there were weeks when patients were not offered any groups. All patients reported knowing how to access mental health in both emergency and non-emergency situations, but that there were sometimes problems getting help quickly when a patient went "man down." The patients' further reported difficulties with some custody officers who were often disrespectful or condescending toward some patients.

The monitor randomly reviewed the healthcare records of 20 EOP patients to assess compliance with Program Guide timeframes during their stays.

Eight of 12 or 67 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 14 calendar days of patient arrival or a level of care change. Eighty-three percent were conducted in confidential settings. Both non-confidential initial psychiatry evaluations were due to patient refusals. Telepsychiatry was not used for these assessments.

Forty-seven of 80 or 59 percent of required routine psychiatry contacts timely occurred at least every 30 calendar days. Eighty-one percent were conducted in confidential settings. Patient refusals were the most frequent reason for non-confidentiality; other reasons included modified programming periods and COVID-19 restrictions. Telepsychiatry was not used for routine psychiatry contacts.

Eleven of 12 or 92 percent of initial primary clinician evaluations timely occurred within 14 calendar days of arrival or a level of care change. Eighty-three percent were conducted confidentially. Patient refusals were the reasons for non-confidential evaluations. Telehealth was not used for initial primary clinician assessments.

Seventy of 112 or 63 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Eighty-five percent were conducted confidentially. Reasons for non-confidentiality were primarily patient refusals, but also included COVID-19, staffing shortages, and modified programming restrictions. Telehealth was not used for routine primary clinician contacts.

Nine of 12 or 75 percent of initial IDTTs timely occurred within 14 calendar days of patient arrival or a level of care change. Required staff attended all reviewed initial IDTTs; patients attended 83 percent.

Concerningly, only two of 17 or 12 percent of routine IDTTs timely occurred every 90 calendar days. Required staff attended 75 percent of routine IDTTs; patients attended 50 percent. Reasons routine IDTTs were held *in absentia* included patient refusals. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

<u>3CMS</u>:

3CMS patient staffing included two psychiatrists, one of whom was a telepsychiatrist, and two primary clinicians. As such, each discipline had caseloads of approximately 305 patients, grossly exceeding caseload ratios for PCs, but also exceeding the ratio for psychiatry.

The monitor's expert observed one Facility B IDTT and four IDTTs on Facility C. The IDTTs were not timely. For example, the Facility B IDTT held on June 6, 2023 was an initial

IDTT for a patient who arrived at CMC on March 22, 2023. Required staff attended the IDTTs, including the primary clinician, psychiatrist, and CC I. Patients also attended all observed IDTTs.

Although the IDTTs exhibited very good collaboration between the PC and psychiatrist, CC I participation was very limited; the CC I only spoke when prompted by the primary clinician to report on RVRs, points, and patients' custody status. Relevant psychosocial histories were provided for each patient, diagnoses and medications were clearly stated, and functional impairments and levels of care were also discussed. Treatment plans were individualized to the extent possible given the staffing shortages, while goals and interventions were appropriate but limited in terms of being individualized. Aside from not being timely, overall, the IDTTs were adequate.

3CMS patients were not offered clinical groups during the review period or at the time of the site visit. However, they were able to attend self-help groups, DRP groups, and NLTGs.

Interviewed staff and patients reported that clinical one-to-one contacts occurred in confidential settings unless the patient declined. Both primary clinicians had their own offices, where they typically met with patients. However, due to staffing shortages, 3CMS patients were not receiving timely IDTTs, or psychiatry or PC contacts. Staff and patients reported that PC contacts occurred approximately every four to six months, while psychiatry contacts occurred approximately every three to four months. Staff further reported that patients who required more frequent clinical contacts than every 90 days were considered for the EOP program due to 3CMS staff's inability to meet the need for such increased contacts. Patients reported receiving annual IDTTs and described them as "high quality." Clinicians did not report any problems with refusals or no-shows for IDTTs or clinical contacts.

Interviewed patients knew how to access mental health in both emergency and non-emergency situations; they reported that it took one to two days to be seen by the PC after submitting an urgent request. They further indicated needing groups, and wanting to program, stating that the lack of clinical treatment was frustrating because 3CMS patients were not "sick enough" to receive treatment. They reported participating in either work or education programs.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

All five patients had required initial psychiatry evaluations prior to the initial IDTT. One hundred percent were confidential. Telepsychiatry conducted one initial psychiatry evaluation.

Eleven of 27 or 41 percent of required routine psychiatry contacts timely occurred at least every 90 days. Ninety-three percent were conducted confidentially. Reasons for non-confidentiality included missing information in the EHRS system. Telepsychiatry conducted 43 percent of routine psychiatry contacts.

None of five patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. One patient did not have an initial PC assessment. Forty percent were conducted confidentially. Telehealth did not conduct any initial primary clinician assessments.

Twelve of 30 or 40 percent of routine primary clinician contacts timely occurred at least every 90 days. One patient was not seen in over one year and another patient had not been seen since November 2022. Forty percent occurred in confidential settings. Telehealth was used for 30 percent of routine primary clinician contacts.

None of five patients had required initial IDTTs within 14 working days of patient arrival or a level of care change. Two patients did not have an initial IDTT. Required staff attended all initial IDTTs; patients attended 60 percent.

Only one of nine or 11 percent of patients had annual IDTTs. Required staff and the patient attended this one annual IDTT. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

CMC's pre-release planning LOP was current.

One social worker filled CMC's 1.9 pre-release coordinator position. Notably, the pre-release coordinator and the PC 2602 involuntary medications coordinator, both clinical social workers, covered for one another when necessary. The pre-release coordinator also provided MHCB coverage on weekends and holidays.

The pre-release coordinator's duties included completion of requests of information for patients released to probation, initiation of pre-release planning assessments prior to forwarding them to the primary clinician for completion, and attendance at CCAT meetings. The pre-release coordinator also participated in monthly headquarters' pre-release planning meetings; however, ISUDT pre-release meetings were curtailed in favor of document and email updates for patients' scheduled for release.

CMC had two assigned TCMP case managers. The pre-release coordinator and TCMP staff reported good communication between them and with custody staff. The pre-release coordinator and TCMP staff also had access to confidential meeting space.

TCMP reported meetings with 139 patients, including 58 EOP and 81 3CMS patients, during the reporting period.  Overall, benefits' applications were submitted for 131 or 94 percent of patients.  Four patients refused TCMP services; others were ineligible or unavailable.  Further, Medi-Cal applications were submitted for 128 or 92 percent of patients, and SSI applications were submitted for 45 of 50 or 90 percent of eligible patients.  There were also applications for veterans' benefits for three potentially eligible applicants, of which one patient was previously determined to be eligible, another's application was pending, and the remaining patient was denied eligibility.

Regrettably, CMC had not offered pre-release planning groups since prior to the COVID-19 outbreak and had no plans to resume them until its staffing situation improved.

Program Access:

a.    Job and Program Assignments

CMC reported that 1,836 job assignments were held by 304 or 46 percent of EOP patients, 389 or 57 percent of 3CMS patients, and 1,143 or 56 percent of non-MHSDS incarcerated persons.

The 795 academic assignments were held by 139 or 21 percent of EOP patients, 179 or 26 percent of 3CMS patients, and 477 or 23 percent of non-MHSDS incarcerated persons.

The 219 vocational education assignments were held by 11 or two percent of EOP patients, 79 or 12 percent of 3CMS patients, and 129 or six percent of non-MHSDS incarcerated persons.

Of the 666 voluntary education assignments, 80 or 12 percent of EOP patients, 146 or 21 percent of 3CMS patients, and 440 or 22 percent of non-MHSDS incarcerated persons, held them.

The 56 substance abuse treatment assignments were held by four or one percent of EOP patients, 18 or three percent of 3CMS patients, and 34 or two percent of non-MHSDS incarcerated persons.

b. Milestone Credits

CMC reported that 26 MHCB patients were eligible to earn milestone credits, of whom 16 or 62 percent earned them, as did six of nine acute care patients, 557 of 636 or 88 percent EOP patients, 244 of 611 or 40 percent of 3CMS patients, and 835 of 1,739 or 48 percent non-MHSDS incarcerated persons.

c. Out-of-Level Housing

CMC reported that 17 EOP and 30 3CMS custody Level II patients were placed in Level I housing, as were eight EOP and four 3CMS custody Level III patients. There were 118 EOP and 58 3CMS custody Level III patients in Level II housing, and one EOP and one 3CMS custody Level II patients in Level III housing. There were also 51 EOP and 43 3CMS custody Level III patients in Level IV housing.

d. ADA Reasonable Accommodation and Grievance Procedure

CMC provided training materials for ADA reasonable accommodation training. Ninety-five percent of CCHCS staff completed the training, as did 99 percent of custody officers. The institution provided grievance procedure training meeting minutes but did not provide training rosters.

e. Periodic Classification Score Reductions: EOP Patients

Review of completed CDCR 840 forms revealed that CMC provided classification score reductions for EOP patients.

487

f.   Unclothed Body Search

Custody staff reported primarily conducting unclothed body searches in holding cells, with adequate coverings to maintain privacy, or in patients' individual cells.

"C" Status:

CMC did not provide "C" Status data for the reporting period.

As of the site visit, 15 incarcerated persons were on "C" Status, but the institution did not identify their level of care.  Reviewed chronos for these 15 individuals detailed applicable movement and program restrictions, the RVRs that led to the "C" Status classification, and the "C" Status time period.

Regrettably, mental health leadership reported that IDTTs for patients on "C" Status only began considering privilege loss mitigation, in accordance with policy, a few weeks prior to the site visit.

Mental Health Referrals:

During the reporting period, CMC reported 2,691 mental health referrals; there were 468 psychiatry referrals and 2,223 referrals to primary clinicians.  For emergent referrals, only one of four psychiatry referrals was seen timely, while 487 of 519 referrals to primary clinicians were timely seen.  For urgent referrals, there were timely responses to 11 of 14 or 79 percent of psychiatry referrals, and to 270 of 298 or 91 percent of primary clinician referrals.  For routine referrals, there were timely responses to 409 of 450 or 91 percent of psychiatry referrals, and to 1,321 of 1,406 or 94 percent of primary clinician referrals.

Custody officers typically knew how to refer patients who needed to be seen utilizing on-line means and paper mechanisms.  However, the utilized forms were older versions that were two revisions prior to the current forms.

Custody and Mental Health Partnership Plan:

CMC's custody and mental health partnership plan LOP was current and in compliance with statewide policy.

Reviewed executive leadership joint rounding forms reflected the conduct of monthly rounding; rounded facilities included the CTC/MHCB, Facility B's EOP hub, West Facility M, East Facility CTC/MHCB/acute care beds, Facility D's EOP/3CMS programs, and East Facility's 3CMS program. The rounding forms indicated required staff attendance and staff and patient interviews. Staff noted concerns with CMC's potential closure, burdensome documentation requirements, and the lack of electricity in administrative segregation. Patients reported concerns with transports to scheduled appointments and the temperature in certain facilities.

CMC did not provide executive staff meeting minutes. Notably, reviewed quality management committee and mental health subcommittee meeting minutes for all months of the review period addressed joint rounding.

Reviewed huddle sheets for second and third watch for patients housed in administrative segregation, the MHCB, and the EOP revealed near-perfect attendance for required staff attendance for all reviewed months. Two observed third watch huddles conducted for Facility D's EOP program and the EOP hub were both collaborative and attended by appropriate staff. Importantly, attending staff were knowledgeable about patients on their units.

CMC conducted weekly 3CMS supervisory meetings that required staff attended for all but one week during the review period. However, reviewed documentation only minimally noted topics that the meetings' discussed, including staffing shortages and COVID-19 issues, and typically did not provide further details beyond identifying these topics.

Reviewed documentation reflecting monthly joint supervisory 3CMS program area tours indicated the touring of East Facility C in October 2022, East Facility A in December 2022, and East Facility B in February 2023; there were also tours of West Facility M in November 2022, West Facility F in January 2023, and West Facility E in March 2023. Required staff attended all tours. Identified staff concerns included drug and gang-related matters and communication issues between mental health and custody staff. Patients' indicated that they often felt uncomfortable informing custody staff of their mental health issues, and further reported infrequent mental health appointments.

Due to EOP staffing shortages, CMC did not offer EOP orientation groups.

CMC distributed the 3CMS orientation brochure to patients who were new to the 3CMS level of care. The institution also provided the monitor with a copy of the brochure.

The institution conducted inmate advisory council (IAC) meetings during two months of the review period on West Facility, but cancelled meetings for the remaining months. All of East Facility's IAC meetings were also cancelled. CMC reported that all cancellations were the result of there being "no agenda items or issues to discuss."

There were 357 staff misconduct complaints filed against custody staff and 26 filed against mental health and medical staff. Of the 357 custody staff misconduct complaints, 337 were resolved, 18 were rejected, one was reassigned, and one was denied. Of the 26 complaints against medical and mental health staff, 21 were closed, two were inactive, two were referred for confidential investigations, and one was awaiting approval. No investigations for misconduct toward a patient were initiated through the appeal process. One custody staff member was reassigned due to a staff misconduct complaint, but no mental health staff were reassigned.

CMC did not provide quarterly round table training during the review period.

The institution reported that 162 of 185 or 88 percent of mental health staff and 744 of 774 or 96 percent of custody staff attended the annual partnership off-post training.

Heat Plan:

The heat plan was only in effect during October of the review period, during which there were two Stage I and one Stage II heat alerts. CMC utilized cooling fans and gave patients water during the Stage II heat alert.

Interviewed housing unit officers were knowledgeable about the heat plan and its respective stages except for Facility A officers, who were unsure of the heat plan's three stages.

Regrettably, none of the housing units had a printed copy of the list of patients who were prescribed heat sensitive medications. When this was brought to a lieutenant's attention, he attempted to obtain an electronic copy of this list but was unable to access it electronically. Additional attempts secured an electronic copy of this list, but it was not current. On the second day of the four-day site visit, the regional lieutenant reported that he was going to ensure that every custody officer received a daily copy of the patient heat medication list. Regrettably, this had not occurred as of the end of the site visit.

Of concern to the monitor during the prior and current round site visits was the location of thermometers. Each housing unit contained three floors. Antiquated mercury thermometers were placed at the custody officer's station, which was at the top of the staircase and had air flow near it due to its location. The cells in the flanking units were much hotter than where the thermometer was placed. When asked, custody officers did not have any other hand-held mechanism to measure the temperature down the halls where the cells were located. They reported relying on fans and cold showers to accommodate rising temperatures.

RVRs:

CMC issued 1,408 RVRs during the review period, of which 787 or 56 percent were issued to MHSDS patients, and 621 or 44 percent were to non-MHSDS incarcerated persons. Of the RVRs issued to mental health caseload patients, 20 RVRs were issued to acute care patients, four to intermediate care patients, 55 to MHCB patients, 362 to EOP patients, and 346 to 3CMS patients.

The monitor reviewed 29 RVRs and the corresponding mental health assessments to assess compliance with CDCR policy. Regrettably, custody staff timely referred the mental health assessment to mental health staff in only six of 29 or 21 percent of cases. Mental health staff completed the assessment and timely returned it to custody staff in 28 of 29 or 97 percent of cases. Clinicians conducted mental health assessments confidentially in 17 of 29 or 59 percent of cases; the patient refused the assessment interview or declined a confidential setting in the 12 remaining cases.

CMC assigned a staff assistant for patients in 22 of 29 or 76 percent of reviewed RVRs.

The SHO documented consideration of the mental health assessment for all 29 reviewed RVRs. The mental health assessment recommended penalty mitigation in 20 cases; penalties were actually mitigated in 11 of 20 or 55 percent of cases.

The clinician recommended documenting patients' behaviors in an alternative manner due to mental illness strongly influencing the behavior in one of 29 or three percent of reviewed RVRs.

All required custody and mental health staff attended RVR mental health assessment training.

<u>Use of Force</u>:

There were no controlled uses of force but 84 immediate use of force incidents.  Sixty-nine or 82 percent of immediate uses of force involved MHSDS patients.  There were also 145 non-use of force incidents, of which 102 or 70 percent involved MHSDS patients.

The monitor's review of 16 immediate uses of force indicated that all were in compliance with CDCR policy.  Notably, one reviewed immediate use of force resulted in the administration of involuntary medications to subdue a patient.

CMC reported 100 percent compliance for completion of use of force training by correctional administrators, captains, lieutenants, sergeants, and correctional officers.  Training for mental health staff was completed by the chief psychiatrist, senior psychiatrist, all seven staff psychiatrists, the telepsychiatrist, and five of seven or 71 percent of registry psychiatrists.  Further, all psychologists and social workers completed this training, as did 38 of 46 or 82 percent of psych techs.

<u>Lockdowns/Modified Programs</u>:

CMC reported one modified programming period due to a COVID-19 outbreak in Facility D-7 that lasted 14 days.

<u>Access to Care</u>:

CMC provided monthly Health Care Access Quality reports from October 2022 through March 2023.  Of 83,465 total issued mental health ducats and add-on appointments, 49,151 or 59 percent were completed and 34,314, or 41 percent were not completed.  Of the non-completed appointments, seven percent were due to custody factors, 29 percent were due to non-custody factors including canceled medical appointments, and 64 percent were due to patient refusals.

CMC staff reported frustration regarding canceled medical appointments. Finding medical doctors who would schedule consecutive appointments and reliable dentists and ophthalmologists were some strategies that were being employed.

Placement of 3CMS Patients into Minimum Support Facilities:

Two 3CMS patients were housed in the MSF in the fire camp during the site visit. One patient was prescribed KOP medications and indicated timely responses when he sought therapeutic support. The second patient had stopped all medications in December 2022 and was doing well without them. Both patients were employed and were learning a trade. The patients praised their CMC mental health providers for provided treatment.

*Coleman* Postings:

*Coleman* postings in English and Spanish were visible in all toured housing units on East yard, as well as on both sides of the MHCB.

**APPENDIX B-10**
**KERN VALLEY STATE PRISON (KVSP)**
**(June 12, 2023 – June 15, 2023)**

Census:

On June 9, 2023, KVSP housed 2,695 inmates, which was a 17 percent decrease since the prior review period.  The mental health caseload population of 1,195 patients, which was 44 percent of KVSP's total incarcerated population, was a three percent increase from the prior review period.

The MHCB housed nine patients and there were no patients in alternative housing.

The 169 mainline EOP patients represented a 25 percent increase from the prior review period, while the 931 mainline 3CMS patients were one patient less than what was reported for the previous reporting period.

The STRH housed 86 patients, including 80 3CMS patients, five EOP patients pending transfer to an EOP hub, and one EOP patient pending PSU transfer.

The administrative segregation unit housed 25 non-MHSDS patients.

Staffing:

The chief psychiatrist position was filled.

Only one of 7.5 psychiatry positions was filled, for an 87 percent vacancy rate.  The use of a 0.25 registry psychiatrist decreased psychiatry vacancies to 6.25, reducing the psychiatry functional vacancy rate to 83 percent.

Five telepsychiatrists covered four positions.  All four medical assistant positions were filled.

KVSP had one psychiatric nurse practitioner but no position.

One of two chief psychologist positions was filled. The remaining position was not filled as a cost-savings measure.

All three senior psychologist supervisor and all three senior psychologist specialist positions were filled. Of 22 psychology positions, 16.5 were filled, for a 25 percent vacancy rate. Two registry psychologists reduced the functional vacancy rate to 16 percent. Three psychologists were unlicensed.

One of two supervising social worker positions was filled. All 10.5 social worker positions were filled, but one social worker was on an extended leave, reflecting a ten percent vacancy rate. One social worker was unlicensed.

Six of 8.5 recreation therapist positions were filled, for a 29 percent vacancy rate. One registry recreation therapist reduced the functional vacancy rate to 18 percent.

One of 1.2 MHSDS registered nurse positions was filled, as were one of 1.2 CNA positions.

The senior psych tech position was filled, as were 24 of 30.2 psych tech positions, indicating a 21 percent vacancy rate.

Positions for all 12 office technicians assigned to mental health were filled.

Positions for the OSS II, HPS II, and two HPS Is were all filled.

As for custody staffing, positions for the warden, chief deputy warden, all six associate wardens, and five of six captains were filled. Twenty-eight of 31.4 positions for lieutenants were filled, but one lieutenant was on an extended leave, for a 14 percent functional vacancy rate. Eighty-one of 99.2 sergeant positions were also filled, but one sergeant was on an extended leave, for a 19 percent functional vacancy rate. Eleven CC IIs covered six positions, and 21 CC Is filled 18 positions. For correctional officers, 841 of 853.2 positions were filled, for a one

percent vacancy rate; however, 58 correctional officers were on extended leaves, increasing the functional vacancy rate to eight percent.

Telepsychiatry:

During the review period, the 3CMS and EOP programs primarily utilized telepsychiatry, but it was also used in the MHCB, and for treatment of intermediate care patients and general population inmates.  Four telepsychiatrists were assigned to the 3CMS program and one was assigned to EOP patients.

For 3CMS patients, telepsychiatry performed 336 initial intake psychiatry evaluations, 1,454 routine mainline 3CMS contacts, 20 urgent referrals, 225 routine referrals, 764 medication noncompliance contacts, seven PC 2602 hearings, five medication consents, two AIMS evaluations, and two 602 appeals' responses.

For EOP patients, telepsychiatry conducted 82 initial intake psychiatry evaluations, 221 routine mainline contacts, one emergent referral, six urgent referrals, 92 routine referrals, 89 medication noncompliance contacts, and four PC 2602 hearings.

Telepsychiatry also conducted 13 initial intake psychiatry evaluations for MHCB patients, as well as seven routine contacts, two emergent referrals, one routine referral, and one medication noncompliance contact.

For intermediate care patients, telepsychiatry performed two initial intake psychiatry evaluations, two routine contacts, five routine referrals, and three medication noncompliance contacts.

Telepsychiatry also conducted seven initial intake evaluations for general population inmates.

<u>Telework</u>:

KVSP did not use telework during the review period.

<u>Staff Recruitment</u>:

The chief of mental health reported trying to create a positive culture that included on-site initiatives to encourage clinicians to work at KVSP, and to retain staff. Among them, new employees received a welcome package that included snacks and office supplies. KVSP's mental health clinicians attended monthly staff meetings that addressed relevant clinical topics and provided education to develop and sharpen clinical skills. The institution also acknowledged staff work anniversaries. Initiatives also sought to improve relationships and bridge any gaps between custody and mental health staff. In this regard, KVSP recently held a barbecue to raise funds for veterans. The chief of mental health believed that these and other efforts helped to create a sense of community at KVSP and had contributed to improved staffing. Notably, interviewed mental health staff reported feeling appreciated and supported by a mental health leadership team that was willing to entertain creative solutions and allow them to use their clinical skills.

<u>Quality Management</u>:

The local governing body met quarterly and addressed CTC license renewal, which was obtained, and DPH reviews and deficiencies, among other issues.

The quality management committee met monthly. Major issues that the QMC addressed included Dashboard compliance for specialty appointments, gender affirming surgery evaluations, and patient refusals.

The mental health subcommittee typically focused on specific Dashboard measures, including diagnostic testing, polypharmacy reviews, timely referrals, discharges, and clinician

discharge follow-up, non-formulary medications and offered treatment hours. These and other mental health measures were tracked and discussed; if they did not report improvement, meeting minutes documented their continuous monitoring. The mental health subcommittee also addressed increasing the number of IDTTs for EOP and 3CMS patients.

The Emergency Medical Response Review Committee (EMRRC) met twice monthly and primarily addressed custody, medical, or overdose issues. One EMRRC meeting reported that mental health would complete a suicide risk assessment for all suspected or actual overdoses.

KVSP's LOP for psychiatry peer review was signed by the chief executive officer and warden in February and March 2023, respectively. It assigned a psychiatrist as chair. However, psychiatry peer review remained on hold from headquarters. Similarly, KVSP was awaiting a headquarters' directive to reinitiate peer review for psychologists and social workers. There was no peer review for the MHCB.

Medication Management:

KVSP provided MAPIP results for December 1, 2022 through May 31, 2023 for compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated compliance for six months for blood pressure, height, weight, medication consents, and thyroid function tests. There was compliance for five months for the Abnormal Involuntary Movement Scale (AIMS) measure. For monitoring EKGs, KVSP was compliant for three of four required months. KVSP reported noncompliance for all six months for glucose, Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), and lipids.

KVSP was not an authorized clozapine initiation or maintenance facility. Nonetheless, the institution occasionally received patients for CTC placement who were prescribed clozapine,

but KVSP did not report the number of patients. Further, these patients did not remain at KVSP after completion of their medical or mental health treatment. As for the close monitoring that clozapine required, KVSP was compliant for the one required month for glucose, CMP, EKG, and lipids. KVSP further reported that no data was required for AIMS, blood pressure, CBC, height, weight, medication consents, or thyroid function tests.

For required monitoring of antidepressants, there was compliance for six months for medication consents, thyroid function tests, and monitoring blood pressure for patients prescribed venlafaxine. No EKGs were required.

For patients prescribed carbamazepine, there was compliance for both required months for obtaining CBC, and for the one required month for CMP and medication consents. For monitoring medication blood levels, KVSP was compliant for one of two required months.

For patients prescribed Depakote, there was compliance for five months for obtaining medication consents, and for three months for monitoring CBC with platelets and CMP. The institution reported compliance for one month for monitoring therapeutic medication levels.

For lamotrigine, KVSP reported compliance for four of five required months for obtaining medication consents.

Regarding lithium, there was compliance for five months for obtaining medication consents, and for four of five required months for EKGs. There was compliance for three months for monitoring kidney function tests, and for three of five required months for monitoring thyroid function tests. There was compliance for two months for monitoring therapeutic blood levels.

For medication management metrics reported by mental health headquarters, KVSP was compliant for six months with continuity of medications upon parole/transfer to the community.

There was compliance for three months for continuity of medications with intra-institutional transfer to ASU/SHU/PSU, and for two months with medication continuity following discharge/transfer from a community hospital and/or DSH.  Shockingly, KVSP reported noncompliance for all six months for many metrics of critical importance, including medication continuity upon inter-institution transfer at receiving and release, continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity with MHCB transfers, observation of HS medication preparation and administration, observation of medication preparation and administration AM and PM, chronic care medications historical administration, and outpatient provider new medication orders.

KVSP reported several corrective action plans (CAPs) for MAPIP measures.  Most centered on educating patients about the importance of taking prescribed medications, consideration of medication discontinuation, and referral to psychiatry to discover the underlying reasons for medication nonadherence and reconsideration of patients' medication regimen.

Psychiatrists' prescribed medications in the CTC for 14 days, and otherwise, for 90 days. KVSP further reported that during the COVID-19 pandemic, prescription lengths were sometimes 180 days, in order to try to ensure medication continuity.  Bridge orders were for up to 30 days.

KVSP indicated that nursing staff received telephone or verbal orders, read the order back to the psychiatrist, and then forwarded the order to the pharmacy to be filled.  A message that the order required co-signature was sent to the psychiatrist.  The electronic medical record system tracked telephone and verbal orders.

The institution reported that 726 patients received 1,660 psychiatric medications as DOT.

Forty-five patients received KOP medications. In accordance with statewide policy, with one exception, all such prescriptions were for SSRIs or duloxetine.

There were 60 medication line observations during the reporting period. All observed lines were under two hours in duration, except for one that was two hours and 40 minutes. KVSP did not report individual patient wait times. Reviewed documentation also indicated a lack of sufficient protection from inclement weather on Facilities A, B, C, D, and M, with submitted CAPs indicating that medication lines lacked awnings due to KVSP's high security mission. There were two instances during second watch on Facility C when a custody officer was not present at medication pass.

KVSP did not indicate that medication administration interfered with mental health programming.

For the period of January through June 2023, between four and six percent of mental health prescriptions were non-formulary.

KVSP reported monthly compliance with polypharmacy reviews, which ranged from 96 to 98 percent. However, the institution did not report the total number of polypharmacy reviews that were due and completed.

There were 221 patients who received 310 medications at HS, nearly all of which were administered at 8:00 p.m. or later, as required.

During the review period, KVSP submitted 29 PC 2602 involuntary medication petitions, including 20 renewals, and five emergency and four non-emergency petitions. KVSP withdrew a petition for a paroling patient. No petitions were missed or not renewed due to administrative or clerical error, and none were denied by the administrative law judge. The institution did not report any barriers submitting required documentation, or any challenges with the Office of

Legal Affairs or Office of Administrative Hearings. A senior psychologist specialist served as the medication court administrator.

KVSP reported compliance for five months for having the PC 2602 court order in the patient's chart. For the related measure of placing the psychiatrist PC 2602 involuntary medication order in the chart, there was compliance for six months.

There was one use of force to administer PC 2602 medications.

Transfers:

The regional senior psychologist specialists conducted a sustainable process paper review in February 2023 that reviewed charts from the fourth quarter of 2022. The report found a decrease in the acceptability of higher level of care (HLOC) documentation from 88 percent in October 2022 to 78 percent during November and December 2022. Reasons reported for this increase in unacceptable documentation were clinicians' failure to submit appropriate narratives and interventions prior to the IDTT and the lack of updated interventions in master treatment plans. The inpatient coordinator and regional senior psychologist specialists discussed these deficiencies and developed quality improvements plans to address the concerns. Notably, during the review period KVSP's inpatient coordinator completed HLOC form audits that were consistent with the findings from the sustainable process.

During the site visit, observed IDTTs across programs revealed that treatment teams did not consistently address HLOC considerations. Although treatment teams occasionally addressed objective indicators, subjective indicators were not discussed beyond vague comments that the patient appeared to be functioning adequately. The inpatient coordinator indicated often attending IDTTs and reported that the indicators would likely have been more thoroughly addressed had he been present at the IDTTs. The inpatient coordinator also reported providing a

lot of continuing on-the-job training, which was especially provided for specific clinicians who monthly audits indicated required remediation in completing HLOC documentation.

Review of a sample of audited HLOC forms to assess the interrater reliability between KVSP's inpatient coordinator and the monitor's expert generally found adequate to good interrater reliability for the assessment of the adequacy of clinical non-referral rationales and for provided treatment modifications. A sample of non-referred patients was also reviewed to assess whether KVSP treatment teams were referring patients when appropriate. Unfortunately, there were several cases where the patient clearly should have been referred to inpatient treatment but was not referred. There were also numerous cases where the HLOC form indicated that the patient was identified for referral consideration due to the lack of treatment participation, but the clinical rationale was solely that the lack of attendance was volitional, without any adequate treatment modifications. Regrettably, there was a lack of analysis of how the patient's choice not to attend treatment impacted his mental health or may have been due to his mental health status. This occurred even when the same form documented the presence of serious psychiatric symptomatology that likely impacted the patient's functioning. This was troubling and these rationales were similar, and it appeared as though treatment teams had been taught a specific formula for patients flagged for poor participation.

During the review period, there were 288 instances of 161 patients who were considered but not referred to inpatient care.

KVSP referred 12 patients to acute care. The MHCB generated all acute care referrals. One acute care referral was rescinded. KVSP timely submitted all 12 referral packets. Eight of 11 acute care referrals timely transferred within ten days. KVSP did not report whether patients' transferred to inpatient care within 72 hours of a bed assignment.

There were 18 referrals to intermediate care, of which 14 referrals were from the EOP program and four were from the MHCB. All referral packets were timely completed. Of the 18 intermediate care referrals, one patient paroled, two were rejected, there was one rescission, and one patient was unable to transfer to inpatient care due to health issues and was treated at the intermediate level of care at KVSP. Of the 13 patients who transferred to intermediate care, only six transferred timely.

There were 12 *Vitek* hearings; five were for acute care patients and seven were for intermediate care patients. No patients prevailed.

There was an attempt to transfer one patient with complex medical needs to inpatient care, but the patient could not be transferred due to severe medical needs.

The inpatient coordinator reported that he learned about patients who were returning to KVSP through the C & PR and typically received one to two days' notice. The inpatient coordinator also reported that he kept a discharge spreadsheet that contained relevant information, including the date he was notified that a patient would be returning, the date the patient arrived, and the date that the 24-hour mental health evaluation was completed. KVSP clinicians also made contact with inpatient clinicians; if the inpatient clinician did not respond, the inpatient coordinator contacted the inpatient clinician.

On June 13, 2023, during the site visit, two intermediate care patients were awaiting transfer to inpatient care. Both were within transfer timeframes.

There were 199 KVSP referrals to the MHCB, of which 125 referrals were admitted and 74 were rescinded. Of the 125 MHCB admissions, 98 patients were admitted to KVSP's MHCB, and 27 patients were admitted to MHCBs at other institutions. Two MHCB admissions took

505

more than 24 hours to transfer. Further, 67 patients were admitted to KVSP's MHCB from other institutions.

Twenty-one patients had three or more MHCB/alternative housing stays. One patient each had 20, 16, ten, nine, eight, seven and six stays, two patients each had five and four stays, and ten patients had three stays.

KVSP reported immediately transferring patients requiring EOP level of care to the institution's EOP program. All patient transfers to STRH were internal and were also immediate.

There were 96 referrals to the EOP hub, of which 80 or 83 percent timely transferred within 30 days. Untimely transfers ranged from one to 44 days. All five patients awaiting transfer to the EOP hub at the time of the site visit were beyond transfer timelines.

There were no transfers to LTRH or the PSU during the review period. During the site visit, one patient was awaiting PSU transfer.

Programming:

STRH:

The caseloads of the STRH PNP and primary clinicians, which typically ranged from 18 to 20 patients, were within established ratios. During the review period, the STRH housed a total of 465 MHSDS patients, including 86 EOP and 379 3CMS patients. The average length of stay for MHSDS patients who were housed in STRH during the review period was 38 days.

Two patients attended three observed IDTTs; the remaining IDTT was held *in absentia.* The IDTTs were well conducted, with all required staff and the psychiatric nurse practitioner in attendance. The IDTTs addressed patients' levels of care, functional impairments, and interventions, provided adequate case conceptualizations, and addressed treatment goals. The

clinicians, PNP, and patients, for the two IDTTs they attended, discussed and agreed with the diagnoses. The supervising psychiatric social worker provided support to patients and clinical staff and guided the IDTTs' direction when either the clinicians or patients needed refocusing. The PNP asked appropriate questions about medications, side effects, and whether patients knew how to access care. The CC I helpfully presented patients' custody levels, and addressed RVRs, if any, answering all custody-related questions.

Six interviewed STRH EOP patients revealed that all knew their clinician and the psychiatric nurse practitioner. They reported being offered four weekly groups and stated they were able to speak with mental health staff when necessary. They did not express any concerns about meeting with a clinician more than once weekly and reported that custody staff timely released them for appointments. However, one patient reported concerns with the psych tech's rote questions of "are you suicidal," which was not what he wanted to hear first thing in the morning.

Fourteen interviewed STRH 3CMS patients reported receiving adequate mental health care. They reported that mental health groups were helpful, but voiced concerns with the lack of mainline 3CMS groups. They also expressed concerns with feeling that there was a lack of advocacy when an MH-115 was presented at ICC; they noted that the MH-115 documented their mental health issues, but that clinicians did not always advocate for them during ICCs.

The interviewed supervising psychiatric social worker, who had worked in STRH since 2019, reported having an office there, which facilitated interactions with mental health, nursing, and custody staff. Three interviewed social workers reported a collegial STRH environment and indicated receiving support from all disciplines, and especially from their supervisor. They noted a manageable workload, which facilitated continuity of care for their patients.

Observed ICCs included the supervising psychiatric social worker, who was the designated mental health clinician, and the chief deputy warden, facility captain, CC II, administrative segregation sergeant, and a correctional officer. The ICCs began with the supervising psychiatric social worker providing past and current information about the patient's level of care, any recent crisis, concerns that could impact the patient's ability to understand the proceedings, and any other contributing factors that the ICC should consider; this discussion occurred before the patient joined the ICC. Once the patient entered the room, the supervising psychiatric social worker inquired about the patient's current mental health and asked about any mental health concerns. The ICC process was adequate, with appropriate interaction between mental health and custody staff. However, the CC II spoke quickly and at times was difficult to understand.

Mental health clinicians and recreation therapists conducted STRH groups.

Review of a sample of ten 114-As for 21 weeks for MHSDS STRH patients revealed the offering of patients at least 18.5 weekly hours of yard and at least three weekly showers for 20 of 21 or 95 percent of examined weeks. There were weekly linen exchanges during ten of 21 or 48 percent of examined weeks.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Fourteen of 16 or 88 percent of patients had timely initial psychiatry evaluations before the initial IDTT. Thirty-one percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry was not used for any reviewed initial psychiatry assessments.

All seven or 100 percent of routine psychiatry contacts timely occurred at least every 90 calendar days. Only ten percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and cell-front contacts. Telepsychiatry was not used for routine psychiatry contacts.

All 15 or 100 percent of initial primary clinician evaluations timely occurred within ten working days of arrival and before the initial IDTT. Twenty-seven percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telehealth was not used for any initial primary clinician assessments.

Forty-four of 64 or 69 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Nineteen percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. One overdue routine primary clinician contact never occurred. Telehealth did not perform any routine primary clinician contacts.

Eleven of 16 or 69 percent of initial IDTTs timely occurred within 14 working days of arrival. Required staff attended all initial IDTTs; patients attended 19 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

Three of five or 60 percent of routine IDTTs timely occurred every 90 days. Required staff attended all routine IDTTs; patients did not attend any routine IDTTs. Reasons routine IDTTs were held *in absentia* included patient refusals. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

Non-Disciplinary Segregation:

During the review period, KVSP designated 53 MHSDS patients as NDS, including seven MHCB, six EOP, and 40 3CMS patients. Of these, 42 patients were approved for

accelerated transfer, of whom 11 were transferred from administrative segregation within policy timelines.  Patients approved for accelerated transfer who were transferred late ranged from one to 63 days late.  During the site visit, there was one NDS patient housed in administrative segregation.

KVSP maintained a tracking sheet that indicated patients' property and privileges, which indicated that patients received all property.

Observed ICCs revealed one patient's NDS placement.  The patient's ICC occurred within ten days of his administrative segregation placement, but it was unclear whether the patient was granted priority for the ICC meeting.  During the supervising psychiatric social worker's initial mental health briefing, she indicated that the patient had a history of decompensating following administrative segregation placement.  This did not appear to be considered in the ICC's decision to place the patient in NDS as opposed to a less restrictive housing alternative.

MHCB:

KVSP operated a 12-bed MHCB; one bed was redlined.  MHCB staff included the chief psychiatrist, one senior psychologist supervisor, four psychologists, and one recreation therapist. The caseloads of the MHCB psychiatrist and clinicians were all within established ratios.

The MHCB had adequate space for therapeutic activities, including one large ADA-accessible yard and two smaller yards.  There was also a dayroom with a television and library books, an office for the MHCB supervisor, an office for MHCB staff, with panels separating the space, and an IDTT/multi-purpose room.  There was also a medical exam room that could be used by MHCB staff for individual sessions.  Staff reported that contacts usually occurred in confidential settings unless patients refused.  Patients reported that staff occasionally conducted

cell-front contacts, but it could not be determined whether these contacts were in addition to required clinical contacts.

During the review period, the MHCB had an average daily census of eight patients. MHCB clinical stays averaged 7.6 days, with 17 clinical stays exceeding ten days. On average, MHCB patients were physically discharged from the MHCB after nine days, indicating an average of an additional physical stay of 1.4 days beyond the clinical stay. Fourteen patients waited more than 72 hours beyond their clinical stay to physically discharge. Thirty patients had physical MHCB stays exceeding ten days.

Two observed IDTTs found all required staff in attendance, as well as the program supervisor and unit sergeant. Although all staff participated in both IDTTs and provided relevant information, the treatment team process was not truly interactive; however, the supervisor attempted to create interactive discussions. Rather, each participant had their area and communicated directly with the patient.

During an initial IDTT, although the patient's medical record had been reviewed, the psychiatrist and psychologist had not completed their assessments beforehand. As such, the IDTT spent a significant amount of time gathering initial assessment data. Further, HLOC referral consideration was not routinely discussed, as this appeared to primarily be the decision of the primary clinician and program supervisor; the psychiatrist and other staff only provided referral input when prompted.

Staff reported that the MHCB offered recreation therapy groups, which record review confirmed. However, such groups were not regular, formally scheduled occurrences. Rather, staff reported that group times were based on other activities that were occurring in the MHCB.

During the site visit, the monitor's expert unsuccessfully attempted to attend MHCB groups, but they did not occur. Data review revealed that approximately 40 percent of MHCB groups were cancelled during the review period. As MHCB patients complained about the amount of time spent in their cells, RT groups would provide them with clinically beneficial activities outside of their cells to help patients cope. Notably, the recreation therapist provided patients with in-cell activities, but it could not be verified whether this was a daily occurrence.

Review of 114-As indicated that MHCB patients were offered yard, showers, and the opportunity to make telephone calls. An interviewed MHCB patient also reported that patients were offered dayroom, but this was not documented on the 114-As. Regrettably, one reviewed 114-A reported that the patient was not offered yard because he was on one-to-one suicide watch, which was in violation of applicable policy.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

Nineteen of 20 or 95 percent of MHCB patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of patient admission. Ninety percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals or were not indicated. Telepsychiatry was not utilized for any reviewed initial psychiatry assessments.

All 50 or 100 percent of twice weekly routine psychiatry contacts timely occurred. Forty-four percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and a lack of confidential space or were not noted. Telepsychiatry conducted four percent of reviewed routine psychiatry contacts.

All 20 or 100 percent of initial primary clinician evaluations timely occurred within 24 hours of patient admission. Ninety-five percent were conducted confidentially. Reasons for non-confidentiality included patient refusals.

For routine primary clinician contacts, 120 of 122 or 98 percent timely occurred. Sixty-six percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals or were not provided. Telehealth was utilized for two percent of routine primary clinician contacts.

Nineteen of 20 or 95 percent of initial IDTTs occurred within 72 hours of patients' arrival. Required staff attended 95 percent of initial IDTTs; patients attended 100 percent.

One hundred percent of patients had routine IDTTs every seven calendar days. Required staff and patients attended 100 percent of routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, but this assignment was not clearly discernable for all cases.

<u>Seclusion and Restraint</u>:

There was one restraint incident during the reporting period, which had a duration of two hours and 37 minutes. However, no formal order or progress note was located in the record as to when restraints were ordered. The discontinuation order indicated the ordering of restraints on December 19, 2022, at 11:20 a.m., but the patient was not placed in restraints until 3:00 p.m. No reason for this delay was provided.

Nursing notes indicated that the patient had been agitated, verbally threatening toward staff, smearing feces over himself and his cell, and "sifting" urine out under his door into the hallway. He was noncompliant with medications and the psychiatrist began an emergency PC 2602 involuntary medication order that coincided with the direction to place him in restraints to

allow for medication administration and an EKG.  Use of force was used to extract him from his

cell and move him to the restraint room, where he was placed in restraints.  There were no

injuries as a result of the use of force or restraints.  The patient was maintained in restraints

without any specified release criteria until the psychiatrist ordered release by way of a telephone

order at 5:37 p.m., after nursing notes described him as calm and no longer threatening toward

staff.  Significantly, this restraint episode did not comply with policy requirements for restraint

documentation by the psychiatrist and mental health staff, though nursing notes were well done.

KVSP did not report any seclusion episodes during the review period.

Crisis Intervention Team:

KVSP's CIT LOP conformed with statewide CIT policy.

During the review period, the institution referred 47 patients to the CIT, including six

MHCB, 27 EOP, and 14 3CMS patients.  Of these patients, the CIT referred 14 patients to the

MHCB, 27 to the same housing level, and six to a different housing level.  Provided information

did not allow for the calculation of response times to CIT activations.

KVSP assigned one clinician to the CIT Tuesday through Friday from 8:00 a.m. to 6:00

p.m.  Whenever the CIT clinician was unavailable, the next level of clinical responder was an

MHCB clinician.  When the MHCB clinician was unavailable, the program "clinician of the day"

responded to the CIT.  Daily the respective programs, including STRH, EOP, and 3CMS,

assigned a clinician of the day to handle CIT activations for that day.

CIT activation occurred when a yard or program area contacted the CIT.  The CIT

clinician would request that the patient be brought to the program office and would review

pertinent documentation.  The CIT clinician would then contact the appropriate nursing

supervisor and lieutenant, both of whom would also review necessary records.  Consistent with

statewide policy, the CIT would meet to discuss the reason for activation and relevant facts about the patient. The team would then meet with the patient to identify precipitants and develop and implement an appropriate plan.

When a patient experienced a mental health crisis after hours, a registered nurse assessed the patient. The nurse then provided pertinent information to the psychiatrist on call through a telephone consult. The psychiatrist subsequently determined whether the patient required alternative housing placement pending completion of a suicide risk assessment the following morning by a clinician.

Alternative Housing:

Staff assigned to alternative housing included staff assigned to the MHCB and the CIT, which included the chief psychiatrist, a senior psychologist supervisor, and several psychologists. MHCB cells were the preferred location to house alternative housing patients. Otherwise, KVSP designated certain STRH cells for alternative housing for patients housed in administrative segregation, as well as certain cells in Facilities C-4, D-8, A-1, and B-1. There were also designated secondary alternative housing cells.

There were 199 alternative housing placements during the review period. Alternative housing stays averaged 0.4 days; the alternative housing stays for patients admitted to the MHCB averaged 0.2 days, while they averaged 0.6 days for patients who were not admitted to the MHCB. Three alternative housing stays exceeded 24 hours.

The monitor viewed four alternative housing cells in Facility C-4, and four cells in STRH. All eight cells were clean and contained a sink and toilet. Review of the cleaning logs indicated that the cells were regularly cleaned.

EOP:

The caseloads for all EOP primary clinicians, which ranged from 21 to 26 patients, were within the established ratio, as were the caseloads of the telepsychiatrist and psychiatrists that covered the EOP program.

During the review period, EOP overflow housing remained a challenge at KVSP. Regrettably, KVSP housed 52 percent of EOP patients in overflow housing during the review period.  However, as of the site visit, following the opening of another EOP housing unit, only one patient remained in overflow housing.  The institution reported that all patients who were housed in overflow housing received weekly primary clinician contacts.  However, group availability varied; some patients were only offered in-cell therapeutic activities.

KVSP reported offering patients a weekly average of 9.6 hours of structured therapeutic activities; patients attended a weekly average of 4.8 hours and refused a weekly average of 4.8 hours.

Eight observed IDTTs were attended by three patients; the remaining five IDTTs were held *in absentia*.  IDTT attendees included the EOP supervisor, on-site psychiatrist, primary clinician, correctional counselor, recreation therapist, and psych tech.  Notably, the content of clinical presentations led by two clinicians and the supervisor varied.  Overall, clinicians discussed recent psychiatric treatment, but a comprehensive summary of psychiatric history was needed.  Each clinician knew the patient well and had good rapport with a strengths-based patient approach, while all staff treated patients respectfully.  Diagnoses were identified but supporting symptoms were not clear.  Attendees participated upon request from the clinician, but spontaneous input was rare, which was necessary for a collaborative multidisciplinary interaction.  While improved collaboration was needed across disciplines, patient collaboration

was very good as patients were routinely asked about their input regarding treatment goals. Higher level of care indicators and continued need for EOP treatment were variably reviewed. Treatment goals were objective, but not clearly measurable to assess treatment progress and identification of treatment interventions was rare.

Staff reported that about half of EOP patients were assigned to telepsychiatry. For unclear reasons, the assigned telepsychiatrist did not attend IDTTs, but the on-site psychiatrist attended. Minor medication adjustments were referred to the assigned provider, delaying treatment. Psychiatric input was limited to identification of medications, side effects, and an assessment of whether medications were helping targeted symptoms regardless of whether the psychiatrist was the assigned provider. There was no input about treatment goals or interventions, including the addition of psychiatric medication as an intervention.

IDTTs for patients on orientation status due to their recent transfer to KVSP were conducted *in absentia.* Staff reported that patients could not enter the EOP treatment area clinic until ICC was completed.

KVSP had an active group schedule that included multiple daily clinical, recreation, and nursing-led therapeutic groups (NLTG).

Observation of a clinician-led relapse prevention group found attentive and engaged participants with clinician prompting. Group content was appropriate, but facilitation of participant-to-participant interaction, an important component of a meaningful therapeutic group process, was needed.

Twenty NLTG groups were conducted weekly for EOP patients. Six EOP patients attended an observed NLTG wellness group on seasonal affective disorder. The group was interactive and utilized a PowerPoint presentation. The presenter was knowledgeable, asked

open ended questions, and followed the curriculum while reading the room and engaging patients at their level.  Following the group, five of six interviewed group participants reported knowing their psychiatrist and primary clinician and reported receiving services in accordance with the Program Guide.

Interviewed patients generally reported confidential telepsychiatry and primary clinician contacts; however, cell-front contacts occurred due to patient refusals or institutional lockdowns. Patients indicated that psychiatry contacts ranged from every 30 to 90 days and denied problems with access to psychiatric medication.  Most patients reported that weekly primary clinician contacts were helpful and taught them various skills to manage their symptoms or stressors. They indicated that treatment groups did not always last for the allotted hour due to late unit release or group completion prior to the group's end time.  Patients further reported that some group content was clinically useful, but also reported wanting more core groups, noting that groups where the activity was a movie or puzzles/coloring were not useful.  Most patients also reported that access to the CIT was a challenge; they had to report that they were suicidal or engage in self-harm to be seen.  Overall, patients reported that mental health was responsive to their needs, but that custody staff "brushed" off complaints, such as cellmate issues.

Twenty patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their EOP stays.

Five of eight or 63 percent of patients had initial psychiatry evaluations prior to the initial IDTT and within 14 calendar days of arrival or a level of care change.  Sixty-three percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals and lack of available treatment space.  Telepsychiatry conducted 38 percent of initial psychiatry assessments.

Twenty of 50 or 40 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Eighty-three percent were conducted in confidential settings. Non-confidential contacts were mostly due to patient refusals. Telepsychiatry conducted 65 percent of reviewed routine contacts.

All eight or 100 percent of initial primary clinician evaluations timely occurred within 14 calendar days of arrival or a level of care change. Fifty percent were conducted in confidential settings. Reasons for non-confidentiality were mostly patient refusals. Telehealth did not conduct any initial primary clinician assessments.

Eighty-seven of 101 or 86 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Sixty-nine percent were conducted in confidential settings. Reasons for non-confidentiality were mostly patient refusals; other reasons were lack of available treatment space, modified programming, and staff shortages which resulted in what KVSP termed "wellness checks." Telehealth did not conduct any routine primary clinician contacts.

All eight initial IDTTs occurred within 14 calendar days of arrival or a level of care change. Required staff attended all initial IDTTs; patients attended 38 percent.

All 17 or 100 percent of routine IDTTs timely occurred every 90 days. Required staff attended 100 percent of routine IDTTs; patients attended 71 percent. Reasons routine IDTTs were held *in absentia* included patient refusals. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

3CMS:

The caseloads of all telepsychiatrists assigned to the 3CMS program, which were between 127 and 210 patients, were within the established ratio. However, the caseloads of 3CMS primary clinicians, which were typically between 128 and 179 patients, exceeded the ratio.

IDTT was scheduled once weekly for each 3CMS yard. A primary clinician led observed Facility C IDTTs. Although all required treatment team members participated in IDTTs, the process was not truly collaborative. Three of eight patients attended IDTTs; the remaining five were held *in absentia.* The treatment team treated patients respectfully. However, IDTTs demonstrated limited discussion of psychosocial history and case conceptualization, while treatment planning was not individualized. IDTTs also did not discuss functional impact from symptoms, while symptoms were discussed in generic terms, such as "depression" or "anxiety," without a patient specific discussion of how the patient experienced them.

Although treatment goals were discussed, collaborative development was unclear, and diagnoses were variably discussed. Goals were not discussed in measurable terms and treatment interventions were not discussed. As an example, in cases where patients reported depression, the clinician discussed general observations as depression stemming from anger and discussed a goal or reducing RVRs but data to support this conclusion, including a nexus between the mood symptom and RVR receipt, was not discussed. Although rationales for non-referral to higher levels of care were discussed, there was no discussion of the rationale for continued 3CMS treatment. Further, some patients were likely ready to be discharged from the 3CMS program, but discharge was not discussed.

Clinician discussion during IDTTs revealed a high threshold or resistance to EOP referrals. Specifically, the psychiatrist shared concerns about a patient with psychosis who was medication resistant and there was discussion about an EOP referral. The clinician hypothesized that the patient would not attend groups and would be discharged to 3CMS and explained that he was "selective on who to do extra paperwork." The supervisor indicated a plan for the clinician to assess the patient and return to IDTT the following week.

Regrettably, the office door remained open during IDTTs that patients attended, which staff reported was due to safety concerns. However, there was no clear incident that precipitated this longstanding practice.

Facility C staff attributed IDTT refusals to many factors including lack of patient interest and competing appointments and other interests. Staff reported that treatment planning was discussed during the primary clinician contact prior to IDTT; when patients refused IDTT, the IDTT outcome was discussed with the patient at the next primary clinician contact. Cell-front primary clinician contacts were attributed to patient refusals. It was also reported that patients were primarily invested in psychiatric medication.

Observed Facility D IDTTs were held in a small but adequate room. All required staff attended, including the telepsychiatrist. Regrettably, the medical assistant, who reported being familiar with the connectivity process, had difficulty connecting with the telepsychiatrist; these connectivity issues resulted in IDTTs beginning 25 minutes late.

The IDTTs began with introductions and patients being asked whether they understood the IDTT's purpose. The medical assistant did not introduce the telepsychiatrist during the first observed IDTT and was prompted to do so by the monitor's expert. The CC I began IDTTs by discussing patient's committing offense, sentence, RVRs and next ICC. The CC I was

supportive, knowledgeable, and engaged.  However, the primary clinician did not consistently

provide or address higher level of care considerations, case formulations incorporating the

diagnosis and treatment goals, or develop new treatment goals or discuss measurable goals for

the next 90 days.  Notably, the supervisor appropriately interjected and otherwise supported the

primary clinician during IDTTs.  The telepsychiatrist appropriately discussed the patient's

medications, possible side effects, next appointment, and how the patient could make an

appointment.

KVSP offered groups to 3CMS patients on Facilities B, C, and D.  There was no group

waitlist at the time of the site visit and groups included those for veterans and transgender

patients.

An observed Facility C transgender group was very well conducted.  There was good

rapport between participants and the group leader and attendees were actively engaged.  The

group leader was empathetic, adept at facilitating participant interactions, and effectively

redirected patients as necessary.

Interviewed group participants spoke highly of the group and group facilitator.  However,

most did not find primary clinician contacts to be useful.  They reported that receipt of ducats

was variable and that most contacts were nonconfidential.  They further reported that clinicians

rarely asked them to come out of their cell and that they had to ask for a confidential contact.

They further reported that officers were routinely present during cell-front contacts.  Patients

reported improved access to mental health as needed for emergencies but stated that they had to

indicate that they were suicidal to access the CIT.

Twenty-four patients were randomly selected to have their healthcare records reviewed

for their 3CMS stays.  Four patients were eliminated from the assessment; two patients were

eliminated because their arrival at KVSP occurred within seven days of the end of the review period, another patient was eliminated because his departure from KVSP occurred three days after the beginning of the review period, and the remaining patient was eliminated because he was in the 3CMS program for only one day during the reporting period.

Eight of nine or 89 percent of patients had timely initial psychiatry evaluations before the initial IDTT. Eighty-nine percent occurred in confidential settings. Telepsychiatry was used for all initial psychiatry evaluations.

Twenty-three of 27 or 85 percent of routine psychiatry contacts timely occurred at least every 90 days. Ninety-one percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted 96 percent of reviewed routine psychiatry contacts.

Six of nine or 67 percent of patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. Forty-four percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and modified programing. Telehealth did not conduct any initial primary clinician assessments.

Twenty-nine of 32 or 91 percent of routine primary clinician contacts timely occurred at least every 90 days. Forty-four percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and modified programing. Telehealth did not conduct any routine primary clinician contacts.

Four of nine or 44 percent of initial IDTTs occurred within 14 working days of patient arrival or a level of care change. Required staff attended all initial IDTTs; patients attended 11 percent. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programing.

Four of five or 80 percent of patients had timely annual IDTTs. Required staff attended all annual IDTTs; patients attended none of the reviewed annual IDTTs. Reasons annual IDTTs were held *in absentia* included patient refusals and modified programing. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Other Issues:

   Pre-Release Planning:

   KVSP's half-time pre-release coordinator was a social worker who had worked at the institution since 2020. In addition to her pre-release coordinator duties, she had a STRH caseload and conducted gender affirming surgery evaluations, among other duties.

   The pre-release coordinator reported that primary clinicians initiated pre-release planning services with patients approximately one year prior to their release. The pre-release coordinator provided her services approximately 30 to 60 days prior to patients' release. These services included completion of a pre-release planning assessment (PRPA). Fifty of 56 MHSDS patients who were eligible for a PRPA completed one. The pre-release coordinator reported that mental health did not track whether released patients applied for or received California identification cards.

   It was further reported that the transitional case management program (TCMP) screened all 56 released MHSDS patients. All but two submitted some applications for services, including 54 applications for Medi-Cal, eight SSI applications, and one application for veterans' benefits.

   KVSP offered pre-release groups for EOP patients that were led by a social worker or recreation therapist that met once weekly. Three EOP patients attended an observed pre-release group. The instructor discussed the pre-release process with them but two of the patients were

knowledgeable about this process. During the group, the facilitator discussed available community resources.

Program Access:

a. Job and Program Assignments

On May 25, 2023, KVSP reported that of 1,242 available job assignments, 63 were held by EOP patients, representing 35 percent of this population. 3CMS patients held 368 job assignments, representing 39 percent of the 3CMS population, as did 811 or 50 percent of non-MHSDS incarcerated persons.

The 691 academic assignments were held by 20 or 11 percent of EOP patients, 218 or 23 percent of 3CMS patients, and 453 or 28 percent of the non-MHSDS population.

The 162 vocational education assignments were held by no EOP patients, 55 or six percent of 3CMS patients, and 107 or seven percent of non-MHSDS incarcerated persons.

The 424 voluntary education assignments were held by 132 or 14 percent of 3CMS patients and 292 or 18 percent of the non-MHSDS population. No EOP patients held voluntary education assignments during the review period.

Ten non-MHSDS incarcerated persons held substance abuse treatment assignments. Neither EOP nor 3CMS patients held these assignments.

b. Milestone Credits

KVSP was unable to report the number of MHSDS patients and non-MHSDS incarcerated persons who were eligible to earn milestone credits, as well as the actual number who earned the credit.

c. Out-of-Level Housing

KVSP reported housing one 3CMS custody Level I patient, three 3CMS custody Level II patients, and two EOP and 11 3CMS custody Level III patients in Level IV housing.

d. ADA Reasonable Accommodation and Grievance Procedure

KVSP provided a copy of the CDCR Form 824 reasonable accommodation request process manual and confirmed implementation of the revised ADA accommodation, grievance procedures, and appeals processes. The institution also provided training rosters that indicated that 21 custody and mental health staff completed the reasonable accommodation training.

e. Periodic Classification Score Reductions: EOP Patients

KVSP provided a sample of 20 completed CDCR 840 forms which indicated the provision of classification score reductions for EOP patients.

f. Unclothed Body Search

Interviewed STRH custody staff reported the procedure for unclothed body searches, which was consistent with KVSP's LOP. These searches were performed in single holding cells or patients' cells to ensure privacy.

"C" Status:

KVSP was unable to report the number of patients on "C" Status during the review period. At the time of the site visit, there were seven 3CMS patients and eight non-MHSDS incarcerated persons on "C" Status. Review of classification committee chronos for 3CMS patients demonstrated that all seven patients had generated a significant disciplinary history within a 180-day period and were deemed to be program failures.

Case-by-Case Reviews:

KVSP reported that ten 3CMS patients required a long-term segregated case conference. All ten case conferences were completed timely. Seven patients were pending completion of the

RVR hearing and/or a decision by the district attorney regarding prosecution; there was no stated reason for the three other patients' retention in segregation. Document review for seven of the long-term segregation case conferences revealed that six reflected consideration of mental health information about the decision to retain the patient in segregated housing.

Mental Health Referrals:

During the review period, KVSP made 1,085 mental health referrals; there were 308 referrals to psychiatry and 777 referrals to primary clinicians. There were 76 emergent, 97 urgent, and 907 routine referrals, and five routine PREA referrals to primary clinicians. For emergent referrals, there were timely responses to the one psychiatry referral, and to 68 of 75 or 91 percent of primary clinician referrals. For urgent referrals, there were timely responses to 18 of 24 or 75 percent of psychiatry referrals and to 66 of 73 or 90 percent of primary clinician referrals. Further, for routine referrals, there were timely responses to 217 of 283 or 77 percent of referrals to psychiatry, and to 544 of 624 or 87 percent of primary clinician referrals. There were timely responses to only two of five or 40 percent of PREA primary clinician referrals.

Custody and Mental Health Partnership Plan:

KVSP's CMHPP LOP was current and aligned with headquarters' directive.

There was executive leadership joint rounding during all six months of the review period. Each monthly form included detailed notes about staff and patient interviews. Issues noted included patient safety concerns, lack of clinical and confidential treatment space, and patients not wanting to meet confidentially with staff due to gang retaliation.

Six months of reviewed quality management committee and mental health subcommittee meeting minutes indicated 100 percent compliance for documenting and addressing the results of executive leadership joint rounding.

The monitor reviewed two weeks of daily huddle sheets for the MHCB, STRH, and EOP programs. There were missing MHCB huddle sheets for three required days. Otherwise, huddle reports were adequately completed and indicated required staff's attendance. The huddle sheets reported relevant patient information, including new patient arrivals, difficult patients, a patient who refused PC 2602 involuntary medication, and a patient who was not eating.

For this two-week period, there were daily huddle sheets for STRH for all days reflecting huddle attendance by required mental health and custody staff, which included notations from staff about new arrivals, and difficult patients. For the EOP program, there were huddle sheets for all required days except one, which included notations about new patient arrivals, refusal of PC 2602 involuntary medications, patients returning from the MHCB, and patients' fighting. All required mental health and custody staff were in attendance.

Two observed EOP huddles were attended by the regular assigned custody housing unit officers, a mental health clinician, the chief of mental health, and nursing staff. Regrettably, all of the content areas on the huddle form were not addressed. The clinician led the discussion, but custody staff did not provide input. Relatedly, nursing staff expressed concern about a complex patient with mental health and medical needs. While there was discussion that addressed the need for a higher level of care referral for him, there was no discussion of a plan for mental health follow-up without prompting from the monitor's expert.

An observed STRH huddle attended by the mental health supervising psychiatric social worker, a correctional officer, and a psych tech discussed four patients who had recently returned to STRH. It also addressed a patient who had received bad news, who a clinician subsequently saw, among other pertinent issues.

Reviewed documentation for two months of weekly 3CMS supervisory meetings conducted on Facilities A, B, C, and D indicated attendance by the mental health supervisor and facility sergeant, addressed pertinent issues, and included notations about new patient arrivals, and any patients of concern.

Two observed weekly 3CMS supervisory meetings conducted on Facilities C and D were well-conducted and attended by required staff, including the mental health supervisor and the respective housing unit custody sergeants. Observed discussions addressed patients returning from a higher level of care, new 3CMS admissions, and patients who demonstrated odd or unusual behavior, or had received bad news. There was also discussion about a patient for whom a custody sergeant had recently submitted a mental health referral.

KVSP provided documentation of monthly joint supervisory 3CMS program area tours for five of six months of the review period. The forms reported the programs and areas visited and reflected staff and patient interviews. Patients indicated timely receiving mental health ducats and knowing how to access mental health services. Staff reported a good working relationship between mental health and custody.

An observed EOP orientation group began ten minutes late. A recreation therapist facilitated this fourth group in the EOP orientation series and included an EOP patient peer facilitator and a sergeant, who arrived late. Patients reported that they had been at KVSP for between two and five months. They also reported that custody staff had only attended the previous and current group and that both times a different custody staff member attended. The established curriculum for the group was followed and the participants were actively engaged.

Review of six months of minutes for inmate advisory council (IAC) meetings conducted on Facilities A, B, C, and D did not indicate the discussion of mental health issues at any of the

meetings. However, all of the IAC meeting minutes were signed by the respective facility captains and IAC chairpersons.

KVSP reported distributing the 3CMS orientation brochure to new patients and also provided the monitor with a copy of the brochure.

There were 203 staff complaints filed against custody during the review period, of which 64 or 34 percent were closed and 139 or 66 percent were reported to be in progress. Unfortunately, 86 or 62 percent of the staff complaints in progress had been pending for between six and nine months without resolution. This was concerning as an adverse action can only be taken against a correctional officer within one year of the date of the misconduct. There were also 15 complaints filed against mental health staff; 13 were closed and two remained in progress. No KVSP staff were reassigned due to a staff misconduct allegation.

Based on provided data, KVSP was not compliant for required staff's attendance at the mandatory quarterly round table training for the MHCB, STRH, and EOP programs. Although the institution provided sign-in sheets for various custody and mental health staff who attended these trainings, KVSP did not also indicate required staff who were required to attend them; on the training dates, significantly more custody and mental health staff were assigned to the units than attended the trainings.

As for attendance at the mandatory CMHPP off-post training, KVSP reported 100 percent compliance for attendance by the warden, chief deputy warden, six correctional administrators, six captains, 28 lieutenants, and 82 sergeants. For correctional officers, 801 of 841 or 95 percent attended the training. For mental health staff, KVSP reported 100 percent compliance for the two chief psychologists, four supervisors, psychiatrist, psychiatric nurse

practitioner, eleven social workers, and seven recreation therapists.  Sixteen of 17 or 94 percent of psychologists also attended the training.

Heat Plan:

Review of KVSP's heat plan LOP indicated compliance with headquarters' directive. Notably, the LOP lacked required information about reasonable accommodations for heat risk patients during heat plan activation.

The heat plan was only in effect during October 2022 of the reporting period.  There were no heat alerts at that time.  Heat plan logs for October 2022 were properly completed and signed by appropriate custody staff and reflected the recording of the required indoor temperature every three hours.

Interviewed custody staff in the administrative segregation unit were knowledgeable about the process following heat plan activation.  They reported receiving a daily list of patients who were prescribed heat-risk medications.  Concerningly, review of the temperature logs during the site visit revealed that staff had signed their name to some of the time frames ahead of time and before a temperature was logged for a particular hour, which compromised the data's reliability, particularly when identifying who reported the data.  Staff reported not offering accommodations for yard time when a heat alert resulted in yard's cancellation.

Interviewed EOP custody staff in two different housing units reflected different levels of knowledge of the heat plan.  Regrettably, two custody staff from one EOP housing unit were unable to indicate any stage of the heat plan or the activation requirements.  In another EOP housing unit, custody staff were very knowledgeable of the procedure following heat plan activation, including the requirements at each activation stage, how to appropriately respond to a patient exhibiting unusual behavior, and where to access the daily list of patients who were

prescribed heat medications.  All heat logs were properly recorded for the day in each of the two visited EOP housing units.

All interviewed officers in the 3CMS housing units were acutely aware of the heat plan's procedures, and of the requirements at each of the heat plan's three stages.  All heat logs were properly recorded for the day.

RVRs:

KVSP issued 2,468 RVRs during the review period, of which 1,231 or 50 percent were issued to MHSDS patients, including five RVRs issued to intermediate care patients, 37 to MHCB patients, 221 to EOP patients, and 968 to 3CMS patients.

Review of 17 RVRs issued to MHSDS patients revealed that custody timely referred the mental health assessment to mental health staff within two days in eight of 17 or 47 percent of cases; late referrals ranged from two to 25 days.  Mental health staff timely completed and returned the assessment to custody within eight days in 16 of 17 or 94 percent of cases; the one late return was three days late.  The mental health assessment was confidentially completed 35 percent of the time, with the patient refusing a confidential assessment on nine occasions or 53 percent of the time and requesting that the interview be conducted at cell front.  Two other assessment interviews were conducted at cell front due to one patient being on quarantine status and another having COVID-19.

Patients were assigned a staff assistant consistent with policy 100 percent of the time.

The senior hearing officer (SHO) documented consideration of the patients' mental health information in 13 of 17 reviewed RVRs or 76 percent of the time.  The SHO mitigated penalty assessment based on the mental health recommendation in all 13 cases where the assessment recommended mitigation.

Required mental health assessment training was completed by five of six correctional administrators, all six captains, 27 of 28 lieutenants, and 78 of 81 sergeants.  For mental health staff, the training was completed by 14 of 17 psychologists, and seven of ten social workers.  Regrettably, of the 17 reviewed mental health assessments, eight or 47 percent were completed by a mental health clinician who had not attended the required training.

Five of eight or 63 percent of reviewed ICC SHU term assessment chronos documented the chairperson's consideration of patients' mental illness in the SHU assessment.

Use of Force:

KVSP reported two controlled use of force incidents involving MHCB patients.  There were also 135 immediate uses of force, of which 106 or 79 percent involved MHSDS patients.

Review of the two controlled uses of force revealed adequate cool down periods, mental health and custody staff's attempt to deescalate the situation and gain patients' compliance, and the videorecording of the incidents.

One of the controlled use of force incidents contained an allegation of the excessive or unnecessary use of force.  As part of KVSP's use of force incident review process, this controlled use of force was noted to be out of compliance as registered nurse clearance was not obtained prior to the use of chemical agents, in violation of CDCR policy.  Further review identified several concerns, which included the extraction team not identifying themselves on video, and staff not remaining at the cell door during the entire cool down period, while all staff did not wear respirators.  During the manager second level of review, it was noted that the patient made a statement of excessive/unnecessary use of force.  Notably, the mandated interview was also not completed within 48 hours per policy timelines.  Additionally, the reviewing incident commander identified that the chemical agents used were not shown on the

video tape prior to being dispersed. However, the identification of policy violations during the mandated use of force reviews demonstrated compliance with CDCR policy and the ability to self-identify areas of concern or improvement.

Review of ten immediate use of force episodes involving MHSDS patients revealed several minor policy violations, which included not submitting a report timely and not wearing protective gear. Notably, none of the four levels of use of force review included a question about the presence or review of body worn camera footage as part of the immediate use of force review. As CDCR has implemented body worn cameras at several institutions with the goal of full implementation systemwide, the use of force review documents should be updated to reflect this improvement in documenting and reviewing use of force incidents.

KVSP reported 100 percent compliance for attendance at the mandatory use of force training by the warden, chief deputy warden, six captains, and 81 sergeants. Further, four of six correctional administrators attended the training, as did 27 of 28 lieutenants, and 778 of 853 correctional officers. As for mental health staff, the training was attended by the chiefs of psychology, and all four supervisory psychiatrists/psychologists/social workers. Further, 18 of 20 psychologists attended the training, as did one of two psychiatrists and ten of 13 social workers.

Lockdowns/Modified Programs:

There was one program lockdown at KVSP from October 10 – 17, 2022 which covered the entire institution except for Facility C-7 and C-8, which were EOP housing units, STRH, and the MSF. During this lockdown, priority ducats were issued, and patients were allowed to attend mental health appointments.

<u>Access to Care Reports</u>:

A review of KVSP's monthly Health Care Access Quality reports from October 2022 to March 2023 reflected the issuance of a total of 42,161 mental health ducats and add-on appointments. Of these, 18,681 or 44 percent were completed and 23,480 or 56 percent were not completed. Of the non-completed appointments, one percent were reportedly not completed due to custody reasons, 39 percent were due to non-custody factors, and 60 percent were due to patient refusals.

<u>*Coleman* Postings</u>:

All toured housing units contained the current *Coleman* posting in English and Spanish in areas that were accessible to patients.

**APPENDIX B-11**
**CALIFORNIA INSTITUTION FOR WOMEN (CIW)**
**(June 20, 2023 – June 23, 2023)**

Census:

On June 20, 2023, CIW housed 978 incarcerated persons, which was a two percent increase since the prior review period. The mental health caseload population of 495 was 51 percent of CIW's total population and represented a two percent decrease from the prior reporting period.

The MHCB housed eight patients. There were no patients in alternative housing.

The mainline EOP population remained relatively constant, with 41 or three fewer patients than during the prior review period. The mainline 3CMS population of 412 represented a nine percent decrease since the previous reporting period.

The PSU housed three patients and there were two patients in the EOP hub.

There were seven 3CMS patients in STRH. LTRH housed nine 3CMS patients.

The CTC housed one intermediate care, one EOP, and two 3CMS patients.

There were nine 3CMS patients in the OHU.

Staffing:

One of two chief psychiatrist positions were filled.

Two of 7.5 psychiatry positions were filled for a 73 percent vacancy rate; however, the use of 5.75 registry psychiatrists eliminated the functional vacancy rate. CIW did not utilize telepsychiatry.

Two of three chief psychologist positions were filled.

Three senior psychologist supervisors covered two positions. Two of four senior psychologist specialist positions were filled. Of 17.5 psychology positions, 15 were filled; one

536

registry psychologist reduced the functional vacancy to nine percent.  Three psychologists were unlicensed.  There were four psychology interns.

Both supervising social worker positions were filled, as were five of 11.4 social worker positions, reflecting a 56 percent vacancy rate.  Three social workers were unlicensed.

Five of six recreation therapist positions were filled for a 17 percent vacancy rate.

All seven senior psych tech positions were filled.  Fifty-four psych techs covered 49.1 positions.

As for nursing staff, 19 of 19.5 supervising registered nurse positions were filled.  Twelve of 20 registered nurse positions were also filled, while six registry nurses decreased the functional vacancy rate to ten percent.  Thirty-three LVNs covered 25.2 positions.  Twenty-two of 34.8 CNA positions were filled, but contractors covered all vacant positions, eliminating the function vacancy rate.

Eight of nine office technician positions were filled for an 11 percent vacancy rate.

Positions for the OSS I and HPS I were filled.  The CHSA I position was vacant.

As for custody staffing, the warden and chief deputy warden positions were filled, as were three of four associate warden positions, and all four captain positions.  All 21.4 lieutenant positions were filled.  Fifty-six of 63.8 sergeant positions were also filled, but five sergeants were on extended leave, for a 20 percent functional vacancy rate.  All nine CC I and 3.5 CC II positions were filled.  CIW had 416 correctional officers for 398.2 positions, but 37 were on extended leaves, for a five percent functional vacancy rate.

Telepsychiatry:

CIW only used telepsychiatry for 3CMS patients for one weekly ten-hour period during the review period.  Although the institution did not utilize telepsychiatry at the time of the site

visit, it had access to the nighttime telepsychiatry pool for emergency matters between 6:00 p.m. and 7:00 a.m.

Telework:

CIW had different telework policies for various staff positions that offered telework from zero to two days weekly. This variability reportedly resulted in staff tension and poor retention.

Staff Recruitment:

Staff expressed concerns with recruitment and retention, emphasizing the need for increased salaries and adequate onboarding for newly hired staff. Mental health staff further reported that staff retention issues directly impacted continuity of care and treatment progress for MHSDS patients.

Quality Management:

Overall, CIW's quality management documentation indicated adequate communication and quality assurance practices within and across disciplines. Problems were generally investigated timely, and corrective action plans (CAPs) appeared effective based on outcome data.

The local governing body achieved quorums for all meetings. It addressed privileging, amendments to policies and procedures, Joint Commission performance data, California Department of Public Health reviews, and a plethora of other issues.

The quality management committee met monthly and always attained quorums. The QMC reviewed quality improvement projects, mental health performance reports, executive leadership joint rounding, and SPRFIT initiatives, among other matters.

The mental health program subcommittee met monthly and also always achieved quorums. Each meeting agenda included three broad categories of discussion, namely, systems

surveillance, QIP/work improvement opportunities, and review of surveys/audits/compliance. The subcommittee developed and reviewed various CAPs and QIPs, all of which demonstrated efforts to self-identify and correct problems.

CIW obtained Joint Commission accreditation in August 2022 for both its inpatient and outpatient programs, including the unlicensed MHCB.

CIW lacked an active peer review program for outpatient psychologists and social workers, which the regional administrator reported was "on hold." However, the chief of mental health had recently implemented a new peer review process for psychiatry.

Medication Management:

CIW provided MAPIP results for October 1, 2023 through March 31, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

The institution reported multiple challenges with meeting required MAPIP metrics, including COVID-19 restrictions, a shortage of laboratory personnel, and patient refusals. Of the 40 required measures for diagnostic monitoring, a mere 18, or 45 percent, were compliant for all required months of the review period. More alarmingly, for medication management, a paltry three of 12, or 25 percent, were compliant for the entire reporting period.

Diagnostic monitoring for patients prescribed atypical antipsychotics demonstrated that CIW was compliant for all six months for monitoring blood pressure, height, weight, and thyroid function tests. There was compliance for five months for glucose, four months for medication consents, three months for Complete Blood Count (CBC) with platelets and Comprehensive Metabolic Panel (CMP), and two months for lipid monitoring. As for EKG monitoring, CIW reported compliance for one of three required months. Alarmingly, CIW was compliant for only one month for the Abnormal Involuntary Movement Scale (AIMS).

CIW was a clozapine initiation and maintenance facility. In accordance with statewide policy, outpatient clozapine initiations were only performed in the MHCB. During the site visit, seven patients were prescribed clozapine. As for clozapine monitoring, CIW reported compliance for six months for blood pressure, glucose, CBC, and weight. There was compliance for all five required months for AIMS and obtaining medication consents, and for five months for CMP. CIW reported compliance for four of five required months for EKGs, and for four months for monitoring height. The facility was compliant with monitoring lipids for three of five required months, and for monitoring thyroid tests for one required month.

For monitoring antidepressants, CIW was compliant for six months for thyroid laboratory tests and blood pressure for patients taking venlafaxine. There was compliance for two months with obtaining medication consents, and for one required month for EKGs.

Regarding carbamazepine, CIW indicated compliance for six months with monitoring medication blood levels and CBC. There was compliance for five required months for medication consents, and for five months for CMP.

For patients prescribed Depakote, CIW was compliant for six months for obtaining medication consents, for five months with monitoring CBC with platelets, and for four months with monitoring CMP. Therapeutic medication level monitoring was compliant for three months.

For lamotrigine, there was compliance for obtaining medication consents for three of five required months.

As for lithium, CIW reported compliance for five months with obtaining medication consents and monitoring kidney function tests. There was compliance for three of four required months for EKGs, and for two months for thyroid tests. Therapeutic medication level monitoring was only compliant for one month.

For medication management metrics reported by mental health headquarters, CIW was compliant for six months with continuity of nurse-administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), chronic care medications historical administration, and outpatient provider new medication orders. The institution achieved compliance for five months with medication continuity for MHCB transfers and upon parole/transfer to the community. For medication continuity following discharge/transfer from a community hospital and/or DSH, there was compliance for four months. For both medication continuity upon inter-institution transfer at receiving and release and with intra-institutional transfer to ASU/SHU/PSU, CIW reported compliance for two months. CIW was compliant for only one month with observation of medication preparation HS. Regrettably, there was noncompliance for all six months for observation of medication preparation AM and PM.

CIW psychiatrists' prescribed medications for up to 30 days for MHCB patients, and for up to 90 days for EOP and 3CMS patients. Bridge orders and discharge prescriptions were prescribed for a maximum of 30 days.

Telephone and verbal orders were only allowed after hours when an on-site psychiatrist was unavailable. Nursing obtained the order and confirmed it by reading it back to the psychiatrist. The nurse entered the orders in EHRS, which were reviewed and confirmed by the psychiatrist on the following business day.

As of March 31, 2023, CIW reported prescribing 1,378 medications as DOT. There were also 112 KOP prescriptions. In accordance with CDCR policy, all KOP prescriptions were for SSRIs or duloxetine, and were for 3CMS patients.

CIW performed medication line audits for all clinics across all watches. The audits determined that the total duration of all medication lines was well under two hours; individual patient wait times were for less than 30 minutes. CIW had permanent structures that provided patients with shade and shelter from inclement weather. The institution denied any conflicts between medication distribution and mental health programming.

CIW reported that beginning in April 2023, correctional officers turned off patients' tablets if they refused medications. Though requested by the monitor's expert, CIW leadership did not provide any statewide or local policy supporting this practice. The monitor's expert expressed concerns to psychiatry and nursing leadership about the coercive nature of this practice. Their response was that patients should take prescribed medications, but that some patients remained in their rooms using their tablets instead of coming to the medication line.

An average of seven percent of psychiatric medications were non-formulary. Mental health leadership reported multiple MHCB admissions from the CCWF reception center, due to changing patients from non-formulary medications such as quetiapine and bupropion to formulary agents, with resultant worsening of psychiatric symptoms.

There were 246 polypharmacy reviews during the review period, which data indicated were timely completed.

Shockingly, only six psychiatric prescriptions at CIW were written as HS medications, which was considerably less than what would be expected given that many psychiatric medications were sedating and traditionally given at HS. CIW leadership explained that this exceptionally low number was due to COVID-19, and nursing, medical, and psychiatry working together to consolidate PM medications, which were given at 7:00 p.m., with HS medications, which were given at 8:00 p.m. or later, whenever possible. Although staff noted that this

difference was only one hour, HS medications must be given at or after 8:00 p.m., while PM medications could be administered two hours before or after the prescribed time, namely, between 5:00 p.m. and 9:00 p.m.

During the review period, CIW submitted 33 PC 2602 involuntary medication petitions, including 13 initial and 20 renewal petitions. There were five emergent and eight non-emergent initial petitions, of which one was denied due to insufficient evidence. One renewal petition was also not renewed due to the psychiatrist's clinical decision. No PC 2602 petitions were withdrawn due to administrative issues. The number of PC 2602 petitions had reportedly significantly increased due to patients' presenting with increased mental illness severity. At the time of the site visit, 18 patients had PC 2602 involuntary medication orders.

CIW reported five months' compliance for having the PC 2602 involuntary medication court order and the related measure of the psychiatrist's order in the chart.

There were two uses of force to administer involuntary medications during the review period.

Transfers:

Due to the unmet needs assessment project, the regional team did not conduct major or minor sustainable process reviews at CIW during the review period.

CIW made 46 referrals to acute care; one was rescinded, but none were rejected. Forty-three of 45 or 96 percent of patients timely transferred to acute care within ten days of referral. The remaining two patients transferred three and four days late; one delay was due to COVID-19 isolation, and the other patient required outside hospital medical care.

For intermediate care, CIW referred 15 patients; no referrals were rescinded, one was rejected, and one transferred to an outside hospital for medical care. All 13 patients timely transferred within 30 days of referral.

CIW completed 19 *Vitek* hearings for 13 acute care and six intermediate care patients. No patients prevailed.

No patients were awaiting acute or intermediate care placement within 72 hours of the site visit.

During the review period, there were 168 instances when 74 patients were considered but not referred to inpatient care.

Of 106 MHCB referrals, 104 patients were admitted. Two referrals were rescinded. Of the 104 MHCB admissions, 103 or 99 percent were admitted within 24 hours of referral.

During the reporting period, 22 patients had 41 PSU placements. All transfers to the PSU timely occurred within 60 days of referral.

CIW immediately placed patients requiring EOP or STRH placement in CIW's internal programs.

Only 21 of 26 patients timely transferred to LTRH. Four transfers were untimely, and one patient's SHU term was suspended.

Programming:

EOP hub and PSU:

Due to a low census, CIW continued to house and program EOP hub and PSU patients together in the PSU. These patients also attended treatment groups together to ensure that groups were large enough to have meaningful discussions and therapeutic value.

During the review period, 19 patients had 29 total stays in the EOP hub. Stays averaged 15 days and ranged from one to 45 days. Twenty-two patients had 41 total PSU stays, with stays averaging 28 days and ranging from one to 112 days.

CIW typically offered patients an average of ten weekly hours of structured treatment during the review period. However, due to the low census, compliance for offered structured treatment in the EOP hub fell below 90 percent in February 2023 when one patient was offered nine weekly hours of structured treatment.

The monitor's expert did not observe any EOP hub or PSU IDTTs as no patients were scheduled for them during the site visit.

EOP hub and PSU patients were assigned to at least one primary clinician-led group. Recreation therapists and nurses facilitated other groups. Staff and patients described recreation therapy-led groups as structured and therapeutic without an overreliance on games and movies.

Observed psych tech rounds for all EOP hub and PSU patients were thorough, with appropriate questions by psych techs. The psych tech was familiar with all patients, spent sufficient time establishing positive rapport, and entered notes about the rounds in EHRS immediately following each patient encounter. All patients were offered in-cell materials.

Five weeks of reviewed 114-A data for EOP hub patients indicated the offering of at least ten weekly hours of yard for four of five reviewed weeks, three weekly showers for three of five weeks, and one weekly linen exchange for four of five weeks. The PSU offered patients ten hours of weekly yard, three weekly showers, and weekly linen exchanges.

Twenty patients were randomly selected to have their healthcare records reviewed for their EOP hub stays.

All 18 or 100 percent of patients had timely initial psychiatry evaluations before the initial IDTT. Thirty-three percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, medical restrictions, modified programming, and unavailable custody escorts. Telepsychiatry was not used for any reviewed initial psychiatry assessments.

Eighty-two percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Only 39 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, medical restrictions, modified programming, and cell-front contacts. Telepsychiatry was not used for reviewed routine psychiatry contacts.

All 18 or 100 percent of initial primary clinician evaluations timely occurred before the initial IDTT. Fifty percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, medical restrictions, unavailable confidential space, and cell-front contacts. Telehealth was not used for any reviewed initial primary clinician evaluations.

Forty-one of 49 or 84 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Only 39 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, medical restrictions, unavailable confidential space, cell-front and group room contacts, and modified programming. Telehealth was not used for any reviewed routine primary clinician contacts.

All 18 or 100 percent of initial IDTTs timely occurred within 14 calendar days of patient arrival. Required staff attended all initial IDTTs; patients attended 72 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

Both routine IDTTs occurred timely every 90 days.  Required staff attended all routine IDTTs; patients attended 50 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

Twenty-one patients were randomly selected to have their healthcare records reviewed for their PSU stays.

All 21 or 100 percent of patients had timely psychiatry evaluations before the initial IDTT.  Fifty-two percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals or unavailable custody escorts.  Telepsychiatry was not used for any reviewed initial psychiatry assessments.

All 34 or 100 percent of routine psychiatry contacts timely occurred at least every 30 calendar days.  Sixty-eight percent were conducted confidentially.  Reasons for non-confidentiality often included patient refusals; however, in some instances confidentiality could not be determined.  Telepsychiatry was not used for any reviewed routine psychiatry contacts.

All 21 or 100 percent of initial primary clinician evaluations timely occurred before the initial IDTT.  Only five percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.  Telehealth was not used for any reviewed initial primary clinician assessments.

Forty-nine of 62 or 79 percent of routine primary clinician contacts timely occurred at least every seven calendar days.  Only 37 percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals, modified programming, and COVID-19 isolation.  Telehealth did not perform any reviewed routine primary clinician contacts.

All 21 or 100 percent of initial IDTTs timely occurred within 14 calendar days of patient arrival. Required staff attended all initial IDTTs; patients attended 81 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

All ten or 100 percent of routine IDTTs occurred every 90 calendar days. Required staff attended all reviewed routine IDTTs; patients attended 90 percent. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

STRH and LTRH:

CIW continued to house STRH and LTRH patients together. These patients also programmed together for groups, but not for yard or dayroom.

During the review period, CIW housed 82 patients in STRH; stays averaged 39 days and ranged from one to 233 days. The institution also housed 41 patients in LTRH, with average stays of 35 days that ranged from one to 119 days.

The major limitation within the STRH/LTRH was space, which included the temporary loss of confidential treatment space during construction. Except for one room with a non-ADA-compliant TTM, the unit lacked confidential treatment space. A room that the psychiatrist previously used was converted to a medication room. All other treatment space was in the dayroom, which contained eight TTMs; two were ADA-compliant. There were also ten restart chairs for groups.

During the review period, CIW offered STRH and LTRH patients an average of 2.2 weekly hours of structured treatment, of which 1.7 hours were attended, and 0.5 hours were refused.

The monitor' expert attended all five IDTTs held during the site visit; there were two initial IDTTs for STRH patients and three initial IDTTs for LTRH patients. Patients attended three of five IDTTs; the other two were held *in absentia.* The attending psychiatrist and primary clinician were the patients' assigned providers. However, these primary clinicians included two unlicensed psychologists and one licensed supervising psychologist.

The IDTT room was adequate in terms of size and lighting. All treatment team members actively used computers and the CC II provided appropriate information. The IDTTs were collaborative and appropriately discussed diagnoses. However, although treatment goals and interventions were broadly appropriate, they lacked time-limited and measurable goals. Additional IDTT deficiencies included inadequate discussion of symptoms supporting diagnoses, and case conceptualizations. The psych tech addressed pertinent issues.

Overall, the STRH and LTRH units demonstrated a cohesive team with a collaborative working relationship among mental health, custody, and nursing staff. The unlicensed psychologists were exceptionally knowledgeable about their patients and indicated receiving appropriate supervision from a licensed psychologist. The unit's psychologist supervisor also exhibited a high level of competence, dedication, and innovative thinking, which included the use of sound, evidence-based behavioral interventions.

An observed group found both participants' actively engaged, with the psychologist ensuring that patients' understood the material. Both the group topic and the method of delivering the information was germane and useful for patients.

The monitor observed three STRH and three LTRH ICCs; all were conducted remotely via Microsoft Teams. Required staff attended all ICCs. The ICCs were collaborative and addressed reasons for administrative segregation retention, less-restrictive housing options, and

patients' understanding ICC outcomes.  Regrettably, connectivity issues hampered the ICC's quality as patients frequently could not be heard through the laptop they were speaking into, which resulted in patients repeating their statements multiple times and ICC disruption.

Both units were compliant with offering ten weekly hours of yard, three weekly showers, and weekly linen exchange.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.

All 16 or 100 percent of patients had timely initial psychiatry evaluations before the initial IDTT.  Only 25 percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals, medical restrictions, modified programming, and unavailable confidential space.  Telepsychiatry was not used for any reviewed initial psychiatry evaluations.

Five of six or 83 percent of routine psychiatry contacts timely occurred at least every 90 calendar days.  Only 33 percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals and unavailable confidential space.  Telepsychiatry did not conduct any reviewed routine psychiatry contacts.

All 16 or 100 percent of initial primary clinician evaluations timely occurred within ten working days of patient arrival and before the initial IDTT.  Fifty-six percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals and medical restrictions.  Telehealth was not used for any reviewed initial primary clinician assessments.

Thirty-nine of 53 or 74 percent of routine primary clinician contacts timely occurred at least every seven calendar days.  Four routine primary clinician encounters were overdue and never occurred.  Forty-five percent were conducted confidentially.  Reasons for non-

confidentiality included patient refusals and unavailable confidential space. Telehealth was not used for any reviewed routine primary clinician contacts.

All 16 or 100 percent of initial IDTTs occurred within 14 working days of patient arrival. Required staff attended all initial IDTTs; patients attended 44 percent. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programming.

The one patient who required routine IDTTs every 90 calendar days did not receive them; both required routine IDTTs never occurred. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

Twenty patients were randomly selected to have their healthcare records reviewed for their LTRH stays.

All 13 or 100 hundred percent had timely initial psychiatry evaluations prior to the initial IDTT. A mere 23 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry was not used for any reviewed initial psychiatry assessments.

All 16 or 100 percent of routine psychiatry contacts timely occurred at least every 90 calendar days. Only 25 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, and lack of confidential space or custody escorts. Telepsychiatry was not used for any reviewed routine psychiatry contacts.

All 13 or 100 percent of initial primary clinician evaluations timely occurred within ten working days of arrival and before the initial IDTT. Forty-six percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, COVID-19

precautions, and a lack of confidential space.  Telehealth was not used for any reviewed initial primary clinician assessments.

Forty-two of 64 or 66 percent of routine primary clinician contacts timely occurred at least every seven calendar days.  Sixty percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals and lack of confidential space.  Telehealth was not used for any reviewed routine primary clinician contacts.

All 13 or 100 percent of initial IDTTs timely occurred within 14 days of patient arrival. Required staff attended all initial IDTTs; patients attended 54 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals.

All four or 100 percent of routine IDTTs timely occurred every 90 calendar days. Required staff attended all routine IDTTs; patients attended 75 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

Non-Disciplinary Segregation:

CIW placed four patients on NDS status during the review period.  One patient was NDS during the site visit.

MHCB:

CIW continued to operate ten licensed MHCB beds in the CTC and 19 unlicensed beds in the Walker unit.  During the site visit, the MHCB census included three patients in the unlicensed Walker unit.  Despite concerns raised during the prior reporting period, CIW continued to place MHCB patients in the Walker unit when there were available licensed beds in the CTC.  CIW lacked a policy regarding placement of patients in unlicensed beds when licensed beds were

available.  Further, despite CIW leadership reporting no differences in patient care between the two units, line staff reported several differences, including meals, supplies, and access to a covered yard during inclement weather and heat.  The monitor's expert found leadership's emphasis on the need to leave beds open in the CTC for patients requiring restraints to be excessive and perplexing.  Nonetheless, CIW leadership reported that the Walker unit would be closed when CIM's 50-bed MHCB opened.

During the review period, the licensed MHCB's average daily census was 4.4 patients; for the Walker unit, the census averaged 7.5 patients.  No patients remained in either MHCB for more than ten days.

The monitor's expert observed four initial IDTTs; two each were conducted in the CTC and in the Walker unit.  All patients sat outside of the TTMs, except for patients on maximum custody status, or where it was clinically indicated.

The IDTT rooms in the CTC and the Walker unit both had adequate space and light.  The CTC's temperature was comfortable, while the Walker unit was warm.  The Walker unit's IDTT room was spacious, but had multiple limitations, including its location.  The room was located behind a staff locker room, which patients walked through to enter.  The presence of staff entering this locker room raised concerns about the confidentiality of presented information.  Further, the patient sat in the middle of the room, with staff sitting around the patient in a square; this setup could be difficult for patients with trauma and/or paranoia.

Required treatment team members personally attended all observed IDTTs with laptops.  Regrettably, all IDTTs displayed fundamental deficiencies, rendering them all inadequate.  In one case, the psychiatrist started a new medication during the IDTT rather than during a confidential individual session.  In another case, the psychiatrist's questioning clearly agitated a patient with

an extensive history of impulsivity and aggression; despite clear verbal and non-verbal signs that the patient was becoming more agitated, the psychiatrist continued to question the patient.

Moreover, the quality of custody information and custody's interactions with patients was concerning; custody officers failed to provide basic information. The CC I also attended virtually, and the patient and CC I could not see each other. It was also difficult for them to hear one another.

Leadership and line staff also reported that the MHCB often had insufficient custody staffing to escort patients to confidential treatment rooms, which resulted in a greater frequency of non-confidential contacts.

Reviewed 114-As' indicated the offering of appropriate yard time to CTC MHCB patients, but only one to three weekly showers, and no linen exchange. Most patients also did not have telephone access. In the Walker unit, reviewed patients did not receive any linen exchange during their weekly stay, most did not receive telephone calls, and several patients did not receive three weekly showers.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

All 20 or 100 percent of patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of admission. Only 40 percent were conducted confidentially. Reasons for non-confidentiality included patient refusals or were unknown. Telepsychiatry did not conduct any reviewed initial psychiatry assessments.

Forty-two of 44 or 95 percent of twice weekly routine psychiatry contacts timely occurred. Thirty percent were conducted confidentially. Reasons for non-confidentiality

included patient refusals, custodial reasons, or were unknown. Telepsychiatry did not conduct any reviewed routine psychiatry contacts.

All 20 or 100 percent of initial primary clinician evaluations timely occurred within 24 hours of admission. Forty percent were conducted confidentially. Telehealth did not conduct any reviewed initial primary clinician evaluations.

For routine primary clinician evaluations, 130 of 131 or 99 percent timely occurred. Forty-nine percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and lack of custody escorts. Telehealth did not conduct any reviewed routine primary clinician assessments.

All 20 or 100 percent of initial IDTTs timely occurred within 72 hours of patient admission. Required staff attended 85 percent of initial IDTTs; patients attended 80 percent. Reasons initial IDTTs were held *in absentia* included patient refusals, while one patient was ill.

Nineteen of 20 or 95 percent of routine IDTTs timely occurred every seven calendar days. Required staff and patients attended 89 percent of routine IDTTs. Reasons routine IDTTs were held *in absentia* included patient refusals. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

CIW submitted multiple logs containing seclusion and restraint information. The data was presented in a confusing format, with some referring to PIP, some referring to MHCB, and handwritten and typed spreadsheets that did not match.

There were five restraint incidents during the reporting period, including four due to self-injurious behavior and one due to the patient using her walker as a weapon and breaking a window.  All instances lasted less than four hours.

There were no seclusion episodes during the review period.

Regrettably, CIW continued to implement "crisis plans" for patients who engaged in self-injurious behavior.  Leadership reported that such plans, including bypassing less-restrictive alternatives and employing standing orders for restraints and injectable medications, were no longer the practice in the PIP.  Dishearteningly, despite assurances, the monitor's expert found multiple cases of this practice in the MHCB, while the CTC daily nursing shift report for June 23, 2023, documented two such cases.  In one case, this report noted that there was a "crisis plan for headbanging bx" (behavior).  The patient's master treatment plans did not list any such procedure.  However, orders in the chart stated that if the patient engaged in behaviors such as headbanging, kicking, or hitting walls or doors and did not respond to verbal redirection, the patient was to be placed in restraints, administered an injectable medication, and remain in restraints for at least one hour after the administration of medication.

The monitor's expert reported his objections to CIW leadership as these orders deviated from several well-accepted standards of care for the safe use of restraints, and most germane in the context of this report, from the Program Guide 12-5-17 governing restraint use.  This section stated, "(t)his policy expressly prohibits any form of an as-needed (PRN) or standing order for restraint or seclusion."  The monitor's expert also noted that while many patients in restraints required injectable medications to maintain safety, each case should be individualized.  Additionally, patients should be released from restraints as quickly as possible, based on

individual clinical factors, not by a predetermined mandated time frame, as the Program Guide indicated in 12-5-22 and -23.

Crisis Intervention Team:

During the reporting period, CIW referred two patients to the CIT. Of those, the CIT referred one patient to the MHCB and the other was returned to the same housing. In neither referral did the "team" make the determination as nursing staff and psychiatry were not in attendance.

CIW provided inconsistent information on the CIT program, requiring substantial time for clarification. The institution reported that CIT services ran daily from 2:00 p.m. until 10:00 p.m. Unfortunately, during the review period, 13 shifts lacked CIT coverage. During those times, on-call responsibilities reverted to the on-call psychiatrist.

Alternative Housing:

CIW's alternative housing LOP was aligned with statewide policy and identified alternative holding cells; it prioritized CTC medical beds, then TTA cells and other cells.

There were 106 alternative housing placements during the reporting period, of which 104 or 98 percent were admitted to the MHCB and two or two percent were rescinded. Stays averaged four hours and two minutes and ranged from seven minutes to eight days and 28 minutes. COVID-19 isolation was the reason for the eight-day alternative housing stay; all other patients left alternative housing within 11 hours of placement.

Two observed alternative housing cells in the CTC were also used for medical patients and had electrical outlets to accommodate hospital beds. Both cells were occupied by hospital beds during the site visit; staff indicated that when these cells housed alternative housing patients, the hospital beds were swapped for cots.

EOP:

CIW was compliant with EOP structured treatment for only three of six months of the review period. Further, in January 2023, a Program Status Report (PSR) related to a COVID-19 breakout resulted in only 30 percent of patients being offered ten weekly hours of structured treatment.

One observed IDTT found all required treatment team members in attendance. The IDTT was adequate, with team members working collaboratively and contributing relevant information toward treatment planning, level of care, and patient safety. The CC I provided useful information and helped the patient set realistic expectations for an upcoming parole hearing. The IDTT appropriately reviewed progress toward treatment goals, which were stated in measurable terms. The IDTT also adequately engaged the patient as a treatment planning participant and demonstrated efforts toward establishing effective communication.

However, while all treatment team members were familiar with the patient, the primary clinician and psychiatrist lacked computers to access patient information or submit orders in real time. Instead, they relied on printed or handwritten notes and recall. Treatment team members were open to feedback about the need for electronic health record access during IDTTs to enter information and submit orders in real time.

EOP groups were led by mental health clinicians, recreation therapists, and nursing staff. CIW reported that each patient was assigned to at least two clinician-led core groups. Group schedules indicated that EOP patients were offered an appropriate range of group topics, which interviewed patients confirmed. To motivate group attendance, CIW provided an incentive program wherein the patients accrued points for treatment attendance. Accrued points could be

used to purchase food and hygiene products.  CIW clinicians also implemented effective interventions aimed at reducing patient refusals, which proved effective based on outcome data.

No groups were scheduled during the site visit, as facilitators were preparing for the next group cycle.

Interviewed EOP patients were generally satisfied with their mental health treatment and the amount and quality of groups, and with the quality and duration of individual contacts. Patients also knew the process for requesting additional mental health contacts, reporting that mental health staff typically responded promptly to such requests.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP treatment.

All 14 or 100 percent of initial psychiatry evaluations timely occurred prior to their initial IDTT and within 14 calendar days of patient arrival or a level of care change.  Eighty-six percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals. Telepsychiatry was not used for any reviewed initial psychiatry assessments.

Forty-eight of 49 or 98 percent of routine psychiatry contacts timely occurred at least every 30 calendar days.  Ninety-two percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals and COVID-19 precautions.  Telepsychiatry was not utilized for any reviewed routine psychiatry contacts.

All 14 or 100 percent of initial primary clinician evaluations timely occurred within 14 calendar days of patient arrival or a change in level of care.  Seventy-one percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals, COVID-19 precautions, and lack of available treatment space.  Telehealth did not conduct any reviewed initial primary clinician assessments.

Seventy-one of 95 or 75 percent of routine primary clinician contacts timely occurred at least every seven calendar days.  Eighty-nine percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals, COVID-19 precautions, and appointments being held at cell front due to modified programming.  Telehealth did not conduct any reviewed routine primary clinician contacts.

Thirteen of 14 or 93 percent of initial IDTTs timely occurred within 14 calendar days of patient arrival or a level of care change.  Required staff attended all 14 or 100 percent of initial IDTTs; patients attended 79 percent.

All seven or 100 percent of routine IDTTs timely occurred every 90 days.  Required staff attended all routine IDTTs; patients attended 91 percent.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, this assignment was not clearly discernable for all cases.

3CMS:

Three observed IDTTs were all of exceptional quality.  The room was adequate, and all members had laptops.  All patients had psychiatry and primary clinician assessments completed prior to initial IDTTs.  The psychiatrist and primary clinicians knew their patients, and presentations allowed for clear clinical conceptualizations.  Interventions discussed included evidence-based treatments, such as trauma-focused Cognitive Behavioral Therapy.  Rehabilitative activity credit (RAC) and mental health groups were also discussed.  Staff provided patients with the 3CMS orientation brochure.

CIW offered groups to 3CMS patients but there were no groups during the site visit due to the group cycle change.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Six of nine or 67 percent of patients had timely initial psychiatry evaluations before the initial IDTT. Sixty-seven percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry was not used for any reviewed initial psychiatry assessments.

Sixteen of 19 or 84 percent of routine primary clinician contacts timely occurred at least every 90 days. Seventy-six percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry was not used for any reviewed routine psychiatry contacts.

Seven of nine or 78 percent of patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. Eighty-nine percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telehealth did not conduct any reviewed initial primary clinician evaluations.

All 31 or 100 percent of routine psychiatry contacts timely occurred at least every 90 days. Seventy-seven percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telehealth did not conduct any reviewed routine primary clinician contacts.

Six of nine or 67 percent of initial IDTTs occurred within 14 working days of arrival or a level of care change. Required staff attended all initial IDTTs; patients attended 89 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

Only one patient required an annual IDTT. The IDTT was held timely, with all required staff and the patient in attendance.

Other Issues:

Pre-Release Planning:

CIW assigned a full-time, licensed social worker to conduct pre-release planning. Her duties included individual patient contacts, attending headquarters' coordination calls with TCMP staff, conducting pre-release groups, and obtaining patient resources.

The institution reported that of 65 3CMS patients scheduled for parole, 44 or 68 percent received pre-release planning, as did ten of 16 or 63 percent of EOP patients. There were also 25 3CMS and six EOP patients scheduled for probation who received pre-release planning services.

A total of 78 pre-release planning assessments (PRPA) were completed. Provided reasons for not completing PRPAs included patients' being out to court, the primary clinician not finishing the assessment, and the patient being missed.

CIW conducted sporadic pre-release groups for EOP patients during the reporting period. Although there were no 3CMS groups between October 2022 and January 2023, due to staffing limitations, three 3CMS patients attended pre-release groups between February and May 2023.

The pre-release coordinator reported working well with TCMP staff, who assisted patients with applications for California identification cards, SSI, and Medi-Cal. Seventeen patients obtained California identification cards; reasons for identification cards not being issued included patient refusals and ineligibility. CIW did not track STOP programming.

Program Access:

a.   Job and Program Assignments

As of April 3, 2023, CIW reported that 416 job assignments were held by 14 or 30 percent of EOP patients, 204 or 45 percent of 3CMS patients, and 198 or 41 percent of non-MHSDS incarcerated persons.

The 321 academic assignments were held by three or seven percent of EOP patients, 179 or 40 percent of 3CMS patients, and 139 or 29 percent of non-MHSDS incarcerated persons.

The 56 vocational education assignments were held by one or two percent of EOP patients, 32 or seven percent of 3CMS patients, and 23 or five percent of non-MHSDS incarcerated persons.

The 145 voluntary education assignments were held by one or two percent of EOP patients, 73 or 16 percent of 3CMS patients, and 71 or 15 percent of non-MHSDS incarcerated persons.

The 109 substance abuse treatment assignments were held by no EOP patients, 53 or 12 percent of 3CMS patients, and 56 or 12 percent of non-MHSDS incarcerated persons.

   b.  <u>Milestone Credits</u>

CIW reported that as of May 4, 2023, 39 of 48 or 81 percent of EOP patients were eligible to earn milestone credits, as were 18 of 443 or four percent of 3CMS patients, and eight of 419 or two percent of non-MHSDS incarcerated persons.

   c.  <u>Out-Of-Level Housing</u>

CIW reported that no patients were housed out-of-level during the review period.

   d.  <u>ADA Reasonable Accommodation and Grievance Procedure</u>

The institution confirmed implementation of the revised ADA accommodations, grievance procedures, and appeals process and provided a copy of the LOP. Review of a random sample of 12 reasonable accommodation requests from MHSDS patients reflected that the requests were related mostly to health care appliances and medical issues.

   e.  <u>Periodic Classification Score Reductions: EOP Patients</u>

Review of a random sample of 15 CDCR 840 forms revealed that classification score reductions were provided for EOP patients. The review indicated that classification scores were

updated consistent with CDCR policy; favorable behavior points were subtracted, and unfavorable behavior points were added to calculate the new classification score.

    f.   Unclothed Body Search

Unclothed body searches in STRH were most frequently performed in TTMs surrounded by coverings, which were easily transportable and covered the TTM in its entirety, ensuring adequate privacy. Custody staff indicated that if a TTM was unavailable, the unclothed body search was performed in the patient's cell.

"C" Status:

During the review period, 24 3CMS patients were designated as "C" Status. At the time of the site visit, there were three 3CMS "C" Status patients.

Case-by-Case Reviews:

No CIW patients required a 150-day case review during the reporting period. However, 22 patients satisfied the criteria for 120-day pre-MERD reviews. All 22 received their 120-day pre-MERD reviews and 14 had their cases presented to the CSR 60 days prior to the MERD's expiration; of the eight who did not, five had pending RVRs, one had a subsequent administrative segregation placement, one had an RVR reduced to non-SHU, and one paroled. No incarcerated persons were retained in administrative segregation beyond their projected MERD.

Mental Health Referrals:

During the reporting period, CIW reported 1,852 mental health referrals; there were 315 psychiatry referrals and 1,537 referrals to primary clinicians. There were 200 emergent, 211 urgent, and 1,441 routine referrals.

For emergent referrals, four of six or 67 percent of psychiatry referrals were seen timely, while 169 of 194 or 87 percent of referrals to primary clinicians were responded to timely. For urgent referrals, there were timely responses to 11 of 21 or 52 percent of psychiatry referrals, and

to 171 of 190 or 90 percent of primary care referrals. Further, for routine referrals, there were

timely responses to 248 of 288 or 86 percent of psychiatry referrals, and to 980 of 1153 or 85

percent of primary clinician referrals.

Interviewed custody officers knew what to do when a patient exhibited bizarre or unusual

behavior. Reviewed MH-5 forms in the housing units were the current July 2022 version.

Custody and Mental Health Partnership Plan:

Review of CIW's CMHPP LOP indicated alignment with the headquarters' directive.

Interviewed mental health staff further reported very good working relationships with custody.

CIW conducted executive leadership joint rounding during all six months of the review

period. Rounded areas included several housing units, including the PSU, OHU, and supportive

care unit. Reviewed executive rounding forms indicated attendance by required staff and

detailed substantive reports from interviewed staff and patients.

Reviewed minutes from three of the warden's executive staff meetings all included

substantive information about executive leadership joint rounding, including addressed issues

and the programs rounded; they also included the executive rounding forms. However, only two

of six months of quality management committee meeting minutes addressed executive rounding.

All reviewed monthly mental health program subcommittee meeting minutes referenced the

rounding; four of six included substantive information about the previous month's rounding,

while some included follow-up information on issues that the rounding identified.

As for huddles, the chief of mental health reported that headquarters disseminated the

specialized bed complete care huddle tool and gave institutions the option to pilot it. CIW

reviewed the tool and found that its existing model was better than the model proposed by

headquarters, and that the new tool would not add value; therefore, CIW decided to not participate in the pilot.

Second watch huddles for the EOP hub, EOP, and PSU were combined, as were STRH and LTRH huddles. Observed huddles conducted in the PSU and EOP were attended by the mental health supervisor, recreation therapists, psych techs, psychologists, the sergeant, and a correctional officer. A medical doctor also attended; however, neither social workers nor nursing staff attended either observed huddle. Adequately addressed topics included new arrivals, patient behavior, group participation, and property, RVRs, and medications.

The monitor also attended a second watch huddle conducted in the EOP using Microsoft Teams. Huddle participants included required staff and sufficiently addressed new arrivals, the nursing report, custody staff redirected to the PIP, effective communication, and patients' pending parole.

Attendees at two STRH/LTRH huddles included the mental health supervisor, psych techs, psychologists, nursing, the sergeant, and a correctional officer. Topics discussed included patient treatment and group participation, medications, effective communication, IDTTs, patient symptoms and behavior, mental health referrals, and a broken toilet.

The monitor also attended two MHCB huddles utilizing Microsoft Teams. Required staff attended and appropriately addressed medications, meals, and patient treatment and symptoms.

CIW staff held weekly 3CMS supervisory meetings during the review period. Unfortunately, a substantial majority of reviewed reports from these meetings did not address any substantive issues but only included signatures of the mental health program supervisor and sergeant. Only a few reports addressed pertinent issues, including 3CMS patients exhibiting odd,

unusual, bizarre, or aggressive behavior, or other significant matters, such as gang issues or hunger strikes.

Reviewed joint supervisory 3CMS program area tour reports reflected visitation of a different housing unit each month and the recording of responses to the prescribed questions for staff and patients. The responses did not indicate any issues of major concern. The program area tours noted good working relationships between custody and mental health staff.

CIW conducted inmate advisory council (IAC) meetings for all months of the review period. Three months of reviewed minutes revealed that the meetings addressed many topics, including medical matters, ADA, and COVID-19. However, the review did not specifically identify topics related to 3CMS patients; the 3CMS supervisor was also not listed as an attendee.

The 3CMS supervisor reported that 3CMS patients received the 3CMS orientation brochure during the initial IDTT. A copy of the brochure was also provided to the monitor.

Patients filed 193 misconduct allegations against mental health and custody staff. No staff were moved to another post due to a staff misconduct allegation.

CIW provided quarterly partnership round table training during the fourth quarter of 2022 and the first quarter of 2023 during second and third watch for custody and mental health staff assigned to the MHCB, EOP, EOP hub, PSU, STRH, and LTRH, and indicated staff who attended the trainings. However, the institution did not identify all staff who were assigned to the units. It thus could not be determined whether all required staff attended the trainings.

As for the annual partnership off-post training, CIW reported attendance by the warden and chief deputy warden, one of four associate wardens, two of four captains, 17 of 21 lieutenants, 53 of 62 sergeants, 345 of 398 correctional officers, and 15 of 17 correctional counselors (I, II, and II). Overall, 435 of 508 or 86 percent of custody staff completed this

training.  For mental health, the training was attended by one of five chiefs, one of five supervisors, two of 20 psychologists, none of four psychiatrists, four of 11 social workers, 13 of 391 nurses, and two of 223 other staff.  Overall, only 23 of 659 or three percent of mental health staff completed the training.

Heat Plan:

Interviewed officers typically required prompting when asked questions about the basic components of the heat plan; some officers used a copy of the heat plan memorandum to assist them, which was permissible.  All housing units had daily, updated copies of a list of patients who were prescribed heat sensitive medications.  Reviewed temperature logs reflected the recording of indoor temperatures by housing unit officers.  Notably, the recorded temperatures were taken in the outer areas of the housing units that received the most sun to attempt to ensure accurate readings.  Because CIW's outdoor temperatures occasionally exceeded 90 degrees during periods outside of the heat season, the institution followed heat plan protocols throughout the year.

The institution reported one Stage I heat alert during the review period, in October 2022.  Notably, no patients experienced a heat-related illness.  Patients were offered the accommodation of dayroom during the Stage I heat alert.

RVRs:

CIW issued 993 RVRs during the review period, of which 684 or 69 percent were issued to MHSDS patients.  Of these 684 RVRs, 21 were issued to MHCB patients, 71 were issued to EOP patients, and 570 were issued to 3CMS patients.  Further, there were nine RVRs issued to acute care patients and 13 issued to intermediate care patients.  Notably, these RVRs included all those pending at CIW, including RVRs issued to CCWF patients who were now housed at CIW.

The monitor reviewed 34 RVRs issued to MHSDS patients during the review period. This review determined that custody staff timely referred the mental health assessment to mental health in six of 34 or 18 percent of cases; the number of days that the prescribed two-day timeframe was exceeded ranged from one to 22 days and averaged 6.4 days. Mental health staff timely completed and returned the assessment to custody in 26 of 34 or 76 percent of cases. The number of days by which the required eight-day timeframe was exceeded ranged from one to five days, averaging 1.9 days.

Clinicians affirmatively responded to assessment question number two on ten occasions, opining that patients' behavior was strongly influenced by mental illness or related symptoms and that the patient would be better served by documenting the behavior in an alternative manner. Eight of these ten cases were in fact documented in an alternative manner. Clinicians also answered yes to assessment question number three on 34 occasions, opining that there was evidence that mental illness contributed to the behavior that led to the RVR. Patients were confidentially interviewed for the assessments in 16 of 34 or 47 percent of the time.

Review of the 34 RVRs confirmed that a staff assistant was always assigned except when the mental health assessment indicated that the patient did not need assistance or waived the staff assistant's services.

Clinicians' recommended penalty mitigation in 30 of 34 or 88 percent of the reviewed assessments. SHOs' actually mitigated penalties based on the mental health assessment in 26 of 30 or 87 percent of cases.

CIW did not issue any RVRs for suicidal or self-injurious behavior.

The institution reported that, during the review period, 20 MHSDS patients were found guilty of offenses for which a SHU term applied and were referred to the ICC for a SHU

assessment.  The monitor reviewed eight of 20 ICC chronos; in each case, the ICC chrono included, under "SHU AUDIT," detailed documentation of the clinical findings in the mental health assessment, the clinical recommendations to the ICC, and how the ICC considered the clinical findings and recommendations in its SHU term assessment deliberations.  The monitor did not identify any instances where the ICC disagreed with the clinicians' findings and/or recommendations.

As for mental health assessment training, all six associate wardens completed the training, as did all four captains, 15 of 20 lieutenants, and 42 of 63 sergeants.  Regarding mental health staff, the training was completed by none of five chiefs, and none of five seniors. However, all four supervisors completed the training, as did one of 20 psychologists, none of four psychiatrists, and none of 34 other staff.  Overall, only five of 72 or seven percent of mental health staff completed the training.

Use of Force:

CIW reported no controlled uses of force involving MHSDS patients and only one involving a non-MHSDS inmate.  There were 36 immediate uses of force involving MHSDS patients, of which six involved use of chemical agents, two involved a combination of physical strengths and holds with the use of chemical agents, one involved a combination of physical strengths and holds with the use of the handheld baton, and 27 involved physical strengths and holds only.

There were also 76 non-use of force episodes, involving 65 MHSDS patients and 11 non-MHSDS inmates.

The monitor reviewed 14 immediate uses of force, including all eight that occurred in the MHCB.  The MHCB incidents involved only physical strength and holds.  Five of the other six

incidents involved the use of OC; in each case, the report included documentation of decontamination protocols for patients and of the premises.  Four of five OC incidents involved one-on-one fights; in two of the fights, the 3CMS patient had a seizure after the use of OC.  All six non-MHCB incident reports included the incident commander's review form.  In two cases, the review identified the use of OC within six feet of the patient.

As for required use of force training, CIW reported that two of four chiefs completed the training, as did all four supervisors, 23 of 24 psychologists, six of 12 psychiatrists, all seven social workers, 31 of 168 nurses, and none of 36 other employees.  Overall, 73 of 255 or 29 percent of mental health staff completed the training.  As for custody staff, the training was completed by the warden and chief deputy warden, one of four associate wardens, two of four captains, 20 of 21 lieutenants, 54 of 63 sergeants, and 343 of 398 correctional officers.  Overall, 422 of 492 or 86 percent of custody staff completed the training.

Lockdowns/Modified Programs:

The institution produced PSRs for three program modifications during the review period. None identified a lockdown.

The first program modification occurred between October 1 and November 7, 2022, and was based on the need for a medical quarantine due to a COVID-19 outbreak in several housing units.  During this modified programming period, adjustments were made to the affected areas as needed.  The second program modification occurred from January 5 – 10, 2023, and was also attributed to a COVID-19 outbreak.  The third program modification was from February 22 – 24, 2023, and was initiated to complete a mass search for dangerous contraband and/or controlled substances and to reduce excess clothing and linen.

Reviewed PSRs typically reflected the delivery of health care services through normal programming, medication distribution in the housing units, and specified that at no time would patients be denied access to health care. There were several instances of PSRs reflecting that priority ducats would be used for health care access.

Access to Care:

CIW provided monthly Health Care Access Quality reports from October 2022 through March 2023. Of 11,959 total issued mental health ducats and add-on appointments, 7,536 or 63 percent were completed and 4,423 or 37 percent were not completed. Of the non-completed appointments, one percent was due to custody factors, 79 percent were due to non-custody factors, and 20 percent were due to patient refusals.

*Coleman* Postings:

*Coleman* postings were observed in all housing units in both English and Spanish.

**APPENDIX B-12**
**SAN QUENTIN STATE PRISON (SQ)**
**(June 27, 2023 – June 30, 2023)**

Census:

On June 27, 2023, SQ housed 3,818 incarcerated persons, which was a 31 percent increase since the prior review period.  The 1,532 mental health patients represented 40 percent of the institution's population and was a 29 percent increase from the previous reporting period.

The MHCB housed no patients.

There were 243 mainline EOP and 1,262 mainline 3CMS patients, including 71 condemned EOP and 111 condemned 3CMS patients.

The administrative segregation population of 128 inmates included eight EOP and 19 3CMS patients.

Staffing:

Both chief psychiatrist positions were filled.  Of 11 psychiatry positions, 7.5 were filled, for a 32 percent vacancy rate.  Two registry psychiatrists reduced the functional vacancy rate to 14 percent.

Two of three chief psychologist positions were filled; one was vacant as a cost-savings measure.  One chief psychologist served as the chief of mental health.  Four of 4.5 senior psychologist supervisor positions were filled, for an 11 percent vacancy rate.  Three of seven senior psychologist specialist positions were also filled for a 57 percent vacancy rate; however, one specialist was on an extended leave, increasing the functional vacancy rate to 71 percent.

Of 30.5 psychologist positions, 26.7 were filled, for a 12 percent vacancy rate.  Registry filled 1.5 positions, reducing the functional vacancy rate to eight percent.  Four psychologists were unlicensed.

573

The position for the supervising clinical social worker was filled. Fourteen of 18 social worker positions were also filled, but one social worker was on extended leave, for a 28 percent functional vacancy rate. One social worker was unlicensed.

Ten of 12 recreation therapist positions were filled. Registry covered two positions, but one recreation therapist was on extended leave, reflecting an eight percent functional vacancy rate.

All three senior psych tech positions were filled. Of 56 psych tech positions, 54.4 were filled, but one psych tech was on an extended leave, for a five percent functional vacancy rate.

One of 1.5 OSS II positions and one of two CHSA positions were filled, as were two of three AGPA positions. The HPS II position was vacant, but one of two HPS I positions were filled.

As for custody staffing, positions for the warden, chief deputy warden, and all six associate wardens were filled, as were all six captains' positions. Thirty-three of 37.4 positions for lieutenants were filled, but one lieutenant was on an extended leave, for a 14 percent functional vacancy rate. Eighty-one of 90 sergeant positions were filled, indicating a ten percent vacancy rate. Of 911.6 correctional officer positions, 841 were filled, but 21 correctional officers were on extended leave, for a ten percent functional vacancy rate.

Telepsychiatry:

SQ did not use telepsychiatry.

Staff Recruitment:

SQ leadership reported that the most significant challenge during the review period was the institution's reopening to intake during a period when it experienced mental health staffing shortages. The institution reported an unprecedented 25 percent population increase since

January 2023, returning its incarcerated population to pre-COVID-19 levels. During this same period, SQ reported the departure of five psychiatrists, a senior psychologist supervisor, a senior psychologist specialist, two psychologists, two social workers, and one recreation therapist.

SQ undertook significant recruitment efforts beginning in February 2023 to address these staffing shortages. Such initiatives resulted in the hiring of three new-to-CDCR psychiatrists, while a fourth psychiatrist working at another CDCR institution returned to SQ to work out-of-class as the chief psychiatrist. The institution also expanded its psychiatry training program to include increased partnering with academic psychiatry programs, in addition to the ongoing 23-year partnership with the UCSF and the psychiatry fellowship program.

As for other mental health staff positions, leadership reported the recent hiring of two senior psychologist supervisors, one psychologist specialist, three psychologists, three social workers, and two registry recreation therapists. SQ also expanded its APA-accredited psychology training program for psychology interns and added two additional post-doctoral unlicensed psychology positions to the mental health program.

Regrettably, SQ reported significant difficulties recruiting and retaining support staff due to the high cost of living in the surrounding geographic area.

Quality Management:

SQ continued to have a comprehensive and useful quality management program. Mental health leadership reported that quality management and quality improvement was incorporated into the fabric of SQ's mental health treatment and overall culture.

The local governing body met monthly and attained quorums. Reviewed minutes were not always dated and in several instances were not signed timely by the CEO. The local governing body regularly addressed potential quality issues and system surveillance in the CTC,

the CTC's unusual occurrence report, LOP review and approval, and clinical privileging, among other matters.

With one exception, the quality management committee met monthly during the reporting period. Reviewed meeting minutes indicated required staff's attendance and attainment of quorums. Standing agenda items included CEO updates, committee/subcommittee reports, including the mental health and nursing subcommittees and the patient safety committee, medication management, performance improvement work plans, quality management, health care access, and LOP review and approval.

The mental health program subcommittee also met monthly and addressed numerous items, including reports from psychiatry, custody, and nursing, the custody and mental health partnership plan, the MHCB, mainline EOP, 3CMS, administrative segregation and condemned programming, MHCB referrals, the CIT, PREA, use of force, timeliness of inpatient referrals, and suicide prevention, among other matters. The minutes included summaries of data relevant to these items.

SQ reported that OnDemand priority indicators monthly tracked numerous mental health performance indicators, including timely clinical discharge follow-ups, IDTTs, psychiatry and primary clinician contacts, mental health referrals, and placement of administrative segregation patients into various programs, as well as offered and scheduled treatment, and IDTT staffing. Clinical leadership also regularly accessed the Dashboard, developing corrective action plans (CAPs) as needed.

SQ audits also addressed numerous matters, including clinical discharge follow-ups, emergent and urgent referrals, transfer timeliness, timely MHCB admissions, and use of force

incidents.  The audits were comprehensive and methodologically sound.  Because SQ regularly conducted audits, the institution did not typically utilize QITs or FITs.

The Emergency Medical Response Review Committee (EMRRC) met monthly and functioned appropriately.  Reviewed minutes contained very good meeting summaries.  Agenda items included system surveillance of all emergency medical response activations and unscheduled transports outside of the institution, and ongoing and new case reviews.  SQ also conducted quarterly emergency response exercises.

Psychiatry peer review was conducted twice in 2022 and also in March 2023.  The April 2023 minutes of the mental health program subcommittee reported that SQ was updating its peer review policy so that it was consistent with the headquarters' directive.  Otherwise, SQ did not conduct peer review for mental health staff pending statewide revision of peer review policy.

SQ disseminated quality management information to line staff through supervisors and staff meetings.  Regrettably, line staff reported little involvement with the quality improvement process.

<u>Medication Management</u>:

SQ provided MAPIP results for October 1, 2022 through March 31, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics revealed that SQ was compliant for six months of the review period for monitoring blood pressure, height, weight, and thyroid function tests.  There was compliance for three of four required months for EKGs, and for two months for measuring the Abnormal Involuntary Movement Scale (AIMS).  Regrettably, there was compliance for only one month for glucose, Complete Blood Count

(CBC) with platelets, and medication consents.  Further, Comprehensive Metabolic Panel (CMP) and lipid monitoring were noncompliant for all six months.

SQ was a clozapine initiation and maintenance facility.  During the site visit, 17 SQ patients were prescribed clozapine.  As for the close monitoring that clozapine required, SQ reported compliance for monitoring blood pressure, CBC, and weight for all six months of the review period.  There was compliance for four months for glucose, EKGs, and height, and for four of five required months for medication consents.  SQ reported compliance for three months for AIMS monitoring, for two months for lipid monitoring, and for one month for monitoring CMP.  SQ was compliant for the one required month for thyroid tests.  Importantly, psychiatry leadership reviewed compliance for clozapine monitoring during weekly psychiatry meetings and also discussed it during monthly mental health subcommittee meetings.

For required monitoring of antidepressants, SQ reported compliance for all six months for thyroid laboratory tests, and monitoring blood pressure for patients prescribed venlafaxine.  There was compliance for the two required months for EKGs, and for one month for medication consents.

SQ did not prescribe carbamazepine to any patients during the review period.

For patients prescribed Depakote, there was compliance for four months with obtaining medication consents, CBC with platelets, and CMP.  SQ indicated compliance for two months for therapeutic medication level monitoring.

For lamotrigine, SQ reported compliance for four of five required months for obtaining medication consents.

As for lithium, there was compliance for five months for obtaining medication consents, and for three of four required months for obtaining thyroid function tests.  SQ noted compliance

for only two months for monitoring medication blood levels, and for one of three required months for obtaining EKGs. Disconcertingly, SQ was noncompliant for all six months for kidney function tests, which substantially concerned the monitor's expert given the risk of potentially permanent kidney damage associated with lithium.

SQ reported that the main reasons for noncompliant MAPIP measures were its loss of five psychiatrists during the review period, combined with a rapid and substantial increase in its patient population.

For medication management metrics reported by mental health headquarters, SQ was compliant for all six months of the review period for continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity with intra-institutional transfer to ASU/SHU/PSU and upon parole/transfer to the community, observation of medication preparation AM and PM, observation of medication preparation HS, chronic care medications historical administration, and outpatient provider new medication orders. There was compliance for five months for medication continuity following discharge/transfer from a community hospital and/or DSH, for three months for medication continuity with MHCB transfers, and for one month for medication continuity upon inter-institution transfer at receiving and release.

Psychiatrists prescribed medications for up to 180 days. Bridge prescriptions were typically for 14 days. As for telephone or verbal orders, nursing staff received them and read them back to the psychiatrist for confirmation. Telephone and verbal orders were tracked in the electronic medical record system. A message that an order required co-signature was sent to the psychiatrist. Health information management provided tracking for completion of co-signing orders.

There were 1,029 patients who received 2,617 psychotropic prescriptions as DOT. Another 179 patients were prescribed KOP psychiatric medications; in accordance with statewide policy, all were for SSRIs or duloxetine.  Psychiatrists also prescribed 33 non-psychotropic KOP prescriptions, which were typically to address the side effects from psychotropic medications.  Although SQ provided a list of all patients who were prescribed KOP medications, the list did not identify levels of care.  The monitor's expert was thus unable to confirm whether all patients who were prescribed KOP medications were at the 3CMS level of care.

During the review period, SQ conducted 78 medication line audits, which confirmed that all such lines were under two hours in total duration, and that no individual patients waited for more than 30 minutes.  The institution reported that medication administration did not conflict with mental health programming.  Most SQ medication lines occurred indoors or at cell front, although there were two outdoor medication lines.

SQ's 2,783 non-formulary psychiatric prescriptions accounted for between 16 and 19 percent of all psychiatric prescriptions.  The institution did not report the total number of patients who were prescribed non-formulary prescriptions.

There was monthly compliance of between 96 and 100 percent for the approximately 500 required polypharmacy reviews.

A total of 482 patients were prescribed 554 psychotropic medications at HS.  SQ reported that 99.7 percent were administered at or after 8:00 p.m., pursuant to policy.

During the review period, 27 patients received PC 2602 involuntary medications.  All four initial petitions, of which one was emergent and three were non-emergent, were granted.  Nineteen of 20 renewal petitions were also granted; one was denied by the administrative law

judge.  No PC 2602 petitions were denied or withdrawn, while three PC 2602 orders were not renewed based on psychiatrist clinical judgment.

SQ's medication court administrator communicated the submission of initial and renewal petitions, and the court opinion regarding them, to the Office of Administrative Hearings and Office of Legal Affairs, which tracked the data electronically.  Each patient's PC 2602 status was also manually submitted into EHRS for CCHCS/CDCR electronic tracking.

As for having the PC 2602 involuntary court order in the medical record, SQ was compliant for one of five required months.  For the related measure of compliance with having the PC 2602 medication order entered by a psychiatrist, SQ was compliant for one of three required months.

No patients were noncompliant with PC 2602 involuntary medication orders necessitating the use of force.

Transfers:

SQ had one full-time inpatient coordinator who was new to the position.  During the fourth quarter of 2022, SQ conducted a minor sustainability review, which occurred remotely due to the unmet needs assessment.  The inpatient coordinator also continued to complete higher level of care (HLOC) form audits consistent with the sustainable process.

The sustainable process typically involved headquarters' staff's review of the adequacy of HLOC forms and the clinical rationales for non-referral and treatment modifications, as well as an assessment of the interrater reliability between SQ's inpatient coordinator and the headquarters' reviewer regarding the HLOC forms.  However, because SQ attained 91 percent compliance for interrater reliability during the last major review, this component was not performed during this minor sustainable review.

Otherwise, this minor review assessed mental health subcommittee minutes and acute and intermediate care non-referral reports for three months, and included regional staff teleconferencing with the HLOC team to assess the data review processes and results. Reviewed mental health subcommittee minutes revealed the attainment of quorums, with the inpatient coordinator or designee present during the meetings. Other identified issues included acute or intermediate referrals that did not adequately indicate the rationale for the referral.

The monitor's expert's review of SQ's inpatient referral log revealed some errors. For example, one condemned patient who was referred to acute care was identified as having been "rescinded" and not noted to have actually transferred to acute care. Another patient who the log indicated had been "rescinded" from an intermediate care referral had not been rescinded.

The monitor's expert's review of a random sample of cases from the non-referral log to assess clinical rationales and treatment modifications indicated that while some HLOC forms were completed comprehensively, others were not. Specifically, there were instances of clinical rationales and treatment modifications that were cut and pasted, while the quality of those rationales and modifications were often inadequate. This resulted in insufficient clinical non-referral rationales and treatment modifications being regularly repeated for a period of time, which most often occurred for mainline EOP patients. This review also identified patients who should have been referred but were not. Although some of these patients were subsequently referred, they nonetheless suffered unnecessarily while awaiting referral.

Further, the monitor's expert reviewed cases from the inpatient coordinator's monthly audits of HLOC forms to assess accuracy, and the interrater reliability with the monitor's expert's findings. Overall, the monitor's expert generally agreed with the inpatient coordinator's assessments. However, there were again instances where clinical rationales and treatment

modifications had been cut and pasted from prior treatment plans without required updates and specificity.  There were also cases where the inpatient coordinator judged clinical rationales and/or treatment modifications as adequate that the monitor's expert found to be insufficient.

During the review period, there were 85 instances of 72 patients who were considered but not referred to inpatient care.  The most likely reasons for non-referral included patients' participation in more than an average of five hours of weekly structured treatment during the previous three months, and/or the patient having less than three MHCB placement referrals during the prior six months.

SQ referred two condemned and ten non-condemned patients to acute care.  One patient was rejected.  SQ timely referred all 12 patients.  Five of 11 acute care referrals timely transferred.  All 11 acute care patients timely transferred within 72 hours of a bed assignment.

There were 20 referrals to intermediate care, of which nine were referrals of non-condemned SQ patients to intermediate care beds at other institutions.  SQ timely referred all 20 patients to intermediate care.  Four intermediate care referrals were rescinded.  Of the 16 patients who transferred to intermediate care, 12 or 75 percent transferred timely.  All intermediate care transfers timely occurred within 72 hours of a bed assignment.

Five patients requested *Vitek* hearings; one patient prevailed.

No SQ patients with complex medical needs were transferred to inpatient care.

SQ referred 211 patients to the MHCB, of which 192 were admitted and 19 were rescinded.   All patients timely transferred within 24 hours.  Nineteen condemned patients were timely admitted to SQ's MHCB.

No patients had three or more MHCB placements.

During the review period, four patients' level of care was reduced from EOP to 3CMS; one patient subsequently returned to the EOP program.

Eight of nine or 89 percent of referrals to the EOP hub timely transferred.

Of 97 patients who transferred to STRH, 66 timely transferred.

No patients transferred to the PSU or LTRH.

One 3CMS patient transferred to another institution for placement into an MSF.

Programming:

Restricted Housing:

SQ's administrative segregation unit was not an EOP hub.

SQ reported adequate clinical contacts for MHSDS patients in administrative segregation. EOP and 3CMS patients housed in restricted housing received weekly primary clinician contacts and daily psych tech rounds.  EOP patients in administrative segregation were generally offered five hours of weekly out-of-cell structured treatment, which included one weekly clinical group on topics such as stress management and coping skills, one recreation therapy group, and one leisure group.  The administrative segregation supervisor noted that 3CMS patients could attend EOP groups because patients were placed in TTMs for these groups.  However, this was a very rare occurrence; typically, 3CMS patients in administrative segregation were not offered groups.

An observed initial IDTT for a 3CMS patient housed in administrative segregation for safety concerns, which was held *in absentia,* was attended by the administrative segregation supervisor, psychiatrist, primary clinician, psych tech, and CC I.  The IDTT was hindered because the CC I was unable to access SOMS and could not provide necessary information about the patient's custody status, RVR details, or other pertinent matters.  However, the primary clinician provided very thorough and appropriate clinical and psychosocial histories and an

appropriate theoretical case conceptualization. The patient's diagnosis and medications were discussed, as were functional impairments, level of care, substance abuse, and safety concerns. Goals and interventions were clinically appropriate and individualized for the patient's presentation and mental status. Overall, the IDTT was adequate except for the CC I's limited participation and the lack of access to the patient's custody records.

Two patients in TTMs attended an observed coping skills/stress management group that a social worker facilitated. The group was well conducted and clinically appropriate, with the facilitator providing pertinent worksheets and effectively engaging both patients.

Six EOP patients interviewed in a group setting reported several issues with administrative segregation clinical contacts. Among them, they indicated sometimes being forced to choose between attending group or yard. They also reported problems with custody staff honoring ducats. Specifically, clinicians had to highlight patients' names on a morning list; if a patient's name was not highlighted, the patient was not pulled for treatment even if previously ducated. Patients also reported that TTMs were not regularly cleaned.

Six interviewed 3CMS patients reported receiving weekly individual sessions with their primary clinician, daily psych tech rounds, and being offered yard three to four times weekly for one to two daily hours. One patient reported that requests to be seen by the primary clinician were honored within one to two days and there were no concerns with patients receiving medications.

The administrative segregation program issued radios and ear buds to all new arrivals; observation indicated that the unit contained an adequate supply of both. All administrative segregation patients were also issued tablets and patients were allowed adequate telephone calls

using the tablet.  Administrative segregation patients were also allowed to make telephone calls on Saturdays from 10:00 a.m. until 7:00 p.m.

Six weeks of reviewed 114-A's documented the offering of at least ten weekly hours of yard for all six weeks, and the offering of three weekly showers for five of six reviewed weeks. Three of six weeks indicated weekly linen exchange.

Three observed administrative segregation ICCs for MHSDS patients revealed one retaining the patient in the unit pending transfer for safety reasons; two others' released the patients.  The acting supervising psychologists attended the ICCs and provided input.  Tellingly, one of the released patients had recently had his sentence commuted from a death sentence to 25 years to life.  The patient had been on death row since 1988, had zero points, and met the criteria for SQ Level II housing.  The patient expressed both anxiety and excitement about his release to the mainline.  The mental health clinician and facility captain both acknowledged his concerns and told him that he would be housed close to custody staff in a unit that housed the older inmate population.  Notably, the ICC chairperson considered mental health information when deciding whether to retain or release a patient from administrative segregation.

Non-Disciplinary Segregation:

During the site visit, six MHSDS patients who were designated as NDS were housed in administrative segregation.  None were approved for expedited transfer.  SQ documented the issuance of allowable property to NDS patients in SOMS within one week following ICC.

MHCB:

The CTC had 40 swing mental health beds for MHCB and acute and intermediate care patients.  The MHCB and intermediate care beds were solely designated for condemned patients. Thirty beds were ADA-compliant.  There were also ten medical beds.

The MHCB shared mental health staff with the PIP. Overall staff assigned to the MHCB and PIP included five psychiatrists, four psychologists, 3.2 social workers, and 3.2 recreation therapists. The MHCB assigned a specific treatment team to all patients upon admission.

The MHCB's LOP was current and consistent with headquarters' policy.

SQ's MHCB housed 19 condemned patients during the review period. The MHCB had an average daily census of one patient. MHCB clinical stays averaged 8.8 days. Six MHCB stays' exceeded ten days; the maximum clinical stay was 18 days. Further, patients waited an average of 1.3 days beyond their clinical stay to physically discharge; four patients waited more than 72 hours beyond their clinical stay to physically discharge. MHCB physical stays averaged 9.9 days and ranged from two to 18 days. Nine physical stays exceeded ten days. Non-condemned SQ patients were transferred to MHCBs at other institutions.

New MHCB admissions were given a history and physical within 24 hours, an updated or new mental health assessment, a suicide risk assessment, and an initial IDTT within 72 hours. MHCB clinical contacts were conducted confidentially. SRASHEs were completed upon discharge for patients admitted for suicidal thoughts or behavior. Clinical supervisors regularly monitored suicide watch and precaution practices. Legible and clinically meaningful discharge summaries were completed timely.

The MHCB contained six covered small management yards and a larger group yard, but staff reported that the group yard was not used for MHCB patients. Observed interview rooms contained TTMs, including ADA modules. There were also two dayrooms for patient use; each contained a telephone and television, and one provided access to a legal library kiosk. The recreation therapist's room had five TTMs, of which one was ADA-approved. There were also

other group rooms that were available for mental health patients' use on the second floor of the hospital.

MHCB patients had dayroom access on a solo basis for one to two hours daily, and use of the small management yard for between 45 and 90 minutes daily. Access to outdoor recreation was at least as equivalent to what was offered to CTC medical patients. Access to group treatment was based on clinical and security status. Patients were also offered three weekly showers.

Staff reported that property, bedding, mechanical restraint (cuffing), and movement restrictions were reviewed timely and relaxed when appropriate.

The monitor reviewed the healthcare records of 17 patients admitted to the MHCB during the review period to assess compliance with Program Guide timeframes during their stays.

Sixteen of 17 or 94 percent of patients had timely initial psychiatry evaluations before the initial IDTT and within 24 hours of patient admission. Sixty-five percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry was not used for initial psychiatry assessments.

Forty-three of 44 or 98 percent of required twice weekly routine psychiatry contacts timely occurred. Sixty-five percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals or unplanned contacts. Telepsychiatry was not used for routine psychiatry contacts.

Eight of 17 or 47 percent of initial primary clinician evaluations timely occurred within 24 hours of admission. Seventy-one percent were confidential. Reasons for non-confidentiality included patient refusals.

For routine primary clinician contacts, 108 of 118 or 92 percent timely occurred. Fifty-four percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and unscheduled contacts.

Sixteen of 17 or 94 percent of initial IDTTs timely occurred within 72 hours of patients' admission. Required staff and patients attended 82 percent of initial IDTTs. Reasons initial IDTTs were held *in absentia* included patient refusals or conflicting appointments.

Nineteen of 20 or 95 percent of routine IDTTs timely occurred every seven calendar days. Required staff attended 90 percent of routine IDTTs; patients attended 75 percent. Reasons routine IDTTs were held *in absentia* included the patient being out to the hospital, conflicting appointments, patient refusals, and COVID-19 restrictions. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

SQ only placed one patient in restraints during the review period. Observed restraint and observation rooms were both clean and unobstructed. Staff reported that the observation room had not been used for several years.

Crisis Intervention Team:

SQ's CIT LOP was consistent with headquarters' policy. The CIT's composition included a mental health clinician, a psychiatrist, as clinically indicated, nursing staff, and a correctional lieutenant. During the site visit, the CIT was staffed from Tuesday through Friday from 12:00 p.m. until 10:00 p.m.

However, due to staffing shortages, the CIT did not operate during the review period, and was only reinstated in May 2023. Accordingly, during the review period, SQ's high risk team

responded to all emergent and urgent referrals and was available until 7:00 p.m.  High risk team

members included psychologists and social workers who were based in the TTA and who

consulted with either the caseload psychiatrist, psychiatrist on call, or the on-site weekend

psychiatrist for necessary psychiatric intervention.  The high risk team also handled receiving

and release admissions, five-day follow-ups, and other mental health referrals and emergencies.

Line staff reported that the high risk team provided effective coverage in lieu of the CIT.

Alternative Housing:

SQ had 18 alternative housing beds.  Alternative housing staff included a part-time

telepsychiatrist, an on call psychiatrist, five psychologists, and three social workers, one of

whom served as the supervisor.

There were 228 alternative housing placements during the review period.  None exceeded

24 hours.

SQ's alternative housing LOP prioritized the utilization of alternative housing cells; the

priority cells were licensed CTC medical beds.  Otherwise, SQ used large holding cells in the

Central Health Services Building.  All cells had adjacent confidential interview space.

Care for the Condemned:

Condemned unit staff reported caseloads of between 25 and 28 patients.

Three observed IDTTs for one EOP and two 3CMS condemned patients found two

patients in attendance; the other IDTT was held *in absentia*.  All required staff attended, but the

CC I attended by telephone.  The two presenting primary clinicians presented adequate case

formulations and treatment plans and goals and addressed interventions and levels of care, and

included patients in the discussions.  There was also a productive discussion about the patient for

the IDTT held *in absentia.*  Both interviewed patients stated that their mental health needs were

met when they attended individual therapy sessions. Unfortunately, they also indicated many delays with custody escorts and strip searches, and reported waiting in cells for up to 30 minutes for an escort.

Five interviewed condemned patients reported a positive rapport with their psychiatrist and primary clinician. Regrettably, they also reported anxiety from the custody transport to and from mental health services, and lack of yard access due to burst pipes, yard cancellations, and the unavailability of the large yard. They also expressed anxiety about where they would be housed after the closure of the condemned unit; many patients reported having established family-like relationships with staff and peers, which would end.

Twenty condemned EOP patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Two of four patients had a timely initial psychiatry evaluation before the initial IDTT and within 14 calendar days of arrival or a level of care change. One overdue initial psychiatry evaluation never occurred. Sixty-seven percent of reviewed initial psychiatry evaluations were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry did not conduct any initial psychiatry assessments.

Seventy-two of 78 or 92 percent of required routine psychiatry contacts timely occurred at least every 30 calendar days. One routine psychiatry contact never occurred. Thirty-eight percent of reviewed routine psychiatry contacts were conducted confidentially. Reasons for non-confidentiality included patient refusals, modified programming, and cell-front, yard, and day room contacts. Telepsychiatry did not conduct any routine contacts.

All four initial primary clinician evaluations timely occurred within 14 calendar days of patient arrival or a change in the level of care. Twenty-five percent were conducted in

confidential settings. Reasons for non-confidentiality included patient refusals and cell-front assessments. No initial primary clinician evaluations used telehealth.

Seventy-eight of 99 or 79 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Three overdue routine primary clinician contacts never occurred. Forty-six percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, modified programming, medical restrictions, and cell-front and group room contacts. One routine primary clinician contact utilized telehealth.

Four of five initial IDTTs timely occurred within 14 calendar days of patient arrival or a level of care change. Required staff attended 100 percent of initial IDTTs; staff attended 20 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

Sixteen of 19 or 84 percent of required routine IDTTs occurred every 90 calendar days. Two overdue routine IDTTs never occurred. Required staff attended 94 percent of routine IDTTs; patients attended 13 percent. Reasons routine IDTTs were held *in absentia* included patient refusals, COVID-19 restrictions, and modified programming. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Twenty condemned 3CMS patients were randomly selected to have their healthcare records reviewed for their stays.

None of two patients had timely initial psychiatry evaluations before the initial IDTT. One or 50 percent was conducted confidentially. The reason for the non-confidential contact was the patient's refusal to meet in a confidential setting. Telepsychiatry did not conduct either initial psychiatry assessment.

592

Twenty-three of 31 or 74 percent of routine psychiatry contacts timely occurred every 90 days.  Thirty-nine percent occurred in confidential settings.  Reasons for non-confidentiality included patient refusals.  Telepsychiatry did not conduct any routine psychiatry contacts.

The one patient who required an initial primary clinician evaluation had one within ten working days of arrival or a level of care change, but it was not conducted confidentially. Telehealth was not used for the assessment.

Forty-four of 46 or 96 percent of routine primary clinician evaluations timely occurred at least every 90 days.  Forty-one percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.  No routine primary clinician contacts used telehealth.

Two of three initial IDTTs timely occurred within 14 working days of patient arrival or a level of care change.  Required staff attended all reviewed initial IDTTs; patients attended none. Reasons initial IDTTs were held *in absentia* included patient refusals.

All 17 or 100 percent of patients had required timely routine IDTTs.  Required staff attended all routine IDTTs; patients attended 23 percent.  Reasons annual IDTTs were held *in absentia* included patient refusals.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

EOP:

SQ's two H units had a combined capacity for 200 EOP patients.  Staffing included an EOP supervisor who had started at SQ in February 2023 and nine clinicians, but one clinician was on an extended leave.

SQ had recently experienced a significant increase in its EOP population, causing space and morale issues, in addition to the concerns created by COVID-19.  Further, the EOP program's clinical culture had previously been based on seniority.  Specifically, new clinicians exclusively facilitated groups, while seasoned clinicians provided individual treatment; this division of labor caused conflict and low morale, and led to the resignation of some new clinicians.  After starting at SQ in 2023, the current EOP supervisor changed this culture so that all clinicians provided groups and individual therapy.  Further, patient group assignments were changed and replaced with a series of groups within a track.  Based on a patient's diagnosis and functional abilities, the patient was placed in one of seven tracks; the groups in the tracks lasted 16 weeks.  EOP clinicians' and patients reported that these changes were beneficial.

Regrettably, mental health leadership and staff reported insufficient treatment space.  Specifically, the H unit had a limited number of offices for EOP clinicians, and these offices were shared with nursing staff.  As such, the EOP supervisor and four of nine staff had offices in the medical unit, which was not near the H unit.  Further, during inclement weather, clinicians with office space in the medical unit had to come to H unit to minimize patients' refusals.  Also, upon arriving on the unit, the clinician negotiated with other clinicians' who shared H unit office space in order to attempt to conduct confidential sessions.

Four observed EOP IDTTs were all adequate or better.  One of these IDTTs was a "special" one to adjust the group curriculum for a patient who disagreed with his assigned curriculum and had begun refusing groups.  The treatment team thus conducted a special IDTT to address the patient's concerns and modified his group treatment program.  Notably, the patient agreed to participate in a different group curriculum that he believed was more appropriate to his clinical needs.

Otherwise, three observed routine IDTTs revealed two patients in attendance and one IDTT held *in absentia* due to the patient's refusal to attend. The EOP supervisor, six primary clinicians, several recreation therapists and psych techs, and the CC I attended all IDTTs. The treatment team demonstrated a very collaborative process, and all disciplines contributed to the IDTTs. Relevant psychosocial and clinical histories were provided for all three IDTTs; a theoretical case conceptualization was also provided for one IDTT. The IDTTs also included appropriate and collaborative discussions about treatment goals, interventions, transition planning, and level of care justification, while diagnoses and medications were clearly stated and agreed to between the psychiatrist and primary clinician. Further, CC I participation was appropriate and meaningful. The monitor's expert was particularly impressed with the IDTT held *in absentia*, as it involved a very complex patient who was a high treatment refuser. The treatment team was very thoughtful in determining how to support the patient without destabilizing him.

Fourteen patients attempted to attend an EOP group on grief and loss. Unfortunately, because the group room's door lock was broken, and the door could not be closed to maintain confidentiality, the group was canceled.

Ten patients attended an observed group on positive relationships. All ten patients had attended at least three previous group sessions. The group began with the facilitator summarizing the prior group session. During the group, the clinician provided examples of good and bad relationships, and asked patients open-ended questions about them. Seven of ten patients were engaged but the clinician did not attempt to engage the three other patients. Overall, the group was well conducted and well received.

Nursing leadership reported that nursing led therapeutic groups (NLTG) were conducted daily for EOP patients, and for other populations; a total of 58 NLTGs occurred weekly. However, SQ was unable to report the number of EOP patients enrolled in NLTGs.

Further, the EOP supervisor was not familiar with the NLTG curriculum and reported that IDTT treatment teams were also unaware of NLTGs. Although NLTG hours counted toward patients' weekly structured therapeutic activity, EOP clinicians were not aware of the actual number of hours that patients attended NLTG groups.

Twenty-three interviewed EOP patients all reported being supported by their primary clinician and receiving timely contacts, as well as receiving more PC contacts when necessary. They indicated enjoying groups and expressed an interest in more, and also requested additional art and music supplies and instruments. Patients indicated feeling part of the treatment team during IDTTs. Regrettably, they also reported a custody officer who was demeaning to staff and patients who had previously been reported multiple times to custody leadership but remained in the unit. Other expressed concerns included custody staff opening the door to the mental health building late, which resulted in patients attending sessions or groups late. Nonetheless, most custody staff were reported to be fair.

Twenty EOP mainline patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

All 12 or 100 percent of patients had timely initial psychiatry evaluations before the initial IDTT and within 14 calendar days of arrival or a change in level of care. Fifty-eight percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, unavailable confidential space, and medical restrictions. Telepsychiatry was not used for any initial psychiatry assessments.

Fifty-two of 70 or 74 percent of required routine psychiatry contacts timely occurred at least every 30 calendar days. Forty percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, medical restrictions, dayroom contacts, and unavailable confidential space. Telepsychiatry did not conduct any routine psychiatry contacts.

Eight of nine or 89 percent of patients had timely required initial primary clinician evaluations within 14 calendar days of arrival or a level of care change. One overdue initial primary clinician evaluation never occurred. Eighty-eight percent were conducted confidentially. Reasons for non-confidentiality included dayroom contacts. No initial primary clinician assessments utilized telehealth.

Sixty-four of 109 or 59 percent of required routine primary clinician contacts timely occurred every seven calendar days. Fourteen overdue routine primary clinician encounters never occurred. Thirty-six percent were conducted confidentially. Reasons for non-confidentiality included modified programming, unavailable confidential treatment space, and dayroom and yard contacts. No routine primary clinician contacts utilized telehealth.

Five of ten or 50 percent of initial IDTTs timely occurred within 14 calendar days of patient arrival or a level of care change. Two overdue initial IDTTs never occurred. Required staff attended all reviewed initial IDTTs; patients attended 88 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

Twelve of 18 or 67 percent of required routine IDTTs timely occurred within 90 calendar days. Two overdue routine IDTTs never occurred. Required staff attended 96 percent of routine IDTTs; staff attended 42 percent. Reasons routine IDTTs were held *in absentia* included patient refusals, COVID-19 protocols, and patients being unable to participate. Of note, the Program

Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

3CMS:

Mental health leadership reported that 3CMS primary clinicians' caseloads approximated 140 patients, which exceeded the established ratio.

The 3CMS supervisor reported that initial clinical contacts and IDTTs were now timelier, but that the 3CMS clinical team had fallen behind on routine primary clinician contacts during the patient influx that occurred during the first quarter of 2023. The supervisor indicated having prioritized initial assessments and IDTTs and that the program was now catching up with routine primary clinician contacts.

The supervisor did not indicate any significant access to care barriers other than staffing and issues with patient movement. Staff and patients both reported that individual psychiatry and primary clinician contacts were typically confidential, except when the patient refused. Clinicians' reported adequate treatment space. During the review period, all treatment team members typically attended 98 percent of IDTTs. The 3CMS program supervisor reported that treatment refusals were very infrequent and usually related to a patient's clinical presentation and symptoms, such as social anxiety or an avoidant attachment style. Staff reported generally good morale, and cohesive treatment teams with members who supported one another.

Seven observed IDTTs were all adequate and attended by required staff, including the 3CMS supervisor, psychiatrist, primary clinician, and CC I. Patients attended six IDTTs. Overall, treatment teams appropriately conducted IDTTs that adequately addressed individualized and clinically appropriate patient care.

The treatment team was collaborative and exhibited strong rapport with patients. The primary clinician provided brief clinical and psychosocial histories for all patients, but theoretical case conceptualizations were limited or absent for five of seven IDTTs. All IDTTs revealed extensive discussions about diagnosis, medication, functional impairments, safety planning, and substance abuse. Most treatment goals and interventions were also individualized, measurable, and appropriate to the patient's clinical needs and presentation. There were also level of care and pre-release planning discussions for all patients. However, CC I participation was inadequate during five of seven IDTTs as the CC I did not provide any meaningful contributions or input. Another CC I who attended the two other IDTTs provided adequate input.

Although 3CMS patients were offered four distinct clinical groups during the review period on anger management, healthy thinking, an LGBTQ+ support group, and a process group for monolingual Spanish speakers, only the group for monolingual Spanish speakers was offered at the time of the site visit. Notably, 3CMS clinical groups were facilitated by psychology interns whose training year was coming to an end during the site visit. These groups were thus on hold until arrival of the new internship cohort in September 2023. As such, the monitor's expert was unable to observe any 3CMS groups.

Twenty mainline 3CMS patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Six of seven or 86 percent of patients had timely initial psychiatry evaluations before the initial IDTT. One overdue initial psychiatry evaluation never occurred. Eighty-three percent were conducted confidentially. Reasons for non-confidentiality included patient refusal. Telepsychiatry did not conduct any initial psychiatry assessments.

Six of 15 or 40 percent of routine psychiatry contacts timely occurred at least every 90 days. Eighty percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry did not conduct any reviewed routine psychiatry contacts.

Three of six or 50 percent of initial primary clinician evaluations timely occurred within ten working days of patient arrival or a level of care change. Eighty-three percent were conducted confidentially. Reasons for non-confidentiality included medical restrictions. No initial primary clinician assessments utilized telehealth.

Fourteen of 21 required routine primary clinician contacts timely occurred at least every 90 days. Eighty-nine percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and modified programming. No routine primary clinician contacts utilized telehealth.

One of seven or 14 percent of initial IDTTs timely occurred within 14 working days of arrival or a level of care change. One overdue initial IDTT never occurred. Required staff attended 100 percent of reviewed initial IDTTs; patients attended 50 percent. Reasons initial IDTTs were held *in absentia* included patient refusals and medical restrictions.

Eight of ten or 80 percent of patients had required timely routine IDTTs. All or 100 percent of required staff attended all reviewed routine IDTTs; patients attended 40 percent. Reasons routine IDTTs were held *in absentia* included patient refusals, modified programming, and cell-front contacts.

Other Issues:

Pre-Release Planning:

SQ did not provide its LOP for pre-release planning.

A clinical social worker filled SQ's pre-release coordinator position. The pre-release coordinator was also a member of the high risk team and was on-call for use of force incidents and cell extractions.

The pre-release coordinator's duties included completion of requests of information (ROI) for patients released on probation. During the review period, the pre-release coordinator reported that SQ released 89 patients to probation. ROIs were completed for 83 patients; five patients refused to sign, and one patient did not require completion of a ROI. The pre-release coordinator also initiated the pre-release planning assessment (PRPA) for 148 patients, which patients' individual clinicians completed, and assisted patients released to probation with housing concerns.

SQ conducted weekly pre-release groups for EOP patients. Observation of a pre-release group indicated the use of the headquarters' curriculum. However, pre-release groups were not offered to 3CMS patients and there were no plans to resume them at the time of the site visit.

The pre-release coordinator and TCMP staff participated in weekly ISUDT pre-release calls. The pre-release coordinator also participated in headquarters' monthly pre-release meetings. The pre-release coordinator and TCMP staff reported good communication between them. Both also indicated a good relationship with custody staff.

SQ had two TCMP case managers, who reported that the most significant challenge had been locating confidential interview space to meet with patients. However, this issue was resolved with mental health leadership's assistance, and office space was set aside for TCMP staff on both a regular schedule and an as-needed basis.

TCMP reported meeting with 33 EOP and 131 3CMS patients during the reporting period. As for various benefits' applications, 182 were submitted on behalf of 143 of 164 or 87

percent of patients.  Six patients refused TCMP services; 15 other patients had access to other resources, or were unavailable to TCMP staff.  Applications for Medi-Cal were submitted for 141 or 86 percent of patients, while SSI applications were submitted on behalf of 36 of 39 or 92 percent of eligible patients.  Of nine potential applicants for veterans' benefits, five patients submitted applications.  Of these five veterans' benefits' applications, one patient was previously determined to be eligible, one patient's application was pending, two patients were denied eligibility, and one was deemed ineligible.

Program Access:

a.   Job and Program Assignments

SQ reported that its 620 job assignments were held by 39 or 15 percent of EOP patients, 298 or 21 percent of 3CMS patients, and 580 or 24 percent of non-MHSDS incarcerated persons.

The 620 academic assignments were held by 18 or seven percent of EOP patients, 192 or 14 percent of 3CMS patients, and 410 or 17 percent of non-MHSDS incarcerated persons.

Of the 54 vocational education assignments, none were held by EOP patients, but 20 or one percent of 3CMS patients held them, as did 34 or one percent of non-MHSDS incarcerated persons.

The 479 voluntary education assignments were held by 14 or five percent of EOP patients, 164 or 12 percent of 3CMS patients, and 301 or 12 percent of non-MHSDS incarcerated persons.

The 199 substance abuse treatment assignments were held by 34 or 13 percent of EOP patients, 87 or six percent of 3CMS patients, and 78 or three percent of non-MHSDS incarcerated persons.

b.  Milestone Credits

SQ reported that all 251 EOP and 314 3CMS patients who were eligible to earn milestone credits earned the credit.

c.  Out-of-Level Housing

SQ reported that 38 EOP and 180 3CMS custody Level I patients were in Level II housing.  There were two EOP and 37 3CMS custody Level III patients in Level II housing, and two 3CMS custody Level IV patients in Level II housing.

d.  ADA Reasonable Accommodation and Grievance Procedure

SQ provided an updated reference training manual for ADA accommodations as well as attendance sheets for training on accommodations and grievance procedures.

e.  Periodic Classification Score Reductions: EOP Patients

SQ provided copies of CDCR Form 840s that indicated that it was providing periodic classification score reductions for EOP patients.

f.  Unclothed Body Search

SQ's LOP concerning unclothed body searches was in compliance with CDCR policy. Interviewed administrative segregation staff capably articulated the unclothed body search policy.

"C" Status:

During the site visit, there was one EOP and 14 3CMS patients on "C" Status.  During the review period, ten EOP and 44 3CMS patients were on "C" status.

Case-by-Case Reviews:

SQ reported not retaining any MHSDS patients in administrative segregation for 150 days during the review period.

<u>Mental Health Referrals</u>:

During the review period, SQ made 1,282 mental health referrals; there were 152 referrals to psychiatry, and 1,130 referrals to primary clinicians. There were 201 emergent, 662 urgent, and 419 routine referrals. For emergent referrals, there were timely responses to 87 percent of psychiatry referrals, and to 98 percent of primary clinician referrals. For urgent referrals, there were timely responses to 79 percent of psychiatry referrals, and to 97 percent of primary clinician contacts. Moreover, for routine referrals, there were timely responses to 76 percent of psychiatry referrals and to 75 percent of primary clinician referrals. Obstacles to timely responding to psychiatry and primary clinician referrals included high patient intake and staffing shortages. Further, during the review period, SQ lacked a CIT and the high risk team responded to all emergent and urgent referrals.

Interviewed custody staff were knowledgeable about completion of the MH-5 form for patients in distress, as well as how to deliver it to appropriate mental health staff.

<u>Custody and Mental Health Partnership Plan</u>:

The institution's CMHPP LOP was current, had been revised in August 2022, and complied with statewide operating policy.

SQ conducted executive leadership joint rounding during five of six months of the review period. Reviewed documentation demonstrated attendance by required custody and mental health leadership at the rounding. The rounding reports indicated positive relationships between mental health and custody staff and several patient concerns with physical plant issues. Patients had consistently positive responses about mental health treatment.

Executive staff meeting minutes indicated announcement of the date and location of the next executive leadership joint rounding, in violation of applicable policy, as the rounding was

supposed to be unannounced. Reviewed executive staff meeting minutes included information about the prior month's rounding.

Meeting minutes for five quality management committee meetings all lacked any information about executive rounding. However, mental health subcommittee meeting minutes included summaries of executive rounding for five of six reviewed meetings.

The monitor reviewed huddle reports for the H unit EOP program, administrative segregation, and the MHCB for December 2022. Second watch huddle reports for H unit were completed for 21 of 22 required days. Regrettably, custody staff did not attend huddles for nine or 43 percent of the days reviewed. However, the huddle reports included information about patients who were decompensating or who had received bad news, and new arrivals. Mental health supervisory staff reported that the H unit had stopped conducting third watch huddles in late 2022 but had resumed them in February 2023.

For administrative segregation, there were second and third watch huddle sheets for 19 of 22 required days; two second watch huddle reports and one third watch huddle report were missing. With one exception, all huddle reports indicated attendance by both mental health and custody staff. However, provided huddle sheets only included the huddle reports' first page, and not all three pages; based on failing to use the entire form, these huddles were noncompliant. For the MHCB, SQ used the specialized bed complete care model (SBCCM) report, which was very thorough and contained detailed information about all MHCB patients. However, of the 22 required days, there were missing second watch huddle forms for 11 days and missing third watch huddle forms for two days.

SQ consistently conducted weekly 3CMS supervisory meetings, but reviewed reports contained minimal information, and typically only referenced new 3CMS arrivals.

The monthly joint supervisory 3CMS program area tours were consistently conducted. Reviewed documentation reflected adequate interviews of staff and patients.

SQ offered EOP orientation groups on a weekly basis. During the review period, 130 patients were assigned to EOP orientation groups. The institution reported providing the EOP orientation brochure to patients.

SQ provided inmate advisory council (IAC) meeting minutes for four of six months of the review period. IAC patient members, and not CDCR staff, prepared the minutes. Regrettably, the minutes did not report staff attendance, and did not address mental health services.

SQ reported distributing the 3CMS orientation brochure to new patients and provided a copy of the brochure to the monitor.

During the review period, patients filed 268 staff complaints. Of these, 105 or 39 percent were determined to be true to some degree, 86 or 32 percent were pending, and 78 or 29 were found not to be true. Of these 268 staff allegations, 148 were for substandard performance, 12 were for PREA, eight addressed use of force, two addressed ADA, and one was related to an RVR. Ninety-six other allegations were deemed as "other." No custody or mental health staff were redirected to another position due to a complaint.

SQ provided quarterly round table training data for the fourth quarter of 2022 and the first quarter of 2023. Quarterly round table training for both quarters for the administrative segregation unit was noncompliant with policy as all required custody staff did not attend the trainings. For the MHCB, SQ did not conduct quarterly round table training for the fourth quarter of 2022 but provided second watch sign-in sheets for the first quarter of 2023. Regrettably, all required custody staff did not attend the second watch training. SQ did not

provide data for the first quarter of 2023 for third watch for the MHCB.  For the EOP program's H unit, again, regrettably, all required custody staff did not attend the training during second and third watch for the fourth quarter of 2022.  SQ did not provide data for the first quarter of 2023. For all programs, it could also not be determined whether required mental health staff attended the training.

The warden, chief deputy warden, and six correctional administrators did not attend the annual partnership off-post training.  However, this training was attended by two of six captains, 30 of 32 lieutenants, 79 of 81 sergeants, and 703 of 793 correctional officers.  For mental health staff, all chief psychologists and supervising psychologists and social workers attended the training, as did 23 of 25 psychologists, six of seven psychiatrists, and eight of ten social workers.

Heat Plan:

SQ did not report any Stage I, Stage II, or Stage III heat alerts during the review period.

Interviewed housing unit custody officers were knowledgeable about the heat plan activation process, and the respective protocols at each stage of the heat plan.  Reviewed logs reflected the appropriate recording of temperatures in the housing units.

SQ reported 92 percent compliance for attendance at heat plan training.

RVRs:

SQ issued 1,547 RVRs during the review period, of which 820 or 53 percent were issued to MHSDS patients.

The monitor reviewed 17 RVRs to assess compliance with CDCR policy.  Custody staff timely referred the mental health assessment to mental health in nine of 17 or 53 percent of cases.  Mental health staff timely completed and returned the assessment to custody in 16 of 17 or 94 percent of cases.  Reviewed mental health assessments were well written and in layman's

607

terms and provided detailed information about patients' mental illness for the senior hearing officer's (SHO) consideration.  The SHO documented consideration of the assessment in 15 of 17 or 88 percent of cases.  The SHO mitigated penalties in all seven instances where the mental health assessment recommended mitigation.

The interview for the mental health assessment was conducted confidentially for five of 17 reviewed cases; the patient declined a confidential interview in the remaining 12 instances.  All 17 reviewed RVRs had a staff assistant assigned pursuant to policy.

Two of six reviewed ICC committee actions documented consideration of the mental health assessment in the assessment of a SHU term.

The mental health assessment training was attended by three of six correctional administrators, three of six captains, 32 of 33 lieutenants, and 54 of 81 sergeants.  For mental health staff, SQ designated seven staff, including psychologists and psychology interns, to complete mental health assessments.  All seven staff members attended the training.

Use of Force:

SQ reported one controlled use of force involving a non-MHSDS incarcerated person.  There were also 28 immediate uses of force involving 22 MHSDS patients.  Four of five reviewed immediate uses of force involving MHSDS patients were found to be in compliance with CDCR policy.  In the noncompliant case, although the patient indicated a staff assault on the medical report of injury, a patient interview was not conducted and included in the incident package as required by policy.  Regrettably, all levels of review overlooked this omission, as the incident was closed without corrective action.

As for attendance at the required use of force training, the warden, chief deputy warden, and six correctional administrators all attended the required training, as did five of six captains,

31 of 32 lieutenants, 79 of 81 sergeants, and 737 of 798 correctional officers.  For mental health staff, the training was attended by one of three chiefs of psychology, 11 of 25 psychologists, three of seven psychiatrists, and seven of ten social workers.

Lockdowns/Modified Programs:

During the review period, SQ experienced 15 program lockdowns that ranged from three to 33 days.  Only one lockdown was institution-wide; the others were for specific housing units or blocks.  Eight program lockdowns were due to quarantines, four followed riots or assaults, and three were due to a lost tool/equipment.  During lockdowns, healthcare ducats, including those for mental health appointments, were allowed.

Access to Care:

Review of SQ's monthly Health Care Access Quality reports from October 2022 through March 2023 indicated the issuance of 60,865 mental health ducats and add-on appointments, of which 38,508 or 63 percent were completed, and 22,357 or 37 percent were not completed.  Of the non-completed appointments, six percent were not completed due to custody factors, 50 percent were due to non-custody factors, and 44 percent were due to patient refusals.

*Coleman* Postings:

There were *Coleman* postings in English and Spanish posted in patient visible areas in all toured housing units.

**APPENDIX B-13**
**CALIFORNIA STATE PRISON/CORCORAN (CSP/Corcoran)**
**(July 10, 2023 – July 14, 2023)**

Census:

On July 7, 2023, CSP/Corcoran housed 3,375 incarcerated persons, which was a one percent increase from the prior reporting period. The 1,595 MHSDS patients represented 47 percent of the institution's population and was a ten percent increase from the previous review period.

The MHCB housed 23 patients, and the CTC housed one acute care patient. There was one patient in alternative housing. There were four EOP and ten 3CMS patients in the OHU.

The 173 mainline EOP patients represented one patient less than the prior review period, while the 1,115 mainline 3CMS patients were a ten percent increase from the previous reporting period.

The administrative segregation population included 93 EOP hub patients, 101 STRH patients, and 74 LTRH patients.

Staffing:

The chief psychiatrist was on an extended leave since January 2023. The senior psychiatrist position was also vacant. Of six psychiatry positions, 1.5 were filled for a vacancy rate of 75 percent; the use of 3.35 registry staff reduced the functional vacancy rate to 19 percent.

All seven telepsychiatry positions were filled, as were six positions for medical assistants.

Both chief psychologist positions were filled, as were all nine senior psychologist positions.

Eight of 38 psychology positions were filled, for an alarming 79 percent vacancy rate. Registry covered 4.74 positions, leaving a 66 percent functional vacancy rate. Five psychologists were unlicensed.

610

The supervising social worker position was filled. Eleven of 16 social worker positions were also filled, for a 31 percent vacancy rate. The use of 2.94 contractors reduced the functional vacancy rate to 13 percent. Four social workers were unlicensed.

Nine of 12.5 recreation therapist positions were filled, reflecting a 28 percent vacancy rate. Registry filled 2.59 positions, reducing the functional vacancy rate to seven percent.

All five registered nurse positions were filled.

All four senior psych tech positions were filled. Of 69 psych tech positions, 60.5 were filled, for a 12 percent vacancy rate.

Fifteen of 17 MHSDS clerical positions were filled. The 0.5 AGPA position was filled, as were the 2.5 HPS I positions and the OSS II position. The CHSA II position was vacant.

For custody, two individuals acting out of class filled the positions for the warden and chief deputy warden. All seven associate warden positions were filled, as were all seven positions for captains. Thirty-nine lieutenants covered 36.2 positions, including one lieutenant who was on extended leave. Of 112.6 sergeant positions, 103 were filled, reflecting a nine percent vacancy rate.

Twenty-four of 25 CC I positions were filled. One CC I was on an extended leave, but six staff acting out of class eliminated the functional vacancy rate. Fifteen of the 15.5 CC II positions were also filled, for a three percent vacancy rate. Although one CC II was on extended leave, five staff acting out of class eliminated the functional vacancy rate. For correctional officers, 971 of 993.2 positions were filled for a two percent vacancy rate; however, 69 correctional officers were on extended leaves, for a nine percent vacancy rate.

<u>Telepsychiatry</u>:

Telepsychiatry was primarily used in the 3CMS program and restricted housing units during the review period.  Four telepsychiatrists were assigned to 3CMS patients; only two had caseloads within the established ratio.  Two telepsychiatrists were assigned to STRH and LTRH; each had caseloads within the ratio.  One additional telepsychiatrist administered PC 2602 medication orders.  CSP/Corcoran was unable to report whether telepsychiatrists completed their required in-person visitation to the institution.

Regrettably, telepsychiatry's use for STRH IDTTs contributed to their lack of collaboration as the telepsychiatrist did not operate as an integrated treatment team member.  The STRH telepsychiatrist was unable to follow the IDTT discussion and order of patients who were seen.  The telepsychiatrist continually inquired which patient was being discussed and frequently asked staff to repeat themselves due to the poor audio quality.  This resulted in IDTT members' spending a lot of time repeating information that had already been extensively discussed.

All observed LTRH IDTTs used telepsychiatry.  At these IDTTs, the telepsychiatrist typically waited for a prompt from the program supervisor before speaking.  The telepsychiatrist also was not involved in collaborative discussions regarding next steps in care, and did not participate in the recommendations.  The LTRH telepsychiatrist also noted the very high rate of refusal in LTRH, which negatively impacted the ability to complete initial assessments.

<u>Telehealth</u>:

The chief psychologist, MHSDS clerical staff, OSS II, AGPA, and two HPS Is teleworked one day weekly.  One 0.5 staff psychiatrist teleworked two days weekly.

Staff Recruitment:

CSP/Corcoran reported significant staffing shortages that affected the provision of mental health treatment and adherence to Program Guide compliance.  Notably, mental health leadership indicated that in addition to the present staffing shortage, as many as three EOP clinicians were leaving the institution in the weeks following the site visit.  These losses were consistent with staffing deterioration since the prior review period, with CSP/Corcoran reporting 27 clinical staff leaving during the past year alone.

Although leadership prioritized the most acute program areas to assign staff, CSP/Corcoran did not use an actual triage or prioritization plan to overcome the significant staffing shortages.  This resulted in brief and inadequate treatment contacts with reduced programming across all levels of care.

Reported barriers to recruitment and employee retention included the unavailability of telehealth opportunities, CSP/Corcoran's location, student loan repayment options at other CDCR institutions, including CSATF, and current pay rates as compared to other employment opportunities.  Staff also indicated that many licensed CSP/Corcoran clinicians were promoted to CDCR management positions or left to work at teletherapy organizations or in less restrictive facilities.

Quality Management:

CSP/Corcoran did not report whether the local governing body met quarterly during the review period.  Meeting minutes from the first quarter of 2023 indicated the attainment of a quorum.  Agenda topics included review of action items, peer review, review of policies and procedures, statewide memoranda, credentialing, and licensing reports.  Reviewed minutes reflected a high level review for all agenda items.

The quality management committee met monthly, achieving a quorum for five of six meetings. Reviewed minutes provided a useful meeting summary. Routine addressed topics included the status of performance improvement work plan (PIWP) projects, OIG updates, subcommittee and health care quality access reports, LOPs, audit and survey findings, and COVID-19 information.

Monthly mental health program subcommittee documentation was detailed and provided a useful summary of discussed topics, including improvement work, system surveillance, program administration, and on-demand mental health reports. A quorum was met for four of six monthly meetings.

Like the previous reporting period, no QITs or FITs were chartered, and no other audits were completed. However, CSP/Corcoran initiated a green belt project which focused on improving compliance with medication consent forms.

The Emergency Medical Response Review Committee conducted biweekly meetings between December 2022 and March 2023, reviewing numerous incidents. Regrettably, documentation of daily required checks and drills were not consistently included.

Medication Management:

During the six month review period, MAPIP results for psychiatric diagnostic monitoring and medication management reflected noncompliance. Of the 39 required measures for diagnostic monitoring, only 13 or 33 percent were compliant for all required months of the review period. For medication management, none of the 12 required measures were compliant for the entire reporting period.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated compliance for all six months with blood pressure, height, weight, and thyroid tests. For EKGs

and medication consents, CSP/Corcoran was compliant for three months. For monitoring the Abnormal Involuntary Movement Scale (AIMS), there was compliance for only two months. CSP/Corcoran was noncompliant for all six months for glucose, Complete Blood Count with platelets (CBC), Comprehensive Metabolic Panel (CMP), and lipids.

During the site visit, CSP/Corcoran reported that seven patients were prescribed clozapine. As for the close monitoring required for this medication, there was compliance for six months with measuring blood pressure, CBC, and weight. CSP/Corcoran was compliant for all five required months for monitoring thyroid function, and for five months for monitoring height. There was compliance for four of five required months for monitoring glucose, CMP, and EKGs, and for three of five required months for medication consents and lipids. CSP/Corcoran reported compliance for two of three required months of monitoring AIMS.

For monitoring antidepressants, there was compliance for six months for thyroid laboratory tests, and blood pressure for patients prescribed venlafaxine. CSP/Corcoran was compliant for only two required months for EKGs, and for two months for medication consents.

For patients prescribed carbamazepine, there was compliance for monitoring therapeutic medication levels, CBC, and CMP for all required months. No medication consents were required during the review period.

For patients prescribed Depakote, there was compliance for three months with obtaining medication consents, and for one month with monitoring CBC with platelets, CMP, and medication blood levels.

CSP/Corcoran was compliant in obtaining medication consents for lamotrigine for three of five required months.

As for lithium, the facility reported compliance for five months with obtaining medication consents, and for four months for monitoring thyroid function tests. There was compliance for three months for kidney function tests, and for two months for monitoring therapeutic blood levels. CSP/Corcoran was complaint with EKGs for one of four required months.

For medication management metrics reported by mental health headquarters, no measures achieved compliance for all six months. Continuity of medications upon parole/transfer to the community was compliant for four months. There was three months' compliance for continuity of medications with intra-institutional transfer to ASU/SHU/PSU, and following discharge/transfer from a community hospital and/or DSH, and for two months for medication continuity upon inter-institution transfer at receiving and release, continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers, excluding ASU/SHU/PSU, and chronic care medications historical administration.

Of particular concern, medication continuity following MHCB transfers was compliant for only one month. Regrettably, three metrics, namely, observation of medication preparation and administration AM and PM, observation of medication preparation and administration HS, and outpatient provider new medication orders were noncompliant for all six months.

Psychiatrists could prescribe medications from 90 to 180 days, but no explanation was provided as to how the length of prescription was determined. Bridge orders' maximum duration was 30 days.

CSP/Corcoran did not report the total number of psychiatric medications prescribed.

During the site visit, CSP/Corcoran reported that 1,024 patients received psychiatric medications DOT. There were also 35 patients who received KOP medications. In accordance

with statewide policy, all prescriptions were for SSRIs. CSP/Corcoran did not provide information to assess whether all patients who received KOP medications were at the 3CMS level of care.

CSP/Corcoran submitted proof of practice that it conducted 48 medication line observations; however, it reported neither individual patient wait times nor medication lines' total duration.

On average, nine percent of medications were non-formulary. A secondary review for prescribing non-formulary medications was not required. CSP/Corcoran continued non-formulary medication prescriptions from other facilities.

CSP/Corcoran did not provide documentation that demonstrated implementation of a process for reviewing polypharmacy.

The institution reported that 625 patients received 1,020 HS medications after 8:00 p.m. Provided documentation was unclear whether they were only psychiatric medications, or all medications. As such, compliance could not be assessed.

CSP/Corcoran could not report the number of patients who were currently receiving PC 2602 involuntary medications. During the review period, the institution filed six initial PC 2602 involuntary medication petitions; there were three emergent and three non-emergent petitions. Of these, three were granted, one was denied, one was withdrawn due to patient consent, and one was dropped in error upon transfer. CSP/Corcoran filed 19 renewal PC 2602 petitions; 18 were granted.

CSP/Corcoran was compliant for four months for having the PC 2602 involuntary court order, and for three of five months for the related measure of having the PC 2602 psychiatrist medication order.

CSP/Corcoran did not provide information about the use of force to administer PC 2602 involuntary medications.

<u>Transfers</u>:

The sustainable process reviews were conducted through record review and without a site visit due to the ongoing unmet needs assessment (UNA). The sustainable process consisted of reviews by a headquarters' representative and CSP/Corcoran's inpatient coordinator to assess a sample of higher level of care (HLOC) documentation to determine whether HLOCs were adequately completed and contained sufficient clinical justification for HLOC referral when there were positive indicators. Notably, headquarters did not review documentation from the fourth quarter of 2022 as CSP/Corcoran had met the required threshold for compliance during the third quarter of 2022 review. Regrettably, headquarters' assessment for the first quarter of 2023 determined that only 60 percent of reviewed HLOC documentation was adequate, which was significantly lower than the inpatient coordinator's finding that 79 percent of reviewed HLOC documentation was adequate. Reported reasons for inadequate HLOC documentation included insufficient clinical rationales, and treatment modifications with some treatment plans that were "still in progress."

Regional staff also randomly selected eight patients who were positive for HLOC considerations according to the December 2022 non-referral log who were not referred, for internal consistency between the HLOC considerations and related clinical documentation. Of the six reviewed cases, six of 75 percent demonstrated internal consistency. However, review for the prior reporting period revealed that 100 percent reflected internal consistency. Regional staff subsequently offered specific recommendations to improve future compliance.

CSP/Corcoran's inpatient coordinator had held the position since September 2022.

During the review period, there were 815 instances of non-referral to inpatient care for 368 patients. CSP/Corcoran did not track the non-referral reasons. However, to assess the quality of non-referral rationales, the monitor's expert reviewed a sample of cases from the non-referral log. While the monitor's expert agreed with the clinical decision of not referring all cases to a higher level of care, clinical non-referral rationales were frequently inadequate, often copied and pasted from prior forms, and reflected simplistic, contradictory, and inaccurate reasoning.

CSP/Corcoran referred 36 patients to acute care. None were rejected, seven were rescinded, and one patient paroled six days after referral. Nine of 28 or 32 percent of patients timely transferred to acute care.

The institution referred 18 patients to intermediate care. None were rejected, but four referrals were rescinded. Of the 14 patients who transferred, only one or seven percent timely transferred within 30 days.

During the site visit, two patients who had been referred to acute care were pending acceptance.

During the review period, one patient with complex medical needs transferred to intermediate care.

*Vitek* hearings were held for five acute care and two intermediate care patients; no patients prevailed.

CSP/Corcoran made 598 MHCB referrals, which was more than double the number of referrals from the prior review period. Of these MHCB referrals, 262 were admitted and 336 were rescinded. Of the 262 MHCB admissions, 194 were admitted to CSP/Corcoran's MHCB

and 68 were admitted to MHCBs at other institutions.  Of CSP/Corcoran's MHCB referrals, 253 or 96 percent were timely admitted within 24 hours of referral.

Patients requiring EOP level of care were timely transferred to the institution's EOP program.  Like during the prior review period, CSP/Corcoran did not track patients whose level of care was reduced from EOP to 3CMS.

Patients who required placement in the EOP hub were moved to the on-site unit without delay.

Twenty-four patients transferred to the PSU during the review period.  All transferred timely.

CSP/Corcoran did not track the timeliness of patient transfers to its STRH or LTRH.

Programming:

MHSDS Patients in Administrative Segregation:

EOP hub:

There were 297 patients who were treated in the EOP hub during the reporting period. Stays averaged 18 days and ranged from one to 350 days.

The EOP hub psychiatrist had a 98 patient caseload, exceeding the established ratio. Three of four psychologists assigned to the EOP hub also had caseloads that exceeded the staff-to-clinician ratio; the remaining psychologist did not have an assigned caseload.

The EOP hub was certified monthly during the review period, but was certified with explanation for four of six months.  During 2023, there was noncompliance for treatment hours in January and April, for pre-screens and psych tech rounds in March, and for timely referrals in May.

EOP hub patients were offered an average of 11.6 weekly hours of structured treatment, attending 6.8 weekly hours and refusing 4.8 hours.

Like the prior review period, CSP/Corcoran reported 100 percent compliance for self-audited IDTTs. However, concerns with audit criteria and the sample size, as well as the monitor's expert's IDTT observations, indicated deficiencies requiring consideration of a corrective action plan (CAP) and further training.

All required treatment team members attended observed IDTTs; the program supervisor and recreation therapist also attended. Regrettably, the IDTTs demonstrated numerous shortcomings. Among them, they did not demonstrate effective treatment and level of care planning. Treatment teams also did not review patients' mental health history, current symptoms to support diagnoses, suicide risk factors, efforts to address the reasons for administrative segregation placement, or responses to treatment interventions. Provided treatment goals were limited to generic statements about reducing depression and anxiety. When indicated, there was no mention of plans to address treatment or medication nonadherence.

Observed IDTTs also lacked collaboration and did not discuss or correct discrepant observations or information. The assigned psychiatrist was reportedly unable to complete initial assessments prior to initial IDTTs, impacting the ability to contribute effectively. The treatment team also did not review inpatient records for patients who had recently returned from inpatient care or discuss related information until after the monitor's expert inquired.

Five recreation therapists facilitated all treatment groups. However, due to burnout, one of these RTs transferred to another program after the review period. Recreation therapist-led groups were scheduled for two hours, five days weekly. Like the preceding review period, the group model typically involved showing a film followed by group discussion. Observed groups

started timely and were well attended.  Interviewed group attendees expressed an interest in groups that were more focused on rehabilitation and parole preparation.

Interviewed EOP hub patients reported that mental health services were typically limited to medication management, recreation therapy groups, and very brief routine primary clinician and psychiatry contacts that were often completed non-confidentially at cell front.  Patients elaborated that two of three primary clinicians typically approached their cell doors to inquire whether a confidential contact was needed.  Patients also consistently reported that the psychiatrist did not offer out-of-cell contacts for routine encounters.  During observed IDTTs, two patients challenged the psychiatrist's claim that they had refused their recent psychiatry appointments.  Healthcare record reviews also indicated a high frequency of cell-front psychiatry and primary clinician contacts, and noncompliance for required daily high refuser contacts.

EOP hub mental health staff reported that some custody officers actively discouraged them from offering out-of-cell contacts and that certain providers were less willing to expend additional efforts to address or elevate this access to care issue.  Mental health staff added that resistance from custody officers was ingrained as a longstanding cultural issue.

Interviewed patients also consistently reported problems with the psychiatrist treating them disrespectfully, which included laughing in response to disclosing sensitive personal information and requesting specific medications.  Significantly, the monitor's expert observed the psychiatrist inappropriately laughing at a patient during IDTT.  Patients' further reported that the psychiatrist failed to follow-up when they requested a confidential contact during tier walks.  Lastly, mental health leadership reported that the psychiatrist routinely cancelled appointments without rescheduling, delaying access to care.

Review of 114-A's for ten EOP hub patients across 19 weeks revealed the offering of three weekly showers during 13 of 19 or 68 percent of examined weeks. Linen exchange was documented in eight of 19 or 42 percent of weeks. Ten hours of offered weekly yard was only documented for five of 19 or 26 percent of examined weeks. However, further review revealed that some custody officers did not document the specific times when yard was offered.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP hub stays.

Fifteen of 17 or 88 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Twenty-four percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, modified programming, and unavailable custody escorts. Telepsychiatry was utilized for one reviewed initial psychiatry evaluation.

Twenty-seven of 30 or 90 percent of routine psychiatry contacts occurred at least every 30 calendar days. Twelve percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, modified programming, and unavailable custody escorts. Six percent of reviewed routine psychiatry contacts used telepsychiatry.

All 17 or 100 percent of initial primary clinician evaluations timely occurred before the initial IDTT. Fifty-nine percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. No initial primary clinician assessments utilized telehealth.

Thirty-seven of 54 or 69 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Twenty-eight percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, modified programming, group room contacts, and staff shortages. Telehealth was not used for routine primary clinician contacts.

All 17 or 100 percent of initial IDTTs occurred within 14 calendar days of patient admission. Ninety-four percent included required staff; 76 percent included patients. Initial IDTTs were held *in absentia* due to patient refusals.

Eighty-six percent of routine IDTTs occurred every 90 calendar days. All reviewed routine IDTTs included required staff; patients attended 57 percent. Routine IDTTs were held *in absentia* due to patient refusals. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

STRH:

The STRH treated 292 3CMS patients during the review period. Total STRH stays averaged 318 days and ranged from 96 to 2,927 days.

The STRH telepsychiatrist had a caseload within the established ratio. Only one of four primary clinicians also had a caseload within the ratio. Two others' exceeded the ratio; one's caseload was more than double. The remaining PC's caseload was not reported.

STRH patients were offered more than the required 1.5 weekly hours of structured treatment during each month of the review period.

All required treatment team members attended observed IDTTs. The program supervisor also attended and typically led the discussions. Regrettably, treatment team comments were often superficial, disorganized, and inadequate for addressing patient care. Treatment plans were also not modified to address new issues or the reason for administrative segregation placement, while level of care was only discussed for two of seven patients. Further, suicide risk and risk factors were not reviewed, even after the program supervisor clarified that two patients had histories of self-harm or attempted suicide.

The use of telepsychiatry contributed to already uncollaborative IDTTs.  The telepsychiatrist did not operate as an integrated treatment team member and was unable to follow discussions.  The telepsychiatrist waited his turn to speak, repeatedly asked which patient was being discussed after long periods of conversation, and, due to poor audio quality, asked patients and staff to repeat themselves on multiple occasions.  Treatment team members thus spent a great deal of time correcting the telepsychiatrist and repeating information that had already been extensively discussed.

 Staffing shortages prevented clinicians from facilitating STRH groups, leading recreation therapists to run them.  Groups typically consisted of a movie or documentary followed by discussion.  Interviewed patients requested more focused groups, including behavior management.

Interviewed STRH patients reported that they generally found recreation therapy groups more beneficial than individual primary clinician contacts due to the latter's brevity.  They also reported that PC contacts were typically limited to assessing mood changes and the potential for harm to self or others, and were not therapeutic interventions consistent with treatment plans.

STRH providers reported that most cell-front contacts resulted from patient refusals.  They also reported, however, that they occurred when they covered for others and when they had to respond to higher priority contacts such as emergent referrals.

Patients confirmed being offered tablets during their first few days of STRH placement.  During the site visit, the STRH had a sufficient supply of them.  Radios were also timely issued, and the unit contained an adequate supply of radios and earbuds.  Four observed STRH patients in new intake cells all had a radio or other electronic device.

Staff indicated issuing personal property to STRH patients within 30 days after ICC. Staff further reported that the delay in personal property issuance typically resulted from patient movement into and out of the unit, as well as incidents within STRH. The property officer reported attempting to issue personal property on the weekend when there was less activity in the unit. Regrettably, the observed property room contained a significant amount of personal property awaiting issuance.

A review of 114-A's for seven STRH patients across 13 weeks revealed that three weekly showers were offered for only two of 13 or 15 percent of weeks. All 13 weeks documented linen exchanges. No patient was offered 18.5 hours of weekly yard during any of the 13 examined weeks. However, further discussion with custody staff revealed that officers typically did not document the specific times when yard was offered.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Ten of 13 or 77 percent of patients had timely initial psychiatry evaluations before the initial IDTT. Ninety-two percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted all 13 or 100 percent of reviewed initial psychiatry assessments.

Thirteen of 16 or 81 percent of routine psychiatry contacts timely occurred at least every 90 days. Sixty-seven percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted all reviewed routine psychiatry contacts.

Five of ten or 50 percent of initial primary clinician evaluations timely occurred within ten working days of arrival and before the initial IDTT. Forty percent were conducted in

confidential settings. Reasons for non-confidentiality included patient refusals. Telehealth did not conduct any initial primary clinician assessments.

Forty-six of 68 or 68 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Twenty-four percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and modified programming. Telehealth did not conduct any routine primary clinician contacts.

Only two of 12 or 16 percent of required initial IDTTs occurred within 14 working days of arrival. Required staff attend 100 percent of initial IDTTs; patients attended 50 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

Five of seven or 71 percent of routine IDTTs timely occurred every 90 calendar days. Required staff attended all reviewed routine IDTTs; patients attended 22 percent. Reasons routine IDTTs were held *in absentia* included patient refusals and patients being in the hospital. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

LTRH:

Seventy-seven patients were treated in LTRH during the review period. Total lengths of stay averaged 477 days and ranged from 142 to 2,916 days.

The telepsychiatrist's caseload was within the established ratio, but all three primary clinicians had caseloads exceeding it. Regrettably, LTRH treatment space was limited and insufficient to provide adequate treatment. Although the IDTT room was available for individual contacts, it was in very poor condition.

Staff and patient interviews revealed that LTRH patients had a high frequency of cell-front contacts.

LTRH patients were offered more than the required minimum of 1.5 weekly hours of structured treatment during the review period.

Required treatment team members attended all seven observed IDTTs, all of which used telepsychiatry. Treatment team members typically contributed to discussions and interacted appropriately with patients; however, the telepsychiatrist generally waited for the supervisor's prompt before speaking. One primary clinician consistently reviewed pertinent background information and critical elements of care during the IDTT; two others' relied on the supervisor's prompts or interventions to achieve the IDTTs' objectives. Although most treatment team members collaboratively discussed next steps in care, the telepsychiatrist was not involved in the discussions or resulting recommendations. Still, with the program supervisor's interventions, IDTTs were generally adequate.

The telepsychiatrist noted during IDTTs that there was a very high rate of refusal in LTRH, making it difficult for them to complete initial assessments. Treatment team staff further reported that relatively few patients were prescribed medications, suggesting that this might be due to the high frequency of telepsychiatry refusals.

Recreation therapists facilitated all LTRH groups; clinician-led groups were not offered during the reporting period. During the site visit, scheduled groups were cancelled due to the lack of a group facilitator. LTRH patients reported that they looked forward to groups, primarily to leave their cells, but also requested more clinician led groups focusing on skill building.

LTRH patients were timely issued radios and there was an adequate supply of radios and earbuds within the unit.

Review of 114-As for 13 LTRH patients across 25 weeks demonstrated that three weekly showers were offered during 19 of 25 or 76 percent of reviewed weeks. Eighteen of 25 or 72 percent of examined weeks documented linen exchanges. Only two of 25 or eight percent of weeks documented adequate yard; however, custody officers stated not typically documenting the specific times when yard was offered.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their LTRH stays. One patient was eliminated from the assessment due to not requiring clinical contacts during the review period.

Thirteen of 18 or 72 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Eighty-nine percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry was utilized for all reviewed initial psychiatry assessments.

Nine of 13 or 69 percent of routine psychiatry contacts occurred at least every 90 days. Seventy-five percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry was utilized for all reviewed routine psychiatry contacts.

Sixteen of 18 or 89 percent of initial primary clinician assessments were completed within ten working days of patient admission and before the initial IDTT. Forty-four percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and staffing shortages, which resulted in cell-front contacts.

Forty-five of 63 or 71 percent of routine primary clinician contacts occurred at least every seven days. Thirty-five percent were conducted confidentially. Reasons for non-confidentiality included staffing shortages and patient refusals.

Twelve of 18 or 67 percent of initial IDTTs timely occurred within 14 working days of patient arrival. Required staff attended 94 percent of initial IDTTs; patients attended 56 percent.

Seven of ten or 70 percent of routine IDTTs timely occurred every 90 calendar days. Required staff attended all routine IDTTs; patients attended 64 percent. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

<u>Non-Disciplinary Segregation</u>:

During the review period, nine EOP and 19 3CMS patients were designated as NDS. All 28 patients were approved for accelerated transfer, but only 11 patients timely transferred from administrative segregation within policy timeframes. Patients approved for accelerated transfer who transferred late ranged from one to 14 days late; CSP/Corcoran did not provide a reason for delays.

At the time of the site visit, CSP/Corcoran housed 15 NDS patients, of whom two required expedited transfer. Disconcertingly, both patients were beyond required expedited transfer timeframes and were respectively late by six and 27 days. The remaining 13 NDS patients had been designated this status for between six and 72 days.

<u>MHCB</u>:

CSP/Corcoran's MHCB had 24 beds, but at various times some cells were redlined. During the review period, the average daily census was 19 patients. MHCB patients' clinical stays averaged nine days, but the clinical stays of 27 percent exceeded ten days, averaging 15.3 days and ranging from 11 to 30 days. Physical stays averaged 10.5 days, with 35 percent exceeding ten days.

Although MHCB staffing was prioritized over lower levels of care, the MHCB nonetheless experienced staffing shortages, negatively impacting treatment. Notably, both psychiatrists' caseloads', including one who was primarily assigned to the CTC, exceeded the established ratio, although caseloads of all four primary clinicians were within the ratio. The primary clinicians included an unlicensed psychologist for whom CSP/Corcoran had applied for and received a waiver from the California Department of Public Health to provide psychology services in a licensed CTC/MHCB, even though staff were required to be licensed. CSP/Corcoran sought this waiver due to staffing shortages.

The MHCB lacked treatment space, requiring most treatment activities, including individual contacts and IDTTs, to be held in the CTC. Because neither the MHCB nor the CTC contained group treatment space, recreation therapists used the outdoor courtyard for treatment.

A sample of reviewed cases indicated timely history and physicals. However, initial mental health assessments were not consistently completed by primary clinicians prior to the initial IDTT and were not routinely confidential. Reviewed cases reflected timely initial suicide risk evaluations, but discharge evaluations were not always timely completed, and safety planning was not always adequately addressed. On a positive note, reviewed cases revealed timely initial and routine IDTTs.

Five observed IDTTs all had required staff in attendance. While the IDTTs varied by clinician, overall, they demonstrated inadequate treatment planning. The IDTTs were not interactive, lacked collaboration, and did not prioritize treatment plan development. Although reviewed treatment plans identified patient's goals and indicated some clinical interventions, treatment goals were not always realistic. Progress notes also did not consistently support the treatment plan's actual implementation.

Despite all treatment team member's IDTT attendance, the IDTTs' culture focused heavily on the primary clinician driving treatment decisions. Topics including patient discharge to a lower level of care were not presented as a team decision. While each discipline had treatment plan goals, only the goals specific to the primary clinician were typically discussed. It was also unclear whether the psychiatrists were familiar with patients as their interactions were more suitable for an individual treatment setting. Despite these limitations, primary clinicians knew their patients and addressed necessary areas adequately.

No treatment groups were offered to MHCB patients.

Record review indicated that patients were often seen by different providers, negatively impacting continuity of care. This also adversely affected treatment due to treatment decisions sometimes being deferred or contradicted, which also delayed discharges. Most reviewed individual contacts also occurred at cell front, precluding the use of evidence-based therapeutic techniques, and negatively impacting the ability to effectively assess patients and develop therapeutic rapport.

Some interviewed MHCB patients reported being out to yard or to dayroom, which observation confirmed. Patients individually attended these activities; they were placed in a treatment module in the dayroom, which also had a television and library, but were free to move about the courtyard. The courtyard also contained a large water jug/cooler and some recreational supplies. Patients had few complaints but expressed a desire to be out of their cells more.

Reviewed 114-A's for MHCB patients revealed that patients were offered showers three times weekly, two hours of daily yard, and 90 minutes of daily day room. Records indicated that patients refused approximately 90 percent of yard and 50 percent of dayroom.

Twenty charts were selected for review for compliance with Program Guide timeframes to assess MHCB stays.

All 20 or 100 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 24 hours of patient admission. Fifty percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and modified programming. Telepsychiatry was used for 20 percent of initial psychiatry assessments.

Forty-six of 47 or 98 percent of required twice weekly routine psychiatry contacts timely occurred. Fifty percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, modified programming, unavailable confidential space and custody escorts, and group room contacts. Nineteen percent utilized telepsychiatry.

All 20 or 100 percent of initial primary clinician evaluations timely occurred within 24 hours of patient admission. Seventy percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and modified programming. One initial assessment utilized telehealth.

For routine primary clinician contacts, 136 of 146 or 93 percent timely occurred. Thirty-six percent were confidential. Reasons for non-confidentiality included patient refusals, modified programming, staff shortages, unavailable confidential space and custody escorts, and group room contacts. Four or three percent utilized telehealth. Further, licensed clinicians completed 93 percent of routine primary clinician contacts; the unlicensed waivered clinician completed the remaining seven percent.

All 20 or 100 percent of initial IDTTs timely occurred within 72 hours of patient admission. Required staff attended 40 percent of initial IDTTs, with RNs being routinely absent.

Patients attended 80 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals and safety concerns.

All 19 or 100 percent of routine IDTTs timely occurred every seven calendar days. Required staff attended 43 percent of routine IDTTs.  Again, RNs were routinely absent. Patients attended 87 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals and safety concerns.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

Seclusion and Restraint:

There were no seclusion or restraint incidents during the review period.

Crisis Intervention Team:

Due to severe staffing shortages, CSP/Corcoran lacked a CIT during the reporting period. This resulted in clinical staff responding to crisis calls as needed.  During evening shifts, staff sent the patient to the TTA, where nursing staff contacted the on-call clinician, who provided a disposition by telephone.

There were 133 CIT activations during the reporting period.  Of those, 61 patients were placed in the MHCB, 71 patients were returned to the same housing level, and one patient was moved to a different unit at CSP/Corcoran.  Unfortunately, provided information did not allow for a calculation of response times to CIT activations.

Alternative Housing:

CSP/Corcoran's LOP was in alignment with headquarters' directive.  The institution used 12 cells in Facility 4A3L for alternative housing.  These cells contained elevated concrete slabs with no tear mattress and blankets, vents with smaller holes to mitigate hanging attempts,

rounded-off concrete edges, and a toilet/sink combo unit.  During the visit, the one alternative housing patient had a psych tech in front of the cell conducting one-to-one observation and recording the patient's activities every 15 minutes.  The monitor also verified that the patient wore a no tear smock.

There were 429 alternative housing placements during the review period, of which 67, or 16 percent of patients, were placed in the MHCB.  Of these alternative housing placements, 409 or 95 percent were for less than 24 hours.  Of the 20 patients who remained in alternative housing for more than 24 hours, nine were admitted to the MHCB; the remaining 11 MHCB referrals were rescinded.  The institution did not indicate reasons for the delay beyond 24 hours for the nine patients who were admitted to the MHCB.

EOP:

CSP/Corcoran's mainline EOP population was primarily housed on Facility 3B with several EOP patients awaiting transfer from Facility 3A.

Insufficient staffing was the primary barrier to providing EOP patients with adequate care.  The EOP psychiatrist's caseload exceeded the established ratio.  Only one of four social workers had a caseload within the ratio.  Only social workers, and not psychologists, treated EOP patients.

Excluding EOP patients on modified programming, patients were offered an average of 12.8 weekly hours of structured treatment, attended a weekly average of seven hours, and refused an average of 5.8 hours.  The EOP supervisor reported that patients were seen individually for weekly primary clinician contacts, but further reported that limited staffing and high caseloads resulted in individual clinical contacts typically consisting of patient wellness checks instead of meaningful therapeutic contacts.

Twelve observed IDTTs found all required staff in attendance. The IDTTs varied by clinician, but overall, were inadequate. Although they generally identified IPOCs, IDTTs did not identify clinical interventions for generic treatment goals and did not discuss patient-specific treatment participation or progress during the previous 90 days to facilitate individualized treatment planning. Rather, interactions primarily focused on assessing the patient's current symptoms, which was better accomplished prior to the IDTT. While the correctional counselor had been asked to cover at the last minute, he provided no input whatsoever other than spontaneously stating that IDTT attendance was the "worst part of the job." He did not have a computer to access records and did not take any notes to share with the assigned counselor.

Recreation groups were typically offered and there were very few clinical groups. Observed recreation groups were well organized and personalized across different activities. The groups included a range of relevant discussion topics including effectively using incarceration time to plan for a successful community discharge and overcoming difficult challenges. During two different groups, RTs were very engaged with patients, redirected inappropriate content, and demonstrated positive relationships with patients. Both observed groups were multifaceted, which allowed patients to be attentive.

Interviewed patients confirmed that, consistent with institutional data, they were offered approximately 13 weekly hours of structured treatment, of which three hours were groups and the remaining time was yard or gym time. Patients indicated satisfaction with individual and group treatment, and noted that consistent group offerings were a program strength. They opined that most of their individual contacts were confidential. They also denied any major issues accessing mental health during a crisis but felt that custody staff could benefit from training on interacting with patients with mental health needs.

EOP patients requiring isolation or quarantine were transferred to overflow housing, but the institution could not provide the number of patients in overflow housing during the review period. During the site visit, five EOP patients were in overflow housing. These patients reported one weekly primary clinician contact and telepsychiatry's use for psychiatry contacts. Packets with handouts, including word searches, sudoku, and mental health education worksheets, took the place of group treatment during EOP overflow housing.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP stays. Notably, many patients' placement history records revealed that they were moved to different levels of care multiple times daily. This resulted in only ten patient records being conducive for review.

All six or 100 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 14 calendar days of patient arrival or a level of care change. Sixty-seven percent were confidential. Reasons for non-confidentiality included patient refusals. Seventeen percent utilized telepsychiatry.

Six of 30 or 20 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Seventy-six percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and cell-front contacts due to staff unavailability. Telepsychiatry conducted 27 percent of contacts.

All six or 100 percent of initial primary clinician evaluations timely occurred within 14 calendar days of patient arrival or a level of care change. Sixty-seven percent were conducted confidentially. No initial assessments utilized telehealth.

Forty-three of 52 or 83 percent of routine primary clinician contacts occurred at least every seven calendar days. Forty percent were conducted confidentially. Reasons for non-

confidentiality included patient refusals, appointments being held at cell front due to staff unavailability, and unspecified medical concerns. No routine contacts used telehealth.

Five of six or 83 percent of initial IDTTs timely occurred within 14 calendar days of arrival or a level of care change. Required staff attended all or 100 percent of initial IDTTs; patients attended 83 percent.

All 11 or 100 percent of routine IDTTs timely occurred every 90 calendar days. Required staff attended all routine IDTTs; patients attended 64 percent. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

3CMS:

CSP/Corcoran's mainline 3CMS population was housed on Facilities 3A, 3B, and 3C. Only two of four telepsychiatrists maintained 3CMS caseloads within the established ratio. One psychologist had a caseload that was approximately double the ratio. One of two unlicensed social workers had a caseload over three times the ratio; the institution could not report the other social worker's caseload.

All required staff attended seven observed IDTTs led by the primary clinician. Regrettably, all were inadequate and did not address relevant psychiatric history, symptoms, functioning, case conceptualization, treatment interventions, or rationale for the level of care. Patient diagnoses were also variably stated, while treatment goals were not sufficiently addressed. Disconcertingly, most observed IDTTs relied on record reviews, with one primary clinician reporting only actually knowing two of the 12 patients who were scheduled for IDTT that day. This likely contributed to staff's lack of collaboration.

While NLTG groups were technically available for 3CMS patients, none were conducted due to limited staffing.

Twenty-three patients were randomly selected to have their healthcare records reviewed to assess their 3CMS stays. Two patients were eliminated from the assessment as both had served extended LTRH terms. A third patient was screened out because he was a mainline 3CMS patient for only one day.

All five or 100 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Telepsychiatry conducted all initial psychiatry evaluations.

Nineteen of 29 or 66 percent of required routine psychiatry contacts timely occurred at least every 90 days. Ninety-six percent were conducted confidentially. Reasons for non-confidential contacts included patient refusals. Telepsychiatry conducted 96 percent of routine psychiatry contacts.

None of five initial primary clinician evaluations occurred within ten working days of patient arrival or a change in level of care. Forty percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. No initial evaluations utilized telehealth.

Ten of 26 or 38 percent of routine primary clinician contacts occurred at least every 90 days. Forty-two percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and modified programing. No routine contacts used telehealth.

Only one of five patients had an initial IDTT, but it did not occur within 14 days of patient arrival or a level of care change. Required staff and the patient attended the initial IDTT.

Three of five patients had annual IDTTs, but only two of three timely occurred. Required staff and patients attended all reviewed annual IDTTs.

Other Issues:

Pre-Release Planning:

The pre-release coordinator was a licensed psychologist who started in this position in November 2021.  In this capacity, she coordinated with internal and external agencies, including county mental health providers, probation, the Division of Adult Parole Operations, and other community and state programs as needed.  The coordinator also facilitated pre-release groups for EOP and 3CMS patients three times weekly, utilizing headquarters' curriculum.

There were 179 MHSDS patients scheduled for release during the reporting period.

Collaboration between the pre-release coordinator and mental health staff was evident as clinicians incorporated pre-release planning in treatment for patients with upcoming release dates.  This included assessments for additional pre-release planning services if needed.  The coordinator took part in the weekly ISUDT meetings and collaborated with the ISUDT nurse to arrange for appropriate resources.

Although the coordinator collaborated with clinicians to complete the pre-release planning assessment (PRPA), substantial staffing shortages impacted the timeframes in which patients were seen.  There were 183 PRPAs scheduled during the reporting period, of which 101, or 55 percent were completed, 29 or 16 percent were patient refusals, and 53 or 29 percent were cancelled.  Reported reasons for cancellation included scheduling conflicts, program changes, and reported "unspecified cancellation" from clinical staff.

CSP/Corcoran had two TCMP caseworkers; one was specifically assigned to MHSDS patients.  TCMP caseworkers met with patients 120 days prior to their release date.  The pre-release coordinator held a weekly team meeting that included the two TCMP caseworkers and two parole services associates.

For EOP and 3CMS patients who were scheduled for released, TCMP caseworkers assisted 48 patients complete Medi-Cal applications and seven patients complete SSI applications. TCMP did not assist any eligible patients with veterans' benefits' applications. The pre-release coordinator indicated that TCMP caseworkers were unable to see some patients prior to release.

Program Access:

a. Jobs and Program Assignments

On June 9, 2023, CSP/Corcoran reported that of 1,362 job assignments, 40 were held by EOP patients, representing 16 percent of this population. Further, 3CMS patients held 464 job assignments, representing 36 percent of this population, as did 858 or 48 percent of non-MHSDS individuals.

The 860 academic assignments were held by 44 or 17 percent of EOP patients, 336 or 26 percent of 3CMS patients, and 480 or 27 percent of the non-MHSDS population.

The 290 vocational assignments were held by 11 or four percent of EOP patients, 112 or nine percent of 3CMS patients, and 167 or nine percent of the non-MHSDS population.

The 11 voluntary education assignments were all held by EOP patients, which represented four percent of the EOP population.

The 268 substance abuse treatment assignments were held by nine or four percent of EOP patients, 118 or nine percent of 3CMS patients, and 141 or eight percent of non-MHSDS incarcerated persons.

b. Milestone Credits

CSP/Corcoran did not indicate the number of patients who were eligible to earn milestone credits or the number of patients who earned them during the review period.

c. Out-of-Level Housing

CSP/Corcoran reported that 11 EOP and 40 3CMS custody Level I patients were housed in Level II housing. Fifteen 3CMS custody Level II patients were housed in Level III housing and five 3CMS custody Level II patients were in Level IV housing. There were nine EOP and 21 3CMS custody Level III patients in Level II housing. Fifteen 3CMS custody Level III patients were housed in Level IV housing. Two EOP and 38 3CMS custody Level IV patients were in Level III housing.

d. ADA Reasonable Accommodation and Grievance Procedure

CSP/Corcoran provided memoranda confirming implementation of the revised ADA accommodation requirements and training rosters reflecting attendance at the reasonable accommodation requirements training. As of the site visit, all required staff had completed the training for the prior year.

e. Periodic Classification Score Reductions: EOP Patients

CSP/Corcoran provided a sample of completed CDCR Form 840s which reflected the provision of classification score reductions for EOP patients.

f. Unclothed Body Search

Interviewed custody staff were knowledgeable about CDCR's unclothed body search policy and could articulate the policy's implementation in the restricted housing units. Staff's implementation and practice of unclothed body searches was consistent with CDCR policy.

"C" Status:

During the review period, there were 72 patients placed on "C" Status, of which 45 or 63 percent were MHSDS patients. The average "C" Status designation duration was 125 days and ranged from two to 179 days. During the site visit, the 20 incarcerated individuals on "C" Status

included ten MHSDS patients. All received multiple serious RVRs within 180 days and were deemed program failures.

Case-by-Case Reviews:

Forty-eight patients met the criteria for long-term segregated case conference reviews, including 18 EOP and 30 3CMS patients. Their average lengths of stay was 540 days. Twenty-eight or 58 percent were retained in administrative segregation for RVRs issued for battery, assault, or other violent behavior, while nine or 19 percent were retained in administrative segregation for further investigation.

Review of the institution's case conference tracking sheet revealed noncompliance with CDCR policy. Specifically, required case conference reviews were only conducted timely 69 percent of the time, while required staff also only attended 69 percent of the time. Decisions were not appropriately documented to articulate the reasons for retention in restricted housing. For 31 percent of cases, CSP/Corcoran's tracking sheet did not indicate when the patient's case conference occurred or the reason for continued retention. However, 11 cases were identified where the associate director specifically requested that a patient's case be returned for review by a certain date.

CSP/Corcoran provided information for 57 cases that satisfied the criteria for 120-day pre-MERD reviews, including 36 LTRH and 21 STRH cases. Of the 36 LTRH cases, nine were presented for ICC pre-MERD with less than 120 days until the expiration of the controlling MERD. Of the 21 STRH cases, 19 were presented for ICC pre-MERD with less than 120 days until the expiration of the controlling MERD. Twenty-five cases were referred to the CSR for review in LTRH while 14 cases were referred to the CSR for review in STRH. No patients in

LTRH and four patients in STRH were retained in administrative segregation beyond the controlling MERD and granted NDS status during the review period.

Mental Health Referrals:

During the reporting period, CSP/Corcoran made 3,791 mental health referrals; there were 1,087 referrals to psychiatry and 2,704 referrals to primary clinicians. There were 848 emergent, 380 urgent, and 2,563 routine referrals.

Overall, CSP/Corcoran reported that only one of three emergent psychiatry referrals had a timely response, although there were timely responses to 774 of 845 or 92 percent of emergent primary clinician referrals. For urgent referrals, there were timely responses to only 20 of 170 or 12 percent of psychiatry referrals and to 182 of 210 or 87 percent of urgent referrals to primary clinicians. Routine referrals reflected noncompliance; there were timely responses to 718 of 914 or 79 percent of psychiatry referrals and to 1,187 of 1,649 or 72 percent of primary clinician referrals.

Custody and Mental Health Partnership Plan:

Mental health, custody, and nursing staff did not report any problems working together in the best interests of MHSDS patients.

CSP/Corcoran's CMHPP LOP was aligned with headquarters' directive but was outdated as it was last revised in January 2022.

Executive leadership joint rounding occurred during five of the review period's six months, with required staff in attendance. Staff unavailability resulted in the cancellation of one month of executive rounding. Toured program areas included the STRH, MHCB, CTC, and EOP hub. The STRH was toured twice during the review period.

Rounding forms indicated good morale between custody and mental health staff and addressed relevant matters including access to clinicians on weekends, CIT coverage, patients with complex needs, communications between staff and patients, and staff morale.  Patient interviews reflected that patients were seen timely for mental health ducats and knew how to contact custody or mental health staff during times of crisis.  However, there were no patient interviews documented for the CTC tour in May 2023, while STRH rounding forms did not reflect follow-up responses.

Like the previous reporting period, executive leadership joint rounding was not referenced in the minutes of monthly QMC or executive staff meetings.  While the rounding was addressed in monthly mental health program subcommittee minutes, only meeting dates were documented, which was insufficient to disseminate information.

Huddle reports for the EOP hub revealed consistent but minimal staff attendance.  Nonetheless, the huddle forms were completed appropriately and documented odd and unusual patient behaviors with exceptional detail.  An observed third watch EOP hub huddle was well conducted.

Reviewed STRH huddle reports revealed differing amounts of staff attendance for second and third watch.  Notably, second watch huddle reports included a telepsychiatrist, which resulted in quality reports that included substantially more detail about patient activities.  An observed second watch huddle was well facilitated.

A sample of LTRH huddle reports from second and third watch revealed minimal staff attendance with varying amounts of detail.  More comprehensive reports were completed during second watch and reflected appropriate documentation of patient bizarre and unusual behavior.

An observed second watch LTRH huddle included appropriate staff and was very thorough, addressing relevant issues.

Reviewed mainline EOP huddle reports lacked required staff attendance and included insufficient information. Specifically, a majority of examined huddle reports only listed new housing unit patients and identified patients who experienced a level of care change during the prior shift. An observed second watch mainline EOP huddle reflected similar staff attendance concerns; however, the huddle was thorough and appropriately collaborative among attending staff.

CSP/Corcoran consistently conducted 3CMS supervisory meetings on all 3CMS yards. However, due to staffing shortages, it was unable to consistently meet the weekly meeting requirement. When the meetings occurred, documents indicated discussing all pertinent information, although it was reported with very little detail. Additionally, the produced weekly huddle reports were not signed by staff members.

CSP/Corcoran conducted monthly joint supervisory 3CMS program area tours for five months of the review period. Appropriate staff attendance was noted, and the forms were completed correctly with relevant detail, including any notable level of care changes, CIT protocols, and COVID-19 procedures. However, patients were typically reluctant to provide details to staff across all months.

During the review period, ten patients were scheduled to attend EOP orientation groups, which were conducted during three of four weeks every month. A primary clinician, sergeant, and patient peer participant conducted the groups. CSP/Corcoran could not indicate the length of time it took to place new patients in EOP orientation groups.

Although monthly inmate advisory council (IAC) meetings occurred on all 3CMS yards, they did not discuss mental health issues or the 3CMS program. Staff attendance varied by yard and included the warden, chief deputy warden, associate wardens, chief of mental health, captains, and clinical social workers.

CSP/Corcoran reported issuing the 3CMS orientation brochure to patients and also provided the monitor with a copy of the brochure.

Patients filed 18 complaints against healthcare staff during the reporting period, of which nine were closed, one was in progress, and eight were referred for a confidential inquiry.

There were 710 complaints against custody staff. Of these, 19 cases were completed, 569 were in progress, 104 were resolved but not sustained, 12 were resolved and sustained, and six were resolved without a finding.

There were 13 investigations of staff misconduct toward patients that were not initiated through the appeal process. Of these investigations, seven resulted in direct action. No CSP/Corcoran staff were moved to another post due to a staff misconduct allegation.

The institution provided quarterly round table training sign-in sheets for the fourth quarter of 2022, and the first and second quarters of 2023. However, documentation was not provided to determine the total number of staff who were required to attend the training. As such, compliance could not be determined.

CSP/Corcoran also reported that 1,003 custody and 691 non-custody staff completed the annual off-post training. However, because documentation was not provided for the total number of staff who were required to attend, compliance could not be determined.

<u>Heat Plan</u>:

CSP/Corcoran's heat plan LOP was compliant with headquarters' directive. During the review period, the heat plan was only in effect during May 2023, when there were ten Stage I and one Stage II heat alerts, but no Stage III heat alerts. The Stage II heat plan procedures were implemented appropriately. There were no reported heat related illnesses.

Interviewed officers in several housing units demonstrated a working knowledge of the procedures associated with heat plan activation. Both interviewed staff and patients who were prescribed heat-sensitive medications indicated that they were aware of the heat plan's requirements. Interviewed officers were also aware of the signs of heat-related illness and how to report them.

Housing officers in all toured units produced daily lists of patients who were prescribed heat-sensitive medications and could identify patients in their housing units on the list. The officers reported that the lists were printed and distributed daily.

Reviewed temperature logs for May 2023 indicated the appropriate recording of outdoor and indoor temperatures. However, it was noted that indoor thermometers in Facilities 4B3L, 4B3R, and 4B4R were not operational during the first two weeks of the month, but were operational during the site visit. Thermometers in other housing units visited were also operational and placed in appropriate locations.

Daily Activity Reports (DAR) for May 2023 did not include any reference to heat plan activations or accommodations provided to patients who were prescribed heat sensitive medications. Of note, the LTRH standalone yards did not have cooling devices despite frequently high temperatures during the review period. Concerningly, the institution reported

that patients generally participated in yard time regardless of high temperatures, adding that some patients would discontinue their heat medications to achieve more out-of-cell time.

As for completion of the heat-related pathologies on-the-job training, overall 80 percent of custody staff completed the training. Specifically, five of six correctional administrators, four of five captains, 30 of 36 lieutenants, 83 of 92 sergeants, 700 of 888 correctional officers, and 33 of 38 correctional counselors completed the training. Further, 55 percent of mental health staff completed the training, including one of three chiefs, seven of nine senior psychologists, all supervising social workers, all social workers, six of 12 psychologists, two of seven psychiatrists, 36 of 63 psych techs, and four of ten recreation therapists.

RVRs:

CSP/Corcoran issued 2,742 RVRs during the review period, of which 1,801 or 65 percent were issued to MHSDS patients, including 239 to MHCB patients, 324 to EOP patients, and 1,191 to 3CMS patients. Forty-seven RVRs were also issued to patients in inpatient programs. Nine RVRs were documented in an alternative manner.

Thirty-five RVRs were reviewed to assess compliance with CDCR policy. Of those, custody staff timely referred the patient to mental health staff for completion of a mental health assessment in 24 or 69 percent of cases. The late referrals ranged from one to 11 days overdue.

Mental health staff timely completed and returned the assessment in 33 or 94 percent of cases. The late mental health assessments ranged from one to three days late; CSP/Corcoran did not provide reasons for delays.

Clinicians conducted the mental health assessment interview in a confidential setting in 11 or 32 percent of reviewed cases. All non-confidential communications were patient refusals.

The senior hearing officer (SHO) appropriately considered clinical input based upon each patient's mental health assessment in all examined RVRs. The reviewing clinician recommended penalty mitigation in 33 or 94 percent of reviewed RVRs. Based upon these recommendations, the SHO mitigated penalties in 28 of 33 or 84 percent of cases.

No RVRs were issued for self-injurious or suicidal behaviors nor for behaviors in connection with placement in restraints or seclusion.

An additional 13 RVRs issued to MHSDS patients that resulted in SHU terms were reviewed to determine if clinical input was considered during classification review. Of these RVRs, all patients had a clinician present during the classification review and each RVR noted that the clinical recommendations in the mental health assessments were considered.

Regarding custody attendance at the mental health assessment training, the training was attended by five of six associate wardens, all captains, 31 of 37 lieutenants, and 84 of 95 sergeants. The institution reported that mental health staff who attended this training included two of three chiefs and seven of 13 senior clinicians. CSP/Corcoran did not provide training compliance data for other mental health providers.

Use of Force:

CSP/Corcoran reported controlled use of force incidents involving 13 MHCB, one EOP, and four 3CMS patients. There were also 312 immediate uses of force involving 327 patients, including 71 MHCB, 64 EOP, and 142 3CMS patients, and 50 non-MHSDS inmates. There were also ten immediate use of force incidents involving inpatient care patients.

Three of four reviewed controlled use of force reports revealed concerns. In one incident, an MHCB patient solely occupied a small management yard and refused to exit when instructed to do so. After a two hour and 15 minute cool down period, physical force was used to remove

him.  The incident report stated that the reason for the controlled use of force was to subdue an attacker, effect custody, overcome resistance, and gain compliance, which was not consistent with the patient's behavior of refusing to exit the small management yard.

In the second incident, medical and mental health reports were not completed as required. In the third incident, a STRH patient who experienced a cell extraction for MHCB placement was issued an RVR for willfully obstructing a peace officer.  The issuance of an RVR involving a cell extraction for placement in an inpatient setting violated applicable CDCR policy.

Ten reviewed immediate uses of force incidents all clearly articulated the justification for the immediate use of force and were found to be within policy guidelines.

CSP/Corcoran reported completion of the mandatory use of force training by the warden, chief deputy warden, and all 37 lieutenants.  Moreover, four of five correctional administrators, five of seven captains, 98 of 99 sergeants, and 335 of 959 correctional officers also attended the training.  As for mental health, the training was completed by two of three chiefs, five of six supervisors, 19 of 24 psychologists, three of seven psychiatrists, and 15 of 17 social workers.

Lockdowns/Modified Programs:

CSP/Corcoran reported five modified programming periods, four of which ranged from seven to 14 days.  The four modified programming periods stemmed from a medical quarantine, a security threat group (STG) attack on staff, and two contraband searches.  During these periods, impacted patients used priority ducats to access health care services and were escorted to medical treatment; medical staff conducted rounds in the housing units and collected health care services request forms.

The fifth modified programming period had been in place for five years due to tension between two rival gangs.  Accordingly, the facility alternated between normal programming and

controlled movement for the two STGs. A custody sergeant reported that tensions remained high at the time of the site visit between these STGs and that they were not capable of programming together.

Access to Care:

A review of CSP/Corcoran's monthly Health Care Access Quality reports from December 2022 to May 2023 reflected the issuance of 81,173 mental health ducats and add-on appointments. Of these, 30,748 or 38 percent were completed and 50,465 or 62 percent were not completed. Of the non-completed appointments, less than one percent were due to custodial reasons, 59 percent were due to non-custodial reasons, and 41 percent were due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

The Minimum Support Facility was deactivated prior to the review period on November 7, 2022.

*Coleman* Postings:

There were current *Coleman* posters in English and Spanish in all visited housing units.

**APPENDIX B-14**
**CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF)**
**(July 24, 2023 – July 28, 2023)**

Census:

On July 21, 2023, CCWF housed 2,310 incarcerated persons, which was a two percent increase from the prior review period. The 1,418 MHSDS patients represented 61 percent of the institution's total population and was an eight percent increase from the previous review period.

CCWF's MHCB was closed and there were no patients in alternative housing.

The 85 mainline EOP and 1,029 mainline 3CMS patients were comparable to these populations during the prior reporting period.

The administrative segregation population consisted of three EOP hub and 32 (non-reception center) STRH 3CMS patients.

The reception center housed four STRH, two EOP, and 263 mainline 3CMS patients.

Staffing:

The chief psychiatrist position was vacant. Of seven psychiatry positions, 4.5 were filled for a 36 percent vacancy rate. The use of 1.75 contractors reduced the functional vacancy rate to 11 percent.

Four telepsychiatrists filled two positions. All six medical assistant positions were filled.

One of two chief psychologist positions were filled. Three senior psychologists filled 2.5 positions.

Of 24 psychology positions, 16.5 were filled for a 31 percent vacancy rate. Two psychologists were unlicensed.

One of 1.5 supervising social worker positions were filled, as were 15 of 17.5 positions for social workers, for a 14 percent vacancy rate. One social worker was unlicensed.

Eight recreation therapists covered six positions.

The senior psych tech position was filled. Of 29.21 psych tech positions, 21.41 were filled for a 27 percent vacancy rate.

Fourteen of 15.2 supervising registered nurse positions were filled, reflecting a seven percent vacancy rate. Of 7.2 registered nurse positions, 4.8 were filled for a vacancy rate of 33 percent.

Of 14.5 MHSDS clerical positions, 13.5 were filled for a seven percent vacancy rate.

The OSS II position was filled, as were two of 2.5 HPS I positions.

As for custody, the warden's position was vacant, but the chief deputy warden's position was filled. Three of five associate warden positions were filled. All six captain positions were filled, but one captain was on an extended leave. Twenty-eight of 29 lieutenant positions were also filled. For sergeants, 55 of 60.4 positions were filled, but two sergeants were on extended leaves. Twenty of 21 CC I positions were filled but one CC I was on an extended leave. All ten CC II positions were filled; two CC IIs were also on long-term leaves. For correctional officers, 426 of 438 positions were filled for a three percent vacancy rate; however, 64 functional vacancies, which included 37 officers on extended leaves, indicated a 15 percent functional vacancy rate.

The institution reported many daily custody staff callouts. For example, on July 26, 2023, custody reported that there were only ten custody staff, including sergeants and lieutenants, each on Facilities A, B, and D, and 11 custody staff on Facility C, which were significantly less officers than should have been on these units. CCWF produced daily activity reports (DARs) documenting the same; on numerous days from July 13 - 26, 2023, the DARs reported that there were "LESS THAN 10 BODIES ON FACILITY" on many facilities.

Custody leadership further reported that, at any given time, ten to 18 custody staff were redirected to transportation duties for off-site medical transports, further exacerbating the custody staffing shortage. Moreover, the entire institution had been on "modified programming" for an unspecified time period, though no PSRs were filed, due to staffing shortages.

Telepsychiatry:

Four telepsychiatrists provided services to 3CMS patients housed in the mainline, reception center, and restricted housing. CCWF only used telepsychiatry in the EOP program to cover for psychiatrists who were on vacation.

Four interviewed 3CMS patients all reported challenges with telepsychiatry's use, including establishing rapport, feeling "heard," and having their non-verbal expressions understood. Further, connectivity also posed a substantial barrier with telepsychiatry's use. Patients reported frequent lags and "cutting out" that impaired their ability to convey information and maintain rapport. All interviewed patients voiced a strong preference for on-site psychiatry.

All telepsychiatrists worked from telepsychiatry hubs. Except for one telepsychiatrist on a temporary assignment, CCWF reported that telepsychiatrists regularly visited the institution.

Telework:

Other than the chief of mental health who teleworked for approximately four weeks in the spring of 2023 due to a medical issue, mental health staff did not telework.

Staff Recruitment:

CCWF conducted interviews on a biweekly basis for vacant positions in coordination with the *Plata* office. Regrettably, the institution noted difficulties recruiting and retaining psychiatrists and psychologists. The reception center was reported to be the hardest hit program.

Quality Management:

CCWF leadership reported that the quality management program had improved since the prior review period.

The local governing body met once during the review period and achieved a quorum. Meeting minutes were adequate and addressed various issues, including the skilled nursing facility project and credentialing for clinical staff.

The quality management committee met monthly. Reviewed meeting minutes indicated that all meetings attained quorums. The QMC focused on several matters during the review period, including performance improvement work plans, subcommittee reports, and review and approval of local operating procedures (LOPs). The minutes from the April 2023 quality management committee meeting reported that, for January 2023, CCWF reported only 77 percent compliance for the quality management/patient safety assessment. As a result, headquarters' developed corrective action plans (CAPs). As of April 23, 2023, three of these CAPS were completed, three were in progress, and one had not yet started.

The mental health program subcommittee met monthly throughout the review period. Reviewed minutes for five of six months addressed institutional CAPs and audits, LOPs, EOP hub certification criteria, the CIT, staffing issues, and screenings for higher levels of care (HLOC).

CCWF quality management staff regularly performed formal and informal audits of areas related to the MHSDS, examining both local and statewide issues within CCWF. Local audits addressed timely primary clinician initial assessment contacts for mainline 3CMS patients, the quality of safety blankets and gowns, and transport attire for MHCB patients. Local CAPS were

developed in response to MHCB deficiencies and for "MH Referral Resolved Before Received." The CAPs' status was addressed and updated appropriately at monthly meetings.

CCWF chartered neither QITs nor FITs during the review period. The headquarters' required ongoing EOP hub QIT and SPRFITs regularly met, with the EOP hub QIT meeting weekly.

CCWF did not schedule any peer review committee meetings during the review period.

Medication Management:

CCWF provided MAPIP results for December 1, 2022 through May 31, 2023 regarding compliance for psychiatric diagnostic monitoring and medication management. Regrettably, CCWF demonstrated inadequacies for both. For diagnostic monitoring, 25 of 40 or 63 percent of required measures were compliant for all six months of the review period; only three of 13 or 23 percent of medication administration measures were compliant for all six months. On a positive note, all required measures for clozapine and antidepressants were compliant for the entire review period.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated that CCWF was compliant for six months for obtaining blood pressure, Complete Blood Count (CBC) with platelets, height, weight, thyroid function tests, and medication consents. The institution reported compliance for five months for monitoring glucose, for four months for Comprehensive Metabolic Panel (CMP), and for three months for monitoring the Abnormal Involuntary Movement Scale (AIMS). There was compliance for only one of five required months for monitoring EKGs, and concerningly, noncompliance for all six months for monitoring lipids.

CCWF was an approved clozapine maintenance facility. However, per statewide policy, patients had to be in the MHCB to initiate clozapine; given that CCWF's MHCB was closed for the review period, the facility did not initiate any patients on clozapine.

As for clozapine monitoring, CCWF was compliant for six months with AIMS, blood pressure, CBC, height, and weight. There was compliance for all five required months for glucose, for four required months for obtaining EKGs, and for three required months for CMP, lipids, and medication consents. No thyroid function tests were required during the review period. Three patients were prescribed clozapine on July 25, 2023.

For required monitoring of antidepressants, compliance was achieved for six months for medication consents, thyroid laboratory tests, and blood pressure for patients' prescribed venlafaxine. CCWF was compliant for two required months for EKGs.

Regarding carbamazepine, CCWF was compliant for obtaining CBC for all four required months. There was compliance for all three required months for CMP and medication consents, and for three of four required months for monitoring therapeutic medication levels.

For patients prescribed Depakote, there was compliance for six months for obtaining medication consents, for five months for monitoring CBC with platelets, for four months for measuring CMP, but for only two months for monitoring therapeutic medication levels.

CCWF was compliant for obtaining medication consents for five of six months for lamotrigine.

As for lithium, the institution reported compliance for five months for obtaining medication consents, for four months for monitoring thyroid function tests, and for three months for monitoring kidney function tests. There was compliance for three of five required months for obtaining EKGs.

For medication management metrics reported by mental health headquarters, CCWF was compliant for six months for medication continuity upon parole/transfer to the community and chronic care medications historical administration, and for four months for medication continuity for MHCB transfers and outpatient provider new medication orders. There was compliance for three months for medication continuity with intra-institutional transfer to ASU/SHU/PSU and following discharge/transfer from a community hospital and/or DSH, and for two months for medication continuity upon inter-institution transfer at receiving and release and continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU). There was compliance for only one month for continuity of medications at the reception center, which was particularly concerning given that CCWF was the only reception center for female patients. There was noncompliance for all six months for observation of medication and administration AM and PM, and medication preparation and administration HS.

CCWF prescribed medications for a maximum of 180 days. Bridge orders were prescribed for up to 30 days. For verbal and telephone orders, nursing read the order back to the prescriber. The institution did not specify the process for tracking and signing verbal or telephone orders.

CCWF reported that 1,046 patients were prescribed 2,496 psychiatric medications. While pre-site documentation indicated that 13 patients were prescribed KOP medications, the facility reported on-site that 179 patients were actually prescribed KOP medications. All were 3CMS patients who were prescribed SSRIs or duloxetine in accordance with policy; one patient was also prescribed an over-the-counter medication typically used for gastrointestinal upset.

Forty-eight medication line audits revealed that all patients received their medications in under 30 minutes. Most medication lines were under two hours in total duration. Facility A reported that there was no shade in the temporary medication line as the permanent medication rooms were under construction, and that one medication line was 2.5 hours in total duration due to food lines interrupting medication distribution.

While medication administration was supposed to occur on the yards for all patients except those housed in restricted housing, EOP, and the medical units, staff and patients reported that nursing often had to enter housing units for medication administration due to custodial shortages. This resulted in the yards being shut down, which CCWF staff reported was required per statewide policy; nursing staff indicated that this was a daily occurrence on at least one yard, and sometimes involved all yards, but no patients missed their medication due to this practice.

Mental health staff reported that psychiatrists sometimes took stable patients off of prescribed medications, only to have the patients subsequently decompensate, reportedly due to those medications having a potential for misuse in the correctional setting. Oversight of this practice was lacking given that CCWF did not have a chief psychiatrist.

CCWF reported an average non-formulary rate of approximately 11 percent during the review period. During May 2023, 336 of 2,817 total prescribed medications were non-formulary.

CCWF reported completing 97 percent of polypharmacy reviews and the monitoring of 257 patients for polypharmacy.

A total of 352 incarcerated persons received medications written at HS, which were virtually always administered at 8:00 p.m. or later.

Ten PC 2602 involuntary medication petitions were filed during the review period.  There was one non-emergent initial petition, but no emergent initial petitions.  Of nine renewal petitions, only one was not renewed due to the patient's parole.  No patients were noncompliant with the involuntary medication process and, thus, there were no uses of force to administer PC 2602 medications.  While CCWF denied any challenges interfacing with the Office of Legal Affairs, it reported barriers with the Office of Administrative Hearings, which frequently rejected petitions for "minor things," such as spelling.  CCWF also reported difficulties communicating with the Administrative Law Judge to schedule PC 2602 hearings.

CCWF reported compliance for all five required months for having the PC 2602 involuntary medication court order in the patient's chart.  For the related measure of the PC 2602 psychiatric medication order being in the chart, there was compliance for four of five required months.

Transfers:

CCWF conducted a minor sustainable review during the fourth quarter of 2022 and a major sustainability review during the first quarter of 2023.  These reviews were conducted remotely and did not include on-site activities such as IDTT observation and housing unit reviews.

The fourth quarter 2022 minor review did not examine the quality of non-referral HLOC form documentation or the interrater reliability between regional staff and CCWF's inpatient coordinator.  However, for this review the regional team identified the absence of important information on the inpatient coordinator's log, including whether patients' timely transferred to inpatient care, and other inaccuracies, such as the log reporting some patients' transfers to inpatient care who were not transferred.  This review also noted other concerns, including

inadequate coverage of required information in the minutes of the mental health program subcommittee.

The first quarter 2023 major sustainable review analyzed the quality of non-referral HLOC form documentation and found many instances of inadequate non-referral rationales and treatment modifications for non-referred patients.  It was believed that this was primarily due to the inpatient coordinator's errors, which was at least partially the result of CCWF not having a permanent inpatient coordinator during most of the review period.  As such, the institution rotated senior specialists through the inpatient coordinator's position while it sought a permanent replacement, which did not occur until March 2023.  Unfortunately, the specialists who temporarily assumed the inpatient coordinator's role were deemed to not be sufficiently proficient with HLOC form documentation and the non-referral process.  Findings for the first quarter of 2023 indicated that reviewed clinical non-referral rationales and treatment modifications were only adequate for 67 percent of reviewed cases.

Notably, the monitor's expert's review of HLOC forms for identified but non-referred patients confirmed these findings, with the adequacy of HLOC form completion varying across providers.  Some treatment teams provided strong clinical rationales for patient non-referral and evidence-based targeted treatment interventions that addressed the underlying behaviors contributing to the positive HLOC referral.  In other cases, however, HLOC documentation was inadequate to justify patient non-referral.  Regrettably, treatment modifications were often copied and pasted from prior HLOC forms and were not clinically updated by each treatment team.  In a small number of cases, identified patients were not referred to inpatient care when documentation supported such a referral.  At least some CCWF clinicians opined that this occurred in part due to the CIW-PIP rejecting referrals.

It should also be noted that CCWF mental health staff reported challenges accessing acute and intermediate care treatment for their patients. They specifically indicated not believing that CIW-PIP staff appropriately consulted with them for relevant information that could clarify matters such as the case conceptualization, treatment plan, and/or justification for admission. Instead, CCWF mental health staff believed that their experience and patient knowledge was minimized by CIW-PIP staff, creating unnecessary challenges to accessing inpatient treatment. CCWF also described difficulties communicating with CIW-PIP staff when CCWF reached out to them but did not receive a response.

As noted above, CCWF's inpatient coordinator, who was a psychologist, had held this position since March 2023; the back-up inpatient coordinator was also a psychologist.

During the review period, there were 80 instances of 51 patients who were considered but not referred to inpatient care.

CCWF did not refer any patients to acute care during the review period.

There were ten intermediate care referrals, of which four were rescinded and none were rejected. Of the six patients who transferred to intermediate care, five or 83 percent timely transferred within 30 days of referral and 72 hours of endorsement; reasons for the one delayed transfer were not provided. On July 27, 2023, one intermediate care patient was awaiting transfer; this patient was within transfer timelines.

One patient with complex medical needs transferred to intermediate care during the review period.

Four *Vitek* hearings were held for intermediate care patients; no patients prevailed.

CCWF transferred 163 patients to CIW's MHCB during the review period. Two patients had three MHCB admissions and 12 had two MHCB placements. Of these patients, 138 or 85

percent transferred within 24 hours of referral. Ten of the 25 late transfers were due to patients' refusal to transfer. Late transfers ranged from six minutes to 1.6 days late.

Eleven of 12 or 92 percent of patients timely transferred to CIW's PSU.

CCWF reported that patients requiring EOP hub placement were moved to the on-site unit without delay.

Patients requiring EOP level of care were timely transferred to CCWF's EOP program.

Patients requiring STRH placement were also moved to the on-site unit without delay.

Of 22 patients transferred to CIW's LTRH, 18 or 82 percent transferred timely. Three of four delayed transfers were due to CIW's LTRH being closed in April 2023.

Sixty patients' levels of care were reduced from EOP to 3CMS during the review period; 11 subsequently returned to the EOP level of care.

Programming:

Reception Center:

CCWF received 1,343 reception center patients during the review period. Overall, stays averaged 37 days; average stays were less than one day and 44 days for EOP and 3CMS patients, respectively. Notably, once reception center patients were identified as requiring EOP level of care, they were quickly moved to EOP mainline housing where EOP staff became responsible for all treatment activities.

Two psychiatrists had caseloads that exceeded the established ratio. Seven psychologists also treated reception center patients; however, because CCWF did not indicate which level of care these psychologists treated, caseloads could not be determined.

While CCWF did not report whether new reception center arrivals received nursing screenings within 24 hours, a review of 14 patients' records revealed that patients had timely

screenings in 13 or 93 percent of cases. The mental health screening was also typically completed timely; 95 percent of all new arrivals received their mental health screening within eight days of admission. Reviewed records also indicated that comprehensive mental health assessments were completed timely in 12 of 14 or 86 percent of reviewed cases; in several instances, they were completed upon arrival at the reception center. Psychiatrists saw patients within one month of arrival in most reviewed cases; however, four of 14 or 29 percent were not seen for six to eight weeks, which was concerning as some of these patients were decompensating or required medication evaluations for continuity of psychotropic treatment. The reception center had limited confidential space.

Ten reviewed records for 3CMS reception center patients indicated that none had a formal treatment plan created while housed in the reception center; this was true even for a patient being referred to acute care. However, eight of ten of reviewed patients were seen timely by their PC and progress notes or initial evaluations included at least one proposed treatment target.

MHSDS Patients in Administrative Segregation:

EOP hub and STRH patients were housed in the same building with no designation of cells for either population. Consequently, mental health staff frequently treated both EOP hub and STRH patients together. Staff included one psychologist and two clinical social workers; all had caseloads within established ratios. An additional STRH psychologist conducted group treatment and had a caseload within the ratio.

EOP hub:

CCWF placed a total of 42 patients in the EOP hub during the review period; the average daily census was between three and four patients. Stays averaged 154 days and ranged from 95

to 323 days.  Nine patients' stays exceeded 90 days.  An EOP mainline psychiatrist provided services in the EOP hub.

The hub self-certified for each month of the review period, reporting compliance above 90 percent for all assessed areas.

EOP hub patients were offered an average of 10.6 weekly hours of structured treatment, attending 6.4 weekly hours and refusing 4.2 weekly hours, for a 39 percent refusal rate.

During the review period, ten EOP hub patients were placed on modified EOP programming for refusing more than 50 percent of offered treatment.  EOP patients on modified programming were offered 8.63 weekly hours of structured treatment, attending 2.58 weekly hours and refusing 6.05 weekly hours, for a 70 percent refusal rate.  EOP patients on modified programming reportedly received daily primary clinician contacts and monthly IDTTS, which record review confirmed.

Reviewed data reported that all 39 EOP hub IDTTs that were held during the review period occurred timely and were appropriately staffed.

The monitor's expert observed one EOP hub initial IDTT.  Required staff attended the IDTT, including a telepsychiatrist, and there were no connectivity issues.  The IDTT was generally adequate except that a clinical case conceptualization was not provided for the patient. Otherwise, the patient's treatment plan was individualized and appropriate, the treatment team demonstrated a highly cohesive and collaborative process, relevant clinical and psychosocial history and the patient's symptoms were discussed, and the patient's diagnosis and psychiatric medications were clearly identified.  Further, treatment goals were appropriate and individualized, and interventions were clearly stated and appropriate to the patient's presentation and goals.

An observed recreation therapy group was facilitated by a registered nurse as opposed to a recreation therapist. Four EOP hub patients in attendance were secured to individual desks/tables instead of being placed in TTMs. The group was not clinically based and had no clinical utility.

Prior to the group, the monitor's expert interviewed all four EOP hub patients. Two patients reported receiving weekly PC contacts, but noted that their PC encouraged cell-front contacts. One patient further reported that the psychiatrist who held cell-front contacts was insensitive to the lack of confidentiality and loudly discussed her diagnoses, medications, and treatment.

A review of two patients' 114-As for three weeks for the offering of yard, showers, and linen exchange revealed 100 percent compliance. The 114-As' also noted the offering of one weekly telephone call. EOP hub patients were issued a radio and earbuds upon arrival, and a tablet soon thereafter.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP hub stays.

Nine of 11 or 82 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Twenty-seven percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry was utilized for one or nine percent of reviewed initial psychiatry assessments.

All eight or 100 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Eleven percent were conducted confidentially. Reasons for non-confidentiality included patient refusals or were unknown. Telepsychiatry was not used for reviewed routine psychiatry contacts.

Ten of 14 or 71 percent of initial primary clinician evaluations timely occurred before the initial IDTT. Twenty-one percent were conducted confidentially. Reasons for non-confidentiality again included patient refusals or were unknown.

Ten of 14 or 71 percent of routine primary clinician encounters timely occurred at least every seven calendar days. Twenty-nine percent were conducted in confidential settings. Reasons for nonconfidential contacts included the lack of available confidential space, patient refusals, or were unknown. Telehealth was not used for any routine primary clinician contacts.

All 11 initial IDTTs timely occurred within 14 calendar days of patient arrival. Required staff attended all initial IDTTs; patients attended 55 percent. IDTTs were held *in absentia* due to patient refusals.

The one patient who required a routine IDTT had it within 90 calendar days. Required staff attended the routine IDTT; the patient did not attend. The IDTT was held *in absentia* due to patient refusal.

STRH:

STRH patients were housed in the same unit as EOP hub patients. During the review period, 232 3CMS patients were placed in STRH; 41 patients had multiple STRH placements. Stays averaged 46 days and ranged from one to 489 days. There were also 29 reception center STRH patients. Stays for reception center STRH patients averaged 29 days and ranged from one to 119 days.

Four observed STRH IDTTs included three initial and one routine IDTT; two were held *in absentia.* Required staff attended the IDTTs, including the telepsychiatrist, and there were no connectivity issues. The IDTTs were generally adequate except that no case conceptualizations were provided for any of the patients. However, diagnoses were clearly stated, and were

supported by symptoms.  The IDTTs also demonstrated collaborative and thoughtful discussions concerning goals, interventions, level of care, safety, and substance abuse.

One IDTT was particularly noteworthy given the treatment team's collaboration and creativity to engage the patient and increase her level of care from 3CMS to EOP.  At the IDTT's conclusion, the patient was very satisfied with the decision to increase her level of care and was excited to attend more group treatment.

STRH patients were offered 90 minutes of weekly group.  These groups were clinical in nature and facilitated by a clinical social worker.  Group topics included anger management, transgender needs/processing, and CBT/DBT-based emotional regulation and skill-building.

The monitor's expert interviewed five 3CMS patients housed in STRH at cell front. Patients' reported receiving daily psych tech rounds and being provided with in-cell activities, as well as receiving timely IDTTs, and being offered 90 minutes of weekly groups and appropriate yard time.  Patients also reported always being offered confidential 1:1 contacts with their primary clinician and psychiatrist.

The interviewed STRH patients all had tablets, which they reported were helpful for coping.  However, they further indicated that the tablets only had limited games and could not be used to communicate with their families.  Regrettably, all five patients reported extremely hot temperatures in their cells, which they stated often exceeded 90 degrees, and occasionally exceeded 100 degrees.  Several patients reported that the heat exacerbated their anxiety; one patient reported an increase in the use of her prn Vistaril at night because the high temperatures triggered panic attacks.

All required staff attended six observed ICCs. Mental health staff provided relevant information for the ICC chairperson including recommendations for double or single celling, medication compliance, and attendance at mental health appointments.

The monitor reviewed 114-As for six patients for 12 weeks for the offering of showers, yard, and linen exchange. This assessment indicated the offering of three weekly showers for 11 of 12 or 92 percent of weeks, ten hours of weekly yard during nine of 12 or 75 percent of weeks, and weekly linen exchange during all 12 weeks.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays. One patient was eliminated from the review due to MHCB referrals during the review period.

Fourteen of 19 or 74 percent of patients had timely initial psychiatry assessments before the initial IDTT. Twenty-one percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted five or 26 percent of initial psychiatry evaluations.

Twenty-eight of 34 or 82 percent of routine psychiatry contacts timely occurred at least every 90 calendar days. Twenty-seven percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry conducted ten or 29 percent of reviewed routine psychiatry contacts.

Fifteen of 19 or 79 percent of initial primary clinician evaluations timely occurred within ten working days of patient arrival and before the initial IDTT. Thirty-two percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Unlicensed psychologists completed two or 11 percent of initial primary clinician assessments.

Forty-one of 66 or 62 percent of routine primary clinician contacts timely occurred at least every seven calendar days.  Fourteen percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals and modified programming.  Unlicensed psychologists completed 22 percent of routine primary clinician contacts.

Thirteen of 19 or 68 percent of initial IDTTs occurred within 14 working days of patient arrival.  Required staff attended all initial IDTTs; patients attended 21 percent.  Reasons initial IDTTs were held *in absentia* included patient refusals.

Ten of 13 or 77 percent of patients had timely routine IDTTs every 90 calendar days.  Required staff attended all routine IDTTs; patients attended 39 percent.  Reasons routine IDTTs were held *in absentia* included patient refusals.

Non-Disciplinary Segregation:

Five patients were designated NDS during the review period, including two EOP and one 3CMS patient, and two general population inmates.  Two of the NDS patients were identified as NDS-200, which required transfer from restricted housing within 72 hours; neither were transferred timely.  The NDS-200 patients transferred one and 35 days late, respectively.  No patients were designated NDS during the site visit.

MHCB:

The MHCB was closed for the entire review period due to the retrofitting of MHCB cells.  As such, all CCWF patients requiring MHCB placement were sent to CIW.  Notably, the extended MHCB closure frequently resulted in custody staff being redirected to transport patients from CCWF to the CIW MHCB, resulting in facility closures or program modifications for the rest of the institution.

671

CCWF mental health staff also reported strained relationships with CIW MHCB staff, which was unfortunate given the frequent collaboration required between the two units. CCWF's mental health staff reported that they felt that CIW MHCB staff did not seriously consider their knowledge of patients or concerns when treating them. Several staff members also reported receiving patients back from the CIW MHCB after extremely brief stays.

The target date to reopen CCWF's MHCB was September 1, 2023.

Seclusion and Restraint:

There were no seclusion or restraint incidents during the review period.

Crisis Intervention Team:

CCWF's staffing shortages negatively impacted crisis responses by reducing the ability to respond as a true CIT to crises. Instead, duties typically allocated to CIT clinical members were reallocated to primary clinicians during their regular workdays. However, CCWF was actively recruiting additional staff who could be assigned to the CIT.

During the site visit, CCWF had only been able to fill one of two CIT clinician positions. As such, during the week from 7:00 a.m. until 5:00 p.m., crisis calls were handled by mental health staff. Thereafter, from 5:00 p.m. until 10:00 p.m., there was an assigned CIT clinician for three weekday days, but no staff was assigned on the remaining two weekdays. The CIT clinician activated the full CIT, including the lieutenant and supervising registered nurse. On weekends, the institution utilized the "scout model," whereby one CIT member initially responded to the crisis and incorporated additional staff as needed.

Alternative Housing:

There were 251 patients placed in alternative housing during the review period, representing a 425 percent increase from the 59 placements during the prior review period.

Twenty-three patients were housed in alternative housing for more than 24 hours, with a range of 24.33 to 62.83 hours.

CCWF's alternative housing LOP was current and was consistent with statewide policy. Alternative housing locations included beds in the medical building, mainline, reception center, and administrative segregation. Observed alternative housing cells were all clean, with mattresses in the cells. No patients were in alternative housing during the site visit.

EOP:

During the review period, CCWF's mainline EOP population was housed on Facility B in building 508. One psychiatrist, four licensed and one unlicensed psychologist, and one social worker treated EOP patients, with caseloads within established ratios. The EOP psychiatrist also treated EOP hub patients. Except for vacation coverage, telepsychiatry did not treat EOP patients.

Like during the previous review period, CCWF implemented a unique plan that placed patients from the reception center in the mainline EOP as quickly as possible. Reported benefits included improved continuity of care as the same clinician provided the initial assessment and follow-up care.

During the review period, CCWF offered EOP patients a weekly average of approximately 14 hours of structured treatment, with patients attending approximately seven hours, or half, of offered treatment, and refusing seven weekly hours. During the site visit, an observed group facilitated by two recreation therapists actually combined two groups due to some patients receiving yard later than scheduled. Ten patients attended the group, which included an appropriate mix of clinically based elements and social activities.

Four observed IDTTs had some positive aspects but were generally inadequate. However, the IDTT room was conducive for its purpose, as it was confidential, with adequate lighting and a comfortable temperature. Required staff were present, used computers, and were actively engaged, empathetic, and knowledgeable about each patient. There was also appropriate psychiatry involvement, which included review of medications, doses, indications, and side effects. Regrettably, the IDTTs showcased numerous limitations, including a lack of case formulations, clear interventions, measurable treatment goals, and, in certain cases, the use of language that was too advanced for patients' clinical state.

EOP patients who required isolation or quarantine were transferred to overflow housing in Facility A or the gymnasium. Although CCWF reported not using such overflow for EOP patients during the review period, at the time of the site visit, due to COVID-19, there were three EOP patients on quarantine status and one EOP patient in isolation.

Twelve interviewed EOP patients mostly reported being satisfied with both psychiatry and primary clinician treatment. All patients knew how to seek help from their clinician or the institution for emergent issues. Unfortunately, patients indicated variability for groups, with most reporting excessive recreational as opposed to clinical content. Most complaints about the lack of programming were due to custody vacancies. Several patients further reported that yard, dayroom, non-mental health groups such as AA/NA, and religious services were severely limited.

Twenty patients were randomly selected to have their healthcare records reviewed for their EOP stays.

All 13 patients had required initial psychiatry evaluations before the initial IDTT and within 14 calendar days of arrival or a level of care change. All 13 or 100 percent were

conducted in confidential settings.  Telepsychiatry was not used for any initial psychiatry assessments.

Thirty-one of 42 or 74 percent of routine psychiatry contacts timely occurred at least every 30 calendar days.  Ninety-eight percent were conducted in confidential settings.  The one routine psychiatric contact that was not confidential was due to patient refusal.  Telepsychiatry was not used for any reviewed routine psychiatry contacts.

Eleven of 13 or 85 percent of initial primary clinician evaluations timely occurred within 14 calendar days of patient arrival or a change in the level of care.  Seventy-seven percent were conducted confidentially.  Reasons for non-confidentiality included patient refusals and a lack of available treatment space.  Telehealth did not conduct any initial primary clinician assessments.

Seventy-five of 92 or 82 percent of routine primary clinician contacts timely occurred at least every seven calendar days.  Seventy percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals and the lack of available treatment space.  Telehealth did not conduct any routine primary clinician contacts.

All 13 or 100 percent of initial IDTTs timely occurred within 14 calendar days of patient arrival or a level of care change.  Required staff and patients attended all initial IDTTs.

All 18 or 100 percent of routine IDTTs timely occurred every 90 calendar days.  Required staff attended all routine IDTTs; patients attended 89 percent.  Reasons for holding routine IDTTs *in absentia* included patient refusals.

3CMS:

The institution's mainline 3CMS population was housed on Facilities A, B, C, and D.  Facility B also housed the Transitional Care Unit (TCU) which, on July 27, 2023, housed 53

incarcerated persons, including 31 3CMS patients.  Staff reported that the TCU was comparable to an unlicensed OHU.

Two psychiatrists primarily treated 3CMS patients; the caseload of one exceeded the established ratio.  A third 3CMS psychiatrist did not have a caseload but treated patients on weekends.  Telepsychiatry also provided services to 3CMS patients, but the institution did not provide telepsychiatrists' 3CMS caseloads.  One 3CMS psychologist's caseload was within the established ratio but the caseloads of six of eight 3CMS social workers exceeded the established ratio.  The 3CMS supervisor did not have a caseload.

Six observed IDTTs found required staff in attendance and actively using computers.  The IDTTs were held in confidential space with a comfortable temperature and sufficient light.  The telepsychiatrist appeared on a large screen with good visibility and sound and there were no connectivity issues.  In a deviation from Program Guide requirements, the primary clinicians reported evaluating all patients prior to the IDTT.  Regrettably, the telepsychiatrist was not the assigned psychiatrist for some patients.

The treatment team was empathic and patient-centered, actively discussing family and visitation issues, which were critical considerations for two patients' mental health.  Nonetheless, despite several positive aspects, the IDTTs had serious limitations, including primary clinicians' requiring prompting for critical topics, a lack of case conceptualizations, and nebulous treatment goals.  Overall, the observed IDTTs were inadequate.

Ten interviewed 3CMS patients from different yards reported generally helpful mental health treatment and that they knew how to access emergent or urgent services.  As was echoed by EOP patients, the main reported issues included not receiving dayroom or yard time, as well as not being allowed to attend AA/NA groups or religious services.  Multiple patients stated that

several housing units were frequently on "modified program" due to custodial staff shortages; as a result, patients reportedly stayed in their cells "almost all of the time," with limited dayroom access.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays. Six of the 20 patients had stays shorter than the required timeframes and, as such, were eliminated from the review.

Six of 12 or 50 percent of patients had a timely initial psychiatry evaluation before the initial IDTT. Ninety-two percent were conducted confidentially. Telepsychiatry conducted four or 33 percent of initial psychiatry assessments.

Twelve of 15 or 80 percent of patients had required timely routine psychiatry contacts at least every 90 calendar days. Ninety percent were conducted in confidential settings. Reasons for non-confidentiality included a patient who was in the CTC and required a bedside interview. Telepsychiatry conducted seven or 35 percent of reviewed routine psychiatry contacts.

Six of 12 or 50 percent of patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. All 12 or 100 percent were conducted confidentially. Telehealth was not used for any initial primary clinician assessments.

Sixteen of 21 or 76 percent of routine primary clinician contacts timely occurred at least every 90 days. Ninety-five percent were conducted confidentially. Telehealth was not used for any routine primary clinician contacts.

Only one of 11 or nine percent of initial IDTTs timely occurred within 14 working days of patient arrival or a level of care change. Two never occurred. Required staff attended all nine initial IDTTs; patients attended 67 percent.

Three of six or 50 percent of patients had timely required annual IDTTs. Required staff attended all annual IDTTs; patients attended 50 percent.

Other Issues:

Pre-Release Planning:

CCWF had two pre-release coordinators; both were social workers. The pre-release coordinators worked in tandem, although one primarily focused on mental health patients and the other on general population inmates. There was a facility-wide pre-release coordination meeting every other week that included the pre-release coordinators, TCMP, and representatives from parole and staffing services, as well as other pre-release specialists. The pre-release coordinators also met weekly with Integrated Substance Use Disorder Treatment (ISUDT) program staff.

There were 449 patients who received pre-release planning services. Although staff reported conducting pre-release planning assessments (PRPA) for patients, they were unable to identify the number of completed PRPAs. Pre-release planning contacts typically occurred beginning within 30 days of patients' expected departure and not the 90 days directed by the Program Guide.

CCWF did not conduct pre-release planning groups during the review period or at the time of the site visit, which mental health leadership attributed to COVID-19. The pre-release coordinator further indicated that it was difficult to conduct such groups due to the turnover in the institution's patient population.

Program Access:

    a.  Job and Program Assignments

On June 1, 2023, CCWF reported that the 1,141 job assignments were held by 51 or 57 percent of EOP patients, 591 or 46 percent of 3CMS patients, and 499 or 49 percent of non-MHSDS incarcerated persons.

The 888 academic assignments were held by 37 or 42 percent of EOP patients, 562 or 44 percent of 3CMS patients, and 499 or 28 percent of the non-MHSDS population.

No EOP patients held the 117 vocational assignments, which were held by 75 or six percent of 3CMS patients, and 42 or four percent of non-MHSDS incarcerated persons.

The 587 voluntary education assignments were held by four or four percent of EOP patients, 297 or 23 percent of 3CMS patients, and 286 or 28 percent of the non-MHSDS population.

The 137 substance abuse treatment assignments were held by three or three percent of EOP patients, 95 or seven percent of 3CMS patients, and 39 or four percent of the non-MHSDS population.

    b.  Milestone Credits

CCWF reported that 84 EOP and 1,265 3CMS patients, and 893 non-MHSDS incarcerated persons, were eligible to earn milestone credits.  Of these patients, 64 or 76 percent of eligible EOP patients, 395 or 31 percent of eligible 3CMS patients, and 328 or 37 percent of the eligible non-MHSDS population earned the credits.

    c.  Out-of-Level Housing

CCWF did not house any patients or incarcerated persons by level.

    d.   ADA Reasonable Accommodation and Grievance Procedure

The institution provided a copy of the CDCR Form 1824 reasonable accommodation request process manual and confirmed implementation of the revised ADA accommodation, grievance procedures, and appeals processes.  However, CCWF did not provide staff training rosters or attendance sheets.

    e.   Periodic Classification Score Reductions:  EOP Patients

CCWF provided a sample of 20 completed CDCR form 840s for MHSDS patients reflecting that the institution provided classification score reductions.

    f.   Unclothed Body Search

Interviewed EOP hub custody staff were knowledgeable of unclothed body search policies and practices.  Patients underwent an unclothed body search if they left the housing unit, but not for movement within the unit.  If the patient was double-celled and the patient being removed was uncomfortable with performing the unclothed body search in front of the cell mate, staff escorted the patient to a private room for the search.

    g.   Custody Officer Body Cameras

CCWF was issued body cameras in January 2023.  Officers reportedly turned their cameras on and off at their discretion when interacting with patients and returned their cameras to the program office at the end of their shift.

    "C" Status:

CCWF was unable to provide data on the number of "C" Status patients during the review period.  During the site visit, there were no patients designated as "C" Status.

Case by Case Reviews:

Eight patients met the criteria for a case-by-case review during the review period. Two were retained in administrative segregation due to an active SHU term, four were pending RVR adjudication for battery with a deadly weapon, one was pending transfer to a male institution, and one was pending a department review board decision. All reviews were completed timely and attended by required staff.

Additionally, 70 patients were identified for 120-day Pre-MERD review; 23 or 33 percent were transferred from restricted housing prior to expiration of the SHU term. Ten reviewed ICC chronos all complied with CDCR policy.

Mental Health Referrals:

CCWF reported 554 mental health referrals during the review period. There were 125 referrals to psychiatry and 429 to primary clinicians. Overall, there were 52 emergent, 33 urgent, and 469 routine referrals. Psychiatry timely responded to one of three emergent referrals, one of three urgent referrals, and 105 of 119 or 88 percent of routine referrals. For primary clinicians, responses were timely to 44 of 49 or 90 percent of emergent referrals, 28 of 30 or 93 percent of urgent referrals, and 277 of 350 or 79 percent of routine referrals. CCWF staff listed COVID-19, staffing shortages, and planned and unplanned absences as reasons for untimely referrals.

Interviewed custody officers throughout CCWF explained the correct procedure for responding to mental health referrals.

Custody and Mental Health Partnership Plan:

CCWF's CMHPP LOP aligned with headquarters' directive and was last revised in November 2022 and was current.

Executive leadership joint rounding occurred during all six months of the review period on three different mainline 3CMS yards, the mainline EOP yard, reception center, and administrative segregation unit.  All required staff attended the rounding.

The executive rounding team interviewed both staff and patients and appropriately reported their findings on the correct form.  Mental health staff noted the need for better communication among mental health staff members while reporting a great relationship with custody.  Interviewed patients indicated the need for more clinical groups, not timely receiving ducats, and difficulty obtaining appointments with mental health staff.  An observed executive leadership joint rounding tour during the site visit revealed similar expressed concerns from staff and patients.

Minutes from the warden's executive meetings, and the quality management committee and mental health program subcommittee all documented executive leadership joint rounding.  However, only the roundings' dates and staff attendance were noted, which was insufficient to disseminate this information and for collaborative discussions.

Given the limited number of EOP hub patients, EOP hub and STRH huddles were held simultaneously.  Reviewed EOP hub/STRH and mainline EOP huddle reports for one week all indicated daily huddles.  They also typically revealed attendance by required staff for mainline EOP huddles, but not for the EOP hub/STRH.  All reviewed huddle forms sufficiently detailed patient activities and revealed a structured approach to evaluating the units' current census and requisite patient care from the prior shift.  Required staff attended observed EOP hub/STRH and EOP huddles and demonstrated collaborative discussions.

CCWF conducted weekly 3CMS supervisory meetings during 22 or 23 weeks of the review period's 26 weeks for Facilities A, B, C, and D.  Reviewed reports and an observed meeting reflected appropriate detail about each meetings' addressed issues.

Joint supervisory 3CMS program area tours occurred monthly on each yard.  Regrettably, reviewed documentation lacked detail and did not elaborate on noted deficiencies in mental health and custody relations.

During the review period, CCWF offered EOP orientation groups to 256 patients; the groups were typically offered once weekly.  Unfortunately, custody participation was reportedly minimal, which an observed group confirmed.

Inmate advisory council meetings occurred monthly during the reporting period on Facilities B, C, and D.  Reviewed meeting minutes were extensive and reflected discussion of mental health-related topics.

CCWF provided a copy of the 3CMS orientation brochure that was distributed to new 3CMS patients.

During the review period, patients filed 30 complaints against mental health staff, of which one incident was pending, five were referred for confidential inquiries, and 24 were closed.  There were also 208 complaints against custody staff.  CCWF also reported 63 investigations of custody staff misconduct toward a patient that were not initiated through the appeals process; of these, 38 were in progress to be completed, 24 were not sustained, and one was determined to be unsubstantiated.  No CCWF staff were moved to another post due to a staff misconduct allegation.

While CCWF provided quarterly round table training attendance records for December 2022 and May 2023, it failed to provide additional documentation of staff who were required to attend the training.  As such, compliance could not be determined.

Forty-nine percent of required mental health staff and 65 percent of required custody staff completed the annual partnership off-post training during the 12 months prior to the site visit.

Heat Plan:

Review of CCWF's heat plan LOP indicated compliance with headquarters' directive. The heat plan was in effect for one month of the review period, during which there were seven Stage I, but no Stage II or III heat alerts.  No patients experienced heat-related illnesses during the review period.

Interviewed custody officers were knowledgeable about heat plan protocols and their responsibilities at the three respective heat plan stages.  Due to custody staff shortages, when patients were recalled inside due to a Stage I heat alert, patients were not offered dayroom but were directly sent to their cells.  Depending on available staff and the housing unit's equipment, large fans were set up to blow air directly down unit halls that were especially hot to cool off patients, while cell doors were kept open to allow the breeze to enter.

Shockingly, staff reported some cells reaching 99 degrees in July 2023.  At that time, staff allowed cell doors to remain open and an industrial fan blew air down the hall while patients were ordered to remain in their cells.  Interviewed staff unanimously reported that the "swamp cooler" system did not work properly once unit temperatures exceeded 80 degrees.

The annual mandatory heat-related pathologies training was attended by 266 of 578 or 55 percent of custody and mental health staff.

RVRs:

CCWF issued 3,045 RVRs during the review period, of which 18 or less than one percent were issued to MHCB patients, 83 or three percent were issued to EOP patients, 2,240 or 74 percent were issued to 3CMS patients, and 688 or 23 percent were issued to the non-MHSDS population.  There were also 16 RVRs issued to patients without an identified mental health level of care.

The monitor reviewed a random sample of 20 RVRs.  Custody staff timely referred the mental health assessment to mental health staff in 16 or 80 percent of the cases.  Late referrals ranged from three to eight days overdue.  Mental health staff timely completed and returned the assessment to custody in 17 instances or 85 percent of the time.  The late assessments ranged from nine to 12 days late; CCWF did not provide reasons for the delays.

Review of the sample indicated that the senior hearing officer (SHO) appropriately considered clinical input based on patients' mental health assessments for all examined RVRs. The reviewing clinician recommended mitigating patients' penalties in six or 30 percent of the 20 reviewed RVRs; the SHO mitigated penalties in all six cases.  The SHO considered each patient's prior disciplinary history and the COVID-19 pandemic in all 14 RVRs where the clinician did not recommend mitigation, and actually mitigated penalties for three additional patients.

Clinicians' confidentially conducted the mental health assessment interview in nine of 20 or 45 percent of reviewed cases.  Of the 11 assessments that were not conducted confidentially, six were due to patient refusals.  Staff assistants' were assigned to assist the patient in the RVR process in 11 of 20 or 55 percent of reviewed RVRs.  All patients were timely served a classified copy of their RVR at least 24 hours prior to the hearing.

685

No RVRs were issued for self-injurious or suicidal behaviors or in connection with patients' placement in restraints or seclusion. No RVRs were documented in an alternative manner.

The monitor reviewed an additional eight RVRs issued to MHSDS patients that resulted in SHU terms to determine if clinical input was considered during classification review. All patients had a clinician present to assess their ability to understand and participate in the classification review and discuss the patient's mental health factors that could impact placement. Each RVR also noted that the mental health assessment's clinical recommendations were considered prior to penalty assessment.

Forty-five percent of custody staff and 36 percent of mental health staff completed mental health assessment training.

Use of Force:

During the review period, there was one controlled and 134 immediate use of force incidents involving 124 MHSDS patients.

The monitor conducted a paper and video review for the one controlled and 15 immediate uses of force. This review revealed that all such incidents complied with CDCR policy. The immediate uses of force mainly addressed patients fighting with one another or patients who were experiencing escalating mental health symptoms.

CCWF reported compliance for both custody and mental health staff attending required use of force training. The warden did not attend the training, but it was attended by the deputy warden, all captains and sergeants, three of four correctional administrators, 25 of 27 lieutenants, and 387 of 396 of correctional officers. For mental health staff, the training was attended by the chief of mental health, supervisory psychologists, senior psychologist specialist, and

psychologists, and by seven of nine psychiatrists, 13 of 14 social workers, and 28 of 29 senior psych techs.

Lockdowns/Modified Programs:

CCWF reported no lockdowns but two modified programming periods during the review period.  Both modified programs stemmed from COVID-19 outbreaks on multiple facilities and lasted 33 and 55 days, respectively.  No interruptions in the delivery of mental health services were reported.

No other modified programming periods were documented during the review period. The institution nonetheless remained on modified programming due to daily custody staffing shortages but no PSRs documented this situation.  CCWF's LOP entitled "Restricted Movement Procedure/Staff Redirect Plan" detailed institutional processes related to staffing shortages, including which positions would be redirected and how movement would be restricted. Movement restrictions included modification or suspension of dayroom, rehabilitative programs, face-to-face college, staff-sponsored self-help groups, and visitation.  Attorney visits, parole board hearings, dental, medical, mental health, and pill lines were expressly not subject to suspension or modification.

Access to Care:

A review of CCWF's monthly Health Care Access Quality Reports from December 2022 to May 2023 reflected the issuance of 49,097 mental health ducats and add-on appointments, of which 24,258 or 49 percent were completed and 24,839 or 51 percent were not completed.  Of the non-completed appointments, less than one percent were not completed due to custody factors, 91 percent were not completed due to non-custody factors, and nine percent were not completed due to patient refusals.

<u>*Coleman* Postings</u>:

All toured housing units contained the current *Coleman* posting in both English and Spanish in areas accessible to patients.

**APPENDIX B-15**
**CALIFORNIA STATE PRISON/LOS ANGELES COUNTY (CSP/LAC)**
**(August 14, 2023 – August 18, 2023)**

Census:

On August 11, 2023, CSP/LAC housed 2,629 incarcerated persons, which was a five percent decrease from the prior reporting period.  The mental health caseload population of 1,425 patients constituted 54 percent of CSP/LAC's total population, and had increased by two percent since the previous review period.

CSP/LAC housed one acute care and four intermediate care patients.

The MHCB housed seven patients and there were 11 patients in alternative housing.

There were 569 mainline EOP and 646 mainline 3CMS patients.

The administrative segregation population included 87 patients in the EOP hub and 100 3CMS patients in STRH.

Staffing:

The chief psychiatrist position was filled, but the position for the senior psychiatrist was vacant.  Six of ten psychiatry positions were filled, for a 40 percent vacancy rate.  The use of 2.69 contractors reduced the functional vacancy rate to 13 percent.

The 0.5 telepsychiatry position was filled, as was the position for the medical assistant assigned to telepsychiatry.

Both chief psychologist positions were filled.  Twelve of 12.5 senior psychologist positions were filled, reflecting a four percent vacancy rate.  Twenty-six of 43 psychologist positions were also filled, for a 40 percent vacancy rate, but contractors filled a 0.5 position, reducing the functional vacancy rate to 38 percent.  Nine psychologists were unlicensed.

The supervising social worker position was filled. Eleven of 16 filled social worker positions indicated a 31 percent vacancy rate. One social worker was on an extended leave and there were three contractors, leaving a 19 percent functional vacancy rate. Four social workers were unlicensed.

CSP/LAC reported that unlicensed primary clinicians required four hours of weekly supervision with a licensed staff member, which consisted of three hours of group supervision and one hour of individual supervision.

Thirteen of 19.5 recreation therapist positions were filled, for a 33 percent vacancy rate.

Both senior psych tech positions were filled. Forty-six of 54 psych tech positions were also filled, for a 15 percent vacancy rate, but two psych techs were on extended leaves, increasing the functional vacancy rate to 19 percent.

Fifteen of 16.2 supervising registered nurse positions were filled for a seven percent vacancy rate. Four of five MHSDS registered nurse positions were also filled, reflecting a 20 percent vacancy rate. Ten of 11.8 CNA positions were filled, for a 15 percent vacancy rate. Of 40.9 LVNs positions, 38.1 were filled, for a seven percent vacancy rate, but five LVNs were on extended leaves, increasing the functional vacancy rate to 19 percent.

Seventeen of 19.5 office tech positions were filled; one office tech was on an extended leave, resulting in an 18 percent functional vacancy rate.

The OSS II position was filled, but the CHSA position was vacant. Both HPS positions and the AGPA position were filled.

As for custody staffing, positions for the warden, chief deputy warden, and all six associate wardens were filled. Five of six captain positions were filled. Positions for 30 of 31 lieutenants were filled but three lieutenants were on extended leaves. Sixty-four of 85 sergeant

positions were also filled, but one sergeant was on an extended leave. Positions for 30 of 31 CC

IIIs, CC IIs, and CC Is were also all filled, but three were on long-term leaves. Of 670

correctional officer positions, 723 were filled, but 47 correctional officers were on extended

leaves, for a 14 percent functional vacancy rate. Regrettably, CSP/LAC reported that custody

staffing shortages impacted patient access to dayroom and yard, as well as custody escorts for

patient treatment.

Telepsychiatry:

Similar to the previous reporting period, CSP/LAC's one telepsychiatrist did not have a

caseload but handled PC 2602 involuntary medication orders. As such, CSP/LAC minimally

utilized telepsychiatry, further reporting that its telepsychiatrist was also assigned to another

institution and worked 20 hours weekly at each facility.

Telework:

Other than telepsychiatry, no other mental health staff teleworked. Nonetheless, mental

health leadership reported that several staff members had applied or planned to apply for

telehealth positions anticipating reduced caseloads, their physical safety would no longer be in

jeopardy, and they would be less likely to burn out. Leadership further opined that headquarters'

plan to hire telehealth primary clinicians was inappropriate for the MHCB and EOP patient

population, and was otherwise not conducive to CSP/LAC's physical plant.

Staff Recruitment:

Mental health leadership reported that recruiting and retaining mental health staff

remained a significant challenge, and that CSP/LAC's "known reputation" of violence impacted

both. It was further noted that CSP/LAC often hired unlicensed clinicians, but once they were

licensed, many of these clinicians opted to leave CSP/LAC. The chief of mental health and CEO

elaborated that without competitive salaries the institution would continue to experience difficulties with staff recruitment and retention.  Staff further reported that hazard pay/pay differential and loan repayment would assist with staff retention.

As for recruitment events, CSP/LAC recently reported participating in a hiring event in Bakersfield.  The institution was also working to develop a practicum program for students in social work programs, and was exploring establishing an internship program.

Quality Management:

The local governing body met quarterly and always attained quorums.  Reviewed meeting minutes reflected the discussion of staff appointments, policy procedure reviews, incident reporting and safety monitoring, resources and fiscal affairs, and other management issues.  Action items included the appointment of a director of nursing, follow-up with building and construction issues, and staff development.  Overall, meeting minutes' indicated that the local governing body achieved intended objectives.

The quality management committee met monthly and achieved quorums.  Comprehensive meeting minutes reported agenda items that included quality improvement projects, system surveillance and quality concerns, patient safety, utilization management, high risk patients, executive leadership joint rounding, and subcommittee reports.  The QMC also reviewed compliance with various benchmarks and implemented needed corrective action plans (CAPs).

Reviewed mental health program subcommittee meeting minutes for five months were also comprehensive.  Agenda items included patient safety, suicide prevention, crisis calls, utilization of alternative housing cells, an EOP hub QIT, and audit results, as well as action plans

to address compliance, unresolved action items, executive leadership joint rounding, and training and development.

Overall, CSP/LAC maintained a useful quality management reporting structure with mechanisms in place to ensure that information was appropriately disseminated within and across disciplines, and to line staff. Additionally, identified deficiencies were appropriately elevated and resulted in CAPs when indicated. Meeting minutes also maintained action items for accountability until their resolution.

Tellingly, CSP/LAC reported that staffing shortages resulted in an inability to initiate needed quality improvement studies during the review period. Such studies were necessary to investigate and address the increase in treatment refusals, utilization of crisis services, and after-hours alternative housing placements.

Due to limited staffing, CSP/LAC did not have an active peer review program during the review period or at the time of the site visit.

Medication Management:

CSP/LAC provided MAPIP results for December 1, 2022 through May 31, 2023 for compliance for psychiatric diagnostic monitoring and medication management. Regrettably, there was widespread and pervasive noncompliance with required medication management measures. For diagnostic monitoring metrics, CSP/LAC was compliant with a mere six of 25 or 24 percent for the entire reporting period. Furthermore, five of 25 or 20 percent of diagnostic monitoring metrics were noncompliant for the reporting period. For medication administration measures, no metric was compliant for the entire review period. Stunningly, nine of 12 or 75 percent of medication administration measures were noncompliant for all six months.

Diagnostic monitoring for patients prescribed atypical antipsychotics demonstrated that CSP/LAC was compliant for all six months for monitoring blood pressure, height, weight, and thyroid function tests. There was compliance for four months for obtaining medication consents, and for three months for EKGs. Regrettably, there was compliance for only one month for monitoring glucose. Alarmingly, there was noncompliance for all six months with Complete Blood Count with platelets (CBC), Comprehensive Metabolic Panel (CMP), lipids, and the Abnormal Involuntary Movement Scale (AIMS).

CSP/LAC was not a clozapine initiation or maintenance facility during the review period.

For required monitoring of antidepressants, CSP/LAC indicated compliance for all six months for monitoring thyroid function tests, and blood pressure for patients prescribed venlafaxine. There was compliance for only two months for obtaining medication consents, and for one of two required months for EKGs.

No CSP/LAC patients were prescribed carbamazepine during the review period.

As for monitoring Depakote, CSP/LAC was compliant for three months for obtaining medication consents, and for two months with monitoring CBC with platelets and CMP. Concerningly, there was noncompliance for all six months for monitoring therapeutic medication levels.

For lamotrigine, CSP/LAC was compliant for obtaining medication consents for four months.

Regarding lithium, the institution reported compliance for three months for obtaining EKGs, and for checking kidney function and thyroid function tests. CSP/LAC reported compliance for three of four required months for obtaining medication consents. Unfortunately,

694

CSP/LAC was only compliant for one of five required months with obtaining therapeutic medication levels.

CSP/LAC reported that noncompliance for some diagnostic monitoring metrics was due to patient refusal and a shortage of laboratory staff. The institution noted the difficulty filling laboratory staff positions, especially given the low salary for this medication classification. Although CSP/LAC reported these difficulties, it did not explain how it was addressing them, such as through a CAP or performance improvement work plan.

For medication management metrics reported by mental health headquarters, CSP/LAC was compliant for five months for medication continuity upon parole/transfer to the community. Shockingly, CSP/LAC was noncompliant for all six months with most metrics, including medication continuity upon inter-institutional transfer at receiving and release, continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and medication continuity following MHCB transfers, intra-institutional transfer to ASU/SHU/PSU, and following discharge/transfer from a community hospital and/or DSH. There was also noncompliance for all six months for observation of medication preparation for HS, observation of medication preparation AM and PM, chronic care medications historical administration, and outpatient provider new medication orders.

CSP/LAC prescribed mental health prescriptions for a maximum of 180 days, but did not specify the length of bridge orders.

For verbal and telephone orders, nursing staff had to "read back" the order to the prescriber. The psychiatrist was to sign the verbal order within 48 hours, or if prescribed over

the weekend or a holiday, on the next business day.  CSP/LAC did not specify the process for tracking the signing of verbal or telephone orders.

CSP/LAC did not report the number of patients who were prescribed psychiatric medications, or the total number of psychiatric prescriptions.

Seventy-three patients were prescribed 83 KOP medications.  While statewide policy dictated that the only mental health prescriptions permitted as KOP were SSRIs and duloxetine, CSP/LAC prescribed multiple nonpermitted KOP prescriptions.  One prescription was for topiramate, a heat medication used for various reasons including seizures, migraines, and mood stabilization.  Additional deviations included vitamins, melatonin, and iron supplements. Statewide policy only allowed KOP mental health prescriptions for patients at the 3CMS level of care; however, CSP/LAC did not submit confirming documentation.

Seventy-two medication line audits reflected patient wait times of less than 30 minutes. However, 12 Facility D audits revealed total medication line durations' exceeding two hours. The extent of these delays was noted to be more extensive than the audits suggested, as mental health staff reported that groups were delayed due to conflicting medication lines.  CSP/LAC had assembled a workgroup to address this issue.

Protection from the elements while waiting in the medication line was sorely lacking on all yards.  CSP/LAC reported that during inmate advisory council (IAC) meetings, patients had reported that the lack of protection from the elements was one reason that they did not go to medication lines during inclement weather.

CSP/LAC reported an average non-formulary rate of approximately four percent during the review period.

There was an average of 98 percent compliance for polypharmacy medication reviews. However, the institution did not submit details surrounding these reviews, or how headquarters' utilized the information.

An average of 453 patients received medications written as HS. However, it was not reported whether they were only for mental health medications, or also included non-mental health medications. CSP/LAC reported 100 percent compliance with the requirement to administer HS medications at 8:00 p.m. or later.

As of June 9, 2023, CSP/LAC reported that 118 patients received PC 2602 involuntary medications, but did not subset this data by level of care.

During the review period, CSP/LAC filed 64 PC 2602 renewal petitions, five initial non-emergent petitions, and no initial emergent petitions. Two petitions were denied; it was unclear whether they were renewals or initial petitions. The two denied petitions were reportedly "due to normal proceedings" and not due to poor tracking or petition mishandling. Two petitions were withdrawn and there were no non-renewals. No barriers with the PC 2602 process were reported.

There were no incidents of non-compliance with PC 2602 medications requiring the use of force.

CSP/LAC was compliant for only one month of the reporting period with having the PC 2602 involuntary medication court order in the chart. For the related metric of having the PC 2602 psychiatry medication order in the chart, there was compliance for three months.

Transfers:

CSP/LAC did not participate in a major or minor sustainable process review during the reporting period as the regional team's resources were redirected to the UNA project.

Nonetheless, the institution's inpatient care coordinator continued to conduct monthly audits as to the quality of non-referral documentation.  These audits revealed that CSP/LAC's providers continued to struggle with "acceptable" non-referral rationales and treatment interventions in lieu of higher level of care (HLOC) referrals.  The inpatient care coordinator used an 85 percent compliance threshold for auditing HLOC documentation, and reported achieving compliance twice during a six-month period; overall, compliance ranged from 69 to 96 percent.

CSP/LAC's inpatient care coordinator was a psychologist; six other psychologists served as backups.  The inpatient coordinator indicated a positive working relationship with IRU, but noted that IRU asked many questions about referred patients.  The inpatient care coordinator attributed acute and intermediate care transfer delays to medical holds, COVID-19, and occasionally a lack of bed space in the PIPs.  She also stated that a lack of custody staff for patient transports periodically resulted in brief transfer delays.

During the review period, there were 1,148 instances of 636 patients who were considered but not referred to inpatient care.

There were 23 acute care referrals.  One referral was rescinded and two were rejected.  All 23 referral packets were timely completed within two working days of identification.  Twelve of 20 or 60 percent of acute care patients timely transferred within ten days.

There were 27 referrals to intermediate care, of which two were rescinded, seven were rejected, and the reasons why patients were not transferred were not provided for two others.  Twenty-four of 27 or 89 percent of intermediate care referral packets were timely completed within five working days of identification.  Six of 16 or 38 percent of patients timely transferred to intermediate care.

During the site visit, one acute and three intermediate care patients were awaiting transfer; all were within transfer timelines.

There were ten *Vitek* hearings. No patients prevailed.

CSP/LAC referred 1,447 patients to the MHCB, of which 177 or 12 percent were actually admitted. The remaining 1,270 MHCB referrals were rescinded. All but one patient was timely admitted to the MHCB within 24 hours of referral. Two patients had three or more MHCB admissions.

All seven patients timely transferred to the PSU.

CSP/LAC patients requiring EOP hub placement or the EOP level of care were timely transferred to the institution's internal programs.

Patients requiring STRH placement were timely transferred to CSP/LAC's STRH.

CSP/LAC transferred nine patients to LTRH during the review period. Seven of nine or 78 percent timely transferred. The two remaining transfers exceeded transfer timelines by eight and 112 days, respectively, with LTRH capacity issues accounting for the delays.

CSP/LAC did not track patients' whose level of care was reduced from EOP to 3CMS.

Programming:

MHSDS Patients in Administrative Segregation:

CSP/LAC's EOP hub was located in Facility D-5. EOP hub patients were escorted to treatment in a separate healthcare building that was located behind the housing unit.

The EOP hub did not satisfy the established staff-to-patient ratio for primary clinicians but complied with the ratio for psychiatry.

During the review period, the EOP hub housed 346 patients, for a total of 391 stays. Stays averaged 38 days and ranged from four to 632 days.

The EOP hub passed certification for four months of the review period, and passed with explanation for a fifth month.  Notably, CSP/LAC had an EOP hub population overage that was housed in a separate housing unit during most of the review period, and was unable to offer the required minimum treatment activities for patients in these units.  Interestingly, the EOP hub certification reports did not mention this overflow population.

EOP hub patients received a total of 5,126 primary clinician contacts during the review period; 66 percent occurred non-confidentially at cell front.  Record review indicated that most cell-front PC contacts were daily high refuser check-ins.  However, this lack of confidential primary clinician contacts was also negatively impacted by patient refusals and modified programming.

During the review period, EOP hub patients also received 799 psychiatry contacts, of which 32 percent took place non-confidentially at cell front.  These nonconfidential contacts were primarily due to patient refusals and modified programming, but a lack of custody escorts also contributed to them.

CSP/LAC offered patients a weekly average of 10.82 hours of structured treatment.  Patients attended an average of 4.01 hours and refused 6.81 hours.  Nineteen EOP hub patients were on modified programming for refusing more than 50 percent of offered treatment.  The patients on modified programming were offered a weekly average of 8.72 hours of structured treatment, and attended 2.84 hours and refused 5.88 hours.

During the review period, the EOP hub conducted 402 IDTTs, including 291 initial and 111 routine IDTTs.  Overall, the routine quarterly IDTTs for EOP hub patients and the 30-day routine IDTTs for EOP hub patients on modified programming were generally timely.  Required staff and a senior psychologist supervisor attended 98 percent of the IDTTs.

Five observed IDTTs were generally adequate and attended by required staff. Patients were placed in TTMs, which were clean. The IDTT room had adequate space, and all treatment team members had computer access. Notably, the treatment team adequately covered all required treatment areas. The IDTTs were also collaborative, and the treatment team provided appropriate psychosocial histories and clinical conceptualizations for each patient.

The monitor's expert observed two recreation therapy groups. Available group activities included music and creative expression, social skills, team games, and other similar recreation therapy and leisure-based groups. Unfortunately, the EOP hub did not provide any primary clinician led groups. While some inconsistencies were observed, the group sessions and patient engagement were generally positive. For example, a music expression group touched on gratitude as a coping skill, demonstrating the value of creative approaches to therapy.

Despite relatively high group treatment refusal rates, CSP/LAC lacked the staffing resources to sufficiently investigate this issue. The lack of group quality may have been one factor driving the refusal rates, as only recreation therapy groups were offered. In addition to lacking clinical content, RT groups also did not always adhere to the group topic. For example, one recreation therapy group titled Dialectical Behavior Treatment (DBT) was actually a trivia game and a movie.

The monitor's expert interviewed five EOP hub patients in a group setting. Patients' expressed positive feedback about timely clinical contacts, IDTTs, and psych tech rounds, reporting that psych techs provided in-cell activities during rounds. They indicated always being offered a confidential appointment when programming was running. Patients' also estimated receiving 12-15 weekly hours of out-of-cell time between groups and yard. Some patients reported custody concerns, including instances of custody staff mocking their symptoms and

mental health status, but further reported that this issue had improved since the introduction of body cameras. Concerningly, patients indicated that custody staff retaliated against them if they submitted complaints by not allowing them to leave their cells for mental health appointments and medication passes.

An observed EOP hub QIT meeting was attended by an associate warden, captain, two primary clinicians, two correctional counselors, and the psych tech supervisor. The meeting demonstrated collaboration and included all participants' active participation. Addressed issues included bed space, offered treatment, and factors impacting data reporting compliance. The team also discussed some individual patients, and safety protocols between clinicians and custody given the recent assault on a psychiatrist in the EOP hub. The meeting demonstrated an open approach to problem-solving and addressing program issues.

Required staff attended two initial and eight subsequent ICCs. Three patients had been placed in restricted housing for safety concerns, one patient was placed there due to a PREA violation, and six other patients were pending RVR review. The ICC released three patients from restricted housing following completion of investigations but retained the remaining seven patients pending further investigations into their safety concerns, RVRs, and the PREA violation. Of the seven patients retained, the ICC recommended three patients' transfer to another facility. Three retained patients were assigned NDS status.

Two weeks of 114-As were each reviewed for ten patients. This review determined that all patients who required initial ICCs received them timely. All patients were also offered three weekly showers, weekly linen exchanges, and an average of 13 hours of weekly yard. Although the 114-As did not indicate whether patients' made telephone calls, a provided phone call log revealed the offering of telephone calls to patients.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their EOP hub stays.

All 18 patients who required initial psychiatry evaluations had timely contacts before the initial IDTT. Sixty-one percent were conducted confidentially. Reasons for non-confidential contacts included patient refusals. Telepsychiatry was not used for any initial psychiatry assessments.

Nineteen of 23 or 83 percent of routine psychiatry contacts timely occurred at least every 30 calendar days. Only 36 percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. No routine psychiatry contacts utilized telepsychiatry.

All 18 patients who required initial primary clinician evaluations had timely contacts before the initial IDTT. Only 44 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and modified programming requiring cell-front assessments.

Twenty-five of 31 or 81 percent of patients had required routine primary clinician contacts at least every seven calendar days. Only 34 percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, staffing shortages, and modified programming requiring cell-front appointments.

Seventeen of 18 or 94 percent of initial IDTTs timely occurred within 14 calendar days of admission. All required staff attended initial IDTTs; patients attended 56 percent.

Four of five or 80 percent of patients had timely routine IDTTs every 90 calendar days. Required staff and 80 percent of patients attended all reviewed routine IDTTs.

<u>STRH</u>:

During the review period, the STRH admitted 372 patients for a total of 532 stays. Stays averaged 37 days and ranged from one to 334 days.

All STRH psychiatrists had caseloads within the established ratio, but all primary clinicians' caseloads exceeded the applicable ratio.

During the review period, STRH patients received a total of 1,489 primary clinician contacts; most occurred in non-confidential settings, of which 70 percent occurred at cell front. There were also 375 psychiatry contacts; 43 percent were non-confidential.

Required staff attended 11 observed IDTTs. The IDTT room was a confidential, comfortable space with a closed door. Except for the psych tech, all participants had computer access. Two of the IDTTs were nearly adequate, but lacked collaborative discussion, and discussion of functional impairments. All of the remaining IDTTs were inadequate.

The covering primary clinician covered the first five IDTTs. Regrettably, they reflected minimal effort and engagement by the primary clinician and the treatment team. Each of these IDTTs took between five and ten minutes and lacked collaborative discussion, individualized goals or interventions, case conceptualizations, treatment progress or barriers, and discussion of diagnostic agreement. In actuality, all of these IDTTs resembled a team "check-in" rather than a treatment team meeting that addressed patient treatment.

A primary clinician who presented his own caseloads facilitated the remaining six IDTTs. This primary clinician was generally adequate in his role, but overall, the IDTTs continued to lack several Program Guide requirements. The psych tech also did not provide any meaningful contribution during any of the IDTTs. When asked for his feedback about each patient, he provided a two thumbs up gesture regardless of patients' actual presentation.

The group schedule identified the scheduling of between 12 and 15 weekly groups. However, the actual groups did not consistently align with the schedule as they were often cancelled or severely delayed by custody-related difficulties with patient movement.

All STRH groups were facilitated by the same recreation therapists who developed the curriculum and group offerings. Group topics included mood management, anger management, coping skills, AA, and CBT-focused groups. Unfortunately, the monitor's expert was unable to observe STRH groups, which was primarily due to custody staffing shortages negatively impacting patient movement. On two separate days during the site visit, the monitor's expert waited 30 minutes beyond the scheduled group start time before exiting the unit.

Four of five STRH patients interviewed at cell front reported receiving weekly primary clinician contacts and being offered at least one weekly group. They generally had no complaints about mental health treatment, and reported that the recreation therapist provided in-cell activities. However, one patient opined that clinicians did not really care about or invest their time in treating patients, further reporting that he hoped to transfer to another facility.

Reviewed 114-As for two weeks each for ten patients revealed compliance for ICCs' occurring within ten days of patient arrival, and for weekly linen exchanges. However, the review also reflected noncompliance for the weekly offering of yard and showers; 18.5 hours of yard was only offered for nine of 20 or 45 percent of reviewed weeks, while three weekly showers were only offered for 13 of 20 or 65 percent of the weeks.

All required staff attended seven STRH ICCs. The ICCs were generally collaborative, and attending participants' exhibited familiarity with patients. Addressed issues included current and past mental health concerns, the reasons for patients' placement in restricted housing and how they could return to the general population, and whether patients' understood the ICC

proceedings. Unfortunately, the CC II began each ICC by reading each patient's disciplinary history and classification in an extremely fast and convoluted nature. The monitor had trouble following the CC II; multiple participants expressed the same concern. On a positive note, after one patient left his ICC extremely upset due to its outcome, the senior psychologist immediately left the room to follow-up with the patient.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Ten of 13 or 77 percent of patients had a timely initial psychiatry evaluation before the initial IDTT. Forty percent were conducted confidentially. Reasons for non-confidentially included patient refusals, unavailable custody escorts, and cell-front contacts. None utilized telepsychiatry.

Five of six or 83 percent of routine psychiatry contacts timely occurred every 90 days. Fifty-four percent were confidential. Reasons for non-confidentiality included patient refusals. None were conducted utilizing telepsychiatry.

Nine of ten or 90 percent of initial primary clinician evaluations occurred within ten working days of arrival and before the initial IDTT. Fifty-six were conducted confidentially. Reasons for non-confidentiality included patient refusals and cell-front contacts. Telehealth did not conduct any initial psychiatry assessments.

Fifteen of 40 or 38 percent of routine primary clinician contacts timely occurred every seven calendar days. Forty-seven percent occurred in confidential settings. Reasons for non-confidentiality included patient refusals, cell-front contacts, and medical restrictions. Telehealth did not conduct any routine primary clinician contacts.

Eleven of 20 or 55 percent of initial IDTTs timely occurred within 14 working days of patient arrival. Required staff attended all initial IDTTs; patients attended 73 percent. Reasons initial IDTTs were held *in absentia* included patient refusals, while one patient was unable to attend due to his housing placement being on another yard.

No patients required routine IDTTs.

Non-Disciplinary Segregation:

During the review period, there were 13 EOP and four 3CMS NDS patients. During the site visit, there was one EOP and one 3CMS NDS patient.

MHCB:

CSP/LAC's MHCB had 12 beds and the CTC had four medical beds.

The MHCB was generally well staffed with one full-time psychiatrist, one part-time psychiatrist, and another psychiatrist who provided weekend coverage. One of two psychiatrists had caseloads within the established ratio. Four primary clinicians who provided coverage in the MHCB and for alternative housing all had caseloads within the applicable ratio. The MHCB also had an assigned recreation therapist.

CSP/LAC did not provide the MHCB's average daily census during the review period. However, MHCB stays averaged ten days and ranged from one to 135 days. Twenty-eight patients' stays exceeded ten days.

While touring the MHCB, the monitor's expert observed that all seven MHCB patients had outdated observation and allowable item orders posted on their cell doors. Three of the postings had not been updated in three days, two orders had not been updated in two days, and the remaining two were beyond 24 hours. One MHCB door posting from three days prior stated that 1:1 suicide watch was required; however, no observer was present, and nursing had not

addressed this issue during rounds. In response to the monitor's expert's inquiry, nursing staff confirmed that there was no active suicide watch order in the electronic healthcare record for this patient.

MHCB staff and patients confirmed that providers offered confidential out-of-cell contacts. One interviewed psychiatrist reported recently increasing the length of contacts with MHCB patients in order to provide more therapeutic services beyond medication management due to MHCB clinicians' being routinely pulled from the unit to respond to crises, alternative housing assessments, and HCPOP coordination issues. It was further reported that, in addition to offering recreation therapy services on the yard, the unit had recently increased non-recreation therapy yard time for all CTC patients.

Required staff attended five observed IDTTs. Participants had laptops to access patient information. While all participants contributed meaningful information, there was inconsistent collaboration about next steps in care. As such, only one of five of the IDTTs was adequate. Further, the IDTTs lacked relevant patient background information, HLOC indicators, retention and discharge rationales, appropriate attention to safety concerns, safety planning, and measurable treatment and discharge goals.

At one IDTT, a nurse stopped the primary clinician from exiting the IDTT to inquire about the patient's level of care plan. The primary clinician responded that the patient would be discharged, despite a lack of relevant discussion during the IDTT. It was unclear whether the patient was clinically ready for discharge, whether the treatment team agreed on discharge and had informed the patient, and whether the discharge level of care would be EOP or 3CMS.

For another patient, the primary clinician and counselor repeatedly ignored the patient's statements about life-threatening safety concerns and plans to self-harm if discharged. The

primary clinician eventually responded that safety concerns were not a mental health issue, while the counselor remained silent. The patient ultimately asked the monitor's expert to intervene and requested that the IDTT follow its own policy regarding safety concerns. This prompted the counselor to ask the primary clinician whether the sergeant had interviewed the patient, and the primary clinician agreed to initiate this process.

Interviewed MHCB providers confirmed that custody staff generally followed their recommendations about cuffing during escort for non-maximum custody patients. Observation indicated that only maximum custody patients were escorted in handcuffs, and the mechanical restraints were promptly removed upon placement in a locked TTM.

Reviewed 114-As for MHCB patients indicated that they were offered adequate out-of-cell time, showers, and weekly phone calls.

Twenty charts were selected for review for compliance with Program Guide timeframes in the MHCB.

All 20 or 100 percent of MHCB patients had timely required initial psychiatry evaluations before the initial IDTT and within 24 hours of patient admission. Sixty-five percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and COVID-19 isolation. Telepsychiatry was not used for initial psychiatry assessments.

Eighty-four of 87 or 97 percent of required twice weekly routine psychiatry contacts timely occurred. Twenty-two percent were conducted in confidential settings. Reasons for non-confidentiality included unknown appointments, patient refusals, and the lack of custody escorts. Telepsychiatry was not utilized.

All 20 or 100 percent of required initial primary clinician evaluations timely occurred within 24 hours of patient admission. Five percent were conducted in confidential settings.

Reasons for non-confidentiality included custody related reasons and patient refusals. Telehealth was not used for initial primary clinician assessments.

For routine primary clinician contacts, 50 of 52 or 96 percent timely occurred. Seventeen percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals. Telehealth was not used.

Nineteen of 20 or 95 percent of initial IDTTs timely occurred within 72 hours of patients' admission. Required staff attended 100 percent of initial IDTTs; patients attended 95 percent.

Forty of 41 or 98 percent of routine IDTTs timely occurred every seven calendar days. Required staff attended 100 percent of routine IDTTs; patients attended 93 percent.

Seclusion and Restraint:

CSP/LAC reported one seclusion incident that lasted less than four hours. There were no restraint episodes.

Crisis Intervention Team:

During the review period, CSP/LAC had an active CIT that responded to crises seven days weekly. There were 573 CIT activations. The large number of CIT activations resulted in the high utilization of already limited mental health, custody, and nursing staff resources.

Although necessary, CSP/LAC was unable to dedicate resources to investigate the high number of CIT activations. Interviewed staff opined several reasons for so many CIT activations. These reasons included the lack of timely and adequate mental health care, patients' use of the CIT to quickly address their mental health and custody needs, and increased violence leading to serious safety concerns on Facility D, which was the EOP yard.

Alternative Housing:

CSP/LAC's LOP was revised in April 2023 and was compliant with headquarters' directive on alternative housing placement. The LOP identified the location of alternative housing cells, which included Facility D-4, and the EOP hub and hub overflow units.

The institution also highly utilized alternative housing during the review period, reporting 1,656 placements, which was almost four times more than what was reported for the prior review period. There was a monthly average of 235 alternative housing placements, with a range of 205 to 276 monthly placements. Stays averaged six hours; three exceeded 24 hours.

The high number of alternative housing placements resulted in the redirection of staff, negatively impacting escorting, yard and dayroom offerings, medication administration wait times, mental health treatment, and other operations. Nursing and custody officers also spent a considerable amount of time providing suicide watch for the high volume of alternative housing patients. An EOP primary clinician assigned to alternative housing reported being overwhelmed with the number of alternative housing placements and the magnitude of alternative housing caseloads, further indicating being unable to spend adequate time with patients.

Regrettably, CSP/LAC did not have the resources to identify the reasons for the significant number of alternative housing admissions, but staff opined that they were most likely the result of insufficient mental health treatment.

EOP:

EOP patients were housed on Facility D. Lower functioning EOP patients were housed on D-1 and D-2, where an activities of daily living group assisted them with self-care. EOP patients with behavioral issues resided on D-3 and D-4. During the site visit, no EOP patients were housed in overflow housing.

The caseloads of psychiatrists and primary clinician assigned to the EOP program exceeded established ratios.  This insufficient staffing, and high staff turnover, seriously impacted continuity of care in the EOP program, while unlicensed clinicians' who required training and clinical supervision created an additional stressor on supervisory resources.  Staff reported the further disruption of EOP programming by staffing shortages that arose in restricted housing, resulting in the redirection of EOP staff to cover programming in STRH and the EOP hub.

During the site visit, the monitor's expert observed that the EOP program was barely being held together by the dedicated mental health staff.  Despite reporting fears for their safety and burn out, staff continued to show up for work based on their investment in the patient population and their peers.

Staff indicated that weekly primary clinician contacts alternated between caseload groups and individual contacts, as permitted by the Program Guide.  Due to staffing shortages, only initial IDTTs were scheduled and routine IDTTs were tabled for an additional 90 days, and thus were held every six months.  Exceptions to delayed routine IDTTs were DDP patients, patients on EOP modified programming, and suicide risk management patients.

Supervisory staff were aware of the proposal to implement telehealth for primary clinicians and reported that social worker interviews had already begun.  However, they further reported that telehealth would not work for the EOP population, identifying the lack of custody escorts for patients and the lack of office space for telehealth providers.

CSP/LAC offered EOP patients a weekly average of 12.91 hours of structured treatment.  Patients' attended a weekly average of 5.18 hours and refused an average of 7.73 hours.  During the reporting period, the were also 43 EOP patients on modified programming.  Notably,

leadership reported that patients frequently missed appointments due to custody staff not opening patient cell doors.

During the site visit, IDTTs were frequently delayed and were extended for up to 30 minutes.  This was primarily attributed to custody staffing shortages, which impacted activities prior to IDTT, such as medication distribution and morning meals.  Nonetheless, required staff attended timely despite IDTT delays, resulting in the inefficient use of staff time.

Fourteen observed IDTTs led by different primary clinicians were all inadequate.  This was primarily due to clinician inexperience despite mentoring by the EOP supervisor.  Suggestions for ways to improve case formulations and treatment planning were discussed with supervisory staff, who were receptive.  However, staff noted that with staffing shortages, their time had been focused on redirecting staff and managing program coverage instead of supervision of treatment quality.

During observed IDTTs, pertinent clinical information including relevant psychosocial history, case conceptualization, and functional impairments were not discussed.  Diagnoses were stated but symptoms and functional impairment to support diagnoses were not discussed; at times, diagnostic clarification was needed.  Symptoms, such as anxiety or depression, were discussed as areas of treatment focus, but specific treatment goals and corresponding interventions to achieve them were rarely discussed.  In some cases, identified treatment needs such as those related to substance use, discharge planning, and treatment nonadherence were not considered as IPOCs.  Safety concerns were also not addressed.

Most observed IDTTs continued the EOP level of care except for one patient who was referred to a higher level of care.  However, rationales for recommended levels of care were not discussed for any patient.  Higher level of care indicators were stated but not conceptualized as

part of patients' overall functioning and in relation to mental illness, functioning, and treatment needs.

IDTT discussion was not collaborative. The primary clinician and supervisor were nonetheless actively engaged with patients; psychiatry input varied but was generally limited to medication concerns. The participation of various correctional counselors was minimal. Some officers' participation ranged from disruptive acts to inattention; one of the correctional counselor's eyes' were closed and he appeared to be sleeping.

Most group programming was recreational in nature, and, except for primary clinician caseload groups, there were no clinical groups. During the site visit, daily provided data indicated group cancellations due to heat-related reasons or provider unavailability. There were also last-minute group cancellations. For non-cancelled groups, numerous provider changes added to continuity of care challenges. Regrettably, during the site visit, almost half of 40 daily scheduled groups were cancelled, which was comparable to cancellation data for the reporting period.

Recreation therapists and patients reported that groups conducted in the visiting room were large and attended by between 40 and 50 patients each. The groups' large size impacted clinical utility, resulting in patients' engaging in self-guided activities such as playing cards.

Three observed primary clinician caseload groups had a clinical focus. While patients preferred these groups over recreation groups due to the ability to learn skills, they were not preferred over weekly individual contacts. Observed topics ranged from a module from a depression workbook, tenets of cognitive behavior therapy, and relapse prevention with related written materials distributed to group members. Clinicians' had good rapport with patients, who were attentive.

Interviewed patients reported that when treatment occurred, it was helpful.  They also reported wanting more clinically focused groups, including treatment for PTSD.  They reported receiving ducats for appointments but added that they were not consistently released for them. Leadership confirmed that this was a known issue and that it was more likely to occur on Facility D.

Interviewed patients also reported concerns about telehealth's use for primary clinician contacts.  In this regard, they stated that they would not feel as comfortable using telehealth for individual treatment, which was when they discussed their most private thoughts and feelings. As such, they reported that their discomfort with telehealth would negatively impact their ability to self-disclose.  By comparison, psychiatry contacts typically only focused on symptoms and medication management, so they were not as concerned with the use of telepsychiatry.  Patients also reported that implementation of body worn cameras had helped to reduce custody officer misconduct.

Twenty patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their EOP stays.

All ten patients had required initial psychiatry evaluations before the initial IDTT and within 14 calendar days of arrival or a level of care change.  Eighty percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals.  Telepsychiatry did not conduct any initial psychiatry assessments.

Fifty-five of 81 or 68 percent of routine psychiatry contacts timely occurred at least every 30 calendar days.  Sixty-eight percent were conducted in confidential settings.  Reasons for non-confidentiality included patient refusals and modified programming.  Telepsychiatry was not utilized for routine psychiatry contacts.

All ten initial primary clinician evaluations timely occurred within 14 calendar days of patient arrival or a change in the level of care. Seventy percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and modified programming. No initial PC assessments utilized telehealth.

Eighty-six of 110 or 78 percent of routine primary clinician contacts timely occurred at least every seven calendar days. Forty-four percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and modified programming. No routine primary clinician contacts were conducted utilizing telehealth.

All three initial IDTTs timely occurred within 14 calendar days of patient arrival or a level of care change. Required staff attend 100 percent; patients attended 80 percent. Reasons initial IDTTs were held *in absentia* included patient refusal.

Twenty-five of 28 or 89 percent of routine IDTTs timely occurred every 90 calendar days. One hundred percent of required staff attended routine IDTTS; patients attended 63 percent. Reasons routine IDTTs were held *in absentia* included patient refusals and modified programming.

3CMS:

One of two psychiatrists and all three primary clinicians had caseloads exceeding established ratios.

The 3CMS supervisor reported that the daily triage of mental health needs was a challenge given the goal of determining which patients would and would not be seen by mental health. Routine IDTTs and routine primary clinician contacts were the lowest priority. Regrettably, some patients had not had a primary clinician contact in one year. Staff were reportedly tired, burnt out, and discouraged.

Five observed IDTTs were inadequate.  Required staff attended IDTTs but they were delayed by 30 minutes.  The primary clinician led the IDTTs and demonstrated good empathy with patients.  The psychiatrist and correctional counselor were also attentive and engaged, displaying professional interactions.  Despite these strengths, treatment team discussions lacked collaboration and the IDTTs did not reflect adequate treatment planning.  Specifically, relevant background information, symptoms, and functional impairments to support diagnoses and treatment planning were not sufficiently discussed.  Other necessary components of treatment planning such as treatment goals and interventions, rationales for level of care, and higher level of care indicators were infrequently discussed.

Seven interviewed patients typically reported delays in primary clinician contacts.  They also indicated that these contacts were often brief in nature and that they did not find them helpful.  Patients reported that on Facility B, primary clinician and psychiatry contacts were not confidential as the clinic door was left open; however, Facility C patients reported confidential provider contacts.  Many patients requested more individual treatment, as well as groups.  Patients reported variable out-of-cell time, noting that dayroom and yard cancellations typically occurred several times weekly due to custody staffing shortages, which mental health leadership confirmed.

Some 3CMS patients requested discharge from the 3CMS given the program's lack of treatment, and reported resorting to self-medication with drugs or alcohol to attempt to manage untreated symptoms.  Patients' also expressed mixed feelings about the potential use of telehealth; most preferred in-person contacts.

Staff reported frustration with the new requirement that patients who engaged in IEX behavior would not receive restricted housing time and would instead be placed in Privilege

Group C or "C" Status for these behaviors. They explained that there was no consequence for this assaultive and emotionally traumatizing behavior that impacted their engagement with offending patients, their overall feeling of safety, and staff retention. Most staff were not supportive of the plan to use telehealth, expressing both logistical and treatment efficacy concerns.

Twenty patients were randomly selected to have their healthcare records reviewed to assess their 3CMS stays.

Six of nine or 67 percent of initial psychiatry evaluations timely occurred before the initial IDTT. Sixty-seven percent were conducted in confidential settings. Telepsychiatry did not conduct any initial psychiatry evaluations.

Twenty-one of 26 or 81 percent of required routine psychiatry contacts timely occurred at least every 90 days. Seventy-one percent were conducted confidentially. Reasons for non-confidentiality included patient refusals. Telepsychiatry was not used for routine psychiatry contacts.

Six of eight or 75 percent of patients had timely initial primary clinician evaluations within ten working days of arrival or a level of care change. Seventy-five percent were conducted confidentially. Reasons for non-confidentiality included lack of confidential space and patient refusals. Telehealth did not conduct any initial primary clinician evaluations.

Eleven of 22 or 50 percent of routine primary clinician contacts timely occurred at least every 90 days. Eighty-two percent were conducted confidentially. Reasons for non-confidentiality included patient refusals and lack of confidential space. Telehealth was not used for routine primary clinician encounters.

Eight of ten or 80 percent of initial IDTTs timely occurred within 14 days of patient arrival or a level of care change. Required staff attended 100 percent; patients attended 70 percent.

Three of six or 50 percent of patients had timely required annual IDTTs. Required staff attended 100 percent; patients attended 50 percent.

Other Issues:

Pre-Release Planning:

Due to staffing shortages, CSP/LAC did not have a pre-release planning coordinator and full-time pre-release duties were not performed. Instead, the supervising psychiatric social worker and another social worker split some of the pre-release planning coordinator's responsibilities such as completion of Requests for Information and submission of transportation chronos. However, other pre-release planning activities, such as completion of the pre-release planning assessment, pre-release contacts and groups, and other services, did not occur. The pre-release planning LOP was also not current.

CSP/LAC further reported minimal TCMP services, which were not tracked, and a lack of housing assistance for released patients. The institution was also unable to report the number of patients who applied for a California identification card.

Program Access:

a. Job and Program Assignments

On June 1, 2023, CSP/LAC reported that 1,236 job assignments were held by 224 or 35 percent of EOP patients, 290 or 39 percent of 3CMS patients, and 722 or 58 percent of non-MHSDS incarcerated persons.

The 755 academic assignments were held by 65 or ten percent of EOP patients, 240 or 32 percent of 3CMS patients, and 450 or 36 percent of the non-MHSDS population.

The 126 vocational education assignments were held by 16 or two percent of EOP patients, 39 or five percent of 3CMS patients, and 71 or six percent of non-MHSDS incarcerated persons.

The 111 voluntary education assignments were held by three or one percent of EOP patients, 29 or four percent of 3CMS patients, and 79 or six percent of non-MHSDS incarcerated persons.

The 55 substance abuse treatment assignments were held by 20 or three percent of 3CMS patients, and 35 or three percent of non-MHSDS persons.  No EOP patients held these assignments.

b.  Milestone Credits

CSP/LAC was unable to report the number of patients who were eligible to earn milestone credits.  The institution nonetheless reported that 384 EOP and 42 3CMS patients, and three non-MHSDS incarcerated persons, earned the credit.

c.  Out-of-Level Housing

CSP/LAC reported that seven EOP and three 3CMS custody Level III and seven EOP and 31 3CMS custody Level IV patients were housed in Level II housing.  There were 35 EOP and 22 3CMS custody Level IV patients in Level III housing.  There were also 52 3CMS custody Level III patients in Level IV housing.

d.  ADA Reasonable Accommodation and Grievance Procedure

CSP/LAC provided a copy of the ADA reasonable accommodation operating procedure, but was unable to provide the CDCR Form 1824 reasonable accommodation request process

manual. The institution also could not confirm implementation of the revised ADA accommodations, grievance procedures, and appeals processes or training rosters or attendance sheets.

e. Periodic Classification Score Reductions: EOP Patients

CSP/LAC provided a randomized sample of completed CDCR Form 840s which reflected the provision of classification score reductions for EOP patients.

f. Unclothed Body Search

CSP/LAC provided several LOPs on unclothed body searches. Interviewed custody officers from the EOP hub and STRH explained that these searches were conducted prior to patients' exiting their cells and often before patients' reentered their cells. Unclothed body searches typically occurred at cell front, or in holding cells, showers, or TTMs. The officers' indicated that the searches were conducted to preserve patient privacy and that metal detectors assisted with the searches. Notably, while interviewed STRH custody officers emphasized the importance of privacy during body searches and indicated use of privacy screens when needed, they could not locate any privacy screens to show the monitor.

"C" Status:

During the review period, 57 patients were on "C" Status, including one MHCB and 37 3CMS patients, and 19 non-MHSDS incarcerated persons. Similar to the previous review period, the institution could not report lengths of stay on "C" Status.

Case-by-Case Reviews:

CSP/LAC reported that 58 patients met the criteria for 150-day case-by-case reviews. Review of case notes for patients retained in administrative segregation beyond 150 days indicated compliance with CDCR policy. Specifically, 40 patients were awaiting resolution of a

RVR and/or district attorney referral, 17 patients were not awaiting RVR resolution, and one patient had their RVR postponed. Further, eight patients were also pending transfer due to enemy concerns, three patients were pending transfer to their endorsed institutions, two patients each were pending temporary medical holds, CSR review, or were retained in maximum custody due to an active or projected SHU term, and one patient each was pending transfer due to safety concerns, awaiting ISU completion of a comprehensive safety concern, or was awaiting a DTP referral; the remaining patients were retained due to pending RVRs. Reviewed documentation also indicated that mental health staff believed that, in three cases, patients' mental illness contributed to the behavior that resulted in segregated housing placement.

CSP/LAC reported that it did not have a historical report indicating patients who required a 120-day pre-MERD review.

Mental Health Referrals:

During the reporting period, CSP/LAC made 3,553 mental health referrals; there were 737 referrals to psychiatry and 2,816 referrals to primary clinicians. There were 1,170 emergent referrals, 383 urgent referrals, and 2,000 routine referrals.

Overall, CSP/LAC reported noncompliance for timely responding to emergent, urgent, and routine referrals to psychiatry and primary clinicians. Specifically, neither emergent psychiatry referral and only 1,004 of 1,168 or 86 percent of emergent primary clinician referrals had timely responses. For urgent referrals, there were timely responses to only two of 82 or three percent of psychiatry referrals and to 256 of 301 or 85 percent of primary clinician referrals. Routine referrals also revealed noncompliance; there were timely responses to 503 of 653 of 77 percent of psychiatry referrals and to 757 of 1,347 or 56 percent of primary clinician referrals.

<u>Custody and Mental Health Partnership Plan</u>:

The institution's CMHPP LOP was compliant with statewide policy and had been revised in February 2023.

Executive leadership joint rounding occurred during five of six months of the review period and used the correct form.  The rounding did not occur during December 2022 due to the retirement of the warden and chief deputy warden.  Rounding documentation indicated required staff's attendance and the interview of staff and patients.  Staff frequently reported a positive working relationship between mental health and custody, but also reported concerns with custody and mental health staffing shortages.  Patients reported that custody and mental health staff were helpful and supportive.

CSP/LAC did not provide executive staff meeting agendas.  Quality management committee and mental health program subcommittee meeting minutes were provided for five of six months.  All reviewed QMC meeting minutes discussed rounding in detail, but only three months of subcommittee minutes referenced the rounding.

CSP/LAC provided huddle sheets for second and third watch from the EOP hub, MHCB, and EOP yards for all weeks of the review period.  Huddles sheets largely reflected required staff's attendance.

Required staff also attended observed EOP and STRH huddles, which utilized the required form.  The EOP huddle was collaborative and reflected all staff's participation. However, the STRH huddle was not collaborative, with mental health staff minimally participating and not demonstrating significant knowledge of discussed patients.

CSP/LAC conducted weekly 3CMS supervisory meetings during all but four weeks of the reporting period.  Required staff attended all meetings.  Agenda items included custody and mental health staffing shortages and individual patient concerns.

Reviewed documentation reflected the occurrence of monthly joint supervisory 3CMS program area tours with required staff in attendance.  Agenda items included new patient arrivals, staffing shortages, patient specific concerns, and patients occasionally not receiving ducats.

Due to custody and mental health staffing shortages, EOP orientation groups were only held during two months of the review period.  A licensed clinical social worker and a sergeant facilitated the groups, but no further pertinent documentation was provided.

CSP/LAC distributed the 3CMS orientation brochure to new patients.

IAC meeting minutes were provided for Facilities A, B, and C for most months of the review period; however, none of the facilities held IAC meetings during December 2022, Facility B did not produce minutes for March 2023, and Facility C did not hold an IAC meeting during April 2023.  The IAC meetings' addressed mental health issues; mental health staff attended most IAC meetings.

Patients filed 562 staff misconduct complaints during the review period, but CSP/LAC did not specify whether the complaints were filed against mental health, custody, or medical staff.  Only 69 percent of complaints were approved for closure.  All misconduct investigations were initiated through the appeal process.  No mental health staff were reassigned due to a staff misconduct complaint.

The institution provided quarterly round table training and provided sign-in sheets for training attendance.  Unfortunately, CSP/LAC did not track employees who did not complete the training so compliance could not be assessed.

CSP/LAC reported that 133 of 199 or 67 percent of required mental health staff and 772 of 817 or 94 percent of custody staff attended the annual partnership off-post training.

Heat Plan:

CSP/LAC's heat plan LOP was current and complied with CDCR policy; it was last revised in May 2023.  The heat plan was only in effect during May 2023 of the review period, when there were ten Stage I heat alerts, but no Stage II or Stage III heat alerts.  No patients experienced heat-related illness during the review period.

Interviewed officers from Facilities A, B, C, and D, and the MHCB and STRH, demonstrated varying knowledge of the heat plan.  For example, multiple interviewed officers on Facilities A, C, and D yard were unaware of the heat plan's three stages.  On Facility A-4 and the MHCB, interviewed officers did not know that the list of patients who were prescribed heat-sensitive medications was updated daily.

Furthermore, officers in Facility B-2 relied on a broken wall-mounted thermometer to record the housing unit's temperature.  In that unit, this thermometer indicated approximately 69/70 degrees Fahrenheit, but the unit was considerably hotter, and the monitor and several custody officers were sweating profusely, indicating that the thermometer was inaccurate and that the recorded temperatures were erroneous.  Further, all recorded temperatures during the week of the site visit were either 69 or 70 degrees Fahrenheit.

The monitor addressed this thermometer issue with Facility B custody officers and the regional lieutenants during the site visit.  One custody officer stated that a work order had been

placed to fix the thermometer and there would be follow-up. The following day, the chief deputy warden reported being aware of this issue and that he would personally handle it. Alarmingly, as of several days after the site visit, reviewed temperature logs from Facility B-2 still indicated a temperature of 69/70 degrees Fahrenheit and that the thermometer had yet to be fixed.

The annual mandatory heat-related pathologies training was attended by all correctional administrators, captains, lieutenants, the CC I supervisor, CC Is, CC IIs, and CC IIIs, and 30 of 31 sergeants and 290 of 298 correctional officers. All required mental health and nursing staff also completed the training.

RVRs:

CSP/LAC issued 3,630 RVRs during the review period, of which 2,691 or 74 percent were issued to MHSDS patients and 939 or 26 percent were issued to non-MHSDS patients. Two RVRs were issued to acute care patients, 17 to intermediate care patients, 120 to MHCB patients, 1,206 to EOP patients, and 1,346 to 3CMS patients.

The monitor reviewed 29 RVRs to assess compliance with CDCR policy. Twenty-two patients were assigned a staff assistant. Custody staff timely referred the mental health assessment to mental health in 19 of 29 or 66 percent of cases. Mental health staff timely completed and returned the assessment to custody in seven of 29 or 24 percent of cases. Patients were confidentially interviewed for the mental health assessment in eight of 29, or 28 percent of reviewed cases. The SHO documented consideration of the mental health assessment in all 29 reviewed cases and mitigated the penalty in 25 of 28 or 89 percent of instances where the clinician recommended mitigation.

In one of the reviewed RVRs, the mental health assessment indicated that the patient's mental illness "strongly influenced" the behavior documented in the RVR. The assessment

stated that the patient's mental health symptoms stemmed from acute substance abuse, which contributed to the patient's alleged behavior.  The clinician opined that the patient had the ability to understand the rules of an appropriate prison setting and to know that there were consequences for such behavior.  The clinician nonetheless recommended mitigation of access to yard and the telephone.  The reviewing lieutenant found the patient guilty as charged, indicating that the patient willfully and unlawfully committed an assault or battery on another individual and was subject to an RVR.

CSP/LAC did not provide mental health assessment training documentation for custody staff.  For mental health, one of three chief psychiatrists/psychologists attended the training, as did all five senior psychologists and five social workers.  Five of seven supervisors also attended the training, as did 19 of 26 psychologists.  None of the 12 psychiatrists attended the training.  Ten of 13 mental health staff with other positions also attended the training.

Use of Force:

CSP/LAC reported 11 controlled and 490 immediate use of force incidents.  All 11 controlled and 433 or 88 percent of immediate uses of force involved MHSDS patients.

Concerningly, all the controlled use of force incidents were still open; none had been closed prior to the site visit, even though some incidents dated as far back as December 2022.  As such, CSP/LAC was unable to produce incident reports for any of the controlled uses of force, but indicated that they all stemmed from cell extractions.  The use of force coordinator attributed the backlog of use of force reviews to ongoing staffing shortages.

Despite not being able to review the incident reports, the monitor reviewed video footage for four of the controlled uses of force.  In three of four viewed incidents, the patient was adequately warned prior to the use of OC spray and physical force to extract the patient from his

cell, and the use of force was appropriate. However, during the fourth incident, the viewed footage did not indicate the patient being taken outside for decontamination after the use of OC spray. Accordingly, the appropriateness of this use of force could not be adequately determined.

The monitor reviewed 18 immediate use of force incidents involving MHSDS patients as well as body worn camera footage from seven of the 18 incidents. This review revealed compliance with CDCR policy and the appropriate use of force in each case.

CSP/LAC reported that 749 of 789 or 95 percent of custody staff and 175 of 195 or 90 percent of mental health staff attended the mandatory use of force training.

Lockdowns/Modified Programs:

CSP/LAC reported no program lockdowns or modified programming during the reporting period. The chief deputy warden indicated that CSP/LAC was committed to resolving issues within 24 hours, thus negating the need for modified programming or PSRs.

Access to Care:

A review of monthly Health Care Access Quality reports from December 2022 through May 2023 reflected the issuance of 220,664 mental health ducats and add-on appointments, of which 82,194 or 37 percent were completed, and 138,470 or 63 percent were not completed. Of the non-completed appointments, three percent were due to custody factors, 57 percent were due to non-custody factors, and 40 percent were due to patient refusals.

*Coleman* Postings:

There were current *Coleman* posters in English and Spanish in all visited housing units.

# APPENDIX C

# CLINICAL CASE REVIEWS

**APPENDIX C-1**
**Richard J. Donovan Correctional Facility (RJD)**
**April 11, 2023 – April 14, 2023**

**Patient A**

This MHCB patient was provided a diagnosis of schizoaffective disorder, bipolar type. He was referred to the MHCB on March 28, 2023 for his third MHCB admission since December 2022, after it was determined that he posed a danger to others due to mental illness. The patient received his psychotropic medications by a PC 2602 order due to grave disability and danger to others.

The initial psychiatric assessment occurred on March 28, 2023. Medication management was appropriate at that visit. Subsequent psychiatric clinical contacts occurred on March 29, March 31, April 2, April 5, April 8, and April 9, 2023.

The initial primary clinician note was dated March 29, 2023; at that time, the patient was described as exhibiting manic symptoms. This note included very useful documentation of current symptomatology. This documentation indicated that nonadherence with psychotropic medications was directly related to many of the patient's psychiatric symptoms. Subsequent primary clinician contacts occurred on March 29, April 1, April 4, April 6, April 7, April 10, and April 11, 2023.

The master treatment plan was dated March 29, 2023. The plan was to clinically stabilize the patient and to consider referral to a higher level of care if clinical stabilization did not occur. The treatment plan was reviewed on April 3, 2023. It appeared that a referral to acute care occurred on April 3, 2023.

An April 3, 2023, a recreation therapy note indicated that the patient was offered access to the recreation yard. An April 6, 2023 progress note documented participation in a 30 minute recreation therapy activity.

A SRASHE was documented.

**Findings**

The care provided to this patient in the MHCB appeared to be clinically appropriate. The referral to a higher level of care for acute care was also appropriate.

**Patient B**

This 68-year-old transgender female patient was referred to the MHCB on April 7, 2023 due to self-injurious behavior. The primary clinician admission note on April 7, 2023 was comprehensive. She was provided diagnoses of adjustment disorder and borderline personality disorder.

The April 8, 2023 psychiatric admission note indicated that the patient, who had been incarcerated for over 49 years, had become overwhelmed with her pending release from prison. Information obtained from staff indicated that the patient had recently been re-sentenced, which resulted in her unexpected release within five days of re-sentencing. The current focus of MHCB treatment was the rapid development of a discharge plan for this patient.

She was again seen by the psychiatrist on April 10, 2023.

The expert attended the patient's IDTT on April 12, 2023. The staff performed a herculean effort in developing a discharge plan for the patient, which was expected to be implemented on the day of the IDTT. The patient was greatly appreciative of the IDTT assistance.

**Findings**

The care provided to this MHCB patient was excellent, and it included a comprehensive discharge plan. It was, however, very likely that her transition back to the community would be extremely difficult due to the unexpected timing of her release.

This case raised concerns and the need for specific interventions that would likely arise with patient re-sentencing precipitated by a judicial review of the original sentence related to the three strikes law.

**Patient C**

This patient was referred to the MHCB on March 28, 2023 due to the presence of psychotic symptoms and after swallowing a foreign object. He was provided diagnoses of substance use disorder and unspecified depressive disorder.

A SRASHE was documented.

The March 29, 2023 primary clinician admission note was comprehensive in content. Subsequent primary clinician contacts occurred on March 31, April 3, April 5, April 7, and April 8, 2023.

The psychiatric admission note documented the presence of delusional thinking. Subsequent psychiatric contacts occurred on March 30, March 31, April 1, and April 2, 2023. On April 3, 2023, an emergent PC 2602 order was completed. The patient was also seen on April 4, 2023, when he was provided with a diagnosis of schizophrenia. He was also seen for psychiatric assessment on April 6, and April 9, 2023.

The master treatment plan was completed on March 29, 2023 and was reviewed on April 7, 2023 when the patient was referred to the acute level of care.

Recreation therapy was provided on April 5, 2023.

The expert observed the patient's IDTT on April 14, 2023. At that time, the patient was treated

with Haldol due to his PC 2602 status, and he exhibited marked improvement. His presentation was consistent with the diagnosis of schizophrenia. The patient was very appreciative of involuntary psychotropic medication treatment due to his significant clinical response and improvement.

**Findings**

The care provided to this MHCB patient appeared to be clinically appropriate. The referral to a higher level of care for acute care was also appropriate.

**Patient D**

This patient was referred to the MHCB on April 6, 2023 due to the presence of delusional thinking. The primary clinician and the psychiatrist completed admission assessments on the following day. The patient had a very recent history of a drug overdose, which appeared not to have been a suicide attempt. He was provided with a diagnosis of psychosis.

The master treatment plan was completed on April 7, 2023.

The April 9, 2023 psychiatric progress note indicated that psychotropic medications were currently not indicated because the patient's symptoms were likely due to an accidental overdose of methamphetamine and heroin. Issues related to the events leading to this accidental overdose were discussed with the primary clinician on April 10, 2023.

**Findings**

The care provided to this MHCB patient appeared to be clinically appropriate.

**Patient E**

This patient was referred to the MHCB on March 26, 2023, after reporting that he had been snorting fentanyl in a suicide attempt.

His master treatment plan was completed on March 27, 2023 and was reviewed on April 4, 2023. He was provided diagnoses of substance use disorder and unspecified depressive disorder. The psychiatric and primary clinician admission assessments were completed on the same day.

A SRASHE was completed on March 27, 2023.

Subsequent primary clinician contacts occurred on March 28, March 31, April 3, April 4, April 6, April 10, and April 11, 2023. Subsequent psychiatric clinical contacts occurred on March 30, April 1, April 2, April 4, April 5, April 7, April 8, April 9, and April 11, 2023.

The patient was referred for acute care on April 4, 2023.

**Findings**

The care provided to this MHCB patient appeared to be clinically appropriate.

**Patient F**

The monitor's expert observed this patient during a primary clinician EOP check-in group. The patient complained about his placement on a PC 2602 order and requested another primary clinician.

The patient's healthcare record was reviewed. On April 12, 2023, a primary clinician progress note indicated that the patient had refused individual sessions with his clinician for eight consecutive weeks. He did not report any mental health concerns, and reportedly presented with a strong sense of entitlement and poor boundaries with his providers. He was included in the suicide risk management program due to recent discharge from a higher level of care; he had recently been discharged from the CMF-PIP intermediate care facility (ICF), where it was suspected that his initial admission was precipitated by gambling debts.

The patient was provided diagnoses of antisocial personality disorder, schizoaffective disorder, bipolar disorder, and polysubstance use disorder.

The March 13, 2023 discharge summary stated "[Patient F] is on PC 2602 for DTS/O. Expires 3/29/23… Patient did well on low dose of medications and did not display any manic symptoms. Future providers: be ready for patient's demand for single cell and [Developmental Disability Program] DDP eval. Primary presentation is antisocial personality disorder. Set firm boundaries and be consistent. Monitor for stress around medical/court issues. Patient does believe that he will be released from prison."

The healthcare record indicated that the patient left the CMF-PIP acute care for court during June 2022, and returned to CMF in December 2022. Prior to leaving the CMF-PIP, he was prescribed Effexor, which was resumed upon his return in December 2022. The patient had previously been treated with Geodon several years ago. He also had a history of assaultive behavior and exhibitionism. He was admitted to the CMF-PIP on January 27, 2022 due to danger to self. He was administratively discharged from July 11, 2022 until his return to the CMF-PIP on December 29, 2022. It appeared that he was subsequently transferred to RJD on March 14, 2023.

The psychiatrist was in the process of renewal of the PC 2602.

A master treatment plan was developed at RJD on March 30, 2023. The patient was not present at the IDTT due to modified programming related to custody issues.

The patient was seen by the psychiatrist on April 3, 2023 in a nonconfidential setting due to modified programming related to custody issues. At that assessment, he was provided diagnoses of unspecified mood disorder, schizoaffective disorder (by history), polysubstance use disorder, and antisocial personality disorder.

**Findings**

The care provided to this patient appeared to be clinically appropriate.  Since his transfer to RJD, the frequency of clinical contacts were consistent with Program Guide requirements.  The patient clearly presented the staff with significant challenges, and those issues appeared to have been addressed in the master treatment plan.

**Patient G**

This patient was seen for an initial psychiatric assessment at RJD on September 8, 2022.  The psychiatrist determined that the patient did not require treatment with psychotropic medications and that follow-up with the psychiatrist would only occur at the patient's request.

The initial primary clinician assessment occurred on October 10, 2022, when it was determined that the patient did not meet the criteria for inclusion in the MHSDS.  The plan was for no further mental health follow-up.

An urgent primary clinician consult occurred on November 1, 2022, following a positive ASU screen.  The patient was to be seen again in one week for follow-up due to depressive symptoms, but he declined participation in the 3CMS program.  He was again seen in one week, and the plan was to see the patient again in two weeks at his request.  He was seen one week later by the primary clinician due to a staff referral.  At that time, the patient requested continued mental health treatment.  He was seen one week later at his request on an urgent basis due to anxiety. He was then transferred to RJD for continued mental health treatment.

The initial primary clinician assessment at RJD occurred on November 21, 2022.  He was provided a diagnosis of major depressive disorder, recurrent with psychotic features, and was included in the MHSDS at the 3CMS level of care.

For unclear reasons, the patient was not referred for a psychiatric evaluation.  The next primary clinician note was dated February 3, 2023.  At that time, he was provided diagnoses of unspecified depressive disorder, amphetamine type substance use disorder, and antisocial personality disorder.

The February 9, 2023 IDTT resulted in documentation of the master treatment plan.  The IDTT noted that the patient was asymptomatic and was not prescribed psychotropic medications.  The documentation indicated consideration of discharge from the 3CMS program soon.

On March 3, 2023, the patient requested discharge from the 3CMS program.  He was seen by a new primary clinician on March 21, 2023 after transfer to another yard.  He again requested removal from the MHSDS.

This patient was seen in an IDTT on April 13, 2023 after transfer from ASU to general population.  He remained asymptomatic and was discharged from the 3CMS program.

**Findings**

The care provided to this 3CMS patient appeared appropriate. It was likely that his prior diagnosis of major depressive disorder had resolved, which would account for the lack of psychiatric referral.

**Patient H**

The monitor's expert observed this patient's IDTT on April 13, 2023. Among his complaints were alleged inappropriate actions directed toward him by a housing correctional officer and an inmate working in the laundry selling to other inmates the "good" clothing and other inmates receiving less desirable clothing returns from the laundry. Staff confirmed that the correctional officer in question was known to be problematic, and this issue had been elevated up the chain of command with little results. The laundry issue was confirmed, as that inmate worker had subsequently been fired. The patient also reported an inability to obtain physician ordered glasses.

The healthcare record of this patient was reviewed. A September 1, 2022 master treatment plan indicated that the patient would remain at the 3CMS level of care due to symptoms of depression. He also met the criteria for a developmental disability designation of DD1. Spanish was his primary language.

He was seen by the psychiatrist on September 22, 2022, and Prozac and melatonin were increased at that visit. He was again seen by the psychiatrist on November 3, 2022, when his depression was assessed as mild. His medications were continued.

On November 29, 2022, the patient was again seen by the primary clinician when his clinical presentation was reportedly unchanged. He reported difficulty obtaining sunglasses that were needed due to photosensitivity.

The patient was seen by the crisis intervention team on December 22, 2022, when he reported difficulty obtaining sunglasses and new shoes and reported being upset with the system. He completed a 602 at that time.

At his January 23, 2023 primary clinician appointment, the patient was housed in the ASU due to COVID-19 isolation.

He was seen again by the psychiatrist on April 12, 2023, when his medications were continued, and was scheduled for follow-up in 90 days.

During his April 13, 2023 IDTT, the patient presented with numerous stressors and clearly was not functioning well. An interpreter was used throughout the IDTT. His level of care was changed to EOP at that IDTT.

**Findings**

The care provided to this 3CMS patient appeared appropriate. The increase in level of care to EOP was also clinically appropriate.

**Patient I**

This patient was seen by the psychiatrist on August 24, 2022, when he was provided with a diagnosis of unspecified anxiety. He was prescribed Vistaril, with planned follow-up in 90 days.

On October 16, 2022, the patient was assessed by a primary clinician after placement in alternative housing due to an apparent accidental overdose. He was cleared to return to his housing unit. Five-day follow-up was subsequently provided.

On October 19, 2022, he received a mental health assessment related to an RVR for distribution of a controlled substance. No mitigation was provided.

Another primary clinician assessment occurred on October 24, 2022, when an additional diagnosis of opioid use disorder was provided. An ISUDT screening occurred on October 26, 2022.

The patient was again seen by a psychiatrist on October 27, 2022, when treatment with Prozac was initiated and follow-up was planned in 90 days.

The master treatment plan was reviewed on November 1, 2022. Routine clinical contacts with the primary clinician occurred on November 3, November 9, and November 16, 2022, while the patient was housed in the ASU. On November 22, 2022, the patient transferred to the CSP/LAC STRH. He returned to RJD on January 23, 2023, and was assessed by a psychiatrist on February 2, 2023. He was seen for a primary clinician assessment on February 13, 2023.

**Findings**

The care provided to this 3CMS patient appeared appropriate.

**Patient K**

This patient's healthcare record was reviewed to assess the care provided at the RJD EOP. His EOP IDTT meeting was observed during the site visit. At the IDTT meeting, his level of care was decreased from the EOP to 3CMS; the patient disagreed with the decision and indicated that he had been "deteriorating" in the last several months. The PC acknowledged that the patient had many external stressors but stated that the patient had demonstrated adequate ability to cope. The psychiatrist reminded the patient that they discussed his anxiety; however, he was medication nonadherent, and the medications were discontinued. The patient reportedly was informed about the impending reduction in level of care during the prior IDTT meeting, with the subsequent focus of treatment on preparation for that change.

The patient was a participant in the ISUDT program and was prescribed naltrexone due to reported strong urges for opiates and alcohol. He also reported poor concentration, anhedonia, anergy, poor appetite, self-harm risk, and other symptoms of depression; the ISUDT physician appropriately referred the patient to mental health. The patient was seen timely for that routine consult.

The prior treatment plan dated January 17, 2023, noted that only the psychiatrist, PC, and CC I were present at the IDTT meeting. The treatment team occurred in absentia, as the patient refused to attend; this indicated that the treatment team could not have informed the patient regarding the decrease in level of care during that treatment team meeting. The treatment plan documented that the PC and the patient had noted areas of improvement; however, during the observed IDTT meeting on April 11, 2023, the patient clearly disagreed. He was provided diagnoses of alcohol use disorder, amphetamine-type substance use disorder, major depressive disorder, opioid use disorder, and unspecified anxiety disorder. The patient was not identified for consideration of referral to a higher level of care and was described as high functioning with ongoing stress due to incarceration and family issues. Multiple treatment goals were established for the patient's impulsive behavior and substance abuse; however, the treatment plan did not include sufficient evidence-based clinical interventions to address the identified treatment goals and impairments.

The patient was not seen weekly by the PC and was not seen timely for medication nonadherence by the psychiatrist. He was occasionally seen at cell front reportedly due to refusing to attend a confidential contact with both the PC and treating psychiatrist. The psychiatrist documented that the patient did not want to take medications and denied symptoms, so the medication was discontinued. The PC progress notes indicated that when they met, the PC and patient appeared to work primarily on establishing rapport and substance use related concerns.

**Findings**

The treatment provided to this RJD EOP patient was inadequate.

The treatment provided did not focus adequately on the patient's reported symptoms or his reduction in level of care. The treatment plan did not accurately address his anxiety, depression, and transition to the 3CMS program. The treatment plan also did not include adequate evidence-based clinical interventions, and the patient was also not seen timely. When he was scheduled for a confidential contact, the patient frequently refused, resulting in dayroom or cell-front contact. The documentation made it difficult to determine whether the patient met the criteria for EOP placement, and it appeared that he had multiple functional impairments resulting from serious mental illness that was exacerbated by substance use. There was also inadequate preparation for the transition from the EOP to the 3CMS level of care.

**Patient L**

This patient's healthcare record was reviewed to assess the care provided at the RJD EOP; he was interviewed during the monitoring visit in an EOP patient group and reported problems with receiving the appropriate medication. Specifically, the patient reported that he had been

prescribed Seroquel in the community which was effective; however, the treating psychiatrist did not request a release of information to access those healthcare records and did not prescribe Seroquel. Further discussion with the patient indicated that he was seen frequently by the psychiatrist regarding identification of an effective medication and his progress and medication side effects were closely monitored.

The problem/diagnosis section of the healthcare record provided a diagnosis of major depression; however, a December 1, 2022 psychiatric note provided a diagnosis of schizophrenia. He was prescribed mirtazapine, trazodone, hydroxyzine, and olanzapine. No consent for a release of information was in the healthcare record. During that visit, the psychiatrist noted that the patient had recently requested transgender hormone therapy. The psychiatric notes also indicated that the patient expressed frustration with being unable to obtain Seroquel; the note did not provide a rationale for not prescribing this medication.

On January 12, 2023, the patient was seen by a different psychiatrist who provided education regarding the process for receiving non-formulary medication. At that visit, Zyprexa was discontinued at the patient's request; the patient informed the psychiatrist that he would rather discontinue Zyprexa if he could not receive Seroquel.

The patient was seen by the treating psychiatrist on January 18, 2023, when he was informed that Seroquel was not recommended due to medical issues and risk to the patient. The patient became quite irritated; however, he ultimately agreed to treatment with Remeron and trazodone. The patient had sporadic adherence with prescribed psychotropic medications, with approximately 50 to 60 percent adherence. The documentation indicated that the patient was seen more frequently than minimally required and in accordance with medication changes and ongoing monitoring for effectiveness and adherence. The psychiatric contacts typically included repeated discussions with the patient regarding the rationale for not prescribing his preferred medication and the process necessary for non-formulary medications. Interdisciplinary progress notes suggested that the patient did not understand the risks posed by his preferred medication.

**Findings**

The care provided to this EOP patient was adequate.

The patient was adequately assessed by psychiatry. As the patient repeatedly stated his preference for the non-formulary medication Seroquel, he was educated about the process for non-formulary medications and that Seroquel was not recommended for him due to possible severe medication side effects. He was seen for timely and appropriate psychiatric contacts.

**Patient M**

This patient's healthcare record was reviewed to assess the care provided at the RJD EOP, and his IDTT meeting was observed during the monitoring visit. The patient was on EOP modified status. The patient received his psychotropic medications by a PC 2602 order due to danger to others, and he was reportedly medication adherent. He was described as isolative with poor hygiene and cell condition. He stated that his cell was unkempt to avoid being assigned a

roommate.  He reportedly made very little progress during his time in the EOP and appeared to be decompensating.  His modified treatment program consisted of one RT yard and weekly individual PC sessions.  He reportedly would leave his cell to sit in the dayroom with the PC but did not attend RT yard or IDTT meetings.

The treatment plans did not target the patient's lack of treatment engagement or poor insight, and specific evidence-based treatment interventions were not provided.  The treatment goals were ineffective, and the treatment plan was not modified over time despite its ineffectiveness.  During the observed IDTT meeting, the treatment team failed to discuss consideration of referral to a higher level of care; only objective referral consideration criteria were identified, such as participation in less than 50 percent of scheduled treatment in the last three months, when subjective criteria also applied.  The patient met other criteria for HLOC referral consideration, as he was unable to function at his current level of care due to a major mental illness, and he had chronic psychiatric symptoms that had not responded sufficiently to at least six months of treatment.  When the treatment team was queried during the IDTT meeting why they were not referring the patient to inpatient treatment, the team did not provide adequate concrete clinical rationale for non-referral.

The patient consistently refused confidential weekly clinical contacts and failed to attend RT yard for at least four months.  The inadequate clinical rationale for non-referral was copied from the prior month for each 30-day IDTT meeting.  RT yards were discontinued due to the patient's failure to attend.  No clinical justification for further reducing treatment opportunities was documented, even as the patient continued to decompensate.  Treatment modifications remained unchanged for each treatment team meeting, despite the lack of improvement and demonstrated ineffectiveness of the treatment.  It appeared that the treatment team failed to consider referral to a higher level of care because the patient was described at his clinical baseline, despite no documentation to support that assumption.

**Findings**

The care provided to this EOP patient was inadequate.

The patient's scheduled treatment was reduced due to his inability to attend; despite the staff acknowledging that his lack of attendance was due to his serious mental illness.  He was placed on modified programming, but his treatment plan was not adequately individualized and did not include evidence-based interventions.  Scheduled treatment was reduced to only 30 minutes of nonconfidential contacts weekly, with no treatment groups or other individual confidential contacts provided.  Unsurprisingly, the patient failed to improve with this inadequate treatment planning and minimal therapeutic activity provided.

The treatment team assumed that the patient was at his clinical baseline; however, no documentation was provided to support this assumption, and the patient should have been considered for referral to a higher level of care.  Due to concerns noted in the care provided to this patient, his case was discussed with the mental health supervisory staff.

**Patient N**

This patient's healthcare record was reviewed to assess the care provided at the RJD EOP, and his IDTT meeting was observed during the monitoring visit. The patient was provided diagnoses of major depressive disorder and opioid use disorder. He was prescribed Cogentin, mirtazapine, and Zyprexa, as well as Vistaril and olanzapine ordered PRN.

The patient was noted to meet objective criteria for consideration of referral to a higher level of care due to his ongoing failure to participate in at least 50 percent of treatment. The clinical rationale for nonreferral was inadequate; as it merely stated that the patient was psychiatrically stable with no evidence of decompensation, despite also documenting that the patient failed to engage with treatment, exhibited bizarre behavior including paranoia and hallucinations, and engaged in ongoing substance use. The patient was described as paranoid, believing that the correctional staff and inmates had killed his family and with plans to kill him.

The treatment team documented that the patient's depressive symptoms were likely the cause of his inability to attend all scheduled treatment activities, yet no change was made to the treatment modifications in the treatment plan and the higher level of care form to address that functional impairment as prior interventions had failed to produce change. Instead, the nonreferral rationale and treatment modifications were simply copied from one treatment plan to the next. Some adequate treatment interventions were included in the master treatment plan, but there was no documentation of such interventions in clinical contact notes; this was noteworthy, as the patient was frequently seen at cell front due to refusal to attend confidential sessions. The PC appeared to assign the patient's difficulties to his substance use, even when the PC documented that there was no objective evidence of such use. The patient was medication nonadherent, and he had poor attendance with group and individual treatment. The treatment plan was not appropriately updated to reflect treatment modifications; this was indicated given the patient's chronic psychiatric symptomatology and lack of improvement.

**Findings**

The care provided to this EOP patient was inadequate.

The treatment plan was not appropriately individualized and did not include adequate treatment goals. The treatment interventions listed in the treatment plan were not implemented during clinical contacts and were of diminishing adequacy as the patient decompensated because the treatment interventions and goals were inappropriate given the patient's significant lack of treatment adherence. The clinical interventions were dependent on the patient engaging with his treatment providers. As the patient failed to improve, the treatment team failed to consider referral to a higher level of care due to their perception that the patient was at his clinical baseline; although there was inadequate documentation to support that assumption. This patient met the criteria for a referral to a higher level of care and should have been referred. The IDTT should meet and completely revise the treatment plan to address the patient's current functional level and symptomatology.

**Patient O**

This 49-year-old patient was provided with a diagnosis of schizoaffective disorder, bipolar type. While housed in the EOP ASU hub between December 24, 2022 and January 20, 2023, he was prescribed hydroxyzine, lamotrigine, levetiracetam, and olanzapine and was fully adherent, as he received his psychotropic medications by a PC 2062 order. His healthcare record was randomly selected for evaluation of the treatment provided in the EOP ASU hub.

The patient was discharged from the ICF level of care and placed in the RJD EOP hub on December 24, 2022. The patient expressed suicidal ideation upon ASU placement and was seen for an evaluation while in alternate housing. A SRASHE was completed and appeared adequate given that the patient refused to engage fully in the evaluation. The decision was made to retain the patient at the EOP level of care and to rescind the MHCB referral. It was noted by the receiving psychiatrist that the patient's antipsychotic medications were discontinued in error prior to the transfer, and the psychiatrist restarted the medications. A clinician-to-clinician contact occurred timely. The five-day follow-up contacts were completed as required.

An initial primary clinician assessment was completed timely, and it was noted that the patient was placed in the ASU as he had refused housing. The assessment was adequate. An initial psychiatric assessment was completed timely and included a review of recent patient treatment history but lacked a broader historical review. The patient was included in the SRMP.

An initial IDTT meeting occurred on January 3, 2023, with required staff members present. The psychiatrist who completed the initial assessment was not in attendance; however, the conclusions drawn from the initial psychiatric assessment were included in the treatment plan. IPOCs were initiated for hallucinations, depression, and self-harm. The goals were consistent with the patient's identified needs, but the interventions were vague. Additional goals were included to address the patient's suicide risk, and the interventions appeared appropriate.

The patient was offered both individual and group sessions with the primary clinician at least weekly; however, none of the clinical contacts evidenced the use of clinical interventions. The patient was also offered several recreational and leisure activities weekly; however, he attended very little treatment. He was not seen again by a psychiatrist prior to his transfer from the ASU.

Psychiatric technician rounds were not documented on December 29, 2022 and January 14, 2023; however, the rounds were otherwise documented daily, and weekly summaries were entered into the EHRS.

**Findings**

The treatment provided to this patient was minimally adequate.

He was seen as required for clinical encounters and was offered adequate structured treatment hours; however, clinical contacts with his primary clinician failed to evidence the use of active clinical interventions. Additionally, there was no documentation that psychiatric technician rounds occurred on two days.

**Patient P**

This 62-year-old patient was provided a diagnosis of major depressive disorder, recurrent, moderate, and schizotypal personality disorder. The patient was also provided a DD1 designation. He was prescribed hydroxyzine and paroxetine with consistent medication adherence. His healthcare record was randomly selected for review of the treatment provided at the ASU EOP hub.

The patient was placed in the ASU due to safety concerns from a mainline EOP unit on January 5, 2023. His initial primary clinician assessment was completed on January 12, 2023, and included limited evidence of update from prior assessments. An initial psychiatric assessment was completed three days later at cell front, as a TTM was unavailable for a confidential session. The evaluation was not comprehensive, and there was limited evidence that a healthcare record review had occurred.

The initial IDTT meeting occurred on January 17, 2023, and included the required disciplines, but the primary clinician and psychiatrist who completed the initial assessments were not in attendance. A psychology intern facilitated the meeting, and the documentation was appropriately co-signed by a supervisor. Only an IPOC for depressed mood was initiated, and additional IPOCs were not initiated despite the patient's request to increase coping, emotional regulation, and communication skills. The treatment plan incorrectly stated that the patient attended programming and engaged in individual contacts. According to the documentation, he did not attend any groups and had not been offered any individual contacts since the ASU placement, other than initial assessments.

The primary clinician contacts were not offered weekly and were provided by three different clinicians during the patient's five-week stay in the ASU. There was limited documentation of interventions or progress toward goals that would support continuity of care. Daily cell-front contacts were completed, as the patient had been identified as a high treatment refuser. A psychiatric contact was completed at cell front by a covering psychiatrist on February 12, 2023. No rationale was provided regarding the reason that this contact did not occur in a confidential setting. The documentation was otherwise adequate.

There was no documentation of the completion of psychiatric technician rounds on January 14, 2023. The patient was offered over ten hours of structured treatment routinely but did not attend most offered treatment.

**Findings**

The treatment provided for this patient was inadequate due to the lack of clinical interventions provided during individual contacts.

The lack of provision of clinical interventions during individual PC contacts was concerning, as the patient did not attend group programming, and individual sessions with the primary clinician were the only time when meaningful treatment could be offered. The continuity of care was

poor, due to changes in the clinicians who saw the patient, this limited rapport and negatively impacted care. Lastly, the psychiatric contacts did not occur in confidential settings.

**Patient Q**

This 60-year-old patient was provided diagnoses of schizoaffective disorder, bipolar type; hallucinogen persisting perception disorder; and polysubstance dependence. While housed in the ASU EOP hub, he was prescribed aripiprazole, buspirone, amitriptyline, mirtazapine, venlafaxine, and melatonin. He was medication adherent. His healthcare record was randomly selected for review of the treatment provided at the ASU EOP hub.

The initial primary clinician assessment was completed by a predoctoral psychology intern. The assessment was adequate and was co-signed by a licensed psychologist. No initial psychiatric assessment or psychiatric contact with the patient was completed prior to the initial IDTT meeting that occurred on January 25, 2023. The IDTT meeting was facilitated by a predoctoral psychology intern and was attended by the required staff; however, no licensed psychologist was present at the meeting. IPOCs for delusions and impulsive behaviors were initiated. The interventions developed to address delusions were appropriate; however, the interventions for impulsive behaviors were inappropriate and generic, for example, to "foster a therapeutic alliance by empathizing with the patient's feelings of distress."

An initial psychiatric assessment was completed on the following day, but the assessment was completed by a different psychiatrist than the one present at the IDTT meeting. The content of the assessment was limited to recent patient history and noted that the patient was delusional, paranoid, and likely a danger to others. The psychiatrist initiated a PC 2602 petition based on the fact that the patient had previously functioned better when a PC 2602 order was in place; however, there was no evidence that the patient was currently medication nonadherent.

The primary clinician contacts were completed weekly by a predoctoral psychology intern and included interventions consistent with the treatment plan. Daily psychiatric technician rounds were documented consistently. The patient was typically offered only one group daily, and he routinely attended the groups offered. He was transferred to another facility on February 4, 2023.

**Findings**

The care and treatment provided to this patient was inadequate.

All primary clinician contacts were conducted by a predoctoral psychology intern, and the patient was never seen by a licensed clinician. An initial psychiatric assessment was not completed prior to the IDTT meeting; and when completed, it contained inaccurate information regarding medication adherence. It was unclear why the psychiatrist did not adjust the patient's medications to address symptoms, rather than initiating a PC 2602 order for a medication adherent patient. There was also no indication that referral to a higher level of care was considered. Additionally, the patient was not offered the required treatment hours.

**Patient R**

This 38-year-old patient was provided diagnoses of borderline personality disorder, major depressive disorder, recurrent episode and factitious disorder imposed on self, in one section of the healthcare record; and adjustment disorder with depressed mood and factitious disorder, provided elsewhere in the record. A psychiatrist also noted a history of unspecified depressive symptoms, and there was also a documented history of traumatic brain injury. Diagnostic clarification was indicated. The patient was prescribed gabapentin, oxcarbazepine, and venlafaxine with medication adherence. He was housed in the ASU EOP hub from September 20, 2022 to October 31, 2022 with a number of brief placements in alternative housing. He was placed in the ASU upon discharge from the MHCB. His healthcare record was randomly selected for review of the treatment provided at the ASU EOP hub.

The patient refused the ASU pre-placement screening and was referred for an emergent mental health consult upon discharge from the MHCB. The documentation from the consult was brief but appropriate. Another consult occurred a few hours later and included a SRASHE which was detailed and thorough. The only concern noted with the SRASHE was the failure to document a safety plan, despite the assessment of moderate acute suicide risk and the patient's ongoing threats of self-injury and reports of suicidal ideation. The patient verbalized suicidal ideation frequently and was seen in response to those statements numerous times during the subsequent days. The resulting SRASHEs were completed and were of variable quality. The five-day follow-up contacts were completed as required and included plans for assisting the patient with transition to the ASU and utilizing his safety plan. This pattern of several consults and placements in alternative housing that usually occurred after-hours with the MHCB referral rescinded in the morning and continued during the entirety of patient's ASU stay. The patient also reported chest pain on several occasions and was assessed by the medical staff and ultimately returned to his cell.

An initial psychiatric assessment was completed on September 23, 2022, at cell front due to custody concerns. The content of the documentation was brief and focused on recent history, rather than a comprehensive assessment of the patient. An initial primary clinician assessment was completed on September 26, 2022, and there was no evidence that the document was updated beyond a mental status examination and description of a recent clinical contact; the content of the assessment was inadequate.

An initial IDTT meeting occurred on September 28, 2022. None of the clinicians, including the primary clinician, psychiatrist, and psychologist who attended the IDTT meeting had previously met with the patient; this despite numerous contacts with other clinicians during the patient's arrival to the ASU and numerous crisis contacts and alternative housing placements. An IPOC for depressed mood was initiated and included vague interventions. There were also goals included to address the patient's inclusion in the SRMP that were marginally adequate. The documentation of prevention planning regarding MHCB placement was appropriately included in the treatment plan; this inclusion could have been helpful; however, the information was not adequately updated from prior documentation.

A clinician-to-clinician contact between an ASU clinician, a senior psychologist supervisor, and

the MHCB clinician was not completed until October 3, 2022; the reason provided for this delay was "the high census in ASU." Of note, the ASU senior psychologist supervisor had not previously met with the patient other than being present for his ICC. The documented exchange included clinical information but no discussion of interventions that were attempted, or goals established with the patient. There was no documented evidence that the patient's assigned primary clinician reviewed the information.

The patient reported that he intentionally overdosed on Effexor and Tylenol on October 8, 2022, and was sent to an emergency room. It was difficult to determine from the documentation if there was evidence of an actual overdose, but the patient was treated with activated charcoal in the emergency room. A SRASHE was completed in a nonconfidential setting upon the patient's return, and it made no mention of the toxicology screen, only that the patient reported an overdose. The SRASHE was otherwise adequate and included a safety plan.

The primary clinician contacts occurred weekly; however, the patient was only seen once by his assigned primary clinician in a confidential setting. The content of primary clinician contacts focused on the grief that the patient reported following the death of his mother. There was no evidence that the patient's suicidal ideation, requests for higher levels of care, or frequent placements in alternative housing were addressed. No routine psychiatric contacts with the patient were documented.

The patient attended most offered groups; however, the groups were solely recreational in nature and did not approach the required 10 hours weekly. The psychiatric technician rounds were documented daily.

**Findings**

The care and treatment provided to this patient was inadequate.

There was evidence of serious lapses in continuity of care, which was especially concerning given the patient's frequent reports of suicidal ideation in what was documented as attempts to obtain a higher level of care. Targeted, behaviorally focused interventions with a consistent clinician were indicated but were never discussed, planned, nor implemented. The patient was not seen as required by the psychiatrist; and groups, which were recreational in nature, were not offered as required. The reported overdose was never addressed therapeutically.

**Patient S**

This 25-year-old patient was provided a diagnosis of schizoaffective disorder, depressive type, and opioid use disorder. He was prescribed olanzapine with adherence. This patient's healthcare record was randomly selected for review of the treatment provided at the ASU EOP hub. He was placed in the ASU for safety concerns on December 4, 2022.

The patient was seen for a timely initial primary clinician assessment. It was difficult to determine how much of the assessment was updated or current versus information that was copied and repeated unchanged from prior assessments. The clinical summary did include some

current information.  A clinician-to-clinician contact was completed and included information consistent with what the patient reported during the initial assessment, including a request to be moved to the 3CMS level of care.

On December 8, 2022, the patient was found unconscious in his cell.  The nursing staff suspected an overdose, and the patient was transferred to the emergency department.  The urine drug screen did not indicate the presence of drugs; however, it was suspected that he may have taken a substance not included in the drug panel, and therefore was not detected.

An initial psychiatric assessment was completed on December 12, 2022.  It was brief in content and only included a recent history with no mention of the recent overdose.  No initial IDTT meeting occurred, as the patient transferred from the facility on December 13, 2022.

The patient began attending groups on December 6, 2022, and he attended most offered groups. The psychiatric technician rounds were documented daily.

**Findings**

In the brief period that the patient was housed in the ASU EOP hub, the care and treatment provided was inadequate.

The initial assessments were cursory, and there was no follow-up with the patient by a mental health clinician after transfer to an emergency department for a suspected overdose.

**APPENDIX C-2**
**Mule Creek State Prison (MCSP)**
**April 11, 2023 – April 14, 2023**

**Patient A**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 40-year-old male with a traumatic developmental history due to neglect, early exposure to substances, and gang affiliation. As an adult, he reportedly suffered significant losses including the death of three sisters. He had a history of difficulties with rage, grief, depression, anxiety, suicidal ideation, and impulsivity.

He was serving a life sentence with the possibility of parole. In April 2020, he was transferred from CTF to MCSP, after reporting suicidal thoughts and impulses to jump from the third tier. He was admitted to the MHCB and subsequently discharged to the EOP level of care. He received mental health services at the EOP level of care for approximately 18 months until August 2021. He did not exhibit functional impairments while receiving treatment in the EOP program. He maintained his activities of daily living (ADLs), advocated for himself, and had 74 percent program participation. On June 17, 2021, he was awarded a general education development (GED).

His level of care was reduced from EOP to 3CMS in August 2021. His initial IDTT and updated IDTT occurred in August 2021 and August 2022, respectively. The updated treatment plan was reviewed for context. Diagnoses provided included major depressive disorder in remission, persistent depressive disorder (dysthymic disorder), and adult antisocial behavior. He also had been provided diagnoses of antisocial personality disorder, and methamphetamine and opioid use disorders in a controlled environment. Except for dysphoria related to family issues and anxiety related to his upcoming Board of Parole hearing, specific symptoms were not identified. Additionally, treatment plan goals were vague, and treatment progress was measured by subjective reports rather than observable behaviors. Non-pharmacological treatment interventions were unclear in the treatment plan.

The treating psychiatrist met with the patient at least every 90 days for medication management; the patient was prescribed Remeron. There was no documentation that the primary clinician met with the patient during the review period.

**Findings**

The care provided to this 3CMS patient was inadequate due to unclear treatment goals and interventions, and the lack of clinical contact with the primary clinician. However, the treatment provided by the psychiatrist was clinically sufficient.

**Patient B**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 34-year-old transgender patient, whose gender identity was female. She arrived at MCSP on May 3, 2022. Healthcare documentation from her primary clinician and treating psychiatrist indicated a parole date of June 2023.

The patient's developmental history was traumatic due to a chaotic family system. She had a history of physical and sexual abuse, and living in foster homes from age four. She reportedly shot herself in 2004. Her intent was unclear; she occasionally reported accidentally shooting herself, and at other times she reported attempting suicide.

There was no treatment plan completed during the review period, so the patient's IDTT documentation from May 19, 2022 was reviewed for context. She was provided with diagnoses of gender dysphoria, generalized anxiety disorder, and borderline personality disorder. The treatment outcome expectations were unclear; however, the treatment plan indicated that the patient would be considered for discharge from the 3CMS level of care after having a stable mental status without support of psychotropic medication for six consecutive months. The treatment plan also identified emotional dysregulation and impulsive behavior as problems. Specific non-pharmacological interventions and contact frequency were not identified. A DBT IPOC was initiated, with goals of learning mindfulness, demonstrating stable interpersonal relationships for six months, and increasing tolerance for unpredictability.

During the review period, the primary clinician met individually with the patient once on October 20, 2022. There was no documentation that the primary clinician ever discussed the DBT IPOC goals with the patient. The primary clinician's sole progress note during the review period was included with a SRASHE which documented low acute and chronic suicide risk. The primary clinician's progress note appeared more as a wellness check, focusing on the patient's mental status rather than addressing her anxiety related to upcoming parole and her intrusive thoughts identified by psychiatry.

The treating psychiatrist met with the patient twice in November 2022 and once in February 2023. She was prescribed Zoloft for depression and hydroxyzine for anxiety and insomnia. A review of psychiatric documentation revealed assessments of her current functioning, symptoms, stressors, and medication responses. Although the psychiatrist suggested treatment with Lexapro to address troubling intrusive thoughts, the patient refused the medication, stating that she would rather develop and utilize coping skills. Despite the patient's desire to utilize non-pharmacological coping skills, the primary clinician failed to see the patient for follow-up after the October 20, 2022 contact.

During the review period, the patient was administered two of four 90-day follow-up SRASHEs after discharge to 3CMS from an MHCB admission on May 13, 2022. On December 15, 2022, the patient was also administered a mental health pre-release planning assessment to assist her transition into the community.

**Findings**

The overall mental health care provided to this patient was inadequate, due to non-pharmacological treatment goals and interventions that were vague and unclear.

There was no documentation that the primary clinician and treating psychiatrist collaboratively managed the patient's depression and anxiety related to her upcoming parole or addressed her sadistic intrusive thoughts. Psychiatric care was otherwise clinically sufficient, along with the 90-day MHCB discharge follow-up evaluations and the mental health pre-release planning assessment.

**Patient C**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 58-year-old male serving a life sentence with the possibility of parole. His eligible parole release date was January 11, 2050.

The patient had an extensive mental health history with depression and anxiety occurring in childhood. He also reported a traumatic brain injury at age ten, resulting in a seizure disorder. After his parents died, he was placed in foster care from age 13 to age 18. During adolescence, he was physically abused, stopped attending school, and began abusing methamphetamine, cannabis, cocaine, and LSD.

He was included in the MHSDS since CDCR arrival with several MHCB and inpatient admissions. He had a history of depression, anxiety, and low frustration tolerance. He reportedly had minimal family support.

No treatment plan was completed during the review period, so the patient's IDTT documentation from August 17, 2022 was reviewed for context. The primary clinician, treating psychiatrist, and correctional counselor attended the IDTT. The patient was absent due to modified programming related to COVID-19 protocols. The treatment plan provided a comprehensive mental health history and case formulation. The patient was provided diagnoses of major depressive disorder recurrent in partial remission, PTSD, and unspecified psychotic disorder. Recommended treatment included psychotropic medication, dialectical behavior therapy, and motivational interviewing. The goals were for the patient to develop empathy toward others and to understand how his behavior impacted others.

The treating psychiatrist met with the patient via telepsychiatry at least every 90 days. During the review period, he had three individual psychiatric contacts with three different psychiatrists, none of whom were the psychiatrist who attended his IDTT. The patient was prescribed Abilify for auditory hallucinations, Prazosin for nightmares, and sertraline for dysphoria.

The primary clinician met with the patient once during the review period.  Documentation suggested that the primary clinician had a therapeutic relationship with the patient.  During their sole contact, the primary clinician explored the patient's ability to function in the yard, safety concerns, symptoms, and treatment progress.  There was no documentation of the provision of dialectical behavior therapy or motivational interviewing.

**Findings**

The mental health care provided to this patient was marginally adequate.

The primary clinician provided supportive counseling rather than the recommended DBT interventions and motivational interviewing.  Psychiatry met with the patient timely with appropriate medication management; however, continuity of care was poor as three different psychiatrists met with the patient individually, and none of those psychiatrists attended his IDTT.

**Patient D**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 55-year-old male serving his first prison term with an eligible parole release date of September 27, 2027.  He was provided a diagnosis of major depressive disorder, recurrent, in full remission.  He arrived in CDCR during September 2009 and began receiving mental health services at the 3CMS level of care within a few months of arrival; the patient was age 28 at that time.

The patient had a family history of depression, suicidal behavior, and alcohol use disorder.  He also reported a history of sexual abuse, and he said that he attempted suicide by cutting his right wrist in 1996 while in Mexico after discovering that his brother had been murdered.  He had limited contact with his wife and children who lived in Mexico.  He worried about his family's financial survival and his daughter's history of depression.  He had a history of being severely beaten while at RJD in 2011, resulting in an attempted suicide by hanging.

No treatment plan was completed during the review period, so the patient's IDTT from June 8, 2022 was reviewed for context, along with the mental health master treatment plan psychiatry review.  During this IDTT, his primary clinician, treating psychiatrist, and correctional counselor were present.  The patient was absent due to scheduling conflicts.  The treatment plan contained a comprehensive mental health history and triggers for the patient's depression, including first prison term, index crime, and previous assault.  His depressive symptoms were controlled with medication treatment; however, the treatment team noted the presence of residual mild to moderate depression and passive suicidal ideation.  Along with depression, the patient had a history of reported auditory hallucinations which occurred approximately every two weeks.  These psychotic symptoms had previously been treated with Risperdal.  The treatment plan also mentioned his historical vulnerability for decompensation, reporting that "without ongoing PC contact and provision of psychotropic medication, he would be at significant risk for decompensation."  Treatment plan goals included reduction of depressive symptoms and

continued medication adherence.  The patient was prescribed Effexor, and a mental health depressed mood IPOC was initiated on June 8, 2022.

During the review period, the patient was seen by telepsychiatry on four occasions in confidential settings for psychiatric assessment and medication management.  The patient appeared motivated for treatment, and he attended his individual psychiatric appointments and NLTG classes.  No documentation was present that indicated that the primary clinician met with the patient, and there was no documentation that the mental health depressed mood IPOC was reviewed.

**Findings**

The care provided to this 3CMS patient was inadequate due to the lack of clinical contact with the primary clinician.  However, the treatment provided by the psychiatrist was clinically sufficient.

**Patient E**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 59-year-old male who arrived in CDCR on December 17, 2009.  He transferred to MCSP on October 3, 2018.  He was serving his first prison term, and he was convicted of a sex offense.  His eligible parole release date was June 23, 2025.

He began receiving mental health services at the 3CMS level of care in 2013.  Historically, the patient was provided with diagnoses of depressive disorder not otherwise specified, and antisocial personality disorder.  During the review period, he was provided a diagnosis of social anxiety disorder.  He had previously been treated with Vistaril, Cymbalta, and Zoloft, which the patient discontinued in January 2023.  He did not have a history of treatment at the EOP, PIP, or MHCB levels of care.

The patient's developmental history was traumatic, and included a chaotic family environment, sexual abuse, and early exposure to drugs and alcohol.  He had a history of inadequate emotional and behavioral control resulting in rage, violent behavior, and subsequent depression and anxiety.  His treatment plan was reviewed by the treatment team on September 7, 2022.  His primary clinician, treating psychiatrist, and correctional counselor were present; the patient was also present and participated in the IDTT.  Documentation of his mental health history was comprehensive, and progress toward treatment goals was discussed.  The patient requested psychopharmacological treatment, stating that he did not want "talk therapy."  He stated that Zoloft slowed him down enough to give him time to think about the consequences of his actions and prevented physical altercations.  His stress was reportedly managed by drawing, venting through his legal writing, and using humor.

The treatment plan documented critical staffing shortages at MCSP, resulting in psychiatric appointments scheduled every 90 days, and primary clinician contacts occurring only as needed.

The primary clinician did not meet with the patient during the review period, while the treating telepsychiatrist met with the patient twice.  The same treating telepsychiatrist met with the patient prior to and after the review period, attended the IDTT, and completed the master treatment plan psychiatry review.  During the January 2023 psychiatric contact, the patient reported discontinuing Zoloft for the past three weeks, stating that he was able to control his emotions without the medication.  He requested discontinuation of Zoloft, and indicated that he would resume the medication if needed.  He was future-oriented, attempting to complete his GED, and making plans for his upcoming parole eligibility in June 2025.

**Finding**s

The overall mental health care provided to this patient was inadequate due to the primary clinician's limited involvement and lack of clinical contact.  This deficiency was offset by the patient's refusal to participate in talk therapy with the primary clinician and his progress in psychiatric therapy.  The psychiatric care provided to this patient was adequate.

**Patient F**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

This patient was a 38-year-old male, serving his first prison term for a conviction of possessing and manufacturing a deadly weapon in county jail.  On August 3, 2022, he transferred from PVSP to MCSP; he had been receiving mental health services at the 3CMS level of care.  On October 27, 2022, the patient transferred from a special needs yard to a minimum security facility and on February 28, 2023, he paroled.

His developmental history appeared unstable and chaotic, characterized by maternal neglect with various men whom she had relationships with intermittently involved in his life.  He graduated from high school and took several college classes.  He also reported having an adolescent daughter and an employment history working in air conditioning and refrigeration.

On August 11, 2022, the patient received an MHPC assessment, and on August 17, 2022, an initial IDTT occurred that was 14 days after arrival at MCSP.  The assessment and treatment plan provided documentation that the patient had an extensive mental health history.  At age nine, he was provided a diagnosis of attention deficit hyperactivity disorder (ADHD), and at age 16, he was provided a diagnosis of schizophrenia.  His psychotic symptoms reportedly began at age nine with auditory and visual hallucinations.  The healthcare record also revealed a history of psychiatric hospitalizations due to psychotic symptoms in 2012 and 2015.  In 2020, he was treated with Zyprexa and lithium, which appeared to control his hallucinations.  He did not have a history of RVRs or placement at the PIP, MHCB, or EOP levels of mental health care.  He reported a long history of anxiety and dysphoria.

During the seven months that the patient was housed at MCSP, he met with several primary clinicians.  He first met with a primary clinician who completed the MHPC assessment and facilitated the initial IDTT.  He met with another primary clinician for an individual session on

October 25, 2022. He met with a third primary clinician on January 23, 2023. This provider documented the patient's long history of treatment for schizophrenia. He reported that the patient continued to refuse treatment with psychotropic medication, as he doubted the validity of his diagnosis despite a history of psychiatric hospitalizations. The patient also reported a goal to visit the Pope someday to share his spiritual experiences. He denied hallucinations but appeared to have religious delusional thinking. The provider documented a diagnosis of schizophrenia spectrum disorder and alcohol use disorder. On February 16, 2023, the patient met with a fourth primary clinician who administered the mental health pre-release planning assessment and provided a diagnosis of generalized anxiety disorder without acknowledging the third primary clinician's differing diagnostic assessment.

**Findings**

The mental health care provided to this patient was inadequate.

The evaluations performed during the review period were cursory and devoid of collateral information. The treatment plan completed during the review period did not clarify the patient's diagnosis, identify meaningful problems, set achievable goals, or select evidence-based interventions to be utilized in treatment. Additionally, the primary clinician who completed the mental health pre-release planning assessment did not address the concerns expressed by the primary clinician who met with the patient three weeks earlier. There was also poor continuity of care, with the patient seen by four different primary clinicians.

**Patient G**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

This patient was a 25-year-old male who entered CDCR on March 15, 2022 at NKSP. He was convicted of human trafficking of minors and corporal injury to specific persons. He was serving his first prison term, and was sentenced to 12 years with an eligible parole release date of January 6, 2028.

While in county jail, the patient requested medication for insomnia; he was prescribed Prozac, Benadryl, Remeron, and melatonin. He discontinued Prozac, and the CDCR psychiatrist discontinued Benadryl and melatonin as they were non-formulary medications. The patient denied a history of receiving mental health services prior to arrest. He also denied a family history of mental health concerns. He had three children, two of whom lived with his parents, and one who was in the care of the child's maternal aunt.

The patient transferred to MCSP on May 11, 2022. His initial psychological assessment was completed on May 23, 2022, and the initial IDTT and master treatment plan psychiatry review were completed on May 26, 2022. Since there was no treatment plan completed during the review period, the initial treatment plan and master treatment plan psychiatry review were reviewed for context. The primary clinician, treating psychiatrist, and correctional counselor were present at the IDTT. The patient was not present at the IDTT due to modified programming

related to COVID-19 restrictions. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood, and was treated with Remeron. Specific diagnostic symptoms, treatment goals, and treatment interventions were not clearly documented in the treatment plan.

Treating psychiatrists met with the patient twice during the review period, while the primary clinician did not meet with him during the review period or during the three months following his initial IDTT.

**Findings**

The mental health care provided to this patient was inadequate.

The treatment team appeared to minimize the adjustment difficulties that led to the patient's diagnosis of adjustment disorder. His adjustment problems were not specified, measurable treatment goals were not clarified, and evidence-based interventions were not selected. The patient received minimal treatment until immediately after the review period in March and April 2023 when he was placed in administrative segregation, admitted to the MHCB, and placed on suicide watch.

**Patient H**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 42-year-old male whose CDCR incarceration began in 2014. He initially received mental health treatment at the 3CMS level of care in 2019, and was transferred from CSATF to MCSP on May 26, 2022. He was serving his third prison term with an estimated parole/release date (EPRD) of April 15, 2024. He was provided diagnoses of major depressive disorder, recurrent, moderate, and paranoid personality disorder. He was prescribed Vistaril on an as-needed basis and Suboxone. His treatment focused on the treatment of depression, anxiety, and paranoid delusional thinking.

The patient had difficulty adjusting to his housing at MCSP. He submitted 7362 requests for increased services with demands for placement at a higher level of care, and had grief of the death of his brother, and threatened suicide. During the review period, his treating psychiatrist met with him three times. The primary clinicians met with him six times, in response to routine and emergent consults to administer the SRASHE and to conduct an early IDTT to discuss his level of care.

The treatment team appeared to be responsive to the patient's treatment needs. They worked collaboratively, referencing each other's evaluations and progress notes. They also worked closely with the patient. The patient's strengths and skill deficits were identified, and treatment sessions focused on addressing specific patient needs. By the end of the review period, the patient made progress; he worked with the correctional counselor about obtaining a job, and was placed on a waitlist for Prison Industry Authority and cognitive behavioral interventions.

Additionally, he began playing his guitar and exercising despite anxiety and occasional panic attacks.

**Findings**

The mental health treatment provided to this patient was adequate.

**Patient I**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 19-year-old male serving his first prison term. He was sentenced to 15 years with an EPRD of March 9, 2032 for attempted murder. His term began on May 16, 2022. He arrived at NKSP on May 16, 2022, and transferred to MCSP on August 17, 2022.

Traumatic family stressors included his father's placement in Napa State Hospital for a triple homicide, his brother's recent murder, and his mother's arrest history of carjacking.

He reportedly had previous diagnoses of unspecified schizophrenia spectrum disorder, a provisional diagnosis of bipolar disorder, and polysubstance use disorders that included use of opioids, Xanax, and stimulants. The patient initially experienced auditory hallucinations at age 13 or 14. He was involved in gang activity at an early age after his adopted mother put him out of the house at age 14. He reported a history of sexual molestation. Additionally, he had an extensive history of substance use disorder that included hallucinogens, prescription medications, and cannabis starting at age 13. His biological parents had 11 children.

As a treatment plan was not completed during the review period, the patient's IDTT documentation from August 29, 2022 was reviewed for context. His primary clinician, treating psychiatrist, and correctional counselor were present at the IDTT. The mental health history in the treatment plan was comprehensive. His diagnosis was unclear except for substance use disorders. The documentation indicated that his reported history of hallucinations may have been drug-induced or a symptom of schizophrenia, and his depression and anxiety may have been related to an adjustment disorder or an unspecified mood disorder. On February 7, 2023, the primary clinician provided diagnoses of unspecified personality disorder, amphetamine use disorder, opioid use disorder, and a provisional diagnosis of unspecified depressive disorder. They also documented possible malingering, as well as a prior diagnosis of substance-induced psychotic disorder.

The treating psychiatrist met with the patient three times in September 2022 and prescribed Zyprexa for psychosis and Lexapro for depressive symptoms. Another psychiatrist who met with the patient in October 2022 discontinued those medications at the patient's request. Additionally, that psychiatrist requested a follow-up appointment within two weeks instead of the usual three months, as he wanted to ensure that the patient did not decompensate due to the psychotropic medication discontinuation and institutional stressors related to his cellmate.

A SRASHE completed in October 2022 assessed the patient with moderate chronic and low acute suicide risk.  The assessment occurred after the patient reported suicidality related to a PREA complaint.  During the last four months of the review period, there was no documentation of any psychiatric contacts.

The primary clinician met with the patient twice in November 2022, and once in February 2023.  During the February contact, the primary clinician referred the patient to the psychiatrist for consideration of medication resumption.  At the end of March 2023, the psychiatrist had not met with the patient.

**Findings**

The mental health care provided to this patient was inadequate.

Although the patient had been housed at MCSP for at least six months, the treatment team did not clarify his diagnoses, set treatment goals, or develop coordinated treatment strategies.  This was particularly important as this patient was young and had a complex psychiatric presentation.

Additionally, the patient was not seen for psychiatric follow-up and assessment after discontinuing antipsychotic and antidepressant medications, which was clinically inappropriate.

**Patient J**

This patient was randomly selected to evaluate the mental health treatment provided in the 3CMS program.

The patient was a 32-year-old male, serving his second prison term for voluntary manslaughter.  He had an eligible parole release date of July 17, 2026.

His developmental history was unstable; his mother was addicted to drugs, and his father was incarcerated.  Both parents had mental illness.  His mother had a history of attempting suicide, and his father had a history of addiction to painkillers and heroin after a gunshot wound to the head.  The maternal grandmother was his primary caretaker.  He began using marijuana at age 10 and cocaine and ecstasy at age 16.  He dropped out of school in the tenth grade and joined a gang at age 16.  He was arrested at age 19.  He had several family losses, including his younger brother and sister who died from carbon monoxide poisoning after they were left in a running car in a garage when the patient was age four.

During the July 19, 2022 IDTT, the patient requested mental health services to address trauma issues including flashbacks, irritability, anxiety, and sleep disturbances before he began working as a volunteer in the juvenile diversion program.  He stated that he dealt with his anxiety himself, indicating that mental health staff only provided him with "a little pill."  Treatment team members explained to him that he could submit a request to mental health for more frequent contacts.

During the review period, the treating psychiatrist met with the patient once on September 1, 2022. The patient expressed concern about medication treatment, but agreed to adhere to treatment with Celexa and Vistaril for six to nine months. Despite this agreement, the psychiatrist did not meet with the patient again during the review period.

A new primary clinician introduced herself and met with the patient five months after his IDTT in response to a 7362 requesting mental health services. He requested services focusing on trauma, social skills, and depression. This primary clinician planned to provide weekly individual contacts, but only met with the patient four weeks later in response to another 7362. During the review period, this patient attended weekly NLTG classes.

**Findings**

The mental health care provided to this patient during the review period was inadequate.

The patient was highly motivated to receive treatment to address issues involving his trauma history. He demonstrated a desire to collaboratively work with his treating psychiatrist and primary clinician; however, the psychiatrist failed to provide follow-up contact after the patient agreed to comply with a newly prescribed medication. Further, his primary clinician also failed to see the patient for follow-up, only responding after the patient submitted a request for mental health services. The new primary clinician met with the patient six months after the IDTT, and then failed to keep planned follow-up appointments.

**Patient K**

This 53-year-old EOP patient transferred to MCSP during 2010, and was housed in D yard. He was provided a diagnosis of major depressive disorder, and was prescribed Effexor, Remeron, and Vistaril. His healthcare record was randomly selected to assess the adequacy of care provided.

Treatment planning during quarterly IDTTs in October 2022 and February 2023 was not updated, individualized, or useful for continuity of care. Regarding outdated treatment planning, an IPOC for danger to self continued since 2018, and an IPOC for depressed mood continued since June 2022. IPOCs to target identified symptoms of shame, guilt, and trauma were not established, indicating that the target of treatment was not individualized. Lastly, a summary of the patient's symptoms, functioning, or treatment progress between IDTT meetings was not completed, which was disruptive for continuity of care.

Primary clinician contacts did not occur timely. Between September 2022 and April 2023, the patient had six individual primary clinician contacts that generally occurred monthly. The two most recent individual contacts in February and April 2023 occurred at cell front and were essentially brief check-ins. Caseload groups were utilized, but the frequency of those groups and individual contacts was not consistent with Program Guide requirements. For example, during March 2023, the patient was seen exclusively in a caseload group; documentation from April 27, 2023 indicated that caseload groups were discontinued, and individual contacts would subsequently occur monthly.

Except for October 2022 when a routine psychiatric contact did not occur, psychiatric contacts occurred monthly. Overall, the patient was described as stable. When the patient's symptoms increased, medication adjustment occurred with the appropriate rationale documented.

The patient was offered six groups during the first full week of April 2023.

**Findings**

The care provided to this patient was inadequate.

Treatment planning was not individualized, and treatment plans were not sufficiently updated or useful for continuity of care. The lack of consistent clinically appropriate contacts by the primary clinician coupled with the informal assessments that occurred during brief contacts did not allow for adequate assessment of the patient's psychiatric symptomatology and functioning or allow for the provision of meaningful treatment.

**Patient L**

This 52-year-old EOP patient arrived at MCSP during 2017, and was housed in D yard. He was provided a diagnosis of schizoaffective disorder, and was prescribed Depakote, Zyprexa, Remeron, and Vistaril. His healthcare record was randomly selected to assess the adequacy of care provided.

IDTT documentation was not individualized or useful for continuity of care. Specifically, documentation between October 2022 and April 2023 did not include a summary of the patient's symptoms, functioning, or treatment progress during the intervals between IDTT meetings. IPOCs established in October 2022 targeted depression and auditory hallucinations; however, they included generic language, and no IPOCs were documented from the April 2023 IDTT meeting.

Between September 2022 and mid-April 2023, individual primary clinician contacts did not occur weekly as required; the frequency ranged from no contacts to three contacts monthly. The individual primary clinician contacts generally reflected a wellness check and not a meaningful therapeutic interaction. Of concern, on December 21, 2022, the patient presented with psychotic symptoms, decline from his previous level of functioning, and symptomatology like that present when his committing offense occurred. Despite this concerning presentation, the psychology intern who met with the patient did not document a plan to consult with the supervisor or psychiatrist.

Psychiatric contacts occurred monthly. The documentation was generally clinically relevant, and medication concerns were addressed. In contrast to primary clinician documentation, psychiatric documentation consistently indicated the presence of mild auditory hallucinations. The patient had recently been treated at an outside hospital for a medical concern. During that time, prescribed Clozaril was discontinued. Upon return to CDCR, the psychiatrist appropriately

provided education about the risk of decompensation, but the patient was reluctant to resume Clozaril.

The patient was offered three groups during the first full week of April 2023.

**Findings**

The care provided to this patient was marginally adequate.

The psychiatric documentation of clinical contacts indicated that the patient was appropriately monitored and treated; however, there were significant lapses between primary clinician contacts, sparse group offerings, and lack of meaningful therapeutic primary clinician contacts. Another significant issue of concern was the psychology intern's lack of appropriate and clinically necessary consultation when the patient abruptly presented with a decline in functioning.

**Patient M**

This 30-year-old EOP patient transferred to MCSP in 2018, and was housed in D yard. He was provided a diagnosis of bipolar disorder with a provisional diagnosis of borderline personality; these diagnoses were updated during his April 2023 IDTT, but they were not reflected in the official place of record. He was prescribed Depakote, Remeron, and Zoloft. His healthcare record was randomly selected to assess the adequacy of care provided.

Treatment planning was outdated. There was no change to an IPOC established in 2018 to target hallucinations or to IPOCs that targeted anxiety, depression, and danger to self that were established in 2019. The IDTT documentation did not include a full summary of symptoms, functioning, and treatment progress; this was information that was necessary for continuity of care, particularly given the changes that occurred in the patient's assigned clinician and psychiatrist.

Primary clinician contacts did not occur timely. Between September 2022 and April 2023, the patient was seen individually one to two times monthly, except in February 2023, when there was no documentation of individual contact. Three of four primary clinician contacts since January 2023 did not occur in a confidential setting. During a contact on March 9, 2023, the patient expressed frustration regarding the lack of individual programming. Overall, the primary clinician documentation did not reflect meaningful therapeutic contact.

Excluding September 2022, psychiatric contacts occurred monthly. Overall, documentation included the patient's symptoms, medication response, or concerns regarding medication treatment.

The patient was offered four groups during the first full week of April 2023.

**Findings**

The care provided to this patient was marginally adequate.

Although the psychiatric care appeared clinically appropriate, the care provided by the primary clinician was significantly inadequate. Further, when routine primary clinician contacts were provided, the documentation indicated that they were not meaningfully therapeutic. In addition, treatment planning was not individualized or updated for several years and was not useful for continuity of care.

**Patient N**

This 40-year-old EOP patient transferred to MCSP from a reception center in November 2022; he was housed in B yard. The patient was provided diagnoses of major depressive disorder, moderate, and unspecified anxiety disorder. He was adherent with prescribed Effexor, Remeron, and Vistaril. His healthcare record was randomly selected to assess the adequacy of care provided.

The initial psychiatric assessment was clinically useful. Monthly telepsychiatry contacts included an assessment of symptoms and medication response.

The primary clinician initial assessment included limited information regarding the patient's chronic history of anxiety and depression, and the documentation was limited to discussion about treatment with psychotropic medications for the past seven years. Importantly, an MHCB hospitalization from November 18 through November 30, 2022 was not discussed; this was critical clinical information regarding the patient's adjustment to CDCR and his ability to manage distress. Most of the clinical summary section was copied from a previous assessment, although not referenced as such. Further, the original documentation that included the following entry was clinically incoherent and unintelligible: "depression, anxiety, has a good bunkie /3 assaults/ enjoy [sic] the grps /ok/ sleep- butter due to cell-mate. meds [sic] are good/depression and anxiety 6-7 [sic] parents, grandparents, uncle, and aunts- large extensive family support," and regarding case formulation "(a)t this time there is insufficient information for a case formulation. Further assessment needed".

The sole IPOC targeted anxiety, and the goal to reduce anxiety to a four on a ten-point scale was clinically reasonable. However, the rationale for the treatment interventions to use goal setting and to address overestimation of threat and underestimation of the patient's resources was unclear. Despite the identification of depression and recent suicidal ideation, these pressing treatment needs were not targeted at the initial or quarterly IDTT meetings. The quarterly IDTT documentation noted improvement in anxiety but lacked a summary of this symptom, the impact on functioning, and the treatment progress since the initial IDTT meeting. The IPOC remained unchanged, despite continued report of depression.

Individual primary clinician contacts occurred at least monthly and twice during the month of January 2023. The patient consistently attributed his anxiety to external factors including his

cellmate, legal issues, and possible transfer; however, little was done to provide education and interventions to manage his anxiety.

A SRASHE was conducted in March 2023; however, the assessment relied on the patient's self-report of a suicidality as a child and did not address his MHCB admission due to suicidal ideation. Despite an assessment of chronic moderate risk at two prior assessments, his chronic suicide risk level was changed from moderate to low. Additionally, factors identified in previous assessments were not considered in the most recent SRASHE.

During the first full week of April 2023, the patient was offered four groups.

**Findings**

The care provided to this patient was inadequate.

The initial assessment was not sufficiently comprehensive, and some content was poorly written. The lack of assessment of specific symptomatology necessary to guide treatment planning negatively impacted that treatment planning, which was not sufficiently individualized. While psychiatric contacts occurred timely and were clinically appropriate, primary clinician contacts were generally not timely, and most were of questionable therapeutic benefit. Lastly, the patient's chronic suicide risk was underestimated, and the lack of treatment interventions for underlying anxiety and depression did not prepare the patient for setbacks or relapse prevention, thus elevating the potential risk for self-harm.

**Patient O**

This 43-year-old patient was treated at the EOP level of care between December 2022 and March 2023. He was provided a diagnosis of major depressive disorder with psychotic features, and was prescribed Zyprexa, prazosin, and Wellbutrin. His healthcare record was randomly selected to assess the adequacy of care provided.

The patient had a long history of depression and psychosis with multiple MHCB admissions and a PIP admission in 2021 due to danger to self. Shortly after transfer to MCSP after MHCB discharge, he was readmitted to the MCSP MHCB from December 12 – 21, 2022 due to suicidal ideation, paranoia, and auditory hallucinations. After his antipsychotic medication was increased, he was discharged to the EOP with a recommendation of "increased contact to practice coping skills and if there is no improvement consider ICF referral." Timely five-day follow-up documentation completed between the time of MHCB discharge and the primary clinician's initial assessment provided a useful assessment of the patient's functioning and level of suicide risk. While the safety plan was reviewed, the patient's response to warning signs was not documented.

The initial psychiatric assessment included relevant current clinical information and the rationale for medication management. However, much of the primary clinician initial assessment and initial IDTT documentation did not convey the patient's current treatment needs; most of the information was historical and had been copied and pasted from previous sources, and the

documentation did not note that the information provided was not current. This was concerning as it prevented adequate continuity of care, as the reviewer would be unaware that the information was outdated. Treatment goals were not documented in the initial treatment plan.

There was no routine psychiatric contact in January 2023, and documentation from February 2023 described the patient as stable. Medication adherence was not timely addressed, despite a documented plan to do so.

Individual primary clinician routine contacts occurred once in January 2023, approximately one month after the initial assessment, and twice in February 2023. While few in number, the contacts were clinically appropriate and included utilization of treatment interventions including psychoeducation, mindfulness, and perspective taking.

On March 6, 2023, the patient was admitted to the MHCB due to command auditory hallucinations to kill himself, and a report that he had made a noose. During that period, he was offered five recreation therapy groups.

**Findings**

The care provided to this patient was inadequate.

The patient had a long history of mental health treatment and inpatient hospitalization, and the lack of coordination of care between the MHCB and EOP was an area of concern. The patient was not adequately monitored as was clinically indicated following MHCB discharge to the EOP. Despite the recommendation at the time of his previous MHCB discharge, he was readmitted to the MHCB for the third time in three months rather than referred to the ICF level of care, which was clinically indicated. This was, in part, likely related to the lack of updated information conveyed in the primary clinician initial assessment and initial IDTT meeting.

**Patient P**

This 69-year-old EOP patient transferred to MCSP in December 2022; he was housed in B yard. Several diagnoses were present in the healthcare record, including schizoaffective disorder and major depressive disorder. The patient was adherent with prescribed Abilify, Depakote, and Vistaril. His healthcare record was randomly selected to assess the adequacy of care provided.

This long-term EOP patient reported that the EOP assisted him in managing depression, paranoia, and auditory hallucinations.

Initial psychiatric and primary clinician assessments documented useful clinical information, although documentation of the status of current symptoms in the primary clinician initial assessment required improvement. The initial IDTT meeting was not attended by the assigned psychiatrist. Treatment planning targeted depression with a goal to reduce it by the establishment of a therapeutic alliance and empathy. Psychosis, an identified symptom, was not targeted. The treatment was not updated during the subsequent routine IDTT, despite reports of increased depression, anxiety, and ongoing psychosis.

This patient was adherent and engaged in treatment. Routine psychiatric contacts described him as psychiatrically stable and the documentation included relevant information regarding medication management, symptom status, and functioning. There was a change in the patient's primary clinician, and the departing clinician appropriately addressed termination issues. Routine primary clinician contacts occurred monthly and were supportive in nature.

During the first week of April 2023, the patient was offered three recreation therapy groups.

**Findings**

The care provided to this patient was inadequate.

Although initial assessments and psychiatric documentation were clinically useful, the deficient primary clinician and group treatment documentation rendered the overall care inadequate. While the patient was stable, the lack of therapeutic treatment other than medication management did not provide him with skills development. In addition, treatment planning was not sufficiently updated, and multidisciplinary collaboration was needed.

**Patient Q**

This 45-year-old EOP patient transferred to MCSP in 2019; he was housed in B yard. His level of care was increased from 3CMS to EOP in May 2022. His provided diagnoses included schizophrenia, obsessive-compulsive disorder, and antisocial personality disorder. He was prescribed Vistaril and Zyprexa. His healthcare record was randomly selected to assess the adequacy of care provided.

During the two quarterly IDTT meetings, two different psychiatric providers were in attendance, although neither was the assigned psychiatrist. IPOCs that targeted delusions were unchanged since May 2022, and an IPOC that targeted anxiety and hallucinations remained unchanged since December 2019.

Routine telepsychiatry contacts occurred consistently throughout the six-month review period. The patient was reportedly stable, and gained the awareness of decreased auditory hallucinations with medication adherence. The patient's symptoms, level of functioning, and medication adjustments were documented.

Between the onset of the reporting period and the site visit, a timeframe of over six months, the patient was seen for three routine primary clinician contacts. Documentation indicated that only one of those contacts was a meaningful therapeutic contact.

During the first week of April 2023, the patient was offered five recreation therapy groups.

**Findings**

The care provided to this patient was inadequate.

Although the patient had severe mental illness, primary clinician contacts did not provide adequate monitoring and clinician engagement. Further, treatment planning was outdated and lacked treatment team coordination given the assigned telepsychiatrist's absence at the IDTT meeting.

**Patient R**

This 31-year-old EOP patient transferred to MCSP in May 2022; he was housed in A yard. He was provided diagnoses of generalized anxiety disorder and PTSD. He was prescribed Lexapro, Remeron, and Vistaril. His healthcare record was randomly selected to assess the adequacy of care provided.

During two quarterly IDTT meetings, IPOCs that targeted impulsive behavior and depression were established in August 2022, and an IPOC for anxiety implemented in June 2022 was continued. Interventions were appropriate and focused on skills development to target symptom reduction; however, these interventions were not implemented in treatment. The clinical summary provided a synopsis of the patient's symptoms, functioning, and treatment engagement; however, it was not useful as it had been minimally changed since first documented in August 2022. Additionally of concern, the repeated past outdated information was not clearly noted as carried-over historical information, and this resulted in impairment in continuity of care. The patient was identified as a treatment refuser; however, an IPOC was not developed to target treatment nonadherence. While treatment modifications were identified, they were not implemented in treatment.

During the six-month review period, individual primary clinician contacts occurred between one and three times monthly, with most occurring twice monthly. Most of these contacts were therapeutic in content with a focus on the patient's interpersonal relationships, which was not consistent with documented treatment planning.

Most monthly psychiatric contacts often occurred at cell front, although the documentation did not consistently indicate that the nonconfidential contact occurred due to a missed scheduled appointment. For those contacts, the documentation was brief in content, and mental status documentation was minimally changed, and at times inconsistent with the brief individualized summary of the contact. For example, in the summary of assessment on March 30, 2023, it was documented that "sleep is ok…eating ok" and on September 14, 2022, it was documented that "sleep has been pretty good and normal appetite". However, in the mental status section during that period, documentation indicated that "sleep is poor appetite is fair." Similarly, during that same timeframe, the patient's affect was described as restricted; in contrast, on January 4, 2023, he was described as smiling. Despite a disclosure of suicidal ideation with increased depression regarding the upcoming holidays and the anniversary of family deaths, during the December 7, 2022 cell-front psychiatric contact, a SRASHE was not completed. This was of concern as the patient had previously been assessed with moderate chronic suicide risk.

During the first week of April 2023, the patient was offered six recreation therapy groups.

**Findings**

The care provided to this patient was inadequate.

Psychiatric assessments often occurred at cell front, documentation was unreliable regarding the patient's mental status, and there was a failure to appropriately assess a report of suicidal ideation. This was particularly problematic given the lack of routine primary clinician contacts that could provide opportunities for skills development. Lastly, treatment planning documentation was not clinically useful for continuity of care. Given the outdated clinical summary and the treatment focus on interpersonal relationships in routine primary clinician contacts, IPOCs were not individualized to the patient's treatment needs.

**Patient S**

This 44-year-old EOP patient had a long history of mental illness, and was housed in B yard. He was provided diagnoses that included schizoaffective disorder, major depressive disorder, and various substance related disorders. He was prescribed several psychotropic medications. His healthcare record was randomly selected to assess the adequacy of care provided.

The patient had a brief MHCB stay in January 2023 due to suicidal ideation precipitated by the death of his sister, and was discharged to return to the EOP. A SRASHE was completed that assessed moderate chronic and low acute suicide risk. Documentation indicated that the patient stated that he had not been suicidal but needed a break from the housing unit to process this loss.

The primary clinician initial assessment included minimal original documentation and lacked a useful clinical summary of the patient's current treatment needs. Both primary clinician and psychiatric assessments copied historical information from previous documentation; there was no synthesis of the information in the context of the patient's change in treatment needs since the MHCB admission.

While five-day follow-up occurred, the documentation indicated that interventions were not sufficiently individualized. Specifically, documentation was completed, but it was generic in content; there was a lack of discussion of the patient's ability to manage his grief, and there was a missed opportunity to utilize clinical interventions to address the patient's grief and coping deficits.

The IPOC established at the initial IDTT targeted negative mental health symptoms, which was not clearly in congruence with the initial assessment. Other than an inappropriate outcome measure of "no MHCB admits or endorsing active SI (suicidal ideation)," risk of self-harm, grief, and increased auditory hallucinations were not targeted despite identification during the IDTT.

The assigned psychiatrist did not attend the IDTT meeting. No routine psychiatric contact was documented in February 2023. Documentation of the contact in March 2023 provided a useful description of the patient's depressive symptoms and functioning. The two monthly primary clinician contacts after the MHCB admission were clinically relevant.

During the first week of April 2023, the patient was offered three recreation therapy groups.

**Findings**

The care provided to this patient was inadequate.

The patient had a serious mental illness and recent MHCB admission for stabilization; however, there was a lack of timely psychiatric and primary clinician contacts, which was particularly concerning given the patient's recent, significant loss. Although it appeared that the patient's treatment needs were addressed during routine clinical contacts rather than adequately targeted in treatment planning, the lapses in timely clinical contact for this patient were concerning and inadequate.

**Patient T**

This 32-year-old EOP patient transferred to MCSP in February 2023 and was housed in A yard. Provided diagnoses were not included in the official place of record. The patient was prescribed Vistaril on an as-needed basis. His healthcare record was randomly selected to assess the adequacy of care provided.

Since placement in CDCR in 2017, the patient received mental health services at the EOP, MHCB, acute, and intermediate levels of care; he had four MHCB hospitalizations. He was discharged from the ICF to the EOP in March 2022. Shortly after arrival to MCSP, he made a suicidal statement and was placed on suicide watch overnight. The patient attributed the statement to anxiety related to a new cellmate. The patient was not provided any skills or interventions to address his anxiety prior to discharge from suicide watch.

Documentation in suicide risk assessments indicated that the patient's suicidal statement did not "appear to be genuine in nature," and staff indicated that he had attempted to manipulate his housing. Given his risk factors, including a history of self-injury that warranted MHCB placements, the assessment of low chronic risk was likely an underestimation. The patient was referred for five-day follow-up that occurred timely, but documentation was not individualized to the precipitating stressor. It appeared that at least one assessment occurred at cell front, as it was documented that the patient "walked away from the door."

Initial psychiatric and primary clinician assessments lacked a useful summary of the patient's current symptoms, functioning, and psychiatric history; thus, the rationale for an IPOC that targeted depression was unclear. Further, no treatment interventions were established. Although the patient reported anxiety during his initial IDTT that was also identified during the initial psychiatric documentation, these reports did not result in the establishment of an anxiety IPOC. Relatedly, psychiatric documentation of regularly induced vomiting was not targeted in treatment. Of note, the assigned psychiatrist was not present at the initial IDTT meeting. Lastly, despite an incident of poor distress tolerance that resulted in a suicidal statement, danger to self was not established as an IPOC.

Routine psychiatric documentation was very brief in content and was not clinically useful. The patient was described as malodorous, but his hygiene was not assessed further, nor was medication adjustment considered. This issue was also not addressed at the routine IDTT meeting, likely due to a covering psychiatrist attending that meeting. There were no primary clinician routine contacts documented from the time of the initial primary clinician assessment in March 2023 to mid-May 2023.

This patient was offered six groups during the first week of April 2023.

**Findings**

The care provided to this patient was inadequate.

The suicide risk assessment narrowly viewed the patient's intentions as manipulative, resulting in missed opportunities to treat his distress at the time of suicide watch discharge and during five-day follow-up. The lack of a useful clinical summary in the initial psychiatric and primary clinician assessments was disruptive to continuity of care and adequate suicide risk assessment. Lastly, the patient's treatment needs were not targeted in treatment planning; there was a lack of multidisciplinary treatment planning, and signs of decompensation were not adequately assessed by treatment providers.

**Patient U**

This 37-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the MCSP EOP hub. He entered CDCR for his current term on October 6, 2016, and was placed at the 3CMS level of care as he had received mental health services at that level during his prior incarceration. During the current incarceration, the patient had several MHCB admissions and referrals for acute and intermediate levels of care. His first MHCB admission occurred in March 2017, and he was discharged to the EOP level of care. He subsequently had three additional MHCB admissions; two acute care admissions from May to September 2017, and February to April 2020; and three intermediate care admissions from September 6 to September 27, 2017, December 2017 to September 2018, and April 2020 to May 2021. The patient had been retained at the EOP level of care since intermediate care discharge in May 2021.

The patient reported four previous suicide attempts using various methods. He was previously included in the suicide risk management program until he was removed from that program on March 23, 2022 due to absence of suicidal ideation and attempts and long-term stability. A SRASHE on September 22, 2022 assessed high chronic and low acute suicide risk.

The patient was placed in the EOP hub on September 15, 2022, and remained there until transfer to the RJD EOP on November 17, 2022. While in the EOP hub, he was provided diagnoses of major depressive disorder, recurrent, and antisocial personality disorder. He was prescribed Wellbutrin and Seroquel at the time of EOP hub placement with reported medication adherence.

The initial IDTT meeting occurred on September 21, 2022, and it was timely; the patient was not in attendance as he refused. A senior psychologist supervisor, psychiatrist, primary clinician, CC

I, and psych tech were in attendance. The initial treatment plan did not identify or contain any IPOCs, goals, treatment focus areas, or interventions. The clinical summary stated that although the patient would be retained at the EOP level of care, it indicated that there was "ample evidence" that he could function at the 3CMS level of care. The patient was described with no functional impairments, normal ADLs, and as highly independent. Although the clinical summary indicated that the patient was medication adherent, this statement contradicted other information in the same treatment plan that the psychiatrist planned to taper the patient's medications due to nonadherence. This initial IDTT was the last IDTT meeting documented prior to the patient's transfer to the RJD EOP on November 17, 2022.

Psychiatric and primary clinician initial assessments occurred timely. The patient was seen weekly for primary clinician contacts and monthly for psychiatric contacts during his ASU placement. Four of eight weekly primary clinician contacts occurred in confidential settings, while the remaining contacts occurred at cell front due to staffing shortages and modified programming. Psychiatric contacts occurred timely in a confidential setting. Primary clinician and psychiatric progress notes indicated that the patient remained stable and demonstrated generally normal mental status throughout his time in the ASU. Review of recreation therapist group progress notes indicated that the patient attended most assigned groups prior to RJD EOP transfer.

**Findings**

The care and treatment provided to this MCSP EOP hub patient was inadequate.

Although primary clinician and psychiatric progress notes indicated that the patient received appropriate and timely individual contacts throughout the review period, the treatment plan documentation was inadequate, as it did not identify any IPOCs, including goals and interventions for the patient. Further, the patient should have received a second 30-day IDTT in late October 2022; however, this IDTT meeting did not occur prior to transfer to the RJD EOP on November 17, 2022.

Of concern were the nonconfidential cell-front contacts that occurred due to severe staffing shortages and the need for an emergency institutional triage plan.

**Patient V**

This 47-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the MCSP EOP hub. He entered CDCR for his current term on July 10, 2010 to serve a life sentence with parole. This patient was placed in the EOP hub between October 7 and November 18, 2022.

The healthcare record documentation was inconsistent regarding the patient's clinical history in CDCR, and the initial primary clinician assessment and treatment plan contained inaccurate information. The initial ASU primary clinician assessment indicated, based on information pulled forward from previous documentation, that the patient was first placed in the MHSDS at the 3CMS level of care on May 19, 2021. The initial IDTT treatment plan also contained this

statement in the clinical summary section. However, other healthcare record documentation indicated that the patient entered the MHSDS at the 3CMS level of care in 2011, and had previously received mental health services at the EOP level of care during 2014. His history was also significant for several MHCB admissions due to suicidal ideation or attempts. He was previously provided diagnoses of substance-induced psychotic disorder, schizoaffective disorder, amphetamine use disorder, and major depressive disorder. While housed in the ASU, he was provided diagnoses of major depressive disorder, amphetamine use disorder, and antisocial personality disorder. He was prescribed Effexor, BuSpar, and clonidine.

The initial IDTT meeting occurred on October 12, 2022. This was the patient's only IDTT meeting from ASU placement on October 7, 2022 and ASU release on November 17, 2022. The IDTT meeting included the necessary participants. The patient was identified as a high treatment refuser, as he refused more that 50 percent of offered treatment. Treatment goals and interventions were appropriate for the patient's symptoms and clinical presentation, focusing on treatment nonadherence, anger, and depressed mood. Treatment goals were individualized and measurable. The patient had a history significant for self-harm, a serious suicide attempt, and chronic passive suicidal ideation. He received SRASHEs on October 26, 2022 and November 15, 2022 while housed in the ASU; both assessed high chronic and moderate acute suicide risk. A safety plan was included in the treatment plan which identified appropriate safety and coping strategies.

This patient received a timely initial primary clinician assessment on October 7, 2022, and the initial psychiatric assessment also occurred timely on October 10, 2022 after ASU placement. He was seen timely for psychiatric contact on November 8, 2022; this contact occurred at cell front, as the patient refused to leave his cell for a confidential contact. During that encounter, he denied depressed mood, and reported normal sleep and no medication side effects. He was reportedly medication adherent and requested prescribed clonidine administered daily rather than ordered on an as-needed basis. Primary clinician contacts occurred timely during the ASU stay. Some contacts occurred in a confidential setting, and some occurred at cell front.

The patient was placed on the high treatment refusal list at the end of October 2022, and was seen for daily primary clinician contacts between November 2 to November 4, 2022. His group attendance improved, and the patient was removed from the high treatment refusal list on November 8, 2022. The final primary clinician contact in ASU occurred on November 15, 2022 in a confidential setting. At the end of that session, the patient reported that he had been experiencing daily suicidal ideation; subsequently, a SRASHE was completed at that time. The patient was not referred to the MHCB, as he did not have a plan or actual intent to act on the suicidal ideation. He was released from the ASU to MCSP Facility A on or about November 18, 2022, where he continued to receive mental health services at the EOP level of care.

**Findings**

The care and treatment provided to this patient in the MCSP EOP hub was generally adequate.

There were, however, documentation issues noted in the initial primary clinician assessment and treatment plan. The initial ASU IDTT meeting occurred timely; however, the treatment plan's

769

clinical history was inaccurate and contained a significant amount of information that was pulled forward from previous documents. Treatment plan goals and interventions were appropriate for the patient's clinical presentation and symptoms. He received timely clinical contacts with the primary clinician and psychiatrist. The patient was appropriately identified as a high treatment refuser when he did not attend assigned groups. He was also seen at cell front daily for three consecutive days until his group attendance improved, and was removed from the high refusal list. SRASHEs were completed on two occasions when the patient expressed suicidal ideation, the provided risk assessments were appropriate, and a safety plan was developed.

**Patient W**

This 34-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the MCSP EOP hub. The patient arrived at CDCR for his current term on September 2, 2016, and was included in the MHSDS on September 19, 2016 at the 3CMS level of care. He was placed in the EOP hub from February 6 through February 20, 2023.

The patient had a history of treatment at the 3CMS and EOP levels of care, and his history was significant for three prior MHCB admissions but no PIP or DSH placements while incarcerated in CDCR. He reportedly had two psychiatric hospitalizations in the community. His most recent MHCB admission occurred from February 7 through February 16, 2022, due to danger to others.

The patient was placed in the MCSP EOP hub on February 6, 2023 for refusing to accept housing and reported safety concerns. Prior to transfer to the ASU, the patient was identified as a high treatment refuser, attending 12 percent of treatment, and demonstrating very poor medication adherence; he otherwise was described as functionally stable.

The patient reported one prior suicide attempt in 2012 when he was in a county jail. While in CDCR, a SRASHE was completed on August 19, 2022, when the patient reported suicidal ideation to be moved from his yard due to safety concerns. During this term, he was placed in the ASU until February 20, 2023, when he was transferred to MCSP's Facility A. While in the EOP hub, he was provided diagnoses of opioid disorder, severe, and amphetamine use disorder, as well as a provisional diagnosis of schizoaffective disorder, depressive type. Although he was reportedly medication nonadherent previously, the patient was reportedly medication adherent while housed in the ASU, and the medications were effective in symptom reduction.

The patient received timely initial and routine clinical contacts during his ASU stay. The initial primary clinician assessment occurred on February 8, 2023. During that assessment, the patient was described as very anxious, and reported an increase in auditory hallucinations consisting of voices speaking negatively about him. He also reportedly requested to see the psychiatrist to discuss medication treatment.

The patient was seen for the initial psychiatric assessment on February 9, 2023; the session occurred in a confidential setting. The patient again reported elevated anxiety and intrusive auditory hallucinations. He denied thoughts or intent to harm himself. The patient was prescribed Zyprexa, clonidine, and Remeron.

The initial IDTT meeting occurred on February 15, 2023. The necessary participants were in attendance, as well as the patient who participated in the meeting. The patient rated his anxiety at seven on a ten-point scale, and reported depressed mood. The treatment plan contained IPOCs for substance abuse, anger, and medication adherence. Goals were measurable and appropriate to the patient's clinical presentation and needs. He reportedly agreed to attend groups and individual sessions with the ASU primary clinician; however, he did not attend any assigned groups during his ASU stay.

The patient was seen for two routine primary clinical contacts while housed in the ASU. A primary clinician contact on February 14, 2023 was conducted at cell front in a nonconfidential setting due to staffing shortage protocols. The primary clinician note indicated that the patient reported that he was stable but did not want to attend ASU groups.

The patient was seen for a psychiatric contact on February 15, 2023, and it was unclear if this contact occurred in a confidential setting. The patient told the psychiatrist that his medications were effective, and his anxiety had decreased. He requested that clonidine be prescribed regularly rather than on an as-needed basis.

The patient did not attend any groups during his 14-day stay in the ASU.

**Findings**

The care and treatment provided to this patient in the MCSP EOP hub was adequate.

Primary clinician and psychiatric contacts occurred timely, as did the IDTT meeting. The treatment plan was individualized and contained measurable and realistic goals and interventions given his brief ASU placement. Medications were adjusted appropriately, and medication management appeared effective. The patient was assigned to groups, although he chose not to attend. There was documentation that the primary clinician encouraged the patient to attend groups.

Of concern were the nonconfidential cell-front contacts that occurred due to severe staffing shortages and the need for an emergency institutional triage plan.

**Patient X**

This 42-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the MCSP EOP hub. This patient entered CDCR in 1997 at age 16, when he received a 55-year sentence, and he remained incarcerated since that time.

The patient had one prior inpatient hospitalization during 2019 that lasted 204 days. He was reportedly stable at the EOP level of care for the past several years. He was placed in the EOP hub on or about December 24, 2022 for battery on a peace officer. At the time of ASU placement, he was provided diagnoses of major depressive disorder, recurrent, moderate, and generalized anxiety disorder. He was reportedly medication adherent with prescribed lithium, Cogentin, Zoloft, and Remeron. The clinician-to-clinician note when the patient transferred to

the ASU described the patient as child-like and "easy-going," and indicated that the patient's most significant stressor was not reaching his mother by phone. The patient was assessed with moderate chronic and low acute suicide risk throughout his stay in the EOP hub.

The initial IDTT, initial psychiatric assessment, and initial primary clinical assessment all occurred timely. The initial IDTT meeting included the necessary participants, and the patient was in attendance. Although the treatment plan contained an appropriate theoretical formulation, the section of the treatment plan for progress towards goals (IPOCs) was not completed. It also appeared that the higher level of care section was likely pulled forward from prior treatment plans, as it mentioned that the patient refused 68 percent of groups, but a higher level of care was not considered because the patient was functioning well despite not attending groups.

The initial primary clinician assessment occurred on December 27, 2022, and it was also incomplete. The note indicated that the primary clinician met with the patient at cell front, and the clinician indicated covering for the patient's assigned primary clinician who was on vacation. The risk of violence section and suicide history sections were not completed. These forms were not updated at any time during the patient's ASU stay.

The initial psychiatric assessment occurred on December 27, 2022 via telepsychiatry with the assistance of a medical assistant as the telepresenter. The patient denied any acute or active distress. He reported anxiety but denied hopelessness, suicidal ideation, and homicidal ideation. He was reportedly adherent with his prescribed medications.

The patient received timely psychiatric contacts during the review period. After the initial psychiatric assessment on December 27, 2022, the patient was seen for confidential psychiatric contacts on January 23 and February 16, 2023. At the January 23 psychiatric contact, the patient denied depressed mood, but expressed frustration that he had not yet received his property despite placement in the ASU for almost a month. He was prescribed Zoloft, Abilify, Remeron, lithium, and Cogentin, with reported medication adherence. He demonstrated no evidence of psychosis or acute symptoms and denied suicidal and homicidal ideation. At the February 16, 2023 psychiatric appointment, the patient remained frustrated due to not receiving his property but was otherwise stable, and the psychiatrist did not note any difficulties or problems.

Primary clinician contacts generally occurred timely throughout the review period and occurred in both confidential and cell-front settings. The cell-front contacts occurred due to staffing shortages or the patient refusing to attend a confidential appointment. Although the treatment plan did not include IPOCs, IPOCs in the progress notes referenced goals focused on reducing anxiety and depressed mood; however, no clinical interventions were documented in the primary clinician progress notes.

The patient's clinical presentation remained relatively consistent throughout the review period. He consistently reported stress related to an RVR, but was also reportedly medication adherent and consistently denied significant mental health symptoms or distress. The patient attended assigned groups consistently, attending 24 of 30 groups during the review period.

**Findings**

The care provided to this patient in the MCSP EOP hub was generally adequate.

However, clinical documentation and treatment planning were inadequate. The patient's treatment plan was incomplete, and no specific goals or clinical interventions (IPOCs) were included in the treatment plan. The patient received timely primary clinician and psychiatric contacts. Psychiatric appointments occurred in confidential settings. The patient was medication adherent, and his symptoms appeared to respond well to prescribed medications. The patient also demonstrated good group attendance, attending anger and stress management, and leisure groups. Primary clinician appointments were offered in a confidential setting on a biweekly basis consistent with the institution's staffing triage plan; however, this resulted in some nonconfidential contacts. Of concern were the nonconfidential cell-front contacts that occurred due to severe staffing shortages and the need for an emergency institutional triage plan.

**Patient Y**

This 39-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the MCSP EOP hub. He was placed in the EOP hub from September 22 to November 21, 2022. The patient was a multi-term CDCR inmate who reportedly entered CDCR for this current term in September 2019. He was housed in general population and not included in the MHSDS during prior incarcerations. The patient was placed in the MHSDS after his first admission to the MHCB on November 22, 2020 due to significant impairment due to mental illness. He was discharged from the MHCB on November 22, 2020 at the 3CMS level of care. The patient remained in the 3CMS program until October 2, 2021, when his level of care was increased to EOP. He reportedly was placed in the EOP after he was discovered keeping a dead bird in his cell and was observed talking to himself as he walked on the track during yard, as well as repeatedly flooding his cell.

The patient's history was not significant for suicidal or self-injurious behaviors, and he was not prescribed psychotropic medications at the time of EOP hub placement. He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. At the time of ASU placement, he denied current mental health symptoms, history of mental health treatment in the community, or history of substance abuse.

The initial primary clinician and psychiatric assessments and the initial IDTT occurred timely upon ASU placement. The initial psychiatric assessment occurred on September 26, 2022, and it was conducted at cell front due to the patient's refusal to leave his cell for a confidential setting. The patient's diagnoses were noted as adjustment disorder with mixed emotional features and disturbance of conduct, and history of unspecified schizophrenia spectrum disorder. He reportedly denied any mental health symptoms and refused to consider taking psychotropic medications. The initial primary clinician assessment was conducted on September 27, 2022. The patient was described as stable. The clinician-to-clinician note from the patient's mainline EOP primary clinician to the ASU primary clinician described the patient as generally stable and that he usually refused to attend assigned groups. That note also indicated that the patient was previously referred to the ICF, but that referral was rescinded after a *Vitek* hearing.

The patient refused to attend his initial IDTT meeting on September 28, 2022. The IDTT meeting otherwise included the necessary participants. The IDTT documentation indicated that the patient denied symptoms and requested placement at the 3CMS level of care. The treatment plan provided IPOCs targeting the patient's irritability and treatment nonadherence. The goals and interventions were appropriate and individualized, including CBT and motivational interviewing interventions to improve insight, judgment, and treatment adherence.

The patient received timely primary clinician and psychiatric contacts during his ASU placement. A psychiatric contact occurred on October 27, 2022 at cell front due to the patient's refusal to leave his cell for a confidential setting. The psychiatrist noted the patient did not demonstrate or report current difficulties or problems, and the patient continued to refuse medication treatment. Primary clinician contacts occurred timely on a weekly basis during the patient's ASU placement. All documented primary clinician contacts occurred at cell front due to the patient's refusal to attend a confidential session. The patient's mental status and clinical presentation were consistently described as stable, and he consistently requested removal from the EOP.

The patient never attended a confidential individual session and did not attend any of his assigned groups. He reportedly left his cell for yard and showers. He was appropriately placed on the high treatment refusal list on October 17, 2022, and received daily check-ins from his primary clinician between October 17 and November 18, 2022.

The patient also never attended a full group session during his ASU stay. The patient reportedly did not want to attend groups if placed in a therapeutic module. It appeared that the high refuser check-ins were conducted consistently and appropriately but were generally ineffective at consistently achieving adequate group attendance.

**Findings**

The care and treatment provided to this MCSP EOP hub patient was adequate.

Primary clinician contacts occurred timely during the ASU placement. Although all primary clinician contacts were conducted at cell front, it appeared that the patient was offered confidential sessions despite his consistent refusals. Treatment plan goals and interventions were appropriate and individualized, despite the primary clinician not having the opportunity to appropriately implement the interventions prescribed due to the patient's refusal to leave his cell. The primary clinician appropriately provided daily high refuser check-ins after the patient was placed on the high treatment refusal list. The patient's mental status and clinical presentation remained stable throughout his ASU placement, despite his treatment refusal and lack of engagement with the treatment team.

**Patient Z**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of care and treatment provided in the MCSP EOP hub. He entered CDCR for his current term in September 2016. He was housed in the EOP hub from November 5 through November 22, 2022 due to self-reported safety concerns. He was placed in the EOP hub directly from the CMF MHCB. He was

admitted to the MHCB after reporting suicidal ideation due to safety concerns, and remained in the MHCB for over 30-days prior to placement in the EOP hub. The clinician-to-clinician note from the CMF MHCB to the MCSP ASU noted that the patient indicated major safety concerns in the D-yard EOP at MCSP. Prior to MHCB and ASU placement, the patient was a Level II EOP patient housed in the MCSP D-yard. The patient was in the suicide risk management program, and reportedly utilized self-injurious behavior to cope with anxiety. He was reportedly placed in the suicide risk management program after being assessed with high suicide risk in the MHCB due to a long pattern of self-injurious behavior both in CDCR and in the community.

The initial IDTT meeting occurred timely on November 9, 2022. The IDTT meeting included the primary clinician, psychiatrist, psychologist supervisor, psych tech, and CC I. The patient attended and participated in the IDTT. The problem list identified PTSD, anxiety disorder, depression, and treatment nonadherence. The treatment plan did not contain IPOCs, goals, or interventions in the appropriate sections of the treatment plan; the only indicated goal was in the safety plan that was initiated while the patient was housed in the MHCB. The only interventions identified in the treatment plan were briefly mentioned in the clinical summary, and included dialectical behavior therapy and improvement of sleep and hygiene; however, these interventions were absent throughout the rest of the treatment plan. There was also no documentation of a mental health master treatment plan psychiatry review in the healthcare record for the EOP hub November 9, 2022 treatment plan.

This patient received timely and appropriate five-day follow-up from November 5 through November 9, 2022 after MHCB discharge and ASU placement. A timely initial psychiatric assessment occurred on November 7, 2022. The assessment was conducted in a confidential setting. The assessment note indicated that the patient was recently admitted to the CMF MHCB due to danger to self, and the patient reported ongoing safety concerns in D-yard at MCSP. The patient also reported auditory hallucinations, paranoia, and social anxiety at the time of ASU placement. He was prescribed Remeron and Vistaril to address depressive and anxiety symptoms. The progress note indicated that the psychiatrist discussed treatment with Effexor, but the patient reported that Effexor had previously caused nightmares. The psychiatrist appropriately provided psychoeducation on treatment with Prazosin for nightmares, and the patient reportedly stated that he would consider these medications. A subsequent psychiatric contact occurred on November 17, 2022, when the patient reportedly expressed frustration and fear as he would return to the MCSP D-yard. At that contact, the patient reportedly threatened to stop eating and told the psychiatrist "maybe when I am back eating I will take the Prazosin for nightmares." The patient denied a suicide plan or specific intent, but stated that he did not want to live and requested to see his primary clinician.

This patient did not receive an initial primary clinician assessment upon ASU placement. He was seen for a primary clinician contact on November 8, 2022; it was unclear whether this contact occurred in a confidential setting. This contact was described as an introductory meeting between the primary clinician and patient, and the patient reportedly denied any acute distress. The progress note identified major depressive disorder, recurrent, moderate, and PTSD as problem areas but did not identify any IPOCs, goals, or interventions. A second routine primary clinician contact occurred on November 17, 2022. It was again unclear whether this contact occurred in a confidential setting. The patient's mood at this contact was described as calm with

denial of acute distress; this observation was in stark contrast to the observations described in the psychiatric note documented approximately 30 minutes later. There was no documentation that the primary clinician followed up with the patient after his request to be seen by the primary clinician during the psychiatric contact. The patient was not seen for subsequent primary clinician contacts prior to ASU release on November 22, 2022.

A SRASHE was completed on November 17, 2022 after the patient reported suicidal ideation; however, the SRASHE noted that the patient reported suicidal ideation due to "being bored," and he quickly retracted the statement and adamantly denied suicidal ideation upon further processing and discussion with the clinician. No safety plan was developed, and the patient was returned to his cell. The patient's chronic risk was assessed as high, and acute risk was assessed as low.

**Findings**

The care and treatment provided to this MCSP EOP hub patient was inadequate.

The documentation of clinical care indicated several areas of concern. No specific treatment planning was provided for this patient to address his clinical needs and presentation. The treatment plan did not contain any IPOCs or relevant goals or interventions to address the major depressive disorder and PTSD identified as problem areas. He did not receive an initial primary clinician assessment after ASU placement. The patient did not attend groups, and it was unclear whether he left his cell for primary clinician appointments. Psychiatric contacts, however, occurred timely and were clinically appropriate. It also appeared that the patient was adherent with prescribed medications.

Healthcare documentation indicated that after the patient left the EOP hub to return to the MCSP D-yard, he reported suicidal ideation and was returned to the MHCB due to danger to self. He subsequently initiated a hunger strike, and was eventually admitted to DSH for stabilization.

**Patient AA**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of care and treatment provided in the MCSP EOP hub. The patient entered CDCR for his current term in 2016. He was placed in the MCSP EOP hub from October 4 through November 17, 2022 for fighting. He was a multi-term CDCR inmate currently serving a nine-year sentence. He received mental health treatment at both the 3CMS and EOP levels of care, and his clinical history was also significant for three MHCB admissions and one ICF hospitalization. The patient reportedly did not have a history of suicidal or self-injurious behaviors. His historical diagnoses included major depressive disorder, unspecified bipolar disorder, substance-induced psychosis, antisocial personality disorder, borderline personality disorder, and methamphetamine use disorder. He also had a history of delusional and disorganized thinking which impaired his ability to follow instructions and maintain social relationships. During his ASU placement, a routine SRASHE was completed on November 16, 2022 immediately prior to transfer from the ASU. The patient was assessed with moderate chronic and low acute suicide risk.

The patient was seen timely for the initial IDTT meeting on October 5, 2022.  The IDTT meeting included the necessary participants; however, the patient refused to attend.  The patient reportedly refused due to back pain.  The clinical summary section was pulled forward from previous treatment plans and notes.  The treatment team identified specific and individualized goals for the patient targeting delusional thinking and substance use difficulties.  Although the goals and interventions were carried forward from the previous treatment plan, they remained appropriate, individualized, and measurable.  This initial IDTT meeting was the only IDTT that occurred prior to the patient's transfer to RJD on November 17, 2022.

This patient received timely primary clinician and psychiatric initial assessments on October 4, 2022, the day of ASU placement.  In the primary clinician initial assessment, the history of present illness section was pulled forward from the previous clinician's progress notes.  The clinician documented the patient's functional impairments appropriately and noted the patient's history of occasionally using Trileptal.  The psychiatric initial assessment confirmed that the patient was prescribed Trileptal, Effexor, and Vistaril; however, he was not prescribed an antipsychotic medication, despite the presence of psychosis including delusional and disorganized thinking.  The psychiatric assessment also noted the patient's extensive substance abuse history.

Primary clinician contacts occurred timely during the patient's ASU stay; however, it was unclear which contacts occurred in a confidential setting.  Primary clinician progress notes documented the patient's treatment engagement, including work on goals identified in the treatment plan; the patient appeared to respond well to the interventions provided.  He was consistently described with significant delusional thinking, and did not attend groups; however, he was also described as generally stable without signs of distress or decompensation.

At a scheduled, confidential psychiatric contact on November 1, 2022, the patient was described as exhibiting grandiose delusional thinking.  The psychiatrist noted that the patient should remain at the EOP level of care.  The patient was placed on the high treatment refuser list on October 24, 2022, after he met the criteria for consideration of referral to a higher level of care due to attending fewer than 50 percent of assigned treatment activities.  The patient was appropriately provided daily cell-front high-refuser check-ins by the primary clinician from October 24 through November 4, 2022.  These efforts appeared successful, as documentation indicated that the patient attended all but one of his assigned groups between November 4, 2022 and his transfer to RJD on November 17, 2022.

**Findings**

The care and treatment provided to this MCSP EOP hub patient was adequate.

The patient received timely clinical contacts, including initial assessments, IDTT meetings, and scheduled individual contacts with the primary clinician and psychiatrist.  Although he initially refused to attend groups, the patient appeared to respond well to daily check-ins provided after placement on the high treatment refusal list, and he attended most offered groups near the end of ASU placement.  The goals and interventions in the treatment plans were appropriate and measurable, and primary clinician progress notes reflected implementation of those

interventions.  The patient also remained medication adherent during ASU placement.  Although the patient remained with significant delusional thinking during ASU placement and at discharge, his symptoms were not disruptive to others, nor did they appear to negatively affect his behavior.

**Patient BB**

This 45-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the MCSP EOP hub.  He was placed in the EOP hub between September 21 and December 6, 2022 for indecent exposure.  He had a history of delusional thinking, hypomania, anxiety, depression, auditory hallucinations, and indecent exposure.  There was no documented history of suicidal ideation or self-harming behaviors.  While housed in the ASU, the patient was provided diagnoses of bipolar I disorder and delusional disorder.

The initial IDTT meeting on September 28, 2022 occurred timely, and necessary staff were in attendance.  The patient refused to attend the IDTT.  Although there were no mental health diagnoses identified in the problem list, the IPOCs identified in the treatment plan addressed the patient's difficulty with anxiety and delusional thinking.  The treatment team focused treatment and interventions on dissuading the patient's impulsive behaviors and helping the patient to develop insight regarding the reasons for those behaviors.  The EOP functional analysis was complete and noted no limitations.  The patient was described as quiet, respectful, and medication adherent since his ASU placement.

The patient was seen for timely primary clinician and psychiatric initial assessments.  At the September 22, 2022 initial psychiatric assessment, the patient reported hearing voices and endorsed delusional thinking but was otherwise noted as behaviorally appropriate.  He was prescribed Wellbutrin, Zyprexa, and Remeron.  Documentation indicated that most, if not all, of the information contained in the initial primary clinician assessment on September 23, 2022 was pulled forward from previous progress notes and treatment plans.  The clinical history was pulled forward from a 2020 treatment plan, and the clinical summary, including goals and interventions, was from the most recent IDTT prior to ASU placement.  The initial primary clinician assessment was generally inadequate, as nearly all of the clinical information was pulled forward from previous documents, with no update provided to inform treatment based on the patient's clinical presentation upon ASU arrival.

The patient received timely and appropriate individual primary clinician contacts during his ASU placement.  The primary clinician contacts occurred weekly and alternated between confidential and cell-front contacts as outlined by the institution's staffing triage plan.  The patient was consistently described as cooperative with no demonstration of acute distress or behavioral concerns during ASU placement.  He was also reportedly medication adherent and attended most assigned groups.

The psychiatric contacts also occurred timely.  The patient was seen for a confidential psychiatric contact on October 20, 2022, when his medications were continued, and he reportedly was calm, sleeping well, and attending most groups.  At a confidential psychiatric contact on November 17, 2022, the patient demonstrated appropriate behavior, reported no distress, and was awaiting transfer to the CSP/Sac PSU.  The patient transferred to the CSP/Sac PSU on December 6, 2022.

**Findings**

The care and treatment provided to this patient in the MCSP EOP hub was adequate.

The patient received timely clinical contacts and IDTT meetings; however, the initial primary clinician assessment was inadequate. The interventions and goals contained in the treatment plan were appropriate to the patient's clinical presentation and needs, and the treatment team appropriately focused on reducing the patient's impulsivity and increasing his insight regarding his behaviors. Although he was not offered many groups due to institutional staffing shortages, the patient did attend most assigned groups. The primary clinician met with him consistently and provided appropriate treatment and interventions. The patient also remained medication adherent during ASU placement and remained stable until he was transferred on December 6, 2022.

Of concern were the nonconfidential cell-front contacts and limited group therapy that occurred due to severe staffing shortages and the need for an emergency institutional triage plan.

**Patient CC**

This 37-year-old patient's healthcare record was reviewed to evaluate the quality of care and treatment provided in the MCSP EOP hub. He was placed in the ASU due to safety concerns on October 19, 2022 after MHCB discharge. This was the patient's first CDCR term. He arrived to CDCR in July 2022, and was immediately placed in the MHCB due to suicidal ideation; he was subsequently discharged to the EOP level of care. Upon ASU placement, the patient was provided diagnoses of adjustment disorder with depression and anxiety, unspecified personality disorder, and hoarding behaviors. He had several MHCB admissions due to suicidal ideation and danger to self during the six months prior to ASU placement; however, all self-reports of suicidal ideation were later recanted, and the patient later acknowledged safety concerns related to drug debts as the primary reason for his reported suicidal ideation. He was placed in the suicide risk management program after he had more than three MHCB placements in four months.

The initial IDTT meeting timely occurred on October 26, 2022. The IDTT included the necessary participants, including the patient. The treatment team noted that the patient was placed in the ASU for safety reasons, and anticipated transfer to another prison. He was provided diagnoses of adjustment disorder with depression and anxiety, unspecified personality disorder, and hoarding behaviors. The patient was described as doing well in the ASU, and committed to working collaboratively with the treatment team. He was prescribed Remeron. The patient reportedly asked for removal from the EOP and placement at the 3CMS level of care.

This patient was seen timely for confidential initial primary clinician and psychiatric assessments, and routine clinical contacts. At the initial psychiatric assessment on October 25, 2022, the patient requested that his level of care be reduced to 3CMS, and he reportedly demonstrated no distress or functional difficulties. The subsequent psychiatric contact on November 23, 2022 was timely and occurred in a confidential setting. The patient was described as calm, cooperative, and "very happy" since learning of the upcoming transfer.

At the initial primary clinician assessment, the patient reportedly endorsed anxiety, PTSD symptoms, and enemy concerns as primary stressors.  The patient also stated that he reported mental health symptoms and utilized the MHSDS for more rapid transfer from the reception center, and that his most recent MHCB admission was prompted by drug debts.  Primary clinician contacts occurred weekly, and the patient was consistently offered sessions in a confidential setting; however, he declined meeting in a confidential setting for two of four appointments.

The patient was consistently described as functioning well on the unit and denied any suicidal ideation or thoughts of self-harm.  He was observed reading, attending some groups, coping well, and in no acute distress.  He was cleared for transfer on November 23, 2022, but was appropriately placed on the high treatment refusal list that same week due to his lack of attendance at assigned groups.  He was seen for three cell-front high refuser contacts between November 29 and December 1, 2022, and subsequently transferred to CSATF on December 6, 2022.

**Findings**

The care and treatment provided to this MCSP EOP hub patient was adequate.

The patient received timely and appropriate clinical contacts.  Initial primary clinician and psychiatric assessments occurred timely, as did the initial IDTT meeting.  The treatment plan provided by the treatment team was appropriate given the patient's presentation.  He received appropriate primary clinician contacts and interventions and was consistently offered a confidential setting for clinical contacts.  He was appropriately designated as a high treatment refuser after poor group attendance.  The patient remained stable and free of acute distress or symptoms during his ASU stay.

**Patient DD**

This 28-year-old patient's healthcare record was reviewed to evaluate the quality of care and treatment provided in the MCSP EOP hub.  He entered CDCR for his current incarceration on August 2, 2019, and was placed at the EOP level of care on March 30, 2022.  He was admitted for inpatient treatment at the acute level of care from June 20 through July 22, 2022.  The patient was initially placed in the EOP hub on October 31, 2022; he remained there for approximately one week, and was again placed in the MHCB from November 7 - 17, 2022.  He was then discharged to the ASU on November 17, 2022.

The patient met three separate criteria for referral to a higher level of care at the time of ASU placement, including treatment refusal, excessive RVRs, and multiple MHCB placements in the past six months.  He had one documented suicide attempt on June 1, 2022, when the patient was discovered with minor lacerations on his arms; he was subsequently placed in the MHCB for three days.

The initial IDTT meeting, and initial primary clinician and psychiatric assessments were provided timely upon ASU placement on October 31, 2022, but the patient refused to participate in the assessments or attend the initial IDTT meeting.

The psychiatrist noted that the patient refused to meet for a confidential session, did not verbally respond to any questions, nodding in response, and had a history of malingering and cannabis use disorder. The only psychotropic medication prescribed was Vistaril on an as-needed basis. The initial psychiatric assessment note from November 21, 2022 was identical to the initial psychiatric assessment note of October 31, 2022, except the diagnosis was updated to unspecified schizophrenia spectrum disorder and selective mutism based on healthcare record review and the patient's presentation at that time.

The patient refused to respond at all when the primary clinician attempted an initial assessment on October 31, 2022. When the patient returned to the ASU from the MHCB on November 17, 2022, the initial primary clinician assessment note dated November 21, 2022 indicated that the patient reported feeling suicidal but did not have a plan or specific intent. The primary clinician indicated that the patient reported and exhibited depressed mood and paranoid delusional thinking, but the session was spontaneously and abruptly ended by the patient without warning or provocation.

The initial IDTT meeting on November 2, 2022 was attended by necessary participants. The patient refused to attend. The patient was described as selectively mute and not responsive to staff since ASU arrival. No IPOCs were included in the treatment plan provided by this IDTT. The higher level of care section of the treatment plan identified DBT, motivational interviewing, and interpersonal skills training as interventions, but these interventions were not included in the remainder of the treatment plan. The patient was assigned ten structured treatment activities weekly, but refused to attend all assigned groups. Another initial IDTT meeting occurred on November 22, 2022 upon the patient's return to the ASU from the MHCB. This IDTT meeting was also attended by all necessary participants, but the patient again refused to attend. The treatment team continued the prior November 2, 2022 treatment plan, which continued to lack specific IPOCs and treatment goals. The patient received appropriate five-day follow-up after both MHCB discharges.

Primary clinician and psychiatric routine contact attempts occurred timely; however, the patient consistently refused to engage with clinicians. Review of weekly primary clinician progress notes indicated that the patient reported intrusive auditory hallucinations and paranoia, but refused to consider treatment with psychotropic medications to reduce his symptoms. He reportedly denied safety concerns and required only one dose of Vistaril on December 9, 2022. The psychiatrist noted that the patient refused to leave his bed when approached for a clinical encounter at the patient's cell front.

**Findings**

The care and treatment provided to this MCSP EOP hub patient was inadequate.

Clinical contacts occurred timely, and the primary clinician attempted to build rapport with the patient prior to transfer to CSATF. It appeared that this patient presented a difficult clinical picture with a history of suspected malingering; however, documentation in the healthcare record was inadequate. The treatment plans did not contain any IPOCs, including specific goals and interventions to address the patient's clinical needs. The patient reportedly demonstrated psychotic symptoms, including negative symptoms such as selective mutism and withdrawal, but there was no documentation that a PC 2602 order was considered, which appeared clinically indicated.

**APPENDIX C-3**
**Salinas Valley State Prison (SVSP)**
**April 18, 2023 – April 21, 2023**

**Patient A**

This 32-year-old EOP patient transferred to SVSP during January 2020; he was housed in Facility D.  Although documentation by mental health clinicians provided diagnoses of schizoaffective disorder, polysubstance use, attention deficit hyperactivity disorder, borderline personality disorder, and antisocial personality disorder, those diagnoses were not included in the official place of record.  He was prescribed olanzapine, and received his psychotropic medications by a PC 2602 order.  His healthcare record was randomly selected to review the adequacy of care provided.

The patient had a history of multiple suicide attempts and self-injurious behavior, with the most recent identified in 2018.  He also had a history of treatment in the MHCB and at the acute level of care; his most recent hospitalization occurred in 2018.

The healthcare record included IPOCs for delusions and treatment nonadherence.  Treatment goals were not supported by clinical documentation; for example, it was unclear how a goal of identifying benefits of increased self-esteem or improved decision-making skills addressed the patient's delusional thinking.

There was a lack of documentation regarding the presence of delusional thinking in the healthcare record until April 13, 2023, when the patient refused to allow laboratory studies.  Use of force was considered but not utilized, as the treatment team decided to obtain legal counsel to determine if the PC 2602 order included laboratory monitoring.  Clinical documentation indicated that the primary clinician planned referral to a higher level of care at the next IDTT one week later.

Of note, a MH5 was documented on March 13, 2023, but there was no documentation that clinical follow-up occurred.

Psychiatric contacts during the review period did not occur monthly.  While not clearly documented, psychiatric contacts occurred by telepsychiatry.  The patient had a pattern of refusals, and the psychiatrist appropriately sought collateral information.  An IDTT was scheduled to address treatment refusals in October and November 2022; however, the IDTT was utilized as a psychiatric contact, and the issue of treatment refusal was not addressed.  The patient was described as stable at his next psychiatric contact in January 2023; however, he refused the subsequent contact in March 2023, and no further psychiatric assessments were documented.

There was no documentation of primary clinician contacts from April 13, 2022 to April 12, 2023.  The April 12, 2023 primary clinician contact documented that the patient had experienced clinical decompensation.

The patient was offered five recreation therapy groups during the month of April 2023, but only attended one of these groups.

**Findings**

This care provided to this patient was inadequate.

The plan to delay referral to a higher level of care for one week delayed necessary treatment for this patient in need of psychiatric stabilization. Provider contacts, group treatment, and IDTTs did not occur as required for this patient whose symptomatology was so severe that a PC 2602 order was in place. The patient was not seen for a routine primary clinician contact in over one year and decompensated during that long interval. His clinical deterioration was only identified by the clinician when use of force was under consideration. Of concern was the delay of referral to a higher level of care for one week even when the patient presented in this acute state. Further, treatment planning was not individualized and did not address identified treatment needs. Utilization of treatment interventions other than medication management was indicated.

**Patient B**

This 41-year-old patient transferred to SVSP during the summer of 2022. He was provided with a diagnosis of major depressive disorder. He had not been prescribed psychotropic medication since March 2022. His healthcare record was randomly selected to review the adequacy of care provided.

Psychiatric contacts occurred timely, and documentation indicated that the patient functioned adequately. There was no documentation of routine primary clinician contacts between the initial assessment in June 2022 and the patient's transfer from the EOP to the 3CMS level of care in November 2022.

Except for an initial assessment and IDTTs, there were no clinician contacts to support the level of care change to 3CMS in November 2022.

**Findings**

The care provided to this patient was inadequate.

While psychiatric care was appropriate, the lack of primary clinician contact for several months did not allow for sufficient assessment to support a collaborative treatment team decision to lower the patient's level of care. Additionally, the lack of clinician contacts did not provide for appropriate discharge planning and the attainment of relapse prevention skills.

**Patient C**

This 32-year-old EOP patient transferred to SVSP during November 2021; he was housed in Facility D. The psychiatrist provided diagnoses of major depressive disorder, PTSD, and various

substance disorders; however, these diagnoses were not included in the official place of record. His healthcare record was randomly selected to review the adequacy of care provided.

Psychiatric contacts generally occurred monthly, but the interval between contacts frequently exceeded 30 days. Two contacts occurred at cell front due to patient refusal. Clinical documentation described the patient as stable and able to manage his mild depressive symptoms.

At the time of the site visit in mid-April 2023, there was no documentation of primary clinician contacts since September 2022. During the first week of April 2023, the patient was offered one group.

The patient refused the sole IDTT during the review period that occurred on March 30, 2023. The previous IDTT occurred seven months prior in August 2022. The healthcare record included an IPOC for depression; however, treatment goals and interventions were not individualized to the patient's treatment needs. As an example, at the time of the IDTT, the patient was adherent with prescribed Remeron and Zoloft; thus, the rationale for the intervention to address distorted thinking about medication was unclear. The patient was identified for high treatment refusals by the sustainable process, but the refusals were not addressed or assessed during the IDTT and in treatment planning.

**Findings**

The care provided to this patient was inadequate.

Provider contacts, group treatment, and IDTTs did not occur as required by the Program Guide, and the intervals between primary clinician contacts and IDTTs were excessive. Although psychiatric documentation indicated that the patient's symptoms were managed by medication treatment, the lack of therapeutic clinical interventions, including individual and group therapy, did not provide him with the necessary skills to manage his symptoms.

**Patient D**

This 51-year-old patient had been housed at SVSP since March 2021, after an MHCB admission for a suicide attempt. The patient had a history of depression, and was provided with a diagnosis of major depressive disorder. He was variably adherent with prescribed Zoloft, Vistaril, and BuSpar. His healthcare record was randomly selected to review the adequacy of care provided.

At the time of the review, seven months had passed since the patient's last IDTT in September 2022. The treatment plan included IPOCs for depression and sleep disturbance. The rationale provided for his level of care was limited to "appears to have adequate ADLs at this time." Treatment goals and interventions were clinically reasonable, although they were not implemented as the patient was not seen for a primary clinician contact in almost seven months. Subsequently, the patient was seen in response to a routine consult after the loss of a family member. During that contact, there was no documentation that clinical interventions occurred or that an assessment of the patient's mental status was performed other than an assessment of risk of harm to self or others.

Telepsychiatry contacts generally occurred every 30 days. Reviewed documentation indicated that ongoing anxiety, sleep disturbance, and depressive symptoms, at times in the moderate range, impacted his work attendance and medication adherence.

**Findings**

The care provided to this patient was inadequate.

Except for telepsychiatry contacts, the mental health care provided did not meet Program Guide requirements and did not address the patient's clinical needs. The presence of ongoing symptoms warranted individual therapy to assist with skill development and management.

**Patient E**

This 49-year-old EOP patient returned to SVSP on March 16, 2023 from the ICF level of care. He was housed in Facility A. The patient was provided with diagnoses of bipolar disorder, borderline personality disorder, depersonalization disorder, and generalized anxiety disorder. He was adherent to his prescribed antipsychotic, anxiolytic, and mood stabilizing medications. His healthcare record was randomly selected to review the adequacy of care provided after the patient reported recent discharge from ICF at a group attended by the monitor's expert.

Five-day follow-up was documented, and a SRASHE assessed the patient with high chronic and low acute suicide risk. The initial primary clinician assessment was timely, individualized, and provided a thorough overview of the patient's psychosocial history and current treatment needs, including impaired reality testing; however, no subsequent routine primary clinician contacts were documented one month later at the time of the site visit. A document labeled as an initial psychiatric assessment lacked sufficient detail consistent with an adequate initial psychiatric assessment.

The initial IDTT was delayed and did not occur until April 6, 2023. An IPOC that targeted self-harm was developed; however, no IPOC for reality testing was initiated. Interventions such as provision of in-cell activities utilizing a positive psychology workbook were mislabeled as goals, while goals to assess symptom and functional change were not identified. Documentation indicated that the patient was included in the suicide risk management program after three suicide attempts with suicidal ideation; however, the safety plan was not completed.

Group treatment was initiated in advance of the IDTT and included five groups between March 29 and April 19, 2023.

**Findings**

The care provided to this patient was inadequate.

While the primary clinician assessment was very good, individual treatment did not occur. The initial psychiatric assessment was poor. Group treatment was not offered consistent with

Program Guide requirements. Treatment planning did not meet the patient's treatment needs, including targeting reality testing, and the safety plan was not appropriately updated.

**Patient F**

This 29-year-old EOP patient transferred to SVSP on March 1, 2023 from DSH-Atascadero. He was housed in Facility A. His diagnoses included schizophrenia spectrum disorder, depression, adjustment disorder, antisocial personality disorder, and alcohol use disorder. The patient was adherent to prescribed medications, and received his medications by a PC 2602 order due to grave disability and danger to self. His healthcare record was randomly selected to review the adequacy of care provided after the patient reported recent discharge from the ICF level of care at a group attended by the monitor's expert.

The summary of clinician-to-clinician contact upon the patient's return from DSH-Atascadero provided a useful description of his inpatient hospitalization. Medication adjustments and diagnostic clarification were targeted. At the hospital, he was provided diagnoses of unspecified schizophrenia, opioid use disorder, obsessive compulsive disorder, borderline personality traits, as well as provisional diagnoses of schizophrenia and schizoaffective disorder; these diagnoses were not reflected in the CDCR healthcare documentation.

Five-day follow-up occurred as required; however, during the five-day period, the patient reported suicidal ideation after work hours and was placed on suicide watch in alternative housing. A SRASHE was completed that assessed high chronic and low acute suicide risk, and suicide watch was discontinued. However, this assessment failed to assess the context and precipitating factors for the patient's distress.

Initial primary clinician and psychiatric assessments needed improvement. While a thorough psychosocial history was documented, the primary clinician assessment lacked a useful summary of current symptoms and treatment needs. A document labeled as an initial psychiatric assessment lacked sufficient detail necessary for an initial psychiatric assessment.

The patient's initial routine contact occurred in the dayroom due to the patient's refusal. He attributed his earlier suicidal statement to auditory hallucinations and poor sleep. His medication was changed, and he reported improvement at his subsequent individual contact. Of note, between these appointments, the patient was scheduled for two appointments that did not occur due to the patient's refusal and custody reasons; however, there was no documentation that attempts were made to evaluate the patient in response to these missed appointments.

The patient was not seen for any routine primary clinician contacts or an initial IDTT prior to decompensation and admission to the MHCB two months later.

**Findings**

The care provided to this patient was inadequate.

The patient's diagnoses and treatment needs were not appropriately assessed or monitored by the treatment team, despite signs of difficulty adjusting to discharge from inpatient hospitalization. Despite placement on suicide watch and MHCB recission within days of the patient's return from the ICF level of care, the patient was not provided with an initial IDTT to coordinate treatment planning, nor was the patient seen for follow-up by the primary clinician.

**Patient G**

This 33-year-old EOP patient's healthcare record was selected from the Facility D overflow roster to review the adequacy of care provided. There were several diagnoses by differing providers included in the healthcare record. He was adherent with multiple prescribed psychotropic medications.

The initial psychiatric assessment included a brief but relevant clinical history and current symptoms, but it offered marginal support for the provided diagnoses of major depression with psychosis, attention deficit hyperactivity disorder, and opioid and methamphetamine use disorders. The patient had an extensive history of depression and attentional issues, and at the time of the evaluation also reported command auditory hallucinations, poor sleep, grief stemming from multiple losses, and thoughts of death. He reported anxiety, impulsiveness, anger, and mood lability during the primary clinician initial assessment when he was provided a diagnosis of major depressive disorder; there was also a lack of sufficient clinical rationale documented for this diagnosis. The patient had a history of suicide attempts, with the most recent occurring two months prior to the assessment by heroin overdose.

Initial IDTT documentation indicated a lack of collaboration between the psychiatrist and the primary clinician. Although both providers were present at the IDTT, symptoms identified during initial assessments were not targeted in treatment planning. Identified IPOCs that included goals and interventions which targeted substance use, treatment nonadherence, and anger were not clearly individualized to the patient's needs. Further, despite the recent suicide attempt and chronic thoughts of death, an IPOC for self-harm was not established.

Routine psychiatric contacts occurred monthly although, at times, the intervals between appointments exceeded 30 days. Most of the documentation was clinically useful, and symptoms were regularly monitored. However, there were multiple diagnostic changes that lacked clear clinical rationale. For example, the patient's diagnosis of major depression was changed after he no longer endorsed psychotic symptoms; this diagnosis was later changed to schizophrenia spectrum and other psychotic disorders. Subsequently, the diagnosis was changed again to substance-induced psychotic disorder with a consideration of a diagnosis of bipolar disorder as well. The patient was seen at cell front following a missed appointment and two refusals; however, his reasons for refusal were not consistently assessed.

The patient was reportedly stable until March 2, 2023, when the psychiatrist documented the presence of delusional thinking, odd behavior, and reports of daily suicide attempts. The psychiatrist was later joined by the primary clinician, and consideration of a PIP referral was documented. The patient was returned to his housing unit, and it was unclear why a SRASHE

was not completed, or a MHCB referral was not considered.  No independent documentation by the primary clinician was located in the healthcare record of that encounter.

The primary clinician met with the patient for a brief, nonconfidential contact at the request of the psychiatrist on March 6, 2023.  This was the only healthcare documentation by the primary clinician during the six-month review period.  The primary clinician indicated that "he did not appear to be in acute distress."

During a psychiatric contact on March 20, 2023, the patient denied symptoms of psychosis and suicidal ideation, and the psychiatrist stated that the patient was "screwing" with the providers.  In contrast, psychiatric documentation on March 23, 2023 indicated that a custody officer stated that the patient often went "man down" and required resuscitation.  On April 19, 2023, the psychiatrist documented recent incidents of suicide attempts and threats, suicide watch placements, and drug-seeking behavior with positive urine tests and possible safety concerns.

Between March 17 and April 5, 2023, five SRASHEs were completed by five different providers, and at least two incidents of suicide watch occurred.  The patient was consistently assessed with high chronic and low or moderate acute suicide risk.  The risk assessments were initiated by the patient's requests for PIP admission and self-reports of overdose, which at times he recanted.  He was seen for five-day follow-up between March 18 and April 10, 2023, although contacts did not consistently occur for five consecutive days, and documentation was not appropriately updated or individualized.

During the first week of April 2023, the patient attended one of the five offered recreation therapy groups.

**Findings**

The care provided to this patient was inadequate.

The patient evidenced emotional distress and functional impairment that was not appropriately addressed.  Despite his acutely psychotic presentation on March 2, 2023 and report of daily suicide attempts with discussion of a PIP referral, a SRASHE was not completed, nor was there documentation regarding consideration of MHCB referral.  Additionally, no IDTT was conducted, and a toxicology screen was also not obtained.  It was unclear whether the patient's possible safety concerns were adequately addressed.

The completion of multiple SRASHEs by different providers resulted in five-day follow-up; however, no clinical treatment interventions other than medications were provided to assist the patient in managing his distress.  Further, there was no documentation of consideration of an IDTT to enhance treatment planning or for referral to a higher level of care.

The patient did not receive much needed individual therapy for grief and depressive symptoms.  The rationale and clarification for diagnoses, collaboration between treatment providers, and targeting of all identified treatment needs at the initial IDTT were indicated.  This limited

provision of treatment was comparable to that provided to other EOP patients at the facility and did not appear impacted by this patient's overflow housing status.

**Patient H**

This 68-year-old EOP patient was housed at SVSP since March 2022.  He was provided with diagnoses of bipolar I disorder and generalized anxiety disorder.  The patient was adherent to prescribed Geodon, BuSpar, and Cogentin.  His healthcare record was selected from the Facility D EOP overflow roster to review the adequacy of provided care.

This patient's only telepsychiatry contact occurred on September 9, 2022, when documentation indicated that he rarely left his cell, including for showers, due to his paranoia.  Subsequently, he refused scheduled monthly and sometimes twice monthly psychiatry appointments.  Psychiatric documentation indicated that an IDTT would be convened to address his treatment refusal; however, the only relevant documentation from the IDTT was "(p)sychiatry notes that he may need more interventions soon if he continues to refuse treatment."  The patient refused to attend the IDTT and subsequent psychiatric contacts; the documentation noted the plan to discuss a level of care change and to schedule another IDTT.  There was, however, no documented follow-up regarding those plans.  IDTT and psychiatric documentation noted consultation with custody and other staff, but this documentation was brief in content, lacked specificity, and was unchanged with each documented treatment refusal.

BuSpar and melatonin were discontinued in December 2022 without an in-person psychiatric assessment.  The sole attempt to see the patient was attempted utilizing a tablet on November 1, 2022; however, the contact was not completed due to technical difficulties.  Cell-front psychiatric contact with the on-site psychiatrist did not occur until April 6, 2023, when BuSpar was resumed.  The patient was described as "deteriorated" with a plan to re-evaluate him in a confidential setting.

IPOCs developed in November 2022 at the only IDTT during the six-month review period targeted treatment nonadherence and depression, but not longstanding paranoia, anxiety, and isolation.

There were few primary clinician contacts documented in the healthcare record.  An initial assessment occurred in October 2022.  Routine contacts occurred in November 2022 and January 2023; the patient refused both contacts, and was seen in nonconfidential settings at cell front and in the rotunda respectively, for brief check-ins.

During the first week of April, the patient refused the three recreation groups that were offered.

**Findings**

The care provided to this patient was inadequate.

The patient did not receive care required by the Program Guide, and the care provided was not implemented as was clinically indicated. This patient, who remained isolated due to paranoia, was insufficiently monitored for changes in his mental status by his treatment providers.

Discontinuation of psychotropic medication without a face-to-face assessment was one of many problems noted in the care provided to this patient. His long-term paranoia was identified as contributing to his isolation, but no further interventions or aggressive attempts to engage him in treatment by either the psychiatrist or primary clinician were documented. An IDTT in which the treatment focus was to address the patient's treatment refusals did not adequately address this issue effectively or collaboratively. His level of functioning was not assessed timely, and the psychiatric plan for the treatment team to reschedule the IDTT and to consider referral to a higher level of care never occurred. Further, after a prolonged period of no in-person assessments by the primary clinician or the psychiatrist, the patient's mental status deteriorated; however, this deterioration was not addressed, and his level of care remained unchanged.

**Patient I**

This 50-year-old DDP, EOP patient was housed at SVSP since 2021; he was housed in Facility A at the time of the site visit. The patient was provided diagnoses that included major depressive disorder, unspecified anxiety disorder, PTSD, and antisocial personality disorder. He was adherent with prescribed Zoloft. His healthcare record was selected to review the adequacy of care provided after his IDTT was observed by the monitor's expert during the site visit.

Except during October 2022, the patient was seen timely by telepsychiatry for monthly psychiatric contacts. After missing three psychiatric appointments, his medication was tapered and discontinued. There was documentation that the psychiatrist attempted to meet with the patient at cell front via the tablet prior to medication discontinuation. The patient resumed attendance at his psychiatric contact in January 2023, but remained dissatisfied with the psychiatrist due to the medication discontinuation. With the exception of this lack of assessment prior to medication discontinuation, psychiatric clinical documentation was useful for continuity of care and provided clear documentation of ongoing elevated depression and anxiety.

The patient's previous IDTT occurred almost one year prior in March 2022. During the IDTT observed during the site visit, addressing the patient's depression was targeted as a treatment goal. However, anxiety and disturbed sleep that were identified by the telepsychiatrist were not targeted. The intervention to reduce depression included completion of a positive psychology workbook in-cell and monitoring of the patient's symptoms and interactions with others.

During the first week of April 2023, the patient did not attend any of the three groups offered.

This patient was not seen for any routine primary clinician contacts during the six-month review period. He was seen for a routine consult on January 31, 2023, but clinical interventions were not offered.

**Findings**

The care provided to this patient was inadequate.

This patient did not receive appropriate care in accordance with his treatment needs or Program Guide requirements, including group and individual contacts. Therapeutic rapport with the psychiatrist was disrupted by the medication discontinuation which occurred without a face-to-face assessment; further, there was no notification to the patient of the change in advance. The IDTT documentation lacked evidence of collaboration, as treatment needs identified by the psychiatrist were not appropriately targeted during treatment planning.

**Patient J**

This 49-year-old EOP patient transferred to SVSP during April 2022, and was housed in Facility A. He was provided a diagnosis of schizophrenia, and was adherent with Invega prescribed for psychotic symptoms. His healthcare record was randomly selected to review the adequacy of care provided.

There were no IDTTs or primary clinician contacts documented during the six-month review period, while no psychiatric contacts were documented in September and November 2022. Telepsychiatry contacts occurred during October and December 2022, and then monthly through April 2023. The healthcare documentation was clinically useful and described the patient as psychiatrically stable, and he was reportedly able to manage his auditory hallucinations.

This patient did not attend the sole recreation therapy group that he was offered during the first week of April 2023.

**Findings**

The care provided to this patient was inadequate.

The patient was not seen for psychiatric or primary clinician contacts timely. Aside from medication management, he was not provided with therapy to assist him in learning skills to manage his mental illness and symptoms of auditory hallucinations and anxiety.

**Patient K**

This 59-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at SVSP.

The patient was housed at CTF where he received mental health services at the 3CMS level of care, when he was admitted to the SVSP MHCB due to suicidal ideation with a plan to hang himself reportedly partially triggered by housing concerns.

The initial psychiatric and PC assessments occurred timely. The initial psychiatric evaluation contained insufficient information supporting the patient's diagnosis. The only diagnoses

included in the problem list were PTSD and antisocial personality disorder. The follow up psychiatric progress notes included a diagnosis of adjustment disorder, unspecified; however, there was no justification provided for this change in diagnosis. The psychiatrist continued mirtazapine for depression and insomnia at the same dosage that the patient was taking prior to the MHCB admission. A SRASHE on December 22, 2022 assessed the patient with moderate chronic and acute suicide risk.

The patient and all required treatment team members were present at the initial timely IDTT meeting. While some treatment team goals were appropriate, such as a reduction of suicidal ideation, other goals were from a template which was not completed. As an example, one such goal was to learn three positive coping skills with the frequency and timeframe for accomplishing those goals not completed. Some interventions were appropriate and included accepting feelings of distress, the creation of a safety plan, and the use of CBT. The IDTT documentation contained inadequate information regarding assessment, interventions, and clinical progress. Sections of treatment plan documentation contained nonsensical information, such as the section entitled "Assessment/Progress Towards Discharge" repeatedly stating "Decreased hearing of right ear."

The discharge IDTT documentation stated that the patient was discharged to the 3CMS level of care, while the psychiatric discharge summary stated incorrectly that he was discharged to the EOP level of care. The patient was discharged to return to CTF on December 29, 2022 at the 3CMS level of care; however, it should be noted that the patient required placement on suicide watch and an MHCB referral that was ultimately rescinded soon after return to CTF.

**Findings**

The quality of care provided to this MHCB patient was inadequate.

While some treatment plan goals were appropriate, others were templated in an incomplete manner. Progress notes did not contain adequate information on diagnoses, assessment of the patient, interventions used in treatment, or progress toward treatment goals. No medication adjustments were made from the patient's dosage prior to the MHCB placement, and this lack of MHCB medication management was also noted in other SVSP MHCB cases reviewed. The discharge IDTT documentation stated that the patient discharged to the 3CMS level of care, while the psychiatric discharge summary documented discharge to the EOP level of care.

As was noted in another SVSP MHCB reviewed case, the patient required an MHCB referral soon after returning to the sending institution, calling into question whether the patient had adequately stabilized prior to discharge.

**Patient L**

This 66-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at SVSP.

The patient was treated at SVSP at the EOP level of care, when he required referral to the MHCB on January 29, 2023 due to cutting himself and reported command auditory hallucinations to kill himself. The SRASHE assessed moderate chronic and high acute suicide risk.

The initial psychiatric evaluation was inadequate, containing essentially no mental status examination. The assessment and plan were woefully incomplete and did not allow a clear clinical conceptualization of the patient.

The patient was provided diagnoses of adjustment disorder with depressed mood and schizoaffective disorder, depressed type. He received his psychotropic medications by a PC 2602 involuntary medication order due to danger to self. His prescribed medications included aripiprazole and paliperidone for psychosis; prazosin for nightmares; benztropine for side effects to antipsychotic medications; and hydroxyzine for anxiety.

The initial treatment plan noted that the patient was referred to the MHCB six times during the preceding six months, resulting in three MHCB admissions. While the patient requested referral to the intermediate level of care, the treatment team did not refer the patient to a higher level of care. One justification given for nonreferral was the clinical team's belief the patient employed impression management to have his needs met.

The follow-up psychiatric notes demonstrated fundamental inadequacies. As was seen in other SVSP MHCB cases reviewed, the assessment and plan section of the note simply stated the patient's medical problems, with no mention of the patient's mental health treatment. The PC notes included the intervention of having the patient to journal his thoughts. The treatment plan was updated to include the patient's nonadherence in treatment activities.

The progress notes indicated that the patient had validated safety concerns and would be placed in restrictive housing upon release from the MHCB. On February 8, 2023, the patient was discharged to the SVSP EOP. On the last day of the five-day follow up checks after the MHCB discharge, the patient had suicidal ideation and cuts on his wrist, requiring subsequent readmission to the MHCB.

**Findings**

The quality of care provided to this MHCB patient was inadequate.

The initial psychiatric examination as well as subsequent progress notes largely lacked fundamental information, including clinical assessment and plan of care. The progress notes rarely stated interventions, or how the interventions connected to treatment planning.

On a positive note, the treatment team did document progress toward some goals in the treatment plan. The documentation indicated that the patient had validated safety concerns and would be placed in restrictive housing upon discharge; however, he was discharged to a mainline EOP.

While the expert noted that medication changes were not always indicated in the MHCB, the lack of changes or only minor medication changes were seen in other SVSP MHCB cases as

794

well.  Also seen in other SVSP MHCB cases, the patient required rapid readmission to the MHCB level of care.

**Patient M**

This 50-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at SVSP.  The patient was housed at CTF and received mental health services at the 3CMS level of care prior to reporting suicidal ideation with a plan to overdose on opiates, requiring MHCB placement on December 21, 2022.  Of note, the patient was on a hunger strike from December 8 to December 21, 2022.  The reported goal of his hunger strike was to obtain single cell status.

The patient had a history of psychiatric hospitalizations in the community.  In 2000, the patient was hospitalized after an overdose of prescription medications.  He had one prior episode of treatment in the MHCB in 2006.  The patient had a history of treatment at the 3CMS and EOP levels of care.

The SRASHE assessed moderate chronic and high acute suicide risk.

The patient was provided diagnoses of PTSD and major depressive disorder.  The psychiatrist prescribed mirtazapine for depression and prazosin for nightmares.

The initial evaluations by both the psychiatrist and the primary clinician as well as the initial IDTT meeting occurred timely.  The initial primary clinician evaluation noted that the patient inconsistency took his prescribed antidepressant medication.  The initial IDTT meeting included all required members, except for the patient who reportedly refused to attend.  The initial treatment goal including reduction of suicidal ideation.  An additional treatment goal was to learn coping skills; however, this appeared to be a templated goal as the frequency and time frame for achieving this goal were left blank.  The treatment interventions included the use of CBT.

On December 25, 2022, progress notes indicated that the patient was seen at the cell front as custody staff was unavailable.  Furthermore, the note stated that the note was entered late due to issues with internet access and resulting inability to access the EHRS.

The psychiatric progress notes eliminated the diagnosis of major depressive disorder without justification.  It was unclear if this indicated a change in diagnosis or was a documentation error that was carried forward in subsequent notes.

On December 29, 2022, the patient discharged to the SVSP EOP.

**Findings**

The quality of care provided to this MHCB patient was inadequate.

The psychiatric documentation included very minimal details in the assessment and plan. Despite the patient's refusal to engage fully in treatment, such as not attending treatment team

meetings, his treatment plan was not updated to address this significant barrier to treatment. Medication changes appeared logical and consistent with the patient's stated diagnosis and clinical presentation. While the initial treatment plan displayed some positive elements including a goal of reducing suicidal ideation and the use of evidence-based modalities such as CBT, the progress notes inconsistently documented the use of those interventions and the patient's response to those interventions. The diagnosis of major depressive disorder disappeared from the psychiatric progress notes. This was particularly concerning not only because it showed diagnostic inconsistency between the PC and the psychiatrist, but also because symptoms of depression prompted the MHCB admission. The documentation also showed that custodial shortages directly negatively impacted patient care, as evidenced by the clinician's inability to see the patient in a confidential setting on at least one occasion.

**APPENDIX C-4**
**California Substance Abuse Treatment Facility (CSATF)**
**May 1, 2023 – May 5, 2023**

**Patient A**

This 24-year-old EOP patient transferred to CSATF in June 2022; his EPRD was July 29, 2023. He was housed in Facility G.  Multiple diagnoses were present in the healthcare record including mood, attentional, psychotic, anxiety, and gender-related disorders.  He was prescribed lithium, prazosin, and Remeron.  His healthcare record was randomly selected to assess the adequacy of provided care.

Routine IDTTs timely occurred during the reporting period, but they lacked an updated clinical summary about the patient's functioning and symptoms between IDTT meetings.  The four IPOCs between September 2022 and March 2023 remained unchanged from the initial IDTT despite minimal improvement.  The only treatment goal was to reduce depression with an intervention to work on goal setting.  Goals to address anxiety, treatment nonadherence, and discharge planning were not developed.  Documentation that identified the patient as a high refuser during IDTTs in January and March 2023 was minimally changed.

Telepsychiatry contacts occurred timely, and at times, occurred more frequently than minimally required.  Documentation of those contacts was thorough, clinically useful, and included diagnostic and medication adjustment rationale, as well as patient symptoms and functioning.

Individual primary clinician contacts generally occurred twice monthly during the review period. Caseload groups with the assigned clinician were supportive in nature and occurred at the required frequency.  Reviewed documentation between January and April 2023 indicated that most individual contacts occurred in a confidential setting except one cell-front contact that occurred due to modified programming and clinician availability.  This documentation provided an overview of the patient's current circumstances but was minimally connected to symptoms or functioning.  Active clinical interventions, including those identified in IDTT documentation targeting refusals or goal setting, were not utilized.

Of concern was the failure to address an alternative housing placement in January 2023 during routine contacts or the IDTT.  Five-day follow-up was completed, but the efficacy was questionable as these contacts were not coupled with the precipitating event.

The patient attended the three groups offered during the last week of April 2023.

**Findings**

The care provided to this patient was inadequate.

Although psychiatric care was appropriate, the overall care provided was not collaborative, and treatment planning was not individualized and updated appropriately.  Individual primary clinician contacts did not occur timely, and documentation suggested that they were not meaningful therapeutic contacts.  Suicide risk was not appropriately managed, and diagnostic clarification was indicated.

**Patient B**

This 45-year-old DDP EOP patient transferred to CSATF during November 2022 after MHCB discharge due to paranoia.  He was housed in Facility G.  The patient had a long history of mental illness, and was provided several diagnoses including mood, anxiety and psychotic disorders.  He was prescribed BuSpar, Zyprexa, and Effexor.  His healthcare record was randomly selected to assess the adequacy of provided care.

The primary clinician initial assessment was copied from previous documentation and not appropriately updated or individualized to current treatment needs; this outdated information was also copied into the initial and routine IDTT documentation.  For example, the patient's presenting problem merely stated the following: "bipolar, schizophrenia, insomnia, anxiety." The sole IPOC targeted anxiety and the only intervention provided was to utilize empathy. Treatment nonadherence was not considered as an IPOC, despite the patient's identification as a high treatment refuser.

Individual primary clinician contacts occurred twice monthly in December 2022, January 2023, and March 2023; caseload groups were offered in April 2023.  Individual contact documentation did not reflect meaningful therapeutic contacts; the documentation indicated that the contacts were primarily check-ins.  Active clinical interventions were not utilized, including those identified in the treatment plan to address treatment refusal.

Initial and routine psychiatric contacts occurred via telepsychiatry, and occurred monthly except during April 2023.  Psychiatric documentation was clinically useful and addressed the patient's attempts at medication diversion.

The patient attended the six groups offered during the last week of April 2023.

**Findings**

The care provided to this patient was inadequate.

There were delays in the care provided by the psychiatrist and primary clinician, while the care provided by the primary clinician, including the initial assessment, treatment plan, and routine contacts, lacked individualization.  Overall, clinical documentation was minimally useful for continuity of care.

**Patient C**

This 59-year-old EOP patient transferred to CSATF in 2014; he was housed in Facility G. Documentation indicated a long history of mental illness, trauma, and suicide attempts.  The patient was provided a diagnosis of major depression, and was prescribed Zoloft and BuSpar. His healthcare record was randomly selected to assess the adequacy of provided care.

Except for April 2023, telepsychiatry contacts with three different providers occurred monthly since September 2022, although those contacts at times exceeded 30 day intervals.  Of note, there were multiple typographical errors in one provider's documentation that, at times, impacted

clinical usefulness.  Otherwise, the documentation was clinically appropriate and described the patient with symptoms of chronic, elevated depressive symptoms and anxiety.

The quarterly IDTT documentation varied in quality; the February 2023 IDTT documentation was appropriate and more clinically useful, as the IPOC for depression was appropriately updated and realistic.  A summary of symptoms and functioning since the last IDTT needed improvement, and an IPOC for danger to self required improvement.

There were lapses in the frequency of individual primary clinician contacts.  There were no individual contacts in October 2022 and January 2023, but three individual contacts occurred in December 2022.  Between September and December 2022, the patient was seen by three different clinicians.  Initially, clinician documentation was sparse and indicated that the contacts were not therapeutic in content; however, beginning in December 2022, the documentation was improved with comprehensive detail provided and included an appropriate mental status exam and the utilization of therapeutic interventions.  A review of two offered EOP caseload groups in March and April 2023 indicated that the content of these groups was supportive and skills based.

After a self-injury incident with intent to die in November 2022 that required sutures, the patient was placed in alternative housing.  He was discharged after a SRASHE assessed moderate chronic and low acute suicide risk; however, there was insufficient clinical rationale provided for the determination of risk.  The precipitating event of self-harm was the termination of a peer relationship; this issue was not addressed, and the patient was returned to his housing unit.  Five-day follow-up was completed; the documentation was poor with little change with each contact.  Further, the incident was not timely addressed in individual therapy with the primary clinician or documented in IDTT discussion.

The patient was offered three groups during the last week of April 2023.

**Findings**

The care provided to this patient was inadequate.

There were delays in the care provided by psychiatrists and primary clinicians, and the quality of provided care was inadequate.  The minimal care that was provided did not appropriately meet this patient's treatment needs, as there was a lack of meaningful therapeutic contacts, appropriate treatment planning and assessment, and adequate management of self-harm.

**Patient D**

This 27-year-old EOP patient transferred to CSATF in September 2021; he was housed in Facility F.  The patient was provided a diagnosis of major depression with psychosis, and was prescribed antipsychotic and mood stabilizing medications.  His healthcare record was randomly selected to assess the adequacy of care provided.

The IDTT documentation was not sufficiently updated to be useful for continuity care, including a summary of functioning, symptoms, and treatment progress since the previous IDTT, level of care rationale, and IPOCs.  The patient's sole IPOC which targeted depression was initiated in September 2021, but it remained unchanged during three quarterly reviews between October

2022 and April 2023. Treatment goals were not individualized and utilized generic language with the sole intervention to empathize with the patient's distress to foster a therapeutic alliance.

A review of individual primary clinician contacts between September 2022 and April 2023 indicated that only three contacts occurred, namely, one in January 2023, and two in March 2023. None of the reviewed individual contacts appeared to be a meaningful therapeutic contact based upon the healthcare documentation. Primary clinician caseload groups occurred infrequently, and the content of those groups was unclear based upon the documentation.

Lapses were also noted in the frequency of psychiatric contacts. Specifically, between September 2022 and April 2023, no contacts occurred in January 2023 and April 2023. The documentation was minimal, but indicated that the patient's depressive symptoms varied, and that he also experienced paranoia and auditory hallucinations.

During April 2023, the patient was offered six groups, one of which was a primary clinician group.

**Findings**

The care provided to this patient was inadequate.

There were lapses in clinical contact with the psychiatrists and primary clinicians. Group therapy was also insufficient, and the quality of care provided appeared inadequate. Additionally clinical documentation for routine contacts and treatment planning was sparse and insufficient for continuity of care. Treatment planning was also not sufficiently updated over time. Overall, the documentation did not convey a useful summary of the patient's symptoms, functioning, psychosocial stressors, or treatment needs.

**Patient E**

This 35-year-old EOP patient was serving a two-year sentence with a release date of May 26, 2023. He was housed in Facility G. The patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Zyprexa, Vistaril, and Thorazine. His healthcare record was randomly selected to assess the adequacy of care provided.

The patient had a long history of mental illness with a history of a PC 2602 order for grave disability and danger to others. His most recent MHCB admission occurred in June 2022 due to thoughts of harming others and psychotropic medication nonadherence.

The documentation of quarterly IDTTs during the review period needed improvement in providing detailed information about the patient's treatment progress, symptoms, and functioning since the previous IDTT; this was necessary for continuity of care. IPOCs targeted anxiety and were adjusted to address pre-release planning given the patient's upcoming release from prison; however, the documentation indicated that the planning was not individualized for the patient's treatment needs. Additionally, the patient's psychotic symptoms and lack of insight were not addressed, which was necessary for successful release.

During the review period, there were lapses in telepsychiatry contacts; the patient was not seen in October 2022 or February 2023. Between September 2022 and April 2023, he was seen by three different telepsychiatrists. Each note included lengthy historical information making it difficult to discern the current status and treatment rationale. Of note, one telepsychiatrist tracked the patient's grooming and self-care utilizing a scale that noted any decline in ADLs, as well as the presence of delusional thinking. These signs and symptoms were not tracked in subsequent psychiatric documentation, a concern given the previous provider's notation that the patient tended to minimize his symptoms.

Primary clinician contacts did not occur timely. There were no individual contacts for three of the review period's six months during September 2022, and January and March 2023. When individual contacts occurred, they took place from monthly to twice monthly. Documentation provided a useful description of the patient's current functioning and stressors; however, documentation of current symptoms required improvement. Treatment interventions were documented but were minimally changed and lacked individualization. Primary clinician caseload groups were documented, but they did not occur consistent with Program Guide frequency requirements. The groups were supportive and skills-based in content.

During April 2023, the patient was offered eight hours of group therapy.

**Findings**

The care provided to this patient was inadequate.

There were significant lapses in individual clinical contacts and the provision of group therapy, as well as deficits in individualized treatment planning and implementation.

**Patient F**

This 39-year-old EOP patient transferred to CSATF in May 2022. He was housed in Facility G. He was prescribed BuSpar and prazosin for generalized anxiety disorder. His healthcare record was randomly selected to assess the adequacy of care provided.

At the time of the site visit in May 2023, no IDTT had been conducted for this patient since October 27, 2022. At that time, an IPOC for anxiety that was developed at the previous IDTT was continued. The goal was to reduce anxiety to an eight or lower on a ten-point scale by the next IDTT. Treatment interventions were not established. A goal of treatment adherence was not established, despite the patient's refusal to attend groups due to anxiety. Modified treatment interventions were clinically relevant.

Reviewed monthly individual primary clinician contacts between November 2022 and January 2023 were succinct but clinically appropriate and included individualized treatment interventions. Following submission of a request for mental health services, the patient was seen on March 1, 2023 to address distress following a court date and the departure of his assigned primary clinician. The documentation did not indicate that the issue of the change in primary clinician was addressed in individual primary clinician sessions. Caseloads groups were provided during March and April 2023; however, the content of those groups was not

individualized for this patient's treatment needs, and the groups did not occur at the frequency required by the Program Guide.

Reviewed telepsychiatry contacts during the reporting period also indicated lapses in contact frequency and problems with continuity of care. Specifically, between September 2022 and April 2023, the patient was seen six times by four different providers. Documentation was clinically useful, targeting his chief complaint of anxiety.

The patient was offered eight groups during the last week of April 2023.

**Findings**

The care provided to this patient was inadequate.

Lapses in clinical contact by the telepsychiatrist and primary clinician, poor continuity of care by primary clinicians, and the lack of individualized treatment planning for this patient who was engaged in treatment were concerning.

**Patient G**

This 29-year-old EOP patient transferred to CSATF in July 2022, and was housed in Facility F. The patient was provided diagnoses that included unspecified schizophrenia, unspecified depressive disorder, other substance-induced psychotic disorder, amphetamine-type substance use disorder, and adult antisocial behavior. He was prescribed lithium, Remeron, Seroquel, Cogentin, and Vistaril. His healthcare record was randomly selected to assess the adequacy of care provided.

IDTT documentation in December 2022 and March 2023 was not sufficiently updated or individualized. IPOCs that targeted substance abuse and depression remained unchanged since August 2022 and did not address identified treatment needs that included paranoia, auditory hallucinations, poor sleep, and group refusals. Despite an upcoming parole date on May 7, 2023, an IPOC for pre-release planning was not developed. There was no summary of his treatment progress or changes in symptoms or functioning between IDTTs to assess treatment progress.

Individual primary clinician contacts did not occur between September and November 2022. Beginning in December 2022, individual contacts generally occurred monthly except for January and February 2023, when the patient was seen three and two times monthly, respectively. There was documentation that individual treatment occurred in confidential settings, and the documentation indicated an adequate assessment of the patient's mental status; however, treatment interventions were not utilized. Further, the patient's anxiety about his upcoming release and fears of relapse were not addressed. Clinician caseload groups were offered, but not at the frequency required by the Program Guide. The content of the groups was therapeutic but not clearly aligned with the patient's individual treatment needs.

Monthly telepsychiatry contacts occurred with five different providers between September 2022 and April 2023. There was considerable variability between telepsychiatrists regarding the level of detail documented of the patient's symptoms, functioning, and the rationale for medication adjustments. The treatment primarily targeted auditory hallucinations.

During April 2023, the patient was offered between two and seven groups weekly.

**Findings**

The care provided to this patient was inadequate.

The quality of treatment planning and individual treatment was inadequate, and the frequency of group and individual therapy was deficient. Aside from medication management, this patient's need for skill development to assist him with symptom management, relapse prevention, and successful transition to the community were not met. Telepsychiatry continuity of care was poor.

**Patient H**

This 57-year-old EOP patient transferred to CSATF in July 2022. He was housed in Facility F. The patient was prescribed Depakote and Vistaril, and was provided a diagnosis of bipolar II disorder. His healthcare record was randomly selected to assess the adequacy of care provided.

Quarterly IDTT meeting documentation between November 2022 and May 2023 were not sufficiently updated to be clinically useful. The sole IPOC targeted depression, and it remained unchanged since it was established in August 2022. No intervention was documented for the IPOC.

During the six-month review period through May 2023, there were two individual primary clinician contacts; one in January 2023 and one in February 2023. Prior to January 2023, the patient had not been seen for individual contacts since July 2022, despite his report of severe depression. The documentation did not include relevant symptoms, impact on functioning, or treatment interventions.

Telepsychiatry contacts also did not occur timely; between September 2022 and May 2023, only five of nine monthly contacts occurred with three different providers. Much of the documentation was brief in content and did not include a mental status examination and was not useful for continuity of care; this was particularly concerning given the number of telepsychiatry provider changes.

**Findings**

The care provided to this patient was inadequate.

The quality of the mental health care was insufficient, care was not provided timely, and it was not useful for continuity of care. Treatment planning was not individualized or implemented during the few primary clinician contacts that occurred; additionally, the patient was not appropriately monitored for increased depression.

**Patient I**

This 54-year-old EOP patient arrived at CSATF during July 2021. He was housed on Facility F. The patient was minimally adherent with Trileptal and valproic acid that were prescribed for

bipolar I disorder.  His healthcare record was randomly selected to assess the adequacy of care provided.

Treatment planning was inadequate given a lack of individualization and relevancy for continuity of care.  An IPOC established in July 2021 targeted hypomania with the sole intervention to foster a therapeutic alliance; this IPOC remained unchanged for three consecutive quarterly IDTT meetings between October 2022 and April 2023.  During that time, the patient was identified as a high treatment refuser; however, his symptoms of anxiety and delusional thinking that contributed to missed treatment were not addressed in IPOCs, nor was his treatment refusal targeted.  Further, the clinical summary did not provide a useful synopsis of the patient's symptoms, functioning, or treatment progress between IDTT meetings.

Individual primary clinician contacts occurred at least monthly during the review period except during February 2023, when there was no documentation of contact.  This documentation provided a brief summary of the patient's functioning and coping, but clinical interventions to manage his symptomatology were rarely utilized, and symptoms identified in IDTT meetings were not clearly assessed.  The mental status exam documentation indicated that the patient's symptoms were unremarkable; this was in contrast to psychiatric documentation that described the patient with symptoms of mental illness.

Telepsychiatry contacts frequently occurred two to three times monthly, exceeding the minimal Program Guide requirements.  The documentation of the patient's current functioning and mental status exam generally remained unchanged across clinical contacts, which minimized its clinical usefulness.  The patient was reportedly medication nonadherent, as he did not want to wait in the pill line; however, other than utilization of encouragement, medication nonadherence was not appropriately addressed by the primary clinician, or the psychiatrist, or in treatment planning.

During April 2023, the patient was offered four groups.  Primary caseload groups were utilized to offset the lack of individual contacts, but the frequency was not consistent with Program Guide requirements.

**Findings**

The care provided to this patient was inadequate.

In addition to lapses in clinical contacts that were inconsistent with Program Guide requirements, treatment was not individualized or updated appropriately to target the patient's clinical needs or to be useful for continuity of care.  Further, poor documentation by the telepsychiatrists and the primary clinician including repetitive documentation hampered continuity of care, as the reader would be unable to discern symptoms or functioning over time.

**Patient J**

This 38-year-old EOP patient transferred to CSATF in April 2022.  He was housed on Facility F.  There was a discrepancy regarding the provision of the psychiatric diagnosis; the psychiatrist provided a diagnosis of bipolar disorder, not otherwise specified, while major depressive disorder was present in the official place of record.  The patient was prescribed Seroquel and Remeron.  His healthcare record was randomly selected to assess the adequacy of care provided.

The IPOCs established in May 2022, targeted anger and substance abuse with the sole intervention to foster a therapeutic alliance; this remained unchanged across three quarterly IDTT meetings between September 2022 and February 2023. Specific goals and interventions for the anger IPOC were not documented. The clinical summary section was not useful for continuity of care, as the patient's symptoms, functioning, and treatment progress since the previous IDTT were not included.

Individual primary clinician contacts occurred weekly during December 2022. However, the frequency of contacts otherwise ranged from no contacts to three monthly contacts between September 2022 and May 2023. When contacts occurred, the content was clinically relevant, and the documentation was useful for continuity of care.

Telepsychiatry contacts did not occur timely, as the patient was not seen in November 2022 or March 2023. Overall, the psychiatric documentation was brief in content and provided limited clinical information about the patient's symptoms and functioning.

During the last week of April 2023, the patient was offered four treatment groups. Primary clinician caseload groups were offered but not at the frequency required.

**Findings**

The care provided to this patient was inadequate.

Primary clinician and psychiatric contacts were untimely, and group therapy was not offered at the required frequency. Additionally, the quality of psychiatric documentation and treatment planning was inconsistent with the provision of continuity of care.

**Patient K**

This 32-year-old male patient was provided a diagnosis of schizoaffective disorder, bipolar type, and was prescribed quetiapine and lorazepam on an as-needed basis. He was intermittently adherent to the prescribed quetiapine and rarely took the lorazepam ordered on an as-needed basis. This patient's case was selected for review following observation of the patient's IDTT during the site visit.

The patient was referred to the MHCB from the EOP on April 21, 2023 due to poor medication adherence, treatment refusal, recent RVRs, and paranoid delusional thinking according to his treating psychiatrist. An inpatient consult and SRASHE were completed on the same date. The patient refused to participate in the clinical interviews; he was assessed with moderate chronic and acute suicide risk, and was referred to the MHCB for significant impairment due to mental illness.

An initial primary clinician assessment was completed the following day. Most sections of the assessment were not completed, and the information that was included was pulled forward from previous assessments. The only updated information was the reason for admission. The initial psychiatric assessment was also completed on April 22, 2023; it indicated that the patient was admitted to the MHCB due to suicidal statements, which was inaccurate; yet later, the actual

reason for admission was documented.  The text of the note also included conflicting information about the patient's prescribed medications.  The narrative noted "patient is presently prescribed venlafaxine, hydroxyzine, and olanzapine," yet lorazepam, olanzapine, and hydroxyzine were documented in the active medications section of the note.  The psychiatrist documented that quetiapine and hydroxyzine would be prescribed for the patient while in the MHCB without any rationale for the medication change other than quetiapine would address psychosis and hydroxyzine would address agitation.  Further, the medication list provided for the master treatment plan psychiatry review on the same date included olanzapine, lorazepam, venlafaxine, and hydroxyzine.  Quetiapine was not included in that document or on the patient's medication administration record (MAR) on that date.

The patient's initial IDTT meeting occurred on April 24, 2023, with required members present; although, the documentation did not indicate whether the patient was present.  A separate nursing note indicated that the patient attended the meeting.  No IPOCs were included in the treatment plan.  The documentation indicated that the patient would be assessed for medication adjustments and determination regarding the appropriate level of care.  The patient was reportedly psychotic, and it was noted that he was at an elevated risk for initiating violence.  Planned interventions included motivational interviewing, psychoeducation, and psychotropic medications to address paranoia and agitation.

During the course of his MHCB stay, the patient was not seen daily by a psychologist or psychiatrist for clinical contacts.  While some contacts occurred with a licensed clinical social worker, no individual contacts were documented for the patient on April 24, April 25, April 27, and May 1, 2023.  Of note, IDTT meetings occurred with the patient present on April 24 and May 1, 2023, and it appeared that these meetings were substituted for individual contacts on those dates.  The quality of the individual contacts with the patient were variable.  Social worker contacts reflected interventions consistent with the treatment plan, but documentation of mental status examinations was marginal.  The documentation of psychologist contacts varied in quality.  One psychologist produced superficial documentation, while another psychologist included comprehensive mental status examinations but little regarding treatment interventions.  There was only one documented follow-up contact with the psychiatrist during the patient's stay, and it included a medication change with limited rationale for that change and no indication that other medications were discontinued.  A recreation therapist offered individual contacts with the patient on three occasions; the patient attended one session.

At an IDTT on May 1, 2023, it was noted that the treatment team had differing opinions regarding the patient's status and ongoing treatment needs.  The psychiatrist determined that inpatient placement was indicated, but the primary clinician, who was a social worker, noted that the patient was stable and ready for return to the EOP level of care.  The patient was referred to the ICF level of care, but was discharged to the EOP while awaiting transfer, and a CCAT was requested.  The CCAT occurred on May 3, 2023, with a recommendation to continue the original plan for ICF referral and EOP placement pending transfer.  A discharge summary was completed by a psychologist on May 3, 2023 that was superficial in content; the totality of the discharge plan was documented as follows: "pt was placed on medications and taking them, able to attend to ADLs, was not in crisis and was D/C back to the yard pending DSH placement.  Pt was aware of this and in agreement.  Pt was stable at D/C."

**Findings**

The care provided to this MHCB patient was inadequate.

The initial primary clinician assessment was incomplete and not updated, the initial psychiatric assessment included inconsistent information about the patient's medications, and the initial treatment plan included no IPOCs. There was documentation that an IPOC for irritability was created at some point; however, this IPOC was not consistent with the patient's identified needs in the treatment plan. Daily contacts with the patient did not occur as required, and when they did occur, the quality varied. Additionally, the discharge documentation was inadequate.

**Patient L**

This 52-year-old male patient was provided diagnoses of unspecified depressive disorder, unspecified schizophrenia spectrum and other psychotic disorder, major depressive disorder, recurrent episode mild, and attention deficit hyperactivity disorder, combined presentation. This patient's healthcare record was randomly selected for review of the treatment provided at the MHCB level of care.

The patient was admitted to the MHCB from STRH on November 9, 2022, to address his reported sleep disturbance, hopelessness, lack of meaning, and suicidal ideation. The initial primary clinician and psychiatric assessments were completed on the same date as the initial IDTT meeting. It appeared that the primary clinician assessment was completed during the meeting, and it included little updated information; further, the information provided was copied from previous assessments. The IDTT documentation omitted the presence of a nurse at the IDTT meeting, despite other documentation that indicated that a nurse was present. The initial treatment plan documentation included goals related to ineffective coping and psychotropic medications, yet failed to note the reasons for admission or the patient's identified goals to address his depression and medical concerns. The planned interventions were, however, appropriate to the patient's treatment needs. A subsequent IDTT occurred on November 17, 2022, and the decision was made to refer the patient to the ICF level of care; there was adequate justification for this referral. The patient did not transfer to the ICF during the subsequent 68 days.

Weekly IDTT meetings occurred with variability in documentation and the adequacy of content. Some documentation included no treatment goals, no clear interventions, and no indication of patient progress toward goals. Others included goals unrelated to the patient's presentation; for example, an IPOC was initiated regarding danger toward others, but the patient's identified issues included paranoia and depression. The final IDTT occurred on January 24, 2023, and the treatment plan was largely incomplete. It included no updates or documentation regarding the decision to rescind the patient's inpatient referral with discharge to the EOP level of care. Of note, until the date of MHCB discharge, the documentation reflected ongoing psychiatric concerns and the continued intention to refer the patient to the ICF level of care.

The patient was not seen daily for individual contacts by a psychiatrist or a psychologist. He was seen by a licensed clinical social worker occasionally, but there were days when there were no individual patient contacts documented by any mental health clinician. There were also several cell-front contacts noted as occurring due to staffing limitations; the documentation of some of these contacts did not include the rationale for the nonconfidential nature of the contacts.

Psychiatric contacts did not occur at least twice weekly. Documentation by psychiatrists was inadequate and did not adequately or accurately reflect the patient's current medication regimen or medication changes consistently. There were indications that medication changes were made in the healthcare record, yet no information was documented by the psychiatrist regarding those changes. Primary clinician contacts were variable in quality, however, most reflected status check-ins and were not indicative of interventions aimed at achieving the patient's treatment goals. Weekly individual contacts with a recreation therapist were documented consistently.

There was no MHCB discharge summary located in the healthcare record. The patient was discharged to the EOP level of care in the ASU.

**Findings**

The care provided to this patient was inadequate.

The treatment plans varied in quality, did not include goals which addressed the treatment needs of the patient identified by his clinicians, and did not include the rationale to discharge the patient and to rescind his inpatient referral. Daily clinical contacts did not occur as required, and the documentation was often inadequate, rarely reflecting interventions provided by primary clinicians. Additionally, psychiatric documentation was not consistently clear regarding medications prescribed or the rationale for prescribing those medications. Several cell-front contacts were documented. There was no MHCB discharge summary documented for this patient, and the final IDTT meeting documentation failed to include any discussion of the decision to discharge the patient to a lower level of care.

**Patient M**

This 30-year-old male patient was provided a diagnosis of other specified schizophrenia spectrum and other psychotic disorder. He was prescribed haloperidol and diphenhydramine under an emergency PC 2602 order for grave disability and danger to others. His healthcare record was randomly selected for review of the treatment provided at the MHCB level of care.

The patient was admitted to the MHCB on September 29, 2022 due to paranoid ideation, auditory hallucinations, and thoughts of harming others. He had been isolating and refusing to attend treatment to avoid hurting others in the EOP. He was prescribed olanzapine and benztropine at the time of admission to the MHCB, but had been refusing to take the medications. The initial assessments were completed timely and were clinically adequate. The patient's initial IDTT occurred on October 3, 2022, with the patient in attendance. While no IPOCs were initiated, the goal of treatment was focused on medication adherence. At the second IDTT on October 10, 2022, the determination was made to refer the patient to the ICF level of

care.  No IPOCs were developed at this meeting in the treatment plan, and the listed symptoms were not consistent with those documented, including depression and hopelessness.

IDTT meetings were documented weekly; however, most were documented as having been conducted at cell front due to the patient's refusal to attend or to engage.  The IDTT documentation was severely inadequate.  Much of the documentation was not completed, and an "x" was entered in required sections; even the participants section was not completed in some cases.  Clinical updates varied in quality, with some including no updates and others with brief clinical updates documented.  Most treatment plan documentation referred to the patient's pending referral to inpatient care, but there was little reference regarding the interventions offered to the patient, including attempts to engage him or to encourage medication adherence.  The one exception was January 2023 IDTT documentation which referenced the patient's recent emergency PC 2602 order and minor improvements in the patient's presentation after medication treatment.

Daily contacts were offered to the patient by a psychiatrist, psychologist or social worker, and weekly contacts were offered by the recreation therapist.  While the patient attended treatment sessions during the first two weeks of his MHCB stay, he consistently refused contacts for the remainder of his stay, and was often nonresponsive to staff at cell front.

Despite the focus on medications and the need for the patient to adhere to his medication regimen, medication adherence was rarely addressed other than on the days that the patient was seen by the psychiatrist, when the focus was primarily on medications not taken on that day.  During late November 2022, laboratory testing revealed that the patient had not been adherent with prescribed paliperidone, despite documentation that indicated medication adherence during the prior month.  Continuity of care between two psychiatrists treating the patient was inadequate; one psychiatrist documented that medications were held due to abnormal laboratory results, but the other psychiatrist made no reference to that issue.

On December 29, 2022, the patient exhibited unprovoked aggression toward staff, and an emergency PC 2602 petition was submitted.  After the patient began taking medications, he became more engaged and attended some individual contacts.  A discharge summary was completed by a psychologist on January 13, 2023, but it was limited in content and included generic goals of attending treatment and taking medications.

Continuity of care among primary clinicians was poor, as several clinicians interacted with the patient at cell front throughout his stay, and there was little evidence that any clinical interventions were attempted.  The recreation therapist attempted to offer weekly contacts, but the patient consistently refused after attending two sessions during the first week of his MHCB stay.

This patient waited 95 days prior to transfer to an ICF.

**Findings**

The care provided to this MHCB patient was inadequate.

The IDTT documentation was extremely inadequate; only occasionally was clinically adequate documentation present in the healthcare record. Continuity of care was poor, and there was little documentation that clinical interventions were attempted beyond brief cell-front contacts. Despite these omissions in treatment, involuntary medications were initiated promptly when clinically indicated.

**Patient N**

This 25-year-old male patient was provided a diagnosis of schizoaffective disorder, depressive type. He was prescribed buspirone, olanzapine, and lorazepam, as well as benztropine, hydroxyzine, and olanzapine on an as-needed basis. This patient's case was randomly selected to review the mental health care provided in the MHCB.
The patient was admitted to the MHCB on January 28, 2023, after reporting suicidal ideation with a plan and command auditory hallucinations to kill himself. The patient had been nonadherent with prescribed medications prior to the MHCB admission. A SRASHE was conducted at cell front without any rationale documented for the nonconfidential assessment. An initial primary clinician assessment was conducted the following day which was also completed at cell front due to patient refusal. Several sections of the assessment were not completed, including the suicide and self-harm summary. The only updated information in the assessment noted that the patient reported ongoing auditory hallucinations and requested transfer to an inpatient facility.

An IDTT meeting occurred on January 31, 2023, with all required staff and the patient in attendance. No IPOCs or treatment goals were documented beyond making changes to the patient's medication regimen. IDTT documentation noted that medication changes had occurred since MHCB admission; yet no psychiatric documentation addressed those changes, and no psychiatric review was completed for the IDTT meeting. In fact, there was no psychiatric documentation located in the patient's healthcare record until the day of MHCB discharge on February 7, 2023. The psychologist made several entries in the healthcare record noting that the patient might be a candidate for treatment with clozapine, but there was no psychiatric documentation of this treatment consideration. All individual daily contacts occurred at the cell door as to the patient refused to leave his cell for confidential sessions.
The patient was referred to the acute inpatient level of care on February 7, 2023, and adequate rationale was provided in the IDTT documentation. The patient attended the IDTT meeting and agreed with the referral. The SRASHE completed at the time of discharge was adequate. The patient transferred to acute care on February 13, 2023. The primary clinician discharge summary was inadequate, as it included no description of the patient's MHCB treatment course, no discharge plan, and no goals for inpatient care.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient was not seen by a psychiatrist at any point during the MHCB stay, despite indication that medication changes had occurred. The patient was seen daily by the primary clinician at cell

front; the rationale provided primarily noted patient refusal, but some staff indicated that staffing limitations were the reason for nonconfidential contacts.  The discharge summary was inadequate and included no information regarding the patient's treatment or response to care while in the MHCB.

## Patient O

This 46-year-old transgender (male to female) patient was provided diagnoses of unspecified anxiety disorder, borderline personality disorder, and antisocial personality disorder.  The patient was prescribed valproic acid, as well as olanzapine and diphenhydramine on an as-needed basis at the time of MHCB discharge.  This patient's case was randomly selected to review the mental health care provided in the MHCB.

The patient was admitted to the MHCB on November 30, 2022, after reporting suicidal ideation after discharge from inpatient treatment.  The patient transferred to the CSATF MHCB.  At the time of admission, the patient was prescribed Invega Sustenna, as well as olanzapine and hydroxyzine on an as-needed basis; the patient received his psychotropic medications by a PC 2602 order.  An initial psychiatric assessment was completed on December 1, 2022.  The psychiatrist noted several possible provisional conditions, including adjustment disorder, depressive episode, and psychosis, without rationale or acknowledgment of the patient's diagnoses already documented in the healthcare record.

The initial primary clinician assessment and initial IDTT meeting were documented as occurring at the same time in the healthcare record.  The initial primary clinician assessment included few updates, and several sections of the assessment were not completed.  The primary clinician, an unlicensed psychologist who completed the initial assessment and the IDTT documentation, noted "(d)ue to staffing shortage, [master treatment plan] is being submitted on behalf of the MHCB treatment team, per request by the chief psychologist."  The treatment plan was to work on "mood reduction skills," stress management, and distress tolerance.  The patient and required staff members attended the IDTT.

The patient was not consistently seen daily for individual contacts, as there were four days in December 2022 and one day in January 2023 when no contacts were documented.  Additionally, the patient was seen at cell front on numerous occasions, with some documentation indicating that the lack of confidential contacts were due to staffing shortages.

On December 5, 2022, the patient engaged in self-harm; however, this incident was not noted during the subsequent IDTT meeting and a self-harm powerform was not completed as required.

Psychiatric documentation was minimal in content, with short status notes documented on most occasions.  On January 5, 2023, a psychiatrist indicated that the patient benefited more from treatment with valproic acid than with Invega Sustenna, and noted that valproic acid was now prescribed for the patient; however, no prior note about the medication change was documented in the healthcare record.  The note did not indicate that the Invega Sustenna had been discontinued, yet medication orders noted that it was discontinued on that date.

The quality of primary clinician documentation varied, with many notes including only status updates and some entries, mostly those written by the clinical social worker, noting the use of interventions consistent with the treatment plan.

Weekly IDTT meetings occurred throughout the MHCB stay. Required staff were present, but the quality of the documentation was limited. Most treatment plans did not address the treatment goals or progress them, but merely noted the ongoing referral to the ICF.

The patient was rejected for inpatient hospitalization on February 16, 2023, as it was opined that inpatient care was countertherapeutic and would reinforce the patient's use of self-harm and threats of self-harm to avoid anxiety about EOP placement. Yet, an IDTT conducted on the same day after the rejection note was documented, made no reference to the rejection, and simply noted that the patient had been "endorsed to Vacaville" and that the patient was unhappy with that decision. There appeared to be no acknowledgment of the rejection decision in the healthcare record, although the clinical social worker documented discussing the option for EOP placement with the patient on February 17, 2023. The psychiatrist continued to indicate that ICF placement was pending in subsequent documentation.

On February 22, 2023, documentation indicated that a rejection CCAT occurred; however, the treating psychiatrist was not present for the meeting. The decision was made to rescind the referral and to discharge the patient to the EOP level of care. Of note, the IDTT documentation completed at the time of the patient's discharge made no reference to the CCAT or the rationale for rescinding the inpatient referral beyond patient stability.

A primary clinician discharge summary was completed on February 24, 2023, and included a thorough history of the patient's care, including the rationale for rescinding the inpatient referral and a recommendation to carefully consider the patient's cellmate choice in the EOP. The section for MHCB prevention planning was not completed, yet its completion would have supported future clinician's decision-making regarding the patient's use of self-harm and threats of self-harm to avoid anxiety and influence housing.

Of note, staff inconsistently utilized gender pronouns in the healthcare record. Some documented she/her while others documented he/his. None of the clinician's clearly documented the patient's pronoun preference in the MHCB documentation.

There was a 73-day period between the referral for inpatient care and MHCB discharge.

**Findings**

This care provided to this patient was inadequate.

Documentation of interventions provided to support stabilization and skill-building was lacking. An incident of self-harm was not addressed in treatment or in treatment planning. Psychiatric documentation did not adequately justify medication changes; this omission was particularly significant given the patient's PC 2602 status. IDTT documentation was sparse. Lastly, there

was a lapse of over two months between the referral for inpatient placement and the referral rejection.

**Patient P**

This 35-year-old male patient was provided a diagnosis of schizophrenia; he was prescribed risperidone, but was generally medication nonadherent. This patient's case was randomly selected to review the mental health care provided in the MHCB.

The patient was admitted to the MHCB on September 7, 2022 due to psychosis and self-harm by hitting himself in the face. Of note, the patient was discharged from the MHCB to the 3CMS level of care five days earlier after admission for the same concerns. The initial primary clinician assessment, initial psychiatric assessment, and initial IDTT occurred on September 8, 2022; however, the patient refused to attend the sessions and responded to questions by the primary clinician at cell front by mimicking laughter without making a sound. It was unclear if the initial psychiatric assessment occurred in a confidential setting or at cell front. There were two master treatment plans entered in the healthcare record on the same date; they were similar but not identical in content. No IPOCs were developed for the patient, but the treatment plans noted that medications would be prescribed to address psychosis, and psychoeducation would be provided to assist in symptom management and improved self-care.

The patient consistently refused all individual contacts with the psychiatrist and primary clinician, and attended only one IDTT. On September 10, 2022, the psychiatrist indicated that involuntary medications were under consideration. However, subsequent psychiatric documentation noted that the patient did not meet the criteria for involuntary medications, despite engaging in self-injury by hitting himself in the face, responding to internal stimuli, isolating, and not attending to his hygiene.

An IDTT occurred on September 15, 2022, and the patient was in attendance. The documentation indicated that the patient would be referred to the ICF level of care with the rationale provided that his communication was severely restricted; there was no reference to the patient's psychosis, self-harm, or functioning deficits. Documentation also indicated that the patient was not in agreement with the referral, so a *Vitek* hearing would be required. The IDTT documentation noted that the patient hit himself in the face repeatedly and was given an emergency injection later in the day on September 15, 2022; yet there was no documentation of medication ordered or administered in any progress notes. The medication administration record noted that the patient was given haloperidol, diphenhydramine, and lorazepam intramuscular injection at 14:52; however, there was no documentation to indicate whether force was utilized.

Daily contacts were offered to the patient with one exception; however, the patient refused all contacts. There was no documentation that therapeutic interventions were attempted. On September 29, 2022, the patient requested a phone call when seen at cell front by the primary clinician; rather than facilitating a call and taking advantage of the patient's willingness to leave his cell, the primary clinician told the patient to talk with the recreation therapist about the phone call. There was no documentation that the recreation therapist met with the patient to facilitate the requested phone call.

In a progress note on October 2, 2022, the primary clinician documented that the patient was informed about a phone conference the prior week when the patient's upcoming release plan was discussed.  There was no documentation of this conference call in the patient's healthcare record.  The October 3, 2022 IDTT documentation noted that the patient was informed of the decision for DSH commitment upon prison release.  Despite this entry, there was no additional documentation in the treatment plan or in the healthcare record regarding this decision.

The IDTT documentation on October 6, 2022 noted that the patient's level of care was reduced to EOP "so he can be evaluated at the county hospital for a 5150" without further explanation provided.  The primary clinician discharge plan included no information about the course of treatment in the MHCB, and the section was not completed.  The discharge plan stated, "pt is releasing to parole – going to hospital for 5150 eval."  Fortunately, a senior psychologist drafted a referral for a WIC 5150 evaluation on October 7, 2022, that included more information than the discharge summary regarding the patient's treatment and response to treatment in the MHCB.  The patient was discharged on parole to an outside hospital on October 9, 2022.

**Findings**

The care provided to this patient was inadequate.

There was limited documentation of treatment interventions attempted, sparse documentation, and lack of consideration of involuntary medication treatment when its use was likely indicated.

**Patient Q**

This 33-year-old patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, other (or unknown) substance intoxication with moderate or severe use disorder, and amphetamine-type substance use disorder, severe.  This patient's case was randomly selected to review the mental health care provided in the MHCB.

This patient was admitted to the MHCB on November 24, 2022, after attacking and possibly attempting to kill another incarcerated individual.  Following the attack, the patient was noted to be laughing and talking to himself.  The initial primary clinician assessment indicated that four referrals had been submitted to mental health to see the patient since September 2022, however, the patient was not seen.  Much of the assessment form was not completed, and no mental status examination was documented.

An initial psychiatric assessment was completed on November 25, 2022.  The content was generic, included no updates to documentation that was pulled forward from prior assessments, and the documentation did not evidence an examination of the patient.  The psychiatrist ordered olanzapine and hydroxyzine on an as-needed basis, and noted that the patient refused routine psychotropic medications.  Of note, lorazepam was ordered on an as-needed basis in addition to olanzapine and hydroxyzine on November 24, 2022 without any accompanying psychiatric documentation; this order occurred prior to the psychiatrist seeing the patient.  Additionally, a

standing order for olanzapine was ordered on November 25, 2022, despite the psychiatrist's documentation that the patient refused routine medications.

An initial IDTT occurred one day late on November 28, 2022, and included required staff and the patient. Documentation noted that the patient was medication adherent but was unlikely to take them once discharged from the MHCB. No IPOCs, treatment goals, or planned interventions were included in the treatment plan.

Attempts were made to see the patient daily; however, he frequently refused during the first week of his stay. On December 1, 2022, an unlicensed psychologist documented a cell-front contact due to staffing shortages. The patient was referred to the ICF on December 5, 2022. The patient attended the IDTT meeting when this decision was made; however, he did not agree with the inpatient referral. While goals were not explicitly stated, treatment interventions and their intended outcomes were included in the treatment plan. The patient began engaging in confidential contacts with clinicians on December 6, 2022. The patient also attended recreation therapy sessions. Most of the psychiatric contacts appeared to occur at cell front; however, the location of the contacts was not consistently documented.

While progress notes mentioned an upcoming *Vitek* hearing, IDTT documentation did not indicate that a hearing was scheduled or conducted. Inpatient consults and other documentation indicated that a transfer was imminent, and on December 23, 2022, a clinical social worker documented that the patient signed a due process MH-7480 form waiving his mental health placement hearing. The patient later rescinded his agreement for transfer during an individual session with his primary clinician on December 25, 2022. The patient refused several subsequent out-of-cell contacts. On December 28, 2022, a progress note by a primary clinician referenced "a *Vitek* hearing officer," but it was not explicitly stated if a hearing occurred.

On December 29, 2022, IDTT documentation noted that a *Vitek* hearing occurred during the past week and resulted in a determination that the inpatient referral would proceed. Subsequently, the patient refused most contacts with clinicians and the recreation therapist with medication nonadherence. Weekly IDTT meetings occurred without the patient in attendance. Despite the *Vitek* hearing, the patient did not transfer to an inpatient setting until February 28, 2022, over two months later; the initial ICF referral was made 85 days prior on December 5, 2022. The primary clinician discharge summary included a patient history, but the section documenting the MHCB treatment course was not completed, and no plan or recommendations were provided for inpatient treatment.

**Findings**

The care provided to this patient was inadequate.

The psychiatric documentation was sparse, generic, and did not correspond with medication changes that occurred. Treatment plans were not comprehensive, and the discharge summary was insufficient and inadequate. Of note, this was a complex and challenging patient.

**Patient R**

This 33-year-old male patient was provided a diagnosis of schizophrenia. Initially, he was prescribed olanzapine, melatonin, and guanfacine, with olanzapine and hydroxyzine ordered on an as-needed basis. The patient was not medication adherent. Eventually, the patient agreed to take mirtazapine and was adherent; however, he remained with psychotic symptoms. This patient's case was randomly selected to review the mental health care provided in the MHCB.

The patient was admitted to the MHCB from the EOP on November 3, 2022. He was seen by the CIT after he expressed suicidal ideation. He had been discharged from an MHCB less than two weeks prior, and refused all offered treatment. The patient was uncooperative, irritable, and defensive. He was assessed with high acute suicide risk.

The patient refused the initial primary clinician assessment, which was completed by a healthcare records review. At the time of admission, he was provided with a diagnosis of unspecified anxiety disorder and was noted to have had three MHCB admissions in the previous two months. The initial psychiatric assessment included little updated information. The assessment indicated that olanzapine and hydroxyzine would be offered on an as-needed basis; yet other medications were prescribed, including guanfacine, melatonin, and lorazepam, which were not mentioned in the assessment. The documentation indicated that the patient would not take antipsychotic medications. The psychiatrist documented the presence of disordered speech and flight of ideas; he provided a diagnosis of an acute psychotic episode.

The initial IDTT meeting occurred one day late on November 7, 2022. Required staff were present. While the patient declined to attend, documentation indicated that the meeting occurred at bedside. The patient was described as delusional with functioning deficits and anxiety, yet no IPOCs were initiated to address these issues. Also, the symptoms and working diagnosis presented by the psychiatrist were not included in the documentation. Treatment goals were vague and included "stabilize/develop coping skills to reduce distress" through medication management and "1:1 therapeutic intervention." The patient refused all clinical contacts over the subsequent week; however, a comprehensive note was written by a psychologist regarding observations of the patient and the development of possible catatonia.

During an IDTT on November 14, 2022, the decision was made to refer the patient to the ICF level of care. The patient refused to attend the IDTT, yet documentation indicated that he was present and contributed to the goals and treatment plan. The patient's diagnosis was updated appropriately.

The patient remained in his cell and refused all contacts until an IDTT on November 28, 2022. He was then described as disoriented with poor memory and stilted conversation. Subsequent weekly IDTT meeting documentation noted the patient's refusal to attend and included limited information regarding his functioning or response to offered treatment. On December 29, 2022, the patient was angry and agitated about his prolonged MHCB stay. He began taking the as-needed medication and engaged with staff during January 2023. Several treatment plans failed to include updates about the patient's clinical status, functioning, or response to treatment. The

primary clinician discharge summary was adequate and included a comprehensive description of the course of treatment.

The patient transferred to inpatient care 99 days after referral.

**Findings**

The treatment provided to this patient was adequate.

As was noted in other MHCB cases reviewed, the psychiatric documentation was sparse, and treatment plan content was inadequate and variable. Despite this, individual contacts were offered consistently; and when the patient engaged with staff, there was evidence of supportive therapeutic interactions.

**Patient S**

This 39-year-old male patient was provided diagnoses of major depressive disorder, recurrent episode, severe and generalized anxiety disorder. At the time of discharge from the MHCB, he was prescribed fluoxetine and buspirone, as well as olanzapine and hydroxyzine ordered on an as-needed basis. His healthcare record was randomly selected to review the mental health care provided in the MHCB.

The patient was admitted to the MHCB from an EOP on October 9, 2022, after verbalizing suicidal ideation with a plan to "eat shellfish and slit my wrist." He was assessed with high chronic and acute suicide risk. The initial primary clinician assessment was documented on October 10, 2022, and it was not completed almost in entirety, with only previous information pulled forward. No mental status examination was documented. The initial psychiatric assessment provided a diagnosis of "depression grief CD [rule out] DTS," and much of the information in the note was also pulled forward. The psychiatrist prescribed olanzapine, buspirone, and hydroxyzine on an as-needed basis, and the psychiatrist indicated that the patient refused regularly prescribed medications.

An initial IDTT meeting occurred on the same date (October 10, 2022); however, it was unclear if the patient attended, as many sections of the treatment plan were not completed, including the section regarding patient participation. No IPOCs were initiated, and no specific treatment goals were documented; however, the plan indicated that medications and psychoeducation would be provided to the patient to assist with agitation, depression, and grief. The rationale for maintaining the patient at the MCHB level of care was adequate. Later that day, it was noted that the patient was not eating, and a hunger strike protocol was initiated.

The next IDTT meeting occurred on October 17, 2022, and the treatment plan included vague treatment goals and objectives. An IPOC was created by nursing to address the patient's lack of food intake, and a mental health IPOC was initiated for danger to self. The decision was made on that date to refer the patient to the ICF, and an adequate rationale for referral was provided.

Daily contacts with either a primary clinician or psychiatrist occurred most days except on October 12, 2022; however, many contacts occurred at cell front. Few primary clinician contacts included the provision of interventions and did not reference treatment goals. One progress note by a psychologist on October 30, 2022 contained, "Pt seen for confidential contact today" as the entirety of the content. Psychiatric progress notes were generic in content and did not correspond with changes in patient care. For example, it was noted that buspirone was started as a regular medication on October 17, 2022, and fluoxetine was started on October 18, 2022; yet no progress notes were documented by a psychiatrist on either dates. Additionally, a psychiatric note on October 20, 2022 failed to note these medications and instead documented only the patient's as-needed medications. Similar concerns regarding failure to review the patient's healthcare record were noted on October 18, 2022, when a primary clinician documented that the patient would remain at the MHCB level of care until his next IDTT; however, the patient had been referred to the ICF the day prior during an IDTT.

IDTT meetings occurred weekly during the 46-day interval between the patient's referral to ICF and actual transfer to an inpatient setting. IDTT documentation consistently documented the patient's need for inpatient care, yet rarely referenced the patient's current engagement in treatment or progress toward treatment goals. The final IDTT meeting occurred on November 28, 2022, and indicated a plan to retain the patient at the ICF level of care in the MHCB while awaiting transfer. A discharge summary was written on December 2, 2022, which was adequate and included the patient's treatment course and response to treatment as well as the need for inpatient care.

**Findings**

The care provided to this MHCB patient was inadequate.

Treatment planning was vague, and the interventions were not documented consistent with the patient's treatment needs. Psychiatric documentation was lacking in content, and there were no entries in the healthcare record on dates when medications were initiated.

**Patient T**

This 44-year-old male patient was provided diagnoses of major depressive disorder, recurrent episode, moderate, and narcissistic personality disorder. At the time of MHCB discharge, he was prescribed olanzapine with a haloperidol injection back-up; the patient received his psychotropic medications by a PC 2602 order.

The patient was referred to the MHCB on November 2, 2022 for significant impairment due to mental illness and possible danger to self. He was described as psychotic and withdrawn with numerous concerns expressed by custody staff. An initial primary clinician assessment was attempted on November 3, 2022, but the patient refused to be seen confidentially and refused to engage at cell front. During the initial IDTT on the same date, it was noted that the patient was not adequately caring for himself. No IPOCs or treatment goals were initiated at that time.

An initial psychiatric assessment was documented on November 5, 2022.  It included a clinical summary that was pulled forward from past assessments, a diagnosis of "psychotic episode with catatonia history of depression" and an entry of "medication – 2602 process", without any additional detail provided.  It could not be determined whether the psychiatrist examined the patient based upon the documentation; however, an AIMS assessment was completed.  While no further details regarding medications were documented by a psychiatrist, a nursing note on November 7, 2022 indicated that the patient was started on emergency involuntary medication.  Psychiatric documentation the following day indicated that family contact had been made, and that the patient had presented similarly in the past.  On November 10, 2022, IDTT documentation indicated that the patient had shown mild improvement with medication treatment, but remained significantly impaired and would be referred to the ICF level of care.  An IPOC addressing suicidality and self-harm was initiated; however, the clinical appropriateness of this IPOC was questionable as the patient was catatonic and mute.

The patient consistently refused all clinical contacts with staff, including routine vital signs and nursing assessments except on November 20, 2022, when he agreed to be seen out of cell.  The patient stood in the therapeutic treatment module with his back to the clinicians the entire time and did not communicate other than moving his head slightly.  He was assessed to be in distress and that a depressed mood accounted for his catatonic presentation.  While the patient was out of his cell, it was noted that his toilet did not function and was nearly filled with feces.  The patient did not report this issue, and staff were apparently unaware.  The patient was moved to a different cell.

Continuity of care in this case was noted to be extremely deficient.  The IDTT documentation and primary clinician contacts were documented by five different clinicians.  There was little evidence that clinicians reviewed the patient's healthcare record.  Examples included failure to document significant events in IDTT documentation, inappropriate IPOCs, and failure to follow through on plans noted in progress notes.  Especially concerning was a primary clinician progress note on December 28, 2022 which noted that the patient should be considered for involuntary medications at his next IDTT meeting; this, despite the patient's psychiatrist having submitted a PC 2602 petition 20 days prior with the hearing scheduled for December 30, 2022.  The need for involuntary medication and the upcoming PC 2602 hearing were not acknowledged in the IDTT documentation at any point.  Additionally, there were differences of opinion regarding the underlying symptoms resulting in the patient's presentation that were not acknowledged or reconciled in the documentation.

On December 30, 2022, the patient was determined to be gravely disabled and lacked the capacity to provide informed consent; thus, he was ordered to receive involuntary psychotropic medications.  Documentation indicated that the patient was depressed with catatonia and psychosis.  This diagnostic profile was not documented in IDTT documentation nor reflected in the patient's diagnosis of record.  A psychiatrist documented prescribing lorazepam on January 2, 2023, with a note that antipsychotic medications were being considered; then in a progress note on January 3, 2022, another psychiatrist indicated that the patient was prescribed olanzapine, an antipsychotic medication.  There was no psychiatric documentation clarifying the initiation of that medication.  Despite these significant changes in the patient's treatment, there was no

mention of these medications in IDTT documentation on January 5, 2023, or in the discharge summary dated January 12, 2023.

Weekly IDTT meetings occurred; however, some were delayed beyond the seven-day requirement.

This patient waited 45 days after a *Vitek* hearing for transfer to an inpatient setting, and a total of 63 days after his inpatient referral was submitted.

**Findings**

The care provided to this patient was inadequate.

Of significant concern was the poor documentation and poor continuity of care. The IDTT documentation rarely included any information about patient functioning or significant changes in the patient's treatment. There was little to no evidence that clinicians reviewed the healthcare record, as evidenced by omissions and documented contradictions. There was delay in the initiation of involuntary medications, which was not justified. Psychiatric documentation was poor. Diagnoses were discrepant across the members of the IDTT that were not addressed. The discharge summary was inadequate and included no reference to the initiation of an involuntary medication order, and there was no description of the patient's treatment course during the MHCB stay.

**Patient U**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the 3CMS level of care at CSATF. The patient was serving his first CDCR prison term with a 15-year sentence. The exact date of CDCR arrival was unclear, but he began his sentence in approximately 2007 to 2008. He was released on early parole on July 14, 2023. The patient was housed at CSATF from April 4, 2019 to his parole date. He had a history of juvenile incarcerations and denied a history of substance abuse, suicide attempts or self-injurious behaviors. He was previously provided diagnoses of major depressive disorder and generalized anxiety disorder, and he did not have a history EOP, MHCB or DSH placements.

One IDTT meeting occurred during the review period on November 2, 2022. This was a special IDTT meeting; as the patient was being considered for placement in a re-entry program, and the meeting included the necessary staff and the patient. The patient reported insomnia as a primary symptom and was provided an IPOC for anxiety in the treatment plan. The IPOC contained adequate goals and a generic but adequate intervention to target the anxiety symptoms. The treatment plan and IDTT documentation were adequate, and the treatment team cleared the patient for placement in the re-entry program. The annual IDTT meeting should have occurred in early April 2023, but that annual IDTT meeting did not occur.

The patient was seen for a PC contact on October 27, 2022, which was the only PC contact during the review period. The contact occurred in a confidential setting, and the purpose of the

contact was a consultation for the re-entry program. The patient reported stable mood, and he was medication adherent. He was provided diagnoses of major depressive disorder, recurrent, and generalized anxiety disorder. The patient denied acute symptoms and reported that he had a good support system. The patient was not provided group therapy between October 27, 2022 and June 8, 2023.

The patient was seen timely for two psychiatric contacts during the review period on November 9, 2022 and December 14, 2022, and the contacts occurred by telepsychiatry. The documentation indicated that the patient consistently reported and demonstrated stable mood without significant increase in symptoms or concerns during the review period. He was prescribed Remeron and Vistaril with medication adherence.

**Findings**

The care provided to this patient was inadequate.

He was not seen timely for PC contacts; he was only seen for one individual PC contact during the review period.

**Patient V**

This 65-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the 3CMS level of care at CSATF. The patient had served several CDCR prison terms, and he arrived at CDCR for his current incarceration on January 11, 1996 with a sentence of life with the possibility of parole. He arrived at CSATF from RJD on November 16, 2005 and remained at CSATF since that time. He was previously provided diagnoses of schizoaffective disorder and polysubstance dependence; additionally, he reported a history of severe PTSD with flashbacks and anxiety as well as auditory and visual hallucinations. He had two community psychiatric hospitalizations. He also reported physical and sexual abuse in prison in 2012 and 2013.

No IDTT meetings were scheduled during the review period. He was seen timely for psychiatric contacts during the review period. The patient was seen for a routine psychiatric contact by telepsychiatry on November 8, 2022, when he was reportedly stable, reported no mental health symptoms, and wanted to continue his medications unchanged. He was subsequently seen for psychiatric contacts on January 31, 2023, April 24, 2023, April 28, 2023, May 9, 2023, and May 23, 2023; at each contact, the patient was described as stable with no reported significant increase in symptoms.

The patient was not seen for individual PC contact during the review period. The documentation indicated that he was seen by the PC on June 30, 2022, and he was not seen for another PC contact until June 29, 2023. The documentation indicated that the PC only saw the patient immediately prior to the annual IDTT meetings.

**Findings**

The care and treatment provided to this CSATF patient was inadequate.

The patient was not seen for PC contacts for approximately one year, and there was no documentation of any PC efforts to check on the mental status or functioning of the patient between annual IDTT meetings.

**Patient W**

This 24-year-old 3CMS patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at CSATF. The patient arrived at the CDCR on December 21, 2021 for his first prison term to serve a 12-year sentence. He entered the CDCR at Wasco State Prison (WSP) reception center and arrived at CSATF on March 2, 2022. The patient reported a long history of juvenile arrests, three inpatient substance abuse programs and one community psychiatric hospitalization after a suicide attempt. He was previously provided diagnoses of bipolar disorder, depression, and insomnia, and he reported no history of auditory or visual hallucinations. The patient experienced PTSD symptoms, including increased anxiety, night sweats, and nightmares.

No IDTT meetings occurred during the review period. An initial PC assessment occurred on April 8, 2022, and the assessment occurred approximately three weeks late. The mental status sections of the initial assessment were not completed, and several other sections of the initial PC assessment were incomplete. The patient was seen for only one PC contact during the review period on October 13, 2022, and the documentation indicated that the contact was in response to an urgent consult; however, the progress note did not include the reason for the urgent consult. Although the patient should have been seen for routine PC contacts in September 2022, January 2023, and April 2023; the patient's next PC contact after the October 13, 2022 contact did not occur until August 1, 2023, after he transferred to SQ on April 12, 2023.

The patient was seen for adequate psychiatric contacts during the review period; however, he should have been seen in October 2022, but there was no documentation of psychiatric contact during that time. He was prescribed Remeron and prazosin. He was seen by a covering psychiatrist on January 4, 2023, when he reported normal mood and increased motivation. The psychiatrist restarted prazosin at the patient's request, as it was discontinued due to poor adherence. The patient demonstrated normal mental status and was provided diagnoses of unspecified depressive disorder and PTSD. At the next psychiatric contact on February 1, 2023, the patient was reportedly not medication adherent, and he acknowledged recent heroin use. The psychiatrist changed Remeron to be taken PRN. He was scheduled to see the psychiatrist on April 5, 2023; however, he refused the scheduled appointment and transferred to SQ on April 12, 2023.

**Findings**

The care and treatment provided to this CSATF patient was inadequate.

The treatment plan was inadequate, as no IPOCs were provided, and the plan of care was limited to medication management. No substantive clinical updates were provided in assessments or progress notes to inform treatment. The initial PC assessment and routine PC contacts were inadequate, and the PC contacts did not occur timely. The psychiatric treatment provided was generally adequate, except for one missed psychiatric contact in October 2022.

**Patient X**

This 69-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at CSATF at the 3CMS level of care. He arrived at CSATF on August 16, 2022, from SQ. The patient had served several CDCR prison terms, and he was currently serving a life sentence with the possibility of parole. He was placed in the 3CMS program on January 11, 2012, and he had a history of multiple MHCB admissions and treatment at the EOP level of care. He had three previous suicide attempts, all by hanging, in 1995, 2011, and 2013.

The initial IDTT meeting at CSATF occurred on November 10, 2022, and this meeting occurred approximately two- and one-half months late. The meeting included the necessary participants and the patient. The treatment plan included an IPOC for depressed mood with adequate goals but inadequate interventions. The patient denied new symptoms and reported normal mood and sleep. He had no RVRs and was on the waitlist for a work assignment. The clinical summary was appropriately informed by the initial PC assessment that occurred on October 14, 2022.

Two PC contacts occurred during the review period. The patient was seen on September 21, 2022, in a confidential setting at the request of the patient's psychiatrist after the patient requested to speak with his clinician. The patient was described as stable with no apparent symptoms or signs of distress, and he denied safety concerns and indicated that his transition to CSATF was good. A SRASHE assessed the patient's chronic suicide risk as high and his acute risk as low. The note indicated that the patient would be seen for routine PC contacts every 90 days.

The patient was next seen by the PC on October 14, 2022, when the initial PC assessment was completed. The patient reported positive response to medication treatment and denied significant symptoms, including auditory and visual hallucinations. The assessment included an adequate history and level of care justifications, and the patient was described as stable, volunteered in cleaning his housing unit, and socialized well with peers. The patient was not seen for subsequent PC contact during the remainder of the review period.

The patient was seen for timely and adequate psychiatric contacts by telepsychiatry during the review period. The initial psychiatric assessment occurred prior to the IDTT meeting and occurred timely. He was provided a diagnosis of unspecified depressive disorder and was prescribed Zyprexa. The psychiatric note indicated that the patient would be seen for follow-up contact in 90 days or sooner. The next routine psychiatric contact occurred on November 29, 2022; the documentation of that contact was adequate, and the patient was stable with progress toward his treatment goals. At the final routine psychiatric contact of the review period on February 14, 2023, the patient was stable, and his medications were continued.

**Findings**

The care and treatment provided to this CSATF patient was inadequate.

The initial IDTT meeting did not occur timely, and the interventions provided in the treatment plan were inadequate. The initial PC assessment was also significantly delayed but was adequately completed. Other than the initial PC assessment, the patient was only seen once by the PC during the review period; the next PC contact did not occur for approximately one year. The psychiatric treatment was appropriate and occurred timely.

**Patient Y**

This 28-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care and treatment provided at CSATF. The patient arrived at CSATF on August 23, 2022 from CSP/Sac. He arrived at the CDCR on November 8, 2016 for his current term to serve a 24-year sentence. He received mental health services at the 3CMS level of care since November 22, 2016, and did not have a history of treatment at the EOP, MHCB, acute or intermediate levels of care. He had no history of community mental health treatment, suicide attempts or self-injurious behaviors.

The only IDTT meeting during the review period occurred on October 4, 2022, six weeks after the patient's arrival and four weeks beyond timeline requirements. The IDTT meeting included the necessary participants, and the patient attended. The problem list included methamphetamine and fentanyl dependence. The treatment plan contained IPOCs for anxiety and depressed mood, and both IPOCs included generic goals and interventions that were appropriate, but not individualized. The patient stated that his goal was to address his depression and anxiety. The treatment plan provided adequate level of care rationalization. The patient demonstrated concrete thinking, but his thinking was linear and goal directed; and the patient was motivated for treatment with a consistently positive affect.

The initial psychiatric assessment occurred on September 19, 2022; this assessment occurred one month after the patient's CSATF arrival but prior to the initial IDTT meeting. The patient reported worsening sleep and moderate depressive and anxiety symptoms. He was prescribed BuSpar and melatonin PRN with adequate medication adherence. At the next psychiatric contact on October 10, 2022, the patient was poorly adherent with BuSpar, and the psychiatrist changed that medication from a standing order to PRN. The next psychiatric contact on March 27, 2023 did not occur timely and was approximately five months late. The documentation indicated that the patient was not seen for psychiatric contact since that date.

The patient was not seen by the PC at CSATF during the review period, and no initial PC assessment was documented since CSATF arrival. There were two progress notes in the healthcare record regarding PC contacts. The patient reportedly refused to attend a scheduled PC contact on September 13, 2022, and the PC noted "no understanding regarding mental status or self-harm could be determined" for the patient. A similar note was documented when the patient refused his next scheduled appointment on December 12, 2022. There was no documentation

that the PC made further attempts to see or to evaluate the patient's mental status and functioning.

**Findings**

The care and treatment provided to this CSATF patient was inadequate.

The patient was not seen for timely or consistent clinical contacts during the review period. The initial IDTT meeting occurred approximately four weeks late, and he was not seen for an initial PC assessment at all. Further, there was no documentation that the PC made any substantive attempts to evaluate the mental status or functioning of the patient since his arrival at CSATF other than contact at the initial IDTT meeting.

**Patient Z**

This 43-year-old patient's healthcare record was reviewed to determine whether the mental health care provided in the STRH at CSATF was adequate. The patient transferred to CSATF in 2018 and was housed in the CSATF STRH from September 9, 2022 to March 10, 2023. The patient was placed in the STRH due to battery on an incarcerated person with a deadly weapon. The patient had no history of mental health treatment in the community and no history of suicide attempts or self-harm. There were no SRASHEs completed while the patient was housed at CSATF between 2018 and 2023.

The patient was provided a diagnosis of mood disorder. Based on the severity of his symptoms in August 2022, the primary clinician suggested that the patient likely met the criteria for major depressive disorder, recurrent, moderate; however, the diagnosis was not changed, and there were no records suggesting that the IDTT considered a diagnostic change or assessment for clarification. The documented symptoms included depressed and anxious mood, negativity, passive suicidal ideation, and intermittent efforts to self-medicate with drug use. The STRH psychiatrist prescribed Zoloft and Cogentin, and the patient was described as only intermittently medication adherent.

No psychiatric initial assessment was completed at CSATF. The psychiatrist did, however, meet with the patient monthly, often in response to medication refusals. All psychiatric contacts occurred at cell front due to the patient refusing to attend a confidential session. A psychiatric note, dated January 30, 2023, indicated that the contact was completed at cell front and that the patient described himself as doing well without medication side effects. At that time, he had refused fewer medication doses; subsequently, he began refusing his medications again, and the psychiatrist met with him in response to medication refusals on February 16 and March 2, 2023. Both contacts occurred at cell front again due to patient refusals. On February 16, 2023, the patient asked the psychiatrist not to discontinue his medications and indicated that he would resume taking them as prescribed. The patient attributed his medication and treatment nonadherence to being "lazy." On March 2, 2023, the psychiatrist noted that the patient did not get out of bed and was uncooperative with minimal responses.

The primary clinician initial assessments were completed at CSATF in July 2018 and August 2022. Despite the patient's report of passive suicidal ideation during the primary clinician assessment in August 2022, no SRASHE was completed at CSATF. All routine primary clinician contacts in the STRH were completed at cell front due to patient refusal. Despite the requirement of weekly STRH primary clinician contacts, he was only seen twice monthly during September 2022, October 2022, November 2022, and January 2023, and only once in February 2023. No STRH primary clinician contacts were documented during December 2022 or March 2023. The longest duration between primary clinician contacts occurred from November 8, 2022 to January 5, 2023. During the most recent primary clinician contact, on February 7, 2023, the patient reportedly was lying in his bed and politely declined to participate.

An initial IDTT meeting occurred in September 2022 when the patient was initially placed in the STRH. Unfortunately, the IDTT did not update treatment goals or interventions at that time, including addressing the behaviors resulting in the STRH placement. Instead, a generic treatment goal from two years prior was copied unchanged that indicated that depression would be reduced to a two of ten on a ten-point scale by the next IDTT meeting through fostering a therapeutic alliance. There were no subsequent STRH IDTT meetings documented, despite the patient remaining there for approximately six months and the documentation referencing ongoing treatment and medication nonadherence.

The patient attended only one of six recreation therapy groups offered in the STRH between January 1 and March 10, 2023.

**Findings**

The care provided to this patient in the STRH was inadequate.

Treatment nonadherence was identified regarding routine primary clinician contacts, offered treatment groups, and IDTT meetings. During the initial IDTT meeting, the treatment team should have reviewed the patient's diagnosis in response to the primary clinician's recommendation one week prior. The treatment plan should have been revised and implemented to address the behavior resulting in the STRH placement, including medication and treatment nonadherence, recently endorsed passive suicidal ideation, and observed functional impairments. Instead, the IDTT copied unchanged and retained only one generic goal and intervention from 2020, which had already proved ineffective as the target date of completion for that goal was the subsequent IDTT meeting.

The routine primary clinician contacts consistently did not occur as required from September 2022 to March 2023, and no primary clinician contacts were offered at all from November 8, 2022 to January 5, 2023. Further, only one primary clinician progress note referenced a therapeutic intervention.

Lastly, none of the STRH providers' progress notes offered an opinion regarding the patient's medication and treatment nonadherence, including whether they were related to depressive symptoms or substance use, both of which were previously documented as areas of concern.

**Patient AA**

This patient's healthcare record was reviewed to determine whether the mental health care provided in the STRH at CSATF was adequate. The patient transferred to CSATF in April 2022 and was housed in the STRH from May 12, 2022 to March 23, 2023. He was provided diagnoses of adjustment disorder and opioid use disorder. The psychiatrist prescribed Trileptal and Remeron, and the patient was adherent with his psychotropic medications while housed in the STRH.

The most recent IDTT meeting occurred on November 30, 2022; however, the documentation indicated that no psychiatrist was present for this IDTT meeting. The STRH treatment plan was limited to a target of anxiety and a goal of reducing anxiety to a four or below on a ten-point scale by the next IDTT meeting; however, the target and goal were copied unchanged from a May 25, 2022 treatment plan, and no meaningful interventions were included. The treatment plan was not revised to address new problems referenced in the healthcare record, including substance use and other behaviors that led to the STRH placement. The IDTT further documented that the patient would be free from anxiety, rather than a more realistic goal of learning to manage his anxiety through healthier coping mechanisms.

While the patient was consistently prescribed psychotropic medication while housed in the STRH, a psychiatric initial assessment was not completed during the 11-month period that the patient remained at CSATF. Routine psychiatric contacts occurred approximately every 30 to 90 days in the STRH and generally occurred in confidential settings.

The primary clinician completed their initial assessment on May 19, 2022; however, the patient was not seen for weekly PC contacts in the STRH as required. The patient was seen for routine primary clinician contacts once or twice monthly from July 2022 to November 2022, but no contact was documented during December 2022. The primary clinician contacts did increase in frequency to three times monthly in February and March 2023, and the contacts generally occurred in a confidential setting. The primary clinician progress notes routinely described the patient as stable, self-motivated, and coping by utilizing Bible studies, writing, reading, music, and exercise. The patient also regularly attended yard and participated in groups when offered.

This patient ultimately transferred from CSATF to MCSP in late March 2023.

**Findings**

The care provided to this patient in the STRH was inadequate.

The IDTT meetings, primary clinician contacts, and group offerings were not provided as required. While routine psychiatric contacts generally occurred timely, an initial psychiatric assessment was not completed at CSATF. The IDTT did not develop a new treatment plan upon placement in the STRH; this was clinically indicated to address new problems, including behaviors resulting in his STRH placement. The providers consistently documented that the patient was high functioning and stable throughout his time in the STRH and attributed his

stability to self-monitoring and managing his own symptoms through exercise, participation in yard, engagement in social interactions, medication adherence, and group treatment participation.

**Patient BB**

This 27-year-old transgender patient's healthcare record was reviewed to evaluate the quality of care provided in the STRH at CSATF. The patient was serving her first CDCR prison term of nine years and initially transferred to CSATF on October 19, 2022. She was placed in the STRH on or around November 17, 2022, where she remained until her eventual transfer to another institution on January 6, 2023. The healthcare record referenced a history of treatment for ADHD symptoms in the community and two prior suicide attempts, one of which occurred at age 16 by hanging and another in March 2021 by intentional overdose. Additionally, prior records referenced a traumatic incident in February 2022, when another incarcerated person violently attacked the patient in her cell and stabbed her in the face.

The patient only received mental health services in CDCR at the 3CMS level of care. Her actual diagnoses were unclear, as the CSATF providers documented different diagnoses following each encounter. In April 2022, a prior institution provided a diagnosis of PTSD. At CSATF, she was provided diagnoses of unspecified anxiety disorder, opioid use disorder, schizophrenia unspecified type, gender dysphoria, major depressive disorder, and PTSD. The IDTT did not document symptoms to support the various diagnoses that were provided.

The initial IDTT meeting occurred timely on December 7, 2022; however, the IDTT failed to update the treatment goals and interventions on that date. Instead, they copied and pasted a treatment plan from April 2022 which solely targeted anxiety with a generic goal to reduce anxiety by the next IDTT meeting. The behavior that resulted in the STRH placement was not addressed in the treatment plan.

A psychiatric initial assessment was not completed at CSATF. A psychiatric nurse practitioner met with the patient on December 12, 2022; however, the patient reported that she did not want medication and preferred to speak with her primary clinician, and she explained that she wanted to speak with her primary clinician regarding a letter that referenced her father's recent death and her mother's recent stroke and COVID-19 diagnosis. Despite apparent distress during this contact, the psychiatric provider documented that the patient's mood was euthymic, and all areas of her mental status were described as within normal limits. Fortunately, the nurse practitioner communicated the patient's request to the primary clinician and documented that the primary clinician responded that they would attempt to meet with the patient if time permitted. No formal referral was in the healthcare record.

The primary clinician conducted an initial assessment on November 30, 2022. Despite the patient's history of suicide attempts, a SRASHE and safety plan were not completed at CSATF. Subsequently, the primary clinician met with the patient only once in December 2022, and once in January 2023. It was unclear whether the second and most recent routine primary clinician contact on January 4, 2023 occurred at cell front or in a confidential setting, as both settings were documented in the progress note on that date.

The primary clinician met with the patient in response to her request to process bad news on December 12, 2022.  The progress note referenced grief-related interventions; however, despite the patient's apparent distress and grief, the primary clinician did not follow up with the patient until almost one month later on January 4, 2023.  In general, the primary clinician contacts did not comply with the STRH requirement for weekly encounters.

The patient required and requested more treatment while housed in the STRH.  When treatment groups were offered, she regularly attended.

**Findings**

The care provided to this patient in the STRH was inadequate.
The patient had a history of suicide attempts, was housed in a high-risk environment, and received news that indicated increased suicide risk.  The STRH treatment team, however, failed to develop an individualized treatment plan with interventions to address new concerns, including the reason for restricted housing placement, grief, as well as suicide and self-harm risk.  Further, the patient was not seen for primary clinician contacts as required and at frequencies that were clinically indicated.

Of note, the patient required MHCB admission due to danger to self that was triggered by grief after her transfer to another facility.

**APPENDIX C-5**
**California Medical Facility (CMF)**
**May 2, 2023 – May 5, 2023**

**Patient A**

This patient was randomly selected to review the level of care provided in the EOP hub. The patient was a 38-year-old male who had served multiple CDCR prison terms. He was currently serving a 12-year sentence which began on March 17, 2015. His EPRD was April 3, 2024.

The patient's developmental history was significant due to several adversities. His parents had histories of mental illness; his mother suffered from anxiety and depression, and his father had schizophrenia. He left school at the ninth grade. The patient was also arrested, and he had a juvenile justice record. At age 15, he began using methamphetamine and alcohol; and at age 16, he reportedly attempted suicide by cutting his wrist due to relationship problems with his girlfriend. After this attempt, the patient was psychiatrically hospitalized for several weeks; however, upon discharge, he was not adherent with outpatient follow-up treatment.

The patient's CDCR adjustment was problematic. On June 23, 2022, after battering two officers and a peer, he was placed in the ASU. At that time, he received mental health services at the EOP level of care at SQ. He was transferred to the CMF ASU on July 21, 2022. The CMF treatment team continued his primary diagnosis from SQ of substance-induced psychotic disorder; he was also provided additional diagnoses of opioid use disorder, bipolar disorder, anxiety disorder, and attention deficit hyperactivity disorder. The rationale provided for the additional diagnoses at CMF was unclear. It was also unclear why the patient was not provided a diagnosis of depressive disorder; this diagnosis was repeatedly discussed in healthcare documentation as his mother died the year that he was incarcerated in 2015, and there was also a personality disorder which was repeatedly mentioned in the RVR mental health assessments. During the review period, the patient was prescribed Wellbutrin, Lexapro, Trileptal, and Vistaril. Additionally, he participated in the Medication-Assisted Treatment (MAT) program, and was treated with Suboxone.

The treating psychiatrist attempted to meet with the patient monthly, and the primary clinician attempted to meet with him weekly; however, he usually refused confidential individual clinical contacts. As a result, the primary clinician usually saw the patient at cell front for brief wellness and safety checks.

During the review period, IDTT meetings occurred monthly except during September 2022. The necessary treatment team members always attended the meetings, except for the patient who rarely attended. As the patient was a high treatment refuser, rarely attended groups, confidential individual sessions, and IDTT meetings, he was placed on a modified treatment plan and was offered limited groups. Treatment plans rarely changed, even after significant events, including on August 9, 2022 when the patient rated his depression at a ten on a scale of one to ten, and when he rated his anxiety at five of ten on September 7, 2022. On September 30, 2022, the primary clinician received a mental health referral indicating that the patient repeatedly stood in his cell, refusing to respond to custody, and refusing to eat his meals. Additionally, on

830

September 30, 2022, he kicked an escort officer in the leg resulting in an RVR for battery on a peace officer. On October 7, 2022, the primary clinician received another mental health referral expressing concern that the patient was withdrawn, hostile, and unable to follow directions. RVR mental health assessments described the patient as polite but distant and guarded with his primary clinician, concealing and/or minimizing his psychiatric symptoms. On December 9, 2022, he was removed from a group for disruptive behavior; and on December 13, 2022, he was again charged with battery on a peace officer. Custody officers reported that the patient exhibited elevated hostility and aggression. The RVR mental health assessments revealed paranoia with irritability, hostility, and possible auditory hallucinations. On December 28, 2022, the patient reported difficulty sleeping due to auditory hallucinations.

The patient was admitted to the MHCB on January 5, 2023, due to danger to self; he was discharged on January 17, 2023. Four of the five-day follow-up contacts were adequately documented. While in the MHCB, the patient reported anxiety attacks and racing thoughts that began in 2013 after he was stabbed in the community. Despite these numerous clinical concerns and significant additional information, the patient's diagnoses and treatment plan remained unchanged. Additionally, the treatment goals and interventions remained vague and were unclear.

**Findings**

The care provided to this patient was inadequate.

The treatment team appeared to be responsive to the patient; however, they did not explore and integrate critical information, such as the trauma of being stabbed in 2013 and reported auditory hallucinations into treatment planning. Despite the patient's apparent mental status deterioration, his treatment goals and interventions were never discussed or changed. Additionally, the treatment team never attempted to collaborate with the ISUDT regarding the primary diagnosis of substance-induced psychotic disorder.

**Patient B**

This patient was randomly selected to review the level of care provided in the EOP hub. The patient was a 34-year-old male serving life with the possibility of parole. He had been incarcerated since 2013. His EPRD was February 6, 2084.

The patient's childhood was traumatic and characterized by neglect, violence, and physical and sexual abuse. His father was reportedly diagnosed with a psychotic disorder, and his mother had depression and substance use disorders. He had three older siblings from his father's side of the family, and four younger siblings from his mother's side of the family. Since age seven, he lived in foster or group homes. He reported early gang involvement and drug exposure. He also spent time in the juvenile justice system and in a state hospital after a failed suicide attempt. While incarcerated in CDCR, the patient previously received mental health services at the 3CMS level of care. He had an extensive disciplinary history with a propensity for violence. During August 2022, he allegedly participated in a gang rape of a transgender inmate at SQ. His family rejected him after participating in the gang rape. Their rejection resulted in suicidal ideation,

reports of having no reason to live, and feelings of depression.  He was placed in the ASU, and his level of care was elevated to EOP.  The patient transferred from MCSP to the CMF MHCB on September 26, 2022, after a SRASHE assessed him with high acute suicide risk.  On October 5, 2022, a SRASHE assessed his acute risk as moderate.  On October 6, 2022, an ASU pre-placement screen determined that the patient was cleared for ASU placement.  The MHCB discharge IDTT occurred on October 6, 2022, and he subsequently transferred to the ASU.  Five-day mental health follow-up contacts occurred from October 7 to October 11, 2022.

The patient received an initial IDTT within 14 days of MHCB discharge, and received the subsequent IDTT within three months of his initial IDTT.  He was provided with diagnoses of unspecified depressive disorder and PTSD; however, specific PTSD symptoms were not identified.  Although the primary clinician provided a diagnosis of PTSD, and the treating psychiatrist provided a diagnosis of cluster B personality traits, there was no documentation to indicate that diagnostic clarification occurred.  Additionally, the EOP hub treatment plans did not clearly identify specific and measurable goals, and the treatment interventions and progress notes were generic and not individualized.  Overall, the EOP hub treatment plans were cursory and devoid of details, making clinical progress difficult to determine and compromising continuity of care by not identifying specific interventions.

The primary clinician met with the patient weekly, and the patient was engaged in treatment.  The primary clinician also appeared to have a therapeutic relationship with the patient, who was motivated to complete dialectical behavior therapy and acceptance and commitment therapy (ACT) worksheets with discussion during weekly sessions.  Unfortunately, the details of the skills utilized and the obstacles to their utilization were not documented in progress notes; the notes merely stated that homework was discussed.  The treating psychiatrist met with the patient at least monthly and prescribed medication treatment for depression.  The psychiatrist repeatedly related the patient's traumatic developmental history to his history of depression and chronic passive suicidal ideation.  There was no documentation of any collaboration between the patient's primary clinician and the treating psychiatrist.

**Findings**

The mental health services provided to this patient were marginally adequate.

Psychiatric and primary clinician contacts were clinically appropriate and adequate.  The treating psychiatrist, who noted the patient's history of trauma and the current effect on symptomatology, had a therapeutic relationship with the patient, who was engaged in psychiatric treatment.  The primary clinician, who focused on the development of coping skills to manage daily frustrations, also had a therapeutic relationship with the patient, who was motivated to complete and discuss homework.  The patient's ability to regulate his emotions appeared to improve during the review period.  Despite these positive treatment interventions, a new treatment team would have had difficulty continuing the care provided by this treatment team due to the absence of diagnostic clarification, the cursory and generic treatment planning, and the dearth of information regarding the skills developed and the obstacles to utilizing those skills.

**Patient C**

This patient was randomly selected to review the level of care provided in the EOP hub.  The patient was a 62-year-old male who was serving a life sentence with parole consideration.  He was convicted of murder after arguing and shooting an individual when he was 22 years old.  His index offense involved discovering his girlfriend's alleged infidelity while under the influence.  He was incarcerated in September 1985 at age 23.

His developmental history included reported sexual abuse at age 12 by a babysitter.  He also reported a history of physical and emotional abuse by his older brother.  His parents reportedly had mental illness and substance abuse.  The patient began using alcohol and cannabis when he was age 16.  He joined the Air Force at age 17 and received an honorable discharge two years later.  He reported using cocaine in his early twenties prior to incarceration.  While in prison, he began using methamphetamine and opioids to cope with anxiety and depression related to his life sentence.

During 2011, the patient was evaluated for depression and was subsequently included in the MHSDS at the 3CMS level of care.  In June 2019, he was admitted to the MHCB due to feelings of hopelessness and after cutting his wrist several times, requiring sutures.  This incident was related to denial by the Board of Parole Hearing.  He was discharged from the MHCB to the acute level of care, and subsequently to the ICF level of care; during March 2022 he was discharged to the EOP level of care.  In June 2022, the patient was placed in the ASU due to an RVR for intent to distribute a controlled substance.

During the review period, two IDTT meetings occurred on September 6, 2022 and December 1, 2022.  The same treatment team was fully present at both IDTT meetings, including the patient.  He was provided diagnoses of major depressive disorder, recurrent and severe, and organic psychosis due to or associated with drugs.  He was not provided a diagnosis of substance use disorder, despite his continued history of utilizing drugs as a maladaptive coping strategy during incarceration.  The treatment plan indicated that the case formulation was comprehensive, but the treatment goals, specific interventions, and contact frequency were unclear.  A review of progress notes revealed that the patient was engaged in treatment, and regularly attended groups and individual sessions with his primary clinician and treating psychiatrist.

The primary clinician met with the patient weekly.  If she was unable to meet with him during the week, he was seen by a covering primary clinician.  The treating psychiatrist met with the patient monthly.  The primary clinician's progress notes clearly and succinctly described utilization of cognitive behavior therapy, dialectical behavior therapy, rational emotive behavior therapy, and acceptance and commitment therapy interventions to decrease his distress and depression and to increase his daily stress tolerance.  The primary clinician met with the patient on January 3, 2023, prior to his transfer to another facility.  An appropriate termination session was documented that included review of the patient's progress and use of cognitive skills to increase stress tolerance.

**Findings**

The care provided to this patient was adequate.

It appeared that the treatment provided to this patient during the review period assisted him in the regulation of his emotions and behavior. The patient was motivated for treatment, and the clinicians provided appropriate interventions and appropriately documented their sessions in progress notes. Treatment plans needed improvement for the reasons previously mentioned.

**Patient D**

This patient was randomly selected to review the level of care provided in the EOP hub. The patient was a 49-year-old male serving a life sentence with consideration of parole. His sentence began on November 27, 1996. He was classified as DD1.

Adverse childhood experiences included a history of sexual abuse, paternal abandonment, and alcohol use at an early age. He had a history of receiving mental health services which included several hospitalizations for depression, suicidal ideation, and auditory hallucinations. The patient was provided diagnoses of schizoaffective disorder bipolar type, and substance use disorders. He also had multiple sclerosis and a seizure disorder. He reported a history of chronic auditory hallucinations and passive suicidal ideation. He also reported a history of chronic self-injurious behavior and serious suicide attempts by overdose of heroin and medications. The patient received his psychotropic medications by a PC 2602 order. His prescribed medications included Clozaril, Depakote, perphenazine, propranolol, and Vistaril.

On July 9, 2022, the patient was admitted to the MHCB after cutting himself. He was stabilized and transferred to the acute level of care and subsequently discharged to the mainline EOP. Three days later on September 26, 2022, the CIT was initiated as the patient had a razor and threatened to cut himself due to safety concerns. A same-day SRASHE noted his history of victimization by peers with attempts to escape these situations by suicide or transfer to an inpatient program. After the SRASHE and ASU pre-placement screen were completed, the patient and providers agreed to an ASU protective custody placement for safety during an enemy investigation. During the next five days, adequate five-day follow-up contacts occurred from September 27 to October 1, 2022.

On October 6, 2022, a primary clinician evaluation and an IDTT meeting occurred, and it was noted that the patient would be included in the suicide risk management program due to three or more MHCB admissions during the past four months. An IDTT also occurred on December 29, 2022. The treatment plans identified issues with distress tolerance, maladaptive coping strategies, and poor impulse control. To increase distress tolerance, the treatment team agreed to utilize dialectical behavior therapy informed interventions to increase distress tolerance. They also agreed to strengthen coping skills and to assist the patient in effectively communicating his needs before threatening self-harm. Treatment plans were essentially unchanged, despite three months of treatment. Treatment plan goals and interventions were identified, but they were not individualized and vague; and they did not clearly identify means or methods to measure progress.

The primary clinician generally met with the patient weekly, and the treating psychiatrist met with him monthly.  Additionally, the primary clinician referred at least two issues to the correctional counselor and recommended that the patient meet with his treating psychiatrist and adhere to laboratory testing for treatment with Clozaril.  In general, the primary clinician's progress notes were documented in free text, starting with the patient's concerns, followed by a statement noting that active listening and validation were utilized, and that the patient's concerns were addressed with slow and simple language.  There was no documentation of dialectical behavior therapy interventions, distress tolerance training, or coping skills training.  Additionally, the progress notes from November 4 and November 11, 2022, suggested that the patient did not feel validated after reporting anxiety related to a prison transfer and enemy concerns.  Following the sessions, the patient began to refuse confidential primary clinician contacts.  He also refused confidential contacts with the psychiatrist, stating that the psychiatrist did not listen to him.  Other treatment concerns included minimal support of the patient's anxiety regarding an ICC meeting on October 26, 2022, no follow-up after the ICC meeting, needed treatment plan modification after failure to place him in the suicide risk management program approximately three weeks after the initial treatment plan, and failure to address Clozaril laboratory testing nonadherence.

**Findings**

The care provided to this patient was generally inadequate.

The providers usually completed required tasks timely; however, the quality of the treatment plans and the treatment provided were inadequate.  Delay in placement in the suicide risk management program was concerning, given the patient's long history of chronic serious mental illness, self-injurious behavior, and significant suicide attempts.  Based on the documentation, the quality of therapeutic relationships and therapeutic interventions needed improvement.

**Patient E**

This patient was randomly selected to review the level of care provided in the EOP hub.  The patient was a 38-year-old male serving a life sentence with the possibility of parole for murder and a 25-year sentence for mayhem and assault with a deadly weapon.  He had received his third strike, and began serving his current term on April 9, 2013 at age 28.  During this term, he entered the MHSDS on October 4, 2013, at the MHCB level of care.

The patient presented with a complex mental health presentation, and his diagnoses were poorly justified.  Although he was provided a diagnosis of unspecified bipolar disorder, he did not present with manic or depressive symptoms.  He was also provided diagnoses of antisocial personality disorder and a borderline personality disorder, opioid use disorder, and stimulant use disorder.  He often reported depression and anxiety; however, the documentation did not include any emotional distress other than prison-related concerns.

IDTT meetings occurred quarterly.  The target symptoms included underlying anger and impulsive violence, and treatment interventions included impulse and anger control IPOCs.  The patient received his psychotropic medications by a PC 2602 order due to danger to himself and

others; he was prescribed Depakote, gabapentin, Wellbutrin, Vistaril, and Haldol. Non-pharmacological treatment included cognitive behavior therapy and psychoeducational training on stress management and anger management. Clinicians also discussed teaching distress tolerance skills, helping to practice and utilize adaptive coping skills, helping to identify emotional triggers, and assisting in seeking professional help for self-care. The patient was expected to document his emotions in a daily journal and to share them with his primary clinician weekly to enhance insight. A review of primary clinician progress notes did not reveal documentation of journaling, psychoeducational skills training, emotional trigger identification, or distress tolerance education.

The treatment team's decision not to refer the patient to a higher level of care was appropriate after it was noted that he met referral criteria after receiving three RVRs in the last three months; however, the lack of referral was not adequately justified considering the IDTT report that his behavior had improved in the ASU. The treatment team also did not discuss the patient's primary diagnosis of a personality disorder, which would have also indicated that inpatient referral was contraindicated. Within two weeks between December 29, 2022 and January 10, 2023, the patient received four RVRs for damage to state property, possession of dangerous contraband, possession of a controlled substance, and arson causing structural damage. Rather than indicating improvement, these RVRs reflected inadequate defenses, emotional dysregulation, behavioral impulsivity, and poor judgment. Possession of dangerous contraband likely foreshadowed aggressive and violent behavior, while the damage to state property, possession of a controlled substance, and arson causing structural damage charges reflected poor anger management and poor judgment. The patient reportedly was able to occasionally utilize several previous treatment strategies such as going to yard, exercising, reading books, and listening to the radio while he was in his cell; however, he was unable to utilize new coping strategies such as increased insight, increased distress tolerance, and increased anger management skills.

**Findings**

The care provided to this patient was inadequate.

The documentation indicated that the treatment team did not review or justify provided diagnoses, or adhere to the treatment plan intervention strategies; this resulted in the patient not benefiting from treatment during the review period.

**Patient F**

This patient was randomly selected to review the level of care provided in the EOP hub. The patient was a 52-year-old male serving a life sentence with the possibility of parole. He began his sentence on October 30, 2008. His EPRD was September 25, 2038. He had two pending RVRs, for battery on a peace officer on November 8, 2020, and for attempted murder on August 25, 2022. These RVRs resulted in a transfer to the CSP/Sac ASU.

The patient's developmental history was traumatic due to domestic violence, physical abuse, and alcohol use. He attended school until the eleventh grade; subsequently, he was incarcerated. He

first affiliated with a gang at age 12 and subsequently developed a juvenile criminal record. He was previously provided diagnoses of antisocial personality disorder, intermittent explosive disorder, bipolar disorder, and depressive disorder related to his life sentence.

He was transferred from the CSP/Sac EOP hub to the CMF EOP hub on October 18, 2022. The primary clinician assessment at CMF was completed on October 20, 2022. The assessment adequately reviewed presenting problems, symptoms, mental health history, suicide and self-harm history, intellectual and functional abilities, and diagnoses. The clinical summary and case formulation were succinct and informative.

The initial CMF EOP hub IDTT meeting occurred on November 1, 2022. All members of the treatment team were present, including the patient. A mental health depressed mood IPOC was initiated, and suicide risk management program treatment goals were discussed that included improved dialectical behavior therapy skills to decrease suicidal ideation; higher level of care considerations and discharge recommendations were also discussed. However, treatment goals were not individualized and included vague goals such as to work on anger management and depression.

The patient was seen by the primary clinician weekly, and by the treating psychiatrist at least monthly. Both his primary clinician and treating psychiatrist appeared to develop trust and rapport with the patient. Progress notes reflected discussions of current issues triggering frustration, anger, and dysphoria. The discussions also included the patient's response to these negative emotions. The primary clinician provided positive feedback to the patient when he controlled his emotions and impulses and encouraged him to continue to appropriately manage his distress and negative impulses. There was no documentation of training or practicing specific dialectical behavior therapy coping skills and/or cognitive behavior therapy cognitive restructuring strategies. Additionally, progress was difficult to measure as baselines were never established. Despite these vague goals, the treatment team reported progress during the IDTT meeting on January 26, 2023; they noted that the patient did not have any angry outbursts or receive any RVRs since CMF ASU arrival.

**Findings**

The overall care provided to this patient was marginally adequate.

The mental health services provided to the patient were clinically sufficient due to the quality of the therapeutic relationships, positive reinforcement, and appropriate management with verbal encouragement. Areas in need of improvement included better treatment goals that were more individualized, as well as dialectical behavior therapy and cognitive behavior therapy that was recommended but not provided by the primary clinician.

**Patient G**

This patient was randomly selected to review the level of care provided in the EOP hub. The patient was a 45-year-old male who was serving a life sentence with consideration of parole. On October 15, 2022, he transferred to the ASU after receiving an RVR for aggravated battery on a

non-inmate by gassing. On November 23, 2022, he transferred from the CSP/Sac EOP hub to the CMF EOP hub.

The initial primary clinician assessment was completed 13 days after CMF ASU arrival on December 6, 2022. The primary clinician had already attempted to meet with the patient on November 30, 2022, and he met with him at cell front on December 2, 2022. The initial primary clinician assessment provided a cursory review of the patient's case formulation. The treating psychiatrist met with the patient on November 29, 2022; however, an initial psychiatric assessment was not completed.

The initial IDTT also occurred on December 6, 2022. All treatment team members were present, including the patient. The treatment team discussed higher level of care considerations. They noted that the patient was positive for indicator seven, namely, high treatment refusal. The treatment team did not refer the patient to a higher level of care, as they indicated that he did not appear to meet the criteria for inpatient treatment at that time. They noted that the patient stated that his low treatment participation was due to safety concerns involving his prior institution. He requested groups at CMF, and described himself as a good programmer. Diagnoses of schizoaffective disorder bipolar type, and substance use disorder were documented, as well as relevant developmental history including a motor vehicle accident at 17 years of age resulting in an unverified traumatic brain injury, subsequent substance abuse, and criminal activity. The treatment team recommended a modified treatment plan due to his history of high treatment refusals. They planned to place him in at least two groups weekly, with his primary clinician providing at least one dialectical behavior therapy mindfulness skills group weekly for the next 30 days. Specific treatment goals and strategies were not identified. The psychiatrist attending the IDTT also completed the master treatment plan psychiatric review on December 6, 2022; however, this psychiatrist was not the treating psychiatrist who met with the patient monthly.

The initial 30-day IDTT occurred on January 5, 2023. At that meeting, the treatment team discussed higher level of care considerations noting that the patient was not a danger to himself or others, was not in distress, and did not exhibit any signs of decompensation; however, within five days, the treating psychiatrist reported that the patient was agitated, making bizarre statements, and reporting constant auditory hallucinations. Within three weeks, she noted that he continued to make bizarre statements and to endorse chronic auditory hallucinations with disorganization. During the second 30-day IDTT on February 2, 2023, the treatment team and the patient agreed to a higher level of care referral. The team also agreed to maintain the modified treatment plan until he transferred to the ICF level of care.

The patient's primary clinician attempted to meet with the patient weekly; however, the patient usually refused to attend a confidential individual session. In response to the patient's refusal, the primary clinician usually met with the patient at cell front on the following day for a wellness and safety check. The patient received his psychotropic medications by a PC 2602 order, and was prescribed Zyprexa, Haldol, Effexor, BuSpar, and melatonin. The psychiatrist quickly established rapport with the patient and detected his decompensation on January 10, 2023. The treatment team and patient agreed to the higher level of care referral. He was transferred to an ICF on March 20, 2023.

**Findings**

The care provided to this patient was adequate.

The treatment team consistently modified the treatment plan to meet the patient's needs.  They monitored him closely, detected decompensation early, quickly referred him to a higher level of care, and maintained him until he transferred to an ICF.

**Patient H**

This patient was randomly selected to review the level of care provided in the EOP hub.  The patient was a 47-year-old transgender female.  She had a sentence of life without parole for charges including murder by using a firearm, a carjacking attempt, and several offenses while incarcerated.  She was designated as a violent felon.  Her prison term began on August 8, 1996.

On September 29, 2022, she transferred from the CMC ASU to the CMF ASU according to HCPOP and an agreement between the CMF C&PR and the CMC EOP hub.  The CMF primary clinician initial assessment was completed on October 3, 2022.  The assessment discussed the patient's presenting problems and symptoms in adequate detail, including her mental health history of violence, impulsive behavior, and suicide attempts, and her mental status.  She was provided diagnoses of unspecified bipolar disorder, borderline personality disorder, and antisocial personality disorder.

The patient was seen by the primary clinician weekly; the sessions included discussion of situational stressors that resulted in anger.  The primary clinician and the patient appeared to have a therapeutic relationship resulting in the patient feeling safe enough to express her frustrations to the clinician, who encouraged her to continue to manage her anger adaptively.  Most primary clinician individual contacts utilized active listening and supportive counseling and recommended continued dialectical behavior therapy and cognitive behavior therapy interventions.  If dialectical behavior therapy and cognitive behavior therapy specific interventions were utilized by the primary clinician, they were not documented; however, a covering primary clinician consistently identified specific dialectical behavior therapy and cognitive behavior therapy interventions utilized during their sessions, as well as recommendations for future sessions.

Three IDTT meetings occurred during the review period on October 13, 2022, January 10, 2023, and February 23, 2023.  Treatment plans identified emotional dysregulation and impulsive behavior as the primary problems; however, specific measurable treatment goals were not identified.  Treatment goals were vague and the means to measure progress were unclear.  Recommended interventions included dialectical behavior therapy and cognitive behavior therapy strategies to help modulate emotions and control impulses.  Detailed interventions and frequencies were not clearly documented.  IDTT meetings were scheduled to meet quarterly; however, a special IDTT occurred during February 2023 due to the patient disruptive behavior during a group session and subsequent suspension from that group.  The treatment team discussed the incident and developed an appropriate plan of action.

**Findings**

The overall care provided to this patient was marginally adequate.

The treatment team members were attentive to this patient's needs and provided the time necessary to support her. The mental health assessment and treatment plans adequately identified problems and recommended interventions; however, goals were vague, and progress was difficult to measure. Additionally, treatment plans' recommended appropriate dialectical behavior therapy and cognitive behavior therapy interventions; however, utilization of specific interventions were rarely documented. The patient's apparent progress in managing emotions and impulses appeared to be largely due to supportive counseling and the quality of therapeutic relationships. The teaching and practicing of new coping skills would likely have enhanced the patient's progress.

**Patient I**

This patient was randomly selected to review the level of care provided in the EOP hub. The patient was a 23-year-old male with an EPRD of February 7, 2026. He was serving a six-year sentence for theft, criminal threat to cause great bodily injury/death, and assault with force likely to produce great bodily injury. He also received a three-year concurrent sentence for assault with a deadly weapon. He transferred to the CMF ASU on June 8, 2022, after his level of care was changed to EOP from 3CMS due to increasing symptoms of anxiety, depression with isolation, social withdrawal, fatigue, and decreased appetite, with auditory hallucinations. He was placed in the ASU due to a pending RVR.

An initial primary clinician assessment was completed on June 9, 2022 at cell front, as the patient refused to leave his cell for a confidential assessment. The assessment reviewed presenting problems and symptoms, and his mental health treatment history, including his suicide and self-harm history. A mental status examination was completed, and a clinical summary and case formulation were developed. The patient was provided diagnoses of disruptive mood dysregulation disorder, antisocial personality disorder, amphetamine-induced bipolar and related disorder, and opioid use disorder.

The initial IDTT meeting occurred on June 16, 2022. During the review period, the IDTT met every 30 days on September 29, 2022, October 27, 2022, November 22, 2022, and December 20, 2022. The IDTT meetings were attended by the required treatment team members. The treatment goals, treatment frequency, and treatment interventions were vague and nonspecific. On October 27, 2022, the treatment team noted that the patient met higher level of care criterion for poor treatment attendance. The treatment team stated that the cause of the patient's poor group attendance was "being a little paranoid about the new cameras and all that." The treatment team decided not to refer the patient to a higher level of care, because he reportedly functioned without impairment in the ASU; he attended yard, exercised daily, and worked on his legal case. The treatment team recommended that the primary clinician utilize cognitive behavior therapy skills to challenge the patient's distorted paranoid thoughts with the goal of increasing group attendance to four groups weekly. The primary clinician planned to use insight-oriented

techniques to explore the basis of his paranoia. He also planned to provide psychoeducation regarding substance use and how it contributed to his paranoia.

The primary clinician met with the patient weekly, and the treating psychiatrist met with him monthly. Most primary clinician and psychiatric contacts occurred at cell front, as the patient frequently refused to attend scheduled confidential appointments. He also refused to attend most groups. His primary clinician repeatedly explained the importance of attending individual confidential sessions and group treatment, and the patient repeatedly provided excuses for missing groups and for requesting schedule changes. Progress notes did not document utilization of cognitive behavioral or insight-oriented intervention strategies to reduce paranoia and to increase individual and group participation. Progress notes and IDTT documentation did not note any discussions or strategies to engage the patient in treatment. There was also no documentation of improvement or progress toward treatment goals.

**Findings**

The care provided to this patient was inadequate.

Most treatment plan documentation did not identify specific problems, set achievable and measurable goals, or identify evidence-based interventions to achieve those goals. When problems, goals, and interventions were identified in the November 2022 treatment plan, there was no documentation indicating that it had been implemented. The goal of increasing the patient's participation in group and individual treatment was not achieved during the review period.

**Patient J**

This patient was randomly selected to review the level of care provided in the EOP hub. The patient was a 42-year-old male with an EPRD of April 2, 2024. He was serving his ninth term, which began in September 2021. He transferred from the SQ EOP hub to CMF, and was admitted to the MHCB on July 4, 2022 due to danger to himself and others after assaulting a correctional officer. The initial psychiatric assessment was completed on July 5, 2022. The patient was provided diagnoses of substance use disorder, unspecified bipolar disorder, major depressive disorder, and obsessive-compulsive disorder. He was prescribed Lexapro, Seroquel, and Suboxone. The initial CMF IDTT meeting occurred on July 7, 2022.

The patient discharged from the MHCB to the ASU on July 14, 2022. The initial primary clinician ASU assessment was completed on July 27, 2022, and the initial ASU IDTT met on July 28, 2022. He was provided diagnoses of major depressive disorder and unspecified anxiety disorder. The patient reported seeking mental health treatment for depression and paranoia while in prison.

During September 2022, the patient refused confidential primary clinician and psychiatric contacts; however, he met with the primary clinician at cell front and completed homework assignments involving dialectical behavior therapy distress tolerance; stop, take a step back, observe, proceed mindfully (STOP); and tactics, techniques and procedures skills which

were reviewed during primary clinician cell-front contacts. On October 1, 2022, the patient reported suicidal ideation, and was placed in alternative housing for one-to-one suicide watch observation. On the following day, a SRASHE was completed that assessed low chronic and acute suicide risk; consequently, a safety plan was not completed. The primary clinician reported that the patient was calm, but was frustrated with his approximately three months ASU placement. He discussed wanting to transfer to an institution where he had access to a television. He was released from alternative housing on October 2, 2022, and five-day follow-up began on October 3, 2022. During these contacts, the primary clinician discussed the patient's frustration and explored coping skills and problem-solving strategies. Additionally, the primary clinician and patient discussed dialectical behavior therapy distress tolerance and radical acceptance strategies and explored how these skills could be applied to the current situation.

The ASU IDTT met on October 13, 2022. While reviewing higher level of care considerations, the team noted that the patient met the higher level of care referral criterion for multiple MHCB referrals. The treatment team did not refer him to a higher level of care, noting that he was not currently a danger to himself or others, and that his mental status was unremarkable. Additionally, they indicated that the patient maintained his ADLs and attended scheduled clinical contacts and groups. The treatment team noted the patient's frustration and anxiety were related to his prolonged ASU placement. The correctional counselor confirmed his endorsement to another institution. The treatment team and custody staff were able to accommodate the patient's request for a cell change, and his primary clinician continued to work with him in identifying environmental and internal triggers to anxiety. The treatment team also recommended that the primary clinician help the patient to develop self-soothing strategies through mindfulness.

The psychiatrist noted on October 17, 2022 that the patient had been placed in the alternative housing crisis unit and was subsequently returned to the ASU. After meeting with the patient, the psychiatrist increased the Seroquel dosage and educated the patient on the benefits of utilizing Zyprexa ordered on an as-needed basis for agitation.

During the patient's last two weeks at CMF, he refused to meet with the primary clinician. He transferred to CSP/Sac on November 9, 2022.

**Findings**

The care provided to this patient was marginally adequate.

The primary clinician appropriately utilized dialectical behavior therapy interventions; however, the treatment team minimized the severity of the patient's condition, and services were poorly coordinated.

**Patient K**

This 63-year-old patient's healthcare record was reviewed to evaluate the quality of EOP care provided at CMF. The patient arrived at CDCR for his current term on June 12, 2003 to serve a sentence of life without parole. He was initially incarcerated at SQ and entered the MHSDS at the 3CMS level of care in November 2004. He remained in the 3CMS program until July 14,

2011, when his level of care was increased to the EOP, and he transferred to CMF. His level of care was reduced to 3CMS on December 10, 2015 but he was again returned to the EOP on May 20, 2016 due to reported aggressive behavior and tangential thinking. The healthcare record noted that the patient had a history of psychiatric hospitalizations, treatment with various psychotropic medications to address his psychotic symptoms, and a long history of EOP modified programming due to his inability to attend and participate effectively in groups.

The patient was provided past diagnoses of schizophrenia spectrum disorder and schizoid personality disorder. He was provided a diagnosis of schizophrenia during the review period. He was described presenting with odd beliefs and behaviors and was unable to engage in meaningful conversations with others, including his treatment team. The documentation indicated that, when the treatment team or anyone attempted to engage the patient in conversation, he replied to inquiry with one or two clear words and then his speech became incoherent. He reportedly attended to his ADLs and work appropriately and was able to maintain stability without medications as long as he was able to adhere to his daily repetitive and ritualistic routine without interference. The patient had poor insight regarding his mental illness and consistently stated that he did not require mental health services.

IDTT meetings occurred monthly during the review period except in October 2023, when no IDTT meeting was documented. The necessary participants attended the IDTT meetings, but the patient refused to attend; documentation indicated that he routinely refused to attend. The goals and IPOCs in the treatment plans remained unchanged during the review period and targeted the patient's treatment and medication nonadherence, though the patient was not prescribed psychotropic medication. The September 15, 2022 IDTT meeting noted that the patient consistently refused to attend medical and mental health appointments, and rarely left his cell or housing unit except to perform his work duties in the housing unit. He also preferred solo tasks, followed directions effectively, and reportedly performed well as a unit porter. During the remainder of the review period, IDTT meetings occurred on November 3 and December 1, 2022, and January 5 and February 9, 2023. The patient's mental status and presentation remained consistent during the review period, and he did not require crisis intervention or management. He reportedly attended yard regularly, occasionally went to the dayroom, and showered and maintained his job prior to COVID-19 precautions. At the February 9, 2023 IDTT meeting, the treatment team addressed an UNA recommendation that the patient be referred to the ICF level of care for psychological testing and evaluation of his symptoms and diagnosis. The team advocated for the patient to remain at CMF; they noted that transfer to an ICF might destabilize him and that it was likely his impairments would prevent him from engaging in testing in any meaningful way.

The patient received timely and appropriate psychiatric contacts during the review period. The psychiatric contacts occurred monthly by telepsychiatry. The patient refused two of seven confidential psychiatric contacts; upon refusal, he was seen at cell front with the assistance of the telepresenter. The patient's presentation was described as stable, and he consistently denied the need for mental health or medical treatment.

Only two PC contacts were documented during the review period; both occurred at cell front, and one occurred in connection with COVID-19 rounding. The patient was on EOP modified

programming prior to and during the review period and, at the February 9, 2023 IDTT meeting, groups were completely removed from the treatment plan.

**Findings**

Although the patient appeared to remain at baseline during the review period, the care and treatment provided to this CMF patient was inadequate.

There were significant problems with inadequate documentation in primary clinician and IDTT notes; specifically, information was copied from prior IDTT meetings and assessments without substantive treatment plan updates.

Psychiatric contacts appeared appropriate during the review period, and it appeared the psychiatrist made efforts to engage the patient and consider psychotropic medications; however, PC contacts were grossly inadequate due to the primary clinician's limited involvement and lack of clinical contact. The patient was only seen for two PC contacts during the review period on September 13, 2022 and February 23, 2023, and both contacts occurred at the cell front. There were no other documented efforts of the PC attempting to engage the patient other than those two contacts.

**Patient L**

This 83-year-old patient's healthcare record was reviewed to evaluate the quality of EOP treatment provided at CMF. The patient entered CDCR for his current term in 2015 with a sentence of 15-years to life. The patient required the use of an interpreter, as English was not his primary language, and he had cognitive limitations with a DD2 designation. The patient's participation in treatment was reportedly very limited by significant medical issues, negative symptoms, and depression. His history was significant with three suicide attempts, two MHCB admissions in 2015 and 2016, and one inpatient hospitalization during 2015. He was initially admitted to the MHCB after cutting his wrists to rid himself of "evil blood." The second MHCB admission occurred due to suicidal ideation with command auditory hallucinations to kill himself.

The patient was placed on EOP modified programming and not assigned to groups. He was reportedly isolative and ignored staff requests to participate in treatment, though attended to his basic hygiene without concern noted and was responsive to staff requests to attend to his ADLs. The treatment team consistently reported that they had no concerns about decline in the patient's mental status or decompensation.

He was provided a diagnosis of major depressive disorder with psychotic features; his psychosis included somatic and religious persecutory delusional thinking. He received his psychotropic medications by a PC 2602 involuntary medication order initiated on October 14, 2022 due to grave disability and danger to self. He was prescribed Zyprexa, Remeron, and Vistaril.

The IDTT meetings during the review period did not occur timely and the documentation was inadequate. The patient was on EOP modified programming status during the review period, and

844

monthly IDTT meetings should have occurred that focused on increasing treatment engagement and ensuring stable functioning.  During the review period, IDTT meetings occurred on September 1, 2022, October 20, 2022, and December 15, 2022; the next IDTT meeting did not occur until May 4, 2023, which was a lapse of approximately five months.  The September 1, 2022 treatment plan contained a sole IPOC for grave disability with a treatment goal to help the patient to develop a better awareness of his mental health and self-care to reduce the risk of decompensation.  Subsequent treatment plans remained essentially unchanged with many sections copied from the prior treatment plan.

Psychiatric contacts occurred monthly and were timely during the review period.  The patient was seen by the psychiatrist for seven contacts during the review period.  Psychiatric contacts were conducted by telepsychiatry with the assistance of an interpreter.  Five of seven contacts occurred at the cell front after the patient refused a confidential session.  The patient left his cell for a confidential session on December 6, 2022, when he described his mood as "well." He was convinced to leave his cell for a confidential psychiatric session on February 24, 2023, after the telepresenter had a poor audiovisual connection.  He was reportedly frustrated about leaving his cell, but was otherwise described as doing well.  The psychiatric progress notes indicated that the patient consistently described his mood as stable.  He consistently refused to allow laboratory testing during the review period, and his medication regimen remained unchanged.

PC contacts during the review period generally occurred timely, but they only occurred during cell-front rounding.  The documentation indicated that the patient was not seen for an individual confidential PC contact during the review period.  The PC notes were generic in content and did not include individualized information or substantive status updates, except for one progress note from a December 29, 2022 cell-front contact that noted the patient interacted appropriately.

**Findings**

The overall care and treatment provided to this patient was inadequate.

IDTT meetings did not occur timely, there was a lack of individual PC contacts, and there was inadequate clinical documentation in the healthcare record.  The psychiatric care provided was adequate.  There was an approximate five-month lapse in IDTT meetings between December 15, 2022 and May 4, 2023.  PC contacts generally occurred timely, but those contacts only occurred at the cell front, and progress notes from those cell-front check-ins were copied and remained unchanged for all but one progress note.  The overall mental health care provided to this patient was inadequate due to the primary clinician's limited involvement and lack of adequate clinical contact.

**Patient M**

This 43-year-old patient's healthcare record was reviewed to evaluate the quality of EOP treatment provided at CMF.  The patient was a first term incarcerated person who entered CDCR in 1997 with a sentence of 129 years to life.  He was housed in general population and not included in the MHSDS until 2006, when he reportedly exhibited psychotic symptoms and was placed at the EOP level of care.  Since 2006, the patient had two MHCB admissions, two ICF

stays, and one year of DSH hospitalization. He was reportedly stable at the EOP level of care since 2017.

The patient was provided a diagnosis of schizophrenia, and his primary symptoms included delusional thinking, significant negative symptoms, and lack of insight regarding his mental illness. He reportedly denied having a mental illness or the need for psychotropic medication treatment. He received his psychotropic medications by a PC 2602 order due to danger to others. He was prescribed Zyprexa. He reportedly attended to his ADLs appropriately, showered daily, went to yard three to four times weekly, and was able to participate appropriately during PC and psychiatric contacts.

Only two IDTT meetings occurred during the review period, and neither were timely. The expert reviewed the August 25, 2022 IDTT meeting; although it occurred outside the review period, it contained more substantive information than subsequent IDTT treatment plans. The patient did not attend that IDTT meeting. The treatment plan contained IPOCs for treatment nonadherence and lack of insight into his mental illness, with primary goals for the patient to attend two groups monthly for a period of three months, and his PC was to provide psychoeducation to improve the patient's insight. The treatment team noted that the patient's symptoms were triggered by crowds; he did not attend EOP groups for this reason and was on a modified treatment plan to only attend his PC caseload group twice monthly. The treatment team noted that the patient actively participated in milieu programming, attended and actively participated in his twice monthly PC caseload group, and the team planned to add a mental health education group at the next IDTT meeting. The documentation indicated that the patient only attended one PC caseload group during October 2023, and did not attend any PC caseload groups in November or December 2023.

At the October 13, 2022 IDTT meeting, the necessary participants were present; however, the patient did not attend. The patient remained an active participant in his PC caseload group but was resistant to adding the mental health education group to his programming. The treatment plan was otherwise unchanged. The December 15, 2022 IDTT meeting also included the necessary participants, and the patient refused to attend. The treatment team again delayed the addition of a mental health education group and noted that the patient continued to actively participate in the PC caseload group; however, the documentation indicated that the patient was not offered PC caseload groups in November or December 2023. The next IDTT meeting did not occur until May 4, 2023.

This patient was seen for timely psychiatric contacts during the review period, and psychiatric contacts occurred monthly by telepsychiatry in a confidential setting. The notes indicated that the patient consistently demonstrated stable mental status and appropriate functioning. His judgment was assessed as fair, but his insight was reportedly poor. He denied any acute symptoms or medication side effects. The PC 2602 order was scheduled to expire in January 2023. Although the patient reported his intention to remain medication adherent without the PC 2602 order, he also maintained that he did not have a mental illness and did not believe that he needed the medication. The psychiatrist appropriately renewed the PC 2602 order in January 2023. Although psychiatric contacts occurred timely, and the patient appeared to receive

appropriate and adequate psychiatric care; review of progress notes indicated that most, if not all, of the information contained in the notes was copied from past assessments without update.

The PC contacts consisted of cell-front rounds or brief check-ins and PC caseload groups. The patient was on EOP modified programming and only scheduled for 0.6 hours of structured therapeutic activities weekly; he attended 0.55 hours for 92 percent attendance. The patient did not show up for one PC contact and was seen for only one confidential PC contact during the review period. He attended PC caseload groups consistently and was an active participant when groups were offered. Of the sixteen PC contacts during the review period, nine occurred at the cell front during rounding and were brief check-ins.

**Findings**

The care and treatment provided to this CMF patient was inadequate.

The treatment plans and clinical progress notes included poor documentation. IDTT meetings did not occur timely, and the patient who was on EOP modified programming did not have an IDTT meeting in September or November 2022. An IDTT meeting occurred in December 2022, but the subsequent IDTT meeting did not occur until May 4, 2023.

The patient received adequate psychiatric care with timely, confidential telepsychiatry sessions, and the patient denied medication side effects or difficulties with his medications. The PC 2602 order was renewed appropriately in January 2023 prior to expiration.

The mental health care provided to this patient was also inadequate due to the primary clinician's limited involvement and lack of clinical contact. PC contacts occurred primarily at the cell front during the review period and were essentially brief check-ins rather than substantive clinical contacts. The treatment plan prescribed two PC caseload groups monthly and, although the patient's participation and attendance were adequate when he was offered groups, he was not offered PC caseload groups in November or December 2022. The clinical documentation in the healthcare record was inadequate, as treatment plans and progress notes contained duplicative and repetitive information that was copied from previous notes and treatment plans without updates.

**Patient N**

This 68-year-old DD2 patient's healthcare record was reviewed to evaluate the quality of EOP care and treatment provided at CMF. Institutional and clinical histories for this patient were limited in the records reviewed. The patient reportedly had an extensive history of psychiatric treatment in the community prior to entering CDCR, including multiple psychiatric hospitalizations and multiple youth commitments in California.

The documentation indicated that an IDTT meeting had not occurred since June 9, 2022; that meeting included the necessary participants, but the patient did not attend. That treatment plan documented that the patient functioned well and was stable with appropriate maintenance of his ADLs. He also demonstrated intermittent anxiety and paranoia, but his anxiety was well

managed using coping skills developed in treatment with the PC. The patient reportedly actively participated in milieu programming and enjoyed his job as a yard porter. He also actively participated in treatment, and it was noted that any inconsistencies in his treatment adherence were usually due to his mental health symptoms.

The patient was prescribed heat sensitive medications. He had a diagnosis of schizoaffective disorder and reported command auditory hallucinations that told him to do bad things.

No IDTT meeting occurred during the review period. Psychiatric contacts generally occurred timely during the review period except for the November 22, 2022 contact that occurred approximately two weeks late. Psychiatric contacts occurred by telepsychiatry in a confidential setting; the patient declined to attend a confidential setting for the December 20, 2020 psychiatric appointment. Review of psychiatric progress notes indicated that the patient and psychiatrist worked collaboratively to determine the best medication regimen for the patient, and his medications were adjusted appropriately. The patient's symptoms appeared to respond well to treatment with Abilify and his dosage was adjusted during the review period to minimize side effects while maximizing clinical effectiveness. Psychiatric contacts were adequate overall.

PC contacts during the review period occurred inconsistently and the patient was not seen for a confidential PC contact during the review period. He attended the eight PC caseload groups that occurred during the review period and was seen by the PC on five occasions for cell-front check-ins. The patient was not seen at all by the PC during November 2022. EOP PC caseload groups were cancelled often, and there were occasionally several weeks between PC caseload groups.

**Findings**

The overall care and treatment provided to this CMF EOP patient was inadequate.

Although the patient was relatively stable during the review period, the mental health care provided was inadequate due to the primary clinician's limited involvement and the lack of clinical contact. Psychiatric care was generally adequate. He was seen timely, in a confidential setting for psychiatric contacts, and his medications were adjusted appropriately.

The care provided by the primary clinician was inadequate. PC contacts did not occur timely and did not occur with the appropriate frequency; further, all occurred either at the cell front or in a group setting. The patient was not seen for a confidential PC contact during the review period. He was only seen for two PC contacts in September 2022, not at all in November 2022, once during January 2023, and only once in February 2023. Additionally, at the time of review in June 2023, there was no documentation of an IDTT meeting since June 9, 2022, approximately one year prior.

**Patient O**

This 48-year-old patient's healthcare record was reviewed to evaluate the quality of EOP treatment provided at CMF. He entered CDCR for his current term in September 2003. The patient had received mental health treatment since childhood; he received treatment at the 3CMS

and EOP levels of care during previous CDCR commitments and received services at the EOP level of care during the current term.

The patient previously was provided diagnoses that included major depressive disorder, PTSD, bipolar disorder, schizophrenia, polysubstance dependence, and antisocial personality disorder. At the time of review, he was provided a diagnosis of major depressive disorder, recurrent, severe with psychotic features; his symptoms included command auditory hallucinations. His CDCR history was significant for three suicide attempts, multiple MHCB admissions, and DSH intermediate care hospitalizations. His suicide attempts occurred in 1991 by jumping from a tier, in 1997 by wrist cutting, and in 2005 by overdose. He received treatment at the ICF level of care from March to June 2013 and from July 2018 to July 2019. He was admitted to the MHCB from October 16 to October 26, 2019, and shortly after the review period from April 14 to April 24, 2023.

The patient was housed in unit N-1 at CMF. This unit was designated for severely and chronically mentally ill patients. He was assessed with moderate chronic and low acute suicide risk during the review period.

The IDTT meetings did not occur timely during the review period and the only IDTT meeting during the review period occurred on October 13, 2022. The expert reviewed the prior treatment plan from the June 30, 2022 IDTT meeting. That treatment plan revealed that the patient was housed in unit N-1 with the goal of maintaining stability and avoiding the need for a higher level of care. He was reportedly described by custody as an "ideal inmate" and did a commendable job in his work as a porter. The unit recreational therapists described the patient as focused and enthusiastic about groups despite his difficulty working in and being around large groups of people. The treatment plan contained IPOCs to address the patient's depressed mood and self-harm history. These treatment targets were not updated since 2021, but the patient responded well to the provided interventions and support. The goals were appropriate and measurable, assisting in decrease in depressed mood and suicidal ideation to a two or below on a ten-point scale. The subsequent IDTT meeting occurred on October 13, 2022, approximately one month late. That meeting included the necessary participants and the patient was present. The patient was described as stable with active participation in treatment. IPOCs and goals remained unchanged from previous treatment plans, and the document indicated that the patient consistently attempted to improve his self-esteem and autonomy when working with his PC in therapy. The next IDTT meeting did not occur until May 4, 2023. The May 4, 2023 treatment plan indicated that the patient was placed in the MHCB from April 14 to April 24, 2023 due to suicidal ideation. He was reportedly in the process of cutting himself when responding staff arrived, and he was subsequently admitted to the MHCB.

Psychiatric contacts occurred timely via telepsychiatry in a confidential setting during the review period. The patient was prescribed Zyprexa, Effexor, and Vistaril. His mental status was consistently described as stable, and he denied acute symptoms or medication side effects. At the August 26, 2022 psychiatric contact, the patient requested discontinuation of prescribed Depakote. The psychiatrist agreed and the patient reportedly remained stable after the Depakote discontinuation. He consistently reported ongoing but manageable command auditory hallucinations, and one of his coping strategies was watching television. At the January 4, 2023

psychiatric contact, the patient reported nightmares but declined treatment with prazosin. He responded well to his medication regimen and was medication adherent during the review period. His mood was consistently described as stable, and he was future oriented.

PC contacts occurred weekly and were timely during the review period. Each PC contact occurred in a confidential setting. Although no specific clinical or therapeutic interventions were identified in the treatment plan, the patient remained highly engaged in his treatment and PC sessions, and IPOCs were tracked appropriately. The patient reportedly often voiced his appreciation for the treatment received in the EOP and utilized the PC sessions to process family dynamics and issues of self-esteem.

The patient was highly engaged in treatment and attended most of his groups. During the review period, he was offered 9.42 hours of structured therapeutic activities; he attended 8.36 hours and refused 1.06 hours. The patient attended 89 percent of offered treatment.

**Findings**

The care and treatment provided to this CMF patient was adequate.

IDTT meetings, however, did not occur timely. He was seen timely for psychiatric and PC contacts and responded well to treatment interventions. The patient's medications were adjusted appropriately, and the psychiatrist solicited the patient's input in medication management. PC progress notes indicated that the patient received weekly, confidential sessions, and the patient was described as highly engaged and invested in therapy with the PC. The patient was offered almost 10 hours of groups weekly and attended 89 percent of offered groups.

**Patient P**

This 57-year-old patient's healthcare record was reviewed to evaluate the quality of EOP treatment provided at CMF. The patient was serving a life sentence with the possibility of parole as a third-strike offender. He was housed in unit G1, the CTC at CMF.

The patient was included in the MHSDS since May 15, 1997. He was initially placed at the 3CMS level of care and remained at the 3CMS level of care until March 29, 2001, when his level of care was increased to the EOP. He had a history of impulsive self-injurious behaviors and seven suicide attempts while in CDCR. The patient attempted suicide by hanging and cutting and, in 1996, set himself on fire resulting in severe burns over his entire body. His acute suicide risk was assessed as moderate, and chronic risk was assessed as high. The patient had seven MHCB admissions, which occurred in 2002, 2003, 2004, 2005, and 2007. He also had a history of extreme depression, auditory hallucinations, and delusional thinking, and his most recent diagnosis was schizoaffective disorder, depressive type. He was prescribed Prozac, prazosin, Abilify, and Cymbalta.

The patient utilized a wheelchair and had numerous significant medical issues and conditions which further impaired his functioning. He was designated for EOP modified programming due to a combination of high group refusals and frequent visits to outside hospitals to address

medical emergencies and concerns.  During the review period, he was offered 3.01 hours of structured therapeutic activities weekly; he attended one hour and refused 2.01 hours, resulting in 33 percent attendance.  He spent a significant amount of time in the law library working on his legal case.

IDTT meetings occurred monthly during the review period; the IDTT meetings did not always occur timely and were sometimes overdue by several days to weeks.  The September 14, 2022 IDTT meeting included the necessary participants, but the patient was not present.  The treatment plan indicated that the patient would remain at the EOP modified programming status due to depressed mood and auditory hallucinations.  His mother reportedly recently died, but he was coping adequately with the loss.  The treatment plan was problematic as significant portions of clinical information were incomplete that informed treatment.  The IPOCs section of the treatment plan was completely blank and did not identify any specific problem areas, goals, or interventions.  Review of subsequent treatment plans from IDTT meetings on October 11, 2022, November 15, 2022, December 27, 2022, and January 31, 2023 revealed that none of those treatment plans contained IPOCs, but treatment goals were included in the level of care section which indicated that the patient would receive cognitive behavioral therapy to address depressive symptoms and develop positive self-talk strategies to address auditory hallucinations.  Each IDTT meeting included the necessary participants.  The patient attended the October 11, 2022 IDTT meeting, but refused to attend the remainder or was at an outside hospital for a medical appointment.

Psychiatric contacts occurred monthly and were timely during the review period.  The psychiatric notes indicated that the patient was engaged in the psychiatric sessions and actively participated in those appointments.  Several contacts occurred at the patient's bedside after he refused to attend appointments in a confidential setting.  He was prescribed Abilify, Prozac, and Cymbalta and was reportedly medication adherent during the review period.

PC contacts generally occurred weekly and were timely, often occurring at the patient's bedside after he refused to attend a confidential contact.  He was consistently described as depressed but stable, with difficulty sleeping due to nightmares of being on fire, and with auditory hallucinations.  PC progress notes indicated that the patient's depressive symptoms remained consistent, and he was essentially at baseline during the review period with no crisis episodes or mental health decompensation.

**Findings**

The care and treatment provided to this CMF patient was generally adequate.

He received timely weekly PC and monthly psychiatric contacts.  It appeared that the patient received appropriate, clinically indicated support from the psychiatrist and PC, and providers went to his bedside for treatment when he was unable or unwilling to leave his bed.  Although IDTT meetings occurred timely on a monthly basis, several key sections of the treatment plan document were not completed until after the review period.  The patient had significant serious medical issues and concerns which compounded his difficulty in engaging in treatment.  He was

appropriately placed on EOP modified programming status given the impact of his medical issues on his ability to participate in mental health programming and treatment.

**Patient Q**

This 65-year-old patient's healthcare record was reviewed to evaluate the quality of EOP care and treatment provided at CMF. The patient arrived at CDCR for his current term on July 19, 1990. He entered the MHSDS on September 13, 2010 at the 3CMS level of care at Folsom State Prison. His level of care was increased to EOP on February 29, 2016 and he transferred to CMF on March 15, 2016 to better address treatment for his depression. The patient did not have a history of MHCB admissions or DSH placements. His historical diagnoses included depression not otherwise specified; major depressive disorder, mild; and mood disorder, not otherwise specified (NOS). In 2016, the treatment team concluded that the patient had recurrent irritable depression that was usually mild to moderate, and that he was prone to developing paranoia when severely depressed. During the review period, he was prescribed Zoloft to address depressive symptoms and Vistaril was ordered on an as-needed basis for anxiety.

Only one IDTT meeting occurred on October 13, 2022 during the review period. The meeting included the necessary participants and the patient. The diagnosis provided in the problem list was major depressive disorder, moderate, recurrent. Ongoing problems were identified as depression and stress associated with having a long prison sentence. The patient was described as functioning well overall, was the lead porter in his housing unit, and regularly attended and participated in groups. He was also noted to be medication adherent with active participation in individual PC sessions. The patient was also reportedly focused on family issues at home and preparing for Board of Parole hearings. The next IDTT meeting did not occur until June 5, 2023.

Psychiatric contacts occurred timely during the review period and in a confidential setting for all but one contact. The patient was prescribed Zoloft and Vistaril and was reportedly medication adherent except for a three-day period in December 2022 when the patient did not take his medications due to a work-related back injury. The psychiatrist appropriately provided psychoeducation regarding the importance of medication adherence. Psychiatric progress notes described the patient's mental status as stable despite significant stressors.

PC contacts occurred in individual sessions, PC caseload groups, and mental health education groups. The patient was seen for six individual PC contacts during the review period, and only one contact occurred as a cell-front check-in that was provided by a covering clinician when the patient's primary clinician was on leave. The patient's remaining contacts occurred in group settings. PC progress notes indicated that the patient's mood was generally stable, and individual sessions focused on developing coping skills for depressive symptoms.

During the review period, he was offered 8.9 hours of structured therapeutic activities and attended 6.1 hours and refused 2.8 hours. His overall group attendance was 69 percent.

**Findings**

The care and treatment provided to this CMF patient was generally adequate.

Although the care was assessed as generally adequate, the care provided was negatively affected by the staffing crisis at CMF. PC contacts did not occur from September 6 to October 4, 2022, October 25 to November 4, 2022, November 10 to November 29, 2022, and from November 29 to December 23, 2022. The frequency of IDTT meetings was inadequate, and only one IDTT meeting occurred during the review period. Psychiatric contacts occurred timely and in a confidential setting unless the patient declined, and he was medication adherent during the review period. Psychiatric progress notes were thoughtful and individualized. PC contacts did not always occur timely, but it appeared that the PC implemented the treatment plan appropriately. The patient stated that the PC sessions were beneficial. The patient's group attendance was adequate at 69 percent. The patient remained stable during the review period and appeared to benefit from the support provided at the EOP level of care, although the previously mentioned omissions in care were noted.

**Patient R**

This 34-year-old patient's healthcare record was reviewed to evaluate the quality of EOP treatment and care provided at CMF. The patient arrived at CDCR for his current term on May 23, 2019; he was serving a 15 years to life sentence. He was admitted to the MHCB for suicidal ideation the day after his CDCR arrival and remained in the MHCB from May 24 to June 17, 2019. He reported feelings of depression, hopelessness, and worthlessness. He was referred to the PIP inpatient care from the MHCB and received treatment there from June 17, 2019 to February 10, 2020. His history was significant for three suicide attempts by cutting in 2006 and 2015, and by attempted hanging on his first day in prison in 2019. He reported ongoing intermittent suicidal ideation.

Only one IDTT meeting occurred during the review period. The October 27, 2022 IDTT meeting included the necessary participants including the patient. He was provided diagnoses of major depressive disorder, single episode, PTSD, and opioid use disorder. The patient was reportedly engaged in treatment and he maintained sobriety. He maintained his ADLs, had no RVRs, and had adequate medication adherence and group participation with greater than 50 percent group attendance. The patient attended college and was enrolled in three courses during the fall of 2022. The treatment plan included IPOCs for depressed mood and anxiety with appropriate and measurable goals and interventions identified. At that IDTT meeting, the patient reported that the EOP was helpful in maintaining his stability.

During the review period, he was offered 8.68 hours of structured therapeutic activities weekly, participated in 5.9 hours, and refused 2.79 hours resulting in 68 percent attendance.

Psychiatric contacts occurred timely, and the patient was seen by telepsychiatrists in a confidential setting. The patient was described as generally stable with a relatively consistent clinical presentation. He was prescribed Lamictal, naltrexone, prazosin, Inderal, and Remeron, and his medication adherence was described as fair. Nightmares were consistently identified as one of the more salient concerns, and he reportedly responded well to prazosin treatment. Medication adherence was reportedly impacted by difficulties and conflict that the patient had with the medication nurse. The patient did not report any safety concerns or suicidal ideation

during the review period and reported to his psychiatrist that coping skills learned in the PC sessions were beneficial.

PC contacts occurred approximately every two weeks, and all but one PC contact occurred at the cell front in a nonconfidential setting. The sole confidential PC contact occurred approximately one month before the patient was scheduled to appear before the parole board, and his PC was changed at the end of the review period. PC progress notes and documentation were inadequate and contained generic language repeated unchanged from contact to contact.

**Findings**

The care and treatment provided to this CMF patient was adequate.

Despite the determination of adequacy, the primary clinician clinical contacts did not occur timely. Although the PC contact frequency was untimely; the patient remained relatively stable.

The patient was only seen for one IDTT meeting during the review period. That sole IDTT meeting was well conducted, well documented, and contained individualized and appropriate goals for the patient's presentation, and the patient attended over 50 percent of his assigned groups. The treatment plan included appropriate level of care discussion and justification, and the patient reported that the EOP care was beneficial to him. Psychiatric contacts occurred timely and were appropriately documented. His medications were monitored and adjusted appropriately, and it appeared the medication nonadherence was due to conflicts with CDCR nursing staff rather than refusal to take his medication.

**Patient S**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of EOP care and treatment provided at CMF. The patient entered CDCR for his current term in 2009 and was placed in the MHSDS on July 9, 2011 at the 3CMS level of care. He was housed at various prisons during his incarceration, including SVSP, VSP, CTF, and CHCF for two MHCB stays. He received mental health services at the 3CMS level of care at the time of his first MHCB admission on September 19, 2017 due to suicidal ideation. He was discharged to the 3CMS level of care where he remained until he was again admitted to the MHCB on January 9, 2019 due to grave disability, including weight loss, response to auditory hallucinations, and inability to care for himself.

The patient was provided diagnoses of mood disorder NOS and psychotic disorder NOS; he also had a history of traumatic brain injury at age 32. He experienced auditory and visual hallucinations in stressful situations. His level of care was increased to EOP on January 17, 2019, and he transferred to CMF for EOP treatment in April 2019. He was reportedly medication adherent and previously received his psychotropic medications by a PC 2602 order that expired in August 2019 and was not renewed.

At the March 10, 2022 IDTT meeting, the treatment team documented that they would attempt to discharge the patient to the 3CMS level of care at his next quarterly IDTT meeting. At the

July 7, 2022 IDTT meeting, the treatment team again stated their focus on discharge to the 3CMS level of care and noted that the patient was stable in the EOP. There were no concerns noted regarding his mental status and the treatment focus remained on the patient's mental health relapse prevention plan, completing his GED program, and continuing to work toward discharge to the 3CMS program.

One IDTT meeting occurred during the review period on November 17, 2022. This meeting included the necessary participants, including the patient. Schizophrenia was identified in the problem list, and the treatment plan contained an IPOC for hallucinations. Interventions identified in the treatment plan were medication adherence, the development of a mental health relapse prevention plan, and eventual discharge to the 3CMS level of care. The treatment team agreed that the patient would benefit from continued limited time at the EOP level of care in preparation for discharge to the 3CMS level of care. The treatment plan documentation was adequate and appropriately individualized for the patient's treatment needs.

This patient received timely psychiatric contacts during the review period. Psychiatric contacts occurred monthly and were conducted by telepsychiatry in a confidential setting. The patient was prescribed Geodon and Remeron with medication adherence. His medications were effective in treating his symptoms, and the patient reported no negative medication side effects. His mental status was consistently normal and his mood was described as cheerful and upbeat during several contacts. The patient expressed frustration with the reduced individual PC contacts and the transition to PC caseload groups. At the January 4, 2023 psychiatric contact, the patient reportedly told the psychiatrist that he wanted to remain in the EOP as he enjoyed his groups and medications, liked the custody staff in the EOP, and was concerned that he would decline with a reduction in his level of care. At the final psychiatric contact of the review period on February 10, 2023, the patient demonstrated a positive and stable mood, attended school and groups, and socialized appropriately on the unit with peers.

The patient was not seen for timely PC contacts during the review period. The assigned PC left for extended leave during June and July 2022, and the senior psychologist supervisor provided coverage. A PC progress note on September 8, 2022 indicated that the patient's mood was stable, and he denied acute stressors or distress. He was engaged in several therapeutic groups including anger management, Alcoholics Anonymous, and Narcotics Anonymous, and he demonstrated interest in treatment and social activities. He also told the supervisor that he was frustrated with the frequent PC changes. The patient was not seen for another individual PC contact until December 29, 2022. Individual PC contacts occurred on December 29, 2022, January 4, 2023, and February 7, 2023. These PC contacts were all brief check-ins either at the cell front or in a nonconfidential setting. Documentation indicated that the patient was assigned a new PC on March 3, 2023; however, at the end of June 2023, he had still not been seen for an individual PC contact with the new PC.

The patient was seen by the PC in a PC caseload group. He attended one PC caseload group in October 2022, two groups in November 2022, two groups in December 2022, two groups in January 2023, and one group in February 2023, when the PC informed the group that she was leaving CMF employment.

The patient's overall group attendance was adequate. During the review period, he was offered 8.04 hours of structured therapeutic activities weekly and attended 6.07 hours and refused 2.14 hours, resulting in 75 percent group attendance overall. The patient participated in PC caseload, mental health education, anger management, and substance abuse groups.

**Findings**

The care and treatment provided to this CMF patient was inadequate.

Although psychiatric contacts and treatment were adequate and appropriate, IDTT meetings and PC contacts were inadequate. Only one IDTT meeting occurred during the review period. The patient was not seen for individual confidential PC contact between September 8, 2022 and December 29, 2022. Although the patient consistently demonstrated stable mood and exhibited significant decrease in functioning during the review period, the documentation indicated that the patient made several requests to be seen by his PC and often waited days or weeks to be seen for a brief cell-front check-in. Group scheduling was also inconsistent, and the documentation indicated that PC caseload groups and mental health education groups were frequently cancelled. These lapses in care appeared related to the significant staffing deficiencies at CMF.

**Patient T**

This 63-year-old patient's healthcare record was reviewed to evaluate the quality of EOP treatment and care provided at CMF. The patient arrived at CDCR for his current term in May 2016 and was initially housed at RJD. He was serving a life sentence for a third strike. The patient received mental health services at the EOP level of care since May 2017. He had a history of youth custodial commitments in California and one reported inpatient hospitalization in 2015. His substance abuse history was significant for the use of phencyclidine (PCP), cocaine, cannabis, and alcohol. The documentation indicated that the patient lacked coping and anger management skills and had high levels of fear. He had a remote history of several suicide attempts. He arrived at CMF in September 2019 and received mental health services at the EOP level of care. He was prescribed Prozac, Vistaril, and Remeron upon arrival at CMF, and was provided a diagnosis of unspecified psychotic disorder.

This patient was only seen for one IDTT meeting during the review period on October 13, 2022. The IDTT meeting included the necessary participants, including the patient. The treatment plan contained an IPOC to address anxiety and included measurable and individualized goals and interventions. The treatment plan indicated that the patient would require mental health treatment at the EOP level of care for the foreseeable future due to the severity of his mental illness. His acute suicide risk was assessed as low, and his chronic suicide risk was assessed as moderate. The treatment team noted that custody staff described the patient as an excellent programmer and recreation therapists and PC reported that the patient was very engaged in treatment. The functional evaluation was clear and complete. The patient was provided diagnoses of generalized anxiety disorder and persistent depressive disorder, and he was reportedly medication adherent. Of note, the clinical summary section of the treatment plan was not updated since the January 20, 2022 IDTT meeting, and the information in that section was copied to the current treatment plan.

Psychiatric contacts occurred timely by telepsychiatry. The patient's medications remained unchanged during the review period, and the patient reported several stressors contributing to increased anxiety, including a resentencing hearing that was continuously delayed. He denied panic attacks or severely acute anxiety symptoms. The psychiatrist indicated that the patient demonstrated ongoing acute mental health needs that justified his retention at the EOP level of care. The patient consistently denied depressive symptoms. The psychiatric progress notes were generally adequate but contained very little updated information, as much of the information was copied unchanged from previous notes.

PC contacts and treatment were inadequate. The patient was seen weekly for PC contacts between September 6, 2022 and December 6, 2022. He was assigned a new PC in December 2022, and was not seen for another individual PC contact for the remainder of the review period. Review of PC progress notes indicated that the patient generally demonstrated stable mood, was observed with appropriate grooming and hygiene, and consistently denied any major psychiatric disturbances beyond chronic, mild anxiety. Many of the IPOC goals and interventions in the treatment plan were absent from the PC progress notes. The PC noted that the patient demonstrated obsessive tendencies but denied any acute risk factors or safely concerns. Progress notes also indicated that the patient engaged in in-depth discussions about himself and his future during the PC sessions. The patient was introduced to his new PC on December 6, 2022 when he was noted to be at his baseline level of functioning.

His group attendance was generally adequate. He was offered 7.74 hours of structured therapeutic activities weekly; 5.72 hours were attended, and 2.75 hours were refused, resulting in 74 percent attendance of structured therapeutic activities.

**Findings**

The care and treatment provided to this CMF patient was inadequate.

Although psychiatric contacts and treatment were adequate during the review period, IDTTs and PC contacts were inadequate. PC progress notes indicated that treatment goals were not specifically addressed during the individual PC sessions. The patient was not seen for PC contacts at all during the review period after the PC caseload group on January 24, 2023. He maintained adequate group attendance throughout the review period and, despite the lack of adequate PC contacts and IDTT meetings, remained stable. The lapses in care appeared related to the significant staffing deficiencies at CMF.

**APPENDIX C-6**
**Valley State Prison (VSP)**
**May 9, 2023 – May 12, 2023**

**Patient A**

This 43-year-old male patient received mental health services at the EOP level of care.  He was provided diagnoses of generalized anxiety disorder, schizoaffective disorder, depressive type, and unspecified depressive disorder.  The patient was prescribed haloperidol decanoate, buspirone, venlafaxine, fluoxetine, and olanzapine, and was consistently adherent with the medications as prescribed.  His case was selected for review to determine the adequacy of care provided to EOP patients in the ASU during the reporting period.

The patient was seen for a timely ASU pre-placement screening on the day of ASU arrival on October 31, 2022.  The day after his placement, he submitted a request to have his medication administration time changed.  Although a psych tech sent a message to the psychiatrist requesting the change, he was not seen in response to this request.

The patient was seen for an initial primary clinician assessment on November 2, 2022.  The content of the assessment was fair and contained inaccurate information; for example, it stated that the patient had not engaged in violence while in prison, yet he was placed in the ASU for battery on his cellmate.

The initial psychiatric assessment occurred on November 8, 2022, and it was clinically adequate.  The patient's requested medication adjustment occurred.  Of note, the psychiatrist did not note that the patient's previous psychiatrist was titrating the patient's venlafaxine with a plan to discontinue it at the next visit.  Additionally, the psychiatrist included diagnoses not noted elsewhere in the healthcare record without rationale provided.

An initial IDTT meeting occurred on November 9, 2022 that included all required participants, including the patient.  The patient's goals were unchanged from the prior IDTT and focused on hallucinations.  There was no mention of the patient's recent violent behavior or safety concerns.  The patient was offered three group sessions while housed in the ASU, and all the groups were recreational in nature.  He attended two of the groups.  Documentation also indicated that the patient remained enrolled in groups conducted in the mainline EOP while he was housed in the ASU, and was documented as absent for those mainline EOP groups.  The patient transferred to another facility on November 22, 2022.

The patient was seen by a psych tech for daily rounds while housed in the ASU.

**Findings**

The treatment provided to this ASU EOP patient was adequate.  Of concern, however, was poor continuity of psychiatric care due to the failure to adequately review prior psychiatric documentation.

**Patient B**

This 44-year-old male patient received mental health services at the EOP level of care. He was provided a diagnosis of major depressive disorder, recurrent episode, moderate. He was prescribed diphenhydramine and mirtazapine that were ordered on an as-needed basis. He was also prescribed buspirone, lithium, and duloxetine; however, he refused to take those medications due to frustration regarding an upcoming transfer, and the medications were discontinued at his request. The patient's healthcare record was reviewed to assess the treatment provided in the VSP ASU.

The patient was treated at the inpatient level of care since July 6, 2021 due to danger to self and significant impairment due to mental health, and was discharged to VSP on January 10, 2023 at the EOP level of care. While at the inpatient level of care, the patient verbalized a preference for discharge to VSP among a few other facilities. A SRASHE was completed on January 11, 2023. The patient was angry that he was removed from a canteen line to complete the suicide risk assessment and was frustrated that his property had not transferred with him. He was largely uncooperative, and the assessment relied heavily on documentation review and patient history. A clinician-to-clinician contact was completed, and five-day follow-up contacts were completed as required.

On January 12, 2023, an ASU pre-placement screening was completed that documented the patient's history of suicide attempts during past ASU housing, and an emergent mental health consult was initiated. The responding clinician noted that the patient was placed in the ASU on non-disciplinary segregation status as a staff member knew the patient prior to incarceration. The patient was angry and tearful about transfer to the ASU, and was largely uncooperative with the assessment but was eventually cleared for ASU placement. The patient then refused his medications and subsequent five-day follow-up contacts.

An initial primary clinician assessment and initial telepsychiatric assessment were completed on January 17, 2023. The patient was frustrated that he was being transferred to another facility and reported that he was not interested in treatment and wanted his medications to be discontinued. The psychiatrist discontinued the patient's medications, retaining mirtazapine and diphenhydramine on an as-needed basis. The initial IDTT meeting occurred on January 18, 2023, and all required treatment team members were present with the patient in attendance. An IPOC for depressed mood was initiated. The plan noted "no new problems;" however, that statement was incorrect as the patient expressed frustration about his upcoming transfer, reported an increase in depression and frustration, expressed helplessness, and had decided to discontinue all medications. The rationale for retaining the patient at the EOP level of care was generic, not individualized, and was like the rationale noted in other patients' healthcare records. The EOP functional assessment was not completed and was noted to be not applicable as the patient was housed in the ASU. The patient was offered one group on January 19, 2023, but he refused. The patient transferred on January 21, 2023. Daily psych tech rounds were documented.

**Findings**

The care provided to this EOP ASU patient was inadequate.

The patient had recently been discharged from an 18 month inpatient hospitalization, and was involuntarily removed from the mainline EOP and placed in the ASU as a staff member knew the patient.  There was no evidence that mental health staff attempted to engage the patient or to address his mental health needs.  The treatment plan did not address the patient's recent challenges or symptoms, was silent about his decision to discontinue all his medications, and provided no interventions to assist the patient with his frustration and feelings of helplessness.

**Patient C**

This 32-year-old male patient received mental health services at the 3CMS level of care.  He was provided with a diagnosis of unspecified depressive disorder and was prescribed divalproex sodium with medication adherence.  This patient's case was selected for review as he was placed in the ASU from September 14 through October 10, 2022.

During September 2022, the patient was seen multiple times by clinicians and his psychiatrist in response to referrals and requests.  The patient typically reported frustration with how infrequently he was seen by mental health staff and how long he had to wait in response to a request or referral.  Despite this, the patient was not scheduled to see his assigned primary clinician or psychiatrist more frequently than every 90 days.  On the day of his placement in the ASU following an assault on a custody officer, the patient had been seen by his PC in response to a referral when he expressed frustration related to how infrequently he was seen by mental health staff.

An ASU pre-placement screen was completed timely.  An initial primary clinician assessment was completed on September 16, 2022, and was clinically adequate.  The initial psychiatric assessment was completed on September 21, 2022.  The psychiatrist provided the patient with a working diagnosis of "bipolar affective disorder," which was not a Diagnostic and Statistical Manual-5 diagnosis, and the psychiatrist did not justify the reason for consideration of this diagnosis.  The initial IDTT occurred on the same day, and an IPOC to address depressed mood was continued.  No IPOCs to address the patient's reported anxiety, symptoms of bipolar illness identified by the psychiatrist, or the patient's explosive behaviors documented in the healthcare record were initiated.  Weekly contacts with the primary clinician included the provision of cognitive behavioral interventions to address the patient's thinking, impulse control, and mood.  Responses to patient requests and staff referrals were completed timely and addressed identified concerns appropriately.

A mental health assessment related to the patient's RVR was completed on September 23, 2022; this assessment noted the patient's diagnosis of unspecified depressive disorder, but not the psychiatric diagnosis provided.  The psychologist noted that the patient's mental health symptoms may have influenced his behavior.

Prior to transfer to another facility, the patient expressed concerns about the transfer.  He discussed these concerns, and they were also noted by a psych tech.  Psych tech rounds were not documented in the healthcare record on October 6, 2022, and they were incomplete on September 20, 2022.

**Findings**

Overall, the mental health care provided to this patient while in the ASU was inadequate.

The treatment plan did not adequately address the patient's reported symptoms and behavioral needs, diagnostic considerations by the psychiatrist were not justified, and psych tech rounds were not completed and/or documented as required.

**Patient D**

This 20-year-old male patient was provided a diagnosis of unspecified anxiety disorder and was prescribed melatonin; however, he was only partially medication adherent. He received mental health services at the EOP level of care. His healthcare record was selected for review, as he was released from alternative housing during the site visit after his referral to the MHCB was rescinded.

The patient arrived at VSP on April 8, 2023 after being discharged from the CMC MHCB; he was discharged to the EOP level of care. He was seen for an initial five-day follow-up contact on April 9, 2023; custody checks were discontinued, and he was seen as required for the next five days. The safety plan was reviewed during each contact.

The patient was seen for an initial psychiatric assessment on April 14, 2023, which was adequate, noting that the patient had reported suicidal ideation to affect his housing, and he denied suicidality once placed in the MHCB. The psychiatrist saw the patient in-person; however, he was not the patient's assigned psychiatrist.

The initial primary clinician assessment was completed on April 19, 2023; the assessment was clinically adequate. The initial IDTT meeting occurred on April 20, 2023, and included all required staff; however, the patient refused to attend. IPOCs for anxiety and pre-release planning were initiated. The EOP functional evaluation section was not completed, and all sections included "n/a" as entries, despite this being the patient's initial placement at the EOP level of care. The patient attended a primary clinician group on April 28, 2023. He refused two recreation therapy groups which were the only groups offered during the following week.

On May 8, 2023 after hours, the patient reported suicidal ideation with a plan to cut himself with a razor. An on-call psychiatrist was contacted who placed the patient on one-to-one observation and referred him to the MHCB. On May 9, 2023, a SRASHE was completed. While the risk assessment portions of the SRASHE were adequate, the safety plan was not; it included limited information, and the clinical impressions/interventions sections were identical throughout the document and were not necessarily applicable to the questions on the form. The decision to rescind the MHCB referral was documented, with the rationale provided that the patient had reported suicidal ideation to be moved from his current yard as he owed debts. Documentation indicated that the patient was placed in the ASU for his safety. There was adequate nursing documentation during his placement in alternative housing.

The patient had an upcoming release date in July 2023, and re-entry planning was documented in the healthcare record, including substance use disorder treatment recommendations and a transitional case management program needs assessment.

**Findings**

The care provided to this EOP patient was inadequate.

The patient was not offered the required structured treatment hours, and no rationale was provided for this omission.  The patient's placement in alternative housing was appropriate, and the decision to rescind the MHCB referral was adequate.  The subjective and objective indicators of low suicide risk assessed with the SRASHE were appropriate; however, the safety plan was inadequate.

**Patient E**

This 22-year-old male patient was provided a diagnosis of unspecified depressive disorder and was not prescribed psychotropic medications.  His case was selected for review after his IDTT was observed during the site visit.  Specifically, the patient mentioned increased irritability and isolation during the IDTT meeting; rather than scheduling the patient for follow-up, the primary clinician advised him to submit a request form to be seen.

The patient was incarcerated for his initial CDCR incarceration on August 3, 2021.  During the initial health screening, he reported insomnia and a history of mental health treatment.  County jail records indicated that the patient posed risk for suicide, as well as treatment with diphenhydramine and melatonin for insomnia.  A comprehensive mental health assessment on September 11, 2021 noted that the patient used psychotropic medications to affect housing while in jail and reported no longer needing them.  A SRASHE was completed on that date that assessed low chronic and acute risk for suicide with appropriate rationale for the risk determinations.  The initial psychiatric assessment was completed on September 21, 2021, and it indicated no need for psychotropic medication treatment or further follow-up.  There was no mention of any history of mental health treatment in the community, and the patient denied any history of drug use.

The patient was first seen by a VSP mental health clinician on April 19, 2023, after an MH-5 urgent referral was submitted by a custody officer on April 18, 2023, noting that the patient's sibling had died, and the patient would benefit from a mental health assessment.  The patient reported struggling with the loss of his brother.  He reported that he would benefit from talking with someone about the loss, as well as preparing for his upcoming release in November 2023.  The patient was recommended for inclusion in the 3CMS program for issues related to grief and anxiety.

An initial primary clinician assessment was completed on April 28, 2023.  The presenting problem indicated that the patient had struggled with depression since early childhood; this was the first documentation of this issue in the healthcare record.  He also endorsed symptoms of sadness, mixed mood disturbance, decreased appetite, and loss of motivation/interest in

activities.  Additionally, the patient later described his mood as "great."  The violence risk assessment section included several inaccuracies, and there was also documentation of a history of cannabis use despite the patient's consistent denial of drug use throughout the healthcare record.  The clinical summary included little updated information since September 2021 and further inconsistencies that were not acknowledged nor rectified.  The assessment made no mention of the patient's loss of his brother or anxiety regarding upcoming release from prison.  The reason for the assessment was noted as "new arrival to the institution;" however, the patient had been housed at VSP since October 2021, and he was being seen in response to a referral for grief and anxiety and placement at the 3CMS level of care.

An initial psychiatric assessment was completed on May 4, 2023; it accurately noted the patient's recent placement at the 3CMS level of care.  The patient discussed his recent interpersonal losses, increased isolation, and decreased appetite.  The patient denied any loss of energy, and his responses were largely consistent with documentation elsewhere in the healthcare record, further highlighting the inaccuracies in the primary clinician's assessment.  The psychiatrist provided a diagnosis of uncomplicated grief with "minimal depression and anxiety" and recommended counseling but no medication treatment.

A routine MH-5 referral was submitted on May 8, 2023 by an Office of Grievance AGPA, noting that the patient had submitted a grievance that documented his concern that his mental health had been adversely affected.

An IDTT meeting observed by the monitor's expert occurred on May 10, 2023.  An IPOC for depressed mood was included in the treatment plan with no mention of grief or loss.  Despite the patient's report of increased feelings of irritability, IDTT documentation noted that the patient had no new symptoms to report.  Despite the patient's upcoming release in November 2023 and previous discussion of anxiety about his upcoming release, "N/A" was entered in the section regarding release planning.  The rationale for retaining the patient at the 3CMS level of care was documented as "continue to work toward sx management and stabilization;" this despite no indications of instability.  There were no updates to the clinical summary that continued to include inaccuracies.  There was no mention of input or findings from the psychiatrist in the IDTT documentation.  Further, there was no acknowledgement of the MH-5 referral submitted two days prior.

The patient was seen by the primary clinician on May 12, 2023 in response to the MH-5 referral.  The progress note stated that the patient was informed that the writer was his new primary clinician, without acknowledgement that they had met two days prior during the IDTT meeting.  The progress note made no reference to the source of the referral or the grievance, no reference to the patient's report of increased feelings of irritability during the IDTT, or document the patient's symptoms of grief and depression.  The note concluded by reminding the patient to submit an MH-5 mental health referral as needed.  However, this statement was documented despite the utilization of the MH-5 form for staff referral use only; patients had to submit request forms (Form 7362).

**Findings**

The care provided to this patient was inadequate.

Primary clinician documentation, including an initial assessment, IDTT documentation, and a progress note in response to a referral, contained inaccuracies, failed to acknowledge issues raised by the patient, conflicted with the psychiatric assessment, and was not consistent with the patient's treatment needs. The psychiatric care was adequate; however, the psychiatrist failed to address differences in diagnostic opinion during the IDTT and did not mention that the patient had presented with symptoms of grief and loss.

**Patient F**

This 37-year-old male patient received mental health services at the 3CMS level of care and was provided a diagnosis of major depressive disorder, single episode in partial remission. He was prescribed sertraline and hydroxyzine on an as-needed basis. He was generally medication adherent, and reported rarely taking the as-needed hydroxyzine. His case was randomly selected for review. The patient's primary language was Spanish, but was described as bilingual. The patient transferred from the EOP to the 3CMS level of care in September 2021.

An annual review and updated clinical summary were completed on September 21, 2022. Documentation indicated that the meeting was conducted in Spanish with a primary clinician certified as a bilingual Spanish translator. The update noted that the patient's depression was in partial remission and that he was engaged in programming including education, groups, and exercise. He had regular family contact. His annual IDTT was completed the following day and included an IPOC for depressed mood. The rationale for retention at the 3CMS level of care was limited to the statement that the patient was prescribed psychotropic medications. Documentation by the patient's telepsychiatrist on October 5, 2022 noted that he reported taking sertraline every other day rather than daily, because he wanted to discontinue the medication; this medication was prescribed as keep-on-person. This information was not noted in the IDTT documentation. The psychiatrist worked with the patient to taper off the medication.

The patient was seen by the primary clinician on December 9, 2022. The content of documentation was limited to a status note, with no indication that treatment interventions were provided. The patient was seen by the telepsychiatrist in February 2023; the interval from the last contact was longer than the 90-day follow-up planned and required by the Program Guide. The sertraline dose was increased, as the patient reported a resurgence of symptoms at the lower medication dose.

There was documentation of patient participation in nursing led treatment groups in which anxiety and medication education were discussed during January and February 2023.

**Findings**

The care provided to this 3CMS patient was inadequate.

The IDTT documentation was sparse, did not review patient progress toward treatment goals, and failed to note the patient's report of medication nonadherence. The telepsychiatry contact frequency was not consistent with Program Guide requirements. The primary clinician documentation did not reflect the use of treatment interventions with the patient to address his symptoms. Despite these omissions in care, the patient did participate in nursing led treatment groups that appeared to be beneficial.

**Patient G**

This 42-year-old male patient was provided diagnoses of unspecified bipolar and related disorder, most recent episode depressed, stimulant abuse, and adjustment reaction with mixed disturbance of emotion. He was prescribed valproic acid. His case was selected from a list of patients who had transferred from the EOP to the 3CMS level of care during the reporting period.

At the beginning of the review period, the patient was transitioned from biweekly primary clinician contacts to monthly contacts at the 3CMS level of care, following transfer from the EOP six weeks prior. The patient denied significant symptoms or functional deficits other than sleep disturbance. He was described as disengaged in sessions with his primary clinician, an issue that had also occurred while the patient was in the EOP. When the patient was seen by his telepsychiatrist on September 14, 2022, he reported additional symptoms, and he requested a medication adjustment. An adjustment was made, and the patient was scheduled to be seen again in two weeks. Later that month, the patient reported to the primary clinician that he was not doing well and wanted to return to the EOP level of care. He reported that his cellmates complained about his poor hygiene, although there was no evidence of poor hygiene. The telepsychiatrist saw the patient the same day and they concurred with the primary clinician that there was no indication for return to the EOP level of care.

On October 7, 2022 the patient reported an intention to kill himself by cutting his wrist with a razor. He was evaluated and transferred to the MHCB. He returned from the MHCB and was placed at the EOP level of care on October 18, 2022. Five-day follow-up contacts and initial assessments were completed timely; however, the patient refused to attend individual sessions and all other treatment and was noted to be intoxicated on drugs after return from the MHCB. At the initial EOP IDTT, the patient was returned to the 3CMS level of care. He immediately made suicidal statements and was returned to the MHCB. He was once again discharged to the EOP level of care on November 10, 2022. The patient was again seen for five-day follow-up contacts. Medication adjustments occurred given the patient's concerns about the interaction of his medications and the drugs that he had been using. The patient became actively engaged in substance use treatment, but remained disengaged from mental health services. He was again discharged to the 3CMS level of care on December 1, 2022. The patient reported suicidal ideation on the day of discharge. He was seen by the crisis intervention team, and his issues were resolved by a housing move. The patient was again seen by the crisis intervention team two days later and was placed on five-day follow-up and returned to his cell.

The initial 3CMS primary clinician and psychiatric evaluations were completed timely, and both reflected an adequate assessment of the patient's treatment needs and history. The patient reported a willingness to remain in the 3CMS program until his release in April 2023. His initial

IDTT meeting occurred on December 21, 2022 that included an IPOC for depressed mood and adequate justification for retaining him at the 3CMS level of care. What was not adequately addressed was the fact that the patient met the criteria for inclusion in the suicide risk management program and the patient's inability to cope with challenges and distress other than by reporting suicidal ideation. There was also no mention of the patient's upcoming prison release in April 2023.

The patient was seen for pre-release planning, and the documentation reflected adequate plans. There was a follow-up session with the psychiatrist on March 13, 2023 which made no mention of the patient's pending release but was adequate with regard to psychiatric care. The patient was not seen again by the primary clinician and was released from prison on April 4, 2023.

**Findings**

The care provided to this patient was inadequate.

Poor communication and collaboration between levels of care, failure to address the patient's inadequate ability to cope with distress, and the lack of recognition of the patient's upcoming prison release by the IDTT contributed to the inadequacy of care provided. While there was initially evidence of increased contacts to assist the patient with transitioning from the EOP to the 3CMS level of care, this was short-lived, and the patient rapidly cycled through levels of care without a comprehensive plan to assist him in success. Additionally, the patient was not seen by the primary clinician at the required frequency in 2023.

**Patient H**

This 61-year-old 3CMS male patient was provided with diagnoses of unspecified depressive disorder, unspecified anxiety disorder, antisocial personality disorder, and polysubstance dependence. The patient was adherent with his prescribed mirtazapine. His case was randomly selected for review. The patient was serving a life sentence with the possibility of parole.

At the start of the reporting period, the patient was on isolation status after testing positive for COVID-19. He remained asymptomatic and was released from isolation on October 10, 2022. He was seen by his primary clinician on November 9, 2022 for routine contact. The documentation reflected a generic status note; other than importing language from an IPOC for anxiety, the patient's symptoms were not documented, assessed, or treated.

The patient was seen by a telepsychiatrist on December 7, 2022 in preparation for the annual IDTT, as he was not prescribed psychotropic medications at that time. The patient told the psychiatrist he wanted to gain better insight into why he continued to accrue RVRs for failing to follow orders. The patient denied the need for medication treatment.

An IDTT meeting occurred on December 20, 2022, and the patient was present at the meeting. The only IPOC in the treatment plan was for an earache initiated by nursing on November 14, 2022. No rationale was provided for retaining the patient at the 3CMS level of care other than "IP has active MH sx. [Inmate patient] will be scheduled with psychiatry." The clinical

summary was noted to have been updated on December 16, 2022, and included a comprehensive history; although, much of the information was pulled forward from the prior year. It noted that the patient reported sleep disturbance, preoccupied thoughts, impulsivity, ruminations, irritability, and low frustration tolerance. The patient would work on coping skills to manage his mood. It also noted that the patient was willing to consider medication treatment.

The patient was seen by the telepsychiatrist on December 22, 2022, and agreed to a trial of mirtazapine with follow-up scheduled in 30 days. He was seen again by the psychiatrist on January 19, 2023, when he reported decreased irritability and improved sleep.

The patient was enrolled in groups, which he reported were beneficial. The patient participated in nursing led treatment groups that addressed anxiety, alcohol use, diabetes management, medication education and opioid use.

The patient was not seen again by the primary clinician during the reporting period; however, a contact should have occurred. Review of the healthcare record revealed that the patient had not been seen by his primary clinician since this review on May 16, 2023.

**Findings**

The care provided to this 3CMS patient was inadequate.

The IDTT documentation did not include specified treatment goals, and the patient was not seen by the primary clinician for over five months. When the patient was seen for a routine contact with his primary clinician in November 2022, the documentation reflected no treatment interventions or assessment of the patient's treatment progress. Psychiatric contacts were adequate, and the patient appeared to benefit and was engaged in nursing led treatment groups.

**Patient I**

This 33-year-old male patient was provided diagnoses of major depressive disorder, recurrent episode, moderate, and PTSD. He was not prescribed psychotropic medications but was prescribed melatonin on an as-needed basis for sleep. The patient's healthcare record was randomly selected for review of the mental health services provided at the 3CMS level of care.

The patient was seen for a routine contact with the telepsychiatrist on September 2, 2022. At that time, he was prescribed prazosin but asked to have it discontinued as he had stopped taking the medication. The patient reported sleeping adequately with melatonin.

The patient was seen by the primary clinician to update the annual assessment on September 19, 2022. The summary appeared comprehensive and included the use of assessment tools and a description of current symptoms; however, on further review it was noted that the content was pulled almost entirely from the prior year, including the plan and disposition.

An IDTT occurred on September 22, 2022, without the patient's assigned primary clinician present. The chief of mental health led the meeting. IPOCs were documented for depression and

anxiety. Appropriate rationale was documented for the patient's retention at the 3CMS level of care, and the plan was updated to reflect the initiation of medication and current symptoms. The treatment addressed depression, anxiety and trauma.

The patient was seen for a routine primary clinician contact on December 13, 2022; however, the contact appeared to be a status check-in with no interventions documented. A routine contact with the telepsychiatrist on December 21, 2022 was clinically adequate. There were no other mental health contacts documented in the healthcare record during the reporting period.

**Findings**

The care provided to this 3CMS patient was inadequate.

Primary clinician contact documentation did not include clinical interventions or mention of treatment goals, and the clinical summary in the most recent treatment plan was almost entirely pulled from the previous year, resulting in inaccurate information regarding the use of assessment tools and the patient's symptom ratings.

**Patient J**

This 35-year-old male patient was provided diagnoses of adjustment disorder with depressed mood, amphetamine-type substance use disorder, severe in early remission, and cannabis use disorder, severe, in sustained remission. The patient was not prescribed psychotropic medications and had been released from custody on January 2, 2023. His healthcare record was selected for review, as he had transferred from the EOP to the 3CMS level of care during the review period.

At the start of the reporting period, the patient was housed in the MHCB due to verbalizing suicidal thoughts related to his housing. He was discharged to the EOP level of care on September 2, 2022 at VSP. He was seen for five-day follow-up contacts, and initial primary clinician and psychiatric assessments occurred on September 9, 2022. The primary clinician and psychiatrist noted that the patient appeared not to have significant mental health symptoms, was functioning well, and seemed disinterested in mental health services. Both indicated that the EOP was likely not indicated for the patient, but the primary clinician noted that continued weekly contacts would assist in making that determination.

A nonconfidential cell-front contact was documented on September 15, 2022 by a covering clinician due to the absence of the patient's assigned primary clinician. The covering primary clinician noted that the contact occurred at cell front due to quarantine procedures; despite the patient testing negative for COVID-19 on September 12, 2022, and the patient having been seen out of cell for all prior healthcare contacts since transfer to VSP ten days prior. He was seen for a confidential primary clinician contact on September 20, 2022, when the patient requested return to the 3CMS level of care.

The initial IDTT occurred on September 29, 2022 when the patient was transferred to the 3CMS level of care. The rationale for decreasing the level of care was that the patient denied symptoms

and he requested decrease in his level of care to the 3CMS program. It was also noted that the patient agreed to the transfer to a lower level of care. Given that the initial primary clinician and psychiatric assessments both included opinions that EOP level of care was likely not warranted, it was unclear why justification beyond patient self-report was omitted from the IDTT documentation. The IDTT clinical summary was not updated and continued to include language from the primary clinician initial assessment that the need for EOP level of care would be assessed during weekly contacts.

The patient was seen for the initial 3CMS primary clinician and psychiatric assessments on October 10, 2022, and both assessments were clinically adequate. The initial IDTT meeting occurred on the following day, and IPOCs for pre-release planning and depressed mood were initiated. The patient attended a two-hour recreation therapy group in October 2022. A pre-release planning contact occurred during November 2022, and the documentation indicated that the contact was clinically adequate.

A routine primary clinician contact, which included completion of a SRASHE, occurred on November 23, 2022. The primary clinician was not the same as the clinician who completed the initial assessment and IDTT documentation, yet this was not acknowledged in the documentation. The patient reported mild anxiety due to his upcoming prison release, but there was no documentation of interventions to support the patient. The patient was released from prison on January 2, 2023.

**Findings**

The care provided to this patient was adequate.

There were, however, concerns regarding the change in primary clinicians that was not addressed with the patient. Additionally, there was no documentation of therapeutic interventions during the only 3CMS primary clinician contact prior to prison release.

Additionally, a non-confidential contact occurred while the patient was in the EOP that was not adequately justified.

**Patient K**

This EOP patient's healthcare record was reviewed to assess the mental health care provided at VSP; his IDTT meeting was observed during the monitoring visit. The patient had received mental health services at the EOP level of care at VSP since December 2019. He had a history of at least two DSH placements and was admitted to the MHCB in 2019 and 2020. He was provided a diagnosis of schizophrenia and was prescribed Thorazine.

The patient was seen timely for IDTT meetings and by the telepsychiatrist; he was seen by the PC every two weeks.

During the observed IDTT meeting, the treatment team members discussed numerous symptoms of concern that should have resulted in consideration of referral to a HLOC; those behaviors

included involvement in an obsessive and rigid exercise routine, recent significant weight loss, grandiose delusional thinking and probable response to auditory hallucinations. The patient minimized those observations and presented with increasingly tangential thinking and word salad. The observations were not documented in the IDTT progress note that incorrectly stated that the patient was resistant to HLOC referral; however, the IDTT actually told the patient that he did not require HLOC referral. The psychiatrist discussed the risks of the current psychotropic medication regimen and recommended safer alternatives; however, the patient was resistant to any medication changes and had poor insight regarding his mental illness.

The documentation indicated that the patient exhibited paranoia and delusional thinking that affected his functioning and interactions with others as well as poor insight regarding his mental illness. The PC worked with the patient to increase his motivation to use coping skills and provided psychoeducation about his mental illness; however, those interventions were ineffective due to the patient's severe and significant symptomatology. The treatment plan was not updated to target the most prominent and problematic symptoms that the patient exhibited, instead targeted depressed mood which was not the most significant behavioral impediment. The patient's rigid belief system, disorganized thinking and psychosis with delusions and paranoia negatively affected his functioning and should have been the primary focus of treatment.

The patient clearly met several subjective criteria for referral to a HLOC, including criterion one (as a result of a mental disorder, patient was unable to function at current level of care), criterion two (required structured inpatient treatment because of a mental disorder), and criterion three (exhibited chronic symptoms that had not responded to six months of treatment).

The patient was in the VSP EOP since 2019 with the same PC since 2020. He was medication resistant and would not consent to medication changes or increasing the medication dosages to therapeutic levels. He had begun to decompensate at least since the beginning of 2023. The treatment team was aware of the patient's excessive exercising, but they minimized this behavior stating that he "obsesses" over exercise. The patient remained with paranoia, rigid thinking, and defensiveness. Despite the senior supervisor and the expert questioning the treatment team about referral and directly inquiring about the clinical rationale for HLOC non-referral that was not documented, the treatment team continued to resist referral to a HLOC.

**Findings**

The care provided to this EOP patient at VSP was grossly inadequate.

The patient clearly met HLOC criteria and required referral to address his decompensation and worsening psychotic symptoms; however, the treatment team inappropriately chose not to do so. No adequate clinical rationale was provided for nonreferral.

Additionally, the treatment plan was not updated, even as interventions failed; and the treatment target of depressed mood was clearly not the primary impediment in the patient's ability to function in the EOP and prison setting.

While the patient was seen timely by the psychiatrist and PC, interventions were not established to develop a therapeutic rapport, to increase medication acceptance and adherence, and to impact lasting behavioral change and symptom reduction. The treatment targets in the treatment plan were inadequate given the patient's primary symptoms and decompensation.

In addition to failing to provide adequate treatment for this EOP patient, the IDTT also failed to provide the patient with timely access to a HLOC when indicated, even when strongly encouraged by the expert and the clinical supervisor present at the IDTT meeting. This was particularly concerning given the patient's lengthy stay in the EOP, the IDTT's familiarity with the patient, and their continued resistance to refer the patient for needed inpatient treatment.

**Patient L**

This patient's case was reviewed as use of force was utilized in response to involuntary medication administration on November 10, 2022. Further review of the use of force incident documentation and the healthcare record indicated that the purpose of the use of force was not solely for medication administration, as no PC 2602 order was in place prior to the use of force. An emergency medication order was, however, obtained when the telepsychiatrist was consulted during the crisis as the patient refused a required housing move to the MHCB and exhibited aggressive behavior.

The healthcare documentation indicated that the patient exhibited bizarre behavior for at least the preceding month, including refusal of food and to leave his room, and report by cellmates that the patient did not sleep at night and stood above them glaring when awakened. An emergent mental health referral was submitted, and a mental health assessment and SRASHE were completed. This precipitated the use of force event. The patient was ultimately referred to the MHCB, which required a move to alternate housing; however, the patient refused the move and was observed with batteries in a sock to utilize as a weapon. Multiple clinicians attempted to deescalate the situation without success. Two oleoresin capsicum vapors and two oleoresin capsicum grenades were used to obtain compliance; however, the use of force eventually occurred, and the patient reportedly struck or attempted to strike officers with a pen and the battery-filled socks. He was removed from the cell, decontaminated, and sent to the hospital for examination of his injuries. This incident resulted in the patient receiving eight staples on his scalp and two areas of sutures on or near his lips with bruising on at least one arm.

This patient was provided multiple diagnoses including bipolar disorder, mixed, severe with psychotic behavior; other schizophrenia spectrum and other psychotic disorder; antisocial personality disorder; and alcohol use disorder, severe, in institutional remission. He refused to accept antipsychotic medication and was only prescribed Lexapro prior to the use of force incident; however, due to nonadherence and refusal to meet with the telepsychiatrist, Lexapro was discontinued on November 9, 2022. The patient had a long history of medication nonadherence, PC 2602 orders, and decompensation when medication nonadherent. The documentation indicated that the patient exhibited decompensation for an extended period, possibly since March 2022; this decompensation was present at the time of the August 2022 IDTT meeting at VSP.

The patient was placed in medical isolation for much of the time at VSP, yet he refused confidential contacts. The last treatment team meeting on August 18, 2022, documented the patient's decompensation, but incorrectly failed to note that he met several subjective HLOC criteria, including having chronic symptoms that had not responded to treatment, and inability to function at the current level of care due to major mental illness. Delusions were targeted in the treatment plan, but no actual clinical interventions were identified and documented. Medication nonadherence was not addressed in the treatment plan IPOCs.

The content of the PC contacts was minimal, due at least in part to the patient's lack of engagement. He refused meals, ducats, medications, and treatment groups; additionally, housing staff noted the patient's uncharacteristic behavior and described the patient as appearing confused with staring at objects for long periods of time. There was documentation that the patient had clear decline in functioning for at least several months before the use of force incident, and the patient met the criteria for referral to a higher level of care; however, none of the documentation prior to the use of force indicated that his treatment team considered or discussed referral despite his evident decompensation.

The patient was ultimately admitted to an MHCB.

**Findings**

The care and treatment provided to this patient at VSP was clearly inadequate.

The patient had a well-documented and lengthy history of involuntary medication orders, medication nonadherence, and decompensation when not adequately treated. For this reason, it was unacceptable that the treatment team waited for referral to a higher level of care or to pursue involuntary medication treatment until the patient deteriorated to the point of requiring use of force to remove the patient and to forcibly administer emergency medication. Additionally, this delay and subsequent use of force resulted injury to the patient. The documentation indicated that the patient exhibited unquestionable decompensation since at least March 2022. The mental health treatment provided was ineffective, yet the treatment team did not convene to discuss the treatment plan or to make necessary modifications. The patient clearly met the criteria for referral to a higher level of care, yet the treatment team did not document consideration of referral or a rationale for nonreferral. The patient should have been referred to a HLOC prior to the crisis that resulted in the use of force; if this had occurred, both physical harm and extended psychological suffering could have been avoided.

**Patient M**

This EOP patient's healthcare record was reviewed to assess the mental health care provided at VSP. The patient arrived at VSP on April 26, 2023, and was placed in the EOP.

An initial assessment was completed on May 4, 2023, and the patient was seen by the telepsychiatrist on May 8, 2023. The IDTT meeting occurred timely on May 9, 2023 for development of the treatment plan.

The patient was provided diagnoses of bipolar II disorder; amphetamine-type use disorder, severe; opioid use disorder, severe; cocaine use disorder, moderate; and cannabis use disorder, moderate. He was prescribed Zyprexa and BuSpar. The patient had multiple recent stressors and was observed by his psychiatrist crying when reporting that his daughter had been sexually abused and was pregnant.

At the May 9, 2023 IDTT meeting, the treatment team identified treatment goals of substance abuse and mania. No baseline for those behaviors and symptoms was documented. The EOP treatment team did not document a comprehensive diagnostic evaluation to clarify if the patient's prior manic symptoms were due to his extensive amphetamine abuse or due to symptoms of bipolar disorder. The diagnosis of bipolar disorder appeared to have been continued from prior documents. While the substance abuse treatment goal appeared reasonable, the interventions were insufficient given the patient's extensive substance abuse. The treatment focused primarily on identifying five triggers and assisting the patient in goal setting, and referral to interdisciplinary substance use disorder treatment or other substance abuse programs were not included. The treatment targets for mania were inappropriate. No interventions, including medication adherence, were provided in the treatment plan for the patient's reported mania. The patient was eventually assessed and enrolled in MAT for substance abuse and was prescribed Suboxone.

The patient was seen every other week by the PC for individual contacts. These contacts appeared to be primarily check-ins with the patient without documentation of the provision of actual clinical interventions. This occurred even as the patient was actively engaged in ongoing substance abuse; the patient even told the PC that pruno had been found in his cell during a search, although he claimed that it belonged to his cellmate.

The patient was not seen monthly by the psychiatrist as required; he was seen by telepsychiatry on May 8, 2023, and July 11, 2023. The patient reported continued anxiety and poor sleep and was prescribed Vistaril PRN for sleep and anxiety.

It did not appear that the treatment team, other than the PC, were aware of the patient's self-report of continued active illicit substance use, and there was no documentation that the PC conferred with the treatment team or the clinical supervisor regarding that matter.

**Findings**

The care and treatment provided to this VSP patient was inadequate.

He was not seen consistently as required by the treating psychiatrist. The patient had an extensive substance abuse history, including multiple amphetamines; yet the diagnosis of bipolar disorder was repeated in treatment planning and progress notes without clinical justification. The patient's mood disorder symptoms could have been related to his ongoing substance use. A comprehensive assessment for diagnostic clarification was indicated.

While the patient acknowledged actively engaging in substance use while at VSP and reported this behavior to the PC; this issue was not discussed with the remainder of the treatment team,

included in treatment planning, or shared with relevant parties such as his ISUDT and MAT providers. The VSP EOP treatment plan did not adequately address the patient's reported symptoms, particularly those that resulted in his placement in the EOP. No actual clinical interventions were included in the treatment plan, nor was there documentation that interventions were implemented during clinical contacts.

**Patient N**

This EOP patient's healthcare record was reviewed to assess the mental health care provided at VSP. The patient arrived at VSP EOP on January 24, 2022, and had the same PC while at VSP. He was provided a diagnosis of schizophrenia with a rule-out diagnosis of PTSD. The patient received his psychotropic medications by a PC 2602 order that was obtained in October 2022 due to danger to others. He was prescribed haloperidol decanoate injection every four weeks, Cogentin, and Vistaril.

The patient was seen every two weeks by the PC. When his group attendance decreased, he increased his group attendance in response to encouragement from the PC. Although some PC clinical contacts appeared to be primarily wellness check-ins, other contacts appeared to utilize cognitive-behavioral techniques such as challenging irrational thoughts and logging the utilization of new coping skills. The PC also worked with the patient on pre-release planning and provided information about community substance abuse treatment and appropriate housing.

The assigned telepsychiatrist saw the patient generally monthly; however, the time between psychiatric contacts ranged from four to seven weeks. The same telepsychiatrist saw the patient from November 2022 to March 2023; however, a different telepsychiatrist saw the patient in April 2023, and yet another telepsychiatrist saw the patient in May 2023. The psychiatrists reviewed medication effectiveness, side effects, and new symptoms during each contact; however, the documentation of some telepsychiatrists was adequate, while others copied significant past information unchanged making it difficult to identify information specific to the current contact.

It appeared that the patient functioned well in the VSP EOP and benefitted from the treatment provided. Although there were periods when his paranoia increased; he was very receptive to the CBT interventions provided by the PC, and he discussed the increase in symptoms with the psychiatrist. He appeared to maintain stability within the structure and support of the EOP.

**Findings**

The care and treatment provided to this VSP patient was adequate.

The patient benefitted from continuity of care with the same PC since his arrival at the VSP EOP in January 2022, and the documentation reflected a strong therapeutic relationship with the PC and receptiveness to provided clinical interventions. The patient attended his treatment groups and was adherent with psychotropic medication. He appeared to stabilize at VSP and was able to maintain his functional level and to benefit from EOP treatment. When the patient experienced increased symptomatology, the PC recognized and responded with appropriate clinical

interventions and referral to the psychiatrist. While the patient was not consistently seen every four weeks by the psychiatrist, the treatment provided by the telepsychiatrists appeared beneficial and appropriate. There were, however, several changes in the assigned telepsychiatrist beginning in April 2023, creating problems with treatment continuity.

**Patient O**

This EOP patient's healthcare record was reviewed to assess the mental health care provided at VSP. The patient arrived at VSP on February 22, 2023; he had previous placement at VSP in the EOP. Upon his return, he was seen timely for an initial PC evaluation, initial psychiatric evaluation, and initial and subsequent IDTT meetings. The patient was convicted of a sex offense, and when previously treated at VSP, he reportedly engaged in negative impression management with endorsement of extreme symptoms. The PC, however, documented that as the patient became more comfortable, he acknowledged that his over-reporting of symptoms was due to safety concerns related to his conviction. Once acknowledged, he began to engage in treatment in a more meaningful and genuine manner.

The patient was provided diagnoses of dysthymia, unspecified anxiety disorder, and antisocial personality disorder. He was prescribed Effexor and Remeron. He was prescribed Zyprexa, but that medication was placed on hold following direction from the prior facility's medical staff due to the need for additional laboratory testing; as the patient's prior results indicated decreasing absolute neutrophil counts, and there was concern that it could be related to the Zyprexa. The patient was treated for anxiety utilizing CBT.

All required treatment team participants were present at the initial VSP IDTT meeting, and anxiety was identified as the treatment target. The patient presented with mild dysphoria but reported extreme symptoms of anxiety and associated difficulty sleeping and eating with few coping skills and no social support. He indicated that he anticipated involvement in treatment and regaining his prior sense of stability and symptom management. He identified three specific goals for the next 90 days to improve his mental status. The treatment interventions focused on continued CBT and building coping strategies while challenging irrational fears. No HLOC referral consideration indicators were noted.

The patient was seen monthly by the same telepsychiatrist usually within 30 days. While the treatment plan included clinically sound interventions to address anxiety, the PC contacts did not always occur every 14 days, and the patient was not always seen by his assigned PC. There was a lapse in PC contact for five weeks from March to May 2023, and different PCs saw the patient on at least four occasions with only occasional contact with the assigned PC. All PC contacts were typically brief in duration which severely limited the ability to implement actual therapeutic interventions. The assigned PC indicated that the patient had no qualifying diagnosis for inclusion in the MHSDS, had few functional impairments, and did not appear to require the EOP level of care. During this period, the patient reported increased significant stressors. In April and May 2023, he reported that his brother died by overdose, and that his father had metastatic cancer. At the end of May 2023, he reported to a covering PC that his father had died, and he did not want a decrease in his level of care at that time.

875

While there may have been some concern for the credibility of the patient's report of significant losses during the time when a reduction in the level of care was considered and the patient's stated desire to remain in the EOP, this issue was not specifically addressed in treatment. The patient had a lengthy history of extreme anxiety and concern regarding his safety with associated deficits in functioning, and it was apparent that he would have trouble transitioning to what he perceived as a less secure environment. Despite this, the assigned PC did not meet regularly with the patient to discuss his concerns regarding placement in the 3CMS program or to plan for transition. The covering PCs did not have the necessary therapeutic relationship with the patient to address this issue adequately; and due to their contacts being limited to wellness check-ins, these intervention should have been implemented by the assigned PC.

**Findings**

The care and treatment provided to this patient was inadequate.

Although the psychiatric care provided appeared adequate; treatment planning and treatment implementation were problematic. There was a lack of continuity of care with PCs. The PC contacts occurred every other week and typically lasted only 15 minutes which was insufficient to implement the treatment interventions outlined in the treatment plan. The patient was then informed that his level of care would decrease by early June 2023, but no transitional planning or treatment focused on anxiety, accommodating change, and managing distress was provided. The patient then began to report increased stress based on external factors and openly discussed not wanting to leave the EOP and considered inappropriate behavior that would result in MHCB placement. This issue should have been addressed specifically in the treatment plan and in individual sessions.

**APPENDIX C-7**
**California State Prison/Sacramento (CSP/Sac)**
**May 15, 2023 – May 19, 2023**

**Patient A**

This 38-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. The patient arrived at CDCR in 2003 to serve a 32-year sentence; he was initially placed at NKSP. He arrived at CSP/Sac in March 2020 from SVSP. He was included in the MHSDS caseload since 2008, when he was placed at the 3CMS level of care. His level of care was increased to EOP in October 2013 due to suicidal ideation and ongoing depression; with stabilization of his symptoms, his level of care was reduced to 3CMS in April 2015. His level of care was again increased to EOP in December 2019 after MHCB admission due to suicidal ideation.

The patient's CDCR mental health history was significant for four MHCB admissions, one DSH hospitalization during February 2016, and two prior suicide attempts. His past diagnoses included PTSD, paranoia, auditory hallucinations, and depression. In late 2019 he exhibited persecutory delusional thinking involving his girlfriend and family. More recently, the patient was reportedly engaged and participated in treatment, and he regularly attended groups and his job assignment. At the time of his arrival at CSP/Sac, the patient was provided diagnoses of major depressive disorder, schizoaffective disorder, depressive type, paranoid personality disorder, and cannabis use disorder, severe.

Quarterly IDTT meetings occurred timely during the review period, and they occurred on September 1, 2022, November 17, 2022, and February 9, 2023. The IDTT meetings included the necessary participants; however, the patient refused to attend any of the IDTT meetings. The documentation did note that the patient was made aware of and agreed with his treatment plan goals. The IPOCs and treatment goals were updated during the review period to reflect changes in the patient's mental status and symptoms. The September 1, 2022 IDTT meeting included IPOCs targeting depressed mood and hallucinations with measurable goals and appropriate interventions. The primary treatment goals were to maintain medication adherence, to gain insight into mental health symptoms, and to work on reframing negative thoughts that impacted his mood. The clinical summary noted that the patient consistently participated in mental health programing when it was available, and he was consistently engaged during primary clinician contacts. Although the patient met the criterion for higher level of care referral consideration, as he was a high treatment refuser due to attending less than 50 percent of his scheduled treatment hours, the documentation indicated that the majority of absences were due to a COVID-19 outbreak. During that time, the patient was on quarantine status and modified programming was implemented due to a lack of staff.

At the next IDTT meeting on November 17, 2022, the treatment team removed the IPOC for hallucinations, as the patient's psychotic symptoms responded well to medication treatment and his auditory hallucinations had decreased and were more tolerable. The IDTT documentation noted the patient's absence at the meeting and also noted his reported racing thoughts, depression, anger, grief, and paranoia. Additionally, he presented with irritability, impatience,

877

uncooperative behavior, and resistance to treatment participation since the previous IDTT meeting. The primary clinician noted goals that included treatment participation, grief processing, improvement in coping skills, and addressing distorted thinking. The treatment plan noted that the patient was prescribed Zyprexa, Remeron, and melatonin to address psychiatric symptoms and sleep difficulties.

The February 9, 2023 IDTT meeting documentation noted the patient's agreement with treatment goals despite his refusal to attend the meeting. The treatment team noted that the patient's mental status continued to improve, and he maintained overall stability but with continued depression and grief due to his father's death in December 2021. The IPOC continued to target the patient's depressed mood. No new symptoms were reported and there was discussion regarding his level of care. The treatment team appropriately decided to retain the patient at the EOP level of care due to verified recent family deaths to process grief and depression.

During the review period, the patient was offered 9.13 hours of structured therapeutic activities, attended 2.59 hours, and refused 6.34 hours, attending 39 percent of offered treatment.

Psychiatric contacts did not occur timely during the review period. Although psychiatric contacts were required monthly, the patient was only seen on September 13, 2022, October 31, 2022, January 17, 2023, and February 14, 2023. On September 13, 2022, the patient was seen for a confidential individual psychiatric contact in the EOP Treatment Center when it was noted that he was not medication adherent, and he demonstrated disorganized thinking, circumstantiality, flight of ideas, loose associations, tangentiality, and active psychosis. Additionally, the psychiatrist noted that he appeared to be responding to auditory hallucinations and was distracted with psychomotor restlessness, poor frustration tolerance, and paranoia. He refused to allow laboratory studies or the psychiatrist's attempts to interview him. The psychiatrist documented his plan to collaborate with the primary clinician to encourage medication adherence and to attempt to improve the patient's rapport with the treatment team.

The patient's next scheduled psychiatric contact was scheduled for October 19, 2022, but the patient went to the EOP Treatment Center but immediately left and refused to be seen. He was seen on October 31, 2022 in the dayroom of his housing unit, as the patient did not show for his scheduled appointment, and the psychiatrist went to the housing unit to see the patient. The patient was reportedly anxious, depressed, and preoccupied by internal stimuli. He reported auditory and visual hallucinations and paranoia, and the psychiatrist noted "presentation of a decompensated thought and mood d/o, rule out schizoaffective d/o and consider chronic paranoid schizophrenia." The patient remained with medication nonadherence. Despite the patient's severely decompensated state, he was not seen for subsequent psychiatric contact until January 11, 2023. At that time, the patient was reportedly medication adherent. He remained with paranoia and delusional thinking, but the severity of symptoms was reportedly decreased, and the psychiatrist attributed the improvement to medication treatment. At the February 14, 2023 psychiatric contact, the patient was reportedly medication adherent, reported that he was "doing well," and demonstrated generally stable mental status.

The primary clinician contacts generally occurred timely during the review period with limited exceptions when two weeks lapsed between contacts. The location of contacts varied, but most

contacts occurred in nonconfidential settings such as at the cell-front or in the yard.  The documentation indicated that the patient reported various reasons that he did not show for appointments, including not receiving a ducat for his appointment in the EOP Treatment Center or modified custody or mental health programming that mandated cell-front contacts rather than confidential contacts in the EOP Treatment Center.  The patient was described as angry and frustrated that custody had not allowed him to leave his cell for appointments.

Progress notes indicated that the patient showed increasing motivation for treatment as the rapport with his primary clinician improved.  In September and October 2022, the patient was described as irritable, impatient, and exhibiting decompensation.  He was seen weekly during November 2022 and demonstrated increasing improvement.  He was reportedly medication adherent with cooperative behavior during primary clinician contacts.  He was seen weekly except for one missed contact on January 13, 2023, and he maintained stability during December 2022 and January 2023.  Three of four primary clinician contacts in February 2023 occurred in a confidential setting in the EOP Treatment Center, and the patient was reportedly stable and highly engaged in therapy with the primary clinician in addressing his depression and grief.  The patient reportedly completed in-cell workbooks and activities.  At the end of the review period, he attended anti-recidivism coalition classes and enjoyed his new job as a barber.

**Findings**

The care and treatment provided to this CSP/Sac patient was inadequate.

The patient was not offered the required ten hours weekly of structured therapeutic activities.  Further, psychiatric contacts did not occur timely.  The patient presented with evidence of psychotic decompensation at a September 2022 psychiatric appointment; however, the appropriate interventions did not occur to address his decompensation.  Additionally, of concern was the period between October 31, 2022 and January 11, 2023 when the patient was not seen by a psychiatrist despite presenting at the earlier appointment with significant psychotic symptoms and medication nonadherence.  The appropriate interventions did not occur to address this decompensation, including increased frequency of psychiatric contacts to monitor symptoms and to assess the need for referral to a higher level of care.

There also appeared to be problems with the patient receiving ducats for scheduled appointments, resulting in nonconfidential contacts by the primary clinician.

After the patient resumed taking his prescribed medications, he exhibited some improvement and eventually was engaged in treatment and was able to attend classes and to work.

As with other CSP/Sac EOP patients reviewed, there were significant programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

**Patient B**

This 36-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. The patient had several CDCR incarcerations, and he entered CDCR for his current term in 2015. He was recently placed at CSP/Sac after completing a 29-month term in the ASU. He was scheduled for parole in October 2023. The patient entered the MHSDS during a prior term, and he received mental health services at the 3CMS, EOP, MHCB, acute and intermediate levels of care. He was not included in the MHSDS from 2006 to February 2014, when he was placed at the 3CMS level of care. His level of care subsequently fluctuated between the various levels of care. He was also hospitalized at DSH during 2016, and his level of care remained EOP since discharge from DSH. He also had an active PC 2602 order due to danger to others and grave disability that would expire on July 13, 2023. He was provided with a diagnosis of schizoaffective disorder. His chronic suicide risk was assessed as moderate, and his acute risk was assessed as low.

The IDTT meetings occurred timely during the review period, and occurred on September 7, 2022, November 30, 2022, and February 22, 2023; all meetings included the necessary participants, and the patient attended. The September 7, 2022 IDTT documentation was adequate, and the resulting treatment plan was appropriate and individualized for this patient's presentation and needs. The treatment plan contained IPOCs for depressed mood and anxiety with measurable goals and interventions. The patient was described as generally stable since the previous IDTT meeting, but the treatment team noted that he often demonstrated rapid speech, heightened anxiety, and bizarre thinking during primary clinician sessions. The treatment plan indicated that the primary clinician would work with the patient on mindfulness and distress tolerance skills. He was prescribed Zyprexa and Benadryl and was medication adherent. Appropriate level of care justification was provided and indicated that the patient benefitted from the increased contacts and programming offered at the EOP level of care. He continued to experience chronic auditory hallucinations and depression but was learning positive coping skills, and those symptoms had minimal impact on his overall functioning. The patient was reportedly future oriented and focused on treatment, and he reported frustration with limited access to care and program disruptions caused by COVID-19 protocols and staffing deficiencies.

At the November 30, 2022 IDTT meeting, it was noted that the patient met the higher level of care referral criterion of high treatment refusal. The treatment team noted that, although his attendance was inconsistent due to program modifications, the patient was motivated to attend individual primary clinician sessions and continued to work on coping skills; however, he generally did not attend groups due to program modification and custody factors. IPOCs for anxiety and depressive symptoms remained relevant and continued; however, there were no IPOCs to address the patient's psychotic symptoms and chronic auditory hallucinations. The treatment team documented a plan for the primary clinician to continue meeting with the patient weekly to encourage treatment adherence, and the primary clinician would work with custody to ensure that the patient was afforded the opportunity to attend treatment.

At the February 22, 2023 IDTT meeting, the patient reported that he was doing well. He was reportedly more comfortably discussing the content and difficulties experienced with the primary clinician. The patient also made significant progress working on mindfulness and distress

tolerance skills. The treatment plan IPOCs remained unchanged, but one additional goal was added for the patient to attend one out of cell activity weekly. Although the treatment team did not identify any functional impairments caused by the patient's symptoms, they indicated that the patient's bizarre thinking and presentation would likely impact his ability to function at a lower level of care.

During the review period, he was offered an average of 3.81 hours of structured therapeutic activities, attended 1.16 hours, and refused 2.64 hours.

Psychiatric contacts did not occur monthly as required, and contacts were delayed between three and eight days during the review period. All psychiatric contacts occurred at the cell-front and not in a confidential setting. Psychiatric contacts during the review period occurred on September 6, 2022, October 14, 2022, November 18, 2022, December 23, 2023, January 20, 2023, and February 23, 2023. The patient was consistently described as calm and cooperative, medication adherent, and psychiatrically stable. He consistently denied symptoms, distress, or an increase in symptoms. The documentation indicated that the patient's medication regimen was effective, and the psychiatrist successfully worked with the patient to encourage medication adherence with the patient's reported intent to remain adherent upon prison release. Psychiatric progress notes were problematic, as the content of the notes was copied and repeated essentially unchanged during subsequent contacts; for example, the mental status section of the progress notes remained unchanged during the review period aside from the patient's subjective report of his own mood at each contact.

Primary clinician contacts during the review period generally occurred timely except when programming was interrupted by institutional or custody factors. When the patient did not present for a scheduled primary clinician appointment in the EOP Treatment Center, the primary clinician went to his housing unit to provide a cell-front check-in. The patient was described as motivated and engaged in treatment, without significant increase in symptoms or acute distress. He was provided supportive therapy, and progress notes documented improvement in his paranoia and depression with therapy; although his auditory hallucinations remained chronic and intrusive. Therapy sessions focused on psychoeducation and reality testing. In January 2023, the patient reported depression and increased anxiety as his parole date approached. The primary clinician appropriately shifted the focus of treatment to release planning and the reframing of negative thoughts.

The documentation noted that the patient's group offerings and attendance increased over time. At the end of the review period, he attended his assigned groups and primary clinician contacts when his programming was not interrupted by custody factors or staffing deficits. He attended clinical groups, RT groups, and nursing led treatment groups during the review period.

**Findings**

The care and treatment provided to this CSP/Sac patient was adequate.

The IDTT meetings occurred timely during the review period. Treatment plans contained measurable goals and included patient collaboration in the development of goals. The patient's

mental status remained stable, and he appeared to positively respond to the treatment provided by his primary clinician and psychiatrist. The patient was medication adherent, and the psychiatrist worked with the patient to encourage continued adherence. The patient was engaged in treatment with his primary clinician, and the primary clinician implemented the interventions in the treatment plan and developed coping skills during confidential individual sessions. The patient was offered and attended clinical, RT, and nursing led treatment groups during the review period.

Some primary clinician and psychiatric contacts did not occur timely, and it appeared that some treatment was limited by custodial and staffing limitations. As with other CSP/Sac EOP patients reviewed, there were significant programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

**Patient C**

This 38-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. There was very limited history present in this patient's healthcare record, as he reportedly refused to sign release of information forms allowing CDCR to obtain prior healthcare records. He was previously provided a diagnosis of schizoaffective disorder, depressive type, and his symptoms included auditory hallucinations, bizarre delusional thinking, paranoia, mood dysregulation, and poor impulse control. He also had a history of very poor attendance and participation in MHSDS programming, as well as indecent exposure incidents, with the most recent incident occurring on June 13, 2019. His CDCR clinical history was significant for MHCB admissions and at least two DSH hospitalizations, with two MHCB admissions in the past two years and DSH hospitalization from May 30, 2018 to June 29, 2019.

There was one documented suicide attempt on January 1, 2015 when the patient cut himself with an intent to die. His chronic suicide risk during the review period was assessed as moderate, and acute risk was assessed as low. He had a history of receiving his psychotropic medications by a PC 2602 order, but more recently, he was not considered a danger to himself or others and did not meet the criteria for grave disability. Historically he declined treatment with psychotropic medications and was described as managing his symptoms at a "low functioning baseline." He reportedly attended yard and was respectful and positive in his interactions with the treatment team. Despite the presence of psychosis, mood instability and paranoia; the patient had poor insight regarding his mental illness.

The IDTT meetings during the review period occurred timely and included the necessary participants, including the patient. IDTT meetings occurred on September 27, 2022 and December 20, 2022. The September 27, 2022 IDTT documentation included IPOCs to reduce negative symptoms to remission and for the patient to attend and participate in programming. His lack of insight regarding his mental illness was noted. At the IDTT meeting, the patient was described as calm and cooperative, but he was responding to internal stimuli. He met the criterion for consideration of referral to a higher level of care due to refusing over 50 percent of offered treatment, but the treatment team determined that his lack of treatment engagement was likely due to negative symptoms and disrupted programming due to high staff turnover and

absences. The treatment team noted that the patient stated that he frequently wanted to attend groups and individual sessions, but he was often not called by custody or released from his cell for scheduled appointments. The treatment focus was to improve the patient's coping strategies through cognitive behavioral therapy interventions and skill building to cope with his disorganized thoughts and behaviors, poor ADLs, internal preoccupation, and severe depression.

The treatment plan remained unchanged at the December 20, 2022 IDTT meeting. The stated goal was to work on his depressive symptoms. He reportedly attended to his ADLs appropriately and was engaged in treatment, attending his scheduled individual sessions, but he missed groups due to modified programming in his housing unit. The patient continued to decline psychotropic medication treatment and remained stable with no overt functional difficulties noted by the treatment team.

The patient was seen timely for monthly psychiatric contacts during the review period. Although he was prescribed venlafaxine, he declined to take the medication. All but one psychiatric contact during the review period occurred in a confidential setting. The only cell-front contact occurred when the patient reported that he did not receive a ducat and did not know that he had an appointment. Psychiatric progress notes indicated that the patient demonstrated good adherence with attendance at individual sessions and groups. The patient consistently demonstrated good rapport and engagement with the psychiatrist, and he reported that his treatment was beneficial.

Primary clinician contacts generally occurred timely during the review period. Although there were two changes in his assigned primary clinician, the patient remained stable and developed rapport with each primary clinician. The primary clinicians noted that the patient minimized his symptoms and attempted to appear less mentally ill. The primary clinicians also stated that the patient was unlikely to be successful in prison without the increased support and clinical contacts provided at the EOP level of care. Primary clinician contacts occurred in a confidential setting in the EOP Treatment Center and at the cell-front, and the patient was consistently engaged in individual primary clinician sessions. IPOCs were discontinued appropriately when treatment goals were met; the IPOC for reducing negative symptoms was met on September 14, 2022. Individual primary clinician contacts focused on the patient's family related issues. Although he regularly attended individual primary clinician sessions, the patient consistently declined to attend the primary clinician caseload group. Despite institutional and housing unit modifications in programming, the patient was generally seen weekly for primary clinician contacts, and the primary clinician saw the patient at the cell-front for a check-in when he did not come to the EOP Treatment Center for his scheduled appointments and groups.

During the review period, the patient was offered 8.45 hours of structured therapeutic activities weekly, attended 3.22 hours, and refused 5.23 hours.

**Findings**

The care and treatment provided to this CSP/Sac patient was inadequate.

Primary clinician contacts occurred every seven to 14 days during the review period. Delays or cancelations in individual primary clinician contacts were often due to modified programming. The primary clinician was changed twice during the review period without notice or warning, but the patient remained stable during both transitions. Although he consistently refused to attend primary clinician caseload groups, the patient was highly engaged in treatment with his primary clinicians and psychiatrist and appeared to respond well. He remained stable and at his baseline without episodes of crisis or decompensation. Clinical contacts appeared beneficial and appropriate, and when the patients did not show for scheduled appointments in the EOP Treatment Center, the clinicians consistently went to the patient's housing unit or located him on the yard to check-in on his mental status and functioning.

Despite the efforts of the primary clinician and psychiatrist to provide adequate care, deficiencies in care were noted. The patient was not offered the required ten hours of treatment, and primary clinician contacts did not occur timely.

As with other CSP/Sac EOP patients reviewed, there were significant programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

**Patient D**

This 40-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. The patient entered CDCR for his third term in December 2014 and was scheduled for release on July 27, 2023. He arrived at CSP/Sac on October 25, 2022. At a November 1, 2022 Unit Classification Committee meeting, the patient was scheduled for transfer to CMC, as he was classified as level 3; he eventually transferred to RJD on January 24, 2023 in preparation for prison release.

He received mental health services at the 3CMS, EOP, and MHCB levels of care during prior incarcerations; additionally, he had two DSH hospitalizations. He was admitted to the MHCB in July 2006 and September 2015, and he was hospitalized at DSH in February 2006 and June 2007. His history was also significant for several suicide attempts, with the most recent suicide attempt occurred in February 2019 when he took an overdose of pills while housed in a county jail. Prior attempts dated back to 2001 and included overdose and cutting.

The patient had a history of PTSD symptoms including nightmares, thought avoidance, hypervigilance, and sleep difficulties after he was stabbed in his back several years ago while incarcerated. He was also evaluated for mood dysregulation with anger from environmental stressors. Upon arrival at CSP/Sac, he was provided diagnoses of bipolar I disorder, manic, mild, and PTSD; although, the patient reportedly did not have a history of manic symptoms or hallucinations. He also reportedly demonstrated obsessive-compulsive behaviors that included contamination fears and the need for order and symmetry; these behaviors reportedly were present since childhood.

The November 2, 2022 IDTT meeting occurred timely, and the meeting included the necessary participants, the EOP supervisor, and the patient. He reported that his primary symptoms and

concerns were anger, impulse control difficulties, and nightmares. Custody staff reported that they had no behavioral concerns regarding the patient. The IDTT documentation was inadequate. The IPOC, higher level of care, and suicide risk sections of the treatment plan were not completed.

The initial psychiatric assessment did not occur timely and was completed on November 8, 2022, approximately two weeks after his CSP/Sac arrival and six days after the initial IDTT meeting. The initial assessment occurred at the cell front after the patient did not show for his scheduled appointment in the EOP Treatment Center. He was prescribed Trileptal, Vistaril, and Effexor and was reportedly medication adherent with no medication side effects. He also denied suicidal ideation, homicidal ideation, visual and auditory hallucinations. Although the initial psychiatric assessment occurred late; subsequent psychiatric contacts occurred timely while the patient was housed at CSP/Sac, and he was seen on December 1, 2022, December 20, 2022, and January 17, 2023. The patient was consistently described as stable with normal mental status. Effexor was increased on January 17, 2023, after the patient reported increased depressive symptoms. Notably, despite the patient frequently discussing his fears and concerns about substance use relapse documented by the primary clinician; psychiatric progress notes did not document the patient's concerns about drug cravings or his difficulty enrolling in the MAT program. This omission indicated probable lack of collaboration and discussion between the primary clinician and the psychiatrist.

The patient was seen timely for PC contacts that occurred in individual sessions and in primary clinician caseload groups. The initial primary clinician assessment occurred timely but was conducted at the cell front and not in a confidential setting. His primary concern was addressing anger and improving communication skills for better functioning upon release. The patient reportedly demonstrated good insight regarding his mental illness and appropriate judgment. He was provided with a diagnosis of unspecified anxiety disorder, and the patient described his mood as depressed. The primary clinician included cognitive behavioral therapy as the primary intervention to address anger and inaccuracies in thinking. The primary clinician indicated that the patient would be retained at the EOP level of care due to his diagnosis and the severity of his mental illness. His acute suicide risk was assessed as low, and chronic risk was assessed as high.

Primary clinician progress notes contained one IPOC for mania that was initiated on November 7, 2022 that was not present in the treatment plan. This IPOC did not appear appropriate, as manic symptoms were not reported or observed by the treatment team or custody staff. An IPOC targeting chronic depressed mood would have been a more clinically appropriate based upon the patient's symptoms. The patient was engaged in treatment with his primary clinician, and he consistently reported frustration with modified programming and problems with access to care. Primary clinician progress note documentation indicated that the patient was future oriented and focused on preparing for his upcoming release. He reported increasing anxiety, specifically related to his generally unsuccessful efforts for placement in the MAT program to address his substance use difficulties. He reported an increase in drug craving, and progress notes documented the primary clinician's appropriate efforts to support the patient by providing therapeutic interventions and contacting their supervisors to discuss difficulty in the MAT program placement.

The patient attended and participated in several groups relevant to his concerns and goals. He participated in anger management, coping skills, and dialectical behavior therapy skills groups. During the review period, he was offered 8.7 hours per week of structured therapeutic activities, attended 5.71 hours, and refused 2.99 hours.

**Findings**

The overall care and treatment provided to this patient was inadequate.

Some clinical contacts did not occur timely, and the documentation was inadequate in his treatment plan and progress notes. He was not offered the required ten hours of structured therapeutic activities weekly. Although the initial IDTT meeting occurred timely; the treatment plan document was incomplete, and several sections were not completed. Although the initial psychiatric assessment was very delayed in completion; the remaining psychiatric contacts occurred timely, and there was good collaboration between the psychiatrist and patient regarding medication management. The patient responded well to medication treatment during the review period.

Primary clinician contacts generally occurred weekly, and progress notes indicated that the primary clinicians provided appropriate and supportive treatment, however the documentation of those contacts was inadequate, as the IPOC identified in the progress notes targeted symptoms which the patient did not endorse or exhibit while housed at CSP/Sac. The primary clinician and psychiatrist provided appropriate follow-up by cell-front check-ins when the patient did not show for scheduled appointments in the EOP Treatment Center.

As with other CSP/Sac EOP patients reviewed, there were programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and access to care.

**Patient E**

This 31-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. The patient arrived at CDCR for his current term in January 2015, and his anticipated release date was March 17, 2023. The patient received mental health treatment since childhood, when he was provided diagnoses that included PTSD, antisocial personality disorder, borderline intellectual functioning, ADHD, conduct disorder, and bipolar disorder. He also had a history of impulsivity, concrete thinking, and violence. He was not included in the MHSDS until he was placed at the 3CMS level of care on March 17, 2021 after attempted suicide by overdose. He had two MHCB admissions between March 2021 and December 2021, and he was subsequently placed at the EOP level of care on December 1, 2021. The patient subsequently had five MHCB admissions and numerous CIT activations due to suicidal ideation. There was no history of DSH or PIP hospitalizations. He had two prior suicide attempts; the first occurred on March 17, 2021 by overdose, and the second suicide attempt occurred on March 27, 2022 by hitting his head. The patient arrived at CSP/Sac on September 14, 2022 after a five-month ASU term. Upon intake at CSP/Sac, he was provided diagnoses of PTSD, antisocial personality disorder, mild intellectual disability, and bipolar I disorder, mixed episodes. He was prescribed Depakote.

886

IDTT meetings occurred timely during the review period. The patient attended the initial CSP/Sac IDTT meeting on September 21, 2022, when he reportedly demonstrated good insight regarding his mental illness and was future oriented. He reported anger, impulsivity, and mood fluctuations. Treatment plan IPOCs were clinically appropriate and individualized. The IPOCs targeted anger and depressed mood, with documentation that the primary clinician would provide cognitive behavioral therapy to decrease his anger and depression. The treatment team also documented the need for an updated DDP evaluation prior to the patient's prison release in March 2023.

The patient refused to attend the October 12, 2022, IDTT meeting; that IDTT meeting occurred as a result of the UNA review, as the patient met the higher level of care criterion for treatment nonadherence. The treatment team maintained the patient's current level of care with adequate justification that he had newly arrived at CSP/Sac and was motivated to participate in programming. The treatment team initiated an IPOC for prerelease planning on October 24, 2022, which contained relevant and appropriate treatment goals. IPOCs for anger and depressed mood were continued from the previous treatment plan.

At his next IDTT meeting on December 14, 2022, the patient attended and contributed to the IDTT process. He was met with the criterion for higher level of care referral consideration due to lack of treatment participation; his lack of treatment adherence was reportedly due to a combination of institutional programming issues and volitional choice. There was also documentation that the patient received an RVR for battery on a prisoner, but there was no mention of this RVR in the IDTT documentation.

At the January 18, 2023 IDTT meeting, the treatment team reported that the patient had been placed in the STRH from January 10 to January 18, 2023. He was reportedly housed in the STRH rather than the EOP Hub because the EOP Hub was at capacity, and the STRH was utilized for EOP Hub overflow housing. The patient reportedly expressed frustration that he did not receive mental health treatment while housed in the STRH. He also reported increased fear and anxiety related to his upcoming parole. At that time, he was prescribed Depakote, Vistaril, and Trileptal with intermittent medication adherence.

At the February 2, 2023, IDTT meeting, the patient was described as generally stable and motivated for parole, but he reported increased stress due to problems with custody staff. He recently received two RVRs that were determined to be the result of mental health symptoms and mood disturbance. The patient was reportedly restricted from out of cell activities on January 19, 2023 due to the recent assaults, and he told the treatment team that he would decline further mental health treatment to focus on preparation for his upcoming parole.

Psychiatric contacts during the review period were provided by telepsychiatry and did not always occur timely. The initial psychiatric assessment on September 21, 2022 occurred timely and reflected a plan to continue medications as prescribed prior to his CSP/Sac arrival. The patient was not seen again by a psychiatrist until December 8, 2022, when he requested resumption of his medications. At his next psychiatric contact on December 12, 2022, the patient reported normal mood and denied acute symptoms. His provided diagnoses included bipolar disorder and

hoarding disorder. The patient was seen in the housing unit on January 3, 2023. He was moderately medication adherent, and he denied medication side effects. He also reported positive benefit from the primary clinician therapy.

The patient was seen by the psychiatrist at the cell-front on January 9, 2023, after he refused to attend a confidential session. At that time, he was described as stable but reported anxiety regarding his upcoming parole. At the next psychiatric contact on January 23, 2023, the patient requested discontinuation of Depakote. The psychiatrist agreed and indicated that the patient would be monitored on Trileptal for mood stabilization. The final psychiatric contact during the review period occurred on February 24, 2023. The patient was reportedly preparing to parole in a few weeks, and the psychiatrist encouraged him to maintain medication adherence after release.

Primary clinician contacts generally occurred timely during the review period and occurred in both confidential and nonconfidential settings. The documentation indicated that the patient was seen at the cell-front when his housing unit was on custody or mental health initiated modified programming, or when he refused to attend a confidential session. There were several instances during the review period when between nine and 14 days lapsed between primary clinician contacts due to modified programming. The patient reportedly expressed his frustration with these interruptions in programming but remained stable during the review period, despite several unexpected and sudden changes in treatment providers. Progress notes indicated that treatment focused on addressing anger symptoms and preparing for upcoming parole. The primary clinician progress notes indicated that the patient was highly engaged in therapy and was able to improve his coping skills.

During the review period, the patient was offered and attended a variety of clinical and recreational therapy groups. Group topics included anger management, life skills, coping, stress management, and primary clinician caseload groups. He was offered 7.19 hours of structured therapeutic activities weekly, attended 3.12 hours, and refused 4.07 hours.

**Findings**

The care and treatment provided to this patient was generally adequate.

There was, however, a lapse in psychiatric contacts between September 21, 2022, and December 8, 2022, when the patient was not medication adherent, and he was not offered the required ten hours per week of structured therapeutic activities. He should have received monthly psychiatry contacts during the review period regardless of medication adherence. The IDTT meetings occurred timely. The reviewed treatment plans contained individualized and appropriate treatment goals and interventions addressing the patient's anger and depression. Treatment goals and focus were updated appropriately to include pre-release planning as the parole date approached. Primary clinician contacts occurred timely except when scheduling was interrupted by modified programming and custody issues. The interventions and support provided by the primary clinician aligned with the IPOCs and interventions identified in the patient's treatment plans. The patient was assigned appropriate treatment groups that included pre-release and clinical anger management groups.

Despite the determination of adequacy of care; as with other CSP/Sac EOP patients reviewed; there were significant programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and access to care.

**Patient F**

This 42-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. The patient arrived at CDCR for his current term on March 3, 2006, and he was serving a 29-year sentence. His history was significant for treatment at the 3CMS, EOP, and MHCB levels of care as well as PIP and DSH hospitalizations. He entered the MHSDS at the 3CMS level of care in April 2006, only one month after CDCR arrival. His level of care was quickly increased to EOP in May 2006, and he remained at the EOP level of care until April 2009. He had several DSH admissions from December 11, 2015 to January 22, 2016, from June 21 to July 24, 2019, and from June 28 to August 16, 2021. His most recent DSH hospitalization occurred on February 11, 2022, after he was referred to intermediate care from the MHCB at CSP/Sac on January 25, 2022 due to depression, suicidal ideation and command auditory hallucinations to harm himself. He transferred from the PIP to the ICF level of care at Coalinga State Hospital where he was hospitalized from February 11 to September 8, 2022. The patient returned to CSP/Sac at the EOP level of care upon Coalinga State Hospital discharge.

Upon discharge from Coalinga State Hospital, the patient was provided a diagnosis of schizoaffective disorder, and discharge medications included Abilify, Remeron, Zoloft, and Vistaril. The patient had a history of medication nonadherence. Despite multiple MHCB admissions and DSH placements for suicidal ideation and danger to self, the patient's CDCR history did not include episodes of actual self-harm. He received his psychotropic medications by a PC 2602 order due to danger to others during the review period. His chronic suicide risk was assessed as high, and his acute risk was assessed as moderate.

Five-day follow-up contacts appropriately occurred upon CSP/Sac arrival from Coalinga State Hospital. Three of five contacts were provided by a mental health clinician, and assessment progress notes were completed appropriately.

The initial IDTT meeting at CSP/Sac did not occur timely and occurred approximately one week late. The IDTT meeting included the necessary participants, including the patient. The treatment team provided IPOCs targeting anger and depressed mood. Objective, measurable goals and specific interventions were provided, and the patient agreed to work on improving his anger and depression. He was appropriately maintained in the SRMP, and the level of care rationale was provided. The clinical summary was copied and unchanged from an IDTT meeting on February 8, 2022.

The next IDTT meeting occurred timely on January 4, 2023, and included the necessary participants; however, the patient refused to attend. The treatment team indicated that the patient had no new symptoms, and he was maintained at the EOP level of care due to low distress

tolerance, impulsivity, and chronic auditory hallucinations. The patient had not demonstrated suicidal or self-injurious behavior during the previous 90 days.

Psychiatric contacts during the review period generally occurred timely, except the initial psychiatric assessment and monthly psychiatric contacts in October and December 2022. The documentation indicated that the patient worked collaboratively with the psychiatrist to determine the most effective medication regimen and to improve medication adherence. The medications were adjusted as his mental status improved, and his diagnosis was updated from schizoaffective disorder to major depressive disorder, recurrent, moderate. The prescribed medications at the end of the review period were Zoloft, Vistaril, and Remeron. It appeared that the patient responded well to medication management, and the command auditory hallucinations resolved during the course of treatment. The psychiatrist appropriately renewed the PC 2602 order in September 2022.

The frequency of primary clinician contacts was negatively impacted by modified programming, scheduled and unscheduled leave by the PC, and PC caseload group cancellations. The initial primary clinician assessment occurred late, and there were several instances when between ten days and three weeks lapsed between primary clinician contacts during the review period. Review of primary clinician progress notes indicated that the primary clinician provided appropriate interventions to address the patient's anxiety and depression, and the treatment that was provided aligned with the treatment plans. The patient was provided in-cell activities and workbooks when he requested them, and individual contacts focused on anger, grief processing, medication adherence, and coping with command auditory hallucinations. Near the end of the review period, the patient was consistently described as stable and medication adherent with no acute clinical concerns or symptoms.

The patient attended clinical, recreation therapy, and primary clinician caseload groups when offered. During the review period, he was offered 6.73 hours of structured therapeutic activities weekly, attended 2.82 hours, and refused 3.91 hours for an overall attendance rate of 42 percent.

**Findings**

The care and treatment provided to this CSP/Sac patient was inadequate.

The initial IDTT meeting, initial PC and initial psychiatric contacts did not occur timely; there were documentation deficiencies, and the patient was not offered ten hours of weekly structured therapeutic activities. Although the patient only attended 42 percent of offered structured therapeutic activities during the review period, it appeared that his high refusal rate was impacted by custody factors and modified programming. Much of the data and information in the initial primary clinician assessment was copied from previous assessments and treatment plans.

Primary clinician progress notes indicated that the patient was engaged in treatment and reported frustration when treatment was modified or cancelled due to institutional or staffing issues. Although the primary clinician contacts were limited; the primary clinician provided the interventions in the treatment plans, and the patient appeared to respond well with improvement in symptoms. The initial psychiatric assessment was appropriately documented, contained a

thorough history, and the prescribed medications were appropriately adjusted and monitored. The psychiatrist also appropriately renewed the PC 2602 order prior to expiration.

As with other CSP/Sac EOP patients reviewed, there were significant programming interruptions due to custody factors, modified programming, and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

**Patient G**

This 35-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac.  The patient entered CDCR for his current term on October 20, 2016 to serve a 21 year sentence.  The patient was placed at the 3CMS level of care on June 27, 2017.  He remained at the 3CMS level of care until his level of care was increased to EOP on November 13, 2018.  He remained at the EOP level of care until he was discharged to GP.  On March 22, 2021, he was removed from the MHSDS due to lack of treatment participation.

His CDCR history was significant for multiple MHCB admissions; the most recent MHCB admission occurred on July 3, 2022, after release from a long ASU term.  The patient arrived at CSP/Sac on September 30, 2022.  Upon CSP/Sac arrival, he was prescribed medications Vistaril, Effexor, lisinopril, and hydrochlorothiazide.  He had a long history of mental health treatment, impulsivity, agitation, mania, and delusional thinking.  His diagnoses at the time of CSP/Sac transfer were unspecified depressive disorder, antisocial personality disorder, and substance use disorder.

The IDTT meetings occurred timely during the review period, and the patient attended the initial IDTT meeting on October 12, 2022.  The meeting included the necessary participants.  He was provided diagnoses of unspecified depressive disorder, antisocial personality disorder, and substance use disorder.  The treatment plan included IPOCs to address anger and depressed mood.  The IPOCs contained appropriate and measurable goals, but specific interventions were not provided in the treatment plan.  The patient was not identified as a high treatment refuser, and he was not included in the SRMP.

The second IDTT meeting of the review period was a quarterly IDTT meeting that occurred on December 28, 2022.  The meeting included the necessary participants, but the patient refused to attend.  His chief complaint was documented as anger, and IPOCs for depressed mood and anger were continued in the treatment plan.  The treatment team reported that the patient did not demonstrate functional impairments.  He reportedly participated primarily in clinical and RT groups and was offered very few primary clinician caseload groups due to frequent cancellations and modified programming.

An IPOC for substance abuse was added to the treatment plan at the February 1, 2023, IDTT meeting.  At that time the patient demonstrated logical and linear thinking with some delusional content but no overt psychosis.  He was retained at the EOP level of care due to impulsive behaviors, and psychotic symptoms including delusional thinking.  The treatment team determined that the patient likely required ICF level of care treatment but did not meet the

criteria for referral.  He was ultimately retained at the EOP level of care as the treatment team believed that he would likely be victimized at a lower level of care.

During the review period, this patient was offered 7.08 hours of structured therapeutic activities per week, attended 4.43 hours, and refused 2.65 hours.  His overall attendance rate during the review period was 63 percent.

Psychiatric contacts occurred timely during the review period except a December 28, 2022 contact that occurred approximately two weeks late.  The patient was medication adherent, and review of progress notes indicated good collaboration between the patient and the psychiatrist. He consistently denied side effects, and the medications were effective in reducing his active mental health symptoms.  He was seen for six psychiatric contacts during the review period, most occurred at the cell-front due to the patient's refusal to attend a confidential session in the EOP Treatment Center.  The patient's medication was appropriately adjusted to encourage medication adherence, and he maintained stability.

Primary clinician contacts did not always occur timely during the review period, and there were instances when up to two weeks lapsed between contacts.  PC contacts frequently occurred at the cell-front rather than in a confidential setting.  Primary clinician contacts occurred in the EOP Treatment Center for scheduled, confidential appointments and at the cell-front or in the yard when the patient did not go to the EOP Treatment Center or when activities in the EOP Treatment Center were cancelled due to modified programming.  The patient was also seen in primary clinician caseload groups.  No initial primary clinician assessment was documented in the healthcare record since the patient's CSP/Sac arrival.  Progress notes indicated that the patient and primary clinician were working to improve social skills and to address anger management.  The patient also expressed interest in art groups and mindfulness groups.  He also repeatedly reported frustration with the interruptions in programming.  The patient was described as highly engaged in individual sessions, was future oriented, and utilized the sessions to process grief and to develop coping skills.

**Findings**

The overall care and treatment provided to this patient was inadequate.

Although the patient maintained stability during the review period, the primary clinician contacts did not always occur timely and often occurred at the cell front.  There was no documentation of the completion of an initial primary clinician assessment upon CSP/Sac arrival.  The patient frequently reported that he did not receive ducats for scheduled appointments with treatment providers, and primary clinician contacts in the EOP Treatment Center were frequently cancelled due to modified programming, resulting in cell-front check-ins rather than confidential individual sessions.  Although primary clinician contacts did not always occur timely, review of progress notes indicated that the patient received clinically appropriate and relevant support and was provided cognitive behavioral therapy and dialectical behavior therapy interventions and skills training on the occasions when primary clinician contacts occurred in the EOP Treatment Center.

As with other CSP/Sac EOP patients reviewed, there were significant programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

## Patient H

This 46-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. The documentation included conflicting information regarding the patient's arrival at CDCR for his current term, but review of the healthcare record suggested that he arrived during 2010 to serve a sentence of life with the possibility of parole. He entered the MHSDS at the 3CMS level of care in July 2011; he had periods when he was not included in the MHSDS, and he subsequently returned to the 3CMS level of care. He was admitted to the MHCB in April 2015 due to danger to self and he was discharged to the PIP. The patient had six MHCB admissions and two acute and intermediate care admissions. In 2021, the patient was hospitalized for 292 days at the SVSP PIP and was discharged at the EOP level of care on or about December 26, 2021. He remained at the EOP level of care for only seven days before he was re-admitted to the CSP/Sac MHCB from January 3 to February 23, 2022, due to danger to self after a serious self-inflicted laceration. At that time, the patient demonstrated increased impulsivity since SVSP PIP discharge including ingestion of pills, self-inflicted laceration, verbal altercation with his cellmate, and increased delusional thinking. He was hospitalized at the CHCF PIP for acute care from February 23 to June 1, 2021, with subsequent intermediate care hospitalization from June 2 to August 10, 2022. He was discharged to the CSP/Sac EOP on August 10, 2022.

The patient was provided with a diagnosis of schizoaffective disorder, bipolar type. He had a long history of impulsivity, agitation, manic symptoms, and delusional thinking. He was a participant in the SRMP during the review period. His acute suicide risk was assessed as low, and his chronic risk was assessed as high. At the time of CSP/Sac arrival, he was prescribed Invega, lithium, Benadryl, and melatonin.

Two routine quarterly IDTT meetings occurred during the review period on November 3, 2022 and February 1, 2023; both meetings included the necessary participants and occurred timely. The patient reportedly refused to attend the November 3, 2022, IDTT meeting. At that meeting, the patient appeared to have maintained stability since CSP/Sac arrival. His mood was described as euthymic, and the patient demonstrated moderate rumination and delusional thinking. The clinical summary indicated that the patient attended clinical contacts and groups and was active and engaged in treatment, however it was noted that he met the higher level of care consideration criterion for treatment nonadherence. The treatment team indicated that his treatment nonadherence was likely due to patient choice and well documented programming and access to care difficulties at CSP/Sac. The treatment plan contained IPOCs for mania, self-harm, and anxiety that were repeated from the previous IDTT meeting. The goals and interventions for those IPOCs were appropriate and individualized. The treatment team appropriately added an IPOC for treatment nonadherence at this IDTT meeting. The patient was continued in the SRMP, and cognitive behavioral therapy and dialectical behavior therapy strategies were incorporated in the treatment plan to improve coping skills and to reduce self-harm. His diagnosis was updated to bipolar I disorder with psychotic features. The treatment team noted that the patient was likely

eligible for discharge to the 3CMS level of care given his clinical presentation, but he was maintained at the EOP level of care due to symptoms of mania, delusional thinking, ongoing negative thoughts, and the likelihood of decompensation at a lower level of care.

The patient attended the subsequent IDTT meeting on February 1, 2023, where he was reportedly actively engaged in the IDTT process. He demonstrated logical and linear thinking with some delusional content. No new symptoms or specific goals were identified in the treatment plan, although an IPOC was added for substance abuse. He also reported medication side effects to the psychiatrist, including shaking and weight loss, and he requested additional medication to address the side effects.

During the review period, the patient was offered 8.13 hours of structured therapeutic activities weekly, attended 3.64 hours, and refused 4.5 hours.

The patient was seen timely for psychiatric contacts during the review period, except in January 2023, and he was reportedly medication adherent. All but two psychiatric contacts occurred at the cell front and not in a confidential setting. The patient consistently reported benefit from prescribed psychotropic medications, and he indicated that side effects previously reported had resolved. At the February 1, 2023, IDTT meeting, the patient reported return of medication side effects caused by his antipsychotic medications. The psychiatrist adjusted and tapered his medications appropriately in response to the patient's concerns, and the side effects reportedly decreased. Although his auditory hallucinations responded well to medication therapy, his delusional thinking remained fixed and consistent.

The patient was generally seen weekly for primary clinician contacts; however, many of those contacts occurred at the cell front, were brief check-ins, and did not occur in a confidential setting. The primary clinician documented access to care and modified programming concerns as the primary factors in treatment nonadherence. Most individual primary clinician contacts in September and October 2022 occurred in the EOP Treatment Center in a confidential setting, however primary clinician contacts during the remainder of the review period generally occurred in a nonconfidential setting at the cell front. The documentation indicated that the patient maintained good rapport with the primary clinician and remained stable, although he continued with delusional thinking. At the September 16, 2022, primary clinician contact, the patient discussed substance abuse and coping skills. At the November 14, 2022, primary clinician contact, he reported using illicit substances the week prior. Despite this reported issue of concern, an IPOC for substance abuse was not added to the treatment plan until February 1, 2023. The primary clinician progress notes were inadequate, as IPOCs were not tracked or updated in the progress notes and there was no specific reference to cognitive behavioral therapy or dialectical behavior therapy coping skills included in the SRMP plan.

**Findings**

The overall care and treatment provided to this CSP/Sac patient was inadequate.

Inadequate clinical documentation and treatment, and poor access to care were primary factors that negatively affected the patient's treatment. He was seen for timely IDTT meetings with

appropriate clinical summaries, level of care justifications, and functional evaluations, however IPOCs did not fully address the patient's treatment needs. Although the patient reported concerns about substance abuse during primary clinician contacts in early September 2022, an IPOC for substance abuse was not added until the IDTT meeting on February 1, 2023. Psychiatric contacts occurred timely, except one delayed contact. Medications were adjusted appropriately in response to medication side effects, with good collaboration between the patient and psychiatrist. Most of the primary clinician and psychiatric contacts, particularly during October and November 2022, occurred at the cell-front and not in a confidential setting. The patient was not offered the required ten hours per week of structured therapeutic activities during the review period.

As with other CSP/Sac EOP patients reviewed; there were significant programming interruptions due to custody factors, modified programming, and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

**Patient I**

This 36-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. The patient arrived at CDCR for his first term in April 2019 to serve a six-year sentence. He arrived at CSP/Sac on October 21, 2021. He entered the MHSDS at the 3CMS level of care upon his arrival to CDCR. He remained at the 3CMS level of care until he was admitted to the MHCB in January 2020 for approximately 11 days due to danger to self with suicidal ideation. He was discharged to the EOP level of care, and his level of care was subsequently reduced to 3CMS in June 2020. His level of care was again increased to EOP in November 2020. He was admitted to the MHCB for danger to self on June 23, 2021 for one day with discharge to the EOP where he remained at the time of the monitoring visit.

The patient's acute suicide risk was assessed as low, and his chronic risk was assessed as moderate during the review period. He reported depressive symptoms with anger since 2014, and he did not receive treatment in the community prior to his arrival at CDCR. The patient also reportedly demonstrated paranoia and delusional thinking. Historically, he was provided diagnoses of schizoaffective disorder, bipolar type, and OCD. Upon CSP/Sac arrival, he was provided diagnoses of bipolar I disorder, most recent episode depressed, and amphetamine use disorder. He was prescribed Zoloft, Benadryl, and Haldol on an as-needed basis at the time of arrival to the institution.

Two quarterly IDTT meetings occurred during the review period on September 21, 2022 and December 14, 2022; both meetings included the necessary participants. The patient did not attend the September 2022 IDTT meeting.

The September 2022 IDTT documentation included appropriate IPOCs to address the patient's chronic depression and substance use. Specific clinically based interventions were provided for substance abuse; however, the interventions for depressed mood were generic and not individualized. The patient also met the criterion for consideration of referral to a higher level of care due to attending less than 50 percent of offered treatment, but the treatment team decided to retain the patient at the EOP level of care as he was engaged in treatment and demonstrated clear

and stable mental status.  The treatment team indicated that the primary clinician would provide motivational interviewing techniques to encourage treatment adherence, and the patient appeared motivated to participate in treatment.  Much of the information in the clinical summary was copied from previous documentation without substantive clinical updates from prior treatment plans.

The patient attended the December 2022 IDTT meeting.  The IPOCs remained unchanged; however, the higher level of care section was not completed.  The discharge criteria, EOP functional evaluation, and most of the clinical summary were copied directly from the September 2022 IDTT documentation.

During the review period, the patient was offered only 4.24 hours of structured therapeutic activities weekly.  The patient attended 61 percent of offered treatment during the review period.  Of the 4.24 hours of structured therapeutic activities offered weekly, he attended 2.58 hours and refused 1.66 hours.

The psychiatric contacts did not occur timely during the review period, and the patient was not seen in September 2022.  An August 31, 2022 psychiatric progress note indicated that the patient demonstrated clear mental status with no acute symptoms.  It was unclear whether this contact occurred at the cell-front or in the EOP Treatment Center in a confidential setting.  The next psychiatric contact on October 21, 2022 occurred in a confidential setting in the EOP Treatment Center.  The patient requested an increase Haldol and Zoloft, and Haldol was changed from taken on an as-needed basis to daily administration.  At the November 1, 2022 and November 23, 2022 psychiatric contacts, the patient was reportedly medication adherent and stable. Benadryl was increased at his request during the November 23, 2022 contact.  The patient was not seen by a psychiatrist in December 2022.  At the January 20, 2023 contact, the patient remained medication adherent, and he reported that the additional Benadryl resulted in improved sleep; he reported no acute symptoms or distress.  The February 24, 2023 psychiatric progress note was copied from the previous note without substantive updates.

The patient was not seen timely for primary clinician contacts during the review period.  Most of the primary clinician contacts occurred at the cell-front due to modified programming and staffing deficiencies.  He was seen for 15 cell-front check-ins by the primary clinician when individual sessions or primary clinician caseload groups were cancelled, and he was not seen for a confidential individual primary clinician contact from September 28 to November 28, 2022.  There were also several instances during the review period when the patient was not seen for a primary clinician contact between nine and fourteen days.  Only seven individual primary clinician contacts occurred in a confidential setting, and he was offered only three primary clinician caseload groups.  He attended two of the three offered primary clinician caseload groups and attended one psychologist-led clinical group focused on coping with anger.  Primary clinician progress notes documented the patient's consistent frustration and increased depression due to modified programming and the lack of clinical contacts and treatment.  When seen, it appeared that the patient was provided appropriate and beneficial psychotherapy and support from the primary clinician.  The IPOCs were not tracked over time in the primary clinician progress notes.

**Findings**

The care and treatment provided to this CSP/Sac patient was inadequate.

The patient was not seen timely for psychiatric and primary clinician contacts during the review period. The treatment plan contained appropriate IPOCs for the patient's symptoms and problem areas, and treatment planning overall was adequate; however, significant portions of background clinical information was copied from prior documentation without update. The primary clinician contacts were inadequate, as timely and confidential contacts did not routinely occur. Primary clinician caseload groups were also not provided timely. Fifteen primary clinician contacts occurred at the cell-front, when the patient's groups or individual sessions were cancelled due to modified programming and staffing problems at the institution. Additionally, the patient was offered only 4.24 hours of structured therapeutic activities weekly, which was insufficient. He frequently reported frustration and increased depression due to the lack of treatment provided.

As with other CSP/Sac EOP patients reviewed; there were significant programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

**Patient J**

This 56-year-old patient's healthcare record was reviewed to assess the EOP care provided at CSP/Sac. He arrived at CDCR for his current term in June 1997 with a sentence of 25 years to life with the possibility of parole for a third strike; he had served several prior CDCR terms. He arrived at CSP/Sac at the EOP level of care on November 14, 2019, and he had been placed in the EOP since July 2007. The patient had a history of multiple MHCB admissions and two hospitalizations at Patton State Hospital. He was provided diagnoses of delusional disorder and major depressive disorder, with symptoms that included delusions of cognitive control, feelings of persecution, agitation, grandiosity, paranoia, and auditory hallucinations. He received his psychotropic medications by a PC 2602 order since June 24, 2020, and he was prescribed antipsychotic medications.

Although a poor historian, the patient reported a history of multiple suicide attempts. His acute suicide risk was assessed as low, and his chronic risk was assessed as high. During the review period, he was initially provided a diagnosis of delusional disorder; but the diagnosis was updated to major depressive disorder, recurrent episode with psychotic features.

Two IDTT meetings occurred during the review period, both of which occurred timely and were attended by necessary participants, including the patient. The treatment plan contained IPOCs targeting depressed mood and treatment nonadherence. The IPOCs contained measurable but generic goals, but specific interventions were absent from the treatment plan. There were no new symptoms reported since the last IDTT meeting. The patient met the criterion for consideration of referral to a higher level of care due to participation in less than 50 percent of offered treatment; however, the treatment team noted that the patient was engaged in his individual sessions, and his lack of participation in treatment and programming were due to frequent cancellations of his groups and education classes. He reportedly did not demonstrate functional

impairments resulting from his mental health symptoms. The clinical summary indicated that since the last IDTT meeting, the patient's mental status remained stable despite his limited programming, and he did not demonstrate delusional thinking. Discussion between the primary clinician and psychiatrist led to elimination of the diagnosis of delusional disorder as a primary diagnosis pending a psychological evaluation. The patient was reportedly medication adherent with his psychotropic medications, but he had significant difficulty controlling his blood glucose levels. The psychiatrist often consulted with the primary care provider regarding better diabetes control.

At the December 29, 2022 IDTT meeting, the patient was reportedly stable. The IPOC for treatment adherence was removed, as the patient met his programming goals and remained treatment adherent during the previous 90 days. No new goals were provided in the treatment plan, and the treatment team continued to focus on stabilizing the patient's diabetes and continuing to work on his coping skills.

During the review period, this patient was offered 8.58 hours of structured therapeutic activities weekly, attended 5.08 hours, and refused 4.21 hours, resulting in 59 percent attendance.

The patient was seen for five psychiatric contacts during the review period. Three of the contacts occurred in the EOP Treatment Center in a confidential setting, and two contacts occurred at the cell-front which was not a confidential setting. He was not seen for psychiatric contact in January 2023, and the psychiatric contact on October 4, 2022 occurred one week late. He was consistently described as clinically stable, but with depressed mood. The patient denied medication side effects and remained medication adherent during the review period. His blood glucose levels reportedly improved by the end of the review period. The patient requested discontinuation of the PC 2602 order that would expire in April 2023; however, the psychiatrist appropriately submitted renewal documents in February 2023.

The patient was seen for 23 primary clinician contacts during the review period. Twelve primary clinician contacts occurred in a nonconfidential setting, and nine contacts occurred in a confidential setting in the EOP Treatment Center; the patient attended one primary clinician caseload group, and he attended one clinician-led clinical group. The patient was not seen timely or consistently for confidential weekly individual primary clinician contacts or primary clinician caseload groups due to modified programming and issues related to custody releasing the patient from his cell for ducated mental health appointments. Primary clinician progress notes indicated that the patient and primary clinician developed a therapeutic rapport, and the primary clinician provided appropriate supportive therapy when able to meet with the patient. The primary clinician noted that the patient consistently denied acute mental health symptoms and concerns despite the lack of treatment due to modified programming, and he regularly completed milestone packets in his cell. Although portions of the progress notes were updated at each contact, significant portions of the progress notes were copied from prior sessions. The patient attended RT groups consistently with good participation and engagement.

**Findings**

The care and treatment provided to this CSP/Sac patient was inadequate.

Although the patient was noted with poor treatment adherence at the September 2022 IDTT meeting, the treatment team noted that his lack of participation was primarily due to group cancellations and modified programming. The IPOCs were updated appropriately, but the IPOCs lacked individualized goals and specific interventions for the primary clinician to provide in treatment. Psychiatric contacts generally occurred timely, but the contact in October 2022 occurred approximately one week late, and the patient was not seen for psychiatric contact in January 2023.

The primary clinician contacts during the review period did not occur timely or consistently. The patient was not seen for weekly confidential individual primary clinician sessions or primary clinician caseload groups due to modified programming and custody issues. He was seen at the cell front for check-ins when he did not show at the EOP Treatment Center for scheduled primary clinician contacts. Most primary clinician contacts occurred at the cell front and not in a confidential setting. The patient was provided in-cell milestone packets and was described as highly engaged in treatment when offered. The primary clinician provided support to the patient; however, this was overshadowed by untimely contacts that did not occur in a confidential setting, and primary clinician progress notes that included repetitive and copied information from prior contacts.

As with other CSP/Sac EOP patients reviewed, there were significant programming interruptions due to custody factors, modified programming and staffing related deficiencies. These issues of concern resulted in impaired provision of treatment and poor access to care.

**Patient K**

This 65-year-old patient's healthcare record was reviewed to evaluate the care provided in the CSP/Sac EOP hub. The patient arrived at CDCR for his current term on May 8, 1985. He received mental health services at the EOP level of care during most of his incarceration. His history included treatment nonadherence and mental health disorders including major depressive disorder, bipolar disorder, schizoaffective disorder, amphetamine use disorder, and alcohol use disorder. His primary symptoms included mood lability, agitation, manic and depressive episodes, suicidal ideation, impulsivity, psychosis, pervasive paranoia, and interpersonal violence. During 2015, the patient seriously assaulted mental health staff. He had a history of multiple MHCB hospitalizations due to suicidal ideation and self-injurious behaviors, as well as a DSH hospitalization from August 27 through October 26, 2015 due to danger to self and others. His history was also remarkable for substance abuse involving heroin, cannabis, alcohol, LSD, and PCP, as well as multiple suicide attempts and lack of insight about his mental illness.

The patient was placed in the CSP/Sac EOP hub on December 4, 2022. During the review period, an initial IDTT meeting occurred on December 14, 2022, and the meeting included the necessary participants, including the patient. The treatment team identified anger as a primary concern, and an IPOC for anger was initiated. The goals were measurable but somewhat generic and not fully individualized. Despite this, no specific clinical interventions were documented. The patient requested placement in the MAT program. The level of care section of the treatment

plan was appropriately completed; however, the functional evaluation was incomplete.  The clinical summary and case formulation were adequate.

The patient was seen by the primary clinician consistently and timely during the review period.  The initial PC assessment occurred on December 8, 2022; this assessment was adequate and documented that the patient had a normal mental status examination.  Subsequent PC contacts revealed various aspects of the patient's functioning.  On December 13, 2022, a confidential scheduled primary clinician individual contact highlighted the patient's poor sleep, perseveration regarding his CDCR history and perceived injustices, and the use of coping mechanisms such as listening to music and reading.  On December 22 and December 29, 2022, nonconfidential cell-front contacts occurred, and these contacts documented the patient's engagement in treatment, his cooperative behavior, and the lack of acute distress.  On January 5 and January 12, 2023, during confidential PC sessions, the primary clinician documented symptoms of rumination, agitation, and anger, and the patient requested medication adjustments.  Subsequent contacts on January 19, January 27, February 3, and February 9, 2023 that occurred both at cell front and in confidential settings noted the patient's stability with appropriate behavior and mood; however, the patient consistently requested medication changes.  He was seen by the PC on February 15 and February 22, 2023, when he presented with stable mental status, but the PC also noted that the patient refused to attend confidential sessions and groups.  The patient reported that, due to medical conditions, it was physically uncomfortable for him to spend time in TTMs between treatment activities, resulting in his treatment nonadherence.  He was seen timely and consistently for high treatment refusal contacts, after it was noted that he attended less than 50 percent of offered treatment, and the PC worked with the patient to adjust his group schedule, resulting in better attendance.

The patient was seen timely for psychiatric contacts during the review period.  At the December 8, 2022 session, the patient presented with normal mental status but was noted with partial medication adherence.  He was prescribed Zyprexa and BuSpar.  On January 9, 2023, he reported increased anxiety and rumination, and the psychiatrist adjusted the BuSpar dosage.  The patient's medication adherence improved since the last psychiatric contact.  On January 25, 2023, however, the patient refused to allow laboratory studies.  At the February 21, 2023 psychiatric contact, the patient reported stability with no significant distress.

The patient was offered 9.9 hours of structured therapeutic activities weekly.  He attended 5.96 hours weekly, resulting in 60 percent attendance; however, he refused 3.94 hours of weekly structured therapeutic activities.

**Findings**

The care and treatment provided to this CSP/Sac EOP hub patient was inadequate.

A positive aspect of this case was the therapeutic rapport that the PC developed with the patient.  He was seen timely for high treatment refusal contacts; however, the documentation of those contacts was sometimes repetitive and inadequate.  The patient reported medical concerns and pain that affected his treatment attendance; while this was partially taken into consideration by treating clinicians, there was no documentation of collaboration between mental health and

medical staff to address these clear impediments to the patient's treatment. Similarly, the patient reported excessive wait times in the TTM between treatment activities, and there was no clear evidence that collaboration occurred with custodial staff to explore potential remedies for this issue of concern.

The patient was offered less treatment than was required. Despite the patient's limited treatment attendance, the PC demonstrated proactive efforts to update the patient's group schedule; however, the treatment team did not place the patient on EOP modified status. This intervention would have mandated more frequent IDTT meetings to address the patient's barriers to treatment. The treatment goals included positive, clinically appropriate aspects, such as addressing the patient's anger; however, the generic interventions provided no reliable means to achieve this goal, and the interventions were inconsistently documented in progress notes.

The psychiatric contacts occurred timely with appropriate medication management. The psychiatrist attempted to see the patient in a confidential setting; however, the patient repeatedly declined. The interventions targeting such refusals were generally lacking. A diagnostic update from bipolar I disorder to schizoaffective disorder was clinically appropriate.

**Patient L**

This 38-year-old patient's healthcare record was reviewed to evaluate the care provided in the CSP/Sac EOP hub. He had served several CDCR prison terms, and his current term began on March 4, 2019; he was serving a sentence of seven years and eight months. The patient had a history of serious RVRs. He received mental health services at the EOP level of care since June 3, 2021; the patient had previously received services at the 3CMS level of care during 2019, 2020, and 2021. He was previously provided diagnoses of major depressive disorder, recurrent, moderate, polysubstance abuse, and antisocial personality disorder; additionally, the documentation described some of his behaviors as histrionic and attention-seeking. He was treated in the MHCB from October 7 to October 8, 2021 due to suicidal ideation and statements.

The patient was placed in the CSP/Sac EOP hub on November 18, 2022. At the time of placement, he was provided diagnoses of antisocial personality disorder and major depressive disorder, recurrent episode, moderate. He was prescribed Cymbalta to address his depressive symptoms.

On November 23, 2022, the initial EOP hub IDTT meeting occurred; the necessary participants were in attendance, as was the patient. A comprehensive treatment plan was established. Specific goals were outlined, including addressing anger, anxiety, and depressed mood. The patient's history of depression and anxiety were noted, as well as his histrionic character traits. The patient met the criterion for consideration of referral to a higher level of care due to treatment nonadherence; however, the treatment team did not make a HLOC referral. One factor contributing to this nonreferral was reportedly the patient's appropriate behavior exhibited in the groups that he attended.

During the February 8, 2023, quarterly EOP hub IDTT meeting, the previous IPOCs were continued. The patient declined to add new treatment goals, and no new symptoms were

reported.  However, concerns persisted about his treatment participation, and the primary clinician was assigned to work with the patient to explore which groups he was interested in, to enroll him in those groups, and to encourage attendance at confidential individual sessions.

The treatment with the primary clinician was impaired by untimely PC contacts, as well as the patient's frequent refusal of confidential treatment.  On November 18, 2022, he was seen at cell front due to his refusal to attend a confidential session in the treatment center.  He denied immediate concerns or signs of distress, but noted that his auditory hallucinations were very intrusive.  His acute suicide risk was assessed as low, and chronic risk was assessed as moderate.  During the review period, the patient was seen for 32 primary clinician contacts.  These contacts varied in location; six occurred in confidential settings in the treatment center, six occurred at cell front due to the patient's refusal, and 20 contacts also occurred at cell front and were identified as high treatment refusal cell-front check-in contacts.  Despite these limitations, it appeared that the primary clinician and patient developed therapeutic rapport.

The psychiatric contacts generally occurred timely, but three of five contacts occurred at cell front rather than in a confidential setting.  On November 18, 2022, the patient was seen at cell front for an initial assessment, when he denied acute symptoms.  This psychiatric assessment was incomplete and inadequate, omitting pertinent information.  On November 28, 2022, a confidential individual psychiatric session occurred in the treatment center.  At that time, the patient requested BuSpar, but the psychiatrist increased the dosage of Cymbalta instead.  Additional contacts occurred on December 29, 2022 and January 26, 2023, and there were varying reports of medication adherence and symptoms.  At a confidential psychiatric contact on February 21, 2023, the patient reported nightmares, and indicated that he wanted to discuss and process his trauma with the primary clinician.  The patient also agreed to improve his medication adherence.

Regarding structured therapeutic activities, the patient was offered 10.88 hours weekly, attended 4.14 hours, and refused 6.74 hours weekly, resulting in a 38 percent attendance rate during the review period.

**Findings**

The care provided to this CSP/Sac EOP hub patient was inadequate.

Positive aspects of treatment included IDTT meetings that were well-organized and collaborative, and clear rapport between the patient and the PC.  The psychiatric contacts generally occurred timely.  The treatment team provided the patient with in-cell therapeutic materials and packets; this was important given his treatment refusal.

Unfortunately, the negative aspects of the care provided were so significant as to render the care inadequate.  The initial psychiatric evaluation omitted essential information and did not allow for a clear clinical conceptualization of the patient.  Some PC contacts occurred untimely.  The high treatment refusal notes consistently included information that was copied unchanged.  While some treatment goals and interventions were suitable for the patient's needs, the treatment team

failed to modify the goals and interventions with the patient's changing clinical presentation, such as worsening auditory hallucinations and reported trauma-related symptomatology.

**Patient M**

This 41-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub. The patient arrived at CDCR in 2012 with an EPRD of 2036. During the review period, he was housed in the CSP/Sac EOP hub from September 24 to October 24, 2022, and from January 10 to March 15, 2023.

The patient was initially placed in the MHSDS in 2014 at the 3CMS level of care. The documentation indicated that the patient had frequent episodes of decompensation requiring crisis services; as a result, his treatment team increased his level of care to EOP on May 10, 2016. He had a history of depressed mood, psychosis, and reportedly a pattern of exaggerating symptoms to influence his level of care or to extend his MHCB stay. Additionally, the patient reported a history of suicide attempts, involving overdose, hanging, and driving off of a cliff. These statements were met with concerns regarding the accuracy of his reports. The last reported suicide attempt occurred by hanging while the patient was housed in a county jail prior to his current CDCR incarceration.

The most recent inpatient hospitalization occurred at the CMF PIP at the intermediate level of care from April 1 through September 22, 2022. During this hospitalization, the treatment team noted that the patient's behavior and clinical presentation suggested a diagnosis of antisocial personality disorder rather than a primary psychotic or mood disorder diagnosis. The patient was also allegedly at risk of exploiting lower functioning patients. Despite the documentation indicating that his symptoms were not clearly consistent with a mood or psychotic disorder, upon arrival at the CSP/Sac EOP hub he was prescribed Zyprexa, an antipsychotic medication, Wellbutrin and Remeron for depression, and Trileptal, a mood stabilizing medication.

The initial IDTT meeting occurred on September 28, 2022; the necessary participants were in attendance, but the patient refused to attend. There were no IPOC goals documented in the treatment plan. The patient expressed interest in using CBT to address negative thoughts and to manage anger. He participated in the MAT program and was prescribed Suboxone. The treatment team noted goals of monitoring the patient's mental status and level of functioning, and seek diagnostic clarity. The discharge criteria were generic, and the patient's involvement in ADLs, yard activities, socialization with peers, and medication adherence were noted. The functional evaluation was appropriately completed.

The patient transferred to the CMF EOP hub from approximately October 23, 2022 to January 10, 2023, when he returned to the CSP/Sac EOP hub as an overflow patient from the CMF EOP hub. An initial IDTT meeting occurred on January 12, 2023; the necessary participants were in attendance, including the patient. He reported drug cravings, auditory hallucinations, and heightened anxiety. The treatment plan contained IPOCs targeting auditory hallucinations, depressed mood, and anxiety. The IPOC targeting hallucinations contained measurable goals but lacked interventions. The remaining IPOCs contained generic but measurable goals but also lacked specific clinical interventions. The level of care justification was appropriate. He was

provided diagnoses of antisocial personality disorder, opioid use disorder, and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Zyprexa and Wellbutrin upon his return to the CSP/Sac EOP hub, and was reportedly medication adherent. The patient also reportedly did not demonstrate significant symptoms or signs of distress since his return.

The patient was seen for three psychiatric contacts during the review period. The initial psychiatric contact occurred on September 27, 2022 at cell front after the patient declined a scheduled individual session in the treatment center. The patient displayed no acute distress and was adherent with prescribed medications. During that visit, he was provided diagnoses of unspecified depressive disorder and opioid use disorder.

Upon the patient's return to the CSP/Sac EOP hub from the CMF EOP hub on January 10, 2023, an initial psychiatric contact occurred when the patient superficially denied all symptoms and displayed a normal mental status. The psychiatrist discontinued the patient's recently added Lamictal, while other medications remained unchanged. He was seen for a routine psychiatric contact on February 3, 2023; this contact also occurred at cell front after the patient declined a confidential contact. He reportedly declined to participate in the cell front interview but did not appear to be in acute distress. His medications were continued as ordered. A routine SRASHE on February 23, 2023, assessed high chronic and low acute suicide risk.

The initial PC contact occurred two weeks after the patient's arrival at the EOP hub on October 7, 2022; the contact occurred at cell front due to staffing shortages and reported time constraints. No significant mental health concerns were reported by the patient during this interaction. Subsequent primary clinician contacts primarily occurred at cell front. The patient was seen for high treatment refusal contacts on October 17, 2022 due to his resistance to attend group and individual sessions in the treatment center; he cited safety concerns and lack of perceived benefit as his reasons for treatment nonadherence. These increased frequency contacts were not continued when the patient returned to the CSP/Sac EOP hub despite his lack of treatment participation. He was seen for six primary clinician contacts between his return to the CSP/Sac EOP hub and the end of the review period. All contacts occurred at cell front except one primary clinician caseload group contact. Progress notes indicated that the patient was stable and did not report any significant difficulties or concerns.

During the review period, the patient attended only ten percent of offered treatment, with significant refusals of structured treatment activities. He was offered 12.45 hours of structured treatment activities weekly but attended only 1.3 hours, while refusing 11.15 hours. Despite his limited participation, he was not identified as a high treatment refuser after returning to CSP/Sac, nor was there documentation regarding consideration of referral to a higher level of care.

**Findings**

The care provided to this patient was inadequate.

The clinical contacts did not occur timely, and the clinical documentation was inadequate. Although the IDTT meetings occurred timely with the necessary participants, the documentation

was inadequate with several sections lacking updates during the review period. The treatment plans included generic goals and lacked specific clinical interventions.

While diagnostic clarification was of the utmost importance and was appropriately recognized as such by the treatment team, no documentation of such clarification was provided. The prescribed psychotropic medications were questionably appropriate for the diagnoses provided.

The primary clinician contacts occurred at cell front and did not always occur timely. The psychiatric contacts did occur timely; they predominantly occurred at cell front and lacked confidentiality. There was no documentation that the treatment team made significant efforts to encourage treatment adherence or to consider increasing his level of care; this despite the patient's treatment refusal that should have resulted in consideration of referral to a higher level of care.

**Patient N**

This 25-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub. He was serving his second CDCR prison term, after paroling during December 2017; he arrived for his current CDCR term on March 17, 2021 and was immediately placed at the 3CMS level of care. His CDCR history was significant for multiple MHCB admissions and one PIP admission. Additionally, he had a long history of suicide attempts dating from age 16 and a history of schizophrenia. The patient's most recent MHCB admission occurred on March 15, 2022 due to danger to self and suicidal ideation; he reported command auditory hallucinations and prepared a sheet to hang himself while endorsing safety concerns. He was discharged from the MHCB to the EOP level of care.

The patient arrived at CSP/Sac on November 4, 2022, and received an RVR after two days, with placement in the EOP hub from November 6, 2022 to April 1, 2023.

The initial IDTT meeting occurred on November 9, 2022; the meeting included the necessary participants except the patient. The treatment team noted that the patient met the criterion for consideration of referral to a higher level of care due to participation in less than 50 percent of offered treatment, and the treatment plan contained IPOCs for impulsive behavior and depressed mood. The patient reportedly told the PC that he intended to program while at the CSP/Sac EOP hub, and that much of his treatment nonadherence was related to paranoia and anxiety related to being in large groups. He was enrolled in six ASU treatment groups and was scheduled for weekly individual PC sessions. The level of care justification was adequate, and the patient previously reported depression and auditory hallucinations.

The next IDTT meeting occurred on January 12, 2023, and the patient again refused to attend. At this IDTT meeting, the treatment team referred the patient to the intermediate level of care due to mental decompensation and worsening of his symptoms contributing to treatment nonadherence. The treatment team noted that the patient did not participate in programming, including refusing confidential sessions and not engaging with the primary clinician during cell-front check-ins. The treatment plan contained IPOCs for treatment nonadherence, impulsive behavior, and depressed mood. The patient reportedly had not engaged in mental health

programming since his arrival at the EOP hub on November 6, 2022. His cell was reportedly dirty, and he reportedly did not shower or go to yard. He demonstrated depressed mood and social withdrawal, and the treatment team opined that he would benefit from highly structured inpatient psychiatric care and a comprehensive treatment program to stabilize his symptoms. He was reportedly medication adherent.

The patient was placed on EOP modified programming while he awaited transfer to the intermediate level of care. On February 23, 2023, a 30-day review EOP modified programming IDTT meeting occurred, and the patient again did not attend. There were no substantive updates or changes noted or included in the treatment plan since the previous IDTT meeting.

The initial psychiatric assessment did not occur timely, as it was completed 16 days after the patient's arrival at the EOP hub. The assessment was conducted at cell front, as the documentation indicated that there were no confidential appointments available that week due to the holiday schedule. He was prescribed Seroquel, Thorazine, and Remeron. He was again seen on December 22, 2022 and January 20, 2023 for routine psychiatric sessions. Both contacts occurred at cell front, and the patient was consistently described as stable with clear mental status. The psychiatric progress notes did not mention the patient's treatment nonadherence and referral to the intermediate level of care; this psychiatric documentation was inadequate and did not align with significant clinical observations and reports elsewhere in the healthcare record.

The PC contacts occurred at cell front, and did not occur timely. The patient was variably responsive to the primary clinician during attempts to engage during cell-front contacts. The primary clinician progress notes included diagnoses of schizophrenia, antisocial personality disorder, borderline personality disorder, and substance use disorder. The patient was generally medication adherent, and the plan was reportedly for the primary clinician to meet with the patient individually twice monthly and for the patient to attend primary clinician caseload groups twice monthly. He repeatedly declined to attend individual confidential primary clinician contacts. The patient's primary symptom was limited to depressed mood until a primary clinician contact on January 11, 2023, when he demonstrated signs of decompensation with hyperactivity at night and an unkempt cell. At the primary clinician contact on January 12, 2023, the patient reported substantial barriers to engaging in programming; he remained in bed most of the day and demonstrated vegetative depressive symptoms, and he agreed with the treatment team's referral to the intermediate level of care. He refused to participate in subsequent cell-front primary clinician contacts.

This patient was offered an average of 10.08 hours of structured therapeutic activities weekly during the review period; he attended an average of 0.08 hours and refused an average of ten hours.

Two SRASHEs were completed during the review period on November 6, 2022 and January 20, 2023; both documented that the patient was assessed with high chronic and low acute suicide risk.

**Findings**

The care provided to this CSP/Sac EOP hub patient was inadequate.

The patient demonstrated consistently depressed mood and decompensation during the review period with appropriate referral to the intermediate level of care. The IDTT meetings included the necessary participants; however, they did not always occur timely. Treatment plans lacked individualized goals and did not provide specific clinical interventions to address treatment refusals and chronically depressed mood. The patient's placement on EOP modified programming was delayed given his treatment nonadherence and symptom-driven resistance to programming. He was identified as a high treatment refuser on November 9, 2022, but was not placed on modified programming timely. The primary clinician demonstrated persistent and appropriate efforts to engage the patient at cell front when he did not show for scheduled individual sessions. However, the psychiatric progress notes were inadequate, as they failed to document the patient's decompensation requiring referral to the intermediate level of care, or even mention that the patient had been referred to a higher level of care.

**Patient O**

This 31-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub. He was serving his first CDCR term with a sentence of 35-years-to-life with the possibility of parole. He entered CDCR on July 25, 2013, and did not receive MHSDS services until his first MHCB admission on January 12, 2021 due to suicidal ideation. He remained in the MHCB until transfer to the CMF PIP for acute care on February 25, 2021. He reportedly stabilized but demonstrated dysthymic mood and endorsed command auditory hallucinations telling him to be aggressive, with intermittent suicidal ideation without a plan. He was discharged to CSP/Sac at the EOP level of care on August 5, 2022. At the time of arrival at CSP/Sac, he was provided diagnoses of major depressive disorder, PTSD, opioid use disorder, amphetamine use disorder, and cognitive impairments. The patient was placed in the CSP/Sac EOP hub from December 20, 2022 to February 9, 2023 pending an available bed in a mainline EOP yard.

Only one IDTT meeting occurred at the CSP/Sac EOP hub during the review period, on December 28, 2022. The meeting occurred timely and included the necessary participants and the patient. He reported mild depression, and the problem list in the treatment plan included diagnoses of persistent depressive disorder, anxiety, and opioid dependence. The treatment plan IPOCs targeted substance abuse and depressed mood. The IPOC for substance abuse included appropriate and individualized goals and interventions. The IPOC for depressed mood contained more generic goals, but also included appropriate interventions. The patient denied new symptoms and was reportedly enthusiastic regarding treatment. Despite recent discharge from the PIP, no higher level of care information was documented in the treatment plan, and the discharge criteria were generic and not individualized. The patient was reportedly medication adherent, attended yard, and attended to his ADLs. The EOP functional evaluation was not completed in the treatment plan. The clinical summary noted that the patient was motivated to manage his depression and anxiety. He denied acute mental health symptoms, and the treatment team noted a documented history of chronic suicidal ideation, command auditory hallucinations, and paranoid ideation.

The patient was seen for timely psychiatric contacts during the review period. The initial psychiatric assessment occurred on December 27, 2022 at cell front, as the patient reportedly refused a confidential session. The patient was reportedly medication adherent and demonstrated clear mental status. He was prescribed Zyprexa, BuSpar, lithium, Benadryl, and Zoloft. The patient was assessed with high chronic and low acute suicide risk. The psychiatrist indicated that the patient would be monitored for manic symptoms and psychosis. At the next psychiatric contact on January 26, 2023, the patient was nonadherent with his Zoloft. His diagnoses at that time were major depressive disorder with psychotic features, opioid use disorder, and amphetamine use disorder, severe. He reportedly denied auditory hallucinations and demonstrated otherwise clear mental status. At the final psychiatric contact during the review period on February 21, 2023, the patient was seen at the treatment center for a confidential session with the psychiatrist. He demonstrated clear mental status, was medication adherent, and was enrolled in the MAT program to address his opiate use disorder.

Primary clinician contacts during the review period generally occurred timely with limited exceptions. Unfortunately, the patient was seen for the initial primary clinician contact at cell front due to modified programming due to inadequate housing unit staffing. The patient was described as stable, and he interacted appropriately with the primary clinician. The initial primary clinician assessment was completed on the following week on December 27, 2022, and was completed appropriately and informed treatment planning. He was provided a diagnosis of persistent depressive disorder at this assessment. The patient was seen for nine clinical PC contacts during the review period; five of them occurred in a confidential setting in the treatment center, and four contacts occurred at cell front, usually due to modified programming. During the first several weeks of the patient's EOP hub stay, he demonstrated anger and difficulty adjusting to the unit. His clinical presentation reportedly improved significantly in January 2023, although he continued to not attend groups in the treatment center. He consistently engaged with the primary clinician during individual contacts, and primary clinician progress notes documented the patient's normal mental status and no significant or acute symptoms during the review period. The patient reported good anger management and the development of appropriate coping skills. He denied new or worsening symptoms. He was seen for high treatment refusal daily clinical cell-front check-ins during January and February 2023; however, those progress notes were repetitive, copied and pasted each day, and provided little to no insight regarding the actual reasons for group attendance refusal. At the conclusion of the review period, the patient's mood was significantly improved, as he was awaiting release from the EOP hub and transfer to the mainline EOP yard at CSP/Sac.

This patient was offered an average of 10.29 hours of structured therapeutic activities weekly during the review period. He attended 2.18 weekly hours and refused 8.11 hours, for a 21 percent overall attendance rate.

**Findings**

The care provided to this CSP/Sac EOP hub patient was inadequate.

The PC and psychiatric contacts generally occurred timely, and progress notes indicated that the patient developed rapport with his clinicians and the treatment team. The IDTT meeting

documentation reflected timely meetings with adequate treatment planning and appropriate goals and interventions.

However, the lack of custodial staff and modified programming had a direct and negative clinical impact and resulted in the completion of multiple sessions at cell front.

Further, the provided diagnoses were inconsistent, and there was no documented plan for clarification.  As an example, the documentation indicated that the patient was provided a diagnosis of major depressive disorder with psychotic features; however, other documentation noted a less severe diagnosis of persistent depressive disorder.  Improvement was also needed regarding the documentation, particularly regarding high treatment refusal notes, as much of this information was repetitive and copied unchanged without determining why the patient refused to attend groups in the treatment center.

**Patient P**

This 50-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub.  The patient was housed at the CSP/Sac EOP hub from December 14, 2022 to February 2, 2023.  He arrived for his current term on March 17, 2022 from the NKSP reception center, and he had several prior CDCR prison terms; his earliest possible release date was March 17, 2023.  The patient was admitted to the MHCB due to danger to self upon his arrival at NKSP, and he reported command auditory hallucinations to kill himself.  He was discharged to the EOP level of care on May 27, 2022, with eventual placement at MCSP on August 25, 2022, where he refused housing, quickly obtained multiple RVRs, and was placed in the MCSP ASU.  The patient had a demonstrated history of aggression during CDCR incarcerations.  He was placed in the CSP/Sac EOP hub on December 14, 2022 due to two RVRs for willingly resisting a peace officer and battery on a prisoner.

The patient had a history of placement at the 3CMS, EOP, MHCB, intermediate, and acute levels of care.  His diagnoses at the time of CSP/Sac EOP hub placement were alcohol use disorder and schizoaffective disorder; his primary symptom was command auditory hallucinations.  He reported the onset of auditory hallucinations and depression approximately at age 30 in 2003.  The patient had been homeless with psychiatric hospitalizations in the community.

On December 21, 2022, the initial EOP hub IDTT meeting occurred, and the meeting included the necessary participants and the patient.  No mental health issues were identified in the problem list of the treatment plan.  Treatment plan IPOCs targeted substance abuse and anger, but the goals provided for each targeted area were inadequate and generalized.  There were no specific clinical interventions provided in the treatment plan.  The treatment plan indicated that the primary clinician would monitor the patient's medication intake and group attendance.  The patient agreed with the primary goals of addressing anger and substance abuse.  Treatment planning was informed primarily by the primary clinician's initial assessment, which was completed based on a healthcare record review, as the patient refused to cooperate with the PC for the initial assessment.  He was described with a lack of insight regarding his mental illness, and he historically denied mental health symptoms.  The higher level of care section of the treatment plan noted that the patient attended less than 50 percent of treatment, that his group

and individual attendance was variable, and that his mental health symptoms had not interfered with his programming. This section noted that the patient lacked interest and motivation to attend groups; however, he attended to his ADLs appropriately and exhibited no overt psychotic symptoms.

The patient was seen for three psychiatric contacts while housed in the EOP hub; the contacts occurred timely, but all occurred at cell front as the patient declined to attend confidential individual sessions in the treatment center. At the initial psychiatric contact on December 19, 2022, the patient agreed to take his medications as prescribed; he was prescribed Zyprexa, BuSpar, and Remeron. The psychiatrist provided diagnoses of alcohol use disorder, severe, in early remission and schizoaffective disorder, bipolar type. The psychiatrist also noted the last SRASHE on November 21, 2022 that assessed low acute and high chronic suicide risk. The next psychiatric appointment on January 18, 2023 also occurred at cell front as the patient again declined to attend a confidential session in the treatment center. He described his mood as good, and his medication adherence had reportedly improved; no medication changes occurred at that meeting. At the final psychiatric contact during the review period on February 13, 2023, the patient was again seen at cell front, and reported that the medications helped to improve his mood. A SRASHE was completed on February 10, 2023, and no change in suicide risk levels was noted.

The PC clinician contacts during the review period generally occurred timely, but all were completed at cell front due to the patient's ongoing refusal to attend a confidential session. His mental status and overall presentation remained consistent and without overtly bizarre and usual behaviors. No custody concerns regarding the patient's behavior were noted during the review period. The initial primary clinician assessment documented the patient's denial of mental health symptoms or the need for treatment or in-cell activities. This assessment documented a recent suicide attempt by laceration without intent to die on August 27, 2022. The next PC contact occurred on December 29, 2022 at cell front due to modified programming and staffing deficiencies. The patient again refused to engage with the primary clinician, and much of the progress note was copied from previous documentation. Weekly PC contacts during November 2022 indicated that the patient only minimally engaged with the primary clinician but remained at his clinical baseline. The primary clinician appeared to make efforts to engage the patient and to encourage interaction, but the patient remained resistant. Near the end of the review period, the patient's mood improved slightly, as he was awaiting release from the ASU. He was seen for daily high treatment refusal contacts, which did not always occur timely but were generally consistent, and the clinical information was updated appropriately regarding the patient's reason for declining to leave his cell to attend treatment and programming.

During the review period, this patient was offered an average of 11.46 hours of structured therapeutic activities weekly, attended a weekly average of 1.98 hours, and refused an average of 9.47 hours. He attended 17 percent of offered treatment during the review period.

**Findings**

The care and treatment provided to this CSP/Sac EOP hub patient was inadequate.

On a positive note, the patient was offered more than ten weekly hours of structured therapeutic activities. The progress notes were updated appropriately and IDTT meetings occurred timely. However, treatment plan goals were generic, and were not individualized for the patient. Even more concerning, the treatment plan did not include interventions for the identified areas of concern and symptoms. The patient was appropriately identified as a high treatment refuser with a lack of interest and motivation to attend any treatment including groups or individual PC appointments.

The psychiatrist provided timely contacts, and the patient reported benefit from prescribed medications. The psychiatrist also consistently encouraged medication adherence. The primary clinician made persistent efforts to engage with the patient, and he was seen timely for PC contacts; however, they all occurred at cell front, and the patient consistently refused to engage with the primary clinician.

Some of the documentation noted that staffing deficiencies and resultant modified programming resulted in nonconfidential cell-front contacts.

**Patient Q**

This 34-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub. The patient was housed in the CSP/Sac EOP hub from December 12, 2022 to February 15, 2023; he transferred to CSP/Sac from KVSP on April 12, 2022. He received treatment at the 3CMS level of care from June 2015 to April 2022, but EOP level of care from November to December 2018. The patient entered CDCR for his current term on May 29, 2015 with an 80-year sentence of life with the possibility of parole. His symptoms included poor coping skills, depressed mood, poor insight, and low frustration tolerance. He denied community mental health treatment or psychiatric hospitalizations. He also had a history of medication nonadherence. Although the patient had no suicidal or self-injurious behavior history while incarcerated, he was admitted to the MHCB due to suicidal ideation. Prior to arrival at CSP/Sac, the patient was housed in the KVSP MHCB from April 2 to April 12, 2022 due to danger to self after he reported suicidal ideation, depression, and anxiety. He was discharged from the MHCB to the EOP level of care.

The patient was placed in the CSP/Sac EOP hub on December 12, 2022. The initial IDTT meeting occurred on December 21, 2022, and this meeting included the necessary participants; however, the patient refused to attend. The treatment plan contained IPOCs targeting depressed mood; however, the treatment plan contained only one generic goal with no clinical interventions that were individualized. Although the higher level of care section indicated that the patient was not in the EOP, this statement was erroneous. Despite the patient not attending his initial IDTT meeting, the discharge planning section of the treatment plan noted that the patient might be ready for discharge to the 3CMS level of care at the next IDTT meeting. The patient was described as calm, stable, and attending to his ADLs. The clinical summary noted that the patient maintained stability. The clinical history section was copied from the previous clinical summary.

The patient was seen for two psychiatric contacts during his EOP hub stay, and both contacts occurred timely. The initial psychiatric assessment occurred on December 19, 2020, seven days after EOP hub placement. This contact occurred at cell front, as the patient declined to attend a confidential session in the treatment center. The psychiatrist indicated that the patient did not demonstrate acute distress or behavior problems and was not prescribed psychotropic medication. He was provided diagnoses of major depressive disorder, recurrent episode, moderate, and antisocial personality disorder. The next psychiatric contact occurred on January 18, 2023; and again, this contact occurred at cell front due to the patient declining to attend a confidential session. The psychiatrist described the patient's cell as clean and noted no issues of concern. Although not prescribed psychotropic medications, the patient remained psychiatrically stable.

All PC contacts occurred at cell front, as the patient repeatedly declined confidential contacts in the treatment center. At the initial primary clinician contact on December 13, 2022, the patient was reportedly stable, calm, cooperative, and in no distress. He was provided a diagnosis of major depressive disorder, recurrent episode, moderate. He repeatedly told the primary clinician that he wanted to isolate, because he was stressed, and that he had no interest in participating in mental health programming or treatment. His mental status was consistently described as clear, and the patient consistently denied acute distress or increase in mental health symptoms. He also declined in-cell activities and reportedly did not provide any specific reason for refusing treatment. The IPOCs were tracked appropriately; and although the patient declined confidential individual appointments, his mental status and clinical presentation remained stable. He was appropriately noted as a high treatment refuser and received daily PC contacts; however, the notes were copied and pasted, generic and not individualized, and did not always occur timely.

**Findings**

The care and treatment provided to this CSP/Sac EOP hub patient was inadequate.

The initial EOP treatment plan only contained one generic goal; no interventions were included. The documentation was erroneous, stating that the patient was not in the EOP. The IDTT meetings, and psychiatry and weekly PC contacts, generally occurred timely. However, the daily high refuser notes were generic, and did not always occur timely. The patient also routinely refused to engage with providers, despite the providers' consistent and persistent efforts to engage the patient in treatment. The patient was offered less than ten hours of structured treatment activities weekly.

**Patient R**

This 30-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub. The patient was housed at the CSP/Sac EOP hub between September 30, 2022 and February 2, 2023. He entered CDCR for his current term in December 2015 with an EPRD in July 2023. The patient was intermittently included in the MHSDS at the 3CMS level, and was admitted to the MHCB in September 2019, and discharged at the EOP level later that month. His primary symptoms included depressed mood and impulsive behaviors. More recently, the patient was admitted to the MHCB on September 17, 2022 due to danger to self,

after he was placed under investigation for an RVR; subsequently, he made a noose with his shirt while in a TTM and attempted to hang himself. His attempt was immediately interrupted by custody staff, and he was admitted to the MHCB due to active suicidal ideation. He also reported grief at that time due to the recent death of his grandmother, and was concerned that the RVR might negatively affect his upcoming release date. He was quickly stabilized and discharged to the EOP level of care on September 26, 2022. At the time of MHCB discharge, he was provided diagnoses of major depressive disorder, single episode, and anxiety disorder, unspecified. He was prescribed Remeron and melatonin.

The initial CSP/Sac EOP hub IDTT meeting occurred on October 5, 2022; however, the patient reportedly refused to attend. No IPOCs were documented in the treatment plan. Other sections of the treatment plan noted anxiety and depression goals that were nonspecific. The patient stated that he wanted to work on preparing for prison release in the next year, and requested job readiness skills, as well as development of better emotional awareness and coping skills. He reportedly attended to his ADLs, went to yard, and socialized with other patients. The EOP functional evaluation was completed appropriately. Overall, the treatment planning documentation was inadequate, as the treatment plan did not contain IPOCs, or specific interventions to target the patient's symptoms or difficulties. The goals provided were overly broad and generalized.

At the next IDTT meeting on December 21, 2022, the patient again refused to attend, and much of the treatment plan was copied unchanged from the initial treatment plan. The treatment plan did include IPOCs for depressed mood and anxiety as target symptoms, but the goals remained generalized and not individualized, and the interventions were inadequate. The symptoms and problems were again copied from the previous treatment plan; however, the patient reported that since his arrival at the CSP/Sac EOP hub, his mood had improved, and he was more engaged in sessions with the primary clinician. The patient met the criterion for consideration of referral to a higher level of care due to treatment nonadherence; he stated that he did not want to attend the groups in the treatment center, but he actively participated in individual PC sessions in the treatment center. The treatment plan indicated that pre-release services would be provided, and the primary clinician would utilize motivational interviewing to encourage treatment participation and to continue to help the patient develop coping strategies. The patient was reportedly medication adherent. The clinical summary in the treatment plan was updated appropriately, and he was provided a diagnosis of unspecified depressive disorder. The goal setting section of the treatment plan was copied from previous treatment plans.

Psychiatric contacts occurred monthly during the review period; however, the contacts did not always occur timely. Additionally, all psychiatric contacts occurred at cell front, as the patient refused to attend confidential psychiatric sessions in the treatment center. He reportedly demonstrated no acute distress, and he was prescribed Vistaril, Remeron, and melatonin to address his depressive and anxiety symptoms. His medication regimen remained unchanged during the review period.

The patient was seen timely for PC contacts during the review period, and he attended most of his primary clinician contacts in a confidential setting in the treatment center. Review of progress notes indicated that the cell-front contacts occurred due to modified custody or mental

health programming due to staffing difficulties.  At the initial PC assessment on September 30, 2022, the patient reportedly participated appropriately in the interview and reported that he wanted to work on depression and anxiety, and was focused on his upcoming parole date.  He continued to focus on parole preparation and pre-release planning, and primary clinician progress notes reflected that the patient was engaged in treatment.  He appeared to manage his depressive and anxiety symptoms well, and the PC provided in-cell activities that were consistently completed.  The primary clinician also provided appropriate support in therapeutic processing with the patient.  Near the end of the review period when the patient was to be released from the EOP hub, his attendance at individual sessions in the treatment center had decreased, and most PC contacts occurred at cell front.  The patient was released from the EOP hub on February 2, 2023.  The documentation indicated that the daily high treatment refusal contacts did not occur timely, and the notes were copied and pasted unchanged by the same clinician without substantive updates.

During the review period, the patient was offered an average of 8.36 hours of structured therapeutic activities weekly, attended an average of 1.1 hours, and refused an average of 7.26 hours.  His overall treatment attendance during the review period was 13 percent.

### Findings

The care and treatment provided to this CSP/Sac EOP hub patient was inadequate.

The IDTT meetings occurred timely with necessary staff in attendance.  While treatment goals were broadly appropriate, they were generalized without specific interventions.  The psychiatric contacts did not always occur timely, and all occurred at cell front and were sometimes delayed by seven to ten days.  The patient was generally medication adherent and appeared to remain psychiatrically stable during the review period.

In most instances, primary clinician contacts generally occurred timely.  Several sessions were conducted at cell front due to the lack of clinical or custodial staff.  The primary clinician appeared to develop good rapport with the patient and provided appropriate support and process-oriented therapy.  The patient developed coping skills, and his insight improved with treatment.  However, the high treatment refusal contact notes were inadequate, as they were unchanged with each contact.  The patient was not offered at least ten hours of structured therapeutic activities as required.

### Patient S

This 39-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub.  The patient was housed in the EOP hub between December 6, 2022, and April 16, 2023.  He was serving a life sentence, and entered the MHSDS at the 3CMS level of care in October 2016, with subsequent placement at the 3CMS, EOP, and MHCB levels of care.  He had a history of impulsivity, depression, and bipolar symptoms, as well as multiple RVRs for assaultive behaviors.  He was provided diagnoses of antisocial personality disorder, mood disorder, bipolar disorder with psychotic features, and polysubstance abuse.  His most recent MHCB hospitalization occurred from November 25 through December 6, 2022 due to self-

injurious behaviors. The documentation indicated that the patient reportedly exaggerated his symptoms to obtain a higher level of care. He was discharged from the MHCB to the CSP/Sac EOP hub on December 6, 2022.

The patient was seen for timely five-day follow-up contacts in the EOP hub after MHCB discharge. The MHCB discharge plan prescribed DBT skills training. He was described as irritable and was unwilling to cooperate with the clinician during the five-day follow-up contacts.

The initial IDTT meeting occurred on December 14, 2022, eight days after the EOP hub placement; the meeting included the necessary participants, but the patient refused to attend. The treatment plan contained an IPOC for anger with measurable goals, but there were no specific clinical interventions provided. The patient denied an increase in symptoms since the EOP hub placement, and there were no concerns noted by custody staff. The patient refused meaningful interactions with his primary clinician, and it was documented that he was focused on transfer to the intermediate level of care by refusing to participate in treatment.

The second IDTT meeting occurred on February 22, 2023; this meeting also included the necessary participants and was timely, but the patient again refused to attend. An IPOC was added for treatment nonadherence which contained appropriate goals, but inadequate interventions. The patient reportedly denied new or worsening symptoms in brief interactions with clinicians, and the treatment plan documented the lack of treatment adherence and the patient's lack of effort to participate. He stated that he preferred instead to listen to music in his cell. The treatment plan contained an appropriate intervention for the primary clinician and psychiatrist to attempt to engage the patient, and to encourage treatment participation. The discharge criteria in the treatment plan were generic and not individualized, and the treatment plan contained limited updates since the previous IDTT meeting.

During the review period, this patient was offered an average of 10.33 hours of structured therapeutic activities weekly; he attended only 0.55 hours, and refused 9.78 hours, resulting in five percent attendance.

The patient was seen timely for psychiatric contacts during the review period. The initial psychiatric assessment occurred on December 12, 2022, when the patient was provided diagnoses of antisocial personality disorder and unspecified bipolar and related disorder. He was prescribed Vistaril PRN, and was reportedly stable. His chronic suicide risk was assessed as moderate, and acute risk was assessed as low. The subsequent psychiatric contact on January 18, 2023 occurred late. The patient requested Wellbutrin; no medication changes occurred at that session. At the final psychiatric contact during the review period on February 13, 2023, the patient demonstrated normal mental status, and the psychiatrist recommended treatment with Remeron, but the patient declined this medication.

The primary clinician contacts occurred timely. The initial primary clinician assessment occurred on December 9, 2022, and the patient was uncooperative with the assessment. As a result, the initial assessment was completed by healthcare record review. Subsequent PC contacts during the review period occurred weekly and were timely, although the patient refused to attend individual confidential contacts. All primary clinician contacts occurred at cell front.

The patient reportedly remained stable, although his mood was consistently described as irritable. Near the end of the review period, the patient was described as minimally cooperative during cell-front contacts and remained irritable and disengaged from treatment. At the final primary clinician contact on February 24, 2023, the patient refused to accept in-cell activities. He was identified as a high treatment refuser due to his treatment nonadherence, and was seen timely for those daily contacts.

**Findings**

The care and treatment provided to this CSP/Sac EOP hub patient was inadequate.

The IDTT meetings occurred timely with necessary staff in attendance, and the treatment plan included an appropriate protocol for clinicians to encourage the patient to engage in treatment. The goals were broadly appropriate based on the patient's clinical presentation; however, the IPOCs were limited and lacked specific interventions to achieve stated goals. One of the three psychiatric contacts occurred later than required. The medication management appeared appropriate.

Almost all primary clinician contacts and high treatment refusal contacts occurred timely; however, they occurred at cell front due to the patient's refusal to attend confidential sessions. The primary clinician made repeated attempts to engage and encourage the patient to participate in treatment. The five-day follow-up contacts after MHCB discharge occurred timely and were appropriately documented.

Despite the MHCB notes reflecting the recommendation for DBT-based treatments, the documentation indicated that this treatment modality was minimally, if at all, implemented.

**Patient T**

This 46-year-old patient's healthcare record was reviewed to evaluate the care provided at the CSP/Sac EOP hub. The patient was housed at the CSP/Sac EOP hub between October 4, 2022 and February 17, 2023. He was serving his first CDCR prison term, and arrived at CDCR in August 2007 to serve a life sentence with the possibility of parole. He was placed at the 3CMS level of care after only four days in CDCR. Since then, he had multiple MHCB admissions and recissions and three PIP hospitalizations. Upon arrival at CSP/Sac on September 29, 2022, the patient immediately reported suicidal ideation while in the R&R. He demanded MHCB placement with threats of self-harm; however, he was ultimately cleared and placed in the EOP hub. The patient had a documented history of utilizing suicidal ideation and threats of self-injurious behavior for secondary gain. He was provided diagnoses of antisocial personality disorder, major depressive disorder, anxiety disorder, and opioid use disorder.

The patient was seen for five-day follow-up contacts upon CSP/Sac EOP hub placement after the MHCB discharge, and the documentation of those contacts was adequate.

The initial IDTT meeting occurred on October 5, 2022; the necessary participants were in attendance, including the patient. The treatment plan included IPOCs targeting depressed mood

and impulsive behaviors; both IPOCs contained adequate and appropriate goals, but the interventions were inadequate and insufficient to address the patient's symptoms and presentation. The rationale for retaining the patient at the EOP level of care was absent, and an EOP functional assessment was not completed, with the rationale provided that the patient was currently placed in ASU. The discharge criteria in the treatment plan were also generic and not individualized. The patient consistently requested a translator for individual sessions and IDTT meetings; however, custody staff reported that they observed the patient conversing with other patients and custody staff efficiently in English. The patient reportedly only requested a translator when interacting with mental health clinicians.

The second IDTT meeting occurred on December 28, 2022; the necessary participants were in attendance, but the patient refused to attend. The IPOCs, including goals and interventions, remained unchanged, as did the discharge criteria. The clinical summary was not updated and was copied from the previous treatment plan. Overall, the treatment plan was not updated appropriately and reflected inadequate documentation, as much of the information was copied from prior documentation.

An initial psychiatric assessment was not completed. The patient refused the assessment, but there was no evidence that the patient's history was reviewed. The psychiatric contacts during the review period were generally adequate, but they did not always occur timely. The patient was prescribed Strattera, BuSpar, Remeron, and Wellbutrin. The psychiatric documentation indicated that the patient remained stable and medication adherent during most of the review period. Of the five psychiatric contacts during the review period, three occurred at cell front, and two occurred in a confidential setting in the treatment center. His chronic suicide risk was assessed as moderate, and his acute risk was assessed as low.

The PC contacts generally occurred timely. At the initial PC assessment on October 4, 2022, the primary clinician noted that the patient was informed of his treatment plan and upcoming IDTT meeting; this assessment was completed appropriately and provided an adequate summary and history, and the assessment informed treatment planning. The patient attended individual sessions with the primary clinician in the treatment center when offered; however, some confidential contacts did not occur due to modified programming. Notably, most PC contacts occurred confidentially in the treatment center and utilized a telephone translation service or a certified translator. The documentation indicated that there were significant and consistent problems with the telephone translator service, and the technology failed prior to the end of many sessions. The individual PC sessions were negatively affected by the frequent equipment problems with the use of translators, as the patient insisted that mental health contacts occur in Spanish. Although the patient was initially placed on the high treatment refusal list, his group attendance improved significantly in November 2022, and high refusal contacts were discontinued.

The patient was offered at least ten hours of structured treatment weekly on average; however, during one week in January 2023, he was offered less than one hour of structured treatment.

**Findings**

The care and treatment provided to this CSP/Sac EOP hub patient was inadequate.

While the IDTT meetings occurred timely with the necessary staff in attendance, the goals were general and not individualized, and the treatment plan lacked specific interventions for this patient's clinical presentation; further, a functional assessment was not completed. Also, at the second IDTT meeting, the patient's progress was not adequately reviewed, and the clinical summary was not updated adequately.

The psychiatric contacts did not consistently occur timely, and no initial psychiatric assessment was completed. While primary clinician contacts generally occurred timely, the individual PC contacts were negatively impacted by language issues and repeated problems with the translation services, in addition to nonconfidential contacts that occurred due to modified programming.

**Patient U**

This 42-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CSP/Sac.

On September 2, 2022, the patient reported suicidal thoughts with a plan of hanging or cutting himself. He also reported that he wanted to harm others. The patient exhibited marked lability with significant agitation, and there was concern that he was possibly manic. The SRASHE assessed moderate chronic and acute suicide risk. The patient had a history of self-injury but had no documented history of suicide attempts.

Upon admission to the MHCB, the initial primary clinician evaluation was limited, as the patient reportedly refused to participate. The patient's diagnosis was difficult to discern from the initial psychiatric evaluation but included anxiety, mood disorder, PTSD, and opioid use disorder. He was prescribed aripiprazole for psychosis and mood stabilization, oxcarbazepine for mood stabilization, venlafaxine for depression, melatonin for insomnia, and hydroxyzine PRN for anxiety.

The initial IDTT meeting occurred more than 72 hours after the MHCB admission; this delay probably occurred due to the Labor Day holiday. The patient was not present for the IDTT meeting. Due to the patient's agitated state, the clinician met with him before and after the IDTT meeting, and this appeared to be clinically appropriate. The treatment goals included reducing depression and building a therapeutic alliance. The goals did not directly address the suicidal and homicidal ideation that precipitated the MHCB admission. While the patient intermittently declined medications and some confidential contacts, the treatment plan did not address those treatment barriers.

Progress notes indicated that inconsistent progress toward treatment goals occurred, and the documentation did not routinely reflect interventions used and the patient's response to those interventions. While the patient had intermittent medication adherence, other than the

psychiatrist documenting encouragement for adherence, there were no clear interventions to address this concern.

The September 12, 2022, progress note on the day of the MHCB discharge noted that the patient stated, "I don't feel safe, I'd start acting out" which reportedly meant cutting or IEX but not suicide. The psychiatric discharge summary on September 12, 2022, noted that the patient remained depressed with stated suicidal ideation; however, the treatment plan of the same date noted that the patient did not have suicidal ideation. The patient was discharged to the ASU EOP hub on September 12, 2022.

A psychiatric technician performed the five-day follow-up contacts on September 17, 2022, and September 18, 2022.  There was no documentation that the patient was seen by a clinician on September 19, 2022, which was required, as psychiatric technicians were not allowed to discontinue five-day follow-up contacts.  The follow-up contacts were continued until September 26, 2022.

**Findings**

The care provided to this CSP/Sac MHCB patient was inadequate.

The initial IDTT meeting occurred after 72 hours of the MHCB placement, which was delayed. The treatment plan did not contain goals regarding suicidality and the reason for the MHCB admission. While there were patient-level outcomes for danger-to-self protocols in place, there were no treatment interventions documented.  There was also limited documentation of the use of specific interventions in individual sessions and the patient's response to those interventions. The documentation noted that the patient continued to report suicidal ideation, yet he was discharged from the MHCB level of care. A five-day follow-up contact on September 19, 2022, was not documented.

**Patient V**

This 66-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CSP/Sac.

On December 14, 2022, the patient reported suicidal ideation with a plan to hang himself.  The patient reported that one trigger was learning that he might have a serious medical illness.  A SRASHE assessed high chronic and acute suicide risk.  Since age 14, the patient had at least four suicide attempts by cutting, hanging, and overdosing.

The patient was provided diagnoses of major depressive disorder; unspecified psychotic disorder; antisocial personality disorder; and substance abuse.  He was prescribed mirtazapine for depression; aripiprazole for psychosis; and diphenhydramine for anxiety.  The patient was also prescribed buprenorphine-naloxone as MAT for opioid use disorder.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting.  The initial psychiatric evaluation was comprehensive and provided a clear clinical conceptualization

of the patient.  The initial IDTT meeting occurred timely and included all required staff members, but the patient refused to attend.  The treatment goals appeared appropriate and included a reduction of suicidal ideation.  The treatment interventions were insufficient, stating that the IDTT would foster a therapeutic alliance.

At the subsequent IDTT meeting on December 19, 2022, the patient reportedly had made no progress in treatment despite medication adherence and supportive interventions.  As such, the patient was referred to the acute level of care.  Of note, the treatment team rescheduled the IDTT meeting to accommodate an important medical appointment.

The patient was transferred to the CHCF acute care unit on December 22, 2022.

**Findings**

The care provided to this MHCB patient was adequate.

The psychiatric evaluation was comprehensive and allowed for adequate conceptualization of the patient.  The treatment goals appeared appropriate for the patient's clinical presentation.  Medication management was appropriate.  The treatment team referred the patient promptly to a higher level of care as was clinically indicated.  The limitations in the patient's care included the lack of documentation of clear interventions in the treatment plan and in progress notes.

**Patient W**

This 31-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CSP/Sac.

On October 5, 2022, while in the MCSP ASU EOP hub, the patient reported suicidal ideation and tied a sheet around his neck; he had also bitten himself the day before.  The assessing clinician noted that the patient had an extensive history of self-injurious behavior and suicide attempts, and he had a suicide attempt in July 2022 that was so severe that he required intubation.  The SRASHE assessed high chronic and acute suicide risk.

The patient was provided diagnoses of unspecified mood disorder; unspecified psychotic disorder; bipolar disorder, type II; borderline personality disorder; and antisocial personality disorder.  He was prescribed valproic acid for mood stabilization, olanzapine for mood stabilization and psychosis, diphenhydramine PRN for anxiety, and melatonin PRN for insomnia.  The patient received his psychotropic medications by a PC 2602 involuntary medication order due to danger to self.

The initial psychiatric evaluation occurred timely prior to the initial IDTT meeting.  An initial PC evaluation was not located in the healthcare record.  The treatment goals included the reduction of suicidal ideation and the elimination of self-harm behaviors.  The treatment interventions included in the treatment plan centered on fostering a therapeutic alliance.  The PC progress notes contained limited information regarding the utilization of the interventions specified in the

treatment plan. The patient requested a referral to the intermediate level of care; however, the treatment team opined that such a referral was not clinically indicated.

The patient reportedly denied suicidal ideation prior to the MHCB discharge. The patient reportedly was pleased about transfer to the CSP/Sac PSU, rather than return to MCSP.

On October 17, 2022, the patient attempted suicide by hanging. Upon assessment by the mental health staff, he reported that this incident occurred due to receiving bad news, but he denied suicidal thoughts at that time. He was continued at the EOP level of care in the PSU. The five-day follow-up contacts after the MHCB stay ended on October 18, 2022.

**Findings**

The care provided to this CSP/Sac MHCB patient was inadequate.

No initial PC evaluation was documented in the healthcare record. The treatment goals appeared appropriate. While the treatment plan intervention of fostering a therapeutic alliance was necessary, this intervention alone was insufficient to address the patient's clinical presentation. The progress notes contained scant information regarding the types of interventions used. While the treatment plan noted that the patient met several higher level of care referral criteria, the rationale provided for nonreferral was insufficient.

Although not directly related to the patient's MHCB care, the expert was alarmed that the patient attempted hanging during the five-day follow-up contacts but was not admitted to the MHCB, nor were the daily contacts extended.

**Patient X**

This patient's healthcare record was reviewed to assess the care and treatment provided in the CSP/Sac PSU. He was placed in restricted housing due to battery on an incarcerated peer with serious bodily injury prior to transfer to the CSP/Sac PSU, and he transferred from the MCSP ASU. He was provided diagnoses of major depressive disorder, recurrent unspecified; borderline personality disorder; and sedative, hypnotic, or anxiolytic use disorder. The patient was prescribed Depakote and Effexor.

The patient was seen timely on November 2, 2022 by the primary clinician and assigned psychiatrist, and the contacts occurred at the cell front as the patient refused to attend confidential appointments. The patient reported to the primary clinician that he was scheduled to attend yard which he preferred rather than the provider appointments. These initial contacts were clearly limited by their nonconfidential nature. Due to the patient's elevation of liver enzymes, the psychiatrist discontinued Depakote and reduced the Effexor dosage; additionally, Abilify was added.

The patient was also seen timely by the IDTT on November 3, 2022, and his treatment team included all required participants; however, the patient refused to attend. The patient met two HLOC objective criteria of participation in less than 50 percent of treatment and multiple MHCB

referrals. The PSU IDTT noted that only two referrals to MHCB treatment were in the healthcare record despite the on-demand report that noted that the patient met the criteria of multiple MHCB referrals. The treatment team provided appropriate clinical rationale for nonreferral for both HLOC indicators and included adequate targeted treatment modifications. No treatment targets were identified beyond those listed in the HLOC form treatment modification section of the treatment plan, and no IPOCs were initiated at that time.

The patient was seen weekly for primary clinician individual contacts, though the contacts did not always occur every seven days. The patient was also assigned to a clinician caseload group. Although the patient was seen by one consistent primary clinician initially, starting in January 2023 he was seen by different primary clinicians, and some indicated that they were covering for the assigned primary clinician. These PC contacts occurred primarily at the cell front due to patient refusal, modified program, quarantine, or for no documented reasons. As a result, the primary clinician contacts were primarily brief check-ins or wellness contacts, even when they did occur in confidential space in the treatment center.

The psychiatric contacts also occurred at the cell front though, on one occasion, the psychiatrist noted that the contact occurred in a "group setting" because the patient refused an individual confidential appointment. There was no further clarification regarding whether the patient was asked questions in that group setting or was taken from the group setting to another space. The patient was maintained on the same psychotropic medications as were prescribed during the initial psychiatric assessment, and was generally seen by the same psychiatrist monthly, although not always within 30 days.

The IDTT meetings occurred timely on December 22, 2022 and February 16, 2023. Depressed mood was the treatment target for both routine IDTT meetings. While some treatment goals were minimally measurable, there was no information regarding the baseline for targeted behaviors to assess whether the treatment goals were adequate. The treatment interventions were inadequate due in large part to the patient's continued refusal of confidential contacts. When the patient was seen in a confidential setting, the progress notes did not document implementation of any of the identified clinical interventions. No realistic clinical interventions were focused on the patient's lack of treatment participation. Despite the limitations of the treatment plan, the treatment team repeatedly noted that the patient was functionally stable; he had not required MHCB placement, was able to advocate for himself, and did not report any distress or decompensation. The treatment modifications were not updated on the HLOC form despite the lack of effectiveness.

At least two referrals from the psychiatric technician were made to the primary clinician due to the poor condition of the patient's cell. Despite those referrals, the PC documentation in response to those referrals never referenced the referrals or the patient's cell condition, and it was questionable whether the primary clinician adequately reviewed the referral documentation.

During January 2023, the documentation indicated that only two to four hours of group treatment were offered to the patient. There was also documentation that indicated that several two-hour groups overlapped in time; for example, on February 1, 2023, a progress note indicated that the patient had full session attendance in a recreational therapist group from 0815 to 1015 hours, and

a second note on the same date by a different recreational therapist documented full session attendance in another group at 0815 to 1015 hours. It appeared that the groups may have been combined, resulting in the erroneous documentation. That apparently incorrect information strongly suggested that notes by that provider were preprinted. The erroneous note indicating attendance should not have noted full attendance, as it made it appear that the patient was in two groups at the same time when only one two-hour group occurred.

**Findings**

The care and treatment provided to this EOP PSU patient was inadequate.

The psychiatric and PC contacts predominately occurred at the cell front and were essentially brief wellness checks. Even when seen confidentially, there was no documentation of the provision of clinical interventions. The treatment team did not update the treatment plan despite continued lack of progress or focus on the patient's poor treatment participation as was clinically indicated. While the treatment team appeared to determine that the patient was stable, they did not include treatment targets to facilitate transfer to a lower level of care, and did not address transition to a lower level of care despite brief mention in the progress notes.

**Patient Y**

This patient's healthcare record was reviewed to assess the care and treatment provided in the CSP/Sac PSU. The patient transferred to the CSP/Sac PSU on December 20, 2022 from the CSP/Corcoran STRH. The patient had received mental health services at the EOP level of care at CSP/LAC; however, his level of care was changed to 3CMS there, and he was transferred to the CSP/Corcoran STRH. The patient had difficulty with this decrease in his level of care, resulting in an 18-day admission to the CSP/Corcoran MHCB due to danger to self. The documentation noted that he had refused to return to the STRH setting from the MHCB resulting in the extended MHCB stay. He was eventually discharged to the ASU EOP hub and then transferred to the CSP/Sac PSU approximately five weeks later.

The patient arrived at CSP/Sac on December 20, 2022, and was seen timely by the primary clinician on December 21, 2022 and by the psychiatrist on December 22, 2022. He was provided diagnoses of bipolar disorder, impulse control disorder, and PTSD. After observing the patient prior to the initial assessment, the psychiatrist noted behavior that the psychiatrist concluded was due to impression management and attempting to appear more acutely ill. This involved the patient initially appearing calm and quiet with no unusual behaviors when he thought that he was unobserved; however, when the patient saw the psychiatrist, he began talking to unseen people. Despite this, the psychiatrist continued treatment with Zyprexa. The patient was seen one week later on December 29, 2022 by a different psychiatrist who attended the initial IDTT meeting, at which time he reported that the voices had not decreased, and the Zyprexa dosage was increased.

The initial IDTT meeting occurred timely on December 29, 2022, with all required disciplines present; the psychiatrist who completed the initial assessment was not present. The HLOC form noted that the patient had four MHCB admissions within the previous six months; however, the treatment team attributed the prior MHCB stays to the patient's response to institutional distress

and an attempt to receive inpatient treatment. The clinical rationale provided for nonreferral to a HLOC was incomplete and only minimally addressed the positive criterion, only stating that the patient denied suicidal and homicidal ideation. The treatment modifications were completely inadequate and did not address the treatment team's concerns regarding the validity of the patient's self-report and the impact on treatment or address the primary symptoms and behavioral impairments that were most relevant to the patient's increase in level of care to EOP and prior MHCB admissions.

The patient's diagnoses were changed to antisocial personality disorder, major depressive disorder, recurrent, unspecified, and substance use disorder; no documentation was provided regarding the rationale for the diagnostic changes, nor was a diagnostic clarification evaluation completed. The patient repeatedly requested transfer to the inpatient state hospital during his interactions with the PSU mental health staff.

On January 20, 2023, the psychiatrist further increased the Zyprexa dosage; this was the third psychiatrist seeing the patient in four weeks. The documentation indicated that the patient had not reported improvement in symptoms that included continued auditory hallucinations, additional visual hallucinations, continued feelings of depression, and anxiety. While the patient was generally seen weekly, though not every seven days, by a primary clinician, he was not typically seen by the assigned primary clinician and was often seen at the cell front either due to no documented reason, poor staffing, or patient refusal. Many of the cell-front contacts appeared to have occurred as those clinicians were covering for the primary clinician.

The patient was screened for an exhibitionism diagnosis on January 17, 2023 by the clinician who appeared to be his assigned primary clinician. The screening noted that the patient denied that the incident occurred and did not participate in treatment, and the behavior was determined to be the result of his personality disorder and not a paraphilia. A mental health disciplinary evaluation occurred on February 16, 2023 and was completed by a non-treating clinician. That assessment included conflicting information, as it noted that the patient's mental disorder appeared to contribute to the behavior; however, the narrative indicated that there was no objective evidence that the patient's mental status contributed to the behavior in question. According to the evaluator, there were also no mental health factors that should have been considered by the ICC.

On the rare occasions when primary clinician contacts occurred confidentially, no clinical interventions were documented and the individual sessions appeared to primarily be brief wellness check-ins during which the patient reiterated his desire for intermediate inpatient treatment. The clinician responded to those requests and attempted to explain the process and reasons that the patient was not referred. The clinician continued to document that the patient did not meet the criteria for inpatient treatment, was high functioning, and did not demonstrate objective evidence of impaired thinking or hallucinations.

**Findings**

The care provided to the PSU patient was inadequate.

There was poor continuity of care, as the patient was seen by multiple mental health providers. While the intake primary clinician and psychiatrist documented their concern regarding the validity of the patient's self-report of symptoms; no efforts were made to objectively evaluate this concern or to revise treatment planning accordingly. The patient's questionable credibility in symptom reporting was repeatedly documented by the assigned primary clinician. The patient was not referred to a HLOC despite his repeated insistence because the treatment team did not believe his self-report and noted that he was high functioning. Despite this, the PSU mental health staff did not document additional observations that supported their determination and did not provide sufficient specific detail regarding evidence that he was stable. No psychological assessment tools were completed to determine the credibility of the patient's self-report. Further, the patient did not receive a comprehensive diagnostic clarification evaluation; in fact, the antipsychotic medication was increased on two separate occasions while at CSP/Sac PSU, suggesting that there were conflicting opinions within the treatment team regarding the patient's credibility.

The initial treatment plan was poorly completed and inadequate for the patient's most acute symptoms and behavioral dysfunction; further, the treatment team was unable to implement the plan due to the treatment discontinuity and the frequency of brief cell-front check-ins rather than adequate assessment in a confidential setting. This patient required a comprehensive diagnostic evaluation with an updated treatment plan that included consideration of HLOC referral.

## Patient Z

This 34-year-old patient was randomly selected for healthcare record review to assess the quality of PSU care provided at CSP/Sac.

The patient was housed at the SVSP STRH when he required MHCB placement on November 29, 2022, due to suicidal ideation. He had a reported history of RVRs including battery causing severe bodily injury and assault on a peace officer.

A SRASHE completed on November 29, 2022 assessed high chronic and acute suicide risk; the suicide risk decreased at the time of the MHCB discharge. The patient had a history of multiple prior suicide attempts, including by hanging, overdose, and the use of a gun. He was discharged to the EOP level of care.

The patient arrived at the CSP/Sac PSU on December 15, 2022. The initial PC contact on December 16, 2022, occurred at cell front, but the documentation did not indicate why this contact had not occurred in a confidential setting. The five-day follow-up contacts were completed as required. The initial psychiatric evaluation on December 21, 2022 also occurred at cell front and did not contain sufficient information to provide a clear clinical conceptualization of the patient.

The patient was provided diagnoses of unspecified depressive disorder and antisocial personality disorder. He was prescribed venlafaxine for depression and mirtazapine for depression and insomnia. Due to poor medication adherence with regularly scheduled mirtazapine, the

psychiatrist changed the prescription to PRN for insomnia. The treatment plan addressed the patient's treatment nonadherence.

The PC and the psychiatrist met with the patient for initial assessments prior to the initial IDTT meeting. The IDTT meeting occurred timely and included all required members including the patient. The treatment goals included reducing depression, learning coping skills, and having remission of depression for three months. The interventions included fostering a therapeutic alliance and the use of goal setting; however, no clear interventions were provided to address the patient's depression. The IDTT meetings occurred timely; however, documentation indicated that the psychiatric contacts did not occur timely.

The patient was released from the CSP/Sac PSU to the KVSP EOP.

**Findings**

The care provided to this CSP/Sac PSU patient was inadequate.

The initial psychiatric evaluation contained insufficient information and did not allow for a clear clinical conceptualization of the patient. Due to the patient's poor adherence with the antidepressant medication mirtazapine, the psychiatrist prescribed this medication PRN for insomnia. The use of this medication on a PRN basis deviated from standard clinical practice. All psychiatric follow-up contacts occurred in a nonconfidential setting at cell front, despite the patient frequently leaving his cell for confidential PC sessions. He was not seen timely for psychiatric contacts as required, and the treatment plan failed to include interventions likely to address the patient's symptoms.

**Patient AA**

This 31-year-old patient's healthcare record was reviewed to assess the care provided in the STRH at CSP/Sac. The patient was serving his fourth CDCR prison term of 14 years for robbery and assault with a deadly weapon. While in the CDCR, the patient had one MHCB admission due to danger to self in August 2018 after a reported suicide attempt by hanging.

The patient initially arrived at CSP/Sac on February 20, 2020, and was housed in the STRH from October 29, 2022 to December 7, 2022. He was placed in the STRH in October 2022 pending an investigation into distribution of controlled substances. The patient also had a pending RVR for possession of a cell phone on October 18, 2022, and received another RVR for refusing a cellmate while housed in the STRH in November 2022.

The patient's diagnoses included unspecified anxiety disorder and major depressive disorder, recurrent, mild. He was not prescribed psychotropic medications while housed in the STRH. The most recent SRASHE assessed his chronic suicide risk as moderate, and his acute risk as low.

The initial IDTT meeting in the STRH did not occur timely, and it did not occur until November 15, 2022, after the patient had an angry outburst and self-injury in the STRH. The treatment

plan, however, did not address anger or other concerning behaviors that contributed to the patient's STRH placement. Instead, the treatment plan was limited to a generic goal and vague intervention for anxiety. Specifically, the plan indicated that the patient's anxiety would be reduced to a four or below on a ten-point scale by the next IDTT meeting to be achieved by encouraging the patient to work on improved functioning through goal setting. Of note, none of the primary clinician progress notes during STRH confinement referenced meaningful interventions for anxiety, anger, or behavioral concerns.

No psychiatric contacts occurred while the patient was housed in the STRH. The most recent psychiatric contact occurred during June 2022, when the patient reported that he did not want medication to manage his symptoms. The assigned STRH primary clinician did not complete an initial primary clinician assessment. The most recent primary clinician assessment occurred in March 2020.

The assigned STRH primary clinician's first progress note, dated November 1, 2022, indicated that the introductory contact was completed at cell front, and that the note was brief due to an institution-wide staffing crisis and competing responsibilities. The routine primary clinician contacts on November 10 and November 23, 2022, occurred at cell front by a covering provider. Fortunately, the covering provider ultimately granted the patient's request for a confidential contact on November 10, 2022, as the patient wanted to discuss his recent angry outburst that resulted in hitting a wall, with a resulting fracture of his arm and placement in a cast. Unfortunately, there were no therapeutic interventions documented for this encounter.

The patient's second contact with his assigned primary clinician occurred in a confidential setting on November 15, 2022. The primary clinician again documented that the note was brief due to staffing shortages and competing responsibilities. The assigned primary clinician's progress note on that date did not reference the patient's anger, recent injury, or necessary therapeutic interventions. During the week of November 23, 2022, a covering primary clinician noted that confidential contacts were not provided in the STRH due to the shortened work week. This cell-front contact was limited to a brief check-in without therapeutic interventions provided.

The patient's third and final contact with his assigned primary clinician in the STRH on December 1, 2022, again occurred at cell front. The provider informed the patient on that date that clinicians would not be available through the end of the year due to required trainings and a "mandatory program redirection." The primary clinician further explained that the patient would be seen by a different clinician going forward, and that required weekly contacts in the STRH would be reduced to every other week due to staffing shortages.

The healthcare record suggested that recreation therapy groups were generally offered two to three times monthly, and that the patient participated in groups when offered.

This patient was transferred to HDSP in February 2023.

**Findings**

The care provided to this patient in the STRH at CSP/Sac was inadequate.

The psychiatrist did not meet with the patient after the STRH placement, and the primary clinician did not complete an initial assessment. The treatment plans failed to address the patient's behaviors resulting in the STRH placement or reported anger that resulted in self-injury a few days prior to the initial IDTT meeting. The progress notes suggested that the patient wanted to be seen for confidential contacts; however, primary clinicians generally completed routine contacts at cell front due to staffing shortages.

Problems with continuity of care among primary clinicians were identified, and neither the covering nor assigned provider addressed the patient's recent angry outburst that resulted in a fractured arm. It was also unclear whether the assigned primary clinician was aware that the incident occurred, as it was not referenced in the progress notes. While the primary clinician appropriately informed the patient that they would no longer be available through the end of the year, this termination session inappropriately occurred at cell front.

The staffing shortages severely impacted the provision of mental health care in the STRH, including poor continuity of care and insufficient nonconfidential check-ins that occurred at cell front. As a result, beginning in December 2022, the CSP/Sac STRH patients were no longer seen for weekly contacts, including at cell front, due to the critical staffing shortages.

**Patient BB**

This 44-year-old transgender patient's healthcare record was reviewed to assess the quality of care provided in the STRH at CSP/Sac. The patient was serving a prison term for kidnapping and first and second-degree robbery. The healthcare record referenced a history of several suicide attempts, multiple WIC 5150 hospital admissions in the community, and self-harm incidents. The patient attempted suicide by overdose at age 19 and most recently engaged in self-harm in 2000.

During her CDCR incarceration, the patient was primarily treated at the 3CMS level of care. She had only one MHCB referral in 2002 that was ultimately rescinded. The patient transferred from the CMF ASU to the CSP/Sac STRH on or around January 5, 2023. She remained in the STRH at CSP/Sac for safety concerns until her transfer to SQ on or around March 22, 2023. The patient also received an RVR on or around December 26, 2022 for possession of tattoo paraphernalia.

The patient was provided diagnoses of bipolar II disorder, gender dysphoria, and histrionic personality disorder. Her primary symptoms included depressed mood, impulsivity, and anxiety. The only psychotropic medication prescribed was melatonin for sleep.

The initial primary clinician assessment occurred on January 20, 2023. Despite the patient's history of suicide attempts, self-harm, complex diagnostic picture, and placement in a high-risk setting, the psychiatrist never met with the patient, and a SRASHE was not updated or reviewed during her time at CSP/Sac.

The STRH IDTT convened once on January 24, 2023, with all required members present at the meeting. The IDTT treatment plan targeted the patient's impulsive behavior and distress tolerance with cognitive therapy to reduce "overwhelming feelings of impatience." The plan also indicated that the patient would be encouraged to leave her cell for confidential sessions. While the patient expressed a desire to participate in individual and group treatment, only two groups were offered during her time in the STRH, and all but one of the sporadically offered primary clinician contacts occurred at cell front. Further, no therapeutic interventions were implemented during the primary clinician contacts to address impulsivity or distress tolerance.

Routine primary clinician contacts were not completed weekly as required in the STRH. All but one routine primary clinician contact occurred at cell front, and notably, only one primary clinician progress note attributed the cell-front contact to a patient refusal. During the one confidential routine primary clinician contact on February 1, 2023, the patient reported that she was no longer able to communicate as frequently with her family due to recent modifications to the tablets in restricted housing. Prior records indicated that the patient communicated with her family almost daily, and their ongoing support served as a protective factor.

On March 3, 2023, the primary clinician met with the patient at cell front and noted that she had expressed impatience and increased frustration while awaiting transfer.

A primary clinician progress note on March 8, 2023 indicated that the patient stopped the primary clinician on the tier to inquire about the committee's determination regarding her gender affirming surgery. The primary clinician responded that they would follow-up with the patient at a later date to discuss the outcome in a confidential setting; however, the patient emphasized that she did not want to wait and was willing to receive the information at cell front. Instead of offering the patient a confidential session to process the outcome on that date, the primary clinician informed the patient at cell front that the committee denied her request and provided the patient with a memorandum explaining their rationale. Surprisingly, the primary clinician never saw the patient for follow-up and processing of the unwelcomed outcome after that contact, and the patient ultimately transferred to SQ on or around March 22, 2023.

**Findings**

The care provided to this patient in the STRH at CSP/Sac was inadequate.

The required STRH contacts did not occur timely or in confidential settings. The mental health services were generally limited to sporadic cell-front primary clinician contacts with only two recreation therapy groups offered while in restricted housing only for safety concerns. The psychiatrist never met with the patient, and a SRASHE was not updated or reviewed with the patient despite her suicide/self-harm history, ongoing stressors, problems with impulsivity, and current housing in a high-risk setting.

Additionally, the patient should have been seen in a confidential setting to discuss the committee's denial of her gender affirming surgery on March 8, 2023. It was especially concerning that the primary clinician did not provide clinically indicated follow-up at all after informing the patient that the committee had denied her surgery.

The staffing shortages severely impacted the provision of mental health care in the STRH, including poor continuity of care and insufficient nonconfidential check-ins that occurred at cell front.  As a result, beginning in December 2022, the CSP/Sac STRH patients were no longer seen for weekly contacts, including at cell front, due to the critical staffing shortages.

**Patient CC**

This 34-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the STRH at CSP/Sac.  The patient was serving a life sentence with a minimum of 240 years for carjacking and controlled substance possession.  He also received nine RVRs between 2019 and 2022.  The patient transferred to CSP/Sac on October 10, 2019, and remained there until March 7, 2023.  While records indicated that he was initially placed in the STRH due to safety and enemy concerns around August 2022, he subsequently received his most recent RVR for battery on an incarcerated person in October 2022.

The patient was provided diagnoses of persistent depressive disorder and alcohol use disorder.  He had no history of suicidal attempts, self-harm, or referrals to a higher level of care.  During the preceding 12-month period, he had not endorsed psychiatric symptoms or been prescribed psychotropic medication.  The progress notes and IDTT documentation between August 2022 and March 2023 consistently described the patient as stable and without psychiatric symptoms.

Prior to May 2022, the patient reported symptoms of grief due to the loss of multiple family members; however, he informed a provider during that time that he had worked through those feelings.  Since at least August 2022, the patient requested removal from the MHSDS, and he had not engaged with mental health services since that time.

In October 2022, the RVR mental health assessment for battery on an incarcerated person indicated that mental health factors had not contributed to the alleged behavior, and the clinician did not offer recommendations for the hearing officer to consider when determining penalties.

The STRH IDTT convened on three occasions between August 2022 and March 2023.  The August and November 2022 treatment plans included one generic goal and intervention for depressed mood that was copied unchanged from an outdated April 2020 treatment plan.  The only intervention from April 2020 indicated that depression would be addressed through fostering a therapeutic alliance by empathizing with the patient's feelings of distress, which was a generic intervention that was not individualized.  The IDTT did not document a justification for retaining the patient in the MHSDS or modify the treatment plans to address his treatment nonadherence.

Although the patient remained at CSP/Sac since October 2019, there were no psychiatric assessments located in the healthcare record.  The most recent primary clinician assessment was completed on April 18, 2020.  Since August 2022, all primary clinician contacts in the STRH were completed at cell front.  Beginning in early December 2022, primary clinician contacts in the STRH were reduced to every two to three weeks due to a severe staffing shortage; however,

this patient was offered only one primary clinician contact in February 2023. The most recent primary clinician contact occurred at cell front due to refusal on March 1, 2023.

STRH treatment groups were not offered to this patient during the review period.

In February 2023, the IDTT documented that the patient's treatment nonadherence was volitional. The IDTT noted a goal of discharging the patient from the MHSDS; however, they did not include interventions or discharge objectives. Further, the IDTT once again failed to justify retaining the patient in the MHSDS, despite his repeated requests for removal since August 2022, and the clinical documentation consistently describing him as stable and without psychiatric symptoms since May 2022.

**Findings**

The care provided to this patient in the STRH at CSP/Sac was inadequate.

The STRH mental health services were not provided as required. The primary clinician contacts did not occur weekly, and STRH treatment groups were not offered at all to this patient between September 2022 and March 2023. While all primary clinician contacts occurred at cell front, some primary clinician progress notes indicated that they occurred in a nonconfidential setting due to patient refusal, and others indicated that they were offered at cell front due to a "large number of scheduled appointments." The treatment plans remained inadequate from August 2022 to March 2023, as they were generic, outdated (from April 2020), did not target patient specific goals, and did not justify the level of care. The progress notes and IDTT documentation suggested that the patient's repeated requests for removal from the MHSDS since August 2022 should have been granted, or that providers should have clearly communicated objectives for achieving his desired outcome of removal from the program.

The staffing shortages severely impacted the provision of mental health care in the STRH, including poor continuity of care and insufficient nonconfidential check-ins that occurred at cell front. As a result, beginning in December 2022, the CSP/Sac STRH patients were no longer seen for weekly contacts, including at cell front, due to the critical staffing shortages.

**APPENDIX C-8**
**California Health Care Facility (CHCF)**
**June 5, 2023 – June 9, 2023**

**Patient A**

This 41-year-old male patient was provided a diagnosis of depressive disorder due to another medical condition with mixed features. He was prescribed mirtazapine and was medication adherent. This case was randomly selected to review the care provided for this EOP patient in the OHU. He was housed in the OHU due to sickle cell disease and resulting chronic pain.

The most recent IDTT meeting occurred on September 1, 2023. There were no mental health IPOCs included in the treatment plan, but treatment goals were listed elsewhere and appeared to be relevant to the patient's identified needs. However, patient progress toward those goals or reassessment of the patient by the IDTT had not occurred in over eight months.

The patient was seen monthly by his assigned psychiatrist for confidential contacts. Psychiatric documentation reflected engagement with the patient and support for his psychiatric needs.

Primary clinician contacts were not scheduled routinely. Many primary clinician contacts during the reporting period were described as "rounding" or occurred in response to patient requests for services. On the few occasions when the patient was seen in a confidential space, the primary clinician documented interventions related to the patient's verbalized needs but did not address treatment goals or patient progress.

There was documentation of recreation therapy groups and nursing led treatment groups offered multiple times each week. The patient was offered an average of 9.6 hours of structured treatment weekly during the reporting period, and he attended an average of 5.2 weekly hours, or 54 percent. It was noted that the patient was enrolled in school and other programming.

**Findings**

The treatment provided to this EOP patient was inadequate.

Routine IDTT meetings did not occur timely during the eight-month period, and primary clinician contacts generally occurred in nonconfidential settings, and primarily consisted of wellness check-ins. However, psychiatric services and recreation therapy groups were provided timely and consistently and were clinically relevant to the patient's treatment needs.

**Patient B**

This 49-year-old male patient was provided diagnoses of bipolar I disorder, current or most recent episode depressed, with psychotic features, and other specified personality disorder. The patient was prescribed lamotrigine and bupropion, as well as hydroxyzine and melatonin ordered on an as-needed basis. The patient was medication adherent. This patient's case was selected to review the care provided, as he was in the EOP and housed in a quarantine unit.

932

The patient was seen every 30 days by his assigned psychiatrist, and the treatment appeared to appropriately address his needs. He was consistently seen in a confidential setting. His assigned psychiatrist was an on-site provider through the end of March 2023, when he was changed to a telepsychiatrist.

During the review period, the patient was seen for three confidential primary clinician contacts. All other primary clinician contacts were nonconfidential wellness check-ins. These check-ins were sporadic, as some occurred weekly, and others occurred monthly without a discernable pattern or explanation. The rationale for nonconfidential check-ins included patient refusals, a maximum custody patient using the telephone which prevented other patients from leaving their cells, and what appeared to be a routine practice for clinician rounding in this unit.

There were no IDTT meetings conducted during the review period, and the last treatment plan located in the healthcare record was dated July 6, 2022.

During the review period, the patient was offered an average of 6.75 weekly hours of structured treatment and attended an average of 5.69 hours, or 84 percent. All groups were recreation therapy groups. There only appeared to be a brief disruption in group programming while the patient was on quarantine status.

**Findings**

The care provided to this EOP patient was inadequate.

Primary clinician contacts did not occur timely in a confidential setting. There was also a lack of documentation of any IDTT meetings or treatment planning in nearly one year; additionally, the patient was offered less than ten weekly hours of group therapy. The patient's treatment did not appear to be affected by his quarantine status other than no group therapy being provided during that period.

**Patient C**

This 61-year-old male patient was provided a diagnosis of unspecified depressive disorder, and was not prescribed psychotropic medications. His healthcare record was randomly selected for review of the care provided to this EOP patient housed in the OHU.

During the review period, one IDTT meeting occurred on December 8, 2022, and there was no documentation of subsequent IDTT meetings. The IDTT documentation included an IPOC for depressed mood as well as nursing IPOCs related to the patient's numerous medical conditions. During the meeting, the patient reported an increase in depressive symptoms and concerns related to his upcoming release. The patient should have been considered for referral to a higher level of care, as he had not attended at least 50 percent of his EOP structured treatment hours. This occurred as the patient was enrolled in groups conducted both in the housing unit and elsewhere. The patient could only attend groups in the housing unit, and the prior treatment plan dated September 2022 noted that he had been changed to EOP modified programming to

accommodate his inability to attend required programming due to his medical needs; however, this change never occurred. While the December 2022 treatment plan noted that the patient would remain at the EOP level of care, he was changed to EOP modified programming at that time according to the OnDemand system. The patient attended groups sporadically, attending an average of 4.2 of 6.7 offered weekly hours or 63 percent.

Psychiatric contacts were documented monthly and included comprehensive assessments that documented the benefit of psychotherapeutic interventions in managing the patient's depressed mood and cognition. The primary clinician documented weekly or biweekly wellness checks with the patient; only two clinically substantive contacts were documented during the reporting period. Despite a release date during September 2023 and documentation of the patient's concerns during the most recent IDTT about his upcoming release, parole plans and reentry planning were not discussed by the primary clinician. There were no documented pre-release contacts. Psychiatric documentation revealed that the patient discussed his concerns about upcoming release during these sessions.

**Findings**

The care provided to this EOP patient was inadequate.

Primary clinician contacts consisted of wellness check-ins and did not address significant treatment needs and interventions. There was no documentation of IDTT meetings conducted for nearly six months. Pre-release planning was also deficient. Despite this, there was documentation that recreation therapy groups were offered consistently, as well as meaningful psychiatric contacts.

**Patient D**

This 34-year-old male patient was provided diagnoses of major depressive disorder and PTSD. He was prescribed olanzapine, paroxetine, bupropion, lithium, doxepin, melatonin, and prazosin. The patient was medication adherent. His case was randomly selected for review of the care provided to this EOP patient on modified programming housed in the CTC.

There was no documentation that any IDTT meetings occurred during the reporting period. The last treatment plan located in the healthcare record was dated July 28, 2022. A translator was utilized for the IDTT as the patient's primary language was Spanish. At that time, the patient was described as making little progress in treatment as evidenced by continued depression and PTSD symptoms. The patient was continued at the EOP modified programming level of care without rationale. While documentation provided adequate rationale for continued placement at the EOP level of care, it was silent about the need for modified programming. Treatment goals were adequate, objective, and individualized to the patient; however, there was no indication about the number of groups or hours of structured treatment that would be offered to the patient. In the EOP functional evaluation, it was noted that the patient was able to attend most program related activities and that his limitations were related to medical issues, not mental health symptomatology. The clinical summary stated that the patient received his psychotropic

medications by a PC 2602 order. It appeared that the PC 2602 order was allowed to expire in August 2022.

Primary clinician contacts occurred every one to two weeks, and many of the sessions addressed the patient's treatment needs and symptoms and demonstrated evidence of interventions consistent with the treatment plan. The safety plan was reviewed as indicated based on the patient's presentation during treatment sessions. On occasion, primary clinician contacts were noted as nonconfidential check-ins.

The assigned telepsychiatrist consistently conducted monthly contacts which were adequate and addressed the patient's needs. On average throughout the reporting period, the patient was offered one to two groups weekly; however, it appeared that the groups were offered in the patient's housing unit and did not appear to include other participants beyond the patient and the recreation therapist. There was very little documentation regarding the content of these sessions.

**Findings**

The care provided to this EOP patient was inadequate.

While the clinical care appeared to be appropriate to the patient's treatment needs, IDTTs did not occur; therefore, no review of the patient's clinical progress occurred, and changes in the patient's mental health needs were not addressed. There was no justification for or description of the patient's EOP modified programming status, making it difficult to discern if the number of treatment hours offered was adequate.

**Patient E**

This 56-year-old transgender female patient was provided with diagnoses of schizoaffective disorder, depressive type, and psychosis. The patient was adherent with her medication regimen that included fluoxetine, benztropine, and haloperidol. This case was randomly selected for review of the care provided to this EOP patient.

One IDTT meeting occurred during the reporting period on December 1, 2022. Another IDTT meeting should have occurred during March 2023; however, that meeting was delayed until April 25, 2023. The December 2022 treatment plan included IPOCs for anxiety and depressed mood with individualized goals and interventions. The patient had high levels of depression and anxiety which warranted continued placement at the EOP level of care. Her progress in treatment was reviewed, and there was evidence of patient participation during the meeting.

The patient was consistently seen monthly by the assigned telepsychiatrist. Telepsychiatry contacts were adequate, and the documentation indicated review of patient functioning and discussions regarding medication effectiveness and side effects.

Primary clinician contacts occurred intermittently, usually monthly. The documentation reflected the appropriate use of clinical interventions consistent with the patient's needs and treatment plan. Progress and symptoms were routinely reviewed. Documentation by the primary clinician

did not consistently include the patient's preferred pronouns. The patient was offered over nine hours of structured treatment weekly, and she attended approximately two-thirds of the groups offered. All groups were provided by recreation therapists.

**Findings**

The care provided to this patient was adequate.

However, primary clinician contacts did not occur timely, and groups were limited to recreation therapy only.

**Patient F**

This 72-year-old male patient received mental health services at the EOP level of care, and was on modified programming status. He was provided a diagnosis of depressive disorder due to another medical condition. The patient was not prescribed psychotropic medications. His case was randomly selected to review the care provided.

During the review period, IDTT meetings occurred every two months, more frequently than minimally required. IPOCs were developed to address the patient's depressed mood. In October 2022, the patient was unable to attend his IDTT as his housing unit was on quarantine status. During that IDTT, the patient reportedly had few symptoms but was retained on EOP modified programming status due to limitations caused by his medical condition and variability in his clinical presentation during sessions. The primary clinician noted that the patient was motivated to reduce the use of his wheelchair and to be placed in a work program. In subsequent IDTT meetings in December 2022 and February 2023, the patient continued to report an absence of depressive symptoms. His treatment goals included the absence of symptoms for at least six months. The IDTT documentation, however, did not indicate the amount of programming that was appropriate for the patient given his EOP modified programming status.

The patient was seen monthly by his assigned telepsychiatrist except between January and March 2023, when the interval between contacts was six weeks. Psychiatric contacts were adequately documented and included adequate assessments and plans, given that the patient was not prescribed psychotropic medications.

Primary clinician contacts occurred once or twice monthly and evidenced interventions and assessments consistent with the patient's needs and treatment plan. Treatment goals were discussed during sessions, as was the patient's need for EOP modified programming and level of group participation.

The patient was offered an average of four hours of group therapy weekly, and he attended three hours most weeks. The groups were facilitated by recreation therapists, and no clinical groups were documented.

**Findings**

The care provided to this patient was adequate.

However, primary clinician contacts were not offered as frequently as was required. Additionally, treatment planning could have benefited from better documentation of the amount of group treatment offered weekly.

**Patient G**

This 62-year-old male patient was provided a diagnosis of major depressive disorder, recurrent episode, moderate. He was prescribed paroxetine and hydroxyzine, and was medication adherent. The patient was designated as DD1 due to cognitive deficits. His case was selected for review of the care provided; his initial IDTT was observed during the site visit, and concerns were noted regarding whether the treatment goals met the patient's verbalized needs.

The patient arrived at CHCF on May 16, 2023. Prior to transfer, he was reportedly a high treatment refuser while housed in the ASU. His mental health history was appropriately identified during the initial health screening upon transfer to CHCF, yet no referral for a mental health evaluation was generated.

The initial primary clinician assessment was completed on May 24, 2023 by an unlicensed social worker. The patient reported moderate depression and anxiety, but denied homicidal ideation, and visual or auditory hallucinations. There was no documentation that the primary clinician inquired regarding the patient's suicide risk. The mental status sections of the assessment were not completed, nor was the EOP functional evaluation. Much of the information in the initial assessment appeared to be copied from prior documentation, and there was no documentation of an assessment of the patient's current clinical needs.

An initial psychiatric assessment was not completed prior to the IDTT. A psychiatry review completed for the IDTT noted that the patient's overall treatment goal was to "maintain stable mental disease."

The observed IDTT occurred on June 6, 2023. An IPOC was created to address the patient's depressed mood, and it included generic goals and interventions. The patient reported that his primary concern was medical issues, including recent diagnosis of prostate cancer and resulting anxiety as his twin brother died of prostate cancer; he was less concerned about his mental health needs. While this information was documented in the healthcare record, goals and interventions were not developed to assist the patient with these concerns and feelings. In the section related to the need for a higher level of care, the patient's failure to attend programming at the previous facility was noted, but the rationale for maintaining him at the EOP level of care was inadequate. The rationale stated that the patient was meeting with his primary clinician and psychiatrist; however, no clinical contacts had occurred other than an initial primary clinician assessment. During the IDTT, the patient reported PREA concerns which were adequately addressed after the IDTT; however, these concerns were not addressed in treatment planning. The EOP functional evaluation included the same entry in all boxes, which was text regarding the patient's adaptive

support needs secondary to his DD1 status with an effective date noted as July 2020. In many instances, the text was unrelated to the abilities being assessed. The clinical summary was copied from the primary clinician initial assessment and included no mental health or clinical information. The case formulation was inadequate.

During the IDTT, the patient was offered the opportunity to enroll in nursing led treatment groups, but this was not included in the IDTT documentation. The IDTT documentation also did not address EOP groups or group schedule.

An initial psychiatric assessment was completed on June 7, 2023, and it was adequate.

**Findings**

The care provided to this EOP patient was inadequate.

The initial primary clinician assessment was inadequate in content, the initial psychiatric assessment was not completed timely, and the treatment plan was not consistent with the patient's identified needs and did not accurately reflect the IDTT meeting discussion.

**Patient H**

This 35-year-old patient was provided a diagnosis of unspecified depressive disorder. He was prescribed bupropion, buspirone, and mirtazapine, as well as diphenhydramine on an as-needed basis. He was intermittently medication nonadherent. His case was selected to review the care provided; the patient was included in the suicide risk management program, and he received mental health services at the EOP level of care.

The patient was discharged from the CSATF MHCB on March 12, 2023 with a transfer to CHCF. He received mental health services at the EOP level of care at CSP/Corcoran prior to the MHCB placement that occurred on February 20, 2023.

The initial five-day follow-up contact was completed by the assigned primary clinician, yet there was no indication that the MHCB discharge summary was reviewed. The assigned primary clinician completed four of the five daily contacts, without review of the discharge summary or the safety plan with the patient. The safety plan was reviewed with the patient on the third day by a psychologist who was not the patient's assigned primary clinician.

On March 16, 2023, the fourth day after discharge, the patient was seen in a confidential setting by the assigned primary clinician, an unlicensed psychologist, and he was oriented to the EOP. He was seen for a nonconfidential contact with the primary clinician on March 20, 2023. No initial primary clinician assessment was documented in the healthcare record.

An initial psychiatric assessment was completed on March 22, 2023. It was noted that the patient was medication nonadherent. The telepsychiatrist who completed the assessment documented a comprehensive review and addressed the patient's nonadherence.

938

The initial IDTT meeting occurred on March 23, 2023, and IPOCs for depressed mood and anxiety were initiated. The treatment plan noted criteria for consideration of referral to a higher level of care, including several MHCB admissions and treatment refusals. The decision was made not to refer the patient to a higher level of care, but to address those issues through therapeutic interventions. Documentation stated that the patient had transferred from CSATF but "documentation before this transfer is not provided in his chart." That statement appeared false, as the psychiatrist documented review of pre-transfer documentation. Other inconsistencies were noted in the treatment plan. The patient was placed in the suicide risk management program, and generic interventions were listed that did not necessarily apply to the reasons why the patient frequently transferred to the MHCB.

The patient was consistently seen monthly by the psychiatrist, who documented adequate confidential contacts that addressed the patient's treatment needs. During April 2023, the psychiatrist noted that the patient had not yet been assigned to groups. The patient was also placed in the ISUDT program in April 2023. The primary clinician saw the patient in response to a request on April 13, 2023, and a SRASHE was completed on April 28, 2023, in response to an emergent consult that the patient had reported suicidal ideation. The SRASHE noted the patient's use of suicidal statements to affect housing without acknowledging that the pattern of behavior had been present for years, and the recent recommendation from MHCB clinicians to address this behavior in treatment. The patient's placement in the suicide risk management program was noted, and a safety plan was appropriately completed.

The patient initiated a hunger strike on May 30, 2023, in response to a planned facility transfer. He was seen by the primary clinician in response to his request regarding the hunger strike. The response was adequate, but no plan for follow-up was documented. There were no routine primary clinician contacts documented during the nearly three-month period that the patient was housed at CHCF, despite his placement in the suicide risk management program.

During his 12 weeks in the EOP, he was offered an average of 6.4 weekly hours of structured treatment, and attended a weekly average of 3.7 hours. The patient was offered ten or more hours of programming for only three of the 12 weeks.

**Findings**

The care provided to this patient was inadequate.

Despite recent MHCB discharge, there was no evidence that the primary clinician reviewed the MHCB discharge summary, or any documentation related to the patient's history. An initial primary clinician assessment was never completed. Additionally, despite placement in the suicide risk management program, report of suicidal ideation, and initiation of a hunger strike, the patient was never seen for routine primary clinician contacts during the 12 weeks reviewed. The patient was not offered structured treatment consistent with requirements until the end of May 2023. Psychiatric contacts, however, occurred monthly and were adequate.

**Patient I**

This 56-year-old male patient was provided a diagnosis of schizophrenia.  He received his psychotropic medications by a PC 2602 order due to danger to others and grave disability.  He was prescribed haloperidol and diphenhydramine, as well as benztropine on an as-needed basis.  Due to the involuntary medication order, the patient was medication adherent.  He was housed in the CTC due to medical needs and utilized a wheelchair.  His healthcare record was reviewed to assess the care provided.

During most of the review period, the patient received mental health services at the EOP level of care, and was on modified programming; however, no IDTT meetings were documented in the healthcare record on August 25, 2022, the date of EOP modified programming placement, or on March 16, 2023, the date that he returned to the EOP level of care.  In fact, the only IDTT meeting documented in the healthcare record during the previous year was dated September 7, 2022, which made no reference to the EOP modified programming status.

Attempts were made by the primary clinician to see the patient one to four times monthly, but the patient consistently refused.  Based on the documentation by the primary clinician, even if the patient agreed to participate, the primary clinician was only able to offer brief wellness checks.

The patient was seen monthly by a psychiatrist, and the sessions primarily occurred in a nonconfidential setting in the housing dayroom.  The psychiatrist noted ongoing tangential and disorganized speech, as well as patient irritability during contacts in October, November, and December 2022.  In January 2023, the patient was sent to a community hospital due to dangerously low sodium levels secondary to psychogenic polydipsia.

The patient also received disciplinary reports for assaulting other patients; his medications were adjusted, and that change appeared to have a positive clinical effect.  The patient became more engaged and began attending some groups in March 2023.  However, during most weeks of the review period, the patient was not offered any groups.  Beginning the week of February 27, 2023, the patient was offered between four and five hours of group therapy, and attended approximately half of the offered groups.

**Findings**

The care provided to this patient was inadequate.

No IDTT meetings were conducted during the review period; this, despite renewal of the PC 2602 order in October 2023, ongoing psychotic symptoms, increased irritability and aggression, and consistent refusal of clinical contacts.  Additionally, even if the patient was willing to engage in treatment, he was not offered sufficient primary clinician contacts or groups.

**Patient J**

This 63-year-old male patient was provided diagnoses of schizoaffective disorder, bipolar type, dementia, and amphetamine use disorder.  He was prescribed risperidone, olanzapine, and

hydroxyzine. He was also designated as DD2. He received mental health services at the EOP level of care in the OHU. His healthcare record was reviewed to assess the care provided.

The patient transferred to CHCF on November 15, 2022 at the EOP level of care. The transfer was precipitated by the patient's dementia and need for treatment at CHCF. Initial psychiatric and primary clinician assessments were completed timely and were adequate. Of concern, the clinical summary in the initial primary clinician assessment included copied text without updates. The initial IDTT occurred on November 22, 2022; no nurse was present, as well as a covering telepsychiatrist. An IPOC was created to address impulsive behavior; however, the individual goals addressed thought distortions and depressed mood. The only intervention listed was that the therapist would foster a therapeutic alliance by empathizing with the patient's distress; this intervention was not clinically indicated to address any of the identified issues. Further, documentation indicated that the patient experienced auditory hallucinations, had a history of engaging in self-harm, and was transferred due to dementia. None of these concerns were addressed in the treatment plan. The patient's adaptive supports were reviewed.

No updated IDTT meetings were documented in the healthcare record through June 2023.

The patient was seen monthly by the assigned psychiatrist, who addressed medication management, patient functioning, and responded appropriately to the patient's requests.

The patient was not seen by his primary clinician. There was documentation of monthly "rounding" which was completed by an unlicensed social worker and included no clinical information other than the patient's lack of issues or concerns. During February 2023, the patient was not seen at all, as he was attending groups when rounds occurred.

The patient attended school, substance use programming, and most EOP groups offered. The patient was consistently offered at least ten hours of programming weekly. He also worked as a porter in the housing unit.

**Findings**

The care provided to this patient was inadequate.

Primary clinician contacts were not documented during the review period, and no IDTT meetings occurred other than an initial IDTT meeting during November 2022.

**Patient K**

This 32-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CHCF.

The patient was assaulted on February 1, 2023, requiring treatment in an intensive care unit. This assault was reportedly triggered by the patient stabbing a fellow incarcerated person in the neck. The patient had reportedly been acting in a bizarre and paranoid manner. Upon return

from the outside hospital on February 5, 2023, the patient voiced suicidal ideation and was subsequently transferred from the MCSP ASU EOP to the CHCF MHCB.

The patient had a history of multiple potentially lethal suicide attempts by hanging and cutting his wrists. The SRASHE assessed high chronic and acute suicide risk.

The patient was provided diagnoses of major depressive disorder with psychotic features and acute stress disorder. He was prescribed mirtazapine and venlafaxine for depression, aripiprazole for psychosis and antidepressant response augmentation, prazosin for nightmares, and hydroxyzine for anxiety.

The initial primary clinician and psychiatric evaluations occurred timely prior to the initial treatment team meeting. The initial psychiatric evaluation contained confusing and conflicting information; stating that the patient denied any thoughts of harming himself, with the next line stating that the patient had suicidal ideation with a plan. The initial treatment team meeting occurred timely and included all required participants and the patient. The treatment goals were appropriate; they focused on reducing suicidal ideation and self-harm and learning new skills to deal with distressing feelings. The interventions were also appropriate, including fostering a therapeutic alliance, and the use of CBT for maladaptive thoughts. The patient received medication management, psychotherapy, and recreational therapy services and made gradual progress. The routine primary clinician and psychiatric contacts occurred timely. On February 14, 2023, the patient was discharged to SVSP at the EOP level of care.

**Findings**

The care provided to this CHCF MHCB patient was adequate.

The treatment plan included appropriate goals and interventions. Medication management was logical, and evidence based. The patient made clear progress during treatment.

While the overall treatment was adequate, the expert noted significant limitations. The initial psychiatric evaluation was internally inconsistent regarding fundamental issues such as dangerousness to self and others. The progress notes lacked a full explanation of the interventions performed and how the interventions connected to the treatment plan goals.

**Patient L**

This 33-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CHCF.

On November 18, 2022, the patient transferred from the WSP reception center to Sierra Conservation Center (SCC). The patient was included in the MHSDS. He was placed in the ASU due to a peer reportedly stating that the patient was an enemy. He was admitted to the MHCB the same day due to thoughts of hurting himself by hitting his head on the corner of the wall. The patient reported severe depression, anxiety and difficulty adjusting to housing in a cell.

942

The patient had one interrupted suicide attempt in 2020, when he made a noose and was discovered by custody staff. The SRASHE assessed high acute and chronic suicide risk.

The patient was provided with a diagnosis of acute stress disorder. While he initially refused psychotropic medications, the patient did agree to start clonidine and hydroxyzine PRN for anxiety. During his treatment, the patient disclosed taking Suboxone that was not prescribed for him while at SCC. The treatment team determined that the patient's withdrawal from this medication might have contributed to his anxiety and distress.

The initial primary clinician and psychiatric evaluations occurred prior to the initial treatment team meeting. The initial psychiatric evaluation was comprehensive. The initial treatment team meeting occurred timely and included all required participants and the patient. While the goal of reducing suicidal ideation was appropriate, the vague intervention of "goal setting" with the patient was inadequate. Additionally, there was no mention of the use of behavioral interventions to address anxiety and distress.

The patient was treated with medication management, psychotherapy, and recreational therapy services. A note from the psychiatrist on November 27, 2022 indicated that the patient practiced coping and breathing techniques for anxiety. He was seen by the primary clinician and psychiatrist timely, except on November 29, 2022, when the psychiatric note stated that the patient was seen in the IDTT meeting, which was not consistent with requirements. The discharge SRASHE assessed high chronic and moderate acute suicide risk. The treatment team carefully explored whether the patient required inclusion in the MHSDS. He reported that he strongly did not want to take psychotropic medications and wished to return to SCC. The treatment team agreed with the patient's decision, and he was clinically discharged on November 29, 2022, with physical discharge to the SCC ASU on November 30, 2022. The five-day follow-up contacts were completed as required.

**Findings**

The care provided to this CHCF MHCB patient was adequate.

The initial psychiatric evaluation was comprehensive and established a clear clinical picture of the patient. Medication management was supportive and appeared appropriate. The treatment team worked closely with the patient regarding the risks and benefits of longer-term treatment in the MHSDS.

While the overall care for the patient was adequate, the expert noted several concerns. The treatment team goals and interventions appeared insufficient to address the patient's degree of distress. The psychiatric contact on November 29, 2022 occurred in the IDTT meeting, which did not qualify as a confidential contact.

**Patient M**

This 40-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CHCF.

The patient was previously housed at VSP and was not included in the MHSDS. On February 5, 2023, the patient reported suicidal ideation, possible thoughts of harming others, and auditory hallucinations which began approximately one week prior. The trigger for this was the patient learning of his father's death.

The patient spoke Spanish, and interpretation services were documented. The patient had four prior MHCB stays as well as prior treatment at the EOP level of care. It was unclear why the patient was not included in the MHSDS prior to the MHCB placement.

The SRASHE assessed moderate chronic and high acute suicide risk. The documentation varied regarding whether the patient had prior suicide attempts.

The patient was provided with a diagnosis of schizoaffective disorder; alternatively, major depressive disorder with psychotic features was also considered. He was prescribed olanzapine for psychosis and hydroxyzine for anxiety.

The initial primary clinician and psychiatric evaluations occurred timely prior to the initial treatment team meeting. The initial treatment team meeting also occurred timely and included all required members and the patient. The treatment goals included reduction of suicidal ideation and identification of three ways to improve decision-making skills; however, the latter goal was templated, with the frequency and timeframe of goal achievement not completed. The interventions included fostering a therapeutic alliance and working on goal setting with the patient.

While the documentation indicated that the patient continued to appear extremely depressed, withdrawn, and dysphoric with ongoing intermittent suicidal ideation and a plan to hang himself; the psychiatrist did not initiate treatment with an antidepressant medication. Some notes suggested that the patient was reluctant regarding medication treatment. The treatment team did not update the treatment plan to address this issue of concern. Of note, many of the patient's sessions with both the primary clinician and psychiatrist occurred at the cell-front; and the documentation was unclear regarding the reasons for the nonconfidential contacts. Some notes stated that they occurred due to the patient's preference; at other times, no reason was provided. The progress notes were also often unclear regarding the patient's diagnosis.

On February 10, 2023, the patient reported to the primary clinician that he had many enemies at VSP, but he reportedly would not reveal their names. On February 15, 2023, the patient was discharged to return to VSP at the EOP level of care. The five-day follow-up contacts occurred as required.

**Findings**

The care provided to this CHCF MHCB patient was inadequate.

While the initial treatment plan goals appeared appropriate, the interventions appeared inadequate to address the patient's symptoms. The diagnosis was frequently difficult to discern from the documentation. Despite the patient having severe depression and suicidal ideation, he was not prescribed an antidepressant medication. While some notes mentioned that the patient was reluctant regarding medication treatment, it was unclear how or if this ambivalence was addressed in treatment planning. Additionally, it was unclear how the treatment team addressed issues of grief, loss, and cultural considerations, given that the patient's reported suicidal ideation and auditory hallucinations that began after the death of his father.

Many of the clinical contacts were nonconfidential and occurred at the cell-front, with several notes failing to document the reason for the nonconfidential contacts. While the patient reportedly declined to reveal specific names of enemies which complicated the evaluation of those enemy concerns, the documentation of these issues appeared incomplete. The patient returned to the institution where he reported enemy concerns.

**APPENDIX C-9**
**California Men's Colony (CMC)**
**June 6, 2023 – June 9, 2023**

**Patient A**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CMC EOP hub. The patient was housed at the CMC EOP hub between December 6, 2022 and March 8, 2023. He entered CDCR for his current term on February 26, 2014 to serve a 29-year sentence. The patient entered the MHSDS in 2011 at the 3CMS level of care. Since then, he received mental health services at the EOP, MHCB and acute levels of care; the acute inpatient hospitalization occurred in 2014, and he was last treated in the MHCB on August 5, 2022. He had a history of anger, poor impulse control, aggressive behavior, lack of empathy, and poor insight, as well as self-injurious behaviors, primarily by cutting when stressed. The patient had three prior documented suicide attempts which included two attempted hangings in the CMC ASU in 2015 and an overdose at CSP/Corcoran in 2019. He received his psychotropic medications by a PC 2602 order due to danger to self and others; the order was renewed on January 12, 2023. A SRASHE on October 13, 2022 assessed high chronic and low acute suicide risk. He was previously provided diagnoses of bipolar disorder, gender dysphoria, borderline personality disorder, antisocial personality disorder, major depressive disorder, cannabis use disorder, and amphetamine use disorder.

The patient was placed in the CMC EOP hub after MHCB discharge on December 6, 2022. Daily five-day follow-up contacts were documented timely upon placement in the CMC EOP hub. The initial IDTT meeting occurred on December 28, 2022; this meeting included the necessary participants, but the patient refused to attend. The problem list in the treatment plan included anxiety and bipolar depression. No IPOCs, goals, or interventions were included in the initial IDTT treatment plan. The patient met the criterion for higher level of care consideration due to three or more RVRs in the last three months; he acquired four RVRs in 2022 prior to the CMC EOP hub placement. The treatment team determined that the patient did not require referral to a higher level of care. The patient was not included in the SRMP when he arrived at the CMC EOP hub, and no discharge or transfer criteria were included in the treatment plan. The patient requested placement in the 3CMS program during the initial PC assessment; however, the treatment team retained the patient at the EOP level of care. He was provided diagnoses of bipolar I disorder, borderline personality disorder, and amphetamine use disorder. The functional impairment section of the treatment plan was blank and incomplete. The patient reported anger and depression as primary concerns.

A second initial IDTT meeting occurred on January 18, 2023, after the patient returned from alternative housing. That meeting included the necessary participants and the patient. The treatment plan included an IPOC for anger, which included appropriate and measurable goals and specific interventions consisting of CBT and DBT skills training and techniques. The patient reported that he wanted to work on anger management. The patient met the criteria for higher level of care consideration due to three or more RVRs and three or more MHCB referrals in the previous three months. The treatment team did not refer the patient to a higher level of care but modified the treatment plan to address his borderline personality symptoms using specific DBT

946

interventions.  The IDTT documentation noted that the patient was placed in the SRMP due to his significant history of self-harm.  The suicide risk management plan provided for mindfulness and DBT skills training.  The patient was reportedly medication adherent and reported no medication side effects.  The clinical summary was updated appropriately since the last treatment plan, and the patient was described as motivated to work on his anger.  The treatment team modified the treatment goals and interventions appropriately.   The patient agreed to remain in the EOP for the next 90 days, and the PC 2602 order was appropriately renewed on January 11, 2023.

The psychiatric contacts occurred timely during the review period.  The initial psychiatric contact on December 13, 2022 occurred at the cell front, as the patient was quarantined due to influenza.  He denied acute symptoms or distress, was noted to demonstrate normal mental status, and had excellent medication adherence.  The psychiatrist noted the patient's bipolar disorder to be in full remission.  He was prescribed Lexapro, Risperdal, clonidine, and Zyprexa ordered PRN.  The patient was placed in alternative housing three days later due to suicidal ideation; he was reportedly provided a cell change and returned to his cell without difficulty.  The patient reported that he used the CIT to obtain a cell change, and acknowledged that this behavior was inappropriate.

The patient refused to participate in the PC 2602 order renewal interview on December 21, 2022.  At the next psychiatric contact on January 17, 2022, he declined to attend a confidential session, and the contact occurred at cell front.  The patient reported no distress and rated his mood as very good.  He continued with good medication adherence and reportedly managed well during his ASU stay.  The subsequent psychiatric contacts occurred in a confidential setting.  The patient demonstrated future orientation and relatively adequate coping skills.  He continued to report suicidal ideation when highly stressed but did not require MHCB or alternative housing placement during the remainder of the review period.

The PC contacts also occurred timely in a confidential setting.  The patient was described as cooperative and engaged with the PC, with normal mental status and no acute symptoms or distress.  He initially requested a level of care reduction to the 3CMS program, stating that he had manipulated the staff for EOP placement as he thought that placement would decrease his SHU term; however, he was maintained at the EOP level of care.  The patient attended groups but did not go to the yard.  The documentation indicated that the patient became more engaged in treatment during the review period.  In January 2023, he was described as highly motivated for treatment and indicated that he wanted to better understand his behaviors to prevent acquiring additional RVRs.  The PC worked with the patient regarding the use of specific CBT techniques and assisted the patient in developing a coping plan to manage chronic frustration.  Although the patient demonstrated an increase in symptoms and self-injurious behavior as the transfer date approached on March 8, 2023, he was able to process that behavior appropriately and the PC provided ongoing support.

**Findings**

The care and treatment provided to this CMC EOP hub patient was adequate.

Although the initial IDTT meeting did not occur timely, and the treatment plan did not include IPOCs, goals, interventions, or discharge and transfer criteria, the treatment team appropriately retained the patient at the EOP level of care and the patient responded well to the increased clinical contacts. The second IDTT meeting occurred timely and the treatment plan was complete. The second treatment plan included appropriate IPOCs, goals, and interventions that were individualized. The patient was appropriately placed in the SRMP after several CIT interventions and self-injurious behaviors. The psychiatric contacts generally occurred timely and were appropriately documented. The PC 2602 order was renewed appropriately. Most psychiatric contacts occurred in a confidential setting. The PC contacts also generally occurred timely and most often occurred in a confidential setting. The patient was increasingly engaged in treatment, and the PC provided CBT and DBT interventions and skills training that were clinically appropriate. The patient reportedly demonstrated improved insight and decreased symptoms.

**Patient B**

This 42-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CMC EOP hub. This patient was transferred to the CMC EOP hub on October 28, 2022. He entered the CDCR for his current term on March 18, 2005; he was originally sentenced to 19 years but, due to subsequent convictions while in prison, was serving a 25-year term. He had a history of numerous serious RVRs and was originally placed in the RJD ASU on September 29, 2022 for an RVR investigation, and he transferred to the CMC EOP hub on October 28, 2022. Upon his arrival at CMC but prior to actual hub placement, the patient was admitted to the MHCB due to self-injurious behavior when he superficially cut his wrist and reported suicidal ideation due to fear of receiving a third strike from a pending RVR.

His history was also remarkable for ongoing depression, impulsivity, high treatment refusal, and indecent exposure behaviors. The patient had four previous suicide attempts, two of which were by overdose or ingestion and two by laceration; however, none of the attempts were of high lethality potential. He had a history of MHCB admissions due to danger to self and suicidal ideation, as well as acute care treatment from October 12, 2021 to April 19, 2022 and subsequent intermediate care hospitalization from April 19, 2022 to April 27, 2022. He was previously provided diagnoses of exhibitionistic disorder, major depressive disorder, recurrent with psychotic features, and other substance use disorder, severe.

The patient was placed in alternative housing upon CMC arrival due to self-injurious behavior and reported suicidal ideation. He was released from alternative housing and placed in the EOP hub on November 3, 2022. Subsequently, he was seen timely and appropriately for five-day follow-up contacts. The patient was placed in alternative housing on four other occasions during the review period due to reported suicidal ideation, which he quickly rescinded; five-day follow up contacts occurred timely after each of those incidents by either a PC or nursing staff. The patient was also seen timely for the initial PC and psychiatric assessments and IDTT meetings upon each return from alternative housing.

The initial IDTT meeting upon EOP hub placement occurred timely with the necessary staff in attendance, including the patient. The treatment team provided an IPOC for depressed mood with measurable and specific goals and interventions that were individualized. The patient reportedly adjusted well to the ASU milieu and participated in treatment. He was medication adherent with prazosin prescribed for nightmares. He attended to his ADLs, denied auditory hallucinations or other psychotic processes, and was receptive to improving his ability to regulate his mood and cope with ASU stressors. Specific interventions included in the higher level of care section of the treatment plan included the PC meeting with the patient once or twice weekly and utilizing CBT and DBT mindfulness skills. The patient was also scheduled for inclusion in SRMP groups when those groups became available. The clinical summary was completed appropriately and contained important details of the patient's clinical history.

The next IDTT meeting occurred on November 29, 2022 after release from alternative housing. The treatment plan remained generally unchanged, and the treatment team noted that the patient had begun to demonstrate adequate coping skills despite his recent alternative housing placement for suicidal ideation.

An IDTT meeting occurred on December 14, 2022 that was attended by the required staff, but the patient was not in attendance due to custody modified programming. The IPOCs remained unchanged, and it was noted that the patient had two alternative housing placements during the past several weeks; the patient reported suicidal ideation due to stress and needing "a break" from the ASU. The functional evaluation and clinical summaries for that treatment plan were completed appropriately.

A quarterly IDTT meeting occurred on March 8, 2023; although the patient refused to attend, the necessary staff were in attendance. The IPOCs remained unchanged, but the patient was noted to have responded well to treatment with no MHCB or alternative housing placements since December 2022 and no RVRs since November 2022. The patient denied auditory hallucinations, and his diagnosis was changed from major depressive disorder with psychotic features to major depressive disorder. The patient reported frustration with the ASU placement and wanted to stop attending groups, but remained cooperative with the PC and attended the individual sessions. He also remained engaged in the SRMP.

The final IDTT meeting during the review period occurred after another return from alternative housing on March 22, 2023. The patient was present at the meeting and agreed with the treatment team to add an IPOC and treatment goals for irritability. The treatment interventions remained appropriate. The patient reported frustration with some group restrictions after receiving an RVR for indecent exposure, but the treatment team addressed this appropriately and encouraged him to address this during his individual PC sessions and to resume attending his assigned groups.

The initial and routine psychiatric contacts occurred timely during the review period. At the initial psychiatric assessment on October 29, 2022, the patient was seen at the cell front and was worried about receiving a life sentence for his pending RVR. He was also upset that he transferred to CMC from RJD which was located closer to his family. The patient was

prescribed Cogentin, Depakote, Lexapro, Zyprexa, Benadryl, and melatonin.  The psychiatrist noted the patient's history of impulsivity and poor distress tolerance.

A subsequent initial psychiatric assessment occurred on November 10, 2022 after MHCB discharge on November 3, 2022.  The patient reported poor sleep, nightmares, and paranoia, as well as a long history of traumatic nightmares related to directly observed and/or experienced violence and trauma.  He also reported depressed mood, constant suicidal ideation without a plan, and a history of auditory hallucinations to kill himself during depressive episodes.  He denied auditory hallucinations since CMC EOP hub placement.

An initial psychiatric assessment was also completed on December 13, 2022 after his return from the MHCB on December 5, 2022.  The patient reported improved sleep with prazosin and significant reduction in nightmares.  He rated his depression as nine of 10 on a ten-point scale, and he reported that his auditory hallucinations had returned but were manageable at that time.  A SRASHE on November 3, 2022 assessed high chronic and low acute suicide risk.

At the January 3, 2023 psychiatric session, the patient requested discontinuation of Zyprexa; he was poorly adherent with Zyprexa, Cogentin, and Lexapro; the psychiatrist discontinued Zyprexa and Cogentin and continued the other medications.  Although the patient reported chronic passive suicidal ideation, he denied a suicidal plan, auditory hallucinations, or paranoia.

On January 12, 2023, the psychiatrist noted that the patient had refused to take Zoloft on three occasions during the previous two weeks.  The patient attributed his medication nonadherence with interpersonal problems with a specific nurse.  He remained stable after discontinuing Zyprexa and did not demonstrate psychotic symptoms.

On February 7, 2023, the patient remained with medication nonadherence, despite his statements to the psychiatrist that he would adhere with taking prescribed medications.  He denied passive suicidal ideation, and his mood was described as stable.  The patient and psychiatrist agreed to a taper of the Depakote, as the patient wanted to decrease the number of psychotropic medications prescribed.

The patient was reportedly stable at psychiatric contacts on March 2, 2022 and March 8, 2022.  At the initial psychiatric assessment on March 23, 2023, after return from alternative housing; the patient reported adequate coping, but he requested to resume treatment with Depakote to address irritability and anger, and the psychiatrist restarted Depakote.

This patient was seen timely for PC initial assessments and routine contacts during the review period.  He was seen for five initial PC assessments during the review period after MHCB and alternative housing placements.  The initial assessments occurred timely, were conducted appropriately, and were well documented.  The clinical summaries were updated appropriately and informed treatment planning.  The initial assessments also provided context regarding the patient's mood and repeated alternative housing placements.  Most PC contacts during the review period occurred in a confidential setting, and the patient demonstrated no acute distress or severe symptoms.  The PC adjusted and updated the treatment goals appropriately.  The patient

appropriately processed his thoughts and feelings during the PC individual sessions, and his coping skills improved with a reduction in the frequency of crisis admissions and RVRs.

**Findings**

The care and treatment provided to this CMC EOP hub patient was adequate.

The IDTT meetings occurred timely and were attended by the requisite staff with the patient at times in attendance. The treatment plan IPOCs and goals were appropriate and individualized. The interventions were clinically appropriate and included CBT and DBT interventions. The patient was appropriately included in the SRMP and provided with a safety plan after repeated alternative housing placements for suicidal ideation. The functional evaluations and clinical summaries were updated appropriately, and the treatment team appeared to respond appropriately to the patient's clinical needs and concerns.

The psychiatric contacts occurred timely, including initial assessments and routine contacts. The medication management was clinically appropriate. The initial and routine PC contacts also occurred timely during the review period. Most PC contacts occurred in a confidential setting. The patient was consistently noted at his clinical baseline and demonstrated no acute symptoms or distress despite his alternative housing placements. The documentation indicated that the alternative housing placements occurred due to frustration and poor problem-solving skills rather than true suicidal ideation or intent.

**Patient C**

This 40-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CMC EOP hub. The patient was housed in the CMC EOP hub from December 29, 2022 until the end of the review period. He arrived at the CDCR for his current term on August 12, 2022 to serve a four-year term with an earliest possible release date of August 15, 2023.

The patient received mental health services at the 3CMS, EOP, MHCB, acute, and intermediate levels of care. The patient was hospitalized in the PIP from January 2, 2019 to February 12, 2019. The most recent MHCB admission occurred on December 8, 2022 after reported suicidal and homicidal ideation; after denial of suicidal ideation on the following day, and he was returned to the EOP. He was provided diagnoses of bipolar I disorder and antisocial personality disorder. The patient had a history of chronic drug use, limited coping skills, and severe impulsivity dating from childhood. He was not prescribed psychotropic medications at the time of the CMC EOP hub placement.

The IDTT meetings occurred timely during the review period. At the initial IDTT meeting on January 11, 2023, the required participants were present including the patient. The higher level of care section of the treatment plan was completed appropriately and provided interventions to address the reported problem areas with the primary goal of reducing RVRs. The problem list included bipolar disorder, and the treatment plan contained an IPOC for impulsive behavior. The goals and interventions were generalized and limited. There were no functional impairments

reported or described in the treatment plan. The clinical summary provided a thorough history and case conceptualization. The patient reported a history of four suicide attempts. He was not included in the SRMP, and no safety plan was documented in the treatment plan.

The 90-day routine IDTT meeting occurred on March 29, 2023 that included the necessary staff, but the patient refused to attend. The treatment team added an IPOC for pre-release planning, as the patient was scheduled for possible prison release in the upcoming six months. No new symptoms were reported. A safety plan dated December 13, 2022 after an MHCB admission was present in the treatment plan; however, the safety plan was incomplete and inadequate. The patient was prescribed Zyprexa PRN approximately two days prior to the IDTT. The patient reportedly made some progress toward the treatment goals, as he was able to identify three coping skills, but was unable to achieve the treatment goal of not acquiring any RVRs since the prior IDTT meeting. The goals and interventions remained appropriate.

The psychiatric contacts occurred timely during the review period. The psychiatrist provided diagnoses of bipolar I disorder and antisocial personality disorder. Most psychiatric contacts occurred in nonconfidential settings, as the patient refused to attend a confidential session. Although the patient reported some periods of high frustration and anger regarding the ASU environment, he did not request any PRN or standing medications. At the final psychiatric contact of the review period on March 27, 2023, the patient remained ambivalent about taking psychotropic medications indicated that he was willing to take Wellbutrin or BuSpar; however, no medication adjustments occurred at that visit.

The PC contacts generally occurred timely during the review period with some isolated two to three day delays noted. The documentation indicated that the PC consistently attempted to engage the patient in treatment; and despite initial reluctance, his treatment engagement improved. His group attendance was above 80 percent for much of the review period, and the patient demonstrated increasing insight regarding his behaviors and mood. The PC progress notes also indicated that the patient worked on anger management materials with the PC and remained relatively stable during the review period.

**Findings**

The care and treatment provided to this CMC EOP hub patient was adequate.

The IDTT meetings occurred timely and were well-staffed. The treatment plans included appropriate treatment goals and interventions primarily targeting the patient's impulsive behaviors. All relevant sections of the treatment plan documents were completed appropriately. The patient was appropriately placed in the SRMP due to his impulsivity, and a pre-release IPOC was added appropriately at the March IDTT meeting. The clinical summaries were thorough and were informed by the PC initial assessments.

The psychiatric contacts during the review period occurred timely. The patient remained generally stable and ambivalent regarding medication treatment, and he was not prescribed psychotropic medications until the end of his ASU stay when he agreed to take Zyprexa PRN. The psychiatrist appropriately provided psychoeducation and encouraged the patient to consider

medication treatment despite his refusals. The PC contacts generally occurred timely, and the documentation noted the successful efforts of the PC in encouraging the patient to engage in treatment. Most PC contacts occurred in a confidential setting, and the patient's irritability appeared to decrease in response to the treatment interventions. The patient attended more than 11 hours of structured treatment activities weekly for most of the review period, and he attended most of his assigned groups.

**Patient D**

This 50-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CMC EOP hub. This was the patient's second CDCR term, and he was serving a sentence of life with the possibility of parole sentence with an earliest possible release date of May 26, 2030. He entered the MHSDS on October 7, 1996 after admission to the MHCB. He primarily received mental health services at the EOP level of care with limited time at the 3CMS level of care, multiple MHCB admissions, and admissions to both the acute and intermediate inpatient levels of care. He had a significant history of self-injurious behavior and suicide attempts and a history of EOP modified programming. He was placed in the SRMP, and SRASHEs assessed high chronic and moderate acute suicide risk. He was provided a diagnosis of major depressive disorder with psychotic features.

The initial IDTT meeting occurred on November 22, 2022, and the necessary participants were in attendance including the patient. The patient expressed enthusiasm about attending groups and requested an increase in BuSpar for anxiety. The treatment plan included IPOCs for hallucinations, depressed mood, and treatment nonadherence. The treatment plan provided appropriate goals and specific interventions that were individualized. The patient was also identified as a participant in the SRMP, and he was placed in alternative housing upon arrival to CMC due to anxiety. The level of care and discharge criteria section noted that the patient required the structure and support of the EOP for stability. The EOP functional evaluation was completed appropriately, and the clinical summary was updated and was appropriate.

The quarterly IDTT meeting occurred on February 15, 2023 and the necessary participants were in attendance; however, the patient refused to attend. The IPOCs were unchanged and remained appropriate. The patient was identified as a high treatment refuser, but the treatment team determined that the poor group attendance was due to a medication side effect; when the medication was discontinued, his group attendance returned to previous levels of adherence. The treatment team retained the patient in the SRMP as a precautionary measure, though the patient had significant periods without suicidal ideation or crisis management interventions.

The psychiatric contacts occurred timely during the review period. At the initial psychiatric contact on November 15, 2022, the patient reported depression and anxiety and was provided diagnoses of schizoaffective disorder and borderline personality disorder. The psychiatrist continued Cymbalta, BuSpar, asenapine, propranolol, Zyprexa and Benadryl PRN. The patient was described as alert and attentive, and engaged appropriately with the psychiatrist. The patient reported increased anxiety and panic attacks, and the psychiatrist adjusted the medications appropriately. At the psychiatric appointment on January 24, 2023, the patient reported increased depression and requested discontinuation of Cymbalta and treatment with Wellbutrin. The

psychiatrist agreed, and the patient appeared to respond well to the medication change. The asenapine was discontinued on March 22, 2023 at the patient's request, and Zyprexa was changed from PRN to a standing medication order. The patient and psychiatrist appeared to work collaboratively regarding medication therapy, and the psychiatrist was appropriately responsive to the patient's concerns about medication effectiveness and side effects.

The PC contacts occurred timely during the review period. At the initial PC contact on November 22, 2022, the patient was described as stable and told the PC that he wanted to work on coping skills and anxiety. He consistently demonstrated euthymic mood and engaged in frequent discussions with the PC about coping skills and triggers. The patient reported conflicts between his group and yard schedule that negatively affected his group attendance. The PC appropriately considered placing the patient on a modified program near the end of the review period due to his group attendance difficulties and refusals. He was assessed with high chronic and low acute suicide risk at the end of the review period.

The patient was seen for high refuser daily contacts by the PC during the review period, and the notes were generally updated appropriately and reflected consistent effort and attention by the PC to encourage the patient to attend his groups.

**Findings**

The care and treatment provided to this CMC EOP hub patient was adequate.

This patient had a significant history of suicidal ideation, suicide attempts, self-injurious behavior, SRMP placement, and command auditory hallucinations. He was seen timely for initial and routine IDTT meetings, psychiatric and PC contacts, and five-day follow-up checks. The necessary participants were in attendance during the IDTT meetings, and the patient participated in treatment planning. The treatment plans contained goals and specific interventions that were individualized and appropriate. The patient remained generally stable during the review period despite poor overall group attendance that was addressed by the treatment team.

The patient appeared to respond well to the treatment interventions. Medication management was appropriate. The PC contacts appeared to be therapeutic and beneficial to the patient. Although the patient did not attend groups consistently due to medication side effects, the PC continued to work with him to adjust his group schedule and considered placement on EOP modified programming at the end of the review period to better address difficulties with group attendance and treatment adherence.

**Patient E**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CMC EOP hub. The patient was housed in the EOP hub from December 12, 2022 to the end of the review period. He arrived for his current CDCR prison term on May 18, 2012, with a sentence of 30 years to life and an earliest release date of March 9, 2039. He entered the MHSDS on May 21, 2012 at the 3CMS level of care, and he

received mental health services at the 3CMS, EOP and MHCB levels of care.  He had 25 MHCB admissions while in the CDCR, and acquired five RVRs in 2022.  He had one suicide attempt while in the CDCR and a history of reporting suicidal ideation to affect his level of care and housing.

The patient was not prescribed, and refused to take, psychotropic medication.  He was previously provided diagnoses of adjustment disorder, antisocial personality disorder, affective disorder, bipolar I disorder, opioid use disorder, cannabis use disorder, and hallucinogen use disorder.  His diagnoses at the time of CMC EOP hub placement were PTSD, paranoid personality disorder, opioid use disorder, mood disorder, other hallucinogen use disorder, cannabis use disorder, and adjustment disorder with depressed mood.

The initial CMC EOP hub IDTT meeting occurred on December 21, 2022.  The necessary participants were in attendance, but the patient refused to attend.  The problem list identified adjustment disorder with depressed mood.  No IPOCs were present in the treatment plan.  The IDTT did not identify higher level of care indicators, and the patient was not included in the SRMP.  The IDTT documentation indicated that the patient would meet with the PC weekly and as needed and was not prescribed psychotropic medications.  There was no EOP functional evaluation completed in this treatment plan.  In the clinical summary, the patient reported primary concerns of depression and anxiety, and reported his anxiety as an eight on a 10-point scale.  The clinical summary was completed adequately and was informed by the PC initial assessment.

The quarterly IDTT meeting occurred on March 15, 2023; the necessary participants were in attendance, and the patient attended.  No IPOCs, new symptoms, or treatment goals were identified in the treatment plan.  The higher level of care section indicated that the patient met the criterion for consideration of referral to a higher level of care due to three or more RVRs in the past three months, and the RVR mental health assessments noted that the infractions were not related to the patient's mental health symptoms.  The treatment team noted at this IDTT that the patient was willing to meet with the PC to develop coping skills and work on impulsivity.  The PC was also to role-play with the patient on healthy communication.  An included safety plan was developed on March 6, 2023; however, the document was inadequate and did not contain any interventions or patient specific information.  The clinical summary was not updated from the previous treatment plan.  The treatment plans for both IDTT meetings were incomplete and inadequate.

The patient was seen timely for psychiatric contacts during the review period.  At the initial psychiatric contact on December 15, 2022, he reported no significant mental health complaints and rated his depression at six of ten on a ten-point scale, and he rated his anxiety at eight of 10.  His clinical presentation was described as normal.  The psychiatrist provided diagnoses of adjustment disorder, PTSD, and paranoid personality disorder.

At the next psychiatric contact on January 9, 2023, which occurred in a confidential setting, the psychiatrist described the patient as uncooperative.  Furthermore, it was noted that the patient only met with the psychiatrist to report that he wanted to transfer from the ASU; he subsequently disengaged completely from the session.

At the January 30, 2023 psychiatric session, the patient reported paranoid ideation and stated that his food had been tampered with and that he was being targeted and treated unfairly. The patient continued to decline medication treatment; however, it appeared that his paranoia did not affect his overall functioning.

The next psychiatric contact occurred approximately three weeks later, on February 21, 2023, when the patient continued to report depressed mood and paranoia related to his food. He continued to decline medications, and the psychiatrist noted that his mental status remained stable aside from his focused paranoia.

The final psychiatric contact in the review period occurred on March 14, 2023, and the patient continued to report paranoia about his food and his mail; he reported no other mental health complaints and the paranoia did not appear to interfere with his functioning. He continued to refuse psychotropic medication treatment.

The patient was seen timely for weekly PC contacts during the review period. The initial PC assessment occurred on December 15, 2022; this assessment informed the IDTT clinical summary and provided a thorough history of the patient, noting his suicidal ideation and suicide attempt history. He presented with normal mental status at that assessment.

The next PC contact on December 20, 2022 occurred in a confidential setting, and the patient described PTSD symptoms. He remained reluctant to take medication and was reportedly in no acute distress. No IPOCs were documented in the progress notes, as there were no IPOCs included in the treatment plan.

The next PC contacts occurred on December 23, 2022 and December 27, 2022; both occurred at cell front. The patient was described as calm during both sessions with euthymic mood. At a confidential individual PC session on January 3, 2023, the patient described his coping mechanisms and reported mistrust of correctional staff and the treatment team. He also requested discharge from the EOP level of care. The subsequent PC contacts occurred in a confidential setting unless the patient declined, and the PC introduced journaling as a coping strategy. The patient also discussed his frustration about the ASU and staff, and the PC worked consistently with the patient to develop his insight, coping skills, and distress tolerance.

**Findings**

The care provided to this CMC EOP hub patient was adequate.

The overall clinical care and treatment was adequate; however, the documentation of treatment planning was inadequate. No IPOCs were developed for specific treatment goals or interventions. Despite the lack of specific goals in the treatment plan, the PC appeared to work with the patient using mindfulness skills training and journaling to improve his coping skills and distress tolerance. Although the patient was not prescribed psychotropic medications, he was seen timely for psychiatric contacts, and the psychiatrist appropriately provided psychoeducation regarding the potential benefits of medication treatment.

The patient was seen timely for weekly PC contacts during the review period, and the PC contacts often occurred in confidential settings unless the patient declined. The patient appeared to demonstrate improvement in coping skills and developed appropriate rapport with the PC. His mental status was consistently described as stable with occasional frustration and paranoia towards staff. He did not require crisis bed placement during the review period, and only one CIT activation occurred for which he was issued a 128B counseling chrono, as he utilized the session to complain about his treatment in the ASU and not for an actual emergency.

**Patient F**

This 29-year-old patient's healthcare record was reviewed to evaluate the quality of the MHCB care provided at CMC. Prior to the MHCB admission, the patient's level of care increased to the EOP on May 3, 2023 and decreased to the 3CMS level of care on May 10, 2023.

The patient transferred from SQ to CMC for MHCB admission on May 21, 2023, and was retained in the MHCB until his eventual discharge to the EOP level of care on June 5, 2023. His symptoms at the time of referral included auditory hallucinations, safety concerns, anxiety, and thoughts of harming others.

The IDTT meetings and individual provider contacts occurred timely during the MHCB stay.

The IDTT meeting initially convened on May 23, 2023 with all required members in attendance. The IDTT noted that the patient continued to endorse auditory hallucinations, thoughts of harming others, anxiety, and fear of custody officers.

The patient was provided a diagnosis of generalized anxiety disorder. He was prescribed Zyprexa and Vistaril PRN.

The IDTT reconvened on May 30, 2023, and concern was documented regarding the patient's paranoid ideation and the possible presence of a psychotic disorder. The Zyprexa was increased, and the IDTT documented a plan to retain the patient in the MHCB to monitor his symptoms and response and to increase the antipsychotic medication. The level of care rationale on that date was appropriate.

The clinicians documented that the patient was generally medication adherent and was engaged in offered services while retained in the MHCB. Although the patient was provided a diagnosis of generalized anxiety disorder, the treatment focused on psychotic symptoms. A progress note dated May 29, 2023 indicated that a psychotic or delusional disorder should be considered.

The MHCB provider progress notes suggested that the patient exhibited signs of stabilization and discharge readiness in early June 2023. While some paranoid thinking persisted, the patient no longer endorsed thoughts of harming others or exhibited objective signs of auditory or visual hallucinations.

On June 6, 2023, the IDTT determined that the patient did not require a HLOC referral despite being retained in the MHCB for more than ten days, and the documented HLOC nonreferral rationale was appropriate. The IDTT did not, however, discuss the patient's diagnosis despite psychosis as the focus of treatment, and the PC progress note suggested that a diagnostic review was indicated.

The IDTT ultimately discharged the patient to the EOP level of care. The discharge level of care rationale was appropriate.

**Findings**

The care provided to this MHCB patient was generally adequate.

The treatment interventions were appropriate for the patient's symptoms. His medications were adjusted and appropriately monitored. The level of care decisions were sufficiently justified, including HLOC nonreferral rationales. The treatment team decision to discharge the patient to the EOP rather than return to the 3CMS level of care was also clinically justified.

It was concerning, however, that the diagnosis of generalized anxiety disorder was not supported at all in the MHCB documentation; and that the IDTT did not discuss or modify the diagnosis for consistency with the patient's symptoms, their own treatment interventions, and the provider recommendation.

**Patient G**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided in the MHCB at CMC. MCSP referred the patient to the MHCB level of care due to grave disability concerns, and he transferred to the CMC MHCB on May 16, 2023. The referring institution indicated that the patient exhibited delusional thinking, hallucinations, poor hygiene, and cell cleanliness and increasing isolation in his cell.

The patient was designated as DD2, and he was provided diagnoses of autism spectrum disorder and polysubstance abuse. Despite the presence of psychotic symptoms and treatment with an antipsychotic medication, the patient was not provided a diagnosis of a psychotic disorder or other diagnosis consistent with his symptomatology. He was prescribed Seroquel and Vistaril PRN, and the patient was medication nonadherent during the MHCB admission.

The IDTT initially convened timely on May 18, 2023 with all required members in attendance. The IDTT documented that the patient continued to exhibit psychotic symptoms and refused his psychotropic medication. The IDTT further indicated that the patient continued to exhibit paranoia, agitation, and poor hygiene. The patient's unwillingness to engaged with the MHCB treatment team was attributed to his psychotic symptoms, including paranoia and agitation. The HLOC section of the treatment plan indicated that the patient had four MHCB admissions within a six-month period; however, they documented that more time was needed to monitor the patient for a potential involuntary medication order, consideration of HLOC referral, and for diagnostic

958

clarification.  The planned treatment interventions in lieu of a HLOC referral were appropriate on that date.

The psychiatric contacts in the MHCB occurred timely, and the psychiatrist appropriately documented information regarding medication indications, adjustments, and adherence.

The primary clinician contacts also occurred timely.  Most PC contacts in the MHCB occurred in a nonconfidential setting, and this was often attributed to the patient's level of agitation.  The PC progress notes provided status updates, suggesting that the patient had not demonstrated progress toward the treatment goals during his MHCB stay.

When the IDTT convened again on May 25, 2023, they noted that the patient had not demonstrated progress during the MHCB admission.  He continued to refuse treatment and medication, and his psychotic symptoms and self-care had not improved.  Still, the IDTT did not refer the patient to a HLOC.  The HLOC nonreferral rationale on that date was inadequate, as it suggested that a referral would not be pursued due to the IRU rejecting referral of the patient in July 2022.  The IDTT instead noted that they would request a CCAT to seek guidance from the IRU regarding next steps in treatment.

The IDTT met again on June 1, 2023, but no information was documented regarding the attendees.  The patient's clinical presentation remained unchanged.  The IDTT indicated on this date that the patient met several HLOC referral criteria, including the MHCB length of stay greater than ten days, the number of MHCB admissions within a six-month period, the lack of treatment participation, and the patient requiring 24-hour care.  Despite the patient meeting multiple HLOC referral criteria, the IDTT still did not refer the patient to a HLOC, and the HLOC section indicated that the patient was rejected by the IRU in July 2022.  They indicated that they were awaiting a response to their request for a CCAT to discuss treatment options.  Despite ongoing medication nonadherence and grave disability due to psychosis, an involuntary medication order also was not pursued.

On June 8, 2023, the IDTT referred the patient to an intermediate care program due to grave disability.

**Findings**

The care provided to this patient in the MHCB at CMC was inadequate.

The lack of timely interventions by the IDTT resulted in delayed access to clinically indicated care.  The psychiatrist appropriately noted that the patient would be monitored for involuntary medication administration at the time of the initial IDTT meeting; however, the psychiatrist did not document a rationale for not pursuing the PC 2602 order during the extended MHCB admission, despite ongoing medication refusals and grave disability concerns.  Diagnostic clarification was also indicated but not addressed.  The patient's presentation at the time of the May 25, 2023 IDTT meeting suggested that a higher level of care referral was indicated; however, during two IDTT meetings, the treatment team noted that they did not refer the patient to a HLOC due to an IRU rejection one year prior.  To prevent delayed access to clinically

indicated care, the IDTT should have submitted the HLOC referral on May 25, 2023 and sought a CCAT to present their case if they were concerned about a potential rejection.

**Patient H**

This maximum custody 29-year-old patient's healthcare record was reviewed to evaluate the quality of the MHCB care provided at CMC.  CSP/Corcoran referred the patient for the MHCB level of care due to danger to self, noting that the patient had endorsed suicidal ideation with a plan to cut his wrist with a razor.  The patient also reported command auditory hallucinations and persecutory delusions.

The patient arrived at the CMC MHCB on May 20, 2023.  The CMC treatment team provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and amphetamine induced psychotic disorder with moderate or severe use.  He was prescribed BuSpar and Abilify, and the patient was described as intermittently medication adherent during the MHCB stay.

The initial IDTT meeting occurred on May 22, 2023 with all required members in attendance.  The IDTT noted that the patient did not meet the criteria for referral to a HLOC on that date.

The IDTT convened again on May 26, 2023 with all required members present.  The IDTT noted again that the patient did not meet HLOC referral criteria, and he would be retained in the MHCB due to ongoing psychotic symptoms and aggression.  Of note, the clinical summary section of the treatment plan was not updated and did not include information regarding treatment progress, new concerns, or treatment obstacles during the admission.

The PC and psychiatric contacts occurred timely.  The progress notes dated May 28 and May 29, 2023 indicated that the patient was observed responding to internal stimuli and that custody staff described the patient as odd.  An RVR mental health assessment conducted on May 26, 2023 indicated that mental illness was a contributing factor to a recent staff assault.  The progress notes further indicated that the patient was unwilling to cooperate with mental health staff during admission and that he engaged in superficial self-injurious behavior on June 1, 2023.

The IDTT convened again on June 2, 2023 with all required members in attendance.  On this date, the patient met the higher level of care referral criterion for an MHCB length of stay beyond ten days.  The patient was not referred to a higher level of care; however, the nonreferral rationale indicated that the IDTT suspected that the patient's presentation was inauthentic and due to secondary gain.  They did not provide a sufficient rationale for this assessment, and this statement was inconsistent with recent progress notes or their comment on that date that the patient remained too unstable to discharge from the MHCB.

The IDTT met again on June 6, 2023 and documented that the patient would be retained in the MHCB due to ongoing psychotic symptoms and recent medication adjustments.  The patient was not referred to a HLOC and the nonreferral rationale was insufficient.  Despite the IDTT continuing to document uncertainty regarding the patient's diagnosis and symptoms, they did not conduct testing or refer the patient for diagnostic clarification to determine the appropriate course of treatment.

This patient was ultimately discharged to the EOP level of care on June 14, 2023.

**Findings**

The care provided to this patient in the MHCB at CMC was inadequate.

The unresolved diagnostic uncertainties of the treatment team clearly interfered with their treatment and level of care planning; however, they did not attempt to resolve those diagnostic uncertainties. While the treatment team intermittently attributed the patient's behaviors to "secondary gain," they did not document a sufficient rationale or plan to address the secondary gain concern, such as addressing potential safety concerns by involving the appropriate custody staff.

In contrast to the IDTT documentation, the daily progress notes referenced evidence of genuine psychotic symptoms including objective signs of psychosis and odd behaviors observed by the custody staff in the unit.

Lastly, the treatment plans were not appropriately modified to address new problems observed during admission, such as self-harm and treatment nonadherence.

**APPENDIX C-10**
**Kern Valley State Prison (KVSP)**
**June 12, 2023 – June 16, 2023**

**Patient A**

This 52-year-old male patient was provided a diagnoses of exhibitionistic disorder, antisocial personality disorder, narcissistic personality disorder, other specified trauma and stressor related disorder, and sexual sadism disorder. He was prescribed sertraline as well as hydroxyzine on an as-needed basis. His healthcare record was selected for review of the MHCB care provided.

The patient was discharged from the MHCB to the EOP level of care on March 23, 2023, and he was seen for a crisis team intervention after expressing suicidal ideation due to concerns about missing property on March 24, 2023. A SRASHE was completed and reflected no current suicidal ideation at the time of the assessment and noted that the patient had engaged in suicidal behavior by tying a torn shirt around his neck on March 19, 2023. The assessment of suicide risk was adequately justified. The patient was referred to custody to resolve his property concerns. Later that day, the patient was seen by nursing staff who contacted the psychiatrist on-call after the patient expressed suicidal ideation related to his property. The on-call psychiatrist placed the patient into alternative housing until he could be evaluated in the morning.

An initial psychiatric assessment was completed on March 25, 2023, which was adequate in content other than it included no disposition or plan for the patient. A few minutes later, another psychiatrist admitted the patient to the MHCB. An initial mental health primary clinician assessment was also completed on the same date that was adequate. The patient was seen daily by a psychologist or psychiatrist. Psychology documentation often reflected the use of appropriate interventions with the patient.

A treatment plan was initiated on March 26, 2023, but the plan was never finalized. The content of the draft document was adequate and included a safety plan, clinical summary, and appropriate treatment goals. An IPOC was created to address the patient's danger to self. A discharge IDTT meeting occurred on March 29, 2023, and included an updated safety plan as well as adequate justification for the patient's discharge to the EOP level of care; however, discharge plans were not updated. Both IDTT meetings included all required staff and the patient. The discharge summary completed by the primary clinician was adequate but included little information regarding follow-up recommendations for the EOP level of care.

The patient was offered packets and outdoor recreation by the recreational therapist while housed in the MHCB, which he refused. A recreational yard group was cancelled due to security staff shortages on March 27, 2023.

**Findings**

The treatment provided to this MHCB patient was adequate.

**Patient B**

This 30-year-old male patient was provided a diagnosis of schizoaffective disorder, bipolar type, and a diagnosis of borderline personality disorder was added at the time of MHCB discharge. He was prescribed haloperidol decanoate and bupropion, and he was generally medication adherent; he was also prescribed olanzapine on an as-needed basis. The patient had refused medications just prior to admission to the MHCB, despite having a PC 2602 order in place. His case was selected for review of the MHCB treatment provided at KVSP.

The patient was placed in the STRH on December 14, 2022, and he declared a hunger strike on December 15, 2022 after not receiving an expected package. Later that day, the patient expressed suicidal ideation and was seen by the CIT. The decision was made to admit the patient to the MHCB level of care. A SRASHE was completed that assessed high acute and chronic suicide risk with adequate justification. The initial primary clinician and psychiatric assessments, as well as the initial treatment plan, were completed on December 16, 2022. The initial primary clinician assessment was not fully completed with several blank sections, including documentation of the patient's suicide and self-harm history, and updates to existing sections were minimal. The initial psychiatric assessment was minimal but adequate. It was unclear if the psychiatric assessment was completed prior to or during the IDTT meeting. The initial IDTT documentation reflected that all required staff and the patient were present at the meeting. An IPOC was created to address the patient's danger to self, and he reportedly expressed his motivation to work to improve his depression. An appropriate plan was developed to address the patient's three MHCB referrals in the previous three months, yet the clinical summary and case formulation were not updated.

Later on the evening of the IDTT meeting, the patient was agitated with kicking of the cell door. An on-call psychiatrist ordered lorazepam to be given by injection, yet it could not be determined from the documentation whether the injection was received voluntarily. The following day, primary clinician contact documentation reflected the patient's self-report of taking olanzapine ordered to be taken as-needed but failed to note the lorazepam injection; this indicated that an adequate healthcare record review was likely not completed.

The patient was seen daily by either a psychologist or psychiatrist; however, several contacts occurred at the cell-front, as the patient refused to attend confidential sessions. There was one occasion when the patient was not seen for a confidential session due to security issues on the unit with other patients. There was documentation that psychologists provided interventions consistent with the treatment plan on occasion, but not consistently. The patient refused recreational therapy contacts and hand-outs.

On December 23, 2022, the patient was seen for a SRASHE, IDTT meeting, and discharge summary. The documentation of these encounters was variable in quality. The IDTT meeting was adequate and included documentation of the patient's progress and goals for upcoming EOP transfer; however, the discharge summary was inadequate and not sufficiently detailed. The description of the course of treatment was copied from the earlier MHCB treatment plan and included future-oriented language about what "will" and "would" occur without any indication

that the planned treatment was provided or how the patient responded to offered treatment during the treatment course. The SRASHE was adequate.

**Findings**

The treatment provided to this MHCB patient was adequate.

Treatment interventions were minimally documented, and the overall treatment progress was not summarized in the documentation.  The patient became more cooperative during the course of treatment with less agitation at the time of discharge, but this appeared to result from the time spent in the MHCB rather than the clinical interventions provided.

**Patient C**

This 38-year-old male patient was provided diagnoses of schizoaffective disorder, bipolar type; PTSD; amphetamine-type substance use disorder, moderate; and opioid use disorder.  He was prescribed sertraline, haloperidol, lurasidone, mirtazapine, prazosin and benztropine as well as a clonidine ordered on an as-needed basis.  The patient was medication adherent.  This case was selected for review of MHCB care provided.

The patient was seen for a CIT contact after expressing homicidal ideation on March 29, 2023.  Of note, a psychiatric technician was documented as the participating staff member on the CIT representing nursing.  This substitution was not consistent with policy.  A SRASHE was adequately completed; and no safety plan was required, as the patient was placed in the MHCB, and he expressed threats of harm to others rather than self-harm.  The psychiatrist saw the patient on the same day for an initial assessment which was adequate. The following day, another psychiatrist saw the patient when haloperidol was prescribed, and the mirtazapine dosage was increased.

An initial primary clinician assessment was completed on March 30, 2023 and was adequate.  An IDTT meeting occurred on the same date, and the documentation made it difficult to determine whether the initial primary clinician assessment was completed prior to or during the IDTT meeting.  An IPOC was created to address the patient's danger toward others, and the IDTT documentation was adequate and included measurable goals and interventions.

The patient was seen daily by either a psychologist or psychiatrist.  The patient was offered confidential contacts daily, with one exception; however, he occasionally refused these contacts.  Contacts generally reflected adequate interventions consistent with the treatment plan; however, the patient was seen by several different psychologists resulting problematic provision of continuity of care.

The patient accepted in-cell materials from the recreational therapist but refused offered yard activities. A discharge IDTT meeting occurred on April 5, 2023, and a discharge SRASHE was completed at that time, as well as a safety plan.  These documents were adequately completed and included appropriate treatment responsiveness and recommendations. The discharge to the EOP level of care was adequately justified.  The discharge summary, however, was inadequate.

Like other discharge summaries reviewed at KVSP, the treatment course was copied from the initial treatment plan and included generic, aspirational language; for example, they included what the treatment team will provide, rather than an accurate description of the treatment actually provided to the patient. There was a brief description of the patient's treatment response.

**Findings**

The treatment provided to this MHCB patient was adequate.

Improvement in continuity of care and the quality of the discharge summary written by the primary clinician was, however, indicated.

**Patient D**

This 37-year-old male patient was provided diagnoses of adjustment disorder with depressed mood and major depressive disorder, recurrent episode, moderate. He was prescribed aripiprazole, hydroxyzine, lamotrigine, fluoxetine, and mirtazapine, as well as benztropine ordered on an as-needed basis. His case was selected for review of the MHCB treatment provided at KVSP.

The patient was admitted to the MHCB on March 25, 2023, after MHCB discharge three days prior. A review of documentation from his prior KVSP MHCB admission noted that the patient had recently attended a court hearing that resulted in bad news, and the patient reported stress related to his legal case as well as family issues and concerns regarding his mental health treatment. The documentation also noted intermittent medication nonadherence, feelings of sadness and depression, and occasional suicidal thoughts. The patient also reported auditory hallucinations. The discharge IDTT failed to adequately document the rationale for nonreferral to inpatient care, or that the patient did not agree with the discharge decision; it also failed to note whether the patient had achieved treatment goals. The treatment team decided to discharge the patient to the 3CMS level of care despite his request for placement to the EOP where he had been placed for six years until transfer to the 3CMS program on March 8, 2023; but the rationale for this discharge decision was unclear.

A discharge SRASHE assessed moderate chronic and low acute suicide risk. Of note, the patient's self-harm history failed to include several documented incidents of self-harm, indicating that these incidents had not been consistently entered into the Self-Harm Powerform as required by policy. This included the self-harm incident of scratching himself and swallowing metal which prompted the MHCB placement on March 11, 2023. A safety plan was completed at the time of discharge, but it was largely inadequate given the patient's pattern of engaging in self-harm during his MHCB stay. On the day of discharge, the patient wrapped a t-shirt around his neck and tied it to the fence in the yard. The safety plan was not updated in response to this event, and the patient was discharged to the ASU at the 3CMS level of care. Of note, there was no Self-Harm Powerform entered in the healthcare record of this event. Eventually, on April 4, 2023, Self-Harm Powerforms were completed to address the patient's behavior on March 11,

March 17 and March 22, 2023. The discharge summary was inadequate and did not reflect the patient's response to treatment or clinically necessary plans to avoid MHCB readmission.

On day three of the five-day follow-up contact with a psychiatric technician on March 25, 2023 (a Saturday), the patient reported suicidal ideation and was placed in alternative housing. A SRASHE was completed, and despite the acute suicide risk increased to moderate, the patient was returned to his cell. Ninety-minutes later, the patient again reported suicidal ideation and was placed in the MHCB by the on-call psychiatrist. There was no documentation entered in the healthcare record regarding the rationale for the MHCB admission.

An initial MHCB primary clinician assessment completed on March 26, 2023 was superficial in content and was inadequate. The patient refused the initial psychiatric assessment, and he smeared his window with feces. The patient also refused to attend the IDTT meeting on March 27, 2023, and he remained "boarded up" in his cell. It was noted that staff were able to complete safety checks by observation utilizing another cell window, and the patient's cell was described as clean other than the door that was smeared with feces. The treatment plan included appropriate treatment goals and consideration of a PC 2602 petition to assist in stabilization and aggression reduction. Despite the patient's recent behavior, he was described with no functional impairments. The patient eventually left his cell and showered, had his cell cleaned and met with a primary clinician. The patient requested to speak only with this specific MHCB primary clinician but was informed that this request was not an option.

In the following days, the patient began engaging in daily contacts with a psychologist or psychiatrist, attended recreational therapy groups and resumed taking his prescribed medication. He refused some contacts when his requested primary clinician was unavailable. The patient initiated a hunger strike on March 31, 2023 due to issues with custody staff; he continued to take his medications, but he refused to further engage with the mental health staff.

The patient was seen by the IDTT at cell-front on April 3, 2023, and it was decided that he would again be discharged to the 3CMS level of care. The patient did not agree with this plan and stated the intention to harm himself if he was not transferred from the facility. The justification for discharge to the 3CMS level of care was unclear, and the reason provided for discharge was that the patient had not harmed himself since MHCB placement and had not demonstrated evidence of distress or auditory hallucinations. The discharge summary was inadequate; it did not include an updated plan to assist the patient in avoiding recurrent MHCB placement; and as was noted with other KVSP discharge summaries reviewed, did not include an adequate description of the treatment course, but instead included generic, future-oriented content. No recommendations were provided. Of note, the patient was readmitted to the MHCB on the following day.

**Findings**

The treatment provided to this MHCB patient was inadequate.

The patient did not receive the treatment necessary to address his behavior, and it appeared from the healthcare documentation that the staff was unable to adequately address his mental health

needs due to his confrontational nature and antagonistic behavior. Unfortunately, this resulted in the patient engaging in several self-harm incidents. Discharge summaries were poor, self-harm incidents were not properly documented, and there was no evidence that staff utilized the therapies outlined in the treatment plan.

**Patient E**

This 42-year-old male patient was provided diagnoses of unspecified bipolar and related disorder and opioid use disorder. He was not prescribed psychotropic medications at the time of MHCB admission but was eventually prescribed olanzapine, benztropine and hydroxyzine. He was generally medication adherent during the MHCB stay. His case was selected for review of mental health care provided in the MHCB.

The patient was referred for placement in the MHCB on February 14, 2023, for worsening psychotic and manic symptoms including disorganized thinking and speech, pressured speech, flight of ideas, ideas of reference, insomnia, hostility, and ongoing psychotropic medication refusal. An initial primary clinician assessment was completed on February 15, 2023 that was adequate given the patient was difficult to engage and refused a confidential contact. An IDTT meeting also occurred on that date with all required staff and the patient present. An IPOC for danger to self was created and included the patient's manic presentation, medication nonadherence, recent suicidal statements, and observed distress. No interventions were included to address these targets except for assessment of the need for a PC 2602 petition. An initial psychiatric assessment was documented after the IDTT meeting, noting that the patient refused the contact. The psychiatrist did not order medications at that time, as the patient verbally refused to accept medications.

Daily contacts were completed with a psychiatrist or psychologist both out-of-cell and at the cell-front when patient refused to leave his cell. The patient was described as acutely manic with disorganized thinking; this clinical presentation made verbal interventions challenging. The patient refused in-cell activities and out-of-cell contacts with a recreational therapist.

The patient remained with manic symptoms during the MHCB stay and verbally refused offers of psychotropic medication but indicated a willingness to consider medications if a referral to an inpatient setting was made. A weekly IDTT meeting occurred on February 22, 2023. While an appropriate decision to refer the patient to the ICF level of care was made, treatment plan documentation was inconsistent with other documentation and was inaccurate. For example, the IDTT noted that the patient was referred to the ICF level of care due to the higher level of care referral indicator related to three or more MHCB referrals in the last six months. The IDTT documentation indicated that the patient was able to function at his current level of care and was not in need of highly structured inpatient psychiatric care, which contradicted other statements in the healthcare documentation. It was noted that the patient agreed with the ICF referral but refused to sign a voluntary admission form, and a *Vitek* hearing would be required.

The treatment plan also reflected that the patient was willing to take diphenhydramine but no other medications. A psychiatric note on the same date noted the initiation of diphenhydramine and a nonemergent PC 2602 petition. On February 24, 2023, however, another psychiatrist

967

documented that the patient "may require" a PC 2602 petition, failing to recognize that the petition had been filed the day prior. Also, an entire section of that psychiatric progress note was identical in content to a note written by the primary clinician the day prior. Later that day, the patient's assigned psychiatrist documented that the patient was served with papers regarding the administration of involuntary medications.

A *Vitek* hearing occurred on February 27, 2023, and the decision was made to transfer the patient to the ICF level of care. On that day, another psychiatrist met with the patient and documented that the patient had agreed to take psychotropic medications, including olanzapine, benztropine and hydroxyzine; however, this information was not noted by the primary clinician who saw the patient on the following day. The patient took the medications as prescribed over subsequent days; however, documentation did not evidence any significant change in his behavior or clinical presentation.

The patient remained in the MHCB and was seen for weekly IDTT meetings until March 15, 2023, when he was discharged to the EOP level of care in the ASU awaiting transfer to an ICF. The rationale for discharge to a lower level of care was unclear. The discharge summary failed to describe the patient's treatment course, noted that the patient was unable to function at a lower level of care, and documented the rationale for transferring the patient to the ASU as the patient's request. As with other KVSP cases reviewed, the discharge summary included generic aspirational language describing the patient's course of treatment that was not applicable at all to the actual treatment provided.

Of note, the patient immediately stopped taking his medication upon ASU placement and began drinking excessive amounts of water; this resulted in readmission to the MHCB and referral to the acute level of care on April 13, 2023. The patient did not transfer to acute care until April 27, 2023.

**Findings**

The treatment provided to this MHCB patient was inadequate.

There was delay in making an appropriate referral for inpatient placement, evidence of failures to review healthcare documentation, inconsistent and inaccurate IDTT documentation and an inadequate discharge summary. Further, the rationale for discharging the patient to a lower level of care in ASU pending referral to ICF was inadequately justified. The patient was presented with acute manic symptoms prior to the MHCB placement, and he consistently refused medications with continued disorganized thinking; yet no referral to inpatient care occurred until seven days after MHCB placement. Similarly, there was delay in petitioning for a PC 2602 order; this was necessary for involuntary medication administration that was clinically indicated for this patient.

**Patient F**

This 39-year-old 3CMS patient was included in the MHSDS during October 2020.  He was provided a diagnosis of major depressive disorder.  His healthcare record was randomly selected to assess the adequacy of care provided.

The documentation of treatment planning was outdated.  The clinical summary had not been updated since the patient was included in the MHSDS, almost two years prior.  Similarly, IPOCs that targeted depression used generic language and were unchanged since 2020.  Interventions to aid in goal achievement were not developed.

The patient had three primary clinician contacts with the same clinician during the review period.  During contacts, the patient reported mild to moderate depressive symptoms.  The documentation provided a useful description of the patient's symptoms, functioning, and management of stressors; however, utilization of clinical interventions was evident in only one of three treatment sessions.  Despite ongoing depressive symptoms that were consistently documented, the patient had the goal of removal from the 3CMS level of care so that he could transfer to a facility closer to family or one with the Male Community Reentry Program.  Of concern, the clinician failed to discuss the risks of premature termination of mental health treatment.

With the goal of a future facility transfer in mind and at the patient's request, his psychotropic medications, Remeron and Vistaril, were discontinued at a September 20, 2022 telepsychiatry appointment.  There was no documentation that the telepsychiatrist discussed the risks of medication discontinuation with the patient.  No subsequent psychiatric contact to evaluate the patient after medications were discontinued was documented.

**Findings**

The care provided to this patient was inadequate.

Treatment planning lacked clinical interventions and was not individualized, updated, or useful for continuity of care.  Psychotropic medications were discontinued without appropriate psychiatric follow-up.  Clinical interventions were rarely utilized during primary clinician contacts.  Additionally, there was no documentation that premature termination from the MHSDS was addressed with the patient.

**Patient G**

This 32-year-old patient was transferred to KVSP during September 2022, and he was housed in Facility D.  He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood.  He was prescribed Zoloft.  His healthcare record was randomly selected to assess the adequacy of care provided.

The patient had been incarcerated since late adolescence and reported that despite chronic depression, he had not sought mental health treatment due to his gang involvement.  He left the

969

gang and was subsequently designated as SNY during the prior year; however, he struggled with this transition.

The patient submitted several requests for services before 3CMS placement. Between January and March 2023, the patient had regular contact with the same clinician. In January 2023, after the patient was seen at his request due to depression, anxiety, and trauma symptoms, he was placed at the 3CMS level of care. However, during a follow-up appointment two weeks later, the documentation indicated that he had not been included in the MHSDS. At that time, he presented with improved mental status, and the plan was to continue biweekly contacts and not to include him in the MHSDS. Two weeks later, the patient submitted a request to be seen due to increased depressive symptoms that were exacerbated by legal stressors and additional time added to his prison sentence. Three weeks later, he submitted another request for services reporting continued symptoms; he requested to see a psychiatrist and again requested placement in the 3CMS program. At that time, a primary clinician assessment was completed, and it was documented that the patient would be placed in the 3CMS program with a referral to the IDTT and a psychiatrist. During this period, clinical contacts documented the patient's symptoms and functioning, but clinical interventions were not utilized to address his mental health concerns.

The primary clinician's initial assessment was not completed in entirety. Further, the documentation was incomplete, as it did not note that the patient had considered receiving mental health services since KVSP placement. Additionally, the documentation did not summarize the patient's multiple requests for mental health services between January and March 2023, nor did it include pertinent information regarding the patient's anxiety, chronic depression, and trauma symptoms.

The initial psychiatric assessment documentation conducted by a telepsychiatrist was brief in content, although key clinical factors were evaluated, and an antidepressant medication was prescribed. The patient was intermittently adherent, but it was unclear if the telepsychiatrist was aware of the patient's variable medication nonadherence.

An IDTT meeting was conducted by a different clinician than the primary clinician who completed the initial assessment and responded to the patient's multiple requests for services. Limited clinical information was added to the brief IDTT documentation that was copied from the primary clinician initial assessment. IPOCs were not established.

Of note, the documentation indicated that the primary clinician assigned to the patient was a different clinician than the one present at the IDTT meeting or the clinician who responded to the patient's multiple requests for services; these changes in providers resulted in disruption to continuity of care and rapport building for this new MHSDS patient.

**Findings**

The care provided to this patient was inadequate.

The patient's placement in the 3CMS program was delayed; and in the interim, he was not offered skills to manage his symptoms. The documentation indicated discrepancies regarding

when 3CMS placement occurred.  When the initial assessment was finally completed; the assessment was inadequate. This issue was important, as the initial assessment provided the basis for adequate treatment planning.  Relatedly, the IDTT documentation was not clinically useful, and IPOCs were not established.  Diagnostic clarification was needed, as the patient reported symptoms indicative of diagnoses of major depressive disorder and PTSD, and there was no documentation that these diagnoses were considered.

## Patient H

This 42-year-old transgender patient was housed at KVSP since 2014; she was housed in the C yard at the time of the monitoring visit.  She was provided diagnoses of major depressive disorder, unspecified bipolar disorder, and gender dysphoria.  She was prescribed Prozac.  Her healthcare record was randomly selected to assess the adequacy of care provided.

The patient refused her scheduled October 2022 IDTT meeting, and she had consistently refused to attend her annual IDTT meetings since 2020.  Documentation in the clinical summary section did not provide a synopsis of the patient's progress in treatment, symptoms or functioning since the previous IDTT meeting; this was important information for continuity of care.  The sole IPOC that targeted depression remained unchanged since establishment in 2017.

Reviewed psychiatric documentation indicated that the patient intermittently attended psychiatric contacts.  Refusals were followed by cell-front wellness checks.  Documentation of confidential contacts addressed symptoms and functioning, and the patient was described as stable.

The patient attended two of three primary clinician contacts during the review period.  The documentation indicated that consultation with custody staff occurred regarding the patient's functioning and included the patient's symptoms, functioning and coping skills.  In-cell programming activities were provided to this stable patient who actively attended college and work; however, when the patient reported distress, specific skills were not reviewed with the patient to assist in increased distress tolerance.

## Findings

The care provided to this stable patient was marginally adequate.

Treatment planning was insufficient given the lack of updated or useful clinical information.  The patient was appropriately monitored by providers; however, other than treatment with psychotropic medications, clinical interventions were minimal and not offered when indicated.

## Patient I

This 42-year-old 3CMS patient had been housed at KVSP since 2015.  He was previously housed in the D yard and was placed in the MHSDS at the 3CMS level of care in January 2023.  He was provided with a diagnosis of unspecified anxiety disorder.  He was not prescribed psychotropic medication.  His healthcare record was randomly selected to assess the adequacy of care provided.

The patient submitted a request for mental health services due to difficulty adjusting to the institution with hypervigilance and constant worrying. The initial primary clinician assessment was only partially completed and lacked a case conceptualization. The patient was referred to the IDTT for inclusion in the MHSDS at the 3CMS level of care. The IPOC developed during the initial IDTT meeting targeted anxiety. Goals were measurable, and included reduced anxiety, and learning three coping skills; however, the goals were not clearly individualized to address the patient's presenting problem. The established intervention was to foster a therapeutic alliance.

After the initial IDTT meeting, the patient was scheduled for monthly primary clinician contacts. Documentation was thorough, clinically useful, and included a summary of the patient's symptoms, functioning and regular utilization of individualized clinical interventions.

**Findings**

The care provided to this patient was adequate.

Despite inadequacies in the initial primary clinician assessment and initial treatment planning; the documentation of routine contacts indicated that meaningful therapeutic contact occurred.

**Patient J**

This 49-year-old patient received mental health services at the 3CMS level of care since placement at KVSP in 2019. He was housed in the C yard. The patient was provided diagnoses of antisocial personality disorder and persistent depressive disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided.

Despite clinical indication, the March 2023 annual treatment plan IPOCs were unchanged since the treatment plan was developed in April 2022. The patient's depressed mood was targeted with goals to reduce depression, to challenge dysfunctional thoughts and to display appropriate behavior for ultimate transfer to a lower level of care. Interventions included improving functioning through goal setting and fostering a therapeutic alliance. Documentation focused on the rationale for nonreferral to a higher level of care rather than the need for continued treatment at the 3CMS level of care. A summary of symptoms, functioning and response to treatment since the previous IDTT meeting was not included.

The primary clinician contacts generally occurred monthly, exceeding the minimum requirements; these contacts were often precipitated by the patient's request for mental health services. The documentation of those contacts was thorough and indicative of meaningful therapeutic interactions. Interpersonal and institutional stressors were routinely assessed and addressed. Appropriate clinical interventions were offered during treatment, and self-help workbooks were completed between sessions.

**Findings**

The care provided to this patient was adequate.

Despite improvement needed in the IDTT documentation, routine contacts were indicative of meaningful therapeutic interactions for this patient who appeared to be clinically stable and engaged in treatment.

**Patient K**

This 32-year-old patient was housed in Facility D, and he had received mental health services at the 3CMS level of care since 2013. He was provided with diagnoses that included adjustment disorder with anxiety and depression; anxiety; grief; opioid use disorder; polysubstance dependence; and PTSD. During the review period, the patient was housed in the mainline general population and in the CTC. His healthcare record was randomly selected to assess the adequacy of care provided.

The IDTT documentation was not clinically useful. The annual October 2022 IDTT documentation was not updated while the patient was housed in general population. Specifically, clinical information regarding symptoms, functioning and progress in treatment had not been updated since 2020. Relatedly, IPOCs that targeted anxiety and depression remained unchanged since 2021, and a substance abuse IPOC established in May 2022 was also not updated.

While housed in the CTC, the patient refused the primary clinician initial assessment and IDTT meeting attendance. It was unclear how IPOCs were established, as the primary clinician initial assessment included limited current clinical information to inform treatment planning. Of particular concern was the lack of information regarding circumstances that led to the month-long CTC admission. IPOCs targeted depression, but it was unclear how the goal of symptom remission was realistic given the patient's ten-year history of 3CMS treatment. Additionally, it was unclear how this goal would be attained; as there was a lack of evidence-based treatment interventions provided, and the sole intervention documented was to foster a therapeutic alliance.

Remeron and Cymbalta were prescribed while the patient was housed in the CTC, after an initial psychiatric assessment. The documentation of this initial psychiatric assessment was more representative of a routine psychiatric contact than a comprehensive initial psychiatric assessment necessary to inform treatment planning.

On February 13, 2023, after a pattern of medication refusal and refusal to cooperate with allowing vital signs checks; the patient removed his peripherally inserted central catheter line used for intravenous antibiotic administration, and he refused further treatment. During an urgent mental health consult, overly brief documentation indicated that the patient's behavior was not related to his mental illness. He was discharged against medical advice on the following day. Following discharge, his pattern of treatment refusals continued and extended to treatment for a chronic medical illness, toxicology screens and MAT treatment.

After returning to general population, the patient was seen at the cell-front after refusing a psychiatric contact to address medication nonadherence. The reason for nonadherence was not addressed, nor were risks associated with refusals addressed in the documentation. He refused scheduled telepsychiatry appointments on March 10, 2023 and April 20, 2023. His medication nonadherence continued, and this issue was not timely or appropriately addressed. The patient did attend his May 10, 2023 telepsychiatry appointment, but there was no documentation that indicated awareness of the patient's recent heroin use.

The patient refused his only scheduled primary clinician contact on April 26, 2023, and he was subsequently seen for a brief cell-front contact.

**Findings**

The care provided to this patient was inadequate.

Coordinated care between medical and mental health providers was clearly necessary for the adequate treatment of this patient, and it did not occur. His dual diagnosis treatment needs were not appropriately addressed in treatment planning, and the treatment plan was not updated, individualized or useful in continuity of care. Further, treatment needs were not addressed as clinically indicated by either the primary clinician or the psychiatrist, including comprehensive assessment regarding the removal of the peripherally inserted central catheter line or the patient's medication and treatment nonadherence.

**Patient L**

This 38-year-old patient received mental health services at the 3CMS level of care since 2020; he was housed in the C yard. He was provided diagnoses of major depressive disorder and anxiety. He was prescribed Remeron on an as-needed basis. His healthcare record was randomly selected to assess the adequacy of care provided.

The March 2023 annual IDTT documentation did not include a summary of the patient's symptoms, impact on functioning, treatment response and pattern of treatment refusals since the previous IDTT meeting. IPOCs that targeted anxiety and depression were not appropriately updated since 2020.

Telepsychiatry contacts generally occurred more frequently than minimally required. The most recent psychiatric documentation was improved and addressed functioning and symptoms; this documentation indicated that the patient was stable and actively engaged in institutional programming. A rationale for medication change was included, and appointment refusals were appropriately responded to by timely cell-front contact.

The patient refused two of three routine primary clinician contacts during the review period. The cell-front contacts appropriately addressed appointment refusals, and a sufficient wellness check was completed including provision of a cognitive behavior workbook.

**Findings**

The care provided to this patient was adequate.

The patient appeared to be clinically stable.  Areas of needed improvement included the updating of the treatment plan and assessment of the need for continued treatment at the 3CMS level of care for this treatment resistant patient.

**Patient M**

This 24-year-old patient had received mental health services at the 3CMS level of care at KVSP since MHCB discharge in 2021.  He was housed in Facility C. The patient was provided with a diagnosis of major depressive disorder.  He was prescribed Remeron and Zoloft, and Vistaril was ordered on an as-needed basis.  His healthcare record was randomly selected to assess the adequacy of care provided.

Information since the previous IDTT meeting regarding the patient's symptoms, functioning and response to treatment, necessary to inform treatment planning, was not included in January 2023 annual IDTT documentation.  An IPOC for depression, implemented in 2021, remained unchanged.

Telepsychiatry contacts included relevant information regarding psychosocial stressors and the impact on mood and functioning.  The response to medication treatment and the rationale for treatment were documented.

Routine primary clinician contacts between October and April 2023 occurred at the cell-front, and the documentation indicated that the patient refused to leave his cell for a confidential contact.  The documentation indicated that this was a brief wellness check regarding the patient's mild depression.  Given the patient's prolonged pattern of refusals, the provision of in-cell activities would have been useful, as well as consultation with custody officers regarding the patient's functioning.

**Findings**

The care provided to this patient was marginally adequate.

While the psychiatric care provided was appropriate, the primary clinician treatment was insufficient.  The ongoing pattern of primary clinician treatment refusals was not appropriately addressed.  Additionally, the patient's full mental status, symptoms and functioning were not appropriately monitored during this prolonged period of treatment refusals or appropriately addressed in treatment planning.  Further, treatment planning was outdated and not useful in providing continuity of care.

**Patient N**

This 46-year-old patient transferred to KVSP during April 2022, and he was housed in the C yard. His level of care was decreased from the EOP to the 3CMS level of care in June 2022. He was provided diagnoses of amphetamine-induced psychotic disorder and unspecified schizophrenia spectrum and other psychotic disorder. Psychiatric documentation also noted a possible additional diagnosis of schizophrenia. He was not prescribed psychotropic medication at the time of the review. His healthcare record was selected for review to assess the adequacy of care provided, as his IDTT meeting was observed during the monitoring visit.

The patient was consistently seen by the same telepsychiatrist during the review period. Refusals were appropriately followed by cell-front contacts in December 2022 and early January 2023, and psychoeducation was provided. The patient had previously been medication nonadherent and his psychotropic medications were discontinued at his request after the January 11, 2023 psychiatric contact. He was seen by the psychiatrist in April 2023 in response to a referral from the primary clinician to reconsider medication resumption. At that time, the patient was described as malodorous and disheveled. He requested placement in the EOP, and he reported paranoia and visual hallucinations. However, despite encouragement and education, he refused to accept psychotropic medications. He was described as apparently decompensated, however, there was not documentation of plans to consult with the primary clinician for further intervention.

On March 31, 2023, the patient submitted a request for mental health services which stated, "I feeling I need EOP, help I hear voices and hysteria." In contrast to the April 7, 2023 psychiatric contact documentation that described the decompensated state of the patient, on April 5, 2023, the primary clinician indicated that there were "no overt indicators of mood or thought disturbance, and no indicators noted for referral for higher LOC in recent huddles". The primary clinician stated that the patient was housed in a single cell, and that he feared receiving a cellmate; the clinician noted that this might be the reason for his request for EOP placement.

During the May 3, 2023 psychiatric contact, the patient again presented with significant psychotic symptoms and disheveled appearance, and he continued to refuse to accept treatment with psychotropic medications.

The annual IDTT meeting occurred on June 13, 2023, and the expert attended this meeting. Despite clinical need, no new IPOCs were added other than a substance abuse IPOC established in May 2022. The symptoms of psychosis described by the psychiatrist were not addressed, however, a primary clinician follow-up was scheduled to assess need for placement in the EOP. The mental health leadership reported that an IDTT meeting was scheduled for the following week for higher level of care referral consideration.

The four primary clinician contacts between December 2022 and May 2023 occurred cell-front. The documentation of these contacts was generally unchanged, stating that the "clinician initiated cell-front contact" and that the patient declined to meet with the clinician in a confidential setting. A wellness check was conducted, but there was no mental status examination documented or consultation with custody staff regarding the patient's functioning.

**Findings**

The care provided to this patient was inadequate.

There was a lack of collaboration between the psychiatrist and the primary clinician, and there was delay in the IDTT meeting to discuss the patient's clinical decompensation, his request for EOP placement, and assessment for referral to a higher level of care. The stark contrast between the psychiatric and the primary clinician assessments was also an area of concern.

**Patient O**

This 53-year-old patient transferred to KVSP during 2021; he was housed in the A yard. He was provided diagnoses of major depressive disorder, antisocial personality disorder and anxiety disorder. He was prescribed Zoloft and Vistaril. His healthcare record was randomly selected to assess the adequacy of care provided.

Telepsychiatry contacts consistently occurred with the same provider during the review period. The documentation focused on symptom assessment and the impact on activities of daily living. The patient was variably medication adherent, but this issue was not consistently addressed.

Between December 2022 and June 2023, the patient was seen by three different primary clinicians. Despite the lack of continuity of care, the documentation was clinically useful and indicated that meaningful therapeutic interactions occurred.

The annual IDTT meeting did not occur during the monitoring period.

**Findings**

The care provided to this patient was adequate.

Provider contacts occurred as clinically indicated and were timely. The documentation was clinically relevant.

**Patient P**

This 41-year-old patient transferred to KVSP on January 31, 2023; he was housed in Facility C. Psychiatric diagnoses were not documented in the official place of record; however, the healthcare record included diagnoses of bipolar I disorder with psychotic features, mood disorder, schizoaffective disorder, bipolar type, and schizophrenia. The patient was prescribed Zyprexa and Paxil. His healthcare record was randomly selected to assess the adequacy of care provided.

The primary clinician initial assessment was conducted cell-front due to patient refusing to leave his cell for a confidential session. The documentation included a comprehensive summary of the patient's long history of mental illness and psychosis but lacked a review of his most recent

symptoms, functioning and treatment response, necessary for treatment planning. The patient had a history of over twenty MHCB placements, but he had maintained a period of stability since February 2022.

The initial psychiatric assessment identified symptoms of anxiety, intermittent depression and chronic paranoia. The patient was adherent with prescribed psychotropic medications. For reasons that were unclear, the only IPOC established at the initial IDTT meeting was for treatment nonadherence. Additional IPOCs were not added during subsequent IDTT meetings, despite clinical indication.

Telepsychiatry contacts did not occur timely, resulting in lapses in care. This was of particular concern, given the patient's pattern of variable medication adherence. Of note, during April 2023, the patient requested a decrease in the Zyprexa dose, and he was cautioned about the risk of decompensation with the medication decrease. As of early June 2023, he had not been evaluated by the psychiatrist, despite periods of nonadherence documented in the medication administration record since May 2023. Further, the patient was seen by several different psychiatrists for initial and routine contacts as well as during IDTT meetings.

Primary clinician contacts between April and June 2023 occasionally occurred in confidential settings, and the cell-front contacts sometimes occurred for reasons other than patient refusals. The documentation regarding the patient's symptoms of anxiety, depression, and psychosis and his functioning was useful. Although the patient was offered from five to seven groups weekly; his attendance varied, and the rationale for treatment nonadherence was not assessed. When the documentation indicated the ongoing presence of auditory hallucinations and medication nonadherence, psychiatric consultation was not sought.

**Findings**

The care provided to this patient with a long history of psychiatric decompensation was inadequate.

Psychiatric contacts did not occur as required or as was clinically indicated. Relatedly, collaboration between the psychiatrist and the primary clinician was necessary but did not occur for this medication nonadherent patient with a long history of psychosis and decompensation who evidenced signs of psychiatric decompensation that coincided with medication nonadherence. The patient's identified treatment needs were not addressed in treatment planning, and the lack of psychiatric provider continuity likely contributed to this issue. While he was regularly monitored during reviewed primary clinician contacts, clinical interventions were not utilized.

**Patient Q**

This 49-year-old transgender patient had been housed at KVSP since April 2022; she was housed in Facility C. She was provided diagnoses of ADHD, bipolar II disorder and PTSD. She was prescribed Abilify, Prozac and prazosin. Her healthcare record was randomly selected to assess the adequacy of care provided.

Reviewed IDTT documentation between October 2022 and June 2023, indicated that IPOCs for anxiety and depression remained unchanged for four routine IDTT meetings since development in May 2022. Goals to reduce symptoms included generic interventions, such as fostering a therapeutic alliance and goal setting; the latter intervention lacked rationale and individualization. Documentation regarding the patient's symptoms, functioning and treatment response was needed.

There were significant lapses in telepsychiatry care and a lack of continuity of care. There was no monthly psychiatric contact during January 2023, and there were no contacts between the February 2023 and June 2023 contacts. The patient's assigned psychiatrist varied for routine contacts and IDTT meeting attendance during the review period. When contacts occurred, documentation was clinically relevant and included an assessment of symptoms and basic functioning including sleep, appetite, and violent behaviors.

Primary clinician routine contacts between April and June 7, 2023 consistently occurred with the same clinician. The documentation indicated that meaningful therapeutic sessions occurred with an unlicensed psychologist, and the documentation focused on the patient's management of current stressors and symptoms with variable utilization of clinical interventions such as psychoeducation and cognitive behavioral therapy.

A review of group documentation, including nursing-led treatment groups, indicated that the patient was offered less than ten hours of weekly group treatment during May 2023.

**Findings**

The care provided to this stable and treatment engaged patient was marginally adequate.

Significant delays and lack of continuity were areas of concern in psychiatric care, and improvement was needed in the documentation of the patient's functioning. Primary clinician documentation indicated meaningful therapeutic primary clinician contact, despite insufficient treatment planning.

**Patient R**

This 33-year-old patient transferred to KVSP from an ICF in September 2022; he was housed in Facility C. The patient had a long history of mental illness which included psychosis, mood instability and self-harm behaviors with multiple inpatient hospitalizations in the MHCB and PIP since 2013. He was provided diagnoses of ADHD, bipolar disorder, schizophrenia, and substance use disorder. He was prescribed several oral psychotropic medications, as well as a long-acting antipsychotic medication administered by monthly injection. His healthcare record was randomly selected to assess the adequacy of care provided.

After discharge from the ICF, an initial psychiatric assessment was not located in the healthcare record and the patient was not seen by the telepsychiatrist until December 14, 2022, three months after transfer to KVSP.

The initial primary clinician assessment was outdated, as historical information was copied from at least December 2021. An IPOC for anger was implemented at the initial IDTT meeting and was continued at the subsequent routine IDTT meeting. Identified depressive and anxiety symptoms were not targeted.

Between the reviewed dates, the patient was seen by three different psychiatrists. There was a lapse in contacts from January 11, 2023 to an MHCB admission on March 28, 2023. Of note, the patient refused a scheduled psychiatric appointment on January 24, 2023, and there was no documentation of psychiatric follow-up prior to the MHCB admission. When contacts occurred, the documentation was brief in content but relevant and adequate for continuity of care, noting the patient's medication adherence.

Reviewed primary clinician documentation was indicative of meaningful therapeutic contacts. The patient's symptoms and functioning were monitored, and clinical interventions were appropriate for grief related to the death of the patient's mother.

The patient had a brief admission to the KVSP MHCB between March 28, 2023 and April 5, 2023 after reported suicidal ideation. During the MHCB stay, symptoms of depression, anxiety and auditory hallucinations decreased, and the patient was returned to the EOP. The initial psychiatric assessment included relevant clinical information except for the history of psychiatric treatment. The primary clinician initial assessment failed to include an updated narrative of the patient's treatment needs upon return to the EOP, and treatment planning narrowly targeted auditory hallucinations.

During May 2023, the patient was offered less than ten hours of groups weekly. Nursing-led treatment groups had not been offered since the MHCB placement.

No SRASHE was documented after EOP placement from the ICF or after the MHCB discharge.

**Findings**

The care provided to this patient was inadequate.

The psychiatric and primary clinician initial assessments were insufficient to inform treatment planning which did not address identified treatment needs; this was particularly important for this patient who had recently been discharged from the ICF level of care. Delays in psychiatric care were an additional area of concern. SRASHEs were not completed as required. These significant deficiencies and omissions in care overshadowed the otherwise adequate care provided by the primary clinician.

**Patient S**

This 39-year-old patient transferred to KVSP from an ICF in March 2022. He was provided diagnoses of schizoaffective disorder, bipolar type and PTSD, and he was prescribed several

psychotropic medications. His healthcare record was randomly selected to assess the adequacy of care provided.

During the review period, the patient had a brief MHCB admission due to difficulty managing command auditory hallucinations. He was discharged to restricted housing and then returned to the mainline EOP in December 2022. Of note, initial assessments and IDTT documentation did not clearly discuss these pertinent events or provide a useful summary of symptoms, precipitants, or maintaining factors to inform treatment planning. The patient was re-admitted to the MHCB on May 18, 2023, where he remained at the time of the review pending ICF acceptance and transfer.

Between October 2022 and May 2023, the patient was seen by four different psychiatrists. The quality of documentation varied by provider, and at times, was difficult to follow due to grammatical errors. During the March 27, 2023 psychiatric contact, there were signs of decompensation and poor distress tolerance that were not communicated to the patient's primary clinician. Of concern, the patient was not seen for psychiatric contact until May 10, 2023, when his mental status had further deteriorated. Although medication changes occurred at that visit, the patient was admitted to the MHCB eight days later.

Reviewed primary clinician documentation provided a thorough description of the patient's symptoms and impact on his functioning. Signs of decompensation were documented by the primary clinician during February 2023; however, this information was not communicated to the psychiatrist. Despite medication adherence during March 2023, the patient reported increased symptoms. Specifically, he reported hallucinations which impacted sleep, visual hallucinations of blood on the walls, paranoia, and loss of appetite resulting in weight loss. In addition, the patient had delusional thinking and poor distress tolerance, resulting in his destruction of his tablet. These symptoms persisted and intensified until the patient was admitted to the MHCB; this admission occurred after two months of documented psychiatric decompensation.

**Findings**

The care provided to this patient with serious mental illness was inadequate.

Of significant concern was the unnecessary delay in referral to a higher level of care from the EOP to MHCB placement; this was particularly concerning as the patient was noted with symptoms of decompensation for several months prior to the MHCB placement. This delay was further hampered by the lack of coordination of care between the primary clinician and psychiatrists, as well as by the multiple psychiatric provider changes. Another area of concern that negatively impacted his care was the documentation of insufficient treatment planning.

**Patient T**

This 40-year-old EOP patient was transferred to KVSP on April 28, 2023, and he was housed in an overflow housing unit. Since KVSP placement, he refused to transfer to the EOP housing as he preferred single cell housing. He was provided a diagnosis of schizophrenia, and he was

adherent with monthly antipsychotic medication injections. His healthcare record was randomly selected to assess the adequacy of care provided.

The initial primary clinician assessment indicated that the patient had a long history of psychosis, violence, substance use and self-harm. His only PIP hospitalization occurred between October 2021 and May 2022. Although the patient engaged with PIP staff at the time of discharge; he had a prolonged pattern of limited interactions with others after the PIP discharge that continued after KVSP transfer.

The patient refused the initial psychiatric assessment scheduled on May 22, 2023, almost one month after KVSP arrival, and he again refused a second attempt on June 5, 2022. A June 9, 2023 psychiatric note was identified as an initial psychiatric assessment; however, most of the information was copied from prior assessments. Further, no mental status assessment was completed, and it was unclear if the patient attended the assessment.

The patient did not attend his initial IDTT meeting when IPOCs for negative symptoms were established. Routine primary clinician documentation noted an IPOC for depression, but this IPOC was not located in the IDTT documentation. Documentation indicated that the patient had been a high treatment refuser since June 2022, which was assessed by prior treatment providers as volitional and not due to decompensation or psychiatric symptomology. The treating clinicians did not appear to consider the patient's prolonged pattern of decreased interactions with others since the PIP discharge or the impact that his negative symptoms had on his limited treatment engagement.

Routine primary clinician contact documentation consistently occurred at cell-front due to the patient refusing to leave his cell for a confidential session. The patient and his cell were described as clean. The patient did leave his cell to obtain medications and meals, but he otherwise remained in his cell. The documentation was unclear regarding whether the patient consistently ate his meals. He consistently avoided eye contact with minimal to no engagement with others.

On May 22, 2023, a custody officer submitted a routine consult to mental health describing the patient as confused and disoriented. On May 30, 2023, the clinician assessing the patient indicated that he was withdrawn and that his behavior was volitional to avoid clinical contact to prevent transfer from his single cell. There was no documentation that the clinician consulted with the referring officer.

The patient did not attend the only group that he was offered on May 10, 2023.

**Findings**

The care provided to this patient with a severe mental illness was clearly inadequate.

The patient did not receive treatment that was clinically indicated, including delay in psychiatric assessment and poor provision of group therapy. The patient's refusals resulted in only cell-front contacts which did not allow for an adequate clinical assessment. An IDTT meeting was needed

to address the impact of his negative symptoms on the prolonged pattern of minimal treatment engagement, as well as to develop targeted interventions and to assess the need for a higher level of care. Additionally, the response by the clinician to the custody officer referral was delayed, and consultation with the referring officer was indicated but did not occur.

**Patient U**

This 27-year-old patient transferred to KVSP on March 3, 2023; he had been discharged from a PIP during February 2023. He was provided diagnoses of antisocial personality disorder, schizoaffective disorder, malingering and alcohol and cannabis use disorders. He was prescribed Abilify, Zyprexa, Cogentin, Depakote, and he received his psychotropic medications by a PC 2602 order due to danger to others and grave disability. His healthcare record was randomly selected to assess the adequacy of care provided.

For reasons that were unclear, the patient was initially placed in restricted housing but was released in response to an ICC less than one week later.

The patient was seen for multiple clinical contacts soon after KVSP placement. During a routine consult, he requested to change his level of care due to gang politics. A CIT was activated on March 9, 2023, after he expressed suicidal ideation but recanted during the evaluation and indicated that he wanted to leave the EOP for placement in the 3CMS program or to obtain a housing change. A SRASHE was completed at that time that assessed moderate chronic and low acute suicide risk. He was sent to an outside hospital after he was observed unresponsive and confused with facial bleeding. The precipitant was unclear, and he was discharged from the hospital against medical advice. He was seen for an urgent mental health consult upon his return from the hospital when he reported distress regarding lack of contact with his girlfriend but denied suicidal ideation. None of these incidents, current symptoms or functioning were included for conceptualization of the patient's current treatment needs in the primary clinician initial assessment, which only included information that was copied from prior assessments. Additionally, the initial primary clinician assessment did not occur timely.

The initial IDTT meeting occurred on March 22, 2023; the initial psychiatric assessment was not timely and did not occur until April 21, 2023. The sole IPOC targeted treatment nonadherence which was not individualized to the factors that impeded the patient's treatment engagement. There was no IPOC for symptoms or impaired functioning. The documentation of the subsequent IDTT meeting in April 2023, indicated that the patient would be considered for transfer to a lower level of care should he remain stable.

The initial psychiatric assessment was conducted cell-front. There was no documentation of psychiatric contact during May 2023. After the patient refused psychiatric contact in early June 2023, he was seen by the onsite psychiatrist with whom he again refused to meet in a confidential setting. The brief documentation of that encounter was not individualized or clinically relevant given the patient's prolonged pattern of treatment refusal.

The patient consistently refused to attend groups and routine primary clinician contacts with two different clinicians. The cell-front contact documentation indicated the completion of a wellness

check, and it was minimally changed with each contact.  At times, the patient's clinical presentation was unusual, as he was described as laughing inappropriately with reportedly a high level of distress and inappropriate affect.  It was consistently documented that his lack of treatment participation was volitional and not representative of decompensation.  It was also documented that the patient had a history of not participating in treatment due to gang politics which was assessed as the current reason for his nonparticipation.  Of note, there was documentation that his cell window was partially covered during several contacts from a different clinician during May 2023.

**Findings**

The care provided to this patient was inadequate.

In addition to the untimely initial assessments, the documentation quality was poor and not individualized for the patient's current treatment needs which impacted treatment planning.  Since KVSP placement, he was only seen at the cell-front which do not allow for an adequate assessment.  Further, the determination that his possible safety concerns impacted treatment participation required multidisciplinary assessment and evaluation in an IDTT meeting.  Diagnostic clarification was needed; the diagnosis of malingering was inappropriate and incorrect given the patient's PC 2602 order that indicated the need for psychiatric treatment due to a major mental illness.

**Patient V**

This 66-year-old patient transferred to KVSP during February 2023.  The patient utilized a wheelchair, and he had multiple medical concerns, including bladder cancer.  His healthcare record was selected to assess the adequacy of care after his case was discussed during an observed EOP third watch huddle.  During the huddle, nursing staff reported that the patient was hostile and insisted on changing his catheter himself in his cell rather than in the medical clinic.  There was discussion of a recent foreign body insertion, but the documentation of this incident was not located in the healthcare record.  After consultation with the mental health leadership, it was reported that the patient was referred for placement in an OHU.

This patient refused contacts with the telepsychiatrist during March and May 2023, and he was seen by the onsite psychiatrist on June 5, 2023.  The patient was minimally engaged during the session, and he denied mental health distress.  The provided diagnoses in the healthcare record documentation varied and required clarification.  This psychiatrist noted a diagnostic history of anxiety, PTSD and antisocial personality disorder.  In contrast, except for anxiety, other documentation noted diagnoses of an adjustment disorder with depressed mood and bipolar disorder.  He was prescribed Depakote, and he received his psychotropic medications by a PC 2602 order.

The primary clinician initial assessment was completed at the cell-front and the documentation was brief in content due to the nonconfidential nature of the assessment.  The patient noted his primary treatment needs as anger and depression which were established as IPOCs during the initial IDTT meeting and were continued during subsequent IDTT meetings; however,

established goals were not individualized. The IDTT documentation noted that the patient did not appear with current danger to himself; however, the rationale for the initiation of an IPOC for danger to self with a goal to reduce suicidal ideation was unclear.

The documentation of primary clinician contacts indicated that meaningful therapeutic sessions occurred with individualized interventions to address the patient's chronic pain and frustration regarding perceived ineffective medical care. His medical ailments impacted his ability to attend groups, and he was placed on modified programming. Consistent with the observed huddle discussion, the documentation indicated that the patient was hostile to nursing staff and that a multidisciplinary meeting was planned for late May 2023; however, the documentation of that meeting was not located in the healthcare record. Additionally, multiple psychiatric referrals were submitted to address the patient's mood instability, and the response to those referrals was delayed.

**Findings**

The care provided to this patient was marginally adequate.

The patient was appropriately monitored and treated by the primary clinician during routine contacts. Multiple psychiatric referrals, however, were not addressed, and needed care was delayed. Coordinated multidisciplinary care between the psychiatrist, primary clinician, medical and mental health staff was needed. Diagnostic clarification was also needed, as well as individualized treatment planning.

**Patient W**

This 55-year-old patient transferred to KVSP during October 2021. He was provided a diagnosis of bipolar disorder, and he was prescribed Lexapro and lithium. His healthcare record was selected for review to assess the adequacy of care provided, as his IDTT meeting was observed during the monitoring visit; however, the patient was not present at the IDTT meeting.

The patient utilized a wheelchair or walker for ambulation, and his housing alternated between the mainline EOP and the CTC due to multiple falls with injuries. The reason for the falls was partly hypothesized as due to substance use; although, no substance use diagnosis was documented. The patient had multiple medical concerns, and he was followed by a neurologist.

The patient was seen by three different telepsychiatrists and the onsite psychiatrist during the reporting period, none of these psychiatrists attended the IDTT meetings. Medication changes occurred during October 2022 due to concern that the prescribed medications contributed to the frequent falls. There was brief improvement in the falls with the medication change and the CTC placement, but the falling episodes resumed. The patient frequently reported depression and anxiety.

Primary clinician contacts occurred with four different providers between March and June 2023; it appeared that these changes occurred in part due to housing relocations. Overall, the documentation of those contacts provided a summary of the patient's functioning and stressors.

The documentation generally indicated that the contacts were therapeutic and beneficial, although, the consistent use of targeted interventions was needed. Occasionally, interpersonal, grief and trauma issues were addressed, but there was no documentation of consideration of a trauma-related diagnosis.

The observed IDTT documentation did not include IPOCs. There was, however, a useful summary regarding the patient's recent mental status and treatment goals included in the clinical summary section, as well as a summary of his treatment history since CDCR placement in 2005.

**Findings**

The care provided to this patient was marginally adequate.

Coordinated mental health, medical, and substance abuse treatment planning was needed. Multiple provider changes resulted in disruption to continuity of care. Treatment planning and implementation needed improvement. Diagnostic clarification was also needed.

**Patient X**

This 36-year-old transgender patient transferred to KVSP on June 1, 2023 from acute inpatient care where he was treated for suicidal ideation, depression, and aggressive behavior. He was housed in Facility C. He was provided diagnoses of schizoaffective disorder and antisocial personality disorder. He was prescribed Abilify and Wellbutrin, and he received his psychotropic medications by a PC 2602 order. His healthcare record was selected for review to assess the adequacy of care provided after his initial IDTT meeting was observed during the monitoring visit.

The five-day follow-up contacts occurred timely; although, minimal clinical information was added to the required content. A SRASHE was completed upon the patient's return to KVSP that assessed high chronic and low acute suicide risk. No safety plan was completed.

Shortly after returning to KVSP on June 10, 2023, the patient ingested a medically concerning amount of toothpaste and an earbud, as he was upset and depressed; he was subsequently transferred to an outside hospital. The patient was discharged from the hospital against medical advice on the following day. This incident was addressed during an urgent consult that occurred on the following day; however, this information was not included in the primary clinician's initial assessment completed by the same clinician. Relatedly, the primary clinician initial assessment did not include any original or recent clinical information including symptoms or functioning and was not individualized to the patient's current treatment needs. During the initial IDTT meeting, IPOCs for hallucinations and self-harm were established; but the goals were not individualized, and interventions were not developed.

The patient attributed his foreign body ingestion to a belief that he had a worm in his stomach, but he was able to engage in reality testing that the discomfort in his abdomen could have been related to his ongoing medical issues. It was also noted that the patient had a history of foreign body ingestion when stressed. A SRASHE assessed chronic moderate and low acute suicide risk.

The patient did not participate in the safety plan development, and the clinician indicated that the patient might be malingering with limited supporting data provided.

The patient was also seen for psychiatric contact the day after he returned from the hospital, but the foreign body ingestion was not addressed in the psychiatric contact documentation. Medication concerns were addressed, and the patient reported ongoing sadness and depression but denied other mental health distress. The documentation noted a history of validated paranoia and psychotropic medication nonadherence attempts despite the presence of a PC 2602 order.

**Findings**

The care provided to this patient was inadequate.

It was unclear why the patient was not referred to alternative housing or the MHCB following hospital discharge against medical advice after the foreign body ingestion. Documentation in the primary clinician assessment and treatment plan excluded pertinent clinical information necessary for continuity of care and efficacious treatment planning. Collaborative treatment planning was needed, as the treatment needs identified by the psychiatrist were not targeted. The assessment of decreased suicide risk from high to moderate chronic risk within ten days was an issue of concern.

**Patient Y**

This 57-year-old patient transferred to KVSP on January 4, 2023 from a PIP where he was treated due to danger to self and others. He was provided diagnoses of schizoaffective disorder, bipolar type, alcohol use disorder, and antisocial personality disorder. He was prescribed Zyprexa, and he received his psychotropic medications by a PC 2602 order. His healthcare record was randomly selected to assess the adequacy of care provided.

The primary clinician initial assessment included a useful summary of the patient's current functioning and long psychiatric history of mental illness and suicide attempts, although some of the information was copied from another provider without identification of original author, date, or level of care. It was documented that the patient was able to manage the presence of daily auditory hallucinations. He, however, denied these symptoms to the onsite psychiatrist during the initial psychiatric assessment.

The IPOCs identified at the initial IDTT meeting that targeted hallucinations and delusions were continued at the subsequent IDTT meeting. Despite identification of new symptoms of depression and anxiety, additional IPOCs were not initiated. Treatment goals were not individualized, and the rationale for implementation was unclear.

After the initial psychiatric assessment with the onsite psychiatrist, the patient was seen by two different telepsychiatry providers, neither of whom attended the IDTT meeting or were his assigned psychiatrist. The documentation of these encounters was clinically appropriate and described the patient as stable during March and June 2023. No other psychiatric documentation was in the healthcare record.

The documentation of primary clinician contacts was thorough and consistently representative of meaningful therapeutic sessions, and appropriate clinical interventions were utilized.

**Findings**

The care provided to this patient was marginally adequate.

The continuity of psychiatric providers, the lack of psychiatric input in treatment planning and untimely routine psychiatric contact were, however, noted. While treatment planning documentation needed improvement in individualization and inclusion of utilized intervention; the routine care provided by the primary clinician was appropriate.

**Patient Z**

This 30-year-old male patient was provided diagnoses of PTSD, depression, amphetamine-type substance use disorder, severe, in early remission, antisocial personality disorder, cannabis use disorder, severe, in early remission, cocaine use disorder, severe, in early remission, opioid dependence, opioid use disorder, other (or unknown) substance-induced psychotic disorder, with moderate or severe use disorder, and other hallucinogen use disorder, severe, in early remission. He was prescribed aripiprazole, buspirone and mirtazapine on an as-needed basis. He was generally adherent with his medication regimen. The patient received mental health services at the 3CMS level of care. His healthcare record was randomly selected for review of the mental health services provided in STRH.

The patient was placed in the ASU on November 22, 2022, after receiving an RVR for battery causing serious injury. His ASU pre-placement screening noted no acute concerns, and the RVR mental health assessment found no concerns with the patient's ability to function in STRH.

The initial mental health assessment was completed on December 2, 2022 at cell front, as the patient refused to participate in a confidential session. The content was adequate, but information was limited by the patient's refusal to engage.

An initial psychiatric assessment was completed on December 5, 2022 by a nurse practitioner, which the patient also refused. The content was limited but adequate. An IDTT meeting occurred on December 14, 2022; the patient refused to attend the IDTT. IPOCs and goals were created to address the patient's anger, depression, and anxiety with appropriate interventions listed. The rationale provided for maintaining the patient at the 3CMS level of care was adequate.

The patient was offered weekly primary clinician contacts and weekly groups; all were refused. He was seen at cell front for all primary clinician contacts and was assessed as adequately as possible given the nonconfidential nature of the contacts. He was offered in-cell self-help reading by the primary clinician, and there was evidence that the content was reviewed.

The patient was seen by the psychiatric nurse practitioner as scheduled and in response to a request. The patient requested a change in medication to assist in concentration, but refused to allow the EKG required to initiate the medication. Additionally, the patient tested positive for drug use, and bupropion was discontinued. The patient was angry and made a veiled threat, but the psychiatric nurse practitioner responded appropriately. A follow-up SRASHE was completed at cell front on January 7, 2023, and it appeared adequate despite the limitations of the cell-front assessment. The primary clinician routinely documented collateral information, and there was continuity of care among providers.

Psych tech rounds were completed daily except on March 2, 2023, when no rounds were documented. The patient transferred to another facility on March 7, 2023.

**Findings**

The care provided to this patient was adequate.

Unfortunately, the patient refused to engage with clinicians, limiting his treatment progress. There was also a lack of documentation for psych tech rounds on March 2, 2023.

**Patient AA**

This 44-year-old male patient was provided a diagnosis of delusional disorder. He was not prescribed psychotropic medications, except hydroxyzine on an as-needed basis. His healthcare record was randomly selected for review of the mental health services provided in STRH. The patient received mental health services at the 3CMS level of care until November 16, 2022, when his level of care was increased to EOP; subsequently he transferred to an EOP hub within 30 days.

The patient was offered weekly primary clinician contacts, but he refused to attend any out-of-cell contacts. The primary clinician documentation remained unchanged for each weekly contact. This was concerning as the notes continued to contain inaccurate information about the patient's contacts with the psychiatric nurse practitioner and failed to note behaviors that resulted in RVRs, including battery on a peace officer.

The patient also refused contacts with the psychiatric nurse practitioner who attempted to prescribe risperidone, but the patient only accepted one dose of the medication. The recreation therapist conducted weekly cell-front contacts. During a November 16, 2022 IDTT meeting that the patient refused to attend, the IDTT decided to increase the patient's level of care to EOP. The IDTT documentation noted the patient's recent RVRs but failed to note that the patient was prescribed risperidone for two weeks.

After EOP placement, the patient was seen by his 3CMS primary clinician, who completed a primary clinician initial assessment, and a psychiatrist completed an initial psychiatric evaluation. The EOP initial IDTT documentation was largely unchanged from the prior 3CMS IDTT documentation completed two weeks prior. Of note, weekly primary clinician progress

notes continued to include the same weekly narrative, including inaccurate information, even after EOP placement.

The patient was seen daily by a psych tech during rounds. On December 9, 2022, the psych tech referred the patient to the psychiatrist, as the patient's cell was in disarray and was filled with trash. The psychiatrist attempted to see the patient on December 12, 2022, but the patient refused. None of this information was included in documentation by the primary clinician on the same date.

**Findings**

The care provided to this patient was adequate.

However, primary clinician documentation was inadequate. Primary clinician notes were copied and included outdated and inaccurate information that was unchanged each week. The IDTT appropriately identified the patient's need for a higher level of care, and he was transferred timely to an EOP hub. The psychiatric nurse practitioner attempted to treat the patient with antipsychotic medication, but the patient refused. After EOP placement, the patient's psychiatric care was transferred to a psychiatrist.

**Patient BB**

This 40-year-old transgender female patient was provided diagnoses of delusional disorder, gender dysphoria, major depressive disorder recurrent episode, severe, and amphetamine-type substance use disorder. The patient was not prescribed psychotropic medications. Spanish was the patient's primary language, and she had limited English comprehension. Her healthcare record was randomly selected for review of the mental health services provided in STRH.

The patient was placed in the STRH on December 14, 2022, and tested positive for COVID-19 on the same date. An initial primary clinician assessment was completed on December 19, 2022 at cell front. The primary clinician documented the patient's refusal of the contact; conversely, documentation indicated that the patient was on COVID-19 isolation status. The assessment was marginally adequate.

An initial psychiatric assessment was scheduled for December 21, 2022, but was rescheduled as the patient was in isolation due to COVID-19. The patient refused the initial psychiatric assessment the following week, but engaged at cell front. The content of this assessment was adequate and noted that the patient was placed in STRH for safety reasons.

An initial IDTT meeting occurred on January 4, 2023. The patient refused to attend the IDTT meeting. The IDTT documentation indicated that the patient had some functional impairments but failed to identify what the impairments were and included no information about the patient's safety concerns. The treatment plan included an IPOC for delusions.

The primary clinician documentation was generic, copied and repeated for each session, and referred to the patient as "he" and not her preferred pronoun "she." It was unclear from the

primary clinician documentation if sessions were conducted in Spanish or English. Weekly primary clinician contacts were refused by the patient, and contacts occurred at cell front.

The recreation therapist also failed to document the patient's preferred pronouns. Weekly recreation therapy groups and the recreation therapist individual contacts were refused by the patient and occurred at the cell front.

The psychiatric nurse practitioner met with the patient at cell front on February 1, 2022, as the patient refused to leave her cell for a confidential contact. The session was conducted in Spanish as the nurse practitioner was Spanish speaking.

Psych tech rounds were completed daily during the patient's STRH stay. The patient transferred to another facility on February 23, 2023.

**Findings**

The care provided to this patient was inadequate.

Primary clinician notes were generic and not individualized, and IDTT documentation failed to identify the patient's functional impairments or provide adequate rationale for retaining the patient at the 3CMS level of care. Further, it was unclear if primary clinician and recreation therapist contacts occurred in the patient's primary language.

**Patient CC**

This 27-year-old male patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, and opioid use disorder. He was prescribed fluoxetine and olanzapine, and hydroxyzine ordered on an as-needed basis. The patient was generally adherent with olanzapine, but only intermittently took fluoxetine. The patient received mental health services at the 3CMS level of care. His case was randomly selected for review of the mental health services provided in STRH.

The patient was placed in the ASU on November 21, 2023, after he was the victim of a stabbing. An ASU pre-placement screening was completed on that date which noted no mental health concerns. Documentation indicated that the patient had only been housed in the general population for 11 days prior to the stabbing; he had previously been released from the ASU.

The patient was seen for an initial psychiatric assessment by a psychiatric nurse practitioner on November 28, 2022, and the initial primary clinician assessment occurred on November 29, 2022. Both assessments were completed at cell front, as the patient refused to leave his cell. The assessments were adequate but limited by the cell-front lack of confidentiality.

An initial IDTT meeting occurred on December 7, 2022. The patient refused to attend the IDTT meeting. The content of IDTT documentation was adequate; however, there was reference that the patient was prescribed medication for depressive symptoms, which he was not. IPOCs for

anxiety, depressed mood, and substance use were initiated.  The rationale for retaining the patient at the 3CMS level of care was adequate.

During December 2022, the patient was offered weekly primary clinician and recreation therapist contacts, but he refused all.  He reportedly accepted some self-help materials offered by the primary clinician but was not interested in the packets offered by the recreation therapist.

On January 6, 2023, a primary clinician noted that the patient was seen in response to a request he made to the psych tech to see a primary clinician, yet there was no documentation in the psych tech rounding noting the referral.  The clinician who saw the patient was not his assigned primary clinician.  The patient reported depression and auditory hallucinations.  The patient reported an interest in receiving more mental health treatment and was referred to a psychiatrist to address his increased depressive symptoms.  He was also provided with self-help materials.  The documentation did not mention that the patient had consistently refused all offered therapeutic contacts to date.
The patient continued to refuse subsequent primary clinician contacts and refused a consult to see the psychiatric nurse practitioner on January 10, 2023, despite his earlier request.  The patient was seen at cell front by the psychiatric nurse practitioner on January 12, 2023, when he again reported increased depression and auditory hallucinations.  The psychiatric nurse practitioner noted that this patient, and four other patients, were all reporting the same symptoms and were requesting a higher level of care.  The psychiatric nurse practitioner also indicated that there was no overt evidence of the symptoms reported by the patient.  The psychiatric nurse practitioner prescribed antipsychotic and antidepressant medications and ordered the necessary laboratory testing and an EKG.  The patient refused the ordered testing; the orders were subsequently cancelled, but the medications were continued.  The patient refused follow-up with the psychiatric nurse practitioner on February 6, 2023; however, no note was entered by the provider about that encounter.

On January 18, 2023, the patient was seen by the primary clinician, and the documentation was very similar in content to prior notes and failed to acknowledge the recent psychiatric consult and change in medications; it only noted the patient's medication that was ordered on an as-needed basis.  This pattern of poor documentation by the primary clinician continued in subsequent notes.  Of concern was the primary clinician documentation that the medication information was "per [medical administration record] MAR summary," yet the medication administration record clearly documented the additional medications.

While the patient refused most recreation therapist groups, he attended a group on January 30, 2023; however, a primary clinician note on the following day included the same language present in prior notes stating "(r)ecord review indicates Pt did not attend most recent treatment group." That statement was incorrect.

Psych tech rounds were documented daily.  On January 20, 2023, the psych tech noted that the patient would be referred to his primary clinician; however, there was no documentation indicating that the patient was seen in response to this referral.  The patient transferred to another facility on February 10, 2023.

**Findings**

The care provided to this patient was inadequate.

The primary clinician documentation was inadequate, inaccurate, and was repeated unchanged each week. The documentation failed to evidence adequate review of the patient's healthcare record, despite statements that the record had been reviewed. As a result, the primary clinician appeared unaware that the patient had reported increased depression and auditory hallucinations which required treatment with psychotropic medications. The primary clinician also failed to note the one occasion when the patient engaged in out-of-cell treatment for a recreation therapy group or to respond to a referral from the psych tech.

Additionally, documentation was inadequate regarding the rationale for the psychiatric nurse practitioner noting that the patient did not demonstrate overt evidence of increased depression and auditory hallucinations and that similar, rapid onset of symptoms was also reported by his peers. Nonetheless, the nurse practitioner prescribed medications to address these symptoms without further investigation. Additionally, the psychiatric nurse practitioner continued to prescribe medications, despite the patient's refusal to undergo necessary laboratory testing and an EKG.

**Patient DD**

This 68-year-old male patient was provided diagnoses of major depressive disorder, PTSD, antisocial personality disorder, and narcissistic personality disorder. He was not prescribed psychotropic medications. His case was randomly selected for review of the mental health services provided in STRH. The patient received mental health services at the EOP level of care and used a wheelchair.

The patient was placed in STRH on November 11, 2022 after MHCB discharge. The STRH placement was due to safety concerns. The patient's level of care was increased to EOP immediately prior to MHCB placement. The patient reported suicidal ideation after he was informed of placement at the EOP level of care.

Upon placement in STRH, the patient was seen daily for five-day follow-up contacts, and the safety plan was reviewed with him. An initial primary clinician assessment was completed at cell front on November 15, 2022, as the patient refused to be seen in a confidential setting. The assessment was adequate and included an appropriate functional assessment and updated clinical summary.

An initial IDTT meeting occurred on November 16, 2022; however, an initial psychiatric assessment was not completed prior to the meeting. The patient refused to attend the IDTT. An IPOC for hallucinations was included in the treatment plan. The rationale for retaining the patient at the EOP level of care was adequate.

The initial psychiatric assessment was completed on November 22, 2022, and was internally inconsistent and challenging to decipher. For example, documentation indicated that the patient

denied "audiovisual hallucinations," yet the psychiatrist described that the patient reported experiencing auditory hallucinations of his cellmate, who had been killed. The note also included the patient's report that his medications were effective, that he was taking them regularly without side effects, and that he preferred to remain on his current medications. The patient was, however, not prescribed any psychotropic medications, and requested bupropion. The psychiatrist did not prescribe any medications for the patient during that contact.

The patient was seen by the primary clinician on three subsequent occasions during the following four weeks. The patient agreed to attend two of the contacts in a confidential setting, and those sessions appeared effective for the patient's needs but were not consistent with the treatment plan. Specifically, the sessions addressed the patient's frustrations with not receiving bupropion and housing concerns, yet the documentation did not mention hallucinations previously described and reported. The patient was seen by psychiatric providers on two occasions; however, he was not seen by the same provider.

The patient refused all recreation therapist groups, reporting that he was unable to attend as he utilized a wheelchair.

The patient was seen daily for psych tech rounds, and transferred to another facility on December 12, 2022.

**Findings**

The care provided to this EOP patient housed in STRH was inadequate.

The patient did not receive a timely initial psychiatric assessment; when he was seen for an assessment, it was inadequate and internally inconsistent. The treatment plan was not individualized, and the goals did not address the patient's current mental health needs. Despite the patient's EOP level of care in STRH, he was not seen weekly by a primary clinician. Continuity of care by psychiatry was poor. The patient was offered group sessions with a recreation therapist for 90 minutes weekly.

**Patient EE**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. The patient was placed in restraints in the MHCB on December 19, 2022, for approximately two and one-half hours. The documentation indicated that the treatment team requested expedited transfer to the acute inpatient program due to the patient's mental health decompensation. His recent behavior included fecal smearing, throwing urine, threatening staff, refusing to leave his cell to shower and severe agitation. Due to his dangerous behavior due to psychosis, he was placed in therapeutic restraints to provide involuntary medications. After the restraints were placed, the patient was provided medications, blood was obtained for laboratory studies, and an EKG was administered. The patient remained verbally aggressive, yelling profanities at the staff. While the psychiatric note suggested that a PC 2602 order was already in place; the nursing notes clarified that while the patient had prior PC 2602 orders, there was not an active

order at the time of the KVSP MHCB placement. The psychiatrist initiated an emergency PC 2602 order, as the patient posed danger to himself and others requiring the use of restraints.

No diagnosis was present in mental health documentation or in the problem/diagnosis section of the healthcare record. The MHCB documentation did note that the patient presented with delusional and psychotic symptoms; however, the specific symptoms were not documented. The patient was prescribed valproic acid, Invega and haloperidol injection in the event of medication refusal; he was also prescribed hydroxyzine PRN.

No progress note or order for restraints was documented by the provider in the healthcare record when restraints were ordered. According to a discontinuation order, the restraints were ordered at 1120 hours on December 19, 2022; however, the patient was not placed into restraints until 1500 hours. Use of force occurred to remove the patient from his cell, to move him to the restraint room, and to place him into restraints. The psychiatrist noted that there were no injuries or incidents resulting from the use of force or restraints. The patient was maintained in restraints without any release criteria documented until release was ordered by the psychiatrist by telephone order at 1737 hours. The documentation of restraint use by the psychiatrist and mental health staff was inadequate, however the nursing documentation was appropriate.

The treatment plan did not specify the patient's behavioral disturbances or psychiatric symptoms beyond verbal aggression, threats, and misuse of bodily fluid resulting in risk of harm. The patient was referred for intermediate inpatient treatment, but the referral was changed and expedited to acute inpatient treatment on the day that restraints were used.

**Findings**

The care provided to this MHCB patient was adequate, but with significant deficiencies in documentation noted.

The documentation of restraint use by the psychiatrist and mental health staff was inadequate. This was problematic as an appropriate order for restraints was not located in the healthcare record, nor was there documentation of circulation checks or range of motion movements other than in the restraint checklist maintained in the unit restraint log. The patient was released from restraints by a telephone order from the psychiatrist. Despite numerous deficiencies in the documentation and care provided to the patient, the treatment team did rapidly recognize the patient's decompensation and enhanced need for acute treatment and took appropriate steps to secure that higher level of care. The patient was appropriately referred for inpatient treatment; the referral was elevated from intermediate to acute treatment as the patient rapidly decompensated while at KVSP MHCB, and the referral was expedited due to the patient's severe decompensation and danger to self and others. The treatment plan was not sufficiently individualized given the patient's extreme behavioral dysfunction and psychiatric symptoms. Treatment goals were also unrealistic, however treatment was essentially limited to medication management due to patient's behavioral disruption and impairment.

**Patient FF**

This patient's healthcare record was reviewed to assess the care provided at KVSP. Additionally, the plaintiffs' attorneys requested determination whether the patient was receiving mental health services at the appropriate level of care. The patient had a history of mental health treatment at the EOP, MHCB, and inpatient levels of care. The most recent master treatment plan noted that the patient had not been hospitalized in the MHCB since August 2022, and he was prescribed psychotropic medications for ongoing depression and auditory hallucinations.

The patient was provided diagnoses of unspecified/other or unknown substance-related disorder and borderline personality disorder. Although the patient reported ongoing symptoms and displayed some functional impairments, it was determined that his symptoms and impairment were not so severe that a higher level of care was indicated. The patient was not deemed a danger to himself or others, was able to advocate for himself, did not experience acute mental health symptoms and was able to program adequately without difficulty. He had a long history of superficial self-injury and reported suicidal ideation due to custody issues and poor distress tolerance.

The patient reported a history of 65 incidents of self-injury; all involved minor lacerations of low severity rating, and the most recent incident occurred in 2021. The patient reported safety concerns and stated that he had enemies at KVSP. The clinician did not appear to adequately integrate the patient's safety concerns into the overall assessment of suicide risk, and the patient was only provided instruction to follow-up with the correctional counselor regarding enemy and safety concerns.

The patient was seen weekly by the PC while housed in the STRH at the 3CMS level of care. He had two serious RVRs pending from 2022. The most recent treatment plan included a treatment goal related only to his depressed mood, and no treatment goal was established for the patient's long-standing self-injurious behavior and suicidal ideation. In addition, the only clinical interventions were to help the patient to learn at least one new coping skill over the next 90 days. The treatment plan was inadequate, as the patient's functional impairments and frequent suicidality and self-injurious behavior were not addressed.

**Findings**

Although the patient appeared to be receiving mental health services at the proper level of care, the care provided was inadequate.

Treatment planning was inadequate, as it did not address the patient's chronic impairment, poor distress tolerance, chronic suicidality, and self-injurious behavior. The treatment team met as soon as possible with an expanded treatment plan that targeted the patient's behavioral impairments with evidence-based clinical interventions. The patient should be closely monitored for decompensation that would necessitate an increase in his level of care, particularly when his RVRs were adjudicated, and if he was scheduled for transfer.

**Patient GG**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. The patient was included on the non-referral log, as he was positive for several higher level of care referral criteria. He was admitted to the MHCB on September 30, 2022 after his grandmother requested a welfare check. The clinician noted that his cell was dirty, he had difficulty following directions, and he demonstrated disorganized thinking, thought blocking, irritable mood, and incomprehensible speech.

The patient was provided a diagnosis of schizophrenia, and he experienced paranoid delusional thinking with auditory, visual and possibly tactile hallucinations. Although he had refused to take psychotropic medications, the MHCB psychiatrist initiated a non-emergency PC 2602 order and prescribed Celexa, Cogentin, risperidone, Vistaril, fluphenazine decanoate, and gabapentin.

The initial MHCB IDTT meeting occurred on October 3, 2022, however the treatment team did not note that the patient met the higher level of care referral criteria of inability to adequately function at the current level of care and requiring a highly structured inpatient care with 24-hour nursing supervision due to a major mental disorder, despite clearly meeting those criteria. The patient presented with markedly delusional thinking and overt psychosis, however, he denied symptoms and refused treatment with Zyprexa. He was described as so floridly psychotic and gravely disabled that the treatment team indicated that he was unable to function in the MHCB setting without significant structure and patience. Despite meeting HLOC criteria, he was not referred to inpatient treatment, and no HLOC indicators were noted.

At the next IDTT meeting on October 10, 2022, the treatment team noted that the patient met HLOC criteria for demonstrating chronic psychiatric symptoms that had not responded sufficiently to treatment and having inability to adequately function at the current level of care. The treatment team decided to refer the patient to intermediate care at that time. Despite this referral, the IDTT on October 19, 2022, included the patient on the non-referral log. That IDTT meeting occurred in the ASU, where the patient was housed after the MHCB discharge pending transfer to the inpatient unit. Although the non-referral log indicated that the patient was not referred to inpatient treatment, the inpatient referral remained in place.

**Findings**

The care provided to this patient was adequate.

The non-referral log was inaccurate, as the patient was referred for intermediate inpatient treatment on October 10, 2022, and the referral remained in effect even on the HLOC form cited on the non-referral log. Although the treatment team could have referred the patient on October 3, 2022 when he met HLOC criteria, they waited to allow the medication treatment an opportunity to take effect, and that decision was reasonable. The patient ultimately transferred to inpatient care.

**Patient HH**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. The patient was identified on the non-referral log on March 8, March 15, and March 22, 2023 while housed in the KVSP MHCB. He was admitted to the MHCB after returning from an outside hospital following a suspected attempted hanging. Upon his return, the patient reported to the staff that he had been harassed and bullied, called a child molester and other names, and would rather kill himself than to endure the continued harassment. He was provided diagnoses of adjustment disorder, antisocial personality disorder and borderline personality disorder; he was prescribed Remeron.

The initial MHCB IDTT meeting occurred on March 8, 2023. The treatment team indicated that the patient met the HLOC criterion of requiring highly structured inpatient psychiatric care with 24-hour nursing supervision. He was not referred for inpatient treatment, and the rationale and treatment modifications were inadequate; no actual rationale for non-referral was clearly stated, and the treatment modifications only listed one required activity, a safety plan.

The next IDTT meeting occurred on March 15, 2023. At that meeting, the treatment team indicated that the patient met the HLOC criterion of placement in the MHCB for at least 10 days, and this was the only HLOC indicator noted. The clinical rationale for non-referral was again not clearly stated and was inadequate. No actual treatment modifications to address the positive criterion were provided, as was required.

The next IDTT meeting occurred on March 22, 2023, and the treatment team again noted that the patient met the criterion of placement in the MHCB for at least 10 days as well as the criterion for three or more RVR assessments in the last three months. The justification for non-referral was inadequate, as no actual clinical rationale was provided. The treatment modifications were also incomplete and inadequate.

Although the documentation indicated that the patient was discharged on March 22, 2023 due to several days without self-injury, medication adherence, and cooperation with mental health contacts, the documentation also noted that the patient tore his sheet and shirt and made a noose when last designated for discharge on March 15, 2023. At that time, the patient was observed standing on his bed preparing to hang himself, when he was stopped and returned to constant suicide watch.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient was not appropriately considered for referral to a HLOC by the KVSP MHCB treatment team. They failed to adequately document the clinical rationale for non-referral and failed to identify and to implement treatment modifications to address the positive HLOC criteria.

**Patient II**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. The patient was admitted to the MHCB on June 6, 2023, due to suicidality with a plan to hang himself in his cell. A SRASHE was completed at the time of the MHCB referral, and the MHCB PC completed another SRASHE on the day after admission. The psychiatrist completed an initial psychiatric evaluation timely within 24 hours; although it was unclear if the evaluation occurred during the IDTT meeting, as the time of the evaluation was similar to the completion of the IDTT documentation and treatment plan. The PC assessment was completed during or following the IDTT meeting, as the document included primarily historical information that was copied from prior documents, and the only current information referenced was disclosed during the IDTT meeting. A history and physical was not completed for the patient during the MHCB stay of eight days. The patient had previously been provided a diagnosis of unspecified mood disorder, but at this MHCB hospitalization, he was provided a diagnosis of adjustment disorder, mixed anxiety, and depressed mood. He was prescribed venlafaxine and was adherent.

The June 7, 2023 initial MHCB IDTT meeting occurred timely. Although the initial treatment plan was minimal and inadequate, on the following day the PC initiated IPOCs related to suicidality, coping, and better strategies for attaining his requests. There was, however, no documentation regarding the status of these IPOCs.

The psychiatric and PC progress notes included historical information that was copied unchanged in each note without clear clinical justification; this made it difficult to determine what specifically occurred during the contact and any new clinical information. While the psychiatrist noted whether the patient was seen at the cell-front, little detail regarding the content of the contact was provided, even when the contact occurred in a confidential setting. The PC documented relevant clinical information regarding the patient's subjective reports, but implemented clinical interventions were not documented. The initial treatment plan was inadequate and did not address the patient's clinical symptomatology and suicide risk. The treatment plan did not include specific targeted interventions, and it simply reiterated Program Guide treatment requirements. More detail regarding interventions was present in some of the PC progress notes, but they did not include clear, objective, and measurable goals. The patient's progress toward treatment goals was not documented; instead, medical problem areas were repeated in that section of documentation. While recreational therapy was to be used to help the patient learn to distract and to cope with difficult emotions, the RT only met with the patient at the cell-front, obviously limiting the therapeutic benefits of that interaction.

The IDTT meeting on June 14, 2023 was led by a different PC than the treating psychologist. The treatment team documentation did not note the patient's progress or course of treatment. The documentation suggested that the patient would be discharged, as a SRASHE on that date reassessed his acute suicide risk as low, and the patient denied suicidality, however the SRASHE was not completed accurately. The acute risk factors, including recent RVRs, and anxiety of possible district attorney referral were not thoroughly addressed in the SRASHE or by the treatment team, however they did note multiple protective factors at the time of discharge that mitigated acute risks.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient was appropriately admitted to the MHCB for stabilization due to suicidal ideation with a plan and increased acute risk factors, however once admitted to the MHCB, little to no actual treatment interventions were documented. While the PC indicated that the psychiatrist would work with the patient to modify his medications as indicated, the psychiatric notes documented continuation of medications unchanged from the outpatient setting. Although the patient reported benefit from medication treatment, the need for MHCB admission and the treatment plan that focused almost exclusively on medication management suggested the need for additional psychiatric interventions. The PC documented check-in contacts with the patient but did not indicate whether CBT or other evidence-based interventions were implemented. It appeared that treatment to address the patient's acute suicide risk was severely inadequate, as the contacts were primarily at the cell-front, and no treatment interventions were documented. The patient's discharge SRASHE was not accurately completed, and the acute and chronic risk factors that precipitated the MHCB admission were not adequately addressed.

**Patient JJ**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. The patient was admitted to the MHCB on May 26, 2023, due to paranoia, possible disorientation while on the yard, bizarre behaviors including climbing on the unit tables during dayroom and making various animal sounds, yelling and pounding on his cell door and walls at night, and reportedly only sleeping for approximately one hour nightly. The patient was discharged from the MHCB on May 24, 2023, and was seen for five-day follow-up contacts, when he was readmitted to the MHCB due to his severely decompensated state.

The initial MHCB psychiatric assessment occurred timely and noted that the patient was gravely disabled upon admission. He was not eating during the prior month, and he stated that he was not hungry, however, he kept the food trays in his room until the food was rotten and custody had to remove them. The patient had lost a significant amount of weight but reported that he was starving because custody was withholding his dietary supplement, with no insight regarding his failure to eat.

The patient was provided diagnoses of schizoaffective disorder, bipolar type, and PTSD. He was prescribed Abilify, Cogentin, BuSpar, and Haldol ordered daily and PRN for agitation. The history and physical was completed timely upon admission, but he was not seen by his treatment team until day five of his stay rather than within 72 hours as required.

The patient refused to attend the initial IDTT meeting. While the patient met the criteria for referral to a HLOC due to several subjective factors including the inability to function at his prior level of care due to a mental illness, the treatment team did ultimately refer the patient to intermediate inpatient treatment due to his poor treatment participation. The treatment modifications while the patient awaited intermediate care placement were comprehensive and clinically sound. Because the MHCB treatment team believed that the patient would

decompensate further if returned to the outpatient setting while awaiting transfer to inpatient care, they retained him in the MHCB until transfer.

Psychiatric progress notes did not document the exploration of indicated medication changes that may have assisted the patient in coping with his paranoia, delusional thinking, and other psychotic symptoms. The PC documented the implementation of evidence-based clinical interventions targeting the patient's limited insight and the development of emotional regulation strategies. These interventions were appropriate to the patient's functional abilities and helpful in preparing the patient for longer-term treatment in an inpatient setting. The patient was ultimately transferred to inpatient treatment on June 14, 2023, after 19 days in the KVSP MHCB.

**Findings**

This patient received adequate care while housed in the KVSP MHCB.

Despite the patient not seen timely by the treatment team, they immediately referred him to intermediate inpatient treatment and developed a clinically sound treatment plan while maintaining him in the MHCB pending transfer. While his psychiatric provider could have explored possible medication changes to assist in the management of psychotic symptoms; the patient was seen consistently, and medications were generally discussed. More detailed documentation regarding the content of those psychiatric contacts and less historical information copied into the note would have been beneficial to subsequent providers regarding medications considered and the rationale for not modifying the patient's medications during acute decompensation.

*

**APPENDIX C-11**
**California Institution for Women (CIW)**
**June 20, 2023 – June 23, 2023**

**Patient A**

This 34-year-old patient was provided diagnoses of PTSD, borderline personality disorder, and schizoaffective disorder. She was prescribed divalproex sodium, haloperidol, lithium, olanzapine, and sertraline with good adherence. The patient received her psychotropic medications by a PC 2602 order since December 2019 with the most recent renewal granted in February 2023 due to danger to self and others. The patient had a DD1 designation requiring adaptive supports in communication, activities of daily living, reading, writing, and understanding rules and procedures. She was placed in the SRMP after engaging in self-injurious behavior while in an inpatient setting. Her healthcare record was randomly selected to evaluate the treatment provided at the EOP level of care.

The patient was placed in a mainline EOP on December 8, 2022 after release from the ASU EOP hub. While in the ASU, the patient was being monitored as a high treatment refuser after refusing more than 50 percent of offered treatment. It was noted at the time of her transfer to the mainline EOP that she had not engaged in self-injurious behavior in nearly four months. The initial PC evaluation was completed timely but showed no evidence of update or that the patient was interviewed as part of the assessment. The initial psychiatric assessment was documented on a progress note, and the note was comprised mainly of the renewal application for the PC 2602 order for which the patient largely refused to engage. The psychiatrist was familiar with the patient from prior contacts.

An initial IDTT meeting occurred within 12 days of the patient's return to the mainline EOP and included all required staff members and the patient. The goals were unchanged from the prior treatment plan and included many goals which the patient had already achieved, such as no recurrence of self-injurious behavior for one week. The functional evaluation was not updated. The IDTT documentation failed to recognize that the patient did not participate in group programming. In fact, during the patient's eight-week stay in the EOP, she never attended more than 50 percent of the structured treatment offered to her; however, the PC weekly contact documentation indicated that the patient attended groups. The PC also failed to document the implementation of any interventions with the patient, documenting only the patient's mental status and self-reported weekly activities. The PC contacts generally occurred weekly. The psychiatric contacts were adequate and occurred as required.

The patient was offered an average of seven hours of structured programming weekly, and only twice was she offered the required ten hours. Of the structured treatment offered, only four groups were provided by clinicians and included clinical content. All other groups were recreational in nature and involved activities such as coloring, ping pong, walking, and making hats.

On January 24, 2023, the patient was seen by both the assigned psychiatrist and PC. The psychiatrist noted that the patient had not taken her medications for one day during the prior week. The PC noted that the patient was reportedly anxious and experienced interpersonal concerns, yet no interventions were documented. The patient engaged in head banging on January 29, 2023 and was subsequently transferred to the MHCB level of care.

**Findings**

The care provided to this EOP patient was inadequate.

The initial PC assessment evidenced no updates or recent assessments of the patient, and the initial treatment plan was not updated to address the patient's current needs. The PC contacts documented no interventions and included inaccurate information regarding patient participation in programming. The patient was rarely offered the required number of structured treatment hours, and most programming offered was recreational. The patient's refusal to participate in programming was not documented or addressed.

**Patient B**

This 38-year-old patient was provided diagnoses of bipolar I disorder, current or most recent episode manic, with psychotic features and substance use disorders. She was prescribed lithium and hydroxyzine but was not consistently adherent with prescribed medications. The patient was also prescribed buprenorphine-naloxone for her substance use disorder. Her healthcare record was randomly selected to assess the delivery of EOP level of care treatment.

The patient discharged from a PIP at the ICF level of care to the EOP level of care on March 8, 2023. She was admitted to the inpatient setting due to psychiatric decompensation as evidenced by self-harming behavior, confusion, volatility, medication hoarding, and drinking her own urine. Her urine drug screen tested positive for opiates and methamphetamine prior to her admission. She was discharged from the PIP with prescriptions for olanzapine, hydroxyzine, benztropine, and propranolol. The inpatient discharge summary from the psychiatrist noted that a petition for emergency involuntary medications was denied in January 2023.

A SRASHE was completed upon transfer to the EOP and appeared adequate. The five-day follow-up contacts were completed as required. The initial PC and psychiatric assessments were completed timely and adequate. The initial IDTT meeting occurred timely, with all required staff and the patient present. The IPOC goals addressed depressed mood and substance use and included clear criteria for transitioning the patient from the EOP to the 3CMS program. An EOP functional evaluation was not completed; however, and inpatient treatment goals were not removed from the treatment plan.

The patient was seen for weekly individual contacts by her assigned PC, and the documentation evidenced interventions provided that were consistent with the treatment plan. Of concern was a nursing note which indicated that the patient tested positive for methamphetamine use on April 11, 2023, yet this was not noted by the PC during a subsequent contact. Monthly psychiatric

contacts documented adequate discussions about medication nonadherence, and medication adjustments occurred as indicated.

The number of group therapy hours was offered as required, and the patient attended more than 50 percent of offered groups. Most groups were recreational in nature, though there was documentation of clinical groups intermittently provided by psychologists and nurses.

The discharge IDTT meeting occurred on April 25, 2023, when the patient was downgraded to the 3CMS level of care. While her level of functioning indicated readiness for 3CMS placement, the IDTT documentation incorrectly stated that the patient was medication adherent since arriving in the EOP and did not include reference to her use of illicit drugs after PIP discharge. This was very important, as the inpatient admission was precipitated by methamphetamine use.

**Findings**

The care and treatment provided to this EOP patient was clinically adequate.

It was, however, concerning that the IDTT failed to adequately document the patient's medication nonadherence, and the discharge IDTT failed to consider the patient's recent methamphetamine use prior to 3CMS placement.

**Patient C**

This 32-year-old patient was provided diagnoses of persistent depressive disorder; major depressive disorder, recurrent episode with psychotic features; opioid use disorder, severe; and amphetamine-type substance use disorder, severe. She was prescribed buspirone, haloperidol, and venlafaxine, and was medication adherent. She was also prescribed mirtazapine and haloperidol PRN. Her healthcare record was randomly selected to assess the delivery of EOP level of care treatment.

The patient was discharged to the EOP level of care from the MHCB on January 4, 2023, where she was treated for suicidal ideation and increased depression. Prior to her MHCB admission, she was receiving mental health services at the 3CMS level of care for one day after transfer from the EOP level of care.

The initial PC and psychiatric assessments were completed timely and adequately. During the initial IDTT meeting, the treatment team adequately considered the need for referral to a higher level of care and noted her three MHCB admissions during the prior 90 days; however, the patient was retained at the EOP level of care with appropriate rationale provided. The PC and psychiatric contacts occurred more frequently than minimally required in appropriate response to the patient's upcoming parole date as well as her diagnosis of breast cancer.

The patient was routinely offered at least ten hours of structured treatment weekly, including a pre-release planning group. She routinely attended her groups and other clinical contacts. While most of the offered groups were recreational, some were facilitated by social workers, psychologists, and nurses. The April 11, 2023 IDTT meeting was adequately documented and

included evidence of multidisciplinary discussion of the patient's needs in light of her parole scheduled for April 19, 2023.

On April 14, 2023, the patient was admitted to the MHCB due to thoughts of self-harm after learning that her April 19, 2023 parole date was changed, and she could be incarcerated for an additional 90 days. Subsequently, the patient returned to the EOP level of care and was released from prison on May 24, 2023.

**Findings**

The care and treatment provided to this EOP patient was adequate.

There was one concern noted related to continuity of care, as the patient had three different PCs assigned to her during her five-month EOP stay.

**Patient D**

This 59-year-old patient was provided a diagnosis of schizoaffective disorder, and was prescribed clozapine, lithium, and sertraline. The patient was adherent with her medication regimen. Her healthcare record was randomly selected to assess the treatment provided at the EOP level of care.

This patient was placed at the EOP level of care following discharge from the MHCB where she was placed to initiate treatment with clozapine to address severe tardive dyskinesia. Initially, she was housed in a medical unit, as she contracted COVID-19 and developed pneumonia; for this reason, she was seen for her initial PC and psychiatric assessments at the cell front. The assessments were adequate given this condition and it was evident that the psychiatrist knew the patient, as she had been in the EOP prior to the MHCB admission. The initial IDTT meeting occurred timely, yet the patient was not present due to her health status. The IDTT documentation did not include treatment goals. The PC progress notes indicated that the patient's hallucinations were targeted in treatment.

Routine psychiatric contacts occurred frequently and revealed appropriate attention to the patient's health and mental health needs as she transitioned to treatment with clozapine. Adjustments were made as needed, and her progress was evident. The PC contacts occurred as required, but the documentation primarily reflected review of the patient's mental status and participation in programming with little evidence that interventions were provided. Given the IPOC related to hallucinations and the patient's reported decrease in these symptoms, the PC check-ins were consistent with the treatment goals. The patient was offered nearly ten hours of structured treatment weekly and attended more than 50 percent of the programming offered.

**Findings**

The care and treatment provided to this EOP patient was adequate; however, the documentation regarding treatment goals and PC interventions needed improvement.

**Patient E**

This 30-year-old transgender patient was provided diagnoses of schizoaffective disorder, bipolar type; gender dysphoria; opioid use disorder, moderate, in early remission; and polysubstance dependence. She vacillated in her gender identification. She was prescribed olanzapine, perphenazine, sertraline, and benztropine and was medication adherent. Her healthcare record was randomly selected to assess the treatment provided at the EOP level of care.

The banner bar in the EHRS indicated that the patient preferred traditionally female pronouns. During a contact with the PC on January 6, 2023, the PC clarified that the patient preferred female pronouns; however, male pronouns were documented frequently, and the patient reportedly identified as male with her incarcerated peers.

The patient transferred to CIW on December 20, 2022 after she had been out to court for thirty days. She was seen immediately upon return to assess her mental health status following the court hearing, and a SRASHE was completed at that time. Both assessments were adequate. The PC and psychiatric initial assessments were timely completed and adequate. The content of the documentation reflected ongoing familiarity with the patient due to the short time that she was out to court. The initial IDTT meeting occurred on January 3, 2023 and included the required staff members; however the PC who was present was not the assigned PC who completed the initial assessment. The IPOCs for substance use and hallucinations were reviewed and continued.

The patient was seen more than minimally required by both the PC and psychiatrist due to patient requests and to address identified needs. She attended more than 50 percent of the programming offered to her; however, she was not offered ten hours of treatment during the four weeks that she was in the EOP. Most of the groups were recreational in nature, though a few were facilitated by clinical staff.

**Findings**

The care and treatment provided to this EOP patient was inadequate.

She was not offered the required number of structured treatment hours for EOP patients. Additionally, many of her therapeutic contacts focused on interpersonal issues, yet these were not included in treatment planning and likely should have been the focus of treatment given that the patient received RVRs due to interpersonal conflicts.

**Patient F**

This 43-year-old patient was provided diagnoses of schizoaffective disorder; cannabis use disorder, moderate; and other hallucinogen use disorder, moderate, in sustained remission. She was prescribed haloperidol, benztropine and sertraline, and was medication adherent. She was also prescribed risperidone and hydroxyzine PRN. She received her psychotropic medications by a PC 2602 order which was initiated in 2014. Her healthcare record was randomly selected to assess the treatment provided for this ASU EOP hub patient.

The patient was discharged from the MHCB to EOP level of care where she was placed ten days prior due to danger to others and overall decompensation. There was documentation of clinician-to-clinician contact following the discharge.

The initial PC and psychiatric assessments were timely completed and adequate. The five-day follow-up contacts were completed as required. The assigned PC was an unlicensed psychologist, and there was no documentation in the EHRS that her initial assessment or clinical contacts were co-signed by a licensed clinician.

An initial IDTT meeting occurred on November 8, 2022, and a licensed psychologist was present with other required staff members. An IPOC was initiated to address the patient's hallucinations with specific treatment goals. An EOP functional evaluation was completed adequately. The patient was consistently offered at least ten hours of structured treatment weekly which she routinely attended. Psychiatric technicians completed and documented weekly summaries that were clinically useful, yet there was no documentation of daily rounds.

Individual contacts with the PC and psychiatrist were completed as required and the documentation was adequate. The psychiatrist completed an evaluation to renew the patient's PC 2602 order on November 14, 2022. The patient refused the lithium prescribed to her while she was in the MHCB, and the psychiatrist discontinued the medication at the patient's request. The patient was readmitted to the MHCB on November 20, 2022 due to interpersonal conflicts and suicidal statements.

**Findings**

The care provided to this patient was adequate, despite the lack of documentation of daily rounds.

**Patient G**

This 33-year-old patient was provided diagnoses of bipolar I disorder, current or most recent episode manic with psychotic features; antisocial personality disorder; and amphetamine-type substance use disorder, severe, in early remission. She was prescribed fluphenazine, haloperidol, topiramate, atomoxetine, and olanzapine PRN. She received her psychotropic medications by a PC 2602 order, and was usually medication adherent. Her healthcare record was randomly selected to assess the treatment provided for this ASU EOP hub patient.

The patient was placed in the ASU at the EOP level of care on March 8, 2023 after discharge from the acute level of care where she had been for almost six weeks to address psychiatric decompensation and dangerousness to others. There was documentation of adequate clinician-to-clinician contact, and the ASU EOP hub PC attended the patient's PIP discharge IDTT meeting.

The initial PC and psychiatric assessments were completed within two days of the patient's ASU arrival and were adequate. One concern was noted; the patient was prescribed fluoxetine which

was increased over time during the PIP hospitalization. The psychiatrist who completed the initial assessment in the ASU noted the prescription and the medication titration and documented that it would continue; however, the order did not appear in the EHRS and was not included in the patient's medication administration record upon arrival to the ASU. It appeared that the medication was abruptly discontinued in error, and this omission was not noted or addressed. The patient reported symptoms of increased anxiety and irritability during the following days with difficulty sleeping. She also reported chest pain and was seen by medical staff for evaluation; she was later admitted to the CTC for flu-like symptoms but did not test positive for COVID-19. She continued to report chest pain and increased anxiety after her return to the ASU.

The SRASHE and five-day follow-up contacts were documented and appeared adequate. Of note, the PC was noted as an unlicensed psychologist in the EHRS, and none of the clinician's documentation was co-signed by a licensed clinician. The initial IDTT meeting included required staff as well as licensed psychologists. The patient did not attend, as she was housed in the CTC. IPOCs were initiated to address impulsivity, substance use, and anxiety. The treatment goals and interventions were clear. The patient was noted as a participant in the SRMP, and goals were included to address suicide risk as well. It was noted that the patient refused most groups offered in the EOP. She was seen routinely and upon request by the PC and the psychiatrist, and she continued to report increased anxiety to her clinicians. Coping strategies and PRN medications were offered.

The patient was offered 3.25 hours of structured treatment weekly during her ASU stay after the IDTT meeting, and she did not attend any groups. There was no documentation of the completion of daily rounds or weekly summaries by the psychiatric technicians. She transferred to another facility on March 23, 2023.

**Findings**

The care and treatment provided to this EOP patient was inadequate.

Her medications were not appropriately continued upon transfer, and the patient was not offered the required number of treatment hours. Additionally, there was no documentation of psychiatric technician rounds, and the patient's lack of attendance at programming was not adequately addressed in treatment planning.

**Patient H**

This 33-year-old transgender patient was provided diagnoses of major depressive disorder, recurrent episode, moderate; antisocial personality disorder; borderline personality disorder; PTSD; generalized anxiety disorder; and gender dysphoria. The patient was not prescribed psychotropic medication; however, a PC 2602 order for treatment with risperidone was denied renewal on August 22, 2022. Her healthcare record was randomly selected to assess the treatment provided for this ASU EOP hub patient.

The patient transferred from the PSU to the ASU EOP hub on December 23, 2023. The initial PC and psychiatric assessments were completed timely but included substantial information

copied unchanged from prior assessments. Of note, prior assessments were completed less than two weeks prior. An initial IDTT meeting occurred on January 3, 2023 with the required staff present, but the patient was absent due to COVID-19 quarantine. IPOCs were created to address impulsivity and depressed mood. The frequent MHCB admissions were noted, and the rationale for retaining the patient at the EOP level of care was adequate. The treatment goals and interventions were clearly documented. There was indication that the patient was being considered for transfer to the 3CMS level of care.

The patient was only seen for a single PC contact prior to transfer, and the contact was conducted at the cell front due to quarantine. The documentation of the PC contact included inaccurate information, including that the patient was taking her medications and that the PC had reviewed the medical administration record (MAR) to confirm the same. The patient was not prescribed medications, thus both statements were untrue.

The patient was offered more than ten hours of treatment weekly and attended most of the groups offered. There was no documentation of psychiatric technician rounds, but weekly summaries were documented.

**Findings**

The care and treatment provided to this EOP patient was inadequate.

The PC documentation was inaccurate, and there was no evidence that the treatment provided was consistent with treatment planning. Psychiatric technician rounds were not completed.

**Patient I**

This 39-year-old transgender patient was provided diagnoses of schizoaffective disorder, both depressive type and bipolar type; PTSD; borderline personality disorder; antisocial personality disorder; opioid use disorder; and opioid dependence. The patient was prescribed levetiracetam, lithium, olanzapine and propranolol and was medication adherent. The patient's healthcare record was randomly selected to assess the provided treatment. Of note, much of the documentation referred to the patient with female pronouns, yet the EHRS banner bar indicated that male pronouns were preferred by the patient.

The patient was placed in the ASU EOP hub on March 17, 2023, following discharge from the MHCB level of care where he was placed due to self-injurious behavior. A clinician-to-clinician contact was completed. An initial PC assessment was completed timely by an unlicensed psychologist, and no co-signature by a licensed clinician was in the healthcare record. The content of the assessment was adequate.

An initial psychiatric assessment was attempted on March 27, 2023, but the patient refused to engage in the assessment. The content was adequate given the limitations of a cell-front contact and the patient's refusal, and the assessment was completed by a healthcare record review. On that same date, the patient was placed on daily contacts due to low group attendance. An IDTT occurred on the following day; however, the psychiatrist present was not the psychiatrist who

completed the initial assessment.  The patient attended the meeting, and IPOCs were initiated to address hallucinations, substance use, and danger to self.  The patient's need to participate more actively in treatment was included in the treatment plan as was adequate rationale for placing the patient on EOP modified programming to support increased participation.  The patient was included in the SRMP; goals to address suicide risk were included in the plan, and the safety plan was reviewed.  A goal for the patient to attend five groups weekly was documented.

Daily PC contacts were documented when the patient failed to attend at least half of his programming, and the patient was reminded of incentives that accompanied program participation.  PC contacts occurred both at the cell front and in a confidential setting when the patient agreed to attend a session; however, interventions were poorly documented.  Daily psychiatric technician rounds and weekly summaries were documented consistently.  The patient was released from the ASU on April 20, 2023.

**Findings**

The treatment provided to this EOP patient was adequate.

Improvements were indicated in the documentation of interventions provided to the patient by the PC.  Additionally, clarification was needed in the healthcare record regarding the patient's identified gender and preferred pronouns.  This lack of clarification presented confusion regarding the appropriate interactions with the patient.

**Patient J**

This 33-year-old patient was provided diagnoses of generalized anxiety disorder; major depressive disorder, recurrent episode, unspecified; borderline personality disorder; and amphetamine-type substance use disorder, severe.  She was prescribed chlorpromazine, escitalopram, and quetiapine with medication adherence.  She was also prescribed Suboxone.  Her healthcare record was randomly selected to assess the treatment provided for this ASU EOP hub patient.

The patient was placed in the ASU from the mainline EOP on January 7, 2023 due to battery on another incarcerated individual.  A clinician-to-clinician contact was completed and appeared clinically useful.  The patient was evaluated by a PC and psychiatrist on January 10, 2023, and a SRASHE was completed as PREA allegations were made against the patient.  The assessments were adequate; however, the PC was an unlicensed psychologist, and there was no evidence that their documentation was co-signed by a licensed clinician.  An initial IDTT meeting occurred on January 11, 2023 that included the required staff in attendance, yet the patient was absent.  The patient's absence was documented as being due to custody modified programming in one EHRS location but then noted as occurring due to the patient's "movement within the institution" in another location.  IPOCs were initiated for anxiety, substance use, and depressed mood.  The rationale for retaining the patient at the EOP level of care was adequate.

During her initial week in the ASU, the patient did not attend programming; subsequently, she was seen daily by the PC.  The patient's anxiety regarding ASU placement dissipated, and she

attended more programming in subsequent weeks.  PC weekly contact documentation evidenced the use of interventions to address issues targeted in the treatment plan.  The psychiatrist was responsive to the patient's needs despite the patient refusing to attend confidential psychiatric sessions.

She was consistently offered at least ten hours of programming weekly and attended most of the offered programming after the first two weeks of ASU placement.  Weekly psychiatric technician rounds summaries were documented; however, there was no documentation indicating that daily rounds were completed.

**Findings**

The care and treatment provided to this patient while in the ASU was adequate.

Although daily psychiatric technician rounding was not documented, and there was failure to satisfactorily account for the patient's absence from the IDTT meeting, the care provided by the PC and psychiatrist was clinically sound.

**Patient K**

This 62-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CIW.

On October 10, 2022, clinicians at the CCWF reception center referred the patient to the MHCB due to erratic behavior and dangerousness to others.  The patient reportedly broke a window and threatened the suicide watch observer monitoring her.  She was unable to engage meaningfully with the assessing clinician.

The SRASHE, on October 10, 2022, assessed the patient with low chronic and moderate acute suicide risk.

The documentation indicated that the patient's CCWF psychiatrist tapered and discontinued the patient's antipsychotic medication risperidone prior to the MHCB admission. The CIW psychiatrist prescribed olanzapine for psychosis and agitation, valproic acid for mood stabilization, and hydroxyzine PRN for anxiety and insomnia. The patient initially refused to accept the medications.  The psychiatrist promptly initiated a PC 2602 involuntary medication petition; subsequently, the patient accepted the medications.

The initial psychiatric and primary clinician evaluations occurred timely prior to the initial treatment team meeting.  The treatment team meeting also occurred timely and included all required participants; however, the patient was unable to attend due to the severity of her current symptoms.  While the treatment plan stated that the patient was not present, the psychiatric note stated that the treatment team was conducted in the presence of the patient.  The treatment goals included medication adherence.  The interventions included the vague plan to "foster therapeutic alliance."

Many of the primary clinician and psychiatric contacts occurred at the cell front. Although most of the cell-front contacts occurred as the patient was too agitated to attend a confidential session; a primary clinician note on October 18, 2022, indicated that the patient was seen at the cell-front due to the lack of escort officers.

The treatment team promptly referred the patient to the acute level of care. The patient was treated at the acute and intermediate levels of care prior to returning to CCWF at the EOP level of care.

**Findings**

The care provided to this CIW MHCB patient was adequate.

Some positive aspects were noted in the care provided, including the prompt initiation of a PC 2602 petition for the patient who was severely ill but refusing needed medications. Similarly, she was promptly referred to the acute level of care, which was clinically indicated.

Despite those interventions, some issues of concern were noted. The patient's diagnosis was difficult to discern from the healthcare documentation. The central treatment goal was medication adherence, and the expert agreed that this was a critical portion of the patient's treatment; however, the lack of behaviorally based interventions to address impulsivity and emotional dysregulation was noted. The treatment plan included vague interventions such as fostering a therapeutic alliance with the patient, and this intervention alone was insufficient to address the severity of the patient's impairment.

Additionally, on at least one occasion, the lack of sufficient custody officers resulted in direct clinical impairment by preventing the clinician from seeing the patient in a confidential setting.

**Patient L**

This 58-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CIW.

On February 28, 2023, while housed at CCWF in the EOP, the patient reported suicidal ideation with plan and intent. A possible contributing factor was difficulty with her roommate. The patient had a long history of prior treatment at the EOP, MHCB, intermediate, and acute levels of care.

The SRASHE assessed moderate chronic and acute suicide risk. The patient had a history of five prior suicide attempts, including stabbing herself, overdosing, and hanging, as well as a history of self-injury.

Although difficult to discern from the healthcare documentation, it appeared that the patient was provided with a diagnosis of schizoaffective disorder. She was prescribed olanzapine for psychosis, hydroxyzine and buspirone for anxiety, fluoxetine for depression, and benztropine to treat the side effects of antipsychotic medication.

The primary clinician and psychiatry initial evaluations were completed timely prior to the initial treatment team meeting. The primary clinician evaluation contained appropriate interim goals. The psychiatric evaluation failed to convey a clear diagnosis. The assessment and plan section of the initial notes stated an ambiguous diagnosis of "Mental health disorder"; however, the problem list and past medical history documented a diagnosis of schizoaffective disorder. The psychiatric progress notes from March 6, 2023, forward documented anxiety, depression, and schizoaffective disorder. The patient reported auditory, visual, and tactile hallucinations, as well as racing thoughts and poor sleep. Although the patient reported racing thoughts and poor sleep which might have indicated symptoms of mania, the psychiatrist initiated treatment with the antidepressant medication fluoxetine for depression; treatment with an antidepressant medication could worsen underlying mania, if present.

The initial treatment team meeting occurred timely and included all required participants, including the patient. The treatment goals centered on reducing feelings of distress, and the interventions were to work on coping and grounding skills with medication adherence. The PC notes documented that the patient was encouraged to engage in coping strategies and activities in the milieu; the notes did not provide clarification regarding what the coping strategies included.

The patient made gradual progress and was discharged to CCWF at the EOP level of care on March 8, 2023. The psychiatric discharge summary on the same date provided an inadequate summary of the patient's treatment. The summary stated that her course was "uneventful" but provided no additional details other than stating that the patient preferred not to change the dosage of one medication. The patient returned to CCWF at the EOP level of care where five-day follow-up contacts were completed as required.

**Findings**

The care provided to this CIW MHCB patient was inadequate.

As observed in other CIW MHCB cases reviewed, the difficulty in determining a fundamental aspect of treatment such as the patient's diagnosis was concerning. The progress notes failed to demonstrate specific interventions performed, and how those interventions connected to the stated treatment plan goals.

The patient reported tactile hallucinations, which were rare symptoms for psychiatric disorders and frequently required evaluation for an underlying medical cause or withdrawal from substances, and the documentation did not reflect that the psychiatrist explored this concern further. Although the patient reported racing thoughts and poor sleep which might be reflective of symptoms of mania, the psychiatrist inappropriately initiated treatment with an antidepressant medication. Generally, this class of medications was contraindicated if the symptoms reflected possible mania. While the term "racing thoughts" might be interpreted differently, and treatment with an antidepressant medication might have indeed been indicated; the documentation failed to provide the necessary justification for this medication choice. The rationale for such treatment departure required the documentation of adequate clinical rationale.

Despite the discharge summary being a critical document used to convey clinical information, the psychiatrist simply wrote that the patient's treatment course was "unremarkable." This conveyed inadequate information to the subsequent treatment team and negatively impacted the continuity of care.

**Patient M**

This 47-year-old patient was randomly selected for healthcare record review to assess the quality of the MHCB care provided at CIW.

The patient received treatment at CIW at the EOP level of care. On December 17, 2022, the patient returned from an outside hospital after undergoing medical evaluation for ingesting between 14 to 22 ibuprofen pills. The patient reported that she took the pills due to tooth pain and that this did not reflect a suicidal act. In an abundance of caution, the assessing clinician decided to place the patient in the MHCB. The patient was upset about this decision.

The SRASHE assessed high chronic and acute suicide risk. The patient had no reported history of suicide attempts or self-injury.

The initial psychiatric evaluation on December 18, 2022, did not include a diagnosis in the assessment section of the form; however, the problem list and past medical history listed schizoaffective disorder. The psychiatrist prescribed olanzapine, a medication traditionally used for psychosis and mood stabilization; however, the reason for treatment with this antipsychotic medication was not provided. Instead, the indication provided for the medication and side effects were templated and generic.

The treatment goals included no self-harm or anger outbursts. The treatment plan listed reducing the severity of suicidal ideation by the patient's self-report; however, the documentation of the same date showed the patient had not reported suicidal ideation. The treatment plan noted that the therapist would monitor the patient's rating of self-harm and help to challenge dichotomous thinking and to develop adaptive responses. The progress notes stated wide-ranging goals such as the patient "will not harm self over the next 1-10 days" and failed to specify the interventions used.

A repeat SRASHE on December 20, 2022, assessed the patient with low chronic and acute suicide risk. The psychiatric discharge summary was completed timely; however, it remained difficult to discern the patient's diagnosis. The patient discharged to CIW at the EOP level of care.

**Findings**

The care provided to this CIW MHCB patient was inadequate.

As was noted in other CIW MHCB cases reviewed, it was unusually difficult to discern fundamental information, such as the patient's diagnosis. The psychiatric information about medication indications was templated and generic, providing limited utility in understanding the

use of specific medications for the patient. The treatment plan goals were inconsistent with the clinical information documented. The most striking of these was that the patient would reduce the amount of suicidal ideation when she had not reported any suicidal ideation.

**Patient N**

This 39-year-old patient's healthcare record was reviewed to evaluate the quality of the EOP care provided in the PSU at CIW. The patient was housed in the PSU from February 2 to March 16, 2023. In January and February 2023, the patient received three RVRs for battery on an incarcerated person, indecent exposure, and resisting staff.

The patient was provided diagnoses of bipolar I disorder, most recent episode manic, borderline personality disorder, and antisocial personality disorder. The assigned psychiatrist prescribed Prozac, Cogentin, and Seroquel. The patient was medication adherent.

The ASU pre-screen was completed timely with negative results. The initial psychiatric assessment was completed in a confidential setting on February 3, 2023. While the PC did not complete an initial assessment, an initial PC contact occurred at cell front on February 3, 2023, prior to the initial IDTT meeting.

During the initial IDTT meeting on February 7, 2023, all required members were present. The IDTT documentation included relevant historical information, and the treatment plan addressed the behavioral concerns contributing to the patient's recent RVRs and PSU placement. Substance use was also targeted in the treatment plan. The IDTT accurately noted a positive HLOC referral criterion regarding the number of RVRs in the past several months. While the IDTT did not refer the patient to a HLOC, the nonreferral rationale and planned interventions in lieu of a referral were appropriate.

The psychiatrist met with the patient for routine contacts twice in February and once in March 2023 to closely monitor her response to recent medication adjustments. All but one psychiatric contact occurred in a confidential setting.

Following the first PC contact on February 3, 2023, all PC contacts occurred in a confidential setting. PC contacts were completed on February 6, February 15, February 24, and February 27, 2023, as well as on March 6, March 11, and March 15, 2023. The progress notes for those contacts suggested that the patient continued to demonstrate progress toward her treatment goals and did not exhibit signs of decompensation while housed in the PSU.

The patient regularly participated in individual and group treatment during her time in the PSU.

**Findings**

The care provided to this PSU patient was adequate.

While PC contacts did not always occur timely, the psychiatric contacts occurred more often than minimally required. The treatment plans appropriately addressed symptoms and behavioral

concerns, including those that seemingly contributed to the RVRs and PSU placement. The HLOC nonreferral rationales were well justified. Overall, the patient appeared to benefit from the treatment provided in the PSU, including medication changes and therapeutic interventions implemented during individual and group contacts.

**Patient O**

This 34-year-old patient's healthcare record was reviewed to evaluate the quality of the EOP care provided in the PSU at CIW. The patient remained in the CIW PSU from December 25, 2022 to January 12, 2023.

The patient was provided diagnoses of bipolar I disorder, most recent episode manic, PTSD, and methamphetamine dependence. The assigned psychiatrist prescribed Abilify, lithium, BuSpar, Zyprexa, and Vistaril.

The IDTT convened on December 27, 2022, with all required members in attendance. The treatment plan targeted anxiety and substance use, as well as the impulsivity and anger that contributed to the recent RVRs and PSU placement. The treatment goals were measurable. The IDTT noted that the patient did not meet any of the higher level of care referral criteria, and the rationale for retaining the patient in the EOP was appropriate.

The psychiatrist met with the patient timely and adjusted her psychotropic medications during the PSU placement. Lithium was increased, PRN medications were prescribed for sleep, and BuSpar was ultimately discontinued. The frequency of psychiatric contacts suggested that the patient was appropriately monitored after those medication changes.

The primary clinician did not complete or update an initial assessment for this patient. While routine PC contacts occurred timely; confidential contacts did not occur on January 10 or January 12, 2023, and a reason for the nonconfidential contacts was not documented. The PC progress notes suggested that the patient was generally adherent with offered treatment services and responded well to the various implemented interventions during the PSU placement.

**Findings**

The care provided to this PSU patient was adequate.

Although a PC initial assessment was not completed, the routine psychiatric and PC contacts at times were offered more frequently than minimally required. The treatment targets and interventions were sufficient in addressing the patient's presenting problems, including behaviors resulting in the RVRs and PSU placement. The psychiatrist adjusted and monitored the patient's medications appropriately during the PSU placement. Overall, the progress notes suggested that the patient benefitted from the treatment interventions that were provided.

**APPENDIX C-12**
**San Quentin State Prison (SQ)**
**June 27, 2023 – June 30, 2023**

**Patient A**

This 41-year-old condemned EOP Grade A patient was treated in the SQ MHCB from January 9 to January 19, 2023.

A SRASHE was completed on January 9, 2023, and the initial PC assessment was completed the following day. A timely history and physical examination were also completed.

The January 9, 2023 initial psychiatric assessment noted that the patient had been provided with a diagnosis of adjustment disorder with depressed mood, and a possible diagnosis of major depressive disorder and substance use, including methamphetamine. The psychiatrist indicated that the patient reported suicidal ideation after an episode of chest pain after methamphetamine use; he denied suicidal plan or intent or homicidal ideation. The patient also denied hallucinations or any psychotic symptoms.

A January 10, 2023, PC progress note stated that the PC attempted to meet with the patient out of cell for the initial assessment; however, the patient was yelling and indicated that he did not wish to talk with anyone. The PC also noted that a custody officer was consulted at the time of the chest pain incident, and the officer provided information regarding the incident that prompted the MHCB admission. He reported that the patient reported getting a "bad dose" of methamphetamine and, as a result, he was taken to the hospital. Upon his return from the hospital, he was asked to provide urine for a drug screen which he declined. The officer informed the patient that his status would be downgraded to Grade B if he did not cooperate with the urine drug screen, however, he reported that the patient "went man down in his cell" and allegedly told custody that he wanted to harm himself. The officer noted that the patient made no attempts to harm himself, and he did not voice suicidal plans. The patient was then taken to the TTA and admitted to the MHCB.

The initial IDTT meeting occurred on January 11, 2023, and a subsequent meeting occurred on January 18, 2023.

The patient was seen consistently by the psychiatrist and the PC while housed in the MHCB.

A SRASHE was completed on January 17, 2023, and January 19, 2023. The master treatment plan was updated on January 18, 2023.

The psychiatric MHCB discharge note was dated January 19, 2023, and indicated that the patient was provided a diagnoses of probable substance-induced mood disorder (methamphetamine), adjustment disorder with disturbance of mood and conduct, and possible major depressive disorder. At the time of discharge, his mental status was described as stable, and the patient demonstrated an appropriate response to treatment. He reportedly did not meet the criteria for

ongoing inpatient treatment and was deemed appropriate for discharge and return to the EOP level of care.

**Findings**

The treatment provided to this MHCB patient was appropriate.

**Patient B**

This 57-year-old transgender female condemned EOP Grade A patient was treated in the SQ MHCB from December 8 to December 15, 2022. A December 8, 2022, PC progress note stated that the patient identified as female and preferred the use of her chosen feminine names; her request was acknowledged by the PC. The patient reported daily depression, and she stated that she no longer wanted to be housed in a men's unit. She subsequently requested MHCB admission. Although the patient did not report suicidal ideation, the PC noted that the patient had a history of suicidal thinking and behavior and indicated that the patient might be in some unreported danger in her housing unit, as she was vague in her report of triggers for her depression and the precipitants of her current crisis. Due to her history of suicidality, the patient was sent to the TTA for evaluation and likely MHCB admission.

A SRASHE was performed on December 8, 2022, and a psychiatric admission note was completed on the same day noting that the patient was admitted to the MHCB on that date for treatment of depression. She had gender reassignment surgery during October 2022, and she was upset that she was not sent directly to a women's prison after her gender reaffirming surgery. The psychiatrist also noted that the patient was in no acute distress and indicated that the current treatment plan was discussed with the patient. The psychiatrist also noted that the patient was adherent with prescribed medications that included melatonin and Lexapro. She was provided diagnoses of persistent depressive disorder as well as history of LSD, alcohol, and cannabis use disorder. The psychiatrist documented the plan to continue current medications and to provide supportive psychotherapy with daily clinical contacts.

Subsequent psychiatric and PC contacts occurred timely.

The master treatment plan was completed on December 9, 2022, as was a history and physical examination.

A December 12, 2022, PC progress note indicated that the patient expressed her frustration with living in a male institution and that she thought that she would be transferred to a female prison soon after her surgery. The PC also stated that there was collateral information indicating likely deterioration in her support system and possible conflict with other inmates. The PC noted that the patient was admitted to assist in restoring her ability to function safely, to address her symptoms of depression, and to address housing issues that significantly impacted her mental health.

A December 14, 2022, psychiatric progress note stated that the patient experienced acute escalation in gender dysphoria symptoms upon return to SQ due to her expectation that she

would be placed in a female institution after her gender affirming surgery, but her symptoms were initially mitigated by placement in the medical CTC and by reassurance that her request for transfer was still pending and might be expedited. The patient's initial distress improved such that she was able to appropriately manage discharge from the CTC to her prior housing. Although she initially appeared to maintain stability in housing while awaiting the outcome of her transfer request, she began to experience, exhibit and report gradual escalation in anxiety, distress, isolation, depressed mood, as well as multiple neurovegetative symptoms that were suggestive of gender dysphoria, an adjustment disorder and a new major depressive episode. The psychiatrist noted that her symptoms did not warrant placement on suicide monitoring; however, stated that due to her ongoing acute and chronic suicide risk factors, she should remain in the MHCB with consideration of ICF referral for further stabilization. The psychiatrist noted that this issue would be discussed in the IDTT on the following day. Lexapro was prescribed to address the depressive symptoms, with plans to titrate as needed.

The IDTT meeting occurred on December 15, 2023, when another SRASHE was also completed. A discharge summary by the PC was completed on December 16, 2022, and the patient was referred to the PIP ICF for continued stabilization.

**Findings**

The treatment provided to this MHCB patient was appropriate.

**Patient C**

This 53-year-old male patient was housed in the MHCB. He was provided diagnoses of antisocial personality disorder, bipolar disorder, borderline personality disorder, major depressive disorder, and PTSD.

An October 24, 2022, psychiatric admission note stated that the patient was doing well until four days prior to admission when he developed sleep difficulties triggered by the staff restroom that was located next to his cell. He subsequently developed increasing hypervigilance, difficulty falling and remaining asleep. The patient also reported increased auditory hallucinations and frustration, with suicidal ideation without plan or intent. He alerted staff and was brought to the TTA. The patient reportedly became agitated while waiting in the TTA; he was subsequently administered oral then intramuscular medications and was placed in clinical restraints. The patient was released from restraints; however, he was again placed into restraints due to head banging. The restraints were again removed, and the patient was placed into his MHCB room with no subsequent self-harm.

The psychiatrist stated that the patient agreed to remain in the MHCB for one to two additional days to ensure stability and until his housing was addressed. He agreed to an increased dose of prazosin to address reported hypervigilance and sleep difficulties, with continuation of other prescribed psychotropic medications.

A history and physical examination occurred on October 24, 2022. A SRASHE was completed that same day as was the initial PC assessment. The patient was seen by the PC on October 25,

2022, and an IDTT meeting occurred on October 26, 2022.  The October 26, 2022, psychiatric discharge summary provided information regarding the patient's MHCB stay and noted that the patient reported and appeared to have returned to his baseline level of functioning.

**Findings**

This treatment provided to this MHCB patient was appropriate.

**Patient D**

This was a 56-year-old condemned Grade A patient who was admitted to the MHCB on January 16, 2023, due to worsening of chronic paranoid delusional thinking regarding others attempting to harm him.  The patient was prescribed Clozaril, Cogentin, mirtazapine, and Haldol, and he received his psychotropic medications by a PC 2602 order.  Prior to MHCB placement, the patient received mental health services at the EOP level of care after a lengthy PIP hospitalization then a brief MHCB admission the year prior due to worsening psychosis and distress.  The patient was classified as condemned since 1997.

The patient had ongoing chronic delusional paranoia; despite this, he reportedly functioned adequately and remained stable and engaged in treatment.

A January 15, 2023, nursing admission note documented the patient's anxiety and delusional thinking that the custody officers wanted to kill him.

The patient was seen by the PC on January 16, 2023, for an admission assessment.  The patient was provided diagnoses of schizophrenia and anxiety disorder.  The PC reported that the patient had decreased sleep and was contemplating initiating a hunger strike to gain the warden's attention.

A history and physical examination occurred on January 16, 2023, and a SRASHE was completed on January 17, 2023.

The initial January 17, 2023, psychiatric admission note provided information regarding the patient's recent history of symptoms, treatment and periods of treatment nonadherence that coincided with exacerbation of symptoms.  The psychiatrist reported his plan to taper and to eventually discontinue Clozaril while increasing the Haldol dosage.  The psychiatrist also indicated that with symptom improvement, discharge to the EOP was planned within the coming week; and if there was no improvement or ongoing nonadherence, PIP referral would be considered.

The patient was seen consistently for subsequent PC and psychiatric contacts.  The IDTT occurred on January 18, 2023.

A January 20, 2023, PC progress note indicated the plan for return to the EOP in four days and indicated that the patient continued to stabilize and appeared with greater improvement as compared to past MHCB admissions.

The patient was seen by the psychiatrist on January 21, 2023; at that time, the psychiatrist reported that the patient was medication adherent with slow stabilization. He was provided diagnoses of schizophrenia spectrum disorder, persistent depressive disorder, and antisocial personality disorder. Additionally, his history of cannabis use disorder was noted as well as differential diagnoses of schizophrenia and schizoaffective disorder.

Another SRASHE was completed on January 24, 2023, and the master treatment plan was updated that same day.

The January 24, 2023, psychiatric discharge note documented the patient's improvement that was consistent with his last MHCB stay and reported that Clozaril was slightly titrated with continuation of other psychotropic medications. The psychiatrist indicated that the patient had exhibited gradual return to his recent baseline of partially attenuated symptoms.

**Findings**

This treatment provided to this MHCB patient was appropriate.

**Patient E**

This 43-year-old condemned patient was admitted to the MHCB on March 24, 2023. The PC admission note documented the events that led to admission. The PC noted that the patient was escorted to the TTA after endorsing suicidal ideation to custody staff in his housing unit. He reported worsening psychotic symptoms after moving from the Adjustment Center to the East Block on March 23, 2023, and the patient reported that the noise in the new housing unit triggered command auditory hallucinations and a plan to kill himself.

The treatment outcome expectations included the elimination of active suicidal ideation and the reduction of symptoms to a baseline level of functioning that was safe and appropriate for outpatient housing.

The March 25, 2023, psychiatric admission note documented the patient's history of schizoaffective disorder, depression, acting out behaviors, suicide attempts, criminal behaviors, and polysubstance use disorder. The patient also had chronic pain, hepatitis, and reported suicidal ideation with a plan to hang himself. The psychiatrist also noted that the patient had a new commitment to death row. The plan was to continue suicide watch with a sitter. The psychiatrist also noted that the patient refused to leave his cell for a confidential contact. He was provided diagnoses of schizophrenia spectrum disorder; unspecified mood disorder; antisocial personality disorder traits; opiate use disorder, including heroin; stimulant use disorder, including methamphetamine use disorder; and cannabis use disorder. Several provisional diagnoses were also provided, and the psychiatrist documented the need for diagnostic clarification.

The patient was seen consistently by the PC and the psychiatrist. A history and physical examination occurred on March 25, 2023.

The March 27, 2023, master treatment plan noted the plan to continue suicide watch due to active suicidal ideation and ongoing report of auditory hallucinations with an estimated ten-day MHCB stay.

The March 30, 2023, psychiatric note documented the patient's report that he was no longer suicidal, was future focused and that he was able to ignore the command auditory hallucinations. The psychiatrist also stated that the patient was relieved that the treatment team was considering a PIP referral. The suicide watch was discontinued, and suicide monitoring was decreased.

The master treatment plan was updated on April 3, 2023, and a second SRASHE was completed on April 5, 2023.

An April 6, 2023, note indicated that the patient was referred to the ICF level of care. A PC discharge note on the same day indicated that, although the patient did not require acute inpatient care, his self-harm behavior would not discontinue rapidly, and a behavior plan was required to transition the patient from an inpatient setting to a very noisy outpatient condemned housing unit.

**Findings**

This treatment provided to this MHCB patient was appropriate.

**Patient F**

This was a 41-year-old condemned (since 2009) Grade A patient was admitted to the MHCB on February 6, 2023. The patient previously received mental health services at the EOP level of care, and he had multiple past psychiatric hospitalizations as well as a history of self-injurious behaviors. The patient had diabetes with past episodes of diabetic ketoacidosis and chronic neuropathic pain. Additionally, he was provided a diagnoses of amphetamine use disorder (in reported stable remission), past amphetamine-induced psychotic episodes, opioid use disorder with past overdoses in reported stable remission, bipolar affective spectrum mood disorder, and mixed cluster B personality disorder. The patient was last discharged from the PIP ICF to the EOP level of care during June 2020.

Prior to the MHCB admission, a February 5, 2023, urgent PC stated that the patient had been seen several times over the weekend in the TTA and he had a pattern of refusing to leave the TTA when cleared and he refused to be escorted to housing and spent the night in the TTA waiting for another evaluation. While there, the patient became very agitated and broke the window, according to the TTA staff. Upon evaluation on the following morning, he was initially uncooperative with the evaluation, but later reported depression and stress after the death of his grandmother. He stated that he could not return to his housing unit due to custody issues, and he requested MHCB admission due to suicidal and homicidal ideation.

The PC indicated that consultation was obtained from supervisory and treating clinicians who advised that the patient not be admitted to the MHCB due to demonstrated manipulative behavior with the intent for MHCB admission which was not recommended by the IDTT. The note

indicated that the patient would be admitted to alternative housing with a safety smock, safety issue and suicide watch with evaluation on the following morning.

The following day the patient was evaluated by a psychiatrist, with the plan to continue observation in the alternative housing. Following a reassessment by the PC, he was admitted to the MHCB due to danger to self. A SRASHE was completed that same day, as was a history and physical examination.

The February 6, 2023, psychiatric admission note documented the patient's history, diagnoses and discussed his personality disorder traits, possible somatization and/or malingering due to safety concerns and housing difficulties. The psychiatrist also discussed medication management and the attempt to discharge the patient from the medical CTC; however, he was uncooperative with the attempts to rehouse him in an outpatient setting. The psychiatrist stated that suicide watch would continue.

The patient was seen consistently and timely by the psychiatrist and the PC in the MHCB.

The master treatment plan was dated February 9, 2023, and the case formulation was clinically appropriate. The master treatment plan was updated on February 15, 2023.

The patient was referred to the intermediate level of care, and the referral was reviewed and approved by the IRU on February 16, 2023, when it was determined that referral to an ICF on single cell status was appropriate.

A February 20, 2023, PC progress note stated that an attempt was made to see the patient for a confidential session on that date, however, the patient was difficult to arouse. Custody and nursing staff were consulted, and the healthcare documentation was reviewed from the preceding weekend. The patient reportedly was sent to an outside hospital on two occasions on February 18 and February 19, 2023, due to complaints related to his report of falling on his left arm. In addition, nursing staff indicated that the patient called multiple "man down" in apparent additional attempts to be sent to an outside hospital. Nursing staff further indicated that he did not return from the outside hospital until early on the morning of the attempted interview, which they indicated was the likely reason for his continued somnolence.

The patient transferred to the PIP on February 21, 2023. An MHCB discharge summary was not located in the healthcare record.

**Findings**

This treatment provided to this MHCB patient was appropriate.

An MHCB discharge summary was not located in the healthcare record. The patient's level of care was changed from MHCB to the intermediate level of care. The treating clinician was not aware that a discharge summary was required as the patient's cell location did not change with the level of care change.

**Patient G**

This was a 42-year-old condemned 3CMS patient who was admitted to the MHCB on January 30, 2023. He was placed on death row in 2018. The patient covered his cell window in the East Block housing unit one day prior, requiring removal from his cell. The patient acknowledged the use of methamphetamines and appeared paranoid and intoxicated. He was provided emergency medicines and was admitted to the MHCB.

The patient was provided diagnoses of methamphetamine intoxication syndrome, methamphetamine use disorder, and antisocial personality disorder traits. He also had a history of medication and treatment nonadherence.

A January 30, 2023, psychiatric admission note documented that the patient was sent to the TTA by the primary care provider due to paranoid and suicidal ideation. A SRASHE was also completed on January 30, 2023.

The patient reportedly felt better after a night of sleep and treatment with Zyprexa in the MHCB. The PC admission assessment occurred on January 31, 2023. This assessment provided a history of the patient's symptoms and treatment, and outlined the plan for continued checks every 15 minutes, continued monitoring for methamphetamine withdrawal and to encourage treatment adherence. A history and physical examination were also completed on January 31, 2023.

The patient was seen by the psychiatrist on February 1, 2023, when it was noted that he indicated that he was ready for discharge. He provided rationale for his recent difficulties and requested that the psychiatrist prescribe Zyprexa daily; the psychiatrist agreed with this request and indicated that the IDTT would meet on the following day to consider discharge. The psychiatrist attributed the patient's behavior and symptoms to continued substance use.

Another SRASHE was completed on February 2, 2023, that assessed low acute suicide risk. A February 2, 2023, IDTT note stated that the patient was eager to return to the East Block and that he appeared improved.

The February 2, 2023, psychiatric discharge summary provided a summary of the patient's MHCB stay and indicated that discharge to the 3CMS level of care would occur. The psychiatrist noted that the patient was assessed with low acute and moderate to high chronic suicide risk, and he was prescribed Zyprexa. He was discharged to the 3CMS level of care.

**Findings**

This treatment provided to this MHCB patient was appropriate.

**Patient H**

This 55-year-old condemned Grade B patient was not included in the MHSDS; however he had previously received mental health services at the 3CMS and MHCB levels of care. He was admitted to the MHCB on January 4, 2023 due to acute stress related to being openly gay on

condemned row, and feeling unsafe due to a lack of response from requests to prison administration. He had a history of violence toward others and was facing anticipated several months of segregation housing.

On January 4, 2023, initial psychiatric assessment noted the reasons for MHCB admission and indicated that the patient denied suicidal ideation; however, noted that the patient felt that he was a threat to others.

A SRASHE and the initial PC assessment were completed on January 4, 2023.

The IDTT met on January 6, 2023. The patient was seen consistently and timely in the MHCB by the psychiatrist and PC.

A second SRASHE was completed on January 11, 2023, and a discharge IDTT occurred on the following day.

The January 12, 2023, psychiatric discharge summary provided information regarding the patient's MHCB stay and noted that there was no clear indication for medication treatment, and that the patient additionally expressed opposition to taking psychotropic medications. The discharge summary noted that given progressive de-escalation, improved insight, motivation to engage with MHSDS services, and increased motivation to refrain from violent behaviors; the patient's acute dangerousness resolved, and he approached readiness for discharge. The patient agreed to discharge to the EOP.

**Findings**

This treatment provided to this MHCB patient was appropriate.

**Patient I**

This 35-year-old condemned grade A patient was admitted to the MHCB from the medical CTC due to continued reported hunger strike with no medical acuity noted. He most recently received mental health services at the 3CMS level of care, and he had past suicidal ideation and attempts that led to MHCB and PIP hospitalizations.

A February 2, 2023, psychiatric admission note indicated that the patient presented in the emergency department with a report of chest pain and a negative medical workup. He was returned to the CTC and determined to be medically stable for MHCB transfer that had previously been planned.

The patient refused to allow the history and physical examination on February 3, 2023.

The initial IDTT meeting occurred on February 3, 2023. A February 3, 2023, PC note provided an adequate case formulation. The patient refused to participate in a SRASHE also scheduled on February 3, 2023.

The patient was seen consistently by the psychiatrist and PC in the MHCB. The treatment plan was updated on February 10, 2023, and February 14, 2023.

A February 10, 2023, psychiatric note noted that the patient had an ongoing hunger strike; however, he began making better adaptive decision making and agreed to and requested water and electrolyte replacement in response to being informed of hypokalemia and associated risks. The psychiatrist noted that this further supported the determination that the patient had adequate medical decisional capacity.

On February 14, 2023, PC progress note stated that the patient continued to consume water and liquid nutritional supplementation; thus, his hunger strike was ended. The patient agreed to complete the SRASHE for the discharge IDTT. He denied current symptoms or concerns.

A SRASHE was completed February 15, 2023. An IDTT occurred on February 16, 2023, which noted that the patient would be discharged to the 3CMS level of care. His overall stability and functioning reportedly had significantly improved, and he reportedly could safely function in an outpatient setting. The PC and psychiatrist repeatedly assessed for mental illness as a contributor to his hunger strike, and it was determined that his hunger strike was solely volitional in nature. They indicated that a higher level of care was not indicated, as the patient had returned to his baseline behavior of eating meals and drinking water. He was reportedly not a risk to himself, others, or suffering from impairment due to mental illness.

The February 16, 2023, psychiatric discharge summary indicated that the patient appeared stable for discharge from the medical CTC. The psychiatrist also noted that the patient was stable for discharge to return to the 3CMS level of care. The patient agreed to resume treatment with Remeron, and he was discharged to the 3CMS program.

**Findings**

This treatment provided to this MHCB patient was appropriate.

**Patient J**

This patient's healthcare record was reviewed to assess the care provided. The patient appeared on the SQ non-referral to inpatient treatment log. According to the log, he met the HLOC referral consideration criterion one (as the result of a mental disorder, the patient was unable to function at the current level of care), criterion three (the patient demonstrated chronic psychiatric symptoms that had not responded sufficiently to at least six months of treatment), and criterion seven (in the last three months, the patient participated in less than 50 percent of treatment).

The patient received mental health treatment at the EOP level of care. He was frequently described in the clinical progress notes as disorganized with a labile mood. The staff documented that he was frequently seen responding to internal stimuli, and he reported ongoing auditory and occasional visual hallucinations. He was provided a diagnosis of schizophrenia, and he was prescribed fluoxetine and olanzapine. The patient had a long history of mental health treatment including inpatient treatment in state hospitals and medication nonadherence.

The PC progress notes were frequently copied unchanged from two to three months prior, and it was unclear what information was current; alternately, the documentation only included current information that was superficial and generic. It did not appear that actual interventions were implemented prior to and immediately after the February 14, 2023 IDTT meeting noted in the referral log.

Review of the February 14, 2023 IDTT documentation indicated that the patient was referred to intermediate inpatient treatment despite his inclusion in the nonreferral log. A review of the referral log confirmed that the patient was referred, and that referral was further supported by an inpatient referral consult completed on the day of the IDTT meeting. It was unclear what programming errors may have occurred as the patient appeared on both the referral and nonreferral logs for the same IDTT meeting. The referral log was also incomplete for this patient. While the patient was referred to inpatient treatment on February 14, 2023, he was not transferred to intermediate inpatient treatment until March 22, 2023, which exceeded the transfer timelines.

During the period between referral and transfer, the SQ mainline EOP staff continued to meet with the patient consistently, although the PC contacts did not appear to include actual therapeutic interventions. The lack of therapeutic interventions was at times due to the severity of the patient's mental illness and paranoia; but no interventions were added to address that issue, and no clinical interventions appeared to have been implemented during those clinical contacts. The patient was last seen for an individual psychiatric contact at SQ on January 31, 2023. There were lapses in timely psychiatric contacts.

**Findings**

The care provided to this patient was inadequate.

Although the patient was appropriately referred to a higher level of care, the mental health treatment received prior to and following the referral prior to transfer was inadequate. The non-referral to inpatient treatment log incorrectly identified the patient as not referred to a HLOC, despite having been referred on the same date. The patient had appropriately been referred to intermediate treatment at the February 14, 2023, IDTT meeting and was correctly identified on the referral log. The patient did not transfer timely, and he waited approximately 36 days for transfer.

The patient experienced acute psychiatric symptoms related to schizophrenia that interfered with his adjustment to dormitory housing and the correctional setting as well as his relationships with peers. While the treatment team recognized his increased need for mental health services and referred him accordingly, the treatment that he received between referral and transfer was problematic. He was not seen individually by the psychiatrist despite documentation of problematic psychotropic medication adherence. Individual contacts with the PC were limited by the patient's mental illness and paranoia and the lack of implementation of any clinical interventions. The patient was appropriately identified for referral to a higher level of care, but

the mental health services provided while awaiting transfer were inadequate. Additionally, he was not timely transferred to intermediate inpatient treatment.

**Patient K**

This 61-year-old condemned EOP patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at SQ. This was the patient's first incarceration, and he arrived at the CDCR in 1998. He had minimal history of mental health treatment and entered the MHSDS by self-referral in May 2022 due to an increase in stressors leading to depressive symptoms and active suicidal ideation. The patient had no history of suicide attempts or inpatient admissions. He entered the MHSDS at the EOP level of care and reportedly benefitted from weekly individual therapy and group programming, with engagement in treatment and good insight regarding his mental health concerns. His primary symptoms included chronic passive suicidal ideation, sleep disturbance, and depressed mood.

Three IDTT meetings occurred during the review period; all meetings occurred timely and included the necessary participants, but the patient declined to attend any of the meetings. At the October 11, 2022, IDTT meeting, the PC reported that the patient requested no changes to his programming. The treatment plan contained a very thorough treatment progress update in the IPOCs section including an IPOC for depression with level of care rationale, interventions, and goals. The goals and interventions were appropriate and individualized. The patient was not a participant in the SRMP, and the EOP functional evaluation was not completed for this IDTT meeting. The clinical summary was thorough and included the patient's historical factors, current presentation, treatment goals, and interventions.

At the next IDTT meeting on January 3, 2023, the patient had made progress since the last IDTT meeting and demonstrated less depressed affect and no suicidal ideation. Most of the treatment plan was copied unchanged from the previous treatment plan.

At the final IDTT meeting of the review period on March 28, 2023, the patient was attending groups and weekly therapy and was using mindfulness meditation to cope with stressors. He denied any new or worsening symptoms and reported that his depression was improving. The patient was appropriately retained at the EOP level of care.

The patient was generally seen timely for psychiatric contacts during the review period. He was not prescribed psychotropic medication but remained stable. The psychiatric contacts primarily occurred at the cell-front or in a holding cell. Review of psychiatric progress notes indicated that the patient remained stable during the review period, and he did not demonstrate any significant increase in symptoms. He reportedly met his treatment plan goals during the review period.

The weekly PC contacts occurred timely during the review period. The documentation indicated that the PC provided clinically appropriate interventions that aligned with the treatment plans. The patient remained stable and consistently denied any increase in symptoms or significant distress. Most PC contacts occurred in a confidential setting unless the patient declined. The PC worked collaboratively with the patient, and the patient requested to remain at the EOP level of care to continue individual therapy and participation in his treatment groups.

During the review period, the patient attended 77 percent of all offered treatment and did not miss weekly scheduled sessions with his PC unless the PC needed to reschedule, or institutional lockdowns impacted his attendance.

**Findings**

The overall care and treatment provided to this SQ condemned EOP patient was adequate.

The IDTT meetings occurred timely with the necessary participants.  The patient remained stable and engaged in treatment.  The treatment goals and interventions were appropriate and individualized, and the diagnosis of major depressive disorder appeared to be appropriate for his clinical presentation.  Although the patient was not prescribed psychotropic medications, he remained stable and was seen timely by the psychiatrist.  The PC contacts occurred timely and were clinically appropriate.  The documentation of PC contacts was adequate, and the PC identified specific interventions and the patient's response appropriately.

**Patient L**

This 62-year-old condemned EOP patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at SQ; he was housed at SQ since 2004.  The patient had a history of multiple MHCB and PIP admissions for chronic depressive symptoms, suicidality, and command auditory hallucinations.  His most recent MHCB admission occurred from June 18, 2019, to June 25, 2019, after a medication overdose that was determined not to be a suicide attempt.  The most recent SRASHE on June 3, 2020, assessed high chronic and low acute suicide risk.  He had good protective factors, including regular contact and support from his family.  He usually attended unit programming, but he did not attend programming that occurred away from his housing unit due to COVID-19 concerns.  He had a history of physical and sexual abuse, substance abuse, and traumatic brain injury, and he was on EOP modified programming.

The monthly IDTT meetings occurred timely during the review period.  He was provided a primary diagnosis of schizoaffective disorder, bipolar type.  The October 18, 2022, IDTT meeting included the necessary participants, but the patient refused to attend.  An IPOC for danger to self was initiated which contained very basic and generic goals and no individualized interventions.  There were no new symptoms reported, and the patient did not meet any HLOC referral criteria.  He demonstrated increased stability, positive mood, and active participation in unit programming since the previous IDTT meeting.

At the next IDTT meeting on November 15, 2022, the IPOCs remained inadequate and unchanged, and the patient reported seasonal depressive symptoms.  The clinical summary was adequate and updated with the patient's recent functioning and mental status.  The remaining IDTT meetings occurred on December 13, 2022, January 10, 2023, February 7, 2023, and March 7, 2023; they all included the necessary participants, but the patient did not attend any of the meetings.  The IPOCs and goals remained unchanged and inadequate during the remainder of the review period.

The patient was seen timely for weekly PC contacts during the review period. Most contacts occurred in a confidential setting unless the patient declined, and he was consistently described as stable and with a euthymic mood. The PC assisted the patient in the development of coping skills, including joining a crocheting group and processing his thoughts. The documentation of PC progress notes was appropriate, and the patient's mental and clinical status were regularly updated.

The psychiatric contacts also occurred timely during the review period. He was prescribed Seroquel, amitriptyline, Abilify, Wellbutrin, and melatonin. Most psychiatric contacts occurred at the cell front due to the patient declining to attend a confidential sessions. At the October 17, 2022, psychiatric contact, the patient reported increased depressive symptoms, and the psychiatrist adjusted his Seroquel. At his next appointment on November 14, 2022, the patient reported improvement in mood and sleep after the medication adjustment and denied any other mental health complaints. At a psychiatric contact on January 23, 2023, the patient had intermittent medication adherence, and the patient and psychiatrist agreed to discontinue Wellbutrin. He remained stable during the remainder of the review period with positive response to medication management.

**Findings**

The overall care and treatment provided to this SQ condemned EOP patient was adequate.

Clinical contacts, including IDTT meetings, PC and psychiatric contacts occurred timely and were well documented. The patient was appropriately placed on EOP modified programming due to his refusal to leave his housing unit for programming due to COVID-19 concerns. The treatment goals and interventions provided in the treatment plans were inadequate; however, the PC contacts were adequate and timely, and most PC contacts occurred in a confidential setting. The psychiatric contacts also occurred timely, and review of psychiatric progress notes indicated good collaboration with the patient with appropriate medication management.

**Patient M**

This 34-year-old EOP condemned patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at SQ. The patient arrived at SQ for this incarceration in February 2017 and was immediately placed at the 3CMS level of care. He also received mental health services at the EOP, acute, and intermediate levels of care. The patient had no history of mental health treatment prior to his SQ placement. His inpatient placements occurred due to grave disability, and the most recent MHCB admission occurred from November 6, 2021, to December 16, 2021, after the patient unintentionally took too much clozapine. He was provided diagnoses of schizophrenia, opioid use disorder, and amphetamine use disorder. He received his psychotropic medications by a PC 2602 order. He historically refused to attend out of cell contacts and preferred to engage in cell-front contacts with the PC and psychiatrist. His symptomatology consisted primarily of negative symptoms, including isolation, poverty of speech, and poor insight.

Two IDTT meetings occurred during the review period; both were quarterly IDTT meetings that included the necessary participants, but the patient declined to attend or to participate in treatment planning. At the initial IDTT meeting, no IPOCs were provided; however, a progress update summary was documented noting that the patient was at his clinical baseline, and the treatment goals were to reduce distress and to remain stable. The treatment plan provided interventions of offering treatment, weekly individual PC contacts, and support from the treatment team. The level of care justification and clinical summary were appropriate.

At the next IDTT meeting on January 31, 2023, the patient reported that he could not go to the yard or groups due to his gang involvement. The patient reported significant transient anxiety due to drug cravings; however, despite his persistent difficulties with substance use and cravings, the treatment team did not add IPOCs or specific treatment goals to address his ongoing substance use.

The psychiatric contacts occurred timely during the review period. The documentation indicated that the patient remained relatively stable but was not always medication adherent with prescribed Clozaril, Prozac, Haldol, and Vistaril. The patient consistently requested Benadryl instead of Vistaril for his anxiety symptoms; however, he had a history of diverting and cheeking medications, so the psychiatrist was cautious but eventually restarted the Benadryl with appropriate constraints and safeguards. He was appropriately placed on MAT to address his substance use disorder. At the February 28, 2023 psychiatric contact, the Clozaril was discontinued, and Zyprexa was prescribed. At the next contact on March 28, 2023, the patient's symptoms were reportedly well controlled, and he requested a modest increase in the Zyprexa dosage.

The PC contacts occurred timely and consistently during the review period, and the contacts occurred both at the cell-front and in confidential settings. The patient and PC appeared to develop positive rapport, and the PC provided clinically appropriate support and interventions including grounding and mindfulness techniques, and supportive reflection. The PC contacts were well documented. It was unclear why the patient's substance use disorder was not addressed in treatment planning.

**Findings**

The overall care and treatment provided to this SQ condemned EOP patient was adequate.

The IDTT meetings, PC and psychiatric contacts occurred timely. The patient remained stable; and although he did not leave the housing unit for programming, he did engage in programming on the unit and in individual PC contacts.

Treatment planning needed improvement, as no IPOCs or specific treatment goals were provided in the treatment plan, and it was unclear why IPOCs or treatment goals specifically targeting the patient's substance use were not developed.

**Patient N**

This 53-year-old EOP condemned patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at SQ. The patient entered the CDCR for his current term in August 1997 and was housed at SQ since October 2000. He entered the MHSDS on April 28, 2021, after a CTC admission and subsequent ICF referral and admission. The patient was placed in the MHSDS after he drank excessive amounts of water, became delirious, and required extraction from his cell and was taken to an outside hospital for treatment and stabilization.

Three IDTT meetings occurred timely during the review period; they included the necessary staff, but the patient consistently refused to attend. The patient was provided a diagnosis of schizophrenia, unspecified, and he demonstrated poor insight regarding his mental illness. The IPOCs in the treatment plan were appropriate and targeted the patient's negative symptoms, delusions, and potential danger to others. Each IPOC contained patient-specific goals and interventions that were clinically appropriate. No new symptoms were reported, although the patient did not engage with the providers. The level of care justification was appropriate and noted that the patient was minimally engaged in treatment or clinical contacts, and occasionally went to the yard. The EOP functional evaluation in the treatment plan was complete. The PC reported that the patient had demonstrated decrease in violent thoughts and identified several positive coping skills.

The next IDTT meeting occurred on January 24, 2023. The IPOCs were unchanged with an emphasis on treatment participation. The patient refused laboratory testing, and his medication adherence was questionable. He was seen weekly at the cell-front since his last IDTT meeting without the report of new symptoms. The level of care justification remained adequate and reasonable.

A special IDTT meeting occurred on February 16, 2023, after the UNA recommended referral to a HLOC due to the patient's treatment nonadherence. The treatment team added an IPOC for treatment nonadherence that contained appropriate goals and interventions; however, they did not refer the patient to a higher level of care, but appropriately provided a three-month period of monitoring for response to treatment goals, or referral to the PIP would be occur. The patient was reportedly likely adherent with Risperdal because he presented with stability without overt psychosis, and he attended to his ADLs and self-care. The goals identified at this IDTT meeting were to avoid PIP admission by meeting specific treatment goals including attending monthly individual PC and psychiatric contacts and weekly groups.

The psychiatric contacts occurred timely during the review period. The patient was prescribed Risperdal to address his psychotic symptoms. All psychiatric contacts occurred at the cell front, as the patient refused to leave his cell for a confidential session. He was described as superficially cooperative with the psychiatrist's inquiries, and he did not demonstrate a significant increase in symptoms or decline in his mental status. The documentation indicated that the psychiatrist consistently made diligent efforts to engage with the patient and to encourage him to leave his cell for treatment and assessment.

The patient was seen for timely and consistent weekly PC contacts during the review period. Almost all PC contacts occurred at the cell front, as the patient declined meeting in a confidential setting. He demonstrated moderate to severe negative symptoms of schizophrenia, which contributed to his isolation and withdrawal from treatment. His engagement and rapport with the PC improved over time, and he notably attended an individual PC session in a confidential setting at the end of the review period.

Of note, after the review period, the patient was placed on EOP modified programming at the next quarterly IDTT meeting, and he was later referred to the ICF level of care.

**Findings**

The overall care and treatment provided to this condemned EOP patient at SQ was adequate.

Clinical contacts, including IDTT meetings, PC and psychiatric contacts occurred timely and were well documented. Although the patient did not attend the IDTT meetings; he was provided with specific and appropriate goals and interventions, and he was retained at the EOP level of care in February 2023 to allow an opportunity to meet treatment goals prior to a higher level of care referral. The psychiatrist made consistent efforts to engage with the patient to leave his cell for treatment. The PC developed a rapport with the patient and successfully encouraged him to attend his first confidential individual PC contact at the end of the review period.

**Patient O**

This 33-year-old condemned EOP patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at SQ. The patient entered CDCR for his current term on March 11, 2015. He spent much of his term at the inpatient level of care for treatment of schizophrenia and depression with suicidal ideation, and he often presented with disorganization, disorientation, and active psychosis including severe auditory hallucinations. The patient had more than five MHCB admissions; and during the review period, he was admitted to the MHCB from November 11, 2022, to November 16, 2022, due to suicidal ideation and danger to self. His chronic suicide risk was assessed as high, and his acute risk was assessed as low.

The IDTT meetings occurred timely during the review period; the patient did not attend any of the IDTT meetings. At the quarterly IDTT meeting on October 11, 2022, the patient reported decrease in auditory hallucinations since the previous meeting, and his providers noted that he had not exhibited delusional thinking during recent contacts. The patient presented primarily with negative symptoms of schizophrenia, and he was medication adherent with better attendance at the individual sessions. The treatment plan did not contain IPOCs or treatment goals.

The next IDTT meeting occurred on November 11, 2022 after the patient was discharged from the MHCB. He reported ongoing auditory hallucinations and fears of victimization; the treatment team noted an irregular sleep pattern, and the patient needed occasional reminders to attend to his ADLs. The MHCB IDTT initiated IPOCs that were continued and included in the

outpatient EOP treatment plan; the IPOCs targeted danger to self and mood state. The clinical summary was updated appropriately, and the patient was retained at the EOP level of care.

The final IDTT meeting of the review period occurred on February 14, 2023. The IPOCs and treatment plan remained largely unchanged, and the treatment team noted that the patient's mental status had declined during the prior month. He only left his cell for one individual contact; he had not recently showered, and he demonstrated active symptoms of psychosis including command auditory hallucinations and delusional thinking, such as refusing to leave his cell because he believed that he would be attacked by a lion. The treatment team appropriately referred the patient to the ICF level of care at that IDTT meeting.

The psychiatric contacts occurred at the cell-front, as the patient repeatedly declined to leave his cell for a confidential session. He was generally medication adherent with occasional missed doses when he was asleep during the medication pass; he was prescribed Prozac, clozapine, Depakote, and Haldol.

He was seen timely for weekly PC contacts, and most occurred in a confidential setting unless the patient declined or slept through his scheduled appointment time. The documentation indicated that the patient was engaged in treatment with the PC, and clinically appropriate interventions were provided. The PC and the psychiatrist collaborated appropriately, particularly as the patient's mental status and condition declined necessitating referral to a higher level of care.

**Findings**

The overall care and treatment provided to this condemned EOP patient was adequate.

The patient was seen timely for IDTT meetings, PC, and psychiatric contacts during the review period. Although the October 2022 IDTT documentation was inadequate, the remaining treatment plans were adequate and contained appropriate IPOCs, treatment goals, interventions, and clinical status updates. The PC provided appropriate therapeutic interventions and support for the patient. The PC and psychiatrist demonstrated collaboration in their treatment planning as the patient's mental status declined, and the treatment team appropriately referred the patient to the ICF level of care in February 2023 due to mental decompensation and lack of treatment engagement.

**APPENDIX C-13**
**California State Prison/Corcoran (CSP/Corcoran)**
**July 10, 2023 – July 14, 2023**

**Patient A**

This 32-year-old patient transferred to CSP/Corcoran during September 2022. At the time of the review, he was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided.

The clinical documentation provided a useful description of the patient's symptoms and functioning, including peer relationships and institutional employment. As the patient progressed in treatment, the psychiatric provider discontinued his psychotropic medications, as his symptoms had discontinued. Accordingly, his diagnoses also changed from major depression and anxiety disorder, unspecified to anxiety and depression, not otherwise specified. This change conflicted with the diagnosis of PTSD that was also present in the healthcare record.

This stable patient was seen almost monthly for telepsychiatry contacts. Two routine primary clinician contacts with two different clinicians occurred during the review period. The documentation of those contacts was brief in content, and when treatment needs including nightmares, disturbed sleep, and familial stressors, were disclosed; clinical interventions were not utilized.

**Findings**

The care provided to this patient was marginally adequate.

The patient was seen for psychiatric contacts more frequently than minimally required, and the documentation of those contacts assisted in facilitating continuity of care. In contrast, primary clinician documentation of clinical contacts did not indicate that the sessions were meaningful therapeutic encounters, and clinical interventions were not utilized which could have assisted in symptom management. Diagnostic clarification was also needed.

**Patient B**

This 44-year-old patient transferred to CSP/Corcoran during 2020. He was provided diagnoses of adjustment disorder with disturbance of emotions and conduct, and antisocial personality disorder. At the time of the review, he was prescribed Remeron for insomnia and anxiety. His healthcare record was randomly selected to assess the adequacy of care provided.

Discrepant information was documented regarding the patient's inclusion in the MHSDS. From February 2021 to November 2021 and from May 2022 to October 2022, the patient was seen at least monthly by mental health clinicians, and sometimes more frequently in response to routine consults. On October 31, 2022, after several clinical contacts in response to the patient's request for services, a primary clinician initial assessment was completed. The assessment did not sufficiently update information regarding his mental health contacts, symptoms and functioning

since 2021.  Further, the summary section was copied from an annual IDTT meeting during 2018.

An initial IDTT meeting occurred on January 3, 2023, when the patient requested mental health treatment.  The IDTT documentation did not address an overnight suicide watch that occurred during October 2022.  Also, an IPOC for danger to self should have been initiated due to the patient's statement that he wanted to harm himself during the October 2022 initial assessment.  An IPOC for anxiety was added to existing IPOCs for irritability and depression, but no IPOC for paranoia was added despite clinical indication.  A goal to reduce symptoms was reasonable, and baseline assessments were documented, however the goals were not individualized.  Additionally, interventions were not established to assist with goal attainment.

The IDTT documentation did not include relevant clinical information to assist with case conceptualization or treatment planning.  Specifically, there was no documentation regarding the patient's preoccupation with obtaining single cell during a December 19, 2022 primary clinician contact.  Nor was there documentation regarding a meeting with the senior psychologist supervisor to address a grievance in which he stated that he had been denied mental health services for more than one year.  The supervisor referred the patient to a psychiatrist, as he had not been seen by a psychiatrist since 3CMS placement in October 2022.

During the psychiatric assessment on December 28, 2022, the patient reported depression and anxiety, but he declined treatment with psychotropic medication.  He also reported a history of hearing his father's voice as well as trauma symptoms.  The psychiatrist provided diagnoses of adjustment disorder with mixed anxiety and depression, psychosis unspecified and possible PTSD; these diagnoses were in contrast to those previously documented in the healthcare record.  Although the psychiatrist documented the plan to see the patient in three months for follow-up, he was not seen by a telepsychiatrist until June 20, 2023, approximately six months later.  At that session, the patient assessed his mood as five of ten on a ten-point scale and reported decreased sleep.  He agreed to take Remeron, an antidepressant medication, on an as-needed basis.

Two SRASHEs were completed after the MHCB referral in October 2022.  The first SRASHE assessed the patient with moderate chronic and low acute suicide risk, which appeared to be an underestimation of risk given the patient's vague threats of self-harm.  Of note, the patient requested EOP placement, and this was not addressed during this visit or at a subsequent contact by the clinician.  A second SRASHE was completed during May 2023 that indicated that chronic risk had decreased to low without consideration of a previous suicide attempt documented in the prior SRASHE.  The assessment of acute risk remained low.

The patient was seen for six mental health consults between March and June 2023.  Despite various stressors, the patient was described as without acute distress, and the documentation of these contacts was brief and representative of a brief wellness check-in.  Except for providing a booklet on Thinking Errors at his request, clinical interventions were not utilized during these contacts to assist in stress management.

**Findings**

The care provided to this patient was inadequate.

The patient had a long history of multiple requests for mental health services; but for reasons that were not clearly documented, he was not timely included in the MHSDS, and he did not receive therapy as indicated or requested. Psychiatric follow-up contacts were delayed, and the primary clinician's initial assessment lacked a useful summary of symptoms and functioning, rationale for 3CMS placement, and an updated clinical summary. Treatment planning was negatively impacted by the insufficient assessment, and treatment planning did not target danger to self which was clinically indicated. Treatment interventions for established IPOCs were not developed or utilized in primary clinician contacts which did not include documentation of meaningful therapeutic encounters and appeared to be brief wellness check-ins. Danger to self was not targeted as an IPOC, and suicide risk assessments minimized the patient's chronic suicide risk. Diagnostic clarification with rationale was needed.

**Patient C**

This 25-year-old patient transferred to CSP/Corcoran's 3CMS program during July 2021 after MHCB placement. He was provided a diagnosis of major depressive disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided.

Lapses were noted in routine primary clinician contacts; after a contact in October 2022, the patient was not seen again for primary clinician contact until seven months later in May 2023. The patient refused this contact. Documentation indicated that the custody staff noted that the patient appeared stable without evidence of decompensation; there was no documentation of cell-front contacts or wellness checks by the clinician. At the time of the monitoring visit, the patient had not been rescheduled to see the primary clinician since his refusal in May 2023.

The patient attended his annual IDTT meeting on June 21, 2023. IPOCs for depression were continued without modification since September 13, 2021, despite the patient's request to address his anxiety symptoms.

**Findings**

The care provided to this patient was inadequate.

On July 10, 2023, the patient had not been seen for primary clinician contact since October 2022, and this lapse in contact exceeded requirements. The patient's treatment needs were not addressed during the IDTT meeting, and treatment goals were not appropriately updated.

**Patient D**

This 32-year-old patient transferred to CSP/Corcoran during October 2021. He was provided diagnoses of adjustment disorder, unspecified and adjustment disorder with anxiety. He was not

prescribed psychotropic medication.  His healthcare record was randomly selected to assess the adequacy of care provided.

The patient was not scheduled for an IDTT meeting during the monitoring period.  The annual IDTT meeting in October 2022 noted that anxiety, targeted as an IPOC, had improved but the patient remained with symptoms warranting continued treatment at the 3CMS level of care.

The patient was seen for one primary clinician contact during the review period on January 24, 2023.  He denied any mental health issues or functional difficulties during that visit, and he appeared to be stable.

**Findings**

The care provided to this patient was inadequate.

His mental status was not assessed since January 24, 2023.  He was not seen timely for primary clinician contacts during the review period.

**Patient E**

This 46-year-old patient transferred to CSP/Corcoran on December 27, 2022 from a reception center.  He was prescribed Prozac, Zyprexa, and Cogentin.  His healthcare record was randomly selected to assess the adequacy of care provided.

An initial psychiatric assessment was not completed since the patient's CDCR placement in October 2022.  A wellness check was completed at the cell front by the telepsychiatrist on January 6, 2023, as the building was on lockdown.  The patient denied difficulties at the meeting.  Although the psychiatrist documented a plan for follow-up in fourteen days, the patient was not seen until April 13, 2023.  At that time, his history of anxiety was documented, and he reported ongoing but vague auditory and visual hallucinations.  At his request, his medication was adjusted with documented rationale provided.

On May 15, 2023, the patient was seen by telepsychiatry for follow-up, and there was conflicting information documented in the progress note regarding the status of the patient's auditory hallucinations.  Specifically, in one paragraph the psychiatrist noted that the patient reported improvement and decrease in auditory hallucinations; however, in the next paragraph, the following was documented: "He denies any hearing [sic] the voices…notes he is hearing 'loud voices.'"  The patient's diagnosis was changed from schizophrenia to psychosis unspecified without rationale provided.  Telepsychiatry contacts in June and July 2023 occurred with two different psychiatrists.  A cell-front wellness check occurred during June 2023, as the patient refused to leave his cell for a confidential session.  During a confidential contact in July 2023, the patient reported continued auditory hallucinations and his diagnosis was again changed to schizoaffective disorder without explanation.  Except for the diagnostic changes noted, the psychiatric documentation was useful in the continuity of care.

The January 25, 2023 initial IDTT meeting established a generic IPOC for hallucinations. The assigned telepsychiatrist attended the IDTT meeting, but it was unclear if the patient attended. The rationale provided for continued treatment at the current level of care was that the patient experienced symptoms of schizophrenia; however, no other clinical information was included in the clinical summary, functional impairments and treatment and psychosocial history sections of the document. Documentation in the case formulation section indicated, "information needs to be updated…not able to collect enough information…due to patient presentation" but no details regarding the patient's presentation were included.

The primary clinician's initial assessment, which occurred five months after the initial IDTT meeting on June 1, 2023, was insufficient. For example, the clinical documentation was limited to "hearing voices all the time and being restless" and the psychiatric history section was limited to "he has been hearing voices for 7 years."

**Findings**

The care provided to this patient was inadequate.

This patient, with severe and persistent mental illness, was not appropriately evaluated by the psychiatrist or primary clinician, and this negatively impacted treatment planning. The primary clinician assessment was substantially delayed, and the quality of the assessment was poor. No initial psychiatric assessment was completed. The patient was not evaluated in a confidential setting by a psychiatrist as clinically indicated until July 2023, more than six months after his arrival. Diagnostic clarification with rationale was needed.

**Patient F**

This 40-year-old patient transferred to CSP/Corcoran during June 2021. He was provided a diagnosis of adjustment disorder with anxiety and depressed mood. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

The patient was not seen by the primary clinician or psychiatrist prior to the IDTT meeting. The last primary clinician contact occurred on October 22, 2022, nine months prior to the IDTT meeting, where he met a newly assigned primary clinician.

During the IDTT meeting, the primary clinician stated that the patient was in treatment due to depression, and treatment would continue. An IPOC for depression was initiated. This statement was confusing, as an IPOC for anxiety was established during the previous IDTT meeting. Further, there was no documentation of depressive symptoms during the October 2022 clinician contact. An IPOC for anxiety established two years prior in July 2021 was continued; although, it was not discussed during the IDTT meeting.

Diagnostic clarification was needed. Specifically, since July 2021, adjustment disorder with anxiety and depression was continued as the patient's diagnosis, despite the criteria for this diagnosis indicating that the disorder was brief and time limited.

**Findings**

The care provided to this patient was inadequate.

At the time of the IDTT meeting, the patient's mental status had not been assessed or monitored by a primary clinician for greater than eight months, and this interval far exceeded requirements. Treatment planning was insufficient, as the patient's treatment needs were not appropriately addressed during the annual IDTT meeting. Diagnostic clarification was needed.

**Patient G**

This 44-year-old patient transferred to CSP/Corcoran on February 28, 2023. He was prescribed BuSpar and Remeron. His healthcare record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

A primary clinician assessment did not occur prior to the initial IDTT meeting which was also significantly delayed following transfer to CSP/Corcoran during February 2023. The initial psychiatric assessment documentation was not a comprehensive initial assessment and was more indicative of a routine contact. Psychiatric diagnoses including substance induced psychotic disorder, unspecified depressive disorder, anxiety disorder and stimulant use disorder, differed from the diagnoses present in the healthcare record that included amphetamine induced psychotic disorder, and schizoaffective disorder, bipolar type. Routine psychiatric contacts occurred monthly between March and May 2023 which exceeded the minimum requirements for contact. Overall, the patient was described as stable, and the clinical documentation was useful for continuity of care.

The patient had a history of substance use, but he had maintained sobriety. Despite this history, there was no discussion of involvement in the ISUDT program during the IDTT meeting or during psychiatric contacts. Although not discussed during the IDTT meeting, an IPOC for substance use was established, however there were no associated goals or interventions.

**Findings**

The care provided to this patient was inadequate.

While routine psychiatric contacts occurred as clinically indicated, other deficiencies in care were problematic. Initial assessments, which identified treatment needs, were insufficient and negatively impacted treatment planning. Diagnostic clarification with clinical rationale was needed. The initial IDTT meeting that belatedly occurred five months after arrival to CSP/Corcoran, was the patient's only contact with the primary clinician.

**Patient H**

This 52-year-old patient transferred to CSP/Corcoran during July 2021.  He was prescribed Wellbutrin.  His healthcare record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

The patient was seen by two different primary clinicians for two contacts that occurred during February 2023 and June 2023.  The documentation did not indicate that the patient was informed of that change in clinicians.  The February 2023 contact occurred in a non-confidential setting and only lasted six minutes.  Both contacts appeared to be brief wellness checks.  At both contacts, the patient denied acute distress and attributed his stability to psychotropic medication treatment.

There was no documentation of treatment planning in preparation for the upcoming IDTT meeting at the June 2023 primary clinician contact.  The documentation indicated that the patient did not attend that IDTT meeting, as he preferred to go to yard instead.  An IPOC for depression was established, and the sole intervention focused on fostering a therapeutic alliance.  There was no documentation regarding the patient's symptoms, functional impairments, treatment history, or treatment response despite a prompt in the electronic healthcare record.

Routine psychiatric contacts occurred in January and June 2023 with the same telepsychiatrist.  The first psychiatric contact occurred at the cell front, as the patient refused to attend a confidential session; he presented with stability and good response to medication treatment.  The documentation of the June 2023 psychiatric appointment was almost incoherent and read "stated significantly his shoulder due to the injury that is being treated medically with patient is having to continue to be depressed or overwhelmed or frustrated.  Most communication….Sleeps without it and sleep."

Diagnostic clarification was needed, as the psychiatrist provided a diagnosis of major depressive disorder, however the official diagnoses included in the EHR were adjustment disorder with mixed disturbance of emotions and conduct, antisocial personality disorder, mood disorder, and possible major depressive disorder.

**Findings**

The care provided to this patient was inadequate.

The most recent psychiatric documentation was poor and did not provide clinically useful information to facilitate continuity of care.  Further, there was a delay in timely routine psychiatric follow-up, which was of concern given the non-confidential nature of the prior contact that did not allow for an appropriate assessment of the patient's functioning.

The patient was not engaged in his treatment planning.  While therapeutic rapport was necessary, clinical interventions to actively target the patient's treatment needs were not established in treatment planning.  Relatedly, clinical interventions were not utilized during primary clinician

contacts, and those contacts did not appear to be meaningful therapeutic interactions.  Diagnostic clarification with rationale was also needed.

**Patient I**

This 54-year-old patient transferred to CSP/Corcoran during July 2021.  He was prescribed Remeron on an as-needed basis.  His healthcare record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

There were differing diagnoses provided by the primary clinician and the psychiatrist.  During the IDTT meeting, the clinician noted the patient's diagnosis of schizoaffective disorder, which was the diagnosis of record.  In contrast, the covering telepsychiatrist provided a diagnosis of major depression and noted that the schizoaffective diagnosis was "obscured."  Clarification of these differing diagnoses was not provided.

At the patient's request, an IPOC for anger was established during the annual IDTT meeting.  An IPOC for negative symptoms was copied from the initial IDTT meeting two years prior, without documentation of discussion of the rationale for continuation.  It was unclear why an IPOC for depression was not established, given documentation of a plan to reduce the patient's depression in the IDTT clinical summary section; the documentation in this section was otherwise brief in content and did not include a summary of the patient's symptoms, functioning or treatment progress despite an EHRS prompt to do so.

The patient was not seen by the primary clinician prior to the IDTT meeting to discuss treatment planning.  Additionally, the primary clinician contact occurred in September 2022, ten months prior, with a clinician who had left CDCR employment; the documentation did not indicate that termination issues were addressed.

Psychiatric contacts, which occurred during January and May 2023 with two different providers, were not timely.  The documentation indicated that treatment focused on anxiety and poor sleep.

**Findings**

The care provided to this patient was inadequate.

His treatment needs were not timely monitored by the treatment providers.  Of significant concern was the ten-month lapse between the previous primary clinician who left CDCR employment and the new clinician's first meeting with the patient during the IDTT meeting; there was no documentation regarding this change in primary clinicians or documentation that treatment termination issues were addressed.  The patient was not involved in his treatment planning, and there was no documentation of collaboration between treatment providers.  There were discrepancies between providers regarding the patient's treatment needs, including diagnosis, that warranted review and clarification.

**Patient J**

This 56-year-old patient transferred to CSP/Corcoran during 2019.  He was provided a diagnosis of adjustment disorder with mixed disturbance of emotions and conduct.  He was not prescribed psychotropic medication.  His healthcare record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

The patient had a history of gang involvement; he left the gang and subsequently sought treatment for depression, irritability, anxiety, sleep disturbance, impulsivity, hypervigilance, and untreated trauma.  He was placed in the MHSDS at the 3CMS level of care during May 2023.  At that time, the patient was housed in a restricted housing unit.

The patient's treatment needs were not appropriately assessed.  For reasons that were unclear, upon release from restricted housing, a clinician completed two primary clinician initial assessments for the patient that were dated less than two weeks apart.  The documentation did not include any assessment or reference to depressive symptoms that were documented one month prior when the patient was placed in restricted housing.  The first assessment on June 16, 2023 documented the primary treatment need as "gets angry very quickly."  The only information provided in the clinical summary was the patient's request for removal from the 3CMS program due to the clinician change after transfer to general population.  The second assessment on June 27, 2023 did not document a primary treatment need; as was noted in the June 16, 2023 assessment, there was no integration of previous clinical information other than documentation that was copied from previous providers.  Documentation in the clinical summary section indicated that the patient was fearful for his safety, as he had left the gang, and this resulted in poor sleep.

The patient declined treatment with psychotropic medication during the initial psychiatric assessment.  The psychiatrist documented that the patient agreed to 3CMS placement because he wanted a single cell.  It was recommended that he discuss the single cell request during the IDTT meeting.

During the IDTT meeting, the patient was reportedly agitated and exhibited hypomanic symptoms.  The initial discussion at the IDTT meeting was the patient's request for removal from the MHSDS; he stated that the program had not benefitted him.  The patient also discussed a prior psychiatric recommendation for medication to assist in poor sleep; however, he was reluctant to taking medications due to possible side effects.  He also discussed stressors that resulted in poor sleep and irritability.  The covering telepsychiatrist intervened by providing education about different medications that might be beneficial and encouraged him to remain in the 3CMS program, to which the patient was receptive.  Of note, the telepsychiatrist did not schedule follow-up to address the patient's concerns or indicate a plan for follow-up by the assigned telepsychiatrist.

The IDTT documentation indicated that IPOCs for anxiety, depression, irritability, and anxiety established during the initial IDTT meeting in May 2023 were continued despite lack of discussion with the patient and lack of supporting documentation.

**Findings**

The care provided to this patient was inadequate.

There were significant discrepancies in the assessment and identification of this patient's treatment needs by the primary clinician after transfer from restricted housing to general population. Treatment planning was insufficient. Further, the patient's safety and single cell concerns were not appropriately discussed in the IDTT meeting, and there was no follow-up plan documented.

**Patient K**

This 41-year-old patient transferred to the mainline EOP from the EOP hub. He was provided diagnoses of schizophrenia and borderline intellectual functioning. He was prescribed Risperdal and Abilify. His health care record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

The primary clinician initial assessment was completed on July 10, 2023 in advance of the initial IDTT meeting on July 11, 2023. While the documentation of treatment needs of hallucinations and anxiety was overly brief in content, an appropriate summary of his current symptoms and long history of mental health treatment for psychosis was included elsewhere in the documentation. The initial psychiatric assessment included a thorough description of the patient's current treatment needs and recent history, but the psychiatric history was limited in content.

The patient's treatment needs were not addressed in treatment planning. Despite identification of anxiety as a treatment need by the primary clinician, an IPOC for anxiety was not established. Additionally, although he was not assessed with depressive symptoms during the psychiatric assessment, an IPOC for depression was initiated. An IPOC for hallucinations was also initiated; but as with the depression IPOC, the goals were generic, and no treatment interventions including medication treatment were identified.

The psychiatric documentation indicated that the patient was noted with borderline intellectual functioning and a childlike presentation; however, these important observations were not included in the IDTT documentation. Further, during the IDTT meeting, the psychiatrist expressed concern about the patient's pending transfer to a different institution; despite this concern, the CC I did not provide information to the IDTT regarding the possibility of an override to prevent transfer and only conveyed minimal information regarding the process when questioned by the expert.

Shortly after transfer from the EOP hub, the patient was scheduled for groups, however there was no IDTT documentation regarding his poor group attendance.

**Findings**

The care provided to this patient was minimally adequate.

Although treatment needs were identified by providers during the initial assessments; there was a lack of collaborative provider discussion regarding those findings during the IDTT meeting, and this negatively impacted treatment planning which was inadequate. It was unclear how treatment goals could be accomplished without the identification and implementation of clinical interventions.

**Patient L**

This 30-year-old patient transferred to CSP/Corcoran on June 29, 2023. He was provided diagnoses of major depression with psychotic features and adjustment disorder with depressed mood. His healthcare record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

There was a discrepancy between the initial primary clinician and psychiatric assessments. The primary clinician's initial assessment noted the presenting problem as hallucinations with no anxiety or depression. In contrast, the initial psychiatric assessment did not document the presence of hallucinations. The patient was prescribed Vistaril for anxiety, however he was resistant to taking an antidepressant medication to address his depressive symptoms. This discrepancy was further worsened by poor provider collaboration regarding treatment planning. An IPOC for hallucinations was initiated, but not for anxiety identified by the psychiatrist. Additionally, no IPOC was initiated for depression, despite the patient's diagnosis of major depression. Further, despite an EPRD of December 2023 that was noted in the IDTT documentation, IPOCs for discharge planning, relapse prevention, and clinical termination were not initiated.

**Findings**

The care provided to this patient was inadequate.

Diagnostic clarification was needed, and there was a lack of provider collaboration to address diagnostic discrepancies that resulted in inadequate treatment planning and identified treatment needs that were not targeted.

**Patient M**

This 30-year-old patient recently transferred from the EOP hub to the mainline EOP. At the time of review, he was housed in an overflow housing unit. He was provided with a diagnosis of generalized anxiety disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided and his IDTT meeting was observed during the monitoring visit.

A primary clinician initial assessment occurred prior to the initial IDTT meeting and upon discharge to the mainline EOP. The assessment occurred cell front as the patient refused to attend a confidential session. The patient reported anxiety as his primary treatment need. The

psychiatric history documentation was not updated since October 2021 and of concern, the history excluded an April 2023 MHCB admission for suicidal ideation.

The patient did not attend either of the two scheduled clinician-led groups provided for EOP overflow patients during the week of June 26, 2023. The July 6, 2023 routine primary clinician contact noted that the patient had attended a group, but the contact documentation was otherwise indicative of a brief wellness check. Treatment interventions for anxiety were not documented.

The patient attended the scheduled telepsychiatry contact on July 7, 2023, but left after waiting several minutes and then refused a subsequent cell-front wellness check. The documentation indicated that the patient would be rescheduled within seven days, but as of July 21, 2023 he had not been seen for psychiatric follow-up.

Although the expert attended the July 12, 2023 IDTT meeting during the monitoring visit, no documentation of that IDTT meeting was located in the healthcare record when reviewed on July 14, 2023 and July 21, 2023.

**Findings**

The care provided to this patient was inadequate.

The initial assessment was not appropriately updated to identify current treatment needs. An initial psychiatric assessment was not rescheduled as documented. Treatment goals were not discussed during the IDTT meeting, and there was no documentation of the IDTT meeting in the healthcare record, despite its occurrence. When clinical contacts occurred, the documentation indicated the occurrence of a brief wellness check and clinical interventions for symptoms were not offered. The provision of group therapy was inadequate.

**Patient N**

This 44-year-old patient was housed in the MHCB during March 2023, where he was treated for self-injurious behavior. At the time of the review, he was housed in an overflow housing unit. He was provided diagnoses of depression, generalized anxiety disorder, and various substance use related disorders. He was prescribed melatonin and Vistaril on an as-needed basis. His healthcare record was randomly selected to assess the adequacy of care provided after his IDTT meeting was observed during the monitoring visit.

Provider initial assessments were thorough in content and included clinically relevant information regarding the patient's current treatment needs and history that included a suicide attempt by overdose in October 2022, self-loathing, and substance use. The patient stated he planned to kill himself when his grandmother died.

The patient intermittently attended his routine primary clinician contacts. Overall, the documentation of those contacts indicated the completion of brief wellness checks with minimal utilization of treatment interventions.

An IPOC for depression was initiated, with an intervention to utilize dialectical behavior therapy handouts for distress tolerance and emotion regulation. There was no IPOC for danger to self, substance use, or anxiety. At the time of review on July 14, 2023, there was also no documentation of the observed July 12, 2023 IDTT meeting.

The patient was scheduled for routine contacts with three different psychiatrists after the initial assessment, and he did not attend two of those appointments. He was subsequently seen by a telepsychiatrist in the dayroom for a wellness check after one refusal. It was unclear if the patient was seen after the June 18, 2023 refusal, as it was documented that the patient was unavailable for a confidential or cell-front psychiatric appointment due to "informed refusal" and noted that the patient was doing well without an appearance of distress.

The patient was scheduled to soon be transferred to another institution. The expert suggested to the institutional leadership that the receiving institution be made aware of the patient's plan for suicide after his grandmother's death, and they indicated that they agreed and would inform the receiving facility.

The 90-day discharge SRASHE was conducted and assessed low acute suicide risk; a discrepancy in the documentation of chronic risk noted both moderate and high chronic suicide risk.

**Findings**

The care provided to this patient was inadequate.

Of major concern was the lack of consideration by the treatment team to communicate the patient's suicidal intent to the receiving treatment team. While in the overflow housing unit, this EOP patient did not receive the required EOP level of care for several months, and the care provided was insufficient. Lack of psychiatric continuity of care likely contributed to the deficiency in treatment planning. Treatment interventions to address treatment needs were not utilized during primary clinician contacts.

**Patient O**

This 51-year-old patient transferred to CSP/Corcoran from an MHCB where he was treated for auditory hallucinations and suicidal ideation with a plan to hang himself. He transferred to CSP/Corcoran at the 3CMS level of care, but his level of care was increased to the EOP shortly after arrival. The psychiatrist provided a diagnosis of schizophrenia that conflicted with the diagnosis of schizoaffective disorder that was located elsewhere in the healthcare record. He was prescribed antipsychotic, antidepressant, and anxiolytic medications. His healthcare record was randomly selected to assess the adequacy of care provided.

The patient had an extensive history of mental illness with symptoms of delusional thinking and hallucinations. His symptoms impacted his ability to participate in the primary clinician initial assessment. Despite the patient's long history of inclusion in the MHSDS, the primary clinician initial assessment documentation did not include pertinent clinical information, including a

recent MHCB admission and a peer assault precipitated by command auditory hallucinations that resulted in the increase in level of care from 3CMS to EOP.

The initial psychiatric assessment completed by telepsychiatry provided a thorough and useful mental status assessment and the rationale for medication adjustment. Routine confidential psychiatric contacts occurred monthly but at times exceeded 30-day intervals, except during June 2023 when there was no psychiatric contact. While his symptoms persisted, the patient's mental status was described as improved and stabilized after the initial assessment, with continued improvement noted during the reporting period. The psychiatric documentation was sufficient for continuity of care.

During the initial IDTT meeting, an IPOC for hallucinations was initiated and was continued during two subsequent quarterly IDTT meetings. However, IPOCs for identified symptoms of paranoia, danger to others, delusional thinking and depression were not targeted. Further, the patient refused to allow laboratory testing for two years due to paranoia; however, an IPOC for treatment non-adherence and attendance was not initiated.

The IDTT identified the patient as a high treatment refuser. Although this was an indicator for consideration of higher level of care referral, the reason provided for non-referral did not appropriately assess the impact of the patient's psychotic symptoms on his treatment attendance.

The patient was seen weekly for primary clinician contacts conducted by two different clinicians and variably by a covering clinician. Contacts varied between cell-front contacts at the patient's request and confidential sessions. Overall, the documentation provided an assessment of the patient's symptoms and functioning but lacked completion of a full mental status examination and the utilization of clinical interventions to address the patient's symptoms.

**Findings**

The care provided to this patient was marginally adequate.

Although the patient ultimately stabilized after medication treatment, inpatient care should have been considered at the time of initial EOP placement considering the patient's significant psychotic symptoms and recent peer assault soon after MHCB discharge. Treatment planning was insufficient. Diagnostic clarification, provider collaboration and improvement in primary clinician documentation were indicated.

**Patient P**

This 53-year-old patient transferred to CSP/Corcoran during September 2022 from an MHCB where he was treated for delusional thinking, suicidal ideation, and danger to others. He was prescribed prazosin at the time of the review. His healthcare record was randomly selected from the housing roster to assess the adequacy of care provided.

Treatment planning was not updated during routine IDTT meetings. IPOCs for depression, anxiety and danger to self that were initiated during the initial IDTT meeting in September 2022

were repeated without change during two subsequent reviewed IDTT meeting documentation. Interventions were not provided to reduce the symptoms associated with each IPOC. Despite identification as a high treatment refuser, an IPOC for treatment attendance was not initiated, and the underlying barriers to treatment were not explored.

Treatment planning documentation was deficient in important areas. The clinical summary from the initial IDTT meeting was copied from prior documentation without update to the patient's symptoms, functioning or treatment progress. Relatedly, the rationale for maintaining the patient at the EOP level of care was insufficient.

Psychiatric contacts were primarily conducted with the onsite psychiatrist but on a few occasions occurred by telepsychiatry. At times, the psychiatric contact intervals exceeded 30 days and there was no documentation of psychiatric contact during March 2023. This was particularly concerning, as the patient requested discontinuation of antipsychotic and antidepressant medications during February 2023. The psychiatrist provided pertinent information regarding the risk of medication discontinuation. The patient experienced an increase in symptoms during April 2023 and his medications were adjusted. The patient remained stable during subsequent reviewed contacts. Overall, the psychiatric documentation was clinically relevant and appropriate for continuity of care.

The diagnoses provided by the psychiatrist including delusional disorder and PTSD varied from those included elsewhere in the healthcare record. They included antisocial personality disorder, amphetamine-induced psychotic disorder, unspecified depressive disorder, and unspecified mood disorder.

This patient was seen by the primary clinician for group and individual contacts. The documentation of those contacts addressed the patient's psychosocial stressors and symptoms and included appropriate clinical interventions.

**Findings**

The care provided to this patient was marginally adequate.

While this patient's treatment needs were generally met during routine provider contacts, a delay in psychiatric follow-up occurred during a high-risk period. Diagnostic clarification was needed, and treatment planning documentation was not useful for continuity of care.

**Patient Q**

This 60-year-old patient transferred to CSP/Corcoran during 2020. He was provided diagnoses of depression, schizoaffective disorder and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Zoloft, Thorazine and Cogentin. His healthcare record was randomly selected from the housing roster to assess the adequacy of care provided.

Quarterly IDTT documentation between December 2022 and June 2023 included an IPOC, which was initiated in 2017, and targeted depression. In March 2023, an IPOC for hallucinations

was initiated. Both IPOCs included a goal to reduce symptoms but did not identify an intervention to accomplish the reduction. The basis of the IPOC for hallucinations was not clearly documented. In contrast, the IDTT documentation consistently noted treatment provided regarding trauma issues. While the summary was dated March 2023, several sentences in that summary were unchanged from the previous IDTT documentation, making it difficult to determine if the treatment planning addressed current concerns.

Of concern, the patient reported chronic suicidal ideation to the primary clinician during February 2023 and to the psychiatrist during March 2023, but this issue did not generate the initiation of an IPOC at the March 2023 IDTT meeting. No SRASHE was conducted since 2020.

Most psychiatric contacts during the review period occurred by telepsychiatry. Psychiatric treatment addressed depression and chronic hallucinations. Except for the April 2023 psychiatric progress note which was overly brief in content, psychiatric documentation was useful and addressed symptoms, functioning, and medication response and the documentation was useful for continuity of care.

Weekly primary clinician contact documentation between April to July 2023 needed improvement. The treatment either focused on traumatic experiences or different personalities that the patient reportedly exhibited. The treatment was primarily supportive in nature, but clinical interventions were needed to address the patient's distress, including depression and hallucinations discussed with the psychiatric provider. Additionally, a full mental status examination was not included in the documentation.

**Findings**

The care provided to this patient was inadequate.

Of primary concern was the lack of appropriate assessment of chronic suicidal ideation by the psychiatrist and the primary clinician. Treatment planning required an update, the rationale for new IPOCs was unclear, and danger to self-treatment needs were not addressed. Primary clinician contacts did not utilize clinical interventions and the documentation was not sufficiently descriptive of the patient's clinical presentation. Diagnostic clarification with rationale was needed.

**Patient R**

This 51-year-old EOP patient transferred to CSP/Corcoran during 2019. He was provided with a diagnosis of schizophrenia. He had a history of alcohol and methamphetamine abuse from which he later abstained due to exacerbation of his mental illness. He was prescribed Vistaril, Invega injection, BuSpar, Cogentin, Remeron and Risperdal. His healthcare record was randomly selected from the housing roster to assess the adequacy of care provided.

Quarterly IDTT meetings between January 2023 and June 2023 were conducted by two different primary clinicians, consistent with a change in primary clinicians. The sole IPOC for hallucinations was initiated in 2020. The IPOC remained minimally changed for each quarterly

review and was not clearly in alignment with the documented treatment needs. Specifically, reports of anxiety that ultimately resulted in an RVR for missing school were not targeted. A summary of the patient's symptoms and functioning was documented, however his treatment response, which would have been useful for treatment planning and continuity of care, was not included.

Routine primary clinician contacts regularly occurred with two different primary clinicians. Both clinicians left CDCR employment during the review period, but neither clinician addressed termination issues with the patient. Regardless, the patient was engaged in individual treatment that utilized clinical interventions for anxiety and hallucinations.

Telepsychiatry and on-site psychiatric contacts occurred monthly, with some contact intervals exceeding thirty days, except during March 2023 when there was no contact. The documentation of the three different psychiatric providers was clinically relevant and included symptoms, functioning, and medication adjustments with explanation.

**Findings**

The care provided to this patient was adequate.

Despite shortcomings in treatment planning documentation, the patient's treatment needs were routinely addressed by the primary clinicians and psychiatric providers.

**Patient S**

This 51-year-old patient transferred to the CSP/Corcoran ASU EOP hub on January 19, 2023 following MHCB discharge. He transferred to the mainline EOP in April 2023. He was provided with diagnoses of bipolar disorder and antisocial personality disorder. The patient was prescribed an Invega injection. His healthcare record was randomly selected from the housing roster to assess the adequacy of care provided.

The primary clinician initial assessment was insufficient. Despite ample documentation in the healthcare record, the psychiatric history was copied from prior assessments by other providers at other levels of care. The recent MHCB placement was not included in the initial assessment documentation.

Documented symptoms of anger, adjustment issues, depression, and paranoia were not targeted in treatment planning. Instead, an IPOC for impulsive behavior was identified at the initial IDTT meeting and was continued at the quarterly IDTT meeting. The clinical rationale for this was unclear. Further, the patient was identified as a high treatment refuser, but an IPOC that targeted treatment attendance was not initiated. The IDTT documentation included an initial treatment plan from August 2022 that targeted the identification of manic symptoms and coping for trauma symptoms. The appropriateness of this information in the current treatment plan was questionable. The higher level of care referral consideration rationale was appropriate and reasonable treatment modifications, such as motivational interviewing, were established.

An initial psychiatric assessment was scheduled for April 14, 2023, but was not completed as the patient left the scheduled appointment prior to being seen. In response, the psychiatrist briefly saw the patient cell front to address medication non-adherence and indicated a plan to discuss the issue further at the IDTT meeting. However, there was no documentation that this discussion occurred and the initial psychiatric assessment was not completed. The patient was seen by three different psychiatric providers, one occurred by telepsychiatry, between April and June 2023 and the documentation of those contacts was useful for continuity of care.

The documentation of weekly primary clinician contacts was descriptive and generally provided useful information regarding the patient's functioning and symptoms. Support, processing, and psychoeducation were utilized after rapport was established. The clinician also provided self-help chapters from the book, Houses of Healing. The clinician was scheduled to end CDCR employment during the week of the monitoring visit, however reviewed documentation did not indicate that clinical termination processing or preparation for continuation with a new primary clinician occurred.

**Findings**

The care provided to this patient was marginally adequate.

Despite assessment and treatment planning deficits, the overall routine treatment provided was appropriate. The primary clinician should have worked with the patient regarding termination issues prior to CDCR employment departure.

**Patient T**

This 65-year-old patient transferred to CSP/Corcoran during 2021. He was provided diagnoses of schizophrenia and antisocial personality disorder. He was prescribed Haldol and Zyprexa, and the patient was reportedly medication adherent. His healthcare record was randomly selected from the housing roster to assess the adequacy of care provided after a group that he attended was observed during the monitoring visit. During the group, the patient was attentive and engaged when prompted by the group facilitator.

Two IDTTs during February and April 2023 were conducted by two different primary clinicians during the review period. An IPOC for delusions, initiated in October 2021, was continued without change. An IPOC for high refusal rate was not initiated, nor was an IPOC for negative symptoms. Both IPOCs were clinically indicated as the patient's negative symptoms could negatively impact his treatment participation. Treatment modifications were reasonable and included psychoeducation and motivational interviewing, although they were minimally utilized.

Psychiatric contacts were untimely due to lapses in contacts. During the review period, the patient was seen by two different psychiatric providers, including one telepsychiatry provider whose documentation was overly brief. The documentation of the onsite psychiatrist provided a comprehensive and useful description of the patient. The documentation addressed discrepancies in the patient's report and conveyed that the psychiatrist knew the patient well and had reviewed

the healthcare record. The psychiatrist appropriately described the patient's flat and frightened affect that was observed during the monitoring visit.

During the review period, the patient was seen by three different primary clinicians, without clear rationale for the lack of continuity. Contacts consistently occurred at the cell front, as the patient refused confidential sessions. The patient was consistently minimally engaged with providers and the clinicians were cognizant of his engagement limitations. Attempts were made to engage him and to encourage out of cell time with a focus on rapport building, which was appropriate for this patient's limited engagement. Although psychotherapy was contraindicated for this patient; clinicians appropriately monitored his mental status.

**Findings**

The care provided to this patient was marginally adequate.

Due to his mental illness, the patient was minimally engaged in treatment. There was a lapse in psychiatric contact, and the psychiatric documentation was variable from very good to poor, which had implications for continuity of care. Treatment planning required improvement in updating IPOCs, developing IPOCs for treatment needs and the development of a useful clinical summary. Of note, the patient generally attended psychiatric contacts, but not primary clinician contacts which warranted assessment and inclusion in treatment planning. The rationale for the clinician change was needed.

**Patient U**

This patient's healthcare record was reviewed to assess the care provided in the MHCB; the patient's initial IDTT meeting was observed during the monitoring visit. The patient was admitted to the MHCB on July 2, 2023, due to suicidal ideation and self-injury after running headfirst into a wall.

The patient was admitted to an MHCB in 2020 due to danger to self; subsequently he was admitted for intermediate inpatient treatment until December 2021 with subsequent discharge to the EOP level of care on February 15, 2023. He reported to staff that his depression had worsened with increasing thoughts that others would harm him. He also waived his parole hearing, stating that he did not deserve release from prison, and he reported increasing guilt regarding his commitment offenses.

The patient was appropriately admitted to the MHCB. The initial MHCB IDTT meeting occurred on July 5, 2023, when the patient was provided diagnoses of major depressive disorder, recurrent, mild and PTSD. The patient reported a history of paranoia and confused thinking, and it was noted that his commitment offense of multiple sexual offenses with children under age 14 may have resulted in fear that others would harm him. The MHCB IDTT established a treatment goal that the patient's suicidal ideation would be in remission by the next IDTT meeting, and the patient would meet his treatment goals with the use of CBT to increase acceptance and tolerance of emotional pain. This treatment intervention appeared to be common for all patients based upon the documentation reviewed and was not individualized.

The seven-day IDTT meeting occurred on July 10, 2023. The patient's level of care was not discussed, and the treatment plan was not changed; despite a statement by a clinician at the IDTT meeting that dialectical behavior therapy would be recommended to his assigned PC and included in the treatment plan. The nursing staff stated that the swelling on the patient's head that occurred after intentionally running headfirst into a wall had resolved; however, the patient continued to report symptoms of a concussion. The patient was cleared for yard and out of cell activity, and he was on "11-minute observations" with partial issue of property and clothing.

The next IDTT meeting occurred on July 12, 2023, and discharge to the EOP was planned as the patient was described as stable without current suicidal ideation; however, the SRMP plan was not updated from the last IDTT meeting, and the patient had reported suicidal ideation with a plan the day before the MHCB discharge. The goals, progress, and HLOC sections were not updated in the treatment plan, despite the patient's discharge to the EOP. The treatment plan should have been updated, as the patient had been in the 3CMS program prior to the MHCB placement rather than the EOP. The safety plan failed to include the patient's general safety concerns regarding his commitment offense and the resulting impact on his suicidality.

The documentation indicated that the patient was seen by different providers daily, often at the cell-front, and that no treatment other than medication management appeared to have been provided.

**Findings**

The care and treatment provided to this MHCB patient was inadequate.

He experienced significant anxiety that increased his suicidal ideation, particularly when in environments where he felt unsafe. The MHCB treatment did not address this anxiety and his unique risks and stressors. The treatment plan was not appropriately individualized, and no therapeutic interventions were implemented; in part, due to the inability to provide adequate treatment at the cell front. The patient continued to report suicidal ideation with a plan until the day before the MHCB discharge.

**Patient V**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. The patient reported suicidal ideation at WSP, and he was seen by nursing on April 24, 2023, and referred to mental health. Once assessed by mental health, he was placed in alternative housing while awaiting the MHCB placement. The patient was admitted to the CSP/Corcoran MHCB on April 25, 2023, due to danger to self. The patient had recently returned to custody at WSP after a conviction of carrying a concealed weapon.

The history and physical and nursing assessment were completed timely. The initial psychiatric and PC assessments also occurred timely; however, the initial psychiatric assessment was conducted at the cell-front, and it was unclear if the initial PC assessment occurred in a confidential setting.

The initial IDTT meeting occurred on April 26, 2023. The IDTT noted that the patient met the HLOC referral consideration indicator of participating in less than 50 percent of treatment. The clinical rationale for non-referral was inadequate; it noted that the patient's lack of treatment engagement was due to paranoid ideation. The treatment modifications were also inadequate, as they were not sufficiently individualized.

The patient was generally seen daily; however, clinical contacts occurred at the cell-front due to modified program, critical staffing shortages or no reason was documented. Some exceptions in daily contacts were noted; the patient was not seen for individual contacts on the dates of the IDTT meetings and on the day of discharge when he was not seen by the PC or psychiatrist. During his MHCB stay, the patient was seen by different PCs which negatively impacted treatment continuity. The progress notes indicated that little treatment beyond medication management was provided. The discharge treatment plan on April 28, 2023 included an inadequate clinical rationale for nonreferral; however, the treatment modifications were adequate.

**Findings**

The care and treatment provided to this MHCB patient was inadequate.

The patient was not appropriately assessed at the time of the MHCB admission and discharge. The treatment plan was not individualized and did not target the precursors to the patient's suicidality and the reasons for the MHCB admission. No evidence-based clinical interventions were identified or implemented beyond medication management, and any treatment provided was significantly compromised by the cell-front contacts that occurred frequently for reasons other than patient refusal, including staffing shortages.

**Patient W**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. He was admitted to the CSP/Corcoran MHCB following significant self-injury; on June 14, 2023, the patient cut his forearm severely requiring medical intervention. This incident occurred after weeks of refusing PC confidential contacts and telepsychiatry appointments. The documentation suggested that the patient had no insight regarding the seriousness of his self-harm behavior, as he alternately reported that his forearm had been itching and implying that he was attempting to stop the itching. He also told the medical staff that he cut himself to relieve stress, but he acknowledged that this cutting incident was more severe than he had planned. While the patient denied suicidal intent, the SPRFIT coordinator completed a self-harm note and indicated that the severity of the injury implied suicidal intent. The injury was so severe that it required the use of a tourniquet and pressure bandage to stop the bleeding for transport to the TTA where he received several sutures to the open and bleeding vein to minimize bleeding and to stabilize the patient for transfer to an emergency room.

The patient was placed in the CSP/Corcoran MHCB on June 16, 2023 after this incident. He was provided diagnoses of bipolar disorder, unspecified and related disorder, antisocial personality

disorder, and opioid use disorder; additionally, it was also noted that the patient abused alcohol and had been an intravenous drug user.  The patient refused to take psychotropic medications, and he was not initially prescribed psychotropic medication at the time of the MHCB admission. When seen for the initial psychiatric evaluation; an emergency PC 2602 petition was initiated, and the patient was prescribed Zyprexa, sertraline, trazodone, and Zyprexa PRN.  The history and physical and initial psychological assessment occurred timely.  A SRASHE was not completed upon MHCB admission, but an assessment was completed at discharge.

The patient was seen timely for the initial IDTT meeting on June 19, 2023; however, treatment planning was significantly deficient.  No IPOCs or initial treatment plan elements were completed, and those sections of the treatment plan merely referenced "no data."  Most of the treatment plan was not completed.  No subjective criteria were noted on the HLOC form, despite the patient clearly meeting HLOC criteria.  No information was included in MHCB prevention section, and no information was included in the safety planning section of the treatment plan. The patient continued to deny suicidality, stating that he cut himself to relieve stress; however, his statement indicated poor judgment and impulsivity.  He refused to cooperate with confidential contacts and was only minimally responsive to mental health staff; and he stated that he did not want therapy, as he did not need coping skills and cutting helped him with coping. The treatment team did not document recognition of the patient's continued high acute suicide risk and did not note the need for acute inpatient treatment.

The patient was seen daily for clinical contacts except for one day when he was only seen in at the IDTT meeting, and the contacts all occurred at the cell-front due to patient refusal, modified program, or for no identified reason.  Continuity of care was poor, as the patient was seen by different psychiatrists, licensed and unlicensed PCs.  The psychiatric documentation did not note whether the contacts occurred in a confidential setting, and the initial psychiatric note on June 17, 2023 was copied and pasted into subsequent notes with little to no new information provided. The documentation indicated that no therapeutic interventions were implemented other than the provision of emergency involuntary medications.

The progress notes indicated that the patient would be discharged at the next IDTT meeting on June 26, 2023; and of concern was the lack of adequate assessment prior to that decision.  The discharge decision appeared based solely on the patient's self-report that he was not suicidal and had no intention to cut himself again.  This determination was made despite the conflicting statements from the patient regarding his reasons for cutting and his inability to remember the cutting incident.

The discharge SRASHE was completed by an unlicensed psychologist who was not provided a waiver, and the evaluation was not completed correctly.  For example, the clinician indicated that the patient had no thoughts of harming himself in the last month despite engaging in what had been documented as a suicide attempt due to lethality of injury approximately ten days prior. The clinician also incorrectly documented that the patient had not engaged in self-harm without intent in the past three months.  Shockingly, the patient's acute suicide risk was assessed as low with high chronic risk, despite two serious suicide attempts in the past two months; there was documentation that the patient cut both sides of his neck and wrist in April 2023 requiring medical intervention and MHCB placement.  Safety planning was poorly performed and was not

realistic considering the patient's history of isolating and refusing mental health treatment contacts while impulsively engaging in significant self-injury.

Unsurprisingly, the patient was readmitted to the MHCB during the monitoring visit, approximately three weeks after the MHCB discharge due to recurrent self-inflicted cutting.

**Findings**

This patient received inadequate treatment while at the CSP/Corcoran MHCB.

He was admitted to the MHCB after a serious suicide attempt but was not considered for referral to acute inpatient treatment which was clinically indicated. The patient had a serious suicide attempt two months prior and no insight regarding his behavior, stating that he cut himself to relieve stress and not for suicidal intent.

While an emergency involuntary medication order was appropriately sought, and emergency psychotropic medications were ordered; no other therapeutic interventions were documented. The initial treatment plan was incomplete and did not include even basic treatment elements. The patient refused to participate in treatment during his MHCB stay, telling the MHCB staff that he did not need coping skills because he cut himself to cope. Despite a multitude of additional risk factors, the decision was made to discharge the patient prior to the IDTT meeting conducted on the tenth day of admission. That IDTT meeting occurred at the cell front due to critical staffing deficiencies, and the suicide-related sections of the treatment plan were not completed. Additionally, the SRASHE completed on that date was not properly completed and underestimated the patient's level of acute suicide risk.

The patient clearly met the criteria for acute inpatient referral considering two recent very serious and potentially lethal suicide attempts. The MHCB IDTT failed to provide treatment to reduce the patient's suicide risk including referral for acute inpatient treatment, and he should have been referred to acute care upon admission to the MHCB which may have prevented his subsequent self-harm by cutting approximately three weeks after MHCB discharge.

**Patient X**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. The patient was admitted to the MHCB on April 29, 2023, due to decompensation and bizarre behavior including reportedly smearing and eating his feces. The documentation indicated that his decompensation had been ongoing for at least one month. His level of care was increased from 3CMS to the EOP on March 8, 2023, while he was housed in the CSATF STRH. The MHCB documentation noted that the patient had not seen a psychiatrist since February 2023 and was only seen once by a PC after the EOP placement until his transfer to the KVSP EOP on April 28, 2023. He was housed at KVSP for only one day when he was referred to the CSP/Corcoran MHCB.

The initial mental health assessments occurred timely, but the health and physical was conducted one day late. The patient was provided diagnoses of unspecified depressive disorder;

amphetamine-type substance use disorder, moderate; cannabis use disorder, moderate; cocaine use disorder, moderate; other hallucinogen use disorder, mild; and antisocial personality disorder. He had been prescribed Remeron, and that medication was continued after the initial MHCB psychiatric evaluation.

The initial IDTT meeting occurred timely on May 1, 2023, and the treatment targeted hallucinations, anxiety, and "mood state." The treatment targets and goals were not objective or measurable; for example, the patient will display behavior appropriate for a lower level of care. Clinical interventions were identified; however, they were not appropriately modified for the short-term stabilization setting of the MHCB. Despite the patient's severe symptoms of psychosis and decompensation, the subjective criteria on the HLOC form were incorrectly noted as absent. The diagnosis of schizophrenia was added to the problem list after the treatment team meeting, but there was no other documentation of the reason for this change. The patient refused to accept antipsychotic medications.

The documentation indicated that the patient refused individual contact and was seen at the cell front. On the third day of MHCB admission on May 2, 2023, the patient reported having an "accident" requiring an exchange of underwear; although no detail was provided about this accident, the implication was that the patient defecated on himself. He refused the offered shower but did request a small amount of soap. When queried regarding his refusals, the patient reported that he was anxious and paranoid, preferred being alone, and he heard command auditory hallucinations telling him various things such as to expose his penis and masturbate, get naked, dance, sing, or stay covered. He also shared his delusional belief that he communicated with the devil regarding sexual behavior, and he stated that he felt comfortable with the devil and that the devil accepted him.

The documentation also indicated that the patient provided conflicting reports of symptoms to different staff. For example, one day, he told the nursing staff that he was suicidal and depressed, while he told the clinician that he was not suicidal or troubled by his auditory hallucinations.

It appeared that the patient quickly improved soon after the MHCB admission without any clinical interventions provided. He was described as lucid with linear thinking and no objective evidence of psychotic symptoms. When MHCB discharge was discussed with the patient, he stated that he was not ready for discharge because he was too paranoid. An IDTT meeting occurred on May 8, 2023, which was day nine of the MHCB stay; at that time the patient was prescribed Abilify for psychosis, and he was retained in the MHCB pending stabilization and medication adherence. On May 11, 2023, the patient reported to the psychiatrist that the Abilify had worsened his hallucinations. When offered a lower medication dosage, he declined and requested several additional days of monitoring for efficacy.

The discharge IDTT meeting occurred on May 12, 2023, when the patient was described as calm with no objective evidence of grave disability, suicidal ideation, or homicidal ideation. He reportedly was focused on his placement but was ultimately discharged to return to the EOP.

**Findings**

This patient received inadequate treatment while housed in the MHCB.

His treatment in the MHCB primarily involved isolation initially, and an appropriate and needed medication change adding an antipsychotic medication did not occur until day nine of the MHCB stay. Despite reports of severe grave disability upon referral, the patient exhibited only mild confusion during intake assessments and was described as linear and goal-directed during contacts. He refused most confidential clinical contacts and laboratory testing, and only minimally interacted with the MHCB staff. Despite this, treatment targets, goals, and interventions were not revised to address the lack of treatment participation.

The documentation indicated that the patient spontaneously improved rapidly, with the only documented evidence of psychosis obtained from the patient's self-report. A thorough diagnostic assessment was necessary to clarify the clinically appropriate diagnosis, as it was very unusual for severe psychotic symptomatology to rapidly improve without appropriate medication treatment or therapeutic interventions. When the patient was prescribed an antipsychotic medication, he reported that it made worsened his hallucinations, but he was ultimately discharged to the EOP.

**Patient Y**

This patient's healthcare record was reviewed to assess the care provided in the MHCB. He was admitted to the MHCB on January 6, 2023, due to danger to self and was discharged on January 12, 2023. The patient had a history of inpatient admissions due to self-injury with and without suicidal intent secondary to exacerbation of paranoia. The current MHCB admission was precipitated by the patient reporting suicidal ideation to staff and explaining that he was having a panic attack because he was seeing demons.

The initial MHCB mental health assessments and health and physical occurred timely. The patient was provided diagnoses of schizophrenia; unspecified delusional disorder; unspecified psychosis not due to a substance or known physiological condition; and amphetamine-type substance use disorder, moderate. An emergency PC 2602 petition for involuntary medication administration due to danger to self was initiated at the initial psychiatric evaluation. He was prescribed fluphenazine, fluoxetine, BuSpar, propranolol, and Invega.

The IDTT meeting on January 9, 2023 occurred timely and targeted danger to self and anxiety. Treatment goals were clinically reasonable and relevant to the treatment targets. The clinical interventions were not sufficiently individualized to the patient's specific risk factors. The IDTT, however, did note that the patient met the positive subjective criteria for referral to a HLOC; and the clinical rationale for nonreferral, that this was early in the MHCB stay and the patient required further assessment, and the treatment modifications were adequate.

The patient was seen daily for clinical contacts except when seen during the IDTT meetings. The contacts occurred in confidential settings and at the cell-front due to modified programming and critical staffing deficiencies. Different PCs performed the contacts than were present at the

IDTT meetings.  The PC contacts appeared to be brief wellness check-ins, and none of the clinical interventions listed in the treatment plan were documented as implemented.

The patient was only seen by the psychiatrist at the time of the initial psychiatric assessment. The discharge SRASHE was completed by a licensed psychologist who noted the patient's high chronic and low acute suicide risk at the time of discharge.  Safety planning was completed and incorporated the patient's discharge setting.  The discharge IDTT meeting occurred on January 12, 2023, but the treatment plan was not completed and did not support the treatment team decision-making process.

**Findings**

This patient received inadequate treatment while in the CSP/Corcoran MHCB.

The patient was not seen timely as required.  The initial treatment planning appeared adequate; however, the listed interventions were not implemented.  There was poor continuity of care, as the patient was seen by several PCs.  He was only seen once by the psychiatrist, and no psychiatric assessment occurred prior to the MHCB discharge.  It was unclear if the discharge was an IDTT decision, as there was no completed treatment plan to document the justification for discharge and planned treatment.

**APPENDIX C-14**
**Central California Women's Facility (CCWF)**
**July 24, 2023 – July 28, 2023**

**Patient A**

This 48-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care and treatment provided at the CCWF EOP hub.  The patient was originally placed in the EOP hub on September 17, 2022 due to safety concerns; during that hub stay, the patient reportedly did not attend any groups, demonstrated poor medication adherence, and was released to the 3CMS level of care in general population on November 23, 2022.  She reportedly decompensated with medication nonadherence, panic attacks, and reported suicidal ideation; this resulted in admission to the MHCB on December 6, 2022, and discharge to the EOP level of care on December 27, 2022 with immediate return to the CCWF EOP hub.  The patient had a history of poor coping skills, impulsivity, defensive thinking and behaviors, medication nonadherence, and poor insight.

The initial IDTT meeting on January 10, 2023 occurred timely and included the necessary participants including the patient.  The patient requested transfer to the PIP, but the treatment team indicated that transfer to a higher level of care was not indicated.  The treatment plan contained IPOCs for anxiety, delusions, and depressed mood.  The IPOC for anxiety contained inadequate goals and interventions.  The IPOC for delusions contained an inadequate goal which was not measurable and generic interventions.  The IPOC for depressed mood contained adequate goals, but generalized interventions.  The patient met the criterion for consideration of referral to a higher level of care due to treatment refusal, as she refused nine hours of groups weekly during the previous six weeks.  The psychiatrist provided psychoeducation regarding the benefits of medications that were ordered on an as-needed basis, and the PC encouraged the patient to attend groups and work on coping skills for anxiety and paranoia.  The provided level of care rationale was appropriate, and the patient was maintained at the EOP level of care due to ongoing delusional thinking and paranoia.  The EOP functional evaluation was completed appropriately and the clinical summary was adequate.

The next IDTT meeting occurred on February 7, 2023; it was unclear if the patient was in attendance.  This IDTT meeting occurred as the patient had been released from the ASU on January 26, 2023, and then immediately returned due to enemy concerns.  The IDTT provided diagnoses of schizoaffective disorder, amphetamine-type substance use disorder, and alcohol use disorder.  The patient reportedly denied the presence of psychotic symptoms and substance use.  She had not attended groups due to a medical issue related to swollen joints; this ailment was well documented and resulted in difficulty for the patient to be cuffed to the group room chairs.  She was reportedly stable with normal mental status.  The IPOCs remained unchanged from the previous treatment plan, but the interventions were improved and with greater specificity.  She was prescribed Prozac, BuSpar, and Abilify; melatonin, Remeron, and Vistaril were ordered on an as-needed basis.

The 30-day modified treatment IDTT meeting occurred on March 7, 2023.  The IPOC for anxiety was removed, but the other IPOCs for depressed mood and delusions continued.  The patient

routinely refused to attend groups due to her medical and mobility issues, and she was provided modified programming of five hours weekly to accommodate her medical symptoms. She reported that she had discontinued all medications on February 16, 2023 due to the possible connection to her medical concerns. She was again described as stable even after discontinuation of her medications, but she reported increased depressive and anxiety symptoms. She attended to her ADLs and was cooperative and polite with the staff. She was released from the ASU two days after this IDTT meeting and returned to a mainline EOP yard.

The patient was seen timely for initial and routine PC contacts during the review period while housed in the EOP hub. The initial PC assessment occurred on December 29, 2022, when she returned to the EOP hub after the MHCB discharge. The patient reportedly initiated this unplanned confidential individual session and spent much of the session focused on the PREA allegations that led to her ASU placement. During the sessions, the PC worked with the patient regarding her symptoms, including her paranoia and treatment goals. This session was documented appropriately in the progress note. Routine PC contacts during the review period occurred timely; most occurred at the cell-front, as the patient repeatedly declined to attend a confidential session. The PC encouraged medication adherence and group attendance and often consulted with custody when the patient refused to attend groups. The patient reported low motivation to attend groups due to her medical condition. The documentation indicated that the PC and patient worked collaboratively regarding the treatment provided and responses to interventions. The patient completed the IPOC for delusions during February 2023, and the patient denied distress or paranoid thinking for several weeks prior to that session. She continued to deny any delusional thinking or paranoia for the remainder of her EOP hub stay, but reported increased anxiety and depressive symptoms after she discontinued medications in mid-February 2023. She was seen for EOP hub cell-front check-ins during the review period when she was described as stable and not in significant distress.

The patient was seen for timely psychiatric contacts during the review period. The initial psychiatric contact occurred on January 3, 2023, after return to the EOP hub from the MHCB. The patient reported increased anxiety, and the psychiatrist continued her medications and increased BuSpar. At the next psychiatric contact on February 7, 2023, the psychiatrist decreased Prozac at the patient's request. At the final EOP hub psychiatric contact on February 21, 2023, the patient told the psychiatrist that she had discontinued her medications on approximately February 16, 2023 with subsequent decrease in her physical health symptoms and pain. She agreed to continue only taking the medications ordered on an as-needed basis and to engage in increased counseling with her PC.

**Findings**

The care and treatment provided to this CCWF EOP hub patient was adequate.

The patient was placed in the ASU due to safety concerns after a PREA allegation and was housed in the ASU at the EOP level of care for approximately two and a half months. The IDTT meetings occurred timely and included the necessary participants, and the patient was present at two of three IDTT meetings. The treatment team maintained the patient's level of care appropriately. IPOC goals and interventions were modified and improved over time to reflect

the patient's clinical presentation.  She was appropriately placed on EOP modified programming due to poor group attendance resulting from medical issues with swollen joints and foot problems.  Clinical contacts with the PC and psychiatrist occurred timely.  The patient was monitored appropriately when her medications were discontinued due to the possible medical side effects; although the patient reported a slight increase in anxiety and depression, she reported a significant reduction in paranoia and did not report or demonstrate psychotic symptoms.  IPOC goals were tracked appropriately in PC progress notes, and several treatment goals were achieved prior to release to the mainline EOP.

**Patient B**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CCWF EOP hub.  The patient was housed in the EOP hub from December 9, 2022 to March 28, 2023; she was admitted to the CIW MHCB from January 21, 2023 to January 25, 2023.  She entered the CDCR at CCWF for her first term on December 8, 2022, to serve two years with the earliest possible release date in July 2023.  She was placed in the ASU only one day after arrival due to the possession of contraband.  She refused to remove her hair extensions, contact lenses, and piercings.  She stated that she did not understand why her hair was a point of contention at the prison and repeatedly stated that she would remain in the ASU for her entire sentence rather than change her appearance.

An urgent consult was requested on December 9, 2022 after the patient reportedly was observed with suspicious behavior and disorientation.  At a clinician contact on December 13, 2022, she presented with poor hygiene.  On January 4, 2023, custody staff placed a routine consult due to the patient's significant and extreme body odor.  The documentation indicated that the patient's cell smelled of urine with trash everywhere, and she boarded her cell window requiring the use of force.  She was admitted to the CIW MHCB on January 21, 2023 for stabilization and returned to the CCWF EOP hub on January 25, 2023 at the EOP level of care.  The patient had poor insight regarding her mental illness and difficulty adjusting to the prison environment.  At the time of MHCB discharge, she was provided a diagnosis of unspecified schizophrenia spectrum or other psychotic disorder, and the MHCB discharge IDTT documentation indicated that she was calm and cooperative without behavioral or safety concerns.  She also participated in programming and met the MHCB treatment goals prior to discharge.

The patient was seen for timely and appropriately documented five-day follow-up contacts upon return to the EOP hub.  The initial IDTT meeting occurred timely on February 7, 2023 with the necessary staff in attendance including the patient.  The problem list included schizoid personality disorder as a mental health concern.  The only IPOC in the treatment plan was for mental health treatment nonadherence, and it contained reasonable goals but limited interventions.  Other goals contained elsewhere in the treatment plan were copied from the MHCB discharge treatment plan summary.  No higher level of care indicators were noted, and the patient was retained at the EOP level of care to closely monitor for decompensation.  The EOP functional evaluation was completed appropriately, and the diagnosis of unspecified schizophrenia spectrum disorder was maintained.

A subsequent IDTT meeting occurred on February 21, 2023 due to an UNA request for ICF level of care consideration; however, the patient was retained at the EOP level of care by the treatment team, as they indicated that an ICF referral was premature. The treatment team also added antisocial personality disorder as a diagnosis; the clinical staff reported that the patient interacted well with others in groups and described her clinical presentation as more behaviorally based rather than indicative of an acute mental illness. The February 21, 2023 sustainable process report indicated that the patient met the higher level of care criterion for treatment refusal and noted that her refusal to remove the contraband items impacted her ability to attend groups. The treatment team also added an additional diagnosis of schizotypal personality disorder. The patient reportedly asked about groups and yard and was motivated to attend. The treatment goals specified in the clinical summary indicated that the PC would work with the patient on treatment adherence using motivational interviewing and CBT techniques. Transfer and discharge criteria were appropriate and targeted antisocial personality disorder behaviors.

The patient refused to attend the final EOP hub IDTT meeting on March 14, 2023. The IPOCs remained unchanged and the patient did not report any new symptoms. No higher level of care referral criterion were noted, including treatment refusal. She actively participated in group treatment and showered every three days when offered; however, she continued to demonstrate an eccentric appearance that the patient described as her expression of individuality. She was noted with improvement toward treatment goals, and the treatment team suggested that the patient maintained the contraband to remain in the ASU for her entire term for a single cell.

She was seen for timely and appropriate psychiatric contacts during the review period. The initial psychiatric contact occurred timely on February 7, 2023, which was the same day as the initial IDTT meeting. The psychiatrist provided a diagnosis of unspecified schizophrenia disorder. No psychotropic medications were prescribed, and the patient denied all mental health symptoms during the initial psychiatric evaluation. The psychiatrist reported that the patient demonstrated normal mental status and was stable. At the next psychiatric contact that occurred at the cell front on February 21, 2023, the patient was described as stable without mental health symptoms and concerns. The diagnosis of antisocial personality disorder was included in the psychiatric progress note at this contact. At the final EOP hub psychiatric contact on March 17, 2023, the patient remained stable and continued to deny mental health symptoms or concerns. The psychiatrist added the diagnosis of schizoid personality disorder at that visit.

The PC contacts occurred timely during the review period. At the initial PC assessment on January 31, 2023, the patient declined to participate so it was conducted by healthcare record review. The patient denied mental health symptoms and concerns or suicidal ideation. The initial assessment was completed appropriately and contained adequate information, given the patient's lack of participation and available history. She refused confidential individual PC contacts during February 2023 and continued to deny symptoms or mental health concerns. The PC conducted timely cell-front contacts and encouraged the patient to participate in groups and individual sessions. The patient reported to the PC that she was not interested in mental health treatment, and she remained stable. The patient reported increased motivation to attend groups during her cell-front contact on February 22, 2023, and she attended confidential sessions for the next four PC contacts. During those contacts, the patient and PC reportedly discussed the patient's treatment nonadherence and coping tools; additionally, the PC provided

psychoeducation about group attendance and treatment adherence. The patient also reported frustration with custody staff, as she was not brought to groups despite her requests to attend. The patient consistently denied symptoms, and her rapport with the PC appeared to improve during the review period. She was released from the ASU on March 28, 2023.

**Findings**

The care and treatment provided to this CCWF EOP hub patient was adequate.

Clinical contacts, including IDTT meetings, initial assessments, and routine contacts, occurred timely. The patient remained stable, and her engagement and rapport with treatment providers gradually improved. She was appropriately retained at the EOP level of care after the MHCB discharge, and the patient responded well to the frequency of clinical contacts and demonstrated positive adjustment to the prison environment.

**Patient C**

This 34-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care and treatment provided at the CCWF EOP hub. The patient was originally placed in the ASU on December 5, 2022 at the 3CMS level of care, but her level of care was increased to the EOP on December 20, 2022. She was released from the EOP hub two days later on December 22, 2022 to the mainline EOP, but she returned to the EOP hub on January 20, 2023. She was subsequently referred to the ICF level of care on February 17, 2023, where she remained until March 15, 2023 when she was discharged and returned to the CCWF EOP hub at the EOP level of care. She remained housed in the EOP hub until April 13, 2023.

This was the patient's first CDCR term to serve a 22-year sentence with an earliest possible release date of December 14, 2032. She received mental health services at all levels of care in the CDCR. She was admitted to the MHCB on April 23, 2020 and discharged May 4, 2020 to the EOP level of care. Her level of care was reduced to 3CMS on November 10, 2020 where she remained until this EOP hub placement.

The patient had a history of treatment and medication nonadherence, self-injurious behavior, auditory hallucinations, disorganized and delusional thinking, paranoia, and aggression. She was previously provided diagnoses of schizoaffective disorder, bipolar disorder, depression, and anxiety. She denied a history of suicide attempts but exhibited self-injurious behaviors primarily by cutting when stressed. She was not prescribed psychotropic medications at the time of review.

The IDTT meetings occurred timely during the review period. The initial EOP hub IDTT meeting included the necessary participants, but the patient refused to attend. At the time of the meeting, the patient was in the 3CMS program and her level of care was increased to the EOP at that meeting. She was provided IPOCs for treatment nonadherence and delusions. The goals and interventions for both IPOCs were appropriate. The patient was described as delusional, agitated, and not engaged in treatment; she denied the need for mental health treatment.

The higher level of care justification was appropriate and contained specific interventions for the PC, psychiatrist, and recreational therapist to provide. The patient was reportedly reluctant to leave the ASU for general population housing. She was released from the EOP hub to the mainline EOP on December 22, 2022 two days later, but returned to the EOP hub on January 20, 2023. Another initial IDTT meeting occurred on January 31, 2023 upon her return to the EOP hub; however, no psychiatric technician was present at the meeting. The patient also refused to attend the IDTT meeting.

The treatment plan included IPOCs for delusions and irritability. The goals for both IPOCs were generalized and limited, and no interventions were provided in the IPOC section of the treatment plan. The treatment team referred the patient to the ICF level of care, as the patient had decompensated, refusing to engage in treatment, and was not amenable to increased contacts or change in treatment interventions; additionally, she was hostile toward the PC.

The patient returned to the CCWF EOP hub on March 15, 2023 after the ICF hospitalization. The IDTT meeting upon return included the necessary participants, and the patient attended. While in inpatient care, the patient was placed on a PC 2602 order. She reported that her symptoms were well controlled, and she demonstrated good insight and improved mood; she also attended group and individual sessions after her return.

She was retained at the EOP level of care, and the stated goal was for the patient to not receive additional RVRs. Only one IPOC was included in the treatment plan for danger to others, and the goals were very generalized and only included treatment attendance. This IPOC was very limited given the patient's recent return from the inpatient level of care. She was prescribed Depakote, risperidone, and Zyprexa on an as-needed basis that was continued from the inpatient stay. The treatment plan again provided specific interventions for each clinician to provide to the patient.

The initial and routine PC contacts occurred timely. The initial PC contact occurred on January 31, 2022 after she returned to the hub from the mainline EOP; however, the patient refused to engage with the PC at the cell-front or in a confidential setting, and she presented with irritability.

A subsequent PC initial assessment occurred on March 16, 2023 upon the patient's return from the ICF. The patient reported that her symptoms were well-managed, and she engaged appropriately with the PC. The treatment focus was medication adherence and not acquiring additional RVRs due to aggressive behavior. Routine PC contacts occurred timely and were appropriately documented.

After ICF discharge, the patient recognized the importance of medication adherence for mental stability, and she denied distressing mental health symptoms. The PC provided CBT interventions and encouraged the patient to attend all out-of-cell activities. The patient remained stable during the remainder of her EOP hub stay, and no significant symptoms were observed or reported. The patient was also medication adherent, and she was provided specific and appropriate interventions as her stability increased.

The psychiatric contacts did not always occur timely, but were adequately documented. The initial psychiatric assessment occurred on February 3, 2023 by telepsychiatry, three days after the initial IDTT meeting. The patient exhibited delusional thinking during the interview regarding her custody status, and she denied auditory and visual hallucinations. She was amenable to treatment with Trileptal and Risperdal, and the psychiatrist increased the Trileptal and started Risperdal during that visit.

The patient agreed to an additional increase in the Risperdal dosage on February 10, 2022, when she was described as very paranoid of personnel and staff in the unit. The psychiatrist filed a non-emergent PC 2602 involuntary medication order at that time. The patient was ambivalent regarding medication treatment, and she refused an injectable long-acting antipsychotic medication. At the initial psychiatric appointment after return from the ICF, the patient was prescribed Zyprexa, Depakote, and Risperdal by a PC 2602 order due to grave disability.

**Findings**

The care and treatment provided to this CCWF EOP hub patient was adequate.

The patient was provided timely and adequate IDTT meetings after ASU placement. Her level of care was appropriately increased and clinically justified. The treatment plans were well documented and provided interventions for each clinician to provide. The PC contacts during the review period also occurred timely and were appropriately documented.

The PC provided specific and appropriate treatment interventions during the review period, particularly as the patient's stability improved after the PIP discharge. The psychiatric contacts were adequate and timely except one initial psychiatric contact that occurred after the initial IDTT meeting.

The patient and psychiatrist collaborated effectively regarding medication treatment, and the psychiatrist appropriately sought a non-emergent PC 2602 order after psychiatric decompensation.

**Patient D**

This 41-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided in the CCWF ASU EOP hub. The patient was housed in the CCWF EOP hub from December 19, 2022 to May 4, 2023, with a brief MHCB admission from December 30, 2022 to January 6, 2023 during that ASU stay. The patient's current CDCR term began in 2021, with an earliest possible release date on February 15, 2024.

The patient was admitted to the MHCB from September 23, 2022 to October 4, 2022 due to bizarre behavior and danger to others. The patient initially presented with irritability and disengagement; however, treatment participation gradually improved with medication adherence. The patient was provided diagnoses of antisocial personality disorder, schizoaffective disorder, amphetamine use disorder, and cannabis use disorder. The patient had a history of six MHCB

admissions but no suicide attempts, as well as an ICF referral on November 8, 2022 that was rescinded on December 1, 2022.

The IDTT meetings occurred timely during the CCWF ASU EOP hub stay. At the initial IDTT meeting on December 27, 2022, the patient refused to attend, but the appropriate staff were in attendance. The treatment plan IPOCs were for danger to others and delusions, and both areas of focus included very generalized goals and limited interventions. The patient was described as irritable, agitated, and with inability to control behaviors; the patient was subsequently referred to the ICF level of care.

The treatment plan identified interventions for the PC and psychiatrist and noted prescribed medications of Haldol, Geodon, Vistaril, Cymbalta, Trileptal, and Cogentin. The EOP functional evaluation was completed appropriately, but the clinical summary was not updated from prior treatment plans. After consultation with the PIP clinicians, the CCWF EOP hub treatment team instead placed the patient in the MHCB for stabilization rather than return to the PIP at the ICF level of care.

The patient returned to the EOP hub from the MHCB on January 6, 2023 and had reportedly stabilized. The January 17, 2023 IDTT meeting had the necessary participants, including the patient. The treatment plan included IPOCs for anger and irritability. The IPOC for anger identified appropriate goals but contained inadequate interventions. The IPOC for irritability contained inadequate goals and interventions. The patient was medication adherent and attended all out-of-cell clinical contacts after the MHCB discharge. The primary treatment goal was no aggressive RVRs for 60 days and no explosive episodes or erratic remarks towards staff or during groups. The patient and the treatment team agreed to schedule a routine IDTT meeting in 60 days to review the level of care and to consider discharge to the 3CMS program. At the routine IDTT meeting on March 14, 2023, the patient was reportedly doing well with less agitation, irritability, and medication adherence and no new RVRs since the last IDTT meeting. The patient achieved treatment goals, and the level of care was decreased to 3CMS.

The PC initial and routine contacts occurred timely during the review period. The documentation of initial PC contacts contained very thorough and complete clinical history but were incomplete as the mental status portions and the EOP functional evaluation were not completed. The routine PC contacts occurred in various settings including confidential office settings, at the cell front, in the group room, and in the yard. The patient repeatedly requested a decrease in the level of care to 3CMS and was very concerned about the impact of the EOP level of care on their active gang membership. The patient had improvement in group participation and insight with good relations with peers and no aggressive behaviors exhibited while in the EOP hub. No additional RVRs were acquired. The Haldol dosage was reduced in early March 2023 and the PC noted an increase in agitation; at the contact on the following week, the patient exhibited much less irritability and anticipated the upcoming IDTT meeting. The patient attended most groups and the IPOCs were tracked appropriately in the PC progress notes. The patient's level of care was reduced to 3CMS at the March 14, 2023 IDTT meeting.

The initial psychiatric assessment occurred timely on December 20, 2022, when the patient reported auditory hallucinations. The patient, however, did not want to take psychotropic

medication or placement at the EOP level of care. The psychiatrist provided diagnoses of antisocial personality disorder, cannabis use disorder, and unspecified schizophrenia spectrum and other psychotic disorder. Another initial psychiatric assessment was completed upon the ---- patient's return from the ICF on January 13, 2023, when the patient reported high levels of anxiety and poor sleep. The patient denied suicidal ideation or homicidal ideation and reported less paranoia regarding peers and staff with no recent hallucinations and a reduction in the severity of mood swings. The psychiatrist indicated that the patient overutilized Vistaril that was ordered on an as-needed basis for anxiety. The patient also minimally attended groups and primarily remained in cell. At that visit, BuSpar and Remeron dosages were increased, and the Vistaril dosage was decreased due to overuse. At the next psychiatric contact on February 17, 2023, the patient requested to discontinue Haldol and was described as stable since the last visit; the psychiatrist agreed and discontinued Haldol. The patient demonstrated improved mood with no acute or psychotic symptoms after Haldol was discontinued.

**Findings**

The care and treatment provided to this CCWF EOP hub patient was adequate.

The IDTT meeting documentation was comprehensive, and the meetings occurred timely with the necessary participants and patient involvement in treatment planning. The treatment team appropriately referred the patient for higher levels of care as appropriate, and treatment plans provided specific interventions for the PC and psychiatrist to provide. The patient's symptoms responded well to treatment and the higher levels of care placement. The patient's paranoia, delusional thinking, irritability, and agitation decreased significantly after return from the MHCB. The rapport between the patient, psychiatrist, and PC improved over time, with good collaboration regarding medication management.

**Patient E**

This 31-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care and treatment provided at the ASU EOP hub at CCWF. The patient was housed in the EOP hub from January 20, 2023 to March 29, 2023, and transferred to the CIW PSU after leaving the EOP hub. The patient arrived at the CDCR for the current term on June 11, 2019 to serve an 11-year sentence with a release date of February 7, 2026. The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care with eight MHCB stays. She had a history of intense mood dysregulation, erratic behavior, self-harm, and chronic misperceptions of others' intentions. Her most recent episode of self-harm involved headbanging on April 25, 2022. She had a history of three suicide attempts that included jumping from a structure in 2009, attempted hanging in 2019, and cutting her throat in 2020. Her chronic suicide risk was assessed as high, and her acute risk was assessed as low.

One IDTT meeting occurred during the ASU EOP hub stay; this meeting included the necessary participants, and the patient was present and participated in treatment planning. The problem list included major depressive disorder, and the treatment plan included an IPOC for irritability. That IPOC identified appropriate and measurable goals with specific and appropriate treatment interventions. Her level of care was increased to the EOP at that IDTT meeting, and the higher

level of care section was completed appropriately; it noted that the patient was unable to function at the 3CMS level of care due to agitated depressive symptoms causing irritability and aggression, and that the patient was not medication adherent. The EOP functional evaluation was completed appropriately, and an appropriate clinical summary was documented.

The PC contacts during the review period at the EOP hub generally occurred timely. Most PC contacts occurred at the cell front, as the patient declined to attend confidential individual sessions. The patient developed coping skills and processed grief with the PC, and the IPOCs were tracked in the PC progress notes and updated appropriately. The patient was provided diagnoses of major depressive disorder recurrent with psychotic features, PTSD, opioid use disorder, amphetamine use disorder, and unspecified personality disorder. The patient generally demonstrated stable clinical presentation and denied acute symptoms and distress after EOP placement.

The patient was seen timely for psychiatric contacts after EOP placement. The initial psychiatric assessment occurred on February 17, 2023 at the cell front, as the patient refused to attend a confidential session. She requested an increase in Prozac and discontinuation of Remeron; the psychiatrist agreed. The patient frequently did not take risperidone, Depakote, and Prozac, and the psychiatrist agreed to reduce the risperidone and to begin to taper that medication. The patient reported that her PTSD symptoms had reduced in intensity, and she denied suicidal ideation or self-injurious behaviors. She refused all medications between February 17 and February 21, 2023 due to medication side effects but resumed medications on February 21, 2023 after treatment with Dulcolax. At the March 17, 2023 psychiatric appointment, the patient stated that she had discontinued all medications except BuSpar during the previous four weeks, and the psychiatrist discontinued those medications except BuSpar. Further medication adjustments occurred at the March 17 and March 27, 2023 psychiatric contacts that included change in BuSpar to as-needed only and discontinuation of Benadryl.

**Findings**

The care and treatment provided to this CCWF EOP hub patient was adequate.

The IDTT meetings occurred timely and demonstrated collaboration within the treatment team and appropriate referral to higher levels of care. The treatment plans provided appropriate goals and interventions and clinical justifications for the treatment team decisions. The psychiatric contacts also occurred timely and medications were adjusted appropriately in consultation with the patient. The patient remained stable as the medications were adjusted and discontinued. The PC contacts also generally occurred timely, and the PC established good rapport with the patient. The patient was able to process grief and stressors during the PC sessions, and the PC provided clinically based interventions to assist with coping skills and to reduce irritability and reactivity. The patient remained stable after returning from the MHCB and prior to her transfer to the CIW PSU.

**Patient F**

This case was selected to review the care provided in the reception center EOP at CCWF. The patient arrived at CCWF on November 22, 2022. The initial health screening occurred timely, but the mental health screening did not occur for 23 days until December 14, 2022. The clinician also attempted to complete the comprehensive psychological assessment on that day, but the patient refused to allow the assessment to be performed in a confidential setting. The patient refused to leave her cell to attend any healthcare-related appointments, including the intake medical history and physical examination. As the patient persistently refused to leave her cell, the initial mental health assessments were completed by healthcare record review and information obtained from the county jail records. The patient also refused to leave her cell for meals and was observed by custodial staff accepting food from others on the unit which the patient acknowledged. The custody staff also reported that the patient refused showers, and the mental health staff noted a foul odor emanating from her cell.

During the mental health screening, it was noted that the patient was not oriented and reported disrupted sleep. She reported prior psychotropic medication treatment, involuntary psychiatric hospitalization, and polysubstance use. The county jail records revealed that the patient had a history of multiple diagnoses including schizoaffective disorder, schizophrenia, and bipolar disorder; additionally, the records noted two hospitalizations due to increasing psychosis and inability to care for herself with medication nonadherence. During the mental health assessments, the custody staff described the patient as aggressive and confrontational, and the initial assessment noted that the patient "bordered" on grave disability but did not require MHCB placement.

On December 12, 2022, custody staff submitted a referral noting that the patient was observed hitting and talking to herself, and she had a foul body odor. She refused a confidential psychiatric contact on the following day to address her decompensation and medication nonadherence. She was seen on December 20, 2022, when the psychiatrist noted that the patient was referred to the EOP level of care; the psychiatrist also noted that the patient had refused almost all contacts since arrival and refused her psychotropic medication for 16 of 21 scheduled days. The patient agreed to modification of her Zyprexa to PRN administration.

The master treatment plan was completed on December 28, 2022, at the initial IDTT meeting; however, only the psychologist was present at the meeting. Despite documentation of custody reports that the patient had not showered and had poor hygiene with a foul body odor and had refused meals and all confidential contacts; the clinician concluded that the patient was not gravely disabled and that there were no concerns regarding her ADLs. This determination appeared solely based on the patient's self-report, despite custody observations and the clinician's own documentation of the patient's body odor. The clinician was unable to fully complete the treatment plan due to the patient's uncooperative behavior; however, referral to a higher level of care was not considered. Treatment nonadherence and depressed mood were targeted in the treatment plan; however, the treatment targets were subjective (for example, rating depression as a two or below on a ten-point scale), no baseline measurements were established, and no evidence-based therapeutic interventions were provided. The interventions provided were inappropriate given the patient's treatment nonadherence and poor insight. The treatment

goal to establish therapeutic rapport was reasonable, but the clinical interventions were inadequate given the acuity of the patient's symptoms. The prescribed psychotropic medication was changed to PRN administration to increase adherence; however, the patient did not take any of the medication doses.

The patient was seen weekly but not every seven days by the EOP PC. These contacts continued to occur at cell front, as the patient refused to leave her cell. The PC documented observing the patient on her bed during one contact, and that her cell was unkempt with trash and belongings scattered on the bed and around the cell. Despite these observations, the patient was not considered gravely disabled or assessed for involuntary medication treatment. The PC documented the plan to continue to monitor the patient for referral to a HLOC. On January 25, 2023, the IDTT met with all required members, and the treatment plan noted that the patient was referred to the MHCB and to acute care. She transferred to the CIW MHCB with a pending acute care referral.

**Findings**

The care provided to this patient at CCWF was grossly inadequate.

The patient had a documented history of psychiatric inpatient hospitalization, involuntary commitment, and decompensation with psychotropic medication nonadherence. She essentially refused all confidential contacts from the time of her arrival at CCWF. She was not seen timely for mental health screening or assessment. The initial EOP IDTT meeting did not include all required participants and failed to consider the need for referral to a HLOC; additionally, practical, evidence-based therapeutic interventions were not developed to address the patient's paranoia, disorientation, poor overall functioning, difficulty with ADLs, and acute psychosis. The patient clearly met the criteria for referral to a higher level of care, but she was not referred until two months after CCWF arrival.

The psychiatrist indicated that the patient did not meet the criteria for a PC 2602 involuntary medication order; however, a clear rationale for this determination was not documented and appeared erroneous. The patient required inpatient treatment and involuntary medication treatment soon after her CCWF arrival based upon the documentation in the healthcare record. Psychotropic medication was refused by the patient as were all clinical efforts. Rather than referral to a HLOC, the patient was allowed to continue to suffer untreated until the end of January 2023 when she was finally referred to an MHCB.

**Patient G**

This case was selected to review the care provided in the reception center EOP at CCWF. The patient arrived at CCWF reception center on May 3, 2023. A mental health screening was completed on May 5, 2023. The comprehensive psychological assessment was attempted on May 17, 2023, but the patient was disoriented with response to internal stimuli and severely disorganized thinking, including word salad. The county jail records noted that the patient had a history of multiple inpatient psychiatric hospitalizations including due to danger to self and others. She was provided a diagnosis of schizoaffective disorder, bipolar type. She was

prescribed benztropine, divalproex sodium, hydroxyzine, paliperidone, and propranolol at county jail; these medications were continued at CCWF. She was seen by the CCWF psychiatrist for medication nonadherence on May 11, 2023; and the psychiatrist discontinued all medications except divalproex sodium and hydroxyzine at the patient's request. During the meeting with the psychiatrist, the patient reported experiencing auditory and visual hallucinations.

The patient was seen for clinical assessment on May 19, 2023, when it was noted that she had been referred to the EOP level of care. The patient had no insight regarding her mental illness, believing that she did not require mental health treatment and exhibiting poor judgement. The initial psychiatric assessment was not completed until May 23, 2023, and this assessment documented that the patient experienced multiple constant auditory hallucinations, paranoia particularly toward peers, and depressed mood.

The IDTT meeting occurred on May 31, 2023; all required participants were present. Medication nonadherence and delusions were established as treatment targets. The interventions listed for medication nonadherence were minimally adequate. The treatment goals and interventions for the treatment target of delusions were clinically inadequate and did not appropriately address the patient's acute symptoms and poor functioning. The IDTT determined that the patient did not meet the criteria for referral to a HLOC. Despite her lack of insight regarding her mental illness, the patient did express willingness to participate in mental health treatment. She was placed in the mainline EOP and enrolled in several EOP treatment groups as she awaited endorsement to CCWF or transfer.

**Findings**

This patient received minimally adequate treatment at CCWF.

The reception center IDTT noted that the patient required a HLOC and referred the patient to the EOP. The treatment plan identified pertinent treatment targets and medication nonadherence interventions that were acceptable for an initial treatment plan; however, the interventions for the treatment target of delusions were subjective in nature, unrealistic, and did not include evidence-based clinical interventions.

**Patient H**

This case was selected to review the care provided in the reception center at CCWF. The patient arrived at the CCWF reception center on February 21, 2023. The initial healthcare screening by nursing was completed on the day of arrival. The mental health screening was completed timely on February 23, 2023, as was the mental health assessment on March 1, 2023. The mental health screening was positive for all indicators except suicide.

The patient was incarcerated for a previous CDCR prison term in 2019, when she was not included in the MHSDS. During this CDCR term, the patient reported multiple symptoms including depression, anxiety, difficulty sleeping, restlessness, auditory and visual hallucinations, racing thoughts, and paranoia. She was prescribed BuSpar and Seroquel from the county jail, and these medications were continued at CCWF. The patient had sporadic medication adherence

since arrival, and she consistently refused medications after February 27, 2023. She had a long history of substance abuse that included marijuana, heroin, methamphetamine, fentanyl, PCP, and ecstasy.

She was seen by the psychiatrist on March 17, 2023 for an initial assessment, when she was provided diagnoses of methamphetamine use disorder and drug-induced anxiety. The psychiatrist tapered and discontinued Seroquel while continuing BuSpar. The patient was seen approximately ten days later for a psychiatric consult, as she had been refusing her medication. The psychiatrist discontinued all psychotropic medications, and the patient reported to her PC that she had no mental health complaints and did not know why she was being seen by a PC when she was not prescribed psychotropic medication. She was seen by the PC timely while in the RC. These contacts were brief with no clinical interventions documented, and the patient typically terminated sessions prior to completion.

**Findings**

The care provided to this CCWF reception center patient was adequate.

She was appropriately screened and assessed. Although she was not seen by the psychiatrist for 25 days after arrival despite treatment with psychotropic medications in the county jail; those medications were continued until she was seen for the initial psychiatric evaluation. The medications were ultimately discontinued due to psychiatric concerns and the patient's request. She was seen timely by the PC; although the documentation of those contacts indicated that they were brief and superficial in content.

**Patient I**

This case was selected to review the care provided in the reception center at CCWF. The CCWF RC log indicated that the patient arrived at CCWF on May 26, 2023; however, the healthcare record documented that the patient actually arrived on April 12, 2023. Initial healthcare screening documents were completed by nursing on both dates, but the healthcare record indicated that the patient was initially transferred to CCWF on April 12, 2023, and she returned to CCWF from the CIW MHCB on May 26, 2023.

The mental health screening was completed on April 17, 2023, but there was no documentation of the timely completion of the comprehensive mental health assessment. She was not assessed until an emergent referral for suicidality was made on May 5, 2023, when a comprehensive assessment and SRASHE were completed. She was provided a diagnosis of adjustment disorder, with mixed anxiety and depressed mood.

The initial psychiatric evaluation occurred on May 4, 2023; and due to anxiety symptoms, she was prescribed Remeron and hydroxyzine.

The patient was seen by a PC on May 16, 2023, after submitting a healthcare services request, as the patient stated that she wanted to hurt others. Progress notes from that contact documented additional diagnoses for major depressive disorder, other specified bipolar and related disorder,

PTSD, and schizoaffective disorder, bipolar type.  As the patient continued to state intent to harm others during the assessment, she was referred to the MHCB and subsequently transferred to CIW.

It appeared that upon her return to CCWF from CIW, she was mistakenly designated as a new arrival rather than a "treat and return" referral to the MHCB.  The patient discharged from the MHCB on May 24, 2023, and returned to CCWF at the 3CMS level of care on May 26, 2023.  The five-day follow-up contacts were completed, and she was seen by the psychiatrist on June 1, 2023. The psychiatrist added Cogentin as a prophylaxis for extra-pyramidal symptoms.  She was not seen again by a PC until July 12, 2023; although she was seen within 90 days of the prior PC contact, clinical indications suggested that she should have been seen sooner for appropriate monitoring after the MHCB discharge and the completion of five-day follow-up contacts.

**Findings**

This patient received minimally adequate treatment at the CCWF reception center.

She was not seen timely for the mental health assessment following a mental health screening with multiple positive indicators.  The patient was not seen until an emergent referral was submitted due to danger to others, when she was appropriately referred and admitted to the CIW MHCB.  The patient would benefit from a comprehensive evaluation for diagnostic clarification, as she was provided with multiple conflicting diagnoses.

**Patient J**

This 20-year-old transgender patient transferred from the MHCB to the EOP level of care in April 2023.  Various diagnoses were provided in the healthcare documentation including avoidant personality disorder, bipolar I disorder, unspecified schizophrenia spectrum and other psychotic disorders, and PTSD.  No diagnosis was provided regarding the patient's long history of substance abuse.  He was prescribed Zyprexa, Cogentin, Vistaril, and Trazadone.  His healthcare record was randomly selected to assess the adequacy of EOP care provided.

The patient had a long history of self-harm and mental health treatment.  Shortly after arrival to the EOP, the patient was placed in alternative housing after he engaged in superficial self-injurious behavior attributed to alleviating feelings of frustration after he was the victim of a peer assault.  An individualized safety plan was developed, and the patient was cleared for return to the EOP by his treating clinician during an informal IDTT meeting.

The primary clinician and psychiatric initial evaluations were comprehensive and provided the basis for IPOCs that targeted treatment needs of self-harm and depressed mood.  However, treatment needs, including hallucinations, mood lability, paranoia, and delusions identified by the psychiatrist were not targeted or included in the IDTT documentation.  The goals were measurable; although like the interventions, were not clearly individualized.

Routine psychiatric documentation was thorough and included a clinically useful summary of improvement in psychotic symptoms.  Medication nonadherence was addressed appropriately.

Similarly, the primary clinician documentation was comprehensive, individualized and representative of meaningful therapeutic contacts with the utilization of appropriate treatment interventions such as distress tolerance, motivational interviewing, psychoeducation, and coping skills. Consistent with the lapse in treatment planning, there was no documentation of psychotic symptoms in the PC documentation that were prevalent throughout the documentation of psychiatric contacts.

Clinical groups in emotion regulation, that was a treatment need, were offered and attended.

**Findings**

The care and treatment provided to this patient was marginally adequate.

Individual provider treatment was appropriate, but the lack of provider collaboration regarding psychotic symptoms negatively impacted the patient's overall treatment. Provider collaboration regarding treatment planning and diagnostic clarification was needed.

**Patient K**

This 38-year-old DD2 patient was placed in the EOP from the MHCB in April 2023. Her EPRD was scheduled for December 2023. The provided psychiatric diagnosis of bipolar disorder conflicted with EHRS diagnoses of obsessive-compulsive disorder, schizoid personality disorder, schizotypal personality disorder, unspecified bipolar and related disorder, and unspecified depressive disorder. She was prescribed Lithium, Cogentin, Vistaril, Prolixin, and BuSpar. She had a long history of substance use and was also diagnosed with alcohol use disorder and amphetamine-type substance use disorder. Her healthcare record was randomly selected to assess the adequacy of care provided.

The patient was admitted to the MHCB due to grave disability. At that time, she was nonadherent with prescribed psychotropic medications. The initial PC assessment included a significant amount of historical information which was copied from multiple sources, but an individualized assessment of the patient's current treatment needs was omitted. The initial psychiatric assessment included pertinent clinical information.

The initial IDTT documentation indicated that the patient's mental status and functioning improved since her MHCB discharge, and she was being discharged to the 3CMS level of care. However, subsequent primary clinician documentation indicated that she remained at the EOP level of care. IPOCs that targeted grave disability and treatment nonadherence were outdated following stabilization after her recent MHCB stay.

Monthly psychiatric documentation included symptom status and medication side effects; although at times, some content remained unchanged. Medication nonadherence was addressed, and the medications were adjusted accordingly.

The primary clinician contacts were often conducted at the cell front due to the patient refusing to attend a confidential session; and when contacts occurred in a confidential setting, they were

not representative of meaningful therapeutic contact. The IDTT documentation that the patient denied symptoms conflicted with other documentation during the weeks prior to downgrade from the EOP level of care when the patient asked her new clinician if she was "from the circus" and was described as highly anxious and manic.

During the quarterly IDTT meeting, the patient was discharged to the 3CMS level of care due to continued stability, her denial of mental health symptoms and lack of treatment participation. The discharge decision conflicted with psychiatric documentation that consistently indicated that the patient required the EOP level of care. There was no documentation of psychiatric input regarding the level of care change in the IDTT documentation.

**Findings**

The care provided to this patient was inadequate.

The lack of a multidisciplinary treatment team decision to discharge this recently decompensated patient to a lower level of care was clinically inappropriate. There was an overreliance on the patient's denial of symptoms that conflicted with her recent clinical presentation. In addition to psychiatric documentation that indicated that the patient required the EOP level of care, decreasing her level of care near her CDCR release was an additional area of concern. Lastly, the pattern of cell-front contacts did not allow for a sufficient mental health assessment; this was even more critical when determining that the patient would be downgraded to a lower level of care. Diagnostic clarification was also needed.

**Patient L**

This 72-year-old patient's level of care was changed from 3CMS to the EOP in March 2023 due to an increase in depressive symptoms that were unable to be managed at a lower level of care despite increased primary clinician contacts. The provided diagnoses varied between providers but included unspecified mood disorder, major depression with psychosis, major depressive disorder, depressive disorder due to medical conditions, and bipolar disorder. She was prescribed Zoloft, Abilify, and BuSpar. Her healthcare record was randomly selected to assess the adequacy of care provided.

IPOCs for depression and anxiety were generally in alignment with the provider's initial assessments. Specific goals and interventions were generic, such as to reduce identified symptoms and to establish a therapeutic alliance, and they were unchanged at the quarterly IDTT meeting. Documentation to continue the EOP level of care to address grief and pain management with appropriate clinical intervention such as progressive relaxation and mindfulness were not included in the IPOCs.

The psychiatric contacts occurred with the same provider, but there were several primary clinician changes during the review period. There was a need for improved multidisciplinary collaboration regarding hallucinations and paranoia targeted by psychiatry that were not included in treatment planning. Overall, the primary clinician documentation indicated that meaningful

therapeutic interactions occurred with the use of clinical interventions, and the documentation was sufficiently thorough for continuity of care.

**Findings**

The care provided to this patient was marginally adequate.

Individual provider contacts were appropriate, but the lack of targeted collaborative treatment for the patient's psychotic symptoms was an area of concern. Relatedly, there was a need for multidisciplinary diagnostic clarification with clinical rationale provided.

**Patient M**

This 32-year-old DD2 patient's level of care was changed from the EOP to 3CMS in June 2023. She was provided a diagnosis of schizoaffective disorder. She was prescribed Prozac, Haldol, and Zyprexa, and she received her psychotropic medications by a PC 2602 order. Her healthcare record was randomly selected to assess the adequacy of care provided.

This patient was admitted to the PIP at the acute level of care in November 2022 after a suicide attempt by hanging. At that time, she was experiencing depressive symptoms and command auditory hallucinations. The provider's initial assessments completed upon her return to the EOP level of care in February 2023 described her mental status and functioning as stabilized, but overall, the assessments lacked sufficient information regarding current treatment needs. Specifically, the psychiatric assessment lacked sufficient mental health history. The clinical history from the initial PC assessment was not appropriately updated, as the information was copied from the PIP referral.

The rationale for IPOCs that targeted depression and self-harm was lacking and inconsistent with the initial PC assessment documentation that indicated that the patient denied depression and suicidal ideation. The IPOCs were continued at the quarterly IDTT meeting where her level of care was changed to 3CMS due to continued stability. It was further documented that her risk of self-harm was mediated by the PC 2602 order, as her recent suicide attempt was attributed to medication nonadherence. The documentation also indicated that placement in the 3CMS program would provide a less stressful environment. The IDTT documentation lacked a useful summary of the patient's functioning and mental status since the previous IDTT meeting.

The routine primary clinician contacts were representative of status wellness checks. The patient consistently requested discharge to the 3CMS level of care, but her reasoning for this request was unclear. Clinical interventions such as transition and discharge planning were not utilized. Only one psychiatric contact occurred in March 2023 prior to her discharge from the EOP in May 2023.

**Findings**

The care provided to this patient was inadequate.

The foremost concern regarding this patient's care was that she was not appropriately monitored by psychiatry prior to her discharge to the 3CMS program and was not appropriately prepared by her treatment team to transition to a lower level of care. In addition, initial assessments were insufficient to assist in the development of individualized treatment planning.

**Patient N**

This 43-year-old patient was placed in the CCWF mainline EOP in April 2023. She was provided diagnoses of borderline personality disorder and major depression in EHRS; however, the psychiatrist provided a diagnosis of major depression with psychosis. She was prescribed Prozac and Vistaril. Her healthcare record was randomly selected to assess the adequacy of care provided during her mainline EOP placement.

The provider's initial assessments were individualized. During the initial PC assessment, the patient reported increased anxiety and depression with the recent onset of hallucinations that she attributed to newly prescribed psychotropic medications. She discussed her history of substance use which resulted in drug debt with peers that contributed to her fear of housing in general population that would occur with transfer to the 3CMS program.

During the psychiatric assessment and subsequent psychiatric routine contacts, the patient reported that she had discontinued her psychotropic medication due to belief that the medications caused atypical hallucinations of ghosts and spirits, and the psychiatrist indicated that she exhibited paranoia. An antipsychotic medication was recommended; however, the patient refused. The routine psychiatric documentation included unorganized current and previous documentation that was difficult to follow.

Overall, primary clinician documentation was descriptive, but there was minimal utilization of clinical interventions. In contrast to psychiatric documentation, there was limited documentation of hallucinations, and consultation with psychiatry was clinically indicated but was not documented.

**Findings**

The care provided to this patient was inadequate.

Due to the patient's variable and atypical clinical presentation, provider collaboration was necessary but did not occur. Relatedly, diagnostic clarification with clinical rationale was needed. The primary clinician contacts did not provide sufficient clinical interventions. The lack of organization of psychiatric documentation negatively impacted continuity of care and multidisciplinary collaboration.

**APPENDIX C-15**
**California State Prison/ Los Angeles County (CSP/LAC)**
**August 14, 2023 – August 18, 2023**

**Patient A**

This 51-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care provided at the CSP/LAC EOP hub. The patient was housed in the CSP/LAC EOP hub from November 29, 2022 to December 13, 2022, and again from January 10, 2023 to May 13, 2023. He began his current CDCR term in 2010, and he was serving a life with the possibility of parole sentence with a maximum release date of August 12, 2039.

The patient entered the MHSDS on September 21, 2010 at the 3CMS level of care. He was first admitted to the MHCB on December 11, 2019 due to a documented suicide attempt by overdose. Subsequently, he was discharged to acute care where he was hospitalized from December 20, 2019 to February 14, 2020, and he was discharged to the ICF level of care. The patient was discharged to the EOP level of care on November 18, 2020 from the ICF; however, he was admitted to the MHCB on June 24, 2021 and discharged to the EOP level of care on July 4, 2021. He was most recently hospitalized for intermediate care from April 2022 to August 2022 due to danger to self; and he was placed at the EOP level of care since that discharge.

The patient reported one year of community psychiatric hospitalization for competency restoration in 2007 at Napa State Hospital, where he was provided with a diagnosis of schizoaffective disorder. While in the CDCR, he was provided diagnoses of antisocial personality disorder and major depressive disorder, recurrent, severe. He was placed in the ASU for safety reasons on August 9, 2022 at VSP; he was subsequently transferred to the ASU at RJD, and he arrived at the CSP/LAC EOP hub on November 29, 2022.

The initial CSP/LAC EOP hub IDTT meeting occurred timely on January 24, 2023; the meeting included the necessary participants, but the patient refused to attend. The problem list in the IDTT documentation listed opioid dependence, stimulant use disorder, and major depressive disorder, recurrent, severe. IPOCs for depressed mood and anxiety were initiated. The IPOC for depressed mood had very limited goals and no interventions, and the IPOC for anxiety contained adequate goals and interventions. The higher level of care section documented that the patient met higher LOC criterion for group and treatment non-adherence; this was an error as the patient was initially assigned to groups during that IDTT meeting. The goals in the higher level of care section were appropriate and individualized. The patient was included in the SRMP, as he reported a history of three previous suicide attempts. The EOP functional evaluation was completed adequately. The clinical summary was inadequate and was copied from the previous treatment plan.

The quarterly IDTT meeting occurred on April 18, 2023. The meeting included the necessary participants, but the patient again refused to attend. The IPOCs were tracked and updated appropriately in the treatment plan. The higher level of care section documented that the patient met higher LOC criterion for treatment refusal, as he refused to attend groups due to being a level two inmate on a level four yard, and he felt unsafe.

The patient attended all his PC and psychiatric individual sessions.  He was reportedly at his clinical baseline, attended to his ADLs and advocated for himself appropriately during most of his ASU stay.  He remained in the SRMP due to increased suicide risk due to his substance abuse history and the recent death of his parents due to COVID-19.  He had no self-injurious behaviors during the past year.  The treatment plan discharge criteria were generic and inadequate, and the clinical summary again was not updated.

Most PC contacts occurred in a confidential setting, and the patient consistently denied any mental health distress or concerns, nor did he exhibit signs of significant anxiety or distress.  His mood was consistently described as calm, and he was able to identify appropriate coping skills.  He was also medication adherent and was active and engaged in treatment.  Reading books was his primary coping mechanism.  His chronic suicide risk was assessed as high, and his acute risk was assessed as low.  The PC provided CBT interventions to help the patient to process his distress and symptoms.  He declined confidential appointments in mid-March 2023, but he continued to deny symptoms and was consistently described as stable during cell-front routine PC contacts.  He was seen for daily high refusal contacts beginning February 8, 2023 due to his refusal to attend groups.  These daily contacts occurred timely.  The PC progress notes were often repetitive and not significantly updated, and there was no mention in PC notes of the patient's reported safety concerns or discussion of his reasons for not attending groups.

The patient was seen timely for psychiatric contacts during the review period.  The initial psychiatric assessment occurred on December 5, 2022 upon arrival to the CSP/LAC EOP hub; however, he only remained there for approximately one week before transfer to the mainline EOP.  When he returned to the EOP hub on January 10, 2023, he was seen for another initial psychiatric assessment on January 18, 2023.  The assessment was completed appropriately, and the patient's medications were noted as Effexor, Remeron, and Vistaril ordered on an as-needed basis.  The patient reported benefit from medication treatment and reported no concerns with medication side effects.  The initial psychiatric assessment included a comprehensive history and assessment, and the psychiatrist provided diagnoses of depressive disorder, unspecified; antisocial personality disorder; opioid use disorder; and amphetamine use disorder.  He was seen for subsequent psychiatric contacts timely.  As the patient refused to attend confidential psychiatric sessions; he was seen at cell front by the psychiatrist.  He was described as stable, and his medications remained unchanged during his EOP hub stay.

**Findings**

The care and treatment provided to this EOP hub patient was adequate.

The IDTT meetings occurred timely and included the necessary participants, and the IPOCs were appropriate with measurable and individualized goals and specific interventions.  The IDTT documentation indicated that the patient informed the treatment team of his reasons for not attending groups, and the treatment team appeared to address this issue appropriately.  The treatment plans were deficient due to generic discharge criteria, and the clinical summary was inadequate as it was copied from the MHCB IDTT documentation prior to the patient's ASU arrival.  PC contacts generally occurred timely, and the patient was consistently described as

stable and coping well by reading in his cell. He consistently met IPOC goals, and the PC documented the use of CBT techniques and interventions. The PC appeared to provide adequate treatment to the patient; however, the documentation was inadequate as it was repetitive with much of the information copied unchanged in each progress note. The daily high refusal contacts occurred timely, but the documentation was repetitive and unchanged with each contact. Psychiatry treatment was adequate; the patient was seen timely, his medications were adjusted as indicated, and the progress notes were thorough and appropriate.

## Patient B

This 68-year-old patient's healthcare record was reviewed to evaluate the quality of mental health care provided at the CSP/LAC EOP hub where the patient was housed from December 12, 2022 to April 11, 2023. He had served several CDCR prison terms, and he entered the CDCR for his current term on August 18, 1999, to serve a life with the possibility of parole sentence.

He entered the MHSDS in 1999 at the 3CMS level of care and remained at that level of care until 2003. Since 2003, he primarily received mental health services at the EOP level of care. He also had several MHCB stays and one ICF hospitalization in 2020. He was most recently placed in the ASU on November 11, 2022 for safety concerns. His most recent MHCB admission occurred prior to his ASU placement from November 4 to November 11, 2022. He was discharged to the EOP level of care at KVSP and was subsequently transferred to the EOP hub at CSP/LAC. He had previously been provided diagnoses of major depressive disorder, PTSD, antisocial personality disorder, and narcissistic personality disorder. He was not prescribed psychotropic medications upon arrival to the EOP hub, but the documentation indicated that he repeatedly requested Wellbutrin.

The initial IDTT meeting occurred on December 20, 2022, and the meeting was timely with the necessary participants; however, the patient refused to attend. The IPOC section of the treatment plan was completely blank. The EOP functional evaluation and clinical summary were completed appropriately. The patient reportedly denied suicidal and homicidal ideation at the time of EOP hub placement.

The next IDTT meeting occurred on March 15, 2023, and the meeting was timely with the necessary participants including the patient who requested Wellbutrin at the meeting. The IPOC section was also not completed at this IDTT meeting. The patient did not report new symptoms, and he reportedly did not meet higher level of care referral criteria. The patient was pending transfer to SVSP; however, the transfer and discharge criteria section of the treatment plan was incomplete and inadequate, and the clinical summary was again not updated from the previous treatment plan. The case formulation was updated appropriately; as it noted that the patient was not experiencing acute symptoms of distress, severe or persistent mental illness, and that his clinical presentation was more consistent with a diagnosis of antisocial personality disorder.

The quality of PC contacts and treatment provided to the patient varied during the review period. The PC changed approximately halfway through the review period, and this change significantly affected the patient's treatment engagement. During the review period, the PC contacts generally occurred timely; however, during the transition to the new PC, a two-week delay occurred

between contacts.  At the initial PC assessment, the patient reportedly refused to answer most questions but requested Wellbutrin.  The initial assessment was generally adequate, and the EOP functional evaluation and clinical summary were utilized in the treatment plan.  The patient was assessed with high chronic and low acute suicide risk. He was provided diagnoses of adjustment disorder with depressed mood; major depressive disorder, recurrent with psychotic features; antisocial personality disorder; PTSD; and narcissistic personality disorder.  Notably, the patient's rapport with his first PC seemed to be severely disrupted during an individual session on December 27, 2022, when the PC was typing the progress note during the treatment session, and this reportedly upset the patient as he angrily terminated the session early.  No IPOC goals were identified in the progress notes.  Further, several subsequent PC progress notes indicated that the patient was medication adherent; however, he was not prescribed psychotropic medications.  He reportedly participated appropriately in groups but was not receptive to attempts by the PC for clinical contacts.  The patient was consistently described with irritability and frustration in his interactions with the PC, but he was also described as stable and not in any acute distress, with consistent denial of suicidal ideation.

The patient's treatment engagement improved significantly after the change in PC on February 24, 2023.  He reportedly vented his frustrations and built rapport with the new PC, but he also consistently requested Wellbutrin and reported depressive symptoms.  The PC documented the use of DBT and mindfulness skills to help the patient to process his frustration.  His mood reportedly improved during late March 2023, when he learned of his upcoming transfer to SVSP; he also sometimes chose to attend yard rather than groups.  The patient transferred to SVSP on April 11, 2023 when he was described as stable.  The high refusal contacts continued during the review period, and they occurred timely; however, the documentation of those contacts was inadequate.

The patient was seen for timely and appropriate psychiatric contacts during the review period.  The initial psychiatric assessment occurred timely in a confidential setting on December 16, 2022, when the patient reported severe depression and problems with eating and sleeping.   He also requested treatment with Wellbutrin, but the psychiatrist declined to prescribe Wellbutrin due to the patient's documented history of medication hoarding and taking an overdose of Wellbutrin.  The psychiatrist documented the patient's anger and noted that he left the appointment early.  At the next contact on December 30, 2022, the patient was seen at cell front, as he refused to attend his scheduled appointment.  The psychiatrist provided a diagnosis of major depressive disorder with psychotic features.  The patient was provided psychoeducation and offered alternative antidepressant or antipsychotic medications; however, he declined, and the psychiatrist did not prescribe medications for the patient.  During the review period, the patient continued to request Wellbutrin at his monthly psychiatric contacts.  At the final two contacts on February 24 and March 24, 2023, the patient reportedly refused to engage with the psychiatrist but was described as stable.

**Findings**

The care and treatment provided to this CSP/LAC EOP hub patient was inadequate.

Although the patient was not prescribed psychotropic medications, the psychiatrist recommended treatment with antidepressant and antipsychotic medications; however, the patient repeatedly declined those medications and focused on treatment with Wellbutrin. The IDTT documentation and treatment plans were inadequate for this patient. The patient was never provided IPOCs in the treatment plans or PC progress notes. The IDTT documentation and treatment plans contained contradictory information between the PC and the psychiatrist regarding whether the patient was prescribed medications. At the quarterly IDTT meeting, the clinical summary was not updated, and there was no transfer or discharge criteria provided in the treatment plan. The PC contacts improved significantly after the change in PC during late February 2023, and those contacts generally occurred timely. The PC progress notes, however, were inadequate. The high refusal contacts occurred timely but were not consistently documented appropriately.

**Patient C**

This 33-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at the CSP/LAC EOP hub, where the patient was housed from January 27, 2023 to February 16, 2023. The patient was deaf and a sign language interpreter was utilized for interactions with clinicians, including IDTT meetings and clinical contacts.

This patient entered the CDCR for his current prison term in 2017, serving a 16-year term. He received one RVR during the past year on January 8, 2023, which led to his ASU term. He entered the MHSDS at the 3CMS level of care on November 9, 2022, and his level of care was increased to EOP on January 25, 2023 after an MHCB admission on January 13, 2023. The patient had no history of suicidal attempts or self-injurious behavior in his self-reported history or the healthcare record. He was provided a diagnosis of unspecified anxiety disorder.

The initial IDTT meeting occurred timely on February 8, 2023, the meeting included the necessary participants including the patient. The patient reported that he was motivated to program and to discharge to the 3CMS level of care, and his goals were to decrease anxiety and to improve his coping skills. The treatment plan contained an IPOC for anxiety that included adequate goals; however, a treatment intervention was inadequate as it directed the patient to develop goals for himself. The patient reported increased anxiety with ASU adjustment, including having no books, writing materials, or a tablet to utilize as coping mechanisms. Discharge and transfer criteria included stabilization on medications, improvement in coping skills, and discharge in six to eight weeks after programming and goal achievement. The documentation also noted the patient's extensive history of stability and programming, as he only acquired two RVRs during the prior 10 years of incarceration. The EOP functional evaluation was completed appropriately, and the treatment plan contained an adequate clinical summary. The patient was discharged to the 3CMS level of care on May 11, 2023, and he transferred to SQ on May 16, 2023.

The initial PC assessment on January 30, 2023 occurred timely. The documentation indicated that the patient's level of care had increased to EOP after the MHCB discharge on January 25, 2023, but there was no clinical rationale provided for the level of care increase. The patient reported a history of ADHD, substance use and previous treatment with Abilify, Lexapro, Melatonin, and BuSpar. Although the clinical summary was complete, the EOP functional

evaluation was not completed in the initial PC assessment. The patient was seen timely for PC contacts during the review period, and all PC contacts occurred in a confidential setting with the assistance of a sign language interpreter. The patient was consistently described as calm and cooperative with a euthymic mood. He was reportedly medication adherent and was motivated for discharge to the 3CMS level of care. The patient was seen for high treatment refusal contacts beginning April 10, 2023. These contacts did not occur timely; however, the patient remained stable and denied any concerns. Notably, the patient was not seen for routine PC contact during the last three weeks of his EOP hub stay.

The patient was seen timely for psychiatric contacts while housed in the EOP hub. At the initial psychiatric contact on January 31, 2023, the patient's medications were documented as Lexapro and Vistaril, and the patient reported stability. The initial psychiatric assessment was adequate and comprehensive, and all psychiatric sessions occurred in a confidential setting. Lexapro was increased at the next psychiatric contact on March 2, 2023; at that time, the patient's mood was described as good, and he was clinically stable and future oriented. At the psychiatric contact on March 29, 2023, the patient reported that he wanted to discharge to the 3CMS level of care. The final EOP hub psychiatric contact occurred on April 26, 2023 when the patient was described as goal-oriented, future-focused, and ready for discharge to the 3CMS level of care and transfer to a level 2 facility.

## Findings

The care and treatment provided to this CSP/LAC EOP hub patient was adequate.

The patient was seen timely for IDTT meetings, and IPOCs targeted anxiety with appropriate goals provided. Relevant sections of the IDTT documentation and the treatment plan were completed appropriately, and the patient was discharged to the 3CMS level of care during his EOP hub stay. The PC contacts were also adequate and generally occurred timely, despite the patient not receiving a contact in the final three weeks prior to transfer. The PC provided appropriate support and interventions. The psychiatric contacts also occurred timely, and the psychiatrist appropriately documented the patient's mental status, presentation, and medication adherence.

## Patient D

This 53-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at the CSP/LAC EOP hub. He was serving a seven-year sentence with an earliest possible release date of March 2024. The patient was housed in the EOP hub from November 14, 2022 to May 12, 2023, after transfer from KVSP. This was his first CDCR prison term, and he arrived at the reception center at WSP during February 2020.

The patient was placed at the 3CMS level of care soon after arrival to the CDCR. His CDCR history was significant for four MHCB stays for self-injurious behavior or suicidal ideation. The first MHCB admission occurred on March 3, 2020, due to suicidal ideation, and the most recent stay occurred in February 2022 after cutting his wrists with a razor. The patient reportedly had a long history of mental health treatment in the community and in the CDCR, and his most recent

documented suicide attempt occurred in August 2021. His primary mental health concerns included issues of anger and depression.

The initial EOP hub IDTT meeting occurred on November 22, 2022, and the meeting included the necessary participants and the patient. The patient was reportedly argumentative about his RVR and medication history and denied psychotic symptoms including auditory hallucinations. The problem list in the treatment plan included bipolar disorder and anxiety. The treatment plan did not include IPOCs, and the recommended treatment interventions in the IPOC section were copied from the previous KVSP IDTT. The patient reported no new symptoms. The IDTT noted that the patient met the criteria for consideration of referral to a higher LOC due to multiple RVRs in the previous three months, however, the RVRs were determined to be not due to mental illness, and the patient had reportedly been stable since ASU arrival. The documentation indicated that the patient's borderline personality disorder and antisocial personality disorder contributed significantly to his interpersonal problems, and this section of the treatment plan provided for specific PC interventions of mindfulness and CBT, as well as behavioral modeling and reinforcement. The patient also met the criteria for consideration of referral to a higher LOC due to high treatment refusal, however, at the IDTT meeting, he reported a desire to program and to participate in groups and individual sessions. The patient reportedly had good ADLs, was medication adherent, and he denied acute symptoms. The discharge criteria were generic but appropriate, and the EOP functional evaluation was complete. The clinical summary was adequate.

The second quarterly IDTT meeting occurred on February 14, 2023, and the meeting included the necessary participants and the patient. The patient reported that his lack of treatment participation was due to medical problems, and he also asked about transfer to another facility. The treatment plan was deficient, as it continued to lack appropriate IPOCs; the only IPOC included was for anger, which was inadequate and overly general. The patient was described as "fairly med adherent," but it was also noted in the treatment refusal section that the patient was using the EOP level of care to meet his housing needs, was stable, and was not motivated to participate in treatment. The treatment team appropriately decided to return in 30 days to consider change to the 3CMS level of care due to lack of treatment participation and ongoing stability. Diagnoses of unspecified bipolar disorder, borderline personality disorder, antisocial personality disorder, and multiple substance use disorders were provided; and the patient was placed in the anger management group track despite his lack of attendance.

The next IDTT meeting occurred on March 22, 2022. The patient attended the meeting, but he left angrily when his level of care was reduced to the 3CMS level of care. The level of care reduction by the treatment team was appropriate. The treatment team noted that the patient had not participated in programming since October 28, 2022.

The initial PC assessment on November 15, 2022 occurred timely, but the patient declined to participate in the assessment. The PC documented treatment with Risperdal and Vistaril. The patient denied suicidal ideation. The clinical summary in the initial assessment was adequate and informed the IDTT, and relevant sections of the PC initial assessment were completed appropriately. The patient was seen timely for weekly contacts during the review period. At a PC contact on December 13, 2022, the patient told the PC that he no longer wanted to remain in

the EOP and wanted placement at the 3CMS level of care; he further stated that he would no longer attend his individual sessions. During the review period, PC progress notes indicated that the patient did not attend his individual contacts, and the PC consistently attempted to engage the patient at cell front in clinically relevant interventions and psychoeducation regarding the benefits of treatment adherence. The patient was described as stable during the review period and consistently declined to participate in groups and individual PC contacts. The PC attempted to provide interventions such as DBT skills training and mindfulness skills training when possible. The patient was seen for high treatment refusal contacts beginning January 4, 2023, which continued until his level of care was reduced on March 22, 2023. The documentation of the high treatment refusal contacts indicated that they did not occur timely. Additionally, those contacts and most PC progress notes were repeated with limited changes or updates with each subsequent note.

The patient was seen for timely psychiatric contacts during the review period. During the initial psychiatric contact on November 18, 2022, treatment with low dose Abilify was initiated, and Vistaril and Cymbalta were discontinued at patient's request. He was described as stable with a mildly depressed mood. At a subsequent contact approximately one month later, the patient requested discontinuation of Abilify and treatment with Risperdal and Effexor, with which the psychiatrist agreed. The patient reported impaired sleep but was otherwise stable, and he read in his cell as a coping strategy. The patient consistently denied any symptoms, including depression and anxiety or other acute concerns. His medications were adjusted appropriately over the course of the review period, with no difficulties reported.

**Findings**

The care and treatment to this EOP hub patient was adequate.

The patient was seen timely for IDTT meetings that included the necessary participants, and the treatment team provided specific interventions regarding treatment refusals and RVRs. The IPOC section in the treatment plan was inadequate, however, the PC provided appropriate interventions during individual sessions, and the patient was appropriately placed at the 3CMS level of care due to stability and lack of interest in programming. The PC contacts were adequate, although high treatment refusal contacts did not occur timely, and the documentation of those contacts was inadequate. Routine PC contacts occurred timely, and the PC made consistent attempts to engage the patient in therapeutic interventions. The psychiatric contacts also occurred timely and were adequate.

**Patient E**

This 26-year-old patient's healthcare record was reviewed to evaluate the quality of mental health treatment provided at the CSP/LAC EOP hub. The patient was housed at the EOP hub during the review period from December 22, 2022 to March 9, 2023. He arrived at CDCR in March 2022 for his first term with a sentence of life with the possibility of parole. He was initially housed in general population, and he entered the MHSDS on July 13, 2022, when he was admitted to the MHCB due to danger to self. He remained in the MHCB from July 13 to July 21, 2022 with discharge to the EOP level of care at the CSP/ LAC mainline EOP.

The patient demonstrated poor adjustment to prison and was classified as DD2 with significant cognitive impairment and concrete thinking.  The documentation indicated that the patient was likely prone to victimization due to his DD2 status, small stature, newness to prison, and his young age.  He had no history of suicidal ideation or self-injurious behaviors in the community.  At the time of EOP hub placement, he was provided diagnoses of psychotic disorder, substance use disorder, adjustment disorder, and cognitive impairment.

The initial IDTT meeting occurred on January 3, 2023, and the meeting included the necessary participants.  The problem list identified ADHD, schizophrenia, anxiety, and adjustment disorder as mental health concerns.  The treatment plan contained one IPOC for self-harm.  The goals were generalized but appropriate given the patient's recent MHCB admission and self-injurious behaviors.  The patient did not report any new symptoms, and his stated goal was discharge to the 3CMS level of care.  The clinical summary and functional evaluations were completed appropriately and provided relevant clinical information informing treatment.  This initial IDTT meeting was the only IDTT meeting that occurred prior to release to the mainline EOP on March 9, 2023.

The initial and routine PC contacts during the review period generally occurred timely, and most occurred in a confidential setting.  At the initial PC assessment on December 27, 2022, the patient requested change to the 3CMS level of care, and he could not identify any specific treatment goals to work on.  The patient reported that he did not need treatment.  The clinical summary in the initial assessment was copied from prior assessments, and there was no mention of the recent MHCB admission in the presenting problem section of the assessment.  The other sections of the initial assessment were completed appropriately and were adequate.  The patient was consistently described as stable, without suicidal ideation or acute symptoms of distress.  The January 17, 2023 PC note indicated that the session occurred in a confidential setting and that placement at the 3CMS level of care would be considered in 30 days if the patient remained stable.

As the patient did not attend his groups, he was seen for high treatment refusal contacts that began on January 30, 2023.  He continued to demonstrate stability, and the IPOCs were tracked appropriately in the PC progress notes.  At the January 31, 2023, PC contact, the patient had achieved the self-harm IPOC goals.  The PC progress notes indicated that the patient did not demonstrate increased symptoms after medication discontinuation in mid-February 2023.  The PC progress notes were inadequate as significant portions of the notes were copied from previous notes with little update provided.  Further, the high treatment refusal contacts did not occur timely and were not well documented.

The patient was seen timely for the initial and routine psychiatric contacts during the review period.  The initial psychiatric assessment occurred on December 30, 2022, and the evaluation occurred at cell front, as the patient did not show for his scheduled appointment.  He was prescribed Zyprexa, Strattera, and Vistaril on an as-needed basis.  He was seen by the psychiatrist approximately two weeks later on January 13, 2023.  He was provided diagnoses of adjustment disorder and psychotic disorder, and the patient reported good mood and no stressors at that time.  At the next psychiatric contact on February 10, 2023, the patient requested

discontinuation of Zyprexa, and Zyprexa and Vistaril were discontinued at that appointment. The patient was not prescribed any psychotropic medications for the remainder of his EOP hub stay. The final psychiatric contact occurred on March 7, 2023 at cell front, as the patient declined to meet in a confidential setting. The patient was described as stable without prescribed psychotropic medications and no reported increase or development of mental health symptoms.

**Findings**

The care and treatment provided to this EOP hub patient was adequate.

The IDTT meetings occurred timely with the necessary participants in attendance. The stated treatment goal was appropriate; and although the IPOC was generalized and not individualized, it was appropriate given the patient's recent MHCB admission and self-injurious behaviors. The treatment plan was completed appropriately and was informed by the PC initial assessment. The initial and routine PC contacts occurred timely, and they occurred in a confidential setting until just prior to release from the EOP hub, when the patient refused to attend confidential sessions but engaged at cell front with the PC. The PC tracked the IPOCs appropriately, and the patient achieved his treatment goals during the review period. The PC progress notes were inadequate, as they were repetitive and contained significant amounts of historical information with little update provided. The high treatment refusal contacts did not occur timely and were not well documented. The psychiatric treatment provided was adequate with timely and comprehensive initial and routine psychiatric contacts. The patient consistently demonstrated positive response to treatment and was able to discontinue all psychotropic medications and to remain stable during the EOP hub stay.

**Patient F**

This 35-year-old patient's healthcare record was reviewed to evaluate the mental healthcare and treatment provided at the CSP/LAC STRH. The patient was housed in the STRH from November 28, 2022, to March 10, 2023, after he was transferred to the STRH from the RJD ASU. This was the patient's first CDCR term, and he arrived at CDCR for this term in September 2011 to serve a 16-year sentence. He was placed in the RJD ASU on September 2, 2022, due to safety concerns as he was the victim of a battery. His CDCR mental health history was significant for several placements at the 3CMS level of care and no history of MHCB, EOP, or PIP placements or admissions; he remained in the 3CMS program since November 2021.

Only one IDTT meeting occurred during the review period on December 14, 2022; this initial IDTT meeting occurred three days late, and the meeting included the required participants and the patient. No mental health concerns were identified in the problem list, and the treatment plan provided one IPOC for depressed mood which contained generalized goals and inadequate interventions. The patient reported no new symptoms and was not a participant in the SRMP. The clinical summary was adequate, described the patient's mood as euthymic, and reported that the patient was cooperative with his PC for the initial assessment.

The initial PC assessment occurred timely on December 10, 2022, and the patient was described as stable and in no distress. His provided diagnosis was major depressive disorder, recurrent,

severe; and although he had no medication prescribed upon his STRH arrival, he was historically prescribed Vistaril and Remeron to address his depressive symptoms. The initial assessment stated that the patient essentially refused to engage with the PC for the assessment; this statement contradicted the clinical summary statement in the treatment plan that the patient was cooperative.

The STRH PC contacts did not occur timely, and the patient refused to attend confidential individual PC sessions after the IDTT meeting. During the patient's stay in the STRH, he denied mental health concerns; his presentation was described as stable, although he often declined to engage with the PC.

One psychiatric contact occurred during his STRH stay; this initial psychiatric assessment occurred on December 13, 2022. The patient was described as uncooperative and refused to answer the psychiatrist's questions. He was not prescribed medications, was noted as stable, and was provided a diagnosis of major depressive disorder, recurrent, severe. The initial assessment was adequate and well-documented. The documentation indicated that the patient did not request or receive any psychiatric follow-up contacts during the remainder of his STRH stay.

The patient was not offered weekly 90-minute therapeutic groups during his STRH stay. He was offered a total of four groups between his placement on November 28, 2022, and when he transferred from the STRH on March 10, 2023; he did not attend any of the offered groups.

**Findings**

The care and treatment provided to this CSP/LAC STRH patient was inadequate.

The initial IDTT meeting did not occur timely, goals and interventions were generalized and not specific, and the clinical summary contradicted the PC notes in the initial assessment regarding the patient's cooperation with the initial assessment. The PC contacts also did not occur timely; there was no documentation that the patient was provided with in-cell activities, and he was not offered weekly groups as required. Although the patient remained stable during the STRH stay, he did not receive timely clinical contacts or individualized treatment.

**Patient G**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CSP/LAC STRH. The patient was housed in the STRH from November 23, 2022, to March 27, 2023, after transfer from the KVSP ASU. He entered CDCR for his current term in 2012 with the release date of June 27, 2045. The patient was in general population until May 2020, when he was admitted to the MHCB due to danger to self as he had suicidal ideation with a plan, and he discharged to the 3CMS level of care on May 28, 2020. The patient had no other MHCB admissions or higher level of care referrals. He also had no documented history of self-injurious behavior or suicide attempts; although, the patient reported one attempted suicide by overdose in November 2019. The patient transferred from the CSP/LAC STRH to the CSP/Corcoran LTRH for a 48-month SHU term on March 27, 2023.

One IDTT meeting occurred during the STRH stay; this initial IDTT meeting occurred on December 21, 2022, approximately one month late. The IDTT meeting included the necessary participants, but the patient refused to attend and did not contribute to his treatment plan. No IPOCs or treatment goals were in the treatment plan, but the patient was reportedly medication adherent with prescribed Remeron. The treatment team retained the patient at the 3CMS level of care to work on mood stability and to continue medication treatment. The clinical summary in the treatment plan was complete and adequately documented.

An initial psychiatric contact occurred timely on December 9, 2022; the patient reported normal mood and denied any symptoms or concerns in STRH adjustment. The psychiatrist provided a diagnosis of major depressive disorder, recurrent, in full remission, and the medications were maintained. The patient did not have any psychiatric contact in January 2022 or February 2022. He was seen for a routine psychiatric contact on March 6, 2023, when he reportedly refused to answer most of the psychiatrist's questions but was described as stable, and no medication changes occurred.

The initial PC assessment occurred timely on November 29, 2022. During that assessment, the patient was described as stable, and he responded to questions about his programming and group attendance. He exhibited an appropriate sense of humor, reportedly interacted well with his peers, and was engaged in the treatment session. The initial PC assessment was completed adequately, and the documentation provided relevant clinical information. The patient was not seen for PC clinical contact during January 2023. The PC note documentation indicated the patient was never provided with IPOCs or specific goals for treatment during his STRH stay.

The patient was offered seven groups during the review period. He was not offered any groups in January 2023 or the first week of February 2023.

**Findings**

The care and treatment provided to this CSP/LAC STRH patient was inadequate.

The initial and only IDTT meeting did not occur timely, did not contain any IPOCs or treatment goals, and did not specify any treatment interventions for the patient. Although he was seen for a timely initial psychiatric assessment, routine psychiatric contacts did not occur every 30 days as required. The PC contacts also did not occur timely, and the patient was never provided treatment goals or a specific treatment plan to maintain his stability or to improve his functioning. He was not offered weekly groups as required.

**Patient H**

This 39-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CSP/LAC STRH. The patient was serving a six-year term with the earliest possible release date of November 16, 2023, and he had served several CDCR prison terms. The patient intermittently received mental health services at the 3CMS and MHCB levels of care. He transferred to CSP/LAC STRH from the Calipatria State Prison (Calipatria) ASU. The PC assessment at Calipatria noted that the patient demonstrated manic

symptoms, and he requested resumption of medication treatment. He reported depression and auditory hallucinations, and Trileptal was prescribed.

The initial IDTT meeting occurred one day late on December 7, 2022; the meeting included the necessary participants and the patient. The problem list included psychosis and "adjustment disorder mixed." No IPOCs were included in the treatment plan, and the patient reportedly demonstrated exaggerated psychotic symptoms to affect his level of care. The treatment team noted that the patient demonstrated normal mental status, and there was no acute distress reported or demonstrated.

The initial psychiatric assessment occurred on December 2, 2022, and the assessment occurred at the cell front, as the patient declined to leave his cell for a confidential session. The patient reported a depressed and anxious mood and was reluctant to answer the psychiatrist's questions or to fully participate in the assessment; he was prescribed Abilify at this initial assessment. A psychiatric progress note on February 27, 2023, documented a diagnosis of adjustment disorder with mixed anxiety and depressed mood, and the psychiatrist discontinued Abilify and initiated Geodon to address an increase in psychotic symptoms.

The initial PC assessment occurred timely on November 29, 2022. The initial assessment was inadequate, and many sections of the PC initial assessment document were not completed. The presenting problem, social history, medication history, clinical summary, and current diagnoses sections were completed; however, the remainder of the initial assessment document was blank. The patient was not seen for timely weekly PC contacts during the review period, as between eight to 31 days lapsed between PC contacts. The patient consistently declined individual confidential PC sessions, and the PC did not document any symptoms that impacted his functioning despite a reported increase in auditory hallucinations in March 2023.

**Findings**

The care and treatment provided to this CSP/LAC STRH patient was inadequate.

No treatment goals or interventions were provided in the treatment plan. He was not seen for timely PC contacts during the review period with several significant delays between contacts. The psychiatric contacts did not occur timely, and he was not seen for psychiatric contact between December 2, 2022, and February 27, 2023, despite being prescribed antipsychotic medications. When the patient did see the psychiatrist after almost one month's delay beyond specified timelines, the patient reported auditory hallucinations and required a change in medication to address his symptoms.

**Patient I**

This 45-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CSP/LAC STRH. The patient was housed in the STRH from December 9, 2022, to May 31, 2023, when his level of care was increased to the EOP. The patient was serving a sentence of life with the possibility of parole. He re-entered the CDCR for his current term on June 22, 2017, and was placed at the 3CMS level of care upon his arrival.

He had a long history of MHSDS services and had received treatment at the 3CMS, EOP, and MHCB levels of care; this included three MHCB admissions due to danger to self. More recently, the patient remained stable at the 3CMS level of care and since his return for his current incarceration had earned his GED and started a college course.

The initial IDTT meeting at the STRH occurred two weeks late on January 4, 2023; the necessary participants were in attendance, and the patient attended. No IPOCs were included in the treatment plan, and the patient did not identify any treatment goals. The patient was reportedly medication adherent with no medication side effects, reported no symptoms impacting his functioning, and there were no problematic reports from custody or nursing staff. The clinical summary in the treatment plan was completed appropriately, and the patient agreed to work on in-cell therapeutic packets while in the STRH.

The next IDTT meeting occurred on May 31, 2023; the necessary participants were in attendance, and the patient attended. The meeting did not occur timely, and the purpose of the IDTT meeting was to refer the patient to the EOP level of care after the treatment team noted that the patient had daily conflicts with staff, was not medication adherent, demonstrated hypomanic symptoms and labile mood, and had three MHCB admissions in the previous six months. The healthcare documentation did not include information indicating that the patient had three MHCB admissions in the previous six months or evidence of severe symptoms or decompensation necessitating referral to a higher level of care.

The initial psychiatric assessment occurred on December 23, 2022. The psychiatrist provided a diagnosis of bipolar II disorder and prescribed Depakote and Vistaril. The patient reported a history of auditory hallucinations and noted that his depression and anxiety had worsened; however, he demonstrated an incongruent affect when reporting these symptoms. The subsequent routine psychiatric contact occurred on March 15, 2023, approximately two months late, and the patient continued to report high levels of depression and anxiety.

The patient was placed in alternative housing from March 24, 2023, to March 25, 2023, after reporting suicidal ideation. An initial psychiatric assessment was completed upon return from alternative housing on March 28, 2023, which did not provide any substantive update.

At the final psychiatric contact of the review period on May 26, 2023, the patient reported worsened mood, and the psychiatrist questioned his medication adherence. Although this was noted as a psychiatric progress note, the patient was not actually seen by the psychiatrist who quoted a report from the psychiatric technician.

The PC contacts occurred inconsistently. The initial PC assessment occurred on December 20, 2022, and was thorough and completed appropriately. The patient was not seen for another PC contact until February 9, 2023, which was his first routine PC contact in the STRH. The documentation of that contact was inadequate and did not provide substantive clinical information. Subsequent contacts in February 2023 by the same PC were also inadequate, and the documentation was copied unchanged for those contacts. After the patient returned from alternative housing to the STRH on March 25, 2023, a safety plan was provided that was adequate and appropriate. He was seen timely for PC contacts during May 2023 when he was

assigned a new PC. The progress notes from this PC were consistent and noted the development of appropriate rapport with the PC; the notes also documented the patient's engagement in therapy to address his emotional control and to process childhood trauma.

**Findings**

The overall care and treatment provided to this CSP/LAC STRH patient was inadequate.

The initial IDTT meeting did not occur timely and did not provide any treatment goals or interventions for the patient. The psychiatry contacts also did not occur timely; and in several instances, it appeared that the psychiatrist relied upon secondhand reports from other clinical staff without consulting with the patient when considering changes in treatment. For example, in the progress notes the psychiatrist reported that the patient's medications were only partially effective, but there was no documentation that a medication change was discussed with the patient on March 15, 2023. The PC contacts were also inadequate, as they did not occur timely, and most progress notes were copied unchanged from prior contacts. The patient demonstrated better treatment engagement after a change in his PC in May 2023.

It was unclear why the patient was referred to the EOP level of care, as the progress notes documented that the PC and psychiatrist consistently described the patient as stable and generally adherent with programming.

**Patient J**

This 22-year-old patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment provided at the CSP/LAC STRH. The patient was admitted to the STRH on December 22, 2022, from WSP. He arrived at CDCR on June 28, 2021, for his first incarceration to serve a life sentence. The patient received treatment at the 3CMS level of care for most of his incarceration, and he had no higher level of care referrals, self-injurious behaviors, or suicide attempts in the CDCR. He experienced depressive symptoms due to his long sentence and adjustment to prison.

One IDTT meeting occurred during the review period on January 4, 2023. This initial IDTT meeting occurred timely with the necessary staff in attendance, and the patient attended and participated in the development of the treatment plan. The treatment plan contained an IPOC for depressed mood, but the IPOC contained generic goals and a vague and inappropriate intervention to help the patient "set goals." The patient did not identify any new goals for treatment, and the treatment team noted that the patient primarily remained in the 3CMS program for medication management. The treatment plan was adequate and addressed the patient's clinical presentation.

The initial psychiatric assessment occurred on January 3, 2023, and it was timely and well documented. The psychiatrist reported that the patient was generally uncooperative with the assessment but was calm and stable in their interactions. He denied suicidal and homicidal ideation and acknowledged medication adherence, but refused to answer questions regarding symptoms or his background. The next psychiatric contact was a consult note on March 2, 2023;

when the psychiatrist discontinued Remeron, as a cell search found several doses of the medication, and the patient had normal sleep without the medication.

The initial PC assessment occurred timely on December 27, 2022; the patient refused to leave his cell for a confidential setting, so the assessment was conducted at the cell front. He was described as stable and declined in-cell activities that were offered. The mental status sections of the initial assessment were not completed, but the clinical summary and presenting problem sections were adequately completed. The overall initial assessment was adequate given the patient's short CDCR history and his lack of participation in the assessment. The next PC contact also occurred cell front on January 19, 2023, when the patient was described as stable and was provided an anger management packet to work on in his cell. He was seen timely for PC contacts during February 2023 with medication adherence; however, the documentation was copied from prior assessments. The patient was released from the STRH to the general population on March 9, 2023.

The patient was offered three groups during the review period on January 5, 2023, February 16, 2023, and March 2, 2023. He attended one of three groups, and the frequency of group offerings was inadequate and inconsistent with requirements.

**Findings**

The overall care and treatment provided to this CSP/LAC STRH patient was inadequate.

Although the initial IDTT meeting was timely and adequate, clinical contacts during the remainder of the review period were often not timely and were poorly documented. The patient was only seen for two psychiatry contacts during the review period which was inconsistent with requirements. The initial PC assessment occurred timely, but the patient was not seen for the subsequent routine PC contact until approximately three weeks later. Although the patient was seen timely for PC contacts during February 2023, progress notes for those contacts were inadequate and were copied and unchanged from previous contacts. The patient was only offered three groups during the review period rather than the weekly groups required.

**Patient K**

This 40-year-old patient transferred to CSP/LAC in March 2022. His healthcare record was randomly selected for review to assess the adequacy of care provided.

The annual IDTT meeting that was due in April 2023 was four months late at the time of the monitoring visit. The IPOC that was established during the initial IDTT meeting in April 2022 targeted depressed mood. No primary clinician contacts were documented since August 2022.

Psychiatric contacts that were conducted by a psychiatric nurse practitioner or a psychiatrist did not occur timely, as the contact frequency ranged from two weeks to three months during the review period. The documentation of those contacts was thorough and described the patient as stable with some mood lability. Although he was a participant in the ISUDT, he endorsed continued substance use that was confirmed by positive urine drug screens. He was provided

diagnoses of mood disorder, ADHD, and substance use disorder as well as an additional diagnosis of adjustment disorder with depressed mood.

**Findings**

The care provided to this patient was inadequate.

The PC contacts were virtually nonexistent, and he had not been seen since August 2022; consequently, the primary treatment for the past year was medication management. The IDTT meeting, which was necessary to improve coordination of care and diagnostic clarification, was also significantly delayed.

**Patient L**

This 60-year-old patient transferred to CSP/LAC on December 22, 2022. He was diagnosed with unspecified depressive disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected for review to assess the adequacy of care provided.

The initial PC assessment and initial IDTT meeting occurred on January 12, 2023; they were not timely. An IPOC for depression was established without clinical justification. Relatedly, the documentation indicated that the patient was receiving mental health services at the 3CMS level of care, but treatment needs were not clearly identified in treatment planning.

The initial psychiatric assessment, which was comprehensive, occurred almost one month after the initial IDTT meeting. During the psychiatric assessment, the patient reported elevated anxiety and depression, but his clinical presentation was not consistent with his self-report. Regardless, this information was not communicated to the primary clinician for follow-up.

There were no documented mental health contacts since the initial psychiatric assessment on February 8, 2023.

**Findings**

The care provided to this patient was inadequate.

The initial and routine contacts did not occur timely, and this omission was further aggravated by the poor quality of treatment documentation. The initial PC assessment lacked sufficient clinical information for treatment planning, and the psychiatrist did not communicate pertinent clinical information to the PC which highlighted the lack of treatment team collaboration. Further, the patient, who was assessed as in need of mental health services, did not receive a mental status assessment or mental health treatment during the eight months since transfer to CSP/LAC. The quality of care provided was poor.

**Patient M**

This 68-year-old patient transferred to CSP/LAC in 2019. He was provided diagnoses of major depressive disorder with psychotic features and unspecified depressive disorder. His healthcare record was randomly selected for review to assess the adequacy of care provided.

The patient had not been prescribed psychotropic medication since 2021, when medications were discontinued at the patient's request. During a routine psychiatric follow-up contact on July 5, 2023, he was reportedly stable.

The most recent PC contact occurred in September 2022, almost one year prior.

**Findings**

The care provided to this patient was inadequate.

Although the patient was deemed in need of mental health services during the prior IDTT meeting, he was not seen for PC contact in almost one year. Additionally, diagnostic clarification was needed.

**Patient N**

This 32-year-old patient transferred to CSP/LAC in February 2021. He was provided a diagnosis of anxiety disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected for review to assess the adequacy of care provided.

The patient submitted multiple requests over a more than a six month timeframe to see mental health between late December 2022 and June 7, 2023. Specifically, on December 28, 2022, he submitted a request asking to see his PC "ASAP." There was no information documented regarding how the request was triaged and, despite an indication that the request was emergent, he was not seen until January 4, 2023. During that January contact, the stressors referenced in the request were not clearly addressed.

Three months later, the patient submitted five requests between March and June 7, 2023 to be seen by mental health, but he was not seen until June 19, 2023. During that mental health contact, he reported that his issues had resolved but also reported intermittent depression. The documentation indicated that issues were discussed and problem solving was utilized.

At the time of the healthcare record review, the last IDTT occurred almost one year and a half prior in March 2022.

**Findings**

The care provided to this patient was inadequate.

There were significant access to care delays despite the patient making repeated requests for mental health intervention. Treatment planning was long overdue, and diagnostic clarification was needed given the patient's report of depression; however, a diagnosis of anxiety was provided by the PC.

**Patient O**

This 70-year-old patient transferred to CSP/LAC in 2018. He was provided diagnoses of schizophrenia, in remission; unspecified depressive disorder; and unspecified schizophrenia spectrum and other psychotic disorder. He had a long history of substance abuse. At the time of the review, he was prescribed Abilify. He was also noted with cognitive impairment and prescribed Aricept by medical staff. His healthcare record was randomly selected for review to assess the adequacy of care provided.

During November 2022, Abilify was discontinued due to the absence of psychotic symptoms coupled with concerning medication side effects. Between that time and April 2023, the patient was not seen for a psychiatric or PC contact. This lack of monitoring did not support his IPOC for decrease in functioning which indicated the need for regular and consistent monitoring.

On April 12, 2023, the patient was placed in alternative housing overnight after making a suicidal statement. The SRASHE conducted on the following day noted that the patient reported tactile and visual hallucinations which were attributed to substance use. He endorsed suicidal ideation with a plan to cut his neck but was assessed as future-oriented and motivated to receive psychotropic medication. The clinician assessed him appropriate for the EOP level of care, and he was released from alternative housing.

Following alternative housing release, the patient was seen for five-day follow-up contacts as required. During that time, he again requested to resume psychotropic medications. Two days later, on April 17, 2023, he submitted a request to see the psychiatrist due to auditory hallucinations; however, the patient was not seen for psychiatric contact until May 1, 2023 when he reported that he was "doing terrible," and he exhibited delusional thinking, hallucinations, religious preoccupation, and elevated anxiety. An antipsychotic medication was initiated, and the patient had marked improvement that was noted at the psychiatric follow-up contact one month later.

The only PC contact since July 2022 occurred in July 2023, and this contact appeared to be a brief wellness check-in.

Although the patient had cognitive deficits requiring treatment with Aricept, there was no documentation of coordinated care between medical or mental health clinicians or evidence that mental health clinicians were aware of his cognitive decline.

**Findings**

The care provided to this patient was significantly inadequate.

Necessary psychiatric follow-up did not occur after the antipsychotic medication was discontinued. In fact, there was no documentation of PC or psychiatric assessment or contact for several months; in the interim, the patient decompensated which could possibly have been prevented by timely assessment and treatment. After his decompensation was identified, there were again delays in psychiatric assessment and failure to refer the patient to a higher level of care. The appropriate care for this patient required coordinated, multidisciplinary treatment given his cognitive impairment, history of substance use, and mental illness. Diagnostic clarification was indicated.

**Patient P**

This 23-year-old patient's healthcare record was randomly selected for review to assess the adequacy of care provided.

Multiple diagnoses were present in the healthcare record that warranted clarification, including antisocial personality disorder, borderline personality disorder, adjustment disorder, depression, and substance use disorder.

The patient transferred to the CSP/LAC EOP from an MHCB in April 2023. During his routine IDTT meeting in July 2023, his level of care was lowered to 3CMS. The provider initial assessments did not include information regarding the patient's current mental health needs, and the initial PC assessment did not include relevant history that occurred from the MHCB discharge in April 2023 to the time that the patient was placed in the 3CMS program in July 2023.

The IDTT documentation appropriately addressed a recent alternative housing placement that was attributed to suicidal ideation. In contrast, the SRASHE attributed the alternative housing placement to a possible overdose. Regardless of the precipitating event, IPOCs for self-harm were indicated but not developed. Further, three MHCB placements since January 2023, a pattern of self-injurious behavior, and recent EOP discharge were not appropriately discussed in the context of the patient's ability to manage at the 3CMS level of care. Instead, an IPOC for anger, which was not discussed with the patient, was implemented. The IDTT discussion of a possible organic etiology to the patient's clinical presentation was also not included in the IDTT documentation.

**Findings**

The care provided to this patient was inadequate.

The provider assessments failed to fully address the patient's complex clinical presentation and treatment needs, including the appropriate consideration of referral to a HLOC. A safety plan was not completed, although clinically indicated. Diagnostic clarification was also needed.

**Patient Q**

This 32-year-old 3CMS patient transferred to CSP/LAC in 2021.  He was provided diagnoses of major depressive disorder, psychoactive substance use disorder, and substance misuse disorder. His healthcare record was randomly selected for review to assess the adequacy of care provided. The patient received mental health services at the 3CMS level of care long-term and was briefly placed in the STRH in July 2023 before returning to general population.

The most recent PC contact occurred almost one year prior in October 2022.  An initial PC assessment was completed after return to general population from the STRH; however, it did not include relevant clinical information regarding his recent mental status or functioning.

In May 2023, after one year without psychotropic medication treatment, the patient requested to resume psychotropic medication due to increased anxiety and depression.  Remeron and Vistaril were prescribed; however, the initial psychiatric assessment after return to the mainline 3CMS program did not include information relevant for a comprehensive evaluation.

During the August 17, 2023 IDTT meeting, an IPOC for depressed mood that was implemented in 2021 was continued without change, despite lack of discussion of depressive symptoms in the initial assessments.  An IPOC for anger was not considered despite his discussion of anger concerns, and an IPOC for discharge planning was not considered despite possible prison release in approximately two months.

**Findings**

The care provided to this patient was inadequate.

The patient did not receive any mental health treatment from the PC during the review period. Provider initial assessments, which are necessary to develop and inform individualized treatment planning, were insufficient.  The treatment planning lacked update, individualization, and patient and psychiatric input.

**Patient R**

This 56-year-old patient transferred to CSP/LAC in October 2022.  He was provided diagnoses of major depressive disorder and antisocial personality disorder.  He was not prescribed psychotropic medications.  His healthcare record was randomly selected for review to assess the adequacy of care provided.

The November 2022 initial treatment plan was incomplete at the time of the record review in August 2023.  An IPOC for depressed mood was established but not addressed during the only primary clinician contact that occurred during the review period in May 2023; this PC contact occurred after multiple mental health requests were submitted between December 2022 and March 2023, despite one request that stated "Requesting mental health A.S.A.P."  The documentation of the sole mental health contact was not representative of a meaningful therapeutic contact and was minimally useful for continuity of care.

**Findings**

The care provided to this patient was inadequate.

The patient did not receive basic mental health care. In addition to multiple prolonged access to care delays, when the patient was ultimately scheduled to see a PC, the documentation of that contact was insufficient for continuity of care or indicative of a meaningful therapeutic interaction.

**Patient S**

This 30-year-old patient transferred to CSP/LAC in April 2022. He was prescribed multiple psychotropic medications including Prolixin, BuSpar, Zyprexa, Remeron, and Cogentin. His healthcare record was randomly selected for review to assess the adequacy of care provided.

The patient was seen at the cell front for several psychiatric assessments, as he refused to attend confidential sessions. The documentation of those contacts was succinct but addressed medication concerns, and medication adjustments occurred as needed. The routine primary clinician contacts also frequently occurred at the cell front due to patient refusals, and these contacts were representative of brief wellness check-ins.

The IDTT documentation indicated that the sole IPOC for treatment nonadherence that was developed in July 2022 was continued. The IPOC was appropriate given the patient's continued pattern of treatment nonadherence; however, the goals and interventions were not updated during quarterly IDTT meetings. Further, when queried by the PC of the reason for his treatment refusals, the patient provided reasons such as sleeping, watching a movie, and not being released from his cell by custody staff, and those excuses were accepted without assessment of the underlying contributing factors. An IPOC for anxiety was indicated based on psychiatric medication treatment, but this issue was not addressed. Relatedly, symptoms of depression, sadness, hopelessness, irritability, and hypersomnia that were included in the June 2023 IDTT documentation were also not targeted.

The diagnoses in the healthcare record included amphetamine-induced psychotic disorder, psychosis, schizoaffective disorder, and unspecified depressive disorder; diagnostic clarification was needed. Conversely, the IDTT documentation attributed the patient's symptoms to PTSD.

**Findings**

The care provided to this patient was inadequate.

For most of the mental health contacts, providers did not complete a sufficient assessment of the patient's mental health status given the cell-front nature of the contacts. There was an overreliance on his self-report regarding missed appointments without therapeutic discussion. His treatment needs, especially barriers to treatment, were not appropriately explored and addressed by treatment team members, and multidisciplinary collaboration was needed. Given

the extent of his refusals, the documentation required specific collateral consultation, such as from custody staff, regarding the patient's daily functioning, rather than a statement regarding an absence of bizarre or concerning behavior. Lastly, diagnostic clarification with clinical rationale and provider agreement was needed.

**Patient T**

This 61-year-old DD2 patient was provided a diagnosis of schizoaffective disorder, bipolar type. He was on modified programming, and he was prescribed Zyprexa and Lithium and received his psychotropic medications by a PC 2602 order. His healthcare record was randomly selected for review to assess the adequacy of care provided.

The treatment planning documentation did not provide sufficient information regarding the patient's functioning between monthly IDTT meetings or the status toward goal achievement. The sole IPOC for grave disability, initiated in July 2022, was continued despite apparent achievement. He was identified as a high treatment refuser, primarily due to poor group attendance which he attributed to medical issues.

Except for June 2023, psychiatric contacts occurred monthly during the review period. The documentation of those contacts included a brief statement that addressed medication side effects and efficacy, MAR review, safety concerns, and overall functioning. Much of the psychiatric documentation included documentation of previous monthly contacts, making it difficult to determine the patient's current status. Of note, the patient missed PC 2602 prescribed medications on January 22, 2023, but was not seen by the psychiatrist for the critical noncompliance alert until February 6, 2023. The documentation indicated that a referral was made to the supervisory staff; however, the missed doses were not discussed with the patient.

Individual PC contact documentation was clinically useful and thorough, and noted that the patient was invested in treatment. A new PC was assigned in July 2023 who utilized various cognitive behavioral therapy interventions to assist in the management of symptoms.

**Findings**

The care provided to this patient was marginally adequate.

His treatment needs were not sufficiently addressed in treatment planning, and the psychiatric documentation was not sufficiently updated; the appropriate update of information was important for continuity of care. The delayed psychiatric contact after the missed PC 2602 medication was an area of concern. In contrast, the routine care provided by the PC was individualized and clinically appropriate for the patient's treatment needs.

**Patient U**

This 62-year-old DD1 patient transferred to CSP/LAC in 2017. He was provided a diagnosis of schizoaffective disorder, depressed type. The patient had not been prescribed psychotropic medication for over one year due to refusal to allow laboratory testing. His healthcare record

was selected for review to assess the adequacy of care provided as his IDTT meeting was observed during the monitoring visit.

The patient arrived for his IDTT meeting but immediately left, and there was no attempt to encourage him to remain for the meeting. The IDTT discussion indicated that the patient had a long history of treatment refusals. An IPOC established in 2019 for negative symptoms was continued, and the goal was for the patient to leave his cell for programming. The information provided regarding his functioning since the previous IDTT meeting was limited, and information that was copied from previous IDTT documentation was undated and therefore had minimal clinical utility.

The psychiatric follow-up contacts were inadequate. In addition to a lapse between February and May 2023 monthly contacts, at the end of July 2023, the documentation indicated that the patient would be rescheduled in one week; however, as of the end of August 2023, there was no documented follow-up. Further, when psychiatric contacts occurred, they occurred at the cell front due to patient refusal which did not allow adequate assessment. The patient was often observed sitting in a dark cell or watching television. He reportedly worked as a porter, but there was no additional collateral information regarding his functioning. His lack of treatment engagement was assessed as volitional, and he was described as functioning at his baseline; however, a review of documentation from 2021 noted that the patient was medication adherent and more engaged in treatment at that time.

There was a change in the patient's PC in early August 2023, and he had good rapport with the new PC. The documentation of those contacts was clinically useful and included descriptions of the patient's functioning and symptoms, including paranoia; this information was not documented in the IDTT discussions.

**Findings**

The care provided to this patient was inadequate.

The patient was severely ill with prominent negative symptoms, and he should have been considered for referral to a HLOC. The documentation indicated that his level of functioning had declined from previous functioning which was not identified by the treatment team. Given his minimal engagement with providers, collateral information regarding his functioning and observation on the unit were necessary but not documented. Further, reassignment to a different psychiatrist would have been useful given his lack of involvement with the provider; this contrasted with his engagement with the new PC.

**Patient V**

This 33-year-old patient transferred to CSP/LAC in 2017 after discharge from the ICF level of care. He was provided diagnoses of unspecified schizophrenia, schizoid personality disorder, and antisocial personality disorder. He was not prescribed psychotropic medication. His healthcare record was selected for review to assess the adequacy of care provided, as his IDTT meeting was observed during the monitoring visit.

The sole IPOC, established in August 2020, targeted irritability. Despite a reported plan during the IDTT meeting to target paranoia, reality testing, and the pattern of treatment refusals, IPOCs for those treatment needs were not established.

As of August 2023, this patient had not been seen for psychiatric contact in three months since May 2023, and there was a pattern of cell-front contacts due to patient refusals during the preceding months. The primary clinician contacts consistently occurred at the cell front when the patient was minimally engaged. He generally responded with a statement that he was "good" and/or gave a thumbs up gesture. During more recent contacts he was described as having appropriate hygiene with a clean cell. Consultation with custody staff indicated no concerns; however, descriptive information was not included in the documentation.

The IDTT discussion indicated that, at times, the patient was observed socializing with peers and attending medical appointments; however, this information was not included in the IDTT documentation.

**Findings**

The care provided to this patient was inadequate. The patient was severely ill with prominent negative symptoms, and there was a prolonged period without an appropriate clinical assessment and consideration of referral to a higher level of care that was clinically indicated. Other areas that contributed to insufficient care included the three-month lapse in psychiatric care; the lack of updated and clinically appropriate treatment planning; and the lack of descriptive collateral information regarding his functioning.

**Patient W**

This 54-year-old patient was provided diagnoses of bipolar I disorder and opioid use disorder. He had a long history of substance use and was actively using opiates in July 2023. His healthcare record was selected for review to assess the adequacy of care provided after a peer assault occurred during the monitoring visit that resulted in that peer's death.

Most routine psychiatric contacts occurred in a confidential setting; however, the contacts were conducted by five different providers. The clinical utility of the documentation varied by provider, and one provider's documentation from May 3, 2023 and May 31, 2023 minimally changed between contacts. Overall, the patient was psychiatrically stable, and medication changes were discussed or adjusted to target symptoms which included mood symptoms and hallucinations. In May 2023, Haldol was discontinued at the patient's request; however, the specific reason was not documented. In July 2023, the patient requested discontinuation of Zyprexa; however, the provider continued the medication due to the nature of the cell-front contact. Review of the medication administration record indicated that the patient consistently refused the medication between July 30, 2023 and August 14, 2023, but no psychiatric follow-up contact was documented.

In contrast to psychiatric contacts, most PC contacts occurred at the cell front due to modified programming, unavailable confidential treatment space, and primarily patient refusals. The documentation of the PC contacts, including the confidential contacts, did not indicate that the sessions were meaningful therapeutic interactions. The patient was generally described as stable, although a full assessment was not possible when conducted at the cell front.

The IDTT documentation included a summary of the patient's functioning between IDTT meetings, but the documentation was minimally changed between meetings. An IPOC for mania, established in July 2022, was continued during the quarterly IDTT meetings despite routine provider documentation lacking support for this treatment need. Relatedly, other treatment needs such as mood, sleep disturbance, relapse prevention, hallucinations, and paranoia, which impacted treatment attendance, were not addressed.

**Findings**

The care provided to this patient was inadequate.

This patient needed coordinated dual diagnosis treatment. The primary treatment provided was medication management, as he did not receive appropriate treatment with the PC. There were multiple psychiatric provider changes; the documentation of those contacts was not consistently updated, and the pattern of medication nonadherence was not appropriately addressed by the psychiatric provider. Further, lack of provider collaboration and updated IPOCs for identified treatment needs resulted in insufficient treatment planning.