# EXHIBIT A

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 1, 2023


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1201 Atwood Avenue
Johnston, RI 02919


*VIA EMAIL ONLY*


Special Master Lopes:

Defendants are in receipt of the Special Master's draft Thirtieth Round Monitoring Report – Part C ("Draft Report") pertaining to Defendants' Compliance with Enhanced Outpatient Programs (EOP) Provisionally Approved Plans, Policies, and Protocols. The Draft Report's findings in Part C are based on site visits at 15 CDCR institutions. (Draft Report at 4.)[1] The Special Master did not provide any formal recommendations and did not request the Court to issue any additional orders. Defendants offer the following objections and comments concerning your Draft Report and request the Draft Report be revised accordingly.

      I.      CDCR Objects to The Draft Report's Use of Conclusory Statements on the Constitutionality of Care Provided to the *Coleman* Class.

The Draft Report observes that "defendants were not fully compliant with either the Program Guide or its staffing plan" and that CDCR expanded triaging, resulting in "*less* than the minimum level of services mandated by the Program Guide." (Draft Report at 2, 3, emphasis in original.) The Draft Report then concludes, "in the meantime, *Coleman* patients went without the adequate mental health services to which they have an 'absolute, undeniable right.'" (*Id.* at 3-4, quoting Dec. 17, 2019 Order, ECF No. 6427 at 45.) But while the Plaintiff class has an undeniable right to adequate mental health treatment, the fact that they may not be receiving Program-Guide level care does not automatically establish an inference that constitutionally inadequate care is being provided. Nor is it the role of the Special Master to decide whether treatment provided satisfies the Constitution.

The Program Guide sets forth the remedy in this case, but the requirements included within the Program Guide are not necessarily tethered to the constitutional minimum. For example, the Draft Report states that "[t]he foundation of adequate mental health care in correctional environments

---

[1] The reporting period for this monitoring report was not provided in the Executive Summary. It is Defendants' understanding that the reporting period in question was September 1, 2022 to February 28, 2023 and that site visits to the institutions occurred between April and August 2023.

relies on the timely and comprehensive completion of clinical assessments and initial IDTT meetings." (Draft Report at 38.) But Interdisciplinary Treatment Teams (IDTT) are unique to CDCR and do not reflect national standards. (*See, e.g.,* National Commission on Correctional Health Care Standards for Health Services in Prisons, 2018 (NCCHC Standards) at P-F-03 Mental Health Services (noting in the "Discussion" of the standard that "[t]he use of an integrated and multidisciplinary team (including correctional staff) to develop treatment plans for inmates displaying manipulative behavior can be effective," but not requiring such a treatment team in the standard itself); *see also Balla v. Idaho*, 29 F.4th 1019, 1026 (9th Cir. 2022) (compliance with NCCHC standards constitutes substantial evidence of adequate medical care in correctional facilities).)

The Draft Report further observes that "many institutions failed to consistently discuss and/or document necessary information for effective planning, including justifications for diagnosis and levels of care, case conceptualizations and functional impairments, collaborative care plans, and individualized measurable treatment objectives." (Draft Report at 39.) But NCCHC standard P-F-03 "Mental Health Services" does not require such components of a treatment plan. (*See* NCCHC Standards at P-F-03.) Similarly, the Draft Report emphasizes treatment goals, treatment interventions, and review of treatment and treatment progress as concerns with IDTT documentation. (Draft Report at 48.) But again, NCCHC standard P-F-03 "Mental Health Services" does not require a particular format or these components. (*See* NCCHC Standards at P-F-03.) Thus, while the Special Master may have observed that institutions have fallen short with respect to Program Guide requirements, the conclusion cannot be inferred that patients are receiving inadequate care, particularly in light of the fact that Program Guide standards exceed NCCHC standards across many metrics.

Finally, Defendants note that the Draft Report is replete with adverbs and adjectives such as "sadly," "astonishingly," "deplorably," and commentary such as "among the worst in recent history," and "among the worst in the history of the *Coleman* case." Such sensational language undermines the potential to have productive relations that could result in identifying solutions. Instead, it demonstrates an adversarial approach that is contrary to the neutral and objective approach an arm of the Court should employ.

Defendants request that the Draft Report be revised accordingly.

II.    CDCR Objects to The Draft Report's Incorrect and Misleading Staffing Calculations.

The Draft Report contains two sections regarding Mental Health staffing: Section I(A) titled "The Staffing Crisis Identified in the Twenty-Ninth Round Monitoring Report Continued Unabated During the Review Period" and Section II(A) titled Mental Health Vacancy Rates Overall and by Discipline During the Thirtieth Monitoring Round. Both sections improperly and intentionally parse the staffing data[2] to dramatize vacancy rates. For example, the data is reported by separating civil service line staff vacancy rates and overall vacancy rates including registry staff. In both

---

[2] Footnote 36 on page 26 of the Draft Report states that "[a]ll data (except for psych techs) reflects Defendants' July 2023 Monthly Staffing Vacancy Reports (ECF No. 7933)." Defendants assume this is the same data that underlies the statements in Section I(A), but request that be made clear in the report.

staffing sections, the Draft Report contains statements such as "[o]f 128.8 staff psychiatry positions, 60.75 were filled for a 53 percent vacancy rate. The use of 51.99 registry staff reduced the number of staff psychiatry vacancies to 16.06, reflecting a functional vacancy rate of 12 percent." (Draft Report at 28.) The Draft Report does not provide a definition for "functional vacancy rate," but it appears it is the vacancy rate after all positions filled by on-site psychiatrists, both civil service and registry, are counted. This parsing of data is improper, however, because neither the Program Guide nor subsequent orders of the *Coleman* Court mandate staffing by civil service only. It is therefore inappropriate to exclude registry providers from any vacancy rate calculation.

Even more misleading, the "functional" vacancy rates reported for staff psychiatrists do not include all filled staff psychiatry positions. Although Defendants are allowed to use Psychiatric Nurse Practitioners (PNPs) to fill staff psychiatry positions, the Special Master does not include positions filled by PNPs in his figures. Instead, those allocated yet filled positions are treated as vacant, thus overstating the actual vacant positions. To further muddy the data, the Draft Report separates telepsychiatry positions from on-site psychiatry positions. Thus, the 12 percent vacancy rate noted above is only for those staff psychiatrists on-site at the institution and does not include the allocated and filled telepsychiatry positions, resulting in an exaggerated—and inaccurate—psychiatry vacancy rate.

This parsing of data is misleading and paints an unnecessarily dire picture of psychiatry staffing at the institutions that does not square with the facts. For example, the Draft Report claims "CMF, CMC, CSP/Corcoran, CSP/LAC, CSATF, KVSP, MCSP, and SQ, indicated staff psychiatry functional vacancy rates exceeding ten percent; CSATF was 62 percent, KVSP was 51 percent, and six institutions were between 11 and 50 percent." (Draft Report at 28.) This is categorically false. In truth, Defendants' July 2023 Monthly Staff Vacancy Report shows that none of the above institutions had vacancy rates above 23 percent for staff psychiatry positions, when accounting for all appropriately filled positions. (ECF No. 7933 at 5.) Defendants' July 2023 Monthly Staffing Vacancy Reports, the same reports the Draft Report relies upon, show an 89 percent fill rate for psychiatry positions statewide and a 95 percent fill rate for staff psychiatrists.

The CSATF vacancy rate of 62 percent presented in the Draft Report is calculated based only on the allocated number of on-site staff psychiatrists and the number of positions filled by on-site civil service and registry psychiatrists. It completely ignores allocated and filled telepsychiatry positions and on-site positions filled by PNPs. Under the Special Master's calculation, there were 4.5 allocated positions filled by 1.70 psychiatrists, resulting in a vacancy rate of 62 percent. This is not representative of psychiatry staffing at CSATF in July 2023. As noted in Defendants' data, there was 1.0 PNP at CSATF in July who was also not accounted for in reported vacancy rate. (*Id.*) If that one PNP was counted, the rate would drop to 40 percent. But even that would not be reflective of the psychiatry staffing at CSATF in July 2023 because telepsychiatry positions are not included in the Special Master's calculation.

As reported in Defendants' July 2023 Monthly Staff Vacancy Report, the vacancy rate for staff psychiatrists at CSATF was 15 percent after all allocated and filled line staff positions were accounted for. (*Id.*) Reporting a 62 percent vacancy rate, when the rate was actually 15 percent is

troubling and misleading and clearly erroneous. The Draft Report includes similar miscalculations and improper exclusions of PNPs and telepsychiatrists throughout.

Defendants object to the parsing of data between civil service, registry, and telemental health staff, as well as to the exclusion of PNPs. Defendants also object to the ten percent vacancy rate threshold for each institution or for subset of staff at each institution as it misapplies the Court's June 13, 2002 and April 11, 2023 orders that apply the vacancy rate on a statewide level. Instead of peppering the Draft Report with erroneous or misleading vacancy rates, the Special Master should refer to Defendant's monthly staffing filings which present the data for civil service and registry providers, as well as telepsychiatrists and PNPs, in a clear and transparent way. If the Special Master refuses to do so, the vacancy rates in the Draft Report should, at a minimum, be revised to appropriately count all filled positions and to clearly identify both the included and excluded positions in each vacancy rate reported.

III.    CDCR Objects to the Observations in The Draft Report About the Potential Need to Cluster EOP Patients.

Clustering is not a viable solution. The Draft Report reiterates the Special Master's prior recommendation that CDCR consider clustering EOP patients "at those institutions where it has been shown that mental health staff can be more readily attracted and retained." (Draft Report at 17-18 (quoting ECF No. 7555 at 164).) This ignores the fact that Defendants have already considered clustering and informed the Special Master of its limitations and potentially negative impacts on patients and mental health staff. (*See* ECF No. 8045 at 13-14; *see also* ECF No. 5922.) The Special Master has never offered evidence to support the notion that clustering would resolve access to care issues.

Despite these extensive objections, the Special Master continues to recommend clustering as though it is a viable option and urges Defendants to move patients to those institutions where he assumes mental health staff can be more readily attracted and retained. Again, the Draft Report does not provide any real guidance on how clustering could be achieved or whether it is realistic. In fact, it is unclear what benefit would be achieved with clustering. Per Defendants' July 2023 Monthly Staffing Vacancy Reports, there is no EOP institution that is at or below a ten percent vacancy rate across psychiatrists, psychologists, social workers, recreational therapists, and medical assistants. (ECF No. 7933.) Given the extensive information in the record regarding why clustering is not a feasible option, any reference to clustering should be stricken from the Draft Report as irrelevant and not supported by the facts.

IV.    The Draft Report Should Strike Questions or Doubts Regarding the Success of the Telepsychiatry Program.

The Draft Report questions whether telepsychiatry has been a success. (*See* Draft Report at 19 ("Whatever 'success' can be attributed to the telepsychiatry policy…").) Yet neither Plaintiffs' counsel nor the Special Master have provided evidence of systemic, or even individual, failures in the provision of care due to the use of the telepsychiatry modality. And Defendants' July 2023 Monthly Staffing Vacancy Reports show an 89 percent fill rate for psychiatry positions statewide and a 95 percent fill rate for staff psychiatrists. In fact, later in the Draft Report, the Special Master

states that the Telepsychiatry Policy "has had a positive impact on defendants' psychiatry staffing levels…." (Draft Report at 21.) Given the overwhelming evidence regarding the success of telepsychiatry, any statements questioning or doubting the success of the program should be stricken as they are unsupported by the evidence in the record.

> V.    The Draft Report Should Clearly Describe Defendants' Position Regarding the Use of Telepsychiatry and the Current Status of the Telemental Health Policy.

As part of the Draft Report, the Special Master provides information regarding the recently issued Telemental Health Policy. The Draft Report incorrectly states that the telehealth policy is based on "the failure of [defendants'] prior efforts to fill the many vacant mental health staff positions." (Draft Report at 18.) But as reflected above, the policy is rooted in the success of telepsychiatry as a modality to deliver mental health care in the prison setting. The policy is also based on changes in the standard of care for all health providers.

Defendants have two primary concerns with the Draft Report's information on telehealth. First, the Draft Report states that the Telemental Health Policy "omits many of the carefully negotiated provisions included in the court-approved telepsychiatry that were intended to safeguard against the wholesale replacement of on- site services." (Draft Report at 20-21.) This statement ignores that Defendants' policy voluntarily put restrictions on the use of telemental health at the Mental Health Crisis Bed, Intermediate Care Facility, and Acute Psychiatric Program levels of care even though telemental health is used for patients at similar levels of care in the community. It also ignores the fact that during the recent negotiations regarding the Telepsychiatry Policy, Defendants vehemently disagreed with the so-called "safeguards" touted by the Special Master and Plaintiffs' counsel, despite evidence that such requirements were contrary to the community standard. (*See* ECF No. 7682-1.) The Court approved the Special Master's recommendation to adopt the Telepsychiatry Policy without the removal of these unnecessary requirements over Defendants' objections. (ECF No. 7807.) Defendants have appealed this order. (ECF No. 7834.) The Special Master should include information regarding Defendants' disagreement with the restrictions in the Telepsychiatry Policy to transparently provide the full scope of the issue.

Second, the Draft Report states that "[c]onceringly, defendants issued the policy to field while the issue was still pending before the Court." (Draft Report at 20.) This statement is false. On August 3, 2023, the Court issued an order noting that "[t]he Special Master has informed the court that on or about July 21, 2023 defendants circulated to him and to plaintiffs' counsel a draft Telemental Health Services Policy." (ECF No. 7901 at 2.) The Court then ordered the parties to meet and confer within 30 days under the supervision of the Special Master concerning the draft policy and to file a joint report on the outcome.[3] (*Id.*) The parties filed a joint statement on September 5, 2023,

---

[3] Defendants provided the Special Master and Plaintiffs' counsel a draft of the Telemental Health Policy before the court issued the order to meet and confer. Prior to the meet and confer, Defendants requested written comments to better prepare for the discussion. On August 24, 2023, I received a call from Deputy Special Master Walsh informing me that the Special Master's team would not provide written comments on the policy because they did not want to get in front of anything the Court may order. Despite this representation, the Draft Report contains significant written comments on the policy even though the Special Master believes the issue is still "pending before the Court." (Draft Report at 20.) In the future, it would be most helpful to Defendants and the process to receive the Special Master's written comments on policies during the meet and confer period. Receiving such comments after the policy has already been issued does not assist in the meet and confer process.

in which Defendants were clear that they would issue the Telemental Health Policy to the field in short order. (ECF No. 7935.) And the Court has been clear that it has not been asked to consider any question regarding the Telemental Health Policy. (Transcript of Hearing 9/29/23 at 9:10-12.) There were no questions regarding Defendants' Telemental Health Policy pending before the Court at the time the policy was issued, and statements such as these, where the Special Master appears to be taking on the role of an advocate, rather than a neutral, are disconcerting. The statement in the Draft Report should be removed.

     VI.    The Draft Report Should Include Information Regarding the Methodology for Adequacy or Compliance.

The Draft Report contains many statements finding Defendants "adequate," "marginally or minimally adequate," "inadequate," "compliant," or "non-compliant" with various Program Guide or Court ordered requirements. But there is no detailed information regarding the methodology or criteria the Special Master used to make these determinations. There is also little-to-no information regarding the sample size of patients or requirements underlying each determination. Without the requested information, it is difficult, if not impossible, for Defendants to validate or verify any of the findings in the Draft Report. Both pieces of information are necessary for transparency and so the parties and the Court can weigh whether the Special Master's findings are clearly erroneous.

     a.    The Methodology or Criteria Underlying Each Determination Should be Added to the Draft Report.

The Draft Report contains many findings of "inadequacy" or "non-compliance" without an explanation of the standard used to make such a determination. For example, Section II(D) of the Draft Report provides the Special Master's summary of the overall quality of care reflected in case reviews. The Draft Report states:

> Of the records reviewed, 87 patients, or 29 percent, were determined to have received adequate care. An additional 25 patients, or eight percent, were found to have received care that was marginally or minimally adequate, meaning that the monitor's expert found concerns within the cases that bordered on inadequacy (e.g., absence of required IDTT meetings, failure to provide treatment hours or required clinical contacts, little evidence of adequate clinical interventions beyond medications). The remaining 190 patients, or 63 percent, were determined to have received inadequate care.

(Draft Report at 44.)

To fully understand the Special Master's findings, the parties and the Court must understand what criteria must be met for the Special Master's experts to determine whether a patient received "adequate" or "marginally or minimally adequate" care. As currently drafted, the Draft Report does not provide the information necessary to understand the criteria for these determinations. In fact, the Draft Report is internally inconsistent as to what constitutes "marginally or minimally adequate" or "inadequate care."

The above quote notes that patients were found to have minimally adequate care when the Special Master's experts found concerns, such as "absence of required IDTT meetings, failure to provide treatment hours or required clinical contacts, little evidence of adequate clinical interventions beyond medications." (*Id.*) Later in the Draft Report, it states that "inadequacy of treatment at the EOP level of care was due to lack of adequate treatment planning (e.g., vague goals, lack of adequate planned interventions, interdisciplinary plans of care (IPOCs) that did not target identified symptoms or functioning deficits), failure in offering group and individual treatment in keeping with Program Guide requirements, cell-front contacts for reasons other than patient refusal, and clinical contacts that did not address the needs of the patient." (Draft Report at 46.) Based on the information provided, it seems that similar criteria, such as failure to offer group or individual contacts could be used to find that patient care was either "marginally or minimally adequate" or "inadequate." This calls into question whether each patient was reviewed using the same adequacy standard.

The Draft Report also contains numerous statements regarding Defendants' "compliance" or "non-compliance" with certain requirements. For example, at page 52, the Draft Report states "Initial primary clinician and/or initial psychiatric assessments were not updated or were not completed prior to a patient's initial IDTT meeting in a number of cases at the reception center at CCWF as well as the EOP level of care, CIW PSU, CSP/Corcoran 3CMS, KVSP EOP, MCSP EOP and EOP hub, CSP/Sac STRH, and CSATF 3CMS and MHCB levels of care." But it is unclear what methodology was used to make this determination. Prior to the reporting period, the Special Master's data expert had remediated two provisionally approved key indicators regarding timely intake evaluations: 1. QC6: IDTTs in Which PC Intake Evaluations were Completed Prior to Initial IDTT (remediated August 5, 2022); and 2. QC7: IDTTs in Which Psychiatry Intake Evaluations were Completed Prior to Initial IDTTs (remediated August 29, 2022). The Draft Report should be revised to specify if the agreed upon and remediated indicators were used to support the determinations regarding compliance or non-compliance above. If the remediated indicators were not used, the methodology underlying the determinations should be provided.

To provide complete transparency and allow the parties and the Court to fully understand whether the Special Master's findings are supported by the facts, the Draft Report should be revised to provide the specific criteria used to determine whether each patient or requirement reviewed was "adequate," "minimally/marginally adequate," "inadequate," "compliant," or "non-compliant."

> b. The Draft Report Should Clarify the Sample Size of Patients or Requirements Reviewed Underlying Each Finding and Whether the Sample Size was Adequate to Provide a Representative Sample of the Population in Question.

Sample sizes have been a topic of numerous discussions in data remediation. While discussions are ongoing, the Special Master's data expert has generally recommended that the sample size for each indictor include review of at least 30 patients or requirements per institution (and sometimes level of care) to provide a representative sample from which conclusions can be drawn. A sample smaller than 30 runs the risk of providing information that is not representative of what is happening across the population in question.

The sample size for the data underlying the vast majority of the findings in the Draft Report is unclear. For example, the Draft Report contains numerous conclusory statements such as "noncompliance with timely routine psychiatry contacts was identified at several institutions, primarily in their mainline EOP and 3CMS programs" (Draft Report at 40) and "[c]ompliance for routine IDTTs was most consistently observed in MHCB and EOP hub settings at the 15 institutions." (Draft Report at 43.)

Even when the sample size is provided, it falls well below what has been recommended by the Special Master's own data expert and what Defendants are being held to in data remediation. For example, the Special Master's team reviewed 302 patient records from 15 institutions. (Draft Report at 44.) These patients were housed in EOP, EOP hubs, MHCB, PSU, STRH, CCCMS, and reception centers. (*Id*.) If the number of patients reviewed were evenly divided between the institutions, then the Special Master's team only reviewed 20-21 patients across all of the listed levels of care per institution. Of the total number of cases reviewed, 110 were EOP mainline patients, 55 patients were in EOP hubs, and only five patients were in the PSU. (*Id*. at 45-46.) This means that less than eight EOP mainline patients and less than seven EOP hub patients were reviewed per institution. Yet, despite the small sample size, these reviews were used to support generalized findings across the levels of care and institutions.

The Special Master's monitoring does not appear to follow the sample size recommended by his data expert. The Draft Report should be revised to include the sample size for each statement regarding compliance. The Special Master should also include a statement explaining if the sample size is smaller than what his data expert recommends and why that number meaningfully represents what is happening in the institution or population in question.

VII. The Draft Report Should Revise References to Medication Administration Process Improvement Program (MAPIP) Measures to Remove the 90 Percent Threshold and More Thoroughly Explain the Methodology.

As noted in the Draft Report, "efforts by the *Coleman* Special Master and the *Plata* Receiver to improve mental health's medication management requirements led to the creation of the Medication Administration Process Improvement Program (MAPIP) audit tool." (Draft Report at 54.) Similar findings about the development of MAPIP are found in past round reports, including the Twenty-Second, Twenty-Third, Twenty-Fourth, Twenty-Seventh, and Twenty-Eight. (ECF Nos. 3990 at 305, 4124 at 18, 4205 at 25, 5779 at 77, and 7045 at 125-126.) Thus, the Special Master's team is very familiar with the MAPIP measures.

In total, there are currently at least 10 Medication Management indicators and 42 Diagnostic Monitoring indicators that are part of MAPIP. Per the Draft Report, "MAPIP compliance of 90 percent or better for a psychiatry measure indicated compliance." (Draft Report at 55.) Instead of looking at the composite indicators available and determining overall compliance, the Special Master seems to require 90 percent compliance with each individual measure. (*Id*. ("As for the specific measures, no institution reported compliance for all 11 diagnostic measures for atypical antipsychotics for all months of the reporting period.")

Defendants object to the application of a 90 percent threshold for both MAPIP sub-measures and composite measures because the indicators count patient refusals as non-compliant.[4] This is clear in the documentation for each MAPIP measure which is available on the CCHCS Dashboard Glossary. (Dashboard-Glossary - CCHCS (ca.gov) (Last visited October 31, 2023).)  For example, the definition for the Diagnostic Monitoring Measure for Antipsychotics: Blood Sugar indicator is the "[p]ercentage of patients prescribed Antipsychotics who *received* appropriate blood sugar (Hemoglobin A1c, Fasting Blood Glucose, or Random Blood Glucose) monitoring that came due within the measurement period." (*Id*. (emphasis added.) Similarly, the definition for the Diagnostic Monitoring Measure for Clozapine: Blood Pressure is the "[p]ercentage of patients prescribed Clozapine who *received* a Blood Pressure test that came due within the measurement period." (*Id*. (emphasis added.) Patients generally have a right to refuse medical tests or treatment, and such a refusal should not be counted against Defendants.

Given this design, staff could do all that is required of them, but the requirement would still be counted as non-compliant if the patient refused the medication or lab work. Such a high and unreasonable threshold for compliance with these measures is inappropriate.

      VIII.   The Draft Report Requires Certain Clarifications or Additional Information.

The Draft Report raises concerns with the accuracy of the scheduled structured activity data and assumes that any potential inaccuracies within that data "presumably inflat[es] offered hours." (Draft Report at 12 fn. 15.) First, scheduled treatment is not a Program Guide requirement. Such information may be helpful to provide context for the amount of structured treatment offered, but it is not reflective of any court ordered requirement. Regardless, CDCR has agreed to review the scheduled treatment indicator in data remediation, so any concerns about the methodology of that indicator will be discussed. Second, the presumption that alleged inaccuracies in the treatment scheduled inflates the data regarding treatment offered is incorrect. As discussed in detail in the Business Rules and Methodology Review (BRMR) meetings, the treatment offered data is based on treatment attended and treatment refused. Scheduled treatment does not factor into the calculation of treatment offered in any way. The statement regarding schedule treatment inflating the hours of treatment offered should be stricken.

The Draft Report assumes that CDCR reopened CSP/Sac's EOP ASU Hub "without resolving the significant administrative segregation EOP population overage and without considering the impact of the institution's critically low staffing levels on mental health treatment offerings in their mainline EOP, STRH, and mainline 3CMS programs." (Draft Report at 12 fn. 13.) No evidence is provided to support this assumption. In fact, CDCR considers not only institution specific factors, but statewide factors, when determining to open or close any program, even temporarily. The finding should be stricken from the Draft Report as unsupported by any evidence.

---

[4] The Special Master has not provided clear thresholds for all items monitored in the Draft Report; however, where the threshold is clearly stated and Defendants disagree, we must object. Defendants understand that the Court has deferred the issue compliance thresholds for the provisionally approved key indicators, including MAPIP measures. Defendants reserve the right to object to any future recommendation regarding compliance thresholds.

In Section II(A) of the Draft Report, there are several statements that registry staff were not used to fill supervisor positions. CDCR does not use registry staff to fill any supervisor positions, so such comments are irrelevant and should be stricken from the Draft Report.

The Draft Report claims "CSP/Sac addressed a significant rise in emergent referrals, which coincided with body camera activation in February 2023; it was suspected that prior to this activation, custody officers may not have been referring patients when indicated." (Draft Report at 34.) The second half of the sentence regarding the possible cause of the increase in emergent referrals is pure speculation and should be stricken from the Draft Report.

The Draft Report claims that none of the EOP patients at MCSP were offered the required ten hours of structured treatment per week. (Draft Report at 41-42.) This statement does not appear to be based on data, and instead is a recitation of unspecified reports by unidentified staff. (*Id*. at 179.) The Special Master's team reviewed the records for 20 EOP patients over the reporting period and did not provide any data regarding the amount of structured treatment offered over the reporting period. (*Id*. at 180, 738-748.) Data should be used to support conclusions of non-compliance. The statement that no EOP patients at MCSP were offered ten hours of structured treatment per week during the reporting period should be stricken unless it can be supported by data.

In several places, the Draft Report states that there were non-compliant initial and routine Primary Clinician (PC) contacts at the California Institution for Women (CIW). CDCR disagrees that there were any non-compliant PC contacts at CIW during the reporting period. Please provide the data underlying this conclusion, including the names and CDCR numbers of the patients reviewed, as well as the methodology used to determine compliance.[5]

The Draft Report states "[t]he Program Guide provides for a clinical stay of up to 10 days in the MHCB." (Draft Report at 69.) The paragraphs following this statement report on compliance with this alleged requirement. While the Program Guide provides for a clinical length of stay up to ten days, it also provides that patients can stay beyond ten days upon approval from the Chief Psychiatrists or designee. (ECF No. 7333-1 at 11, 72.) The Draft Report should reflect the exception allowed by the Program Guide.

Beginning on page 94 of the Draft Report, the Special Master provides information regarding the percent of EOP patients who are enrolled in opportunities, such as education, vocations, or job assignments. However, there is no evidence in the Draft Report that suggests the monitoring considered whether the percentages reported included patients eligible for the assignment in question. For example, patients with TABE scores of 12.9 or higher and those who have completed their GED are not eligible for general education assignments. Further, patients may be deemed medically or psychiatrically disabled, which may limit their eligibility for assignments. The

---

[5] It is unclear from the Draft Report what methodology the Special Master used to determine whether routine PC contacts were compliant. However, it is possible that the discrepancy between the Special Master and Defendants' findings stem from the interpretation of the requirement for "weekly" PC contacts. (ECF No. 7333-1 at 59.) Defendants have objected to the Special Master's interpretation of "weekly." (*See* ECF No. 8041.) Defendants' objections are incorporated here to the extent the Special Master relied on his interpretation of "weekly" in determining whether Defendants were compliant with any Program Guide or Court ordered requirements in the Draft Report.

information presented is incomplete and not transparent if only a subset of the EOP patients included in the data reported are actually eligible for the assignments at issue. Failure to take patient eligibility into account may inappropriately inflate the number of patients who are not in certain assignments. Defendants request that the Special Master revise the Draft Report to state whether patient eligibility is taken into account in the percentages provided, and if so, how.

The Draft Report notes "problems with continuity of care, lack of PC led groups assigned on individual patient need, and with individual sessions replaced with brief welfare checks, often completed at cell side" as a result of low staffing. (Draft Report at 108). However, neither continuity of care, nor PC-led groups are Program Guide requirements. (*See* ECF No. 8037.) Further, there is no data in the Draft Report to support concerns regarding systemic welfare checks that were completed cell-side. The Electronic Health Record System (EHRS) has a check-out code specifically for wellness checks. On April 5, 2022, CDCR updated its internal reports and indicators to exclude any contact checked out as a "wellness check" as a routine Program Guide compliant PC or psychiatry contact. Thus, the data provided regarding routine PC or psychiatry contacts did not include wellness checks. The Special Master seems to rely solely on a statement from an EOP supervisor at one institution to support this conclusion. (*See* Draft Report at 11.) The above statement should be removed from the Draft Report as it is not reflective of Program Guide requirements and is not supported by data.

Page 456 of the Draft Report states that the MHCB at California Men's Colony (CMC) "lacked [Therapeutic Treatment Modules] TTMs to accommodate Maximum custody patients." This is incorrect. The A and B sides of the CMC MHCB each have a group room with TTMs available for maximum custody patients to program. The above-referenced statement should be stricken.

The Draft Report includes summaries of findings for individual institutions. In the review of Central California Women's Facility, the Draft Report notes that the monitor reviewed 114-As for patients in Short Term Restricted Housing (STRH) over 12 weeks and found that the patients were offered "15 hours of weekly yard during nine of 12 or 75 percent of weeks…." (Draft Report at 651.) However, the out-of-cell requirement for STRH patients is 10 hours of yard and 3.5 hours of additional out-of-cell activity, not including the required 90 minutes of structured treatment. (ECF No. 7333-1 at 452.) Thus, the threshold of 15 hours of weekly yard time is incorrect. The findings in the Draft Report for CCWF and any other institution using the 15-hour threshold should be revised to reflect the correct threshold of 10 hours of yard and 3.5 hours of additional out of cell activity.

IX.     The Special Master Should Use Remediated Indicators in Future Monitoring.

The Court's July 1, 2021 order required the Special Master to "test and monitor the functionality and efficacy of the indicators on the provisionally approved list during his Twenty-Ninth Monitoring Round…." (ECF No. 7216.) To date, the Special Master has not used any of the 70 indicators remediated by his data expert as part of his monitoring. (*See* ECF No. 8011 at 3.) It is unclear why the Special Master did not rely on any of the remediated indicators during his recent monitoring of the EOP institutions even though 15 indicators were remediated before the start of

the reporting period.[6] Defendants request that the Special Master use the indicators remediated through the data remediation process in his monitoring moving forward.

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney IV
Office of Legal Affairs
California Department of Corrections and Rehabilitation

---

[6] The following indicators were remediated prior to September 1, 2022: 1. AC16.1: ASU Pre-Screens; 2. AC16.2: ASU GP Screens; 3. AC11: IDTTs in a Confidential Setting; 4. AC10: Effective Communication Achieved; 5. SC7: Thermometer Checks Completed and Accurate; 6. SP11: Housing Unit/Inmate Living Area with Emergency Response Equipment and Daily Inventories; 7. RH30: Percentage of IDTTs Observed in Which a Health Record and C-File were Available; 8. SP16: ASU Intake Inmates Appropriately Housed; 9. AC15: Percentage of Observed Receptions Cetner MH Screens in a Confidential Setting; 10. RH31: Peace Officers Observed to Carry Their CPR Mouth Shields; 11. QC6: IDTTs in Which PC Intake Evaluations were Completed Prior to Initial IDTT; 12. AC20: Custody MH Referrals; 13. QC12: IDTTs with Observed Interactive Process; 14. QC2: Cases w/doc of Appropriateness of LOC Discussed for PTS Identified by 7388B as Potentially Requiring HLOC; and 15. QC7: IDTTs in Which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT.

# EXHIBIT B

| | |
|---|---|
| **From:** | Hockerson, Dillon@CDCR |
| **To:** | Cara Trapani |
| **Cc:** | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; Weber, Nicholas@CDCR; Bentz, Melissa@CDCR; Thind, Sundeep@CDCR; Ernest Galvan; Coleman Team - RBG Only; Steve Fama; Lopes Matthew; psydocmain@gmail.com; Cindy Radavsky; Irizarry, Cristina; Dan Potter; Henry A. Dlugacz; upcjdegroot@gmail.com; Metzner, Jeffrey; Karen Rea; Kerry Hughes; Walsh Kerry F.; lhayesta@msn.com; McClendon-Hunt, LaTri-c-ea; Lopez, Lana L.; Maria Masotta; Ryan, Jr., Michael F.; Mary Perrien; Patricia Williams; Gribbin Rachel; Sharen Barboza; Millham, Sofia A.; Raffa Steven; trougeux@hotmail.com; Tavares, Zelia M |
| **Subject:** | RE: Coleman, Lack of Response to Sick Call Slips at SATF,  **REDACTED**  [IMAN-DMS.FID12440] |
| **Date:** | Wednesday, May 3, 2023 5:54:11 PM |
| **Attachments:** | 2023-05-03 Staffing Triage Plans.xlsx |

Dear Cara,

Attached is a list of the institutions and their triage plans in place due to staffing shortages. Feel free to contact me if you would like to discuss further.

Sincerely,

**Dillon Hockerson**
Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

**From:** Cara Trapani <CTrapani@rbgg.com>
**Sent:** Friday, April 7, 2023 4:44 PM
**To:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Matt Lopes <mlopes@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky <cradavsky@gmail.com>; Cristina Irizarry <cirizarry@pldolaw.com>; Dan Potter <dpotter@alumni.brown.edu>; Henry D. Dlugacz <hdlugacz@blhny.com>; James DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Karen Rea <karenrea01@gmail.com>; Kerry Courtney Hughes, MD <dockc99@aol.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt <lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta <maria@drmariamasotta.com>; Michael Ryan <mryan@pldolaw.com>; Mary Perrien <mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin <rgribbin@pldolaw.com>; Sharen Barboza <sharen@sharenbarboza.com>; Sofia Millham <smillham@pldolaw.com>; Steven Raffa <sraffa@pldolaw.com>; Tim Rougeux <trougeux@hotmail.com>; Zelia M. Tavares <ztavares@pldolaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR

<Sundeep.Thind@cdcr.ca.gov>
**Subject:** Re: Coleman, Lack of Response to Sick Call Slips at SATF, **REDACTED** [IMAN-DMS.FID12440]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Dillon,

What other institutions are operating under this or a similar triaging process, either in response to staffing shortages or any other reasons?

For example, we understand from client correspondence that for the last 10 weeks, since January, at least some EOP patients on CHCF's E-Facility have been receiving ducats for 1-on-1 mental health appointments, but their primary clinician does not show up.  We have also received reports that patients at both CHCF and CMF were told that starting next week, primary clinicians would no longer be scheduling regular one on ones with their patients, and instead all patients would be seen together in group therapy (unless they are experiencing a mental health emergency, or are a danger to themselves or others).

Thank you,
Cara Trapani

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

**(Pronouns – she/her/hers)**

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at ctrapani@rbgg.com.

---

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Wednesday, April 5, 2023 2:17:53 PM
**To:** Ernest Galvan <EGalvan@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Matt Lopes <mlopes@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky <cradavsky@gmail.com>; Cristina Irizarry <cirizarry@pldolaw.com>; Dan Potter <dpotter@alumni.brown.edu>; Henry D. Dlugacz <hdlugacz@blhny.com>; James DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Karen Rea <karenrea01@gmail.com>; Kerry Courtney Hughes, MD <dockc99@aol.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt <lmcclendonhunt@pldolaw.com>; Lana Lopez

<llopez@pldolaw.com>; Maria Masotta <maria@drmariamasotta.com>; Michael Ryan <mryan@pldolaw.com>; Mary Perrien <mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin <rgribbin@pldolaw.com>; Sharen Barboza <sharen@sharenbarboza.com>; Sofia Millham <smillham@pldolaw.com>; Steven Raffa <sraffa@pldolaw.com>; Tim Rougeux <trougeux@hotmail.com>; Zelia M. Tavares <ztavares@pldolaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Subject:** RE: Coleman, Lack of Response to Sick Call Slips at SATF,  REDACTED [IMAN-DMS.FID12440]

| [EXTERNAL MESSAGE NOTICE] |
|---|

Dear Ernie,

I write in regards to Plaintiffs email regarding multiple Form 7362s submitted by **REDACTED** , that appeared to have not been responded to at Substance Abuse Treatment Facility (SATF). Each form was received by mental health staff at SATF and were all submitted as routine consult, rather than Emergent or Urgent.   REDACTED has been scheduled for a mental health contact on Friday, April 7.  The delay in scheduling Routine contacts is caused by SATF's staffing shortages, and scheduling Emergent and Urgent consults take precedent over Routine consults.  The California Department of Corrections is making every effort to fill staffing vacancies by conducting hiring fairs, utilizing the California Correctional Health Care System Workforce Development Unit, direct solicitation with graduate schools of psychology, etc.

Feel free to contact me if you would like to discuss further.

Sincerely,
**Dillon Hockerson**
Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

**From:** Ernest Galvan <EGalvan@rbgg.com>
**Sent:** Wednesday, April 5, 2023 12:54 PM
**To:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Matt Lopes <mlopes@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky

<cradavsky@gmail.com>; Cristina Irizarry <cirizarry@pldolaw.com>; Dan Potter
<dpotter@alumni.brown.edu>; Henry D. Dlugacz <hdlugacz@blhny.com>; James DeGroot
<upcjdegroot@gmail.com>; Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Karen Rea
<karenrea01@gmail.com>; Kerry Courtney Hughes, MD <dockc99@aol.com>; Kerry F. Walsh
<kwalsh@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt
<lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta
<maria@drmariamasotta.com>; Michael Ryan <mryan@pldolaw.com>; Mary Perrien
<mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin
<rgribbin@pldolaw.com>; Sharen Barboza <sharen@sharenbarboza.com>; Sofia Millham
<smillham@pldolaw.com>; Steven Raffa <sraffa@pldolaw.com>; Tim Rougeux
<trougeux@hotmail.com>; Zelia M. Tavares <ztavares@pldolaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com)
<swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain
<Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Weber,
Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR
<Sundeep.Thind@cdcr.ca.gov>
**Subject:** Coleman, Lack of Response to Sick Call Slips at SATF, REDACTED [IMAN-
DMS.FID12440]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you
> recognize the sender and know the content is safe.

Dear Counsel--

A *Coleman* class member at SATF has reported to us that mental health staff there are not
responding to his 7362 sick call requests.   REDACTED, CDCR number above, had asked at his most
recent IDTT to be made EOP due to increasing distress, but was told he would remain in CCCMS and
should use the 7362 process if his distress continued.  He has done so, with 7362s in his health
record dated 2/2, 2/9, 2/11, 2/17, 3/2, 3/12, and 4/3, and as far as we can see he has not been seen
by mental health in all that time.

Please advise as to what the obstacles are to getting CCCMS care at SATF.

Thank you.

Ernest Galvan
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 296-2293 (direct)
(415) 694-3606 (mobile)
(415) 433-7104 (fax)
egalvan@rbgg.com

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbgg.com

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

**ASP**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| Multiple | All | Contacts | >Prioritize: emergent/urgent referrals; new arrivals.<br>>Reschedule routine appointments. |
| | | Groups | >Decreased amount of groups offered. |
| | | IDTT | >Reschedule routine appointments if no time. |

**CHCF**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| E-Yard | ML EOP | Groups | >Clinicians will facilitate four core groups per week. |
| | | 1:1 MHPC | >Offer 12 confidential contact per week. Current caseloads allow one confidential contact per month. |
| | | IDTT | >Each clinician shall conduct only four IDTTs per week. >Prioritize initial, level of care changes, and special IDTTs. |
| | | Prioritization | >Urgent or emergent consults. >Five-day follow-ups. >Suicide Risk Assessment and Self-Harm Evaluations. > Initial MHPC contacts. |
| | | Exception | >All patients in the Suicide Risk Management Program will be maintained by Program Guide requirements. |
| | ML CCCMS | Prioritization | >SRASHES. |
| | | Contacts | > No MHPC contacts unless it is a level of care change IDTT. >Psychiatry will continue to see patients. |
| C-Yard | EOP | Exceptions | >All patients in the Suicide Risk Management Program will be maintained by Program Guide requirements. >Any patients the clinicians deem high risk will be seen weekly. |
| | | Prioritization | >Urgent, emergent, routine referrals. >Five-day follow-ups. >Timely SRASHEs. |
| | | IDTTs | >Only initial and level of care change IDTTs. |
| | | Contacts | >Patients not in the SRMP will be seen every other week. >Monthly confidential MHPC 1:1. >Psychiatrist will address urgent or emergent medication issues. |
| | | Groups | >Schedule a minimum of five hours of group treatment per week. |
| | CCCMS | Exception | >All patients in the Suicide Risk Management Program will be maintained by Program Guide requirements. |
| | | Prioritization | >Urgent or emergent consults. >Five-day follow-ups. >Timely SRE. > Initial Intakes and IDTTs will be conducted. >Cap routine IDTTs to focus initial intake, initial IDTTs, and patient contacts. |

| | | Contacts | >Cell front is default for contacts, but provider can either pull the patient out for a confidential session, or put in a referral to see the patient before the next routine contact. |
|---|---|---|---|
| D-Yard | CTC (EOP) | Exceptions | >All patients in the Suicide Risk Management Program will be maintained by Program Guide requirements.<br>>Any patients the clinicians deem high risk will be seen weekly. |
| | | Prioritization | >Urgent, emergent, routine referrals.<br>>Five-day follow-ups.<br>>Timely SRASHEs. |
| | | IDTTs | >Only initial and level of care change IDTTs. |
| | | Contacts | >Patients not in the SRMP will be seen every other week.<br>>Monthly confidential MHPC 1:1.<br>>Psychiatrist will address urgent or emergent medication issues. |
| | | Groups | >Schedule a minimum of five hours of group treatment per week. |
| | CTC (CCCMS) | Exception | >All patients in the Suicide Risk Management Program will be maintained by Program Guide requirements. |
| | | Prioritization | >Urgent or emergent consults.<br>>Five-day follow-ups.<br>>Timely SRE<br>> Initial Evaluations and IDTTs.<br>>Cap IDTTs to focus on patient contact. |
| | | Contacts | >Patients not in the SRMP will be seen every other week.<br>>Cell front is default for contacts, but provider can either pull the patient out for a confidential session, or put in a referral to see the patient before the next routine contact. |

**CMC**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| D Yard | EOP | Contacts | >Monthly Psychiatry appointments will alleviate the MHPC's weekly routine contact for that week. (This will not count towards Program Guide compliance for Timely MHPC contacts).<br>>MHPCs shall conduct weekly contacts for two-thirds of their caseload, unless a patient is deemed high risk and requires more frequent 1:1 contacts.<br>>MHPCs shall conduct cell front contacts for entire caseload each week to triage patients for 1:1 contacts. |

**CMF**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| Multiple | CCCMS | Contacts | >All regular patient care in CCCMS (for both patients prescribed and not prescribed medications – psychiatry) will be conducted by the assigned psychiatry staff within that program. |
| | | IDTT | >Routine CCCMS IDTT's that are not clinically indicated will be suspended.<br>>CCCMS IDTT's for routine, discharge (higher and lower level of care), and clinically indicated will continue. |
| | | CIT | >Respond to all 7362's and MH-5's for the CCCMS population.<br>>Complete any routine SRASHE forms. |
| Multiple | ML EOP | Contacts | >1:1 contacts for stable patients are done as needed or in response to a 7362 or MH-5.<br>>Exception: (1)patients in the SRMP; (2) EOPs on Modified Programming for clinical reasons; and (3) any patient that is also DD2-3.<br>>Clinical documentation should clearly show the clinical rationale explaining why patients are assessed as being stable. |
| | | Groups | >All MHPC's will run a minimum of four (4) clinical groups a week.<br>>All RT's will run a minimum of four (4) groups per day.<br>>Group treatment will be primarily conducted by nursing and RT.<br>>Stable and unstable designations are also fluid. If a patient is assessed as low risk but later struggles then they are triaged into the high risk grouping and vice versa. |
| | | IDTTs | >Schedule Hierarchy: (1) Initial; (2) Higher Level of Care concerns; (3) Male Community Re-entry Program.<br>>EOP Modified Program will be conducted every 60 days rather than 30 days.<br>>Routine IDTT's that are not clinically indicated will be cancelled at this time. If at any time ANY team member believes that it is clinically indicated to see a patient in IDTT than the patient will be scheduled.<br>>All referrals to an alternate level of care (except for MHCB) shall be scheduled for a Routine IDTT. |

**COR**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| Multiple | CCCMS | Prioritize | >Initials, Urgent/Emergent referrals, 5 day follow-ups, and SRASHEs. |
| Multiple | ML EOP | Caseload groups | >MHPCs conducting caseload groups. Two cohorts created: MHPC sees one cohort for 1:1s, and the other cohort in a group format. Then switch cohorts every week. |
| LTRH | CCCMS | Contacts | >1:1 every other week, and cell front every week. |

**CTF**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| All | CCCMS | Pre-Release Planning | >Pre-release tasks are shared between all MHPCs. |

**LAC**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| All | All | Prioritize Resources | 1. MHCB and Crisis intervention;<br>2. ASU EOP;<br>3. STRH;<br>4. ML EOP;<br>5 CCCMS. |

**MCSP**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| A-Yard Building 2 | EOP Overflow | Medication | >Medication management is handled by cell front medication pass in lieu of a medication window in the housing unit. |
| A-Yard | EOP | Contacts | >MHPC 1:1 scheduled twice per month. |
| All (2nd Watch only) | All (2nd Watch only) | Multiple | >Divide duties regarding: RVR MHAs; adding any Alternative Housing placements to the MHCB clinician duties (including contacting HCPOP, facilitating transfers to outside MHCB programs and ensuring in-person SRASHEs are completed). <br>>(Weekends only) Divided duties regarding: completing higher level of care PIP discharge SRASHEs, and providing 24-hour follow up for ASU DDP placements. |
| Multiple | CCCMS | IDTT | >IDTT due dates are monitored and scheduled based on acuity, level of care changes, and Initial IDTTs when routine due dates cannot be met. <br>>Level of care changes to higher levels of care and initials are prioritized. |
| Multiple | ML EOP | Groups | >Groups solely provided by RTs; NLTGs are also offered. |
|  |  | IDTTs | >Priority Hierarchy: Initials, Suicide Risk Management Program (SRMP) patients, LOC changes, patients meeting Sustainable Process higher level of care criteria, and custody program reviews (single cell, Male Community Re-entry Program Reviews, C-Status IDTT Reviews). <br>>Routine IDTTs are triaged based on acuity and patient need. |
|  |  | Contacts | >MHPC 1:1 scheduled once per month, cell front contact if patient refused. <br>>Confidential contacts were prioritized for consults, SRMP patients, patient's pending a transfer to a higher level of care and as clinically indicated. |
| D-Yard | EOP | Case Management | >Case Management groups scheduled once per week. If a patient misses the groups for an entire month, then a welfare check will be conducted. |
|  |  | Contacts | >Prioritize Routine/Urgent/Emergent consults as clinically determined by the MHPC and Supervisor. <br>>Clinician of the day covers 5-day follow-ups and huddles. |
|  |  | IDTT | >Level of care changes to higher levels of care and initials are prioritized. |

**NKSP**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| All | All | Prioritize Resources | 1. MHCB and crisis intervention;<br>2. RC screening;<br>3. Initial intake assessments;<br>4. EOP;<br>5. CCCMS. |

**RJD**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| A Yard | EOP | IDTT | >Try to do all IDTTs in-person except when MHPC is out unexpectedly, then IDTTs are done LATE. |
| | | Groups | > MHPC does weekly check-in groups. Patients that miss the group are not seen unless high risk (Suicide Risk Management Program or if patient has high stressor factor) or clinically indicated. |
| | | Consults | >For Crisis Intervention Teams and routine Suicide Risk Evaluations, use Columbia Suicide Severity Rating Scale if acute risk is low. <br>>Conduct Routine SREs late if no available coverage. <br>>MHPC 1:1 every other week unless clinically indicated. |
| | | CIT | >CITs conducted without nursing or custody if not present 15 minutes after the start time. |
| | CCCMS | IDTTS | >Prioritize by clinically indicated (level of care change, time sensitive treatment team issues), initial, then routine. |
| | | Consults | >For Crisis Intervention Teams and routine Suicide Risk Evaluations, use Columbia Suicide Severity Rating Scale if acute risk is low. <br>>Prioritize by Emergent consults, Urgent consults, Routine SREs, Routine consults, Initial contacts, then Routine. <br>>Conduct Routine SREs late if no available coverage. |
| | | CIT | >CITs conducted without nursing or custody if not present 15 minutes after the start time. |
| B Yard | ASU | Consults | >Repeated emergent from individual reporting Suicidal Ideation, utilize 4-hour response time for the second assessment. Use  Columbia Suicide Severity Rating Scale when there have been several emergent consults for the same patient in a day. |
| C Yard | CCCMS | Groups | >Led by Practicum Students in additional to two Nursing Led Therapeutic Groups. |
| | | Contacts | >Prioritize: Initials, SRASHEs, Routine consults. |
| | EOP | Consults | >For Crisis Intervention Teams and routine Suicide Risk Evaluations, use Columbia Suicide Severity Rating Scale if acute risk is low. <br>>Conduct Routine SREs late if no available coverage. |
| | | Groups | > MHPC does weekly check-in groups. Patients that miss the group are not seen unless high risk (Suicide Risk Management Program or if patient has high stressor factor) or clinically indicated. |

| | | | |
|---|---|---|---|
| D Yard | ML CCCMS | SRE | >MHPCs complete emergent and urgent consults, SREs may be completed late. |
| E Yard | CCCMS | IDTT | >Prioritize initial, level of care changes, Male Community Reentry Program, and clinically indicated.<br>>If MHPC is out then conduct the IDTT late.<br>>No Routine IDTTs. |
| | EOP | IDTT | >If MHPC is out then conduct the IDTT late. |

**SAC**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| Multiple | ML EOP | Contacts | >1:1 contacts every other week. |
| STRH | CCCMS | Contacts | >1:1 contacts every other week. |
| PSU A | EOP | "2 PC Caseload Model" | >2 MHPC Caseload Model: one MHPC conduct caseload groups, cell front contacts for refusals, rounds and monitors daily in-call activities; and the other MHPC conducts 1:1s, crisis triage response, 7497s, and 5 day follow-ups. Both MHPC conduct treatment planning during IDTTs. |

**SATF**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| All | All | Prioritize Resources | 1. MHCB and Crisis Intervention;<br>2. SRASHEs;<br>3. Five-day follow-ups;<br>4. RVR MHAs;<br>5. Routine consults;<br>6. Timely MHPC contacts. |

SVSP

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| Multiple | EOP | Triage Hierarchy | 1. Emergency Referrals including emergency SREs;<br>2. Five-day discharge follow-ups;<br>3. Urgent Referrals;<br>4. Referrals to DSH/PIP including individual contacts;<br>5. 72 Hour SREs post DSH/MHCB discharge;<br>6. SRMP Contacts-individual or group;<br>7. RVR's;<br>8. New Arrival MHPC;<br>9. New Arrival IDTT;<br>10. Level of care reviews and IDTT/7388 B's sessions;<br>11. 90 Day Follow up SRASHEs;<br>12. Routine Referrals;<br>13. Weekly 1:1 MHPC Groups;<br>14. 90 Day IDTT;<br>15. Clinical Groups. |
| Multiple | CCCMS | Triage Hierarchy | 1. Emergency Referrals including emergency SREs;<br>2. Discharge Follow-ups;<br>3. Urgent Referrals;<br>4. Referrals to DSH/PIP including individual contacts;<br>5. 72 Hours Follow-up SREs post DSH/MHCB discharge;<br>6. SRMP Contacts-individual or group;<br>7. RVR's;<br>8. New Arrival MHPC;<br>9. New Arrival IDTT;<br>10. Level of care reviews and IDTT/7388 B's sessions;<br>11. 90 Day Follow up SRASHE;<br>12. Routine Referrals;<br>13. 90 Day 1:1 MHPC Groups;<br>14. Annual IDTT;<br>15. Group Treatment. |

**WSP**

| Yard/Building | Level Of Care | Function | Triage |
|---|---|---|---|
| All | All | Prioritize Resources | > Level of Acuity: 1. Crisis, 2. EOP, 3. ASU.<br>> Diagnostic and screenings.<br>>Consults: 1. Emergent, 2. Urgent, 3. Routine.<br>>Initial MH Assessment for timely transfers to mainline.<br>>Other time sensitive evaluations: DDP cases, RVRs, and Healthcare Grievances. |

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 29, 2023

Special Master Lopes                              Coleman Plaintiffs' Counsel
Pannone Lopes Devereaux and O'Gara LLC            Rosen Bien Galvan and Grunfeld LLP
Northwoods Office Park, Suite 215N                101 Mission Street, Sixth Floor
1301 Atwood Avenue                                San Francisco, A 94105
Johnston, RI 02919

VIA EMAIL

Special Master Lopes and Plaintiffs' Counsel,

I write regarding the California Department of Corrections and Rehabilitation's (CDCR)
Restricted Housing Unit (RHU) project.  CDCR began the RHU project in response to the
Governor's veto of AB2632 which directed CDCR to develop regulations revising the use of
restricted housing.  (See https://www.gov.ca.gov/wp-content/uploads/2022/09/AB-2632-
VETO.pdf?emrc=ccbc61)  Attached to this email for your review are draft regulatory packages
that will be necessary to implement the changes described below.  These drafts are being shared
with you and other external stakeholders simultaneously and may receive additional edits based
on those conversations prior to finalization.  CDCR is developing streamlined mental health
policies to govern these new units and will share those drafts when they are ready.  CDCR
requests that you provide us your comments and feedback on the regulatory package no later
than July 31, 2023.

     I.       Overview of the Restricted Housing Unit Program Changes

CDCR's RHU program will result in less inmates being housed in restricted housing, shorter
stays for those that do, enhanced property and out of cell time for some, and a reduction in
number of RHU programs and beds statewide.  CDCR has also developed an RHU Programming
Credit which inmates may earn by participating in programming, including mental health
services.  Each credit will reduce the length of stay in restricted housing.

        A.  Restricted Housing Unit Matrix Changes and Length of Stay Reductions

CDCR has revised its Restricted Housing Unit matrix to only include charges for violent
behavior as eligible for RHU placement.  CDCR removed over a dozen offenses from the RHU
matrix and converted the penalty for those offenses to placement on Workgroup/Program Group
C status.  (See e.g., draft Title 15 sections 3044(f)(1)(B) and 3337(g).)  The fourteen offenses
removed from the RHU matrix are as follows:

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 2

- Battery on an inmate without serious injury.
- Distribution of Controlled Substances as defined in Section 3000
- Escape with force or attempted escape with force against a person
- Attempted escape from any departmental prison or institution other than a camp, MSF, or reentry facility
- Inciting conditions likely to threaten institutional security
- Harassment: a willful course of conduct, which alarms, annoys or terrorizes a specific person, group, or entity in the free society and which serves no legitimate purpose, either directly or indirectly
- Acting in a leadership role by directing or controlling STG behavior that is a behavior listed in the Assessment Chart
- Recruiting inmates to become an STG affiliate or to take part in STG activities that is a behavior listed in this SHUR Assessment Chart
- Acting in a leadership role to generate, move, or facilitate assets or proceeds as a result of or in support of prohibited STG business dealings
- Theft of destruction of State property by any means where the loss or potential loss exceeds $10,000 or threatens the safety of others
- Extortion or bribery of a non-inmate
- Extortion or bribery of an inmate
- Indecent Exposure
- Sexual disorderly conduct (2 or more offenses within a 12-month period).

For offenses that will still result in a RHU term, CDCR will make changes to the length of RHU terms and further simplify the sentencing structure. (See draft Title 15 section 3337(g), RHU Matrix.) CDCR will replace low, expected and high terms with a single "set term" which will be set as half of the old "expected" term. (Id.) For instance, battery on a non-inmate with a weapon previously had a low term of 18 months, an expected term of 30 months, and a high term of 42 months. Under the revisions, the offense will carry a set term of 15 months. CDCR has removed mitigation and aggravation factors from the matrix (see old Title 15 section 3341.3), and removed consecutive RHU terms. (See old Title 15 section 3341.4.)

To further rehabilitation within the RHUs and reduce length of stay, CDCR will create a RHU Programming Credit. (See draft Title 15 section 3345.) The RHU Programming Credit will allow inmates to reduce their RHU term by completing programs through Division of Rehabilitation Programs or by attending their assigned mental health treatment. MHSDS patients will still receive Milestone Completion Credits for participation in structured treatment. Those same treatment hours will also count towards RHU Programming Credits. For every twenty-hours of departmentally approved rehabilitative programming or completed mental health treatment, inmates will receive five days off their RHU terms. MHSDS patients will also have access to the same departmentally approved rehabilitative programming as GP RHU inmates.

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 3

    B.  Property and Privilege Revisions

CDCR will set out of cell time at a minimum of 20 hours per week for all RHU inmates, regardless of mental health status or level of care.  This change will increase out of cell time for general population RHU inmates, CCCMS patients currently in reception center and female STRHs and all LTRH patients.  Institutions will be required to provide at least ten hours of yard per week.  (See draft Title 15 section 3343(i).)

CDCR is also increasing property allowances to all RHU inmates.  The changes are reflected in the revised property matrices.  The property changes also increase property for Non-Disciplinary RHU inmates.

    C.  Reduction of Restricted Housing Programs and Unnecessary Transfers

CDCR will reduce the number of restricted housing programs from six to three by combining short (i.e. ASU) and long term (i.e. SHU) units for all levels of care.  For instance, the Short Term Restricted Housing (STRH) unit and Long Term Restricted Housing (LTRH) unit will be combined and renamed the Correctional Clinical Case Management System (CCCMS) Restricted Housing Unit.  CDCR will take the same approach for general population and Enhanced Outpatient Program (EOP) RHUs.  CDCR's goal is to significantly reduce unnecessary transfers through.  For MHSDS patients, this plan will increase continuity of care and, for many, allow them to remain at their home institution while in a RHU by removing the requirement to transfer to an LTRH or a Psychiatric Services Unit.

CDCR plans to reduce the number of restricted housing beds statewide.  Those changes will mostly occur on a rolling basis once CDCR implements the RHU program later this year.  CDCR has, however, identified the Pelican Bay SHU as the first unit to deactivate in fall 2023.

    II.    Coleman Remedy

CDCR's RHU regulations result in changes to several components of the Coleman Compendium.  While grammatical changes have been made throughout Title 15 sections on restricted housing, the following Compendium regulations have been changed.

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 4

| Compendium Section | RHU Changes |
|---|---|
| **CCR Title 15, Section 3190, subdivisions (c) and (l)(3), General Policy regarding Personal Property and Religious Personal Property, specifically for inmates in segregation** | Grammatical Edits |
| **CCR Title 15, section 3269, Inmate Housing Assignment** | Grammatical Edits |
| **CCR Title 15, Section 3335, subdivision (a), Administrative Segregation, Non Disciplinary Segregation (NDS)** | Moved to section 3335(b); Grammatical edits and additions to 3335(b)(1)(A) through (G) consistent with NDS policy |
| **CCR Title 15, Section 3317, Mental Health Assessment for Disciplinary Proceedings** | Grammatical edits to 3317(b)(4) |
| **CCR Title 15, section 3340, subdivision (a)(4) and (a)(4)(A), regarding Assistance to Inmates for Administrative Segregation Classification Hearings** | Moved to new section 3344; Grammatical edits |
| **CCR Title 15, section 3341.2, Psychiatric Services Unit** | Repealed; see new section 3335.2; Grammatical edits |
| **CCR Title 15, Section 3341.8, subdivision (b), Security Housing Unit/Psychiatric Services Unit Classification Hearings, Pre-MERD Hearing. This regulation codifies provisions of the September 12, 2014, memo 120-Day Pre-Minimum Eligible Release Date Review Expectations** | Section 3341.8 is repealed. Pre-MERD language modified and moved to new section 3341(g)(1)-(2); changes pre-MERD timeline from 120 days to 90 days; Grammatical edits |
| **CCR Title 15, section 3342, subdivision (b), regarding Case Review** | Moved to new section 3347; Grammatical edits |
| **CCR Title 15, section 3344, subdivision (b), regarding Administrative Segregation Records** | Moved to new section 3349; Grammatical edits |
| **DOM Appendix A, Inmate Property – Matrix – Authorized Personal Property Schedules for Administrative Segregation Unit/Security Housing Unit/Psychiatric Services Unit Male Inmates and Female Inmates** | Grammatical and substantive revisions |
| **DOM Appendix D, Non Disciplinary Segregation (NDS) Personal Property Matrix** | Grammatical and substantive revisions |

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 5

CDCR also anticipates applying the EOP Administrative Segregation Unit Hub certification process to focus on the newly created EOP RHUs. Clinically, EOP RHUs will operate the same as EOP ASU Hubs or PSUs. CDCR anticipates circulating a draft policy addressing the treatment requirements for the EOP RHU and CCCMS RHU at a later date.

Finally, CDCR has identified the July 27, 2004 order on the maximum capacity for R.J. Donovan's (RJD) EOP ASU Hub as a barrier to successful implementation of the RHU plan. (See ECF No. 1598 at 2.) RJD's EOP ASU Hub is the only housing unit in the state with a court ordered population cap. RJD's EOP ASU Hub will convert to an EOP RHU under CDCR's plan. However, with its current court ordered cap of sixty-three patients, RJD will be forced to transfer patients to other EOP RHUs to stay under the cap, thwarting the goal of reducing unnecessary transfers and increasing continuity of care. CDCR requests that Plaintiffs and the Special Master consider a stipulation ending the cap at RJD.

III.    Conclusion

CDCR looks forward to your comments as it works to finalize the regulation package and move forward with implementing these new programs. Please let me know if you have any questions or would like to discuss further.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
California Department of Corrections and Rehabilitation
Office of Legal Affairs

# EXHIBIT C

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE (H1)

CONFIDENTIAL

Mental Health Summary by Level of Care

Data Refreshed: 7/31/23 6:29 AM

| Institution | CCCMS Operational Capacity | CCCMS Population | CCCMS % Occupied | CCCMS Vacant Beds | EOP Population | EOP % Occupied | EOP Vacant Beds | MHCB Design Capacity | MHCB Population | MHCB % Occupied | MHCB Vacant Beds | ICF Design Capacity | ICF Population | ICF % Occupied | ICF Vacant Beds | APP Design Capacity (Flex bed) | APP Population | APP % Occupied | APP Vacant Beds | Total Mental Health Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 1,350 | 1,509 | 112% | -159 | | | | | | | | | | | | | | | | 1,509 |
| CAL | | 3 | | | | | | | | | | | | | | | | | | 3 |
| CCI | 950 | 643 | 68% | 307 | | | | | | | | | | | | | | | | 645 |
| CEN | | 5 | | | | | | | | | | | | | | | | | | 5 |
| CHCF | 650 | 618 | 95% | 32 | 417 | 185% | -192 | 80 | 24 | 30% | 56 | | | | | | | | | 2,443 |
| CIM | 1,150 | 788 | 69% | 362 | | | | 34 | 27 | 79% | 7 | | | | | | | | | 823 |
| CMC | 650 | 509 | 78% | 141 | 633 | 115% | | 44 | 40 | 91% | 4 | 330 | 269 | 82% | 61 | 202 | 115 | 57% | 87 | 1,192 |
| CMF | 400 | 528 | 132% | -128 | 509 | 130% | | 50 | 44 | 88% | 6 | 146 | 105 | 72% | 41 | 250 | 164 | 66% | 86 | 1,350 |
| COR | 1,150 | 1,323 | 115% | -173 | 263 | 175% | | 24 | 24 | 100% | 0 | | | | | | | | | 1,613 |
| CRC | 1,350 | 1,168 | 87% | 182 | | | | | | | | | | | | | | | | 1,171 |
| CTF | 900 | 916 | 102% | -16 | | | | | | | | | | | | | | | | 918 |
| CVSP | | 1 | | | | | | | | | | | | | | | | | | 1 |
| FOL | 400 | 425 | 106% | -25 | | | | | | | | | | | | | | | | 427 |
| HDSP | 450 | 745 | 166% | -295 | | | | 10 | | | | | | | | | | | | 750 |
| ISP | | 7 | | | | | | | | | | | | | | | | | | 7 |
| KVSP | 800 | 951 | 119% | -151 | 237 | 123% | -45 | 12 | 14 | 117% | -2 | | | | | | | | | 2,204 |
| LAC | 650 | 746 | 115% | -96 | 654 | 109% | -54 | 12 | 20 | 167% | -8 | | | | | | | | | 1,424 |
| MCSP | 1,450 | 1,445 | 100% | 5 | 832 | 106% | -46 | 8 | 7 | 88% | 1 | | | | | | | | | 2,287 |
| NKSP | 1,000 | 1,003 | 100% | -3 | 108 | | | 10 | 8 | 80% | | | | | | | | | | 1,210 |
| PBSP | 400 | 350 | 88% | 50 | 4 | | | 10 | 9 | 90% | 1 | | | | | | | | | 367 |
| PVSP | 500 | 586 | 117% | -86 | | | | | | | | | | | | | | | | 590 |
| RJD | 1,200 | 1,190 | 99% | 10 | 856 | 99% | -14 | 14 | 17 | 121% | 3 | | | | | | | | | 2,068 |
| SAC | 300 | 369 | 123% | -69 | 727 | 128% | | 24 | 20 | 83% | 4 | 246 | 204 | 83% | 42 | 34 | 11 | 32% | 23 | 1,228 |
| SATF | 1,900 | 1,811 | 95% | 89 | 618 | 94% | | 20 | 17 | 85% | 3 | | | | | | | | | 2,050 |
| SCC | 150 | 201 | 134% | -51 | | | | | | | | | | | | | | | | 202 |
| SOL | 700 | 760 | 109% | -60 | | | | 9 | 7 | 78% | | | | | | | | | | 769 |
| SQ | 1,050 | 1,242 | 118% | -192 | 282 | 141% | | 8 | | | | | | | | | | | | 1,562 |
| SVSP | 1,150 | 1,103 | 96% | 47 | 293 | 119% | | 10 | 13 | 130% | -3 | 256 | 57 | 22% | 199 | | | | | 1,614 |
| VSP | 1,000 | 1,143 | 114% | -143 | 350 | 94% | | | | | | | | | | | | | | 1,495 |
| WSP | 1,250 | 1,248 | 100% | 2 | 131 | 100% | | 6 | | | | | | | | | | | | 1,388 |
| DSH | | | | | | | | | | | | | | | | | | | | 58 |
| DSH-ASH | | | | | | | | | | | | 50 | 46 | 92% | 4 | | | | | 46 |
| **Male Subtotal** | 22,900 | 23,333 | 102% | -433 | 6,941 | 106% | -1,137 | 389 | 310 | 80% | 79 | 1,028 | 725 | 71% | 303 | 486 | 320 | 66% | 166 | 31,629 |
| CCWF | 1,250 | 1,354 | 108% | -104 | | | | | | | | | | | | | | | | |
| CIW | 500 | 436 | 87% | 64 | | | | | | | | 30 | 49 | 163% | -19 | 45 | 4 | 9% | 41 | |
| DSH-PSH | | | | | | | | | | | | | | | | | | | | 12 |
| **Female Subtotal** | 1,750 | 1,791 | 102% | -41 | 145 | 64% | 50 | 41 | 11 | 27% | 30 | 30 | 49 | 163% | -19 | 45 | 4 | 9% | 41 | 2,000 |
| **General Total** | 24,650 | 25,124 | 102% | -474 | 7,086 | 104% | -1,087 | 430 | 321 | 75% | 109 | 1,058 | 774 | 73% | 284 | 531 | 324 | 61% | 207 | 33,629 |

EOP Operational Capacities subtotals (Male): 5,804 (General Population EOP), 585 (Administrative Segregation EOP), 172 (PSU); (General Total): 5,999, 605, 182.

NOTES:

1. This report provides operational capacities, population, and vacant beds detail by mental health level of care and institution. Level of care is based on Current Mental Health level of care code in SOMS. For each level of care, a summary of patients by SOMS housing program and institution is provided. Data Source is EDS, as of the "Data Refreshed" time stamp.

2. Definitions:
   - Operational Capacity = the number of beds available in the program based on factors such as treatment space and staffing, determined by Facility Planning, Construction, & Management.
   - Design Capacity = the total number of beds available in the program, determined by Facility Planning, Construction, & Management.
   - Population = total census per SOMS as of the "Data Refreshed" time stamp shown on the report.
   - % Occupied = (Population) / (Capacity) x 100.
   - Vacant Beds = the number of beds available after subtracting the Population from the Capacity.
   - The "PIP" column in the "Psychiatry Inpatient Program (PIP) Housing" refers to programs that have the ability to house patients requiring ICF and APP levels of care.
   - APP is a level of care and patients are housed in PIP or J-Flex beds. J-Flex beds can house patients requiring ICF, APP, or MHCB level of care.

3. Housing Groups:
   - GP Housing Group census includes patients in the following housing programs: Camp Program Beds, Debriefing Program Beds, General Population, Institution Hearing Program, Minimum Security Facility, Non-Designated Program Facility, Protective Housing Unit, Restricted Custody General Population, Sensitive Needs Yard (SNY), SNY Fire House, Minimum Support Facility (MSF), Transitional Housing Unit, Unknown, Varied Use and Work Crew.

CCHCS, Corrections Services, Compliance & Reporting Unit

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/31/23 6:29 AM

## Correctional Clinical Case Management System (CCCMS) Level of Care Population by Housing Program

| Institution | RC (Reception Center) | GP* (General Population) | EOP (Enhanced Outpatient Program) | MHCB (Mental Health Crisis Bed) | Intermediate | Flex | CTC/SNF (Correctional Treatment Center/Skilled Nursing Facility) | Hospice | OHU (Outpatient Housing Unit) | ASU (Administrative Segregation Unit) | Condemned | LTRH (Long Term Restricted Housing Unit) | NDS (Non-Disciplinary Segregation) | PSU (Psychiatric Services Unit) | SHU (Security Housing Unit) | STRH (Short Term Restricted Housing Unit) | Total CCCMS Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | | 1,503 | | | | | | | 3 | | | | | | | | 1,506 |
| CAL | | 3 | | | | | | | | | | | | | | | 3 |
| CCI | | 608 | | | | | | | | 30 | | | | | | | 643 |
| CEN | | 5 | | | | | | | | | | | | | | | 5 |
| CHCF | | 312 | 1 | | | | 116 | | 189 | | | | | | | | 618 |
| CIM | | 754 | | | | | | | 19 | 15 | | | | | | | 788 |
| CMC | | 501 | | | | | 3 | | | 5 | | | | | | | 509 |
| CMF | | 490 | | 1 | | | | 4 | 15 | 8 | | | | | | | 528 |
| COR | | 1,119 | | | | | 10 | | 11 | | | 61 | | | | 113 | 1,323 |
| CRC | | 1,166 | | | | | 19 | | 2 | 2 | | | | | | | 1,168 |
| CTF | | 909 | | | | | | | 4 | 3 | | | | | | | 916 |
| CVSP | | 1 | | | | | | | | | | | | | | | 1 |
| FOL | | 414 | | | | | | | 11 | | | | | | | | 425 |
| HDSP | | 719 | | | | | | | | 2 | | | | | | 26 | 745 |
| ISP | | 5 | | | | | | | | | | | | | | | 7 |
| KVSP | | 872 | | | | | 7 | | | 10 | | | | | | 72 | 951 |
| LAC | | 637 | 7 | | | | 2 | | | 10 | | | | | | 90 | 746 |
| MCSP | | 1,415 | 3 | | | | 1 | | | 26 | | | | | | | 1,445 |
| NKSP | 764 | 217 | | | | | 2 | | | 20 | | | | | | | 1,003 |
| PBSP | | 294 | | | | | 1 | | | | | | | | | 55 | 350 |
| PVSP | | 530 | | | | | | | | | | | | | | 56 | 586 |
| RJD | | 1,109 | 18 | | | | 7 | | | 56 | | | | | | | 1,190 |
| SAC | | 288 | 15 | | | | | | | 1 | | | | | | 65 | 369 |
| SATF | | 1,737 | | | | | 4 | | | | | | | | | 70 | 1,811 |
| SCC | | 193 | | | | | | | | 8 | | | | | | | 201 |
| SOL | | 735 | | | | | 1 | | | 24 | | | | | | | 760 |
| SQ | | 1,105 | | | | | 6 | | | 22 | 109 | | | | | | 1,242 |
| SVSP | | 1,016 | 1 | | | | 5 | | | | | | | | | 81 | 1,103 |
| VSP | | 1,115 | | | | | | | 10 | 18 | | | | | | | 1,143 |
| WSP | 1,007 | 206 | | | | | 3 | | | 32 | | | | | | | 1,248 |
| DSH-ASH | | | | | | | | | | | | | | | | | |
| DSH-CSH | | | | | | | | | | | | | | | | | |
| **Male Subtotal** | **1,771** | **19,978** | **45** | **1** | | **0** | **187** | **4** | **258** | **291** | **109** | **61** | **0** | **0** | **0** | **628** | **23,333** |
| CCWF | | 1,016 | | | | | 15 | | | 40 | 9 | | | | | | 1,354 |
| CIW | | 422 | | | | 1 | | | 8 | 6 | | | | | | | 436 |
| DSH-PSH | | | | | | | | | | | | | | | | | 1 |
| **Female Subtotal** | **274** | **1,438** | **0** | **0** | | **1** | **15** | **0** | **8** | **46** | **9** | **0** | **0** | **0** | **0** | **1,791** |
| **Grand Total** | **2,045** | **21,416** | **45** | **1** | | **1** | **202** | **4** | **266** | **337** | **118** | **61** | **0** | **0** | **0** | **628** | **25,124** |

Data Printed: 7/31/2023 7:12 AM

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/31/23 6:29 AM

Enhanced Outpatient Program (EOP) Level of Care Population by Housing Program

| Institution | RC (Reception Center) | GP* (General Population) | EOP (Enhanced Outpatient Program) | MHCB (Mental Health Crisis Bed) | Intermediate | Flex | CTC/SNF (Correctional Treatment Center/Skilled Nursing Facility) | Hospice | OHU (Outpatient Housing Unit) | ASU (Administrative Segregation Unit) | Condemned | LTRH (Long Term Restricted Housing Unit) | NDS (Non-Disciplinary Segregation) | PSU (Psychiatric Services Unit) | SHU (Security Housing Unit) | STRH (Short Term Restricted Housing Unit) | Total EOP Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | Psychiatric Inpatient Program (PIP) Housing — Specialized Medical Beds Housing — Restricted Housing |
| ASP | | 3 | | | | | | | | | | | | | | | 3 |
| CAL | | | | | | | | | | | | | | | | | |
| CCI | | | | | | | | | | | | | | | | | 2 |
| CEN | | | | | | | | | | 2 | | | | | | | 2 |
| CHCF | | 3 | 213 | 2 | 1 | 2 | 68 | | 128 | | | | | | | | 417 |
| CIM | | 1 | | | | | | | | | | | | | | | 1 |
| CMC | | | 549 | | | | 3 | | | 81 | | | | | | | 633 |
| CMF | | 1 | 430 | 2 | | 10 | 15 | | 17 | 34 | | | | | | | 509 |
| COR | | 14 | 151 | 1 | | | 10 | | 4 | 83 | | | | | | | 263 |
| CRC | | 3 | | | | | | | | | | | | | | | 3 |
| CTF | | 2 | | | | | | | | | | | | | | | 2 |
| CVSP | | | | | | | | | | | | | | | | | |
| FOL | | 1 | | | | | | | | 1 | | | | | | | 2 |
| HDSP | | 4 | | | | | | | | | | | | | | 1 | 5 |
| ISP | | | | | | | | | | | | | | | | | |
| KVSP | | 46 | 165 | | | | 1 | | | | | | | | | 25 | 237 |
| LAC | | 12 | 562 | | | | | | | 79 | | | | | | 1 | 654 |
| MCSP | | 19 | 760 | | | | | | | 53 | | | | | | | 832 |
| NKSP | 98 | | | 1 | | | | | | 9 | | | | | | | 108 |
| PBSP | | 4 | | | | | | | | | | | | | | 3 | 7 |
| PVSP | | 2 | | | | | | | | | | | | | | 2 | 4 |
| RJD | | | 795 | | | | 2 | | | 59 | | | | | | | 856 |
| SAC | | | 500 | | | | | | | 65 | | | | 162 | | | 727 |
| SATF | | 9 | 589 | | | | 8 | | | | | | | | | 12 | 618 |
| SCC | | | | | | | | | | 1 | | | | | | | 1 |
| SOL | | | | 1 | | | | | | | | | | | | | 1 |
| SQ | | 12 | 181 | | | | | | | 11 | 78 | | | | | | 282 |
| SVSP | | 36 | 224 | | 7 | | 4 | | | | | | | | | 22 | 293 |
| VSP | | 1 | 339 | | | | | | 2 | 8 | | | | | | | 350 |
| WSP | 123 | | | | | | | | | 8 | | | | | | | 131 |
| DSH-ASH | | | | | | | | | | | | | | | | | |
| DSH-CSH | | | | | | | | | | | | | | | | | |
| DSH-PSH | | | | | | | | | | | | | | | | | |
| Male Subtotal | 221 | 173 | 5,458 | 7 | 8 | 12 | 111 | 0 | 151 | 494 | 78 | 0 | 0 | 162 | 0 | 66 | 6,941 |
| CCWF | | 33 | 56 | | | | 2 | | | 5 | | | | | | | 96 |
| CIW | | | 41 | | 1 | | 1 | | | 3 | | | | 3 | | | 48 |
| DSH-PSH | | | | | | | | | | | | | | | | | 1 |
| Female Subtotal | 0 | 33 | 97 | 0 | 1 | 0 | 3 | 0 | 0 | 8 | 0 | 0 | 0 | 3 | 0 | 0 | 145 |
| Grand Total | 221 | 206 | 5,555 | 7 | 9 | 12 | 114 | 0 | 151 | 502 | 78 | 0 | 0 | 165 | 0 | 66 | 7,086 |

CCHCS, Corrections Services, Compliance & Reporting Unit

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/31/23 6:29 AM

## Mental Health Crisis Bed (MHCB) Level of Care Population by Housing Program

| Institution | RC (Reception Center) | GP* (General Population) | EOP (Enhanced Outpatient Program) | MHCB (Mental Health Crisis Bed) | Intermediate | Flex | CTC/SNF (Correctional Treatment Center/Skilled Nursing Facility) | Hospice | OHU (Outpatient Housing Unit) | ASU (Administrative Segregation Unit) | Condemned | LTRH (Long Term Restricted Housing Unit) | NDS (Non-Disciplinary Segregation) | PSU (Psychiatric Services Unit) | SHU (Security Housing Unit) | STRH (Short Term Restricted Housing Unit) | Total MHCB Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Psychiatric Inpatient Program (PIP) Housing | | Specialized Medical Beds Housing | | | | | Restricted Housing | | | | | |
| ASP | | | | | | | | | | | | | | | | | |
| CAL | | | | | | | | | | | | | | | | | |
| CCI | | | | | | | | | | | | | | | | | |
| CEN | | | | | | | | | | | | | | | | | |
| CHCF | | | | 22 | | | 2 | | | | | | | | | | 24 |
| CIM | | | | 27 | | | | | | | | | | | | | 27 |
| CMC | | 3 | | 32 | | 5 | | | | | | | | | | | 40 |
| CMF | | | | 44 | | | | | | | | | | | | | 44 |
| COR | | 3 | | 21 | | | | | | | | | | | | | 24 |
| CRC | | | | | | | | | | | | | | | | | |
| CTF | | | | | | | | | | | | | | | | | |
| CVSP | | | | | | | | | | | | | | | | | |
| FOL | | | | | | | | | | | | | | | | | |
| HDSP | | | | | | | | | | | | | | | | | |
| ISP | | | | | | | | | | | | | | | | | |
| KVSP | | 4 | | 9 | | | | | | 1 | | | | | | | 14 |
| LAC | | 2 | 3 | 11 | | | | | | 1 | | | | | | 3 | 20 |
| MCSP | | 1 | | 6 | | | | | | | | | | | | | 7 |
| NKSP | | | | 8 | | | | | | | | | | | | | 8 |
| PBSP | | | | 9 | | | | | | | | | | | | | 9 |
| PVSP | | | | | | | | | | | | | | | | | |
| RJD | | | 2 | 10 | | | | | | 5 | | | | | | | 17 |
| SAC | | | | 14 | | | | | | | | | | 6 | | | 20 |
| SATF | | | 1 | 15 | | | | | | | | | | | | 1 | 17 |
| SCC | | | | | | | | | | | | | | | | | |
| SOL | | | | 7 | | | | | | | | | | | | | 7 |
| SQ | | 1 | 1 | | | 6 | | | | | | | | | | | 8 |
| SVSP | | 5 | | 8 | | | | | | | | | | | | | 13 |
| VSP | | 2 | | | | | | | | | | | | | | | 2 |
| WSP | 2 | | | 5 | | | 1 | | | | | | | | | | 8 |
| DSH-ASH | | | | | 1 | | | | | | | | | | | | 1 |
| DSH-CSH | | | | | | | | | | | | | | | | | |
| **Male Subtotal** | **2** | **21** | **7** | **248** | **1** | **11** | **3** | **0** | **0** | **7** | **0** | **0** | **0** | **6** | **0** | **4** | **310** |
| CCWF | | | 1 | | | | | | | | | | | | | | 1 |
| CIW | | | | 10 | | | | | | | | | | | | | 10 |
| DSH-PSH | | | | | | | | | | | | | | | | | |
| **Female Subtotal** | **0** | **0** | **1** | **10** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **11** |
| **Grand Total** | **2** | **21** | **8** | **258** | **1** | **11** | **3** | **0** | **0** | **7** | **0** | **0** | **0** | **6** | **0** | **4** | **321** |

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/31/23 6:29 AM

## Intermediate Care Facility (ICF) Level of Care Population by Housing Program

| Institution | RC | GP* | EOP | MHCB | Intermediate | Flex | CTC/SNF | Hospice | OHU | Condemned | LTRH | NDS | ASU | PSU | SHU | STRH | Total ICF Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | | | | | | | | | | | | | | | | | |
| CAL | | | | | | | | | | | | | | | | | |
| CCI | | | | | | | | | | | | | | | | | |
| CEN | | | | | | | | | | | | | | | | | |
| CHCF | | | | 3 | 253 | 12 | 1 | | | | | | | | | | 269 |
| CIM | | | | 2 | | 2 | | | | | | | | | | | 4 |
| CMC | | | | | | | | | | | | | | | | | |
| CMF | | | | 1 | 65 | 38 | 1 | | | | | | | | | | 105 |
| COR | | | | 1 | | | | | | | | | | | | | 1 |
| CRC | | | | | | | | | | | | | | | | | |
| CTF | | | | | | | | | | | | | | | | | |
| CVSP | | | | | | | | | | | | | | | | | |
| FOL | | | | | | | | | | | | | | | | | |
| HDSP | | | | | | | | | | | | | | | | | |
| ISP | | | | | | | | | | | | | | | | | |
| KVSP | | | 1 | | | | | | | | | | | | | | 1 |
| LAC | | | 2 | | | | | | | | | | 1 | | | | 3 |
| MCSP | | | 1 | | | | | | | | | | | | | | 1 |
| NKSP | | | | | | | | | | | | | | | | | |
| PBSP | | | | 1 | | | | | | | | | | | | | 1 |
| PVSP | | | | | | | | | | | | | | | | | |
| RJD | | | 1 | 2 | | | | | | | | | | | | | 3 |
| SAC | | | 1 | 6 | | | | | | | | | | 1 | | | 8 |
| SATF | | | | 3 | | | | | | | | | | | | | 3 |
| SCC | | | | | | | | | | | | | | | | | |
| SOL | | | | | | | | | | | | | | | | | |
| SQ | | | | | | 19 | | | | | | | | | | | 19 |
| SVSP | | 1 | 1 | 1 | 199 | | 2 | | | | | | | | | | 204 |
| VSP | | | | | | | | | | | | | | | | | |
| WSP | | | | | | | | | | | | | | | | | |
| DSH-ASH | | | | | 57 | | | | | | | | | | | | 57 |
| DSH-CSH | | | | | 46 | | | | | | | | | | | | 46 |
| *Male Subtotal* | 0 | 1 | 7 | 20 | 620 | 71 | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 725 |
| CCWF | | | 1 | | | | | | | | | | | | | | 1 |
| CIW | | | | 2 | | 35 | 1 | | | | | | | | | | 38 |
| DSH-PSH | | | | | 10 | | | | | | | | | | | | 10 |
| *Female Subtotal* | 0 | 0 | 1 | 2 | 10 | 35 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 49 |
| **Grand Total** | 0 | 1 | 8 | 22 | 630 | 106 | 5 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 774 |

Column key:
- RC — Reception Center
- GP* — General Population
- EOP — Enhanced Outpatient Program
- MHCB — Mental Health Crisis Bed
- CTC/SNF — Correctional Treatment Center/Skilled Nursing Facility
- OHU — Outpatient Housing Unit
- LTRH — Long Term Restricted Housing Unit
- NDS — Non-Disciplinary Segregation
- ASU — Administrative Segregation Unit
- PSU — Psychiatric Services Unit
- SHU — Security Housing Unit
- STRH — Short-Term Restricted Housing Unit

(Specialized Medical Beds Housing: CTC/SNF, Hospice, OHU; Restricted Housing: LTRH, NDS, ASU, PSU, SHU, STRH; PIP Housing: Intermediate, Flex)

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/31/23 6:29 AM

## Acute Psychiatric Program (APP) Level of Care Population by Housing Program

| Institution | RC (Reception Center) | GP* (General Population) | EOP (Enhanced Outpatient Program) | MHCB (Mental Health Crisis Bed) | Intermediate | Flex | CTC/SNF (Correctional Treatment Center/Skilled Nursing Facility) | Hospice | OHU (Outpatient Housing Unit) | ASU (Administrative Segregation Unit) | Condemned | LTRH (Long Term Restricted Housing Unit) | NDS (Non-Disciplinary Segregation) | PSU (Psychiatric Services Unit) | SHU (Security Housing Unit) | STRH (Short Term Restricted Housing Unit) | Total APP Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Psychiatric Inpatient Program (PIP) Housing | | Specialized Medical Beds Housing | | | Restricted Housing | | | | | | | |
| ASP | | | | | | | | | | | | | | | | | |
| CAL | | | | | | | | | | | | | | | | | |
| CCI | | | | | | | | | | | | | | | | | |
| CEN | | | | | | | | | | | | | | | | | |
| CHCF | | | | 1 | | 114 | | | | | | | | | | | 115 |
| CIM | | | | 7 | | | | | | | | | | | | | 7 |
| CMC | | | | 2 | | 4 | | | | | | | | | | | 6 |
| CMF | | | | 1 | | 163 | | | | | | | | | | | 164 |
| COR | | | | 1 | | | 1 | | | | | | | | | | 2 |
| CRC | | | | | | | | | | | | | | | | | |
| CTF | | | | | | | | | | | | | | | | | |
| CVSP | | | | | | | | | | | | | | | | | |
| FOL | | | | | | | | | | | | | | | | | |
| HDSP | | | | | | | | | | | | | | | | | |
| ISP | | | | | | | | | | | | | | | | | |
| KVSP | | | | 1 | | | | | | | | | | | | | 1 |
| LAC | | | | 1 | | | | | | | | | | | | | 1 |
| MCSP | | | | 2 | | | | | | | | | | | | | 2 |
| NKSP | | | | 1 | | | | | | | | | | | | | 1 |
| PBSP | | | | | | | | | | | | | | | | | |
| PVSP | | | | | | | | | | | | | | | | | |
| RJD | | | | 2 | | | | | | | | | | | | | 2 |
| SAC | | | | 4 | | | | | | | | | | | | | 4 |
| SATF | | | | 1 | | | | | | | | | | | | | 1 |
| SCC | | | | | | | | | | | | | | | | | |
| SOL | | | | 1 | | | | | | | | | | | | | 1 |
| SQ | | | | | | 10 | 1 | | | | | | | | | | 11 |
| SVSP | | | | 1 | | | | | | | | | | | | | 1 |
| VSP | | | | | | | | | | | | | | | | | |
| WSP | | | | 1 | | | | | | | | | | | | | 1 |
| DSH-ASH | | | | | | | | | | | | | | | | | |
| DSH-CSH | | | | | | | | | | | | | | | | | |
| *Male Subtotal* | 0 | 0 | 0 | 27 | 0 | 291 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 320 |
| CCWF | | | | | | 2 | | | | | | | | | | | 2 |
| CIW | | | | 2 | | | | | | | | | | | | | 2 |
| DSH-PSH | | | | | | | | | | | | | | | | | |
| *Female Subtotal* | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| *Grand Total* | 0 | 0 | 0 | 29 | 0 | 293 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 324 |

# EXHIBIT D

**STATE OF CALIFORNIA**
Budget Change Proposal - Cover Sheet
DF-46 (REV 10/20)

| Fiscal Year | Business Unit | Department | | Priority No. |
|---|---|---|---|---|
| 2023-24 | 5225 | California Department of Corrections and Rehabilitation | | |

| Budget Request Name | Program | Subprogram |
|---|---|---|
| 5225-320-BCP-2023-MR | 4660–Mental Health Services - Adult | 4660014-Mental Health Other-Adult |

**Budget Request Description**
Expansion of the Statewide Tele-Mental Health Program

**Budget Request Summary**
The California Department of Corrections and Rehabilitation and California Correctional Health Care Services request 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144.0 positions and $16.8 million General Fund in 2025-26 and ongoing to expand the use of Tele-Mental Health services to include psychology and social work in addition to psychiatry.

| Requires Legislation | Code Section(s) to be Added/Amended/Repealed |
|---|---|
| ☐ Yes    ☒ No | |

| Does this BCP contain information technology (IT) components? ☒ Yes   ☐ No | Department CIO | Date |
|---|---|---|
| *If yes, departmental Chief Information Officer must sign.* | Cheryl Larson | 5/12/2023 |

**For IT requests, specify the project number, the most recent project approval document (FSR, SPR, S1BA, S2AA, S3SD, S4PRA), and the approval date.**

Project No.    Project Approval Document:

Approval Date:

**If proposal affects another department, does other department concur with proposal?** ☐ Yes ☐ No
*Attach comments of affected department, signed and dated by the department director or designee.*

| Prepared By | Date | Reviewed By | Date |
|---|---|---|---|
| Amar Mehta | 5/12/2023 | Duane Reeder | 5/12/2023 |
| **Department Director** | **Date** | **Agency Secretary** | **Date** |
| Diana Toche | 5/12/2023 | Jeff Macomber | 5/12/2023 |

**Department of Finance Use Only**

**Additional Review:** ☐ Capital Outlay ☐ ITCU ☐ FSCU ☐ OSAE ☐ Dept. of Technology

| PPBA | Date submitted to the Legislature |
|---|---|
| Allison Hewitt | 5/12/2023 |

**A. Budget Request Summary**

The California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS) request 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144.0 positions and $16.8 million General Fund in 2025-26 and ongoing to expand the use of Tele-Mental Health (TMH) services to include psychology and social work in addition to psychiatry.

This request includes funding to establish dedicated TMH management, supervisory oversight, administrative support, tele-presenters, research staff, and information technology (IT) support to help optimize and improve the expanded program, along with purchasing TMH equipment.

**B. Background/History**

*Coleman v. Newsom* is a class action lawsuit filed in 1990, in which the plaintiffs alleged that defendants (CDCR) provided an unconstitutional level of Mental Health Care to inmate-patients. In 1995, following a trial before the magistrate judge, the District Court found CDCR in violation of their Eighth Amendment duty to provide California's mentally ill incarcerated individuals with access to adequate mental health care and appointed a Special Master to monitor CDCR's compliance with court-ordered relief.

On February 28, 2023, the court ordered that CDCR address inadequate mental health staffing levels in California's prisons. The order requires CDCR to comply with staffing ratios in the 2009 Staffing Plan and the maximum ten percent vacancy rate from the court's June 13, 2002, order. CDCR has already implemented a successful tele-psychiatry program that has improved access to mental health care services and reduced staffing shortages. Expanding this program to include tele-psychology and tele-social work will further improve the delivery of mental health care services in the prison system.

Secure videoconferencing improves access to care, enabling patients at institutions to meet with tele-psychiatrists with support from onsite tele-presenters. Tele-psychiatrists are located across the state to allow access to candidate pools that otherwise would not be able to serve the CDCR population. These successes can be built upon by expanding TMH services to include psychologists and social workers.

In addition, the Statewide Mental Health Program (SMHP) is governed by its own court-approved policy with detailed rules and reporting requirements and is responsible for expanding services through a number of court-approved initiatives. While TMH clinicians can assist institutions, they do not significantly decrease the workload of onsite supervisors, who must continue to attend committees, liaise with other disciplines, and perform regular duties. Tele-psychiatry maintains internal control over the clinical and operational support supervision of all tele-psychiatrists, allowing supervisors to respond quickly to obstacles and hurdles and maintain relationships with providers they have recruited. The Statewide Telepsychiatry Program (STP) hired and retained over 90 civil service psychiatrists, crediting the separate supervisory structure as a key component to hiring and retaining a stable group of clinicians to see patients.

Expanding TMH services to include psychologists and social workers will greatly benefit CDCR in improving the delivery of mental health care services to patients while meeting court-ordered requirements. With the proper operational support structure and oversight, CDCR can build upon the success of the STP to further improve the Statewide Mental Health Program and provide an additional opportunity to support recruitment and retention of hard-to-fill clinical positions.

**Resource History**
*(Dollars in thousands)*

| Program Budget | PY – 4 | PY – 3 | PY – 2 | PY-1 | PY | CY |
|---|---|---|---|---|---|---|
| Authorized Expenditures* | $221,886 | $211,507 | $233,436 | $214,800 | $224,524 | $224,712 |
| Actual Expenditures* | $217,173 | $203,939 | $205,887 | $179,654 | $154,414 | $151,957 |
| Authorized Positions* | 1,213.5 | 1,156 | 1,282.5 | 1,178.3 | 1,231 | 1,233 |
| Filled Positions* | 1,164.25 | 1,090.55 | 1,102.85 | 954.85 | 810.2 | 788.78 |
| Vacancies* | 49.25 | 65.45 | 179.65 | 223.45 | 420.8 | 444.22 |

* Mental Health program Psychologist and Social Worker positions only.

## C.  State Level Consideration

To comply with federal court orders resulting from *Coleman v. Newsom*, CDCR is mandated to provide a constitutionally adequate level of mental health care to the incarcerated population, with a fill rate of at least 90 percent for specified clinical positions, including psychiatrists, psychologists, and licensed clinical social workers. CDCR has implemented a number of strategic and innovative recruitment and outreach efforts, but achieving a 90 percent fill-rate for these clinical positions has proven challenging for the Department. Additionally, recent trends in the labor market have resulted in a nationwide shortage of mental health clinicians, including psychologists and licensed social workers.

The STP was developed to improve patient care while helping with the recruitment and retention of psychiatrist positions, and its recent growth has significantly improved patients' access to mental health care services. Building on the success of the STP, adding tele-psychology and tele-social work services will enhance the core components of the mental health system and help CDCR fill these hard-to-fill classifications.

## D.  Justification

To improve access to mental health services for incarcerated individuals, CDCR and CCHCS are requesting 85.0 positions and $11.0 million General Fund starting in fiscal year 2023-24 and 144.0 positions and $16.8 million ongoing to provide the necessary staffing to operationalize the expansion of the Tele-Mental Health Program to include psychology and social work components. As a part of this proposal, CDCR/CCHCS will redirect 100 existing psychologist and clinical social worker positions to serve in the Tele-Mental Health Program. The resources requested in this BCP will serve as the operational, supervisory, and administrative support for the redirected positions in providing tele-mental health services.

Developing and implementing tele-psychology and tele-social work will require focused effort by the Department as well as the level of additional resources requested. The STP, which was initiated in 2014-15, required significant coordination to develop, implement, and expand to its current staffing level. For instance, expanding CDCR's night shift program from two part-time doctors at 10 institutions to 12 doctors covering all facilities, seven nights a week, took almost two years of planning, hiring, and coordination by a team of senior supervising psychiatrists with support from two chief psychiatrists. CDCR expects developing and implementing tele-psychology and tele-social work to be similarly challenging, necessitating more supervisory resources to develop policies, procedures, coordinate with institutions and IT, hire and train line staff, and address any bumps in the road as CDCR integrates these new services into CDCR's existing infrastructure.

**Tele-Mental Health Leadership, Recruitment, and Integration**

As CDCR and CCHCS expands its STP to include tele-psychology and tele-social work, it will be crucial to hire a team of professionals to support, manage, and supervise the development and implementation of services necessary to facilitate daily operations.

Tele-presenters (medical assistants [MAs]) play an important role in providing technical and onsite support for the tele-psychology and tele-social work services. MAs will be calculated at a 1:1 ratio to psychologists and social workers providing teleservices and will be managed by Supervising Registered Nurse (SRN) IIs, which are calculated at a 1:12 ratio. These MAs will help facilitate TMH services at the institution, ensuring that the technology is working properly and that sessions can proceed smoothly. They will help prepare patients for their appointments, alert the provider to any remarkable patient issues observed, and ensure that the necessary equipment is in place. In addition, MAs will be responsible for confirming the scheduling of TMH sessions, ensuring patients attend their appointments, coordinating care between the TMH providers and onsite mental health staff, and helping to ensure patients receive appropriate follow-up care as needed.

To support TMH, CDCR will need to hire an Assistant Deputy Director (ADD) that will be responsible for overseeing the program's expansion and ensuring that it meets the needs of CDCR's incarcerated population. This position will require extensive knowledge and experience in tele-health, as well as strong leadership and communication skills to coordinate with various stakeholders and agencies.

In addition, two Chief Psychologists, six Senior Psychologist Supervisors, one Supervising Psychiatric Social Worker (SPSW) II, and three SPSW Is will support the ADD and provide supervision for the mental health clinicians within TMH. This team is responsible for enforcing policy, procedures, and training requirements. They will also coordinate with institutions and IT to sort out daily logistics necessary to deliver mental health services. Additionally, they will be responsible for all hiring and training of line staff to ensure the program is implemented smoothly.

Similar to the STP, although the existing line staff fall under existing on-site supervisory positions, the supervisory structure for on-site psychologists and social workers cannot be transferred or shared with off-site counterparts. As TMH expands, proper operational support structure and oversight are needed to ensure its success. A separate supervisory structure is necessary to manage day-to-day operations, oversee quality control, provide clinical supervision, coordinate institutional assignments, and more. The roles of tele-health supervisors and onsite supervisors are largely independent of one another, as TMH has its own duties and functions, with significant coordination costs that onsite supervisors cannot manage.

The Senior Psychologist Supervisor and Supervising Psychiatric Social Worker I positions requested were calculated based on a ratio of 1:12 line staff psychologists and social workers providing tele-services. Chief Psychologist and Supervising Psychiatric Social Worker II positions were calculated based on a ratio of 1:4 supervisory psychologist and social worker positions. Additionally, a Senior Psychologist Supervisor or Supervising Psychiatric Social Worker I position were allocated when the number of line staff full-time equivalents (FTEs) reached half of the ratio, in order to maintain appropriate supervision. For example, 6 FTEs (50 percent of the ratio of 12:1) would result in the first additional Senior or Supervising allocation, and 12 + 6 = 18 FTEs would result in a second Senior or Supervising allocation. Similarly, a Chief position will be allocated when the number of Seniors reaches half of the ratio; for example, 2 FTEs (50 percent of the ratio of 4:1) would result in the first Chief position, and 4 + 2 = 6 FTEs would result in the second Chief position.

Given that CDCR/CCHCS are redirecting 100 line staff psychologists and social workers (66-77 psychologists and 30-41 social workers), utilizing the ratios described above results in a need for 6 Senior Psychologists and 3 Supervising Social Worker Is. Based on the first line supervisory numbers, CDCR/CCHCS are requesting 2 Chief Psychologists and 1 Supervising Psychiatric Social Worker II.

The 1 Research Data (RD) Supervisor I, 1 RD II, 1 RD Specialist I, and 1 RD Analyst II positions requested all play a critical role in maintaining and updating CDCR's OnDemand data reports for compliance, PowerBI reports for operations, and end-user support needed to train and orient new TMH staff. Reporting requirements for a new TMH program will be significant and will require a slightly different set of benchmarks to measure additional axes such as connection strength, dropped calls, bandwidth infrastructure, etc. These experts can ensure that the data is accurately collected and analyzed to generate comprehensive reports to track progress for CDCR and the court and identify areas for improvement. Additionally, they can assist in the development of training materials and user manuals for new TMH staff, ensuring that they are properly oriented and effectively using the technology and systems necessary for their work. The RD Supervisor I & II will provide leadership and oversight for the analytical team, spending the majority of their time in coordination and supervision activities. The RD Specialist I will develop and utilize research methodology and techniques to improve data collection and analysis, while the RD Analyst II will perform a variety of tasks including complex and specific research and data subset analysis needed to support these efforts and include outliers. By working together, these positions can ensure that CDCR's TMH program has the necessary data and systems to support successful implementation and improvements.

### Tele-Mental Health Operational Support

The implementation of a TMH program in a correctional facility is a complex process that involves the integration of many moving parts. The expansion of services requires the addition of many new positions, the modification of existing systems and infrastructure, the development of new policies and procedures, and the coordination of various stakeholders across multiple locations. These changes require careful planning, organization, and management to ensure a successful implementation. To address the growth of the TMH program, CDCR requires positions for administrative support, which will allow the TMH clinicians to focus on critical clinical work. The SMHP needs to ensure operational and administrative support for the new tele-health structure. This provides consistent oversight for support staff and ensures sustainable long-term supervision of line staff.

The TMH program requires support across all program areas to ensure its success. Staff will provide analytical support, develop policies and procedures, and assist with hiring. They will create timelines, provide logistical expertise, and design ongoing maintenance for project sustainability. This team will monitor and audit adherence to TMH services, conduct complex data analysis, and lead targeted improvement projects as a subject matter expert on scheduling and mental health services logistics. Utilizing project management tools, CDCR will enhance and expand TMH services. With continued growth of TMH, the Staff Service Manager (SSM) III will oversee an existing SSM II, and one additional SSM II who will manage two SSM Is, and a Health Program Specialist (HPS) II. One SSM I will oversee the tele-psychology program and the other will oversee the tele-social worker program. One HPS I and three Staff Services Analyst (SSA)/Associate Governmental Program Analysts (AGPAs) will be assigned to each team and provide support to the TMH program, Chief Psychologists, and Supervising Psychiatric Social Worker II positions. (See Workload Analysis for details).

Resource Request for Tele-Mental Health:

- ADD Psychiatrist – 1.0
- Chief Psychologist – 2.0 (1.0 Budget Year [BY], 1.0 BY+1)
- Senior Psychologist Supervisor – 6.0 (3.0 BY, 3.0 BY+1)
- SPSW I – 3.0 (2.0 BY, 1.0 BY+1)
- SPSW II – 1.0
- MA – 100.0 (50.0 BY, 50.0 BY+1)
- SRN II – 8.0 (4.0 BY, 4.0 BY+1)
- RD Supervisor I – 1.0
- RD Supervisor II – 1.0
- RD Analyst II – 1.0

- RD Specialist I – 1.0
- SSM III – 1.0
- SSM II – 1.0
- SSM I – 2.0
- HPS II – 1.0
- HPS I – 2.0
- SSA/AGPA – 6.0

**TMH Information Technology Positions and Equipment**

The CCHCS Information Technology Services Division (ITSD) supports approximately 18,000 employees statewide at all correctional institutions, 14 remote administrative offices, 1 Central Fill Pharmacy, 1 Health Records Center, and headquarters offices. The ITSD services align with the Receiver's Turnaround Plan of Action, Goal 5 – Establish Medical Support Infrastructure, by providing technology support for health care administration in a correctional setting. To support the growth of the Tele-Mental Health Program, CCHCS ITSD requests additional positions be established to provide operations support as follows.

One tele-health support position at the IT Specialist I level is required to support network connectivity and the tele-health video communications systems and solutions. The resource will support tele-health video conferencing systems (Cisco Unified Call Manager), Cisco DX80 monitors and Cisco Webex systems, equipment services, hardware, and software solutions statewide. This position will provide first and second level enterprise-wide IT tele-health support and provision, troubleshoot tele-health communication equipment, and train and assist the customers in the use of tele-health hardware and software across the enterprise.

- Currently the tele-health program is supporting 850 tele-health carts and accounts across the enterprise with 11 positions at a current ratio of 77:1.
- Tele-health expects to add approximately 200 additional carts and accounts bringing the total number to 1,050 carts and accounts. With the additional positions the ratio of support would be 104:1.
- Without the additional ITSD position, the ratio would be 113:1 for these new positions. This would result in longer wait times for service and provisioning requests and longer issue-resolution times, which may impact the ability of the SMHP to deliver patient care using these critical tele-health video conferencing systems.

In addition, an ITSD support position at the IT Associate level is needed in the customer support center to provide first and second level centralized enterprise IT support for the additional positions requested. This position will resolve the first and second tier account issues, installs, and software application maintenance needs. Support and maintenance will also be provided for the IT desktop equipment, such as laptops and associated peripherals and provide enterprise-wide technology solutions in support of the mission of the SMHP.

**ITSD Services Hardware/Software Request**

In addition to the staffing described above, ITSD requires additional hardware and software for the program to operate effectively, as shown below.

| Item | Unit Cost One Time | Unit Cost ongoing | FY 23/24[1] | FY 24/25[2] | FY 25/26[3] | FY 26/27[4] | FY 27/28 and ongoing[5] |
|---|---|---|---|---|---|---|---|
| Cisco DX80 Monitors | $2,500 | $500 | $250,000 | $300,000 | $100,000 | $100,000 | $100,000 |
| Smart Net Total Care | $375 | $375 | $37,500 | $75,000 | $75,000 | $75,000 | $75,000 |
| Call Manager Licensing | $150 | $150 | $15,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| Call Manager Software Support | $40 | $40 | $4,000 | $8,000 | $8,000 | $8,000 | $8,000 |
| Webex Meeting License | $250 | $250 | $25,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Webex Meeting Audio License | $180 | $180 | $18,000 | $36,000 | $36,000 | $36,000 | $36,000 |
| EHRS Licensing | $1,500 | $1,500 | $75,000 | $150,000 | $150,000 | $150,000 | $150,000 |
| Microsoft Licensing | Varies | Varies | $30,942 | $63,840 | $69,720 | $76,692 | $84,361 |
| Total | | | $455,442 | $712,840 | $518,720 | $525,692 | $533,361 |

[1]FY 23/24 includes 100 one-time costs.

[2]FY 24/25 includes 100 one-time cost and 100 ongoing costs (from FY 23/24).

[3]FY 25/26 includes 200 ongoing costs (from FY 23/24 & 24/25).

[4]FY 26/27 includes 200 ongoing costs (from FY 23/24 - 25/26).

[5]FY 27/28 includes 200 ongoing costs (from FY 23/24 - 26/27).

Resource Request:
- IT Associate – 1.0
- IT Specialist I – 1.0

## Human Resources Positions

CCHCS HR is responsible for headquarters, regional, and institutional recruitment and hiring processes, while delivering innovative HR solutions and services that attract and serve a diverse and highly qualified workforce. HR is also responsible for providing support and guidance to departmental programs and institutions on HR related issues. This HR request is for 4.0 positions that will be established to focus on mental health recruiting and hiring initiatives.

To meet the increased need for the SMHP, HR must expand all mental health clinical recruitment and hiring campaigns to fill current vacancies as well as all mental health positions within this request. HR continues to seek ways to further promote mental health career opportunities and increase candidate awareness with innovative campaigns bridging multiple efforts and reaching multi-generational candidates. However, demands nationwide for mental health providers have greatly impacted the ability for the State to hire what has become an increasingly competitive resource.

In order to compete for candidates in an already strained and competitive workforce, HR has established an end-to-end recruitment and hiring experience to help fill growing vacancies throughout the department. These focused hiring events allow prospective candidates to submit job applications, participate in on-line civil service examinations, and in-person or virtual interviews. If successful, candidates are live-scanned, extended tentative job offers, and given instructions and assistance to begin the credentialling process. HR has expanded this concept and has begun hosting modified hiring events that start at the interview stage. In order to accommodate candidate's schedules, HR posts job advertisements inviting candidates to schedule interviews based on their convenience/availability including virtual or in-person interviews.

Based on the increasing workload, HR is requesting permanent funding for positions to maintain and support mental health program recruitment and hiring initiatives including the new TMH program, while addressing current staffing deficiencies and ensuring the SMHP workload demands are met efficiently, accurately, and timely. HR requests SSA/AGPA and Personnel Technician (PT) II positions to manage the recruitment process to fill vacant positions, post job announcements, analyze

personnel actions, and initiate and complete "Requests for Personnel Actions" in order to establish, recruit, fill, reclassify and redirect positions in accordance with state and departmental laws, rules, processes, procedures, and perform other duties as required. The Personnel Specialist (PS) position will be responsible for the personnel transactions of an assigned roster and is responsible for the processing of attendance and payroll for employees in a variety of bargaining units, as well as excluded employees. The PS is also responsible for interpreting and applying the personnel related laws, rules, regulations, policies, and memoranda of understanding, and performing salary determinations.

Without these positions, HR will experience challenges meeting the recruitment needs and high demands of the SMHP initiatives, in addition to continued implementation of the TMH program. Approval of this request is necessary to ensure HR continues to provide prompt and consistent services, critical to the Department's mission.

Resource Request:

- SSA/AGPA – 2.0
- PT II – 1.0
- PS – 1.0

## E. Outcomes and Accountability

The expansion of TMH services is critical to meeting the mental health needs of CDCR patients. The requested supervisory and support staff will enable the department to sustain and improve the quality of mental health care services provided remotely. Additionally, the implementation of tele-psychology and tele-social work services will greatly enhance the capacity to deliver comprehensive mental health care to patients, including access to evidence-based treatment modalities. The recruitment and retention efforts will ensure adequate staffing levels to support patient care with the benefit of helping CDCR/CCHCS meet court-mandated fill rates. Furthermore, the research studies conducted with the support of the requested research positions will provide valuable data on the effectiveness of TMH services in an incarcerated setting, enabling the department to continuously improve its services and demonstrate accountability to the court. Ultimately, the requested staff will facilitate the development and implementation of a sustainable and effective TMH program that meets the mental health needs of CDCR patients.

## F. Analysis of All Feasible Alternatives

### Alternative #1

Approve 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144.0 positions and $16.8 million General Fund in 2025-26 and ongoing expand the use of tele-Mental Health (TMH) services to include psychology and social work in addition to psychiatry. This request includes funding to establish a dedicated TMH program including clinical management and supervisory oversight, tele-presenters, operational oversight and support, HR resources, IT resources and equipment, and establishes ratios by which to adjust supervisory positions and tele-presenters as TMH authority changes.

**Pros:**

- Supports recruitment and retention of clinical positions.
- Tele-psychologists and tele-social workers will be able to focus on providing patient mental health care without the potential need to perform ad-hoc supervisory functions.
- Appropriate supervisory span of control.
- Appropriate clinical and operational support and leadership positions.
- Resources necessary to provide sustainable structure for department to maximize the opportunity to improve recruitment and retention.

**Cons:**

• Requires General Fund support.


**Alternative #2**

Do not approve any positions requested in this proposal.

**Pros:**

• No impact on the General Fund.

**Cons:**

• CDCR will be unable to improve access to mental health services for incarcerated individuals and provide appropriate clinical care to the entire incarcerated population.

• Continues challenges and delays to recruit and retain mental health clinicians.


**G. Implementation Plan**

Upon approval of the 2023 Budget Act, CDCR will advertise and recruit for the 35.0 positions that exclude the MAs. The remaining 50.0 MAs will be established, advertised, and recruited upon the hiring of the clinicians.

Starting July 2024, CDCR will advertise and recruit the 9.0 additional positions that exclude the MAs. The remaining 50.0 MAs will be established, advertised, and recruited for upon the hiring of the clinicians.


**H. Supplemental Information**

Attachment A – TMH Workload Analysis
Attachment B – IT Workload Analysis
Attachment C – HR Workload Analysis

Court orders available upon request: ECF No.7741, ECF No.7742, and ECF No.7743


**I. Recommendation**

Alternative #1 - Approve request for 85.0 positions and $11.0 million General Fund in 2023-24, 144.0 positions and $17.3 million General Fund in 2024-25, and 144 positions and $16.8 million General Fund in 2025-26 and ongoing to expand the use of TMH services to include psychology and social worker in addition to psychiatry. This request includes funding to establish a dedicated TMH program including management and supervisory oversight, tele-presenters, operational oversight and support, HR resources, IT resources and equipment and establish ratios by which to adjust supervisory positions as TMH authority changes.

# BCP Fiscal Detail Sheet

BCP Title: Expansion of the Statewide Tele-Mental Health Program

BR Name: 5225-320-BCP-2023-MR

Budget Request Summary

## Personal Services

| Personal Services | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| Positions - Permanent | 0.0 | 85.0 | 144.0 | 144.0 | 144.0 | 144.0 |
| **Total Positions** | **0.0** | **85.0** | **144.0** | **144.0** | **144.0** | **144.0** |
| Salaries and Wages | 0 | 6,452 | 10,357 | 10,357 | 10,357 | 10,357 |
| Earnings - Permanent | | | | | | |
| **Total Salaries and Wages** | **$0** | **$6,452** | **$10,357** | **$10,357** | **$10,357** | **$10,357** |
| Total Staff Benefits | 0 | 3,429 | 5,600 | 5,600 | 5,600 | 5,600 |
| **Total Personal Services** | **$0** | **$9,881** | **$15,957** | **$15,957** | **$15,957** | **$15,957** |

## Operating Expenses and Equipment

| Operating Expenses and Equipment | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 5301 - General Expense | 0 | 35 | 54 | 54 | 54 | 54 |
| 5302 - Printing | 0 | 9 | 10 | 10 | 10 | 10 |
| 5304 - Communications | 0 | 14 | 14 | 14 | 14 | 14 |
| 5306 - Postage | 0 | 3 | 3 | 3 | 3 | 3 |
| 5320 - Travel: In-State | 0 | 40 | 56 | 56 | 56 | 56 |
| 5322 - Training | 0 | 12 | 19 | 19 | 19 | 19 |
| 5324 - Facilities Operation | 0 | 34 | 34 | 34 | 34 | 34 |
| 5326 - Utilities | 0 | 1 | 1 | 1 | 1 | 1 |
| 5340 - Consulting and Professional Services - External | 0 | 5 | 5 | 5 | 5 | 5 |
| 5340 - Consulting and Professional Services - Interdepartmental | 0 | 2 | 2 | 2 | 2 | 2 |
| 5346 - Information Technology | 0 | 207 | 415 | 421 | 428 | 435 |
| 5368 - Non-Capital Asset Purchases - Equipment | 0 | 714 | 745 | 250 | 250 | 250 |
| 539X - Other | 0 | 2 | 3 | 3 | 3 | 3 |
| **Total Operating Expenses and Equipment** | **$0** | **$1,078** | **$1,361** | **$872** | **$879** | **$888** |

Total Budget Request

| Total Budget Request | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| **Total Budget Request** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |

## Fund Summary

### Fund Source

| Fund Source | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| State Operations - 0001 - General Fund | 0 | 10,959 | 17,318 | 16,829 | 16,836 | 16,844 |
| **Total State Operations Expenditures** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |
| **Total All Funds** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |

## Program Summary

### Program Funding

| Program Funding | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 4670 - Dental and Mental Health Services Administration-Adult | 0 | 4,300 | 5,316 | 5,306 | 5,306 | 5,309 |
| 4650012 - Medical Administration-Adult | 0 | 1,278 | 1,525 | 1,331 | 1,338 | 1,343 |
| 4650014 - Medical Other-Adult | 0 | 899 | 1,790 | 1,782 | 1,782 | 1,782 |
| 4660014 - Mental Health Other-Adult | 0 | 4,482 | 8,687 | 8,410 | 8,410 | 8,410 |
| **Total All Programs** | **$0** | **$10,959** | **$17,318** | **$16,829** | **$16,836** | **$16,844** |

# Personal Services Details

## Positions

| Positions | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 1303 - Personnel Spec (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 1401 - Info Tech Assoc (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 1402 - Info Tech Spec I (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 4800 - Staff Svcs Mgr I (Eff. 07-01-2023) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| 4801 - Staff Svcs Mgr II (Supvry) (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 4802 - Staff Svcs Mgr III (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5161 - Pers Techn II (Spec) (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5393 - Assoc Govtl Program Analyst (Eff. 07-01-2023) | 0.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| 5731 - Research Data Analyst II (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5734 - Research Data Supvr I (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5737 - Research Data Supvr II (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 5742 - Research Data Spec I (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 7374 - Medical Assistant (Eff. 07-01-2023) | 0.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| 7374 - Medical Assistant (Eff. 07-01-2024) | 0.0 | 0.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| 8239 - Receiver's Med Exec (Safety) (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 8336 - Hlth Program Spec II (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 8338 - Hlth Program Spec I (Eff. 07-01-2023) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| 9288 - Sr Psychologist - CF (Supvr) (Eff. 07-01-2023) | 0.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| 9288 - Sr Psychologist - CF (Supvr) (Eff. 07-01-2024) | 0.0 | 0.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| 9291 - Supvng Psych Soc Worker I - CF (Eff. 07-01-2023) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| 9291 - Supvng Psych Soc Worker I - CF (Eff. 07-01-2024) | 0.0 | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 9292 - Supvng Psych Soc Worker II - CF (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 9318 - Supvng Registered Nurse II - CF (Eff. 07-01-2023) | 0.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| 9318 - Supvng Registered Nurse II - CF (Eff. 07-01-2024) | 0.0 | 0.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| 9859 - Chief Psychologist - CF (Eff. 07-01-2023) | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| 9859 - Chief Psychologist - CF (Eff. 07-01-2024) | 0.0 | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Total Positions** | **0.0** | **85.0** | **144.0** | **144.0** | **144.0** | **144.0** |

Salaries and Wages

| Salaries and Wages | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 1303 - Personnel Spec (Eff. 07-01-2023) | 0 | 61 | 61 | 61 | 61 | 61 |
| 1401 - Info Tech Assoc (Eff. 07-01-2023) | 0 | 78 | 78 | 78 | 78 | 78 |
| 1402 - Info Tech Spec I (Eff. 07-01-2023) | 0 | 97 | 97 | 97 | 97 | 97 |
| 4800 - Staff Svcs Mgr I (Eff. 07-01-2023) | 0 | 183 | 183 | 183 | 183 | 183 |
| 4801 - Staff Svcs Mgr II (Suprvy) (Eff. 07-01-2023) | 0 | 100 | 100 | 100 | 100 | 100 |
| 4802 - Staff Svcs Mgr III (Eff. 07-01-2023) | 0 | 115 | 115 | 115 | 115 | 115 |
| 5161 - Pers Techn II (Spec) (Eff. 07-01-2023) | 0 | 58 | 58 | 58 | 58 | 58 |
| 5393 - Assoc Govtl Program Analyst (Eff. 07-01-2023) | 0 | 621 | 621 | 621 | 621 | 621 |
| 5731 - Research Data Analyst II (Eff. 07-01-2023) | 0 | 81 | 81 | 81 | 81 | 81 |
| 5734 - Research Data Supvr I (Eff. 07-01-2023) | 0 | 91 | 91 | 91 | 91 | 91 |
| 5737 - Research Data Supvr II (Eff. 07-01-2023) | 0 | 100 | 100 | 100 | 100 | 100 |
| 5742 - Research Data Spec I (Eff. 07-01-2023) | 0 | 85 | 85 | 85 | 85 | 85 |
| 7374 - Medical Assistant (Eff. 07-01-2023) | 0 | 2,561 | 2,561 | 2,561 | 2,561 | 2,561 |
| 7374 - Medical Assistant (Eff. 07-01-2024) | 0 | 0 | 2,561 | 2,561 | 2,561 | 2,561 |
| 8239 - Receiver's Med Exec (Safety) (Eff. 07-01-2023) | 0 | 384 | 384 | 384 | 384 | 384 |
| 8336 - Hlth Program Spec II (Eff. 07-01-2023) | 0 | 93 | 93 | 93 | 93 | 93 |
| 8338 - Hlth Program Spec I (Eff. 07-01-2023) | 0 | 170 | 170 | 170 | 170 | 170 |
| 9288 - Sr Psychologist - CF (Supvr) (Eff. 07-01-2023) | 0 | 435 | 435 | 435 | 435 | 435 |
| 9288 - Sr Psychologist - CF (Supvr) (Eff. 07-01-2024) | 0 | 0 | 435 | 435 | 435 | 435 |
| 9291 - Supvng Psych Soc Worker I - CF (Eff. 07-01-2023) | 0 | 223 | 223 | 223 | 223 | 223 |
| 9291 - Supvng Psych Soc Worker I - CF (Eff. 07-01-2024) | 0 | 0 | 112 | 112 | 112 | 112 |
| 9292 - Supvng Psych Soc Worker II - CF (Eff. 07-01-2023) | 0 | 119 | 119 | 119 | 119 | 119 |
| 9318 - Supvng Registered Nurse II - CF (Eff. 07-01-2023) | 0 | 619 | 619 | 619 | 619 | 619 |
| 9318 - Supvng Registered Nurse II - CF (Eff. 07-01-2024) | 0 | 0 | 619 | 619 | 619 | 619 |
| 9859 - Chief Psychologist - CF (Eff. 07-01-2023) | 0 | 178 | 178 | 178 | 178 | 178 |
| 9859 - Chief Psychologist - CF (Eff. 07-01-2024) | 0 | 0 | 178 | 178 | 178 | 178 |
| **Total Salaries and Wages** | **$0** | **$6,452** | **$10,357** | **$10,357** | **$10,357** | **$10,357** |

Staff Benefits

| Staff Benefits | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 5150450 - Medicare Taxation | 0 | 94 | 151 | 151 | 151 | 151 |
| 5150500 - OASDI | 0 | 120 | 120 | 120 | 120 | 120 |
| 5150600 - Retirement - General | 0 | 1,434 | 2,323 | 2,323 | 2,323 | 2,323 |
| 5150800 - Workers' Compensation | 0 | 249 | 405 | 405 | 405 | 405 |

| Staff Benefits | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| 5150820 - Other Post-Employment Benefits (OPEB) Employer Contributions | 0 | 153 | 249 | 249 | 249 | 249 |
| 5150900 - Staff Benefits - Other | 0 | 1,379 | 2,352 | 2,352 | 2,352 | 2,352 |
| **Total Staff Benefits** | **$0** | **$3,429** | **$5,600** | **$5,600** | **$5,600** | **$5,600** |

## Total Personal Services

| Total Personal Services | FY23 Current Year | FY23 Budget Year | FY23 BY+1 | FY23 BY+2 | FY23 BY+3 | FY23 BY+4 |
|---|---|---|---|---|---|---|
| **Total Personal Services** | **$0** | **$9,881** | **$15,957** | **$15,957** | **$15,957** | **$15,957** |

# Attachment A

**California Department of Corrections and Rehabilitation**
**California Correctional Health Care Services**
**Statewide Telepsychiatry Program**

**Workload Assumptions**

| | |
|---|---|
| Work-hours per person per year* | 1776 |

Daytime Shift

| | |
|---|---|
| Days in Work Year | 260 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

24/7 Services

| | |
|---|---|
| Hours in Work Day | 24 |
| Days in Work Year | 236 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

Assumptions

| | |
|---|---|
| The requested PY resources are to accommodate new workload requirements set forth by court orders as described in the Finance Letter narrative (dates). | |
| This is not an expansion of existing work previously established, but rather new tasks related to the addition of activities to the workload. | |

| | |
|---|---|
| For class specific assumptions, see individual tabs. | |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Assistant Deputy Director RME (Clinical)

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Participates in local process development team efforts to assess and improve processes of care related to medication management, and TMH services; including gender minority, serves as subject matter expert to policy development and/or improvements based on current tele-mental health research. | 1.0 | 420.0 | 420.0 |
| Assists in the achievement of state compliance with Coleman court orders and works to accurately measure and improve the quality and access of TMH services to patients. Develops assessment tools to analyze quality assurance and quality improvement and reports on tele-mental health practice and performance trends. | 3.0 | 52.0 | 156.0 |
| Monitors statewide mental health staffing levels, including line staff Psychiatrist, Psychologist, and Social Worker classifications. Works to improve statewide staffing and more specifically to address staffing shortages via implementation of TMH, as well as compensatory measures, recruitment strategies, and contract and bargaining unit negotiations. | 2.0 | 52.0 | 104.0 |
| Directs administrative operations and clinical oversight of the TMH program, collaborates with all institutions to assess the institutional needs for TMH services and implements new services or additional services when indicated. | 1.0 | 420.0 | 420.0 |
| Acts on behalf of the Deputy Director, Statewide Mental Health Program in meetings, policy development and procedures, project coordination, administrative functions within the Executive Office, CDCR, health care providers, and the public on mental health care issues. | 1.0 | 260.0 | 260.0 |
| Supervises hubs or home-based treatment, recruits highly capable candidates, recruits, trains, and supervises Chief Psychiatrists and other supervisors in the TMH program, conducts probationary and annual performance evaluations on direct reports, and evaluates and provides feedback to employees under their supervision. | 1.0 | 260.0 | 260.0 |
| Serves as a tele-mental health subject matter expert in executive and staff meetings and trainings; and statewide mental health program committees and workgroups to ensure proper protocols and standards are maintained. Serves as a resource/consultant to other mental health care executives and subordinate staff for case reviews and appeals regarding psychiatric care and/or treatment plans. | 8.0 | 52.0 | 416.0 |
| Participates in Continuing Medical Education. | 24.0 | 2.0 | 48.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **2,084.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.2** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

**Classification: Chief Psychologist**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Oversee the Tele-psychology program and Senior Psychologist Supervisors. Provide supervision of the development, delivery, and monitoring of specialized mental health training programs. Ensure supervision of the clinical work of psychologists occurs in areas such as program operation and evaluation, in order to provide direction for specific clinical psychology programs, ensure compliance with professional standards of practice, license maintenance requirements, American Psychological Association (APA) ethical guidelines, and laws and regulations applied to the practice of psychology, using Mental Health Services Delivery System (MHSDS) program guidelines, professional standards of practice, APA ethical guidelines, laws and regulations applied to the practice of psychology, communication skills, organization skills. | 30.0 | 52.0 | 1560.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinate the training, proctorship, orientation, and supervision of new state employees, to ensure that all employees learn the knowledge and skills (e.g., criminal behavior, substance abuse, major mental illnesses) to work within their scope of practice and fully function in their position, understand the safety and security procedures they need to follow, understand the use of the MHSDS program guidelines. | 17.0 | 12.0 | 204.0 |
| Participate in supervisory meetings, Mental Health related committees, medical staff committees to provide mental health expertise in relation to the MHSDS, learn new departmental and institutional policies and procedures, share information between institutional programs, using knowledge of the mental health program's function and procedures, communication skills, understanding of group dynamics, organizational change process, and an understanding of the department's organization, chain of command, and protocol. Coordinate implementation of TMH program, including expansion activities and night shift telepsychology. | 15.0 | 52.0 | 780.0 |
| Consult with mental health subject matter experts, medical, and custody regarding inmates involved with MHSDS, program planning, implementation, and evaluation in order to assess the impact of specialized mental health training to provide information to and solicit information from others about the purpose, implementation, and activities of mental health programs. | 15.0 | 52.0 | 780.0 |
| Responsible for training reports and correspondence with management. Perform program evaluation studies on new and/or existing training programs in order to determine their effectiveness at meeting program guidelines and departmental needs, provide information to court monitors and the chain of command, make changes as part of a quality management program, identify problems and needs, recommend changes and improvements. | 10.0 | 12.0 | 120.0 |
| Participate in Continuing Education and other activities required to maintain licensure to practice. | 16.0 | 2.0 | 32.0 |
| Plan mandated mental health programs training and other special programs in order to improve mental health care delivery, meet specialized needs of particular populations in the institution, and comply with rules, regulations, and court mandates using knowledge of Local Operating Procedures (LOPs), professional standards of practice guidelines, rules, regulations, and court mandates, coordination with different programs (e.g., custody, labor relations, medical), organizational skills, communication skills. | 15.0 | 12.0 | 180.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **3656.0** |
| **TOTAL POSITIONS PROJECTED** | | | **2.1** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

**Classification: Senior Psychologist Supervisor**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Provides administrative program management including oversight of implementation and monitoring of tele-mental Health Program (TMH) requirements, statewide policies and procedures. Works collaboratively with statewide institutions to coordinate delivery of a comprehensive and integrated tele-psychology program. Assists TMH and institutional leadership with the implementation and maintenance of mental health services via tele communication. | 46.0 | 52.0 | 2392.0 |
| Supervises tele-psychologists within the tele-mental health department. Perform program evaluation studies on new and/or existing training programs in order to determine their effectiveness at meeting program guidelines and departmental needs, provide information to court monitors and the chain of command, make changes as part of a quality management program, identify problems and needs, recommend changes and improvements. Coordinate implementation of TMH program, including expansion activities and night shift tele-psychology. | 86.0 | 52.0 | 4472.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinates and organizes training and orientation for TMH employees. Responsible for training reports and correspondence with management. | 23.0 | 12.0 | 276.0 |
| Assist with the coordination of personnel matters to ensure that allocated staff resources are utilized efficiently. Completes probationary and annual performance evaluations. Evaluates staff performance and takes or recommends appropriate action based on audits of staff's casework activities. | 11.0 | 12.0 | 132.0 |
| Participation in statewide and local trainings, and in Continuing Education and other activities required to maintain licensure to practice. Provides direct patient care if necessary. Consults with professional personnel on the technical aspects of research design and analysis of data; maintains familiarity with professional developments and research. | 15.0 | 2.0 | 30.0 |
| Prepares and/or reviews medical records and patient case reports when necessary. Advises staff of appropriate treatment techniques for specific cases. Participates in Interdisciplinary Treatment Team planning sessions and case reviews as needed. Confers with physicians, nurses, and medical assistants regarding patient status and medications. Responds to emergencies and provides emergency tele-psychological evaluation and treatment when necessary. Provides evaluation and treatment to patients when necessary. | 46.0 | 52.0 | 2392.0 |
| Conducts workgroups; participate in/conducts statewide planning meetings and conferences; identify needs related to Specialized TMH Training, Clinical Psychologist training needs and quality improvement efforts. Participate in supervisory meetings, Mental Health related committees, medical staff committees. | 18.0 | 52.0 | 936.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **10,630.00** |
| **TOTAL POSITIONS PROJECTED** | | | **6.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

### Classification: Supervising Psychiatric Social Worker I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Provides administrative program management including oversight of implementation and monitoring of tele-mental Health Program (TMH) requirements, statewide policies and procedures. Works collaboratively with statewide institutions to coordinate delivery of a comprehensive and integrated tele-social work program. Assists TMH and institutional leadership with the implementation and maintenance of mental health services via tele communication, including expansion activities and night shift tele-social work. | 25.0 | 52.0 | 1300.0 |
| Supervises tele social workers within the tele-mental health department. Coordinates with headquarters, statewide and institutional departmental teams on quality management and quality improvement initiatives. | 25.0 | 52.0 | 1300.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinates and organizes training and orientation for TMH employees. Responsible for training reports and correspondence with management. | 4.0 | 12.0 | 48.0 |
| Assist with the coordination of personnel matters to ensure that allocated staff resources are utilized efficiently. Completes probationary and annual performance evaluations. Evaluates staff performance and takes or recommends appropriate action based on audits of staff's casework activities. | 2.0 | 12.0 | 24.0 |
| Regional oversight of Pre-Release program and coordination with local treatment teams and clinical providers to ensure clinical contacts are completed for continuity of care. | 13.0 | 52.0 | 676.0 |
| Schedule and facilitate Coordinated Clinical Assessment Team (CCAT) with community provider for MHSDS patients. | 7.0 | 52.0 | 364.0 |
| Facilitate and schedule tele-mental health appointments between patient and community case managers and/or providers. | 7.0 | 52.0 | 364.0 |
| Monitor factors impacting release and release dates and communicate with case managers as changes occur. | 4.0 | 52.0 | 208.0 |
| Obtain release of information when records are needed by providers outside of normal processes established with county behavioral health departments. | 3.0 | 52.0 | 156.0 |
| Participation in statewide and local trainings, and in Continuing Education and other activities required to maintain licensure to practice. Provides direct patient care if necessary. Consults with professional personnel on the technical aspects of research design and analysis of data; maintains familiarity with professional developments and | 5.0 | 2.0 | 10.0 |
| Conduct workgroups; participate in/conducts statewide planning meetings and conferences; identify needs related to Specialized TMH Training, Clinical Social Work training needs and quality improvement efforts. | 16.0 | 52.0 | 832.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **5282.0** |
| **TOTAL POSITIONS PROJECTED** | | | **3.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Supervising Psychiatric Social Worker II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Oversee the Tele-social work program and Supervising Psychiatric Social Worker I. Ensures supervision of the development, delivery, and monitoring of specialized mental health training programs occurs. Provide direction for specific clinical social work programs, ensure compliance with professional standards of practice, license maintenance requirements, and laws and regulations applied to the practice of social work, using MHSDS program guidelines, professional standards of practice. Coordinate implementation of TMH program, including expansion activities and night shift tele-social work. | 12.0 | 52.0 | 624.0 |
| Oversees recruitment and hiring of TMH staff. Provides oversight of personnel issues within the department. Participates in screening and hiring interviews of various applicants for TMH positions. Coordinate the training, proctorship, orientation, and supervision of new state employees to ensure that all employees learn the knowledge and skills they need to work within their scope of practice and fully function in their position, understand the safety and security procedures they need to follow, understand the use of the MHSDS program guidelines. | 9.0 | 12.0 | 108.0 |
| Participate in supervisory meetings, TMH related committees, medical staff committees to provide mental health expertise in relation to the MHSDS, learn new departmental and institutional policies and procedures, share information between institutional programs, using knowledge of the mental health program's function and procedures, communication skills, understanding of group dynamics, organizational change process, and an understanding of the department's organization, chain of command, and protocol. | 10.0 | 52.0 | 520.0 |
| Design and develop quality management training tools. Responsible for quality reporting and audits. | 8.0 | 12.0 | 96.0 |
| Perform program evaluation studies on new and/or existing training programs in order to determine their effectiveness at meeting program guidelines and departmental needs, provide information to court monitors and the chain of command, make changes as part of a quality management program, identify problems and needs, recommend changes and improvements. | 2.0 | 12.0 | 24.0 |
| Participate in Continuing Education and other activities required to maintain licensure to practice. | 7.0 | 2.0 | 14.0 |
| Manage SW Pre-Release Program and supervise Regional Supervising Psychiatric Social Worker Is. Oversee coordination with local treatment teams and clinical providers to ensure clinical contacts are completed for continuity of care. | 5.0 | 52.0 | 260.0 |
| Oversee coordination with local treatment teams and clinical providers to ensure clinical contacts are completed for continuity of care. | 1.0 | 52.0 | 52.0 |
| Ensure tele-mental health appointments are scheduled between patient and community case managers and/or providers. | 1.0 | 52.0 | 52.0 |
| Monitor factors impacting release and release dates and communicate with case managers as changes occur. | 1.0 | 52.0 | 52.0 |
| Provides high level reports, administrative documents related to pre-release activities and status updates/recommendations to executive management. | 1.0 | 52.0 | 52.0 |
| Plan mandated mental health programs training and other special programs in order to improve mental health care delivery, meet specialized needs of particular populations in the institution, and comply with rules, regulations, and court mandates using knowledge of Local Operating procedures (LOPs), professional standards of practice guidelines, rules, regulations, and court mandates, coordination with different programs (e.g., custody, labor relations, medical), organizational skills, communication skills. | 6.0 | 12.0 | 72.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | **1926.0** | |
| **TOTAL POSITIONS PROJECTED** | | **1.1** | |

**California Correctional Health Care Services**
**Program Area: Nursing**
**Issue: Tele-Mental Health Program**

## Classification:  Medical Assistant

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Training (Basic Life Support) | 400.0 | 0.5 | 200.0 |
| Training (Mandatory Annual Training) | 3200.0 | 1.0 | 3200.0 |
| Facilitating tele-mental encounters via videoconferencing (while tele-mental health clinician is doing assessments). | 1000.0 | 52.0 | 52000.0 |
| Conducting initial observations and recording patient's condition; then reporting findings to Tele-psychiatrist. | 500.0 | 52.0 | 26000.0 |
| Observing patient behavior during and after encounter with telepsychiatry and reporting to Tele-psychiatrist. | 500.0 | 52.0 | 26000.0 |
| Documenting clinical observations in chart (including obtaining vital signs, height, weight). | 500.0 | 52.0 | 26000.0 |
| Collaborating with tele-mental health clinicians on facilitating appropriate treatment to patient. | 500.0 | 52.0 | 26000.0 |
| Testing to ensure telepsychiatry equipment is in working condition at beginning of every shift. | 70.0 | 52.0 | 3640.0 |
| Collaborating with local nursing staff to meet clinical needs of the patient (including beginning & end of shift sign-outs). | 70.0 | 52.0 | 3640.0 |
| Assisting patient with physical care, including activities of daily living, ensuring patient safety. | 100.0 | 52.0 | 5200.0 |
| Monitor patient on suicide watch until appropriate relief arrives and documents all activities related to the suicide watch assignments. | 100.0 | 12.0 | 1200.0 |
| Contacting local staff in the event of emergency issues, and transferring appropriate clinical information and documentation. | 100.0 | 52.0 | 5200.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **178280.0** |
| **TOTAL POSITIONS PROJECTED** | | | **100.4** |

**California Correctional Health Care Services**
**Program Area: Nursing**
**Issue: Tele-Mental Health Program**

## Classification:  Supervising Registered Nurse II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Administratively supervises medical assistants (MAs) facilitating tele-mental encounters via videoconferencing, testing to ensure tele-psychiatry equipment is in working condition at beginning of every shift, observing patient behavior during and after encounter with tele-psychiatry and reporting to the tele-psychiatrist, conducting initial observations and recording patient's condition and reporting findings to Tele-psychiatrist, collaborating with local staff to meet clinical needs of the patient (including beginning & end of shift sign-outs), and documenting clinical observations in chart (including obtaining vital signs, height, weight). | 100.0 | 52.0 | 5200.0 |
| Administratively supervises MAs assisting patients with physical care including activities of daily living, ensuring patient safety, monitoring patients on suicide watch until | 60.0 | 52.0 | 3120.0 |
| Manages personnel functions including timesheets, performance evaluations, probation reports, Equal Employment Opportunity (EEO) and Employee Relations Office (ERO) complaints, etc. | 54.0 | 52.0 | 2808.0 |
| Training new MAs in required duties such as taking vital signs, using the electronic health record system (EHRS), providing updated clinical data to physicians, and other nursing duties. | 60.0 | 52.0 | 3120.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **14248.0** |
| **TOTAL POSITIONS PROJECTED** | | | **8.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Research Data Supervisor I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Apply personnel management, supervision, and training principles to effectively oversee the work activities of employees to ensure the unit operates smoothly and supports the newly created tele-mental health program and efforts to recruit and retain more mental health providers. | 10.0 | 52.0 | 520.0 |
| Work and coordinate with interdisciplinary teams to conduct studies and research projects. | 8.0 | 52.0 | 416.0 |
| Review and edit written reports for accuracy, completeness, and compliance with applicable laws and regulations. | 6.0 | 52.0 | 312.0 |
| Review the work of subordinate staff and provide constructive feedback from the perspective of a supervisor. | 6.0 | 52.0 | 312.0 |
| Plan, organize, and manage a research function in compliance with departmental policies and regulations. | 3.0 | 52.0 | 156.0 |
| Use problem-solving techniques and processes to identify and resolve issues related to the completion of work assignments. | 3.0 | 52.0 | 156.0 |
| Manage workload and assignments of others to meet work unit and project objectives and deadlines. | 2.0 | 52.0 | 104.0 |
| Delegate work to staff to ensure work projects are completed on time and within budget. | 1.0 | 52.0 | 52.0 |
| Apply leadership principles and methods to motivate and maintain the productivity of work unit staff members in accomplishing program objectives. | 1.0 | 52.0 | 52.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **2080.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.2** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

### Classification: Research Data Supervisor II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Provides overarching support to the tele-mental health program by identifying new data points that are not yet measured and considering how to capture that data. This includes internal metrics that can assist in targeting efforts to recruit and retain more mental health providers. | 8.0 | 52.0 | 416.0 |
| Supervises staff responsible for carrying out the work of the analytics unit including providing research guidance on research design, advanced statistical analyses and interpretations of results, developing and presenting findings, and identifying additional ways that data can be used to inform and guide the departmental decision making process. | 7.0 | 52.0 | 364.0 |
| Establishes and maintains project priorities and timelines, managing a complex program and developing and effectively using all available resources. | 4.0 | 52.0 | 208.0 |
| Plans and manages a research function, including overseeing the work activities of employees to ensure the unit operates. | 4.0 | 52.0 | 208.0 |
| Provides oversight on projects, ensuring that end products or services are delivered on schedule, within the established budget, and in compliance with applicable laws. Review and edit written reports, using interdisciplinary teams effectively in the conduct of studies. | 3.0 | 52.0 | 156.0 |
| Acts as technical expert to senior management, program supervisors, and departmental employees on data analysis and development of data management and reporting methods. | 3.0 | 52.0 | 156.0 |
| Delegates work to staff to ensure work projects are completed on time and within budget, and review the work of subordinate staff. | 3.0 | 52.0 | 156.0 |
| Objectively identify all facts and implications related to a situation before drawing conclusions and determining courses of action. | 2.0 | 52.0 | 104.0 |
| Utilizes project management techniques to manage the progress of programs and project activities to ensure that project timelines and schedules are appropriately established, modified, and adhered to. | 1.5 | 52.0 | 78.0 |
| Develops standard operating procedures and policies related to the conducting of human resource-related business analytics. | 1.0 | 52.0 | 52.0 |
| Ensures adequate cross training to ensure that all staff have the capabilities they need to be maximally effective in their analytical work. | 1.0 | 52.0 | 52.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1950.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Research Data Analyst II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Developing and writing programs to track and analyze tele-mental Health Program productivity. | 7.0 | 52.0 | 364.0 |
| Developing program tools to assess with utilization and allocation of tele-mental health program resources. | 6.0 | 52.0 | 312.0 |
| Creating programs that track, analyze, and generate reports submitted to the courts on technical quality of tele-mental health program. | 6.0 | 52.0 | 312.0 |
| Creating programs that track, analyze, and generate reports submitted to the courts on the participation of tele-mental Health Program in Interdisciplinary Treatment Team meetings. | 5.0 | 52.0 | 260.0 |
| Providing statistical analysis and generating reports on clinical equivalence of tele-mental health program versus onsite psychiatry. | 4.0 | 52.0 | 208.0 |
| Developing both qualitative and quantitative measures of tele-mental Health Program versus onsite psychiatry. | 3.0 | 52.0 | 156.0 |
| Coordinating the creation of reports submitted to the court. | 2.0 | 52.0 | 104.0 |
| Designing, planning, and implementing quality improvement projects on data gathering and reporting. | 2.0 | 52.0 | 104.0 |
| Organizing and strategizing for upcoming tele-mental health program needs. | 0.5 | 52.0 | 26.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 1846.0 |
| TOTAL POSITIONS PROJECTED | | | 1.0 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

### Classification: Research Data Specialist I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Collaborating with IT, CCHCS Quality Management and other discipline related to tele-mental Health Program improvement. | 50.0 | 5.0 | 250.0 |
| Creating and maintaining Power BI reports. | 30.0 | 6.0 | 180.0 |
| Enhancing current Power BI reports. | 30.0 | 6.0 | 180.0 |
| Fulfilling data request from internal and external stakeholders with detailed methodology, validation and verification. | 30.0 | 6.0 | 180.0 |
| Developing scripts, stored procedures, and triggers for development, applying bug fixes and managing SQL database. | 25.0 | 6.0 | 150.0 |
| Maintaining applications, reports and tools ensuring they reach maximum efficiency and function under satisfactory conditions. | 25.0 | 6.0 | 150.0 |
| Reviewing test writing results and documenting findings. | 20.0 | 6.0 | 120.0 |
| Validating and verifying changes to ensure system changes meet requirements and specifications and that it fulfills its intended purpose. | 18.0 | 5.0 | 90.0 |
| Designing, planning, and implementing quality improvement projects on data gathering and reporting. | 15.0 | 5.0 | 75.0 |
| Monitoring, triaging, addressing and resolving ticket from Service Now and statewide communication. | 15.0 | 6.0 | 90.0 |
| Enhancing the Business Rules Methodology Review (BRMR) Share point site. | 8.0 | 6.0 | 48.0 |
| Attending and participating in BRMR related meetings. | 7.0 | 6.0 | 42.0 |
| Coordinating, preparing, tracking and reviewing indicators for BRMR meeting. | 7.0 | 6.0 | 42.0 |
| Enhancing current reports by adding "about this report" to all MH reports. | 7.0 | 6.0 | 42.0 |
| Monitoring, triaging, addressing and resolving ticket from Service Now Incidents. | 7.0 | 6.0 | 42.0 |
| Monitoring, triaging, addressing and resolving ticket from Service Now Task. | 7.0 | 6.0 | 42.0 |
| Participating in internal team meetings. | 7.0 | 6.0 | 42.0 |
| Coordinating, creating, tracking and preparing statewide webinars and training. | 3.0 | 6.0 | 18.0 |
| Professional growth. | 3.0 | 5.0 | 15.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1798.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.0** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  HPS II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Tracking, reporting, and monitoring of TMH strategic goals. Reviewing reports, briefing documents, and presenting materials to Mental Health leadership, Office of Legal Affairs and the Coleman court. | 3.0 | 52.0 | 156.0 |
| Leading teams and managing special projects and initiatives, including quality improvement initiatives, and other TMH service projects. | 3.0 | 52.0 | 156.0 |
| Monitoring, auditing, and reporting on adherence to TMH requirements. | 1.0 | 52.0 | 52.0 |
| Utilizing project management tools to lead TMH improvement projects. Reporting on  timelines, updating stakeholders on goals and benchmarks, providing logistical expertise, and designing ongoing maintenance for project sustainability. | 1.0 | 52.0 | 52.0 |
| Conducting complex reviews and detailed data analysis of TMH services performance and outcome measures. Conducting statistical analysis reports, feasibility studies and proposals in support of TMH improvement projects. | 2.0 | 52.0 | 104.0 |
| Leading HPS Is who produce and track measures to determine efficacy of TMH initiatives, policies/procedures, and making recommendations of new initiatives. | 2.0 | 52.0 | 104.0 |
| Lead TMH policy and procedure development efforts. Tracking status, corresponding with internal and external stakeholders. Develop streamlined processes to expedite implementation. Develop labor negotiation tools and assist with inquiries related to TMH and SMHP litigation. | 20.0 | 52.0 | 1040.0 |
| Attend all staff meetings and TMH workgroups. | 1.0 | 52.0 | 52.0 |
| Attending internal and external training courses. | 4.0 | 12.0 | 48.0 |
| Traveling to institutions to assist assessment of current and future TMH services. | 6.0 | 12.0 | 72.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 1836.0 |
| TOTAL POSITIONS PROJECTED | | | 1.0 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  SSM III

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Oversees TMH and SMHP functions and operational support teams and directly supervises SSM IIs, HPS IIs and support staff. Develops implementation plans to effectively respond to emerging priorities. | 13.0 | 52.0 | 676.0 |
| Monitor data validation review related to TMH and SMHP. | 2.0 | 52.0 | 150.0 |
| Participate in strategic planning and process improvement activities relating to TMH and SMHP, including development and evaluation of policies, procedures, and protocols critical to improving the quality of mental health services. | 5.0 | 52.0 | 260.0 |
| Oversight of design, planning, and implementing quality improvement projects specifically relating to TMH and SMHP. | 4.0 | 52.0 | 208.0 |
| Reporting TMH workgroup outcomes across disciplines and to executive Leadership. | 2.0 | 52.0 | 104.0 |
| Leading, organizing, and participating in TMH workgroup activities. | 2.0 | 52.0 | 104.0 |
| Participating in and co-facilitating internal team meetings. | 2.0 | 52.0 | 104.0 |
| Performance evaluations, staff development and team building. | 1.0 | 52.0 | 200.0 |
| Coordinate, track, review materials and participate in statewide webinars and training related to TMH. | 1.0 | 52.0 | 52.0 |
| Provide oversight related to the planning, development, and ongoing maintenance of TMH and SMHP programs to ensure high-quality work is delivered within required timelines. | 1.0 | 52.0 | 52.0 |
| Direct department wide assignments of the most sensitive, complex, and/or confidential nature. Provides recommendations and feedback to CEA, executive leadership, Office of Legal Affairs, and the Coleman Court. | 3.0 | 52.0 | 156.0 |
| Assess program needs and recommend specific actions to facilitate organizational effectiveness and promote workforce excellence. | 2.0 | 52.0 | 104.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **2170.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.2** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  SSM II

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Oversee Teams of SSM Is and support staff within the TMH Operational Support Section. Coordinate activities, projects, implementation of TMH program, policies, procedures, and continuous improvement activities, including TMH support related to gender minority related services, policies and procedures, litigation data analytics,  Electronic Health Record System, Quality Management/Utilization Management. | 15.0 | 52.0 | 780.0 |
| Reporting workgroup outcomes across disciplines, TMH clinicians, executive leadership and legal. | 1.0 | 52.0 | 52.0 |
| Coordinating TMH efforts between SSM IIIs, CEAs, Headquarters clinicians, institutions, and HPS II. | 1.0 | 52.0 | 52.0 |
| Directs program development through statistical analyses, research, and program implementation. | 2.0 | 52.0 | 104.0 |
| Provides oversight related to the planning, development, implementation, and on-going maintenance to ensure high quality work is delivered within timelines. | 1.0 | 52.0 | 52.0 |
| Ensures program is consistent and in-line with the policies and procedures of the TMH and the Department. | 2.0 | 52.0 | 104.0 |
| Organizes and directs the most efficient and effective courses of action in the identification of assessed issues, needs, corrective actions, and improvements for TMH. | 2.0 | 52.0 | 104.0 |
| Oversees staff development, implementation, and on-going maintenance of specialized policy, planning, and system assistance related to program operations; determining impacted and affected program activities. | 4.0 | 52.0 | 208.0 |
| Directs program needs and provides oversight and supervision to SSM Is and analytical teams. | 3.0 | 52.0 | 156.0 |
| Leading, organizing, and participating in workgroup activities for TMH and related operational functions. | 2.0 | 52.0 | 104.0 |
| Participating in and co-facilitating internal team meetings. | 2.0 | 52.0 | 104.0 |
| Performance evaluations and team building. | 1.0 | 52.0 | 52.0 |
| Monitoring audits and reviewing reports for Tele MH services including gender minority, Electronic Health Records System, Quality Management/Utilization Management. | 2.0 | 52.0 | 104.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1976.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  SSM I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
| --- | --- | --- | --- |
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Overseeing a team of HPSs and AGPAs for the 3 TMH program areas (PSYL, SW). Coordinating activities, managing workload, projects, implementation of TMH program, policies, procedures, and continuous improvement activities. | 40.0 | 52.0 | 2080.0 |
| Reporting workgroup outcomes across disciplines and TMH clinicians. | 2.0 | 52.0 | 104.0 |
| Leading, organizing, and participating in workgroup activities for TMH. | 6.0 | 52.0 | 312.0 |
| Participating in and cofacilitating internal team meetings. | 4.0 | 52.0 | 208.0 |
| Providing supervisory guidance to staff. | 4.0 | 52.0 | 208.0 |
| Designing, planning, and implementing quality improvement projects for TMH. | 4.0 | 52.0 | 208.0 |
| Assisting staff with determining the methodologies and requirements needed to deliver relevant and quality training and for developing and maintaining relationships with key business partners needed to support critical training activities. | 4.0 | 52.0 | 208.0 |
| Performance evaluations, staff development and team building. | 4.0 | 52.0 | 208.0 |
| Monitoring audits and reviewing reports/documents for Tele MH services, including policies and procedures, EHRS, UM/QM, TMH gender minority services. | 4.0 | 52.0 | 208.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 3,744.0 |
| TOTAL POSITIONS PROJECTED | | | 2.1 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification: Health Program Specialist I

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Tracking, reporting, and monitoring of TMH strategic goals. | 16.0 | 52.0 | 832.0 |
| Special projects and TMH operational support activities, including, quality improvement initiatives. | 16.0 | 52.0 | 832.0 |
| Monitoring, auditing, and reporting on adherence to TMH requirements. | 4.0 | 52.0 | 208.0 |
| Utilizing project management tools to support improvement projects in order to enhance TMH services. Creating timelines, updating stakeholders on goals and benchmarks, providing logistical expertise, and designing ongoing maintenance for TMH sustainability. | 2.0 | 52.0 | 104.0 |
| Preparing TMH reports, briefing documents, and presenting materials to Mental Health leadership and the Coleman court. | 4.0 | 52.0 | 208.0 |
| Conducting targeted improvement projects as TMH subject matter expert on TMH scheduling, mental health services logistics, and expansion initiatives. | 5.0 | 52.0 | 260.0 |
| Providing detailed statistical analysis reports, feasibility studies and proposals in support of TMH improvement projects. | 5.0 | 52.0 | 260.0 |
| Conducting complex and detailed data analysis of TMH services performance and outcome measures. | 5.0 | 52.0 | 260.0 |
| Producing and tracking measures to determine efficacy of TMH initiatives and making recommendations for future initiatives. | 4.0 | 52.0 | 208.0 |
| Attend staff meetings and TMH workgroups. | 4.0 | 52.0 | 208.0 |
| Attending internal and external training courses. | 3.0 | 52.0 | 156.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 3536.0 |
| TOTAL POSITIONS PROJECTED | | | 2.0 |

**California Department of Corrections and Rehabilitation**
**Division of Health Care Services**
**Program Area: SMHP**
**Issue: Tele-Mental Health Program**

## Classification:  AGPA

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| Tracking, reporting, and monitoring of TMH strategic goals. | 40.0 | 52.0 | 2080.0 |
| Assist with preparing and editing TMH reports and briefing documents that will be presented to Mental Health leadership and the Coleman court. | 20.0 | 52.0 | 1040.0 |
| Providing detailed analysis reports, in support of improvement projects for TMH services including gender minority, policies, Electronic Health Record System, Quality Management/Utilization Management, and data analytics. | 20.0 | 52.0 | 1040.0 |
| Conducting data analysis of TMH services performance and outcome measures. | 20.0 | 52.0 | 1040.0 |
| Producing and tracking measures to determine efficacy of TMH expansion initiatives and making recommendations for future TMH expansion of new initiatives. | 10.0 | 52.0 | 520.0 |
| Attend staff meetings and TMH workgroups. | 15.0 | 52.0 | 780.0 |
| Support improvement projects in order to enhance TMH services. Tracking timelines, updating stakeholders on goals and benchmarks, providing logistical expertise, and designing ongoing maintenance for project sustainability. | 15.0 | 52.0 | 780.0 |
| Assist with TMH policy development, editing, and review. Assist with inquiries related to various litigation pertaining to TMH and SMHP. | 10.0 | 52.0 | 520.0 |
| Attending internal and external training courses. | 6.0 | 52.0 | 312.0 |
| Provides support to executive leadership. | 60.0 | 52.0 | 3120.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 11232.0 |
| TOTAL POSITIONS PROJECTED | | | 6.3 |

# Attachment B

Attachment B

**California Department of Corrections and Rehabilitation**
**California Correctional Health Care Services**
**Statewide Telepsychiatry Program**

## Workload Assumptions

| | |
|---|---|
| Work-hours per person per year* | 1776 |

Daytime Shift

| | |
|---|---|
| Days in Work Year | 260 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

24/7 Services

| | |
|---|---|
| Hours in Work Day | 24 |
| Days in Work Year | 236 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

Assumptions

| | |
|---|---|
| The requested PY resources are to accommodate new workload requirements set forth | |
| by court orders as described in the Finance Letter narrative (dates). | |
| This is not an expansion of existing work previously established, | |
| but rather new tasks related to the addition of activities to the workload. | |

| | |
|---|---|
| For class specific assumptions, see individual tabs. | |

**California Correctional Health Care Services**
**Program Area: ITSD Customer Support Center**
**Issue: Tele-Mental Health Program**

**Classification: Information Technology Associate (ITSD MH Support) for OPS**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Network connectivity. | 0.8 | 100.0 | 75.0 |
| Account management. | 0.3 | 75.0 | 18.8 |
| Procurement (Major Equipment). | 2.0 | 5.0 | 10.0 |
| Develops work plans, proposals and reporting. | 5.0 | 5.0 | 25.0 |
| Provides special services to customers and other department units. | 3.0 | 4.0 | 12.0 |
| Troubleshoots Equipment/malfunction. | 0.8 | 1185.0 | 888.8 |
| Basic training. | 0.5 | 50.0 | 25.0 |
| Detailed training. | 2.0 | 1.5 | 3.0 |
| Testing network, peripherals. | 0.3 | 280.0 | 70.0 |
| Software management. | 0.3 | 50.0 | 12.5 |
| Hardware management. | 0.5 | 110.0 | 55.0 |
| Deploy Telehealth/psych cart (Region 1) | 5.5 | 6.0 | 33.0 |
| Deploy Telehealth/psych cart (Region 2) | 12.0 | 6.0 | 72.0 |
| Deploy Telehealth/psych cart (Region 3) | 12.0 | 10.0 | 120.0 |
| Deploy Telehealth/psych cart (Region 4) | 22.0 | 7.0 | 154.0 |
| Documentation. | 1.0 | 38.0 | 38.0 |
| Asset management (general duties). | 0.3 | 300.0 | 75.0 |
| Answer incoming calls for enterprise support. | 0.2 | 500.0 | 100.0 |
| Service Now ticket create/move /change. | 0.2 | 1000.0 | 150.0 |
| Provisioning. | 0.3 | 200.0 | 50.0 |
| Product research. | 2.0 | 4.0 | 8.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1995.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

**California Correctional Health Care Services**
**Program Area: ITSD Infrastructure**
**Issue: Tele-Mental Health Program**

**Classification: Information Technology Specialist I for Telehealth**

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Connecting network. | 1.0 | 100.0 | 100.0 |
| Managing accounts. | 0.5 | 80.0 | 40.0 |
| Procuring telehealth equipment and peripherals. | 2.0 | 10.0 | 20.0 |
| Developing work plans, proposals and reporting. | 5.0 | 5.0 | 25.0 |
| Providing special services to customers and other department units. | 1.0 | 15.0 | 15.0 |
| Troubleshooting equipment and malfunction. | 0.5 | 750.0 | 375.0 |
| Conducting basic training. | 1.0 | 40.0 | 40.0 |
| Conducting detailed training. | 1.0 | 10.0 | 10.0 |
| Testing network and telehealth peripherals. | 0.5 | 150.0 | 75.0 |
| Managing software. | 0.5 | 60.0 | 30.0 |
| Managing hardware. | 0.5 | 60.0 | 30.0 |
| Deploying telehealth equipment (Region 1). | 12.0 | 13.0 | 156.0 |
| Deploying telehealth equipment (Region 2). | 12.0 | 13.0 | 156.0 |
| Deploying telehealth equipment (Region 3). | 12.0 | 13.0 | 156.0 |
| Deploying telehealth equipment (Region 4). | 12.0 | 13.0 | 156.0 |
| Documenting. | 2.0 | 40.0 | 80.0 |
| Managing assets (general duties). | 0.3 | 300.0 | 75.0 |
| Answering incoming calls. | 0.2 | 500.0 | 100.0 |
| Creating, moving, and updating Solution Center Tickets. | 0.5 | 500.0 | 250.0 |
| Provisioning. | 0.5 | 100.0 | 50.0 |
| Researching products. | 1.0 | 25.0 | 25.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1964.0** |
| **TOTAL POSITIONS PROJECTED** | | | **1.1** |

# Attachment C

Attachment C

**California Department of Corrections and Rehabilitation**
**California Correctional Health Care Services**
**Statewide Telepsychiatry Program**

**Workload Assumptions**

| Work-hours per person per year * | 1776 |
|---|---|

Daytime Shift

| Days in Work Year | 260 |
|---|---|
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

24/7 Services

| Hours in Work Day | 24 |
|---|---|
| Days in Work Year | 236 |
| Weeks in Work Year | 52 |
| Months in Work Year | 12 |

Assumptions

| The requested PY resources are to accommodate new workload requirements set forth | |
|---|---|
| by court orders as described in the Finance Letter narrative (dates). | |
| This is not an expansion of existing work previously established, | |
| but rather new tasks related to the addition of activities to the workload. | |

| For class specific assumptions, see individual tabs. | |
|---|---|

**California Correctional Health Care Services**
**Human Resources**

**Classification:  Associate Governmental Program Analyst**

| ACTIVITY / TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Task* | | | |
| Provides hiring support to headquarters, regional and institutions for Tele-Mental, mental health programs, and institution vacancies to mental health positions by guiding candidates through the recruitment and hiring process as the principal point of contact for all hiring-related activities. This includes communicating to candidate on location(s) of interest, ensuring completion of pre-interview documentation, establishing interview dates, assessing interview questions, screening applications, verifying valid licensure/certification, establishing livescan appointments, ensuring completion of pre-hire documentation, including credentialing and compiling of hiring packet, and follow up. | 18.0 | 100.0 | 1,800.0 |
| Provides hiring support at all hiring events which includes set up at the event, assists candidates with exams, interviews, pre-employment, livescan and tentative offer.  Prepares all hiring paperwork at the event to ensure quick hires and follows up for completion of hires from these events. | 26.0 | 3.5 | 91.0 |
| Ensures hires are progressing appropriately. Coordinates with candidate, hiring programs, credentialing unit, livescan unit, etc. to ensure progress, determining impacts and formulating solutions, and escalates issues to management, as needed. | 15.0 | 100.0 | 1,500.0 |
| Main point of contact for leads which may not result in interview for assigned classification. Communicates with candidates via telephone and email regarding employment inquiries. | 1.0 | 25.0 | 25.0 |
| Coordinates departmental subject matter experts for conferences, interview panel members, local job fairs, and other recruitment events. | 1.0 | 30.0 | 30.0 |
| Produces ad hoc reports for program and executive management regarding mental health and Event hiring data and individual hiring status. | 0.5 | 12.0 | 6.0 |
| Consults and regularly follows up to determine the effectiveness of recruiting plans. Compiles and analyzes the data pertaining to mental health recruitment activities, outreach efforts, and educational partnerships. Makes recommendations to management in regards to establishing recruiting requirements. | 0.5 | 65.0 | 32.5 |
| Works directly with headquarters, regional offices and institutions hiring programs and other Human Resources (HR) programs to address any questions or concerns regarding hiring process. Communicates to programs regarding status of hires and/or candidate pools.  Works towards process improvements and streamlining of hiring timelines through teamwork with programs. | 0.5 | 100.0 | 50.0 |
| Develops social-media recruitment tools, including updating the CCHCS social media pages and accounts in conjunction with Graphic Designers, in addition to other social media strategies to provide referrals to CCHCS recruitment website or other strategies. | 4.0 | 7.5 | 30.0 |
| Requests/posts job ads on the California Department of Human Resources and California Correctional Health Care Services job posting sites and other employment sites as required. Ensures advertisements are posted correctly and free from error. | 0.5 | 15.0 | 7.5 |
| Maintains and develops graphics for social media recruitment platforms such as Facebook, CareerArc, and LinkedIn. Conducts associated research on a monthly basis (image searches, ensures adherence to State of California social media policies, maintains company and career pages, coordination of targeted digital campaigns, and research on best practices). | 5.0 | 12.0 | 60.0 |
| Continues process improvements and streamlining of hiring timelines to expedite hires. | 5.0 | 3.0 | 15.0 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **3,647.0** |
| **TOTAL POSITIONS PROJECTED** | | | **2.1** |

**Note:** Column C- task assumptions are derived either by:

Number of tasks, per institution, per month, per year (Row 9)

Number of tasks, per training (Row 10)

Number of tasks per month (Rows= 11-14, 16)

Number of classes plus new classes (Row= 15)

**California Correctional Health Care Services**
**Human Resources**

## Classification:  Personnel Technician II (Specialist)

| ACTIVITY /TASK | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
|---|---|---|---|
| | PROJECTED ONGOING WORKLOAD | | |
| *Specific Task* | | | |
| Downloads data from California Correctional Health Care Services (CCHCS) exam platform (HODES) to include in clinical/non-clinical  report.  Download State Restriction of Appoint (E2) report and enter E2s into Examination Certification Online System (ECOS).  Audits E2s. | 1.0 | 500.0 | 500.0 |
| Responds to applicant inquiries regarding exam related information.  Prepares notices of exam results and mail to candidates.  Assists analysts with testing online exams in HODES. Updates exam bulletins and organizes electronic exam materials. | 4.0 | 50.0 | 200.0 |
| Prepares ECOS postings for all mental health classifications, initiates and completes the certification process. Provides information to candidates regarding list eligibility and the certification process.  Completes changes to the on-line system as requested by candidates. | 2.0 | 175.0 | 350.0 |
| Analyzes applicants experience and education from the state application or Statement of Qualifications.  Contacts candidates for additional information if needed and verify valid licensure and or certifications.  Utilizes resource materials to ensure applicable state rules are applied to each exam/certification process. | 3.0 | 150.0 | 450.0 |
| Assists with the exam and certification process at all hiring events including candidate prescreening, attending all events and setting up and taking down the event venue. | 30.0 | 3.5 | 105.0 |
| Provides support to Human Resources staff and California Correctional Health Care Services institution Field Liaison Analysts, screen incoming calls and refers analytical questions to the appropriate analyst; sort, file and track incoming mental health applications and mail correspondence.  Reconciles error reports and audit system processes. | 2.0 | 63.0 | 126.0 |
| Americans with Disability Acts compliance functions. | 1.0 | 0.3 | 0.3 |
| **TOTAL HOURS PROJECTED ANNUALLY** | | | **1,731.3** |
| **TOTAL POSITIONS PROJECTED** | | | **1.0** |

**Note:** Column C- task assumptions are derived either by:

Number of tasks, per institution, per month, per year (Row 9)
Number of tasks, per training (Row 10)
Number of tasks per month (Rows= 11-14, 16)
Number of classes plus new classes (Row= 15)

California Correctional Health Care Services
Human Resources

## Classification:  Personnel Specialist

| ACTIVITY TASK | PROJECTED ONGOING WORKLOAD | | |
|---|---|---|---|
| | HOURS TO COMPLETE TASK | NUMBER OF TASKS PER YEAR | NUMBER OF HOURS PER YEAR |
| *Specific Activity* | | | |
| Makes independent decisions on salary determination based on civil service laws and rules - including specific mental health pay differentials that must be reviewed and applied based on eligibility criteria. | 2.00 | 125 | 250.0 |
| Keys appointment transactions on the Personnel Action Request (PAR) and Employee Action Requests via the State Controllers computer system ensuring that all information is accurate and complete. . | 0.75 | 125 | 93.8 |
| Keys separation transactions on the PAR form via the State Controllers computer system.  Prepare and process timely lump sum calculations and payments for separating employees to avoid penalties. | 3.00 | 25 | 75.0 |
| Keys all miscellaneous pay transactions such as overtime, shift pay, On-Call/Callback, Psychiatrist of the Day, Holiday Pay and Out of Class pay.  Keys all miscellaneous employment transactions on the PAR such as locked in pay differentials, range changes, tenure changes, time base changes, and leave of absences. | 0.50 | 600 | 300.0 |
| Processes all benefit documents for employees including health, dental, vision, life insurance, flex-elect and Consolidated Omnibus Budget Reconciliation Act (COBRA).  Processes and monitors Catastrophic Time Banks, Family Medical Leave Act, State Disability Insurance, Non Industrial Disability Insurance, and Temporary Disability. | 2.50 | 250 | 625.0 |
| Maintains attendance records and reconciles monthly payroll with received timesheets to ensure payroll is accurate.  Audits time sheets against employees leave and ensures that time off is reflected in the California Leave Accounting System.  Sets up accounts receivables if employee has insufficient time to cover ableness. | 8.00 | 26 | 208.0 |
| Maintains and files all employee related documents in the Official Personnel File.  Files all payroll documents in accordance with the Department of General Services retention schedule. | 1.00 | 52 | 52.0 |
| Processes garnishments and levies, researches and monitors collections, prepares salary advances and ensures collection, process and monitor accounts receivables to ensure timely collection.  Updates and maintains all Salary Advance and Accounts Receivable information in Business Information System. | 3.00 | 52 | 156.0 |
| TOTAL HOURS PROJECTED ANNUALLY | | | 1,759.8 |
| TOTAL POSITIONS PROJECTED | | | 1.0 |

**Note:** Column C- task assumptions are derived either by:

Number of tasks, per institution, per month, per year (Row 9)

Number of tasks, per training (Row 10)

Number of tasks per month (Rows= 11-14, 16)

Number of classes plus new classes (Row= 15)

# EXHIBIT E

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 29, 2023

Special Master Lopes                          Coleman Plaintiffs' Counsel
Pannone Lopes Devereaux and O'Gara LLC        Rosen Bien Galvan and Grunfeld LLP
Northwoods Office Park, Suite 215N            101 Mission Street, Sixth Floor
1301 Atwood Avenue                            San Francisco, A 94105
Johnston, RI 02919

VIA EMAIL

Special Master Lopes and Plaintiffs' Counsel,

I write regarding the California Department of Corrections and Rehabilitation's (CDCR) Restricted Housing Unit (RHU) project.  CDCR began the RHU project in response to the Governor's veto of AB2632 which directed CDCR to develop regulations revising the use of restricted housing.  (See https://www.gov.ca.gov/wp-content/uploads/2022/09/AB-2632-VETO.pdf?emrc=ccbc61)  Attached to this email for your review are draft regulatory packages that will be necessary to implement the changes described below.  These drafts are being shared with you and other external stakeholders simultaneously and may receive additional edits based on those conversations prior to finalization.  CDCR is developing streamlined mental health policies to govern these new units and will share those drafts when they are ready.  CDCR requests that you provide us your comments and feedback on the regulatory package no later than July 31, 2023.

I.      Overview of the Restricted Housing Unit Program Changes

CDCR's RHU program will result in less inmates being housed in restricted housing, shorter stays for those that do, enhanced property and out of cell time for some, and a reduction in number of RHU programs and beds statewide.  CDCR has also developed an RHU Programming Credit which inmates may earn by participating in programming, including mental health services.  Each credit will reduce the length of stay in restricted housing.

A.   Restricted Housing Unit Matrix Changes and Length of Stay Reductions

CDCR has revised its Restricted Housing Unit matrix to only include charges for violent behavior as eligible for RHU placement.  CDCR removed over a dozen offenses from the RHU matrix and converted the penalty for those offenses to placement on Workgroup/Program Group C status.  (See e.g., draft Title 15 sections 3044(f)(1)(B) and 3337(g).)  The fourteen offenses removed from the RHU matrix are as follows:

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 2

- Battery on an inmate without serious injury.
- Distribution of Controlled Substances as defined in Section 3000
- Escape with force or attempted escape with force against a person
- Attempted escape from any departmental prison or institution other than a camp, MSF, or reentry facility
- Inciting conditions likely to threaten institutional security
- Harassment: a willful course of conduct, which alarms, annoys or terrorizes a specific person, group, or entity in the free society and which serves no legitimate purpose, either directly or indirectly
- Acting in a leadership role by directing or controlling STG behavior that is a behavior listed in the Assessment Chart
- Recruiting inmates to become an STG affiliate or to take part in STG activities that is a behavior listed in this SHUR Assessment Chart
- Acting in a leadership role to generate, move, or facilitate assets or proceeds as a result of or in support of prohibited STG business dealings
- Theft of destruction of State property by any means where the loss or potential loss exceeds $10,000 or threatens the safety of others
- Extortion or bribery of a non-inmate
- Extortion or bribery of an inmate
- Indecent Exposure
- Sexual disorderly conduct (2 or more offenses within a 12-month period).

For offenses that will still result in a RHU term, CDCR will make changes to the length of RHU terms and further simplify the sentencing structure. (See draft Title 15 section 3337(g), RHU Matrix.) CDCR will replace low, expected and high terms with a single "set term" which will be set as half of the old "expected" term. (Id.) For instance, battery on a non-inmate with a weapon previously had a low term of 18 months, an expected term of 30 months, and a high term of 42 months. Under the revisions, the offense will carry a set term of 15 months. CDCR has removed mitigation and aggravation factors from the matrix (see old Title 15 section 3341.3), and removed consecutive RHU terms. (See old Title 15 section 3341.4.)

To further rehabilitation within the RHUs and reduce length of stay, CDCR will create a RHU Programming Credit. (See draft Title 15 section 3345.) The RHU Programming Credit will allow inmates to reduce their RHU term by completing programs through Division of Rehabilitation Programs or by attending their assigned mental health treatment. MHSDS patients will still receive Milestone Completion Credits for participation in structured treatment. Those same treatment hours will also count towards RHU Programming Credits. For every twenty-hours of departmentally approved rehabilitative programming or completed mental health treatment, inmates will receive five days off their RHU terms. MHSDS patients will also have access to the same departmentally approved rehabilitative programming as GP RHU inmates.

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 3

    B.   Property and Privilege Revisions

CDCR will set out of cell time at a minimum of 20 hours per week for all RHU inmates, regardless of mental health status or level of care.  This change will increase out of cell time for general population RHU inmates, CCCMS patients currently in reception center and female STRHs and all LTRH patients.  Institutions will be required to provide at least ten hours of yard per week.  (See draft Title 15 section 3343(i).)

CDCR is also increasing property allowances to all RHU inmates.  The changes are reflected in the revised property matrices.  The property changes also increase property for Non-Disciplinary RHU inmates.

    C.   Reduction of Restricted Housing Programs and Unnecessary Transfers

CDCR will reduce the number of restricted housing programs from six to three by combining short (i.e. ASU) and long term (i.e. SHU) units for all levels of care.  For instance, the Short Term Restricted Housing (STRH) unit and Long Term Restricted Housing (LTRH) unit will be combined and renamed the Correctional Clinical Case Management System (CCCMS) Restricted Housing Unit.  CDCR will take the same approach for general population and Enhanced Outpatient Program (EOP) RHUs.  CDCR's goal is to significantly reduce unnecessary transfers through.  For MHSDS patients, this plan will increase continuity of care and, for many, allow them to remain at their home institution while in a RHU by removing the requirement to transfer to an LTRH or a Psychiatric Services Unit.

CDCR plans to reduce the number of restricted housing beds statewide.  Those changes will mostly occur on a rolling basis once CDCR implements the RHU program later this year.  CDCR has, however, identified the Pelican Bay SHU as the first unit to deactivate in fall 2023.

    II.    Coleman Remedy

CDCR's RHU regulations result in changes to several components of the Coleman Compendium.  While grammatical changes have been made throughout Title 15 sections on restricted housing, the following Compendium regulations have been changed.

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 4

| Compendium Section | RHU Changes |
|---|---|
| **CCR Title 15, Section 3190, subdivisions (c) and (l)(3), General Policy regarding Personal Property and Religious Personal Property, specifically for inmates in segregation** | Grammatical Edits |
| **CCR Title 15, section 3269, Inmate Housing Assignment** | Grammatical Edits |
| **CCR Title 15, Section 3335, subdivision (a), Administrative Segregation, Non Disciplinary Segregation (NDS)** | Moved to section 3335(b); Grammatical edits and additions to 3335(b)(1)(A) through (G) consistent with NDS policy |
| **CCR Title 15, Section 3317, Mental Health Assessment for Disciplinary Proceedings** | Grammatical edits to 3317(b)(4) |
| **CCR Title 15, section 3340, subdivision (a)(4) and (a)(4)(A), regarding Assistance to Inmates for Administrative Segregation Classification Hearings** | Moved to new section 3344; Grammatical edits |
| **CCR Title 15, section 3341.2, Psychiatric Services Unit** | Repealed; see new section 3335.2; Grammatical edits |
| **CCR Title 15, Section 3341.8, subdivision (b), Security Housing Unit/Psychiatric Services Unit Classification Hearings, Pre-MERD Hearing. This regulation codifies provisions of the September 12, 2014, memo 120-Day Pre-Minimum Eligible Release Date Review Expectations** | Section 3341.8 is repealed. Pre-MERD language modified and moved to new section 3341(g)(1)-(2); changes pre-MERD timeline from 120 days to 90 days; Grammatical edits |
| **CCR Title 15, section 3342, subdivision (b), regarding Case Review** | Moved to new section 3347; Grammatical edits |
| **CCR Title 15, section 3344, subdivision (b), regarding Administrative Segregation Records** | Moved to new section 3349; Grammatical edits |
| **DOM Appendix A, Inmate Property – Matrix – Authorized Personal Property Schedules for Administrative Segregation Unit/Security Housing Unit/Psychiatric Services Unit Male Inmates and Female Inmates** | Grammatical and substantive revisions |
| **DOM Appendix D, Non Disciplinary Segregation (NDS) Personal Property Matrix** | Grammatical and substantive revisions |

Special Master Lopes
Coleman Plaintiffs' Counsel
Page 5


CDCR also anticipates applying the EOP Administrative Segregation Unit Hub certification process to focus on the newly created EOP RHUs.  Clinically, EOP RHUs will operate the same as EOP ASU Hubs or PSUs.  CDCR anticipates circulating a draft policy addressing the treatment requirements for the EOP RHU and CCCMS RHU at a later date.

Finally, CDCR has identified the July 27, 2004 order on the maximum capacity for R.J. Donovan's (RJD) EOP ASU Hub as a barrier to successful implementation of the RHU plan. (See ECF No. 1598 at 2.)  RJD's EOP ASU Hub is the only housing unit in the state with a court ordered population cap.  RJD's EOP ASU Hub will convert to an EOP RHU under CDCR's plan.  However, with its current court ordered cap of sixty-three patients, RJD will be forced to transfer patients to other EOP RHUs to stay under the cap, thwarting the goal of reducing unnecessary transfers and increasing continuity of care.  CDCR requests that Plaintiffs and the Special Master consider a stipulation ending the cap at RJD.

III.    Conclusion

CDCR looks forward to your comments as it works to finalize the regulation package and move forward with implementing these new programs.  Please let me know if you have any questions or would like to discuss further.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
California Department of Corrections and Rehabilitation
Office of Legal Affairs

# EXHIBIT F

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**DIVISION OF HEALTH CARE SERVICES**
STATEWIDE MENTAL HEALTH PROGRAM
P.O. Box 588500
Elk Grove, California 95758



October 27, 2023

Matthew A. Lopes, Jr. Esquire                    via: Elise Owens Thorn, Esquire
Office of the Special Master                            Deputy Attorney General
Pannone Lopes & Devereaux LLC                    Department of Justice
317 Iron Horse Point Way, Suite 301                1300 "I" Street, Suite 125
Providence, RI  02908                                    P. O. Box 944255
                                                                Sacramento, CA  94244-2550

I have reviewed reports from the institution's Chiefs of Mental Health, Chief Executive Officers, Wardens, and Regional Administrators, and have reviewed Mental Health Performance Reports, summarizing institutional performance.

After this review, I am able to make a certification based upon the combined clinical expertise of the Regional Mental Health Administrators, the Chief of Quality Management for Mental Health, and my personal review of performance information.

The following Enhanced Outpatient Program (EOP) Administrative Segregation Unit (ASU) Hubs, with a box checked, have met Mental Health Services Delivery System (MHSDS) Program Guide requirements during a review conducted September 2023, for data and reviews conducted from August 1, 2023 through August 31, 2023.

☒ Central California Women's Facility          ☐ California State Prison, Corcoran (COR)
    (CCWF)                                          ☒ California State Prison,
☐ California Health Care Facility (CHCF)              Los Angeles County (LAC)
☒ California Institution for Women              ☒ Mule Creek State Prison (MCSP)
    (CIW)                                            ☐ Richard J. Donovan Correctional
☒ California Men's Colony (CMC)                      Facility (RJD)
☐ California Medical Facility (CMF)              ☒ California State Prison, Sacramento
                                                                    (SAC)

California Health Care Facility (CHCF) remains closed due to staffing shortages.

California Medical Facility (CMF) did not meet expectations due to Treatment Offered (60%). This deficiency is attributed to the cancellation of sixteen groups August 3 due to an institutional recall, and the cancellation of 12 groups August 7 due to no provider availability. In lieu of treatment offered, patients deemed to be high risk continue to be prioritized and are seen by their assigned clinicians and/or Crisis Intervention Team (CIT) (as available) for additional contacts when clinically indicated.  High risk patients are discussed at the ASU Morning Meeting and twice daily unit huddles, and clinicians continue to provide psychoeducation to patients regarding submitting 7362/MH-5 for additional support if needed. CMF remains closed to intake.

DocuSign Envelope ID: 7C42C102-4298-42A5-B087-C9B1031FDFCD

Matthew A. Lopes, Jr. Esquire
Page 2

California State Prison, Corcoran (COR) did not meet expectations due to Timely Mental Health Referrals (80%). This deficiency is attributed to a covering psychiatrist canceling instead of voiding or moving consults. Additionally, two appointments were ordered just prior to a patient transferring and the receiving institution was not notified. One appointment was not scheduled timely and one not seen timely by clinician (urgent was a few hour past timelines). There was also one emergent appointment triggered by a nursing screen, but no mental health staff were notified of this referral. Staff were trained on appropriate procedures regarding these issues. COR remains closed to intake.

Richard J. Donovan Correctional Facility (RJD) did not meet expectations due to Timely Mental Health Referrals (82%) and Treatment Offered (85%). The Timely Mental Health Referrals deficiency was attributed to a high census, an increase in intakes, and staffing challenges including training new staff. During this time, RJD prioritized emergent and urgent consults, 5-Day Follow Ups, SRASHEs, initial contacts, and weekly routine contacts. Plans for improvement include recruiting and interviewing potential candidates to fill current vacancies and adjusting staff schedules as needed to staff ASU adequately. Custody staff are informed daily about ASU population numbers to support efforts in managing patient movement, and programming delays are addressed immediately to ensure effective and timely problem-solving strategies are in place. The Treatment offered deficiency was attributed to largely the same causes. RJD remains open to intake.

As we have discussed clearly with the Office of the Special Master for several months, we continue to allow patients from the same institution to transfer to their institution's EOP ASU Hub even if currently closed, as institutions that do not have an EOP ASU Hub must be routed outside. We recognize this is not in compliance with policy and make no representations otherwise. This is due to the limited number of beds available statewide at this time, and we hope to remedy this through a variety of interventions occurring over the coming months, including changes to restricted housing units statewide. We continue to monitor closed institutions, as above, to ensure that they are the safest places to maintain these patients, and we will transfer patients out if a specific hub is deemed to be unable to maintain safe standards of care for these patients.

If you have any questions, please contact me at (415) 342-8054.

Sincerely,

DocuSigned by:

Amar Mehta

46AE21AE5D5B4D3...

AMAR MEHTA, M.D.
Deputy Director, Statewide Mental Health Program
California Department of Corrections and Rehabilitation