Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7318
Fax: (916) 324-5205
E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
1676 N. California Boulevard, Suite 620
Walnut Creek, CA 94596
Telephone: (925) 746-8460
Fax: (925) 746-8490
E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT – PART B: SPECIAL MASTER'S MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS (ECF NO. 8085)** |

**TABLE OF CONTENTS**

Page

Introduction .................................................................................................................................. 1
    I.      Staffing ........................................................................................................................ 1
         A.    Findings in the Report do not demonstrate that the ninety-percent standard applies to the DSH staffing plan ............................................................................................... 1
         B.    DSH is following its Staffing Plan and taking appropriate steps to address staffing retention and recruitment ................................................................................... 2
    II.     Quality of Care Issues ................................................................................................. 5
         A.    DSH provides sufficient group therapy ............................................................... 6
         B.    Criticisms of individual treatment issues represent differing clinical opinions but are not evidence of inadequate care or systemic lack of access to care ............................ 7
         C.    Findings on inadequate treatment are not supported by mental health policies or standards of care .................................................................................................. 8
         D.    The Report Fails to Capture the Full Extent of Group Treatment Offered ............... 11
         E.    There is no requirement that every patient have a behavioral treatment plan ........... 13
    III.    The Report Mischaracterizes Suicide Risks ............................................................... 13
    IV.    Defendants Continue to Properly Review, Approve, and Transfer Coleman Patients to DSH ........................................................................................................................ 13
Conclusion ................................................................................................................................ 15
Certification .............................................................................................................................. 16

i

Defs. Objections to 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

# TABLE OF AUTHORITIES

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment .................................................................................................... 11

**OTHER AUTHORITIES**

Human Resources, PL 22-25, *Pay Differential 324 Department Of Corrections and Rehabilitation –Mental Health Recruitment Retention Bonus –Bargaining Units 16, 19, and Excludeds* (2022) §§ 14.324.1-3, *available at* https://www.calhr.ca.gov/Pay%20Differentials%20Library/Pay_Differential_324.pdf ............................................................................................................................. 4

Legislative Analysts Office, *MOU Fiscal Analysis: Bargaining Unit 18 (Psychiatric Technicians)*(2022), *available at* https://lao.ca.gov/Publications/Report/4617 ....................... 4

ii

Defs. Objections to 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

# INTRODUCTION

On December 15, 2023, the Special Master filed his thirtieth round monitoring report on the inpatient mental healthcare programs at the California Department of State Hospitals (DSH) (Report). (ECF No. 8085.) Defendants object to the Report to the extent that it does not address the issues raised in Defendants' June 30, 2023 response to the draft report and request that the Court reject the Special Master's three recommendations for orders.

**I.   STAFFING**

The Report recommends that the Court order that "DSH-Atascadero undertake all necessary steps to comply with the DSH Staffing Plan to reduce its staffing vacancies to no more than ten percent for the disciplines of psychiatry, psychology, social work, and rehabilitation therapy." (ECF No. 8085 at 78.) Defendants object to the Report's findings and recommendation because there is no basis—either factual or legal—to impose such an order.

**A.   Findings in the Report do not demonstrate that the ninety-percent standard applies to the DSH staffing plan.**

There exists no court order or other legal requirement that would subject DSH to a ninety-percent fill rate standard, nor does the Report identify one. The Report appears to assess the adequacy of DSH staffing based on the June 2002 (ECF No. 1383) and March 2022 (ECF No. 7504) orders that require CDCR to maintain a ninety-percent fill rate for certain mental health staff classifications. (ECF No. 8085 at 13, 75, and 76.) Plainly, those orders apply to CDCR, not DSH. And while the Report describes the various staffing rates at the DSH programs (*id*. 34-38), it does not address the point made in Defendants' June 30 objections that, "the DSH Staffing Plan does not require that DSH must maintain a ninety-percent fill rate for all allocated positions." (ECF No. 7078-1.) It also does not refute Defendants' objection that the order approving the DSH Staffing Plan did not impose a ninety-percent requirement or make findings about the adequacy of DSH's care that would permit it to impose such an order. (ECF No. 7108.)

Instead, the Report makes the tenuous argument that the DSH Staffing Plan itself establishes that DSH must maintain no greater than a ten-percent staff vacancy rate because the plan reports then-current staff fill rates against a ninety-percent threshold. (ECF No. 8085 at 13.)

1

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

The Report claims that the 90% fill rate can be implied from references in the DSH Staffing Plan. (*Id.*) But the Report is only referencing a monitoring standard. This is consistent with prior orders that require the reporting of compliance from zero to 100 percent. (ECF No. 6846 at 24.) Had DSH intended its staffing plan to contain a ninety-percent fill rate requirement, it would have stated so explicitly.

The DSH Staffing Plan does, however, explicitly state staffing requirements for *Coleman* patients in the form of ratios. The plan describes a transition from a 1:35 staffing ratio to a 1:30 staffing ratio for each of its units serving *Coleman*-class patients. (ECF No. 7078-1 at 3-7.) DSH implemented this change in staffing ratios in July 2021, and as noted in the Special Master's Report, "all three institutions satisfied the 1:30 staff-to-patient staffing ratio" during the monitoring period. (ECF No 8085 at 34.) Thus, the report found that there were appropriate staffing levels for all *Coleman* patients per DSH's staffing ratios. Because DSH has satisfied its staffing-plan ratios, there is no basis for the Special Master's second recommendation.

There is also nothing in the order approving the DSH Staffing Plan indicating that the orders that apply to CDCR's staffing plans apply to DSH. CDCR's staffing plan is undeniably different than the DSH staffing plan. (ECF Nos. 3693 and 7078-1.) Defendants objected to the draft report on this basis and the final Report was not revised to address the objection. There are no findings that the DSH staffing allocation methodology is similar or comparable to the methodology CDCR uses to develop its staffing allocations. CDCR's Staffing Plan allocates staff positions based on a twice-annual allocation that is based on patient census and the DSH Staffing Plan allocates positions based on *Coleman* bed capacity. (ECF No. 7801-1 at 2-3.) The Report's silence on this distinction is problematic.

    **B.**    **DSH is following its Staffing Plan and taking appropriate steps to address staffing retention and recruitment.**

The Report does not demonstrate that DSH is failing to take appropriate steps to maintain adequate staffing. Consequently, there is no basis for the recommended order. DSH has multiple efforts underway (non-salary related) to increase recruitment of individuals to mental health classifications, including launching significant marketing campaigns. (Decl. Carolina Klein, ¶ 4.)

2

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

DSH also continues to offer internship, fellowship, and residency programs as noted in the Staffing Plan. (*Id.*) DSH has contracted with Cooperative Personnel Services-HR to design and implement significant research and surveys to launch tailored digital and e-mail marketing campaigns and virtual career fairs for some of its hard to recruit and retain classifications, including psychiatrists, psychologists, registered nurses, and psychiatric technicians. (*Id.* ¶ 5.)

DSH has also successfully implemented the new Residency Program referenced in its Staffing Plan at DSH-Napa in partnership with St. Joseph Medical Center. (Klein Decl. ¶ 6.) The residency program will train additional psychiatrists for the DSH system. (*Id.*) The first cohort of seven residents began the program in July 2021 and the second cohort of seven residents started in July 2022. (*Id.*) Another seven residents started in July 2023. (*Id.*) When fully implemented in July 2024, it is anticipated that twenty-eight psychiatry residents will be in training in this program. (*Id.*)

Moreover, the 2023 Budget Act includes additional funding for the development and implementation of pipeline, recruitment, and retention initiatives to sustain and grow DSH's psychiatric workforce. (Klein Decl. ¶ 7.) These initiatives go beyond what is included in the DSH Staffing Plan. (*Id.*) The Budget Change Proposal[1] included a total of 7.0 positions in fiscal year (FY) 2023-24 and ongoing; and funding through the General Fund (GF) of $6.5 million in FY 2023-24, $7.1 million in FY 2024-25, $7.3 million in FY 2025-26, $7.7 million in FY 2026-27 and $8.3 million in FY 2027-28 and ongoing. (*Id.*) The purpose of this is to add residencies and fellowships, and offer clinical rotations as a means to improve recruitment and retention of psychiatrists. (*Id.*)

The State has also successfully negotiated recruitment and retention pay differentials for psychiatric technicians with the California Association of Psychiatric Technicians and for Psychiatrists with the Union of American Physicians and Dentist (UAPD). (Klein Decl. ¶ 8.) Effective in 2022, the bonuses include $400 per month for Psychiatric Technicians and Senior Psychiatric Technicians at DSH-Atascadero, and $200 per month for Psychiatric Technicians and

---

[1] Dep't of State Hospitals, DF-46, *Budget Change Proposal* (2023), *available at* esd.dof.ca.gov/Documents/bcp/2324/FY2324_ORG4440_BCP6472.pdf.

3

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

Senior Psychiatric Technicians at every facility except for Patton.[2] (*Id.*) Psychiatrist bonuses of $20,000 became effective in 2021 and payable in $5,000 increments at 6, 24, 60, and 84 months of employment.[3]

Recent negotiations with various labor unions regarding new labor contracts, including the UAPD and the American Federation of State, County, and Municipal Employees, whose membership includes psychologists, social workers, and rehabilitation therapists, resulted in significant salary adjustments for staff who provide treatment and services to the *Coleman* patients. The table below summarizes the negotiated salary improvements for psychiatrists, registered nurses, psychiatric technicians, rehabilitation therapists, and licensed vocational nurses, published at https://www.calhr.ca.gov/state-hr-professionals/Pages/bargaining-contracts.aspx:

| Classification | Adjustment Amount |
| --- | --- |
| Psychiatrists (Bargaining Unit 16) | 3% - General Salary Increase<br>15% - In-Person Differential for Psychiatrists<br>1% - Pay Differential 324 – 1% recruitment and retention bonus payment and will increase 1% every year until year seven.<br>135% - Compensation of 135% of hourly rate for completing additional caseload beyond the normal caseload.<br>$10,000 - Pay Differential 324 - One-Time Payment for Psychiatrist Classes if employee worked over 84 pay periods.<br>$1,000 - Health Provider Recognition Payment |
| Registered Nurse-Safety (Bargaining Unit 17) | 3% - General Salary Increase<br>$1,450 - Health Care Facility Retention Payment |
| Psychiatric Technicians (Bargaining Unit 18) | 4% Special Salary Adjustment at Maximum Salary<br>Pay Differential 463 - 1% Longevity Increase (20 or more years)<br>$1,200 Pay Differential 462 - Mental Health and Wellness Stipend<br>$400/$200 Monthly Recruitment and Retention Differential Stipends ($400 for Atascadero and $200 for Coalinga, Metropolitan, and Napa) |

---

[2] Legislative Analysts Office, *MOU Fiscal Analysis: Bargaining Unit 18 (Psychiatric Technicians)* (2022), *available at* https://lao.ca.gov/Publications/Report/4617.

[3] California Department of Human Resources, PL 22-25, *Pay Differential 324 Department Of Corrections and Rehabilitation –Mental Health Recruitment Retention Bonus –Bargaining Units 16, 19, and Excludeds* (2022) §§ 14.324.1-3, *available at* https://www.calhr.ca.gov/Pay%20Differentials%20Library/Pay_Differential_324.pdf.

4

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

| Rehabilitation Therapists (Bargaining Unit 19) | **Music** <br> 3% General Salary Increase <br> 1.50% Special Salary Adjustment <br> 8% Special Salary Adjustment <br> $1,450 Health Care Facility Retention Payment <br> $500 Allowance for Required Continuing Education Units <br> **Occupational** <br> 3% General Salary Increase <br> 4.35% Special Salary Adjustment <br> 6% Special Salary Adjustment <br> $1,450 Health Care Facility Retention Payment <br> **Recreational** <br> 3% General Salary Increase <br> 1.50% Special Salary Adjustment <br> 8% Special Salary Adjustment <br> $1,450 Health Care Facility Retention Payment <br> **Art** <br> 3% General Salary Increase <br> 1.50% Special Salary Adjustment <br> 8% Special Salary Adjustment <br> $1,450 Health Care Facility Retention Payment <br> $500 Allowance for Required Continuing Education Units <br> **Clinical Social Worker** <br> 3% General Salary Increase <br> 3% Special Salary Adjustment at Maximum Salary <br> $10,000 Pay Differential 324 – One-Time Payment for Clinical Social Worker Classes if employee worked over 84 pay periods. <br> $1,450 Health Care Facility Retention Payment <br> **Psychologist** <br> 3% General Salary Increase <br> 10% Special Salary Adjustment at Maximum Salary <br> $10,000 Pay Differential 324 – One-Time Payment for Psychologist Classes. <br> $1,450 Health Care Facility Retention Payment |
|---|---|

## II. QUALITY OF CARE ISSUES

The Report includes various findings that criticize DSH for providing inadequate care and a recommendation that "all DSH hospitals take the necessary steps to provide patients with sufficient group and individual therapy." (ECF No. 8085 at 78.) Defendants objected to this recommendation and raised specific deficiencies in the draft report, some of which the Special

5

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

1  Master addresses in the Report. (ECF No. 8085 at 14-16.) But the Report remains deficient
2  because it does not cite to any scientific standards or authority that individual therapy is a
3  required element of an adequate mental health treatment plan. The Report also does not
4  demonstrate systemic issues concerning the quality of treatment and ignores existing policies that
5  set forth the required treatment for inpatient mental health care.

6  **A. DSH provides sufficient group therapy.**

7  DSH provides *Coleman* class members with sufficient group therapy as required under the
8  Program Guide and mental health policies and regulations. This treatment is reflected in the DSH
9  Governing Body Reports provided to the Special Master. (Thorn Decl. ¶ 2, Exhibit A, A-028, A-
10  058 and A-090.)

11  At DSH-Atascadero, providing centralized treatment services remains challenging due to
12  repeated COVID-19 surges and the redirection of Recovery Mall Services (RMS) program staff
13  to address COVID-19 quarantine and isolation staffing needs. (Decl. of Jason Black, ¶ 4.)
14  However, as COVID-19 surges subside, DSH-Atascadero continues to look for opportunities to
15  increase both core and supplemental groups in the centralized areas. (*Id*.) As reflected in the
16  July – December 2022 Governing Body Report, some centralized groups and services reopened,
17  including Education and the Music Room. (*Id*.; Thorn Decl. Exhibit A, A-016.) The library
18  reopened with scheduled time slots by program and the gymnasium and main courtyard re-opened
19  for 30-minute unit sessions. (*Id*.) Recent progress in 2023 has included the transition of
20  substance abuse treatment back to a centralized program and the restart of NA and AA meetings
21  with community self-help entities. (*Id*.) RMS also has developed plans to reopen the Arts and
22  Crafts center to offer rehabilitation and healthy living groups this coming quarter. (*Id*.) As DSH-
23  Atascadero continues to recover from the pandemic, additional off-unit treatment programming
24  for *Coleman* patients will be more readily available. (*Id*. ¶ 5.)

25  *Coleman* patients' post-discharge status also supports the adequacy of treatment provided.
26  Of the seventy-four *Coleman* patients discharged to a lower level of care during the monitoring
27  period, twelve were admitted to a MHCB within thirty days of discharge. (Decl. of Brian
28  Zollweg, Psy. ¶ 2.) Only four of those patients were admitted to the MHCB due to genuine

6
Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

psychiatric distress and of those four, only two were admitted to inpatient care (one was admitted to an acute level of care and one was admitted to an intermediate level of care). (*Id.*) The other eight patients who were admitted to the MHCB within thirty days of discharge were determined to have used the MHCB for secondary gain, had safety concerns, or had difficulty adjusting to prison due to spending prolonged time in a state hospital setting. (*Id.*)

Thus, the evidence presented does not demonstrate that *Coleman* patients at DSH are receiving insufficient group or individualized therapy—indeed, patients' post-discharge outcomes belie this claim.

> **B.  Criticisms of individual treatment issues represent differing clinical opinions but are not evidence of inadequate care or systemic lack of access to care.**

The Report includes clinical reviews of patients treated in DSH programs during the monitoring period. (ECF No. 8085 at 133-227.) The Special Master responded to Defendants' criticism here and corrected the count of reviews from 19 to 63. (ECF No. 8085 at 15.) These reviews include criticisms that focus on individual treatment issues. But the criticisms represent differing clinical opinions between the Special Master's experts and DSH clinicians. (Zollweg Decl. ¶ 3.) The Special Master's different clinical opinions are not evidence of inadequate care, a systemic lack of access to care, or a failure to comply with the *Coleman* remedial plan.

The Special Master's clinical opinions that care for the reviewed patients was inadequate are not supported by objective findings—such as chart notes—indicating that any patient decompensated or suffered an adverse mental health outcome as a result of the alleged inadequacies. In response to this objection, the Report attempts to clarify the basis for finding treatment inadequate: "the absence of decompensation and/or suffering of the reviewed patients does not indicate that the provided treatment was adequate; rather, patient improvement and progress toward treatment goals constitutes adequate treatment." (ECF No. 8085 at 15-16.) Defendants requested specific information that was absent in the individual case reviews included in the Report—information necessary to substantiate the Report's conclusion of inadequate care. Instead of providing the data, the Special Master stated that, "defendants' inadequate care also ignores the suffering, and possibly worsened prognosis, that patients may have endured during the

7

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

time when they were undertreated, as well as what this reveals about their system of care." (*Id.*) Speculation about what a patient "may" or possibly might experience is not evidence and does not support a finding of inadequate care. The Special Master's response to this objection does not address Defendants' request for more information or the defect in the Report; i.e., that objective evidence and findings in support of the Special Master's clinical experts' opinion are lacking.

### C. Findings on inadequate treatment are not supported by mental health policies or standards of care.

The Report states that the lack of individual therapy resulted in patients not receiving adequate treatment. (ECF No. 8085 at 40.) Defendants questioned this finding in their objections to the draft report. (ECF No. 8085-1 at 11-12.) Defendants also questioned this finding when they met with the Special Master and his experts to discuss the draft report. They asked the Special Master and his clinical experts for evidence that not using one-on-one treatment resulted in patients not receiving adequate treatment. (Zollweg Decl. ¶ 4.) The Special Master's experts were not able to point to any specific patient or chart reviewed to support this conclusion. (*Id.*)

The Special Master's mandate is to monitor Defendants' compliance with the remedial plan. (ECF No. 640 at 4.) As reflected below, the Report does not provide any standards or requirements for the provision of individual therapy, and it does not demonstrate that the lack of individual treatment will result in inadequate mental health care.

In response to Defendants' concerns with findings that treatment was inadequate unless the patients all received individual treatment, the Special Master agreed that not all patients require individual therapy and agreed to clarify the Report to read that only "some" patients who may have been clinically indicated for individual therapy did not receive this type of individual treatment. (ECF No. 8085 at 16.) However, the final Report maintains the general finding that the number of hours of offered individual treatment at DSH-Atascadero was inadequate for an inpatient program. (ECF No. 8085 at 85.) Such a generalized finding is inconsistent with established standards for inpatient treatment, the Special Master's agreement to clarify the draft report, and DSH governing documents. The Governing Body Reports indicate that individual therapy is available based on clinical need:

8

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

> The ICF 2684 treatment units have multidisciplinary teams (psychiatrist, psychologist, social worker, rehabilitation therapist, and level of care staff). Individualized treatment plans address each patient's reason for referral and the expected treatment goals. Treatment modalities include individual therapy, group therapy (e.g., substance abuse treatment, Cognitive Behavioral Therapy (CBT), Dialectical Behavioral Therapy (DBT), medication and symptom management, and others).

(Thorn Decl., Exhibit A at A-006.)

Defendants clearly identify in their objections to the draft report that there is no requirement to provide individual therapy in the Program Guide, in Title 22, or in any other mental health policy applicable to the DSH programs that treat *Coleman* class members. (ECF No. 8085-1 at 11-12.) Tellingly, the Report offers nothing by way of guidance on any clinical or legal requirement for individual therapy. Instead, in response to this objection, the Report identifies three case reviews where the Special Master clinical team purportedly opine that the lack of individual therapy resulted in patients not receiving adequate treatment. (*Id.* at 16.) But the Report lacks a rationale for the statement that a "lack of individual therapy resulted in patients not receiving adequate treatment," and the three patient chart reviews do not establish such a standard of care or demonstrate that any patient decompensated or suffered an adverse mental health outcome as a result of not receiving individual treatment.

For example, the Report notes on page 9, "[n]onetheless, at least three case reviews found that the lack of individual therapy resulted in patients not receiving adequate treatment. *See infra* pp. 160 – 162, 180 – 182, and 184 – 186." (ECF No. 8085 at 16.) The Report references the review of Patient Y's chart (*Id*. at 167-169) and concludes that "more frequent individual treatment should have been considered for this patient given his presenting problems upon admission and lack of engagement with staff and peers on the unit." (*Id.* at 169.) But the Report does not reference Patient Y's discharge summary which notes that Patient Y attended 81% of his treatment groups, socialized well with peers, played games in the day room, and showed no signs of vegetative symptoms that would be consistent with a depressive disorder. (Zellwig Decl. ⁋5.) Given his group attendance and significant improvement in signs and symptoms, there was no indication for individual treatment. (*Id.*) Patient Y was appropriately discharged from DSH-A

9

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

after he made veiled threats to make weapons and attempted to assault a peer and showed no signs of a severe mental illness that required prolonged inpatient psychiatric hospitalization.

The Report references that Patient L (*Id.* at 189) "should have received closer monitoring by increased individual encounters," but there is nothing in the Report that ties the need to monitor a patient through increased individual encounters with a clinical need for individual therapy/treatment. In fact, the term "individual encounters" appears three times in the Report and is not used in context of providing individual therapy/treatment. The reference to Patient L in the rationale on why a lack of individual therapy for some patients was indicative of inadequate treatment appears to be in error.

Lastly, the Report references Patient O (*Id.* at 184-186) as an example of a patient whose treatment was inadequate due to a lack of individual treatment. But the findings in the Report reflect reasons other than a need for individual treatment to justify their finding that Patient O's treatment was inadequate. A reduction in group attendance from 100% to 80% is not a clinically indicated rationale for requiring individual therapy as the patient continued to have high attendance and participation for over six months of his treatment at DSH-Coalinga. (Zollweg Decl. ¶ 6.)

The Report and predecessor reports do not provide any scientific, academic or legal authority to support the Report's criticisms that a lack of individual therapy resulted in patients receiving inadequate treatment. The DSH Staffing Plan and the DSH continuous quality improvement process, both approved by the Special Master and the Court, lack any requirement for individual treatment. While the Report references the DSH governing-body reports to support a finding that DSH is required to offer 20 hours of treatment to *Coleman* patients, DSH and the Special Master's experts and monitors did not designate minimum individual treatment hours, nor was there any agreement that behavioral plans were a requirement or a prerequisite to a finding of adequate treatment. This is consistent with Defendants' previously-stated position that the DSH governing-body reports that reference the provision of 20 hours of treatment show that Coleman patients are offered and attend a varied amount of weekly group treatment and supplemental activities.

The Special Master's findings that appear to require individual treatment are not consistent with evidence-based psychiatric or psychological treatment standards. DSH practitioners utilize individual treatment when clinically indicated. (Zollweg Decl. ¶ 7.) Patients receive individual therapy only when clinicians believe treatment objectives will be met through individual therapy. (*Id*.) The Report does not provide any psychiatric or scientific support that individual therapy is the default standard of care. Utilizing group therapy over individual therapy—after the application of sound clinical judgment—is not a violation of the Eighth Amendment or evidence of inadequate care.

### D. The Report Fails to Capture the Full Extent of Group Treatment Offered.

The Report contains findings that DSH-Atascadero and DSH-Patton provided inadequate treatment based on data reported by DSH. (ECF No. 8085 at 39.) While the Report corrected some omissions of data that DSH identified in its letter response to the draft report, the Report still does not include the full spectrum of the treatment offered.

The DSH-Atascadero Coleman Governing Body Report for July 1, 2022 – December 31, 2022 indicates that the total average treatment hours offered per patient per week was 21.16 hours for patients past 30 days of admission. (Black Decl. ¶ 6.) The Special Master has this data as he was provided the Governing Body Report. (Thorn Decl. ¶ 2, Exhibit A.) Average hours attended per patient per week was 10.68. Total average hours of treatment per patient per week offered ranged from a low of 15.39 in August to a high of 26.28 hours in December. (*Id*.) Average core group hours offered per patient per week ranged from 5.29 hours in December to 9.95 hours in August. (*Id*.) December core group hours were low due to the 2-week term break; however, those core group hours were offset by 20.97 average supplemental hours offered during December. (*Id*.)

In response to criticisms regarding the adequacy of treatment provided to patients at DSH-Patton, Defendants summarize the nature of the mental health treatment DSH-Patton makes available to *Coleman* patients, including core group offerings and supplemental activities. (Decl. of Janine Wallace ¶ 3.) Core offerings consist of psychoeducation and group therapy focused on

11

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

1  meeting treatment goals and includes topics such as Understanding Mental Health, Morning
2  Focus, Coping Skills, Anger Management, Self Help: Self Maintenance, Seeking Safety, Journal
3  Therapy, Therapeutic Community, Dual Recovery, Leisure Education, Gardening and Choices.
4  (*Id.*) Supplemental activities include Alcoholics/Narcotics Anonymous, leisure activities (Board
5  games, Journal writing, Coloring, Bingo, Sport activities, Talent shows) and religious activities.
6  (*Id.*)  DSH-Patton plans to continue training staff on capturing supplemental group hours and
7  encouraging consistent use of rosters to capture supplemental activities.  (*Id.*)

8      The DSH-Coalinga July – December 2022 Governing Body Report shows that the average
9  weekly core group hours per patient offered were above 10 hours per week throughout the review
10 period with the exception of December, when an average of 8.22 core group hours were offered.
11 (Thorn Decl. Exhibit A at A-046; Decl. of Jose Perez at ¶ 3.)  The hospital experienced a
12 COVID-19 outbreak during December 2022, which may have reduced core group offerings.
13 (Perez Decl. ¶ 5.)  DSH-Coalinga offered a high number of supplemental activity hours, ranging
14 from an average of 28.28 to 46.31 hours per patient per week during each month of the review
15 period. (*Id.*)  Total average attended treatment hours per patient per week ranged from 14.39 to
16 18.05 across the six-month period. (*Id.*)  Per the Governing Body Report, Central Program/Mall
17 Services in concert with the Social Work, Psychology, and Rehabilitation Therapy Departments
18 worked jointly to improve clinical services to offer Coleman patients 20 hours of treatment and
19 supplemental activities per week. (*Id.*)  Supplemental activities include recreational therapy
20 groups that are held taking place throughout the unit, in the art center, the gymnasium, and the
21 music center. (*Id.* ¶ 4.)  These supplemental activities include a variety of groups offered by
22 rehabilitation therapists, psychiatric technicians, and various other staff members.  (*Id.*)
23 Supplemental activities on unit include Cinema appreciation, game hour, current events, popcorn
24 social, and movie night. Off unit groups include, Catholic services, Islamic services, various other
25 spiritual services, sports yard, gymnasium groups, library time, and music center offerings.  (*Id.*)

26     As summarized in the preceding paragraphs, *Coleman* patients are offered and attend a
27 substantial amount of group treatment as well as supplemental activities.  The data does not
28

12
Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

support the Report's finding that mental health treatment is inadequate based on the quantity of group treatment offered to *Coleman* patients.

### E. There is no requirement that every patient have a behavioral treatment plan.

The Report criticizes DSH programs for not having behavioral treatment plans for *Coleman* class members. (ECF No. 8085 at 50.) But as with other criticisms, the Report does not provide any authority for such a requirement for every patient. The Report offers only that DSH should have such programs available, should a patient need it, and that "the Special Master has historically monitored the use of behavioral plans and will continue to do so in the future." (ECF No. 8085 at 16.) The Report on this issue is non-responsive. Accordingly, there is no basis to support a finding that a lack of a behavioral treatment plan means the treatment is inadequate.

## III. THE REPORT MISCHARACTERIZES SUICIDE RISKS

The Report summarizes three cases that allegedly involved an inadequate assessment of suicide risk. (ECF No. 8085 at 59-63.) The three cases identified in the Report do not include any suicide attempts or serious self-injury that occurred at DSH or within 30 days of discharge back to CDCR. DSH requested that the Report clarify the reporting of these issues and provide additional factual bases for the purported findings. (ECF No. 8085-1 at 14.) The Special Master refused to provide the requested information "because the Report is clear and unambiguous and the cases speak for themselves," and "the actual absence of any ensuing suicide attempts, serious self-injury, or other negative outcomes is not evidence of adequate suicide risk assessments." (ECF No. 8085 at 17.) Simply stating that the Report is "clear" does not make it so, and the Special Master's failure to identify any evidence of inadequate suicide risk assessments speaks volumes.

## IV. DEFENDANTS CONTINUE TO PROPERLY REVIEW, APPROVE, AND TRANSFER *COLEMAN* PATIENTS TO DSH

The Report recommends that the Court enter an order requiring that DSH "take all necessary steps to prioritize the identification and referral of all appropriate Coleman patients to

13

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

DSH, eliminate any barriers to their admission to DSH hospitals, and end any underutilization of Coleman-designated beds." (ECF No. 8085 at 78.)  Defendants objected to this recommendation because DSH is already taking all necessary and required steps under current policies to prioritize the identification and referral of appropriate *Coleman* patients to DSH.  (*See* ECF No. 7969 at 5-11.)

The Special Master disagrees and provides as support the reduction in the number of referrals to DSH and the fact that many patients referred to inpatient care require a higher LRH than unlocked dorms.  (ECF No. 8085 at 17-18.)  But those facts do not demonstrate that DSH has not taken necessary steps to prioritize the identification and referral of all appropriate *Coleman* patients to DSH, to eliminate any barriers to their admission to DSH hospitals, and to end any underutilization of Coleman-designated beds.  The Report provides a conclusion but leaves out any factual analysis.

As Defendants pointed out in their objections to the draft report, Defendants are already taking reasonable steps to ensure that DSH beds are appropriately used for APP and ICF patients who qualify for placement and treatment in the unlocked dorm setting.  (Zollweg Decl. ¶ 8.) Those patients' qualifications are based on thorough assessments and vetting under current policies that govern placement in DSH.  (*Id*.)  The steps under the referral process are used to manage inpatient referrals and admissions to DSH.  (*Id*.)  CDCR refers patients to DSH based on CDCR clinical input.  (*Id*.)  And DSH conducts a thorough chart review of the patient and previous hospitalizations in accordance with the MOU and Policy Directive 3601: Referral, Admission and Movement.  (*Id*.)

The only "barriers" to admitting patients to DSH identified in the Report are the current policies and procedures that comport with *Coleman* court orders.  As the Report recognizes, Defendants have recently taken additional steps to augment the reviews of patients under the current policies. (ECF No. 8085 at 17-18.)  The *Trial Processes for DSH Review of Coleman Patients* was recently presented to the Special Master and Plaintiffs and includes the review every inpatient referral with a Least Restrictive Housing designation of Unlocked Dorms regardless of clinical housing recommendation.  (Zollweg Decl. ¶ 9.)  The purpose of the additional reviews is

14

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

1  to increase the pool of referrals DSH reviews and hypothetically should lead to increase in
2  admissions to DSH.  (*Id.*)
3      Although the Report does not mention it, the Court already ordered the parties to meet "to
4  discuss possible revisions to the Least Restrictive Housing policy and other steps to enhance class
5  members' access to Department of State Hospital (DSH) programs, including but not limited to
6  the new two-step plan developed by CDCR and DSH to enhance review of referrals of inmate-
7  patients who are eligible for placement in unlocked dormitory inpatient settings to determine their
8  eligibility for admission to DSH."  (ECF No. 8066 at 5.)  Those discussions have commenced.

## CONCLUSION

The Report demonstrates that Defendants are properly admitting and treating *Coleman* patients in DSH in compliance with the inpatient referral and admission policies.  The fact that Defendants are looking at ways to improve the system is not evidence of inadequate treatment or a failure to prioritize inpatient care at DSH.

Defendants timely submitted objections to the draft report, requesting specific information that the Special Master should have obtained through his monitoring activities.  Instead of providing the requested information, the Special Master piled-on additional criticisms.  Defendants continue to be disappointed by such refusals to provide the guidance the Special Master is tasked with providing, and with his lack of transparency.

Defendants request that the Court reject the Special Master's three recommendations.  As stated above, the Court has ordered and Defendants have taken steps to prioritize the identification and referral of all appropriate *Coleman* patients to DSH, to eliminate any barriers to their admission to DSH hospitals, and to end any underutilization of *Coleman*-designated beds.  The Report lacks any guidance on what further steps Defendants should take.  As such, Defendants should not be ordered to do something that the Special Master is not prepared or able to articulate.

The recommendation that the June 2002 order be applied to DSH staffing is not supported by any order and a staffing plan reference to a ninety-percent threshold does not constitute a legally enforceable order or an acknowledgment that CDCR staffing orders are applicable to

15

Defs. Objections to the 30th Round Monitoring Report-Part B (2:90-cv-00520 KJM-DB (PC))

20237875.1

DSH. If the Court is inclined to impose the 2002 order on DSH, Defendants are entitled to due process that includes the presentation of a motion or other evidentiary proceeding.

Finally, there is no legal or clinical foundation to the Special Master's assertion that individual therapy is a required element of DSH's mental health program, the *Coleman* remedial plan, or any other mental health treatment standards. DSH clinicians use individual therapy for patients as clinically indicated.

## CERTIFICATION

The undersigned certify that they have read the following orders that are relevant to the issues addressed in these objections: ECF Nos. 640, 1383, 5573, 5583, 5726, 6846, 7108, 7504, and 8066.

Dated: January 4, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General

*/s/ Elise Owens Thorn*
Elise Owens Thorn
Deputy Attorney General
*Attorneys for Defendants*

Dated: January 4, 2024

HANSON BRIDGETT LLP

*/s/ Samantha Wolff*
PAUL MELLO
SAMANTHA D. WOLFF
*Attorneys for Defendants*