1  ROB BONTA, SBN 202668
   Attorney General of California
2  MONICA N. ANDERSON, SBN 182970
   DAMON MCCLAIN, SBN 209508
3  Supervising Deputy Attorney General
   ELISE OWENS THORN, SBN 145931
4  NAMRATA KOTWANI, SBN 308741
   Deputy Attorneys General
5   1300 I Street, Suite 125
    P.O. Box 944255
6   Sacramento, CA 94244-2550
    Telephone: (916) 210-7318
7   Fax: (916) 324-5205
    E-mail: Elise.Thorn@doj.ca.gov
8  *Attorneys for Defendants*

   HANSON BRIDGETT LLP
   PAUL B. MELLO, SBN 179755
   SAMANTHA D. WOLFF, SBN 240280
   KAYLEN KADOTANI, SBN 294114
   DAVID C. CASARRUBIAS, SBN 321994
   CARSON R. NIELLO, SBN 329970
    1676 N. CALIFORNIA BLVD., SUITE 620
    WALNUT CREEK, CALIFORNIA 94596
    TELEPHONE: 925-746-8460
    FACSIMILE:  925-746-8490
   *Attorneys for Defendants*

9

10

11

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

13

14

15  RALPH COLEMAN, et al.,

16          Plaintiffs,

17      v.

18  GAVIN NEWSOM, et al.

19          Defendants.

Case No. 2:90-CV-00520- KJM-DB

**DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT ON DEFENDANTS' COMPLIANCE WITH ENHANCED OUTPATIENT PROGRAMS PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS.**

Judge:    Hon. Kimberly J. Mueller

20

21

22

23

24

25

26

27

28

20298845.1

## INTRODUCTION

On December 22, 2023, the Special Master filed his Thirtieth Round Monitoring Report – Part C: Special Master's Monitoring Report pertaining to Defendants' Compliance with Enhanced Outpatient Programs (EOP) Provisionally Approved Plans, Policies, and Protocols ("Report"). (ECF No. 8095.) The Special Master provided the parties with a draft of the Report on October 2, 2023 ("Draft Report"), and Defendants submitted objections to the Draft Report on November 1, 2023. (*See* Exhibit A to the Report, ECF No. 8095-1.)[1] Defendants continue to disagree with and object to the Report for the reasons stated in their November 1, 2023 objections, and reassert certain of those objections, as set forth below.[2]

## OBJECTIONS

### I.    THE REPORT IMPROPERLY USES CONCLUSORY STATEMENTS ON THE CONSTITUTIONALITY OF CARE PROVIDED TO THE COLEMAN CLASS

The Report states that "defendants were not fully compliant with either the Program Guide or its staffing plan" and that CDCR expanded triaging, resulting in "less than the minimum level of services mandated by the Program Guide." (Report at 12.) The Report then concludes, "in the meantime, Coleman patients went without the adequate mental health services to which they have an 'absolute, undeniable right.'" (*Id*. at 13, quoting Dec. 17, 2019 Order, ECF No. 6427 at 45.) However, inadequate care cannot necessarily be inferred from the Special Master's observations about institutions falling short of Program Guide requirements. That is because Program Guide standards exceed National Commission on Correctional Health Care (NCCHC) standards—which have been found to correlate to constitutionality—across many metrics. *See Balla v. Idaho*, 29 F.4th 1019, 1026 (noting that the district court "concluded that '[t]he NCCHC accreditation,' and defendants' completion of the modified compliance plan, 'while not determinative, constitute substantial evidence of adequate medical care,'" and finding that the district court "applied the

---

[1] Page number citation is based on the Court's ECF pagination.

[2] Given the length of the Reports and the workload of the clinical teams, which includes – among other duties – providing and reviewing patient care, managing the mental healthcare system, and training, Defendants believe that the 30-day timeframe in which to respond to the Draft Reports is insufficient to verify the factual representations in the Reports.

20298845.1

appropriate legal standards."). The National Commission on Correctional Health Care[3] (NCCHC) standard for treatment plans states, "[t]he intent of this standard is that mental health patients receive care tailored to their individual needs." (*See* ECF No. 7828-2, Exh. A.) National Commission on Correctional Health Care, *Standards for Mental Health Services in Prisons* (2015), Policy MH-D-05 at 68.)

By way of example, the Report states that "[t]he foundation of adequate mental health care in correctional environments relies on the timely and comprehensive completion of clinical assessments and initial IDTT meetings." (*Id.* at 67.) This statement is a legal conclusion without a factual basis. The use of Interdisciplinary Treatment Teams (IDTT) is unique to CDCR and do not reflect national standards. (*See* National Commission on Correctional Health Care Standards for Health Services in Prisons, 2018 (NCCHC Standards) at P-F-03 Mental Health Services (noting that "[t]he use of an integrated and multidisciplinary team (including correctional staff) to develop treatment plans for inmates displaying manipulative behavior can be effective," but not requiring such a treatment team in the standard).)

In addition, the Report suggests that patients are receiving inadequate care, in part, because "many institutions failed to consistently discuss and/or document necessary information for effective planning, including justifications for diagnosis and levels of care, case conceptualizations and functional impairments, collaborative care plans, and individualized measurable treatment objectives." (Report at 68.) While it may be true that some institutions did not reach Program Guide standards, it cannot be reasonably inferred from that deviation that the care provided was inadequate. Indeed, NCCHC standards do not require such components of a treatment plan, and this is another instance of the Program Guide's higher standards compared to NCCHC. (*See* NCCHC Standards at P-F-03.) In addition to the Program Guide exceeding NCCHC standards across many metrics, several programs within CDCR's mental health system have been accredited by The Joint

---

[3] The National Commission on Correctional Health Care (NCCHC) is nationally recognized as setting the standard for correctional mental health care. CDCR often consults NCCHC mental health standards in crafting new policies as these standards bear significant weight and reflect current best practices. The relevant NCCHC standards are contained in NCCHC's *Standards for Mental Health Services in Correctional Facilities* (2015).

1   Commission[4], which utilizes on-site surveys as part of the accreditation process for health care

2   organizations.[5]  Accordingly, Defendants object to the Special Master's characterization that

3   requirements set forth in the Program Guide are necessarily tethered to the constitutional minimum.

4   (*See* Report at 67, 68, and 77.)

5       Defendants respectfully request that the Court reject the Special Master's improper use of

6   conclusory statements as to the constitutionality of care provided to the *Coleman* class.[6]

7   **II.    THE REPORT CONTAINS INCORRECT AND MISLEADING STAFFING
           CALCULATIONS.**

8

9       The Report contains two sections regarding Mental Health staffing: Section I(A) titled "The

10  Staffing Crisis Identified in the Twenty-Ninth Round Monitoring Report Continued Unabated

11  During the Review Period" and Section II(A) titled "Mental Health Vacancy Rates Overall and by

12  Discipline During the Thirtieth Monitoring Round." Both sections improperly parse the staffing data

13  to dramatize vacancy rates. For example, the data is reported by separating civil service line staff

14  vacancy rates and overall vacancy rates including registry staff. (*See* Report at 32 and 54.) While

15  the Report specifies what is included in the vacancy rate calculations, this parsing of data is improper

16  because neither the Program Guide nor subsequent orders of the *Coleman* Court mandate staffing

17  by civil service employees only. Therefore the Report should be revised to include registry providers

18

19  _____

20  [4] "The Joint Commission is the nation's oldest and largest standards-setting and accrediting body in health care. . . . [The Joint Commission's] state-of-the-art standards focus on patient safety and quality of care." (*See* https://www.jointcommission.org/who-we-are/facts-about-the-joint-commission/joint-commission-faqs/).

21

22  [5] The Joint Commission has accredited the following CDCR mental health care programs: Behavioral Health Care, Ambulatory Health Care, and Nursing Care at CIW; Behavioral Health Care accreditation for the PIP Program at SQSP; Behavioral Health Care accreditation for the PIP Program at CHCF; and Behavioral Health Care and Ambulatory Health Care accreditation for the Outpatient Programs at FSP.

23

24

25  [6] "[T]he Special Master is not tasked with 'assessing whether the State's prison mental health care system satisfies constitutional standards.' [] That assessment is for this court. It is true that in working with the defendants to create a remedial plan, the Special Master gave "due regard for the constitutional deficiencies" in the prison's mental health care system. Order of Reference, filed December 11, 1995 (Doc. No. 640), at 2. However, with respect to the [25th Round Monitoring Report], the Special Master's task is to measure the State's compliance with "any remedial plan that this court may order." (ECF No. 4361.)

26

27

28

-4-     Case No. 2:90-CV-00520- KJM-DB
DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT

1   in the vacancy rate calculation.

2       The Report also misstates the "functional" vacancy rates for staff psychiatrists by not

3   including all filled staff psychiatry positions. (*See* Report at 54-57 and 60.) Although Defendants

4   are allowed to use Psychiatric Nurse Practitioners (PNPs) to fill staff psychiatry positions, the Report

5   excludes positions filled by PNPs and overstates the actual vacant positions. The Report also

6   separates telepsychiatry positions from on-site psychiatry positions, which paints an inaccurate

7   picture of psychiatry staffing at the institutions. For example, the Report states that, "CMF, CMC,

8   CSP/Corcoran, CSP/LAC, CSATF, KVSP, MCSP, and SQ, indicated on-site staff psychiatry

9   functional vacancy rates exceeding ten percent; CSATF was 62 percent, KVSP was 51 percent, and

10  six institutions were between 11 and 50 percent." (*Id.* at 56.) But this is plainly inaccurate because

11  Defendants' July 2023 Monthly Staff Vacancy Report shows that, when accounting for all

12  appropriately filled positions, none of the above institutions had vacancy rates above 23 percent for

13  staff psychiatry positions. (ECF No. 7933 at 5.) Defendants' July 2023 Monthly Staffing Vacancy

14  Reports, the same reports the Draft Report relies upon, show an 89 percent fill rate for psychiatry

15  positions statewide and a 95 percent fill rate for staff psychiatrists. (*Id.*)

16      Accordingly, Defendants object to the separate reporting of data between civil service,

17  registry, and telemental health staff, as well as to the exclusion of PNPs. Defendants also object to

18  the statements applying the ten percent vacancy rate threshold for each institution or for the subset

19  of staff at each institution as it misapplies the Court's June 13, 2002 and April 11, 2023 orders that

20  apply the vacancy rate on a statewide level. (*See* ECF Nos. 1383 and 7806.)

21      Defendants respectfully request that any order adopting the findings in the Report refer to

22  Defendants' monthly staffing filings which present the data for civil service and registry providers,

23  as well as telepsychiatrists and PNPs, both separately and in the aggregate; or, alternatively, that the

24  order reflect all filled positions and clearly identify both the included and excluded positions in each

25  vacancy rate reported.

26

27  / / /

28  / / /

## III.    THE REPORT'S CLUSTERING RECOMMENDATION IS UNSUPPORTED AND SHOULD BE STRICKEN

The Special Master reiterates his prior recommendation that CDCR consider clustering EOP patients "at those institutions where it has been shown that mental health staff can be more readily attracted and retained." (Report at 44-45 (quoting ECF No. 7555 at 164).) This statement ignores the fact that Defendants have already considered clustering and informed the Special Master of its limitations and potentially negative impacts on patients and mental health staff. (*See* ECF No. 8045 at 13-14; *see also* ECF No. 5922.) Moreover, the Special Master has never offered evidence to support the notion that clustering would resolve access to care issues.  Nor does the Report provide any real guidance on how clustering could be achieved or whether it is realistic. Additionally, Defendants' July 2023 Monthly Staffing Vacancy Reports show that there is no EOP institution that is at or below a ten percent vacancy rate across psychiatrists, psychologists, social workers, recreational therapists, and medical assistants. (ECF No. 7933.)

Given the extensive information in the record regarding why clustering is not a feasible option, Defendants request that any reference to clustering be stricken from any order adopting the findings in the Report as irrelevant and not supported by the facts.

## IV.    THE REPORT CONTAINS INACCURATE STATEMENTS ABOUT DEFENDANTS' TELEMENTAL HEALTH POLICY

Defendants have two concerns with the Report's information on telehealth. First, the Report states that "[c]oncerningly, defendants issued the policy to field prior to resolving plaintiffs' and the Special Master's experts' questions and concerns about the policy." (Report at 47.) This statement is lacks context. While plaintiffs and the Special Master's experts may disagree with Defendants' responses, Defendants addressed and resolved those questions and concerns prior to issuing the Telemental Health Policy to the field. The language above, however, conflates a disagreement regarding responses and Defendants' failure to resolve plaintiffs' and the Special Master's experts' questions and concerns. Further, on August 3, 2023, the Court issued an order noting that "[t]he Special Master has informed the court that on or about July 21, 2023 defendants circulated to him and to plaintiffs' counsel a draft Telemental Health Services Policy." (ECF No. 7901 at 2.) The

Court then ordered the parties to meet and confer within 30 days under the supervision of the Special Master concerning the draft policy and to file a joint report on the outcome. (*Id*.) Defendants followed the Court's order and, in a joint statement on September 5, 2023, reported that they would issue the Telemental Health Policy to the field in short order. (ECF No. 7935.) And the Court stated clearly that it has not been asked to consider any question regarding the Telemental Health Policy. (Transcript of Hearing 9/29/23 at 9:10-12.) Accordingly, Defendants resolved plaintiffs' and the Special Master's experts' questions and concerns about the policy; thus, there were no questions regarding Defendants' Telemental Health Policy pending before the Court at the time the policy was issued. The statement in the Report should therefore be removed.

Second, the Report inaccurately references the Telemental Health Policy's "facilitation of the replacement of on-site services for EOPs (as opposed to the Telepsychiatry Policy, where remote services only "supplement" on-site services in EOPs)." (Report at 48.) This, however, is a misrepresentation of the Telemental Health Policy since CDCR has never indicated that it would stop on-site recruitment. Thus, this statement should be removed.

## V. THE REPORT'S FINDINGS ARE BASED ON AN UNDISCLOSED METHODOLOGY AND ARE THEREFORE INCAPABLE OF VALIDATION OR VERIFICATION

The Report contains many statements finding Defendants "adequate," "marginally or minimally adequate," "inadequate," "compliant," or "non-compliant" with various Program Guide or Court-ordered requirements. But the Report fails to include clear definitions for the application of these terms. Nor does the Report include detailed information regarding the methodology or criteria the Special Master used to make these determinations. In fact, the following language demonstrates how the Report is internally inconsistent as to what constitutes "marginally or minimally adequate" or "inadequate care:"

> Of the records reviewed, 87 patients, or 29 percent, were determined to have received adequate care. An additional 25 patients, or eight percent, were found to have received care that was marginally or minimally adequate, meaning that the monitor's expert found concerns within the cases that bordered on inadequacy (e.g., absence of required IDTT meetings, failure to provide treatment hours or required clinical contacts, little evidence of adequate clinical interventions beyond medications). The remaining 190 patients, or 63 percent, were determined to have received inadequate care.

1  (Report at 73.)

2      It appears the Special Master's experts are using the same standards for finding patient care

3  minimally adequate or inadequate without explaining the basis for the findings.  The section above

4  is illustrative.  It indicates that patients were found to have minimally adequate care when the Special

5  Master's experts found concerns, such as "absence of required IDTT meetings, failure to provide

6  treatment hours or required clinical contacts, little evidence of adequate clinical interventions

7  beyond medications." (*Id.*) In the same section, however, the Report states that "inadequacy of

8  treatment at the EOP level of care was due to lack of adequate treatment planning (e.g., vague goals,

9  lack of adequate planned interventions, interdisciplinary plans of care (IPOCs) that did not target

10  identified symptoms or functioning deficits), failure in offering group and individual treatment in

11  keeping with Program Guide requirements, cell-front contacts for reasons other than patient refusal,

12  and clinical contacts that did not address the needs of the patient." (*Id.* at 75.) Thus, similar criteria—

13  e.g., failure to offer group or individual contacts—could be used to conclude that patient care was

14  "marginally or minimally adequate" or "inadequate." (*Id.* 73-75.) This calls into question whether

15  each patient was reviewed using the same adequacy standard.

16      In order to fully understand the Special Master's findings, the criteria to determine whether

17  a patient received "adequate" or "marginally or minimally adequate" care must be clear. The Report,

18  however, does not include the information necessary to ascertain the criteria used for these

19  determinations. In fact, a U.S. Department of Justice memoranda has recognized the importance of

20  transparency with respect criteria in assessment tools: "[c]reating a standard set of assessment tools

21  that is available to monitors will not only increase the consistency of monitor assessments but also

22  provide monitored entities with clearer expectations of the metrics that may be used to assess

23  progress and thus also a clearer understanding of the kind of systems and data collection efforts they

24  might need to implement in order to reach compliance." (Memorandum from U.S. Dept. of Justice

25  on Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving State/Local

26  Governmental Entities (September 13, 2021) (Last visited January 9, 2024),

27  https://www.justice.gov/d9/pages/attachments/2021/09/13/review_of_the_use_of_monitors_in_civ

28  il_settlement_agreements_and_consent_decrees_involving_state_and_local_government.pdf.)

20298845.1

Accordingly, to provide complete transparency and allow the parties and the Court to fully understand whether the Special Master's findings are supported by the facts, the Report should be revised to provide the specific criteria used to determine whether each patient or requirement reviewed was "adequate," "minimally/marginally adequate," "inadequate," "compliant," or "non-compliant." This information is also necessary for CDCR to improve care and determine if detailed objections are needed.

Further, despite Defendants request in the November 1, 2023 objections to the Draft Report, the Report includes little-to-no information regarding the sample size of patients or requirements underlying each determination. Absent such information, it is difficult, if not impossible, for Defendants to validate or verify any of the findings in the Report. For instance, the Report states in conclusory fashion that, "noncompliance with timely routine psychiatry contacts was identified at several institutions, primarily in their mainline EOP and 3CMS programs, and in SQ's condemned EOP program." (Report at 68.) Further, the Report states that, "[c]ompliance for routine IDTTs was most consistently observed in MHCB and EOP hub settings at the 15 institutions." (*Id.* at 71.) Yet, no data is included to permit verification. Moreover, the absence of such data makes it virtually impossible for Defendants' to object to the underlying findings in the Report.

Where the Report does provide a sample size, it falls significantly below that which has been recommended by the Special Master's own data expert and the standards Defendants are held to in data remediation.[7] For example, the Report states that the Special Master's team reviewed 302 patient records from 15 institutions, which accounted for patients housed in EOP, EOP hubs, MHCB, PSU, STRH, CCCMS, and Reception Centers. (*Id.* at 73.) Provided that the number of patients reviewed were evenly divided between institutions, the Special Master's team reviewed only 20-21 patients across all of the listed levels of care at each institution in the Report. Of the total number of cases reviewed, 110 were EOP mainline patients, 55 patients were in EOP hubs, and only

---

[7] Sample sizes have been a topic of numerous discussions in data remediation. While discussions are ongoing, the Special Master's data expert has generally recommended that the sample size for each indictor include review of at least 30 patients or requirements per institution (and sometimes level of care) to provide a representative sample from which conclusions can be drawn. A sample smaller than 30 runs the risk of providing information that is not representative of what is happening across the population in question. (*See* Exhibit A to the Report at 8.)

20298845.1

1    five patients were in the PSU. (*Id.* at 74.) Therefore, fewer than eight EOP mainline patients and

2    seven EOP hub patients were reviewed per institution. Notwithstanding this small sample size, these

3    reviews were the basis of generalized findings across the levels of care at the institutions listed in

4    the Report. (*Id.* at 73-76.) By contrast, Defendants have routinely been told by the Special Master's

5    data expert in the data remediation process that sample sizes of fewer than 30 are inadequate to

6    establish any inferences.

7            Information regarding sampling size is critical to being able to apply results to a wider patient

8    population. Thus, the Report should be revised to include the sample size of patients for each

9    statement regarding compliance. In instances where the sample size is smaller than what his data

10   expert recommends, the Report should also include a statement explaining if and how that number

11   meaningfully represents what is happening in the institution or population in question.

12   **VI.    THE REPORT'S APPLICATION OF A 90% THRESHOLD FOR MEDICATION
             ADMINISTRATION PROCESS IMPROVEMENT PROGRAM ("MAPIP")**

13           **MEASURES UNFAIRLY COUNTS PATIENT REFUSALS AS NON-COMPLIANT**

14           The Report incorrectly states that Defendants "appear to be objecting to how their own data

15   is measured and reported, specifically with respect to patient refusals." (*Id.* at 24.) This

16   mischaracterizes Defendants' position. Defendants object to the application of an arbitrary

17   compliance threshold, which is not an objection to their own data.

18           Specifically, Defendants object to the application of a 90-percent threshold for both MAPIP

19   sub-measures and composite measures because the indicators count patient refusals as non-

20   compliant.[8] This is clear in the documentation for each MAPIP measure which is available on the

21   CCHCS Dashboard Glossary. (Dashboard-Glossary - CCHCS (ca.gov) (Last visited January 8,

22   2024).) For example, the definition for the Diagnostic Monitoring Measure for Antipsychotics:

23   Blood Sugar indicator is the "[p]ercentage of patients prescribed Antipsychotics who *received*

24   *appropriate* blood sugar (Hemoglobin A1c, Fasting Blood Glucose, or Random Blood Glucose)

25   _____

26   [8] The Special Master has not provided clear thresholds for all items monitored in the Draft Report;
     however, where the threshold is clearly stated and Defendants disagree, we must object.
     Defendants understand that the Court has deferred the issue compliance thresholds for the

27   provisionally approved key indicators, including MAPIP measures. Defendants reserve the right to
     object to any future recommendation regarding compliance thresholds. (*See* Exhibit A to the

28   Report at 10.)

1  monitoring that came due within the measurement period." (*Id.* (emphasis added.) Similarly, the

2  definition for the Diagnostic Monitoring Measure for Clozapine: Blood Pressure is the "[p]ercentage

3  of patients prescribed Clozapine who *received* a Blood Pressure test that came due within the

4  measurement period." (*Id.* (emphasis added.) Patients generally have a right to refuse medical tests

5  or treatment, and such a refusal should not be counted against Defendants.

6       Given this design, CDCR staff could do all that is required of them, but the requirement

7  would still be counted as non-compliant if the patient refused the medication or lab work. Such a

8  high and unreasonable threshold for compliance with these measures is inappropriate and

9  unworkable. Accordingly, Defendants request that the 90-percent threshold be stricken from any

10 order adopting the findings in the Report.

11 **VII.    THE REPORT CONTAINS MULTIPLE FINDINGS THAT LACK EVIDENTIARY
       SUPPORT AND REQUIRE CLARIFICATION**

12

13      Defendants previously objected to the Draft Report's statement concerning the inaccuracy

14 of the scheduled structured activity data, and the notion that any potential inaccuracies within the

15 data "presumably inflat[es] offered hours." (Report at 24-25.) In response to this objection, the

16 Special Master revised "presumably" to "potentially." (*Id.* at 25.) But this revision fails to

17 acknowledge the basic fact that "offered hours" accounts for treatment attended and treatment

18 refused. This issue was also discussed in the Business Rules and Methodology Review (BRMR).

19 And critically, the number of "offered hours" is affected *only* by under scheduling in that it can

20 restrict the number of hours a patient can choose to attend or refuse. Indeed, the revision underscores

21 a continued misunderstanding of the definition of "offered hours."

22      In addition,, scheduled treatment is not a Program Guide requirement. Such information may

23 be helpful to provide context for the amount of structured treatment offered, but it is not reflective

24 of any court ordered requirement. Regardless, CDCR has agreed to review the scheduled treatment

25 indicator in data remediation, so any concerns about the methodology of that indicator will be

26 discussed. And because the number of offered hours is affected only by under scheduling—i.e.,

27 restricting the number of hours—it is incorrect that potential inaccuracies within scheduled

28 structured treatment activity data "potentially" inflates offered hours. (Report at 25.) As discussed

1   in detail in the Business Rules and Methodology Review (BRMR) meetings, the treatment offered

2   data is based on treatment attended and treatment refused. Scheduled treatment does not factor into

3   the calculation of treatment offered in any way. Thus, the statement regarding scheduled treatment

4   inflating the hours of treatment offered should be stricken.

5       The Report states "[t]he Program Guide provides for a clinical stay of up to ten days in the

6   MHCB." (Report at 98.) The paragraphs following this statement report on compliance with this

7   alleged requirement. While the Program Guide provides for a clinical length of stay up to ten days,

8   it also provides that patients can stay beyond ten days upon approval from the Chief Psychiatrist or

9   designee. (ECF No. 7333-1 at 11, 72.) Defendants do not, as the report suggests, seek to strike any

10  language, but rather, request that the Report accurately reflect the length of stay provided by the

11  Program Guide. (*See* Report at 28.)

12  **VIII.    THE SPECIAL MASTER SHOULD USE REMEDIATED INDICATORS IN FUTURE MONITORING**

13

14      The Court's July 1, 2021 order required the Special Master to "test and monitor the

15  functionality and efficacy of the indicators on the provisionally approved list during his Twenty-

16  Ninth Monitoring Round…." (ECF No. 7216.) To date, the Special Master has not used any of the

17  70 indicators remediated by his data expert as part of his monitoring. (*See* ECF No. 8011 at 3.) The

18  Report states that the Special Master "expects Defendants to provide remediated data derived from

19  the provisionally approved key indicators upon conclusion of the data remediation process, subject

20  to further instruction from the Court." (Report at 31.) Defendants will provide remediated data in

21  the next round of monitoring for all remediated indicators for which data is being gathered.

22  However, while Defendants have agreed to audit questions and scoring for on-site indicators,

23  Defendants are unable to conduct those audits because, to date, CQIT tours are not occurring.

24  Defendants therefore request that the Court direct the Special Master to use the remediated data and

25  on-site audits, including sample size, audit questions, and scoring, in all future monitoring.

26  / / /

27  / / /

28  / / /

DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT

1    **IX.    CONCLUSION**

2    　　Defendants respectfully request that their objections to the Special Master's Report be

3    considered by this Court, and that any order flowing from the Report address the issues noted

4    above and in Defendants' November 1, 2023 objections at Exhibit A to the Report. (*See* ECF No.

5    8095-1.)

6    　　　　　　　　　　　　　　　　**CERTIFICATION**

7    　　Defendants' counsel certifies that they reviewed the following orders relevant to this filing:

8    ECF Nos. 547, 612, 640, 1383, 4316, 4688, 4925, 5188, 5274, 5573, 5852, 6211, 6214, 6315,

9    6427, 6460, 6639, 7216, 7806, and 7901.

10    DATED:  January 12, 2024                       Respectfully submitted,

11                                                   HANSON BRIDGETT LLP

12

13                                         By:　　__/s/ Carson Niello__
                                               PAUL B. MELLO
14                                             SAMANTHA D. WOLFF
                                               DAVID C. CASARRUBIAS
15                                             CARSON R. NIELLO
                                               Attorneys for Defendants
16

17

18    DATED:  January 12, 2024                       ROB BONTA
                                                   Attorney General of California
19                                                 Damon McClain
                                                   Supervising Deputy Attorney General
20
                                           By:　　__s/ Elise Owens Thorn__
21                                             ELISE OWENS THORN
                                               Deputy Attorney General
22                                             Attorneys for Defendants

23

24

25

26

27

28

DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT