| | |
|---|---|
| Rob Bonta, State Bar No. 202668<br>Attorney General of California<br>Monica N. Anderson, State Bar No. 182970<br>Senior Assistant Attorney General<br>Damon McClain, State Bar No. 209508<br>Supervising Deputy Attorney General<br>Elise Owens Thorn, State Bar No. 145931<br>Namrata Kotwani, State Bar No. 308741<br>Deputy Attorneys General<br>  1300 I Street, Suite 125<br>  P.O. Box 944255<br>  Sacramento, CA 94244-2550<br>  Telephone: (916) 210-7318<br>  Fax: (916) 324-5205<br>  E-mail: Elise.Thorn@doj.ca.gov<br>*Attorneys for Defendants* | Hanson Bridgett LLP<br>Lawrence M. Cirelli, SBN 114710<br>Paul B. Mello, SBN 179755<br>Samantha D. Wolff, SBN 240280<br>Kaylen Kadotani, SBN 294114<br>David C. Casarrubias, SBN 321994<br>Carson R. Niello, SBN 329970<br>1676 N. California Blvd., Suite 620<br>Walnut Creek, California 94596<br>Telephone: 925-746-8460<br>Facsimile: 925-746-8490<br>*Attorneys for Defendants* |

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>      Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**THE PARTIES' JOINT STATEMENT REGARDING TOUR DISPUTE**<br><br>Judge: Hon. Kimberly J. Mueller |

**JOINT STATEMENT REGARDING AREAS OF AGREEMENT**

The parties engaged in an extensive weeks-long meet and confer process in an effort to attempt to limit their areas of disagreement regarding Defendants' experts' tours. On November 16, 2023, Defendants proposed that their experts conduct tours of 28 facilities (including re-tours of the five facilities toured in July of 2023) covering the following components: IDTTs; ICCs; Huddles; Screening (including, but not limited to, R&R nurse screenings, initial mental health screens, crisis intervention team, urgent and emergent referral assessments, pre-Ad Seg screening, alternative housing assessments, and psych tech rounds); Group Treatment; 1:1 Treatment; 1:1 MHMD assessments (across all LOCs); 1:1 MHPC assessments (across all LOCs); RVR mental health assessments; Patient Interviews.

The parties then met by video conference four times and exchanged countless emails and written proposals regarding the tour parameters. In the end, the parties reached agreement on all but two areas of the tours: the experts' observation of one-on-one treatment and screening, and the scope and pace of tours. The parties also disagree whether the Court should hold a hearing to discuss these issues further. The parties provide the Court with their separate statements regarding the areas of disagreement, and agree that subject to the Court's approval, Defendants' experts' tours shall be governed by the parties' agreements outlined below and the Court's resolution of the remaining issues in dispute.

**A.     Agreements Regarding Number and Pace of Tours**

1. Plaintiffs agree to make best efforts to staff each tour with three representatives to enable Defendants' experts to split into three groups while onsite. To the extent there are occasions where Plaintiffs can only send two representatives, Defendants have informed Plaintiffs that they believe it will impact the duration of the tours. Defendants' experts' will not observe patients or interact with patients without a Plaintiffs' counsel representative present.

2. Defendants agree: to schedule only one tour at a time; to provide Plaintiffs with 30 days' notice in scheduling tours; to provide detailed information about the tour schedule as soon as practicable and provide the daily tour schedule by the end of the

day prior; to make best efforts to avoid tours on nights and weekends and unless an unexpected need arises during the tour, to provide Plaintiffs with 14 days' notice if they wish to include nights and weekends, understanding that if Plaintiffs are not able to staff those parts of the tours despite making best efforts to do so, the experts will not be able to observe or interact with class members; to provide a list of patients whose treatment events are observed (in advance of the date where possible); and to provide copies of any documents their experts request from the institutions during the tour that are received during or following the tour.

### B. Agreements Regarding Tour Parameters

3. Defendants' experts may conduct patient interviews, provided Plaintiffs' counsel are present. Defendants will provide a list of questions in advance to plaintiffs' counsel. Plaintiffs' counsel may meet with their clients alone, in advance of the interview, but agree not to share the experts' specific questions in advance with their clients. Plaintiffs' counsel may terminate the interview if necessary to protect their clients' attorney-client privilege or privilege against self-incrimination. Defendants' experts agree not to audio record the interviews. Defendants will provide Plaintiffs with a list of interviewees typically 48 hours in advance of the interviews.

4. Defendants' experts may observe group treatment provided all patients in the group consent to the observation and the treating clinician(s) does not believe the observation will interfere with or disrupt the treatment or worsen a patient's condition.

5. Defendants' experts may observe Interdisciplinary Treatment Team (IDTT) meetings and Institutional Classification Committees (ICC) provided informed consent is obtained from the patient and the clinician does not believe the observation will interfere with or disrupt the treatment or worsen a patient's condition.

6. Defendants' experts may observe treatment huddles (no patient consent is necessary).

7. The parties agreed upon the language of an informed consent script to be read to patients by their clinician in the presence of counsel. Printed copies of the consent script will be available in both English and Spanish and the treating clinician shall offer

1  to provide each patient with a copy. A true and correct copy of the English version of
2  the informed consent script is attached as **Exhibit A.** Plaintiffs reserve the right to
3  request changes to the Spanish version of the script to conform with the English
4  version after seeing Defendants' proposed translation.

5  8. The parties agreed upon specific tour parameters to guide the behavior of counsel for
6  both parties and the experts during the tours. A true and correct copy of the Tour
7  Parameters is attached as **Exhibit B.**

8  9. Defendants' experts agree to maintain class members' confidentiality except to the
9  extent disclosure is necessary to prevent a risk of harm to the patient or others. The
10 experts' report will not identify patients by name, CDCR number, or any other
11 personally identifying information, but will likely have a key to cross-reference those
12 patients described in the report.

13  The only issues concerning the tours remaining to be resolved relate to whether
14 Defendants' experts may observe one-on-one treatment or screenings (including RVR mental
15 health assessments), and how many institutions they may tour and evaluate (including the number
16 of institutions that may be toured each month and the number of days total per month that may be
17 spent touring). Those issues are briefed separately by each party below. We jointly request that
18 the Court resolve these remaining disputes regarding the scope, pace, and parameters of
19 Defendants' proposed expert tours.

20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

# DEFENDANTS' STATEMENT

## II.   1:1 Observations are Critical Components of VRJS/Falcon's Evaluation[1]

As Defendants have explained, the purpose of the VRJS/Falcon study is to conduct a broad, unbiased and objective assessment of CDCR's delivery of mental healthcare and services. *See*, *e.g.*, Dec. of D. McClain, ECF No. 7885 at ¶ 2 & Ex. A; Dec. of E. Falcon, Psy.D, ECF No. 7884 ("July Falcon Dec."), at ¶ 4; ECF No. 8005 at 6:10-19.[2] This study is designed to include "[d]irect observations of services, assessments and interventions," which "are integral components of this process." *See* July Falcon Dec. at ¶ 12. Plaintiffs seek to curtail the contours of these, including by refusing to allow observations of clinician-patient interactions. Because these observations are critical components of the experts' study and are consistent with evaluation practices in the industry, Defendants request that this Court permit such observations. *See id.*, ¶ 9.

The rationale for 1:1 patient-clinician observations is straightforward: "It is essential when evaluating the quality of mental health care being provided to any person that actual clinical contact between that person and his or her therapist be physically observed." Dec. D. Stephens, Psy.D., ¶ 7; *see also*, Dec. S. Helfand, Psy.D., ¶ 6. Such observations "must be included along with reviewing documentation in order to have a complete picture and understanding" of the care provided; these observations provide validation of the documentation of clinical care, and supplement the information obtained from other data sources. Stephens Dec., ¶ 7; Dec. J. Andrade, ¶ 19. The observation of "service delivery" allows for the potential gap of "work-as-imagined vs. work-as-done" to be actually assessed and improved. Helfand Dec., ¶ 6. There are discrepancies

---

[1] Defendants request that the Court issue its ruling on the disputed issues based on the parties' written submissions without oral argument in order to permit VRJS/Falcon to continue their work without further delay. Plaintiffs had previously agreed to proceed without a hearing in connection with Defendants' prior motion on these issues, but have since changed their position. (Dec. of Kaylen Kadotani, filed herewith, ¶ 6, fn. 1.)

[2] Plaintiffs argue that Defendants' true intention is litigation, and therefore these tours constitute discovery. Plaintiffs are wrong. Defendants have indicated numerous times that they cannot predetermine their experts' findings, which would inform their litigation strategy. Plaintiffs' guesswork as to Defendants' litigation strategy should not overrule Defendants' stated intentions. Nor is a self-evaluation discovery simply because the parties are engaged in litigation. Mot. To Lift Injunction Halting VRJS/ Falcon Tours, ECF No. 8005, at 6:21-9:13; *see also Doe v. Eli Lilly & Co., Inc.*, 99 F.R.D. 126, 128 (D.D.C. 1983). Plaintiffs' references to case law pertaining to discovery limits are therefore unavailing.

between a clinician's perception and documentation of client goals and progress, versus that of an observer, and observing these clinical interactions fulfills a significant piece of the evaluative puzzle that cannot be substituted through other means. Stephens Dec., ¶ 7.

Observation of treatment sessions is a standard evaluative tool within and outside of corrections. Similar 1:1 observations were conducted in this case, without objection, by prior defense experts and members of the Special Master's team without any indication that the sessions had somehow been compromised. *See, e.g.,* McClain Dec., ECF No. 7885, at ¶ 12; Thirtieth Round Monitoring Report – Part C (Dec. 22, 2023), ECF No. 8095, at 178. In addition, the VRJS/Falcon clinicians have personally experienced and are aware of 1:1 observations in similar settings without incident. Andrade Dec., ¶ 17; Dec. R. Timme, ¶¶ 13-14; Helfand Dec., ¶¶ 7-8; Stephens Dec., ¶¶ 8-10. Direct observations of clinical services is a routine, and necessary, part of clinical training and accreditation, including by NCCHC, the body that accredits prisons. Andrade Dec., ¶¶ 14-16; Helfand Dec., ¶ 8. Such observations are also common in other settings, such as contract monitoring, evaluation and supervision of practice, assessment of consent decree and settlement agreements, and quality improvement initiatives. Helfand Dec., ¶ 7.

As Plaintiffs previously observed in a 2018 filing regarding future prison tours: "it is unclear how the experts could be expected to opine that CDCR is providing constitutionally adequate care without ever observing the care provided." Plfs' Mem. (Jan. 28, 2018), ECF No. 5764-1, at 13:2-4. Defendants agree.

### A.     Defendants' Proposal

In an effort to compromise and to underscore the importance of these 1:1 observations, Defendants agreed to numerous safeguards and conditions, including:[3] obtaining informed consent (and providing copies of the script to patients upon request); having a VRJS clinician silently observe a small number of treatment sessions (without Defense counsel present); permitting Plaintiffs' counsel to meet privately with their clients beforehand; permitting the clinician to object to the observation if they believed it would interfere with the treatment or worsen the

---

[3] Defendants also requested that Plaintiffs' counsel provide their ideas for safeguards that could be implemented to alleviate their concerns, but no feedback or proposals have been provided.

patient's condition; permitting the patient to revoke consent at any time; and affording the patient the opportunity to continue to meet with the clinician privately immediately following the observation, without the expert present. Dec. of Kaylen Kadotani, filed herewith, at ¶ 8.

This proposal is noteworthy for several reasons. First, the scope of the contemplated informed consent provides extensive protections throughout the encounter. Not only can the patient decline the observation at any time, but so can the CDCR clinician if they determine an outside observer may impact the patient's treatment and/or condition.[4]

Second, giving patients the opportunity to meet with their CDCR clinician privately following the observed portion of the session would address concerns that the patient might not interact normally or speak freely due to the outside observer's presence, which is Plaintiffs' counsel's primary reason for rejecting this component of the study. Helfand Dec., ¶ 9.

Third, the safeguards proposed by Defendants are in line with, if not in excess of, industry standards for similar interactions and provide adequate protections for the patient. Helfand Dec., ¶¶ 8-9; Andrade Dec., ¶¶ 17-18. Indeed, notwithstanding decades of monitoring in this case, Defendants are not aware of any prior use of an informed consent script by members of the Special Master's team or experts retained by either side. McClain Dec., ECF No. 7885, ¶ 9.

### B.     Plaintiffs' objection to these proposed observations lacks merit.

Plaintiffs' speculative concern about the potential impact of a silent third-party observation of 1:1 treatment and screenings lacks merit for several reasons. ***First***, there is no evidence that a single observed session will have a detrimental impact on the overall provision of care to the patient. Stephens Dec., ¶ 8. In fact, Dr. Stephens opines that no such harm or impacts will result in this context. *Id*. ***Second***, Defendants have offered numerous safeguards that are specifically tailored to alleviate Plaintiffs' concern, as explained in detail above. These safeguards and conditions are designed to protect the patients and ensure the efficacy and integrity of their treatment session. ***Third***, previous defense experts, including tele-mental health expert Dr. Penn,

---

[4] Importantly, as highly skilled and trained clinicians themselves, the VRJS/Falcon team are able to exercise their own judgment to leave an encounter if any issues arise, regardless of any objection by the patient or CDCR clinician. Timme Dec., ¶ 14.

and members of the Special Master's team have observed 1:1s in the past without objection from Plaintiffs and without any indication that the sessions had somehow been compromised.[5] Accordingly, Plaintiffs' counsel's objection to 1:1 observations lacks merit and should be rejected.

### III. The Scope and Pacing of Defendants' Tours

Plaintiffs' position regarding the permissible scope and pacing of Defendants' tours continues to shift, even just hours before filing this statement. Defendants first gave notice of the VRJS/Falcon prison tours in April 2023. McClain Dec., ECF No. 7885, ¶ 2. At the time, Plaintiffs' counsel did not object and requested only that they receive further notice of when the tours would be scheduled. *Id.* Meanwhile, VRJS/Falcon worked on the "massive logistical undertaking" of establishing its methodologies and assembling its team of approximately 30 experts from numerous fields. July Falcon Dec., ¶ 5.

In July 2023, the VRJS/Falcon team was able to complete partial tours at five of CDCR's prisons before the Court ordered a stay at Plaintiffs' request pending the completion of the bifurcated enforcement proceedings.[6] Andrade Dec., ¶ 12. Shortly after the proceedings, Defendants' counsel reinitiated meet and confer discussions regarding the scope and conduct of the VRJS/Falcon tours. Kadotani Dec., ¶ 2. The parties spent nearly two months negotiating the details of these tours and were left with just a few outstanding issues that required Court resolution. However, Plaintiffs now appear to be backtracking on their prior agreements, including whether the experts tours should proceed at all.[7]

---

[5] Plaintiffs' submission on this issue raises additional grounds for objection that were not previously raised during the parties' extensive meet and confer discussions. In any case, those objections also lack merit. For instance, Plaintiffs' argument that 1:1 observations are of low evidentiary value is not a reason to deny the observations altogether. VRJS/Falcon believe that these observations hold significant importance in their evaluation, which Plaintiffs are free to disagree with at a later time.

[6] Although Plaintiffs' counsel did not initially object to the VRJS/Falcon tours, a series of subsequent objections, including as to the scope and conduct of the tours and their alleged burden, ultimately resulted in the Court staying the tours until after the enforcement proceedings. *See* ECF Nos. 7897, 7918.

[7] Plaintiffs also backtrack on other issues of pace and scope. For instance, they had previously "agree[d] to 10 additional tours beyond the 5 conducted this summer," and "no more than 2 tours

Notwithstanding Plaintiffs' about-face, the Court should permit Defendants' experts to tour all 28 institutions where mental health treatment is provided in order to fulfill their objective of performing a comprehensive, systemwide evaluation. Further, the Court should permit VRJS/Falcon to proceed with up to three tours and 13 touring days per month so that the experts can maintain consistency and maximize the efficacy of the study.

### A.   VRJS/Falcon should be permitted to tour all 28 institutions.

During meet and confer negotiations, Plaintiffs contended, without compelling justification, that Defendants' expert tours should be limited to a "pilot of a subset of institutions" and sought to limit VRJS/Falcon to just ten additional tours. Kadotani Dec., ¶ 10. Plaintiffs never articulated a basis for this restriction, other than it was burdensome for Plaintiffs' counsel to attend tours. *Ibid*. Nor did Plaintiffs ever specify which institutions they believed could be omitted. *Ibid*. Plaintiffs now propose a maximum of 10 prisons. Plaintiffs' proposal is unworkable and should be rejected for the reasons discussed below.

First, limiting the tours to a "subset" of prisons prohibits Defendants from conducting the systemwide evaluation of mental health care that their experts recommend. Indeed, VRJS/Falcon did not suggest studying only a handful of institutions; rather, they recommended a systemwide study. It would be difficult for the VRJS/Falcon team to conduct a thorough and complete study if they are only given access to a subset of the available data. *See* Stephens Dec., ¶ 11; Andrade Dec., ¶¶ 11, 13; Helfand Dec., ¶¶ 10-11; Timme Dec., ¶ 12. Plaintiffs seem to suggest that Defendants' expert tours in 2013 established an acceptable baseline for adequate evaluation of the system (where only 13 prisons were visited for 1-2 days apiece), but forget that they criticized the limited scope of that evaluation. *See* Pltfs.' Opp'n to Mot. to Terminate, ECF No. 4422, at 14, 15, 36, 73; Pltfs.' Evidentiary Obj., ECF No. 4405, at 20, 26, 27, 28. Moreover, Plaintiffs' proportionality argument is nonsensical in light of the fact that Defendants' experts can only perform a systemwide evaluation if they are able to tour all of the subject institutions. There is no

---

per month, and no more than 10 days of touring per month." Kadotani Dec., ¶ 10 & Ex. C. They now advocate for far less.

"proportion" of institutions that can adequately replace VRJS/Falcon's systemwide study.

Second, while some institutions may have similar facilities and layouts, no two prisons are alike. Numerous factors ultimately make each prison uniquely different, and therefore worthy of separate and distinct evaluation by the experts, such as: different patient populations and acuities; different layouts and facilities; different mental health and custodial leadership compliments, including some with vacancies and others fully staffed; the types of services, groups, and educational and occupational opportunities vary widely from institution to institution; geographic differences, like vicinity to other institutions or medical facilities, weather, etc., impact how patients receive care; among others. *See generally*, Dec. Mehta, filed herewith; *see also*, Stephens Dec., ¶ 12; Andrade Dec., ¶ 13; Timme Dec., ¶ 11. It bears noting that the Special Master's team usually visits every institution – presumably because it would otherwise be challenging to evaluate a system without inspecting all aspects of that system. This fact further supports the notion that Defendants' experts should be permitted to tour all prisons where care is provided.

Third, any additional pauses to conduct "further discussions" would lead to even more delays and further undue prejudice to Defendants. Indeed, the meet and confer leading up to this submission took nearly two months and still requires briefing and resolution by the Court, and Defendants' tours have already been on hold for approximately six months. Moreover, counsel for the parties have agreed to maintain ongoing discussions in order to address any issues with the tours as they arise, obviating the need for a preemptive pause. Kadotani Dec., ¶ 4.

Finally, Defendants have the right to monitor and self-evaluate their own mental health care system and facilities without unreasonable restrictions and limitations. In fact, Defendants have a responsibility to "self-monitor, and as necessary, self-correct inadequacies in the delivery of mental health care." ECF No. 6846 at 10:17-18. Plaintiffs' efforts to limit Defendants from undertaking this important work infringes on Defendants' due process rights and would establish a dangerous precedent.  For these reasons, the Court should permit Defendants' experts to conduct their intended tours of all 28 applicable institutions.

### B. The Court should permit VRJS/Falcon to conduct up to three tours per month

Despite the fact that the VRJS/Falcon tours are already at least six months behind

schedule, Plaintiffs wish to further slow the pace by limiting Defendants to just one tour and five days per month (notably, this differs from their position during the parties' meet and confers). Kadotani Dec., ¶ 11. Defendants, on the other hand, after already making concessions as to the scope and pacing of the tours, propose three tours and 13 days of touring per month. *Id*. With this pacing, the tours can be completed in just over nine months, whereas Plaintiffs' proposal to tour no more than 5 days per month would extend the tours to 22 months. Andrade Dec., ¶ 11. This slow pace would also impede the experts from synthesizing the information obtained to make institutional comparisons relevant and informative. *Id.*; Helfand Dec. ¶ 10.

Proceeding with Defendants' modest pace is important in order to maintain consistency and to maximize the efficacy of VRJS/Falcon's work. Maintaining this pace "will allow for continuity of the assessment and the ability to make timely points of comparison across domains enhancing our ability to synthesize all components of the study." Helfand Dec., ¶ 10; *see also*, Stephens Dec., ¶ 14. Further, VRJS/Falcon have already expended significant time and resources towards assembling this expert team, working out the logistics, establishing and refining the methodologies and framework, and modifying the terms of the study in light of Plaintiffs' objections. If the pace of tours is slowed any further, then the overall length of the study will be extended, which becomes more expensive and creates substantial risk of attrition of team members and critical institutional knowledge. Dec. of E. Falcon (Oct. 10, 2023), ECF No. 8005-1, at ¶¶ 3-7.

Defendants have already agreed to limit the pacing and scope of the VRJS/Falcon tours in an effort to ease any staffing burden, but further limitations are unjustified and unfair for the reasons discussed above. Nor should these tours impact staff at the institutions, who will simply be observed in their duties but not taken away from performing them. The Court should therefore permit VRJS/Falcon to conduct up to three tours and 13 touring days per month.

## **CONCLUSION**

A party's self-evaluation of its systems and operations does not constitute discovery simply because the opposing party wishes to place limits on it. Defendants here seek to conduct a fair and thorough evaluation of their system, have agreed to significant concessions to address Plaintiffs' concerns, and should not be further delayed in completing this important work.

# PLAINTIFFS' STATEMENT

## A. Defendants' Expert tours are Discovery, Subject to Limits.

Despite Defendants' repeated assertions that their expert tours are solely for self-monitoring purposes, the tours are discovery in preparation for litigation, as the Court has already recognized. *See* July 28, 2023 Order, ECF No. 7897 at 2–3. The Court can regulate the tours pursuant to its "authority to place limits on discovery." Oct. 24, 2023 Order, ECF No. 8029 at 2–3 n.2 (quoting *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)). In fact, Defendants have repeatedly conceded that the tours are for litigation. Defendants stated they will decide whether to move "to terminate or modify" the remedial orders in this case "pending the experts' determination and recommendation(s)." July Bien Decl., ECF No. 7886 at 14 (Apr. 21, 2023 Paul B. Mello Letter at 2); *see also* Informed Consent Script filed herewith as Exhibit A ("CDCR may use what it learns to ask the Court to change mental health services or end court oversight of these services."). Defendants' reliance on the Court's September 3, 2020 CQIT Order, ECF No. 6846, is therefore disingenuous: the self-monitoring and self-correcting CQIT process would only be further delayed and disrupted by the Falcon tours.

The Court has broad discretion to manage and limit discovery. *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). Discovery must be proportional to the needs of the case, considering "the importance of the issues, . . . the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Moi v. Chihuly Studio, Inc.*, 846 F. App'x 497, 499–500 (9th Cir. 2021). The inquiry into proportionality is especially important where discovery is closed, as it is here. *See* Aug. 4, 2021 Tr., ECF No. 7267 at 7; *see also* Aug. 14, 2019 Order, ECF No. 6242 at 3; Sept. 20, 2018 Order, ECF No. 5928 at 12.

Defendants' proposal—to have 30 litigation experts conduct multiple day tours at 28 prisons with up to 13 days of touring each month for the foreseeable future—is overly burdensome and disproportional to the needs of this case. Defendants must focus their attention on remediating the many remaining constitutional violations. *See* Sept. 30, 2020 Order, ECF No.

6846 at 28–29; *see also* Jan. 6, 2023 Order, ECF No. 7699 at 2. Defendants are so far from that milestone that they are already facing nearly $76 million in potential contempt fines for staffing deficiencies in their outpatient programs, and will likely face additional enforcement proceedings to address both dire staffing shortages in their inpatient programs and the persistent failure to comply with court-ordered suicide prevention measures. *See* Defs' Monthly MH Staffing Vacancy Report, ECF No. 8104 at 23; Feb. 28, 2023 Order, ECF No. 7743; Oct. 11, 2023 Order, ECF No. 8009.

### B. Defendants' Proposal Would Burden Patient Care.

Defendants' proposed tours will cause an immense burden on CDCR's mental health system, which is already straining under extreme staffing shortages. *See* Special Master's 30th Round Report Part C ("EOP Report"), ECF No. 8095; Defs' Monthly MH Staffing Vacancy Report, ECF No. 8104. Defendants have not shown why the colossal discovery they seek is necessary, much less that any benefits they might derive would outweigh the negative impact on patient care. *See O'Connor v. CDCR*, No. 219CV0658KJMKJNP, 2021 WL 4147106, at *1, *9 (E.D. Cal. Sept. 13, 2021) (party seeking discovery bears burden to show objections to discovery are not meritorious).

The proposed pace and scope of the tours is unprecedented. When Defendants conducted expert tours before moving to terminate this case in 2013, they used only four experts, who toured thirteen institutions. *See* Mem. in Support of Mot. to Terminate, ECF No. 4275-1 at 14–15; *Coleman v. Brown*, 938 F. Supp. 2d 955, 963 (E.D. Cal. 2013); 2024 Bien Decl., filed herewith ¶¶ 10–11. Defendants noted at the time that discovery on that scale allowed observation of "82% of the entire Enhanced Outpatient Program population" and "80% of the system's inpatient crisis beds." ECF No. 4275-1 at 15. And when the VRJS/Falcon experts conducted tours in Fall 2021, each expert spent no more than one day—in many cases a half-day—at each of the 15 prisons they toured. 2024 Bien Decl. ¶ 10. The experts also toured as a single group. *Id.*

The proposed tours, by contrast, would cause a significant disruption in institutions' provision of mental health care. The Special Master recently observed that the current staffing vacancies, "and the resultant diminution in both the quantity and quality of mental health care . . .

are indisputably among the worst in recent memory and could be among the worst in the history of the *Coleman* case." EOP Report, ECF No. 8095 at 11–12. These vacancies are "placing *Coleman* class members at grave and unacceptable risk of harm." *Id.* at 11; *see also, e.g.*, Tr. 10-5-23 ECF No. 8013 at 31:2–34:13 (Dr. David) ("We can't provide Program Guide services. We're not even providing . . . standard of care in the community at this point . . . . [I]t is nowhere [near] good enough for the needs of our patients."). This dire lack of treatment is already causing harm. In 2022, CDCR suspended suicide prevention measures due to inadequate staffing. *See* 2022 Report on Suicides, ECF No. 8017 at 54, 105–06. The number of suicides in CDCR increased by fifty-percent from 2022 to 2023, and CDCR's suicide reviewers concluded that several patients who died in 2023 received inadequate treatment due to the staffing vacancies. *See* 2024 Bien Decl. ¶¶ 7–8.

Tours on the scale proposed would necessarily impact patient care. At each institution the experts visit, staff time and resources would be diverted from providing care to accommodating the experts, as occurred during the July 2023 tours. *See* Jan. 3, 2024 Decl. of Pablo Stewart ("2024 Stewart Decl.") filed herewith ¶¶ 21–22; July Bien Decl., ECF No. 7886 ¶ 19; Xu Decl., ECF No. 7891 ¶ 14; Jackson-Gleich Decl., ECF No. 7892 ¶ 16; Tolman Decl., ECF No. 7893 ¶¶ 14-15. Defendants' claim that the Falcon experts will exercise professional judgment to benefit patients is belied by their conduct during the July 2023 tours. *See* 2024 Bien Decl. ¶ 15; July Bien Decl., ECF No. 7886 ¶ 22; Yelin Decl., ECF No. 7889 ¶ 5; Xu Decl., ECF No. 7891 ¶¶ 10-21; Jackson-Gleich Decl., ECF No. 7892 ¶¶ 15-18; Tolman Decl., ECF No. 7893 ¶¶ 14-17.

The tours will also be cumulative of staff members' engagement with the Special Master's team during monitoring tours, which are essential, unbiased evaluations of compliance that permit the Court to perform its constitutional obligation to oversee the ongoing remedy in this case. *See* Dec. 11, 1995 Order of Reference, ECF No. 640. Defendants' tours are litigation-focused and adverse to patients who are the Plaintiffs in this matter, *see* July Bien Decl. ECF No. 7886 ¶ 2, yet Defendants propose a scale "more akin to the monitoring undertaken by a court-appointed monitor such as the *Coleman* Special Master than to discovery in litigation." *See* 2024 Stewart Decl. ¶ 14. By further burdening an already-understaffed system, Defendants' tours would expose class

members to an unacceptable risk of harm, without eliciting meaningfully different information than what is available in the Special Master's reports, through Defendants' existing internal auditing, and in their other available records. *See infra,* Section C.3.

Defendants' proposed schedule will also divert all parties' time and resources from the many case priorities the Court has ordered to be completed, and which remain unfinished. This essential work includes data remediation and development of a complete CQI Tool; implementing a Personality Disorder program; modifying policies and practices regarding use of DSH beds to ensure timely transfers to inpatient care; implementing all outstanding Hayes suicide prevention measures; implementing the Court-ordered minimum treatment standards in the PIPs; implementing an appropriate tele-mental health program; and coming into complete compliance with maximum staffing vacancy rates for both inpatient and outpatient programs, among many other things. *See* Dec. 23, 2019 Order, ECF No. 6435; Sept. 3, 2020 Order, ECF No. 6846 at 24 n.12; Aug. 25, 2021 Order, ECF No. 7283 at 3–4; May 24, 2023 Order, ECF No. 7847; Nov. 15, 2023 Order, ECF No. 8066; Feb. 28, 2023 Order, ECF No. 7743; Aug. 25, 2023 Order, ECF No. 7924; Dec. 15, 2023 Order, ECF No. 8087; Feb. 28, 2023 Order, ECF No. 7742; Oct. 11, 2023 Order, ECF No. 8009; *see also* 2024 Bien Decl. ¶¶ 4–5. Each of these ongoing efforts requires significant focus. If Defendants' thirty experts are permitted to visit facilities thirteen days out of every month as they propose, the parties and the Special Master—whose staff will be attending every tour—will not be able to devote sufficient attention to the Court's crucial priorities. *See* 2024 Bien Decl. ¶¶ 2–6.

The proposed scope and pace of Defendants' discovery is, simply put, "too much." *Crystal Lakes v. Bath & Body Works, LLC*, No. 2:16-CV-2989-MCE-GGH, 2018 WL 533915, at *1 (E.D. Cal. Jan. 23, 2018), *order clarified*, 2018 WL 1071335 (E.D. Cal. Feb. 23, 2018). Their request should be denied as overly burdensome, cumulative of other available information, and disproportionate to the needs of the case. *See, e.g.*, *O'Connor*, No. 219CV0658KJMKJNP, 2021 WL 4147106, at *1, *4–5, *7 (denying motion to compel because requested discovery of CDCR was overly broad); *Bryant v. Thomas*, 669 F. App'x 476, 476 (9th Cir. 2016) (citing *Hallett,* 296 F.3d at 751) (affirming denial of motion to compel where requested information could be obtained

from medical files).

If the Court permits the tours to proceed, it should limit them to a maximum of ten prisons for no more than 5 days at each, and one tour per month (5 tour days per month).

### C. Defendants' Litigation Experts Should Not Be Permitted to Observe Patients' 1:1 Mental Health Treatment and Mental Health Screenings

The Court should deny Defendants' request to have their litigation experts observe mental health 1:1 treatment and screenings,[8] which would be unduly burdensome, oppressive, and embarrassing to class members, and disproportionate and cumulative of other available information. *See Moi v. Chihuly Studio, Inc.*, 846 F. App'x 497 at 500; *Hallett*, 296 F.3d at 751; Fed. R. Civ. P. 26(b), (c)(1). In CDCR's far-overstretched mental health system, *see supra* Section B, allowing observations of 1:1s and screenings would be dangerously burdensome, especially given the other sources of information available. *See* 2024 Bien Decl. ¶ 9; 2024 Stewart Decl. ¶¶ 24–40. Patients in the current MHSDS often do not receive required confidential 1:1 and screening mental health care because of short staffing. *See, e.g.*, EOP Report, ECF No. 8095 at 29–31, 35–41. The few clinical contacts they receive should not be co-opted for Defendants' litigation goals.[9]

#### 1. The Observations Would be Dangerous to Patients

Confidentiality is the bedrock of all psychiatric care. The point of providing treatment in a confidential setting is to help the patient and clinician form a therapeutic and transparent relationship where they can discuss and address symptoms and medication side effects, including, among other things, command auditory hallucinations and violent delusional thoughts, suicidal ideation, plan, and intent. *See* 2024 Stewart Decl. ¶¶ 25–27. Inserting Defendants' experts into treatment necessarily removes confidentiality, defeating the purpose of the interaction and creating

---

[8] RVR mental health assessments are a type of screening and should be precluded. *See* 2024 Stewart Decl. ¶¶ 29–30 & Ex. C.

[9] Defendants take out of context a quote from Plaintiffs' January 28, 2018 motion for case management orders and sanctions. Following Defendants' *ex parte* staffing tours conducted at nine facilities in December 2017 and January 2018, Plaintiffs requested sanctions and *limits* on Defendants' future touring, *See* ECF No. 5764-1 at 4. Plaintiffs noted it was unclear whether Defendants' experts had *ex parte* contact with class members during treatment or other activities. *See id.* at 15-16.

grave risks to patients up to and including suicide. *See id.* ¶ 29. With a third-party present, patients would be less inclined to divulge information they consider embarrassing or private, and providers would be less able to identify and treat patients' symptoms. *See id.* This unacceptable disruption would be especially profound as Defendants plan to have their attorneys invade the clinical interaction alongside a Plaintiffs' attorney and Special Master's expert. *See id.* ¶ 34.

The disruption Defendants' litigation experts would cause is incomparable and unique. *See id.* ¶¶ 35–37. A *party's* expert observing 1:1s is unusual and rare in litigation; Defendants do not appear to have provided any examples of 1:1 observations allowed in a similar context. *See* 2024 Bien Decl. ¶¶ 12–14. In this case, Plaintiffs' experts have rarely or never observed a confidential, scheduled 1:1 clinician-patient session in person, nor have the Special Master's clinical experts. *See id.* ¶ 12. Defendants' expert, counsel, and the Special Master conducted limited telepsychiatry observations in December 2022, to observe a novel treatment modality, but that was a rare example in this case and very different from the current proposal both in scope and purpose. *See* ECF No. 7883, Pltfs' Statement at 4-5; ECF No. 7891, Xu Decl. ¶¶ 26-28; 2024 Bien Decl. ¶ 12.

Defendants' unprecedented proposal to interfere with 1:1 mental health treatment and screenings is oppressively disruptive and dangerous.

### 2. The Burden Would Be Disproportionate to the Value

In addition to being disruptive, the presence of one or more outside observers would reduce the value of the observations. Social science research recognizes that potential biases are introduced when participants know that they are being studied; the presence of multiple observers increases these effects. *See* 2024 Stewart Decl. ¶¶ 31–34. Allowing observers into a 1:1 mental health treatment or mental health screening session makes the session no longer 1:1, and thus changes the nature of the interaction. *See id.* ¶¶ 33–34. The CDCR clinicians under observation would act differently knowing they were being evaluated by peers who report to their employer, and patients may decline to discuss their symptoms, fears, and side-effects in the presence of observers. *See id.* ¶ 33. The relatively complex informed consent procedure—necessary to keep the observation within ethical guardrails so patients know the observations may be used against

them in litigation—increases the biases. *See id.* ¶¶ 31, 34, 37. The value of the discovery would be diminished, weakening the justification for imposing the burden on patients and their clinicians. *See id.* ¶¶ 31–34.

### 3. There Are Other Sources Of Information Available.

Defendants can pursue other less disruptive and dangerous methods of discovery. Their litigation experts can gain sufficient information about the quality of mental health care—including 1:1 mental health treatment and screenings—by analyzing health care records and other available documents. *See id.* ¶ 38. They can also interview clinical and custody leadership and line staff, which typically provides highly valuable information. *See id* ¶ 39. And Plaintiffs have agreed that if these tours move forward they may include interviews with patients, as well as observations of group treatment, IDTTs, huddles, and ICCs, which would allow the experts to observe patient interactions by every clinical and custodial classification. *See id.* ¶ 39. The Court should not permit Defendants' experts to observe any 1:1 mental health treatment or screenings. *See id.* ¶¶ 24, 40.

### CONCLUSION

Defendants' tours are discovery, which the Court has the power and duty to limit. If the Court decides to reopen discovery and allow the tours to proceed, Plaintiffs request a protective order precluding any observations of 1:1 mental health treatment and screenings, limiting defendants' tours to a maximum of ten prisons for no more than 5 days at each, and one prison tour per month (5 days of touring per month).

### PLAINTIFFS' CERTIFICATION OF ORDERS REVIEWED

Plaintiffs' counsel Marc J. Shinn-Krantz certifies that he reviewed the following orders relevant to this filing: ECF Nos. 8029, 8007, 7924, 7918, 7917, 7897, 7880, 7856, 7847, 7786, 7741, 7541, 7283, 7267, 6846, 6242, 5928, 5794, 5786, 5774, 4539, 640.

Plaintiffs' counsel Adrienne Spiegel certifies that she reviewed the following orders relevant to this filing: ECF Nos. 8087, 8066, 8029, 8009, 7924, 7897, 7847, 7804, 7743, 7742, 7699, 7283, 6846, 6435, 6242, 5928, 640.

/ / /

| | | |
|---|---|---|
| DATED: January 17, 2024 | ROSEN BIEN GALVAN & GRUNFELD LLP | |
| | By: | /s/ Marc J. Shinn-Krantz |
| | | Marc J. Shinn-Krantz |
| | | *Attorneys for Plaintiffs* |

| | | |
|---|---|---|
| DATED: January 17, 2024 | ROSEN BIEN GALVAN & GRUNFELD LLP | |
| | By: | /s/ Adrienne Spiegel |
| | | Adrienne Spiegel |
| | | *Attorneys for Plaintiffs* |

## DEFENDANTS' CERTIFICATION

Defense counsel certify that they have read the following orders relevant to this filing: ECF Nos. 5794, 7880, 7897, 7918, 8000, 8007, 8029.

DATED: January 17, 2024        ROB BONTA
                               Attorney General of California


                               By:      /s/ Elise Owens Thorn
                                   DAMON MCCLAIN
                                   Supervising Deputy Attorney General
                                   ELISE OWENS THORN
                                   Deputy Attorney General
                                   *Attorneys for Defendants*


DATED: January 17, 2024        HANSON BRIDGETT LLP


                               By:      /s/ Kaylen Kadotani
                                   LAWRENCE M. CIRELLI
                                   PAUL B. MELLO
                                   SAMANTHA D. WOLFF
                                   KAYLEN S. KADOTANI
                                   *Attorneys for Defendants*