ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: 925-746-8460
FACSIMILE: 925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al. <br><br> Defendants. | Case No. 2:90-CV-00520- KJM-DB <br><br> **DECLARATION OF ROBIN BELCHER-TIMME, PSY.D., ABPP, IN SUPPORT OF DEFENDANTS' PORTION OF JOINT STATEMENT RE TOUR DISPUTES** <br><br> Judge: Hon. Kimberly J. Mueller |

I, Robin O. Belcher-Timme, Psy.D., ABPP (Forensic), declare as follows:

1. I am a Psychologist, licensed to practice in Delaware, Maryland, and Pennsylvania. I also hold certificates from the Psychological Interjurisdictional Compact Commission (PsyPact) with Authority to Practice Interjurisdictional Telepsychology (APIT) and a Temporary Authorization to Practice (TAP) allowing me to practice in approximately 35 additional states and territories.

2. In addition to a doctoral degree in clinical psychology, I hold master's degrees in criminal justice (MACJ), secondary English education (MA), and clinical psychology (MA). I am

board-certified as a Diplomate in forensic psychology by the American Board of Professional Psychology (ABPP) and a Fellow of the American Academy of Forensic Psychology (AAFP). I hold certificates as a Certified Correctional Health Professional (CCHP), Certified Correctional Health Professional with a Mental Health specialty (CCPH-MH) and am one of approximately 40 individuals to hold a Certified Correctional Health Professional – Advanced (CCHP-A). My specialties include clinical, correctional, and forensic psychology.

3. I am a Principal and Senior Expert with Falcon Correctional and Community Services, inc. ("Falcon"). In that capacity, I work with teams engaged in facility-wide or system-wide studies of care and custody; to arrive at key observations of their systems; to validate exemplary practices; and to provide recommendations to elevate how justice and healthcare are delivered. As a Principal, I ensure fidelity to our models and represent our corporate interests, while as a Senior Expert, I participate in field work, often leading teams conducting studies or otherwise serving our clients. In addition to facility-wide and system-wide studies and technical assistance for implementation, I also lead teams providing subject matter expertise to firms engaged in the architectural programming and design of innovative correctional facilities.

4. My experience in direct service in prisons has included positions as Practicum Student, Staff Psychologist, Chief Psychologist, Statewide Director of Mental Health, and Vice President of Correctional Healthcare. I have delivered or supervised behavioral health (mental health and/or substance use disorder treatment) in 15 correctional facilities across two states, and including experience as a forensic evaluator, I have practiced psychology in a total of more than 75 jails and prisons across the United States. Inclusive of my experience as a Senior Expert with Falcon Correctional and Community Services, inc., I have worked in approximately 125 jails and prisons across the United States, Norway, Belgium, and Germany.

5. Since 2021, I have been a member of the Falcon team conducting a system-wide study of staffing, and the Mental Health Service Delivery System (MHSDS) in the California Department of Corrections and Rehabilitation (CDCR).

6. The Falcon team spent many months preparing for the active engagement phases of the study, to include the development of scientific methods to gather quantitative and qualitative

data. The design of the study developed by the Falcon team proposed a series of industry-standard methods for data collection, to include data and document review, accessing medical charts, conducting site visits, observing clinical activities, and interviewing patients receiving care in the MHSDS.

7. I lead a team of Falcon experts assigned to California Medical Facility (CMF) among others, and along with two of my colleagues, we spent four days on site in August before the Court issued a directive to pause facility studies during our fifth day on site.

8. Although we were able to accomplish a great deal of work while on-site, we were precluded from speaking with patients in the MHSDS and from observing individual clinical encounters.

9. I am aware that the issue of observing individual clinical encounters is being considered by the Court currently. Additionally, I am aware that the prospect of visiting and studying all 28 proposed facilities is also being considered by the Court at this juncture.

10. With respect to the latter question of the Falcon team visiting all 28 facilities as proposed, the issue is relatively straightforward. One common model of assessing the optimization of healthcare systems includes approaching the question with aims to 1) improve the quality of patient care; 2) improve the experience of receiving care; 3) improve the experience of delivering care for professionals; and 4) reducing the costs of that care.[1,2,3]

11. The quality of patient care can vary tremendously across prisons and capturing the actual services (as opposed to those planned and documented) is critical. Even if the quality of

---

[1] Bodenheimer, T. & Sinsky, C. (2014). From triple to quadruple aim: Care of the patient requires care of the provider. *Annals of Family Medicine*, 12(6), 573-576.

[2] Berwick, D., Nolan, T. & Whittington, J. (2008). The triple aim: care, health, and cost. *Health Affairs*, 27(3).

[3] Berwick, D., Beckman, A. & Gondt, S. (2021) The triple aim applied to correctional health systems. *Journal of the American Medical Association*, published online February 8, 2021. Retrieved April 18, 2023 from: http://jamanetwork.com.

care were assessed as a system-wide analysis, it simply cannot be assumed that the experience of receiving care, nor the experience of delivering care as a professional, is equivalent across all 28 facilities. Physical plant, facility resources, geographic location, correctional culture, and the subjective components of what it means to be a patient or provider in the MHSDS are demonstrably different across facilities, as we have already seen in our work across just five facilities to date. It is impossible to truly compare SAC to SQ, for example, or CHCF to RJD. The facilities require a nuanced appreciation of their unique qualities relative to one another, and the patients and clinical professionals living and working there deserve that individualized attention and representation in our study.

12. Similarly, the methods developed by Falcon are based on a specific scientific approach to gathering quantitative and qualitative data from each of the 28 facilities. The approach warrants several days on-site, given these requirements. Having conducted the initial site visit to CMF, four-and-a-half days was simply not enough time to complete the study, even if we were allowed to interview patients and observe clinical encounters. It is imperative that the Falcon team be allowed to study all 28 facilities as proposed, and to do so in a manner that allows for fidelity to the research model as designed.

13. Observing individual clinical encounters has long been a standard practice in similar situations. From residency training programs to clinical supervision sessions,[4] site visits from the Joint Commission[5] or CARF International[6] accreditation visits, observing encounters between clinicians and patients is a critical component of assessing the quality of care delivery, the experience of receiving care, and the experience of delivering that care as a professional.

14. While it is recognized that the presence of a third party can potentially impact the

---

[4] Beigzadeh, A., Yamani, N., Sharifpoor, E., Bahaadingeigy, K., and Adibi, P. (2020). Teaching and learning in clinical rounds: A qualitative meta-analysis. *Journal of Emergency Practice and Trauma,* 7(1), 46-55.

[5] https://www.jointcommission.org/resources/news-and-multimedia/fact-sheets/facts-about-on-site-survey-process/

[6] https://carf.org/accreditation/steps-accreditation/

therapeutic encounter, and even do so in a way that detracts from the effectiveness of treatment, the team has put in place safeguards to protect patients from potential harm. First, each patient must give informed consent before an observer may enter the room, exercising his or her autonomy and demonstrating an understanding and appreciation of the risks, benefits, alternatives, and implications of the observer's presence. Second, each of the professionals who would observe individual encounters is highly skilled and trained as clinicians, and we are all able to exercise judgment to leave an encounter if those concerns arise. I have done that in my own observations of other clinical encounters in the past. Third, the treating clinician may ask the observer to leave the encounter if concerns arise that the observer's presence is interfering with or disrupting the treatment or worsening the patient's condition, another example of something that has occurred previously, and with which I would certainly comply, immediately and without question. With these protections in place, I have seen these observation sessions proceed smoothly and without incident, with each of the three adults in the room capable of ending the observation experience at any time.

15. Observing individual clinical encounters is an important part of this study for the reasons articulated above. There is no better way to observe patient care *in vivo* versus as planned and documented, and indeed this method is widely accepted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in Newark, Delaware on January 17, 2024.

/s/ Robin O. Belcher-Timme
Robin O. Belcher-Timme, Psy.D., ABPP, CCHP-A