Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
Lawrence M. Cirelli, SBN 114710
Paul B. Mello, SBN 179755
Samantha D. Wolff, SBN 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:  925-746-8460
Facsimile:  925-746-8490
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DECLARATION OF STEVEN J HELFAND, PSY.D, IN SUPPORT OF DEFENDANTS' PORTION OF JOINT STATEMENT REGARDING TOUR DISPUTES**<br><br>Judge:   Hon. Kimberly J. Mueller |

I, Steven J Helfand, Psy.D., CCHP, declare as follows:

1.  I am a doctoral level Psychologist licensed to practice in the state of New York. My training and expertise are in the fields of clinical and correctional psychology, and I hold certification as a Certified Correctional Healthcare Professional (CCHP).

2.  I have served as a Senior Expert for Falcon, Inc. (Falcon) from October 2022 to July 2023, and as Vice President and Senior Expert from July 2023 to present. Falcon has been engaged along with Voorhis Robertson Justice Services (VRJS) by the State of California to perform a systemwide study of CDCR's behavioral health services. My current work with Falcon involves designing and conducting system-wide studies related to behavioral health, health, and

custody practices within jails and prisons and with justice-involved community members with the goals of identifying strengths and challenges, and developing and implementing recommendations as opportunities for improvement.

3. I am a nationally recognized expert in correctional health and behavioral health care and operations. For over 25 years I have overseen services in more than 70 facilities across nine states to include two state prison systems to develop, implement, and manage jail and prison mental health and health programs. I have held the positions of Director of Mental Health / HSA, Deputy Director of Mental Health, Director of Forensic Mental Health, Statewide Director of Mental Health, Regional Vice President, and Senior Vice President within such settings. I have also held the position of Executive Director for a not-for-profit outpatient behavioral health center interfacing with community members to include the justice-involved. I have been in leadership positions within systems under settlement agreement related to mental health services, conditions of confinement, and reentry to include the Nassau County Sheriff's Department Connecticut Department of Correction, and New York City Department of Correction, and have worked within or consulted to other systems under settlement or consent decree. Over the past 20 years, I have also served as an expert witness or mental health consultant to jails and prisons in an additional 10 states. I hold extensive experience and expertise in: mental health program development for jails and prisons, suicide and self-injury evaluation and prevention, treatment of the seriously mentally ill (SMI) and restrictive housing reform, restrictive housing evaluation and programming, behavioral treatment planning, correctional staffing analysis, correctional inpatient programs, reentry practices, community outpatient programs, policy development, national correctional mental health standards development, correctional health accreditation preparation, and correctional health care surveying. I have also served as a consultant to the National Commission on Correctional Health Care Resources, Inc (NRI) providing assessment and technical assistance to multiple county jail systems. I have been active in advancing mental health and health care within jails and prisons including a significant contribution to the inaugural National Commission on Correctional Health Care (NCCHC) Mental Health Standards and training on those standards and have presented and published on contemporary correctional mental health topics.

4.      My work at Falcon includes ongoing evaluations of behavioral health and related correctional practices within several state prison systems undergoing litigation to include the Arizona Department of Corrections Reentry and Rehabilitation (ADCRR). Since October 2022 I have been a member of the Falcon formulation and research teams engaged in a system-wide study of the Mental Health Service Delivery System (MHSDS) in the California Department of Corrections and Rehabilitation (CDCR). The system-wide study includes the creation of a methodology to obtain both quantitative and qualitative information. This includes methods that I have utilized previously to include health record review, policy review, data review, on-site visits, observation of service delivery processes, and interviews of staff who deliver and patients who receive care.

5.      This declaration is written to address what I view as barriers to completing our study as intended and in line with my experience in either conducting or observing the conducting of system wide studies, monitoring, and technical assistance activities within jails, prisons, and community settings. The issues of interest are the observation of one-to-one behavioral health encounters and allowing our experts to access all 28 CDCR facilities where mental health patients may reside.

6.      The actual service delivery to patients or potential patients reflects levels of adherence to policies and expected best practices, such as those included in the MHSDS Program Guide and related memorandums. Observation of service delivery is an integral piece of a comprehensive systemwide study reflective of the quality of care and can be confirmatory or non-confirmatory and allows for otherwise unobtainable inferences about both the staff and patient experience. Such factors are part of the widely accepted Quadruple Aim of Health Care[1], a model for optimal health service performance[2]. Permitting observation of some activities such as IDTT and group offerings, but not the most prevalent service delivery types to include individual

---

[1] Sikka R, Morath JM, Leape L The Quadruple Aim: care, health, cost and meaning in work *BMJ Quality & Safety* 2015;**24:**608-610.
[2] Enhancing healthcare efficiency to achieve the Quadruple Aim: an exploratory study - PMC (nih.gov)

assessment and counseling is restrictive to a systemwide study of mental health service delivery. The concept of work-as-imagined versus work-as-done[3] is a recognized challenge related to patient safety and has been addressed in the area of mental health and suicide risk[4]. Observation of actual service delivery allows for this potential gap to be assessed and improvements can come from an understanding of how work is actually done in comparison to what is expected.

7. The utilization of observation of service delivery within healthcare is a common and accepted practice for assessments to round out formulations for activities such as contract monitoring, evaluation/supervision of practice, assessment of consent decree and settlement agreements, quality improvement initiatives, and accreditation review. The American Medical Association (AMA) Code of Medical Ethics section 3.1.2 Patient Privacy & Outside Observers to the Clinical Encounter[5] contemplates observation for multiple purposes and sets forth clear safeguards to include patient agreement, consensus that the observer will not compromise care, and adherence to standards for medical privacy and confidentiality that Falcon's proposed observation plan adheres to. Outside of jail and prison settings, CARF International (CARF)[6] and The Joint Commission (TJC)[7] utilize on-site surveys as part of the accreditation process to include "observation of professionals providing care of organizational practices and observations of those providing care."

8. In my experience within jails and prisons, I have never experienced the preclusions proposed for observation of one-to-one services. As a surveyor for the National Commission on

---

[3] Deutsch ES. PA-PSRS Patient Saf Advis. June 2017;14:80-83.

[4] Mackenhauer, J., Winsløv, J.-H., Holmskov, J., Brødsgaard, I., Larsen, T. G., & Mainz, J. (2022). Analysis of suicides reported as adverse events in psychiatry resulted in nine quality improvement initiatives. *Crisis: The Journal of Crisis Intervention and Suicide Prevention, 43*(4), 307–314.

[5] https: //code-medical-ethics.ama-assn.org/sites/default/files/2022-08/3.1.2.pdf

[6] https://carf.org/accreditation/steps-accreditation/

[7] https://www.jointcommission.org/who-we-are/facts-about-the-joint-commission/joint-commission-faqs/

Correctional Health Care (NCCHC) I have observed screening, assessments, and treatment sessions that were occurring on a one-to-one basis. As a corrections based administrator, my programs have been the subject of surveys and monitoring that have included such observation of one-to-one practices. In addition, as a Director of Mental Health for a state prison system, I along with appointed monitors have observed facility specific rules violation assessments as part of settlement agreement monitoring and I have individually observed the same as part of supervision and quality improvement initiatives. I also note that in the Special Masters Thirtieth Round Monitoring report, Part C, there appear to be two individual telehealth sessions that were observed. I see no distinction between being present for observation of in-person and telehealth one on to service delivery and believe that the former provides more accessible opportunity for patient or clinician to communicate any concerns about continuing the observation.

9. The safeguards that Falcon has proposed for either patient, practitioner, or clinician observer to either not begin or discontinue the observation as well as unobserved time at the end of the encounter are in line with observation practices and AMA ethics and allow for patient protections to mitigate any unintended impact of the observation.

10. Falcon's study design includes a review of all 28 facilities where mental health patients reside and receive services. Observing only parts of a system does not provide insight into care across the full system. We are interested in looking at consistency or inconsistency of care across facilities within this systemwide study to assess if the experience of delivering and receiving care is varied based on the physical plant, leadership, culture, and other ways in which individual prisons within a system may differ. Further, being able to assess at least three facilities per month will allow for continuity of the assessment and the ability to make timely points of comparison across domains enhancing our ability to synthesize all components of the study. This minimum of three visits per month will allow the interviews and observations from the 28 facilities to be synthesized within a six to nine month period that will make comparisons most optimal and relevant, fresh in the minds of our experts, and reflective of the contemporaneous practice expectations for each facility.

11. Other than evaluating the adequacy of care in single cases or in cases with narrow

scopes of interest, I have not individually or as part of a team evaluated the operations of a system without visiting all facilities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in New York, New York on January 17, 2023.

*/s/ Steven J. Helfand*
Steven J. Helfand, Psy.D., CCHP