Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
　1300 I Street, Suite 125
　P.O. Box 944255
　Sacramento, CA 94244-2550
　Telephone:  (916) 210-7318
　Fax:  (916) 324-5205
　E-mail:  Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
Lawrence M. Cirelli, SBN 114710
Paul B. Mello, SBN 179755
Samantha D. Wolff, SBN 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:   925-746-8460
Facsimile:   925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>GAVIN NEWSOM, et al.<br><br>　　　　Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DECLARATION OF DAVID STEPHENS, PSY.D., IN SUPPORT OF DEFENDANTS' PORTION OF JOINT STATEMENT REGARDING TOUR DISPUTE**<br><br>Judge:   Hon. Kimberly J. Mueller |

I, David Stephens, Psy.D., declare as follows:

1. I am a Neuropsychologist and a Clinical and Correctional Psychologist, and a Certified Correctional Healthcare Professional specializing in Mental Health (CCHP-MH), with over 25 years of experience. I am a nationally recognized expert in correctional mental health in jails and prisons across the country. I have been the Director or Chief of Mental/Behavioral Health for three state Departments of Correction, with oversight of all psychiatric, mental health, substance abuse, and sex offender services for those prison systems.

2. I have overseen the mental health services in jails throughout the United States and wrote the curriculum for a joint National Institute of Corrections/National Commission on

1   Correctional Health Care training initiative entitled, "Planning and Implementing Effective Mental

2   Health Services in Jails."  I have consulted on the provision of mental health services in five

3   additional Departments of Correction.  I was the initial mental health expert for the National

4   Commission on Correctional Health Care (NCCHC) and their consulting branch, NRI Resources.

5   I was a part of reviewing the initial draft for the NCCHC Prison Mental Health Standards, and was

6   on the committee that developed the Mental Health Certification for NCCHC (CCHP-MH).

7         3.      I worked as the Academic Dean for a graduate school of psychology, overseeing all

8   the clinical programs for students earning masters and doctoral degrees leading to licensure as

9   clinical mental health professionals, marriage and family therapists, and psychologists.  In this role

10  I developed and implemented the first specialization in Correctional Mental Health in an

11  accredited clinical psychology doctoral program in the United States.

12        4.      I hold expertise in: mental health program development for jails and prisons,

13  suicide prevention, evidence-based programming for justice involved people with serious mental-

14  illness, architectural neuroscience, co-occurring disorders, brain rehabilitation, officer and staff

15  wellness, autism treatment, inpatient and outpatient programs, community reintegration, policy

16  development, and specialized assistance to facilities and systems in class action litigation.

17  Specifically, I have worked with large consent decree facilities, and those undergoing settlement

18  agreements: the Wyoming Department of Corrections, the Colorado Mental Health Institute-

19  Pueblo, the Idaho Department of Corrections, and the Bernalillo County Metropolitan Detention

20  Facility in Albuquerque (NM).  I have evaluated or currently am evaluating mental health and

21  psychiatric programs and systems in several Departments of Correction, some of which are

22  undergoing litigation, including: the Massachusetts Department of Correction (MADOC), the

23  Louisiana Department of Corrections (LADOC), the Illinois Department of Corrections (IDOC),

24  and the Idaho Department of Corrections (IDOC).

25        5.      I have trained and taught hundreds of healthcare and security staff in various

26  correctional mental health and crisis intervention topics and have served as a keynote or plenary

27  speaker for many industry audiences on such topics as: co-occurring disorders (including in

28  corrections), prisoner re-entry, architectural neuroscience, suicide prevention, implementing

mental health services in jails, formulary management in correctional facilities, and therapeutic community units in prisons and state hospitals.

6. I am a member of the American Correctional Association, the Academy of Neuroscience for Architecture, and have provided dozens of professional presentations at NCCHC conferences, GAINS Center Conferences, and others. My comprehensive skills, credentials, training, and expertise are a unique combination, not readily available in many correctional healthcare experts or executives.

***Rationale for observing 1:1 sessions:***

7. It is essential when evaluating the quality of mental health care being provided to any person that actual clinical contact between that person and his or her therapist be physically observed. This is not to be used as a substitute for reviewing documentation of clinical encounters but must be included along with reviewing documentation in order to have a complete picture and understanding of the clinical care being provided and received. The direct observation of 1:1 sessions provides validation or invalidation of the contents of the documentation of clinical care. Research has indicated that there is significant discrepancy between the therapist perception and documentation of client goals and progress in a given session, and an observer's perception of session goals and progress.[1]

8. There is not an issue of harm to the individual receiving services as a result of being observed during a single psychotherapy or supportive session. The available literature on observers being present in psychotherapy sessions focuses primarily on supervisor/supervisee scenarios that are carried out over an extended period of time, not on one-time quality assessments.[2] Conversely, the available literature on assessment of quality care in the provision of mental health services does not address the effect of the assessor being present during a 1:1

---

[1] Hurlburt, M.S., Garland, A.F., Nguyen, K. *et al.* (2010) Child and Family Therapy Process: Concordance of Therapist and Observational Perspectives. *Adm Policy Ment Health* 37, 230–244 (2010). https://doi.org/10.1007/s10488-009-025

[2] Yager, J., Lee, J.S. (2023). Third party observation in psychotherapy: playing to the audience. *The American Journal of Psychotherapy* 10, https://doi.org/10.1176/appi.psychotherapy20230002

1  session, so we must rely on the literature discussed above on this effect during clinical
2  supervision.  As noted, the literature is focused on ongoing supervision over a period of time
3  (typically varying from the several months of an academic term to the several years needed for
4  professional licensure).  In the absence of focused literature specifically on the topic of the effect
5  of monitoring a single session as part of a system evaluation we can identify several factors that
6  support the conclusion that no harm is visited upon an incarcerated person who has a single
7  session of mental health treatment observed by a system evaluator.  These factors include the fact
8  that in the article cited above any harm that may have occurred did so only after all parties
9  involved in the clinical encounter (person receiving care, therapist, and observer/supervisor)
10 adapted to the environment and context of having the additional person (supervisor) present over a
11 period of time.  There is no discussion of any deleterious effects occurring during the initial
12 encounter with an observer present.
13         9.     Additionally, the observations here will be conducted by a person with years or
14 decades of experience providing mental health services in the correctional environment generally,
15 and in the prison environment specifically.  This clinical and professional expertise allows the
16 observer of the session to identify if the person receiving services is uncomfortable with him or
17 her present or may be desirous of or in need of care without the observer present.  At any point
18 during the observed session the observer will ask the person receiving care if he or she would like
19 the observer to leave if any discomfort or distress is noted.  We encourage the mental health
20 clinician to offer an additional session in the days following the observed session to address any
21 concerns the person may not have felt comfortable discussing with the observer present, or any
22 negative effects coming from the observed session.  Of relevance in this context is that we will
23 have obtained permission for all observations that occur from the person receiving services.
24 Finally, bearing in mind the protective factors just discussed, these encounters will consist of a
25 highly skilled and empathic observation of a single session in the context of ongoing treatment
26 that has occurred over months and years, which means it is a fraction of the total treatment
27 experience and thus will have little or no impact, positively or negatively, on the care being
28 provided to and experienced by the person receiving care. The thoughtful and high level of

1. precautions being taken before the observed session, the readiness of the highly experienced observer to remove herself or himself from the session of any distress or contraindication is noted, and the recommendation for follow-up with the person who was observed in the days following the observation all result in no harm occurring to the individuals who volunteer to be observed.

10. It is standard industry practice to have individual sessions monitored as part of an assessment of the quality of mental health care being provided. As additional precautions, however, as noted above, we will obtain permission from every patient prior to observing the 1:1 session. We will also have the clinician continue to meet with the person receiving care following our observation, without us present, to address any concerns or issues the person may be experiencing.

***Rationale for visiting all 28 facilities that provide mental health services:***

11. In order to provide a comprehensive opinion on the status of mental health care in CDCR we must observe the care being provided in every facility where mental health care is available. Similar to the situation involving observing 1:1 sessions, there is often discrepancy between the documentation of care and the actual provision of care. It is not possible to determine the quality of care being provided in the facility without being present and observing what is happening at that facility.

12. Additionally, there are staffing variances at each facility, which contribute to variability in the type and amount of care that is provided. It is equally true that two facilities with identical staffing ratios and percentages of filled positions vary in the type, amount, and quality of care that is provided. We cannot obtain an accurate picture of the mental health care being provided across the system if we cannot view in person the mental health services being provided at all facilities in the system that provide mental health care.

13. Our commitment to CDCR is that we will understand and describe the mental health care being provided to all inmates in the system, which includes the provision of care at each facility.

14. In order to maintain continuity of observations and interpretations the site visits to all 28 facilities must be completed in a calendar year. This allows for an apples-to-apples

comparison of the mental health care being provided at each CDCR facility, and minimizes the use of interpretative explanations and hypotheses to reconcile variances in care due to changes in policy, operational procedure, etc.  In order to complete our visits at all 28 facilities within a calendar year, we must have the ability to visit no more than 3 facilities across 13 days each month.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in Colorado Springs, Colorado on January 17, 2024.

                                  */s/ David Stephens*
                                  David Stephens, Psy.D.