| | |
|---|---|
| DONALD SPECTER – 083925<br>STEVEN FAMA – 099641<br>MARGOT MENDELSON – 268583<br>PRISON LAW OFFICE<br>1917 Fifth Street<br>Berkeley, California 94710-1916<br>Telephone: (510) 280-2621<br><br>CLAUDIA CENTER – 158255<br>DISABILITY RIGHTS EDUCATION<br>AND DEFENSE FUND, INC.<br>Ed Roberts Campus<br>3075 Adeline Street, Suite 210<br>Berkeley, California 94703-2578<br>Telephone: (510) 644-2555 | MICHAEL W. BIEN – 096891<br>ERNEST GALVAN – 196065<br>LISA ELLS – 243657<br>JENNY S. YELIN – 273601<br>THOMAS NOLAN – 169692<br>MICHAEL S. NUNEZ – 280535<br>MARC J. SHINN-KRANTZ – 312968<br>ALEXANDER GOURSE – 321631<br>GINGER JACKSON-GLEICH – 324454<br>ADRIENNE PON HARROLD – 326640<br>AMY XU – 330707<br>ADRIENNE SPIEGEL – 330482<br>MAYA E. CAMPBELL – 345180<br>LUMA KHABBAZ – 351492<br>ROSEN BIEN<br>GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California 94105-1738<br>Telephone: (415) 433-6830 |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' POSITION FOR JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS**<br><br>Judge: Hon. Kimberly J. Mueller |

[4422501.5]

I, Michael W. Bien, declare:

1. I am a partner in the law firm Rosen Bien Galvan & Grunfeld LLP ("RBGG"), a member of the Bar for this Court, and counsel of record for the Plaintiff class in this litigation. I have personal knowledge of the facts stated herein and if called as a witness I would and could competently so testify. I make this declaration in opposition to Defendants' request to undertake extensive expert tours for the purpose of litigation and in support of Plaintiffs' Position for Joint Statement Re Defendants' Expert Tours.

2. In my experience in *Coleman* and many other cases, it is critical to observe and accompany the tour of an opposing expert so that it will be possible later to cross-examine the expert properly and to respond to the expert's opinion with opposing experts. By being present, Plaintiffs' counsel can learn what each defense expert did and for how long, who they spoke to and what was said, which units they visited, which documents and information were provided, and more. Plaintiffs' counsel can also take note of what the defense expert chose not to observe, who they ignored, and what information they chose to avoid. Reviewing a testifying experts' notes and emails and taking their deposition cannot replace the information learned by observing the expert on the tour. It is therefore my opinion as lead counsel in this case that one of our attorneys must be present during every interaction with or observation of one of our clients by Defendants' VRJS/Falcon experts. I do not believe this work can be done sufficiently by non-attorneys, given the litigation posture of these tours and the need to be able to prepare to cross-examine the experts when they testify.

3. Defendants request that their experts tour all 28 Mental Health Services Delivery System ("MHSDS") facilities (including re-touring the five they already toured in Summer 2023), that each tour include multiple experts and proceed for a minimum of five days, and that they be able to tour for up to 13 business days every month. They also intend to have three experts touring each institution simultaneously, and doing separate observations on each tour. We have committed to sending two attorneys on each tour, and we will make efforts to send three. But at the pace Defendants propose, even with just two

[4422501.5]    1

attorneys on each tour, we would be required to devote a total of 26 days' worth of attorney time each month to the VRJS/Falcon tours, plus travel time, for at least the next 14 months. This will be a serious hardship for Plaintiffs' counsel.

4. Our firm employs 28 lawyers, 15 of whom now work at least part time on *Coleman*. Two of these attorneys will be unavailable in 2024 due to parenting leave or other reasons. Our co-counsel, the Prison Law Office, has one or sometimes two lawyers who work on this case. Our current work in *Coleman* includes, but is not limited to, work on the following, all of which the Court has ordered the parties and the Special Master to focus on: data remediation; studying and implementing a program for patients with Personality Disorders; modifying Defendants' Least Restrictive Housing Policy and practices regarding utilization of Department of State Hospitals inpatient beds to ensure timely transfers to inpatient care; fully implementing all outstanding suicide prevention measures recommended by the Special Master's Suicide Prevention Expert Lindsay Hayes; implementing the court-ordered minimum treatment standards in the PIPs; implementing an appropriate tele-mental health program; and monitoring CDCR's efforts to come into complete compliance with maximum staffing vacancy rates for both inpatient and outpatient programs. Some of this work is very time-intensive. Data remediation, for example, requires at least five hours per week of meetings, significant additional work to review and comment on Defendants' draft indicators, and several of our attorneys' involvement. And some of these focus areas may result in evidentiary hearings this year, including Defendants' compliance with suicide prevention requirements and the PIP maximum staffing vacancy rates. These attorneys are also responsible for the ongoing appellate work in this case.

5. All of the work just described is in addition to significant work we do on an ongoing basis, including but not limited to, corresponding with thousands of *Coleman* class members; reviewing correspondence for urgent issues and notifying CDCR through the *Coleman* Project Team process; interviewing our clients and preparing memos for the Special Master's monitoring teams when they are preparing to tour an institution;

[4422501.5]

2

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' POSITION FOR JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS

reviewing all suicides and writing an annual letter analyzing trends in the year's suicides; reviewing, commenting on, and negotiating with Defendants about policy and regulatory changes; writing advocacy letters on behalf of specific class members; analyzing Defendants' monthly data productions; and preparing status reports, briefs, and other documents for the Court.

6. All of the RBGG attorneys who work on *Coleman*, as well as the attorneys from the PLO who work on the case, also have significant responsibilities in other cases. In fact, several members of our team will have multi-day and even multi-week trials in other complex cases in 2024. In anticipation of the possible commencement of Defendants' VRJS/Falcon litigation expert tours, we were able to hire two additional lawyers (counted among the total of 15 RBGG attorneys on the team). Even with this additional capacity, Defendants' tours, if allowed to proceed on the scale and at the pace they propose, will make it very challenging for our firm to complete the ongoing essential work in *Coleman*, not to mention to fulfill our obligations to our firm's many other clients.

7. CDCR notifies my office of every suicide death that occurs in CDCR prisons. In 2022, there were 20 suicides in CDCR. In 2023, there were 30 suicides in CDCR. That constitutes a fifty-percent (50%) increase in the number of suicides in just one year, even though the mid-year total CDCR population did not change much from 2022 to 2023.

8. CDCR also provides my office with copies of the final suicide reports (FSR) that CDCR suicide reviewers prepare for every suicide in a CDCR prison. Based on our preliminary review of the FSRs for suicides that occurred in 2023, CDCR's suicide reviewers concluded in several cases that the patients were not receiving mental health treatment as required by the Program Guide (including timely IDTTs, regular Primary Clinician contacts, and group treatment), often due to the severe staffing shortages, which the reviewers concluded may have contributed to the patients' decisions to end their lives. One EOP patient who recently died by suicide, for example, did not have regular confidential visits with his clinician for a ten-month period preceding his death, which the

1 clinician noted was due to staffing shortages; instead, he was seen cell-front only.

2    9.   Over the course of November and December of 2023, Plaintiffs' counsel and Defense Counsel engaged in four Meet and Confer sessions regarding Defendants' litigation experts' tours in response to the Court's Oct. 24, 2023 Order. *See* ECF No. 8029 at 5. They took place on November 17, November 30, December 7, and December 13. I was present at all four sessions. Our position throughout the meet and confer process, and indeed since we initially sought to pause the tours last summer, has been that the Court has the authority to decide whether to allow the tours—which constitute discovery—to proceed at all, and to set whatever parameters it finds appropriate for any tours that go forward. *See* July 25, 2023 Joint Statement, ECF No. 7883. We negotiated during the meet and confer process in good faith to try to resolve our disputes with Defendants about the number, scope, pace, and parameters of the tours so that we could limit the issues the Court might be required to resolve. But we always understood and made clear to Defendants that the Court could ignore or change any agreements the parties made because the Court ultimately has the authority to decide whether discovery should be reopened and what the limits of that discovery should be. Our inclusion of language in the parties' Joint Statement about the possibility that the Court might disallow any of the proposed tours or might set different limits than those we negotiated with Defendants is not a new position. And while we did "offer" as a resolution of our dispute to agree to two tours per month with no more than ten days of touring per month, that was a compromise offer, not a position we are bound to in the litigation over the current dispute on the scope of the tours. That proposal also came after Defendants rejected our original proposal, made on December 11, 2023, of no more than one tour per month. Based on my conversations with Pablo Stewart, and for the reasons explained in his declaration, I do not believe that allowing Defendants' experts to observe confidential 1:1 mental health treatment sessions in the context of this litigation is appropriate. Nor do I believe that any safeguards could adequately protect class members from the distortion of the clinical space that Defendants' experts' presence would create. We therefore did not accept any of Defendants' proposals,

[4422501.5]

4

as none could address our core concern that the experts' presence alone would deprive patients of increasingly rare confidential 1:1 treatment sessions.  Defendants have offered to allow patients to have essentially a second appointment right after the experts leave as a way to make up for the disruption in the first appointment.  This idea is not workable in a system where clinicians are already stretched past the breaking point, with institutions throughout CDCR already triaging care, and patients booked back-to-back for appointments measured in minutes if they happen at all.  Offering patients a second unobserved appointment after the first observed one also underscores that the observed appointments would be an artificial performance with the real connection taking place after the observers leave.

10. The volume and pace of tours Defendants now propose is a dramatic increase from the tours the VRJS/Falcon experts conducted in Fall 2021.  In 2021, each expert spent no more than one day (and in many cases a half day) at each of the 15 prisons they toured.  The experts toured as a unit and did not split up.  The experts did not tour multiple prisons simultaneously.  And no one from the Special Master's team attended any of the Fall 2021 tours.

11. In 2013, when Defendants conducted expert tours before moving to terminate this case, they used only four experts, who toured a total of thirteen institutions. It is my recollection that these tours (which were *ex parte*) lasted only a day or two at each institution.

12. Based on my experience with prison litigation involving mental health since 1985, a party's expert observing 1:1 mental health treatment is exceedingly unusual and rare.  In this case, to my knowledge, Plaintiffs' experts have never observed a confidential, scheduled 1:1 mental health clinician-patient session, although they may have observed a limited number of screenings and cell-front encounters.  During the telepsychiatry dispute, Defendants' expert and Plaintiffs' counsel observed a very limited number of telepsychiatry sessions.  That is the exception that proves the rule, and it was for the limited purpose of observing a brand new modality of care, which is distinct from

Defendants' request here.  The same is true for clinical experts the Special Master employs.  I and other attorneys from my office have attended dozens of Special Master monitoring tours during this case, and while we have seen his experts observe cell-front contacts and a limited number of screenings, we do not recall seeing the experts observe, in person, a scheduled confidential 1:1 treatment session between a clinician and patient.

13. At the time of the writing of this Declaration, Defendants have not provided any examples of litigation experts, in the course of discovery, observing confidential mental health 1:1 clinical encounters with patients.  Defendants did provide four documents in response to Plaintiffs' request for examples of this type of observation: Two were publicly available consultant-style reports that the Falcon group prepared for Departments of Corrections in other states.  Neither report appears to have been connected to active litigation, and neither clearly described the third party sitting in on 1:1 treatment sessions.  The other two documents Defendants provided were connected to litigation but the reports were prepared by neutral Monitors who had been appointed pursuant to a consent decree.  Those reports are akin to the Special Master's report in this case, and are not comparable to discovery by an adverse party's expert of the type Defendants seek here.  In any event, based on our review, neither report clearly references any in person observation of confidential 1:1 treatment sessions.

14. Despite Plaintiffs' repeated requests, Defendants also have not provided Plaintiffs any authority to support their assertion that for a qualitative study of a mental healthcare system to be methodologically sound, it must include direct observation of 1:1 treatment sessions between clinician and patient.  In the past, Defendants' litigation expert Elizabeth Falcon testified that she consulted with her employees and it is their consensus position that "[i]t is common for outside clinicians to observe 1:1 treatment, including for training or evaluative purposes.  The American Medical Association Code of Medical ethics, section 3.1.2 Patient Privacy and Outside Observers to the Clinical Encounter confirms this process and states its conditions."  *See* ECF No. 7884 at 9 & n.1 (citing an electronic link to the ethics guidance).  The cited ethics provision, however, allows outside

observers only where specific criteria are met, including that "[t]he presence of the observer will not compromise care." See AMA Code of Medical Ethics § 3.1.2, available at https://code-medical-ethics.ama-assn.org/sites/default/files/2022-08/3.1.2.pdf (last accessed Jan. 16, 2023).

15. When Defendants' experts toured five institutions in Summer 2023, I and other RBGG lawyers saw how the experts' presence impacted the treatment patients received. For example, at a group recreational therapy session that Defendants' experts observed and I was present for, the recreational therapist ended the session early, stating that the patients had been "unusually quiet," despite usually being "very talkative"—a change she attributed to the presence of observers. July Bien Decl., ECF No. 7886 ¶ 22. In a different recreational therapy group, after being told that the group would be observed, the therapist stated that the group "would not discuss anything personal." Xu Decl., ECF No. 7891 ¶ 11. During an observed PIP treatment group, a patient mentioned that the treatment was different because of the presence of observers. Id. ¶ 15. In yet another observed group session, a patient left because he was not comfortable with observers but did not want to "ruin it for everyone else" by objecting to the observers' presence, so he sacrificed his own treatment. Id. ¶ 18. And in an observed IDTT, a patient stated that he did not want to talk about gang debriefing in front of the group, prompting the clinician to reassure the patient that they would "talk about it later." Jackson-Gleich Decl., ECF No. 7892 ¶ 18. In no case did we observe an expert proactively offer to leave so that the objecting patient could remain and the treatment could proceed without disruption. These are just some examples of the effect Defendants' experts' presence had on patient care.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 17th day of January, 2024.

/s/ Michael W. Bien

Michael W. Bien

[4422501.5]                                    7
DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' POSITION FOR JOINT STATEMENT RE DEFENDANTS' EXPERT TOURS