1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:    (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
ADRIENNE SPIEGEL – 330482
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

10  Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART B OF THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT**

Judge:  Hon. Kimberly J. Mueller

[4425324.4]

**TABLE OF CONTENTS**

Page

I.    THE COURT SHOULD ADOPT THE REPORT IN FULL BECAUSE DEFENDANTS HAVE NOT SHOWN THAT ANY OF THE SPECIAL MASTER'S FACTUAL FINDINGS ARE CLEARLY ERRONEOUS.................... 1

II.   THE COURT SHOULD ORDER DSH TO REDUCE STAFFING VACANCIES AT ATASCADERO STATE HOSPITAL TO NO MORE THAN TEN PERCENT FOR THE DISCIPLINES OF PSYCHIATRY, PSYCHOLOGY, SOCIAL WORK, AND REHABILITATION THERAPY........... 1

III.  THE COURT SHOULD ORDER DSH TO PROVIDE PATIENTS WITH SUFFICIENT GROUP AND INDIVIDUAL THERAPY........................................ 6

        1.    Group Therapy ................................................................. 6

        2.    Individual Therapy .............................................................. 8

IV.   THE COURT SHOULD ORDER *ALL* DEFENDANTS TO UNDERTAKE ALL NECESSARY STEPS TO PRIORITIZE THE IDENTIFICATION, REFERRAL, AND ADMISSION OF ALL APPROPRIATE *COLEMAN* PATIENTS TO DSH AND END THE ONGOING UNDERUTILIZATION OF *COLEMAN*-DESIGNATED BEDS. .................................................... 12

V.    DEFENDANTS HAVE NOT SHOWN THAT THE SPECIAL MASTER'S FINDINGS ABOUT INADEQUATE TREATMENT PLANS AND SUICIDE RISK ASSESSMENTS ARE CLEARLY ERRONEOUS...................... 14

CERTIFICATION ............................................................................................ 15

1

**TABLE OF AUTHORITIES**

2
                                                                                              **Page**

3

**CASES**

4

*In re U.S.A. Motel Corp.*,
5        450 F.2d 499 (9th Cir. 1971) ................................................................................ 1

6  *McCormack v. Hiedeman*,
          694 F.3d 1004 (9th Cir. 2012) ........................................................................... 1
7

*Oil, Chemical & Atomic Workers Int'l Union v. N.L.R.B.*,
8        547 F.2d 575 (D.C. Cir. 1976) ............................................................................ 1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

On January 4, 2024, Defendants filed objections to the December 15, 2023 Special Master's Thirtieth Round Monitoring Report – Part B, on the Inpatient Mental Health Care Programs at the California Department of State Hospitals (hereinafter, "the Report").  *See* Thirtieth Round DSH Rpt., ECF No. 8085; Defs' Objs to Thirtieth Round DSH Rpt., ECF No. 8106.  Defendants raise numerous legal and factual objections to the Report—none of which should give the Court pause.  Defendants' legal objections are wrong on the law, their factual objections do not establish clear error, and the Court should adopt the Report's findings and each of its three recommendations in full.

**I.     THE COURT SHOULD ADOPT THE REPORT IN FULL BECAUSE DEFENDANTS HAVE NOT SHOWN THAT ANY OF THE SPECIAL MASTER'S FACTUAL FINDINGS ARE CLEARLY ERRONEOUS.**

The Order of Reference in this case provides that "the court shall accept the special master's findings of fact unless they are clearly erroneous."  Order of Reference, ECF No. 640 at 8.  A finding is "clearly erroneous if, on review of the entire evidence, the reviewing court arrives at the firm conviction that the finding is mistaken." *In re U.S.A. Motor Corp.*, 450 F.2d 499, 503 (9th Cir. 1971); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("To be clearly erroneous, a decision must strike the court as more than just maybe or probably wrong; it must … strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." (internal citations and quotation marks omitted)).  The objecting party has the burden of proving clear error. *See Oil, Chemical & Atomic Workers Int'l Union v. N.L.R.B.*, 547 F.2d 575, 580 (D.C. Cir. 1976).  As explained in greater detail below, because Defendants have not met their burden of showing that *any* factual findings in the Report are clearly erroneous, the Court should adopt the Report in full.

**II.     THE COURT SHOULD ORDER DSH TO REDUCE STAFFING VACANCIES AT ATASCADERO STATE HOSPITAL TO NO MORE THAN TEN PERCENT FOR THE DISCIPLINES OF PSYCHIATRY, PSYCHOLOGY, SOCIAL WORK, AND REHABILITATION THERAPY.**

DSH's court-ordered Staffing Plan requires units reserved for *Coleman* patients to

[4425324.4]
1

1  be staffed with one psychiatrist, one psychologist, one social worker, and one

2  rehabilitation therapist for every 30 beds in the unit.  *See* DSH Staffing Plan, ECF No.

3  7078-1 at 6; Aug. 20, 2022 Order, ECF No. 7688; ECF No. 8106 at 5 (noting that "the

4  DSH Staffing Plan allocates staff positions based on *Coleman* bed capacity").  As the

5  Staffing Plan explains, DSH settled on this 1:30 ratio after a thorough workload study that

6  considered the distinctive needs of the *Coleman* population in DSH,  the specific treatment

7  requirements that apply to that population, and the amount of time needed to satisfy these

8  needs and requirements.  ECF No. 7078-1 at 3-6.  The Special Master's Thirtieth Round

9  Report finds that relevant positions at Coalinga and Patton state hospitals were fully

10  staffed, but that the functional vacancy rates for these positions at Atascadero State

11  Hospital (ASH) ranged from 22 percent to 44 percent – a finding Defendants do not

12  dispute.  ECF No. 8085 at 30, 34, 80.  Because DSH "must satisfy" the minimum staffing

13  requirements in its own Staffing Plan in order to "provide *Coleman* patients with adequate

14  care," *id.* at 75-76, the Special Master recommends that the Court order DSH-Atascadero

15  to "undertake all necessary steps to comply with the DSH Staffing Plan to reduce its

16  staffing vacancies to no more than ten percent for the disciplines of psychiatry,

17  psychology, social work, and rehabilitation therapy," *id.* at 78.

18        Defendants object to this recommendation because the Court has not previously

19  ordered DSH fill at least 90 percent of the positions allocated according to its Staffing

20  Plan.  *See* ECF No. 8106 at 4-5.  As Plaintiffs previously explained, the Court's June 13,

21  2002 order (ECF No. 1383) can plausibly be read to encompass all Defendants, including

22  DSH.  *See* Pls Reply to Defs' Objs. to 2021 Inpatient Report, ECF No. 7067 at 7-8.  And if

23  the requirements of the 2002 order do not apply, that does not render the Special Master's

24  recommendation unfounded, nor his findings that ASH is well below the 90-percent

25  threshold clearly erroneous.  If anything, the Special Master's recommendation and the

26  factual findings up on which it is based are directly responsive to the Court's warning, the

27  last time Defendant raised this argument, that "any determination that particular clinical

28  staffing classifications are outside the scope of [the June 13, 2002] order would likely

[4425324.4]

2

1  leave a void this court would need to then fill with a further ruling," for which the

2  information in the Special Master's reports would be "useful."  *See* Aug. 17, 2022 Order,

3  ECF No. 7605, at 6.  Beyond complaining that no order has yet set a minimum staffing

4  threshold (hence the Special Master's recommendation), Defendants do not identify any

5  basis on which to conclude that 90% is not the appropriate rate.

6          Defendants argue that the DSH Staffing Plan itself does not provide a basis for the

7  Special Master's proposed 90-percent threshold because the Plan does not explicitly state

8  that at least 90 percent of positions must be filled.  ECF No. 8106 at 4-5.  This is a red

9  herring.  DSH's staffing plan clearly sets the "required staffing" level in its *Coleman* units

10  at one psychiatrist, one psychologist, one social worker, and one rehabilitation therapist for

11  every 30 beds in the unit, ECF No. 7078-1 at 6, and the Court has already ordered DSH to

12  "complete[ly] implement[]" that plan, Oct. 10, 2017 Order, ECF No. 5711 at 1, 30.

13  Defendants do not say what they think "complete implementation" of the DSH plan means,

14  but their position appears to be that neither the plan itself nor the Court's order requires

15  DSH to fill *any* mental health positions at all.  *See* ECF No. 8106 at 4-5; ECF No. 7078-1

16  at 6.  This position—which echoes Defendants' recent efforts to reject any minimum

17  staffing level requirement, no matter the threshold—is absurd and contrary to the history of

18  this case. *See* Oct. 11, 2023 Order, ECF No. 8009, at 2 (striking Defendants' pleading

19  asserting "there is no quantifiable staffing threshold that is required by the Constitution,

20  and … any arbitrary maximum vacancy rate is not an appropriate proxy for measuring

21  Defendants' constitutional compliance").

22          If neither the Plan itself nor the Court's previous orders establish a 90-percent fill

23  requirement, as Defendants claim, then "complete implementation" of the DSH staffing

24  plan means filling *100 percent* of the positions that Plan says are "required" to meet the

25  1:30 staff-to-bed-capacity ratio.[1]  If anything, then, the Special Master's recommended

26

27  [1] The Special Master's recommended order would be entirely consistent with this
    understanding of DSH's obligations under the Court's existing orders.  The Special
28  (footnote continued)

[4425324.4]
                                            3

1 order is generous to Defendants in permitting less than full staffing.

2      Defendants also claim "there is no basis" for the Special Master's recommended

3 staffing order because the Report purportedly finds that DSH *is* complying with its staffing

4 plan. *See* ECF No. 8106 at 5.  But the Report finds no such thing.  Defendants' claim rests

5 entirely on a single sentence in the Report stating that "all three [DSH] institutions

6 satisfied the 1:30 staff-to-patient staffing ratio," *id.* (quoting ECF No. 8085 at 34), but this

7 sentence clearly refers to the ratio of staff to patients *actually housed* in DSH's *Coleman*

8 units at a particular moment in time.  This is not the ratio that matters for purposes of

9 assessing DSH's compliance with its Staffing Plan, which, as Defendants admit in the very

10 next paragraph of their objections, "allocates positions based on *Coleman* <u>bed capacity</u>,"

11 not the number of beds that are occupied at any given time.  ECF No. 8106 at 5 (emphasis

12 added); *see also* Aug. 23, 2023 Order, ECF No. 7923 at 4; ECF No. 7078-1 at 2.  Indeed,

13 elsewhere in the Report the Special Master makes clear the only reason ASH exceeded a

14 1:30 staff-to-*patient* ratio was "[d]ue to [ASH]'s low *Coleman* census."  ECF No. 8085 at

15 80.  Defendants' failure to refer and admit eligible *Coleman* patients to ASH is itself one

16 of the major problems discussed in the Report, *see, e.g.*, *id.* at 11, 30-32, and it cannot not

17 possibly justify a finding that DSH is complying with a staffing plan that expressly

18 allocates positions based on bed capacity rather than census numbers,[2] particularly since

19 ───────────────

20 Master's recommended order simply clarifies the threshold for substantial compliance with DSH's existing obligation to "complete[ly] implement[]" its staffing plan—just as the

21 Court's previous 90-percent-fill-rate orders clarify the threshold for substantial compliance with CDCR's obligation to "full[y] implement[]" its 2009 staffing plan.  ECF No. 5711 at

22 1, 30; *see also* Pls.' Opening Brief for Hearing on Staffing, ECF No. 7952 at 7 (arguing that the Court's previous 90-percent-fill-rate orders "are not freestanding injunctions subject to the doctrine of substantial compliance, but rather *definitions of what constitutes*

23 *substantial compliance* with the staffing ratios that [CDCR] developed and [has] been ordered to fully implement").

24 [2] Defendants' argument that the Special Master fails to account for differences between

25 CDCR and DSH's staffing methodologies suffers from the same flaw.  *See* ECF No. 8106 at 5.  While Defendants assert that CDCR's Staffing Plan is based on census rates, that is

26 simply not true for the CDCR's inpatient programs.  Like DSH's Staffing Plan, the allocations in CDCR's PIP Staffing Plan are based on beds, not census rates, and are

27 nonetheless subject to the same maximum ten-percent vacancy rate threshold as CDCR's outpatient programs.  *See* Oct. 11, 2023 Order, ECF No. 8009 at 3; *see also* Aug. 23, 2023

28 (footnote continued)

[4425324.4]

4

1  Defendants are in the midst of dedicated efforts to increase that census. *See* Nov. 15, 2023

2  Order, ECF No. 8066, at 5; *see also* Parties' Joint Rpt. Re Inpatient Transfer Timelines,

3  ECF No. 7969 at 6 (describing newly developed two-step trial process to review class

4  members potentially eligible for DSH transfer).

5          Finally, Defendants argue that "there is no basis for the recommended order"

6  because DSH is already "taking appropriate steps to address staffing retention and

7  recruitment."  ECF No. 8106 at 5.  Defendants do not explain what they mean by

8  "appropriate" steps or why the steps they claim to be taking are sufficient to meet their

9  obligations, much less how they could be expected to reduce the 22- to 44-percent clinical

10 functional vacancy rates at ASH to at or below ten percent.  The Special Master's

11 recommended order would require them to take all *necessary* steps to reduce staffing

12 vacancies at ASH, and Defendants' laundry list of recruitment measures does not show

13 that there is no "basis" for such an order.  In fact, virtually all of the measures they identify

14 are either longstanding efforts or minor changes to existing practices that have not moved

15 the needle on staffing levels at ASH, *see* ECF No, 8106 at 6, 7-8 (describing continuation

16 of internship, fellowship, and residency programs included in the DSH Staffing Plan and

17 detailing routine annual compensation increases), or are directed at positions or facilities

18 that are not at issue here, *id.* at 6-7 (describing bonuses for psychiatric technicians and

19 DSH-Napa residency program).  Indeed, there is nothing in either the Budget Change

20 Proposal or the Declaration of Caroline Klein that suggests any of the proposed additional

21 funding will be used to recruit relevant clinical staff for ASH's *Coleman* unit.  *Id.*[3]

22

23 Order, ECF No. 7923 at 2-4 (noting both PIP and DSH Staffing Plans use a staff-to-bed
   ratio, after Defendants abandoned a staff-to-patient ratio for their inpatient facilities).
24
   [3] Defendants assert—but do not seriously argue—that issuing the Special Master's
25 recommended staffing order would deprive them of due process because there has been no
   "motion or other evidentiary proceeding" to consider the merits of such an order.  ECF No.
26 8106 at 19. This argument is clearly meritless, as Defendants have been permitted to both
   formally comment on and file a full brief and evidence objecting to the Special Master's
27 findings and recommendations on this point.  Yet nowhere do they articulate a single
   reason why a lesser standard ought to apply to the DSH inpatient programs than CDCR's
28 mental health programs, including its inpatient programs.

[4425324.4]

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART B OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

1    This Court has already made plain that constitutional compliance "'requires

2  defendants' full implementation of their staffing plans.'"  Feb. 28, 2023 Order, ECF No.

3  7742 at 1 (quoting ECF No. 5711 at 1).  Defendants do not contest that DSH's clinical

4  positions required by their own staffing plan are roughly a quarter to almost a half vacant

5  at ASH, even after accounting for registry.  The Court should adopt the Special Master's

6  findings in full and issue the recommended staffing order because Defendants have not

7  shown it is legally improper or unsupported by the Report's findings.

8  **III.    THE COURT SHOULD ORDER DSH TO PROVIDE PATIENTS WITH
            SUFFICIENT GROUP AND INDIVIDUAL THERAPY.**

9

10    Defendants next object to the Special Master's recommendation that the Court order

11  DSH to "take the necessary steps to provide [*Coleman*] patients with sufficient group and

12  individual therapy."  ECF No. 8085 at 78.  Although Defendants acknowledge that the

13  Special Master addressed "some of" the purported "deficiencies" Defendants claimed to

14  have identified in their comments on an earlier draft of the Report, Defendants continue to

15  object to the Special Master's recommendation because (1) they claim the group therapy

16  provided in DSH is "sufficient," and (2) they disagree with the Report's conclusion that

17  ASH and CSH does not routinely provide individual therapy to *Coleman* patients who

18  need it.  ECF No. 8106 at 9-13.  Plaintiffs address Defendants' arguments, which largely

19  hinge on the Special Master's factual findings and are thus reviewed for clear error, in

20  turn.

21    **1.    Group Therapy**

22    The Report finds that "the number of offered hours of group treatment was

23  inadequate" at Atascadero and Patton state hospitals.  ECF No. 8085 at 39.  Specifically,

24  the Report finds that patients at ASH were offered an average of 7.5 hours of core groups

25  and 5.9 hours of supplemental groups per week, and that patients at PSH were offered an

26  average of 9.69 hours of core groups and 1.79 hours of supplemental groups per week.  *Id.*

27  at 39-40.  Defendants do not dispute the accuracy of any of these figures.  *See* ECF No.

28  8106 at 9-10, 14-15.  According to this Court's orders, these levels of offered structured

[4425324.4]

1  group therapy are ipso facto inadequate.  *See* Aug. 23, 2023 Order, ECF No. 7924 at 8

2  (noting prior court adoption of Special Master findings that offering less than ten hours of

3  structured therapeutic activity in inpatient programs is inadequate).  Defendants' objection

4  is therefore foreclosed.

5      Ignoring the law of this case, Defendants blame "repeated COVID-19 surges" at

6  ASH for the low number of group hours offered to *Coleman* patients there.  ECF No. 8106

7  at 9-10.  Defendants also point to additional data suggesting that the "[t]otal average hours

8  of treatment per patient per week" at ASH increased in December 2022, as well as a

9  declaration submitted by PSH's Executive Director that lists general topics that she states

10  are "include[d]" in PSH's "core offerings" and "supplemental activities."  *Id.* at 14-15.

11      None of Defendants' additional evidence calls into question the Special Master's

12  finding that the group treatment offered at ASH and PSH is "inadequate for an inpatient

13  care program," let alone demonstrates that this finding is clearly erroneous.  ECF No. 8085

14  at 39; ECF No. 640 at 8.  For almost four years now, the specter of "repeated COVID-19

15  surges" has been Defendants' go-to excuse for neglecting their constitutional obligations in

16  this case; it is not evidence that the group treatment provided at ASH is adequate for an

17  inpatient program.  And the data Defendants cite for the proposition that "total hours of

18  treatment" increased at ASH shows that the increase was entirely a product of

19  "supplemental groups"—that is, unstructured "leisure activities" such as "Bingo, Movie

20  Groups, Bowling or courtyard activities, [and] exercise groups."  *See* Thorn Decl., ECF

21  No. 8106-1 at 18, 31.  In fact, this data shows that the weekly average hours of "core"

22  groups offered at ASH *declined* over the course of the monitoring period to a level that is

23  barely *half* the 10-hour minimum that this Court and DSH itself has concluded is necessary

24  to provide adequate care in an inpatient setting.  *Id.* at 31 (showing decline in core group

25  hours); *id.* at 17 (requiring "at least 10 hours" of "core treatment" each week for "all

26  patients"); ECF No. 7924 at 4 (describing the court-ordered Continuous Quality

27  Improvement [CQI] process through which DSH developed this standard); *id.* at 8 (citing

28  prior court orders holding that offering less than ten hours of core groups per week in

[4425324.4]

7

1  inpatient programs is inadequate).

2  The vague list of topics that are purportedly "included" in PSH's treatment

3  offerings, meanwhile, says nothing about how often these topics are offered or the quality

4  of the offerings.  ECF No. 8106 at 14-15.  Finally, Defendants' reliance on the declaration

5  of Brian Zollweg, Psy.D, attesting to "*Coleman* patients' post-discharge status" – which

6  was not previously presented to the Special Master – neither justifies why a 30-day crisis

7  bed readmission rate should be treated as the definitive benchmark nor conclusively

8  establishes the adequacy of DSH's care (particularly when reviewing the Special Master's

9  contrary findings for clear error only).  *Id.* at 9-10 (citing Zollweg Decl., ECF No. 8106-3

10  ¶ 2).  The point remains uncontested that DSH provides less core group treatment than its

11  own standards, and this Court's orders, say is required.

12  The Court should overrule Defendants' objection to the Special Master's findings of

13  inadequate group treatment at ASH and PSH because Defendants' evidence does not come

14  close to showing clear error.

15  **2.  Individual Therapy**

16  The Report finds that DSH "did not routinely utilize individual treatment with

17  *Coleman* patients" at ASH and CSH and that this "resulted in some patients not receiving

18  adequate treatment."  ECF No. 8085 at 40.  These findings are based on 63 individual case

19  reviews conducted by the Special Master's experts.  *Id.* at 15.  These 63 patients represent

20  one-third of all *Coleman* patients who received treatment from DSH during the monitoring

21  period.  *Id.*

22  Defendants assert that "the Special Master's different clinical opinions are not

23  evidence of inadequate care" or "a systemic lack of access to care."  ECF No. 8106 at 10.

24  But the only evidence Defendants offer to rebut the findings of the Special Master's team

25  of nationally recognized experts is a short declaration submitted by Brian Zollweg, Psy.D,

26  an "Assistant Chief Psychologist" at DSH.  *See* ECF No. 8106-3 ¶ 1.  That declaration

27  states that Dr. Zollweg reviewed "the charts" of an unspecified number of "patients

28  admitted to and discharged from DSH during the reporting period."  *Id.* ¶ 2.  "Based on

[4425324.4]

8

1   that review," Dr. Zollweg concludes that "*Coleman* patients' post-discharge status supports

2   the adequacy of treatment DSH provided to those patients." *Id.*

3        Unlike the Special Master's experts, who provided nearly one hundred single-

4   spaced pages of summaries and notes from the case reviews that formed the bases for the

5   Special Master's findings, *see* ECF No. 8085 at 133-227, Dr. Zollweg provides only two

6   short paragraphs disputing the Special Master's conclusions about the adequacy of the care

7   provided to two of the individual patients whose charts he reviewed.  *See* ECF No. 8106-3

8   ¶¶ 5-6; *see also* ECF No. 8106 at 12-13 (describing Zollweg's review of Patients Y and

9   O).  Defendants' brief articulates disagreement with a third chart review summary, about

10  which Dr. Zollweg does not opine.  *See* ECF No. 8106 at 13 (contesting the Special

11  Master's findings as to Patient L, without reference to evidence).  Notably, Defendants

12  failed to raise any of these specific objections about the Special Master's conclusions with

13  regard to these patients in their comments on an earlier draft of the Report, as the Order of

14  Reference requires.  *See* ECF No. 8085-1 at 7-15; ECF No. 640 at 4-5, 8.  As a result,

15  Defendants effectively prevented the Special Master and his experts from responding to

16  their arguments before issuing his final report.

17        Dr. Zollweg's opinions (and Defendants' assertions in their pleading) do not show

18  clear error in any event.  He cites no published research  (or unpublished research, for that

19  matter) that supports his cursory opinions that the patients in question did not require

20  individual therapy, as the Special Master's experts concluded.  ECF No. 8106-3 ¶¶ 5-6.

21  Nor does Dr. Zollweg provide any explanation or basis for his assumption that the "post-

22  discharge status" of former DSH patients represents a reliable metric for assessing the

23  adequacy of the care they received in DSH, *id.* ¶ 2, despite Defendants' criticism of the

24  Special Master for failing to "provide any scientific, academic or legal support" for his

25  findings to the contrary.  *See* ECF No. 8106 at 13.  Presumably, patients who are well

26  enough to be discharged from inpatient care are less likely to suffer the type of immediate

27  mental health crisis that Dr. Zollweg relied on as a proxy for adequate treatment prior to

28  discharge.  Even assuming this standard is correct and the new evidence credited, it ignores

1   the care provided to patients who have not yet improved enough to discharged.

2          What's more, Defendants' myopic attempts to pick apart three individual case

3   summaries completely ignores the fact that DSH itself agrees that it is required to provide

4   individual therapy "based on clinical need."  ECF No. 8106 at 11.  The Program Guide

5   requires no less.  *See* ECF No. 7333-1 at 113 (treatment in ICF program must be drawn

6   from "a wide variety of treatment modalities … including individual psychotherapy").

7   Moreover, DSH has concluded that adequate inpatient treatment requires "at least 10

8   hours" of "core" treatment—which they define as including "individual therapy."  ECF

9   No. 8106-1 at 17; ECF No. 7924 at 4.  Nor do Defendants contest that individual therapy is

10  part of the treatment protocol anticipated by DSH's Staffing Plan.  *See* ECF No. 7078-1 at

11  1 ("Each discipline within the treatment team works together to develop a treatment plan,

12  diagnosis, delivery of *one-to-one* and group treatment, goal setting and medication

13  management." (emphasis added)); *id.* at 4 ("The majority of time requirements are for

14  long-term treatment goals and objectives that are identified and monitored through

15  monthly treatment plans and conferences and advanced with various therapeutic

16  interventions and treatment modalities such as group and *individual therapy*." (emphasis

17  added)).

18          Nor are the Special Master's findings underlying his recommendation limited to

19  those articulated in this Report.  Indeed, the Special Master has repeatedly called on DSH

20  to address and improve its inadequate provision of individual therapy for those needing it.

21  *See, e.g.*, 2022 DSH Report, ECF No. 7625 at 40-41, 58 (finding ASH's institutional

22  culture did not view individual treatment as essential to adequate care and provided only 5-

23  10% of patients with an average of less than one hour of weekly individual treatment; that

24  CSH provided only 29 individual treatment hours total in the monitoring period (less than

25  0.2 percent of all offered treatment); and that adequacy of PSH's individual treatment

26  could not be assessed due to poor reporting; and concluding that "DSH must address the

27  minimal amount of individual treatment provided at the hospitals through the development

28  and implementation of effective guidelines regarding meaningful indicated individual

1   treatment for members of the *Coleman* class.  DSH must also train staff to provide such

2   individual treatment and provide appropriate supervision regarding this aspect of patient

3   care."); 2021 Inpatient Report, ECF No. 7039 at 50 ("Individual treatment continued to be

4   rarely offered, provided, or tracked in the inpatient programs at CDCR and DSH and

5   continues to need the focused attention of CDCR and DSH as indicated in the 2018

6   Inpatient Care Report."); *id.* at 117 ("[I]n the case of DSH-Atascadero and DSH-Coalinga,

7   patients did not have access to sufficient individual treatment."); 2018 Inpatient Report,

8   ECF No. 5894 at 27 ("Individual treatment was rarely offered or provided across inpatient

9   programs, and where provided was either woefully inadequate, or not accurately tracked.

10  Developing and implementing meaningful guidelines and training staff regarding the

11  provision of adequate individual treatment must be addressed by CDCR and DSH.").

12        The deficiencies are long-standing and well-established.  The Special Master's most

13  recent findings, which are not clearly erroneous, are just the tip of the iceberg.  The Court

14  should overrule Defendants' objection to the Special Master's findings and

15  recommendations concerning inadequate individual therapy.  The Special Master's

16  findings that *some* – not necessarily all – patients require individual therapy are fully

17  aligned with the Program Guide, as well as Defendants' own Staffing Plan and CQI

18  standards.  They are consistent with the Special Master's prior reporting that has been

19  adopted by this Court.

20        While Defendants assert that "DSH clinicians use individual therapy for patients as

21  clinically indicated" (ECF No. 8106 at 19), the Special Master's monitoring has repeatedly

22  disagreed.  The Special Master's neutral findings that some DSH class members who need

23  individual treatment are not receiving it are not clearly erroneous.  And his

24  recommendation that DSH be required to "take the necessary steps to provide patients with

25  sufficient … individual therapy" is well supported by not only this Report, but the last

26  three monitoring reports pleading with DSH to rectify this issue that have been ignored.

27  The Court should reject Defendants' objections and adopt the Special Master's third

28  recommendation in full.

[4425324.4]

11

1  **IV.    THE COURT SHOULD ORDER *ALL* DEFENDANTS TO UNDERTAKE ALL NECESSARY STEPS TO PRIORITIZE THE IDENTIFICATION, REFERRAL, AND ADMISSION OF ALL APPROPRIATE *COLEMAN* PATIENTS TO DSH AND END THE ONGOING UNDERUTILIZATION OF *COLEMAN*-DESIGNATED BEDS.**

2

3

4      The Report finds that "the patient census at DSH-Atascadero reached new historic

5  lows during the review period, with only 67 *Coleman* patients occupying the hospital's 256

6  *Coleman*-designated beds."  ECF No. 8085 at 30.  Indeed, the number of *Coleman* patients

7  referred and admitted to DSH-Atascadero dropped sharply from the already historically

8  low numbers referred and admitted during the previous monitoring period.  *Id.* at 30, 62-

9  63.  The Report specifically notes that this "precipitous drop in the *Coleman* census at

10  DSH-Atascadero occurred simultaneously with defendants' apparent 'backsliding on

11  timely transfer of Intermediate Care Facility (ICF) referrals to the PIPs," and that the

12  underutilization of DSH beds is a product of the interplay of CDCR's referral practices

13  with DSH's admission practices.  *See id.* at 11, 31.  Because of the intertwined nature of

14  this inter-agency referral and admission process, the Special Master recommends that the

15  Court order "*all* defendants"—not just DSH— to "take all necessary steps to prioritize the

16  identification and referral of all appropriate *Coleman* patients to DSH, eliminate any

17  barriers to their admission to DSH hospitals, and end any underutilization of *Coleman*-

18  designated beds" at DSH.  *Id.* at 78 (emphasis added).

19      Defendants ignore the reference to "all defendants" in the Special Master's

20  recommendation and object to it on the grounds that "DSH is already taking all necessary

21  and required steps under current policies to prioritize the identification and referral of

22  appropriate *Coleman* patients to DSH."  ECF No. 8106 at 17.  Defendants offer no

23  evidence that <u>CDCR</u> is taking any steps whatsoever to end the underutilization of DSH

24  beds beyond a bare assertion in the declaration of Dr. Zollweg (who does not work for

25  CDCR and has not since 2020) that "CDCR refers patients to DSH based on CDCR

26  clinical input."  *Id.*; ECF No. 8106-3 ¶ 8.  Dr. Zollweg does not explain how he has

27  personal knowledge of the steps CDCR is taking to address its role in the problems

28  identified by the Special Master, and his vague, conclusory assertion that "CDCR" refers

[4425324.4]

12

1  patients "based on clinical input" would not show that CDCR is already taking "all

2  necessary steps" in any event.  The Special Master has repeatedly found—including in his

3  most recent report focused on the PIPs, to which neither party objected and which the

4  Court adopted on June 9, 2023, *see* ECF No. 7854—that CDCR does not comply with the

5  requirements in its own "Least Restrictive Housing" (LRH) Policy that are designed to

6  ensure that patients who should be referred to DSH are not kept in unnecessarily restrictive

7  settings in CDCR.  *See, e.g.*, ECF No. 7833 at 93, 138, 158, 223-25 (Thirtieth Round PIP

8  Monitoring Report finding that IDTTs rarely discuss patients' eligibility for less restrictive

9  inpatient placements); ECF No. 7555 at 115-16 (similar findings in 29th Round PIP

10 Monitoring Report); ECF No. 7039 at 43 (similar findings in 28th Round PIP Monitoring

11 Report); ECF No. 6579 at 20 (similar findings in 2020 Report on Access to DSH); *see also*

12 ECF No. 7833 at 74-75 (noting lack of treatment planning for reducing LRH designations);

13 ECF No. 7555 at 114-16 (same).  It is readily apparent that CDCR is not taking all

14 necessary steps to fill the DSH beds, and has not for a long time.

15      Nor does DSH show that it is taking all necessary steps—or even claim that it is

16 doing so.  Rather, DSH asserts that it is taking only those "necessary" steps that are also

17 "required steps under current policies."  ECF No. 8106 at 17.  Indeed, the very fact that

18 DSH has found roughly forty percent more patients are eligible for DSH than CDCR

19 identified under the existing policies each time it has spot-checked the inpatient referrals

20 manifestly illustrates that the current policies and practices are not working.  *See* ECF No.

21 7969 at 10-11. That is precisely why Defendants are in the midst of piloting a new process

22 as part of the court-ordered meet and confer to address the failures of the existing LRH

23 protocol to ensure timely access to adequate inpatient care.  *See* ECF No. 8066 at 5.  But

24 that process is merely a six-month trial that Defendants have not committed to make

25 permanent.  *See* ECF No. 7969 at 7; ECF No. 8106 at 17 (referring to this process as a

26 "trial process").  And it may yet prove insufficient.

27      The census for the *Coleman* beds at ASH is at an all-time low, and referrals and

28 admissions continued to drop during the monitoring period.  The Special Master has

1  documented the many ways in which Defendants have failed to properly implement their

2  LRH process—a "key component of defendants' comprehensive remedial structure" aimed

3  at "ensur[ing] class members have timely access to necessary inpatient mental health care", ECF

4  No. 8066 at 2—for years.  The Special Master's recommendation is exceedingly well

5  founded, and indeed long past due.  It should be adopted promptly.

6  **V.    DEFENDANTS HAVE NOT SHOWN THAT THE SPECIAL MASTER'S FINDINGS ABOUT INADEQUATE TREATMENT PLANS AND SUICIDE**

7  **RISK ASSESSMENTS ARE CLEARLY ERRONEOUS.**

8          Finally, Defendants object to the Special Master's findings about the lack of

9  behavioral treatment planning and the inadequacy of suicide risk assessments for *Coleman*

10  patients in DSH.  ECF No. 8106 at 16.  Defendants do not cite any evidence whatsoever

11  that calls the Special Master's findings into question, let alone evidence that shows those

12  findings are clearly erroneous.  Their arguments also misstate the Special Master's

13  findings:  The criticism that the "Report does not provide any authority for [a behavioral

14  treatment planning] requirement for every patient" (*id.*) is undercut by Defendants' own

15  acknowledgement in the next sentence that the Report merely recommends that such

16  treatment be available when patients need it.  Defendants do not contest that point, which,

17  as the Special Master observes, is entirely consistent with his historical monitoring

18  findings, all of which were adopted by this Court.  *See* ECF No. 8085 at 16.

19          Similarly, Defendants do not come close to establishing clear error in the Special

20  Master's findings that certain[4] reviewed cases involved inadequate suicide risk

21  assessments.  The adequacy of a suicide risk assessment is not evaluated solely by whether

22  the patient later killed or tried to kill themselves, as Defendants seem to imply.  *See* ECF

23

24  [4] Despite the Order of Reference requirement that Defendants specifically identify the findings to which they object (ECF No. 640 at 8), Defendants vaguely assert objections to

25  "summari[es] [of] three cases that allegedly involved an inadequate assessment of suicide risk."  ECF No. 8106 at 16.  They do not identify which three cases they are referring to

26  either here or in their comments on the draft report, and they cite to a section of the Report at pages 59-63 that covers not only case reviews summaries of four (not three) patients

27  involving suicide risk and prevention deficiencies, but also sections of the Report covering access to treatment and referrals.  Objections like these, which are so unfocused and

28  unclear they are almost impossible to address, should be dismissed out of hand.

[4425324.4]

14

1    No. 8106 at 16.  The Special Master's factual findings are outlined in detail in his Report,

2    both in the case summaries and in the detailed patient chart review summaries.  *See* ECF

3    No. 8085 at 59-60, 167-69 (ASH Patient Y), 210-12 (PSH Patient B), 214-17 (PSH

4    Patients D and E).  Defendants do not seriously contend they have met the burden to show

5    any of those findings are clearly erroneous.

6                                **CERTIFICATION**

7          Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

8    filing: ECF Nos.  640, 1383, 5711, 7605, 7688, 7742, 7854, 7923, 7924, 8009, 8066.

9

10   DATED:  January 23, 2024              Respectfully submitted,

11                                         ROSEN BIEN GALVAN & GRUNFELD LLP

12
                                          By:  */s/ Alexander Gourse*
13                                             Alexander Gourse

14                                         Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28
[4425324.4]
                                        15
PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART B OF THE SPECIAL MASTER'S
                      THIRTIETH ROUND MONITORING REPORT