DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
AMY XU – 330707
ADRIENNE SPIEGEL – 330482
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge:   Hon. Kimberly J. Mueller |

[4426770.7]

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

I.    THE COURT SHOULD ADOPT THE REPORT IN FULL BECAUSE
      DEFENDANTS HAVE NOT SHOWN THAT ANY OF THE SPECIAL
      MASTER'S FACTUAL FINDINGS ARE CLEARLY ERRONEOUS................... 1

II.   DEFENDANTS' OBJECTIONS ARE MERITLESS................................................. 2

      A.    Defendants' Demand that the Special Master Monitor NCCHC
            Standards Rather than the Court-Ordered Remedial Plan Should be
            Strongly Rejected ........................................................................................ 2

      B.    Defendants' Objections to the Special Master's Reporting on Staffing
            Vacancies Fail .............................................................................................. 5

      C.    Defendants' Disagreement Does Not Render the Special Master's
            Clustering Suggestion Clearly Erroneous .................................................. 8

      D.    Defendants' Attempts to Wordsmith the Special Master's Telemental
            Health Discussion Should Be Rejected ...................................................... 9

      E.    This Court has Already Rejected Defendants' Objection Concerning
            the Special Master's Methodology............................................................ 11

      F.    Defendants' MAPIP Objections Lack Merit ............................................. 13

      G.    Defendants' Stray Objections Regarding Structured Treatment Data
            and MHCB Timeframes Are Unfounded .................................................. 14

      H.    Defendants' Request For an Order Requiring the Special Master to
            Use Their Data Is Inappropriate and Premature ....................................... 16

CONCLUSION.................................................................................................... 16

CERTIFICATION ............................................................................................... 16

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Balla v. Idaho*,
        29 F.4th 1019 (9th Cir. 2022) ..................................................................... 4

*In re U.S.A. Motel Corp.*,
        450 F.2d 499 (9th Cir. 1971) ...................................................................... 1

*McCormack v. Hiedeman*,
        694 F.3d 1004 (9th Cir. 2012) .................................................................... 1

*Oil, Chemical & Atomic Workers Int'l Union v. N.L.R.B.*,
        547 F.2d 575 (D.C. Cir. 1976)..................................................................... 2

5

6

7

8

9

10

11

**OTHER AUTHORITIES**

12

Attorney General Merrick Garland, *Memorandum for Heads of Civil Litigating Components United States Attorneys re Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving State and Local Governmental Entities*, at 6 (September 13, 2021) .................................................. 12

Caoimhe Madden et al., *Potential Value of Patient Record Review to Assess and Improve Patient Safety in General Practice: A Systemic Review*, 24(1) Eur. J. Gen. Pract., at 193 (2018) ............................................................ 13

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

On January 12, 2024, Defendants filed objections to the December 22, 2023, Special Master's Thirtieth Round Monitoring Report – Part C, on Defendants' Enhanced Outpatient Programs ("EOP") Compliance with Provisionally Approved Plans, Policies, and Protocols (hereinafter, "the Report"), in which the Special Master found that current levels of clinical staffing vacancies and related deficiencies in care are among the worst in the multi-decade history of this case. *See* Thirtieth Round EOP Rpt., ECF No. 8095; Defs.' Objs. To Thirtieth Round EOP Rpt., ECF No. 8108. Defendants do not contest that core finding—because they cannot. Instead, Defendants raise numerous objections to the Report that either attempt to resuscitate legal positions this Court has already rejected or essentially amount to disagreements over the Special Master's word choice or framing of various issues. None establish clear error or any other legally cognizable basis for the Court to reject a single word of the Report. The Court therefore should adopt the Report's findings detailing the extremely dire state of mental healthcare in the EOP programs in full.

**I.     THE COURT SHOULD ADOPT THE REPORT IN FULL BECAUSE DEFENDANTS HAVE NOT SHOWN THAT ANY OF THE SPECIAL MASTER'S FACTUAL FINDINGS ARE CLEARLY ERRONEOUS**

The Order of Reference in this case provides that "the court shall accept the special master's findings of fact unless they are clearly erroneous." Order of Reference, ECF No. 640, at 8.[1] A finding is "clearly erroneous if, on review of the entire evidence, the reviewing court arrives at the firm conviction that the finding is mistaken." *In re U.S.A. Motel Corp.*, 450 F.2d 499, 503 (9th Cir. 1971); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("To be clearly erroneous, a decision must strike the court as more than just maybe or probably wrong; it must … strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." (internal citations and quotation marks omitted)). The objecting party has the burden of proving clear error. *See Oil,*

---

[1] Page citations to documents in the docket are based on ECF pagination.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

1  *Chemical & Atomic Workers Int'l Union v. N.L.R.B.*, 547 F.2d 575, 580 (D.C. Cir. 1976).

2  As explained in greater detail below, because Defendants have not met their burden of

3  showing that *any* factual findings in the Report are clearly erroneous, the Court should

4  adopt the Report in full.

5  **II.    DEFENDANTS' OBJECTIONS ARE MERITLESS**

6      **A.    Defendants' Demand that the Special Master Monitor NCCHC**
        **Standards Rather than the Court-Ordered Remedial Plan Should be**

7          **Strongly Rejected**

8         Defendants claim that the Special Master erred when he wrote that "defendants

9  were not fully compliant with either the Program Guide or CDCR's staffing plan" and

10  were therefore providing inadequate care to the *Coleman* class. *See* ECF No. 8108, at 2;

11  ECF No. 8095, at 12-13.  Notably, Defendants do not claim that they are actually

12  complying with the Program Guide or other remedial orders.  Because they cannot contest

13  the Special Master's core finding that staffing vacancies and mental health care

14  deficiencies "are indisputably among the worst in recent memory and could be among the

15  worst in the history of the *Coleman* case" (ECF No. 8095, at 11-12), Defendants attempt to

16  move the goal posts.  Knowing full well this Court's prior holdings to the contrary,

17  Defendants argue that "inadequate care cannot necessarily be inferred from the Special

18  Master's observations about institutions falling short of Program Guide requirements"—

19  because, in their view, the Program Guide requires more than what the Constitution

20  demands.  ECF No. 8108, at 2.

21         As an initial matter, Defendants have no basis to assert that the Special Master has

22  claimed "the requirements set forth in the Program Guide are necessarily tethered to the

23  constitutional minimum," or that he has made "conclusory statements as to the

24  constitutionality of care provided to the *Coleman* class." *Id.* at 3-4.  Aside from quoting

25  this Court, not a single page in the Report contains any discussion of a constitutional

26  standard whatsoever.  As Defendants admit in footnote six of their objections, they

27  understand this Court has expressly reserved any evaluation of constitutional compliance

28  for itself.  *See id.* at 4 n.6 (quoting Feb. 28, 2013 Order, ECF No. 4361, at 2-3).  The

Special Master is tasked with assessing Defendants' compliance with the remedial plans in this case—chief among them the Program Guide. *See* ECF No. 4361, at 2-3. And that is exactly what he has done in this Report.

As the Special Master pointed out in his Report, Defendants' initial objection is "analogous to objections defendants have unsuccessfully made for years." ECF No. 8095, at 16 (citing Defs.' Objs. To Twenty-Fifth Round Report, ECF No. 4347, at 4 (objecting that the Special Master "has not even attempted to assess [Defendants'] system against [a constitutional] standard"); ECF No. 4361 at 2-3 (rejecting that objection)); *see also* Apr. 5, 2013 Order, ECF No. 4539, at 8 n.5 (same). Contrary to Defendants' assertions, this Court has repeatedly held that it is the Program Guide—not the National Commission on Correctional Health Care (NCCHC) standards to which Defendants cite—that is grounded in the requirements of the Eighth Amendment, and it is Defendants' compliance with the Program Guide—not these industry guidelines—that the Special Master is directed to monitor. Defendants' argument that the Special Master cannot state that Defendants are providing inadequate care, when Defendants do not contest that they are wildly out of compliance with the Program Guide (which Defendants themselves developed and presented as their plan to remediate the identified constitutional violations), betrays a fundamental misunderstanding of the Special Master's duties and this Court's holdings. Pursuant to the court-ordered powers and duties prescribed in the Order of Reference, the NCCHC standards have no role in the Special Master's compliance reporting unless and until this Court adopts them as a remedy for the ongoing constitutional violations. *See* ECF No. 640, at 4 (ordering Special Master to "monitor defendants' implementation of and compliance with any remedial plan that this court may order," and to "prepare and file with the court periodic reports assessing defendants' compliance with such remedial plan as the court may order"). This objection is utterly without merit.

Nor does *Balla v. Idaho*, 29 F.4th 1019 (9th Cir. 2022), stand for the proposition that NCCHC standards correlate to constitutionality of care, as Defendants attest. While it is true that the *Balla* Court concluded that a prison's NCCHC accreditation helped

1   establish "substantial evidence of adequate medical care," *id.* at 1026, that is only because

2   both parties had originally agreed that NCCHC accreditation would lead to voluntary

3   termination of the court's remedial orders, *id.* at 1022—which is, of course, not the case

4   here.  The Court in *Balla* also stated that it was "defendants' completion of the modified

5   compliance plan" in that case, in addition to NCCHC accreditation, that helped establish

6   the adequacy of medical care that the institution was providing.  *Id.* at 1026. Thus, while

7   accreditation or compliance with NCCHC standards may be evidence that is favorable to a

8   correctional institution, to say that it "correlate[s] to constitutionality," as Defendants

9   claim (ECF No. 8108, at 2), is certainly a step too far.  *See Balla*, 29 F. 4th at 1026 (noting

10  district court's conclusion that accreditation was "not determinative" of constitutionality).

11          Moreover, even if the standards cited by Defendants *were* relevant, the Special

12  Master's findings to which Defendants object do not actually conflict with those same

13  standards—contrary to Defendants' claims.  Defendants take issue with two specific

14  statements made by the Special Master.  They first argue that the Special Master's

15  statement that "[t]he foundation of adequate mental health care in correctional

16  environments relies on the timely and comprehensive completion of clinical assessments

17  and initial IDTT meetings" is incorrect because "the use of Interdisciplinary Treatment

18  Teams (IDTT) is unique to CDCR and do not reflect national standards."  ECF No. 8108,

19  at 3; *see also* ECF No. 8095, at 67.  But the same NCCHC standard they cite lists

20  coordinated cross-disciplinary patient care as indicative of compliance and finds that "the

21  use of an integrated and multidisciplinary team (including correctional staff) to develop

22  treatment plans … can be effective" in meeting the standard.  *See* NCCHC Standards,

23  Ex. A to Kotwani Decl., ECF No. 7828-2, at 21-22.  That guideline further instructs cor-

24  rectional mental health systems to document the policies and procedures the system is

25  utilizing to meet the overarching standard of ensuring "mental health services are available

26  for all inmates who require them."  *Id.*  That is exactly what CDCR has done here in the

27  Program Guide, in which CDCR has chosen to make IDTTs a central building block of

28  their chosen remedy.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

1    Defendants' other objection to the Special Master's language is plagued by similar

2  issues.  They argue that the Special Master's contention that patients are receiving

3  inadequate care because "many institutions failed to consistently discuss and/or document

4  necessary information for effective care planning, including justifications for diagnosis and

5  levels of care, case conceptualizations and functional impairments, collaborative care

6  plans, and individualized measurable treatment objectives" is improper because "NCCHC

7  standards do not require such components of a treatment plan."  ECF No. 8108, at 3; *see*

8  *also* ECF No. 8095, at 68.  But the NCCHC's definition of a treatment plan and its

9  standards regarding those plans track these requirements closely.  *See* ECF No. 7828-2, at

10  15 (treatment plan defined as a "series of written statements specifying a patient's

11  particular course of therapy and the roles of qualified mental health professionals in

12  carrying it out.  Such a plan is individualized, may be multidisciplinary, and is based on an

13  assessment of the patient's needs.  It contains a statement of short- and long-term goals as

14  well as the methods by which those goals will be pursued."); *see also id.* at 15-16

15  (NCCHC Standard directing that "[m]ental health services are provided according to

16  individual *treatment plans*" and assessing compliance by, *inter alia*, looking at whether the

17  plan is developed collaboratively with the patient, is sufficiently documented, and contains

18  "treatment goals and objectives, interventions necessary to achieve those goals, and

19  notation of clinical progress").  And the NCCHC's list of "outcome quality improvement

20  studies" include "assessing whether the treatment plans were sufficient to address patients'

21  underlying mental health problems."  *Id.* at 11.  Assuming arguendo the NCCHC's

22  standards have any relevance at all, they are consistent with the Program Guide and the

23  Special Master's monitoring, even if they do not use identical language.  The Court should

24  summarily overrule Defendants' baseless objection.

25    **B.    Defendants' Objections to the Special Master's Reporting on Staffing
          Vacancies Fail**

26

27    Defendants claim that the Special Master (a) improperly separates civil service line

28  staff from registry staff in order to "dramatize vacancy rates"; (b) misstates the

1  "functional" vacancy rates for staff psychiatrists by not including Psychiatric Nurse

2  Practitioners (PNPs) and by separating telepsychiatry positions from on-site psychiatry

3  positions; and (c) improperly applies the ten-percent vacancy rate threshold to each

4  institution.  ECF No. 8108, at 4-5.

5       Regarding the first objection, Defendants are not claiming that the data reported by

6  the Special Master is incorrect; they merely do not like the way that this data is presented.

7  That objection does not establish clear error.  In fact, it does not establish any error

8  whatsoever.  As the Special Master pointed out in his response to this objection, it has been

9  his longstanding practice to report vacancy rates in this manner, and it is also the same

10 exact way that CDCR organizes staffing data in its own monthly reports.  ECF No. 8095,

11 at 18.  Defendants argue that "the Report should be revised to include registry providers in

12 the vacancy rate calculation," ECF No. 8108, at 4-5, but the Special Master *does* report the

13 total vacancy rate that includes registry staff.  *See, e.g.*, ECF No. 8095, at 54-55 ("There

14 was also a 53 percent on-site staff psychiatry vacancy rate, which decreased to a 12 percent

15 functional vacancy rate with the use of registry staff."); *id.* at 55 ("Concerningly, the

16 vacancy rate for staff psychologists increased from 48 percent during the 29th monitoring

17 round to 52 percent during the review period; however, though still alarmingly high,

18 registry staff reduced the functional vacancy to 45 percent."); *id.* at 56 ("The use of 51.99

19 registry staff reduced the number of on-site staff psychiatry vacancies to 16.06, reflecting a

20 functional vacancy rate of 12 percent.").  This objection is without merit.

21      Defendants' second objection with respect to the inclusion of PNPs and the separa-

22 tion of on-site psychiatrists and telepsychiatrists is similarly baseless.  In response to

23 Defendants' original complaint about the exclusion of PNPs, the Special Master already

24 edited his Report to include PNPs in the overall functional vacancy rates.  *See id.* at 54

25 (adding "except for staff psychiatry" to statement that overall vacancy rates for all disci-

26 plines exceeded ten percent, after he added PNPs to the staff psychiatry vacancy rate); *id.*

27 at 55 (adding, "[a]ccounting for telepsychiatry and psychiatric nurse practitioners, the

28 overall functional vacancy for staff psychiatry at the 15 EOP institutions was nine

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

1   percent"); *id.* at 60 (adding, "while the overall staff psychiatry vacancy rate was nine

2   percent when accounting for all eligible positions").  Defendants apparently did not bother

3   to look at the Special Master's edits before re-asserting their objection, resulting in a waste

4   of this Court's time.  Additionally, similar to the separation of registry staff from other

5   staff, the separation of on-site psychiatrists from telepsychiatrists in data reporting has

6   been a longstanding practice of both the Special Master and CDCR, and it is an objection

7   that has previously been rejected by this Court.  *See, e.g.*, July 14, 2021 Order, ECF No.

8   7229, at 3-4 ("Defendants have not cited to anything in the record that precludes the

9   Special Master from analyzing data provided by Defendants to report on vacancy rates in

10  specific staffing categories").

11          Lastly, Defendants' third objection regarding the Special Master's discussion of the

12  ten-percent threshold at the institution level is not erroneous.  The Special Master has not

13  opined on whether Defendants' compliance ought to be measured at an institution level, as

14  Defendants assert.  His reporting of staff vacancy rates at the institution level is simply

15  information that he is providing to the Court, in order to supply the Court and the parties

16  with more context about the data.  The Special Master has consistently discussed the ten-

17  percent threshold at the institution level, without prior objection from Defendants.  *See,*

18  *e.g.*, Special Master's Twenty-Ninth Round Monitoring Rprt. – Part C, ECF No. 7715, at

19  73-77; Special Master's Twenty-Ninth Round Monitoring Rprt. – Part D, ECF No. 7716,

20  at 31, 35-37; Special Master's Twenty-Eighth Round Monitoring Rprt., ECF No. 7074, at

21  93-96; *see also* Defs.' Objs. to Twenty-Ninth Round Monitoring Rprt. – Parts C and D,

22  ECF No. 7733 (not objecting to use of ten-percent threshold at institution level); Defs.'

23  Objs. to Twenty-Eighth Round Monitoring Rprt., ECF No. 7082 (same).  It is again

24  appropriate for him to provide this relevant information in this Report and in no way

25  "misapplies the Court's … orders that apply the vacancy rate on a statewide level," as

26  Defendants contend.  *See* ECF No. 8108, at 5 (citing ECF Nos. 1383 and 7806).

27

28

1

**C.    Defendants' Disagreement Does Not Render the Special Master's Clustering Suggestion Clearly Erroneous**

2

3    Defendants next object to a single sentence included in the Report regarding the

4  idea of clustering: "The Special Master reiterates his observation from the preceding

5  monitoring round that it may be time for 'CDCR to consider targeted EOP population

6  reductions and "potential clustering of higher-acuity mentally ill inmates at those

7  institutions where it has been shown that mental health staff can be more readily attracted

8  and retained." ' "  ECF No. 8095 at 44-45 (quoting Twenty-Ninth Round Monitoring Rpt.

9  – Part A, ECF No. 7555, at 164; Aug. 9, 2016 Order, ECF No. 5477, at 5).  Notably, the

10  Special Master has not requested any order requiring Defendants to further analyze

11  clustering.  Nonetheless, Defendants claim that this single mention of clustering is

12  "irrelevant" and "not supported by the facts," "given the extensive information in the

13  record regarding why clustering is not a feasible option." ECF No. 8108, at 6.

14    This objection is baseless for several reasons.  First, there is no reason to conclude

15  that the Special Master's mere mentioning of clustering as a possible option for

16  Defendants to consider constitutes a finding of fact that is clearly erroneous; the reality is

17  that his opinion that CDCR should reconsider clustering as a possible solution is not a

18  finding of fact at all.  The Special Master is well within his right to identify possible

19  solutions that could be considered to improve compliance, given the Report's through

20  documentation of CDCR's extreme clinical staffing shortages, which the Special Master

21  has directly linked to systemic deprivations of mental health care.  This is particularly true

22  when the Court itself has repeatedly and recently identified the idea of clustering as

23  potentially salient to the ongoing staffing crisis.  *See* Oct. 24, 2023 Order, ECF No. 8031,

24  at 3 (ordering supplemental briefing on clustering); *see also* July 2, 2020 Order, ECF No.

25  6750, at 1-2 (ordering briefing on clustering); Oct. 10, 2017 Order, ECF No. 5711, at 26

26  (ordering Defendants to develop clustering plans).  Defendants have no basis to request

27  this statement be stricken from the record.

28    Second, Defendants utterly fail to substantiate their claim that "extensive informa-

1   tion" exists in the record proving that "clustering is not a feasible option."  ECF No. 8108,

2   at 6.  Defendants point only to a clustering analysis conducted more than five years ago.

3   *See id.* (citing to previous analysis of clustering from 2018 and 2023 pleading discussing

4   same).  That outdated analysis—which predates the pandemic, the launch of CDCR's

5   telemental health and telepsychiatry programs, and the most egregious staffing vacancy

6   levels in decades—establishes nothing, especially when recent testimony continues to

7   reiterate that recruiting mental health professionals to work at remote institutions is a

8   barrier to properly staffing those institutions.  *See* ECF No. 8046, at 10-11 (arguing that

9   "[t]he lack of any recent attention to clustering shows that Defendants have not exhausted

10  all reasonable measures" to comply with staffing obligations).  Nor does Defendants'

11  citation to recent monthly data showing widespread vacancies at EOP institutions help

12  their case.  *See* ECF No. 8108, at 6 (citing July 2023 monthly data).  Rather than

13  disproving that additional targeted clustering, beyond what exists in the system today,

14  could improve their ability to fill positions, Defendants end up highlighting exactly how

15  dire the current situation is.  The truth is, Defendants simply are not willing to further

16  consider clustering, even in the face of nearly $85 million in contempt fines.  *See* ECF No.

17  8120, at 23 (reporting $84,455,118 in fines accumulated through December 2023).  That is

18  not a reason to strike the Special Master's statement, which comes with no recommenda-

19  tion for an order requiring Defendants to adopt further clustering measures.

20      **D.    Defendants' Attempts to Wordsmith the Special Master's Telemental**
           **Health Discussion Should Be Rejected**

21

22      Defendants raise two objections to the Report's discussion of CDCR's Telemental

23  Health Policy, both of which amount to quibbles over language used by the Special Master

24  and do not rise to the level of clear error.  Defendants first argue that it is inaccurate to say

25  that "defendants issued the [telemental health] policy to field prior to resolving plaintiffs'

26  and the Special Master's experts' questions and concerns about the policy."  ECF No.

27  8108, at 6 (quoting ECF No. 8095, at 47).  They claim that, because there was no order

28  barring them from issuing their policy to the field before resolving those concerns, it was

1  appropriate for them to do so, and, thus, there were "no questions regarding Defendants'

2  Telemental Health Policy pending before the Court at the time the policy was issued." *Id.*

3  at 6-7.  Even assuming Defendants are correct, that does not mean the parties' questions

4  and concerns had been resolved.  As the Special Master points out, the Telemental Health

5  Policy that was issued omits many of the provisions that had been carefully negotiated into

6  the court-approved Telepsychiatry Policy.  *See* ECF No. 8095, at 47-48.  And the fact that

7  this Court, on December 14, 2023, directed the parties to engage in further meet-and-

8  confer sessions about the Telemental Health Policy, and directed the Special Master to

9  develop a proposed new policy, only further reinforces the idea that the parties' questions

10  and concerns have *not* been resolved.  *See* Dec. 15, 2023 Order, ECF No. 8087.  The

11  Special Master's finding that the "defendants issued the policy prior to resolving plaintiffs'

12  and the Special Master's experts' concerns about the policy" is objectively true, and

13  Defendants have not shown that it is clearly erroneous.

14      Second, Defendants claim that it is inaccurate for the Special Master to say that the

15  current Telemental Health Policy represents a potential " 'facilitation of the replacement of

16  on-site services for EOPs,' " because "CDCR has never indicated that it would stop on-site

17  recruitment."  ECF No. 8108, at 7 (quoting ECF No. 8095, at 48).  But just because CDCR

18  has never explicitly said that it would stop recruiting on-site mental health professionals

19  does not mean that the Special Master cannot express concern that the Telemental Health

20  Policy, as currently constituted, potentially allows for that outcome.  The Special Master

21  noted how the current Telemental Health Policy does not contain many of the safeguards

22  that were included in the court-approved Telepsychiatry Policy, including stronger

23  language guarding against the use of telemental health at higher levels of care, calls for

24  more frequent site visits by tele-PCs, and a requirement for CDCR to continue recruiting

25  on-site PCs.  ECF No. 8095, at 48. It is a reasonable inference for the Special Master and

26  his experts to make that these policies have the potential to "facilitat[e] the replacement of

27  on-site services for EOPs."  Describing that concern—which Plaintiffs share—is not clear

28

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

1  error.[2]

2  **E.    This Court has Already Rejected Defendants' Objection Concerning the
        Special Master's Methodology**

3

4       Defendants next object to the Report's use of terms such as "adequate," "marginally

5  or minimally adequate," "inadequate," "compliant," or "non-compliant," with respect to

6  various Program Guide requirements.  ECF No. 8108, at 7-10.  According to Defendants, it

7  was necessary for the Special Master to include "clear definitions" of these terms, in

8  addition to "detailed information regarding the methodology or criteria the Special Master

9  used to make these determinations."  *Id.*  But as the Special Master correctly notes, this

10 Court has already rejected this objection.  *See* ECF No. 8095, at 23 ("In response to similar

11 objections to the Twenty-Ninth Round Monitoring Report, the Court found '[t]he words

12 "adequate" and "inadequate" are clear on their face, and [the Twenty-Ninth Round

13 Monitoring] Report Part D clearly states that marginally adequate care means there were

14 concerns about the care of the patient that bordered on inadequacy.'  Further, the Court

15 noted that the Special Master had used the phrase 'marginally adequate' in prior reports

16 without objections from defendants." (quoting Apr. 13, 2023 Order, ECF No. 7808, at 9-

17 10)).  This objection is therefore foreclosed.

18      But even if it were not, Defendants' objection is baseless.  Defendants claim that the

19 Special Master's Report is "internally inconsistent" because it gave certain examples to

20 describe care that was "marginally or minimally adequate" (e.g., "absence of required

21 IDTT meetings, failure to provide treatment hours or required clinical contacts, little

22 evidence of adequate clinical interventions beyond medications") while offering similar

23 examples to describe care that was deemed "inadequate."  ECF No. 8108, at 7-8.  But

24 Defendants fail to acknowledge the obvious:  The difference between "minimally

25

26 ─────────────────────
   [2] Defendants' failure to previously object to this language in their November 1, 2023,
27 comments on the draft version of the Report presents an additional basis to overrule this
   objection. *See* Ex. A to Special Master's Thirtieth Round Monitoring Rprt. – Part C, ECF
28 No. 8095-1 at 6-7 (describing concerns about the Special Master's discussion of the
   Telemental Health Policy but not objecting to this language); *see also* ECF No. 640 at 8.

1   adequate" and "inadequate" can often simply be a matter of degree; both descriptions will

2   cover the same criteria, but care that is "inadequate" will necessarily have more

3   deficiencies in number, degree, or comparative scope than care that is "minimally

4   adequate."  Defendants argue that additional "information regarding the methodology or

5   criteria the Special Master used" is "necessary for CDCR to improve care and determine if

6   detailed objections are needed."  *Id.* at 7-9.  Yet, the Special Master gives Defendants, in

7   Appendix C to his Report, a copy of all 302 clinical case reviews, including information

8   regarding the team's findings (inadequate v. minimally adequate v. appropriate), as well as

9   detailed reasons for each finding in every case.  *See* ECF No. 8095, at 739-1115.  For

10  Defendants to say that they cannot use this bevy of information to improve care is

11  disingenuous.

12        The Department of Justice memorandum to which Defendants cite also does not

13  support their contention that these terms are insufficiently clear.  That document is a

14  directive issued by the Attorney General to heads of the civil divisions of U.S. Attorney

15  offices and its Civil Rights Division, with a recommendation to create a standardized set of

16  assessments *across monitors in different jurisdictions*, in order to increase the consistency

17  of DOJ monitor assessments across jurisdictions.  *See* Attorney General Merrick Garland,

18  *Memorandum for Heads of Civil Litigating Components United States Attorneys re Review*

19  *of the Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving*

20  *State and Local Governmental Entities*, at 6 (September 13, 2021) (last visited Feb. 1,

21  2024), *available at*

22  https://www.justice.gov/d9/pages/attachments/2021/09/13/review_of_the_use_of_monitors

23  _in_civil_settlement_agreements_and_consent_decrees_involving_state_and_local_govern

24  ment.pdf.  It has no relevance here, where the same Special Master has been consistently

25  monitoring the same single system, using the same methods, for decades.  And nowhere in

26  the memorandum does it say that monitors cannot or should not rely on the kind of

27  qualitative assessments at issue here.  The Special Master's experts are utilizing their

28  extensive clinical judgment and professional expertise to assess the adequacy and safety of

1  clinical care provided to individual patients.  These kinds of clinical reviews of medical

2  records are a well-established research method and an important source of information

3  about the quality of clinical care in many settings.  *See, e.g.*, Caoimhe Madden et al.,

4  *Potential Value of Patient Record Review to Assess and Improve Patient Safety in General*

5  *Practice: A Systemic Review*, 24(1) Eur. J. Gen. Pract., at 193 (2018), *available at*

6  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6104614/ (noting that "patient record

7  reviews (PRRs) … allow corrective, systematic improvements to be taken, which may help

8  to prevent the patient from future harm," and explaining that "PRRs have been widely used

9  within hospital settings and have been identified as a promising measure of safety in

10 general practice").  Notably, Defendants do not take issue with any of the 302 clinical case

11 reviews that they have been provided.

12      Finally, Defendants' complaints about sample size fall flat.  As always, the Special

13 Master's diligent factual findings are based on documents provided by Defendants and on-

14 site inspections attended at all times by Defendants.  Those inspections consisted of

15 extensive record reviews, treatment observations, and staff and patient interviews

16 conducted in conjunction with Defendants' staff and in reliance on Defendants' own

17 documents.  While Defendants claim certain findings are "conclusory" (ECF No. 8108, at

18 9), they cite only to statements from the Report's high-level summary section—ignoring

19 both the Report's extremely detailed institution-level findings (ECF No. 8095, at 145-738)

20 and the hundreds of pages of clinical case reviews (*id*. at 739-1115).  There is nothing

21 "conclusory" about the Special Master's Report.  And any complaints about a supposed

22 mismatch between the sample sizes in the Report and those being discussed in the data

23 remediation process can and should be addressed in that forum—they do not form a basis

24 for an objection to the Report itself.  *See* ECF No. 8108, at 9-10.  In sum, Defendants'

25 regurgitated objections to the Special Master's purportedly unclear methodologies remain

26 unfounded, and this Court should again dismiss them out of hand.

27      **F.    Defendants' MAPIP Objections Lack Merit**

28      Defendants object to the Special Master's discussion of a 90% compliance

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S
THIRTIETH ROUND MONITORING REPORT

1    threshold with respect to CDCR's Medication Administration Process Improvement

2    Program ("MAPIP") because it purportedly does not match how CCHCS reports on

3    medication management.  ECF No. 8108, at 10-11.  Those kinds of complaints belong in

4    the data remediation discussion, not in objections to the Special Master's Report, particu-

5    larly where the Special Master's monitoring has been consistent on this point for years,

6    with no objections from Defendants.  *See, e.g.,* Special Master's Twenty-Ninth Round

7    Monitoring Rprt. – Part C, ECF No. 7715, at 111; Special Master's Twenty-Ninth Round

8    Monitoring Rprt. – Part D, ECF No. 7716, at 65; Special Master's Twenty-Eighth Round

9    Monitoring Rprt., ECF No. 7074, at 127; *see also* Defs.' Objs. to Special Master's Twenty-

10   Ninth Monitoring Rprt. – Parts C and D, ECF No. 7733 (not objecting to use of 90%

11   compliance threshold); Defs.' Objs. to Special Master's Monitoring Rprt., ECF No. 7082

12   (same).  Indeed, Defendants implicitly acknowledge that their objection is foreclosed by

13   agreeing that this Court has already "deferred the issue of compliance thresholds for the

14   provisionally approved key indicators, including MAPIP measures" to the data remedia-

15   tion process.  ECF No. 8108, at 10 n.8; *see also* ECF No. 8095, at 24.  This objection, too,

16   is baseless.

17       **G.    Defendants' Stray Objections Regarding Structured Treatment Data
              and MHCB Timeframes Are Unfounded**

18

19       Defendants object to the Special Master's statement highlighting a concern about

20   the potential inaccuracy of scheduled structured activity data, after the Special Master

21   noted that when EOP patients moved to different housing units, they were scheduled for

22   the new housing unit's group activities without being removed from the schedule of their

23   former housing unit's groups, "potentially inflating offered hours." ECF No. 8095, at 282-

24   83; *see also* ECF No. 8108, at 11-12. In response to Defendants' objections to the Draft

25   Report, the Special Master had already softened the language in his final Report, from

26   stating that this issue "presumably inflat[es] offered hours" to noting it "potentially

27   inflat[es] offered hours." ECF No. 8095, at 25. Defendants still assert that the Special

28   Master misunderstands how "offered hours" are calculated, even though the Special

Master cited instances in which the regional mental health team found patients who had been scheduled for up to 50 hours of structured treatment activity. *Id.* at 25 n.10. Whatever the case, Defendants concede that this issue, too, will be rectified during the data remediation process. ECF No. 8108, at 11-12. It most certainly does not rise to the level of clear error.

Defendants also object to the Special Master's statement that the "Program Guide provides for a clinical stay up to ten days in the MHCB" and to ensuing paragraphs that they claim "report on compliance with this alleged requirement." ECF No. 8108, at 12 (quoting ECF No. 8095, at 98). While Defendants are correct that the Program Guide allows for a stay longer than ten days with approval from the Chief of Mental Health, or designee, that does not mean that the Special Master committed clear error. Nowhere in the Special Master's description of the average clinical length of stay in MHCBs for each institution does he say that CDCR is not "compliant" with the Program Guide. The Special Master certainly can, and should, provide data to this Court regarding the average length of stay in MHCBs by institution, and routinely does so in his monitoring reports. *See, e.g.,* Special Master's Twenty-Ninth Round Monitoring Rprt. – Part C, ECF No. 7715, at 130; Special Master's Twenty-Ninth Round Monitoring Rprt. – Part D, ECF No. 7716, at 75-76; Special Master's Twenty-Eighth Round Monitoring Rprt., ECF No. 7074, at 149. Even if stays longer than ten days are permitted on a limited basis, the fact that five EOP institutions reported *average* lengths of stay longer than ten days indicates that there may be reasons, apart from reasoned medical judgment, that Defendants are not appropriately and timely moving patients into higher levels of care. As the Special Master noted, Defendants asserted this identical objection to his Twenty-Ninth Monitoring Round Report – and this Court rejected it. ECF No. 8095, at 28 (citing Apr. 13, 2023 Order, ECF No. 7808, at 9). The reporting of average MHCB stays is helpful, perfectly reasonable, and certainly not clearly erroneous. The Court should deny this objection.

1
2

**H.    Defendants' Request For an Order Requiring the Special Master to Use Their Data Is Inappropriate and Premature**

3    Lastly, Defendants object that the Special Master has not "used any of the 70

4    indicators remediated by his data expert as part of his monitoring." ECF No. 8108, at 12.

5    The Special Master had already responded to this identical objection made to his draft

6    Report, indicating that he "expects Defendants to provide remediated data derived from the

7    provisionally approved key indicators upon conclusion of the data remediation process."

8    ECF No. 8095, at 31. The Special Master's response was sufficient, as the data

9    remediation process remains ongoing.  Defendants nonetheless "request that the Court

10   direct the Special Master to use the remediated data and on-site audits, including sample

11   size, audit questions, and scoring, in all future monitoring."  ECF No. 8108, at 12.  If

12   Defendants seek court action, they must file a noticed motion instead of burying requests

13   for relief in random pleadings.  *See* Dec. 24, 2020 Order, ECF No. 7003.  This "objection"

14   ignores established procedure and should be ignored.

**CONCLUSION**

15
16   For the reasons discussed above, Defendants' objections are meritless.  Plaintiffs

17   urge the Court to adopt the Report in full.

**CERTIFICATION**

18
19   Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

20   filing: ECF Nos. 640, 4361, 4539, 5477, 5711, 6750, 7003, 7229, 7808, 8031, and 8087.

21

22   DATED:  February 1, 2024          Respectfully submitted,

23                                     ROSEN BIEN GALVAN & GRUNFELD LLP

24
25                                     By:  */s/ Jared Miller*
                                            Jared Miller

26
27                                     Attorneys for Plaintiffs

28

[4426770.7]

Case No. 2:90-CV-00520-KJM-DB

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART C OF THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT