1

ORIGINAL

1      UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF CALIFORNIA

3      BEFORE THE HONORABLE
       KIMBERLY J. MUELLER, MAGISTRATE JUDGE PRESIDING

4      _____

5  RALPH COLEMAN, et al.,          )  Case No. 2:90-cv-0520-KJM-DB
                                    )
6  Plaintiffs,                      )  Videoconference Hearing
                                    )
7              v.                   )  Wednesday, February 7, 2024
                                    )
8  GAVIN NEWSOM, et al.,            )
                                    )
9  Defendants.                      )
                                    )
10 _____

11            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                  Pages 1 through 22

13

14

15

16

17

18

19

20
       _____
21 OFFICIAL REPORTER:        Abigail R. Torres, CSR, RPR/RMR, FCRR
                             CSR No. 13700
22                           United States District Court
                             Eastern District of California
23                           501 I Street, Suite 4-100
                             Sacramento, California 95814
24

   *Proceedings recorded by mechanical stenography.  Transcript*
25 *produced by computer-aided transcription.*

**APPEARANCES:**

For the Plaintiffs:    ROSEN, BIEN, GALVAN & GRUNFELD
                       101 Mission Street
                       Sixth Floor
                       San Francisco, California 94105
                       By:  MICHAEL BIEN, ESQ.
                       By:  JENNY SNAY YELIN, ESQ.
                       By:  AMY XU, ESQ.


For the Defendants:    HANSON BRIDGETT, LLP
                       1676 N. California Boulevard
                       Suite 620
                       Walnut Creek, California 94596
                       By:  PAUL B. MELLO, ESQ.
                            -oOo-
                       HANSON BRIDGETT, LLP
                       425 Market Street
                       Suite 2600
                       San Francisco, California 94105
                       By:  LAWRENCE MICHAEL CIRELLI, ESQ.
                            -oOo-
                       CALIFORNIA DEPARTMENT OF JUSTICE
                       OFFICE OF THE ATTORNEY GENERAL
                       1300 I Street
                       Suite 125
                       Sacramento, California 94244
                       BY:  ELISE OWENS THORN, ESQ.
                            -oOo-
                       CALIFORNIA DEPARTMENT OF JUSTICE
                       OFFICE OF THE ATTORNEY GENERAL
                       455 Golden Gate Avenue
                       Suite 11000
                       San Francisco, California 94102
                       BY:  DAMON GRANT McCLAIN, ESQ.
                       BY:  NAMRATA KOTWANI, ESQ.

1    **SACRAMENTO, CALIFORNIA; WEDNESDAY, FEBRUARY 7, 2024; 10:04 A.M.**

2                              -oOo-

3           THE CLERK:  Calling Civil Case 90-520, *Coleman, et*

4    *al., v. Newsom, et al.*

5           This is on for a videoconference hearing.

6           THE COURT:  All right.  Good morning.

7           Appearances, please, let's start with lead counsel for

8    Plaintiffs.

9           MR. BIEN:  Good morning, Your Honor.

10          Michael Bien, Jenny Yelin, and Amy Xu for Rosen, Bien,

11   Galvan & Grunfeld, Plaintiffs' counsel.

12          THE COURT:  All right.  Good morning to all of you.

13          And for the Defense.

14          MR. MELLO:  Good morning, Your Honor.

15          Paul Mello and Lawrence Cirelli from

16   Hanson & Bridgett, along with Damon McClain, Elise Thorn, and

17   Namrata Kotwani from the AG's office.  And I apologize up

18   front.  I woke up with a cold and a bad voice, so if the court

19   reporter or Your Honor or opposing counsel has issues, please

20   let me know.  I'm literally trying to scream into the camera

21   right now.  So my apologies, Your Honor.

22          THE COURT:  All right.  No worries.  The Court

23   understands what that can be like.

24          All right.  So I had given the parties a few questions

25   to address, but I wanted to start with a few other threshold

1    questions.  As I'm looking at the stipulation and order, Docket

2    7392, December 9th of 2021, this is approving the plan and the

3    parties' stipulation.

4           I just wanted to make -- my understanding, I gather

5    that no one thinks the disputed resolution process is

6    implicated by the current posture.  The disputed resolution

7    process provides that if Plaintiffs believe Defendants are

8    violating the terms of the stipulation, then Plaintiffs provide

9    notice, reasonable period negotiations.

10          No one thinks that stipulation is triggered by what's

11    currently before the Court in the form of the Defendants'

12    objections.

13          Is that right, Mr. Bien?

14          MR. BIEN:  We -- we agree, Your Honor, that this is

15    not the kind of dispute that was contemplated by paragraph 12,

16    because it concerns an issue that is beyond the scope of those

17    issues.  In other words, the CQIT -- whether or not the special

18    master is going to make a recommendation in CQIT is part of

19    this Court's order and everyone understood that when we agreed

20    to proceed with the installation of the TTMs and Defendants'

21    policies.  And there's no surprise here -- there's no dispute

22    that that would go into that process.

23          THE COURT:  All right.  Agreed, Mr. Mello?

24          MR. MELLO:  I agree that the dispute resolution is not

25    triggered regarding this dispute.  I completely disagree with

1    everything else that was just said.

2            THE COURT:  Understood.  So in terms of one

3    observation the Plaintiffs make -- or argument they make in

4    their opposition to the Defense Motion A, do the Defendants

5    agree it's the Defendants that have the burden of proving clear

6    error to persuade the Court to not adopt the special master's

7    recommendation here?

8            Mr. Mello?

9            MR. MELLO:  Your Honor, the order of reference, I

10   think may have been lost in, I think, over time.  But the order

11   of reference says that the findings of fact of the special

12   master are subject to review for clear error, not

13   recommendations of the special master.

14           THE COURT:  That's fair.

15           Mr. Bien.

16           MR. BIEN:  I think that there is -- I agree that there

17   is a distinction between findings of fact and recommendation,

18   in terms of your view.  I think there's still clear error as to

19   the findings of fact and the necessary -- the necessity for

20   this and the history of violations of class members' rights in

21   these units and the need for it.  Those are factual findings.

22           The -- the specific recommendation the Court can

23   review, maybe give deference to recommendation, obviously, but

24   it's not clear error.

25           MR. MELLO:  Your Honor, if I may?

1          THE COURT:  Notwithstanding -- I mean, the Plaintiffs

2    go on to cite the Court's May 2023 order.  But are you making a

3    distinction here now?  So acknowledged, Mr. Mello, and what

4    more do you want me to know on that point?

5          MR. MELLO:  No.  I'm just pointing the Court to

6    page 8, lines, you know, 14 through 20 of the order of

7    reference.  It ends with "the Court shall accept the special

8    master's findings of fact, unless they are clearly within this

9    period."

10          Earlier in that same paragraph it talks about the

11   difference between findings of fact, any recommendations.  And

12   Mr. Bien's reading of that paragraph, if there's a finding of

13   fact, it would swallow up any recommendation and make them be

14   subject to the same standard, when the order of reference is

15   quite clear on its face.

16          THE COURT:  All right.  Well, if you want to say more

17   about that, you can in any further argument when I give you

18   that opportunity.

19          Mr. Bien, or whoever else might cover this point, just

20   help me understand the defense argument made in reply that the

21   Court has never found the use of TTMs, recognizing your -- your

22   rephrasing of the TTMs as cages.

23          The Court has never found the use of TTMs as

24   constitutionally harmful such that it requires remedy here.

25   The Court has never made such a finding.

1          Do you concede that?

2          MR. BIEN:  Yes, Your Honor.  We concede that the TTMs

3    have never been specifically addressed by the Court, but

4    this -- that is not what is driving the constitutional

5    violation here.

6          The constitutional violation is the interference with

7    the ability of clinicians to deliver mental health care in

8    inpatient psychiatric units due to the excessive use of max

9    custody status and inability of Defendants to figure out how to

10   remove it.

11         You know, there's -- it's imposed as a blanket, the

12   Court and the special master found.  In other words, everyone

13   who came from segregation units were deemed max custody, even

14   if they had been in segregation for safety reasons.  There was

15   no good way of removing it.  It was removed.  It look a long

16   time.  There's no urgency to remove it.  And the result was

17   that patients were denied any kind of treatment.  Patients

18   frequently were locked in their rooms.  Only had cell-front

19   treatment, and so it wasn't just cages.  The earlier reports,

20   the special master dealt with cuffing as a result of max

21   custody in these inpatient units.

22         So we agreed to this stipulation to -- in celebration

23   of a positive move by Defendants to address this underlying

24   barrier to delivering mental health care in these units by

25   addressing this restriction, making it more timely, and

1   appropriate for inpatient unit, having ways of getting it

2   removed and reviewed so that the -- the cages or TTMs are

3   only -- are the by-product of a policy.

4          And we have left that out of the stipulation.  They're

5   not addressed.  The parties expressly don't address whether

6   TTMs are constitutional or unconstitutional.  But we found a

7   way -- that's what the settlement is about -- to allow the

8   positive program to go forward.

9          And, by the way, as far as we can see, it has improved

10  the situation.  There's obviously more that needs to be done

11  with staffing and other things, but this is a positive step.

12  And, you know -- and I think -- so, yes, there are not specific

13  findings about TTMs, but there are specific findings in many

14  instances about custodial interference with mental health care,

15  in inpatient psychiatric units.

16         Of course, they were not CCR units until lifted shift.

17  But since then, there have been multiple findings about -- the

18  deficiencies in these units and the ongoing constitutional

19  violations, including the max custody as a major barrier.

20         So there's no lack of constitutional findings to

21  support the remedy that was agreed to here.

22         THE COURT:  Mr. Mello, two points.  One, why is that

23  broader framing not fair -- not fair, given the totality of the

24  record before the Court?  And then a second question, just

25  looking at the parties' stipulation, CQIT indicators weren't

1   excluded expressly in the stipulation.  Right?

2          MR. MELLO:  No.  I think timing is important on the

3   CQIT indicators.  Right.  There were subsequent orders that

4   indicated that CQIT would be -- would measure the key

5   components of the Coleman Eighth Amendment remedy, but I feel

6   like -- a little bit like if it was in a deposition, I'd ask to

7   go back and have the question reread to me because I lost it in

8   Mr. Bien's response.

9          But I think --

10         THE COURT:  Well, I think the -- the point is it's not

11  just about -- there may not have been specific findings about

12  TTMs, but there's a broader -- there have been findings.

13  There's a clear record with respect to conditions in the PIPs

14  max custody.  That that's the broader framing that the Court

15  should be focused on here, not just whether or not it's made a

16  pinpoint finding about TTMs.

17         MR. MELLO:  So, again, that swallows -- that makes

18  everything a potential key competent of an Eighth Amendment

19  violation, and it's not permitted.  The reality is in answering

20  your question, there are no findings regarding the use of TTMs.

21  TTMs have been used for over a decade.  The special masters

22  reported on the use of TTMs in segregation for years.

23         The orders adopting those findings tacitly approved

24  the use of TTMs, and TTMs specs are specifically part of the

25  compendium.  They're -- included in the compendium is the specs

1    that must be used for use of TTMs.  But, again, there's no

2    finding that they're unconstitutional, and we're losing the

3    real issue here.

4         The crux of this dispute is Defendants entered into an

5    agreement.  An agreement that was based upon their

6    understanding that this classification memo would not become

7    part of the Coleman Eighth Amendment remedy.  That's what they

8    bargained for.

9         So the Court is really left with two things.  One,

10   either honoring Defendants' specific intent or recognizing

11   clearly there was no meeting of the minds.  And, therefore, the

12   stipulation has to go away pursuant to pure contract law.

13        Either you honor -- either the Court honors

14   Defendants' intent or it has to do away with the stipulation,

15   because there was no meeting of the minds.  But it --

16        THE COURT:  I understand that argument.

17        MR. MELLO:  I'm sorry.  May I continue?  I don't want

18   to step on Your Honor.

19        THE COURT:  Yes.

20        MR. MELLO:  Accordingly, Your Honor, the TTM

21   stipulation was about the TTMs.  But Defendants do not dispute

22   that the special master will continue to monitor the care

23   provided and received by patients in the PIPs, including those

24   patients who were on max custody classification.

25        There's various items in data remediation in that

1  CQIT -- I could list them for this Court -- that identify all

2  the ways that the special master can monitor that actual care

3  received by patients in the PIPs.  So that will continue.

4        In addition, this Court has issued an order about

5  minimum treatment standards in the PIPs or truth in ours.  That

6  same order will presumably be monitored by -- or that policy

7  will be monitored by the special master -- special master --

8  pardon me, Your Honor -- special master's team.

9        So the care will continue to be monitored.  And

10 Defendants implored the Court not to do violence to an

11 agreement that they thought they reached with Plaintiffs'

12 counsel.  And if -- if that agreement is not going to be

13 honored, then there's no meeting of the minds, and there's

14 nothing to be -- that doesn't mean that the Court -- that the

15 Court and the special master doesn't have the means to monitor

16 actual care being received in the PIPs, including by those

17 patients who are on max custody classification status.

18       And I'm waning, so I'm going to go on mute so I can

19 take a drink, Your Honor, and I appreciate the opportunity to

20 speak.

21       THE COURT:  I do have more questions.  I want to more

22 fully understand the Defense position in response to

23 Plaintiffs' argument that there's no other reliable source of

24 information regarding max custody usage for Coleman class

25 members.

1         Plaintiffs say that there's an older order that is no

2    longer useful and so argue that the only way to ensure

3    information is collected and provides transparency is through

4    the Court's approval of the special master's recommendation.

5         Just -- I'm just testing the Defense position here.

6    What if the Court approved the special master's recommendation

7    that -- with the direction there would be an asterisk by the

8    indicators to which Defense now objects?

9         The Defense is committed to providing information

10   based on the TTM stipulation.  The two years hasn't run yet.  I

11   think it runs in September, if I understand correctly.  If

12   there were an asterisk just preserving the Defense position and

13   the information we're collecting, does that sufficiently

14   address the -- the Defendants' concern?

15        MR. MELLO:  I don't think it does.  The parties

16   entered into an agreement that provides for information and it

17   provides for a meet-and-confer for the continuing of

18   information.

19        I think if we go back to the order of reference, the

20   order of reference says that the special master will monitor --

21   help facilitate development of the remedy and monitor clients

22   with the Coleman Eighth Amendment remedy.

23        Here, you would be monitoring a classification policy,

24   a classification policy that is by its terms not a portion of

25   the Coleman Eighth Amendment remedy.  And so, therefore, that

 1   asterisk doesn't help.  It doesn't solve the underlying

 2   foundational issue, which is, the parties entered into an

 3   agreement or they didn't and then there's nothing to monitor,

 4   or that special master is only supposed to monitor aspects of

 5   the Eighth Amendment remedy, and classification is not one of

 6   them, specially when one layers on the fact that there's all

 7   these other means to evaluate whether PIP patients are

 8   receiving care, including PIP patients on max custody status.

 9            Thank you, Your Honor.  I hope --

10            THE COURT:  What specifically is your response to the

11   Plaintiffs' argument that they could not have been aware in

12   2021 that the information provided by Defendants, upon which

13   they had historically relied, was unreliable and would not be

14   remediated?

15            MR. MELLO:  So do I have a specific response?  We

16   currently spend hundreds of hours, thousands of hours on data

17   remediation -- the parties.  There are multiple means for

18   Plaintiffs' counsel to receive information.

19            The Defendants have been subject to monitoring and

20   oversight by the special master for 28 and a half years.  There

21   are various vehicles.  We are not in the same place that we

22   were in 2020.  And I think harking back to earlier times, the

23   lack of transparency doesn't seem fair in today's world when we

24   literally spend hundreds of hours on transparency and data

25   remediation.

1        THE COURT:  Mr. Bien, on that point, help me

2   understand the Plaintiffs' position.  Mr. Mello is saying,

3   "Well, there is some information collected, even if not through

4   the exact proposed indicator."  Just help me understand how big

5   the gap is.  And why -- why the proposed indicator --

6   indicators are needed to fill that gap?

7        MR. BIEN:  The gap is that me and the special master

8   have identified and -- by the way, and the Defendants -- the

9   Defendants have identified the max custody status and its

10  failure to be removed probably and the failure to be addressed

11  in the clinical process as an ongoing obstacle and cause of the

12  ongoing constitutional violations in these units.

13        The -- we need to have a means of monitoring whether

14  or not Defendants are -- are taking the measures that we agreed

15  to, to -- and they agreed to, to review and promptly remove max

16  custody because without removing max custody, they can't

17  deliver treatment.

18        So if we just pretend -- if we're just measuring

19  treatment -- we know that this is the obstacle to treatment --

20  then we're going to be right back where we started.  We haven't

21  achieved anything out of this process.

22        And, again, I disagree with Mr. Mello as to what the

23  parties agreed to.  There's no word in here that says "CQIT

24  indicators."  The Court's approval expressly said what was

25  going to happen; that this issue was going to be referred to

15

1  the special master.  The Defendants appealed, and then

2  dismissed their feel.  They then acted in reliance, knowing

3  what the Court's order was, knowing what the special master was

4  charged with, installed the cages, cooperated with their

5  program and moved along with the process.

6       It's -- to say now that they were surprised when, in

7  fact, the Court's order approving the stipulation expressly

8  stated what was going to happen, that she was referring it to

9  the -- that you were referring it to the special master for

10  his -- his recommendations, there's no surprise involved here.

11  It was knowing.  We knew when we negotiated the stipulation

12  this is a federal class action, and that whatever we negotiated

13  has to be presented to the Court for its approval.

14       The Court originally rejected the stipulation.  We

15  went back to the Court.  And, eventually, the Court approved it

16  with conditions.  We all understood what happened.  There's no

17  surprise.  And I don't think there's any confusion.  I mean,

18  it's up to the Court to construe what the parties agreed to.  I

19  disagree with Mr. Mello about what we agreed to.  What we

20  agreed to, it's the words of the document.  It doesn't say what

21  they say it says.  This is an enforceable part of the Coleman

22  remedy and -- be part of the program guide or compendium.

23  That's what we agreed to, because that -- because we were

24  fighting about the program guide and compendium in that period.

25       At the same moment when the Court approved this, the

1    Court acknowledged that that whole process of updates and

2    program guide and compendium had been a failure, I think was a

3    quote from the Court, and that you're moving away from that,

4    which I think we all agreed to.

5         So that is what we were talking about when we said

6    it's not part of the program guide or compendium.  I didn't

7    mean it wasn't part of the remedy.  We wouldn't have agreed to

8    something this important and allow cages to come into this

9    treatment unit, which was something that we'd been resisting

10   for a long, long period, without a -- an enforceable,

11   monitorable remedy.

12        Again, there's no words here about limiting the power

13   of the special master, and the parties knew that we had invoked

14   power of the special master, his monitoring recommendations.

15   This is -- you know, and, again, the Defendants got the benefit

16   of the bargain.  We allowed them to move forward without

17   litigation.  It was something that they wanted to do that we,

18   you know, had seen as anathema, using treatment modules for

19   psychiatric care, specially in inpatient psychiatric hospitals.

20        So, you know, we agreed to defer that dispute and

21   allow them to move forward and -- with the modules, as long as

22   they agreed to a process that was going to limit the number of

23   people that went into them and to reduce the amount of time

24   that each patient had to spend there, and that the clinicians

25   and the custody would be devoted to directing their treatment

1  to those behaviors that were keeping the person, you know,

2  restricted from treatment.

3         So we thought those were important things.  I don't

4  really know what the problem here is.  Everyone seemed to

5  agree -- Defendants and their staff, clinical and custody --

6  that this was an important part of moving forward in solving an

7  important problem that was standing in the way of

8  constitutional care in these units.  I still don't understand

9  what the problem is.  This is an important issue.  We need to

10  address it.  Defendant --

11         THE COURT:  That's why I'm here, to make certain I'm

12  clear on what's going on.  So I'll allow any wrap-up argument

13  now.  I think we've covered the issues that surfaced in my

14  order on February 2nd.

15         Mr. Mello, you could -- you could go next, then

16  Mr. Bien.  And then I'll let you know if I need to hear

17  anything more.  Perhaps, Mr. Mello, you can clarify, if you

18  think you haven't already, how the Defendants would demonstrate

19  to the Court their meeting of the Eighth Amendment obligations

20  to these class members, if they remain a part of the class.

21         And then for each of you -- I mean, I do remember this

22  as a positive development, the fact that the parties were able

23  to reach a stipulation, so the other issue -- I served this in

24  my order is -- I mean, is it just for me to decide now?  Or

25  even if the dispute resolution process isn't triggered by the

1   stipulation itself, should I -- should I give you some time?

2   Should I send you to -- to some kind of neutral to try to, you

3   know, keep the focus on the positive aspects of this

4   stipulation and just solve this in a pragmatic way?

5           Judge Newman is no longer available to the Court after

6   today, but I can find another Court-approved mediator, if that

7   might -- might help.  Otherwise, I'm prepared to do my job.

8           So, Mr. Mello, you first, any wrap-up, including

9   covering the issues I just underscored.

10          MR. MELLO:  Yes.  So -- and I admit -- and I'm

11   starting to fade, Your Honor, so I apologize if I --

12          THE COURT:  Do you want to -- do you want to yield to

13   someone else?

14          MR. MELLO:  No, no, no.  So I would say that -- I

15   don't need to repeat myself as to our position that there was

16   an agreement -- and if there wasn't an agreement, if Mr. Bien

17   says we're wrong, then there wasn't an agreement.  There's

18   nothing to enforce.

19          There's no remedy -- Coleman Eighth Amendment remedy

20   with respect to TTMs.  There's no order prohibiting them.  In

21   fact, TTMs have been monitored and used for years.  And Your

22   Honor's questions, of course, we believe that patients in the

23   PIPs, including max custody patients, are class members, so the

24   Question two, A, is not applicable.  Question three, I think

25   we've spoken to.

1         You also asked, are the parties prepared to address

2    whether -- or other issues presented in Defendants' motion can

3    be resolved without setting aside the stipulation and

4    precipitating further litigation?  I also teed up -- or saw

5    that that was a question Your Honor asked.  I think that to the

6    point you raised, now I'm remembering about, would going to a

7    neutral help, I don't have any client authority on that, so I

8    can't speak to that issue right now.  But my gut tells me, no,

9    this issue should be decided.  But, again, I don't have any

10   client authority to take that position.

11        Number 2, I believe that the stipulation -- if the

12   Court allows the stipulation to continue and the -- granting

13   Plaintiffs' motion that monitoring of this custodial policy not

14   occur and become a key indicator when it has not been

15   adjudicated to be part of the Coleman remedy, an Eighth

16   Amendment violation, I think it's sufficient.  Right?

17        The Court can allow the parties' stipulation to

18   continue.  At the two-year mark, the parties will continue to

19   meet and confer about production of documents, et cetera.  And,

20   most importantly -- I'll close with this -- the special master

21   has multiple means to monitor the care received by patients in

22   the PIPs, including those patients in max custody.  And "oh, by

23   the way, patients on max custody are receiving care."  That's

24   not true.

25        And with that, Your Honor, I think I would submit,

1    unless you have more questions for me.  And I appreciate you

2    and the court reporter putting up with my Kermit the Frog voice

3    today.  Thank you.

4            THE COURT:  All right.  Mr. Bien?

5            MR. BIEN:  I think I agree that -- I'm not sure that

6    there's a purpose to going to negotiation with a neutral.  I'm

7    always open to that, if Defendants -- if there's something they

8    want to talk about.

9            I do notice that I don't really see any reason -- any

10   basis for Defendants' objections.  If they have specific

11   objections to any of the particular indicators, they, sort of,

12   took a home-run position with the special master and with us.

13           And, of course, we're -- we're open to if they have a

14   particular objection to an indicator for some reason other

15   than, you know, they think they didn't agree to, you know,

16   "It's legally improper."  You know, is there something

17   technically wrong with the indicators?  Is it measuring

18   something incorrect?  Of course, we're open to looking at that.

19           They really didn't make any -- I really don't

20   understand -- any reason for their objection other than they

21   feel that there's something unfair about this becoming an

22   indicator.  And -- which, of course, they've expressed, you

23   know, properly in their -- in their briefing and today,

24   Mr. Mello, again.

25           But I do think that it's -- it's for the Court to

1    construe, based on the record before it, what -- what the words

2    mean.  And I -- you know, we are prepared to have -- have the

3    Court decide the issue, at this point.

4            I think it's important to move on from this.  And,

5    again, I don't -- I don't think there's a lack of meeting of

6    the minds.  I think we all knew what we were doing.

7            THE COURT:  All right.  All right.  I have what I

8    need, so the matter is submitted.

9            Thank you very much.  You may sign off.

10           MR. MELLO:  May I ask one question, Your Honor?

11           THE COURT:  All right.

12           MR. MELLO:  Two issues.  One, the Court referenced the

13   motion to strike.  The Defendants think that a motion to strike

14   the reply should be overruled.  The Court asked -- invited

15   Defendants to file a motion.  Normal motion practice says "file

16   the motion and opposition reply," and there was nothing in the

17   order that said you didn't have the right to reply.

18           And so we think the motion to strike should be denied.

19   And then if I may -- and I'll just say it.  Defendants -- I

20   believe, the issue of the tours has been submitted.  Defendants

21   have been enjoined from tours since the third week of July,

22   which is, I believe, six and a half months.  And we would like

23   for those -- a ruling issued and Defendants' experts to be

24   allowed to tour their facilities.

25           And I appreciate you allowing me to speak to both of

 1    those issues, Your Honor.  Thank you.

 2         THE COURT:  All right.  I didn't calendar this for

 3    general status.  The Court has quite a bit before it in this

 4    case and otherwise.  I am aware of what's pending before me.

 5    Because the door was opened to -- for housekeeping, and just so

 6    it's clear, I'm going to consider the reply.  I'm not granting

 7    the motion to strike.

 8         So, Mr. Bien, anything other, in terms of general

 9    status, you want me to know?

10         MR. BIEN:  No, Your Honor.  There's, obviously, a lot

11    of things on our -- on your plate and on our plates, and --

12    we're -- we appreciate how much the Court is devoting to our

13    litigation.

14         THE COURT:  All right.  All right.

15         Thank you, again.  The matter is submitted.  You may

16    sign off.

17         MR. MELLO:  Thank you, Your Honor.

18         (The proceedings were adjourned at 10:36 a.m.)

19              **C E R T I F I C A T E**

20         I, Abigail R. Torres, certify that I am a duly
      qualified and acting Official Court Reporter for the United
21    States District Court; that the foregoing is a true and
      accurate transcript of the proceedings as taken by me in the
22    above-entitled matter on February 7, 2024; and that the format
      used complies with the rules and requirements of the United
23    States Judicial Conference.
      DATED:  February 9th, 2024, San Diego
24    /S/ABIGAIL R. TORRES
      _____
25    U.S. Official Court Reporter