ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: 925-746-8460
FACSIMILE: 925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>    Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S REQUEST FOR ADDITIONAL STAFF AND INCREASED COMPENSATION**<br><br>Judge:  Hon. Kimberly J. Mueller |

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | ARGUMENT | 2 |
| | A. After 28 Years and Continuous Growth of the Special Mastership, the Special Master's Request for Additional Staff Should be Denied Because it Appears Unnecessary and Inconsistent with the Shared Goal of Ending Judicial Oversight. | 3 |
| | B. The Special Master's Request Lacks Safeguards Recommended By the Department of Justice | 8 |
| | C. The Special Master's Comparisons to *Armstrong* and Reference to Defense Experts Have No Bearing on the Request for Additional Staff and Increased Compensation. | 10 |
| III. | CONCLUSION | 11 |

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Armstrong v. Newsom*,
   No. 4:94-cv-02307 (N.D. Cal.), ECF No. 3575-1 (filed Feb. 13, 2024) ................... 5, 6, 10, 11

**Other Authorities**

Fed. R. Civ. P.
   26(b)(4)(E) ............................................................................................................... 11
   53(a)(3) .................................................................................................................... 11

Fed. R. Evid. 702 ............................................................................................................... 11

U.S. Attorney General, *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving State and Local Governmental Entities*, U.S. Department of Justice (September 13, 2021) ....................................... 8

## I.  INTRODUCTION

Since the Court's Order appointing the Special Master in 1995 (ECF No. 639), the State of California has paid the Special Master and his team nearly $120 million to guide the State towards meeting its constitutional obligations and to monitor its mental health policies and procedures.[1] In fiscal years 2021-22 and 2022-23 alone, the State paid the Special Master and his team $9,616,430 and $10,368,719, respectively—more than the total paid by the State in the first eleven years of the Special Mastership.  (Declaration of Nick Weber In Support of Defendants' Response to the Special Master's Request for Additional Staff and Increased Compensation "Weber Decl.," Ex. A at 3 & Ex. B at 11.)  Moreover, the Special Master's team has grown to include thirty court-appointed individuals as of November 2023.  (*See* ECF No. 8091.)  This growth is indicative of a continuous expansion that ignores the direction of the case and Defendants' substantial progress toward a sustainable remedy.

---

[1] *See* ECF Nos. 652, 660, 668, 676, 694, 702, 711, 726, 745, 759, 772, 780, 791, 811, 825, 835, 853, 864, 871, 884, 888, 894, 899, 907, 919, 926, 934, 942, 956, 961, 967, 973, 990, 996, 1004, 1013, 1017, 1020, 1046, 1045, 1050, 1056, 1062, 1067, 1077, 1083, 1100, 1115, 1133, 1138, 1145, 1166, 1173, 1181, 1190, 1202, 1218, 1223, 1226, 1236, 1254, 1259, 1267, 1276, 1277, 1283, 1293, 1302, 1327, 1313, 1321, 1340, 1348, 1358, 1368, 1379, 1385, 1395, 1407, 1427, 1445, 1468, 1482, 1490, 1510, 1513, 1514, 1517, 1523, 1532, 1540, 1543, 1550, 1552, 1555, 1565, 1567, 1569, 1573, 1578, 1592, 1597, 1600, 1606, 1616, 1629, 1631, 1639, 1651, 1655, 1657, 1666, 1670, 1672, 1678, 1696, 1706, 1714, 1725, 1747, 1768, 1782, 1798, 1825, 1839, 1932, 1966, 1987, 2001, 2048, 2106, 2120, 2153, 2164, 2206, 2271, 2295, 2329, 2390, 2400, 2469, 2585, 2622, 2672, 2683, 2749, 2775, 2815, 2831, 2922, 3018, 3131, 3264, 3312, 3403, 3457, 3553, 3562, 3567, 3603, 3625, 3628, 3650, 3672, 3718, 3745, 3757, 3796, 3812, 3826, 3835, 3863, 3868, 3895, 3901, 3925, 3944, 3963, 3968, 3982, 3986, 4001, 4014, 4015, 4036, 4037, 4075, 4091, 4104, 4123, 4128, 4151, 4161, 4173, 4174, 4189, 4202, 4216, 4233, 4248, 4257, 4267, 4270, 4310, 4548, 4554, 4573, 4634, 4648, 4723, 4776, 4802, 4895, 4944, 4960, 5029, 5079, 5109, 5132, 5145, 5168, 5186, 5203, 5221, 5232, 5234, 5239, 5247, 5270, 5280, 5294, 5302, 5302, 5313, 5326, 5332, 5350, 5355, 5370, 5378, 5390, 5408, 5409, 5419, 5434, 5446, 5457, 5472, 5483, 5494, 5507, 5527, 5531, 5561, 5570, 5581, 5604, 5620, 5638, 5652, 5666, 5693, 5722, 5739, 5743, 5767, 5776, 5807, 5823, 5826, 5851, 5859, 5865, 5866, 5877, 5940, 5974, 6020, 6049, 6069, 6077, 6098, 6119, 6141, 6162, 6191, 6227, 6250, 6294, 6382, 6404, 6428, 6458, 6500, 6583, 6683, 6704, 6782, 6805, 6851, 6899, 6927, 6968, 6983, 7034, 7090, 7097, 7140, 7178, 7222, 7321, 7307, 7354, 7379, 7387, 7403, 7446, 7497, 7510, 7547, 7583, 7585, 7603, 7607, 7626, 7658, 7685, 7687, 7707, 7747, 7774, 7814, 7874, 7862, 7896, 7934, 7964, 8030, 8077, 8091, 8125, and 8135.

20522812.1                                   1                      Case No. 2:90-CV-00520- KJM-DB
DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S REQUEST FOR ADDITIONAL STAFF AND INCREASED COMPENSATION

Yet, on February 15, 2024,[2] the Special Master filed a request seeking the appointment of six new permanent staff members—three experts, two monitors and a paralegal—and an increase in rates ranging from 52% for deputies to 18% for paralegals (Special Master's Request). (ECF No. 8130.) According to the Special Master, the additional staff will purportedly replace a retiring expert and monitor, as well as improve the capacity to efficiently and expeditiously perform his duties. (*Id.* at 3, fn. 1.)

Defendants oppose the Special Master's Request on the grounds that hiring more permanent staff is incongruous with the substantial improvements to CDCR's delivery of statewide mental health care over the span of the 28 years of the Special Mastership. Moreover, both requests conflict with U.S. Department of Justice guidance concerning the use of monitors in civil litigation involving state entities.[3] And adding more staff appears on its face to conflict with the shared goal of ending judicial oversight.

Accordingly, the Court should: (1) deny the Special Master's Request for additional staff and increased compensation, and (2) request the Special Master present a plan to reduce the number of team members and set forth short-term and long-term timelines for compliance, consistent with U.S. Department of Justice guidance.

## II.   ARGUMENT

The Special Master maintains there are several reasons that warrant the appointment of additional staff and increased compensation, including his duties involving monitoring compliance with the Program Guide in CDCR institutions, conducting on-site monitoring tours of Defendants' institutions and programs, increased report-writing responsibilities, and the time that has passed since his compensation rates were increased. (ECF No. 8130, Special Master's Request, at 2-3,

---

[2] This request comes at a time amid a projected $38 billion state budget deficit. *See* Governor's Proposed 2024-25 Budget Summary, p. 1, https://ebudget.ca.gov/2024-25/pdf/BudgetSummary/FullBudgetSummary.pdf.

[3] This Court has acknowledged that US DOJ guidance is relevant to issues in this case by inviting the US DOJ to participate in this case "to address serious constitutional violations, mental health staffing levels and suicide prevention, as well as any other issues identified by the court or implicated by this action." (ECF No. 7817, citing ECF No. 7699.)

11-12.)  Defendants recognize that there are numerous time-consuming requirements in *Coleman* that exert significant burdens on the Court, the parties, and the Special Master.  But in light of the 28-year existence of the mastership and the Special Master's insufficient rationale for an increase in compensation rates, the Court should deny this request.

> **A.   After 28 Years and Continuous Growth of the Special Mastership, the Special Master's Request for Additional Staff Should be Denied Because it Appears Unnecessary and Inconsistent with the Shared Goal of Ending Judicial Oversight.**

Since the Court's appointment of the Special Master in December 1995, CDCR's mental health care facilities and the provision of mental health care have been substantially expanded and improved.  CDCR's Mental Health Services Delivery System (MHSDS) no longer resembles the system that was in place in 1990 when this case was filed, or in 1995 when the Special Master was first appointed.  CDCR's budget for the provision of mental healthcare services to the *Coleman* class has substantially increased from approximately $40 million in 1990 to over $650 million in 2023-2024.[4]  CDCR's fiscal year 1992-93 budget contained just 376.6 authorized mental health care positions to serve an incarcerated population of 113,000, whereas this year's budget allocated over 3,200 positions to serve a total incarcerated population of nearly 94,000.[5]

In the December 11, 1995 Order of Reference, the Court appointed a Special Master to assist in the development of a remedial plan and "effectively address[] the constitutional violations set forth in [the Court's September 13, 1995 order]."  (ECF No. 640.)  On January 19, 1996, when the Special Master's team consisted of only J. Michael Keating, Jr., the Court directed the first payment to the Special Master in the amount of $11,868.97.  (ECF No. 652.)  In a February 15, 1996 Order, the Court granted the Special Master's request for an expert and a staff member, which increased the size of the Special Master's team to three people.  (ECF No. 664.)  In a March

---

[4] https://ebudget.ca.gov/budget/2023-24EN/#/ExpendituresPosistions/5225

[5] CDCR's Total Population Report for February 14, 2024, available at https://www.cdcr.ca.gov/research/population-reports-2/; 2023-24 State Budget, Department of Corrections and Rehabilitation, available at https://ebudget.ca.gov/budget/2023-24EN/#/Department/5225; https://lao.ca.gov/analysis/1990/09_corrections_1990.pdf

14, 1996 Order, the Court granted the Special Master's second request for four additional staff (including three Mental Health Experts and one Assistant Special Master), which increased the size of his team to seven members. (ECF No. 670.) In a March 25, 1998 Order, the Special Master's team grew to a total of ten members following the Court's Order granting the Special Master's request to appoint three additional team members (including one Mental Health Expert and two Assistant Special Masters). (ECF No. 924.) Nearly ten years later, as reflected on an invoice included in an October 22, 2007 Order, the Special Master's team had grown to include 21 individuals, which, other than J. Michael Keating Jr., consisted of 6 Mental Health Experts and 14 attorneys/monitors. (ECF No. 2469.) By November 2023, there were a total of 30 members on the Special Master's team. (ECF No. 8091.)

The increase in the members of the Special Master's team over time has been accompanied by a growth in how much Defendants are billed for their services:

| Year | Governor | Special Master Team Fees |
|------|----------|--------------------------|
| 1996 | Pete Wilson | $58,859.85 |
| 1997 | Pete Wilson | $585,423.21 |
| 1998 | Pete Wilson | $1,063,136.79 |
| 1999 | Gray Davis | $825,140.46 |
| 2000 | Gray Davis | $2,020,779.19 |
| 2001 | Gray Davis | $2,015,782.19 |
| 2002 | Gray Davis | $2,193,751.09 |
| 2003 | Gray Davis | $1,811,487.90 |
| 2004 | Arnold Schwarzenegger | $2,099,018.24 |
| 2005 | Arnold Schwarzenegger | $2,407,778.79 |
| 2006 | Arnold Schwarzenegger | $3,056,139.47 |
| 2007 | Arnold Schwarzenegger | $4,482,840.91 |
| 2008 | Arnold Schwarzenegger | $4,645,948.55 |
| 2009 | Arnold Schwarzenegger | $4,462,379.41 |

| Year | Governor | Amount |
|---|---|---|
| 2010 | Arnold Schwarzenegger | **$5,006,891.57** |
| 2011 | Edmund G. Brown | **$4,635,362.80** |
| 2012 | Edmund G. Brown | **$3,764,831.07** |
| 2013 | Edmund G. Brown | **$3,790,176.12** |
| 2014 | Edmund G. Brown | **$5,191,791.39** |
| 2015 | Edmund G. Brown | **$4,975,862.72** |
| 2016 | Edmund G. Brown | **$5,209,352.91** |
| 2017 | Edmund G. Brown | **$4,704,637.85** |
| 2018 | Edmund G. Brown | **$5,767,295.48** |
| 2019 | Gavin Newsom | **$5,431,282.59** |
| 2020 | Gavin Newsom | **$9,537,538.47** |
| 2021 | Gavin Newsom | **$8,916,627.37** |
| 2022 | Gavin Newsom | **$9,616,430.43** |
| 2023 | Gavin Newsom | **$10,368,719.00** |

*See* fn. 1, *supra*; *see also* Weber Decl., Ex. A at 3 & Ex. B at 11. Yet despite these increases over the last 28 years, the Special Master says greater efficiency will be gained by having more staff. (*See* Special Master's Request, ECF No. 8130.)

The Special Master cites several reasons for adding staff: continuing obligations of monitoring compliance, including the supervision of court-ordered meet-and-confers; coordinating with the *Armstrong* court expert and *Plata* receiver; increased report writing; and Defendants' experts tours (which the Court has paused, over Defendants' objection). With the exception of Defendants' tours (discussed below), Defendants do not dispute the Special Master's characterization of his team's workload.

But more work does not mean additional staff are required. The Special Master does not state deadlines are being missed or that members of his team are leaving because of the demands of the monitorship. Increased efficiency, which the Special Master says will be gained with more staff, should always be sought. Yet the Special Master does not identify ways short of adding

more staff that have been considered.[6]

Indeed, there is a reasonable question about how efficiently the current staff are utilized, and whether additional team members are truly needed given the manner in which Special Master team resources are currently deployed. Numerous team members attend meetings together. (*See* Weber Decl., Exhibits, C-G; *see also, e.g.*, ECF Nos. 8038, 8077, 8091, 8125, and 8134.) For instance, over ten team members routinely attend meet and confer discussions. (*See id.*, Exhibits, C-G, *e.g.*, Ex. F (December 2023 bill) at 24-25[7], 34, 37, 40, 43, 46, 48, 49, 52, 55, 60 (numerous team members attending the same meetings on 12/21/23), Ex. G (January 2024 bill) at 16, 17 ("participate in multiple team meetings"), 20-21, 36-37, 39, 41, 43-44, 46, 49-50, 52, 54, 56, 58, 59, 62, 64-65, 67, 71 (referencing team meetings and numerous team members attending the same meetings on 1/10/24 and 1/17/24).) Additionally, the Special Master acknowledges that on average, 6.5 members of the Special Master's team attended approximately 78 data remediation meetings in 2023. (ECF No. 8130 at 4, fn. 8.) It is unclear why so many members of the Special Master's team are necessary for each meeting. By contrast, the expert's team in *Armstrong v. Newsom*, to which the Special Master makes comparisons, is comprised of two staff members and two retained consultants. (Weber Decl., Ex. B (CDCR Office of Legal Affairs, Class Action Capital Outlay Annual Legislative Report, Fiscal Year 2022-23; *see Armstrong v. Newsom*, No. 4:94-cv-02307 (N.D. Cal.), ECF No. 3575-1 at 1-5 (filed Feb. 13, 2024).

Similarly, seven to ten members of the Special Master's team attended four days of the staffing contempt proceedings, and several appear to have billed a significant amount of time to prepare for the hearing, though the Special Master and his team played no apparent role in this

---

[6] With respect to the Special Master's proposed new team members, although Defendants do not dispute their credentials, Defendants question the necessity of appointing a former Deputy Sheriff to a team that already includes thirty people. (Special Master's Request, at 9.) Indeed, it is unclear what particular expertise this individual would bring to the team, what critical gaps he is needed to fill that cannot be addressed by existing team members. Defendants are at a disadvantage in addressing these questions because the Special Master's request does not address them.

[7] Page numbers refer to the PDF pagination.

proceeding.  (*See* Weber Decl. at Ex. C (September invoice) at 31, 40, 49, 53, 60, 62, 67; *id.* at Ex. D (October invoice) at 11-14, 38, 43, 45.)  These individuals billed a combined approximately 270 hours[8] across four days at a cost of approximately $65,000—a figure that does not even include time billed for travel or the cost of accommodations, travel and meals.  (*See id.*)  This included time billed by Special Master team members with expertise in general psychiatry, psychology, and suicide prevention—not staffing or labor economics.  CDCR's General Counsel, Jennifer Neill, even emailed the Deputy Special Master after the first day of the staffing contempt hearing to inquire whether the entire team that was present intended to remain for the pendency of the proceedings, and if so, if they intended to charge the State for their time and travel.  (Weber Decl., Ex. H.)  Ms. Neill's email went unanswered and no explanation was provided as to why all of these team members needed to be present to observe the proceeding.  (*Id.* at ¶ 11.)

Nor can the ongoing data remediation project justify adding more staff.  While the Special Master points to the data remediation process as an undertaking that warrants the appointment of additional staff, this process began in 2020 and the Court has stated, "[t]he record shows progress to date [concerning data remediation] that now puts the end of the road well into view."  (ECF No. 8121 at 4.)  Indeed, the Court's deadline for the completion of the data remediation process is March 31, 2024, which is merely a month away.  (*Id.* at 5.)  Thus, it is unclear how or why these additional personnel are needed with data remediation reaching a close.

The Special Master's reference to oversight of Defendants' experts' tours as justification for his requested expansion is similarly unpersuasive.  (Special Master's Request, at 5.)  The Special Master's Request indicates that, because of the five tours that occurred in July 2023, the Special Master was purportedly "forced to remove experts and monitors from scheduled 30th Round tours," and he had to postpone one 30th Round Monitoring tour.  (*Id.*)  While Defendants were never informed that their touring of their own system caused the Special Master to cancel

---

[8] It is not clear exactly how much of the individuals' time billed was related solely to court hearing attendance, as most individuals' time entries included additional vague tasks, including "[r]eview email," "attention to correspondence and filings," "attention to email," and "participate in team meetings."  (*See, e.g.*, Weber Decl. at Exhibit C at 32, 49, 54, 60.)

any 30th Round Monitoring tours, regardless, the Court issued an Order on July 28, 2023 halting further tours.  (*See* ECF No. 7897.)  Moreover, the Special Master is not obligated to staff Defendants' experts' tours, to the extent this court permits them to resume.  The Special Master is not a party to this case, and the Order of Reference does not require him to attend expert tours conducted by the parties.  Indeed, this Court directed that the Special Master *not* attend Defendants' experts' tours in 2021 "so that his energy and resources can remain focused on the Twenty-Ninth Monitoring Round and participation in all upcoming settlement conferences." (ECF No. 7283 at 4:9-12.)  It is therefore unclear why the Special Master believes his attendance at future tours is necessary.

This court has indicated its desire to bring about an end to this case, and a request to expand monitoring personnel is at odds with that goal.  Moreover, the current composition of the Special Master's team—which is presently comprised of approximately 14 experts and 15 monitors and attorneys, many of whom have been members of this monitoring team for a number of years—should be more than sufficient to bring this case to a close.  (ECF No. 8134.)  Because it does not appear that additional staff are needed, the Special Master's Request for increased rates and additional staff should be denied.

### B. The Special Master's Request Lacks Safeguards Recommended By the Department of Justice

The experience and recommendations of the Department of Justice in using monitors also informs Defendants' objections.  A 2021 Department of Justice memorandum from Attorney General Merrick Garland on the subject of "Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving State and Local Governmental Entities," issued on September 13, 2021 (*See* Weber Decl., Exhibit, I "DOJ memo")[9] provides a "set of principles for

---

[9] U.S. Attorney General, *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees Involving State and Local Governmental Entities*, U.S. Department of Justice (September 13, 2021), available at
https://www.justice.gov/d9/pages/attachments/2021/09/13/review_of_the_use_of_monitors_in_civil_settlement_agreements_and_consent_decrees_involving_state_and_local_government.pdf
(courtesy copy attached as Exhibit I to the Weber Declaration).

the use of monitors in civil settlement agreements and consent decrees involving state and local governmental entities" and guidance "on how to improve the use of monitorships going forward." (*Id.* at 1, 3.)[10] While the DOJ memo is not binding, it is instructive and provides helpful guidance in evaluating the Special Master's request.

Specifically, the DOJ memo recommends safeguards to minimize the cost to jurisdictions and encourage monitor accountability to the court, the parties, and the public. For instance, the DOJ suggests an annual cap on monitors' fees, structuring monitorships to encourage the use of pro bono time and possible partnership with academic institutions or non-profit organizations, exploring alternative or flat-fee arrangements, among other recommendations. (*See* Weber Decl., Exhibit, I "DOJ memo" at 5-6.) The DOJ also recommends additional safeguards unrelated to billing arrangements, including term limits for monitors that can be renewed through judicial evaluation and reappointment, a public monitoring plan that sets forth short-term and long-term timelines for compliance, and public disclosure of the monitor's bills and monitoring methodologies, among others. (*Id.*, at 4-6.)

While Defendants readily acknowledge this matter was litigated, not settled via consent decree, the rationale for such cost constraints and safeguards—to "ensure that monitors are not viewed, rightly or wrongly, as making their monitoring work into a career"—remain the same. (*Id.* at 5.) Yet none of these safeguards exist in this matter, nor does it appear that the Special Master's team has considered staffing efficiencies, such as the use of pro bono time, before making this request. (*Id.* at 5-6.)

With respect to additional staff, such requests, per the DOJ, should be met with scrutiny. (*See* Weber Decl., Exhibit, I "DOJ memo" at 4: "Constraining monitor costs also minimizes any actual conflict of interest between a monitor's duty to the jurisdiction and her bottom line. Monitorships should be designed to avoid even the appearance that a monitor is primarily motivated by profit. Such an appearance can undermine a community's trust in the consent decree process.") But, as the above table demonstrates, the cost to the State for the Special Master's

---

[10] Page numbers cited refer to the PDF pagination of the memo.

monitoring has increased exponentially over time, to the point where it has averaged approximately $9.6 million per year for the past four years. Defendants are concerned about the continuous increase in the Special Master's staff and the recent request for increased fees, especially when coupled with a lack of safeguards, including those recommended by the DOJ, for such court-ordered monitoring. Absent any such safeguards to ensure responsible expenditure of the public fisc, and in light of the magnitude of the increased expenditure relating to monitoring fees in this case, Defendants object to a request to increase rates.[11]

**C. The Special Master's Comparisons to *Armstrong* and Reference to Defense Experts Have No Bearing on the Request for Additional Staff and Increased Compensation.**

The Special Master's request for increased compensation rates is based, in part, on a comparison to the rates for monitors and experts in *Armstrong v. Newsom*.[12] (Special Master's Request at 12-13.) But the comparison to *Armstrong* is misplaced because that case has significantly fewer experts. *Armstrong v. Newsom*, No. 4:94-cv-02307 (N.D. Cal.), ECF No. 3575-1 at 1-5 (filed Feb. 13, 2024). Regardless of the *Armstrong* expert's team's two staff members and retention of two consultants, the State paid only $790,959 for services rendered to the parties and the court in fiscal year 2021-22, and $755,76.27 for services rendered in fiscal year 2022-23. (Weber Decl., Ex. A (CDCR Office of Legal Affairs, Class Action Capital Outlay Annual Legislative Report, Fiscal Year 2021-22), at 8; *id.* at Ex. B (CDCR Office of Legal Affairs, Class Action Capital Outlay Annual Legislative Report, Fiscal Year 2022-23) at 7.)[13] Moreover, over the past five fiscal years, the State has paid the *Armstrong* expert's team an

---

[11] The Special Master's requested rate increases range from 52% for the Deputy Special Master and expert categories, 50% for the Special Master, 40% for monitors, 18% for paralegals, and 55% for travel time. By way of example, if one assumes an overall blended rate increase of 40%, and taking the Special Master team's 2023 expenditure as a baseline, the State can expect the Special Master's team's annual bill to increase by approximately $4.1 million. That would result in $14.5 million in Special Master fees this year if this request is granted.

[12] The Special Master notes that the compensation rates for the Court's Expert's team in *Armstrong* range from $300 - $900 per hour.

[13] Page numbers cited here refer to the report's pagination, not the PDF pagination.

average of $473,416 per year in fees. (*Id.*) Here, by contrast, the State has paid the Special Master's team an average of $8,767,333.03 per year in fees over the past five fiscal years – approximately *eighteen times* the fees paid to the *Armstrong* expert's team. (*See* fn. 1, *supra*; *see also* Weber Decl., Exs. A & B.)

The Special Master also cites to fees and expenses paid to subject matter experts retained for limited purposes to justify his request for increased compensation. (ECF No. 8130 at 15-16.) This is an incongruous comparison that does not support an increase in fees. Whereas the majority of the Special Master's team and experts appear to work on the *Coleman* case on a full-time or nearly full-time basis, Defendants' subject matter experts have only been retained to perform discreet tasks or advise on limited and specific issues. They have not been retained to evaluate all areas of this case on a more permanent or full-time basis. Nor do rules of court that protect against excessive fees or improper use of expert witnesses apply to members of the Special Master's team, who are court-appointed officials. *See* Fed. R. Civ. P. 26(b)(4)(E); Fed. R. Evid. 702; *cf.* Fed. R. Civ. P. 53(a)(3) (requiring the court to "consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay.").

Because the Special Master's Request cites to inapplicable and unpersuasive reasons in support of his request for increased fees and additional staff, it should be denied.

## III.    CONCLUSION

During the life of this case, California has seen six different Governors, approximately twelve Secretaries of CDCR (or its predecessor organization), and has increased annual spending on the delivery of mental healthcare to the class from approximately $40 million in 1990 to over $650 million in 2023-2024.[14] It has also spent nearly $120 million on Special Master Fees. (*See* fn. 1, *supra*.) Now is not the time to increase compensation or expand the Special Master's team, particularly in light of DOJ guidance that monitorships must "be designed and administered with awareness that every dollar spent on a monitorship is a dollar that cannot be spent on other policy priorities." (DOJ Memo at 4.) Defendants therefore request that the Court deny the Special

---

[14] *See* https://ebudget.ca.gov/budget/2023-24EN/#/ExpendituresPosistions/5225

Master's Request for the Appointment of Additional Staff and Increased Compensation. The Court should also require the Special Master to develop a plan to streamline his team and establish the safeguards identified in the DOJ memo including setting forth short-term and long-term timelines for compliance.

DATED: February 26, 2024

ROB BONTA
Attorney General of California

By: /s/ *Elise Owens Thorn*
DAMON MCCLAIN
Supervising Deputy Attorney General
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

DATED: February 26, 2024

HANSON BRIDGETT LLP

By: /s/ *Paul B. Mello*
LAWRENCE M. CIRELLI
PAUL B. MELLO
SAMANTHA D. WOLFF
*Attorneys for Defendants*